**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No. 9:17-CV-80495

CONSUMER FINANCIAL PROTECTION BUREAU,
      Plaintiff,

vs.

OCWEN FINANCIAL CORPORATION,
      a Florida corporation,

OCWEN MORTGAGE SERVICING, INC.,
      a U. S. Virgin Islands corporation, and

OCWEN LOAN SERVICING, LLC,
      a Delaware limited liability company,

      Defendants.

_____

## COMPLAINT

1.      The Consumer Financial Protection Bureau ("Bureau") brings this action against Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC (collectively "Ocwen" or "Defendants") under Sections 1054 and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5564 and 5565. Ocwen is one of the largest mortgage servicers in the United States. The Company specializes in servicing the loans of distressed borrowers. It committed numerous violations of Federal consumer financial laws that have harmed borrowers. Among other things, Ocwen has improperly calculated loan balances, misapplied borrower payments, failed to correctly process escrow and insurance payments, and failed to properly investigate and make corrections in response to consumer complaints. Ocwen has

1

compounded these failures by illegally foreclosing upon borrowers' loans and selling loan servicing rights to servicers without fully disclosing or correcting errors in borrowers' loan files.

2.      The Bureau brings this action against the Defendants under: (1) Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536; (2) Sections 807(2)(a), 807(10), and 808 of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e(2)(a), 1692e(10), and 1692f (the "FDCPA"); (3) Sections 6 and 19 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2617, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation X"); (4) Section 105(a) of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1604(a), and the regulations promulgated thereunder at Regulation Z, 12 C.F.R. part 1026 ("Regulation Z"); and (5) Section 3(b) of the Homeowners Protection Act of 1998, 12 U.S.C. § 4902(b) (the "HPA").

3.      The Bureau brings this action to obtain permanent injunctive relief, restitution, refunds, disgorgement, damages, civil monetary penalties, and other relief for the Defendants' violations of Federal consumer financial law.

## JURISDICTION AND VENUE

4.      The Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f) because Defendants are located in or do business in this district and part of the events giving rise to the claims took place in this district.

## **PLAINTIFF**

6.     The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

7.     The CFPA is a Federal consumer financial law. 12 U.S.C. § 5481(14). Under Sections 1031 and 1036 of the CFPA, it is unlawful for any covered person to commit or engage in unfair, deceptive, or abusive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

8.     The FDCPA, RESPA, TILA, and HPA are Federal consumer financial laws. 12 U.S.C. § 5481(14). Under Section 1036 of the CFPA, it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C § 5536(a)(1)(A). Violations of the FDCPA, RESPA, TILA, and HPA are therefore violations of Section 1036 of the CFPA. 12 U.S.C § 5536(a)(1)(A).

9.     The Bureau is authorized to commence civil actions in federal district court, in its own name, to address violations of Federal consumer financial law, including violations of the CFPA. 12 U.S.C. § 5564(a) and (b).

## **DEFENDANTS**

10.     Ocwen Financial Corporation ("OFC") is a publicly-traded Florida corporation that maintains its principal place of business in West Palm Beach, Florida. At all times relevant to this complaint, OFC has done business in this District and throughout the United States.

3

11.     Ocwen Mortgage Servicing, Inc. ("OMS") is a United States Virgin Island corporation that maintains its principal place of business in the United States Virgin Islands. At all times relevant to this complaint, OMS has done business in this District and throughout the United States.

12.     Ocwen Loan Servicing, LLC ("OLS") is a Delaware limited liability company that maintains its principal place of business in West Palm Beach, Florida. At all times relevant to this complaint, OLS has done business in this District and throughout the United States.

13.     OFC, through its subsidiaries, originates and services loans. OFC, OMS, and OLS (collectively "Ocwen") engage in servicing activities relating to the loans by, among other things, processing borrower payments, administering loss mitigation processes, and managing foreclosures. Ocwen also acquires and collects upon borrowers' mortgage debts that are in default.

14.     OFC, the parent and publicly-traded company, wholly owns all of the common stock of its primary operating subsidiary, OMS. OMS wholly owns the stock of another of OFC's primary operating subsidiaries, OLS. All three entities share and have shared key executives, such as Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox. All three entities, through OFC, file a consolidated financial statement with OFC's public disclosures.

15.     OFC controls, directs, operates, and participates in mortgage servicing activities, including the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Ocwen's loans. OFC enters into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. OFC has contracted for such products and services, including a

system of record and related technology services, for and on behalf of Ocwen's affiliates, which include OMS and OLS.

16.     OMS is also engaged in servicing loans. OMS is licensed by numerous state regulators to service loans and collect mortgage debts. OMS has entered into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. OMS has contracted for such products and services, including a system of record and related technology services used by OLS and OFC. OLS also represented, in an August 23, 2016 Consent Order with the State of Washington Department of Financial Institutions, that OMS engages in the servicing or subservicing of OLS loans.

17.     OLS is also engaged in servicing loans. OLS is licensed by numerous state regulators to service loans and collect upon borrowers' mortgage debts. OLS is also the owner of the mortgage servicing rights for the loans that Ocwen services.

18.     Under OFC's and OMS's direction, authority, and control, OLS has also engaged in the marketing and processing and transmitting of payments for credit monitoring products, financial advisory products, and other products that are added on to Ocwen borrowers' accounts.

19.     OFC, OMS, and OLS are, and have been at all times relevant to this Complaint, "covered persons," as that term is defined by 12 U.S.C. § 5481(6)(A), because they offer or provide a consumer financial product or service for use by consumers primarily for personal, family, or household purposes, or that is delivered, offered, or provided in connection with such a product or service by: servicing mortgage loans; collecting on consumers' mortgage debts; and marketing and processing and transmitting payments for credit monitoring products, financial advisory products, and

other products that are added on to the accounts of borrowers whose loans they service ("add-on products"). 12 U.S.C. § 5481(15)(A)(i), (iv), (vii), (viii), and (x).

20.     OFC is, and has been at all times relevant to this Complaint, a "related person" because, as described in Paragraph 14, it is the direct and indirect shareholder of all OMS and OLS stock, and is thus a "controlling shareholder" and "shareholder...or other person...who materially participates in the conduct of the affairs" of OMS and OLS, which are covered persons.  12 U.S.C. § 5481(25)(C)(i) and (ii). OFC is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B). OMS is, and has been at all times relevant to this Complaint, a "related person" because, as described in Paragraph 14, it owns all of OLS's stock and is thus a "controlling shareholder" and a "shareholder...or other person...who materially participates in the conduct of the affairs" of OLS, which is a covered person. 12 U.S.C. § 5481(25)(C)(i) and (ii). OMS is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

21.     OFC and OMS are, and have been at all times relevant to this Complaint, service providers to OLS because, as described in Paragraphs 15 and 16, OFC and OMS have provided material services to OLS. 12 U.S.C. § 5481(26)(A). OFC and OMS have also controlled and participated in the design, operation, and maintenance of OLS's mortgage servicing activities and marketing and processing and transmitting payments for add-on products. 12 U.S.C. § 5481(26)(A)(i).

22.     OLS, OMS, and OFC operate as a "common enterprise." OLS, OMS, and OFC have conducted the business practices described below through interconnected companies that have common business functions, employees, and office locations. OFC and OMS control (either formally or informally) and operate OLS's mortgage servicing

activities and marketing of and payment processing and transmitting payments for add-on products. OFC and OMS also contract for critical mortgage servicing operations for and on behalf of OLS. OFC, OMS, and OLS also file consolidated financial statements and share employees and offices. Accordingly, an act by one entity constitutes an act by each entity comprising the "common enterprise," and OFC, OMS, and OLS are each jointly and severally liable for the acts and practices alleged below.

23.     As described in Paragraphs 14-18, OFC and OMS have directed and controlled OLS's mortgage servicing activities and marketing of and payment processing and transmitting payments for add-on products, and authorized OLS to service Ocwen's loans. Employees of OFC and OMS have knowledge of and control or have the ability to control the activities of OLS discussed herein. OFC and OMS, as OLS's principals, are liable for the actions of their agent, OLS.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

#### A.     Company background.

24.     William Erbey formed Ocwen in 1988. He served as the Company's Chief Executive Officer until 2010. Ronald Faris succeeded Erbey and continues to serve as Ocwen's Chief Executive Officer.

25.     Between 2010 and the first quarter of 2014, Ocwen's residential servicing portfolio grew from 351,595 loans with an aggregate unpaid principal balance of approximately $50 billion to 2,861,918 loans with an aggregate unpaid principal balance of approximately $465 billion. Ocwen's largest acquisition during this time period was its 2013 purchase of Residential Capital, LLC's ("Residential Capital") servicing platform and its mortgage servicing rights to 1,740,000 loans with an aggregate unpaid principal

balance of approximate $183.1 billion. As of December 31, 2016, Ocwen serviced approximately 1,393,766 loans with an aggregate unpaid principal balance of approximately $209 billion. Its loans are located in all fifty states and the District of Columbia.

26.     Borrowers do not choose their mortgage servicer and have no control over whether and how Ocwen services their loans.

**B.     Ocwen's REALServicing System of Record.**

27.     Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

28.     Servicers also respond to borrower inquiries, handle loss mitigation requests, and initiate foreclosure proceedings, among other functions.

29.     To perform these tasks, servicers input loan and borrower information into electronic databases, often referred to as systems of record. Systems of record are essential to a servicer's ability to service loans in accordance with applicable legal requirements. If the information the servicer inputs into the system of record is inaccurate, or the system itself has deficiencies that produce inaccurate information even when the servicer inputs correct information, a servicer can make critical errors that harm borrowers.

30.     Ocwen has used and continues to use a proprietary system of record, REALServicing, and its related sub-systems (collectively "REALServicing").

31.     In 2009, Ocwen spun off its internal technology department into a separate company, Altisource Portfolio Solutions ("Altisource"). As a result of this spin-

off, Altisource owns and maintains the REALServicing platform. Ocwen has contracted with Altisource for technology services. In 2012 and 2013, while Erbey was the Chairman of the Boards of both Altisource and Ocwen, Ocwen extended this technology-services contract through 2025.

32.     No other mortgage servicer uses REALServicing.

## II.   OCWEN HAS SERVICED LOANS BASED ON INACCURATE AND INCOMPLETE BORROWER LOAN INFORMATION

33.     As set forth in greater detail below, Ocwen has serviced loans and collected upon debts based on inaccurate and incomplete borrower loan information. Ocwen has often input inaccurate and incomplete information, or failed to input accurate or complete information, about borrowers' loans into its REALServicing system of record. Even when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about borrowers' loans due to system deficiencies. Because of these system deficiencies, Ocwen has had to rely upon manual processes and workarounds that have themselves resulted in errors in borrowers' loan information.

34.     Ocwen's use of inaccurate and incomplete information to collect mortgage, tax, and insurance payments, communicate with borrowers about loss mitigation issues, proceed with foreclosures, and when selling the servicing rights of borrowers' loans to new servicers has resulted in significant harm to borrowers.

### A.   Ocwen loaded inaccurate and incomplete information into REALServicing and serviced loans using this information.

35.     When Ocwen acquires servicing rights for loans, it moves, or "boards," the records for those loans from the prior servicers' systems of record onto REALServicing.

36.     As described in Paragraph 25, between 2010 and 2014, Ocwen acquired the rights to service millions of residential loans, including more than 1.7 million

Residential Capital loans. Ocwen inputted inaccurate and incomplete loan information and payment data from these acquisitions into REALServicing.

> 1.    *Ocwen boarded inaccurate and incomplete loan and payment data from prior servicers into REALServicing.*

37.    In many instances, the systems of record that other servicers use contain data fields that are different from the data fields in REALServicing. To check whether it is correctly boarding loan data from the prior servicer's systems onto REALServicing, Ocwen verifies critical loan data fields—such as interest rate, property type, and unpaid principal balance—by matching it with the information in the borrower's loan documentation. If the information in REALServicing does not match what Ocwen finds in the documents, Ocwen is supposed to correct the error in REALServicing.

38.    To ensure the loan data it is using to service loans is complete and accurate, Ocwen seeks to complete this loan verification process within 60 days of boarding the loan onto REALServicing. Since 2014, however, Ocwen has not completed this process within 60 days. Instead, it has relied on unverified loan information for months—and often for more than a year—to service hundreds of thousands of loans.

39.    As of December 2013, Ocwen had a backlog of more than 400,000 transferred loans that remained unverified. It did not finish verifying and making corrections to critical data fields for these loans until August 31, 2014. Due to this backlog, Ocwen also delayed verifying the 1.7 million Residential Capital loans it previously acquired in 2013, and which it moved from Residential Capital's servicing platform and boarded onto REALServicing on a rolling basis beginning in early 2014. Ocwen did not even begin the verification process for the Residential Capital loans until September 1, 2014; at that time, Ocwen was servicing more than 1.1 million unverified

Residential Capital loans on REALServicing. By the end of 2014, when Ocwen completed boarding Residential Capital loans onto REALServicing, the verification backlog had grown to more than 1.3 million unverified Residential Capital loans. As of April 2016, Ocwen still had a backlog of more than 263,000 unverified Residential Capital loans.

40.     In November 2014, Ocwen determined that it was taking, on average, 261 days to complete its verification process for each loan it boarded. In some cases, the verification process has taken more than a year, far beyond Ocwen's expected 60-day time period.

41.     As of 2014, in addition to boarding loans with inaccurate loan information, Ocwen also boarded loans that contained payment history data that it had reason to believe was inaccurate or incomplete. Ocwen, for example, boarded incomplete or incorrect payment histories onto REALServicing, such as payment histories that include misapplied payments and transactions that occurred before the loan was even originated.

42.     As of 2014, Ocwen had also failed to verify whether the prior servicers' corporate advances or fees for servicing-related expenses—such as attorneys' fees, property inspection fees, property preservation fees, force-placed insurance charges, and foreclosure-related expenses—were valid and actually owed by borrowers. In many instances, Ocwen has charged borrowers for these charges and fees, even though neither Ocwen nor the prior servicer had invoices or other documents to support these charges and fees, and even though Ocwen was receiving disputes from borrowers claiming that these charges or fees were not owed.

43.     For example, in December 2014, when Ocwen reviewed loans it had boarded the previous year, it determined that it was missing invoices or other documents to support $98 million in corporate advances that it had charged to borrowers. In June 2015, Ocwen also learned that it did not have documentation to support $58 million out of $85 million in corporate advances that it had charged to borrowers whose loans it transferred to new servicers.

2.     *As a result of Ocwen's verification failures, Ocwen has serviced thousands of loans based on incorrect information.*

44.     Because Ocwen failed to verify the accuracy and completeness of borrowers' loan data during its expected 60-day time period after boarding, it has delayed correcting any loan data errors or incomplete loan information. As a result of the delay—in many instances, more than a year—Ocwen serviced a significant number of loans based on inaccurate loan information.

45.     According to Ocwen, which tracked the results of its verification of loans from 2014 through at least April 2016, a significant percentage of the loans it ultimately verified contained errors or incomplete information and required corrections. For example, in April 2014, Ocwen reported that 72 percent of the loans it verified that month contained errors or incomplete information and required corrections in REALServicing. In March 2016, 90 percent of the loans Ocwen verified contained errors or incomplete information that required corrections.

