<u>Exhibit A – APPENDIX OF UNPUBLISHED AUTHORITIES</u>

A. *Manns v. City of Atlanta*,
No. 1:06-CV-0609, 2006 WL 2466836 (N.D. GA, Aug. 23, 2006)...............2

B. *Carter v. City of Melbourne*,
No. 6:11-CV-824, 2012 WL 12896254 (M.D. FL March 29, 2012)................6

C. *CFPB v.  NDG Financial Corp.*,
No. 15-CV-5211, 2016 WL 7188792 (S.D.N.Y Dec. 2, 2016)..........................12

D. *CFPB v. D and D Marketing Inc. et al.,*
No. 15-CV-09692 (C.D. CA Nov. 17, 2016).....................................................30

E. *CFPB v. ITT Educ. Servs.,*
No. 1:14-CV-00292-SEB-TAB, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015)..56

F. *CFPB v. TCF National Bank*,
No. 17-CV-00166 (D. Minn. March 30, 2017)
Order .............................................................................................................92

G. *CFPB v. TCF National Bank*,
No. 17-CV-00166 (D. Minn. April 26, 2017)
Order .............................................................................................................95

2006 WL 2466836
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

Shawn MANNS, Plaintiff,
v.
CITY OF ATLANTA, et al., Defendants.

Civil Action File No. 1:06-CV-0609-TWT.
|
Aug. 23, 2006.

**Attorneys and Law Firms**

Clarence Victor Long, Office of C. Victor Long, Atlanta, GA, for Plaintiff.

Cleora S. Anderson, City of Atlanta, Law Department, Atlanta, GA, for Defendants.

*OPINION AND ORDER*

THOMAS W. THRASH, JR, District Judge.

**\*1** This is an employment discrimination action. It is before the Court on the Report and Recommendation [Doc. 18] of the Magistrate Judge recommending that the Defendants' First Motion to Dismiss [Doc. 5] be granted as to the Plaintiff's Title VII claims and denied as to his § 1981 claim; and that the Defendants' Second Motion to Dismiss [Doc. 13] be denied. The Court approves and adopts the Report and Recommendation as the judgment of the Court. The Defendants' First Motion to Dismiss [Doc. 5] is granted as to the Plaintiff's Title VII claims and denied as to his § 1981 claim. The Defendants' Second Motion to Dismiss [Doc. 13] is denied.

SO ORDERED, this 22 day of August, 2006.

JANET F. KING, Magistrate Judge.

*ORDER FOR SERVICE OF REPORT AND RECOMMENDATION*

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance

with 28 U.S.C. § 636(b)(1) and this Court's Local Rules LR 73 and LCrR 58.1. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of the factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093 (11th Cir.1983), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

**SO ORDERED,** this 14th day of July, 2006.

*REPORT AND RECOMMENDATION*

Pending before the court are two (2) motions to dismiss filed by Defendants City of Atlanta and Dennis Rubin. Plaintiff Shawn Manns filed his employment discrimination complaint [Doc. 1] in this case on March 15, 2006. Instead of filing an answer, Defendants filed a motion [Doc. 5] to dismiss Plaintiff's complaint on April 14, 2006. On May 31, 2006, Defendants filed a second motion [Doc. 13] to dismiss. Defendants' motions are filed pursuant to Federal Rule of Civil Procedure 12(b)(6), which permits a party to assert by motion the defense of "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the [non-moving party] can prove no set of facts which entitle him to relief."[1] *Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1484 (11th Cir.1994); *see also Bernard v. Calejo,* 17 F.Supp.2d 1311, 1314 (S.D.Fla.1998) ("Dismissal is justified only when 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' ") (citation omitted).

"Moreover, the district court must view the facts presented in the pleadings, and all inferences drawn thereof, in the light most favorable to the non-moving party." *Thunderwave v. Carnival Corporation*, 954 F.Supp. 1562, 1564 (S.D.Fla.1997); *see also Bernard*, 17 F.Supp.2d at 1314 (same). Furthermore, a party " 'need not set forth all the facts upon which the claim is based; rather, a short and plain statement of the claim is sufficient if it gives the [opposing party] fair notice of what the claim is and the grounds upon which it rests.' " *Harris v. Procter & Gamble Cellulose Co.*, 73 F.3d 321, 324 (11th Cir.1996) (quoting *Mann v. Adams Realty Co., Inc.*, 556 F.2d 288, 293 (5th Cir.1977)). And, a plaintiff is not required to "plead law or match facts to every element of a legal theory in [his] complaint." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C.Cir .2000). The reviewing court must keep in mind that a "motion to dismiss for failure to state a claim upon which relief can be granted merely tests the sufficiency of the complaint; it does not decide the merits of the case." *Wein v. American Huts, Inc.*, 313 F.Supp.2d 1356, 1359 (S.D.Fla.2004) (citing *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir.1984)).

### 1. Defendants' First Motion to Dismiss

**\*2** Defendants make three (3) arguments in support of their first Rule 12(b)(6) motion [Doc. 5] to dismiss filed on April 14, 2006. First, Defendants contend that Plaintiff Manns' Title VII claims are barred because Plaintiff failed to file his complaint within ninety (90) days of receiving a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"), as required by Title VII. [Doc. 5 at 4-6]. Second, Defendants argue that Plaintiff's Title VII claims against Dennis Rubin should be dismissed because individual defendants cannot be held liable under Title VII. [Doc. 5 at 6]. Third, Defendants assert that Plaintiff's claim based on 42 U .S.C. § 1983 must be dismissed because "a Section 1983 claim cannot stand without Plaintiff pleading some cognizable underlying federal violation." [Doc. 5 at 7].

Defendants' first two (2) arguments are persuasive, and Plaintiff acknowledges that his Title VII claims must be dismissed. Title VII provides that "within ninety days after the giving of such notice [of dismissal of the charge] a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved...." 42 U.S.C. § 2000e-5(f)(1). In his response to Defendants' motion to dismiss, Plaintiff Manns concedes that his Title VII claims are untimely because he did not bring them within ninety (90) days of receiving his EEOC right to sue letter. [Doc. 12 at 2]. With respect to Plaintiff's Title VII claim against individual Defendant Rubin, it is well settled that "[i]ndividual capacity suits

under Title VII are ... inappropriate." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991); *see also Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995) (individual defendants "cannot be held liable under ... Title VII"). Plaintiff Manns acknowledges that Title VII does not provide him with a cause of action against individual Defendant Rubin. [Doc. 12 at 2]. The court, therefore, **RECOMMENDS** that Defendants' motion [Doc. 5] to dismiss be **GRANTED** on Plaintiff's Title VII claims against both Defendant City of Atlanta and Defendant Rubin and that these claims dismissed with prejudice.

Defendants' final argument is that Plaintiff Manns' claim based on 42 U.S.C. § 1983[‡] must be dismissed because Plaintiff has not asserted an underlying constitutional or statutory violation. [Doc. 5 at 7]. Defendants are correct in noting that § 1983 is not a source of substantive federal rights. Rather, the statute "merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979) (citation omitted). Defendants contend that "Plaintiff's Complaint fails to tie his Section 1983 Claim to a cognizable constitutional [or statutory] violation." [Doc. 5 at 7]. Defendants are incorrect.

Defendants allege that Plaintiff's complaint only asserts claims based on § 1983 and Title VII. But the first paragraph of Plaintiff's complaint states, "The Plaintiff brings this action pursuant to 42 U.S.C. Section 1983 fro [sic] the violation of rights contained in Section 1981...." [Doc. 1 at 1]. The second paragraph of Plaintiff's complaint also mentions "Plaintiff's 42 U.S.C. * [sic] 1981 claims." [*Id.*]. Section 1981(a) reads, in pertinent part: "All persons ... shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws ... as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). Plaintiff states in his complaint that he is asserting claims for racial discrimination and retaliation. [Doc. 1 at 19-27]. There is no question that Plaintiff's complaint could have been drafted more carefully. However, Plaintiff has given Defendants "fair notice of what the claim is and the grounds upon which it rests," which is all that it is required to satisfy Federal Rule of Civil Procedure 8. *Harris*, 73 F.3d at 324 (internal quotations omitted). For these reasons, the court **RECOMMENDS** that Defendants' motion [Doc. 5] to dismiss filed on April 14, 2006, be **DENIED** on Plaintiff's § 1983/1981 claim.

### 2. Defendants' Second Motion to Dismiss

**\*3** On May 31, 2006, Defendants filed a second motion [Doc. 13] to dismiss Plaintiff's complaint. Defendants argue in this latest motion to dismiss that "assuming the

factual averments in Plaintiff's most recent Complaint are true, as the Court must for purposes of a 12(b)(6) motion, Plaintiff has still failed to state facts sufficient to maintain a Section 1981/1983 discrimination claim as a matter of law." [Doc. 13 at 3]. Defendants contend that: 1) Plaintiff's disparate treatment claim should be dismissed because he has failed to identify a similarly situated comparator; 2) Plaintiff's retaliation claims should be dismissed because he has not asserted that he participated in any statutorily protected conduct; 3) Plaintiff's § 1983 claim against the City of Atlanta should be dismissed because he has not asserted that a City policy caused the alleged discrimination; and 4) Plaintiff's claim against Dennis Rubin is barred on the basis of qualified immunity.[3] [Doc. 13 at 5].

Plaintiff Manns has filed a response addressing the substance of Defendants' arguments. [Doc. 16]. However, Plaintiff initially argues that the court should not even address the substantive issues raised in Defendants' second motion to dismiss because Defendants did not raise them in their first motion. Plaintiff contends that the filing of successive pre-answer motions to dismiss is improper. [Doc. 16 at 3-4]. The court finds Plaintiff's argument on this issue to be persuasive.

Rule 12(g) provides, "If a party makes a motion under [Rule 12] but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted...." In other words, "Rule 12(g) requires all of the permitted Rule 12(b) defenses to be raised in a single, consolidated motion rather than in multiple or successive motions." *CGHH v. Cesta Punta Deportes,* 2006 U.S. Dist. LEXIS 15015, * 7 (N.D.Ga., March 31, 2006, J. Story). The rule does provide an exception, however, for "a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated." Fed.R.Civ.P. 12(g). The relevant portion of Rule 12(h)(2) provides, "A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits." Fed.R.Civ.P. 12(h)(2).

In the present case, Rule 12(h)(2) does not apply. Although Defendants have asserted a defense of failure to state a claim as allowed by the rule, this defense has been made pursuant to a Rule 12(b)(6) motion to dismiss. Rule 12(h)(2) only allows a failure to state a claim defense to be made in one of three (3) categories: a Rule 7(a) "pleading"; a motion for judgment on the pleadings provided by Rule 12(c); or at trial on the merits.[4] "Defendants' second 12(b)(6) motion simply does not fall

into any of these three categories." *Stoffels v. SBC Communications, Inc.,* 430 F.Supp.2d 642, 2006 WL 1195222, *5 (W.D.Tex., Feb. 3, 2006).

**\*4** As the court in *Stoffels* recently noted, the leading commentators on federal practice and procedure agree that "Rule 12(g) normally bars successive pre-answer motions to dismiss." *Id .* Professors Wright and Miller state, "The right to raise these defenses by preliminary motion is lost when the defendant neglects to consolidate them in his initial motion." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1385. Similarly, Professor Moore writes, "If omitted from the initial motion, [the defenses listed in Rule 12(h)(2), including failure to state a claim] may not be raised in a successive Rule 12 motion, but may be raised in any Rule 7(a) responsive pleading, in a Rule 12(c) motion for judgment on the pleadings, or at trial on the merits." 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.23.

In summary, "Rule 12(g) specifically prohibits a party that has previously filed a motion to dismiss from filing a second pre-answer motion to dismiss raising an omitted defense that could have been presented in the first motion to dismiss...." *Skrtich v. Thornton,* 280 F.3d 1295, 1306 (11th Cir.2002). While there are exceptions to Rule 12(g)'s prohibition, none of them are applicable in the present case. "Moreover, even this express exemption from the waiver rule does not contemplate or allow the filing of successive Rule 12 motions." *CGHH,* 2006 U.S. Dist. LEXIS 15015, * 8 n. 4. The defenses raised by Defendants in their second motion to dismiss could have been raised in their first motion, and Defendants arguments to the contrary are not persuasive. [Doc. 17 at 1-3].

Defendants first contend that their second motion to dismiss for failure to state a claim does not fall within the restriction set forth in Rule 12(g) because the first motion to dismiss addressed the claims as pled by Plaintiff which did not include bringing § 1983 through § 1981. Therefore, they assert that they could not have raised the challenges to the complaint contained in the second motion to dismiss in the first motion to dismiss and should be allowed to do so in a second pre-answer motion. [Doc. 17 at 2]. As already noted, the first paragraph of Plaintiff's complaint states, "The Plaintiff brings this action pursuant to 42 U.S.C. Section 1983 fro [sic] the violation of rights contained in Section 1981...." [Doc. 1 at 1]. The second paragraph of Plaintiff's complaint also mentions "Plaintiff's 42 U.S.C. * [sic] 1981 claims." [*Id.*]. Plaintiff did pled § 1981 as the basis for his § 1983 claims. Defendants were put on notice of

the basis of Plaintiff's § 1983 claims and, therefore, should have brought all of their Rule 12(b)(6) claims in the first motion to dismiss.

The second argument that Defendants make focuses on the defense of qualified immunity which is raised in the second motion to dismiss and which Defendants assert cannot be waived. [Doc. 17 at 3]. The Defendants misconstrue the effect of Rule 12(g)'s prohibition on successive pre-answer motions. This court has not found that the defense of qualified immunity is waived but has only held that it cannot be asserted in the successive motion to dismiss filed pursuant to Rule 12(b)(6). The facts in the case cited by Defendants, *White v. Bibb County, Georgia,* 28 F.Supp.2d 1374 (M.D.Ga.1998), are inapposite to the facts at issue in this case as that decision addresses the issue of waiver of the defense. *Id.* at 1381-82. Defendant Rubin has not waived that defense, and he may raise it in an appropriate pleading after the answer is filed but not in this successive pre-answer motion to dismiss.

**\*5** Accordingly, the undersigned finds that Defendants' second pre-answer motion [Doc. 13] to dismiss is barred

by Rule 12(g). It is **RECOMMENDED** that Defendants' motion [Doc. 13] to dismiss filed on May 31, 2006, be **DENIED.**

**3. Conclusion**
For all the foregoing reasons and cited authority, the undersigned **RECOMMENDS:** that Defendants' first motion [Doc. 5] to dismiss, which was filed on April 14, 2006, be **GRANTED** on Plaintiff's Title VII claims and **DENIED** on Plaintiff's § 1983/1981 claim; and that Defendants' second motion [Doc. 13] to dismiss, which was filed on May 31, 2006, be **DENIED.**

Because no Title VII claims remain in this action, the Clerk is **DIRECTED** to terminate this reference.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2466836

Footnotes

1   "This is especially true in Title VII cases where the court is required to be liberal rather than technical in pleading requirements." *Ferrell v. Busbee,* 91 F.R.D. 225, 230 (N.D.Ga.1981).

2   Section 1983 provides, in pertinent part: "Every person who, under color of any statute ... of any State ... subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...." 42 U.S.C. § 1983.

3   Defendants also claim that Plaintiff's disparate impact claim should be dismissed. [Doc. 13 at 4]. However, as Plaintiff notes, he has not asserted a claim for disparate impact. [Doc. 16 at 5].

4   Rule 7(a) defines a "pleading" as "a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim ...; a third-party complaint ...; and a third-party answer...." Fed.R.Civ.P. 7(a).

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 12896254
Only the Westlaw citation is currently available.
United States District Court,
M.D. Florida,
**Orlando Division**.

Francis R. Carter, JR., Plaintiff,
v.
City of Melbourne, Donald L. Carey, and Jack M.
Schluckebier, Defendants.

Case No. 6:11–cv–824–Orl–22DAB
|
Signed 03/29/2012

### ORDER

ANNE C. CONWAY, United States District Judge

**\*1** This cause comes before the Court for consideration of the following motions: (1) Defendant Donald L. Carey's Motion to Dismiss Counts IV and V of Plaintiff's Second Amended Complaint (Doc. No. 67); (2) Defendant Jack M. Schluckebier's Motion to Dismiss Counts IV and V of Plaintiff's Second Amended Complaint (Doc. No. 76); and (3) Defendant the City of Melbourne's Motion to Dismiss Count IV of Plaintiff's Second Amended Complaint (Doc. No. 73).[1] Plaintiff Francis R. Carter filed a single response in opposition. (Doc. No. 85.)

### I. BACKGROUND

For present purposes, the Court accepts as true the following facts from Plaintiff's Second Amended Complaint. (Doc. No. 64.) Plaintiff served as a police officer for the City of Melbourne (the "City") for twenty-two years. (Id. at ¶ 2.) On May 12, 2003, Defendant Schluckebier, as City Manager, selected Defendant Carey as Chief of Police for the City of Melbourne Police Department, though the officers did not support his appointment. (Id. at ¶ 22.) Plaintiff disapproved of Carey's selection based on previous votes of "no confidence" Carey received while serving as the chief of police in other cities.[2] (Id. at ¶¶ 19, 20.) From 2003 to 2009, Plaintiff voiced his concern regarding Carey's management. (Id. at ¶ 24.) Plaintiff then ran for chairman of the Melbourne police union on a campaign promise to challenge Carey's policies and practices and was elected on November 19, 2009. (Id. at ¶¶ 25, 30.)

After Plaintiff's election as chairman, Plaintiff alleges that defendants initiated a series of Internal Affairs investigations into Plaintiff's professional conduct. First, Internal Affairs began investigating Plaintiff after receiving a complaint on November 2, 2009 by Plaintiff's ex-girlfriend that Plaintiff used a free apartment as an unauthorized gratuity. (Id. at ¶ 26.) In connection with the apartment investigation, Internal Affairs examined surveillance videos from Plaintiff's police vehicle, and subsequently initiated another investigation into Plaintiff's "pattern of conduct of racial profiling" and Plaintiff's unlawful search and seizure during a traffic stop. (Id. at ¶¶ 26, 32, 34, 37, 45.) As a result of the Internal Affairs investigation, and at Carey's insistence, Plaintiff's case was turned over to the Florida Department of Law Enforcement, and Plaintiff was arrested and charged with official misconduct and falsification of records. (Id. at ¶¶ 38, 40.) In a public press release, Carey and Schluckebier "issued or approved" on behalf of the City a press release announcing that the charges against Plaintiff "emanat[ed] from a number of traffic stops ... made on people of color." (Id. at ¶ 40.)

**\*2** Carey ordered Plaintiff to report to Internal Affairs on February 16, 2010 for an interview regarding the apartment investigation. (Id. at ¶ 46.) Plaintiff informed Carey that he made plans to be out of the country at that time, but Internal Affairs refused to reschedule the interview. (Id. at ¶¶ 47, 49.) Though afforded the opportunity to appear at an August, 13, 2010 hearing regarding his prospective termination, Plaintiff did not attend based on the advice of counsel and the pending criminal charges against him. (Id. at ¶ 59.) On August 19, 2010, the Interim Chief of Police terminated Plaintiff for (1) issuing citations to citizens for infractions they did not commit; (2) failing to properly use his in-car video system; (3) trespassing persons from where they were not legally eligible to be trespassed; (4) failing to follow direct orders from supervisors regarding attendance during the Internal Affairs investigation; and (5) obtaining a free apartment as an unauthorized gratuity.[3] (Id. at ¶ 60.) Though the state attorney dropped all criminal charges against Plaintiff in March of 2011, the City did not offer Plaintiff his job back. (Id. at ¶¶ 64, 65.) In May of 2011, an attorney for the City publicly stated that Plaintiff was seeking "a huge bag of gold" from the City as a result of his termination and would not be reinstated as a police officer. (Id. at ¶ 65.)

### II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim, the court must accept as true all factual allegations in the complaint and draw all inferences derived from those facts in the light most favorable to the plaintiff. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). A plaintiff must supply "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, ——(2009) (citing *Twombly*, 550 U.S. at 556).

## III. ANALYSIS

### A. Count IV: "Defamation Under 42 U.S.C. § 1983"

In Count IV, Plaintiff purports to state a cause of action against the City, Carey and Schluckebier for "defamation under § 1983." Standing alone, alleged injury to reputation does not state a claim under the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693, 701–02 (1976). However, pursuant to the "stigma-plus" test established in *Paul*, stigma to a plaintiff's reputation, plus the deprivation of a previously recognized property or liberty interest, may amount to a deprivation of a constitutionally protected liberty interest. *Behrens v. Regier*, 422 F.3d 1255, 1259–60 (11th Cir. 2005). The "plus" prong of the analysis refers to "a right or status previously recognized by state law." *Paul*, 424 U.S. at 711. To establish a deprivation of a liberty interest without due process, a plaintiff must show: (1) a false statement; (2) of a stigmatizing nature; (3) attending a governmental employee's discharge; (4) made public; (5) by the governmental employer; (6) without a meaningful opportunity for a name-clearing hearing. *Warren v. Crawford*, 927 F.2d 559, 565 (11th Cir. 1991).

Carey, Schluckebier and the City argue that Plaintiff does not allege that they denied him a meaningful opportunity for a name-clearing hearing. Additionally, Carey and Schluckebier contend that Plaintiff does not allege that the false statements attended his discharge. In response, Plaintiff argues that he sufficiently alleged a deprivation of a constitutionally protected liberty interest, and in the alternative, that he also sufficiently alleged a deprivation of his property interest in his continued employment. Further, Plaintiff argues that the City cannot move to dismiss Count IV on the basis that Plaintiff was not denied a meaningful opportunity to clear his name

because the City failed to assert that argument in its motion to dismiss the First Amended Complaint.

### 1. Alleged Liberty Interest

Plaintiff alleges that Defendants scheduled a hearing regarding his prospective termination but he did not attend based on the advice of counsel and due to the pending criminal charges against him. (Doc. No. 64 ¶ 59.) The court previously dismissed Count IV because Plaintiff alleged that Defendants provided an opportunity for him to be heard. (Doc. No. 57.) Plaintiff now amends the Second Amended Complaint to allege that he

> **\*3** was denied a meaningful opportunity to clear his name because any interview or hearing regarding his activities or employment was neither fair nor impartial. Any hearing or interview required by the city regarding [Plaintiff's] possible termination was run concurrently with his criminal proceeding and [Plaintiff] reasonably believed that any statements made supporting his position could be used against him in his criminal proceeding or result in further criminal charges.

(*Id.* at ¶ 111.)

However, the fact that the hearing was "neither fair nor impartial" did not impact Plaintiff's ability to receive adequate due process. *See Campbell v. Pierce Cnty., Ga.*, 741 F.2d 1342, 1346 (11th Cir. 1984) ("As to appellant's charge that the composition of the tribunal rendered impartiality impossible, we agree with the district court that the nature of the hearing resolves this question. Because the purpose of the hearing was not to re-evaluate appellant's termination but to allow her to clear her name, the fact that the tribunal was composed of members of the Board of Commissioners did not impair its ability to preside in an acceptably impartial manner."). Additionally, Plaintiff cannot state a claim for failure to provide due process by alleging that he did not attend the hearing to avoid making incriminating statements. *See Harrison v. Wille*, 132 F.3d 679, 684 (11th Cir. 1998) (holding that plaintiff's choice to exercise his Fifth Amendment right and remain silent at a pretermination hearing did not negate the fact that the opportunity to tell his side of the story existed). Ultimately, Plaintiff's refusal to participate in the hearing does not show that

defendants failed to provide him a meaningful opportunity to be heard. *See id.*

In his response, Plaintiff also argues the Notice of Possible Termination only provided him "with the ability to address his termination for supposed violation[s] of agency policy, not the bad acts which form the gravamen of his defamation claim." (Doc. No. 85 p. 10.) However, the opportunity for a name clearing hearing "is not as strict as the process required before one can be deprived of a property interest." *Harrison*, 132 F.3d at 683 n.9. Therefore, "due process [is] satisfied by the same opportunities provided for notice and hearing from the termination itself." *Id.* Moreover, the alleged defamatory statements—that Plaintiff questionably arrested "people of color," that Plaintiff is a "bad cop" and a "rogue cop," and that Plaintiff used a free apartment as an unauthorized gratuity—concern the charges for which Plaintiff was terminated.[4] (Doc. No. 64 ¶¶ 60, 103.) Thus, Plaintiff cannot prevail on an argument that he was entitled to a hearing explicitly to address "the bad acts which form the gravamen of his defamation claim." *See Campbell*, 741 F.2d at 1345 ("Because it is provided simply to cleanse the reputation of the claimant, the hearing need not take place prior to his termination or to the publication of related information adverse to his interests."). Since Plaintiff does not allege that he received an inadequate opportunity to be heard, Count IV does not state a claim.[5]

### 2. Alleged Property Interest

**\*4** In the alternative, Plaintiff argues that he sufficiently alleges the deprivation of a protectable property interest in his employment without due process. According to Plaintiff, whether defendants afforded him a "name-clearing hearing" does not pertain to this claim. However, to the extent Plaintiff attempts to assert a claim for deprivation of a property interest in his employment unrelated to a claim for deprivation of a liberty interest in his reputation, Plaintiff does not articulate the grounds upon which it rests. For example, Plaintiff does not show how defendants failed to provide the process due with respect to his alleged property interest. Even if Plaintiff intended to state a claim for a deprivation of his property interest in employment without due process, which the court doubts, he still must allege that "the state refuse[d] to provide a process sufficient to remedy the procedural deprivation."[6] *Cotton v. Jackson*, 216 F.3d 1328, 1330–31 (11th Cir. 2000) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc)).

In support of this argument, Plaintiff relies on *Beckwith v. City of Daytona Beach Shores, Fla.* for the proposition that a state employee need not allege a protectable property interest, or any other state-created right, to maintain a First Amendment retaliatory discharge claim. 58 F.3d 1554, 1562 (11th Cir. 1995) (distinguishing *McKinney v. Pate* on this ground). In this regard, Plaintiff argues that he "seeks to vindicate a right arising under the Constitution, not one which is created by the state." (Doc. No. 85 p. 7.) However, Plaintiff does not show how the allegations in Count IV state a claim for a First Amendment cause of action. *See Beckwith*, 58 F.3d at 1563–64 (describing the four-part test under which the court analyzes an alleged First Amendment retaliatory discharge claim). Plaintiff's arguments regarding his alleged "property interest" do not save his due process claim from dismissal.

### 3. The City's Motion to Dismiss

Finally, Plaintiff argues that the City cannot move to dismiss Count IV on the basis that Plaintiff failed to allege the denial of an opportunity to clear his name because it did not raise the argument in its initial motion to dismiss. Previously, the court granted Carey and Schluckebier's motion to dismiss Count IV in the First Amended Complaint on this ground. However, the City unpersuasively argued that Plaintiff failed to state a cause of action for § 1983 to the extent Plaintiff premised Count IV on state tort law. (Doc. No. 46.) In denying the City's first motion to dismiss, the court held only that the Eleventh Circuit has recognized a § 1983 claim for deprivation of a liberty interest in reputation. (Doc. No. 57.)

Rule 12(g)(2) bars successive Rule 12(b)(6) motions based on a defense that was available to the party but omitted from its earlier motion. However, Rule 12(h)(2) preserves a party's right to raise the defense of failure to state a claim at a later stage in the proceeding. Therefore, some courts have applied Rule 12 permissively to allow a successive Rule 12(b)(6) motion to be filed when such motions are not filed for the purpose of delay and their adjudication will expedite the resolution of the case. *See Stoffels v. SBC Commc'ns, Inc.*, 430 F. Supp. 2d 642, 648–49 (W.D. Tex. 2006) (citations omitted). Since Carey and Schluckebier properly moved to dismiss based on the failure to allege a name-clearing hearing, Plaintiff cannot assert any delay resulting from the City's motion on the same ground. Instead, ruling on the City's motion to dismiss Count IV will conserve time and expense at a later stage in the case.

**B. Count V: "Conspiracy to Commit All Counts Under 42 U.S.C. § 1983"**

**\*5** In Count V, Plaintiff purports to state a claim against Carey and Schluckebier for "Conspiracy to Commit All Counts Under 42 U.S.C. § 1983."[7] Defendants move to dismiss Count V on the basis that Plaintiff fails to allege a plausible conspiracy, and in the alternative, that the intracorporate conspiracy doctrine bars a claim for conspiracy against them. The court previously dismissed Count V on both grounds. In doing so, the court rejected Plaintiff's argument that the independent personal stake exception to the intracorporate conspiracy doctrine applied, since Plaintiff alleged only that Carey, Schluckebier and the City shared a common objective in the alleged conspiracy. After amending Count V, Plaintiff argues that he plausibly alleges that Carey and Schluckebier, acting pursuant to an independent personal stake, conspired to deprive Plaintiff of his constitutional rights.

**1. Failure to State a Claim**

To prevail on a conspiracy claim under § 1983, a plaintiff "must show that the parties reached an understanding to deny the plaintiff his or her rights ... [and] prove an actionable wrong to support the conspiracy." *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) (citations and quotations omitted). Plaintiff must inform a defendant of "the nature of the conspiracy" alleged, instead of simply alleging " that a conspiracy existed." *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984) (citations omitted). "[T]he linchpin for conspiracy is agreement, which presupposes communication ...." *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992).

Plaintiff argues that he plausibly alleges that Carey and Schluckebier conspired to deprive him of his constitutionally recognized interest in his continued employment. After Schluckebier selected Carey as Police Chief in 2003, the only alleged communications between Carey and Schluckebier occurred in connection with a press release issued by the City to announce Plaintiff's arrest. On January 25, 2010, Carey e-mailed Schluckebier a "confidential" press release announcing Plaintiff's arrest, as it was Schluckebier's responsibility as City Manager to review and approve every press release prior to publication. (Doc. No. 64 ¶ 39.) That same day, Carey informed Plaintiff that the results of the Internal Affairs investigation indicated that there may be probable cause for Plaintiff's arrest for official misconduct and records falsification. (*Id.* at ¶ 38); (Doc. No. 64–3). Three days

later, the Florida Department of Law Enforcement arrested and charged Plaintiff. (*Id.* at ¶ 40.) On the day of Plaintiff's arrest, Carey and Schluckebier, on behalf of the City, "issued or approved" the press release announcing that the charges against Plaintiff "emanat[ed] from a number of traffic stops ... made on people of color." (*Id.* at ¶ 40); (Doc. No. 64–4). In response to a negative reaction to the phrase "people of color," in March of 2010 Schluckebier disciplined Carey for issuing the press release. (*Id.* at ¶ 53) (Doc. No. 64–14).

Despite Plaintiff's argument to the contrary, the communications between Carey and Schluckebier regarding the press release do not create a reasonable inference that Carey and Schluckebier "conspired over" Plaintiff's arrest days before it occurred. (Doc. No. 85 p. 16.) Even after considering the Second Amended Complaint in its entirety, Plaintiff fails to plausibly allege that Carey and Schluckebier "reached an understanding" to violate Plaintiff's rights. Additionally, Plaintiff does not plausibly allege an underlying denial of Plaintiff's constitutional rights. *See GJR Inv., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1370 (11th Cir. 1998), *overruled on other grounds by Iqbal*, 556 U.S. 662. Rather, Plaintiff alleges in a conclusory fashion that Carey and Schluckebier "conspired to intentionally deprive [Plaintiff] of his Constitutionally recognized interest in his continued employment with the Melbourne Police Department." (Doc. No. 64 ¶ 119.) Since Plaintiff does not plausibly allege either an agreement or an underlying constitutional violation, Count V must be dismissed.

**2. Intracorporate Conspiracy Doctrine**

**\*6** In the alternative, Defendants move to dismiss Count V on the basis that the intracorporate conspiracy doctrine bars Plaintiff's claim. In response, Plaintiff argues that the doctrine does not apply because Carey and Schluckebier harbored an "independent personal stake" in the outcome of the conspiracy.

The intracorporate conspiracy doctrine provides "that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (*en banc*)). "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.* Some circuit courts have held that the intracorporate conspiracy

doctrine does not bar intracorporate conspiracies when the employees conspired for their own personal purposes rather than those of their employer. *See, e.g., Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985) (explaining that an exception to the intracorporate conspiracy doctrine exists where the corporate agents are motivated by "an independent personal stake in achieving the corporation's illegal objective").

Plaintiff alleges that Carey and Schluckebier harbored an "independent personal stake" in the conspiracy to terminate Plaintiff. According to Plaintiff, Carey and Schluckebier conspired in a manner independent from the City and personal to themselves, as both feared for their own employment and relative authority within the City once Plaintiff became chairman of the union.[8] However, the Eleventh Circuit has not explicitly adopted the independent personal stake exception. *See Grider*, 618 F.3d at 1263 (discussing the exception but declining to apply it based on the facts). Moreover, Plaintiff does not persuade the court that it should apply the exception when the defendants' alleged personal motivations concern a speculative future benefit associated with their continued employment. *See Bryant v. Jones*, 464 F. Supp. 2d 1273, 1288–89 & n.12 (N.D. Ga. 2006) (refusing to apply the independent personal stake exception since the Eleventh Circuit has not adopted it, and finding that if the Eleventh Circuit did adopt the exception, it would apply only to defendants with an independent economic stake in the conspiracy as opposed to a stake in an unspecified political benefit or an interest in keeping a job), *rev'd in part on other grounds*, 575 F.3d 1281 (11th Cir. 2009). Even if Plaintiff plausibly alleged a conspiracy, the intracorporate conspiracy doctrine would bar his claim.

**IV. CONCLUSION**

**\*7** Because the court has already afforded Plaintiff two opportunities to amend, dismissal with prejudice and without leave of amend is appropriate. Based on the foregoing, it is **ORDERED** as follows:

1. Defendant Donald L. Carey's Motion to Dismiss Counts IV and V of Plaintiff's Second Amended Complaint (Doc. No. 67), filed on February 20, 2012, is **GRANTED**. Counts IV and V are **DISMISSED WITH PREJUDICE**.

2. Defendant City of Melbourne's Motion to Dismiss Count IV (Doc. No. 73), filed on February 24, 2012, is **GRANTED**. Count IV is **DISMISSED WITH PREJUDICE**.

3. Defendant Jack M. Schluckebier's Motion to Dismiss Counts IV and V of Plaintiff's Second Amended Complaint (Doc. No. 76), filed on March 1, 2012 is **GRANTED**. Counts IV and V are **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on March 29, 2012.

**All Citations**

Slip Copy, 2012 WL 12896254

Footnotes

[1]   The City withdrew its motion to dismiss Count V, which Plaintiff did not bring against the City in the Second Amended Complaint. (Doc. No. 84.)

[2]   A police union passes a vote of "no confidence" to communicate to the community and city management that the union perceives the police chief to be "incompetent, disinterested and/or uncaring." (Doc. No. 64 ¶ 19 n.1.)

[3]   Carey announced his retirement on April 9, 2010, after the Fraternal Order of Police passed a vote of "no confidence" against him. (Doc. No. 64 ¶¶ 54, 56.)

[4]   Plaintiff recognizes as much in arguing that the statements attended his discharge: "It is undisputed that the defamatory statements published by Defendants occurred in connection with and are reasonably related to [Plaintiff's] termination." (Doc. No. 85 p. 11.)

[5]   In light of this finding, the court will not address Carey and Schluckebier's additional argument that the alleged defamatory statements did not attend Plaintiff's discharge.

[6]   Plaintiff appears to argue that he states a claim because defendants did not move to dismiss Count IV on the basis that Plaintiff did not allege insufficient due process in connection with the deprivation of his property interest. (Doc. No. 85 p. 6.) However, the allegations in Count IV suggest only that Plaintiff intended to assert a claim for the deprivation of

his liberty interest in his reputation. Furthermore, to the extent Plaintiff argues that his alleged property interest constitutes the "plus" element of the "stigma-plus" test, Plaintiff does not demonstrate that this fact transforms a deprivation of a liberty interest claim into a deprivation of a property interest claim. *See Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000) ("[W]hen reputational damage is sustained in connection with a termination of employment, it may give rise to a procedural due process claim for deprivation of liberty which is actionable under § 1983.").

7    In Counts I, II and III, Plaintiff respectively purports to allege, pursuant to § 1893, that defendants violated his First Amendment rights, falsely arrested and imprisoned him, and maliciously prosecuted him.

8    Specifically, Plaintiff alleges "Carey was aware that [Plaintiff] was running for Chairman of the union on the promise of challenging Carey's policies and procedures as Chief of Police and potentially seeking to organize a vote of 'no confidence' against Carey." (Doc. No. 64 ¶ 121.) Plaintiff also alleges that "Schluckebier was aware that [Plaintiff] had a professional relationship with City Council members and [Plaintiff's] election as Chairman of the union was a concern for Schluckebier as [Plaintiff] was perceived as a threat to his authority." (*Id.* at ¶ 122.)

---

**End of Document**                                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7188792
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Consumer Financial Protection Bureau, Plaintiff,

v.

NDG Financial Corp., et al., Defendants.

