**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION
BUREAU,

        Plaintiff,

   v.

OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
and OCWEN LOAN SERVICING, LLC,

        Defendants.

**DEFENDANTS' MOTION TO DISMISS AND**
**INCORPORATED MEMORANDUM OF LAW**

Defendants hereby move to dismiss the Plaintiff's Complaint with prejudice on the grounds explained in the incorporated memorandum of law.

Perhaps the most central tenet of our constitutional system is that there is a universal right to be treated equally and fairly by the federal government. Among other things, this means that citizens are protected against government overreach by the Founders' carefully-crafted system of checks and balances. This also means that everyone gets fair notice of the requirements of any laws they must comply with *before* being sued or prosecuted, and that when the government tells citizens what to do it does not change the rules *afterwards* and then sue or prosecute. This lawsuit by the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") violates each of these principles. For these reasons, and others, it must be dismissed.

The CFPB alleges that Defendants Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc. and Ocwen Loan Servicing, LLC (which the Bureau collectively defines as "Ocwen"), violated various federal laws and regulations in servicing residential mortgage loans since January 1, 2014. Ocwen strenuously disputes the allegations in the 318-paragraph Complaint, which is long on bluster and loaded with overblown accusations of misconduct and alleged consumer harm. To the contrary, Ocwen prides itself on its work as an advocate for the borrowers whose loans it services, and Ocwen has been recognized—and lauded—for having agreed to modify more borrowers' loans than any other mortgage servicer. Ocwen has a strong and committed team whose performance earns Ocwen the approval of numerous community groups, borrower advocates, ratings agencies and other independent evaluators of its work. If and when necessary, Ocwen is ready to show (on the merits) why the Complaint does not establish any liability.

But this case cannot even reach that stage because the Complaint must be dismissed from the outset due to the constitutional, statutory, and pleading defects detailed in this Motion.

First, the entire Complaint must be dismissed on constitutional grounds because the CFPB violates the system of checks and balances that protects Ocwen, and every citizen, from an unbridled government agency. The 2010 Consumer Financial Protection Act ("CFPA") that created the CFPB consolidated a massive amount of regulatory and enforcement power over virtually all of our nation's consumer financial services laws in the hands of a single person, the CFPB's Director, and then insulated that position from accountability to the only executive Article I recognizes, the President. This constitutional defect is exacerbated because the CFPB is

1

insulated from any meaningful check by the second political branch of federal government, the Congress.  Instead, the CFPB appropriates its own funds and faces no meaningful congressional oversight.  The unrestrained power resting with the CFPB has led to the exact results one would fear:  an overly-aggressive agency that has attempted at every turn to expand its own power and the scope of the laws it enforces.

Although more than a dozen other district courts and two circuit courts (not including the Eleventh Circuit) are actively considering the CFPB's constitutionality, Ocwen, as one of the nation's largest mortgage servicers, does not lightly challenge its own federal regulator on such a politically-sensitive issue.  But here, the overreach of the CFPB's Complaint resulting from its unchecked power leaves Ocwen no choice but to seek at the threshold a ruling on the constitutionality of the CFPB.  As explained below, because the Director's position is unconstitutional, under Article I, and because the Bureau operates without constitutionally-required oversight, under Article II, the CFPB has no authority to bring this lawsuit.  Thus, the case must be dismissed until a constitutionally-valid Director and constitutionally-composed agency are in place.  This is a problem that only Congress, not the courts, can fix.

Second, substantial parts of the Complaint independently fail because the CFPB is suing Ocwen for failure to live up to legal requirements that do not exist today and that the CFPB is attempting to create, and then impose, through this lawsuit.  This sort of 'regulation through enforcement' is unfair and legally impermissible.  Among other claims, the CFPB asserts that Ocwen acted "unfairly or "deceptively" by allegedly using inadequate loan servicing software (its REALServicing platform) and inaccurate loan servicing data.  But the Bureau has no law, regulation, guidance, interpretation or instruction about enforceable standards or benchmarks that a servicer like Ocwen must meet in operating its technology.  The CFPB also sues Ocwen for collecting on amounts without first independently substantiating them, even though the CFPB is simultaneously engaged in writing regulations that, only if enacted, may for the first time *create* such a duty.  And the CFPB accuses Ocwen of improperly processing foreclosures while also working on loan modifications—so-called dual tracking—but takes the position that Ocwen is liable even as to borrowers who fall outside of the protections in the CFPB's detailed dual tracking regulation.  Ocwen strives always to comply with the law, but it should not be sued for failing to comply with something that is not yet (and may never become) the law.

Third, and ironically alongside these newly-minted claims, the CFPB overreaches in the

other direction and sues on claims and legal rights that are subsumed within a past settlement agreement with Ocwen. In a 2014 Consent Judgment entered by the District Court for the District of Columbia (DC District Court), the CFPB and Ocwen agreed that on a forward-looking basis, the conduct that is now the subject of Counts I, III, IV, VII, VIII, XIII and part of Count X would be evaluated through an independent third party monitor and remedied only if the monitor found a material violation that Ocwen failed to cure (and even then, only if certain other conditions were met). Principles of *res judicata* and waiver prevent the CFPB from now attempting to double dip and sue Ocwen outside of these limitations. Ocwen is entitled to the benefit of the deal it struck with the government, and these Counts must be dismissed as a result.

These three fundamental flaws in the Complaint are not the only reasons for dismissal, as discussed further below. The Complaint is riddled with pleading deficiencies, due in part to the generalized nature of its claims of misconduct—this failing is all the more notable given that the CFPB prefaces the 14 Counts with 220 paragraphs of charged, accusatory allegations. It is, in short, the kind of Complaint one might expect from an agency that appears to view itself as untethered to basic legal requirements that apply to every other litigant. The Court should not allow it to proceed. For the reasons herein, the Complaint should be dismissed with prejudice.[1]

## BACKGROUND

This case's roots trace back to the aftermath of the nation's last financial crisis, which spurred Congress to pass the Dodd-Frank Act in 2010 and create a powerful new regulator, the CFPB. *See* Dodd Frank Wall Street Reform and Consumer Protection Act of 2010 § 1021; 12 U.S.C. § 5491. As addressed in more detail below (*infra*, pp.5-10), the CFPB was vested with immense power and resources, to an extent unlike any other federal agency, while also having effectively no oversight from either Congress or the President. One of the powers granted to the newly-formed Bureau was the supervision of non-bank mortgage loan servicers, such as Ocwen.

Coincident with Congress' response to the financial crisis, Ocwen became widely recognized and praised for its industry-leading foreclosure prevention and loss mitigation efforts.[2] As a result of those efforts, since 2008 Ocwen has kept more people in their homes

---

[1] Exhibit 1 to Ocwen's Motion to Dismiss lists the bases for dismissal of each Count.

[2] Ocwen understands this Court must limit itself to the four-corners of the Complaint, and its legal arguments are precisely limited to the Complaint and a judicially-noticeable federal court judgment. But because the CFPB attempts to paint such a starkly negative picture of Ocwen's servicing practices, Ocwen believes it is misleading to let that picture go unrebutted.

through loan modifications than *any other mortgage* servicer—more than 718,000 people, or about half the population of Palm Beach County.  In fact, Ocwen has provided 20% of all the permanent loan modifications offered by all servicers through the federal government's signature Home Affordable Modification Program.[3]

Ocwen, like virtually all other loan servicers, faced challenges in dealing with the massive wave of defaults during the last financial crisis.  These challenges were increased when Ocwen took on the loan servicing responsibilities of several other servicers, including Homeward Residential, Litton Loan Servicing, and Residential Capital.  In late 2013, the CFPB and 49 states sued Ocwen in DC District Court, alleging that these acquired entities, as well as Ocwen, had engaged in many of the same mortgage servicing and foreclosure regulatory violations that are now in the CFPB's Complaint before this Court.  Compl. ¶ 20, *CFPB v. Ocwen Fin. Corp.*, No. 13-2025 (D.D.C. Dec. 19, 2013) (DE 1).  That case was settled by means of a consent judgment in a fashion that included agreements as to how loans were to be serviced for the following three years, and set up a detailed system of testing loans, under Court supervision and at Ocwen's expense, that directly contradicts many of the claims asserted by the CFPB's Complaint.  That consent judgment, referred to as the National Mortgage Settlement ("NMS"), provides the basis to dismiss large portions of this case on grounds of *res judicata* and related equitable principles.

The current lawsuit purports to challenge wholesale many of Ocwen's operations and decisions made since the NMS.  Although the CFPB directly supervises Ocwen's operations, and has agreements to share information from the 50 states who also directly supervise Ocwen's operations, the Bureau took no action to bring this suit until right before the three-year NMS limitations period ran.  The timing undermines the Bureau's own heated allegations that there has been "significant harm to borrowers" that entire time.  Ocwen does not believe such harm has occurred and, as the CFPB knows (and the Complaint grudgingly acknowledges in ¶ 146), Ocwen has a history of proactively providing remedies to borrowers when it makes an error.

The CFPB's allegations are particularly disappointing because they are entirely

---

[3] *See, e.g.*, Kenneth R. Harney, *Throwing Out a Lifeline to Underwater Borrowers*, The Washington Post (Aug. 6, 2011) (Ocwen "is drawing praise from consumer advocates active in foreclosure prevention"); Olivera Perkins, *Banks Urged to Reduce the Principal on Mortgages*, Plain Dealer (July 5, 2012) (praising Ocwen's "principal reduction model"); Ocwen Cares, Caring in Action, http://www.ocwencares.com/news/720000-loan-modifications-helping-homeowners-avoid-fore closure-nationwide/ (Jan. 30, 2017).

inconsistent with reports by *independent* parties, including the *public* reports of the independent monitor appointed under the NMS, that disprove the CFPB's assertions of widespread errors. The CFPB's claims that Ocwen's data and systems are hopelessly inaccurate are not credible in light of the many ongoing, *independent* evaluations of those same technologies that have found that Ocwen is fully up to the task of servicing loans consistent with detailed servicing requirements imposed by the CFPB in the NMS settlement. Ocwen surely agrees that no servicing system or company is perfect, and that it makes errors and strives to improve. But the CFPB's generalized and overstated allegations are unjustified, and not reflective of the truth.

Whatever the CFPB's underlying motivation for what it has alleged, this case has no merit on its face and the Complaint should be dismissed.

