UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN

CONSUMER FINANCIAL PROTECTION
BUREAU,

       Plaintiff,

  v.

OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
and OCWEN LOAN SERVICING, LLC,

       Defendants.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

Taking the same kitchen-sink approach to opposing dismissal as it took in the 318-paragraph Complaint, the Consumer Financial Protection Bureau ("CFPB") offers a welter of responses to Defendants' Motion to Dismiss, (DE 31) ("Motion").  *See* Plaintiff's Opposition (DE 35) ("Opp.").  Ocwen's reply below shows that the CFPB has no persuasive reasons the case ought not be dismissed: because it is prosecuted by an unconstitutional agency, because it is inconsistent with that agency's own promises to Ocwen embodied in the NMS Consent Judgment, because the Complaint is unfairly conclusory, and because various of the causes of action simply do not state a claim.  While space constraints prevent Ocwen from replying to some of the minor points the CFPB offers—many of which appear in an astounding 208 footnotes, often many lines long and plainly crafted to avoid the 35-page brief limit—this brief addresses the main elements.  Ocwen once again asks this Court to hold oral argument, particularly given the Court's invitation to the Attorney General to provide his views as to whether the CFPB's structure is unconstitutional. (DE 36.)

## ARGUMENT

**I.    THE CFPB'S CONSTITUTIONAL FLAWS, TAKEN TOGETHER, REQUIRE DISMISSAL OF THE COMPLAINT.**

**A.    The CFPB Is Unconstitutional Because Its Features Subvert The President's Powers And Authority Under Article II.**

The Opposition's argument (Opp. at 2-9), that the CFPB's structure does not violate the separation of powers misses the forest for the trees—even if each of the CFPB's features, standing alone, may not pose a constitutional problem, the combination of those features is constitutionally fatal.  The CFPB does not contest that it possesses the many features that render it unconstitutional: a single Director, appointed for a five year term, who may be removed only for cause, with authority over almost every aspect of the American economy, and a broad swath of Executive powers.  It instead maintains there is no issue with this combination, as the features are "common to most independent agencies, particularly the FTC."  Opp. at 5.  The CFPB fails to address, however, that while one or more federal agencies may share a feature in common with the CFPB, none possesses all of them.  Taken together, those features form an unconstitutional impingement on the President's power under Article II to "Take Care that the Laws are faithfully executed."  U.S. CONST., art. II, § 3.

The CFPB's other constitutional arguments fall apart upon analysis.  The CFPB first contends that the for-cause limit on removal does not unconstitutionally undermine the Executive

1

because of *Humphrey's Executor*, 295 U.S. 602 (1935), and *Morrison v. Olson*, 487 U.S. 654 (1988). But neither case excuses the CFPB's constitutional infirmities—both cases involved Executive agencies that were fundamentally different in composition and purpose than the CFPB. *Humphrey's Executor*, as explained in the opening Motion (at 7-8), involved the multi-member FTC with staggered terms for each of the Commissioners. That fact is consequential both because the deliberative nature of a multi-member body necessarily means the agency serves as a check on itself,[1] and every President is able to appoint at least one Commissioner during the span of his four-year term (if not more)—something the *Humphrey's Executor* Court found significant. 295 U.S. at 624. By contrast, all who work for the CFPB—from the Deputy Director down—are appointed by the Director, who has a five-year term, so the President may never get to appoint anyone at the agency. Of further significance, the FTC was viewed by the *Humphrey's Executor* Court as a bipartisan, expert body intended to be relatively insulated from the kind of partisan zeal that can infect an agency headed by a single executive, and so less threatening to the ability of the people to control their government through an accountable President. The same is not true of the CFPB—with only one Director, who in turn controls everyone else in the bureaucracy, the CFPB will almost necessarily be a *partisan* agency, thus increasing the likelihood the President will actively disagree with a Director appointed by a predecessor but leaving him or her no chance to do anything about it.

*Morrison* is inapposite because it involved a sub-cabinet agency that was quite restricted in powers and reach, the Office of the Independent Counsel, which therefore posed no material threat to constitutional powers. Unlike the CFPB Director, the independent counsel had a single, limited mandate: to investigate (and potentially prosecute) "certain high-ranking Government officials for violations of federal criminal laws." 487 U.S. at 660. In upholding the counsel's insulation from at-will removal, the Court found important that she had "limited jurisdiction and tenure[,] lacking policymaking or significant administrative authority." *Id.* at 691. Further, the independent counsel was an "inferior officer," subject to the scrutiny of an Executive officer, the

---

[1] The CFPB brushes off the multi-member feature as constitutionally insignificant, citing silence from *Humphrey's Executor* and an out-of-context quotation from the D.C. Circuit's opinion in *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016). The CFPB fails to acknowledge the *PHH* court's repeated focus on the fact that "the deliberative process and multiple viewpoints in a multi-member independent agency can help ensure that an agency does not wrongly bring an enforcement action or adopt rules that unduly infringe individual liberty." *Id.* at 26-27.

