[EN BANC ORAL ARGUMENT SCHEDULED FOR MAY 24, 2017]

**No. 15-1177**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PHH CORPORATION, et al.,

Petitioners,

v.

CONSUMER FINANCIAL PROTECTION BUREAU,

Respondent.

_____

ON PETITION FOR REVIEW OF AN ORDER OF THE
CONSUMER FINANCIAL PROTECTION BUREAU

_____

## BRIEF FOR THE UNITED STATES
## AS AMICUS CURIAE

_____

CHAD A. READLER
  *Acting Assistant Attorney General*

DOUGLAS N. LETTER
MARK B. STERN
DANIEL TENNY
TARA S. MORRISSEY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*
  *(202) 514-1838*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing in this Court are listed in the Opening En Banc Brief for Petitioners.

After this Court granted rehearing en banc, the following newly appeared as amici before this Court:  The Cato Institute, RD Legal Funding, LLC, RD Legal Finance, LLC; RD Legal Partners, LP, Roni Dersovitz, and the States of Missouri, Alabama, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Nevada, Oklahoma, South Carolina, South Dakota, Texas, West Virginia, and Wisconsin.

The following have filed a notice of intent to participate as amicus: The Attorneys General of the States of Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont and Washington, and the District of Columbia.

### B.    Ruling Under Review

This is a petition for review of a Final Order in *In the Matter of PHH Corporation*, Docket No. 2014-CFPB-0002 (June 4, 2015) [JA 1].  The Bureau's decision is unreported.

### C.    Related Cases

Counsel are unaware of any related cases within the meaning of Rule 28(a)(1)(C).

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION AND SUMMARY ........................................................................... 1

STATEMENT ............................................................................................................... 3

ARGUMENT ................................................................................................................ 5

    I.    *Humphrey's Executor* Upheld Removal Restrictions For Members
Of Multi-Headed Commissions And Should Not Be Extended By
This Court To The CFPB, Which Is Headed By A Single Director ......... 5

        A.    Under the Constitution and Supreme Court precedent, the
general rule is that the President must have authority to
remove Executive Branch agency heads at will .............................. 5

        B.    *Humphrey's Executor* created an exception to the general rule
only for multi-member regulatory commissions ............................. 8

        C.    *Humphrey's Executor* should not be extended to the CFPB .......... 12

    II.    The Panel Correctly Concluded That The For-Cause Removal
Provision Is Severable From The Remainder Of The CFPB
Statutory Scheme ...................................................................................... 19

    III.    The Court Has Discretion To Reach The Constitutionality Of
The Bureau's For-Cause Removal Provision, And May
Appropriately Do So Here ........................................................................ 22

    IV.    The Court's Decision In *Lucia* Should Not Affect The
Disposition Of This Case .......................................................................... 22

CONCLUSION .......................................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                **Page(s)**

*Alaska Airlines, Inc. v. Brock,*
480 U.S. 678 (1987) ................................................................. 21

*Ayotte v. Planned Parenthood of N. New Eng.,*
546 U.S. 320 (2006) ................................................................. 20

*Bowsher v. Synar,*
478 U.S. 714 (1986) ................................................................... 6

*Clinton v. Jones,*
520 U.S. 681 (1997) ................................................................. 13

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
561 U.S. 477 (2010) ......................................... 6, 7, 8, 9, 14, 16, 17, 20, 21

*Ex parte Hennen,*
38 U.S. (13 Pet.) 230 (1839) ....................................................... 7

*Humphrey's Executor v. United States,*
295 U.S. 602 (1935) .......................................... 1, 2, 3, 5, 8, 9, 12, 16

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
684 F.3d 1332 (D.C. Cir. 2012) .............................................. 20, 21

*Lucia v. SEC,*
832 F.3d 277 (D.C. Cir. 2016) .................................................. 22

*Morrison v. Olson,*
487 U.S. 654 (1988) .......................................................... 8, 10, 14, 16

*Myers v. United States,*
272 U.S. 52 (1926) ............................................................... 5, 6, 7

*NLRB v. Noel Canning,*
134 S. Ct. 2550 (2014) ............................................................ 16

*Northwest Austin Mun. Util. Dist. No. One v. Holder,*
557 U.S. 193 (2009) ................................................................. 22

*The Pocket Veto Case,*
    279 U.S. 655 (1929) ............................................................................ 16

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................................ 13

*Wiener v. United States,*
    357 U.S. 349 (1958) .............................................................................. 9


## U.S. Constitution:

Art. II, § 1, cl. 1 ........................................................................................ 5

