```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
             CASE NO.   17-80495-cv-MARRA/MATTHEWMAN
 3


 4
     CONSUMER FINANCIAL PROTECTION BUREAU,
 5
                     Plaintiff,
 6
         vs.
 7
                                      West Palm Beach, Florida
 8                                    June 11, 2018
     OCWEN FINANCIAL CORPORATION,      Pages 1-82
 9   OCWEN MORTGAGE SERVICING, INC.,
     and OCWEN LOAN SERVICING, LLC,
10
                     Defendants.
11   _____

12                  TRANSCRIPT OF DISCOVERY HEARING
               BEFORE THE HONORABLE WILLIAM MATTHEWMAN
13                 UNITED STATES MAGISTRATE JUDGE


14
     APPEARANCES:
15
     FOR THE PLAINTIFF:
16                          Consumer Financial Protection Bureau
                            BY:  JEAN MARIE HEALEY, ESQ.
17                          BY:  JAN EDWARDS SINGELMANN, ESQ.
                            1700 G Street Northwest
18                          Washington, DC  20552

19
     FOR THE DEFENDANTS:
20                          Greenberg Traurig
                            BY:  ANDREW STUART WEIN, ESQ.
21                          777 South Flagler Drive
                            Suite 300E
22                          West Palm Beach, Florida 33401

23                          Goodwin Proctor, LLP
                            BY:  SABRINA M. ROSE-SMITH, ESQ.
24                          901 New York Avenue, NW
                            Washington, DC  20001
25
```

```
 1    TRANSCRIBED BY:      DAWN M. SAVINO, RPR
                           Official Court Stenographer
 2                         400 N. Miami Avenue, 10S03
                           Miami, Florida  33128
 3                         Telephone:  305-523-5598
```

 4

 5                          P-R-O-C-E-E-D-I-N-G-S

 6            THE COURT:  All right.  Good afternoon.  Let's go ahead

 7     and call the case.

 8            COURTROOM DEPUTY:  Yes, Judge.  Calling case number

 9     17-80495-CV-Marra slash Matthewman.  Consumer Financial

10     Protection Bureau against Ocwen Financial Corporation, Ocwen

11     Mortgage Servicing, Incorporated and Ocwen Loan Servicing, LLC.

12            THE COURT:  All right.  So let's get appearances.  Who

13     do we have here for the Plaintiffs?

14            MS. HEALEY:  Hello, Your Honor.  Jean Healey for the --

15            THE COURT:  I'm having a hard time hearing you.  Could

16     you try that again?

17            COURTROOM DEPUTY:  Don't press it.  You need the light

18     on.

19            MS. HEALEY:  Yeah, it's on.

20            Jean Healey for the Consumer Financial Protection

21     Bureau.

22            THE COURT:  All right.  Thank you.

23            MR. SINGELMANN:  And Jan Singelmann for the Consumer

24     Financial Protection Bureau.

25            THE COURT:  All right.  Thank you.

1     All right.  Now, who do we have here for the
2   Defendants?
3       MR. WEIN:  Good afternoon, Your Honor.  Andrew Wein
4   from Greenberg Traurig for Ocwen, and I would like to introduce
5   my colleague from Goodwin Proctor.
6       MS. ROSE-SMITH:  Sabrina Rose-Smith, Your Honor.  Good
7   afternoon.
8       THE COURT:  All right.  Good afternoon.
9       Okay.  So this is a hearing on Plaintiff's motion to
10  compel complete answers to Plaintiff's first set of
11  interrogatories, Docket Entry 95; Plaintiff's sealed motion to
12  compel complete answers to Plaintiff's first set of
13  interrogatories, Docket Entry 99; Plaintiff's motion to
14  challenge Defendant's confidential designations and incorporated
15  memorandum of law, Docket Entry 106.
16      Now, I also note I believe there's also Mr. Jovanov
17  here?  Is that right?  All right.  And I believe that
18  Mr. Jovanov is pro se, and he apparently filed, at Docket Entry
19  100, a motion for leave to file and enter into evidence
20  documents as *amicus curiae* for benefit of the Court.  Let me
21  just tell you, Mr. Jovanov, that's not set for today, even
22  though you're here.  I'm assuming the parties are going to
23  respond to that.  I don't know if either the Plaintiff or the
24  Defendants have responded to that yet, but that's at Docket
25  Entry 100.  So it's probably just about -- it was filed on May

1    25th, so it's probably fairly close to needing a response.  So

2    let me ask counsel for Plaintiffs, are you going to be

3    responding to that?

4             MS. HEALEY:  Your Honor, we're happy to do so if you

5    think that it would aid the Court in the resolution of that

6    motion.

7             THE COURT:  I think it would -- it should be responded

8    to, and then the Court will decide what to do with it.  Same

9    with Defendants?  Are you going to be responding to that?

10            MS. ROSE-SMITH:  Yes, Your Honor.

11            THE COURT:  I'll tell you what.  I'll just give you

12   both until Friday of this week, that will be the 15th of June,

13   to file responses to the motion for leave to file and enter into

14   evidence by Mr. Jovanov, J-O-V-A-N-O-V, who is appearing pro se,

15   and then the Court will decide what, if anything, to do with

16   that and go from there.  But that's not on for today.  I just

17   wanted to notify you of that.

18            Okay.  So as far as dealing with these -- with these

19   motions, I also know that there is a request to unseal that was

20   made some time ago which the parties have responded to, and the

21   Court will decide in due course dealing with, I believe,

22   Altisource, and that's not on for today either.

23            So what is on today is interrogatories 9 through 11 and

24   13 and a motion to compel complete answers.  And then a dispute

25   over whether or not the interrogatory responses are deemed

1   confidential under the protective order or not.

2            So what I'm going to do -- so I want to go ahead with a

3   public hearing.  If there are any portions, when you get into

4   the document, if necessary, that you believe need to be sealed

5   in light of the protective order, or any other issues, then

6   you'll need to explain those to me and I'll determine on an

7   issue by issue basis if they need to be sealed or not.  But I'd

8   like to do all or at least almost all of this in public, if

9   possible.

10           So let me -- we'll talk about the confidentiality in a

11  moment, but let's talk about the interrogatories 9 through 11

12  which the Plaintiff seeking to compel production on.  And I've

13  read through everything and the record is now voluminous.

14           Let me just ask a few questions.  In 9 through 11,

15  you're asking about information dealing with whether a

16  borrower's insurance was erroneously cancelled.  You're asking

17  about borrowers' insurance being reinstated at a higher

18  insurance premium and any forced-placed insurance and then

19  remediation as to those issues.

20           I mean, in general, that's what the request is for.

21  And we're talking about apparently a period of time from January

22  14th through January 18th, correct?  Plaintiff?

23           MR. SINGELMANN:  Yes, Your Honor.

24           THE COURT:  If you want to go to the podium, that's

25  fine.  And I have some questions for you to start this off.

1           MR. SINGELMANN:  Yes, Your Honor.

2           THE COURT:  Now, this is an enforcement action by CFPB,

3      correct?

4           MR. SINGELMANN:  Yes, Your Honor.

5           THE COURT:  All right.  So -- and the time period you

6      believe is relevant is January 14th through January of 2018.

7           MR. SINGELMANN:  2018, correct.

8           THE COURT:  Okay.  So we're talking about four years;

9      '14, '15, '16 and '17 up through January of '18.

10          Now, first of all, why do you need all this

11     information?  You're asking for a lot of information about a lot

12     of borrowers.  Why do you need all that information in order to

13     pursue an enforcement action, Number 1?

14          And my follow-up question to that is what if I simply

15     ordered the Defendants to produce all of their files during

16     those four years to you, and you look through the information

17     and figure it all out.

18          So those would be my first two questions.  Why do you

19     need so much information, how many loans are we talking about

20     are at issue here over this four year period, why do you need

21     each and every loan file and why is that going to help your

22     enforcement action.

23          MR. SINGELMANN:  Right, Your Honor.  So our complaint

24     alleges, among the many different violations of federal law,

25     violations relating to Defendants' erroneous cancellation of

1   borrowers' insurance and then, you know, the resulting harm.  As

2   the Consumer Financial Protection Bureau, our mission is to

3   protect consumers.  So critical to the purpose of our complaint

4   is providing remediation and restitution to harmed borrowers.

5   So for the time period that our complaint covers, it's critical

6   for us to, one, identify those borrowers who actually have been

7   impacted whose insurance has been erroneously cancelled.

8         And so I just want to clarify at the outset, it's not

9   necessarily 76,000 or 100,000 borrowers, it's unclear what that

10  number is.  Those are numbers that were put forth in the

11  declaration of {Mr. Combs, and those are -- we believe, you

12  know, that's perhaps a first cut.  But we think that there are

13  many different ways that whatever that number is, it can be

14  narrowed.  We have identified several different sources of

15  potentially responsive information in our briefs.

16        First of all, borrower complaints.  The borrowers, if

17  they complained that their insurance was erroneously cancelled,

18  Defendants already have an independent obligation to review all

19  borrower complaints, investigate whether they're valid and

20  respond to the borrower.  So there should already be some

21  responsive information if Defendants are, as required, you know,

22  appropriately responding to consumer complaints.  So that work

23  has been done essentially, Your Honor.  They just need to tally

24  the results.

25        Another source.  They had a recent audit that we just

1    learned of in late 2017 that indicated that for borrowers for

2    newly originated loans, they were having some problems in their

3    system in terms of insurance and that there was a risk of

4    erroneous cancellations.  In that audit, it specifically

5    required the Defendants -- this was an internal audit -- to

6    conduct a review or a look-back and determine whether in fact

7    there had been identified borrowers who had been harmed and if

8    so, to develop a remediation plan and submit that to the

9    Defendants' internal remediation working group.

10         THE COURT:  So what if the Court just ordered

11    production by the Defendants of ongoing audits, internal audits,

12    assurance audits, scorecards and consumer complaints?

13         MR. SINGELMANN:  Right.  So we think that a lot of --

14         THE COURT:  In other words, I'm trying to figure out

15    who should do the work here.  Does the Defendants, do they have

16    to go through every loan file and every one of these things and

17    tell you where they acted allegedly erroneously?  Or do they

18    give you the raw information and you spend the time and you

19    figure it out and spend as much time as you want trying to

20    figure it out yourself.  I'm trying to understand, because

21    there's got to be a balance here and a proportionality here and

22    there's got to be relevance here.  So I'm trying to understand

23    really what to do with the discovery situation in this case.

24         MR. SINGELMANN:  Right.  And Your Honor, we do think

25    there's a middle ground.  You know, again, I talked about these

1    sources of responsive information.  We think at the very outset,

2    that the Defendants should review these sources of responsive

3    information and that they can provide answers to interrogatories

4    9 through 11.

5          Another example is they are required, for example,

6    under a consent order with the state of Maryland, to identify

7    and provide remediation to all borrowers for whom they have

8    erroneously cancelled insurance.  This is, again, the exact same

9    stuff that we're requesting.

10          THE COURT:  But that would only be in Maryland.

11          MR. SINGELMANN:  It would only be in Maryland.  So

12    Defendants' response to us has been sometimes, you know, we're

13    not going to give you information about, for example, how many

14    borrower complaints there are.  You know, in other instances the

15    response has been even if we look at this information, the best

16    we can provide you is a partial response, and that's not going

17    to be complete and our position is we understand that.  Okay?

18    And as we are willing to work with Defendants, but we would

19    suggest that in the first instance, they should review these

20    existing sources of information.  It's not only important

21    because they can provide partial answers to the Bureau's

22    interrogatories on the basis of these sources of information,

23    but let's say that, you know, they had proposed sampling.  If

24    they want to do that then -- that it a very complicated task.

25    It's something that you have to get the methodology right, you

1   have to really look in to identifying the appropriate

2   characteristics of the population to ensure that the sampling

3   methodology is going to result in valid results that can

4   actually be imputed out to other -- to the larger population.

5          THE COURT:  Well, that's true.  But, I mean, one way to

6   do it is to do an initial sampling and then have the parties

7   review that and see what that produces and whether that's

8   helpful or not.

9          MR. SINGELMANN:  Yeah.  We would just suggest that

10  there's a lot of different ways to find a middle ground.  Again,

11  if you have -- let's say, you know, you take Mr. Combs at his

12  word, and say the population is 76,000.  That can be

13  substantially narrowed by already identified impacted borrowers.

14  They've already done this.  For example, the 2014 -- September

15  2014 to January 2015 time period, that's a partial answer and

16  you know --

17         THE COURT.  ...have those documents?  Because I read

18  something in here in the -- I believe it was in the joint notice

19  and it said, for example -- this is on Docket Entry 114, top of

20  Page 4, it says further, Ocwen suggested that if the intent in

21  demanding that Ocwen review these sources, parenthesis, which

22  sources the Bureau already has and in many cases has had for

23  months.

