UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80495-CIV-MARRA/MATTHEWMAN

CONSUMER FINANCIAL PROTECTION
BUREAU

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
and OCWEN LOAN SERVICING, LLC

Defendants.
_______________________________________/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

This Cause is before the Court upon Defendants' Motion to Dismiss the Complaint ("Motion") (ECF No. 31, Mot.). Plaintiff filed a response in opposition to the Motion to Dismiss (ECF No. 35, Opp.), and Defendants filed a reply in further support of the Motion (ECF No. 37, Reply). The parties also filed supplemental briefing on the Motion. The Court has considered the Motion and the arguments of counsel and is otherwise fully advised in the premises. For the following reasons, the Motion is granted in part and denied in part.

## I. BACKGROUND

This action was initiated by the Consumer Financial Protection Bureau ("CFPB"), a federal agency charged with enforcing federal consumer financial laws, against Defendants, Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), and Ocwen Loan Servicing, LLC ("OLS"), corporations engaged in the business of mortgage servicing, for alleged wrongdoing in connection with their businesses. (ECF No. 1, Compl. ¶ 1).

The CFPB brings this action pursuant to: 1) Sections 1031 and 1036 of the Consumer

Financial Protection Act ("CFPA"), 12 US.C. §§ 5531, 5536; 2) Sections 807(2)(a), 807(10), and 808 of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e(2)(a), 1692e(10), and 1692f; 3) Sections 6 and 19 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2617, and Regulation X, 12 C.F.R. part 1024; 4) Section 105(a) of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1604(a), and Regulation Z ("Reg. Z"), 12 C.F.R. part 1026; and 5) Section 3(b) of the Homeowners Protection Act of 1998 ("HPA"), 12 U.S.C. § 4902(b). (*Id.* at ¶ 2).

**1. Defendants' Corporate Structure**

According to the allegations in the Complaint, which this Court must accept as true for purposes of this Motion, Defendants are three corporations engaged in mortgage servicing such as processing borrower payments, administering loss mitigation processes, and conducting foreclosures. (*Id.* at ¶¶ 13, 15-17). OFC wholly owns the common stock of its primary subsidiary, OMS; OMS, in turn, wholly owns the stock of OLS, another OFC subsidiary. (*Id.* at ¶ 14).

OFC is the parent and publicly-traded company that allegedly controls, directs, operates, and participates in mortgage servicing activities ranging from daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Defendants' loans. (*Id.* at ¶¶ 14-15).

OMS also allegedly services loans and is licensed by several state regulators to service loans and collect mortgage debts. (*Id.* at ¶ 16). In a 2016 Consent Order with the State of Washington Department of Financial Institutions, OLS represented that OMS engages in the servicing or subservicing of OLS loans. (*Id.*).

OLS allegedly services loans and is also licensed by numerous state regulators to service

loans and collect mortgage debts. (*Id.* at ¶ 17). The Complaint alleges through OFC and OMS's direction, authority, and control, OLS has engaged in the marketing, processing, and transmitting of payments for credit monitoring products, financial advisor products, and other products that are added on to Ocwen borrowers' accounts. (*Id.* at ¶ 18).

**2. Defendants' Alleged Actions**

The Complaint includes fourteen counts alleging that: Defendants' use of inaccurate and incomplete information to service loans is an unfair act or practice under the CFPA and the FDCPA (Counts I and VIII); Defendants have engaged in deceptive acts and practices regarding loan terms and status and collection practices under the CFPA and the FDCPA (Counts II and IX); Defendants have engaged in unfair and deceptive foreclosure practices and communications under the CFPA (Counts III and IV); Defendants' billing and processing of payments for add-on products is unfair under the CFPA (Count V); Defendants' marketing of add-on products is deceptive under the CFPA (Count VI); Defendants' failure to credit payments timely and appropriately violates TILA and Regulation X (Count VII); Defendants' escrow practices violated RESPA (Count X); Defendants have failed to make appropriate corrections or reasonable investigations after receiving notices of error in violation of RESPA (Count XI); Defendants' servicing policies and procedures violate RESPA (Count XII); Defendants' foreclosure practices, including commencing first notices of filing of a foreclosure, obtaining foreclosure judgments, and conducting foreclosure sales, constitute a violation of RESPA (Count XIII); and Defendants' have failed to terminate private mortgage insurance automatically in violation of the HPA (Count XIV). (*Id*. at ¶¶ 221-318).

The Complaint alleges that Defendants boarded inaccurate and incomplete loan information into their REALServicing system and serviced borrowers' loans using this defective

information.[1] (*Id*. at ¶¶ 33-36). The CFPB alleges that a loan servicer is supposed to verify critical loan data when boarding data from the prior servicer's system, and if the information does not match what the loan servicer finds in the documents, the REALServicing errors should be corrected. (*Id*. at ¶¶ 38). The CFPB alleges that since 2014, Defendants have not completed the loan verification process within 60 days of boarding loans onto REALServicing, which is the policy Ocwen has put in place. (*Id.* at ¶¶ 38-40). Instead, it is alleged the loan data being utilized is frequently unverified for over a year, and in November 2014 took, on average, 261 days. (*Id*. at ¶¶ 38-40). Defendants' allegedly failed to verify whether prior servicers' fees for servicing-related expenses were valid and actually owed by borrowers. (*Id.* at ¶ 42). As a result, Defendants charged borrowers for servicing-related fees and corporate advances despite having no supporting documents or invoices, and even in light of borrowers disputing the charges. (*Id*. at ¶¶ 42-48).

According to the Complaint, the deficient servicing platform REALServicing exacerbated inaccurate loan information. (*Id*. at ¶ 49). Allegedly, Defendants and their outside consultants concluded that REALServicing was deficient. (*Id.* at ¶¶ 50-63). Nevertheless, Defendants failed to address the problems despite the deficiencies impacting the Defendants' ability to service the loans lawfully. (*Id*. at ¶¶ 49-63).

Defendants also allegedly relied excessively on manual data entry and reports to address REALServicing's failures, which the CFPB alleges introduced the risk of human error and the workaround systems lacked sufficient controls to prevent or detect mistakes. (*Id.* at ¶¶ 64-68).

The Complaint alleges that the use of inaccurate and incomplete data has harmed borrowers and does not benefit consumers or competition because it does not result in cost savings, enhanced

---

[1] Loan boarding is the process of entering new loans in a servicing company's software system.

customer service, or other benefits to consumers or competition. (*Id.* at ¶¶ 69-72).

The Complaint then alleges servicing failures that have harmed borrowers in several ways, such as: 1) mishandling borrowers' payments (*Id*. at ¶¶ 73-99); 2) botching escrow accounts (*Id*. at ¶¶ 100-28); 3) mishandling borrowers' hazard insurance (*Id*. at ¶¶ 129-43); 4) mishandling borrowers' private mortgage insurance (*Id.* at ¶¶ 144-46); 5) unlawfully marketing and processing payments for add-on products (*Id.* at ¶¶ 147-55); 6) failing to identify and communicate with successors in interest properly (*Id.* at ¶¶ 156-62); 7) failing to protect borrowers after making servicing errors (*Id.* at ¶¶ 163-76); and 8) engaging in unlawful foreclosure practices (*Id*. at ¶¶ 177-201).

The CFPB identified six major ways in which Defendants failed to comply with Regulation X, Regulation Z, the CFPA and the FDCPA. (*Id*. at ¶ 81). The Complaint alleges:

1. Defendants have sent borrowers statements containing inaccurate or outdated information because of inaccurate information in REALServicing. (*Id*. at ¶ 82).
2. Defendants have failed to credit properly full periodic payments that borrowers made on the date of receipt, which results in late fees, negative credit reporting, and inaccurate loan delinquencies. (*Id*. at ¶ 83).
3. Defendants have failed to credit payments from borrowers' suspense accounts timely when the suspense amount has accumulated sufficient funds to cover a full periodic payment; this failure has resulted in the improper imposition of late fees and determinations of delinquency. (*Id*. at ¶ 87).
4. Defendants have misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due. (*Id*. at ¶ 89). Defendants have identified instances where it was charging incorrect amounts to borrowers, which directly impacted the monthly account

statement sent to borrowers. (*Id.*).

5. Defendants have failed to process and apply payments correctly in accordance with certain bankruptcy requirements. (*Id*. at ¶ 90).
6. Defendants have communicated inaccurate information to borrowers about amounts due, amounts received, dates as to when Defendants received borrowers' payments, and borrower delinquency statuses. (*Id*. at ¶ 91).

The Complaint alleges that these errors in crediting borrower payments and use of inaccurate payment information have harmed borrowers in the following ways: charging improper late fees; reporting incorrect, negative payment information to credit reporting agencies; subjecting borrowers to collection calls based on inaccurate information; and wrongly threatening borrowers with foreclosure. (*Id*. at ¶ 92). The Complaint also alleges Defendants have failed to correct errors—even when those errors have been identified—which has resulted in stress, embarrassment, and disruptions for consumers due to mistaken collection calls, unwarranted foreclosure notices, and needlessly causing property sales to fall through. (*Id*. at ¶¶ 93-99).

The CFPB alleges Defendants have botched borrowers' escrow accounts by failing to perform basic tasks largely due to system failures, control lapses, and an over-reliance on manual processes. (*Id*. at ¶¶ 100-22). The Complaint alleges Defendants have failed to: conduct escrow analyses or conduct them accurately; send timely accurate escrow statements; and account for and apply borrower escrow shortage payments. (*Id*).

The Complaint alleges since 2014, Defendants have mishandled borrowers' hazard insurance by failing to make timely payments of premiums, and they have serviced loans based on inaccurate insurance data leading to wrongful insurance premium charges. (*Id*. at ¶¶ 129-43).

The CFPB alleges since 2014, Defendants have also mishandled borrowers' private

mortgage insurance by failing to cancel it timely pursuant to the HPA. (*Id*. at ¶ 144-46).

The Complaint alleges since 2011, Defendants have been directly and materially involved in marketing and processing payments from customers for 109 or more add-on financial advisory products or services in ways that are in violation of the CFPA. (*Id*. at ¶¶ 147-55). Allegedly, Defendants have sent misleading solicitations to borrowers to enroll in add-on products and have enrolled borrowers in add-on products without proof of their affirmative consent. (*Id.* at ¶¶ 149-55). This allegedly has resulted in financial harm to the borrowers. (*Id*.).

Defendants have allegedly improperly failed to identify and communicate with successors in interest between January 2014 to mid-2015 in violation of Regulation X; Defendants allegedly failed to implement proper policies and procedures reasonably designed to handle accounts for successors in interest to a deceased borrower, especially when successors were applying for loss mitigation assistance. (*Id*. at ¶¶ 156-62).

The Complaint alleges that Defendants have failed to protect borrowers by not reasonably investigating and making corrections after receiving borrower complaints, which has caused significant harm to borrowers. (*Id*. at ¶¶ 163-76).

The CFPB alleges Defendants have engaged in unlawful foreclosure practices such as failing to maintain foreclosure-related information which has resulted in Defendants wrongfully initiating foreclosure proceedings and wrongfully conducting foreclosure sales in violation of Regulation X and the CFPA. (*Id*. at ¶¶ 177-201).

The Complaint also alleges that since 2015, Defendants have failed to provide complete and accurate loan information to new servicers in violation of Regulation X, which has caused significant borrower harm. (*Id*. at ¶¶ 202-12).

The CFPB alleges that Defendants have failed to remediate sufficiently the harm borrowers

suffered; and there is no consistent policy in place for borrower remediation—not even for systemic failures Defendants have identified. (*Id*. at ¶¶ 213-20).

1. **Defendants' Motion to Dismiss**

Defendants first seek dismissal of the Complaint on the ground that the CFPB is unconstitutional. (Mot. at 5-11).

Defendants also seek dismissal of Counts I, II, VIII, and IX on the ground that the CFPB is suing for failure to comply with legal requirements that do not yet exist, but which the CFPB is attempting to create and then impose through enforcement. (*Id*. at 12-15). Defendants insist that there was a lack of notice that their conduct was "unfair" or "deceptive." (*Id*. at 12-15, 26-28).

Next, Defendants claim Counts I, III, IV, VII, VIII, and XIII should be dismissed, and Count X should partially be dismissed, on the basis of waiver or res judicata because the CFPB is suing on claims and legal rights that are precluded by a 2013 Consent Judgment between OFC, OLS, the CFPB, D.C., and 49 states. (*Id*. at 4-5, 17-23).

Additionally, Defendants claim all Counts should be dismissed because the Complaint is an impermissible "shotgun" pleading and it fails to distinguish among the Defendants. (*Id*. at 23-25).

Defendants also argue all counts should be dismissed for a failure to state claims under Rule 8, and that Counts II and IX, alleging deceptive practices, are subject to and fail to state a claim under Rule 9(b). (*Id*. at 16-17, 25-30, 32, 34-35).

Defendants argue Counts V and VI are barred by the statute of limitations and Counts VII, VIII, and IX are subject to partial dismissal based on the statute of limitations. (*Id*. at 29-30, 31-32).

Finally, Defendants insist Counts VIII and IX should be dismissed, and Counts X, XI, XII,

and XIII should be partially dismissed, because one or more Defendants are not covered by the applicable statute. (*Id*. at 31, 34).

## II. LEGAL STANDARD

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do;" additionally, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alteration omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. The Court must accept all plaintiff's factual allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

"A district court, before dismissing a complaint with prejudice because of a mere pleading defect, ordinarily must give a plaintiff one opportunity to amend the complaint and to cure the pleading defect." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1239 (11th Cir. 2000).

