UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 9:17-CV-80495-MARRA**

CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., and OCWEN LOAN SERVICING, LLC,

Defendants.

_______________________________________________/

**CASE NO. 9:17-CV-80496-MARRA**

OFFICE OF THE ATTORNEY GENERAL, THE STATE OF FLORIDA,
Department of Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION, *et al.*,

Defendants.

_______________________________________________/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FLORIDA PLAINTIFFS' SECOND AMENDED COMPLAINT**

This Cause is before the Court upon Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint With Prejudice ("Motion to Dismiss") (ECF No. 96, Mot.). Plaintiffs filed a

Response in Opposition to the Motion to Dismiss (ECF No. 100, Opp.), and Defendants filed a Reply in further support of the Motion to Dismiss (ECF No. 101, Reply).

The Court has considered the Motion to Dismiss and the arguments of counsel and is otherwise fully advised in the premises. Fort the following reasons, the Motion to Dismiss is granted in part and denied in part.

## I. BACKGROUND

This action arises out of Defendants', Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), and Ocwen Loan Servicing, LLC ("OLS"), alleged actions in improper servicing of single-family residential mortgages. (ECF No. 88, SAC ¶ 1).

Plaintiffs, the Office of the Attorney General, the State of Florida, Department of Legal Affairs ("Florida Attorney General"), and the Office of Financial Regulation, the State of Florida, Division of Consumer Finance ("Florida OFR") (collectively, "the State") seek injunctive and other statutory relief under the Consumer Financial Protection Act ("CFPA") to enforce Section 6 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation X")., and Section 3(b) of the Homeowners Protection Act of 1998, 12 U.S.C. § 4902(b) ("HPA"). (*Id.* at ¶¶ 1, 9-10). The Florida OFR brings this action to enforce Chapter 494 of the Florida Statutes. (*Id.* at ¶ 11).

The Second Amended Complaint ("SAC") is pled in 8 counts, as follows:

- Count I: Failure to Disburse Escrow Timely Violations under RESPA and Regulation X (12 U.S.C. § 2605(g), 12 C.F.R. §§ 1024.17(k)(1) and 1024.34(a), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A));

- Count II: Escrow Analysis and Escrow Collection Violations under RESPA (Section 6(g) of RESPA and Regulation X, 12 C.F.R. §§ 1024.17(c)(3), 1024.17(f)(2)(i), 1024.17(f)(3) and (4), 1024.17(i), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A));
- Count III: Loss Mitigation and Foreclosure Violations under RESPA and Regulation X (Section 6(k) of RESPA, 12 U.S.C. § 2605(k), Regulation X, 12 C.F.R. §§ 1024.41(b)(2)(i)(B), 1024.41(c)(1)(i)-(ii), 1024.41(f)(2) and 1024.41(g), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A);
- Count IV: Failure to Cancel Private Mortgage Insurance ("PMI") in Violation of the Homeowners Protection Act ("HPA") (12 U.SC. § 4902(b))
- Count V: Unfair and Deceptive Loan Practices in Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Fla. Stat. § 501.204(1));
- Count VI: Unfair and Deceptive Payment Applications in Violation of FDUTPA (Fla. Stat. § 501.204(1));
- Count VII: Failure to Disburse Escrow Payments Timely in Violation of Florida Statutes § 494 (Fla. Stat. § 494.00255(1)(m))
    a. Alleged by the Florida OFR against OLS;
- Count VIII: Failure to File a Financial Audit Report Timely in Violation of Florida Statutes § 494 (Fla. Stat. § 494.0063)
    a. Alleged by the Florida OFR against OLS.

## II. LEGAL STANDARD

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do;" additionally, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alteration omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. The Court must accept all plaintiff's factual allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

"A district court, before dismissing a complaint with prejudice because of a mere pleading defect, ordinarily must give a plaintiff one opportunity to amend the complaint and to cure the pleading defect." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1239 (11th Cir. 2000).

## III. DISCUSSION

### A. Res judicata and waiver

Defendants argue that Counts I, III, VI, and VII are subject to dismissal and almost all of Count V is subject to dismissal based on the doctrine of res judicata. (Mot. at 4-12; Reply at 1-4). Defendants argue the 2014 National Mortgage Settlement ("NMS") Consent Judgment was forward-looking and encompasses the period of time for which Florida brings suit.[1] (Mot. at 4-6).

[1] Consent Decree, *Consumer Financial Protection Bureau, et al., v. Ocwen Financial Corp. and Ocwen Loan Servicing, LLC*, Case No. 1:13-cv-02025-RMC (D.D.C. Feb. 26, 2014), available at

Defendants assert that the NMS's enforcement framework is the exclusive mechanism for enforcement and argue that many of the State's claims are covered by the NMS and therefore are precluded.

The State insists the 2014 Consent Judgment does not impact the instant cause of action. (Opp. at 2-8). The State argues the Motion to Dismiss only addresses one of the four requirements for res judicata to preclude these claims. (*Id.* at 6-7). The State also argues Defendants' waiver argument must fail because the Defendants fail to point to language which would compel the prosecution of future violations through the Consent Judgment's enforcement framework. (*Id.* at 2-3).

1. Legal Standard:

"The doctrine of res judicata, or claim preclusion, forecloses relitigation of matters actually or potentially litigated in an earlier lawsuit." *Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1244 (11th Cir. 1991). A "Consent Judgment constitutes a former adjudication that is entitled to res judicata effect." *Brosnick v. Wells Fargo Bank, N.A.*, 2018 WL 6807340, at *7 (S.D. Fla. Sept. 25, 2018).

"Federal courts apply state law to questions of res judicata." *Manning v. City of Auburn*, 953 F.2d 1355, 1358 (11th Cir. 1992). "Under Florida law, res judicata applies where there is a judgment on the merits in a prior suit and bars subsequent litigation where there is: '(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity of the quality [or capacity] of the persons for or against whom the claim is made.'" *Certex USA, Inc. v. Vidal*, 706 F. Supp. 2d 1291, 1293 (S.D. Fla. 2010) (quoting *The Fla. Bar v. St. Louis*, 967 So.2d 108, 119 (Fla. 2007)).

---

https://files.consumerfinance.gov/f/201312_cfpb_consent-order_ocwen.pdf.

"Although *res judicata* is not a defense under Rule 12(b), and generally should be raised as an affirmative defense under Rule 8(c), Fed.R.Civ.P., it may be raised in a Rule 12(b)(6) motion where the existence of the defense can be determined from the face of the complaint." *Solis v. Glob. Acceptance Credit Co., L.P.*, 601 F. App'x 767, 771 (11th Cir. 2015).

2. Analysis:

Defendants move for dismissal or partial dismissal of Counts I, III, V, VI, and VII on the basis of res judicata; Counts VI and VII are dismissed on other grounds and therefore the Court need not address the application of res judicata on those counts.

This Court has explained, "[g]enerally, res judicata 'is an affirmative defense that should be raised under Rule 8(c),' but 'a party may raise a res judicata defense by motion rather than by answer where the defense's existence can be judged on the face of the complaint.'" *L & M Companies, Inc. v. Navilio*, 2016 WL 6916775, at *1 (S.D. Fla. Jan. 25, 2016) (quoting *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982)).

Unlike the Consumer Financial Protection Bureau's ("CFPB") Complaint in *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Inc. et al*, No. 17-80495-CIV (S.D. Fla. Apr. 20, 2017), DE 1, the State's SAC includes reference to a 2014 Consent Judgment, therefore inviting the defense's existence from the face of the complaint. In the "Defendants' history with regulators" portion of the SAC, it details:

> Ocwen Financial and Ocwen Loan Servicing entered a Consent Judgment dated February 26, 2014, with the Florida Attorney General and 48 other states, the District of Columbia and the CFPB to address and resolve servicing misconduct, including misapplying borrower payments, failing to maintain accurate account statements, charging unauthorized fees for default-related services, improperly imposing force-placed insurance, failing to provide accurate and timely information to borrowers relating to loss mitigation services and eligibility for loan modifications; among other misconduct.

(SAC ¶ 55). The SAC makes no further mention of the 2014 Consent Judgment; however, the SAC is suing over "misconduct occurring since February 27, 2014," which is the day after the Consent Judgment was entered into. (*Id.* at ¶ 1).

Defendants ask that the Court dismiss the following allegations from the SAC on the basis of res judicata or waiver:

1. The use of incorrect, incomplete, or missing loan servicing data allegations (SAC ¶¶ 200(a)) and the loan statements allegations (*id.* ¶ 201(a)–(d), (f)–(g)) are subject to a billing statement inaccuracy Metric (33, NMS C.J., Ex. D at D1-21) with a 5% error threshold;
2. The imposition of LPI allegations (SAC ¶ 200(b)–(c), (g)) are subject to an improper administration of LPI Metric (¶ 6.C.ii, NMS C.J., Ex. D at D1-16) with a 5% error threshold;
3. The charging excessive property inspection, BPO fees, or default fees allegations (SAC ¶ 200(d)–(e), 184(e)) are subject to an inappropriate fees (including property valuation, preservation, and late fees) Metric (4.B.,4.D, NMS C.J., Ex. D at D1-7, D1-8) with a 5% error threshold;
4. The failure to honor existing trial loan modification agreement allegations (SAC ¶ 200(i)) are subject to an improper processing of pending loan modification requests from prior servicer Metric (6.D.i., NMS C.J., Ex. D at D1-17) with a 5% error threshold rate;
5. The misrepresenting foreclosure deadlines and statuses allegations (SAC ¶ 201(h)–(k)) are subject to an incorrect modification denials Metric (1.B., NMS C.J., Ex. D at D1-2) with a 5% error threshold and improper loan modification and denial notice process Metrics (30 and 31, NMS C.J., Ex. D at D1-18, D1-19) subject to a 5% error threshold; and
6. The misapplying payments allegations (SAC ¶¶ 216–18) are subject to an inaccurate and untimely payment applications Metric (4.A, NMS C.J., Ex. D at D1-7) subject to a 5% error threshold.

