**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA**

CONSUMER FINANCIAL PROTECTION
BUREAU,

                  Plaintiff,

     v.

OCWEN FINANCIAL CORPORATION; OCWEN
MORTGAGE SERVICING, INC.; and OCWEN
LOAN SERVICING, LLC, and PHH
MORTGAGE CORPORATION, a New Jersey
corporation, as successor-in-interest to Ocwen
Loan Servicing, LLC

                  Defendants.

**CASE NO. 9:17-CV-80496-MARRA**

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA,
Department of Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

                  Plaintiffs,

     v.

OCWEN FINANCIAL CORPORATION,
a Florida corporation, OCWEN MORTGAGE
SERVICING, INC., a U.S. Virgin Islands
corporation, OCWEN LOAN
SERVICING, LLC, a Delaware limited
liability company, and PHH MORTGAGE
CORPORATION, a New Jersey corporation,
as successor-in-interest to Ocwen Loan
Servicing, LLC.

                  Defendants.

**<u>FLORIDA PLAINTIFFS' THIRD AMENDED COMPLAINT</u>**

Plaintiffs, the Office of the Attorney General, The State of Florida, Department of Legal Affairs (the "Florida Attorney General"), and the Office of Financial Regulation, The State of Florida, Division of Consumer Finance (the "Florida Office of Financial Regulation") (collectively, the "Plaintiffs"), by and through their undersigned attorneys, sue defendants, Ocwen Financial Corporation, a Florida corporation ("Ocwen Financial"), Ocwen Mortgage Servicing, Inc., a U.S. Virgin Islands corporation ("Ocwen Mortgage Servicing"), Ocwen Loan Servicing, LLC, a Delaware limited liability company ("Ocwen Loan Servicing"), and PHH Mortgage Corporation, a New Jersey corporation, as successor-in-interest to Ocwen Loan Servicing ("PHH Mortgage") (Ocwen Financial, Ocwen Mortgage Servicing, Ocwen Loan Servicing and PHH are collectively referred to herein as the "Ocwen Defendants" or "Ocwen"), and respectfully allege as follows:

## INTRODUCTION

1.     This is a civil action filed by the Florida Attorney General and the Florida Office of Financial Regulation against the Ocwen Defendants for misconduct occurring since February 27, 2014, relating to their servicing of single-family residential mortgages.  The parent company Ocwen Financial is based in West Palm Beach, Florida.

2.     In violation of federal and Florida consumer protection laws, the Ocwen Defendants have engaged in acts and practices that have resulted in harm to consumers in Florida and throughout the United States.  Ocwen's reliance on a deficient system of record, along with other conduct, has resulted in the mishandling loan modifications, misapplied mortgage payments, failure to run escrow analyses, failure to make insurance payments from borrowers' escrow accounts causing home insurance policies to be cancelled, overcharging borrowers' accounts for

default fees, and widespread miscommunications to borrowers throughout Florida and the United States.

3.     Deficiencies in the Ocwen Defendants' system of record throughout the majority of the time period relevant to this action have been widespread and often required manual fixes.

4.     Harm to borrowers has also resulted from the Ocwen Defendants' failures to implement adequate control over vendors.

5.     The Ocwen Defendants knew or should have known that their servicing errors were widespread and that the technology used in their systems, including their proprietary system of record, was compromised and functioning below industry standard.  The Ocwen Defendants knew or should have known that their system of record did not interface properly with prior servicers' and vendors' technologies, and they should have exercised due diligence to ensure a fully functional servicing platform.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action because it presents a federal question, 28 U.S.C. § 1331 and is an action "brought under Federal consumer financial law," 12 U.S.C. § 5565(a).  This action is brought by the Florida Attorney General pursuant to its authority under 12 U.S.C. §§ 5536 and 5552.  This action is brought by the Florida Office of Financial Regulation pursuant to its authority under 12 U.S.C. §§ 5536 and 5552.

7.     In addition, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the state law claims asserted by the Florida Attorney General because those claims are so related to the claims brought under Federal consumer financial law that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the claims brought by Plaintiffs under the Consumer Financial Protection Act of 2010 (the "CFPA").

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f) because the Ocwen Defendants are located in or do business in this district and a substantial part of the events or omissions and course of conduct giving rise to the claims set forth in this Third Amended Complaint occurred in this district.

## PLAINTIFFS

9.      This action is brought by the Plaintiffs – however, the Florida Office of Financial Regulation is only a party to Count I – to seek injunctive and other statutory relief under the CFPA to enforce (i) Section 6 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation X"), (ii) Section 3(b) of the Homeowners Protection Act of 1998, 12 U.S.C. § 4902(b) ("HPA"), and (iii) the CFPA's prohibition on any covered person or servicer provider from engaging in any unfair or deceptive acts or practices, pursuant to 12 U.S.C. 5536(a)(1)(B).  RESPA and HPA are Federal consumer financial laws.  12 U.S.C. §§ 5481(12)(M) & (14).  Violations of RESPA and HPA represent violations of the CFPA.  *See* 12 U.S.C. § 5536(a)(1)(A), 5481(12)(M) & (14); *see also* 12 U.S.C. § 4909(a)(4).  Each Plaintiff is an enforcing authority of the CFPA, and therefore they are authorized to bring this action and to enforce the CFPA.  12 U.S.C. § 5552.  The CFPA prohibits the violation of Federal consumer financial law by any covered person or service provider.  *See* 12 U.S.C. § 5536(a)(1)(A).  The CFPA also prohibits any covered person or service provider from "engag[ing] in any unfair, deceptive, or abusive act or practice."  *See* 12 U.S.C. § 5536(a)(1)(B).

10.     This action is also brought by the Florida Attorney General pursuant to the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA").  The Florida Attorney General is an enforcing authority of FDUTPA.  *See* Fla. Stat. § 501.203(2)

(2019).  The Office of the Florida Attorney General has conducted an investigation of the matters alleged herein, and the head of the enforcing authority, the Attorney General, has determined that this enforcement action serves the public interest.  The FDUTPA statutory violations alleged herein affect more than one judicial circuit of the state of Florida.  As an enforcing authority under FDUTPA, the Florida Attorney General is authorized to pursue this action to enjoin FDUTPA violations and to obtain legal, equitable, or other appropriate relief, including restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, and other relief as may be appropriate pursuant to Sections 501.207, 501.2075, and 501.2077, Florida Statutes.

## DEFENDANTS

11.     Defendant Ocwen Financial is a publicly traded Florida corporation with its principal place of business in West Palm Beach, Florida.  Ocwen Financial and its consolidated subsidiaries provide residential mortgage servicing services and engages in specialty servicing and other mortgage-related services.  At all times relevant to this Third Amended Complaint, Ocwen Financial transacts or has transacted business in this district, throughout the State of Florida and the United States.

12.     Defendant Ocwen Mortgage Servicing is a United States Virgin Islands corporation.  Ocwen Mortgage Servicing's principal place of business is in the United States Virgin Islands.  At all times relevant to this Third Amended Complaint, Ocwen Mortgage Servicing transacts or has transacted business in this district, throughout the state of Florida and the United States.  Ocwen Mortgage Servicing is a direct subsidiary of Ocwen Financial.

13.     At times relevant to this action, Defendant Ocwen Loan Servicing was a Delaware limited liability company and until June 1, 2019 it was a wholly-owned second-tier subsidiary servicing company of Ocwen Financial.  Ocwen Loan Servicing has maintained its principal place of business in West Palm Beach, Florida.  As set forth in Ocwen's Corporate Disclosure (Case No.

17-cv-80495, DE 451), Ocwen Loan Servicing merged into PHH Mortgage Corporation (previously defined as "PHH Mortgage") on June 1, 2019, and PHH Mortgage is successor by merger to Ocwen Loan Servicing.   PHH Mortgage is a wholly owned subsidiary of PHH Corporation.  Ocwen Financial owns 100% of the common stock of PHH Corporation; according to Ocwen's corporate filings, Ocwen completed its acquisition of PHH Corporation on October 4, 2018.  For purposes of this Third Amended Complaint, references to Ocwen Loan Servicing are to Ocwen Loan Servicing through June 1, 2019, and PHH, in its role as successor in interest to Ocwen Loan Servicing, with respect to the time-period from June 1, 2019 forward.  Ocwen Loan Servicing is a direct subsidiary of Ocwen Mortgage Servicing.  Ocwen Loan Servicing is licensed as a mortgage lender pursuant to Chapter 494, Florida Statutes, and holds license No. MLD765 from the Florida Office of Financial Regulation.  Ocwen Loan Servicing's mortgage lender license with the State of Florida is active through December 31, 2019.  At all times relevant to this Third Amended Complaint, Ocwen Loan Servicing transacts or has transacted business in this district and throughout the State of Florida and United States.

14.    Ocwen Financial, through its consolidated subsidiaries, originates and services loans.  The Ocwen Defendants engage in servicing activities for "federally related mortgage loans" as defined in Regulation X, the implementing regulation of RESPA.  *See* 12 C.F.R. § 1024.2.  Such servicing activities related to these "federally related mortgage loans" include, but are not limited to, receiving and processing borrower payments, making payments of principal and interest to the owners of the loans, administering loss mitigation processes, and managing foreclosures.  The Ocwen Defendants also acquire and collect upon borrowers' mortgage debts that are in default.

15.    Ocwen Financial, the parent and publicly traded company, wholly owns all of the common stock of its primary operating subsidiary, Ocwen Mortgage Servicing.  Ocwen Mortgage

Servicing wholly owned the stock of another of Ocwen Financial's primary operating subsidiaries, Ocwen Loan Servicing, from January 1, 2014 until June 1, 2019.  All three entities share and have shared key executives, including Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox.  Each of the three entities, through Ocwen Financial, file a consolidated financial statement with Ocwen Financial's public disclosures.

16.     Ocwen Financial directs, operates, and participates in mortgage servicing activities, including the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations, for Ocwen's loans. Ocwen Financial enters into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. Ocwen Financial has contracted for such products and services, including a system of record and related technology services, for and on behalf of Ocwen's affiliates, which include Ocwen Mortgage Servicing and Ocwen Loan Servicing.

17.     Ocwen Mortgage Servicing is also engaged in servicing loans for borrowers. Ocwen Mortgage Servicing is licensed by numerous state regulators to service loans and collect mortgage debts. It has entered into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. Ocwen Mortgage Servicing has also contracted for such products and services, including a system of record and related technology services used by Ocwen Loan Servicing and Ocwen Financial.  Ocwen Loan Servicing also represented in an August 23, 2016 Consent Order with the State of Washington Department Financial Institutions, that Ocwen Mortgage Servicing engages in the servicing or subservicing of Ocwen Loan Servicing loans.

18.     Ocwen Loan Servicing is a servicer and has been licensed by numerous state regulators to service loans and collect borrowers' mortgage debts.

19.    At all times relevant to this Third Amended Complaint, each of the Ocwen Defendants has been a "covered person," as defined by 12 U.S.C. § 5481(6)(A).  Each entity offers or provides a consumer financial product or service for use by consumers primarily for personal, family, or household purposes, or that is delivered, offered, or provided in connection with such a product or service by servicing mortgage loans and collecting on consumers' mortgage debts, among other services. 12 U.S.C. § 5481(15)(A)(i) and (x).

