**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495 and CASE NO. 9:17-CV-80495**
**MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

---

OFFICE OF THE ATTORNEY GENERAL, THE STATE OF FLORIDA, Department of Legal Affairs,
and
OFFICE OF FINANCIAL REGULATION, THE STATE OF FLORIDA, Division of Consumer Finance,

Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

---

**DEFENDANTS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

ARGUMENT ........ 3

I. THE PARTIES' AGREEMENT AND CONSENT JUDGMENT BAR ALMOST ALL PLAINTIFFS' CLAIMS (CFPB COUNTS I-IX & FL COUNTS I-III, VI-VIII) ........ 4

A. The Parties' 2013 Lawsuit and Settlement Agreement/Consent Judgment ........ 4

B. Ocwen Abided by the NMS Agreement and Consent Judgment Faithfully, and at Considerable Effort and Expense ........ 6

C. Almost All of Plaintiffs' Claims Here Involve the Same Conduct Covered by the NMS Settlement Agreement and Consent Judgment ........ 6

D. The NMS Bars Plaintiffs' Overlapping Claims ........ 8

E. Plaintiffs' Overlapping Claims Are Also Barred by Waiver ........ 10

F. *Res Judicata* Also Bars Plaintiffs' Overlapping Claims ........ 11

II. PLAINTIFFS CANNOT SHOW A TRIABLE ISSUE OF FACT ON ANY OF THEIR CLAIMS (ALL CFPB AND FLORIDA COUNTS) ........ 13

A. The CFPB Has No Evidence To Prove That Ocwen's Servicing of Many or All of the [redacted] Loans Violated any Law ........ 16

1. The CFPB Offered No Expert Testimony That Ocwen Improperly Serviced Any Loan, Despite Repeatedly Telling the Court It Would Prove Its Case with Expert Analysis of Individual Loans ........ 17

2. The CFPB Cannot Prove Its Claims Through Non-Expert Evidence ........ 18

B. Florida Has No Evidence To Prove That Each of the Loans It Has Listed Violated the Cited Law ........ 22

1. Florida Has No Expert Evidence To Prove Its Claims ........ 22

2. Florida Cannot Prove It Claims Through Non-Expert Evidence ........ 23

III. PLAINTIFFS HAVE NO EVIDENCE TO PROVE CONSUMER DAMAGES. ........ 27

A. The CFPB Cannot Prove the Alleged Consumer Damages ........ 27

1. Defendants Are Entitled to Summary Judgment on CFPB's Claim to Recover [redacted] ........ 28

2. Defendants Are Entitled to Summary Judgment on the CFPB's Consumer Damages Claim for [redacted] ........ 30

B. Florida Has No Evidence to Prove Its Consumer Damages Claims ........ 31

IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING LOSS MITIGATION APPLICATIONS (COUNT III) ........ 31

V. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON MOST ESCROW VIOLATION CLAIMS (CFPB COUNT VII & FLORIDA COUNTS I AND II) ........ 33

A. The Court Should Grant Summary Judgment as to [redacted] Loans for Which the

CFPB Has Not Even Identified the Purported Escrow Violation ............................................ 33

B. Plaintiffs Cannot Show Ocwen Acted Recklessly or Knowingly by Allegedly Failing to Conduct Annual Escrow Analyses for Borrowers Who Were Delinquent, in Bankruptcy, or in Foreclosure ........................................................................................................... 34

VI. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CHALLENGING OCWEN'S POLICIES (COUNT VIII) ............................................ 36

VII. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON FLORIDA'S REMAINING FDUTPA CLAIMS ........................................................................................ 36

VIII. DEFENDANTS OFC AND OMS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY DID NOT ENGAGE IN SERVICING ACTIVITIES .................................. 38

CONCLUSION ........................................................................................................................... 39

Defendants Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), Ocwen Loan Servicing, LLC ("OLS"), and PHH Mortgage Corporation ("PHH") (collectively, "Ocwen" or "Defendants") move for summary judgment on all claims asserted by the Consumer Financial Protection Bureau ("CFPB") and Florida's Office of the Attorney General ("OAG") and Office of Financial Regulation ("OFR," together with OAG, "Florida").

## INTRODUCTION

At the start of 2014, Florida, the CFPB, and Ocwen made a deal. First, the parties agreed Ocwen would pay or provide consumer remediation of over $2 billion to resolve allegations made by Plaintiffs related to Ocwen's servicing of certain mortgage loans ***before*** 2014. Second, the plaintiffs and Ocwen agreed that Ocwen would service mortgage loans in the ***future***—beginning in 2014 and continuing through at least February 2017—in accordance with certain defined standards, with an independent monitor to test for Ocwen's compliance and to report the results to both the CFPB and Florida. Recognizing that absolute perfection in loan servicing, while always the goal, is almost impossible to achieve, Ocwen's agreement with Plaintiffs did not require it. Instead, each agreement contained servicing error tolerance thresholds that Ocwen had to stay below, as well as mandatory dispute resolution procedures and limited potential penalties if—but only if—the monitor concluded that Ocwen failed to comply with those error tolerance thresholds and Ocwen failed to cure. The settlement was submitted to and approved by a federal district court as a consent judgment. The parties have no disputes about these facts.

Just about the time Ocwen and the Plaintiffs reached those agreements, the CFPB also finalized new mortgage servicing rules that enshrined into law many of the same compliance requirements that Ocwen already had agreed to. While the Dodd-Frank Act empowers both the CFPB and Florida to enforce those legal requirements as to almost all companies, the CFPB and Florida had agreed to a different enforcement regime with Ocwen—with some requirements mirroring the new regulations, and some more stringent—during the Ocwen monitoring period.

Ocwen complied with the parties' agreements, and Plaintiffs do not allege otherwise. The independent monitor evaluated Ocwen's compliance and issued regular reports between 2014 and 2017, and those reports were available to and received by both Plaintiffs. The monitor reported that, with few exceptions, Ocwen stayed within the error tolerance thresholds set forth in the agreement. For those few exceptions, the parties resolved the compliance issues in accordance with the settlement. And even in the vast majority of instances where Ocwen was

under the error tolerance thresholds, the monitor reported the numbers of errors, such that the CFPB and Florida were well aware of when and how often Ocwen made servicing errors.

Nonetheless, just as the monitoring period drew to a close and after the CFPB and Florida had reaped all the benefits of the settlement, each sued Ocwen. Incredibly, both suits center on claims over servicing errors that occurred ***during*** the monitoring period and that the monitor already had found were ***below*** the parties' agreed-upon error threshold levels. ***In other words, the CFPB and Florida brought this lawsuit as if the parties' agreements meant nothing.***

Plaintiffs' conduct in requiring Ocwen meet specific 2014-2017 servicing standards under the stringent eye of an independent monitor, watching Ocwen satisfy those standards, and then suing Ocwen for more money anyway violates the agreed-to settlement terms and is grossly unfair. It also defies common sense. Had the CFPB and Florida announced back in early 2014 that they reserved the right to sue Ocwen for the very conduct at issue in the consent judgment even if Ocwen met the negotiated servicing standards, it is doubtful the district court would have approved the Ocwen settlements and it is certain that Ocwen would not have agreed to them. Plaintiffs want more than they bargained for, and the Court should not allow it. Ocwen is entitled to summary judgment on all claims that overlap with, and are governed by, the parties' settlement. As shown below, that would dispose of almost all of Plaintiffs' claims.

Even if Plaintiffs' claims were not barred by the parties' prior settlement, this lawsuit fails and Ocwen is entitled to summary judgment because Plaintiffs developed no admissible evidence that would enable them to prevail.

Both lawsuits assert scattershot claims alleging that Ocwen made various different kinds of loan-specific servicing errors. Given the sprawling and diffuse collection of asserted errors and legal violations, Judge Matthewman expressly warned Plaintiffs that they would have to prove their claims "by loan number"—that is, with specific evidence for each specific loan—and required Plaintiffs to identify which specific loans violated which legal standard and what specific evidence would prove each of those violations. SMF ¶ 71 & Ex. 28 at 29:13-20. For more than two years, the CFPB and Florida tried to develop admissible evidence of that, demanding Ocwen produce almost 7 million pages of documents and more than 15 fact depositions on top of the tens of thousands of documents and 8 depositions the CFPB demanded during the three-year pre-suit investigation. Judge Matthewman heard over a dozen discovery disputes instigated by Plaintiffs, granted them multiple discovery deadline extensions, and,

importantly, ordered a production of Ocwen's loan level servicing data on more than 1.5 million [redacted] loans [redacted] In fact, the data production was so massive and unnecessary Judge Matthewman ordered the CFPB itself to pay for it.

With discovery now over, Plaintiffs cannot prove individual violations or damages. Despite promising the Court that they would use experts to summarize and prove up the specific violations under each specific law for each individual loan, Plaintiffs have no expert opinion as to any specific loans and have abandoned their plan to establish liability though a summary expert witness. Plaintiffs still cannot prove, as to each loan, what Ocwen's servicing failure was, and what harm that failure caused. Instead, all they have—and gave Ocwen—are [redacted], and Plaintiffs will ask the Court to assume every loan identified in those documents violated the law—with no way to show the Court that any loan actually did. It should not be enough to survive summary judgment. The Plaintiffs' burden of proof simply demands a more fulsome showing than Plaintiffs can make. This fundamental lack of evidence despite years to prove their claims, along with limitations in Plaintiffs' prior agreements with Ocwen entitle Ocwen to judgment on every count in both complaints.

Ocwen also argues other independent grounds for summary judgment below, including that Plaintiffs have no proof that any consumer was injured. For the multiple reasons discussed below, the Court should grant Ocwen summary judgment, in whole or in part. Ocwen summarizes the grounds for its motion as to Plaintiff and each count in Exhibit 1 to this Motion and Memorandum. To support its motion, Ocwen also submits a Statement of Material Facts ("SMF"), and an Appendix of Record Evidence, each filed separately.

