**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION
BUREAU,
                      Plaintiff,
     v.
OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
OCWEN LOAN SERVICING, LLC; and PHH
MORTGAGE CORPORATION,
                           Defendants.

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA,
Department of Legal Affairs,
     and
OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

               Plaintiffs,

     v.

OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
OCWEN LOAN SERVICING, LLC, and PHH
MORTGAGE CORPORATION,
                          Defendants.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE**
**TESTIMONY OF PLAINTIFFS' EXPERT DANIEL MCFADDEN**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

BACKGROUND ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 6

    I.   Professor McFadden's opinions are relevant…...………………………………………..6

        A.   Professor McFadden relied on Ocwen's servicing data ....................................... 7

        B.   Professor McFadden's Foreclosure-Initiation Model is relevant to damages…...8

        C.   Professor McFadden's damages opinions are also relevant to Ocwen's
            liability and penalties .......................................................................................... 11

    II.  Professor McFadden's opinions are reliable…...………………………………………12

        A.   A discrete-time proportional-hazards econometric model is well-suited
            to this case ........................................................................................................... 13

        B.   Professor McFadden reliably applied his Foreclosure-Initiation Model ............. 15

        C.   Professor McFadden made reasonable choices regarding his sources and
            assumptions. ........................................................................................................ 16

        D.   Professor McFadden's Opportunity-Cost Model is reliable................................ 18

        E.   Any alleged flaws go to the weight of Professor McFadden's testimony,
            not admissibility. ................................................................................................. 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.R. v. Dudek*,
  2016 WL 3221140 (S.D. Fla. June 9, 2016) ................................................................... 10

*Adkins v. Morgan Stanley*,
  2013 WL 3835198 (S.D.N.Y. July 25, 2013) ................................................................ 10

*Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*,
  615 F.3d 1352 (11th Cir. 2010) ................................................................................. 7, 20

*Allapattah Servs., Inc. v. Exxon Corp.*,
  61 F. Supp. 2d 1335 (S.D. Fla. 1999) ............................................................................. 3

*Allison v. McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ....................................................................................... 6

*Baez v. Wal-Mart Stores E., LP*,
  2012 WL 13005547 (S.D. Fla. May 14, 2012) ............................................................. 20

*Bazemore v. Friday*,
  478 U.S 385 (1986). ............................................................................................ 3, 8, 20

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*,
  178 F. Supp. 2d 198 (E.D.N.Y. 2001) .......................................................................... 10

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) ............................................................................... 10

*Catalina Rental Apartments, Inc. v. Pac. Ins. Co.*,
  2007 WL 1970808 (S.D. Fla. July 3, 2007) ................................................................. 20

*Chapman v. Procter & Gamble Distrib., LLC*,
  766 F. 3d 1296 (11th Cir. 2014) ................................................................................... 11

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) ......................................................................................... 3

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ........................................................................................ 10

*Cotromano v. United Techs. Corp.*,
  2018 WL 2047468 (S.D. Fla. May 2, 2018) ................................................................... 7

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ......................................................................................................... 6

*Diamond Resorts Int'l, Inc. v. Aaronson*, No.,
  2019 WL 8301669 (M.D. Fla. Feb. 5, 2019) ............................................................... 20

*Frasca v. NCL (Bah.), Ltd.*,
    654 Fed.App'x. 949 (11th Cir. 2016) ............................................................ 20

*Hamilton v. Suntrust Mortg. Inc.*,
    6 F. Supp. 3d 1300 (S.D. Fla. 2014) ............................................................ 11

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ...................................................................................... 9

*In re Denture Cream Prod. Liab. Litig.*,
    2015 WL 392021 (S.D. Fla. Jan. 28, 2015) ................................................. 20

*In re Disposable Contact Lens Antitrust*,
    329 F.R.D. 336 (M.D. Fla. 2018) ................................................................. 20

*In re Neurontin Mktg. & Sales Practices Litig.*,
    712 F.3d 21 (1st Cir. 2013) ....................................................... 8, 9, 10, 12

*In re Polypropylene Carpet Antitrust Litig.*,
    93 F.Supp.2d 1348 (N.D.Ga. 2000) ......................................................... 3, 8, 16

*In re Titanium Dioxide Antitrust Litig.*,
    2013 WL 1855980 (D. Md. May 1, 2013) .................................................. 20

*Jones v. Otis Elevator Co.*,
    861 F.2d 655 (11th Cir. 1988) .................................................................... 13

*Lane v. Wells Fargo Bank, N.A.*,
    2013 WL 3187410 (N.D. Cal. June 21, 2013) ............................................ 11

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) .................................................................... 20

*Mizrahi v. Yamaha Motor Corp., U.S.A.*,
    2019 WL 3318527 (S.D. Fla. July 19, 2019) ............................................. 13

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
    382 F.3d 546 (5th Cir. 2004) ...................................................................... 20

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ....................................................... 13, 14, 20

*Resco Prod., Inc. v. Bosai Minerals Grp.*,
    2015 WL 5521768 (W.D. Pa. Sept. 18, 2015) ............................................ 16

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) .................................................................. 13

**Statutes**

12 U.S.C. § 5531(c)(1) .................................................................................... 12

12 U.S.C. § 5565(c)(3)(C) ............................................................................... 12

**Rules**

Fed. R. Evid. 401 ................................................................................................ 6

Fed. R. Evid. 702 ............................................................................................. 6, 9

**Regulations**

12 C.F.R. § 1024.38(c)(2) ................................................................................... 7

12 C.F.R. § 1024.41(g) ....................................................................................... 7

Ocwen's motion to exclude the opinions of Professor Daniel McFadden, a Nobel Prize-winning economist, should be denied because his opinions are relevant and reliable.[1] Professor McFadden's opinions are relevant to damages, liability, and civil money penalties. Professor McFadden's opinions also are reliable. Professor McFadden built two models to calculate damages: an opportunity-cost model that calculates damages from Ocwen's over-collection of money, and an econometric model that determines how many foreclosure initiations are attributable to Ocwen's untimely escrow-account analyses. Ocwen does not dispute the general validity of these models. Rather, Ocwen—relying on the unsubstantiated criticisms of its rebuttal expert, Dr. Hamm—criticizes how the models were applied to the facts of this case, arguing that Professor McFadden relied on flawed data, omitted variables, and made faulty assumptions. But in his surrebuttal (which Ocwen ignores in its motion), Professor McFadden has already explained why none of Dr. Hamm's criticisms are valid. And it is well-established that, even if credited, such criticisms are not a basis to exclude an expert's testimony, but rather speak to the testimony's weight at trial.

