# Exhibit 1 (redacted)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN

CONSUMER FINANCIAL PROTECTION
BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION,
OCWEN MORTGAGE SERVICING, INC.,
and OCWEN LOAN SERVICING, LLC,

Defendants.

### CASE NO. 9:17-CV-80496-MARRA-MATTHEWMAN

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA,
Department of Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION, *et
al.*,

Defendants.

**SECOND AMENDED EXPERT REPORT**

**OF**

**PROFESSOR DANIEL MCFADDEN**


**ON BEHALF OF**

**CONSUMER FINANCIAL PROTECTION BUREAU**


September 19, 2019

## TABLE OF CONTENTS

I.      Introduction and Summary ...................................................................1

   A.      Qualifications ..............................................................................1

   B.      Assignment ................................................................................2

   C.      Summary of Opinions .................................................................2

II.     Background on Mortgage Servicing and Ocwen ........................................5

III.    Ocwen's Servicing Failures Resulted in Borrower Harm............................6

   A.      Late Escrow Analyses .................................................................9

   B.      PMI Overcharges.......................................................................11

   C.      ARM Servicing Failures.............................................................11

   D.      Other Servicing Failures............................................................11

IV.     Overview of the Damages Framework ...................................................12

   A.      Economic Background on Opportunity Costs and Payment Shocks ................12

   B.      Background on Overcharges and Undercharges ..................................14

V.      Opportunity Costs from Overpayments ...................................................17

   A.      Opportunity Costs for the Late Escrow Analysis Population ...........................21

   B.      Opportunity Costs to the PMI Overcharges Population....................................32

   C.      Opportunity Costs to the ARM Servicing Errors Population.............................35

   D.      Summary of Opportunity Costs Across the Harmed Populations......................38

VI.     Damages from Additional Foreclosures ...................................................38

   A.      My Econometric Model Estimates the Number of Additional Foreclosures From Ocwen's Servicing Failures ...........................................................43

   B.      Estimated Cost Per Foreclosure to Borrowers Harmed By Ocwen's Servicing Failures.................................................................................53

   C.      Summary of Damages from Additional Foreclosures........................................61

   D.      Costs Not Quantified to the Borrower and Community....................................62

VII.    Conclusion ...........................................................................................68

Privileged and Confidential

## I.   INTRODUCTION AND SUMMARY

### A.   QUALIFICATIONS

1.   My name is Daniel McFadden. I am the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and also the Presidential Professor of Health Economics at the University of Southern California. Previously, I was the James R. Killian Professor of Economics at MIT. I received my Ph.D. in Economics from the University of Minnesota in 1962. I am also a principal of the Brattle Group ("Brattle"), an economics and financial consulting firm.

2.   I have received numerous fellowships and honors over my career. In 2000, I was awarded the Nobel Memorial Prize in Economics for showing "how to statistically handle fundamental aspects of microdata, namely data on the most important decisions we make in life: the choice of education, occupation, place of residence, marital status, number of children, so called discrete choices."[1] In 1975, I was awarded the John Bates Clark Medal by the American Economic Association, given to the economist under 40 who has made the most significant contribution to economics.

3.   I have served as the Chair of the National Academy of Science section on Economic Sciences and am on the Advisory Committee for the Journal of Applied Econometrics. I have previously served as an editor of several other peer-reviewed academic journals, and am past-president of the American Economic Association the Econometric Society, and the Western Economics Association International.

4.   Over the course of my career, I have published more than one hundred peer-reviewed articles and have written or edited several academic books and monographs on economic modelling. My curriculum vitae, which provides a more detailed summary of my qualifications, including a list of my publications and a list of my previous expert testimony within the last four years, is attached as Appendix A. Appendix B lists the materials that I considered to form my opinion. I reserve the

---

[1]   "Daniel L. McFadden – Facts," The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2000," https://old.nobelprize.org/nobel_prizes/economic-sciences/laureates/2000/mcfadden-facts.html (last viewed on August 5, 2019).

right to revise my analysis and conclusions should additional information become available prior to trial.

5.  Brattle charges $1,100 per hour for my services. Several Brattle colleagues have helped me in preparing the analyses I used to establish my conclusions in this matter. Brattle charges between $295 and $625 per hour for these staff members. Our compensation is not contingent on my findings or on the result of this proceeding.

### B. ASSIGNMENT

6.  I have been asked by the Consumer Financial Protection Bureau ("CFPB") to calculate damages attributable to mortgage servicing failures by Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC (collectively, "Ocwen").

### C. SUMMARY OF OPINIONS

7.  I have estimated damages for a subset of borrowers impacted by Ocwen's mortgage servicing failures between January 1, 2014 and August 6, 2018. My understanding of the legal and contractual obligations that Ocwen had in their loan servicing business, the types of failures that occurred in Ocwen's servicing of its portfolio of loans, and the nature of the consequences of these failures for borrowers, is based on the CFPB Complaint,[2] Expert Report of John Searson,[3] and instructions of counsel; I have engaged in no independent study of these issues and offer no opinions on them. I have been asked by counsel to quantify the economic losses to borrowers from these Ocwen loan servicing failures. My analysis is limited to

---

[2]   Complaint, Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC, Case No. 9:17-CV-80495, April 20, 2017 ("CFPB Complaint").

[3]   Expert Report of John Searson, Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC, Case No. 9:17-CV-80495, August 15, 2019 ("Searson Report").

[4]   The damages analyses require information about the dates when the servicing failure began and ended, the amount that the borrower overpaid or underpaid because of the servicing failure, and the timing and amount by which Ocwen may have compensated the borrower for the overpayment. For the three populations listed in ¶ 7, Ocwen either provided this information as a result of their analysis or I am able to make reasonable assumptions to infer the relevant information. I discuss my assumptions in more detail in section V.

Privileged and Confidential

servicing failures for which I have sufficient data to conduct a rigorous analysis.[4] The servicing failures that I am able to study include:

  a. **Late Escrow Analyses:** Escrow analyses performed on borrowers'[5] accounts more than 395 days after the prior escrow analysis;

  b. **PMI Overcharges:** Private mortgage insurance ("PMI") policies that were not cancelled after the borrower's principal balance dropped to about 80 percent of the original property value; and

  c. **ARM Servicing Failures:** Adjustable rate mortgages ("ARMs") for which Ocwen charged borrowers based on the wrong principal and/or interest payment.

8. Overall, I understand from Ocwen's Reponses to Interrogatories and the Bureau's Requests for Production that Ocwen's servicing failures affected numerous borrowers. For example, among the types of servicing failures for which I am able to estimate damages (Late Escrow Analyses, PMI Overcharges, and ARM Servicing Failures), Ocwen's servicing failures impacted approximately 400,000 borrowers.[6]

9. Ocwen's servicing failures led to at least two forms of damages to borrowers that I am able to measure: (1) forgone interest on overpayments that borrowers made in response to Ocwen's overcharges, and (2) costs from additional foreclosures that resulted from Ocwen's Late Escrow Analyses. In addition, there are other forms of damages, discussed later, that I am unable to quantify, either because the data from Ocwen that I can analyze are incomplete, or analysis would require unsupported

---

[4]   The damages analyses require information about the dates when the servicing failure began and ended, the amount that the borrower overpaid or underpaid because of the servicing failure, and the timing and amount by which Ocwen may have compensated the borrower for the overpayment. For the three populations listed in ¶ 7, Ocwen either provided this information as a result of their analysis or I am able to make reasonable assumptions to infer the relevant information. I discuss my assumptions in more detail in section V.

[5]   Throughout this report I use the term "borrower(s) to refer to those individuals associated with loans that Ocwen services except in sections reviewing the literature in which borrowers refers to borrowers generally and not necessarily Ocwen borrowers.

[6]   See Table 1 below.

[6]   See Table 1 below.

Privileged and Confidential

assumptions, or both. If, further data become available in the future, I may be able to quantify some of these additional damages.

10. Damages from forgone interest on overpayments sum to $1.4 million for Late Escrow Analyses, $0.3 million for PMI Overcharges, and $0.3 for ARM Servicing Failures.[7] Where there are data deficiencies, I have made conservative assumptions to make these calculations. Damages could be higher if new information—such as dates when ARM Servicing Failures began for a substantial fraction of affected borrowers—becomes available that would revise my assumptions. Moreover, using Ocwen's data produced in response to CFPB's Requests for Production and Ocwen's approach to identifying late analyses, I have found an additional 34,006 late escrow analyses that were omitted from Ocwen's Interrogatory response (though I did not quantify damages for borrowers associated with these additional untimely analyses).[8]

11. Damages for the costs to borrowers of additional foreclosures range from $352 million to $484 million depending on the estimate of cost per foreclosure applied from the literature and Ocwen's production.[9] My econometric model predicts that Late Escrow Analyses increased borrowers' probability of foreclosure by 6.1 percent, or 16,636 additional foreclosures between January 1, 2014 and August 6, 2018.[10]

12. The damages estimates are conservative for three reasons in addition to the data limitations noted above in ¶ 10. First, I understand from counsel that there are additional types of servicing failures that may have impacted hundreds of thousands of borrowers. In my report, I present counts of these other types of failures but do

---

[7]   In my summary of opinions, I report the results based on the damages estimate around the midpoint of a range that I think is appropriate. I present the ranges in section V.

[8]   I identify late escrow analyses based on prior escrow analysis dates, as opposed to first payment dates associated with those prior analyses. In my review of Ocwen's approach, I found that Ocwen sometimes used prior escrow analysis dates and, on other occasions, used prior first payment dates. See Appendix C for details on my methodology to identify additional late escrow analyses.

[9]   My damages estimates based on additional foreclosure initiations would be conservative if Ocwen's servicing failures also led to other additional adverse events, such as deed in lieu and short sales, where the borrower lost title to his or her home through an alternate route to foreclosure.

[10]   6.1 percent is the weighted average cumulative probability of additional foreclosures between borrowers who were overcharged (6.73 percent) and borrowers who were undercharged (5.07 percent).

Privileged and Confidential

not have sufficient data on dates and/or amounts to calculate damages. Second, my damages calculations do not include social costs such as reduced neighborhood property values and local tax revenue. Third, my estimate of damages does not include damages to borrowers that are difficult to quantify in dollars, ranging from increased uncertainty that would impede borrowers' ability to manage their finances to loss of a stable living environment and increased emergency room visits.

## II.     BACKGROUND ON MORTGAGE SERVICING AND OCWEN

13. Ocwen is a mortgage servicer.[11] Mortgage servicers are responsible for, among other things, collecting mortgage payments, paying taxes and insurance on time for borrowers with escrow accounts, sometimes modifying loans when borrowers struggle to make payments, and carrying out the foreclosure process.[12]

14. Ocwen, founded in 1988,[13] grew to become one of the nation's largest non-bank mortgage servicers. At its founding, however, Ocwen was a relatively small servicer. However, beginning in 2010, it expanded rapidly, mainly by acquiring portfolios of mortgage servicing rights ("MSRs") from other mortgage servicers. Between May 2010 and December 2013, Ocwen made eleven acquisitions.[14] Through these acquisitions, Ocwen increased the number of loans that it serviced from 351,595 loans (with an aggregate unpaid principal balance of $50 billion) to 2,861,918 loans (with an aggregate unpaid principal balance of $464.7 billion) in 2013.[15] As shown in Figure 1, the number of loans serviced has fallen since then, but remains in excess of 1.5 million.

---

[11]   Searson Report, p. 4.

[12]   Ocwen Financial Corporation, 2018 Form 10-K Annual Report, p. 4 ("We are a financial services company that services and originates loans.").

[13]   "Our Company," Ocwen, http://www.ocwen.com/our-company (last viewed on August 12, 2019).

[14]   Searson Report, p. 5.

[15]   Ocwen Financial Corporation Form 10-K 2013, pp. 3-4.

Privileged and Confidential

**Figure 1: Number of Loans Serviced By Ocwen, 2009-2018**



Sources: Ocwen Financial Corporation Form 10-K 2009-2019.

15. In the time period following this rapid expansion, Ocwen failed to meet numerous industry best practices and, as a result, subjected borrowers to increased risk of servicing errors.[16]

## III.     OCWEN'S SERVICING FAILURES RESULTED IN BORROWER HARM

16. Ocwen's servicing failures are defined as instances in which the CFPB alleged that Ocwen has not met its legal requirements. These legal requirements include those set forth in the CFPB's complaint, including violations of the Consumer Financial Protection Act ("CFPA"), the Truth in Lending Act ("TILA"), the Fair Debt Collection Practices Act ("FDCPA") the Real Estate Settlement Procedures Act ("RESPA"), and the Homeowners Protection Act ("HPA") (collectively "Federal consumer financial protection laws").[17] Moreover, following these servicing failures, Ocwen either did not take appropriate actions to fully remediate borrowers or did not remediate in a timely manner.

17. Counsel has instructed me to assume liability- that is, that Ocwen's conduct violated the law -- and I estimate damages for the three specific types of servicing failures with sufficient data, as stated above in ¶ 7. The borrowers impacted by these three servicing failures were specifically identified by Ocwen in the following sources:

---

[16]    Searson Report, Sections VI and VII.

[17]    CFPB Complaint ¶¶ 221–318.

Privileged and Confidential

    a. For Late Escrow Analyses, Ocwen's Verified Interrogatory Responses 1-4;[18]

    b. For PMI Overcharges, Ocwen's response to Request for Production 9-10 from the Bureau's Second Set of Requests for Production; and

    c. For ARM Servicing Failures, the deposition testimony of Tom Arnett[19] and Ocwen's response to Request for Production 48 from the Bureau's Fourth Set of Requests for Production.

18. Since the date I filed my report, the Court issued an order on Ocwen's Motion to Dismiss. I understand that Judge Marra dismissed certain of the Bureau's counts without prejudice and gave the Bureau permission to amend its Complaint.[20] Judge Marra's order does not change my opinions in this case. Specifically, I quantified damages assuming liability as follows:

    a. As requested by counsel, in calculating opportunity costs for the late escrow analysis population I assumed Ocwen is liable for: (1) unfair acts in violation of the CFPA[21] through Ocwen's use of inaccurate and incomplete information to service loans; *and/or* (2) violations of Regulation X and RESPA[22] through Ocwen's failure to perform timely escrow analyses;

    b. As requested by counsel, in calculating opportunity costs to the PMI overcharge population I assumed Ocwen is liable for: (1) unfair acts in violation of the CFPA[23] through Ocwen's use of inaccurate and

---

[18] Defendants' Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, May 28, 2019 ("Rogs 1-13").

[19] Deposition Testimony of Tom Arnett, May 22, 2019 ("Arnett Deposition") 29:3-40:4.

[20] Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp., No. 9:17-cv-80495-KAM (S.D. Fla. Sept. 5, 2019) (order granting in part and denying in part Ocwens' motion to dismiss). To date, the CFPB has not amended its complaint, although I understand that they have until September 27, 2019 to do so.

[21] 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B).

[22] 12 U.S.C. §§ 2605(g), 12 C.F.R. §§ 1024.17(c)(3) and (f)(1), and 12 U.S.C. § 5536(a)(1)(A).

[23] 12 U.S.C. §§ 5531(a) and (c) and, 5536(a)(1)(B).

Privileged and Confidential

incomplete information to service loans; *and/or* (2) violations of the HPA[24] through Ocwen's failure to terminate PMI.

   c.  As requested by counsel, in calculating opportunity costs to the ARM servicing errors population I assumed Ocwen is liable for: (1) unfair acts in violation of the CFPA[25] through Ocwen's use of inaccurate and incomplete information to service loans; and

   d.  As requested by counsel, in calculating damages from additional foreclosures for the late escrow analysis population I assumed Ocwen is liable for: (1) unfair acts in violation of the CFPA[26] through Ocwen's use of inaccurate and incomplete information to service loans); *and/or* (2) Regulation X and RESPA[27] Ocwen's failure to perform timely escrow analyses.

19. My opinions regarding the damages ascribed to the above violations do not change based on Judge Marra's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss.

20. Table 1 presents the total number of failures, and the number of borrowers, associated with each of the above categories. For Late Escrow Analyses, Ocwen provided interrogatory responses where it identified a population of borrowers for whom Ocwen "did not complete an Escrow Account Analysis within thirty days of the completion of the applicable Escrow Account Computation Year."[28] Ocwen's response also contains its analysis of (i) dates when the servicing failure began and ended, (ii) the amount that borrowers overpaid or underpaid, and (iii) if applicable, the amount that Ocwen remediated.[29] For the other two servicing failures, Ocwen did not provide similar datasets with as robust a set of information. As a consequence, and as I will describe in more detail in section V, for these other

---

[24]  12 U.S.C. § 4902(b) and 12 U.S.C. § 5536(a)(1)(A).

[25]  12 U.S.C. §§ 5531(a) and (c) and, 5536(a)(1)(B).

[26]  12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B).

[27]  12 U.S.C. §§ 2605(g), 12 C.F.R. §§ 1024.17(c)(3) and (f)(1) and 12 U.S.C. § 5536(a)(1)(A).

[28]  Rogs 1-13 at p. 9.

[29]  However, Ocwen's interrogatory responses did not necessarily contain all late escrow analyses, and some loans were still missing dates or over- and underpayment amounts.

Privileged and Confidential

categories it was necessary to combine information from multiple data tables in Ocwen's production, and where gaps and inconsistencies remained, make conservative assumptions in order to calculate damages.

21. In column [B] of Table 1 below, I summarize the number of failures identified by Ocwen. For the Late Escrow Analyses population, I identified an additional 34,006 late escrow analyses based on data from Ocwen's response to Requests 19 and 24 from the Bureau's Fifth Set of Requests for Production and their approach to flagging late escrow analyses; details of my analysis are included in Appendix C. I did not estimate damages for these loans, but if I were provided additional information such as the loans' disbursements for at least one year prior to the missed escrow analysis and escrow account balance over time, I would be able to do so.

**Table 1: Number of Servicing Failures Identified by Ocwen and Possible Number of Additional Failures for Types of Servicing Failures That Are Included in Damages**

| Servicing Failure [A] | Number of Failures Identified by Ocwen [B] |
|---|---|
| [1]  Late Escrow Analyses | 391,603 |
| [2]  PMI Overcharges | 7,856 |
| [3]  ARM Servicing Errors | 2,176 |
| **[4]  Total** | **401,635** |

Sources:

[1][B]: Rogs 1-4, Exhibit C.

[2][B]: OCW-CFPB-001-06730240.

[3][B]: OCW-CFPB-001-06048934; OCW-CFPB-001-06048935. Ocwen's Response to Requests 19 and 22 from the Bureau's Fifth Set of Requests and Arnett Deposition 29:3-40:4. See Appendix D for details.

### A.  LATE ESCROW ANALYSES

22. Among the three types of servicing failures in Table 1, the Late Escrow Analyses population represents the largest number of failures at 391,603. This population represents those borrowers for whom Ocwen identified that it failed to complete an annual escrow analysis "within thirty days of the completion of the applicable

Privileged and Confidential

Escrow Account Computation Year."[30] Not completing a timely escrow analysis can cause harm to a borrower. Specifically, by delaying the annual escrow analysis, Ocwen would not have updated the escrow payment amount that it was charging the borrower to reflect, for example, changes in tax and insurance information. Therefore, the borrower may have been paying more or less than the escrow amount actually required had Ocwen performed the analysis on time, through the date when Ocwen actually performed the belated analysis. Of the total approximately 391,000 untimely escrow analyses, more than 43,000 late analyses affected borrowers in bankruptcy in which Ocwen not only failed to conduct an escrow analysis on time but also failed to provide a Bankruptcy Notice of payment changes.[31]

23. Ocwen's count of late escrow analyses in Table 1 excludes the 34,006 potential late escrow analyses identified in Appendix C. In addition, Ocwen's responses on late escrow analyses also likely substantially understates for how long the escrow analyses were delayed.[32] Ocwen made use of certain assumptions that shorten the reported length of time when the borrower's escrow analysis was delayed reducing damages.

24. For example, in some instances, when Ocwen on-boards[33] (*i.e.,* begins servicing) a loan that originated at an earlier date, it assumes that the time lapse between Ocwen's first escrow analysis for this loan and the loan's previous escrow analysis equals the time since on-boarding. This assumption by Ocwen undercounts the number of days the error was in place because the prior escrow analysis may have been performed well before the on-boarding date. Generally speaking, shortening the number of days an escrow analysis is late reduces the total damages, that is, it is an assumption made in Ocwen's favor.

---

[30]   Rogs 1-13 at p. 9.

[31]   Rogs 1-4, Exhibit D.

[32]   Although Ocwen is likely to have understated the duration of the period of harm, I use their responses in Exhibit C of Ocwen's Interrogatory Responses 1-4 ("Rogs 1-4") as reported.

[33]   Deposition Transcript of Andrew Combs, May 29, 2019, 68:21-69:3; Daniel K Reeve, September 19, 2016 (3:23 PM), "RE: Last Escrow Analysis 09/02/2016 and 09/07/2016," OCW-CFPB-001-05819247.

Privileged and Confidential

### B. PMI OVERCHARGES

25. As shown in row 2 of Table 1, the PMI Overcharges population includes at least 7,856 failures. Mortgage insurance, also known as PMI, is insurance that borrowers are required to hold when their principal balance exceeds a threshold percentage of the purchase price of their home. For the PMI Overcharges population, Ocwen failed to cancel their PMI when their loans achieved the status where PMI was no longer required, resulting in the over collection of insurance premiums. In Ocwen's Management Assertion of Issue Remediation form, the Mortgage Insurance Department attributed the "root cause" of PMI Overcharges to "[u]nreliable or missing data for mortgage insurance cancellations in REALServicing®" and was "in the process of identifying the root cause for unreliable data in REALServicing®."[34] "Internal testing" showed that dates were "missing or inaccurate in approximately 90 percent of test cases."[35]

### C. ARM SERVICING FAILURES

26. The third category of servicing failures in Table 1 is the ARMs Servicing Failures population with at least 2,176 failures. These loans specify periodic adjustments to required payments in response to market interest rates. Servicing failures occurred when Ocwen made untimely adjustments or incorrectly calculated the required payments. These servicing failures are identified in Ocwen's records for these loans by a combination of certain comment codes.[36] I identified ARM servicing failures by reviewing borrowers with these comment codes and through Ocwen response to Request 48 from the Bureau's Fourth Set of Requests for Productions.[37]

### D. OTHER SERVICING FAILURES

27. In addition to the populations in Table 1 for which I calculated damages, Ocwen internal documents identify additional populations of borrowers who appear to have experienced numerous other servicing failures. Table 2 below highlights examples

---

[34]   OCW-030-0024009.

[35]   OCW-030-0024021 at 22.

[36]   Arnett Deposition 29:3-40:4.

[37]   OCW-CFPB-001-06048934; OCW-CFPB-001-06048935.

of these types of failures and the number of loans potentially impacted by these failures.

**Table 2: Number of Select Servicing Failures Identified by Ocwen that are Not Accounted for in the Damages Analysis**

| | Servicing Failure [A] | Number of Failures Identified by Ocwen [B] |
|---|---|---|
| [1] | Loan Verification Errors | 628,152 |
| [2] | Failure to Send Annual Escrow Statements | 147,589 |
| [3] | Inaccurate Reinstatement Quotes | 82,763 |
| [4] | Escrow Shortage Errors | 36,054 |
| [5] | Interest Only Errors | 4,216 |
| **[6]** | **Total** | **898,774** |

Sources:

[1] OCW-CFPB-001-00083874; OCW-CFPB-001-00083901. The number in the table reflects the number of unique loans.

[2] OCW-CFPB-001-01294664.

[3] Rogs 5–8, Exhibit I.

[4] Rog 12, Exhibit H.

[5] OCW-024-0103993; OCW-024-0104007.

[6]: = [1] + [2] + [3] + [4] + [5]

## IV.    OVERVIEW OF THE DAMAGES FRAMEWORK

### A.    ECONOMIC BACKGROUND ON OPPORTUNITY COSTS AND PAYMENT SHOCKS

28. Two concepts that are important to understanding the harm that flows from Ocwen's servicing errors are "opportunity cost" and "payment shock." Both concepts are well established in economics. Applied in the context of mortgage servicing and the Ocwen litigation, these concepts generally relate to overcharging and undercharging borrowers. That is, changing the payment flow[38] between the borrower and Ocwen can lead to opportunity costs and additional adverse credit events—such as mortgage default—through payment shocks. I explain both concepts more fully below.

---

[38]   "Payment flow" refers to the periodic or lump sum payment over time from the borrower to Ocwen, and vice versa, such as a monthly escrow payment or surplus check.[39]   Susan L. Ettner, "The Opportunity Costs of Elder Care," *Jounral of Human Resources*, 1996, 31(1): 189-205.

Privileged and Confidential

29. Economists typically define "opportunity costs" as the value of the best alternative(s) that are not chosen. The concept is ubiquitous in the field of economics. As examples, labor economists have studied the "opportunity cost" of caregiving over working in the formal labor market[39] while health economists have evaluated the trade-off between investing in one medical intervention over another treatment option.[40]

30. A payment shock is a "sudden … change in payment obligations that a consumer cannot control,"[41] such as an increase in interest rates after the expiration of a "teaser rate" for an adjustable rate mortgage (ARM). Particularly after the economic recession, researchers have studied the impact of payment shocks arising from changes in the interest rate for ARMs or balloon payments at the end of the draw period for home equity lines of credit (HELOCs) on credit outcomes. Studies have generally shown found that shocks lead to higher default rates, although the magnitude of the effect can vary along dimensions such as the loan's performance history.

31. deRitis, Kuo, and Liang (2010) analyzed the effect of payment shocks from interest rate resets for ARMs caused by either the expiration of the teaser rate or by an increase in the index rate to which the interest rate is pegged.[42] Focusing on subprime hybrid ARMs from 1998-2008, the authors found that both sources of payment shocks increased the probability that the borrower transitioned to a higher level of delinquency; the effect was larger for shocks driven by teaser rates and for borrowers who had been current on payments prior to the shock. Di Maggio et al. (2017) found that ARM interest resets that reduced mortgage payments led to increases in auto purchases and repayment of household debt.[43]

---

[39] Susan L. Ettner, "The Opportunity Costs of Elder Care," *Jounral of Human Resources*, 1996, 31(1): 189-205.

[40] Louise B. Russell, "Opportunity Costs in Modern Medicine," *Health Affairs*, 1992, 11(2):162-169.

[41] Nidhi Verma, "A deeper understanding of payment shock dynamics," *Journal of Risk Management in Financial Institutions*, 2017, 10(3): 276.

[42] Cristian deRitis, Chionglong Kuo, and Yongping Liang, "Payment shock and mortgage performance," *Journal of Housing Economics*, 2010, 19: 295-314.

[43] Marco Di Maggio, Amir Kermani, Benjamin J. Keys, Tomasz Piskorski, Rodney Ramcharan, Amit Seru, and Vincent Yao, "Interest Rate Pass-Through: Mortgage Rates, Household Consumption, and Voluntary Deleveraging," *American Economic Review*, 2017, 107(11): 3550-3588.

Privileged and Confidential

32. On HELOCs, Johnson and Sarama (2015) estimated that HELOCs reaching the end of the draw were 2.9 percentage points more likely to default than HELOCs not reaching the end of the draw. For higher-risk borrowers (*i.e.,* credit scores below 725 and combined-loan-to-value ratios above 80 percent) with a balloon HELOC, the default rate on the loan was 16 percentage points higher at the end of draw relative to a higher-risk HELOC that did not reach end of draw.[44] Epouhe and Hall (2016) and Qi and Scheule (2016) analyzed both the timing and payment size of the shock using data from the Office of the Comptroller of the Currency Home Equity Loan-Level Data and similarly found heightened default risk.[45]

## B. BACKGROUND ON OVERCHARGES AND UNDERCHARGES

33. In general, Ocwen's servicing failures deprived borrowers of timely and accurate information on the status of their loans, increasing their uncertainty and denying them opportunities to make their best use of funds they were owed, and subjecting them to payment shocks from being overcharged or undercharged. These overcharges and undercharges damages borrowers in at least two measurable ways. First, in light of such unexpected payments, borrowers may have turned to expensive sources of funding to meet their mortgage obligations, or have been denied the opportunity to reduce expensive unsecured debt obligations. Second, borrowers are also potentially harmed as overcharges and undercharges may have precipitated adverse credit events—namely, delinquency, foreclosure, and bankruptcy—imposing significant harm. As further detailed below, these harms are illustrated in Figure 2 (overcharges) and Figure 3 (undercharges). In addition to these harms, it is worth noting that some adverse credit events can lead to additional social costs, that is, costs to others not involved in the loan servicing transactions such as negative impacts on surrounding home values, lost government tax revenues, and increased demands for social services. I discuss these costs in section VI.D below.

---

[44]   Kathleen W. Johnson and Robert F. Sarama, "End of the Line: Behavior of HELOC Borrowers Facing Payment Changes," Finance and Economics Discussion Series 2015-073, Washington: Board of Governors of the Federal Reserve System, http://dx.doi.org/10.17016/FEDS.2015.073 at p. 17 and Table 4, p. 32.

[45]   Onesime Epouhe and Arden Hall, "Payment shock in HELOCs at the end of the draw period," *Journal of Economics and Business*, 2016, 84: 131-147 and Min Qi and Harald Harry Scheule, "The Impact of Positive Payment Shocks on Mortgage Credit Risk–A Natural Experiment from Home Equity Lines of Credit at End of Draw," *available at SSRN 2781359*, 2016.

Privileged and Confidential

34. As shown in Figure 2, a borrower who experienced an overcharge may or may not have been able to pay the amount that Ocwen demanded. If she had paid the additional amount, then the overpayment would constitute an opportunity cost. For example, the borrower could have applied those funds to another use such as paying down her credit card debt and thereby avoid interest charges.

35. If the borrower was not able to pay the additional amount demanded by Ocwen or was unable to pay on other credit accounts, then she may have subsequently experienced an adverse credit event such as delinquency, bankruptcy, or foreclosure. Bankruptcy and foreclosure would impose transaction costs including legal fees and moving expenses as well as equity loss on the home value. Additional costs may include deteriorated health of the borrower, reduced property values in the neighborhood, and higher crime rates.

**Figure 2: Harm Flowing from Overcharges**



36. Undercharges operate differently. With an undercharge, if Ocwen seeks to collect that undercharge at a later date, then the borrower would receive a payment shock. This payment shock occurs when Ocwen, at the time of recoupment, demands a higher payment that the borrower did not anticipate or was unable to absorb (Figure 3).[46] The borrower may fall into an adverse credit event, and the repercussions would be similar to those that were described in the paragraph above.

---

[46]   See ¶ 30 above for a brief summary of the literature on payment shocks.

Privileged and Confidential

**Figure 3: Harm Flowing from Undercharges**



37. I quantify the impacts for both sets of harms: (1) opportunity costs for borrowers who were overcharged and (2) the harm resulting from an adverse credit event as measured through transaction costs and equity losses following:

    a.  For opportunity costs, I modeled the payment flows from the borrower to Ocwen and, when applicable, remediated payments from Ocwen to the borrower. More specifically, I modeled the difference in payment flows between the borrower and Ocwen in the but-for world without, a world without Ocwen's servicing failure and the actual flows. I then calculated the net present value ("NPV") of the difference in payment flows to arrive at damages capturing the loss to borrowers in interest that could have been avoided, assuming that they have credit card debt, and at the margin could have reduced this debt.[47] This is described below in section V.

    b.  For transaction costs and equity loss associated with adverse credit events, I focused on additional foreclosures that resulted from Ocwen's servicing failures.[48] I developed an econometric model to estimate the increase in

---

[47]  For a more detailed explanation of why I apply an average credit card interest rate to quantify opportunity costs, see ¶¶ 41-42.

[48]  In the damages analysis of adverse credit events resulting from Ocwen's servicing failures, I focus on foreclosures because bankruptcy and delinquency are noisier outcomes. A borrower may file for

Privileged and Confidential

the probability of foreclosure per month after Ocwen failed to meet its obligations to its borrowers. Having estimated the increase in probability, I calculated the number of additional foreclosure events and applied an average cost per foreclosure to arrive at monetary damages to homeowners. This is described in detail below in section VI.

