# EXHIBIT 2
# (redacted)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION
BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION,
OCWEN MORTGAGE SERVICING, INC.,
and OCWEN LOAN SERVICING, LLC,

Defendants.

**CASE NO. 9:17-CV-80496-MARRA-MATTHEWMAN**

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA,
Department of Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION, *et
al.*,

Defendants.

**SURREBUTTAL EXPERT REPORT**

**OF**

**PROFESSOR DANIEL MCFADDEN**


**ON BEHALF OF**

**CONSUMER FINANCIAL PROTECTION BUREAU**


November 14, 2019

Privileged and Confidential

**TABLE OF CONTENTS**

I.  Introduction...................................................................................................2

    A.  Purpose and Qualifications....................................................................2

    B.  Summary of Findings and Opinions........................................................2

II.  Responses to Dr. Hamm on Opportunity Costs .........................................5

    A.  Dr. Hamm is Incorrect: Credit Card Interest Rates Are a Conservative Measure for the Discount Rate of an Ocwen Borrower Harmed by Ocwen's Servicing Failures..........6

    B.  Dr. Hamm's Assertion that I Should Not Have Relied on Sworn Interrogatory and Data Request Responses Provided by Ocwen is Unreasonable.......................................10

    C.  Contrary to Dr. Hamm's Misunderstanding of Opportunity Cost, Overcharged Ocwen Customers with Shortages in the Late Escrow Analysis Population Suffered Opportunity Cost Damages.............................................................................11

    D.  Dr. Hamm Misunderstands How I Addressed the "Offsetting Impact of Subsequent Escrow Analyses".............................................................................13

    E.  Damages Reflecting Interest Payments on Escrow Balances When Required by State Law ....................................................................................13

    F.  Minor Corrections Related to My Opportunity Cost Damages Analysis.............15

III.  Responses to Dr. Hamm Regarding Damages from Additional Foreclosures..........16

    A.  Foreclosure Model................................................................................16

    B.  Cost Per Foreclosure ...........................................................................39

IV.  Conclusion .................................................................................................48

Privileged and Confidential

## I.     INTRODUCTION

### A.     PURPOSE AND QUALIFICATIONS

1.     I have been asked by the Consumer Financial Protection Bureau to respond to the criticisms of my Second Amended Expert Report in this matter submitted on September 19, 2019 by Dr. William G. Hamm on behalf of Ocwen.[1]

2.     I presented my qualifications in my previous export report, and they remain current. I have attached an updated CV in Appendix A, which includes an additional expert report filed since my previous report. Appendix B is a list of materials that I considered to form my opinion in this report. I reserve the right to amend my analysis and conclusions should additional information become available prior to trial.

### B.     SUMMARY OF FINDINGS AND OPINIONS

3.     Dr. Hamm criticizes both my opportunity costs and foreclosure costs damages calculations. Dr. Hamm's claims reflect a misunderstanding of my work as well as the underlying framework for damages. I strongly disagree with Dr. Hamm's conclusion that Ocwen's mismanagement of borrowers' escrow accounts caused negligible damages. I summarize my responses to his arguments below.

4.     Dr. Hamm asserts that there are virtually no opportunity costs damages resulting from Ocwen's servicing failures. His arguments are specious for the following reasons:

   a.     The principal reason why Dr. Hamm's damages are zero (or close to zero) is because he argues that "the most appropriate discount rate to use as a measure of the borrowers' opportunity cost with respect to overpayments is zero, with an upper bound equal to 3.25%."[2] Dr. Hamm appears to misunderstand what an opportunity cost is and fails to consider the profile of Ocwen borrowers, who tend to be more financially vulnerable than the average borrower. In contrast, I show that the discount rate that I use for my opportunity cost

---

[1]   Expert Report of William G. Hamm, Ph.D., Rebuttal of Professor Daniel McFadden, October 15, 2019 ("Hamm Report").

[2]   Hamm Report ¶ 10.

Privileged and Confidential

damages, which is based on credit card interest rates, reasonably reflects Ocwen borrowers' opportunity costs. Given the financial circumstances of many of Ocwen's borrowers, credit card interest rates may, in many cases, understate the actual loss of benefits to borrowers from having access to the funds wrongfully withheld by Ocwen.

b. Dr. Hamm's assertion that overcharges do not cause damages in the case of borrowers who are up-to-date on all required payments but have escrow shortages does not make economic sense: customers who are overcharged by Ocwen lose benefits they would otherwise have from being able to access to the overcharged funds. Damages to these customers should not be excluded.

c. Dr. Hamm is correct in one narrow area that it is appropriate to credit interest paid on overcharges against the loss of benefit from losing access to the overcharged funds. Revising my overcharge damages calculations to account for interest paid on escrow accounts leads to a reduction in my damages estimate from approximately $1.4 million[3] to $1.3 million. Since I use the highest possible interest rate Dr. Hamm suggests,[4] my approach is conservative.

5. Dr. Hamm claims that my approach to estimate damages from additional foreclosures following Ocwen's servicing failures is fatally flawed. Dr. Hamm concluded that foreclosure-related damages are $0 because (1) there is no discernible relationship between Ocwen's servicing failures and the likelihood of foreclosure and (2) there is no cost to borrowers from foreclosure.

a. Unlike Dr. Hamm, however, I conducted a statistical analysis to determine whether Ocwen's servicing failures led to additional foreclosures and, as

---

[3] Second Amended Expert Report of Professor Daniel McFadden on Behalf of Consumer Financial Protection Bureau, September 19, 2019 ("McFadden Second Amended Report"), Table 4.

[4] Hamm Report ¶ 10.

Privileged and Confidential

shown in my prior report, found that such a relationship exists and is robust to numerous sensitivity tests. Dr. Hamm rejects this finding on two grounds: first, he relies on his "experience in loan servicing"[5] to predetermine that there can be no link between Ocwen's servicing failures and foreclosure, and second, he criticizes the econometrics without any empirical testing of his own. His critiques of my econometric analysis are rooted in his lack of knowledge about the literature, misunderstanding of my model, and disregarding my sensitivity analyses.

    b.   Dr. Hamm claims that there is minimal cost to borrowers from foreclosure because borrowers typically have no equity on the property (which Dr. Hamm portrays as the primary reason why anyone goes into foreclosure) and because administrative and legal fees are often paid by the investor rather than the borrower. As I show below, on the basis of the literature and Ocwen's documents that have been made available to me, Dr. Hamm is incorrect. Dr. Hamm's critique denies the role the servicing has in contributing to the foreclosure in the first instance. Moreover, borrowers who have foreclosure sales typically receive lower proceeds than non-distressed sales, and numerous studies have found that foreclosures can occur regardless of the borrowers' equity position. Pertaining to administrative and legal fees, I pointed out in my prior report that Ocwen's own policies state that such costs are assessed to the borrower. Although Dr. Hamm claims that these costs are "almost never" borne by the borrower, he offers no supporting evidence.[6]

6.    Dr. Hamm makes the unreasonable assertion that I should not have relied on sworn interrogatory and data request responses provided by Ocwen. Dr. Hamm offers no reliable rationale for why my reliance was incorrect, and instead elects to ignore Ocwen's own verified as true and accurate interrogatory responses that take advantage of multiple data sources. Instead, Dr. Hamm looks narrowly at just one set of transaction data which requires him to interpret single transactions and offer a

---

[5]   Hamm Report ¶ 17.

[6]   Hamm Report ¶ 393.

Privileged and Confidential

conclusion. Dr. Hamm's use of, at best, a proxy method to identify untimely escrow analyses from a single dataset to the exclusion of other data is inappropriate when a direct verified interrogatory answer that consulted additional data is available.

7.   Below, I provide further detail supporting these opinions.

## II.   RESPONSES TO DR. HAMM ON OPPORTUNITY COSTS

8.   Dr. Hamm criticizes my opportunity cost estimates in several dimensions. Indeed, he concludes that Ocwen customers did not incur such costs as a result of flawed mortgage servicing. Dr. Hamm's primary criticisms are:

   a.   Ocwen customers paid overcharges from savings accounts or other sources with negligible interest costs;

   b.   I relied on the wrong Ocwen data for purposes of calculating damages;

   c.   Ocwen customers whose late escrow analysis showed a shortage[7] requiring an upward adjustment in escrow payments are not harmed if a timely escrow analysis would have established lower escrow payments than the customers actually experienced;

   d.   I did not account for the "the offsetting impact of subsequent escrow analyses" in my cash flow analysis;[8] and

   e.   I failed to offset overpayments with interest payments on escrow balances.

   The first four criticisms are not valid. The last is valid, and I have addressed it in my damages calculations. It has a modest impact on my opportunity cost damages. In this section, I address each of Dr. Hamm's criticisms listed above and provide an overview of minor corrections to my analysis, details of which are enclosed in Appendix C.

---

[7]   A shortage results when the borrower's escrow balance is forecasted to fall below the "cushion" amount of (typically) two monthly payments sometime during the upcoming year. If the escrow balance is forecasted to be above the cushion, then the borrower has an escrow surplus.

[8]   Hamm Report, Section VI.B.2.c.

Privileged and Confidential

### A.  DR. HAMM IS INCORRECT: CREDIT CARD INTEREST RATES ARE A CONSERVATIVE MEASURE FOR THE DISCOUNT RATE OF AN OCWEN BORROWER HARMED BY OCWEN'S SERVICING FAILURES

9.  Dr. Hamm claims that the appropriate discount rate is zero for opportunity costs damages and should be no greater than 3.25 percent under any circumstances. His reasoning is that borrowers would be paying the overcharge amounts out of low-interest saving or checking accounts. Below, I present evidence supporting my use of the credit card interest rates as an appropriate and conservative measure of the borrower's discount rate.

#### 1.  Many Households Use Credit Cards, Payday Loans, and Other Methods of Payment to Cover Unanticipated Expenses

10.  The Board of Governors of the Federal Reserve's annual reports show that a sizeable number of households use credit cards and methods of payment other than cash or savings to cover unanticipated expenses. As demonstrated in the 2018 Report on the Economic Well-Being of U.S. Households, 16 to 21 percent of individuals responded that they would use credit sources including credit card debt, payday loan, deposit advance, overdraft, bank loan, or a line of credit to cover a $400 emergency expense. Another 12 percent of individuals answered that they "would not be able to pay for the expense right now."[9] In 2014, the share of individuals using alternative approaches was even higher at 18 to 25 percent and 14 percent identified as not "able to pay for the expense right now."[10]

---

[9]  Board of Governors of the Federal Reserve System, Report on the Economic Well-Being of U.S. Households in 2018, May 2019 at p. 22. The results of the report are based on a nationally representative online panel (p. 53).

[10]  Board of Governors of the Federal Reserve System, Report on the Economic Well-Being of U.S. Households in 2014, June 9 2015, Appendix 3 Question E3A, https://www.federalreserve.gov/econresdata/2015-economic-well-being-of-us-households-in-2014-appendix-3.htm (last viewed on November 13, 2019).

Privileged and Confidential

### 2.    Many Borrowers Carry Credit Card Balances and Credit Card Debt from Month-to-Month

11.    Dr. Hamm claims that the use of credit card interest rates is "unsound"[11] for two reasons: first, most households do not "actually carry credit card debt from month-to-month"[12] and therefore do not pay credit card interest; and second, many borrowers pay either the minimum or near minimum amount required so as to suggest that such borrowers would not use extra cash to pay down their credit card debt, but instead some other use.[13] To support his claims, Dr. Hamm cites to the National Foundation for Credit Counseling's annual Consumer Financial Literacy Survey in which 33 to 39 percent of households responded that they carry debt from month-to-month.[14] Dr. Hamm also cites to a working paper (Keys and Wang, 2016) that finds that "29% of accounts regularly make payments at or near the minimum payment."[15] Neither fact undermines the argument that credit card interest rates serve as a reasonable discount rate.

12.    First in reaching his conclusion that most borrowers "do not pay interest on their credit card,"[16] Dr. Hamm assumes the average percentages found in the Consumer Financial Literacy Survey are similar to Ocwen's borrower population. But Dr. Hamm failed to consider that that Ocwen's population is unique. As I detail in section III.A.1.c below, Ocwen borrowers tend to be higher risk than the average borrower represented in the survey relied upon by Dr. Hamm.

13.    Dr. Hamm's reliance on the Consumer Financial Literacy Survey to show that less than 40 percent of households pay credit card interest because they do not carry a credit card

---

[11]   Hamm Report, VI.B.b.

[12]   Hamm Report ¶ 155.

[13]   Hamm Report ¶ 157.

[14]   Hamm Report ¶ 155.

[15]   Benjamin Keys and Jialan Wang, "Minimum Payments and Debt Paydown in Consumer Credit Cards," NBER Working Paper, October 2016 ("Keys and Wang").

[16]   Hamm Report ¶ 156.

Privileged and Confidential

balance month-to-month[17] is undermined by two common survey issues. First, responses from self-reported surveys can be biased from the selection of respondents (i.e., individuals who respond to the survey are not representative of the population of interest). Second, survey results can be compromised by reporting biases, such as underreporting of certain behaviors. There is reason to believe that these biases are present in the statistics that Dr. Hamm relies on. Indeed, according to the CFPB Credit Card Database, which is the dataset that Keys and Wang relied on, only 33 percent of credit card accounts were paid in full;[18] this implies that 67 percent of accounts were not paid in full and therefore carried debt across months. This disjunction between the roughly 40 percent who reported carrying debt in the survey and 67 percent of accounts that were not paid in full based on data from credit card issuers suggests that the self-reported survey may be underestimating debt that rolled over to the next month. From an economic standpoint, the implication of a borrower carrying credit debt from one month into the next month is that that borrower's opportunity cost of funds must be *higher* than the interest on the credit card interest rate. If this were not the case, then economic theory suggests that the borrower would instead pay down their credit card debt.

14.   Furthermore, Keys and Wang, find that the share of accounts paid at or near the minimum is larger for borrowers with lower FICO scores, larger balances, and lower income.[19] These borrowers are also more likely to have carryover debt on their credit card accounts and have discount rates higher than credit card interest rates. As I discussed in more detail in section III.A.1.c below, Ocwen's customers are more likely to have lower FICO scores. Therefore, the estimated share of Ocwen customers with carryover credit card debt and discount rates above the credit card interest rates is likely to be higher than 67 percent.

---

[17]   Hamm Report, Table 5.

[18]   The authors' dataset from the CFPB Credit Card Database spanned the time period February 2008 through December 2013 and covered more than 85 percent of credit card industry balances. See Keys and Wang, p. 10.

[19]   Keys and Wang, Figure 4 on p. 45.

Privileged and Confidential

### 3. Contrary to Dr. Hamm's Claims, Numerous Studies in the Economics Literature Have Estimated Discount Rates in Excess of the Credit Card Interest Rate

15.    Dr. Hamm argues that two papers on household discount rates that I cited in my prior report provide "no support" for the discount rates that I apply in my opportunity costs analysis.[20] Dr. Hamm's critiques are wrong.

a.    He claims that the first article (Hausman, 1979) is irrelevant for reasons including the researcher studies "energy-using durables" in the 1970s, the sample size was small particularly at the upper and lower income levels, and low-income households who receive an interest rate of 89 percent would "not have been lower-income households any longer."[21] Dr. Hamm misses my point: there is a long history of economic studies on household decision-making showing that in making purchase and budgeting decisions, consumers heavily discount future costs relative to current costs, behavior consistent with being credit-constrained and subject to very high discount rates.[22]

b.    Regarding the second article (Frederick et al, 2002), which is a literature review on discounting and time preference, Dr. Hamm contends that the article "does not reach a conclusion on how best to measure opportunity cost, and instead publishes calculation results from other research papers."[23] Furthermore, Dr. Hamm complains that the review does not include a study that specifically analyzes "opportunity costs incurred by borrowers as a result of temporary overpayments."[24] It is worth noting that literature reviews

---

[20]    Hamm Report ¶¶ 159-167.

[21]    Hamm Report ¶¶ 159-163. Jerry Hausman, "Individual Discount Rates and the Purchase and Utilization of Energy-Using Durables," The Bell Journal of Economics 10, no. 1 (Spring 1979): 33-54.

[22]    In addition, as evidence that Hausman's study was influential on the field, this article has over 1,500 citations according to Google Scholar.

[23]    Hamm Report ¶ 165, citing Shane Frederick, George Loewenstein, and Ted O'Donoghue, "Time Discounting and Time Preference: A Critical Review," Journal of Economic Literature 40 (2002): 377.

[24]    Hamm Report ¶ 166.

Privileged and Confidential

typically serve the purpose of summarizing previous studies and calculations, yet Dr. Hamm attempts to paint those attributes as a failing of the paper.

16. These articles demonstrate that numerous studies have found discount rates well in excess of the credit card interest rates that I applied in my analysis. While I did not rely on the quantitative results from these papers due to the varying contexts in which these estimates were developed, these papers are instructive and support the finding that households have discount rates well in excess of the savings rate applied by Dr. Hamm.

### B. DR. HAMM'S ASSERTION THAT I SHOULD NOT HAVE RELIED ON SWORN INTERROGATORY AND DATA REQUEST RESPONSES PROVIDED BY OCWEN IS UNREASONABLE

17. In my calculation of the opportunity cost damages for borrowers harmed by overcharges caused by late escrow analyses, I have utilized data provided by Ocwen in response to the Bureau's Interrogatories 1 and 2.[25] He claims that I instead should have recreated this data from scratch using the detailed transaction history data for each loan.[26] But this does not make sense. There is no reason to think that the verified interrogatory responses (Exhibits A and C) are inferior to attempting to recreate the data based solely on the Transaction History data as suggested by Dr. Hamm. In fact, Ocwen—through its corporate witness, Mr. Combs—testified that it performed the analysis that produced the interrogatory responses I made use of and that, in doing so, made use of a wider set of internal Ocwen data than just the Transaction History data, for example comment codes.[27] Further, Ocwen, and Mr. Combs specifically, attested that these interrogatory responses are "true and correct."[28] Dr. Hamm ignores these verified responses and instead relies on what is, at best, a second best proxy method. Dr. Hamm's critique is

---

[25] Defendants' Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, June 14, 2019 ("Rogs 1-13," including "Rogs 1-4").

[26] Hamm Report ¶ 193.  Further, in footnote 118, Dr. Hamm clarifies that "RFP #22 of the Bureau's Fifth Set of Requests for Production" is the data sources he is referring to when discussing "Transaction History data."

[27] Deposition of Andrew Combs, May 29, 2019 ("Combs Deposition") at pp. 51-53, 70-73.

[28] Ocwen's Verification of Its Responses to Plaintiff's First Set of Interrogatories, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC*, Case No. 9:17-CV-80495, May 28, 2019.

Privileged and Confidential

inappropriate; he should not rely on a proxy method to identify untimely escrow analyses based narrowly on a single set of data, but instead should have relied on Ocwen's own verified responses that take advantage of additional business records and personnel knowledge.[29]

### C. CONTRARY TO DR. HAMM'S MISUNDERSTANDING OF OPPORTUNITY COST, OVERCHARGED OCWEN CUSTOMERS WITH SHORTAGES IN THE LATE ESCROW ANALYSIS POPULATION SUFFERED OPPORTUNITY COST DAMAGES

18. Dr. Hamm claims that Ocwen customers with shortages in their escrow accounts throughout the period of lateness[30] "were not actually overcharged" because they were "underfunding their escrow accounts."[31] As such, Dr. Hamm claims that none of these loans suffer any opportunity cost damages.[32] Dr. Hamm's claims are inaccurate: if a customer is denied the benefit of funds they were entitled to hold onto for a period of time, that customer suffered opportunity cost damages, irrespective of accounting following this time period.

19. As I explain in my prior report, overcharges result from differences in the customer's cash flow between the actual and but-for worlds.[33] If a timely escrow analysis would have resulted in lower escrow payments for a customer, the customer has been overcharged during the period in which Ocwen delayed performing an escrow analysis. This is important because, during the period of delay, the customer could have

---

[29] In Hamm Report ¶¶ 192-193, Dr. Hamm argues that I should have ignored Ocwen's "good faith effort" in creating Rogs 1-4, Exhibit C, and instead should have attempted to recreate the exhibit from Transactional History data, which he deems to be "the most reliable data" (Hamm Report ¶ 135). Ocwen's Verification of Its Responses to Plaintiff's First Set of Interrogatories, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC*, Case No. 9:17-CV-80495, May 28, 2019.

[30] Defined for this population as the period between the Analysis Due Date (i.e., the date when Ocwen states that the escrow analysis should have been completed but was not) and Last Analysis Date (i.e., the date when Ocwen performed the escrow analysis, which was late) in Rogs 1-4, Exhibit C.

[31] Hamm Report ¶ 11.

[32] Hamm Report ¶ 178.

[33] McFadden Second Amended Report ¶ 37.

Privileged and Confidential

allocated those additional funds to more productive uses. As discussed in my previous report, this forms the economic basis for opportunity cost damages.[34]

20. My opportunity cost damages recognize harm to any customer who overpaid as a result of Ocwen's delays in performing escrow analyses. As I explained in my prior report, Ocwen identified cases where, despite the borrower having an overall shortage in their account, during the time period which Ocwen failed to perform an escrow analysis, the borrower was being overcharged for escrow.[35] In other words, Ocwen identified cases where a borrower's monthly escrow payment would have gone down had the escrow analysis been done on time, but since Ocwen did not perform the analysis on time, it continued to collect an inflated amount. This can occur even though the ultimate balance on the escrow account at the time Ocwen performs the analysis is a shortage. Since the customer paid more than they should have, I include such customers in my opportunity cost damages.

21. On the other hand, Dr. Hamm claims that overcharged Ocwen borrowers with an escrow shortage "did not suffer any opportunity cost damages" based on an incorrect notion of opportunity cost. He argues that "the borrower on a loan with an escrow shortage … has underpaid the servicer relative to the amounts disbursed from the escrow account [emphasis added]"[36] and is therefore unharmed. However, Dr. Hamm's error lies in that he compares actual escrow payments with actual escrow disbursements—both of which occurred in the actual world where Ocwen did not conduct the escrow analysis on time—instead of actual escrow payments with *but-for escrow payments*, i.e., the payments that the customer would have needed to make if Ocwen had performed the analysis on time. Thus, Dr. Hamm once again ignores the

---

[34]   McFadden Second Amended Report ¶ 39.

[35]   These are cases where Ocwen identified a positive "shortage/surplus" amount in Exhibit C but Exhibit A shows a shortage amount.  As described on p. 11 of Rogs 1-13, Exhibit A shows the shortage or surplus that accrued during the entire period from the prior escrow analysis to the late escrow analysis (i.e. the shortage or surplus computed at the time of the late escrow analysis) while Exhibit C limits to the shortage or surplus that accrued during just the late period.  The positive accrued amount in Exhibit C identifies the case as an overpayment.

[36]   Hamm Report ¶ 178.

Privileged and Confidential

role that Ocwen's servicing error plays. For overcharges, Ocwen's servicing error meant that customers' actual escrow payments exceeded their but-for escrow payments; so, a borrower with an ultimate shortage could still be overcharged during the time period when the escrow analysis was delayed. Ocwen has an obligation to provide its customers with timely information about their escrow accounts and payments, and the relevant comparison for identifying harmed customers is actual versus but-for escrow payments.

22.   Whether or not a borrower had a shortage on the analysis due date or late analysis date is irrelevant. If they would have been able to pay less had Ocwen performed escrow analyses on time, then they suffered opportunity cost damages from not having access to the reduction in payments over the period of harm.