46.     As a result of the findings of its verification process, from September 2014 until April 2016, Ocwen determined that it needed to make more than 870,000 corrections in REALServicing, including, more than: 43,000 corrections to the maximum late fees a borrower could be charged (under state law); 31,000 corrections to

loans' maturity dates; 27,000 corrections to loan terms; 24,000 corrections to loans' first interest rate cap maximum; and 5,000 corrections to loans' interest rates.

47.     Even when Ocwen completed its verification process and identified inaccuracies in loan data, in many instances, Ocwen has failed to accurately correct the errors in REALServicing. For example, in November 2014, Ocwen conducted an internal audit and found that its loan verification personnel were not properly correcting or updating the information in REALServicing in 63 percent of loans the audit team reviewed. The audit found that Ocwen personnel had failed to properly correct critical data fields such as loan maturity date, loan term, first payment date, balloon term, and first interest rate cap.

48.     In 2015, Ocwen's outside consultant identified additional deficiencies in Ocwen's loan boarding process, such as:

- "High volume of loans error out of the automated process for unknown reasons requiring manual revision";

- "Limited available data fields cause various groups to use and reuse same fields for different information"; and

- "Limited system functionality in place to accommodate SCRA [Servicemembers Civil Relief Act] requirements (e.g., unable to stop fees if fee was in place prior to customer becoming SCRA eligible)."

**B.    Ocwen's reliance on its deficient servicing platform, REALServicing, has exacerbated its use of inaccurate loan information.**

1.    *Ocwen and its outside consultant have concluded that REALServicing is failing.*

49.    Ocwen's own senior leadership has repeatedly recognized and acknowledged REALServicing's failures.

50.    For example, in an internal communication in 2014 with Ocwen's Chief Executive Officer, Ocwen's Head of Servicing described Ocwen's technology as:

> **An absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow I would**. I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here. I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous. (Emphasis added.)

51.    Ocwen's former Head of Servicing Compliance testified in May 2016 that she was "absolutely" concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015. She testified that she, other members of the Compliance Department, and the leaders of Servicing Operations, Loss Mitigation, and other Ocwen business units "frequently" and "loudly" raised this concern. In determining the root cause of various issues, she explained, "**the answer would almost always be REALServicing and the processes that we're using**, would be the answer we would get from the business . . . .  [It was a] commonality across all of [the business units] . . . . Everything in servicing, every department in servicing."

52.    These senior leaders' conclusions are not outliers. Between 2014 and 2016, Ocwen assessed REALServicing and also hired an outside consultant to do the same.

Both Ocwen and its consultant concluded that REALServicing lacks the basic system architecture and design necessary to properly service loans.

53.     Since 2014, Ocwen has also tracked its regulatory violations, risk areas, and other failures in spreadsheets named "Risk Convergence Reports." Each regulatory violation, risk item, or failure identified in the report includes a description of the issue, the date Ocwen identified the issue, whether the issue is dependent on Altisource, the status of any technology fix or other operational remediation, and other information.

54.     Each item in the Risk Convergence Reports is assigned a risk rating, ranging from "R1" to "R5." "R1" is the highest risk rating, which Ocwen defines as: "Potential adverse impact of over $5 million"; "Actual or high possibility for fraud, waste or abuse"; "Breach of company policy or procedures (frequent, repeat, or disregarding policy)"; "Noncompliance with the law or regulation"; or "Material errors or irregularities are a reasonable possibility."

55.     According to Ocwen's list of items in the Risk Convergence Report, the items often resulted from and have continued due to REALServicing failures or system limitations. When, for example, Ocwen conducted its first on-site audit of Altisource and REALServicing in 2014, Ocwen auditors concluded that, although 70 percent of the items contained within the Risk Convergence Report related to "technology projects and enhancements" that Altisource was responsible for, little progress was being made to resolve the items due to Altisource's "lack of priority."

56.     As of August 2015, Ocwen had catalogued 2,803 issues on its Risk Convergence Report. Of those 2,803 issues, Ocwen assigned the highest risk rating, "R1," to more than 550 issues, many of which resulted from REALServicing's deficiencies.

57.     In 2016, Ocwen's Chief Information Officer and other personnel performed an architectural assessment of REALServicing, and reported, among other things, that REALServicing had "significant deficiencies represent[ing] significant risk and expense to Ocwen" and concluded that the "the most important dimensions of Core Technology" to REALServicing, such as performance and scalability, loan type support, risk exposure, and organizational capability, compare "unfavorably" to other mortgage platforms.

> 2.     *REALServicing's deficiencies impact Ocwen's ability to lawfully service loans.*

58.     REALServicing suffers from fundamental system architecture and design flaws, including a lack of properly managed data, lack of automation, and lack of capacity. These flaws have adversely impacted the accuracy of the information that Ocwen uses to service loans—and, thus, Ocwen's ability to service loans—in a number of ways.

59.     First, with respect to Ocwen's data management, REALServicing requires the use of more than 10,000 comment codes and flags. Yet, Ocwen lacks a complete data dictionary defining its comment codes, flags, and data fields. As a result, Ocwen personnel do not share a common understanding of what these comment codes or flags mean or how Ocwen personnel should use them.

60.     Ocwen employees also do not understand how changes to certain codes impact other codes or work processes. Ocwen's former Head of Compliance, who worked at Ocwen from August of 2013 until September of 2015, testified in May 2016 that during his tenure at Ocwen he repeatedly requested information on the meaning and basic descriptive information of comment codes; how Ocwen's business units used

them; and what downstream activities the codes trigger and what upstream activities trigger the codes. He further testified that "neither Ocwen nor Altisource could provide that information." Further, he testified that Ocwen's use of thousands of REALServicing comment codes was "antiquated" and that it was "inappropriate" that Ocwen did not have a data dictionary to define these codes and describe their impact on other activities.

61.     Second, REALServicing lacks the necessary automation and functionality to handle basic servicing operations. In 2015, an Ocwen consultant concluded that REALServicing had limited workflows and lacked  automation. As detailed in the next subsection and Section III, in certain areas, such as payment processing and escrow, this lack of automation has resulted in significant and excessive manual workarounds that have created errors in borrowers' accounts.

62.     Third, REALServicing has lacked the capacity to process the large number of loans that Ocwen has acquired and, in part as a result, it has not been functional for lengthy periods of time. After Ocwen's large 2013 and 2014 loan acquisitions, Ocwen's personnel reported "high incidents of system unavailability." For example, for the year of 2014, Ocwen's officials reported that its loss mitigation system "was down approximately 17,000 work hours." In internal communications in 2014, Ocwen's Head of Loss Mitigation expressed exasperation about the unavailability of Ocwen's loan modification systems:

> **I am sorry guys, this has broken my back. Enough is enough on daily issues with these systems.** We have lost more than 15 days of production of past 3 months ... I need this system up every day and performing. **It is clear by the issues over the past 3 months that there are not any controls on data and system quality.** (Emphases added.)

17

63.     Fourth, REALServicing suffers from various bugs, defects, and failures. For example, in 2014, due to programming errors and data not properly converting among REALServicing applications, Ocwen sent more than 1,800 borrowers permanent loan modification agreements that contained incorrect interest rate, principal payment, maturity date, and balloon payment information.

### C.     Ocwen has relied excessively on manual data entry and reports to address REALServicing's failures.

64.     Because of REALServicing's failures and limitations, Ocwen has resorted to manual processes, which themselves have resulted in errors. Ocwen's consultant reached the following conclusions—which Ocwen conceded were correct—after analyzing REALServicing and interviewing Ocwen business leaders:

- "[Ocwen's] lack of business process automation has resulted in **excessive manual processes to address gaps**";

- "Manual workarounds and reporting are widely used to compensate for insufficient system functionality to complete, track, or control processes"; and

- "While appearing cost effective, manual controls pose **significant risk in heightened compliance environment.**" (Emphases in original.)

65.     Ocwen creates reports–typically referred to as "control reports"–to catch errors and mistakes or data that REALServicing cannot process due to a lack of automation and other system deficiencies, but these reports are of limited use for at least two reasons.

66.     First, as Ocwen's former Head of Compliance testified, the reports are only effective to the extent that they are based on accurate and complete data. But Ocwen's former Head of Servicing Compliance, who worked for Ocwen from April of 2014 until

18

August 2015, testified in May 2016 that REALServicing lacks the necessary data to generate effective control reports and detect problems. She explained, for example, that when generating a control report using a certain field in REALServicing, that field is "used about five different ways" so the report generates a "whole mish-mash of information" that does not help Ocwen personnel understand whether an exception or error occurred.

67.     Second, Ocwen's manual workarounds and processes introduce the risk of human error. As Ocwen's former Head of Compliance testified, the concern that such manual processes could result in human error is "one of the sort of classic reasons one automates a manual process." Other former and current Ocwen business unit leaders have reiterated this point.

68.     For these reasons, Ocwen's controls have been ineffective. As Ocwen's former Head of Servicing Compliance testified: **"[E]very business unit in the entire organization" lacked sufficient controls to prevent mistakes and to detect when mistakes occurred.**

   **D.     Ocwen's use of inaccurate and incomplete information has harmed borrowers.**

69.     Ocwen's use of inaccurate and incomplete information resulting from its boarding of inaccurate and incomplete information into REALServicing, REALServicing's deficiencies, and Ocwen's error-prone manual processes has caused or is likely to have caused borrowers substantial harm, and resulted in Ocwen communicating, orally and in writing, information to borrowers that it knew or had a reason to know was inaccurate.

70.     Ocwen is aware of this substantial harm or likelihood of substantial harm. In 2015, Ocwen's outside consultant conducted interviews with Ocwen business leaders. These leaders identified 67 failures—or "pain points"—representing "functional and/or technical deficiencies" that "stemm[ed] from systematic and manual processes," including the following:

- With respect to escrow: a "technical gap causing escrow analysis to be conducted incorrectly" and a "manual bankruptcy workaround for loans acquired already in bankruptcy, causes information to be deleted from history as new information is updated. This information should be disclosed to the borrower in order to calculated  escrow accurately";

- With respect to insurance disbursements: "no systematic controls exist in to prevent duplicate disbursements in REALServicing resulting in 6k -12k incidents per year. Personnel must manually remove necessary codes (e.g., paid in full, service released)";

- With respect to loan modification processes: "[u]pon review of a [loan modification] package, terms are found to be incorrect approximately 80% of the time (e.g., NPV miscalculation, final modification date incorrect)";

- With respect to foreclosure data: "[d]ata between REALResolution [the REALServicing application for foreclosures] and REALServicing is not always in sync due to lack of adequate system mapping"; and

- With respect to the payment of borrower taxes: "[a]lthough tax assessment information is supposed to be used to project more accurate payments, REALServicing automatically uses last years billing amount, even if installments for the current year are different."

71.     More generally, Ocwen has serviced borrowers' loans and communicated, orally and in writing, with borrowers using inaccurate and incomplete information, including information relating to borrowers' loan terms, amounts received from and owed by borrowers, escrow amounts, insurance amounts, and/or loss mitigation and foreclosure information. As set forth above and below in Section III, because Ocwen has serviced loans based on inaccurate and incomplete information, it has, among other things, collected or attempted to collect inaccurate amounts from borrowers, failed to timely pay borrowers' insurance policies, provided borrowers with loan modifications with inaccurate terms, and initiated wrongful foreclosure proceedings upon borrowers' loans.

72.     Ocwen's use of a deficient system of record that results in inaccurate and incomplete borrower loan information does not benefit consumers or competition. Such a system of record does not result in cost savings, enhanced customer service, or other benefit to consumers or competition.

## III.   OCWEN'S SERVICING FAILURES HAVE MANIFESTED THEMSELVES IN AT LEAST EIGHT DISTINCT WAYS THAT HARM BORROWERS

### A.   Ocwen has mishandled borrowers' payments.

73.     Ocwen is required to correctly credit borrowers' payments, including any overpayment or partial payments, consistent with the borrowers' mortgage notes and applicable laws, including Regulation Z.

74.     Ocwen has routinely failed to send borrowers timely and accurate periodic statements, failed to timely and accurately credit and apply borrower payments, and failed to correct billing and payment errors.

75.     Each day, Ocwen cashiering personnel manually enter, pull, and match entries in REALServicing for more than 45,000 borrower-related transactions, including 5,000 payment transactions and more than 40,000 disbursements. Ocwen internal business units requested that Ocwen automate REALServicing to process borrowers' payments and disbursements for taxes and insurance. They explained that, "due to the volume[,]" there is an "immense need to automate this reconciliation" to ensure "no risk for data loss or corruption."

76.     As Ocwen's former Head of Compliance testified, Ocwen has a higher risk profile in the mortgage servicing industry due its heavy use of manual processes in its Cashiering Unit, which handles credits to (*e.g.*, borrowers' payments) and debits from (*e.g.*, disbursements for taxes or insurances) a borrower's loan balance.

1.     *Ocwen's obligations under Regulation Z, Regulation X, the CFPA, and the FDCPA.*

77.     Under Regulation Z, a servicer generally must provide a borrower with a periodic statement each month that details, among other things, the amount the borrower must pay that month, how the servicer will break down and apply the borrower's monthly payment, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account. When a servicer receives a full periodic payment for a loan secured by the consumer's principal residence, it must credit the payment as of the date the payment is received unless, among other exceptions, the delay in crediting does not result in a charge to the borrower or negative reporting to a consumer reporting agency.

78.     If the servicer receives a partial payment and holds it in a suspense or unapplied funds account, Ocwen must, after accumulating funds sufficient to cover a

periodic payment, treat such funds as a full periodic payment (*e.g.*, an amount sufficient to cover principal, interest, and escrow, if applicable, for any given billing cycle).

79.     Under Regulation X, a servicer is also required to have policies and procedures reasonably designed to ensure, among other objectives, that the servicer is providing accurate and timely disclosures to a borrower as required by applicable law, such as periodic statements required under Regulation Z.

80.     In addition to the requirements under Regulation Z and Regulation X, a servicer is prohibited from engaging in unfair, deceptive, and abusive acts and practices related to payment crediting and debt collection activities under the CFPA and FDCPA.

            2.      *Ocwen has failed to comply with Regulation Z, Regulation X, the CFPA, and the FDCPA.*

81.     Ocwen has failed to comply with Regulation Z, Regulation X, the CFPA, and/or the FDCPA in at least six ways.

82.     First, in numerous instances, Ocwen has sent borrowers periodic statements that contain inaccurate information—such as the date when Ocwen received a borrower payment or the payment amount owed by a borrower—because of inaccurate information in REALServicing. In other instances, even when the information in REALServicing has been accurate, REALServicing's deficiencies have resulted in Ocwen sending borrowers periodic statements with inaccurate information related to interest, late fees, escrow amounts, prepayment penalty statuses, payment amounts, deferred principal balance amounts, and payments that Ocwen should have credited but refused to credit and returned to borrowers. As demonstrated by Ocwen's recurring inaccuracies in its periodic statements, Ocwen has also failed to maintain reasonably designed

policies and procedures to ensure that it is providing borrowers with accurate and timely periodic statements.