No. 15-cv-5211 (CM)
|
Filed 12/02/2016

**Attorneys and Law Firms**

Charles Robert Gayle, Edward Joseph Reilly, II, Mark Samburg, Consumer Financial Protection Bureau, Washington, DC, for Plaintiff.

Jeffrey Alan Brown, Sarah Dean Lyons, Richard Francis Hans, Jr., Constance Che Hang Tse, DLA Piper LLP (US), Katie Gant Crane, Kenneth E. Lee, Levine Lee LLP, New York, NY, Steven A. Engel, Dechert, LLP, Benjamin Boyd, DLA Piper LLP, Washington, DC, for Defendants.

**DECISION AND ORDER DENYING
DEFENDANTS' MOTIONS TO DISMISS**

McMahon, C.J.

**\*1** This action was brought by Plaintiff, the Consumer Financial Protection Bureau ("CFPB") against a group of twenty-one interconnected corporations and individuals (collectively, "Defendants")[1] that allegedly operated a cross-border online payday lending scheme. Via three separate motions to dismiss (Dkt. Nos. 64, 67, and 81), Defendants argue that the first amended complaint ("FAC") should be dismissed because: (1) the Court lacks personal jurisdiction, (2) the claims presented are time-barred or retroactive, (3) the FAC fails to state a claim, and (4) the CFPB is unconstitutional.

For the reasons set forth below, Defendants' motions to dismiss are DENIED.

**Background Facts**

The twenty-one Defendants are interconnected corporate

entities or individuals that the CFPB alleges jointly operated an online payday lending scheme that made loans to U.S. customers in violation of state usury laws, and then used unfair, deceptive, and abusive practices ("UDAAP") to collect on the loans and profit from those revenues, thereby violating the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a), enacted as Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376("Dodd-Frank Act"). The CFPB also alleges that some of Defendants' loan agreements contained irrevocable wage assignment clauses that violated the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3). The CFPB seeks permanent injunctive relief, restitution, refund of monies paid, and disgorgement of ill-gotten gains.

**I. Defendants' Corporate Structure**
Defendants are a collection of individuals and corporations located in Canada and Malta that the CFPB asserts operated as "a seamless unit to offer unlicensed and usurious payday loans over the Internet to US consumers" from 2005 to 2013. (Am. Compl. ¶ 7, Dkt. No. 47.) Defendants can best be organized into four major groups based on their post-2009 corporate structure and the nature of the allegations against them: (1) the European Group; (2) the Canadian Group; (3) the Owners Group; and (4) the Officers/Directors Group.

**A. European Group**
The European Group consists of Defendants (all of which are Named Defendants) Northway Financial Corp. Ltd. ("Northway"), Northway Broker, Ltd. ("Northway Broker"), and related non-defendant entities. Northway and Northway Broker are both registered private limited liability companies ("PLLCs") based out of Sliema, Malta. (Id. ¶¶ 26, 30.) Since 2009, both are indirect subsidiaries of non-defendant New Northway S.A. ("New Northway"), through non-defendant Cumberland Holdings Ltd. (Id. ¶¶ 11, 63-64, 109.)

**\*2** According to the CFPB, Northway "extends credit to US consumers in the form of payday loans" via a series of Internet "doing business as" ("DBA") websites. (Id. ¶ 27.) These DBA websites have various names, including "CashTransferCenters.com; PRLDirect.com; 247Greenstreet.com; GreenPicket.com; PaydayAvenue.com; CashTaxi.com; PixyCash.com; SonicPayday.com; and Zip19.com." (Id.) The CFPB alleges that Northway originates the loans in all fifty states, including New York. (Id. ¶ 152.)

The loans are generally short term, usually fourteen days,

"ranging from $100-$1500 with finance charges between $19.26 and $26.98 per $100 borrowed." (*Id.* ¶ 153.) Due to the short-term nature of the loans, this results in an annual percentage rate ("APR") ranging from 599% to 703%. (*Id.* ¶ 158.) In addition, some of the loan agreements include an irrevocable wage assignment clause that provides, in essence, that "if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages." (*Id.* ¶ 155.) According to the FAC, such clauses were invoked on numerous occasions to collect money directly from consumers' payroll accounts. (*Id.* ¶ 156.)

Northway Broker provides "money brokering services to US consumers applying for payday loans from Northway via the DBA websites." (*Id.* ¶ 31.) According to the CFPB, Northway Broker generates revenue through broker fees for Northway's loans as well as non-sufficient funds ("NSF") fees collected when consumers default on loan payments. (*Id.* ¶ 32.) As such, Northway Broker is a party to the loan agreements with consumers. (*Id.* ¶ 31-32.) It also "contract[s] with credit reporting agencies that provide background information on potential Northway loan applicants." (*Id.* ¶ 35.)

### B. Canadian Group

The Canadian Group consists of the following Defendants (all of which are Named Defendants only): NDG Financial Corp. ("NDG"); NDG's direct subsidiaries E-Care Contact Centers Ltd. ("E-Care"), Blizzard Interactive Corp. ("Blizzard"), and New World Consolidated Lenders Corp. ("NWCL"); and NWCL's subsidiaries New World Lenders Corp. ("NWL"), Payroll Loans First Lenders Corp. ("PLFL"), and New World RRSP Lenders ("NWRRSP"). All of the Canadian Group Defendants were or are Canadian corporations. (*Id.* ¶¶ 17, 36, 42, 49, 51-52, 54.) NDG and E-Care share the same principal place of business, an address in Surrey, British Columbia, but have other additional addresses throughout Canada. (*Id.* ¶¶ 17-20, 37-39.) Blizzard has its principal place of business in Winnipeg, Manitoba, although it also allegedly shares some addresses with E-Care and NDG. (*Id.* ¶¶ 42-43.) NWL and NWCL are incorporated in British Columbia, as were PLFL and NWRRSP, which have both been dissolved. (*Id.* ¶¶ 49-55.)

The FAC contains few direct allegations against NDG, other than that unnamed NDG "personnel" allegedly "established and managed banking and payment processing relationships with US-based service providers on behalf of [NDG's] subsidiaries and entities with which it is under common control." (*Id.* ¶ 25.)

E-Care allegedly collects the loans extended by Northway, as well as provides services to Northway such as "managing Northway's relationships with banks, Third Party Processors (TPPP), and credit reporting agencies...." (*Id.* ¶¶ 40-41.)

**3** Blizzard allegedly identifies potential customers for Northway by generating a target demographic profile, which it then sends to third-party lead generator services. (*Id.* ¶¶ 44-45.) Blizzard, working with a lead generator, specifically targeted potential consumers in New York and New Jersey in June 2013. (*Id.* ¶ 131.) It also allegedly "maintains software that redirects its purchased leads to the DBA websites." (*Id.* ¶ 132.)

NWCL, NWL, PLFL, and NWRRSP (collectively, the "Funding Entities") were or are fundraising vehicles for raising capital for Northway to distribute as loans. (*Id.* ¶¶ 47-56.) The FAC does not allege that this fundraising activity took place in the United States, or that the fundraising itself was in any way illegal.

### C. Owners Group

According to the FAC, New Northway and NDG were each controlled by three separate corporations from 2009 to 2013: (1) Sagewood Holdings Ltd. ("Sagewood"), which owned 50.1% of shares in New Northway and NDG; (2) Knightsbridge Holdings Ltd. ("Knightsbridge"), which owned 39.8% of each; and (3) 0562752 B.C. Ltd. ("0562752"), which owned 10.1% of each. (*Id.* ¶¶ 62, 92, 97.) In turn, each of these three corporations was wholly-owned by one of the three individual Defendants: (1) Peter Ash owned 100% of Sagewood; (2) Paul Ash owned 100% of Knightsbridge; and (3) Paul Grehan owned 100% of 0562752. (*Id.* ¶¶ 14-16.)

The FAC alleges that, around September 1, 2013, control was transferred from Sagewood, Knightsbridge, and 0562752 to three new corporations: (1) Emerald Willow Holdings, Ltd. ("Emerald Willow") assumed Sagewood's shares; (2) Red River Holdings Company, Ltd. ("Red River") assumed Knightsbridge's shares; and (3) Twillingate Holdings, Ltd. ("Twillingate") assumed 0562752's shares. (*Id.* ¶¶ 13, 22, 111.)

All Owners Group Defendants are listed as Relief Defendants only, except for Peter Ash and Sagewood, which are listed as both Named Defendants and Relief Defendants.

13

#### D. Officers/Directors Group

The last group of Defendants are three officers of the various corporate Defendants: Kimberly DeThomas, Jeremy Sabourin, and William Wrixon. The FAC also refers to these individuals as the "Current Owners," but does not provide any details about their ownership interests. (*See id.* ¶ 211.) The CFPB's brief more directly alleges that these individuals are, respectively, 100% owners of Emerald Willow, Red River, and Twillingate. (Pl.'s Mem. of Law in Opp'n to Defs.' Mots. to Dismiss ("Pl's Br.") at 8, Dkt. No. 90.) Each of the three Defendants in the Officers/Directors Group is listed as both a Named Defendant and a Relief Defendant.

DeThomas is allegedly the Chief Executive Officer ("CEO") of NDG and E-Care; the CEO, President, and Director of NWL; CEO and President of NWRRSP; Director of PLFL, NWCL, Northway, Northway Broker, and Blizzard; and charged with "managerial responsibility" over NDG and E-Care. (Am. Compl. ¶¶ 72-79.)

Sabourin is allegedly the Chief Operation Officer ("COO") of NDG; the President of Blizzard; an "officer or director" for E-Care, each of the Funding Entities, and Red River; and charged with "managerial responsibility" over NDG, E-Care, Blizzard, NWL, and NWCL. (*Id.* ¶¶ 81-85.)

Wrixon is allegedly the Chief Financial Officer ("CFO") of NDG, Blizzard, and NWL; an "officer or director" for E-Care, Blizzard, PLFL, NWCL, and Twillingate; and charged with "managerial responsibility" over NDG, E-Care, Blizzard, NWL, and NWCL. (*Id.* ¶¶ 86-88.)

#### II. Defendants' Alleged Actions

**\*4** The FAC includes nine counts, based on five types of alleged activity: (1) that Defendants' misrepresentations to consumers that they owed money on illegal loans constituted "deceptive" (Count I), "unfair" (Count II), and "abusive" (Count III) practices under the CFPA, 12 U.S.C. § 5536(a)(1)(B); (2) that Defendants' misrepresentations to consumers that U.S. and state laws did not apply to their loans constituted "deceptive" (Count IV) and "abusive" (Count V) practices under the CFPA, *id.;* (3) that Defendants' misrepresentations regarding the repercussions of nonpayment constituted "deceptive" practices under the CFPA, *id.* (Count VI);[2] (4) that Defendants' conditioning of loans on illegal wage assignment clauses violated the Credit Practices Rule, 16 C.F.R. § 444.2(a)(3) (Count VII), and constituted an "unfair" practice under the CFPA, 12 U.S.C. § 5536(a)(1)(B) (Count VIII); and (5) that the Relief Defendants possess funds illegally obtained through this enterprise (Count IX).

#### A. Misrepresentations Regarding Loan Validity

Counts I through III are based on the allegation that Defendants "represented expressly or by implication that consumers ... were obligated to repay loan amounts, an obligation that in fact did not exist because the loans violated state licensing and/or usury laws that declared such amounts void." (Am. Compl. ¶ 276.) Specifically, E-Care "contact[ed] delinquent consumers by phone, email, and letter, restating the consumer's obligation to repay the principal and interest in full, along with a $39.00 NSF fee, and a $20.00 late payment fee." (*Id.* ¶ 160.)

The loans were void, the CFPB argues, because various state laws prohibit charging APRs at the levels that Defendants charged (from 599% to 703%). For example, New York makes it illegal for an unlicensed person or corporation to, directly or indirectly, charge interest at a rate exceeding 16% annually on covered loans. *See* N.Y. Gen. Oblig. Law § 5-501(1)-(2); N.Y. Banking Law § 14-a(1). Loans exceeding that rate are void *ab initio* as usurious. N.Y. Gen. Oblig. Law § 5-511(1). Additionally, New York prohibits engaging in the business of making personal loans of $25,000 or less without a license. N.Y. Banking Law § 340. Such loans are void if their interest rates exceed those permitted to a licensee. *Id.* § 355. In such case, "the lender shall have no right to collect or receive any principal, interest or charge whatsoever." *Id.*

#### B. Misrepresentations Regarding Applicability of U.S. and State Laws

Counts IV and V allege that Defendants falsely represented to consumers that U.S. and state laws did not apply to their loans. These representations were made in the loan agreements themselves, which indicated "that US federal and state laws did not apply to Northway and Northway Broker, the consumer's account, or to the terms of the loan agreement." (Am. Compl. ¶ 168.) Additionally, if consumers contacted Defendants to "report a complaint, dispute a charge, or request reimbursement," Defendants would assert "that the consumers' state laws did not apply." (*Id.* ¶ 169.) The FAC includes a portion of a form letter allegedly sent in response to consumer inquiries, which stated:

> If you take a moment to review the attached loan agreement, you will see that [Northway] is a Financial Institution licensed and regulated in accordance with the European Union (EU) Directives. As such,

the laws of the Republic of Malta (member State of the European Union), not the state of [consumer's state of residence] applies to its terms. We provided you with this notice so that you would understand the terms of your loan.

(*Id.* ¶ 170.)

By contrast, the CFPB asserts, Defendants acknowledged to potential investors (in biannual Offering Memoranda issued between 2005 and 2013), to at least one U.S. bank (in an application to process Automated Clearing House ("ACH") transactions), and to its auditors (in a 2010 external audit), that Northway's loans were indeed subject to U.S. and state laws. (*Id.* ¶¶ 186-209.) According to the FAC, Northway's loans were void in the following states based on state licensing law, state usury law, or both: Arizona, Arkansas, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Utah. (*Id.* ¶ 268.) Additionally, consumers in Colorado were not obligated to pay the excess fees and finance charges that Northway levied. (*Id.* ¶ 269.)

**C. Misrepresentations Regarding Consequences of Non-Payment**

**\*5** Count VI alleges that certain Defendants (the European Group, the Canadian Group, and DeThomas) misrepresented to consumers the consequences of non-payment of the loans. E-Care allegedly "falsely represented to consumers that non-payment of debt would result in lawsuit, arrest, imprisonment, or wage garnishment," despite the fact that E-Care lacked "the intention or legal authority to take such actions." (*Id.* ¶ 161.)

**D. Use of Irrevocable Wage Assignment Clauses**

Counts VII and VIII allege that Northway sometimes conditioned its loans on irrevocable wage assignment clauses. According to the FAC, the standard clause provided that, "if the consumer defaults on the loan for more than seven days from the date that payment is due, the consumer authorizes the NDG Enterprise to instruct the consumer's employer to pay the outstanding loan amount directly to the NDG Enterprise from the consumer's wages." (*Id.* ¶ 155.)

Not only were the clauses included in the loan agreements, but the CFPB alleges they were actually enforced using ACH debit entries. (*Id.* ¶¶ 156-57.) The

CFPB claims such clauses can result in "serious and detrimental interference with employment relationships," can "negatively affects promotions, pay raises, and job assignments," can "result in job loss," and can "disrupt[ ] consumers' finances and ... make it difficult for ... consumer [s] to purchase necessities or discharge other obligations in a timely fashion." (*Id.* ¶¶ 328-29.)

**E. Unjust Enrichment**

Lastly, the FAC alleges that the Relief Defendants (the Owners Group and the Officers/Directors Group) have been unjustly enriched by their receipt of funds or other assets that are traceable to the funds unlawfully obtained from consumers. (*Id.* ¶¶ 333-35.) The CFPA empowers this Court to provide various forms of equitable or legal relief in such circumstances. *See* 12 U.S.C. § 5565(a)(1)-(2).

**Procedural History**

The CFPB filed its initial complaint against Defendants in July 2015. Sagewood moved to dismiss the complaint on November 17, 2015, and then withdrew that motion on December 17, 2015. (Dkt. Nos. 41, 53.) Pursuant to a stipulation among the parties, the CFPB filed an amended complaint on December 11, 2015. (Dkt. No. 47.) Defendants then filed three separate motions to dismiss: Paul Ash, Peter Ash, Sagewood, and Knightsbridge moved on March 16, 2016 (the "Ash Motion" and the "Ash Brief") (Dkt. Nos. 64 & 65); the European Group, the Canadian Group, and the Officers/Directors Group moved on March 16, 2016 (the "NDG Motion" and the "NDG Brief") (Dkt. Nos. 67 & 68); and Grehan and 0562752 moved on April 11, 2016 (the "Grehan Motion" and the "Grehan Brief") (Dkt. Nos. 81 & 85). Each of the motions seeks a dismissal of the FAC under Rule 12(b)(2), for lack of personal jurisdiction, and dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted, on multiple (and frequently overlapping) grounds.

**Discussion**

**I. Personal Jurisdiction**

All Defendants argue that this Court lacks personal jurisdiction over them, and therefore the FAC must be dismissed under Rule 12(b)(2). Because the CFPB has made a *prima facie* showing of jurisdiction over all twenty-one Defendants, Defendants' motions to dismiss are denied.

15

#### A. Legal Standard

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendants. *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003); *DiStefano v. Carozzi N. Am., Inc.,* 286 F.3d 81, 84 (2d Cir. 2001). The plaintiff's burden of proof "depends upon the procedural context in which the jurisdictional challenge in raised." *Navaera Scis., LLC v. Acuity Forensic Inc.,* 667 F. Supp. 2d 369, 373 (S.D.N.Y. 2009). Where, as here, no evidentiary hearing has been held, the plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir. 1986). A *prima facie* showing requires that the plaintiff "plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.,* 975 F. Supp. 562, 564 (S.D.N.Y. 1997). Conclusory allegations that merely restate the legal standard are insufficient to constitute a *prima facie* showing—plaintiffs must cite specific facts supporting their legal conclusions. *See Jazini v. Nissan Motor Co.,* 148 F.3d 181, 184-85 (2d Cir. 1998); *Weiss v. Barc, Inc.,* No. 12 Civ. 7571, 2013 WL 2355509, at *1 (S.D.N.Y. May 29, 2013). "Legal conclusions couched as factual allegations are not factual allegations and cannot substitute for them." *In re Ski Train Fire,* 230 F. Supp. 2d 376, 382 (S.D.N.Y. 2002); *see also Chaplin v. Kido Indus. Co., Ltd.,* No. 10 Civ. 5711, 2011 WL 2314866, at *2 (S.D.N.Y. June 7, 2011).

**\*6** A determination regarding personal jurisdiction requires a factual inquiry that goes beyond the complaint, therefore "all pertinent documentation submitted by the parties may be considered in deciding the motion." *Pilates, Inc. v. Pilates Inst.,* 891 F. Supp. 175, 178 n.2 (S.D.N.Y. 1995) (internal quotation marks omitted). All pleadings and affidavits are to be construed in the light most favorable to the plaintiff, and any doubt is to be resolved in the plaintiff's favor. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir. 1985).

#### B. Analysis

All parties agree that the Court lacks general jurisdiction over Defendants, none of which is domiciled in the United States. The only question is whether, as the CFPB asserts, this Court has specific jurisdiction over them. The specific jurisdiction analysis in New York is a two-fold inquiry. First, the Court must determine whether New York law permits the exercise of personal jurisdiction over any Defendant. Second, the Court must determine whether exercising jurisdiction comports with due

process. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945).

The CFPB argues that the Court has jurisdiction over all Defendants via the "transacting business" prong of New York's long-arm statute. The statute provides, in relevant part, that "a court may exercise personal jurisdiction over any non-domiciliary, ... who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state...." C.P.L.R. § 302(a)(1). The transacting business requirement "requires only a minimal quantity of activity, provided that it is of the right nature and quality." *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782),* 731 F. Supp. 587, 592 (S.D.N.Y. 1990). A single transaction may be sufficient for personal jurisdiction under § 302(a)(1), and physical presence by the defendant in New York is not required. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 787 (2d Cir. 1999).

Even the CFPB acknowledges (at least implicitly) that not all Defendants had direct contact with the New York forum. Indeed, as discussed below, it appears from the FAC that only Northway, Northway Broker, E-Care, and Blizzard did. The CFPB's theory of jurisdiction therefore hinges on treating all Defendants as a unified entity, such that the contacts made by those Defendants may justifiably be imputed to the others. To do so, the CFPB must establish that Northway, Northway Broker, E-Care, and Blizzard acted as either "agent[s]" or "mere department[s]" of the other Defendants. *Jazini,* 148 F.3d at 184. Because I conclude that the CFPB has plausibly alleged the existence of an agency relationship among all Defendants, there is no need to evaluate whether some or all Defendants would also qualify under the "mere department" test, or whether jurisdiction would lie under Fed. R. Civ. P. 4(k), which the CFPB asserts as an alternative.

#### 1. Certain Defendants Had Direct Contacts with the New York Forum

The FAC contains allegations that are more than sufficient to establish that Northway, Northway Broker, E-Care, and Blizzard directly engaged in the transaction of business in New York and other states.

Northway is alleged to be the originator of loans that are made over the Internet to consumers in New York and other states, and the operator of the DBA websites. (Am. Compl. ¶¶ 27, 152.) Northway Broker provides the consumers with brokerage services for which it collects

fees and, along with Northway, is a named party to the loan agreements. (*Id.* ¶¶ 31-32.) The operation of the DBA websites and the provision of financial services to New York consumers are two separate potential grounds for satisfying the transacting business test.

**\*7** Courts in New York use a "spectrum of interactivity" test to determine whether the operation of a website constitutes the transaction of business in New York. *McCrann v. RIU Hotels S.A.*, No. 09 Civ. 9188, 2010 WL 5094396, at \*5 (S.D.N.Y. Dec. 6, 2010). This spectrum ranges from essentially passive websites, which are considered analogous to a widely-circulated advertisement and do not establish personal jurisdiction, to highly interactive websites that, for example, allow a defendant to knowingly and repeatedly transmit computer files to customers in other states. *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).

The CFPB alleges that the DBA websites operated by Northway were highly interactive, allowing customers to apply for, accept, and manage their loans online. Consumers would establish accounts on the websites with unique usernames and passwords. (Am. Compl. ¶ 135.) Users would be required to provide their checking account number, social security number, date of birth, and home address. (*Id.* ¶ 137.) Funds would be distributed directly into consumer s checking accounts via an ACH credit. (*Id.* ¶ 138.) This level of interactivity undoubtedly falls at the high end of the internet commercial activity spectrum. *Citigroup*, 97 F. Supp. 2d at 565 & n.8.

But, beyond the websites themselves, the CFPB alleges that New York consumers actually *received* loans to which Northway and Northway Broker were named parties—loans which form the basis of this lawsuit. Indeed, the FAC includes a portion of a form letter sent to New York consumers by Northway in late 2013 (after it received a cease-and-desist letter from the New York Department of Financial Services) stating that "Northway Financial Corporation Ltd has decided to no longer provide loans to residents of the State of New York.... It has always adhered strictly to the terms of its license conditions, followed federal U.S. law and treated all of its customers, *including those in New York,* with the utmost fairness and respect." (Am. Compl. ¶ 203 (emphasis added).) There is no question that the extension of consumer credit and the provision of brokerage services are qualifying business activities for purposes of the New York long-arm statute. The FAC clearly alleges that Northway and Northway Broker transacted business in New York.

E-care's debt-collection efforts also constitute transacting business within New York. According to the FAC, E-Care contacted consumers by phone, e-mail, and letter in order to obtain repayment. (*Id.* ¶¶ 40-41, 160.) While the FAC does not provide details of specific transactions between E-Care and New York consumers, it does plausibly allege the extension of credit to New York consumers by Northway and Northway Broker, followed by debt-collection efforts to those same consumers by E-Care. Even minimal active efforts to collect debts from a single New York consumer—such as mailing a debt collection letter or contacting a debtor by phone—can be sufficient to establish personal jurisdiction. *See Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015); *Sisler v. Wal-Mart Stores, Inc.*, No. 02 Civ. 602A, 2003 WL 23508105, at \*1 (W.D.N.Y. Dec. 24, 2003); *Sluys v. Hand*, 831 F. Supp. 321, 324 (S.D.N.Y. 1993). Furthermore, E-Care used New York correspondent bank accounts to conduct wire transfers between the enterprise's U.S. customers and its own Canadian accounts. (Am. Compl. ¶¶ 147-51.) As the New York Court of Appeals recently confirmed, deliberate use of New York-based correspondent accounts to further an international scheme can be sufficient standing alone to meet the "transacting business" requirement. *See Al Rushaid v. Pictet & Cie*, No. 180, 2016 WL 6837930 (N.Y. Nov. 22, 2016). Based on these allegations, this Court has personal jurisdiction over E-Care under New York's long-arm statute.

**\*8** Lastly, Blizzard allegedly used a lead generator service to target New York and New Jersey consumers, and allegedly maintains software to redirect those consumers to the DBA websites operated by Northway. (Am. Compl. ¶¶ 131-32.) Such activities, which directly and intentionally target New York residents, meet the transacting business requirement. *See, e.g., Lawson v. Full Tilt Poker Ltd.*, 930 F. Supp. 2d 476, 484 (S.D.N.Y. 2013).

The FAC thus contains sufficient factual allegations to conclude that the Court has personal jurisdiction under New York's long-arm statute over Northway, Northway Broker, E-Care, and Blizzard (the "New York Defendants") through their direct business transactions in New York. Personal jurisdiction over the remaining entities and individuals (the Owners Group, the Officers/Directors Group, and the Funding Entities) only exists if it can be imputed from the New York-based activities of the New York Defendants.

## 2. The FAC Plausibly Alleges the Existence of an Agency Relationship Between Defendants

New York's long-arm statute notes that jurisdiction may be established by a defendant's activities conducted either "in person or *through an agent.*" CPLR § 302 (emphasis added). Although courts assessing the existence of an agency relationship for purposes of § 302 "have focused on the realities of the relationship in question rather than the formalities of agency law," *CutCo*, 806 F.2d at 366, there are traditionally four elements to consider. The alleged agent must have acted (1) for the benefit of, (2) with the knowledge of, (3) with the consent of, and (4) under the control of, the principal. *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981); *see also CutCo*, 806 F.2d at 366.

The CFPB plausibly alleges that the Owners Group benefitted from, knew about, consented to, and controlled, the activities of the New York Defendants. The FAC alleges that the proceeds of the payday loans extended by Northway and Northway Broker and collected by E-Care were primarily distributed to the Owners Group via shareholder dividends. (Am. Compl. ¶ 236.) These dividends, which may have amounted to millions of dollars annually, continued to be distributed to Peter Ash, Paul Ash, and Grehan through their respective companies after the 2009 handoff of "operational control" to the Officers/Directors Group until the transfer of ownership to Emerald Willow, Red River, and Twillingate in 2013. (*Id.* ¶¶ 236, 239.) As the ultimate shareholders (and, in some cases, founders) of all of the New York Defendants, the Owners Group undoubtedly had knowledge of and consented to those entities' general activities. The FAC includes details about specific actions that Peter Ash, Paul Ash, and Grehan took to establish the payday lending operation and to direct profits to themselves through accounts belonging to Sagewood, Knightsbridge, and 0562752. (*See, e.g., id.* ¶¶ 118(g)-(q), 225-28.) Lastly, the Owners Group, even if they lacked the formal status of a partnership or joint venture, nonetheless indirectly jointly owned the New York Defendants and thus exercised sufficient control over them to satisfy the agency test. *See Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 361 (S.D.N.Y. 2004); *see also CutCo*, 806 F.2d at 366.

Despite Defendants' arguments, this is not a case like *Gerstle v. National Credit Adjusters, LLC*, 76 F. Supp. 3d 503, 508-10 (S.D.N.Y. 2015), where the plaintiff merely alleged that the corporation's employee vaguely "authorized and permitted" the forum-targeting conduct by the corporation. The Owners Group Defendants indirectly owned all of the New York Defendants until 2013. The FAC details how each individual in the Owners Group possessed signing authority over various bank accounts used by the other Defendants to transfer proceeds from the payday loan scheme to other entities and to themselves for personal use. (Am. Compl. ¶¶ 219-29.) Even after ceding day-to-day control of the companies to the Officers/Directors Group, Peter Ash, Paul Ash, and Grehan continued to collect dividends and provide strategic direction to the point that the companies continued to reflect their beliefs. (*Id.* ¶¶ 239-40.) This is sufficient, certainly at the pleading stage, to establish an agency relationship.

**\*9** Similarly, the FAC alleges that the Officers/Directors also benefitted from, had knowledge of, consented to, and exercised control over, the activities of the New York Defendants. Although the FAC is vague about what ownership role the Officers/Directors currently play, it does clearly allege that the Officers/Directors have received profits from the payday loan scheme. (*Id.* ¶ 227.) The allegations also clearly show that the Officers/Directors Group had knowledge of, consented to, and exercised control over, the scheme, and details their personal roles in recruiting employees, training staff, marketing the loans, and managing the companies. (*Id.* ¶¶ 205-09, 230-41.) DeThomas, for example, allegedly signed letters to a state financial regulator as President of E-Care regarding their alleged debt collection practices. (*Id.* ¶¶ 181-85.) Sabourin allegedly signed an agreement as President of Blizzard with a lead generator to locate potential customers in the United States. (*Id.* ¶ 241.) Wrixon allegedly signed a certification confirming he was Secretary of Blizzard and the custodian of its corporate records. (*Id.* ¶ 238.) All three individual Owners Group Defendants were signatories to the biannual offering memoranda that described the enterprise's debt-collection practices. (*Id.* ¶¶ 187-91.) The FAC contains more than adequate factual detail to support the allegation that the Officers/Directors acted as principals over the New York Defendants.

Finally, the FAC sufficiently pleads that Funding Entities meet the test for an agency relationship, although this presents a closer question. The FAC alleges that funds were transferred from the accounts used to collect the enterprise's consumer loan repayment deposits to accounts belonging to each of the Funding Entities, among other Defendants. (*Id.* ¶¶ 147, 226.) The FAC alleges that NWL issued biannual offering memoranda (signed by the individual Owners Group Defendants) between 2005 and 2013 that were used to solicit potential investors in the payday lending scheme. (*Id.* ¶¶ 187-91, 218.) These memoranda described how entities like Northway and Northway Broker were the Funding Entities' "affiliates" that made and collected the payday loans to U.S. consumers, which is how the entire enterprise generated revenue. (*Id.* ¶¶ 187-91.) These

allegations make clear that the Funding Entities knew about, consented to, and benefited from the payday lending activities of the New York Defendants.

The only close question is whether the Funding Entities exerted any degree of "control" over any of the New York Entities. This requirement, for purposes of § 302, is generally applied flexibly, requiring only "some measure" of control by the "principal" over the "agent." *Mayes v. Leipziger,* 674 F.2d 178, 181 (2d Cir. 1982). This minimal level of required control does not need to be formal or direct. *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir. 2000). Such control has been readily found among corporations where the "agent" is a wholly-owned subsidiary of the "principal," but it has also been found in numerous occasions among corporate affiliates like those at issue here. *See Palmieri v. Estefan,* 793 F. Supp. 1182, 1194 (S.D.N.Y. 1992); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.,* 756 F. Supp. 126, 130 (S.D.N.Y. 1991); *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467 (1988). The FAC alleges, with significant detail, how the work of the New York Defendants was interrelated to the activities of the Funding Entities, which could not solicit investors absent the rest of the payday lending operation. The FAC also alleges that all of the corporate Defendants are or were ultimately owned (and thus *formally* controlled) by a small group of individuals, who also serve or served in various overlapping officer and director positions at the different entities. This level of interconnection, financial reliance, and mutual benefit between the Funding Entities and the New York Defendants is sufficient, at least at the pleading stage, to establish long-arm jurisdiction over the Funding Entities.

### 3. The Exercise of Personal Jurisdiction over Defendants Comports with Due Process

Having determined that New York's long-arm statute would extend the state's jurisdiction over all twenty-one Defendants, I must assess whether the exercise of this jurisdiction comports with federal due process. This analysis has two related components: the "minimum contacts" test and the "reasonableness" inquiry. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567-58 (2d Cir. 1996).

**\*10** The first test asks whether the defendant has sufficient "minimum contacts" with the forum to justify the court's exercise of personal jurisdiction. Where, as here, the case is predicated on specific jurisdiction, minimum contacts exist "where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into

court there." *Bank Brussels Lambert,* 305 F.3d at 127 (internal quotation marks omitted) (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 152 (2d Cir. 2001)).

Here, according to the FAC, Defendants, through the actions of their agents Northway, Northway Broker, E-Care, and Blizzard, intentionally targeted New York consumers with their payday loans and generated profits from those consumers. Blizzard, for example, allegedly used a lead generator service to locate potential New York customers, and then directed them to the DBA websites where they could apply for loans from Northway and Northway Broker. In 2013, New York's state financial regulator sent Defendants a cease-and-desist letter regarding their New York lending activities. (Am. Compl. ¶¶ 172-73.) In response, Northway sent a letter to its New York consumers saying it was halting its New York lending activity. (*Id.* ¶ 203.) The FAC's allegations suggest that Defendants were fully aware that they were extending credit to consumers in New York, and thus Defendants could foresee being subject to litigation here as a result of their actions.

The second aspect of the due process inquiry asks whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice," that is, whether it is reasonable under the circumstances of the particular case. *Metro. Life,* 84 F.3d at 568. Courts are to consider five factors when assessing reasonableness:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.* While the exercise of jurisdiction is favored where minimum contacts have been found to exist, jurisdiction may be defeated where the defendant presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477 (1985).

Defendants present no compelling reason why the exercise of personal jurisdiction would be unreasonable in

this case. The NDG Motion asserts that, because Defendants are located in Canada and Malta, litigating in New York imposes a significant burden. This may be true, but all of the other factors weigh in the CFPB's favor. The CFPB seeks to remedy wrongs allegedly committed against New York consumers in violation of federal law, which favors a finding of jurisdiction. Furthermore, evidence of the loans made to consumers may come, at least in part, from consumers themselves, who would be located in this forum. Judicial economy and the interests of the forum thus outweigh any burden imposed on Defendants.

I therefore conclude that the exercise of personal jurisdiction over all Defendants is proper, and Defendants' motions to dismiss under Rule 12(b)(2) are denied.

## II. Failure to State UDAAP Claims Under the CFPA

**\*11** Defendants argue for dismissal of the CFPA UDAAP-based claims because: (1) the FAC fails to allege that certain Defendants are covered by the CFPA's provisions, (2) it fails to extend liability to all Defendants under a "common enterprise" theory, (3) it fails to provide details on specific consumer transactions, and (4) it is an improper attempt to enforce state usury law. Each of these arguments fails.

In deciding a motion to dismiss under Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir. 2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal quotation marks, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the

plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal,* 556 U.S. at 680.

### A. Applicability of the CFPA

Defendants first argue that the FAC's UDAAP claims should be dismissed because Peter Ash, Sagewood, NDG, and the members of the Officers/Directors Group are neither "covered persons" nor "service providers" under the CFPA, and thus are not covered by its restrictions. 12 U.S.C. § 5481(6), (26). The Ash Motion also argues that Paul Ash and Knightsbridge are not covered by the CFPA's definitions, but, as they are named as Relief Defendants only, that is irrelevant.

The CFPA's UDAAP provision prohibits any "covered person" or "service provider" from engaging in "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1). The law defines "covered person" to mean (1) "any person that engages in offering or providing a consumer financial product or service" and (2) "any affiliate" of such person if the affiliate "acts as a service provider" to them. § 5481(6). An "affiliate" of a covered person means "any person that controls, is controlled by, or is under common control with" the covered person. § 5481(1). A "service provider" means (with some exceptions not relevant here) "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service." § 5481(26)(A). Although the term "material service" is not defined in the CFPA, it includes "participat[ing] in designing, operating, or maintaining [a] consumer financial product or service." 12 U.S.C. § 5481(26)(A)(i).

Additionally, the CFPA law treats as a "covered person" any person meeting the definition of a "related person." § 5481(25)(B). The definition of "related person" includes any "director," "officer," "controlling shareholder," or "agent" of a covered person, any "employee charged with managerial responsibility for" a covered person, and "any shareholder, consultant, joint venture partner, or other person" who "materially participates in the conduct of the affairs of [a] covered person." § 5481(25)(C)(i)-(ii).

**\*12** Starting with where the parties agree, Defendants do not contest that the FAC plausibly alleges that Northway, Northway Broker, and E-Care are all covered persons by either extending loans to U.S. consumers, collecting payments on those loans, or providing brokering services. *See* § 5481(5), (15)(A)(i), (x). The FAC also alleges that Blizzard and the Funding Entities provide material services to covered persons by recruiting investors and identifying potential customers for Northway and the other entities. Blizzard and the Funding Entities are all

commonly controlled with Northway, Northway Broker, and E-Care, and thus qualify as covered persons themselves as affiliates and service providers of covered persons.