## ARGUMENT

**I.    THE STRUCTURE OF THE CFPB IS UNCONSTITUTIONAL, AND THE COMPLAINT MUST BE DISMISSED.**

The CFPB and its Director are unlike any federal agency and agency head. The agency's powers are vast. It is charged with enforcing *nineteen* consumer finance statutes, *see* 12 U.S.C. § 5481(12), and has the ability to reach not only almost every person that offers a consumer finance product or service, but also those *related* to such providers. 12 U.S.C. §§ 5481(6), (25), (26), 5536(a). Moreover, among those nineteen statutes is the Dodd-Frank Act, which includes a universally-applicable prohibition on unfair, deceptive, and abusive practices that is largely left to the CFPB to define and enforce at its sole discretion. *Id.* § 5536(a)(1)(B).[4]

With regard to the broad group of individuals and companies covered by those nineteen statutes, the Bureau and its Director have the power to conduct supervision, *id.* § 5514, to pass regulations, *id.* § 5512, to investigate persons for legal compliance, *id.* § 5562, and to bring agency adjudications, litigation, and other enforcement actions, *id.* §§ 5563, 5564. Perhaps above all, the Bureau possesses a key feature of Executive agencies in the modern administrative state: the ability to go beyond "the legislative standard . . . prescribed," *Humphrey's Ex'r v. United States,* 295 U.S. 602, 628 (1935), and promulgate policy through rulemaking, *see* 12 U.S.C. § 5512; *id.* § 5531(b). The CFPB's rulemaking authority is "exclusive" to all others, including the President and other agencies with otherwise-overlapping authority, despite the President's constitutional charge to "take care that the laws be faithfully executed." U.S. Const.

_____

[4] Ocwen has a pending request to invite the Attorney General to participate in this argument. *See* DE 24.

art. II, § 3.  And other federal officers, *i.e.*, the Board of Governors of the Federal Reserve, are barred by *statute* from interfering with the affairs of the Bureau.  12 U.S.C. § 5492(c)(2).

The CFPB's Director is also assigned the power to run the agency unchecked—the Director alone is singlehandedly responsible for selecting and overseeing the individuals responsible for carrying out these extensive responsibilities, and initially ruling on all appeals of administrative actions.  *Id.* § 5492(b); 12 C.F.R. § 1081.405.  But despite this extraordinary grant of power, the Director is not subject to any oversight.  The Director serves a five-year term and, unlike other heads of federal executive agencies, does not serve at the pleasure of the President. 12 U.S.C. § 5491(c)(1).  Unlike other officials, high and low, each of whom serves at the pleasure of the nationally-elected President, the President may terminate the Director only "for inefficiency, neglect of duty, or malfeasance of office."  *Id.* § 5491(c)(3).  When the Director's term expires, he continues on until his replacement arrives.  *Id.* § 5491(c)(2).

Although Congress created the CFPB and the Director's position, it is severely limited in how it may oversee the Bureau and the Director's business.  The CFPA takes away from Congress the ability to rein in the CFPB's spending; rather, the CFPB may take a sum of money from the Federal Reserve that it deems is necessary, no questions asked.  *Id.* § 5497(a)(1)-(2). The congressional appropriations committees are even explicitly barred from inquiring how the CFPB uses this money.  *Id.* § 5497(a)(2)(C).

These two facets of the CFPB, taken together, transform it from a garden-variety executive agency into one that is an unconstitutional anomaly.  In effect, the CFPB is insulated from two of the three constitutional branches, thereby avoiding the normal and required checks and balances otherwise built into our form of republican government.  Despite the CFPB's well-intentioned creation in response to the last financial crisis, the structural protections of the Constitution must prevail over attempts to upset the traditional relationship between the President, Congress, and the courts.

> **A.**  **The CFPB Director's For-Cause Removal Provision Unconstitutionally Restricts the President's Duty to "Faithfully Execute" the Laws.**

The Constitution vests "[t]he executive Power" in "*a*" single President, who "shall take care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1 (emphasis added); *id.* § 3.  Because of the Founders' decision to adopt a unitary executive, not a plural one, "administrative agencies remain under presidential control and . . . subject to the President's responsibilities."  *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 57 n.43 (D.D.C. 1998); *see*

*also Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981) ("The executive power under our Constitution, after all, is not shared it rests exclusively with the President."). The CFPB is unconstitutional because it is structured to have Executive powers while also simultaneously being unanswerable to the President. This cannot be so.

The Constitution grants the President—and the President alone—the power to control and supervise the Executive Branch. *Costle*, 657 F.2d at 405. The President's attendant "powers of appointment and removal," *id*., necessarily mean that the President has exclusive authority to decide which individuals will assist him in enforcing the law, *Myers v. United States*, 272 U.S. 52, 121 (1926). "[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (quotation omitted).

Part and parcel of the power to appoint is the President's "exclusive power of removal," which must be exercisable "without delay." *Myers*, 272 U.S. at 134. The removal power is the only means by which a President can ensure that his subordinates comply with his directives and enact the policies that the President demands. *See Bowsher v. Synar*, 478 U.S. 714, 726 (1985).

The CFPB Director stands as the lone exception—the only official who wields such broad, discretionary executive power on his own, yet does not answer to the President or any other politically accountable official. Even though the Director is a principal officer in charge of an "Executive agency," 12 U.S.C. § 5491(a), the President may not remove the Director except for "inefficiency, neglect of duty, or malfeasance in office," or at the end of a five-year term that is longer than the President's own. *Id.* § 5491(c)(3). Thus, the President cannot dismiss the CFPB Director even when the President vehemently disagrees with the Director's actions or policies. *See Humphrey's Ex'r*, 295 U.S. at 619, 625 (for-cause dismissal does not include policy disagreements). This denies the President the ability to appoint a Director of his choosing who agrees with him and restricts his Constitutional mandate to ensure faithful execution of the laws. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 356 (1958).

This type of restriction on the President's core executive powers has no historical precedent, which is relevant when assessing the constitutionality of a new type of agency. *Free Enter. Fund*, 561 U.S. at 505; *see also NLRB v. Canning*, 134 S. Ct. 2550, 2553 (2014) ("The longstanding 'practice of the government' can inform this Court's determination of 'what the law is' in a separation-of-powers case."). In more than two centuries of practice under our

Constitution, the Supreme Court has upheld such a constraint on the Presidential removal power for only one type of appointee: a member of a multi-member "body of experts 'appointed by law and informed by experience.'" *Humphrey's Ex'r*, 295 U.S. at 624. The CFPB obviously does not meet this requirement.

Indeed, the reasoning in *Humphrey's Executor* actually highlights how the CFPB's structure and powers are unprecedented and unconstitutional. Among other reasons the Supreme Court permitted a narrow exception to the traditional organization of executive officers, the Court cited: (1) the staggered tenure provisions of the FTC, which guaranteed that the President could appoint Commissioners and thereby change the composition of the Commission; (2) the Court's perception that FTC's "duties are neither political nor executive, but predominantly quasi judicial and quasi legislative," and its members "are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience,'" and (3) the observation that FTC was "created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid," and so could not "in any proper sense be characterized as an arm or an eye of the executive." *Id.* at 624, 628.

None of these considerations are true of the CFPB and its Director, the latter of whom wields executive power and, because of the five-year term, may be in place for a large part or even all of a President's four years in office. The absence of a multi-member format exacerbates the infirmity for, unlike the CFPB, the FTC reflects power that is spread out across the different members, each with his or her own views and none of whom can act without the agreement of at least one more. This provides the benefit of "a built-in monitoring system for interests on both sides," and thus avoids "arbitrary decision making and [] protect[s] individual liberty because the multi-member structure—and its inherent requirement for compromise and consensus—will tend to lead to decisions that are not as extreme, idiosyncratic, or otherwise off the rails." *PHH Corp. v. CFPB*, 839 F.3d 1, 27 (D.C. Cir. 2016), *en banc reh'g granted*, No. 15-1177 (D.C. Cir. Feb. 16, 2017). Nor could the CFPB ever be characterized as serving as a "legislative or [] judicial aid": instead, it exercises a broad array of Executive powers including "law enforcement authority," a "core executive power" that belongs exclusively to the Executive Branch. *John Doe Co. v. CFPB*, 849 F.3d 1129, 1132 (D.C. Cir. 2017). There has never been an agency headed by a single director, unanswerable to the President, that possesses the amount of federal

power that the CFPB and its Director have now.

The CFPB's executive structure unconstitutionally restricts the President's power.  The President cannot exercise his power to remove, cannot control the policies that are promulgated, and is effectively bound by a single appointment decision of his predecessor.  None of this is permissible under well-established separation precedents on Executive authority.  *See Free Enter. Fund*, 561 U.S. at 496 (if the President or those "directly responsible to him" are without "full control" over the ability to remove those exercising executive powers, "[t]he President is stripped of the power [the Court's] precedents have preserved, and his ability to execute the laws—by holding his subordinates accountable for their conduct—is impaired"); *see also id.* at 497 (sitting President cannot unconstitutionally bind powers of future Presidents).  Whatever Congress's intentions were in enacting the Dodd-Frank Act, it could not reduce "the Chief Magistrate to a cajoler-in-chief."  *Id.* at 502.

The friction between the independent, unelected Director and the Office of the President is not an abstract hypothetical.  While the Constitutional infirmity exists regardless of the policies of the current President, the gap between the President's policies and those of the CFPB bring this problem into sharp relief.  *See* Office of Mgmt. & Budget, *Budget of the U.S. Government Fiscal Year 2018:  A New Foundation* 15 (2017) (stating that the current policy choices by the CFPB "imped[e] free commerce" and reflect an agency with "unchecked regulatory and punitive power").  Despite a President who has set forth an express policy goal of "revers[ing] burdensome regulations that hinder financial innovation and reduce access to credit for hardworking American families," the President has virtually no power to influence the CFPB, and therefore vast areas of consumer finance, beyond mere cajoling.  *Id; see Free Enter. Fund*, 561 U.S. at 502.  The Constitution does not allow for such Executive pluralism; the President cannot be the "Chief Magistrate" of all but consumer finance.

**B.      The CFPB's Unchecked Ability to Spend Its Funds Undermines Congress's Power of the Purse, Violating Article II.**

There is yet another constitutional infirmity with the CFPB:  its unchecked power to dictate and control its own budget, without any effective oversight.  This not only adds to the constitutional concerns attendant to the CFPB's structure and powers, it serves as its own independent ground for striking the Bureau down.

The President does not request, and Congress does not appropriate, set sums of money each year for the CFPB; instead, the Director instructs the Federal Reserve to transfer an amount

of money that he determines is appropriate to carry out the CFPB's functions, up to 12 percent of the Federal Reserve's multi-billion dollar operating expenses for the year (which last year, for example, permitted the CFPB to request over $640 million if it so desired).  12 U.S.C. § 5497(a)(1)-(2); https://www.federalreserve.gov/publications/files/2016-annual-report.pdf.  By statute, the House and Senate Appropriations Committees are barred from reviewing how the CFPB spends the money it appropriates to itself.  *Id.* § 5497(a)(2)(C).