2

Attorney General, and therefore not a substantial threat to "unduly trammel[] on executive authority." *Id.* at 691.  The CFPB Director cannot be more different than the independent counsel on both of these measures.  Moreover, the independent counsel's jurisdiction was defined and limited by the Special Division, and her criminal prosecutions would obviously be subjected to judicial review.  *Id.* at 662 (citing 28 U.S.C. § 593(b)).  The Director, by contrast, can effectively make his own laws via regulation, and then enforce them in his own administrative proceeding, where he is also the first line of appellate review.

Apart from the inapposite cases, the CFPB also wrongly claims that its reach is not unusual, and that other agencies have just as sweeping a mandate as the CFPB.  As an example, the CFPB cites the FTC's jurisdiction over seventy-one (71) laws. Opp. 4.  This point adds nothing to the CFPB's already-made argument about *Humphrey's Executor*, which specifically addressed the FTC.  And in pressing too hard, the CFPB overplays its hand; when the Court actually looks up the cited laws it will find that many are extremely narrow and often merely clarify what constitutes violations of the Commission's organic statute, the FTC Act.  *See e.g.,* 15 U.S.C. § 70 *et seq.* (deceptive textile fiber products identification is a violation of the FTC Act).  That Congress assigned the administration of those types of enactments to an independent commission does not come close to justifying its sweeping assignment of all meaningful consumer financial services statutes to an unaccountable CFPB.  There is simply no comparing the CFPB's expansive and unchecked powers to the FTC's authority over laws like the Muhammad Ali Boxing Reform Act and the Dolphin Protection Consumer Information Act.

All told, there has never been an independent agency charged with such a mandate that has been headed by a single Director who may be removed only for cause.  This structure may allow the President to "identify the official responsible for any problems," as the CFPB notes (Opp. at 7), but it does not permit the President to actually do anything about that official or the whims of his maverick agency.  Nor does it allow the electorate to perform a reasonable check on that official, through the President.  Given this serious constriction on Presidential power, and without a historical basis for it, the CFPB's infringement on the President's authority cannot stand.  *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010).

      **B.**     **The CFPB's Funding Scheme Contributes To The Bureau's Unconstitutional Structure.**

Responding to Ocwen's argument that the Bureau's funding structure violates Article I's Appropriations Clause, the CFPB first claims that nothing in the Constitution "requires agencies

to be funded through annual appropriations." Opp. at 8.  While it is true that courts have blessed funding schemes under which agencies are allowed by Congress to fund themselves by collecting money from entities the agencies oversee, the CFPB does not self-finance in that way.  Instead, the CFPB has been granted the actual power to appropriate—it gets to raid funds raised by the Federal Reserve Board ("FRB") that would otherwise go to the general Treasury and be subject to appropriation by Congress.  12 U.S.C. § 289.  That the Director may obtain federal funds with no congressional oversight is yet another unconstitutional facet of his position.  It is no answer to this flagrant misdirection to argue that the CFPB is constitutional because Congress may someday fix the agency's funding scheme. Opp. at 8.  *See, e.g.*, *Romero v. Hodgson*, 319 F. Supp. 1201, 1206 (N.D. Cal. 1970).  Nor is this the only flaw with the CFPA that affects Congressional ability to oversee the executive.  Mot. at 6, 9-11.  Giving the CFPB unbridled funding power, superior even to Congress' power of the purse, and otherwise insulating the CFPB from Congressional review, are noxious to separation-of-powers principles.

> **C.  Congress Never Intended For The CFPB To Be Led By A Single Director Who Is Terminable At Will.**

The CFPB argues this Court can simply fix its flaws by deleting the requirement that the Director be terminable only for cause.  This is not true, for two reasons.  First, and simplest, this fix is insufficient because it does not address any issues other than the Director's tenure.  Second, the CFPB's argument hinges on the CFPA's general severability clause—a clause that does not address the CFPB's structural composition specifically.  12 U.S.C. § 5302.  As the Supreme Court has noted, "the ultimate determination of severability will rarely turn on the presence or absence of such a clause." *United States v. Jackson*, 390 U.S. 570, 586 n.27 (1968).  And the CFPB has failed to address the reasons why Congress would not have wanted a CFPB led by a single Director answerable to the President but not to Congress (Mot. at 12), all of which cast doubt as to whether, as the Opposition puts it, "Congress would have preferred the law with the offending provisions severed instead of no law at all." *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).