Art. II, § 2, cl. 2 ........................................................................................ 6

Art. II, § 3 ................................................................................................. 5


## Statutes:

Act of Mar. 2, 1889, ch. 382, § 6, 25 Stat. 855, 861-62 ...................... 11

Interstate Commerce Act, ch. 104, § 11, 24 Stat. 379, 383 (1887) ............ 11

12 U.S.C. § 4502(20) ............................................................................. 18

12 U.S.C. § 5302 .................................................................................... 21

12 U.S.C. § 5481(6) ............................................................................... 19

12 U.S.C. § 5491(b) ................................................................................. 1

12 U.S.C. § 5491(c)(1) ............................................................................. 1

12 U.S.C. § 5491(c)(3) ............................................................................. 1

12 U.S.C. § 5511(a) ................................................................................. 3

12 U.S.C. § 5511(c) ................................................................................. 3

12 U.S.C. § 5531 ..................................................................................... 4

12 U.S.C. § 5562 ..................................................................................... 3

12 U.S.C. § 5563 ................................................................................................ 3

12 U.S.C. § 5564(b) ........................................................................................ 4, 5

12 U.S.C. § 5565 ................................................................................................ 3

12 U.S.C. § 5581(b) ........................................................................................ 1, 4

15 U.S.C. § 41 (1934) ...................................................................................... 8, 9

42 U.S.C. § 902(a) ........................................................................................... 18

**Rule:**

Fed. R. App. P. 29(a) ........................................................................................ 1

**Legislative Material:**

1 Annals of Cong. 463 (Joseph Gales ed., 1834) ............................................. 6

51 Cong. Rec. 10, 376 (1914) ......................................................................... 11

S. Comm. on Governmental Affairs, *Study on Federal Regulation*,
S. Doc. No. 95-91, vol. 5 (1977) ............................................................. 10, 11

**Other Authorities**

Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies
(and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013) ................................ 12

Kenneth Culp Davis, *Administrative Law of the Seventies* (1976) ...................... 12

*The Federalist No. 70* (J. Cooke ed., 1961) (Hamilton) .................................. 6, 8

Letter from James Madison to Thomas Jefferson (June 30, 1789),
16 *Documentary History of the First Federal Congress* 893 (2004) ........................ 7

Mem. Op. for the Gen. Counsel, Civil Serv. Comm'n,
2 Op. O.L.C. 120 (1978) ................................................................ 17

Memorandum of Disapproval on a Bill Concerning
Whistleblower Protection, 2 Pub. Papers 1391 (Oct. 26, 1988)................................ 17

Statement on Signing the Social Security Independence and Program
Improvements Act of 1994, 2 Pub. Papers 1471 (Aug. 15, 1994) ............................ 18

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ...................... 13

## GLOSSARY

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| FHFA | Federal Housing Finance Agency |
| FTC | Federal Trade Commission |
| HUD | Department of Housing and Urban Development |

## INTRODUCTION AND SUMMARY

The United States respectfully submits this brief as amicus curiae pursuant to Federal Rule of Appellate Procedure 29(a), in order to address the issues posed by the Court in its order granting rehearing en banc.

In 2010, Congress created the Consumer Financial Protection Bureau (CFPB) as part of the Dodd-Frank Act, giving the CFPB authority to enforce U.S. consumer-protection laws that had previously been administered by seven different government agencies, as well as new provisions added by Dodd-Frank itself. *See* 12 U.S.C. § 5581(b). The CFPB is headed by a single Director who is appointed by the President, with the advice and consent of the Senate, for a term of five years, *id.* § 5491(b), (c)(1), and who may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office," *id.* § 5491(c)(3).

The panel in this case held that this "for cause" removal provision violates the constitutional separation of powers. Op. 9-10. The panel explained—and neither party disputes—that, as a general matter, the President has "Article II authority to supervise, direct, and remove at will subordinate [principal] officers in the Executive Branch" in order to exercise his vested power and duty to faithfully execute the laws. Op. 4. The panel recognized as well that *Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935), established an exception to that rule, holding that Congress may "forbid [the] removal except for cause" of members of the Federal Trade

Commission (FTC)—a holding that has been understood to cover members of other multi-member regulatory commissions that share certain features and functions with the FTC.  Op. 4.

The principal constitutional question in this case is whether the exception to the President's removal authority recognized in *Humphrey's Executor* should be extended by this Court beyond multi-member regulatory commissions to an agency headed by a single Director.  While we do not agree with all of the reasoning in the panel's opinion, the United States agrees with the panel's conclusion that single-headed agencies are meaningfully different from the type of multi-member regulatory commission addressed in *Humphrey's Executor*.