24         So these underlying sources that you're referring to

25  that the Defendants should have to look at to answer the

1      interrogatory, do you have those sources?

2              MR. SINGELMANN:  Well, we have, for example, the audit

3      which we've attached for example as Exhibit, I believe it's 23

4      or 24, and you'll see it's two pages, Your Honor.  And what it

5      does, it identifies findings.  And then it has this is the plan,

6      but there's not necessarily the back-up to those.  And so we

7      don't have all that information.

8              So the answer in terms of identifying impacted

9      borrowers and whether they have received remediation, the answer

10     is no, we don't have that information.

11             THE COURT:  What about the other materials?  Because I

12     know that you were arguing that ongoing audits, Defendants'

13     internal audits, assurance reports, scorecards, consumer

14     complaints.  Do you have any of those documents?

15             MR. SINGELMANN:  We have some consumer complaints from

16     Defendants, but they cut off at a certain time period and we're

17     getting more, but we don't have all of them.  And so the answer,

18     again, going to be no.  The other thing that we don't have --

19             THE COURT:  What about internal audits?  Do you have

20     Defendants' internal audits?

21             MR. SINGELMANN:  We have -- we have received internal

22     audits, but not all the follow on.  For example, the 2017

23     internal audit that we cited, it calls for a -- you know, a

24     look-back and remediation plan.  We don't have any of that

25     information.  We asked Defendants last Tuesday during our meet

1    and confer about what the status of that was, and they cut it

2    off and said we're not going to talk about that because this is

3    unreasonably expensive and we should do sampling and, you know,

4    we shouldn't do both.  So we don't have.

5         The other critical thing that we don't have that

6    Defendants have is, you know, there's -- separately one of the

7    things that we identified, one of the other sources that we

8    identified is a current escrow audit that a third party is

9    conducting as required by state banking regulators for 30 out of

10   50 states.  This escrow audit covers a variety of different

11   issues, but it includes specifically lender-placed insurance.

12   On top of that, for certain states like Massachusetts, the

13   auditors are reviewing 100% of consumer complaints and

14   identifying whether the Defendants appropriately responded

15   including, for example, correcting any issues and providing

16   remediation.  So that work, we understand, is being done.  We

17   understand that is an in-process audit.  It's not complete.  We

18   realize that and, you know, we're willing to work with the

19   Defendants if they receive information from that that's

20   responsive.  As that's ongoing, as it becomes available, we're

21   willing to, you know, let them answer that -- let them answer as

22   that information becomes available.

23        THE COURT:  During this four year period, how many

24   loans do you think you're talking about?

25        MR. SINGELMANN:  Well, I think Defendants included some

1    information -- their prior review.  I think that's probably the

2    best source of a point of reference, Your Honor.  They

3    identified initially, you know, potentially 10,000 loans for

4    that time period.  Of those that actually got reduced down to --

5         MS. HEALEY:  Approximately 4,000, I believe.

6         MR. SINGELMANN:  Approximately 4,000 impacted loans

7    during that -- you know, I mean, it depends on whether you start

8    on September 1st or September 30th.  But approximately five to

9    six month time period.  And so, you know, during the entire time

10   period, if you extrapolate that out, it's probably around, you

11   know, 80,000 potentially impacted loans and, you know,

12   potentially, you know, 35 to 40 that are harm to borrowers.

13        The other thing I'd note, Your Honor, is in terms of

14   proportionality, I think we have to keep consumers in mind here.

15   These are consumers who were harmed if their insurance was

16   erroneously cancelled, and it's really important that we ensure

17   that those consumers, if Defendants in fact provided remediation

18   to those consumers, if they made them whole, if they corrected

19   whatever error there was, they should be able to document that

20   and we should be able to ensure that those consumers, to the

21   extent errors that caused them harm, that they have been

22   remediated.  That's very important.  So this isn't just an

23   academic exercise where we're, you know, tallying potential

24   damages or trying to extrapolate different things.  It's very

25   important that we identify these consumers and ensure that they

1   have been properly remediated.

2        THE COURT:  So what relief are you seeking?  Let's

3   assume that 50,000 borrowers were impacted during the four year

4   period.  Are you seeking relief for all borrowers, just the

5   50,000 borrowers?  Are you seeking injunctive relief, are you

6   seeking remediation to those 50,000 or to everybody?  I mean,

7   I'm trying to understand what it is that you are seeking in this

8   enforcement action that requires such extensive discovery.

9        MR. SINGELMANN:  Your Honor, I would say that first of

10  all, that our discovery seeks very basic information.  Again,

11  just identity of impacted or harmed borrowers.

12       THE COURT:  But there's a lot.  There's a lot.  I mean

13  --

14       MR. SINGELMANN:  There's a lot of them, but that's --

15       THE COURT:  We're talking big numbers.  My question is,

16  what are you seeking in your lawsuit that allows you to get this

17  information?  In other words, it has -- the information you're

18  requesting has to tie in to claims or defenses and it has to be

19  proportional to what it is you're seeking.  So at the end of the

20  day, if you win, what relief do you want?

21       MR. SINGELMANN:  Restitution to the extent they haven't

22  been provided.  Remediation.  We want them to be remediated and

23  we need to make sure they actually have.  We can't just have

24  them, you know, tell us but not show us that they provided

25  remediation.  That's been something that if they have provided

1    remediation, they should validate it and, you know, they will

2    get credit for it.  If they haven't, we're going to request that

3    they provide that remediation.

4         We're also going to assess whether there have been

5    other damages that have resulted.  Is the remediation

6    sufficient.  And that's information we can only, you know,

7    determine, you know, once we have the basic information at hand.

8    Who is the person that was harmed and what steps has Ocwen

9    taken, if any, to remediate that harm.

10        THE COURT:  So how do you suggest that Ocwen should go

11   through answering 9 through 11?  Should they look through every

12   single loan file that they have?  Should they look only to the

13   audits and the other internal materials that you mentioned?

14   Should they do sampling or should they do something else?

15        MR. SINGELMANN:  We would suggest two things, Your

16   Honor.  As a first step, they need to review the existing

17   sources of responsive or potentially responsive information.

18   These include the sources that we've identified in our briefs.

19   That said, they have an independent obligation to identify these

20   as part of a reasonable inquiry.

21        The example I want to give is the recently -- we only

22   recently, in the past month or so, received the November 2017

23   audit that identified issues.  We wouldn't know that, they

24   should know that.  And so, you know, we don't want to say these

25   are the only sources, these are the ones the Bureau identified

 1      because these are the only ones we know.  They are in a better

 2      position to know what are responsive sources of information.

 3      But at a bare minimum, they should review the sources of

 4      information that we have identified in our briefs, the internal

 5      audits, the external audits, the escrow audit for state banking

 6      regulators, other audits that they're doing under consent orders

 7      with the states, the 2015 and 2017 audits and critically,

 8      borrower complaints.  You know, we would think that if borrowers

 9      have -- had their insurance erroneously cancelled, we think

10      there is going to be a lot of them who are going to have

11      complained.

12              Again, this is something -- work that Ocwen should have

13      already done.  They already have an obligation to investigate

14      and respond to borrowers when they submit complaints.  So that's

15      just a matter of going back and reviewing their existing records

16      and tallying the results.

17              And to your other point, Your Honor, in terms of, you

18      know, this is a large number, that's just because they harmed --

19      they potentially harmed a lot of people.  So, I mean, I think in

20      terms of proportionality, you have to keep in mind the harm to

21      consumers here.  I mean, if it was -- you know, they shouldn't

22      get to evade an accounting of their conduct just because the

23      scope of it is so large.

24              The other portion I would say, because you asked me

25      what we want, that's the first step.  We -- the past week, we've

1    -- you know, as we have conducted further meet and confers with

2    Defendants, we have, you know, talked internally, and one of the

3    things that we proposed for Interrogatory 13 and not reply was

4    hey, you can do this, we think that there are potential

5    reasonable inquiries that can be done that can, at a minimum,

6    narrow the population for which, you know, a loan file review

7    would need to be done.

8          You know, a second step may be allowing the Bureau to

9    conduct a reasonable inspection of Defendant's systems.  But we

10   would say that in the first instance, we think it's likely that

11   you can really narrow the potential population here by just

12   looking at existing sources.  Even if they don't provide

13   complete answers and they only -- are only able to provide

14   partial answers based on these sources of information, they're

15   going to identify impacted borrowers.  And so you're going to

16   take that, you know, population of 90,000 and you're going to

17   whittle it down.

18         You're going to, through the process, identify perhaps

19   specific errors that are resulting in spikes in borrower

20   complaints or other systemic issues.  For example, what we saw

21   in the audits.  And you're going to be able to take what you've

22   learned, all right, these are errors that happened or this was

23   an error that happened associated with the transition to a new

24   vendor, or when they switched back to the old vendor, and you

25   may be able to focus in on those time periods.  And we think

1    we'll be in a better position to having a meaningful

2    conversation about, you know, what that next step should be

3    after Defendants have actually reviewed and answered based on

4    the existing sources of information.

5             THE COURT:  Now as to Interrogatory 13.

6             MR. SINGELMANN:  Yes, Your Honor.

7             THE COURT:  That only deals with the 2015 and 2016

8    audit; is that right?

9             MR. SINGELMANN:  So Interrogatory 13, it requests for

10   the same time period, Your Honor.  So the 2015 and 2016 audits,

11   those audits required look-backs and remediation for what seems

12   like a fairly significant time period in 2015 and 2016 that

13   would, again, whittle down that initial starting population of

14   36,000 down to something, you know, we don't know how much

15   smaller, but much smaller.

16            THE COURT:  Well, what if I ordered Ocwen to use these

17   -- as far as Interrogatory 13, what if I ordered Ocwen to use

18   the 2015 and 2016 audits to provide a better and more complete

19   answer to Interrogatory 13?  Would that solve your problem?

20            MR. SINGELMANN:  I mean, we think they should answer --

21   they should provide a partial answer at a minimum, but I think

22   it's important to take a step back.

23            First of all with Interrogatory 13, they told us -- you

24   know, led us to believe and told us for months that they were

25   going to answer Interrogatory 13 with complete remediation.  In

1    their opposition, they -- I think the best way to say this is

2    they don't accurately reflect that they made that representation

3    to us, and that we relied on that representation for months

4    until after they provided their interrogatory answer, at which

5    point they informed us that they were going back and decided

6    that they couldn't actually provide complete and accurate

7    answers.

8         So what they represented to the Court in their

9    opposition that they have always maintained their objections,

10   that they always suggested sampling, that is just not true.  So

11   I just wanted to clarify that for the record.  I think

12   Defendants have partially acknowledged that that is not an

13   accurate representation of what happened.  The joint notice does

14   reflect that, in fact, Defendants had agreed to provide us with

15   this information, and then later decided that they couldn't

16   provide that information to us.  So I just want to clarify that

17   for the record.

18        But looking at Interrogatory 13, I think it's important

19   to keep in mind what type of information the Bureau is asking

20   for here.  This one is a little easier in some ways.  First of

21   all, because we already have an identified population.  They

22   have already identified a little over 36,000 borrowers in their

23   answer to Interrogatory 12.  And what Interrogatory 13 is about

24   is these are borrowers for whom Defendants didn't timely process

25   an escrow shortage payment to the borrower, and this is why that

1    matters.  For many of those borrowers, the Defendants increased

2    the borrowers' monthly payments to collect the same escrow

3    shortage payment that the borrower had already paid.

4            So Defendants have claimed in a narrative answer that

5    they remediated these borrowers, but not necessarily

6    immediately.  Instead, they state that they would have refunded

7    the amounts that they over-collected or twice collected from

8    borrowers the next time they conducted an escrow analysis.  So

9    this could be, you know, a month later, but it could be three

10   months later or eight months later or much longer.  In the

11   meantime, they're continuing to collect the escrow shortage

12   payment from the borrower in the form of increased monthly

13   payments.  So this could be, you know, $10 over one month that

14   most borrowers could probably handle, or it could be a lot more

15   over a much longer time period which could be particularly

16   difficult for borrowers on fixed incomes.

17           So what we're requesting in Interrogatory 13 is basic

18   remediation information for these 36,000 impacted borrowers.

19   First of all, what remediation did they provide and when did

20   they provide it.  This information is really important to the

21   Bureau.

22           I know you asked on Interrogatory 9 through 11 why do

23   you need this, why is this relevant.  We need, again, to first

24   confirm that Defendants actually provided remediation.  Second,

25   based on the delay in refunding that over-collection, whether

1    it's a month, whether it's nine months or longer, and the

2    amount, that's going to really allow us to better assess the

3    scope of harm and, you know, also assess, you know, potential

4    downstream impacts for borrowers who had difficulty making these

5    payments where there was payment shock.  So it's, you know,

6    really important that they -- that the Bureau receive this

7    information.