## III. DISCUSSION

**A. Constitutionality of the CFPB**

Defendants argue that the for-cause removal provision and independent funding aspects of the CFPB's structure, when taken together, render the agency unconstitutional. This Court disagrees for the well-stated reasons given by the Court of Appeals for the District of Columbia Circuit in *PHH Corp. v. Consumer Financial Protection Bureau*, 881 F.3d 75 (D.C. Cir. 2018). Sitting *en banc*, the court of appeals in *PHH* held "that federal law providing the Director of the CFPB with a five-year term in office, subject to removal by the President only for 'inefficiency, neglect of duty, or malfeasance in office,' is consistent with the President's constitutional authority." *Id.* at 84.

In reaching its holding, the *PHH* court reasoned that Congress's choice to include a for-cause removal provision did not impede the President's ability to fulfill his constitutional role. *Id.* The court explained that Congress validly decided that the CFPB needed a measure of independence and chose a constitutionally acceptable means to protect it. *Id.* at 93. The court pointed out that the character of the office in question is central to the analysis of whether Congress may enact a for-cause removal protection. *Id.* at 94. As to the character of the CFPB, the *PHH* court found that the CFPB's function as a consumer protection agency and independent financial regulator is remarkably similar to that of the FTC, whose for-cause removal protection was upheld by an unanimous Supreme Court in *Humphrey's Ex'r v. United States*, 295 U.S. 602, 630 (1935). 881 F.3d at 94-95. The *PHH* court also found that the CFPB's independent funding source had no constitutional effect on the President's power. *Id.* at 96. Moreover, the *PHH* court opined that the fact that the CFPB is headed by a single Director is not problematic because the Supreme Court's decision in *Morrison v. Olson*, 487 U.S. 654, 691–92 (1988), upheld the constitutionality of for-cause removal protection for an individual agency head who exercised substantial executive

authority. 881 F.3d at 96.

The Ninth Circuit also recently rejected the argument that "an agency with the CFPB's broad law-enforcement powers may not be headed by a single Director removable by the President only for cause," by holding that "[t]he Supreme Court's separation-of-powers decisions, in particular *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Morrison v. Olson*, 487 U.S. 654 (1988) . . . lead us to conclude that the CFPB's structure is constitutionally permissible." *Consumer Fin. Prot. Bureau v. Seila Law LLC*, 923 F.3d 680, 683 (9th Cir. 2019) (internal citations altered). The court reaffirmed that it considered "*Humphrey's Executor* and *Morrison* as controlling here," because "[t]hose cases indicate that the for-cause removal restriction protecting the CFPB's Director does not 'impede the President's ability to perform his constitutional duty' to ensure that the laws are faithfully executed." *Id.* at 684 (quoting *Morrison*, 487 U.S. at 691). The court concluded, "[t]he Supreme Court is of course free to revisit those precedents, but we are not." *Id.*

Based upon these reasons and the other reasons amplified in the *PHH en banc* opinion, this Court too finds that the CFPB is without constitutional defect.

**B. Res judicata and waiver**

Defendants argue that Counts I, III, IV, VII, VIII, and XIII should be dismissed and argue for partial dismissal of Count X on the basis of res judicata.[2] (Mot. at 21-22). Defendants insist that the Consent Judgment ("NMS") into which the CFPB, 49 states, the District of Columbia, and OFC and OLS entered, which was approved by the District of Columbia District Court on February 26, 2014, encompasses the period of time covered by the lawsuit and precludes numerous CFPB

[2] Defendants also assert that Counts II, IX, XI, and XII also overlap with the NMS' Servicing Standards and Metrics for some of the conduct alleged; if these partially overlapping Counts are not dismissed on the other grounds detailed in Defendants' motion, Defendants intend to move for partial summary judgment on the NMS res judicata grounds. (Mot. at 17 n.7).

claims. (*Id.*).

The CFPB responds that Defendants cannot use the Consent Judgment as a shield because it did not release Defendants from liability for any counts in the Complaint. (Opp. at 14-18). The CFPB points to the language of the release that limits it to conduct that occurred on or before December 18, 2013, and therefore does not cover future conduct. (*Id.* at 15). The CFPB also highlights the Consent Judgment's reservation of rights for the CFPB and the terms that nothing limits the CFPB's authority except to the extent the CFPB released claims in the Consent Judgment. (*Id.*). The CFPB also contends that res judicata does not apply to the claims in the Complaint. (*Id.* at 16-18). The CFPB underscores that res judicata does not apply to claims which arose after the original pleading was filed in the earlier litigation that were limited to claims the CFPB asserted or could have asserted relating to servicing conduct that occurred on or before December 18, 2013. (*Id.* at 18). The CFPB further contends the Complaint's allegations pertain to conduct that has taken place since January 2014, and some of the claims are based on regulations that were not even in effect until January 10, 2014. (*Id.*).

1. <u>Legal Standard:</u>

"The doctrine of res judicata, or claim preclusion, forecloses relitigation of matters actually or potentially litigated in an earlier lawsuit." *Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1244 (11th Cir. 1991). A "Consent Judgment constitutes a former adjudication that is entitled to res judicata effect." *Brosnick v. Wells Fargo Bank, N.A.*, 2018 WL 6807340, at *7 (S.D. Fla. Sept. 25, 2018). "Federal courts apply state law to questions of res judicata." *Manning v. City of Auburn*, 953 F.2d 1355, 1358 (11th Cir. 1992). "Under Florida law, res judicata applies where there is a judgment on the merits in a prior suit and bars subsequent litigation where there is: '(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons

and parties to the action; and (4) identity of the quality [or capacity] of the persons for or against whom the claim is made.'" *Certex USA, Inc. v. Vidal*, 706 F. Supp. 2d 1291, 1293 (S.D. Fla. 2010) (quoting *The Fla. Bar v. St. Louis,* 967 So.2d 108, 119 (Fla. 2007)).

2. Analysis:

Res judicata is an affirmative defense that is not proper for resolution on Defendants' motion to dismiss.

This Court has explained, "[g]enerally, res judicata 'is an affirmative defense that should be raised under Rule 8(c),' but 'a party may raise a res judicata defense by motion rather than by answer where the defense's existence can be judged on the face of the complaint.'" *L & M Companies, Inc. v. Navilio*, 2016 WL 6916775, at *1 (S.D. Fla. Jan. 25, 2016) (quoting *Concordia v. Bendekovic,* 693 F.2d 1073, 1075 (11th Cir. 1982)).

Here, Defendants admit that "the Complaint *does not even mention* the NMS." (Mot. at 19) (emphasis in original). Accordingly, Defendants' motion on this ground "fails because the existence of this res judicata defense cannot be judged on the face of the complaint." *Navilio*, 2016 WL 6916775, at *1.

**C. Defendants are not covered by the applicable statute**

Defendants move for dismissal of Counts VIII and IX, and partial dismissal of Counts X, XI, XII, and XIII. (Mot. at 31, 34-35).

a) Counts VIII & IX:

Defendants argue that Counts VIII and IX should be dismissed because the Complaint fails to allege facts that plausibly show that each Defendant acted as a "debt collector" as defined by the FDCPA. (Mot. at 31). Defendants are correct.

The FDCPA, in pertinent part, provides:

> (6) The term ''debt collector'' means any person who uses any instrumentality of interstate commerce or the mails in any business the **principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another**. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include—
>
> ….
>
> (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) **concerns a debt which was not in default at the time it was obtained by such person**; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

15 U.S.C. §1692a(6) (emphasis added).

The Eleventh Circuit has explained that it is no longer enough to simply allege that a defendant has acquired debts already in default. *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1318 (11th Cir. 2015) (holding "our inquiry under § 1692a(6) is not whether [defendant] regularly collects on debts *originally* owed or due another and now owed to [defendant]; our inquiry is whether [defendant] regularly collects on debts owed or due another at the time of collection."). Put another way, "[a]n entity collecting on its own debts—even debts originally owned by another and acquired after default—does not qualify as a 'debt collector.'" *Arencibia v. Mortg. Guar. Ins. Corp.*, 659 F. App'x 564, 566 (11th Cir. 2016).

The Eleventh Circuit elaborated, "where a person does not fall within subsection (F) or any one of the six statutory exclusions, he is not deemed a 'debt collector' as a matter of course," and still "must satisfy the Act's substantive requirements." *Davidson*, 797 F.3d at 1314. The court reasoned that:

> Pursuant to the plain language of the statute, a "debt collector" includes (1) "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts," or (2) any person "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."

*Id.* (quoting 15 U.S.C. § 1692a(6)). In sum, a person or entity is not a "'debt collector' where the [entity] does not regularly collect or attempt to collect on debts 'owed or due another' and where 'the collection of any debts' is not 'the principal purpose' of the [entity]'s business, even where the consumer's debt was in default at the time the [entity] acquired it." *Id*. at 1311 (quoting 15 U.S.C. § 1692a(6)).

The Complaint plausibly alleges that Defendants collect or attempt to collect its *own* debts. (Compl. ¶¶ 13, 264-69, 271, 276). However, as in *Davidson*, the Complaint fails to plead factual allegations from which the Court can plausibly infer that Defendants *regularly* collect or attempt to collect on debts owed or due *another* at the time of collection. *Davidson*, 797 F.3d at 1318.

Accordingly, Counts VIII and IX are dismissed without prejudice. The CFPB is given leave to amend, and the CFPB can, in the Amended Complaint, replead the FDCPA claims in Counts VIII and IX and allege facts to support the contention that one or all of the Ocwen Defendants is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

b) <u>Counts X, XI, XII, XIII:</u>

Defendants seek partial dismissal of Counts X, XI, XII, and XIII on the grounds that the Complaint fails to plausibly allege that OFC or OMS are servicers under Section 6 of RESPA. (Mot. at 34); 12 U.S.C. § 2605.

Under 12 U.S.C. § 2605(i)(2), "'servicer' means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)." 12 U.S.C. § 2605(i)(2). "Servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

Defendants cite to case law holding that a parent or subsidiary cannot be assigned liability under RESPA if that entity is not engaging in the servicing of loans. *See McCarley v. KPMG Int'l*, 293 F. App'x 719, 722 (11th Cir. 2008) ("[plaintiff] alleges that HFC III is essentially the same entity as HSBC Mortgage Services for purposes of RESPA, he offered no authority—and we have found none—assigning liability to parent or subsidiary companies under RESPA."). However, in *McCarley*, the Eleventh Circuit was reviewing the district court's grant of summary judgment not a motion to dismiss; there, the district court had more facts to consider before finding the lone defendant "was not the servicer of the loan." *Id.*

In contrast, the Complaint plausibly alleges that all three Defendants are engaged in loan servicing activities as defined by RESPA. 12 U.S.C. § 2605(i)(3).

The Complaint alleges that OMS: 1) is licensed by several state regulators to service loans and collect mortgage debts; 2) has entered into agreements for products and services required for servicing mortgages; 3) has contracted for those products and services, namely the system of

record and related technology services used by OLS and OFC; and 4) has even represented in a 2016 Consent Order with the State of Washington that it engages in the servicing or subservicing of OLS loans. (Compl. ¶ 16). Taking the allegations as true, the Complaint plausibly alleges that OMS is a servicer under RESPA. *See Hishon*, 467 U.S. at 73; 12 U.S.C. § 2605(i)(2)-(3).

As for OFC, the Complaint alleges that the entity controls, directs, operates, and participates in mortgage servicing activities, namely the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Defendants' loans. (Compl. ¶15). This plausibly alleges that OFC engages in servicing activities as defined by RESPA, and therefore survives a motion to dismiss. 12 U.S.C. § 2605(i)(2)-(3).

As discussed below, under a common enterprise theory, the conduct of one entity imposes liability on the other entities. However, neither the CFPB nor Defendants address the applicability of common enterprise liability under RESPA. The Court need not rule on the issue at this juncture, however, because the Complaint plausibly alleges that all three are engaged in the servicing or subservicing of loans.

**D. Impermissible "shotgun" pleading**

Defendants argue that all counts should be dismissed under Rule 12(b)(6) for impermissible "shotgun" pleading or, alternatively, move that this Court order a more definite statement pursuant to Rule 12(e). (Mot. at 23-24). Defendants take issue with the CFPB's Complaint structure that they criticize for unfairly incorporating the 220 factual allegations into the 14 causes of action instead of breaking out the conduct. (*Id.*).

The CFPB responds that Defendants misunderstand shotgun pleadings. (Opp. at 18). The CFPB points to caselaw that has clarified when it is permissible to consolidate numerous paragraphs of the complaint in a count. (*Id.* at 18-19). The CFPB insists a complaint is only an

impermissible shotgun pleading if it incorporates each preceding count, not each preceding paragraph. (*Id.*). The CFPB also asserts that even if this Court finds that the Complaint was improper shotgun pleading, the proper remedy is to order a more definite statement, not dismissal. (*Id.* at 19).

1. Legal Standard:

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). "Rule 8(a)(2) requires a complaint to include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Rule 10(b) states:

> A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and each defense other than a denial--must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).

"Rule 12(b)(6) provides that, in responding to a complaint, a defendant—prior to answering the complaint—may move the district court to dismiss the complaint for 'failure to state a claim upon which relief can be granted.'" *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127 n.3 (11th Cir. 2014) (quoting Fed. R. Civ. P. 12(b)(6)). The Eleventh Circuit has cautioned:

> Under 12(e) the Court must determine whether the complaint is such that 'a party cannot reasonably be required to frame a responsive pleading.' But the fact that a careful Judge, in the exercise of that wise discretion controlled by the prescribed principles of that rule, might so conclude does not permit him to dismiss the complaint for failure to state a claim. 'It may well be that petitioner's complaint as now drawn is too vague, but that is no ground for dismissing his action.'

*Mitchell v. E-Z Way Towers, Inc.*, 269 F.2d 126, 130 (5th Cir. 1959) (quoting *Glus v. Brooklyn E.*

*Dist. Terminal*, 359 U.S. 231, 235 (1959)).[3]

2. Analysis:

"A defendant served with a shotgun complaint should move the district court to dismiss the complaint pursuant to Rule 12(b)(6) or for a more definite statement pursuant to Rule 12(e)4 on the ground that the complaint provides it with insufficient notice to enable it to file an answer." *Paylor*, 748 F.3d at 1126–27. "In dismissing a shotgun complaint for noncompliance with Rule 8(a), a district court must give the plaintiff 'one chance to remedy such deficiencies.'" *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) (citation omitted).