(Mot. at 34).

**a. Whether the Consent Judgment is the Exclusive Mechanism for Enforcement:**

The NMS Consent Judgment outlined the "release of certain claims and remedies" as follows:

> Subject to the exceptions in Paragraph C (concerning excluded claims) below, the CFPB fully and finally releases the Released Parties from all potential liability that has been or might have been asserted by the CFPB relating to mortgage servicing

> practices described in the complaint (the "Mortgage Servicing Practices") that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013.

(NMS at E-3). The NMS Consent Judgment further provided:

> This Consent Judgment **shall remain in full force and effect for three years from the date it is entered** ("the Term"), at which time Defendant's obligations under the Consent Judgment shall expire, except that pursuant to Exhibit D, Defendant shall submit a final Quarterly Report for the last quarter or portion thereof falling within the Term and cooperate with the Monitor's review of said report, which shall conclude no later than six months after the end of the Term. **Defendant shall have no further obligations under this Consent Judgment six months after the expiration of the Term, but the Court shall retain jurisdiction for purposes of enforcing or remedying any outstanding violations that are identified in the final Monitor Report and that have occurred but not been cured during the Term**. The expiration of this Consent Judgment shall not affect any Releases.

(NMS ¶ 15) (emphasis added). Accordingly, the sunset date is February 26, 2017.

The State and Defendants disagree on the implications of a District of Columbia Circuit Court of Appeals case that similarly dealt with a National Mortgage Settlement; the court summarized the issues as such:

> The nub of Appellant's suit, regarding the Settlement, is that the Monitor's decision that Chase had complied was incorrect because Chase falsely certified that it had complied. Appellant alleges that damages are due to the United States and various state governments based on potential penalties for lender violations set forth in the Settlement—damages out of which, under the False Claims Act, he is entitled to a share.

*United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Ass'n*, 878 F.3d 309, 313 (D.C. Cir. 2017). Defendants argue *Schneider* stands for the proposition that a suit that attempted to plead around an NMS "constituted an improper collateral attack on a judgment committed to the Monitor's discretion by the [NMS]." (Mot. at 10 (quoting *Schneider*, 878 F.3d at 313)). The State responds that *Schneider* only applies to actions attempting to enforce an NMS, whereas the State here does not purport to try to enforce the terms of the NMS. (Opp. at 5).

Here, in contrast to *Schneider*, the State's SAC never invokes the Independent Monitor's findings, final report, or explicitly discusses Defendants' compliance with the NMS terms. *Cf. Schneider*, 878 F.3d at 314 ("Appellant ultimately only challenges the Monitor's legal determination that Chase complied with the Settlement.").

However, Defendants argue that *Schneider* only held that "the district court's determination that he was obliged to exhaust his claims under the Settlement's dispute resolution procedures was misconceived," because "[a]lthough he purported to represent the United States under the False Claims Act once he filed suit, he had no standing at all before he filed suit." *Id.* The court concluded "[h]e thus could hardly have exhausted the Settlement's dispute resolution procedures; by the time he had standing to do so, it was already too late." *Id.* Defendants argue that, here, the State was a party to the NMS and therefore would have had standing to enforce the consent judgment and should have exhausted the dispute resolution procedures.

Importantly, the court never reached the exhaustion issue or whether an action regarding similar conduct outlined in the consent judgment could be separate from an action to enforce the consent judgment:

> Although the government takes no position on the merits, its position on exhaustion necessarily assumes that a false claim suit may be brought independent of the Settlement. Conceptually, according to the government, **a false claim suit is different—it has a broader reach—than an action to enforce a contract**. Naturally, Appellant makes the same conceptual argument. We need not decide that issue, however, because if any act could form the basis of a false claim suit, it certainly is not presented by this case.

*Id.* (emphasis added).

While not a false claims act suit, the State takes a similar position—this is not an action to enforce a contract but rather something broader. To support that stance, the State argues the "[e]nforcement framework tolerated errors in as many as 10% of OFC and OLS loans indicates it

was never intended to ensure compliance with all state and federal laws, but instead a mechanism to test whether OFC and OLS were making progress implementing servicing standards required by the Consent Judgment." (Opp. at 3-4). The Consent Judgment also provided "[n]othing in this Consent Judgment shall relieve Defendant of its obligation to comply with applicable state and federal law." (NMS ¶ 17).

The Court finds that it cannot conclude, as a matter of law, whether the instant action is an enforcement action of the Consent Judgment. As the State explains, it is "not an action seeking remedies for uncured 'Potential Violations' as that term is defined in the Consent Judgment, but rather it is an action seeking relief for violations of state and federal consumer protection laws, many of which **occurred, and are still [allegedly] occurring after the Consent Judgment's sunset**." (*Id*. at 4) (emphasis added).

Accordingly, the Court finds Defendants' argument of res judicata is an affirmative defense that is inappropriate to rule on at this juncture. Even if the Court were to find that res judicata applied, the suit alleges conduct that occurred subsequent to the sunset period, which would not be covered by the NMS enforcement framework. The Court concludes it must wait for summary judgment or further evidence to determine whether the NMS precludes the causes of action alleged by the State.

**b. Waiver**

Defendants argue "[n]either the state of Florida, *nor any other party to the NMS*, has brought an action pursuant to the NMS terms, contending that Ocwen has failed to abide by the detailed requirements of servicing loans set forth in that document." (Mot. at 11-12). Defendants' argument bolsters the position that the Motion to Dismiss is an improper juncture to rule on the res judicata issue. Even if the Court were to conclude that the NMS set forth the proper and

exclusive mechanisms for enforcement, the Court cannot tell from the face of the SAC that the claims are barred by res judicata and that the State is failing to comply with the terms of the NMS because there is no mention of the Monitor's findings, identification of potential violations, or certificate of compliance in the SAC.

Additionally, even if the NMS were forward-looking and precluded any enforcement apart from the terms specified, the NMS sunsets on February 26, 2017. The original Complaint was filed April 20, 2017 and both the original and Second Amended Complaint allege the conduct is ongoing; the SAC therefore alleges violations occurring outside the scope of the NMS, which may not be precluded by res judicata. Accepting the allegations as true and construing them in the light most favorable to the plaintiff, the Court finds that the Motion to Dismiss cannot be granted on the basis of waiver. *See Sallah ex rel. MRT LLC v. Worldwide Clearing LLC*, 860 F. Supp. 2d 1329, 1333 (S.D. Fla. 2011)

B. Impermissible shotgun pleading

Defendants insist the entire SAC should be dismissed for impermissible shotgun pleading. (Mot. at 12-14).

The State responds that the SAC does not incorporate each preceding count into each successive count, nor does it have the other hallmarks of a shotgun pleading. (Opp. at 9-10).

1. Legal Standard:

"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). "Rule 8(a)(2) requires a complaint to include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Rule 10(b) states:

> A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and each defense other than a denial--must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).

"Rule 12(b)(6) provides that, in responding to a complaint, a defendant—prior to answering the complaint—may move the district court to dismiss the complaint for 'failure to state a claim upon which relief can be granted.'" *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127 n.3 (11th Cir. 2014) (quoting Fed. R. Civ. P. 12(b)(6)). The Eleventh Circuit has cautioned:

> Under 12(e) the Court must determine whether the complaint is such that 'a party cannot reasonably be required to frame a responsive pleading.' But the fact that a careful Judge, in the exercise of that wise discretion controlled by the prescribed principles of that rule, might so conclude does not permit him to dismiss the complaint for failure to state a claim. 'It may well be that petitioner's complaint as now drawn is too vague, but that is no ground for dismissing his action.'

*Mitchell v. E-Z Way Towers, Inc.*, 269 F.2d 126, 130 (5th Cir. 1959) (quoting *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 235 (1959)).[2]

2. <u>Analysis:</u>

"A defendant served with a shotgun complaint should move the district court to dismiss the complaint pursuant to Rule 12(b)(6) or for a more definite statement pursuant to Rule 12(e)4 on the ground that the complaint provides it with insufficient notice to enable it to file an answer." *Paylor*, 748 F.3d at 1126–27. "In dismissing a shotgun complaint for noncompliance with Rule 8(a), a district court must give the plaintiff 'one chance to remedy such deficiencies.'" *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) (citation omitted).

[2] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

The Eleventh Circuit has summarized the variety of improper pleadings often lumped together under the banner "shotgun pleadings":

> Shotgun pleadings include complaints that: (1) contain multiple counts where each count adopts the allegations of all preceding counts; (2) do not re-allege all preceding counts but are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) do not separate each cause of action or claim for relief into separate counts; or (4) contain counts that present more than one discrete claim for relief.

*Silverthorne v. Yeaman*, 668 F. App'x 354, 355 (11th Cir. 2016) (quoting *Weiland*, 792 F.3d at 1321-24).