20.    As set forth in Paragraphs 13 and 15, at all times relevant to this Third Amended Complaint, Ocwen Financial has been a "related person" because, it has been the direct and indirect shareholder of all Ocwen Mortgage Servicing and Ocwen Loan Servicing stock, and is thus a "controlling shareholder" and "shareholder…or other person…who materially participates in the conduct of the affairs" of Ocwen Mortgage Servicing and Ocwen Loan Servicing, which are covered persons.  12 U.S.C. § 5481(25)(C)(i) and (ii).  Ocwen Financial is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law. 12 U.S.C. § 5481(25)(B).  At all times relevant to this Third Amended Complaint, Ocwen Mortgage Servicing has been a "related person" because, as described in Paragraphs 13 and 15, it owned all of Ocwen Loan Servicing's stock at all times relevant to this action until June 1, 2019 and is thus a "controlling shareholder" and a "shareholder…or other person…who materially participates in the conduct of the affairs" of Ocwen Loan Servicing, which is a covered person.  12 U.S.C. § 5481(25)(C)(i) and (ii).  At all times relevant to this Third Amended Complaint, Ocwen Mortgage Servicing is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

21.    At all times relevant to this Third Amended Complaint, Ocwen Financial and Ocwen Mortgage Servicing have been service providers, as defined in 12 U.S.C. § 5481(26)(A),

to Ocwen Loan Servicing because, as described above, Ocwen Financial and Ocwen Mortgage Servicing have provided material services to Ocwen Loan Servicing.  Ocwen Financial and Ocwen Mortgage Servicing have also controlled and participated in the design, operation, and maintenance of Ocwen Loan Servicing's mortgage servicing activities.   12 U.S.C. § 5481(26)(A)(i).

22.     At all times relevant to this Third Amended Complaint, Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have operated as a "common enterprise." Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have conducted the business practices described below through interconnected companies that have common business functions, employees, and office locations. Ocwen Financial and Ocwen Mortgage Servicing control (either formally or informally) and operate Ocwen Loan Servicing's mortgage servicing activities.  Ocwen Financial and Ocwen Mortgage Servicing also contract for critical mortgage servicing operations for and on behalf of Ocwen Loan Servicing.  Additionally, Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing file consolidated financial statements and share employees and offices.  Accordingly, an act by one entity constitutes an act by each entity comprising the "common enterprise" and Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing are each jointly and severally liable for the acts and practices alleged below.

23.     As described in Paragraphs 13-22, at all times relevant to this Third Amended Complaint, Ocwen Financial and Ocwen Mortgage Servicing have directed and controlled Ocwen Loan Servicing's mortgage servicing activities and authorize Ocwen Loan Servicing to service the Ocwen Defendants' loans.  Employees of Ocwen Financial and Ocwen Mortgage Servicing have knowledge of and control, or have the ability to control, the activities of Ocwen Loan Servicing,

as discussed herein.  Therefore, Ocwen Financial and Ocwen Mortgage Servicing, as Ocwen Loan

Servicing's principals, are liable for the actions of their agent, Ocwen Loan Servicing.

24.     The Ocwen Defendants are engaged in trade or commerce in the State of Florida

and are subject to the consumer protection laws of the State of Florida. The consumer protection

laws of the State of Florida include laws prohibiting unfair or deceptive acts or practices.

I.     **BACKGROUND**

A.     **The Mortgage Servicing Industry**

25.     The single-family mortgage servicing industry consists of financial services entities

and other firms that service mortgages for residential properties designed to house one to four

family dwellings.

26.     A servicer is responsible for mortgage administration activities, known as servicing

activities, which generally include collecting payments from borrowers, applying payments made

in an agreed-upon order to borrowers' indebtedness, pursuing collections from delinquent

borrowers, and pursuing either loss mitigation or foreclosure, as appropriate, when borrowers

become delinquent on mortgage payments.

27.     Servicers utilize software, known as a system of record, to input and maintain loan

and borrower information.  Accurate and functioning systems of record are extremely important

to a servicer's ability to comply with state and federal law.

28.     Individual loans are typically escrowed, which means that the servicer collects a

budgeted escrow payment on an installment basis over the course of the year.  The servicer, rather

than the borrower, is entrusted with making monetary disbursements to taxing authorities, hazard

insurance providers, and other entities.  Installment payments for escrowed loans are comprised of

principal, interest, and escrow payments.  Servicers are required to perform an accurate annual

escrow analysis to determine the installment payment amount.  Following the escrow analysis, the

servicer must provide an escrow statement to the borrower.  Borrowers are completely reliant on the servicer to timely disburse funds to the appropriate entities out of the loan's escrow account.

29.     In the event a borrower fails to provide a servicer with documentation that their home is insured, a servicer may force-place insurance on the home.  Force-placed insurance premiums are frequently two-to-three times or more the price of an insurance policy purchased by the borrower.  Generally, a servicer enters into an agreement with a force-placed insurance vendor that exclusively provides force-placed insurance policies to the servicer.

30.     A servicer who does not own a mortgage loan may become the servicer by acquiring "mortgage servicing rights" or by entering into a contract with a master servicer to act on its behalf as subservicer.  Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments and may seek loss mitigation assistance from the servicer to avoid foreclosure on the loan.

**B.     Background Information Regarding the Ocwen Defendants**

31.     The Ocwen Defendants service and subservice home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and of the United States. At the time this case was initially filed, Ocwen was the second largest non-bank mortgage servicer in the United States and its servicing portfolio included approximately 125,000 loans secured by property located in the State of Florida.  As of December 2016, Florida loans accounted for 9.14% of the Ocwen Defendants' total portfolio of single-family residential mortgage loans.

32.     Borrowers do not choose their mortgage servicer and have no control over whether and how the Ocwen Defendants service their loans.

33.     Following the onset of the mortgage crisis, the Ocwen Defendants experienced rapid growth.  Beginning in late 2012, the Ocwen Defendants began making large acquisitions

of mortgage servicing rights and over a nine-month period, from December 2012 through August 2013, the Ocwen Defendants acquired the servicing rights to over 2.6 million loans with over $347 billion in unpaid principal balance (UPB) from Homeward, Residential Capital, LLC (ResCap) and Ally Bank.  By the end of 2014, the Ocwen Defendants' portfolio had nearly doubled in size, and the aggregate unpaid principal balance of the loans in their portfolio grew from nearly $204 billion at year end 2012 to over $398 billion by year end 2014.

34.     The Ocwen Defendants' rapid growth led to an increase in the complexity of its operations as Ocwen attempted to assimilate new loans into its portfolio.

35.     Ocwen specializes in "default servicing" where Ocwen's portfolio of loans consists of many loans where the borrowers are more at risk of default and often encounter hardships or difficulties in making payments.

36.     In addition to collecting payments and disbursing escrows, Ocwen regularly reviews mortgage loans for potential loss mitigation or loss mitigation options, including loan modifications, and manages the foreclosure process.

37.     While Ocwen Loan Servicing has been flagship mortgage loan servicer within the Ocwen family, as set forth above, each of the Ocwen Defendants perform mortgage servicing and/or debt collection activities.

38.     Prior to 2015, William Erbey served as Chairman to Ocwen Financial and Altisource, at a minimum.  Mr. Erbey was forced to resign in January 2015 under the terms of a Consent Order Ocwen Financial and Ocwen Loan Servicing entered with New York Department of Financial Services ("NY DFS").  NY DFS described the conflicts of interest between Ocwen Financial, Ocwen Loan Servicing, and Altisource as wide spread.

**C.** **The 2015 Limited Multi-State Regulator Examination of Ocwen**

39.     The Florida Office of Financial Regulation engaged in a limited examination of Ocwen Loan Servicing, LLC in 2015, along with the states of Maryland, Massachusetts, Mississippi, Montana, and Washington, in response primarily to concerns raised by consumer complaints about Ocwen's handling of borrower escrow accounts and the failure to make insurance payments from escrow accounts.  The examination review period was January 1, 2013 through February 28, 2015, and the examination team reviewed loan samples from this time-period.

40.     During this multi-state examination of Ocwen, the Florida Office of Financial Regulation identified compliance violations of both federal law – specifically, RESPA – and state law.

41.     OFR's filing of the instant action was to resolve certain issues identified through the 2015 limited examination.

**D.** **Overview of the Ocwen Defendants' Inadequate System of Record: REALServicing**

42.     Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

43.     Servicers use systems of record to service loans and automate servicing functions.

44.     In 2009, Ocwen Financial spun off its internal technology department into a separate company, Altisource Portfolio Solutions ("Altisource"), which is an affiliated vendor.  As a result of this spin-off, Altisource owned and maintained the REALServicing platform, and Ocwen contracted with Altisource for technology services through 2025.  At the time Ocwen extended its technology services contract with Altisource through 2025, William Erbey was the

chairman of the board for both Ocwen Financial and Altisource, and he had a substantial ownership of both companies.

45.    From 2009 through 2019, Ocwen used REALServicing as its system of record, including its sub-systems.

46.    The Ocwen Defendants have relied on Altisource to provide technology services and perform other servicing functions, including but not limited to information technology solutions for the application of payments and the preservation of loan payment and loan balance information.

47.    REALServicing and its related applications consist of a patchwork of legacy systems, some of which were inherited from companies acquired by the Ocwen Defendants over the years.

48.    REALServicing suffers from fundamental architecture and design flaws, including lack of properly managed data, lack of automation, and lack of capacity.

49.    REALServicing is unable to adequately handle the volume and complexity of the Ocwen Defendants' post-2012 portfolio, which is further discussed below.  REALServicing has not been properly maintained, the system functionality has deteriorated, and the platform often malfunctions.  REALServicing has required Ocwen Defendants' personnel or their vendors to input data using ill-defined codes and manual data entry to fix failures of the automated systems, resulting in serious data integrity challenges.

50.    These flaws have adversely impacted the accuracy of information the Ocwen Defendants use to service loans.

51.    The Ocwen Defendants have known that REALServicing is not an adequate system of record, is unreliable, and cannot be trusted to accurately maintain information, including

homeowners' loan and payment information.  Nonetheless, the Ocwen Defendants maintained REALServicing as their system of record until 2019, including through its period of rapid growth.

52.     The Ocwen Defendants' management was frequently advised of the operational deficiencies and compliance failures of functions dependent upon REALServicing, including continuing compliance concerns.  Ocwen employees advised their management that compliance concerns stemming from REALServicing encompassed several departments in servicing, including escrow.  Despite knowledge of widespread problems, the Ocwen Defendants were resistant to making consumer redress and failed to implement appropriate controls and take adequate actions to ensure compliance with consumer protection laws.

53.     No other mortgage servicer has used REALServicing since 2014, and prior to this time REALServicing was not prevalent in the industry.

54.     As a result of the patchwork of systems, duplicative and confusing comment codes, overall lack of uniformity within REALServicing, and the Ocwen Defendants' reliance upon outdated and unreliable technology, borrowers have suffered serious harm.  As set forth more fully below, the Ocwen Defendants have miscalculated borrowers' mortgage payments, failed to properly adjust mortgage rates, improperly applied borrowers' mortgage payments, failed to make timely payment of insurance premiums from escrow accounts, mailed insurance payments to wrong addresses, overcharged delinquent borrowers for property inspections and maintenance, and mailed time-sensitive correspondence to borrowers with erroneous dates.  These errors have resulted in overcharges that have in some instances forced borrowers into default, which could have led to foreclosure.