## ARGUMENT

Because the CFPB and Florida have the underlying burden of proof in these cases, all that Ocwen needs to do in this summary judgment motion is to point out that Plaintiffs lack sufficient evidence to prove their claims. As this Court has held, "[a] summary judgment movant may carry its initial burden by 'pointing out . . . that there is an absence of evidence to support the nonmoving party's case.'" *In re Chiquita Brands Int'l Inc.*, 2019 U.S. Dist. LEXIS 153856,

*156 (S.D. Fla. Sept. 5, 2019) (Marra, J.) (quoting *Celotex v. Catrett*, 477 U.S. 317, 325 (1986)).

Once Ocwen has pointed out that Plaintiffs lack sufficient evidence, Plaintiffs must, in order to avoid summary judgment, demonstrate that they do have enough evidence to prove up their claims. As this Court explained: "If [the summary judgment movant's] burden is met, the non-moving party must then come forward with 'evidence showing that there is a triable issue as to an element essential to that party's claim.'" *Id*. Summary judgment is required unless "the nonmovant has presented competent evidence on which a reasonable juror could rule in its favor on each element of its claim." *Id*. at *157 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). *See also Thompson v. McDonald*, 2019 U.S. Dist. LEXIS 50566, at *3 (S.D. Fla. Mar. 25, 2019) (Marra, J.) (summary judgment standards).

## I. THE PARTIES' AGREEMENT AND CONSENT JUDGMENT BAR ALMOST ALL PLAINTIFFS' CLAIMS (CFPB COUNTS I-IX & FL COUNTS I-III, VI-VIII)

When Ocwen moved to dismiss these cases because Plaintiffs' claims were foreclosed by the parties' settlement agreement and consent judgment settling Plaintiffs' 2013 lawsuit against Defendants, the Court deferred this issue to summary judgment. ECF No. 452 at 12 ("CFPB MTD Op."); ECF No. 477 at 9 ("Florida MTD Op."). As the record shows, those settlement agreements bar the vast majority of both Plaintiffs' claims.

### A. The Parties' 2013 Lawsuit and Settlement Agreement/Consent Judgment

In 2013, the CFPB, Florida, and other states sued Defendants OFC and OLS alleging that Ocwen's loan servicing practices violated federal and state law. SMF ¶ 1. The plaintiffs alleged Ocwen was engaging in "practices" that included, among others, "failing to provide accurate and timely information to borrowers," "providing false or misleading information to borrowers," "failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements," and "failing to properly process borrowers' applications." *Id.* ¶ 2. Plaintiffs sought not only monetary relief for Ocwen's alleged past conduct, but also sought to address Ocwen's ***future conduct***—that is Ocwen's conduct from 2014 forward—by asking the court to "[p]ermanently enjoin Ocwen from committing future violations." *Id.* ¶ 3.

The parties to the 2013 lawsuit, including the CFPB and Florida, resolved all of Plaintiffs' claims—as to both Ocwen's past ***and future*** conduct—through a settlement agreement, referred to as the National Mortgage Settlement ("NMS"), which was incorporated into a Consent Judgment. *Id.* ¶¶ 4-6. (Defendants filed a copy of the Consent Judgment and

NMS at Docket No. 32 in the present case).[1] As the U.S. Supreme Court has observed, in a consent judgment with the government, "[n]aturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). That was the case with the NMS: it represented a compromise of claims related to Ocwen's past conduct, but also limited Plaintiffs' claims relating to Ocwen's future conduct for the following three years (generally from 2014-2017).

The NMS Consent Judgment contained some terms that were very favorable to the CFPB and Florida. Ocwen agreed, among other terms, to: (1) provide $2 billion in relief to customers; (2) pay an additional $127.3 million into a borrower relief fund; (3) abide by a 46-page single-spaced stipulation that contained over 300 detailed "Servicing Standards;" (4) consent to and pay for extensive ongoing monitoring, including detailed reports from the NMS Monitor to the NMS Monitoring Committee; and (5) consent to the NMS's enforcement framework and provide certain remedies if Ocwen failed to meet the "Servicing Standards" and related Metrics. SMF ¶ 8; *see also* SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 1-2 (D.D.C. Sept. 6, 2017) (noting requirements of Consent Judgment). Those Servicing Standards and Metrics covered dozens of different categories of servicing compliance, including accuracy of information, escrow, loan modification and foreclosure procedure—nearly all of the very same servicing conduct and regulatory requirements that these lawsuits cover. SMF ¶¶ 9-16.

In exchange for those benefits, Plaintiffs here (and the other state parties) agreed that the government would release all claims for Ocwen's past conduct ***and*** that Ocwen would not be subject to any judicial or administrative enforcement action arising out of its future conduct concerning the subject matter of the Servicing Standards and metrics except under strictly limited circumstances. *Id.* ¶¶ 9-10. Specifically, the parties agreed that Ocwen would be in compliance unless: (1) any servicing violations exceeded certain agreed-upon "Threshold Error Rates" as measured by the NMS Monitor; (2) Ocwen had the opportunity to cure any errors; and (3) Ocwen had failed to cure them. *Id.* Only if those preconditions were met could Plaintiffs bring an action in the federal court that had entered the Consent Judgment and, at most, seek

[1] OFR was not a party to the NMS, but agreed to abide by its terms. SMF ¶ 7. Even if it had not, OFR is bound by the consent judgment as an agency of the State of Florida, a party to the NMS. *Johnson v. Ala. Dep't of Human Resources*, 546 F. App'x 863, 868 (11th Cir. 2013).

non-monetary remedies and a civil penalty of $1 million for the first violation. *Id.* ¶¶ 9, 24-34.

### B. Ocwen Abided by the NMS Agreement and Consent Judgment Faithfully, and at Considerable Effort and Expense

Between February 2014 and August 2017, Ocwen expended significant time and resources to comply with the NMS's arduous Servicing Standards and Metrics, and to assist in the NMS's extensive monitoring of those standards. SMF ¶¶ 17-19, 53-54. To that end, Ocwen estimates that it spent over $55 million and hundreds of thousands of employee hours on NMS-related monitoring, reporting, and audits, as well as NMS-related process improvements and remediation if and when necessary. *Id.* ¶ 55. As a result of Ocwen's ongoing efforts, the NMS Monitor reported that Ocwen almost always met the NMS Servicing Standards and performed within the agreed-upon thresholds. *Id.* ¶ 64. In the rare instances where Ocwen was found to have exceeded certain thresholds, the reports (and subsequent inaction of the NMS parties) reflect that Ocwen was able to cure the issue and bring itself into compliance with the agreement. *Id.* ¶ 65. And in the one instance where Ocwen could not cure its failure of a single metric for a single quarter, the Monitoring Committee filed an unopposed consent motion to enforce the NMS Consent Judgment—triggering the sole remedies (a $1 million penalty and non-monetary equitable relief) contemplated by the NMS. *Id.* ¶¶ 66-67.

As parties to the settlement and members of the NMS Monitoring Committee, Florida and the CFPB were active, engaged participants throughout this process. *Id.* ¶¶ 56-57, 59-61. For example, the CFPB and OAG received each quarterly report from the NMS Monitor and participated in meetings with the Monitor and fellow committee members to discuss those reports. *Id.* ¶¶ 57, 60. OFR likewise had unfettered access to "any information or documents in the possession of the [Monitoring Committee]" and was aware of the same. *Id.* ¶ 58 & Ex. 11. Plaintiffs knew from the Monitor's reports that, although Ocwen was satisfying the agreed tolerances, it inevitably was making some mistakes. *Id.* ¶¶ 61-65. Yet, from 2014 forward, neither Plaintiff sought relief in court for errors below the agreed-upon thresholds. The evident reason, of course, is Plaintiffs understood that, under the NMS, a below-threshold number of errors would not be actionable.

### C. Almost All of Plaintiffs' Claims Here Involve the Same Conduct Covered by the NMS Settlement Agreement and Consent Judgment

It is indisputable that almost all of the alleged conduct at issue in the present cases is covered by the terms of the NMS. As shown in detail in Defendants' Statement of Material

Facts ("SMF"), Counts I-IX of the CFPB's Amended Complaint are each covered, in whole or in part, by the NMS. SMF ¶¶ 36-44. The chart below demonstrates the overlapping CFPB counts:

| Count in CFPB Amended Complaint | Nature Of Claim | Overlapping NMS Servicing Standards and Metrics |
|---|---|---|
| Count I | CFPA – use of inaccurate or incomplete information | Servicing Standards I.B.1-I.B.11 (SMF Ex. 3)<br>Metrics 4.B & 33 (SMF Ex. 6 at D1-7, D1-21) |
| Count II | CFPA – misrepresentations to borrowers | Servicing Standards I.B.1-I.B.11 (SMF Ex. 3)<br>Metrics 4.B & 33 (SMF Ex. 6 at D1-7, D1-21) |
| Count III | CFPA – premature foreclosures | Servicing Standards IV.B.1-IV.B.2, IV.B.11, IV.D.2 (SMF Ex. 3)<br>Metrics 6 & 30 (SMF Ex. 6 at D1-16, D1-18) |
| Count IV | TILA and CFPA – failure to provide accurate periodic statements | Servicing Standards I.B.1-I.B.5, I.B.8-I.B.10 (SMF Ex. 3)<br>Metrics 4.B & 33 (SMF Ex. 6 at D1-7, D1-21) |
| Count V | FDCPA and CFPA – use of inaccurate and incomplete information | Servicing Standards I.B.1-I.B.11 (SMF Ex. 3)<br>Metrics 4.B & 33 (SMF Ex. 6 at D1-7, D1-21) |
| Count VI | FDCPA and CFPA – misrepresentations to borrowers | Servicing Standards I.B.1-I.B.11 (SMF Ex. 3)<br>Metrics 4.B & 33 (SMF Ex. 6 at D1-7, D1-21) |
| Count VII | RESPA and CFPA – various alleged escrow-related violations | Servicing Standards I.B, VII.A.1 (SMF Ex. 3)<br>Metrics 4.B., 33 (SMF Ex. 6 at D1-7, D1-21) |
| Count VIII | RESPA and CFPA – inadequate policies and procedures | Servicing Standard II.A (SMF Ex. 3)<br>Metric 5 (SMF Ex. 6 at D1-9) |
| Count IX | RESPA and CFPA – foreclosure-related conduct | Servicing Standard IV.B (SMF Ex. 3)<br>Metrics 1, 3, 6, 30 (SMF Ex. 6 at D1-2-D1-3, D1-5-D1-6, D1-13-D1-16, D1-18) |