## BACKGROUND

Professor McFadden's two models quantify the harms to borrowers from whom Ocwen over- and under-collected monies because of its servicing errors. When a servicer over-collects money from a borrower, it causes at least two financial harms. First, it deprives the borrower of the use of their funds, and second, it increases the risk that they will have a foreclosure initiated against them.[2] When a servicer under-collects from a borrower and then later attempts to recoup the under-charged amount by requiring an additional payment on top of the borrower's regular payment, it also, among other harms, increases the risk that the borrower will have a foreclosure initiated against them.[3] These harms are known as "opportunity cost" and "payment shock," and

---

[1] *See* Professor McFadden's Second Amended Expert Report (Sept. 19, 2019) ("McFadden Report"), attached as Ex. 1; Professor McFadden's Surrebuttal Expert Report (Nov. 14, 2019) ("McFadden Surrebuttal"), attached as Ex. 2. Professor McFadden drafted his report on behalf of the Bureau. Florida put Ocwen on notice of their intent to rely on Professor McFadden when conferring about and ultimately filing Plaintiffs' motion to consolidate their cases. (ECF No. 115). Florida reiterated their intent through multiple communications in late January 2020. Ocwen does not—and cannot—claim any prejudice based on Florida's reliance on Professor McFadden, particularly since there will be a consolidated trial.

[2] McFadden Report ¶¶ 34–35, 39.

[3] *Id.* ¶ 36.

they are well-recognized in economics, including mortgage-finance economics.[4]

Professor McFadden's first model is an opportunity-cost model ("Opportunity-Cost Model"). An opportunity cost is "the value of the best alternative(s) that are not chosen."[5] In this case, opportunity-cost damages are the value of the funds that borrowers were deprived of during the time that Ocwen over-collected from them.[6] In calculating these damages, Professor McFadden used Ocwen's responses to interrogatories and document requests, including the loan-level servicing-system data that Ocwen used to service loans ("Servicing Data")[7] to identify: (1) borrowers who were overcharged by Ocwen and in fact overpaid; and (2) the period of time each borrower lacked access to their funds.[8]

To determine these borrowers' best alternative use for the deprived funds (and so their opportunity cost), Professor McFadden studied the characteristics of actual Ocwen borrowers, and concluded that, given their financial vulnerability, they were most likely to use excess funds to pay other debt.[9] Professor McFadden further supported this decision by reviewing credit-score and other data for Ocwen borrowers to determine their financial vulnerability.[10] He concluded that the "reasonable interest rate" for affected Ocwen borrowers is the interest rate on credit-card debt "because in today's economy, credit card rates are a reasonable, if not conservative estimate of the borrower's marginal cost of credit."[11]

Professor McFadden calculated opportunity-cost damages for borrowers who overpaid because of three servicing failures: (1) borrowers who overpaid into their escrow accounts because Ocwen failed to perform timely escrow-account analyses;[12] (2) borrowers who overpaid premiums for private mortgage insurance ("PMI") because Ocwen failed to cancel it as

---

[4] *Id.* ¶¶ 28–33 (explaining opportunity cost and payment shock).
[5] *Id.* ¶ 29; *see also* McFadden Surrebuttal ¶¶ 10–16.
[6] *Id.* ¶¶ 33–34, 39.
[7] Pls. St. of Facts ISO Mot. for Summ. Judg. ("Pls. SOF"), ECF 633, SJX 155 (Bureau's request for loan-level servicing data), SJX 156 (Ocwen's responses to request) & SJX 35 (Sebastian 30(b)(6) Dep. at 11:6–12:2) (produced loan-level servicing data is the data Ocwen used to service loans); McFadden Report ¶¶ 40, 55, 102–107, App'x E (identifying data relied on).
[8] McFadden Report ¶ 40.
[9] *Id.* ¶¶ 40–42; McFadden Surrebuttal ¶¶10–16, 44–48.
[10] McFadden Surrebuttal ¶¶ 44–48
[11] McFadden Report ¶ 41; *see also* McFadden Surrebuttal ¶¶ 10–16.
[12] McFadden Report ¶¶ 48–65.

required;[13] and (3) borrowers with adjustable-rate mortgages who overpaid principal and interest amounts because Ocwen failed to make necessary adjustments to their loans.[14] Depending on which of three potential credit card interest rates one uses, Professor McFadden estimates that total opportunity-cost damages are $1,491,462; $1,798,530; or $2,182,115.[15]

Professor McFadden's second model estimates the increased risk of foreclosure initiations as a consequence of Ocwen's untimely escrow-account analyses ("Foreclosure-Initiation Model"). Professor McFadden calculated this increased risk only for borrowers who suffered an untimely escrow-account analysis ("Relevant Borrowers").[16]

To quantify the harm from increased risk of foreclosure initiation, Professor McFadden used a standard statistical method for establishing damages: an econometric model.[17] Econometric models identify the relationship between two or more variables.[18] From his analysis of Ocwen's failures to perform timely escrow analyses and the financial vulnerability of Ocwen's borrowers, Professor McFadden decided that the most appropriate econometric model was a discrete-time proportional-hazards model,[19] which is a form of multiple regression analysis.[20] Courts have long recognized econometric models as a valid and reliable way to show damages.[21] The discrete-time proportional-hazards model, in particular, is "commonly used by industry participants to analyze the risk of default," including, as in this case, to analyze how

---

[13] *Id*. ¶¶ 66–72.

[14] *Id*. ¶¶ 73–77.

[15] McFadden Surrebuttal, Table 6.

[16] Professor McFadden excluded some borrowers with untimely escrow-account analyses from his foreclosure-initiation model, and so determined damages for only 272,007 of the approximately 389,000 borrowers who suffered an untimely analysis. McFadden Report, Table 15, ¶ 22, and App'x G.

[17] McFadden Report ¶¶ 79–80.

[18] *In re Polypropylene Carpet Antitrust Litig.*, 93 F.Supp.2d 1348, 1359 (N.D.Ga. 2000).

[19] McFadden Report ¶ 88.

[20] *Id*. ¶ 87.

[21] *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400–01 (J. Brennan, concurring in part and joined by all other members of the Court) (regression analysis, a type of econometric model, is an acceptable way to establish damages); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) (statistician's testimony on damages would be helpful because regression analysis is "a methodology that is well-established as reliable); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1347 (S.D. Fla. 1999), *aff'd*, 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).

much an event impacted the probability of foreclosure for a borrower.[22]

Professor McFadden's Foreclosure-Initiation Model is an econometric model that isolates the impact of an independent variable (Ocwen's untimely analyses) on the dependent variable (the probability of foreclosure initiation), as opposed to other causes:

> [a]t a high level, the harm that I am quantifying in this section relates to the increased probability that borrowers have foreclosure initiated against them as a consequence of Ocwen's failure, and measuring (in dollars) the cost to the borrower for that increased probability. I use commonly accepted econometric methods to control for the relevant variables that affect both the occurrence of late escrow servicing failures and foreclosure initiations, and thus am able to isolate from other possible causes the increased probability of foreclosure initiation to the borrowers that is the result of Ocwen's servicing failure.[23]

Professor McFadden's calculation of foreclosure-initiation damages involved three steps: (1) using his econometric model, he determined the increased risk of foreclosure initiation for each borrower as a consequence of Ocwen's failure to perform a timely escrow analysis (*i.e.*, he determined the harm to each Relevant Borrower); (2) with these probabilities, he calculated the number of foreclosure initiations attributable to Ocwen's untimely escrow analyses, as opposed to other factors; and (3) he calculated the average cost per foreclosure initiation.[24]

To isolate the impact of Ocwen's untimely escrow analyses on the risk of foreclosure initiation, Professor McFadden's model controlled for the borrower-specific, loan-specific, macroeconomic, and other factors that may have contributed to an increased risk of foreclosure initiation.[25] In total, he controlled for over twenty independent variables, including numerous borrower- and loan-specific variables.[26]

The data Professor McFadden used for this econometric model included the Servicing Data that Ocwen used to service borrowers' loans and produced in discovery, and Ocwen's interrogatory responses identifying the borrowers with untimely analyses and the borrowers' individual shortages and surpluses that accrued due to this failure, among other data sources.