38. Because transaction costs and equity losses to homeowners only capture a fraction of damages to Ocwen's borrowers, I discuss social costs, including reduced access to credit, that can be difficult to quantify in dollars. I provide a summary of the literature on social costs, including both non-monetary consequences to homeowners and costs to the community, and papers that use credit reporting data to study reduced access to credit following foreclosure.

## V.  OPPORTUNITY COSTS FROM OVERPAYMENTS

39. One consequence of Ocwen's servicing failures was to deprive borrowers of the ability to use their money for alternative beneficial uses of their choice, and instead, to overpay Ocwen. For example, instead of overpaying Ocwen, borrowers who accrued surpluses as a result of Ocwen's failure to perform a timely escrow analysis may have preferred to redirect these overpayments to pay down more costly debt and thereby avoided extra interest payments.[49] As discussed above, I refer to this type of harm as an "opportunity cost," because Ocwen's borrowers missed the opportunity to allocate funds to more productive uses.[50]

40.  To measure the opportunity cost of borrowers' overpayments to Ocwen because of Ocwen's conduct, I first constructed the monthly stream of overpayments from the borrower to Ocwen during the period of harm (*e.g.*, the period between the date when Ocwen *should have* completed the analysis and the date when Ocwen performed the belated escrow analysis) using information provided by Ocwen

---

bankruptcy because of worsening credit in their non-mortgage accounts, which I am not able to observe for Ocwen's borrowers. Borrowers may transition in and out of delinquency fairly frequently for reasons that may be related to transient shocks to the borrower whereas transitions in and out of foreclosure are less common.

[49]  Other uses include delaying preventative healthcare visits, which could have lasting health consequences, avoiding delinquency on other accounts, and contributing to savings. I do not quantify these damages, which may be even larger than accumulated interest payments on credit-card debt.

[50]  See ¶ 29 above on opportunity costs in the economics literature.

Privileged and Confidential

through Interrogatory Responses and Requests for Production. Next, I constructed the monthly stream of net payments from Ocwen to the borrower after the period of harm. In the context of late escrow analyses, this would vary depending on the borrower's escrow status at the single point in time when the escrow analysis was completed; a lump sum payment to the borrower if the escrow status reflects a surplus at that point in time, or a series of equal monthly reductions in monthly escrow amounts if the borrower's escrow status reflects a shortage at that point in time. Third, I calculated the NPV of these net payment streams to the month prior to the date when the servicing failure started (*e.g.*, the month before an escrow analysis should have been completed but was not); this value would capture the interest owed to the borrower on his or her overpayments.

41. The results of this type of analysis are sensitive to the interest rate applied. Thus, I present results under three different assumptions of the annual interest rate. These rates bound what I consider a reasonable interest rate faced by the affected Ocwen borrowers on other outstanding debt. I chose to use a range of average credit card interest rates to estimate opportunity costs because in today's economy, credit card rates are a reasonable, if not conservative, estimate of the borrower's marginal cost of credit. If the borrower paid her credit card debt, she would avoid interest payments in the future. Further, credit cards are a widely used source of household credit in the U.S. The number of credit card accounts is approximately 500 million.[51] Moreover, credit card rates are typically lower than the rates that economists generally accept as a household's time value of money, and is therefore conservative.

42. Specifically, since at least the 1970s, numerous papers in the economics literature have attempted to estimate the amount that households are willing to give up on a future date in return for having cash today, which is also called the household's time value of money, or discount rate. Consumers are credit-constrained if they max out their credit cards and other sources of unsecured debt, and in this case their discount rates will be at least as high as the highest interest rate on any form of unsecured debt available to them. In a seminal paper published in 1979, the discount rate for

---

[51]   Federal Reserve Bank of New York, Center for Microeconomic Data, Quarterly Report on Household Debt and Credit, 2019: 2Q (Released August 2019) www.newyorkfed.org/microeconomics.

Privileged and Confidential

lower income households could be as high as 27 percent to 89 percent—well above the credit card rates that I use in this model. Note, estimates of household discount rates identified in the literature can vary because they are sensitive to factors such as the empirical approach (*e.g.,* field versus experimental study) and the time period over which the analysis is conducted. Because of this variance in rates, I have chosen to use credit card interest rates in my analysis. Credit card rates also lie below the ranges of consumer discount rates found in the literature.[52]

43. The three specific rates that I apply in my analysis are:

    a. As a lower bound, I apply 13 percent, which is the average annual commercial bank interest rate on credit card plans for accounts assessed interest in 2014. This series is published by the Federal Reserve Board of Governors, and interest rates range from 13.19 percent in 2014 to 16.04 percent in 2018.[53]

    b. As a midpoint, I apply 16 percent, which is the approximate average annual effective interest rate on general purpose revolving accounts among near-prime, subprime, and deep subprime borrowers in 2017.[54] This number comes from the Consumer Finance Protection Bureau's report, "The Consumer Credit Card Market" and is consistent with the average minimum annual percentage rate across types of cards reported by the U.S. News and World Report.[55]

    c. As an upper bound, I apply 20 percent, which is the approximate average retail annual percentage rate for the same group of borrowers as (b)

---

[52] See Shane Frederick, George Loewenstein, and Ted O'Donoghue, "Time Discounting and Time Preference: A Critical Review," *Journal of Economic Literature*, June 2002, 40: 351-401 and Jerry Hausman, "Individual Discount Rates and the Purchase and Utilization of Energy-Using Durables," *The Bell Journal of Economics*, Spring 1979, 10(1): 33-54.

[53] https://www.federalreserve.gov/releases/g19/current/ (last viewed on May 1, 2019). See also https://fred.stlouisfed.org/series/TERMCBCCINTNS (last viewed on May 1, 2019).

[54] Consumer Finance Protection Bureau, "The Consumer Credit Card Market," December 2017, p. 79 (Figure 6).

[55] "Average Credit Card APR," U.S. News & World Report, July 1, 2019, https://creditcards.usnews.com/articles/average-apr (last viewed on August 5, 2019).

Privileged and Confidential

above.[56] This is a conservative rate relative to the average maximum annual percentage rate from a 2018 survey from the U.S. News and World Report, which ranges from 20.55 percent to 26.93 percent across card types.[57]

44. Applying this method described in ¶ 40 to the Late Escrow Analysis population,[58] I find that damages to borrowers range from $1.2 million to $1.7 million depending on the interest rate. These results only reflect damages for borrowers identified in Rogs 1–4, Exhibit C with both overcharges and a late analysis date. For loans with overcharges but no late analysis dates,[59] I am not able to reliably calculate damages without further information about the time period over which Ocwen acquired the accrued surplus.

45. Using the same approach described in ¶ 40, I estimated that damages to borrowers for failures related to PMI Overcharges would be $0.3 million to $0.4 million. For ARM Servicing Errors, damages range from $0.3 million to $0.4 million.

46. Further, I understand that there are other servicing errors that may have also led to an overcharge. For loans with overpayments resulting from other servicing failures, such as Ocwen's failure to timely apply escrow shortage payments as identified in Rog. 12, I reserve the right to amend the damages calculation should relevant information be made available, for this overpayment population, such as: (1) the overpayment amount that the customer paid; (2) the date it was paid; and (3) the date that Ocwen adjusted the borrower's monthly escrow payment to account for this shortage payment.

---

[56] Consumer Finance Protection Bureau, "The Consumer Credit Card Market," December 2017, p. 78 (Figure 5).

[57] "Average Credit Card APR," U.S. News & World Report, July 1, 2019, https://creditcards.usnews.com/articles/average-apr (last viewed on August 5, 2019).

[58] Specifically, I use information provided by Ocwen in Rogs 1-4, Exhibits A-F.

[59] There are several reasons why some loans would not have an actual analysis date; examples include (1) Ocwen did not complete the escrow analysis before the date when the data was extracted from Ocwen's database; (2) the loan was transferred to another servicer before Ocwen completed an escrow analysis; or (3) the loan was charged off before Ocwen completed an escrow analysis. Although Ocwen did not report an actual analysis date for these loans, Ocwen did provide an accrued surplus without further information about what "end date" was used to calculate the accrual.

47. The remainder of this section is organized as follows: Sections V.A, V.B, and V.C provide details on my calculations for the Late Escrow Analyses, PMI Overcharges, and ARM Servicing Failures populations, respectively. In each of these sections, I describe my methodology to construct net payment flows and conclude with a summary of damages from overpayments caused by the servicing failure.

## A.   OPPORTUNITY COSTS FOR THE LATE ESCROW ANALYSIS POPULATION

48. In their Verified Responses to Interrogatories 1-4, Exhibit C, Ocwen provided information—on a loan-by-loan basis—about which loans had a late escrow analysis between January 1, 2014 and January 8, 2018, dates when the escrow should have been completed ("but-for analysis date") and when the belated escrow was completed ("actual analysis date"), and the overcharged amount between those dates.[60] For these loans with late escrow analyses, Ocwen also provided information in Exhibit F about the loan's surplus or shortage[61] balance on the late analysis date, the number of spread months if the loan had a shortage, the refund amount and date if the loan had a surplus.[62] Based on the information in Exhibits C and F, I construct the net payment flow from the borrower to Ocwen, as I will discuss in more detail below.

49. Because the overcharge that Ocwen reports is a difference between escrow balance levels between the actual and but-for worlds, one cannot assume that all overcharges were paid by borrower. The reason is that an escrow balance can

---

[60]   In this section, I use the term "overcharge" to refer to the accrued surplus. "Accrued surplus" means that the borrower's escrow shortage or surplus balance is higher in the actual world on the actual analysis date than her balance would have been in the but-for world, possibly on the but-for analysis date although Ocwen's workpapers does not make it clear. The escrow balance may be higher in the actual world because the customer made larger monthly payments than she would have if Ocwen had completed the escrow analysis on time.

[61]   A shortage on the escrow account means that the borrower does not have sufficient funds in her escrow account to maintain an escrow balance above a statutory minimum throughout the year. More precisely, the shortage is a difference between the borrower's actual escrow balance at the start of the computation year and the escrow balance required at the start of the computation year such that the escrow's balance will not fall below the cushion amount during the year. The cushion amount is generally two times the target amount, which is the monthly payment required to cover the forecasted disbursements in the computation year. According to RESPA, the maximum cushion that a servicer may charge is "one-sixth (1/6) of the estimated total annual payments from the escrow account" (Regulation X §1024.11(c)(i)).

[62]   For some borrowers, the actual analysis date was blank. Borrowers who were bankrupt at the time of the but-for analysis date often did not have a numerical value for the accrual surplus.

Privileged and Confidential

increase for (at least) two reasons: first, the borrower makes a payment into the account, and second, the servicer gives a credit to the account.[63] To be conservative, I attempt to identify borrowers who actually paid the overcharge amounts by focusing on borrowers who were current on the late analysis date and whose regular escrow payments exceeded the overcharge amount during the period when the escrow analysis was delayed.

50. I quantified the opportunity cost to borrowers who overpaid because of Ocwen's failure to perform a timely escrow analysis. This population is limited to those borrowers Ocwen identified in Rogs 1–4, and who, based on Ocwen's data, were overcharged during the damages period.[64] For this population, the period of harm is the period of time between the but-for analysis date and the late analysis date. Because Ocwen failed to perform the annual escrow analysis on the but-for analysis date, it also did not adjust the monthly escrow payment to reflect the amount that it should have collected had it performed this analysis.[65]

51. The borrower's escrow balance on the actual analysis date is independent of whether or not the borrower was overcharged as a result of Ocwen's servicing failure. An overcharge means that the borrower's escrow balance was higher in the actual world relative to the but-for world, but it has no implications on the escrow balance level at a point in time. For example, a borrower with an overcharge of $100 may have had a shortage of -$150 in the but-for world and -$50 in the actual world. Alternatively, this borrower may have had a shortage of -$75 in the but-for world and a surplus of $25 in the actual world. As a third alternative, this borrower may have had a surplus of $50 in the but-for world and a surplus of $150 in the actual world. In all three cases, the borrower would appear to have an overcharge of $100, but her escrow balance on an analysis date could be either a shortage or surplus.

---

[63]   For example, when a borrower gets a loan modification, the servicer may use credits to the escrow balance for principal adjustments.

[64]   In this section, I count the number of borrowers but in some cases, borrowers can have multiple late escrow analyses.

[65]   For example, suppose that a borrower was paying a monthly escrow payment amount of $200 and her insurance premiums were decreasing. When Ocwen performs an escrow analysis, the borrower's monthly payment would be lowered, say by $20 per month. If Ocwen does not complete a timely escrow analysis, then the borrower would continue to pay $200 when she should, instead, pay $180. Ocwen overcharges this borrower by $20 per month.

Privileged and Confidential

52. A borrower's balance—surplus or shortage— on the late analysis date, while relevant, does not alter the fact that all of these borrowers were overcharged during the damages period. The reason why the escrow status at the late analysis date is relevant is because the escrow status on this date determines how a borrower would have had their overcharged escrow amount "refunded" to them. Borrowers with an escrow status of surplus on the late analysis date would have received a one-time lump sum check as a refund. Borrowers with an escrow status of shortage on the late analysis date, however, would be "refunded" monthly, as a portion of their overpayment would be applied proportionally to lower each subsequent shortage payment. I detail this analysis further below.

53. Sections V.A.1 and V.A.2 describes the methodology to construct the net payment flow from the borrower to Ocwen and vice versa. Descriptive statistics about the overcharge amounts and number of days between the date when the escrow analysis should have been completed and date when the late escrow analysis was completed are shown in section V.A.3. Damages on the overpayments are presented in V.A.4.

### 1. Categorizing the Harmed Population Delinquency Status and Shortage/Surplus Balance on Key Dates

54. Ocwen identifies 391,603 instances of late escrow analyses since 2014.[66] Among these instances, 195,153 failures resulted in overcharges.[67]

55. As discussed in ¶ 49, to be conservative, I have not included all borrowers with overcharges in the opportunity costs damages analysis. I imposed two criteria to identify borrowers who were overcharged and who likely made the overpayment:

    a. First, I only included borrowers who were current on the late analysis date.[68] This assumption ensures that, if the borrower was current on the late analysis date, then the borrower likely paid the overcharge amount.[69] In contrast, if the borrower was delinquent on the late

---

[66] Ocwen provided this information as Rogs 1-4, Exhibit C.

[67] Rogs 1-4, Exhibit C.

[68] "Current" means that the borrower is up to date on her monthly mortgage payments.

[69] As I discussed in ¶ 49, a borrower may appear to have an overcharge for reasons aside from overpayments.

23

Privileged and Confidential

analysis, then she may have not paid the overcharged amount and was therefore deemed to have fallen behind on escrow payments.

  b.  Second, even within this subpopulation, I attempted to exclude individuals who did not appear to have made sufficient payments to have covered the overcharge. I only include borrowers for whom I can verify made escrow payments in excess of the overcharged amount.[70]

56. Figure 4 shows the number of borrowers for whom I can observe overpayments based on the criteria that I described above. The total number of borrowers that meet both criteria is 93,223. These borrowers can be divided into six groups according to their delinquency status as of the but-for analysis date and their escrow status (surplus/shortage) on this date and on the actual analysis date.[71]

**Figure 4: Count of Loans in Untimely Escrow Population by Groups With Evidence of Overpayment**

| | | | Actual Analysis Date | |
|---|---|---|---|---|
| | | | Surplus | Shortage |
| | | | Current | Current |
| But-For Analysis Date | Surplus | Current | 27,068 | |
| | | Delinquent | 1,316 | |
| | Shortage | Current | 6,145 | 56,321 |
| | | Delinquent | 371 | 2,002 |

57. In summary, I estimate opportunity cost damages attributed to servicing failures among the Late Escrow Analyses population with overcharges that meet the following criteria:

  c.  Borrower was current on the late analysis date;

  d.  Borrower's escrow payments between the but-for analysis date and late analysis date exceeded the overcharge amount.

---

[70]  In Ocwen's transaction history data, which Ocwen produced in response to Request 22 from the Bureau's Fifth Set of Requests, I observe regular, spread, and escrow payments over the period of harm. I calculated the total amount sent by the borrower that was allocated to their escrow accounts and verified that the total escrow payment over the period of harm was at least as large as the overcharge amount.

[71]  Note that there are eight possible combinations of these variables, but I only identify six groups. This is because a borrower who overpaid into her escrow account cannot start with a surplus on the but-for analysis date and end with a shortage on the actual analysis date.

Privileged and Confidential

## 2. Modeling Payment Flows for Overpayments Because of Ocwen's Late Escrow Analyses

58. To estimate the forgone interest on overpayments that constitute the opportunity costs damages, I construct monthly payment flows capturing both the amount that the borrower overpaid to Ocwen before the late analysis date and Ocwen's net payments to the borrower after the late analysis date. I then applied an NPV calculation on the payment flows to estimate damages.

59. The timing of the borrower's net payment flow after the late escrow analysis is important to the analysis. There are two possible payment streams: first, the borrower may have received a surplus check in a lump sum after the late escrow analysis; or second, the borrower may have had a reduction in the monthly escrow payment because of a reduced shortage spread (relative to the but-for world in which the borrower was not overcharged).[72] I use the term "repayment method" to refer to these two payment streams. Figure 5 shows how I assigned repayment methods to failures in the harmed population that met the criteria outlined in ¶ 55. The numbers in parentheses represent the number of borrowers in each category.

---

[72] In the analysis, the overpayment is equally spread across months between the but-for analysis date and actual analysis date. In practice, borrowers who had a surplus on the but-for analysis date and were current would have received a surplus check from Ocwen within 30 days of the escrow analysis. I did not implement the surplus check on the but-for analysis date in my analysis because of analytical complications such as how to model the payment flow if the overcharge amount exceeds the surplus on the but-for analysis date. In the NPV framework, equally spreading the overpayment would error on understating damages relative to a lump-sum payment after the but-for analysis date.

Privileged and Confidential

**Figure 5: Assignment of Repayment Methods**



Note: I use the term "borrowers" and recognize that these are discrete instances of untimely escrow analyses that resulted in an accrued surplus.

60. If the loan has an escrow status reflecting a shortage on the late analysis date, I apply the "Spread" Repayment Method, which models the repayment in installments over a shortage spread period, which is at least 12 months according to RESPA regulations.[73] In Rogs 1–4, I observe a spread period of 12–60 months. I detail in Figure 6 an example using a single borrower, Loan No. ⬛⬛⬛ Column [1] shows that over the period of harm, the borrower had an overcharge totaling $279.09[74], which implies that the borrower had overpaid by $69.77 every month during the 4 months in the period of harm. Column [2] shows this calculation. Moreover, Rogs 1–4 identifies the late analysis as occurring in February 2015, and a shortage spread period of 12 months. In column [3], I spread the overcharge over the 12 months following the late analysis date, amounting to a monthly repayment of $23.26. Column [4] shows payment flows from the borrower's perspective. Positive numbers show net payments from the borrower to Ocwen, and negative numbers show net payments from Ocwen to the borrower. Taken together, column [4] shows that the borrower's overpayment during the period of harm is partially offset by repayments from Ocwen in the 12 months following the period of harm.

---

[73]  24 CFR § 3500.17(f)(3)(ii) "If an escrow account analysis discloses a shortage that is greater than or equal to one month's escrow account payment, then the servicer has two possible courses of action: (A) The servicer may allow a shortage to exist and do nothing to change it; or (B) The servicer may require the borrower to repay the shortage in equal monthly payments over at least a 12-month period."

[74]  Rogs 1–4, Exhibit C.

Privileged and Confidential

Column [5] applies an NPV calculation to column [4], showing total damages to be $26.92 for this loan.

### Figure 6: Example for "Spread" Repayment Method (Loan ▮▮▮▮▮)

| | | Accrued Surplus | Borrower Overpayment | Ocwen Repayment | Net Borrower Overpayments | NPV of Net Borrower Overpayments |
|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | [5] |
| *But-For Analysis Date* | Oct-14 | | | | | |
| | Nov-14 | | $69.77 | | $69.77 | $68.85 |
| | Dec-14 | | $69.77 | | $69.77 | $67.95 |
| | Jan-15 | | $69.77 | | $69.77 | $67.05 |
| *Actual Analysis Date* | Feb-15 | $279.09 | $69.77 | | $69.77 | $66.17 |
| *Refund Spread (12 months)* | Mar-15 | | | $23.26 | -$23.26 | -$21.77 |
| *Refund Spread (12 months)* | Apr-15 | | | $23.26 | -$23.26 | -$21.48 |
| *Refund Spread (12 months)* | May-15 | | | $23.26 | -$23.26 | -$21.20 |
| *Refund Spread (12 months)* | Jun-15 | | | $23.26 | -$23.26 | -$20.92 |
| *Refund Spread (12 months)* | Jul-15 | | | $23.26 | -$23.26 | -$20.64 |
| *Refund Spread (12 months)* | Aug-15 | | | $23.26 | -$23.26 | -$20.37 |
| *Refund Spread (12 months)* | Sep-15 | | | $23.26 | -$23.26 | -$20.10 |
| *Refund Spread (12 months)* | Oct-15 | | | $23.26 | -$23.26 | -$19.84 |
| *Refund Spread (12 months)* | Nov-15 | | | $23.26 | -$23.26 | -$19.58 |
| *Refund Spread (12 months)* | Dec-15 | | | $23.26 | -$23.26 | -$19.32 |
| *Refund Spread (12 months)* | Jan-16 | | | $23.26 | -$23.26 | -$19.07 |
| *Refund Spread (12 months)* | Feb-16 | | | $23.26 | -$23.26 | -$18.82 |
| | | | | | **Opportunity Cost Damages** | **$26.92** |

Sources: Rogs 1-4, Exhibits C and F.

Notes:

[2]: [1] / Number of Months between Nov-14 and Feb-15.

[3]: [1].

[4]: [2] - [3].

[5]: Calculated using an annual interest rate of 16 percent to October 1, 2014, the beginning of month of the But-for analysis date. The monthly interest rate is 0.16/12, or 1.33 percent. Opportunity cost damages is the sum of [5].

61. For borrowers whose escrow status reflects a surplus on the late analysis date, I apply the "Lump Sum" Repayment Method, which models the repayment made in one installment if the loan has an overcharge smaller than or equal to the surplus on the late analysis date. Rogs 1-4, Exhibit F (tab "surplus (June 15 update)") provides a refund date. In cases where the refund date is not provided, I assume that the refund was given to the borrower the month after the late analysis date according to RESPA regulations.[75] I detail in Figure 7 this estimation methodology applied to a

---

[75]  24 CFR § 3500.17(f)(2)(i) "If an escrow account analysis discloses a surplus, the servicer shall, within 30 days from the date of the analysis, refund the surplus to the borrower if the surplus is greater than or equal to 50 dollars ($50). If the surplus is less than 50 dollars ($50), the servicer may refund such amount to the borrower, or credit such amount against the next year's escrow payments."

Privileged and Confidential

single borrower, Loan No. ███████. Column [1] shows that over the period of harm, an overcharge of $361.74[76]. Column [2] shows the implied monthly overpayment of $90.44 over the period of harm of 4 months. Rogs 1-4, Exhibit C shows that the late analysis on July 2014 found a surplus of $602.46, and that this amount was refunded to the borrower in August 2014. Since the surplus refund amount was larger than the overcharge of $361.74, I model the full repayment of the accrued surplus on the surplus refund date of August 2014. This decision is shown in column [3]. Similar to the prior example, I calculate net payment flows from the perspective of the borrower in column [4], and an NPV of the payment flows in column [5]. This results in total opportunity cost damages of $11.44 for this loan.

**Figure 7: Example for "Lump Sum" Repayment Method (Loan ███████)**

| | | Accrued Surplus | Borrower Overpayment | Ocwen Repayment | Net Borrower Overpayments | NPV of Net Borrower Overpayments |
|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | [5] |
| *But-For Analysis Date* | Mar-14 | | | | | |
| | Apr-14 | | $90.44 | | $90.44 | $89.25 |
| | May-14 | | $90.44 | | $90.44 | $88.07 |
| | Jun-14 | | $90.44 | | $90.44 | $86.91 |
| *Actual Analysis Date* | Jul-14 | $361.74 | $90.44 | | $90.44 | $85.77 |
| *Refund Date* | Aug-14 | | | $361.74 | -$361.74 | -$338.56 |
| | | | | **Opportunity Cost Damages** | | **$11.44** |

Sources: Rogs 1-4, Exhibits C and F.
Notes:
[2]: [1] / Number of Months between Apr-14 and Jul-14.
[3]: [1].
[4]: [2] - [3].
[5]: Calculated using an annual interest rate of 16 percent to March 1, 2014, the beginning of month of the But-for analysis date. The monthly interest rate is 0.16/12, or 1.33 percent. Opportunity cost damages is the sum of [5].

62. Lastly, for borrowers with the escrow status reflecting a surplus on the late analysis date, and where the overcharge is larger than the surplus on the late analysis date, I apply the "Lump Sum and Spread" Repayment Method. In order to have an overcharge greater than the surplus, the account would have had a shortage on the but-for analysis date. I model a combination of the two repayment methods aforementioned. Using Loan ██████ as an example shown in Figure 8: overcharge over the period of harm is $133.90 (from Rogs 1-4, Exhibit C, shown in

---

[76]   Rogs 1–4, Exhibit C.

**Privileged and Confidential**

column [1]). The late analysis performed in March 2015 revealed a surplus of $119.07 in the account (from Rogs 1-4, Exhibit F). Rogs 1-4, Exhibit F also shows that the surplus was refunded the month after, in April 2015. Since the surplus was smaller than the overcharge, and since the loan would have had a shortage on the but-for analysis date, I model the remaining accrued surplus of $14.83 (= $133.90 - $119.07) as being spread across 12 months following the late analysis date. Both lump sum and spread repayments are calculated in column [4]. Columns [5] and [6] calculate the net payment flows from the perspective of the customer and the NPV of the flows. These calculations result in opportunity cost damages of $8.27 for this loan.

Privileged and Confidential

**Figure 8: Example for "Lump Sum and Spread" Repayment Method (Loan ███████)**

| | | Accrued Surplus | Surplus | Borrower Over-payment | Ocwen Re-payment | Net Borrower Over-payments | NPV of Net Borrower Over-payments |
|---|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | [5] | [6] |
| *But-For Analysis Date* | Jul-14 | | | | | | |
| | Aug-14 | | | $16.74 | | $16.74 | $16.52 |
| | Sep-14 | | | $16.74 | | $16.74 | $16.30 |
| | Oct-14 | | | $16.74 | | $16.74 | $16.09 |
| | Nov-14 | | | $16.74 | | $16.74 | $15.87 |
| | Dec-14 | | | $16.74 | | $16.74 | $15.66 |
| | Jan-15 | | | $16.74 | | $16.74 | $15.46 |
| | Feb-15 | | | $16.74 | | $16.74 | $15.26 |
| *Actual Analysis Date* | Mar-15 | $133.90 | $119.07 | $16.74 | | $16.74 | $15.05 |
| *Lump Sum + Refund Spread (12 months)* | Apr-15 | | | | $120.31 | -$120.31 | -$106.79 |
| *Refund Spread (12 months)* | May-15 | | | | $1.24 | -$1.24 | -$1.08 |
| *Refund Spread (12 months)* | Jun-15 | | | | $1.24 | -$1.24 | -$1.07 |
| *Refund Spread (12 months)* | Jul-15 | | | | $1.24 | -$1.24 | -$1.05 |
| *Refund Spread (12 months)* | Aug-15 | | | | $1.24 | -$1.24 | -$1.04 |
| *Refund Spread (12 months)* | Sep-15 | | | | $1.24 | -$1.24 | -$1.03 |
| *Refund Spread (12 months)* | Oct-15 | | | | $1.24 | -$1.24 | -$1.01 |
| *Refund Spread (12 months)* | Nov-15 | | | | $1.24 | -$1.24 | -$1.00 |
| *Refund Spread (12 months)* | Dec-15 | | | | $1.24 | -$1.24 | -$0.99 |
| *Refund Spread (12 months)* | Jan-16 | | | | $1.24 | -$1.24 | -$0.97 |
| *Refund Spread (12 months)* | Feb-16 | | | | $1.24 | -$1.24 | -$0.96 |
| *Refund Spread (12 months)* | Mar-16 | | | | $1.24 | -$1.24 | -$0.95 |
| | | | | | **Opportunity Cost Damages** | | **$8.27** |

Sources: Rogs 1-4, Exhibits C and F.

Notes:

[3]: [1] / Number of Months between Aug-14 and Mar-15.

[4]: [2] + ( [1] - [2] ) / 12 for Apr-15, ( [1] - [2] ) / 12 for May-15 onwards.

[5]: [3] - [4].

[6]: Calculated using an annual interest rate of 16 percent to July 1, 2014, the beginning of month of the But-for analysis date. The monthly interest rate is 0.16/12, or 1.33 percent. Opportunity cost damages is the sum of [6].

### 3. Descriptive Statistics of Late Escrow Analyses Resulting in Overpayments

63. As shown in Table 3 below, I find that there were 93,223 servicing failures that caused borrowers to overpay Ocwen between but-for analysis date and late analysis date. Among these borrowers, the average overcharge per late escrow analysis is $208, and the average number of months between the missed and late escrow analysis dates is 1.4.

Privileged and Confidential

**Table 3: Descriptive Statistics of the Subgroups in the Late Escrow Analyses Population that Are Included in the Opportunity Costs Damages**

|  | On Missed Analysis Date: | | On Late Analysis Date: | | | Average Per Failure | |
|---|---|---|---|---|---|---|---|
|  | Shortage/ Surplus | Loan Status | Shortage/ Surplus | Loan Status | Number of Failures | Accrued Surplus | # Months Late |
|  | [A] | [B] | [C] | [D] | [E] | [F] | [G] |
| [1] | Surplus | Current | Surplus | Current | 27,068 | $205 | 1.4 |
| [2] | Surplus | Delinquent | Surplus | Current | 1,316 | $426 | 2.4 |
| [3] | Shortage | Current | Surplus | Current | 6,145 | $325 | 1.5 |
| [4] | Shortage | Delinquent | Surplus | Current | 371 | $669 | 3.5 |
| [5] | Shortage | Current | Shortage | Current | 56,321 | $187 | 1.2 |
| [6] | Shortage | Delinquent | Shortage | Current | 2,002 | $280 | 2.7 |
| **[7]** |  |  |  | **Total:** | **93,223** | **$208** | **1.4** |

Sources: Rogs 1-4, Exhibits C and F; Ocwen's Response to Request 5 from the Bureau's Fifth Set of Requests for Production; Ocwen's response to the Civil Investigation Demand (April 2016).

Notes: In this table, "borrower" is synonymous with a discrete instance of a servicing failure. Interest rates reported above the columns are annual.

[7][E]: = Sum of [1][E] through [6][E]

[8][E]: Weighted average overcharge across borrowers.

[9][E]: Weighted average number of months between the missed escrow analysis and the late escrow analysis across borrowers.

## 4. Summary of Damages for Late Escrow Analyses Resulting in Overpayments

64. Table 4 presents damages by subgroup in the Late Escrow Analyses Population based on the loan's escrow balance status (shortage or surplus) and loan status on the but-for analysis date and the late analysis date. Columns [F], [G], and [H] show the results of the analysis based on the three interest rates discussed in ¶ 41. Overall, damages range from $1.2 million to $1.7 million.[77] Across the subgroups, damages are highest for loans that were current on both the but-for analysis date and late analysis date and that had shortages on both dates (see row [5]); damages estimates range from $0.9 million to $1.4 million. As expected with the NPV framework, damages for subgroups in which Ocwen's pays a surplus check to the borrower after the late analysis date is tend to be smaller because the period over which interest would accrue on the borrower's overpayment is shorter.

---

[77]   If asked, I would be able to allocate damages across individual loans and to scale damages to a January 10, 2014 start date.