### D.   DR. HAMM MISUNDERSTANDS HOW I ADDRESSED THE "OFFSETTING IMPACT OF SUBSEQUENT ESCROW ANALYSES"

23.   Dr. Hamm's criticism that I fail to consider "the offsetting impact of subsequent escrow analyses" in my cash flow analysis is based on his misunderstanding of the but-for world that I used to compute opportunity cost damages. Under Dr. Hamm's theory, the cash impacts from Ocwen's delayed escrow analysis should continue in perpetuity. As a reasonable way to limit the time horizon over which cash flow differences between the but-for and actual worlds persist, I defined a but-for world in which Ocwen performs escrow analyses on the missed escrow analysis date and also on the actual date when the analysis was performed. In this case, cash flow differences between the but-for and actual worlds do not persist longer than the period over which the escrow shortage would be spread after the actual date when the escrow analysis was performed.

### E.   DAMAGES REFLECTING INTEREST PAYMENTS ON ESCROW BALANCES WHEN REQUIRED BY STATE LAW

24.   Dr. Hamm is correct that it is appropriate to credit interest paid on overcharges against the loss of benefit from losing access to the overcharged funds. Revising my overcharge damages calculations to account for interest paid on escrow accounts (using

his "highest interest rate that Ocwen paid on any escrow account balance"[37] to calculate the interest credited to all borrowers subject to state-required interest payments) leads to a relatively small reduction in my damages estimate.

25. In Table 1, I show revised damages calculations for the Late Escrow Analysis population. To be conservative, I assumed an annual interest rate of 3.25 percent for Ocwen borrowers who received interest payments on their escrow balances as required by state law; thus, for these borrowers, the effective discount rate is 12.7 percent.[38] In addition, to be conservative, I assumed that all borrowers for whom Ocwen's data did not record a state or borrowers in the District of Columbia,[39] Puerto Rico, and the Virgin Islands received interest payments of 3.25 percent annually. In spite of my conservative assumption to credit all accounts earning interest at Dr. Hamm's highest possible interest rate, the reduction in damages is modest; it decreases from approximately $1.4 million to $1.3 million in the case where I assume a discount rate of 16 percent for funds lost due to Ocwen's servicing failures.

---

[37] Hamm Report ¶ 10.

[38] To determine that the effective discount rate is 12.7 percent, I solved for x in the following equation: $\frac{1+0.16/12}{1+0.0325/12} = 1 + x/12$.

[39] Dr. Hamm did not include District of Columbia in Exhibit 5; however, in some cases, District of Columbia requires interest payments. See Code of the District of Columbia, § 42-1704 (e), https://code.dccouncil.us/dc/council/code/sections/42-1704.html (last viewed on November 13, 2019).

Privileged and Confidential

### Table 1
### Damages for the Late Escrow Analysis Population that Overpaid Ocwen Remain Large After Crediting State-Required Interest on Escrow Balances

| | | Number of Failures | Damages by Discount Rate | | |
| --- | --- | --- | --- | --- | --- |
| | | | 13% | 16% | 20% |
| **Prior Damages Estimate** | | | | | |
| Total | [A] | 93,223 | $1,188,115 | $1,420,930 | $1,715,706 |
| **Updated Damages** | | | | | |
| Loans without Interest Payments | [B] | 65,471 | $820,739 | $981,267 | $1,184,625 |
| Loans with Interest Payments | [C] | 27,752 | $284,515 | $360,349 | $456,171 |
| Total | [D] | 93,223 | $1,105,253 | $1,341,616 | $1,640,796 |
| **Difference** | | | | | |
| Dollar | [E] | | $82,862 | $79,314 | $74,910 |
| Percentage | [F] | | 7.0% | 5.6% | 4.4% |

Sources and Notes:
[A]: McFadden Second Amended Report, Table 4.
[B]: Loans not in the 15 states identified in Hamm Report, Exhibit 5, and loans for which Hamm did not identify EIN payments.
[C]: Loans in the 15 states identified in Hamm Report, Exhibit 5, and loans with missing state information, or are in District of Columbia, Puerto Rico, or the Virgin Islands.
[D]: [B] + [C].
[E]: [A] - [D].
[F]: [E] / [A].

### F.   MINOR CORRECTIONS RELATED TO MY OPPORTUNITY COST DAMAGES ANALYSIS

26.   In response to some of Dr. Hamm's criticisms, I have made minor corrections to my opportunity cost damages analysis that I detail in Appendix C. Specifically, I have accepted Dr. Hamm's damages calculation for the PMI overcharges population with the exception that I apply a discount rate that more appropriately captures the opportunity cost of these funds to Ocwen's borrowers.[40] In addition, I respond to two corrections from Dr. Hamm that have no impact on my damages estimates.

---

[40]   See section II.A for my discussion about the appropriate discount rates for Ocwen's borrowers.

Privileged and Confidential

## III. RESPONSES TO DR. HAMM REGARDING DAMAGES FROM ADDITIONAL FORECLOSURES

27. In this section, I address Dr. Hamm's critiques of my estimates of damages from additional foreclosures.[41] His criticism focuses on three areas: 1) my foreclosure model, 2) my estimates of the cost per foreclosure, and 3) my claims on additional foreclosure costs that I was not able to quantify. I address each of his criticisms in turn.

### A. FORECLOSURE MODEL

28. Dr. Hamm argues that my foreclosure model is "fatally flawed in numerous ways," and that my model "fails to reliably show that any foreclosures or any foreclosure-related damages resulted from the allegedly delayed escrow analyses."[42] As I demonstrate below, Dr. Hamm's criticisms stem from a fundamental misunderstanding of the basis for my damages calculation, of the details of my foreclosure model, and of the way that damages are identified in such a model. I group his criticisms into two groups, conceptual critiques and implementation critiques, and address each of these criticisms below.

#### 1. Conceptual Critiques

##### a) My Proportional Hazards Model is Well-Accepted in the Literature and Applied in Mortgage Finance

29. Dr. Hamm claims that the literature of mortgage finance does not endorse the use of discrete proportional hazard models like the one I used in my affirmative report.[43] He also states that the studies on payment shocks that I cited do not utilize a discrete proportional hazard model like the one I use.[44]

30. His first claim that the literature on mortgage finance does not use proportional hazard models is false. For example, Goodstein et al. use both a dynamic logit model as well

---

[41] See Hamm Report, Section VII.

[42] See Hamm Report ¶ 16.

[43] Hamm Report ¶ 272.

[44] Hamm Report ¶ 277.

Privileged and Confidential

as a proportional hazard model to analyze the impact of foreclosures in neighboring zip codes on the probability of foreclosure of a borrower.[45] Moreover, numerous studies analyze default models using dynamic logit or probit models that are equivalent to discrete-time duration models like the one I used.[46,47] In addition, proportional hazard models like the one I use are commonly being used by industry participants to analyze the risk of default.[48]

31. Dr. Hamm also criticizes my model by asserting that none of the studies cited in the literature on payment shock use my proportional hazard model. This criticism is misplaced. First, one of the studies on payment shocks cited in my affirmative report, as well as in Dr. Hamm's report, use a variant of the discrete-time proportional hazards model to analyze mortgage behavior.[49] Therefore, Dr. Hamm's characterization of my model as something completely foreign and untried in evaluating mortgage loan performance is unfounded.[50] Second, most of the studies on payment shocks cited seek to analyze the impact of payment shocks on both default and prepayment. In these studies, loans can either be current or in default.

32. Dr. Hamm suggests that I should have used a competing risk model such as those referenced in the literature on payment shocks. Because a loan can go from being

---

[45] Ryan Goodstein, Paul Hanouna, Carlos D. Ramirez, and Christof W. Stahel, "Are Foreclosures Contagious?," FDIC Center for Financial Research Working Paper No. 2011-4 (February 2011).

[46] See, for example, Ronel Elul, Nicholas S. Souleles, Souphala Chomsisengphet, Dennis Glennon, and Robert Hunt, "What 'Triggers' Mortgage Default?" The American Economic Review 100, no. 2 (May 2010): 491 and David B. Gross and Nicholas S. Souleles, "An Empirical Analysis of Personal Bankruptcy and Delinquency," The Review of Financial Studies 15, no. 1 (2002): 326.

[47] This equivalence is discussed in Tyler Shumway, "Forecasting Bankruptcy More Accurately: A Simple Hazard Model," The Journal of Business 74, no. 1 (January 2001): 101–124.

[48] Roger M. Stein, Ashish Das, Yufeng Ding and Shirish Chinchalkar, "Moody's Mortgage Metrics Prime: A Quasi-Structural Model of Prime Mortgage Portfolio Losses," Moody's Research Labs (2010).

[49] See Hamm Report ¶ 281.

[50] See Hamm Report ¶ 284.

Privileged and Confidential

current to either becoming delinquent or being prepaid, these are considered competing risks. Even if the risk of prepayment and the risk of foreclosure initiation are correlated, perhaps because a borrower with a higher probability of recovery from distress may also have more opportunities for loan modification, refinance, or an orderly sale, there is no reason to believe that this correlation is different for borrowers who experience a servicing failure and those who do not. Therefore, I have a sound basis for relying on a proportional hazard model for the single risk of foreclosure. It is worth noting that Dr. Hamm does not provide an alternative model of his own.

### b)      My Causation Theory is Both Credible and Consistent

33.   Dr. Hamm states that my model does not have a credible causation theory regarding the impact of overcharges and undercharges from Ocwen servicing failures.[51] To support his argument, he puts forward two central claims, both of which are incorrect. The first of these relates to whether or not borrowers face actual cash losses. The second pertains to whether undercharges constitute a payment shock by virtue of the literature and magnitude observed.

34.   First, Dr. Hamm contends that overcharged borrowers, as well as undercharged borrowers who have an escrow surplus at the time of the actual [late] analysis date, could not have been harmed from the servicing failure in a way that increases the likelihood of foreclosure initiation.[52] The reason for this, he argues, is that these borrowers would not have needed to pay additional amounts to Ocwen when the late escrow analysis was eventually performed.

35.   Dr. Hamm's argument, however, falls apart on closer examination of how borrowers were harmed from Ocwen's servicing failures. An untimely escrow analysis results in borrowers being charged payments that are higher or lower than what they should have been had the analysis been performed on time. A delayed escrow analysis that results in borrowers being charged a higher amount during the period of when the escrow

---

[51]  See Hamm Report, Section VII.B.1.

[52]  See Hamm Report ¶ 259 and ¶ 267.

Privileged and Confidential

analysis was delayed can lead to borrowers overpaying.[53] This overpayment robs them of funds that could have been used for other purposes, from paying for groceries to reducing debt. For undercharges, borrowers were harmed as they were charged a lower amount than they should have been, and thus had a lower balance in their escrow accounts when the late escrow analysis was actually performed. This reduction in or underfunding of the escrow balance may cause hardship for customers with little or no financial cushion. A relevant measure of damages would quantify these differences in cash flows for the borrower between the actual world where there was a servicing failure and the but-for world when there was none.

36.  Several examples should clarify the harm to borrowers and its potential impact on foreclosure initiation in the cases alleged by Dr. Hamm. Consider first a high-risk borrower that was overcharged because an escrow analysis was not conducted on time. If the borrower is already struggling financially, the borrower can fall behind on its payments (or further behind), and the lender might end up initiating a foreclosure on the borrower. Now consider the counterfactual situation where the escrow analysis was actually conducted on time, resulting in a lower escrow payment for the borrower. This but-for lower escrow payment might have helped the borrower avoid falling behind on its payments, thus reducing the likelihood of foreclosure being initiated.

37.  Similarly, consider another borrower in a similar situation like the one in the example above, but who was undercharged. There are two cases depending on whether or not the borrower has an escrow shortage or surplus at the time of the late analysis. Since Dr. Hamm only criticizes the case in which an undercharged borrower had an escrow surplus[54] at the time the escrow analysis was eventually performed, I focus on this case. In this case, Ocwen led borrowers to believe that the borrowers' monthly escrow payment obligations were lower than they should expect. Since borrowers—particularly financially vulnerable borrowers such as many of Ocwen's customers—are making

---

[53]  As borrowers would have continued to make the same escrow payments as before, which are higher than what they should have been if the escrow analysis had been performed on time.

[54]  See footnote 7 above for a definition of escrow surplus.

Privileged and Confidential

financial decisions with the rest of their budget, and inaccurate information about their escrow accounts may lead to suboptimal financial decisions when allocating household resources.[55] This is especially true for borrowers whose escrow analyses were delayed for multiple months or even years. Such borrowers, may be allocating those resources (i.e., spending that money) on other needs because they believe that Ocwen is collecting the correct amount or that they have a larger surplus in their escrow accounts than they, in fact, do.

38.   These examples illustrate two crucial issues in the quantification of damages. First, servicing failures can push borrowers into a worse financial position than they would otherwise be. This worsening financial position can drive these already struggling borrowers to foreclosure. Second, what matters for damages is the comparison in the outcomes of borrowers in the actual world where they had a servicing failure versus the counterfactual scenario where there was no servicing failure. Stated simply, the financial vulnerability of these borrowers is important to understanding how the servicing error push borrowers over the edge into experiencing an adverse outcome, here, foreclosure. These counterfactuals are precisely what my model is estimating. That is, my model quantifies the incremental impact of servicing failure on the likelihood of foreclosure initiation for these financially vulnerable borrowers.

39.   Second, Dr. Hamm asserts that damages stemming from a payment shock from undercharges is not supported by the literature.[56] Relatedly, Dr. Hamm also argues that payment shocks from undercharges are inconsistent with the literature I reviewed. He claims that in the mortgage finance literature, a payment shock refers to either the acquisition of new loans by a borrower or a sudden increase in the monthly payment on an existing loan such as changes in interest payments from ARM and HELOC adjustments. He states that "I know of no study that characterizes normal escrow payment changes as a source of 'payment shock,' much less the small, temporary and self-correcting payment increases that result from undercharges."[57] His statement is

---

[55]   See my discussion in McFadden Second Amended Report, Section VI.D.1.

[56]   Hamm Report ¶¶ 260-262.

[57]   See Hamm Report ¶ 260.

Privileged and Confidential

anchored by a very narrow and incomplete review of the literature that I cited. As one of the articles I mentioned in my affirmative report clearly states, "*a payment shock is a change in payment obligations that a consumer cannot control.*"[58] Indeed, the literature analyzes a range of sources that give rise to payment shocks including unexpected hospital visits.[59] Thus, a payment shock applies more broadly than the cases considered by Dr. Hamm.[60] Clearly, unexpected payment obligations to repay undercharges from Ocwen's servicing failures lead to changes in consumer's payment obligations that they could not control and therefore constitute a payment shock.

40.  Dr. Hamm also claims that the magnitude of the payment shocks in the mortgage finance literature is much larger than the payment shock from undercharges from untimely escrow. One benchmark for the magnitude of the undercharges would be the change in the escrow payment relative to the prior escrow payment; another benchmark would be the change in mortgage payments relative to previous mortgage payments, including escrow payments.[61] Among undercharged Ocwen borrowers whose monthly statements were produced by Ocwen in this case,[62] I find that 75.0 percent of Ocwen borrowers had undercharges greater than 5 percent of their escrow payments and 30.7 percent had undercharges greater than 5 percent of their monthly mortgage and escrow

---

[58]  See McFadden Second Amended Report ¶ 30, citing Nidhi Verma, "A deeper understanding of payment shock dynamics," Journal of Risk Management in Financial Institutions 10, no. 3 (2017): 276.

[59]  See Carlos Dobkin, Amy Finkelstein, Raymond Kluender, and Matthew J. Notowidigdo, "The Economic Consequences of Hospital Admissions," American Economic Review 108, no. 2 (2018): 308-352.

[60]  A payment shock applies more broadly outside the mortgage finance literature. For example, an unexpected and sudden increase in state taxes would constitute a payment shock as well as a medical bill from an emergency room visit.

[61]  I consider mortgage payments to consist of principal and interest payments.

[62]  See Ocwen's response to the 21st request in the Bureau's Fifth Set of Requests for Production. To calculate the undercharge as a share of escrow or of monthly mortgage payments, I focused on monthly statements that were indicated as current as of the bill date. Approximately 50 percent of undercharged Ocwen borrowers had one or more current monthly statements in Ocwen's production.

Privileged and Confidential

payments.[63]  In comparison, the studies that Dr. Hamm and I cite found a magnitude of 5 percent up to more than 50 percent.[64]

41.     Finally, Dr. Hamm states that "…the cited literature considers the entire payment change as a shock. In the present matter, however, most of each payment change was inevitable, and would have occurred even in the absence of an alleged delay."[65] Dr. Hamm implies that because most of the payment increase was inevitable, this is somehow inconsistent with the payment shock literature. In fact, the payment shock literature studies inevitable changes in mortgage payments driven, for example, by the expiration of teaser rates of ARMs or end of HELOC drawing periods.[66]  Moreover, even if the change in payment was inevitable, from the perspective of the borrower, this is still an unexpected payment shock, which, as described above, could have potentially harmed the borrower. Therefore, Dr. Hamm's criticism in this area is misplaced.

### c)     *Impact of Delayed Escrow Analysis Increases with Magnitude of Overcharges and Undercharges*

42.     Dr. Hamm claims that it is implausible for escrow analysis delay to cause additional foreclosures given the magnitude of the opportunity costs I quantified in my affirmative report.[67] Dr. Hamm is incorrect as he ignores the financial vulnerability of the Ocwen borrowers who experienced the servicing error. Further, missed opportunity costs are not the only factor that increases the likelihood of foreclosure initiations in the model. Foreclosure initiations are also caused by the differences in payment obligations in the actual world relative to a counterfactual world where the escrow analysis was

---

[63]   Average undercharge is calculated as accrued shortage divided by the sum of the latest monthly escrow, principal, and interest payments prior to the late analysis. See Appendix D for more details.

[64]   Hamm Report, footnote 179.

[65]   Hamm Report ¶ 262.

[66]   See Cristian deRitis, Chionglong Kuo, and Yongping Liang, "Payment shock and mortgage performance," Journal of Housing Economics 19 (2010): 295-314, and Kathleen W. Johnson and Robert F. Sarama, "End of the Line: Behavior of HELOC Borrowers Facing Payment Changes," Finance and Economics Discussion Series 2015-073, Washington: Board of Governors of the Federal Reserve System, http://dx.doi.org/10.17016/FEDS.2015.073 at p. 17 and Table 4, p. 32.

[67]   Hamm Report ¶ 249.

Privileged and Confidential

conducted on time. These differences are measured by the overcharges and undercharges.

43. Dr. Hamm relies heavily on comparisons to average borrowers in his criticism of my opportunity cost and foreclosure cost damages. In particular, he claims that my foreclosure damages estimates are unreasonable given that the magnitude of the overcharges/undercharges were small. However, Dr. Hamm ignores the actual composition of Ocwen's customer base, many of whom were in precarious financial circumstances prior to the occurrence of the servicing error.

44. Specifically, Ocwen presents itself as a mortgage servicing company that specializes in serving at-risk borrowers. In its 2018 10-K report, Ocwen stated, "We believe our core competency serving underserved and at-risk borrowers will provide a competitive advantage for certain acquisitions of MSRs."[68] Ocwen's own expert in this matter, Mr. Marcel Bryar, emphasizes the unique composition of Ocwen's borrowers and describes Ocwen as "[specializing] in servicing non-conventional loans that are particularly challenging to service and Ocwen often acquires the loans it services from servicers who no longer want to or simply cannot service the loans."[69]

45. These descriptions are consistent with differences between Ocwen and non-Ocwen loans on risk characteristics in the Mortgage Backed Securities ("MBS") panel data.[70] These risk characteristics are recorded at the time of loan origination. In my descriptive analysis below, I define an "Ocwen loan" as a loan that Ocwen listed in its reply to the Bureau's first request in the Fifth Set of Requests of Production and that I was able to

---

[68]   Ocwen Financial Corporation, 2018 Form 10-K at p. 4.

[69]   Rebuttal Expert Report of Marcel Bryar, October 15, 2019 ¶ 29.

[70]   These differences in the averages between populations illustrate the importance of controlling for these characteristics in my econometric model. Note that my primary model is estimated on Ocwen loans only using Ocwen's responses to Interrogatories and the Bureau's Fifth Set of Requests for Production.

Privileged and Confidential

identify in the MBS data based on loan amount and zip code.[71] A "non-Ocwen loan" is a loan that was not serviced by Ocwen between January 1, 2014 and August 6, 2018.

46.    Figure 1 and Figure 2 depict the cumulative distributions of borrowers' FICO scores and combined loan-to-value ("CLTV"),[72] respectively, at the time of origination for Ocwen loans and non-Ocwen loans. Lower FICO scores indicate that the loan is more likely to default than loans with higher FICO scores. Figure 1 shows the cumulative distribution of FICO scores for Ocwen and non-Ocwen loans. The lines show the share of loans serviced by Ocwen (dotted light blue line) or not serviced by Ocwen (solid dark blue line) with FICO scores at or below the corresponding FICO-score level on the horizontal axis. For example, 75 percent of Ocwen borrowers in the MBS data had FICO scores at or below 700 at the time of origination; in contrast, 25 percent of non-Ocwen borrowers had FICO scores at or below 700. The fact that the line for Ocwen borrowers is always above the line for non-Ocwen borrowers indicates that Ocwen's borrowers tend to have lower FICO scores than non-Ocwen borrowers.

---

[71]   See McFadden Second Amended Report, Appendix F that describes how I identified loans harmed by Ocwen's servicing errors in the MBS data.

[72]   FICO scores are one type of credit score that indicates the borrower's credit risk to lenders and creditors. CLTV is measured as the sum of principal balances across mortgages on a given property divided by the property's fair market value. CLTV can also serve as an indicator of the borrower's credit risk because it captures the share of the property's value that is debt.

Privileged and Confidential

**Figure 1: Cumulative Distribution of FICO Scores at Origination Across Securitized Loans by Servicer Shows that Ocwen Borrowers Have, On Average, Lower FICO Scores Than Non-Ocwen Borrowers**



Source: MBS Data. Loans with FICO scores above 850 or below 300 are excluded from the figure.

47.   Figure 2 shows the cumulative distribution of Ocwen and non-Ocwen loans by CLTV. A higher CLTV means that the aggregate mortgage loan amount on the property is large relative to the appraised property value, and the property is more encumbered (i.e., debt obligations are large relative to the asset value). The lines show the share of Ocwen or Non-Ocwen loans with a CLTV less than or equal to the CLTV at that level; for example, nearly 60 percent of Non-Ocwen loans have CLTVs at origination below 80 percent, and nearly 50 percent of Ocwen loans have CLTVs at origination less than 80 percent. While nearly all of the Ocwen and non-Ocwen loans have CLTV at or below 100 percent, Ocwen loans have, on average, a higher CLTV ratio than non-Ocwen loans. This is apparent because the curve for Ocwen loans is generally below that of Non-Ocwen loans, which indicates that a smaller share of Ocwen loans have CLTV at origination below that designated level.

Privileged and Confidential

**Figure 2: Cumulative Distribution of Combined Loan-to-Value at Origination Across Securitized Loans by Servicer Shows that a Larger Share of Ocwen Borrowers Have CLTV Between 80 and 100 Than Non-Ocwen Borrowers**



Source: MBS Data. Loans with CLTV ratios above 150 are not shown in the figure.

48.  In summary, Ocwen's customers are, on average, at higher credit risk than the average U.S. borrower, and therefore have a higher financial vulnerability. This fact is supported by Ocwen's self-description in its annual reports, Mr. Bryar's testimony, and descriptive statistics from a third-party source, the MBS panel data. For this population, inaccurate reporting and demands for payment that may seem small to an average household can precipitate into negative and sometimes dire consequences.