83.     Second, Ocwen has failed to properly credit full periodic payments that borrowers properly made to Ocwen as of the date of receipt, wrongly resulting in late fees, negative credit reporting, and inaccurate loan delinquencies.

84.     Since at least 2014, Ocwen has known that its lockbox vendor, which handled its intake of physical payments (*e.g.*, checks) until 2016, was unable to accurately record the date when Ocwen received a borrower's physical payment. As Ocwen detailed in its Risk Convergence Reports, this failure has resulted in "delayed payment posting, incorrect payment effective dating, late fees assessment, and negative credit reporting."

85.     Ocwen has identified numerous other payment processing errors by its personnel and lockbox vendor, including:

- Inconsistent processing of multiple payments (2 or more checks in one envelope) that "cause misapplication of physical payments by applying as an individual payment instead of combined multi-payment";

- Ocwen's lockbox vendor's failure to image correspondence received with payments, resulting in payments not being correctly identified "until a borrower claim is received. Ultimately, this results in delays in payment posting process, late fee assessment, and negative credit reporting;" and

- Where borrower payments by wire are manually entered and converted by Ocwen personnel into REALServicing: "[s]ometimes the file conversion does not convert the data properly and the data needs to be reviewed, corrected and uploaded to

REALServicing by Cashiering" and "[e]rrors can occur during this manual process."

86.     Even after switching lockbox vendors in 2016, Ocwen continued to identify payment processing mistakes. For example, in January of 2016, Ocwen found that "$8,420,208 in payments were received but not posted to customer's accounts." Ocwen concluded: "Management has identified that not applying received payments or loading payments multiple times has become a common occurrence."

87.     Third, Ocwen has failed to timely credit payments from borrowers' suspense accounts when the suspense amount has accumulated sufficient funds to cover a full periodic payment. Ocwen has allowed borrowers' payments to languish in suspense accounts for several days, months, and even years. As a result of Ocwen's failure to timely credit payments in suspense accounts, in certain instances, Ocwen has charged borrowers late fees and deemed borrowers to be delinquent.

88.     For example, a September 15, 2015 audit by investors of loans Ocwen serviced found that: "unapplied/suspense funds were not properly maintained," and that, as of June 2015, more than 4,000 of the investor's loans had suspense amounts "aged over 90 days up to 1,236 days" that totaled more than $2.6 million with amounts ranging to $0.01 to more than $27,000. The auditors also found that for the miscellaneous suspense account there were more than 2,000 investor loans "with amounts over 90 days and up to 680 days and that totaled over $1.9 million with amounts [in the suspense account] ranging from $0.01 to $267,475.64."

89.     Fourth, Ocwen has misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due. Once Ocwen receives a payment from a borrower, the mortgage contract specifies how Ocwen must credit the payment (*e.g.*, to

principal and interest first, then to any late and default fees). Ocwen has identified numerous instances where it has misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due. For example, in May 2016 Ocwen determined that, due to a failed attempt in 2014 to fix a REALServicing technology flaw, it was charging incorrect amounts to borrowers and was "not being compliant with the terms dictated in the note" which "directly impact  the monthly account statement sent to the borrowers."

90.     Fifth, for borrowers in bankruptcy, Ocwen has failed to process and apply payments correctly in accordance with certain bankruptcy requirements. By 2016, Ocwen had concluded that REALServicing was broken in a number of ways that adversely affected borrowers whose loans were subject to bankruptcy protections, including that:

- "When REALServicing makes a contractual payment using pre- or post-petition funds, the payment covers only the principal and interest component. Escrow is not paid. This is contrary to what a bankruptcy court expects. Payments should only be made for the full contractual amount, including the escrow (as calculated for the due date of the payment to be made);"

- "There is no connection between the proof of claim as determined in Equator/REALResolution [the system Ocwen uses to process bankruptcy] and the pre-petition arrearage balances in REALServicing. The proof of claim figures need to become the REALServicing arrearage balances."

- "The process of converting a bankruptcy trustee payment to a payment batch is highly manual and, therefore, both inefficient and at risk of error. Ocwen receives funds from bankruptcy trustees that, generally, need to be applied to borrower

accounts as either pre-petition payments, post-petition payments, or bankruptcy interests. There are some cases where, due to loan status, funds from the trustee are not applied as payment, but are applied to miscellaneous suspense or other non-payment accounts. Ocwen receives funds from bankruptcy trustees in a single check that usually covers multiple accounts. Ocwen needs to apply the funds across the different loans."

91.     Sixth, based on Ocwen's above failures, Ocwen has communicated, orally and in writing, inaccurate information to borrowers about amounts due from borrowers, amounts received from borrowers, dates as to when Ocwen received borrowers' payments, and borrower delinquency statuses. These representations are material to borrowers managing their mortgages and are likely to mislead borrowers acting reasonably under the circumstances.

3.      *Ocwen's payment processing failures have caused significant borrower harm.*

92.     Ocwen's errors in crediting borrower payments and use of inaccurate payment information have significantly harmed borrowers. Ocwen has charged borrowers improper late fees; reported inaccurate, negative payment information to credit reporting agencies; subjected borrowers to collection calls based on inaccurate information; and wrongly threatened borrowers with foreclosure. This conduct has harmed borrowers financially and caused borrower frustration and emotional distress.

93.     Even when Ocwen has identified a payment error, in many instances it has not properly corrected the error. Pursuant to Ocwen's policies and procedures, its Cashiering Department corrects identified errors through a "reversal request" or

correction to a borrower's account. In many instances, however, Ocwen's personnel have not made the reversal request in a timely or accurate manner.

94.     A March 30, 2016 internal audit found, for example, that Ocwen's Cashiering Department lacked controls to ensure that reversal requests–approximately 3,700 a month at that time—were timely and accurately processed. The auditors also found that, when Ocwen actually processed reversal requests, it processed requests in the sample incorrectly.

95.     Not surprisingly, given Ocwen's significant problems crediting and applying borrower payments, a large number of borrowers have complained about Ocwen's payment processing.

96.     From April 2015 to April 2016 alone, Ocwen received complaints from more than 68,000 borrowers related to its processing of payments. Ocwen determined it made numerous errors in the following categories: "Payments Not Applied Correctly"; "Funds Not Applied Correctly";  "Reversal Requests"; "Late and NSF Fees"; "Payment Missing –Not Applied to Account"; "Chargeback Issue - Borrower Disputes Charged Back Item"; "Fee Assessed Improperly"; "Payment Not Processed Timely"; "ACH Drafted Incorrectly (Incorrect Date, Multiple Drafts, etc.)"; "Payoff Overage"; "ACH Payment – Chargeback"; and "Incorrect Data in the Account Statement."

97.     The experience of one consumer trying to prepay her mortgage in April 2016 is illustrative of Ocwen's payment processing errors. According to the consumer, she sent Ocwen two checks—one for principal and interest, and one check for her escrow payment—on or around April 2, 2016 to prepay her May 2016 mortgage payment. Even though the borrower stated that she sent the checks in the same envelope, Ocwen records indicate that it received and processed the payments on different days. In

addition, when the borrower received her May 2016 mortgage statement, she reports that Ocwen had misapplied her April 2016 principal and interest payment into a suspense account. As a result, even though the borrower had sent Ocwen funds in advance to *prepay* her mortgage, the consumer reports that Ocwen changed her status to delinquent in May 2016, charged her late fees, and made disruptive and embarrassing collection calls to her at her home and work.

98.     Another borrower complained that Ocwen began rejecting her monthly payments in November of 2014, even though she had been making full payments pursuant to a September 2014 loan modification. The borrower states that when she contacted Ocwen, an Ocwen case manager told her that Ocwen's systems had rejected the payment because the modified payment amount that Ocwen had recorded in its system was a few cents different than the modified monthly payment amount that Ocwen had told the borrower to pay in a letter approving her loan modification. After supposedly fixing this issue, the borrower reports that Ocwen then began misapplying her payments to the previous month (*e.g.*, claiming the borrower made her January 2015 payment in February 2015). As a result, the borrower began receiving delinquency notices and eventually a notice of default from Ocwen indicating that she had a past due balance of $2,446.66. The borrower reports that she made repeated attempts to get Ocwen to correct its mistakes, but as of October 2016, Ocwen had still not fixed them. According to the borrower, this ordeal has caused her a significant amount of stress and embarrassment: "It is very embarrassing to come home and see a notice on my door of an impending foreclosure especially when I have made and continue to make my mortgage payments to Ocwen."

99.     Another borrower complained that Ocwen sent him an inaccurate payoff quote that caused the borrower's pending property sale to fall through. In a March 31, 2016 letter, Ocwen sent the borrower a payoff statement with a payoff balance of $88,325.49. A few months later, on September 8, 2016 Ocwen sent the borrower another payoff statement that listed a payoff balance of $139,149.61—$50,000 more than the payoff quote Ocwen provided just a few months earlier. According to the borrower, he contacted Ocwen at least 15 times to dispute the payoff amount, but was not able to get Ocwen to address the matter until he submitted a complaint to the Bureau and the Texas Attorney General. In a letter dated September 28, 2016, Ocwen admitted that "the figures on the payoff statement sent on September 8, 2016 were incorrect." In the letter, Ocwen stated that it had generated a new payoff statement with a corrected payoff amount of $84,569.90—more than $55,000 less than the payoff quote Ocwen provided to the borrower a few weeks earlier. Ocwen did not explain, though, how the error had occurred in the first place. According to the borrower, due to the payoff discrepancy, he had to delay the pending sale of the property and the sale fell through. He had to find another buyer for his property, which he later did.

**B.     Ocwen has botched borrowers' escrow accounts.**

100.     Ocwen has also failed to perform basic tasks associated with managing borrowers' escrow accounts. Specifically, due to systems failures, control lapses, and excessive reliance on manual processes, Ocwen has failed to conduct escrow analyses or accurate escrow analyses; failed to timely send borrowers accurate escrow statements; and failed to properly account for and apply borrower escrow shortage payments.

101.     As of April 2016, Ocwen managed escrow accounts for more than 78 percent of the loans it services. In 2014, Ocwen hired consultants to review and report

upon its escrow practices. The resulting report identified more than **three million** "documented CFPB violations" during 2014, including Ocwen's failure to: provide escrow statements or accurate escrow statements to borrowers; conduct escrow analyses or accurate escrow analyses; and accurately impose hazard and flood insurance.

1. *Ocwen's obligations under RESPA, the CFPA, and the FDCPA.*

102. RESPA and Regulation X generally require servicers to do the following for escrow accounts that they establish in connection with a federally related mortgage loan: (1) perform an annual escrow analysis to determine the monthly escrow account payments for the next computation year; (2) provide an annual statement reflecting the activity in the escrow account during the escrow account computation year and a projection of the activity in the account for the next year; (3) refund to the borrower any surplus disclosed in an escrow analysis or, if the surplus is less than $50, alternatively credit such surplus against future escrow payments; and (4) potentially seek repayment for any shortage (*i.e.*, the amount by which a current escrow account balance falls short of the target balance at the time of an escrow analysis) disclosed in an escrow analysis.

103. Under Regulation X, a servicer is also required to have policies and procedures reasonably designed to ensure, among other objectives, that the servicer is providing accurate and timely disclosures to a borrower as required by applicable law, such as escrow statements required under Regulation X.

104. In addition, the CFPA and FDCPA prohibit servicers from engaging in unfair, deceptive, and abusive acts and practices related to escrow and debt collection activities.

2.     *Ocwen has failed to comply with RESPA, the CFPA, and the FDCPA.*

105.    Ocwen has failed to comply with RESPA, the CFPA, and/or the FDCPA in at least five ways.

106.    First, as of mid-2014, Ocwen had failed to conduct annual escrow analyses within the required time period for up to 230,000 delinquent borrowers and up to 60,000 borrowers who had filed for bankruptcy, in violation of Regulation X.

107.    According to the Head of Ocwen's Escrow Department, until at least July or August of 2014, Ocwen did not conduct these annual analyses for borrowers in delinquency.

108.    Ocwen's failure to conduct escrow analyses for borrowers in delinquency also impacted the accuracy of its borrowers' payoff and reinstatement quotes. Because REALServicing's calculation of delinquent borrowers' payoff and reinstatement quotes—the amount they need to pay to respectively payoff or reinstate their loan to become current—depends in part on borrowers' escrow balances, REALServicing miscalculated the payoff and reinstatement quotes for many of the loans for which Ocwen did not conduct an escrow analysis. Ocwen's failure to conduct escrow analyses resulted in Ocwen providing up to 5,000 delinquent borrowers with inaccurate reinstatement quotes.

109.    In some instances, Ocwen failed to perform or timely perform escrow analyses during the pendency of a Chapter 13 bankruptcy. Further, Ocwen failed to service its loans in accordance with bankruptcy protections and has attempted to collect purported escrow shortages or arrears in violation of bankruptcy orders and rules.

110.    In June 2016, Ocwen's Head of Bankruptcy testified that more than 22,000 borrowers in bankruptcy were impacted by Ocwen's failure to conduct a timely escrow analysis and that Ocwen is currently attempting to remediate these borrowers. Ocwen's consumer complaint data indicates that, for the year of April 2015 to April 2016, at least 8,000 of these 22,000 impacted borrowers complained to Ocwen.

111.    In many instances, even when Ocwen has performed escrow analyses on borrowers' accounts, Ocwen has either: (1) failed to send escrow statements to borrowers because of REALServicing system deficiencies; or (2) sent inaccurate escrow statements. Consequently, Ocwen has failed to maintain reasonably designed policies and procedures to ensure that borrowers receive timely and accurate escrow statements.

112.    As a result, in mid-2014, Ocwen performed escrow analyses for an estimated 10,000 to 20,000 borrowers but then failed to generate or timely send the required escrow statements to these borrowers within the required year.

113.    When Ocwen has sent escrow statements, in many instances, the escrow statements have contained inaccurate information pertaining to the borrowers' account histories, escrow balances, and escrow payments. In September of 2014, Ocwen's then Head of Servicing Compliance acknowledged this failure in internal e-mails:

> **Escrow notices not compliant with RESPA, not sent timely or not sent at all are huge and are the foundation for all else.** These are, by the way, the three biggest borrower communication issues across the board for Ocwen - required content not included, letter not sent, or letter not sent timely. **This is estimated to impact 800,000 borrowers or 52% of the Ocwen customer base.** (Emphases added.)

114.    Third, Ocwen has failed to timely process escrow shortage payments—*i.e.*, payments that borrowers made at Ocwen's request to satisfy a shortage or deficiency in

their escrow accounts—that Ocwen needed to pay the borrowers' insurance or tax disbursements, in violation of Regulation X.

115.    Since 2014, Ocwen's personnel has manually entered a comment code in REALServicing when the borrower has paid an escrow shortage. As Ocwen's auditors found in a March 30, 2016 audit, however, Ocwen did not have adequate controls over the entry of these comment codes and therefore Ocwen did not catch when its personnel failed to manually enter appropriate comment codes relating to escrow shortages. As Ocwen's auditors found, this resulted in "the continued collection of escrow shortage amounts" that borrowers already paid. Specifically, Ocwen failed to timely process escrow shortage payments for what Ocwen estimates to be 5,000 to 10,000 borrowers.