NDG, in addition to being a "related person" by virtue of its status as controlling shareholder of Blizzard and E-Care, is also a service provider to Northway and Northway Broker because it provided material services to those entities. According to the FAC, NDG personnel "established and managed banking and payment processing relationships with US-based service providers on behalf of its subsidiaries and entities with which it is under common control." (Am. Compl. ¶ 25.) NDG staff communicated with Originating Depository Financial Institution ("ODFI") service providers and TPPPs using Northway, Northway Broker, and E-Care email addresses. (*Id.* ¶¶ 143-44.) As the CFPB notes, relationships with ODFIs and TPPPs are necessary in order to transfer money to and from U.S. consumers, a vital component of the enterprise's payday lending business. (Pl.'s Br. at 27.) NDG's services were thus important for "operating" and "maintaining," § 5481(26)(A)(i), the consumer financial services Northway and Northway Broker were providing, under the ordinary meaning of those terms. *See CFPB v. ITT Educ. Servs., Inc.,* No. 1:14 Civ. 00292, 2015 WL 1013508, at *25 (S.D. Ind. Mar. 6, 2015). NDG thus also falls into the statute's definition of service provider.

Peter Ash and Sagewood, as controlling shareholders of other covered persons (NDG, Northway, Northway Broker, Blizzard, E-Care, and the Funding Entities), also qualify as covered persons through their status as "related persons." § 5481(25)(B), (C)(i). Although the FAC contains allegations that suggest the material participation by the other members of the Owners Group—Paul Ash, Knightsbridge, Grehan, 0562752, Red River, Twillingate, and the current controlling shareholder Emerald Willow—each is only named as a Relief Defendant, meaning their status as a covered person is not at issue.

Lastly, each member of the Officers/Directors Group, as an officer or director of multiple covered persons, (*see* Am. Compl. ¶¶ 72-88), qualifies as a related person under the CFPA.[3] § 5481(25)(C)(i). Thus, all are treated for purposes of federal consumer financial law as covered persons themselves. § 5481(25)(B).

The CFPB has properly alleged that the CFPA's UDAAP provision covers all of the Named Defendants in this case.

## B. Specificity of CFPA Claims

Next, the Ash and NDG Motions argue that the FAC fails to sufficiently plead the elements necessary to

demonstrate that any Defendant engaged in unfair, deceptive, or abusive acts or practices in violation of the CFPA. Specifically, Defendants claim that the FAC fails to identify any particular loans made to consumers, any particular consumers injured by those loans, or any particular material statements that were deceptive. These failures, Defendants argue, make the FAC too conclusory to pass muster under the *Iqbal/Twombly* standard.

### 1. Unfair Acts or Practices

**\*13** The FAC includes two counts of engaging in "unfair" acts or practices under the CFPA: Count II alleges that misrepresenting to consumers that they owed money on loans that they legally did not owe constitutes an "unfair" act or practice, and Count VIII alleges that conditioning certain loans on illegal wage assignment clauses is an "unfair" act or practice. Defendants argue these allegations are conclusory, and that by failing to identify specific loans or consumers affected, the FAC fails to give fair notice of the conduct alleged.

In order to declare an act or practice is "unfair" under the CFPA's rulemaking authority, the CFPB must have "a reasonable basis" to conclude that "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers," and that "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). This standard for the meaning of unfair acts or practices is borrowed from the Federal Trade Commission Act ("FTCA"). *ITT Educ. Servs.,* 2015 WL 1013508, at *25. Under the FTCA, a "substantial injury" is generally a financial one, although other types of injuries are cognizable as well. *Id.*

The CFPB has plausibly pleaded that Northway, Northway Broker, and E-Care violated the CFPA's prohibition on engaging in unfair acts or practices. First, falsely representing to consumers that they owe money that they, in fact, do not owe is likely to cause consumers pecuniary injury in the form of repayments that they otherwise would not make. Although Defendants argue that the loss to consumers may have been outweighed by "countervailing benefits to consumers or competition," that argument is entirely unsupported. Losing money they are otherwise entitled to keep provides consumers no conceivable benefit, and Defendants do not even bother proffering one.

Second, incorporating irrevocable wage assignment clauses into Northway and Northway Broker's loan agreements is also an unfair practice under the CFPA.

Again, such assignments, if utilized, would deprive consumers of money they were not legally obligated to repay, a clear financial harm without a possible countervailing benefit. Indeed, the FAC lays out a litany of potential harms that can result from the use of these clauses. (Am. Compl. ¶¶ 328-29.) And the FAC alleges that these clauses were not only incorporated into loan agreements but actually enforced on some occasions. (*Id.* ¶¶ 156-57.) If proved, these allegations would show that consumers were deprived of money via contractual provisions that were automatic (and thus, by definition, could not be avoided) and that have no countervailing benefits.

Third, Defendants are incorrect that *Iqbal* and *Twombly* require the CFPB to identify specific consumers targeted by the payday lending scheme in order to survive a motion to dismiss. The CFPA does not require the CFPB to identify individual consumers in its complaint, and Fed. R. Civ. P. 8 does not require any plaintiff to identify the proof that undergirds a complaint's allegations. *See, e.g., FTC v. Tax Club, Inc.,* 994 F. Supp. 2d 461, 473 (S.D.N.Y. 2014) (finding, for state-law UDAP claim, agency was "not required to name the consumers affected by the allegedly fraudulent conduct" in complaint).

The FAC thus plausibly alleges that Northway and Northway Broker, as parties to the loan agreements with the wage-assignment clauses, (Am. Compl. ¶¶ 31-32, 155), and E-Care, as the collection agency, (*Id.* ¶ 160), engaged in unfair consumer lending practices.

## 2. Deceptive Acts or Practices

**\*14** The FAC includes three counts of engaging in "deceptive" acts or practices under the CFPA: Counts I, IV, and VI. Counts I and IV are asserted against all Named Defendants, Count VI is asserted only against the European Group, the Canadian Group and DeThomas. While the term "deceptive" is not defined in the CFPA, all parties accept for purposes of this case that the term bears the same meaning as under the FTCA. *See* 15 U.S.C. § 45(a)(1).

To prove the existence of a deceptive act or practice under the FTCA, a plaintiff must show three elements: "(1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), [that] the representation, omission, or practice is material." *FTC v. Med. Billers Network, Inc.,* 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008) (alteration in original) (quoting *FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 63 (2d Cir. 2006)).

Count I alleges that Named Defendants deceived consumers regarding Defendants' right to collect on loans that were actually void under state usury law. Count IV alleges that Named Defendants misled consumers regarding the applicability of state and federal law. Count VI accuses the European Group, the Canadian Group and DeThomas of deception regarding the consequences of non-payment. Defendants do not contest that, for each of these counts, the FAC plausibly alleges that certain Defendants made misleading representations to consumers; Defendants only argue that the CFPB has not pleaded that those misrepresentations were *material.* (*See* NDG Br. at 25-26.)

It is well-established that falsely representing to a consumer that he or she owes money constitutes making a "material" misrepresentation. *See Verity Int'l,* 335 F. Supp. 2d at 496-97. Misrepresentations regarding the legal or practical consequences of failing to pay back such a debt—for example, that it would result in "lawsuits, arrest, imprisonment, or wage garnishment" (Am. Compl. ¶ 311)—are also material, as they are likely to affect the consumer's conduct regarding the alleged debt. *See FTC v. Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001). Similarly, misrepresenting the applicability of state or federal law to the loans—laws that would, if applicable, make the loans void—is just as likely to affect consumer decisionmaking and is therefore a material misrepresentation.

Defendants' argument—that withholding information from (or worse, actually affirmatively lying to) consumers regarding their legal obligations to repay loans are actions that are unlikely to affect consumer decisionmaking—is, frankly, bizarre. It is also completely unsupported by caselaw, and therefore Counts I, IV, and VI will not be dismissed on these grounds.

The FAC plausibly alleges that Northway, Northway Broker, and E-Care, through their various roles in the enterprise, violated the CFPA's prohibition on deceptive practices.

## 3. Abusive Acts or Practices

Counts III and V allege that Named Defendants, by misrepresenting to consumers that they owed money on the void loans and by misrepresenting the applicability of state and federal law to the loans, engaged in "abusive" practices. Defendants argue that, by failing to identify specific loans or consumers affected, the CFPB cannot allege the elements of an abusiveness claim.

The CFPA provides that the CFPB cannot declare an act or practice abusive unless the act or practice "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or "takes unreasonable advantage" of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service," "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service," or "the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d).

*15 Again, the CFPB has pleaded sufficient facts to survive a motion dismiss on these claims. Falsely representing to consumers that the loans they sought (1) are valid and must be repaid and (2) are not covered by state or federal law "materially interferes" with consumers' ability to understand the terms and conditions of their loans. It should be patently obvious to any lender that most consumers will be completely unaware of the details of their state's usury laws, such that misrepresenting the nature of those laws will interfere with the consumer's ability to understand the loan agreement's terms and to make an informed choice about the loan. In the only other case the Court is aware of interpreting the CFPA's prohibition on abusive practices, another court found that allegations of similar misrepresentations by a student loan provider were sufficient to survive a motion to dismiss. *See Illinois v. Alta Colleges, Inc.,* No. 14 Civ. 3786, 2014 WL 4377579, at *2 (N.D. Ill. Sept. 4, 2014).

Again, the misrepresentations at issue were allegedly made by Northway, Northway Broker, and E-Care, and thus the FAC has plausibly alleged violations of the abusive prong of the CFPA's UDAAP provision by these three entities.

### C. Common Enterprise Liability

The Ash and NDG Motions next argue that, even if the FAC plausibly alleges UDAAP violations by Northway, Northway Broker, and E-Care, that the CFPA claims should be dismissed as to the remaining Named Defendants, because extension of liability to them relies on a "common enterprise" theory. Defendants argue that common enterprise liability does not exist under the CFPA, and that even if it does, it was not properly pleaded here. The CFPB argues that all Named Defendants are liable under common enterprise, alter-ego, and agency theories of liability.

### 1. Existence of Common Enterprise Liability Under the CFPA

Ordinarily, pleadings against multiple defendants must specify the "claims with which each individual defendant is charged." 5 Fed. Prac. & Proc. Civ. § 1248 (3d ed. 2016). The common enterprise doctrine, in the FTCA context, operates to "prevent individuals and companies from using corporate structures to circumvent the FTCA." *FTC v. PayDay Fin. LLC,* 989 F. Supp. 2d 799, 808-09 (D.S.D. 2013). The CFPB argues that the doctrine should also apply to the CFPA because the two statutes serve the same public purpose, and because the statutes use similar language.

The CFPB makes a compelling argument that the language of the CFPA's provisions was designed to parallel those of the FTCA. The FTCA prohibits "unfair or deceptive acts or practices," in or affecting commerce, 15 U.S.C. § 45(a)(1), while the CFPA prohibits "covered person[s] or service provider[s]" from engaging in "any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1). The FTCA's language has long been interpreted to include common enterprise liability. *See Delaware Watch Co. v. FTC,* 332 F.2d 745, 746 (2d Cir. 1964). And the Supreme Court has stated that "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States,* 342 U.S. 246, 263 (1952).

Indeed, as discussed above, courts have adopted the established meaning of other words in § 5536 from the FTCA, in acknowledgment of the two provisions' similarity. *See, e.g., CFPB v. Gordon,* 819 F.3d 1179, 1193 (9th Cir. 2016) (adopting definition of "deceptive" from FTCA); *ITT Educ. Servs.,* 2015 WL 1013508, at *25 (adopting definition of "unfair" from FTCA). Defendants provide no rationale why these parallel provisions of law should not be interpreted in the same way, and even advocate in a footnote that the term "deceptive" as used in the CFPA should be interpreted to have the same meaning as under the FTCA. (*See* NDG Br. at 25 n.6).

*16 Defendants highlight two structural differences between the FTCA and CFPA that they argue warrant treating the two statutes differently. (*See* Ash Reply Br. at 16, n.10, Dkt. No. 93.) Defendants point to the CFPA's inclusion of a "related person" definition, 12 U.S.C. § 5481(25), and the statute's prohibition on "knowingly or recklessly provid[ing] substantial assistance to a covered

person or service provider" in violation of a CFPB-promulgated rule, 12 U.S.C. § 5536(a)(3), to argue that the CFPA provides for specific types of derivative liability to the exclusion of common-law forms of liability like the common enterprise theory. However, neither of these statutory provisions provides for derivative liability for violations of the UDAAP provision. The "related person" definition merely expands the universe of actors who may be responsible for their own violations of the UDAAP provision, and the "substantial assistance" provision only applies to violations of agency-promulgated rules, not the statute's UDAAP provision. These provisions do not alter the conclusion that the similarities in language and structure between the CFPA and FTCA support the extension of the FTCA's long-established theory of common enterprise liability to the CFPA.

The FTCA and CFPA were also enacted for similar purposes. Both statutes are designed to protect the public from practices that unfairly exploit the imbalance of power between the individual consumer and the corporation. They empower watchdog agencies—like the CFPB and FTC—to enforce their standards through investigation and litigation. And the FTCA's public-interest purpose is precisely why the common enterprise doctrine was established under the FTCA in the first place. As the Sixth Circuit stated nearly half a century ago: "[W]here the public interest is involved, as it is in the enforcement of Section 5 of the Federal Trade Commission Act, a strict adherence to common law principles is not required in the determination of whether a parent should be held [liable] for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." *P.F. Collier & Son Corp. v. FTC,* 427 F.2d 261, 267 (6th Cir. 1970). The same logic has led to courts in this Circuit to apply common enterprise liability to other financial protection statutes, like the Commodity Exchange Act *See CFTC v. Int'l Fin. Servs. (N.Y.), Inc.,* 323 F. Supp. 2d 482, 508 (S.D.N.Y. 2004).

Due to the CFPA's recent vintage, only one other court has considered the question of whether common enterprise liability should apply under it. *See Pennsylvania v. Think Fin., Inc.,* No. 14 Civ. 7139, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016). The *Think Finance* court concluded that the doctrine should not apply under the CFPA, because (1) the CFPA may be enforced by multiple state and federal government agencies (while the FTCA may only be enforced by the FTC), and (2) the CFPA allows suit against "abusive" practices, in addition to "unfair" and "deceptive" ones, unlike the FTCA.

It is unclear why either of those is a relevant consideration when determining whether common enterprise liability exists under the CFPA, and the *Think Finance* court did not attempt to explain its reasoning. The doctrine is judicially established, and designed to deal with "a case in which the same individuals were transacting an integrated business through a maze of interrelated companies." *Delaware Watch,* 332 F.2d at 746. The fact that multiple government agencies could theoretically enforce the statute, or that the statute covers a wider array of unlawful practices, does not appear pertinent to the calculus. What appears relevant are the two statutes' public-interest purposes and Congress's use of parallel language and structure. I conclude that common enterprise liability does apply under the CFPA and reject the holding of *Think Finance.*

## 2. Application of Common Enterprise Liability

Under a common enterprise theory, "each entity within a set of interrelated companies may be held jointly and severally liable for the actions of other entities that are part of the group." *Tax Club,* 994 F. Supp. 2d at 469. Courts consider five non-dispositive factors in evaluating whether a common enterprise exists between two defendants: "whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Id.* (quoting *FTC v. Consumer Health Benefits Ass'n, No.* 10 Civ. 3551, 2012 WL 1890242, at *5 (E.D.N.Y. May 23, 2012)).

**\*17** First, the remaining Canadian Group entities (Blizzard, NDG, and the Funding Entities) all share most of these factors with E-Care. They all share officers and employees. (Am. Compl. ¶¶ 72-79, 81-85, 86-88.) They are all operated under common control. (*Id.* ¶ 11.) NDG, Blizzard, and E-Care all share office space. (*Id.* ¶¶ 17-20, 37-39, 42-43.) All are alleged to have comingled funds. (*Id.* ¶¶ 147, 226.)

Second, Sagewood shared some of these factors with Northway, Northway Broker, and E-Care, at least until its controlling stake in these companies was transferred to Emerald Willow in September 2013. (*Id.* ¶ 13.) Sagewood is not alleged to have had any employees, and had no officers other than Peter Ash, who was an officer and director of nearly all the other corporate Named Defendants until 2009 and continued to exert control over the enterprise until long after that. (*Id.* ¶¶ 67, 233.) Sagewood was the indirect controlling shareholder of all of the Canadian Group and European Group Defendants

24

until 2013, satisfying the common control factor. (*Id.* ¶¶ 61-62.) Although Sagewood's address was not shared with any other entities, Peter Ash did use as his business address the same location that was used by Defendants E-Care, Emerald Willow, NDG, NWL, PLFL, and NWRRSP. (*Id.* ¶¶ 17, 18, 38, 50, 52, 54, 58, 60.) Funds allegedly travelled between accounts controlled by Sagewood and the other Defendants and were allegedly used by Peter Ash for personal purposes unrelated to the enterprise. (*Id.* ¶¶ 225, 228-29, 242-52.)

I am satisfied that, at least at the pleading stage, the CFPB has alleged common enterprise liability for the CFPA counts against Sagewood and all of the European Group and Canadian Group Defendants. However, common enterprise liability only applies to corporations, not to individuals, *see Tax Club*, 994 F. Supp. 2d at 469, so it cannot be used to extend liability to the Officers/Directors Group or to Peter Ash personally.

### D. Individual Liability
The CFPB argues that the four individual Named Defendants are all liable for the CFPA violations committed by the corporate Named Defendants under the standard for individual liability borrowed from the FTCA. Defendants do not appear to contest that the FTCA's standard applies here.

Under that standard, an individual will be liable for corporate unfair, deceptive, or abusive acts or practices if (1) he or she "participated directly in the wrongful acts or practices" or had the authority to control the corporate defendant who did, and (2) "had some knowledge of the acts or practices." *Tax Club*, 994 F. Supp. 2d at 471 (quoting *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000)); *accord Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *5. Authority to control a company "can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Med. Billers Network*, 543 F. Supp. 2d at 320 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)). The knowledge requirement "may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* (quoting *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985)).

*18 The FAC alleges that each of the Officers/Directors Defendants was actively involved in the business affairs of Northway, Northway Broker, and E-Care during the period in question, with the three individuals taking over day-to-day management of the companies beginning in 2009. (Am. Compl. ¶¶ 230-41.) Each served as an officer or director (or both) of either Northway, Northway Broker, or E-Care. (*Id.* ¶¶ 72-88.) And each had (or should have had, based on the allegations) knowledge of the misrepresentations made by the corporations they controlled. The Officers/Directors should have known that state and federal laws applied to the loans their companies issued because they signed an offering memorandum in September 2013 admitting that fact. (*Id.* ¶¶ 205, 209.) They should have known that their loans were void in many states because various state financial regulators (including New York's) sent them cease-and-desist letters between 2011 and 2014, some of which triggered responses signed by the Officers/Directors themselves. (*Id.* ¶¶ 167-76, 201-204.)

Peter Ash also meets the standard for individual liability based on the FAC's allegations. Until 2013, he was the sole controlling shareholder of all of the entities that originated the loans and made the representations at issue. He established the corporations, set up their bank accounts, and personally hired their first employees, including some of the Officers/Directors. (*Id.* ¶¶ 118, 210, 213-15, 218-23.) He, along with Paul Ash and Paul Grehan, continued to provide strategic direction as owners to the companies after they handed over day-to-day control. (*Id.* ¶ 239.) He was a personal signatory to multiple offering memoranda that described Northway's lending practices, including how the loans were secured by potentially unenforceable wage assignment clauses and were potentially void due to their violation of state usury laws. (*Id.* ¶ 186-89.) The FAC therefore plausibly alleges personal liability of Peter Ash and the Officers/Directors Group.

### E. State Usury Law
The Ash and NDG Motions make another argument as to why the CFPA claims should be dismissed for failure to state a claim: that the claims are an improper attempt by the CFPB to enforce state usury laws. Defendants are correct that the CFPB is not empowered by Congress to enforce state law, and is not permitted to establish a federal usury limit by regulation. 12 U.S.C. § 5517(o). However, none of the FAC's claims is seeking relief for a violation of a usury limit. Instead, Counts I, II, and III seek relief for *misrepresentations* to consumers about their legal obligation to repay loans that were, in fact, invalid due to state usury laws. Just as lying about committing a prior crime can constitute a separate offense of perjury, misrepresenting to consumers the legal status of an invalid loan agreement can constitute a separate violation of consumer protection law. Defendants offer no

legal support for their theory that the CFPB's claims in this case are an improper "end run" around the prohibition on establishment of a federal usury limit and the Court is not aware of any.

### III. Failure to State Credit Practices Rule Claim

The Ash Motion argues that Counts VII and VIII should be dismissed because Paul Ash, Peter Ash, Sagewood, and Knightsbridge are not covered by the Credit Practices Rule. The NDG Motion argues that Count VII should be dismissed as insufficiently specific to properly allege a violation of the Credit Practices Rule.

First, Count VIII is not a Credit Practices Rule claim, but rather a CFPA claim, so it will not be dismissed. Second, Paul Ash and Knightsbridge are not Named Defendants and are therefore not covered by either Count VII or Count VIII. Third, for the same reasons that the CFPA claims will not be dismissed for failure to identify particular consumers and particular loans, Count VII will not be dismissed, as the CFPB is not required to identify its proof at the pleadings stage.

The Credit Practices Rule is a regulation promulgated by the FTC under 15 U.S.C. § 57a, which the CFPA gives the CFPB the authority to enforce "to the extent that such rule applies to a covered person or service provider with respect to the offering or provision of a consumer financial product or service." 12 U.S.C. § 5581(b)(5)(B)(ii). Among other things, the Credit Practices Rule prohibits a "lender" from "tak[ing] or receiv[ing] from a consumer an obligation that ... contains an assignment of wages or other earnings" unless assignment is "revocable at the will of the debtor," is a qualifying "payroll deduction plan or preauthorized payment plan," or "applies only to wages or other earnings already earned at the time of the assignment." 16 C.F.R. § 444.2(a)(3). A "lender" is elsewhere defined as any person "who engages in the business of lending money to consumers" within the FTC's jurisdiction. § 444.1(a).

**\*19** As already discussed, all Named Defendants constitute covered persons or are treated as covered persons under federal consumer financial protection law. All corporate Named Defendants are jointly and severally liable for their participation in the "common enterprise"—which all agree certainly applies to rules promulgated under the FTCA—and the individual Named Defendants are liable by virtue of their knowledge and direct participation or control over the corporate entities. Per the FAC's allegations, Northway and Northway Broker constitute lenders because they lent money to consumers. The FAC also alleges that, in their capacity as

lenders, Northway and Northway Broker incorporated irrevocable wage assignment clauses into some of their loan agreements, and E-Care received automatic payments from consumers under those clauses. (Am. Compl. ¶¶ 155-57, 324.) Therefore, the CFPB has properly alleged a Credit Practices Rule violation against all Named Defendants.

### IV. Time Bar / Retroactivity

The Ash and Grehan Motions argue that the FAC should be dismissed as to their Defendants as time-barred or precluded by retroactivity, because the conduct alleged falls outside the relevant statute of limitations period or else occurred prior to the date upon which the CFPA became effective. To clarify, although the Ash and Grehan Motions appear to seek dismissal of the entire FAC, Peter Ash and Sagewood are the only Owners Group Defendants covered by most of the FAC's claims. The other Owners Group Defendants are only Relief Defendants, and are thus implicated only by Count IX, which the Grehan Motion argues is bound by the CFPA's statute of limitations for UDAAP claims since it seeks disgorgement of funds received in violation of the CFPA's UDAAP provision. Furthermore, Count VII is not a CFPA-based claim and is therefore not covered by the law's statute of limitations, and Peter Ash and Sagewood do not specifically argue in the Ash Motion for its dismissal on timeliness grounds.

A statute of limitations defense is ordinarily an affirmative defense that must be raised in an answer; however, it may be decided on a Rule 12(b)(6) motion if the defense "is clear from the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir. 2008). The CFPA provides that, for UDAAP claims, "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). The date of discovery is the date when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir. 1992).

The CFPB's original complaint was filed under seal on July 6, 2015, and was unsealed on July 31, 2016. (*See* Dkt. Nos. 2, 5, 6.) That complaint did not name any individual Defendants nor any Relief Defendants; the only Owners Group Defendant named was Sagewood. (Dkt. No. 6.) The FAC (which added Peter Ash as a Named Defendant and all of the Owners Group as Relief Defendants) was filed on December 11, 2015. (Dkt. No. 47.) The Ash Motion therefore argues that the alleged

offending conduct occurred prior to July 2012 and that the CFPB knew of, or should have discovered, the facts underlying the UDAAP claims prior to that date. The Grehan Motion argues that disgorgement of any funds received prior to December 2012 would be improper for the same reason.

While the CFPB does allege that some of Defendants' actions occurred prior to July 2012, it also alleges that the payday lending scheme continued to operate into 2013 and 2014. The FAC includes a table of usurious rates that Northway and Northway Broker allegedly charged U.S. consumers that was taken from one of the DBA websites in May 2013. (Am. Compl. ¶ 158.) Blizzard is accused of working with a lead generator to target New York and New Jersey consumers in 2013 and of directing those leads to the DBA websites operated by Northway. (*Id.* ¶¶ 130-32, 241.) State regulators have allegedly sent multiple cease-and-desist letters to Northway from 2008 through 2014 (including one in August 2013 from the New York Department of Financial Services), suggesting that Northway's lending activities continued throughout this period across the United States. (*Id.* ¶¶ 172-73.) The Funding Entities continued to issue biannual offering memoranda into at least September 2013 in order to raise money for the enterprise, and NWRRSP and PLFL remained operational until November 2013 and July 2014, respectively. (*Id.* ¶¶ 53, 55, 187, 209.) The enterprise continued to provide information to credit reporting agencies about its consumers until 2014. (*Id.* ¶ 166.) Profits from the payday lending scheme appear to have continued to flow between the various Defendants into at least 2013. (*Id.* ¶¶ 184, 242-52.)

**\*20** Because the CFPB's UDAAP claims are based on Defendants' alleged misrepresentations to consumers regarding their loans, each representation would constitute a new and separate cause of action under the CFPA. The FAC plausibly alleges that the Canadian Group and European Group Defendants engaged in a continuing course of conduct that extended well past July 2012. The Owners Group continued to own (and provide some direction to) all of the other corporate Defendants until at least September 2013, and the Officers/Directors Group continued to operate the entities until 2014. (*Id.* ¶¶ 110-11, 230-40.) Profits from the enterprise continued to flow to Relief Defendants at least into 2013. (*Id.* ¶¶ 184, 242-52.) Although Defendants are correct that the statute of limitations timelines are different depending on whether the Defendant was named in the original complaint (in which case activity prior to July 2012 is outside the statute of limitations period) or only in the FAC (in which case activity prior to December 2012 is outside the limitations period), the FAC's UDAAP counts

and the disgorgement count plausibly allege that all the relevant Defendants acted or received funds within their respective statute of limitations period, which is enough at this stage to allow discovery to proceed.

As for retroactivity, the CFPA provides that its provisions, including the UDAAP provisions the CFPB asserts were violated here, became effective on the "designated transfer date," which the Secretary of the Treasury established by regulation as July 21, 2011. *See* 12 U.S.C. §§ 5481(9), 5581, 5582; Designated Transfer Date, 75 Fed. Reg. 57,252, 52,253 (Sept. 20, 2010). While retroactivity of legislation is not per se unlawful, there is a presumption against retroactivity—the legal effect of conduct is generally governed only by the law that existed when the conduct took place. *Gordon,* 819 F.3d at 1196-97 (vacating and remanding for further consideration of whether it is appropriate to calculate monetary judgment based on activity that pre-dated the CFPA's effectiveness).

Whether the CFPA's UDAAP provisions apply retroactively is a question that the Court need not answer today, as the CFPB has made clear that it seeks relief in Counts I-VI and VIII only for activity that occurred after July 2011—as, indeed, it must, since the statute of limitations period for all Named Defendants does not extend earlier than 2012. (*See* Pl.'s Br. at 44-45.) The FAC includes allegations about pre-July 2011 activity, but those allegations are only used establish the factual background of Defendants' activities, and are not the conduct that forms the basis of the FAC's UDAAP counts. As just discussed, the FAC includes sufficient allegations of activity occurring in 2013 and 2014 to maintain this suit at this stage, so there is no concern about retroactivity. Lastly, Count VII seeks relief for violations of the Credit Practices Rule, which went into effect in 1985, long before the enterprise was even established, and therefore it (and any related disgorgement relief sought in Count IX) are not being applied retroactively.

## V. Unjust Enrichment

The Ash and NDG Motions additionally argue that Count IX, which seeks disgorgement of funds held be Relief Defendants, should be dismissed because such relief does not exist under the CFPA and the FAC fails to identify which funds are allegedly improperly held.

A relief defendant is a person who "holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *CFTC v. Walsh,* 618 F.3d 218, 225 (2d Cir. 2010) (quoting *SEC v. Colello,* 139 F.3d 674, 676 (9th Cir. 1998)). Courts have the power

to order disgorgement from a relief defendant where the relief defendant "(1) is in possession of ill-gotten funds and (2) lacks a legitimate claim to those funds." *Id.* Such disgorgement is proper even where the relief defendant is not accused of any wrongdoing. *SEC v. Cavanagh,* 155 F.3d 129, 136 (2d Cir. 1998).

The federal courts have broad equitable powers which can be employed to recover ill-gotten gains for the benefit of victims, which is why courts frequently allowed agencies like the CFTC, FTC, and SEC to seek disgorgement from relief defendants. *See CFTC v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 192 n.4 (4th Cir. 2002). The CFPA specifically provides for remedies including refunding of money, restitution, and disgorgement for unjust enrichment, among others. *See* 12 U.S.C. § 5565(a)(2). Although often asserted in the fraud context, relief defendants are sometimes named in consumer protection cases brought by the FTC. *See, e.g., FTC v. LeadClick Media, LLC,* 838 F.3d 158, 177 (2d Cir. 2016); *FTC v. Johnson,* No. 2:10 Civ. 02203, 2013 WL 2460359, at *7 (D. Nev. June 6, 2013).

**\*21** The FAC sufficiently alleges that Relief Defendants are in possession of funds which were obtained through unlawful practices and to which they are not legitimately entitled. It alleges that, as a result of the CFPA and Credit Practices Rule violations discussed above, the enterprise generated profits in the tens of millions of dollars annually. (Am. Compl. ¶¶ 118, 151, 184, 236.) These profits were distributed to the Owners Group Defendants in the form of regular dividends. (*Id.* ¶ 236.) And, reading the FAC in the light most favorable to the CFPB, it suggests that the Officers/Directors are now the owners of the enterprise and are the ultimate recipients of the dividends that have been distributed since 2013. (*Id.* ¶ 211.) The FAC does not, as Defendants note, identify every specific distribution that the CFPB will presumably seek to prove at trial. It does, however, describe the type and frequency of the payments at issue, which is sufficient at the pleadings stage. These funds, if obtained as profits from activity that violated federal law, are proper subjects of a potential future disgorgement order.

## VI. Constitutionality

Lastly, Defendants argue the CFPB is unconstitutional in structure, and that therefore the entire FAC should be dismissed. Their argument, in essence, is that the CFPB's simultaneous independence from the Legislative Branch (because it may seek funding from outside the ordinary appropriations process under 12 U.S.C. § 5497(a)) and the Executive Branch (because it is headed by a Director who may only be removed for cause under 12 U.S.C. § 5491(c)(3)) is a separation-of-powers violation. As a result, Defendants argue, the CFPB lacks the authority to bring this suit at all, and therefore the entire FAC must be dismissed.

The D.C. Circuit recently opined at length on the merits of the second half of Defendants' argument and concluded that the CFPB's structure violated Article II of the Constitution by insulating the Director from all but for-cause removal by the President. *See PHH Corp. v. CFPB,* 839 F.3d 1, 12 (D.C. Cir. 2016). Whatever the merits of that decision, I need not address its substance here, because although the D.C. Circuit found that the CFPB's structure was unconstitutional, it did not declare the agency incapable of enforcing the laws Congress charged it with executing. Instead, it merely excised the Director's for-cause removal protection from the statute and permitted the suit before it to continue unaffected. *Id.* at 39. Therefore, even if Defendants are correct that the CFPB's structure is unconstitutional, the only appropriate remedy would not prevent or delay this suit; the necessary correction (assuming that correction *was* necessary) has already been implemented by the D.C. Circuit in *PHH.* Defendants' motions to dismiss on constitutional grounds are, therefore, denied.

## All Citations

Slip Copy, 2016 WL 7188792

## Footnotes

1    Fourteen individuals or corporations are named defendants in this matter ("Named Defendants"): NDG Financial Corp.; Northway Financial Corp., Ltd.; Northway Broker, Ltd.; E-Care Contact Centers, Ltd.; Blizzard Interactive Corp.; New World Consolidated Lending Corp.; New World Lenders Corp.; Payroll Loans First Lenders Corp.; New World RRSP Lenders Corp.; Peter Ash; Sagewood Holdings, Ltd.; Kimberly DeThomas; Jeremy Sabourin; and William Wrixon. Twelve individuals or corporations are named as relief defendants ("Relief Defendants"), five of which are also Named Defendants: Peter Ash; Sagewood Holdings, Ltd.; Paul Ash; Knightsbridge Holdings, Ltd.; Paul Grehan; 0562752 B.C., Ltd.; Kimberly DeThomas; Emerald Willow Holdings, Ltd.; Jeremy Sabourin; Red River Holdings Company Ltd.; William Wrixon; and Twillingate Holdings Ltd.

2       Count VI is asserted against only the European Group Defendants, the Canadian Group Defendants, and DeThomas.

3       The NDG Motion's argument, (*see* NDG Br. at 21-22), that § 5481(25)(C)(i) requires directors or officers to have "managerial responsibility" over a covered person in order to qualify as related persons is a clear misreading of the statute, which only requires managerial responsibility for *employees,* not officers or directors.

---

**End of Document**                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

Present: The Honorable    Philip S. Gutierrez, United States District Judge

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorneys Present for Plaintiff(s):         Attorneys Present for Defendant(s):

Not Present                     Not Present

**Proceedings (In Chambers):**     **Order DENYING Defendants' Motions to Dismiss**

Before the Court are three motions to dismiss in three related cases. *See Consumer Financial Protection Bureau* ("*CFPB*") *v. D and D Marketing, et al.*, CV 15-9692 PSG (Ex), Dkt. # 39 ("*T3 Mot.*"); *CFPB v. Fomichev*, CV 16-2724 PSG (Ex), Dkt. # 29 ("*Fomichev Mot.*"); *CFPB v. Gasparyan*, CV 16-2725 PSG (Ex), Dkt. # 31 ("*Gasparyan Mot.*"). The Court finds the matters appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); L.R. 7-15. After considering all the papers submitted by all the parties, the Court DENIES Defendants' motions.

## I.    <u>Background</u>

In December 2015, Plaintiff CFPB filed a Complaint against Defendants D and D Marketing, Inc., d/b/a T3Leads ("T3"), and Grigor and Marina Demirchyan for violations of the Consumer Financial Protection Act ("CFPA") of 2010. *See* CV 15-9692 PSG (Ex), Dkt. # 1. Grigor Demirchyan is T3's president, CEO, CFO, and sole director, and Marina Demirchyan is T3's vice president and accountant. In April 2016, Plaintiff filed two additional, related complaints for similar violations against Defendants Dmitry Fomichev and Davit Gasparyan, who both played a role in the founding and management of T3. *See* CV 16-2724 PSG (Ex), Dkt. # 1 ("*Fomichev Compl.*"), ¶¶ 7-10; CV 16-2725 PSG (Ex), Dkt. # 1 ("*Gasparyan Compl.*"), ¶ 5. Plaintiff subsequently filed amended Complaints in all three cases. *See* CV 15-9692 PSG (Ex), Dkt. # 37 ("*T3 Amended Compl.*"); CV 16-2724 PSG (Ex), Dkt. # 28 ("*Fomichev Amended Compl.*"); CV 16-2725 PSG (Ex), Dkt. # 30 ("*Gasparyan Amended Compl.*"). Because the three

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

Complaints are related and the three motions to dismiss are interlocking, the Court treats them together.