This arrangement, one under which the CFPB is fiscally accountable to *no* branch of Government, unconstitutionally blocks the oversight authority attendant to Congress's exclusive power to direct federal spending in the first instance.  The Appropriations Clause, U.S. Const. art. I, § 8, cl. 1, gives to Congress "a controlling influence over the executive power."  1 Joseph Story, *Commentaries on the Constitution of the United States*, § 531 p. 384 (Thomas M. Cooley ed., 4th ed., 2011).  It is intended as "a restriction upon the disbursing authority of the Executive department," *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937), with the "established rule" being that "the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress," *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion).  The power to appropriate monies from the general treasury is a non-delegable right that belongs to Congress alone.  *See United States v. Realty Co.*, 163 U.S. 427, 440-41 (1896).

Yet with the CFPB, Congress cannot use the power of the purse to reach "difficult judgments" as to whether the agency is properly using federal funds.  Congress is unable to conduct for the CFPB's actions "a most useful and salutary check upon profusion and extravagance," *OPM v. Richmond*, 496 U.S. 414, 427-28 (1990), and is unable to determine whether "a public purpose" is served by how the CFPB spends its money.  *Carmichael v. S. Coal & Coke Co.*, 301 U.S. 495, 515 (1937).  Congress has assigned to the CFPB and its Director the ability to appropriate funds otherwise intended for the general treasury to itself.  But the Constitution says that authority lies with Congress alone.  *See Buckley v. Valeo*, 424 U.S. 1, 132 (1976) (per curiam) (Congress cannot choose to enact statutes that "offend well-established constitutional restrictions stemming from the separation of powers").  The absence of any meaningful fiscal oversight is yet another strike against the CFPB's unconstitutional form.

### C.   Because the CFPB's Structural Defects Cannot Be Cured at This Time or in This Court, Dismissal Is the Only Appropriate Remedy.

Ocwen fully embraces federal regulation of the loan servicing industry and uniform

consumer protections at all stages of mortgage servicing.  But the unprecedented powers ascribed to the Director, combined with the operation of an agency unchecked by Congress, leaves the country with an important corner of the federal government that is insulated from the two political branches.  In turn, this means that citizens who vote cannot influence the policy, direction and results of the CFPB.  The lack of accountability has had predictable results, including emboldening the CFPB to file the overreaching Complaint here.

The only appropriate remedy for this overreach is to hold the CFPB unconstitutional and dismiss this lawsuit until Congress puts a constitutional agency and Director in place.  When an agency's enabling statute suffers from a "constitutional flaw" it ordinarily may be fixed by "limit[ing] the solution to the problem, severing any problematic portions while leaving the remainder intact."  *Free Enter. Fund*, 561 U.S. at 508.  But severability is not an option when "it is evident that the Legislature would not have enacted those provisions . . . independently of that which is [invalid]."  *Id.* at 509.  This Court should not attempt a partial remedy, jury rigging the statute to introduce some form of increased accountability, because that is neither consistent with Congressional intent nor practical.

As noted above, in enacting Dodd-Frank and creating the CFPB, Congress expressed its desire to have a "completely independent" agency, "with an independently appointed director, an independent budget, and an autonomous rulemaking authority."  156 Cong. Rec. H5239 (2010) (Rep. Maloney).  The legislative record confirms that Congress would not have conferred these powers—especially immunity from its own appropriations process—while nevertheless making the Director answerable directly to the President.  Nor is there a reason to think Congress and the then-President would have supported an insulated Director but making the Bureau fully-accountable under the power of the purse.  To the contrary, the legislative history suggests that the proponents of Dodd-Frank valued independence over all and, if not able to achieve that, may have resorted instead to the initial design for the agency, a multi-member commission, or come up with some sort of alternative design.  *PHH Corp.*, 839 F.3d at 6.  The necessary rewriting can only be done by Congress.  Dismissal is therefore the only appropriate remedy.

II.    **THE CLAIMS FOR ALLEGED LOAN SERVICING SYSTEM AND DATA INACCURACIES MUST BE DISMISSED (COUNTS I, II, VIII & IX).**

A.    **There Is No Such Thing as a Claim for Relief Resting Entirely on the Assertion a Company's Computer System Contains Some Amount of "Inaccurate" Data or Does Not Work Perfectly (Counts I and VIII).**

Nowhere in the individual causes of action is the CFPB's overreach more apparent than in its claims denominated as Count I and Count VIII.  The Bureau claims that it is an actionable unfair business practice for Ocwen to have allegedly used information to service mortgage loans that sometimes was "inaccurate" and/or "incomplete."  By the CFPB's allegations, operating a less-than-perfect loan servicing platform violates the twin prohibitions on unfair business practices contained in the CFPA, 12 U.S.C. §§ 5531, 5536 (Count I), and the Fair Debt Collection Practices Act, 15 U.S.C. § 1592f ("FDCPA")(Count VIII).  There is no law, regulation, administrative advisory, or case law that supports such a claim.  Nor should a claim that having a computer system that is not perfect be recognized—it amounts to the worst type of regulation, regulation through enforcement.[5]  Instead, this Court should dismiss Count I and Count VIII because it is unsupported and unsupportable.

The contours of this unprecedented claim are breathtaking.  The assertion made is that Ocwen's REALServicing system is not sufficiently accurate through some combination of input mistakes, imported data from prior servicers that had errors, software malfunctions, and manual fixes that the Bureau deems inadequate to some unspecified degree.  The CFPB makes no allegations as to whether all of the alleged inaccuracies are material and, if not, which are, and no allegations of any standards of accuracy or completeness Ocwen was supposed to have met.  It simply asserts that what Ocwen did was unfair.

This is not a cognizable cause of action, under either the CFPA or the Fair Debt Collections Practices Act ("FDCPA").  There is no precedent for it—none.  And there is no basis for it either.  The CFPB points to no articulated criterion by which the functions, accuracy and completeness of REALServicing can and should be judged, measured and tested—as a legal matter in a court of law under pains of potential confiscatory penalties, 12 U.S.C. § 5455, or remedies under the FDCPA, 15 U.S.C. § 1692k.  It is a fundamental tenet that a court cannot

---

[5] *See* John Villa & Ryan Scarborough, *The Law of Unintended Consequences: How the CFPB's Unprecedented Legislative Authority and Enforcement Approach Has Invited Increasing Challenges*, 35 No. 7 Banking & Fin. Servs. Pol'y Rep. 22, 22, 24 (July 2016) (detailing evidence of and problems with the CFPB's regulation by enforcement efforts).

punish a party for failing to live up to a standard that is cut from whole cloth without reference to any meaningful and objective standard of care or other agreed requirement of performance. Yet that is exactly what the CFPB impermissibly invites this Court to do by suing Ocwen for servicing loans with "inaccurate" or "incomplete" information.

The CFPB's suggestion that it nevertheless can sue under its authority to remedy an "unfair" business practice is a mere fig leaf. This is true for three independent reasons.

<u>First</u>, the prohibitions on unfair business practices in either of the CFPA or the FDCPA provides no basis for this Court to understand—much less apply—any standards for how accurate or complete a servicing system must be, how effective any manual servicing must be, which data is materially important and which is not, and other criteria to determine whether Ocwen's electronic systems were too off the mark to be fair to consumers. The CFPB certainly does not direct this Court to any requirement, rule, industry standard, or technologic measurement that Ocwen's servicing system fails to meet. Under these circumstances, merely pronouncing that the system is "unfair" to consumers is advocacy, not a legal claim. It would, in effect, allow the CFPB to freely pick winners and losers among regulated entities, essentially choosing for itself which ones are allowed to continue operating and which are not because their technology is not to the CFPB's liking.

<u>Second</u>, for related reasons, Count I and Count VIII are not cognizable because Ocwen had no fair notice under the Due Process Clause as to how the technological and operational parameters of a loan servicing system or data inputs could violate the law. The Due Process Clause prohibits an agency from meting out punishment (or asking the Court to do so) when the defendant had no way to know at the time it acted what was prohibited and what was permitted. *See Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1313 (S.D. Fla. 2006) (finding wage statute unconstitutionally vague where "[t]he Court is wholly at a loss as to how it would instruct any jury, let alone on what standards would apply here at the summary judgment stage, as to what constitutes "'manual labor,' or what constitutes 'extra pay' . . ."). Here, the infinitely malleable concept of "unfairness," placed in the hands of an unaccountable agency, provided no guidepost at all to Ocwen as to what it was required to do.

Statutes must "set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974) (citations and internal quotation marks omitted). A regulatory prohibition

does not give fair notice if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Ga. Pac. Corp. v. OSHRC*, 25 F.3d 999, 1005 (11th Cir. 1994) (citation and internal quotation marks omitted). When an agency rule fails to provide such notice, the rulemaking agency "should remedy the situation by promulgating a clearer regulation rather than forcing the judiciary to press the limits of judicial construction." *Id.* at 1006.

Notably, the CFPB has never provided any meaningful guidance as to what is an "unfair" practice and how to avoid UDAAP liability in operating a mortgage loan servicing platform. Agencies must announce new rules in *some way. NLRB v. Bell Aerospace*, 416 U.S. 267, 295 (1974). Despite the fact that it possesses the authority and duty under the CFPA to "prescribe rules . . . identifying as unlawful unfair, deceptive, or abusive acts or practices," 12 U.S.C. § 5531(b), and generally to prescribe regulations under the FDCPA, 15 U.S.C. § 1692l(d), the CFPB has yet to promulgate *a single rule* explaining what is "unfair" in either context. Less formal means of obtaining advice about the lawfulness of conduct, such as a no-action letter, are also off-limits—the CFPB will issue a no-action letter under only "exceptional circumstances," to the tune of one to three requests a year. *See* 81 Fed. Reg. 8,686, 8,691. The CFPB has declined to release any descriptive policy statements about the UDAAP provision, instead producing a bulletin that can be best described as mere parroting of the statutory standard. CFPB Bulletin 2013-07, Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts (July 10, 2013). Similarly unhelpful is a lone "Supervision and Examination Manual," which states that what is "unfair" must be gleaned from "non-binding policy statements, guidance, examination procedures, and enforcement actions." CFPB Supervision & Examination Manual, UDAAP 1 n.2 (Oct. 2012) (CFPB Exam Manual).

The plain inadequacy of such guidance stands in starker focus for Ocwen, as there simply is no indication in "non-binding policy statements, guidance, examination procedures, and enforcement actions" about how to judge the adequacy of loan data, loan servicing software and manual servicing operations. Indeed, the CFPB is *just now* in the process of considering issuing a proposed rule on the accuracy of data used by supposed debt collectors.[6] The Constitution does not allow the CFPB to sue Ocwen for not successfully predicting what the CFPB thinks

---

[6] CFPB Proposal, Small Business Review Panel for Debt Collector and Debt Buyer Rulemaking: Outline of Proposals Under Consideration and Alternatives Considered, at 8 (July 28, 2016), http://files.consumerfinance.gov/f/documents/20160727_cfpb_Outline_of_proposals.pdf.

about an accuracy standard before such a standard is even promulgated.