**II.  THE NMS CONSENT JUDGMENT BARS COUNTS I, III, IV, VII, VIII, AND XIII, AND PART OF COUNT X.**

In the Motion (at 19-20), Ocwen detailed how six Counts, I, III, IV, VII, VIII, and XIII, and portions of a seventh, Count X ("the Overlapping Counts"), overlap with Servicing Standards and Metrics that are to be exclusively enforced within the NMS Consent Judgment

4

enforcement framework. Since the CFPB does not allege that the agreed triggers for enforcement have occurred, and because it seeks relief that is barred by the Consent Judgment, those claims should be dismissed. *Id.* The CFPB does not dispute that the conduct at issue in the Overlapping Counts is, indeed, entirely covered by the Consent Judgment. Opp. at 14-18. Having conceded the overlap, the only question for this Court is what to do about that.

The CFPB uses the majority of its briefing on the issue (Opp. at 14-16), to argue that, because the Release did not apply to future conduct, recovery under the Overlapping Counts is not barred. That misses the point entirely. The Motion does not argue that the CFPB *released* all claims relating to the alleged conduct in the Overlapping Counts, or that it cannot sue about that conduct. *See* Mot. at 17-23. To the contrary, Ocwen conceded that the CFPB *may* bring certain claims concerning the Overlapping Counts. *See* Mot. at 21-22. The point is that such claims are subject to the terms, conditions and remedial limitations expressly provided in the Consent Judgment, which requires that before any remedy be sought for the subject conduct: (1) the Monitor must find a "Potential Violation" of a legal standard; (2) the "Potential Violation" must be found to have exceeded the "Threshold Error Rate" the CFPB had agreed to for that standard; and (3) the "Potential Violation" must have remained uncured by Ocwen. NMS C.J. Ex. D at D-1, -4, -10 to -11. The NMS Settlement also embodied the CFPB's agreement that if the subject conduct became actionable through an enforcement matter, the Bureau's remedies would be limited. Mot. at 19. These counts must be dismissed because the CFPB failed to plead that any of these conditions precedent occurred prior to filing suit and because the CFPB has not limited its recovery as previously agreed in the NMS Consent Judgment.

The Opposition next raises the legal argument (Opp. at 16-17), that *res judicata* cannot bar the Overlapping Counts because the claims asserted and relief sought in this case could not have been obtained in the prior NMS action. This is demonstrably untrue, as the CFPB included a prayer for forward-looking injunctive relief in its NMS complaint and, through the NMS Consent Judgment, the CFPB did obtain forward-looking relief and the right to enforce a breach of the legal standards within certain parameters. *See* Compl., *CFPB v. Ocwen Fin. Corp.*, No. 12-cv-00361, ECF No. 1 (D.D.C. Dec. 19, 2013). Ocwen's argument is that *res judicata* limits the CFPB's ability to now sue for more than the Bureau had agreed to.

The CFPB's contention (Opp. at 17-18), that *res judicata* and waiver are inapplicable because there is no overlap between this case and the NMS is exceedingly odd in light of the

5

CFPB's failure to contest Ocwen's argument that the Overlapping Claims mimic identical requirements spelled out in the NMS Consent Judgment. Where a prior judgment limits the enforcement methods or remedies available to a party, any claims that do not fall within the enforcement terms (or limitations) of those judgments are barred by *res judicata* and waiver. Mot. at 21-23 (citing cases).

Most troubling to those concerned about the good faith of government agencies, the Opposition audaciously announces that "[e]ven if the alleged conduct violates the Consent Judgment and Federal consumer financial laws, the Bureau has discretion as to which source of law it enforces." Opp. at 15-16 n.91. But it defies logic to suggest the parties (and the NMS court) ever contemplated or agreed the CFPB later could choose unilaterally to jettison the detailed procedures and penalties limitations in the NMS Consent Judgment because the Bureau wanted a better result, or a better headline. Ocwen has not been free to ignore the NMS settlement, such as by resolving a "Potential Violation" as it saw fit; instead Ocwen has been required to self-report and obtain specific approval by the Monitor for corrective action under the terms of the NMS Consent Judgment. NMS C.J. at D-11. Over the past three-plus years, Ocwen invested millions of dollars and tens-of-thousands of man-hours to comply with the many detailed NMS performance, monitoring, and enforcement mechanisms. It did so in reliance on the parties' agreements in the NMS Consent Judgment. The CFPB may not renege on the deal. As another court in this district aptly put it, "[t]he government, *more than any other party,* must be held to honor its commitments." *Reed v. United States*, 717 F. Supp. 1511, 1518 (S.D. Fla. 1988) (emphasis added).