The Supreme Court's analysis in *Humphrey's Executor* was premised on the nature of the FTC as a continuing deliberative body, composed of several members with staggered terms to maintain institutional expertise and promote a measure of stability that would not be immediately undermined by political vicissitudes.  A single-headed agency, of course, lacks those critical structural attributes that have been thought to justify "independent" status for multi-member regulatory commissions. Moreover, because a single agency head is unchecked by the constraints of group decision-making among members appointed by different Presidents, there is a greater risk that an "independent" agency headed by a single person will engage in extreme departures from the President's executive policy.  And as the panel recognized, while

multi-member regulatory commissions sharing the characteristics of the FTC discussed in *Humphrey's Executor* have existed for over a century, limitations on the President's authority to remove a single agency head are a recent development to which the Executive Branch has consistently objected.

We therefore urge the Court to decline to extend the exception recognized in *Humphrey's Executor* in this case. In addition, in our view, the panel correctly applied severability principles and therefore properly struck down only the for-cause removal restrictions.

## STATEMENT

Congress created the CFPB in 2010, as part of the Dodd-Frank Act, directing the Bureau to "seek to implement and, where applicable, enforce Federal consumer financial law" in order to ensure that "all consumers have access to markets for consumer financial products and services" and that the markets for such products and services are "fair, transparent, and competitive." 12 U.S.C. § 5511(a). The CFPB has authority to regulate the consumer-finance industry, including loans, credit cards, and other financial products and services offered to consumers. It has power to prescribe rules implementing consumer-protection laws; to conduct investigations of market actors; and to enforce consumer-protection laws in administrative proceedings and in federal court, including through civil monetary penalties. *See, e.g.*, *id.* §§ 5511(c), 5562, 5563, 5565. Congress transferred to the CFPB the authority to exercise functions that

had previously been spread among seven different federal agencies. *Id.* § 5581(b). Although some of the powers transferred to the CFPB came from multi-member commissions whose members are not subject to removal at will by the President, functions at issue in this case were transferred from the Department of Housing and Urban Development (HUD), a Cabinet agency. The CFPB is also tasked with enforcing new statutory requirements related to consumer finance. *See, e.g., id.* § 5531.

This case involves a petition for review of a CFPB order requiring PHH Corporation to pay $109 million in disgorgement. A panel of this Court vacated the order on several statutory and constitutional grounds.

The CFPB (acting through its own attorneys, *see* 12 U.S.C. § 5564(b)), sought rehearing. This Court invited the Solicitor General to respond to the rehearing petition. The brief of the United States supported rehearing en banc, and took issue with aspects of the panel's analysis. The brief did not take a position on the constitutionality of the CFPB's structure, but observed that the "conferral of broad policymaking and enforcement authority on a single person below the President, whom the President may not remove except for cause, . . . raises a significant constitutional question that the Supreme Court has not yet squarely confronted." U.S. Resp. Br. 2. The brief urged that the Court's analysis should focus on "preserving (or appropriately limiting) the powers and roles of each Branch," rather

than on a particular structure's "impact on individual liberty as a freestanding basis for finding a separation-of-powers violation." *Id.* at 10, 12.[1]

This Court granted the petition for rehearing en banc, instructing the parties to address various specified issues.

## ARGUMENT

**I.**  *Humphrey's Executor* **Upheld Removal Restrictions For Members Of Multi-Headed Commissions And Should Not Be Extended By This Court To The CFPB, Which Is Headed By A Single Director**

    **A.**  **Under the Constitution and Supreme Court precedent, the general rule is that the President must have authority to remove Executive Branch agency heads at will.**

Article II of the Constitution provides that the "[t]he executive Power shall be vested" in the President, and that he shall "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3. These provisions reflect the Framers' intention to create a strong, unitary Executive. *See Myers v. United States*, 272

---

[1]  The CFPB has authority to represent itself in federal district courts and courts of appeals, and typically does so. 12 U.S.C. § 5564(b). In one case filed against several federal agencies and departments, however, the Department of Justice represented all government defendants, including the CFPB. The government's district court briefs in that case argued that, based on the Supreme Court's decision in *Humphrey's Executor*, the CFPB's for-cause removal provision is consistent with the Constitution. *See State National Bank of Big Spring v. Mnuchin*, No. 1:12-cv-1032 (D.D.C.). After reviewing the panel's opinion here and further considering the issue, the Department has concluded that the better view is that the provision is unconstitutional. The Department is working with the CFPB to substitute the CFPB's own attorneys in that litigation.