8            Again, we think a lot of the work has probably already

9    been done for the 2015 and 2016 audits and quite honestly, Your

10   Honor, they should have reviewed these audits already.  We

11   specifically identified the 2015 audit in the text of our

12   interrogatory.  Both the 2015 and the 2016 audits were the

13   subject of the testimony of their corporate witness.  He

14   testified that with respect to the 2015 audit, they conducted a

15   look-back.  They identified five to 10,000 harmed borrowers and

16   they provided remediation.  So if they've done these things, you

17   know, they should be able to document them.  Otherwise, how are

18   they internally able to validate and make representations that

19   they've actually provided remediation.

20           THE COURT:  Well, 13 requests that for each of the

21   borrowers identified in 12, describe the remediation it provided

22   and the date of remediation.  And that's referring to 36,000 and

23   some borrowers allegedly; is that right?

24           MR. SINGELMANN:  Yes, sir.

25           THE COURT:  All right.  Let me hear from the Defendants

1    on all this.  And I have -- the first questions I have for you

2    are the same I had for the Plaintiff's counsel which is, it

3    looks like this is January of '14 through January of '18.  If I

4    just ordered you to supply all your files for that period of

5    time to the Plaintiffs and let them look through and figure it

6    out, what would be wrong with that?

7              MS. ROSE-SMITH:  Well, there are a couple of -- couple

8    of issues.  It's not as if there would be anything wrong with

9    that.  The problem is we've already given the Bureau -- this

10   lawsuit didn't start the day the complaint was filed.  So the

11   Bureau actually has 1.5 million pages of documents from the

12   Defendants.  They've taken 20 days of testimony.  They've gotten

13   18 written reports, 67 data polls.  Ten CIDs over the course of

14   seven months.  So the reason that they --

15             THE COURT:  What's a CID?

16             MS. ROSE-SMITH:  These are the civil investigative

17   demands that were issued by the Bureau.  And those came in the

18   form of demands for testimony, demands for documents and demands

19   for data.

20             THE COURT:  This is before this lawsuit started?

21             MS. ROSE-SMITH:  This is before the complaint was

22   filed.

23             And so all of that information is available to the

24   Bureau.  And in fact, the reason that they can serially continue

25   to identify with every one of their briefs a new document that

1    they believe we should have reviewed is because they already

2    have all of that information, and then they are still in the

3    process of getting information.  So with regard to the audits

4    and other reports that you were just discussing with Plaintiff's

5    counsel earlier, while they have come back to us and said please

6    give us additional supporting data on some of these, they

7    actually have all of these audits already.  And I can go through

8    every single one of them and tell you why they won't answer the

9    question, but I want to first answer the Court's original

10   question which is why not just give them all the loan files.

11          So we're in the process actually right now of producing

12   2,000 or so loan files that the Bureau's requested.  That

13   process is more labor-intensive than you might think because the

14   system is not -- I think people tend to see it as an electronic

15   file that's the same as something that you would pull off the

16   shelf with the borrower's name and loan number on it and

17   everything is in it.  That's not the case.  So everything in the

18   servicing system is segmented in to different pieces because

19   it's designed to be used every day by the individuals who are

20   servicing loans.  So in order to compile all that information in

21   to one place, download it all, put it into the e-discovery

22   vendor and then review the parts of it that need to be reviewed

23   for privilege, it's actually pretty labor-intensive and it's

24   taken a few months for us to get.

25          THE COURT:  For 2,000 loans.

1          MS. ROSE-SMITH:  For 2,000 loans.  So there is a

2     significant burden there.  But I would say that that 2,000

3     loans, although they were demanded for a different purpose, on a

4     number of different occasions I've said why don't we start

5     there.  Right?  Let's start with what you already have and see

6     if we can use that to narrow what it is that you're seeking.

7          THE COURT:  What year did those 2,000 loans relate to?

8          MS. ROSE-SMITH:  So those loans cover a population

9     that's throughout this time period.  Okay.  But to be fair to

10    the Bureau, they are -- they were requested for a different

11    issue that they've brought up in their lawsuit.  So but what I

12    have said, and I said this particularly with regard to

13    Interrogatory 3 which I'll get to in a minute, why don't we just

14    pull 100, right?  We've told what you remediation we did, let's

15    pull 100, and then you can look at those and if it turns out

16    that the remediation that we said that we provided isn't there,

17    then we can talk about what we need to do after that.

18          But in our view because we think that that information

19    has already been -- that the remediation is in the file and that

20    you can see what we've done there, if you pull 100, you should

21    see the remediation in the 100 instances.  And if you see it in

22    100 instances then maybe -- I understand trust but verify, but

23    maybe if you see it 100 times, then you can verify that in fact

24    the thing that Ocwen has said in its interrogatories it did, it

25    did.  And if you don't, then that would be a reason for us to

1    consider something a little bit more broad.  So but that's

2    easier to do for Interrogatory 13 and that was why that was my

3    proposal there.

4            For Interrogatories 9 through 11, even if we were to

5    just pull the files and sort of hand them over to the Bureau to

6    look at, the problem isn't that I can't pull a report or that

7    the client can't pull a report that says here are the number of

8    borrowers that this might have happened to.  And in every one of

9    the sources that the Bureau has cited to you today, Your Honor,

10   they are identifying populations that this might have happened

11   to.  The question is, to get to who it actually happened to, and

12   whether they were harmed by that, you have to actually look at

13   the file more broadly.  And so that's the reason why,

14   notwithstanding that the Bureau is in possession of any number

15   of audits, all those borrower complaints that they have, all of

16   the -- all of the other data and information that they got

17   pre-discovery, they can't answer this question.  They still

18   asked it of Ocwen.  And the reason is because those sources

19   don't answer that information.

20           A perfect example of this is borrower complaints.  A

21   list of borrower complaints will tell you what the borrower

22   complained about.  But they have asked Ocwen in an interrogatory

23   to make an affirmative statement about what we did or didn't do

24   wrong.  The number of people who complained about something is

25   not equal to the number of people where something happened that

1   was affirmatively a violation of law or an erroneous

2   cancellation as used in the interrogatories.

3          And so what I've said to them is if you want all the

4   borrower complaints, if you want us to fill in the gap because

5   they have all of them up to a certain point but they don't have

6   them going forward, I said we can get you that. The problem is

7   that once you review all of those or once you demand that Ocwen

8   review all of those, you still won't have an answer to your

9   question.  And every one of these sources, some of them don't

10  even provide a partial answer.  But even for those that do, what

11  the Bureau is saying is that Ocwen should bear the burden of

12  looking at all of these sources, cobbling together different

13  populations from here and there so borrowers that they

14  identified, the Maryland one that they cited in their brief,

15  identifies nine borrowers.  So all of those borrowers, and then

16  all of the borrowers from this audit or that audit, and put all

17  of those together.  And then after we've reviewed all of the

18  information that we need to do in order to get to that

19  population, wherever there is a gap, to then review on an

20  individual loan level basis each of those.

21          So say I get all of Maryland for 2014, I still need all

22  49 other states for the rest of 2014, plus Maryland, and

23  everybody else from 2015 to 2018.  And that's the problem, is

24  that even if we were to do what the Bureau said -- and I should

25  pause here, Your Honor, and say that the Bureau repeatedly says

1   that we haven't looked at this information and that we haven't

2   done a reasonable investigation, but in fact we have.  And I --

3   we went to the line of business and we asked them, we asked them

4   all about all of these specific things.  What they tell us is

5   that this information isn't there, and then we tell the Bureau

6   that and then they say well, what about this thing and what

7   about this thing.  And so they keep representing to the Court

8   that we haven't looked, but that's because we asked the broader

9   question and now they are identifying specific things. And even

10  having gone back to look at those, I can tell you that those

11  sources aren't the answer.

12        And so while it is -- it is possible to pull the loan

13  files and just sort of hand them over to the Bureau and say

14  here, have that, there's a lot of burden to doing that and a lot

15  of expense because all of those files, the servicing notes and

16  other information have to be reviewed for privilege.  And that's

17  actually the thing that's taking probably the largest amount of

18  time for the 2000.  And then the sources that they identified

19  won't answer the question, and I'm happy to go through, if the

20  Court is interested, every one of the ones that they have

21  identified and tell you specifically what we understand it will

22  and won't offer the Court.  So having not been able to get it by

23  just sort of handing over loan files, which the Bureau hasn't

24  even asked for and I don't think wants because that's why they

25  want -- they want us to package it nicely for them in an

1  interrogatory response.

2          THE COURT:  Well, I mean, you know, part of me accepts

3  your argument on Interrogatory 9.  I'm looking at Interrogatory

4  9 and it says identify each account for which the borrower's

5  insurance was erroneously cancelled.  Now, you know, normally in

6  civil litigation, the Plaintiff asks for all of this or all of

7  that, but it didn't ask you to make a legal determination or a

8  factual determination about what you erroneously cancelled.

9          MS. ROSE-SMITH:  That's right.

10         THE COURT:  So it seems to me in some respect that the

11 Plaintiffs are asking you to do their work.  Because normally,

12 it's the Plaintiff that has to prove their case that you

13 allegedly erroneously cancelled borrower's insurance.

14         On the other hand, when I read the joint notice,

15 there's a section here where it provides on Docket Entry 99-1,

16 which is sealed, at the top of Page 7, you state that Ocwen has

17 determined that, and you list a number, were erroneously

18 cancelled as defined above.  So it seems like you've already

19 made that determination as to some, and so I don't see the harm

20 of giving them that information if you already have that.  So

21 I'm trying to understand where we are in this situation because

22 --

23         MS. ROSE-SMITH:  Sure.

24         THE COURT:  -- it seems like they're asking in

25 Interrogatory 9 for all -- identify each account for which the

1    borrower's insurance was erroneously cancelled.  And then

2    they're referring to a deposition or testimony of a corporate

3    witness where he mentioned a number of accounts which you refer

4    to later as being potentially impacted.  Not actually impacted,

5    but potentially impacted.  So --

6         MS. ROSE-SMITH:  So I --

7         THE COURT:  I'm trying to understand, where they're

8    asking for you to make the determination as to which were

9    erroneously cancelled, which to me, as a prior litigator, seems

10   to be like turning the burden around.

11        On the other hand, you do mention later on in the joint

12   notice at the top of Page 7 that there are a number that have

13   been erroneously cancelled as defined above.  So what is it

14   you're willing to produce, you're not producing, you can't

15   produce, I'm trying to understand where we are on 9.

16        MS. ROSE-SMITH:  So we identified -- and this is

17   actually to the point that the Bureau was making about well, if

18   the audits or other information show this, then they ought to

19   give it to us.  There was one review that actually -- it doesn't

20   cover the entire time period, but there was one review that

21   answered exactly the question that the Bureau asked.  And so for

22   that review, we went back and looked at the information and we

23   gave them that information.  So our supplemental answer to

24   Interrogatory Number 9 says we can't identify the borrowers and

25   answer this question directly for all of the time period, but

1    for the time period from August 2016 to December 2017, we

2    actually can because we did a review that answered this precise

3    question.  And in that review, there is -- we identified sort of

4    a number of borrowers, right?  And then there's a separate

5    review that has to do with the response to Interrogatory Number

6    13 which has to do with the five to 10,000 loans that the

7    corporate witness testified about.

8           But where we had something that precisely answered the

9    question, we gave them that.  The issue is that that only covers

10   August 2016 to December 2017, and so there's time on the front

11   end of the time period and the back end of the time period that

12   that doesn't cover.  And when we identified that -- the number

13   that we actually looked at and that we could identify, that's

14   how we know that identifying the populations on the front and

15   the back end are going to be difficult to do.

16          And so, in fact, that's the basis of Mr. Combs'

17   declaration where he says we already know how much work this is

18   going to take.  And so because we had the vendor do it, we had a

19   review, there was a process.  And so the -- I guess the issue is

20   that since it doesn't cover the entire time period, what do we

21   do about the rest.

22          And so my proposal has been from the very beginning,

23   I'll give you what I have.  If it answers your precise question,

24   let's sample the rest.  So let's take that -- those years, and

25   I'm not saying that we couldn't use other information, right?

1          So they pointed to audits that identified specific

2    problems and say all right, we're going to narrow the population

3    for pulling a sample to these specific set of problems or

4    issues, and sample from that population so we know we're not

5    just pulling from a broad group and we get an unrepresentative

6    sample, or a sample that doesn't closely enough approximate what

7    it is that we're actually asking the question.  It's that part

8    that I can't identify.

9          Where I can tell them, and you'll see this in both the

10   response that I gave them for Interrogatory Number 12, which is

11   the population that's identified for Interrogatory Number 13 and

12   for Interrogatory 9, wherever I can tell them the population and

13   it answers the precise question, not the broader, is this an

14   audit or a review of escrow generally, which is what a lot of

15   these that the Bureau has pointed to, if it answers the precise

16   question, then I try to give it to them.