The Eleventh Circuit has summarized the variety of improper pleadings often lumped together under the banner "shotgun pleadings":

> Shotgun pleadings include complaints that: (1) contain multiple counts where each count adopts the allegations of all preceding counts; (2) do not re-allege all preceding counts but are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) do not separate each cause of action or claim for relief into separate counts; or (4) contain counts that present more than one discrete claim for relief.

*Silverthorne v. Yeaman*, 668 F. App'x 354, 355 (11th Cir. 2016) (quoting *Weiland*, 792 F.3d at 1321-24).

In *Weiland*, the Eleventh Circuit explained that a pleading could initially appear to be a shotgun pleading, however, upon closer examination, it was properly pleaded:

> [Plaintiff]'s re-alleging of paragraphs 1 through 49 at the beginning of each count looks, at first glance, like the most common type of shotgun pleading. But it is not. As we have already discussed, **this Court has condemned the incorporation of preceding paragraphs** where a complaint "contains several counts, each one incorporating by reference the allegations of its predecessors [i.e., predecessor *counts*], **leading to a situation where most of the counts (i.e., all but**

[3] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

> **the first) contain irrelevant factual allegations and legal conclusions**." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir.2002); *see also Magluta v. Samples,* 256 F.3d 1282, 1284 (11th Cir.2001) (identifying a complaint as a shotgun pleading where "[e]ach count incorporates by reference the allegations made in a section entitled 'General Factual Allegations'—which comprise[d] 146 numbered paragraphs—*while also incorporating the allegations of any count or counts that precede[d]* it.") (emphasis added**). What we have here is different. The allegations of each count are not rolled into every successive count on down the line.**

*Weiland*, 792 F.3d at 1324 (emphasis added).

However, in *Jackson v. Bank of America, N.A.*, the Eleventh Circuit elaborated that "[t]his case is illustrative" of why the Eleventh Circuit "has filled many pages of the Federal Reporter condemning shotgun pleadings and explaining their vices," because the amended complaint "employs a multitude of claims and incorporates by reference all of its factual allegations into each claim, making it nearly impossible for Defendants and the Court to determine with any certainty which factual allegations give rise to which claims for relief." *Jackson*, 898 F.3d at 1356. The *Jackson* court held that "the amended complaint patently violates Federal Rule of Civil Procedure 8" because "[a]t twenty-eight pages long and having incorporated all 123 paragraphs of allegations into all sixteen counts, it is neither 'short' nor 'plain.'" *Id.*

The instant Complaint is ninety-two pages long and incorporates all 220 paragraphs of allegations into each of the fourteen counts, regardless of whether the factual allegations pertain to the cause of action. The Court concludes this constitutes improper shotgun pleading and a violation of Rule 8 and *Twombly*/*Iqbal*, requiring dismissal of the CFPB's complaint without prejudice. *Id.*; *see also City of Miami v. JPMorgan Chase & Co.*, 171 F. Supp. 3d 1309, 1314 (S.D. Fla. 2016).

The CFPB is given leave to amend its Complaint to segregate the factual allegations that relate to each Count.

**E. Failure to distinguish among defendants**

Defendants move to dismiss all counts on the basis that the Complaint relies entirely on improper group pleading. (Mot. at 24). Defendants argue that the Complaint fails to specify what each Defendant did for each cause of action. (*Id.* at 24-25). Defendants insist that the Complaint therefore failed to provide sufficient notice about what each Defendant is liable for in the various counts. (*Id.*). Defendants contend that the three Defendants are distinct entities and that the Complaint impermissibly only refers to them collectively as "Ocwen" for all 220 factual allegations and the 14 causes of action. (*Id.*).

The CFPB responds that the Complaint alleges that each Ocwen Defendant is liable for each count. (Opp. at 29). The CFPB maintains that the Complaint adequately described the relationship between each Defendant and subsequently detailed how each defendant is a "covered person" as defined by 12 U.S.C. § 5481(6)(A); is engaged in servicing activities; and that Defendants jointly operate as a common enterprise. (*Id.*). The CFPB also maintains that OFC and OMS are OLS's principals, and therefore each is liable for the acts of their agent, OLS. (*Id.*).

As for Defendants' contention that they are not sufficiently put on notice about which Defendant is responsible for what conduct, the CFPB responds that Defendants can be collectively defined as "Ocwen" in the Complaint because each entity engaged in the conduct underlying each Count individually and under common enterprise and principal-agent theories. (Opp. at 29-30). The CFPB argues therefore that each Defendant is on notice of the claims against it. (*Id.* at 30).

1. <u>Legal Standard:</u>

"When a complaint indiscriminately lumps all defendants together, it fails to comply with Rule 8." *Joseph v. Bernstein*, 2014 WL 4101392, at *3 (S.D. Fla. Aug. 19, 2014), *aff'd*, 612 F. App'x 551 (11th Cir. 2015). "While a complaint against multiple defendants may be 'read as

making the same allegation against each defendant individually,' the 'factual allegations must give each defendant 'fair notice' of the nature of the claim and the 'grounds' on which the claim rests.'" *Id*. (citations omitted).

"Where multiple corporate entities operate a 'common enterprise,' each of the interrelated companies may be held liable for the actions of the other. As a result, complaints alleging the liability of a common enterprise need not allege that each defendant committed a particular unlawful act." *People v. Debt Resolve, Inc.*, 2019 WL 2865251, at *4 (S.D.N.Y. July 3, 2019) (citations omitted).

2. Analysis:

This Court has dismissed complaints where the plaintiff has engaged in improper group pleading, noting that, it is "wholly improper" because "[b]y comingling the factual allegations against all defendants, realleging every previous allegation by reference in each claim for relief, and presenting all counts under the doctrine of joint and several liability, [plaintiff] has effectively placed the onus on Movants to discern which, if any, of the allegations are brought against them." *U.S. Bank Nat. Ass'n v. Capparelli*, 2014 WL 2807648, at *3 (S.D. Fla. June 20, 2014).

a) Existence of common enterprise liability

The Complaint as pled never establishes that common enterprise liability is available under each cause of action.[4] Nevertheless, the Court finds that common enterprise liability has been consistently applied to the CFPA. *See Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, 2016 WL 7188792, at *16 (S.D.N.Y. Dec. 2, 2016) (holding "common enterprise liability does apply under the CFPA"); *Consumer Fin. Prot. Bureau v. Think Fin., LLC*, 2018 WL 3707911, at *7 (D. Mont.

[4] The Complaint merely alleges that the three Ocwen Defendants satisfy the common-enterprise test, and then the Complaint repeats the allegation that each Defendant is liable individually and under common enterprise and principal-agent theories for each count. (Compl. ¶ 22). The Complaint does not cite to case law that provides that common enterprise liability is available under the statutes cited.

Aug. 3, 2018) ("The Court thus concludes that common enterprise liability presents a plausible means by which the CFPB may state a claim against Defendants alleging violation of the CFPA."); *Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols., LLC*, 2019 WL 1295004, at *14 (N.D. Ga. Mar. 21, 2019) (acknowledging the commonalities between the FTCA and the CFPA before determining "for the purposes of this Order, the Court finds it appropriate to rely on the common enterprise doctrine); *but see Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016) (holding "the common enterprise theory should not be superimposed on a claim under the Dodd-Frank Act").

The Court also finds that the common enterprise liability theory has been applied to claims arising under TILA and the FDCPA.[5] *See Debt Resolve, Inc.*, 2019 WL 2865251, at *4 (finding "at the motion to dismiss stage, Plaintiff need only allege facts plausibly supporting the existence of a common enterprise, not prove that such an enterprise in fact exists" in a Complaint alleging violations of TILA and other consumer protection laws); *Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 657–58 (W.D.N.Y. 2017) (applying common enterprise theory of liability to FTCA, FDCPA, and state law claims before determining that "'as a matter of law in summary judgment, this Court cannot declare all of the Defendants to constitute a 'common enterprise.' There is some common enterprise here, but which Defendants and whether all Defendants are part of a common enterprise is a matter left open for trial.'") (quoting *F.T.C. v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 810 (D.S.D. 2013)).

The Court concludes that common enterprise liability presents a plausible means by which the CFPB may state a claim against Defendants.

[5] As to the counts alleging violations of RESPA and HPA, the parties have not briefed whether common enterprise liability applies to those causes of action, and the Court declines to make a determination on that issue at this time.

b) Application of Common Enterprise Liability

"To determine whether a common enterprise, or 'maze of interrelated companies,' exists, courts consider 'the pattern and frame-work of the whole enterprise.'" *Vantage Point*, 266 F. Supp. 3d at 656 (quoting *Delaware Watch Co. v. F.T.C.*, 332 F.2d 745, 746 (2d Cir. 1964)). "Factors relevant in a court's consideration of whether a common enterprise among entities exists include whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *F.T.C. v. Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *5 (E.D.N.Y. May 23, 2012). "[A] common enterprise analysis is neither an alter ego inquiry nor an issue of corporate veil piercing; instead, the entities within the enterprise may be separate and distinct corporations." *Vantage Point*, 266 F. Supp. 3d at 656. Courts have also found "that entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142–43 (9th Cir. 2010).

The CFPB alleges that the three Defendants operate as a common enterprise. (Compl. ¶ 22). The Complaint alleges:

> OLS, OMS, and OFC have conducted the business practices described below through interconnected companies that have common business functions, employees, and office locations. OFC and OMS control (either formally or informally) and operate OLS's mortgage servicing activities and marketing of and payment processing and transmitting payments for addon products. OFC and OMS also contract for critical mortgage servicing operations for and on behalf of OLS. OFC, OMS, and OLS also file consolidated financial statements and share employees and offices. Accordingly, an act by one entity constitutes an act by each entity comprising the "common enterprise," and OFC, OMS, and OLS are each jointly and severally liable for the acts and practices alleged below.

(*Id.*). The Complaint also plausibly alleges "vertical or horizontal commonality." *Network Servs. Depot, Inc.*, 617 F.3d at 1142–43. The Complaint further specifies:

> OFC, the parent and publicly-traded company, wholly owns all of the common stock of its primary operating subsidiary, OMS. OMS wholly owns the stock of another of OFC's primary operating subsidiaries, OLS. All three entities share and have shared key executives, such as Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox. All three entities, through OFC, file a consolidated financial statement with OFC's public disclosures.

(Compl. ¶ 14).

While these factors are non-dispositive, the Court finds the Complaint plausibly alleges common enterprise liability, and therefore it is not necessary to replead to differentiate the Defendants. *See NDG Fin. Corp.*, 2016 WL 7188792, at *16.

**F. Failure to state a claim under Rule 9(b)**

Defendants argue Counts II and IX should be dismissed for failure to state a claim under Fed. R. Civ. P. 9(b). (Mot. at 26). Defendants insist that that Rule 9(b) applies to the CFPB's Count IX allegations of misleading debt collection communications under FDCPA. (*Id.* at 26). Defendants further argue that Count II should be subject to Rule 9(b) under the CFPB's deceptive practices standards. (*Id.* at 26-27). Defendants concede, however, that this Court has declined to apply Rule 9(b) to allegations of deception brought by the FTC and Defendants acknowledge that the FTC's deception standard mirrors the CFPB's. (*Id.* at 26). Defendants nevertheless urge the Court to apply Rule 9(b). (*Id.* at 27).

The CFPB responds that Counts II and IX are not subject to 9(b)'s heightened pleading standards. (Opp. at 22). The CFPB maintains that 9(b) should not be applied to the deception claims under the CFPA and FDCPA. (*Id.* at 23). The CFPB asserts that while not subject to 9(b), the claims have been adequately pled. (*Id.* at 22-23).

1. Legal Standard:

Rule 9(b)of the Federal Rules of Civil Procedure states "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ.

P. 9(b). "The particularity requirement of Rule 9(b) serves an important purpose in fraud actions by 'alerting defendants to the precise misconduct with which they are charged and protecting spurious charges of immoral and fraudulent behavior.'" *Jackson v. Genesys Credit Mgmt.*, 2007 WL 4181024, at *3 (S.D. Fla. Nov. 21, 2007) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001)*)*. "The application of Rule 9(b), however, must not abrogate the concept of notice pleading under the federal rules." *Id.* The Eleventh Circuit explained that:

> Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

*Ziemba*, 256 F.3d at 1202 (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)) (internal quotation omitted).

2. <u>Analysis:</u>

The Court concludes that 9(b)'s heightened pleading standards do not apply to the CFPB's deception claims brought under the CFPA and FDCPA.

As the Northern District of Georgia explained in *CFPB v. Hanna*:

> Absent some clear, binding directive from Congress, the Supreme Court, or the Eleventh Circuit, this Court finds it inappropriate to impose a heightened pleading standard in a consumer protection case, even if there is a fraud dimension to any of the claims. Accordingly, the Court does not apply Rule 9(b) to the FDCPA or CFPA claims here.

*Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1373–74 (N.D. Ga. 2015) (hereinafter "*Hanna*"). There, the court reaffirmed that CFPA and FDCPA deception claims are analyzed the same way as deception claims under the FTCA. *Id.* (citing *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1175 (11th Cir. 1985)). The court then explained that "[u]nlike a fraud claim, the FDCPA 'does not ordinarily require proof of intentional violation and,

as a result, is described by some as a strict liability statute.'" *Id.* at 1372 (quoting *LeBlanc v. Unifund CCR Partners,* 601 F.3d 1185, 1190 (11th Cir. 2010). The court noted "Rule 9(b) expressly applies only to claims alleging 'fraud or mistake,' and as the Tenth Circuit and several district courts have reasoned, consumer protection claims are not claims of fraud, even if there is a deceptive dimension to them." *Id.*

The *Hanna* court also highlighted the United States Supreme Court's warnings not to extend heightened pleading standards beyond claims for fraud or mistake. *Id.* (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)). Finally, the court considered how "[a] consumer's ability to enforce his rights under the FDCPA or CFPA would no doubt be hindered if courts impose a heightened pleading standard," and how applying 9(b) "is also inconsistent with the remedial nature of consumer protection statutes" and incongruous with the purposes of 9(b). *Id.* at 1373.