In *Weiland*, the Eleventh Circuit explained that a pleading could initially appear to be a shotgun pleading, however, upon closer examination, it was properly pleaded:

> [Plaintiff]'s re-alleging of paragraphs 1 through 49 at the beginning of each count looks, at first glance, like the most common type of shotgun pleading. But it is not. As we have already discussed, **this Court has condemned the incorporation of preceding paragraphs** where a complaint "contains several counts, each one incorporating by reference the allegations of its predecessors [i.e., predecessor *counts*], **leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions**." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir.2002); *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir.2001) (identifying a complaint as a shotgun pleading where "[e]ach count incorporates by reference the allegations made in a section entitled 'General Factual Allegations'—which comprise[d] 146 numbered paragraphs—*while also incorporating the allegations of any count or counts that precede[d]* it.") (emphasis added**). What we have here is different. The allegations of each count are not rolled into every successive count on down the line.**

*Weiland*, 792 F.3d at 1324 (emphasis added).

However, in *Jackson v. Bank of America, N.A.*, the Eleventh Circuit elaborated that "[t]his case is illustrative" of why the Eleventh Circuit "has filled many pages of the Federal Reporter condemning shotgun pleadings and explaining their vices," because the amended complaint "employs a multitude of claims and incorporates by reference all of its factual allegations into each claim, making it nearly impossible for Defendants and the Court to determine with any certainty

which factual allegations give rise to which claims for relief." *Jackson*, 898 F.3d at 1356. The *Jackson* court held that "the amended complaint patently violates Federal Rule of Civil Procedure 8" because "[a]t twenty-eight pages long and having incorporated all 123 paragraphs of allegations into all sixteen counts, it is neither 'short' nor 'plain.'" *Id.*

The SAC is fifty-six pages long and incorporates all 146 paragraphs of allegations into each of the fourteen counts, regardless of whether the factual allegations pertain to the cause of action. The Court concludes this constitutes improper shotgun pleading and a violation of Rule 8 and *Twombly*/*Iqbal*, requiring dismissal of the CFPB's complaint without prejudice. *Id.*; *see also City of Miami v. JPMorgan Chase & Co.*, 171 F. Supp. 3d 1309, 1314 (S.D. Fla. 2016).

The State is given leave to amend its Complaint to segregate the factual allegations that relate to each Count. While this is the State's Second Amended Complaint, the State is given at least one opportunity after the Court addresses the merits of the cause of action to amend its Complaint.

C. Failure to distinguish amongst Defendants

Defendants argue Counts I, II, III, IV, V, and VI should be dismissed for a failure to distinguish amongst Defendants. (Mot. at 14-16). In addition to Defendants' arguments about improper group pleading, Defendants add "even if the SAC allegations are true, only OLS could be liable because it is the only entity servicing loans in Florida." (Mot. at 14 n.13).

The State responds that the SAC's allegations are appropriate for a common enterprise. (Opp. at 10). The State also argues that it has plausibly alleged that each Ocwen has engaged in servicing loans.

1. Legal Standard:

"When a complaint indiscriminately lumps all defendants together, it fails to comply with

Rule 8." *Joseph v. Bernstein*, 2014 WL 4101392, at *3 (S.D. Fla. Aug. 19, 2014), *aff'd*, 612 F. App'x 551 (11th Cir. 2015). "While a complaint against multiple defendants may be 'read as making the same allegation against each defendant individually,' the 'factual allegations must give each defendant 'fair notice' of the nature of the claim and the 'grounds' on which the claim rests.'" *Id*. (citations omitted).

"Where multiple corporate entities operate a 'common enterprise,' each of the interrelated companies may be held liable for the actions of the other. As a result, complaints alleging the liability of a common enterprise need not allege that each defendant committed a particular unlawful act." *People v. Debt Resolve, Inc.*, 2019 WL 2865251, at *4 (S.D.N.Y. July 3, 2019) (citations omitted).

2. Analysis:

This Court has dismissed complaints where the plaintiff has engaged in improper group pleading, noting that, it is "wholly improper" because "[b]y comingling the factual allegations against all defendants, realleging every previous allegation by reference in each claim for relief, and presenting all counts under the doctrine of joint and several liability, [plaintiff] has effectively placed the onus on Movants to discern which, if any, of the allegations are brought against them." *U.S. Bank Nat. Ass'n v. Capparelli*, 2014 WL 2807648, at *3 (S.D. Fla. June 20, 2014).

a) Existence of common enterprise liability

The SAC as pled never establishes that common enterprise liability is available under each cause of action.[3] However, upon the Court's own research and analysis, the SAC does not need to be repled on the basis of improper group pleading.

[3] The SAC merely alleges that the three Ocwen Defendants satisfy the common-enterprise test, and then the SAC repeats the allegation that each Defendant is liable individually and under common enterprise and principal-agent theories for each count. ( SAC ¶ 25). The SAC does not cite to case law that provides that common enterprise liability is available under the statutes cited.

First, the Court notes that the application of common enterprise liability to RESPA or HPA violations is uncertain. To the Court's knowledge, no case law has expressly addressed the availability of common enterprise liability under the statutes. However, the Court notes that common enterprise liability has been consistently applied to the CFPA, which is technically how the State is able to sue for RESPA and HPA violations.[4] *See Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, 2016 WL 7188792, at *16 (S.D.N.Y. Dec. 2, 2016) (holding "common enterprise liability does apply under the CFPA"); *Consumer Fin. Prot. Bureau v. Think Fin., LLC,* 2018 WL 3707911, at *7 (D. Mont. Aug. 3, 2018) ("The Court thus concludes that common enterprise liability presents a plausible means by which the CFPB may state a claim against Defendants alleging violation of the CFPA."); *Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols., LLC*, 2019 WL 1295004, at *14 (N.D. Ga. Mar. 21, 2019) (acknowledging the commonalities between the FTCA and the CFPA before determining "for the purposes of this Order, the Court finds it appropriate to rely on the common enterprise doctrine); *but see Pennsylvania v. Think Fin. Inc.,* 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016) (holding "the common enterprise theory should not be superimposed on a claim under the Dodd-Frank Act").

The Court also finds common enterprise liability has been applied to FDUTPA claims. *See Fed. Trade Comm'n v. Life Mgmt. Servs. of Orange Cty., LLC*, 350 F. Supp. 3d 1246, 1259–60 (M.D. Fla. 2018) (holding the defendants "were engaged in a common enterprise and can be held jointly and severally liable for the actions of each entity" in a case alleging FTCA and FDUTPA

[4] The RESPA violations are brought pursuant to the CFPA; the SAC states "[t]hrough the CFPA, the Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce RESPA and its implementing regulation, Regulation X. *See* 12 U.S.C. § 5552(a)(1)." (SAC ¶ 68). The HPA violations are also brought pursuant to the CFPA: "[t]hrough the CFPA, the Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce the HPA. *See* 12 U.S.C. § 5552(a)(1)." (*Id.* at ¶ 76).

violations.); *Office of Attorney Gen. Dep't of Legal Affairs v. Moving & Storage Accounting Inc.*, 2019 WL 2255575, at *9 (S.D. Fla. Mar. 22, 2019), *report and recommendation adopted sub nom. Office of Attorney Gen. v. Moving & Storage Accounting Inc.*, 2019 WL 3429123 (S.D. Fla. May 1, 2019) (holding "[t]he Plaintiff further alleged 'who' was involved with, or responsible for, the deceptive acts, specifically alleging all claims against all Defendants (who operated through a common enterprise" as satisfying pleading requirements in an action alleging FDUTPA claims).

The Court concludes that common enterprise liability presents a plausible means by which the State may state a claim against Defendants under FDUTPA. The Court declines to rule on the application of common enterprise liability to RESPA and HPA at this juncture, because the SAC plausibly alleges individual "servicer" liability of each Ocwen Defendant.[5]

b) Application of Common Enterprise Liability

"To determine whether a common enterprise, or 'maze of interrelated companies,' exists, courts consider 'the pattern and frame-work of the whole enterprise.'" *Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 656 (W.D.N.Y. 2017)(quoting *Delaware Watch Co. v. F.T.C.*, 332 F.2d 745, 746 (2d Cir. 1964)). "Factors relevant in a court's consideration of whether a common enterprise among entities exists include whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *F.T.C. v. Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *5 (E.D.N.Y. May 23, 2012). "[A] common enterprise analysis is neither an alter ego inquiry nor an issue of corporate veil piercing; instead, the entities within the enterprise may be separate and distinct corporations." *Vantage Point*, 266 F. Supp. 3d at 656. Courts have also

[5] "Servicer" as defined by the HPA, 12 U.S.C. § 4901(16), means a servicer as defined in RESPA, 12 U.S.C. § 2605(i)(2). Defendants' argument that OMS and OFC are not servicers under RESPA is discussed below.

found "that entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142–43 (9th Cir. 2010).

The State alleges that the three Defendants operate as a common enterprise. (SAC ¶ 25). The SAC alleges:

> At all times relevant to this Second Amended Complaint, Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have operated as a "common enterprise." Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have conducted the business practices described below through interconnected companies that have **common business functions, employees, and office locations**. Ocwen Financial and Ocwen Mortgage Servicing control (either formally or informally) and operate Ocwen Loan Servicing's mortgage servicing activities. Ocwen Financial also contracts for critical mortgage servicing operations for and on behalf of Ocwen Mortgage Servicing and Ocwen Loan Servicing. Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing also file consolidated financial statements and share employees and offices. Accordingly, an act by one entity constitutes an act by each entity

(*Id.*) (emphasis added). To further bolster the contention the three operate as a common enterprise, the SAC alleges: "**[a]ll three entities share and have shared key executives**, including Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox. **Each of the three entities, through Ocwen Financial, file a consolidated financial statement** with Ocwen Financial's public disclosures." (*Id.* at ¶ 16) (emphasis added).