II.     **THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) AND REGULATION X**

55.     The CFPA defines RESPA as a Federal consumer financial law.  12 U.S.C. § 5481(12)(M) & (14).

56.     In the CFPA, Congress transferred rulemaking authority over RESPA to the Consumer Financial Protection Bureau, which re-codified mortgage servicing related provisions of RESPA into 12 C.F.R. Part 1024, and designated it "Regulation X."  Regulation X is the implementing regulation of RESPA.  The sections of Regulation X specifically discussed below and at issue in Counts I, II, and III in this action, Section 1024.17, Section 1024.34 and Section 1024.41, are all effective as of January 10, 2014.  *See* 12 C.F.R. §§ 1024.17, 1024.34 & 1024.41.

57.     RESPA and Regulation X apply to "federally related mortgage loans."  *See* 12 C.F.R. § 1024.5(a).  Section 1024.2(b) of Regulation X defines "federally related mortgage loans" (hereinafter "Federally Related Mortgage Loans").  *See* 12 C.F.R. § 1024.2(b).

58.     RESPA and Regulation X apply to the conduct of "servicers," including the servicing of Federally Related Mortgage Loans, the administration of borrowers' escrow accounts, error resolution procedures, force-placed insurance, general servicing policies, procedures and requirements, and loss mitigation procedures.  *See* 12 C.F.R. § 1024.2(b); *see also* 12 C.F.R. §§ 1024.34, 1024.35, 1024.37, 1024.38, and 1024.41.

59.     Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan." 12 C.F.R. § 1024.2(b). Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan … and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the

borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract." 12 C.F.R. § 1024.2(b).

60.     Under RESPA and Regulation X, the Ocwen Defendants are "servicers" because they receive payments from borrowers pursuant to the terms of Federally Related Mortgage Loans and are responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

61.     Through the CFPA, the Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce RESPA and its implementing regulation, Regulation X.  *See* 12 U.S.C. § 5552(a)(1).

**A.     Applicable Escrow Related RESPA and Regulation X Protections**

62.     Regulation X requires servicers to conduct annual escrow analyses for borrowers at the completion of the escrow account computation year to determine the borrower's monthly escrow account payments for the next computation year, pursuant to 12 C.F.R. § 1024.17(c)(3).

63.     Regulation X requires services to refund escrow surpluses to current borrowers within thirty (30) days from the date of the escrow account analysis to the extent the surplus is greater than or equal to fifty dollars ($50.00), pursuant to 12 C.F.R. § 1024.17(f)(2)(i).  Under this provision of Regulation X, a borrower is current if the servicer receives the borrower's payments within 30 days of the payment due date, pursuant to 12 C.F.R. § 1024.17(f)(2)(ii).

64.     Regulation X requires that the servicer provide an annual escrow account statement to the borrower within thirty (30) days of the completion of the escrow account computation year, pursuant to 12 C.F.R. § 1024.17(i).  However, Regulation X does not require the servicer to submit an annual escrow account statement to the borrower (i) if at the time the servicer conducts the escrow analysis the borrower is more than 30 days overdue, (ii) if the servicer has brought an

action for foreclosure against the borrower, or (iii) if the borrower is in bankruptcy, pursuant to 12 C.F.R. 1024.17(i)(2).  The annual escrow account statement must include, among other things, an account history reflecting the activity in the account during the escrow account computation year, and a projection of the activity in the account for the next year, pursuant to 12 C.F.R. § 1024.17(i)(1).

65.     Additionally, Regulation X prohibits a servicer from collecting escrow shortages or other deficiencies when a shortage or deficiency does not exist.  12 C.F.R. § 1024.17(f)(3) & (4).

66.     Section 6(g) of RESPA, 12 U.S.C. § 2605(g) states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

67.     Regulation X further explains the requirements of Section 6(g) of RESPA.  At all times relevant to this action, Section 1024.17(k)(1) of Regulation X requires that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than thirty (30) days overdue." Similarly, at all times relevant to this action, Section 1024.34(a) of Regulation X requires that "[i]f the terms of a mortgage loan require the borrower to make payments to the servicer of the mortgage loan for deposit into an escrow account to pay taxes, insurance premiums, and other charges for the mortgaged property, the servicer shall make payments from the escrow account in a timely

manner, that is, on or before the deadline to avoid a penalty, as governed by the requirements in § 1027.17(k)."

68.    Therefore, under RESPA and Regulation X, servicers are required to timely disburse from borrowers' escrow accounts payments, including the payment of hazard or homeowner's insurance premiums, assuming the borrower's payment is not more than 30 days overdue. *See* 12 U.S.C. § 2605(g) & 12 C.F.R. §§ 1024.17(k) & 1024.34(a).

**B.    Applicable Loss Mitigation and Foreclosure Related RESPA and Regulation X Protections**

69.    RESPA and its implementing regulation, Regulation X, provides borrowers with numerous protections during loss mitigation and foreclosure processes. More specifically, at all times relevant to this action, as further described below, Section 1024.41 of Regulation X imposes certain loss mitigation and foreclosure requirements on servicers with respect to mortgage loans secured by property that is the borrower's principal residence. *See* 12 C.F.R. §§ 1024.30(c)(2) & 1024.41.

70.    Regulation X requires that if a servicer receives a loss mitigation application forty-five (45) days or more before a foreclosure sale, the servicer shall "promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete," 12 C.F.R. § 1024.41(b)(2)(i)(A), and within five (5) days after receiving a loss mitigation application, the servicer must send the borrower written notice ("Acknowledgement Letter") that it acknowledges receipt of the loss mitigation application and that it has determined that the loss mitigation application is either complete or incomplete. 12 C.F.R. § 1024.41(b)(2)(i)(B). If the loss mitigation application is incomplete, the Acknowledgement Letter must state the additional documents and information the borrower must submit to make the loss mitigation application complete. 12 C.F.R. § 1024.41(b)(2)(i)(B).

Regulation X requires that servicers "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b)(1).

71.     A loss mitigation application is complete ("Complete Application") under Regulation X, when the "servicer has received all of the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1).

72.     An application is facially complete ("Facially Complete Application") under Regulation X if a borrower submits all the missing documents and information that the servicer requests in the Acknowledgment Letter, or if no additional information is requested in the Acknowledgment Letter. 12 C.F.R. § 1024.41(c)(2)(iv).

73.     Regulation X requires that if a servicer receives a Complete Application more than thirty-seven (37) days before a foreclosure sale, then, within thirty (30) days of receiving the application the servicer shall evaluate the borrower for all loss mitigation options available, and provide the borrower with, among other things, written notice of the servicer's determination ("Evaluation Notice") of which loss mitigation options, if any, the servicer will offer to the borrower. 12 C.F.R. § 1024.41(c)(1)(i)-(ii). In the Evaluation Notice, the servicer must also notify the borrower of the amount of time the borrower has to accept or reject an offer of a loss mitigation program, if applicable, and the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such appeal and any requirements for making an appeal. 12 C.F.R. § 1024.41(c)(1)(ii).

74.     Regulation X also requires that if a servicer denies a borrower's Complete Application for any trial or permanent loan modification option available to the borrower, then the servicer must include in the Evaluation Notice the specific reason(s) for the servicer's

determination for each trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.  12 C.F.R. § 1024.41(d).

75.     With respect to foreclosures, Regulation X requires that a servicer cannot make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process (collectively, a "First Filing") unless (i) the borrower is more than one hundred and twenty (120) days delinquent on its mortgage loan obligation; (ii) the foreclosure is based on the borrower's violation of a due-on-sale clause; or (iii) the servicer is joining a foreclosure action of a subordinate lienholder.  12 C.F.R. § 1024.41(f)(1).

76.     Regulation X also generally requires that if a borrower submits a Complete Application during the "pre-foreclosure review period" set forth in 12 C.F.R. § 1024.41(f)(1), or before a servicer has made the First Filing, a servicer cannot make the First Filing unless: (i) the servicer sent the borrower the Evaluation Notice stating that the borrower is not eligible for any loss mitigation option and that the appeal process is not applicable, the borrower has not requested an appeal within the applicable time period, or the borrower's appeal has been denied; (ii) the borrower has rejected all loss mitigation options offered by the servicer; or (iii) the borrower has failed to perform under a loss mitigation agreement.   12 C.F.R. § 1024.41(f)(2).

77.     Similarly, Regulation X requires that if the borrower submits a Complete Application after a servicer has made the First Filing, but more than thirty-seven (37) days before the first scheduled foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless (i) the servicer sent the borrower the Evaluation Notice stating that the borrower is not eligible for any loss mitigation option and the appeal process is not applicable, the borrower has not requested an appeal within the applicable time period, or the borrower's appeal has been denied; (ii) the borrower has rejected all loss mitigation options offered

by the servicer; or (iii) the borrower has failed to perform under a loss mitigation agreement.  12
C.F.R. 1024.41(g).

78.     Until October 19, 2017, Section 1024.41(i) of Regulation X limits the protections
set forth in Section 1024.41 as follows: "A servicer is only required to comply with the
requirements of this section for a single complete loss mitigation application for a borrower's
mortgage loan account."  Effective as of October 19, 2017, Section 1024.41(i) of Regulation X
was modified to state "[a] servicer must comply with the requirements of this section for a
borrower's loss mitigation application, unless the servicer has previously complied with the
requirements of this section for a complete loss mitigation application submitted by the borrower
and the borrower has been delinquent at all times since submitting the prior complete application."

79.     Regulation X also generally prohibits servicers from initiating a First Filing,
obtaining a foreclosure judgment, or conducting a foreclosure sale if the servicer discovers that
additional information or corrections to a previously submitted document are required to complete
a Facially Complete Application and the borrower has not had a reasonable opportunity to
complete the application.  *See* 12 C.F.R. §§ 1024.41(c)(2)(iv), (f)(2) & (g).

## III.     THE HOMEOWNERS PROTECTION ACT

80.     Under the Homeowners Protection Act ("HPA"), servicers are required, under
certain conditions, to automatically terminate a mortgagor's requirement to pay private mortgage
insurance in connection with a residential mortgage transaction on a certain date called the
"termination date." 12 U.S.C. § 4902(b).

81.     A "servicer" as defined by the HPA, 12 U.S.C. § 4901(16), means a servicer as
defined in RESPA, 12 U.S.C. § 2605(i)(2), with respect to a residential mortgage.  As referenced
in Paragraphs 14, 17 and 18, at a minimum, the Ocwen Defendants are servicers.

82.      A "mortgagor" as defined by the HPA, 12 U.S.C. § 4901(11), means the "original borrower under a residential mortgage or his or her successors or assignees."

83.      A "residential mortgage" as defined by the HPA, 12 U.S.C. § 4901(14), means a "mortgage loan, or other evidence of a security interest with respect to a single-family dwelling that is the principal residence of the mortgagor."

84.      A "residential mortgage transaction" as defined by the HPA, 12 U.S.C. § 4901(15), means a transaction consummated on or after the date that is 1 year after July 29, 1998, in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against a single-family dwelling that is the principal residence of the mortgagor to finance the acquisition, initial construction or refinancing of that dwelling."

85.      "Private mortgage insurance" as defined by the HPA, 12 U.S.C. § 4901(13), means "mortgage insurance other than mortgage insurance made available under the National Housing Act, 12 U.S.C. § 1701, title 38, or title V of the Housing Act of 1949, 42 U.S.C. 1471 et seq."