Likewise, Counts I-III and VI-VIII in Florida's complaint are covered by the NMS. SMF ¶¶ 45-52. The chart below demonstrates the overlapping Florida counts:

| Count In FL TAC | Nature Of Claim | Overlapping NMS Servicing Standards and Metrics |
|---|---|---|
| Count I | RESPA – advancing payments for homeowner's existing policy | Servicing Standard VII.A.1 (SMF Ex. 3) |
| Count II | RESPA – various alleged escrow-related violations | Servicing Standards I.B (SMF Ex. 3)<br>Metrics 4.B & 33 (SMF Ex. 6, at D1-7, D1-21) |
| Count III | RESPA – foreclosure-related conduct | Servicing Standard IV.B (SMF Ex. 3)<br>Metrics 1, 3, 6, 30 (SMF Ex. 6 at D1-2-D1-3, D1-5-D1-6, D1-13-D1-16, D1-18) |
| Count VI | FDUTPA – force-placed insurance | Servicing Standards VII.A.1, VII.A.5, VII.A.8 (SMF Ex. 3)<br>Metric 5 (SMF Ex. 6 at D1-16) |
| Count VII | FDUTPA – excessive LPI-related fees | Servicing Standards VI.A.1, VI.C.1-VI.C.2 (SMF Ex. 3)<br>Metric 4.B (SMF Ex. 6 at D1-7) |
| Count VIII | CFPA – miscalculations of borrower payments/charges and inaccurate reporting | Servicing Standards I.B (SMF Ex. 3)<br>Metrics 4.B & 33 (SMF Ex. 6 at D1-7, D1-21) |

Below, Ocwen refers to these as the "Overlapping Claims." Only Count X in the CFPB's complaint and Count IV in the Florida complaint have no corresponding NMS metric.

### D. The NMS Bars Plaintiffs' Overlapping Claims

Consent judgments and settlement agreements are enforceable against the government. *E.g.*, *Armour & Co.*, 402 U.S. at 681-82. This is true even where the agreement limits claims or remedies the government might otherwise pursue by law. *Id.* at 682-83. Indeed, this Court has held that "[t]he government, more than any other party, must be held to honor its commitments. When the government fails, United States Courts must be prepared to enforce these commitments." *Reed v. United States*, 717 F. Supp. 1511, 1518 (S.D. Fla. 1988), *aff'd*, 891 F.2d 878 (11th Cir. 1990). And when they are enforced, as here, consent judgments and settlement agreements are subject to normal rules of contract interpretation. *Pottinger v. City of Miami*, 805

F.3d 1293, 1298 (11th Cir. 2015).

The NMS and consent judgment's provisions are mandatory and bind all parties. Using explicitly mandatory language, the CFPB, Florida, and Ocwen mutually agreed in the NMS both (1) that Ocwen's future conduct during the monitoring period was to be judged according to the agreed Servicing Standards and related Metrics to measure those standards, and (2) that any non-compliance with those agreed standards would be addressed through the agreed Enforcement Terms, including as to remedies and available judicial forum. SMF ¶¶ 10-16, 53-54. As to the former, the parties agreed that Ocwen "***shall comply with the Servicing Standards***, attached hereto as Exhibit A." *Id.* ¶ 10 & Ex. 2, NMS C.J. ¶ 3 (emphasis added). As to the latter, the parties agreed that "[t]he Servicing Standards . . . ***shall be enforced in accordance with the authorities provided in the Enforcement Terms***, attached hereto as Exhibit D." *Id.* ¶ 14 & Ex. 2, NMS C.J. ¶ 6 (emphasis added). Underscoring the agreement's mandatory terms, the parties agreed that the CFPB and Florida could withdraw from the Consent Judgment only if Ocwen failed to make a required payment. *Id.* ¶ 35.

It is also clear that Plaintiffs' lawsuits violate the settlement terms. In measuring Ocwen's conduct, the NMS provided that the Plaintiffs could pursue enforcement proceedings if, but only if, Ocwen's servicing performance failed to meet the specified threshold error rates during the monitoring period. *Id.* ¶¶ 13-16, 24-34. The CFPB and Florida have not alleged, and cannot prove, that Ocwen has exceeded that agreed-upon error rate. *Id.* ¶ 67. Thus, Plaintiffs are violating the settlement by suing over alleged errors that were below the agreed-upon thresholds.

As to the agreed-upon dispute resolution process, courts discussing the similar settlements that other loan servicers reached have explained that "the [NMS] contains a series of steps before [a servicer] could be penalized for violating the servicing standards, including the Monitor's citation, failure to cure, [and] failure of informal dispute resolution . . . ." *United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Assoc.*, 878 F.3d 309, 315 (D.C. Cir. 2017); *see also* SMF Ex. 12, *CFPB v. Ocwen*, No. 13-cv-02025, ECF No. 45 at 1-4 (describing the specific "detailed" steps that must be taken before seeking to enforce the NMS in Ocwen's case). Plaintiffs here bypassed those required procedures. In fact, as the Court noted already, the CFPB's complaint fails to mention them, and Florida did so only in passing. And as to the agreed-upon available remedies and forum-selection clause, the NMS's enforcement terms expressly provide that any actions relating to Ocwen's 2014-2017 conduct "***shall***" be subject to

specific and capped remedies, and may be brought only in the U.S. District Court for the District of Columbia. SMF ¶¶ 9-10, 32-34 (emphasis added). The remedies Plaintiffs seek here far exceed those allowed by the NMS, and they brought their actions in the wrong court. For each and all these reasons, Plaintiffs' claims here violate the parties' settlement agreement and consent judgment.

Indeed, Plaintiffs' claims here contravene the fundamental bargain that the parties struck in the NMS. In exchange for the agreed-upon threshold error rates and limited dispute-resolution procedures and remedies, Ocwen agreed to undertake steps concerning its future conduct that it did not believe were required by law, and accepted various burdensome requirements and costs—including increased internal compliance measures and appointment of an expensive Ocwen-funded external Monitor. *Id.* ¶¶ 10-11, 17-21, 54-55. When Ocwen or the NMS Monitor identified an issue, any corrective actions that Ocwen would undertake to change its servicing practices required submission of such changes to, and approval of such plans by, the NMS Monitor. *Id.* ¶¶ 22, 29, 61-62. Allowing the CFPB and Florida to agree on permitted error rates and dispute resolution procedures in the NMS, demand compliance during the monitoring period and use the NMS itself to ensure it, require the court-appointed monitor to review and approve any corrective actions, and then completely disregard those threshold error rates to bring suit under the CFPA and RESPA for every servicing error below the error rates would deprive Ocwen of any and all benefits from the NMS while giving Plaintiffs double remedies and more enforcement power than they would have had under the NMS or by statute alone.

Both the CFPB and Florida previously argued that their claims here are not barred because the NMS's release provisions did not release the CFPB's claims for conduct occurring after the date of the NMS. CFPB MTD Opp'n at 15-16 (ECF No. 35); Florida MTD Opp'n at 7-8 (ECF No. 26). That argument misses the point. Plaintiffs did not ***release*** claims relating to Ocwen's conduct during the monitoring period—***they just negotiated which claims they could pursue and how they would pursue them***. The Parties' agreements are enforceable, and the Court should enter judgment for Ocwen on the Overlapping Claims.

**E. Plaintiffs' Overlapping Claims Are Also Barred by Waiver**

Plaintiffs' claims are also barred because they waived their rights to bring the Overlapping Claims both by entering into the NMS and by failing to raise concerns regarding Ocwen's compliance upon receipt of the monitor's detailed reports during the reporting period.

First, as the Supreme Court explained in *Armour*, by entering into a consent judgment, "[t]he parties *waive* their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation." 402 U.S. 681 (emphasis added). Here, by entering into the NMS and Consent Judgment, Plaintiffs waived their rights to bring suit for pre-2014 conduct, and limited their rights to litigate their statutory claims concerning Ocwen's 2014-early 2017 servicing conduct. They did so to reap the extensive benefits they got under the NMS as described above, and also to save themselves "the time, expense, and inevitable risk of litigation." *Armour*, 402 U.S. at 681; SMF ¶¶ 8-9. Plaintiffs may claim the CFPA and RESPA would otherwise allow them to assert claims and seek massive penalties and damages for all individual errors below the NMS threshold, but they can and did agree to limit that enforcement power. *See Armour*, 402 U.S. at 682-83 (affirming dismissal based on consent judgment because, "although the relief the Government seeks may be in keeping with the purposes of the antitrust laws, we do not believe that it is supported by the terms of the consent decree").