Professor McFadden calculated the increased risk of foreclosure initiation for two groups:

---

[22] McFadden Surrebuttal ¶¶ 30–32.
[23] *Id*. ¶ 79.
[24] *Id*. ¶ 80.
[25] McFadden Report ¶¶ 86–87, 98–101, Table 11, App'x G.
[26] *Id*. Table 11, Notes.

(1) borrowers whom Ocwen overcharged due to its untimely analyses; and (2) borrowers whom Ocwen undercharged (and then later sought to recoup undercharged amounts in extra monthly payments).[27] He found an average increase in the cumulative probability of foreclosure initiation—*i.e.*, the aggregate probability of the initiation occurring over the time period in his model—of 5.1% for undercharged Relevant Borrowers; 6.7% for overcharged Relevant Borrowers; and 6.1% for the populations combined.[28] These increased probabilities (*i.e.*, the increased risks) mean that 16,636 foreclosure initiations against Relevant Borrowers between January 1, 2014 and August 6, 2018 are attributable to Ocwen's untimely analyses.[29] Professor McFadden confirmed the model's reliability through several robustness checks. For example, he estimated his model using an alternative data set and found consistent results.[30]

Notably, although Professor McFadden estimates the average increased risk of foreclosure initiation attributable to Ocwen's escrow analyses failures, his model shows that each Relevant Borrower suffered harm and each has their own risk of foreclosure initiation based on their borrower and loan characteristics. Professor McFadden can allocate damages to individual borrowers based on these individual probabilities.[31]

To determine the monetary harm to borrowers from the increased risk of foreclosure initiation, Professor McFadden calculated the average cost of a foreclosure initiation, which takes into account that not every initiated foreclosure is completed and not every completed foreclosure ends in an eviction.[32] Because the costs associated with a foreclosure initiation differ based on whether the foreclosure was completed, Professor McFadden calculated two ratios: (1) initiated foreclosures to completed foreclosures (as opposed to rescinded); and (2) completed foreclosures to evictions.[33] To do so, Professor McFadden used the Servicing Data that Ocwen used to document when foreclosures were initiated and completed.[34] From this data, Professor McFadden was able to study all foreclosures that were initiated against Relevant Borrowers

---

[27] McFadden Report ¶ 110 & Table 12.
[28] McFadden Surrebuttal Report, Table 12, Notes, ¶ 139, App'x G.
[29] McFadden Report ¶¶ 11, 139.
[30] *Id.* ¶¶ 107, 111–113, App'x H.
[31] *Id.* ¶ 123 n.128.
[32] *Id.* ¶¶ 114–122.
[33] *Id.* ¶¶ 114–117.
[34] *Id.* ¶ 118.

between January 1, 2014 and August 6, 2018. Of these initiated foreclosures, Professor McFadden identified that approximately 46% had the foreclosure completed ("Observed Foreclosures") and approximately 54% had the foreclosure initiated but the data indicated that it was still pending ("Ongoing Foreclosures").[35] From the Observed Foreclosures, Professor McFadden calculated the two ratios described above. Because the Ongoing Foreclosures lacked any data on whether they were completed or the borrowers were evicted, Professor McFadden assumed that the ratios from the population of Observed Foreclosures were the same for the population of Ongoing Foreclosures. In other words, Professor McFadden extrapolated the ratios from the Observed Foreclosures to the Ongoing Foreclosures.[36]

Finally, Professor McFadden determined the costs associated with each phase of foreclosure: initiated, completed but not evicted, and completed and evicted. He calculated two different average foreclosure costs: (1) by using Ocwen's internal sources and produced data, and if neither was available, public sources; and (2) by relying on a well-cited study ("Moreno Report").[37] Professor McFadden made conservative assumptions when calculating foreclosure costs.[38] By combining the average increased risk of foreclosure initiation with the average cost of foreclosure, he quantified the foreclosure-related damages to Relevant Borrowers attributable to Ocwen's untimely analyses. These damages total $351.5 million or $483.5 million, depending on which of the two average foreclosure costs one uses.[39]

## ARGUMENT

## I.   PROFESSOR MCFADDEN'S OPINIONS ARE RELEVANT.

Testimony is relevant if "it has any tendency to make a fact more or less probable" and "the fact is of consequence in determining the action."[40] This standard "is a liberal one."[41] Courts may preclude expert testimony as irrelevant if it does not, as required by Rule 702, "'assist the trier of fact to understand the evidence or to determine a fact in issue.'"[42] As this Court has

---

[35] *Id*. ¶ 116 & Fig. 10 (observed foreclosures include the 1.5% where sales were rescinded).
[36] *Id*. ¶¶ 114–117.
[37] *Id*. ¶¶ 118–119, Table 13.
[38] *Id*. ¶¶ 115, 115 n.114, 118, 121 n.127.
[39] *Id*. ¶ 123 & Table 15.
[40] Fed. R. Evid. 401.
[41] *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 587 (1993).
[42] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999).

explained, the standard for this so-called "fit" requirement is "not that high, although it is higher than bare relevance."[43] Here, Professor McFadden will assist this Court determine a central issue in this case: the harm caused by Ocwen's unlawful conduct.

### A. Professor McFadden relied on Ocwen's servicing data.

Professor McFadden relied on Ocwen's Servicing Data in his damages models.[44] This is the very data that Ocwen used to service borrowers' loans.[45] Ocwen asserts that Professor McFadden's opinions are irrelevant because he "did not analyze any of the data Ocwen produced from consumers' *servicing files*."[46] This argument is meritless. First, Professor McFadden's choice to rely on Ocwen's Servicing Data is a question of reliability, not relevance.[47] Second, his choice was also sound. Ocwen produced only 2,422 servicing files for a specific group of borrowers related to other Bureau allegations; it did not produce servicing files specifically for the borrowers at issue in Professor McFadden's damages calculations.[48] The Servicing Data, on the other hand, covered approximately 1.5 million borrowers, including all the borrowers for whom Professor McFadden quantified damages. And more importantly, servicing files are just the underlying documents containing borrower and loan information.[49] Ocwen does not point to any information in the 2,422 servicing files that is not also in the Servicing Data or that it thinks Professor McFadden should have considered. Notably, Ocwen's own expert also relied on the Servicing Data, because he believed that data extracted from Ocwen's systems was the "most reliable data," and did not perform any analysis based on a review of any servicing files.[50]

---

[43] *Cotromano v. United Techs. Corp.*, No. 10-cv-80840, 2018 WL 2047468, at *14 (S.D. Fla. May 2, 2018) (internal citations omitted).