Privileged and Confidential

**Table 4: Damages for the Late Escrow Analyses Population that Overpaid Ocwen by Interest Rate**

| | On Missed Analysis Date: | | On Late Analysis Date: | | | Damages by Interest Rate | | |
|---|---|---|---|---|---|---|---|---|
| | Shortage/ Surplus | Loan Status | Shortage/ Surplus | Loan Status | Number of Failures | 13% | 16% | 20% |
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
| [1] | Surplus | Current | Surplus | Current | 27,068 | $62,477 | $76,244 | $94,239 |
| [2] | Surplus | Delinquent | Surplus | Current | 1,316 | $14,422 | $17,455 | $21,339 |
| [3] | Shortage | Current | Surplus | Current | 6,145 | $80,958 | $98,189 | $120,380 |
| [4] | Shortage | Delinquent | Surplus | Current | 371 | $15,384 | $18,433 | $22,244 |
| [5] | Shortage | Current | Shortage | Current | 56,321 | $936,241 | $1,120,435 | $1,353,376 |
| [6] | Shortage | Delinquent | Shortage | Current | 2,002 | $78,632 | $90,174 | $104,128 |
| [7] | | | | Total: | 93,223 | $1,188,115 | $1,420,930 | $1,715,706 |

Sources: Rogs 1-4, Exhibits C and F; Ocwen's Response to Request 5, including supplement on June 14, 2019, from the Bureau's Fifth Set of Requests for Production; Ocwen's Response to Civil Investigation Demand (April 2016).

Notes: In this table, "borrower" is synonymous with a discrete instance of a servicing failure.

Interest rates reported above the columns are annual.

65. The damages results do not include borrowers who were delinquent on the date of the late analysis, even though some borrowers may have been delinquent on the late analysis date because of Ocwen's overcharges. My analysis does not account for late fees or other consequences of delinquency (such as a lower credit score) that borrowers who were delinquent on the date of the late escrow analysis may have sustained.

## B. OPPORTUNITY COSTS TO THE PMI OVERCHARGES POPULATION

66. Private mortgage insurance, or PMI, protects lenders against the risk of borrower default and foreclosure. It is typically charged to borrowers whose loans have a loan-to-value ratio of 80 percent (*i.e.,* the borrower cannot afford a down payment of 20 percent of the property's purchase price[78]). PMI is typically charged as a monthly premium added to mortgage payments and can be an undue burden for consumers. The Homeowners Protection Act ("HPA"), also known as the PMI

---

[78] "What is private mortgage insurance," Consumer Financial Protection Bureau, http://www.consumerfinance.gov/ask-cfpb/what-is-private-mortgage-insurance-en-122/ (last viewed on August 5, 2019). *See* 12 U.S.C. § 4901(13) (definition of "private mortgage insurance") and 12 U.S.C. § 4901(18) (definition of "termination date" as the date on which the principal balance of a mortgage "is first scheduled to reach 78 percent of the original value of the property securing the loan.").

Privileged and Confidential

Cancellation Act, outlines procedures for the cancellation and termination of PMI policies.[79]

67. Based on Ocwen's response to CFPB's request on PMI cancellations, I found that Ocwen had failed to cancel PMI in accordance with HPA procedures on 7,856 occasions and verified in Ocwen's transactions record that 6,293 borrowers paid the overcharged amount.[80] These borrowers overpaid on their premiums during the period of harm and therefore are included in the damages analysis.

## 1. Example and Methodology to Calculate Opportunity Costs for the PMI Overcharges Population

68. The period of harm for each loan is between the date when Ocwen was obligated to cancel PMI ("effective cancellation date") and the date when Ocwen stopped collecting PMI premiums ("cancellation date"). During the period of harm, the borrower paid a monthly PMI premium; after identifying the error, Ocwen claims to have corrected for the overcharge by providing a credit to the borrower on the "credit date" with interest of 3.25 percent per year.[81] If the period of harm began before 2014, I included the monthly premium payments on or after January 1, 2014 only and prorated the credited amount accordingly. Cancellation dates, monthly premiums, credit amounts, and credit dates are provided by Ocwen. The effective cancellation date is calculated such that the credit amount paid reflects monthly premiums paid between the effective cancellation date and the cancellation date.[82]

69. Using the aforementioned variables, I constructed a payment stream for each loan and calculate opportunity cost damages. As an example, Table 5 shows the steps of

---

[79]  "Homeowners Protection Act (PMI Cancellation Act)," CFPB Consumer Laws and Regulations, http://files.consumerfinance.gov/f/documents/102012_cfpb_homeowners-protection-act-hpa-pmi-cancellation-act_procedures.pdf (last viewed on August 5, 2019).

[80]  OCW-CFPB-001-06730240 lists 7,856 failures (a "failure" defined as a loan-credit date pair). I verified if the servicing failure corresponded to an overpayment by matching credits with disbursements that Ocwen paid to the borrower within 7 days of the credit date in Ocwen's transactions database (Ocwen's Response to Request 22 from the Bureau's Fifth Set of Requests) and Ocwen's Response to CFPB's Civil Investigation Demand issued on April 8, 2016("April CID").

[81]  Daniel K. Reeves, August 25, 2014 (10:25 AM), email to Thomas J Diller, "PMI Auto-Termination," OCW3-027-0005675.

[82]  For example, for loan ▉▉▉▉▉▉, effective cancellation date is calculated to be 6/21/2015, which is 16 months prior to the cancellation date (10/21/2016). 16 = 1032.8/63.16. $1032.80 is the credit amount, $63.16 is the monthly premium.

**Privileged and Confidential**

these calculations for a single borrower (Loan Number ▓▓▓▓). Column [1] shows monthly PMI premiums paid by the borrower between the effective cancellation date in June 2016 and cancellation date in October 2016. In September 2016, the borrower was credited back the overcharged premiums from June to October 2016, amount shown in column [2]. I assume that the borrower was credited the amount in column [3], which includes a 3.25 percent interest. Column [4] shows the net payments the borrower made to Ocwen. For this example, I applied a 16 percent interest rate and calculated the NPV of these payments to August 15, 2019. Opportunity cost damages for this loan would be $79.88 as of August 15, 2019.

**Table 5: Example of Calculating Opportunity Cost Damages for PMI Overcharges Population (Loan Number ▓▓▓▓)**

|        | Premium | Credit | Credit with Interest | Net Payments from Borrower | Net Present Value of Payments |
|--------|---------|--------|----------------------|----------------------------|-------------------------------|
|        | [1]     | [2]    | [3]                  | [4]                        | [5]                           |
| Jun-16 | $88.65  |        |                      | $88.65                     | $88.65                        |
| Jul-16 | $88.65  |        |                      | $88.65                     | $87.48                        |
| Aug-16 | $88.65  |        |                      | $88.65                     | $86.33                        |
| Sep-16 | $88.65  | $354.60| $366.12              | -$277.47                   | -$266.67                      |
| Oct-16 | $88.65  |        |                      | $88.65                     | $84.08                        |
|        |         |        | **Opportunity Cost Damages** |                   | **$79.88**                    |

Source: Information on loan ▓▓▓▓ from OCW-CFPB-001-06730240.
Notes:
[3]: [2] with a 3.25% interest.
[4]: [1] - [3].
[5]: NPV of [4]. Calculated using an annual interest rate of 16 percent to August 15, 2019. The monthly interest rate is 0.16/12, or 1.33 percent. Opportunity cost damages is the sum of [5].

## 2. Summary of Damages for PMI Overcharges

70. Applying this method to loans in the PMI Overcharges population with verified disbursements equal to the credit amount, I find that damages to borrowers range from $319,433 to $373,717 depending on the interest rate.

**Table 6: Summary of NPV Damages by Interest Rate for the PMI Overcharges Population**

| Annual Interest Rate: | 13% | 16% | 20% |
|---|---|---|---|
| | [1] | [2] | [3] |
| PMI Overcharges | $319,432.97 | $343,622.90 | $373,717.03 |

Source: OCW-CFPB-001-06730240, Ocwen's Response to Request 22 from the Bureau's Fifth Set of Requests for Production.

## C. Opportunity Costs to the ARM Servicing Errors Population

71. An ARM is a type of mortgage loan for which the interest rate varies throughout the life of the loan, and principal and interest payments otherwise adjust periodically. Internal audits revealed that Ocwen failed to properly adjust interest charged for ARM loans that resulted in overcharges and undercharges on interest payments.[83]

72. Through relevant comment codes identified by Ocwen's corporate deponent, I identified 1,263 instances of loans that needed adjustments to correct for servicing failures because of overcharges by Ocwen. In the opportunity cost damages analysis, I included 1,204 failures that I confirmed had an overcharge by their meeting the following criteria, as outlined by Tom Arnett in his 30(b)(6) deposition:[84]

   a. These loans are tagged with comment code ARMADJ. ARMADJ indicated that an ARM audit had been completed and that adjustments to the account are required.

   b. Ocwen initiated a reversal request within 7 days of the ARM audit, indicating that the servicing error was likely corrected.

   c. Ocwen made a disbursement to the borrower (in a transaction labelled "SMD") within 15 days of the reversal request made in b above. Moreover, the disbursement amount equaled the payment suspense amount associated with the ARMADJ comment.

---

[83] See e.g., OCW-CFPB-001-06048935 (identifying overcharges); OCW-CFPB-001-06048934 (identifying undercharges); see also Arnett Deposition pp. 29-39.

[84] Arnett Deposition 29:3-40:4.

Privileged and Confidential

    d. Offsetting transactions, *i.e.*, transactions with disbursements of the same magnitude and different signs, for the same loan were removed.

### 1. Example and Methodology to Calculate Opportunity Costs for the ARM Servicing Errors Population

73. The period of harm is the period during which Ocwen failed to adjust the interest rate or principal and interest payment on the loan accurately, causing the borrower to pay a higher amount than he or she would have paid otherwise. For the purposes of this analysis, I define the period of harm for each loan as the time period bound by the following dates:

    a. To identify the start of the failure, I first matched the date when the ARM audit was performed to the date indicating that a change needed to be made in Ocwen's "pending change" data table. Then, I assigned the "change date," meaning the date to which the change should apply, as the start of the period when the ARM Servicing Error was in place.[85]

    b. To mark the end of the servicing failure, I used the date on which the ARM audit was performed.

74. For approximately two-thirds of the ARM Servicing Errors failures, I was not able to find an entry in the "pending change" data table Therefore, I imputed the start date based on the average duration of the servicing failure that I observed for failures that ended in the same quarter and had start dates. If the imputed start date was earlier than the loan's boarding date, then I adjusted the start date to the boarding date.

75. I do not observe the correct interest rate that would have applied to each loan had Ocwen properly adjusted. Instead, I infer monthly overpayment by spreading the SMD disbursement (extracted from Ocwen's transaction data) over the period of harm. Columns [1] and [2] in Table 8 shows this calculation. In column [3], I assume the overpayment is refunded to the borrower in full during the month the ARM audit was performed. Column [4] shows the net payments the borrower made

---

[85] If there were multiple entries for the same pending change date, then I assigned the earliest change date.

**Privileged and Confidential**

to Ocwen, money the borrower could have used in other financially beneficial ways. I assumed a 16 percent interest rate and calculated the NPV of these payments to August 15, 2019, shown in column [5]. For this loan, opportunity cost damages are calculated to be $7.00 as of August 15, 2019.

**Table 8: Example of Calculating Opportunity Cost Damages for ARM Servicing Errors (Loan Number ▮▮▮▮▮▮)**

| | Suspense Disbursements | Over-payment | Refund | Net Payments from Borrower | Net Present Value of Payments |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| Mar-16 | | $90.23 | | $90.23 | $90.23 |
| Apr-16 | | $90.23 | | $90.23 | $89.04 |
| May-16 | | $90.23 | | $90.23 | $87.87 |
| Jun-16 | $360.92 | $90.23 | $360.92 | -$270.69 | -$260.14 |
| | | | | **Opportunity Cost Damages** | **$7.00** |

Sources: Information on loan ▮▮▮▮▮▮ from Ocwen's Responses to Requests 19, 22, and 24 from the Bureau's Fifth Set of Requests for Production. Arnett Deposition 29:3-40:4.

Notes:

[2]: [1] / 10, where 10 is the number of months between August 2015 and May 2016.

[4]: [2] - [3].

[5]: NPV of [4]. Calculated using an annual interest rate of 16 percent to August 15, 2019. The monthly interest rate is 0.16/12, or 1.33 percent. Opportunity cost damages is the sum of [5].

## 2.  Summary of Damages for ARM Servicing Errors

76. Applying this method to all loans in the ARM Servicing Errors population, I find that damages to borrowers range from $288,684 to $394,490 depending on the interest rate applied.

**Table 9: Summary of NPV Damages by Interest Rate for the ARM Servicing Errors Population**

| *Annual Interest Rate:* | 13% | 16% | 20% |
|---|---|---|---|
| | [1] | [2] | [3] |
| ARM Servicing Errors | $288,684 | $337,569 | $394,490 |

Sources: OCW-CFPB-001-02292346; OCW-CFPB-001-05787062; Ocwen's Responses to Requests 1, 19, and 24 from the Bureau's Fifth Set of Production; Arnett Deposition 29:3-40:4.

Privileged and Confidential

### D. Summary of Opportunity Costs Across the Harmed Populations

77. Table 10 summarizes damages by servicing failure population across the range of interest rates. Across the three populations, opportunity costs for overcharges range from $1.8 million to $2.5 million.

**Table 10: Summary of Opportunity Cost Damages by Servicing Failure Population and Interest Rate**

|  | Annual Interest Rate | | |
|---|---|---|---|
| Servicing Failure Population<br>[A] | 13%<br>[B] | 16%<br>[C] | 20%<br>[D] |
| [1]  Late Escrow Analyses | $1,188,115 | $1,420,930 | $1,715,706 |
| [2]  PMI Overcharges | $319,433 | $343,623 | $373,717 |
| [3]  ARM Servicing Errors | $288,684 | $337,569 | $394,490 |
| **[4]  Total** | **$1,796,232** | **$2,102,122** | **$2,483,913** |

Notes: See Table 4 for row [1], Table 6 for row [2], and Table 9 for row [3]. Row [4] is the sum of rows [1]-[3] in the same column.

## VI.    DAMAGES FROM ADDITIONAL FORECLOSURES

78. In addition to the opportunity costs that Ocwen's servicing failures imposed on its borrowers described in section V, Ocwen's borrowers experiencing a service failure subsequently were at elevated risk of adverse financial events, specifically initiation of foreclosure proceedings, and the economic costs associated with these events. Damages from this cause equal the borrower's expected economic loss from a foreclosure times the number of foreclosures that would not have occurred but for the service failures.

79. At a high level, the harm that I am quantifying in this section relates to the increased probability that borrowers have foreclosure initiated against them as a consequence of Ocwen's failure, and measuring (in dollars) the cost to the borrower for that increased probability. I use commonly accepted econometric methods to control for the relevant variables that affect both the occurrence of late escrow servicing failures and foreclosure initiations, and thus am able to isolate from other possible causes the increased probability of foreclosure initiation to the borrowers that is the result of Ocwen's servicing failure.

80. More specifically, my approach to estimate damages that follow from this increased probability of foreclosure involves three steps. First, in section VI.A, I developed an econometric model to estimate the increase in the monthly probability of foreclosure initiation that is attributed to Ocwen's servicing failures. Using the monthly increase in the probability of foreclosure initiation, I can calculate the share of foreclosure initiations that can be attributed to Ocwen's servicing failures during the damages period. Second, in section VI.B, I calculate the average cost per foreclosure using information on Ocwen's foreclosure fees identified in their documents and also foreclosure fees identified in well accepted academic studies. Third, in section VI.C, I combined the results from the previous two steps to calculate total costs as a measure of damages for the additional foreclosures. Lastly, in section VI.D, I discuss literature on additional costs of foreclosure that are not captured in the damages results.

81. In my analysis of damages from additional foreclosures, I focus on borrowers who suffered from Late Escrow Analyses. The reasons for this focus are (1) of the populations I am studying, late escrow analysis is the most common service failure experienced by Ocwen loans, (2) there is considerable data and external evidence on the occurrence and cost of foreclosures, and (3) as described in Appendix H, our analysis shows no elevated risk of bankruptcies subsequent to a late escrow analysis, and while there may be some increase in the risk of delinquencies, they are quite common even when loans do not experience servicing failures and their economic cost to be borrower is relatively small.

82. Beyond the immediate opportunity costs to borrowers from Ocwen servicing failures, primarily lost opportunities to reduce the cost of carrying unsecured debt (i.e., credit card balances), these borrowers may incur substantial longer-term economic losses. For example, if servicing failures increase the risk of subsequent adverse financial events such as lowered credit scores, mortgage loan delinquencies, bankruptcies, or foreclosures, then these servicing failures are responsible for the increased economic costs to affected borrowers, and their neighbors and community that result from these adverse events. Several causal mechanisms may link servicing failures to increased risk of later adverse financial events. On the side of the borrower, servicing failures may add to ongoing financial stress, perhaps reducing the borrower's incentive or ability to avoid default on his or her mortgage. On the

**Privileged and Confidential**

side of Ocwen, servicing failures may themselves place a loan in jeopardy if detection and correction of the failure alters Ocwen's classification and software processing of a loan, or affects the Ocwen administrative unit responsible for handling the loan. Further, the servicing failure may itself lower the level of trust between Ocwen and the borrower, leading to increased scrutiny and less administrative flexibility from Ocwen.

83. To analyze the impact of Ocwen servicing failures on the risk of later adverse financial events, I consider the problem as one of statistical survival analysis, asking how the probability of surviving without an adverse event is influenced by the occurrence of a servicing failure. Figure 9 illustrates the calculation. Consider the risk that loans "treated" by a servicing failure at a specified "treatment" time will later experience an adverse financial event, specifically initiation of a foreclosure; we will refer to these loans as "cases". The curve in the figure labelled "Case" gives the probability that loans in this class will survive to each time since treatment without having an adverse event occur. Next consider a class of loans that have a distribution of observed loan and borrower characteristics that is the same as the distribution of these observed characteristics among the cases at the same treatment time, but do not experience a servicing failure at this treatment time. We refer to this class as "controls", and say that at the treatment time, they have been treated to "no servicing failure". The curve in the figure labelled "Control" gives the probability that loans in this class will survive without having an adverse event. If the treatment of a service failure increases the probability of an adverse event, then the control survival curve lies above the case survival curve, as depicted in the figure. The last time on the right of the figure is the time when a cases experiences a foreclosure initiation and observation ends.

**Privileged and Confidential**

**Figure 9: Probability of Survival with or without Servicing Failure**



84. The share of loans from 0 to A experience no adverse event from the treatment time to the end of observation, while the share from A to B experience an adverse event in the as-is circumstance of being treated with a service failure at the treatment time, but would not have in the but-for circumstance of being treated with "no service failure". The share of loans from B to 1 experience an adverse event whether or not they are treated to a service failure, but in the as-is circumstance this experience is accelerated relative to when it would have occurred had they not been treated to a service failure. The expected borrowers' economic loss per case from adverse events caused by the service failure equals the cost per foreclosure times the share of cases between A and B.

85. The analysis program just described is a standard one in epidemiological research, where the question is the effect of a treatment on the probability of survival. A major question in such research is whether differences between "cases" and "controls" following the treatment were caused by the treatment, or were influenced by observed or unobserved confounding factors. In the survival analysis I have done in this case, I am able to control for or rule out these confounding factors, and exclude subpopulations of loans with possible confounding factors, such as pre-existing bankruptcies or delinquencies, whose influence cannot be fully controlled, so that I have high confidence that the elevated risks that I measure following service failures are caused by these failures. In this analysis, I have been helped by

41

Privileged and Confidential

three critical features of the Ocwen servicing failures, and the data Ocwen has provided on loans affected by these failures. The first is that I assume that Ocwen's data regarding the affected loans includes all key variables that may have influenced the administrative processing of these loans, and hence the likelihood that this processing would lead to a servicing failure. As support for this assumption, I note that Ocwen had not only a legal directive to provide these data, but also a positive incentive to turn over complete data on variables that entered their administrative processing decisions. The reason is that controlling for the effects of these variables could reduce their liability for harm to affected loans, and omitting such variables would prevent them from introducing them in their rebuttal defense. Second, once the observed variables such as loan type and size, origin date, and borrower characteristics that may have influenced administrative processing decisions are accounted for, the "treatment" of servicing failures conditioned on these observed variables must occur at random, both respect to which loans experience these failures and when they occur. The reason is that Ocwen's administrative assignment of treatments, which loans incur servicing failures and when, cannot be influenced by variables they do not observe. Thus, conditioning on the variables they observe, the assignment of treatments is random; i.e., each loan has an equal probability of receiving a service failure treatment, and if they receive a service failure, the same probabilities of receiving it sooner rather than later. This gives the assignment of servicing failure treatments in the Ocwen data the key properties of Randomized Controlled Trials (RCT), the "gold standard" in scientific research for determining the causal effect of treatments without confounding by external, ecological factors. RCT designs are ubiquitous in the determination of whether new medical procedures, devices, and drugs are efficacious. In the analysis of the risk of adverse financial events in this report, Ocwen's "assignment" of servicing failures behaves like a RCT. Then, once the observed variables that may enter administrative processing decisions are accounted for, there is no possibility that differences in outcomes for cases and controls are due to factors that are unobserved by Ocwen and consequently not controlled in my analysis.

Privileged and Confidential

### A. MY ECONOMETRIC MODEL ESTIMATES THE NUMBER OF ADDITIONAL FORECLOSURES FROM OCWEN'S SERVICING FAILURES

86. In this section, I focus the analysis on the set of borrowers that suffered from an untimely escrow analysis and subsequently experienced a foreclosure initiation and its attendant economic costs. While there are other servicing failures and other adverse financial events that can be subjected to the same analysis, this combination of events is of leading importance because untimely escrow analysis is the most common servicing failure, and foreclosure is usually the adverse financial event with the largest economic impact, on the borrower and the community. In conformity with the approach to survival analysis outlined in the preceding paragraphs, I take as cases a sample of Ocwen loans that experienced an untimely escrow analysis, and as controls a sample of Ocwen loans who did not experience this servicing failure, as well as cases that did not experience a servicing failure at the same treatment time. I also control for observed characteristics in estimating the risk of foreclosure. The resulting analysis is sometimes referred to as a "parametric difference-in-difference" approach that in effect calculates

$$\left( \begin{bmatrix} Case\ Risk \\ after \\ service\ failure \end{bmatrix} - \begin{bmatrix} Control\ Risk \\ after\ time\ of \\ service\ failure \end{bmatrix} \right) - \left( \begin{bmatrix} Case\ Risk \\ before \\ service\ failure \end{bmatrix} - \begin{bmatrix} Control\ Risk \\ before\ time\ of \\ service\ failure \end{bmatrix} \right),$$

87.     with the square bracket subtractions netting out any systematic differences in the case and control populations prior to the service failure treatment, and the parentheses subtraction then giving the systematic difference in risk following the assignment of the service failure treatment. I estimate foreclosure risk using a discrete time proportional hazards model. A proportional hazards model is similar to a regression model in which one explains the impact of explanatory or right-hand-side variables on a dependent or left-hand-side variable.[86] In this case, the left-hand-side variable is an indicator of whether and when a loan foreclosure was initiated.[87] I can use such a model to isolate the impact of Ocwen's servicing failures on the

---

[86] Proportional hazards models are more appropriate to model the probability that a loan survives without foreclosure initiation.

[87] In a proportional hazard model, the dependent or left-hand-side variable is an indicator variable that takes the value of one if a foreclosure was initiated on a loan in a given month, and zero otherwise.

**Privileged and Confidential**

probability that a foreclosure is initiated in any given month, controlling for other characteristics that determine the likelihood of foreclosure.

88. More precisely, the discrete time proportional hazard model estimates the probability that a foreclosure is initiated in a particular month, conditional on having survived up to that month, as a function of macroeconomic factors, loan characteristics, and flags for Ocwen's servicing failures. The model thus estimates the increase in the monthly probability of foreclosure initiation that is attributed to Ocwen's servicing failures. Using the monthly increase in the probability of foreclosure initiation, I can calculate the expected number of additional foreclosure initiations that can be attributed to Ocwen's servicing failures during the damages period.

### 1. Model

89. I define the probability that a foreclosure is initiated on loan $i$ in calendar month $t$ conditional on having survived up to $t$ as $h_i(t)$.[88] The discrete time proportional hazards model assumes that this probability takes the following form:

90. $$h_i(t) = 1 - \exp(-\lambda_t \cdot \exp(Servicing\ Failure_{it}\boldsymbol{\beta} + X_{izt}\boldsymbol{\alpha} + Macro_{izt}\boldsymbol{\mu})),$$

91.     Subscript $i$ denotes loan, $z$ denotes zip code, and $t$ denotes calendar month, with the first month of observations indexed $t = 0$. $Servicing\ Failure_{it}$ are flags that capture if a loan has a servicing failure before month $t$. $X_{izt}$ is a vector of control variables that include loan and borrower characteristics determined before the date of a service failure. $Macro_{zt}$ is a vector of macroeconomic controls. Finally, $\lambda_t$ is the baseline hazard, or baseline probability of foreclosure initiation, and $\boldsymbol{\beta}$, $\boldsymbol{\alpha}$, $\boldsymbol{\mu}$ are parameter vectors.[89] The corresponding survival probabilities satisfy

92. $S_i(t) = [1 - h_i(0)] \cdot [1 - h_i(1)] \cdot \ldots \cdot [1 - h_i(t-1)]$

93. $$= \exp(-\sum_{m=0}^{t-1} \lambda_m \cdot \exp(Servicing\ Failure_{im}\boldsymbol{\beta} + X_{izm}\boldsymbol{\alpha} + Macro_{izm}\boldsymbol{\mu})),$$

---

[88]   This probability is also known as the hazard rate.

[89]   The baseline hazard is estimated non-parametrically under the assumption that it is constant within a quarter.

Privileged and Confidential

94. In this specification, the probability of foreclosure will depend on the observed characteristics of the loan and current economic conditions, including whether servicing failures occurred in the past, and cannot depend on lapsed time since the occurrence of servicing failures. This simplification implies that in the absence of time-varying $X_{izm}$ and $Macro_{izm}$, and a time-varying baseline hazard $\lambda_t$, the survival curves illustrated in Figure 9 will be exponential, corresponding to hazard rates that are independent of duration since the time of a servicing failure treatment.

95. To identify the impact of Ocwen's servicing failures, I use the fact I have performance data on loans that suffered a servicing failure before and after the servicing failure occurred. I can thus contrast the foreclosure experience of the loans before and after they are harmed by the servicing failure after controlling for all other factors that influence foreclosure initiation. This will give me a quantifiable measure of the effect of servicing failure on the probability of foreclosure initiation.[90]

2. In the main specification, I focus on the population of borrowers that experienced an untimely escrow analysis by Ocwen as identified in Ocwen's Interrogatory Responses 1-4, Exhibit C. As I explained in more detail in sections IV.A and IV.B above, these borrowers may have been overcharged or undercharged, or simply left uncertain, for a time between when the escrow analysis was mandated and when it was actually performed. For overcharged borrowers, the harm started when they began being overcharged after the escrow analysis was due ("Analysis Due Date"). For undercharged borrowers, the harm began after the new escrow analysis was actually performed ("Last Analysis Date"), and they had to start to pay back the undercharges.

96. To estimate the impact of these servicing failures, I included an indicator variable that takes the value of one for overcharged (undercharged) loans after the harm starts and zero otherwise. This indicator variable captures the incremental impact of the servicing failure on the probability of foreclosure. I also included an indicator variable that takes the value of one if a loan was overcharged (undercharged) and

---

[90] This is similar to a differences-in-differences with staggered adoption in the Econometrics literature. See for example Susan Athey and Guido W. Imbens, "Design-based Analysis in Difference-In-Differences Settings with Staggered Adoption," NBER Working Paper No. 24963, August 2018.

**Privileged and Confidential**

zero otherwise.[91] This variable captures the average difference in the probability of foreclosure initiations for loans that suffered an untimely escrow analysis relative to loans in the control group.

97.  The main specification is estimated on a 50 percent random sample of the total number of loans who suffered an untimely escrow analysis and are included in Ocwen's Interrogatory Response 1-4, Exhibit C. This amounts to 149,185 loans with an untimely escrow analysis.[92] The sample also includes 47,051 loans for which the CFPB did not identify a servicing error of the type in their complaint. These loans are included as a control group in the estimation.[93]

98. To control for macroeconomic conditions that might also be driving the likelihood of foreclosure, I include a number of variables. I include the quarterly growth in the 3-digit zip code-level housing price index ("HPI") relative to the HPI in the month of the loan's origination.[94] This measure influences both the borrower's incentive to default (if his mortgage is underwater for example) and also his ability to refinance. I also include the unemployment rate at the county level to control for local macroeconomic conditions of the borrower. Note that factors such as borrower's income, age, and employment status are accounted for in the difference-in-difference analysis by the random assignment of servicing failure treatments once variables observed by Ocwen, and hence controlled in our analysis, are taken into account.

99. To control for loan characteristics observed by Ocwen that may be related to both the probability of a service failure treatment and the risk of foreclosure irrespective of treatment, I use the following loan-level controls:

---

[91]  I also include an indicator variable for loans in that have either missing accruals or accruals equal to zero.

[92]  Of these, 82,805 were overcharged, 48,769 were undercharged, 16,298 had missing accruals and 1,313 had accrual amounts equal to zero.

[93]  The number of loans included in the estimation is smaller than the original sample as a results of data cleaning and missing observations for some of our explanatory variables. For details on the cleaning procedure refer to Appendix G.

[94]  The Housing Price Index measures the quarterly average price changes in repeat sales or refinancing on the same properties over time. The index measures prices over time relative to the average price for the first quarter of 1995.

Privileged and Confidential

- Lien position: whether a loan is a first or second lien.

- Property type: whether a property is a single-family home, a condo, a two to four-unit, a planned unit development (PUD), or other.[95,96]

- Occupancy type: whether the property is owner-occupied, non-owner occupied, or other.[97]

- Mortgage type: whether a mortgage is fixed-rate, an ARM, a HELOC, a Balloon mortgage, or other.[98]

- Logarithm of the origination loan amount in dollars.

- Logarithm of the age of the loan in months.

- Square of the logarithm of the age of the loan.

100. To make sure that the model is identifying the impact of servicing failures, and not the impact of other loan status flags that coincide with the timing of the servicing failure, I control for the status of these flags prior to the servicing failures. In particular, I include indicator variables that are equal to one after a loan was bankrupt or seriously delinquent prior to the servicing failure and zero otherwise.[99,100] I also include indicator variables that are equal to one after a loan entered a permanent loan modification or forbearance before a servicing failure and zero otherwise. The model also controls for aggregate macroeconomic trends by using quarter-year fixed effects.

101. Finally, the model also controls for differences in foreclosure regulation that vary across states by including state fixed effects.

---

[95] Two to four units include duplexes, triplexes, and fourplexes.

[96] "Other" property types represent a very small fraction of loans and include: mobile homes and land.

[97] "Other" occupancy types represent a very small fraction of loans and include: vacant, partially vacant, and unknown.

[98] "Other" mortgage types represent a very small fraction of loans and include: Graduated Payment Mortgage (GPM), Growing Equity Mortgage (GEM), and subsidized mortgages.

[99] We considered loan as seriously delinquent if it is 90+ days delinquent.

[100] For the control group, the indicator variables equal to one after the loan was bankrupt or seriously delinquent and zero otherwise.

Privileged and Confidential

## 2. Data

102. To estimate the model, I relied on information from three separate datasets produced by Ocwen: The Plaintiff's Fifth Set of Requests for Production to Defendants ("RFP's"), the CFPB's April 8, 2016 Civil Investigative Demand (CID) ("April CID"), and Ocwen's Response to Interrogatory Responses 1-4, Exhibit C ("Exhibit C"). Ocwen's RFP's contain data for the period from January 2014 to August 2018. The April CID covers data for loans that were serviced by Ocwen between January 1, 2014, and April 30, 2016. Finally, the Ocwen's Response to Interrogatory Responses 1-4, Exhibit C contains data on untimely escrow analysis with due dates starting on January 1, 2014, up to December 31, 2017. The model is estimated using data for the period from January 2014 to August 2018.

103. The dates determining the start of the harm for the borrowers that suffered from an untimely escrow analysis comes from Ocwen's Response to Interrogatory Responses 1-4, Exhibit C. As I explained in more detail in Section IV.B above, these are given by the Analysis due date for overcharged borrowers, and by the last analysis date for the undercharged borrowers.