49.  Furthermore, with this context in mind, even small overcharges and undercharges from a delayed escrow analysis could have an impact on borrowers who are already on the brink of financial ruin.[73] Whether small overcharges/undercharges can lead to foreclosure initiation is a testable hypothesis. To test this, I estimated a model in which I allow the impact of the servicing failure to vary by the magnitude of the overcharge/undercharge. The table below shows the estimated cumulative probabilities

---

[73] A recent survey from the Board of Governors of the Federal Reserve System finds that around 40 percent of adults from a national representative sample would have difficulty using cash to pay a hypothetical expense of $400. See Board of Governors of the Federal Reserve System, Report on the Economic Well-Being of U.S. Households in 2018, May 2019 at p. 21.

Privileged and Confidential

of foreclosure initiation by quintiles in the magnitude of overcharges and undercharges.[74]

**Table 2: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation By Magnitude of Overcharge and Undercharge (in percentage points)**

| Quintile | Overcharge | Undercharge |
|----------|-----------|-------------|
| [1] | [2] | [3] |
| 1 | 4.56 | 3.52 |
| 2 | 5.61 | 3.80 |
| 3 | 5.64 | 4.89 |
| 4 | 6.70 | 5.95 |
| 5 | 11.67 | 7.98 |
| **Average across all loans** | 6.60 | 4.91 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.
Notes:
[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for each quintile of overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.

50.   As the table above shows, I find an effect of servicing failures even for small overcharges/undercharges. Moreover, I find that that the effect increases with the size of the overcharge/undercharge. Using these probabilities, the total estimates of damages would be $358.6 million using the foreclosure costs based on Ocwen and public sources and $493.2 million using foreclosure costs based on the Moreno report.

---

[74]   For overcharges the quintiles ranges are: 1) $0.01-$34.47, 2) $34.48-$107.42, 3) $107.44-$240.76, 4) $240.77-$556.65, and 5) $556.67-$354,750.60. For undercharges the quintiles ranges are: 1) $0.01-$14.32, 2) $14.33-$38.55, 3) $38.56-$95.62, 4) $95.64-$309.32, and 5) $309.40-$93,954.24.

Privileged and Confidential

2. **Implementation Critiques**

a) *Controlling for the Two Distinct Late-Escrow Populations Identified by Dr. Hamm Does Not Change My Conclusions*

51. Dr. Hamm argues that the vast majority of loans that experience an escrow analysis delay fall into one of two groups: 1) loans that had an escrow analysis due date between December 2014 and March 2015 when Ocwen was undertaking a systems change, and 2) loans that had an escrow analysis due outside this period and that were predominantly delinquent at the time of the analysis due date.[75] Dr. Hamm further suggests that these two groups of loans should have been analyzed separately.[76]

52. Even if it was the case that loans with an untimely escrow analysis fell within these two groups, there is no reason for modeling these populations separately. As explained in my prior report, my model controls for all observable characteristics that are correlated with both servicing failure and foreclosure initiation.[77] In particular, pertaining to the cases alleged by Dr. Hamm, my model controls for delinquency status as well as for time fixed effects. Regardless, as a robustness test, I estimated separate models for loans that had an escrow analysis due before December 2014 and loans that had an escrow due analysis between December 2014 and March 2015.[78] The following table shows the cumulative probability of foreclosure initiation for these two groups of loans.

---

[75] See Hamm Report ¶94 and ¶294.

[76] See Hamm Report ¶294.

[77] See McFadden Report ¶85.

[78] Both models include the full set of unharmed loans in the estimation.

Privileged and Confidential

**Table 3: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation By Month of Untimely Escrow Analysis Due Date (in percentage points)**

| Period of Months: | Jan-2014 to Nov-2014 | Dec-2014 to Mar-2015 |
|---|---|---|
| | [1] | [2] |
| Overcharged Loans | 6.68 | 1.78 |
| Undercharged Loans | 6.88 | 2.06 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.
Notes:
[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.

53.     As the table above shows, even when analyzing both groups separately as suggested by Dr. Hamm, I found that Ocwen's untimely escrow analysis increases the likelihood that foreclosure is initiated. Using these probabilities, the total estimates of damages for loans with an untimely escrow analysis in the period from January 2014 to November 2014 would be $89.2 million using the foreclosure costs based on Ocwen and public sources, and $122.7 million using foreclosure costs based on the Moreno report.[79] For loans with an untimely escrow analysis from December 2014 to March 2015, total damages would be $81.8 million using the foreclosure costs based on Ocwen and public sources and $112.5 million using foreclosure costs based on the Moreno report.[80] The combined impact from these two populations is $171.0 million using the

---

[79]   See McFadden Report Section VI.B for details on the construction of damages.

[80]   Based on his "discussion with Andrew Combs," Dr. Hamm claims that a "system change" between December 2014 and March 2015 caused Ocwen to "put the escrow analysis process on hold for a period of time" (Hamm Report ¶¶ 92, 294). I have no means to corroborate or confirm Dr. Hamm's claim. If it is correct, then this system change affected all Ocwen borrowers who had an escrow analysis due during that period, independent of their risk characteristics. For customers who had a late escrow analysis because of the system change, there can be no unobserved factor that influences both the customers' likelihood of having a late escrow and likelihood of foreclosure initiation. For these customers, the impact is an unambiguous causal measure of the impact of the servicing error on foreclosure initiation.

29

Privileged and Confidential

foreclosure costs based on Ocwen and public sources and $235.2 million using the Moreno report.[81] These combined damages omit cases where the late escrow analysis happened after March 2015.

### b) My Dependent Variable is Properly Specified

54.     Dr. Hamm claims that my model's dependent variable is wrong as it overstates foreclosures by 31 percent.[82] However, as clearly stated in my affirmative report, my model describes the probability of foreclosure initiations, not the probability of foreclosures.[83] My damages estimates use the probabilities of the various outcomes and borrower costs for each loan to form an expected cost of the events following a foreclosure initiation.[84] His criticism, therefore, is irrelevant.

### c) My Model Appropriately Controls for Loans that Were Delinquent Prior to the Servicing Error

55.     Dr. Hamm claims that I state that "…loans with a delinquency or foreclosure prior to the Alleged Analysis Due Date should be excluded when attempting to estimate additional foreclosures resulting from the allegedly delayed escrow analyses."[85] Dr. Hamm mischaracterizes my report. To support this incorrect characterization of my opinions, Dr. Hamm selectively cites part of my opinion but completely omits a crucial part of the quote. He uses this incomplete citation to conclude that I claim to exclude loans with preexisting delinquencies in my analysis.[86] The complete quote reads:

> "The analysis program just described is a standard one in epidemiological research, where the question is the effect of a treatment on the probability of

---

[81]    When I apply the cumulative probabilities of foreclosure initiation based on Ocwen customers who had late escrow analyses between December 2014 and March 2015 to calculate damages across all harmed borrowers, damages would be $108.3 million or $149.0 million depending on the cost per foreclosure (Ocwen and Public Sources or the Moreno report, respectively).

[82]    Hamm Report ¶ 327.

[83]    McFadden Second Amended Report ¶ 88.

[84]    McFadden Second Amended Report ¶¶ 116-117.

[85]    Hamm Report ¶ 334.

[86]    The incomplete quote is included in Hamm Report ¶ 335.

Privileged and Confidential

survival. A major question in such research is whether differences between "cases" and "controls" following the treatment were caused by the treatment, or were influenced by observed or unobserved confounding factors. In the survival analysis I have done in this case, I am able **to control for or rule out these confounding factors**, and exclude subpopulations of loans with possible confounding factors, such as pre-existing bankruptcies or delinquencies, whose influence cannot be fully controlled, so that I have high confidence that the elevated risks that I measure following service failures are caused by these failures. (emphasis added)"[87]

56. As the full quote states, in my foreclosure model, I can control for confounding factors like pre-existing bankruptcies or delinquencies. In the alternative, I can also exclude subpopulations of loans with these same confounding factors. In my prior report, I performed both these analyses. The main specification of my model controls for confounding factors that could influence the assignment of servicing failures ("treatment"). Among these controls I included a flag for loans that had previous delinquency, bankruptcy, loan modification, or forbearance before the harm from servicing failures.[88]

57. My understanding is that Ocwen's legal obligation to provide timely escrow analysis applied to delinquent as well as non-delinquent loans. Moreover, an escrow analysis on a delinquent loan would enter determination of the amount in arrears, and this might affect the ability of the borrower to become current, and thus the probability that foreclosure is initiated. Therefore, there is no reason to exclude these loans from the analysis. Furthermore, borrowers who are already delinquent are more financially vulnerable and therefore are likely to be more affected by Ocwen's servicing failures.

58. To confirm that the results of my benchmark specification are not driven by loans that had an adverse credit event prior to the servicing failure, I also estimated an additional robustness test. In particular, I estimated my proportional hazards model excluding all loans that experienced an untimely escrow analysis and that had an adverse credit event

---

[87]  McFadden Second Amended Report ¶ 85.

[88]  McFadden Second Amended Report ¶ 100.

Privileged and Confidential

before the servicing failure.[89,90] The table below shows the results of this robustness test.

**Table 4: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation**
**Loans Without Prior Adverse Credit Events at time of Servicing Failure**
**(in percentage points)**

|  | Cumulative Probability |
| --- | --- |
|  | [1] |
| Overcharged Loans | 5.62 |
| Undercharged Loans | 4.37 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.
Notes:
[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.

59.   As the table above shows, even for the sample of "clean" loans, the model shows that an untimely escrow analysis due to Ocwen's servicing failures increased the probability that a foreclosure is initiated by 5.62 percentage points for overcharged loans and by 4.37 percentage points for undercharged loans. Using these probabilities, the total estimates of damages would be $234.6 million using the foreclosure costs based on Ocwen and public sources and $322.7 million using foreclosure costs based on the Moreno report.

---

[89]   These adverse credit events are: 90 days or more delinquent, bankruptcy, permanent loan modification, and forbearance.

[90]   In my prior report, I performed a similar analysis like the one described above. See McFadden Second Amended Report ¶ 112 and Appendix H. There is one important difference between this specification and the one in my prior report. In the specification of my original report, I only excluded loans that had an overcharge or an undercharge, and that had an adverse status prior to the servicing failure. In the current specification, by contrast, I also exclude harmed loans with missing and zero accruals that had an adverse status prior to the servicing failure.

### d) *Dr. Hamm's Delinquency Proxy is Incomplete Relative to Ocwen's Own Responses*

60. Instead of relying on the delinquency information provided by Ocwen in response to RFP 5 of the CFPB's Fifth Set of Requests for Production to Defendants, Dr. Hamm uses the transaction data in RFP 22 to calculate his own delinquency measures.[91]  His justification is that RFP 5 "is information that can be calculated from the Transaction History data"[92] But it is unclear why Dr. Hamm believes deriving the data, *i.e.*, a proxy method, is superior to using the direct data, and Dr. Hamm does not attempt to explain why it would be. Further, perhaps Dr. Hamm's claim of what delinquency data is derivable was true of the original response to RFP 5 but the original response omitted numerous delinquent loans and, when a supplement to RFP 5 was later provided, the accompanying submittal letters described a process which required reviewing data "for the following RFP Nos.: 8-10 and 22" for "how additional delinquency information can be gleaned from the Fifth Request for Production."[93] Given that Ocwen is surely more familiar with the intricacies of their own internal databases than I am, there is no legitimate reason to follow Dr. Hamm's suggestion to try to recreate RFP 5 using only one of the four required RFP sources (i.e., only RFP 22) and, in so doing, unnecessarily risk omitting instances of delinquency.

### e) *Dr. Hamm Fails to Understand That Harm from Ocwen Can Increase the Likelihood of Foreclosure Even When the Reported Reasons for Default Do Not Mention the Servicing Error*

61. Dr. Hamm argues in his report that my damages theory ignores relevant data produced by Ocwen, indicating the reason for a loan defaulting. Further, he claims that since "…there is no mystery as to why these loans ended up in foreclosure," they should have been excluded from both my proportional hazards model and damages calculation.[94]

---

[91]  See Hamm Report ¶¶ 138-139 and footnotes 32, 93.

[92]  See Hamm Report, footnote 93.

[93]  Catalina E. Azuero at Goodwin Proctor LLP, Letter to the Consumer Financial Protection Bureau, "Re: CFPB v. Ocwen Financial Corp., et al.; Case No: 9:17-CV-80495-KAM," June 18, 2019.

[94]  See Hamm Report ¶ 338.

Privileged and Confidential

There are three problems with his claims. First, the reason for a loan defaulting might be different than the reason that a loan eventually ends up in foreclosure initiation. For example, an unexpected medical bill may have pushed the borrower into delinquency, and Ocwen's servicing failures reduced the borrower's ability to exit delinquency. Second, as I argue below, even if there are other factors that contribute to a borrower becoming delinquent, that does not in any way undermine the fact that the servicing failure also played an incremental part in pushing borrowers to default and ultimately foreclosure initiation. In fact, it is this incremental impact that my proportional hazard model measures. Third, Dr. Hamm does no analysis to connect his various alternative causes to a borrower's ability to pay their mortgage, or to measure how they might contribute incrementally to a foreclosure.

62. According to Dr. Hamm's Exhibit 10E, the top three most prevalent reasons for default were some type of reduction of income.[95]  In other words, the most likely reason for default is that the borrower doesn't have enough money available to keep up with their mortgage payments. But it is exactly a borrower struggling to keep up with their mortgage payment who is most at risk of being put over the edge from, for example, being overcharged due to a servicing failure or suffering a payment shock. Thus there is no basis for Dr. Hamm's claim that I should have excluded these loans from my model and damages calculation.

### f)     My Model Results Do Not Depend on Control Group Loans Having an Escrow Account

63. Dr. Hamm claims that 27 percent of loans in the group of unharmed loans that I included in my analysis do not have an escrow account.[96,97] He further implies that including these loans in the model biases my results on the impact of servicing failures

---

[95]  These reasons are 1) curtailment of income, 2) reduction of income, and 3) loss of income/unemployment. See Hamm Report, Exhibit 10E.

[96]  See Hamm Report ¶ 287.

[97]  Dr. Hamm identifies the loans as not having an escrow account when the escrow balance in the Transaction History data (RFP 22) was always zero. I have not seen any testimony or documents from Ocwen indicating the appropriate way to identify loans without escrow accounts in the data.

and makes them unreliable.[98] As I demonstrate below, dropping loans that allegedly do not have escrow accounts have minimal impact on the estimates of the model and damages.

64.    The following table shows the results of the foreclosure model from removing the alleged unharmed loans without an escrow account and compares the results with my original results.

**Table 5: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation Excluding Loans without Escrow Accounts (in percentage points)**

|                     | Prior Report | Excluding Loans with No-Escrow |
| ------------------- | ------------ | ------------------------------ |
|                     | [1]          | [2]                            |
| Overcharged Loans   | 6.73         | 6.75                           |
| Undercharged Loans  | 5.07         | 5.10                           |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.
Notes:
[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.

65.    As the table shows, the impact of removing the 27% unharmed loans which Dr. Hamm alleges have no escrow accounts is *de minimis*. Using these probabilities, the total estimates of damages would *increase* from $351.5 million to $352.7 million using the foreclosure costs based on Ocwen and public sources, and from $483.5 million to $485.2 million using foreclosure costs based on the Moreno report.

---

[98]    See Hamm Report ¶ 288.

Privileged and Confidential

### g) *My Model Results Are Robust to the Omitted Variables that Dr. Hamm Proffered, Which I Addressed in My Prior Report*

66.  Dr. Hamm argues that I omitted important variables that have a significant impact on foreclosure and delinquency.[99]  In particular he emphasizes that I omitted three variables: loan-to-value ratios, credit scores, and debt to income measures.

67.  I agree with Dr. Hamm that these variables could be determinants of loan performance. Although Ocwen did not reliably collect this information, I recognized the importance of these variables, and in my previous report, I conducted a robustness test using an alternative data set and estimated a model that included these variables.[100] The results, which are included in Appendix H of my prior report, confirm the conclusions of my main specification that loans that suffered an untimely escrow analysis, faced an increase in the probability of foreclosure initiation. Dr. Hamm, however, did not acknowledge these results in his report.

68.  Dr. Hamm also argues that I should have controlled for three additional factors in my model: the behavior of prior servicer, the impact of other payment changes, and investor requirements in the model. [101] The data that I have from Ocwen does not allow me to include these factors in my model, and Dr. Hamm does not offer any data source which would allow me to do so. As discussed in my prior report, the impact of servicing failures is identified by the difference in risk before and after the servicing failure for Ocwen loans in the sample.[102] Dr. Hamm does not perform any analysis or test to show that these factors systematically coincide with the timing of the harm from untimely escrow, and therefore affect my conclusions. Thus, Dr. Hamm's critique is misplaced.

---

[99]  See Hamm Report ¶ 301.

[100]  I used the *Mortgage Backed Securities* (MBS) data set for this test. See McFadden Second Amended Report ¶ 113.

[101]  See Hamm Report ¶¶ 318, 321, 325.

[102]  See McFadden Second Amended Report ¶¶ 86-87.

Privileged and Confidential

> h)  **Dr. Hamm's Rejection of My Model Based on a Small Number of Unexpected Coefficient Signs is Not Consistent with Standard Econometric Practice**

69.  Dr. Hamm claims that some of the results from my model are inconsistent with established principles of mortgage finance.[103] In particular, he argues that the coefficient estimates for the unemployment rate, the investor dummy, and loan age have the wrong sign.[104] Irrespective of Dr. Hamm's arguments, the model results are robust to excluding these variables from the specification.[105]

70.  There are a number of factors suggesting that the signs and magnitudes of these coefficients are not clear a priori.  Unemployment rates vary from region to region for structural reasons, and while it is reasonable to expect that a decline in economic activity and increase in the unemployment rate in a given region would be associated with increased distress among borrowers, interregional variation in economic activity and lender practices are sufficiently confounding to obscure a priori expectations.  The aftermath of the great recession is likely to have influenced disproportionally the economic status of borrowers with older loans among those serviced by Ocwen, upsetting the relationship between age and default risk expected under stationary conditions.  Finally, the years following the great recession were not necessarily typical in terms of the stability of homeowner incomes compared with the rental streams that determine investor's ability to make payments on their mortgages.

71.  Moreover, it is important to note that Ocwen customers are not a representative sample of the average U.S. borrowers. In fact, as I detail above, they are a riskier set of borrowers than the average population of borrowers. Because of this, the usual principles of mortgage finance need not necessarily apply as we are not comparing these risky borrowers with a normal set of borrowers. Consider, for example, investor-owned properties. Looking at the whole population of loans, it might be true that

---

[103]  Hamm Report ¶ 344.

[104]  The results imply that an increase in the unemployment rate lowers foreclosure initiations, that investor-owned properties are less likely to foreclose, and that older loans have a higher probability of foreclosure initiation.

[105]  See Appendix E.

Privileged and Confidential

investor-owned properties are riskier than owner-occupied. However, this conclusion might not hold in the small and riskier sample of loans and borrowers in the Ocwen data. Among this riskier set of borrowers, those that own properties as an investment might actually be relatively safer as they likely have better sources of cash flows than owner-occupied borrowers.

72. My results for loan age are not inconsistent with the results found in the literature. For example, deRitis, Kuo, and Liang (2010) show that the relationship between loan age and delinquency is not always decreasing in age as suggested by Dr. Hamm.[106]

### i) *My Model Measures the Incremental Impact of Servicing Errors on Foreclosure Initiations*

73. Dr. Hamm claims that because my model predicts additional foreclosures from untimely escrows that would account for a large fraction of observed foreclosures for the harmed populations, my results are irrational. He supports this claim by arguing that according to my model "…all of the factors that have been found by scholars and mortgage finance professionals to comprise the primary causes of defaults and foreclosures – job losses, serious medical problems, divorces, deaths, major financial problems, incarcerations, negative equity, etc. – collectively account for fewer foreclosures (49%) than escrow analysis delays (51%)."[107] My model does not imply that all these factors account for fewer foreclosures than escrow analysis delays. These factors, in fact, might be the main contributors to the eventual foreclosures. What my model implies is that *controlling for* these other important factors, the *incremental impact* of the untimely escrow analysis helps explain a significant fraction of the observed foreclosures. Moreover, my model's results are consistent with the observed large differential in foreclosure initiation rates between harmed and unharmed borrowers.[108]

---

[106] Cristian deRitis, Chionglong Kuo, and Yongping Liang, "Payment shock and mortgage performance," Journal of Housing Economics 19 (2010): 295-314.

[107] Hamm Report ¶ 355.

[108] The foreclosure initiation rates for overcharged and undercharged loans are 12.9 percent and 17.8 percent, respectively, in my regression data. By contrast, the foreclosure initiation rate is 3.7 percent for unharmed loans.

Privileged and Confidential

74. Contrary to Dr. Hamm's contention, I have controlled for other important factors that influence a borrower's likelihood of foreclosure initiation and that would correlate with Ocwen's servicing failures. Dr. Hamm has not provided any empirical support that any such unobserved factors would explain my results. Since neither Ocwen nor Dr. Hamm have identified any relationship between service failures and unobserved borrower characteristics, I have no basis to control for any additional factors that could contribute to foreclosure.

## B.    COST PER FORECLOSURE

75. Dr. Hamm claims that "foreclosure is generally for borrowers who have no equity in their mortgaged property; borrowers with equity have a powerful economic incentive – and usually the ability – to avoid foreclosure by selling their homes or refinancing their mortgages."[109] Dr. Hamm portrays zero or negative equity as a primary reason for foreclosure and, in support of this point, cites to two studies analyzing "strategic defaults" during the 2008/2009 housing crisis.[110] According to Dr. Hamm's logic, there can be no equity loss from foreclosure on a property with no equity at the time of sale. Moreover, Dr. Hamm proffers calculations using Ocwen's data to purportedly show that 88 percent of loans in which foreclosure sales had occurred among the harmed loans were "under water" (i.e., homes in which the mortgage loan and expenses exceed the appraised value of the home). Therefore, according to Dr. Hamm, there is no equity on these homes for the borrowers, and if anything, investors—not homeowners—experienced losses.

76. Dr. Hamm's arguments are fundamentally inconsistent with the way in which the literature measures equity loss from foreclosure and ignore that studies have documented numerous reasons why foreclosure can occur regardless of the borrower's equity on the property. In this section, I first summarize findings from the literature related to equity loss (section III.B.1) and drivers of foreclosure (section III.B.2). Then,

---

[109] Hamm Report ¶ 390.

[110] Hamm Report ¶ 373 ("Most borrower defaults occur because the borrower is unable to afford the monthly mortgage payments and does not have equity in the mortgaged property. Most other defaults occur because a borrower has decided to strategically default, due to negative equity in the mortgaged property.").

Privileged and Confidential

I use Dr. Hamm's example of a borrower who lived in ███████ to illustrate his errors. Next, I address Dr. Hamm's critique that administrative and legal fees are not paid by borrowers and point to contradictory information from Ocwen's own records. Finally, I reiterate that my estimate of the cost per foreclosure to the borrower is conservative because there are several additional expenses that I am not able to quantify because of data limitations.

### 1.    The Literature Discusses Losses from the "Foreclosure Discount" and Loss of a Long-term Financial Investment

77.   In the literature on consequences of foreclosure on borrowers, there are two forms of equity loss: first, foreclosures and distressed sales more generally often sell as a discount relative to non-distressed sales, and second, borrowers lose out on the long-term financial investment in their homes.