116.    Fourth, in many instances, Ocwen has miscalculated borrowers' escrow amounts or mistakenly imposed escrow requirements, resulting in Ocwen charging, collecting, or attempting to collect, through communications to borrowers, incorrect escrow amounts.

117.    Ocwen has miscalculated borrowers' escrow amounts by mistakenly paying borrowers' insurance premium charges twice; disbursing borrowers' insurance premiums to the wrong insurance companies; creating escrow accounts even though borrowers were already paying their insurance premiums or taxes directly to their insurance companies or taxing authorities; and failing to account for escrow amounts or accurate escrow amounts in borrowers' loan modification payment amounts (*e.g.*, borrowers' modified monthly mortgage payments), which borrowers learn of only after accepting the new modified amount.

118.    In the bankruptcy context, Ocwen has also failed to generate accurate escrow amounts. In late 2014, the Head of Ocwen's Escrow Department wrote in an email, which was forwarded to Ocwen's Chief Executive Officer:

> **I've stressed importance of getting the BK escrow balance issues fixed, but no confirmation of root cause or target correction date** . . . . It's a system issue because a bucket that determines the amount of money that a customer sends for their monthly payment can change with no record of why on the system . . . . **Please help get the importance across on this issue.** If this is not fixed, I cannot recommend that we move to analyze BK for the portfolio. Even with a control report to catch them, there is still risk the balance will be wrong when you actually analyze the account. (Emphases added.)

119.    In late 2014, Ocwen's then Head of Servicing also emailed Ocwen's Chief Executive Officer and asked for additional consulting resources to handle Ocwen's escrow deficiencies because, as Ocwen's Head of Servicing Operations reported: "you are familiar with this issue - the BK escrow balance bucket is wrong and requires every BK loan to be manually reviewed and we can still have errors."

120.    Fifth, as a result of Ocwen's above failures, Ocwen has communicated, orally and in writing, inaccurate information to borrowers about escrow amounts, reinstatement amounts, and payoff amounts. These representations are material to borrowers managing their mortgages and are likely to mislead borrowers acting reasonably under the circumstances.

3.    *Ocwen's escrow failures have caused significant borrower harm.*

121.    Ocwen's escrow errors have caused significant harm to borrowers, including the costs and emotional distress that borrowers suffer when attempting to get Ocwen to correct its mistakes.

122.    This type of harm can disproportionately affect borrowers in bankruptcy.

As Ocwen's former Head of Servicing Compliance testified:

> If you have a borrower who is sixty days down or in BK [bankruptcy], if an analysis is done and they find that the escrow account is short and the payment has to go up by fifty bucks.....If you've got somebody that's sixty days down or in BK [bankruptcy] and all of a sudden, because of a shortage in the escrow account, their payment goes up by fifty bucks, that can make a big difference. So it can have a disproportionate impact because they're already on the ropes financially.

123.    From April 2015 to April 2016, Ocwen received more than 53,000 complaints relating to its handling of escrow accounts. Ocwen determined it made numerous errors in the following categories: "Escrow Analysis Needed, Last Analysis Incorrect"; "Escrow Payment Change Inquiry"; "Escrow Info Incorrect or Not Set Up"; "Escrow Analysis Needed"; "Escrow Overage Not Received"; "Escrow Payment Change Dispute"; "Escrow Analysis Needed due to Payment"; "Negative Escrow Balance"; "Escrow Analysis Requested due to Refund"; and "Taxes Escrowed- Paid on Wrong Parcel."

124.    One borrower contacted Ocwen multiple times to complain about an incorrect, inflated escrow deficiency. The borrower had previously filed for bankruptcy, and by a bankruptcy court order on June 1, 2015, his account was deemed current with an escrow deficiency of $530.67. Despite the court order, Ocwen continued to report an escrow deficiency of $8,468.03. The borrower complained repeatedly to Ocwen, but to no avail. In March 2016, the borrower filed a complaint against Ocwen with the Bureau and the Texas Attorney General. In a response letter dated June 3, 2016, Ocwen acknowledged that, per the June 1, 2015 court order, the borrower's account should have been deemed current with an escrow shortage of only $530.67. Ocwen also

admitted that it had sent the borrower two escrow statements that reflected an "incorrect escrow account balance deficiency" and apologized for any "frustrations [the borrower had] incurred as a result of the error." Ocwen agreed to make corrections to the borrower's account, run a new escrow analysis, waive all fees and expenses that Ocwen had charged to the account, and amend any negatively reported credit information.

125.    The complaint submitted by another borrower typifies the myriad of payment processing, escrow, and insurance errors Ocwen makes, and how they can drive borrowers into foreclosure. The borrower complained about the following series of errors:

- When the borrower entered into a loan modification in April of 2016, his principal balance increased by more than $161,000, but Ocwen was unable to explain why his balance increased by this amount;

- Even though the borrower made his required monthly modification payments on time, Ocwen repeatedly failed to post his payments on time or at all;

- Ocwen charged the borrower for flood insurance that the borrower did not need because his property was not in flood zone; and

- Ocwen then erroneously attempted to foreclose on the borrower.

126.    In a letter dated February 10, 2017, Ocwen admitted to multiple errors in the process:

- Ocwen explained that the increase in the borrower's principal balance when his loan was modified was because the borrower had a negative escrow balance of $88,124.55 and $124,912.71 had been capitalized during modification. But Ocwen did not explain why the borrower's principal balance had increased to $161,000.

- Ocwen admitted, though, that the negative escrow balance was wrong and based on erroneous charges it imposed on the borrower for lender-placed flood and hazard insurance: "When the modification was completed the calculations used Lenders Placed Flood Insurance and Lenders Placed Hazard Insurance for multiple years that were not necessarily due."

- As a result of these erroneous charges, Ocwen determined that the borrower actually had a positive escrow balance or **_surplus_** of $36,788.16 in his escrow account, not an negative escrow balance or deficiency of more than $88,000.

127.    In light of these errors, Ocwen stated that it would be "re-modifying the loans current terms accordingly" and would attempt to waive the foreclosure fees it had imposed on the borrowers' account. On March 24, 2017, the foreclosure proceedings against the borrower were voluntarily dismissed.

128.    This borrower's experience also illustrates the types of harm that Ocwen's errors impose on borrowers. The borrower described the ordeal as follows:

> I spent one full day a week for the last three and a half years dealing with Ocwen, this includes calling the company mainly waiting on the phone on hold and talking to individuals at their call center . . . and faxing and emailing. Recently I have spent a large amount of time and money dealing with the foreclosure proceedings. The costs and time included attorney fees and paying for my own counsel, which cost between $6,000 and $8,000, to respond to the Notice of Foreclosure, amongst other costs.

### C.    Ocwen has mishandled borrowers' hazard insurance.

129.    Ocwen has failed to make timely payments of borrowers' hazard insurance premiums and serviced loans based on inaccurate insurance data that has led to wrongful insurance premium charges.

        1.     *Ocwen's obligations under RESPA, the CFPA, and FDCPA.*

130.    Under RESPA and Regulation X, if a borrower's monthly payment includes a payment for hazard insurance, such as homeowner's insurance, wind insurance, or other types of property-related insurance, then the servicer must generally make disbursements in a timely manner, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than 30 days overdue.

131.    In addition, the CFPA and FDCPA prohibit servicers from engaging in unfair, deceptive, and abusive acts and practices related to debt collection activities and in connection with mortgage servicing, including in the context of charges its imposes relating to borrowers' insurance policies, such as flood insurance policies.

        2.     *Ocwen has failed to comply with its RESPA, CFPA, and FDCPA obligations.*

132.    Ocwen has failed to comply with RESPA, the CFPA, and FDCPA in at least three ways.

133.    First, in numerous instances since September 2014, Ocwen has failed to properly disburse borrowers' payments to their hazard insurance companies. Due to syncing and updating failures between REALServicing and Ocwen's insurance vendor's system, Ocwen's insurance vendor did not recognize that numerous Ocwen borrowers had escrow accounts and therefore failed to make disbursements to these borrowers' insurance companies. In other instances, incorrect account data in REALServicing has resulted in Ocwen making incorrect disbursements for borrowers' insurance policies. Ocwen, for example, made double payments (out of borrowers' accounts) for the same insurance policy on approximately 3,275 accounts, disbursed premiums to wrong

payees, and failed to timely disburse funds to pay approximately 40,000 insurance premiums.

134.    Ocwen's failures have resulted in the lapse of hazard insurance coverage for more than 10,000 borrowers. As of March 2015, more than:

- 1,500 of these borrowers were able to reinstate their insurance policy, but had to pay a higher premium;

- 3,000 of these borrowers received letters from Ocwen indicating that it was going to impose force-placed insurance on their loans because they lacked hazard insurance;

- 500 of these borrowers had force-placed insurance imposed on their loans by Ocwen; and

- 100 of these borrowers were foreclosed upon by Ocwen.

135.    For borrowers who were forced to pay a more expensive premium to reinstate or obtain new hazard insurance coverage, Ocwen's insurance vendor ultimately agreed to provide a credit to the borrower to cover the increase in premium for at least three years.

136.    Second, Ocwen's use of inaccurate insurance data to service borrowers' loans has led it to charge borrowers for insurance premiums for insurance policies that borrowers were not required to maintain. For example, Ocwen has repeatedly used inaccurate flood insurance data to service its loans.

137.    In early 2014, a large bank servicer who transferred the subservicing rights of its loans to Ocwen audited a sample of  loans where Ocwen had force-placed flood insurance policies on borrowers' properties. For approximately half of the loans it tested, the large bank servicer found that Ocwen had imposed force-placed flood

insurance on borrowers' homes, despite the fact that the large bank's records indicated that the borrowers already had their own flood insurance policies in place.

138.    In late 2014, when Ocwen reviewed its escrow processes, it also found that it had "[i]nconsistent and/or incomplete flood determination data loaded for all loans on REALServicing" and that "[a]ccurate flood determination data is required to ensure appropriate tracking of flood insurance."

139.    In early 2015, when Ocwen audited flood zone data among its various service providers, it found more than 3,000 loans for which the flood-zone-related data in REALServicing was inaccurate. In July of 2015, Ocwen's auditors also concluded that Ocwen "lacks sufficient controls to ensure lender-placed flood insurance policies do not exceed regulatory required coverage amounts." Ocwen's auditors also reviewed a sample of 40 loans where the property was located in a flood zone and noted: "there were several loans where the lender-placed flood insurance policy amounts exceeded the required statutory or investor minimum coverage. Further, there were instances where gap insurance policies were created, even though the customer independently purchased sufficient flood coverage."

140.    Third, based on Ocwen's above insurance-related failures, Ocwen has communicated, orally and in writing, inaccurate information to borrowers about the amount or whether insurance premium charges are due from borrowers. These representations are material to borrowers managing their mortgages and are likely to mislead borrowers acting reasonably under the circumstances.

       3.    *Ocwen's insurance failures have caused significant borrower harm.*

141.    Ocwen's insurance failures have caused substantial financial and emotional harm to borrowers. From April 2015 to April 2016, Ocwen received complaints from more than 19,000 borrowers related to its management of borrowers' insurance policies. Ocwen found that it had made numerous errors relating to force-placed insurance imposed on borrowers' accounts, borrowers' hazard insurance not being paid, and insurance refunds not being timely refunded or paid to borrowers.

142.    For example, one borrower complained to Ocwen that it had erroneously force-placed flood insurance on his property. According to the borrower, he had to take out a loan to pay the more than $4,300 cost of the flood insurance policy. In a May 3, 2016 letter, Ocwen admitted that "[i]n review of the account, [the force-placed flood insurance policy] was due to an incorrect loan number provided by the insurance company."

143.    Another borrower's experience highlights the difficulty borrowers have had in getting Ocwen to correct its insurance errors, as well as the downstream effects these errors can have on borrowers' escrow accounts and payments amounts. This borrower complained to Ocwen multiple times about her escrow payments, but was not able to resolve her complaints until she submitted a complaint through her state regulator. In a May 8, 2015 letter responding to the borrower and the state regulator, Ocwen admitted that it had made a "duplicative disbursement for windstorm  hazard insurance," resulting in the borrower being overcharged for insurance. In addition, Ocwen conceded that the duplicate wind insurance payment had caused her escrow

balance to appear artificially low, which resulted in Ocwen incorrectly increasing the borrower's monthly payment to account for the purported shortage.

### D.     Ocwen has mishandled borrowers' private mortgage insurance.

144.     Ocwen has also failed to timely cancel borrower's private mortgage insurance ("PMI"). Borrowers are generally required to purchase PMI when they obtain a mortgage but have a down payment of less than 20 percent, or when they refinance their mortgage but have less than 20 percent equity in their property.

145.     Under HPA, servicers are required to automatically terminate a borrower's requirement to pay PMI on the "termination date," the date when the principal balance of the mortgage is first scheduled to reach 78 percent of the original value of the property or, if the borrower is not current as of the termination date, the first day of the first month beginning after the date that the borrower becomes current on the loan.

146.     Since 2014, Ocwen has failed to comply with the HPA by failing to timely terminate borrowers' PMI after learning that the termination data contained in REALServicing was often unreliable or missing altogether. Ocwen ultimately overcharged borrowers approximately $1.2 million for PMI premiums, which Ocwen later refunded to borrowers.

### E.     Ocwen has unlawfully marketed and processed payments for add-on products.

147.     Since at least 2011, Ocwen has been directly and materially involved in marketing and processing payments from consumers for at least 109 add-on products. These products include identity theft protection products, credit monitoring, and other financial advisory products or services.

> 1. *Ocwen's role in marketing and processing payments for add-on products.*

148.    Until it stopped marketing add-on products in 2013, Ocwen marketed add-on products to the borrowers whose loans it serviced. Among other things, Ocwen: assisted in the development of add-on product solicitations; reviewed and approved each add-on product solicitation; and identified the borrowers whom Ocwen and its add-on product vendor would target for a particular marketing campaign.

> 2. *Ocwen has failed to comply with the CFPA by enrolling borrowers into add-on products through misleading solicitations.*

149.    Ocwen has sent borrowers misleading solicitations to enroll them into add-on products.

150.    One solicitation was in the form of a voucher for $40 worth of gasoline. This solicitation did not clearly or conspicuously disclose that to actually redeem the voucher, the borrower had to enroll in the add-on product and remain in it for at least one year, during which time the borrower would be obligated to pay a monthly fee of $14.95 per month. The solicitation also did not clearly or conspicuously disclose that the borrower would receive the $40 in four separate $10 vouchers provided quarterly. This information was listed in small print on the second page of the solicitation, and not on the face of the enrollment voucher that the borrower signs and submits.

151.    Ocwen also sent a solicitation that appeared to be a check from Ocwen made out to the borrower. This check solicitation came in a "fold and tear" envelope and included a prominent Ocwen logo in the return address section of the envelope. The face of the check included a date, a check number, a routing number, and was made payable to the borrower. The solicitation only disclosed in small print directly above the check

amount, and in small print on the back of the check, that, by cashing the check, the borrower was agreeing to enroll in an add-on product.