Defendant T3 is in the business of purchasing and selling consumer information, known as "leads." *T3 Amended Compl.* ¶ 5. T3 purchases leads from non-party entities, called "lead generators," and it sells the leads to other non-party entities, called "lead purchasers." *Id.* ¶¶ 8-10, 18-25. The gravamen of the CFPB's Complaints is a concern that deception is an integral part of the lead-generating and lead-purchasing system run by Defendants. At the front end, "lead generators" make representations to consumers about the quality of loans that they will receive from lenders. On the back end, "lead purchasers" offer consumers loans at usurious rates. Plaintiff alleges that T3 acts as a "middle man" or "lead aggregator" in the system and controls the information flow between the lead generators and the lead purchasers. *Id.* ¶¶ 40-41. It also alleges that T3 occasionally acts as its own "lead generator." *Id.* ¶ 9. As described in the Complaints, T3's role as a "middle man" in the system allows the lead generators to "claim ignorance" of the terms of the loans ultimately offered to consumers, and it allows the lead purchasers to "claim ignorance" of the methods used to attract consumers. *Id.*

The system starts with the lead generators that advertise short-term and payday loans to consumers through various websites. *Id.* ¶¶ 8-9, 18-25. To induce consumers to enter financial information into the websites, the lead generators make representations about the quality of loans that consumers are likely to receive from lenders. Lead generators make statements like, "lenders comply with all state and federal regulations to short-term loans" and "[t]heir rates are reasonable." *Id.* ¶ 21. Plaintiff alleges that the lead generators make it seem as if, by entering their information, the consumer is providing information directly to lenders. In reality, however, as soon as the consumer enters financial information, the "lead" is transferred to T3 and sold to "lead purchasers." *Id.* ¶ 18. T3 aggregates the leads and sells them to the highest bidder through a software system known as "ping tree." *Id.* ¶¶ 16, 25. Because the whole process happens in a matter of seconds and the consumer is redirected to a lead purchaser website without notice, the consumer has no way of knowing that the representations made on the lead-generator website are no longer valid or that their financial information has been shared with third parties. *Id.* ¶¶ 27, 40-41.

The system ends with the "lead purchasers." The lead purchaser base is largely comprised of small-loan and payday lenders that rely on leads to generate business for their

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |
| Title | CFPB v. D and D Marketing *et al.* | | |
| | CFPB v. Fomichev | | |
| | CFPB v. Gasparyan | | |

loans. Plaintiff alleges that the majority of lenders affiliated with T3's services are lenders organized by Indian tribes, also known as "tribal lenders" or "offshore lenders." *Id.* ¶¶ 31-32. By virtue of their organization under the laws of a foreign jurisdiction, offshore lenders do not need to comply with state consumer protection laws or state laws against usury. *Id.* Some of T3's lead purchasers are lenders that have been barred from lending in certain states because they charge unlawfully high interest rates to consumers. *Id.* ¶ 40. For these lenders, the only way to continue to access consumers in the state where they are barred is through a "lead aggregator" like T3. *Id.* In addition to charging high interest rates, Plaintiff alleges that many lead purchasers are involved in "fraudulent schemes," including "contacting consumers to collect non-existing debt." *Id.* ¶ 36. To demonstrate the pervasiveness of such unlawful conduct, Plaintiff points to an internal email from a T3 employee who referred to "the notorious scams we deal with on a daily basis." *Id.*

In 2012, the CFPB issued guidance to businesses operating in the consumer lead industry. *Defendant D&D Marketing's Request for Judicial Notice* ("*T3 RJN*"), Ex. A. The Court may take judicial notice of the guidance pursuant to Rule 201(b), which allows the Court to take notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Because the guidance is publicly available on the CFPB website, and Defendants do not challenge its accuracy, judicial notice is proper here. In relevant part, the guidance states:

> The Consumer Financial Protection Bureau ("CFPB") expects supervised banks and nonbanks to oversee their business relationships with service providers in a matter than ensures compliance with Federal consumer financial law . . .

> A service provider that is unfamiliar with the legal requirements applicable to the products or services being offered, or that does not make efforts to implement those requirements carefully and effectively, or that exhibits weak internal controls, can harm consumers and create potential liabilities for both the service provider and the entity with which it has a business relationship. Depending on the circumstances, legal responsibility may lie with the supervised bank or nonbank as well as with the supervised service provider.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | | Date | November 17, 2016 |
|---|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | | |

*T3 RJN*, Ex. A. In 2013, T3 developed a "Lender Audit Questionnaire" and requested information regarding whether its lead purchasers complied with the laws of the states where they made loans. *T3 Amended Compl.* ¶ 37. Plaintiff asserts that, although many purchasers failed to respond to the questionnaire or provided incomplete information, T3 continued to do business with them. *Id.*

The CFPB now alleges that T3 and its founders and officers, the Demirchyans, Fomichev, and Gasparyan ("Defendants"), have violated the Consumer Financial Protection Act ("CFPA"). Specifically, Plaintiff alleges that Defendants allowed consumers to be exposed to lenders that could cause them substantial harm and they took advantage of consumers' lack of understanding of the material risks, costs, and conditions of their loans. Because the CFPB filed three separate complaints, Defendants have filed three motions to dismiss.

II.     Legal Standard

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all allegations of material facts in the Complaint and must construe all inferences in the light most favorable to the non-moving party. *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

In considering a motion to dismiss, the Court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attacked to the pleading." *Branch v. Tunnell*, 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|----------|--------------------|------|-------------------|
|          | CV 16-2724 PSG (Ex) |      |                   |
|          | CV 16-2725 PSG (Ex) |      |                   |

| Title | CFPB v. D and D Marketing *et al.* |
|-------|-----------------------------------|
|       | CFPB v. Fomichev |
|       | CFPB v. Gasparyan |

F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds in Galbrath v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

III.   Discussion

Defendants move to dismiss the Complaints on what the Court characterizes as seven different grounds. The Court organizes these grounds for dismissal from most expansive to least, and ultimately finds each ground without merit.

First, Defendant Fomichev challenges the constitutionality of the structure of the CFPB, arguing that it violates the removal power of Article II and the Appropriations Clause of Article I. *See Fomichev Mot.* 6:16-22, 8:4-13. The other Defendants incorporate these constitutional arguments by reference in their own motions to dismiss.

Second, Defendants argue that the CFPA and the CFPB have not given Defendants adequate notice of conduct that is "unfair" or "abusive" under the CFPA. *See T3 Mot.* 9:13-16, 11:15-24, 15:21-25; *Gasparyan Mot.* 3:14-17. Defendants assert that the terms "unfair" and "abusive" are unconstitutionally vague, and they fault Plaintiff for rushing to litigation without adequately defining the terms through a proper rulemaking.

Third, Defendants argue that T3 is not a "service provider" under the CFPA because it provides only "ministerial" services to lead generators and purchasers.

Fourth, Defendants argue that the Complaints fail to state a claim for relief. Defendants argue that the Court should dismiss the Complaints as a matter of law because the conduct that they allege is lawful, given that the law imposes no duty on Defendants to monitor third-party generators and purchasers. Defendants also argue that the Complaints must be judged by a heightened pleading standard. Individually, Defendants then assert particular reasons about why the Complaint against them is conclusory and lacking in sufficient facts.

Fifth, Defendants contend that the CFPB is not entitled to the relief it seeks because the CFPA does not allow for the recovery of restitution, penalties, or attorneys' fees.

Sixth, Defendant Gasparyan asserts that the Complaint against him must be dismissed for

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

failure to join indispensable parties.

Seventh, Defendant Gasparyan argues that the allegations against him are untimely because his conduct occurred outside the CFPA's statute of limitations.

The Court will take each of Defendants' arguments in turn.

### A.    Constitutional Argument

Defendants argue that the CFPB has no power to enforce the CFPA because the structure of the CFPB is unconstitutional. *See Fomichev Mot.* 6:16-22, 8:4-13. Specifically, Defendants argue that three features render the CFPB unconstitutional: (1) the President's ability to remove the CFPB Director for cause only, (2) that the CFPB is led by a Director, not a multi-member commission, and (3) that the CFPB is funded by the Federal Reserve System, and not by regular congressional appropriations, and so cannot be monitored adequately by Congress. *See generally Fomichev Mot.* The structure of the CFPB is essential to this issue, so the Court will briefly review its key features.

Congress created the CFPB in 2010 with the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act" or "Act"). The Act tasked the CFPB with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." *See* 12 U.S.C. § 5491(a). Those laws included eighteen pre-existing consumer-protection statutes and Title X of the Dodd-Frank Act, 12 U.S.C. §§ 5531(a), 5536(a)(1), under which this case is prosecuted. At the head of the CFPB is a single Director, who is appointed to a five-year term by the President with the advice and consent of the Senate. *Id.* § 5491(a)-(b). The President may remove the Director only "for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(c)(3). The CFPB receives its funding from the Federal Reserve, not annual congressional appropriations. *Id.* § 5497(a)(1). Each year, funding is capped at 12 percent of the operating expenses of the Federal Reserve (adjusted for inflation). *Id.* § 5497(a)(1), (2).

The CFPB has provided much fodder for constitutional objection in the years since its creation. Courts across the country are split over whether the structure of the CFPB—particularly the powers accorded to the Director—violates Article II of the Constitution.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|----------------------------------|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

*Compare PHH Corp. v. CFPB*, No. 15-1177, 2016 WL 5898801 (D.C. Cir. Oct. 11, 2016) (holding that the CFPB is unconstitutionally structured in violation of Article II of the Constitution), *with CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014) (finding that the CFPB does not impermissibly interfere with the President's removal power)*, and CFPB v. ITT Educational Servs.*, CV 14-292 SEB (TABx), 2015 WL 1013508, at *9 (S.D. Ind. Mar. 6, 2015) (upholding the CFPB structure as constitutional). The Ninth Circuit has not yet addressed the issue.

Having reviewed the relevant cases, the Court finds the recent opinion of the D.C. Circuit most persuasive. In its lengthy and comprehensive analysis, the D.C. Circuit reviewed the foundations of the executive removal powers and surveyed the structure of executive branch agencies, and found the CFPA truly unusual in the amount of power that it conferred on a single Director. *See PHH Corp.*, 2016 WL 5898801, at *7-12 ("The concentration of massive, unchecked power in a single Director marks a departure from settled historical practice and makes the CFPB unique among traditional independent agencies . . ."). In light of the Director's expansive powers, the Circuit ultimately concluded that the limitation on the President's removal powers—requiring the President to establish that the Director had engaged in "inefficiency, neglect of duty, or malfeasance"—violated Article II of the U.S. Constitution. *See id.* at *4 ("This new agency, the CFPB, lacks that critical check and structural protection, yet wields vast power over the U.S. economy. So 'this wolf comes as a wolf.'"). Importantly, however, although the court found the structure unconstitutional, it recognized that the remedy for the violation did not require the CFPB to halt operations. *Id.* Instead, the D.C. Circuit reasoned:

> What is the remedy for that constitutional flaw? PHH contends that the constitutional flaw means that we must shut down the entire CFPB (if not invalidate the entire Dodd-Frank Act) until Congress, if it chooses, passes new legislation fixing the constitutional flaw. To remedy the constitutional flaw, we follow the Supreme Court's precedents, including *Free Enterprise Fund*, and simply sever the statute's unconstitutional for-cause provision from the remainder of the statute. Here, that targeted remedy will not affect the ongoing operations of the CFPB.
>
> …
>
> In so ruling, we underscore the important but limited real-world implications of our

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|----------------------------------|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

decision.  As before, the CFPB will continue to operate and perform its many critical responsibilities, albeit under the ultimate supervision and direction of the President.

*Id.* at *4-5.  Thus, the court severed the for-cause provision from the law and allowed the CFPB to continue operations.  *Id.*  The Court finds this result measured and well-conceived, and accordingly, the Court adopts the same reasoning here.  The CFPB may continue to perform its duties, including the prosecution of this case against Defendants, even though its Director is now subject to direct removal by the President.

Because the D.C. Circuit did not consider whether the funding structure of the CFPB violated the Appropriations Clause, the Court separately considers this argument here. Defendants argue that, by receiving its funding through the Federal Reserve instead of congressional appropriations, the CFPB is unconstitutionally exempted from congressional oversight.  *See Fomichev Mot.* 11:4-28.  The Court disagrees.  The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  However, as Judge Staton reasoned in *CFPB v. Morgan Drexen, Inc.*, "[t]he Appropriations Clause 'does not in any way circumscribe Congress from creating self-financing programs . . . without first appropriating the funds as it does in typical appropriation and supplement appropriation acts."  *See* 60 F. Supp. 3d 1082, 1089 (quoting *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Fed. Cl. 2003), *aff'd*, 365 F.3d 1333 (Fed. Cir. 2004), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011)).  Congress's decision to allow the CFPB to self-fund through the Federal Reserve instead of annual appropriations from Congress does not violate the Appropriations Clause because it was still Congress, and not the executive or judicial branch, that made the decision about how the CFPB should be funded.  The Court therefore also concludes that the funding structure of the CFPB does not violate the Appropriations Clause, and it dismisses Defendants' constitutional arguments about the CFPB's structure.

### B.     CFPA Arguments

Defendants next argue that the Section X of the Dodd-Frank Act—Congress's most recent addition to the country's consumer financial protection laws—is unconstitutional because it does not provide regulated entities with adequate notice of the conduct that the CFPB will deem unlawful.  The CFPA makes it unlawful for "any covered person or service provider" to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

"engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B); *see also* 12 U.S.C. § 5531(a). The law defines an "unfair" act as:

> **(A)** [an] act or practice [that] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

> **(B)** such substantial injury is not outweighed by counterveiling benefits to consumers or to competition.

*See* 12 U.S.C. § 5531(c). The law defines an "abusive" act as an act or practice that:

> **(1)** materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

> **(2)** takes unreasonable advantage of—

> > **(A)** a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

> > **(B)** the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

> > **(C)** the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

*Id.* § 5531(d). The CFPA also imposes liability on any person who "knowingly or recklessly provide[s] substantial assistance to a covered person or service provider in violation" of the act. 12 U.S.C. § 5536(a)(3). Section 5564(a) of the Act authorizes the CFPB to "commence a civil action against such person to impose a civil penalty . . . ." *Id.* § 5564; *see also id.* § 5565 (describing penalties for violations).

Defendants first argue that the CFPA is unconstitutional because it does not provide Defendants with notice of the activities that might give rise to a violation of the statute and because it is overly vague. *See Fomichev Mot.* 11:15-25; 13:23-24. Defendants do not point to a

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|----------------------------------------------------------------|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

specific vague term in the statute, but instead argue generally that the law does not provide fair notice of the need to "vet and monitor" the conduct of the third parties. *See T3 Mot.* 10:8-10 ("Defendants are not aware of any case law, statute, regulation, rule, or other agency guidance that requires any service provider to 'vet and monitor' the conduct of the third parties with which they do business."); *Gasparyan Mot.* 7:17-19.

It is well established that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). However, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (internal citations omitted). Moreover, courts have recognized that "most statutes must deal with untold and unforeseen variations in factual situations," and as a result, Congress must "inevitably limit the specificity with which legislators can spell out prohibitions." *See CFPB v. CashCall, Inc.*, CV 15-7522 JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016).

Courts have recognized that the term "unfair" in Section X of the Dodd Frank Act taps into a "well-developed and long-established" definition of the same term in section 5 of the Federal Trade Commission Act ("FTCA"). *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) (recognizing that the CFPA and the FTCA use "very similar phrasing"); *accord ITT Education Services, Inc.*, 2015 WL 1013508, at *17 ("The Bureau's own Supervision and Examination Manual confirms what the near-identical language of the two statutes suggests: that longstanding interpretations of the FTCA should inform interpretation of the CFPA as well."). The FTCA is now more than a century old and Courts have given shape to the meaning of its ban on "unfair or deceptive acts or practices." Because of the tradition of these terms and Congress's reliance on the FTCA in crafting the CFPA, the Court cannot conclude that the use of the term "unfair" in Section X of the Dodd-Frank Act renders the CFPA unconstitutionally vague. *See* 12 U.S.C. § 5531(d) (defining the term "abusive").

The Court makes the same determination as to the term "abusive." Although the term "abusive" does not appear in the FTCA, the courts that have examined this term have found that it represents a "more flexible, expansive standard" than the term "unfair" for consumer protection laws. *See ITT Education Servs.*, 2015 WL 1013508, at *18-19. The added flexibility

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

of the standard does not make the law unconstitutionally vague, especially since the statute itself provides ample definition for the term "abusive."  *See* 12 U.S.C. 5531(d); *see also ITT Education Servs.*, 2015 WL 1013508, at *19.  It defines an "abusive" act as an act that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" and an act that takes "unreasonable advantage" of consumers' lack of understanding of material conditions, inability to protect themselves, or reasonable reliance.  *See* 12 U.S.C. 5531(d).  Because the law itself explains what the term "abusive" means, the Court cannot conclude that any part of Section X is unconstitutionally vague.

     In further support of this conclusion, the Court recognizes the ample guidance that the CFPB has provided to businesses of how it intends to interpret the mandates in the CFPA.[1]  In 2012, the CFPB told businesses that they would be held responsible for monitoring the practices of third parties.  *See T3 Opp.* 6:5-8 (citing *T3's RJN*, Ex. A).  The guidance contained no ambiguity:  businesses were instructed to monitor each other or risk liability under the law.[2]

---

[1]     The Court is in receipt of a Notice of Supplemental Authority, filed by Defendants T3 and the Demirchyans on November 3, 2016.  Dkt. # 55.  In the Notice, Defendants ask the Court to consider the CFPB's most recent Compliance Bulletin and Policy Guidance.  *Id.*  In significant part, the 2016 guidance is identical to the guidance already before the Court.  *See Notice of Supplemental Authority*, Ex. A, at 2 ("Service provider is generally defined in section 1002(26) of the Dodd-Frank Act as 'any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product of service.'") ("A service provider that is unfamiliar with the legal requirements applicable to the products or services being offered, or that does not make efforts to implement those requirements carefully and effectively, or that exhibits weak internal controls, can harm consumers and create potential liabilities for both the service provider and the entity with which it has a legal relationship.").  Thus, the updated Notice does not change the outcome here.

[2]     Defendants argue that the "duty to monitor" that the guidance describes only flows one way: from banks and other lenders to service providers.  A review of the guidance demonstrates that this is not true.  The CFPB instructed businesses that "legal responsibility may lie with the supervised bank or non-bank *as well as* with the supervised service provider."  *See T3 RJN*, Ex. A.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

Because this guidance came from the agency responsible for administering the statute, Defendants should have taken the CFPB's expert opinion quite seriously. The Complaints suggests that Defendants did so—at least initially. In 2013, Defendants developed and issued a "Lender Audit Questionnaire" to prospective lead purchasers. *Fomichev Amended Compl.* ¶ 39; *Gasparyan Amended Compl.* ¶ 39. Despite these initial steps toward compliance, Defendants never followed up on the questionnaire and continued to do business with non-responsive entities. *T3 Opp.* 5:1-7. In light of the allegations in the Complaint, Defendants' argument that they did not have adequate notice of a duty to monitor third-party lead purchasers and generators is implausible.

Even if the Court were to accept Defendants' arguments that this CFPB prosecution is a departure from other prosecutions and that the CFBP now advances a new interpretation of the law, courts have recognized that due process concerns do not preclude an agency from prosecuting "borderline cases." *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 256 (3d Cir. 2015). In a case interpreting the FTCA, the Third Circuit recognized that, although the terms of the law may be "far from precise," the law provides adequate notice if Defendants could "reasonably foresee" that a court could construe its conduct as falling within the statute. *See id.* at 256 ("[A] company is not entitled to such precision as would eliminate all close calls. . . . the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." (citing *Nash v. United States*, 299 U.S. 373, 377 (1913)). Here, there is little doubt that fair notice is satisfied, given the links between the CFPA and the FTCA, and the CFPB's guidance as to liability. Thus, the Court declines Defendants' invitation to find that the law—or, more precisely, the CFPB's interpretation of the law—is invalid.

Finally, Defendants fault the CFPB for rushing to litigation rather than first clarifying the scope of Section X of the Dodd-Frank Act through rulemaking. They argue that this enforcement action is the equivalent of "retroactive legislation" because it seeks to penalize Defendants for conduct that was lawful at the time it was completed and because the CFPB is "not authorized to utilize this complaint as the first means of giving [Defendants] notice of the duties the CFPB seeks to establish." *See Gasparyan Mot.* 3:14-17, 9:13-16. For the reasons already discussed above and those below, the Court finds these arguments lacking in merit. It is the agency's prerogative to decide whether to proceed through a rulemaking, where it issues regulations associated with the law, or through an adjudication, where it develops the law

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|----------------------------------|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

through adversarial process. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."). The CFPB here has chosen to proceed through litigation. It did not abuse its discretion in so deciding.

In sum, the Court rejects Defendants' arguments that the CFPA is vague or that the CFPB did not provide Defendants with adequate notice that their conduct might be subject to civil penalties.

### C. Service Provider Status

Defendants next argue that T3 is not a "service provider" and so is not covered by the CFPA. *See T3 Mot.* 4:20-27. Under the CFPA, a "service provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that . . . processes transactions relating to the consumer financial product or service." 12 U.S.C. § 5481(26)(A). The law excludes from the definition of service provider "any person who provides a support service of a type provided to businesses generally or a similar ministerial service." § 5481(26)(B).

Plaintiff argues that T3 is a service provider because it plays an "integral role" in "processing and selling consumer-loan applications to small-dollar lenders." *T3 Opp.* 2:25-27. It also asserts that, because T3's services are "uniquely tailored to the needs of small-dollar lenders," T3 is not a seller that supplies services to "businesses generally." *See id.* 4:1-4. For their part, Defendants suggest that T3 is only a "ministerial service" because it transfers consumer data from generators to purchasers without any "discretion" from its staff. *T3 Mot.* 6:6-14; *see also T3 Mot.* 5:19-21; *Gasparyan Mot.* 14-17.

Defendants have failed to show why "discretion" should have anything to do with the assessment of whether it is a "service provider" under the CFPA. Instead, the Court is convinced by Plaintiff's argument that Congress designed the service provider exception for "ministerial" service providers to protect third-party services—like office supply or food vendors, or internet service providers—that supply "material" services to "covered persons" but

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

do not have reason to know of the underlying illegality of the covered person's conduct. Plaintiff's interpretation of the ministerial exemption is supported by an explicit exemption in the law for businesses that provide "time or space for an advertisement" of a consumer financial product, including "print, newspaper, or electronic media." *Id.* § 5481(26)(B)(ii). Vendors that provide advertising space are akin to the office supply or food vendors because these third-party businesses cannot reasonably be expected to vet and monitor the entities with which they do business. But T3 does not qualify as such a "ministerial" service provider. As Plaintiff points out, T3's services are specific to the business of small-dollar lending, so it has reason to know the dynamics of the trade. Moreover, T3 has the capacity, through its connections with purchasers and lenders, to vet and monitor "covered persons," like the lenders with which it does business. *See T3 Opp.* 3:25-4:1. The law explicitly contemplates that entities like T3 that "process transactions" related to consumer financial products will be liable for violations of the law. *See* § 5481(26)(A).

Accordingly, the Court cannot conclude, based on the facts alleged in the Complaint, that T3 is not a service provider under the CFPA.

D. <u>Failure to State a Claim</u>

Defendants dispute the sufficiency of the amended Complaints by arguing that (1) the claims fail as a matter of law, (2) the Complaints must be subjected to a heightened pleading standard, and (3) the CFPB's factual allegations are inadequate. The Court first addresses Defendants' argument that T3's conduct is lawful. The Court then turns to assess the pleading standard and the individual allegations against each Defendant.

i. *Unlawful Conduct*

The CFPB alleges that Defendants' conduct is unlawful under both the unfair and abusive prongs of the CFPA. *See T3 Amended Compl.* ¶¶ 43-53, 59-67. Under the law, conduct is "unfair" if it (1) causes or is likely to cause substantial injury to consumers, (2) is not reasonably avoidable by consumers, and (3) is not outweighed by countervailing benefits to consumers or to competition. *See* 12 U.S.C. § 5531(c)(1). Conduct is abusive if it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or takes unreasonable advantage of consumers. *See id.* § 5531(d).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |
| Title | CFPB v. D and D Marketing *et al.* | | |
| | CFPB v. Fomichev | | |
| | CFPB v. Gasparyan | | |

Defendants make three general arguments about why the conduct alleged in the Complaints is lawful. First, they argue that they have no duty to monitor the statements made by the third-party generators and purchasers. *See id.* 18:4-20; *see also supra* Part B & C. Second, T3 argues that its conduct is "commercially reasonable" and an "undeniably common practice." *See T3 Reply* 6:12-17; *T3 Mot.* 11:24-28 (arguing that the lead generators' statements are "puffery"); *T3 Mot.* 12:15-16 (arguing that the tribal lenders' statements are lawful because tribal lenders do not have to comply with state usury laws). They argue that the lead generators' statements are lawful because the lead generators have no way of knowing what loan terms are ultimately offered to consumers, and they do not know what T3 intends to do with the lead. Defendants argue that the lead purchasers' practices are similarly lawful because purchasers, like tribal lenders, do not violate the laws of the jurisdictions in which they sit. Third, Defendants argue that their conduct is lawful because the lead purchasers make disclosures that negate any "misleading statements" from other parties. *See T3 Mot.* 11:24-28, 12:3-11; *see also id.* 12:3-11 ("Even if the statements were misleading, they are not unlawful because, as the Bureau alleges, consumers are automatically redirected to lenders' websites, which disclose the identity of the lender and the terms of the offered loans.").

The Court dismisses Defendants' first and second arguments straight away. The Court has already addressed the first, having found that CFPB and the CFPA provided Defendants with adequate notice of their duty to monitor the businesses with which they transact. *See supra* Part B & C. The Court finds the second argument equally unavailing because it takes too narrow a view of the allegations in the Complaints. Plaintiff's case does not rest on an assumption that the lead purchasers or lead generators violated the law. Rather, Plaintiff asserts that Defendants, as the middle men, made it possible for each party to claim ignorance of the other's unlawful practices. It also alleges that the collaboration among the entities, when taken together, was designed to confuse consumers. Thus, Defendants' argument that the practices of its generators and purchasers are "commercially reasonable" is neither here nor there. Defendants are also wrong that the conduct of their partners is lawful. As an example, courts in this district and elsewhere have recognized that "offshore lenders" that charge usurious interest rates to consumers violate state consumer financial protection laws. *See CFPB v. CashCall, Inc.*, CV 15-7522 JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016).

Having disposed of the first and second arguments, the Court now turns to the third: whether the "disclosures" made by the lead generators and lead purchasers negate wrongfulness

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|----------|-------------------------------------------------------------------|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

on the part of Defendants. Defendants point to legal precedents that fault consumers for failing to read and fully understand their legal obligations. *See FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 945-46 (N.D. Ill. 2008). The Court construes this argument as part of Defendants' broader argument that consumers could have "reasonably avoided" injury by reading the disclosures.

"In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010). An injury is reasonably avoidable if consumers "'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012) (quoting *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)).

Although the law generally requires consumers to understand their legal obligations, the Dodd-Frank Act recognized that even diligent consumers could be misled by bad actors. In the scheme alleged in the Complaints, Defendants purportedly took advantage of a system of disclosures designed to deceive even consumers that read disclosures. At the start of the scheme, lead generators disclose that "lenders comply with all state and federal regulations to short-term loans" and that "[t]heir rates are reasonable." *T3 Amended Compl.* ¶ 21. But, by the end of the scheme, after the lead generators sell the consumer information to T3 and T3 sells it to lead purchasers, the initial disclosures are ignored. *See id.* ¶ 36; *T3 Opp.* 11:24-12:1. Many consumers end up in loans that do not comply with state or federal regulations. No amount of disclosure at the back-end can negate the contradiction between the lead generators' representations and the lead purchasers' back-end disclosures. In short, because Defendants' system, as alleged, was designed to deceive, it is unreasonable for Defendants to now argue that consumers could have avoided injury by wising up to the scheme earlier on.

Accordingly, the Court finds that the allegations in the Complaint, which must be taken as true, are sufficient to raise a plausible inference that Defendants have engaged in unlawful conduct. *T3 Opp.* 13:5-7.

   *ii. Heightened Pleading Standard*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

In their next argument, Defendants assert that the Rule 9(b) pleading standard applies to claims under the CFPA. Under Rule 9(b), a party alleging fraud or mistake must state their allegations with "particularity." Although district courts are split as to whether Rule 9(b) should apply to consumer protection claims, the majority of courts have found that a heightened pleading standard is inappropriate, even if there is a "deceptive" dimension to such claims. *See CFPB v. Frederick J. Hanna & Assoc., P.C.*, 114 F. Supp. 3d 1342 (N.D. Ga. 2015); *Neild v. Wolpoff & Abramson, LLP*, 453 F. Supp. 2d 918, 923-24 (E.D. Va. 2006) (collecting cases and deciding that a § 1692e(8) violation is not fraud so Rule 9(b) does not apply); *see also FTC v. Freecom Commc'ns, Inc.*, 410 F.3d 1192, 1204 n.7 (10th Cir. 2005) (declining to apply Rule 9(b) to the FTCA); *Le Blanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010) (declining to apply Rule 9(b) to the Fair Debt Collection Practices Act). These courts rely on the United States Supreme Court's caution against extending the heightened pleading standard beyond claims for fraud of mistake, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993), and the "remedial nature" of consumer protection statutes, which are designed to facilitate a consumer's ability to enforce their rights. *See Frederick J. Hanna & Assoc.*, 114 F. Supp. 3d at 1371-74.

Defendants point to *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097 (9th Cir. 2003) as a controlling case in this Circuit on the issue of whether consumer financial protection laws are subject to a heightened pleading standard. Having reviewed the case, the Court finds the holding in *Vess* too narrow to extend to the Complaints here. In *Vess*, plaintiff alleged violations of California Civil Code section 1770 and California Business and Professions Code sections 17200 and 17500, which prohibit "unfair methods of competition and unfair or deceptive acts" and "untrue or misleading statements." *Id.* at 1101-02. The Ninth Circuit recognized that the complaint in *Vess* contained both fraud allegations and allegations where fraud was not an essential element to the claim. *See id.* at 1103. The court concluded, "[W]here fraud is not an essential element of a claim, only allegations ("averments") of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." *Id.* at 1105. The Ninth Circuit defined "fraud" narrowly to include only claims that allege that a defendant made a false representation, knew of its falsity, and intended to defraud, and where the plaintiff relied on the statement and established damages. *Id.* The court went on to find that many of plaintiff's consumer protection claims—including claims that defendant failed to act to protect consumers—were not fraud claims and thus subject only to the Rule 8 pleading standard. *Id.* at 1106.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
|  | CV 16-2724 PSG (Ex) | | |
|  | CV 16-2725 PSG (Ex) | | |

| Title | CFPB v. D and D Marketing *et al.* |
|---|---|
|  | CFPB v. Fomichev |
|  | CFPB v. Gasparyan |

The Complaints here do not allege that Defendants made misrepresentations to consumers knowing of their falsity—an element essential to a fraud claim. Instead, the Complaints allege that Defendants failed to monitor and vet the entities with which they did business and so facilitated a scheme that took advantage of consumer confusion. Given the Ninth Circuit's narrow interpretation of "fraud" in *Vess*, these claims need not satisfy a heightened pleading standard. Accordingly, the Court rejects Defendants' argument that a heightened pleading standard applies to the Complaints.

### iii.      *Allegations Specific to Each Defendant*

The Court now individually examines each Complaint to determine whether Plaintiff has pled sufficient facts to state a plausible claim for relief against each Defendant. The Court proceeds in the order that Plaintiff filed its Complaints by first examining the allegations against T3 and the Demirchyans, then Fomichev and Gasparyan. The Court ultimately finds that the Complaints raise a plausible inference of illegal conduct as to all Defendants, and accordingly, the Court denies Defendants' motions to dismiss for failure to state a claim.

#### a.      *T3*

As it relates to the specific allegations against it, T3 argues that the CFPB has not pled enough facts to support the allegation that its conduct is likely to result in substantial injury to consumers. *See* 12 U.S.C. § 5531(c)(1); *T3 Mot.* 17:16-18, 18:4-20. Courts have found that there is a "likelihood of substantial injury" to consumers where plaintiff can show that "injury is a predictable consequence" of the Defendant's actions. *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010).

The CFPB alleges that T3 knew or should have known that the leads that it provided to lead purchasers would result in void loans because the lead purchasers would fail to comply with the laws of the consumer's state. *See T3 Opp.* 10:14-20. It also asserts that T3 sold consumer information to entities that it knew were likely involved in fraudulent activity. *Id.* 10:21-11:2. Accepting the allegations in the Complaint as true, Plaintiff has adequately pled substantial injury. It has shown it likely that consumers, who provide their financial information to lead generators, may end up entering into loans that are either void or in violation of state usury laws. If the facts are true, consumers may also be exposed to fraudulent schemes that jeopardize their

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |
| Title | CFPB v. D and D Marketing *et al.* | | |
| | CFPB v. Fomichev | | |
| | CFPB v. Gasparyan | | |

credit and financial health.  Given these possibilities, the Court cannot conclude, at this phase in the litigation, that there is no likelihood of substantial injury to consumers.

> *b.    Demirchyans*

The CFPA makes it unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of [§ 5531]."  *See* 12 U.S.C. § 5536(a)(3).  The Demirchyans argue that the factual allegations in the Complaint are insufficient to establish that they (1) acted knowingly or recklessly, or (2) provided "substantial assistance" in violation of § 5531.  *See T3 Mot.* 21:3-23:8.

Turning first to the state of mind required to violate the CFPA, the parties dispute the definition of "knowingly" under the law.  *See T3 Opp.* 13-14; *T3 Reply* 10.  Plaintiff argues that "knowingly" requires defendants to have only "knowledge of the facts, acts or transactions constituting the alleged violation."  *See T3 Opp.* 13-14.  Defendants argue that they must have "'actual knowledge' of the primary wrong and of the aider and abettor's 'role in furthering that violation.'"  *See T3 Reply* 10.  Although Defendants have the better of this argument,[3] it is of no moment because the allegations against the Dmirchyans satisfy even the stricter definition of "knowing."  The allegations also meet the standard for recklessness, which requires Plaintiff to establish sufficient facts to show that defendant's conduct led to "an unjustifiably high risk of

---

[3]    Ninth Circuit courts have recognized the Federal Trade Commission Act ("FTCA") as an important analog for interpreting terms in the CFPA.  *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) (adopting meaning of "deceptive act or practice" from the FTCA in recognition of Congress's reliance on the FTCA in drafting the CFPA); *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1072 n.3 (9th Cir. 2016) (recognizing that the CFPB shares concurrent authority with the Federal Trade Commission to enforce the FTCA and that the missions of the laws are overlapping); *CFPB v. IrvineWebWorks, Inc.*, SACV 14-1967 JVS (ANx), 2016 WL 1056662, at *12.  The term "knowing" has an established meaning in the context of the FTCA, 15 U.S.C. § 45(m)(1)(A), which is "actual knowledge or knowledge fairly implied based on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule."  Thus, the Court adopts the FTCA's interpretation for the term "knowingly" in the CFPA.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

harm that is either known or so obvious that it should be known." *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69 (2007).

The Complaint alleges that both Grigor and Marina Demirchyan had significant responsibility in managing T3 and its operations. Grigor Demirchyan is President, CEO, CFO, and T3's sole director. *T3 Amended Compl.* ¶ 6. He also provided accounting services for the corporation. *Id.* Marina Demirchyan is T3's Vice President and also provides accounting services. *Id.* ¶ 7. The Complaint alleges that the Demirchyans "had authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network." *Id.* ¶ 15. They also designed T3's process for filtering and selling consumer information to lead purchasers. *Id.* ¶ 17. These allegations raise a plausible inference that the Demirchyans not only knew of T3's business model, but also of the unlawful conduct of T3's lead generators and purchasers, and T3's role in the scheme. Accordingly, the Court declines to dismiss the Complaint for failure to state sufficient facts to establish that the Demirchyans acted knowingly or recklessly.

Second, the Demirchyans argue that they did not provide "substantial assistance" to T3. To show "substantial assistance," Plaintiff must establish that Defendants "in some sort associate[d] himself with the venture, that [they] participate[d] in it as in something that [they] wishe[d] to bring about, [and] that [they sought] by his action to make it succeed." *See SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).[4] Courts have found that the substantial assistance doctrine does not impose a demanding standard. *See FTC v. Consumer Health Benefits Ass'n*, CV 10-3551 ILG (RLMx), 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011). Rather, the law requires only that the assistance be "more than mere casual or incidental dealing with a seller or telemarketer that is unrelated to the violation of the Rule." *See id.*

---

[4]     Because Courts have not interpreted the term "substantial assistance" in the context of the CFPA, it is appropriate to look to analogous administrative laws, like the FTCA and federal securities laws, for guidance. *See United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter.").

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | | Date | November 17, 2016 |
|----------|-------------------------------------------------------------------|---|------|-------------------|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | | |

The T3 Amended Complaint alleges that the Demirchyans "had the authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network." *T3 Amended Compl.* ¶ 15. It also asserts that the Demirchyans "shared responsibility for deciding the position of each purchaser in the ping tree" used to distribute consumer information to lead purchasers. *Id.* ¶ 17. Accepting these factual allegations as true, Plaintiff has established a plausible inference that the Demirchyans were more than incidentally involved in T3's business.[5]

        *c.*     *Fomichev*

Defendant Fomichev argues that the Complaint does not show that he provided "substantial assistance" to T3 or other service providers. *Fomichev Mot.* 15:10-22, 16:15-21 ("[N]owhere does the Amended Complaint allege that Mr. Fomichev has ever read such an application, visited the websites that allegedly contain inaccurate statements, or otherwise acted or possessed any knowledge that would cause him to be personally liable for wrongdoing."). He also asserts that the Complaint "fails to allege any conduct to which injury is attributed" because all injuries are "future and potential." *Id.* 17:3-12. Because the Court has already established that the CFPB adequately pled injury, the Court focuses here on whether the CFPB has demonstrated that Fomichev substantially assisted in the alleged illegal enterprise.