"What constitutes an unfair or deceptive practice requires an individualized, 'fact-specific' inquiry." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013).  The problem with the CFPB's approach to fair notice—which is to say nothing until it brings a lawsuit or enforcement action—is that "unfairness" is, by its very nature, an unknowable standard.   It was impossible for Ocwen to have discerned, from a hodgepodge of different cases spanning different industries and types of covered persons, a standard which would have informed Ocwen of how its mortgage servicing system might run afoul of the UDAAP provision's "unfairness" prohibition.  Ocwen instead was left with what the Due Process Clause forbids in the first place:  "guess[ing] at its meaning." *Ga. Pac. Corp.*, 25 F.3d at 1005.  This is unacceptable, and the Due Process Clause requires dismissal of any claim based upon such a vague standard.

<u>Finally</u>, Counts I and VIII must be dismissed because,  the CFPA requires the CFPB to "declare" an act as unfair before suing to address that purportedly unfair act or practice.  12 U.S.C. §§ 5531(a), (c).  The CFPA states that the Bureau "shall have *no* authority . . . to declare an act or practice . . . unfair," unless it first "has a reasonable basis to conclude that—(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." *Id.* § 5531(c).  A "declaration," in turn, must come in the form of an agency proceeding—either a rulemaking or an adjudication. *Bell Aerospace*, 416 U.S. at 295.  The Bureau does not "declare" anything through its consent judgments, *see Langton v. Hogan*, 71 F.3d 930, 935 (1st Cir. 1995), nor does it "declare" anything by pursuing litigation on a set of facts for the first time in court, *cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012).

Making a set of factual allegations and slapping the label of "unfair" as a conclusory allegation at the end does not articulate anything about the "reasonable basis" for such a conclusion.  Not only is there no evidence here that the CFPB has engaged in weighing the section 5531(c) factors, the CFPB has refused outright to do so on a prospective basis.

Independently and together, these reasons require the dismissal of the completely-novel and unsupportable claims in Counts I and VIII.

**B.      Counts I and VIII Fail to Plead Facts to Support an Unfairness Claim.**

Count I and Count VIII are further insufficient for neither provides any substance to support the allegations underpinning each of the general elements of the "unfair" standard.  A claim of unfairness must allege, *inter alia*, the defendant (1) engaged in certain defined conduct that was unfair, and that resulted in (2) substantial injury to consumers, (3) such that the consumers could not reasonably have known about, avoided, or bargained for the injury, and (4) where the injury was not outweighed by a countervailing benefit to consumers.  15 U.S.C. § 5531(c); *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1364 (11th Cir. 1988) (defining elements for the FTC's similar unfairness standard).  Here, the CFPB has not given this Court any factual particulars to support the notion that Ocwen's data systems and processes have been the *cause* of any consumer injury, let alone substantial injury.  The relevant allegations are woefully inadequate because the two Counts (which are identical) do not allege which supposed deficiencies, if any, are material.  Unless the CFPB is taking the breathtaking position that *any* inaccuracies in data or *any* misstep by a computer program or *any* error in manual addition rises to the level of an "unfair" business practice, punishable in federal court, regardless of harm, then the cause of action needs to be more specific in defining exactly what Ocwen was required to do and how it fell short.

Instead, the CFPB only offers a hedged conjecture that Ocwen's data over a laundry list of loan servicing fields *either* "causes or is likely to cause substantial injury to consumers." Compl. ¶¶ 227-28.  But the CFPB does not back-up this conjecture with any specific example or even explanation of precisely what kind of injury will result.  This is not enough.  *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1549-50 (2016) (plaintiff cannot allege a "bare" violation of consumer protection law "divorced from any concrete harm" because a violation "may result in no harm"); *see also Orkin*, 849 F.2d at 1364 (unfairness standard requires finding of "substantial injury").

There is a reason these types of facts are entirely absent from the Complaint.  The CFPB is attempting to create an entirely new type of "unfairness" claim here, one grounded in a misguided attempt to use this Court to dictate some standard for mortgage loan servicing technical automation accuracy.  That is not the function of the judiciary, which is charged with *enforcing* the law and not with *making* the law.  The suggested claim is so amorphous it is hard to fathom how any court could reasonably judge whether Ocwen has complied with the law let alone provide an appropriate remedy that is fair, and not retroactively punitive.

As a result of these deficiencies, the CFPB has not met its burden of adequately pleading the elements of an unfair act or practice under either the CFPA, 12 U.S.C. § 5531(c), in Count I, or the FDCPA, 15 U.S.C. § 1692f, in Count VIII.  Each should be dismissed.

**C.**     **Counts II and IX Fail for the Same Reasons as Counts I and VIII.**

Having asserted in Counts I and VIII that Ocwen has "inaccurate" and "incomplete" loan servicing data and systems, the CFPB alleges in Counts II and IX that because of those deficiencies Ocwen's communications with its borrower clients were deceptive, violating the CFPA, 12 U.S.C. § 5536, and the FDCPA, 15 U.S.C. § 1692e.  These two, wholly-derivative claims, cannot stand where their predicate causes of action do not state a claim for relief.  Just as with respect to Counts I and VIII, the CFPB has never previously offered any guidance suggesting or detailing how alleged data errors or manual mistakes in mortgage servicing or accounts can rise to the level of a "deceptive" business practice.  Even the Complaint does not explain the relevant standard as to when the ordinary-course use of servicing information becomes suddenly actionable, including how the Court should assess materiality.  Thus, the grounds for dismissal argued with respect to Counts I and VIII apply equally to Counts II and IX.

**III.    THE NMS JUDGMENT PRECLUDES SIX CAUSES OF ACTION (COUNTS I, III, IV, VII, VIII, AND XIII) AND PART OF ANOTHER CLAIM (COUNT X).**

One of the principal dangers of having an unaccountable government agency, such as the CFPB, is that its actions risk not being moored to either reasonable dictates or the rule of law. The Complaint brings those fears to life by asserting claims that are barred by the NMS settlement court's Consent Judgment—a federal judgment to which the CFPB is an expressly-bound party.  This Court should apply *res judicata*, and related principles of fundamental fairness that prevent a party like the CFPB from suing about matters it already resolved, and dismiss Counts I, III, IV, VII, VIII, and XIII in their entirety, and Count X partially, because each are incompatible with the NMS.[7]

**A.**     **The NMS Consent Judgment Defined Certain Aspects of Ocwen's Conduct, and Limited the CFPB's Remedies.**

As mentioned above, in late 2013 the CFPB and 49 state plaintiffs sued Ocwen over

---

[7] Numerous other Counts, including Counts II, IX, XI, and XII, also overlap with the NMS's Servicing Standards and Metrics for at least some of the conduct alleged.  If these partially overlapping Counts are not dismissed on the other grounds detailed in this Motion, Ocwen will move for partial summary judgment on NMS *res judicata* grounds at the appropriate time.

allegations that certain aspects of Ocwen's loan servicing transgressed federal and state requirements. After reaching a settlement, the parties submitted a Consent Judgment (with extensive attachments) laying out the settlement's terms to the D.C. District Court, which approved it on February 26, 2014. Consent Judgment, *CFPB v. Ocwen Fin. Corp.*, No. 13-2025 (D.D.C. Feb. 26, 2014) (DE 12) ("NMS Consent Judgment" or "NMS C.J."). *See* Notice of Filing (DE 32). Pursuant to the NMS Consent Judgment, and among other terms, Ocwen agreed to provide $2 billion in consumer relief to its mortgage servicing customers and to pay an additional $127.3 million into a borrower relief fund, and the government parties provided a near-blanket release of Ocwen for all past loan servicing conduct. NMS C.J. ¶¶ 4-5.

Relevant to this action, the NMS also was forward-looking. The agreement, embodied in the ultimate Consent Judgment, included a 46-page single spaced stipulation of over 300 detailed "Servicing Standards," which Ocwen agreed to adhere to in servicing loans at least through February, 2017. NMS C.J. ¶ 3 ("[Ocwen] shall comply with the Servicing Standards"). To ensure compliance with the Servicing Standards and define the process and remedies in the event Ocwen did not perform, the CFPB and Ocwen agreed to an extensive enforcement framework which was also made part of the Judgment. NMS C.J. ¶ 6 ("The Servicing Standards. . . are incorporated herein as the judgment of the Court and shall be enforced in accordance with the authorities provided in the Enforcement Terms, attached hereto as Exhibit D"). Under this framework, the parties appointed an external "Monitor," to be funded at Ocwen's expense, to investigate and regularly report to the parties and the DC District Court on Ocwen's compliance with the Servicing Standards. Joseph Smith, the former North Carolina Commissioner of Banks, serves as the Monitor, as he also does for similar settlements involving other large mortgage servicers. As the exclusive test of compliance, the NMS established a number of servicing "Metrics" which measured objectively-measurable events such as whether Ocwen promptly processed payments (*id.,* Ex. D at D1-7), charged allowed fees (*id.* at D1-7), or provided accurate billing statements (*id.* at D1-21).

The NMS did not require perfection from Ocwen. Instead, each Metric set a defined tolerance for error—the "Threshold Error Rate"—allowing cumulative breaches of the Metrics to reach up to 10% in a reporting period before the Monitor could find a "Potential Violation" of

the NMS.[8]  NMS C.J., Ex. D. at D-1, -4, -10 to -11.  Any such "Potential Violation" would not be considered a violation of the settlement, as Ocwen then had the "right to cure" Potential Violations by implementing and completing a corrective action plan approved by the Monitor. *Id.* at D-11.

As part of the Court's judgment, the NMS imposed a variety of other limitations on Ocwen's potential liability for failing to comply with the Servicing Standards.  First, there was a "phase-in" period where Ocwen was provided up to 180 days to meet certain Metrics.  *Id.* at D-1 ¶A.  Second, the NMS limited the remedies the CFPB could seek for uncured violations, providing the CFPB could only seek non-monetary equitable relief and civil penalties which in most cases cannot exceed $1 million.  *Id.* at D-14.  Third, there were limitations built in to ensure that only "material non-compliance" needed to be addressed.  *Id.*, Ex. A at A-46.

For the servicing operations it expressly covers, the NMS Consent Judgment thus defines for the CFPB and Ocwen (and the states) applicable Servicing Standards, how those Standards must be implemented and monitored, and the range of available remedies for non-compliance with those Standards.  It does so for Ocwen's servicing operations within the three years that nearly precisely encompasses the period of time covered by this lawsuit. *Compare* NMS C.J., Ex. D at D-15 (standards "in effect" for three years from Feb. 24, 2014), *with* Compl. (case filed Apr. 20, 2017).  *See* 12 U.S.C. § 5564(g) (three year CFPA statute of limitations).