The CFPB is also wrong in its argument that having to abide by commitments made in a consent order would be an impermissible waiver of sovereign authority.[2] This cannot be true or private parties would find it difficult in many situations to settle disputes with the government. It also is not the law. *Armour & Co.*, 402 U.S. 673, 681-83 (1971) (by agreeing to a consent decree, government can waive its ability to sue for relief otherwise available to it as the sovereign).

---

[2] In support of this argument, the CFPB cites cases that stand for the proposition that in commercial or treaty arrangements Congress cannot waive its right to change the law. Opp. at 16 nn.95-96. The cases are off point, for here we have an agency, with no power to make laws, and which otherwise has bound itself by a federal court order, and so the considerations that animated the cited cases are completely absent.

### III. THE COMPLAINT OTHERWISE FAILS TO STATE A CLAIM FOR RELIEF.

#### A. The Unfairness Claim In Counts I And VIII Is Not Legally Supportable.

In the Motion (at 16-17), Ocwen argued that Counts I and VIII are both vague and unprecedented, because each rests on the assertion that Ocwen's use of data and a servicing system that contained errors and inaccuracies constitutes an "unfair" act or practice under the CFPA and FDCPA. The Opposition starts off the response (Opp. at 19-20), by trying to rewrite both the Complaint and the Motion, claiming the CFPB does not seek any recovery for Ocwen's use of its servicing system and claiming that the Motion does not argue why assertions of inaccurate data should be dismissed. With respect to the first contention, putting aside what a fair reading of the Complaint would be, Ocwen accepts the CFPB's concession that it does not seek any recovery or other remedy based on Ocwen's use of the REALServicing loan servicing system.

Turning to the other argument, Ocwen certainly did (and does) seek dismissal of Counts I and VIII to the extent the counts allege that use of allegedly "inaccurate" data is an actionable unfair practice. *See, e.g.,* Mot. at 12 (describing Counts as alleging it was unfair for Ocwen to "use[] information to service mortgage loans that sometimes was 'inaccurate' or 'incomplete.'"). *See generally id.* at 12-15. In direct response to the substantive reasons that the "inaccurate" data aspects of Counts I and VIII fail—because of the lack of articulated criteria or standards for accuracy (*id.* at 12-13), and the lack of fair notice (*id.* at 13-15)—the Opposition merely pronounces that "[n]either argument is applicable." Opp. at 10. The CFPB does not respond at all to Ocwen's point that Counts I and VIII are infirm, and the underlying claim of unfairness not viable, because there are no specific allegations concerning what level of accuracy should have been observed and how alleged inaccuracy (rather than other factors) materially caused substantial harm to consumers. Mot. at 16.

Ultimately, the Opposition does launch a defense of its belief that it put industry participants on fair notice of the alleged legal duties that underlie Counts I and VIII (based on standards of "unfairness"), as well as Counts II and IX (based on standards of "deception"). Opp. at 10-12. The CFPB points to the enforcement history of both the FTC and the CFPB, and certain informal CFPB guidance as "publicly-accessible materials" that it asserts warned Ocwen of what the law required. *Id.* at 10 & nn.62-64, 11 & nn.65-66, 12 & nn.73-74, 13 & n.75. But neither provide the type of fair warning that the Due Process Clause demands. As the Supreme

7

Court has held, enforcement actions are inadequate basis for fair notice because "enforcement decisions are informed by a host of factors, some bearing no relation to the agency's views regarding whether a violation has occurred." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012). The other cited source, CFPB bulletins, do not telegraph what the law requires, as they do not carry with them the force of law. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). The particular publication the CFPB cites—a February 2013 Bulletin that generally warns about potential regulatory risks relating to "transfers of servicing" (Opp. at 11)—is too non-specific to provide notice of anything.

Fair notice requires more—a clear statement as to what the law actually is, with specific rules or at least guideposts for affected citizens. Even the materials CFPB points to do not help anyone to understand the crucial questions of what level of accuracy is required and of which material data. Lacking such guidance, Ocwen could not have reasonably foreseen that the conduct alleged in these Counts was illegal under the CFPA.

The CFPB cynically protests it had no duty to "declare" ahead of time that it was going to define this kind of generic conduct—namely, loan servicing based on some amount of "inaccurate" data—as "unfair" or "deceptive." But the language of the CFPA disagrees (Mot. at 15) and the cases cited by the CFPB on this point do not involve the CFPB significantly expanding the scope of "unfairness" beyond any reasonable or pre-determinable concept (*see* Opp. at n. 79).

### B. Counts I, II, VIII, And IX Lack Sufficient Detail Or Legal Support.
#### 1. The Four Counts' Threadbare Allegations Are Wholly Inadequate.