U.S. 52, 116 (1926); *see also The Federalist No. 70*, at 472-73 (J. Cooke ed., 1961)
(Hamilton). Of particular relevance here, "if any power whatsoever is in its nature
Executive, it is the power of appointing, overseeing, and controlling those who
execute the laws." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S.
477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834)
(remarks of Madison)). "[A]s part of his executive power," the President "select[s]
those who [are] to act for him under his direction in the execution of the laws."
*Myers*, 272 U.S. at 117; *see also* U.S. Const. art. II, § 2, cl. 2. Just as the President's
ability to "select[] . . . administrative officers is essential" to the exercise of "his
executive power," so too is his ability to "remov[e] those for whom he cannot
continue to be responsible." *Myers*, 272 U.S. at 117; *see also Bowsher v. Synar*, 478 U.S.
714, 726 (1986) ("Once an officer is appointed, it is only the authority that can
remove him, and not the authority that appointed him, that he must fear and, in the
performance of his functions, obey." (quotation marks omitted)).

Accordingly, "[s]ince 1789, the Constitution has been understood to empower
the President to keep [executive] officers accountable—by removing them from
office, if necessary." *Free Enterprise Fund*, 561 U.S. at 483. Indeed, the First
Congress—many of whose members took part in the Constitution's framing—
extensively debated the President's removal authority when creating the Department
of Foreign Affairs (which later became the Department of State). "The view that

'prevailed' . . . was that the executive power included a power to oversee executive officers through removal; because that traditional power was not 'expressly taken away, it remained with the President.'" *Id.* at 492 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 *Documentary History of the First Federal Congress* 893 (2004)). This view "soon became the 'settled and well understood construction of the Constitution.'" *Id.* (quoting *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839)).

Affirming this established understanding, the Supreme Court held in *Myers* that the President's executive power necessarily includes "the exclusive power of removal." *Myers*, 272 U.S. at 122. "[T]o hold otherwise," the Court explained, "would make it impossible for the President . . . to take care that the laws be faithfully executed." *Id.* at 164. The Court thus invalidated a statutory provision that "denied . . . the President" the "unrestricted power of removal" of officers appointed by the President with the advice and consent of the Senate. *Id.* at 176; *see also id.* at 107.

In sum, as the Supreme Court recently reaffirmed, the President's executive power "includes, as a general matter, the authority to remove those who assist him in carrying out his duties" to faithfully execute the laws. *Free Enterprise Fund*, 561 U.S. at 513-14. "Without such power, the President could not be held fully accountable" for how executive power is exercised, and "[s]uch diffusion of authority 'would greatly

diminish the intended and necessary responsibility of the chief magistrate himself.'" *Id.* at 514 (quoting *The Federalist No. 70*, at 478).

Although the Supreme Court has upheld certain "limited restrictions" on the President's general removal power with respect to inferior officers, *Free Enterprise Fund*, 561 U.S. at 495, the Court has recognized only one such restriction with respect to principal officers who head agencies:  the exception recognized in *Humphrey's Executor*.  *See id.* at 492-95.  As demonstrated below, that exception does not apply to the CFPB's Director, and it should not be so extended.

### B.    *Humphrey's Executor* created an exception to the general rule only for multi-member regulatory commissions.

In *Humphrey's Executor*, the Supreme Court upheld a provision of the Federal Trade Commission Act establishing that FTC commissioners could be removed only for "inefficiency, neglect of duty, or malfeasance in office."  *Humphrey's Executor*, 295 U.S. at 620 (quoting 15 U.S.C. § 41 (1934)).  The Court's conclusion rested on its view at the time that the FTC "cannot in any proper sense be characterized as an arm or an eye of the executive," but rather "acts in part quasi-legislatively and in part quasi-judicially."  *Humphrey's Executor*, 295 U.S. at 628.[2]

---

[2] Since that time, the Supreme Court has observed that "the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree."  *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988).

That characterization of the FTC was based not only on its substantive functions, but also on its structural features as an "administrative body." *See Humphrey's Executor*, 295 U.S. at 628. The FTC had five members with staggered terms, and no more than three of them could be of the same political party. *See id.* at 619-20. The Court thus emphasized early in its opinion that the FTC was "called upon to exercise the trained judgment of a body of experts" and was "so arranged that the membership would not be subject to complete change at any one time." *See id.* at 624. Indeed, the direct relationship perceived between those structural features and the restriction on the President's removal power was underscored by the fact that they all were enacted in the same statutory section. 15 U.S.C. § 41 (1934), *quoted in Humphrey's Executor*, 295 U.S. at 620.