17         And so I would just say, Your Honor, that the issue

18   isn't our inability to figure this out.  Right?  We can.  The

19   problem is the work that it takes to figure that out is really

20   extensive.  And because it requires that we actually look at

21   each one of these files, go through, look at why it is, we can

22   pull how many borrowers were cancelled, right?  And just say

23   here's the total number.  That's not the question.  It's the

24   erroneously cancelled part.  It's the part where the Bureau

25   wants us to do the work.  And in doing that work, what we're

1  saying is it's expensive, and instead of having to bear the cost

2  -- we're not saying -- I mean, I could have, I could have said

3  we're not going to answer these and I'm going to file a motion

4  for protective order because this is you asking us to do your

5  work.  But instead, I said let's come up with a way to get your

6  answer.  And to me, the way to get that answer is to come up

7  with a sample population and let that sample tell us about the

8  rest of the population and let that be the answer.

9        And I think in litigation, that's not an uncommon thing

10  to do.  And if it turns out, Your Honor, that there is some

11  reason why the sample is problematic in some way, once we work

12  together to devise it -- and I'm happy to work with them, it's

13  not as if we have not said that we would work with them, but

14  they have just said categorically we will not sample.  And so if

15  there's some reason, Your Honor, that the sample doesn't

16  adequately address the needs for litigation, then we can take an

17  incremental approach to this.  We can start with what we can do

18  right now, what we can agree on, and if that doesn't work, we

19  can figure out why is it that that sample is not going to work

20  for us, let's come up with a way to tweak that or to adjust it

21  or do what we need to do. But the Bureau just won't consider

22  sampling at all.  And I understand that they have a need.

23        And I want to address this one final thing, that I

24  understand that they have a need to identify borrowers who were

25  harmed.  One, I would say that a lot of the numbers that they

1    have thrown around in their pleadings are individuals where we

2    have already given them the objective information, here's the

3    universe of possible harm borrowers.  What we're trying to get

4    at now is the number of borrowers actually harmed, and that

5    number has been, in every instance that we've looked at this,

6    exponentially smaller.  But getting to that smaller number is

7    the burden, right?  The actual review.  That's the problem.

8         And so it's not that we don't want to -- want to figure

9    out who the borrowers were who were harmed.  But the fact is

10   even for the Bureau and all of their other investigations, if

11   they can't identify the specific population, then what they do

12   is they then come to the Court and say you should -- the Court

13   should order that the Defendant remediate the universe of harmed

14   borrowers.  That's just the way litigation has to work.  Because

15   you can't know every single thing, and in fact, Ocwen has taken

16   that approach and over-remediated on a number of different

17   issues itself.  So it isn't as if, Judge, you don't order today

18   that they look at every single file that some borrower is going

19   to have been harmed and not ever have their day in court.  It's

20   just that from a practical perspective, we're not going to put

21   on evidence at trial of 36,000 or 70,000 individual loans and

22   what happened to them.  There's going to have to be some method

23   by which we manage that.  And to me, that method, the most

24   appropriate way of getting at that in a way that's fair for both

25   sides is to sample.

```
 1              THE COURT:  Okay.  Let me ask you a couple questions.
 2     Now, you indicated that in -- regarding Interrogatory 9, that
 3     you've already provided a number of accounts that you determined
 4     were erroneously cancelled, correct?
 5              MS. ROSE-SMITH:  Yes.
 6              THE COURT:  Now, and you said that that covers the
 7     period of August of '16 through December of '17?
 8              MS. ROSE-SMITH:  Yes.
 9              THE COURT:  All right.  So really then, the only
10     remaining area that's accurate, and I'll turn to Plaintiffs in a
11     second, on that would be January of '14 to July of '16.  Because
12     the time period in this case is January of '14 to January of
13     '18.  So if you've given August of 2016 to December 2017, then
14     really we're talking about January '14 through up to August of
15     '16.
16              Now, the information that you gave them in those
17     erroneously cancelled, does that apply -- does that information
18     answer the questions in 9, 10 and 11 for each of those accounts?
19              MS. ROSE-SMITH:  Yes.  So we have -- we identified --
20     because that was a specific review that we have all of the data
21     and all the remediation, the answer is yes.  So we were able to
22     identify borrowers that we refunded money to, borrowers that we
23     -- and that we did other -- we did other things to remediate.
24     So yes.
25              THE COURT:  All right.  So just stay there for a second.
```

```
 1              Let me ask Plaintiff's counsel, what about that?  If
 2   you've already gotten the information of borrowers that had --
 3   were erroneously cancelled or of the erroneously cancelled
 4   accounts between August of '16 and December of '17, doesn't that
 5   answer all the questions to 9, 10 and 11?
 6              MR. SINGELMANN:  Your Honor, I think defense counsel
 7   just has the wrong information.  They provided September 2014
 8   through January 2015.  That's the time period in the joint
 9   notice.  So I think it's just a mistake.  So we don't actually
10   -- I mean --
11              MS. ROSE-SMITH:  You know what, it may be -- you know
12   what, you may be right.  I may have written it down in my notes
13   so it is -- it's a smaller population, Your Honor, that's the --
14   so yeah.  There's a bigger period on the front end of that.
15              THE COURT:  So it's January --
16              MS. ROSE-SMITH:  He's right.
17              THE COURT:  So it's September of '14 to January of '15;
18   is that right?
19              MR. SINGELMANN:  Yes, Your Honor.
20              THE COURT:  Is that correct,
21              MS. ROSE-SMITH:  Yes.  I just had the time period for a
22   different interrogatory, Your Honor, when I wrote it down in my
23   notes.  I apologize for that.
24              THE COURT:  All right.  So then going back to
25   Plaintiffs for a second, so you have this information for the
```

1     period of time from September of '14 to January of '15 regarding

2     9, 10 and 11.

3             MR. SINGELMANN:  Yes, Your Honor.

4             THE COURT:  Okay.  So the question is, how do we get

5     you this information for the period of time from January of '14

6     through August of '14 and then February of '15 through January

7     of '18?

8             MR. SINGELMANN:  Yes, Your Honor.

9             THE COURT:  Right?

10            MS. ROSE-SMITH:  Right.

11            THE COURT:  Okay.  So now I can do a number of things.

12    Number 1 is I can order the Defendant to go through every single

13    file that they have and provide that information to you.  I

14    think that's probably going to take -- and I know there was an

15    affidavit filed, I believe.  To me, that would seem to be

16    extremely burdensome and expensive and disproportionate in light

17    of the benefit obtained would be.  So that's option one.  Go

18    through every single file, produce everything that you have and

19    answer those interrogatories that the Plaintiffs have

20    propounded.

21            The second possibility is look at your audits and your

22    internal data and this other information that allegedly has

23    already been compiled, and do a better answer to the

24    interrogatories.

25            And then the third option seems to me to be sampling.

1        All right.  Now, would you agree on both sides that

2   those would be the three options?

3        MR. SINGELMANN:  Yes.  I mean, as to option two, I

4   think there would be -- we wouldn't -- the Bureau wouldn't want

5   to foreclose that it could be helpful to conduct an inspection

6   of Defendant's system in order to determine whether there's

7   queries or further narrowing that can be done if that --

8        THE COURT:  Right.  Well, the inspection issue is

9   something that I would not allow until after this first phase of

10  discovery was produced, and then you would have to come in and

11  show me why it's defective and inefficient.

12       MR. SINGELMANN:  I would -- yes.  Then I would --

13       THE COURT:  Because I read that in your joint notice

14  and I'm not prepared to order an inspection now.  I'm not

15  foreclosing it down the road, but I'm not ordering it now.  It's

16  going to depend on what else is produced.

17       So while I've got you up there, defense counsel, while

18  you're there -- it's Ms. Rose-Smith, correct?

19       MS. ROSE-SMITH:  Yes, Your Honor.

20       THE COURT:  All right.  So of those three options,

21  having to produce every file or go through every single file and

22  answer the information; Number 2, looking at your data that you

23  already have compiled and answering it or Number 3, doing

24  sampling, or some combination of 2 and 3, tell me what your

25  suggestion is as to 9, 10 and 11.

```
 1              MS. ROSE-SMITH:  So Your Honor, my suggestion is that
 2     we do sampling.  And I'll tell you that it is not as if ordering
 3     everything wouldn't solve the problem.  The issue is just the
 4     burden and the expense of ordering everything.  So I don't want
 5     to represent that --
 6              (Cross-talk between the Court and counsel)
 7              THE COURT:  And how burdensome and expensive would that
 8     be?
 9              MS. ROSE-SMITH:  Well, so in this particular instance
10     it would be the cost and the processing of the loan files.  And
11     based on the 2000 that we've already produced, it would be
12     expensive.  I don't have a precise figure for how much it would
13     cost because I couldn't get the total number of loans.  But we
14     did make an effort to try and determine how much this would cost
15     and the vendors quotes are in the millions.  And there is a --
16              THE COURT:  In the millions of dollars?
17              MS. ROSE-SMITH:  Yes, millions of dollars.  But to be
18     fair, that's not to look at just loan files, but that's to
19     actually answer the underlying question based on a review.  The
20     production of loan files itself, the specific costs are all of
21     the time that it takes to pull down all of the loan files, then
22     the vendor costs for reviewing and processing and all of that,
23     then the review for privilege.  So those are the three layers of
24     expense, not including my time and, you know, more senior people
25     on the case whose job it is just to sort of look at what our
```

1    response is going to be and how we say it, but the actual

2    processing of the work.  And while I can get you figures on

3    that, Your Honor, I can tell you that it's not -- it's going to

4    be expensive.

5         And the other thing that would be significant is that

6    it takes a long time, because the group that does this

7    processing also has to do other work for the business.  So it

8    isn't as if there is a separate group of people that we can take

9    off line to pull information.  They're doing lots of stuff,

10   including work for the review that's going on one of the state

11   review -- or the state audit that the Bureau is talking about.

12   So that's the burden on the order everything.

13        I will be perfectly candid with the Court.  If the

14   Court orders that we look at these documents, I can tell you

15   standing here today that those documents don't answer the

16   question.  Some of them don't even provide a partial answer.

17             THE COURT:  Audits and things of that nature?

18             MS. ROSE-SMITH:  Yes.  So at least everything that

19   they've cited --

20             THE COURT:  So you're representing to me that even

21   looking at those documents, it doesn't provide the answers in 9,

22   10 and 11?

23             MS. ROSE-SMITH:  No, it doesn't.  I am representing

24   that.  And I can go through all of them and I'll give you a

25   perfect example, because this is one that I have precise figures

```
 1    on for you.

 2           So the Bureau suggests that we could figure out whether

 3    or not borrowers' insurance was cancelled based on borrower

 4    complaints.  So we went back and actually -- we looked

 5    originally at whether borrower complaints would answer that

 6    question, and the answer is no, because the information about

 7    whether or not that borrower complaint was something that was an

 8    erroneous cancellation based on only those factors that could be

 9    attributable to Ocwen from a liability perspective, the tracking

10    that we do on borrower complaints doesn't answer that.  It just

11    answers what did the borrower complain about, how did we fix it

12    for the borrower.  So we don't have the precise answer.

13           Instead, what we can do is we can search for -- within

14    this topic escrow and the topic of payments, we can search all

15    of the sub-topics that might relate to erroneous cancellations.

16    So we can search account set-up, or cancellation or insurance

17    provider, a number of different, like, complaint tabs that we

18    have within the database.  If we do that, just what I described,

19    what you get is 37,510 complaints.  And then you have 37,000

20    complaints, so that's not 37,000 borrowers whose insurance was

21    erroneously cancelled.

22           THE COURT:  You're talking about doing search terms

23    against the complaints?

24           MS. ROSE-SMITH:  Right.  To narrow them.

25           THE COURT:  Right.  But those search terms are still
```

1    giving you an inordinate amount of docs.

2         MS. ROSE-SMITH:  Right, and then we have to look at all

3    37,000 to figure out whether or not, regardless of how the

4    borrower felt about it, whether or not it was actually Ocwen's

5    fault because that's what the Bureau is asking.

6         And the Protiviti review that they referenced, Your

7    Honor, this is an ongoing state escrow audit that is designed to

8    answer a number of different questions.  Those -- none of them

9    are the precise question that the Bureau has asked and in fact,

10   the Protiviti review is based on sampling.  So it's a sample of

11   loans from 30 of 50 states for the time period that's at issue.

12   So again, we've got 20 states and we're sampling even to get to

13   that review.  So there's that.

14        Also, that review won't be complete until the end of

15   the year, and so -- and isn't specific to the erroneous

16   cancellation question.