Moreover, this Court has expressly rejected applying 9(b) to fraud claims brought under the FTCA:

> The Court finds the rationale of the Tenth Circuit in *Freecom Communications* persuasive: "A § 5 claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b).... Unlike the elements of common law fraud, the FTC need not prove scienter, reliance, or injury to establish a § 5 violation."

*F.T.C. v. Sterling Precious Metals, LLC,* 2013 WL 595713, at *3 (S.D. Fla. Feb. 15, 2013) (quoting *F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005)).

While Defendants point to *Jackson*, where this Court in 2007 applied 9(b) to the plaintiff's claim brought under the FDCPA, the CFPB responds that the *Jackson* court only applied 9(b) because the plaintiff expressly alleged claims of fraud. *Jackson*, 2007 WL 4181024, at *3. The Court agrees with that distinction; the court in *Jackson* was presented with a complaint where

"Plaintiff here alleges a fraud claim," and this Court determined the allegations of a "pattern of Conduct of Fraud and Duplicity . . . . fails to plead a fraud claim with the required particularity." *Id.*

In contrast to *Jackson*, Counts II and IX here do not expressly allege fraud but rather are analogous to the claims discussed in *Hanna* that were determined to not be subject to 9(b) because they were distinct from fraud "as contemplated by Rule 9(b)." *Id.*; *Hanna*, 114 F. Supp. 3d at 1373–74.

Count II alleges Defendants have made material false, misleading, or unsubstantiated representations to borrowers that their loans have certain unpaid balances; monthly payments; delinquency statuses; unpaid fees; reinstatement amounts; escrow amounts due; payoff amounts due; insurance amounts due; and other amounts due, and that Defendants had knowledge or reason to believe that: (1) prior servicer data was inaccurate or missing and Defendants neglected to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on loans; (2) the system of record contained inaccurate information caused by systemic failures, manual entry errors, and incorrect information provided by previous service providers and Defendants failed to substantiate the accuracy of the data before collecting or foreclosing on loans; and (3) Defendants failed to substantiate the accuracy of the information after consumers disputed, challenged, or questioned the accuracy of Defendants' information and would collect or foreclose on loans in spite of consumers' disputes. (Compl. ¶¶ 231-34). This claim, brought under Sections 1031 and 1036 of the CFPA, is distinct from common law fraud and therefore is not subject to 9(b)'s heightened pleading standards. *Hanna*, 114 F. Supp. 3d at 1374.

Count IX alleges the same conduct detailed in Count II violates Sections 807(2) and (10) of the FDCPA as well as § 1036(a)(1)(A) of the CFPA. (Compl. ¶¶ 275-78). Count IX is

dismissed without prejudice for failure to allege that Defendants are covered under the FDCPA. If repleaded properly, it is likewise not subject to 9(b)'s pleading standards, as explained in *Hanna*. *Hanna*, 114 F. Supp. 3d at 1374.

For the reasons stated above, this Court declines to apply 9(b) to Counts II and IX, and those counts are instead subject only to Rule 8(a)'s plausibility standard.

**G. Lack of notice that conduct was "unfair" or "deceptive"**

Defendants insist that Counts I, II, VIII, and IX should be dismissed for a lack of fair notice that it is an unfair business practice for them to have used information to service mortgage loans that sometimes was inaccurate or incomplete. (Mot. at 12). Defendants assert that the CFPB is overreaching by alleging that "operating a less-than-perfect loan servicing platform violates the twin prohibitions on unfair business" under the CFPA, 12 U.S.C. §§ 5531, 5536 (Count I), and the FDCPA, 15 U.S.C. § 1692f (Count VIII). (*Id.*). Defendants claim that this is an egregious example of regulation through enforcement because there is nothing that makes "having a computer system that is not perfect" illegal. (*Id.*). Defendants also argue that the Complaint fails to allege "whether all of the alleged inaccuracies are material and, if not, which are, and [there are] no allegations of any standards of accuracy or completeness Ocwen was supposed to have met." (*Id.*). Defendants contend that there was not fair notice of what conduct the CFBP would consider "unfair" or "deceptive," and have also failed to provide particulars to the Court as to what conduct has been the cause of substantial consumer injury. (*Id.* at 16-17). Defendants question whether the CFPB intends to take the radical position that "*any* inaccuracies in data or *any* misstep by a computer program or *any* error in manual addition rises to the level of an 'unfair' business practice" and asks that the "cause of action . . . be more specific in defining exactly what Ocwen was required to do and how it fell short." (*Id.* at 16). With regards to the deceptive conduct, Defendants argue

that there is no duty to substantiate the accuracy of the account information in its system under the CFPA or FDCPA; Defendants allege this is an attempt by the CFPB to "graft an entirely new requirement onto federal law." (*Id.* at 28).

The CFPB responds that Defendants have fair notice that their conduct violates the CFPA and FDCPA. (Opp. at 9). The CFPB insists that Defendants' as-applied challenge must fail. (*Id.* at 10). The CFPB also argues that Defendants have mischaracterized the Complaint as "alleging that it is unfair to use a deficient system of record," when the Complaint instead alleges that servicing loans using inaccurate or incomplete information is unfair and that Defendants had fair notice that such conduct was illegal. (*Id.* at 9-10). The CFPB points to CFPB and FTC enforcement actions as well as a CFPB bulletin to support the contention Defendants had fair notice. (*Id.* at 11). As for the Motion to Dismiss' arguments about deceptive conduct, the CFPB argues that the FTC Act's deception standard requires that a person have a reasonable basis for their representations; the CFPB also points to the agency's bulletin that instructed that representations about a consumer's debt should be supported. (*Id.* at 12-13).

1. <u>Level of Scrutiny:</u>

"Because the CFPA is an economic regulation, and [the defendant] does not contend that the statute inhibits its constitutionally-protected activity, the CFPA is subject to a lenient vagueness test." *Illinois v. Alta Colleges, Inc.*, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014).

2. <u>Legal standard:</u>

"The CFPB is authorized to use the extent of its enforcement powers to 'prevent' certain acts or practices that are 'unfair,' 'deceptive,' or 'abusive.'" *Universal Debt & Payment Sols., LLC*, 2019 WL 1295004, at *6 (citing 12 U.S.C. § 5531(a)). "For an unfair act or practice, the CFPB must show that '[1] the act or practice causes or is likely to cause substantial injury

to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition.'" *Id.* (quoting 12 U.S.C. § 5531(c)(1)).

3. Analysis:

Even though Counts VIII and IX are dismissed for a failure to plausibly allege that Defendants qualify as "debt collectors" under 15 U.S.C. § 1692a(6), the Court will address the fair notice arguments for these FDCPA counts. Counts I and II, under the CFPA, survive Defendants' motion to dismiss on the fair notice grounds for reasons stated below.

**a)** Regulation through enforcement actions

Defendants protest that the CFPB is improperly regulating through enforcement actions and that the CFPA requires the CFPB to "declare" an act as unfair before suing. (Mot. at 12-15). Defendants further argue that a declaration must be in the form of rulemaking or an adjudication and that the CFPB does not "declare" anything in a consent judgment or by filing a complaint. (*Id.* at 15).

Federal courts have rejected this argument. *Consumer Fin. Prot. Bureau v. Navient Corp.*, 2017 WL 3380530, at *8 (M.D. Pa. Aug. 4, 2017) (concluding "the Court finds that the plain language of the CFP Act does not impose a requirement on the Bureau to engage in rulemaking before bringing an enforcement action."); *Consumer Fin. Prot. Bureau v. Think Fin., LLC*, 2018 WL 3707911, at *3 (D. Mont. Aug. 3, 2018); *CFPB v. D & D Mktg.*, 2016 WL 8849698, at *7 (C.D. Cal. Nov. 17, 2016) (finding "[t]he CFPB here has chosen to proceed through litigation. It did not abuse its discretion in so deciding.").

As in *Navient*, Defendants "failed to explain—or cite to any authority which would explain—why 'declare' must refer only to rulemaking and not litigation, and why it would be

improper for the CFPB to declare something unlawful through litigation." *Navient Corp.*, 2017 WL 3380530, at *6. The Court finds the reasoning in *Navient* persuasive;

> The plain meaning of the statutory language provides that the CFPB has both the power to engage in rulemaking, 12 U.S.C. §§ 5512(b)(1), 5531(b), and litigation, 12 U.S.C §§ 5531(a), 5564(a), to address unfair, deceptive, or abusive acts or practices. The most harmonious construction of these provisions is that the CFPB may proceed either via rulemaking or an enforcement action.

*Id.* at *7. The court in *Navient* also looked to the parallel FTCA and noted that "[t]his Court is unaware of any court that has held that the use of 'declare' in section 45(n) requires the FTC to proceed via rulemaking before institution of an enforcement action," but "[i]nstead, 'Circuit Courts of Appeal have affirmed FTC unfairness actions in a variety of contexts *without* preexisting rules or regulations specifically addressing the conduct-at-issue.'" *Id.* (quoting *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 618 (D.N.J. 2014) *aff'd*, 799 F.3d 236 (3d Cir. 2015)).

The Court finds that the CFPB was not required to engaged in rulemaking prior to bringing an enforcement action.

**b)** <u>Fair notice</u>

The CFPB alleges that Defendants had fair notice that servicing loans using inaccurate or incomplete information is an unfair or deceptive act or practice under the CFPA and FDCPA. (Opp. at 9-13). While Defendants insist that Counts I and II are "vague" and "unprecedented" and deprive Defendants of fair notice, case law holds otherwise. (Mot. at 12-15).

i. <u>CFPA</u>

Many courts have rejected Defendants' argument that the CFPA left defendants without fair notice of what acts or practices the CFPB considers unfair, deceptive, or abusive. *See Navient Corp.*, 2017 WL 3380530, at *8; *Wyndham*, 799 F.3d at 255; *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 904 (S.D. Ind. 2015); *NDG Fin. Corp.*, 2016 WL 7188792,

at *13; *Alta Colleges, Inc.*, 2014 WL 4377579, at *4.

In light of numerous federal court decisions finding that the CFPA passes the lenient vagueness test, Defendants cite to caselaw interpreting a Massachusetts consumer protection law prohibiting "unfair or deceptive acts or practices in the conduct of any trade or commerce" where the First Circuit held, "[w]hat constitutes an unfair or deceptive practice requires an individualized, 'fact-specific' inquiry." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013) (citation omitted); Mass. Gen. Laws ch. 93A § 2. The holding in *Woods*, however, does not stand for the proposition that the terms "unfair" or "deceptive" fail to provide fair notice or are unconstitutionally vague. *Woods*, 733 F.3d at 358. Instead, the First Circuit affirmed the order granting the motion to dismiss because the Complaint's "failure to set forth any particular acts or practices marked by 'an extortionate quality ... of unfairness [and deceptiveness],'" was insufficient to state a claim. *Id.* (alterations in original) (citation omitted). The Court does not challenge *Woods*' holding that determining, "[w]hat constitutes an unfair or deceptive practice requires an individualized, 'fact-specific' inquiry," but in contrast to the facts presented in *Woods*, the CFPB has plausibly alleged unfair acts or practices. *Id*.

*ITT* also undercuts Defendants' argument that there was a lack of fair notice of what could constitute an unfair practice under the CFPA. *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 904; (Mot. at 2). The Southern District of Indiana explained:

> The CFPA, like the FTCA before it, has empowered the agency itself to fill in the broad outlines of its authority with specific regulations and interpretations. The agency and the courts have done so in fleshing out the term "unfair ... act or practice," and Congress has tapped into that existing body of law in framing the CFPA with identical terminology. We thus have no difficulty in rejecting [defendant]'s suggestion that a reasonable business entity would be forced to guess at the term's meaning, or would be subject to agency's standardless discretion in its enforcement.

*Id.* The court there elaborated, "[defendant]'s contention that the term 'unfair ... act or practice'

is unconstitutionally vague falters in the face of a century's worth of legislative and judicial guidance establishing and refining the term's meaning. We recognize, of course, that the language *itself* may be 'inherently insusceptible of precise definition.'" *Id.* (citation omitted). The court explained "the issue before us is not whether the word 'abusive' can be vague in *any* context, but whether the statutory language incorporating that term gives [defendant] fair notice of conduct forbidden and permitted in *this* context." *Id.* at 906. The court concluded, "the language in question provides at least the minimal level of clarity that the due process clause demands of non-criminal economic regulation" and "[b]ecause the CFPA itself elaborates the conditions under which a business's conduct may be found abusive—and because agencies and courts have successfully applied the term as used in closely related consumer protection statutes and regulations. . . ." *Id.*

In *F.T.C. v. Wyndham Worldwide Corp.*, the Third Circuit considered a similar question of whether the hotel chain had fair notice of what the FTC might consider unfair, deceptive, or abusive. *Wyndham*, 799 F.3d at 255. Ultimately, the Third Circuit concluded that the defendant "was not entitled to know with ascertainable certainty the FTC's interpretation of what cybersecurity practices are required by § 45(a)." *Id.* The court elaborated:

> Instead, the relevant question in this appeal is **whether [defendant] had fair notice that its conduct could fall within the meaning of the statute**. If later proceedings in this case develop such that the proper resolution is to defer to an agency interpretation that gives rise to [defendant]'s liability, we leave to that time a fuller exploration of the level of notice required. For now, however, it is enough to say that we accept [defendant]'s forceful contention that we are interpreting the FTC Act (as the District Court did). As a necessary consequence, **[defendant] is only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute**.