While these factors are non-dispositive, the Court finds the SAC plausibly alleges common enterprise liability, and therefore it is not necessary to replead to differentiate the Defendants. *See NDG Fin. Corp.*, 2016 WL 7188792, at *16.

D. Failure to state a claim under Rule 8

Defendants argue Counts I, III, IV, and VI should be dismissed and Counts II and V should be partially dismissed for failure to state a claim under Rule 8. (Mot. at 15-21). Defendants argue

that the Counts summarily parrot statutory language without providing factual examples, thereby failing to state a plausible claim for relief. (*Id*. at 15).

The State responds that Rule 8(a) is satisfied. (Opp. at 8-9).

**1. RESPA violations: Counts I, II, III**

a. Whether OFC and OMS are "Servicers" under RESPA:

First, Defendants argue that OMS and OFC are not servicers under RESPA, which calls for the dismissal of OFC and OMS from Counts I, II, and III. (Mot. at 16-17).

Under 12 U.S.C. § 2605(i)(2), "'servicer' means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)." 12 U.S.C. § 2605(i)(2). "Servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

Defendants cite to case law holding that a parent or subsidiary cannot be assigned liability under RESPA if that entity is not engaging in the servicing of loans. *See McCarley v. KPMG Int'l*, 293 F. App'x 719, 722 (11th Cir. 2008) ("[plaintiff] alleges that HFC III is essentially the same entity as HSBC Mortgage Services for purposes of RESPA, he offered no authority—and we have found none—assigning liability to parent or subsidiary companies under RESPA."). However, in *McCarley*, the Eleventh Circuit was reviewing the district court's grant of summary judgment not a motion to dismiss; there, the district court had more facts to consider before finding the lone defendant "was not the servicer of the loan." *Id.*

In contrast, the SAC plausibly alleges that all three Defendants are engaged in loan servicing activities as defined by RESPA. 12 U.S.C. § 2605(i)(3); (SAC ¶¶ 15-19, 34, 39, 67, 77).

The SAC alleges that OMS: 1) is licensed by several state regulators to service loans and collect mortgage debts; 2) has entered into agreements for products and services required for servicing mortgages; and 3) has contracted for those products and services, namely the system of record and related technology services used by OLS and OFC. (SAC ¶ 18). Taking the allegations as true, the SAC plausibly alleges that OMS is a servicer under RESPA. *See Hishon*, 467 U.S. at 73; 12 U.S.C. § 2605(i)(2)-(3).

As for OFC, the SAC alleges that the entity controls, directs, operates, and participates in mortgage servicing activities, namely the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Defendants' loans. (SAC ¶ 17). The SAC also alleges that OFC has entered into agreements for products and services required for servicing mortgages. (*Id.*). This plausibly alleges that OFC engages in servicing activities as defined by RESPA, and therefore survives a motion to dismiss. 12 U.S.C. § 2605(i)(2)-(3).

As discussed previously, under a common enterprise theory, the conduct of one entity imposes liability on the other entities. However, neither the State nor Defendants adequately address the applicability of common enterprise liability under RESPA. The Court need not rule on the issue at this juncture, however, because the SAC plausibly alleges that all three are engaged in the servicing or subservicing of loans. (*See* ¶ 17-19).

b. <u>Whether Counts I and II are vague or conclusory</u>:

Defendants argue that Count I should be dismissed for parroting mere legal conclusions. (Mot. at 18-19). Defendants also argue that Count I is duplicative of the CFPB's claim. (*Id.*).

The State responds that it is not required to detail each individual complainant in the SAC. (Opp. at 14). The State points to Florida caselaw that holds "we have previously rejected the argument that Appellant, as the enforcing authority under FDUTPA, is required to name those consumers on whose behalf it is litigating a FDUTPA action." *State v. Beach Blvd Auto. Inc.*, 139 So. 3d 380, 393–94 (Fla. 1st DCA 2014).

The Court finds that Count I is not merely parroting legal conclusions and provides sufficient factual allegations to support the State's cause of action. (*See* SAC ¶¶ 153, 119-26). The SAC alleges "[o]ver 10,000 borrowers were affected nationwide by these errors, over 1,250 of whom were Floridians who suffered financial harm as a result of the Ocwen Defendants' mishandling of borrowers' hazard insurance payments." (*Id.* at ¶ 125). The Court concludes the same principle of an enforcing authority under FDUTPA should apply to the State enforcing RESPA and therefore rejects the contention that the State was required to specify the complainants. *Beach Blvd. Auto Inc.*, 139 So. 3d at 393-94.

Defendants' arguments that similar cases have been dismissed for a failure to allege RESPA violations sufficiently are misplaced. Those cases were dismissed because the plaintiffs failed to adequately allege a pattern or practice of noncompliance with RESPA. The cases Defendants cite were brought by individuals alleging a pattern or practice of noncompliance based on a few interactions with the defendants, whereas the instant action is brought by the State alleging knowledge of widespread consumer complaints. *Cf. Rodriguez v. Seterus, Inc.*, 2015 WL 5677182, at *3 (S.D. Fla. Sept. 28, 2015) ("Notwithstanding Plaintiff's attempt at construing Defendant's alleged violation as violating three separate provisions of RESPA, there is in actuality only one RESPA violation here."); *Miranda v. Ocwen Loan Servicing, LLC*, 148 F. Supp. 3d 1349, 1355–56 (S.D. Fla. 2015) (Finding "[a]llegations that the defendant refused to supply some

requested information to unidentified nonparties, without identifying any wrongfully withheld information, "are too conclusory to state a claim based on a pattern or practice of RESPA noncompliance.") (citation omitted).

The Court also rejects Defendants' contention that Count I should be dismissed for being duplicative of the CFPB's claims; these are separate causes of action brought by different parties who independently have standing to sue. There is also the potential for different remedies.

Next, Defendants argue that Counts I and II fail because the regulations apply only to current loans, which Defendants claim the SAC has not specifically alleged. (Mot. at 18-19).

However, Count I specifies that:

> at all times relevant to this action, Section 1024.17(k)(1) of Regulation X requires that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty, **as long as the borrower's payment is not more than thirty (30) days overdue**." Similarly, at all times relevant to this action, Section 1024.34(a) of Regulation X requires that "[i]f the terms of a mortgage loan require the borrower to make payments to the servicer of the mortgage loan for deposit into an escrow account to pay taxes, insurance premiums, and other charges for the mortgaged property, the servicer shall make payments from the escrow account in a timely manner, that is, on or before the deadline to avoid a penalty, **as governed by the requirements in § 1027.17(k)**."

(SAC ¶ 150) (emphasis added). Count I proceeds to allege "[i]n the course of servicing Federally Related Mortgage Loans since February 27, 2014, the Ocwen Defendants have failed to make timely disbursements from borrowers' escrow accounts for items such as hazard insurance premiums." (*Id.* at ¶ 153). Because Count I expressly alleges the requirement that the loan be current in order for the protections to be triggered, the Court can infer that the State's allegations only pertain to loans that are not late. Count I therefore fully conveys all elements of the claim.

Count II alleges violations of 12 C.F.R. § 1024.17(c)(3), which states "the servicer must conduct an escrow account analysis at the completion of the escrow account computation year to

determine the borrower's monthly escrow account payments for the next computation year, subject to the limitations of paragraph (c)(1)(ii) of this section." (SAC ¶ 162); 12 C.F.R. § 1024.17(c)(3). The requirement to conduct an annual escrow account analysis is not contingent upon a loan being current; therefore, there are no Rule 8(a) pleading deficiencies with this portion of Count II.

Next, Count II alleges violations of 12 C.F.R. § 1024.17(f)(3), which provides:

> (3) Shortages. (i) If an escrow account analysis discloses a shortage of less than one month's escrow account payment, then the servicer has three possible courses of action:
>
> (A) The servicer may allow a shortage to exist and do nothing to change it;
> (B) The servicer may require the borrower to repay the shortage amount within 30 days; or
> (C) The servicer may require the borrower to repay the shortage amount in equal monthly payments over at least a 12-month period.
>
> (ii) If an escrow account analysis discloses a shortage that is greater than or equal to one month's escrow account payment, then the servicer has two possible courses of action:
>
> (A) The servicer may allow a shortage to exist and do nothing to change it; or
> (B) The servicer may require the borrower to repay the shortage in equal monthly payments over at least a 12- month period.

12 C.F.R. §1024.17(f)(3). Count II alleges "[i]n the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(f)(3), the Ocwen Defendants have collected escrow shortages and other escrow deficiencies that did not exist, as such payments were, in fact, already paid by borrowers." (SAC ¶ 163). There is no statutory requirement that a loan be current for protections regarding escrow account shortages to be triggered.

Count II then alleges violations of 12 C.F.R. § 1024.17(f)(2)(i), which governs surpluses and provides:

> If an escrow account analysis discloses a surplus, the servicer shall, within 30 days from the date of the analysis, refund the surplus to the borrower if the surplus is greater than or equal to 50 dollars ($50). If the surplus is less than 50 dollars ($50),

> the servicer may refund such amount to the borrower, or credit such amount against the next year's escrow payments.