86.      "Mortgage insurance" as defined by the HPA, 12 U.S.C. § 4901(8), means "insurance, including any mortgage guaranty insurance, against the nonpayment of, or default on, an individual mortgage or loan involved in a residential mortgage transaction."

87.      The "termination date" as defined by the HPA, 12 U.S.C. § 4901(18), means the date when:

    a.    With respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

    b.    With respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that

date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

88.     Under the HPA, the Ocwen Defendants are "servicers" because they are servicers as defined under RESPA.

89.     Through the CFPA, the Florida Attorney General has authority to enforce the HPA. *See* 12 U.S.C. § 5552(a)(1).

## IV.     THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

90.     FDUTPA provides that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Fla. Stat. 501.204(1).

91.     FDUTPA defines "[t]rade or commerce" as:

> the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated.  "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

Fla. Stat. 501.203(8).

92.     Under FDUTPA, the "enforcing authority" means the Department of Legal Affairs if the violation occurs in or affects more than one judicial circuit.  Fla. Stat. § 501.202(2).

93.     Under FDUTPA, a person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen, pursuant to Section 501.2077, Florida Statutes.  Under FDUTPA, a "senior citizen" is a person who is "60 years of age or older."  Fla Stat. § 501.2077(1)(e).  Willful violations of FDUTPA occur when the person knew or should have

known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

94.     The remedies of the "enforcing authority" under FDUTPA are set forth in Section 501.207, Florida Statutes, and include brining an action "to enjoin any person who has violated, is violating, or is otherwise likely to violate" FDUTPA.   Fla. Stat. § 501.207.

## V.     THE CONSUMER FINANCIAL PROTECTION ACT

95.     Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice."

96.     Acts or practices are unfair under the CFPA if "the act or practice causes or is likely to cause substantial injury to consumers which are not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c).

97.     An act or practice is deceptive if it misleads or is likely to mislead the consumer; the consumer's interpretation is reasonable under the circumstances; and the misleading act or practice is material.

98.     Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), prohibits covered persons from committing any act or omission in violation of a Federal consumer financial law.

99.     Section 1002(14) of the CFPA, 12 U.S.C. § 5481(14), defines RESPA and HPA as Federal consumer financial laws.

**VI.      THE OCWEN DEFENDANTS HAVE ENGAGED IN MORTGAGE SERVICING MISCONDUCT**

     **A.      The Ocwen Defendants Often Service Loans of the Most Vulnerable Borrowers**

     100.      At all times material hereto, the Ocwen Defendants have serviced and subserviced home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and throughout the United States.  The Ocwen Defendants' business model is to keep a portfolio of loans with a high percentage of loans where the borrowers are at an increased risk of default, or are in default, and often encounter hardships or difficulties in making payments.

     101.      Because of the nature of the Ocwen Defendants' portfolio of distressed loans, the Ocwen Defendants' personnel frequently interact with borrowers who are delinquent, at risk of delinquency, have complaints or inquiries about their mortgages, have filed for bankruptcy, or require immediate loss mitigation assistance.

     102.      Borrowers in imminent danger of losing their homes require immediate attention and accurate information from a servicer.  The Ocwen Defendants are often unable to fulfill this basic need and incapable of effectively executing its fundamental servicing functions.

     103.      Borrowers continue to suffer through frustrating loss mitigation processes, errors in payment applications, poor record keeping, and a basic inability to effectively address consumer concerns.

     104.      Since 2014, the Florida Attorney General and Florida Office of Financial Regulation have collectively received over 1,000 complaints raising serious concerns regarding the Ocwen Defendants' servicing practices.  More than half of the complaints are from Florida borrowers.  The complaints primarily identify mortgage-servicing-related issues by the Ocwen Defendants, including, but not limited to: (1) escrow account issues, including force-placed insurance; (2) payment processing issues; (3) loss mitigation practices; and (4) customer service.

26

105.     Borrowers often complain that the Ocwen Defendants' employees are unable to address borrowers' concerns, even after repeated calls.  The Ocwen Defendants' employees cannot access the required system to address borrower concerns and therefore often lack knowledge regarding the borrower's loan.  Borrowers are frustrated because they are unable to reach a live person to discuss their concerns and unable to have their call escalated or transferred.

106.     Since 2014, the Florida Attorney General has engaged Ocwen on numerous occasions to discuss grave concerns regarding the serious and troubling issues arising from regulatory exams and consumer complaints.   Nonetheless, Ocwen's mortgage servicing misconduct has continued.

**B.     The Ocwen Defendants' Decision to Rely on REALServicing Has Resulted in Borrower Harm**

107.     The Ocwen Defendants' affirmative decision to use its proprietary system of record, REALServicing, which in turn benefitted at least one of Ocwen's principals, has resulted in harm to borrowers.  But for Ocwen's decisions to use and remain on the REALServicing platform, the errors resulting from inaccurate and incomplete borrower loan information would not have occurred.  The system deficiencies that Ocwen chose to address through a patchwork of manual processes and workarounds, which were at many times overloaded and understaffed, do not result from "an attempt to collect a debt by exercising one's legal remedies."  In contrast, the Ocwen Defendants' affirmative – and unique – business decision to insist upon utilization of the REALServicing platform does not flow directly from the master servicers' rights and duties, but rather, is an element injected by the Ocwen Defendants that has had a direct impact on various groups of consumers, as set forth in greater detail below.  This business decision to use REALServicing resulted in direct provision of services to borrowers, including but not limited to

the communication and collection of inaccurate payments, that does not simply flow from a lender's pursuit of legal remedies.

108.    When Ocwen acquires servicing rights for loans, it moves, or "boards," the records for those loans from the prior servicers' systems of record onto REALServicing.

109.    As described in Paragraph 33, between 2010 and 2014, Ocwen acquired the rights to service millions of residential loans, including more than 1.7 million ResCap loans. Ocwen input inaccurate and incomplete loan information and payment data from these acquisitions into REALServicing.

110.    In many instances, the systems of record that other servicers use contain data fields that are different from the data fields in REALServicing.  To check whether Ocwen correctly boarded loan data from the prior servicer's systems onto REALServicing, the Ocwen Defendants implemented a process to "verify" critical loan data fields—such as interest rate, property type, and unpaid principal balance—by matching it with the information in the borrower's loan documentation.  If the information in REALServicing did not match what Ocwen finds in the documents, Ocwen was supposed to correct the error in REALServicing.

111.    To ensure the loan data it is using to service loans is complete and accurate, Ocwen seeks to complete this loan verification process within 60 days of boarding the loan onto REALServicing.  Since 2014, however, Ocwen has not completed this process within 60 days. Instead, Ocwen has relied on unverified loan information for months—and often for more than a year—to service hundreds of thousands of loans.

112.    As of December 2013, Ocwen had a backlog of more than 400,000 transferred loans that remained unverified.  It did not finish verifying and making corrections to critical data fields for these loans until August 31, 2014.  Due to this backlog, Ocwen also delayed verifying the 1.7

million ResCap loans it previously acquired in 2013, and which it moved from ResCap's servicing platform and boarded onto REALServicing on a rolling basis beginning in early 2014. Ocwen did not even begin the verification process for the ResCap loans until September 1, 2014; at that time, Ocwen was servicing more than 1.1 million unverified ResCap loans on REALServicing. By the end of 2014, when Ocwen completed boarding ResCap loans onto REALServicing, the verification backlog had grown to more than 1.3 million unverified ResCap loans. As of April 2016, Ocwen still had a backlog of more than 263,000 unverified ResCap loans.

113.   In November 2014, Ocwen determined that it was taking, on average, 261 days to complete its verification process for each loan it boarded. As stated above, in some cases, the verification process has taken more than a year, far beyond Ocwen's expected 60-day time period.

114.   As of 2014, in addition to boarding loans with inaccurate loan information, Ocwen identified certain types of loans, such as adjustable rate mortgages and home equity lines of credit, that had inaccuracies that affected the amounts Ocwen charged to borrowers.

115.   Because Ocwen failed to verify the accuracy and completeness of borrowers' loan data during its expected 60-day time period after boarding, it has delayed correcting any loan data errors or incomplete loan information. As a result of the delay—in many instances, more than a year—Ocwen serviced a significant number of loans based on inaccurate loan information.

116.   According to Ocwen, which tracked the results of its loan verification from 2014 through at least September 2017, a significant percentage of the loans it ultimately verified contained errors or incomplete information and required corrections. For example, in April 2014, Ocwen reported that 72 percent of the loans it verified that month contained errors or incomplete information and required corrections in REALServicing. In March 2016, 90 percent of the loans Ocwen verified contained errors or incomplete information that required corrections.

117.    As a result of the findings of its verification process, from September 2014 until April 2016, Ocwen determined that it needed to make more than 870,000 corrections in REALServicing, including at a minimum, the following corrections: 43,000 corrections to the maximum late fees a borrower could be charged (under state law); 31,000 corrections to loans' maturity dates; 27,000 corrections to loan terms; 24,000 corrections to loans' first interest rate cap maximum; and 5,000 corrections to loans' interest rates.

118.    Even when Ocwen completed its verification process and identified inaccuracies in loan data, in many instances, Ocwen has failed to accurately correct the errors in REALServicing. For example, in November 2014, Ocwen conducted an internal audit and found that its loan verification personnel were not properly correcting or updating the information in REALServicing in 63 percent of loans the audit team reviewed.  The audit found that Ocwen personnel had failed to properly correct critical data fields such as loan maturity date, loan term, first payment date, balloon term, and first interest rate cap.

       *i.*      ***The Ocwen Defendants knew that REALServicing was deficient and below-industry standard.***

119.    REALServicing suffers from fundamental system architecture and design flaws, including a lack of properly managed data, lack of automation, and lack of capacity.  These flaws have adversely impacted the accuracy of the information that Ocwen uses to service loans—and, thus, Ocwen's ability to service loans—in a number of ways.

120.    First, with respect to Ocwen's data management, REALServicing requires the use of more than 10,000 comment codes and flags.  Yet, Ocwen lacks a complete, uniform data dictionary defining its comment codes, flags, and data fields.  As a result, Ocwen personnel do not share a common understanding of what these comment codes or flags mean or how Ocwen personnel should use them.

121.    Ocwen's own senior leadership has repeatedly recognized and acknowledged REALServicing's failures.

122.    Ocwen's former Head of Compliance, who worked at Ocwen from August of 2013 until September of 2015, testified in May 2016 that during his tenure at Ocwen he repeatedly requested information on the meaning and basic descriptive information of comment codes; how Ocwen's business units used them; and what downstream activities the codes trigger and what upstream activities trigger the codes. He further testified that "neither Ocwen nor Altisource could provide that information." Further, he testified that Ocwen's use of thousands of REALServicing comment codes was "antiquated" and that it was "inappropriate" that Ocwen did not have a data dictionary to define these codes and describe their impact on other activities.

123.    In an internal communication dated July 11, 2014 with Ocwen's Chief Executive Officer, Ocwen's head of Servicing described Ocwen's technology as:

> An absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow I would. I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here. I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous. (Emphasis added.)