Plaintiffs further waived the right to bring the claims they are pursing because they failed to raise them in response to NMS Monitor findings. Ocwen's servicing activity was extensively detailed in numerous reports that the CFPB and Florida received on at least a quarterly basis. SMF ¶¶ 23, 64, 65. Those reports indicated that although Ocwen generally was in compliance with the NMS's agreed-upon tolerances, like all servicers, Ocwen made some errors. *Id.* ¶¶ 64-65. If the CFPB or Florida wished to raise claims relating to such errors, they should have done so when they got the reports and utilized the NMS's dispute resolution framework. Indeed, any corrective actions that Ocwen undertook during the NMS monitoring period to address servicing errors related to the Overlapping Claims would have required the review and approval of the NMS Monitor. *Id.* ¶¶ 29, 62. Ocwen was not even at complete liberty to design its compliance strategies—it had to remediate issues in a manner which satisfied the NMS Monitor. *Id.* Whatever their motives, having failed to timely raise those claims then, the CFPB and Florida waived any right to assert them now. To allow Plaintiffs to reap the benefits of the monitor's work during the monitoring period, raise no issue, then bring suit for the same loans during the same period the very moment the monitor's work concluded would be grossly inequitable.

**F. *Res Judicata* Also Bars Plaintiffs' Overlapping Claims**

"The doctrine of *res judicata*, or claim preclusion, prevents re-litigation of matters actually or potentially litigated in an earlier lawsuit." *Richardson v. Alabama State Bd. of Educ.*,

935 F.2d 1240, 1244 (11th Cir. 1991) (citation omitted). The doctrine applies if (1) there is a final judgment, (2) rendered by a court of competent jurisdiction, (3) the parties are identical, (4) and the causes of action are identical. *Id.* (citations omitted); *CSX Transp., Inc. v. Bhd. of Maint. of Way Employees*, 327 F.3d 1309, 1316 (11th Cir. 2003) ("federal preclusion principles apply to prior federal decisions, whether previously decided in diversity or federal question jurisdiction"). A "consent decree, although founded on the agreement of the parties, is a judgment," and so preclusion principles apply equally to such agreed judgments. *Paradise v. Prescott*, 767 F.2d 1514, 1525 (11th Cir. 1985), *aff'd*, *United States v. Paradise*, 480 U.S. 149 (1987) (quotations omitted).[2] Importantly, as noted, *res judicata* bars claims that could have been litigated in an earlier case, as well as claims that actually were. *See, e.g.*, *Griswold v. Cty. of Hillsborough*, 598 F.3d 1289, 1294 (11th Cir. 2010) (precluding claims that a party could have raised in prior litigation); *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1240 (11th Cir. 1999).

As shown above, Plaintiffs' 2013 complaint did, in fact, seek relief concerning Ocwen's ***future*** conduct in servicing loans. Both the CFPB and Florida sought a ruling determining what actions Ocwen would be required to undertake while servicing loans during the monitoring period. The NMS therefore explicitly addresses Ocwen's future conduct and governs resolution of any compliance violations within the covered servicing areas. Courts repeatedly have held that where a lawsuit results in a consent judgment, that prior lawsuit and judgment bar subsequent claims that overlap with the consent judgment.[3] On that basis, Ocwen also is entitled

---

[2] *See also Brosnick v. Wells Fargo Bank, N.A.*, 2018 WL 6807340, at *7 (S.D. Fla. Sept. 25, 2018) (a "Consent Judgment constitutes a former adjudication that is entitled to res judicata effect").

[3] *See Gates v. Towery*, 456 F. Supp. 2d 953, 963-65 (N.D. Ill. 2006) (dismissing plaintiff's claim for injunctive relief on *res judicata* grounds due to continuing nature of a consent judgment governing plaintiff's rights); *World's Finest Chocolate, Inc. v. World Candies, Inc.*, 409 F. Supp. 840, 844-45 (N.D. Ill. 1976) (holding that terms of consent judgment were *res judicata* and rejecting attempt to sue for violation of consent judgment in another court); *Affiliated Hosp. Prods, Inc. v. Merdel Game Mfg.*, 513 F.2d 1183, 1185-86 (2d Cir. 1975) (holding that settlement agreement controlled and limited parties to remedies provided in the agreement); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2015 WL 5051660, at *3 (S.D.N.Y. Aug. 26, 2015) (dismissing claim for continuing violation because it was precluded by consent judgment); *see also United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Assoc.*, 878 F.3d 309, 315 (D.C. Cir. 2017) (finding the "[r]elator's suit constituted an improper collateral attack on a judgment committed to the Monitor's discretion by the [NMS]").

to summary judgment on the Overlapping Claims.

## II. PLAINTIFFS CANNOT SHOW A TRIABLE ISSUE OF FACT ON ANY OF THEIR CLAIMS (ALL CFPB AND FLORIDA COUNTS)

The Court should grant summary judgment to Ocwen on all Counts because Plaintiffs cannot, as they must, present individualized evidence to prove their sprawling claims [redacted] Here, the CFPB and Florida cannot meet this burden because (1) they failed to develop the loan-level expert testimony that they promised the Court they would use to prove their claims at trial, and (2) they cannot, for a host of practical, procedural, and substantive reasons, instead prove their claims by dumping hundreds of documents into evidence with a plea that the Court piece them all together into coherent legal claims. Defendants are therefore entitled to summary judgment.[4]

Plaintiffs' indiscriminate choice to bring claims on over [redacted], then refuse the Court's unsubtle suggestion that they sample and extrapolate to prove their claims does not entitle them to evidentiary shortcuts now. Their allegations require proof of a legal violation as to each individual loan. In their complaints, Plaintiffs did not allege a single overarching claim that ***might***, if pled and proved, establish violations for many loans. Instead, Plaintiffs brought an expansive array of disparate servicing violations, and claim Ocwen gave some, but not all, consumers inaccurate or incomplete or misleading information, mismanaged loan escrow calculations or borrowers' payments or hazard insurance or private mortgage insurance for some borrowers, overcharged or undercharged or failed to cancel certain services, and committed various types of foreclosure errors as to different loans, to name only some of the allegations. To prove up this hodgepodge of allegations at trial, the CFPB and Florida must identify the affected loans, establish a governing legal standard for each claim, and prove that ***those specific loans*** violated ***that specific standard***. This is especially so because the laws Plaintiffs invoke are highly technical and often apply only in defined circumstances. *See*, *e.g.*, CFPB Am. Comp. ¶¶ 268-73 (acknowledging technical details).

For example, Plaintiffs contend Ocwen failed to comply with Regulation X in proceeding with foreclosure despite a pending loan modification application. CFPB Am Compl. ¶¶ 274-77. But, Regulation X only applies in specific circumstances and Plaintiffs have no evidence that

---

[4] As already noted, this Court has explained that, at summary judgment, a defendant merely must "point[] out" that plaintiff lacks evidence, whereupon the plaintiff "must then . . . present[] competent evidence on which a [trier of fact] could rule in its favor…" *See* page 3-4 *supra*.

each those circumstances applied for each loan at issue here. *See* 12 C.F.R. § 1024.41 (regulation ***does not apply*** when an application has already been denied, or is submitted less than 37 days before foreclosure, or is incomplete, among other limits). And as yet another example, while Plaintiffs contend that Ocwen serviced loans using inaccurate information (CFPB Am. Compl. ¶¶ 205-12), not every piece of information in a loan file is used for servicing, and Plaintiffs cannot establish a legal violation without evidence that the inaccuracy was material to the servicing of the loan.[5] Thus, Plaintiffs cannot show a legal violation by offering documents showing only that, at some point in Ocwen's loan verification process, it corrected an inaccuracy. Instead, the nature of that inaccuracy matters—in loan servicing, an incorrectly spelled middle name is fundamentally different than an inaccurate loan payment due date.

This problem was precisely the concern Judge Matthewman raised when he implored the Plaintiffs to take a sample of Ocwen's loans and loan data, and make their cases by identifying proof of errors in the loan sample and extrapolating across all similar loans. SMF ¶ 70. Both Plaintiffs declined to do so. *Id.* Indeed, CFPB objected precisely because "[a] sample would not identify the ***specific*** borrowers who were harmed by Defendants' violation of law, or the ***specific*** harm to those borrowers, limiting the [CFPB's] ability to prove its case." *Id.* ¶ 92 & Ex. 57 at 6 (ECF No. 200) (emphasis in original). Plaintiffs argument was successful. They got the data on every loan; now Ocwen is entitled to summary judgment because they failed to use it.

After both Plaintiffs declined Judge Matthewman's suggestion on sampling, he repeatedly warned Plaintiffs that, to prove their claims at trial, they would have to adduce specific evidence "by loan number." For example, at the May 2, 2019 hearing, he said:

> But if you present this case to a jury or even summary judgment, aren't you going to have to go by loan number? In other words, aren't you going to have to say this loan was violative and this loan was violative and have to prove it? I mean, at some point aren't you going to have to prove loan numbers, that a certain loan number or a certain group of loan numbers, whatever it is, somehow violated a law or statute?

---

[5] Indeed, as the CFPB makes clear in its own enforcement manual, not even the Bureau expects perfection. Rather, the CFPB instructs its examiners to focus on "significant inaccuracies" and "draw a conclusion as to whether the type of harm resulting from the violation(s) would have a minimal, limited, considerable, or serious impact on consumers." CFPB Examination Procedures, at CMR 15, 18 (Aug. 2017), available at https://files.consumerfinance.gov/f/documents/201708_cfpb_compliance-management-review_supervision-and-examination-manual.pdf.