[44] *See, e.g.*, McFadden Report ¶¶ 17, 21, 55, 73, 102–107, Tables 11 & 12, Fig. 10, App'x E.

[45] Pls. SOF, SJX 35 (Sebastian 30(b)(6) Dep. at 11:6–12:2).

[46] Defs.' Mot. to Exclude Testimony of Bureau Expert Daniel McFadden ("Mot."), ECF No. 638 at 5–6 (emphasis added).

[47] *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1363–64 (evaluating data choice as a question of reliability).

[48] Defs.' Opp. Mot. to Compel Servicing Files, ECF No. 181 at 1, n.1 (regarding 2,422 servicing files related to the Bureau's 12 C.F.R. § 1024.41(g) claims, not the untimely-analysis population).

[49] *See* 12 C.F.R. § 1024.38(c)(2) (requiring a servicing file to include, for example, communications between borrowers and servicers and loss-mitigation applications.)

[50] Expert Report of William G. Hamm, Ph.D ("Hamm Report") (Oct. 15, 2019) ¶ 135, attached as Ex. 3. Ocwen's own expert, however, made the flawed choice to rely only on the generic credits and debits in the Servicing Data while ignoring more specific Servicing Data.

**B. Professor McFadden's Foreclosure-Initiation Model is relevant to damages.**

Professor McFadden used an econometric model to determine the damages that are attributable to Ocwen's failure to timely perform escrow analyses. Quantifying damages in this manner is standard practice and expressly accepted by the Supreme Court.[51] Ocwen argues—without citing any legal authority—that the model is irrelevant because it does not show that Ocwen's conduct caused any foreclosure initiations.[52] But that is exactly what the Foreclosure-Initiation Model does: it determines each Relevant Borrower's increased risk of foreclosure initiation attributable to Ocwen's untimely escrow analyses (and not other causes), and the resulting number of foreclosure initiations that would not have occurred "but for" the untimely analyses. Professor McFadden used these probabilities to find the aggregate damages to Relevant Borrowers, which can be allocated at an individual level.

Econometric modeling "is a well-worn statistical technique used in a variety of contexts to examine the nature of the relation, if any, between two or more variables," by accounting "for the major independent influences on the dependant variable—the variable that is estimated or forecast by the model—in order to arrive at a reliable prediction of the dependant variable."[53] Here, Professor McFadden's model accounts for the major independent influences (such as pre-existing delinquency status) on a dependent variable (the risk of foreclosure initiation) to "isolate from other possible causes" the impact "that is the result of" Ocwen's untimely analyses.[54]

This precise type of analysis has been recognized for decades as a valid way to show damages.[55] For example, In *In re Neurontin Mktg. & Sales Practices Litig.* the First Circuit affirmed a damages award to plaintiffs who were injured by a manufacturer's fraudulent marketing scheme that led doctors to prescribe a drug.[56] Instead of individual doctors testifying that they prescribed the drug because of the marketing, the plaintiffs relied on an expert's regression analysis to show that the injury (an increase in the drug's sales) was "causally affected by the fraudulent marketing scheme."[57] Like Professor McFadden's model, the expert's

---

[51] *See Bazemore*, 478 U.S. at 400–01; *see also* McFadden Report ¶ 87.

[52] Mot. at 6–7. Ocwen does not object to the relevance of the opportunity-cost damages opinions.

[53] *In re Polypropylene Carpet Antitrust Litig.*, 93 F.Supp.2d at 1359.

[54] McFadden Report ¶ 79 & App. G ¶ 15.

[55] *See* n. 21 *supra.*

[56] 712 F.3d 21, 25 (1st Cir. 2013) ("*Neurontin*").

[57] *Id.* at 29–30 (expert explaining that "doctor-by-doctor" evidence was unreliable compared to

"analysis established causation by performing a regression analysis" on a dependent variable (the drug's sales) to determine the effect of a given independent variable (the fraudulent marketing scheme) "while controlling for" other independent variables (other factors that could have affected the drug's sales).[58] Like Professor McFadden, the *Neurontin* expert concluded that a certain percentage of issued prescriptions were attributable to the fraudulent marketing.[59] And like here, the *Neurontin* defendants argued that only individualized, doctor-specific evidence "could prove causation."[60] The court rejected this argument, explaining that "[]it is clear that [the expert's] evidence met [the] requirements of Federal Rule of Evidence 702," since "regression analysis is a well-recognized and scientifically valid approach to understanding statistical data, and courts have long permitted parties to use statistical data to establish causal relationships."[61]

Ignoring the case law that makes clear that an econometric analysis can establish damages, Ocwen asserts that an increased risk of foreclosure initiation "is not proximate cause."[62] To the extent proximate cause must be shown in the damages context, it requires a "direct relation between the injury asserted and the injurious conduct alleged."[63] Professor McFadden's model shows exactly such a direct relationship between Ocwen's untimely analyses and the harm of an increased risk of foreclosure.[64]

Moreover, Professor McFadden's model shows that 16,636 foreclosure initiations between January 1, 2014 and August 6, 2018 against Relevant Borrowers would not have occurred but for Ocwen's untimely analyses.[65] It is commonplace for experts to calculate damages this way: using econometric analyses to calculate the rate at which an event would have occurred but for a defendant's unlawful conduct, and then to use that rate to calculate the damages caused by the conduct.[66]

---

econometric models).
[58] *Id*. at 30.
[59] *Id*.
[60] *Id*. at 39.
[61] *Id*. at 42.
[62] Mot. at 7 ("increased statistical probability is not proximate cause").
[63] *Neurontin,* 712 F. 3d at 35 (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).
[64] *See* nn. 17–23 *supra*.
[65] McFadden Report  ¶¶ 78, 139.
[66] *See, e.g.*, *Neurontin,* 712 F. 3d at 32 (percentage of medication that was prescribed as a result of fraudulent marketing practices was combined with average cost of alternative medication to

Ocwen cites to a single case in support of its argument that the Foreclosure-Initiation Model does not show causation, but that case shows the error in Ocwen's position. In *A.R. v. Dudek*, the Department of Justice alleged that Florida engaged in a systemic violation of the Americans with Disabilities Act by limiting the availability of community-based services; as relief, DOJ sought damages for all children who were institutionalized in Florida's nursing homes.[67] But the court explained that, for there to be a violation in the first instance, a child must be *unduly* institutionalized, and then found that there were some institutionalized children who were not.[68] For children who were not unduly institutionalized, the court concluded there was "no [ADA] violation and, thus, no actionable injury caused by Florida's" actions.[69]

That is not the case here. Unlike in *Dudek*, Plaintiffs here seek—and Professor McFadden calculated—foreclosure damages only for borrowers who were subject to a violation (an untimely escrow analyses).[70] If Ocwen is claiming that borrowers who experienced an increased risk of foreclosure but no foreclosure initiation did not suffer a legally cognizable injury, Ocwen is incorrect.[71]

Ocwen also argues that Professor McFadden's opinions are irrelevant to causation "because he fails to account for relevant causal considerations" in his model, such as job loss.[72]

---

calculate total damages); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002) (damages based on expert's use of statistical techniques to estimate what plaintiff's market share would have been but for defendant's anti-competitive behavior); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 849 (D.N.J. 2015) (expert's opinion on drug prices that would have existed but for defendants' anti-competitive behavior was combined with total drug sales to calculate total damages); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198, 228 (E.D.N.Y. 2001), *rev'd on other grounds, Empire Healthchoice, Inc. v. Philip Morris USA, Inc.,* 393 F.3d 312 (2d Cir. 2004) (expert's opinion based on regression analysis and other statistical techniques that 4.5% more smokers would have quit each year but for defendant's deceptive advertising was combined with opinions on annual smoking costs to determine total annual damages).