104. Loan characteristics come from RFP1. This includes information on origination date, loan amount at origination, lien position, property type, occupancy type, and mortgage type. RFP1 also contains information on the borrowers' address, including zip code, which I use to merge in the data on the HPI and unemployment rate.

105. Data on loan performance comes from multiple RFP's and from the April CID data. Foreclosure history comes from RFP's 9 and 10. Bankruptcy history comes from RFP 7, RFP7 Supplemental, and RFP 19. The delinquency history comes from RFP 5 supplemented with information from the April CID. Data on loan modifications come from RFP 13. Finally, data on forbearance comes from RFP 14.

Privileged and Confidential

106. Data on the HPI comes from the Federal Housing Finance Agency.[101]
Unemployment rates come from the Bureau of Labor Statistics.[102]

107. In addition to these data sets, I relied on a detailed data set of private-label securitized loans compiled by MBSData for additional robustness checks.[103,104] This data set contains performance history data, as well as detailed loan characteristics at origination for a large share of privately securitized mortgages.[105] I was able to match a subset of Ocwen loans in the RFP's to the MBS data using information on loan characteristics provided in RFP1.[106] This data set allows me to estimate a model using non-Ocwen loans as a control group as a robustness test. I describe this robustness test in more detail below.

### 3.  Results

108. The following table includes the estimates of the coefficients on the proportional hazards model. See Appendix G for the description of each of the variables included in the model.[107]

---

[101] I use the quarterly 3-digit zip code All-Transactions Housing Price Index Published by the FHFA. According to the FHFA "The FHFA Housing Price Index (HPI) is a broad measure of the movement of single-family house prices. The HPI is a weighted, repeat-sales index, meaning that it measures average price changes in repeat sales or refinancing on the same properties. This information is obtained by reviewing repeat mortgage transactions on single-family properties whose mortgages have been purchased or securitized by Fannie Mae or Freddie Mac since January 1975." See https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx (last viewed August 12, 2019).

[102] See https://www.bls.gov/lau/ (last viewed August 12, 2019).

[103] "MBSData, LLC is a leading provider of non-agency mortgage backed securities data and analytics to the structured finance marketplace." See http://www.mbsdata.com/ (last viewed August 12, 2019).

[104] Private-label securitized loans are those loans that are securitized by private institutions as opposed to agency securitized loans which are the loans that were securitized by the Government Sponsored Entities (GSE's) Fannie Mae, Freddie Mac, and the Government Corporation Ginnie Mae.

[105] MBSData includes information on approximately 30 million private-label mortgage loans.

[106] I match loans using origination date, lien position, loan amount at origination, and zip code. See Appendix F for a detailed description of the matching process.

[107] For brevity, the table below omits the coefficient estimates for the state and quarter-year fixed effects. The coefficient estimates on these variables can be found in my workpapers.

Privileged and Confidential

## Table 11: Coefficient Estimates of Proportional Hazard Model

| Dependent Variable: Foreclosure Flag | | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-value |
| | [1] | [2] | [3] |
| Harmed Loan Indicators | | | |
|     Overcharged Flag | 0.184 | 0.044 | 0.000 |
|     **Overcharged After Analysis Due Date Flag** | **1.356** | **0.038** | **0.000** |
|     Undercharged Flag | 0.750 | 0.036 | 0.000 |
|     **Undercharged After Last Analysis Date Flag** | **0.711** | **0.030** | **0.000** |
|     Loans with Accruals Equal to Zero Flag | 1.058 | 0.081 | 0.000 |
|     Loans with Accruals Missing Flag | 1.543 | 0.029 | 0.000 |
| | | | |
| Loan Status Controls | | | |
|     Bankruptcy Status Before Harm Flag | 0.118 | 0.021 | 0.000 |
|     Delinquency Status Before Harm Flag | 1.506 | 0.015 | 0.000 |
|     Permanent Loan Mod. Before Harm Flag | -0.088 | 0.025 | 0.000 |
|     Forbearance Before Harm Flag | -0.281 | 0.072 | 0.000 |
| | | | |
| Other Controls | | | |
|     Housing Price Index Percent Change | -0.253 | 0.042 | 0.000 |
|     Unemployment Rate | -0.012 | 0.005 | 0.011 |
|     Log of Loan Age (Months) | 10.567 | 0.562 | 0.000 |
|     Log of Loan Age Squared (Months) | -1.069 | 0.061 | 0.000 |
|     Log of Loan Amount ($) | 0.052 | 0.011 | 0.000 |
| | | | |
| Lien Position | | | |
|     Second | -1.466 | 0.116 | 0.000 |
| Property Type | | | |
|     2-4 Units | -0.057 | 0.025 | 0.020 |
|     Planned Unit Development | -0.009 | 0.022 | 0.697 |
|     Condo | 0.057 | 0.024 | 0.019 |
|     Other | -0.177 | 0.044 | 0.000 |
| Occupancy Type | | | |
|     Non-Owner | -1.322 | 0.074 | 0.000 |
|     Other | 1.539 | 0.014 | 0.000 |
| Mortgage Type | | | |
|     ARM | 0.103 | 0.015 | 0.000 |
|     Balloon | 0.156 | 0.015 | 0.000 |
|     HELOC | 0.446 | 0.350 | 0.202 |
|     Other | 0.188 | 0.056 | 0.001 |
| Constant | -34.000 | 1.316 | 0.000 |
| | | | |
| Log Likelihood | | -160,964.39 | |
| Number of Observations | | 6,286,761 | |
| Number of Loans | | 196,236 | |
| Zero Outcomes | | 6,255,477 | |
| Nonzero Outcomes | | 31,284 | |
| Wald Chi Squared | | 78,465.65 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rogs 1-4, Exhibit C; RFP data; FHA and BLS.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Standard errors clustered at the loan level.

[3]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[4]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

109. The coefficients that capture the impact of the untimely escrow analysis on the probability of foreclosure initiation are both positive and highly statistically

**Privileged and Confidential**

significant.[108] This shows that loans which were overcharged or undercharged because of servicing failures from Ocwen have a higher likelihood of foreclosure initiation after being harmed by the servicing failure. As discussed above, the impact of a servicing failure, like an untimely escrow analysis, on the probability of foreclosure initiation may be driven by the financial impact on the borrower. However, the servicing failure can also affect the probability of foreclosure initiation if the detection and correction of the failure alters Ocwen's classification and software processing of a loan, or if it affects the Ocwen administrative unit responsible for handling the loan. Moreover, it can also leads to an increase in the probability of foreclosure initiation if the failure leads to increased scrutiny and less administrative flexibility on behalf of Ocwen.

110. Using the estimates of the model shown in Table 11, and the sample data, I can calculate the impact of Ocwen's untimely escrow analysis.[109] The following table gives the average increase in the cumulative probability of foreclosure from Ocwen's servicing failures for overcharged and undercharged loans, respectively. The results indicate that on average, Ocwen's untimely escrow analysis that led to customers being overcharged increased the average cumulative probability that a foreclosure is initiated by 6.73 percentage points. Similarly, late escrow analysis that led to customers being undercharged increased the average cumulative probability of an initiated foreclosure by 5.07 percentage points.

---

[108] These are the coefficients labeled "Overcharged After Analysis Due Date Flag" and "Undercharged After Last Analysis Date Flag" in the table above.

[109] For each harmed loan I calculate the cumulative probability of survival from the time of the harm from servicing failures to the loan's last observation in the sample, for both the actual world where the loans suffered from the servicing failure and for the counterfactual scenario where the loan did not suffer a servicing failure. I then take the differences between these cumulative probabilities and calculate the average across loans in the sample separately for overcharged and undercharged loans. See Appendix G for more details.

Privileged and Confidential

**Table 12: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation**

**(in percentage points)**

|  | Impact |
|---|---|
|  | [1] |
| Overcharged Loans | 6.733 |
| Undercharged Loans | 5.073 |

Sources: Rogs 1-4, Exhibit C; RFP data; FHA and BLS.

Notes: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See Appendix G for more details.

### 4. Robustness

111. In addition to my main specification above, I estimated a number of additional models to test whether the results for my model were robust to both model and sample specification. I outline the robustness test below and include their results in Appendix H.

### a)    *Models using the Ocwen sample*

112. To test the robustness of my model, I performed a series of robustness tests using the same sample of loans as in my original specification. In my first robustness test, I estimated my main specification but excluding from the model harmed loans that suffered adverse credit events before the harm from servicing failures.[110] In addition, I tested the conclusions of the model if I allow the impact of the harm from servicing failure to vary by the length of time elapsed since the beginning of the harm from the servicing failure. My results in Appendix H show that the conclusions of my main model are robust to these modifications.[111]

---

[110]  I removed from the sample loans that were bankrupt, seriously delinquent, were in forbearance, or received a permanent loan modification before the servicing failure.

[111]  See Appendix H for additional details on these specifications.

Privileged and Confidential

> ### b) *Result using the matched MBS-Ocwen sample using non-Ocwen loans as controls*

113. As an additional robustness check, I estimated a model using the MBS performance and origination data on a sample of Ocwen loans with untimely escrow analysis that I was able to match to MBS. I also included a random sample of approximately 100 thousand non-Ocwen loans to use as controls.[112] The results, included in Appendix H, confirm the conclusions of my main model.

## B. ESTIMATED COST PER FORECLOSURE TO BORROWERS HARMED BY OCWEN'S SERVICING FAILURES

114. The model I described above provides me with the basis to estimate the number of Ocwen borrower foreclosures that will result from Ocwen's servicing failures. Damages will be the product of the number of expected foreclosures times the cost per foreclosure. In this section, I describe how I estimated the average cost per foreclosure of Ocwen's harmed borrowers.

115. Foreclosure costs to homeowners consist of administrative and legal fees, relocation costs, equity loss on the home, and income tax liability. Administrative and legal fees include filing and attorney fees that are passed onto the customer by the servicer.[113] Relocation costs refer to expenses associated with moving one's residence. Equity loss is the decline in property value on the home. Income tax is levied on the cancellation of debt income and gain for foreclosure.[114] The cost of

---

[112]  The random sample of loans was drawn from the set of MBS loans that have performance history after 2013.

[113]  OCW-019-0011419 at -429 ("The Firm's engagement was to review and analyze [Ocwen's] default, foreclosure and bankruptcy-related fees and costs (default-related) paid by [Ocwen] and assessed to a Borrower's mortgage loan account for the 12-month period from June 1, 2013 to May 31, 2014 (Review Period)." Footnote on "assessed" in the previous quote stated that "We analyzed the fees assess to a mortgage loan account, without regard to whether the fees were collected from the Borrower."). See also OCW-CFPB-001-06523242_0005 ("Navigant Consulting, Inc. …performed a periodic market analysis on default related fees and expenses assessed to borrowers / investors associated with servicing activities") and OCW-CFPB-001-06523242_0025 ("Navigant sampled 5 loans in default to conduct a life of default analysis of the total sum of default related fees assessed to borrowers during foreclosure…" The four fees in the summary table are Foreclosure Attorney / Trustee Costs Fee, Publication / Posting Fee, Process Server Fee, and Title Fee Cost.).

[114]  There are several exceptions to the income tax, including: (1) debt that was discharged through bankruptcy, (2) debt that was cancelled when the borrower was insolvent, *i.e.*, the borrower's total debts exceeded total assets, and (3) income from debt discharged on the borrower's principal residence if the borrower lived in the home for two or more years and the debt was forgiven between calendar years 2007 and 2016. Because I am not able to observe the total debt and assets of Ocwen's

**Privileged and Confidential**

foreclosure to a particular homeowner depends on how far the foreclosure process had proceeded (*e.g.*, rescinded, sold, or evicted). While all initiated foreclosures incur administrative and legal fees, relocation fees and equity loss apply to foreclosures that proceed to sale and eviction. To be conservative, I assume that foreclosures with completed sales but not evictions do not have relocation fees.

116. Therefore, to estimate the average cost of foreclosure among Ocwen's harmed borrowers, I first calculated the share of loans at various stages of foreclosure as shown in Figure 10. The figure reflects loans on which Ocwen had previously been late to perform an escrow analysis and later initiated foreclosure. Among the 32,190 loans in the Late Escrow Analysis population on which Ocwen had later initiated foreclosure, 44.6 percent of foreclosures had completed sales, 1.5 percent of foreclosures had been rescinded, and 53.9 percent of foreclosures appeared to remain outstanding through the last date of the dataset. Approximately one-third of completed sales, or 14 percent of initiated foreclosures after the missed or late escrow analysis, had eviction dates in the dataset; the remaining two-thirds did not have eviction dates listed in the dataset.

---

customers, I have made the conservative choice of omitting the income tax liability from foreclosure. Internal Revenue Service, "Home Foreclosure and Debt Cancellation," http://www.irs.gov/newsroom/home-foreclosure-and-debt-cancellation (last viewed on July 25, 2019).

Privileged and Confidential

**Figure 10: Observed Share of Loans on Which Ocwen Initiated Foreclosure between January 1, 2014 and August 6, 2018 and Previously Was Late to Perform an Escrow Analysis, by Outcome after Foreclosure Initiation**



Sources: Ocwen's Response to Requests 9 and 10 from the Bureau's Fifth Set of Requests for Production

Notes: Percentages are calculated based on borrowers who had a foreclosure initiated after harm (but-for analysis date for overcharges and late analysis date for undercharges). Loans are allocated based on the outcome that is nearest to the foreclosure initiation date.

117. When calculating the average cost of foreclosure to the homeowner, I assumed that the observed ratio of initiated foreclosures proceeding to sale relative to those that are rescinded is constant and can therefore be applied to the ongoing foreclosures. In other words, among the ongoing foreclosures, 3 percent would be rescinded and 97 percent would proceed to a sale, where one-third would be evicted and two-thirds would not be evicted.

118. Table 13 summarizes the breakdown of foreclosure costs by component and data source(s). In column [A], I report component costs based on Ocwen's records when available or public sources. Each component is calculated as follows:

a. I derived the legal and administrative fees per foreclosure from Ocwen's Semi-Annual Market Fee Analysis 6/1/2014 to 2/28/2015 dated December 1, 2015 and Semi-Annual Market Fee Analysis 3/1/2015-8/31/2015 dated July 12, 2016,[115] which reports fees from the review periods of June 1, 2014 through February 28, 2015 and March 1, 2015 through August 31,

---

[115]   OCW-CFPB-001-06235505.

Privileged and Confidential

2015. Navigant, a consulting firm, prepared the presentation and reported statistics on default related fees from all states. Fees are broken down by category (such as Foreclosure and Bankruptcy) and transaction (such as Eviction Fees, Foreclosure technology fee, and Initial Registration). Foreclosure Attorney Fees were, on average, $431 during this period.[116] Process server and publication/posting costs were, on average, $248.36 and $406.46, respectively.[117] My estimate of legal and administrative fees is conservative in so far as I do not include additional costs that servicers may assess to borrowers including title fees.[118] Moreover, fees may be incurred multiple times for a given foreclosure proceeding such that total attorney fees could be multiples higher than the fee shown in Table 13.[119] These legal and administrative fees do not include borrower-incurred legal costs.

b.   Relocation costs are estimated as the average cost in the price range for a local "move across town" from a 3-bedroom house, which was $560 to $1,000.[120] This cost reflects the cost of hiring a truck and two movers; it does not include search costs for the new home or lost wages from time away from work.

c.   Equity loss is estimated as the decrease in the property value at the time of foreclosure. The property value discount of 10 percent is a conservative

---

[116]  OCW-CFPB-001-06235505 at slide 13. Separately, Ocwen reported Foreclosure Attorney Cost of $51.59, and I did not include this transaction in the costs per foreclosure calculation.

[117]  OCW-CFPB-001-06235505 at slide 13. Ocwen's Annual Report of Default-Related Fees & Costs for the Review Period June 1, 2013 – May 31, 2014 reported lower average costs for process server at $166 and higher average costs for publication/posting at $500. The report noted that these averages had fallen from $179 (to $166) and $529 (to $500) since the last review period (OCW-049-0071308 at -332 and -333).

[118]  OCW-CFPB-001-06523242 at slide 26: "Navigant sampled 5 loans in default to conduct a life of default analysis of the total sum of default related fees assessed to borrowers during foreclosure, where Ocwen had a maximum scheduled fee amount per event." In the five-loan sample analysis, title fee cost is considered as assessed to borrowers during foreclosure.

[119]  OCW-CFPB-001-06523242 at slide 26-28.[120]  Mary Boone, "How Much Does It Cost to Move," Zillow.com, March 23, 2018, https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663/ (last viewed on August 9, 2019).

[120]  Mary Boone, "How Much Does It Cost to Move," Zillow.com, March 23, 2018, https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663/ (last viewed on August 9, 2019).

**Privileged and Confidential**

estimate of the REO discount from the academic literature.[121] To calculate the average fair market value at foreclosure, I applied the appreciation in the county-level housing price index from origination to foreclosure initiation to the home purchase price. On average, the fair market value at foreclosure among harmed borrowers in the Late Escrow Analyses population was $204,704. The equity loss is the product of the discount and fair market value, which is just over $20,000.

---

[121]   See Federal Housing Finance Agency, "A Primer on Price Discount of Real Estate Owned (REO) Properties," Mortgage Market Note 12-01 at p. 4: "While the academic estimates range from zero to 50 percent depending on location, time and controls used in the econometric models, the majority of estimates of REO discount in the academic literature are in the 10 to 25 percent range, particularly for nationwide averages."

Privileged and Confidential

### Table 13: Estimated Costs by Component of Foreclosure Costs

|  | Ocwen & Public Sources | Moreno 1995 Report |
|---|---|---|
|  | [A] | [B] |
| **Legal and Administrative Fees** |  |  |
| [1] Attorney/Trustee Fees | $431 | $1,328 |
| [2] Publication/Posting and Process Server Costs | $655 | $1,992 |
| [3] Subtotal: Legal & Admin Fees | $1,086 | $3,320 |
| **Relocation Costs** |  |  |
| [4] Relocation Costs Per Foreclosure | $780 | N/A |
| **Equity Loss** |  |  |
| [5] Property Value Discount | 10% | 13% |
| [6] Average Fair Market Value at Foreclosure | $204,704 | $204,704 |
| [7] Subtotal: Equity Loss | $20,470 | $26,612 |

Sources and Notes

https://beta.bls.gov/dataViewer/view/timeseries/CUUR0000SA0 [1][A]: Attorney/Trustee Fees are the average of the Foreclosure Attorney Fees from OCW-CFPB-001-06235505 at slide 13 and OCW-CFPB-001-06523242 at slide 15.

[1][B]: Moreno 1995, Exhibit F; inflation adjusted to 2019 dollars.

[2][A]: Publication/Posting and Process Server Costs are the averages of the Publication/Posting and Process Server Costs Fees from the OCW-001-06235505 at slide 13 and OCW-001-06523242 at slide 15.

[2][B]: This estimate also includes title work and filing fees, from Moreno 1995, Exhibit F; inflation adjusted to 2019 dollars using CPI.

[3]: = [1] + [2]

[4][A]: Mary Boone, "How Much Does It Cost to Move," Zillow.com, March 23, 2018 at https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663/ (last viewed on August 9, 2019).

[5][A]: Federal Housing Finance Agency, "A Primer on Price Discount of Real Estate Owned (REO) Properties," Mortgage Market Note 12-01 at p. 4.

[5][B]: Moreno 1995; inflation adjusted to 2019 dollars using CPI.

[6][A] & [6][B] = purchase price x (1+ Housing Price Index). Purchase price is from Ocwen's Response to Request 1 from the Bureau's Fifth Set of Requests for Production. Housing Price Index is the percentage change in the property value between the foreclosure date and the loan origination date. The geographical information of the loans from Ocwen's Response to Request 1 from the Bureau's Fifth Set of Requests for Production is matched to area-specific housing price indices from Federal Housing Finance Agency, accessed on July 21, 2019, at https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-IndexDatasets.aspx#qat, and from Zillow, accessed on July 21, 2019 at https://www.zillow.com/research/data/.

[6][B]: Moreno 1995, p12; inflation adjusted to 2019 dollars using CPI.

[7]: = [5] x [6]

119. As an alternative measure of foreclosure costs, I have included cost components from a well-cited study conducted by the Family Housing Fund in 1995.[122] The study followed 800 households in Minneapolis and St. Paul between 1991 and 1995

---

[122]  Ana Moreno, "The Cost-Effectiveness of Mortgage Foreclosure Prevention," Minneapolis: Family Housing Fund, 1995.

**Privileged and Confidential**

and estimated that the average cost of foreclosure to homeowners was approximately \$7,200, which is the equity loss on the home.[123] As recent at 2010, this figure has been cited by government program evaluation reports on the cost to homeowners.[124] Exhibit F of Moreno's report listed "Fannie Mae's Typical Expenses During the Foreclosure Process," and Foreclosure Legal Fees and Legal Expenses (title work, filing fees, and publication costs) were \$800 and \$1,200, respectively.[125] I inflation-adjusted these cost components from 1995 to 2018/19 dollars using the consumer price index.[126]

120. Combining the cost components in Table 13 with share of loans by stage in the foreclosure process as discussed in ¶ 117 above, Table 14 shows the calculation of the average foreclosure cost to a homeowner in the Late Escrow Analyses population. Each column corresponds to a set of loans in the Late Escrow Analyses population that, having started the foreclosure process, reached the designated stage in the foreclosure process. Rows 1 and 2 list the share of loans as observed in data and reweighted, respectively. Rows 3-5 are the components of foreclosure costs using numbers from Ocwen and Public Sources, and rows 7-9 are the components using Moreno's 1995 report.

---

[123]   Moreno (1995) at p. 12 ("Long-term loss of the financial investment in the property. For the homeowners served by NRRC and St. Paul HIO the difference between the assessed market value and the balance on the home mortgage was \$7,200 on average." Footnote cites to Wilder Research Center's Quarterly Report, Cumulative from 7/1/91 to 12/31/94.).

[124]   U.S. Department of Housing and Urban Development, "Economic Impact Analysis of the FHA Refinance Program for Borrowers in Negative Equity Positions," 2010, https://www.hud.gov/sites/documents/IA-REFINANCENEGATIVEEQUITY.PDF (last viewed on August 3, 2019) at p. 9. See also Joint Economic Committee, "Sheltering Neighborhoods from the Subprime Foreclosure Storm," April 11, 2007, https://www.jec.senate.gov/archive/Documents/Reports/subprime11apr2007revised.pdf (last viewed on August 3, 2019) at p. 14.

[125]   Moreno (1995) at p. 35.

[126]   To adjust for inflation, I multiplied Moreno's estimates by (253.268, which is the average CPI from July 2018 to June 2019 / 152.383, which is the average CPI from January 1995 to December 1995). Bureau of Labor Statistics, "CPI-All Urban Consumers (Current Series)," https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201906.pdf   (last   viewed   on August 3, 2019).

Privileged and Confidential

### Table 14: Foreclosure Costs by Stage of Foreclosure Process and Average Foreclosure Costs to Homeowners

| | Foreclosure Ongoing | Foreclosure Rescinded | Foreclosure Sale Closed | | Total: All Loans Reweighted |
| | | | Evicted | Not Evicted | |
| | [A] | [B] | [C] | [D] | [E] |
| [1]  Share of Loans (Observed) | 53.9% | 1.5% | 14.2% | 30.4% | **100%** |
| [2]  Share of Loans (Reweighted) | | 3.3% | 30.8% | 65.9% | **100%** |
| **Foreclosure Costs: Ocwen and Public Sources** | | | | | |
| [3]  Legal and Administrative Fees | | $1,086 | $1,086 | $1,086 | **$1,086** |
| [4]  Relocation Fees | | | $780 | | **$240** |
| [5]  Equity Loss | | | $20,470 | $20,470 | **$19,804** |
| [6]  **Total Cost Per Foreclosure (Ocwen & Public)** | | $1,086 | $22,336 | $21,556 | **$21,130** |
| **Foreclosure Costs: Moreno 1995 Report** | | | | | |
| [7]  Legal and Administrative Fees | | $3,320 | $3,320 | $3,320 | **$3,320** |
| [8]  Relocation Fees | | | N/A | | **N/A** |
| [9]  Equity Loss | | | $26,612 | $26,612 | **$25,746** |
| [10] **Total Cost Per Foreclosure (Moreno 1995)** | | $3,320 | $29,932 | $29,932 | **$29,066** |

Sources and Notes:

[1]: Ocwen's Response to Requests 9 and 10 from the Bureau's Fifth Set of Requests for Production.

[2][B]: = [1][B]/([1][B]+[1][C]+[1][D])

[2][C]: = [1][C]/([1][B]+[1][C]+[1][D])

[2][D]: = [1][D]/([1][B]+[1][C]+[1][D])

[3]: Attorney/Trustee Fees are the average of the Foreclosure Attorney Fees from OCW-CFPB-001-06235505 at slide 13 and OCW-CFPB-001-06523242 at slide 15.

[4]: Mary Boone, "How Much Does It Cost to Move," Zillow.com, March 23, 2018, https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663/ (last viewed on August 9, 2019).

[5]: See Table 17: Estimated Costs by Component of Foreclosure Costs.

[6]: = [3] + [4] + [5]

[7] & [9]: From Table 17: Estimated Costs by Component of Foreclosure Costs.

121. Based on Ocwen's data and public sources, the average cost of foreclosure is $21,130.[127] The average is calculated from three possible outcomes after foreclosure initiation:

    a.   For foreclosures that were rescinded (column [B]), which are expected to comprise 3 percent of foreclosures initiated in the harmed population, the pecuniary costs included legal and administrative fees only of $1,086.

---

[127]  This calculation is conservative compared to damages amounts entered in some recent federal court cases involving foreclosure. For example, a federal district court recently upheld a jury verdict against Ocwen that awarded a borrower $582,000 in actual damages, largely for the emotional distress stemming from Ocwen wrongfully deeming her loan to be in default, refusing to accept payments, and threatening her with foreclosure. Saccameno v. Ocwen Loan Servicing, LLC, 372 F. Supp. 3d 609, 631–32 (N.D. Ill. 2019). The jury also awarded $3 million in punitive damages, for which Ocwen filed an appeal. Ocwen is not contesting the $582,000 in compensatory damages.

Privileged and Confidential

b. For foreclosures in which the sale closed and the homeowner was evicted (column [C]), which are expected to be 31 percent of foreclosures initiated in the harmed population, the cost included legal and administrative fees, relocation fees, and equity losses; costs summed to $22,336.

c. Foreclosures in which the sale closed but no eviction, costs comprised of legal and administrative fees and equity losses; the total was $21,556. This group is expected to be 66 percent of foreclosures initiated in the harmed population.

122. Similarly, using the cost estimates from Moreno's study, the average cost of foreclosure is $29,066. Although relocation costs are not included, the average based on Moreno is higher because (1) legal and administrative fees are larger than that which are observed in Ocwen's production and (2) the property discount rate is slightly higher at 13 percent versus 10 percent. As I discussed in ¶ 118.c, my choice of 10 percent is a conservative estimate from the literature.

## C. SUMMARY OF DAMAGES FROM ADDITIONAL FORECLOSURES

123. Table 15 combines the estimated cost per foreclosure from section VI.B and number of additional foreclosures between January 1, 2014 and August 31, 2018 from section VI.A. Damages range from $352 million to $484 million depending on the estimated average cost per foreclosure.[128]

---

[128] If asked, I would be able to allocate damages across individual loans and to scale damages to a January 10, 2014 start date.

Privileged and Confidential

**Table 15: Calculation of Damages from Additional Foreclosures Attributed to Ocwen's Untimely Escrow Analyses**

| | Cost Per Foreclosure Sources: | | | | | |
| | Ocwen and Public Sources | | | Moreno 1995 Report | | |
| | Overcharge | Undercharge | Total | Overcharge | Undercharge | Total |
| | [A] | [B] | [C] | [D] | [E] | [F] |
| [1] Average cost per foreclosure ($) | $21,130 | $21,130 | $21,130 | $29,066 | $29,066 | $29,066 |
| [2] Cumul. prob. of add'l foreclosures | 6.73% | 5.07% | 6.12% | 6.73% | 5.07% | 6.12% |
| [3] # loans harmed by servicing failure | 170,954 | 101,053 | 272,007 | 170,954 | 101,053 | 272,007 |
| [4] # add'l foreclosures | 11,510 | 5,126 | 16,636 | 11,510 | 5,126 | 16,636 |
| [5] **Total foreclosure costs ($ millions)** | $243.2 | $108.3 | **$351.5** | $334.5 | $149.0 | **$483.5** |

Sources and Notes:

[1]: See Table 14.

[2]: See Table 12.

[3]: Number of loans with overcharges and undercharges in Rogs 1-4, Exhibit C excluding loans that were ever bankrupt and loans that had a foreclosure sale prior to the earliest foreclosure initiation date in Ocwen's Response to Request 9 from the Bureau's Fifth Set of Requests for Production.

[4]: = [2] x [3].

[5]: = [1] x [4].

## D.   COSTS NOT QUANTIFIED TO THE BORROWER AND COMMUNITY

124. The damages I have calculated do not capture other costs to the borrowers and communities that could constitute damages. Although these costs and damages are difficult to quantify, there is evidence from the academic literature that they can be sizeable. In this section, I describe three specific types of costs. First, borrowers are harmed by inaccurate and timely information regarding their loans that can adversely affect their financial position. Second, borrowers forced into foreclosure suffer from credit constraints and find it difficult to re-enter the housing market for some time after foreclosure. Third, homeowners near foreclosed homes may suffer property value reductions. This not only harms the homeowners, it reduces the property tax base and thereby reduces local (city and county) tax revenues. I review the academic literature regarding these costs below.

### 1.   Receiving Accurate and Timely Information is Critical in Financial Decision-making

125. Because of Ocwen's servicing failures, borrowers did not have accurate information about their financial obligations on their escrow accounts and mortgage loans. Acting on inaccurate information would lead borrowers to make suboptimal financial decisions when allocating household resources. Stated simply, borrowers' ability to make the best financial decisions relies on their having accurate

**Privileged and Confidential**

information regarding the relative costs of each option. If a borrower is presented with inaccurate information regarding amounts due on their mortgage, then their financial decision making is compromised. For example, if a borrower is presented with a lower monthly escrow payment (for example, $200) relative to the payment that she would have been assessed with an on-time escrow analysis, then the borrower may use the additional funds that she thought were at her disposal to pay down other less costly debt. Had the borrower known that her obligations to her mortgage were higher, then she may have made her full escrow payment instead.

126. More specifically, inaccurate information leads to suboptimal decisions because it changes the relative value that a consumer ascribes to his or her options. In a classic consumer choice model, the consumer weighs the net benefits of a particular option against his or her alternative options. If presented with the wrong information, the consumer may overestimate the relative cost of Option A to Option B. In doing so, she may select Option B when she would have preferred Option A had the correct information been shared.

127. There are numerous papers in the economic literature that analyze how the provision of information influences decision-making and consumer well-being. For example, in health economics, researchers have studied how information frictions such as the lack of information about which providers are in-network, affect choice across health insurance plans.[129] These researchers found that consumers who erroneously thought that one health insurance plan provided a broader provider network than the other plan (when, in fact, the networks were the same) were willing to pay, on average, $2,267 more for the plan than consumers who knew the correct information.[130] Furthermore, in an experimental setting, a recent working paper by a former Director of the Federal Trade Commission Bureau of Economics showed that, when incentives between the information holder and receiver are misaligned,

---

[129] Benjamin R. Handel, Jonathan T. Kolstad, "Health Insurance for 'Humans:' Information Frictions, Plan Choice, and Consumer Welfare," *American Economic Review*, 2015, 105(8): 2449-2500. On information frictions and choice in the health care industry, see also Jeffrey R. Kling, Sendhil Mullainathan, Eldar Shafir, Lee C. Vermeulen, and Marian V. Wrobel, "Comparison Friction: Experimental Evidence from Medicare Drug Plans," *The Quarterly Journal of Economics*, 2012, 127:199-235.