78.   The foreclosure "discount" is well noted in the popular press. For example, a blog post titled "What is Foreclosure?" on Hubzu (a website that presents itself as "among the nation's largest online real estate auction sites") names several benefits of purchasing a foreclosed home, namely "prices lower than market value."[111] This message is echoed by realtors who were interviewed in the article "How to buy a foreclosed home in 5 steps" from Bankrate.com.[112] Redfin and U.S. News and World Report present both the advantages and risks of buying a foreclosed home: "...for buyers willing to take the

---

[111] "Foreclosed homes are often sold at prices lower than market value. If the home is still in pre-foreclosure, the homeowner may want to sell the home as-is for a lower price to avoid going into foreclosure. These types of sellers are also often in a hurry to get the home off their hands, speeding up the sometimes lengthy buying and closing processes. While some foreclosed homes are neglected toward the end of ownership, that isn't always the case — some may only need a few minor repairs or none at all." Hubzu, "What is a Foreclosure?," August 2, 2019, https://www.hubzu.com/blog/what-is-a-foreclosure/ (last viewed on November 9, 2019).

[112] "'The advantage of purchasing a foreclosure property is, in short, price,' says John Soffee, a Realtor with Freedom Realty Services in Midlothian, Virginia... In the right situation, 'you are getting something below market value because the bank is motivated to get the home sold,' says Rose Sklar of The Sklar Team of Coldwell Banker in Weston, Florida. 'Also, the bank tends to negotiate more than a typical seller would.'" Bankrate.com, "How to Buy a Foreclosed Home in 5 Steps," June 19, 2019, https://www.bankrate.com/real-estate/how-to-buy-a-foreclosed-home/ (last viewed on November 14, 2019).

Privileged and Confidential

extra legwork, purchasing a foreclosure can be a great way to get a deal on your dream house."[113]

79.     The literature on the foreclosure discount has typically focused on Real Estate Owned ("REO") homes, as Dr. Hamm had noted in his report.[114] Although researchers have debated the exact magnitude of the discount, studies have generally found discounts in the range of 10-20 percent relative to non-foreclosure sales, which Dr. Hamm does not dispute.[115] Instead Dr. Hamm takes issue with the fact that losses from REO sales would be borne by the investor and not the borrower.

80.     Dr. Hamm is incorrect in his claim that foreclosure discounts, even in REO sales, do not harm the borrower. First, if the borrower is able to sell the home for an amount greater than his/her mortgage balance, then the loss from the foreclosure discount would be borne by the borrower. Second, if the borrower is not able to sell the home for more than his/her mortgage balance, then the home will typically be repossessed by the mortgage servicer or investor. The foreclosure discount may be one of the reasons why the borrower was not able to sell the home for a higher amount and therefore lost title to his/her home. Moreover, in at least 38 states including Florida, a lender may sue the borrower for the difference between the foreclosure sale price and the borrower's

---

[113]   Redfin, "How to Buy a Foreclosed Home," January 2019, https://www.redfin.com/guides/how-to-buy-a-foreclosed-home (last viewed on November 10, 2019); Chris Kissell, "How to Buy a Foreclosed Home," U.S. News and World Reports, June 11, 2018, https://loans.usnews.com/how-to-buy-a-foreclosed-home (last viewed on November 10, 2019) ("The biggest lure of buying a foreclosure is the potential savings you get compared with buying a similar nondistressed property. 'It can be like a 15 percent discount on your neighboring houses,' Reiss says. 'So, it can be significant.'" David Reiss is a law professor and academic programs director of the Center for Urban Business Entrepreneurship at Brooklyn Law School.).

[114]   Hamm Report ¶¶ 384-386.

[115]   In addition to the Federal Housing Finance Agency's Mortgage Market Note that I cited in my prior report, see also Kai-yan Lee, "Examining REO Sales and Price Discounts in Massachusetts" in *REO & Vacant Properties: Strategies for Neighborhood Stabilization*, a Joint Publication of the Federal Reserve Banks of Boston and Cleveland and the Federal Reserve Board, 2010 at p. 55. Both studies summarize papers that analyze REO sales during the 1980s, 1990s, and 2000s.

Privileged and Confidential

mortgage balance; these states are known as "recourse states."[116] Among Ocwen borrowers who were harmed by Ocwen's delay in performing an escrow analysis, approximately 67 percent are located in a recourse state, 31 percent are located in a non-recourse state, and the remaining 2 percent in Puerto Rico and territories. For these reasons, foreclosure discounts are likely to impose financial costs on borrowers.

81.   Whereas the foreclosure discount focuses on the gap in price between a foreclosure and comparable non-foreclosure sale at the same point in time, the second component of a borrower's equity loss is that he/she loses on a long-term financial investment, which is the focus of the Moreno report's estimate.[117] The Moreno report defines the long-term financial loss as the "difference between the assessed market value and the balance on the home mortgage," which was "$7,200 on average" in 1995 (the average assessed

---

[116]   Andra C. Ghent and Marianna Kudlyak, "Recourse and Residential Mortgage Default: Theory and Evidence from U.S. States," Federal Reserve Bank of Richmond Working Paper No. 09-10R, June 10, 2010. Nevada is considered to be a non-recourse state after its change. See also Ariel Olson, "Kicked While They're Down: Deficiency Judgments and the Great Recession," Emory Law Journal 67 (2018): 1273-1311.

[117]   In his report, Dr. Hamm poses two other critiques of the Moreno report that are baseless.

First, Dr. Hamm criticizes the robustness of the Moreno report as a study that did not undergo peer review (Hamm Report ¶ 391). However, the results from this study have been used in several government policy reports, including Joint Economic Committee, "Sheltering Neighborhoods from the Subprime Foreclosure Storm," June 22, 2007, https://www.jec.senate.gov/public/index.cfm/democrats/2007/6/report-update-sheltering-neighborhoods-from-the-subprime-foreclosure-storm_1095 (last viewed on November 13, 2019) at p. 14; U.S. Department of Housing and Urban Development. Economic Impact Analysis of the FHA Refinance Program for Borrowers in Negative Equity Positions. Washington, DC, 2010, https://www.hud.gov/sites/documents/IA-REFINANCENEGATIVEEQUITY.PDF (last viewed on November 13, 2019) at p. 9. Both reports refer to Moreno's costs to homeowners as transaction costs or administrative costs; however, Moreno report itself listed this cost of $7,200 to homeowners under "[l]ong-term loss of the financial investment in the property" (Moreno report, p. 12).

Second, according to Dr. Hamm, the $7,200 amount could not be the estimated cost of foreclosure because it was based on homeowners who may have been able to avoid foreclosure through the Mortgage Foreclosure Prevention Program (Hamm Report ¶ 390). Dr. Hamm's reasoning errs in that his argument assumes that foreclosure costs can only be calculated from households that actually experienced foreclosure. This is incorrect: foreclosure costs are measured based on differences between a scenario, possibly hypothetical, with a foreclosure sale and a scenario without a foreclosure sale. There is no reason why non-foreclosed homes could not inform an estimate of the potential equity loss.

Privileged and Confidential

market value was $55,400).[118] This measure is conservative in that it does not capture the estimated long-term financial loss from foreclosure; borrowers who were able to stay in their homes would have held on to this equity while borrowers who lost their homes would not. My model does not include this long-term financial loss, and thus is conservative. The reason why this measure is conservative is that, if housing prices continued to grow, then the equity on the home would increase as well, and the gap between the foreclosed and non-foreclosed borrowers would be even greater.

82.   Indeed, my model does not account for this long-term financial loss despite the fact that housing prices were growing during the damages period. In Figure 3, I have plotted zip-code-level growth rates in housing prices relative to the first quarter of 2014 using the Housing Price Index from the Federal Housing Finance Agency. I focus on zip codes where Ocwen borrowers were affected by a late escrow analysis and had a foreclosure sale between the first quarter of 2014 and the fourth quarter of 2018. The "weighted average" corresponds to the average zip code, weighted by the number of foreclosed homes directly impacted by Ocwen's servicing failure in the county.[119] I have also included the growth rates of the zip codes in the 5th and 95th percentiles. Across the majority of zip codes, housing prices appreciated over this period such that the loss of a long-term financial investment for these borrowers would likely be understated.

---

[118]  Moreno report, p. 12.

[119]  As I noted in my prior report (McFadden Second Amended Report ¶ 134), neighboring home values may also be impacted by a foreclosure sale; therefore, to the extent that Ocwen's servicing failure led to an additional foreclosure in the county, borrowers unaffiliated with Ocwen may have been harmed as well.

Privileged and Confidential

**Figure 3: Growth in Housing Prices from First Quarter of 2014 through Fourth Quarter of 2018**



Source: Federal Housing Finance Authority Housing Price Index.
Notes: Weighted by number of Ocwen borrowers in the zip code with a late escrow analysis and foreclosure sale.

83.   In summary, Dr. Hamm's assertions that borrowers experience no equity loss from foreclosure are baseless. Indeed, the double-hit from the foreclosure discount and loss of long-term financial investment can be devastating to a borrower's financial position.

## 2. The Literature Has Found that Foreclosures Can Occur Regardless of the Borrower's Equity Position

84.   Dr. Hamm ignores the fact that numerous studies have found that foreclosures can occur regardless of the borrower's equity position. In its literature review, the U.S. Department of Housing and Urban Development's Office of Policy and Development Research's *2010 Report to Congress on the Root Causes of the Foreclosure Crisis*, which Dr. Hamm cited in his report, states that "a lack of housing equity by itself generally does a poor job of predicting mortgage delinquencies, which are a necessary

**Privileged and Confidential**

precursor to foreclosures."[120] The report goes on to say that, although "a lack of home equity is an important determinant of foreclosures as it precludes other means that borrowers can take to resolve an inability to meet mortgage obligations," foreclosures often precipitate from "some other event that makes borrowers financially insolvent."[121] This point noted in the HUD report is consistent with the findings of recent papers that emphasize the importance of borrowers' ability to pay, as opposed to equity or wealth, in explaining default behavior.[122]

### 3. Dr. Hamm's Example of an Ocwen Borrower who Lived in ▇▇▇▇ Illustrates His Error

85.     Dr. Hamm's example of an Ocwen borrower in ▇▇▇▇ serves as a perfect example of his error.[123] The home sold for $330,000 in December 2017. Dr. Hamm claims that the homeowners walked away with approximately $158,000 and would therefore be unharmed. However, Ocwen's own database (specifically, Ocwen's response to request 18 in the Bureau's Fifth Set of Requests for Production) reports that the "as is mid market value" as of October 3, 2017 was $367,758—which is $37,758 above the selling price—and Zillow's list price of the home on September 22, 2017 was $369,900—

---

[120] U.S. Department of Housing and Urban Development's Office of Policy and Development Research, Report to Congress on the Root Causes of the Foreclosure Crisis, January 2010, p. 15.

[121] U.S. Department of Housing and Urban Development's Office of Policy and Development Research, Report to Congress on the Root Causes of the Foreclosure Crisis, January 2010, p. 15.

[122] Peter Ganong and Pascal Noel, "Liquidity vs. Wealth in Household Debt Obligations: Evidence from Housing Policy in the Great Recession," NBER Working Paper, August 2018 and Kristopher Gerardi, Kyle F. Herkenhoff, Lee E. Ohanian, and Paul S. Willen, "Can't Pay or Won't Pay? Unemployment, Negative Equity, and Strategic Default," The Review of Financial Studies 31, no. 3 (revised January 2017): 1098-1131. Several studies have also found that, contrary to the concept of "strategic default," numerous borrowers with negative equity do not default as predicted by traditional models; see Neil Bhutta, Jane Dokko, and Hui Shan, "Consumer Ruthlessness and Mortgage Default during the 2007 to 2009 Housing Bust," The Journal of Finance 72, no. 6 (December 2017): 2433-2466 and Brent T. White, "Underwater and Not Walking Away: Shame, Fear, and the Social Management of the Housing Crisis," Wake Forest Law Review 45 (October 2010): 971-1023.

[123] The loan number of this borrower is ▇▇▇▇.

Privileged and Confidential

which is $39,900 above the selling price.[124] On the Zillow listing, the description noted: "PRICE DRASTICALLY REDUCED. SELLERS MOTIVATED" [capitalized letters in original]. Contrary to Dr. Hamm's explanation, equity loss in this example would be the difference in the home value between the amount that the borrower could have sold his/her home for if he/she had not been compelled to make the sale and the amount at which the house was actually sold.

### 4. Dr. Hamm's Assertion that Borrowers Do Not Pay Legal and Administrative Fees Related to Foreclosure is Baseless

86. Dr. Hamm claims that the legal and administrative fees that I included as costs to the borrower from foreclosure are typically fronted by servicers and reimbursed by investors. Thus, according to Dr. Hamm, these costs are "almost never paid by borrowers."[125] However, he does not offer support for his argument aside from citing to the Fannie Mae expense schedule in the Moreno report, and he appears to disregard information provided from Ocwen's own records.

87. The legal and administrative fees that I include in damages are, first of all, borrower-assessed fees listed in an Ocwen-commissioned report by Navigant on "Semi-Annual Market Fee Analysis and 3/1/2015 – 8/31/2015 Default Related Fees – All States." Specifically, Navigant named the following "default related fees **assessed to borrowers during foreclosure** [emphasis added]:" Foreclosure Attorney/Trustee Costs Fee, Publication/Posting Fee, Process Server Fee, and Title Fee Cost.[126]

88. Second, borrowers like Ocwen's customers are likely liable for these foreclosure fees as stated in standard contracts such as the Fannie Mae/Freddie Mac Uniform Instrument (Form 3010) mortgage note for single-family homes in Florida.[127] These fees would be

---

[124] "█████████     ████     ███████    ███    ██████," Zillow.com https://www.zillow.com/homedetails███████████████████████████ (last viewed on November 14, 2019).

[125] Hamm Rebuttal Report ¶ 393.

[126] OCW-CFPB-001-06523242 at p. 26.

[127] Florida-Single Family-Fannie Mae/Freddie Mac Uniform Instrument, Form 3010, 1/01, https://www.fanniemae.com/content/legal_form/3010w.doc (last viewed on November 13, 2019). ("Lenders actions can include, but are not limited to:… (c) paying reasonable

**Privileged and Confidential**

added to the mortgage amount owed by the customer, including when reinstating or paying off his or her loan. In the event of a foreclosure sale, proceeds from the foreclosure sale are first used to pay amounts due under mortgage, including foreclosure fees—possibly with interest—assessed by the servicer, before a borrower is able to recover any of his or her equity from the foreclosure sale proceeds.

89.   Both Ocwen's internal documents and standard mortgage contracts state that borrowers are obligated to pay foreclosure administrative and legal fees. Dr. Hamm has not presented evidence showing that Ocwen borrowers are not indebted to pay these fees. I have estimated these costs using reasonable estimates from Ocwen's internal documents and the Moreno report, which—as Dr. Hamm pointed out—draws on typical Fannie Mae expenses. If more information about the extent to which Ocwen's borrowers did not meet their obligations becomes available, I am prepared to extend my analysis.

### 5.   My Estimate of Cost Per Foreclosure to Borrowers is Conservative Because There Are Additional Expenses That I Have Not Quantified

90.   It is worth noting that equity loss is only one of numerous costs imposed on homeowners as a result of foreclosure. As laid out in the Moreno Report, additional costs to the borrower that I did not include in my analysis are:[128]

a.   "Loss of a stable and secure place to live."

b.   "A damaged credit rating that may become a barrier in accessing rental housing or buying a home again."

---

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding…. Any amounts disbursed by Lender under this Section [Protection of Lender's Interest in the Property and Rights Under this Security Instrument] shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.")

[128]   Moreno report, pp. 12-13.

Privileged and Confidential

    c.   "Potentially higher costs to replace lost housing."

    d.   "Possible tax consequences on the forgiven indebtedness."

91.   I have not quantified these additional costs because of data limitations; examples of additional information that would be required for such an analysis include borrowers' non-mortgage credit accounts, tax records, and residential history.

## IV.   CONCLUSION

92.   Dr. Hamm concludes that, even assuming liability, Ocwen's servicing failures that affected hundreds of thousands of its customers over several years resulted in no damages. According to Dr. Hamm, damages for opportunity costs are zero because the appropriate discount rate of Ocwen's overcharges is zero—in other words, there was no benefit to customers to have funds on hand rather than in their escrow accounts with Ocwen. Dr. Hamm asserts that damages for additional foreclosures are zero because borrowers allegedly incur no costs from foreclosure and, without any empirical analysis of his own, Dr. Hamm claims that Ocwen's servicing failures have no relationship with the likelihood that the foreclosure was initiated on the borrower.

93.   I disagree with Dr. Hamm's conclusions and find his arguments to be baseless. Dr. Hamm's reasoning defies economic principles, the relevant literature, and standard econometric practices. He appears to disregard supporting analyses that address his claims that I had included in my prior report. Moreover, he attempts to undermine my analysis by presenting anecdotal evidence implying that Ocwen's sworn and verified interrogatory responses are incorrect. He further makes claims as to a lack of damages due to his varying concerns with my model but notably provides no modeling results to support his concerns.

94.   Table 6 below summarizes the damages calculation in my prior report and in this report for opportunity costs. As shown, there is little difference in the opportunity cost damages from my prior report. At the discount rates that I have considered, opportunity cost damages are approximately $2 million.

Privileged and Confidential

**Table 6: Summary of My Damages Estimates for <u>Opportunity Costs</u> in USD**

| | | Damages Estimates - Prior Report by Discount Rate | | | Damages Estimates - Surrebuttal by Discount Rate | | |
|---|---|---|---|---|---|---|---|
| Servicing Failure Population | | 13% | 16% | 20% | 13% | 16% | 20% |
| [A] | | [B] | [C] | [D] | [E] | [F] | [G] |
| [1] | Late Escrow Analyses | $1,188,115 | $1,420,930 | $1,715,706 | $1,105,253 | $1,341,616 | $1,640,796 |
| [2] | PMI Overcharges | $319,433 | $343,623 | $373,717 | $97,525 | $119,345 | $146,829 |
| [3] | ARM Servicing Errors | $288,684 | $337,569 | $394,490 | $288,684 | $337,569 | $394,490 |
| [4] | Total | $1,796,232 | $2,102,122 | $2,483,913 | $1,491,462 | $1,798,530 | $2,182,115 |

Sources and Notes: Values are reported in USD.
[B], [C], [D]: McFadden Second Amended Report, Table 10.
[1][E]-[1][G]: Table 1.
[2][E]-[2][G]: Appendix C, Table 1.
[3][E]-[3][G]: See [3][B]-[3][D].

95.   Table 7 summarizes the foreclosure costs sensitivity calculations described in this report and compares them to my damages estimate. Notwithstanding the criticisms of Dr. Hamm, I have received no additional data or evidence that establishes that the assumptions underlying my statistical analysis are incorrect. On the basis of those assumptions, my conclusion is that foreclosure cost damages are either $351.5 million or $483.5 million depending on the method used to cost the consequences to customers of foreclosure initiation. The table also reports alternative calculations resulting from sensitivity analyses of the assumptions underlying my statistical calculations.

Privileged and Confidential

**Table 7: Summary of My Damages Estimates and Sensitivity Analyses for <u>Foreclosure Costs</u> in USD millions**

| | Description of Damages Estimate<br>[A] | Ocwen and Public Sources<br>[B] | Moreno 1995 Report<br>[C] |
|---|---|---|---|
| | | Cost Per Foreclosure Sources: | |
| [1] | Damages Estimates - Prior Report | $351.5 | $483.5 |
| | *Damages Estimates from Sensitivity Analyses in My Surrebuttal* | | |
| [2] | Model with Varying Impact by Magnitude of Overcharge or Undercharge | $358.6 | $493.2 |
| [3] | Model excl. Loans Without Escrow Accounts | $352.7 | $485.2 |
| [4] | Model incl. Loans Without Prior Adverse Credit Events at Time of Error | $234.6 | $322.7 |
| [5] | Separate Models for Servicing Failures in Jan-14 - Nov-14 & Dec-14-Mar-15 | $171.0 | $235.2 |
| [6] | Applying Cumul. Prob. Based on Dec-14 - Mar-15 Failures to All Harmed | $108.3 | $149.0 |

Sources and Notes: Values are reported in millions of USD.
[1]: McFadden Second Amended Report, Table 15.
[2]: ¶ 50.
[3]: ¶ 65.
[4]: ¶ 59.
[5]: ¶ 53. Damages exclude borrowers with late escrow analyses after March 2015.
[6]: Footnote 81.

*Daniel L McFadden*

_____

Daniel McFadden

Signed on November 14, 2019 at Oakland, California

Appendix A

## Daniel L. McFadden
Principal

San Francisco, CA                    +1.415.217.1000                    Daniel.McFadden@brattle.com

**Professor Daniel McFadden** is a principal with The Brattle Group, which provides consulting services and expert testimony on economic, finance, regulatory and strategic issues to corporations, law firms and public agencies worldwide.

Professor Daniel McFadden, recipient of the 2000 Nobel Prize in Economics, is the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and the founding director of its Econometrics Laboratory. He is also the Presidential Professor of Health Economics at the University of Southern California, where he has joint appointments at the USC Sol Price School of Public Policy and the Department of Economics at USC Dornsife College. Previously, he was the James R. Killian Professor of Economics at MIT, the Irving Fisher Research Professor at Yale University, and the Fairchild Distinguished Scholar at the California Institute of Technology. He was awarded the Nobel Prize for his numerous contributions to quantitative economic science and, in particular, his pioneering theoretical, methodological, and empirical work in the analyses of discrete choices.  Dr. McFadden has received numerous other awards including the John Bates Clark Medal given every two years to the American economist under the age of forty who has made the most outstanding contribution to the field of economic science.  Dr. McFadden received his Ph.D. in Economics from the University of Minnesota in 1962.  There he also earned his B.S. in Physics, with high distinction, in 1957.