152.    Ocwen has also enrolled borrowers into add-on products without proof of their affirmative consent. Ocwen did not require its add-on product vendors to provide proof that a borrower agreed to enroll in the add-on product before Ocwen began billing and collecting payments from the borrower for the add-on product. As a result, unless Ocwen specifically requested a copy of the call recording or other proof of enrollment, Ocwen did not know whether the borrower actually agreed to enroll in the add-on product. And if a borrower complained that he or she did not agree to enroll in the add-on product, Ocwen has stated that: "Sometimes by not responding to [an add-on product] vendor, the vendor assumes you accepted the coverage."

153.    In addition to its role in marketing and enrolling borrowers into add-on products through misleading solicitations, Ocwen processed payments, including billing and collecting payments, from these borrowers for these products.

### 3.    *Ocwen's solicitation, enrollment, and payment processing practices for add-on products have caused significant borrower harm.*

154.    Ocwen's role in marketing and processing payments from borrowers for add-on products has resulted in significant financial harm to borrowers. In many instances, borrowers paid for add-on products that they were misled into enrolling in.

155.    Ocwen's borrower complaint records reveal that numerous borrowers contacted Ocwen to complain that they never agreed to enroll in the add-on products. Borrowers also complained that, after questioning Ocwen about the add-on charges, they learned that Ocwen enrolled borrowers into such products after the borrowers

cashed vouchers or checks, even though borrowers were unaware that cashing such vouchers or checks would result in their enrollment in the add-on products.

### F.   Ocwen has failed to properly identify and communicate with successors in interest.

156.    Between January 2014 and mid-2015, Ocwen failed to implement policies and procedures that were reasonably designed to meet the objective of Ocwen properly handling accounts for successors in interest to a deceased borrower ("successors"), particularly when successors were applying for loss mitigation assistance. As a result, Ocwen failed to properly recognize individuals as successors, denied loss mitigation assistance to, and, in some instances, ultimately conducted foreclosure sales upon the loans of successors who may have been eligible for a loan modification or other loss mitigation options.

1.    *Ocwen's obligations under Regulation X.*

157.    Under Regulation X, servicers are required to have policies and procedures that are reasonably designed to ensure upon notification of the death of a borrower the servicer can promptly identify and facilitate communication with a successor with respect to the property secured by the deceased borrower's mortgage loan.

158.    When a borrower passes away, a successor to the borrower's property interest may seek to communicate with a servicer about the deceased borrower's mortgage loan. A successor may want information about the status of the mortgage loan obligation prior to assuming the mortgage. A successor may also apply for loss mitigation assistance prior to assuming the mortgage in order to determine whether the mortgage loan obligation is affordable for the successor.

> 2.   *Ocwen has failed to comply with its obligations under Regulation X.*

159.   Between January 2014 and mid-2015, appropriate Ocwen business units did not have policies and procedures to ensure that Ocwen handled successors in interest as required under Regulation X. As a result, when potential successors called Ocwen, its call center personnel did not provide clear and complete information and generally only requested death certificates, a last will and testament, and/or a probate order from potential successors, even though Ocwen has required additional documentation, such as a letter of testamentary or a letter of administration, to establish that an individual's status as a successor.

160.   Ocwen has also lacked reasonably-designed policies and procedures to ensure that it promptly identified and facilitated communications with a successor about the appropriate steps and information required for a successor to assume a mortgage and obtain a loan modification. Prior to mid-2015, certain Ocwen business units, such as Loss Mitigation, had no policies and procedures relating to successors. Other business units did have policies and procedures, but they were deficient. As a result, when successors have contacted Ocwen to apply for loss mitigation assistance, Ocwen personnel have provided them with incomplete or inaccurate information about Ocwen's specific requirements regarding the loss mitigation application and assumption process.

> 3.   *Ocwen's failure to comply with its Regulation X obligations has caused significant harm to successors.*

161.   Ocwen's failure to maintain reasonably-designed policies and procedures has made it more difficult for, and in many instances actually prevented, successors from obtaining necessary information about the status of a deceased borrower's

mortgage and potential loss mitigation options. Ocwen has estimated that, when it incorrectly denied loan modifications on the ground that there was no successor when Ocwen's own records indicated that there was a successor, it has "harmed" at least 202 borrowers and that there was "probable harm" to 195 borrowers. As of January 2016, Ocwen had also initiated foreclosure proceedings on at least 314 of the loans that it identified as potentially being impacted by its failures.

162.    For example, one potential successor complained that Ocwen had provided her with misinformation about the requirements for receiving a loan modification for her deceased mother-in-law's property. According to the potential successor, when she contacted Ocwen to inform it that her mother-in-law had passed away and that she and her husband wanted to request loss mitigation assistance to keep the property, Ocwen told her that she and her husband would not need to assume the mortgage. According to the potential successor, Ocwen later informed her—after she had made all required payments under a trial modification—that if she wanted to receive a permanent modification, she and her husband would have to assume the mortgage. The potential successor also complained that Ocwen had wrongfully charged foreclosure fees to the account, even though Ocwen records showed it had placed a foreclosure hold on the account.  The potential successor complained to Ocwen, which directed the potential successor to its foreclosure firm, to explain the foreclosure fees. When the potential successor contacted Ocwen's foreclosure firm about the foreclosure fees, however, she reports that the firm told her that it had not done any work because the foreclosure was on hold.

### G. Ocwen has failed to protect borrowers when it has made servicing errors.

163.     Ocwen's errors at every loan servicing stage have made it even more important that the company adequately investigate and respond to borrower complaints and notices of errors. These functions can act as a "safety net" to catch borrowers before they are further harmed by a servicer's unlawful conduct. Here, too, Ocwen has failed borrowers. Since April 2015, Ocwen has received more than 580,000 complaints and written notices of error from more than 300,000 different borrowers.

164.     Since 2014, Ocwen has routinely failed to reasonably investigate, and, when appropriate, make corrections in response to borrower complaints and notices of errors. These failures have caused serious harm to consumers.

#### 1.     *Ocwen's obligations under Regulation X.*

165.     Under Regulation X, servicers are required to have policies and procedures that are reasonably designed to ensure that Ocwen investigates, responds to, and, as appropriate, makes corrections in response to complaints by borrowers. Written borrower notices that are sent to an Ocwen-designated address and allege certain types of errors are considered a qualified written request and notice of error (collectively "NOE") and entitle borrowers to additional protections under RESPA and Regulation X. For both complaints and written NOEs, servicers generally are required to conduct a reasonable investigation of the alleged error and, as appropriate, make corrections.

#### 2.     *Ocwen has failed to comply with its obligations under Regulation X.*

166.     Ocwen has failed to comply with the requirements of Regulation X in at least two ways.

167.     First, Ocwen has failed to implement policies and procedures that are reasonably designed to meet the consumer complaint handling objectives to respond, investigate, and, where appropriate, correct errors.

168.     Per Ocwen's policy, Ocwen call center personnel are supposed to escalate repeat complaints regarding the same issue to a supervisor or a designated call center employee, known as the borrower's "Escalation Relationship Manager." But, due to insufficient policies and procedures and an overreliance on rigid scripting, Ocwen call center personnel have failed to adequately resolve the complaint or escalate the call for investigation and correction of the error. As a result, borrowers have been forced to call Ocwen multiple times about the same complaint before the call center personnel escalate the matter for investigation and error correction.

169.     In April 2015, Ocwen implemented new policies and procedures to address the difficulty its call center personnel had in recognizing and escalating borrower complaints. These policies and procedures, however, were not reasonably designed to handle consumer complaints. For example, instead of requiring Ocwen to identify a complaint the first time a borrower calls in, the new policies and procedures place the burden on the borrower to complain multiple times–at least five times in nine days– before Ocwen will automatically escalate their complaint for resolution to an Escalation Relationship Manager.

170.     As a result, many borrowers have been forced to call Ocwen multiple times before Ocwen investigated and corrected their error. For example, of the more than 450,000 complaints that Ocwen processed from April 2015 through April 2016, approximately 68 percent involved borrowers who contacted Ocwen multiple times within a 15-day period; approximately 40 percent involved borrowers who contacted

Ocwen three or more times within a 15-day period; and approximately 17 percent involved borrowers who contacted Ocwen five or more times within a 15-day period.

171.    Ocwen's policies and procedures have not been reasonably designed to ensure that its personnel conduct reasonable investigations of the alleged error in complaints. Ocwen's policies and procedures, for instance, direct Ocwen personnel to rely on the information in REALServicing to investigate complaints. Thus, Ocwen's ability to appropriately investigate complaints is largely dependent on the accuracy of the information contained within REALServicing. Further, Ocwen's policies and procedures provide little to no guidance to personnel on how to document the step-by-step basis for their conclusions regarding the validity of an alleged error.

172.    Ocwen's policies and procedures also provide little or no guidance to personnel about how to correct errors. For example, Ocwen's policies and procedures do not detail what factors personnel should consider when recommending remediation, including what types of harms and downstream impacts to borrowers they should consider. At best, Ocwen's policies and procedures identify certain forms of remediation such as fee waivers and credit reporting corrections, but do not inform personnel when these or other forms of remediation are appropriate. Without such guidance, Ocwen personnel are left to their own discretion to determine whether an error has occurred, and, if so, how to correct the error.

173.    Second, as a result of Ocwen's above policies and procedures, which also apply to NOEs, Ocwen has failed to conduct reasonable investigations and/or, where appropriate, make corrections of errors in borrowers' complaints and NOEs. Among other things, Ocwen has relied on inaccurate data in REALServicing, and the Ocwen personnel who investigate borrowers' complaints and NOEs are not required to cross-

reference Ocwen's known and documented systemic errors, such as the payment processing and application, escrow, and insurance errors, and thus do not consider that information in their investigations. Further, in responding to certain complaints and NOEs, Ocwen has simply parroted back the information in REALServicing, including details set forth in payment and escrow histories, without addressing the errors presented by borrowers.

### 3. *Ocwen's consumer complaint and NOE handling failures have caused significant borrower harm.*

174.    Ocwen's failure to properly investigate consumer complaints and NOEs and correct errors has caused significant consumer harm.

175.    Ocwen's consumer complaint and NOE failures are illustrated by the experience of several borrowers, including those described in Paragraphs 97, 98, 99, 124, 125, 126, 142, 143, 162, 211, and 212, who complained to Ocwen multiple times in order to try to get Ocwen to correct errors.

176.    One borrower repeatedly contacted Ocwen throughout 2014  to have Ocwen correct an error with her escrow account. When the borrower's loan was transferred to Ocwen in August 2013, Ocwen set up an escrow account and incorrectly began making disbursements for property taxes and property insurance, even though the borrower had a tax deferment as part of a program for low income-seniors and paid her own property insurance. In July 2014, Ocwen sent the borrower a notice of default, which included an escrow balance of $3,841.92, late fees, and other fees and charges. After the borrower was unable to get Ocwen to resolve her dispute, she submitted, through AARP's Legal Counsel for the Elderly, a Qualified Written Request and NOE regarding the escrow mistakes and the related errors. Ocwen's response only contained

generic account information and did not correct the errors. It was only after the borrower's counsel sent Ocwen another complaint to the Bureau in October 2014 that Ocwen responded, in a letter dated December 17, 2014, in which it stated it would remove the borrower's escrow balance, waive late fees, and reduce the borrower's payment amount to $302.43, which was the original and correct amount of the borrower's payment.

### H.     Ocwen has engaged in unlawful foreclosure practices.

177.    Ocwen has long touted its ability to service and modify distressed loans, claiming, "helping homeowners is what we do." In fact, Ocwen has failed to accurately maintain foreclosure-related information necessary to ensure that it provides borrowers with required foreclosure protections. As a result of these and other failures, Ocwen has wrongfully initiated foreclosure proceedings and wrongfully conducted foreclosure sales.

#### 1.     *Ocwen's obligations under Regulation X and the CFPA.*

178.    Regulation X provides borrowers with a variety of protections when they apply for a loan modification or other loss mitigation option, such as a short sale, in connection with a mortgage secured by their principal residence. Several of these protections are triggered once the borrower submits an oral or written application for a loss mitigation option.

179.    Under Regulation X, if a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, it must provide the borrower an acknowledgement letter within five days that states whether the application is "complete," and, if it is not, what additional documents and information the borrower must submit to complete the application ("Acknowledgment Letter"). A loss mitigation

application is complete under Regulation X when the servicer has received all of the information it requires from a borrower to evaluate the borrower's application for all available loss mitigation options ("Complete Application"). An application is facially complete under Regulation X if a borrower provides the information and documentation that the servicer requests in the Acknowledgment Letter or if no additional information is requested in the Acknowledgment Letter ("Facially Complete Application").

180.    Regulation X also requires that, if a servicer receives a Complete Application more than 37 days before a foreclosure sale, it must evaluate the borrower for all available loss mitigation options and provide the borrower with a written notice within 30 days indicating, among other things, whether it will offer the borrower any loss mitigation options ("Evaluation Notice").

181.    Regulation X also includes requirements relating to a servicer's access to and ability to exchange information with its service providers. Regulation X generally requires a servicer to, among other things, have policies and procedures reasonably designed to ensure that the servicer is providing appropriate servicer personnel with access to accurate and current documents and information reflecting actions performed by its service providers, such as foreclosure attorneys responsible for handling Ocwen's foreclosure proceedings.

182.    Regulation X also generally prohibits servicers from, among other things, commencing a first notice or filing of a foreclosure ("First Filing"), obtaining a foreclosure judgment, or conducting a foreclosure sale if: (1) the servicer discovers that additional information or corrections to a previously submitted document are required to complete a Facially Complete Application and the borrower has not had a reasonable opportunity to complete the application; (2) the servicer has timely received a Complete

Application but has not yet evaluated the application; (3) the time for the borrower to respond to a loss mitigation offer or to appeal a loan modification denial has not expired; or (4) the borrower is performing upon a loss mitigation agreement (*e.g.*, a trial loan modification or short-term payment forbearance program).

183.    In addition, a servicer is prohibited from engaging in unfair, deceptive, and abusive acts and practices, including in the context of foreclosure activity, under the CFPA.

> 2.    *Ocwen's deficient foreclosure policies and procedures violate Regulation X.*

184.    Ocwen uses foreclosure attorneys to provide it with various foreclosure services, including commencing and completing foreclosures upon borrowers' loans, and placing "foreclosure holds" on borrowers' accounts to prevent the initiation of a foreclosure or obtain a stay or postponent of a foreclosure. Ocwen's policies and procedures relating to its foreclosure attorneys are deficient, however, as they fail to ensure that Ocwen receives accurate and current information reflecting its foreclosure attorneys' actions.

185.    From at least 2014 through at least April 2016, Ocwen has been aware that it has not received timely or accurate information from its foreclosure attorneys. For example, in 2014, Ocwen's auditors found that one of Ocwen's largest foreclosure law firms in Florida had failed to timely update Ocwen's system with current foreclosure sale dates for 100 percent of the loan files tested. In response to this finding, the firm explained that it "continues for have periodic, on-going access issues within [Ocwen's systems], which at times hinders our ability to comply with the several issues noted during the audit." In another 2014 audit, Ocwen found that another of Ocwen's Florida

foreclosure law firms had failed to upload documents to Ocwen's system for 100 percent of the loan files tested.