Contrary to Fomichev's characterization that the Complaint only alleges his status as an officer of T3, the Complaint contains enough facts that, taken a as true, raise a plausible inference that Fomichev is liable for violations of the CFPA. It asserts that Fomichev co-founded T3 in 2005 and owns more than 50 percent of the business. *Fomichev Amended Compl.* ¶ 7. It also asserts that Fomichev "design[ed] the proprietary software and systems used to transact T3's business." *Id.* ¶ 8. Like the Demirchyans, the Complaint also concludes that Fomichev had the authority and responsibility to decide whether to accept a purchaser or

---

[5]      The Court declines the CFPB's invitation to examine the filings in the state court cases, *Gasparyan v. Demirchyan, et al.*, BC554306 (Cal. Super. Ct. Aug. 8, 2014), and *Gasparyan v. D and D Marketing, et al.*, BC585895 (Cal. Super. Ct. June 23, 2015), where Defendants purportedly make competing claims as to their ownership of T3. *See T3 Opp.* 17 n.77. The allegations in the Complaint are sufficient to raise a plausible inference that Defendants provided substantial assistance to T3 in connection with a violation of the CFPA.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

generator into T3's business. *Id.* ¶ 17. Even if it is true that Fomichev never visited the third-party websites personally, his alleged knowledge of the consumer information industry, his significant involvement with T3, and his awareness of the interplay among consumers, generators, and purchasers, is enough to raise a plausible inference that Fomichev is liable for substantially assisting T3 in a violation of the CFPA. Accordingly, the Court denies Fomichev's motion for failure to state a claim.

### d.    *Gasparyan*

Defendant Gasparyan also asserts two reasons why the Court should dismiss the Complaint against him. First, Gasparyan argues that the Complaint does not allege "any facts to support the allegation that Gasparyan acted 'knowingly and recklessly.'" *Gasparyan Mot.* 10-12. Second, Gasparyan argues that the Complaint does not allege a "substantial causal connection" between Gasparyan's action and the purported harm. *Id.* 13-14. Like the previous arguments, the Court likewise finds both of Gasparyan's arguments availing.

As the Court concluded above, "knowingly" under the CFPA means to have "actual knowledge or knowledge fairly implied" that the acts are "unfair or deceptive and [are] prohibited by such rule." *See* 15 U.S.C. § 45(m)(1)(A) (defining "knowingly" under the FTCA). "Recklessness" requires the defendant to take "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *See Safeco*, 551 U.S. at 68-69. The Complaint alleges that Defendant Gasparyan co-founded T3 with Fomichev in 2005, and served as the company's chief financial officer until 2009 and its chief marketing officer until 2014. *Gasparyan Compl.* ¶¶ 7-8. Like the other Complaints, the Gasparyan Complaint asserts that Gasparyan "had authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network." *Id.* ¶ 17. It also alleges that Gasparyan played a role in designing T3's "ping" system, which sold consumer data to the highest bidder without regard for consumer expectations or the promises made to consumers by lead generators. *Id.* ¶ 19. As with the other Complaints, these facts are sufficient to raise a plausible inference that Gasparyan knew of the company's conduct and disregarded a substantial risk that consumers would be misled or harmed by the sharing of their information with unsavory purchasers.

Moving to Gasparyan's second argument, the Court is also satisfied that the complaint

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) <br> CV 16-2724 PSG (Ex) <br> CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.* <br> CFPB v. Fomichev <br> CFPB v. Gasparyan | | |

shows a causal connection between Gasparyan's conduct and consumer harm. By alleging that Gasparyan founded and maintained a service that sells consumer information without adequate vetting, the Complaint raises a plausible inference that Gasparyan's conduct is linked to the consumer harm. Gasparyan's attempts to argue that the Complaint does not allege any actual harm or actual misconduct are meritless. Accordingly, the Court denies Defendant Gasparyan's motion to dismiss for failure to state a claim.

E.     <u>Remedies</u>

Defendants next argue that the CFBP cannot recover restitution, penalties, or its attorneys' fees. *See T3 Mot.* 24:17-20. Where relief is unavailable as a matter of law, that portion of the prayer of relief must be dismissed. *See In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1170 (C.D. Cal. 2011). However, that is not the case here. The CFPA permits the Court to order Defendants to pay restitution and other penalties for violations of the CFPA, and to pay the costs of the litigation. *See* 12 U.S.C. §§ 5565(a)(2)(C), (H), 5565(b) ("In any action brought by the Bureau . . . [it] may recover its costs in connection with prosecuting such action if the Bureau . . . is the prevailing party in the action."). Because the law is abundantly clear on this point, the Court finds Defendants' argument meritless and declines to strike any portion of Plaintiff's prayer for relief.

F.     <u>Lead Generators and Purchasers are Indispensable Parties</u>

In the sixth category of arguments, Defendant Gasparyan argues that T3, the lead generators, and the lead purchasers are indispensable parties. *Gasparyan Mot.* 17-20. Specifically, Gasparyan argues that he will be unable to defend the claims against him because his liability is tied to T3. He is also concerned that, because some of the tribal lenders possess sovereign immunity, he would not be able to obtain discovery from these parties unless they are joined. *Id.* 18.

Gasparyan's reasons do not meet the standard required for joinder of parties. The Federal Rules of Civil Procedure provide that a party must be joined if (1) the Court cannot accord complete relief without the absent party, or if proceeding without the party might (2) impair the party's ability to protect their interest, or (3) subject the party to a substantial risk that it might incur "double, multiple, or otherwise inconsistent obligations because of the interest." *See* Fed.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex)<br>CV 16-2724 PSG (Ex)<br>CV 16-2725 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| Title | CFPB v. D and D Marketing *et al.*<br>CFPB v. Fomichev<br>CFPB v. Gasparyan | | |

R. Civ. P. 19(a)(1). The three grounds do not apply here. First, there is no risk that the Court cannot provide complete relief because the Gasparyan Complaint seeks only to hold Gasparyan liable for his actions in operating T3. Second, although there is a risk that third parties will be affected by the enforcement action against Gasparyan, nothing about this litigation impairs the third party's ability to protect their interest through separate litigation. *See Gasparyan Opp.* 21. Third, there is no risk of "double, multiple, or otherwise inconsistent" obligations. The three CFPB complaints related to T3's conduct are all before the Court, which can provide a uniform and consistent disposition as to all parties. Because none of the three grounds for necessary joinder apply to this case, the Court denies Defendant Gasparyan's motion to dismiss for failure to join indispensable parties.

### G. Time-Barred

Finally, Gasparyan argues that the CFPB "is barred by the statute of limitations from bringing any claims against Gasparyan for any action which took place prior to 2013." *Gasparyan Mot.* 21. Gasparyan faults the CFPB for failing to plead the dates of the wrongful conduct. *Id.* 21:20-28. Under the CFPA, the CFPB may not bring an action for conduct that occurred "more than 3 years after the date of discovery of the violation to which the action relates." 12 U.S.C. § 5564(g). The CFPB correctly points out that nothing on the face of the amended complaint suggests that Gasparyan's conduct occurred before April 2013, more than three years before CFPB brought the Complaint. *See Gasparyan Opp.* 22:5-15. Accordingly, the Court cannot conclude that the Complaint is barred by the statute of limitations. Should the issue remain relevant, however, Defendant may renew the argument in a motion for summary judgment.

## IV. Conclusion

Having considered the moving, opposing, and reply papers in the three related cases, the Court DENIES Defendants' motions to dismiss. The Court concludes:

1. Although the Court finds that the combination of the power accorded to the CFPB Director and the limitations on the President's removal powers violate Article II of the Constitution, these constitutional concerns do not prevent the CFPB from prosecuting this case and do not warrant dismissal of the Complaints.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|---|---|---|---|
| | CV 16-2724 PSG (Ex) | | |
| | CV 16-2725 PSG (Ex) | | |

| Title | CFPB v. D and D Marketing *et al.* |
|---|---|
| | CFPB v. Fomichev |
| | CFPB v. Gasparyan |

2.  The CFPA and the CFPB provided adequate notice of conduct that is "unfair" or "abusive," the CFPA is not unconstitutionally vague, and the CFPB did not abuse its discretion by choosing to enforce the CFPA through adjudications rather than rulemaking.

3.  T3 is a service provider as contemplated by the CFPA.

4.  Interpreting the Complaints in Plaintiff's favor, the Complaints state violations under the CFPA and plead sufficient facts to raise a plausible inference that Defendants are liable for the conduct alleged. The Complaints are not subject to a heightened pleading standard.

5.  The CFPB is entitled to the relief that it seeks because it can recover restitution, penalties, and costs under the CFPA.

6.  Plaintiff has not failed to join indispensable parties to the Gasparyan Complaint.

7.  Because the face of the Gasparyan Complaint does not allege a violation for conduct that occurred before April 2013, the Court cannot conclude that the Gasparyan Complaint is barred by the CFPA's three-year statute of limitations.

**IT IS SO ORDERED.**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 15-9692 PSG (Ex) | Date | November 17, 2016 |
|----------|---------------------|------|-------------------|
|          | CV 16-2724 PSG (Ex) |      |                   |
|          | CV 16-2725 PSG (Ex) |      |                   |

| Title | CFPB v. D and D Marketing *et al.* |
|-------|-------------------------------------|
|       | CFPB v. Fomichev                    |
|       | CFPB v. Gasparyan                   |

55

KeyCite Blue Flag – Appeal Notification
Appeal Filed by CFPB v. ITT EDUCATIONAL SERVICES, INC., 7th Cir., April 8, 2015

2015 WL 1013508
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

CONSUMER FINANCIAL PROTECTION BUREAU, Plaintiff,
v.
ITT EDUCATIONAL SERVICES, INC., Defendant.

No. 1:14–cv–00292–SEB–TAB.
|
Signed March 6, 2015.

**Synopsis**
**Background:** The Consumer Financial Protection Bureau (CFPB) brought action against a for-profit, post-secondary educational institution, claiming that the educational institution's extension of temporary credit to students violated the Consumer Financial Protection Act (CFPA) and the Truth in Lending Act (TILA). The educational institution moved to dismiss.

**Holdings:** The District Court, Sarah Evans Barker, J., held that:

[1] the CFPA's restriction on the President's ability to remove the CFPB's Director did not violate the President's constitutional removal powers;

[2] a provision of the CFPA which stated that the CFPB's determinations were subject to Chevron deference did not impermissibly limit judicial oversight;

[3] the CFPA's prohibition of "any unfair act or practice" was not void for vagueness;

[4] the CFPA's prohibition of "abusive" acts or practices was not void for vagueness;

[5] the institution qualified as a "covered person" and a "service provider" under the CFPA;

[6] the CFPB stated an unfair act or practice claim against the institution;

[7] the CFPB stated an abusive practice claim against the institution; and

[8] in a matter of first impression, the Truth in Lending Act's (TILA) one-year statute of limitations applied to civil actions brought by the CFPB.

Motion granted in part and denied in part.

West Headnotes (41)

[1]     **Federal Courts**
        Evidence; Affidavits
        **Federal Courts**
        Presumptions and burden of proof

        In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor; however, a court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

        Cases that cite this headnote

[2]     **Federal Civil Procedure**
        Claim for relief in general

        A pleading satisfies the core requirement of fairness to the defendant so long as it provides enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests.

        Cases that cite this headnote

[3]     **Federal Civil Procedure**
        Construction of pleadings

        On a motion to dismiss for failure to state a claim, a plaintiff receives the benefit of imagination, so long as the hypotheses are

consistent with the complaint. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[4]    Public Employment**
🔑 Selection by officers
**Public Employment**
🔑 Authority to impose adverse action;  manner and mode of imposition
**United States**
🔑 Power to appoint
**United States**
🔑 In general;  power to remove

The President's power to appoint and remove officers of the Executive Branch broadly derives from his Article II mandate to take care that the laws be faithfully executed. U.S.C.A. Const. Art. 2, § 3.

Cases that cite this headnote

**[5]    Public Employment**
🔑 Competence or performance in general
**United States**
🔑 Grounds

The Consumer Financial Protection Act's (CFPA) restriction on the President's ability remove the Director of the Consumer Financial Protection Bureau to when the President "loses confidence in the intelligence, ability, judgment, or loyalty" of the Director did not violate the President's power under Article II to appoint and remove officers of the Executive Branch under the "Take Care" Clause, as the Bureau had some of the quasi-legislative and quasi-judicial functions that characterized other independent regulatory agencies. U.S.C.A. Const. Art. 2, § 3; Consumer Financial Protection Act of 2010, § 1011(c)(3), 12 U.S.C.A. § 5491(c)(3).

Cases that cite this headnote

**[6]    Constitutional Law**

🔑 Appointment, tenure and removal of public employees and officials
**Public Employment**
🔑 Authority to impose adverse action;  manner and mode of imposition
**United States**
🔑 In general;  power to remove

Congress may place restrictions on the removal of the officers of quasi-legislative or quasi-judicial independent regulatory agencies; Congress may likewise enact tenure protections for an executive inferior officer, if his or her duties are well-defined and discrete in scope, but Congress may not, however, shield an inferior officer behind two layers of tenure protection.

Cases that cite this headnote

**[7]    Statutes**
🔑 Powers of separate houses of legislature

The Origination Clause does not prohibit Congress from enacting funding structures for agencies that differ from the procedures prescribed by the ordinary appropriations process; nor does the Constitution prohibit Congress from creating funding mechanisms that enjoy some degree of insulation from its own year-to-year control. U.S.C.A. Const. Art. 1, § 7, cl. 1.

Cases that cite this headnote

**[8]    Administrative Law and Procedure**
🔑 Trade or business
**Antitrust and Trade Regulation**
🔑 Powers, functions, jurisdiction, and authority
**Antitrust and Trade Regulation**
🔑 Judicial review
**Constitutional Law**
🔑 Appellate procedure and judicial review

A provision of the Consumer Financial Protection Act (CFPA), which stated that the determinations of the Consumer Financial Protection Board (CFPB) regarding any federal consumer law would be applied as if the CFPB was the only agency authorized to apply,

enforce, interpret, or administer the provisions of such federal consumer financial law, did not impermissibly limit judicial oversight in ways that were relevant to separation of powers analysis; the provision merely prescribed that the CFPB's constructions of organic law in its subject area are to be given *Chevron* deference. Consumer Financial Protection Act of 2010, § 1022(b)(4)(B), 12 U.S.C.A. § 5512(b)(4)(B).

1 Cases that cite this headnote

[9]   **Constitutional Law**
🔑 Constitutionality of Statutory Provisions

Where Congress has acted, a challenge to the constitutionality of its enactments must show not merely that the legislature has taken a path not before explicitly sanctioned by the judicial branch, but that it has affirmatively violated constitutional principles.

Cases that cite this headnote

[10]   **Constitutional Law**
🔑 Presumptions and Construction as to Constitutionality

While novelty does not create a presumption of unconstitutionality, a court may well find, in certain circumstances, that the lack of historical precedent for an entity raises a red flag.

Cases that cite this headnote

[11]   **Constitutional Law**
🔑 Vagueness as to Covered Conduct or Standards of Enforcement; Offenses and Penalties

A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.

Cases that cite this headnote

[12]   **Constitutional Law**
🔑 Certainty and definiteness; vagueness

A statute is void for vagueness under the Fifth Amendment if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[13]   **Constitutional Law**
🔑 Certainty and definiteness; vagueness

The void for vagueness doctrine under the Fifth Amendment is not implicated merely because it may at times be difficult to prove an incriminating fact, nor can a court declare a law unconstitutionally vague based on the mere fact that close cases can be envisioned under its provisions; rather, courts refuse to apply a statutory standard only where it is so amorphous that reasonable observers have no choice but to guess at its meaning, and differ as to its application. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[14]   **Constitutional Law**
🔑 Certainty and definiteness; vagueness

The degree of vagueness that the Constitution tolerates under the Fifth Amendment, as well as the relative importance of fair notice and fair enforcement, depends in part on the nature of the enactment. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

[15]   **Constitutional Law**
🔑 Certainty and definiteness; vagueness
**Constitutional Law**
🔑 Vagueness

Under the Fifth Amendment's void for vagueness doctrine, less clarity is demanded of laws or regulations that are enforced through civil action rather than prosecution. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[16]** **Constitutional Law**
👉Penalties, fines, and sanctions in general

The possibility of steep fines, by itself, does not render a statute quasi-criminal, and thus subject to more stringent review afforded to criminal statutes under the Fifth Amendment's void for vagueness doctrine. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[17]** **Constitutional Law**
👉Certainty and definiteness; vagueness
**Constitutional Law**
👉Speech, press, assembly, and petition

If the enforcement of a law threatens to chill protected speech or the exercise of another fundamental right, courts apply more stringent scrutiny to its clarity and the fairness of its notice under the Fifth Amendment's void for vagueness doctrine. U.S.C.A. Const.Amends. 1, 5.

Cases that cite this headnote

**[18]** **Constitutional Law**
👉Trade or Business

Courts review economic regulations with less severe scrutiny when conducting a vagueness inquiry, because their subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.

Cases that cite this headnote

**[19]** **Constitutional Law**
👉Particular Subjects and Regulations

Provisions of the Consumer Financial Protection Act (CFPA), which prohibited unfair and abusive conduct, were not subject to heightened scrutiny on a Fifth Amendment challenge for vagueness, where the CFPA only imposed civil liability, and the CFPA only governed economic activity rather than protected constitutional interests, like free expression. U.S.C.A. Const.Amends. 1, 5; Consumer Financial Protection Act of 2010, § 1036(a)(1)(B), 12 U.S.C.A. § 5536(a)(1)(B).

1 Cases that cite this headnote

**[20]** **Antitrust and Trade Regulation**
👉Validity
**Constitutional Law**
👉Particular Subjects and Regulations

The Consumer Financial Protection Act's (CFPA) prohibition on "any unfair act or practice" was not void for vagueness under the Fifth Amendment, where the CFPA's prohibition closely mirrored language used in the Federal Trade Commission Act that prohibited "unfair or deceptive acts or practices in or affecting commerce," and the FTCA's definition of "unfair and or deceptive acts" had been subject to a century of interpretation and refinement. U.S.C.A. Const.Amend. 5; Consumer Financial Protection Act of 2010, § 1036(a)(1)(B), 12 U.S.C.A. § 5536(a)(1)(B); Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

4 Cases that cite this headnote

**[21]** **Statutes**
👉Defined terms; definitional provisions

It is a fundamental canon of construction that when Congress employs a term with a

specialized meaning relevant to the matter at hand, that meaning governs.

Cases that cite this headnote

[22]   **Statutes**
       🔑 Technical terms, terms of art, and legal terms

If Congress has borrowed a term of art from its own existing body of legislation, a court presumes that it did so advisedly.

Cases that cite this headnote

[23]   **Antitrust and Trade Regulation**
       🔑 In general; unfairness
       **Antitrust and Trade Regulation**
       🔑 Source of prohibition or obligation; lawfulness

A practice is unfair under the Federal Trade Commission Act (FTCA) when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

1 Cases that cite this headnote

[24]   **Antitrust and Trade Regulation**
       🔑 Validity
       **Constitutional Law**
       🔑 Particular Subjects and Regulations

The Consumer Financial Protection Act's (CFPA) prohibition on "abusive" acts or practices was not void for vagueness under the Fifth Amendment, even though the expansion of consumer protection law to abusive practices was novel in the context of the CFPA, where the CFPA elaborated on the conditions under which a business's conduct may be found abusive, and agencies and courts had successfully applied the term "abusive" as used in closely related consumer protection statutes and regulations. U.S.C.A. Const.Amend. 5; Consumer Financial

Protection Act of 2010, §§ 1031(d), 1036(a)(1)(B), 12 U.S.C.A. §§ 5531(d), 5536(a)(1)(B); Fair Debt Collection Practices Act, § 802(a), 15 U.S.C.A. § 1692(a); Telemarketing and Consumer Fraud and Abuse Prevention Act, § 3, 15 U.S.C.A. § 6102.

2 Cases that cite this headnote

[25]   **Constitutional Law**
       🔑 Rule making

Congress cannot grant an executive agency rulemaking powers so broad that it has empowered the agency to engage in de facto legislating itself, in other words, Congress's mandate must lay down an intelligible principle to which the agency is directed to conform.

Cases that cite this headnote

[26]   **Statutes**
       🔑 Undefined terms

When a word is not defined by statute, a court normally construes it in accord with its ordinary or natural meaning.

Cases that cite this headnote

[27]   **Statutes**
       🔑 Plain Language; Plain, Ordinary, or Common Meaning
       **Statutes**
       🔑 Design, structure, or scheme

In ascertaining the plain meaning of a statute a court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.

Cases that cite this headnote

[28]   **Antitrust and Trade Regulation**

🔑Credit repair and counseling

Claims that a for-profit, post-secondary educational institution advised students on how to manage their debt to the institution, after taking out temporary loans, that the institution channeled students into a private loan program, and that the institution completed nearly every step in the process of acquiring loans on the students' behalf, including filling out the requisite forms, save signatures, and forwarding them to the lender, sufficiently alleged that the institution engaged in credit counseling and assisting a consumer with debt management, as required to be a "covered person" under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1002(15)(A)(viii),   12   U.S.C.A.   § 5481(15)(A)(viii).

Cases that cite this headnote

[29]   **Statutes**
🔑Plain, literal, or clear meaning; ambiguity

Where legislative history has interpretive value, that value lies in clarifying statutory ambiguity.

Cases that cite this headnote

[30]   **Antitrust and Trade Regulation**
🔑Finance and banking in general; lending

Claims that a for-profit, post-secondary educational institution used temporary loans as a tool to pre-qualify students for private loans, that the institution developed the loans' underwriting criteria, and that the institution paid the credit union membership fees in a lead credit union that made loans to the students on behalf of the students who took out the loans, sufficiently alleged that the institution qualified as a "service provider" under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1002(26)(A)(i), 12 U.S.C.A. § 5481(26)(A)(i).

Cases that cite this headnote

[31]   **Antitrust and Trade Regulation**
🔑Reliance; causation; injury, loss, or damage

Although the harm involved need not be massive on an annual basis to count as substantial injury under the Consumer Financial Protection Act (CFPA), a trivial or speculative harm will not suffice. Consumer Financial Protection Act of 2010, § 1031(c)(1),   12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

[32]   **Antitrust and Trade Regulation**
🔑Finance and banking in general; lending
**Antitrust and Trade Regulation**
🔑Credit repair and counseling

Claims that a for-profit, post-secondary educational institution directed 8,600 students into private loans, that the private loans carried interest rates as high as 16.25% and origination fees as high as 10%, and that some 64% of the students defaulted on their private loans, exacerbating their debt and financial distress, adequately alleged a substantial financial injury to the students, as required to support the Consumer Finance Protection Bureau's unfair act or practice action against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

[33]   **Antitrust and Trade Regulation**
🔑Finance and banking in general; lending
**Antitrust and Trade Regulation**
🔑Credit repair and counseling

Claims that a for-profit, post-secondary educational institution employed intrusive and overbearing tactics in ensuring that students rolled over their temporary loans into private loans, that some students did not realize that they had taken out private loans because of the

rushed and automated manner in which institution processed the students' paperwork, and that the institution used the withholding of course materials, transcripts, and transfer credits as leverage to convince students to take out the private loans, sufficiently alleged that the institution's tactics caused the students' injuries, as required to support the Consumer Finance Protection Bureau's unfair act or practice action against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

[34]    **Antitrust and Trade Regulation**
Contractual relationships and breach of contract in general

While relevant, formal contract principles are not conclusive in an unfair practices claim.

Cases that cite this headnote

[35]    **Antitrust and Trade Regulation**
Finance and banking in general; lending
**Antitrust and Trade Regulation**
Credit repair and counseling

Claims that a for-profit, post-secondary educational institution engaged in so much "hand-holding" in assisting students in applying for private loans that the students' role was often reduced to signing completed forms, and that the institution leveraged the threat of withholding transcripts and denying transferability of credits, or expelling students outright if they failed to make up their "tuition gap," sufficiently alleged that the students lacked a reasonable alternative to agreeing to take out private loans, as required to support the Consumer Finance Protection Bureau's unfair act or practice action against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

[36]    **Antitrust and Trade Regulation**
Reliance; causation; injury, loss, or damage

An injury is reasonably avoidable under the Consumer Financial Protection Act (CFPA) if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact. Consumer Financial Protection Act of 2010, § 1031(c)(1), 12 U.S.C.A. § 5531(c)(1).

Cases that cite this headnote

[37]    **Antitrust and Trade Regulation**
Finance and banking in general; lending
**Antitrust and Trade Regulation**
Credit repair and counseling

Claims that signing up students for private loans enabled a for-profit, post-secondary educational institution to clear doubtful assets from its balance sheets, created by extending temporary loans to students, sufficiently alleged that the institution derived unreasonable advantage from its conduct, as required for the Consumer Finance Protection Bureau to bring an abusive practice claim against the institution under the Consumer Financial Protection Act (CFPA). Consumer Financial Protection Act of 2010, § 1031(d)(2), 12 U.S.C.A. § 5531(d)(2).

Cases that cite this headnote

[38]    **Antitrust and Trade Regulation**
Particular cases

To withstand a motion to dismiss for failure to state a claim, a plaintiff's allegations that a group of consumers relied on a defendant's representations need not contain specific allegations as to any particular consumer's individual reliance. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[39]**  **Antitrust and Trade Regulation**
👉Finance and banking in general;  lending
**Antitrust and Trade Regulation**
👉Credit repair and counseling

Claims that staff at a for-profit, post-secondary educational institution represented to students that they would work in the interests of their students to better their lives, that the staff assured prospective students of large salaries upon graduation, and that some students believed that the staff was acting in the students' interests in signing them up for private loans, sufficiently alleged that the institution took unreasonable advantage of students' reasonable reliance, as required for the Consumer Finance Protection Bureau to bring an abusive practice claim against the institution. Consumer Financial Protection Act of 2010, § 1031(d)(2)(C), 12 U.S.C.A. § 5531(d)(2)(C).

Cases that cite this headnote

**[40]**  **Federal Civil Procedure**
👉Alternate, Hypothetical and Inconsistent Claims

A complaint may advance inconsistent legal theories based on the same set of facts.

Cases that cite this headnote

**[41]**  **Consumer Credit**
👉Time to sue and limitations

The one-year limitations period in the Truth in Lending Act's (TILA) provision governing civil liability applied to actions brought by the Consumer Finance Protection Bureau, even though the Consumer Financial Protection Act (CFPA) amended the TILA to grant the Bureau the power to bring administrative enforcement actions, which was not subject to any limitations period. Truth in Lending Act, §§ 108(a)(6), 130(e), 15 U.S.C.A. §§ 1607(a)(6), 1640(e).

Cases that cite this headnote

**Attorneys and Law Firms**

Ethan H. Levisohn, Maureen E. McOwen, Cynthia Gooen Lesser, Consumer Financial Protection Bureau, Washington, DC, for Plaintiff.

Douglas R. Cox, Jason J. Mendro, Lucas C. Townsend, Gibson Dunn & Crutcher LLP, Washington, DC, Philip A. Whistler, Thomas Eugene Mixdorf, Ice Miller LLP, Indianapolis, IN, Timothy John Hatch, Gibson Dunn & Crutcher LLP, Los Angeles, CA, for Defendant.

***ORDER ON DEFENDANT'S MOTION TO DISMISS***

SARAH EVANS BARKER, District Judge.

**\*1** This cause is before the Court on Defendant ITT Educational Services, Inc.'s Motion to Dismiss [Docket No. 15], filed on April 28, 2014 pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7). For the reasons set forth below, the Motion is DENIED in part and GRANTED in part.

***Factual and Procedural Background***

Plaintiff Consumer Financial Protection Bureau ("the Bureau"), a United States federal agency, has brought this suit against Defendant, alleging violations of provisions of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), & 5565, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.,* and regulations thereunder. Because this cause is before us on a motion to dismiss, we consider the facts as presented by the Bureau's Complaint.

Defendant ITT Educational Services, Inc. ("ITT") is a publicly-traded, for-profit company offering post-secondary courses and degrees to students at more than 100 locations nationwide.[1] ¶ 2.[2] Many of ITT's students and prospective students have limited financial means[3], and ITT therefore derives much of its revenue from federal aid, including loans, secured by the students. ¶¶ 4–5. Some 80% of ITT's revenue, in fact, comes from

aid granted under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.* ("Title IV Aid"). However, a large number of students are still unable to afford full tuition to enroll at ITT even with federal assistance. To enable students to close this "tuition gap," ITT extended to many of them short-term, no-interest loans called "Temporary Credit." The Temporary Credit packages were offered to students at the beginning of an academic year, and payment was due nine months later, at the close of the school year. ¶ 6.

**ITT's aggressive tactics**
The Bureau alleges that ITT employed the Temporary Credit loans as an "entry point" for "pushing" students into taking out private loans when the Temporary Credit came due and students were again unable fully to afford tuition for coming school terms. ¶ 7. According to the Bureau, ITT misled students about the balance of costs and benefits associated with ITT enrollment—thus guiding them into an unmanageable financial predicament—in a number of ways.

In the first place, ITT represented to students through oral representations and advertisements that its programs greatly advanced an enrollee's career prospects and job placement rates; the Bureau alleges that these representations were exaggerated and were based on incomplete information. ¶¶ 29–33. The Bureau utilized "mystery shoppers"—young men or women presenting themselves as prospective students—who reported that ITT staff made exaggerated claims about student success, such as that graduates with associates' degrees "usually make six figures." ¶ 41. In contrast to these claims, ITT's annual disclosures in 2012 indicated that "reported annualized salaries initially following graduation averaged approximately $32,061 for the Employable Graduates in 2011." ¶ 46.[4]

**\*2** The Bureau alleges that ITT also misleadingly represented to prospective students that its "national accreditation" placed it on par with other major educational institutions. ¶ 54. In fact, while a "national" accreditation sounds authoritative, most non-profit colleges and universities are "regionally" accredited; such institutions accept transfer credits from for-profit schools like ITT only on a case-by-case basis. ¶¶ 50–53. According to the Bureau, ITT not only created an inaccurate overall impression in this respect, but also misled some prospective students in a more specific way: one recruiter claimed that ITT had the same accreditation as "all other schools"; another falsely claimed that "ITT Tech is accredited by the Department of Defense." ¶ 54.

Having given prospective students an inflated notion of

the standing of the school and the career benefits derived from the degrees it bestowed, the Bureau alleges that ITT's recruiting staff engaged in heavy-handed methods to convince students to enroll. These methods included frequent phone calls and in-person multimedia presentations that mystery shoppers described as overwhelming in nature. ¶¶ 56, 58–60, 62. Prospective students were encouraged to take an admission test that, in fact, was "virtually impossible to fail," but was used to give them the impression that the school had rigorous admissions standards and that their passing the test augured well for their prospects. ¶ 61. Despite the volubility of the overall sales pitch, the Bureau maintains that ITT recruiters were instructed to be vague and evasive on the question of costs; they responded to applicants' questions by stating, "I cannot tell you what your exact cost will be," or by asking, "Do you want a discount education, or a valuable one that will give you a return in the future?" ¶ 57.

Once students agreed to enroll, the Bureau alleges that ITT then switched gears, hurrying them through the enrollment and financial aid processes—so quickly that "many consumers did not know or did not understand what they signed up for." ¶ 64. Specifically, ITT required enrollees to sign an Enrollment Agreement before they could receive any information about their financial aid options or meet with financial aid staff. ¶ 66. Mystery shoppers reported being rushed through e-signatures of documents, including authorizations to request transcripts and credit check approvals without understanding the nature of the forms they were signing. ¶ 67. One mystery shopper recounted that an ITT representative forged her signature on a number of e-documents, explaining that she was "trying to help and it was the only way she could give me the test to help push me through." ¶ 72. The Bureau asserts that financial aid officers then "took control" of the process, rushing enrollees through form signatures and providing them with little detailed information; in the words of a mystery shopper, the process was "a bit overwhelming with how quickly we went through everything, and I wasn't exactly clear on everything the [staff member] was having me sign up for." ¶ 83.

**\*3** Once students had completed an academic term at ITT, the time came for them to "repackage" their financial aid and loans for the next year. The Bureau alleges that ITT's financial aid staff employed aggressive tactics in seeking to repackage students, including tracking them down on campus, barring or pulling them from class, and enlisting the aid of other ITT staff such as professors. An ITT executive conceded that the school also used the threat of withholding course materials and transcripts as "leverage"

to ensure that students would repackage. ¶¶ 85–87. At both the initial and repackaging stages, ITT staff encouraged students to rely on school representatives in seeing them through the process, including the use of forms that automatically populated and required only the students' signatures at the conclusion of the process. An executive stated that ITT was "essentially holding [the students'] hands"; one mystery shopper stated that a financial aid coordinator told him that he would "get more free money that I don't have to pay back if I let them take care of my paperwork."[5] ¶¶ 90–92.

**The "private loans"**

The Bureau's claims against ITT focus on its assertion that, having knowingly cajoled and guided students into a financial predicament in which they were already heavily invested in an ITT degree yet lacked the financial resources to complete it—with the Temporary Credit expiring and financial aid insufficient to fully cover the "tuition gap"—ITT then persuaded continuing students to take out financially irresponsible "private loans" from third-party lenders. In the Bureau's words:

> ITT Financial Aid staff coerced students into taking out loans that they did not want, did not understand, or did not even realize they were getting.... ITT sought to have its students pay for the tuition gap with ostensible third-party loans because outside sources of payment could be booked as income to the company, improving its free cash flow and the appearance of its financial statements, and because outside sources of revenue helped ITT meet a requirement by the Department of Education that at least 10% of its revenue be derived from sources outside Title IV loans and grants.

¶¶ 97–98.

One of the sources of the students' predicament was ITT's alleged failure to adequately disclose the nature of the nine-month Temporary Credit to new students. Students who received the Temporary Credit signed a "Cost Summary Payment Addendum" (CSPA), which stated that the loan was to last for the length of an academic year and carry no interest. According to the Bureau, however, the CSPA's references to "new

temporary credit" and "renewal of carryforward temporary credit" could mislead students into believing that renewal of the no-interest loan for future academic years was available. Some students believed that the Temporary Credit would be available until they graduated, ¶ 105, and a mystery shopper reported that she had been led to believe that future years' costs would be "covered under a new temporary credit and that I would owe no money out of pocket." ¶ 107. One director of finance at an ITT location instructed staff to describe the Temporary Credit as "funding" rather than as a loan that would have to be repaid. ¶ 108. ITT was aware that many or most students lacked the ability to repay the Temporary Credit, and it characterized them as "doubtful accounts" on its balance sheets. ¶ 113.

**\*4** The Bureau alleges that, beginning in 2008, ITT constructed two "private loan" programs as a vehicle for students to discharge the Temporary Credit: continuing students would use the cash they received from the new loans to pay off their debt to ITT and thus remove the "doubtful accounts" from ITT's balance sheets. Of these two programs, only one—the Student CU Connect (SCUC) program—operated during the July–December 2011 time period covered by the Complaint.[6] The Complaint asserts that ITT was heavily involved in the creation of the SCUC program: developing its underwriting criteria, providing a credit facility, paying the credit union membership fees in the lead credit union on behalf of the students taking out the SCUC loans, and providing the SCUC loan originators with a stop-loss guarantee that it would make them whole for losses if defaults on the loans exceeded 35%. ¶ 121. ITT was the "sole intermediary" between SCUC and its students; funds were disbursed through ITT to the student, and could be used only to pay ITT for tuition and not for any other purpose. Additionally, eligibility criteria for the loans were tailored such that, if students had received Temporary Credit, they were automatically eligible for an ITT private loan.[7] ¶¶ 116, 122.

The loans granted under the SCUC program carried a 10–year term. For students with credit scores below 600, the interest rate after April 2011 was 13% plus prime—or 16.25%—in addition to a 10% origination fee. Nearly half of the students taking SCUC loans fell into this low-credit-score cohort. ¶¶ 123–124. These rates are drastically higher than those available under federal Stafford loans, whose rates since 2009 have ranged from 3.4% for subsidized borrowers to 6.8% for unsubsidized borrowers. ¶ 125. Despite their exacting terms, some 79% of the SCUC loans issued went to continuing ITT students who had previously received Temporary Credit in their first year at ITT. ¶ 126. As of May 2011, ITT's consultant

for loan default analysis projected a gross default rate of 61.3% for the existing SCUC loans. ¶ 127.