## B.    A Number of the CFPB's Claims of Improper Servicing Conduct Completely Overlap with Servicing Standards Defined in the NMS.

Even though the NMS defined standards of conduct for Ocwen's servicing practices during virtually the entire period covered by its lawsuit, the Complaint *does not even mention* the NMS.  This glaring omission cannot hide, however, that at least five of the CFPB's claims overlap with claims settled in the NMS:

- **Counts I and VIII** identically allege that Ocwen input and used "accurate and incomplete information," in servicing borrower accounts.  Compl. ¶¶ 227, 271.  Yet account accuracy requirements are the subject of an entire section of the NMS Judgment.  Servicing Standard I.B ("Requirements for Accuracy and Verification of Borrower's Account Information"). Among the standards are ones for posting and application of payments, imposition of fees, accounting and error correction, as well as independent review of account information, and Metric testing of procedures to document key account activities. NMS C.J., Ex. A ¶ I.B; *id.*, Ex. D at D1-12.

---

[8] *See United States v. Bank of Am., N.A.*, 78 F. Supp. 3d 520, 533 (D.D.C. 2015) (similar NMS "Consent Judgment does not require absolute perfection in loan servicing").

- **Count III** alleges that Ocwen foreclosed on borrowers even though the borrowers were performing on a workout or other loss mitigation option. Compl. ¶ 236. This allegation is completely covered by Servicing Standards IV.B.1, IV.B.2, and IV.B.11 (no referral to foreclosure while a loan or trial modification is pending), and Metric 1 (testing for such errors). NMS C.J., Ex. A ¶¶ IV.B.1-2, IV.B.11; *id.* Ex. D at D1-2.

- **Count IV** contends Ocwen told borrowers applying for a loan modification that they had a period of time to submit additional documents and that those borrowers would not be foreclosed in the meantime. Compl. ¶¶ 240-41. This supposed violation is completely congruent with Servicing Standard IV.D.2 (Ocwen must disclose and provide accurate information relating to loss mitigation programs), and Metric 30 (testing whether Ocwen afforded borrowers 30 days to provide supplemental documentation before proceeding to foreclosure). NMS C.J., Ex. A ¶ IV.D.2; *id.*, Ex. D at D1-18.

- **Count VII** asserts Ocwen failed to credit payments, advance payment due dates when sufficient moneys accumulate in suspense accounts, and provide accurate periodic billing statements. Compl. ¶¶ 258-62. The alleged conduct overlaps with Servicing Standards I.B.1 (prompt acceptance and application of payments), I.B.3 (post payments within two business days), I.B.3.b (advancing payment due dates when sufficient moneys accumulate in suspense accounts) and I.B.5 (timely and accurate periodic statements), as measured by Metrics 4.B (timely payment processing) and 33 (accurate monthly billing statements). NMS C.J., Ex. A ¶¶ I.B.1-I.B.5, I.B.8-I.B.10; *id.*, Ex. D at D1-7, D1-21.

- **Count X** includes, among other things, the allegation that Ocwen failed to pay borrowers' hazard insurance premiums when they became due. Compl. ¶ 286. This mirrors NMS Servicing Standard VII.A.1, which requires such hazard coverage payments be made. NMS C.J., Ex. A ¶ VII.A.1.

- **Count XIII** centers on alleged "dual tracking" violations, meaning situations where Ocwen proceeded to foreclosure at the same time as the borrower was on a track towards loan modification or other non-foreclosure solution. Compl. ¶¶ 303-307. Yet, dual tracking rules are comprehensively set out under the five-page Servicing Standard IV.B ("Dual Track Restricted" section), and Metrics 1, 3, 6, and 30 (testing whether Ocwen improperly initiated or foreclosed during a trial modification period or after a borrower applied for a modification). NMS C.J., Ex. A ¶ IV.B; *id.*, Ex. D at D1-2-D1-3, D1-5-D1-6, D1-13-D1-16, and D1-18.

Collectively, this brief refers to these as the Overlapping NMS Counts.

This overlap should not be surprising, given that at the time of the NMS the CFPB had promulgated new regulations governing servicing, which were to go into effect in January of 2014. Accordingly, it built various components into the NMS that mirrored the regulatory requirements that it was about to impose on the entire industry. The CFPB's inclusion of the Overlapping NMS Counts in the Complaint effectively ignores the NMS entirely. But the law does not allow the CFPB to sue Ocwen over any of these listed matters (again) because principles of prior adjudication and fundamental fairness bar the Bureau from doing so.

###### C.  *Res Judicata* Precludes Recovery Under the Overlapping NMS Counts.

One of the most basic legal principles is that when two parties resolve a claim, whether through a contested judgment or an agreed judgment, that resolution is binding and preemptive of future overlapping actions.  That principle is often enforced under *res judicata* which, applied here, requires the dismissal of the Overlapping NMS Counts: Counts I, III, IV, VII, VIII and XIII and so much of Count X as is dependent on alleged failures to pay hazard insurance when due.

"The doctrine of *res judicata*, or claim preclusion, forecloses relitigation of matters actually or potentially litigated in an earlier lawsuit."  *Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1244 (11th Cir. 1991) (citing *S.E.L. Maduro, Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1481 (11th Cir. 1987)).  The doctrine applies if (1) there is a final judgment, (2) rendered by a court of competent jurisdiction, (3) the parties are identical, (4) and the causes of action are identical.  *Id.* (citations omitted).  A "consent decree, although founded on the agreement of the parties, is a judgment," and so preclusion principles apply equally to such agreed judgments.  *Paradise v. Prescott*, 767 F.2d 1514, 1525 (11th Cir. 1985), *aff'd*, *United States v. Paradise*, 480 U.S. 149 (1987) (quotations omitted).  Thus, where a party to a prior consent decree later attempts to bring "overlapping" claims against another decree party that fall within that prior judgment, those claims are barred.  *See Gates v. Towery*, 456 F. Supp. 2d 953, 963-65 (N.D. Ill. 2006) (dismissing plaintiff's claim for injunctive relief on *res judicata* grounds due to continuing nature of a consent decree governing plaintiff's rights); *World's Finest Chocolate, Inc. v. World Candies, Inc.*, 409 F. Supp. 840, 844-45 (N.D. Ill. 1976) (holding that terms of consent judgment were *res judicata* and rejecting attempt to sue for violation of consent judgment in another court); *Affiliated Hosp. Prods, Inc. v. Merdel Game Mfg.*, 513 F.2d 1183, 1185-86 (2d Cir. 1975) (holding that settlement agreement controlled and limited parties to remedies provided in the agreement); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2015 WL 5051660, at *3 (S.D.N.Y. Aug. 26, 2015) (dismissing claim for continuing violation because it was precluded by consent judgment).

Here, there is no reasonable dispute that the NMS meets the first three criteria for the application of *res judicata*.  The fourth criteria is also met.  The NMS resulted in a final Consent Judgment by which the Court agreed to the parties' choice to define certain Servicing Standards and limited remedies for alleged breach of those Standards over the following three years.  Among those judgment-defined requirements are the same requirements that form the basis for

21

the CFPB's causes of action in the Overlapping NMS Counts.

By operation of the NMS Consent Judgment, the CFPB is barred from suing Ocwen about the servicing conduct it settled, which the DC District Court incorporated into that Judgment, without abiding by the full contours of the Judgment.  This means that to state a claim for relief in each of the Overlapping NMS Counts, the CFPB must allege more than just that Ocwen did not service loans appropriately.  An actionable claim can exist, if at all, only if the CFPB also alleges that the specific conditions detailed in the NMS Consent Judgment for finding and remedying violations occurred, including, (a) that the Monitor found a violation of the Servicing Standard, (b) the violation exceeded the applicable Threshold Error Rate for a Metric, and (c) the violation remained uncured after Ocwen had an opportunity to address it.  NMS C.J., Ex. D at D-1, -4, -10-11.[9]  Even if that is alleged, the full range of relief potentially permitted under the CFPA—all of which the CFPB seeks in the Complaint—is not available as relief for the Overlapping NMS Counts; the CFPB agreed and the NMS court ordered that available remedies for conduct including that alleged in the Overlapping NMS Counts here is non-monetary equitable relief and civil penalties limited in most instances to $1 million per uncured violation.  *Id.* at D-14.  Borrower relief is also significantly limited.  *See* NMS C.J., Ex. E ¶ F.

Any recovery against Ocwen on the Overlapping NMS Counts is barred by *res judicata* because the CFPB does not allege that Ocwen's alleged failures were also found by the Monitor, reported on, or uncured, and because the claims are not otherwise limited as the CFPB agreed and the NMS Judgment stipulated.  Having agreed to the NMS Consent Judgment, the CFPB made the choice to define and limit Ocwen's rights and responsibilities, as well as its own rights, with respect to certain servicing conduct.  It cannot now sue Ocwen for more.

**D.     By Agreeing to the NMS, the CFPB Waived the Ability to Bring These Claims In An Independent Action.**

The Overlapping NMS Counts are further barred by the NMS Consent Judgment because the CFPB waived its right to bring these claims outside the NMS enforcement framework.  As the Supreme Court has stated, in a consent judgment, parties "waive their right to litigate the

---

[9]  There are other limits on the CFPB's claims.  The CFPB is barred by *res judicata* from suing Ocwen at all for alleged conduct during the permitted phase-in periods. NMS C.J., Ex. D ¶ A (variously defining April 27, May 27 and August 5, 2014 as effective dates).  The CFPB also cannot sue for immaterial violations or for borrower harm in certain circumstances.  *See id.* at D-6-D-9; *id.*, Ex. A at A-46.

issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation." *United States v. Armour & Co.,* 402 U.S. 673, 681-82 (1971).  These waivers are judicially enforceable and binding even where the consent judgment limits relief otherwise available by law.  *See id.* at 682-83.

In asserting its overlapping NMS Counts, the CFPB attempts to renege on its bargain and enforce claims waived by the NMS.  In exchange for Ocwen's agreeing to the Consent Judgment remediation and servicing terms, the CFPB waived its ability to litigate future actions governed by NMS Servicing Standards and Metrics except as described in the NMS's enforcement framework, which permits actions only if specific conditions have been met.  *See* NMS C.J. ¶¶ 6, 12, 15; *id.*, Ex. D ¶¶ A, E, & I.  Here, this is both an equitable and a pleading failure because when a party sues over conduct covered by a binding agreement among parties, such as the NMS Consent Judgment, a plausible claim must plead that the plaintiff has satisfied any conditions precedent to filing a suit.  *See* Fed. R. Civ. P. 9(c); *Ben Fu Li v. Tan*, 2017 WL 2464680, at *2 (S.D. Fla. June 7, 2017) (dismissing case because "Plaintiff failed to allege that he satisfied *any* conditions precedent") (emphasis in original).  Ocwen is entitled to the benefit of the bargain it negotiated with the CFPB.  *See Reed v. United States*, 717 F. Supp. 1511, 1518 (S.D. Fla. 1988), *aff'd*, 891 F.2d 878 (11th Cir. 1990) ("The government, *more than any other party, must be held to honor its commitments*. When the government fails, United States Courts must be prepared to enforce these commitments.") (emphasis added).