Ocwen explained in its Motion that Counts I and VIII, the CFPA and FDCPA unfairness claims, and Counts II and IX, the CFPA and FDCPA deception claims, are unsupported by sufficient factual allegations to state a claim. Mot. at 16-17, 26-28. In response (Opp. at 20-21), the CFPB defends its unfairness claims by quoting the very aspects of the Complaint Ocwen challenged: vague and broad statements that data were "inaccurate" without any detail as to why, to what extent, and why the data elements were material.

Its response as to the "deception" counts is even less persuasive. Rebutting Ocwen's concern that the Complaint does not identify the supposed deceptive misrepresentations, relying instead on vague allegations that Ocwen made representations "directly or indirectly, expressly or by implication," (Mot. at 26-27), the CFPB insists that the Complaint "contains extensive

8

allegations" concerning the "types of deceptive representations" made and their materially misleading nature. Opp. at 24. But merely alleging the "types" of representations is clearly not enough. The only allegations concerning why the representations were material and misleading are in a single conclusory sentence, repeated in each of the sections identified in the Opposition as relevant, asserting that "[t]hese representations are material to borrowers managing their mortgages and are likely to mislead borrowers acting responsibly under the circumstances." Compl. ¶¶ 91, 120, 140. Boilerplate is not enough to state a plausible claim. *MgGee v. JP Morgan Chase Bank, NA*, 520 F. App'x 829, 832 (11th Cir. 2013) (dismissing claim for negligent misrepresentation when only allegation concerning "reliance" element was the "repetitively offered . . . conclusory claim that [plaintiffs] 'relied upon the [defendants'] statements to proceed with the purchase"); *Hill v. Celebrity Cruises, Inc.*, 2010 WL 11442595, at *6 (S.D. Fla. Sept. 14, 2010) (similar).

### 2. Counts II And IX Are Based On A Non-Existent Duty To Substantiate.

Ocwen also challenged the assumption in Counts II and IX that Ocwen acted deceptively by allegedly not obtaining and reviewing information to substantiate the accuracy of account information prior to routine loan servicing. Mot. at 28-29. In response, the Bureau does not point to any general legal requirement of pre-substantiation. The limited duty of substantiation is generally confined to the advertising context, as the CFPB's own authorities highlight. *See* Opp. at 12 n.69 (*citing FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994)). The only direct authority the Opposition cites, the CFPB's 2013 Bulletin on debt collection, at most only suggests that pre-substantiation will "minimize the risk" of errors, but it does not impose any rules. Opp. at 12. This is not surprising, for, as the Motion explained and the Opposition ignores, the CFPB is only beginning the process of writing regulations that might ultimately impose a general pre-substantiation requirement. *See* Mot. at 28.

Diverting attention, the Opposition points to situations where a business knew it had no good faith basis for debt collection statements. Opp. at 12. Those are not relevant to the claim the CFPB is making that Ocwen's representations are actionable, in part, because they were "not substantiated." Compl. ¶¶ 233, 277. If by citing those situations the CFPB is admitting that the duty to substantiate arises only where a business has specific reason to doubt the accuracy of a fact, then Ocwen's Motion should be granted to the extent the Complaint alleges a broader duty to substantiate.

9

### C.     The Complaint Alleges No Facts Supporting Count V's Claim That Ocwen Unfairly Enrolled Customers In Add-On Products.

As the Motion explained, Count V fails to adequately state a claim for "unfair" practices based on the allegation Ocwen "enrolled consumers in add-on products without their consent." Compl. ¶ 245.  This conclusion is unsupported by the relevant factual allegations, which, at most, assert only that Ocwen enrolled customers in add on-products "*without proof of their affirmative consent.*" Mot. at 29-30; Compl. ¶ 152 (emphasis added).  Recognizing the problem, the Opposition claims the Complaint alleges that vendors "enroll a borrower" if the borrower did not respond to a solicitation.  Opp. at 29 & n.166 (not contesting Ocwen's position that the vendor's role includes "enrolling borrowers").  The rejoinder provides a further basis for dismissal of Count V, which is predicated on the allegation it was Ocwen, not the vendor, that enrolled borrowers.  In any event, this is not alleged in the Complaint, and the CFPB may not amend its Complaint by relying on assertions made in its Opposition.  *E.g.*, *Grandrimo v. Parkcrest Harbour Island Condominium Ass'n., Inc.*, 2011 WL 550579, at *5 (M.D. Fla. Feb. 9, 2011).  Similarly, the footnote argument (Opp. at 29, n.166), that Count V can be saved for a variety of reasons, including agent-principal liability, also impermissibly seeks to add to the Complaint, and should be ignored in any event because CFPB cannot stretch page limits by making new and substantive arguments in footnotes.