The holding in *Humphrey's Executor* has been understood to encompass other multi-member commissions with features and functions similar to those of the FTC. *See, e.g., Wiener v. United States*, 357 U.S. 349, 355-56 (1958) (holding that "[t]he philosophy of *Humphrey's Executor*" precludes at-will removal of members of the War Claims Commission, a three-member body that was charged with adjudicating war-related compensation claims); *see also Free Enterprise Fund*, 561 U.S. at 483 ("In *Humphrey's Executor*, we held that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." (citation omitted));

9

*Morrison v. Olson*, 487 U.S. 654, 724-25 (1988) (Scalia, J., dissenting) ("[R]emoval

restrictions have been generally regarded as lawful for so-called 'independent

regulatory agencies,' such as the Federal Trade Commission, the Interstate Commerce

Commission, and the Consumer Product Safety Commission, which engage

substantially in what has been called the 'quasi-legislative activity' of rulemaking . . . ."

(citations omitted)).

   As the panel noted, it is "not merely accidental or coincidental" that the

"independent agencies" that were established and understood to be covered by

*Humphrey's Executor* have been "multi-member" bodies.  Op. 48.  Rather, it has been

generally recognized that the removal restriction is a concomitant of—indeed,

"inextricably bound together" with—a continuing deliberative body.  Op. 48-49

(citing various sources).  Thus, as an extensive study of independent agencies

conducted in 1977 by the Senate Committee on Governmental Affairs concluded,

"[t]he size of the commission, the length of the terms, and the fact that they do not all

lapse at one time are key elements of the independent structure."  S. Comm. on

Governmental Affairs, *Study on Federal Regulation*, S. Doc. No. 95-91, vol. 5, at 35

(1977).  These features, typically accompanied by a limitation on the President's

removal authority, were "the basic structural features which [had] marked every

independent regulatory commission, beginning with the" Interstate Commerce

Commission in the 1880s. *Id.* at 36; *see also* Interstate Commerce Act, ch. 104, § 11, 24 Stat. 379, 383 (1887); Act of Mar. 2, 1889, ch. 382, § 6, 25 Stat. 855, 861-62.

The structure of multi-member agencies with staggered-term memberships was designed to promote long-term continuity and expertise, and that goal was thought to be furthered by restricting the President's power to remove the members of such agencies. As the 1977 Senate study observed, "regulatory policies would tend to be more permanent and consistent to the extent that they were not identified with any particular administration or party," and "[a]brupt change would therefore be minimized." *Study on Federal Regulation*, vol. 5, at 29-30; *see also* 51 Cong. Rec. 10,376 (1914) (contemplating that Federal Trade Commission "would have precedents and traditions and a continuous policy and would be free from the effect of . . . changing incumbency").

In addition, the structure of multi-member agencies was designed to facilitate deliberative group decision-making, and that goal too was thought to be furthered by removal restrictions. In fact, the Senate study concluded that the "[c]hief" consideration in determining whether to create an independent commission, rather than a standard executive agency, "is the relative importance to be attached to group decision-making." *Study on Federal Regulation*, vol. 5, at 79. Similarly, Professor Kenneth Culp Davis expressed the view that independent commissions are created primarily because they exercise adjudicative functions, and that these bodies should

11

have multiple members "just as we want appellate courts to be made up of plural members, to protect against the idiosyncracies of a single individual." Kenneth Culp Davis, *Administrative Law of the Seventies* 15 (1976); *see also* Op. 45 (noting that "unlike single-Director independent agencies, multi-member independent agencies 'can foster more deliberative decision making'" (quoting Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 794 (2013)).

        **C.**    ***Humphrey's Executor* should not be extended to the CFPB.**

      **1.**  A single-headed independent agency is not covered by an essential aspect of the rationale underlying *Humphrey's Executor* and independent multi-member commissions. The CFPB lacks the structural features that the Supreme Court relied upon in part when characterizing the FTC as a "quasi-legislative," "quasi-judicial" "administrative body." *Humphrey's Executor*, 295 U.S. at 628. A multi-member commission with staggered-term memberships is established as "a body of experts" that by its nature operates in an interactive and deliberative manner, and is "so arranged that the membership would not be subject to complete change at any one time." *Id.* at 624. Restricting the President's power to remove the members of such commissions is thus thought to facilitate deliberative group decision-making and promote an inherent institutional continuity.