17        They reference Maryland Division of Banks' consent

18   order.  That only covers Maryland as Your Honor pointed out

19   earlier.  Massachusetts, the one that they pointed to in their

20   brief is actually part of the same Protiviti review that I just

21   told you about.  That's what's referenced in that in that order.

22   And again, that's a sample and will only tell you a limited

23   amount of information not specific.

24        We went through and identified all the different types

25   of scorecards, Q and A reports of all of these different pieces

1      of information, and I can tell you that there are eight

2      different categories of reports.  Some of those reports are

3      generated daily, some of them are generated monthly and some of

4      them are generated on off cycles, depending on what the audit is

5      for and all of that.  And so what we would have to do if we

6      chose option Number 2 is we would have to review all of that and

7      try to piece together an answer.  And once we cobble together

8      what we had wherever there are gaps, it is still the Bureau's

9      position that we would have to look and to try to fill those

10     gaps.  And so for that reason, option Number 2 is -- has

11     probably a greater level of burden because in the end, it still

12     involves a low level review.  But before we can even get there,

13     we have to do all of this other work.

14          Notwithstanding that, Ocwen's employees and everyone

15     that we interview and all of the documents that we've reviewed

16     tell us that those are not going to have the underlying answer

17     to the Bureau's question.  So for me and for my client, the most

18     reasonable thing to do to cover those gaps is to sample.

19          THE COURT:  And the sampling that you're proposing

20     would have to be -- if we did it on a yearly basis, it would be

21     from January of '14 to August of '14; from February of '15 to

22     December of '15; all of '16, from January 16th to December of

23     '16, and then from January of '17 to January of '18.

24          MS. ROSE-SMITH:  Yes.  And we have offered to work with

25     the Bureau.  So one of the things that the Bureau has said is

1    that some of these audits might identify specific issues, and we

2    are happy to work with them to make sure that we include loans

3    in the sample that reflect a particular -- a particular type of

4    issue if we can narrow it down to that specific issue.  In other

5    words, we don't want to -- I understand that they might have a

6    concern with well, if you just take a sample of everything, then

7    that sample is going to look disproportionately good as opposed

8    to a sample of the ones that we actually think are the problems.

9    And if that's the case, we certainly are willing to work with

10   them so that we're pulling a sample that is a realistic

11   representation of what the whole might be.  And my view, Your

12   Honor, is we could even start with a very small sample, see if

13   it's getting the Bureau what they want and then if it is, then

14   maybe we'll use that methodology for a full sample.  But if it's

15   not, then we can go back and we can try to tweak it and fix it

16   so that they get to a point where they get what they want.

17            THE COURT:  And this would be a sample of just loans?

18   Or a sample of loans that were potentially a problem loan or

19   what are you suggesting the sample be of?

20            MS. ROSE-SMITH:  So it would be a sample of loans where

21   the borrower's insurance was cancelled, right?  So that's the

22   first cut.  And then in Mr. Combs declaration, he suggested that

23   there's -- that we could take a waterfall approach in order to

24   figure out what we might -- how do I do that.  So if you look at

25   his declaration at Paragraph 10, he says what we could do is we

1    could start with the full cancellation population, right, for

2    the time period that we've just discussed, and we can use a

3    sampling process there to identify various data scenarios and

4    fact patterns that might have resulted in an erroneous

5    cancellation, right?  You know, this is something that Ocwen

6    specifically did that then caused that the insurance be

7    cancelled.  And so we can look at some loan files and records to

8    determine okay, is that particular data scenario, does that

9    actually reflect something that Ocwen did.  Okay.  So that means

10   that that population, we want to pull and we want to include

11   because those are potentially -- those are potentially impacted

12   loans.  And we can go through that iterative process, we're just

13   not doing it on every loan, we're doing it on some fractions of

14   populations to try and identify issues in order to get to the

15   ultimate question.

16          So if you look at -- he's describing in that -- in that

17   paragraph, the process that he would take if he were -- if he

18   were -- why it is that we have to do a manual review and what

19   he's looking for, but that process is also what we would suggest

20   we could do in order to sample which is --

21          THE COURT:  Where is that affidavit filed at?

22          MS. ROSE-SMITH:  It was filed under seal and it was --

23   it was included in our opposition to the --

24          THE COURT:  The Docket Entry number?

25          MS. ROSE-SMITH:  Yeah.  I don't --

1    THE COURT:  I'm sorry?

2    MR. WEIN:  The sealed version is 103, I believe.

3    MS. ROSE-SMITH:  Okay.

4    THE COURT:  So it's 103.

5    MS. ROSE-SMITH:  I'm happy to -- if the Court permits

6    it, I'm happy to bring it up on mine.  The only note I have on

7    it is it says Combs declaration at the top, so I can see it in

8    really big letters.

9    THE COURT:  No, I have it here.  I like to just refer

10   to it in the record so that we know where we are.  It's

11   declaration of Andrew Combs in support of Defendants' opposition

12   and it's at Docket Entry 103-1, and it's seven pages long.

13   MS. ROSE-SMITH:  Yes.  And at Page 4, what he is

14   describing in the course of talking about Interrogatories 9

15   through 11, he's talking about figuring out the population that

16   would be subject to a manual review.  And once we get to a

17   population that we think would be subject to a manual review,

18   because of the way that he proposes that we get to that

19   population, we could sample from that.  Right?  The number will

20   still be large because it won't answer the precise question, but

21   that would be a population where we have identified specific

22   issues that may have resulted in a cancellation that was caused

23   by Ocwen from a population of all loans that were cancelled and

24   from that, we would then take a subset and we could do it subset

25   by issue, or subset altogether, depending on, you know, what the

1    parties end up agreeing to.  And then we would look at those.

2    And that would result in a much smaller population, and it would

3    give the Bureau information about whether or not specific

4    actions or specific issues caused an erroneous cancellation.

5         THE COURT:  Now, are you using an IT vendor for this or

6    are you doing this in-house?

7         MS. ROSE-SMITH:  So this narrowing process, they do

8    in-house.

9         THE COURT:  Uh-huh.

10        MS. ROSE-SMITH:  And so during the investigation, we've

11   been -- we have been -- Ocwen previously provided to the Bureau

12   the queries that they used to try and do this -- do other data

13   pulls.  And if it would aid in resolution and make the Bureau

14   comfortable, we could do the same thing for narrowing down this

15   population.  Those data queries, the Bureau suggests that that

16   means that we can pull exactly the answer.  That's not true.

17   But whatever we do pull or whatever we do use in order to

18   identify the population from which we would sample, if it would

19   be -- if it would be useful, we can identify that to the Bureau

20   as well so that they at least know, and certainly we would

21   expect that they would have some input, and we would have a back

22   and forth discussion to narrow the population in the first place

23   for sampling.

24        THE COURT:  All right.  Thank you.

25        So let me go to Plaintiff's counsel now and let me ask

1    you, the three options we discussed were Number 1, giving

2    everything over, and it seems like that's not workable.  In

3    other words, every single file --

4              MR. SINGELMANN:  Right.

5              THE COURT:  -- they produced, and that doesn't seem to

6    make sense.

7              The second option is look at the underlying data, and I

8    have Ms. Rose-Smith who is representing, as an officer of the

9    court, that she's looked at that underlying data, that the

10   client has looked at the underlying data and it just doesn't

11   answer your questions.

12             MR. SINGELMANN:  I think that she's clarified that it

13   doesn't answer the precise question, but we have accepted that

14   some of the sources that we have identified will nevertheless

15   allow Defendants to provide partial answers, you know.  And

16   that, again, is going to either identify potentially impacted

17   populations with respect to the audits and the follow-up that

18   they did from the audits that we don't have.

19             But I do question how, you know, some of these sources

20   will provide responsive information.  Maryland will provide

21   responsive information.  The audit, I don't think we should

22   prejudge an audit that's ongoing that's not complete.

23             THE COURT:  Yeah, but if it's ongoing, I can't order

24   that produced.  It's ongoing.  See, that's the problem.  I mean,

25   at this point, she's given you -- they've given you the audits

1    and the other internal information, correct?

2          MR. SINGELMANN:  They have given us the audits but not

3    the follow-up information on the look-backs that were provided

4    and the specific remediation that was provided.

5          MS. ROSE-SMITH:  We have, Your Honor, where the -- so

6    when Ocwen does an audit, there's an audit and then there is

7    something called a management assertion form and that is where

8    the company sums up what happened, what the mistake was or

9    wasn't, and what ultimately they did.  Sometimes with that

10   information, they include specific populations of loans that

11   were impacted by a specific issue or were remediated based on a

12   specific issue.  Sometimes -- and it's a more generalized

13   assertion form and says for all of these borrowers, we fixed

14   this because it will all shake out in their next escrow review

15   or something like that.  And so where there was a management

16   assertion form and they've asked for the various back-up details

17   for all of that and where we've had it, we've produced it.

18          The problem is that in some cases, there isn't specific

19   loan level information other than what's reflected in the files

20   themselves, and that's the thing that we've talked about, the

21   Bureau and I have talked about a number of different times, that

22   there may be remediation that was done in connection with an

23   audit, but you'd have to look at the files to see it.

24          THE COURT:  All right.  So let me go back to

25   Plaintiff's counsel.  You know, I order sampling in various

cases, and I've done it recently and I like to do discovery from

inside out.  Instead of ordering everything produced at once in

this global massive production, to start with certain discovery

and then move from there after you have a chance to review it

and you have a better idea of what it is.  That is going to be

contained in these documents.

So the question would be if I ordered a sample size, if

I ordered a sampling, would I order a sample size for each year.

For example, so many files for 2014, from January of '14 to

August of '14.  So many files for 2015, from February '15 to

December of '15.  So many files for 2016, from January '16 to

December '16, and then finally so many files for the period of

January '17 through January '18.  In other words, 25 files for

each period, 100 files for each period, 50 files for each period

and see where that gets us.  I'm trying to understand what type

of sampling might be reasonable in this case which would give

you some information, Plaintiffs, which would allow you to look

at that information, and then at that point you would have a

more educated basis to come in and say okay, we've looked at

this and this tells us A, B, C and D, now we would request the

following.

And so I'm trying to understand -- I don't know any

other way to do this other than sampling.  I have -- it's

obvious that there's too many files for them to be produced en

masse, in total for this four year period or approximate four

1    year period.  The underlying documents don't answer everything.

2    So the question is a sample at least to get everybody started in

3    this case.

4           So I'm trying to understand as far as the sampling, Ms.

5    Rose-Smith, if I ordered a sampling of 50 files from each of

6    those respective periods, would that work?  What are you

7    suggesting?

8           MS. ROSE-SMITH:  I'm sorry, I thought you were looking

9    at me, Your Honor.  I apologize.

10          THE COURT:  Let me ask the Defendants first, then I'll

11   go to the Plaintiffs.

12          MS. ROSE-SMITH:  I was just going to say yes, that

13   would be fine.  And in fact, Ocwen would prefer that we do it by

14   year, because it's no secret that one of Ocwen's position in

15   this case has been that its compliance got better as the years

16   went forward.  So we wouldn't necessarily want 2014 to be

17   representative of what happened in 2018, and so we actually

18   would prefer that it be ordered by year.  Even if that results

19   in a larger number, it would be better.

20          THE COURT:  And that would be a sample of loans where

21   the borrowers' insurance was cancelled.  So in other words,

22   whatever -- if that's what I decide to do, whatever number I

23   ordered, then would you start off with a set of borrowers -- a

24   sample of loans or would you start out with a set of loans where

25   the borrowers' insurance was cancelled.  And from that set of

1    loans where the borrowers' insurance was cancelled, you would

2    pull out in some random fashion, which I would order, the number

3    of files that I order and then provide that information to the

4    Defendants.

5         MS. ROSE-SMITH:  Yes.  So we could -- so two caveats.

6    I know I'm making it even more difficult, but we can do better

7    than just to say of all borrowers whose insurance was

8    erroneously cancelled.  We can actually go through and try to

9    make sure that we are identifying specific events or occurrences

10   within the files that would be something other than the

11   borrowers -- the borrower paid off their loan, for example, or

12   something like that.  So we could do that if the Bureau is

13   willing to work with us on that.

14        THE COURT:  What would the set be then?  Would it be --

15        MS. ROSE-SMITH:  So that's the thing is that that's not

16   yet defined because we would have to go through -- in order to

17   get to that, what we do is we start with that broader population

18   of borrowers whose insurance was cancelled, and then we would

19   say okay, let's look at 10 over here and 10 over here and 10

20   over here and see what do those 10 tell me about the kinds of

21   issues that are happening or that we're seeing on the files.

22   Okay.  Three of those things are things that it looks like this

23   is something that was Ocwen's fault.  Let's try and pull a bunch

24   of the loans that were Ocwen's fault.  But again -- so that's a

25   way of being more specific in the sampling if it would be

1      helpful.