*Id.* (emphasis added).

The Middle District of Pennsylvania adopted the reasoning from *Wyndham*, finding that

the "fair notice argument fails if it was reasonably foreseeable to [defendant] that a court could construe their alleged conduct as unfair, deceptive, or abusive under the CFP Act. [Defendant], however, has only advanced arguments as to why it did not have fair notice of *the Bureau's* interpretation of the CFP Act." *Navient Corp.*, 2017 WL 3380530 at *8. The *Navient* court went on to find that "the CFPB's interpretation of whether its allegations constitute unfair, deceptive, or abusive acts or practices is irrelevant to whether [defendant] had fair notice of the conduct the CFP Act itself proscribes," and "[s]tripped of these irrelevant arguments, [defendant]'s position reduces to its assertion that it complied with" "other statutory, regulatory, and contractual obligations does not relieve [defendant] of its obligation to refrain from committing acts that are unlawful under the CFP Act." *Id.* The court additionally rejected defendant's contention that "it was not reasonably foreseeable to [defendant] that a court could construe the acts or practices alleged in the Complaint as violations of the CFP Act." *Id.*

In rejecting CFPA vagueness challenges, courts have established that the CFPA provides a definition of "unfair" practices. *See Alta Colleges, Inc.*, 2014 WL 4377579, at *4 (paraphrasing 12 U.S.C. § 5531(c)(1) as "defining an unfair practice as one that causes or is likely to cause substantial injury to consumers that they cannot reasonably avoid and is not outweighed by benefits to consumers or competition"). While the CFPA never defines a "deceptive" practice, courts have ruled that it holds the same meaning as under the Federal Trade Commission Act: "that the act or practice is 'material,' [if] it 'misleads or is likely to mislead the consumer,' and '[t]he consumer's interpretation [of the act or practice] is reasonable under the circumstances.'" *Id.*

The Court adopts the reasoning of *Wyndham*, *Navient*, and other decisions, in finding that "the relevant question . . . is whether [defendant] had fair notice that its conduct could fall within

the meaning of the statute" and that a defendant "is only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute." *Wyndham*, 799 F.3d at 255.

ii. <u>FDCPA</u>

"In 1977 Congress enacted the FDCPA 'to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'" *Oppenheim v. I.C. Sys., Inc.*, 627 F.3d 833, 836 (11th Cir. 2010) (quoting 15 U.S.C. § 1692(e)). The FDCPA, while older than the CFPA, has faced far fewer challenges contesting the constitutionality for lack of fair notice. *See Hanna*, 114 F. Supp. 3d at 1368 (noting "Defendants cite no case voiding any application of the least sophisticated consumer standard as unconstitutionally vague.").

In *Hanna*, the court rejected the argument that "applying a 'non-existent' standard would render the FDCPA void for vagueness," because "[i]f Defendants' argument were correct, then any application of the least sophisticated consumer standard to novel factual circumstances would likewise render the § 1692e void for vagueness. That can't be right." *Id.* As in the CFPA scrutiny, the *Hanna* court concluded that the FDCPA is only unconstitutionally vague if "it is so indefinite as 'really to be no rule or standard at all.'" *Id.* (citations omitted). The *Hanna* court continued, "[t]he challenged statute need not be precise. '[A]ll that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding.'" *Hanna*, 114 F. Supp. 3d at 1368 (quoting *This That and The Other Gift & Tobacco, Inc. v. Cobb County, Ga.,* 285 F.3d 1319, 1325 (11th Cir. 2002)).

**c)** <u>Notice provided</u>

Defendants have been given fair notice of the CFPB's interpretation of the CFPA and

FDCPA.

In support of their contention that enforcement actions cannot be a basis for fair notice, Defendants point to Supreme Court case law that holds "[w]e acknowledge that an agency's enforcement decisions are informed by a host of factors, some bearing no relation to the agency's views regarding whether a violation has occurred." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012). However, that case dealt with a markedly different statutory and regulatory history. A footnote explains, prior to 2009, the Wage and Hour Division only opined on the exempt status at issue once—in 1945. *Id.* n.16. In contrast, the CFPB has only been an agency for under a decade, and during that time has actively enforced "unfair" and "deceptive" practices, which is significantly different from the scenario with which *Christopher* dealt. There, the Supreme Court explained, "[b]ut where, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." *Id.* at 158. Defendants' argument that an active enforcement history is equally blindsiding and deprives them of fair notice is rejected.

The CFPB points to the several enforcement actions and CFPB-issued guidance that would have given Defendants fair notice of what the agency could consider "unfair" or "deceptive" acts or practices. (Opp. at 12).

The CFPB issued a bulletin in 2013 ("2013 Bulletin") with the subject "Mortgage Servicing Transfers" that was framed as "guidance to residential mortgage servicers and subservicers (collectively, servicers), to address potential risks to consumers that may arise in connection with transfers of servicing." CFPB, CFPB Bulletin 2013-01: Mortgage Servicing Transfers, at 1 (February 11, 2013).[6] The 2013 Bulletin advised that "[t]he CFPB has particular concerns related

[6] Available at https://files.consumerfinance.gov/f/201302_cfpb_bulletin-on-servicing-transfers.pdf.

to servicing transfers that arise from consumer complaints and supervisory work related to servicing transfers," and detailed the areas that CFPB examiners would pay close attention to such as:

> 1. How a transferor servicer has prepared for the transfer of servicing rights and/or responsibilities, including:
>
> a. What steps it takes before the transfer to ensure that information is transferred in a manner that is compatible with the transferee's servicing system;
>
> b. What procedures it had in place, before the transfer, to ensure that it would provide adequate information to the transferee servicer to facilitate that servicer's complying with its obligations without unnecessary interruption in servicing; and
>
> c. In what manner and how timely, after the transfer, the transferor intends to respond to inquiries from the transferee or the consumer about transferred loans.
>
> 2. How a transferee servicer handles the files transferred to it, including:
>
> a. What due diligence the transferee performs to ensure that it conveys accurate information to consumers, including, for example, information regarding amounts they owe and their delinquency status, if applicable;
>
> b. What procedures the transferee had in place to identify loss mitigation in process *(e.g.,* trial or permanent modifications, forbearance plans, or short sale/deed-inlieu agreements) at the time of transfer;
>
> c. What due diligence the transferee performs to ensure that the servicing platform or other systems it employs accurately reflect all account-level information including, for example, fees assessed to a borrower's mortgage loan account;
>
> d. What training the transferee conducts to ensure that all staff who will have operational access to the servicing platform are able to interpret, operate, manage, access, and utilize the transferred loan information; and
>
> e. What post-transfer audits the transferee servicer conducts to confirm that all data were properly transferred, and whether the transferee servicer corrects any identified errors.
>
> 3. For loans with loss mitigation in process *(e.g.,* pending loss mitigation applications, trial modifications, forbearance plans, or short sale/deed-in-lieu agreements), what policies the transferor and transferee implemented, including what procedures they adopted to ensure that:
>
> a. The transferee receives information regarding which loans are in any state of loss mitigation prior to the effective date of the transfer;
>
> b. The transferor sends, and the transferee receives, loss mitigation applications, financial documents, previous loss mitigation history *(e.g.,* borrower failed a loan modification previously) and executed copies of prior servicers' loss mitigation agreements and documents;
>
> c. The transferee is properly applying, after transfer, payments due under an

> applicable loan modification agreement or other applicable payment modification agreement;
> d. The transferee properly considers applicable loan modification or forbearance agreements before demanding or collecting amounts due;
> e. The transferee has documented circumstances in which it will require new supporting documentation from the borrower to be considered for a trial modification or converted to a permanent modification; and
> f. The transferor or transferee accurately informs the borrower of the status of any loss mitigation application that remains pending at the time of transfer.

*Id.* at 3-5.

"Fair notice is satisfied . . . as long as the company can reasonably foresee that a court could construe its conduct as falling within the meaning of the statute." *Wyndham*, 799 F.3d at 256. The publicly-available 2013 Bulletin provides fair notice that the conduct alleged in Counts I and VIII could be actionable. For a civil statute regulating economic activities "a party lacks fair notice when the relevant standard is 'so vague as to be no rule or standard at all.'" *Id.* at 250 (citation omitted). The 2013 Bulletin the CFPB highlights refutes Defendants' contention that the relevant standard is too vague to provide fair notice. (Opp. at 12). In addition to the 2013 Bulletin, the CFPB points to a number of enforcement actions that the Bureau argues provided fair notice to Defendants that their conduct could be considered "unfair" acts or practices. (*Id.* at 11).

As for the deception claims, the CFPB points to FTC and CFPB's enforcement actions, which confirmed that the agencies expect that servicers and debt collectors must: 1) have a reasonable basis for their representations to borrowers before communicating such representations to borrowers; and 2) cannot make representations where there is reason to know that the underlying information is inaccurate or incomplete. (*Id*. at 12).

The Central District of California was presented with a similar fair notice argument, which was rejected after considering the CFPB's contention that the Bureau provided "ample guidance . . . to businesses of how it intends to interpret the mandates of the CFPA."

*D & D Mktg.*, 2016 WL 8849698, at *7. The court remarked "Defendants should have taken the CFPB's expert opinion quite seriously. The Complaints suggests that Defendants did so—at least initially." *Id.*

As in *D and D Marketing*, the Complaint plausibly alleges that Defendants were aware that the use of inaccurate and incomplete information to service loans as alleged in Count I was unfair and the acts and practices regarding loan terms and statuses alleged in Count II were deceptive. *Id.* (concluding "[i]n light of the allegations in the Complaint, Defendants' argument that they did not have adequate notice of a duty to monitor third-party lead purchasers and generators is implausible."). For example, the Complaint alleges that "Ocwen's own senior leadership has repeatedly recognized and acknowledged REALServicing's failures" and that "Ocwen's former Head of Servicing Compliance testified in May 2016 that she was 'absolutely' concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015." (Compl. ¶¶ 49-51).

As for the FDCPA, when applying the "common understanding" standard, the *Hanna* court found that "lawyers certainly have a 'common understanding' that only skimming a complaint for typographical errors—as alleged in the Complaint—is not the same as being meaningfully involved in the review of the client's claims and drafting of the complaint," and accordingly rejected the vagueness argument. *Id.* at 1368–69.

As in *Hanna*, Defendants here, mortgage servicers, have a "common understanding" that making material representations that were allegedly false or misleading or not substantiated at the time to borrowers whose loans were in default that their loans have unpaid balances, monthly payments, delinquency statuses, unpaid fees, reinstatement amounts, escrow amounts due, payoff amounts due, insurance amounts due, and other amounts due could be considered "unfair" or

"deceptive" conduct under the FDCPA.

Even without a "common understanding," the CFPB points to an FTC enforcement action that resulted in a Stipulated Final Judgment and Order that restrained and enjoined defendants from "using false representations or deceptive means to collect or attempt to collect a debt or to obtain information concerning a consumer, in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10)." *FTC v. EMC Mortg. Corp.*, No. 4:08-CV-338 at 4 (E.D. Tex. Sep. 8, 2008).[7]

Accordingly, the Court rejects Defendants' fair notice challenges to Counts I, II, VIII, and IX.

**d)** Duty to substantiate

Defendants also argue that the CFPB attempts to engraft a duty to substantiate onto federal law in Counts II and IX. (Mot. at 28-29). Defendants insist that the "Complaint's position that it is a deceptive business practice to ever communicate an account balance to a borrower without some unspecified level of prior substantiation." (Mot. at 28).

The CFPB responds that Defendants had fair notice that making representations to borrowers about amounts due that were not substantiated when Defendants had reason to know that they were relying upon inaccurate or incomplete information could be prohibited under the CFPA and FDCPA. (Opp. at 11-13).

Defendants claim the "Bureau has announced that it intends at some point soon to propose, and perhaps ultimately enact, certain pre-collection substantiation requirements that would apply to third party debt collectors (though notably not loan servicers, such as Ocwen)," and argue this indicates that the conduct alleged in Counts II and IX could not violate the CFPA or FDCPA. (Mot. at 28).

[7] Available at https://www.ftc.gov/enforcement/cases-proceedings/062-3031/emc-mortgage-co.

The CFPB in turn points to how the deception standard under the FTCA has been framed in an FTC consent judgment and how the FTC and CFPB have pursued enforcement actions. (Opp. at 12). The CFPB insists those actions "affirm that servicers and debt collectors must: (1) have a reasonable basis for their representations to borrowers before communicating such representations to borrowers; and (2) cannot make representations where there is reason to know that the underlying information is inaccurate or incomplete" which would put Defendants on notice that such conduct could be prohibited. (*Id.* at 12-13). The CFPB finally points to a 2013 Bulletin titled "Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts" that instructed that "[e]nsuring that claims are supported before they are made will minimize the risk of omitting material information and/or making false statements that could mislead consumers." (*Id.* at 12).[8]

The Court rejects Defendants' assertion that Counts II and IX add a duty to substantiate where there was none under federal law, and finds that there was fair notice that such conduct, taken in light of all the facts and circumstances, could be considered violations of the CFPA and FDCPA. While Count IX is dismissed without prejudice for failure to allege Defendants are covered under the FDCPA, Count II is not subject to dismissal on this basis.

**H. Statute of limitations**

Defendants contend that Counts V and VI are barred by the statute of limitations and argue Counts VII, VIII, and IX are partially time-barred. (Mot. at 29-32). Defendants insist that the CFPA has a three-year statute of limitations and that the CFPB is only permitted to sue for conduct that occurred on or after April 20, 2014. (*Id.* at 29). Counts VI and VI allege conduct that dates back to 2011, and the Complaint notes that Defendants stopped marketing add-on products in

[8] Available at https://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf.