12 C.F.R. § 1024.17(f)(2)(i); (SAC ¶¶ 164, 158b). Here, Defendants' argument has merit because 12 C.F.R. § 1024.17(f)(2)(ii) states "[t]hese provisions regarding *surpluses* apply if the borrower is current at the time of the escrow account analysis." 12 C.F.R. § 1024.17(f)(2)(ii) (emphasis added). This portion of Count II is required to specify that the "borrower is current" for the protections related to surpluses to be triggered.

The portion of Count II that alleges violations of escrow account deficiencies pursuant to 12 C.F.R. § 1024.17(f)(4) is similarly lacking. (SAC ¶¶ 164, 159). The regulation further provides "[t]hese provisions regarding deficiencies apply if the borrower is current at the time of the escrow account analysis." 12 C.F.R. § 1024.17(f)(4)(iii).

Finally, the portion of Count II alleging violations of annual escrow amount statements pursuant to 12 C.F.R. § 1024.17(i) is also deficient. 12 C.F.R. § 1024.17(i)(2) provides:

> (2) **No annual statements in the case of default, foreclosure, or bankruptcy**. This paragraph (i)(2) contains an exemption from the provisions of § 1024.17(i)(1). **If at the time the servicer conducts the escrow account analysis the borrower is more than 30 days overdue**, then the **servicer is exempt from the requirements of submitting an annual escrow account statement to the borrower under § 1024.17(i)**. This exemption also applies in situations where the servicer has brought an action for foreclosure under the underlying federally related mortgage loan, or where the borrower is in bankruptcy proceedings. If the servicer does not issue an annual statement pursuant to this exemption and the loan subsequently is reinstated or otherwise becomes current, the servicer shall provide a history of the account since the last annual statement (which may be longer than 1 year) within 90 days of the date the account became current.

12 C.F.R. § 1024.17(i)(2) (emphasis added).

The portions of Count II alleging violations of 12 C.F.R. § 1024.17(f)(2) and (4) as well as § 1024.17(i) fail to plead that the violations alleged were for current loans, and therefore these portions of Count II are dismissed without prejudice.

c. Whether Count III is overbroad:

Defendants argue that Count III is factually and legally overbroad because it does not specify that the alleged violations involved the first loss mitigation applications submitted by a borrower. (Mot. at 20-21). Defendants also argue Count III fails to specify that the violations occurred with borrowers who submitted a complete application when at least 37 days were left before the sale was at that point scheduled. (*Id.*).

Federal courts are split on the issue of whether 12 C.F.R. § 1024.41(i) is an affirmative defense. Most recently, the Fifth Circuit held that a defendant's contention that it could not have violated RESPA because it had complied with the loss mitigation application processing provision was not an affirmative defense but rather was a denial. *Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan Tr. 2006-7*, 920 F.3d 269, 274 (5th Cir. 2019). The Fifth Circuit acknowledged that the Middle District of Florida reached the opposite conclusion in *Amarchand v. CitiMortgage*. *Id.* In *Amarchand*, the court found:

> While Plaintiff has not alleged that the subject loss mitigation application was her only application, for purposes of the motion to dismiss, her allegations are accepted as true. Without considering matters beyond the four corners of the Amended Complaint, her claim has facial plausibility. Defendant's contention is better raised as an affirmative defense and dispositive motion.

*Amarchand v. CitiMortgage, Inc.*, 2016 WL 1031303, at *2 (M.D. Fla. Mar. 9, 2016) (citation omitted).

The State's SAC never includes the modifiers "first" or "only" in describing the loss mitigation applications. The Fifth Circuit decision implies that whether the loss mitigation application is the first or only communication that Defendants received is an essential element of the claim because "the Defendants only had to comply with the regulation for one loss mitigation application." *Germain*, 920 F.3d at 274 (citing *Germain v. U.S. Bank Nat'l Ass'n*, 2018 WL

1517860, at *6 (N.D. Tex. Mar. 28, 2018) (finding "Section 1024.41 only requires a servicer to comply with its requirements for one application, and that it does not exclude applications submitted before its effective date of January 10, 2014.")); *see also Ruiz v. PennyMac Loan Servs., LLC*, 2018 WL 4772410, at *2 (N.D. Tex. Oct. 3, 2018) (finding plaintiff "does not allege any facts that enable the court to draw the reasonable inference that the loan modification application he submitted . . . was his first complete loss mitigation application" and "[n]or does he adequately plead that he became current on his payments after PennyMac considered any previous complete loss mitigation application. [Plaintiff] must allege facts that plausibly plead a claim under one of these alternatives in order to state a claim for a violation of § 1024.41."). Section 1024.41(i) provides that:

> A servicer must comply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application.

12 C.F.R. § 1024.41(i).

The Court finds that the SAC must plead that the alleged loss mitigation applications were the first or only applications. *See Germain*, 920 F.3d at 274.

Next, Defendants argue that the Count III fails because the State alleges that Defendants violated RESPA by obtaining foreclosure judgments or conducting foreclosure sales on borrowers who submitted a complete application more than 37 days before a foreclosure sale. (Mot. at 21). Defendants argue the date of the ultimate foreclosure sale is irrelevant; instead "the protections of Section 1024.41 apply only to the much smaller subset of borrowers who completed an application when at least 37 days were left before the sale was at that point *scheduled*." (*Id*.).

The Eleventh Circuit held that "[b]ecause we determine timeliness based on the scheduled date of the foreclosure sale as of the date the Borrowers' complete application was received, it is irrelevant to our timeliness analysis that Ocwen subsequently rescheduled the foreclosure sale for a later date." *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1010 (11th Cir. 2016).

The Court finds that a borrower must satisfy the first-scheduled sale requirement for the protections to apply to rescheduled sales; protections do not apply to a borrower whose application was not filed more than 37 days before the first scheduled sale. The SAC does not specify that the loss mitigation applications were filed more than 37 days before a foreclosure sale was first *scheduled*. (SAC ¶¶ 185, 87, 91, 102, 174).

The Court therefore grants Defendants' Motion to Dismiss Count III on this ground. Upon repleading, the State must allege that the completed loss mitigation applications were filed more than 37 days before the first sale was scheduled and that the alleged applications were the first or only application filed by the borrower. *See Lage*, 839 F.3d at 1011.

**2. HPA violation: Count IV**

Count IV alleges violations of Section 4902(b) of the HPA, 12 U.S.C. § 4902(b), and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A). "The HPA governs when and how private mortgage insurance can be cancelled or must be terminated." *Rice v. Green Tree Servicing, LLC*, 2015 WL 5443708, at *4 (N.D.W. Va. Sept. 15, 2015). "Pursuant to 12 U.S.C. § 4902(b)(1), a PMI requirement in connection with a residential mortgage transaction shall automatically terminate 'on the termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction.'" *Id.*

Defendants argue Count IV "simply state[s] broad conclusions of fact with no specificity or consumer examples." (Mot. at 2). The State does not expressly address this argument.

The SAC alleges "Ocwen Defendants have failed to comply with the HPA by failing to timely terminate borrowers' PMI after learning that the termination data contained in REALServicing was often unreliable or missing altogether." (SAC ¶ 146). Rule 8(a) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The SAC need not allege each individual complainant or HPA violation as long as the factual allegations are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Count IV's allegation that "[i]n numerous instances since February 27, 2014, Ocwen Defendants have failed to automatically terminate private mortgage insurance for borrowers who were current or became current on their mortgage as of their termination date" is a short and plain statement of the claim plausibly alleging the State is entitled to relief and therefore satisfies Rule 8(a). (SAC ¶ 191).

E. Not trade or commerce

Defendants argue Counts V and VI should be dismissed because loan servicing is not "trade or commerce" as defined by the statute, and therefore is not conduct governed by FDUTPA. (Mot. at 22-27). Defendants also argue the State failed to plead unfairness properly. (*Id.* at 29-34). Defendants urge the Court to limit the State's damages under FDUTPA because the State fails to allege actual damages, and the State cannot recover damages or restitution on behalf of borrowers who already obtained relief. (*Id.* at 27-29).

The State responds that FDUTPA should be liberally construed and that Defendants are engaged in "trade or commerce." (Opp. at 17-23). The State argues the unfairness standard is pled properly and that the State provided fair notice of the specific unfair or deceptive practices. (*Id.* at 23-27). The State argues that an enforcement authority need not plead damages. (*Id.* at 27-

30). The State additionally argues that coverage by a prior class action is only a potential defense to the scope of recovery on behalf of consumers. (*Id.* at 30-31).

1. Legal Standard

"A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1323 (S.D. Fla. 2014). Florida Statute § 501.203(8) further provides:

> "Trade or commerce" means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

Fla. Stat. § 501.203(8).

"An FDUPTA claim cannot be asserted against a defendant who is simply collecting a debt." *Blake v. Seterus, Inc.*, 2017 WL 543223, at *2 (S.D. Fla. Feb. 9, 2017). "Many courts have held that a servicer's attempts to enforce a mortgage are not actionable under FDUTPA." *Bank of Am., N.A. v. Zaskey*, 2016 WL 2897410, at *10 (S.D. Fla. May 18, 2016). Courts have even held "[s]ervicing and loan collection activity is not 'trade or commerce' as a matter of law." *Genao v. CitiMortgage, Inc.*, 2017 WL 10775439, at *4 (S.D. Fla. Feb. 10, 2017), *report and recommendation adopted*, 2017 WL 10775411 (S.D. Fla. Mar. 1, 2017).