124.    Ocwen's former head of Servicing Compliance testified in May 2016 that she was "absolutely" concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015.  She testified that she, other members of the Compliance Department, and the leaders of Servicing Operations, Loss Mitigation, and other Ocwen business units "frequently" and "loudly" raised this concern.  In determining the root cause of various issues, she explained, "the answer would almost always be REALServicing and the processes that we're using, would be the answer we would get from the

business ....  [It was a] commonality across all of [the business units] .... Everything in servicing, every department in servicing."

125.    These senior leaders' conclusions are not outliers.  Between 2014 and 2016, Ocwen assessed REALServicing and also hired an outside consultant to do the same.  Both Ocwen and its consultant concluded that REALServicing lacks the basic system architecture and design necessary to properly service loans.

126.    In 2016, Ocwen's Chief Information Officer and other personnel performed an architectural assessment of REALServicing, and reported, among other things, that REALServicing had "significant deficiencies represent[ing] significant risk and expense to Ocwen" and concluded that the "the most important dimensions of Core Technology" to REALServicing, such as performance and scalability, loan type support, risk exposure, and organizational capability, compare "unfavorably" to other mortgage platforms.

127.    Ocwen hired a consultant to assess its servicing of Fannie Mae loans and the consultant found, among other things, in its report issued on September 18, 2015 that "Ocwen's REALServicing system is not an industry standard platform, and in our opinion, Ocwen is dependent on its vendor for support more than seen with other commonly used platforms."

128.    In 2015, an Ocwen consultant concluded that REALServicing had limited workflows and lacked automation. As detailed in the next subsection in certain areas, such as payment processing and escrow, this lack of automation has resulted in significant and excessive manual workarounds that have created errors in borrowers' accounts.

> ii.    **Ocwen has relied excessively on manual data entry and reports to address REALServicing's failures.**

129.    Because of REALServicing's failures and limitations, Ocwen has resorted to manual processes, which themselves have resulted in errors.  In 2015, Ocwen's consultant reached

the following conclusions—which Ocwen conceded were correct—after analyzing REALServicing and interviewing Ocwen business leaders:

- "[Ocwen's] lack of business process automation has resulted in excessive manual processes to address gaps";
- "Manual workarounds and reporting are widely used to compensate for insufficient system functionality to complete, track, or control processes"; and
- "While appearing cost effective, manual controls pose significant risk in heightened compliance environment."
- "High usage of manual processes and end-user computing (primarily Excel) to address systemic investor and compliance gaps, increasing transactional and financial risk."  (Emphases in original.)

130.    Ocwen creates reports—typically referred to as "control reports"—to catch errors and mistakes or data that REALServicing cannot process due to a lack of automation and other system deficiencies, but these reports are of limited use.

131.    For example, as Ocwen's former Head of Compliance testified, the reports are only effective to the extent that they are based on accurate and complete data.  Ocwen's former Head of Servicing Compliance, who worked for Ocwen from April of 2014 until August 2015, testified in May 2016 that REALServicing lacks the necessary data to generate effective control reports and detect problems. She explained, for example, that when generating a control report using a certain field in REALServicing, that field is "used about five different ways" so the report generates a "whole mish-mash of information" that does not help Ocwen personnel understand whether an exception or error occurred.

132.    Further, Ocwen's manual workarounds and processes introduce the risk of human error.  As Ocwen's former Head of Compliance testified, the concern that such manual processes could result in human error is "one of the sort of classic reasons one automates a manual process." Other former and current Ocwen business unit leaders have reiterated this point.

133.    Ocwen's controls have therefore been ineffective.

134.   As Ocwen's former Head of Servicing Compliance testified: "[E]very business unit in the entire organization" lacked sufficient controls to prevent mistakes and to detect when mistakes occurred.

> ### iii.   *Ocwen's business decision to use and maintain REALServicing has directly caused borrower harm that is not due to mere servicing activity.*

135.   REALServicing's deficiencies, and Ocwen's error-prone manual processes have caused or are likely to have caused borrowers substantial harm, and resulted in Ocwen communicating, orally and in writing, information to borrowers that it knew or had a reason to know was inaccurate.   Ocwen is aware of this substantial harm or likelihood of substantial harm.

136.   In 2015, Ocwen's outside consultant conducted interviews with Ocwen business leaders. These leaders identified 67 failures—or "pain points"—representing "functional and/or technical deficiencies" that "stemm[ed] from systematic and manual processes," including the following:

- With respect to escrow: a "technical gap causing escrow analysis to be conducted incorrectly" and a "manual bankruptcy workaround for loans acquired already in bankruptcy, causes information to be deleted from history as new information is updated. This information should be disclosed to the borrower in order to calculated escrow accurately";
- With respect to insurance disbursements: "no systematic controls exist in to prevent duplicate disbursements in REALServicing resulting in 6k -12k incidents per year. Personnel must manually remove necessary codes (e.g., paid in full, service released)";
- With respect to loan modification processes: "[u]pon review of a [loan modification] package, terms are found to be incorrect approximately 80% of the time (e.g., NPV miscalculation, final modification date incorrect)";
- With respect to foreclosure data: "[d]ata between REALResolution [the REALServicing application for foreclosures] and REALServicing is not always in sync due to lack of adequate system mapping"; and
- With respect to the payment of borrower taxes: "[a]lthough tax assessment information is supposed to be used to project more accurate payments, REALServicing automatically uses last years billing amount, even if installments for the current year are different."

137.    More generally, Ocwen has miscalculated amounts due from borrowers, collected upon borrower debts, and communicated, orally and in writing, with borrowers using inaccurate and incomplete information, including information relating to borrowers' loan terms, amounts received from and owed by borrowers, escrow amounts, insurance amounts, and/or loss mitigation information.

138.    As a result of its reliance on REALServicing, Ocwen has collected or attempted to collect inaccurate amounts from borrowers, failed to timely pay borrowers' insurance premiums, provided borrowers with loan modifications with inaccurate terms, and initiated wrongful foreclosure proceedings upon borrowers' loans.  Additionally, deficiencies with REALServicing lie at the root of various problems with the Ocwen Defendants' calculation of delinquent borrowers' payoff and reinstatement quotes; that is, the amount a borrower must pay to respectively payoff or reinstate his/her loan to become current.  These payoff and reinstatement quotes depend upon borrowers' escrow balances.

139.    Further, Ocwen failed to obtain or review information substantiating the accuracy of borrower loan data prior to collecting upon borrowers' debts and foreclosing upon their loans, even though Ocwen knew it boarded inaccurate information, had system and manual errors creating inaccurate information, and numerous borrowers complained about and disputed the information Ocwen was using.

140.    Since at least 2014 and based on its reliance on REALServicing, Ocwen has committed numerous payment processing errors that have resulted in Ocwen's using inaccurate information about the amounts it received from borrowers when servicing borrowers' loans.

141.    Ocwen has used inaccurate information about the amounts borrowers owe to service their loans and collect upon their debts. These errors were especially common with respect

to adjustable rate mortgages or loans for which borrowers had sought the protections of bankruptcy.

142.     As a result of Ocwen's failure to timely verify information that it had received from prior servicers, when Ocwen loaded incorrect loan terms into REALServicing, Ocwen miscalculated the amounts due from borrowers for certain of those loans. These errors were especially common with respect to adjustable rate loans or home equity lines of credit and Ocwen knew the loan terms it loaded had significant inaccuracies that affected Ocwen's calculations of the amounts due from such borrowers.

143.     Ocwen identified numerous other instances where it miscalculated borrowers' amounts due, such as payoff or reinstatement amounts. For example, in May 2016 Ocwen determined that, due to a failed attempt in 2014 to fix a REALServicing technology flaw, it was charging incorrect amounts to borrowers and was "not being compliant with the terms dictated in the note" which "directly impact the monthly account statement sent to the borrowers."

144.     In 2014, due to programming errors and data not properly converting among REALServicing applications, Ocwen sent more than 1,800 borrowers permanent loan modification agreements that contained incorrect interest rate, principal payment, maturity date, and balloon payment information.

145.     Ocwen has also communicated inaccurate information about amounts borrowers owed or that Ocwen received as a result of the errors described in Paragraphs 138-144.  Ocwen communicated such information orally and in writing, including in monthly periodic and billing statements, and quotes to borrowers. These representations are material to borrowers managing their mortgages and are likely to mislead borrowers acting reasonably under the circumstances.

146.    Ocwen's calculation and use of inaccurate payment information and amounts due have significantly harmed borrowers. Ocwen has charged borrowers improper late fees; reported inaccurate, negative payment information to credit reporting agencies; subjected borrowers to collection calls based on inaccurate information; and wrongly threatened borrowers with foreclosure. This conduct has harmed borrowers financially and caused borrowers frustration and emotional distress.

147.    Even when Ocwen has identified a payment error, in many instances it has not properly corrected the error. Pursuant to Ocwen's policies and procedures, its Cashiering Department corrects identified errors through a "reversal request" or correction to a borrower's account. In many instances, however, Ocwen's personnel have not made the reversal request in a timely or accurate manner.

148.    A March 30, 2016 internal audit found, for example, that Ocwen's Cashiering Department lacked controls to ensure that reversal requests–approximately 3,700 a month at that time—were timely and accurately processed. The auditors also found that, when Ocwen actually processed reversal requests, it processed requests in the sample incorrectly.

**C.    The Ocwen Defendants Have Made Egregious Errors While Handling Borrowers' Escrow Accounts**

   ***i.    The Ocwen Defendants' Escrow Account Management Violations***

149.    The Ocwen Defendants have failed to perform the most basic tasks regarding the management of borrowers' escrow accounts.  In violation of RESPA and Regulation X, the Ocwen Defendants have failed to conduct annual escrow analyses, failed to conduct accurate escrow analyses, failed to provide borrowers with annual escrow statements, which are required to reflect escrow account history, failed to properly refund escrow surpluses to borrowers, and collected escrow shortages or deficiencies from borrowers when such shortages or deficiencies did not exist.

150.    As of mid-2014, the Ocwen Defendants had failed to conduct annual escrow analyses within the required time-period for up to 230,000 delinquent borrowers, including Florida borrowers, up to 60,000 borrowers who had filed for bankruptcy, and other borrowers.  Based on an audit by Fannie Mae, Ocwen determined that due to its systematic issues in preparing escrow statements, it failed to timely refund surpluses to borrowers in violation of Regulation X.

151.    According to the head of Ocwen's Escrow Department, until at least July or August 2014, Ocwen did not perform annual escrow analyses for delinquent borrowers.  For those borrowers for whom Ocwen failed to timely analyze escrow accounts, the Ocwen Defendants continued to use inaccurate monthly escrow amounts to service their loans and collect upon their debts and sent to borrowers monthly billing or annual statements with inaccurate monthly escrow amounts.

152.    The Ocwen Defendants have relied on inaccurate or incomplete information to manage borrower escrow accounts.  For example, Ocwen refunded borrowers incorrect surplus amounts due to manual error and delays in the release of escrow surplus funds.

153.    Because of deficiencies in REALServicing, Ocwen also provided borrowers with inaccurate payoff and reinstatement quotes.

154.    In many instances, even when the Ocwen Defendants have performed escrow analyses on borrowers' accounts, the Ocwen Defendants have either: (1) failed to send the required escrow statements to borrowers, including borrowers who were not delinquent, in foreclosure or in bankruptcy at the time of the escrow analysis; or (2) sent inaccurate escrow statements which included inaccurate information pertaining to the borrowers' escrow account histories, escrow balances, and escrow payments.