SMF ¶ 71 & Ex. 28 at 29:13-20.[6]

The two central remedies Plaintiffs seek—civil monetary penalties and consumer remediation—also reinforce Plaintiffs' obligation to prove which, if any, loans were unlawfully serviced. Both remedies are based on the number of individual violations, and Plaintiffs both have committed to the position that penalties must be calculated based on the number of violations. SMF ¶ 73; *id.* Ex. 128 (CFPB's First Supplement to Its Initial Disclosures) (stating that it computes the total penalty amount as "(# of … Violations) x (# of Days of Violations) x (Penalty Amount…)"); [redacted]. [redacted] Both positions are consistent with the legal standards for penalties and consumer remediation. 12 U.S.C. § 5565; *A.R. v. Dudek*, 2016 WL 3221140, at *11 (S.D. Fla. June 9, 2016).

In discovery, Plaintiffs not only acknowledged that they would need to prove their claims for individual loans, but used that duty as a crowbar for demanding, and getting, voluminous quantities of loan-specific information and documents from Ocwen. For example, the CFPB told Judge Matthewman that "the data, the actual loan-level data, is what the Bureau needs to complete these [loan] analyses in order to, ***with precision***, provide the defendants with I think what they're asking for in terms of … ***each precise error*** that the Bureau says existed in these files." SMF ¶ 75 & Ex. 30 at 21:3-7 (emphasis added). Thus, the CFPB sought both to justify its demand for loan-level information and acknowledged Ocwen's demand for loan-level disclosures from Plaintiffs. *Id.* Likewise, Judge Matthewman specifically ordered Plaintiffs to disclose which specific loans were improperly serviced and, in detail, the basis for those contentions. SMF ¶ 76; ECF No. 396, ¶ 3 (6/6/2019 Order); SMF Ex. 30 at 31:8-12 (6/5/2019

---

[6] Similarly, on December 4, 2019, Judge Matthewman said: "This is a difficult case to try because of the amount of documents and the amount of distinct, separate allegations that are made and the differences between this borrower and that borrower. It really is a complicated prosecution when it comes to that." SMF ¶ 72 & Ex. 29 at 179:25-80:4.

Tr.) (instructing that where CFPB alleges a violation, defendants have the "absolute right" to "get to the bottom of what their evidence is to support that allegation"); *id.* at 46:3-14 (agreeing with Defendants' counsel's statement that Plaintiffs should "identify the loans that belong in these buckets and the evidence you have that supports why you said that those loans had" violations); *id.* at 51:9-12 ("[OAG] [y]ou brought a complaint. You're the one who started the lawsuit. If you don't have facts supporting your allegations, then that will be a motion that I'm sure the defense will file.").

Plaintiffs never offered any loan-specific evidence, which means at trial Plaintiffs will not be able at meet their burden of proving (a) ***which*** specific loans (b) violated ***what*** specific legal standard (c) as a result of ***what*** specific servicing error.

### A. The CFPB Has No Evidence To Prove That Ocwen's Servicing of Many or All of the 2,000,000-Plus Listed Loans Violated any Law

For most Counts of its Amended Complaint, the CFPB provided Defendants with long lists of the loans—[redacted]—for which the CFPB is asserting a violation. Specifically, CFPB's allegations are as follows:

| Count In CFPB Amended Complaint | Nature Of Claim | [redacted] |
|---|---|---|
| Count I | CFPA – use of inaccurate or incomplete information | [redacted] |
| Count II | CFPA – misrepresentations to borrowers | [redacted] |
| Count III | CFPA – premature foreclosures | [redacted] |
| Count IV | TILA and CFPA – failure to provide accurate periodic statements | [redacted] |
| Count V | FDCPA and CFPA – use of inaccurate and incomplete information | [redacted] |
| Count VI | FDCPA and CFPA – misrepresentations to borrowers | [redacted] |
| Count VII | RESPA and CFPA – various alleged escrow-related violations | [redacted] |
| Count VIII | RESPA and CFPA – inadequate policies and procedures | [redacted] |
| Count IX | RESPA and CFPA – foreclosure-related conduct | [redacted] |
| Count X | HPA and CFPA – failure to automatically terminate PMI | [redacted] |

[redacted]. The CFPB may contend a loan violates the CFPA and include it on a list grouped by Count to survive early dismissal, but at trial, it must prove violations as to each loan.

### 1. The CFPB Offered No Expert Testimony That Ocwen Improperly Serviced Any Loan, Despite Repeatedly Telling the Court It Would Prove Its Case with Expert Analysis of Individual Loans

During discovery, the CFPB moved to compel defendants to produce extensive loan-specific data for over 1.5 million Ocwen loans by arguing that its experts needed to analyze each loan so that they could testify as to their alleged defects. SMF ¶¶ 92-94. This colloquy with Judge Matthewman, at one of many discovery hearings, is instructive. The Court began by asking the CFPB how it could prove up its case involving well over a million separate loans, saying to CFPB's counsel: "A trial in this case, you are not going to be producing information about 1.58 million people in file form. You are going to do this in some sort of overarching expert opinion type of testimony." SMF ¶ 93; SMF Ex. 56 at 88:18-23 (11/29/2018 Tr). CFPB's counsel responded by confirming the discovery was needed so it could be summarized by an expert:

> Yes. That's exactly right. . . . ***[W]ith respect to Your Honor's first question about the expert, we do intend for the expert to look through the 1.58 million borrowers and to crunch and assess the data, both in a summary witness fashion and both as to an expert opinion with respect to all of the errors ….***

*Id.* ¶ 94 & Ex. 56 at 88:22-24-89:9-14 (11/29/2018 Tr.) (emphasis added). Discovery proceeded on that basis, with data and loan-level production that led the Court to remark this is "probably one of the most overly discovered cases I've ever seen." *Id.* ¶ 95 & Ex. 134 at 28:8-9 (1/24/2019 Tr.).

But, even after receiving all the loan-specific data, and with discovery now closed, the CFPB cannot deliver on its promises to present testimony from an expert who has "look[ed] through the 1.58 million borrowers" and will furnish "an expert opinion with respect to all of the errors." SMF ¶¶ 94, 96. ***CFPB offered no such expert.***

Neither of the two experts the CFPB designated testified that Ocwen's servicing of any loan used inaccurate information, involved misrepresentations to borrowers, or was improper in any other way alleged in the complaint. [redacted]

[redacted]

In short, the CFPB has no witness to testify that Ocwen's servicing of each (or any) at-issue loan had a defect—which is exactly what that the CFPB promised the Court it would use to prove its case at trial. The absence of that promised evidence is fatal to the CFPB's claims.

**2. The CFPB Cannot Prove Its Claims Through Non-Expert Evidence**

When Ocwen sought evidence that supports its claims on the lists of loans at deposition, the CFPB did not provide an expert but it instead gave Ocwen [redacted] It is as if Plaintiffs dumped pieces of a puzzle on the floor and now ask this Court (and Ocwen) to put it together.

For three separate reasons, the CFPB cannot prove liability with the only evidence the CFPB has left at this point (since it designated no expert): [redacted].[8]

---

7 [redacted]

8 [redacted] cannot satisfy CFPB's

a) <u>The CFPB cannot simply introduce documents and leave the Court to determine how each document proves liability.</u>

For both practical and legal reasons, the CFPB cannot prove up its claims at trial with documents alone. Judge Matthewman previously observed that it would be unmanageable for the CFPB to make a trial presentation by dumping documents or data concerning [redacted] loans. *See* page 14-15 *supra*. [redacted] If that were even attempted, it would be grossly unfair to Ocwen. The Defendants are entitled to contest liability based on individual loans and the idiosyncratic legal requirements that might be implicated. And the CFPB must, as explained above, present individual loan level evidence in order to seek, at least, penalties or consumer remediation.

Having promised that it would manageably prove its extensive claims through summary expert testimony, and having used that promise as a cudgel to compel Ocwen to produce massive quantities of discovery materials for that promised expert's review, the CFPB cannot now claim that such expert testimony was never needed all along. As Judge Matthewman keenly appreciated, the CFPB's case cannot be proven without such an approach. *See* SMF ¶ 93.

b) [redacted]

[redacted]

---

summary judgment burden, which is to "present[] competent evidence" sufficient to prove its claims. *See* pages 3-4 *supra*.

[redacted] This failure of proof entitles Ocwen to summary judgment. [redacted]

[redacted] Thus, not only has the CFPB failed to show that it has competent evidence to prove its claims for each loan, it has not even disclosed the substance of its claims for each loan. Having failed to timely disclose their evidence, the CFPB now cannot prove their claims at trial.

c) [redacted]

[redacted] Three examples make the lack of proof clear.

Example 1: [redacted]

[redacted] No factfinder could find from the face of this document that Ocwen's servicing of every loan listed in the document violated federal law.

Example 2: [redacted] For instance, Count X alleges that Ocwen failed to properly terminate private mortgage insurance, [redacted]

Example 3: Most egregious is the CFPB's failure to support Count IV, in which it claims Ocwen failed to provide accurate periodic statements to consumers. SMF ¶ 115. For this Count, the CFPB not only has failed to adduce evidence to establish that claim for each at-issue loan, the CFPB has failed even to identify any of the loans at issue. [redacted] Having failed both to identify each loan (*i.e.,* which loans in Count I are at issue in Count IV), and to offer evidence of inaccurate statements, the CFPB indisputably failed to "present competent evidence" to prove this claim.

In short, these examples illustrate a critical flaw in the CFPB's prosecution of this case.

After years of discovery, CFPB ***tells*** this Court Ocwen violated the law as to each loan, but in building its case, it did not amass admissible evidence to ***show*** it. To avoid summary judgment, it is the CFPB's burden to show it has admissible evidence sufficient to prove each element of each of its claims. *See* pages 3-4 *supra*. The CFPB cannot meet this burden.