[67] 2016 WL 3221140, at *3–4 (S.D. Fla. June 9, 2016).

[68] *Dudek*, 2016 WL 3221140, at *12.

[69] *Id*.

[70] *Id*.

[71] *See, e.g.*, *Adkins v. Morgan Stanley*, No. 12-cv-7667, 2013 WL 3835198, at *3 (S.D.N.Y. July 25, 2013) ("Plaintiffs have suffered a cognizable injury. . . . These loans placed Plaintiffs at greater risk of default, delinquency, and foreclosure.").

[72] Mot. at 7.

But arguments that an expert failed to consider alternative explanations—such as omitted variables—are attacks on reliability, not relevance, as the only case cited by Ocwen indicates.[73] And as explained more fully in Section II below, this argument fails because Professor McFadden controls for all relevant major factors that influence the probability of foreclosure initiation, Ocwen offers no statistical evidence to show otherwise, and whether a model omitted variables is a question of weight, not admissibility.

Ocwen also asserts that Professor McFadden's foreclosure-cost opinions are irrelevant because "he failed to show that any consumer actually paid the additional foreclosure costs."[74] Relatedly, Ocwen argues that his opinions are unreliable to calculate foreclosure costs "because his source data is unreliable."[75] Both arguments are wrong. First, borrowers suffer economic harm when they are required to pay an amount, regardless of whether they have paid it yet, because they are indebted for that amount.[76] Second, Professor McFadden's foreclosure-cost data choices were sound. Ocwen's Servicing Data does not identify foreclosure costs being assessed or paid, and thus cannot be used to find those costs and payments.[77] Professor McFadden therefore relied on other Ocwen data and documents, as well as a well-cited report, for foreclosure costs.[78] These sources included a report commissioned by Ocwen that identified fees that were charged to Ocwen borrowers when foreclosures were initiated.[79] In any event, attacks on an expert's sources speak to reliability, not relevance, and are generally questions of weight, not admissibility, as discussed in Section II below.

### C. Professor McFadden's opinions are also relevant to Ocwen's liability and penalties.

Professor McFadden assumed liability for the relevant servicing failures,[80] as is

---

[73] *Chapman*, 766 F. 3d at 1310.

[74] Mot. at 8.

[75] Mot. at 8.

[76] *See, e.g., Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1300, 1307 (S.D. Fla. 2014) (holding that being "charged for the force-placed insurance premiums" is an injury despite not paying the premiums because it increased the borrower's debt); *Lane v. Wells Fargo Bank, N.A.*, No. 12-cv-04026, 2013 WL 3187410, at *11 (N.D. Cal. June 21, 2013).

[77] Ocwen's Servicing Data that identifies transactional credits and debits uses generic descriptions and do not explicitly identify any foreclosure-related costs. *See* K. Sebastian Dep. Ex. 156, attached as Ex. 4 (transaction data dictionary).

[78] McFadden Report ¶¶ 118–119.

[79] McFadden Surrebuttal ¶¶ 86–89.

[80] McFadden Report ¶ 17.

11

customary for a damages expert.[81] Plaintiffs do not rely on his opinions to support their motion for summary judgment. But his opinions *are* relevant to Ocwen's liability on Plaintiff's unfairness claims. For an act or practice to be unfair, it must cause or be likely to cause substantial injury to consumers and not be outweighed by countervailing benefits.[82] Professor McFadden's opinions on the harms attributable to Ocwen's servicing failures and the lack of countervailing benefits can aid this Court in deciding whether Ocwen's conduct met this standard if this claim is not resolved on summary judgment.[83]

Professor McFadden limited his quantified damages to "servicing failures for which [he had] sufficient data to conduct a rigorous analysis."[84] Because Ocwen did not maintain sufficient data, he was unable to quantify damages for nearly 900,000 borrowers who experienced servicing errors other than untimely escrow-account analyses, over-collection of PMI, and ARM-borrower overcharges.[85] That Professor McFadden could not quantify other harms caused by Ocwen because of limitations in Ocwen's data is relevant to this Court's findings on damages.[86] Moreover, he was able to provide opinions on difficult-to-quantify harms that are relevant to damages and whether Ocwen's practices caused or were likely to cause substantial harm.[87] And his opinions are relevant to civil money penalties, as this Court must consider "the severity of the risks to or losses of the consumer" as a potential mitigating factor.[88]

## II.   PROFESSOR MCFADDEN'S OPINIONS ARE RELIABLE.

When evaluating the reliability of scientific expert opinion, the trial judge must assess whether the "methodology underlying the testimony is scientifically valid" and "properly can be

---

[81] *Neurontin*, 712 F. 3d at 30 ("As is customary for such experts, Dr. Rosenthal testified that she 'assumed that the allegations in the complaint are true'").

[82] 12 U.S.C. § 5531(c)(1).

[83] *See* McFadden Report ¶¶ 141–143 (opinions regarding countervailing benefits).

[84] *Id*. ¶ 7, n.4.

[85] *Id*. ¶¶ 7 n.4, 27 & Table 2.

[86] *See, e.g., Neurontin*, 712 F. 3d at 49 (In proving damages "plaintiff has a more relaxed burden of proof . . . especially if as in this case the defendants' conduct has made it difficult for the plaintiff to prove the precise extent of his damages. Under such circumstances, damages do not need to be proven with mathematical certainty, provided an award has a rational basis in the evidence. Otherwise 'the more grievous the wrong done, the less likelihood there would be of a recovery.") (internal citations and quotation marks omitted).

[87] *See* McFadden Report ¶¶ 124–135.

[88] 12 U.S.C. § 5565(c)(3)(C).

applied to the facts in issue."[89] To determine scientific validity, courts consider "to the extent practicable" whether the theory is testable, has been subjected to peer review, its error rate, and whether it is generally accepted in the scientific community.[90] When a method is scientifically valid in general, then the identification of alleged flaws "is precisely the role of cross-examination" at trial and so speaks to weight rather than admissibility.[91]

Professor McFadden used common and generally valid methods— an opportunity-cost model and a discrete-time proportional-hazards econometric model—to calculate damages. Ocwen cannot credibly dispute their general scientific validity. Instead, it criticizes—without any substantiation—how they were applied in this case by alleging that Professor McFadden omitted variables, relied on improper sources, and made faulty assumptions. Ocwen is wrong: Professor's McFadden's models are well-suited to this case, he reliably applied them, and he made reasonable choices regarding his sources and assumptions. And even if there were minor flaws (which there are not), any such weaknesses would go to weight, not admissibility.