[130] Handel and Kolstad (2015) at p. 2452.

the former used complex disclosures to obfuscate the true value and thereby cause receivers to make more errors when guessing the value.[131]

128. Information is clearly important in financial decision making as evinced by the literature on "hard and soft" information in the banking industry. Hard information refers to numerical data points, such as credit scores, whereas soft information are provided in text. Soft information may be "hardened" as exemplified by the origins of credit ratings in the 19th century.[132] In a recent working paper, Liberti and Petersen (2018) provide a survey of papers that have studied the roles and influences of hard and soft information in the financial sector.[133]

129. Pertaining to household financial decisions, researchers have analyzed the impact of financial literacy on financial decision-making, such as planning for retirement and using more expensive credit. Focusing on the population ages 18 years and older in the Rand American Life Panel, Lusardi and Mitchell (2017) found that individuals who ranked higher in financial literacy[134] had given more thought to retirement.[135] Lusardi and Tufano (2015) estimated that borrowers with lower debt literacy paid

---

[131] Ginger Zhe Jin, Michael Luca, and Daniel J. Martin, "Complex Disclosure," NBER Working Paper No. 24675, October 2018. In the experiment, a sender randomly draws a number between 1 and 10 and decides how many computer-generated numbers that sum to the true number (up to 20) to present to the receiver. The sender would like the receiver to guess as high of a number as possible while the received would like to guess the correct number. In this setting, senders were more likely to send complex signals when they drew lower numbers, and while receivers surmised that the number was likely low, the complexity worked to the senders' advantage.

[132] José Maria Liberti and Mitchell A. Petersen, "Information: Hard and Soft," NBER Working Paper No. 25075, September 2018 at p. 7.

[133] José Maria Liberti and Mitchell A. Petersen, "Information: Hard and Soft," NBER Working Paper No. 25075, September 2018.

[134] The authors distinguish between levels of financial literacy. Basic financial literacy was measured based on the respondent's understanding of terms such as compound interest, inflation, and time value of money. Advanced financial literacy questions included the function of the stock market, relation between interest rates and bond prices, and risk diversification.

[135] Annamaria Lusardi and Olivia S. Mitchell, "How Ordinary Consumers Make Complex Economic Decisions: Financial Literacy and Retirement Readiness," *Quarterly Journal of Finance,* 2017, 7(3): 1750008-1-17500083-1. The question was worded as, "How much have you thought about retirement? A lot, some, little, or hardly at all?" The model estimates indicate that individuals with advanced financial literacy had thought more about retirement relative to those with lower financial literacy even after controlling for age, education, and other observed characteristics. Based on the model specification, it is difficult to translate the coefficient into a quantified amount, such as the probability of responding that he/she thought a lot about retirement.

46 percent more fees than those with higher literacy levels.[136] These findings are corroborated in other studies discussed in survey papers such as Hastings, Madrian, and Skimmyhorn (2013) and Lusardi and Mitchell (2014).[137]

130. Collectively, these studies about the influence of information and provision of information on economic outcomes show that information plays a critical role in decision making.

## 2. Trends from Credit Reporting Data Show That, After Foreclosure, Credit Outcomes May Be Slow to Recover

131. As one of three "consequents of foreclosure for borrowers," identified in Ocwen's corporate training manual on foreclosure is "Damages Credit Rating" and is accompanied by the explanation: "A foreclosure on the Credit Report would badly affect the borrower's credit rating and would impair his/her ability to get credit in the future."[138] Indeed, foreclosure can reduce future access to credit because lenders view it as an indicator that the borrower is more likely to default on a loan and it is visible on the borrower's credit report for 7 years after the date of the initial delinquency on the mortgage loan account.[139]

132. Using credit reporting data primarily through the financial crisis, researchers have analyzed the effects of foreclosure on credit outcomes including new mortgages, credit scores, and delinquency status on non-mortgage credit accounts. For example,

---

[136] Annamaria Lusardi and Peter Tufano, "Debt literacy, financial experiences, and overindebtedness," *Journal of Pension Economics & Finance*, 2015, 14(4): 332-368. Working with a market research firm, the authors conducted a phone survey of approximately 1,000 U.S. respondents. Debt literacy is measured by three questions related to compound interest, credit card debt, and choice of "the most advantageous mean of payment, given two options."

[137] Annamaria Lusardi and Olivia S. Mitchell, "The Economic Importance of Financial Literacy: Theory and Evidence," *Journal of Economic Literature*, 2014, 52(1): 5-44 and Justine S. Hastings, Brigitte C. Madrian, and William L. Skimmyhorn, "Financial Literacy, Financial Education, and Economic Outcomes," *Annual Review of Economics*, 2013, 5:347-373.

[138] OCW-CFPB-001-01464439 at -55. The two other consequences are "Property Loss: Borrower would lose title over the property and would have to vacate the property" and "Deficiency Liability: After foreclosure, if the appraised value of the property is less than the amount the borrower owes to lender, then the borrower might be liability for the difference amount. It is called Deficiency Judgment."

[139] Molloy and Shan (2013), p. 230; see also Stacy Smith, "Am I Able to get an Old Foreclosure Taken off my Credit Report," Experian, June 8, 2017, https://www.experian.com/blogs/ask-experian/am-i-able-to-get-an-old-foreclosure-taken-off-my-credit-report/ (last viewed on August 10, 2019).

Privileged and Confidential

Hedberg and Krainer (2010) found that few borrowers—less than 14 percent—had a new mortgage 7 or more years after foreclosure.[140]

133. Two studies analyzed how quickly credit scores recovered after foreclosure and arrived at different conclusions. Brevoort and Cooper (2013) found that delinquency rates on auto and credit card debt remained elevated relative to pre-foreclosure levels for at least 5 years after foreclosure start.[141] Because of higher rates of delinquency, the borrowers' credit scores were also slow to recover, particularly for prime borrowers. The authors used Equifax Consumer Credit Panel from the first quarter of 1999 through the fourth quarter of 2010. Using data on mortgages from CoreLogic and credit accounts from TransUnion from September 2004 through July 2009, Demyanyk (2017) argued that moving from serious delinquency (90+ days delinquent) to foreclosure had a small impact on credit scores relative to the drop observed when the borrower transitioned from current to 30 days delinquent.[142] Demyanyk also found that credit scores rebounded in a year after foreclosure because borrowers who foreclose are more likely to pay their credit card debt and make fewer credit inquiries. Besides differences in datasets (Equifax versus TransUnion) and years included in the analysis, a key difference between Brevoort and Cooper (2013) and Demyanyk (2017) is that the latter decomposed the decline in credit score by delinquency status and studied changes within a relatively narrow window of time around the foreclosure event whereas the former analyzed trends in credit scores 5 to 10 years before and after foreclosure for prime and subprime borrowers.

### 3. Foreclosures Incur Costs on Communities through Reduced Property Values and Tax Revenues

134. In addition to the direct costs to borrowers that I have addressed so far, I think that it is worth noting that late payments, delinquencies, and ultimately foreclosure impose

---

[140] See Figure 4 in William Hedberg and John Krainer, "Credit Access Following a Mortgage Default," *Federal Reserve Bank of San Francisco Economic Letter*, October 29, 2012.

[141] See Figures 8 and 9 and Table 5 in Kenneth P. Brevoort and Cheryl R. Cooper, "Foreclosure's Wake: The Credit Experiences of Individuals Following Foreclosure," *Real Estate Economics*, 2013, 41(4): 747-792.

[142] Yuliya Demyanyk, "The Impact of Missed Payments and Foreclosures on Credit Scores," *Quarterly Review of Economics and Finance,* 2017, 64: 108-119. Demyanyk did not specify whether she was focusing on the foreclosure start or completion.

Privileged and Confidential

costs on others as well. These external costs appear non-trivial based on a review of the economics literature.[143] The rapid rise in foreclosures beginning in 2007 prompted research regarding the impacts of foreclosure on property values, crime, and health. Foreclosures, for example, have been found to have a contagion effect on the surrounding properties as nearby owners are more likely to face foreclosure or suffer reductions in their property values. A recent study determined that a single foreclosures leads to an additional 0.3 to 0.6 foreclosures nearby.[144] An earlier study found that a single foreclosure causes between 0.5 to 0.7 additional foreclosures.[145] Another study found that a one unit increase in neighborhood foreclosures increased the likelihood of further foreclosures by 18 percent.[146] Numerous studies published over the past decade or so found that foreclosed homes reduced the values of neighboring properties by between 1 and 8 percent.[147] A few studies have found substantially higher impacts with respect to price effects, in the range of 22 to 50 percent.[148]

---

[143] Economists define these external costs as costs to parties other than the producer or buyer of a good or service.

[144] Arpit Gupta, "Foreclosure Contagion and the Neighborhood Spillover Effects of Mortgage Defaults," *The Journal of Finance*, 2019, 0(0): 1-53.

[145] David J. Munroe and Laurence Wilse-Samson, "Foreclosure Contagion: Measurement and Mechanisms," Columbia University, Department of Economics, December 14, 2013.

[146] Charles Towe and Chad Lawley, "The Contagion Effect of Neighboring Foreclosures," *American Economic Journal: Economic Policy, 2013, 5*(2): 313-335.

[147] Dan Immergluck and Geoff Smith, "The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values," *Housing Policy Debate, 2006, 17* (1): 57-79; Tammy Leonard and James C. Murdoch, "The Neighborhood Effects of Foreclosure," *Journal of Geographical Systems*, 2009, 11: 317-332; Gupta (2019); Zhengou Lin, Eric Rosenblatt and Vincent W. Yao, "Spillover Effects of Foreclosures on Neighborhood Property Values," *The Journal of Real Estate Finance and Economics*, 2009, 38(4): 387-407; Yishen Liu and Anthony M. Yezer, "Foreclosure Externalities: Have We Confused the Cure with the Disease?" *Real Estate Economics* ,2019, 0(0): 1-33; Kai-yan Lee, "Foreclosure's Price-Depressing Spillover Effects on Local Properties: A Literature Review," *Federal Reserve Bank of Boston*, September 2008, 2008-01; and John P. Harding, Eric Rosenblatt and Vincent W. Yao, "The Contagion Effect of Foreclosed Properties," *Journal of Urban Economics*, 2008, 3:164-178.

[148] A recent study by Lui and Yezer (2019) found that property value reductions were related to property deterioration resulting from under investment triggered by events leading up to foreclosure including late payments and delinquencies, suggesting that foreclosure is the cure rather than the cause of observed losses. Even if this is the case, Ocwen's failures are still linked to the outcomes observed.

Privileged and Confidential

135. Local governments also suffer losses as lower housing prices reduce property tax revenues.[149] At the same time, these governments face greater demands for public safety and health services if foreclosure contagion occurs. Studies have linked foreclosures to increased crime, less household stability, and increased health care demand.[150]

## VII.   CONCLUSION

136. I have estimated damages for a subset of borrowers impacted by Ocwen's mortgage servicing failures between January 1, 2014 and August 6, 2018.

137. Ocwen's servicing failures led to at least two forms of quantifiable damages to borrowers that I am able to quantify: (1) forgone interest on overpayments that borrowers made in response to Ocwen's overcharges, and (2) costs from additional foreclosures that resulted from Ocwen's Late Escrow Analyses. In addition, there are other forms of damages, discussed later, that I am unable to quantify, either because the data from Ocwen that I can analyze is incomplete, or analysis would require unsupported assumptions, or both. If in the future, further data become available, I may be able to quantify some of these additional damages.

138. Damages from forgone interest on overpayments sum to $1.4 million for Late Escrow Analyses, $0.3 million for PMI Overcharges, and $0.3 for ARM Servicing Failures.[151] Where there are data deficiencies, I have made conservative assumptions to make these calculations. Damages could be higher if new information—such as dates when ARM Servicing Failures began for a substantial fraction of harmed borrowers—becomes available that would revise my

---

[149] U.S Congress, "The 2007 Joint Economic Report of the Joint Economic Committee Congress of the United States on the 2007 Economic Report of the President Together with Minority Views."

[150] Thomas D. Stucky, John R. Ottensmann and Seth B. Payton. "The Effects of Foreclosure on Crime in Indianapolis, 2003-2008," *Social Science Quarterly*, 2012, 93(3): 602-624; Immergluck and Smith (2006); Thomas G. Kingsley, Robin Smith, and David Price, "The Impacts of Foreclosures on Families and Communities," *The Urban Institute,* May 2009; Raven Molloy and Hui Shan, "The Postforeclosure Experience of U.S. Households," *Real Estate Economics*, 2013, 41(2): 225-254; Janet Currie and Erdal Tekin, "Is There a Link between Foreclosure and Health?" *American Economic Journal: Economic Policy,* 2015, 7(1): 63-94; and Janelle Downing, "The Health Effects of the Foreclosure Crisis and Unaffordable Housing: A Systematic Review and Explanation of Evidence," *Social Science & Medicine* 2016, 162: 88-96.

[151] In my summary of opinions, I report the results based on the damages estimate around the midpoint of a range that I think is appropriate. I present the ranges in section V.

**Privileged and Confidential**

assumptions. Moreover, using Ocwen's data produced in response to CFPB's Requests for Production and Ocwen's approach to identifying late analyses, I have found an additional 34,006 late escrow analyses that were omitted from Ocwen's Interrogatory response (though I did not quantify damages for borrowers associated with these additional untimely analyses).

139. Damages for the costs to borrowers of additional foreclosures range from $352 million to $484 million depending on the estimate of cost per foreclosure applied from the literature and Ocwen's production. My econometric model predicts that Late Escrow Analyses increased borrowers' probability of foreclosure by 6.1 percent, or 16,636 additional foreclosures between January 1, 2014 and August 6, 2018.

140. The damages estimates are conservative for three reasons in addition to the data limitations noted above in ¶ 10. First, I understand from counsel that there are additional types of servicing failures that may have impacted hundreds of thousands of borrowers. In my report, I present counts of these other types of failures but do not have sufficient data on dates and/or amounts to calculate damages. Second, my damages calculations do not include social costs such as reduced neighborhood property values and local tax revenue. Third, my estimate of damages does not include damages to borrowers that are difficult to quantify in dollars, ranging from increased uncertainty that would impede borrowers' ability to manage their finances to loss of a stable living environment and increased emergency room visits.

141. Finally, counsel has asked me to consider from an economic perspective, whether the harms resulting from Ocwen's servicing failures is outweighed by countervailing benefits to consumers or to competition. Simply stated, the answer is no. This is true for at least two reasons.

142. First, there is no benefit to consumers from servicing loans with inaccurate and incomplete information. It would be false to assert that Ocwen faced a legitimate constraint, whereby it was forced to choose to either commit servicing errors for one class of borrowers (losers) or not commit servicing errors to the other class of borrowers (winners). Indeed, Ocwen should have complied with the law as it applied to all borrowers. As such, there is no legitimate weighing of the benefit

Privileged and Confidential

earned by the winners from Ocwen having not committed a servicing error that can be weighed against the loss to losers who had their loan serviced with inaccurate and incomplete data. Thus consumers are simply left with the loss, which I quantify above.

143. Second, Ocwen's practices were anti-competitive in the economic sense. If Ocwen was able to reduce its prices to its investors because it did not incur the costs of investing in, for example, its staff and processes, in order to sufficiently service loans with accurate and complete records in potential violation of the law and other applicable requirements, such as the terms of the mortgage loans, it could undercut on price those mortgage servicers who did incur the cost of complying with the legal mortgage servicing requirements. Further, to the extent that Ocwen transfers out loans that contain inaccurate and incomplete data, the subsequent servicer would also incur potential increases in costs from having to identify and correct this inaccurate and incomplete data upon receipt, or the potential harm associated with the inaccuracies leading to a servicing failure on their end.

_____

Daniel McFadden

Signed on September 19, 2019 at Oakland, California

Appendix A

## Daniel L. McFadden
### Principal

San Francisco, CA                    +1.415.217.1000                    Daniel.McFadden@brattle.com

**Professor Daniel McFadden** is a principal with The Brattle Group, which provides consulting services and expert testimony on economic, finance, regulatory and strategic issues to corporations, law firms and public agencies worldwide.

Professor Daniel McFadden, recipient of the 2000 Nobel Prize in Economics, is the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and the founding director of its Econometrics Laboratory. He is also the Presidential Professor of Health Economics at the University of Southern California, where he has joint appointments at the USC Sol Price School of Public Policy and the Department of Economics at USC Dornsife College. Previously, he was the James R. Killian Professor of Economics at MIT, the Irving Fisher Research Professor at Yale University, and the Fairchild Distinguished Scholar at the California Institute of Technology. He was awarded the Nobel Prize for his numerous contributions to quantitative economic science and, in particular, his pioneering theoretical, methodological, and empirical work in the analyses of discrete choices. Dr. McFadden has received numerous other awards including the John Bates Clark Medal given every two years to the American economist under the age of forty who has made the most outstanding contribution to the field of economic science. Dr. McFadden received his Ph.D. in Economics from the University of Minnesota in 1962. There he also earned his B.S. in Physics, with high distinction, in 1957.

Dr. McFadden has also held the following academic appointments:

| | |
|---|---|
| 2014- | Presidential Professor of Health Economics, University of Southern California |
| 1996- | Director, Econometrics Laboratory, University of California, Berkeley |
| 1995-1996 | Chair, Department of Economics, University of California, Berkeley |
| 1991-1995 | Director, Econometrics Laboratory, University of California, Berkeley |
| 1990- | E. Morris Cox Chair, University of California, Berkeley |
| 1990- | Professor of Economics, University of California, Berkeley |
| 1990 | Sherman Fairchild Distinguished Scholar, California Institute of Technology |
| 1986-1991 | Director, Statistics Center, Massachusetts Institute of Technology |
| 1984-1991 | James R. Killian Chair, Massachusetts Institute of Technology |
| 1978-1991 | Professor of Economics, Massachusetts Institute of Technology |
| 1977-1978 | Irving Fisher Research Professor, Yale University |
| 1968-1979 | Professor of Economics, University of California, Berkeley |
| 1966-1967 | Visiting Associate Professor, University of Chicago |
| 1966-1968 | Associate Professor of Economics, University of California, Berkeley |
| 1963-1966 | Assistant Professor of Economics, University of California, Berkeley |
| 1962-1963 | Assistant Professor of Economics, University of Pittsburgh |
| 1961-1962 | Instructor, Economics, University of Minnesota |



Daniel L. McFadden

| 1959-1960 | Research Assistant, Social Psychology, University of Minnesota |
| 1957-1958 | Instructor, Physics, University of Minnesota |

## EXPERIENCE

Dr. McFadden has had a varied background in professional and public service. Among his achievements are:

- President, American Economic Association (AEA) (2005)
- Chair, National Academy of Science (NAS) Section 54 Economic Sciences (2003- )
- Chair, NAS Committee on Methods of Forecasting Demand and Supply of Doctoral Scientists and Engineers (1997-2000)
- Advisory Committee, Journal of Applied Economics (1996- )
- NAS Commission on Science, Engineering, and Public Policy (1995- )
- Chair, AEA Committee on Electronic Publication (1994- )
- Vice President, American Economics Association (1994)
- NAS Committee on Behavioral and Social Sciences and Education (1989-1994)
- Panel Study of Income Dynamics, Advisory Board (1988-1991)
- Executive Committee, American Economics Association (1985-1987)
- President, Econometric Society (1985)
- Executive Committee, Econometric Society (1983-1986)
- Council of the Econometric Society (1983-1986)
- Vice President, Econometric Society (1983-1984)
- NAS Committee on Energy Demand Modeling (1983-1984)
- NAS Committee, Basic Research in the Social Sciences (1982-1987)
- Chair, AEA Awards Committee (1981-1984)
- Board of Directors, National Bureau of Economic Research (1980-1983)
- Editor, Econometric Society Monographs (1980-1983)
- Review Committee, California Energy Commission (1979)
- Sloan Foundation Book Committee (1977-1979)
- Executive Committee, Econometric Society (1978-1980)
- Board of Editors, Transportation Research (1978-1980)



2

Daniel L. McFadden

- Associate Editor, Journal of Econometrics (1977-1978)
- Board of Directors, National Bureau of Economic Research (1976-1977)
- Executive Committee, Transportation Research Board (1975-1978)
- City of Berkeley, Coordinated Transit Project (1975-1976)
- Advisory Committee on Transportation Models, Metropolitan Transportation Commission (1975)
- Council of the Econometric Society (1974-1980)
- Elected Member, Universities National Bureau (1974-1977)
- Board of Editors, Journal of Mathematical Economics (1973-1977)
- Board of Editors, American Economic Review (1971-1974)
- Chair, NSF-NBER Conference, Economics of Uncertainty (1970- )
- Economics Advisory Panel, National Science Foundation (1969-1971)
- Editor, Journal of Statistical Physics (1968-1970)

**MIT – RELATED:**

- Committee on Curricula, 1990-91
- Killian Award Committee, 1984
- Center for Energy Policy Research, Program Board, 1983-84
- Engineering Dean Search Committee, 1980-81
- Provost's Committee on Statistics, 1979-80
- CTS Advisory Board, 1978-79

**BERKELEY – RELATED:**

- Director of Graduate Studies, 1994-95
- IBER Advisory Committee, 1993-95 (Chair, 1994-95)

**PROFESSIONAL AFFILIATIONS**

- American Economics Association
- The Econometric Society
- American Statistical Association
- Mathematical Association of America



Daniel L. McFadden

- Transportation Research Board

**FELLOWSHIPS, SCHOLARSHIPS, HONORS, AND AWARDS**

- Honorary Degree, University of Montreal (2004)
- Honorary Degree, University College London (2003)
- Richard Stone Prize in Applied Econometrics (2000-2001)
- Nobel Prize in Economics (Joint Recipient) (2000)
- Nemmers Prize in Economics, Northwestern University (2000)
- American Agricultural Economics Association, Best Paper Prize (1994)
- University of Chicago, LLD (1992)
- Frisch Medal, Econometric Society (1986)
- Elected to National Academy of Science (1981)
- Outstanding Teacher Award, MIT (1981)
- Fisher-Schultz Lecture, Econometrics Society (1979)
- Elected to American Academy of Arts and Sciences (1977)
- John Bates Clark Medal, American Economics Association (1975)
- Elected Fellow, Econometrics Society (1969)
- Ford Faculty Research Fellow (1966-1967)
- Mellon Post-Doctoral Fellow (1962-1963)
- Earhart Fellow (1960-1961)
- Ford Foundation Behavioral Science Fellow (1958-1962)

Daniel L. McFadden

## PUBLICATIONS

### Books and Monographs

Essays on Economic Behavior Under Uncertainty, with M. Balch and S. Wu (eds.), North Holland: Amsterdam, 1974.

Urban Travel Demand: A Behavioral Analysis, with T. Domencich, North Holland: Amsterdam, 1975. Reprinted by The Blackstone Company: Mount Pleasant, MI, 1996.

*Production Economics: A Dual Approach to Theory and Applications*, with M. Fuss (eds.), North Holland: Amsterdam, 1978.

*Structural Analysis of Discrete Data with Econometric Applications*, with C.F. Manski (eds.), MIT Press: Cambridge, MA, 1981.

Microeconomic Modeling and Policy Analysis: Studies in Residential Energy Demand, with T. Cowing, Academic Press: New York, 1984.

Preferences, Uncertainty, and Optimality: Essays in Honor of Leonid Hurwicz, with J. Chipman and M.K. Richter (eds.), Westview Press: Boulder, CO, 1990.

*Handbook of Econometrics Vol IV*, with R. Engle (eds.), North Holland: Amsterdam, 1994.

*Statistical Tools,* manuscript in preparation.

Rationality and equilibrium, a symposium in honor of Marcel K. Richter, series: <u>Studies in Economic Theory</u>, vol. 26, with C.D Aliprantis, R.L. Matzkin, J.C. Moore,  N.C. Yannelis, (Eds.), Springer-Verlag: Berlin Heidelberg 2006.

## ARTICLES

### Production Theory

"Constant Elasticity of Substitution Production Functions," *Review of Economic Studies*, 1963.

"A Review of 'Manufacturing Production Functions in the U.S., 1957: An Interindustry and Interstate Comparison of Productivity'," *Journal of the American Statistical Association*, March 1967.

"Cost, Revenue, and Profit Functions," in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

 "A Survey of Functional Forms in the Economic Analysis of Production," with M. Fuss and Y. Mundlak, in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, Vol. I, 219-268, North Holland: Amsterdam, 1978.



Daniel L. McFadden

"The General Linear Profit Function," in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Flexibility Versus Efficiency in Ex Ante Plant Design," with M. Fuss, in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Estimation Techniques for the Elasticity of Substitution and Other Production Parameters," in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Measurement of the Elasticity of Factor Substitution and Bias of Technical Change," with P. Diamond and M. Rodriguez, in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Joint Estimation of Freight Transportation Decisions Under Nonrandom Sampling," with C. Winston and A. Boersch-Supan, in A. Daughety (ed.), *Analytical Studies in Transport Economics*, 137-157, Cambridge University Press: Cambridge, 1985.

## Econometrics

"Conditional Logit Analysis of Qualitative Choice Behavior," in P. Zarembka (ed.), *Frontiers in Econometrics*, 105-142, Academic Press: New York, 1973.

"Comments on 'Estimation of a Stochastic Model of Reproduction: An Econometric Approach'," in N. Terleckyj (ed.), *Household Production and Consumption*, 139-145, National Bureau of Economic Research: New York, 1975.

"The Revealed Preferences of a Government Bureaucracy: Theory," *The Bell Journal of Economics and Management Science*, Autumn 1975.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence," *The Bell Journal of Economics and Management Science*, No. 1, 55-72, Spring 1976.

"A Comment on Discriminant Analysis 'Versus' Logit Analysis," *Annals of Economic and Social Measurement*, 1976.

"Quantal Choice Analysis: A Survey," *Annals of Economic and Social Measurement*, 1976.

"Econometric Models for Probabilistic Choice Among Products," *The Journal of Business*, 1980.

"Econometric Models of Probabilistic Choice," in C.F. Manski and D. McFadden (eds.), *Structural Analysis of Discrete Data with Econometric Applications*, 198-272, MIT Press: Cambridge, MA, 1981.

"Alternative Estimators and Sample Designs for Discrete Choice Analysis," with C.F. Manski, in C.F. Manski and D. McFadden (eds.), *Structural Analysis of Discrete Data with Econometric Applications*. 2-50, MIT Press: Cambridge, MA, 1981.



Daniel L. McFadden

"Qualitative Response Models," in W. Hildenbrand (ed.), *Advances in Econometrics: Invited Papers for the Fourth World Congress of the Econometric Society*, Econometric Society Monograph, 1-37, Cambridge University Press: Cambridge, 1982.

"Specification Tests for the Multinomial Logit Model," with J. Hausman, *Econometrica*, September 1984.

"Econometric Analysis of Qualitative Response Models," in Z. Griliches and M. Intrilligator (eds.), *Handbook of Econometrics*, Elsevier: Amsterdam, 1984.

"Comment on Technical Problems in Social Experimentation: Cost versus Ease of Analysis," in J.A. Hausman and D.A. Wise (eds.), *Social Experimentation*, 214-219, National Bureau of Economic Research: Chicago, 1985.

"The Choice Theory Approach to Market Research," *Marketing Science*, Fall 1986.

"The Demand for Local Telephone Service: A Fully Discrete Model of Residential Calling Patterns and Service Choices," with K. Train and M. Ben-Akiva, *The Rand Journal of Economics*, Spring 1987.

"Regression-Based Specification Tests for the Multinomial Logit Model," *Journal of Econometrics*, 1987.

"What do Microeconometricians Really Do?" *Proceedings of the American Statistical Association*, 402-405, Business Statistics Section, 1987.

"Comment on Joel Horowitz and George Neumann, Semiparametric Estimation of Employment Duration Models," with A. Han, *Econometric Reviews*, 1987/1988.

"Econometric Modeling of Locational Behavior," *Annals of Operations Research: Facility Location Analysis: Theory and Applications*, 1989.

"A Method of Simulated Moments for Estimation of Discrete Response Models Without Numerical Integration," *Econometrica*, September 1989.

"Testing for Stochastic Dominance," in T. Fomby and T.K. Seo (eds.), *Studies in the Economics of Uncertainty*, 113-134, Springer: New York, 1989.

"Micro-simulation of Local Residential Telephone Demand Under Alternative Service Options and Rate Structures," with T. Atherton, M. Ben-Akiva, and K. Train, in A. de Fontenay, M. Shugard, and D. Sibley (eds.), *Telecommunications Demand Modelling*, 137-163, Elsevier: Amsterdam, 1990.

"Advances in Computation, Statistical Methods, and Testing of Discrete Choice Models," *Marketing Letters*, 1991.

"Efficient Estimation by Multinomial Approximation and Sequential Simulation," with W. Beckert and A. Eymann, Working Paper, July 1994.

"Large Sample Estimation and Hypothesis Testing," with W. Newey, in R. Engle and D. McFadden, (eds.) *Handbook of Econometrics*, North Holland: Amsterdam, 1994.



Daniel L. McFadden

"Estimation by Simulation," with P. Ruud, *The Review of Economics and Statistics*, November 1994.

"Simulation of Multivariate Normal Rectangle Probabilities and Their Derivatives: Theoretical and Computational Results," with V. Hajivassiliou and P. Ruud, *Journal of Econometrics*, May-June 1996.

"Lectures on Simulation-Assisted Statistical Inference," presented at the EC-squared Conference, Florence, Italy, December 12, 1996.

"Estimation of Some Partially Specified Nonlinear Models," with C. Ai, *Journal of Econometrics*, January-February 1997.

"Modeling Methods for Discrete Choice Analysis," with M. Ben-Akiva, et al., *Marketing Letters*, July 1997.

"The Method of Simulated Scores with Application to Models of External Debt Crises," with V. Hajivassiliou, *Econometrica*, July 1998.

"Estimating Features of a Distribution from Binomial Data," with A. Lewbel, Working Paper, May 1997. "Mixed MNL Models for Discrete Response," with K. Train, Working Paper, December 1996, revised November 1998.

"On Selecting Regression Variables to Maximize Their Significance," Working Paper, July 1998. "Economic Choices," Nobel Lecture, December 2000. *American Economic Review*, June 2001.

"Observational Studies: Choice-based sampling," forthcoming in *International Encyclopedia of Social and Behavior Sciences*, Vol. 2.1, Article 92, Elsevier Science: Amsterdam, 2001.

**"Discrete Choice Models Incorporating Revealed Preferences and Psychometric Data," with T. Morikawa and M. Ben-Akiva,** *Econometric Models In Marketing*, **Vol. 16, 27-53, Elsevier Science: Oxford, 2002.**

"Characteristics of Generalized Extreme Value Distributions," with M. Bielaire and D. Bolduc, Working Paper, April, 2003

"Structural Simulation of Facility Sharing: Unbundling Policies and Investment Strategy in Local Exchange Markets," by Nauman Ilias, Paul C. Liu, Daniel L. McFadden, Lisa Wood, Glenn A. Woroch & William P. Zarakas, 2005.

"Statistical Analysis of Choice Experiments and Surveys" with A. Bemmaor, F. Caro, J. Dominitz, B. Jun, A. Lewbel, R. Matzkin, F. Molinari, N. Schwarz, R. Willis and J. Winter, Marketing Letters, 16:3/4, 183-196, December 2005.

"Free Markets and Fettered Consumers". American Economic Research, 96:1, March 2006.

"The estimation of generalized extreme value models from choice-based samples", Transportation Research Part B: Methodological, Vol. 42, 4, 381-394, May 2008.



Daniel L. McFadden

"Risk, Uncertainty and Discrete Choice Models", with A. de Palma, M. Ben-Akiva, D. Brownstone, C. Holt, T. Magnac, P. Moffatt, N. Picard, K. Train, P. Wakker, J. Walker,  Marketing Letters, 19:3/4, 269-285, July 2008.

"Semiparametric Analysis", Quantile, no. 5, pp. 29-40, September 2008.

"Conditional Logit Analysis of Qualitative Choice Behavior", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 337-374, 2009.

"Maximal Uniform Convergence Rates in Parametric Estimation Problems", with Walter Beckert, Econometric Theory, Vol. 26, Issue 2, 469-500, April 2010.