Dr. McFadden has also held the following academic appointments:

| | |
|---|---|
| 2014- | Presidential Professor of Health Economics, University of Southern California |
| 1996- | Director, Econometrics Laboratory, University of California, Berkeley |
| 1995-1996 | Chair, Department of Economics, University of California, Berkeley |
| 1991-1995 | Director, Econometrics Laboratory, University of California, Berkeley |
| 1990- | E. Morris Cox Chair, University of California, Berkeley |
| 1990- | Professor of Economics, University of California, Berkeley |
| 1990 | Sherman Fairchild Distinguished Scholar, California Institute of Technology |
| 1986-1991 | Director, Statistics Center, Massachusetts Institute of Technology |
| 1984-1991 | James R. Killian Chair, Massachusetts Institute of Technology |
| 1978-1991 | Professor of Economics, Massachusetts Institute of Technology |
| 1977-1978 | Irving Fisher Research Professor, Yale University |
| 1968-1979 | Professor of Economics, University of California, Berkeley |
| 1966-1967 | Visiting Associate Professor, University of Chicago |
| 1966-1968 | Associate Professor of Economics, University of California, Berkeley |
| 1963-1966 | Assistant Professor of Economics, University of California, Berkeley |
| 1962-1963 | Assistant Professor of Economics, University of Pittsburgh |
| 1961-1962 | Instructor, Economics, University of Minnesota |



**Daniel L. McFadden**

| | |
|---|---|
| 1959-1960 | Research Assistant, Social Psychology, University of Minnesota |
| 1957-1958 | Instructor, Physics, University of Minnesota |

## EXPERIENCE

Dr. McFadden has had a varied background in professional and public service. Among his achievements are:

- President, American Economic Association (AEA) (2005)
- Chair, National Academy of Science (NAS) Section 54 Economic Sciences (2003- )
- Chair, NAS Committee on Methods of Forecasting Demand and Supply of Doctoral Scientists and Engineers (1997-2000)
- Advisory Committee, Journal of Applied Economics (1996- )
- NAS Commission on Science, Engineering, and Public Policy (1995- )
- Chair, AEA Committee on Electronic Publication (1994- )
- Vice President, American Economics Association (1994)
- NAS Committee on Behavioral and Social Sciences and Education (1989-1994)
- Panel Study of Income Dynamics, Advisory Board (1988-1991)
- Executive Committee, American Economics Association (1985-1987)
- President, Econometric Society (1985)
- Executive Committee, Econometric Society (1983-1986)
- Council of the Econometric Society (1983-1986)
- Vice President, Econometric Society (1983-1984)
- NAS Committee on Energy Demand Modeling (1983-1984)
- NAS Committee, Basic Research in the Social Sciences (1982-1987)
- Chair, AEA Awards Committee (1981-1984)
- Board of Directors, National Bureau of Economic Research (1980-1983)
- Editor, Econometric Society Monographs (1980-1983)
- Review Committee, California Energy Commission (1979)
- Sloan Foundation Book Committee (1977-1979)
- Executive Committee, Econometric Society (1978-1980)
- Board of Editors, Transportation Research (1978-1980)



**Daniel L. McFadden**

- Associate Editor, Journal of Econometrics (1977-1978)
- Board of Directors, National Bureau of Economic Research (1976-1977)
- Executive Committee, Transportation Research Board (1975-1978)
- City of Berkeley, Coordinated Transit Project (1975-1976)
- Advisory Committee on Transportation Models, Metropolitan Transportation Commission (1975)
- Council of the Econometric Society (1974-1980)
- Elected Member, Universities National Bureau (1974-1977)
- Board of Editors, Journal of Mathematical Economics (1973-1977)
- Board of Editors, American Economic Review (1971-1974)
- Chair, NSF-NBER Conference, Economics of Uncertainty (1970- )
- Economics Advisory Panel, National Science Foundation (1969-1971)
- Editor, Journal of Statistical Physics (1968-1970)

**MIT – RELATED:**

- Committee on Curricula, 1990-91
- Killian Award Committee, 1984
- Center for Energy Policy Research, Program Board, 1983-84
- Engineering Dean Search Committee, 1980-81
- Provost's Committee on Statistics, 1979-80
- CTS Advisory Board, 1978-79

**BERKELEY – RELATED:**

- Director of Graduate Studies, 1994-95
- IBER Advisory Committee, 1993-95 (Chair, 1994-95)

**PROFESSIONAL AFFILIATIONS**

- American Economics Association
- The Econometric Society
- American Statistical Association
- Mathematical Association of America



Daniel L. McFadden

- Transportation Research Board

**FELLOWSHIPS, SCHOLARSHIPS, HONORS, AND AWARDS**

- Honorary Degree, University of Montreal (2004)
- Honorary Degree, University College London (2003)
- Richard Stone Prize in Applied Econometrics (2000-2001)
- Nobel Prize in Economics (Joint Recipient) (2000)
- Nemmers Prize in Economics, Northwestern University (2000)
- American Agricultural Economics Association, Best Paper Prize (1994)
- University of Chicago, LLD (1992)
- Frisch Medal, Econometric Society (1986)
- Elected to National Academy of Science (1981)
- Outstanding Teacher Award, MIT (1981)
- Fisher-Schultz Lecture, Econometrics Society (1979)
- Elected to American Academy of Arts and Sciences (1977)
- John Bates Clark Medal, American Economics Association (1975)
- Elected Fellow, Econometrics Society (1969)
- Ford Faculty Research Fellow (1966-1967)
- Mellon Post-Doctoral Fellow (1962-1963)
- Earhart Fellow (1960-1961)
- Ford Foundation Behavioral Science Fellow (1958-1962)

**Daniel L. McFadden**

## PUBLICATIONS

### Books and Monographs

Essays on Economic Behavior Under Uncertainty, with M. Balch and S. Wu (eds.), North Holland: Amsterdam, 1974.

Urban Travel Demand: A Behavioral Analysis, with T. Domencich, North Holland: Amsterdam, 1975. Reprinted by The Blackstone Company: Mount Pleasant, MI, 1996.

*Production Economics: A Dual Approach to Theory and Applications*, with M. Fuss (eds.), North Holland: Amsterdam, 1978.

*Structural Analysis of Discrete Data with Econometric Applications*, with C.F. Manski (eds.), MIT Press: Cambridge, MA, 1981.

Microeconomic Modeling and Policy Analysis: Studies in Residential Energy Demand, with T. Cowing, Academic Press: New York, 1984.

Preferences, Uncertainty, and Optimality: Essays in Honor of Leonid Hurwicz, with J. Chipman and M.K. Richter (eds.), Westview Press: Boulder, CO, 1990.

*Handbook of Econometrics Vol IV*, with R. Engle (eds.), North Holland: Amsterdam, 1994.

*Statistical Tools,* manuscript in preparation.

Rationality and equilibrium, a symposium in honor of Marcel K. Richter, series: <u>Studies in Economic Theory</u>, vol. 26, with C.D Aliprantis, R.L. Matzkin, J.C. Moore,  N.C. Yannelis, (Eds.), Springer-Verlag: Berlin Heidelberg 2006.

## ARTICLES

### Production Theory

"Constant Elasticity of Substitution Production Functions," *Review of Economic Studies*, 1963.

"A Review of 'Manufacturing Production Functions in the U.S., 1957: An Interindustry and Interstate Comparison of Productivity'," *Journal of the American Statistical Association*, March 1967.

"Cost, Revenue, and Profit Functions," in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

 "A Survey of Functional Forms in the Economic Analysis of Production," with M. Fuss and Y. Mundlak, in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, Vol. I, 219-268, North Holland: Amsterdam, 1978.

**Daniel L. McFadden**

"The General Linear Profit Function," in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Flexibility Versus Efficiency in Ex Ante Plant Design," with M. Fuss, in M. Fuss and D. McFadden (eds.), *Production Economics: a Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Estimation Techniques for the Elasticity of Substitution and Other Production Parameters," in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Measurement of the Elasticity of Factor Substitution and Bias of Technical Change," with P. Diamond and M. Rodriguez, in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Joint Estimation of Freight Transportation Decisions Under Nonrandom Sampling," with C. Winston and A. Boersch-Supan, in A. Daughety (ed.), *Analytical Studies in Transport Economics*, 137-157, Cambridge University Press: Cambridge, 1985.

## Econometrics

"Conditional Logit Analysis of Qualitative Choice Behavior," in P. Zarembka (ed.), *Frontiers in Econometrics*, 105-142, Academic Press: New York, 1973.

"Comments on 'Estimation of a Stochastic Model of Reproduction: An Econometric Approach'," in N. Terleckyj (ed.), *Household Production and Consumption*, 139-145, National Bureau of Economic Research: New York, 1975.

"The Revealed Preferences of a Government Bureaucracy: Theory," *The Bell Journal of Economics and Management Science*, Autumn 1975.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence," *The Bell Journal of Economics and Management Science*, No. 1, 55-72, Spring 1976.

"A Comment on Discriminant Analysis 'Versus' Logit Analysis," *Annals of Economic and Social Measurement*, 1976.

"Quantal Choice Analysis: A Survey," *Annals of Economic and Social Measurement*, 1976.

"Econometric Models for Probabilistic Choice Among Products," *The Journal of Business*, 1980.

"Econometric Models of Probabilistic Choice," in C.F. Manski and D. McFadden (eds.), *Structural Analysis of Discrete Data with Econometric Applications*, 198-272, MIT Press: Cambridge, MA, 1981.

"Alternative Estimators and Sample Designs for Discrete Choice Analysis," with C.F. Manski, in C.F. Manski and D. McFadden (eds.), *Structural Analysis of Discrete Data with Econometric Applications*. 2-50, MIT Press: Cambridge, MA, 1981.



"Qualitative Response Models," in W. Hildenbrand (ed.), *Advances in Econometrics: Invited Papers for the Fourth World Congress of the Econometric Society*, Econometric Society Monograph, 1-37, Cambridge University Press: Cambridge, 1982.

"Specification Tests for the Multinomial Logit Model," with J. Hausman, *Econometrica*, September 1984.

"Econometric Analysis of Qualitative Response Models," in Z. Griliches and M. Intrilligator (eds.), *Handbook of Econometrics*, Elsevier: Amsterdam, 1984.

"Comment on Technical Problems in Social Experimentation: Cost versus Ease of Analysis," in J.A. Hausman and D.A. Wise (eds.), *Social Experimentation*, 214-219, National Bureau of Economic Research: Chicago, 1985.

"The Choice Theory Approach to Market Research," *Marketing Science*, Fall 1986.

"The Demand for Local Telephone Service: A Fully Discrete Model of Residential Calling Patterns and Service Choices," with K. Train and M. Ben-Akiva, *The Rand Journal of Economics*, Spring 1987.

"Regression-Based Specification Tests for the Multinomial Logit Model," *Journal of Econometrics*, 1987.

"What do Microeconometricians <u>Really</u> Do?" *Proceedings of the American Statistical Association*, 402-405, Business Statistics Section, 1987.

"Comment on Joel Horowitz and George Neumann, Semiparametric Estimation of Employment Duration Models," with A. Han, *Econometric Reviews*, 1987/1988.

"Econometric Modeling of Locational Behavior," *Annals of Operations Research: Facility Location Analysis: Theory and Applications*, 1989.

"A Method of Simulated Moments for Estimation of Discrete Response Models Without Numerical Integration," *Econometrica*, September 1989.

"Testing for Stochastic Dominance," in T. Fomby and T.K. Seo (eds.), *Studies in the Economics of Uncertainty*, 113-134, Springer: New York, 1989.

"Micro-simulation of Local Residential Telephone Demand Under Alternative Service Options and Rate Structures," with T. Atherton, M. Ben-Akiva, and K. Train, in A. de Fontenay, M. Shugard, and D. Sibley (eds.), *Telecommunications Demand Modelling*, 137-163, Elsevier: Amsterdam, 1990.

"Advances in Computation, Statistical Methods, and Testing of Discrete Choice Models," *Marketing Letters*, 1991.

"Efficient Estimation by Multinomial Approximation and Sequential Simulation," with W. Beckert and A. Eymann, Working Paper, July 1994.

"Large Sample Estimation and Hypothesis Testing," with W. Newey, in R. Engle and D. McFadden, (eds.) *Handbook of Econometrics*, North Holland: Amsterdam, 1994.



Daniel L. McFadden

"Estimation by Simulation," with P. Ruud, *The Review of Economics and Statistics*, November 1994.

"Simulation of Multivariate Normal Rectangle Probabilities and Their Derivatives: Theoretical and Computational Results," with V. Hajivassiliou and P. Ruud, *Journal of Econometrics*, May-June 1996.

"Lectures on Simulation-Assisted Statistical Inference," presented at the EC-squared Conference, Florence, Italy, December 12, 1996.

"Estimation of Some Partially Specified Nonlinear Models," with C. Ai, *Journal of Econometrics*, January-February 1997.

"Modeling Methods for Discrete Choice Analysis," with M. Ben-Akiva, et al., *Marketing Letters*, July 1997.

"The Method of Simulated Scores with Application to Models of External Debt Crises," with V. Hajivassiliou, *Econometrica*, July 1998.

"Estimating Features of a Distribution from Binomial Data," with A. Lewbel, Working Paper, May 1997.
"Mixed MNL Models for Discrete Response," with K. Train, Working Paper, December 1996, revised November 1998.

"On Selecting Regression Variables to Maximize Their Significance," Working Paper, July 1998.
"Economic Choices," Nobel Lecture, December 2000.  *American Economic Review*, June 2001.

"Observational Studies: Choice-based sampling," forthcoming in *International Encyclopedia of Social and Behavior Sciences*, Vol. 2.1, Article 92, Elsevier Science: Amsterdam, 2001.

**"Discrete Choice Models Incorporating Revealed Preferences and Psychometric Data," with T. Morikawa and M. Ben-Akiva,** *Econometric Models In Marketing*, **Vol. 16, 27-53, Elsevier Science: Oxford, 2002.**

"Characteristics of Generalized Extreme Value Distributions," with M. Bielaire and D. Bolduc, Working Paper, April, 2003

"Structural Simulation of Facility Sharing: Unbundling Policies and Investment Strategy in Local Exchange Markets," by Nauman Ilias, Paul C. Liu, Daniel L. McFadden, Lisa Wood, Glenn A. Woroch & William P. Zarakas, 2005.

"Statistical Analysis of Choice Experiments and Surveys" with A. Bemmaor, F. Caro, J. Dominitz, B. Jun, A. Lewbel, R. Matzkin, F. Molinari, N. Schwarz, R. Willis and J. Winter, Marketing Letters, 16:3/4, 183-196, December 2005.

 "Free Markets and Fettered Consumers". American Economic Research, 96:1, March 2006.

 "The estimation of generalized extreme value models from choice-based samples", Transportation Research Part B: Methodological, Vol. 42, 4, 381-394, May 2008.



Daniel L. McFadden

"Risk, Uncertainty and Discrete Choice Models", with A. de Palma, M. Ben-Akiva, D. Brownstone, C. Holt, T. Magnac, P. Moffatt, N. Picard, K. Train, P. Wakker, J. Walker,  Marketing Letters, 19:3/4, 269-285, July 2008.

"Semiparametric Analysis", Quantile, no. 5, pp. 29-40, September 2008.

"Conditional Logit Analysis of Qualitative Choice Behavior", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 337-374, 2009.

"Maximal Uniform Convergence Rates in Parametric Estimation Problems", with Walter Beckert, Econometric Theory, Vol. 26, Issue 2, 469-500, April 2010.

 "Choice probability generating functions", with M. Fosgerau and M. Bierlaire, Working Paper,  August 2010.

"Estimating Features of a Distribution from Binomial Data"  with Lewbel, A., Linton, O.,  *Journal of Econometrics*, Vol. 162, No. 2, pp. 170-88, June 2, 2011.

"Economic Juries and Public Project Provision," *Journal of Econometrics*, Vol. 166, No. 1, pp. 116-126, January 2012.

## Transportation

"The Measurement of Urban Travel Demand," *Journal of Public Economics*, 303-328, 1974.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models," with F. Reid, *Transportation Research Record: Travel Behavior and Values*, No. 534, 24-37, 1975.

"The Mathematical Theory of Demand Models," in P. Stopher and A. Meyburg (eds.), *Behavioral Travel-demand Models*, 305-314, D.C. Heath and Co.: Lexington, MA, 1976.

"Demand Model Estimation and Validation," with A.P. Talvitie and Associates, *Urban Travel Demand Forecasting Project, Final Report, Volume V*, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Demographic Data and Policy Analysis," with S. Cosslett, G. Duguay, and W. Jung, *Urban Travel Demand Forecasting Project, Final Report*, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Quantitative Methods for Analyzing Travel Behaviour of Individuals: Some Recent Developments," in D. Hensher and P. Stopher (eds.), *Behavioural Travel Modelling*, 279-318, Croom Helm London: London, 1978.



Daniel L. McFadden

"An Application of Diagnostic Tests for the Independence from Irrelevant Alternatives Property of the Multinomial Logit Model," with W. Tye and K. Train, *Transportation Research Record: Forecasting Passenger and Freight Travel*, No. 637, 39-46, Transportation Research Board, 1978.

"Modelling the Choice of Residential Location," in A. Karlqvist, L. Lundqvist, F. Snickars, and J. Weibull (eds.), *Spatial Interaction Theory and Planning Models*, 75-96, North Holland: Amsterdam, 1978. Reprinted in J. Quigley (ed.), *The Economics of Housing*, Edward Elgar: London, 1997.

"The Goods/Leisure Tradeoff and Disaggregate Work Trip Mode Choice Models," with K. Train, *Transportation Research*, February 1978.

"The Theory and Practice of Disaggregate Demand Forecasting for Various Modes of Urban Transportation," in *Emerging Transportation Planning Methods*, U.S. Department of Transportation DOT-RSPA-DPB-50-78-2, August 1978. Reprinted in T.H. Oum, et al. (eds.), *Transport Economics: Selected Readings*, 51-80, Seoul Press: Seoul, 1995.

"Overview and Summary: Urban Travel Demand Forecasting Project," with F. Reid, A. Talvitie, M. Johnson, and Associates, *The Urban Travel Demand Forecasting Project, Final Report, Volume I*, Institute of Transportation Studies, University of California, Berkeley, June 1979.

"Measuring Willingness-to-Pay for Transportation Improvements" in T. Gärling, T. Laitila, and K. Westin (eds.) *Theoretical Foundations of Travel Choice Modeling*, 339-364, Elsevier Science: Amsterdam, 1998.

"Disaggregate Behaviorial Travel Deman's RUM Side: A 30-Year Retrospective," forthcoming in *The Leading Edge of Travel Behavior Research*, Davide Heshner and J. King (eds.) Pergamon Press: Oxford, 2002.

"Interstate Wine Shipments and E-Commerce," Journal of Wine Economics, Vol. 1, No. 1, May 2006, pp. 3-6.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models", with F. Reid, *Elgar Reference Collection. Classics in Planning Series*, Vol. 2, pp. 191-204, 2006.

"The behavioral science of transportation", Transport Policy Volume 14, Issue 4, 269-274, July 2007.

"The Measurement of Urban Travel", *Classics in Planning*, Vol. 7, pp. 69-94, 2007.

"Modelling the Choice of Residential Location", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 409-430, 2009.



**Daniel L. McFadden**

## Economic Growth and Development

"Comment on 'An Optimum Fiscal Policy in an Aggregate Model of Economic Growth'," in I. Adelman and E. Thorbecke (eds.), *The Theory and Design of Economic Development*, 140-146, Johns Hopkins Press: Baltimore, MD, 1966.

"The Evaluation of Development Programmes," *The Review of Economic Studies*, 1967.

"On the Existence of Optimal Development Plans," in H. Kuhn (ed.) *Proceedings of the Sixth Princeton Symposium on Mathematical Programming*, 403-427, Princeton University Press: Princeton, NJ, 1970. "Criteria for Public Investment: Comment," *The Journal of Political Economy*, November/December 1972.

"On the Existence of Optimal Development Programmes in Infinite-Horizon Economies," in J. Mirrlees and N.H. Stern (eds.), *Models of Economic Growth*, 260-282, Macmillan: Great Britain, 1973.

"Is There Life After Debt? An Econometric Analysis of the Creditworthiness of Developing Countries," with R. Eckaus, G. Feder, V. Hajivassiliou, and S. O'Connell, in J. Cuddington and G. Smith, *International Debt and the Developing Countries*, 179-209, International Bank for Reconstruction and Development/The World Bank: Washington, D.C., 1985.

"Hot Money and Cold Comfort: Global Capital Movement and Financial Crises in Emerging Economies", Lecture, Latin American and Carribean Economics Association ANEC Conference on Globalization and Development, 2004.

"Free Markets and Fettered Consumers", *American Economic Review,* Vol. 96, pp. 5-29, March 2006.

"100 Years of the American Economic Review: The Top 20 Articles", with K. Arrow, B. Bernheim, M. Feldstein, J. Poterba, R. Solow, *American Economic Review*, Vol. 101, pp. 1-8, February 2011.

## Economic Theory and Mathematical Economics

"On Hicksian Stability," in J.N. Wolfe (ed.), *Value, Capital, and Growth*, 329-351, University Press: Edinburgh, 1969.

"On the Controllability of Decentralized Macroeconomic Systems: The Assignment Problem," in H.E. Kuhn and P. Szego (eds.), *Mathematical Systems Theory and Economics 1*, 221-239, Springer-Verlag: New York, 1969.

"A Simple Remark on the Second Best Pareto Optimality of Market Equilibria" *Journal of Economic Theory*, June 1969.

"A Technical Note on Classical Gains from Trade," with J.M. Grandmont, *Journal of International Economics*, 1972.

THE **Brattle** GROUP

Daniel L. McFadden

"On Some Facets of Betting: Comments," in M.S. Balch, D. McFadden, and S.Y. Wu (eds.), *Essays on Economic Behavior Under Uncertainty*, 126-137, North-Holland: Amsterdam, 1974.

"Some Uses of the Expenditure Function in Public Finance," with P.A. Diamond, *Journal of Public Economics*, 1974.  Reprinted in J. Creedy (ed.), *Measuring Welfare Changes and Tax Burdens*, Edward Elgar: London, September 1998.

"A Characterization of Community Excess Demand Functions," with R. Mantel, A. Mas-Colell, and M.K. Richter, *Journal of Economic Theory*, 1974.

"An Example of the Non-Existence of Malinvaud Prices in a Tight Economy," *Journal of Mathematical Economics*, 1975.

"Tchebyscheff Bounds for the Space of Agent Characteristics," *Journal of Mathematical Economics*, 1975.

"On Efficiency and Pareto Optimality of Competitive Programs in Closed Multisector Models," with M. Majumdar and T. Mitra, *Journal of Economic Theory*, August 1976.

"Definite Quadratic Forms Subject to Constraint," in M. Fuss and D. McFadden (eds.), *Production Economics:  A Dual Approach to Theory and Applications*, North-Holland: Amsterdam, 1978.

"Necessary and Sufficient Conditions for the Classical Programming Problem," in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"Convex Analysis," in M. Fuss and D. McFadden (eds.), *Production Economics: A Dual Approach to Theory and Applications*, North Holland: Amsterdam, 1978.

"A Note on the Computability of Tests of the Strong Axiom of Revealed Preference," *Journal of Mathematical Economics*, 1979.

"Pareto Optimality and Competitive Equilibrium in Infinite Horizon Economies," with M. Majumdar and T. Mitra, *Journal of Mathematical Economics*, 1980.

"Welfare Analysis of Incomplete Adjustment to Climatic Change," in V.K. Smith and A. White (eds.), *Advances in Applied Micro-economics*, JAI Press: Greenwich, CT, 1984.

"Stochastic Rationality and Revealed Stochastic Preference," with M.K. Richter, in J. Chipman, D. McFadden, and M.K. Richter (eds.), *Preferences, Uncertainty, and Optimality, Essays in Honor of Leo Hurwicz*, 161-186, Westview Press: Boulder, CO, 1990.

**Daniel L. McFadden**

"Consumers' Evaluation of New Products: Learning from Self and Others," with K. Train, *Journal of Political Economy*, 1996.

"Economic Choice Behavior: Psychological Foundations and the Contributions of Amos Tversky," Working Paper, August 1996.

"Rationality for Economists," Working Paper presented at the NSF Symposium on Eliciting Preferences, July 1997. Forthcoming in *Journal of Risk and Uncertainty*, December 1999.

"Extended Framework for Modeling Choice Behavior," with M. Ben-Akiva, et al. *Marketing Letters*, Vol. 10, Issue 3, Kluwer, 187-203, August 1999.

"Pricing in a Competitive Market with a Common Network Resource," Working Paper, April 2003.

"Hybrid Choice Models: Progress and Challenges," with M. Ben-Akiva et. Al., *Marketing Letters*, Vol. 13, Issue 3, 163-175, August 2002.

"Epilogue," *Marketing Letters,* Vol. 13, Issue 3, 163-175, August 2002.

"Revealed Stochastic Preference:  A Synthesis," Economic Theory, Springer, vol. 26(2), pages 245-264, August 2005.