186.    The deficiency of Ocwen's policies and procedures was highlighted again in 2015 when Ocwen's auditors found that its foreclosure law firms had failed to provide Ocwen with timely and accurate information. For example:

- In a 2015 audit of one the Ocwen's foreclosure law firms in Florida referenced in Paragraph 185, Ocwen found that the firm was still not accurately updating Ocwen's system with the correct foreclosure milestone dates. Ocwen described the impact as follows: "When incorrect data is inputted into the system, Ocwen staff is unaware of the current status of the foreclosure proceedings" and presents "data integrity issues." In response to the 2015 audit, the firm pointed out that transferred loans may contain incorrect dates, but stated that it could not update those loan files because there was a "hold" placed on transferred loans.

- In another 2015 audit, Ocwen found that of one of its Oregon foreclosure firms had failed to timely upload documentation to Ocwen's system for 80 percent of the loan files tested. The audit report listed the cause as "Some of the Firm personnel are not familiar with [Ocwen's system] document upload."

- In another 2015 audit of one of its foreclosure firms in New Jersey, Ocwen found that the firm had failed to upload all documents to Ocwen's systems for 60 percent of the loan files tested "result[ing] in missing documentation [in Ocwen's system] for SCRA [Servicemembers Civil Relief Act] and PACER checks." The audit identified the reason for the failure as: "The Firm was unaware of the requirement for filed and or recorded documentation to be uploaded [to Ocwen's system]." Ocwen's auditors also described the impact of the failure: "Failure to

upload documents to [Ocwen's system] affects the [ability of the] servicer to view and ensure all documents completed by the attorney were accurate."

187.    The audit findings for these firms are not outliers. In March 2016, Ocwen conducted an internal audit of its foreclosure operations and found, for foreclosures initiated between July and December 2015, that:

- "Foreclosure documents are not consistently uploaded on [Ocwen's system] by attorney firms. In 15 (13%) of 120 foreclosure initiation events reviewed, documents were not uploaded to [Ocwen's system] by external counsel."

- "Delays occur in uploading foreclosure related documents on [Ocwen's system]. In 12 (30%) of 40 foreclosure initiation events reviewed, documents were uploaded to [Ocwen's system] by external counsel between 3 and 11 days after event completion."

- "Publication dates updated in [Ocwen's system] by external attorneys do not accurately reflect the event completion date. A review of 30 foreclosures with a 'Publication Completed' event date updated in [Ocwen's system] identified 18 (60%) where documentation did not support the event completion date in [Ocwen's system]."

188.    Key Ocwen personnel have also been aware that Ocwen's foreclosure attorneys' failure to provide accurate and current information has negatively impacted Ocwen's ability to service loans. In December 2015, Ocwen's Head of Loss Mitigation testified that he became aware earlier in 2015 that Ocwen's systems had missing or inaccurate foreclosure sale dates. He explained that Ocwen Loss Mitigation employees rely on  theforeclosure sale date to, among other things, determine how many days to grant borrowers to return missing documents in connection with their loss mitigation

applications. He further testified that he reached out to Ocwen's Head of Foreclosure to inform him that the Loss Mitigation department needed foreclosure sale dates in the system and asked him to work with Ocwen's foreclosure attorneys to ensure that they input these dates into Ocwen's system, but he was unaware of what actions, if any, Ocwen took to ensure that this actually occurred.

189.    In May 2016, Ocwen's Head of Foreclosure also testified that he was aware that Ocwen's foreclosure attorneys had not always provided Ocwen with timely and accurate foreclosure information. He further testified that:

- Some of Ocwen's attorney managers tested the accuracy of the data Ocwen's foreclosure firms entered into Ocwen's systems, but acknowledged that not all of Ocwen's attorney managers follow this practice and that the practice was not required by Ocwen's policies and procedures.

- Ocwen's system prevents foreclosure attorneys from making any changes to the foreclosure sale date when there is foreclosure hold on an account, and that Ocwen did not have a policy that required its foreclosure attorneys to contact Ocwen with any updated foreclosure sale date information (since they could not make changes in the system) when a foreclosure hold was in place.

190.    As a result of Ocwen's policies and procedure deficiencies, Ocwen has initiated foreclosures, obtained foreclosure judgments, and conducted foreclosure sales on borrowers' accounts in which Ocwen had placed a foreclosure hold. As of May 2016, Ocwen has maintained a daily report, which it calls the "Dual Tracking Report," that tracks the date, identity of the borrower, and reasons why Ocwen initiated a foreclosure, obtained a foreclosure judgment, or conducted a foreclosure sale even though a borrower's account had a foreclosure hold.

191.     Below are two charts from one of Ocwen's Dual Tracking Reports. The first chart catalogues instances where Ocwen initiated a foreclosure proceeding even though Ocwen had placed a foreclosure "hold" on the loan, a process known as "dual tracking." The chart identifies the reason or root cause for each "[d]ual [t]rack violation," such as "attorney proceeded while the file was on hold." The chart shows that, by Ocwen's own analysis, between November 2015 and April 2016, Ocwen attorneys initiated one hundred and twenty foreclosure proceedings when the subject loan was subject to a foreclosure hold.



192.     The second chart below indicates the reasons that borrowers' accounts were subject to foreclosure holds. It shows that the vast majority of the foreclosure holds that Ocwen violated were in place because borrowers had submitted a completed loan modification package, and thus were potentially subject to Regulation X foreclosure protections.



       3.    *Ocwen initiated foreclosures and conducted foreclosure sales in*
*violation of Regulation X and the CFPA.*

193.    Ocwen has initiated First Filings, obtained foreclosure judgments, and conducted foreclosure sales in violation of Regulation X and the CFPA in at least five ways.

194.    First, Ocwen has inappropriately made at least one thousand foreclosure First Filings at the time that it was still evaluating Complete Applications it had previously and timely received from borrowers on or after January 10, 2014.

195.    Second, in numerous instances, Ocwen has inappropriately obtained foreclosure judgments and conducted foreclosure sales on the homes of borrowers who had a mortgage secured by their principal residence, had timely sent Ocwen a Complete Application more than 37 days before a pending foreclosure sale on or after January 10, 2014, and: (1) were still waiting for Ocwen to evaluate their Complete Application; (2) still had time to accept loss mitigation options that Ocwen had offered to them; or (3) were performing upon loss mitigation agreements.

196.    Third, in numerous instances, Ocwen has inappropriately conducted foreclosure sales on the homes of borrowers who had a mortgage secured by their principal residence and had timely sent Ocwen a Facially Complete Application more than 37 days before a pending foreclosure sale on or after January 10, 2014. After these borrowers submitted Facially Complete Applications, Ocwen determined it needed additional information. Ocwen sent these borrowers a letter requesting that they submit the additional information and gave the borrowers a deadline, usually 30 days, to submit that information, but then foreclosed on the borrowers before that deadline.

197.    Fourth, in numerous instances, Ocwen has inappropriately conducted foreclosure sales on the homes of borrowers before the deadline it provided these borrowers to submit missing documents. These borrowers had submitted incomplete applications for loss mitigation assistance. Ocwen sent the borrowers letters requesting that they submit the missing documents or information and gave the borrowers a deadline, but then foreclosed before that deadline.

198.    Ocwen's Head of Loss Mitigation has conceded that foreclosing on borrowers before the deadlines it communicated to borrowers to submit additional or missing information is deceptive and confuses borrowers. These representations are material to borrowers and are likely to mislead borrowers acting reasonably under the circumstances. These borrowers reasonably interpret Ocwen's request for additional or missing information to evaluate the borrowers' loss mitigation applications to mean that Ocwen will not foreclose on them before the expiration of the deadline Ocwen provided for submitting the additional or missing information.

199.    In an email with the subject "Sale Date before Missing Doc Expiration," an official in Ocwen's Loss Mitigation department wrote:

> Please confirm if our missing letter states that if they don't send a complete package we will go ahead with sale irrespective of the missing doc due date. To me **that does not sound right, where we inform the borrower to send in documents by a date but go ahead with sale prior to expiration of that date**. (Emphasis added.)

The Head of Ocwen's Loss Mitigation Department agreed, responding:

> **If there is no denial on the current instance you should not be going to sale, period.** Even though we have disclosure language around 37 days before FC and 7th day at midnight **you will get hit with UDAP every single time** you do not follow the rules above. You need to think like the customer which is without a denial you will still think you have time. (Emphases added)

200.    Fifth, Ocwen has inappropriately conducted foreclosure sales on the homes of borrowers who were performing upon agreements for loss mitigation options, such as a loan modification. The borrowers accepted and were performing upon the terms of the options—for example, by making trial payments according to the terms of a loan modification. Even though the borrowers had been doing everything they were supposed to do, Ocwen unilaterally breached the terms of its loss mitigation agreements with borrowers and foreclosed on their loans.

> 4.    *Ocwen's foreclosure failures have caused significant borrower harm.*

201.    Aside from the obvious harm to any borrower whose home is wrongfully foreclosed upon, Ocwen's illegal foreclosure practices have also caused significant financial harm, emotional distress, negative credit reporting, and other harm to borrowers.

## IV.    OCWEN HAS FAILED TO PROVIDE COMPLETE AND ACCURATE LOAN INFORMATION TO NEW SERVICERS

202.    Since 2015, Ocwen has sold hundreds of thousands of its rights to service borrowers' loans, also referred to as mortgage servicing rights ("MSRs"), to new

mortgage servicers. Ocwen has failed, however, to provide complete and accurate borrower loan information to the new servicers or to notify new servicers of errors that are likely to impact the accuracy and completeness of the transferred borrower records.

### A.   Ocwen's obligations under Regulation X.

203.   Regulation X requires a transferor servicer to maintain policies and procedures reasonably designed to ensure that it can timely transfer all information and documents in its possession or control relating to the transferred loan to the new servicer in a form and manner that ensures the accuracy of the transferred information and documents and that enables the new servicer to comply with applicable laws and the terms of the new servicer's obligations to the owner or assignee of the mortgage loan ("investor guidelines").

### B.   Ocwen's failure to comply with Regulation X.

204.   Ocwen has failed to comply with Regulation X's policy and procedure requirements relating to transfers in at least two ways.

205.   The first deficiency in Ocwen's policies and procedures relates to the ***form and manner*** in which Ocwen has transferred borrower loan information to new servicers. As part of a loan transfer, Ocwen provides new servicers with raw loan-level borrower data, but does not provide adequate means to interpret that data. In particular, Ocwen's policies and procedures do not require it to provide new servicers with a complete and accurate data dictionary that defines the more than 10,000 comment codes and flags that Ocwen has used to service borrowers' loans. Instead, Ocwen's policy calls for the production of a more limited data dictionary that only includes the current definitions for the comment codes and flags, but omits the historic definitions of comment codes or flags whose use or meaning has changed over time. As a

result, new servicers have no way of knowing the meaning of the codes or flags in borrower account history or how they were used.

206.    Ocwen has also provided new servicers with summary reports for certain populations of borrowers, such as those in loss mitigation or foreclosure. But these reports omit critical information that the new servicer needs to provide borrowers with the protections to which they are entitled under applicable law, and Ocwen's policies and procedures do not require it to provide this information to the new servicer. For example, prior to November 2015, Ocwen failed to provide information for the loans being transferred in a form that new servicers could understand whether borrowers had:

- A foreclosure sale date close to the transfer date, which new servicers needed in order to avoid erroneously foreclosing on the borrower, who may have been entitled to protections under Regulation X or other applicable laws; and

- Previously filed for bankruptcy and had obtained a discharge in that proceeding, which the new servicer would need to know in order to comply with applicable federal law and bankruptcy court orders.

207.    Second, Ocwen's policies and procedures have failed to ensure that, prior to transferring loans to a new servicer, Ocwen has ***disclosed known inaccuracies and errors that may or have impacted the accuracy or completeness*** of the transferred borrower loan records and the new servicer's ability to comply with applicable law and investor guidelines. Ocwen has not disclosed, for example, errors it tracks in its Risk Convergence Reports or audit findings that Ocwen knew or should have known impacted the accuracy or completeness of the loan information and the new servicer's ability to comply with applicable law and investor guidelines.

208.    Ocwen's Head of Servicing Transfers testified, for example, that he was not aware if Ocwen had disclosed to new servicers that Ocwen had:

- Incorrectly calculated certain borrowers' reinstatement quotes, including those in demand letters and foreclosure affidavits;

- Failed to credit payments made by up to 10,000 borrowers to satisfy their escrow shortages;

- Failed to make payment changes relating to escrow changes for up to 22,000 borrowers in bankruptcy; and

- Initiated unlawful foreclosure proceedings upon borrowers, in violation of Regulation X.

### C.    Ocwen's failure to transfer complete and accurate borrower records has caused significant borrower harm.

209.    Ocwen's failure to transfer complete and accurate borrower records and disclose known errors to new servicers impacts borrowers after their loans have been transferred to a new servicer.

210.    According to Ocwen's records, from April 2015 to April 2016, Ocwen received more than 6,800 complaints from borrowers related to the transfer of their loans by Ocwen to a new servicer.

211.    For example, one borrower complained that his monthly payment amount increased by 47 percent when Ocwen failed to correct its escrow errors before transferring the borrower's loan to a new servicer. In June 2014, Ocwen approved the borrower for a loan modification agreement that reduced his monthly payment to $1,639.07. Around November 2015, Ocwen transferred the borrower's loan to a new servicer. In March 2016, the new servicer conducted an escrow analysis and determined

that the borrower had an escrow shortage of $9,164.13, and that, as a result, the borrower's payment would increase by $777.49, from $1,639.07 to $2,398.54. The borrower contacted Ocwen when the new servicer was unable to explain why the borrower had such a large escrow shortage. In a June 1, 2016 letter, Ocwen admitted that it had made an "error in its escrow application at the time of modification." As a result, Ocwen only capitalized a portion of the borrower's total escrow balance when it modified the borrower's loan. To correct its error and unbeknownst to the borrower, Ocwen reduced the balance in the borrower's escrow account two days before transferring the loan that left the borrower's escrow account with a negative balance of $4,440.91. The borrower reports that he was eventually forced to retain an attorney, pay more than $5,000 in legal fees to ensure that Ocwen correct its error, and obtain a new repayment plan with the new servicer to cover the escrow shortage.

212.    Another borrower complained that Ocwen did not transfer complete information about his payments and loan modification to the new servicer. As a result, the new servicer refused to recognize the borrower's loan modification and stated that the borrower owed more than $10,000 in past due payments. When the borrower complained to Ocwen, it admitted in a letter that the borrower had made his required modification payments but that Ocwen had failed to properly apply the funds. Ocwen also admitted that it had been attempting to correct its payment application error through a reversal request on the borrower's account so it could reapply the borrowers' payments, but had incorrectly processed the reversal request. And then before Ocwen could complete its second attempt at a reversal request to fix its error, Ocwen had transferred the loan to the new servicer. Instead of alerting the new servicer to its mistakes, Ocwen had simply transferred the borrower's loan, leaving the $19,182.69 in

payments that the borrower had made pursuant to his loan modification agreement in a suspense account.

## V.    OCWEN HAS FAILED TO SUFFICIENTLY REMEDIATE HARM TO BORROWERS

213.    Ocwen is aware that its servicing failures have caused significant harm to borrowers and that these failures can have devastating consequences.