Crucially, the Bureau alleges that these "private" loans, though nominally originated by third-party lenders, were the brainchild of ITT and that ITT consciously steered economically distressed students, faced with indebtedness upon the expiration of the Temporary Credit, into the SCUC loans. ITT executives, in quarterly earnings calls with investors and analysts, stated that the ITT private loan program was a vehicle for taking the Temporary Credit off of ITT's balance sheets. ¶ 134. In referring to the PEAKS program, which ran from 2009 to 2011 and operated similarly to the SCUC program, ITT's CEO allegedly discussed the interrelatedness of the programs as follows:

> We still anticipate offering internal financing to first-year students.... Second year students then would be eligible for financing through the PEAKS program, to have financing for their forward-looking studies, as well as refinancing any institutional funding provided to them during the first year.... But it works that way, second-year students are in the PEAKS program, and first year will continue to be on the balance sheet.

**\*5** ...

> Basically the way the program is set up, if you think about the balance sheet aspects of this, obviously positive cash flow elements there. And some of that will come from [accounts receivable] that is going to be converted into the PEAKS program, which was our plan all along.

¶¶ 135–136. In a later conference call in 2011, ITT's CEO affirmed that the SCUC program was part of this same "plan," noting that SCUC was "substantially similar for us relative to the PEAKS program so that it's structurally similar and the economics are very, very similar." ¶ 137. According to the Bureau, many students did not migrate from the Temporary Credit to the "private loans" with eyes fully open: some accepted the new loans in reliance upon ITT's acting in their interests, while others did not realize they had incurred a new type of debt because of the "rushed and automated manner" in which ITT financial staff processed the students' paperwork. ¶¶ 141–142.

For those students who had Temporary Credit debt at the close of their first year at ITT but who did not take out "private loans," ITT offered them an incentive to pay off the debt in a lump sum upon graduation—in the form of a 25% discount. ¶ 144. For those students who were unable to pay off the Temporary Credit debt in a lump sum, ITT

offered a "temporary credit installment plan" involving monthly payments that ranged, depending on the total amount owed, from six months to more than six years. ¶ 146. According to the Bureau, the paperwork students were given upon enrolling in the installment plan did not disclose this forgone 25% discount as constituting a "finance charge." ¶¶ 148–151.

### *Legal Analysis*

### Standard of Review

**1. Standard under Rule 12(b)(1)**
[1] The Federal Rules of Civil Procedure command that courts dismiss any suit over which they lack subject matter jurisdiction—whether acting on the motion of a party or *sua sponte. See* Fed. R. Civ. Pro. 12(b)(1). In ruling on a motion to dismiss under Rule 12(b)(1), we "must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 771 (7th Cir.2002); *Transit Express, Inc. v. Ettinger,* 246 F.3d 1018, 1023 (7th Cir.2001). We may, however, "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *See Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir.1993); *Estate of Eiteljorg ex rel. Eiteljorg v. Eiteljorg,* 813 F.Supp.2d 1069, 1074 (S.D.Ind.2011).

**2. Standard under Rule 12(b)(6)**
[2] Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of claims for "failure to state a claim upon which relief may be granted." Fed.R.Civ.P. 12(b)(6). In determining the sufficiency of a claim, the court considers all allegations in the complaint to be true and draws such reasonable inferences as required in the plaintiff's favor. *Jacobs v. City of Chi.,* 215 F.3d 758, 765 (7th Cir.2000). Federal Rule of Civil Procedure 8(a) applies, with several enumerated exceptions, to all civil claims, and it establishes a liberal pleading regime in which a plaintiff must provide only a "short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. Pro. 8(a)(2); this reflects the modern policy judgment that claims should be "determined on their merits rather than through missteps in pleading." *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 779 (7th Cir.2007) (citing 2 James W. Moore, et al., *Moore's Federal*

*Practice* § 8.04 (3d ed.2006)). A pleading satisfies the core requirement of fairness to the defendant so long as it provides "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1083 (7th Cir.2008).

**\*6** In its decisions in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the United States Supreme Court introduced a more stringent formulation of the pleading requirements under Rule 8. In addition to providing fair notice to a defendant, the Court clarified that a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). Plausibility requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir.2007) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Instead, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* The plausibility of a complaint depends upon the context in which the allegations are situated, and turns on more than the pleadings' level of factual specificity; the same factually sparse pleading could be fantastic and unrealistic in one setting and entirely plausible in another. *See In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F.Supp.2d 363, 370 (M.D.Pa.2008).

[3] Although *Twombly* and *Iqbal* represent a new gloss on the standards governing the sufficiency of pleadings, they do not overturn the fundamental principle of liberality embodied in Rule 8. As this Court has noted, "notice pleading is still all that is required, and 'a plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.' " *United States v. City of Evansville,* 2011 WL 52467, at \*1 (S.D.Ind. Jan. 8, 2011) (quoting *Tamayo,* 526 F.3d at 1083). On a motion to dismiss, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994).

## Discussion

This suit arises primarily under the Consumer Financial Protection Act (CFPA), the Bureau's organic statute. Congress enacted the CFPA as Title X of the "Dodd–Frank Act" of 2010, with the stated purpose of "ensuring that the federal consumer financial laws are enforced consistently so that consumers may access markets for financial products, and so that these markets are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Counts One through Three of the Complaint allege that ITT engaged in "unfair" and "abusive" acts or practices, in violation of the CFPA's operative provisions, 12 U.S.C. §§ 5531(c)(1), 5531(d)(2)(B) & 5531(d)(2)(C). The Bureau further alleges in Count Four that ITT's nondisclosure of a finance charge violated the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.,* and its implementing Regulation Z, 12 C.F.R. § 1026.17.

**\*7** ITT seeks dismissal on three broad grounds. First, it contends that the Bureau lacks standing to bring this suit because it is an unconstitutional entity and the CFPA's prohibitions violate the due process clause. Second, ITT urges that the complaint fails to state a claim because ITT is not a covered entity subject to its provisions. Lastly, ITT argues that all four counts fail on their merits. We address these bases of ITT's motion in turn.

## I. Constitutionality of the CFPA

### A. Removal Power and the "Take Care" Clause

ITT argues that the CFPA violates the constitutional separation of powers by unduly restricting the President's authority to remove the Bureau's Director if he "loses confidence in the intelligence, ability, judgment, or loyalty" of that officer. *See* Def.'s Br. 8 (citing *Myers v. United States,* 272 U.S. 52, 134, 47 S.Ct. 21, 71 L.Ed. 160 (1926)). Because the Bureau is an unconstitutional entity and thus lacks standing, ITT urges that the suit must be dismissed in its entirety for the absence of a justiciable case or controversy. Def.'s Reply 3 n. 4; *Susan B. Anthony List v. Driehaus,* ——U.S. ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014). To explain ITT's misreading of the constitutional protections afforded the President's power to remove officials like the Director of the Bureau, it is necessary to review the evolution of the doctrine.

#### 1. Evolution of Removal Power Doctrine

[4] The President's power to appoint and remove officers of the Executive Branch broadly derives from his Article II mandate to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3. *See also* U.S. Const. Art. II, § 1, cl. 1 (the "Vesting Clause") ("The executive Power shall be vested in a President of the United States of America."). The Constitution also specifically

delineates the scope of the President's appointment power:

> He shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II, § 2, cl. 2. As to the question of the President's *removal* authority, however, the document is conspicuously silent.

Despite the lack of a clear textual command, the Supreme Court has long recognized that some degree of discretion in removing executive officers is inherent in the President's powers and must be protected from excessive legislative encroachment. The Court first addressed the issue in Chief Justice Taft's voluminous opinion in *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). After examining at length the course of debates in 1789's First Congress, the Court found evidence of an early consensus that, though appointment of principal executive officers was conditioned upon the "advice and consent" of the Senate, the authority to remove lay with the President alone. 272 U.S. at 111–115, 47 S.Ct. 21. The Court found the assumptions of the early Congress to be sound, and explicitly ratified them. The Constitution vested the executive power in the President, the Court reasoned, and the removal power inherent in executive authority—based on traditions inherited from the prerogatives of the British Crown—remained vested in him unless the Constitution specified otherwise.[8] Moreover, on more functional grounds, it would be difficult to imagine the President successfully fulfilling his mandate to "take care that the laws be faithfully executed" if he were unable to command the obedience of the subordinates through which he exercised his powers. *Id.* at 115–135, 47 S.Ct. 21. The *Myers* Court therefore held that Congress was prohibited from unduly limiting the President's "power of removing those for whom he cannot continue to be responsible." *Id.* at 117, 47 S.Ct. 21.

**8** But the Executive Branch is far larger, and its

responsibilities far more diverse, now than in the time of the First Congress or even of William Howard Taft. The rise of the "administrative state" during the New Deal and in ensuing decades has spawned a number of independent agencies—formally within the Executive Branch but deriving much of their perceived value from their insulation from party politics and the President's personal fiat. In *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), the Court recognized that with respect to the officers of agencies like the Federal Trade Commission, which are "quasi-legislative and quasi-judicial" rather than "purely executive," the President's authority to remove need not be as absolute as *Myers* had proclaimed. 295 U.S. at 627–629, 55 S.Ct. 869. Because "one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will," *id.* at 629, 55 S.Ct. 869, the Court upheld Congress's statutory mandate that the FTC commissioners be removed only for cause—for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620, 55 S.Ct. 869 (quoting 15 U.S.C. § 41).

In two more recent landmark cases, the Supreme Court has considered the application of its removal doctrine to "inferior" officers: those who report directly not to the President but to another appointed official within the Executive Branch. In *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), the Court determined that the statute[9] authorizing "independent counsels" within the Department of Justice, whom the Attorney General appointed and could remove only for cause, did not unconstitutionally abridge the President's powers. Though the independent counsel was surely an "executive" rather than "quasi-legislative" or "quasi-judicial" officer—his primary function, after all, was criminal investigation and prosecution—Congress's protection of his independence was nonetheless appropriate. This was so in large part because the independent counsel's duties were discrete in scope:

> [T]he independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority. Although the counsel exercises no small amount of discretion and judgment in deciding how to carry out his or her duties under the Act, we simply do not see how the President's need to control the exercise of that discretion is so central to the

functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President.

*Id.* at 691–692, 108 S.Ct. 2597. Moreover, the Court noted, the President did retain the ability to exercise some control over an independent counsel through his at-will appointee, the Attorney General. *Id.* at 692, 108 S.Ct. 2597.

In its 2010 decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board,* 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010), however, the Court drew a bright line limiting the leeway afforded to Congress by the progeny of *Humphrey's Executor* and *Morrison:* Congress could not insulate an inferior officer from presidential oversight with *two* layers of for-cause protection. There, the Court held that the for-cause removal of the commissioners of the Public Company Accounting Oversight Board, an entity created by the Sarbanes–Oxley Act under the aegis of the SEC—whose commissioners themselves may be removed by the President only in limited circumstances—violated the spirit of the "take care" clause. It reasoned as follows:

**\*9** A second level of tenure protection changes the nature of the President's review. Now the Commission cannot remove a Board member at will. The President therefore cannot hold the Commission fully accountable for the Board's conduct, to the same extent that he may hold the Commission accountable for everything else that it does. The Commissioners are not responsible for the Board's actions. They are only responsible for their own determination of whether the Act's rigorous good-cause standard is met. And even if the President disagrees with their determination, he is powerless to intervene-unless that determination is so unreasonable as to constitute "inefficiency, neglect of duty, or malfeasance in office." *Humphrey's Executor,* [295 U.S. at 620, 55 S.Ct. 869].... This novel structure does not merely add to the Board's independence, but transforms it.

561 U.S. at 496, 130 S.Ct. 3138.

### 2. ITT's Principal Argument

[5] [6] Thus, in the nearly 90 years since *Myers,* the Supreme Court has qualified the doctrine of the President's removal authority it espoused in that decision in at least three respects. Congress may place restrictions on the removal of the officers of "quasi-legislative" or "quasi-judicial" independent regulatory agencies

(*Humphrey's Executor* ); it may likewise enact tenure protections for an executive inferior officer, if his or her duties are well-defined and discrete in scope (*Morrison* ). It may *not,* however, shield an inferior officer behind two layers of tenure protection (*Free Enterprise Fund* ). ITT's contentions notwithstanding, we conclude that the structure of the CFPA is permissible when viewed through this doctrinal prism.

ITT first argues that, because "the limitations on removal here are far more restrictive than a 'good cause' provision," the CFPA runs afoul of *Free Enterprise Fund's* dictum that "the President cannot 'take care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." Def.'s Br. 8 (quoting *Free Enter. Fund,* 561 U.S. at 484, 130 S.Ct. 3138). In fact, however, the CFPA specifies precisely the same grounds for removal as the archetypal "for cause" provision approved by the Court in *Humphrey's Executor:* the President may remove the Bureau's director only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). *Compare with* 15 U.S.C. § 41 ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.") (cited in *Humphrey's Executor,* 295 U.S. at 619, 628, 632, 55 S.Ct. 869).

ITT's notion that the degree of insulation from executive oversight afforded the Bureau's Director is explicitly proscribed by precedent therefore lacks merit. The Director is responsible directly to the President, without the additional layer of screening the Court found problematic in the structure of the Public Company Accounting Oversight Board. *Cf. Free Enterprise Fund,* 561 U.S. at 507, 130 S.Ct. 3138 (distinguishing circumstances where "the President has ... authority to initiate a Board member's removal for cause"). The CFPA's structure is thus unconstitutional only if the authority wielded by the Bureau exceeds the bounds recognized by *Humphrey's Executor* and *Morrison.*

**\*10** Here, there is no doubt that the Bureau partakes of some of the quasi-legislative and quasi-judicial functions that characterize an independent regulatory agency. It is invested with the authority to engage in rulemaking to further implement Congress's enactments on the subject of consumer financial protection, and its regulatory powers include administrative adjudication. 12 U.S.C. §§ 5511, 5562–5565. *Cf. Humphrey's Executor,* 295 U.S. at 628, 55 S.Ct. 869 (noting that the FTC "is an administrative body created by Congress to carry into effect legislative policies embodied in the statute"); *Buckley v. Valeo,* 424 U.S. 1, 140–141, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (noting that the "administrative"

functions performed by the Federal Election Commission are "of kinds usually performed by independent regulatory agencies"). The Bureau also undoubtedly wields paradigmatic "executive" powers—notably the authority to bring suit on behalf of the United States—but we find no basis for concluding that the Director's powers are so great that the inability to remove him or her at whim fatally undermines the President's constitutional prerogatives.

While it is true that the Bureau does not operate only for a fixed time like a Department of Justice independent counsel, *cf. Morrison,* 487 U.S. at 672, 108 S.Ct. 2597 ("[T]he office of the independent counsel is 'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task ...."), its enforcement powers are constrained within the subject-matter of its organic statute. ITT objects specifically to CFPA's grant of litigating authority, arguing that the Bureau has "broad jurisdiction and significant power over numerous industries," and that "without meaningful Presidential control over the Director, the Director could initiate suits advancing his—and not the President's—views on the proper construction of federal laws." Def.'s Br. 9. But courts have long and consistently upheld the endowment of regulatory agencies with law enforcement powers against constitutional challenge. *See Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (implicitly affirming the proposition that "officers of the United States" other than the President and Attorney General, such as FTC commissioners, may engage in the enforcement of federal law). This is true of the Securities and Exchange Commission, whose commissioners are subject to removal only for cause and which enjoys broad enforcement powers over publicly traded companies. *See SEC v. Blinder, Robinson, & Co., Inc.,* 855 F.2d 677, 682 (10th Cir.1988) (upholding the SEC's constitutionality and observing that *Humphrey's Executor* "stands generally for the proposition that Congress can, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted to inefficiency, neglect of duty, or malfeasance in office"); *see also SEC v. Sachdeva,* 2011 WL 933967, at *1 (E.D.Wis. Mar. 16, 2011) (employing the same reasoning). It is true as well of the FTC, which possesses similar power to bring civil suit on the government's behalf and upon whose organic statute a considerable portion of the CFPA's operative language is based. *See FTC v. Am. Nat'l Cellular, Inc.,* 810 F.2d 1511, 1514 (9th Cir.1987).

**\*11** We therefore reject ITT's argument that the Supreme Court's established removal power jurisprudence

forecloses the for-cause removal protections of the Bureau's Director.

### 3. ITT's Alternate Grounds of Unconstitutionality

In its reply brief, ITT shifts gears. Rather than contending that the Bureau runs afoul of any particular precedent, it asserts that no federal entity has heretofore "combine[d] the Bureau's panoply of problematic features"—including the length of the Director's tenure, 12 U.S.C. § 5491(c)(3); for-cause removal of the Director, *id.* at § 5491(c)(3); the fact that the Bureau's authority is concentrated in a single director rather than a multi-member commission[10], *id.* at § 5491(b)(1); its "unconstitutionally appointed" Deputy Director, *id.* at § 5491(b)(5); its "immunity from the congressional appropriations process," *id.* at § 5497(a)(2)(C); and its "unprecedented restrictions on judicial review," *id.* at §§ 5512(b)(4)(B), 5513(a), 5513(c)(3)(B)(ii), & 5513(c)(8); among other ostensibly problematic features. Def.'s Reply 3.

There are at least two problems with ITT's "mosaic" theory of the Bureau's unconstitutionality. First, ITT never offers a convincing basis for the conclusion that many of these features of the CFPA contribute, even in a piecemeal sense, to the Bureau's unconstitutionality. Second, its generalized assault on the "unprecedented" nature of the Bureau proceeds from the mistaken premise that that which is not specifically approved by precedent is forbidden.

ITT notes, for instance, that the CFPA empowers the Director to delegate any or all of his powers to any "duly authorized employee, representative, or agent." 12 U.S.C. § 5492(b). Citing the Supreme Court's decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), it then asserts that this power to delegate "further undermines the President's control over Executive officials." Def.'s Br. 9 (citing *Buckley,* 424 U.S. at 36, 96 S.Ct. 612). The cited portion of *Buckley* merely reviews the body of Supreme Court precedent on the appointment and removal powers of the President, and reaffirms the unremarkable proposition that "members of independent agencies are not independent of the Executive with respect to their appointments." 424 U.S. at 136, 96 S.Ct. 612. We have difficulty extracting from this language any notion that the Constitution is offended by allowing a presidential appointee to delegate some of her own authority to her subordinates; such delegation is a commonplace and unavoidable feature of any large institution. *See, e.g.,* 21 U.S.C. § 871(a) (permitting the Attorney General to "delegate any of his functions [under the Controlled Substances Act] to any officer or employee of the Department of Justice"). *See also*

States, 500 U.S. 160, 169, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (implicitly affirming the constitutionality of the delegation authority granted in 21 U.S.C. § 871(a)).

ITT also takes issue with the Director's authority to appoint the Deputy Director. See Def.'s Br. 9 n. 6 (citing 12 U.S.C. § 5491(b)(5)). The Constitution provides that Congress may vest the heads of Executive Departments with authority to appoint inferior officers. U.S. Const. Art. II, § 2, cl. 2; Free Enter. Fund, 561 U.S. at 510–511, 130 S.Ct. 3138. ITT insists that the Bureau, as an entity "established in the Federal Reserve system"—itself an independent regulatory agency, see 12 U.S.C. § 5491(a); 44 U.S.C. § 3502(5)—is not an Executive Department. The Director, it contends, thus lacks constitutional sanction to appoint his own deputy. We disagree. As the Bureau notes, the CFPB is not in any meaningful sense subordinate to the Federal Reserve Board of Governors, and its Director, as we have seen, is appointed by the President directly. Under the more expansive definition of "department" approved by the Court in Free Enterprise Fund, the Bureau likely qualifies as a "separate allotment or part of business; a distinct province, in which a class of duties are allotted to a particular person." See 561 U.S. at 511, 130 S.Ct. 3138 (concluding that the SEC is a " 'Department' for the purposes of the Appointments Clause").[11] We need not decide the question, however, because ITT has not attempted to demonstrate that the Deputy Director has any relationship to this matter, or that the unconstitutionality of his or her appointment process affects the Bureau's standing to bring suit. See generally Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328–329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (discussing the severability of unconstitutional portions of statutes and affirming that, "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem").

*12 [7] Turning to the Bureau's funding, ITT complains that the "Director may unilaterally claim up to 12% of the Federal Reserve's budget ... without Congress's approval." Def.'s Br. 9 (citing 12 U.S.C. § 5497(a)). According to ITT, this "immunity from the Congressional appropriations process" further contributes to the Bureau's unconstitutionality. Def.'s Reply 3. ITT overstates the degree of the Bureau's insulation from congressional control; more to the point, it neglects to explain how the Bureau's source of funding implicates constitutional concerns. The CFPA does indeed restrict the House and Senate Appropriations Committees from reviewing the Bureau's primary funding source, see 12 U.S.C. § 5497(a)(2)(C), but it does not strip Congress as a whole of its power to modify appropriations as it sees fit.[12] As the Bureau has pointed out, the Constitution does not

prohibit Congress from enacting funding structures for agencies that differ from the procedures prescribed by the ordinary appropriations process. See AINS, Inc. v. United States, 56 Fed.Cl. 522, 539 (Fed.Cl.2003) (criticizing the "erroneous view that Congress cannot create special funds and self-financing programs distinct and isolated from the general Treasury funds"). Nor does the Constitution prohibit Congress from creating funding mechanisms that enjoy some degree of insulation from its own year-to-year control. "Congress itself may choose, however, to loosen its own reins on public expenditure. So, for example, although Congress ordinarily requires that appropriations be spent within a single year, it may also authorize appropriations that continue for a longer period of time." Am. Fed'n of Gov't Emps., AFL–CIO, Local 1647 v. Fed. Labor Relations Auth., 388 F.3d 405, 409 (3d Cir.2004). See also See Nat'l Ass'n of Reg'l Councils v. Costle, 564 F.2d 583, 587 & n. 10 (D.C.Cir.1977). ITT's conclusory assertion that the CFPA's funding structure violates the Origination Clause, U.S. Const. Art. I, § 7, cl. 1, is therefore without merit.

[8] Lastly, ITT argues, in a footnote, that the "CFPA ... limits judicial oversight in ways that are relevant to separation of powers analysis." Def.'s Br. 10 n. 7. ITT cites three statutory provisions in support of this point. Two of them, 12 U.S.C. § 5513(a) and 12 U.S.C. § 5513(c)(3)(B)(ii), have nothing to do with judicial review.[13] The third cited provision does concern judicial review, stating that "the deference that a court affords the Bureau with respect to a determination by the Bureau regarding the meaning of interpretation of any provision of a Federal consumer law shall be applied as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law." 12 U.S.C. § 5512(b)(4)(B). This merely prescribes that the Bureau's constructions of organic law in its subject area are to be given deference, in accordance with the well-established principles first enunciated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 740, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering."). ITT has not succeeded in identifying anything remotely problematic about the CFPA's provision for judicial review of the Bureau's decisions.

*13 Regardless of the groundlessness of its individualized objections to the Bureau's statutory features, ITT's argument in reply proceeds from a flawed premise. The CFPA is undoubtedly new—and its combination of

features thus, in some sense, "unprecedented." Its constitutionality has not yet been subject to authoritative review by the Supreme Court or by any of the Courts of Appeals, and while a number of United States District Courts around the nation have begun to apply the Act, only one so far has addressed a challenge to its constitutionality based on the separation of powers.[14] In that case, *Consumer Financial Protection Bureau v. Morgan Drexen, Inc.,* ——F.Supp.3d ——, 2014 WL 5785615 (C.D.Cal. Jan. 10, 2014), the Central District of California considered, and rejected, a defendant's claims that the CFPA unlawfully abridged the President's removal power and that the statute endowed the Director with unconstitutional power to delegate his or her authority. ——F.Supp.3d at —— – ——, 2014 WL 5785615, at *3–4.

[9] Apart from two law review articles[15] and an opinion piece in the *Wall Street Journal*[16], ITT cites no authority for its theory that the Bureau's amalgamated features render it unconstitutional. Rather, it appears to argue that, because precedent does not explicitly sanction the Bureau's structure and range of powers—which ITT asserts constitute "a gross departure from longstanding practice"—the CFPA exceeds constitutional bounds. Def.'s Reply 2. This inverts the premise from which we must start in exercising judicial review over Congress: the presumption of constitutionality. *Morrison,* 529 U.S. at 607, 120 S.Ct. 1740; *Brown v. Maryland,* 25 U.S. 419, 436, 12 Wheat. 419, 6 L.Ed. 678 (1827). This principle of prudential judicial deference is a venerable one: Chief Justice Marshall, the Court's first and greatest exponent of judicial review, cautioned that a court should declare legislation unconstitutional only when "[t]he opposition between the constitution and the law [is] such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher v. Peck,* 10 U.S. 87, 128, 6 Cranch 87, 3 L.Ed. 162 (1810). Where Congress has acted, a challenge to the constitutionality of its enactments must show not merely that the legislature has taken a path not before explicitly sanctioned by the judicial branch, but that it has affirmatively violated constitutional principles.

[10] ITT thus bears a considerable burden in arguing that, though none of the CFPA's features is itself expressly unconstitutional, the statute as a whole nonetheless runs afoul of the separation of powers. Such a showing is certainly not impossible. *See Ass'n of Am. Railroads v. U.S. Dep't of Transp.,* 721 F.3d 666, 673 (D.C.Cir.2013) ("Just because two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute."). Moreover, while novelty does not create a presumption of

unconstitutionality, a court may well find, in certain circumstances, that the lack of historical precedent for an entity raises a red flag. *Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 2586, 183 L.Ed.2d 450 (2012) (in addressing the constitutionality of the "Obamacare" individual mandate, noting that while "there is a first time for everything," "sometimes the most telling indication of a severe constitutional problem, is the lack of historical precedent") (additional citations omitted). The Bureau, however, is no venture into uncharted waters; it is a variation on a theme—the independent regulatory agency with enforcement power—that has been a recurring feature of the modern administrative state. *See Humphrey's Executor,* 295 U.S. at 629, 55 S.Ct. 869; *SEC v. Blinder, Robinson, & Co.,* 855 F.2d 677, 682 (10th Cir.1988).

**\*14** With respect to the removal power doctrine that serves as the core of ITT's claim, the question we must answer, at its simplest level, is a functional one: "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Morrison,* 487 U.S. at 691, 108 S.Ct. 2597. As we have already noted, we believe that the structure and powers of the Bureau are sufficiently analogous to those of the FTC, SEC, and other regulatory agencies that the question of the constitutionality of the CFPA's removal provision is settled by *Humphrey's Executor* and its progeny. *See Humphrey's Executor,* 295 U.S. at 629, 55 S.Ct. 869. *See also Morgan Drexen,* —— F.Supp.3d at ——, 2014 WL 5785615, at *4 ("It is no more difficult for the President to assure that the Director of the CFPB is 'competently performing his or her statutory responsibilities' than it was for the President to oversee the leadership of the FTC at the time of *Humphrey's Executor.*"). Additionally, ITT has not shown that any of the CFPA's other provisions, whether considered individually or in the aggregate, unconstitutionally infringe on the President's authority to "take care that the laws be faithfully executed"—or otherwise undermine the constitutional separation of powers. We therefore reject ITT's challenge to the constitutionality of the Consumer Financial Protection Act on this basis.

**B. Statutory Vagueness in Violation of Due Process**
ITT also asserts that the Bureau's claims against it under the CFPA fail because the statute's prohibitions on "unfair" and "abusive" conduct "fail to give educational institutions fair notice of what is required of them." Def.'s Br. 4 (citing *FCC v. Fox Television Stations, Inc.,* —— U.S. ——, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012)). This vagueness, it insists, violates the Due Process clause of the Fifth Amendment and renders these

portions of the CFPA unenforceable against ITT.[17]

**[11] [12] [13]** "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television,* 132 S.Ct. at 2315; *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ("Living under a rule of law entails various suppositions, one of which is that all persons are entitled to be informed as to what the State commands or forbids.") (citations omitted). A statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams,* 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61,* 251 F.3d 662, 666 (7th Cir.2001). This doctrine is not implicated merely because "it may at times be difficult to prove an incriminating fact." *Fox Television,* 132 S.Ct. at 2315. Nor can a court declare a law unconstitutionally vague based on "the mere fact that close cases can be envisioned" under its provisions. *Williams,* 553 U.S. at 305–306, 128 S.Ct. 1830. Rather, we refuse to apply a statutory standard only where it is so amorphous that reasonable observers have no choice but to "guess at its meaning [,] and differ as to its application." *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). *See also Fox Television,* 132 S.Ct. at 2315.

**\*15** The CFPA provides: "It shall be unlawful for ... any covered person or service provider ... to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). Count One of the Complaint alleges that ITT violated the Act by engaging in "unfair" conduct, while Counts Two and Three allege "abusive" conduct. ITT argues that the unconstitutional vagueness of Section 5536, as applied here, mandates the dismissal of all three counts. Before addressing, in turn, the purported vagueness of the terms "unfair" and "abusive," we pause to resolve the parties' dispute regarding the level of judicial scrutiny warranted by the economic regulation in question.

## 1. Level of Scrutiny

**[14] [15] [16]** Not all laws are created equal with respect to vagueness doctrine. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). One important distinguishing factor is whether a statute imposes criminal, or merely civil, penalties; less clarity is demanded of laws or regulations that are enforced through civil action rather than prosecution. *Id.* at 498–499, 102 S.Ct. 1186 ("The Court has ... expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *Gresham v. Peterson,* 225 F.3d 899, 908 (7th Cir.2000) (observing that "laws imposing civil rather than criminal penalties do not demand the same high level of clarity").[18]

**[17] [18]** Regardless of whether a statute is civil or criminal in nature, courts also demand considerably greater clarity from laws impacting "the exercise of constitutionally protected rights"—particularly the expression rights guaranteed in the First Amendment. *Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186. If the enforcement of a law threatens to chill protected speech or the exercise of another fundamental right, we apply more stringent scrutiny to its clarity and the fairness of its notice. *See Fox Television,* 132 S.Ct. at 2318 (discussing the heightened stringency of the vagueness inquiry for regulations that "touch upon sensitive areas of basic First Amendment freedoms") (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)). *See also Reno v. Am. Civil Liberties Union,* 521 U.S. 844, 870–871, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect"). We review economic regulations, however, with less severe scrutiny. This is because their "subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186.

**\*16** **[19]** Here, ITT asserts that, despite the concededly economic nature of the CFPA's prohibitions, a stricter vagueness standard should nonetheless apply, for two reasons. First, it contends that economic regulations receive lax scrutiny only if their subject area is "narrow"; since the FCPA, by contrast, is "broad," a reviewing court should demand more clarity. This misconstrues the case law. ITT cites *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), in which the Court stated that "[i]n the field of regulatory statutes governing business activities, where the acts are in a narrow category, greater leeway is allowed."

162, 92 S.Ct. 839. In both *Papachristou* and the landmark *Hoffman Estates* decision that followed it, the Supreme Court reasoned that economic regulations deserve looser scrutiny not *if* their subject matter is narrow, but *because* the subject matter of such regulations is inherently more likely to be narrow. *Id., Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186. *See also Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,* 1 F.3d 1, 4 (D.C.Cir.1993) (noting that "modern vagueness cases have *invariably* afforded less protection" to regulations of economic activity) (emphasis added). Like other federal regulatory statutes, the FCPA is indeed "narrower" than a criminal statute, in that it applies only to certain covered entities and to a particular class of economic activity. *See* 12 U.S.C. § 5536(a)(1).

Second, ITT insists that the CFPA warrants greater scrutiny because it does, in fact, impinge on its constitutionally protected rights. ITT urges that it has a "constitutionally protected property interest[ ]" in participating in federal student loan programs, and the regulation of its communications to its students chills its First Amendment speech rights.[19] Def.'s Reply 4–5. ITT proves too much by its contention: such a broad conception of a statute's impact on constitutional rights would render the distinction between economic and non-economic regulations nugatory. Almost by definition, an economic regulation impacts the "property" interests of the regulated party; short of contending that the CFPA constitutes a "taking" without due process of its property interest in participating in the federal student loan programs under the Fifth Amendment—a claim ITT never makes—ITT cannot invoke the aura of fundamental constitutional rights simply because the law impacts the disposition of its property. *See, e.g., Betancourt v. Bloomberg,* 448 F.3d 547 (2d Cir.2006) (city ordinance forbidding property from being left in public areas, as applied to a homeless man's cardboard shelter, did not encroach on any constitutionally protected rights).

ITT's invocation of its free speech rights is similarly overstated. In support of the notion that "the Bureau ... is attempting to impose liability for truthful communications between ITT and students, chilling ITT's First Amendment rights," ITT cites *Sorrell v. IMS Health, Inc.,* ––– U.S. ––––, 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011). Unlike the law at issue in *Sorrell,* however, the CFPA does not target commercial *speech;* still less does it constitute content discrimination. *Cf.* 131 S.Ct. at 2665 ("But [the statute] imposes more than an incidental burden on protected expression. Both on its face and in its practical operation, Vermont's law imposes a burden based on the content of speech and the identity of the speaker."). Commercial activity inevitably involves

"communications" between buyers and sellers; it does not follow, however, that economic regulations targeting economic behavior violate the First Amendment simply because they might impact speech in this broadest sense. *Id.* at 2664 ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). A great deal of the body of national antitrust and consumer protection law—of which the CFPA is the latest exemplar—depends for its well-established legality on the recognition that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *See Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949).

**\*17** We therefore conclude that, as a statute imposing only civil liability and governing economic activity rather than protected constitutional interest like free expression, the CFPA's language is not subject to heightened scrutiny for vagueness. *See Illinois v. Alta Colleges, Inc.,* 2014 WL 4377579, at \*3–4 (N.D.Ill. Sept. 4, 2014) (finding that "the CFPA is an economic regulation ... subject to a lenient vagueness test"). We proceed to consider the two statutory terms at issue with that understanding in mind.

### 2. "Unfair" Act or Practice

[20] ITT argues that the CFPA's prohibition on "any unfair ... act or practice," 12 U.S.C. § 5536(a)(1)(B), is utterly "standardless" and thus unacceptably vague. Because the prohibition on "unfair" practices taps into a well-developed and long-established definition of the term, we disagree.

[21] [22] It is a fundamental canon of construction that when Congress employs a term with a specialized meaning relevant to the matter at hand, that meaning governs. *See Moskal v. United States,* 498 U.S. 103, 121, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (Scalia, J., dissenting). If Congress has "borrowed" a term of art from its own existing body of legislation, we therefore presume that it did so advisedly. *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In the words of Justice Frankfurter, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings its soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L.Rev. 527, 537 (1947).

Here, the statute's prohibition on "any unfair [or] deceptive act or practice" closely mirrors the language employed by Section 5 of the Federal Trade Commission Act, which proscribes "unfair or deceptive acts or

practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The Bureau's own Supervision and Examination Manual confirms what the near-identical language of the two statutes suggests: that longstanding interpretations of the FTCA should inform interpretation of the CFPA as well. *See* CFPB Supervision and Examination Manual at 174 n. 2 (2d ed.2012).[20]

[23] The FTCA is now more than a century old, and the meaning of its terminology—such as "unfair or deceptive acts or practices" (or "UDAPs")—has been given concrete shape by successive generations of interpretation and refinement. Indeed, the definition has grown more precise over time. "A practice is 'unfair,' " as the Seventh Circuit observed in 1976 according to the FTC's older, broader standard, when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 (7th Cir.1976). From the earliest days of the statute, courts had turned aside challenges to the language on the basis of vagueness. "The phrase is no more indefinite than 'due process of law.' ... If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' ... 'unfair use,' ... and the like." *Sears, Roebuck & Co. v. Fed. Trade Comm'n,* 258 F. 307, 311 (7th Cir.1919).[21] A 1980 FTC policy statement, followed by a 1994 congressional amendment to the statutory language itself, provided more robust—and quantitative—guidance on the meaning of the term. Conduct may only qualify as an unfair act or practice (UDAP) if it: (1) causes or is likely to cause substantial injury to consumers; (2) which is not reasonably avoidable by consumers themselves, and (3) is not outweighed by countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n), added by P.L. 103–312, § 9 (Aug. 19, 1994).

*18 ITT's contention that the term "unfair ... act or practice" is unconstitutionally vague falters in the face of a century's worth of legislative and judicial guidance establishing and refining the term's meaning. We recognize, of course, that the language *itself* may be "inherently insusceptible of precise definition." *See Scott v. Ass'n for Childbirth at Home, Int'l,* 88 Ill.2d 279, 58 Ill.Dec. 761, 430 N.E.2d 1012, 1018 (1981).[22] But Congress's charter for an agency could not, and should not, use descriptions so precise that they foreclose any interpretive uncertainty. "[F]ew words possess the precision of mathematical symbols; most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the

business of government inevitably limit the specificity with which legislators can spell out prohibitions." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The CFPA, like the FTCA before it, has empowered the agency itself to fill in the broad outlines of its authority with specific regulations and interpretations. The agency and the courts have done so in fleshing out the term "unfair ... act or practice," and Congress has tapped into that existing body of law in framing the CFPA with identical terminology. We thus have no difficulty in rejecting ITT's suggestion that a reasonable business entity would be forced to guess at the term's meaning, or would be subject to agency's standardless discretion in its enforcement. *Cf. Papachristou,* 405 U.S. at 161, 92 S.Ct. 839.[23]

### 3. "Abusive" Act or Practice

[24] ITT likewise argues that the CFPA's prohibition on "abusive" acts or practices, upon which Counts Two and Three of the Complaint are predicated, is unconstitutionally vague.