Thus, the NMS covers the conduct at issue in these Counts, and the CFPB's independent claims for additional or different recoveries with respect to that conduct have been waived.  The CFPB has not alleged any right to recover against Ocwen to the extent the NMS preserved such claims in a greatly-limited way, so the Overlapping NMS Counts must be dismissed.[10]

## IV.   THE COMPLAINT DOES NOT MEET THE REQUIREMENTS OF RULE 8.

### A.   The Complaint Is an Impermissible "Shotgun" Pleading.

In the pages below, this Motion details numerous individualized pleading deficiencies in the Complaint.  But there is also a root cause of all these deficiencies that provides grounds for dismissal of the entire Complaint:  the CFPB's improper "shotgun" pleading.  In typical shotgun fashion, the Complaint begins with a laundry list of 220 generalized allegations, and then

---

[10]  Other equitable principles that cannot be decided on the face of the Complaint, including estoppel, also bar the Overlapping NMS Counts, and will be raised later in the case if necessary.

incorporates all 220 allegations into every one of its 14 counts.  *See, e.g.*, Compl. ¶¶ 226, 231, 235, 239.  *Cf.  Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998) (shotgun pleadings "invariably begin with a long list of general allegations, most of which are immaterial to most of the claims for relief" that are then "incorporated by reference into each count of the complaint.").  Ocwen is thus left to sift through nearly 70 pages of allegations and guess at which ones supposedly support each Count.  The Eleventh Circuit has "roundly, repeatedly, and consistently" condemned this type of pleading practice because it "unnecessarily tax[es] the time and resources" of trial and appellate courts.  *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014); *Keith v. DeKalb Cty., Ga.,* 749 F.3d 1034, 1045 n.39 (11th Cir. 2014).

Even where some of the 220 incorporated paragraphs appear intended to have supporting allegations, it is entirely unclear what the scope or exact nature of the CFPB's claim is. Compounding this issue, the Complaint jumbles different time frames when Ocwen is alleged to have engaged in certain practices, alleging that while problems began in 2014, many were fixed in mid-2014 or 2015 (*e.g.*, Compl. ¶¶ 107, 159-60), while others are ongoing (*e.g., id.* ¶ 39). Because these allegations are incorporated into all fourteen Counts, Ocwen is left guessing when the CFPB claims certain violations of the law supposedly occurred.

The shotgun nature of the Complaint is also improper because it threatens to render this case unmanageable.  There is no way to meaningfully target or cabin relevant discovery when the CFPB's claims are based on generalized statements of misconduct—unconnected to any specific consumers or accounts—all of which are then incorporated into fourteen different Counts.[11]  *See Johnson Enters.*, 162 F.3d at 1332-33.  The Complaint should either be dismissed in its entirety under Rule 12(b)(6), or a more definite statement ordered pursuant to Rule 12(e). *See Paylor*, 748 F.3d at 1126-27.

## B.    The Complaint Relies Entirely on Improper Group Pleading.

The Complaint also must be dismissed because its shotgun pleading approach spills over into improperly lumping all three of the defendants together without specifying which defendants actually engaged in the specific conduct at issue in each cause of action.  The three defendants in

---

[11] Curiously, the CFPB has taken the position in its section of the Joint Scheduling Conference Report that this suit actually involves 29 "separate" violations.  It does not.  But if the CFPB believes the Complaint is twice as complex than appears, this only demonstrates the need for this Court to impose discipline on the Bureau's pleading.

this case are distinct when the CFPB identifies them: Ocwen Loan Servicing, LLC ("OLS"), which is engaged in servicing loans, collects on borrowers' debts, and owns mortgage servicing rights, (Compl. ¶ 17); Ocwen Mortgage Servicing, Inc. ("OMS"), which engages in servicing and subservicing of loans and also directs OLS in certain activities, (Compl. ¶¶ 16, 18); and Ocwen Financial Corporation ("OFC") which the Complaint alleges controls OLS and OMS but is not itself a servicer, (*see* Compl. ¶¶ 15, 18).   But the Complaint nevertheless cavalierly defines all three defendants collectively as "Ocwen" and refers only to the combined defendants for the entirety of the 220 "factual allegations" and each of the 14 causes of action.  Compl. ¶ 13.  The Complaint does not specify, for example, which of the three defendants actually communicated with borrowers, actually processed payments, actually marketed add-on products, or actually did or failed to do any of the things alleged to have occurred.  This failure to differentiate between the defendants is impermissible group pleading, and requires dismissal.  *US Bank Nat'l Ass'n v. Capparelli*, 2014 WL 2807648, at *5 (S.D. Fla. June 20, 2014) (Marra, J.).

      C.      **Many of the Claims Are Vague and Conclusory.**

     In the Complaint, the CFPB has made a deliberate choice to deny both Ocwen and this Court sufficient information on specific alleged violations of the statutes or regulations at-issue. This may be because, at least in some instances, the CFPB has not actually identified specific violations—despite the ongoing NMS monitoring and the CFPB's ability to supervise Ocwen and review loan files if desired—but the ultimate reason is irrelevant.  To the extent a complaint merely recites the requirements of a statute without providing any factual examples of when the defendant violated said statute, it fails to state a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678; *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1376 (S.D. Fla. 2015).

     This is a defect that repeats over and over again throughout the Complaint.  Many of the concerns are addressed elsewhere in this brief, such as the reliance of the four Counts based on allegedly "deceptive" conduct (Counts II, IV, VI, IX), which merely assert that misrepresentations were made "directly or indirectly, expressly or by implication."  *E.g.*, Compl. ¶¶ 232, 240, 249, 276.  And the Complaint repeatedly relies on the (inadequate) crutch that violations occurred in "numerous instances" over several years without providing even the most minimal sense of what this means.  *See, e.g.*, *id.* ¶ 295 (Count XII); *id.* ¶¶ 306-07 (Count XIII).

     The Complaint also universally resorts to summarily parroting statutory language or claim elements (verbatim) without providing any meaningful additional detail.  *See, e.g.*, Compl.

¶ 317 (Count XIV, alleging violations of Homeowners' Protection Act (HPA), 12 U.S.C. § 4902(b), by merely copying the statutory language with no other factual details).  There is no justification for these kinds of conclusory pleading, certainly not in the light of the CFPB's multi-year investigation and ongoing monitoring of Ocwen's servicing practices.

## V.   CERTAIN COUNTS FAIL ON OTHER GROUNDS AS WELL.

### A.   The General Claims That Ocwen Routinely Engaged in Deceptive Communications (Counts II and IX) Are Deficient for Additional Reasons.

#### 1.   There Is No Detail Given to Put Ocwen on Fair Notice.

Initially and dispositively, both Counts II and IX are insufficient because they are completely devoid of the specific "who, what, where and how" elements that must be pled to make out a claim of fraud.  Rule 9(b) applies to the CFPB's attempt to plead a claim for misleading debt collection communications restricted by FDCPA, which is the basis for Count IX.  *Jackson v. Genesys Credit Mgmt.*, 2007 WL 4181024, at *3 (S.D. Fla. Nov. 21, 2007).  To comply with the Rule, the Complaint must plead: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)).

The same pleadings standards should be applied to the identical allegations of deceptive conduct being made in Count II, under the Bureau's deceptive practices standard.  *E.g.*, *CFPB v. Prime Marketing Holdings, LLC*, No. 2:16-cv-7111, at 10-11 (DE 32) (C.D. Cal. Nov. 15, 2016) (claim for deceptive acts or practices under CFPA dismissed for failure to meet Rule 9(b)'s pleading standard); *FTC v. Lights of Am.*, 760 F. Supp. 2d 848, 852-53 (C.D. Cal. 2010) (Rule 9(b) applies to deceptive claim under Section 5 of FTC Act).  While this Court previously declined to apply Rule 9(b) to an allegation of deception being brought by the FTC, (*FTC v. Sterling Precious Metals, LLC*, 2013 WL 595713, at *3 (S.D. Fla. Feb. 15, 2013)), and the FTC's general deception standard mirrors the CFPB's, given the overlapping causes of action and the otherwise vaguely pled Complaint, Ocwen urges the Court to apply the Rule here.  In any event, to give fair notice of the claim to Ocwen and state a "plausible" claim under Rule 8 standards, these claims of deception should specifically identify the statements, their source, and

their content.  *See Librizzi*, 120 F. Supp. 3d at 1380-81 (dismissing claim where plaintiff "did not allege the contents of the communications which plausibly indicate that an attempt to collect the debt was 'false, deceptive, or misleading,' or 'unfair or unconscionable'").

Whatever the legal standard, neither Count II nor Count IX meet these requirements. Even the seemingly easiest part of any deceptive representation claim—the Step One requirement of identifying the misstatement or omission—is wholly missing.  Instead, the CFPB only generally alleges in Counts II and IX that Ocwen made representations "directly or indirectly, expressly or by implication" about amounts due or other facts about serviced loans. Compl. ¶¶ 232, 276.  Whatever this means (and Ocwen is literally at a loss as to how one makes an indirect representation by implication), this cannot support a deceptive representation claim because it is entirely unclear what constituted the representations at-issue.  Having rested on supposed deception by statements made "directly or indirectly, expressly or by implication," there is no, or insufficient, detail about the maker, content, the misleading nature, or impact of those statements.  And, finally, there is no allegation as to which consumers (or even how many) received deceptive communications, other than "numerous."  Fair pleading requires more than reciting the elements of a cause of action in a conclusory showing.

Related to this concern, Counts II and IX allege with insufficient detail that Ocwen's alleged representations were both material, and that they misled or were likely to mislead consumers.  *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).  A representation is material only if it is "of a kind usually relied upon by a reasonably prudent person," *FTC v. Army Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989), or if it is "likely to affect a consumer's decision to buy a product or service," *CFPB v. Mortgage Law Group, LLP*, 196 F. Supp. 3d 920, 939 (W.D. Wis. 2016).  Instead, the Complaint resorts to generalized allegations, featuring the addition in the two Counts of the adjective "material" to describe the supposed misrepresentations about amounts due.  Compl. ¶¶ 233 (Count II), 277 (Count IX); *see also id.* ¶¶ 91, 120, 140, 198 (alleging statements about borrowers' files were "material to borrowers managing their mortgages and are likely to mislead borrowers acting reasonably under the circumstances").  No individual plaintiff would be allowed to proceed on such threadbare deception claims and neither can the CFPB.  *E.g., McGee v. JP Morgan Chase Bank, NA*, 520 F. App'x 829, 832 (11th Cir. 2013) (dismissing claim for negligent misrepresentation when only allegation concerning "reliance" element was the "repetitively offered . . . conclusory claim that

[plaintiffs] 'relied upon the [defendants'] statements to proceed with the purchase"); *Hill v. Celebrity Cruises, Inc.*, 2010 WL 11442595, at *6 (S.D. Fla. Sept. 14, 2010) (claim of reliance on alleged misrepresentations was "example of 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, which do not suffice'") (citation omitted).