### D.     The Complaint, On Its Face, Alleges Time-Barred Claims.

In its Motion (at 29-32), Ocwen demonstrated that Count VI, and portions of Counts V, VII, VIII, and IX are time barred by applicable statutes of limitations.  The Opposition's attempts to justify the timeliness of these claims are not only unconvincing, they misstate the law.

<u>Count VII (TILA) and Counts VIII and IX (FDCPA) – One Year Limitations.</u>  The CFPB begrudgingly concedes (Opp. at 35, n.207), that the only federal court to address the precise issue of the statute of limitations for a CFPB enforcement action alleging a TILA violation rejected the same limitations arguments the CFPB makes here and held that TILA's one-year statute of limitations applies.  *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 922-23 (S.D. Ind. 2015).  That court reasoned that applying the one-year bar to CFPB actions was the only reading consistent with the Supreme Court's caution against reading exceptions into statutes of limitations and with Congress' demonstrated "concern that a creditor not face limitless liability in terms of time."  *Id.*  This rationale is equally applicable to the FDCPA.  The CFPB's assertion that there is no limitations rule for enforcement actions, so the catchall five-year limitations bar

10

applies (Opp. at 35, citing 28 U.S.C. § 2462), makes a mockery of the evident intent of Congress to keep such claims on a tight time leash.

As a result, Counts VII, VIII, and IX should be partially dismissed, as to alleged violations that "occurred" outside the one-year period. 15 U.S.C. § 1640(e) ("occurrence of the violation" triggers the bar); 15 U.S.C. § 1692k(d) (same). Because the occurrence of a TILA or FDCPA "violation" of the type alleged is easily discernable from the date an action was taken or when a communication was sent, courts routinely dismiss claims with prejudice where the complaint alleges actions that occurred more than one year after an alleged TILA or FDCPA violation.[3]

<u>Counts V and VI (CFPA) – Three Year Limitations.</u>  As stated in the Motion (at 29), for the claims that relate to add-on products, all of Count VI and the portions of Count V concerning enrollment are also time-barred. The CFPB argues (Opp. at 33), that the Court should decline to dismiss the CFPA claims because the Complaint asserted conduct that was continuing or ongoing. As an initial matter, that is simply not true in relevant part, for the conduct of soliciting and enrolling consumers began in 2011 and ceased in 2013.[4] Compl. ¶¶ 147-49, 249. It is no answer for the CFPB to hide behind any discovery rule contained in the CFPA's three-year bar. Because it is evident from the face of the Complaint that the conduct occurred outside the limitations period, the government must plead facts that plausibly show the claims are not time-barred. *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 518-20 (6th Cir. 2008) (finding the plaintiff must "plead facts in avoidance of the statute of limitations defense" where the time bar is evident from the face of other factual allegations).[5]

---

[3] Mot. at 30 (citing cases); *see also Mantz v. TRS Recovery Servs., Inc.*, 2011 WL 4104914, at *2 (S.D. Fla. Sept. 15, 2011) (Marra, J.) (dismissing FDCPA claim based on facts alleged because "the statute of limitations begins to accrue on the date immediately following an alleged violation of the statute").

[4] While the Complaint does not allege specifically when Ocwen stopped enrolling customers, a fair inference is that any enrollment came close in time to the alleged marketing (which is alleged to have ceased in 2013), and so is time-bared as well. Compl. ¶¶ 147-48, 245.

[5] *See also Altenel, Inc. v. Millennium Partners, L.L.C.*, 947 F. Supp. 2d 1357, 1374 (S.D. Fla. 2013) (dismissing claim as time-barred after considering whether plaintiff alleged facts that plausibly showed claim was not time-barred); *United States ex rel. Jordan v. Northrop Grumman Corp.*, 2002 WL 35628747, at *5 (C.D. Cal. Aug. 5, 2002) (applying similar statute of limitations and holding that once defendant met its burden to show claims occurred outside of the limitations period, the government had the burden to allege a basis for tolling).

11

> E. **The CFPB Fails To Allege The Ocwen Defendants Acted As Debt Collectors (Counts VIII – IX) Or That OFC And OMS Are Servicers (Counts X – XIII).**

As Ocwen argued (Mot. at 31), Counts VIII and IX must be dismissed because the CFPB failed to allege how each Ocwen defendant acted as a "debt collector" as defined by the FDCPA or to describe the accounts that those defendants collected. In response (Opp. at 32), the CFPB incorrectly asserts that Ocwen's Motion should be denied because the Motion seeks to impose a heightened pleading standard for these claims. In fact, this Court requires that a complaint allege facts demonstrating that a defendant acted as debt collector on the loans that give rise to the FDCPA claim. *Bentley v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1371 (S.D. Fla. 2011). Here, the CFPB's conclusory allegations (Compl. ¶¶ 270-78) fail to satisfy that ordinary pleading standard, thus the FDCPA claims must be dismissed.