An agency headed by a single officer has none of those attributes.  To the contrary, it embodies a quintessentially executive structure.  "The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known."  *Printz v. United States*, 521 U.S. 898, 922 (1997); *see also Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring) (describing how the Founders "consciously decid[ed] to vest Executive authority in one person rather than several," in contrast with their vesting of legislative and judicial powers in multi-member bodies).  It has long been recognized that "[d]ecision, activity, secre[c]y, and d[i]spatch will generally characterise the proceedings of one man in a much more eminent degree[] than the proceedings of a greater number."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1414, at 283 (1833).  The Constitution itself specifies the official who must exercise that sort of executive power:  the President, acting either personally or through subordinate officers who are accountable to him and whose actions he can control.  The principles animating the exception in *Humphrey's Executor* do not apply when Congress carves off a portion of that quintessentially executive power and vests it in a single principal officer below the President who is not subject to the President's control.

Insofar as the Supreme Court has retreated from its rationale in *Humphrey's Executor* in sustaining the FTC structure as "quasi-legislative" and "quasi-judicial," it is particularly significant that the CFPB does not possess the structural features that

characterized the FTC.  As the Court acknowledged in *Morrison*, "it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Morrison*, 487 U.S. at 689 n.28.  Consequently, it is imperative that an executive agency still seeking to be characterized as "quasi-legislative" or "quasi-judicial" under *Humphrey's Executor* at least have a multi-member structure, with its attributes of a deliberative body designed to have accumulated and collective insights and expertise as well as inherent institutional continuity.  Indeed, given "[t]he difficulty of defining such categories of 'executive' or 'quasi-legislative' officials," *Morrison*, 487 U.S. at 689 n.28, extending the "limited" *Humphrey's Executor* exception for multi-member commissions to single agency heads could threaten to swallow the "general" rule of *Myers* and Article II.  *See Free Enterprise Fund*, 561 U.S. at 495, 513.[3]

**2.**  Moreover, a single-headed independent agency creates concerns regarding the dispersion of executive power that are greater than those created by a multi-member independent commission.  Although the President's removal authority is identical in the two cases, a single-headed independent agency presents a greater risk

---

[3] Although *Morrison* upheld a "good cause" removal restriction for an independent counsel who was a "purely executive" official, the Court reasoned that the President's duty to faithfully execute the laws was not impermissibly impaired because the prosecutor was "an inferior officer … with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." *Morrison*, 487 U.S. at 689-91.  That holding obviously does not apply to any principal officer who heads an executive agency, especially the CFPB Director.

than a multi-member independent commission of taking actions or adopting policies inconsistent with the President's executive policy. That is so for two related reasons.

*First*, whereas a multi-headed commission generally must engage in at least some degree of deliberation and collaboration, which tend toward compromise, a single Director can decisively implement his own views and exercise discretion without these structural constraints. *See* Op. 46. It is for such reasons that the Framers adopted a strong, unitary Executive—headed by the President—rather than a weak, divided one. Vesting such power in a single person not answerable to the President constitutes a stark departure from that framework.

*Second*, the difference in decision-making is reinforced by the difference in the timing and composition of appointments to the two types of agencies. For a multi-headed commission with staggered terms, the President is generally assured to have an opportunity to appoint at least some of its members, and the bipartisan-membership requirement that is common for such commissions further increases the likelihood that at least some of the holdover members share the President's views. *See* Op. 58. By contrast, where a single Director has a term greater than four years (as is true for the CFPB), a President may never get to appoint the Director. *See id.* An agency where a President lacks control over both back-end removal and front-end appointment represents a further departure from the constitutional design.

15

To be sure, the frequency with which the threat of extreme departures from the President's executive policy materializes will depend on the particular circumstances, but the "added" risk of such departures "makes a difference." *See Free Enterprise Fund*, 561 U.S. at 495. Whereas the interference with executive power was mitigated in *Morrison* by the independent counsel's limited authority, and mitigated in *Humphrey's Executor* by the FTC's multi-member nature, the CFPB's interference with executive power is exacerbated by both its single-headed nature and its wide-ranging policy making and enforcement authority over private conduct.