2             The alternative, of course, is to do the broader review

3      which is to say okay, of all borrowers whose insurance was

4      erroneously cancelled, then let's pull 100 per year or 50 per

5      year of all those borrowers and then see what's in them, right?

6      And that might be the better -- that might be a better fodder

7      for discovery for the Bureau if what we're trying to do is take

8      a sort of inside out approach, because then they can look at all

9      the ways that this manifests and decide what it is that they

10     would like to know more about and that might be a better way of

11     doing it.  Ocwen can do it either way.  It's really just up to

12     the Bureau and their preference.

13             THE COURT:  All right.  So let me hear from

14     Mr. Singelmann on this.

15             MR. SINGELMANN:  Thank you, Your Honor.  So I think we

16     have concerns about the methodology.  It's not just about -- you

17     know, and I think to Ms. Rose-Smith's credit she's not simply

18     suggesting that we do a random sample for the reasons she

19     articulated as well.  The question, you know, and she -- Ms.

20     Rose-Smith also identified oh yeah, well we can perhaps identify

21     issues.  I think that's the real question.  If we were to

22     sample, and the Bureau continues to have concerns about

23     potential prejudice to its ability to, you know, prove up

24     damages when we're extrapolating based on sampling.

25             But setting that aside, the real question is how do we

1    get the methodology so that it's reliable and that we can take a

2    sample and extrapolate to the general -- a broader population.

3    And so when we're talking about issues, these things aren't

4    predetermined necessarily, and that's why we suggested doing

5    these reviews looking at the audits, what are the particular

6    characteristics of borrowers within those audits that made them

7    more susceptible to cancellations.  Even if, you know, Ms.

8    Rose-Smith is correct in that, you know, perhaps the audits and

9    the look-backs, they over-identified potentially impacted

10    borrowers and not just those who were harmed, you know, do they

11    disproportionately come from a single geographic area.  Were

12    they subject to particular system errors that flared up during a

13    certain time period.  And it's really difficult to be able to

14    figure out how do we develop a properly stratified sample

15    without having that type of information.  And we have the

16    ability, to a certain degree, to get a good head start on that

17    information based on information from existing sources. So maybe

18    --

19         THE COURT:  But if you already have copies of those

20    existing sources, why haven't you figured that out?

21         MR. SINGELMANN:  We don't.  We don't, Your Honor.  We

22    just -- we don't -- we had the audit.  We don't have the

23    follow-up to the 2015, 2016.  We don't know who those borrowers

24    are.  We don't know if they come from a particular geographic

25    area, we don't know the errors that they had come in a

1    particular month due to a particular system error.  That's

2    information that we just don't have, Your Honor.  So --

3              THE COURT:  Where would that information be?

4              MR. SINGELMANN:  Defendants have that information.

5              THE COURT:  But where?  Where would they have it?

6              MR. SINGELMANN:  You know --

7              THE COURT:  But you've been investigating this case for

8    a long time.

9              MR. SINGELMANN:  Right.

10             THE COURT:  So it's not like you just came in this case

11   and you don't know anything.

12             MR. SINGELMANN:  You know, it's -- their corporate

13   deponent testified that they conducted a look-back and that they

14   provided remediation.  He identified five to 10,000 borrowers, I

15   don't understand how they don't keep records to validate what

16   they did.  Or there's information in e-mails that says hey, this

17   is what we're doing; hey, if we're going to provide, this is

18   instruction to the people who are actually doing the

19   remediation.  This stuff doesn't happen in a vacuum.  It's not

20   like somebody from Ocwen magically just, you know, identifies

21   people and remediates them.  There has to be some kind of

22   electronic paper trial.  And so we're at a loss.  They haven't

23   produced it.  They said they don't know where it is or they

24   don't have it, or maybe it's not in the specific forms like

25   management assertion forms.  But, you know, I mean --

```
 1              THE COURT:  You mentioned the Number 5000 or 10,000?
 2    What was that?
 3              MR. SINGELMANN:  Their corporate witness testified to
 4    following the 2015 audit identifying five to 10,000 borrowers,
 5    and that Defendants conducted a look-back to identify those and
 6    that's the number he remembers.  So there was -- you know, there
 7    was a process, he's not making this up.  He didn't, you know --
 8    I don't suspect he would make it up under oath.
 9              THE COURT:  You don't have any look-back documents?
10              MR. SINGELMANN:  No, Your Honor.
11              THE COURT:  What about that, Counsel?
12              MS. ROSE-SMITH:  Your Honor, this is what we've already
13    provided in our interrogatory response.  So that particular
14    population relates to an audit that -- that Ocwen conducted that
15    had to do with its insurance vendor.  There were -- and so we,
16    in our interrogatory response, identified the population of
17    potentially impacted loans, the number that the vendor ended up
18    reviewing in order to determine whether or not there was a
19    particular problem, and the population that they determined were
20    -- were erroneously cancelled as we defined in it our
21    interrogatory response.  So in Number 9, we gave them that
22    answer.
23              In 10, we identified, to the extent that we could, the
24    number of accounts where Ocwen obtained hazard insurance on
25    behalf of the borrower, or that the borrower obtained coverage
```

1    at a higher premium.

2         Then in 11, we identified specifically where we

3    provided credits to those borrowers.  So that population that

4    has to do with that look-back, that's the -- we did give that

5    information, and I believe there's some follow-up that the

6    Bureau's asked and we have said that we will try to provide

7    additional information about that look-back, right?  The problem

8    is that that look-back only covers a tiny period, and we don't

9    have information like that for all of the other periods.

10        THE COURT:  That tiny period is September '14 through

11   January '15?

12        MS. ROSE-SMITH:  Yes.  Because they had identified a

13   specific issue with their vendor, and so they did an audit to

14   determine how many borrowers were impacted by that issue.

15        THE COURT:  You have look-backs for other periods of

16   time?

17        MS. ROSE-SMITH:  Not that are specific to erroneously

18   cancelled insurance.  There are lots of different reviews for

19   various aspects of the escrow process, and in fact, some of the

20   other documents that they've cited, Your Honor, have to do with

21   did -- was Ocwen setting up new escrow accounts properly for

22   borrowers who -- for new loans that borrowers had just gotten,

23   right, were they setting it up proper in the first place.  They

24   cited that as one of the places that we can look, but that

25   doesn't answer the question about whether insurance was

1    erroneously cancelled.  So that's why we did go back and try to

2    figure out if there were other look-backs, and the reason we

3    only gave them information from one is because there's only one

4    that answer that specific question.

5         THE COURT:  For the relevant time period of '14 through

6    '18, do you have any files that would indicate potentially

7    erroneously cancelled accounts?

8         MS. ROSE-SMITH:  No, Your Honor.  So there are -- there

9    are -- so there are always files that might indicate that there

10   was an erroneously cancelled account, right?  Borrower

11   complaints, for example, may indicate that some borrower thinks

12   that that's the case for their loan.  The issue is that there

13   isn't any place where we have a compilation of having looked at

14   all of those various issues and decided yes, we did or no, we

15   didn't erroneously cancel it in order to be able to provide it

16   in the interrogatory.  And the sources themselves don't identify

17   it, right?

18        So the Bureau -- it's not as if we have information

19   that is supporting all of these audits that we're not giving the

20   Bureau because we don't want them to have it.  They have what we

21   have and they've -- they have presumably looked, just as we've

22   looked, and it doesn't answer the question.  There just isn't a

23   way around that.

24        THE COURT:  So now, in this dispute now, we're talking

25   about interrogatories, so we're not talking about a request for

1    production, but we're talking about a sample size.  So is it

2    your understanding that you would do this sample and provide the

3    information contained in the sample to the Defendants, or you

4    would do the sample and provide better responses to 9, 10 and

5    11?

6            MS. ROSE-SMITH:  Yes.  Our position was the latter,

7    Your Honor, that we would do the sample and then based on the

8    sample, we would provide more complete responses to the

9    interrogatory with that sample.  But if the Bureau will accept

10   that we just produce the information for the loans that we chose

11   instead and do the work themselves, then Ocwen's not going to

12   say no to that.

13           THE COURT:  And do you have any idea how burdensome it

14   is to go through a universe of loans where borrowers' insurance

15   was cancelled and pick out 100 or 200 each period to review and

16   provide?

17           MS. ROSE-SMITH:  So that we can do, because we can

18   identify the universe of borrowers whose insurance was

19   cancelled.  Then it's just a matter of pulling any -- any of the

20   loans.  And while I haven't specifically said okay, if we were

21   to pull 100 from each year how long would it take and how much

22   would it cost and all of that, my sense is if you're just

23   pulling the information and having to get it, then it would just

24   be a matter of producing the servicing files and servicing

25   records, which isn't nothing, as I said at the beginning of all

1    of this, but it's doable in lieu of looking at, you know,

2    potentially 80, 90,000 loans.

3         THE COURT:  All right.  So let me hear from Plaintiff's

4    counsel on this because I need to get -- I need to get on to the

5    last issue, and then I have a search warrant I have to address

6    shortly.

7         MR. SINGELMANN:  Okay.  Your Honor, so in terms of

8    sampling, I think we were talking only about interrogatories 9

9    through 11 for the most part.  So I want to address that and if

10   you want to discuss 13, I do think there are data queries.

11        But for interrogatories 9 through 11, if the Court is

12   inclined to require sampling, it's really important, we think,

13   to not just pull 50 loans per quarter or per time period, but to

14   really stratify on the issues.  And we would focus on the

15   consumer complaints, because borrowers have an incentive to, you

16   know, complain and identify when they think their insurance has

17   been erroneously cancelled.  That would be perhaps a first step.

18        And a second step would be the waterfall approach that

19   they have identified but applied to, you know, the consumer

20   complaints in terms of drawing on a sample.  That may get us,

21   you know, closer to a stratified sample that has --

22        THE COURT:  Do you have an ESI vendor or an IT vendor

23   that you're using?

24        MS. HEALEY:  Yes.  Yes.

25        THE COURT:  All right.  So here's what I'm going to do

1    on 9 through 11.  I'm going to require a sample and I am going

2    to require a sampling.  That doesn't mean that's your only

3    relief, it's without prejudice for you to come back later and

4    ask for additional relief.  But I am going to require a

5    sampling.

6         What I'm going to do is I'm going to have your ESI

7    vendor, your IT vendor talk with the Defendants and figure out a

8    way if you all can agree on a sample size and a -- a sample

9    universe to start with.  Whether the sample universe would be

10   consumer complaints, whether the sample universe would be all

11   loans where insurance was cancelled, whether the universe would

12   be something else.  If you can't agree on it very quickly, then

13   I'm just going to order some sample universe and some sample

14   size.

15        I think it would make more sense for the parties, and I

16   always suggest this in these sampling cases, I do think this is

17   a case where we have to do, at the outset, sampling.  I'm not

18   saying that that's all it's going to be, but at the outset we

19   have to do sampling.  You know -- both sides know the case

20   better than I do.  I could sit here and I could say I'm going to

21   order 200 samples from the period January '14 to August '14 and

22   200 from February '15 to December '15 and 300 from January '16

23   to December '16, and 300 from January '17 to January '18 and it

24   would be a universe of all files where borrowers' insurance were

25   cancelled, and it would have to be some sort of random selection

1    process that would be done.  That may or may not get you where

2    you want to go.  You might have a better suggestion, and I'm

3    telling the Defendants that I am going to order this stuff

4    produced.  It's going to get to them.

5         Both sides have to figure out how to get this

6    information, since both sides sort of agree that giving every

7    file over to the Plaintiffs isn't a workable solution, we have

8    to figure something else out.  I'm hearing different things.

9    I'm hearing the parties seem to agree that this isn't a case

10   where every single file can be produced, and then the Plaintiffs

11   can go through them and figure everything out themselves.  So

12   I'm hearing from the Plaintiffs well, the underlying data, they

13   really haven't looked at it enough and given us the answer and

14   there's more stuff there.  So I want you to address that because

15   if there is more stuff there that you can provide to the

16   Plaintiffs that will answer the questions, I want you to do

17   that.  But I also think this is a perfect case for sampling.

18        The amount of loans that must be at issue are

19   astronomical, I am sure, over this four year period.  At least

20   when you start out with all loans that Ocwen serviced and then

21   you get to all loans where insurance was cancelled and then

22   under that you get to loans where are insurance was cancelled

23   due to some error or erroneous determination by Ocwen, we're

24   probably starting out with a very large number, and I don't know

25   where we get to for that bottom number.  But there has to be

 1   some way to sample that so that the Plaintiffs get their

 2   information, and then they can sit back and say okay, this is

 3   what we've gotten, you do a better response to 9 through 11

 4   based on that sampling, provide the raw data to the Plaintiffs,

 5   and then we can come back and figure out where we are at that

 6   point.