2013. (Compl. ¶¶ 245, 148). Count VII is allegedly time-barred by TILA's one-year statute of limitations to the extent it alleges violations prior to December 23, 2015. (Mot. at 30). Counts VIII and IX are partially time-barred, because according to Defendants, the FDCPA has a one-year statute of limitations period and the CFPB alleges conduct going back to January of 2014. (*Id.* at 30-31).

The CFPB asserts to two main reasons why statute of limitations is not a basis for dismissing any of the Counts: 1) Defendants cannot show from the face of the Complaint that these counts are time barred; and 2) Defendants misunderstand the statute of limitations provisions of the CFPA, FDCPA, and TILA. (Opp. at 32-35).

1. <u>Legal Standard:</u>

"Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004). "Generally, the question of whether a claim is barred by the statute of limitations is best raised as an affirmative defense in the answer, rather than in a motion to dismiss." *Persaud v. Bank of Am., N.A.*, 2014 WL 4260853, at *11 (S.D. Fla. Aug. 28, 2014). "A statute of limitations bar is 'an affirmative defense, and ... plaintiff[s][are] not required to negate an affirmative defense in [their] complaint.'" *La Grasta*, 358 F.3d at 845 (quoting *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir. 1993)).

"In other words, '[a]t the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute.'" *Lindley v. City of Birmingham, Ala.*, 515 F. App'x 813, 815 (11th Cir. 2013) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n. 13 (11th Cir. 2005) (quotation marks omitted)).

2. Analysis:

Here, Defendants fail to show that the running of statute of limitations is apparent on the face of the Complaint, especially where the conduct is ongoing or allegedly occurred within the relevant limitations period. *See La Grasta*, 358 F.3d at 845–46. The Complaint plausibly alleges that the wrongful conduct is either ongoing or falls within the statute of limitations, which is all that must be pled to survive a Rule 12(b)(6) motion.

a) CFPA claims

The CFPA states that for unfair, deceptive, and abusive acts or practices ("UDAAP"), "no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). "The date of discovery is the date when the plaintiff 'obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *NDG Fin. Corp.*, 2016 WL 7188792, at *19 (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992)).

In *NDG Financial Corp.*, the Southern District of New York determined that a motion to dismiss should not be granted on the basis of statute of limitations, "[b]ecause the CFPB's UDAAP claims are based on Defendants' alleged misrepresentations to consumers regarding their loans, each representation would constitute a new and separate cause of action under the CFPA." *Id.* at *20. There, the court concluded that while "[t]he FAC includes allegations about pre-July 2011 activity," which would be excluded under the statute of limitations, "those allegations are only used [to] establish the factual background of Defendants' activities, and are not the conduct that forms the basis of the [first amended complaint]'s UDAAP counts." *Id.*

Defendants contend that Counts V and VI are time-barred because the three-year statute of

limitations means the CFPB can only sue for conduct that occurred on or after April 20, 2014, and the Complaint alleges that:

> Until it **stopped marketing add-on products in 2013**, Ocwen marketed add-on products to the borrowers whose loans it serviced. Among other things, Ocwen: assisted in the development of add-on product solicitations; reviewed and approved each add-on product solicitation; and identified the borrowers whom Ocwen and its add-on product vendor would target for a particular marketing campaign.

(Mot. at 29; Compl. ¶148) (emphasis added). It is true that, "if [a plaintiff] pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court." *Tregenza*, 12 F.3d at 718. However, in this instance, the CFPB's argument that that the CFPA's language expressly states that the three-year statute of limitations only begins to run "after the date of discovery of the violation to which an action relates," is enough to survive a motion to dismiss. (Opp. at 33 (quoting 12 U.S.C. § 5564(g)(1))).

Even though Defendants might have stopped marketing the add-on products in 2013, it is a question of fact as to when the CFPB discovered the violations, which should be explored through discovery. *See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) ("The commencement of the statute of limitations is a question of fact."). Defendants cannot show as a matter of law on the face of the Complaint that the CFPB discovered Defendants' violations on or before January 2014. Therefore, the motion to dismiss Counts V and VI cannot be granted on this basis. (*See* Compl. ¶¶ 245, 249).

b) <u>FDCPA Claims</u>

Defendants move for partial dismissal of Counts VIII and IX under the statute of limitations of the FDCPA. (Mot. at 31-32). These Counts are dismissed for a failure to allege that Defendants qualify as a "debt collector" under the FDCPA. However, because that the CFPB is given leave to amend, the Court notes the following.

Defendants point to 15 U.S.C. § 1692k, which provides: "[a]n action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, **within one year from the date on which the violation occurs**." 15 U.S.C. § 1692k(d) (emphasis added). Because the Complaint alleges conduct stemming back to January 10, 2014, Defendants move for partial dismissal for claims occurring prior to December 23, 2015. (Mot. at 32).

The CFPB responds that Defendants misunderstand the application of 15 U.S.C. § 1692k, which the CFPB insists is inapplicable to an administrative enforcement action brought by the CFPB. (Opp. at 34). The CFPB argues that 15 U.S.C. § 1692k, which is captioned "Civil liability," and includes language referring to "person," applies only to actions brought privately, whereas actions brought by the CFPB are subject to 15 U.S.C. § 1692*l*, which is captioned "Administrative enforcement." (*Id.* at 34); 15 U.S.C. §§ 1692k, 1692*l*. Because 15 U.S.C. § 1692*l* does not provide a statute of limitations, the CFPB asserts that the only limitations period is the five-year statute of limitations under 28 U.S.C. § 2462, which is imposed on the federal government for actions seeking civil fines, penalties, or forfeitures. (Opp. at 34).

"Courts have a 'duty to construe statutes, not isolated provisions.'" *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)). While § 1692k(d) provides "[a]n action to enforce any liability . . . may be brought . . . within one year from the date on which the violation occurs," the Court must look at the statute in context. 15 U.S.C. § 1692k(d). Section 1692k, "Civil liability," makes no reference to any governmental plaintiff and arguably applies only to private causes of action. For example, § 1692k(a) provides "any debt collector who fails to comply with any

provision of this subchapter . . . is liable to such person" and then discusses "any action by an individual" and "in the case of a class action." 15 U.S.C. § 1692k(a).

In contrast, the very next section, "Administrative enforcement," 15 U.S.C. § 1692*l*(b) provides:

> Subject to subtitle B of the Consumer Financial Protection Act of 2010, compliance with any requirements imposed under this subchapter shall be enforced under—
>
> . . .
>
> (6) **subtitle E of the Consumer Financial Protection Act of 2010** [12 U.S.C. 5561 et seq.], by the Bureau, with respect to any person subject to this subchapter.

15 U.S.C. § 1692*l*(b)(6) (emphasis added). The "Administrative enforcement" section further provides that:

> For the purpose of the exercise by any agency referred to in subsection (b) of this section of its powers under any Act referred to in that subsection, **a violation of any requirement imposed under this subchapter shall be deemed to be a violation of a requirement imposed under that Act**.

15 U.S.C. § 1692*l*(c) (emphasis added).

The CFPB contends this means that "in a [CFPB] action to enforce the FDCPA, a violation of the FDCPA shall be 'deemed' a violation of the CFPA." (Opp. at 34). The Court agrees.

Looking to subtitle E of the CFPA, 12 U.S.C. § 5564(g) governs the "Time for bringing action" under the CFPA:

> (g) Time for bringing action
> (1) In general
> Except as otherwise permitted by law or equity, **no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates**.
> (2) Limitations under other Federal laws
> (A) In general
> **An action arising under this title does not include claims arising *solely* under enumerated consumer laws**.
> (B) Bureau authority

> In any action arising solely under an enumerated consumer law, the Bureau may commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable.
> (C) Transferred authority
> In any action arising solely under laws for which authorities were transferred under subtitles F and H, the Bureau may commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable.

12 U.S.C. § 5564(g) (emphasis added).

The Court rejects the CFPB's argument that 28 U.S.C. § 2462 provides the applicable statute of limitations; the Court instead finds that the Bureau is subject to the three-year statute of limitations pursuant to 12 U.S.C. § 5564(g)(1). Because the CFPB brings this action under the FDCPA and the CFPA, in addition to other consumer laws, 12 U.S.C. § 5564(g)(2)(A) does not preclude the application of the CFPA's three-year statute of limitations to the instant action.

The Court declines to make a ruling on whether the claims alleged by the CFPB are time-barred because they have been dismissed on other grounds, but the Court emphasizes that any FDCPA claims would be subject to a three-year statute of limitations pursuant to 12 U.S.C. § 5564(g)(1).

c) <u>TILA claims</u>

Defendants raise similar arguments about the CFPB's TILA claims and highlight a Southern District of Indiana case that found that the CFPB was subject to TILA's one-year statute of limitations pursuant to 15 U.S.C. § 1640(e). (Mot. at 30); *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 923.

In response, the CFPB asserts analogous arguments made in connection with the FDCPA, insisting that the CFPB's action is not subject to 15 U.S.C. § 1640, captioned "Civil liability" and is instead only subject to the general five-year limitations period under 28 U.S.C. § 2462. (Opp. at 34-35).

15 U.S.C. § 1640(e), captioned "Jurisdiction of courts; limitations on actions; State attorney general enforcement," states:

> Except as provided in the subsequent sentence, **any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, <u>within one year</u> from the date of the occurrence of the violation** or, in the case of a violation involving a private education loan (as that term is defined in section 1650(a) of this title), 1 year from the date on which the first regular payment of principal is due under the loan. **Any action under this section with respect to any violation of section 1639, 1639b, or 1639c of this title may be brought in any United States district court, or in any other court of competent jurisdiction, <u>before the end of the 3-year period beginning on the date of the occurrence of the violation</u>.** This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law. **An action to enforce a violation of section 1639, 1639b, 1639c, 1639d, 1639e, 1639f, 1639g, or 1639h of this title may also be brought by the <u>appropriate State attorney general</u> in any appropriate United States district court, or any other court of competent jurisdiction, <u>not later than 3 years after the date on which the violation occurs</u>.** The State attorney general shall provide prior written notice of any such civil action to the Federal agency responsible for enforcement under section 1607 of this title and shall provide the agency with a copy of the complaint. If prior notice is not feasible, the State attorney general shall provide notice to such agency immediately upon instituting the action. The Federal agency may--
> **(1)** intervene in the action;
> **(2)** upon intervening--
> > **(A)** remove the action to the appropriate United States district court, if it was not originally brought there; and
> > **(B)** be heard on all matters arising in the action; and
>
> **(3)** file a petition for appeal.

15 U.S.C. § 1640(e) (emphasis added).

The Complaint alleges violations of TILA's implementing regulation, Regulation Z, specifically 12 C.F.R. §§ 1026.36(c)(1)(i) and (ii), and 12 C.F.R. § 1026.41(d). (Compl. ¶ 263). Courts have held that Regulation Z is governed by TILA's statute of limitations, and therefore Regulation Z actions are subject to the one-year statute of limitations. *See Prescott v. PHH Mortg. Corp.*, 2017 WL 510449, at *4 (E.D. Va. Feb. 7, 2017), *aff'd*, 689 Fed. Appx. 769 (4th Cir. 2017)

("But Regulation Z, like most of TILA, is governed by a one-year statute of limitations."); *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 922.

However, even if Regulation Z actions are subject to TILA statute of limitations, the CFPB contends that the Bureau is not subject to 15 U.S.C. § 1640(e). (Opp. at 35). The CFPB emphasizes that § 1640 discusses "individual" and "class action," which should not be interpreted as applying to an administrative action. (*Id.*). The CFPB counters that the Bureau is only subject to 15 U.S.C. § 1607(a), captioned "Administrative enforcement," which provides no limitation period. (*Id.*). The CFPB then reasserts the theory that the Bureau is only subject to the general five-year limitations period under 28 U.S.C. § 2462. (*Id.*).

The Court concludes that 15 U.S.C. § 1640(e) does not apply to administrative actions.[9] However, as with the FDCPA statute of limitations, the Court is not convinced that it need look to 28 U.S.C. § 2462 for the statute of limitations. Instead, the Court finds that the CFPB is subject to the CFPA's three-year statute of limitations.

15 U.S.C. § 1607(a)(6) states that "[s]ubject to subtitle B of the Consumer Financial Protection Act of 2010, compliance with the requirements imposed under this subchapter shall be enforced under-- (6) **subtitle E of the Consumer Financial Protection Act of 2010**, by the Bureau, with respect to any person subject to this subchapter." 15 U.S.C.A. § 1607(a)(6) (emphasis added). Subtitle E of the CFPA, section 1054 governs "Litigation authority," and 12 U.S.C. § 5564(g), captioned "Time for bringing action," provides that "[e]xcept as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1).

Because the Complaint includes allegations that fall within the three-year statute of

---

[9] The Court acknowledges it arrives at a different conclusion than the United States District Court for the Southern District of Indiana. *Cf. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 923.

limitations window, the Court need not find what allegations are outside the applicable time-period for Count VII, and it is therefore not a basis for dismissal. (Compl. ¶ 258).

**I. Whether Regulation X precludes Counts III and IV under the CFPA**

Defendants argue Counts III and IV should be dismissed on the basis that 12 U.S.C. § 1024.41 precludes separate recovery under the CFPA. (Mot. at 33). Defendants insist that "[h]aving regulated comprehensively in a defined area, the CFPB may not invoke a generic grant of authority to sue Ocwen even if, as the CFPB apparently believes, the dual-tracking regulation it enacted does not cover all consumers." (*Id*. at 33). Defendants again argue that this is a "form of retroactive regulation by enforcement." (*Id.* at 33-34).

The CFPB responds that Defendants fail to cite to any legal support or statutory exemption to bolster the claim that Regulation X precludes the CFPB from bringing actions under the CFPA. (Opp. at 26). The CFPB argues that caselaw holds to the contrary: "subsequent regulatory requirements do not preclude liability under the independent and pre-existing statutory prohibitions on unfair and deceptive conduct." (*Id.* citing *Wyndham*, 799 F.3d at 247). The CFPB further adds that it has discretion to select which statute it enforces. (*Id.* citing *United States v. Batchelder*, 442 U.S. 114, 123–24 (1979) (holding "[t]his Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute[] under either so long as it does not discriminate against any class of defendants.").