This Court explained why mortgage servicers are generally excluded from the "trade or commerce" statutory definition:

> The loan servicer did not 'advertise, solicit, provide, offer or distribute' anything to the plaintiffs. According to the amended complaint, CitiMortgage merely obtained a legal interest in a mortgage note from a third party lender and proceeded to take efforts to enforce the terms of that mortgage. Even if the defendant were alleged to

> be a creditor or even an assignee of the debt, its activities do not meet FDUTPA's definition of "trade or commerce."

*Benjamin v. CitiMortgage, Inc.*, 2013 WL 1891284, at *5 (S.D. Fla. May 6, 2013). This Court has also dismissed claims because "none of Defendants' loan modification activities fall within the purview of trade or commerce," and "[a]s with mortgage enforcement generally, a loan servicer's handling of a loss mitigation application—obligatory and reactive in nature—does not involve the loan servicer "advertising, soliciting, providing, offering, or distributing" anything to borrowers." *Rodriguez v. Ocwen Fin. Corp.*, 2017 WL 3593972, at *6 (S.D. Fla. Aug. 21, 2017) (quoting Fla. Stat. § 501.203(8)).

However, courts have held that FDUTPA covers some conduct that is related to debt collection such as: force-placement of insurance where none was required, charging excessive amounts for force-placed insurance, billing for specific services that were unauthorized or never performed, or double-billing. *See Zaskey*, 2016 WL 2897410, at *10; *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1224 (S.D. Fla. 2013); *Alhassid*, 60 F. Supp. 3d at 1324; *MSPA Claims 1, LLC v. Halifax Health, Inc*, 295 F. Supp. 3d 1335, 1341 (M.D. Fla. 2018), *reconsideration denied*, 2018 WL 3458298 (M.D. Fla. July 18, 2018).

2. Analysis

Count V alleges Defendants engaged in unfair acts that are likely to cause substantial injury to consumers including: "a) the use of incorrect data or incomplete or missing documentation to service borrowers' loans; b) **the imposition of force-placed insurance in excessive amounts of coverage**; c) **the imposition of force-placed insurance where the borrower had insurance**; d) **charging borrowers excessive property inspection fees**; e) **charging borrowers excessive BPO[6] fees**; f) back-dating time-sensitive letters to borrowers; g) failing to make escrow

[6] The SAC alleges "[t]he Ocwen Defendants, through their system of record REALServicing, erroneously ordered

disbursements for insurance; h) failing to release liens in a timely fashion; i) failing to honor existing trial loan modification agreements; and j) using unlicensed vendors to conduct mortgage servicing functions." (SAC ¶ 200) (emphasis added).

Count VI alleges that Defendants engaged in unfair trade practices by: a) failing to send accurate periodic statements with the current amount due; b) failing to explain how borrowers' future payments will be applied; c) failing to account to borrowers all account activity; d) retaining a partial payment in a suspense or unapplied funds account without disclosing the total amount of funds; e) failing to treat funds as a periodic payment; and f) failing to credit borrowers' full periodic payments as of the date of receipt. (*Id.* at ¶¶ 212-18).

a) **Trade or Commerce:**

This Court's holdings in *Zaskey* and *Martorella* are instructive for the SAC's force-placed insurance FDUTPA claims. This Court in *Martorella* found that the defendants "purchasing excessively priced insurance policies that provide less comprehensive coverage, while keeping a portion of those excessive premiums as commissions or other remuneration" could constitute a violation of FDUTPA. *Martorella*, 931 F. Supp. 2d at 1223. This Court elaborated "[t]he conduct challenged in the Complaint is Defendants' provision of insurance (a product) to Martorella for which Martorella paid excessive premiums and Defendants received kickbacks in the form of commissions" which "falls squarely within 'the statute's broad definition of 'trade or commerce.''" *Id.* (quoting *Schauer v. Gen. Motors Acceptance Corp.*, 819 So. 2d 809, 812 (Fla. 4th DCA 2002)).

---

Broker's Price Opinions ("BPO") and property inspections more frequently than allowable on loans in default. As a result, the Ocwen Defendants have overcharged borrowers excess fees for BPOs of $100 to $300 per loan. An estimated 120,082 Florida borrowers were overcharged by over $822,000 (aggregate) for excess property inspection fees. In total, the Ocwen Defendants assessed millions of dollars in default fees against borrowers. The Ocwen Defendants' vendor, Altisource, provides services for the assessment of default related services, such as BPOs and property inspections." (SAC ¶¶ 128-29).

Similarly, in *Zaskey*, the defendants "obtaining lender-placed insurance in the Zaskeys' name on the property that they no longer owned after the short sale" was considered actionable under FDUTPA. *Zaskey*, 2016 WL 2897410, at *8. The Court found "to the extent the Zaskeys' FDUTPA claim is based on the force-placement of insurance on the property, Green Tree's motion to dismiss is denied," however, "[t]o the extent the Zaskeys' FDUTPA claim is based on other behavior, the Court finds that this is debt collection activity not actionable under FDUTPA, and Green Tree's motion to dismiss is granted." *Zaskey*, 2016 WL 2897410, at *11.

Notably, *Zaskey* and *Martorella*'s holdings do not stand for the proposition that force-placed insurance is a per-se violation of FDUTPA, because mortgages frequently contain provisions permitting force-placed insurance. *See Karp v. Bank of Am., N.A.*, 2013 WL 1121256, at *5 (M.D. Fla. Mar. 18, 2013) ("Plaintiff acknowledged that the Mortgage governs the terms by which Defendant is permitted to force-place insurance to cover the mortgaged property."). However, when the force-placed insurance is imposed where none is required as in *Zaskey*, or is charged in excess of what is required thereby constituting a kick-back as in *Martorella*, the conduct is considered "trade or commerce" within the meaning of Florida Statutes § 501.203(8).

This Court has held, "[i]f all the SAC alleged were loan collection activities, even if those activities were improper, FDUTPA would not apply." *Alhassid*, 60 F. Supp. 3d at 1323. However, the Court found there was a cause of action under FDUTPA when the defendant "assessed and sought to collect fees outside the scope of its legal entitlement, and more importantly, billed Plaintiffs for *specific services* which were unauthorized and which [the defendant] never performed." *Id.* at 1324 (emphasis in original). The Court called attention to the defendant charging the plaintiff for "property preservation," "property inspections," and "property appraisals." *Id.* The Court explained "[w]hile appurtenant to the pursuit of [the defendant]'s

mortgage servicing rights, those activities can be construed as the **separate offer or provision of services** within the meaning of FDUTPA" and likened it to "the force-placed insurance policy and premium assessed by the defendant in *Martorella*" where "certain of the unauthorized activities complained of by Plaintiffs here come within the scope of FDUTPA." *Id.* (citing *Martorella*, 931 F. Supp. at 1224) (emphasis added); *see also Contreras v. Nationstar LLC*, 2017 WL 3438769, at *6–7 (E.D. Cal. Aug. 10, 2017) (denying motion to dismiss of FDUTPA claims where plaintiff "alleges Nationstar charged her marked-up inspection fees, fees for services that were unauthorized and/or never performed, as well as foreclosure fees despite not being in foreclosure.").

Here, Count V alleges conduct that extends beyond mere "loan collection activities" by alleging "b) the imposition of force-placed insurance in excessive amounts of coverage; c) the imposition of force-placed insurance where the borrower had insurance; d) charging borrowers excessive property inspection fees; [and] e) charging borrowers excessive BPO fees." (SAC ¶¶ 200). This is analogous to conduct considered to be "trade or commerce" in *Zaskey*, *Alhassid*, and *Martorella*. *See Zaskey*, 2016 WL 2897410, at *11; *Alhassid*, 60 F. Supp. 3d at 1323; and *Martorella*, 931 F. Supp. 2d at 1223.

Accordingly, the Court finds that Count V may proceed insofar as the FDUTPA claim is based upon the force-placement of insurance in excess of what was required by mortgage terms or charging excessive property inspection fees or BPO fees. (SAC ¶ 200). To the extent the State's Count V FDUTPA claim is based upon debt collection activity of mortgage loans or loan modification agreements, the Court finds that is not "trade or commerce" and the Motion to Dismiss is granted. (*Id.*).

The Court finds all of the conduct alleged in Count VI to be limited to debt collection and the invoicing or application of payments. (*Id.* at ¶¶ 212-18). The Court finds this falls outside of the meaning of "trade or commerce," as there was no "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property." Fla. Stat. § 501.203(8). Therefore, the Motion to Dismiss is granted for Count VI; Count VI is dismissed with prejudice since granting leave to amend on these matters would be futile .

b) **Unfairness standard:**

FDUTPA states "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.20(1). There is no statutory definition of unfairness, and courts have relied on two different articulations of "unfairness" standards. *See CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, 2018 WL 905752, at *14 (M.D. Fla. Feb. 15, 2018) ("The statute does not define "unfair and deceptive act or practice."). This Court has held:

> Applying the more recent definition (as opposed to the historical definition) of an "unfair practice" requires that the injury to the consumer: (1) must be substantial; (2) must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) must be an injury that consumers themselves could not reasonably have avoided.