155.    The Ocwen Defendants have also failed to timely process escrow shortage payments, which resulted in the continued collection of purported escrow shortage amounts that borrowers had already paid, and therefore, the Ocwen Defendants had no right to collect such amounts.

156.    Since at least 2014, Ocwen personnel have emailed their Escrow Department or manually entered a comment code in REALServicing when the borrower has paid an escrow shortage to request that the Escrow Department manually remove the shortage portion from the borrower's monthly escrow payment.  Errors in these processes caused Ocwen to collect shortages that borrowers had already paid.

157.    Ocwen's auditors found in a March 30, 2016 audit that Ocwen did not have adequate controls over the entry of the comment code and therefore Ocwen did not catch when its personnel failed to manually enter the appropriate escrow shortage receipt comment code.  This resulted in "the continued collection of escrow shortage amounts" that borrowers already paid. Specifically, Ocwen failed to timely process escrow shortage payments for thousands of borrowers, including Florida borrowers, resulting in Ocwen collecting or attempting to collect inaccurate escrow shortage amounts that borrowers did not, in fact, owe because they already paid them.

158.    In some instances, the Ocwen Defendants failed to perform or timely perform escrow analyses during the pendency of a borrower's Chapter 13 bankruptcy.  The Ocwen Defendants failed to service loans in accordance with bankruptcy protections in place for borrowers by attempting to collect purported escrow shortages that should have been discharged.

159.    Due to the Ocwen Defendants' failures related to borrowers' escrow accounts, including but not limited to disbursement of inaccurate escrow amounts, reinstatement amounts

and payoff amounts, the Ocwen Defendants have communicated material information to borrowers that the Ocwen Defendants knew or should have known was inaccurate. The above practices employed by the Ocwen Defendants caused borrowers to receive inaccurate and misleading escrow-related communications.

### ii.    The Ocwen Defendants' Escrow Account Disbursement and Force Placed Insurance Errors

160.    On behalf of escrowed borrowers whose payments were no more than 30 days overdue, the Ocwen Defendants have failed to properly disburse escrow funds, including, but not limited to, the failure to make timely payments of borrowers' – specifically including Florida borrowers – hazard insurance premiums.

161.    The Ocwen Defendants' failure to timely pay borrowers' insurance premiums has resulted in erroneous cancellation of insurance policies, lapses in insurance coverage, and excessive and expensive improper force-placed insurance policies, among other consequences. Frequently, force-placed insurance policies do not have as good coverage for the borrowers compared to borrower chosen policies.

162.    In September 2014, Ocwen transitioned insurance vendors from a company called Assurant to Southwest Business Corporation (SWBC). After the transition, several operational defects were identified, including rejection of disbursements, erroneously flagged and updated loans, and checks for disbursements from borrowers' escrow accounts were sent to incorrect payees or addresses.

163.    The Ocwen Defendants discovered that due to the REALServicing errors and vendor errors, they made the following errors with respect to disbursements from borrowers' escrow accounts: they failed to send out insurance payments, they sent payments to incorrect

payees and addresses, and they could not account for the payees or addresses to which payment were sent.

164.    In some cases, the Ocwen Defendants force-placed excessive and expensive insurance policies and adjusted borrowers' payments to collect higher premiums.  Once the errors were discovered, the Ocwen Defendants scrambled to reinstate lapsed policies.  Unfortunately, the Ocwen Defendants were unable to reinstate or obtain insurance at the same or cheaper rate for many borrowers, resulting in a premium increase.

165.    Over 10,000 borrowers were affected nationwide by these errors, and Ocwen failed to make timely disbursements to approximately 850 Florida borrowers causing hundreds of Florida borrowers' insurance policies to be cancelled.

166.    Due to the Ocwen Defendants' failure to properly disburse borrowers' payments to their insurance companies, borrowers endured frustration, and confusion, and many borrowers suffered financial harm if they had to obtain new and more expensive insurance policies either in the form of a private placement policy or lender placed insurance.

167.    Additionally, the Ocwen Defendants imposed force-placed insurance on borrowers who already had insurance coverage.

168.    For example, in early 2014, a large bank servicer who transferred the subservicing rights of its loans to Ocwen audited a sample of loans where Ocwen had force-placed flood insurance policies on borrowers' properties. For approximately half of the loans it tested, the large bank servicer found that Ocwen had imposed force-placed flood insurance on borrowers' homes, despite the fact that the large bank's records indicated that the borrowers already had their own flood insurance policies in place.

169.    Finally, Ocwen has imposed force-placed insurance on borrowers in excessive amounts of coverage.

170.    For example, in 2014, Ocwen imposed lender placed insurance coverage of over $500,000 on a borrower who should have had only approximately $50,000 in coverage.

171.    Borrowers are harmed by excessive coverage because they have to pay the premiums for the insurance.

### D.    The Ocwen Defendants' Loss Mitigation and Foreclosure Failures

172.    The Ocwen Defendants have failed to maintain accurate or complete foreclosure-related information, which is necessary to provide their borrowers with mandatory foreclosure protections.  In part, this has been caused by the Ocwen Defendants' errors in boarding loans acquired from other servicers into REALServicing, the Ocwen Defendants' error-prone manual processes, and REALServicing's deficiencies, all of which has caused or is likely to have caused borrowers substantial harm from wrongfully initiated foreclosure proceedings and wrongful foreclosure sales.

173.    The Ocwen Defendants have failed to maintain and communicate accurate and necessary foreclosure-related information, which can directly impact whether a borrower seeks the foreclosure protections available under federal law.

174.    After receiving a Complete Application or Facially Complete Application for loss mitigation, the Ocwen Defendants have failed to place delinquent loans on hold and proceeded with a First Filing or seeking a foreclosure judgment in violation of federal law.

175.    The Ocwen Defendants have failed to provide or timely provide the required Acknowledgement Letters upon receipt of a loss mitigation application and have failed to include in the Acknowledgement Letters the additional documents and information the borrower must submit to make the application a Complete Application.

42

176.    The Ocwen Defendants' manual entry errors, failure to maintain accurate loan data, and inaccurate controls have resulted in poor loan modification decisions, and the initiation of wrongful foreclosure proceedings

177.    In numerous instances, the Ocwen Defendants have inappropriately conducted foreclosure sales on the home of borrowers who had a mortgage secured by their principal residence and had timely sent the Ocwen Defendants a Facially Complete Application more than thirty-seven (37) days before a pending foreclosure sale, but the Ocwen Defendants foreclosed on the borrowers before giving them a reasonable amount of time to complete their application.

178.    Borrowers have suffered significant harm, including the loss of their homes, financial losses, and other consequences as a result of the Ocwen Defendants' careless, inaccurate, incomplete, and misleading loss mitigation notices.

**E.      The Ocwen Defendants Have Charged Borrowers Excessive Default-Related Fees**

179.    At a minimum, during 2014 and 2015, the Ocwen Defendants overcharged default-related fees to borrowers.

180.    The Ocwen Defendants ordered property inspections more often that was contractually allowable, ordered multiple property inspections for the same property during the same property, and charged more for property inspections than was permissible by contract. Moreover, Ocwen was ordering property inspections related to properties where loss mitigation workouts were pending.

181.    Overcharges for property inspections caused transferred balances to exceed allowable amounts.

182.    The Ocwen Defendants' vendor, Altisource, provides services for the assessment of default related services, including property inspections.

183.    Ocwen's own documents conclude that Ocwen does not have effective oversight over its vendor's (Altisource's) property management activities.  At times relevant to this action, Ocwen did not ensure that property inspection work was completed and appropriate, that competitive billing took place, and/or that billing of work performed was accurate.

184.    According to the 2015 MMC Exam Report, an estimated 120,082 Florida borrowers were overcharged by over $822,000 (aggregate) for excess property inspection fees.

**F.     Ocwen Has Failed to Timely Terminate Borrowers' Private Mortgage Insurance**

185.    Ocwen Defendants have also failed to timely cancel borrowers' private mortgage insurance ("PMI").

186.    Borrowers/mortgagors are generally required to purchase PMI when they obtain a mortgage but have a down payment of less than 20 percent, or when they refinance their mortgage but have less than 20 percent equity in their property.

187.    Under HPA, servicers are required to automatically terminate a mortgagor's requirement to pay PMI on the "termination date," the date when the principal balance of the mortgage is first scheduled to reach 78 percent of the original value of the property or, if the borrower is not current as of the termination date, the first day of the first month beginning after the date that the borrower becomes current on the loan.

188.    Upon information and belief, Ocwen's system of record, REALServicing had unreliable or missing data for timely PMI cancellations.  Because REALServicing could not be relied upon, in 2014 Ocwen had its employees performing manual reviews of loans to performing manual calculations.

189.    Ocwen stated in its own Action Plan dated September 5, 2014 dealing with this issue that "[i]nternal testing has shown the [termination] date to be missing or inaccurate in

approximately 90 percent of test cases."   The Action Plan further states that "[t]he current methodology results in inaccurate termination of PMI.   In addition, there is currently no system automation related to automatic PMI termination."   In the same Action Plan, Ocwen identified approximately 700 loans "expected to meet automatic termination requirements each month."

190.   The Ocwen Defendants have failed to comply with the HPA by failing to timely terminate borrowers' PMI.

191.   The Ocwen Defendants' failure to timely terminate borrowers' PMI caused the Ocwen Defendants to overcharge borrowers, including Florida borrowers, for PMI premiums.

### COUNT I

**Violation of CFPA Based on RESPA Violations for Failure to
Timely Disburse Insurance Premiums from Escrow
(By Plaintiffs against the Ocwen Defendants)**

192.   The allegations in paragraphs 1-61, 66-68, 98-99, 104, 107-136, 138, and 160-166 are incorporated here by reference.

193.   Under RESPA and Regulation X, the Ocwen Defendants are servicers.

194.   RESPA is a Federal consumer financial law under the CFPA.

195.   In the course of servicing Federally Related Mortgage Loans since February 27, 2014, the Ocwen Defendants have failed to timely disburse from escrow payments of insurance premiums on behalf of escrowed borrowers whose payments were no more than 30 days overdue, as further described in Paragraphs 160-166.

196.   The Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce RESPA and its implementing regulation, Regulation X.   *See* 12 U.S.C. § 5552(a)(1).

197.    The acts and practices described in Paragraph 195 constitute violations of Section (6)(g) of RESPA, 12 U.S.C. § 2605(g), and Regulation X, 12 C.F.R. §§ 1024.17(k)(1) and 1024.34(a), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

198.    Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

a.      equitable relief, including a permanent or temporary injunction;

b.      rescission or reformation of contracts;

c.      refund of moneys or return of real property;

d.      restitution;

e.      disgorgement or compensation for unjust enrichment;

f.      payment of damages or other monetary relief;

g.      public notification regarding the violation, including the costs of notification;

h.      limits on the activities or functions of the person; and

i.      civil money penalties, including but not limited to those provided under 12 U.S.C. §§ 5565.

## COUNT II

**Violation of CFPA Based on Escrow Related RESPA Violations**
**(By Florida Attorney General against the Ocwen Defendants)**

199.    The allegations in paragraphs 1-65, 98-99, 104, 107-136, 149-159 are incorporated here by reference.

200.    Under RESPA and Regulation X, the Ocwen Defendants are servicers.

201.    RESPA is a Federal consumer financial law under the CFPA.

202.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(c)(3), the Ocwen Defendants have failed to conduct annual escrow analyses for borrowers.