The CFPB did not deliver the expert or summary testimony it told the Court would establish wrongful conduct as to each loan. It declined Judge Matthewman's invitation to sample loans and prove violations in the sample that could be extrapolated to all loans. Its responses to Ocwen's interrogatories are merely [redacted] Ocwen is therefore entitled to summary judgment as to all the CFPB's claims.

**B. Florida Has No Evidence To Prove That Each of the Loans It Has Listed Violated the Cited Law**

Florida's evidentiary record suffers from the same flaws in the CFPB's case, as well as others. To meet the requirement that it reveal the substance of its claims, [redacted] but, like the CFPB, Florida (1) has no expert witness who can opine that Ocwen improperly serviced each (or even any) loan, and (2) cannot prove its claims solely with non-expert evidence. Since the CFPB's proof is insufficient, so is Florida's.

[redacted] For these reasons, Florida too cannot satisfy its burden to prove its claims.

**1. Florida Has No Expert Evidence To Prove Its Claims**

Like the CFPB, Florida promised during discovery that it would prove its case at trial through summary expert testimony and represented that [redacted]

And like the CFPB, Florida has ***no*** expert evidence that Ocwen's servicing of each (or any) of the listed loans was defective in any way. Florida's only proffered expert witness, Dr. Lawrence Powell, did not testify that Ocwen did anything wrong in servicing any loan. [redacted]

[redacted]

Florida has also suggested that it intends to rely on the CFPB's experts. *Id.* ¶ 141. As shown above, however, neither of CFPB's experts testified to any defect in each (or any) loan. *See* pages 17-18 *supra*. Moreover, Florida did not timely disclose Mr. Searson or Dr. McFadden as expert witnesses (SMF ¶¶ 138-42), and so Florida could not rely on their opinions in any event. Fed. R. Civ. P. 37(c)(1); *see also Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (excluding expert opinion for failure to comply with disclosure requirements), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58 (2006).[9]

**2. Florida Cannot Prove It Claims Through Non-Expert Evidence**

Florida's lack of any expert who can testify that Ocwen improperly serviced any of the loans at issue means that Florida cannot prove up its rambling claims at trial. Simply put, there Florida has no way to establish at trial that Ocwen's servicing of [redacted] loans [redacted] violated the laws under which Florida sued because Florida has no witness to testify that Ocwen did anything wrong in servicing each of the loans.

The non-expert evidence that Florida proffered in support of its claims is patently insufficient. In response to the Court's directive that Plaintiffs identify the loans they allege are at issue in this litigation, Florida [redacted]

9 [redacted]

[redacted]

First, as discussed above, [redacted]

Furthermore, Ocwen is left to guess what Florida believes it did wrong, because Florida has never identified, for each listed loan, what Ocwen supposedly did wrong or what law (*i.e.*, Count) Ocwen supposedly violated. [redacted]

10 [redacted]

11 [redacted]

[redacted] None of those documents would provide a legal basis for the fact-finder to rule against Ocwen at trial, and thus are insufficient to meet Florida's burden at summary judgment.

Consumer complaints: [redacted] Further, Florida cannot prove its claims at trial based solely on consumers complaints because they are inadmissible hearsay. Fed. R. Evid. 802. "[C]onsumer complaints do not have sufficient indicia of trustworthiness," because "consumers often made the complaints with hopes of receiving some type of refund or other financial benefit," "[t]he complaints were not made under oath," and "the complaints list events that, perhaps not created in anticipation of litigation, were created with knowledge that litigation was possible." *FTC v E.M.A. Nationwide, Inc.*, No. 12-2394, 2013 WL 4545143, at *2 (N.D. Oh. Aug. 27, 2013); *see also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1252 n.3 (S.D. Fla. 2007) (excluding consumer complaint records at summary judgment). Even if the complaints were admissible and tied to each allegation Florida makes, [redacted]

[redacted] But these consumer complaints are not admissible evidence and cannot be used to prove up Florida's claims. Fed. R. Evid. 802; *E.M.A. Nationwide, Inc.*, 2013 WL 4545143, at

*2. [redacted]

Defendants' discovery responses: [redacted] But this is false. [redacted]

Ocwen audit reports: [redacted]

For example, Florida claims that Ocwen violated the HPA, 12 U.S.C. § 4902(b), by failing to automatically terminate private mortgage insurance ("PMI") in compliance with that statute. FL TAC ¶¶ 220-24. [redacted] But one necessary element of Florida's HPA claim is that payments for the PMI were in fact "made by the mortgagor." 12 U.S.C.

§ 4902(b). [redacted]

[redacted]

In sum, just like the CFPB, Florida has no expert evidence that Ocwen's servicing of each of the [redacted] loans violated the law, and Florida cannot prove up its expansive claims by resorting to inadmissible, unconfirmed, inapposite, and scattershot non-expert evidence. Defendants thus are entitled to summary judgment on all of Florida's claims.

## III. PLAINTIFFS HAVE NO EVIDENCE TO PROVE CONSUMER DAMAGES

In Plaintiffs' prayers for relief, they seek a monetary recovery (labeled as "restitution," "damages," or "refunds") for injury that consumers supposedly suffered as a result of Ocwen's alleged violations. In the same way they cannot prove their substantive claims, Plaintiffs have no evidence to prove any such consumer damages.

### A. The CFPB Cannot Prove the Alleged Consumer Damages

In early 2018, the CFPB produced a chart asserting that it was seeking recovery for various categories of alleged borrower losses. *See* SMF Ex. 128, at App'x A (CFPB's First Supplement to Its Initial Disclosures (Dec. 17, 2018)). Ultimately, however, the CFPB's

damages expert's did not opine on each of these alleged categories of damages asserted in the chart, [redacted] Accordingly, because the CFPB has no evidence to prove the other damages categories listed in the CFPB's earlier chart, Defendants are entitled to summary judgment on those other damages claims.

Defendants also are entitled to summary judgment on both of the consumer damages claims theorized by the CFPB's damages expert, Daniel McFadden. As a threshold matter, McFadden's testimony should be excluded for the multiple reasons set forth in Defendants' separate *Daubert* motion. Moreover, as Ocwen now shows, McFadden's opinions, even if not excluded, are insufficient to support either of the CFPB's remaining consumer damages claims.

**1. Defendants Are Entitled to Summary Judgment on CFPB's Claim to Recover** [redacted]

Count VII alleges that Ocwen was late in performing escrow analyses for thousands of specific loans. *See* SMF ¶ 180 (citing CFPB's list of loans with allegedly late escrow analyses). [redacted]

But McFadden does not identify ***any*** specific loan that actually went into foreclosure as a result of a late escrow analysis, much less the amount of ***any*** loss suffered by the borrower of such a loan. [redacted]

McFadden's theoretical model, [redacted] is insufficient to establish consumer damages as a matter of law. This is so because it fails to establish (1) that any individual loan ***actually*** went into foreclosure as a result of a late escrow analysis (as opposed to all of the other possible reasons why each loan could go into foreclosure) and (2) what damages the borrower on each such loan ***actually*** suffered. [redacted] As noted above, the CFPB contends that Ocwen performed late escrow analyses for certain specific loans, but not for all loans, and that only some of the loans with allegedly-late escrow analyses went into foreclosure. *Id.* ¶¶ 180, 182-83. Consequently, precedent establishes that in these circumstances—where Ocwen's alleged late escrow analyses may have caused damage to only some borrowers, and even then in differing amounts—the CFPB must prove causation and damages with ***individualized*** evidence.

In *A.R. v. Dudek*, 2016 WL 3221140, at *11-12 (S.D. Fla. June 9, 2016), for example, the United States asserted that a Florida agency had violated the Americans with Disabilities Act in ways that injured various nonparty institutionalized children. The defendant moved for summary judgment on the damages claim because the United States could not, "child by child, … present individualized evidence of the nature and extent of any" harm. *Id*. at *5 (internal citation and quotation marks omitted). This Court held that "[e]ven when the United States is expressly authorized to recover damages on behalf of nonparties, to be entitled to damages in any specific case, the United States—just like any other plaintiff—must establish causation and an injury in fact." *Id*. at *11.[12] This Court then held that the United States had to prove the defendant's conduct "actually and proximately caused" harm for "*each* child for whom [the United States] seeks damages." *Id*. (emphasis in original). Finally, this Court found that the United States' "characterization of its declaratory and injunctive relief claims as 'systematic' neither alters the individualized nature of its damage claims nor deprives [defendant] of the right to challenge the facts underlying those damage claims." *Id*. (internal citation and quotation marks omitted). The

[12] As binding precedent in support of this principle, the Court pointed out that in *General Tel. Co. of the Nw., Inc. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 324 (1980), the Supreme Court held that although the EEOC was authorized to sue for damages (back pay) on behalf of individuals aggrieved by their employer's pervasive discriminatory practices, the EEOC was expected to specifically establish at trial which individuals were "adversely affected" by the employer's practices and the amount of their damages. *Dudek*, 2016 WL 3221140, at *11.

Court granted defendants summary judgment as to the damages claims.[13] *Id.* at *15-16.

The same reasoning and conclusion apply here. The CFPB asserts that only some of the borrowers whose escrow analyses were late suffered foreclosures as a result. Thus, both the cause of any damage, and the amount of that supposed damage, is individualized and differs from borrower to borrower. Under the Supreme Court's decision in *General Telephone*, and this Court's decision in *Dudek*, the CFPB must adduce individualized evidence establishing which loans in fact went into foreclosure as the actual and proximate result of any delayed escrow analysis, as well as what actual damages were suffered by the borrowers on those specific loans. Its failure to do either dooms its consumer damages claims. *See also*, *e.g.*, *Paz v. Seterus*, Inc., 2016 WL 3948053, at *6 (S.D. Fla. Apr. 27, 2016) (to survive summary judgment on damages, plaintiff must present a "concrete record of evidence" showing that the borrower "incurred certain fees and costs as a result of [defendant]'s RESPA violations); *Rourk v. Bank of Am. N.A.*, 2013 WL 5595964, at *6 (M.D. Ga. Oct. 11, 2013) (granting summary judgment for defendant given lack of evidence that alleged servicing failure caused plaintiff to default). Therefore, even if McFadden's opinion is not excluded under *Daubert*, Defendants are entitled to summary judgment as to damages because the CFPB has no individualized evidence.