**A. A discrete-time proportional-hazards econometric model is well-suited to this case.**

Professor McFadden's Foreclosure-Initiation Model is a discrete-time proportional-hazards model, which is a well-accepted econometric modeling technique that has been used in many areas.[92] Ocwen recognizes its general validity, acknowledging that "the econometric model he chose" has been "commonly used in the medical sciences" and has been employed to "successful use [ ] in other areas."[93] And Ocwen does not identify any case where this model was excluded as unreliable. But Ocwen asserts that Professor McFadden's model choice is unreliable in this case because it is not appropriate "in the mortgage-servicing context," since, according to Ocwen, "[m]ortgage finance scholars . . . do not use discrete proportional hazards models as

---

[89] *United States v. Frazier*, 387 F.3d 1244, 1261–1262 (11th Cir. 2004).

[90] *Id.*

[91] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1343, 1345 (11th Cir. 2003) (affirming district court's rejection of *Daubert* challenge that alleged methodological flaws because "the identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination"); *see also, e.g.*, *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988); *Mizrahi v. Yamaha Motor Corp., U.S.A.*, No. 17-cv-24484, 2019 WL 3318527, at *4 (S.D. Fla. July 19, 2019) (same).

[92] McFadden Surrebuttal ¶¶ 29–32 (identifying studies using discrete-time proportional-hazards models and similar models).

[93] Mot. at 12.

McFadden did."[94] Ocwen believes that Professor McFadden should have used a competing-risk proportional-hazards model instead.[95] These arguments are without merit.

Discrete-time proportional-hazards models have been applied in mortgage finance, including to estimate the probability of foreclosures caused by a certain event.[96] Ocwen's argument to the contrary ignores Professor McFadden's explanation of this in his surrebuttal report.[97] Ocwen argues that academic literature has not endorsed his model for "predicting the impact of *servicing errors* on probability of foreclosure."[98] But an exact match to the facts of the current case is not needed to find a method valid.[99]

Ocwen argues that Professor McFadden's opinions are unreliable because they are "estimates with no error rate."[100] Courts sometimes look to a method's error rate as *one factor* in assessing general reliability.[101] Because the reliability of proportional-hazards modeling is not credibly in dispute, Ocwen's argument about not having an error rate in this case is inapposite, especially because Professor McFadden validated his results with several robustness checks. Further, Ocwen does not present evidence of an error rate that would call into question the reliability of Professor McFadden's results.

Professor McFadden's choice to use a single-risk, discrete-time proportional-hazards model, as opposed to one with multiple competing risks, is well-founded.[102] Professor McFadden explained that there is no reason to believe that a competing-risk model is appropriate in this case.[103] Notably, Ocwen's expert did not specify or create an alternative model and so does not show that a competing-risk model would have been more reliable.[104] Despite not creating its own

---

[94] *Id.* at 12–13.
[95] *Id.* at 12–14 (citing Hamm Report ¶ 278).
[96] McFadden Surrebuttal ¶¶ 29–32 (identifying relevant studies, including one which studied the impact of foreclosures in neighborhoods on the probability of foreclosure of a borrower).
[97] *Id.*
[98] Mot. at 13 (emphasis added).
[99] *See, e.g.*, *Quiet Tech.*, 326 F.3d at 1343 (methodology was valid because it has "been used and applied in applications which are very analogous to the case we have before us").
[100] Mot. at 19.
[101] *See, e.g.*, *Quiet Tech.*, 326 F.3d at 1343.
[102] McFadden Report ¶¶ 87–88; McFadden Surrebuttal ¶ 32.
[103] McFadden Surrebuttal ¶ 32.
[104] *Id.* ¶ 32; Deposition of William G. Hamm, Ph.D ("Hamm Dep."), attached as Ex. 5, at 119:17–120:11.

model, Ocwen asserts that Professor McFadden's discrete-time proportional-hazards model is unreliable because the signs of some coefficients are "irrational."[105] This is not true: Professor McFadden explained why the coefficient signs make sense and are consistent with econometrics literature.[106] Among other reasons, Ocwen's borrowers are more financially vulnerable than average U.S. borrowers, and so "the usual principles of mortgage finance need not necessarily apply as we are not comparing these risky borrowers with a normal set of borrowers."[107]

### B. Professor McFadden reliably applied his Foreclosure-Initiation Model.

Professor McFadden—who Ocwen acknowledges is a "recognized expert in the field of econometrics"[108]—made well-founded choices in designing and carrying out his model.

Without any econometric analysis, Ocwen makes three critiques of Professor McFadden's implementation of his Foreclosure-Initiation Model. First, Ocwen contends that "[Professor] McFadden's chosen control group is invalid" because he "failed to control for whether a given loan was at risk of a delayed escrow account analysis, so 27% of the loans in the control group he used . . . did not even have escrow accounts."[109] But the model's "results do not depend on the control group loans having an escrow account."[110] Further, the method Ocwen (through Dr. Hamm) used to determine which borrowers have escrow accounts is itself flawed. Dr. Hamm ignored the Servicing Data on *escrow accounts* that Ocwen produced, and instead speculated about whether borrowers had escrow accounts by interpreting individual credits and debits in the Servicing Data.[111] Dr. Hamm provided no basis for his decision,[112] which is flawed because specific escrow data was available. And finally, even if one were to agree with this critique, removing the 27 percent of loans that Ocwen claims should be removed from the control group *increases* the damages estimate slightly[113]—a fact that Ocwen ignores.

Second, Ocwen attempts to exclude 50% of the Relevant Borrowers by arguing that

---

[105] Mot. at 14.
[106] McFadden Surrebuttal ¶¶ 69–72.
[107] *Id*. ¶ 71.
[108] Mot. at 12.
[109] *Id*. at 15 (citing Hamm Report ¶ 287).
[110] McFadden Surrebuttal at III.A.2.f.
[111] *Id*. ¶ 63, n.97.
[112] Hamm Report ¶¶ 287–289.
[113] McFadden Surrebuttal at ¶¶ 63–65.

borrowers with a pre-existing delinquency should be excluded from the model.[114] But Professor McFadden controlled for pre-existing delinquency in his model to isolate the impact of untimely analyses even for borrowers who had such delinquencies, and so there is no justification to exclude these borrowers who were harmed as a result of Ocwen's conduct.[115] Further, Dr. Hamm's determination of whether a borrower was delinquent is flawed because he ignored the Servicing Data that Ocwen used to document whether borrowers were delinquent and instead speculated as to their delinquency status by interpreting individual debits and credits.[116]

Third, Ocwen claims that Professor McFadden ignored supposed "actual causes of default," such as job loss, by failing to control for them.[117] But there are at least three reasons why these "omitted-variable" arguments are incorrect.[118] And Dr. Hamm did not perform any statistical analysis to show that any alternative cause or omitted variable would impact the model.[119] Omitted-variable arguments are generally not a basis to exclude a model, and especially so absent some substantiation.[120]

### C. Professor McFadden made reasonable choices regarding his sources and assumptions.

Professor McFadden made sound choices regarding what data to rely on and what assumptions to make when data was unavailable.