 "Choice probability generating functions", with M. Fosgerau and M. Bierlaire, Working Paper,  August 2010.

"Estimating Features of a Distribution from Binomial Data"  with Lewbel, A., Linton, O.,  *Journal of Econometrics*, Vol. 162, No. 2, pp. 170-88, June 2, 2011.

"Economic Juries and Public Project Provision," *Journal of Econometrics*, Vol. 166, No. 1, pp. 116-126, January 2012.

## Transportation

"The Measurement of Urban Travel Demand," *Journal of Public Economics*, 303-328, 1974.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models," with F. Reid, *Transportation Research Record: Travel Behavior and Values*, No. 534, 24-37, 1975.

"The Mathematical Theory of Demand Models," in P. Stopher and A. Meyburg (eds.), *Behavioral Travel-demand Models*, 305-314, D.C. Heath and Co.: Lexington, MA, 1976.

"Demand Model Estimation and Validation," with A.P. Talvitie and Associates, *Urban Travel Demand Forecasting Project, Final Report, Volume V*, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Demographic Data and Policy Analysis," with S. Cosslett, G. Duguay, and W. Jung, *Urban Travel Demand Forecasting Project, Final Report*, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Quantitative Methods for Analyzing Travel Behaviour of Individuals: Some Recent Developments," in D. Hensher and P. Stopher (eds.), *Behavioural Travel Modelling*, 279-318, Croom Helm London: London, 1978.



Daniel L. McFadden

"An Application of Diagnostic Tests for the Independence from Irrelevant Alternatives Property of the Multinomial Logit Model," with W. Tye and K. Train, *Transportation Research Record: Forecasting Passenger and Freight Travel*, No. 637, 39-46, Transportation Research Board, 1978.

"Modelling the Choice of Residential Location," in A. Karlqvist, L. Lundqvist, F. Snickars, and J. Weibull (eds.), *Spatial Interaction Theory and Planning Models*, 75-96, North Holland: Amsterdam, 1978. Reprinted in J. Quigley (ed.), *The Economics of Housing*, Edward Elgar: London, 1997.

"The Goods/Leisure Tradeoff and Disaggregate Work Trip Mode Choice Models," with K. Train, *Transportation Research*, February 1978.

"The Theory and Practice of Disaggregate Demand Forecasting for Various Modes of Urban Transportation," in *Emerging Transportation Planning Methods*, U.S. Department of Transportation DOT-RSPA-DPB-50-78-2, August 1978. Reprinted in T.H. Oum, et al. (eds.), *Transport Economics: Selected Readings*, 51-80, Seoul Press: Seoul, 1995.

"Overview and Summary: Urban Travel Demand Forecasting Project," with F. Reid, A. Talvitie, M. Johnson, and Associates, *The Urban Travel Demand Forecasting Project, Final Report, Volume I*, Institute of Transportation Studies, University of California, Berkeley, June 1979.

"Measuring Willingness-to-Pay for Transportation Improvements" in T. Gärling, T. Laitila, and K. Westin (eds.) *Theoretical Foundations of Travel Choice Modeling*, 339-364, Elsevier Science: Amsterdam, 1998.

"Disaggregate Behaviorial Travel Deman's RUM Side: A 30-Year Retrospective," forthcoming in *The Leading Edge of Travel Behavior Research*, Davide Heshner and J. King (eds.) Pergamon Press: Oxford, 2002.

"Interstate Wine Shipments and E-Commerce," Journal of Wine Economics, Vol. 1, No. 1, May 2006, pp. 3-6.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models", with F. Reid, *Elgar Reference Collection. Classics in Planning Series*, Vol. 2, pp. 191-204, 2006.

"The behavioral science of transportation", Transport Policy Volume 14, Issue 4, 269-274, July 2007.

"The Measurement of Urban Travel", *Classics in Planning*, Vol. 7, pp. 69-94, 2007.

"Modelling the Choice of Residential Location", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 409-430, 2009.



Daniel L. McFadden

## Economic Growth and Development

"Comment on 'An Optimum Fiscal Policy in an Aggregate Model of Economic Growth'," in I. Adelman and E. Thorbecke (eds.), *The Theory and Design of Economic Development*, 140-146, Johns Hopkins Press: Baltimore, MD, 1966.

"The Evaluation of Development Programmes," *The Review of Economic Studies*, 1967.

"On the Existence of Optimal Development Plans," in H. Kuhn (ed.) *Proceedings of the Sixth Princeton Symposium on Mathematical Programming*, 403-427, Princeton University Press: Princeton, NJ, 1970. "Criteria for Public Investment: Comment," *The Journal of Political Economy*, November/December 1972.

"On the Existence of Optimal Development Programmes in Infinite-Horizon Economies," in J. Mirrlees and N.H. Stern (eds.), *Models of Economic Growth*, 260-282, Macmillan: Great Britain, 1973.

"Is There Life After Debt? An Econometric Analysis of the Creditworthiness of Developing Countries," with R. Eckaus, G. Feder, V. Hajivassiliou, and S. O'Connell, in J. Cuddington and G. Smith, *International Debt and the Developing Countries*, 179-209, International Bank for Reconstruction and Development/The World Bank: Washington, D.C., 1985.

"Hot Money and Cold Comfort: Global Capital Movement and Financial Crises in Emerging Economies", Lecture, Latin American and Carribean Economics Association ANEC Conference on Globalization and Development, 2004.

"Free Markets and Fettered Consumers", *American Economic Review,* Vol. 96, pp. 5-29, March 2006.

"100 Years of the American Economic Review: The Top 20 Articles", with K. Arrow, B. Bernheim, M. Feldstein, J. Poterba, R. Solow, *American Economic Review*, Vol. 101, pp. 1-8, February 2011.

## Economic Theory and Mathematical Economics

"On Hicksian Stability," in J.N. Wolfe (ed.), *Value, Capital, and Growth*, 329-351, University Press: Edinburgh, 1969.

"On the Controllability of Decentralized Macroeconomic Systems: The Assignment Problem," in H.E. Kuhn and P. Szego (eds.), *Mathematical Systems Theory and Economics 1*, 221-239, Springer-Verlag: New York, 1969.

"A Simple Remark on the Second Best Pareto Optimality of Market Equilibria" *Journal of Economic Theory*, June 1969.

"A Technical Note on Classical Gains from Trade," with J.M. Grandmont, *Journal of International Economics*, 1972.



11

Daniel L. McFadden

"On Some Facets of Betting: Comments," in M.S. Balch, D. McFadden, and S.Y. Wu (eds.), *Essays on Economic Behavior Under Uncertainty*, 126-137, North-Holland: Amsterdam, 1974.

"Some Uses of the Expenditure Function in Public Finance," with P.A. Diamond, *Journal of Public Economics*, 1974.  Reprinted in J. Creedy (ed.), *Measuring Welfare Changes and Tax Burdens*, Edward Elgar: London, September 1998.

"A Characterization of Community Excess Demand Functions," with R. Mantel, A. Mas-Colell, and M.K. Richter, *Journal of Economic Theory*, 1974.

"An Example of the Non-Existence of Malinvaud Prices in a Tight Economy," *Journal of Mathematical Economics*, 1975.

"Tchebyscheff Bounds for the Space of Agent Characteristics," *Journal of Mathematical Economics*, 1975.

"On Efficiency and Pareto Optimality of Competitive Programs in Closed Multisector Models," with M. Majumdar and T. Mitra, *Journal of Economic Theory*, August 1976.

"Definite Quadratic Forms Subject to Constraint," in M. Fuss and D. McFadden (eds.), *Production Economics:  A Dual Approach to Theory and Applications*, North-Holland: Amsterdam, 1978.

"Necessary and Sufficient Conditions for the Classical Programming Problem," in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Convex Analysis," in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"A Note on the Computability of Tests of the Strong Axiom of Revealed Preference," *Journal of Mathematical Economics*, 1979.

"Pareto Optimality and Competitive Equilibrium in Infinite Horizon Economies," with M. Majumdar and T. Mitra, *Journal of Mathematical Economics*, 1980.

"Welfare Analysis of Incomplete Adjustment to Climatic Change," in V.K. Smith and A. White (eds.), *Advances in Applied Micro-economics*, JAI Press: Greenwich, CT, 1984.

"Stochastic Rationality and Revealed Stochastic Preference," with M.K. Richter, in J. Chipman, D. McFadden, and M.K. Richter (eds.), *Preferences, Uncertainty, and Optimality, Essays in Honor of Leo Hurwicz*, 161-186, Westview Press: Boulder, CO, 1990.



Daniel L. McFadden

"Consumers' Evaluation of New Products: Learning from Self and Others," with K. Train, *Journal of Political Economy*, 1996.

"Economic Choice Behavior: Psychological Foundations and the Contributions of Amos Tversky," Working Paper, August 1996.

"Rationality for Economists," Working Paper presented at the NSF Symposium on Eliciting Preferences, July 1997.  Forthcoming in *Journal of Risk and Uncertainty*, December 1999.

"Extended Framework for Modeling Choice Behavior," with M. Ben-Akiva, et al.  *Marketing Letters*, Vol. 10, Issue 3, Kluwer, 187-203, August 1999.

"Pricing in a Competitive Market with a Common Network Resource," Working Paper, April 2003.

"Hybrid Choice Models: Progress and Challenges," with M. Ben-Akiva et. Al., *Marketing Letters*, Vol. 13, Issue 3, 163-175, August 2002.

"Epilogue," *Marketing Letters,* Vol. 13, Issue 3, 163-175, August 2002.

"Revealed Stochastic Preference:  A Synthesis," Economic Theory, Springer, vol. 26(2), pages 245-264, August 2005.

"Welfare Economics at the Extensive Margin Giving Gorman Polar Consumers Some Latitude," Working Paper, June 2004.

"The Misuse of Econometrics in Litigation," by Susan J. Guthrie, Paul C. Liu, Daniel L. McFadden and Kenneth T. Wise, *ABA Monograph on Econometrics*, Forthcoming, 2005.

"The Misuse of Econometrics in Estimating Damages," with Kenneth T. Wise, et. al.  *ABA monograph on Econometrics*, 2005.

"The Browser War - Econometric Analysis of Markov Perfect Equilibrium in Markets with Network Effects," with Mark Jenkins et. al.  Presented at the American Economic Association Annual Meeting.  7-9 January 2005.  Philadelphia, PA.

"The Science of Pleasure: The Measurement of Consumer Welfare," Frisch Memorial Lecture, Plenary Session at the Econometric Society World Congress, upcoming, 19-24 August 2005, University College London.
"Rationality and Equilibrium: A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzkin, J. Moore, N. Yannelis, *Studies in Economic Theory*, No. 26, pp. viii, 252, April 2006

"Revealed Stochastic Preference: A Synthesis", *Studies in Economic Theory,* No. 26, pp. 1-20, 2006.



Daniel L. McFadden

Foreward to "'Rationality and Equilibrium' – A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzin, J. Moore, N. Yannelis, *Studies in Economic Theory,* No. 26, pp. v-vi, 2006.

"Human Capital Accumulation and Depreciation", Review of Agricultural Economics, vol. 30, no. 3, 379-85, Fall 2008.

"The Revealed Preferences of a Government Bureaucracy: Theory", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 375-390, 2009.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 391-408, 2009.

"100 Years of the American Economic Review: The Top 20 Articles," Arrow, K.J., Bernheim, B.D., Feldstein, M.S., Poterba, J. M., Solow, R.M., American Economic Review, Vol. 101, No. 1, pp. 1-8, February 2011.

"Choice Probability Generating Functions", Bierlaire, M., Fogerau, M., *NBER Working Paper Series*, No. 17970, 2012.

## Energy

"Forecasting the Impacts of Alternative Electricity Rate Structures: A Feasibility Study," Final Report, California Energy Commission, 1976.

"Determinants of the Long-Run Demand for Electricity," with C. Puig and D. Kirshner, *Proceedings of the American Statistical Association*, 1978.

"A Two-Level Electricity Demand Model," with J. Hausman and M. Kinnucan, *Journal of Econometrics*, 1979.

"Residential Energy Demand Modeling and the NIECS Data Base: An Evaluation," with T. Cowing and J. Dubin, Report No. MIT-EL-82-009, MIT Energy Laboratory, January 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The ORNL Model," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-032WP, MIT Energy Laboratory, April 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The REEPS Model," with T. Cowing, Discussion Paper No. MIT-EL 82-057WP, MIT Energy Laboratory, April 1982.



Daniel L. McFadden

"An Evaluation of the ORNL Residential Energy Use Model," *EPRI Report EA-2442*, Electronic Research Institute: Palo Alto, June 1982.

"The NIECS Data Base and Its Use in Residential Energy Demand Modeling," with T. Cowing and J. Dubin, Discussion Paper No. MIT-EL-82-041WP, MIT Energy Laboratory, June 1982.

"A Thermal Model for Single-Family Owner-Occupied Detached Dwellings in NIECS," with J. Dubin, Discussion Paper No. MIT-EL-040WP, MIT Energy Laboratory, June 1982.

"A Comparative Evaluation of the ORNL and REEPS Models of Residential Energy Demand for Forecasting Residential Energy Policy Impacts," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-061WP, MIT Energy Laboratory, July 1982.

"Residential End-Use Energy Planning System (REEPS)," with A. Goett, *EPRI Report* EA-2512, Electronic Power Research Institute: Palo Alto, July 1982.

"An Econometric Analysis of Residential Electric Appliance Holdings and Consumption," with J. Dubin, *Econometrica*, March 1984.

"The Residential End-Use Energy Planning System: Simulation Model Structure and Empirical Analysis," with A. Goett, in J. Moroney (ed.), *Advances in the Economics of Energy and Resources*, JAI Press: Greenwich, CT, 1984.

"Consumer Attitudes and Voluntary Rate Schedules for Public Utilities," with K. Train and A. Goett, *the Review of Economics and Statistics*, August 1987.

"Estimating Household Value of Electric Service Reliability with Market Research Data," with A. Goett and C-K. Woo, *Energy Journal: Special Electricity Reliability Issue*, 1988.

"A theory of the perturbed consumer with general budgets", with M. Fogeraru, *NBER Working Paper Series*, No. 17953, 2012.

## Health Economics

"Estimation of Response Probabilities from Augmented Retrospective Observations," with D. Hsieh and C. Manski, *Journal of the American Statistical Association*, No. 391, 651-662, September 1985.

"The Dynamics of Housing Demand by the Elderly: Wealth, Cash Flow, and Demographic Effects," with J. Feinstein, in D. Wise (ed), *The Economics of Aging*, 55-91, University of Chicago Press: Chicago, 1989. "The Dynamics of Housing Demand by the Elderly: User Cost Effects," with C. Ai, J. Feinstein, and H. Pollakowski, in D. Wise (ed.), *Issues in the Economics of Aging*, 33-87, University of Chicago Press: Chicago, 1990.



Daniel L. McFadden

"Problems of Housing the Elderly in the United States and Japan," in Y. Noguchi and D. Wise (eds.), *Aging in the United States and Japan*, 109-137, University of Chicago Press: Chicago, 1994.

"Demographics, the Housing Market, and the Welfare of the Elderly," in D. Wise (ed.), *Studies in the Economics of Aging*, 225-285, University of Chicago Press: Chicago, 1994.

"Living Arrangements: Health and Wealth Effects," with A. Boersh-Supan and R. Schnabel, in D. Wise (ed.), *Advances in the Economics of Aging*, 193-216, University of Chicago Press: Chicago, 1996.

"Comment on 'Elderly Health, Housing, and Mobility'," in D. Wise (ed.), *Advances in the Economics of Aging*, 317-320, University of Chicago Press: Chicago, 1996.

"The Impact of Demographics on Housing and Nonhousing Wealth in the United States," with H. Hoynes, in M. Hurd and N. Yashiro (Eds.), *The Economic Effects of Aging in the United States and Japan*, 153-194, University of Chicago Press: Chicago, 1997.

"Subjective Survival Curves and Life Cycle Behavior," with M. Hurd and L. Gan, in D. Wise (ed.), *Inquiries in the Economics of Aging*, 259-305, University of Chicago Press: Chicago, 1998.

"*Consumption and Savings Balances of the Elderly: Experimental Evidence on Survey Response Bias*," with M. Hurd, et al., in D. Wise (ed.), *Frontiers in the Economics of Aging*, 353-387, University of Chicago Press: Chicago, 1998.

"Healthy, Wealthy, and Wise? Socioeconomic Status, Morbidity, and Mortality among the Elderly," with M. Hurd and A. Merrill, Working Paper, April 1998.

"Predictors of Mortality Among the Elderly," with M. Hurd and A. Merill, working paper, December 1999. Forthcoming in D. Wise (ed.) *Themes in the Economics of Aging*, University of Chicago Press: Chicago, 2001.

"Comment on Incentive Effects of Social Security Under an Uncertain Disability Option," in D. Wise (ed.) *Themes in the Economics of Aging*, University of Chicago Press: Chicago, 2001.

"Response Behavior in Surveys of the Elderly: Experimental Evidence from Internet Surveys" with Joachim Winter, Conference Draft, March 2001.

"Healthy, Wealthy, and Wise? Tests for Direct Causal Paths between Health and Socioeconomic Status", with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal of Econometrics, Vol 112, Issue 1, 3-56, 2003.

"Response," with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal Of Econometrics, Vol 112, Issue 1, 129-133, 2003.

"Individual Subjective Survival Curves", with L. Gan and M. Hurd, NBER Working Paper No. 9480, January



Daniel L. McFadden

2003.

"Subjective Mortality Risk and Bequests", with L. Gan, G. Gong and M. Hurd, NBER Working Paper No. 10789, September 2004.

"Broken Down by Work and Sex: How Our Health Declines: Comment, Analyses in the Economics of Aging, pp. 205-12, 2005.

"Medicare prescription drug coverage: Consumer information and preferences", with J. Winter, R. Balza, F. Caro, F. Heiss, B. Jun and R. Matzkin, Proceedings of the National Academy of Sciences, May 2006.

"Who Failed to Enroll in Medicare Part D, and Why? Early Results", with J. Winter and F. Heiss. Health Affairs, doi: 10.1377/hlthaff.25.w344, August 2006.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with J. Winter and F. Heiss, Working Paper, November, 2007.

"Consumer-Directed Health Care: Can Consumers Look After Themselves?", with J. Winter and F. Heiss, Swiss Journal of Economics and Statistics, 144(3), 285-307 July, 2008.

"Human Capital Accumulation and Depreciation", *Review of Agricultural Economics*, Vol. 30, Issue 3, pp. 379-385, October 2008.

"Want to Monitor Medicare's New Drug Benefit Program? Start by Sending a Check for $120,000", Economists' Voices, vol. 5, no. 4, 2008.

"The Human Side of Mechanism Design, A Tribute to Leo Hurwicz and Jean-Jacque Laffont," *Review of Economic Design*, 13, (1), 77-100 & 377, 2009.

"Regulation of private health insurance markets: Lessons from enrollment, plan type choice, and adverse selection in Medicare Part D", with J. Winter and F. Heiss, NBER Working Paper 15392, October 2009.

"The Impact of Employer Matching on Savings Plan Participation under Automatic Enrollment: Comment, Research Findings" in *The Economics of Aging*, pp. 327-35, 2010.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with F. Heiss, J. Winter, Research Findings in the *Economics on Aging*, pp. 413-481, 2010.

"Healthy, Wealthy and Wise?" Revisited: An Analysis of the Causal Pathways from Socio-economic Status to Health," Stowasser, T., Heiss, F., Winter, J., National Bureau of Economic Research, Inc, NBER Working Papers: 17273, 2011.

"Remedies for Sick Insurance", with C. Noton, P. Olivella, NBER Working Paper Series, No. 17938, 2012.



Daniel L. McFadden

"Plan Selection in Medicare Part D: Evidence from Administrative Data", with F. Heiss, A, Leive, J. Winter, NBER Working Paper Series, No. 18166, 2012.

"The New Science of Pleasure", NBER Working Paper Series, No. 18687, 2013.

## Environmental Economics

"Assessing Use Value Losses Caused by Natural Resource Injury," with J.A. Hausman and G. Leonard, in J. Hausman (ed.), *Contingent Valuation: a Critical Assessment*, 341-363, North Holland: Amsterdam, 1993.

"Issues in the Contingent Valuation of Environmental Goods: Methodologies for Data Collection and Analysis," with G. Leonard, in J. Hausman (ed.), *Contingent Valuation: a Critical Assessment*, 165-208, North Holland: Amsterdam, 1993.

"Contingent Valuation and Social Choice," *American Journal of Agricultural Economics*, November 1994.

"A Utility-consistent, Combined Discrete Choice and Count Data Model Assessing Recreational Use Losses Due to Natural Resource Damage," with J. Hausman and G. Leonard, *Journal of Political Economics*, 1995.

"Estimating Natural Resource Damages with and without Contingent Valuation, " by Susan J. Guthrie, Daniel L. McFadden and Kenneth T. Wise, at the *88th Annual Meeting of the Air and Waste Management Association*, 1995.

"*Why is Natural Resource Damage Assessment So Hard?*," Hibbard Lecture, Agricultural and Resource Economics, University of Wisconsin, Madison, May, 1996.

"Measuring Environmental Injury in the Presence of Confounding Risks," Working Paper, May 1996.

"On the Analysis of Endogenously Recruited Panels," Working Paper, February 1997.
"Can Meta-analyses of CV Studies Determine Their Reliability?" Working Paper, October 1997.

"*Referendum Contingent Valuation, Anchoring, and Willingness to Pay for Public Goods*," with D. Green, K. Jacowitz, and D. Kahneman, *Resource and Energy Economics*, 1998.
"Computing Willingness-to-Pay in Random Utility Models," in J. Moore, R. Riezman, and J. Melvin (eds.), *Trade, Theory and Econometrics: Essays in Honour of John S. Chipman*, Routledge, forthcoming January 1999.

"Comment on Discussion of Morey and Waldman's 'Measurement Error in Recreation Demand Models,'" with K. Train and R. Johnson, *Journal of Environmental Economics and Management*, Vol. 40, pp. 76-81 (2000).

## EXPERT TESTIMONY & CONSULTING



Daniel L. McFadden

In an administrative law case, *U.S. DOE vs. Cities Service Corp.*, I prepared written testimony and testified in support of defendant Cities on alleged damages from overcharges. My analysis considered the issue of the marginal cost of production of "new oil" and the econometric techniques appropriate for this analysis. (1987)

In the patent damages case of *Polaroid v. Kodak,* I served as a consulting expert to Polaroid on the economic theory of the case and the methodology used to estimate damages. (1989)

In the case of *U.S. DOJ vs. Exxon Company USA*, arising from the Exxon Valdez oil spill, I prepared for Exxon estimates of damages from loss of recreational opportunities. I was not deposed and did not testify prior to settlement of the case. However, I subsequently testified before a NOAA rule-making committee on some aspects of environmental damage assessment. (1990-1992)

In the case of *Northern Industries vs. Portec*, a contract dispute, I analyzed the market for railroad cranes on behalf of defendant Portec to determine whether the plaintiff was damaged, and critiqued a NERA analysis. I was deposed and testified. (1991-1994)

On behalf of defendant Atlantic Richfield Company, I submitted an expert report and was deposed in the case of *State of Montana vs. ARCO*, which involved contamination of streams arising from historical smelter operations of Anaconda Copper Company. My analysis considered the valuation of damages to consumer welfare from the contamination. (1993-1998)

I was deposed and testified on behalf of the defendants in the Industrial Excess Landfill case, a class action against Goodyear, Goodrich, and Firestone Rubber companies. My analysis focused on the estimation of damages from stigma. (1994-1995)

I was deposed in the case of *Apple Computer vs. ICSOP*. On behalf of the defendants, I analyzed the economic basis for allocation of a settlement between Apple Inc. and Apple Computer in a case involving trademark infringement and licensing of future use. (1995)

I submitted an expert report and was deposed in a case alleging unjust enrichment from trade secrets, *American Airlines vs. Northwestern Airlines*. On behalf of the defendant, I critiqued the damage analysis of the plaintiff=s experts. (1997)

I submitted an expert report, was deposed, and testified on behalf of Globe Metallurgical who was a defendant in a price-fixing civil anti-trust suit in the ferrosilicon products industry. My analysis focused on the reliability of the methodology used to detect whether plaintiffs were damaged. (1998)

I was a member of a three-person mediation team that mediated a suit in which the State of California and others were the plaintiffs and Bank of America was the Defendant. The case involved damages to the State from a failure of the Bank to return funds from inactive accounts. (1998)



Daniel L. McFadden

I submitted an amicus brief to a federal appeals court in reference to a Daubert ruling on the econometric analysis of an expert in a civil suit regarding unfair business practices. The issue in that case was whether the methodology used was a reliable indicator of damage to a competitor from alleged anticompetitive conduct. (2000)

I submitted an expert report and was deposed on behalf of Northpoint Communications in *Northpoint Communications vs. Verizon Communications*. My analysis estimated the loss in the market value of Northpoint as a result of a breach of contract by Verizon. (2001)

I submitted an expert report and was deposed on behalf of DuPont in the Choline Vitamins price- fixing litigation. My analysis estimated damages from the alleged anticompetitive conduct. (2001)

I submitted an expert report and was deposed on behalf of General Electric in *State of New Mexico ex rel, vs. General Electric, et al.* Case number CV 99-1254 BSJ and CV 99-1118 BSJ. The case involved the estimation of stigma damages. I submitted an amicus brief to the United States Supreme Court on this issue. (2002)

I submitted an expert opinion and was deposed and testified on behalf of Visa USA in a class-action litigation regarding pricing of foreign exchange services for credit card users. *Schwartz vs. Visa International, et al*, Case number 822404-4. (2002)

I submitted an expert report and was deposed on behalf of Cellnet of Ohio in *Westside Cellular Inc. dba Cellnet of Ohio vs. New Par et.al.* My analysis estimated damages from alleged illegal pricing of access to a telecommunications network. (2002)

I was retained as the damages expert in a patent infringement case involving reasonable royalties for an electronics invention. The case was dismissed. (2002)

I was retained as the damages expert by AOL in the *Netscape v. Microsoft* antitrust case. This case settled prior to submission of an expert report. (2002-2003)

I was retained as the damages expert by Sun Microsystems in *Sun v. Microsoft* antitrust case. This case settled prior to submission of an expert report. (2003-2004)

I testified in a private arbitration regarding damages from alleged conduct of a participant in an auction for a company. The principals and issues are confidential. (2003)

I submitted a co-authored amicus brief to the Supreme Court in reference to the regulation of interstate wine shipments. (2004)



Daniel L. McFadden

I submitted an expert report, an affidavit, and was deposed and testified in the Rocky Flats Plant case, a class action against Dow Chemical and Rockwell.  On behalf of the defendants, I critiqued the plaintiffs= and defendants damage analysis, and rendered an opinion on their reliability.  (1997-2006)

I submitted an expert report and testified at trial in Australia in an antitrust matter on behalf of plaintiff in *Seven v. News Corp.*

I testified at trial on behalf of the defendants in *Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, Civil Action: 01-CV-12257-PBS.  (2006)

I submitted expert reports on damages, co-authored expert reports on antitrust liability, and provided deposition testimony on behalf of the defendants in *Nitro Distributing, Inc., et al. v. Alticor, Inc., Amway Corporation, and Quixtar, Inc.* Case No. 03-3290-CV-S-RED (2007)

I co-authored a paper on behalf of Qualcomm titled "The Costs of the ITC Downstream Exclusion Order to the U. S. Economy," July 10, 2007, for the Presidential Review Phase of *Certain Baseband Processor Chips and Chipsets, Transmitter and Receiver (Radio) Chips, Power Control Chips, and Products Containing Same, Including Cellular Telephone Handsets*, USITC Inv. No. 337–TA–543.

I submitted an expert report on a patent matter on behalf of the defendants in *Every Penny Counts, Inc. v. Bank of America Corporation and Bank of America, N.A.,* Case No. 2:07-CV-42-FTM-29SPC.  (2008)

I testified at trial on behalf of the defendants in *Daniels Sharpsmart v. Tyco International, et al.* (2008)

I submitted an expert report in *Jarra Creek Central Packing Shed Pty Ltd v Amcor Ltd,* Case No. (P)NSD702/2006. (2011)

I submitted an affidavit on behalf of the plaintiffs in *DIRECTV, Inc. and EchoStar Satellite LLC v Loren L. Chumley, Commission of Revenue, State of Tennessee*, Case No. 03-2408-IV (2011)

I submitted an expert report on behalf of the defendants in *Sandra Landwehr v. AOL, Inc.*, **Case No.** 1:11-cv-01014-CMH-TRJ. (2012)

I was retained as a statistical expert by plaintiffs in the matter of *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp., and Bank of America Corporation*, Supreme Court of the State of New York, County of New York, Index no. 650042/09E, May 6, 2010. This case settled prior to submission of an expert report.

I submitted an expert report in the matter of *United States of America v. Countrywide Financial Corporation et.al.* (12CIV.1422(JSR)), May 7, 2013 and a revised report on June 6, 2013. I testified at deposition in this proceeding on June 11, 2013. I submitted an updated report on August 23, 2013.



Daniel L. McFadden

I was retained as a consulting expert by defendant in the matter of *In RE: High-Tech Employee Antitrust Litigation,* United States District Court Northern District of California, San Jose Division, Master Docket No. 11-CV-2509-LHK. (2011)

I submitted an expert report (September 2013), a rebuttal report (December 2013), and testified at trial (November 2016) on behalf of plaintiffs in the matter of *U.S. Airways, Inc., v. Sabre Holdings Corporation*, United States District Court Southern District of New York, Civil Action No. 1:11-ev-02725-MGC.

I submitted an expert report (October 6, 2014) *in the Matter of Determination of Rates and Terms for Digital Performance in Sound Recordings and Ephemeral Recordings (Web IV)*, No. 14-CRB-0001-WR.

I submitted an expert report (December 2014), deposition and hearing testimony (March 2015) at a Daubert hearing on the reliability of a proffered structural model of sports content broadcasting in *Laumann et al. v. National Hockey League et al.*, 12-cv-1817 (SAS) and *Garber et al. v. Office of the Commissioner of Baseball et al.*, 12-cv-3704 (SAS), S.D.N.Y.

I submitted an expert report (January 2015) and provided trial testimony (September 2016) on behalf of defendants in the matter of *VirnetX Inc, v. Apple*, United States District Court, Eastern Division of Texas, Tyler Division, Civil Action No.6:11-cv-00563.

I assisted BP in the evaluation of consumer losses due to lost recreational resources on the Gulf of Mexico in the wake of the Deepwater Horizon accident. This matter settled in April 2016 prior to the submission of an expert report.

I submitted an expert report (August 14, 2017), and a supplemental report (September 22, 2017) on behalf of plaintiffs in the matter of *United States v. Novartis Pharmaceuticals Corp.,* United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (March 1, 2018) on behalf of plaintiffs in the matter of *United States v. Novartis Pharmaceuticals Corp.,* United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (April 10, 2018) on behalf of General Motors, Inc., *In Re: General Motors LLC, Ignition Switch Litigation*, United States District Court for the Southern District of New York, Case No. 14-MD-2543 (JMF).

I was retained for a class of insurance subscribers who allege an antitrust injury by a consortium of insurers who maintain horizontal agreements that allocate markets and limit competition.

I submitted expert reports on behalf of defendant Polaris Industries Inc. in the matter of Riley Johanssohn et al. v. Polaris Industries No. 0:16-cv-03348-PJS-LIB on January 31, 2019, April 25, 2019 and August 1, 2019.

I was deposed (February 25, 2019 and May 22, 2019) on behalf of Polaris.



Privileged and Confidential

## Appendix B: Documents Considered

### I.   LITERATURE

1.   Athey, Susan and Guido W. Imbens. "Design-based Analysis in Difference-In-Differences Settings with Staggered Adoption," NBER Working Paper, No. 24963, August 2018.

2.   Brevoort, Kenneth P. and Cheryl R. Cooper. "Foreclosure's Wake: The Credit Experiences of Individuals Following Foreclosure," *Real Estate Economics*, 2013, 41(4): 747-792.