"Welfare Economics at the Extensive Margin Giving Gorman Polar Consumers Some Latitude," Working Paper, June 2004.

"The Misuse of Econometrics in Litigation," by Susan J. Guthrie, Paul C. Liu, Daniel L. McFadden and Kenneth T. Wise, *ABA Monograph on Econometrics*, Forthcoming, 2005.

"The Misuse of Econometrics in Estimating Damages," with Kenneth T. Wise, et. al. *ABA monograph on Econometrics*, 2005.

"The Browser War - Econometric Analysis of Markov Perfect Equilibrium in Markets with Network Effects," with Mark Jenkins et. al.  Presented at the American Economic Association Annual Meeting. 7-9 January 2005.  Philadelphia, PA.

"The Science of Pleasure: The Measurement of Consumer Welfare," Frisch Memorial Lecture, Plenary Session at the Econometric Society World Congress, upcoming, 19-24 August 2005, University College London.

"Rationality and Equilibrium: A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzkin, J. Moore, N. Yannelis, *Studies in Economic Theory*, No. 26, pp. viii, 252, April 2006

"Revealed Stochastic Preference: A Synthesis", *Studies in Economic Theory,* No. 26, pp. 1-20, 2006.

Daniel L. McFadden

Foreward to "'Rationality and Equilibrium' – A Symposium in Honor of Marcel K. Richter", with C. Aliprantis, R. Matzin, J. Moore, N. Yannelis, *Studies in Economic Theory,* No. 26, pp. v-vi, 2006.

"Human Capital Accumulation and Depreciation", Review of Agricultural Economics, vol. 30, no. 3, 379-85, Fall 2008.

"The Revealed Preferences of a Government Bureaucracy: Theory", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 375-390, 2009.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence", *Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics*, Vol. 3, pp. 391-408, 2009.

"100 Years of the American Economic Review: The Top 20 Articles," Arrow, K.J., Bernheim, B.D., Feldstein, M.S., Poterba, J. M., Solow, R.M., American Economic Review, Vol. 101, No. 1, pp. 1-8, February 2011.

"Choice Probability Generating Functions", Bierlaire, M., Fogerau, M., *NBER Working Paper Series*, No. 17970, 2012.

## Energy

"Forecasting the Impacts of Alternative Electricity Rate Structures: A Feasibility Study," Final Report, California Energy Commission, 1976.

"Determinants of the Long-Run Demand for Electricity," with C. Puig and D. Kirshner, *Proceedings of the American Statistical Association*, 1978.

"A Two-Level Electricity Demand Model," with J. Hausman and M. Kinnucan, *Journal of Econometrics*, 1979.

"Residential Energy Demand Modeling and the NIECS Data Base: An Evaluation," with T. Cowing and J. Dubin, Report No. MIT-EL-82-009, MIT Energy Laboratory, January 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The ORNL Model," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-032WP, MIT Energy Laboratory, April 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The REEPS Model," with T. Cowing, Discussion Paper No. MIT-EL 82-057WP, MIT Energy Laboratory, April 1982.



Daniel L. McFadden

"An Evaluation of the ORNL Residential Energy Use Model," *EPRI Report EA-2442*, Electronic Research Institute: Palo Alto, June 1982.

"The NIECS Data Base and Its Use in Residential Energy Demand Modeling," with T. Cowing and J. Dubin, Discussion Paper No. MIT-EL-82-041WP, MIT Energy Laboratory, June 1982.

"A Thermal Model for Single-Family Owner-Occupied Detached Dwellings in NIECS," with J. Dubin, Discussion Paper No. MIT-EL-040WP, MIT Energy Laboratory, June 1982.

"A Comparative Evaluation of the ORNL and REEPS Models of Residential Energy Demand for Forecasting Residential Energy Policy Impacts," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-061WP, MIT Energy Laboratory, July 1982.

"Residential End-Use Energy Planning System (REEPS)," with A. Goett, *EPRI Report* EA-2512, Electronic Power Research Institute: Palo Alto, July 1982.

"An Econometric Analysis of Residential Electric Appliance Holdings and Consumption," with J. Dubin, *Econometrica*, March 1984.

"The Residential End-Use Energy Planning System: Simulation Model Structure and Empirical Analysis," with A. Goett, in J. Moroney (ed.), *Advances in the Economics of Energy and Resources*, JAI Press: Greenwich, CT, 1984.

"Consumer Attitudes and Voluntary Rate Schedules for Public Utilities," with K. Train and A. Goett, *the Review of Economics and Statistics*, August 1987.

"Estimating Household Value of Electric Service Reliability with Market Research Data," with A. Goett and C-K. Woo, *Energy Journal: Special Electricity Reliability Issue*, 1988.

"A theory of the perturbed consumer with general budgets", with M. Fogeraru, *NBER Working Paper Series*, No. 17953, 2012.

## Health Economics

"Estimation of Response Probabilities from Augmented Retrospective Observations," with D. Hsieh and C. Manski, *Journal of the American Statistical Association*, No. 391, 651-662, September 1985.

"The Dynamics of Housing Demand by the Elderly: Wealth, Cash Flow, and Demographic Effects," with J. Feinstein, in D. Wise (ed), *The Economics of Aging*, 55-91, University of Chicago Press: Chicago, 1989. "The Dynamics of Housing Demand by the Elderly: User Cost Effects," with C. Ai, J. Feinstein, and H. Pollakowski, in D. Wise (ed.), *Issues in the Economics of Aging*, 33-87, University of Chicago Press: Chicago, 1990.

Daniel L. McFadden

"Problems of Housing the Elderly in the United States and Japan," in Y. Noguchi and D. Wise (eds.), *Aging in the United States and Japan*, 109-137, University of Chicago Press: Chicago, 1994.

"Demographics, the Housing Market, and the Welfare of the Elderly," in D. Wise (ed.), *Studies in the Economics of Aging*, 225-285, University of Chicago Press: Chicago, 1994.

"Living Arrangements: Health and Wealth Effects," with A. Boersh-Supan and R. Schnabel, in D. Wise (ed.), *Advances in the Economics of Aging*, 193-216, University of Chicago Press: Chicago, 1996.

"Comment on 'Elderly Health, Housing, and Mobility'," in D. Wise (ed.), *Advances in the Economics of Aging*, 317-320, University of Chicago Press: Chicago, 1996.

"The Impact of Demographics on Housing and Nonhousing Wealth in the United States," with H. Hoynes, in M. Hurd and N. Yashiro (Eds.), *The Economic Effects of Aging in the United States and Japan*, 153-194, University of Chicago Press: Chicago, 1997.

"Subjective Survival Curves and Life Cycle Behavior," with M. Hurd and L. Gan, in D. Wise (ed.), *Inquiries in the Economics of Aging*, 259-305, University of Chicago Press: Chicago, 1998.

"*Consumption and Savings Balances of the Elderly: Experimental Evidence on Survey Response Bias*," with M. Hurd, et al., in D. Wise (ed.), *Frontiers in the Economics of Aging*, 353-387, University of Chicago Press: Chicago, 1998.

"Healthy, Wealthy, and Wise? Socioeconomic Status, Morbidity, and Mortality among the Elderly," with M. Hurd and A. Merrill, Working Paper, April 1998.

"Predictors of Mortality Among the Elderly," with M. Hurd and A. Merill, working paper, December 1999. Forthcoming in D. Wise (ed.) *Themes in the Economics of Aging*, University of Chicago Press: Chicago, 2001.

"Comment on Incentive Effects of Social Security Under an Uncertain Disability Option," in D. Wise (ed.) *Themes in the Economics of Aging*, University of Chicago Press: Chicago, 2001.

"Response Behavior in Surveys of the Elderly: Experimental Evidence from Internet Surveys" with Joachim Winter, Conference Draft, March 2001.

"Healthy, Wealthy, and Wise? Tests for Direct Causal Paths between Health and Socioeconomic Status", with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal of Econometrics, Vol 112, Issue 1, 3-56, 2003.

"Response," with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal Of Econometrics, Vol 112, Issue 1, 129-133, 2003.

"Individual Subjective Survival Curves", with L. Gan and M. Hurd, NBER Working Paper No. 9480, January



Daniel L. McFadden

2003.

"Subjective Mortality Risk and Bequests", with L. Gan, G. Gong and M. Hurd, NBER Working Paper No. 10789, September 2004.

"Broken Down by Work and Sex: How Our Health Declines: Comment, Analyses in the Economics of Aging, pp. 205-12, 2005.

"Medicare prescription drug coverage: Consumer information and preferences", with  J. Winter, R. Balza, F. Caro, F. Heiss, B. Jun and R. Matzkin, Proceedings of the National Academy of Sciences, May 2006.

"Who Failed to Enroll in Medicare Part D, and Why? Early Results", with J. Winter and F. Heiss. Health Affairs, doi: 10.1377/hlthaff.25.w344, August 2006.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with J. Winter and F. Heiss, Working Paper, November, 2007.

"Consumer-Directed Health Care: Can Consumers Look After Themselves?",  with J. Winter and F. Heiss, Swiss Journal of Economics and Statistics, 144(3), 285-307 July, 2008.

"Human Capital Accumulation and Depreciation", *Review of Agricultural Economics*, Vol. 30, Issue 3, pp. 379-385, October 2008.

"Want to Monitor Medicare's New Drug Benefit Program? Start by Sending a Check for $120,000", Economists' Voices, vol. 5, no. 4, 2008.

"The Human Side of Mechanism Design, A Tribute to Leo Hurwicz and Jean-Jacque Laffont," *Review of Economic Design*, 13, (1), 77-100 & 377, 2009.

"Regulation of private health insurance markets: Lessons from enrollment, plan type choice, and adverse selection in Medicare Part D", with J. Winter and F. Heiss, NBER Working Paper 15392, October 2009.

"The Impact of Employer Matching on Savings Plan Participation under Automatic Enrollment: Comment, Research Findings" in *The Economics of Aging*, pp. 327-35, 2010.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans", with F. Heiss, J. Winter, Research Findings in the *Economics on Aging*, pp. 413-481, 2010.

"Healthy, Wealthy and Wise?" Revisited: An Analysis of the Causal Pathways from Socio-economic Status to Health,"   Stowasser, T., Heiss, F., Winter, J., National Bureau of Economic Research, Inc, NBER Working Papers: 17273, 2011.

"Remedies for Sick Insurance", with C. Noton, P. Olivella, NBER Working Paper Series, No. 17938, 2012.

Daniel L. McFadden

"Plan Selection in Medicare Part D: Evidence from Administrative Data", with F. Heiss, A, Leive, J. Winter, NBER Working Paper Series, No. 18166, 2012.

"The New Science of Pleasure", NBER Working Paper Series, No. 18687, 2013.

## Environmental Economics

"Assessing Use Value Losses Caused by Natural Resource Injury," with J.A. Hausman and G. Leonard, in J. Hausman (ed.), *Contingent Valuation: a Critical Assessment*, 341-363, North Holland: Amsterdam, 1993.

"Issues in the Contingent Valuation of Environmental Goods: Methodologies for Data Collection and Analysis," with G. Leonard, in J. Hausman (ed.), *Contingent Valuation: a Critical Assessment*, 165-208, North Holland: Amsterdam, 1993.

"Contingent Valuation and Social Choice," *American Journal of Agricultural Economics*, November 1994.

"A Utility-consistent, Combined Discrete Choice and Count Data Model Assessing Recreational Use Losses Due to Natural Resource Damage," with J. Hausman and G. Leonard, *Journal of Political Economics*, 1995.

"Estimating Natural Resource Damages with and without Contingent Valuation, " by Susan J. Guthrie, Daniel L. McFadden and Kenneth T. Wise, at the *88*[th] *Annual Meeting of the Air and Waste Management Association*, 1995.

"*Why is Natural Resource Damage Assessment So Hard?*," Hibbard Lecture, Agricultural and Resource Economics, University of Wisconsin, Madison, May, 1996.

"Measuring Environmental Injury in the Presence of Confounding Risks," Working Paper, May 1996.

"On the Analysis of Endogenously Recruited Panels," Working Paper, February 1997.
"Can Meta-analyses of CV Studies Determine Their Reliability?" Working Paper, October 1997.

"*Referendum Contingent Valuation, Anchoring, and Willingness to Pay for Public Goods*," with D. Green, K. Jacowitz, and D. Kahneman, *Resource and Energy Economics*, 1998.
"Computing Willingness-to-Pay in Random Utility Models," in J. Moore, R. Riezman, and J. Melvin (eds.), *Trade, Theory and Econometrics: Essays in Honour of John S. Chipman*, Routledge, forthcoming January 1999.

"Comment on Discussion of Morey and Waldman's 'Measurement Error in Recreation Demand Models,'" with K. Train and R. Johnson, *Journal of Environmental Economics and Management*, Vol. 40, pp. 76-81 (2000).

## EXPERT TESTIMONY & CONSULTING



Daniel L. McFadden

In an administrative law case, *U.S. DOE vs. Cities Service Corp.*, I prepared written testimony and testified in support of defendant Cities on alleged damages from overcharges. My analysis considered the issue of the marginal cost of production of "new oil" and the econometric techniques appropriate for this analysis. (1987)

In the patent damages case of *Polaroid v. Kodak,* I served as a consulting expert to Polaroid on the economic theory of the case and the methodology used to estimate damages. (1989)

In the case of *U.S. DOJ vs. Exxon Company USA*, arising from the Exxon Valdez oil spill, I prepared for Exxon estimates of damages from loss of recreational opportunities. I was not deposed and did not testify prior to settlement of the case. However, I subsequently testified before a NOAA rule-making committee on some aspects of environmental damage assessment. (1990-1992)

In the case of *Northern Industries vs. Portec*, a contract dispute, I analyzed the market for railroad cranes on behalf of defendant Portec to determine whether the plaintiff was damaged, and critiqued a NERA analysis. I was deposed and testified. (1991-1994)

On behalf of defendant Atlantic Richfield Company, I submitted an expert report and was deposed in the case of *State of Montana vs. ARCO*, which involved contamination of streams arising from historical smelter operations of Anaconda Copper Company. My analysis considered the valuation of damages to consumer welfare from the contamination. (1993-1998)

I was deposed and testified on behalf of the defendants in the Industrial Excess Landfill case, a class action against Goodyear, Goodrich, and Firestone Rubber companies. My analysis focused on the estimation of damages from stigma. (1994-1995)

I was deposed in the case of *Apple Computer vs. ICSOP*. On behalf of the defendants, I analyzed the economic basis for allocation of a settlement between Apple Inc. and Apple Computer in a case involving trademark infringement and licensing of future use. (1995)

I submitted an expert report and was deposed in a case alleging unjust enrichment from trade secrets, *American Airlines vs. Northwestern Airlines*. On behalf of the defendant, I critiqued the damage analysis of the plaintiff=s experts. (1997)

I submitted an expert report, was deposed, and testified on behalf of Globe Metallurgical who was a defendant in a price-fixing civil anti-trust suit in the ferrosilicon products industry. My analysis focused on the reliability of the methodology used to detect whether plaintiffs were damaged. (1998)

I was a member of a three-person mediation team that mediated a suit in which the State of California and others were the plaintiffs and Bank of America was the Defendant. The case involved damages to the State from a failure of the Bank to return funds from inactive accounts. (1998)



Daniel L. McFadden

I submitted an amicus brief to a federal appeals court in reference to a Daubert ruling on the econometric analysis of an expert in a civil suit regarding unfair business practices. The issue in that case was whether the methodology used was a reliable indicator of damage to a competitor from alleged anticompetitive conduct. (2000)

I submitted an expert report and was deposed on behalf of Northpoint Communications in *Northpoint Communications vs. Verizon Communications.* My analysis estimated the loss in the market value of Northpoint as a result of a breach of contract by Verizon. (2001)

I submitted an expert report and was deposed on behalf of DuPont in the Choline Vitamins price- fixing litigation. My analysis estimated damages from the alleged anticompetitive conduct. (2001)

I submitted an expert report and was deposed on behalf of General Electric in *State of New Mexico ex rel, vs. General Electric, et al.* Case number CV 99-1254 BSJ and CV 99-1118 BSJ. The case involved the estimation of stigma damages. I submitted an amicus brief to the United States Supreme Court on this issue. (2002)

I submitted an expert opinion and was deposed and testified on behalf of Visa USA in a class-action litigation regarding pricing of foreign exchange services for credit card users. *Schwartz vs. Visa International, et al*, Case number 822404-4. (2002)

I submitted an expert report and was deposed on behalf of Cellnet of Ohio in *Westside Cellular Inc. dba Cellnet of Ohio vs. New Par et.al.* My analysis estimated damages from alleged illegal pricing of access to a telecommunications network. (2002)

I was retained as the damages expert in a patent infringement case involving reasonable royalties for an electronics invention. The case was dismissed. (2002)

I was retained as the damages expert by AOL in the *Netscape v. Microsoft* antitrust case. This case settled prior to submission of an expert report. (2002-2003)

I was retained as the damages expert by Sun Microsystems in *Sun v. Microsoft* antitrust case. This case settled prior to submission of an expert report. (2003-2004)

I testified in a private arbitration regarding damages from alleged conduct of a participant in an auction for a company. The principals and issues are confidential. (2003)

I submitted a co-authored amicus brief to the Supreme Court in reference to the regulation of interstate wine shipments. (2004)

Daniel L. McFadden

I submitted an expert report, an affidavit, and was deposed and testified in the Rocky Flats Plant case, a class action against Dow Chemical and Rockwell.  On behalf of the defendants, I critiqued the plaintiffs= and defendants damage analysis, and rendered an opinion on their reliability.  (1997-2006)

I submitted an expert report and testified at trial in Australia in an antitrust matter on behalf of plaintiff in *Seven v. News Corp.*

I testified at trial on behalf of the defendants in *Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, Civil Action: 01-CV-12257-PBS.  (2006)

I submitted expert reports on damages, co-authored expert reports on antitrust liability, and provided deposition testimony on behalf of the defendants in *Nitro Distributing, Inc., et al. v. Alticor, Inc., Amway Corporation, and Quixtar, Inc.* Case No. 03-3290-CV-S-RED (2007)

I co-authored a paper on behalf of Qualcomm titled "The Costs of the ITC Downstream Exclusion Order to the U. S. Economy," July 10, 2007, for the Presidential Review Phase of *Certain Baseband Processor Chips and Chipsets, Transmitter and Receiver (Radio) Chips, Power Control Chips, and Products Containing Same, Including Cellular Telephone Handsets*, USITC Inv. No. 337–TA–543.

I submitted an expert report on a patent matter on behalf of the defendants in *Every Penny Counts, Inc. v. Bank of America Corporation and Bank of America, N.A.,* Case No. 2:07-CV-42-FTM-29SPC.  (2008)

I testified at trial on behalf of the defendants in *Daniels Sharpsmart v. Tyco International, et al.* (2008)

I submitted an expert report in *Jarra Creek Central Packing Shed Pty Ltd v Amcor Ltd,* Case No. (P)NSD702/2006. (2011)

I submitted an affidavit on behalf of the plaintiffs in *DIRECTV, Inc. and EchoStar Satellite LLC v Loren L. Chumley, Commission of Revenue, State of Tennessee*, Case No. 03-2408-IV (2011)

I submitted an expert report on behalf of the defendants in *Sandra Landwehr v. AOL, Inc.*, **Case No.** 1:11-cv-01014-CMH-TRJ. (2012)

I was retained as a statistical expert by plaintiffs in the matter of *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp., and Bank of America Corporation*, Supreme Court of the State of New York, County of New York, Index no. 650042/09E, May 6, 2010. This case settled prior to submission of an expert report.

I submitted an expert report in the matter of *United States of America v. Countrywide Financial Corporation et.al.* (12CIV.1422(JSR)), May 7, 2013 and a revised report on June 6, 2013. I testified at deposition in this proceeding on June 11, 2013. I submitted an updated report on August 23, 2013.



Daniel L. McFadden

I was retained as a consulting expert by defendant in the matter of *In RE: High-Tech Employee Antitrust Litigation,* United States District Court Northern District of California, San Jose Division, Master Docket No. 11-CV-2509-LHK. (2011)

I submitted an expert report (September 2013), a rebuttal report (December 2013), and testified at trial (November 2016) on behalf of plaintiffs in the matter of *U.S. Airways, Inc., v. Sabre Holdings Corporation*, United States District Court Southern District of New York, Civil Action No. 1:11-ev-02725-MGC.

I submitted an expert report (October 6, 2014)  *in the Matter of Determination of Rates and Terms for Digital Performance in Sound Recordings and Ephemeral Recordings (Web IV)*, No. 14-CRB-0001-WR.

I submitted an expert report (December 2014), deposition and hearing testimony (March 2015) at a Daubert hearing on the reliability of a proffered structural model of sports content broadcasting in *Laumann et al. v. National Hockey League et al.*, 12-cv-1817 (SAS) and *Garber et al. v. Office of the Commissioner of Baseball et al.*, 12-cv-3704 (SAS), S.D.N.Y.

I submitted an expert report (January 2015) and provided trial testimony (September 2016) on behalf of defendants in the matter of *VirnetX Inc, v. Apple*, United States District Court, Eastern Division of Texas, Tyler Division, Civil Action No.6:11-cv-00563.

I assisted BP in the evaluation of consumer losses due to lost recreational resources on the Gulf of Mexico in the wake of the Deepwater Horizon accident. This matter settled in April 2016 prior to the submission of an expert report.

I submitted an expert report (August 14, 2017), and a supplemental report (September 22, 2017) on behalf of plaintiffs in the matter of *United States v. Novartis Pharmaceuticals Corp.,* United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (March 1, 2018) on behalf of plaintiffs in the matter of *United States v. Novartis Pharmaceuticals Corp.,* United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (April 10, 2018) on behalf of General Motors, Inc., *In Re: General Motors LLC, Ignition Switch Litigation*, United States District Court for the Southern District of New York, Case No. 14-MD-2543 (JMF).

I was retained for a class of insurance subscribers who allege an antitrust injury by a consortium of insurers who maintain horizontal agreements that allocate markets and limit competition.

I submitted expert reports on behalf of defendant Polaris Industries Inc. in the matter of Riley Johanssohn et al. v. Polaris Industries No. 0:16-cv-03348-PJS-LIB on January 31, 2019, April 25, 2019 and August 1, 2019.

I was deposed (February 25, 2019 and May 22, 2019) on behalf of Polaris.



**Daniel L. McFadden**

I submitted an expert report on behalf of the Consumer Financial Protection Bureau in the matter of Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al. No. 9:17-CV-80495-MARRA-MATTHEWMAN on August 15, 2019.

I submitted an expert report on behalf of defendant Mondelez International Inc. in the matter of Patrick McMorrow, Marco Ohlin and Melody DiGregorio, et al. v. Mondelez International Inc. No. 3:17-cv-02327-BAS-JLB on October 30, 2019.



**Privileged and Confidential**

## Appendix B: Documents Considered

### I.   EXPERT REPORTS/DEPOSITIONS

1.   Deposition of Andrew Combs, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC*, No. 9:17-CV-80495, May 29, 2019.

2.   Expert Report of William G. Hamm, Ph.D., Rebuttal of Professor Daniel McFadden, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC,* No. 9:17-CV-80495, October 15, 2019.

3.   Second Amended Expert Report of Professor Daniel McFadden on behalf of Consumer Financial Protection Bureau, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC,* Case No. 9:17-CV-80495, September 19, 2019.

4.   Rebuttal Expert Report of Marcel Bryar, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing,* No. 9:17-CV-80495, October 15, 2019.