214.    Despite its awareness of the harm it has caused, Ocwen has had no consistent policy, procedure, or practice for providing borrower remediation, even when it has identified a systemic failure that could harm numerous borrowers.

215.    Ocwen has lacked a systematic process to track and analyze errors it learns of through borrower complaints or NOEs to determine whether other borrowers may have been harmed by the same errors. As a result, Ocwen has typically only corrected errors or provided remediation to those borrowers who have complained (assuming Ocwen recognizes the call as an actual complaint, investigates, and/or makes a correction) or submitted an NOE, but generally has not corrected the same or similar errors for other borrowers who did not complain.

216.    Ocwen also has not had policies or procedures requiring it to determine whether a risk item on its Risk Convergence Report has impacted or harmed borrowers, or whether borrower remediation is required, before it "closes" that risk item.

217.    Instead, Ocwen has focused on operational remediation to correct the error and prevent any *future* impact on borrowers. As a result, in many instances, Ocwen has failed to identify the borrower population that was impacted by a given risk item or to provide full remediation to that population. Instead, Ocwen generally

provides borrower remediation only when a borrower complains to Ocwen or when a court or regulator requires Ocwen to provide a borrower with relief.

218.  As Ocwen's former Head of Servicing Compliance testified in May of 2016:

> The company didn't have a policy or a protocol [for borrower remediation]. And with all of the issues, you saw how many issues there were [on the Risk Convergence Report], there just wasn't an appetite to back up and create an approach to this. Would I have liked that to have happened, I would have loved it, but it did not happen and there wasn't an appetite for it.

219.  Ocwen's "appetite" for borrower remediation appears to have been further diminished when the remediation could have a significant financial impact on Ocwen. For example, in one email, Ocwen personnel discussed Ocwen's auditors' findings that Ocwen lacked "processes to review and ensure compliance with state laws for negative amortization" relating to adjustable rate mortgages, and whether to review impacted loans and provide borrowers with remediation. After analyzing the potential $21 million in costs for Ocwen to remediate, Ocwen declined to do so due to the "substantial, negative financial impact and Legal confirmation that [Privileged material redacted] is sufficient justification to forego the lookback."

220.  Ultimately, Ocwen's former Head of Compliance conceded in testimony that Ocwen should remediate borrowers who were harmed by Ocwen's errors and suffered potential harm. When asked if Ocwen did so, she conceded: "Could the company have done more? Absolutely."

## VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT

221.    Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice."

222.    Acts or practices are unfair under the CFPA if "the act or practice causes or is likely to cause substantial injury to consumers which are not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c).

223.    An act or practice is deceptive if it misleads or is likely to mislead the consumer; the consumer's interpretation is reasonable under the circumstances; and the misleading act or practice is material.

224.    Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), prohibits covered persons from committing any act or omission in violation of a Federal consumer financial law.

225.    Section 1002(14) of the CFPA, 12 U.S.C. § 5481(14), defines the FDCPA, RESPA, TILA, and HPA as Federal consumer financial laws.

### COUNT I
### Ocwen's Use of Inaccurate and Incomplete Information to Service Loans is Unfair

226.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

227.    In numerous instances since January 2014, Ocwen has used inaccurate and incomplete information to service borrowers' loans because it has input inaccurate and incomplete information about borrowers into its REALServicing system of record, REALServicing has generated inaccurate information about borrowers' loans due to

system deficiencies, and/or Ocwen's manual processes have themselves resulted in errors. This inaccurate and incomplete information relates to borrowers':

    a. Loan terms, including interest rate(s), balloon payments, and maturity dates;

    b. Amounts received from and owed by borrowers, including monthly payments and the date Ocwen received the payments, unpaid fees, payoff amounts, and reinstatement amounts;

    c. Escrow amounts, including borrowers' escrow balances, disbursements made on behalf of borrowers, and escrow shortages;

    d. Insurance coverage, disbursements, and amounts due, including premiums Ocwen charged to borrowers for hazard insurance, flood insurance, and purchase mortgage insurance; and/or

    e. Loss mitigation and foreclosure information, including information required of borrowers to complete loss mitigation applications, terms of loan modification agreements, and the dates of pending foreclosure sales.

228.    Ocwen's use of inaccurate or incomplete information to service loans causes or is likely to cause substantial injury to consumers, such as the unlawful commencement of foreclosures, unlawful foreclosure sales, improper handling of loss mitigation applications, misapplication of borrowers' payments, collection and billing of inaccurate and incorrect amounts, imposition of inappropriate fees and charges, inaccurate delinquency statuses, inaccurate negative credit reporting, and/or emotional distress.

229. These injuries cannot be reasonably avoided by consumers, who do not choose their mortgage servicer, and are not outweighed by countervailing benefits to consumers or competition.

230. Ocwen's acts and practices as described in Paragraph 227 constitute unfair acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B).

**COUNT II**
**Ocwen's Deceptive Acts and Practices Regarding Loan Terms and Status**

231. The Bureau incorporates by reference the allegations of Paragraphs 1-220.

232. In numerous instances since January 2014, in the course of servicing mortgage loans and collecting debts from consumers, Ocwen has represented to borrowers, directly or indirectly, expressly or by implication, that their loans have certain unpaid balances; monthly payments; delinquency statuses; unpaid fees; reinstatement amounts; escrow amounts due; payoff amounts due; insurance amounts due; and/or other amounts due.

233. In truth and fact, in numerous instances the material representations set forth in the above-referenced Paragraph 232 were false, misleading, or were not substantiated at the time the representations were made, including but not limited to representations made where Ocwen had knowledge or reason to believe that:

a. The prior servicer data and records upon which it was relying were inaccurate or missing but it had failed to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on borrowers' loans;

    b.   Its system of record contained inaccurate information due to system errors and limitations, manual entry errors, and incorrect information provided by service providers but it had failed to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on borrowers' loans; and/or

    c.   Consumers had disputed, challenged, or questioned the validity or accuracy of Ocwen's information but it had failed to obtain or review information substantiating the accuracy of the information, or failed to consider the consumers' disputes, prior to collecting or foreclosing on borrowers' loans.

234.    Ocwen's acts and practices as described in Paragraphs 232-233 constitute deceptive acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## COUNT III
### Ocwen's Unfair Foreclosure Practices

235.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

236.    In numerous instances since January 2014, in connection with servicing mortgage loans, Ocwen has unilaterally breached contracts with borrowers by foreclosing on their loans even though the borrowers were performing on agreements on loss mitigation options.

237.    Ocwen's actions caused or were likely to cause substantial injury to borrowers that borrowers could not reasonably avoid themselves and that are not outweighed by countervailing benefits to borrowers or to competition.

238.    Ocwen's acts and practices as described in Paragraph 236 constitute unfair acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B).

## COUNT IV
## Ocwen's Deceptive Foreclosure Communications

239.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

240.    In numerous instances since 2014, in connection with servicing mortgage loans, Ocwen misrepresented, directly or indirectly, expressly or by implication, that borrowers had a certain amount of time, typically 30 days, to submit additional information that Ocwen needed to complete and evaluate their loss mitigation applications and that borrowers would not be foreclosed on while that request was pending.

241.    In truth and in fact, while Ocwen's requests for additional information it needed to complete and evaluate borrowers' loss mitigation applications were pending, Ocwen would foreclose on the borrowers.

242.    The representations set forth in Paragraphs 240 were false or misleading and were material to borrowers' decisions relating to their mortgages.

243.    Ocwen's acts and practices as described in Paragraphs 240-241 constitute deceptive acts and practices in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## COUNT V
## Ocwen's Unfair Billing and Processing of Payments for Add-On Products

244.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

245.    In numerous instances since July 2011, in connection with Ocwen's servicing of a borrower's mortgage loan, Ocwen enrolled consumers in add-on products

without their consent and then billed, collected, and processed payments from these consumers.

246.    Ocwen's actions caused or were likely to cause substantial injury to borrowers that borrowers could not reasonably avoid themselves and that are not outweighed by countervailing benefits to borrowers or to competition.

247.    Ocwen's acts and practices as described in Paragraph 245 constitute unfair acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B).

## COUNT VI
## Ocwen's Deceptive Marketing of Add-On Products

248.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

249.    In numerous instances since July 2011, while marketing and soliciting borrowers to enroll in add-on products in connection with its servicing of mortgage loans, Ocwen has represented, directly or indirectly, expressly or by implication, that the borrower was receiving a cash voucher or  a refund check.

250.    In truth and in fact, Ocwen was soliciting the consumer to enroll in add-on products. In numerous instances, Ocwen failed to disclose, or disclose adequately, the material terms and conditions of the offer, including that in order to redeem the voucher or check the borrower had to enroll in an add-on product, which included a monthly fee. In numerous instances, Ocwen also failed to disclose or disclose adequately that in order to redeem the voucher, borrowers had to remain enrolled in the add-on product for at least a year and pay monthly fees, and that the borrowers would receive the value of the voucher in quarterly installments.

251.    The representations set forth in Paragraphs 249-250, and Ocwen's failure to disclose, or disclose adequately, the material terms and conditions of the offer, constitute deceptive acts and practices in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## VIOLATIONS OF THE TRUTH-IN-LENDING ACT

252.    TILA and its implementing regulation, Regulation Z, at 12 C.F.R. § 1026.36(c)(1), prohibit certain acts and practices and contain certain requirements relating to payment processing in connection "with a consumer credit transaction secured by a consumer's principal dwelling."

253.    "Consumer credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(12) means, "credit offered or extended to a consumer primarily for personal, family, or household purposes."

254.    "Credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(14) means "the right to defer payment of debt or to incur debt and defer its payment."

255.    A "dwelling" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(19), means a "residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes an individual condominium unit, cooperative unit, mobile home, and trailer, if it is used as a residence."

256.    Ocwen is the servicer of consumer credit secured by consumers' principal dwellings where it services mortgages that have been extended to consumers primarily for personal, family, or household purposes and secure consumers' principal residential structures that contains one to four units.

## COUNT VII
### Ocwen's Failure to Timely and Appropriately Credit Payments

257.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

258.    As of January 10, 2014, Regulation Z generally requires Ocwen, when it receives a full periodic payment, to credit the payment as of the date of receipt unless the failure to do so does not result in a charge to the borrower or negative reporting. 12 C.F.R. § 1026.36(c)(1)(i). If Ocwen retains a partial payment, or a payment less than the full periodic payment, which it holds in a suspense or unapplied funds account, Ocwen must also, after an accumulation of sufficient funds to cover a periodic payment, treat such funds as a periodic payment. 12 C.F.R. § 1026.36(c)(1)(ii).

259.    Further, under Regulation Z, Ocwen must, subject to certain exceptions, provide borrowers with a monthly periodic statement or billing statement detailing information such as the amount due, how Ocwen will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account. 12 C.F.R. § 1026.41(d).

260.    In numerous instances since January 10, 2014, Ocwen has failed to timely and appropriately credit full periodic payments made by borrowers as of the date of receipt.

261.    In numerous instances since January 10, 2014, Ocwen has failed to timely and appropriately credit borrowers' payments it is holding in suspense accounts, where Ocwen, after an accumulation of sufficient funds to cover a periodic payment in

borrowers' suspense accounts, has failed to treat such funds as a periodic payment as of the date of receipt.

262.   In numerous instances since January 10, 2014, Ocwen has failed to send borrowers periodic statements accurately detailing information such as the amount due, how Ocwen will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account.

263.   The acts and practices described in Paragraphs 260-262 constitute violations of 12 C.F.R. §§ 1026.36(c)(1)(i) and (ii), 1026.41(d), and  1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

264.   Section 808 of the FDCPA, 15 U.S.C. § 1692f, prohibits debt collectors, such as Ocwen, from engaging in unfair or unconscionable means to collect or attempt to collect any debt.

265.   Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors, such as Ocwen, from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Section 807(2) prohibits the false representation of the character, amount, or legal status of the debt. Section 807(10) prohibits debt collectors from using any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

266.   The term "consumer" as defined in Section 803(3) of the FDCPA, 15 U.S.C. § 1692a(3), means "any natural person obligated or allegedly obligated to pay any debt."

267.    The term "debt" as defined in Section 803(5) of the FDCPA, 15 U.S.C. § 1692a(5), means "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

268.    The term "debt collector" as defined by Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6) means, in relevant part, any person who "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" or who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." It does not include a person collecting debts owed to another to the extent the debts were not in default at the time that the person obtained them. 15 U.S.C. § 1692a(6)(F)(iii).

269.    Ocwen acquires servicing rights to some mortgages that are in default at the time of transfer and proceeds to collect on those mortgages. With respect to those debts, Ocwen is a debt collector as defined by the FDCPA because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another and its collection activities are covered by the FDCPA.

### COUNT VIII
**Ocwen's Use of Inaccurate and Incomplete Information to Service Loans is Unfair**

270.    The Bureau incorporates by reference the allegations of  Paragraphs 1-220.

271.    In numerous instances since January 2014, Ocwen has used inaccurate and incomplete information, including incorrect data and incomplete or missing documentation, to service borrowers' loans that were in default when Ocwen acquired

the rights to service such loans. This inaccurate and incomplete information relates to borrowers:

  a. Loan terms, including interest rate(s), balloon payments, principals, including deferred principals, and maturity dates;

  b. Amounts received from and owed by borrowers, including monthly payments and the date Ocwen received the payments, unpaid fees, payoff amounts, and reinstatement amounts;

  c. Escrow amounts, including borrowers' escrow balances, disbursements made on behalf of borrowers, escrow surpluses, and escrow shortages;

  d. Insurance coverage, disbursements, and amounts due, including premiums Ocwen charged to borrowers for hazard insurance, flood insurance, and purchase mortgage insurance; and

  e. Loss mitigation and foreclosure information, including information required of borrowers to complete loss mitigation applications, terms of loan modification agreements, and the dates of pending foreclosure sales.

272.   Ocwen's use of inaccurate or incomplete information to service loans causes or is likely to cause substantial injury to consumers, such as the unlawful commencement of foreclosures, unlawful foreclosure sales, improper handling of loss mitigation applications, misapplication of borrowers' payments, collection and billing of inaccurate and incorrect amounts, imposition of inappropriate late and other fees and charges, inaccurate delinquency statuses, inaccurate negative credit reporting, and/or emotional distress.

273.    These injuries cannot be reasonably avoided by consumers, who do not choose their mortgage servicer, and are not outweighed by countervailing benefits to consumers or competition.

274.    Ocwen's acts and practices as described in Paragraph 271 constitute unfair acts and practices in violation of Section 808 of the FDCPA. 15 U.S.C. § 1692f, and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

<div align="center">

**COUNT IX**
**Ocwen's Deceptive Debt Collection Practices**

</div>

275.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

276.    In numerous instances since January 2014, Ocwen has represented to borrowers whose loans Ocwen acquired the servicing rights to when the loan was in default, directly or indirectly, expressly or by implication, in communications with borrowers, that their loans have certain unpaid balances; monthly payments; delinquency statuses; unpaid fees; reinstatement amounts; escrow amounts due; payoff amounts due; insurance amounts due; and other amounts due.