The one respect in which the CFPA's definition of covered misconduct differs from that of the FTCA is the addition of the term "abusive." *Compare* 12 U.S.C. § 5536(a)(1)(B) *with* 15 U.S.C. § 45(a). The legislative history of the CFPA suggests that the term was added, in part, to enable the Bureau to reach forms of misconduct not embraced by the more rigid, cost-benefit standard that had grown up around the terms "unfair" and "deceptive." Sheila Bair, then the chairwoman of the FDIC, advocated adding the term to consumer finance legislation in a 2007 hearing, stating: " 'Abusive' is a more flexible standard [than "unfair" or "deceptive"] to address some of the practices that make us all uncomfortable." *Improving Fed. Consumer Protection in Fin. Servs., Hearing Before the H. Comm. on Fin. Servs.,* 110th Cong. 37–41 (2007). The new "abusive" standard is one of the chief salient features of the CFPA, and has been widely recognized as such. *See* Tiffany S. Lee, *No More Abuse: The Dodd–Frank and Consumer Fin. Protection Act's "Abusive" Standard,* 14 J. Consumer & Com. L. 118, 119–121 (2011) (collecting academic and industry commentary).

Contextual evidence thus suggests that "abusive" conduct is defined according to a more flexible, expansive standard than had heretofore been present in federal consumer protection law. *See Improving Fed. Consumer Protection, supra,* at 40. We need not read the tea leaves of legislative history, however, to apprehend a standard according to which abusive conduct may be measured. In fact, the statute itself provides significant guidance:

*19 The Bureau shall have no authority under this

section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—

(1) Materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) Takes unreasonable advantage of-

(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

(B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

(C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531(d).[24]

ITT observes, correctly, that "abusive" is a novel term in the context of the statute. To emphasize what they characterize as the fatal indefiniteness of the language, they quote the 2012 hearing testimony of inaugural Bureau Director Richard Cordray:

> [The Bureau] ha[s] been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and circumstances issue.... Probably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise when that would seem to fit the bill under the prongs.

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP, Fin. Servs. & Bailouts of Pub. & Private Programs,* 112th Cong. 112–107, at 69 (2012). While the term's meaning may be less well-established in the field of consumer protection that that of "unfair," however, the CFPA hardly marks the first time Congress has employed it. The Fair Debt Collections Practices Act (FDCPA), first enacted in 1977, specifically declared as its aim to redress "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The statute prohibits "any conduct the natural consequence of which is to harass, oppress, or *abuse* any person," and it proceeds to enumerate a non-exhaustive list of six types

of offending conduct. 15 U.S.C. § 1692d. The FTC has brought over 60 enforcement actions pursuant to this provision since it became effective in 1978, enabling the growth of an appreciable corpus of judicial commentary explicating the meaning of abusive treatment of consumers. *See* Amanda L. Wait, *The New Bureau of Consumer Fin. Protection—An Overview,* at 1 (Am. Bar Ass'n 2010). In a similar vein, the Federal Telemarketing Sales Rule ("FTSR"), promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102, forbids "abusive telemarketing acts or practices." 16 C.F.R. § 310.4. Like the FDCPA, the Rule provides an illustrative list of conduct qualifying as "abusive." *Id.*

ITT also cites judicial decisions in which judges expressed frustration with the amorphous nature of the term "abusive." In *Ustrak v. Fairman,* 781 F.2d 573 (7th Cir.1986), the Seventh Circuit decried a prison regulation forbidding "disrespectful" and "abusive" prisoner conduct for its vagueness. The court declined to find the regulation unconstitutional, however, reasoning that First Amendment vagueness doctrine is less strictly applied in the context of prisons. 781 F.2d at 580. In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), Justice Scalia—concurring separately—discussed Title VII's prohibition on "hostile or abusive work environments." He mused that " '[a]busive' (or 'hostile,' which in this context I take to mean the same thing) does not seem to be a very clear standard." 510 U.S. at 24, 114 S.Ct. 367 (Scalia, J., concurring). Despite his misgivings about the statute's language, however, he acquiesced in the test the Court had adopted to give shape to the "inherently vague statutory language." *Id.* at 25, 114 S.Ct. 367.

**\*20** [25] As ITT itself acknowledges, however, the issue before us is not whether the word "abusive" can be vague in *any* context, but whether the statutory language incorporating that term gives ITT fair notice of conduct forbidden and permitted in *this* context. Def.'s Reply 5 (citing *Holder,* 561 U.S. at 18, 130 S.Ct. 2705). Because the CFPA itself elaborates the conditions under which a business's conduct may be found abusive—and because agencies and courts have successfully applied the term as used in closely related consumer protection statutes and regulations—we conclude that the language in question provides at least the minimal level of clarity that the due process clause demands of non-criminal economic regulation. *See Alta Colleges, Inc.,* 2014 WL 4377579, at \*3–4. *Cf. Gates & Fox Co., Inc. v. Occupational Safety & Health Review Comm'n,* 790 F.2d 154, 156 (D.C.Cir.1986) (invalidating OSHA's interpretation of a regulation as applied to a defendant, but expressing no

opinion on "whether, in a non-penal context, the Commission's interpretation ... might be permissible").[25]

## II. Whether ITT is a "Covered Entity"

ITT argues that Counts One, Two, and Three of the Complaint fail to state a claim because ITT is not a covered entity subject to suit under the CFPA. Def.'s Br. 13–19. We conclude that, taking the Bureau's factual allegations as true, the pleadings place ITT within the statute's purview.

The operative provisions under which the Bureau has sued ITT apply only to a "covered person" or "service provider." 12 U.S.C. § 5536(a)(1). The Act defines a "covered person," in turn, as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "product or service," as the phrase implies, is more than simply the direct extension of a loan to a consumer: it may include "brokering" or servicing loans, 12 U.S.C. § 5481(15)(A)(i), as well as "providing financial advisory services ... to consumers on individual financial matters." *Id.* at § 5481(15)(A)(viii). The CFPA defines a "service provider," on the other hand, as one who "provides a material service to a covered person in connection with" the covered person's offering of a "consumer financial product." *Id.* at § 5481(26)(A). Such material service may include participating in "designing, operating, or maintaining the consumer financial product or service," or processing "transactions relating to the consumer financial product or service." *Id.*

ITT may thus qualify as a "covered person" in three ways germane to the conduct alleged: (1) as a direct provider of consumer financial products—loans—to its students; (2) as a "broker" of those loans or other credit instruments; or (3) by providing "financial advisory services" to students. Alternatively, it may qualify as a "service provider" if it provided a material service to another covered entity—here, the originator of the third-party loans—as defined under the statute.

### A. Whether ITT is a "Covered Person"

#### 1. "Engages In"

**\*21** As an antecedent matter, ITT insists that it is not a "covered person" because it has not "engaged in" any of the statutory activities. According to ITT, an entity "engages" in the provision of consumer financial products or services only if it does so as a business or profession. Since it is primarily an educational institution and only tangentially, if at all, involved in consumer financial products and services, ITT maintains that its business falls

outside the CFPA's scope. Def.'s Reply 8–9.

ITT notes, correctly, that we should "look to the language and design of the statute as a whole" in construing the meaning of a particular statutory provision. Def.'s Reply 8 (citing *United States v. Graham,* 305 F.3d 1094, 1102 (10th Cir.2002)). It then points to 12 U.S.C. § 5393(b)(1)(B), a provision which extends the coverage of a different portion of the consumer protection law to executives and senior officers of companies who "engaged or participated in any unsafe or unsound practice." 12 U.S.C. § 5393(b)(1)(B). The use of the disjunctive "or," ITT contends, signals that to "engage" must denote a greater degree of involvement than mere "participation." Def.'s Reply 9. ITT also appeals to Webster's Dictionary, one of whose definitions of "engage" is "to begin and carry on an enterprise, especially a business or profession." *Id.* at 8 (citing Webster's Third New Int'l Dictionary 751 (1976)).

[26] [27] We are not persuaded that the CFPA uses "engage" here in anything other than its ordinary sense. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). "In ascertaining the plain meaning of [a] statute," in turn, "[we] must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). The plainest meaning of the term "engage" is "to occupy or involve oneself; take part; be active." *See United States v. Graham,* 305 F.3d 1094, 1102 (10th Cir.2002) (citing Webster's New World College Dictionary at 450 (3rd ed.1997)). Congress's use of the term elsewhere in the Dodd–Frank Act comports with this broad, common-sense reading. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). For instance, the Act defines the term "person regulated by a State insurance regulator" as "any person that is *engaged in the business of* insurance." 12 U.S.C. § 5481(22) (emphasis added). If "engaging" in an activity were synonymous with "being in the business of" that activity, this definition would be redundant. *Cf. In re Total Realty Management, LLC,* 706 F.3d 245, 251 (4th Cir.2013) ("Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce some terms to mere surplusage.") (quoting *PSINet, Inc. v. Chapman,* 362 F.3d 227, 232 (4th Cir.2004)).[26]

### 2. "Financial Advisory Services"

**\*22** ITT may thus qualify as a "covered person" under the CFPA so long as it involved itself in any of the statutorily-governed conduct, regardless of whether doing so was its primary business focus. Here, the Bureau has not pleaded that ITT itself offered to students the "third-party loans" that are the subject of its claims—at least in the sense that ITT, rather than the third-party creditors, was the titular lender. *See* Compl. ¶¶ 11, 18, 98, 110, 130. *See also* Compl. ¶ 17 (alleging that ITT engaged in "offering or providing loans, *through certain private loan programs,* to its students") (emphasis added).[27] Nor has the Bureau satisfactorily pleaded that ITT served as a "broker," as the statute defines that term. The Dodd–Frank Act expressly incorporates the definition of "broker" contained in the Securities Exchange Act of 1934. 12 U.S.C. § 5301(15). A broker is therefore "any person engaged in the business of effecting transactions ... for the account of others."[28] 15 U.S.C. § 78c(a)(4)(A). While the Bureau protests that we should apply this definition only "except as the context otherwise requires," 12 U.S.C. § 5301, it has pointed to no indication that the context of Title X actually does dictate a different usage. In fact, the CFPA's own definitions section makes reference to "broker[s] or dealer[s] that [are] required to be registered under the Securities Exchange Act"—a context clue that, if anything, further suggests that the specialized, imported meaning applies. 12 U.S.C. § 5481(21)(A). Because the Bureau has not alleged that ITT was engaged in the "business" of effecting loan transactions on behalf of its students, its conduct as an educational institution does not qualify it as a broker under 12 U.S.C. § 5481(15)(A)(i).

[28] The Bureau has, however, sufficiently stated a claim that ITT engaged in conduct qualifying as the provision of "financial advisory services." The Act specifies that such advisory services include, without limitation, "providing credit counseling to any consumer" and "providing services to assist a consumer with debt management or debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure." 12 U.S.C. § 5481(15)(A)(viii). The Complaint includes allegations that ITT advised students on how to manage their debt to the school after having taken out Temporary Credit; this advice often channeled the students into the private loan programs. Compl. at ¶¶ 110, 138–151. According to the Bureau, ITT completed nearly every step in the process of acquiring CUSO loans on the students' behalf, including filling out the requisite forms (save signatures) and forwarding them to the lending credit union. *Id.* at ¶¶ 91–92, 122, 139. At a minimum, we conclude that such conduct, if proven, would fall within the realm of "credit

counseling" and "assist[ing] a consumer with debt management."

ITT retorts that, despite the fact that the statute itself defines "financial advisory services" only by a non-exclusive list of qualifying conduct, we should apply a more specialized, restrictive definition: those services "so closely related to banking ... as to be a proper incident thereto." Def.'s Br. 16 (citing 12 C.F.R. § 225.28(a)). It bases this definition on the CFPA's legislative history—specifically, the report of the Committee on Banking, Housing, and Urban Affairs to the full Senate recommending the measure's passage. S.Rep. No. 111–176, at 160 (2010). That report, officially authored by Senator Dodd, notes that the term "financial product or service," as used in the CFPA, was "modeled on the activities that are permissible for a bank or a bank holding company, such as under section 4(k) of the Bank Holding Company Act [BHCA] and implementing regulations." *Id.* The BHCA, which as its title suggests regulates bank holding companies, provides in relevant part that, in addition to banking itself, the regulated entities are permitted to engage in activities that are "financial in nature or incidental to such financial activity" or are "complementary to a financial activity." 12 U.S.C. § 1843(k). Both that statute and its implementing "Regulation Y" go on to provide lists of such permissible activities. *Id.* at § 1843(k)(4); 12 C.F.R. § 225.28(b).

**\*23** We approach the use of legislative history as an aid to statutory interpretation with serious reservations. The myriad legislative materials accompanying any statute, none of which have been subject to bicameralism and presentment, lend themselves easily to manipulation. In the Supreme Court's words, "judicial investigation of legislative history has a tendency to become ... an exercise in 'looking over a crowd and picking out your friends.' " *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (citations omitted). Committee reports merit particular skepticism, for they "may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Id. See also Milner v. Dep't of the Navy,* 562 U.S. 562, 131 S.Ct. 1259, 1267, 179 L.Ed.2d 268 (2011).

[29] Those reservations notwithstanding, ITT's reasoning is unconvincing. While the reference to activities "so closely related to banking ... as to be a proper incident thereto" may seem on its face as if it would exclude any activities conducted by an educational entity, the definition

proffered by the BHCA and its regulations is permissive in nature—and is accompanied by a broad list of non-banking activities that qualify. The BHCA provides that "[p]roviding financial, investment, or economic advisory services" qualifies as an activity that is "financial in nature." 12 U.S.C. § 1843(k)(4)(C). Its implementing regulation affirms that "[f]inancial and investment advisory activities" are permissible for the bank holding companies subject to the statute. 12 C.F.R. § 225.28(b)(6). Even if Congress did intend the statute to track the BHCA's definition, in other words, the BHCA does not state that "activities so closely related to banking ... as to be incident thereto" excludes advisory services. And as to what the term "advisory services" *itself* means, the BHCA is no more enlightening than the CFPA. Where legislative history has interpretive value, that value lies in clarifying statutory ambiguity. *See Milner,* 131 S.Ct. at 1267 ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."). The Senate Report serves no such purpose here. While the statute itself may not define "financial advisory services" in pellucid terms, the legislative history cited by ITT offers no significant support for ITT's preferred restrictive definition.

ITT offers another, related argument against interpreting the CFPA's "financial advisory services" to include its interactions with its students. "Congress," it reminds us, does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). Including an educational institution like ITT within the ambit of entities liable under the statute for providing financial advisory services is such a significant step, ITT insists, that Congress could hardly have taken it without more explicitly saying so. In *American Bar Association v. F.T.C.,* 430 F.3d 457 (D.C.Cir.2005), which ITT cites in support of its argument, the D.C. Circuit rejected the FTC's attempt to regulate a law firm as a "financial institution." There, the FTC had supported its expansive reading by pointing to the statute's broad definition of a financial institution as "any institution the business of which is engaging in financial activities," and by noting the same lengthy list of permissible non-banking activities for "financial institutions" that we have already discussed above. 430 F.3d at 467. The court ruled that the statutory framework governing financial institutions, including Congress's definition of the term, contained insufficient ambiguity to warrant deference to the agency's attempt to cram a "rather large elephant in a rather obscure mousehole." *Id.* at 469.

*24 While we do not question the wisdom of the D.C. Circuit's decision in *American Bar Association,* we find it distinguishable. The Consumer Financial Protection Act

is aptly named: Congress stated that its purpose is to ensure "that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511. As we have already discussed, the statute does *not* restrict its regulatory reach to "financial institutions." *See* 12 U.S.C. §§ 5536, 5481. In the absence of any indication that holding educational institutions—or law firms, for that matter—liable for unfairness to consumers is contrary to the statute's goals, we see no reason to circumscribe what Congress has spoken broadly. *See* Pl.'s Ex. 3 (*Consumer Fin. Prot. Bureau v. Gordon* (C.D.Cal. June 26, 2013)).[29] While it may be an unacceptably dramatic conceptual leap to label a law firm as a "financial institution," it is hardly a leap at all to say that a school offers "financial advisory services" to its students—particularly on the facts alleged here.

## B. "Service Provider"

[30] ITT also qualifies as a "service provider" under the CFPA. As we have previously noted, the statute extends its reach to any entity that "provides a material service to a covered person in connection with" the covered person's offering of a "consumer financial product." A "material service" may include participating in the "designing, operating, or maintaining" of the consumer financial product or service in question. *See* 12 U.S.C. § 5481(26)(A)(i).

ITT does not dispute that the third-party originators of the SCUC "private loans" were "covered persons" based on the Bureau's allegations. *See* 12 U.S.C. §§ 5481(5), 5481(6). As for ITT's accessory role, the school cannot be held to account for its role in "designing" the loan programs in 2008 and 2009, since the CFPA did not take effect until July 2011. Def.'s Br. 17 (citing *Molosky v. Wash. Mut., Inc.,* 664 F.3d 109, 113 n. 1 (6th Cir.2011) (provisions of the Dodd–Frank Act are not retroactive)). *See also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (discussing principles of statutory retroactivity). The Bureau has also pleaded, however, that ITT was heavily involved in operating and maintaining the loan program. The Complaint alleges that ITT used Temporary Credit as a tool to pre-qualify students for the private loans, that ITT developed the loans' underwriting criteria, that it paid the credit union membership fees in the lead credit union on behalf of the students who took out the loans, and that it provided a stop-loss guarantee to the programs' lenders—covering any losses from defaults exceeding 35% of participating students. Compl. ¶¶ 116–117, 121–122. These allegations are more than "unsupported generalities"—as ITT calls them—and they suffice to meet the Bureau's burden at this stage of the litigation. *Cf. Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

**\*25** The only piece of evidence ITT offers in favor of a reading of "operating" and "maintaining" that excludes the alleged conduct is a quotation from the 2012 CFPB bulletin. According to ITT, "the Bureau ... has stated that 'service providers' are entities to whom covered persons have 'outsource[d]' functions that would otherwise fall within the Bureau's jurisdiction." Def.'s Br. 18 n. 11 (citing CFPB Bulletin 2012–03, at 1). An examination of the Bureau's full statement in the 2012 Bulletin, however, is inconsistent with the impression ITT seeks to convey. The Bulletin states as follows:

> The CFPB recognizes that the use of service providers is often an appropriate business decision for supervised banks and nonbanks. Supervised banks and nonbanks may outsource certain functions to service providers due to resource constraints, use service providers to develop and market additional products or services, or rely on expertise from service providers that would not otherwise be available without significant investment.

CFPB Bulletin 2012–03, at 1. Thus, whether or not we view "outsourced" functions as distinctive from those allegedly performed by ITT, ITT's cited source does not actually assert that an entity is a service provider only if it performs such functions. We see no reason to read "operating" and "maintaining" as bearing anything other than their ordinary meaning; seen in this light, the Bureau has stated a claim that ITT falls into the covered category of "service provider."

### III. Adequacy of the Bureau's Pleadings under the CFPA

We now turn, lastly, to the Bureau's allegations themselves. ITT argues that each of Counts One, Two, and Three fails to state a claim. Because the guiding standard for each count is different, we consider them separately.

### A. Count One: Unfair Acts or Practices

Count One of the Complaint alleges that, "[f]rom July 21, 2011 through December 2011, ITT subjected consumers to undue influence or coerced them into taking out ITT Private Loans through a variety of unfair acts and practices designed to interfere with the consumers' ability to make informed, uncoerced choices." Compl. ¶ 160. The

Bureau alleges that this conduct constituted an "unfair ... act or practice" under the CFPA. 12 U.S.C. § 5536(a)(1)(B).

In order to state a claim for an unfair act or practice under the Act, a plaintiff must establish that: "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1). The parties dispute the sufficiency of the Complaint with respect to each of these three elements.

### 1. Substantial Injury

[31] Under the standard for unfair practices that the statute has borrowed from the FTCA, a "substantial" injury in the context of consumer protection is most often a financial one. *See F.T.C. v. Direct Mktg. Concepts, Inc.,* 569 F.Supp.2d 285, 299 (D.Mass.2008) (citing Letter from Federal Trade Comm'n to Senators Ford and Danforth (Dec. 17, 1980)); *Am. Fin. Servs. Ass'n v. F.T.C.,* 767 F.2d 957, 972 (D.C.Cir.1985). Although the harm involved need not be massive on an annual basis to count as substantial, *cf. Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d 1354, 1365 (11th Cir.1988), a "trivial or speculative" harm will not suffice. *See FTC v. IFC Credit Corp.,* 543 F.Supp.2d 925, 945 (N.D.Ill.2008).

**\*26** [32] Here, the Bureau has alleged that approximately 8,600 ITT students suffered financial harm when they were directed by ITT into the "private loans" between July and December 2011. Compl. ¶¶ 120, 162. The private loans into which ITT channeled its students carried interest rates as high as 16.25% and origination fees as high as 10%, which "translates to thousands of dollars for each customer over the life of the loan, and millions of dollars across the group." Pl.'s Resp. 20 (citing Compl. ¶ 124). According to the Bureau, the students who took out these loans were predominantly in fragile financial health, and, according to ITT's own projections, some 64% of them defaulted, exacerbating their debt and financial distress. Compl. ¶¶ 124, 154. These allegations adequately describe a substantial financial injury to the students.[30]

Rather than engage directly with these accusations, ITT contends that the Court necessarily lacks a metric by which to judge whether the students were harmed by the loans. According to ITT, there is no "discernible standard" by which the Court could determine that a loan was "unaffordable"; ITT points out that while there is a lengthy regulation defining the scope of affordability for *mortgages,* no analogous authoritative guidance exists for

these loans. Def.'s Br. 20–21 (citing 12 C.F.R. § 1026.43(c)). Further, ITT cites 12 U.S.C. § 5517(*o* ), which prohibits the Bureau from establishing a "usury limit applicable to an extension of credit"—with the implication that if the Bureau cannot impose usury caps, then it cannot object to loans on the basis of their unaffordability. *Id.* at 21. ITT's thrusts here are misdirected. The Bureau is not required to plead here that the private loans crossed any sort of discrete "affordability" threshold, nor does the ultimate success of the claim hinge on whether the rates charged in the loans are *per se* unreasonable or usurious. Rather, the Bureau must plead that ITT's conduct harmed the students' welfare, and the facts it has plausibly pled could support such an inference if proven.

More to the point, ITT objects that the Complaint has not stated a claim that the misconduct caused the harm of which the Bureau complains. The essence of ITT's argument is that the Bureau has not shown that ITT *forced* any students to take out the private loans—and that without coercion it is impossible to show that ITT's actions were the proximate cause of any subsequent financial harm. Def.'s Br. 21–23. ITT relies on *Cohen v. American Security Insurance Co.,* 735 F.3d 601 (7th Cir.2013). In that decision, the Seventh Circuit addressed a homeowner's claim against a mortgage lender that, pursuant to its contract with the homeowner, had procured hazard insurance on the homeowner's behalf after the homeowner allowed previous coverage to lapse. 735 F.3d at 603–606. The homeowner brought a claim under Illinois's analogue to the FTCA, alleging that the lender had engaged in unfair practices by "coercing" her into paying for high-cost insurance coverage. The court rejected the plaintiff's theory, reasoning that the coverage requirement was common in such contracts, and "if it was not coercive to demand that [she] maintain insurance coverage on the property (and it certainly was not), it cannot have been coercive for [the lender] to threaten to invoke the contractual remedies available for breach of that duty." *Id.* at 610. In other words, the plaintiff had not demonstrated that either the circumstances of the signing of the contract, or its enforcement by the lender in signing up the plaintiff for expensive coverage, had unduly impeded the plaintiff's freedom of choice.

*27 *Cohen* affirms that "insisting that a contract partner fulfill his contractual duties ... is not coercion," 735 F.3d at 609, but it does not speak meaningfully to the separate question of when the circumstances of a contract's formation may be coercive. Rather, the Seventh Circuit there found that the plaintiff's allegations of unfairness in the contracts' origins lacked plausibility: the lender disclosed the insurance requirement "clearly and fully"

throughout the process, and the plaintiff's allegation that the lender was providing a "kickback" to its insurance affiliate was conclusory. *Id.* at 609–610. In short, there was "a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness." *Id.* at 610 (quoting *Robinson v. Toyota Motor Credit Co.,* 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 962 (2002)).

[33] [34] While relevant, formal contract principles are thus "not conclusive" in an unfair practices claim, for this "is an action that charges 'unfairness,' and legality and unfairness are not necessarily congruent." *FTC v. IFC Credit Corp.,* 543 F.Supp.2d 925, 948, 953 (N.D.Ill.2008) (citing *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)). Here, the Bureau alleges that ITT's tactics were effectively "coercive" for two principal reasons. First, the "repackaging" process was "rushed and controlled" by the ITT financial aid staff, and staff members employed intrusive and overbearing tactics in ensuring that students rolled over their Temporary Credit into private loans, Compl. ¶¶ 85, 87; some students, according to the Bureau, "did not even realize they took out the ITT Private Loans because of the rushed and automated manner in which ITT Financial Aid staff processed ITT students' paperwork." *Id.* at ¶ 142. Second, ITT used the withholding of course materials, transcripts, and transfer credits as leverage to convince impecunious students who had already invested greatly in an ITT education to take out the loans to enable them to keep their heads above water. *Id.* at ¶¶ 160(a)–(c). *See also* ¶¶ 8, 9, 87, 97, 139–140. The Complaint states that "[s]ome students objected to the ITT Private Loans, but they were told that if they refused to use them, they either had to pay any outstanding Temporary Credit and the next year's tuition gap—which most could not do—or leave the school in the middle of their program and forfeit the investment they had made so far." *Id.* at ¶ 140. Courts have found that both types of tactic can satisfy the causation element of an unfair practices claim. *See F.T.C. v. Zamani,* 2011 WL 2222065, at *9 (C.D.Cal. June 6, 2011) (purveyors of mortgage refinance service committed unfair practices by signing up customers by misrepresenting the "success rate" of the modification program, the recoverability of an up-front fee, and the rates and terms available). In particular, we agree with the Bureau that the threat of withholding vital educational assets like transcripts and class credit is not only likely but appears calculated to produce considerable leverage over ITT students, and that under certain circumstances the deployment of such leverage could fairly be termed "coercive." *Am. Fin. Servs. Ass'n,* 767 F.2d at 973 ("The injury resulting from 'threats' or 'suggestions' of seizure [of household furnishings pursuant to a credit agreement]

is not limited to psychological harm. Consumers threatened with the loss of their most basic possessions become desperate and peculiarly vulnerable to any suggested 'ways out.' ").

**\*28** The Bureau has alleged that ITT rushed students through the loan "repackaging" process, left them ill-informed about the nature of the contracts they were signing, and exploited the students' vulnerable financial positions to steer them into loans that provided a temporary solution to the students' problems (and benefited ITT's balance sheets) but deepened their longterm distress.[31] Without abandoning the common law's presumption that parties should be held to the terms of contracts to which they freely agreed, our inquiry into "unfair" practices under the statute requires us to look past form and into substance. *See IFC Credit, 543 F.Supp.2d at 948* ("[T]his is not an action at common law for simple breach of contract or for fraud. Rather it is an action under a federal statute that makes unlawful conduct causing substantial, unavoidable injury...."). These allegations, if substantiated, would satisfy the Bureau's burden of proof on the question of substantial injury and causation.

### 2. "Reasonably Avoidable"

[35] [36] Our inquiry into whether consumers' injury was "reasonably avoidable" focuses on "whether the consumers had a free and informed choice," and it thus overlaps significantly with the previous discussion of coercion. *See Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1168 (9th Cir.2012); Am. Fin. Servs., 767 F.2d at 976.* "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Id.* (quoting *Orkin, 849 F.2d at 1365–1366 (11th Cir.1988)).*

Here, ITT contends that any injury sustained by the students as a result of the private loan debt was reasonably avoidable because the students always remained formally free to fill their "tuition gaps" by any means they chose; indeed, as the Complaint concedes, some students opted not to take out the private loans and managed to satisfy their debts by other means. *See* Compl. ¶¶ 25–26, 143. Moreover, ITT notes that the contracts signed by students did disclose the nature of both the Temporary Credit and the private loans, and it further insists that the school disclosed the effect of outstanding debt on the transferability of credit. Def.'s Br. 24.

In response, the Bureau urges that its pleadings

demonstrate that, regardless of whether the injury was formally avoidable, students lacked a free choice as a practical matter. First, the Bureau has alleged that the choice students made was not a meaningfully "informed" one, since ITT staff engaged in so much "hand-holding" that the students' role was often reduced to signing forms already completed for them.[32] Compl. ¶¶ 85–87, 91, 141–142. Since the public policy in favor of holding contracting parties to their agreements depends in part on their having a "full opportunity to read" the contracts in question, these allegations at least raise a question regarding whether the students were adequately informed. *Cf. Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 394 (7th Cir.2003). See also Paterson v. Wells Fargo Bank, N.A., 2012 WL 4483525, at \*5 (N.D.Ill. Sept. 27, 2012)* (allowing claim under the Illinois analogue to the FTCA to proceed even where written terms of the contract conflicted with alleged misrepresentations). Second, the Complaint states that the "choice" enjoyed by students, even assuming they fully understood its nature, was an illusory one. As the FTC has explained in fleshing out its parallel "unfairness" standard, an injury may not be reasonably avoidable where a defendant "exercise[s] undue influence over highly susceptible classes of purchasers." *See IFC Credit Corp., 543 F.Supp.2d at 946* (quoting H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 37 (1983)). The Bureau's allegations that ITT leveraged the threat of withholding transcripts and denying transferability of credits, or expelling students outright if they failed to make up their "tuition gap," describe a scenario in which students were boxed into a corner. *See* Compl. ¶¶ 87, 160(a)–(b), 163. *See also Wendorf v. Landers, 755 F.Supp.2d 972, 979 (N.D.Ill.2010)* (noting that a plaintiff states a claim under Illinois's analogue to the FTCA where "the defendant's conduct gave plaintiff no reasonable alternative" to suffering the injury in question).[33]

**\*29** We agree with the Bureau. Regardless of any difficulty it may face in proving its allegations that ITT guided its students into a precarious position and exploited that vulnerability to channel them into unwise and damaging debt obligations, its Complaint satisfactorily states its claim at this stage. We "give the plaintiff the benefit of imagination, so long as the hypothesis are consistent with the complaint." *Bissessur v. Ind. Univ. Bd. of Trustees, 581 F.3d 599, 603 (7th Cir.2009)* (quoting *Sanjuan, 40 F.3d at 251*).

### 3. Whether Harm Outweighed Benefit to Consumers

The harm-benefit balance associated with ITT's conduct is a particularly fact-dependent issue. *See Am. Fin. Servs., 767 F.2d at 986–988.* Perhaps realizing as much, neither

party devotes much discussion to it. ITT argues, in effect, that the lifelong benefits flowing from a postsecondary degree must outweigh the economic harm allegedly inflicted by the loans: "Many graduates from various types of post-secondary educational institutions advance in their careers following the 'entry-level' positions obtained upon graduation.... [A]bsent private loans, students with Temporary Credit balances or otherwise in need of funds to cover an additional year of tuition would almost certainly have been worse off." Def.'s Br. 25. This argument misses the central thrust of the Bureau's accusations: that ITT's unfair practices lay in creating a stark choice between the private loans and dropping out of college. *See* Pl.'s Resp. 25. The finder of fact will thus need to frame the question more precisely, inquiring whether the harm of the situation created by ITT's conduct outweighed any benefit such conduct conveyed upon students.

The Bureau has alleged in its Complaint that "[t]he injury to the ITT students who took out ITT Private Loans was not outweighed by countervailing benefits to consumers or to competition." Compl. ¶ 164. Standing on its own, such an allegation might be inadequate and conclusory. Read in conjunction with the Complaint's other, more detailed, allegations concerning the nature of the harm suffered, however, we conclude that it is sufficient to state a claim that the third element of the "unfairness" test has been satisfied. *See* Compl. ¶¶ 46–49, 85–87, 97–98, 138–142.

**B. Counts Two and Three: Abusive Practices**
The Bureau brings two counts alleging that "abusive" acts or practices in violation of 12 U.S.C. § 5531: Count Two alleges that ITT took unreasonable advantage of the inability of consumers to protect their own interests in selecting or using a consumer financial product, Compl. ¶¶ 166–173; and Count Three alleges that ITT took unreasonable advantage of the reasonable reliance by consumers on ITT to act in the consumers' interests. Compl. ¶¶ 174–182.

**1. "Unreasonable Advantage"**
[37] As a threshold matter, ITT objects that the Bureau has not stated a claim that it took "unreasonable advantage" of its students—a necessary element of both of its claims regarding "abusive" acts or practices. Def.'s Br. 25–27 (citing 12 U.S.C. § 5531(d)(2)). In ITT's words: "There is no allegation that ITT received any fees or interest from any private loan. To the contrary, the complaint alleges that ITT 'guaranteed' the very same private loans for which it supposedly predicted a 60% default rate ... which undermines the Bureau's unlikely claim of 'advantage.' "

Def.'s Br. 26 (citing *Bissessur,* 581 F.3d at 603–604).

**\*30** But the Bureau has, in fact, alleged that ITT derived an advantage from its conduct. In the absence of evidence indicating that we should do otherwise, we construe the language of a statute according to its "plain language," giving the words used their ordinary meaning." *Lara Ruiz v. I.N.S.,* 241 F.3d 934, 940 (7th Cir.2001) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs., Ltd. P'ship,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). The ordinary meaning of "to take advantage of" is "to make use of for one's own benefit," to "use to advantage," or to "profit by." Webster's Third New Int'l Dictionary 2331 (3d ed.1993). Here, the Bureau has alleged that signing up students for the private loans enabled ITT to clear the "doubtful assets" represented by the Temporary Credit off its balance sheets, converting it into "immediate income and cash-on-hand." Compl. ¶ 114.[34] In fact, the Bureau's allegations quote senior ITT officials stating that ITT designed the loan programs precisely in order to derive such an economic benefit from them. Compl. ¶¶ 134–137. Given the Bureau's allegations about the unfair nature of the students' predicament, the Complaint sufficiently pleads that ITT derived "unreasonable advantage" from its conduct, according to the term's ordinary, broad meaning.[35]

**2. Count Two: Students' Inability to Protect Their Interests**
In defining the scope of "abusive" acts or practices, the CFPA lays out several routes to liability. One means by which a defendant's conduct may be abusive is if the defendant "takes unreasonable advantage of ... the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B).

ITT assails the Complaint for "posit[ing] that students were unable to protect their own interests in the repackaging process 'because' they lacked the resources or time to repay any outstanding Temporary Credit or obtain private loans elsewhere." Def.'s Br. 28 (citing Compl. ¶ 171). ITT continues, objecting that "[t]he complaint does not show that ITT limited the amount of time students had to arrange financing from any source, prevented students from paying with family funds, or prevented students from taking a period to work and then resuming their education when they had paid their Temporary Credit balance." *Id.* Contrary to ITT's assertions, the Bureau has in fact alleged that ITT contributed to the students' vulnerability by knowingly waiving its minimal credit criteria to allow students to take out Temporary Credit, and by engaging in the same aggressive, hand-holding tactics described elsewhere in

connection with the later "repackaging" process. Compl. ¶¶ 100, 63–84.

Regardless of who caused the students' vulnerability, the Bureau's burden here is to show that they were, in fact, unable to protect their own interests. As we have discussed before in connection with "coercion" and the lack of a reasonable alternative, ITT's argument relies too heavily on a formalistic reading of the statutory requirement. It is likely true, as ITT asserts, that students never lost the theoretical power to defend their interests, in the sense that they could have walked away from ITT entirely and refused to take out new debt. *See* Def.'s Br. 28. A reasonable reading of the statutory language, however, is that it refers to oppressive circumstances—when a consumer is unable to protect herself not in absolute terms, but *relative to* the excessively stronger position of the defendant. *See, e.g., Ting v. AT & T,* 319 F.3d 1126, 1148–1149 (9th Cir.2003) (noting that, under doctrine of procedural unconscionability, a literal, physical lack of consumer choice is not necessary to show oppressiveness). *See also* Carey Alexander, *Abusive: Dodd–Frank Section 1031 and the Continuing Struggle to Protect Consumers,* 85 St. John's L.Rev. 1105, 1114–1119 (2011) (discussing the legislative history of the "abusive" standard as consistent with the understanding that it is a statutory codification of the common-law doctrine of unconscionability). As we have already discussed, the Complaint sufficiently alleges that such oppressive circumstances existed here.[36] We therefore conclude that Count Two of the Complaint states a claim for relief.