### 2.     The CFPB Cannot Use This Case to Create a Duty to "Substantiate," or Hold Ocwen Liable for Allegedly Collecting Without Due Diligence

Separate from the vagueness of the allegations, the CFPB engages in improper overreach through these Counts, asserting that Ocwen should be held liable for deceptive practices because it allegedly collected on accounts where it "had failed to obtain or review information substantiating the accuracy of" the account information in its system. *See* Compl. ¶ 233, a-c (relying on lack of substantiation "prior to collecting" as sole examples of deception). The allegation that it is legally deceptive for a mortgage company to collect on an account without some unspecified pre-collection "substantiation" is not a fair statement of the law, as such a duty appears nowhere in the CFPA or the FDCPA. Moreover, the CFPB has not promulgated any regulation that would create such an obligation in connection with a servicing transfer, even though it was granted the authority to do so under the CFPA. *See* 12 U.S.C. §§ 5512(b), 5481(12). Rather, Counts II and IX are in this respect an attempt by the CFPB to graft an entirely new requirement onto federal law. The Court should not recognize such a requirement.

The CFPB itself has recognized that substantiation is not currently required *prior* to loan servicing or debt collection—the Bureau has announced that it intends at some point soon to propose, and perhaps ultimately enact, certain pre-collection substantiation requirements that would apply to third party debt collectors (though notably not loan servicers, such as Ocwen). *Supra* footnote 4 But even these proposals do not go so far as the Complaint's position that it is a deceptive business practice to ever communicate an account balance to a borrower without some unspecified level of prior substantiation. Compl. ¶¶ 233, 277. Instead, the CFPB's own proposals—coming from a Bureau rule-maker, not an enforcement attorney—only suggest that debt be reviewed for warning signs of inaccuracy prior to collection. *Supra* n.10. Quite obviously, the CFPB would not be proposing limited substantiation requirements, applicable to persons other than Ocwen, if it believed (as the Complaint indicates) that affirmative substantiation of *every* fact on *every* account is necessary and if it believed that it is a legally-deceptive practice for a mortgage servicer to communicate with a borrower without it.

And it is not surprising that the CFPB recognizes that federal law does not contemplate

the account and debt substantiation duty Count II and Count IX seek to impose.  The FDCPA prohibits false statements in the sections the Bureau relies on (Compl. ¶ 278, citing 15 U.S.C. § 1692e(2)(A), 1692e(10)), and do not reach the issue of whether the statements were made with back-up letters, due diligence, or the like.  Similarly, the CFPA's deception standard looks at whether the statements were misleading.  *See* CFPB Exam Manual at UDAAP 5.

This is not to say, of course, that Ocwen endorses the apparent practices of some third-party collectors with respect to having a good faith basis to collect on a debt.  But the CFPB's attempt to label ordinary mortgage servicing "deceptive" if account data is not subjected to an undefined level of substantiation should not be entertained.  As with Counts I and VIII, the CFPB does not even allege what type of substantiation would have been required in order for Ocwen not to have violated the CFPA or the FDCPA, as alleged in Counts II and IX.  The CFPB cannot seek to amend these statutes through vague and creative pleading.

### B.     The "Add-On Products" Claims (Counts V and VI) Fail.

Counts V and VI concern the practice by which Ocwen allegedly "marketed" (Count VI) and "enrolled" (Count V) borrowers for independent products, such as credit monitoring. Compl. ¶ 147.  The alleged activity is said to stretch back to 2011.  *Id.*

#### 1.     Count VI, And At Least Part of Count V, Are Time Barred.

The CFPA provides for a three year statute of limitations.  12 U.S.C. § 5564(g)(1); *CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *19-20 (S.D.N.Y. Dec. 2, 2016).  The CFPB filed its Complaint on April 20, 2017, which means it can only sue for conduct that occurred on or after April 20, 2014.[12]  But the Complaint affirmatively pleads that the conduct at issue in these Counts dates back to 2011 and that "Ocwen stopped marketing add-on products in 2013." Compl. ¶¶ 147-48, 245, 249.  Plainly, Count VI, which alleges solely that Ocwen engaged in "deceptive marketing" is barred by limitations.  And while the Complaint does not allege when Ocwen stopped enrolling customers, the enrollment claim in Count V is time barred to the extent the alleged conduct occurred outside the same three-year limitations window.

#### 2.     Count V Is Not Factually Supported.

Apart from the time bar, Count V's claim that Ocwen is liable for unfair conduct because it "enrolled consumers in add-on products without their consent" (Compl. ¶ 245), cannot stand

---

[12] Due to four narrow tolling agreements Ocwen agrees the beginning of the limitations period dates back to December 23, 2013, though the CFPB has not alleged tolling.

because it is not supported with the relevant factual allegations.  Almost 100 paragraphs earlier in the sprawling Complaint, the CFPB set forth its factual assertions about add-on products.  *See id.* ¶¶ 147-155.  In the allegations central to the claim asserted later in Count V, the CFPB alleged only that "Ocwen enrolled borrowers into add-on products *without proof of* their affirmative consent," complaining that Ocwen did not require "vendors to provide [such] proof" to Ocwen.  *Id.* ¶ 152.  There is, of course, a wide gulf between the legal claim alleged in Count V—enrolling consumers without consent—and the facts alleged, which amount to enrolling consumers without having in hand the vendor's proof of that consent.  The Complaint does not identify even a single factual instance where a borrower was enrolled by Ocwen without such borrower's consent.  Moreover, the facts alleged in paragraph 152 further undermine Count V, for it is obvious that CFPB contends that it was the vendors who were in contact with the borrowers and the vendors who obtained the consent to enroll.  On its face, then, Count V is unsupported and must be dismissed.

### C.    The TILA Claims (Count VII) Are Largely Time-Barred.

Even apart from the other failures raised earlier, *supra* pp. 17-22, Count VII must be dismissed to the extent it seeks to challenge conduct prior to December 23, 2015.  Although the CFPB seeks to pursue a claim for violations "since January 10, 2014," TILA has a strict one year statute of limitation.  15 U.S.C. § 1640(e); *see also Hayes v. U.S. Bank Nat'l Ass'n*, 2014 WL 2938534, at *3 (S.D. Fla. June 30, 2014) (Marra, J.), *aff'd,* 648 F. App'x 883 (11th Cir. 2016).  As the Eleventh Circuit has explained, Congress created TILA's brief, one-year statute of limitations period because it was "concern[ed] that a creditor not face limitless liability in terms of time" in civil suits brought under TILA.  *Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of the Treasury, OCC*, 118 F.3d 1461, 1467 (11th Cir. 1997).  This concern applies equally to suits brought by the government—thus TILA's limitations period also applies to the government, including, specifically, the CFPB.  *CFPB v. ITT Educ. Servs., Inc*., 219 F. Supp. 3d 878, 922-23 (S.D. Ind. 2015) (when the CFPB "chooses to enforce [TILA] by filing a civil suit rather than resorting to the administrative actions under its power," Congress's concerns regarding unlimited TILA liability apply—"indeed, they may apply with still greater force") (citing *Gabelli v. SEC*, 133 S. Ct. 1216, 1224 (2013)).  As a result, Count VII must be at least partially dismissed to the extent it sues over TILA violations prior to December 23, 2015.

### D.   The FDCPA Claims (Counts VIII and IX) Fail to Allege Required Pleading Elements and Are Partially Time-Barred.

#### 1.   The Complaint Fails to Allege Facts that Plausibly Show Each Ocwen Defendant Acted as a "Debt Collector."

Counts VIII and IX, which seek to recover for alleged violations of the FDCPA, must be dismissed because the CFPB does not actually allege facts to support the assertion that each Ocwen defendant was a debt collector as defined by the statute.  *See Bentley v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1371 (S.D. Fla. 2011) (plaintiff must allege facts showing "the defendant is a debt collector as defined by the FDCPA").  Under the FDCPA, the term "debt collector" is closely defined for present purposes as one who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The definition goes on to specifically exclude, among others, "any person collecting or attempting to collect any debt owed or due or asserted to owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F); *see also* Compl. ¶¶ 270-78 (conceding that FDCPA claims are limited to mortgages in default when acquired by a servicer).  Thus, a "mortgage service compan[y]" is never a debt collector if the debt at issue was not in default at the time it was obtained by the servicer.  *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1314-15 & n.4 (11th Cir. 2015) (citing S. Rep. No. 95-382, at 3-4); *Bentley*, 773 F. Supp. 2d at 1371.[13]

Counts VIII and IX fail this test.  Without distinguishing at all between the three separate Ocwen defendants, the Complaint merely recites the definitions and asserts that "Ocwen" acquires servicing for some loans when they are "in default" and "with respect to those loans" Ocwen is a debt collector.  Compl. ¶¶ 264-274.  The Complaint never identifies any such accounts or describes them in any way.  More troubling, the Complaint does not distinguish among the various entities, some of which do not even service loans.  In order to state a FDCPA claim, the CFPB must come forward with *facts* on which this Court can find the "debt collector" definition met as to each defendant.  Without more, the FDCPA Counts fail.

#### 2.   Many of the FDCPA Claims Also Are Time-Barred.

As with other claims brought by the CFPB, *supra* pp. 29-31, the majority of the CFPB's

---

[13] *See also Renfrow v. First Mortg. Am., Inc.*, 2011 WL 2416247, at *3-4 (S.D. Fla. June 13, 2011) (Marra, J.) (dismissing claim where alleged facts did not establish debt was in default when assigned to mortgage servicer); *Bentley*, 773 F. Supp. 2d at 1371 (same).

FDCPA claims in Counts VIII and IX are facially time-barred by the FDCPA's one year statute of limitation.  15 U.S.C. § 1692k(d).  Despite this clear one year limitations period, and the Complaint's April 20, 2017 filing date, the CFPB seeks to recover FDCPA violations on "numerous instances since January 10, 2014."  *See* Compl. ¶¶ 271, 276.  This is an improper overreach and Counts VIII and IX must be dismissed as to the CFPB's claims on events occurring prior to December 23, 2015.  *See ITT Educ. Servs.,* 219 F. Supp. 3d at 922-23.