Ocwen similarly argued (Mot. at 34-35) that the CFPB did not plausibly allege that the two tag-along defendants, OFC (the parent) and OMS (an affiliate), are "servicers" under RESPA because the CFPB pled no facts to support a claim that either receive payments from borrowers. *Id.* The CFPB points (Opp. at 31), only to its conclusory allegation in paragraph 13 of the Complaint that "OFC, OMS, and OLS (collectively 'Ocwen') engage in servicing activities by . . . processing borrower payments" and argues that its RESPA counts (X-XIII) are sufficient because the Court must accept this allegation as true. But a court's "duty to accept the facts in the complaint as true does not require [it] to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007). Nor is it sufficient in light of the later, more specific allegations about each entity, which assert that OFC and OMS merely contract for "products and services" necessary for OLS (the servicer) to service loans. Compl. ¶¶ 15-16. OFC and OMS should be dismissed from these Counts.

The CFPB argues in the alternative (Opp. at 31-32), that even if OFC and OMS are not "debt collectors" under the FDCPA or "servicers" under RESPA, they should still not be dismissed as parties because the CFPB alleged all the defendants are liable under "common enterprise and principal-agent liability." Apart from the impropriety of invoking common law concepts as a fig leaf to cover up impermissible group pleading, courts refuse to permit secondary liability of this type under statutes that are "precise about who . . . can be liable." *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006). The FDCPA and RESPA are

12

precise that liability is limited to conduct by a "debt collector" or by "any servicer," respectively, so secondary liability is not appropriate. OFC and OMS should be dismissed from these claims.

  F. **The Dual Tracking Claims (Counts III, IV, and XIII) Fail.**

    1. **Count XIII Is Impermissibly Broad.**

Ocwen previously demonstrated (Mot. at 32-33), that the main foreclosure dual-tracking claim, Count XIII, does not state a claim because it seeks to impose liability under a regulation, Section 1024.41 ("Section 41"), for conduct that is not within the rule's ambit. Specifically, Section 41 has two important conditions—it only applies to a borrower's first completed loss mitigation application and its protections only are triggered if that application is submitted more than 37 days before the then-scheduled foreclosure sale date. The CFPB never alleged either of these conditions were met for those instances where the CFPB claims Ocwen violated Section 41. Mot. at 32-33.

The CFPB concedes (Opp. at 26-27), as it must, that duplicative loss mitigation requests are not covered by the regulation and that the then-scheduled foreclosure sale date is the date that matters. But it argues these are not bases to dismiss Count XIII because they are "factual and affirmative defenses" that the CFPB does not have to negate.

This is incorrect because the CFPB is suing for an alleged violation of Section 41, and so it cannot recover anything unless it shows the subject modification requests were not duplicative and had been timely submitted. An *element* of a claim is not an affirmative defense. Borrowers cannot bring such claims without alleging the request for a loan modification was their first completed application, and neither can the CFPB. *E.g., Jones v. Select Portfolio Servicing, Inc.*, 2016 WL 6581279, at *7 (N.D. Tex. Oct. 12, 2016).[6] Indeed, from all that appears of Count XIII, the CFPB may actually be suing only about untimely and duplicative modification requests. Unless and until the CFPB alleges in good faith that it knows of dual tracking that actually violated Section 41, Count XIII must be dismissed.

---

[6] The CFPB is wrong when it asserts that Section 41 can apply to *every* completed loan modification application, under certain circumstances. Opp. at 26 & n.153. Its interpretation makes no sense since that position would obviously rob the one-application rule of any force. The Court need not address the point, as the CFPB has not alleged any facts that would even implicate its imagined exception.

## 2. Section 41 Precludes Recovery For Counts III And IV.

Ocwen also demonstrated (Mot. at 33-34), that Counts III and IV, seeking a remedy for dual-tracking under general provisions of the CFPA prohibiting unfair and deceptive practices, cannot be sustained because the CFPB's Section 41 regulation comprehensively occupies the field. The CFPB cannot attempt to use the CFPA's general provisions to sue Ocwen for not complying with requirements that are additional or different from Section 41.