**3.** Furthermore, unlike multi-member independent commissions, single-headed independent agencies are a relatively novel innovation. In the separation-of-powers context, "the lack of historical precedent" for a new structure is "[p]erhaps the most telling indication of [a] severe constitutional problem." *Free Enterprise Fund*, 561 U.S. at 505; *see also NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) ("'[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929))). In *Free Enterprise Fund*, for instance, because "historical practice had settled on one level of for-cause removal for a President to remove the head of an independent agency," Op. 42, the Court declined to extend *Humphrey's Executor* to a "novel structure": two layers of for-cause removal. *Free Enterprise Fund*, 561 U.S. at 496. The

Supreme Court has thus been reluctant to expand *Humphrey's Executor* to "new situation[s] not yet encountered by the Court." *Id.* at 483.

Here, as the panel explained, until relatively recently all independent agencies have been structured as multi-member commissions. Op. 27-35. Congress has created agencies with a single head subject to for-cause removal on only three other occasions.

*First*, in 1978, Congress established the Office of Special Counsel as an entity with a single head subject to removal only for cause. Op. 31. Among other functions, the Office of Special Counsel can seek corrective action through the Merit Systems Protection Board for violations of federal civil service personnel principles. The Office of Legal Counsel opposed the for-cause removal provision, Mem. Op. for the Gen. Counsel, Civil Serv. Comm'n, 2 Op. O.L.C. 120 (1978), and President Reagan vetoed subsequent legislation regarding the Office of Special Counsel, citing "serious constitutional concerns" about the agency's independent status. *See* Memorandum of Disapproval on a Bill Concerning Whistleblower Protection, 2 Pub. Papers 1391, 1392 (Oct. 26, 1988). As the panel noted, moreover, the Office's "narrow jurisdiction" over "government employers and employees" provides no historical support for creating a very different single-headed independent agency exercising general regulatory and enforcement power over private parties operating in a large sector of the economy, such as the CFPB. Op. 31-32.

17

*Second*, in 1994, Congress made the Social Security Administration a separate agency headed by a single Commissioner appointed for a term of six years and removable only for cause.  Op. 30; *see also* 42 U.S.C. § 902(a).  When appraising the bill, President Clinton issued a signing statement noting that "in the opinion of the Department of Justice, the provision that the President can remove the single Commissioner only for neglect of duty or malfeasance in office raises a significant constitutional question."  Statement on Signing the Social Security Independence and Program Improvements Act of 1994, 2 Pub. Papers 1471, 1472 (Aug. 15, 1994).  Moreover, as the panel recognized, the Social Security Administration overwhelmingly engages in "supervision of the adjudication of private claims for benefits," not in bringing enforcement actions against private citizens, which makes it an inapposite precedent for the CFPB.  Op. 30-31.

*Third*, the Federal Housing Finance Agency (FHFA), which Congress created during the 2008 financial crisis to oversee Fannie Mae and Freddie Mac, is also headed by a single Director subject to removal only for cause.  Op. 33.  We are not aware of any Executive Branch comment on its single-director structure at the time of enactment of that emergency legislation.  In any event, the FHFA is a safety and soundness regulator for specified government-sponsored enterprises, namely Fannie Mae and Freddie Mac—for which the agency has acted as conservator since its inception—as well as federal home loan banks.  *Compare* 12 U.S.C. § 4502(20)

(defining "regulated entit[ies]" within jurisdiction of FHFA), *with id.* § 5481(6)

(defining "covered person" regulated by the CFPB as "any person that engages in

offering or providing a consumer financial product or service").[4]

Thus, to date, the Supreme Court has sanctioned a limitation on the power to

remove principal officers of the United States only for members of multi-member

bodies.  Neither history nor precedent suggests that *Humphrey's Executor* should be

extended to the CFPB.

In sum, a removal restriction for the Director of the CFPB is an unwarranted

limitation on the President's executive power.  This Court should not extend the

exception established by the Supreme Court in *Humphrey's Executor* to undermine the

general constitutional rule that the President may remove principal officers at will.

## II.     The Panel Correctly Concluded That The For-Cause Removal Provision Is Severable From The Remainder Of The CFPB Statutory Scheme

The panel correctly concluded (Op. 65-69) that the proper remedy for the

constitutional violation is to sever the provision limiting the President's authority to

remove the CFPB's Director, not to declare the entire agency and its operations

unconstitutional.

---

[4] The panel in this case appropriately did not address the application of its
ruling to other agencies not before the Court.

This conclusion follows directly from the Supreme Court's decision in *Free Enterprise Fund*, which applied the familiar principle that, when "'confronting a constitutional flaw in a statute,'" courts generally "'try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'" *Free Enterprise Fund*, 561 U.S. at 508 (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006)).  Even though Congress had not enacted a severability clause, the Court there held unconstitutional only the removal restrictions pertaining to members of the Public Company Accounting Oversight Board, and went on to hold that the proper remedy was to invalidate the removal restrictions, leaving the board members removable at will.  *Id.* at 509.  The Court reasoned that the Sarbanes-Oxley Act would "remain[] fully operative as a law with these tenure restrictions excised," and that no evidence suggested that Congress "would have preferred no Board at all to a Board whose members are removable at will."  *Id.* (quotation marks omitted).