 7            So that's the only way I can see handling this.  And I

 8   had this come up with a recent case, a non-Ocwen case, where

 9   discovery was sought over thousands and thousands and thousands

10   of patient files and again, the same type of thing.  It was

11   impossible for a hospital to go through every single patient

12   file and provide the information, but we're working on a

13   sampling situation.

14      And I will tell you that sampling works a lot better when

15   both sides cooperate.  And, you know, and I say this in every

16   case:  Stuff is not going to get hidden, it's not going to not

17   get produced, things aren't going to get discovered.  It's a

18   question of how we do it in a way that is reasonable,

19   economical, expeditious and doesn't cause an inordinate expense

20   to one side to get information to the other side.  But the

21   information has to be produced to allow the Plaintiffs to try

22   and prove their case.  Allow the Plaintiff to try and prove its

23   case.  Just like you're going to be entitled to information to

24   prove any affirmative defenses or anything else that you might

25   have from the Plaintiffs.  So it's got to be a two-way street.

1

2          So I'm going to give you -- this is what?  Today's the

3    11.  I'm going to give you until January 18th, a week from today

4    -- June 18th, a week from today, to confer and try and figure

5    out a proposed sampling process that the Plaintiff's ESI or IT

6    vendor agrees with and the Defendants agree with.  And then

7    propose that to the Court and if I approve it, then that's what

8    we'll do very quickly.  If you can't agree on that, then I'm

9    telling you now I'm just going to decide what the sample is,

10   what the sample size is, what the universe is and you all may

11   like it or you may not, but I have no choice if the parties

12   can't work together to get this information.  So that's for 9

13   through 11.

14          Now I think it's a different situation in 13.  In 13,

15   we're talking about the processing escrow shortage payments.

16   And in Interrogatory 12, Ocwen identified a number of borrowers

17   for whom it failed to timely or accurately process an escrow

18   shortage payment, from what I understand.  And it was a large

19   number of borrowers.  What 13 requests is that for each of those

20   borrowers, Ocwen described any remediation it provided and the

21   date it provided such remediation.  Again, Ocwen's position

22   seems to be that -- I think there was a compromise that was

23   proposed.  Number 1, that there be -- that there's a loan level

24   record or that the papers are reviewed to determine if there is

25   a loan level record of remediation efforts made in connection

1   with the two audits identified by the Bureau and two, those

2   results could be cross-referenced against the population of

3   loans identified in Interrogatory 12 as a preliminary effort to

4   provide a portion of the remediation data that Ocwen is

5   requesting.

6         So I'm trying to understand on 13, what is the best way

7   to get the information to the Plaintiffs regarding that number

8   of borrowers who had -- who had that issue.  How do we get that

9   information.

10        So let me ask -- I'll ask, since you're at the podium,

11  let me ask Defendants counsel first.

12        MS. ROSE-SMITH:  So the issue, Your Honor, is the

13  nature of the remediation.  So in Interrogatory Number 13, we've

14  said the way -- if Ocwen doesn't -- doesn't credit an account

15  for an escrow shortage payment, the way that this gets fixed is

16  that when the borrower's escrow analysis is done, then what

17  happens is if they've made extra payments, those extra payments

18  get reflected, and so their escrow account is larger than it

19  should be and so the amount either gets refunded, or if they've

20  made extra payments, but not withstanding their taxes went up

21  and so their escrow is short for some reason, then they will get

22  -- they'll have time to pay that additional amount back and so

23  there may not be any refund.

24        The issue is that because all of these escrow -- escrow

25  analyses are done on different cycles.  Figuring out what the

1   Bureau wants, so they know that the remediation is right, and

2   they may think that's sufficient or insufficient but they know

3   what we did.  The question is for each one of the individuals in

4   this population, what date did you do it on and what amount

5   resulted in the end.  Did you give them a credit back or did you

6   not have to give them a credit back.

7          And so what I've said to the Bureau is, I originally

8   said listen, we've told you what it is that we did, why don't

9   you just start -- I'm not saying this is the only answer, but

10  just start by pulling 100 of those files and see if we actually

11  did what we said we did.  If we did, then maybe you'll be

12  content that we did what we said we did.  If we didn't, then you

13  have a reason to go back and look at a whole bunch more loans

14  and we'll have to figure out something there.

15         But then, the Bureau came back and said well, we know

16  that there are -- there are two audits that had -- that address

17  this issue, not precisely in some cases, but address this issue,

18  will you just look at whether or not you can find underlying

19  information on those and then run those up against the defined

20  population of borrowers and tell us what you did on that date.

21  And we said that it isn't clear to us, we've already looked, but

22  it isn't clear to us that we have loan level data for each date

23  and each amount for each of those borrowers as opposed to here's

24  a list of borrowers for whom we fixed it by doing this thing.

25  But if we did, we would do that.  But because we couldn't

1    definitively say that that will give them the date and the

2    amount for each one of the borrowers that were identified in

3    those audits, that wasn't sufficient.

4         And so my proposal, I guess Your Honor, is I'm still

5    willing to do that.  I'm not sure that it's going to get the

6    Bureau the answer that they want, and so it would seem to me, to

7    be fair to both, we can do that first thing, right, so they can

8    have that information.  We've already said we would do it, but

9    then we should also -- whether or not, really, it gives them the

10   information that they want, we should also just pull some and

11   see if we did the thing that we said we did or not, and if we

12   didn't, then I think that's -- that is a broader discussion

13   about what it means that we didn't do it.  But at least that's

14   someplace for us to start and those 100 would give us -- if we

15   didn't, for example, it might give us some information about

16   what circumstances existed that were such that we didn't do it

17   or something like that, and then the question can be more

18   precisely defined and we can come up with an answer.

19        THE COURT:  So your proposal is to do a better answer

20   to 13 based on other information, and then do some sort of

21   sampling to follow-up and check the files?

22        MS. ROSE-SMITH:  Yes.

23        THE COURT:  All right.  Let me hear from the Plaintiffs

24   on that issue.

25        MR. SINGELMANN:  All right.  Thank you, Your Honor.

1    Two issues.  The first, just wanted to clarify, this

2    just isn't a matter of checking the box and confirming that the

3    Defendants did in fact provide remediation.

4    THE COURT:  Can you pull the microphone a little closer

5    to you?

6    MR. SINGELMANN:  Sure.  Sorry about that.

7    So let me just repeat.  Two main issues.  The first is

8    that this is not just an interrogatory that is seeking to check

9    the box and confirm that Defendants, in fact, provided

10    remediation, but it's to also get objective data that allows the

11    Bureau to assess if and how the borrower was damaged.  It's not

12    just that they got a refund, but did they get a refund nine

13    months later and was there other harm that was associated with

14    the borrowers not having that money or perhaps not being able to

15    make payments or perhaps just not having -- you know, there's an

16    opportunity cost to paying an extra hundred dollars on your

17    mortgage.  So that's the first issue.  So again, it's just not a

18    matter of remediation.

19    The second thing is what we're requesting, this is --

20    it is different than Interrogatory 9 to your point.  This is

21    objective data.  I think we're looking at some very discrete

22    facts here.  We already know, because based on Defendants'

23    answer to Interrogatory 12, the number of borrowers for whom

24    they did not timely process an escrow shortage payment.  So we

25    don't have that in 9.  We have that for 13 already, so that's

1    done.  We just need a review to determine did they continue to

2    collect the escrow shortage payment.  They should be able to --

3    you know, that's objective data.  Yes or no.  If so, how much.

4    Again, objective data, how much did they collect.

5              THE COURT:  That's for a large number of borrowers.

6              MR. SINGELMANN:  It is, and then for how long.

7              THE COURT:  How do we get to the point where you get

8    the information you need about, you know, how long it was until

9    people got remediated without having to have them go through

10   that large number of files?

11             MR. SINGELMANN:  Right.  So during our investigation,

12   we -- you know, we did review a lot of Defendants' data, their

13   systems, and their payment histories that they keep for

14   borrowers.  So we do believe that most, if not all, of the

15   information can be answered through data queries.  So we would

16   suggest that -- you know, we would agree with Defendants' step

17   one providing a more complete answer based on the 2015 and 2016

18   audits.

19             THE COURT:  Right.  I am going to order that, I think

20   both sides agree on that.  I'm going to order the Defendants to

21   provide a more complete answer to Interrogatory 13 based on the

22   2015 and 2016 audits.

23             MR. SINGELMANN:  Right.  We would suggest that step

24   two, instead of just being sampling, it should -- that the

25   parties should work together to develop data queries, and we

1    have very specific thoughts on those data queries that would

2    pull all, or most of, the responsive information that we're

3    requesting for Interrogatory 13.  And then to the extent that

4    there is anything that remains unanswered that, you know, we're

5    willing to continue to work with Defendants on this.

6           THE COURT:  All right.  So what about data queries,

7    Counsel?  I mean, would you be willing to work with the

8    Plaintiffs and try to develop data queries that they believe

9    will pull this information they need?

10          MS. ROSE-SMITH:  Yes, Your Honor.  The one thing that I

11   would say is that we've asked this question, and the team at

12   Ocwen doesn't think that the data queries will get it.  And so

13   while I'm happy to provide them the information that we pull in

14   the data queries based on what it is that the Bureau would like

15   us to pull, I would prefer that we just give them that

16   information.  The concern I have is that they want me to answer

17   an interrogatory saying "here are all the times I messed up and

18   here's how we fixed it", and they want that as an affirmative

19   admission from Ocwen when whatever these data queries are.  We

20   are not hopeful that they will actually get to that specific

21   answer.  So if -- we're happy to do it, and maybe that's just a

22   start.  But if we do that, I'd like to just provide them that

23   data, and our concerns about it, if there are any, rather than

24   answering the interrogatory with an affirmative admission based

25   on that data.

1        THE COURT:  All right.  So the way I'm going to handle

2   13 I think is step one, as I said, I'm going to require the

3   Defendants to provide a better response to 13 based on the 2015

4   and the 2016 audits.  Number 2, I'm going to order the parties

5   to work together to try and develop appropriate data queries

6   that would pull most or all of the information sought and then

7   three, I'll require the data to be produced to the Plaintiffs.

8        Beyond that, I will reserve on whether I will order any

9   random sampling after that to pull certain files to see if we're

10  getting what we need to get or if the information is complete,

11  and I'll also reserve on any requests by an inspection by the

12  Plaintiffs because I think that's a little premature at this

13  point until we complete this process.  All right?

14        The last issue that we had today was this

15  confidentiality designation issue.  And the way I understand it

16  -- and let me just talk to both Counsel -- is that the parties

17  agree that the documents underlying the responses to

18  interrogatories 1 through 15 are confidential, correct?

19        MS. ROSE-SMITH:  Yes.

20        THE COURT:  Correct, Counsel?

21        MS. HEALEY:  Yes, the account level data.

22        THE COURT:  The account level data.  However, the

23  Plaintiff's position is that these answers to interrogatories

24  really aren't confidential because sometimes they're saying

25  they're objecting or they're just not providing information

1  that's covered under the confidentiality agreement.  And so your

2  position is that the responses should not be treated

3  confidentially, that the Defendants haven't met their burden of

4  proving that those responses to Interrogatories 1 through 15 are

5  confidential.  Correct?

6      MS. HEALEY:  Yes, Your Honor, as to those narrative

7  answers.

8      THE COURT:  Okay.  So let me just ask you, because I

9  know we're running out of time here and I have some criminal

10 duty matters I have to go deal with, but can you -- I've read

11 through the responses, through some of the responses to the

12 interrogatories.  Is there one or two that you can point to in

13 the record, and I know that they're sealed, but if you could

14 just tell me the page number they're on and explain to me where

15 in your answer to the interrogatory anything that is

16 confidential or proprietary or competitive, any of the

17 categories that are in the order, the protective order, it would

18 violate.

19     MS. ROSE-SMITH:  Yes.  So since I have it in front of

20 me, I can tell you that our supplemental response to

21 Interrogatory Number 12 is one.

22     THE COURT:  All right.  Hold on just a second.  Where

23 is that found?  Do you have the Docket Entry?