The Court finds *Wyndham* persuasive. *Wyndham*, 799 F.3d at 247. There, the court rejected defendant's contention that "these 'tailored grants of substantive authority to the FTC in the cybersecurity field would be inexplicable if the Commission already had general substantive authority over this field'" and defendant's suggestion that "Congress excluded cybersecurity from the FTC's unfairness authority by enacting these measures." *Id.*

In the absence of any legal support for Defendants' position that Regulation X limits the CFPB's authority to bring actions under the CFPA, the Court declines to dismiss Counts III and IV on that basis.

**J. Failure to state a claim under Rule 8**

**1. <u>Counts I & VIII:</u>**

Count VIII is dismissed without prejudice for failure to allege that Defendants are covered by the FDCPA, so it will not be addressed for any Rule 8 deficiencies.

Count I alleges that using inaccurate and incomplete information to service loans constitutes unfair acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B). (Compl. ¶¶ 226-30).

The CFPA prohibits "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). The CFPA provides that an act or practice is unfair if it: (1) "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers"; and (2) "is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

Defendants insist that the facts pled fail to support an unfairness claim. (Mot. at 16-17). Defendants argue that the Complaint "has not given factual particulars to support the notion that Ocwen's data systems and processes have been the *cause* of any consumer injury, let alone substantial injury." (*Id.* at 16). Defendants argue that this is mere conjecture and cite to the Supreme Court's holding that a plaintiff "could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III" when bringing a claim under the Fair Credit Reporting Act. (*Id.*); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), *as revised* (May 24, 2016). Finally, Defendants suggest that the CFPB

is attempting to "use this Court to dictate some standard for mortgage loan servicing technical automation accuracy" which, "is not the function of the judiciary." (Mot. at 16).

The CFPB responds that Defendants again mischaracterize the unfairness claim because the CFPB is not "alleging that Defendants' deficient system of record is unfair" but instead alleges "Defendants have engaged in unfair conduct by servicing loans using inaccurate and incomplete information." (Opp. at 19-20) (citing Compl. ¶¶ 227-28, 33-72).

The Court rejects the argument that the Complaint failed to plead sufficient factual allegations. (*See* Compl. ¶¶ 35-68, 69-72, 82-90). The Court sees no merit in the *Spokeo* comparison because taking the allegations as true, the Complaint plausibly states "substantial injuries" resulted from Defendants' conduct including the wrongful imposition of late fees, reporting incorrect negative credit information about borrowers, and wrongfully threatening borrowers with foreclosure. *Spokeo*, 136 S. Ct. at 1549; (*see* Compl. ¶ 92). As in the fair notice analysis, the Court does not agree with Defendants' framing of the unfairness counts as imposing technical standards. The Court finds that Count I plausibly states a claim under 12 U.S.C. § 5531(c)(1) for which relief may be granted.

**2. <u>Counts II & IX:</u>**

Count IX has been dismissed for not adequately pleading that Defendants qualify as "debt collectors" under the FDCPA, but the Court finds that Count II satisfies Rule 8(a)'s pleading standard.

The CFPA prohibits "any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B). "An act or practice is deceptive if: (1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.'" *Consumer Fin. Prot. Bureau v. Gordon*,

819 F.3d 1179, 1192 (9th Cir. 2016) (quoting *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)).

Defendants insist that Count II fails to satisfy Rule 8 because it alleges with "insufficient detail" that Defendants' "alleged representations were both material, and that they misled or were likely to mislead consumers." (Mot. at 27). Defendants take issue with the generalized allegations in Count II and insist that no plaintiff would be able to proceed with "threadbare" deception claims like these. (*Id.*) (citing *McGee v. JP Morgan Chase Bank, NA,* 520 F. App'x 829, 832 (11th Cir. 2013)).

The CFPB responds that it thoroughly alleges Defendants' "failures in the areas of handling borrowers' payments, escrow, and insurance that form the basis for the deception claims in Counts II and IX." (Opp. at 24). The CFPB then highlights Sections III-A, B, and C as including allegations: 1) identifying the federal consumer laws the CFPB alleges Defendants violated, including the CFPA and FDCPA's prohibition on deceptive conduct (Compl. ¶¶ 80, 108, 131); 2) describing the many ways in which Defendants have made errors in borrowers' accounts (*Id.* at ¶¶ 81-90, 105-19, 132-39); 3) describing how these errors resulted in Defendants communicating inaccurate information to borrowers (*Id.* at ¶¶ 91, 120, 140); and 4) alleging that these deceptive representations were material and likely to mislead borrowers acting reasonably under the circumstances. (*Id.*).

The factual allegations describe the harm to borrowers and feature examples of borrower testimonials about the types of deceptive representations Defendants have allegedly made and the harm those representations have caused, which make those alleged deceptive representations material. (*See id.* at ¶¶ 97-99). Count II summarizes the specific types of representations Defendants made to borrowers including "that their loans have certain unpaid balances; monthly

payments; delinquency statuses; unpaid fees; reinstatement amounts; escrow amounts due; payoff amounts due; insurance amounts due; and other amounts due." (*Id.* at ¶¶ 232).

The Court finds that the Complaint sufficiently alleges violations of the CFPA in Count II.

**3. <u>Count V:</u>**

Defendants argue that Count V fails to satisfy Rule 8(a)'s plausibility standard. (Mot. at 29-30). The Court disagrees.

Defendants point to a gap between the legal claim, in this instance, the allegation that Defendants were enrolling customers without consent, and the facts alleged—enrolling customers without having in-hand the vendor's proof of that consent. (*Id.* at 30).

The CFPB responds that Complaint alleges that Defendants have billed and collected payments from borrowers for add-on products, including instances where the borrower did not enroll in the product. (Opp. at 28; Compl. ¶ 152). The Court agrees that the Complaint pleads Count V with adequate specificity. (Compl. ¶ 148-55, 244-47).

The CFPB also asks that this Court reject Defendants' argument that they cannot be liable when it was their add-on vendor that was responsible for enrolling borrowers into add-on products. (Opp. at 29 n.166; Mot. at 30). The CFPB is correct in arguing that a principal can be liable for the acts of the add-on vendor. *See F.T.C. v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (holding "[u]nder the FTC Act, a principal is liable for the misrepresentations of his agent acting within the scope of the agent's actual or apparent authority.").

The Court finds that the Complaint sufficiently alleges violations of the CFPA in Count V to survive a motion to dismiss.

### 4. <u>Counts III, IV & XIII:</u>

Defendants argue that Counts III, IV, and XIII are inadequately pled and should be dismissed under Rule 8. (Mot. at 32-34). The Court disagrees.

#### a) Count III:

Count III alleges that since January 2014, Defendants have unilaterally breached contracts with borrowers by foreclosing on their loans even though borrowers were performing on agreements on loss mitigation options, which constitute unfair acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B). (Compl. ¶ 235-38).

Defendants insist that Count III is insufficiently pled because "the CFPB does not allege what contracts and what contract terms were breached;" "it is unclear . . . whether it refers to oral or written agreements, the original contract, a modified contract, or a novation, and certainly no terms are identified;" and it "does not explain what 'performing on agreements on loss mitigation options' means." (Mot. at 34). Defendants protest that "performing" is too vague "because loss mitigation options can include, for example, consent foreclosures and deeds in lieu" and "[t]he CFPB cannot reasonably claim it is unfair to foreclose on a borrower who *wants* to be rid of a property." (*Id.* at 34).

The CFPB also points to "the allegations in Section II-H of the Complaint, which are incorporated by reference into Count III" that "include allegations that Defendants foreclosed on borrowers who were making trial payments according to the terms of a loan modification agreement and on borrowers who should have been subject to a foreclosure hold because they had a loan modification or other loss mitigation agreement." (Opp. at 25) (citing Compl. ¶¶ 192, 200).

Count III plausibly states a claim for which relief can be granted under the CFPA and therefore is not subject to dismissal on this ground.

**b) Count IV:**

As to Count IV, the Court finds that the Complaint adequately alleges that Defendants engaged in deceptive foreclosure practices in violation of the CFPA. (Compl. ¶¶ 239-43).

The CFPB alleges that Defendants' conduct violates Section 5531(a) of the CFPA, which states:

> The Bureau may take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.

12 U.S.C. § 5531(a). The Complaint also alleges conduct in violation of § 5536(a)(1)(B) of the CFPA, which provides "[i]t shall be unlawful for— (1) any covered person or service provider— . . . (B) to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

The Complaint alleges that "[i]n numerous instances since 2014, in connection with servicing mortgage loans, Ocwen misrepresented, directly or indirectly, expressly or by implication, that borrowers had a certain amount of time, typically 30 days, to submit additional information that Ocwen needed to complete and evaluate their loss mitigation applications and that borrowers would not be foreclosed on while that request was pending." (Compl. ¶ 240). The Complaint further alleges "while Ocwen's requests for additional information it needed to complete and evaluate borrowers' loss mitigation applications were pending, Ocwen would foreclose on the borrowers." (*Id.* at ¶ 241).

The Complaint also alleges that Defendants were aware that their conduct was in violation of the CFPA:

> In an email with the subject "Sale Date before Missing Doc Expiration," an official in Ocwen's Loss Mitigation department wrote:
>
> Please confirm if our missing letter states that if they don't send a complete package we will go ahead with sale irrespective of the missing doc due date. To me **that does not sound right, where we inform the borrower to send in documents by a date but go ahead with sale prior to expiration of that date**.
>
> The Head of Ocwen's Loss Mitigation Department agreed, responding:
>
> **If there is no denial on the current instance you should not be going to sale, period.** Even though we have disclosure language around 37 days before FC and 7th day at midnight **you will get hit with UDAP every single time** you do not follow the rules above. You need to think like the customer which is without a denial you will still think you have time.

(*Id*. at ¶ 199) (emphasis in Complaint).

Taking the allegations as true, Count IV adequately states a claim that Defendants engaged in foreclosure communications that were false or misleading and were material to decisions related to borrowers' mortgages in violation of the CFPA.

**c) Count XIII:**

Count XIII alleges that Defendants' conduct in relation to foreclosures violates Sections 6(j)(3), 6(k)(1)(C), 6(k)(1)(E) and 19(a) of RESPA, 12 U.S.C. §§ 2605(j)(3), (k)(1)(C), and (k)(1)(E), and 12 U.S.C. § 2617(a), and Regulation X, 12 C.F.R. §§ 1024.41(b)(2)(i)(B), 1024.41(c)(1)(i) and (ii), 1024.41(f)(2), and 1024.41(g) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A). (Compl. ¶¶ 297-308).

i. <u>Pleading Requirement: First Loan Mitigation Application</u>

Defendants first insist Count XIII's allegations fail to state a claim under Rule 8 because the Count fails to allege that any of the purported regulatory violations occurred with respect to a consumer's first completed loss mitigation application. (Mot. at 32-33). Defendants point to *Trionfo v. Bank of America*, which dismissed RESPA claims because the alleged communication

that violated RESPA was not the first time the plaintiffs submitted a loan modification. *Trionfo v. Bank of Am., N.A.*, 2015 WL 5165415, at *4 (D. Md. Sept. 2, 2015). The court found that "the statute clearly only applies to those submitting applications for the first time" because "protection is only extended to first-time applicants for a reason: 'provid[ing] appropriate incentives for borrowers to submit all appropriate information in the application and allow[ ][ing] servicers to dedicate resources to reviewing applications most capable of succeeding on loss mitigation options.'" *Id.* (quoting Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10836 (Feb. 14, 2013)). Defendants also highlight a footnote from the Fifth Circuit's opinion in *Wentzell v. JPMorgan Chase Bank*, which stated:

> Federal regulations restrict a mortgage servicer's ability to engage in dual tracking. *See* 12 C.F.R. § 1024.41. Courts have recognized a federal cause of action against a servicer for "dual tracking" under this provision. *See, e.g.*, *Houle v. Green Tree Servicing*, No. 14–CV–14654, 2015 WL 1867526, at *3 (E.D. Mich. Apr. 23, 2015) ("Borrowers have a private right of action against lenders who evaluate a loss mitigation application while at the same time pursuing foreclosure."). The federal restrictions, however, apply only to a borrower's first loss mitigation application. *See* 12 C.F.R. § 1024.41(i). Since the Wentzells' claims relate to later alleged loan modifications, they have not stated a claim even under the federal regulation.

*Wentzell v. JPMorgan Chase Bank, Nat. Ass'n*, 627 F. App'x 314, 318 n.4 (5th Cir. 2015).

The CFPB responds that "whether a loss mitigation application is duplicative and thus not subject to Section 41's protections is an affirmative and factual defense only available once a servicer has shown that it previously complied with *all* of Section 41's requirements for the first complete loss mitigation application for a borrower." (Opp. at 26-27). To support this, the CFPB cites to an Eleventh Circuit opinion which dealt with a Title VIII exemption; the Eleventh Circuit remarked "courts have generally treated statutory exemptions from remedial statutes as affirmative defenses." *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1013 (11th Cir. 1982).

Federal courts are split on the issue of whether § 1024.41(i) is an affirmative defense. Most recently, the Fifth Circuit held that a defendant's contention that it could not have violated RESPA because it had complied with the loss mitigation application processing provision was not an affirmative defense but rather was a denial. *Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan Tr. 2006-7*, 920 F.3d 269, 274 (5th Cir. 2019). The Fifth Circuit acknowledged that the Middle District of Florida reached the opposite conclusion in *Amarchand v. CitiMortgage*. *Id.* In *Amarchand*, the court found:

> While Plaintiff has not alleged that the subject loss mitigation application was her only application, for purposes of the motion to dismiss, her allegations are accepted as true. Without considering matters beyond the four corners of the Amended Complaint, her claim has facial plausibility. Defendant's contention is better raised as an affirmative defense and dispositive motion.