*Martorella v. Deutsche Bank Nat'l Tr. Co.*, 2015 WL 11347664, at *5 (S.D. Fla. Aug. 6, 2015). However, other courts have held "[a]n unfair practice is one that ''offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.''" *CEMEX*, 2018 WL 905752, at *14 (quoting *Intercoastal Realty, Inc. v. Tracy*, 706 F. Supp. 2d 1325, 1333 (S.D. Fla. 2010) (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)).

The Court need not evaluate the SAC's pleading of Count VI as it is dismissed. Turning our attention to Count V, the Court finds the SAC adequately pleads a FDUTPA claim under either standard.

Contrary to Defendants characterizations, Count V is not asserting "the unprecedented position that an imperfect servicing system is unfair under FDUTPA." (Mot. at 30). Instead, Count V alleges: "a. the use of incorrect data or incomplete or missing documentation to service borrowers' loans; b. the imposition of force-placed insurance in excessive amounts of coverage; c. the imposition of force-placed insurance where the borrower had insurance; d. charging borrowers excessive property inspection fees; e. charging borrowers excessive BPO fees; f. back-dating time-sensitive letters to borrowers; g. failing to make escrow disbursements for insurance; h. failing to release liens in a timely fashion; i. failing to honor existing trial loan modification agreements; and j. using unlicensed vendors to conduct mortgage servicing functions." (SAC ¶ 200).

Florida and federal courts have consistently held that "a specific rule or regulation is not necessary to the determination of what constitutes an unfair or deceptive practice under section 504.204(1)." *Dep't of Legal Affairs v. Father & Son Moving & Storage, Inc.*, 643 So. 2d 22, 24 (Fla. 4th DCA 1994); *see also State of Fla., Office of Atty. Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005) ("an act does not need to violate a specific rule or regulation in order to be considered deceptive. . . Therefore, the relevant analysis for this Court is whether . . . the moving party, has demonstrated that a specific federal or state law affirmatively authorized it to engage in the conduct alleged in the Complaints, *not* whether Plaintiffs have demonstrated that [defendant]'s conduct violates a specific rule or regulation."). The Court therefore rejects Defendants' fair notice argument.

The Court finds Count V sufficiently pleads a FDUTPA claim insofar as the allegations of: the imposition of force-placed insurance in excessive amounts of coverage; the imposition of force-placed insurance where the borrower had insurance; charging borrowers excessive property inspection fees; and charging borrowers excessive BPO fees.

Applying the *Martorella* standard, Count V adequately pleads that the injury to the consumer is substantial; it alleges that Defendants' acts and practices "have substantially injured and will likely continue to injure and prejudice the public." *Martorella*, 2015 WL 11347664, at *5; (SAC ¶ 204). It also pleads elements two and three; "these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the consumers themselves could have reasonably avoided." (SAC ¶ 204). Additionally, Count V pleads "established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers" in accordance with the alternative unfairness standard. (SAC ¶ 204); *CEMEX*, 2018 WL 905752, at *14.

c) **Damages:**

The State and Defendants disagree over whether FDUTPA requires the State to plead actual damages.

The State has somewhat clarified its position; the State's Response to the Motion to Dismiss states "[t]he Attorney General does not seek actual damages." (Opp. at 30). In Defendants' Reply, Defendants note that "the SAC's allegations had sought actual damages before the Opposition conceded the issue" and argue this does not absolve the State from satisfying pleading requirements. (Reply at 12) (citing to SAC ¶¶ 156, 168, 188 and Prayer for Relief ¶ 3)). While those portions of the SAC seek "refund of moneys or return of real property" among other

relief, Paragraphs 156, 168, and 188 of the SAC pertain to RESPA and Regulation X violations and are irrelevant to the pleading standards of FDUTPA.

The State argues Fla. Stat. § 501.207(1) provides three distinct causes of action the Attorney General may bring:

> (1) The enforcing authority may bring:
> (a) An action to obtain a declaratory judgment that an act or practice violates this part.
> (b) An action to enjoin any person who has violated, is violating, or is otherwise likely to violate, this part.
> (c) An action on behalf of one or more consumers or governmental entities for the actual damages caused by an act or practice in violation of this part. However, damages are not recoverable under this section against a retailer who has in good faith engaged in the dissemination of claims of a manufacturer or wholesaler without actual knowledge that it violated this part.

Fla. Stat. § 501.207(1). The State then suggests the remedies available are distinct from the type of action the enforcing authority brings. Section 501.207(3) provides:

> (3) **Upon motion of the enforcing authority or any interested party in any action brought under subsection (1), the court may make appropriate orders, including**, but not limited to, appointment of a general or special magistrate or receiver or sequestration or freezing of assets, to reimburse consumers or governmental entities found to have been damaged; to carry out a transaction in accordance with the reasonable expectations of consumers or governmental entities; to strike or limit the application of clauses of contracts to avoid an unconscionable result; to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise; to order any defendant to divest herself or himself of any interest in any enterprise, including real estate; to impose reasonable restrictions upon the future activities of any defendant to impede her or him from engaging in or establishing the same type of endeavor; to order the dissolution or reorganization of any enterprise; or to **grant legal, equitable, or other appropriate relief**. The court may assess the expenses of a general or special magistrate or receiver against a person who has violated, is violating, or is otherwise likely to violate this part. Any injunctive order, whether temporary or permanent, issued by the court shall be effective throughout the state unless otherwise provided in the order.

Fla. Stat. § 501.207(3) (emphasis added).

Defendants point to case law holding "[a]ctual damages are an essential element of a FDUTPA claim." (Mot. at 28) (citing *Outreach Hous., LLC v. Office of the Attorney Gen., Dep't of Legal Affairs*, 221 So. 3d 691, 696 (Fla. 4th DCA 2017).

However, the Florida Fourth District Court of Appeal recently clarified the holding of *Outreach Housing* explaining, "[o]nly when an enforcing authority is seeking recovery of actual damages under subparagraph (1)(c), or a private individual is seeking recovery of consumers' actual damages—as opposed to injunctive relief—is that party required to plead and prove "actual damages." *Office of Attorney Gen. v. Bilotti*, 267 So. 3d 1, 3 (Fla. 4th DCA 2019). In *Outreach Housing*, "the AG filed a complaint for violations of FDUTPA seeking to recover the actual damages suffered by consumers pursuant to section 501.207(1)(c), Florida Statutes (2008)." *Id.* at 3. In contrast, in *Bilotti*, "the AG was seeking relief under subparagraph (1)(b), not (1)(c), of section 501.207; thus, *Outreach Housing* is not applicable to the instant case." *Id.* at 4.

The SAC never specifies which portion of Fla. Stat. § 501.207(1) the State brings the action under. However, the State explains Counts V and VI are statutory enforcement actions to enjoin FDUTPA violations and bring about "refund of moneys to consumers; restitution; disgorgement, and any other injunctive or equitable relief allowable under law." (SAC at 56, ¶ 3). Reading the SAC in the light most favorable to the State, the FDUTPA counts do not seek actual damages, and therefore, actual damages need not be pled. *See Bilotti* at 3-4.

d) **Implications of prior class-action:**

Defendants argue "the State overreaches insofar as it purports to seek monetary damages on behalf of borrowers who have already obtained a remedy and released their LPI-based claims[7] in a class action settlement in a separate litigation against Ocwen." (Mot. at 29) (citing *Lee v.*

[7] "LPI" stands for lender-placed insurance. (Mot. at 25-26).

*Ocwen Loan Servicing, LLC*, No. 14-60649 (S.D. Fla. 2014) (DE 111-1) (the "*Lee* Settlement") and (DE 185) (the "*Lee* Final Judgment")).

There is no mention of the *Lee* Settlement or *Lee* Final Judgment in the SAC, and the Court cannot tell from the face of the SAC that it is raising claims that have already been released. The Court finds that this is an affirmative defense not required to be negated in a complaint and does not provide a basis for dismissal. *See Brown v. One Beacon Ins. Co. Inc.*, 317 F. App'x 915, 916–17 (11th Cir. 2009) (holding "[w]hen determining a motion to dismiss, a court may consider the complaint, its attachments, and documents attached to the defendant's motion to dismiss if the attached documents are central to the plaintiff's claims and referred to by the plaintiff without converting the motion to a motion for summary judgment.") (emphasis added).

F. <u>The OFR's authority to bring suit for monetary penalties</u>

Defendants argue Counts VII and VII should be dismissed because the Florida OFR is not authorized to bring suit for monetary penalties and may only seek monetary penalties in an administrative proceeding. (Mot. at 34-35).

The State responds that failure to comply with Florida regulatory laws may include an administrative fine. (Opp. at 35). The State argues the Florida OFR is due $5,000 for each category of violation, which amounts to a total administrative penalty of $10,000. (Opp. at 35).

1. <u>Analysis:</u>

The Florida OFR brings Counts VII and VIII solely against OLS. (SAC ¶¶ 223-35). Count VII alleges violations of 12 C.F.R. § 1024.7(k), which the Florida OFR is authorized to enforce pursuant to Fla. Stat. § 494.00255(1)(m). Section 494.00255(1)(u) provides:

> (1) Each of the following acts constitutes a ground for which the disciplinary actions specified in subsection (2) may be taken against a person licensed or required to be licensed under part II or part III of this chapter:

…

> (u) Failure to comply with, or violations of, any provision of this chapter, or any rule or order made or issued under this chapter.