203.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(i), the Ocwen Defendants have failed to provide annual escrow account statements within thirty (30) days of the completion of the escrow account computation year to borrowers who were not in default (over 30 days overdue), in foreclosure or in bankruptcy at the time of the escrow account analysis.

204.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(f)(3), the Ocwen Defendants have collected escrow shortages and other escrow deficiencies that did not exist, as such payments were, in fact, already paid by borrowers.

205.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(f)(2), the Ocwen Defendants have failed to refund escrow surpluses to current borrowers – borrowers whose payments to the servicer were made within 30 days of the payment due date – within thirty (30) days from the date of the escrow account analysis to the extent the surplus is greater than or equal to fifty dollars ($50.00).

206.    The Florida Attorney General has authority to enforce RESPA and its implementing regulation, Regulation X.  See 12 U.S.C. § 5552(a)(1).

207.    The acts and practices described in Paragraphs 202-205 constitute violations of Section 6(g) of RESPA and Regulation X, 12 C.F.R. §§ 1024.17(c)(3), 1024.17(i), 1024.17(f)(3), 1024.17(f)(2), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

208.    Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

a.      equitable relief, including a permanent or temporary injunction;

b.      rescission or reformation of contracts;

c.      refund of moneys or return of real property;

       d.       restitution;

       e.       disgorgement or compensation for unjust enrichment;

       f.       payment of damages or other monetary relief;

       g.       public notification regarding the violation, including the costs of notification;

       h.       limits on the activities or functions of the person; and

       i.       civil money penalties, including but not limited to those provided under 12 U.S.C. § 5565.

## COUNT III

**Violation of CFPA Based on Loss Mitigation and Foreclosure Related RESPA Violations (By Plaintiff Florida Attorney General against the Ocwen Defendants)**

209.    The allegations in paragraphs 1-61, 69-79, 98-99, 104, 107-136, 138 and 172-178 are incorporated here by reference.

210.    From January 10, 2014 until October 19, 2017, the protections in Section 1024.41 of Regulation X, as described in paragraphs 69-79, do not apply if the Ocwen Defendants have already complied with the requirements of 12 C.F.R. § 1024.41 for a Complete Application.  In other words, if Ocwen received a Complete Application and complied with all requirements set forth in 12 C.F.R. § 1024.41, then a subsequent loss mitigation application would not be subject to Regulation X's requirements. Thus, the term "First Complete Application" refers to Complete Applications that Ocwen received and for which Ocwen had not previously complied with the requirements of 12 C.F.R. § 1024.41 for a Complete Application.

211.    Under RESPA and Regulation X, the Ocwen Defendants are servicers.

212.    RESPA is a Federal consumer financial law under the CFPA.

213.    In the course of servicing Federally Related Mortgage Loans between February 27, 2014 and October 19, 2017, in violation of 12 C.F.R. § 1024.41(b)(2)(i)(B), within five (5) days

after receiving a borrower's first or only loss mitigation application, the Ocwen Defendants have failed to send borrowers whose mortgages are secured by their principal residences the required Acknowledgement Letter informing borrowers that they received the loss mitigation application and their determination whether the loss mitigation application is complete or incomplete.

214.    In the course of servicing Federally Related Mortgage Loans between February 27, 2014 and October 19, 2017, in violation of 12 C.F.R. § 1024.41(c)(1)(i)-(ii), with respect to borrowers whose mortgages are secured by their principal residences and who submitted a First Complete Application more than thirty-seven (37) days before the first foreclosure sale was scheduled, the Ocwen Defendants have failed to, within thirty (30) days of receiving a First Complete Applications, evaluate such borrowers for all loss mitigation options available and provide such borrowers with the mandatory Evaluation Notice including all of the required information, which includes, but is not limited to, the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such appeal and any requirements for making an appeal.

215.    In the course of servicing Federally Related Mortgage Loans between February 27, 2014 and October 19, 2017, the Ocwen Defendants have violated 12 C.F.R. § 1024.41(f)(2), by, including, but not limited to, making the First Filing without previously providing the borrowers – whose mortgages are secured by their principal residence and who submitted a First Complete Application during either the pre-foreclosure review period or before the First Filing – the required Evaluation Notice stating that the borrower is not eligible for any loss mitigation option and the appeal process is not applicable, the borrower has not timely requested an appeal, or the borrower's appeal has been denied.

216.     In the course of servicing Federally Related Mortgage Loans between February 27, 2014 and October 19, 2017, the Ocwen Defendants have moved for foreclosure judgments or conducted foreclosure sales in violation of 12 C.F.R. §1024.41(g).  More specifically, since February 27, 2014, the Ocwen Defendants moved for foreclosure sales or conducted foreclosure sales on borrowers whose mortgages are secured by their principal residence and who submitted a First Complete Application after the First Filing, but more than thirty-seven (37) days before the first foreclosure sale was scheduled, and (i) the Ocwen Defendants failed to provide the Evaluation Notice to the borrower prior to moving for foreclosure judgment or conducting the foreclosure sale; (ii) the borrower had not rejected all loss mitigation options offered by the Ocwen Defendants; or (iii) the borrower did not fail to perform under a loss mitigation agreement.

217.     The Florida Attorney General has authority to enforce RESPA and its implementing regulation, Regulation X.  See 12 U.S.C. § 5552(a)(1).

218.     The acts and practices described in Paragraphs 213-216 constitute violations of Section 6(k) of RESPA, 12 U.S.C. § 2605(k), Regulation X, 12 C.F.R. §§ 1024.41(b)(2)(i)(B), 1024.41(c)(1)(i)-(ii), 1024.41(f)(2) and 1024.41(g), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

219.     Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

a.       equitable relief, including a permanent or temporary injunction;

b.       rescission or reformation of contracts;

c.       refund of moneys or return of real property;

d.       restitution;

e.       disgorgement or compensation for unjust enrichment;

f.       payment of damages or other monetary relief;

g.      public notification regarding the violation, including the costs of notification;

h.      limits on the activities or functions of the person; and

i.       civil money penalties.

## COUNT IV

### Violations of CFPA Based on Violations of the HPA
### (By Florida Attorney General against the Ocwen Defendants)

220.    The allegations in paragraphs 1-54, 80-89, 98-99, 104, 107-136, and 185-191 are incorporated here by reference.

221.    Ocwen Defendants are the servicer for mortgagors or the original borrowers under a residential mortgage with respect to single-family dwellings that are their principal residences.

222.    In numerous instances since February 27, 2014, Ocwen Defendants have failed to automatically terminate private mortgage insurance in connection with residential mortgage transactions (i) on the termination date if, on that date, the mortgagor was current on the payments required by the terms of the residential mortgage; or (ii) if the mortgagor was not current as of the termination date, the first day of the first month beginning after that date that the mortgagor became current on the payments required by the terms of the residential mortgage transaction, as alleged in Paragraphs 167-171.

223.    The Florida Attorney General has the authority to enforce the HPA. *See* 12 U.S.C. § 5552(a)(1). The acts and practices described herein, including at Paragraphs 167-171 and 222, constitute violations of Section 4902(b) of the HPA, 12 U.S.C. § 4902(b), and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

224.    Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

a.      equitable relief, including a permanent or temporary injunction;

b.      rescission or reformation of contracts;

     c.      refund of moneys or return of real property;

     d.      restitution;

     e.      disgorgement or compensation for unjust enrichment;

     f.      payment of damages or other monetary relief;

     g.      public notification regarding the violation, including the costs of notification;

     h.      limits on the activities or functions of the person; and

     i.      civil money penalties.

## COUNT V

### Violations of the Florida Deceptive and Unfair Trade Practices Act
### (By Florida Attorney General against the Ocwen Defendants)

225.    The allegations in paragraphs 1-54, 90-94, 104, 106-148, 156, and 159 are incorporated here by reference.

226.    At all times relevant to this action, the Ocwen Defendants engaged in trade or commerce as defined in Section 501.203(8), Florida Statutes, and continue to engage in "trade or commerce."

227.    At all times relevant to this action, the Ocwen Defendants provided services as referenced within Section 501.203(8), Florida Statutes, within the State of Florida and throughout the United States and continue to provide services within the State of Florida and throughout the United States.

228.    In the course of providing services that directly impacted consumers, including affecting the amount of money consumers paid in connection with their mortgage loans, the Ocwen Defendants made the business decision to use and maintain use of REALServicing as their system of record.

229.    The Ocwen Defendants' reliance on REALServicing, and its failure to implement an adequate framework to address known deficiencies in REALServicing resulted in miscalculation of payments due by borrowers and miscommunications about terms and payments due by borrowers, including errors related to the terms of the loans including interest rates, balloon payments, whether a loan had an adjustable rate, and maturity dates as set forth in Paragraphs 110, 117-118, and 137-143, for example.   These miscalculations led to misinformation and miscommunications about monthly payments due from borrowers, payoff amounts and reinstatement amounts as set forth in paragraphs 110, 114, 137-138, 142-145, for example, as well as errors related to escrow accounts, as set forth in paragraphs 136-137, for example.

230.    Ocwen's business decision to rely on REALServicing and failure to fix its known deficiencies while simultaneously growing its portfolio has caused or is likely to cause substantial injury to consumers, such as miscalculation of charges due, collection and billing of inaccurate and incorrect amounts, imposition of inappropriate fees and charges, inaccurate negative credit reporting, and other consequences.

231.    Ocwen's business decision to rely on REALServicing and failure to fix its known deficiencies while simultaneously growing its portfolio has caused or is likely to cause miscommunications to borrowers, including misrepresenting to borrowers outstanding loan balances, monthly payments due, escrow amounts due, loan reinstatement amounts, and insurance amounts due, as set forth in Paragraph 229 and the Paragraphs cited therein.

232.    Since February 27, 2014, the Ocwen Defendants have engaged in the unfair or deceptive acts described in Paragraph 229 and the Paragraphs cited therein that are likely to cause substantial injury to consumers and the substantial injury is not reasonably avoidable by consumer and is not outweighed by countervailing benefit to the consumers.

233.    When the Ocwen Defendants engaged in the conduct described in Paragraph 229 and the Paragraphs cited therein, they knew or should have known that their system of record contains inaccurate information about borrower payments and amounts due, including interest rates, loan terms, maturity dates, reinstatement amounts, suspense balances, default fees dues, and delinquency statuses, all of which Ocwen relied upon in communicating directly with borrowers and requiring payments from borrowers.

234.    The Ocwen Defendants have willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

235.    These above-described acts and practices of the Ocwen Defendants have substantially injured and will likely continue to injure and prejudice the public.  The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition and are not injuries that the consumers themselves could have reasonably avoided.

236.    Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

### <u>COUNT VI</u>

**Violations of the Florida Deceptive and Unfair Trade Practices Act
for Ocwen's Force-Placed Insurance Errors
(By Florida Attorney General against the Ocwen Defendants)**

237.    The allegations in paragraphs 1-54, 90-94, 104, 106, 107-136, and 167-171 are incorporated here by reference.

238.    At all times relevant to this action the Ocwen Defendants engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes, and continue to engage in "trade or commerce."