**2. Defendants Are Entitled to Summary Judgment on the CFPB's Consumer Damages Claim for [redacted]**

[redacted]

Under the damages caselaw just discussed, because the alleged consumer damages varied among the allegedly affected borrowers, the CFPB was required to adduce ***individualized, actual***

[13] The United States did not file an objection to the Magistrate's decision, which thereupon became a final decision of this Court.

evidence of the "foregone interest" damages suffered by each borrower. *See* pages 28-30 *supra*. But the CFPB and McFadden have no evidence that each borrower [redacted] This damages claim is based entirely on assumptions and cannot proceed.

### B. Florida Has No Evidence to Prove Its Consumer Damages Claims

Florida likewise has no competent evidence to prove any consumer damages. [redacted] Therefore, Powell's testimony constitutes no evidence to prove Florida's damages claims. As noted above, Florida has also belatedly purported to rely on the report and testimony offered by the CFPB's proffered damages expert, McFadden, as evidence to support Florida's damages claim. Even assuming Florida can rely on McFadden without timely disclosing its intent to do so, McFadden's testimony is legally insufficient as shown above. Defendants are thus entitled to summary judgment on Florida's damages claims.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING LOSS MITIGATION APPLICATIONS (COUNT III)

Count III of the CFPB's Amended Complaint alleges that Ocwen sent letters to borrowers who submitted incomplete loss mitigation applications promising that they would have 30 days to submit the missing information, but then foreclosed on the loans before that 30-day period expired. CFPB Am. Compl. ¶¶ 219-21. T[redacted] Defendants are entitled to summary judgment on Count III (and any other Counts if based on this alleged CFPA violation) because the CFPB cannot prove

Ocwen violated Regulation X.

Regulation X, 12 C.F.R. § 1024.41, comprehensively defines the rights and duties of borrowers and servicers in connection with loss mitigation applications, thus the CFPB cannot invoke the CFPA's general terms to impose new requirements not set forth in Regulation X. As this Court has previously held:

> [RESPA] is a consumer protection statute that regulates the real estate settlement process. As part of that process, Regulation X provides a ***comprehensive*** set of interrelated requirements and deadlines that servicers must comply with when a borrower submits a loss mitigation application.

*Brosnick v. Wells Fargo Bank, N.A.*, 2018 WL 6807340, *8 (S.D. Fla. Sept. 25, 2018) (emphasis added and citation omitted). The CFPB does not, and cannot, contend that Ocwen's conduct violated Regulation X because Regulation X does not require servicers to delay foreclosure if the borrower failed to submit a complete loss mitigation application within a defined time period.

Ocwen therefore did not violate the actual requirements, and the CFPB cannot assert claims relating to that same conduct under the more-general provisions of the CFPA, as Count III seeks to do. Where, as here, one statute specifically addresses a subject, litigants are barred from seeking to apply more general statutes to that same subject. As the Supreme Court has explained, "[i]t is a commonplace of statutory construction that the specific governs the general," and "[t]hat is particularly true where … Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citations omitted). That is precisely the situation here. As this Court has held, RESPA and Regulation X provide a "comprehensive" scheme that, in the Supreme Court's words, "deliberately targeted specific problems"—namely, "to ensure that, before a borrower with a federally related loan loses her home to foreclosure, she is afforded a reasonable opportunity to seek alternatives through a loss mitigation application submitted for the servicer's review" (*Brosnick*, *supra*)—"with specific solutions"—namely, Regulation X's "interrelated requirements and deadlines that servicers must comply with when a borrower submits a loss mitigation application" (*Brosnick*, *supra*). 12 C.F.R. § 1024.41(b), (c), (f). Indeed, in issuing the Regulation, the CFPB underscored its comprehensiveness by declaring that the rule "established a set of consistent national procedures and expectations regarding loss mitigation" and would "ensure that borrowers have a full and fair opportunity to receive an evaluation for a loss mitigation option before suffering the harms associated with foreclosure."

78 Fed. Reg. 10696, 10815 (Feb. 14, 2013) (codified at 12 C.F.R. pt. 1024). By contrast, the CFPA provision under which CFPB seeks to assert its Count III claim is much more general, broadly providing that a servicer may not engage in any "unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5536(a)(1)(B).

In sum, because RESPA and Regulation X provide comprehensive rules specifically addressing loss mitigation applications, the CFPB cannot invoke the CFPA's more general provisions to upset the balance of rights and obligations struck in Regulation X or to impose additional requirements not contained in that regulation. For this reason, Ocwen is entitled to summary judgment as to Count III.

## V. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON MOST ESCROW VIOLATION CLAIMS (CFPB COUNT VII & FLORIDA COUNTS I AND II)

The Court should enter summary judgment for Ocwen as to most of Plaintiffs' escrow violation claims for two additional reasons beyond those in Sections I-III, above. Specifically, summary judgment is proper: (1) as to [redacted] loans for which the CFPB failed to identify the purported escrow violations, much less offer evidence proving that a violation occurred; and (2) to the extent Plaintiffs seek to recover penalties concerning Ocwen's purported failure to perform an escrow analysis for loans that were delinquent, in bankruptcy, or in foreclosure, because Plaintiffs cannot show Ocwen acted recklessly or intentionally.

### A. The Court Should Grant Summary Judgment as to [redacted] Loans for Which the CFPB Has Not Even Identified the Purported Escrow Violation

Count VII of the Amended Complaint alleged four specific escrow-related violations where Ocwen purportedly: (1) "failed to pay hazard insurance premiums in a timely manner" (¶ 257); (2) "[f]ailed to timely conduct annual escrow analyses" (¶ 259(a)); (3) "[f]ailed to provide borrowers who were not delinquent, in foreclosure, or in bankruptcy with escrow statements" (¶ 259(b)); and (4) "[c]ollected escrow shortages that did not exist" (¶ 259(c)). *See also* SMF ¶ 200. [redacted]

[redacted]

---

[14] As explained above, although CFPB has identified the supposed escrow violations of those loans, CFPB has no evidence establishing those violations. *See* Section II *supra*.

[redacted] Having failed to identify an escrow-related violation for these loans, much less come forward with evidence to prove such a violation, the claims cannot proceed to trial. *See*, *e.g.*, *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000) ("bare and self-serving allegation[s]" are "inadequate to carry [plaintiff]'s burden on summary judgement"); *Holt v. Blakely*, 167 F. App'x 86, 88-89 (11th Cir. 2006) (on summary judgment, "an adverse party may not rest upon the mere allegations" of its pleading, but "must set forth specific facts showing that there is a genuine issue for trial.") (citation omitted); *Thompson v. McDonald*, No. 16-808110-CIV-MARRA, 2019 U.S. Dist. LEXIS 50566, at *3 (S.D. Fla. Mar. 25, 2019) (Marra, J.) ("Unsupported speculation does not create a genuine issue of material fact."), *aff'd*, 2020 U.S. App. LEXIS 3552 (11th Cir. Feb. 6, 2020).[15]

**B. Plaintiffs Cannot Show Ocwen Acted Recklessly or Knowingly by Allegedly Failing to Conduct Annual Escrow Analyses for Borrowers Who Were Delinquent, in Bankruptcy, or in Foreclosure**

The CFPA provides that a person who violates a federal consumer financial law may be subject to penalty of up to $5,000, whereas a person who does so "recklessly" or "knowingly" may be subject to a penalty of up to $25,000 or $1,000,0000, respectively. 12 U.S.C. § 5565(c)(2).[16] Plaintiffs allege that Regulation X (12 C.F.R. § 1024.17(i)) required Ocwen to perform an annual escrow analysis even for borrowers whose loans were delinquent, in bankruptcy, or in foreclosure and seek penalties for Ocwen's alleged failure to do so. CFPB Am. Compl. ¶¶ 258(a), 259(a); FL TAC ¶ 202. But this makes no sense because ***Ocwen had no duty to send an annual escrow statement to borrowers whose loans were delinquent, in bankruptcy, or in foreclosure when the analysis was purportedly due***. SMF ¶ 207. Plaintiffs conceded as much when they failed to replead such a claim in their amended pleadings. So to the extent that Plaintiffs seek enhanced civil money penalties for those claims, Defendants are entitled to

[15] Defendants also are entitled to summary judgment against Florida where Florida has adopted CFPB's loan lists. *See* SMF ¶¶ 122, 128.

[16] These are the amounts stated in the statute, prior to any possible adjustment for inflation.

summary judgment as to those enhanced penalty claims. Even if Ocwen was required to perform annual escrow analyses for those categories of borrowers, the CFPB cannot show Ocwen acted either "knowingly" or "recklessly" when it reached the opposite conclusion at the time.

Further, the CFPB cannot prove Ocwen's acted "recklessly" or "knowingly" in interpreting the applicable regulation as not requiring an annual escrow analysis for borrowers who were not going to be receiving an annual escrow statement pursuant to Regulation X. Plaintiffs must admit that Regulation X did not require Ocwen to provide annual escrow ***statements*** to borrowers who were delinquent, in bankruptcy, or in foreclosure at the time the statement otherwise would have been due. 12 C.F.R. § 1024.17(i)(2); SMF ¶ 207. Moreover, when HUD issued Regulation X in 1994, it expressly said that the purpose of conducting the annual escrow ***analysis*** was to prepare the annual escrow ***statement***, and indeed that the annual escrow analysis was just "one step in the process of preparing the escrow account statements." SMF ¶ 208. Specifically, when HUD promulgated the regulation, HUD expressly said:

> HUD considers the annual escrow account statement to be the borrower's tool to check the past year's escrow account activities and the projections for the next year. As such, ***HUD believes that servicers need to perform an escrow account analysis to make the statements meaningful. An escrow account analysis, therefore, is one step in the process of preparing the escrow account statements***.