Ocwen takes issue with the data and assumptions used by Professor McFadden to determine the ratio of foreclosure initiations to completed foreclosures, arguing that he overestimates the number of completed foreclosures.[121] This criticism is not valid. As explained in the background section above, Professor McFadden identified from the Servicing Data the ratio of foreclosure initiations to completions for one group of Relevant Borrowers and then

---

[114] Mot. at 10 (citing Hamm Report ¶ 337).
[115] McFadden Surrebuttal ¶¶ 55–57.
[116] *Id.* ¶ 60.
[117] Mot. at 10 (citing Hamm Report ¶ 342).
[118] McFadden Surrebuttal ¶¶ 61–62, 66–68.
[119] Hamm Dep. at 138:17–139:2; 141:1–141:12; 142:15–143:3; 143:15–144:4; 144:20–145:8; 146:9–146:25; 147:18–149:2 (Dr. Hamm performed no analysis to determine the impact of supposed omitted variables); 186:8–188:24 (Dr. Hamm performed no analysis to determine the impact of his default-reason alternative-causation critique).
[120] *See, e.g.*, *Resco Prod., Inc. v. Bosai Minerals Grp.*, No. 06-cv-235, 2015 WL 5521768, at *6 (W.D. Pa. Sept. 18, 2015); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d at 1365.
[121] Mot. at 9 (citing Hamm Report ¶¶ 16–17, 332), 15 (citing Hamm Report ¶¶ 327–333).

extrapolated this ratio for another group based on the reasonable assumption that the ratio is the same for all Relevant Borrowers.[122] Dr. Hamm, on the other hand, ignored the part of the Servicing Data that Ocwen used to document when foreclosures were initiated and completed, instead speculating based on individual debits and credits in the Servicing Data to form his opinions.[123] Professor McFadden used relevant data and made reasonable assumptions and so his methodology for calculating foreclosure costs is reliable.

Ocwen also asserts that Professor McFadden "failed to conduct a consumer-by-consumer foreclosure damages calculation from the Ocwen data" and so made faulty assumptions.[124] But as described above, Ocwen's Servicing Data does not identify specific foreclosure costs.[125] That lack of data, of course, does not mean the borrowers did not incur those costs. Professor McFadden, therefore, used other reasonable sources to determine foreclosure costs, such as the Ocwen-commissioned report identifying foreclosure fees.[126] This method is not only reliable, but also conservative.[127] Indeed, because of the limitations in Ocwen's data, there were several foreclosure-related expenses that consumers incurred but that Professor McFadden could not quantify and does not include in his model.[128]

Ocwen also argues that 602 borrowers did not experience equity loss—one component of foreclosures costs—because, according to Dr. Hamm, the borrowers sold their homes and paid off their loans in time to prevent a foreclosure sale.[129] But Dr. Hamm relied on a flawed methodology—interpreting generic debits and credits—to speculate as to whether the foreclosure sales were prevented.[130] And even if these borrowers did sell their homes before their foreclosure sales, Professor McFadden explained why they still would have suffered equity loss,[131] including the very borrower highlighted by Dr. Hamm as support for his argument.[132]

---

[122] *See*, *supra*, nn. 32–36 and accompanying text.
[123] Hamm Report ¶¶ 329, 332, Table 10.
[124] Mot. at 15–16.
[125] *See* n. 77 *supra*.
[126] McFadden Report ¶¶ 118–119; McFadden Surrebuttal ¶ 87.
[127] *Id.* ¶¶ 118, 121.
[128] *Id.* ¶ 118; McFadden Surrebuttal ¶¶ 90–91.
[129] Mot. at 15 (citing Hamm Report ¶ 377).
[130] *See* Hamm Report ¶¶ 331–332, Table 10, ¶ 377.
[131] McFadden Surrebuttal ¶¶ 77–85.
[132] *Id.* ¶ 85.

Ocwen takes issue with two other foreclosure-cost sources, as well. First, Ocwen questions Professor McFadden's use of a blog post on Zillow.com for an estimate of relocation costs—not by arguing that moving costs are inappropriately included in foreclosure costs or the cost estimate is inaccurate—but rather by attacking the credibility of the post's author.[133] As Professor McFadden explained at his deposition, there is no reason to think that the moving-cost estimate is inaccurate or biased.[134] Second, Ocwen questions a study relied on by Professor McFadden for an upper estimate of foreclosure costs (the Moreno Report), suggesting, without evidence, that its authors were biased or had an incentive to overestimate equity losses from foreclosures.[135] The Moreno Report is well-cited in mortgage-finance literature, several government policy reports have relied on it, and it provides a conservative estimate of foreclosure costs because it does not account for long-term financial loss from foreclosure.[136] Professor McFadden's reliance on it was reasonable and appropriate.

Ocwen also argues that Professor McFadden "had *no knowledge whatsoever* about the basis" for relocation costs and foreclosure costs, even alleging that Professor McFadden signed his report "falsely."[137] This allegation is baseless. As is customary, Professor McFadden's staff, working at his direction, assisted him with his report.[138] But Professor McFadden understood and drew his own conclusions about the sources that he ultimately relied on.[139]

### D. Professor McFadden's Opportunity-Cost Model is reliable.

Professor McFadden's Opportunity-Cost Model is also reliable. Ocwen's own expert acknowledges the general validity of calculating opportunity costs.[140] Ocwen's attacks on how the methodology was applied in this case are not valid.

First, Ocwen asserts that Professor McFadden ignored evidence that "85% of the

---

[133] Mot. at 17.
[134] Deposition of Daniel McFadden ("McFadden Dep.") at 186:20–189:17, attached as Ex. 6.
[135] Mot. at 18.
[136] McFadden Surrebuttal at ¶ 81, n.117.
[137] Mot. at 19 (citing McFadden Dep. at 65:5–66:4; 181:13–182:23) (emphasis in original).
[138] McFadden Report ¶ 5. Ocwen's expert was also assisted by staff. Hamm Rebuttal ¶ 4.
[139] *See* McFadden Dep. at Tr. 65:5–66:4 (Professor McFadden concluded that the Moreno report indicates the costs of foreclosure "by my own review of the paper"); *id*. at 181:13–182:23 (explaining that he "understood the source from which" relocation cost was drawn and concluded that the cost was plausible and reasonable).
[140] Hamm Report ¶ 152.

consumers McFadden assumed were overcharged . . . were actually undercharged."[141] Ocwen's argument is based on a misconception that borrowers with shortages were not overcharged due to untimely analyses. Each borrower for whom Professor McFadden calculated opportunity-cost damages was overcharged as a result of an untimely analysis, including borrowers with shortages in their escrow accounts.[142] Because they were overcharged, Professor McFadden's calculation of opportunity-cost damages for them was valid.

Ocwen also cites its expert to argue that Professor McFadden's PMI- and ARM-opportunity-cost models make assumptions about data that was purportedly in the Servicing Data.[143] With respect to the PMI-opportunity-cost model, Professor McFadden made a minor adjustment to his model that addresses Dr. Hamm's critique.[144] With respect to the ARM model, Professor McFadden used Servicing Data that was available and made reasonable inferences that were necessary because of Ocwen's data limitations.[145] Ocwen has not shown what impact, if any, its criticism has on Professor McFadden's results.