3.   Currie, Janet, and Erdal Tekin. "Is There a Link between Foreclosure and Health?" *American Economic Journal: Economic Policy,* 2015, 7(1): 63-94.

4.   Demyanyk, Yuliya. "The Impact of Missed Payments and Foreclosures on Credit Scores," *Quarterly Review of Economics and Finance*, 2017, 64: 108-119.

5.   DeRitis, Cristian, Chionglong Kuo, and Yongping Liang. "Payment shock and mortgage performance," *Journal of Housing Economics*, 2010, 19: 295-314.

6.   Di Maggio, Marco, Amir Kermani, Benjamin J. Keys, Tomasz Piskorski, Rodney Ramcharan, Amit Seru, and Vincent Yao. "Interest Rate Pass-Through: Mortgage Rates, Household Consumption, and Voluntary Deleveraging," *American Economic Review*, 2017, 107(11): 3550-3588.

7.   Downing, Janelle. "The Health Effects of the Foreclosure Crisis and Unaffordable Housing: A Systematic Review and Explanation of Evidence," *Social Science & Medicine* 2016, 162: 88-96. Accessed July 26, 2019. https://doi.org/10.1016/j.socscimed.2016.06.014.

8.   Epouhe, Onesime and Arden Hall; "Payment shock in HELOCs at the end of the draw period," *Journal of Economics and Business*, 2016, 84: 131-147.

9.   Frederick, Shane, George Loewenstein, and Ted O'Donoghue. "Time Discounting and Time Preference: A Critical Review," *Journal of Economic Literature*, June 2002, 40: 351-401.

10.   Gupta, Arpit. "Foreclosure Contagion and the Neighborhood Spillover Effects of Mortgage Defaults." *The Journal of Finance,* 2019, Early View, Online Version of Record before inclusion in an issue: 1-53. Accessed July 30, 2019. https://onlinelibrary.wiley.com/doi/pdf/10.1111/jofi.12821.

11.   Handel, Benjamin R. and Jonathan T. Kolstad. "Health Insurance for 'Humans:' Information Frictions, Plan Choice, and Consumer Welfare," *American Economic Review*, 2015, 105(8): 2449-2500.

Privileged and Confidential

12. Harding, John P., Eric Rosenblatt and Vincent W. Yao. "The Contagion Effect of Foreclosed Properties," *Journal of Urban Economics*, July 15, 2008, 3:164-178. Accessed 5, 2019. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1160354 .

13. Hastings, Justine S., Brigitte C. Madrian, and William L. Skimmyhorn, "Financial Literacy, Financial Education, and Economic Outcomes," *Annual Review of Economics*, 2013, 5:347-373.

14. Hausman, Jerry, "Individual Discount Rates and the Purchase and Utilization of Energy-Using Durables," *The Bell Journal of Economics*, Spring 1979, 10(1): 33-54.

15. Hedberg, William and John Krainer, "Credit Access Following a Mortgage Default," *Federal Reserve Bank of San Francisco Economic Letter*, October 29, 2012.

16. Immergluck, Dan, and Geoff Smith. "The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values," *Housing Policy Debate* 2006, 17 (1): 57-79. Accessed July 25, 2019. https://www.researchgate.net/publication/237246807_The_External_Costs_of_Foreclosure_The_Impact_of_Single-Family_Mortgage_Foreclosures_on_Property_Values.

17. Johnson, Kathleen W., and Robert F. Sarama, "End of the Line: Behavior of HELOC Borrowers Facing Payment Changes," *Finance and Economics Discussion Series 2015-073, Washington: Board of Governors of the Federal Reserve System*. Accessed August 31, 2018. http://dx.doi.org/10.17016/FEDS.2015.073.

18. Kingsley, Thomas G., Robin Smith, and David Price. "The Impacts of Foreclosures on Families and Communities," *The Urban Institute*. May 2009. Accessed July 31, 2019. https://www.urban.org/sites/default/files/publication/30426/411909-The-Impacts-of-Foreclosures-on-Families-and-Communities.PDF.

19. Kling, Jeffrey R., Sendhil Mullainathan, Eldar Shafir, Lee C. Vermeulen, and Marian V. Wrobel, "Comparison Friction: Experimental Evidence from Medicare Drug Plans," *The Quarterly Journal of Economics*, 2012, 127:199-235. Accessed August 12, 2019. https://academic.oup.com/qje/article/127/1/199/1833354.

20. Lee, Kai-yan. "Foreclosure's Price-Depressing Spillover Effects on Local Properties: A Literature Review," *Federal Reserve Bank of Boston*, September 2008, 2008-01.

21. Leonard, Tammy, and James C. Murdoch. "The Neighborhood Effects of Foreclosure," *Journal of Geographical Systems*, 2009, 11: 317-332. Accessed August 2, 2019. https://link.springer.com/article/10.1007/s10109-009-0088-6.

22. Liberti, José Maria and Mitchell A. Petersen, "Information: Hard and Soft," NBER Working Paper No. 25075, September 2018.

23. Lin, Zhengou, Eric Rosenblatt and Vincent W. Yao. "Spillover Effects of Foreclosures on Neighborhood Property Values." *The Journal of Real Estate Finance and Economics*, 2009, 38(4): 387-407. Accessed July 31, 2019. https://link.springer.com/article/10.1007/s11146-007-9093-z.

Privileged and Confidential

24. Liu, Yishen, and Anthony M. Yezer. "Foreclosure Externalities: Have We Confused the Cure with the Disease?" *Real Estate Economics*, 2019, 0(0): 1-33. Accessed August 1, 2019. https://onlinelibrary.wiley.com/doi/abs/10.1111/1540-6229.12281.

25. Lusardi, Annamaria and Olivia S. Mitchell, "How Ordinary Consumers Make Complex Economic Decisions: Financial Literacy and Retirement Readiness," *Quarterly Journal of Finance,* 2017, 7(3): 1750008-1-17500083-1.

26. Lusardi, Annamaria and Olivia S. Mitchell, "The Economic Importance of Financial Literacy: Theory and Evidence," *Journal of Economic Literature*, 2014, 52(1): 5-44

27. Lusardi, Annamaria and Peter Tufano, "Debt literacy, financial experiences, and overindebtedness," *Journal of Pension Economics & Finance*, 2015, 14(4): 332-368.

28. Min Qi and Harald Harry Scheule, "The Impact of Positive Payment Shocks on Mortgage Credit Risk–A Natural Experiment from Home Equity Lines of Credit at End of Draw," available at *SSRN 2781359*, 2016.

29. Molloy, Raven, and Hui Shan. "The Postforeclosure Experience of U.S. Households," *Real Estate Economics*, 2013, 41(2): 225-254. Accessed July 25, 2019. https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1540-6229.2012.00344.x.

30. Moreno, Ana "The Cost-Effectiveness of Mortgage Foreclosure Prevention," *Family Housing Fund Minneapolis*, Minnesota, 1995.

31. Munroe, David J. and Laurence Wilse-Samson. "Foreclosure Contagion: Measurement and Mechanisms," *Columbia University, Department of Economics*, December 14, 2013.

32. Russell, Louise B. "Opportunity Costs in Modern Medicine," *Health Affairs, 1992,* 11(2): 162-169. August 9, 2019. https://www.healthaffairs.org/doi/10.1377/hlthaff.11.2.162.

33. Stucky, Thomas D., John R. Ottensmann and Seth B. Payton. "The Effects of Foreclosure on Crime in Indianapolis, 2003-2008," *Social Science Quarterly*, 2012, 93(3): 602-624. Accessed July 31, 2019. https://www.jstor.org/stable/42864089.

34. Towe, Charles, and Chad Lawley. "The Contagion Effect of Neighboring Foreclosures," *American Economic Journal: Economic Policy, 2013,* 5(2): 313-335. Accessed July 31, 2019.  https://www.jstor.org/stable/43189336.

35. U.S Congress. "The 2007 Joint Economic Report of the Joint Economic Committee Congress of the United States on the 2007 Economic Report of the President Together with Minority Views." Accessed July 31, 2019. https://www.jec.senate.gov/reports/110th Congress/The 2007 Joint Economic Report (1810).pdf.

36. Verma, Nidhi. "A deeper understanding of payment shock dynamics," *Journal of Risk Management in Financial Institutions*, 2017, 10(3): 276.

Privileged and Confidential

37.  Zhe Jin, Ginger, Michael Luca, and Daniel J. Martin, "Complex Disclosure," NBER Working Paper No. 24675, October 2018.

## II.   EXPERT REPORTS/ DEPOSITIONS

1.  Andrew S. Combs Deposition, May 29, 2019.

2.  Expert Report of John Searson, Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC, Case No. 9:17-CV-80495, August 15, 2019.

3.  Christopher Kennedy Deposition, May 30, 2019.

4.  Kim McCall Miller Deposition, May 15, 2019.

5.  Krysta Sebastian Deposition, May 21, 2019.

6.  Julie Kacher Deposition, May 21, 2019.

7.  Mark Kearns Deposition, May 30, 2019.

8.  Parveen Aery Deposition, May 15, 2019.

9.  Paul Abate Deposition, May 21, 2019.

10.  Sherri Goodman Deposition, May 22, 2019.

11.  Steven Haas Deposition, May 15, 2019.

12.  Tom Arnett Deposition, May 22, 2019.

## III.   PUBLIC FILINGS AND LAWS

1.  24 CFR § 3500. "Real Estate Settlement Procedures Act." govinfo, April 1, 2000. Accessed August 14, 2019. https://www.govinfo.gov/app/details/CFR-2000-title24-vol5/CFR-2000-title24-vol5-part3500.

2.  12 U.S.C. § 4901 (13). "Private Mortgage Insurance." govinfo, January 3, 2012. Accessed August 15, 2019. https://www.govinfo.gov/app/details/USCODE-2011-title12/USCODE-2011-title12-chap49-sec4901.

3.  Compliant, Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC, Case No. 9:17-CV-80495, April 20, 2017.

4.  Consumer Finance Protection Bureau, "The Consumer Credit Card Market," December 2017.

5.  Federal Housing Finance Agency, "A Primer on Price Discount of Real Estate Owned (REO) Properties," *Mortgage Market Note* 12-0, September 17, 2012.

Privileged and Confidential

6. Ocwen Financial Corporation, 2009 Form 10-K Annual Report, March 8, 2010.

7. Ocwen Financial Corporation, 2010 Form 10-K Annual Report, February 28, 2011.

8. Ocwen Financial Corporation, 2011 Form 10-K Annual Report, February 29, 2012.

9. Ocwen Financial Corporation, 2012 Form 10-K Annual Report, March 1, 2013.

10. Ocwen Financial Corporation, 2013 Form 10-K Annual Report, March 3, 2014.

11. Ocwen Financial Corporation, 2014 Form 10-K Annual Report, May 11, 2015.

12. Ocwen Financial Corporation, 2015 Form 10-K Annual Report, February 29, 2016.

13. Ocwen Financial Corporation, 2016 Form 10-K Annual Report, February 23, 2017.

14. Ocwen Financial Corporation, 2017 Form 10-K Annual Report, February 28, 2018.

15. Ocwen Financial Corporation, 2018 Form 10-K Annual Report, February 27, 2019.

16. Ocwen Financial Corporation, 2019 Form 10-Q Quarterly Report, August 6, 2019.

17. Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC, Case No. 9:17-CV-80495, September 5, 2019.

18. Plaintiff's Fifth Set of Requests for Production to Defendants, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation*, No. 9:17-CV-80495.

19. Saccameno v. Ocwen Loan Servicing, LLC, 372 F. Supp. 3d 609, 631–32 (N.D. Ill. 2019).

20. U.S Congress. "The 2007 Joint Economic Report of the Joint Economic Committee Congress of the United States on the 2007 Economic Report of the President Together with Minority Views," Accessed July 31, 2019. https://www.jec.senate.gov/reports/110thCongress/The2007JointEconomicReport(1810).pdf.

## IV.   WEBSITES

1. "Average Credit Card APR," U.S. News & World Report, July 1, 2019. Accessed August 5, 2019, https://creditcards.usnews.com/articles/average-apr.

2. Board of Governors of the Federal Reserve System. "Consumer Credit – Current Release," *Federal Reserve System Press Release*. June 2019. Accessed August 12, 2019, https://www.federalreserve.gov/releases/g19/current/.

3. Boone, Mary. "How Much Does It Cost to Move," *Zillow.com*, March 23, 2018. Accessed August 9, 2019, https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663/.

Privileged and Confidential

4. Bureau of Labor Statistics, "CPI-All Urban Consumers (Current Series)," Accessed August 3, 2019, https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201906.pdf.

5. Consumer Finance Protection Bureau. CFPB Consumer Laws and Regulations, "Homeowners Protection Act (PMI Cancellation Act)," October 2012. Accessed August 5, 2019, http://files.consumerfinance.gov/f/documents/102012_cfpb_homeowners-protection-act-hpa-pmi-cancellation-act_procedures.pdf.

6. Consumer Financial Protection Bureau. "What is Private Mortgage Insurance," July 28, 2017. Accessed August 5, 2019, https://www.consumerfinance.gov/ask-cfpb/what-is-private-mortgage-insurance-en-122/.

7. Federal Housing Finance Agency (FHFA). "House Price Index," Accessed August 12, 2019, https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx.

8. Federal Reserve Bank of New York, Center for Microeconomic Data. "Quarterly Report on Household Debt and Credit, 2019: 2Q,"August 2019. Accessed August 14, 2019, www.newyorkfed.org/microeconomics/hhdc.

9. FRED (Federal Reserve Bank of St. Louis). "Commercial Bank Interest Rate on Credit Plans, Accounts Assessed Interest," May 2019. Accessed August 12, 2019, https://fred.stlouisfed.org/series/TERMCBCCINTNS.

10. Internal Revenue Service, "Home Foreclosure and Debt Cancellation," Accessed July 25, 2019, http://www.irs.gov/newsroom/home-foreclosure-and-debt-cancellation.

11. Joint Economic Committee, "Sheltering Neighborhoods from the Subprime Foreclosure Storm," April 11, 2007. Accessed August 3, 2019, https://www.jec.senate.gov/archive/Documents/Reports/subprime11apr2007revised.pdf.

12. MBS Data: Mortgage Backed Securities Data & Analytics. Accessed August 12, 2019, http://www.mbsdata.com/.

13. Nobel Prizes and Laureates. "'Daniel L. McFadden – Facts,' The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2000," Accessed August 12, 2019, https://old.nobelprize.org/nobel_prizes/economicsciences/laureates/2000/mcfadden-facts.html .

14. Ocwen Financial Corporation. "Our Company," Accessed August 12, 2019, http://www.ocwen.com/our-company.

15. Smith, Stacy. "Am I Able to get an Old Foreclosure Taken Off my Credit Report," *Experian*, June 8, 2017. Accessed August 10, 2019,

Privileged and Confidential

https://www.experian.com/blogs/ask-experian/am-i-able-to-get-an-old-foreclosure-taken-off-my-credit-report/.

16. U.S. Department of Housing and Urban Development, "Economic Impact Analysis of the FHA Refinance Program for Borrowers in Negative Equity Positions," 2010. Accessed August 3, 2019, https://www.hud.gov/sites/documents/IA-REFINANCENEGATIVEEQUITY.PDF.

17. United States Department of Labor, Bureau of Labor Statistics. "Local Area Unemployment Statistics," Accessed August 12, 2019, https://www.bls.gov/lau/.

## V.    OTHER

1. Consumer Financial Protection Bureau's Civil Investigative Demand. April 8, 2016.

2. Ocwen's Response to Interrogatory No. 1-13, May 28, 2019.

3. OCW2-006-0022070.

4. OCW3-004-0000029.

5. OCW-012-0000120.

6. OCW-012-0000550.

7. OCW-013-0007376.

8. OCW-019-0011419.

9. OCW-024-0103993.

10. OCW-024-0104007.

11. OCW3-027-0005675.

12. OCW-049-0071308.

13. OCW-030-0024009.

14. OCW-030-0024021.

15. OCW-CFPB-001-01585895.

16. OCW-CFPB-001-06730240.

17. OCW-CFPB-001-06048934.

18. OCW-CFPB-001-06048935.

19. OCW-CFPB-001-00083874.

20. OCW-CFPB-001-00083901.

21. OCW-CFPB-001-01294664.

**Privileged and Confidential**

22. OCW-CFPB-001-02292346.

23. OCW-CFPB-001-05787062.

24. OCW-CFPB-001-06523242.

25. OCW-CFPB-001-06235505.

26. OCW-CFPB-001-05819247.

27. OCW-CFPB-001-01464439.

28. Rogs 1-4 Exhibit A.

29. Rogs 1-4 Exhibit B.

30. Rogs 1-4 Exhibit C.

31. Rogs 1-4 Exhibit F.

32. Rogs 5-8 Exhibit I.

33. Rog 12 Exhibit H.

**Privileged and Confidential**

**Appendix C: Additional Late Escrow Analyses Omitted from Rogs 1-4, Exhibit C[1]**

## I.   OVERVIEW

1.   Defendants' Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants 1-4, Exhibit C ("Exhibit C") identifies instances where Ocwen admits to servicing failures related to untimely escrow analyses. Based on discovery data in this case, I have attempted to verify that Exhibit C identifies all such cases. Focusing only on loans that are not associated with any delinquency, bankruptcy, or foreclosure, I identified 34,006 additional servicing failures that are not identified in Rog 2.2, but which I believe is late, consistent with how Ocwen had put together Exhibit C. In other words, I believe Ocwen had underreported the number of servicing failures in Exhibit C. This memo documents the basis for that assertion.

## II.   ROGS 1-4, EXHIBIT C

2.   In Ocwen's Verified Responses and Objections to the Bureau's First Set of Interrogatories to Defendants, Ocwen described the process for creating Exhibit C. Among the general population of loans that required an escrow analysis between January 1, 2014 and January 8, 2018, Ocwen determined whether it performed timely escrow analyses or not. For loans with which Ocwen did not perform a timely escrow analysis, Ocwen produced an exhibit with the following variables:

   a.   **Loan Number**

   b.   **Analysis Due Date:** 1 year and 30 days from the prior analysis date

   c.   **Last Analysis Date:** the late escrow analysis resulting in an accrued shortage or surplus

   d.   **Shortage/Surplus:** escrow shortage or surplus accrued between the analysis due date and the last analysis date

---

[1]   Defendants' Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, May 28, 2019 ("Rogs").

Privileged and Confidential

### III.  BRATTLE'S REPLICATION

3.   To verify that Exhibit C is a comprehensive source of servicing failures related to untimely escrow analyses, I use Ocwen's Responses to Requests from the Bureau's Fifth Set of Requests for Production to reconstruct the loan number, analysis due date, and last analysis date variables reported in Exhibit C. I limit my replication to loans that are not associated with any delinquency, bankruptcy, or foreclosure events.

4.   Three of Ocwen's Responses to Requests from the Bureau's Fifth Set that include analysis date information and could be used as basis for my replication:

   a.   **Ocwen's Response to Request 19 ("RFP 19A," Relevant Codes or Flags)** includes the date that code or flag was entered (CREATEDDT).

   b.   **Ocwen's Response to Request 24 ("RFP 24A," Pending Change Entries)** includes the date of entry (CREATEDDT).

   c.   **Ocwen's Response to Request 29 ("RFP 29," Escrow Statements)** includes the effective date of the statement (EFFDATE).

5.   I rely on RFP 19A because it has the best coverage and supplement it with RFP 24A for the earlier time period that is not covered by RFP 19A. I combine the information from RFP 19A and RFP 24A to construct a list of analysis dates for each loan included. I calculate the gap between each pair of analysis dates and regard an escrow analysis late if the gap is larger than one year and thirty days.

### IV.  ADDITIONAL SERVICING FAILURES IDENTIFIED

6.   I identify 34,006 additional servicing failures that are not captured in Exhibit C. I restrict analysis due date to later than January 1, 2014, and late analysis date to before January 8, 2018, which is consistent with the date ranges of Exhibit C.

Privileged and Confidential

**Figure 1: Examples of Additional Late Escrow Analyses**

| Loan Number | Prior Analysis Date (RFP 24A) | Late Analysis Date (RFP 19 A) | Lateness (Days) |
|---|---|---|---|
| ███ | 12/5/2012 | 2/6/2014 | 33 |
| | 12/3/2012 | 2/23/2014 | 52 |
| | 12/3/2012 | 1/28/2014 | 26 |
| | 12/4/2012 | 1/28/2014 | 25 |
| | 12/4/2012 | 1/13/2014 | 10 |

Sources: Ocwen's Responses to Requests 19 and 24 from the Bureau's Fifth Set of Requests for Production.

7.     In Figure 2, I summarize date ranges of Exhibit C and the additional servicing failures I identified. The minima and medians of analysis due date and late analysis date are similar, while the maxima of the analysis due date and late analysis date in the additional servicing failures are later than the ones in Exhibit C. The median and maximum of average lateness in additional servicing failures is also larger than that reported in Exhibit C. Note that when comparing these two datasets, I only consider the loans with non-missing analysis due date and late analysis date in Exhibit C.

**Figure 2: Summary Statistics—Rogs 1-4, Exhibit C versus Additional Late Escrow Analyses**

| | Min | Median | Max |
|---|---|---|---|
| *Rogs 1-4, Exhibit C* | | | |
| Analysis Due Date | 1/1/2014 | 1/31/2015 | 8/31/2017 |
| Late Analysis Date | 1/5/2014 | 2/27/2015 | 10/13/2017 |
| Lateness (in days) | 1 | 27 | 1283 |
| *Additional Late Analyses* | | | |
| Analysis Due Date | 1/2/2014 | 2/5/2015 | 12/31/2017 |
| Late Analysis Date | 1/6/2014 | 2/23/2015 | 1/8/2018 |
| Lateness (in days) | 1 | 32 | 1306 |

Source: Rogs 1-4, Exhibit C; Ocwen's Responses to Requests 19 and 24 from the Bureau's Fifth Set of Requests for Production.

Privileged and Confidential

### Appendix D: Analysis of PMI Overcharges and ARM Servicing Failures Populations

## I. PMI OVERCHARGES POPULATION

1. This section details how I constructed the dataset of PMI Overcharges. My analysis of the Private Mortgage Insurance ("PMI") draws from OCW-CFPB-001-06730240, which was Ocwen's Response to Requests 9-10 from the Bureau's Second Set of Requests for Production; Ocwen's Response to Request 22 from the Bureau's Fifth Set of Requests for Production ("RFP 22," Transaction History); and Ocwen's Response to CFPB's Civil Investigative Demand that was issued on April 8, 2016 ("April CID").

2. OCW-CFPB-001-06730240 contains a list of loans for which Ocwen "failed to automatically cancel a Borrower's [PMI] when the balance on the Loan reached 78 percent of the home's original appraised value."[1]  For each loan, Ocwen identified the date when the PMI policy should have been cancelled ("Effective Cancellation Date,") the date when the PMI policy was actually cancelled ("Cancellation Date"), the date when Ocwen credited the borrower ("Credit Date"), the amount credited to the borrower ("Credit Amount") and the monthly premium of policy ("Premium").[2]  This table from Ocwen served as the basis of my dataset.

3. To be conservative, I verified that the borrower paid the overcharge amount by looking in RFP 22 and the April CID payments dataset for a disbursement from Ocwen that matched the reported credit amount in OCW-CFPB-001-06730240. More specifically, if I was able to match the credit amount (identified by transaction type "EIC" in RFP 22) to a disbursement amount of equal magnitude (transaction type "EMD") within 7 days of the credit date, then I assume that the borrower had paid the additional premiums such that Ocwen would—as observed in RFP 22 and the April CID payments dataset—refund the overcharged amounts.[3]

---

[1]  Request 9 from Plaintiff's Second Set of Requests for Production to Defendants, p. 13.

[2]  There is an additional data field, "Type," that takes on the values of Additional or Settlement.  I do not use this variable in my analysis.

[3]  I matched the credit amount in OCW-CFPB-001-06730240 to the EIC amount in RFP 22 based on exact amounts and dates in which the credit date was within three days of the transaction date.

Privileged and Confidential

## II.   ARM SERVICING FAILURES POPULATION

4.   This section details how I prepared the overcharge dataset for my analysis which includes the overcharge amount, the start date for the harm and the end date for the harm related to adjustable rate mortgage ("ARM") servicing failures. In addition, I describe the construction of the start dates I identified for these harmed borrowers. I also note the Ocwen produced file I used to supplement the overcharge population.

### A.   OVERCHARGE

5.   To construct the ARM Servicing Failures population that Ocwen overcharged, I used Ocwen's Responses to Requests 19 ("RFP 19A," Comments), 22 ("RFP 22," Transaction History), and 24 ("RFP 24A," Pending Change) from the Bureau's Fifth Set of Requests for Production.

#### 1.   Identifying the Overcharge Population[4]

6.   RFP 19A provides comments data used by Ocwen to identify needed actions or outstanding issues for serviced loans. I extracted the following fields: Loan Number ("LOANNUMBE"), Comment Code ("STDCALIAS"), Created Date ("CREATEDDT"), and Full Comment ("COMMENTS"). I included loans which had both ARMADJ and RVRQ comment codes. I limited the set to loans with RVRQ comment within 3 days before or after an ARMADJ comment.

7.   Additionally, I included loans from a list of overcharges identified by Ocwen.[5] This file includes Loan Number, Adjustment Date, and Overcharge Amount.

#### 2.   Identifying Harm Amounts

8.   I further extracted information from the Full Comment, including the Payment Suspense amount. See example of ARMADJ comment below (bolded font on Payment suspense amount was added):

---

[4]   My approach to identifying the overcharge population is based on the testimony of corporate deponent Tom Arnett; see Deposition Transcript of Tom Arnett, May 22, 2019 at 29:3-40:4.

[5]   OCW-CFPB-001-06048935.

2

> *An ARM audit has been completed. The following adjustments are being requested:*
>
> *Interest: $-42.54*
>
> *Principal: $0.00*
>
> ***Payment suspense: $42.54***
>
> *Refund to borrower: $42.54*

9.   RFP 22 includes full transaction histories for Ocwen-serviced loans. I included loans which had Suspense Miscellaneous Disbursement ("SMD") transactions with amounts matching the "Payment Suspense" amounts found in the ARMADJ comment. I limited the set to loans with a matching SMD transaction within 15 days following the ARMADJ comment. Based on information from an Ocwen employee, I interpret these transactions to be Ocwen refunds to borrowers for overcharges.

10.   I removed offsetting and duplicate transactions from the set.

### 3.    Identifying Overcharge End Dates

11.   I interpret the Created Date from RFP 19A and the Adjustment Date from the Ocwen identified overcharges[6] as the relevant end dates of the overcharge caused by Ocwen.

### 4.    Identifying Overcharge Start Dates

12.   To identify the start of the harm from overcharges, I used RFP 24A. RFP 24A is Ocwen's Pending Change database which was used to adjust payments. Relevant fields from RFP 24A include Loan Number "LOANNUMBER", Change Date "CHANGEDATE", and Pending Change Date "PENDCHNGDT." Change Date is the date that Ocwen realizes an adjustment is needed and creates a pending change line. Pending Change Date is the effective date of the adjustment, which can occur retroactively (Pending Change Date < Change Date) or in the future (Pending Change Date > Change Date). If multiple adjustments are needed to correct an issue for a given

---

[6]   OCW-CFPB-001-06048935.

Privileged and Confidential

loan, multiple lines are created with the same Change Date, but multiple Pending Change Dates depending on when the adjustments are needed.

13.   To identify the start of the harm, I matched the ARMADJ Created Date or Ocwen identified overcharge[7] Adjustment Date to the Change Date in RFP 24A. I then identified the earliest Pending Change Date corresponding with that Change Date.

14.   I was able to match roughly one third of the relevant overcharge population to RFP 24A. For those without an exact match to the Change Date, I impute the start date using data from those that do match to RFP 24A. In preparation for imputing the start date, I calculate the quarterly average for days outstanding between the overcharge end date (ARMADJ Created Date or Adjustment Date) and the start date from RFP 24A. See table of quarterly averages below.

**Table 1: Average Days Outstanding by Quarter of Overcharge End Date**

| Quarter | Year | Average Days Outstanding |
|---------|------|--------------------------|
| Q2 | 2015 | |
| Q3 | 2015 | |
| Q1 | 2016 | 205 |
| Q2 | 2016 | 798 |
| Q3 | 2016 | 867 |
| Q4 | 2016 | 1,329 |
| Q1 | 2017 | 1,166 |
| Q2 | 2017 | 967 |
| Q3 | 2017 | 769 |
| Q4 | 2017 | 1,109 |
| Q1 | 2018 | 1,200 |
| Q2 | 2018 | 1,048 |
| Q3 | 2018 | 999 |

15.   I was unable to calculate a quarterly average for Q2 and Q3 in 2015 because I was not able to match any loans to RFP 24A for those quarters. For these loans, I used the quarterly average calculated for Q1 2016.

---

[7]   OCW-CFPB-001-06048935.

**Privileged and Confidential**

16.     I imputed the start date for those loans without exact matches to RFP 24A as
        [ARMADJ Created Date or Adjustment Date] - [Quarterly Average of Days
        Outstanding].

17.     I corrected any instances where the matched or imputed start date fell before the loan's
        boarding date to the boarding date "BOARDEDDT" from Ocwen's Response to
        Request 1 from the Bureau's Fifth Set of Requests for Production where available.

Privileged and Confidential

## Appendix E: Data Description

1. This data appendix describes the underlying data sources and methodology I used to identify and produce timelines of credit events for Ocwen loans.

2. My analysis produced timelines for all loans which suffered from various credit events and added flags to a panel dataset that indicated a loans status regarding each of those credit events:

   1. Creating Credit Event Timelines
      a. Foreclosure
      b. Bankruptcy
      c. Delinquency
      d. Forbearance
      e. Permanent Modifications
   2. Adding Flags to the Ocwen Panel

## I. CREATING CREDIT EVENT TIMELINES

3. I used data produced by Ocwen to identify periods in which loans suffered adverse credit events.

### A. FORECLOSURE

4. I used RFP 9 to identify foreclosure start dates using the "FCL_PROC_START_DATE" (foreclosure filing date) field and RFP 10 data to identify foreclosure end dates using the "SALEHELDDT" and "RESCINDEDDT" fields. I flagged any loan number as having ongoing foreclosure proceedings if there is no sale held date listed in RFP 10, but there is a foreclosure filing date in RFP 9. I flagged any loan number as having a rescinded foreclosure if every sale held date listed in RFP 10 is rescinded. I flagged any loan number as having been on-boarded into Ocwen's system already foreclosed if there is no foreclosure filing date but there is a sale held date. I made the same assumption for loans

Privileged and Confidential

whose earliest foreclosure filing date in RFP 9 falls after their earliest sale held date listed in RFP 10[1].

5.   For loans which I flagged as having been in foreclosure proceedings at the time of on-boarding, I did not impute a start date of foreclosure. For all other loans, I took the earliest foreclosure first legal start date as the start date of foreclosure.

6.   For loans which I flagged as having ongoing foreclosure proceedings, I did not impute an end date of foreclosure. For loans which I flagged as having a rescinded foreclosure, I took the latest sale held date as the end of foreclosure proceedings. For all other loans, I took the latest non-rescinded sale held date as the end date of foreclosure.

### B.   BANKRUPTCY

7.   I used RFP7 and the RFP7 Supplement data to identify bankruptcy start and end dates. For each loan number, I assumed the date listed as the Bankruptcy Master Filed Date ("BRMFILED") to be the start of bankruptcy. I assumed the date listed as the Bankruptcy Master Closed Date ("BRMCLSD") to be the end of each bankruptcy period for a loan.

8.   I supplement this data with data in the RFP19 A comments. I searched for bankruptcy filing and discharge dates for loans which were not reported in either the original or supplemental RFP 7 data.

9.   I dropped any loan for which the aforementioned start date occurs later than the aforementioned end date. I also dropped any loan which has a missing bankruptcy start date.

### C.   DELINQUENCY

10.   I used RFP 5, and the April CID to identify delinquency start and end dates.

---

[1]   I assumed these loans had some earlier foreclosure filing date which occurred prior to the loan being on-boarded to Ocwen's system and was therefore unobserved in the Ocwen data.