### II.   INTERROGATORY RESPONSES AND DOCUMENTS CITED THEREIN

1.   Defendants' Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC,* No. 9:17-CV-80495, June 14, 2019.

2.   Ocwen's Verification of Its Responses to Plaintiff's First Set of Interrogatories, *Consumer Financial Protection Bureau v. Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC,* No. 9:17-CV-80495, May 28, 2019.

### III.   LITERATURE

3.   Bhutta, Neil, Jane Dokko, and Hui Shan. "Consumer Ruthlessness and Mortgage Default during the 2007 to 2009 Housing Bust." *The Journal of Finance*. 72, No. 6 (2017): 2433-2466.

4.   deRitis, Cristian, Chionglong Kuo, and Yongping Liang. "Payment shock and mortgage performance." *Journal of Housing Economics*. 19 (2010): 295-314.

5.   Dobkin, Carlos, Amy Finkelstein, Raymond Kluender, and Matthew J. Notowidigdo."The Economic Consequences of Hospital Admissions." *American Economic Review*. 108, no. 2 (2018): 308-352.

Privileged and Confidential

6.  Elul, Ronel, Nicholas S. Souleles, Souphala Chomsisengphet, Dennis Glennon, and Robert Hunt. "What 'Triggers' Mortgage Default?" *The American Economic Review*. 100, no. 2 (May 2010): 490-501.

7.  Frederick, Shane, George Loewenstein, and Ted O'Donoghue. "Time Discounting and Time Preference: A Critical Review." *Journal of Economic Literature*. 40 (2002): 351-401.

8.  Ganong, Peter and Pascal Noel. "Liquidity vs. Wealth in Household Debt Obligations: Evidence from Housing Policy in the Great Recession." *NBER Working Paper*. (August 2018).

9.  Gerardi, Kristopher, Kyle F. Herkenhoff, Lee E. Ohanian, and Paul S. Willen. "Can't Pay or Won't Pay? Unemployment, Negative Equity, and Strategic Default." *The Review of Financial Studies* 31, no. 3 (2018): 1098-1131.

10. Ghent, Andra C. and Marianna Kudlyak. "Recourse and Residential Mortgage Default: Theory and Evidence from U.S. States," *Federal Reserve Bank of Richmond Working Paper*. No. 09-10R. (2010).

11. Goodstein, Ryan, Paul E. Hanouna, Carlos D. Ramirez, and Christof W. Stahel. "Are Foreclosures Contagious?" *GMU Working Paper in Economics*. No. 11-12 (January 19, 2011).

12. Gross, David B., and Nicholas S. Souleles. "An Empirical Analysis of Personal Bankruptcy and Delinquency." *Review of Financial Studies*. 15, no. 1 (2002): 319–347.

13. Hausman, Jerry. "Individual Discount Rates and the Purchase and Utilization of Energy-Using Durables." *The Bell Journal of Economics*. 10, no. 1 (Spring 1979): 33-54.

14. Iacus, Stefano M., Gary King, and Giuseppe Porro. "Causal Inference Without Balance Checking: Coarsened Exact Matching." *Political Analysis*. 20, no 1. (2012): 1-24.

15. Johnson, Kathleen W., and Robert F. Sarama. "End of the Line: Behavior of HELOC Borrowers Facing Payment Changes." *Finance and Economics Discussion Series*. (2015): 1-33. http://dx.doi.org/10.17016/FEDS.2015.073.

16. Joint Economic Committee. "Sheltering Neighborhoods from the Subprime Foreclosure Storm." June 22, 2007. Accessed on November 13, 2019. https://www.jec.senate.gov/public/index.cfm/democrats/2007/6/report-update-sheltering-neighborhoods-from-the-subprime-foreclosure-storm_1095.

17. Keys, Benjamin and Jialan Wang. "Minimum Payments and Debt Paydown in Consumer Credit Cards." *NBER Working Paper*. (October 2016).

18. Lee, Kai-yan. "Examining REO Sales and Price Discounts in Massachusetts." *REO & Vacant Properties: Strategies for Neighborhood Stabilization*. (2010): 55-64.

19. Moreno, Anna. "Cost Effectiveness of Mortgage Foreclosure Prevention." *Family Housing Fund: Minneapolis, Minnesota*. (1995).

**Privileged and Confidential**

20. Olson, Ariel. "Kicked While They're Down: Deficiency Judgments and the Great Recession." *Emory Law Journal*. 67 (2018): 1273-1311.

21. Shumway Tyler, "Forecasting Bankruptcy More Accurately: A Simple Hazard Model," *The Journal of Business*. 74, no. 1 (2001): 101–124.

22. Stein, Roger M., Ashish Xavier Das, Yufeng Ding and Shirish Chinchalkar. "Moody's Mortgage Metrics Prime: A Quasi-Structural Model of Prime Mortgage Portfolio Losses." *Moody's Research Labs*. (2010).

23. U.S. Department of Housing and Urban Development. "Economic Impact Analysis of the FHA Refinance Program for Borrowers in Negative Equity Positions." Accessed on November 13, 2019. https://www.hud.gov/sites/documents/IA-REFINANCENEGATIVEEQUITY.PDF.

24. U.S. Department of Housing and Urban Development's Office of Policy and Development Research. "Report to Congress on the Root Causes of the Foreclosure Crisis." January 2010.

25. Verma, Nidhi. "A deeper understanding of payment shock dynamics." *Journal of Risk Management in Financial Institutions*. 10, No. 3 (2017): 276-281.

26. White, Brent T. "Underwater and Not Walking Away: Shame, Fear, and the Social Management of the Housing Crisis." *Wake Forest Law Review*. 45 (2010): 971-1023.

## IV.   WEBSITES

1. "████████████████████████ Zillow.com. Accessed on November 14, 2019. https://www.zillow.com/homedetails/████████████████████ ██████████████

2. "How to Buy a Foreclosed Home." Redfin. Accessed on November 10, 2019. https://www.redfin.com/guides/how-to-buy-a-foreclosed-home.

3. "How to Buy a Foreclosed Home." U.S. News and World Reports. Accessed on November 10, 2019. https://loans.usnews.com/how-to-buy-a-foreclosed-home.

4. "How to Buy a Foreclosed Home in 5 Steps." Bankrate.com. Accessed on November 14, 2019. https://www.bankrate.com/real-estate/how-to-buy-a-foreclosed-home/.

5. "What is a Foreclosure?" Hubzu. Accessed on November 9, 2019. https://www.hubzu.com/blog/what-is-a-foreclosure/.

## V.   DATA

1. Federal Housing Finance Agency (FHFA). "House Price Index." Accessed August 12, 2019. https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx.Mortgage Back Securities Data.

2. MBS Data: Mortgage Backed Securities Data & Analytics. Accessed August 12, 2019. http://www.mbsdata.com/.

**Privileged and Confidential**

3. United States Department of Labor, Bureau of Labor Statistics. "Local Area Unemployment Statistics." Accessed August 12, 2019. https://www.bls.gov/lau/.

## VI.  OTHER

1. Board of Governors of the Federal Reserve System. Report on the Economic Well-Being of U.S. Households in 2014, Appendix 3. June 9 2015. Accessed on November 13, 2019. https://www.federalreserve.gov/econresdata/2015-economic-well-being-of-us-households-in-2014-appendix-3.htm.

2. Board of Governors of the Federal Reserve System. Report on the Economic Well-Being of U.S. Households in 2018. May 2019.

3. Catalina E. Azuero at Goodwin Proctor LLP, Letter to the Consumer Financial Protection Bureau, "Re: CFPB v. Ocwen Financial Corp., et al.; Case No: 9:17-CV-80495-KAM," June 18, 2019.

4. Code of the District of Columbia. § 42-1704 (e). Accessed on November 13, 2019. https://code.dccouncil.us/dc/council/code/sections/42-1704.html.

5. Florida-Single Family-Fannie Mae/Freddie Mac Uniform Instrument. Form 3010. 1/01. Accessed on November 13, 2019.
   https://www.fanniemae.com/content/legal_form/3010w.doc.

6. Ocwen's Responses to the Bureau's Fifth Set of Requests for Production and documents cited therein.

7. Ocwen Financial Corporation, 2018 Form 10-K Annual Report, February 27, 2019.

8. OCW-CFPB-001-06523242.

9. OCW-CFPB-001-06730240.

Privileged and Confidential

**Appendix C: Minor Corrections Related to My Opportunity Cost Damages Analysis**

1.      In this appendix, I describe minor corrections to my opportunity cost damages analysis that respond to some of Dr. Hamm's criticisms. Specifically, I have largely accepted Dr. Hamm's damages calculation for the PMI overcharges population with the exception that I apply a discount rate that, in my opinion, more appropriately captures the opportunity cost of these funds to Ocwen's customers. These results are discussed in section I below. In section II, I respond to minor corrections that have no impact on damages.

## I.      DAMAGES FOR THE PMI OVERCHARGES POPULATION

2.      Dr. Hamm claims a number of data-related issues with my PMI overcharge damages calculation. When working with Ocwen's data related to the PMI overcharges population, I have found that numerous data inconsistencies. As an example, for some borrowers, their PMI cancellation dates come before their credit dates while for other borrowers, the reverse is true.[1] That being the case, I have calculated a lower bound for PMI overcharge damages by accepting all of Dr. Hamm's data-related issues but applying a reasonable discount rate as described above.[2] In Table 1, I present the results of this calculation which shows significant borrower harm even after accepting Dr. Hamm's data criticisms.

---

[1]   Another example is that one might expect that the credit amount would equal the monthly premium multiplied by the number of months when the borrower was overcharged, which would be an integer. However, for numerous customers, the credit amount divided by the number of months of overcharge does not yield an integer (OCW-CFPB-001-06730240). Based on my examination of individual customers using the Transaction History data, it appears that, for borrowers, monthly premiums can vary from month-to-month during the period when the borrower was overcharged; for other borrowers, I was unable to align the reported credit amount with monthly premium payments.

[2]   In Dr. Hamm's analysis, he excluded damages for loans that received interest payments. The reason is that, under Dr. Hamm's assumption that the discount rate should be no greater than 3.25 percent, these overcharged customers would have been fully compensated by Ocwen. However, if one applies a more appropriate discount rate as I have discussed in section II.A, then damages for PMI-overcharged customers would not be zero.

**Privileged and Confidential**

3.   I calculate damages for loans with interest payments by modeling a 3.25 percent increase in credits to Ocwen borrowers. Contrary to Dr. Hamm's critique that applying the full 3.25 percent interest even if the period of harm is less than one year is an erroneous understatement of damages,[3] I find that over half of the loans with interest payments[4] received an interest credit of 3.25 percent regardless of the number of months over which Ocwen's customers were overcharged.

4.   As shown in Table 1 below, applying a 16 percent credit card interest rate, damages are at least $119,345 (compared to $343,623 using my original interpretation of the data).

---

[3]   Hamm Report, Section VI.B.3.c.

[4]   I adopted Dr. Hamm's method to identify customers who received interest payments; these customers were part of Ocwen's remediation effort in August 2014 (Hamm Report ¶ 237).

Privileged and Confidential

**Table 1**
**Summary of NPV Damages by Interest Rate for the PMI Overcharges Population**

|  |  | Number of Failures | Damages by Discount Rate | | |
|---|---|---|---|---|---|
|  |  |  | 13% | 16% | 20% |
| **Prior Damages Estimate** |  |  |  |  |  |
| Total | [A] | 6,293 | $319,433 | $343,623 | $373,717 |
| **Updated Damages** |  |  |  |  |  |
| Loans without Interest Payments | [B] | 4,218 | $95,636 | $114,112 | $136,948 |
| Loans with Interest Payments | [C] | 2,075 | $1,889 | $5,233 | $9,881 |
| Total | [D] | 6,293 | $97,525 | $119,345 | $146,829 |
| **Difference** |  |  |  |  |  |
| Dollar | [E] |  | $221,908 | $224,278 | $226,888 |
| Percentage | [F] |  | 69.5% | 65.3% | 60.7% |

Sources and Notes:
[A]: McFadden Second Amended Report Table 6.
[B]: All loans used in prior damages estimate except for August 2014 Remediation loans.
[C]: All August 2014 Remediation loans used in prior damages estimate.
[D]: [B] + [C].
[E]: [A] - [D].
[F]: [E] / [A].

## II.   CORRECTIONS THAT HAVE NO SUBSTANTIVE EFFECT ON DAMAGES

5.     In this section I respond to some minor issues raised by Dr. Hamm. These issues do not have any impact on the magnitude of opportunity cost damages.

6.     As Dr. Hamm noted, loan ███████, which I use to illustrate the "spread" repayment method,[5] is not included in my damages tabulations because it is delinquent as of the Late Analysis Date. Given that I did not assess damages for this loan, Dr. Hamm's claim that my methodology "'finds' that a loan known to be undamaged has been damaged"[6] is baseless.

---

[5]   McFadden Second Amended Report ¶ 60 and Table 6.

[6]   Hamm Report ¶ 200.

**Privileged and Confidential**

7.  I had erroneously left in descriptions of an outdated NPV calculation in the PMI section of my prior report.[7] The analysis is correct, but the report text had not been updated. The reported NPV numbers reflect discounting back to the date when insurance should have been canceled.

---

[7]  McFadden Second Amended Report Section V.B.1.

**Privileged and Confidential**

### Appendix D: Calculation of Undercharges as Percentage of Monthly Escrow and Mortgage Payments

1.  This appendix describes the underlying data sources and methodology that I used to calculate the average undercharge from an untimely escrow analysis as a fraction of monthly principal, interest, and escrow payments.

2.  My analysis is broken down into two categories:

    a.  Calculations using the latest monthly mortgage payment (i.e., principal and interest) and escrow payment that precede the late escrow analysis date, i.e., the date when the escrow analysis was actually performed.

    b.  Calculations using the latest monthly escrow payment that is prior to the late escrow analysis date. The difference here from (a) above is that I do not consider monthly principal and interest payments.

3.  I relied on RFP 21, i.e., Ocwen's response to the 21st request of the Bureau's Fifth Set of Requests for Production, which Ocwen provided in response to the Bureau's request for periodic statements that Ocwen sent to its customers, for its monthly charges of principal ("CURRPRIN"), interest ("CURRINT"), and escrow ("CURRESCROW"). I only considered monthly charges for current customers, indicated by "BILLTYPE" of "CURR," to prevent inaccurate comparisons of undercharges on irregular charges. For example, delinquent customers or customers who paid ahead. I also used the billing date ("BILLDATE") of these monthly payments to ensure that I only used the latest set of monthly payments prior to the date that the untimely escrow analysis was performed.

4.  I used Exhibit C from Rogs 1-4, which Ocwen provided as customers who experienced untimely escrow analysis, to identify customers with undercharges. I defined undercharge as an accrued shortage, represented by a "SHORTAGE/SURPLUS" value of less than 0. As mentioned before, I used the "LAST ANALYSIS DATE" variable to determine the date that the untimely escrow analysis was actually performed.

**Privileged and Confidential**

5.   I combined the relevant variables mentioned above to create a dataset with a unique observation for each undercharge failure. That is, the same customer could be in my dataset more than once if Ocwen undercharged the customer on more than one occasion. Each failure had its associated undercharge, untimely escrow analysis date, and set of monthly payments.

6.   Before running calculations, I took three steps to clean my dataset of 132,126 instances of failure with undercharges. First, I dropped 62,078 instances of failure which had missing date of untimely escrow analysis, principal payment, interest payment, or escrow payment. These missing values were NULL in underlying RFP 21 data, which indicated to me that any total payment calculated from these observations would be erroneous. Of these 62,078 instances of failure, 17,974 had a missing "LAST ANALYSIS DATE" and 44,104 had missing payment information. I also filtered out 101 instances of failure with an escrow payment or total monthly payment of $0 to avoid calculated undercharge percentages from being infinite. Finally, I removed outliers by dropping 3,625 instances of failure with undercharges, escrow payments, or total payments in the top or bottom 1% of the remaining population.

7.   After cleaning my dataset, I divided each instance of failure's undercharge by the sum of monthly principal, interest, and escrow payments to calculate the undercharge as a fraction of latest monthly mortgage payment. Of the remaining 66,322 instances of failure in my cleaned dataset, 30.7% had an undercharge fraction greater than 5%.

8.   I divided each instance of failure's undercharge by its escrow payment to calculate the undercharge as a fraction of latest monthly escrow payment. Of the remaining 66,322 instances of failure in my cleaned dataset, 75.0% had an undercharge fraction greater than 5%.

**Privileged and Confidential**

### Appendix E: Robustness Tests for Proportional Hazards Model

1.  This Appendix describes the proportional hazards models used for the results described in the main text of the report. It also includes the tables with the coefficients of all the models estimated.[1] All of the models used below are based on a sample that includes only Ocwen loans.

### I.   MODELS ALLOWING IMPACT TO VARY WITH MAGNITUDE OF OVERCHARGE/UNDERCHARGE

2.  The following tables show the results of estimating my proportional hazard model but allowing the impact of the untimely escrow analysis to vary by the magnitude of the overcharge/undercharge. In particular, the model allows this impact to vary depending on the quintile of overcharges/undercharges.[2]

---

[1]   The estimated increases in the cumulative probability of foreclosure initiation for overcharged and undercharged loans for these models are included in the main text of the report.

[2]   I include dummies for each quintile of overcharges/undercharges. Similarly, the model includes the interaction between the overcharge quintile dummies and the After Analysis Due Date flag as well as the interactions between the undercharge quintile dummies and the After Last Analysis Date Flag. These interactions capture the impact of the untimely escrow analysis on the likelihood of foreclosure initiation.

Privileged and Confidential

## Table 1: Coefficient Estimates of Proportional Hazard Model By Magnitude of Overcharge and Undercharge

| Explanatory Variable | Dependent Variable: Foreclosure Initiation Flag | | |
|---|---|---|---|
| | Coefficient | Standard Error | P-Value |
| | [1] | [2] | [3] |
| **Harmed Loan Indicators** | | | |
| Overcharged Flag Q1 | 0.142 | 0.077 | 0.066 |
| Overcharged Flag Q2 | 0.206 | 0.075 | 0.006 |
| Overcharged Flag Q3 | 0.220 | 0.082 | 0.008 |
| Overcharged Flag Q4 | 0.043 | 0.093 | 0.646 |
| Overcharged Flag Q5 | 0.473 | 0.085 | 0.000 |
| **Overcharged After Analysis Due Date Flag Q1** | **1.181** | **0.078** | **0.000** |
| **Overcharged After Analysis Due Date Flag Q2** | **1.238** | **0.075** | **0.000** |
| **Overcharged After Analysis Due Date Flag Q3** | **1.270** | **0.082** | **0.000** |
| **Overcharged After Analysis Due Date Flag Q4** | **1.480** | **0.092** | **0.000** |
| **Overcharged After Analysis Due Date Flag Q5** | **1.351** | **0.082** | **0.000** |
| Undercharged Flag Q1 | 0.021 | 0.095 | 0.827 |
| Undercharged Flag Q2 | 0.347 | 0.080 | 0.000 |
| Undercharged Flag Q3 | 0.598 | 0.066 | 0.000 |
| Undercharged Flag Q4 | 0.989 | 0.053 | 0.000 |
| Undercharged Flag Q5 | 1.198 | 0.050 | 0.000 |
| **Undercharged After Last Analysis Date Flag Q1** | **1.114** | **0.099** | **0.000** |
| **Undercharged After Last Analysis Date Flag Q2** | **0.929** | **0.083** | **0.000** |
| **Undercharged After Last Analysis Date Flag Q3** | **0.831** | **0.068** | **0.000** |
| **Undercharged After Last Analysis Date Flag Q4** | **0.590** | **0.052** | **0.000** |
| **Undercharged After Last Analysis Date Flag Q5** | **0.480** | **0.047** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.091 | 0.080 | 0.000 |
| Loans with Accruals Missing Flag | 1.608 | 0.029 | 0.000 |
| | | | |
| **Loan Status Controls** | | | |
| Bankruptcy Status Before Harm Flag | 0.102 | 0.021 | 0.000 |
| Delinquency Status Before Harm Flag | 1.453 | 0.016 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.068 | 0.025 | 0.007 |
| Forbearance Before Harm Flag | -0.242 | 0.073 | 0.001 |
| | | | |
| **Other Controls** | | | |
| Housing Price Index Percent Change | -0.269 | 0.042 | 0.000 |
| Unemployment Rate | -0.012 | 0.005 | 0.013 |
| Log of Loan Age (Months) | 10.921 | 0.577 | 0.000 |
| Log of Loan Age Squared (Months) | -1.107 | 0.063 | 0.000 |
| Log of Loan Amount ($) | 0.009 | 0.011 | 0.430 |
| | | | |
| **Lien Position** | | | |
| Second | -1.523 | 0.116 | 0.000 |
| **Property Type** | | | |
| 2-4 Units | -0.054 | 0.025 | 0.026 |
| Planned Unit Development | -0.005 | 0.022 | 0.841 |
| Condo | 0.078 | 0.025 | 0.001 |
| Other | -0.177 | 0.045 | 0.000 |
| **Occupancy Type** | | | |
| Non-Owner | -1.287 | 0.074 | 0.000 |
| Other | 1.504 | 0.014 | 0.000 |
| **Mortgage Type** | | | |
| ARM | -0.054 | 0.018 | 0.002 |
| Balloon | 0.182 | 0.347 | 0.600 |
| HELOC | -0.150 | 0.015 | 0.000 |
| Other | 0.037 | 0.057 | 0.510 |
| Constant | -34.137 | 1.350 | 0.000 |
| | | | |
| Log Likelihood | -160,592.18 | | |
| Number of Observations | 6,286,761 | | |
| Number of Loans | 196,236 | | |
| Zero Outcomes | 6,255,477 | | |
| Nonzero Outcomes | 31,284 | | |
| Wald Chi Squared | 77,837 | | |
| Probability > Chi Squared | 0.00 | | |

**Privileged and Confidential**

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[3]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

[4]: Model includes quintile dummies of overcharges/undercharges and interaction of these dummies with After Analysis Due Date flag (for overcharges) and after Last Analysis Date flags (for undercharges).

**Privileged and Confidential**

## II.   MODELS BY MONTH OF UNTIMELY ESCROW ANALYSIS

3.   I estimated my proportional hazard model separately for loans that had an escrow analysis due before December 2014 and loans that had an escrow due analysis between December 2014 and March 2015.[3] The following tables shows the estimates of the coefficients of each model.

---

[3]   Both models include the full set of unharmed loans in the estimation.