277.    In truth and fact, in numerous instances the material representations set forth in the above-referenced Paragraph 276 were false or misleading, or were not substantiated at the time the representations were made, including but not limited to representations made where Ocwen had knowledge or reason to believe that:

a.  The prior servicer data and records upon which it was relying were inaccurate or missing but it had failed to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on borrowers' loans;

  b. Its system of record contained inaccurate information due to system errors and limitations, manual entry errors, and incorrect information provided by service providers but it had failed to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on borrowers' loans; and

  c. Consumers had disputed, challenged, or questioned the validity or accuracy of Ocwen's information but it had failed to obtain or review information substantiating the accuracy of the information, or failed to consider the consumers' disputes, prior to collecting or foreclosing on borrowers' loans.

278. The acts and practices described in Paragraphs 276-277 constitute violations of Sections 807(2) and (10) of the FDCPA, 15 U.S.C. §§ 1692e(2)(A) and 1692e(10) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## <u>VIOLATIONS OF THE REAL SETTLEMENT PROCEDURES ACT</u>

279. RESPA and its implementing regulation, Regulation X, apply to "federally related mortgage loans," including the servicing of those loans, the administration of their escrow accounts, error resolution procedures, force-placed insurance, general servicing policies and procedures, and loss mitigation procedures.

280. RESPA and Regulation X apply to the conduct of "servicers." Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan." Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan . . . and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the

borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract."

281.    Ocwen is a servicer under RESPA and Regulation X because it receives payments from borrowers pursuant to the terms of federally related mortgage loans and is responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

## COUNT X
### Ocwen's Escrow Violations

282.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

283.    As of January 10, 2014, Section 6(g) of RESPA, 12 U.S.C. § 2605(g) states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

284.    The requirements of Section 6(g) are further explained in Regulation X, 12 C.F.R. § 1024.17(k) and 34(a), which states "[i]f the terms of any federally related mortgage loan require the consumer to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty."

285.    In numerous instances since January 10, 2014, Ocwen has failed to pay borrowers' hazard insurance premiums in a timely manner as the payments became due.

286.    Section 1024.17 of Regulation X requires Ocwen to:

    a.  Conduct annual escrow analyses for borrowers, 12 C.F.R. § 1024.17(c)(3) and (f)(1);

    b.  Provide borrowers with annual escrow statements within 30 days of the completion of the escrow account computation year, 12 C.F.R. § 1024.17(i); and

    c.  Only collect escrow shortages when a shortage, in fact, exists, 12 C.F.R. § 1024.17(f)(3).

287.    In numerous instances since January 10, 2014, Ocwen has:

    a.  Failed to timely conduct annual escrow analyses for borrowers and, in some instances, failed to conduct the escrow analyses altogether;

    b.  Failed to provide borrowers with escrow statements within 30 days of the completion of the escrow account computation year and, in some instances, failed to provide the escrow statements at all; and

    c.  Collected escrow shortages that did not exist because it failed to timely process borrowers' escrow shortage payments.

288.    The acts and practices described in Paragraphs 285 and 287 constitute violations of Section 6(g) of RESPA and Regulation X, 12 C.F.R. §§ 1024.17(k), 1024.17(c)(3), 1024.17(i), 1024.17(f)(1) and (3), and 1024.34(a) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## COUNT XI
### Ocwen's Notice of Error Violations

289.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

290.    As of January 10, 2014, Section 6(e)(2) and (k)(1)(c) of RESPA, 12 U.S.C. §§ 2605(e)(2) and (k)(1)(c), requires Ocwen to conduct an investigation of a qualified written request and make appropriate corrections to a consumer's account. Regulation X further explains that a qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error ("NOE") and that a servicer generally must either: (1) correct the error or errors identified by the borrower and provide the borrower with a written notification regarding the correction; or (2) conduct a reasonable investigation of an alleged error and provide the borrower with a written notification that indicates that the servicer has determined no error occurred and provides additional required information. 12 C.F.R. § 1024.35(a) and (e)(1).

291.    In numerous instances since January 10, 2014, Ocwen has failed to make appropriate corrections relating to NOEs when it finds errors in borrowers' accounts, and has failed to conduct reasonable investigations of NOEs.

292.    The acts and practices described in Paragraph 291 constitute violations of Section 6(e)(2) and (k)(1)(c) of RESPA, 12 U.S.C. §§ 2605(e)(2) and (k)(1)(c), and Regulation X, 12 C.F.R. §§ 1024.35(a) and 1024.35(e)(1) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## COUNT XII
### Ocwen's Servicing Policies and Procedures Violations

293.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

294.    As of January 10, 2014, pursuant to Regulation X, which was promulgated under Section 19(a) of RESPA, 12 U.S.C. § 2617(a), Ocwen must maintain policies and

procedures reasonably designed to ensure that it achieves the objectives set forth in 12 C.F.R. § 1024.38(b). 12 C.F.R. § 1024.38(a). These objectives include:

    a.  Providing "accurate and timely disclosures to a borrower as required by [Subpart C of Regulation X] or other applicable law," 12 C.F.R. § 1024.38(b)(1)(i);

    b.  Investigating, responding to, and, as appropriate, making "corrections in response to complaints asserted by a borrower," 12 C.F.R. § 1024.38(b)(1)(ii);

    c.  Upon notification of the death of a borrower, promptly identifying and facilitating "communication with the successor in interest of the deceased borrower with respect to the property secured by the deceased borrower's mortgage loan," 12 C.F.R. § 1024.38(b)(1)(vi);

    d.  Providing Ocwen's personnel with access to "accurate and current documents and information reflecting actions performed by service providers," 12 C.F.R. § 1024.38(b)(3)(i); and

    e.  Timely transferring all information and documents in Ocwen's possession or control relating to the transferred mortgage loans to a transferee or new servicer "in a form and manner that ensures the accuracy of the information and documents transferred" and enables the new servicer to comply with the new servicers' obligations to the owner or assignee of the mortgage loan and applicable law, 12 C.F.R. § 1024.38(b)(4)(i).

295.    In numerous instances since January 10, 2014, Ocwen has:

a.  Failed to maintain policies and procedures reasonably designed to ensure that it sends borrowers accurate and timely escrow statements and periodic statements;

b.  Failed to maintain policies and procedures reasonably designed to ensure that it is investigating, responding to, and, as appropriate, making corrections in response to complaints asserted by a borrower;

c.  Failed to maintain policies and procedures reasonably designed to ensure that upon notification of the death of a borrower it promptly identifies and facilitates communication with successors, as evidenced by its failure to:

    i.  Promptly identify successors, which, in turn, impacted successors' assumption of the deceased borrower's loan and ability to obtain loss mitigation assistance; and

    ii.  Communicate to potential and actual successors Ocwen's requirements to confirm a person as a successor and obtain loss mitigation assistance;

d.  Failed to maintain policies and procedures reasonably designed to provide appropriate Ocwen personnel with access to accurate and current documents and information reflecting actions performed by Ocwen's foreclosure attorneys; and/or

e.  Failed to maintain policies and procedures reasonably designed to ensure that it could transfer all information and documents in a form and manner that ensures new servicers have complete and accurate

information and are able to comply with applicable laws by failing,

prior to a transfer, to:

    i.    Transfer information in a form and manner that ensures new

        servicers have accurate borrower records and are able to

        comply with applicable laws; and

    ii.    Disclose to new servicers known errors or failures that

        impact or likely impact the accuracy of transferred borrower

        records and a new servicer's ability to comply with applicable

        laws.

296.    The acts and practices described in Paragraph 295 constitute violations of

Sections 19(a) of RESPA, 12 U.S.C. § 2617(a) and Regulation X, §§ 12 C.F.R. 1024.38(a),

12 C.F.R. 1024.38(b)(1)(i), (ii), and (vi), 1024.38(b)(3)(i), and 1024.38(b)(4)(i), and §

1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## COUNT XIII
### Ocwen's Foreclosure Violations

297.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

298.    As of January 10, 2014, Regulation X, which the Bureau promulgated

pursuant to Sections 6(j)(3), 6(k)(1)(C), 6(k)(1)(E) and 19(a) of RESPA, 12 U.S.C. §§

2605(j)(3), (k)(1)(C), and (k)(1)(E), and 12 U.S.C. § 2617(a), provides borrowers with a

variety of protections during their loss mitigation application and foreclosure processes.

299.    Under Regulation X, if a servicer receives a loss mitigation application,

which is an oral or written request for a loss mitigation option that is accompanied by

any information required by a servicer for evaluation for a loss mitigation option ("Loss

Mitigation Application"), from borrowers whose mortgage is secured by their principal residence, certain protections are triggered.

300.    Under Regulation X, if a servicer receives a Loss Mitigation Application 45 days or more before a foreclosure sale, it must send the borrower an acknowledgement letter within five days that indicates if the application is complete and, if it is not, states the additional documents and information that the borrower must submit to complete the application ("Acknowledgment Letter"). A Loss Mitigation Application is complete under Regulation X when the servicer has received all of the information it requires from a borrower to evaluate the borrower's application for all available loss mitigation options ("Complete Application"). An application is facially complete under Regulation X if a borrower provides the information and documentation that the servicer requests in the Acknowledgment Letter or if no additional information is requested in the Acknowledgment Letter ("Facially Complete Application").

301.    Regulation X also requires that, if a servicer receives a Complete Application more than 37 days before a foreclosure sale, it must evaluate the borrower for all available loss mitigation options and provide the borrower with a written notice within 30 days indicating, among other things, whether it will offer the borrower any loss mitigation options.

302.    Regulation X also generally prohibits servicers from, among other things, commencing a first notice of filing of a foreclosure ("First Filing"), obtaining a foreclosure judgment, or conducting a foreclosure sale if: (1) the servicer discovers that additional information or corrections to a previously submitted document are required to complete a Facially Complete Application and the borrower has not had a reasonable opportunity to complete the application; (2) the servicer has timely received a Complete

88

Application but has not yet evaluated the application; (3) the time for the borrower to respond to a loss mitigation offer or to appeal a loan modification denial has not expired; or (4) the borrower is performing upon a loss mitigation agreement (*e.g.*, a trial loan modification or short-term payment forbearance program).

303.    On or after January 10, 2014, Ocwen received Loss Mitigation Applications from borrowers whose mortgages are secured by their principal residences.

304.    On or after January 10, 2014, Ocwen received Complete Applications from borrowers whose mortgages are secured by their principal residences.

305.    On or after January 10, 2014, Ocwen received Facially Complete Applications from borrowers whose mortgages are secured by their principal residences.

306.    In numerous instances, Ocwen has made First Filings even though Ocwen was still evaluating borrowers' Complete Applications that it had received on or after January 10, 2014 and more than 37 days before a foreclosure sale.

307.    In numerous instances, Ocwen has obtained foreclosure judgments and/or conducted foreclosure sales upon the homes of borrowers from whom it received a Complete Application or Facially Complete Application on or after January 10, 2014 and more than 37 days before a foreclosure sale, and who: (1) were waiting for Ocwen to evaluate their Complete Application; (2) still had time to accept a loss mitigation offer; (3) were performing upon a loss mitigation agreement; or (4) had not been provided with a reasonable opportunity to provide Ocwen with missing information or corrected information required to complete a Facially Complete Application.

308.    The acts and practices described in Paragraphs 305-306 constitute violations of Sections 6(j)(3), 6(k)(1)(C), 6(k)(1)(E) and 19(a) of RESPA, 12 U.S.C. §§ 2605(j)(3), (k)(1)(C), and (k)(1)(E), and 12 U.S.C. § 2617(a), and Regulation X, 12 C.F.R.

§§ 1024.41(b)(2)(i)(B), 1024.41(c)(1)(i) and (ii), 1024.41(f)(2), and 1024.41(g) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## **VIOLATIONS OF THE HOMEOWNERS PROTECTION ACT**

309.    Under the Homeowners Protection Act (HPA), servicers are required, under certain conditions, to automatically terminate a mortgagee's requirement to pay private mortgage insurance on a certain date called the "termination date." 12 U.S.C. § 4902(b).

310.    A "servicer" as defined by the HPA, 12 U.S.C. § 4901(16), means a servicer as defined in RESPA, 12 U.S.C. § 2605(i)(2). As referenced in Paragraphs 13, 16, and 17, Ocwen is a servicer.

311.    A "mortgagor" as defined by the HPA, 12 U.S.C. § 4901(11), means the "original borrower under a residential mortgage or his or her successors or assignees."

312.    A "residential mortgage" as defined by the HPA, 12 U.S.C. § 4901(14), means a "mortgage loan, or other evidence of a security interest with respect to a single-family dwelling that is the principal residence of the mortgagor."

313.    "Private mortgage insurance" as defined by the HPA, 12 U.S.C. § 4901(10), means "mortgage insurance other than mortgage insurance made available under the National Housing Act, 12 U.S.C. § 1701, title 38, or title V of the Housing Act of 1949, 42 U.S.C. 1471 et seq."

314.    The "termination date" as defined by the HPA, 12 U.S.C. § 4901(18), means the date when:

> a.   With respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the

outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

b. With respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

## COUNT XIV
### Ocwen's Violations of the HPA

315.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

316.    Ocwen is the servicer for mortgagors or the original borrowers under a residential mortgage with respect to single-family dwellings that are their principal residences.

317.    In numerous instances since January 2014, Ocwen has failed to automatically terminate private mortgage insurance for borrowers who were current or became current on their mortgage as of their termination date.

318.    The acts and practices described in Paragraph 316 constitute violations of Section 4901(b) of the HPA, 12 U.S.C. § 4901(b) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## Prayer for Relief

Wherefore, the Bureau, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, requests that the Court:

1. Permanently enjoin Defendants from committing future violations of the CFPA, FDCPA, RESPA, TILA, and HPA, and enter such other injunctive relief as appropriate, including ordering that, if any Defendant is found to be in material non-compliance with any injunction entered by the Court, the Defendant must claw back any non-salary bonuses or other compensation it has paid, or stock option it has granted, to any officer or director of the Defendant in connection with the time period during which the Defendant was not in compliance;

2. Award such relief as the Court finds necessary to redress injury to consumers, including, but not limited to, rescission or reform of contracts; refund of moneys; restitution; and payment of damages or other monetary relief;

3. Award such relief as the Court finds necessary to disgorge the Defendants of unlawful gains;

4. Impose civil money penalties against the Defendants;

5. Order the Defendants to pay costs and fees incurred in prosecuting this action; and

6. Award additional relief as the Court may deem just and proper.

Dated: April 20, 2017

Respectfully submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau

ANTHONY ALEXIS
Enforcement Director

CARA PETERSEN
Deputy Enforcement Director
For Litigation

GABRIEL O'MALLEY
Assistant Litigation Deputy

/s/ Jean Healey_____
Jean Healey
E-mail: jean.healey@cfpb.gov
Phone: 202-435-7514
Facsimile: (202) 435-7722
1700 G Street NW
Washington, DC 20552

Jan Singelmann
E-mail: jan.singelmann@cfpb.gov
Phone: 202-435-9670
Facsimile: (202) 435-7722
1700 G Street NW
Washington, DC 20552

Atur Desai
E-mail: atur.desai@cfpb.gov
Phone: 202-435-7978
Facsimile: (202) 435-7722
1700 G Street NW
Washington, DC 20552