### 3. Count Three: Students' Reasonable Reliance on ITT

**\*31** Count Three of the Complaint asserts an alternate ground of ITT's liability for "abusive" conduct: that ITT "[took] unreasonable advantage of ... the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C).

[38] "Reasonable reliance" is a familiar concept in tort law, and it is a question of fact generally not appropriate for resolution on a motion to dismiss, or even summary judgment. *See Pippenger v. McQuik's Oilube, Inc.,* 854 F.Supp. 1411, 1427 (S.D.Ind.1994) ("[G]enerally speaking, the questions of reasonable diligence and reasonable reliance are questions of fact for the jury to decide."). To withstand a motion to dismiss, a plaintiff's allegations that a group of consumers relied on a defendant's representations need not contain specific allegations as to any particular consumer's individual reliance. *See F.T.C. v. Security Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir.1991) ("It would be inconsistent with the statutory purpose [of the FTC] for the court to require proof of subjective reliance by each individual consumer."); *F.T.C. v. Kuykendall,* 371 F.3d 745, 765–766 (10th Cir.2004).

[39] The Bureau has alleged that, throughout their time at the school, ITT staff represented to students that they would "work in the interests of [their] students to better their lives." Compl. ¶¶ 29–32. This included orally assuring prospective students of large salaries, "usually ... six figures," upon graduation. *Id.* at ¶¶ 40–42. According to the Complaint, "[s]ome ITT students accepted the ITT Private Loans because they believed ITT Financial Aid staff was acting in their interests in signing them up for such loans, and they believed, based on ITT's representations, that ITT in general was acting in their interest to better their lives." Compl. ¶ 141. Thus, the Bureau has alleged both that ITT students relied upon staff members' representations as to the private loans, and that students act in reasonable reliance on the school's misrepresentations as to the nature and role of the financial aid staff. *See* Compl. ¶¶ 95–96 ("Despite words and actions to the contrary, ITT staff was not trained, nor was the staff instructed, to safeguard students' financial interests.... Most of ITT's metrics for evaluating the performance of Financial Aid staff were related to how many students had completed financial aid packages...."). *See also Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.,* 773 F.Supp.2d 151, 172 (D.D.C.2011) ("Even though mortgage brokers operate on behalf of neither the consumer nor the creditor, reasonable consumers may erroneous believe that loan originators are working on their behalf.") (citations omitted).[37]

[40] ITT argues broadly that the claim fails both because its allegations are inconsistent with the Bureau's theory that students were "coerced" into taking out the private loans, and because the Bureau's allegations are nothing more than "bare assertions." ITT's first argument is groundless: a complaint may advance inconsistent legal theories based on the same set of facts. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7th Cir.2008) ("Although our pleading rules do not tolerate factual inconsistencies in a complaint, they do permit inconsistencies in legal theories.") (citing *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 805, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)). The Bureau has alleged no facts overtly inconsistent with those upon which it bases its claim in Count Three.

**\*32** ITT's argument that the Bureau's allegations fail the *Iqbal/Twombly* "plausibility" standard spring from a similarly erroneous premise. ITT insists that paragraphs

65 and 92 of the complaint, alleging that students were given insufficient information about the loan process and that ITT employees "did all the work" for them, offer only "bare conclusions." Def.'s Br. 31 (citing Compl. ¶¶ 65, 92). As for the allegations of misconduct more specifically relating to the "repackaging" process, Compl. ¶¶ 85–87, 138–142, ITT asserts that they are nothing more than " 'threadbare recitals of the elements of a cause of action' devoid of factual content." *Id.* (quoting *Iqbal, 556 U.S. at 678, 129 S.Ct. 1937*).

"A plaintiff must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Reger Dev., LLC v. Nat'l City Bank, 592 F.3d 759, 764 (7th Cir.2010)* (quoting *Tamayo, 526 F.3d at 1083*). In other words, a plaintiff must plead facts that plausibly give rise to a right to relief—but he need not, at this stage, *prove* those facts. The portions of the Complaint to which ITT refers are not "recitals" of the elements of a legal claim at all; rather, they are allegations of fact. *See* Compl. ¶¶ 85–87, 138–142. Reading these allegations in the context of the extensive and detailed allegations of the Complaint as a whole, we find that they contain enough facts to "state a claim to relief that is plausible on its face." *See Killingsworth, 507 F.3d at 618–619*. The Bureau need not do more at this stage, and we thus reject ITT's repeated suggestions otherwise.

We thus conclude that Count Three, like Count Two, satisfies the pleading requirements imposed by the Federal Rules of Civil Procedure and withstands ITT's motion to dismiss.

### 4. Count Four: Violation of the Truth in Lending Act

[41] "Regulation Z," promulgated by the Federal Reserve Board in implementation of the Truth in Lending Act, *15 U.S.C. § 1601 et seq.*, requires the disclosure of certain "finance charges," as defined by the Act, in writing before the consummation of the transaction giving rise to the charges. *12 C.F.R. §§ 1026.17, 18(d).*[38] *See also 15 U.S.C. § 1605(a)* (defining "finance charge"). The Bureau alleges that the discount ITT offered students who paid off their Temporary Credit balances in a lump sum constituted a finance charge, and that ITT's failure to disclose the charge violated TILA and Regulation Z. Compl. ¶¶ 184–191. We do not reach the merits of the claim, because we agree with ITT that Count Four is barred by the applicable statute of limitations.

ITT contends that this claim is governed by the section of TILA governing "civil liability," which provides that "any

action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." *15 U.S.C. § 1640(e)*; *Basham v. Fin. Am. Corp., 583 F.2d 918, 927 (7th Cir.1978)*. Because the Complaint was filed on February 26, 2014—well more than one year after the conduct described in the allegations occurred—ITT asserts that this action lies outside the limitations period. Def.'s Br. 34; Def.'s Reply 19.

**\*33** The Bureau counters that its claim in Count Four is governed not by TILA's civil liability provision, but by *15 U.S.C. § 1607*, the section of the statute which grants the Bureau—together with several other federal agencies—power to "enforce[e] compliance with any requirement imposed" by the Act. *15 U.S.C. § 1607(a)(6)*. Enforcement actions brought under *15 U.S.C. § 1607* are not subject to the one-year statute of limitations imposed by *Section 1640*. *See* Fed. Reserve Bd. Consumer Compliance Handbook, Regulation Z, at 57. *See also Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 238, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004)* (noting that the Federal Reserve Board and its staff have been designated by Congress as the primary source for interpretation and application of TILA).

We disagree with the Bureau's interpretation of the distinction between the two statutory provisions. First, we see no persuasive evidence that *15 U.S.C. § 1640* governs only *private* civil actions. The provision itself does not exclude actions in which a government agency is the plaintiff, and in fact it explicitly recognizes the possibility of intervention by federal agencies in civil suits initiated by private parties. *15 U.S.C. § 1640(e)(1)*.[39] Second, agency interpretations support the conclusion that the agency enforcement powers contemplated by *Section 1607* are *administrative* in nature, and are separate from any authorization to file civil suits. In interpreting its enforcement authority under TILA, the Comptroller of the Currency stated that "[t]he Comptroller's administrative authority to enforce compliance with the Truth in Lending Act and Regulation Z ... [is] based on Section 108 of the Act [*15 U.S.C. § 1607*] and *12 U.S.C. § 1818(b)* [the Federal Institutions Supervisory Act]. The authority of these sections is separate from and independent of the civil liability provisions of ... the Truth in Lending Act." OCC Interpretive Letter, Fed. Banking L. Rep. 85,040 (Oct. 6, 1977). Similarly, the Federal Reserve's interpretive manual for Regulation Z states that "*regulatory administrative* enforcement actions ... are not subject to the one-year statute of limitations." Fed. Reserve Board Consumer Compliance Handbook, Regulation Z at 57 (Nov.2013) (emphasis added).

In a recent decision, the Supreme Court reaffirmed the principle that "the cases in which a statute of limitation may be suspended by causes not mentioned in the statute itself ... are very limited in character, and are to be admitted with great caution; otherwise the court would make the law instead of administering it." *Gabelli v. SEC,* —— U.S. ——, 133 S.Ct. 1216, 1224, 185 L.Ed.2d 297 (2013) (quoting *Amy v. City of Watertown,* 130 U.S. 320, 324, 9 S.Ct. 537, 32 L.Ed. 953 (1889)). Here, Congress demonstrated its "concern that a creditor not face limitless liability in terms of time" by setting a one-year statute of limitations for the filing of civil suits under TILA. *Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, Office of Comptroller of Currency,* 118 F.3d 1461, 1467 (11th Cir.1997). When the government chooses to enforce the Act by filing a civil suit rather than resorting to the administrative actions under its power, we see no reason why the same congressional concerns should not apply—indeed, they may apply with still greater force. *See Gabelli,* 133 S.Ct. at 1223 (noting that government "civil penalty" actions under the SEC, among other things, "label defendants [as] wrongdoers"). This seems to be a case of first impression: ITT can point to no cases in which a court has applied the civil statute of limitations to a suit brought by the Bureau, and the Bureau has pointed to no civil actions brought by the CFPB—or any other agency—pursuant to 15 U.S.C. § 1607. Under such circumstances, guided by the agencies' own interpretive language and the jurisprudential rule-of-thumb recently reaffirmed by the Supreme Court, we decline to read an exception for agency plaintiffs into the one-year statute of limitations imposed by TILA's civil liability provision. We therefore dismiss Count Four as time-barred.

## IV. Failure to Join Necessary Parties

**\*34** Hidden within ITT's brief is an extraordinarily concise alternative argument for dismissal. "To the extent the Bureau seeks to recover from ITT the payments made by students to third-party lenders pursuant to their lending contracts, the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(7) for failure to join those third-party lenders as necessary parties." Def.'s Br. 14 (citing *United States ex rel. Hall v. Tribal Dev. Corp.,* 100 F.3d 476, 479–481 (7th Cir.1996)). Federal Rule of Civil Procedure 19 prescribes a multi-part inquiry to guide courts and parties in ensuring "the joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources." *Davis Cos. v. Emerald Casino, Inc.,* 268 F.3d 477, 481–482 (7th Cir.2001) (quoting *Moore v. Ashland Oil, Inc.,* 901 F.2d 1445, 1447 (7th Cir.1990)). ITT has not engaged in any analysis under this standard, nor has it provided any argument at all in support of its Rule 12(b)(7) motion other than the single sentence quoted above. We deem this underdeveloped argument to be waived. *See DeBoard v. Comfort Inn,* 2013 WL 5592418, at *3 (S.D.Ind. Oct. 9, 2013) (citing *Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 718 (7th Cir.2012)). *See also United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991) ("Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

### Conclusion

For the foregoing reasons, ITT's motion to dismiss is DENIED as to Counts One, Two, and Three of the Complaint, and GRANTED as to Count Four of the Complaint.

IT IS SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2015 WL 1013508

## Footnotes

[1]   ITT is incorporated in Delaware, and maintains its headquarters in Carmel, Indiana, within the Southern District of Indiana. ¶ 16.

[2]   Within this narrative of the facts, citations containing only paragraph numbers refer to the Complaint, found at Docket No. 1.

[3]   The Bureau quotes ITT's chief financial officer as stating that the "average ITT student is earning around $18,000 per year and has a credit score under 600 at the time he or she enrolls." Compl. ¶ 24.

[4]   The Bureau asserts that even these numbers are exaggerated because "annualizing" graduates' salaries hides the effect of part-time jobs. Compl. ¶ 47.

5    As ITT has pointed out, the "mystery shoppers," for obvious reasons, were utilized only in reporting on how ITT treated enrollees during the initial stage, rather than the repackaging stage for continuing students. Although the Bureau's allegations regarding mystery shopper reports are placed in its Complaint adjacent to allegations regarding the repackaging stage, it is important to bear this distinction in mind.

6    The other, the PEAKS program, evidently ran out of funds and stopped operating earlier in 2011. ¶¶ 129–132.

7    An exception to this eligibility was made for students who had declared bankruptcy within the previous 24 months. ¶ 116.

8    *See also United States v. Williams,* 504 U.S. 36, 51, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (discussing the interpretive value of British monarchical tradition).

9    The Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591 *et seq.*

10    ITT never elaborates on this objection or provides any rationale for the objectionability of concentrating the agency's authority in a Director rather than a commission. American constitutional history, in certain contexts, does undoubtedly betray a certain antipathy to the concentration of power. In the Federalist Papers, James Madison cautioned that "[t]he accumulation of all powers legislative, executive, and judiciary in the same hands ... may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 324 (J. Cooke ed.1961). Justice Stevens later cited this language, in his opinion in *Hamdan v. Rumsfeld,* 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), in explaining his opposition to the excessive combination of executive, legislative, and adjudicative authority in military tribunals. *See Consumer Fin. Protection Bureau v. Morgan Drexen, Inc.,* ——F.Supp.3d ——, ——, 2014 WL 5785615, at *8 (C.D.Cal. Jan. 10, 2014) (citing *Hamdan,* 548 U.S. at 600–602, 126 S.Ct. 2749). But we find no support for the notion that creating a consumer protection agency with a single head rather than a commission structure necessarily runs counter to constitutional principles, and ITT has certainly provided us with no such argument.

11    ITT's undeveloped contention that the CFPB is unprecedented and problematic because it is "an independent agency within an independent agency," Def.'s Reply 3 (citing 12 U.S.C. § 5491(a)), is unpersuasive for the same reason.

12    The statute empowers the Director to draw funds annually from the Federal Reserve in the amount he determines to be "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. § 5497(a)(1). It does, however, place a formula-based spending cap on this amount, *id.* at § 5497(a)(2), and it imposes a number of other conditions on the Director's use of the funds so derived.

13    Both these subsections of the statute concern the authority of the Financial Stability Oversight Council established under subchapter 1 (12 U.S.C. § 5311 *et seq.*) of the legislation. They set for the Council's ability to review, stay, or reverse a regulation promulgated by the Bureau under certain defined circumstances.

14    The Northern District of Illinois recently rejected a defendant's argument that the Bureau is an unconstitutional entity because the operative provisions of the CFPA are impermissibly vague, in violation of the Due Process clause. *See Illinois v. Alta Colleges, Inc.,* 2014 WL 4377579, at *3–4 (N.D.Ill. Sept. 4, 2014). We address this issue below, and we ultimately agree with the conclusion reached by our sister district court.

15    Of the two articles cited by ITT, one posits that the Bureau's "unique" structure raises questions of constitutionality, while the other more specifically critiques the Director's power to appoint the Deputy Director. *See* Eric Pearson, *A Brief Essay on the Constitutionality of the Consumer Financial Protection Bureau,* 47 Creighton L.Rev. 99, 120–121 (Dec.2013) (criticizing the "functionalist" approach to the separation of powers analysis); Kent Barnett, *The Consumer Financial Protection Bureau's Appointment with Trouble,* 60 Am. U.L.Rev. 1459, 1488 (June 2011) (arguing that "the Deputy Director's appointment is constitutional is a significant question" deserving of courts' attention). Both articles, while certainly offering legitimate and serious analysis, proceed from a formalist understanding of the separation of powers that we conclude is not supported by the Supreme Court's jurisprudence—including its most recent authoritative discussion of the issue in *Free Enterprise Fund.*

16    The article to which ITT refers, "Why Dodd–Frank is Unconstitutional," was written by two attorneys in conjunction with a suit they filed in D.C. District Court seeking a declaration that Titles I, II, and X of the Act (including the CFPA) were unconstitutional. C. Boyden Gray & Jim R. Purcell, *Why Dodd–Frank is Unconstitutional,* Wall St. J., June 21, 2012, at A17. That suit was subsequently dismissed for lack of standing. *See State Nat'l Bank of Big Spring v. Lew,* 958

F.Supp.2d 127 (D.D.C.2013) (granting the Secretary of the Treasury's motion to dismiss). While the article may be interesting as a sort of executive summary of that ill-fated suit, it hardly qualifies as constitutional analysis in its own right.

17   The Bureau correctly notes that, at least outside the context of First Amendment overbreadth, it is only appropriate here for ITT to challenge the statute *as applied* rather than facially. *See* Pl.'s Resp. 7 n. 6 (citing *Holder v. Humanitarian Law Project,* 561 U.S. 1, 18, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010)). *See also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").

18   In a footnote to its reply brief, ITT argues that, under *Hoffman Estates,* the CFPA merits stricter review because its penalties, though civil in nature, are "quasi-criminal," with a "prohibitory and stigmatizing effect." Def.'s Reply 5 n. 5 (citing *Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186). Though ITT is correct that the CFPA does authorize the imposition of heavy fines, 12 U.S.C. § 5565(c)(2), it forbids exemplary or punitive damages. And although it has sought rescission, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties, its Complaint does not seek "public notification regarding the violation" or "limits on the activities or functions of the [defendant]." Compl. 33–34. *Cf.* 12 U.S.C. § 5565(a)(2). The possibility of steep fines, by itself, does not render a statute "quasi-criminal." *See Ford Motor Co. v. Tex. Dep't of Transp.,* 264 F.3d 493, 508 (5th Cir.2001). *Cf. Karlin v. Foust,* 188 F.3d 446, 465 (7th Cir.1999) (statute is quasi-criminal in that it "imposes professional discipline" and levies forfeiture penalties upon physicians who make unreasonable emergency medical determinations).

19   ITT also urges that it "has a protected interest in not being subject to an enforcement action by an unconstitutional agency." Def.'s Reply 5 (citing *Nat'l Labor Relations Bd. v. Noel Canning,* ——U.S. ——, 134 S.Ct. 2550, 2559, 189 L.Ed.2d 538 (2014); *Free Enter. Fund,* 561 U.S. at 491 & n., 130 S.Ct. 31382). We have already entertained, and rejected, ITT's argument that the Bureau's structure is unconstitutional. Alternatively, if ITT is attempting to argue that the operative language of the CFPA is unconstitutionally vague because the CFPA is unconstitutional, ITT is arguing in circles.

20   Accessed at http://files.consumerfinance.gov/f/201210_cfpb_ supervision-and-examination-manual-v2.pdf (February 19, 2015).

21   Although the statute was never overturned as vague and was repeatedly held to be enforceable by the courts, it must be noted in the interests of historical accuracy that the 1980 FTC guidance and subsequent 1994 statutory amendment were prompted, at least in part, by criticism that the existing construction of the language rendered it too indefinite. *See, e.g.,* Nelson, *The Politicization of FTC Rulemaking,* 8 Conn. L.Rev. 413, 414 (1976); The Washington Post, Sec. A, p. 22 (Mar. 1, 1978) (cited in "Modern Refinement of F.T.C. Standards," 1 Consumer Law Sales Practices and Credit Regulation § 120 (updated Sept. 2014)).

22   ITT also cites *Beler v. Blatt, Hasenmiller, Leibsker & Moore,* 480 F.3d 470, 474 (7th Cir.2007), a Seventh Circuit decision which observes that, in the context of the FDCPA, "the phrase 'unfair or unconscionable' is as vague as they come." 480 F.3d at 474. The court noted that the statute authorized the FTC to issue advisory opinions "giving shape to these and other vague terms"; the problem was that there, unlike here, no such agency guidance had been forthcoming. *Id.* Regardless, the court in *Beler* addressed a different question than that presented here: whether "federal judges ought ... use this ambulatory language to displace decisions consciously made by state legislatures and courts about how judgment creditors collect judgments entered under state law." *Id.* at 475.

23   ITT's argument that the statute is vague and standardless is somewhat compromised by its ease in applying the very same supposedly nonexistent standards, later in its brief, to insist that the Bureau has failed to state a claim for unfair acts or practices.

24   ITT contends that this provision's reference to "unreasonable advantage" and "reasonable reliance" is *itself* vague. ITT's Br. 12. In support, it quotes Justice Scalia's concurrence in *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), in which he opined that " '[a]busive' ... does not seem to me a very clear standard—and I do not think clarity is at all increased by adding the adverb 'objectively' or by appealing to a 'reasonable person['s] notion of what the vague word means." 510 U.S. at 24, 114 S.Ct. 367 (Scalia, J., concurring). While Justice Scalia complained about the indefinite nature of the standards guiding judicial construction of a criminal statute's prohibition of "abusive" conduct—and further observe that the "reasonable man" test did not meaningfully clarify matters—he did not actually assert that the statute in question was void for vagueness. And as the Bureau has noted, the use of "reasonableness" as a proxy for objectivity is hardly an alien feature in the law. *See Barclays Bank PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 315–316, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) ("We note, initially, that

'reasonableness' is a guide admitting effective judicial review in myriad settings, from encounters between the police and citizenry ... to the more closely analogous federal income tax context.") (citations omitted); *United States v. Ragen,* 314 U.S. 513, 522, 62 S.Ct. 374, 86 L.Ed. 383 (1942) (noting that determinations "by reference to a standard of 'reasonableness' are not unusual under federal income tax laws").

25    In a footnote to its brief, ITT argues that these statutory provisions are unconstitutional, alternatively, because they constitute impermissible delegation of legislative power to the Executive Branch. Def.'s Br. 12 n. 9. Congress cannot grant an executive agency rulemaking powers so broad that it has empowered the agency to engage in *de facto* legislating itself—in other words, Congress's mandate must lay down "an intelligible principle to which the [agency] is directed to conform." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The Supreme Court has invalidated Acts of Congress on this basis on less than a handful of occasions; most famously, in *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the Court struck down a portion of the National Industrial Recovery Act, a centerpiece of the New Deal, because it granted the President the authority to regulate the economy by promulgating "codes of fair competition." 295 U.S. at 531, 55 S.Ct. 837. While the Supreme Court's relatively recent decision in *Whitman* may have dispelled the impression that the "non-delegation" doctrine was a dormant relic of pre(or anti-) New Deal conservatism, there is no doubt here that Congress has supplied an "intelligible principle" to the Bureau. As the Bureau points out, the degree of specificity provided in the CFPA compares quite favorably to other organic statutes that have withstood constitutional challenge. *See, e.g., Yakus v. United States,* 321 U.S. 414, 420, 426–427, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (mandate to the Office of Price Administration to fix "fair and equitable" commodity prices laid down an intelligible principle); *Touby v. United States,* 500 U.S. 160, 165–167, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (provision of Controlled Substances Act empowering Attorney General to classify a drug on a temporary basis where "necessary to avoid an imminent hazard to the public safety" laid down an intelligible principle).

26    We find that ITT's citation to another portion of the statute, 12 U.S.C. § 5393(b)(1)(B), which refers to a company that "engaged *or* participated" in qualifying activities, is less persuasive. As we have noted, ITT insists that the disjunctive "or" should signal that to *engage* is to be involved in greater depth in an activity than to merely *participate*. But the fact that the statute uses those two words tells us nothing about which of the two has the "deeper" meaning, if either. In our view, this passage is most naturally read as an instance of what Justice Scalia called the "iteration to which lawyers, alas, are particularly addicted—such as 'give, grant, bargain, sell, and convey,' ... or 'right, title, and interest.' " *Moskai v. United States,* 498 U.S. 103, 120, 111 S.Ct. 461 (Scalia, J., dissenting) (citing B. Garner, *A Dictionary of Modern Legal Usage,* at 197–200 (1987)). Webster's Dictionary, for instance, recognizes that the two words may be used interchangeably. Webster's Third New Int'l Dictionary 751 (3d ed.1993).

27    The CFPA's "merchant exclusion," 12 U.S.C. § 5517(a), does not apply. The Act states that the Bureau may not generally exercise authority "with respect to a person who is a merchant, retailer, or seller of any nonfinancial good or service and is engaged in the sale or brokerage of such nonfinancial good or service." *Id.* at § 5517(a)(1). The exclusion only applies, however, insofar as the merchant in question "extends credit directly to a consumer ... for the purpose of enabling that consumer to purchase" non-financial goods from that merchant—or engages in two other types of conduct not material here. *Id.* at § 5517(a)(2)(i)–(iii).With respect to the private loans, the Bureau has not successfully pleaded that ITT "directly extended" credit; therefore, any statutory exclusion that would bar this route to liability is irrelevant. With respect to the Temporary Credit, the Bureau has pleaded that ITT charged students a "finance charge." *See* Compl. ¶¶ 185–187 (citing 12 C.F.R. § 1026.4(b)(9)). Under another limitation to the statutory exemption, ITT's conduct in "regularly" extending credit that bears a finance charge is also unshielded by the "merchant exclusion." *See* 12 U.S.C. § 5517(a)(2)(B)(iii).

28    The Securities Exchange Act definition further specifies that the "transactions" in question must be "in securities." 15 U.S.C. § 78c(a)(4)(A). We assume that Congress intended to import the definition without that limitation; including the limitation would render the definition inapposite for the context of consumer financial protection.

29    The CFPA expressly restricts the authority of the Bureau over the "practice of law." 12 U.S.C. § 5517(e). However, this limitation applies only to products or services "offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship." *Id.* at § 5517(e)(2)(A). Thus, the CFPA could bring suit against a law firm engaged in the provision of financial products or services not incident to its legal representation of its clients. Notably, the statute contains no such exclusion concerning educational institutions. *See* 12 U.S.C. § 5517.

30    ITT takes issue with the Bureau's "conclusory assertions" regarding what students "wanted, understood, or knew" when they took out the ITT private loans. Def.'s Br. 20 (citing *Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir.2014)) (discussing the *Twombly/Iqbal* pleading standards requiring a plaintiff to "state a claim to relief that is plausible on its face"). This objection is misguided. Regardless of whether the Bureau's allegations regarding the

students' state of mind are plausible, that question has no bearing on whether the students suffered substantial harm.

31   ITT objects that the bulk of the Bureau's allegations regarding misinformation to "mystery shoppers" fall outside the statute's effective date, and that the Bureau has not specifically alleged that misconduct occurred during the "repackaging" stage for continuing students. Def.'s Br. 21–22. To the contrary, although many of the "mystery shopper" allegations are not directly relevant here, the Complaint also contains a number of allegations that specifically concern the process in question. *See* Compl. ¶ ¶ 85–87, 97–98, 138–142. Even if we view the allegations concerning ITT's conduct towards prospective students as mere table-setting and immaterial to the CFPA claims, the Complaint contains more than enough relevant allegations to state a claim.

32   The Bureau additionally alleges that the students were victims of a larger "bait-and-switch" pattern, since they were rushed through the earlier Temporary Credit applications and ill-informed of the nature of that debt—which in turn rendered them more vulnerable when it came time to "repackage." Compl. ¶¶ 103–108. We agree with ITT, however, that we must focus on ITT's conduct that fell within the July–December 2011 period in which the CFPA was enforceable; since the allegations center on the private loans and no student's initial and "repackaging" stages could both have taken place in that six-month window, we do not directly consider the allegations of antecedent misconduct. *See* Def.'s Reply 12–13.

33   ITT points to *Todd v. Collecto, Inc.,* 731 F.3d 734 (7th Cir.2013), an FDCPA decision in which the Seventh Circuit observed that it was not "unfair," in the context of the FDCPA, "for a college to withhold a student's transcript until she has settled her debt to the school." 731 F.3d at 739. As the court in *Todd* itself noted, however, the three-part standard for unfairness under the FTCA (and now the CFPA) does not fit perfectly with the "unfairness" described in Section 1692f of the FDCPA. *Id.* Regardless, the question of whether it is unfair to *collect* a pre-existing debt by withholding transcripts is a different question than whether it is unfair to goad students into *incurring* debt by use of such a threat.

34   ITT argues that since the Bureau has not alleged that the school caused the students' subsequent high default rate on the private loans, the Bureau cannot have stated a claim that the loans were "abusive." While proximate cause is indeed a necessarily element of a theory of liability, as ITT points out, *see* Def.'s Br. 27 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 1390, 188 L.Ed.2d 392 (2014)), the Bureau's claim is not that ITT derived advantage from the fact that the students later defaulted, but from the cash flow generated by their taking out the loans in the first place. Whether or not ITT caused the students later to default—or derived some sort of benefit from that default—is irrelevant.

35   As to the "unreasonable" nature of the advantage ITT allegedly derived from the transactions, ITT objects that its course of conduct is simply "how financial aid in higher education works." In support, it cites *Jackson v. Bank of America Corp.,* 711 F.3d 788 (7th Cir.2013), in which the Seventh Circuit dismissed a procedural unconscionability claim regarding a mortgage contract because "[t]here is nothing in the record to indicate that [plaintiffs] did not understand the terms of their loan ... [or] that the [plaintiffs] did not understand the potential consequences of defaulting on their loan." 711 F.3d at 793. Here, the Bureau has, in fact, alleged such lack of understanding on the part of the students. *See* Compl. ¶ 142. More to the point, ITT's "slippery slope" argument is inapposite. If, once the factual record is developed, it turns out that ITT's practices are fully in line with the practices of colleges and universities nationwide, the Bureau would face a steep (but not necessarily impossible) hill to climb in establishing that such common practices "take unreasonable advantage" of students. But the Bureau has alleged conduct that—we hope—is not simply par for the course; at any rate, the "everyone else is doing it" defense does not support a motion to dismiss absent an argument that the allegations are legally invalid or factually implausible.

36   In its brief, ITT again raises the argument that using transfer credits as leverage cannot be a violation of the statute because precedent dictates that "educational institutions may—and do—withhold credits for transferring students with outstanding tuition balances." Def.'s Br. 28 (citing *In re Oliver,* 499 B.R. 617, 620–621 (Bankr.S.D.Ind.2013)). *In re Oliver,* the new case ITT cites (in addition to *Todd v. Collecto,* which we have already discussed), is a bankruptcy decision concerning whether an unpaid balance on a student account meets the definition of an education loan under the statutory discharge exception for student loan debt. 499 B.R. at 620–621. Like *Todd,* it has nothing to do with the separate question of whether it may be "abusive" for an educational institution to use its authority to withhold transcripts or transfer credits as leverage in persuading students to take out new debt.

37   As we have stated above, we conclude that the absence of overt misrepresentations in the forms the students signed, to the extent that their formal correctness conflicts with the Bureau's allegations of oral misrepresentations, is not fatal to the Bureau's claim. While a common-law fraud action might be frustrated under most conditions by the existence of a written contract without any factual misrepresentations, the standard may be different under a statutory cause of action—particularly one that does not authorize private enforcement. *See FTC v. Minuteman Press,* 53 F.Supp.2d 248, 262–263 (E.D.N.Y.1998) ("Thus, ... a conflict between a specific disclaimer and a contrary oral

representation—typically fatal to a reasonable reliance argument in a purely private suit—is ... actionable by the FTC....").

[38]    The CFPA subsequently transferred rulemaking authority pursuant to this regulation from the Federal Reserve to the Bureau. *See* Pl.'s Resp. 33 n. 23.

[39]    As the Bureau notes, the Third Circuit in *Vallies v. Sky Bank,* 591 F.3d 152 (3d Cir.2009), did refer to Section 1640 as creating a "private" cause of action. 591 F.3d at 156. That discussion was outside the context of the distinction we examine here, however; we read the court's description as a slightly overbroad paraphrase rather than a considered restriction.

---

**End of Document**                                            © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Consumer Finance Protection Bureau,

       Plaintiff,

                                 Civ. No. 17-166 (RHK/KMM)

v.                                  **ORDER**

TCF National Bank,

       Defendant.

---

Two entities have filed Motions to appear as *amicus curiae* in this action and submit memoranda in support of Defendant's Motion to Dismiss.  (Doc. Nos. 40, 42.) Accordingly, **IT IS ORDERED** as follows:

1.      Any party interested in appearing as *amicus curiae* in this matter in connection with Defendant's Motion to Dismiss must serve and file a motion requesting permission to so appear on or before April 14, 2017;

2.      The motion described in paragraph (1) shall explain how the interested party's expertise, special interest, and competence could assist the Court.  The motion shall not exceed 1,000 words;

3.      The motion described in paragraph (1) shall be accompanied by the interested party's proposed *amicus curiae* memorandum, which shall not exceed 6,000 words;

4. The motion and memorandum described in paragraphs (2) and (3), respectively, shall be accompanied by a certificate of compliance in the form described in District of Minnesota Local Rule 7.1(f)(2);

5. Any response in opposition to a motion seeking leave to appear as *amicus curiae* shall be served and filed on or before April 21, 2017, shall not exceed 1,000 words, and shall be accompanied by a certificate of compliance in the form described in Local Rule 7.1(f)(2);

6. No reply briefs or further submissions – whether by letter, affidavit, memorandum, or otherwise – will be permitted by interested parties seeking to appear as *amicus curiae*;

7. If an interested party's motion to appear as *amicus curiae* is granted, only its initial *amicus curiae* memorandum will be accepted and considered;

8. In order to file a motion to appear as *amicus curiae* in this matter, counsel must either be admitted to practice in this Court or associated with local counsel, in accordance with the terms of Local Rule 83.5;

9. The briefing schedule on Defendant's Motion to Dismiss is **MODIFIED** as follows: (i) Plaintiff's memorandum in opposition to the Motion, along with all supporting documents, shall be served and filed no later than May 19, 2017; and (ii) Defendant's reply memorandum in further support of its Motion, if any, along with all supporting documents, shall be served and filed no later than May 26, 2017; and

- 2 -

10.     The hearing on Defendant's Motion is **CONTINUED** from May 16, 2017, to Wednesday, June 14, 2017, at 8:00 a.m. in Courtroom 7A, Warren E. Burger Federal Building and United States Courthouse, 316 North Robert Street, St. Paul, Minnesota.

Dated: March 30, 2017                    s/Richard H. Kyle
                                         RICHARD H. KYLE
                                         United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Consumer Finance Protection Bureau,

        Plaintiff,

                                    Civ. No. 17-166 (RHK/DTS)

v.                                   **ORDER**

TCF National Bank,

        Defendant.

---

      This matter is before the Court on two Motions by third-parties to appear as *amicus curiae* in this action, in connection with Defendant's pending Motion to Dismiss.

      The first Motion was brought by a group of fourteen bankers' associations representing nearly 2,500 banks; their 11-page memorandum does not "restate all the legal arguments and . . . precedent" in Defendant's brief, but rather addresses "the significant impact this lawsuit could have on the banking industry as a whole."  (Doc. No. 41 at 2.)  Plaintiff does not oppose the associations' Motion, and the Court finds that the associations' expertise in the banking industry would be helpful in addressing the issues raised in this case and in Defendant's Motion to Dismiss.  Moreover, consideration of the associations' 11-page brief would not impose an undue burden on Plaintiff or the Court. Accordingly, the associations' Motion (Doc. No. 40) will be granted.

      The second Motion was brought by the Chamber of Commerce of the United States of America (the "Chamber"), self-described as "the world's largest business federation" representing "the interests of more than 3 million companies and professional

organizations of every size, in every industry sector, and from every region of the country." (Doc. No. 43 at 1.) Unlike the associations, however, the Chamber's brief largely rehashes and expands upon arguments made by Defendant in its Motion to Dismiss. (Compare, e.g., Doc. No. 38 at 41-42 (Defendant arguing that Plaintiff is unconstitutionally structured) with Doc. No. 43 at 4-16 (Chamber arguing the same); Doc. No. 38 at 28-32 (Defendant arguing that claims for conduct occurring before July 11, 2011 are untimely) with Doc. No. 43 at 17-20 (Chamber making the same argument).) For this reason, the Court will deny the Chamber's Motion. The purpose of an *amicus curiae* (or "friend of the Court") is "to call the court's attention to law, facts, or circumstances in a matter then before it *that may otherwise escape its consideration*." Pettet v. May, No. 2:11-CV-4049, 2011 WL 3354089, at *4 (W.D. Mo. Aug. 3, 2011) (emphasis added) (citation omitted). Hence, where a proposed *amicus* brief "essentially duplicates a party's brief," leave to appear as *amicus curiae* will be denied. Voices for Choices v. Ill. Bell Tel. Co., 339 F.3d 542, 544 (7th Cir. 2003). That is precisely the case here. Defendant is represented by not one, not two, but three large and experienced law firms, which together have filed a comprehensive and lengthy memorandum; further explication of the issues raised therein is neither helpful to the Court nor a wise use of its (or Plaintiff's) resources. See Mausolf v. Babbitt, 158 F.R.D. 143, 148 (D. Minn. 1994) (Erickson, M.J.) ("The amicus privilege rests in the discretion of the court[,] which may grant or refuse leave according as it deems the proffered information timely, useful, or otherwise.") (internal quotation marks and citation omitted), rev'd on other grounds, 85 F.3d 1295 (8th Cir. 1996).

- 2 -

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that (1) the associations' Motion to Appear as Amicus Curiae (Doc. No. 40) is **GRANTED**, and Plaintiff shall address the associations' arguments in its response to Defendant's Motion to Dismiss,[1] and (2) the Chamber's Motion to Appear as Amicus Curiae (Doc. No. 42) is **DENIED**.

Dated: April 26, 2017                            s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge

---

[1] Although the associations are granted leave to appear as *amicus curiae*, they will not be permitted to argue at the hearing on the Motion to Dismiss, nor will they be permitted to submit a reply brief.

- 3 -