### E.   The Dual-Tracking Causes of Action (Counts III, IV and XIII) Are Overbroad and Do Not State a Claim.

The Complaint's assertions about dual-tracking loan servicing—that Ocwen allegedly started, and in some instances completed foreclosures while working with the same borrower on a loan modification—appear in three places.  Count XIII is the central claim and alleges violations of RESPA and its Regulation X, which is the CFPB's comprehensive, seven-page set of rules that dictate how modification applications should be handled and processed, decided, implemented, and appealed and the defined circumstances under which foreclosures must be avoided or put on hold in light of applications or modifications.  Compl. ¶ 308, citing, *inter alia*, 12 C.F.R. § 1024.41 ("Section 1024.41").  But apparently because the CFPB is unhappy with the reach of that regulation, the Complaint also alleges that Ocwen violated the general prohibition on "unfair" practices where it allegedly completed certain dual-tracked foreclosures (Count III) and supposedly did not hold up completion of foreclosure pending receipt of missing paperwork (Count IV).  Each claim must be dismissed, but for different reasons.

### 1.   The CFPB Fails to Allege Regulatory Violations in Count XIII.

The operative dual tracking regulation, Section 1024.41, provides that dual-tracking protections are limited to only the first "complete loss mitigation application for a borrower's mortgage loan account."  12 C.F.R. § 1024.41(i).  Citing this limitation, numerous courts have dismissed consumers' Section 1024.41 claims for relief from alleged dual-tracking problems when the consumers challenged something other than the servicer's actions with respect to the first completed application on the account.  *See, e.g., Wentzell v. JPMorgan Chase Bank, N.A.,* 627 F. App'x 314, 318 n.4 (5th Cir. 2015); *Trionfo v. Bank of Am., N.A.,* 2015 WL 5165415, at *4 (D. Md. Sept. 2, 2015).  Count XIII is similarly deficient, because it is not limited in the manner Section 1024.41 is limited: the claim fails to allege that any of the purported regulatory

violations occurred with respect to a consumer's first completed loss mitigation application.[14] *See Trionfo*, 2015 WL 5165415 at *4.  Count XIII must be dismissed without this allegation.

The CFPB's dual-tracking claim in Count XIII also fails to support any recovery because the CFPB alleges that Ocwen violated RESPA by obtaining foreclosure judgments or conducting foreclosure sales on borrowers who submitted a complete application "more than 37 days before a foreclosure sale."  Compl. ¶ 307.  But the date of the ultimate foreclosure sale is irrelevant, as CFPB guidance and case law make clear.  The protections of Section 1024.41 apply only to the much smaller subset of borrowers who completed an application when at least 37 days were left before the sale was at that point *scheduled*.  *See Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1010 (11th Cir. 2016); 78 Fed. Reg. 60,382, 60,396-97.  The difference matters greatly, since sales are often postponed—including as a result of Section 1024.41.  So, accepting the CFPB's allegations as true, there were no violations, as a loss mitigation application received more than 37 days before the ultimate foreclosure sale may not be entitled to protection.  *See Lage*, 839 F.3d at 1010.  This too is grounds for dismissal of Count XIII.

## 2.     Section 1024.41 Precludes Separate Recovery for Counts III and IV.

Once again seeking to overstep the bounds of its own authority, the CFPB wrongly sues Ocwen for committing "unfair" or "deceptive" business practices by allegedly completing foreclosures where the borrower was performing on a loan modification (Count III) or was still in the process of applying (Count IV).  Compl. ¶¶ 238, 243, citing 12 U.S.C. § 5536(a)(1)(B). Yet, as referred to above, the CFPB's dual tracking regulations deal in a comprehensive way with how foreclosures should be pursued and how modification applications must be processed, and in the regulation define what is required, what exceptions apply, and which types of borrower situations receive no special protection. 12 C.F.R. § 1024.41.  Having regulated comprehensively in a defined area, the CFPB may not invoke a generic grant of authority to sue Ocwen even if, as the CFPB apparently believes, the dual-tracking regulation it enacted does not cover all consumers.  This form of retroactive regulation by enforcement, using the UDAAP authority to broaden an existing regulation to "fill gaps" in this way, is improper.  Moreover, the CFPB's theory suffers from the same fair notice failures detailed above, *supra* pp.12-16, because

---

[14] The CFPB even acknowledges this deficiency, alleging that borrowers who have submitted a complete loan modification application are only "potentially subject" to Regulation X protections.  Compl. ¶ 192.  The CFPB has proposed a *new* regulation that would expand this protection under Regulation X, but it has yet to go into effect.  *See* 81 Fed. Reg. 72,160.

Ocwen was entitled to presume its compliance with *comprehensive* regulations would protect it from a contrary lawsuit by its regulator. Ocwen was entitled to follow Section 1024.41 as the rule to live by, and the Court should not entertain the CFPB's request to change the rules now.

### 3. Count III Otherwise Does Not State a Claim for Unfair Practices.

Apart from the concern with overlapping claims, Count III is not even sufficiently pled. Count III claims that, in "numerous instances . . . Ocwen has unilaterally breached contracts with borrowers by foreclosing on their loans even though the borrowers were performing on agreements on loss mitigation options." Compl. ¶ 236. That is the extent of the description. This is not enough, for the CFPB does not allege what contracts and what contract terms were breached; it is unclear, for example, whether it refers to oral or written agreements, the original contract, a modified contract, or a novation, and certainly no terms are identified. And Count III does not explain what "performing on agreements on loss mitigation options" means. So it is unclear what "performance" entails or if this refers to all types of loss mitigation options, or just some smaller subset. This type of detail is important because loss mitigation options can include, for example, consent foreclosures and deeds in lieu. *E.g.*, U.S. Dep't of Hous. & Urban Dev., 4000.1: FHA Single Family Housing Policy Handbook, sec. III(A)(2)(j)(i). The CFPB cannot reasonably claim it is unfair to foreclose on a borrower who *wants* to be rid of a property.

### F. The RESPA Claims (Counts X – XIII) Are Deficient in Several Ways.

### 1. OFC and OMS Must Be Dismissed from All RESPA Counts Because the Complaint Fails to Plausibly Allege They Are "Servicers."

The CFPB has sued Ocwen under Section 6 of RESPA, which governs the servicing of mortgage loans. *See* 12 U.S.C. § 2605. "Servicing" is defined under RESPA as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan." *Id.* § 2605(i)(3). Courts have thus consistently held that entities not engaged in the servicing of loans—including parents or subsidiaries to servicers—cannot violate RESPA. *See McCarley v. KPMG Int'l*, 293 F. App'x 719, 722 (11th Cir. 2008) (plaintiff "offered no authority—and we have found none—assigning liability to parent or subsidiary companies under RESPA"); *Bernstein v. Wells Fargo Bank, N.A.*, 2016 WL 4546653, at *4 (N.D. Ga. May 13, 2016).

Here, the CFPB fails to plausibly allege that OFC or OMS are "servicers." The CFPB alleges that OFC "controls, directs, operates, and participates in mortgage servicing activities" by "enter[ing] into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt." Compl. ¶ 15. It also alleges that OMS contracts for products

and services and that OMS "licensed" to service loans.  *Id.* ¶ 16.  But the Complaint nowhere alleges—let alone provides facts in support—that OFC or OMS themselves receive payments from borrowers.  *See* 12 U.S.C. § 2605(i)(3).  Nor can OFC or OMS face servicer liability under RESPA solely due to their affiliation with OLS.  *See McCarley*, 293 F. App'x at 722.  Therefore, OFC and OMS should be dismissed from the RESPA claims.  *See Bernstein*, 2016 WL 4546653 at *4; *Bennett*, *v. Nationstar Mortg., LLC*, 2015 WL 5294321, at *11 (S.D. Ala. Sept. 8, 2015).

> **2.      The Complaint Fails to Allege Notice of Error Violations in Count XI.**

In Count XI, the CFPB alleges that Ocwen failed to make appropriate corrections and failed to conduct reasonable investigations upon receiving notices of error ("NOEs").  Compl. ¶ 291.  In support of this Count, the Complaint (¶¶ 167-73) contains allegations about supposed "complaints" that borrowers submitted to Ocwen that were not properly handled.

But the Complaint wholly fails to adequately plead a regulatory violation.  A NOE is defined as a "written notice" that "asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes occurred."  12 C.F.R. § 1024.35(a).  Despite this definition, most of the relevant factual allegations in the Complaint focus on complaints submitted to Ocwen's "call center," (Compl. ¶¶ 167-73), which necessarily could not meet the regulatory definition of a "written" NOE.  When the Complaint does make factual allegations about purported NOEs in particular, it merely parrots conclusory allegations that Ocwen had deficient policies and procedures that "also apply to NOEs," such that Ocwen failed to "make corrections of errors in borrowers' complaints and NOEs."  Notably, the Complaint does not allege a single written complaint was sent to Ocwen that "include[d] the name of the borrower" and "information that enable[d] [Ocwen] to identify the borrower's mortgage loan account."  12 C.F.R. § 1024.35(a).  These allegations are plainly deficient.  *See Librizzi*, 120 F. Supp. 3d at 1376.

> **CONCLUSION**

WHEREFORE, Ocwen requests the Complaint be dismissed with prejudice.

> **REQUEST FOR ORAL ARGUMENT**

Ocwen hereby requests oral argument lasting 45 minutes per side.  Ocwen believes oral argument will aid the Court due to (i) the unique constitutional issues raised in the Motion, which appear to be matters of first impression in the Eleventh Circuit, (ii) the *res judicata* issues concerning the NMS, and (iii) the far-reaching nature of the Complaint and its 14 Counts.

Dated:  June 23, 2017                   Respectfully submitted,


                                        s/ Bridget Ann Berry
                                        Bridget Ann Berry
                                        **GREENBERG TRAURIG, P.A.**
                                        777 South Flagler Drive, Suite 300 East
                                        West Palm Beach, FL  33401
                                        Tel.:  561.650.7900
                                        BerryB@gtlaw.com

                                        Thomas M. Hefferon (*pro hac vice*)
                                        Sabrina M. Rose-Smith (*pro hac vice*)
                                        **GOODWIN PROCTER LLP**
                                        901 New York Ave., NW
                                        Washington, DC 20001
                                        Tel.:  202.346.4000
                                        thefferon@goodwinlaw.com
                                        srosesmith@goodwinlaw.com

                                        *Attorneys for Defendants Ocwen Financial Corp.,*
                                        *Ocwen Mortgage Servicing, Inc., and Ocwen*
                                        *Loan Servicing, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 23, 2017 via CM/ECF on all counsel or parties of record listed below:


Anthony Alexis, Enforcement Director
Cara Petersen, Deputy Enforcement Director For Litigation
Gabriel O'Malley, Assistant Litigation Deputy

Jean Healey
Email:  jean.healey@cfpb.gov
Jan Singelmann
E-mail:  jan.singelmann@cfpb.gov
Atur Desai
E-mail: atur.desai@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC  20552

                                    s/ Bridget Ann Berry
                                    Bridget Ann Berry