The CFPB responds (Opp. at 26), as it has elsewhere, with the pronouncement that it can "choose which statute it enforces" and so ignore Section 41 and sue for more than what that regulation would permit. This position is grossly inequitable and flatly inconsistent with law— Section 41. When the CFPB enacted Section 41, it declared that the regulation was setting "national mortgage servicing standards" that "establish appropriate expectations for loss mitigation processes for borrowers and for owners or assignees of mortgage loans." 78 FR 10815; *see also* 78 FR 10698 (Section 41 sets "specified loss mitigation procedures" that "[s]ervicers are required to follow"). Section 41—and principles of fair notice—preclude the CFPB from attempting to impose additional requirements and additional liability beyond what is allowed under Section 41.[7]

CFPB's other attempt to justify its double-dip requires little discussion. The CFPB says that it can invoke the CFPA in the Complaint because Section 41 was promulgated under RESPA. Opp. at 26. But the CFPB also expressly relied on the CFPA in enacting Section 41, claiming the regulation was "appropriate and necessary . . . to further the goals of the [CFPA] to ensure a fair, transparent, and competitive market for mortgage servicing." 78 FR 10815; *see also* 78 FR 10822.

CFPB then asserts that Ocwen has not identified any conflict between Section 41 and the CFPA theory in Counts III and IV. Opp. at 26. But Section 41's detailed rules for how servicers must process lost mitigation applications, and limits on liability for duplicative or untimely

---

[7] The case law CFPB relies on does not support the Bureau on this issue. Opp. at 26 (citing *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)). The question in *Wyndham* was whether a subsequent Congressional enactment limited the scope of authority Congress had granted to the FTC in a prior statute. *Id.* at 247. *Wyndham* thus says nothing about this situation, where an agency set out to comprehensively regulate in a certain area and now claims that conduct in compliance with that regulation can still subject a company to liability under an earlier, broadly worded statute of general applicability.

applications, are in direct conflict with the attempts through Counts III and IV to impose liability under the CFPA. Counts III and IV should be dismissed.

### G. Count III Does Not Otherwise State A Claim.

In its Motion (at 34), Ocwen highlighted that Count III's claim, that in "numerous instances . . . Ocwen has unilaterally breached contracts with borrowers by foreclosing on their loans even though the borrowers were performing on agreements on loss mitigation options," Compl. ¶ 236, is not supported by sufficient factual allegations. The Opposition takes the remarkable position that this single sentence is enough to state a claim for unfair foreclosure practices, and, recognizing the weakness of that position, suggests that allegations in Section III.H of the Complaint provide additional clarity. Opp. at 25-26. But as best as Ocwen can tell, only Paragraph 200, and one clause in Paragraph 195, actually relate to this claim—and they do not offer any additional detail beyond the single allegation in the Count itself. This barebones allegation simply is insufficient to carry Count III, and consequently it must be dismissed.

### H. Count XI Fails Because The Factual Allegations Do Not Track The NOE Regulations.

In addressing Count XI (Mot. at 35), Ocwen argued that Count XI fails to state a claim for alleged notice of error ("NOEs") violations under 12 C.F.R. § 1024.35 because the Complaint's supporting allegations were not about "written" NOEs, which is all the regulation addresses. The CFPB argues (Opp. at 28), that it adequately alleged there were "specific deficiencies in Defendants' complaint handling and NOE policies and procedures" and that it is under no further obligation "to allege which specific complaints were in fact 'written' and which otherwise meet the other technical requirements of a NOE." But the allegedly-deficient policies and procedures the CFPB points to involve Ocwen's "call center" (Opp. at 28 (citing Compl. ¶¶ 167-72)), which necessarily do not constitute "written" NOEs. *See* 12 C.F.R. § 1024.35(a). Without an allegation of a pattern of violations of written NOEs,[8] Count IX does not state a claim.

### CONCLUSION

The Court should dismiss the Complaint without leave to amend.

---

[8] The CFPB only points to a single instance (Opp. at 28), where it alleges a borrower submitted a "written" NOE that may satisfy the regulatory definition. *See* Compl. ¶ 176. But the CFPB is alleging a pattern of NOE violations, and one example is not sufficient to state a plausible claim.

15

Dated:  August 4, 2017	Respectfully submitted,

                                            s/ Bridget Ann Berry
Bridget Ann Berry
**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, Suite 300 East
West Palm Beach, FL  33401
Tel.:  561.650.7900
berryb@gtlaw.com


Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
**GOODWIN PROCTER LLP**
901 New York Ave., NW
Washington, DC 20001
Tel.:  202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com

*Attorneys for Defendants Ocwen Financial Corp., Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on August 4, 2017 via CM/ECF on all counsel or parties of record listed below:

Anthony Alexis, Enforcement Director
Cara Petersen, Deputy Enforcement Director For Litigation
Gabriel O'Malley, Assistant Litigation Deputy

Jean Healey
Email:  jean.healey@cfpb.gov
Jan Singelmann
E-mail:  jan.singelmann@cfpb.gov
Atur Desai
E-mail: atur.desai@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC  20552

                                                s/ Bridget Ann Berry
                                                Bridget Ann Berry