Similarly, in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), this Court held that copyright royalty judges, who are charged with setting royalty rates for digital transmissions of recorded music, were principal officers who had not been appointed by the President and confirmed by the Senate.  The Court held that the proper remedy was to invalidate only a provision that limited the Librarian of Congress's ability to remove the judges.  *Id.* at 1340-41.  The

20

Court concluded that this remedy "eliminates the Appointments Clause violation and minimizes any collateral damage." *Id.* at 1340.

Here, as in those cases, severing the removal restriction is the proper remedy. Absent the for-cause removal provision, the Dodd-Frank Act and its CFPB-related provisions will remain "fully operative." *Free Enterprise Fund*, 561 U.S. at 509. And, as in *Free Enterprise Fund,* there is no evidence that Congress would have preferred no Bureau at all to a Bureau whose Director was removable at will. *See id.* Citing one legislator's statement that Congress sought to create a "completely independent" agency, PHH Br. 30, PHH speculates that Congress would have preferred to have no agency at all in the absence of a for-cause removal provision. But Congress never expressed this sentiment, and the Dodd-Frank Act's severability clause underscores that Congress would not have intended this result. 12 U.S.C. § 5302; *see Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987) (noting that severability clause "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision," and "unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute"). While it may be possible to conceive of other ways to remedy the constitutional violation, "[s]uch editorial freedom . . . belongs to the Legislature, not the Judiciary." *Free Enterprise Fund*, 561 U.S. at 510.

21

## III.   The Court Has Discretion To Reach The Constitutionality Of The Bureau's For-Cause Removal Provision, And May Appropriately Do So Here

We previously noted (U.S. Resp. Br. 12-14) that this Court may avoid deciding the separation-of-powers question in light of the panel's ruling on the statutory issues, which were the focus of the panel-stage briefing. The United States takes no position on the statutory issues in this case, but in the event that the ultimate resolution of those issues results in vacatur of the CFPB's order, it is within this Court's discretion to avoid ruling on the constitutional question. *See Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009); *see also* Op. of Henderson, J., at 8. That said, as the case has now been set for plenary briefing and en banc argument on the separation-of-powers question, and as that question is likely to recur in pending and future cases, it would be appropriate for the Court to provide needed clarity by exercising its discretion to resolve the separation-of-powers issue now.

## IV.   The Court's Decision In *Lucia* Should Not Affect The Disposition Of This Case

This Court has granted rehearing en banc in *Lucia v. SEC,* 832 F.3d 277 (D.C. Cir. 2016), to consider whether administrative law judges of the Securities and Exchange Commission are officers of the United States within the meaning of the Appointments Clause. If the Court concludes that these administrative law judges are not officers, its holding will not affect the Court's treatment of the other issues in this case. If the Court reaches a different conclusion in *Lucia*, its decision need not bear

22

on the proper disposition of this case.  In addition to deciding the separation-of-powers question, the panel vacated the CFPB's order on due process and statutory grounds; a conclusion that the administrative law judge who heard PHH's case was unconstitutionally appointed could only provide an additional, independent ground for vacatur.  If the CFPB pursues sanctions against PHH in new proceedings on remand, such proceedings will, of course, need to be consistent with the outcome in *Lucia*.  That prospect should not affect this Court's determination whether to reach the separation-of-powers question at this time.

## CONCLUSION

For the foregoing reasons, the for-cause removal provision should be invalidated and severed from the remainder of the Dodd-Frank Act.

Respectfully submitted,

CHAD A. READLER
  *Acting Assistant Attorney General*

DOUGLAS N. LETTER
MARK B. STERN

 *s/ Daniel Tenny*
DANIEL TENNY
TARA S. MORRISSEY
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7215*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., N.W.*
 *Washington, D.C. 20530*
 *(202) 514-1838*

MARCH 2017

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief satisfies the type-volume requirements of Rule

29(a)(5).  This brief contains 5,410 words.

*s/ Daniel Tenny*
Daniel Tenny

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2017, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and will be served via the CM/ECF system.  I also caused 30 paper copies of the brief to be hand delivered to the Court.


_s/ Daniel Tenny_____
Daniel Tenny