24     MS. ROSE-SMITH:  So this was attached, I think, to the

25 Bureau's motion but -- do you happen to have the docket number?

```
 1              MR. WEIN:  So the Bureau's motion was at, I believe,
 2     106.
 3              MS. HEALEY:  It's Exhibit 8.
 4              MS. ROSE-SMITH:  Exhibit 8.
 5              MS. HEALEY:  Page 5 and 6.
 6              THE COURT:  Hold on just a second.  106 or 108?  Wait.
 7     That's not it.  Hold on.
 8              THE COURT:  All right.  I see this is the -- okay.
 9     Docket Entry 106 is the Plaintiff's motion to challenge.  Is it
10     attached to that?
11              MS. ROSE-SMITH:  Exhibit 6 or 8?
12              MS. HEALEY:  Exhibit 8, I believe, Your Honor.
13              MS. ROSE-SMITH:  Eight.
14              THE COURT:  I don't think I have that.  I don't think I
15     have that here.
16              So I'll tell you what.  Because I'm going to have to go
17     look at this a little bit more, so just tell me if it's Docket
18     Entry 106, it's Exhibit 8?
19              MR. WEIN:  Page 6.
20              THE COURT:  Okay.  Exhibit 8, Page 6?
21              MS. ROSE-SMITH:  Yes.  And there is a description of an
22     internal -- what Ocwen calls a service level accuracy standard
23     and how we use that.  So the question is about timeliness and
24     about the -- and there's not a definition for timely under the
25     regs, so in order to answer the question, we used Ocwen's
```

1   internal -- it's an internal standard.  It gives the number of

2   days, it gives what we've done, it gives changes that we made

3   between the 2014 start date to July 2015, one standard applied,

4   and then we changed it and the days and why we do that, right?

5   So there's actually --

6            THE COURT:  What interrogatory is that responding to?

7            MS. ROSE-SMITH:  This is Interrogatory Number 12.

8            THE COURT:  So DE 106, Exhibit 8, Page 6 responding to

9   Interrogatory 12.

10           MS. ROSE-SMITH:  Yes.  And there are other instances

11   where we are doing the same thing.  Right?  Describing how it

12   works at Ocwen and what it is that we do.

13           And I would just say, Your Honor, that this is one of

14   those instances where this is all just discovery information and

15   in fact, as you've just ordered us to supplement these same

16   interrogatories, they're not even final discovery information.

17   So -- and it remains Ocwen's position that this is sort of a

18   premature battle to fight, and that the information ought to

19   just remain sealed until if the Bureau has a use for it, you

20   know, or if they move for summary judgment or other public

21   proceeding where there is a public interest, that's fine.  But

22   in the interim, leaving this information confidential doesn't

23   seem to be prejudicial to the Bureau in any way, and also will

24   avoid you having to make this same determination.  Because if we

25   change the answer, especially if we're now going to be adding

1    information from our audit reports and other data, then

2    notwithstanding what you say about these particular answers as

3    they exist today, we might end up having to assert

4    confidentiality over them once they're supplemented.

5            And so I would just say that this might be something

6    that the Court takes up -- reserves at this time and takes up at

7    a later date when the information becomes necessary to use in

8    public.

9            THE COURT:  All right.  Because there is a difference

10   in the law, especially in Eleventh Circuit law between documents

11   collected during discovery, which normally are not considered

12   judicial records, and then documents that are attached to

13   substantive motions and things of that nature or entered into

14   evidence.  And so, you know, I have to balance that and look at

15   that.

16           So what's the Plaintiff's position on this?  Is it your

17   position that all of these interrogatory responses should be

18   unsealed and not be confidential, or what?

19           MS. HEALEY:  Yes, Your Honor.  So with respect to our

20   position -- and I understand where the Eleventh Circuit is in

21   terms of discovery materials, and I appreciate that.  I also

22   appreciate the only reason I sit here today in this chair is

23   because there is a public interest in this case, and so there is

24   a balancing test that needs to occur, particularly with this

25   many people and this many borrowers potentially at issue.

1          But fundamentally, the question also is whether this is

2     protected in fact under the protective order as confidential

3     information.  And if you would flip to the next page,

4     Interrogatory 13, for which the Bureau has had to file four

5     motions to seal relating to, for example, this motion to compel

6     and this interrogatory, that's burdensome, that needlessly

7     restricts public access where we don't believe the underlying

8     information is in fact confidential.  So I would say this is a

9     very ripe issue, particularly if we're going to continue

10    discussing this information back and forth when at the end of

11    the day, I think to Your Honor's point, where is the trade

12    secret?  Show me where the trade secret is.  To the extent that

13    there is a trade secret, then we're willing to work with them in

14    terms of a redaction.  But we don't want to continue just

15    fruitlessly putting documents under seal just because they're

16    stamped confidential.  We believe that the information should be

17    carefully redacted, including not only for the benefit of the

18    Bureau who has to deal with sealing this information, but also

19    the Court to the extent it affects sealing the courtroom, and

20    more generally the public should have a right to access

21    information that is in fact not confidential.  It should have a

22    right to see what's going on in the public filings of this case

23    which, you know, we may have, for example, one borrower and five

24    people from the Florida AG behind us, but people do review the

25    docket all across the United States in terms of what's happening

1    in this matter.

2          And so a part of this is just us wanting to be very

3    careful about making sure we're protecting the public's access

4    to this information, and making sure that information that is

5    being stamped confidential, including boilerplate objections or

6    really fundamentally, for example, with respect to Interrogatory

7    12, the one that -- that Counsel just pointed you to, some of

8    that arguably may be proprietary business information with

9    respect to the SLA.  But other information within may not be.

10   Like Service Level Agreement.  So you know --

11          MS. ROSE-SMITH:  Accuracy.

12          MS. HEALEY:  -- that procedure.

13          But there's also information in here, and as you saw,

14   the whole entire conversation for the prior hearing was not

15   about the SLA, it was about the 36,000 people which is in fact

16   the relevant information that I believe has been designated as

17   confidential that we've been discussing this whole entire time,

18   but the question is is the 36,000 people who were impacted a

19   trade secret?  Is it confidential?  Is it proprietary business

20   information?  Is it competitively sensitive information?  That's

21   the irony.  It's none of those, and nor is it competitively

22   sensitive.  It's not PII, in part because part of the issue is,

23   you know, I'm concerned, we're concerned, the Bureau's concerned

24   that the Defendants are using these categories, frankly, to

25   over-designate information.  And we just want to make certain

1    that the information that should qualify is being designated or

2    specifically redacted, because it's important that we carefully

3    calibrate, particularly in a case where there is such a strong

4    public interest.

5              THE COURT:  All right.  Ms. Rose-Smith?

6              MS. ROSE-SMITH:  Well, I would just say a couple of

7    things, Your Honor.  The first is, one of the categories of

8    protected information in the protective order is designed

9    precisely for something like interrogatories where you take the

10   underlying information that both sides agree is protected and

11   you summarize that information for the purpose of providing a

12   narrative.  Right?  So it doesn't seem to be in the spirit of

13   compliance with the protective order to say that all of the

14   underlying data is protected.  But when you try to make an

15   effort to summarize it in an interrogatory, that information is

16   free game.  So that's one issue, and that actually has to do

17   with the number that everybody else sort of avoided saying today

18   until just now, but that's the point.

19              And the reason for that is because that number isn't a

20   number of people that Ocwen thinks that they have harmed, it's

21   the number of people that, based on the way that we have defined

22   our answer, are the number of people that were impacted using

23   the definitions that we're using and that -- putting all of that

24   together doesn't mean that it's an admission that Ocwen has done

25   something terrible.  But when the Bureau gets to throw that

1    number around, they actually do cause a harm to Ocwen when they

2    say in every public filing that this many people have been

3    harmed or that many people have been harmed.

4           The second issue, and the other thing I would say about

5    this is is we're not talking about like the formula for Coke,

6    right?  We're talking about business processes in a large

7    mortgage servicer.  There are other mortgage servicers, and with

8    the SLA in particular, this is not something that's required by

9    statute.  So the way that the businesses choose to do it is

10   proprietary to the business, right?  They ultimately have to

11   defend it, their process to the Bureau, but it's ultimately

12   proprietary to them.  And so when we're describing business

13   processes, or in the case of Interrogatory Number 9 where our

14   answer describes an audit that we forced our insurance vendors

15   to go through and what they looked at, what they were looking at

16   it, what we thought the specific problem, all of that, those

17   pieces of information, yeah, they're not the recipe for Coke,

18   but they are internal processes that are competitive, sensitive

19   information for a servicer that's in a market competing with

20   other servicers who may have different processes and/or may use

21   the same or different insurance vendors.

22          So I would just say that notwithstanding that it's some

23   immediately jump out -- jumps-out-at-you trade secret, they are

24   proprietary processes and that's important to protect too,

25   especially when the answer that we're giving is preliminary and

1    especially when it's just given in discovery and it's not either

2    party's ultimate position at trial or even on a dispositive

3    motion.

4              THE COURT:  All right.  Yes.  Did you want to add

5    anything, Ms. Healey?

6              MS. HEALEY:  Yes, Your Honor.  I would just refer to

7    you Eleventh Circuit and recent District Court cases in Wilson,

8    Honeyfeld and MSP Recovery.  Here in these cases, you see the

9    consistent theme that judges in grappling with these questions

10   are looking at is this, in fact, trade secret information as

11   defined by the Eleventh Circuit in Chicago Tribune, for example,

12   or is what this really is is that if this were released to the

13   public, then the company would suffer financial harm or

14   reputational harm.  And simply concluding that, that the company

15   would suffer financial or reputational harm is insufficient.

16   And courts have found this, like I said in Wilson, Honeyfeld and

17   MSP.  In MSP, for example, the Court found that the Plaintiff's

18   affidavit only contained conclusory statements ad failed to

19   detail any or specify or quantify any purported value of the

20   information to itself or its competitors, and simply concluding

21   that information is insufficient.

22              Likewise, just to step back, using the example that

23   Ocwen's Counsel used with respect to the details of the review

24   that was done by their vendor, you know, being mindful that this

25   is still a public hearing and open right now, what I would say

1   is is this, in fact, secret information.  This is information

2   that has also been identified through, in part, state banks'

3   regulator orders, it's been out there, it's been out there for

4   two years now, without, for example, you know, the sort of harm

5   that Ocwen posits it would suffer, it would suffer in the

6   marketplace.  In fact, Ocwen's stock has risen over those last

7   few years.

8          And so I think there's a threshold question, and the

9   Bureau referred to some of this in our reply when you look at --

10  really look at the content of the answers and what they're

11  saying.  Is this in fact secret information?  Is this already

12  out in the marketplace?  And more fundamentally, is what they're

13  really saying is that this information could be harmful, but

14  they're really concluding it in a way that courts have

15  repeatedly found is insufficient to meet their burden to show

16  good cause that the information be sealed.

17         THE COURT:  All right.  I'm going to take it under

18  advisement.  I mean, I'm a strong believer in public access to

19  the courts and to what goes on in the courts.  On the other

20  hand, discovery is not normally part of -- the documents

21  obtained in discovery are not normally, under Eleventh Circuit

22  law, part of the judicial process or judicial documents.  As I

23  said, when they get filed with summary judgment motions or

24  exhibits at trial or in support of something, another motion,

25  then they are.  But I'm going to take a look at the responses to

1    the interrogatories a little bit more in detail, and then I'll

2    get an order out on this in the near future.

3           So I think we had said the deadlines were June 18th.

4    And as far as the -- what I ordered on Interrogatory 13, would

5    you all be able to get that conferral by June 18th as well?  And

6    provide me with a status of where you are?

7           MS. HEALEY:  Yes, Your Honor.

8           MR. SINGELMANN:  Our only suggestion would be, it might

9    -- we want to be mindful of the queries that we give and

10   whether, you know, they will be able to run them by the 18th.

11   We can certainly meet and confer and have initial conversations

12   by the 18th, absolutely.

13          THE COURT:  All right.  Why don't you do that by the

14   18th.  And then as far as interrogatory -- well, as far as that,

15   if you could file some sort of notice with me as how things are

16   going and what the status is, and whether we need a further

17   hearing on that, and then we'll figure out where we go from

18   there.  But I think that's probably the best way to go.

19          All right?  Anything else on either side before we

20   break?

21          MR. SINGELMANN:  Your Honor, real quick.  I know this

22   has been a public hearing, I think everyone has been very

23   careful about how documents have been described.  I would just

24   ask is it possible that we could have the transcript just sealed

25   until -- for some period of time for parties to review the draft

1    transcript, to make sure nothing got discussed in the record?  I

2    don't think anything did that was --

3          THE COURT:  You know, I'm not really inclined to seal

4    it at this point, Number 1.  And the other problem is when we're

5    doing a recording as we are here, it needs to be sealed in

6    advance of the conversation.

7          MR. SINGELMANN:  Okay.  I don't think anything

8    problematic occurred.  Thank you.

9          THE COURT:  All right.  Thank you.  You all have a good

10   afternoon.

11          (PROCEEDINGS CONCLUDED)

12                       *  *  *  *  *

13                  **C E R T I F I C A T E**

     I certify that the foregoing is a correct transcript from the
14   digital audio recording of proceedings in the above-entitled
     matter.
15

16   6/14/2018_____          /s/ Dawn M. Savino_
     Date                      DAWN M. SAVINO, RPR
17

18

19

20

21

22

23

24

25