*Amarchand v. CitiMortgage, Inc.*, 2016 WL 1031303, at *2 (M.D. Fla. Mar. 9, 2016) (citation omitted).

The CFPB's Complaint never includes the modifiers "first" or "only" in describing the loss mitigation applications. The Fifth Circuit decision implies that whether the loss mitigation application is the first or only communication that Defendants received is an essential element of the claim because "the Defendants only had to comply with the regulation for one loss mitigation application." *Germain*, 920 F.3d at 274 (citing *Germain v. U.S. Bank Nat'l Ass'n*, 2018 WL 1517860, at *6 (N.D. Tex. Mar. 28, 2018) (finding "Section 1024.41 only requires a servicer to comply with its requirements for one application, and that it does not exclude applications submitted before its effective date of January 10, 2014.")); *see also Ruiz v. PennyMac Loan Servs., LLC*, 2018 WL 4772410, at *2 (N.D. Tex. Oct. 3, 2018) (finding plaintiff "does not allege any facts that enable the court to draw the reasonable inference that the loan modification application he submitted . . . was his first complete loss mitigation application" and "[n]or does he adequately

plead that he became current on his payments after PennyMac considered any previous complete loss mitigation application. [Plaintiff] must allege facts that plausibly plead a claim under one of these alternatives in order to state a claim for a violation of § 1024.41."). Section 1024.41(i) provides that:

> A servicer must comply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application.

12 C.F.R. § 1024.41(i).

The Court finds that the Complaint must plead that the alleged loss mitigation applications were the first or only applications. *See Germain*, 920 F.3d at 274.

ii. Pleading Requirement: Filing 37 Days Prior to Scheduled Foreclosure Sale

Next, Defendants argue that the Count XIII fails because the CFPB alleges that Defendants violated RESPA by obtaining foreclosure judgments or conducting foreclosure sales on borrowers who submitted a complete application more than 37 days before a foreclosure sale. (Mot. at 32). Defendants argue the date of the ultimate foreclosure sale is irrelevant; instead "the protections of Section 1024.41 apply only to the much smaller subset of borrowers who completed an application when at least 37 days were left before the sale was at that point *scheduled*." (*Id*.).

The CFPB responds that 12 C.F.R. § 1024.41(g) applies to completed loss mitigation applications submitted more than 37 days before a foreclosure sale, regardless of whether the sale is later rescheduled. (Opp. at 26-27). The CFPB argues that the pleadings correspond to what Section 41(g) requires. (*See* Compl. ¶ 195-99).

Section 1024.41(g) states:

> If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-

> judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:
> (1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
> (2) The borrower rejects all loss mitigation options offered by the servicer; or
> (3) The borrower fails to perform under an agreement on a loss mitigation option.

12 C.F.R. § 1024.41(g).

To support the proposition that the protections apply even if the sale is later rescheduled, the CFPB points to the Comment for 1024.41, which states, "[t]he protections under § 1024.41 that have been determined to apply to a borrower pursuant to § 1024.41(b)(3) remain in effect thereafter, even if a foreclosure sale is later scheduled or rescheduled." 12 C.F.R. § 1024 supp. I, § 41(b)(3) cmt. 2.

The CFPB also insists that Defendants' argument that it may have received complete applications less than 37 days before the foreclosure sale, which may have been later postponed, is also a factual defense that does not need to be negated in the Complaint.

The Eleventh Circuit held that "[b]ecause we determine timeliness based on the scheduled date of the foreclosure sale as of the date the Borrowers' complete application was received, it is irrelevant to our timeliness analysis that Ocwen subsequently rescheduled the foreclosure sale for a later date." *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1010 (11th Cir. 2016).

The Court finds that a borrower must satisfy the first-scheduled sale requirement for the protections to apply to rescheduled sales; protections do not apply to a borrower whose application was not filed more than 37 days before the first scheduled sale. The Complaint alleges that the loss mitigation applications in question were ones Defendants received after January 10, 2014—therefore avoiding retroactivity issues—however, it does not specify that the loss mitigation

applications were filed more than 37 days before a foreclosure sale was scheduled. (Compl. ¶¶ 303-07, 195-96, 199).

The Court therefore grants Defendants' Motion to Dismiss Count XIII on this ground. Upon repleading, the CFPB must allege that the completed loss mitigation applications were filed more that 37 days before the first sale was scheduled and that the alleged applications were the first or only application filed by the borrower. *See Lage*, 839 F.3d at 1011.

**5. <u>Count XI:</u>**

Count XI alleges that since January 10, 2014, Ocwen has failed to make appropriate corrections relating to Notice of Errors ("NOEs") when it finds errors in borrowers' accounts, and has failed to conduct reasonable investigations of NOEs. The CFPB asserts this constitutes violations of Section 6(e)(2) and (k)(1)(c) of RESPA, 12 U.S.C. §§ 2605(e)(2) and (k)(1)(c), and Regulation X, 12 C.F.R. §§ 1024.35(a) and 1024.35(e)(1) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A). (Compl. ¶¶ 289-92).

Defendants first argue that a NOE is defined as a "written notice" under 12 C.F.R. § 1024.35(a), but the Complaint largely references complaints directed to Defendants' call center. (Mot. at 36) (citing Compl. ¶¶ 167-73).

This argument fails because separate portions of the Complaint address written NOEs, and the Complaint does not rely on allegations pertaining to call center policies and procedures for Count XI. (Compl. ¶¶ 173-76).

Next, Defendants argue that the Complaint "parrots conclusory allegations" and "the Complaint does not allege a single written complaint was sent to Ocwen that 'include[d] the name of the borrower' and 'information that enable[d] [Ocwen] to identify the borrower's mortgage loan account.'" (Mot. at 35) (quoting 12 C.F.R. § 1024.35(a)).

The CFPB responds that the Complaint does not parrot conclusory allegations, but instead alleges that the deficiencies in Defendants' complaint and NOE policies and procedures have resulted in Defendants' failure to conduct investigations and make corrections because Defendants "(1) rely on inaccurate data in Defendants' system of record to investigate complaints and NOEs; (2) fail to consider documented systemic errors in complaint and NOE investigations; and (3) in responding to borrowers, for some complaints and NOES, simply parrot back information contained in their system of record without addressing the error." (Opp. at 28). The CFPB also points to "a representative consumer narrative in paragraph 176 that illustrates Defendants' NOE violations," which contradicts Defendants' claim that the Complaint fails to include an identifiable NOE. (*Id.*).

The CFPB argues that Defendants attempt to impose a new pleading standard and the Bureau rejects Defendants' contention that the specific complaints be "written," which the CFPB insists "is not the law." (*Id.*). Rather, the CFPB insists it "does not need to identify specific NOEs in its Complaint to plead violations of RESPA." (*Id.*).

The Court rejects the CFPB's contention that NOEs do not need to be written. 12 C.F.R. § 1024.35(a). However, because the Complaint plausibly alleges instances of written NOEs, it satisfies Rule 8(a). (*See* Compl. ¶ 176).

**6. <u>Count XII:</u>**

Count XII alleges that since January 10, 2014, Defendants' servicing policies and procedures have violated Sections 19(a) of RESPA, 12 U.S.C. § 2617(a) and Regulation X, 12 C.F.R. §§ 1024.38(a), 1024.38(b)(1)(i), (ii), and (vi), 1024.38(b)(3)(i), and 1024.38(b)(4)(i), and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A). (Compl. ¶¶ 293-96).

Defendants make no specific objections to Count XII aside from a generalized argument that "the Complaint repeatedly relies on the (inadequate) crutch that violations occurred in 'numerous instances' over several years without providing even the most minimal sense of what this means." (Mot. at 25) (citing Compl. ¶ 295).

The Complaint alleges that Defendants' have failed to maintain policies and procedures reasonably designed to ensure it achieves the objectives promulgated in 12 C.F.R. § 1024.38(b). (Compl. ¶ 294-95). The Complaint specifically alleges that Defendants have failed to maintain policies and procedures reasonably designed to ensure: (1) that it sends borrowers accurate and timely escrow statements and periodic statements; (2) that it is investigating, responding to, and, as appropriate, making corrections in response to complaints asserted by a borrower; and (3) that upon notification of the death of a borrower it promptly identifies and facilitates communication with successors. (*Id*. at ¶ 295). The Complaint includes specific factual allegations to support these claims. (*Id.* at ¶¶ 96-99, 110-13, 211, 162).

The Complaint further alleges that Defendants failed to maintain policies and procedures reasonably designed to: (1) provide Defendants' personnel with access to accurate and current documents and information pertaining to actions performed by Defendants' foreclosure attorneys; and (2) ensure that it could transfer all information and documents in a way that enables new servicers to have complete and accurate information and comply with applicable laws, and failed to disclose to new servicers known errors or failures that impact or likely impact the accuracy of transferred borrower records and a new servicer's ability to comply with applicable laws. (*Id.* at ¶ 295). The Complaint provides sufficient factual allegations to put Defendants on notice as to the claims being asserted against them. (*See id*. at ¶¶ 186-92, 205-08).

The Court finds Count XII satisfies Rule 8(a)'s pleading standards.

**7. <u>Count X:</u>**

The Complaint alleges that since January 10, 2014, Defendants have failed to pay borrowers' hazard insurance premiums in a timely manner as payments become due in violation of 12 C.F.R. §§ 1024.17(k) and 1024.34(a). (*Id.* at ¶¶ 284-85, 288). The Complaint includes factual allegations to support these claims. (*Id*. at ¶¶ 132-34).

The Complaint further alleges that since January 10, 2014, Defendants have failed to conduct annual escrow analyses for borrowers timely or even failed to conduct the escrow analyses altogether; have failed to provide borrowers with escrow statements within 30 days of the completion of the escrow account computation year or failed to provide the escrow statements at all; and have collected escrow shortages that did not exist because it failed to process borrowers' escrow shortage payments timely. (*Id.* at ¶¶ 286-88). The Complaint alleges these constitute violations of Section 6(g) of RESPA and Regulation X, 12 C.F.R. §§ 1024.17(c)(3), 1024.17(i), 1024.17(f)(1) and (3), and 1024.34(a), and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A). (*Id*. at ¶ 288). The Complaint includes sufficient factual allegations to support this claim. (*Id.* at ¶¶ 100-01, 106-28).

The Court finds Count X satisfies Rule 8(a)'s pleading standard.

**8. <u>Count VI:</u>**

The Complaint alleges that in numerous instances since July 2011, while marketing and soliciting borrowers to enroll in add-on products in connection with its servicing of mortgage loans, Defendants have represented, directly or indirectly, expressly or by implication, that the borrower was receiving a cash voucher or a refund check. (*Id*. at ¶ 249). The Complaint further alleges Defendants were soliciting the consumer to enroll in add-on products and frequently failed to disclose, or disclose adequately, the material terms and conditions of the offer, including that in order to redeem the voucher or check the borrower had to enroll in an add-on product, which

included a monthly fee. (*Id.* at ¶ 250). The CFPB next alleges that Defendants failed to disclose or disclose adequately that in order to redeem the voucher, borrowers had to remain enrolled in the add-on product for at least a year and pay monthly fees, and that the borrowers would receive the value of the voucher in quarterly installments. (*Id.*). Count VI alleges that these constitute deceptive acts and practices in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B). (*Id.* at ¶¶ 249-51).

Defendants make no specific argument as to why Count VI fails to satisfy Rule 8.

The Court finds that Count VI plausibly alleges a claim for which relief may be granted and satisfies Rule 8. (*See id*. at ¶¶ 147-55).

**9. <u>Count VII</u>:**

Count VII alleges that in numerous instances since January 10, 2014, Defendants have failed to credit timely and appropriately various forms of payments and failed to send borrowers periodic statements accurately detailing information. (*Id.* at ¶¶ 260-62). The Complaint alleges that these are violations of 12 C.F.R. §§ 1026.36(c)(1)(i) and (ii), 1026.41(d), and 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A). (*Id.* at ¶ 263).

Defendants make no specific argument about the sufficiency of the pleading apart from a generalized insistence that it fails to state a claim.

The Complaint includes factual allegations to support the claim. (*See id.* at ¶¶ 82-99). The Court finds that Count VII satisfies Rule 8's pleading standard.

**10. <u>Count XIV</u>**:

The Complaint alleges that since January 2014, Ocwen has failed to terminate private mortgage insurance automatically for borrowers who were current or became current on their mortgage as of their termination date, which constitutes violations of Section 4901(b) of the HPA,

12 U.S.C. § 4901(b), and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A). (Compl. ¶¶ 315-18).

Defendants argue that Count XIV fails to satisfy Rule 8 because it copies the statutory language of the HPA with no other factual details. (Mot. at 25-26).

The Court finds that the Complaint includes adequate factual allegations to support Count XIV. (*See* Compl. ¶¶ 144-46). The Court therefore rejects the Motion to Dismiss Count XIV on this ground.

## IV. CONCLUSION

In conclusion, the Court finds that the CFPB has stated a viable claim for relief under the CFPA, TILA, RESPA, and HPA against Defendants. Counts VIII and IX are dismissed without prejudice for failure to allege that Defendants qualify as a "debt collector" under the FDCPA. Count XIII is also dismissed without prejudice for failure to allege the essential elements of a claim under 12 C.F.R. §§ 1024.41(g), (i).

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss [ECF No. 31] is **GRANTED IN PART AND DENIED IN PART**.

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely granted when justice so requires." Therefore, in accordance with the usual practice upon granting a motion to dismiss, leave to replead the complaint will be permitted.

The CFPB may file an Amended Complaint on or before September 27, 2019. After the CFPB files an Amended Complaint, the parties are directed to file an updated joint scheduling

report within 20 days of the filing of the Amended Complaint.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 5th day of September, 2019.

KENNETH A. MARRA
United States District Judge