Fla. Stat. § 494.00255(1)(u). OLS is a licensed "mortgage lender" as defined in Fla. Stat. § 494.001(24) and therefore subject to disciplinary actions under the Florida OFR's authority. Pursuant to Fla. Stat. § 494.00255(2), if the Florida OFR finds a violation of any act specified in § 494.00255(1),

> [OFR] may enter an order imposing one or more of the following penalties:
> (a) Issuance of a reprimand.
> (b) Suspension of a license, subject to reinstatement upon satisfying all reasonable conditions imposed by the office.
> (c) Revocation of a license.
> (d) Denial of a license.
> (e) Imposition of a fine in an amount up to $25,000 for each count or separate offense.
> (f) An administrative fine of up to $1,000 per day, but not to exceed $25,000 cumulatively, for each day that:
>> 1. A mortgage broker or mortgage lender conducts business at an unlicensed branch office.
>> 2. An unlicensed person acts as a loan originator, a mortgage broker, or a mortgage lender.

Fla. Stat. § 494.0255(2).

Count VIII alleges that the 2014 annual financial audit report for OLS was submitted to the Florida OFR on May 14, 2015, which was more than 120 days after the close of its fiscal year, December 31. Fla. Stat. § 494.0063, in pertinent part provides "[t]he mortgage lender shall submit a copy of the report to the office within 120 days after the end of the licensee's fiscal year." Fla. Stat. § 494.0063. OLS's deadline for submitting the 2014 report was April 30, 2015. The State argues such a violation is punishable by fine. (SAC ¶¶ 234-35).

Defendants contrast the State's position that the Florida OFR is authorized to sue for monetary damages for Chapter 494 offenses with Chapter 494's clear grant of authority to pursue

injunctive relief. (Reply at 15 n.1). Section 494.0013, titled "Injunction to restrain violations," provides:

> (1) The office may bring action through its own counsel in the name and on behalf of the state against any person who has violated or is about to violate any provision of this chapter or any rule of the commission or order of the office issued under this chapter to enjoin the person from continuing in or engaging in any act in furtherance of the violation.

Fla. Stat. § 494.0013(1). Defendants claim there is no similar grant of authority to the Florida OFR to bring suit for monetary penalties because § 494.00255(2) states "[i]f the office finds a person in violation of any act specified in this section, **it may enter an order** imposing one or more of the following penalties," which Defendants claim forecloses the possibility the OFR could bring suit to impose such a penalty. (Mot. at 34-35 (quoting Fla. Stat. § 494.00255(2)) (emphasis added).

The State responds that Fla. Stat. § 494.002 refutes that assumption, because it provides "[t]his **chapter does not limit any statutory or common-law right** of any person to bring any action in any court for any act involved in the mortgage loan business or **the right of the state to punish any person for any violation of any law**." Fla. Stat. § 494.002 (emphasis added).

The Court finds that § 494.002 does not create a cause of action where an administrative action is specified in the controlling statute. This conclusion rests on the Defendants' arguments that Chapter 494 creates an administrative remedy and does not permit the court to stand in the shoes of the administrative agency, even where the administrative agency requests the Court do so. *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 513 (1943) ("Of course, the courts should not arrogate to themselves the functions of administrative agencies."). It is extraordinarily rare for an administrative agency to forego its own enforcement authority, however, even in this unusual role-reversal, the Court must abide by the boundaries established by

the State legislature. *See e.g. United States v. Morton Salt Co.*, 338 U.S. 632, 643 (1950) (holding "Congress obviously deemed it a function of the Commission, rather than of the courts, to probe compliance with such decrees, even when it had no part in obtaining them.").

Section 494.00255 enacts administrative procedures for the Florida OFR to handle violations of Chapter 494. The only indication the legislature authorizes the Florida OFR to bring an action in court, outside of that framework, is in Fla. Stat. § 494.0013, which permits only injunctive relief. Fla. Stat. § 494.0013. It is well-established that "[an agency] may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 485 (2001). The principle that "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion" applies equally to the state legislature. *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013). "Both [an agency's] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *Id.* at 297.

The Florida OFR cannot invoke a statutory scheme's silence on suing for monetary penalties as permission to deviate from the established administrative procedures to accomplish the same objective—$5,000 for each violation. *See e.g. Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160–61 (2000) ("It is therefore clear, based on the FDCA's overall regulatory scheme and the subsequent tobacco legislation, that Congress has directly spoken to the question at issue and precluded the FDA from regulating tobacco products.").

The Court grants the Motion to Dismiss Counts VII and VIII; the counts are dismissed with prejudice because leave to amend would be futile.

G. Statute of limitations

Defendants contend Counts I, II, III, IV, and VII should be dismissed insofar as they seek recovery for alleged violations barred by the applicable statute of limitations. (Mot. at 35).

The State responds that statute of limitations are an affirmative defense that plaintiffs are not required to negate in the complaint. (Opp. at 34).

1. Legal Standard:

"Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845-46 (11th Cir. 2004). "Generally, the question of whether a claim is barred by the statute of limitations is best raised as an affirmative defense in the answer, rather than in a motion to dismiss." *Persaud v. Bank of Am., N.A.*, 2014 WL 4260853, at *11 (S.D. Fla. Aug. 28, 2014). "A statute of limitations bar is 'an affirmative defense, and ... plaintiff[s][are] not required to negate an affirmative defense in [their] complaint.'" *La Grasta*, 358 F.3d at 845 (quoting *Tregenza v. Great American Communications Co.*, 12 F.3d 717, 718 (7th Cir. 1993)).

"In other words, '[a]t the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute.'" *Lindley v. City of Birmingham, Ala.*, 515 F. App'x 813, 815 (11th Cir. 2013) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n. 13 (11th Cir. 2005) (quotation marks omitted)).

2. Analysis:

**i. RESPA**

Defendants insist that the State's RESPA claims brought are subject to a three-year statute of limitation pursuant to 12 U.S.C. § 5564(g) and 12 U.S.C. § 2614. (Mot. at 35).

RESPA provides that:

> Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred, within 3 years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation, **except that actions brought by** the Bureau, the Secretary, **the Attorney General of any State,** or the insurance commissioner of any State may be brought within 3 years from the date of the occurrence of the violation.

12 U.S.C. § 2614 (emphasis added).

Counts I, II, and III allege Defendants have committed violations of RESPA since February 27, 2014 (SAC ¶¶ 153-56, 162-68, 181-88). Defendants argue that the State could recover for alleged RESPA violations that occurred only on or after April 20, 2014.[8]

The State argues that Defendants' argument that alleged violations occurring between February 27, 2014 and April 20, 2014 are time barred is an affirmative defense.

The Court finds that because this action is brought by the Attorney General of Florida, the statute of limitations for the RESPA counts begin 3 years from the date of occurrence of the violation. 12 U.S.C. § 2614. However, the SAC plausibly alleges that the wrongful conduct is either ongoing or falls within the limitations period, which is conduct that occurred on or after April 20, 2014, which is all that must be pled to survive a Rule 12(b)(6) motion.

**ii. HPA**

The HPA provides that: "[n]o action may be brought by a mortgagor under subsection (a) later than **2 years after** the **date of the discovery** of the violation that is the subject of the action." 12 U.S.C. § 4907(b) (emphasis added).

In Count IV, the SAC alleges that in numerous instances since February 27, 2014

[8] These Counts were part of the original Complaint, filed on April 20, 2017.

Defendants have failed to terminate automatically private mortgage insurance for borrowers who were current or became current on their mortgage as of their termination date. (SAC ¶ 191). Defendants respond that the State could recover for alleged HPA violations that occurred only on or after July 11, 2016, given the HPA's two-year statute of limitations.[9] (Mot. at 35).

It is a question of fact as to when the State discovered the alleged HPA violations, which should be explored through discovery. *See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) ("The commencement of the statute of limitations is a question of fact.").

Defendants cannot show as a matter of law from the face of the SAC that the State discovered Defendants' violations on or before July 11, 2016. Therefore, the motion to dismiss Count IV cannot be granted on this basis.

**iii. Chapter 494**

The Florida OFR brought Count VII under Chapter 494, Fla. Stat., for RESPA and Regulation X violations. The State argues 95.011(3)(f) "[a]n action founded on a statutory liability" applies, which would set a statute of limitations of 4 years. Fla. Stat. § 95.11(3)(f).

Count VII is dismissed with prejudice on the basis that the OFR has no authority to bring suit for monetary penalties, so the Court need not address the statute of limitations argument. Granting Florida OFR leave to amend would be futile.

## IV. CONCLUSION

In conclusion, the Court finds that the State has stated a viable claim for relief under RESPA, HPA, and FDUTPA against Defendants. Count II is partially dismissed without prejudice for failure to allege that the loans were current. Count III is dismissed without prejudice for failure

[9] The HPA claim, Count IV, was newly added in the SAC on July 11, 2018.

to plead essential elements of a claim under 12 C.F.R. § 1024.41(i). Count VI is dismissed with prejudice for failure to allege conduct defined as "trade or commerce" under FDUTPA. Counts VII and VIII are dismissed with prejudice because the Florida OFR may not bring a suit for monetary penalties where it could have obtained the relief sought in an enforcement action.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss [ECF No. 96] is **GRANTED IN PART AND DENIED IN PART**.

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely granted when justice so requires." Therefore, in accordance with the usual practice upon granting a motion to dismiss, leave to replead the complaint will be permitted.

The State may file an Amended Complaint on or before October 19, 2019. After the State files an Amended Complaint, the parties are directed to file an updated joint scheduling report within 20 days of the filing of the Amended Complaint.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of September, 2019.

KENNETH A. MARRA
United States District Judge