239.    At all times relevant to this action, the Ocwen Defendants provided services, as referenced in Section 501.203(8), Florida Statutes, within the State of Florida and throughout the United States and continue to provide services within the State of Florida and throughout the United States.

240.    Since February 27, 2014, the Ocwen Defendants have engaged in unfair acts that are likely to cause substantial injury to consumers and the substantial injury is not reasonably avoidable by consumer and is not outweighed by countervailing benefit to the consumers.  These unfair acts include, among others,

    a.    The imposition of force-placed insurance in excessive amounts of coverage as alleged in Paragraphs 169-171; and

    b.    The imposition of force-placed insurance where the borrower had insurance as alleged in Paragraphs 167-168.

241.    The Ocwen Defendants have willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

242.    These above-described acts and practices of the Ocwen Defendants have substantially injured and will likely continue to injure and prejudice the public.  The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits

to consumers or competition and are not injuries that the consumers themselves could have reasonably avoided.

243.    Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

## <u>COUNT VII</u>

**Violations of the Florida Deceptive and Unfair Trade Practices Act
for Ocwen's Excessive Property Inspection Fees Charged to Borrowers
(By Florida Attorney General against the Ocwen Defendants)**

244.    The allegations in paragraphs 1-54, 90-94, 104, 106-136, and 179-184 are incorporated here by reference.

245.    At all times relevant to this action the Ocwen Defendants engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes, and continue to engage in "trade or commerce."

246.    At all times relevant to this action, the Ocwen Defendants provided services, as referenced in Section 501.203(8), Florida Statutes, within the State of Florida and throughout the United States and continue to provide services within the State of Florida and throughout the United States.

247.    Since February 27, 2014, the Ocwen Defendants have engaged in unfair acts that are likely to cause substantial injury to consumers and the substantial injury is not reasonably avoidable by consumer and is not outweighed by countervailing benefit to the consumers.  These unfair acts include, among others, charging borrowers excessive property inspection fees, as alleged in Paragraphs 179-184.

248.     The Ocwen Defendants have willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

249.     These above-described acts and practices of the Ocwen Defendants have substantially injured and will likely continue to injure and prejudice the public.  The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition and are not injuries that the consumers themselves could have reasonably avoided.

250.     Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

## COUNT VIII

### Violation of CFPA for Unfair and Deceptive Acts
### (By Florida Attorney General against the Ocwen Defendants)

251.     The allegations in paragraphs 1-54, 95-99, 104, 106-148, 156, 158-159 are incorporated here by reference.

252.     The Florida Attorney General has the authority to enforce the CFPA.  *See* 12 U.S.C. § 5552(a)(1).

253.     The acts and practices enumerated in this Count VIII constitute violations of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

254.     In the course of providing services that directly impact consumers, including affecting the amount of money consumers paid in connection with their mortgage loans, the Ocwen

Defendants made the business decision to use and maintain use of REALServicing as their system of record.

255.    The Ocwen Defendants' reliance on REALServicing, and their failure to implement an adequate framework to address known deficiencies in REALServicing, resulted in miscalculation of payments due by borrowers and miscommunications about terms and payments due by borrowers, including errors related to the terms of the loans including interest rates, balloon payments, whether a loan had an adjustable rate, and maturity dates as set forth in Paragraphs 110, 117-118, and 137-143, for example.   These miscalculations led to misinformation and miscommunications about monthly payments due from borrowers, payoff amounts and reinstatement amounts as set forth in paragraphs 110, 114, 137-138, 142-145, for example, as well as errors related to escrow accounts, as set forth in paragraphs 136-137, for example.

256.    Ocwen has also failed to timely pay borrowers' insurance premiums, provided borrowers with loan modifications with inaccurate terms, and initiated wrongful foreclosure proceedings upon borrowers' loans.

257.    When the Ocwen Defendants engaged in the conduct described in Paragraphs 255 (and the Paragraphs cited therein) and Paragraph 256 cited therein, they knew or should have known their system of record contained inaccurate information about borrower payments and amounts due, including reinstatement amounts, suspense balances, default fees dues, and delinquency statuses, all of which Ocwen uses in demand letters, periodic billing statements, foreclosure filings, and other communications with borrowers; that the data and records upon which Ocwen was relying was inaccurate or missing; that Ocwen had systematically failed to review information that is necessary to have a reasonable basis to collect on, foreclose on, or transfer borrowers' loans.

258.    Ocwen's business decision to rely on REALServicing and failure to fix its known deficiencies while simultaneously growing its portfolio has caused or is likely to cause substantial injury to consumers, such as miscalculation of charges due, collection and billing of inaccurate and incorrect amounts, imposition of inappropriate fees and charges, inaccurate negative credit reporting, and other consequences.

259.    Ocwen's acts and practices set forth in Paragraphs 255 (and the Paragraphs cited therein) and Paragraph 256, have substantially injured and will likely continue to injure and prejudice the public.  The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition and are not injuries that the consumers themselves could have reasonably avoided.

260.    Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

261.    Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

a.      equitable relief, including a permanent or temporary injunction;

b.      rescission or reformation of contracts;

c.      refund of moneys or return of real property;

d.      restitution;

e.      disgorgement or compensation for unjust enrichment;

f.      payment of damages or other monetary relief;

g.      public notification regarding the violation, including the costs of notification;

h.      limits on the activities or functions of the person; and

i.    civil money penalties, including but not limited to those provided under 12 U.S.C.

§§ 5565.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, pursuant to 12 U.S.C. §§ 5552 & 5565, Sections 501.207,

501.2075, 501.2077, and 494.00255(2), Florida Statutes, and the Court's own powers to grant legal

or equitable relief, request that the Court:

1.    Permanently enjoin the Ocwen Defendants, their officers, agents, servants,

employees, attorneys, and those persons in active concert or participation with them, who receive

actual notice of the injunction from committing future violations of the CFPA, RESPA, 12 U.S.C.

§ 2601 *et seq*., and its implementing regulations, Regulation X, HPA, and FDUTPA, and including

restrictions on the future business activities of the Ocwen Defendants to prevent violations of the

law;

2.    Enter judgment as follows: (i) in favor of Plaintiffs, Florida Attorney General and

Florida Office of Financial Regulation, against the Ocwen Defendants, jointly and severally, on

Count I; (ii) in favor of Plaintiff, Florida Attorney General, against Ocwen Defendants, jointly and

severally, on Count II, Count III, Count IV, Count V, Count VI, Count VII, and Count VIII;

3.    Award such relief as the Court finds necessary to redress harm to consumers,

including, but not limited to, refund of moneys to consumers; restitution; disgorgement, and any

other injunctive or equitable relief allowable under law, including, but not limited to, pursuant to

12 U.S.C. § 5565(a) and Section 501.207(3), Florida Statutes;

4.    Assess against Ocwen Defendants, jointly and severally, civil penalties in favor of

the Florida Attorney General, the amount of Ten Thousand Dollars ($10,000.00) for each violation

of FDUTPA in accordance with Section 501.2075, Florida Statutes, Fifteen Thousand Dollars

($15,000.00) for each violation that victimized or attempted to victimize, a senior citizen in accordance with Section 501.2077, Florida Statutes;

5.    Assess against the Ocwen Defendants, jointly and severally, civil penalties in favor of the Florida Attorney General, pursuant to 12 U.S.C. § 5565(c);

6.    Assess against the Ocwen Defendants, jointly and severally, civil penalties in favor of the Florida Office of Financial Regulation, pursuant to 12 U.S.C. § 5565(c);

7.    Award the Florida Attorney General reasonable attorney's fees and costs pursuant to Sections 501.2105 and 501.2075 of FDUTPA, and as otherwise allowable by applicable statutes or law;

8.    Order the Ocwen Defendants to pay costs and fees incurred in prosecuting this action; and

9.    Award additional relief as the Court may deem just and proper.

Dated: November 1, 2019                    Respectfully Submitted,

                                           Office of the Attorney General
                                           The State of Florida
                                           Department of Legal Affairs
                                           Pamela Jo Bondi
                                           Attorney General

                                           **By: */s/ Jennifer Hayes Pinder*** _____

                                           Jennifer Hayes Pinder
                                           Senior Assistant Attorney General
                                           Fla. Bar No.: 17325
                                           Email: *Jennifer.Pinder@myfloridalegal.co*m
                                           Victoria Butler

                                           Director, Consumer Protection Division
                                           Fla. Bar No.: 861250
                                           Email: *Victoria.Butler@myfloridalegal.com*

                                           Sasha Funk Granai
                                           Assistant Chief-Attorney General

Fla. Bar No.: 96648
Email: *Sasha.Granai@myfloridalegal.com*

3507 East Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515

Office of Financial Regulations
The State of Florida
Division of Consumer Finance

**By: /s/ *Scott Fransen***
Scott R. Fransen
Assistant General Counsel
Fla. Bar No.: 0994571
Email: *Scott.Fransen@flofr.com*
1313 N. Tampa St., Suite 615
Tampa, FL 33602
Telephone: 813-218-5364
Facsimile: 813-272-3752

Miriam S. Wilkinson
Chief Counsel
Fla. Bar No.: 972101
Email: *Miriam.Wilkinson@flofr.com*

Anthony Cammarata
General Counsel
Fla. Bar No.: 767492
Email: *Anthony.Cammarata@flofr.com*
The Fletcher Building
200 E. Gaines Street
Tallahassee, FL 32399-0370
Telephone: 850-410-9601

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2019, a true and correct copy of the foregoing was

served on the following via CM/ECF:

Thomas M. Hefferon, Esq.
Goodwin Procter LLP
Email: thefferon@goodwinlaw.com

Sabrina M. Rose-Smith, Esq.
Goodwin Procter LLP
Email: srosesmith@goodwinlaw.com

Catalina E Azuero, Esq.
Goodwin Procter LLP
Email: CAzuero@goodwinlaw.com

Laura S. Craven, Esq.
Goodwin Procter LLP
Email: LCraven@goodwinlaw.com

Amanda B. Protess, Esq.
Goodwin Procter LLP
Email: aprotess@goodwinlaw.com

Laura Stoll, Esq.
Goodwin Procter LLP
Email: lstoll@goodwinlaw.com

Mathew S. Sheldon, Esq.
Goodwin Procter LLP
Email: msheldon@goodwinlaw.com

Matthew L. Riffee
Goodwin Procter LLP
Email: MRiffee@goodwinlaw.com

Tierney E. Smith
Goodwin Procter LLP
Email: TierneySmith@goodwinlaw.com

W. Kyle Tayman
Goodwin Procter, LLP
Email: KTayman@goodwinlaw.com

Andrew Stuart Wein, Esq.
Greenberg Traurig, PA
Email: weina@gtlaw.com

Bridget Ann Berry, Esq.
Greenberg Traurig, P.A.
Email: BerryB@gtlaw.com,
darschs@gtlaw.com, thomsonj@gtlaw.com,
whitfieldd@gtlaw.com, and
WPBLitDock@GTLAW.com

Matthew P. Previn, Esq.
Buckley LLP
Email: mprevin@buckleysandler.com


Attorneys for Defendants Ocwen Financial, Corporation, Ocwen Mortgage Servicing, Inc. Loan Servicing, LLC, and PHH Mortgage Corporation.

By: */s/ Jennifer Hayes Pinder*
Jennifer Hayes Pinder
Senior Assistant Attorney General