59 Fed. Reg. 53,890, 53,896 (Oct. 26, 1994) (emphasis added); SMF ¶ 208. [redacted]

[redacted] Thus, no reasonable factfinder could find that Ocwen acted either knowingly or recklessly in thinking it was not required to prepare an annual escrow analysis for non-performing loans. *See CFPB v. Mortgage Law Grp., LLP*, 366 F. Supp. 3d 1039, 1056 (W.D. Wis. Nov. 15, 2018) (action not reckless absent proof of "indifference" to "obvious risks"); *CFPB v. CashCall, Inc.*, 2018 U.S. Dist. LEXIS 9057, at *47-

48 (C.D. Cal. Jan. 19, 2018) (defendants did not "knowingly" violate CFPA where there was no evidence defendants knew the structure of their loan program would subject them to liability). Ocwen should be granted summary judgment if Plaintiffs seek enhanced penalties for failure to conduct annual escrow analyses for these borrowers.

## VI. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CHALLENGING OCWEN'S POLICIES (COUNT VIII)

Regulation X provides that "[a] servicer shall maintain policies and procedures that are reasonably designed to achieve" certain enumerated objectives. 12 C.F.R. § 1024.38(a). Count VIII of CFPB's Amended Complaint (¶¶ 261-66) alleges that Ocwen did not maintain such policies governing three activities: (1) obtaining "accurate and current" information from foreclosure counsel; (2) addressing borrower complaints; and (3) completing outbound servicing transfers. Ocwen is entitled to summary judgment on this Count because [redacted] Because Searson's opinion is based on an irrelevant legal standard, it cannot satisfy CFPB's burden of proof. *See, e.g.*, *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 135 (D. Mass. 2003) ("Because Dr. Brunski's opinion is addressed to only half of the functionality question, that is whether the design is essential, it is based on an erroneous legal standard, and the opinion cannot defeat summary judgment."). But it is undisputed that Ocwen maintained policies concerning each of these areas. SMF ¶¶ 216-219. [redacted] In light of this unrebutted record evidence, there is no genuine dispute as to whether Ocwen's policies were "reasonably designed" to achieve its objectives.

## VII. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON FLORIDA'S REMAINING FDUTPA CLAIMS

In Florida's two remaining claims for violation of FDUTPA (Counts VI and VII), Florida alleges that Defendants "engaged in unfair acts that are likely to cause substantial injury to consumers," by (1) "impos[ing] [lender]-placed insurance ["LPI"] in excessive amounts of coverage" or "where the borrower had insurance" and (2) "charging borrowers excessive

---

[redacted]

property inspection fees." FL TAC ¶¶ 240, 247. Florida further alleges that Defendants "willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law." *Id.* ¶¶ 241, 248. But Florida has no evidence that Ocwen violated FDUTPA with respect to any particular loan, let alone that it did so "willfully."

First, Florida has identified no competent evidence that Ocwen improperly placed LPI on any loan, either in "excessive amounts of coverage" or "where the borrower had insurance." [redacted]

Second, Florida has no evidence that Ocwen improperly charged any borrower property inspection fees. As a threshold matter, Florida fails to offer evidence that any one loan was charged an improper property inspection fee. [redacted]

---

18 [redacted]

19 [redacted]

[redacted]

Nor does Florida offer any evidence (in the form of expert testimony or otherwise) that any of the issues [redacted] actually rises to the level of an "unfair" act or practice that has substantially injured consumers—as they must, to prove a violation of FDUTPA. *See* Fla. Stat. § 501.204. [redacted] But it is well-established that whether property inspection fees are permissible is a matter of contract law, and that the standard for imposing such fees may vary from mortgage to mortgage and loan to loan. *See Stitt v. Citibank*, No. 12-3892, 2015 WL 9177662, at *5 (N.D. Cal. Dec. 17, 2015) ("Some mortgages impose a standard of reasonableness or appropriateness, while others impose a standard of necessity before allowing fees such as property inspections."). Further, whether an individual fee was permissible as a matter of contract would need to be assessed on a fee-by-fee basis, something no expert did. [redacted]

Third, even if Florida had produced any evidence of loan-level violations (and it has not), Florida cannot prove Ocwen's conduct in placing insurance or charging property inspection fees was a "willful[]" violation of law. FDUTPA permits OAG to recover "a civil penalty of not more than $10,000" for "willful" violations only. Fla. Stat. § 501.2075. To establish a willful violation, OAG must show Ocwen "knew or should have known that [its] conduct was unfair or deceptive or prohibited by rule." *Id.* For the same reasons Florida has failed to establish that any loan identified as at issue for the conduct alleged Counts VI and VII amounts to a violation of law at all, Florida likewise has no evidence that any such loan was a "willful" violation.

## VIII. DEFENDANTS OFC AND OMS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY DID NOT ENGAGE IN SERVICING ACTIVITIES

The MTD Opinions held that the Complaint alleged facts that, if true, would establish that Defendants OFC and OMS – in addition to Defendant OLS—were engaged in "servicing" loans and hence could be held liable under RESPA (which applies only to entities engaged in

servicing loans). CFPB MTD Op. at 16-17; FL MTD Op. at 17. But discovery has disproved those factual allegations, and so OFC and OMS are entitled to summary judgment.

Under RESPA, a "servicer" is defined as the person responsible for "servicing" a loan. 12 U.S.C. § 2605(i)(2). The term "servicing" means "receiving any scheduled periodic payments…[and] making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C § 2605(i)(3). Neither OFC or OMS meet the definition of loan servicer. The record adduced in discovery establishes that only OLS received periodic payments from borrowers and made payments from those amounts. SMF ¶¶ 240-43. Specifically, borrowers remitted their payments to OLS. *Id.* ¶¶ 241-42. OLS was the entity that made payments from those amounts. *Id.* ¶¶ 241, 243. Though the CFPB alleges that OFC or OMS were engaged in other activities – such as "insurance, loss mitigation, foreclosure, call center, and consumer complaint operations" or providing "a system of and related technology services" (Am. Compl. ¶¶ 15-16) – those alleged activities are not "servicing" within RESPA's limited definition.

Alternatively, Plaintiffs argue that even if OFC and OMS were not servicers, they can be held liable under RESPA pursuant to a "common enterprise" theory. But the Eleventh Circuit and other courts have held that parent companies cannot be held liable under RESPA. *See McCarley v. KPMG Int'l*, 293 F. App'x 719, 722 (11th Cir. 2008) (unpublished opinion) (plaintiff "offered no authority—and we have found none—assigning liability to parent or subsidiary companies under RESPA"); *Bernstein v. Wells Fargo Bank, N.A.*, 2016 WL 4546653, at *4 n.3 (N.D. Ga. May 13, 2016); *Reese v. JPMorgan Chase & Co.*, 2009 WL 10702443, at *4 (S.D. Fla. July 15, 2009) (dismissing RESPA claim against subsidiary under *McCarley*); *Bennett, v. Nationstar Mortg., LLC*, 2015 WL 5294321, at *11 (S.D. Ala. Sept. 8, 2015).

**CONCLUSION**

For each and all of these reasons, summary judgment should be granted to Defendants as to all of Plaintiffs' claims.

Dated: June 5, 2020

Respectfully submitted,

*/s/ Catalina E. Azuero*

Bridget Ann Berry
Andrew Stuart Wein
**GREENBERG TRAURIG, P.A.**

777 South Flagler Drive, FL 33401
Tel.: 561.650.7900
berryb@gtlaw.com
weina@gtlaw.com

Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: 202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com

Laura A. Stoll (*pro hac vice*)
**GOODWIN PROCTER LLP**
601 S. Figueroa Street
Los Angeles, CA 90017
Tel.: 213.426.2500
lstoll@goodwinlaw.com

Catalina E. Azuero (Florida Bar No. 821411)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
cazuero@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 5, 2020 via ECF on all counsel or parties of record listed below:

Jennifer Hayes Pinder
Email: Jennifer.Pinder@myfloridalegal.com

Sasha Funk Granai
Email: Sasha.Granai@myfloridalegal.com

Victoria Butler
Email: Victoria.Butler@myfloridalegal.com

Scott R. Fransen
Email: Scott.Fransen@flofr.com

Miriam S. Wilkinson
Email: Miriam.Wilkinson@flofr.com

Anthony Cammarata
Email: Anthony.Cammarata@flofr.com

Jean Healey
Email: jean.healey@cfpb.gov

Atur Desai
E-mail: atur.desai@cfpb.gov

Tianna Baez
E-mail: tianna.baez@cfpb.gov

Amanda Roberson
E-mail: amanda.roberson@cfpb.gov

Stephanie Brenowitz
E-mail: stephanie.brenowitz@cfpb.gov

Erin Mary Kelly
E-mail: erin.kelly@cfpb.gov

James Savage
E-mail: james.savage@cfpb.gov

Greg Nodler
E-mail: greg.nodler@cfpb.gov

Michael Posner
E-mail: michael.posner@cfpb.gov

Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov

Shirley T. Chiu
E-mail: shirley.chiu@cfpb.gov

Blaine Winship
E-mail: blaine.winship@myfloridalegal.com

Joaquin Alvarez
E-Mail: Joaquin.alvarez@flofr.com

/s/ Catalina Azuero
Catalina E. Azuero