Ocwen also questions Professor McFadden's assumption that borrowers would have paid down credit-card debt if they had not overpaid Ocwen.[146] Professor McFadden has presented evidence showing that using credit-card interest rates to calculate opportunity costs is not only appropriate (since studies show that many borrowers use credit cards to cover unanticipated expenses and carry balances from month-to-month and Ocwen's specific borrower population is more financially vulnerable than average Americans), but also conservative (since economic studies have estimated discount rates *higher* than credit-card rates).[147]

### E. Any alleged flaws go to the weight of Professor McFadden's testimony, not admissibility.

When a method is scientifically valid in general, alleged flaws speak to weight rather

---

[141] Mot. at 11. Ocwen later makes the same argument, relying on its expert. *Id* at 16 (citing Hamm Report ¶¶ 177–178).
[142] McFadden Surrebuttal ¶¶ 18–22.
[143] Mot. at 11 (citing Hamm Report ¶¶ 236–239).
[144] McFadden Surrebuttal ¶ 26, App'x C.
[145] McFadden Report ¶¶ 71–77.
[146] Mot. at 16–17 (citing Hamm Report ¶¶ 153–157, 177–178).
[147] McFadden Surrebuttal at ¶¶ 9–16, 43–48.

than admissibility.[148] Because Professor McFadden's models are scientifically valid ways to calculate damages, Ocwen's criticisms (even if credited) are not a basis to exclude his testimony.[149] This principle—ignored by Ocwen in its motion—applies to each of Ocwen's criticisms: that an expert relied on flawed sources,[150] omitted variables,[151] or made faulty assumptions,[152] or that coefficient signs were unexpected.[153] Applying this principle, courts routinely reject challenges like Ocwen's to an expert's methodological choices when the expert used a generally valid method, like Professor McFadden.[154] This Court should too.

## CONCLUSION

For the above reasons, Ocwen's motion to exclude the testimony of Professor Daniel McFadden should be denied.

---

[148] *Quiet Tech.*, 326 F.3d at 1343.

[149] *Id.*

[150] *See, e.g.*, *Advanced Bodycare Sols.*, 615 F.3d at 1363–64 (arguments about expert's underlying data "went not to admissibility but to 'the weight to be attributed to [his] testimony'"); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration.") (emphasis in original).

[151] *See, e.g.*, *Bazemore*, 478 U.S. at 400 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.") (internal citation omitted); *Quiet Tech.*, 326 F.3d at 1346.

[152] *See, e.g.*, *Frasca v. NCL (Bah.), Ltd.*, 654 Fed.App'x. 949, 953 n.2 (11th Cir. 2016) ("incorrect assumptions . . . attack the weight and the persuasiveness of the expert's testimony, not its admissibility"); *Maiz v. Virani*, 253 F.3d 641, 666–67 (11th Cir. 2001); *Baez v. Wal-Mart Stores E., LP*, No. 10-cv-62344, 2012 WL 13005547, at *4 (S.D. Fla. May 14, 2012).

[153] *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, No. 10-cv-0318, 2013 WL 1855980, at *17 (D. Md. May 1, 2013).

[154] *See, e.g.*, *Quiet Tech.*, 326 F.3d at 1345; *Diamond Resorts Int'l, Inc. v. Aaronson*, No. 17-cv-1394, 2019 WL 8301669, at *3 (M.D. Fla. Feb. 5, 2019); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 385 (M.D. Fla. 2018); *In re Denture Cream Prod. Liab.*, No. 09-cv-2051, 2015 WL 392021, at *18 (S.D. Fla. Jan. 28, 2015); *Baez*, 2012 WL 13005547, at *4; *Catalina Rental Apartments, Inc. v. Pac. Ins. Co.*, 06-cv-20532, 2007 WL 1970808, at *5 (S.D. Fla. July 3, 2007).

Date: June 26, 2020                          Respectfully submitted,

                                             Attorneys for Plaintiff,
                                             CONSUMER FINANCIAL PROTECTION BUREAU

                                             JOHN C. WELLS
                                             Deputy Enforcement Director

                                             JAMES T. SUGARMAN
                                             Assistant Litigation Deputy

                                             /s/ Atur Desai
                                             Atur Desai
                                             Phone: 202-435-7978
                                             E-mail: atur.desai@cfpb.gov

                                             Michael Posner          michael.posner@cfpb.gov
                                             Jean Healey             jean.healeydippold@cfpb.gov
                                             Shirley Chiu            shirley.chiu@cfpb.gov
                                             Tianna Baez             tianna.baez@cfpb.gov
                                             Stephanie Brenowitz     stephanie.brenowitz@cfpb.gov
                                             Erin Mary Kelly         erin.kelly@cfpb.gov
                                             Greg Nodler             greg.nodler@cfpb.gov
                                             Amanda Roberson         amanda.roberson@cfpb.gov
                                             James Savage            james.savage@cfpb.gov
                                             Doug Wilson             doug.wilson@cfpb.gov

                                             1700 G Street NW
                                             Washington, DC 20552
                                             Facsimile: (202) 435-7722

                                             Respectfully Submitted,

                                             Office of the Attorney General
                                             The State of Florida
                                             Department of Legal Affairs
                                             Ashley Moody
                                             Attorney General

                                             /s/ Jennifer Hayes Pinder
                                             Jennifer Hayes Pinder
                                             Senior Assistant Attorney General
                                             Fla. Bar No.: 17325
                                             Email: Jennifer.Pinder@myfloridalegal.com

                                             Sasha Funk Granai

Assistant Chief-Assistant Attorney General
Fla. Bar No.: 96648
Email: Sasha.Granai@myfloridalegal.com

Victoria Butler
Director, Consumer Protection Division
Fla. Bar No.: 861250
Email: Victoria.Butler@myfloridalegal.com
3507 East Frontage Road, Suite 325 Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515

Respectfully Submitted,

Office of Financial Regulations
The State of Florida
Division of Consumer Finance

/s/ Joaquin Alvarez
Joaquin Alvarez
Assistant General Counsel
Fla. Bar No.: 113647
Email: Joaquin.Alvarez@flofr.com
The Fletcher Building
200 East Gaines Street
Tallahassee, FL 32399
Telephone: 850-410-9554
Facsimile: 850-410-9914

Scott R. Fransen
Assistant General Counsel
Fla. Bar No.: 0994571
Email: Scott.Fransen@flofr.com
1313 N. Tampa St., Suite 615
Tampa, FL 33602
Telephone: 813-218-5364
Facsimile: 813-272-3752

Miriam S. Wilkinson
Chief Counsel
Fla. Bar No.: 972101
Email: Miriam.Wilkinson@flofr.com

Anthony Cammarata
General Counsel
Fla. Bar No.: 767492

Email: Anthony.Cammarata@flofr.com
The Fletcher Building
200 E. Gaines Street
Tallahassee, FL 32399-0370
Telephone: 850-410-9601