Privileged and Confidential

11. For loans in RFP 5 I took the delinquency start and end dates as given and computed a delinquency length. Additionally, I took the cured flag as given. For loans that have a delinquency cure date followed by a delinquency start date on the next day, I considered those as ongoing (continuous) delinquencies until the next cure date.

12. For loans in RFP 1 that are not in RFP 5, I used the April CID to identify additional delinquencies. I took the earliest delinquency start date as the start of a delinquency period and the earliest subsequent delinquency cured date as the end date. For loans which do not have any cured date listed, I assume the delinquencies to be ongoing. I then compute a delinquency length using the start and end dates identified.

13. I also considered the list of loans provided by Ocwen as a supplement to RPF 5. For loans where I identified delinquency dates in the April CID data, which were also in this supplemental list, I used the April CID delinquency dates. However, there were also a set of loans that were not identified as delinquent in the April CID data, but were identified as being delinquent at least once according to the supplemental RFP 5 list, I assumed that these loans were always delinquent since January 2014.

### D. FORBEARANCE

14. From RFP 14, I use the field "CREATEDDT" as the start date of the forbearance period and "CLSDDT" as the end date. I excluded rows for which the start date is the same as the end date.

### E. PERMANENT MODIFICATIONS

15. In RFP 13, I used the "PERMNT_MOD_DT" as the permanent modification date. In cases where there were more than one such date for a loan, I used the earliest permanent modification date.

## II. ADDING FLAGS TO THE OCWEN PANEL

16. For the data used to estimate the model, I constructed a panel dataset of loans with a row for each month. The starting month of the loan is the latest of the loan's boarded date onto Ocwen and January 2014. The last monthly observation for each loan is the earliest

Privileged and Confidential

of the loan's service transfer date off of Ocwen's portfolio (if applicable), its payoff date (if applicable) and August 2018.

17. For each month in this dataset, I compared the start and end dates of bankruptcies, delinquencies, foreclosure and forbearance as described above to impute variables that indicate whether a certain credit event was ongoing in any given month. I created a variable indicating if a given month was on or after the earliest permanent modification for a loan, where applicable.

Privileged and Confidential

## Appendix F: Data Description

1. This appendix describes the underlying data sources and methodology I used to create a panel dataset based on MBS data. The MBS panel provides an alternative set of loans and variables to the data produced by Ocwen, which I used for alternative controls to my proportional hazard model. This dataset was used for estimating an alternate result for the marginal probability of foreclosure for loans which suffered an untimely escrow analysis.

2. My analysis involved two general steps that I discuss in detail below:

    1. Identifying Ocwen Loans within the MBS Data
    2. Creating the MBS Panel

## I. IDENTIFYING OCWEN LOANS WITHIN THE MBS DATA

3. I used RFP 1, from Ocwen's production, along with the MBS Origination data ("MBS Origination"), which contains origination-level characteristics of securitized loans. Each of these data sets include characteristics of loans such as the property ZIP code, lien position, origination date, and original loan amount, amongst others. I used these four specified variables ("matching variables") to identify RFP 1 loans in the MBS data.

### A. CLEANING OCWEN LOAN INFORMATION

4. RFP 1 provides characteristics for borrowers and loans that are managed by Ocwen. I extracted the following fields and cleaned any data anomalies: property ZIP code ("PROPZIP"), lien position ("LIENPOS"), origination date ("CLOSINGDT"), and original loan amount ("ORGPRINBAL").

### B. CLEANING MBS LOAN INFORMATION

5. MBS Origination suffers from a few inconsistencies which I had to reconcile. I extracted the following fields and cleaned any data anomalies: property ZIP code ("Property ZIP Code / MSA"), lien position ("Lien Position"), original loan amount ("Original Loan Amount"), and origination date ("Origination Date"). One key inconsistency within the

Privileged and Confidential

data is that the source files appear to have differing reporting standards. I found that some loans have property ZIP code and origination date information reported at a more aggregated level. Specifically, certain source files report only the first three digits of the property's ZIP code. Others only report the origination month. Others still report both variables at the aggregated levels.

### C.   MATCHING LOANS

6.   In matching Ocwen loans with loans in MBS Origination, I took several measures to avoid false-positives[1]. First, I attempted to match loans with the most granular level of information before attempting to match loans with more aggregated data. Second, I dropped loans in MBS Origination which were duplicates in the matching variables. Finally, I dropped any pairs from my final crosswalk which mapped loans in MBS Origination to multiple loans in RFP1. These precautions are detailed below.

*Matching Granular Information First*

7.   I split MBS Origination into four data sets – one for each combination of ZIP code and origination date specificity – using the source file from which each loan is drawn. I first attempted to match RFP 1 loans to the set of loans in MBS Origination sourced from files which report five digit ZIP codes and origination date. I then attempted to match the remaining, unmatched, RFP 1 loans to the set of loans in MBS Origination sourced from files which report five digit ZIP codes and origination month. I repeated this process of matching the remaining RFP 1 loans with the last two data sets – first with source files that report three digit ZIP codes and origination date, and finally with those that report three digit ZIP codes and origination month.

*Dropping Duplicate Loans in MBS Origination*

---

[1]   I define false-positives to be loans in MBS Origination which get matched to loans in RFP 1 based on my four matching variables, but which are not actually the same loan.

8.  Prior to matching, I dropped loans from each of the four datasets described above which are non-unique in the matching variables. This process eliminated the possibility for a loan in RFP 1 to match multiple loans in MBS Origination.

*Dropping Pairs with Identical MBS Origination Loan Matches*

9.  Once I finish the matching process, I dropped additional loans from my crosswalk. Specifically, I dropped instances where one loan number in MBS Origination matched to multiple loans in RFP 1.

10. I dropped these uncertain matches to remain conservative. Rather than including non-RFP 1 loans in the set of harmed loans, I preferred to leave possible RFP 1 loans in the control group.

## II.   CREATING THE MBS PANEL

11. I used the MBS Origination data ("MBS Origination"), the MBS Remittance data ("MBS Remittance"), the MBS Servicer History data ("MBS Servicer History"), and the my crosswalk which maps loans in RFP 1 to loans in MBS Origination to create the MBS panel.

### A.   CLEANING MBS ORIGINATION

12. I added a flag to MBS Origination RFP 1 loans, using my crosswalk. I then dropped RFP 1 loans which do not suffer from untimely escrow.

13. The MBS data uses the combination of series id ("Series ID"), pool number ("Pool Number"), and loan number ("Loan Number") as its key. However, between MBS Origination and MBS Remittance, there are inconsistencies with series id and pool number. This could arise from loans transferring from one series or pool to another, or simply be a result of missing data. As a solution, I resorted to using only the loan number as my key between MBS data sets. I therefore dropped any loans with duplicate loan numbers ("Loan Number") in MBS Origination.

Privileged and Confidential

### B. SAMPLING LOANS

14. I constructed my panel using two sets of loans: all loans in MBS which matched to loans in RFP 1, and a roughly equal sized control group of loans which were never serviced by Ocwen.

15. In order to generate the sample of loans for my control group, I sampled from the set of distinct loan numbers in MBS Remittance. The remittance information for MBS data is split between archived data ("MBS Remittance Archive"), and more recent data ("MBS Remittance"). MBS Remittance Archive contains remittance history through the end of 2012. MBS Remittance contains remittance history starting in 2013. The damage period began on January 1, 2014; each untimely escrow loan has not defaulted up until this point. Each loan with remittance history in MBS Remittance had not defaulted up until January 1, 2013. Therefore, sampling from this set of loans provided the most appropriate control group.

16. I filtered out all loans in the sampled control group which had ever been serviced by Ocwen, according to the MBS Servicer History data ("MBS Servicer History").

### C. JOINING MBS REMITTANCE DATA

17. My last step in producing the MBS panel data is to join MBS Remittance onto my set of Ocwen-harmed plus sampled control loans.

18. I remove all loans that have duplicate distribution date observations. There are some loans that have missing entries. For every missing month, I impute all variables based on the latest observed month prior to the missing entry.

**Privileged and Confidential**

## Appendix G: Proportional Hazards Model and Data

1.  This Appendix describes the discrete time proportional hazards model and explains how I calculate the impact on the average cumulative probability of foreclosure initiations due to servicing failures. The Appendix also describes the variables included in the estimation.

## I.   THE DISCRETE TIME PROPORTIONAL HAZARDS MODEL

2.  I define the probability that a foreclosure is initiated on loan i on month t conditional on having survived up to t as $h_i(t)$. In the proportional hazards model, tj

$$h_i(t) = 1 - \exp(-\lambda_t \cdot \exp(Servicing\ Failure_{it}\boldsymbol{\beta} + X_{izt}\boldsymbol{\alpha} + Macro_{izt}\boldsymbol{\mu})),$$

Subscript i denotes loan, z denotes zip code, and t denotes calendar month, with the first month of observations indexed t = 0. $Servicing\ Failure_{it}$ is a vector of flags that capture if a loan has a servicing failure before month t. $X_{izt}$ is a vector of control variables that include loan and borrower characteristics determined before the date of a service failure. $Macro_{zt}$ is a vector of macroeconomic controls. Finally, $\lambda_t$ is the baseline hazard, or baseline probability of foreclosure initiation, and $\boldsymbol{\beta}, \boldsymbol{\alpha}, \boldsymbol{\mu}$ are parameter vectors.[1]  The corresponding survival probabilities satisfy

$$S_i(t) = [1 - h_i(0)] \cdot [1 - h_i(1)] \cdot ... \cdot [1 - h_i(t-1)]$$

$$= \exp(-\textstyle\sum_{m=0}^{t-1} \lambda_m \cdot \exp(Servicing\ Failure_{im}\boldsymbol{\beta} + X_{izm}\boldsymbol{\alpha} + Macro_{izm}\boldsymbol{\mu})),$$

3.  Given data on loan performance by month as well as data on the timing of servicing failures, loan characteristics, and macroeconomic variables, I can estimate the model above and obtain estimates of the coefficients $\widehat{\boldsymbol{\beta}}, \widehat{\boldsymbol{\delta}}$, and $\widehat{\boldsymbol{\mu}}$ and the baseline hazard $\hat{\lambda}_t$. Then, for each loan *i* on month *t,* the fitted hazard rate is given by:

---

[1]   The baseline hazard is estimated non-parametrically under the assumption that it is constant within a quarter.

Privileged and Confidential

$$\widehat{h_\iota}(t) = 1 - \exp(-\hat{\lambda}_t \exp(Servicing\ Failure_{it}\widehat{\boldsymbol{\beta}} + X_{it}\widehat{\boldsymbol{\delta}} + Macro_{izt}\widehat{\boldsymbol{\mu}})),$$

4. Let $\bar{h}_i(t)$ denote the fitted hazard rate for a harmed loan $i$ in month $t$ in the counterfactual scenario where the servicing failure did not occur (so $Servicing\ Failure_{it} = 0$ ). The fitted hazard rate for this virtual control is therefore given by:

$$\bar{h_\iota}(t) = 1 - \exp(-\hat{\lambda}_t \exp(Servicing\ Failure_i\widehat{\boldsymbol{\beta}_1} + X_{it}\widehat{\boldsymbol{\delta}} + Macro_{izt}\widehat{\boldsymbol{\mu}})),$$

## II.   CALCULATING THE AVERAGE CUMULATIVE PROBABILITY OF FORECLOSURE

5. For each harmed loan $i$, that experienced a servicing failure at time $t_i$ I can calculate the fitted probability of survival from the month of the start of the harm from the servicing failure to its last observation in the sample as:

$$S^{as}(t_i) = \prod_{t=t_i}^{T_i}(1 - \widehat{h_\iota}(t)),$$

Where $t_i$ is the month when the harm from the servicing failure starts and $T_i$ the last month that loan $i$ appears in the data. Similarly, the fitted probability of survival in the counterfactual scenario without a servicing failure is given by:

$$S^{bf}(t_i) = \prod_{t=t_i}^{T_i}(1 - \bar{h_\iota}(t)),$$

Now, define $\Delta_i$ as:

$$\Delta_i = S^{as}(t_i) - S^{bf}(t_i)$$

$\Delta_i$ measures the reduction in the probability of survival to the end of the sample for loan $i$ that is attributed to the servicing failures. Thus, $-\Delta_i$ measures the increase in the cumulative probability that a foreclosure is initiated on or before the end of the sample because of

Privileged and Confidential

servicing failures for loan *i*. I then calculate the average $-\Delta_i$ for overcharged and undercharged loans separately.

### A.   OCWEN ONLY SAMPLE

6.   The sample of loans corresponds to monthly observations of loan performance data and loan and characteristics .

### 1.   Variables Used in the Model

7.   My main specification includes the following explanatory variables:

   a.   Loan status indicators: the model includes indicator variables for loans that suffered an overcharge, an undercharged, loans that have accrual amounts missing, and loans that have accrual amounts of zero.

   b.   For overcharged loans, the model includes a flag equal to one at and after the start of the harm (Analysis Due Date), and zero otherwise.

   c.   For undercharged loans, the model includes a flag equal to one at and after the start of the harm (Late Analysis Date), and zero otherwise.

8.   I also control for the status of adverse credit events prior to the servicing failures.  In particular, I include indicator variables that are equal to one after a loan was bankrupt or seriously delinquent prior to the servicing failure and zero otherwise.[2,3]  I also include indicator variables that are equal to one after a loan entered a permanent loan modification or forbearance before a servicing failure and zero otherwise.

9.   The model includes the following Macroeconomic controls:

---

[2]   We considered loan as seriously delinquent if it is 90+ days delinquent.

[3]   For the control group, the indicator variables equal to one after the loan was bankrupt or seriously delinquent and zero otherwise.

Privileged and Confidential

    a.   The quarterly growth in the 3-digit zip code-level housing price index ("HPI") relative to the HPI in the month of the loan's origination.[4,5]

    b.   The monthly unemployment rate at the county level come from the Bureau of Labor Statistics.[6]

10.   My model also controls for the following loan characteristics:

    a.   Lien position: whether a loan is a first or second lien.

    b.   Property type: whether a property is a single-family home, a condo, a two to four-unit, a planned unit development (PUD), or other.[7][8,9]

    c.   Occupancy type: whether the property is owner-occupied, non-owner occupied, a second home, or other.[10]

    d.   Mortgage type: whether a mortgage is fixed-rate, an ARM, a HELOC, a Balloon mortgage, or other.[11]

    e.   Logarithm of the origination loan amount in dollars.

---

[4]. I use the quarterly 3-digit zip code All-Transactions Housing Price Index Published by the FHFA. According to the FHFA "The FHFA Housing Price Index (HPI) is a broad measure of the movement of single-family house prices. The HPI is a weighted, repeat-sales index, meaning that it measures average price changes in repeat sales or refinancing on the same properties. This information is obtained by reviewing repeat mortgage transactions on single-family properties whose mortgages have been purchased or securitized by Fannie Mae or Freddie Mac since January 1975." See https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx.

[5] Because some zip codes were updated through time, I supplemented the HPI information with data from Zillow in order to create a crosswalk for zip codes over time. See https://www.zillow.com/research/data/, and my workpapers for additional details.

[6] See https://www.bls.gov/lau/

[7] Because of the small number observations in some of the loan characteristics reported by Ocwen, I group some of them into one category. A list with my groupings is provided with my work papers.

[8] Two to four units include duplexes, triplexes, and fourplexes.

[9] "Other" property types represent a very small fraction of loans and include: mobile homes and land.

[10] "Other" occupancy types represent a very small fraction of loans and include: vacant, partially vacant, and unknown.

[11] "Other" mortgage types represent a very small fraction of loans and include: Graduated Payment Mortgage (GPM), Growing Equity Mortgage (GEM), and subsidized mortgages.

Privileged and Confidential

    f.   Logarithm of the age of the loan in months.

    g.   Square of the logarithm of the age of the loan.

11.   The model also controls for quarter-year fixed effects and state fixed effects.

### 2.   Additional Data Filters

12.   Loans omitted from the data used to the estimate model include:

    a.   Loans that had evidence of foreclosure initiation prior to January 2014.

    b.   Loans that were bankrupt at any point in the month of their analysis due date.

    c.   Loans pertaining to commercial property types or non-residential real estate, as identified by Counsel.

    d.   Loans with missing data on the Housing Price Index both at the ZIP code and state level.

    e.   Loans that were undercharged due to untimely escrow analyses and had a missing last analysis date value.

13.   Loans omitted due to perfect separation:[12]

    a.   Loans in the state of Puerto Rico (PR).

    b.   Loans with second home occupancy type.

    c.   Loans with lien position other than first liens or second liens.

### B.   MATCHED MBS-OCWEN SAMPLE

14.   The construction of the MBS-Ocwen Sample is explained in detail in Appendix F.

---

[12]  Observations with some categories had to be dropped before estimation because the categories predicted foreclosure initiation perfectly.

Privileged and Confidential

### 1.      Variables Used in the Model

15.    As the Ocwen-only model, the MBS model controls for HPI, unemployment, loan age, loan amount at origination, quarter-year fixed effects. It also controls for previous bankruptcy status and serious delinquency status prior to the harm.

16.    As in the Ocwen-only specification the model includes the following explanatory variables:

    a.    Loan status indicators: the model includes indicator variables for loans that suffered an overcharge, an undercharged, loans that have accrual amounts missing, and loans that have accrual amounts of zero.

    b.    For overcharged loans, the model includes a flag equal to one at and after the start of the harm (Analysis Due Date), and zero otherwise.

    c.    For undercharged loans, the model includes a flag equal to one at and after the start of the harm (Late Analysis Date), and zero otherwise.

17.    The MBS data allows us to control for additional characteristics such as:

    a.    FICO Score at origination.

    b.    Combined Loan to Value at Origination (CLTV).

    c.    Debt to Income at Origination (DTI).[13]

    d.    Term of the mortgage in months at origination.

18.    In addition to lien position, occupancy, property type and loan type[14], the MBS panel includes the following controls:

---

[13]    DTI is missing for a substantial fraction of loans.  For missing DTI's we impute zero, and include a separate indicator that equals 1 if DTI for a particular loan was missing.

[14]    For some observations, the loan type is missing in the data. For these observations I included an additional categorical variable called missing.

Privileged and Confidential

    a.   Loan purpose: whether a loan is for purchase, cash refinance and other refinance.

    b.   Documentation type: whether the loan was originated with full income documentation, Limited, or other.[15]

### 2.    Additional Data Filters

19.   Loans omitted from the data used to the estimate model include:

    a.   Loans that had evidence of foreclosure initiation prior to January 2014.

    b.   Loans that were bankrupt at any point in the month of their analysis due date.

    c.   Loans pertaining to "commercial", "mixed-use" or "other" property type categories.

    d.   "Commercial" or "Commercial, insured" loan types.

    e.   Loans with missing data on the Housing Price Index both at the ZIP code and state level.

    f.   Loans that were undercharged due to untimely escrow analyses and had a missing last analysis date value.

20.   Loans omitted due to perfect separation:[16]

    a.   Third lien loans.

---

[15]  For some observations, the documentation type is missing in the data. For these observations I included an additional categorical variable called missing.

[16]  Observations with some categories had to be dropped before estimation because the categories predicted foreclosure initiation perfectly.

**Privileged and Confidential**

## Appendix H: Robustness Tests for Proportional Hazards Model

1.   To test the robustness of my model, I performed a series of tests. The first two tests were performed using only the sample of Ocwen loans, and the third test was performed using a matched sample of MBS and Ocwen loans. See Appendix G for more details. In my first robustness test, I estimated my main specification but excluding from the model harmed loans that suffered adverse credit events before the harm from servicing failures. In my second robustness test, I allow the impact of the harm from servicing failure to vary by the length of time elapsed since the beginning of the harm. The third test estimates the proportional hazards model using the matched MBS-Ocwen data as controls. The tables below include the results from these robustness tests.[1]

## I.   OCWEN ONLY MODELS

2.   The following two tables show the results of my main specification but excluding undercharged and overcharged loans that suffered a bankruptcy, serious delinquency, a permanent loan modification, or forbearance before the start of the harm from the servicing failure. The model continues to control for adverse credit statuses for the sample of loans in the control group.

---

[1]   For brevity, the tables below omit the coefficient estimates for the state and quarter-year fixed effects. The coefficient estimates on these variables can be found in my workpapers.

1

Privileged and Confidential

## Table 1: Coefficient Estimates of Proportional Hazard Model Excluding Harmed Loans with Previous Adverse Credit Events

| | Dependent Variable: Foreclosure Flag | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-value |
| | [1] | [2] | [3] |
| **Harmed Loans Indicators** | | | |
| Overcharged Flag | -0 246 | 0.071 | 0.000 |
| **Overcharged After Analysis Due Date Flag** | **1.921** | **0.064** | **0.000** |
| Undercharged Flag | 0.519 | 0 065 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.174** | **0.067** | **0.010** |
| Loans with Accruals Equal to Zero Flag | 1.098 | 0 083 | 0.000 |
| Loans with Accruals Missing Flag | 1 598 | 0.035 | 0.000 |
| **Loan Status Controls** | | | |
| Bankruptcy Status Before Harm Flag | -0.095 | 0 031 | 0.002 |
| Delinquency Status Before Harm Flag | 1.467 | 0.038 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.381 | 0 035 | 0.000 |
| Forbearance Before Harm Flag | -0.136 | 0.113 | 0.229 |
| **Other Controls** | | | |
| Housing Price Index Percent Change | -0.353 | 0 054 | 0.000 |
| Unemployment Rate | -0 012 | 0.006 | 0.043 |
| Log of Loan Age (Months) | 10.924 | 0.702 | 0.000 |
| Log of Loan Age Squared (Months) | -1 096 | 0.077 | 0.000 |
| Log of Loan Amount ($) | 0 027 | 0.015 | 0.070 |
| **Lien Position** | | | |
| Second | -1 577 | 0.119 | 0.000 |
| **Property Type** | | | |
| 2-4 Units | -0.119 | 0.033 | 0.000 |
| Planned Unit Development | -0 045 | 0.030 | 0.132 |
| Condo | 0 029 | 0.030 | 0.343 |
| Other | -0.194 | 0.058 | 0.001 |
| **Occupancy Type** | | | |
| Non-Owner | -1.728 | 0.102 | 0.000 |
| Other | 1.594 | 0 019 | 0.000 |
| **Mortgage Type** | | | |
| ARM | 0.119 | 0.019 | 0.000 |
| Balloon | 0.292 | 0 020 | 0.000 |
| HELOC | 0.408 | 0.412 | 0.322 |
| Other | 0.419 | 0 073 | 0.000 |
| Constant | -34 529 | 1.644 | 0.000 |
| Log Likelihood | | -96,002.99 | |
| Number of Observations | | 5,270,274 | |
| Number of Loans | | 165,421 | |
| Zero Outcomes | | 5,252,169 | |
| Nonzero Outcomes | | 18,105 | |
| Wald Chi Squared | | 57,556.38 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rog 2.2, RFP data, FHA and BLS.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[3]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

[4]: Model excludes overcharged and undercharged loans with bankruptcies, serious delinquencies, forbearance, and permanent loan modifications before the start of harm from servicing failure.

Privileged and Confidential

**Table 2: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation Excluding Harmed Loans with Previous Adverse Credit Events**

**(in percentage points)**

|  | Impact |
| --- | --- |
|  | [1] |
| Overcharged Loans | 5.522 |
| Undercharged Loans | 0.345 |

Sources: Rog 2.2, RFP data, FHA and BLS.
Notes:
[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See Appendix G for more details.
[2]: Model excludes overcharged and undercharged loans with bankruptcies, serious delinquencies, forbearance, and permanent loan modifications before the start of harm from servicing failure.

3.   The next two tables show the results of my main specification but allowing the impact of servicing failures to vary by the time since the start of the harm. In order to capture the effect of the time since start of the harm, the model includes as an explanatory variable the number of months from the start of the harm as well as its square.

Privileged and Confidential

### Table 3: Coefficient Estimates of Proportional Hazard Model Allowing Impact of Harm to Vary Through Time

| Dependent Variable: Foreclosure Flag | | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-value |
| | [1] | [2] | [3] |
| **Harmed Loans Indicators** | | | |
| Overcharged Flag | 0.219 | 0.045 | 0.000 |
| **Overcharged After Analysis Due Date Flag** | **1.456** | **0.042** | **0.000** |
| **Months After Analysis Due Date** | **-0.005** | **0.003** | **0.094** |
| **Months After Analysis Due Date Squared** | **0.000** | **0.000** | **0.063** |
| Undercharged Flag | 0.784 | 0.037 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.526** | **0.038** | **0.000** |
| **Months After Last Analysis Date** | **0.028** | **0.004** | **0.000** |
| **Months After Last Analysis Date Squared** | **-0.001** | **0.000** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.073 | 0.081 | 0.000 |
| Loans with Accruals Missing Flag | 1.558 | 0.029 | 0.000 |
| | | | |
| **Loan Status Controls** | | | |
| Bankruptcy Status Before Harm Flag | 0.111 | 0.021 | 0 000 |
| Delinquency Status Before Harm Flag | 1.519 | 0.015 | 0 000 |
| Permanent Loan Mod. Before Harm Flag | -0.127 | 0.026 | 0.000 |
| Forbearance Before Harm Flag | -0.297 | 0.072 | 0.000 |
| | | | |
| **Other Controls** | | | |
| Housing Price Index Percent Change | -0.249 | 0.042 | 0 000 |
| Unemployment Rate | -0.013 | 0.005 | 0 009 |
| Log of Loan Age (Months) | 10.650 | 0.564 | 0.000 |
| Log of Loan Age Squared (Months) | -1.078 | 0.061 | 0.000 |
| Log of Loan Amount ($) | 0.051 | 0.011 | 0.000 |
| | | | |
| **Lien Position** | | | |
| Second | -1.475 | 0.116 | 0 000 |
| **Property Type** | | | |
| 2-4 Units | -0.059 | 0.025 | 0.016 |
| Planned Unit Development | -0.011 | 0.022 | 0.640 |
| Condo | 0.056 | 0.024 | 0 021 |
| Other | -0.182 | 0.045 | 0.000 |
| **Occupancy Type** | | | |
| Non-Owner | -1.325 | 0.074 | 0 000 |
| Other | 1.538 | 0.014 | 0.000 |
| **Mortgage Type** | | | |
| ARM | -0.063 | 0.018 | 0 000 |
| Fixed Rate | -0.165 | 0.015 | 0 000 |
| HELOC | 0.272 | 0.349 | 0.436 |
| Other | 0.027 | 0.057 | 0.637 |
| Constant | -34.080 | 1.320 | 0 000 |
| | | | |
| Log Likelihood | -160,884.10 | | |
| Number of Observations | 6,286,761 | | |
| Number of Loans | 196,236 | | |
| Zero Outcomes | 6,255,477 | | |
| Nonzero Outcomes | 31,284 | | |
| Wald Chi Squared | 78,186.62 | | |
| Probability > Chi Squared | 0.000 | | |

Sources: Rog 2.2, RFP data, FHA and BLS.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Standard errors clustered at the loan level.

[3]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[4]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

Privileged and Confidential

**Table 4: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation Allowing Impact of Harm to Vary Through Time**

**(in percentage points)**

|  | Impact |
|---|---|
|  | [1] |
| Overcharged Loans | 6.658 |
| Undercharged Loans | 4.824 |

Sources: Rog 2.2, RFP data, FHA and BLS.
Notes:
[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See Appendix G for more details.
[2]: Model includes months since servicing failure harm and its square.

## II. OCWEN-MBS MODEL

4. The following two tables show the results of the proportional hazards model estimated on a sample of matched Ocwen loans and non-Ocwen loans from the matched MBS-Ocwen sample described in more detail in Appendices F and G above.

5

Privileged and Confidential

### Table 5: Coefficient Estimates of Proportional Hazard Model Excluding for Matched MBS-Ocwen Sample

| Dependent Variable: Foreclosure Flag | | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-value |
| | [1] | [2] | [3] |
| **Harmed Loans Indicators** | | | |
| Overcharged Flag | -0.015 | 0.046 | 0.741 |
| Overcharged After Analysis Due Date Flag | 0.510 | 0.043 | 0.000 |
| Undercharged Flag | 0.204 | 0.044 | 0.000 |
| Undercharged After Last Analysis Date Flag | 0.286 | 0.044 | 0.000 |
| Loans with Accruals Equal to Zero Flag | 0.622 | 0.123 | 0.000 |
| Loans with Accruals Missing Flag | 1.106 | 0.042 | 0.000 |
| **Loan Status Controls** | | | |
| Bankruptcy Status Before Servicing Failure Flag | 0.491 | 0.036 | 0.000 |
| Delinquency Status Before Servicing Failure Flag | 2.677 | 0.028 | 0.000 |
| **Other Controls** | | | |
| Housing Price Index Percent Change | -0.742 | 0.092 | 0.000 |
| Unemployment Rate | -0.009 | 0.009 | 0.311 |
| Log of Loan Age (Months) | 8.940 | 1.223 | 0.000 |
| Log of Loan Age Squared (Months) | -0.859 | 0.135 | 0.000 |
| Log of Loan Amount ($) | -0.118 | 0.023 | 0.000 |
| FICO Score at Origination | -0.001 | 0.000 | 0.000 |
| Combined Loan-To-Value (CLTV) at Origination | 0.003 | 0.001 | 0.000 |
| Debt-To-Income Ratio (DTI) at Origination | 0.002 | 0.002 | 0.337 |
| Missing DTI Flag | -0.071 | 0.069 | 0.308 |
| Term (Months) at Origination | 0.001 | 0.000 | 0.026 |
| **Lien Position** | | | |
| Second | -2.631 | 0.308 | 0.000 |
| **Property Type** | | | |
| 2-4 Units | 0.020 | 0.049 | 0.684 |
| Planned Unit Development | -0.051 | 0.039 | 0.187 |
| Condo | -0.009 | 0.048 | 0.845 |
| Other | -0.043 | 0.129 | 0.739 |
| **Occupancy Type** | | | |
| Non-Owner | 0.027 | 0.038 | 0.469 |
| Second Home | 0.156 | 0.094 | 0.097 |
| Other | 0.051 | 0.127 | 0.688 |
| **Loan Type** | | | |
| Government Sponsored | -0.641 | 0.376 | 0.088 |
| Jumbo | -0.095 | 0.121 | 0.431 |
| Missing | -0.117 | 0.051 | 0.022 |
| Other | 0.155 | 0.151 | 0.302 |
| Subprime | -0.075 | 0.034 | 0.028 |
| **Loan Purpose** | | | |
| Refinance Cash out | -0.014 | 0.025 | 0.593 |
| Refinance Non-cash out | -0.023 | 0.038 | 0.543 |
| Other | -0.002 | 0.080 | 0.982 |
| **Documentation Type** | | | |
| Limited | 0.040 | 0.024 | 0.096 |
| Missing | -0.387 | 0.074 | 0.000 |
| None | 0.154 | 0.092 | 0.092 |
| Other | -0.008 | 0.532 | 0.989 |
| Constant | -27.50 | 2.80 | 0.00 |
| Log Likelihood | | -51,259.67 | |
| Number of Observations | | 3,480,506 | |
| Number of loans | | 108,629 | |
| Zero Outcomes | | 3,470,497 | |
| Nonzero Outcomes | | 10,009 | |
| Wald Chi Squared | | 27,381.67 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rog 2.2, RFP data, FHA, BLS and MBS.

Notes:

[1]: Regression includes property state and year fixed effects.

[2]: Standard errors clustered at the loan level.

[3]: Omitted categories for lien position are 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for loan type is conventional (fixed rate). The omitted category for loan purpose is purchase. Omitted category for documentation type is full documentation.

[4]: The regression does not include an indicator for non-Ocwen loans so coefficients on harmed loan populations are measured relative to the non-Ocwen loans.

Privileged and Confidential

**Table 6: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation for Matched MBS-Ocwen Sample**

**(in percentage points)**

|                      | Impact |
|                      | [1]    |
|----------------------|--------|
| Overcharged Loans    | 3.074  |
| Undercharged Loans   | 1.929  |

Sources: Rog 2.2, RFP data, FHA, BLS, and MBS.
Notes:
[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See Appendix G for more details.