Privileged and Confidential

**Table 2: Coefficient Estimates of Proportional Hazard Model for Loans with Escrow Analysis Due Date Between January2014 and November 2014**

| Explanatory Variable | Dependent Variable: Foreclosure Initiation Flag | | |
| --- | --- | --- | --- |
| | Coefficient | Standard Error | P-Value |
| | [1] | [2] | [3] |
| Harmed Loan Indicators | | | |
| Overcharged Flag | 1.894 | 0.055 | 0.000 |
| **Overcharged After Analysis Due Date Flag** | **0.315** | **0.048** | **0.000** |
| Undercharged Flag | 1.880 | 0.042 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.301** | **0.033** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.662 | 0.095 | 0.000 |
| Loans with Accruals Missing Flag | 2.116 | 0.033 | 0.000 |
| | | | |
| Loan Status Controls | | | |
| Bankruptcy Status Before Harm Flag | -0.045 | 0.022 | 0.044 |
| Delinquency Status Before Harm Flag | 0.490 | 0.018 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.030 | 0.028 | 0.292 |
| Forbearance Before Harm Flag | -0.394 | 0.087 | 0.000 |
| | | | |
| Other Controls | | | |
| Housing Price Index Percent Change | -0.022 | 0.049 | 0.656 |
| Unemployment Rate | -0.027 | 0.006 | 0.000 |
| Log of Loan Age (Months) | 8.530 | 0.664 | 0.000 |
| Log of Loan Age Squared (Months) | -0.889 | 0.072 | 0.000 |
| Log of Loan Amount ($) | 0.014 | 0.012 | 0.273 |
| | | | |
| Lien Position | | | |
| Second | -1.615 | 0.116 | 0.000 |
| Property Type | | | |
| 2-4 Units | -0.036 | 0.027 | 0.184 |
| Planned Unit Development | 0.035 | 0.026 | 0.173 |
| Condo | 0.045 | 0.027 | 0.089 |
| Other | -0.235 | 0.049 | 0.000 |
| Occupancy Type | | | |
| Non-Owner | -0.340 | 0.090 | 0.000 |
| Other | 1.269 | 0.015 | 0.000 |
| Mortgage Type | | | |
| ARM | 0.036 | 0.016 | 0.030 |
| Balloon | -0.016 | 0.016 | 0.324 |
| HELOC | 0.044 | 0.323 | 0.892 |
| Other | -0.002 | 0.057 | 0.968 |
| Constant | -27.761 | 1.576 | 0.000 |
| | | | |
| Log Likelihood | | -121,392.30 | |
| Number of Observations | | 2,733,713 | |
| Number of Loans | | 91,232 | |
| Zero Outcomes | | 2,708,234 | |
| Nonzero Outcomes | | 25,479 | |
| Wald Chi Squared | | 36,244 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Standard errors clustered at the loan level.

[3]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[4]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

Privileged and Confidential

**Table 3: Coefficient Estimates of Proportional Hazard Model for Loans with Escrow Analysis Due Date Between December 2014 and March 2015**

| Explanatory Variable | Coefficient | Standard Error | P-Value |
|---|---|---|---|
| Dependent Variable: Foreclosure Initiation Flag | | | |
| | [1] | [2] | [3] |
| **Harmed Loan Indicators** | | | |
| Overcharged Flag | -0.621 | 0.093 | 0.000 |
| **Overcharged After Analysis Due Date Flag** | **1.179** | **0.091** | **0.000** |
| Undercharged Flag | -0.568 | 0.107 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **1.281** | **0.108** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.096 | 0.186 | 0.000 |
| Loans with Accruals Missing Flag | 1.696 | 0.045 | 0.000 |
| | | | |
| **Loan Status Controls** | | | |
| Bankruptcy Status Before Harm Flag | 0.141 | 0.054 | 0.009 |
| Delinquency Status Before Harm Flag | 1.836 | 0.033 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.314 | 0.043 | 0.000 |
| Forbearance Before Harm Flag | -0.316 | 0.127 | 0.013 |
| | | | |
| **Other Controls** | | | |
| Housing Price Index Percent Change | -0.317 | 0.082 | 0.000 |
| Unemployment Rate | 0.006 | 0.008 | 0.484 |
| Log of Loan Age (Months) | 6.604 | 0.819 | 0.000 |
| Log of Loan Age Squared (Months) | -0.669 | 0.091 | 0.000 |
| Log of Loan Amount ($) | -0.026 | 0.025 | 0.304 |
| | | | |
| **Lien Position** | | | |
| Second | -1.572 | 0.126 | 0.000 |
| **Property Type** | | | |
| 2-4 Units | -0.145 | 0.061 | 0.016 |
| Planned Unit Development | -0.024 | 0.048 | 0.614 |
| Condo | 0.112 | 0.056 | 0.045 |
| Other | 0.011 | 0.096 | 0.910 |
| **Occupancy Type** | | | |
| Non-Owner | -1.407 | 0.137 | 0.000 |
| Other | 1.845 | 0.031 | 0.000 |
| **Mortgage Type** | | | |
| ARM | -0.052 | 0.042 | 0.218 |
| Balloon | 0.310 | 0.032 | 0.000 |
| HELOC | . | . | . |
| Other | 0.032 | 0.142 | 0.824 |
| Constant | -23.943 | 1.878 | 0.000 |
| | | | |
| Log Likelihood | | -42,905.60 | |
| Number of Observations | | 5,025,606 | |
| Number of Loans | | 150,029 | |
| Zero Outcomes | | 5,018,549 | |
| Nonzero Outcomes | | 7,057 | |
| Wald Chi Squared | | 25,336 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Standard errors clustered at the loan level.

[3]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[4]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

**Privileged and Confidential**

### III.   MODEL EXCLUDING LOANS WITH PRIOR ADVERSE CREDIT EVENTS AT TIME OF SERVICING FAILURE

4.   I estimated my proportional hazards model excluding all loans that experienced an untimely escrow analysis and that had an adverse credit event before the time of the servicing failure.[4] The table below shows the estimates of the coefficients of this model.

---

[4]   The adverse credit events considered are 90 days or more delinquent, bankruptcy, permanent loan modification, and forbearance.

Privileged and Confidential

## Table 4: Coefficient Estimates of Proportional Hazard Model for Loans Without Prior Adverse Credit Events at time of Servicing Failure

| Dependent Variable: Foreclosure Initiation Flag | | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-Value |
| | [1] | [2] | [3] |
| Harmed Loan Indicators | | | |
| Overcharged Flag | -1.427 | 0.082 | 0.000 |
| **Overcharged After Analysis Due Date Flag** | **2.389** | **0.080** | **0.000** |
| Undercharged Flag | 0.284 | 0.045 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.945** | **0.043** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 0.632 | 0.141 | 0.000 |
| Loans with Accruals Missing Flag | 1.762 | 0.032 | 0.000 |
| Other Controls | | | |
| Housing Price Index Percent Change | -0.545 | 0.058 | 0.000 |
| Unemployment Rate | -0.004 | 0.006 | 0.552 |
| Log of Loan Age (Months) | 12.999 | 0.789 | 0.000 |
| Log of Loan Age Squared (Months) | -1.293 | 0.086 | 0.000 |
| Log of Loan Amount ($) | 0.088 | 0.015 | 0.000 |
| Lien Position | | | |
| Second | -1.538 | 0.120 | 0.000 |
| Property Type | | | |
| 2-4 Units | -0.128 | 0.035 | 0.000 |
| Planned Unit Development | -0.090 | 0.031 | 0.004 |
| Condo | 0.061 | 0.031 | 0.048 |
| Other | -0.139 | 0.054 | 0.010 |
| Occupancy Type | | | |
| Non-Owner | -2.092 | 0.119 | 0.000 |
| Other | 2.073 | 0.020 | 0.000 |
| Mortgage Type | | | |
| ARM | 0.239 | 0.019 | 0.000 |
| Balloon | 0.242 | 0.021 | 0.000 |
| HELOC | 0.023 | 0.506 | 0.964 |
| Other | 0.466 | 0.067 | 0.000 |
| Constant | -41.143 | 1.844 | 0.000 |
| Log Likelihood | | -89,485.68 | |
| Number of Observations | | 5,168,118 | |
| Number of Loans | | 162,245 | |
| Zero Outcomes | | 5,151,609 | |
| Nonzero Outcomes | | 16,509 | |
| Wald Chi Squared | | 47,594 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; Bureau of Labor Statistics; and Mortgage Backed Securities Data.
Notes:
[1]: Regression includes property state and year fixed effects.
[2]: Standard errors clustered at the loan level.
[3]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for loan type is conventional (fixed rate). The omitted category for loan purpose is purchase. Omitted category for documentation type is full documentation.
[4]: The regression does not include an indicator for non-Ocwen loans so coefficients on harmed loan populations are measured relative to the non-Ocwen loans.

Privileged and Confidential

IV.  **MODEL EXCLUDING LOANS ALLEGEDLY LACKING ESCROW ACCOUNTS**

5.    I estimated my benchmark specification removing the alleged unharmed loans without an escrow account. The following table shows the estimated coefficients of this model.

Privileged and Confidential

## Table 5: Coefficient Estimates of Proportional Hazard Model Excluding Loans Allegedly Without Escrow Accounts

Dependent Variable: Foreclosure Initiation Flag

| Explanatory Variable | Coefficient | Standard Error | P-Value |
|---|---|---|---|
| | [1] | [2] | [3] |
| Harmed Loan Indicators | | | |
| Overcharged Flag | 0.121 | 0.044 | 0.006 |
| **Overcharged After Analysis Due Date Flag** | **1.360** | **0.038** | **0.000** |
| Undercharged Flag | 0.690 | 0.037 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.715** | **0.030** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.003 | 0.076 | 0.000 |
| Loans with Accruals Missing Flag | 1.487 | 0.029 | 0.000 |
| | | | |
| Loan Status Controls | | | |
| Bankruptcy Status Before Harm Flag | 0.120 | 0.020 | 0.000 |
| Delinquency Status Before Harm Flag | 1.497 | 0.015 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.104 | 0.025 | 0.000 |
| Forbearance Before Harm Flag | -0.285 | 0.074 | 0.000 |
| | | | |
| Other Controls | | | |
| Housing Price Index Percent Change | -0.261 | 0.041 | 0.000 |
| Unemployment Rate | -0.013 | 0.005 | 0.009 |
| Log of Loan Age (Months) | 10.403 | 0.557 | 0.000 |
| Log of Loan Age Squared (Months) | -1.053 | 0.061 | 0.000 |
| Log of Loan Amount ($) | 0.050 | 0.011 | 0.000 |
| | | | |
| Lien Position | | | |
| Second | -0.421 | 0.317 | 0.185 |
| Property Type | | | |
| 2-4 Units | -0.057 | 0.024 | 0.017 |
| Planned Unit Development | -0.010 | 0.023 | 0.669 |
| Condo | 0.057 | 0.024 | 0.017 |
| Other | -0.180 | 0.045 | 0.000 |
| Occupancy Type | | | |
| Non-Owner | -1.318 | 0.076 | 0.000 |
| Other | 1.538 | 0.013 | 0.000 |
| Mortgage Type | | | |
| ARM | 0.100 | 0.015 | 0.000 |
| Balloon | 0.154 | 0.014 | 0.000 |
| HELOC | 0.513 | 0.336 | 0.127 |
| Other | 0.186 | 0.056 | 0.001 |
| Constant | -33.493 | 1.303 | 0.000 |

| | |
|---|---|
| Log Likelihood | -160,195.79 |
| Number of Observations | 5,877,417 |
| Number of Loans | 183,708 |
| Zero Outcomes | 5,846,211 |
| Nonzero Outcomes | 31,206 |
| Wald Chi Squared | 76,538 |
| Probability > Chi Squared | 0.00 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; Bureau of Labor Statistics; and Mortgage Backed Securities Data.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Standard errors clustered at the loan level.

[3]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for loan type is conventional (fixed rate). The omitted category for loan purpose is purchase. Omitted category for documentation type is full documentation.

[4]: The regression does not include an indicator for non-Ocwen loans so coefficients on harmed loan populations are measured relative to the non-Ocwen loans.

Privileged and Confidential

## V.   MODEL EXCLUDING UNEMPLOYMENT, LOAN AGE AND OCCUPANCY TYPE

6.   I estimated my benchmark specification excluding either unemployment rate, the variables related to loan age, or occupancy type. In a final specification, I exclude all three variables at the same time. The following tables include the coefficient estimates of these models as well as the increase in the cumulative probability of foreclosure initiation.

Privileged and Confidential

### Table 6: Coefficient Estimates of Proportional Hazard Model Excluding Unemployment

Dependent Variable: Foreclosure Initiation Flag

| Explanatory Variable | Coefficient | Standard Error | P-Value |
|---|---|---|---|
| | [1] | [2] | [3] |
| **Harmed Loan Indicators** | | | |
| Overcharged Flag | 0.184 | 0.044 | 0.000 |
| **Overcharged After Analysis Due Date Flag** | **1.356** | **0.038** | **0.000** |
| Undercharged Flag | 0.750 | 0.036 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.712** | **0.030** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.056 | 0.081 | 0.000 |
| Loans with Accruals Missing Flag | 1.543 | 0.029 | 0.000 |
| | | | |
| **Loan Status Controls** | | | |
| Bankruptcy Status Before Harm Flag | 0.118 | 0.021 | 0.000 |
| Delinquency Status Before Harm Flag | 1.505 | 0.015 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.088 | 0.025 | 0.000 |
| Forbearance Before Harm Flag | -0.280 | 0.072 | 0.000 |
| | | | |
| **Other Controls** | | | |
| Housing Price Index Percent Change | -0.241 | 0.041 | 0.000 |
| Log of Loan Age (Months) | 10.624 | 0.563 | 0.000 |
| Log of Loan Age Squared (Months) | -1.076 | 0.061 | 0.000 |
| Log of Loan Amount ($) | 0.057 | 0.011 | 0.000 |
| | | | |
| **Lien Position** | | | |
| Second | -1.459 | 0.116 | 0.000 |
| **Property Type** | | | |
| 2-4 Units | -0.061 | 0.024 | 0.013 |
| Planned Unit Development | -0.006 | 0.022 | 0.786 |
| Condo | 0.061 | 0.024 | 0.012 |
| Other | -0.179 | 0.044 | 0.000 |
| **Occupancy Type** | | | |
| Non-Owner | -1.322 | 0.074 | 0.000 |
| Other | 1.538 | 0.014 | 0.000 |
| **Mortgage Type** | | | |
| ARM | 0.103 | 0.015 | 0.000 |
| Balloon | 0.156 | 0.015 | 0.000 |
| HELOC | 0.451 | 0.349 | 0.197 |
| Other | 0.188 | 0.056 | 0.001 |
| Constant | -34.290 | 1.313 | 0.000 |

| | |
|---|---|
| Log Likelihood | -160,967.78 |
| Number of Observations | 6,286,761 |
| Number of Loans | 196,236 |
| Zero Outcomes | 6,255,477 |
| Nonzero Outcomes | 31,284 |
| Wald Chi Squared | 78,458 |
| Probability > Chi Squared | 0.00 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[3]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

Privileged and Confidential

**Table 7: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation Excluding Unemployment**

**(in percentage points)**

|  | Impact |
|---|---|
|  | [1] |
| Overcharged Loans | 6.734 |
| Undercharged Loans | 5.076 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.

**Privileged and Confidential**

## Table 8: Coefficient Estimates of Proportional Hazard Model Excluding Loan Age

| Dependent Variable: Foreclosure Initiation Flag | | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-Value |
| | [1] | [2] | [3] |
| **Harmed Loan Indicators** | | | |
| Overcharged Flag | 0.098 | 0.044 | 0.027 |
| **Overcharged After Analysis Due Date Flag** | **1.448** | **0.038** | **0.000** |
| Undercharged Flag | 0.735 | 0.036 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.749** | **0.030** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.043 | 0.081 | 0.000 |
| Loans with Accruals Missing Flag | 1.554 | 0.029 | 0.000 |
| | | | |
| **Loan Status Controls** | | | |
| Bankruptcy Status Before Harm Flag | 0.131 | 0.021 | 0.000 |
| Delinquency Status Before Harm Flag | 1.604 | 0.016 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.067 | 0.025 | 0.007 |
| Forbearance Before Harm Flag | -0.282 | 0.073 | 0.000 |
| | | | |
| **Other Controls** | | | |
| Housing Price Index Percent Change | -0.330 | 0.032 | 0.000 |
| Unemployment Rate | -0.012 | 0.005 | 0.014 |
| Log of Loan Amount ($) | 0.025 | 0.011 | 0.028 |
| | | | |
| **Lien Position** | | | |
| Second | -1.418 | 0.116 | 0.000 |
| **Property Type** | | | |
| 2-4 Units | -0.040 | 0.025 | 0.102 |
| Planned Unit Development | -0.053 | 0.022 | 0.018 |
| Condo | 0.036 | 0.024 | 0.143 |
| Other | -0.162 | 0.045 | 0.000 |
| **Occupancy Type** | | | |
| Non-Owner | -1.375 | 0.074 | 0.000 |
| Other | 1.561 | 0.014 | 0.000 |
| **Mortgage Type** | | | |
| ARM | 0.178 | 0.016 | 0.000 |
| Balloon | 0.229 | 0.015 | 0.000 |
| HELOC | 0.487 | 0.370 | 0.188 |
| Other | 0.267 | 0.057 | 0.000 |
| Constant | -7.792 | 0.261 | 0.000 |
| | | | |
| Log Likelihood | | -161,709.50 | |
| Number of Observations | | 6,286,813 | |
| Number of Loans | | 196,236 | |
| Zero Outcomes | | 6,255,529 | |
| Nonzero Outcomes | | 31,284 | |
| Wald Chi Squared | | 82,193 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[3]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

Privileged and Confidential

**Table 9: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation Excluding Loan Age**

**(in percentage points)**

|  | Impact |
|---|---|
|  | [1] |
| Overcharged Loans | 7.002 |
| Undercharged Loans | 5.266 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.

Privileged and Confidential

## Table 10: Coefficient Estimates of Proportional Hazard Model Excluding Occupancy Type

| Dependent Variable: Foreclosure Initiation Flag | | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-Value |
| | [1] | [2] | [3] |
| Harmed Loan Indicators | | | |
| Overcharged Flag | 0.135 | 0.045 | 0.002 |
| **Overcharged After Analysis Due Date Flag** | **1.469** | **0.039** | **0.000** |
| Undercharged Flag | 0.838 | 0.036 | 0.000 |
| **Undercharged After Last Analysis Date Flag** | **0.799** | **0.030** | **0.000** |
| Loans with Accruals Equal to Zero Flag | 1.301 | 0.080 | 0.000 |
| Loans with Accruals Missing Flag | 1.916 | 0.029 | 0.000 |
| | | | |
| Loan Status Controls | | | |
| Bankruptcy Status Before Harm Flag | 0.176 | 0.021 | 0.000 |
| Delinquency Status Before Harm Flag | 1.706 | 0.016 | 0.000 |
| Permanent Loan Mod. Before Harm Flag | -0.224 | 0.025 | 0.000 |
| Forbearance Before Harm Flag | -0.484 | 0.074 | 0.000 |
| | | | |
| Other Controls | | | |
| Housing Price Index Percent Change | -0.513 | 0.042 | 0.000 |
| Unemployment Rate | -0.006 | 0.005 | 0.232 |
| Log of Loan Age (Months) | 11.475 | 0.576 | 0.000 |
| Log of Loan Age Squared (Months) | -1.162 | 0.063 | 0.000 |
| Log of Loan Amount ($) | -0.077 | 0.011 | 0.000 |
| | | | |
| Lien Position | | | |
| Second | -1.798 | 0.116 | 0.000 |
| Property Type | | | |
| 2-4 Units | -0.081 | 0.023 | 0.000 |
| Planned Unit Development | -0.030 | 0.022 | 0.176 |
| Condo | 0.004 | 0.023 | 0.856 |
| Other | 0.102 | 0.044 | 0.021 |
| Mortgage Type | | | |
| ARM | 0.222 | 0.015 | 0.000 |
| Balloon | -0.118 | 0.014 | 0.000 |
| HELOC | 0.168 | 0.305 | 0.582 |
| Other | 0.256 | 0.060 | 0.000 |
| Constant | -34.180 | 1.347 | 0.000 |
| | | | |
| Log Likelihood | | -168,215.33 | |
| Number of Observations | | 6,286,761 | |
| Number of Loans | | 196,236 | |
| Zero Outcomes | | 6,255,477 | |
| Nonzero Outcomes | | 31,284 | |
| Wald Chi Squared | | 55,056 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[3]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

**Privileged and Confidential**

### Table 11: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation Excluding Occupancy Type

### (in percentage points)

| | Impact |
| --- | --- |
| | [1] |
| Overcharged Loans | 7.236 |
| Undercharged Loans | 6.083 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.

**Privileged and Confidential**

**Table 12: Coefficient Estimates of Proportional Hazard Model Excluding Unemployment, Loan Age, and Occupancy Type**

| Dependent Variable: Foreclosure Initiation Flag | | | |
|---|---|---|---|
| Explanatory Variable | Coefficient | Standard Error | P-Value |
| | [1] | [2] | [3] |
| Harmed Loan Indicators | | | |
|    Overcharged Flag | 0.051 | 0.045 | 0.251 |
|    **Overcharged After Analysis Due Date Flag** | **1.562** | **0.039** | **0.000** |
|    Undercharged Flag | 0.813 | 0.036 | 0.000 |
|    **Undercharged After Last Analysis Date Flag** | **0.847** | **0.030** | **0.000** |
|    Loans with Accruals Equal to Zero Flag | 1.289 | 0.080 | 0.000 |
|    Loans with Accruals Missing Flag | 1.927 | 0.029 | 0.000 |
| Loan Status Controls | | | |
|    Bankruptcy Status Before Harm Flag | 0.190 | 0.021 | 0.000 |
|    Delinquency Status Before Harm Flag | 1.825 | 0.016 | 0.000 |
|    Permanent Loan Mod. Before Harm Flag | -0.205 | 0.025 | 0.000 |
|    Forbearance Before Harm Flag | -0.488 | 0.074 | 0.000 |
| Other Controls | | | |
|    Housing Price Index Percent Change | -0.609 | 0.032 | 0.000 |
|    Log of Loan Amount ($) | -0.111 | 0.011 | 0.000 |
| Lien Position | | | |
|    Second | -1.750 | 0.116 | 0.000 |
| Property Type | | | |
|    2-4 Units | -0.052 | 0.023 | 0.025 |
|    Planned Unit Development | -0.084 | 0.022 | 0.000 |
|    Condo | -0.020 | 0.023 | 0.382 |
|    Other | 0.130 | 0.045 | 0.004 |
| Mortgage Type | | | |
|    ARM | 0.315 | 0.016 | 0.000 |
|    Balloon | -0.040 | 0.015 | 0.006 |
|    HELOC | 0.216 | 0.314 | 0.491 |
|    Other | 0.353 | 0.061 | 0.000 |
| Constant | -5.741 | 0.253 | 0.000 |
| Log Likelihood | | -169,159.26 | |
| Number of Observations | | 6,286,81 | |
| Number of Loans | | 196,236 | |
| Zero Outcomes | | 6,255,529 | |
| Nonzero Outcomes | | 31,284 | |
| Wald Chi Squared | | 59,145 | |
| Probability > Chi Squared | | 0.00 | |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: Regression includes property state and quarter-year fixed effects.

[2]: Omitted categories for lien position is 1st lien. The omitted category for property type is single family home. The omitted category for occupancy type is owner occupied. Omitted category for mortgage type is fixed rate.

[3]: The regression does not include an indicator for loans in the control group so coefficients on harmed loan populations are measured relative to the control group.

**Privileged and Confidential**

### Table 13: Impact of Ocwen's Untimely Escrow Analysis on the Average Cumulative Probability of Foreclosure Initiation Excluding Unemployment, Loan Age, and Occupancy Type

**(in percentage points)**

|  | Impact |
|---|---|
|  | [1] |
| Overcharged Loans | 7.492 |
| Undercharged Loans | 6.334 |

Sources: Rogs 1-4, Exhibit C; Ocwen's Responses to the Bureau's Fifth Set of Requests for Production; Federal Housing Finance Agency; and Bureau of Labor Statistics.

Notes:

[1]: The results are derived by calculating for each harmed loan in the sample, the difference in the cumulative probability of survival between the actual world were the loans suffered from the servicing failure and the counterfactual scenario where it did not. I then calculate the average across loans in the sample separately for overcharged and undercharged loans. See McFadden Second Amended Report, Appendix G for more details.