# EXHIBIT 3 (redacted)

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,       *Plaintiff*, <br><br> v. <br><br> OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., and OCWEN LOAN SERVICING, LLC,       *Defendants*. | **No. 9:17-CV-80495** <br> Judge Marra <br> Judge Matthewman |
| OFFICE OF THE ATTORNEY GENERAL, THE STATE OF FLORIDA, Department of Legal Affairs, <br><br> and <br><br> OFFICE OF FINANCIAL REGULATION, THE STATE OF FLORIDA, Division of Consumer Finance,       *Plaintiffs*, <br><br> v. <br><br> OCWEN FINANCIAL CORPORATION, et al.,       *Defendants*. | **No. 9:17-CV-80496** <br> Judge Marra <br> Judge Matthewman |

# Expert Report of

# William G. Hamm, Ph.D.

## *Rebuttal of Professor Daniel McFadden*

## Date: October 15, 2019

*William G. Hamm* (signature)

**EMERYVILLE, CA**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# Table of Contents

**Page**

I. Introduction ................................................................................................... 1

II. Summary of Opinions ................................................................................... 4

    A.  Professor McFadden's Opportunity Cost Damages Opinions .................................. 4

        1.  Professor McFadden significantly overstates borrower opportunity costs. ...... 4

        2.  Professor McFadden's delayed escrow analysis model is severely flawed. ...... 5

        3.  Professor McFadden's PMI Overcharges Model also is severely flawed. ....... 6

        4.  Professor McFadden's ARM Overcharges Model is flawed. .......................... 6

        5.  My Affirmative Calculation of Opportunity Cost Damages............................ 6

    B.  Professor McFadden's Opinions on Damages from Additional Foreclosures......... 7

        1.  Professor McFadden lacks a credible and consistent causation theory, thereby undermining the credibility and reliability of his damages opinion. ................ 8

        2.  Professor McFadden uses an unproven and unrealistic model that is different from those used in the literature he cites. ........................................ 9

        3.  Professor McFadden's control group is invalid, causing the results of his damages model to be equally invalid. .......................................... 10

        4.  Professor McFadden's model omits key variables that have been found to increase the probability of default and foreclosure, thereby invalidating the model's integrity. ..................................................................... 11

        5.  Professor McFadden's decision to count as foreclosures loans that paid off, were modified, or were reinstated, is fatal to his opinions. .......................... 11

        6.  Professor McFadden erroneously includes many loans in his analysis that, *by his own admission,* did not experience foreclosure as a result of an allegedly delayed escrow analysis, invalidating his damages calculation..................... 12

        7.  Professor McFadden ignores data produced by Ocwen that refutes his conclusions on causation.................................................................. 12

        8.  Professor McFadden's model yields results that contradict well-established principles of mortgage finance, thereby undermining the credibility of the model......................................................................................... 13

        9.  Professor McFadden failed to perform a basic reasonableness check of his results, and he therefore failed to recognize that his results are unreasonable. 13

        10.  Professor McFadden's estimates of foreclosure costs are not supported by the literature he cites and are contradicted by data he relied upon. ...................... 14

    C.  Other Purported Servicing Failures Identified by Professor McFadden................ 16

III. Qualifications ............................................................................................... 17

    A.  Work Experience ........................................................................................ 17

**Table of Contents**
**(Continued)**

| | | Page |
|---|---|---|
| 1. | 1969-1977: OMB | 17 |
| 2. | 1977-1986: California Legislative Analyst's Office | 19 |
| 3. | 1986-1991: World Savings and Loan Association | 20 |
| 4. | 1991-1995: Federal Home Loan Bank of San Francisco | 20 |
| 5. | 1996-2010: LECG, LLC | 22 |
| 6. | 2010-Present: Berkeley Research Group, LLC | 22 |
| B. | Education | 22 |
| C. | Areas of Expertise | 23 |
| D. | Publications | 23 |
| IV. | Background | 24 |
| A. | The Plaintiff's Allegations | 24 |
| B. | Loan Servicing | 24 |
| 1. | Servicing Performing Loans | 24 |
| 2. | Servicing Non-Performing Loans | 25 |
| 3. | Protecting the Investor's Interest in the Collateral Securing the Loan | 26 |
| 4. | Hazard Insurance | 26 |
| 5. | Real Estate Taxes | 27 |
| 6. | Mortgage Insurance | 28 |
| 7. | Escrow Accounts | 28 |
| 8. | Payment of Property Taxes and Insurance Premiums for Loans in Default | 31 |
| 9. | Understanding the Mechanics of Escrow Accounts | 31 |
| C. | Allegedly Delayed Escrow Analysis Population | 34 |
| D. | Foreclosures | 38 |
| 1. | Judicial vs. Non-Judicial Foreclosure | 39 |
| 2. | First Filing | 39 |
| 3. | Foreclosure Sale | 39 |
| 4. | REO | 40 |
| E. | Professor McFadden's Damages Calculations | 40 |
| 1. | Opportunity Cost Damages | 41 |
| 2. | Damages from Additional Foreclosures | 45 |
| 3. | Counts of Servicing Failures for Which Damages Were Not Calculated | 50 |

**Table of Contents**
**(Continued)**

| | Page |
|---|---|
| V. Assignment and Methodology | 51 |
|   A. Assignment | 51 |
|   B. Assumptions | 51 |
|   C. Data | 51 |
|     1. Raw Transactional Data | 51 |
|     2. Remediation Work Product | 52 |
|     3. Litigation Work Product | 52 |
|   D. Methodology | 53 |
|     1. Opportunity Cost Damages | 53 |
|     2. Damages from Additional Foreclosures | 53 |
|     3. Counts of Servicing Failures for Which Damages Were Not Calculated | 54 |
| VI. Professor McFadden's Opportunity Cost Damages | 55 |
|   A. Overview | 55 |
|     1. Summary of Errors and Deficiencies in Professor McFadden's Analysis | 55 |
|     2. My Affirmative Opinions on Damages | 56 |
|   B. Detailed Analysis of Professor McFadden's Opportunity Cost Damages | 57 |
|     1. Professor McFadden Significantly Overstates the Measure of the Borrowers' Opportunity Cost | 57 |
|     2. Allegedly Delayed Escrow Analyses | 66 |
|     3. Alleged PMI Overcharges | 88 |
|     4. Alleged ARM Overcharges | 92 |
|     5. Summary | 93 |
| VII. Professor McFadden's Estimate of Damages from Additional Foreclosures | 95 |
|   A. Overview | 95 |
|     1. Summary of My Opinions Regarding Professor McFadden's Analysis | 95 |
|     2. Affirmative Opinions on Damages | 97 |
|   B. Detailed Analysis of Professor McFadden's Estimated Damages from Additional Foreclosures | 98 |
|     1. Professor McFadden's analysis lacks a credible and consistent causation theory. | 98 |
|     2. Professor McFadden uses an unproven and unrealistic model that is different from those used in the literature he cites. | 104 |

## Table of Contents
### (Continued)

Page

3.  Professor McFadden's control group is invalid and not scientifically sound. 108

4.  Professor McFadden ignores a critical difference between the two main groups of loans with alleged escrow analysis delays...................................... 111

5.  Professor McFadden's foreclosure damages model is unreliable and invalid because he omits variables that mortgage finance scholars and professionals agree influence the probability of default and foreclosure. ........................... 111

6.  Professor McFadden misidentifies his dependent variable: foreclosures..... 122

7.  Professor McFadden includes loans in his analysis that, by his own admission, did not foreclose as a result of any allegedly delayed escrow analysis. ....... 125

8.  Professor McFadden ignores other data produced by Ocwen relevant to causation. .................................................................................................. 128

9.  Professor McFadden's model yields results that contradict well-established principles of mortgage finance..................................................................... 132

10. Because Professor McFadden failed to perform a basic reasonableness check of his results, he failed to see that the modeled foreclosure probabilities are contradicted by the available data................................................................. 135

11. Professor McFadden's estimates of foreclosure costs are not supported by the literature *he* cites and are contradicted by data *he* relied upon. .................... 143

C.  Additional Costs that Professor McFadden Claims to Exist, but Did Not Quantify 153

D.  Conclusion on Professor McFadden's Estimate of Foreclosure-Related Damages 154

VIII. Professor McFadden's Assertion Regarding Other So-Called Servicing Failures............................................................................................................. 156

A.  Professor McFadden's Failure to Document Any of the Alleged Servicing Failures...........................................................................................................156

B.  Alleged Loan Verification Errors ......................................................................156

C.  Alleged Failures to Send Escrow Statements ....................................................157

D.  Allegedly Inaccurate Reinstatement Quotes......................................................158

E.  Alleged Escrow Shortage Errors........................................................................160

F.  Alleged Interest-Only Errors..............................................................................161

IX. Conclusion ................................................................................................ 163

A.  Professor McFadden's Opportunity Cost Damages Opinions ............................163

B.  Professor McFadden's Opinions on Damages from Additional Foreclosures.....164

C.  Other Purported Servicing Failures Identified by Professor McFadden..............166

## I. INTRODUCTION

1. My name is William G. Hamm.  I am a professional economist and a Managing Director of Berkeley Research Group, LLC ("BRG"), an economics consulting and expert-services firm headquartered in Emeryville, California.  BRG provides analysis and advice to clients on complex matters involving economics and finance through 44 offices on five continents.

2. I have been retained by Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), and Ocwen Loan Servicing, LLC ("OLS") (collectively "Ocwen"), through their counsel, Goodwin Procter LLP ("Goodwin"), to review, evaluate, and respond to the Second Amended Expert Report of Professor Daniel McFadden submitted on Behalf of the Consumer Financial Protection Bureau (the "Bureau") and dated September 19, 2019 (the "McFadden Report"), and any supplements and amendments thereto.[1]

3. The results of my analysis are summarized below in a section entitled Summary of Opinions, and the details of my analysis and the bases for my opinions are explained throughout this report.  My analysis draws on my experience as the head of a large loan servicing business unit, my expertise as a professional economist, documents and data produced during fact discovery in this matter, deposition testimony taken during this matter, and certain publicly available information.  A full listing of the materials I considered in completing my assignment is found at **Exhibit 1** to this report.

---

[1] Professor McFadden's initial report was provided on August 15, 2019.  It was supplemented first on August 27, 2019, and again on September 19, 2019.  Certain work product relied upon by Professor McFadden has still not been produced.  Specifically, Professor McFadden has yet to produce all of the work product utilized to transform the CFPB_19A csv files produced by Ocwen into the RFP 19A SQL data table, "RFP_19A_Comments," utilized in Professor McFadden's analysis.

4. For my time spent working on this matter, BRG is being compensated at my customary hourly billing rate of $675. BRG staff working at my direction and under my supervision provided assistance with the preparation of this report, and BRG is being compensated for their work at each staff member's normal hourly billing rate. I have no financial interest in the outcome of this case. My compensation and BRG's compensation are not contingent in any way on my analysis or the outcome of this matter.

5. My analysis is ongoing, and I reserve the right to supplement this report and to expand or revise my opinions if additional information relevant to these opinions is forthcoming, as may be permitted under the applicable rules or by the Court.

6. The remainder of this report is organized as follows:

- Part II provides a summary of the opinions I will offer if I am called to testify in this matter;

- Part III summarizes my qualifications to perform the analyses I conducted with respect to certain issues before the Court, and to reach the opinions set forth in this report;

- Part IV provides background information relevant to my analysis;

- Part V sets forth my assignment as well as (1) the assumptions on which my analyses are based, (2) the methodology I employed, and (3) the data I used in conducting my analyses and reaching the opinions set forth in this report;

- Part VI reports my analysis of, and findings regarding, Professor McFadden's opportunity cost damages calculations;

- Part VII reports my analysis of, and findings regarding, Professor McFadden's calculations of damages from additional foreclosures;

- Part VIII summarizes my analysis of purported additional servicing failures by Ocwen that are discussed in Professor McFadden's report, and sets forth my opinions as to whether such purported failures would be expected to have caused economic harm to borrowers; and

- Part IX summarizes the opinions I reached based on my analyses.

## II. SUMMARY OF OPINIONS

7.  As discussed herein, my primary opinions can be summarized as follows:

**A.      Professor McFadden's Opportunity Cost Damages Opinions**

    **1.      Professor McFadden significantly overstates borrower opportunity costs.**

8.  Professor McFadden's opportunity cost damages calculations are significantly overstated because his assumption regarding the borrowers' opportunity costs is untenable and greatly inflated.  He asserts that each borrower's opportunity cost should be calculated using the interest rate charged on consumer credit cards.  His basis for this assertion, apparently, is his belief that: (a) all affected borrowers carried credit card debt from month-to-month, and (b) all such borrowers would have either (i) used overpayment funds to pay down credit card debt, or (ii) funded the escrow overpayment with credit card debt.

9.  The research cited by Professor McFadden does not support his methodology.  Furthermore, his assumption about credit card debt is contradicted by the following facts:

    a)  Most households do not carry credit card balances from month-to-month, and therefore do not pay credit card interest rates; and

    b)  Many cardholders who do carry such balances make only the minimum required payment each month, and do not dedicate all of their excess monthly funds to pay down their balances.

10.  The most likely funding source for escrow payments (including overpayments) is a borrower's own funds, whether held in a checking or savings account, or otherwise.  Given that such accounts have tended to pay no material interest during the applicable time period, it is unlikely that temporary escrow overpayments would have caused borrowers to sustain any appreciable opportunity cost damages.  Under no circumstances, however, would the opportunity cost discount rate of these temporary overpayments exceed 3.25% – the highest interest rate that

Ocwen paid on any escrow account balance.  In my opinion, the most appropriate interest rate to use as a measure of the borrowers' opportunity cost with respect to overpayments is zero, with an upper bound equal to 3.25%.

**2.      Professor McFadden's delayed escrow analysis model is severely flawed.**

11.      Professor McFadden's opportunity cost damages model is so severely flawed that it fails to reliably calculate any damages in connection with allegedly delayed escrow analyses. In addition to overstating the opportunity cost discount rate, he makes the following errors in his delayed escrow analysis opportunity cost calculation:

a)      85% of his calculated damages are for borrowers who were not actually overcharged but rather were underfunding their escrow accounts and thereby had escrow shortages, notwithstanding the alleged overcharges;

b)      He ignores the interest accrued on some escrow account balances;

c)      He fails to consider the offsetting impact of escrow payment changes resulting from subsequent escrow analyses;

d)      He ignores the actual timing of borrower payments, as shown in documents produced by Ocwen and accessible to him, and instead makes unsupported assumptions about payment timing; and

e)      He inappropriately relies on Ocwen's litigation work product, rather than the transaction history that is the primary record of escrow receipts and disbursements for every loan that Ocwen services.

12.      The defects in Professor McFadden's delayed escrow analysis opportunity cost damages model are revealed by an analysis of the loans *he* cites as examples in his report.  This analysis clearly establishes that none of the borrowers on these loans suffered opportunity cost damages.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                             5

### 3. Professor McFadden's PMI Overcharges Model also is severely flawed.

13.     Professor McFadden's PMI overcharges opportunity cost damages model is also severely flawed, apart from the use of an inflated interest rate to measure a borrower's opportunity cost.  The principal flaws in this model, which he does not accurately describe in his report, are as follows:

> a)      He erroneously assumes that the PMI refunds Ocwen remitted to borrowers were deficient; and
>
> b)      He assumes, contrary to the evidence, that Ocwen paid one year's worth of interest to borrowers on their PMI refunds, regardless of the interval between borrower payment and the refund.

### 4. Professor McFadden's ARM Overcharges Model is flawed.

14.     Professor McFadden assumes that a 0.4% error rate in calculating ARM interest rates represents a servicing failure by Ocwen in violation of the Consumer Financial Protection Act.  In addition to his use of an inflated interest rate to measure a borrower's opportunity cost, Professor McFadden's ARM overcharges model overstates damages because it incorrectly assumes that the overcharge amount was constant over time, despite the fact that the overcharges declined over time.

### 5. My Affirmative Calculation of Opportunity Cost Damages

15.     After correcting for Professor McFadden's use of an inflated interest rate to measure a borrower's opportunity cost and other errors in Professor McFadden's opportunity cost damages calculations, I conclude that the appropriate measure of the borrowers' opportunity cost damages is $0, with a generous upper bound on these damages equal to $141,143.  My opinion is summarized in **Table 1** below.

**Table 1**

**Summary of Opportunity Cost Damages**

|  | McFadden Lower Bound | McFadden Upper Bound | Hamm Most Likely Amount | Hamm Corrected Upper Bound |
|---|---|---|---|---|
| Delayed Escrow Analyses | $1,188,115 | $1,715,706 | $0 | $29,020 |
| PMI Overcharges | $319,433 | $373,717 | $0 | $26,518 |
| ARM Overcharges | $288,684 | $394,490 | $0 | $85,605 |
|  | $1,796,232 | $2,483,913 | $0 | $141,143 |

## B.   Professor McFadden's Opinions on Damages from Additional Foreclosures

16.    Professor McFadden's claim that the allegedly delayed escrow analyses caused 16,636 foreclosures, at a cost to borrowers ranging from $351.5 million to $483.5 million, is based on a model that is fatally flawed in numerous ways.  In fact, his model fails to reliably show that *any* foreclosures or *any* foreclosure-related damages resulted from the allegedly delayed escrow analyses.

17.    Based on my experience in loan servicing, I would not expect the alleged escrow analysis delays – many of which, applying Professor McFadden's logic, conferred clear economic benefits on the borrowers – to either cause foreclosures or increase the probability of foreclosure.  Generally speaking, foreclosures occur because the borrower is fundamentally unable to afford his or her loan and lacks equity in the property – not because of small,

temporary, and self-correcting over- or under-charges for the borrower's escrow account.  My analysis of foreclosures in connection with loans subject to alleged escrow analysis delays fully confirms my expectation.  In my opinion, any such delays did not cause a single foreclosure, and the foreclosure-related damages from these delays are $0.

      **1.**      **Professor McFadden lacks a credible and consistent causation theory, thereby undermining the credibility and reliability of his damages opinion.**

      18.      Professor McFadden refers to loans that were purportedly under-billed during the alleged escrow analysis delay period as "undercharge" loans.  He refers to loans that were purportedly over-billed during the alleged escrow analysis delay period as "overcharge" loans.  Professor McFadden incorrectly claims that all "undercharge" loans had their escrow payment go up by a larger amount as a result of an allegedly delayed analysis.  He bases his estimate of damages on the theory that the relatively brief delay in increasing the borrower's payment to escrow caused excessive "payment shock" when the escrow payment went up, and this "payment shock" may have pushed loans into default and foreclosure.  The "payment shock" literature he cites as the foundation for his theory, however, provides no support for his theory because this literature is not applicable to the payment changes resulting from a delayed escrow analysis.  There is simply no precedent for characterizing the small, temporary payment changes associated with escrow analysis delays as instances of "payment shock."  Furthermore, his causation theory for "undercharge" loans is at odds with the theory underlying his opportunity cost model for the loans at issue.

      19.      For "overcharge" loans, Professor McFadden's theory of causation is predicated on a false characterization of the facts.  He claims that Ocwen demanded additional "overcharge" amounts from borrowers during the alleged delay period.  In reality, the alleged delay simply meant that the pre-existing escrow payment did not change.  No additional amounts beyond what

the borrowers were already paying (if the loan was current) or not paying (if the loan was delinquent) were demanded from borrowers.

20.     Professor McFadden's causation theory for "overcharge" loans is also highly speculative because it contends that loans which were already seriously delinquent at the time of the alleged escrow analysis delay, and therefore already prime candidates for foreclosure, were pushed into foreclosure by the temporarily delayed escrow analysis, and not by the factors responsible for the pre-existing serious delinquency (which Professor McFadden does not properly control for in his analysis).

**2.      Professor McFadden uses an unproven and unrealistic model that is different from those used in the literature he cites.**

21.     Professor McFadden's discrete time proportional hazards model attempts to estimate the probability of foreclosure (the "hazard"), based on various independent variables. He does not cite any mortgage finance literature in support of either his decision to utilize a proportional hazards model of this type, or the independent variables he chose to include and not include in the model.

22.     Professor McFadden opines that his approach is "a standard one in epidemiological research, where the question is the effect of a treatment on the probability of survival."[2]  He never explains how a model that is "standard" in epidemiological research (a branch of medical science) is an appropriate model to use for making predictions in the field of mortgage finance.  In fact, in choosing to use a discrete time proportional hazards model, Professor McFadden ignores a significant body of applicable literature in the field of mortgage finance, including the literature he, himself, cites in his report.  This literature does not endorse the use of discrete proportional hazard models of the type he opted to use in his report.

---

[2] McFadden Report, p. 41.

### 3. Professor McFadden's control group is invalid, causing the results of his damages model to be equally invalid.

23. Professor McFadden correctly claims that a scientifically valid control group must control for all factors affecting the probability of foreclosure and whether or not a given loan was at risk of an escrow analysis delay. His model, however, fails his own test, because it fails to control for whether or not a given loan was at risk of a delayed escrow account analysis. The data show that 27% of the loans in Professor McFadden's control group differed from the loans in his treatment group in a fundamental way: they could not have received a delayed escrow analysis because these loans did not have escrow accounts.

24. Furthermore, despite the importance of controlling for factors that affected the assignment of a loan to the treatment group (*i.e.,* the loans with an escrow analysis delay), Professor McFadden apparently performed no analysis of why some loans received a late escrow analysis and others did not. Rather, he simply assumed that each loan in Ocwen's portfolio had an equal probability of having a delayed escrow analysis. In reality, however, Ocwen-serviced loans did not have equal probabilities of receiving a delayed escrow analysis. Delinquent loans had a very high probability of receiving a delayed escrow analysis, and performing loans had a very low probability, because prior to 2015 Ocwen had a practice that it would not perform escrow analyses for delinquent loans. It should come as no surprise that, with the deck stacked in this manner, Professor McFadden found loans with a delayed escrow analysis (loans that were far more likely to be delinquent) were more likely to undergo foreclosure. Delinquent loans, as a group, are more likely to reach foreclosure than non-delinquent loans, regardless of whether the escrow analysis is timely or late.

4.   **Professor McFadden's model omits key variables that have been found to increase the probability of default and foreclosure, thereby invalidating the model's integrity.**

25.    Professor McFadden assumes that the Ocwen-produced data he used in his analysis, together with the data he obtained through research, are sufficient to allow him to fully control for all "confounding factors."  In support of his assumption, he claims that Ocwen had an incentive to produce all of the data that he would need in his model.  His claim is unfounded and without merit.  First, he apparently assumes that Ocwen had foreknowledge of what data he would need for his model.  Second, he apparently is unaware of the fact that no servicer possesses all the data needed to control for all "confounding factors."

26.    As a consequence, in building his model, Professor McFadden failed to control for several known "confounding factors" including: the amount of borrower equity in the mortgaged collateral, the borrower's credit score, the borrower's payment capacity, and other payment changes.  Nor does he control for servicing errors made by prior servicers – an especially surprising omission, given his opinion that such errors can have a profound and long-lasting impact on a loan's fate.

5.   **Professor McFadden's decision to count as foreclosures loans that paid off, were modified, or were reinstated, is fatal to his opinions.**

27.    Professor McFadden assumes that once a foreclosure is initiated, the loan is essentially "dead" unless the foreclosure is rescinded.  His assumption is false.  Apparently, he is unaware that even after a foreclosure is initiated, it can be ended in a variety of ways, such as by reinstatement of the loan, sale of the property, or a loan modification.  His model counts all of these outcomes as "foreclosures," even though they are not foreclosures.

28.    As a consequence, Professor McFadden incorrectly identifies 31% more foreclosures in his model than actually occurred.  Stated differently, out of the 32,190 "harmed"

loans that Professor McFadden claims to have ended in foreclosure, 25% ended the foreclosure through reinstatement, modification, or sale of the property.  This error is significant because Professor McFadden's model seeks to explain how many of these "foreclosures" were caused by a late escrow analysis.

> **6.     Professor McFadden erroneously includes many loans in his analysis that, *by his own admission,* did not experience foreclosure as a result of an allegedly delayed escrow analysis, invalidating his damages calculation.**

29.     Professor McFadden acknowledges that for loans with a pre-existing default or foreclosure as of the date that the escrow analysis was allegedly due (the "Alleged Analysis Due Date"),[3] the delayed analysis cannot be shown to have caused a foreclosure.  Nevertheless, 50% of the allegedly harmed and foreclosed loans for which Professor McFadden calculates damages were already in serious default as of the Alleged Analysis Due Date.  In other words, the default giving rise to the foreclosure had already occurred, and therefore the foreclosure was not caused by the allegedly delayed escrow analysis as Professor McFadden wrongly claims.

> **7.     Professor McFadden ignores data produced by Ocwen that refutes his conclusions on causation.**

30.     I have analyzed reason for default data produced by Ocwen for the "harmed" loans for which Professor McFadden calculates foreclosure-related damages, after excluding the loans which Professor McFadden misidentifies as "foreclosures" (25%) and the loans which defaulted prior to the alleged delayed escrow analysis (50%).  In other words, I analyzed this data for the remaining 25% of allegedly harmed and foreclosed loans.  Data produced by Ocwen shows that for at least 17% of the allegedly harmed and foreclosed loans, the reason for default had nothing to do with an escrow analysis delay.  Rather, the default resulted from a reduction in

---

[3] Labeled as the Analysis Due Date in the file utilized by Professor McFadden.

borrower income, medical problems, or some other change in the borrower's circumstances unrelated to his or her escrow account.

**8.      Professor McFadden's model yields results that contradict well-established principles of mortgage finance, thereby undermining the credibility of the model.**

31.      A clear indication that Professor McFadden's model is incapable of yielding reliable results is that the model yields counterfactual results.  Specifically, it purports to find that:

    a)      As unemployment goes up, the risk of foreclosure goes down;

    b)      Investment properties have a lower foreclosure risk than owner-occupied properties; and

    c)      As loans become more seasoned (that is, as the period of borrower performance gets longer), the risk of foreclosure increases.

Lenders, investors, and economists have found through experience and analysis that in each of these cases, the reverse is true.

**9.      Professor McFadden failed to perform a basic reasonableness check of his results, and he therefore failed to recognize that his results are unreasonable.**

32.      Professor McFadden failed to follow the advice given in most, if not all, introductory econometrics texts: make sure that the model's results actually make sense. Professor McFadden's model implies that for loans subject to allegedly delayed escrow analyses, 51% of the foreclosures that occurred were a result of the allegedly delayed analysis.  In other words, his model indicates that more foreclosures resulted from a small, temporary, and self-correcting over- or under-charge, than from the combined effect of the following causes: loss of employment, financial problems, major medical problems, divorce, incarceration of the borrower, and negative equity in the property.  Such a finding is unreasonable.

33.    Professor McFadden's finding is also refuted by the evidence.  First, as summarized in **Table 2**, even without studying the facts and circumstances of default and foreclosure for each of the loans that Professor McFadden claims were "harmed and foreclosed," I am able to rule out the possibility that the allegedly delayed escrow analysis caused a foreclosure for 92% of these loans.

**Table 2**

**Summary of Data Analysis of Allegedly Harmed and Foreclosed Loans**

**Before Individual Analysis**

|  | Percent |
|---|---|
| Mis-specified Foreclosures | 25 |
| Pre-Existing Defaults | 50 |
| Unrelated Reason for Default | 17 |
| Percent with No Foreclosure Caused by Delayed Escrow Analysis - Before Individual Analysis | 92 |

34.    Second, my individual analysis of 100 loans selected at random from the loan population for which Professor McFadden calculates damages shows that not one of the loans – much less half of them – had a foreclosure that could reasonably be attributed to the allegedly delayed analysis.

**10.    Professor McFadden's estimates of foreclosure costs are not supported by the literature he cites and are contradicted by data he relied upon.**

35.    Professor McFadden wrongly opines that the average foreclosure causes the borrower to lose between $20,460 and $26,612 of equity in the mortgaged property.  Here again,

a simple reasonableness check would have enabled him to avoid making this mistake.  Professor McFadden should have asked himself: why would a borrower with $20,000 of equity in his or her home allow a foreclosure to occur, rather than sell the home and pocket the equity remaining after selling expenses?  Putting aside the implausibility of Professor McFadden's opinion, his claim is contradicted by mortgage finance literature and data readily available to him.

36.    Contrary to Professor McFadden's opinion, the normative experience for foreclosures is that the borrower has negative equity in the property, and it is the investor who owns the loan – not the borrower – that is left with a loss when the foreclosure sale takes place.

37.    In an attempt to support his lower-bound estimate of the average borrower's equity loss ($20,460), Professor McFadden utilizes an estimate of the discount on property value experienced by *investors* when real estate owned ("REO") is sold.  He essentially transmogrifies the investor's loss on REO into the borrower's loss.

38.    In an attempt to support his upper-bound estimate of the average borrower's equity loss ($26,612), Professor McFadden cites to a non-peer-reviewed paper that contains no information on borrowers' equity losses from foreclosure.  He also utilizes a flawed methodology to adjust for inflation.

39.    In addition, Professor McFadden incorrectly claims that legal and administrative fees paid by investors in connection with foreclosures are paid by borrowers.  In fact, the source material that Professor McFadden cites in support of his opinion describes these charges as *investor*-paid fees.  Here again, Professor McFadden transmogrifies an investor cost into a borrower cost.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**C.      Other Purported Servicing Failures Identified by Professor McFadden**

40.      Professor McFadden's claim that Ocwen is guilty of 898,774 "servicing failures" misrepresents the cited documents and is unsupported.  Moreover, his contention that all of these alleged "servicing failures" were capable of impacting the borrower is clearly wrong.

### III. QUALIFICATIONS

41.     In this part, I summarize my relevant qualifications to assist the Court and the jury by providing expert testimony in this matter.

#### A.     Work Experience

42.     I have worked as a professional economist for more than 50 years, including extensive service in both the public and private sectors.  This section summarizes my relevant professional experience.

#### 1.     1969-1977: OMB

43.     After leaving graduate school, I joined the Bureau of the Budget (now the Office of Management and Budget, or "OMB") as a program and budget analyst.  In 1972, I was promoted to the position of Assistant Division Director[4] and appointed Chief of OMB's Housing Branch.  In this capacity, I was responsible for analyzing the federal Government's principal programs for making adequate housing accessible to low-income families, promoting homeownership, and stabilizing the Nation's housing market.  These responsibilities encompassed:

- The activities of the Federal Home Loan Bank System in support of mortgage lending and financial institutions whose primary line of business was making residential mortgage loans;

- The Federal Savings and Loan Insurance Corporation ("FSLIC"), which played a key role in helping mortgage lenders attract the retail deposits needed to fund residential mortgage loans at affordable interest rates;

---

[4] The title of my position was later changed to "Assistant Division Chief."

- The Government National Mortgage Association ("Ginnie Mae"), which facilitates mortgage lending by guaranteeing securities backed by federally insured or guaranteed mortgage loans, so as to increase liquidity in the mortgage market;

- The Federal Home Loan Mortgage Corporation (now Freddie Mac), which also facilitates mortgage lending by guaranteeing securities backed by conventional (*i.e.*, not federally backed) mortgage loans;

- The single-family and multi-family mortgage insurance programs operated by the Federal Housing Administration ("FHA");

- The Department of Housing and Urban Development's ("HUD's") numerous other programs for promoting homeownership and increasing the supply of affordable housing, including those programs typically referred to by the section of the National Housing Act that authorized them – Section 221(d)(3), Section 235, and Section 236, as well as the low-rent public housing and Section 8 housing subsidy programs;

- The mortgage loan guarantee program administered by the Veterans Administration (now the Department of Veterans Affairs or "VA"); and

- The rural housing programs operated by the Department of Agriculture's Farmers Home Administration (now part of Rural Development).[5]

44.    I retained all of these responsibilities when, in 1976, I was promoted to the position of Division Director and given responsibility for the Housing, Veterans, and Labor Programs Division – one of the eight program divisions that comprised OMB's principal operating units.

---

[5] I shared this responsibility with OMB's Agriculture Branch.

45.     Throughout my career at OMB,[6] I was responsible for analyzing, and making recommendations to the White House on, all of the issues that arose in connection with my assigned programs.  My responsibilities included evaluating the programs' effectiveness in achieving Congressional and Executive Branch objectives; analyzing the programs' funding requirements; and reviewing all relevant legislation and regulations.

46.     During the 1972-74 period, I led an effort that completely restructured the federal government's subsidized housing policy.  My analyses of the existing subsidy programs' effectiveness helped convince the White House and Congress to replace these programs with the Section 8 Rental Housing Subsidy Program ("Section 8"), which 45 years later is still HUD's primary vehicle for helping lower-income families obtain adequate housing.  I helped draft the legislation authorizing the Section 8 program, and was heavily involved in determining the maximum fair-market rents eligible for subsidy under the program.  During this period, I also developed the first special analysis of federal aid to housing.  This analysis covered all housing assistance programs administered by Government agencies, including tax and credit programs.

47.     As a result of my service at OMB, I became intimately familiar with the importance of the housing market to the U.S. economy and how this market functions.

**2.     1977-1986:  California Legislative Analyst's Office**

48.     In 1977, after conducting a nationwide search, the California Legislature selected me to be the state's Legislative Analyst.  I became the third person to hold this position since it was established in 1941.  As the state's Legislative Analyst, I headed a 95-person office that was responsible for analyzing the programs and budgets of all state agencies, including the California Department of Housing and Community Development and the California Housing Finance

---

[6] Although OMB is part of the Executive Office of the President, I held non-partisan career positions throughout my tenure at the agency.

Agency.  During my tenure, I frequently testified before the Legislature on housing issues.

When I left the Legislative Analyst's Office in 1986, the Legislature passed a joint resolution

commending me for my knowledge, my personal integrity, and my unbiased analyses.

### 3.    1986-1991:  World Savings and Loan Association

49.    In 1986, I accepted a position as Vice President with World Savings and Loan

Association ("World"), a profitable financial institution heavily involved in the mortgage market.

Initially, I headed the Operations Analysis Department – World's internal consulting group.  In

this capacity, I analyzed – and made recommendations for improving – the operations of all

entities within the company, including the retail savings branches, the loan origination centers,

and the loan servicing business unit.  In addition, I coordinated budgeting for the company,

managed its product profitability system,[7] and modeled all proposed capital outlays.  This

experience greatly enhanced my understanding of the economics of mortgage lending and

servicing.

50.    In 1988, I was put in charge of customer service for 75,000 mortgage loan

borrowers.  Approximately seven months later, I was promoted to the position of Loan Service

Manager and given responsibility for 12 departments and 200 employees serving 155,000 real

estate loan customers.  In this capacity, I became knowledgeable about the challenges of

servicing real estate mortgage loans, how servicers seek to keep loans performing, and the

economics of the servicing business.

### 4.    1991-1995:  Federal Home Loan Bank of San Francisco

51.    In 1991, I was recruited to become a Senior Vice President ("SVP") at the Federal

Home Loan Bank of San Francisco ("FHLB-SF").  The FHLB-SF is a privately capitalized

---

[7] The product profitability system established the unit cost to World of performing the key functions involved in gathering retail deposits, obtaining wholesale financing, originating mortgage loans, and servicing loans.

wholesale bank that is an important source of credit for housing-oriented financial institutions headquartered in California, Arizona, and Nevada.  Early in 1992, the bank's President put me in charge of Marketing and Sales – a position I held until late in the year, when I was promoted to the newly created position of Executive Vice President and became the bank's Chief Operating Officer ("COO").

52.     As COO, I was the bank's number two officer, accountable to the President and the Board of Directors for all of the bank's financial and business operations.  My responsibilities included strategy development, business planning, investments, lending, borrowing, cash management, hedging, sales, marketing, underwriting, collateral management, credit risk management, information systems, accounting, financial reporting, and managing the bank's capital position.  In addition, I was responsible for the bank's community investment and affordable housing programs.  These programs help reduce the cost of developing housing for lower-income families.  I also was accountable for compiling and publishing the Eleventh District Cost of Funds Index ("COFI") – the basis for the adjustable interest rates on billions of dollars of mortgages and other debt instruments.

53.     As COO, I was an active member of the bank's Executive Committee, its Credit Committee, and its Asset/Liability Committee ("ALCO").  The Executive Committee was the primary planning, policy setting, and oversight body within the Bank.  The Credit Committee reviewed the financial condition, performance, and management of each member institution, and assessed the institution's creditworthiness and financial prospects.  The ALCO monitored the Bank's exposure to changes in market interest rates, and ensured that the Bank complied with the interest rate risk exposure limits imposed by the regulators and adopted by the Board of Directors.  This committee also oversaw the Bank's $9.2 billion investment portfolio.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    21

54.     My responsibilities as COO also included ensuring that the collateral pledged by borrowers was sufficient to protect the bank if they defaulted on their loans.  Bank staff reviewed the collateral, most of which consisted of mortgage loans on residential properties, and reported their findings to the Credit Committee.

### 5.     1996-2010: LECG, LLC

55.     In 1996, I became a Principal (later called "Director") at the Law & Economics Consulting Group, Inc. (later renamed LECG).  In 1999, I was promoted to Managing Director and assigned the responsibility for managing LECG's flagship office in Emeryville, California – a position I held until 2005.  In January 2008, LECG's CEO appointed me Global Head of the firm's economics practices, including competition policy, regulated industries, and securities litigation.  I gave up this position in September 2009, in order to return to full-time consulting.

### 6.     2010-Present: Berkeley Research Group, LLC

56.     In 2010, I joined Berkeley Research Group as a Director (later called Managing Director).  The nature of my consulting work, however, did not change as a result of the switch from LECG to BRG.  As an economics consultant, I am retained by business organizations and government entities to analyze the economic and public policy consequences of existing or proposed law in a variety of policy areas.  I also am frequently retained to give expert testimony at trial on complex issues involving economics and finance.  Among my past clients are agencies of the United States government, which have retained me to give expert testimony in approximately 40 litigation matters.  Much of my work involves the development or analysis of complex financial models.

### B.     Education

57.     I have an A.B. degree from Dartmouth College, where I was the only one in my 800-member class to be admitted to both the government and economics honors programs.  I

graduated magna cum laude, with high distinction in my major.  I also was elected to the Dartmouth chapter of Phi Beta Kappa and shared the Colby Prize, which is given annually to the outstanding Government major in the graduating class.

58.     In addition, I have an M.A. and a Ph.D. in economics from the University of Michigan.  While at Michigan, I received numerous fellowships, including one from the National Science Foundation, and was elected to Phi Kappa Phi – the nation's oldest, largest, and most selective honor society for economists and other scholars.  My doctoral dissertation is titled "Wage Determination in Public Utilities."

59.     My curriculum vitae is attached as **Exhibit 2**.

**C.     Areas of Expertise**

60.     I have previously been qualified by federal courts as an expert in the following areas (among others): economics, economic valuation, financial modeling, loan servicing, and interest-rate risk.  I have given expert testimony on economic damages at more than 20 trials.  A listing of my expert testimony in the last four years appears in **Exhibit 3**.

**D.     Publications**

61.     **Exhibit 4** provides a listing of my recent publications.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                    23

## IV. BACKGROUND

### A.      The Plaintiff's Allegations

62.      It is my understanding that the Bureau generally alleges that Ocwen violated certain loan servicing regulations.  In analyzing the damages calculations in the McFadden Report, I have assumed *arguendo* that Ocwen sometimes failed to perform escrow analyses in a timely manner, sometimes failed to cancel private mortgage insurance in a timely manner, and sometimes serviced adjustable-rate mortgage loans ("ARMs") with inaccurate information, causing it to temporarily over-collect from borrowers in certain instances.[8]

### B.      Loan Servicing

63.      OLS is a mortgage loan servicer.  In this capacity, it interacts with borrowers on behalf of investors who own the loans being serviced.

64.      In this part, I provide background information on loan servicing and escrow accounts that is relevant to the opinions set forth later in this report.  I believe this background information also will be helpful to the Court in evaluating Professor McFadden's damages claims.

#### 1.      Servicing Performing Loans

65.      In the loan-servicing industry, loans on which borrowers are making their agreed-upon payments in a timely fashion are called "performing loans."  With respect to such loans, a servicer's principal responsibilities are to: (a) collect and apply the borrower's payments; (b) remit to the investor its share of those payments; and (c) provide an accounting to both the investor and the borrower.[9]  The two primary means of communication between a servicer and

---

[8] McFadden Report, pp. 7-8.

[9] Other responsibilities include facilitating loan payoffs, approving requests for assumptions and reconveyances, and answering borrowers' questions about their loans.

borrowers who are current on their loans are (a) the monthly statements prepared by the servicer (together with annual tax forms, such as 1098s), and (b) inquiries to the servicer's customer service department initiated by the borrower.

### 2. Servicing Non-Performing Loans

66.     When a borrower fails to perform according to the terms agreed upon with the lender, the borrower is considered to have defaulted on his or her mortgage loan.  Some defaults are inadvertent and temporary, resulting from mistakes on the borrower's part, such as forgetting to send in a payment before the end of the grace period (typically 15 days after the payment due date) or sending the payment to the wrong address.  Permanent defaults (*i.e.*, when a borrower permanently stops making payments as agreed) most commonly arise when a borrower is no longer able to afford the monthly mortgage payment, including any required payments to an escrow account, often due to an impairment of the borrower's financial position.[10]

67.     Since the onset of the financial crisis in 2007, "strategic defaults" have become more common, posing an additional challenge for loan servicers such as OLS.  A "strategic default" occurs when a borrower has the means to make the required mortgage payment but no longer desires to do so.  "Strategic defaults" usually reflect the fact that, due to a fall in home prices, the borrower owes more on his or her mortgage loan than the mortgaged property is

---

[10] For example, a 2015 study found that 80% of defaulting households experienced a major shock to their cash flow, such as a job loss, a severe income loss, divorce, or hospitalization (*see* Gerardi, *et al.*, *Can't Pay or Won't Pay?  Unemployment, Negative Equity, and Strategic Default*, Federal Reserve Bank of Boston Working Papers, No. 15-13).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

worth – a situation described as "negative equity."  Research estimates that "strategic defaults" comprised between 18% and 26% of defaults following the onset of the financial crisis.[11]

### 3. Protecting the Investor's Interest in the Collateral Securing the Loan

68.     It is the servicer's responsibility to protect the investor's interest in the collateral (*i.e.*, the mortgaged property) that the borrowers pledged as security for their loans.  By protecting the collateral, the servicer will prevent or minimize the investor's loss (and sometimes the borrower's loss, as well) in the event the borrower stops fulfilling his or her contractual obligations set forth in the mortgage documents.

### 4. Hazard Insurance

69.     One way that a servicer protects an investor's interest is by ensuring that the borrower maintains adequate hazard insurance for the mortgaged property.  When the mortgaged property is adequately insured, the loan is effectively secured,[12] even if the property is damaged or destroyed by fire, flood, or some other disaster.  When borrowers sign the security instruments associated with their mortgage loans (*i.e.*, a mortgage or deed of trust), they agree to maintain adequate insurance on the property.  For example, the standard security instrument on the Fannie Mae website for Florida loans contains the following provision:

> Borrower shall keep the improvements now existing or hereafter erected on
> the Property insured against loss by fire, hazards included within the term

---

[11] A survey of 1,000 households in 2008-2009 (designed to be representative of all U.S. households) found that 26% of defaults were strategic defaults.  This finding was based on responses to a survey that asked participants how many people they knew who had defaulted on their mortgage, and how many of these people walked away from their mortgages, even though they could afford to make the required monthly payment (Guiso, Luigi, Paola Sapienza, and Luigi Zingales, "Moral and Social Constraints to Strategic Default on Mortgages," Einaudi Institute for Economics and Finance, EIEF Working Paper, 05/09, June 2009).  A 2010 study used borrower-level credit bureau files to identify strategic defaults, defined as mortgage defaults by borrowers who kept their non-real-estate trade-lines current (a proxy for ability to pay).  The study found that 19% of mortgage defaults in Q4 2008 and Q2 2009 were strategic defaults (Experian/Oliver Wyman Market Intelligence Report, *Understanding strategic default in mortgages: Q2 2010 update*, Experian, Oliver Wyman, www.marketintelligencereports.com (available at: https://www.experian.com/assets/decision-analytics/reports/strategic-default-report-2-2010.pdf).

[12] To the extent of the market value of the property.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.[13]

**5.      Real Estate Taxes**

70.      A second way that a servicer protects an investor's security interest in the mortgaged property is by ensuring that the investor's lien does not become subordinated to liens held by other claimants, such as a local taxing authority.  When borrowers sign the security instruments associated with their mortgage loans, they agree to pay their property taxes.  For example, the standard security instrument on the Fannie Mae website for Florida loans contains the following provision:

> Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument…[14]

71.      If a homeowner fails to pay his or her property taxes, one remedy available to the tax collector is to place a lien on the property, which typically takes precedence over the investor's lien.  To guard against this risk, servicers typically contract with an outside vendor to monitor tax payments on property pledged as collateral for the loans they service.  If the vendor reports that the taxes are past due, the servicer typically will make the required payment on the borrower's behalf.[15]

---

[13] Downloaded August 29, 2019 from https://www.fanniemae.com/singlefamily/security-instruments.  A similar provision is in the security instruments for other states.

[14] Downloaded August 29, 2019 from https://www.fanniemae.com/singlefamily/security-instruments.  A similar provision is in the security instruments for other states.

[15] By paying past-due property taxes on the borrower's behalf, the servicer may confer benefits on the borrower, as well as on the investor.  By keeping the borrower's property-tax status current, the servicer may avoid or minimize late fees that the borrower would otherwise incur.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 6. Mortgage Insurance

72.     In addition to hazard insurance, which in my experience is required for all mortgage loans, some mortgage loans also require the borrower to obtain mortgage insurance or "PMI."[16]  PMI insures lenders against some or all of the loss that occurs when a borrower permanently defaults on his or her loan obligations and the proceeds from mortgaged property are insufficient to fully compensate the lender for the amounts owed.  PMI has been a common requirement for mortgage loans when the loan-to-value ratio at the time of origination is in excess of 80%.  In many instances, PMI premiums are paid by the borrower on a monthly basis, although there are PMI policies that require payment in a lump sum at the time of origination, or that are purchased directly by the lender (*i.e.*, lender-paid PMI).

73.     For loans with monthly PMI payments by the borrower, the insurance is not required to be in place during the entire life of the loan.  Borrowers may ask a servicer to cancel PMI if they can show that their loan-to-value ratio is 80% or lower.  Lenders are required to cancel PMI for most performing loans when the principal balance drops to 78% of the property value at origination.

### 7. Escrow Accounts

74.     For higher risk loans, lenders or servicers (on behalf of investors) may require at the inception of the loan that a borrower fund an escrow account[17] to provide a source of funding for insurance-policy premiums (both hazard and PMI) and property taxes when they are due.  An escrow account reduces the risk that property taxes and insurance premiums will not be paid by the borrower on time.[18]

---

[16] The "P" in PMI stands for "private."

[17] Escrow accounts are often referred to as "impound accounts"; the names can be used interchangeably.

[18] In my experience, all loans with borrower-paid PMI have escrow accounts.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                28

### a.     How escrow accounts work

75.     When an escrow account is established, the servicer: (a) collects from the borrower with each monthly payment (in addition to the amounts for principal and interest) an amount needed to pay taxes and insurance; (b) deposits the monies collected into a special account in the borrower's name; and then (c) makes payments from the account for insurance premiums and property taxes on the borrower's behalf when they are due.

76.     Although the servicer maintains the escrow account, the money in the account belongs to the borrower and can only be used for authorized purposes.  In this respect, an escrow account is like any other depository account: the funds in the account represent an asset for the homeowner, and a liability for the servicer.  When a borrower sells his or her home at a point in time when neither a property tax bill nor an insurance premium is due, the borrower will be paid the balance of the funds in the escrow account.

### b.     Benefits to the borrower

77.     In addition to the risk-reduction benefit to the mortgage loan holder, an escrow account also provides benefits to the borrower.  It converts what would normally be relatively large and infrequent payments into a stable monthly payment. The escrow account thereby lessens the potential burden associated with paying what is typically an annual mortgage insurance premium and a semi-annual property tax payment.  The escrow account also saves borrowers the hassle of monitoring their bank account balances to ensure they maintain sufficient funds to cover the irregular property tax and insurance payments.  In this way, the escrow account offers the borrower a convenience.  The escrow account mitigates the risk of late

payment of property taxes and the fees associated with such late payments.[19]  Finally, many borrowers receive favorable interest rates on their escrow balance.

### c.    Interest on escrow accounts

78.    In 15 states, mortgage servicers are required to pay interest on escrow account balances.[20]  Each state has its own regulations specifying the minimum interest rate.  The rates mandated by these 15 states either approximate the rates paid on savings accounts, or are modestly above these rates.  The most populous state requiring an interest rate above prevailing savings account rates is California, which requires servicers to pay a rate not less than 2%.  The law in Minnesota is more generous, requiring payment of a 3% interest rate.  In Alaska, the law has the potential to be even more generous: Alaska requires the payment of interest at the note rate, less 2%.[21]

79.     Since 2014, savings account interest rates have been so low that most savings accounts generate no material earnings.  For example, the National Money Market Rate on Deposits Less than $100,000, as published by the Federal Reserve Bank of St. Louis, was 0.08% from 2014 through mid-2017, before gradually climbing to about 0.19% as the Federal Reserve began to raise its benchmark rate.[22]  To put this rate into perspective, a $1,000 balance earning interest at 0.08% generates $0.80 of interest per year.

80.     As a consequence of the foregoing, borrowers in states like California, Minnesota, and Alaska are, all else constant, better off having funds in escrow accounts than in their personal savings accounts, let alone their checking account.  Because savings account interest

---

[19] Based on my review of the data produced in this matter, when Ocwen was late making a property tax payment, it would pay the late fee out of its own funds.

[20] *See* **Exhibit 5**.

[21] *See* **Exhibit 5**.

[22] This data was retrieved from https://fred.stlouisfed.org/series/MMNRNJ.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

rates since 2014 have been so low, even borrowers in states where servicers are not required to pay interest have not been meaningfully disadvantaged by having their funds held in escrow accounts.[23]

### 8. Payment of Property Taxes and Insurance Premiums for Loans in Default

81.     Because it is the servicer's responsibility to protect the investor's interest in the collateral, the servicer must continue to pay property taxes and insurance premiums even when a borrower is not funding the escrow account.  In instances of more sustained defaults, such as when a borrower falls more than 60-days behind on his monthly payments, it is common for the escrow balance to become negative.  When an escrow balance turns negative, it means that the servicer is no longer using the borrower's funds to make property tax and insurance payments on his or her behalf, but rather is advancing its own funds on behalf of the borrower until such time that either (a) Ocwen is reimbursed from proceeds that would otherwise go to the investor (*e.g.*, in the event of a loan modification or disposition of the collateral), or (b) the borrower reinstates his loan.  A negative escrow balance is referred to as an escrow "deficiency."

### 9. Understanding the Mechanics of Escrow Accounts

82.     In order to evaluate the validity of Professor McFadden's damages calculations, it is important to understand the mechanics of an escrow account.

#### a.     The annual escrow analysis

83.     At a general level, a loan servicer will analyze disbursement activity from each escrow account once each year,[24] and project the monthly escrow payment amount that needs to be collected from the borrower in order to: (a) have sufficient funds on deposit in the account to

---

[23] Especially after consideration is given to the other benefits of an escrow account that I described earlier.

[24] A borrower can request a non-standard interim analysis if, for example, insurance premiums or property tax liabilities change.

make the required tax and insurance payments, and (b) maintain a cushion in the account equal to two months of escrow payments (the "Cushion Amount").[25]

84.     The first step in the escrow analysis is to calculate a target escrow payment equal to one-twelfth of the projected annual escrow disbursements (the "Target Escrow Payment"). Servicers assume that future escrow disbursements will be equal to disbursements during the previous twelve-months.  The second step is to project a monthly escrow balance assuming collection of the Target Escrow Payment and disbursement of the expected property tax and insurance payments.  The servicer compares the minimum projected monthly balance in the escrow account to the Cushion Amount.  If the minimum projected balance in any month is below the Cushion Amount, the difference is a "shortage," and if the minimum balance is above the cushion, the difference is a "surplus."  The borrower can pay the shortage immediately, but the default payment method is for the borrower to repay the shortage over twelve months by adding one-twelfth of the shortage to the Target Escrow Payment.  In the case of larger shortages, Ocwen usually gives borrowers more time to amortize the shortage.[26]  For a performing loan, a surplus is refunded shortly after the escrow analysis is performed.

85.     The servicer will communicate the results of its escrow analysis to the borrower by way of a special escrow statement, and will generally reset the borrower's monthly escrow payment after each analysis.  The payment change date is usually at least forty-five to sixty days after the escrow analysis date, in order to provide sufficient notice to a borrower of the payment change.  The escrow payment change is also communicated to the borrower on the regular monthly billing statements.

---

[25] *See* 12 CFR § 1024.17, retrieved from https://www.consumerfinance.gov/policy-compliance/rulemaking/regulations/1024/17/.

[26] Declaration of Andrew Combs dated August 1, 2019, p. 2.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

86.     Because the escrow analysis process involves several variables and several calculation steps, I believe it might be helpful to the Court if I explain the mechanics of the process in more detail.  I do so at **Appendix A**, using one of Professor McFadden's example loans (loan number ████████

### b.    Escrow Surpluses and Shortages

87.     An escrow <u>surplus</u> is created when the actual run rate of escrow disbursement activity is below the escrow payment amount (calculated based on the assumption that future disbursements will equal disbursement during the preceding 12 months).  An escrow <u>shortage</u> is created when the actual run rate of escrow disbursements exceeds the escrow payment amount (calculated based on the same assumption). In some states, a portion of the shortage can be offset by interest paid on escrow account balances.

88.     The foregoing principles are summarized in **Figure 1**, below.

**Figure 1**

**Development of Escrow Surplus and Shortage**



| Escrow Disbursement Run Rate | < | Escrow Payment | = | Surplus |
| Escrow Disbursement Run Rate | > | Escrow Payment | = | Shortage |

89.     All else constant, tax and insurance payments tend to increase from year to year, meaning that escrow account analyses tend to underestimate disbursements, resulting in shortages.  These shortages generally are repaid by increasing the borrower's new Target Escrow Payment by one-twelfth of the shortage amount.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### c.  Escrow surpluses and shortages are self-correcting

90.     While the specific timing of cash flows to and from borrowers on performing loans depends upon the timing of each escrow analysis relative to the timing of changes in escrow disbursement activity, the amounts ultimately paid by a borrower over the life of a given loan will be no more than the amount disbursed by the servicer (and less than these disbursements in the case of an interest-bearing escrow account).  In any given year, a borrower may pay more or less to the escrow account than the amount the servicer disbursed on his or her behalf, but over time a borrower who does not default will pay no more than the amount of property tax and insurance payments disbursed from the account.  A borrower who defaults on his or her obligations to the lender, of course, will almost always pay less than the amount that the servicer disbursed on his or her behalf.[27]

## C.     Allegedly Delayed Escrow Analysis Population

91.     Professor McFadden calculates opportunity cost damages and damages from additional foreclosures for loans subjected to an allegedly delayed escrow analysis.  As discussed more fully throughout this report, Professor McFadden's calculations rely primarily on data provided by Exhibits A and C to Ocwen's *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019*.  This data lists 391,603 instances where Ocwen did not perform an Escrow Analysis within thirty days of the completion of the applicable Escrow Account Computation Year.

92.     Two factors account for the vast majority of these allegedly delayed analyses.  First, prior to 2015, Ocwen's interpretation of the applicable regulations concluded that escrow

---

[27] The portion of escrow disbursements that the borrower does not fund will almost always be paid by the investor, except in cases where the proceeds from liquidating the mortgaged property are non-existent, or so low that they do not provide a sufficient repayment source.

analyses were not required for delinquent loans,[28] because the regulations did not require that the servicer send an escrow statement to a delinquent borrower.[29]  This practice was described by Andrew Combs during his deposition, which Professor McFadden included in his list of documents considered.[30]  Second, a system change that occurred in late 2014 and early 2015 caused Ocwen to put the escrow analysis process on hold for a period of time.[31]  I have prepared two analyses that may be helpful to the Court in understanding the pattern and dispersion of these alleged escrow analysis delays.

93.     **Figure 2,** below, shows the number of allegedly delayed analyses, by the month in which the escrow analysis was allegedly due (the "Alleged Analysis Due Date").[32]  The bar chart distinguishes loans that were delinquent as of the Alleged Analysis Due Date from those that were not delinquent.

---

[28] Deposition of Andrew Combs, 12:7-13:9.

[29] Deposition of Andrew Combs, 12:7-13:9; and 12 CFR § 1024.17 (retrieved from https://www.consumerfinance.gov/policy-compliance/rulemaking/regulations/1024/17/) noting: "(2) No annual statements in the case of default, foreclosure, or bankruptcy. This paragraph (i)(2) contains an exemption from the provisions of § 1024.17(i)(1). If at the time the servicer conducts the escrow account analysis the borrower is more than 30 days overdue, then the servicer is exempt from the requirements of submitting an annual escrow account statement to the borrower under § 1024.17(i). This exemption also applies in situations where the servicer has brought an action for foreclosure under the underlying federally related mortgage loan, or where the borrower is in bankruptcy proceedings. If the servicer does not issue an annual statement pursuant to this exemption and the loan subsequently is reinstated or otherwise becomes current, the servicer shall provide a history of the account since the last annual statement (which may be longer than 1 year) within 90 days of the date the account became current."

[30] Appendix B to the McFadden Report.

[31] Per discussion with Andrew Combs.

[32] This chart is limited to the 272,007 loans which Professor McFadden classifies as "harmed," and for which he calculates damages.  I consider a loan delinquent on the Alleged Analysis Due Date if the payment due date as of the analysis due date was more than 31 days prior to the Alleged Analysis Due Date.  This analysis utilizes the Transaction History data produced by Ocwen in this matter at RFP 22 in response to *Plaintiff's Fifth Set of Requests for Production to Defendants*.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 2**
**Distribution of Allegedly Delayed Escrow Analyses**
**By Month of Alleged Analysis Due Date and Payment Status[33]**



94.     **Figure 2** illustrates several important findings about the allegedly delayed analyses:

- The number of allegedly delayed escrow analyses went down substantially after March 2015.  Stated differently, 99% of the allegedly delayed analysis occurred during or before March 2015.

- In months other than December 2014 through March 2015, 84% of allegedly delayed analyses involved delinquent loans.

- There was a temporary spike in allegedly delayed analyses starting in December 2014 and continuing through March 2015.  The spike was driven by allegedly

---

[33] The data underlying **Figure 2** is attached at **Exhibit 6A**.  Per the Deposition Testimony of Andrew Combs (12:7-13:9), I define a delinquency as at least 60 days delinquent, so as to conform to Ocwen's practice at the time.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

delayed analyses for performing loans.  In fact, 95% of the alleged delays for performing loans occurred between December 2014 and March 2015.

95.     **Table 3,** below, shows the average length of the alleged delay in completing the escrow analyses, by the status of the loan as of the Alleged Analysis Due Date.  It shows that the alleged delays for performing loans were generally quite short: 37 days on average.  In contrast, the alleged delays for delinquent loans were longer: 161 days on average.  The reason for this difference is that based on its interpretation of the applicable regulations, Ocwen did not perform escrow analyses for delinquent loans prior to March 2015.  As a result of this practice, escrow analyses for delinquent loans generally were delayed until either the loan became current or the practice was changed and Ocwen began performing annual escrow analyses for these loans.

96.     In contrast, the vast majority of the delays for performing loans were the result of Ocwen's temporary inability to perform escrow analyses during late 2014 and early 2015, while it was upgrading its loan servicing system.[34]  The resulting delays in completing escrow analyses were relatively short.  Otherwise, it is my understanding that an escrow analysis for performing loans might be briefly delayed in the normal course of business if Ocwen is unable to obtain the information needed to perform the analysis (for example, from a taxing authority or insurance carrier).  Because there is normally a lag between the escrow analysis date and the date when the new payment based on the analysis takes effect, a short delay in completing the analysis may not even affect the timing or amount of the borrower's new mortgage loan payments.

97.     Also in **Table 3**, I also report the proportions of loans with allegedly late escrow analyses that were subject to foreclosure.  Not surprisingly, the rate of foreclosure for delinquent loans (33.6%) is much higher than the rate of foreclosure for loans that were performing at the

---

[34] Per BRG interview of Andrew Combs.

time of the allegedly delayed analysis (1.5%).  Although delinquent loans comprise 23% of the loans subject to an alleged escrow analysis delay,[35] they accounted for 96% of foreclosures.[36]

**Table 3**
**Average Days of Alleged Delay and Foreclosure Percent, by Payment Status[37]**

|  | Number of Loans | Average Days of Delay[38] | Foreclosure Percent |
|---|---|---|---|
| Performing Loans | 209,360 | 37 days | 1.5% |
| Delinquent Loans | 62,647 | 161 days | 33.6% |
| Overall | 272,007 | 66 days | 8.9% |

98.     In summary, two distinct factors explain the vast majority of the allegedly delayed escrow analyses, resulting in two very distinct populations of loans – in terms of the reason for the delay, the length of the delay, and the subsequent performance of the loans.

**D.      Foreclosures**

99.     The largest category of damages calculated by Professor McFadden is damages that he contends are associated with foreclosures caused by the allegedly delayed escrow analyses.  In this section, I provide a brief background on the foreclosure process.

---

[35] 62,647 divided by 272,007.

[36] 33.6% divided by (1.5% + 33.6%).

[37] This data is at **Exhibit 6B**.

[38] There are 11,970 loans in the 272,007 with no Actual Analysis Date (*i.e.*, "last analysis date"), and for which the days of delay is therefore not calculable.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 1. Judicial vs. Non-Judicial Foreclosure

100.    Generally speaking, there are two types of foreclosures: judicial and non-judicial. In a judicial foreclosure, the process through which the lender takes title to the mortgaged property is administered by the courts.  In a non-judicial state, the lender can obtain title to the mortgaged property outside of the court system.  In the U.S., 29 states have non-judicial foreclosure processes.[39]

### 2. First Filing

101.    In a judicial foreclosure, the first step is the filing of a complaint with the court. In a non-judicial foreclosure, the first filing usually occurs when the lender provides the borrower with a notice of default.[40]  Borrowers generally have the ability to end the foreclosure process after the first filing by reinstating the loan, by obtaining a loan modification, by selling the home and paying off the loan in full, or through other forms of loss mitigation such as a short sale or giving the lender the deed-in-lieu of foreclosure.  The foreclosure process is put on hold while loss mitigation options are considered, and is discontinued if loss mitigation is feasible. There is not a corollary process to the first filing that provides notification to interested parties that the foreclosure process has been terminated.

### 3. Foreclosure Sale

102.    If a foreclosure is not terminated, the end of the process is a foreclosure sale.  The foreclosure sale typically is scheduled later in the process, after the first filing, and usually takes a long time.  For example, Fannie Mae publishes a "maximum number of allowable days" between the due date of the last paid installment (which is at least 120 days before the first filing)

---

[39] https://www.fanniemae.com/content/guide_exhibit/foreclosure-timeframes-compensatory-fees-allowable-delays.pdf.

[40] In some states, there are other forms of notification.

and the foreclosure sale date.  The average duration is 671 days, with an average of 522 days for non-judicial foreclosure states and 837 days for judicial foreclosure states.[41]

103.    Ocwen produced a data set of foreclosure sales showing the date each sale was held and whether a sale was rescinded.  Loans with a first filing that show-up in Ocwen's foreclosure sale data were classified by Professor McFadden as either "sale finished" or "rescinded."  Loans with a first filing that are not listed in the foreclosure sale data are classified by Professor McFadden as "ongoing."

### 4.    REO

104.    The price at which a property is offered at a foreclosure sale is generally at least equal to the amount owed on the loan.  While some homes are purchased by third parties at the foreclosure sale, the far more-common outcome is the transfer of title to the lender because the market does not value the property at an amount equal to or greater than the amounts owed.  When a property goes through the foreclosure sale process and is not acquired by a third party, it becomes real estate owned ("REO") by the lender.  The servicer typically seeks to sell the REO as soon as possible, to mitigate the investor's loss.

### E.    Professor McFadden's Damages Calculations

105.    Professor McFadden purports to estimate two types of damages that allegedly resulted from Ocwen's servicing errors: opportunity cost damages and foreclosure-related damages.

---

[41] https://www.fanniemae.com/content/guide_exhibit/foreclosure-timeframes-compensatory-fees-allowable-delays.pdf.

### 1.      Opportunity Cost Damages

106.     Professor McFadden identifies certain loans where he claims an Ocwen servicing error caused borrowers to temporarily pay more on their mortgages than they should have been required to pay.[42]  He acknowledges that these borrowers were reimbursed in full for the overcharges, but he nonetheless claims that the overcharges caused borrowers to sustain opportunity cost damages during the period between payment and reimbursement.[43]  Professor McFadden claims that during the overcharge period, the excess payments may have caused borrowers to turn to expensive sources of funding to obtain the money needed to pay the overcharge amounts, or alternatively, the overcharges may have prevented borrowers from paying down expensive unsecured obligations.[44]

107.     Professor McFadden opines that the best measure of a borrower's opportunity cost resulting from overpayments is the interest rate on credit card balances carried over from month-to-month, which he estimates to be either 13%, 16%, or 20%.[45]

### a.      Overcharges Resulting from Allegedly Delayed Escrow Analyses

108.     Professor McFadden estimates that total opportunity cost damages to borrowers on 93,223 loans that experienced allegedly delayed escrow analyses range from $1.2 million to $1.7 million.[46]  The first step in Professor McFadden's damages methodology is to retrieve the "Escrow Surplus" that was reported by Ocwen to have "accrued" during "each time period for

---

[42] McFadden Report, pp. 17-18.

[43] McFadden Report, pp. 17-23.  Professor McFadden implies, though he does not say so in his report, that Ocwen's reimbursements for improperly charged PMI fees were less than the amounts charged borrowers.  As I discuss below, he offers no evidence in support of this allegation, and my review of the evidence proves that he is mistaken.

[44] McFadden Report, pp. 14, 17.

[45] McFadden Report, pp. 19-20.

[46] McFadden Report, p. 32.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

which Ocwen did not perform an Escrow Analysis." This data appears in Exhibit C to Ocwen's *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019.*[47]

109. The second step in his methodology is to divide this accrued escrow surplus amount by the number of months associated with each alleged delay, so as to calculate a monthly overpayment. As a simple example, if Exhibit C reported an accrued surplus of $100 associated with a four-month delay, Professor McFadden would calculate a $25 overpayment for each of the four months during the alleged delay period.

110. The third step is to model the period of time over which the borrower was reimbursed for this overpayment.[48] Professor McFadden modeled three repayment scenarios:

a)  *Lump Sum Repayment Method* – If the borrower had a surplus escrow balance on the Actual Analysis Date, Professor McFadden assumes that the overpayment was repaid to the borrower in a single lump sum on that date.

b)  *Spread Repayment Method* – If the borrower had an escrow shortage on both the Alleged Analysis Due Date and the Actual Analysis Date, Professor McFadden assumes that the overpayment was repaid over the time period that Ocwen gave the borrower to repay the escrow shortage – ranging from 12 months to 60 months.

c)  *Lump Sum and Spread Repayment Method* – If the borrower had an escrow shortage on the Alleged Analysis Due Date, but an escrow surplus on the Actual Analysis Date, Professor McFadden assumes that the overpayment was partially

---

[47] Exhibit C to Ocwen's *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019.*

[48] Each of these calculation methods is shown in the McFadden Report at pp. 25-30.

repaid from the escrow surplus on the Actual Analysis Date, with the balance repaid over the time period Ocwen generally gave the borrower to repay the escrow shortage.

111.    The fourth step in Professor McFadden's methodology is to calculate the present-value of both the overpayments and repayments as of the Alleged Analysis Due Date, and take the difference as the borrower's opportunity cost damages.[49]

### b.    Overcharges of PMI Premiums

112.    Professor McFadden asserts that for 7,856 loans, Ocwen "failed to cancel PMI in accordance with HPA procedures." Although he acknowledges that Ocwen reimbursed borrowers for most of the allegedly improper PMI premium payments, he asserts that these borrowers incurred opportunity cost damages during the interval between the premium payments and the cancellation dates.[50] Professor McFadden estimates these damages for borrowers on 6,293 loans to range from $319,433 to $373,717.[51] (The difference between the 7,856 and 6,293 is the number of loans for which Professor McFadden was unable to show that the improperly charged premiums were actually paid by borrowers.[52])

113.    In estimating the amount of opportunity cost damages allegedly incurred by borrowers as a result of PMI overcharges, Professor McFadden uses the same methodology he used in estimating the damages associated with delayed escrow analyses. He first models the timing of the monthly overpayments and repayments. He then calculates for each loan the

---

[49] McFadden Report, pp. 25-30.
[50] McFadden Report, p. 33.
[51] McFadden Report, pp. 33-34.
[52] McFadden Report, p. 33.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    43

present-value of the two amounts at the time of the first overpayment period.[53]  While Professor McFadden states in his report that he "calculated the NPV of these payments to August 15, 2019,"[54] a review of both his Table 5 and the detailed loan-level damages output he produced reveals that this is not what he, in fact, did.[55]

114.    Professor McFadden also offset his estimate of damages by crediting borrowers with one year's worth of interest on the amount of their overpayment using a 3.25 percent rate.[56] He claims he did so because Ocwen provided such an interest credit on overpayments.

### c.    Overcharges Associated with Alleged ARM Servicing Errors

115.    Professor McFadden identifies 1,263 "instances of loans that needed adjustments to correct for servicing failures because of overcharges by Ocwen."[57]  He calculates damages of $288,684 to $394,490 associated with 1,204 of these loans.[58]

116.    According to Professor McFadden, he identified these 1,204 loans using comment codes and Transaction History data that Ocwen provided.  He assumes that any time Ocwen performed an audit of an adjustable rate mortgage (as indicated in the comment codes), made a correction to the payment amount (as indicated in the comment codes), and issued the borrower a refund (as indicated in the Transaction History data), it is evidence of a servicing failure by Ocwen.[59]  Nowhere does Professor McFadden point-out the incidence of corrections to ARM interest rates.  Based on my analysis of the comment data utilized by Professor McFadden in

---

[53] McFadden Report, pp. 33-35.

[54] McFadden Report, p. 34.

[55] *See, e.g.*, 0.16PMI_dmg.csv.

[56] McFadden Report, p. 34.

[57] McFadden Report, p. 35.

[58] McFadden Report, pp. 35, 37.

[59] McFadden Report, pp. 35-36.

making his estimates, there are 317,207 ARM loans that had interest rate adjustments in the data provided by Ocwen.[60]  Therefore, the loans requiring adjustments that he identifies represent 0.4% of these ARM loans.

117.    Professor McFadden calculates damages associated with alleged ARM servicing errors by identifying the refund amount, and then spreading this amount equally over the interval between the effective date of the correction (or January 1, 2014 if the effective date was before January 1, 2014) and the date of the audit (or, in many cases, an estimate of this interval).[61] Professor McFadden then calculates the present-value of each amount as of the first date of overpayment, and estimates opportunity cost damages as the excess of the present-valued overpayments above the present-valued repayment.[62]

### 2.    Damages from Additional Foreclosures

118.    By far the largest category of damages that Professor McFadden estimates stems from what he claims are "Additional Foreclosures Attributed to Ocwen's Untimely Escrow Analyses."[63]  He estimates that Ocwen's allegedly delayed escrow analyses associated with "overcharges" and "undercharges" caused 16,636 additional loans to go into foreclosure.[64]  He also asserts that 32,190 of the loans for which Ocwen was allegedly delayed in completing an escrow analysis that resulted in an "overcharge" or "undercharge" had a foreclosure initiated by Ocwen (hereinafter, the "32,190 Allegedly Harmed and Foreclosed Loans").[65]  Therefore, while

---

[60] I utilized the RFP 19A data utilized by Professor McFadden and produced as parts 1 through 65.  I identified ARM adjustments with the comment code "ARM."

[61] McFadden Report, pp. 36-37.

[62] McFadden Report, p. 37.

[63] McFadden Report, p. 62.

[64] McFadden Report, p. 62.

[65] McFadden Report, p. 54.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

he does not say so explicitly in his report, Professor McFadden claims that at least 51% of the initiated foreclosures for this group of loans were caused by temporarily delayed escrow analyses, and all other factors – job loss, hospitalization, divorce, income changes, incarceration of the borrower, negative equity, etc. – caused the remaining 49 percent.[66]

119.    Professor McFadden opines that each of the 16,636 additional foreclosures imposed a cost on the borrower averaging between $21,130 and $29,066.[67]  On this basis, he estimates additional foreclosure damages to borrowers ranging from $351.5 million to $483.5 million.[68]

### a.    Professor McFadden's Discrete Time Proportional Hazards Model

120.    To estimate the number of additional foreclosures caused by the allegedly delayed escrow analyses, Professor McFadden employs a discrete time proportional hazards model.[69]  He identifies the "harmed" loans as those reported at Exhibit C to Ocwen's *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019*.  He classifies any loan for which Exhibit C reports an "accrued surplus" as an overcharge loan, and any loan listed at Exhibit C with an "accrued shortage" as an undercharge loan.[70]  Professor McFadden states that he used his discrete time proportional hazards model to analyze a 50% sample drawn from the "harmed" loans (149,185 sampled loans), and 47,051 loans for which the Bureau did not identify "a servicing error of the type in their complaint."[71]

---

[66] Calculated as 16,636 divided by 32,190.

[67] McFadden Report, p. 62.

[68] McFadden Report, p. 62.

[69] McFadden Report, p. 43.

[70] McFadden Report, p. 44.

[71] McFadden Report, p. 46.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

121.    Professor McFadden model estimates a 6.733% average increase in foreclosure probability for overcharged loans, and a 5.073% average increase in foreclosure probability for undercharged loans.[72]

### b.    Professor McFadden's Lower-Bound Estimate of Foreclosure Cost

122.    Professor McFadden's lower-bound estimate of average borrower foreclosure cost, in the amount of $21,130, consists of three elements: (a) legal and administrative fees of $1,086 for all loans, (b) relocation costs of $780 for an estimated 14.2% of borrowers who were evicted from their property, and (c) equity loss of $20,470, for an estimated 96.7% of the borrowers whose foreclosures were not rescinded.[73]

123.    He derives his estimate of legal and administrative fees by adding together the average reported foreclosure attorney fees ($431) and publication/posting and process server costs ($655), as reported in semi-annual market fee analysis reports that Navigant Consulting prepared for Ocwen covering the periods June 1, 2014 to August 31, 2015.[74]  Professor McFadden derives his estimate of relocation costs from an article published on a Zillow.com blog page by Mary Boone, titled "How Much Does it Cost to Move."[75]

---

[72] McFadden Report, pp. 51-52.

[73] McFadden Report, pp. 58-60.

[74] OCW-CFPB-001-06235505 covers the period 6/1/14 to 2/28/15, and the page cited by Professor McFadden is page 13.  OCW-CFPB-001-0652342 covers the period 3/1/15 to 8/31/15, and the page cited by Professor McFadden is page 15.

[75] https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663/.  Zillow describes Ms. Boone as follows: "Mary was a newspaper writer/editor for 13 years and worked as spokesperson for a Fortune 500 Company before becoming a freelance writer. She has authored more than two dozen books for young readers and writes for a handful of regional home and garden magazines." (https://www.zillow.com/blog/author/maryboone/).  It is not clear why Professor McFadden only applies this figure to evicted borrowers.  Any borrower who loses a home to foreclosure must move out of the home (whether voluntarily or through eviction).  If a borrower has voluntarily vacated the home for a reason other than Ocwen's conduct, then it was necessarily the case that this foreclosure was for some other reason, and should not be included in the damages calculation.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

124.     Professor McFadden's estimate of equity loss per borrower is based on a paper published by the Federal Housing Finance Agency ("FHFA") in which the Agency estimates the price discount on REO (*i.e.*, bank-owned properties) sales, relative to non-REO sales.  He then multiplies the lower-end discount (10%) by what he estimates to be the home values for the "harmed borrowers" ($204,704),[76] yielding a calculation of $20,470.[77]

> **c.     Professor McFadden's Upper-Bound Estimate of Foreclosure Costs**

125.     Professor McFadden's upper-bound estimate of foreclosure costs ($29,066) is derived from a 1995 report by Ana Moreno, titled "The Cost-Effectiveness of Mortgage Foreclosure Prevention," which appears on the Family Housing Fund's website.[78]  The Moreno Report describes the Family Housing Fund as "a nonprofit organization whose mission is to preserve and expand quality affordable housing for families with low and moderate incomes in the seven county metropolitan area of Minneapolis and Saint Paul, Minnesota."[79]

126.     Professor McFadden claims that his $26,612 upper bound average equity loss estimate is equal to the $7,200 estimate in the Moreno Report, adjusted for inflation using the consumer price index.[80]  The $7,200 estimate in the Moreno Report is described as follows:

> Long-term loss of the financial investment in the property. For the homeowners served by [the Northside Residents Redevelopment Council (NRRC)] and [Saint Paul Housing Information Office (HIO)] the difference between the assessed market value and the balance on the home mortgage was $7,200 on average.[81]

---

[76] Professor McFadden calculates this based on the purchase price of properties listed in an Ocwen dataset produced in this matter, multiplied by a factor for an intervening change in property value per home price indices he obtained from the Federal Housing Finance Administration and Zillow.

[77] McFadden Report, pp. 56-58.

[78] McFadden Report, pp. 58-60.  No information is provided about Ana Moreno in the Moreno Report other than describing her as a "housing consultant."

[79] Moreno Report, introduction page.

[80] McFadden Report, p. 58.

[81] Moreno Report, p. 12.

127.    The report cites "Wilder Research Center's Quarterly Report, Cumulative from 7/1/91 to 12/31/94," ("Wilder Report") as support for the $7,200.[82]  The homes and loans underlying the Wilder Report's calculation are described in the Moreno Report as follows:

   a)    Over 800 homeowners in Minneapolis and Saint Paul who received foreclosure prevention counseling and/or emergency assistance between July 1, 1991 and December 31, 1994;

   b)    60 percent had their mortgages reinstated;

   c)    Fifty percent of those reinstated were "still current in their mortgage payments two years after coming to the program."[83]

128.    A most-important descriptive statistic about this $7,200 figure, however, is omitted from both the Moreno Report and Professor McFadden's report: the proportion of loans that actually had a foreclosure.  I address this very important omission later in section VII.C of this report.

129.    Professor McFadden also derives from Exhibit F of the Moreno Report an inflation-adjusted estimate for legal and administrative fees incurred in connection with foreclosures: $3,320.[84]  Exhibit F is characterized in the Moreno Report as showing expenses born by *Fannie Mae,* as the owner of the loan.[85]  It is not clear why Professor McFadden treats

---

[82] Moreno Report, p. 12.  The report also notes: "Of the homeowners served, almost a quarter had two or more mortgages on their house.  Therefore, for those homeowners the home equity would be reduced by the amount of other mortgages on the home."  In effect, Ms. Moreno acknowledges that the $7,200 figure is overstated.

[83] Moreno Report, pp. 10-12.

[84] McFadden Report, pp. 58-60.

[85] Moreno Report, p. 16 and Exhibit F.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

costs borne by Fannie Mae as borrower costs.[86]  I also address this issue later in section VII.C of this report.

130.     Professor McFadden claims that his damages estimates for foreclosures caused by allegedly delayed escrow analyses do not capture other costs that could constitute damages.[87]  In his report, he attempts to explain how "receiving accurate and timely information is critical in financial decision making," but he fails to explain how such allegedly inaccurate or untimely information caused foreclosures or otherwise harmed borrowers.[88]  He also opines that a borrower may experience damages from a lower credit score resulting from a foreclosure.[89]  Finally Professor McFadden opines that "foreclosures incur [*sic.*] costs on communities through reduced property values and tax revenues."[90]

### 3.     Counts of Servicing Failures for Which Damages Were Not Calculated

131.     Finally, Professor McFadden claims that "Ocwen internal documents identify additional populations of borrower who appear to have experienced numerous other servicing failures."[91]  He then presents counts of these purported "failures," by type of failure, and the number of loans "potentially impacted by these failures."[92]  Professor McFadden does not offer opinions on damages with respect to these "other servicing failures," does not explain why he includes this tabulation in his report, and does not explain how these incidences may have "impacted" borrowers.

---

[86] Professor McFadden also quotes the Moreno Report description: "Fannie Mae's Typical Expenses During the Foreclosure Process." (McFadden Report, p. 59).  Without justification, Professor McFadden transmogrifies these Fannie Mae costs to be borrower costs.

[87] McFadden Report, p. 62.

[88] McFadden Report, pp. 62-65.

[89] McFadden Report, pp. 65-66.

[90] McFadden Report, pp. 66-68.

[91] McFadden Report, pp. 11-12.

[92] McFadden Report, p. 12.

## V. ASSIGNMENT AND METHODOLOGY

### A.     Assignment

132.     My primary assignment in this matter was to evaluate Professor McFadden's opinions on damages, and where appropriate, provide my own opinions.  I was also asked to evaluate the extent to which Professor McFadden's assumptions regarding liability are consistent with the claims articulated by the Bureau and with the information that Ocwen provided in discovery.  Finally, I was asked to consider the "servicing failures" identified by Professor McFadden, for which he does not calculate damages, and assess the likelihood that each type of purported "servicing failure" would lead to borrower harm.

### B.     Assumptions

133.     Ocwen's counsel directed me to assume *arguendo* that the Court will find for the Bureau on liability.

### C.     Data

134.     The data I have utilized for purposes of carrying out my assignment is listed at **Exhibit 1** to this report.  During the course of discovery, Ocwen produced millions of data records and many documents.  For purposes of my assignment, it was important that I understand the nature of each data set, as this affects the reliability of the data contained therein.

#### 1.     Raw Transactional Data

135.     One type of data produced in this matter is data extracted from Ocwen's systems, without summarization or manipulation.  A prime example of such data is the Transaction History data produced in response to the Bureau's Request for Production Number 22, in response to *Plaintiff's Fifth Set of Requests for Production to Defendants*.  Transaction History data contains each transaction that Ocwen posted to each loan in its servicing portfolio.  This data set shows, for example, each disbursement from escrow, each amount collected and applied

to the borrower's loan, how each amount was applied to the loan, a record of each loan modification, and the amounts collected in the event of a short sale, foreclosure sale, or REO sale. Throughout this report, I refer to this kind of data as "Raw Transactional Data." When analyzing loan servicing activities, Raw Transactional Data is the most reliable data because (a) it is compiled in the ordinary course of business, (b) it is used to service the loans, and (c) it is subject to Ocwen's internal control processes.

### 2.       Remediation Work Product

136.    A second type of data produced in this matter is remediation work product. From time to time in the ordinary course of business, if Ocwen identified inaccuracies in its loan servicing activities or opportunities for improvement, it would undertake remediation activities and prepare work product in the course of such activities. Such work product may have been used to perform some sort of remediation, or it may have been prepared to summarize the remediation. Throughout this report, I refer to this kind of data as "Remediation Work Product."

137.    Generally speaking, the activities reflected in remediation work product can be corroborated by Raw Transactional Data. I consider Remediation Work Product to be reliable, because (a) it is prepared in the ordinary course of business, (b) it is used to service loans, and (c) it is subject to Ocwen's internal control processes. Where possible, I have endeavored to cross-check Remediation Work Product against Raw Transactional Data. While Remediation Work Product contains information about Ocwen's efforts to remediate certain issues, I have not categorically assumed that all activities reported in Remediation Work Product are indicative of servicing regulations violations.

### 3.       Litigation Work Product

138.    A third type of data produced in this matter is "Litigation Work Product." Throughout this litigation, the Bureau has made numerous requests of Ocwen to provide

information that is not directly available in its Raw Transactional Data or in any Remediation Work Product.  In certain instances, the Bureau requested information that the Bureau itself, or its consultants, could have computed from the Raw Transactional Data.[93]  In response to the Bureau's requests, Ocwen's staff undertook to perform the requested calculations.

139.    It is important to note that Ocwen did not use its Litigation Work Product to service loans, and these reports were not prepared in the ordinary course of business.  In my opinion, experts should not rely on Litigation Work Product if the data they are seeking is available in either the Raw Transactional Data or the Remediation Work Product, since these are primary data sources.  As a damages expert, I generally prefer to rely on contemporaneous information prepared in the ordinary course of business, rather than on litigation work product.

## D.    Methodology

### 1.    Opportunity Cost Damages

140.    In analyzing Professor McFadden's opportunity cost damages estimates, I reviewed his description of the estimates, the estimates themselves, the explicit and implicit assumptions underlying them, and the bases he offered in support of them.  I also tested Professor McFadden's calculations for specific loans using the Raw Transactional Data.  After correcting the errors that I identified in Professor McFadden's models, I then performed my own calculations using what I regard as the appropriate interest rate for estimating opportunity cost damages, as well as an interest rate that can serve as an upper bound on these damages.

### 2.    Damages from Additional Foreclosures

141.    To analyze Professor McFadden's estimates of damages resulting from foreclosures allegedly caused by escrow analysis delays, I first evaluated his discrete time

---

[93] For example, the delinquency information produced in response to RFP #5 of the *Plaintiff's Fifth Set of Requests for Production to Defendants* is information that can be calculated from the Transaction History data.

proportional hazards model, including the assumptions underlying the model, the specification of variables in the model, the inputs used by the model, and the model's outputs.  I also analyzed the per-foreclosure damages estimates he provided, as well as his causation theories.

142.    I reviewed the literature cited by Professor McFadden in support of his analysis, and performed my own review of the relevant literature.  To test the reasonableness and reliability of Professor McFadden's model, I selected a 100-loan random sample from the population of loans for which Professor McFadden calculates damages and which he claims experienced foreclosure.  For each loan in the sample, I analyzed the Raw Transactional Data and determined whether there was a foreclosure, and if so, whether the allegedly delayed escrow analysis caused the foreclosure or was linked to the default event giving rise to the foreclosure.  I then compared the findings from my review with Professor McFadden's results.

### 3.    Counts of Servicing Failures for Which Damages Were Not Calculated

143.    I recomputed each of the loan counts in Table 2 of the McFadden Report, evaluated the extent to which these counts actually represent "servicing failures," and evaluated the likelihood that such "servicing failures" would result in harm to borrowers.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    54

## VI. PROFESSOR MCFADDEN'S OPPORTUNITY COST DAMAGES

144.    In this section, I offer my opinions on Professor McFadden's estimate of opportunity cost damages for three categories of borrowers: (a) those with allegedly delayed escrow account analyses, (b) those with allegedly improper charges for PMI, and (c) those borrowers with ARM loans who allegedly were overcharged.

### A.    Overview

#### 1.    Summary of Errors and Deficiencies in Professor McFadden's Analysis

145.    In my opinion, Professor McFadden's estimate of the borrowers' opportunity cost damages significantly overstates the harm that borrowers actually experienced as a result of Ocwen's alleged servicing errors.  The overstatement results primarily from the illogical and inflated interest rates that Professor McFadden uses to represent a borrower's opportunity cost. He assumes that in the but-for world, (a) all affected borrowers would have carried credit card debt, and (b) all of these borrowers either would have (i) used the funds they allegedly overpaid to pay-down credit card debt or (ii) funded the overpayments with credit card debt.[94]  On this basis, he claims that each borrower's opportunity cost is best represented by the interest rate on consumer credit card debt, which he estimates at 13%, 16%, and 20%.  Professor McFadden's assumptions regarding borrower behavior in the but-for world, however, have no basis in fact.

146.    Professor McFadden's opportunity cost damages calculations for delayed escrow analyses, PMI overcharges, and ARM loan servicing errors also suffer from serious methodological flaws, as explained more fully below.

---

[94] McFadden Report, p. 15 ("I then calculated the net present value ("NPV") of the difference in payment flows to arrive at damages capturing the loss to borrowers in interest that could have been avoided, assuming that they have credit card debt, and at the margin could have reduced this debt.").

### 2. My Affirmative Opinions on Damages

147. After correcting the flaws in Professor McFadden assumptions and methodology, I find that the opportunity cost damages suffered by Ocwen's borrowers is not materially different from $0 (my Most-Likely estimate). My research indicates that the most-likely funding sources for small, temporary, and self-correcting overpayments are the borrowers' own checking and savings accounts. Accordingly, in the but-for world, where Ocwen did not overcharge borrowers, the amounts in question would have been held in these accounts and earned interest at the prevailing rates, or no interest at all. The rates on checking and savings accounts, therefore, best represent the borrower's opportunity cost for foregoing the use of their funds.

148. Given the interest rate environment that prevailed during the period relevant to this litigation, if the funds used to cover any such overpayments had, instead, been kept in these accounts, they would not have provided the borrowers with meaningful interest income.

149. Even using a generous (and, in my opinion, excessive) interest rate of 3.25% – apparently the highest escrow interest rate paid by Ocwen – as a measure of the borrowers' opportunity costs, opportunity cost damages would be $141,143 (my Upper-Bound estimate). These results are summarized in **Table 4** below.

**Table 4**
**Summary of Opportunity Cost Damages**

|  | McFadden Lower Bound | McFadden Upper Bound | Hamm Most Likely Amount | Hamm Corrected Upper Bound |
|---|---|---|---|---|
| Delayed Escrow Analyses | $1,188,115 | $1,715,706 | $0 | $29,020 |
| PMI Overcharges | $319,433 | $373,717 | $0 | $26,518 |
| ARM Overcharges | $288,684 | $394,490 | $0 | $85,605 |
|  | $1,796,232 | $2,483,913 | $0 | $141,143 |

**B.      Detailed Analysis of Professor McFadden's Opportunity Cost Damages**

**1.      Professor McFadden Significantly Overstates the Measure of the Borrowers' Opportunity Cost**

**a.      The Economic Concept of Opportunity Cost**

150.    Opportunity Cost is defined in economics as the cost associated with

opportunities that are forgone when resources are not put to their best alternative use.[95]  One

college economics textbook illustrates the concept of opportunity cost as follows:

> For example, consider a firm that owns a building and therefore pays no rent for office space.  Does this mean that the cost of the office space is zero?  While a financial accountant would say yes, an economist would note that the firm could have earned rent on the office space by leasing it to another company.  This foregone rent is the opportunity cost of utilizing the office space and should be included as part of the economic cost of doing

---

[95] Pindyck and Rubinfeld, *Microeconomics, Sixth Edition*, Prentice-Hall, 2006, p. 214.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

business.[96]

In this example, if the firm could have earned $5,000 per month leasing the space to a third party, rather than occupying the space itself, the firm incurs an opportunity cost of $5,000 per month, even though there is no outflow of cash.

151.     In the economics literature, the concept of opportunity cost is often applied in the context of investment decision-making.[97]  For example, if an individual believes he or she can normally achieve a risk-adjusted return of 5% on an investment, his or her opportunity cost of capital is 5%.  The individual should only pursue a new investment if the expected returns exceed 5%.

152.     The concept of opportunity cost is often employed in damages analyses.  To measure the harm that the defendant's wrongful actions caused the plaintiff, economists construct what is called a "but-for world," in which everything is the same as it was in the real world, except for the absence of the defendant's wrongful actions.  The difference between the plaintiff's economic position in the real world and what its economic position would have been in the but-for world is the measure of the plaintiff's economic damages.  In effect, the defendant's wrongful actions denied the plaintiff the *opportunity* to better itself financially, and thereby imposed an *opportunity cost* on the plaintiff.

### b.     Professor McFadden's Assumed Measure of Opportunity Cost Is Unsound and Unsupportable

153.     Professor McFadden's opportunity cost damages model uses credit card interest rates as the measure of the opportunity cost that borrowers incurred during the period when Ocwen held funds that allegedly should have been in their pockets (or their bank accounts).  He

---

[96] *Id.*

[97] *Id.*, pp. 554-555.

assumes that in the but-for world, a world in which there were no delayed escrow account analyses, no temporary overcharges for PMI, and no overpayments by ARM borrowers, borrowers would have used the amounts that they overpaid on their loans to pay-down credit card debt, thereby reducing the amount of interest they paid on this debt.[98]

154.    In an attempt to justify his use of credit card interest rates as a measure of the borrowers' opportunity cost, Professor McFadden observes that there are many credit cards outstanding in the United States (500 million).[99]  This statistic, however, provides no support for his assumption that in the but-for world, borrowers would have used the funds in question to pay-down their credit card balances.  Most credit-card holders do not carry balances from one month to the next, and therefore pay no interest on their cards.

155.    The National Foundation for Credit Counseling commissions an annual Consumer Financial Literacy Survey that reports, among other things, the percentage of households carrying revolving credit card debt.  The reported results, summarized in **Table 5**, below, show that since 2014, only 33 to 39 percent of households actually carry credit card debt from month-to-month.

---

[98] McFadden Report, p. 16 ("I then calculated the net present value ("NPV") of the difference in payment flows to arrive at damages capturing the loss to borrowers in interest that could have been avoided, assuming that they have credit card debt, and at the margin could have reduced this debt.")

[99] McFadden Report, p. 18. Citing Federal Reserve Bank of New York, Center for Microeconomic Data, Quarterly Report on Household Debt and Credit, 2019: 2Q (Released August 2019) www.newyorkfed.org/micro economics.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    59

**Table 5**
**Consumer Financial Literacy Survey**
**Responses to Question: Roughly how much credit card debt, if any, does your household carry from month to month?[100]**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| % of Respondents Indicating "Any" | 34 | 33 | 35 | 39 | 38 | 37 |
| # of Respondents to Question | 2,016 | 2,017 | 1,668 | 1,649 | 2,017 | 2,086 |

156.    As the table demonstrates, 61 to 69 percent of all households do not pay interest on their credit cards because they make the payments required to avoid interest charges. Assuming the percentages for homeowners are similar,[101] this means that Professor McFadden's assumption regarding the appropriate measure of a borrower's opportunity cost clearly is not valid for most of the borrowers for which he calculates opportunity cost damages.

157.    Nor is his assumption valid for many of the credit-card holders who do carry balances from month to month.  A research paper published by the National Bureau of Economic Research in October 2016, using credit card data published by the plaintiff in this litigation, the Consumer Financial Protection Bureau, found that "29% of accounts regularly make payments at or near the minimum."[102]  The paper further notes that, "some consumers whose optimal repayment is higher than the minimum may underpay due to anchoring."  In other words, some

---

[100] The summary page for the survey (https://www.nfcc.org/2019-consumer-financial-literacy-survey/) notes that: "A majority of U.S. adults, six out of ten, have had credit card debt in the past 12 months, and nearly 2 in 5 indicate their household carries such debt from month to month."

[101] The percentage for homeowners is likely to be higher because, as a group, non-delinquent homeowners (the type at issue in this portion of Professor McFadden's analysis) are wealthier than renters, and therefore less likely to need unsecured loans at relatively high interest rates.

[102] Keys and Wang, *Minimum Payments and Debt Paydown in Consumer Credit Cards*, October 2016, retrieved from https://www.nber.org/papers/w22742.pdf.

credit card holders may pay the minimum by choice, not because they are unable to pay more. This finding indicates that even in the case of those borrowers who do carry credit card balances from one month to the next, Professor McFadden's assumption that in the but-for world, these borrowers would have used the funds in question to pay down their balances, is speculative and almost certainly false for many of them.

158.   In light of the empirical findings summarized above, there is no sound economic basis for Professor McFadden's assumption that the relevant borrowers would have either used overpayment funds to pay down credit card debt or funded the escrow overpayment with credit card debt.

### c.   Research papers cited by Professor McFadden provide no support for his assumed opportunity cost interest rate

159.   As support for his assumptions, Professor McFadden cites to a paper he describes as a "seminal paper published in 1979," which finds that "the discount rate for lower income households could be as high as 27 percent to 89 percent."[103]  This paper, however, provides no support for his opportunity cost discount rates.  The paper's authors did not analyze the opportunity cost (or discount rate) for individuals who make small, temporary, and self-correcting overpayments on their mortgage loans.  The topic of the paper is "Individual Discount Rates and the Purchase and Utilization of Energy-Using Durables."[104]  Needless to say, escrow accounts are not "energy-using durables."

---

[103] McFadden Report, pp. 18-19.

[104] Jerry A. Hausman, *Individual Discount Rates and the Purchase and Utilization of Energy-Using Durables*, The Bell Journal of Economics, Vol. 10, No. 1 (Spring 1979), pp. 33-54. Retrieved from JSTOR.

160.    Second, the authors caution against using the paper in precisely the way Professor McFadden has used it.  The paper reports implied discount rates by income class, based on observations of between 3 and 17 people in each class.  It states:

> While the estimates at the *extreme classes* should be taken as *very uncertain* both because of the *small number of people in each of those classes* and because of the log linearity of the specification, the results do indicate that the discount rate varies markedly with income" (emphasis added).[105]

161.    Third, the research presented in the paper is from a period of time (the late 1970s) when interest rates were much higher than they are today.  For example, the average interest rate on 10-year Treasury Notes in 1979 was more than five times the average rate on these instruments in 2016.[106]  Accordingly, the paper's conclusions – whatever they mean – are not valid in today's interest rate environment.

162.    Fourth, Professor McFadden does not control for changes in behavior that may have occurred over the intervening forty years.

163.    More importantly, even if the paper's estimates of how lower-income households value credit were reliable, rather than (in the author's words) "very uncertain," they would shed no light on how the overpayments in question affected the borrowers' economic position.  If, in the but-for world, the affected lower-income households could have invested their funds so as to yield 27 percent to 89 percent, they clearly would not have been lower-income households any longer.  The inference that Ocwen's borrowers had access to such returns is fanciful.

164.    In sum, this paper is not relevant to the issue before the Court: what economic return would the affected borrowers have realized in the but-for world, where they did not make small, temporary, and self-correcting overpayments on their loans?

---

[105] *Id,* at p. 53.

[106] Federal Reserve Bank of St. Louis at https://fred.stlouisfed.org/series/GS10.  Averages calculated by the author.

165.     Professor McFadden also cites a 2002 paper in support of his assumed opportunity cost discount rate.  This paper does not reach a conclusion on how best to measure opportunity cost, and instead publishes calculation results from other research papers.  The information in the paper is summarized as follows:

> The [discounted-utility] model assumes that a person's time preference can be captured by a single discount rate, ρ.  Over the past three decades, there have been many attempts to measure this rate. Some of these estimates are derived from observations of "real-world" behaviors (e.g., the choice between electrical appliances that differ in their initial purchase price and long-run operating costs). Others are derived from experimental elicitation procedures (e.g., respondents' answers to the question "Which would you prefer: $100 today or $150 one year from today?"). Table 1 summarizes the implicit discount rates from all studies that we could locate in which discount rates were either directly reported or easily computed from the reported data.[107]

166.     This research paper does not describe any of the listed studies as attempting to determine the opportunity costs incurred by borrowers as a result of temporary overpayments.  Nor does it provide any insight into how these borrowers would have used the overpayment amount in the but-for world.  This study, therefore, is also not applicable to the present matter.

167.     In summary, Professor McFadden's assumed opportunity cost discount rates of 13%, 16%, and 20% are unsupported and unsound, and have the effect of greatly inflating his estimate of damages.

### d.     The Borrowers' Probable Opportunity Costs either Were Very Low or Zero

168.     In my opinion, the most-likely measure of the borrower's opportunity costs attributable to the alleged overpayments is the rate that the democratic process has established as fair compensation for holding funds in an escrow account.

---

[107] McFadden Report, p. 19, citing Shane Frederick, George Loewenstein, and Ted O'Donoghue, "Time Discounting and Time Preference: A Critical Review," *Journal of Economic Literature*, June 2002, 40: 351-401.  At 377.

169.     As set forth above, escrow surpluses occur frequently in the ordinary course of loan servicing.  In fact, for performing loans the Bureau's escrow account regulations are designed to produce a positive escrow balance most of the time.  Yet, only 15 states require payment of interest on these balances; lawmakers in the other 35 states apparently have concluded that fairness considerations do not require borrowers to be compensated for holding positive escrow balances.  Nor has the U.S. Congress enacted a law, or the Bureau adopted regulations, requiring the payment of interest on such balances.

170.     With respect to the 15 states that require the payment of interest on escrow balances, most of them set the minimum rate to be paid at levels comparable to the rates paid on ordinary savings accounts.  Since 2014, the rate of interest paid on these accounts has been close to zero.  The most populous state requiring the payment of interest on escrow account balances is California, which has set the minimum interest rate at 2 percent.  The highest specified minimum rate is 3 percent in Minnesota, although Alaska's minimum rate – set at 2 percent below the note rate – at times may exceed this level.[108]  In correspondence cited by Professor McFadden, Ocwen notes that the highest rate required for any escrow account as of August 2014 was 3.25 percent (which I assume was for a loan in Alaska).[109]

171.     In summary, no state requires the payment of interest on escrow account balances at rates anywhere close to the rates Professor McFadden uses in his damages estimates.  Nor does any state use credit card rates as the basis for the rate that must be paid on escrow account balances.  To the contrary, states with escrow interest requirements generally specify that

---

[108] This information is summarized at **Exhibit 5**.

[109] McFadden Report, p. 33 citing Daniel K. Reeves, August 25, 2014 (10:25 AM), email to Thomas J Diller, "PMI Auto-Termination," OCW3-027-0005675.

borrowers should receive interest consistent with what they would have received if the funds had been held in a savings account.

172.    The case for using prevailing rates on savings accounts as a measure of the affected borrowers' opportunity costs is especially persuasive, given what we know about how consumers meet unexpected demands for cash.  The Consumer Financial Literacy Survey, mentioned above, also asked respondents "If you needed $2,000 for an emergency, where/how would you get the money?"  Only 7-9 percent of respondents over the relevant time period indicated that they would borrow the money from either a payday lender or other short-term funding source.[110]  According to the survey, most respondents said they would turn to low cost or no cost funding sources even for an unexpected $2,000 payment.  It is reasonable to assume that an even greater number would use low-cost or no-cost funding alternatives to cover unexpected payments one-tenth the size of the hypothetical emergency payment referenced in the Survey. (According to Professor McFadden, overpayments by Ocwen borrowers averaged $208.[111])

173.    Data published by the U.S. Bureau of Economic Analysis also supports an assumption that small, temporary, and self-correcting overpayments caused by a delayed escrow analysis were funded with savings drawn from low-yielding or no-yielding bank accounts.  The personal savings rate in the United States has been between approximately 6% and 9% of income from 2014 to the present.[112]  This suggests that most borrowers have some amount of savings, and would be able to utilize low- or no-cost savings before tapping expensive credit card financing to cover escrow overpayments.

---

[110] Data retrieved from https://www.nfcc.org/2019-consumer-financial-literacy-survey/.

[111] McFadden Report, p. 30.

[112] Data retrieved from https://fred.stlouisfed.org/series/PSAVERT.

174.     Based on the foregoing, and consistent with the actions of state lawmakers, I conclude that the most-likely funding source for escrow overpayments is a borrower's own funds, whether held in a checking or savings account, or otherwise.  Given that such accounts tended to pay very low rates of interest during the applicable time period (if they paid any interest at all), it is unlikely that temporary escrow overpayments would have caused borrowers to sustain any material opportunity cost damages.

175.     In my opinion, therefore, the appropriate interest rate to use as a measure of the borrowers' opportunity cost with respect to small, temporary, and self-correcting escrow overpayments resulting from allegedly delayed escrow account analyses is the market interest rate on checking and savings accounts.  This rate was zero or near zero over the period of time relevant to this litigation.  If the Court concludes that, notwithstanding the minimal opportunity cost damages incurred by affected borrowers, they should receive some compensation for foregoing the use of their funds for several months, it is my opinion that the upper bound of possible interest rates that could be used in calculating their compensation is 3.25 percent - the highest interest rate that paid on an escrow account balance as of August 2014.

### 2.     Allegedly Delayed Escrow Analyses

176.     In this part of my report, I identify the specific flaws in the methodology Professor McFadden uses to estimate damages allegedly resulting from delayed escrow analyses. I will then highlight the manifestations of these flaws, using the same loans he uses as examples in his report.

### a.     85% of Professor McFadden's calculated damages are for borrowers who were *not* overcharged.

177.     The largest category of loans for which Professor McFadden calculates damages consists of loans that he claims had escrow *shortages* on the Alleged Analysis Due Date <u>and</u> the

Actual Analysis Date.  For these loans, Professor McFadden models the repayment of his claimed overpayments using his "spread" repayment method described earlier in this report. This category contains 63% of the loans for which he calculates damages, and it accounts for 85% of his estimated damages.[113]

178.      As explained above, an escrow shortage only exists when prior escrow payments made by the borrower were insufficient to cover disbursements made by the servicer on the borrower's behalf.  In other words, the borrower on a loan with an escrow shortage, by definition, has not overpaid the servicer; rather, he or she has underpaid the servicer relative to the amounts disbursed from the escrow account.  Therefore, Professor McFadden is wrong when he asserts that borrowers with escrow shortages paid too much to Ocwen.  In reality, they paid too little,[114] and did not suffer any opportunity cost damages.[115]  As a consequence of this major error, Professor McFadden's damages are overstated by at least 85%, even using his inflated opportunity cost interest rate.

---

[113] *See* **Exhibit 7**.  The disproportion between the count of loans (63%) and the amount of damages (85%) is a function of the longer "spread" repayment periods that Professor McFadden used for these loans.

[114] This is not to say they paid less than what was asked of them, only that their payments did not sufficiently fund their escrow accounts so as to eliminate a shortage.

[115] Professor McFadden appears to have made this error because he believes "[t]he borrower's escrow balance on the actual analysis date is independent of whether or not the borrower was overcharged as a result of Ocwen's servicing failure" (McFadden Report, p. 22).  He then attempts to justify his belief with an abstract tautological exercise.  At page 22, he states:

> The borrower's escrow balance on the actual analysis date is independent of whether or not the borrower was overcharged as a result of Ocwen's servicing failure.  An overcharge means that the borrower's escrow balance was higher in the actual world relative to the but-for world, but it has no implications on the escrow balance level at a point in time. For example, a borrower with an overcharge of $100 may have had a shortage of -$150 in the but-for world and -$50 in the actual world.  Alternatively, this borrower may have had a shortage of -$75 in the but-for world and a surplus of $25 in the actual world. As a third alternative, this borrower may have had a surplus of $50 in the but-for world and a surplus of $150 in the actual world. In all three cases, the borrower would appear to have an overcharge of $100, but her escrow balance on an analysis date could be either a shortage or surplus.

Professor McFadden's attempt to justify his contention is completely removed from the reality of loan servicing.   Professor McFadden fails to test the validity of his methodology or his understanding with any actual escrow accounts, as I will do later in this expert report.

### b. Professor McFadden's analysis is incomplete because it ignores interest accrued on escrow balances.

179.    The foundation for Professor McFadden's opportunity cost damages model is his assertion that borrowers were delayed in receiving the economic benefits from use of their own funds because the funds were tied up in escrow accounts and not accessible to them. Accordingly, his analysis assumes that the escrow balance but for the alleged delay would have been lower than the actual escrow balance.

180.    For 28,354 of the loans included in his damages estimates, the borrowers received interest on their escrow balances, including on the alleged overcharged amounts.[116]  If these balances had been lower, as modeled in Professor McFadden's analysis, the amount of interest earned by these borrowers also would have also been lower.  Professor McFadden fails to take into account the interest earned on the alleged excess account balances, causing him to further overstate opportunity cost damages.

181.    In my opinion, any borrower who received interest on his or her alleged excessive escrow balance did not sustain opportunity cost damages as a result of a delayed escrow analysis. These borrowers were compensated for maintaining the alleged excess balances at or above the minimum interest rates that state lawmakers or regulators have determined to be fair compensation for holding such balances in their accounts.

### c. Professor McFadden fails to consider the offsetting impact of subsequent escrow analyses.

182.    Professor McFadden models a series of escrow overpayments and repayments over a finite period of time.  He appears to implicitly assume that after this finite period of time, the escrow payments in the "but for" world (where the escrow analysis was not delayed) would

---

[116] *See* **Exhibit 7**.

have been identical to the actual escrow payments.  This assumption is wrong because it fails to consider offsetting changes that occurred subsequently for most, if not all, of these loans.

183.    For example, if in the but-for world, Ocwen had conducted a given escrow analysis on the due date three months earlier than the actual analysis, it would have also conducted the next escrow analysis three months earlier, and the impact of this and subsequent escrow analyses on borrower payments would have been different than they were in the real world.  Professor McFadden's damages model fails to take these offsetting differences into account.

184.    **Figure 3**, below, illustrates this failure on Professor McFadden's part.  It shows that a hypothetical escrow analysis at the end of Actual Period 1 will include disbursements 2 and 3, while the escrow analysis at the end of But For Period 1 will include disbursements 1 and 2.  Similarly, the escrow analysis at the end of Actual Period 2 will include disbursements 4 and 5, while the escrow analysis at the end of But For Period 2 will include disbursements 3 and 4.  Each calculation would yield different results.  These differences would offset over time, reflecting the self-correcting nature of escrow account surpluses and shortages, but borrower payments in the two scenarios would be different, causing the present value calculations to yield results that differ from Professor McFadden's.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3**

**The Continuing Impact of Escrow Analysis Delay: An Illustration**



d.    **Professor McFadden ignores the actual timing of borrower payments and imposes his own arbitrary timing.**

185.    The actual time-value benefit that a borrower could have realized if an escrow analysis had been completed on a timely basis depends on when the borrower actually made payments to escrow.  For example, if a borrower was delinquent on his or her loan, and then reinstated it the day before completion of an escrow analysis that was delayed by 4-months, and if the analysis calculated a surplus in the escrow account, the borrower did not experience any meaningful opportunity cost because he or she was only deprived of the overpayment amount for 1-day.  Professor McFadden's methodology, however, would estimate damages for such a borrower as if he or she had been deprived of these funds for 4-months.

186.    It was not necessary for Professor McFadden to impose his own time pattern on the alleged overpayments.  The Transaction History data, which was available to Professor

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

McFadden, shows the *actual* timing of each borrower payment.  Yet, his opportunity cost damage calculations do not depend on, or even consider, the actual timing of borrower payments.

187.     For example, Professor McFadden asserts that 4 percent of the loans for which he calculates damages were delinquent (*i.e.*, not paying) as of the Alleged Escrow Analysis Due Date.  In estimating damages for these borrowers, however, Professor McFadden disregards the Transaction History data and assumes that on the Alleged Escrow Analysis Due Date, these borrowers did what they did not actually do: make a timely payment.  This error, like the other errors I have identified, has the effect of inflating Professor McFadden's calculation of damages.

       e.    **Professor McFadden relies on Ocwen's litigation work product, when he should have relied on the Transaction History data.**

188.     Professor McFadden's damages calculations rely primarily on two litigation work product data queries that Ocwen produced in response to the Bureau's requests.  Specifically, Professor McFadden relies on:

a)     An Ocwen data query produced as Exhibit A to Ocwen's *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019,* asking Ocwen to identify instances where it "did not perform an Escrow Analysis within thirty days of the completion of the applicable Escrow Account Computation Year" ("Ocwen's Exhibit A Litigation Work Product"); and

b)     An Ocwen data query produced as Exhibit C to Ocwen's *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019,* asking Ocwen to identify "the Escrow Shortage or Escrow Surplus, if any,

that accrued during [each time period for which Ocwen did not perform an Escrow Analysis]" ("Ocwen's Exhibit C Litigation Work Product").[117]

189.    These work products were created for the sole purpose of responding to the Bureau's requests.  They are not records maintained and used in the normal course of business

190.    While I did not attempt to fully audit Ocwen's Exhibit A Litigation Work Product, I noted seeming inconsistencies between the data reported at Exhibit A and the underlying Transaction History data.  Specifically, I found that for more than 3,000 of the identified delays, the escrow payment for the loan actually changed during the reported delay period.[118]  Because an escrow payment normally is changed only as a result of an escrow analysis, I cannot rule out the possibility that Exhibit A is an over-inclusive listing of delayed analyses.  I note that Ocwen did not describe Exhibit A as a dispositive listing of delayed escrow analyses, but as a listing of loans where "Ocwen's data indicates that it did not complete an Escrow Account Analysis within thirty days of the completion of the applicable Escrow Account Computation Year."[119]

---

[117] *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019.*

[118] Of the 391,603 records at Ocwen's Exhibit A Litigation Work Product, I have identified 3,082 instances where the escrow payment changed.  I identify escrow payment changes using the Transaction History data produced in response to RFP #22 of the Bureau's Fifth Set of Requests for Production.  To identify escrow payment changes, I first limited the Transaction History data for the loans at Ocwen's Exhibit A Litigation Work Product to exclude reversed entries, and entries reversing other entries.  I also limited the data to include transactions with a positive amount in the ESCROW_AMT and INTEREST_AMT fields, as well as a positive amount in the CUST_SENT_AMT field.  I then sorted the data by EFFECTIVE_DATE and NEXTDUEDT.  I consider any change in the escrow payment of more than $1 to be a change.  I do not consider as a payment change, instances where the same payment occurs more than once - *i.e.*, where the payment changes from A to B and then back to A.

[119] *Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019.*

191.    Ocwen describes its Exhibit C Litigation Work Product as containing "the loan level information for the accrued shortage and surplus amounts."  Andrew Combs further testified that Ocwen's Exhibit C Litigation Work Product shows the following calculation:

> So if you were to perform an analysis, let's say three months late, we attempted to calculate what the analysis should have been for the first 12 months and then attempted to calculate what the delta would have been if the analysis was performed three months late and that is what -- that is what the model generated from a calculation.[120]

192.    From the foregoing, it is clear that Ocwen's Exhibit C Litigation Work Product is Ocwen's "attempt" at performing a calculation requested by the Bureau, not a mere extract of data utilized by Ocwen in the ordinary course of business.  In fact, Ocwen's Exhibit C Litigation Work Product is the output generated from 792 lines of SQL code written by Ocwen in furtherance of what I understand to be its good faith effort to provide the result of the hypothetical calculation requested by the Bureau.[121]

193.    Professor McFadden did not need to use Ocwen's Exhibit C Litigation Work Product in order to estimate the borrowers opportunity cost damages.  The target escrow payment and any surplus or shortage in the escrow account can be calculated for any loan using the Transaction History data produced in this litigation.  Rather than perform his own analysis based on actual Transaction History data, however, Professor McFadden chose instead to rely on Ocwen's Exhibit C Litigation Work Product.  If Professor McFadden made any attempt to test the accuracy and suitability of Ocwen's Exhibit C Litigation Work Product for his analysis, he did not document his efforts in the material he produced for this litigation.

---

[120] Deposition of Andrew Combs, pp. 72-73.
[121] OCW-CFPB-001-05479659_CFPB-VOL-066.

194.    Professor McFadden's interpretation and subsequent use of Ocwen's Exhibit C Litigation Work Product in his damages model yields clearly erroneous estimates of damages, as I will demonstrate using the very same loans Professor McFadden singles-out for discussion in his report.

**f.    The same loans Professor McFadden uses to illustrate how his model works reveal the fatal flaws in the model.**

195.    In his report, Professor McFadden uses three loans (the Example Loans) to illustrate how his opportunity cost damages model works.  Here, I analyze these loans (plus one more) using Ocwen's Transaction History data, and then compare my findings with Professor McFadden's.

**(1)    Loan Number ▮▮▮▮ – Purported Example of a Loan Accruing a Surplus Repaid Using the "Spread" Repayment Method**

196.    In Figure 6 of his report, Professor McFadden asserts that Loan Number ▮▮▮▮ accrued a surplus of $279.09 between the analysis due date of October 3, 2014 and the actual analysis date of February 25, 2015.  He then asserts that the borrower was damaged by having to make excessive escrow payments in the amount of $69.77 per month for four months (*i.e.*, $279.09 divided by 4), before being fully reimbursed for these overpayments, in the form of a reduced escrow payment during the twelve months from March 2015 to February 2016.[122]

---

[122] McFadden Report, pp. 25-26.  I note that because of the longer repayment period in his "spread repayment" example, as compared with the "lump sum" example (*i.e.*, repayment over 12 months rather than immediately on the escrow analysis date), even though the delay period is four months in both examples, Professor McFadden calculates damages for loan number ▮▮▮▮ that equal 10% of the purported accrued surplus, whereas for loan number ▮▮▮▮ Professor McFadden calculates damages that equal 3% of the purported accrued surplus.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                74

**(a) Flaw #1: Professor McFadden's flawed methodology that ignores actual payment data finds damages for a borrower that even he recognizes was not damaged.**

197.     Professor McFadden claims to have excluded borrowers who were not current on their loan at the Actual Analysis Date from his opportunity cost damage estimates.  His reason for this exclusion is that delinquent borrowers are unlikely to have actually paid a calculated overcharge amount.[123]  Notwithstanding his claim, however, Professor McFadden's first example loan was delinquent on both the Alleged Analysis Due Date and the Actual Analysis Date, and had a negative (or deficient) escrow balance on both of these dates.  This is shown in **Table 6**.

**Table 6**
**Status of Loan Number** ██████████

|  | Alleged Analysis Due Date | Actual Analysis Date |
|---|---|---|
| Date | 10/03/14 | 02/25/15 |
| Escrow Balance | ($399.45) | ($94.51) |
| # of Months Past-Due | 7 | 4 |

---

[123] McFadden Report, pp. 23-24.  "First, I only included borrowers who were current on the late analysis date…. If the borrower was delinquent on the late analysis [date], then she may have not paid the overcharged amount and was therefore deemed to have fallen behind on escrow payments."

[124] The Alleged Analysis Due Date and the Actual Analysis Date are reported in Ocwen's Exhibit C Litigation Work Product.  The escrow balances and months past-due are derived from the Transaction History data produced by Ocwen in this matter.  To obtain the escrow balance and past-due information, I look at the first Transaction History record with an effective date after the relevant analysis date.  The escrow balance is reported in the ESCROWBAL field, and the number of months past-due is a comparison of the NEXTDUEDT to the analysis date, allowing for a 15-day grace period.

198.     This loan fails the test *Professor McFadden* established to qualify a loan for inclusion in his damages calculation.[125]  Moreover, it is clear that the borrower on this loan was not damaged by the alleged escrow analysis delay, given the fact that the escrow account balance was negative on both the but-for and actual analysis dates.  Yet, Professor McFadden's methodology finds that this borrower was damaged in the amount of $26.92, as shown in Figure 6 of his report.

199.     Perhaps Professor McFadden recognizes that his methodology yields an erroneous result because this loan, and the reported $26.92 in damages, are not included in the damages calculations summarized at Table 4 of his report.[126]  In any case, I find it unusual that he would use an admittedly undamaged loan as the very first example of how his methodology calculates damages.

200.     More importantly, this example, selected by Professor McFadden, illustrates as well as any loan I could have selected, why his methodology is unreliable: the methodology "finds" that a loan known to be undamaged has been damaged.  Had Professor McFadden used the actual payment data produced by Ocwen to analyze Loan Number ███████ he would have confirmed that the borrower was not overcharged, and hence was not damaged.

201.     In sum, Professor McFadden's first example loan nicely illustrates how his flawed methodology can find damages to borrowers when none exists.

### (b) Flaw #2: Loans with escrow shortages did not make overpayments.

---

[125] This loan, and the reported damages amount of $26.92 shown in Figure 6 of the McFadden Report, are not actually included in the damages calculations summarized at Table 4 of the McFadden Report.

[126] *i.e.*, loan number █████ is not among the 93,223 loans for which Professor McFadden calculates damages.

202.     Even if we assumed, for purposes of illustration, that Loan Number ████████ was not delinquent as of the Actual Analysis Date, this loan still would allow us to demonstrate a critical fact that Professor McFadden overlooks: loans with escrow account shortages *benefit* from a delayed payment increase, and therefore are not damaged by the delay in completing the analysis.

203.     The result of Ocwen's delayed escrow analysis for this loan was an increase in the borrower's escrow payment from $200.77 to $231.94.[127]  Using Professor McFadden's logic, the delay allowed the borrower to retain for his or her own use funds that otherwise would have been paid into escrow.  For this borrower, the opportunity cost clearly was less than zero (*i.e.,* a benefit, not a cost), yet Professor McFadden's methodology finds positive opportunity cost damages.

204.     A similar payment increase would have occurred on the Alleged Analysis Due Date.  As of this date, the trailing twelve months escrow disbursement total was $2,532.87[128] – yielding a calculated Target Payment Amount of $211.07 ($2,532.87 divided by 12).  Similarly, as of the Actual Analysis Date, the trailing twelve months escrow disbursement total was $2,530.22[129] – yielding a slightly smaller calculated Target Payment Amount of $210.85 ($2,530.22 divided by 12).[130]  The borrower's monthly escrow payment prior to the analysis was $200.77.  As such, the escrow account was being underfunded by around $10 per month (the difference between approximately $211 in average monthly disbursements and approximately

---

[127] Based on the ESCROW_AMT field in the Transaction History data.

[128] This amount is calculated based on a $1,303.87 property tax payment on November 13, 2013 and a $1,229 hazard insurance premium payment on September 3, 2014, all as posted in the Transaction History data.

[129] This amount is calculated based on a $1,229 hazard insurance premium payment on September 3, 2014 and a $1,301.22 property tax payment on November 14, 2014, as posted in the Transaction History data.

[130] One-twelfth of the escrow shortage was then added to the Target Payment Amount to achieve the new escrow payment.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

$201 in average monthly inflows), thereby creating a shortage, and making a payment increase to resolve the shortage inevitable.

205.    In summary, even if this loan had been current (and not delinquent), the borrower would not have been damaged from the delayed escrow analysis.  This analysis also illustrates that borrowers on loans with escrow shortages on the Actual Analysis Date did not make overpayments; they did not pay enough.

**(2)    Loan # ▮▮▮▮▮ – Purported Example of a Loan Accruing a Surplus Repaid Under the "Lump Sum" Repayment Method**

206.    Professor McFadden's damages calculation for Loan Number ▮▮▮▮▮ is based on the "accrued surplus" between the March 20, 2014 Alleged Analysis Due Date and the July 30, 2014 Actual Analysis Date, in the amount of $361.74.  This is the surplus amount that Ocwen reported at its Exhibit C Litigation Work Product.  Professor McFadden assumes that during the alleged four-month delay period, the borrower made four escrow overpayments, each in the amount of $90.44 (*i.e.*, $361.74 divided by 4).[131]  He then calculates damages as the difference in the time value of the $90.44 purported monthly overpayments and the reimbursement for these purported overpayments via a lump-sum payment of $361.74.[132]

207.    Professor McFadden opines that this borrower suffered opportunity cost damages because she overpaid her escrow payment for four months before the overpayment amount was refunded to her.  His opinion, however, is contradicted by the Transaction History data for this loan, which makes clear that this borrower suffered no economic loss as a result of the allegedly delayed escrow analysis.

---

[131] McFadden Report, p. 28.
[132] McFadden Report, p. 28.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### (a) Flaw #1: Professor McFadden ignores the fact that the borrower received interest on the alleged overcharge.

208.    The first flaw in Professor McFadden's analysis of this loan is that he ignores the interest that the borrower received on her escrow balance.  The mortgaged property for the loan was located in New York,[133] where servicers are required to pay at least 2% interest on escrow balances.[134]  Therefore, to the extent that the borrower's escrow balance was temporarily over funded, the borrower earned interest on the excess.  Because this borrower was compensated for the alleged overpayment at a rate deemed by the ███████████ to be appropriate for amounts held in an escrow account, it is my opinion that she was not damaged by the alleged untimely escrow analysis.[135]

### (b) Flaw #2: Professor McFadden disregards the Transaction History data for this loan.

209.    The second flaw in Professor McFadden's analysis of this loan is that it overstates the monthly payment differential during the alleged delay period, and therefore overstates damages.  The escrow disbursement activity for this loan during the trailing twelve months ending in March 2014 was $2,824.05,[136] which would have translated into a Target Escrow Payment of $235.34 per month if an escrow analysis had been completed on that date.  The borrower's monthly escrow payment at the time of the analysis was $244.79.  As a consequence, the borrower's monthly payments during the alleged escrow analysis delay period were overstated by no more than $9.45 per month – *i.e.*, the difference between the actual monthly

---

[133] Per data produced in response to RFP #1 of the Bureau's Fifth Set of Requests for Production.

[134] **Exhibit 5**.

[135] The Transaction History data for this loan shows a quarterly posting of escrow interest, denoted with TRANSACTION_TYPE of EIN.

[136] Per the Transaction History data for this loan.  This amount includes the following property tax payments: 7/17/13: $701.15; 9/24/13: $167.15; 12/13/13: $701.15; and 1/27/14: $528.60.  This amount also includes a 2/5/14 hazard insurance payment of $726.

payment at the time ($244.79) and what would have been the Target Escrow Payment as of March 2014 ($235.34).[137]

210.    Professor McFadden, however, calculates the monthly differential to be $90.44 – about 10 times the actual monthly payment difference for this loan during the alleged delay period.

### (3)    Loan Number ████ – A Loan for which Professor McFadden Calculates Damages of $5,731.49 Using the "Spread" Repayment Method

211.    Professor McFadden estimates damages for Loan Number ████ in the amount of $5,731.49.  This is the largest estimate of damages for any loan considered by Professor McFadden – more than double the next-largest estimate ($2,635.22),[138] and more than 27 times the average for all loans ($208).[139]

212.    For this loan, Professor McFadden takes the accrued surplus at Ocwen's Exhibit C Litigation Work Product in the amount of $10,328.07, and assumes that the borrower overpaid this amount at a rate of $251.90 per month over the 41-month period between the January 1, 2014 Alleged Analysis Due Date and the June 6, 2017 Actual Analysis Date, and was then reimbursed for this overpayment over the ensuing 60 month period (which apparently is still in process).[140]  Professor McFadden's opinion regarding the damages experienced by the borrower is wrong.

---

[137] When the borrower's escrow payment was reset, it reset to $235.04 - $0.30 more than what it would have been on the Alleged Analysis Due Date.  Professor McFadden contends that such a 30-cent-per-month "payment shock" would increase the loan's probability of foreclosure for this loan.

[138] Per *total_damages.FST*.

[139] McFadden Report, p. 31.

[140] Per *total_damages.FST*.

**(a) Flaw #1: Professor McFadden's failure to utilize the Transaction History data in his analysis causes him to reach the wrong conclusion.**

213.    Based on the Transaction History data for this loan, it does not appear that Ocwen failed to perform an escrow analysis on this loan between January 1, 2014 and June 6, 2017. During this period, the borrower's escrow payment changed twice: from $141.44 per month to $699.07 per month for the payment due on February 1, 2015, and then to $759.69 for the payment due on December 1, 2015.[141]  These payment increases were necessary to make progress toward eliminating a significant escrow *deficiency* in the account that existed prior to February 2015.

214.    I am not aware of any reason that would cause an escrow payment to change, other than an escrow analysis performed by the servicer.  Hence, it appears that Professor McFadden's estimate of this borrower's opportunity cost damages is based on a faulty assumption about the length of the escrow analysis delay, and therefore greatly inflated.

**(b) Flaw #2: Professor McFadden's methodology finds that this borrower was damaged, even though the borrower's escrow account has been continuously underfunded.**

215.    Again, according to the Transaction History data, this loan did not accumulate a borrower-paid escrow surplus between January 1, 2014 and June 6, 2017, or at any other time. In fact, the borrower has consistently *underpaid* Ocwen for purposes of maintaining the escrow account balance at the required level.  Since 2014 and continuing to today, the escrow account for this loan has been serially underfunded (*i.e.*, borrower payments to escrow are less than

---

[141] These payment changes are reported in the Transaction History data and also at the data produced in response to RFP #24 of the Bureau's Fifth Set of Requests for Production.

escrow disbursements),[142] such that the escrow account has been, and continues to be, deficient. Yet, according to Professor McFadden, this borrower suffered the largest opportunity cost damages of any Ocwen borrower with a delayed escrow analysis.

216.    **Figure 4**, below, summarizes the monthly escrow balance for this loan since January 1, 2014.

**Figure 4**
**Escrow Balance for Loan** ▮▮▮▮▮



217.    As the figure makes clear, even assuming, counterfactually, that this loan's escrow analysis was delayed by about 3.5 years, the borrower most certainly was not overpaying

---

[142] The average annual property tax payment from escrow for this loan during the alleged escrow analysis delay period was $4,274, or $356 per month. Due to the prolonged period where Ocwen was collecting only $141.44 per month, a significant escrow deficiency (and shortage) developed in the account. For example, as of January 1, 2014, the escrow balance was a $5,073.13 deficiency. By January 1, 2015, this deficiency had increased to $8,247.43. The subsequent escrow payment increases helped to reduce the deficiency, but a deficiency continued to exist nonetheless. Then, after July 29, 2016, the borrower stopped making payments until the loan was modified in May 2017. Prior to the loan modification, the loan had a $303.14 escrow deficiency ($1,062.83 before a trial payment was posted on April 28, 2017). This deficiency was temporarily cured with the loan modification (the loan modification reduced the interest rate on the loan from 12.375% to 3.5%, saving the borrower more than $500 per month, according to Payment Change data produced in response to RFP #24 of the Bureau's Fifth Set of Requests for Production). However, the transaction history for the loan shows that Ocwen made a significant property tax payment just after modifying the loan, which created a new escrow deficiency and shortage. The escrow statement data for this loan (produced in response to RFP #29 of the Bureau's Fifth Set of Requests for Production) shows that Ocwen gave the borrower 60 months (5 years) to repay this shortage.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to escrow during the alleged delay period, and therefore did not suffer any opportunity cost damages, much less damages of $5,731.49, as Professor McFadden claims.

>**(4)    Loan Number ███████ – Purported Example of a Loan Accruing a Surplus Repaid Under the "Lump Sum and Spread" Repayment Method**

218.    For another one of his examples, Loan Number ████████ Professor McFadden estimates the borrower's damages using the calculated accrued surplus of $133.90, as reported in Ocwen's Exhibit C Litigation Work Product.  Professor McFadden opines that, because this loan would have had a shortage as of the Alleged Analysis Due Date (July 31, 2014), but had a surplus as of the Actual Analysis Date (March 28, 2015), the accrued surplus reflects overpayments by the borrower during the alleged 8-month delay period amounting to $16.74 per month.  He also claims that the overpayments were refunded to the borrower in two ways: (1) a $119.07 surplus refund payment on the Actual Analysis Date, and (2) by reducing his monthly payments by $1.24 over the next twelve months.[143]

>**(a)  Flaw #1: Professor McFadden ignores the fact that the borrower received interest on the alleged overcharge.**

219.    The first flaw in Professor McFadden's analysis of this loan is that he ignores the interest that the borrower received on the alleged overcharge.  Because the borrower was compensated for the overcharge in an amount that the State of California deemed appropriate compensation for funds held in an escrow account, in my opinion he was not damaged by any temporary excess of funds in the account.[144]

---

[143] McFadden Report, pp. 28-30.

[144] Per data produced in response to RFP #1 of the Bureau's Fifth Set of Requests for Production, the mortgaged property was located in California, where a minimum 2% interest is required (see **Exhibit 5**).  I have confirmed that escrow interest was posted for this loan using the Transaction History data.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**(b) Flaw #2: Professor McFadden's failure to utilize the Transaction History data causes him to reach the wrong conclusion.**

220.     More importantly, contrary to Professor McFadden's analysis, the borrower on this loan *benefited* from the alleged delay.  On the Actual Analysis Date (March 28, 2015), Ocwen (i) calculated the trailing twelve-month escrow disbursement activity to be $4,073.77, (ii) reduced the monthly escrow payment from $390.12 to one-twelfth of the trailing twelve-month average amount ($339.48),[145] and (iii) paid the borrower the calculated surplus of $119.07.[146]

221.     If Ocwen had run an escrow analysis as of July 31, 2014 (the Alleged Analysis Due Date),[147] it would have calculated trailing twelve-month escrow disbursement activity to be $4,640.87, and changed the borrower's monthly escrow payment from $390.12 to $386.74.  In **Table 7**, I show the target payment amount that an escrow analysis would have yielded if completed on the Alleged Analysis Due Date, and compare it to the amount calculated on the Actual Analysis Date.

---

[145] The pre- and post-analysis payments are reported in the Transaction History data.

[146] The surplus amount is posted to the escrow statement data produced in response to RFP #29 of the Bureau's Fifth Set of Requests for Production, and the payment is confirmed in the Transaction History data.

[147] It is worth noting that only days prior to July 31, 2014, the loan was severely delinquent. The borrower reinstated the loan, to bring it current, on July 21, 2014.

**Table 7**

**Target Payment Amount Calculations for Loan ▮▮▮▮ Assuming the Escrow Analysis Was Conducted on (1) the Alleged Analysis Due Date and (2) the Actual Analysis Date**

|  | Alleged Analysis Due Date | Actual Analysis Date |  |
| --- | --- | --- | --- |
|  | 07/31/14 | 03/28/15 | Difference |
| Trailing Twelve-Month Disbursement Total | $4,640.87 | $4,073.77 |  |
|  | ÷ 12 | ÷ 12 |  |
| Target Payment Amount | $386.74 | $339.48 | ($47.26) |

222. The reason for the drop in the disbursement activity between July 31, 2014 and March 28, 2015 was a new homeowner's insurance policy with a lower premium.[148]

223. In **Table 8** below, I show that for the twelve-month period starting September 2014 (the effective date of a hypothetical July 2014 escrow analysis), the borrower actually would have paid more into escrow than the borrower actually paid if the analysis had been performed on the Alleged Analysis Due Date.

---

[148] The borrower obtained an insurance policy in June 2014 ($398 per year) that was $200 less costly than the prior insurance policy ($598 per year). The new policy was also obtained prior to the natural expiration of the old policy. The old insurance policy was paid for on August 7, 2013 and the new policy was paid for on June 4, 2014 – two months before the expiration of the prior policy. There are two financial consequences of cancelling a prior policy prematurely in order to obtain a new policy. First, the borrower will receive a proportionate refund of insurance premiums – in this case, approximately two-twelfths of $598, or about $100. Second, the standard twelve-month lookback will tend to overstate a more nuanced projection of escrow disbursements because the lookback period contains two insurance premium payments, when the norm would be to make one payment per year.  It is not until sufficient time has passed for the extra insurance premium payment to fall out of the lookback window that the lookback amount will normalize. In this case, as shown in **Table 7** above, this normalization did not occur until after the Alleged Analysis Due Date.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                 85

**Table 8**

**Comparison of Actual and But For Escrow Payments for Loan** ███

| Month | Actual Escrow Payment | But For Escrow Payment | Actual Minus But For |
|---|---|---|---|
| 09/14 | 390.12 | 386.74 | 3.38 |
| 10/14 | 390.12 | 386.74 | 3.38 |
| 11/14 | 390.12 | 386.74 | 3.38 |
| 12/14 | 390.12 | 386.74 | 3.38 |
| 01/15 | 390.12 | 386.74 | 3.38 |
| 02/15 | 390.12 | 386.74 | 3.38 |
| 03/15 | 390.12 | 386.74 | 3.38 |
| 04/15 | 390.12 | 386.74 | 3.38 |
| 05/15 | 390.12 | 386.74 | 3.38 |
| 06/15 | 339.48 | 386.74 | (47.26) |
| 07/15 | 339.48 | 386.74 | (47.26) |
| 08/15 | 339.48 | 386.74 | (47.26) |
| Escrow Payment Savings | | | (111.36) |

224.    In short, the borrower benefitted from the alleged untimely escrow analysis; he was not harmed as Professor McFadden claims he was.

> **g.    Upper Bound on Opportunity Cost Damages from Allegedly Delayed Escrow Analyses**

225.    In summary, I have analyzed each of the loans Professor McFadden, himself, provides as examples of loans where the borrowers sustained opportunity cost damages in connection with alleged escrow analysis delays.  I have also analyzed one additional loan for which Professor McFadden calculates opportunity cost damages, to compensate for the fact that

one of his example loans is not actually included in his damages calculation.[149]  My analysis shows that none of these borrowers suffered any opportunity cost damages.  Yet, Professor McFadden's flawed methodology purports to show that all four borrowers were harmed by the alleged delay.

226.    In my opinion, these flaws invalidate Professor McFadden's damages model, leaving him without any means to show that any borrower suffered opportunity cost damages as a result of an allegedly delayed escrow analysis.  Put differently, Professor McFadden has failed to substantiate a damages number other than $0.

227.    To assist the Court, I have utilized Professor McFadden's flawed model to calculate the upper-bound of damages,[150] after making the following corrections to the model:

a)    I excluded loans where the Actual Escrow Analysis found an escrow *shortage*, as these borrowers, by definition, did not overpay Ocwen;

b)    I excluded loans that earned interest on the calculated excess escrow balance;[151] and

c)    I replaced Professor McFadden's inflated interest rates with the highest interest rate that Ocwen paid on an escrow account balance as of August 2014 – 3.25%.  In my opinion, even this interest rate overstates damages because the most-likely opportunity cost to borrowers who made overpayments was not materially different from $0.

---

[149] I chose this loan to discuss because Professor McFadden claims the borrower had the largest opportunity cost damages of any loan he considered.

[150] The errors in Professor McFadden's model lead to overstatements, not understatements.

[151] As indicated by EIN transactions in the TRANSACTION_TYPE field.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

228.     Simply excluding the loans identified in items a) and b), above, reduces Professor McFadden's opportunity cost damages estimate using a 16 percent interest rate, by 91%, from $1,420,930 to $134,265.  Replacing Professor McFadden's overstated interest rate for the remaining loans further reduces his estimate of damages to $29,020 – which I regard as an upper bound on opportunity cost damages from delayed escrow analyses.[152]  As noted above, in my opinion the most-likely amount of opportunity cost damages suffered by these borrowers is $0.

**3.     Alleged PMI Overcharges**

229.     Professor McFadden's PMI opportunity cost damages model is so severely flawed that it overstates damages by approximately tenfold.

**a.     In his report, Professor McFadden fails to accurately describe his methodology.**

230.     In paragraph 69 of his report, Professor McFadden states, "I applied a 16 percent interest rate and calculated the NPV of these payments to August 15, 2019."[153]  His description of what he did, however, is not accurate.  As Table 5 in his report (which immediately follows the sentence quoted above) and his *R* output[154] make clear, the NPV of each modeled payment is calculated as of the first applicable payment date – not as of August 15, 2019.  In the case of the example loan, this date is June 2016.  Because there is no interval between the first applicable payment date (June 2016) and the valuation date (also June 2016), there is no need to discount the payment for the time value of money; the NPV of the June 2016 $88.65 payment is equal to the undiscounted amount – $88.65.  If the model had calculated the NPV as of August 15, 2019, the NPV of this modeled payment would have been much larger than $88.65.

---

[152] *See* **Exhibit 7**.

[153] McFadden Report, p. 34.

[154] *See, e.g.*, 0.16PMI_dmg.csv.

### b. Professor McFadden implicitly (and erroneously) assumes that Ocwen's PMI refunds to borrowers were deficient.

231.    Nowhere in his report does Professor McFadden claim that Ocwen's PMI refunds to borrowers were in any way deficient, in that they failed to fully reimburse the borrowers for the amounts they paid for unnecessary PMI premiums.  He only claims that borrowers are entitled to opportunity cost damages for the interval between the premium payment and the refund date.

232.    Professor McFadden's model, however, assumes – erroneously – that a portion of unnecessary PMI premiums was not refunded to borrowers, and instead was retained by Ocwen. He appears to make this error because he assumes that premium payments were made in certain months when the Transaction History data shows they were not made.

233.    The loan that Professor McFadden chose to highlight in Table 5 of his report provides a perfect example of this error.  As the table shows, his model includes five PMI overpayments of $88.65 each – for a total of $443.25.[155]  The same table shows a credit of only $354.60 – or $88.65 less than the modeled overpayments.[156]  Thus, Professor McFadden's model includes more premiums than credits (before discounting), even though he does not claim that Ocwen failed to refund any unnecessary PMI premiums.

234.    Apparently, Professor McFadden made this mistake because he assumes that borrowers were charged PMI premiums in the month identified as containing the "Cancellation Date" in the source file he relied upon.[157]  If Professor McFadden had tested this assumption by consulting the Transaction History data produced by Ocwen in this matter, he would have

---

[155] McFadden Report, p. 34.
[156] McFadden Report, p. 34.
[157] See OCW-CFPB-001-06730240.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                                    89

discovered that no PMI premium was paid by the borrower on this loan in October 2016 (the month of the "Cancellation Date" for this premium).  The data show that Ocwen paid the last PMI premium of $88.65 for this loan in August 2016 and lowered the borrower's monthly escrow payment by $88.65 after September.  Contrary to Table 5 of the McFadden Report, neither Ocwen nor the borrower paid a PMI premium during October 2016.

235.    Correcting this error causes Professor McFadden's model to calculate *negative* damages for the loan in Table 5 equal to $4.20, rather than positive damages of $79.88.[158]  The same error causes his model to overstate damages for other loans that allegedly had unnecessary PMI premium payments.

> **c.    Professor McFadden erroneously assumes that all borrowers received a full year's interest on their PMI refunds.**

236.    Professor McFadden states that "Ocwen claims to have corrected for the overcharge by providing a credit to the borrower on the 'credit date' with interest of 3.25 percent per year."[159]  Apparently on this basis, he assumes that such a credit was provided for all loans.[160]

237.    Professor McFadden's treatment of interest in his model is flawed in two important respects.  First, his assumption that a 3.25 percent interest credit was issued for all 6,293 loans covered by his damages calculation, is false.  The email he cites in support of this assumption was written in August 2014, and relates to a specific remediation effort conducted in that month and involving 2,526 loans.[161]  While it appears that Ocwen did credit interest to

---

[158] Calculated as $79.88 less $84.08, see McFadden Report, p. 34.

[159] McFadden Report, p. 33.

[160] McFadden Report, p. 34.

[161] Daniel K. Reeves, August 25, 2014 (10:25 AM), email to Thomas J Diller, "PMI Auto-Termination," OCW3-027-0005675.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    90

borrowers who received refunds as a result of this remediation effort,[162] the transaction histories for other loans included in Professor McFadden's damages analysis do not show that a 3.25 percent credit was issued.  For example, the loan he uses in his report to illustrate how his model works received a refund equal to exactly four months of PMI premiums, but it was not credited with interest.[163]

238.    Second, Professor McFadden wrongly assumed that Ocwen paid interest on each PMI refund in an amount equal to 3.25 percent of the refund – in other words, providing the borrower with a full year's interest for every refund.  This assumption appears to be arbitrary; it is not supported in his report or in the materials that accompanied it.  It is also wrong.  Professor McFadden's error has the effect of *understating* his calculation of opportunity cost damages for those borrowers who paid unnecessary PMI premiums.  For example, his estimate of damages for the loan discussed in Table 5 of his report are negative once the imaginary October PMI payment is removed, only because one year's worth of interest at 3.25 percent more than offsets 16 percent interest accrued over a period ranging from one to four months.

239.    Two changes to Professor McFadden's model must be made to correct for his faulty handling of the interest factor.  First, any loan remediated as part of the August 2014 effort should be omitted from the calculation of damages, as each of these borrowers was more than fully compensated, in the form of an interest credit, for any opportunity cost associated with the temporary overpayment.  Second, Professor McFadden's escrow interest credit should be removed for all other loans for which he calculates damages.  In the case of his example loan,

---

[162] *e.g.*, loan number ███████ received a credit of $123.18, equal to 6 months of premiums at $20.53 per month (*see* OCW-CFPB-001-06730240).  This loan also received and was paid escrow interest of $4 in early September 2014 (per Transaction History data).  Which actually implies interest of more than 3.25%.

[163] Per the Transaction History data for this loan.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                91

these changes result in an estimate of damages equal to $6.88 – or 91% below his damages estimate.

### d.    Professor McFadden utilizes an excessive opportunity cost.

240.    As discussed at length in section VI.B of this report, Professor McFadden uses an inappropriate and excessive interest rate to calculate opportunity cost damages for unnecessary PMI payments (*i.e.*, credit card interest rates of 13, 16, or 20 percent).  In my opinion, the most-likely opportunity cost that affected borrowers incurred is not materially in excess of $0.  To assist the Court, however, I have also calculated opportunity cost damages using a 3.25% interest rate, as an upper bound on damages.  After making the corrections described above (including the removal of loans that received an interest payment from the August 2014 remediation), I calculate the upper-bound on opportunity cost damages for loans with delayed PMI cancellations as $26,518.[164]

### 4.    Alleged ARM Overcharges

241.    Professor McFadden's opportunity cost damages associated with alleged ARM overcharges are predicated on his assumption that any instance in which Ocwen performed an audit of an ARM loan, made an adjustment to the loan, and issued the borrower a refund is evidence that Ocwen violated an applicable law or regulation.[165]  As noted previously, the loans requiring adjustments that he identifies represent 0.4% of ARM loans serviced by Ocwen.[166]

242.    Professor McFadden's model for calculating opportunity cost damages from alleged ARM overcharges suffers from at least two flaws.

---

[164] *See* **Exhibit 8**.

[165] McFadden Report, p. 8 states: "As requested by counsel, in calculating opportunity costs to the ARM servicing errors population I assumed Ocwen is liable for: (1) unfair acts in violation of the CFPA through Ocwen's use of inaccurate and incomplete information to service loans."

[166] See paragraph 116 above.

243.     First, Professor McFadden's method of allocating the total overcharge to specific months tends to overstate damages.  Specifically, Professor McFadden assumes that the nominal amount of the overcharge was the same in each month that an overcharge occurred, including months before January 2014 (the first month of his damages analysis).  However, the overcharge is derived from an overstated interest rate that is applied to a generally declining monthly principal balance.  As a consequence, for loans with overcharges pre-dating January 2014, the monthly amounts would tend to be lower after January 2014, than they were before.

244.     Second, Professor McFadden's methodology for estimating opportunity cost damages from alleged ARM overcharges uses excessive and unsupported interest rates (*i.e.,* credit card interest rates of 13, 16, or 20 percent).  As I demonstrated earlier in this report, the most-likely outcome for borrowers that experienced an ARM overcharge was an opportunity cost that is not materially different from $0.  To assist the Court, however, I have calculated opportunity cost damages for this group of borrowers using a 3.25% interest rate, as an upper-bound on opportunity cost damages.  My calculations show this upper-bound for loans with alleged ARM overcharges to be $85,605.[167]  This methodology tends to overstate damages because it does not correct Professor McFadden's method of allocating the total overcharge to individual months.

**5.     Summary**

245.     To sum-up, Professor McFadden's estimates of opportunity cost damages rely on an unsupported and illogical interest rate that causes these estimates to be significantly

---

[167] *See* **Exhibit 9**.  I note that for most of the ARM loans at issue, Professor McFadden estimates opportunity cost damages that are relatively small.  Most of his estimated damages are attributed to a relatively small number of loans.  In fact, 83 of the 1,204 loans (7%) account for 50% of the total damages, and when my 3.25% upper bound measure of opportunity cost is used, 565 loans (47 percent) have estimated damages that are less than $10.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                                    93

overstated.  In addition, his methodology for estimating opportunity cost damages attributable to delayed escrow analyses and PMI overcharges suffers from serious flaws that are fatal to his opinions.  In fact, the flaws in his estimates for delayed escrow analyses are so severe that, when corrected, his model fails to show any damages at all.

246.    In my opinion, the most-likely opportunity cost damages suffered by borrowers as a result of the three alleged servicing failures addressed by Professor McFadden is $0, and a generous upper bound on opportunity cost damages is $141,143.  These results are summarized in **Table 9**.

### Table 9

### Summary of Opportunity Cost Damages

|  | McFadden Lower Bound | McFadden Upper Bound | Hamm Most Likely Amount | Hamm Corrected Upper Bound |
|---|---|---|---|---|
| Delayed Escrow Analyses | $1,188,115 | $1,715,706 | $0 | $29,020 |
| PMI Overcharges | $319,433 | $373,717 | $0 | $26,518 |
| ARM Overcharges | $288,684 | $394,490 | $0 | $85,605 |
|  | $1,796,232 | $2,483,913 | $0 | $141,143 |

## VII. Professor McFadden's Estimate of Damages from Additional Foreclosures

247.     In this part of my report, I present my opinions on Professor McFadden's estimate of the damages that he claims resulted from foreclosures that were caused by delayed escrow analyses.

### A.     Overview

### 1.     Summary of My Opinions Regarding Professor McFadden's Analysis

248.     Professor McFadden's opinion on foreclosure-related damages rests entirely on a novel quantitative model that is not based on any coherent or plausible economic theory. Without a plausible theory that explains the output of such a model, the model's results are questionable at best.

249.     On its face, Professor McFadden's opinion on the additional foreclosures caused by escrow analysis delays is implausible, given the magnitude of the opportunity cost damages that *he claims* were experienced by borrowers.  According to him, the 93,223 loans that he claims suffered opportunity cost damages due to the escrow analysis delays had an average delay of 1.4 months, and an average accrued surplus of $208, and *he estimates* that the average amount of opportunity cost damages experienced by the borrowers on these loans was $15.[168]  Even for the entire population of 272,007 loans which he claims had an increased foreclosure probability due to the escrow analysis delay, the average delay was 2.2 months.[169]

250.     To put these amounts in perspective, I note that:

---

[168] At 16% interest.  These calculations are summarized at McFadden Report, pp. 30-31.

[169] 66 days per **Exhibit 6B**.

- The average size of these loans at origination was $202,717.[170]

- The average monthly payment (including payments for taxes and insurance) on these loans was $1,347.[171]

- The average write-off for the subset of these loans that went through foreclosure and where the property was liquidated was $147,713.[172]

- The average monthly household cell phone bill is $119.[173]

251.    Professor McFadden would have the Court believe that an event causing economic damages averaging $15 per borrower by his calculation (and $1.26 per borrower at my upper bound)[174] caused 16,636 otherwise good loans to go bad, leading to damages averaging $21,130 to $29,066 per foreclosure.  Such an opinion cannot be credited, no matter how complex the model that produced this finding.

252.    Based on my years of experience in loan servicing, mortgage finance, and housing economics, I conclude that Professor McFadden's opinion fails a basic reasonableness test. Loans do not go to foreclosure because of relatively small, brief, and entirely self-correcting payment differences, but rather because of a fundamental, and incurable, inability or unwillingness on the part of the borrower to make the necessary loan payments.  The implausible

---

[170] Calculated using the Borrower and Loan Information produced in response to RFP #1 of the Bureau's Fifth Set of Requests for Production (ORGPRINBAL) for 267,177 of the 272,002 loans for which this data is available.

[171] Based on the total CURRINT, CURRPRIN, and CURRESCROW reported in the Monthly Billing Statement data produced in response to RFP #21 of the Bureau's Fifth Set of Requests for Production for 248,484 of the 272,002 loans for which this data is available.

[172] The sum of PRINCIPAL_AMT, INTEREST_AMT, and ESCROW_AMT for PYC, PYW, or PYG transactions for 22,878 loans with such transactions posted in the Transaction History data produced in response to RFP #22 of the Bureau's Fifth Set of Requests for Production.

[173] Scott Mackey and Joseph Bisop-Henchman, "Wireless Taxes and Fees Climb Again in 2018," *Tax Foundation*, December 11, 2018, retrieved from https://taxfoundation.org/cell-phone-taxes-2018/.  "A typical American household with four wireless phones paying $100 per month for taxable wireless service can expect to pay about $229 per year [$19 per month] in wireless taxes, fees, and surcharges."

[174] $29,020 in total for 22,983 loans, per **Exhibit 7**.

nature of Professor McFadden's conclusion is merely symptomatic of the many flaws in his damages model. As explained more fully in section VII.B, below, Professor McFadden uses an inappropriate and flawed methodology in his attempt to calculate foreclosure-related damages resulting from the brief and self-correcting alleged delays in performing escrow analyses.

### 2. Affirmative Opinions on Damages

253.    Based on my experience, I would not expect the alleged escrow analysis delays to have a material impact on the probability of foreclosure. Such a delay is only capable of causing a modest and temporary change in monthly payments – the type of change that is commonplace in loan servicing, and that will be corrected automatically through subsequent escrow analyses.

254.    It is inconceivable to me that, during the period since 2013, a relatively small change in the monthly payment on a loan that the borrower could otherwise afford would cause the loan to go to foreclosure. Real estate loans generally proceed to a foreclosure sale only when (a) the borrower is fundamentally unable to afford the loan, (b) all other loss mitigation options (such as forbearance and loan modification) have been exhausted, and (c) the borrower lacks sufficient equity in his or her home to make a sale economically advantageous.

255.    To test the reliability of Professor McFadden's opinions on foreclosure-related damages attributable to delayed escrow analyses, I randomly sampled 100 loans (a) for which an escrow analysis allegedly was delayed, (b) that, according to Professor McFadden, went through foreclosure, and (c) that were included in Professor McFadden's damages calculations. After analyzing this sample, I found not a single instance where the alleged escrow analysis delay caused or was even linked to a foreclosure. This finding is completely in accord with my experience as a loan servicing manager and my research in this matter.

256.    Based on the foregoing, it is my opinion that no damages from additional foreclosures can be attributed to the allegedly delayed escrow analyses.

### B.   Detailed Analysis of Professor McFadden's Estimated Damages from Additional Foreclosures

#### 1.   Professor McFadden's analysis lacks a credible and consistent causation theory.

257.   An econometric model, such as the model Professor McFadden uses to calculate foreclosure-related damages, must be based on a plausible theory about causation.  Such a theory is needed to keep the model honest.  Without such a theory, a model builder can keep adding and subtracting variables until he or she gets the desired results.

##### a.   Professor McFadden's payment shock causation theory is not supported by the literature he cites.

258.   Professor McFadden's theory of causation for borrowers that went through foreclosure after being *undercharged* by Ocwen during the escrow analysis delay period, is that these borrowers were subject to "payment shock" when their escrow payments eventually increased.[175]  Professor McFadden claims that this "payment shock" increased the foreclosure probability by 5.073% for a population of 101,053 loans.[176]

259.   As an initial matter, I note that 10.3% of the "undercharge" loans in Professor McFadden's damages analysis had an escrow *surplus* as of the Actual Analysis Date.[177]  A loan that has an escrow surplus because the servicer collected more than the amount needed to cover disbursements (i) will have the surplus returned to the borrower, and (ii) will have the monthly payment *reduced* to avoid building another escrow surplus.  A loan with an escrow surplus did not experience a payment increase, let alone a "payment shock."  Professor McFadden's

---

[175] McFadden Report, pp. 15-16.

[176] McFadden Report, p. 62.

[177] Correlating Professor McFadden's *eligible_loans_for_fcl_damages.csv* file with Ocwen's Exhibit A Litigation Work Product.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

causation theory for "undercharge" loans is, therefore, built on an incorrect assumption that all of these loans experienced a payment increase.

260.    As support for his causation theory, Professor McFadden cites to various research papers on the subject of payment shock.  In the mortgage finance literature, "payment shock" generally refers to two scenarios.  One possible scenario is when a borrower applies for a mortgage loan and the new loan will substantially increase the borrower's monthly housing payment.  The second type of "payment shock" is a sudden increase in the monthly payment on an existing loan, such as may occur when a so-called teaser or introductory rate expires, when a negative amortization loan begins to require full amortization, or when the draw period on a HELOC ends and the HELOC begins to amortize.  I know of no study that characterizes normal escrow payment changes as a source of "payment shock,"[178] much less the small, temporary and self-correcting payment increases that result from undercharges.

261.    The problem with Professor McFadden's payment shock theory is twofold.  First, the literature that he cites in support of his theory is not applicable to the relatively small increases in escrow payments needed to recoup the undercharges that occurred during the period when the escrow analysis was delayed.  These "payment shock" studies address relatively large payment changes related to changes in the amortization of a loan (*e.g.*, end of the HELOC draw

---

[178] The causal factor in Professor McFadden's model is not a normal escrow payment change, such as those that result from an increase in property taxes or insurance premiums.  The "shock" that Professor McFadden claims increased the probability of the borrowers' defaults is one-twelfth of the accrued underpayment.  No matter when the escrow analysis was performed, these borrowers could not have avoided the "shock" of a normal payment increase.

period) or the interest rate (*e.g.*, expiration of a teaser rate).[179]  The literature does not include studies that analyze the effect of small temporary payment changes driven by delays in analyzing escrow accounts.

262.    Second, the cited literature considers the entire payment change as a shock.  In the present matter, however, most of each payment change was inevitable, and would have occurred even in the absence of an alleged delay.  Consider a hypothetical "undercharge" loan subjected to a delayed escrow analysis.  The borrower's required escrow payment would have increased even if the analysis had not been delayed, because the old payment was insufficient to cover disbursements from the escrow account on behalf of the borrower.  The alleged delay merely caused the already inevitable payment increase to be marginally greater.

263.    To illustrate the foregoing, I have analyzed the magnitude of escrow payment increases for non-delayed escrow analyses relative to the payment increases associated with the delayed escrow analyses, using the Transaction History data produced by Ocwen in this matter. The average monthly mortgage payment increase for non-delayed escrow analyses is 5.9%.  For

---

[179] While not all of the studies cited by Professor McFadden list the magnitude of payment shock that was analyzed, some do, and the magnitude of the shock is much larger than those resulting from the allegedly delayed escrow payment changes.  For example, deRitis, Juo, and Liang (2010) note that the average payment increase in the event of "teaser shock" was 22% and the average payment increase for "rate shock" was 5%.  Professor McFadden notes that the authors concluded "the effect was larger for shocks driven by teaser rates."   Similarly, Epouhe and Hall (2016) report the proportion of loans associated with ranges of payment increases classified as payment shock. Based on the reported data, approximately 82% of the loans had payment increases of 50% or more (see Table 2 of this study).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                              100

payment increases associated with allegedly delayed analyses, the average payment increase is 6.7%.[180]  Therefore, the increase in excess of a typical escrow payment increase was 0.8%.[181]

264.   "Payment shock" literature simply does not address the effect of an incremental increase to a payment that was already increasing.  In light of the foregoing, there is no support for Professor McFadden's "payment shock" theory in the economics literature.  I know of no precedent for labelling a marginal increase to an inevitable, but relatively, small payment increase as a "payment shock."

> **b.   Professor McFadden's theory of causation is also at odds with his opportunity cost damages model.**

265.   Professor McFadden's approach to damages for undercharge loans is also inconsistent with his opportunity cost damages model.  He claims that overcharge borrowers suffered opportunity cost damages because they were not able to use the overcharge funds to pay-down interest bearing debt.  When it comes to undercharge borrowers, however, Professor McFadden argues that they, too, were harmed, even though, using the same logic, these borrowers received an interest-free loan from Ocwen.  As a matter of economics, if a borrower is harmed when an excess of funds is held in escrow, then allowing a borrower to underfund the escrow account should put the borrower in a stronger economic position and make it less likely that the borrower will default on his or her loan.  Simply put, Professor McFadden's causation

---

[180] I identify actual monthly mortgage payment change increases resulting from an escrow payment change using the full RFP 22 Transaction History data.  I first limit the Transaction History data to transactions that are not reversals or reversing transactions, with an amount in the INTEREST_AMT and ESCROW_AMT fields, and with an amount greater than $0 in the CUST_SENT_AMT field.  I sort the data by EFFECTIVE_DATE and NEXTDUEDT.  I flag escrow payment changes as a change of more than $1 in the escrow payment.  I consider an escrow payment change to relate to an allegedly delayed analysis if it is the first escrow payment change with an EFFECTIVE_DATE after the Actual Analysis Date for that loan number.  The percentage change is the percentage change in the total of PRINCIPAL_AMT, INTEREST_AMT, AND ESCROW_AMT.

[181] I have not performed a calculation of what the escrow payment change would have been for each individual allegedly delayed loan if the analysis had not been delayed.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

theory for undercharge borrowers erroneously holds that borrowers were both worse-off and better-off as a result of the same event.

### c. Professor McFadden fails to articulate a credible causation theory for "overcharge" loans.

266. Most of Professor McFadden's calculated damages are associated with what he labels "overcharge" loans. He calculates a 6.733% average increase in foreclosure probability for these loans, and he applies this probability to 170,954 such loans.[182] He fails to articulate a plausible theory as to how a temporary overcharge that was fully repaid could have caused permanent default and foreclosure. All Professor McFadden has to say in support of his theory is this:

> If the borrower was not able to pay the additional amount demanded by Ocwen or was unable to pay on other credit accounts, then she may have subsequently experienced an adverse credit event such as delinquency, bankruptcy, or foreclosure.[183]

267. This theory provides no insight into how the "overcharge" could have caused a "subsequent adverse credit event." More importantly, there are two apparent flaws in Professor McFadden's attempt to justify his theory. First, for these loans, there was no "additional amount demanded by Ocwen." The overcharge to which Professor McFadden refers occurred because Ocwen failed to *lower* the existing payment that a non-delinquent borrower had shown himself or herself fully capable of making both prior to the Alleged Analysis Due Date and during the alleged overcharge period.[184] In short, Professor McFadden's overcharge theory is predicated on an event – Ocwen demanding that the borrower pay an "additional amount" – that did not occur.

---

[182] McFadden Report, p. 62.

[183] McFadden Report, p. 15.

[184] Professor McFadden identifies 93,223 loans as current as of the Actual Analysis Date, of which 1,687 had been delinquent as of the Alleged Analysis Due Date. The borrowers on these 1,687 loans managed to cure the delinquency and make the required payments during the alleged delay period. See McFadden Report, pp. 23-24.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

268.     Second, Professor McFadden's overcharge causation theory for delinquent borrowers is highly speculative.  By Professor McFadden's own admission, many "overcharge" borrowers were delinquent, and therefore did not pay the alleged overcharge and did not sustain opportunity cost damages.  Among the 272,007 loans for which Professor McFadden calculates an increased probability of foreclosure from delayed escrow analysis, 77,731 (29%) were "overcharged," but according to him, did not pay the overcharge because they were delinquent.[185]

269.     One such loan is Loan Number ▮▮▮▮▮▮▮  This loan allegedly had its escrow analysis delayed from January 1, 2014 to May 28, 2014.  As of January 1, 2014, the loan was still in default on the September 1, 2010 payment, meaning that it was <u>40</u> payments past due.  The January 17, 2014 billing statement said that this borrower owed $87,732 in order to bring the loan current.  The May 19, 2014 billing statement reported an amount due of $104,583.  Ocwen's Exhibit C Litigation Work Product reports an accrued surplus for this loan of $1,535 – or $128 per month for about five months.  Professor McFadden's overcharge causation theory for loans like this one seems to be that the borrower could have perhaps reinstated the loan if only Ocwen would have lowered the reinstatement amount by $1,535, from $104,583 to $103,048.  Never mind that this borrower was unable or unwilling to afford the $87,732 needed to reinstate the loan when the escrow analysis allegedly was due, and had been unable or unwilling to make loan payments for each of the prior 40 months.

---

[185] Calculated as the loans listed in McFadden's population of 272,007 allegedly harmed loans and classified as "overcharge" loans (170,954), that are not part of the 93,223 loans for which Professor McFadden calculates opportunity cost damages.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

270.     For seriously delinquent loans, such as number ████████ Professor McFadden's theory that a delayed escrow was the cause of the foreclosure is highly speculative, and simply not viable.

**2.      Professor McFadden uses an unproven and unrealistic model that is different from those used in the literature he cites.**

271.     Professor McFadden's discrete time proportional hazards model attempts to estimate the probability of foreclosure (the "hazard"), based on various independent variables. He does not cite any mortgage finance literature regarding either his decision to utilize a proportional hazards model of this type, or the independent variables he chose to include and not include in the model.

272.     Professor McFadden opines that his approach is "a standard one in epidemiological research, where the question is the effect of a treatment on the probability of survival."[186]  He never explains how a model that is "standard" in epidemiological research is an appropriate model to use for making predictions in the field of mortgage finance.  In fact, in choosing to use a discrete time proportional hazards model, Professor McFadden ignores a significant body of applicable literature in the field of mortgage finance, including the literature he, himself, cites in his report.  This literature does not endorse the use of discrete proportional hazard models of the type he opted to use in estimating damages.

273.     The performance of residential mortgage loan debt, and specifically the factors impacting default, foreclosure, and loss, have been widely studied and applied in government, the private sector, and academia.  This is because the performance of residential mortgage loan debt is of significant importance to government and private entities.

---

[186] McFadden Report, p. 41.

274.     Government and private entities that purchase or guarantee mortgage loans require that loans comply with their underwriting guidelines, so that they can minimize, and appropriately price for, default risk.  In order to develop effective underwriting guidelines, an entity must have an up-to-date understanding of the factors that affect default and loss.

275.     Similarly, under the Home Affordable Modification Program (HAMP), a modification could only be made if the Net Present Value (NPV) of the modified loan was greater than that of the unmodified loan.  In order to compare the two NPVs, a lender was required to model the expected default and loss under each scenario, accounting for a variety of outcomes that can occur – *i.e.*, not simply survival and foreclosure.[187]

276.     Private mortgage insurance companies also use quantitative models to assess the probability that a loan will default and cause the insurer to incur a loss.  Radian, one of the largest mortgage insurance companies, states the following in its most recent 10-K filing:

> A premium rate is determined when insurance coverage is requested on a mortgage, which is generally near the time of loan origination. Premiums for our mortgage insurance products are established based on performance models that consider a broad range of borrower, loan and property characteristics as well as current and projected market and economic conditions.[188]

277.     In an attempt to support his "payment shock" causation theory, Professor McFadden cites several academic studies of how payment shocks affect loan performance.  Each of these studies employs an econometric model to study the impact of payment shock, yet none utilizes a discrete proportional hazards model of the type Professor McFadden uses.

---

[187] Fannie Mae, as the administrator of the program on behalf of the US Government, published guidelines for modeling the NPVs, see https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/BaseNPVModel Documentationv7.pdf.

[188] Radian Group, Inc., 2018 10-K, filed March 28, 2019, p. 16.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

278.    I believe the reason these studies did not use a discrete proportional hazards model is because most mortgage finance scholars recognize that a mortgage loan's performance is far more complicated and has more than just two outcomes: "survival" or foreclosure.  Rather, a mortgage loan has competing outcomes, or "competing risks," that require researchers to use models that allow for more than two outcomes.  For example, a mortgage loan can (a) perform to maturity; (b) prepay before maturity without a default; (c) default and then fully prepay without a loan modification; (d) default and go through foreclosure; (e) receive a modification, and then perform throughout the modification period; or (f) default, receive a loan modification, default on the modified loan, and go through foreclosure.

279.    A 2014 paper published in the *Journal of Real Estate Finance and Economics* notes in its introduction that, "[M]ortgage default and foreclosure are less a single event than a process with uncertain duration and an eventual resolution that can vary widely across lenders, borrowers and neighborhoods."[189]   The study reached the following finding:

> the outcomes of the foreclosure process are significantly related to: loan characteristics including the borrower's credit history, current loan-to-value and the presence of a junior lien; the borrower's post-default payment behavior, including the borrower's participation in foreclosure counseling; neighborhood characteristics such as foreclosure rates, recent house price depreciation and median income; and the borrower's race and ethnicity[190]

280.    Each of the "payment shock" studies cited by Professor McFadden utilize a quantitative model that, unlike Professor McFadden's model, accounts for these competing risks.  Although Professor McFadden relies on these models to buttress his theory of causation, none of

---

[189] Chan, Sharygin, Been, and Haughwout, "Pathways After Default: What Happens to Distressed Mortgage Borrowers and Their Homes?" *Journal of Real Estate Finance and Economics*, 2014, 45:342-379 at 343.

[190] *Id.*, at 342.

them utilize a model similar to his. For example, deRitis, Kuo, and Liang (2010) have this to say about model selection:

> The standard discrete time logistic transition model is a natural choice of functional form to study the effect of payment shocks on the monthly transition rates *across different mortgage status*. We model *a complete decision structure* by applying a multinomial logistic model.[191] (*emphasis added*)

281. Johnson and Sarama's (2015) comments on model selection are as follows:

> Following the literature on first mortgage default…we estimate a model that attempts to *account for two reasons for default*: (1) the borrower optimally exercises a financial option associated with the termination of the mortgage and (2) the borrower faces liquidity constraints that prevent the servicing of the debt…Our baseline model is a reduced form model that implicitly captures the degree to which borrower, loan, and macroeconomic factors contribute to *the likelihood of mortgage termination through both of these channels. We jointly model the default and payoff* in a discrete-time hazard model that assumes that the hazard rate at time t, is the sum of the hazards associated with default, and payoff…we organize our data so that we can estimate the model using a multinomial logit.[192] (*emphasis added*)

282. Epouhe and Hall (2016) describe their model selection as follows:

> We analyze default in a standard *competing hazard setup with default and prepayment as terminal states*…we test two measures of payment shock: estimated percent change in payment and estimated dollar change in payment.[193] (*emphasis added*)

283. Qi and Scheule (2016) explain their process of selecting a model as follows:

> In our data set, we observe three potential *competing outcomes* for HELOCs: (i) non-default and non-payoff, (ii) default, and (iii) payoff… Our main findings are based on the multinomial logit models… Multinomial logit models are common in mortgage delinquency modeling…

---

[191] Cristian deRitis, Chionglong Kuo, and Yongping Liang, "Payment shock and mortgage performance," *Journal of Housing Economics*, 2010, 19: 295-314 at 298.

[192] Kathleen W. Johnson and Robert F. Sarama, "End of the Line: Behavior of HELOC Borrowers Facing Payment Changes," Finance and Economics Discussion Series 2015-073, Washington: Board of Governors of the Federal Reserve System, http://dx.doi.org/10.17016/FEDS.2015.073 at pp. 8-9.

[193] Onesime Epouhe and Arden Hall, "Payment shock in HELOCs at the end of the draw period," *Journal of Economics and Business*, 2016, 84: 131-147, at 137.

> *Multinomial logit models are comparable to competing hazard models.*[194]
> (*emphasis added*)

284.     In summary, in selecting a model for his analysis, Professor McFadden disregards a significant body of literature in favor of other models – even the literature he cites in his report.  Given the ubiquity of well-established methods for evaluating mortgage loan performance, Professor McFadden should have explained why he rejected these methods and instead decided to use a novel and untried methodology.

### 3.     Professor McFadden's control group is invalid and not scientifically sound.

285.     Professor McFadden correctly states the requirements for a valid control group when performing his difference-in-difference statistical analysis: the assignment of loans to the treatment group (that is, loans with delayed escrow analyses) must be random:

> Ocwen's administrative assignment of treatments, which loans incur servicing failures and when, cannot be influenced by variables they do not observe. Thus, conditioning on the variables they do observe, the assignment of treatments is random; i.e., *each loan has an equal probability of receiving a service failure treatment*, and if they receive a service failure, the same probabilities of receiving it sooner rather than later. This gives the assignment of servicing failure treatments in the Ocwen data the key properties of Randomized Controlled Trials (RCT), the "gold standard" in scientific research for determining the causal effect of treatments without confounding by external, ecological factors. RCT designs are ubiquitous in the determination of whether new medical procedures, devices, and drugs are efficacious. In the analysis of the risk of adverse financial events in this report, Ocwen's "assignment" of servicing failures behaves like a RCT. Then, once the observed variables that may enter administrative processing decisions are accounted for, there is no possibility that differences in outcomes for cases and controls are due to factors that are unobserved by Ocwen and consequently not controlled in my analysis.[195]

---

[194] Min Qi and Harald Harry Scheule, "The Impact of Positive Payment Shocks on Mortgage Credit Risk– A Natural Experiment from Home Equity Lines of Credit at End of Draw," available at SSRN 2781359, 2016, pp. 13-14.

[195] McFadden Report, p. 42.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

286.     Professor McFadden's control group – the foundation for his analysis of foreclosure-related damages – fails the very test that he sets for a valid control group, for two important reasons.

> **(a) His control group is invalid because many of the loans in this group do not have escrow accounts.**

287.     First, he fails to take account of the single most-important variable that makes a loan susceptible to a late escrow analysis: the presence of an escrow account.  Obviously, a loan without an escrow account cannot have a late escrow analysis.  Yet, 27% of the loans in Professor McFadden's control group did not have escrow accounts, while 100 percent of the loans in the treatment group had one.[196]

288.     This failure, by itself, renders Professor McFadden's opinions unreliable and invalid.  Loans with escrow accounts are dissimilar from loans without such accounts.  Lenders are much more likely to waive the requirement for an escrow account if the borrower has an excellent credit history and a low loan-to-value ratio.  These same two characteristics also make it less likely that the borrower will default, and that a default will lead to foreclosure.  Therefore, the loans in Professor McFadden's control group would be less likely than the loans in his treatment group to default, even if all escrow analyses had been timely, meaning that no reliable conclusions about the impact of late escrow analyses on foreclosure rates can be drawn from Professor McFadden's analysis.

289.     I note that Professor McFadden was given the data he needed to eliminate loans without an escrow account and avoid this deficiency in his control group, but apparently he chose not to use it.

---

[196] I identified loans as not having an escrow account when the escrow balance in the Transaction History data was always zero.

**(b)   The percentage of delinquent loans in the treatment group was much larger than the corresponding percentage for the control group.**

290.     Second, Professor McFadden's assumption that "each loan has an equal probability of receiving a service failure treatment," is demonstrably false.  In fact, loans with a significantly greater chance of going into foreclosure – loans that were already delinquent – had a much greater chance of becoming part of his treatment group, and loans with a smaller chance of going into foreclosure – performing loans – had a correspondingly greater chance of becoming part of his control group.

291.     I believe Professor McFadden chose to assume – falsely – that "the assignment of treatments is random"[197] because he undertook no investigation of the factors that caused a loan to receive a late escrow analysis.  As I noted earlier in this report, the assignment of "treatments" (*i.e.*, delayed escrow analyses) was far from random. Prior to 2014 and throughout 2014, Ocwen believed – rightly or wrongly – that it was not required to perform escrow analyses for delinquent loans, and it had a practice that it would not perform annual escrow analyses for such loans.  Therefore, delinquent loans were much more likely than performing loans to have had a delayed escrow analysis.  With the deck stacked in this manner, it should come as no surprise that Professor McFadden found loans with a delayed escrow analysis were more likely to undergo foreclosure.  Delinquent loans, as a group, are more likely to reach foreclosure than non-delinquent loans, regardless of whether the escrow analysis is timely or late.

292.     Once these two foregoing flaws are taken into account,[198] it becomes clear that Professor McFadden's model does not satisfy the conditions *he* specifies for reliable scientific research.

---

[197] McFadden Report, p. 42.

[198] *i.e.,* the inclusion of loans without escrow accounts and the erroneous assumption that the assignment of treatments was random.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                110

293.     In sum, by assuming that the assignment of loans to the treatment group was random, rather than the result of a conscious business practice, Professor McFadden foreordained his conclusion.  This flaw in his methodology, by itself, is sufficient to render his opinion unreliable.

### 4.     Professor McFadden ignores a critical difference between the two main groups of loans with alleged escrow analysis delays.

294.     As noted earlier in this report, the vast majority of loans that allegedly experienced escrow analysis delays fall into one of two categories: (a) loans that were delinquent on the escrow analysis due date, and (b) loans that hit their due date during the period December 2014 - March 2015, when Ocwen was temporarily not performing escrow analyses because of a systems change.  As shown in **Table 3**, unlike the first group, the second group primarily consists of performing loans.  In addition, the alleged delay period for the performing loans was much shorter than it was for non-performing loans.  As would be expected, the delinquent group of loans was far more likely to go to foreclosure (33.6%) than the performing group of loans (1.5%).  The loans that were already delinquent on the Alleged Analysis Due Date account for nearly all of the foreclosures.

295.     Because of these differences, the two groups of loans should have been analyzed separately, so as not to contaminate the subsequent experience of the performing loans with the predictable and not-surprising propensity of delinquent loans to court foreclosure.

### 5.     Professor McFadden's foreclosure damages model is unreliable and invalid because he omits variables that mortgage finance scholars and professionals agree influence the probability of default and foreclosure.

296.     Professor McFadden and I agree that an econometric model which omits variables that exert a material influence on the dependent variable (here, the probability that a loan will go into foreclosure) cannot yield reliable results.  These omitted variables are often referred to as

"confounding" factors.  As I will demonstrate, Professor McFadden has omitted from his model several factors that mortgage finance scholars and professionals agree are among the most-important determinants of foreclosure.  The absence of these confounding factors is sufficient to invalidate the results of his model, even without taking into account the other critical flaws discussed in my report.

### a. Professor McFadden agrees that confounding factors must be controlled or ruled-out.

297.    Professor McFadden describes his model and assumptions as follows:

> I use commonly accepted econometric methods to control for the relevant variables that affect both the occurrence of late escrow servicing failures and foreclosure initiations, and thus am able to isolate from other possible causes the increased probability of foreclosure initiation to the borrowers that is the result of Ocwen's servicing failure.[199]

> The analysis program just described is a standard one in epidemiological research, where the question is the effect of a treatment on the probability of survival. A major question in such research is whether differences between "cases" and "controls" following the treatment were caused by the treatment, or were influenced by observed or unobserved confounding factors. In the survival analysis I have done in this case, I am able to control for or rule out these confounding factors, and exclude subpopulations of loans with possible confounding factors, such as preexisting bankruptcies or delinquencies, whose influence cannot be fully controlled, so that I have high confidence that the elevated risks that I measure following service failures are caused by these failures. In this analysis, I have been helped by three critical features of the Ocwen servicing failures, and the data Ocwen has provided on loans affected by these failures. The first is that I *assume* that Ocwen's data regarding the affected loans includes all key variables that may have influenced the administrative processing of these loans, and hence the likelihood that this processing would lead to a servicing failure. As support for this assumption, I note that Ocwen had not only a legal directive to provide these data, but also a positive incentive to turn over complete data on variables that entered their administrative processing decisions. The reason is that controlling for the effects of these variables could reduce their liability for harm to affected loans, and omitting such variables would prevent them from introducing them in their rebuttal

---

[199] McFadden Report, p. 38.

defense.[200] (emphasis added)

### b. Professor McFadden's claim that he has controlled or ruled-out confounding factors is wrong.

298.    Professor McFadden dismisses the risk that he has omitted important variables from his model by assuming it away.  Specifically, he assumes that the data Ocwen produced, together with the data he obtained through his research, allows him to fully control for all "confounding factors."  His assumption, however, is untenable, for three reasons.

299.    First, Ocwen could not have known that the Bureau's expert would endeavor to use a discrete proportional hazards model to estimate the increased foreclosure probability resulting from delayed escrow analyses.[201]  Nor could Ocwen have known what variables Professor McFadden would want to include in such an analysis.  Because Ocwen could not know in advance what data Professor McFadden would need for his model, there is no basis for his assumption that "Ocwen's data regarding the affected loans includes all key variables that may have influenced the administrative processing of these loans."

300.    Second, no servicer, including Ocwen, possesses data for all important confounding factors, as explained more fully below.  Third, even when Professor McFadden had data that is relevant to explaining the probability of foreclosure, he failed to include it in his model.

### c. Professor McFadden omits confounding factors from his model.

301.    Economists generally agree that certain characteristics of borrowers, loans, and mortgaged property have a significant impact on the likelihood of default and foreclosure.  These factors are widely used in credit risk models, and are invariably collected and analyzed during

---

[200] McFadden Report, pp. 41-42.

[201] Indeed, I am aware of no economic models suggesting that escrow payment changes, large or small, increase the probability of foreclosure.

the loan underwriting process.  Among these characteristics are at least three that Professor McFadden omits from his model.

### (1)    Equity

302.    Equity – the borrower's economic interest in the mortgaged property – is most commonly measured by the loan-to-value ratio ("LTV") or combined loan-to-value ratio ("CLTV").  As *The Handbook of Fixed Income Securities* notes, this ratio "has an impact on the expected payment performance of the obligor because high LTVs may indicate greater likelihood of default on the loan."[202]  Similarly, in *Securitization, Structuring and Investment Analysis,* the authors note that, "Historically, LTV ratios have proven to be important predictors of foreclosure.  Higher LTV loans have a higher risk of default."[203]

303.    The model that the U.S. Government required loan servicers to use in determining the probability of default in HAMP modifications includes the mark-to-market loan-to-value ratio as an independent variable.[204]  Likewise, an April 2017 HUD paper on the importance of mortgage down payments as deterrents to delinquency uses LTV as an independent variable, and notes that LTV is widely used as an independent variable in other similar studies.[205]  Chan, Sharygin, Been, and Haughwout (2014) use LTV as an independent variable in their default

---

[202] Fabozzi, Frank J.. *The Handbook of Fixed Income Securities, Eighth Edition*. 2012: McGraw-Hill Education. Kindle Edition. The text also notes, "For the purposes of underwriting a loan, CLTVs are more indicative of the borrower's credit standing and indebtedness than LTVs and therefore a better gauge of the creditworthiness of the loan."

[203] Davidson, Sanders, Wolff, Ching, *Securitization, Structuring and Investment Analysis*. John Wiley & Sons, Inc. 2003, p. 291.

[204] https://www hmpadmin.com/portal/programs/docs/hamp_servicer/BaseNPVModelDocumentationv7.pdf and https://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/2011-07_WorkingPaper_11-1_508.pdf.

[205] https://www huduser.gov/portal/sites/default/files/pdf/Downpayment-FinalReport.pdf.

model, and note that higher LTV and lower or negative equity increase the probability of default and foreclosure.[206]

304.    In April 2008, Federal Reserve Board Governor Randall S. Kroszner testified before the House Committee on Financial Services on the importance of borrower equity in determining loan performance:

> … the current housing difficulties differ from those in the past, largely because of the pervasiveness of situations known as negative equity positions in which the amount owed on the mortgage exceeds the current market value of the property.  A distressed borrower with a negative equity position may have neither the means nor the incentive to remain in the home.[207]

305.    Similarly, an October 2010 paper published by the National Community Reinvestment Coalition noted:

> once negative equity reaches 25 percent, homeowners tend to start defaulting at the same rate as investors.[208]

306.    Even the "payment shock" literature cited by Professor McFadden notes the importance of equity as a determinant of loan performance:

> Consistent with our prior beliefs, mortgage characteristics and house prices are the main factors explaining a borrower's decision not to make a mortgage payment… Housing equity…was an important determinant of delinquency: A mortgage loan with less housing equity was found to be more likely to become more delinquent.[209]

---

[206] Chan, Sharygin, Been, and Haughwout, "Pathways After Default: What Happens to Distressed Mortgage Borrowers and Their Homes," *Journal of Real Estate Finance and Economics,* 2014, 48:342-379.

[207] Testimony of Governor Randall S. Kroszner on Federal Housing Administration Housing Stabilization and Homeownership Act Before the Committee on Financial Services, U.S. House of Representatives, April 9, 2008 (https://www.federalreserve.gov/newsevents/testimony/kroszner20080409a.htm).

[208] James H. Carr and Michelle Mulcahy, "Rebuilding Communities in Economic Distress: Local Strategies to Sustain Homeownership, Reclaim Vacant Properties, and Promote Community-Based Employment," National Community Reinvestment Coalition, October 2010, p. 7 (https://www.fdic.gov/about/comein/mar11.pdf).

[209] Cristian deRitis, Chionglong Kuo, and Yongping Liang, "Payment shock and mortgage performance," *Journal of Housing Economics*, 2010, 19: 295-314, at 306.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                115

307.     Clearly, the amount of equity and the existence of negative equity are among the most, if not <u>the</u> most, important determining factors affecting the probability of default and foreclosure.  Because Professor McFadden omits this crucial factor from his model, his claim that he has controlled for all "confounding factors" is demonstrably false.[210]  As a consequence, his model yields results that are not reliable.

308.     Unfortunately, this is a flaw that is not easily rectified, at least not with Ocwen data.  When a loan is in default, it is common for servicers to periodically re-value the property and re-calculate an LTV, although servicers generally are not able to calculate a CLTV because they are not informed as to the balance of other liens.[211]  For loans that are not in default, however, servicers typically do not re-value the property and do not calculate LTVs.  For this litigation, Ocwen produced data on LTVs based on property valuations performed between 2013 and 2017,[212] but only for defaulted loans, and only for periods when a default persisted.  Because loan servicers such as OLS do not regularly calculate LTVs (or CLTVs) for all loans, Ocwen lacks the capability to produce a comprehensive dataset for LTVs or CLTVs.

309.     A model that does not control for confounding factors cannot serve as the basis for a reliable opinion on the extent to which – if any – the delayed escrow analyses affected foreclosures.

---

[210] Professor McFadden's inclusion of a variable for changes in home price and another for the origination loan amount are not proxies for LTV or CLTV.  The home price change variable simply addresses whether the underlying property appreciated or depreciated.  Home price change, by itself, says nothing about the amount of equity.  The loan amount at origination, by itself, says nothing about the current LTV or CLTV, or even the current loan balance for that matter.

[211] Unless the servicer services both the first and second lien.

[212] Data produced in response to RFP #18 of the Bureau's Fifth Set of Requests for Production.

### (2) Credit Score

310. Credit scores are another important indicator of default probability. Virtually all underwriters use a loan applicant's credit score as an objective representation of the borrower's credit history which indicates the probability that the applicant will fulfill his or her obligations to pay the lender and not default on the loan.[213] A 2015 research paper published by the Federal Reserve Bank of Kansas City, titled *Credit Scoring and Loan Default*, states that, "The industry standard for measuring consumer credit risk in the U.S. is the FICO score."[214] The credit score is also used by the U.S. Government for determining the probability of default in HAMP,[215] and by the April 2017 HUD Paper cited earlier.[216]

311. Professor McFadden acknowledges that an impaired credit score negatively impacts an individual's ability to obtain financing.[217] Despite the importance of credit scores in predicting defaults and foreclosures, however, he fails to use a credit-score variable in his proportional hazards model, even though he agrees that it is important to control for previous adverse credit events in connection with loans.[218] The data on adverse credit events that he uses in his model, however, generally dates back only to 2013 and 2014, and does not flag prior adverse credit events. Use of the borrowers' credit scores would have helped him compensate for the lack of relevant data, while also providing information on each borrower's history of servicing other debts.

---

[213] *The Handbook of Fixed Income Securities* notes that, "Credit scores are useful in quantifying the potential borrower's credit history."

[214] https://www.kansascityfed.org/publicat/reswkpap/pdf/rwp15-02.pdf.

[215] https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/BaseNPVModelDocumentationv7.pdf and https://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/2011-07_WorkingPaper_11-1_508.pdf.

[216] https://www.huduser.gov/portal/sites/default/files/pdf/Downpayment-FinalReport.pdf.

[217] McFadden Report, pp. 65-66.

[218] McFadden Report, p. 47.

312.    Professor McFadden had access to this data.  Ocwen periodically collects credit score data for the loans it services, and Ocwen produced this data for more than 1.5 million loans subject to the Bureau's request.[219]  Professor McFadden simply chose not to use the data in his model, despite its importance in predicting defaults and foreclosures.

### (3)    Payment Capacity

313.    The ratio of a borrower's monthly debt service payments to monthly income ("DTI") is a widely used metric in evaluating default risk.  In fact, the DTI ratio is the main metric used by lenders to evaluate a borrower's ability to afford mortgage payments.  For example, the *Handbook of Fixed Income Securities* states:

> In order to ensure that borrowers' obligations are consistent with income, lenders calculate debt-to-income (or DTI) ratios that compare the potential monthly payment on the loan to the borrower's monthly income.[220]

314.    Given its importance in predicting defaults, the debt-to-income ratio is one of the most important factors considered in underwriting new mortgages.[221]  It was also a key factor in evaluating whether a loan modification makes sense under programs such as HAMP.[222]

315.    By omitting any measure of payment capacity, Professor McFadden's model makes the implicit – and untenable – assumption that all borrowers in a given geography had an equal financial capacity to make their monthly mortgage payments.

---

[219] In response to RFP #15 of the Bureau's Fifth Set of Requests for Production.

[220] Fabozzi, Frank J. *The Handbook of Fixed Income Securities, Eighth Edition*. 2012: McGraw-Hill Education. Kindle Edition.

[221] *See, e.g.*, https://www.fanniemae.com/content/guide/selling/b3/6/02 html.

[222] *See, e.g.,* https://www.hmpadmin.com/portal/learningcenter/docs/presentations/mhaservicerwebinar_ stdaltwtrfall_presentation.pdf; https://www hmpadmin.com/portal/programs/docs/hamp_servicer/BaseNPVModel Documentationv7.pdf; and https://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/2011-07_WorkingPaper_11-1_508.pdf.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                        118

316.     This, too, is a difficult omission to correct.  Mortgage servicers, like Ocwen, only calculate DTI when evaluating requests for loan modifications.  Consequently, this metric is not gathered for all loans, nor is it gathered for all defaulted loans, because not all borrowers who default apply for a loan modification.  Ocwen was asked to produce DTI data by the Bureau, and produced the limited DTI data that it had.[223]  The data, however, is significantly less than what is needed to perform a valid analysis of the factors that influence the probability of defaults and foreclosures.

317.     In addition to equity, credit score, and payment capacity, three other factors not considered during the loan underwriting process can affect the probability that a given loan will go through foreclosure.

### (4)     Actions of a Prior Servicer

318.     Professor McFadden's damages model assumes that adverse actions by a loan servicer can affect the borrower's ability to make monthly mortgage payments on a loan for many years to come.  If this were true, it would be important for a damages model, like Professor McFadden's, to control for the possibility that systematic adverse actions were taken by a prior servicer.  This is another confounding factor omitted from his model.

319.     As of 2014, a majority of the 2,486,038 Ocwen-serviced loans were previously serviced by another servicer.[224]  During the period 2010 through March 2014, Ocwen acquired servicing rights for approximately 3.6 million loans from other servicers.[225]  A significant proportion of the acquired loans were delinquent when they were boarded to Ocwen's system.[226]

---

[223] Data produced in response to RFP #17 of the Bureau's Fifth Set of Requests for Production.

[224] Ocwen 2014 10-K, filed May 11, 2015, p. 40.

[225] Some of these loans would have transferred to another servicer or would have paid-off or been liquidated between the acquisition date and 2014 – which is why the number of loans serviced as of 2014 is lower than the number of loans acquired.

[226] Ocwen 2014 10-K, filed May 11, 2015, p. 6.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    119

Ocwen's books and records, however, do not contain any information on the extent to which the previous servicers properly serviced these and other acquired loans.  It is my understanding that Ocwen has data regarding the identity of prior servicers for each loan, but that the Bureau has not requested this data to-date.

320.    By not controlling for servicing failures on the part of prior servicers, Professor McFadden's model cannot separate the contribution of Ocwen's conduct to the foreclosure rate from the contribution made by prior servicers' conduct.

### (5)    Other Payment Changes

321.    Professor McFadden's theory of damages holds that changes in required monthly payments can increase the probability of default and foreclosure through a phenomenon he refers to as "payment shock."  As the research he cites in support of his theory makes clear, the required monthly payment can go up for a variety of reasons besides the need to recapture underpayments caused by a late escrow analysis.  Professor McFadden's model, however, makes no effort to control for these other payment changes – changes that, unlike those he included, have been shown in the economic literature to affect the probability of default.

322.    This is an important omission, because these other payment changes, such as those related to timely escrow analyses, loan modifications, amortization changes, and interest rate changes, can be much larger than the payment changes Professor McFadden claims resulted from tardy escrow analyses.  Therefore, if Professor McFadden is right that payment changes can adversely affect borrowers and increase the probability of foreclosure, he has chosen to omit from his model what *he* regards as an important variable determining the probability of foreclosure.  He had sufficient data on these other payment changes to control for them in his analysis, but he chose not to do so.

323.     I can illustrate the importance of these other types of payment changes using one of the 32,190 Allegedly Harmed and Foreclosed Loans: Loan Number ███████  This loan was current during the entire alleged delay period of twenty-seven days (from January 31, 2015 to February 27, 2015).[227]  The escrow analysis resulted in a new escrow payment that was $15 lower than the old escrow payment, as well as a $173 lump-sum payment to the borrower to eliminate the surplus in his escrow account.[228]  The effective date of the $15 payment reduction was delayed by no more than one month (from April 1, 2015 to May 1, 2015) and the $173 payment to the borrower was delayed by no more than 27 days (from perhaps February 20, 2015 to March 19, 2015).  The 27-day delay in the escrow analysis did not harm the borrower.

324.     The borrower defaulted on the April 1, 2015 payment – the month *before* the new escrow payment was set to take effect and *after* the borrower received the $173 payment from Ocwen.  The likely reason for this default appears to be a true "payment shock": expiration of the loan's interest-only period on the loan's 10-year anniversary – a common feature of interest only loans.  In order to begin fully amortizing the loan, the prior interest-only payment of $430 became a principal and interest payment, and increased to $1,054 effective on April 1, 2015 – a 108% increase.[229]  Professor McFadden had the data to control for such payment shocks but failed to do so, despite having reviewed the "payment shock" literature.

---

[227] The payments due for January, February, and March of 2015 were all made within the 15-day grace period.  The trailing-twelve month escrow disbursement activity for this loan was also essentially unchanged during this brief delay.  As of February 27, trailing-twelve month disbursements were $1,573.07, and as of January 31, the trailing-twelve month disbursements were $1,575.20 – a different of $2.13.

[228] The prior escrow payment was $146.31 (per the Transaction History data), and the new escrow payment was $131.08 (per the Escrow Statement data).  The $173 payment was made on March 19, 2015.

[229] Per the monthly billing statement data produced by Ocwen.  The percent increase is the prior payment of $576.31 ($430 interest plus $146.31 escrow) compared to the new payment of $1,200.23 ($1,053.92 P&I plus $146.31 escrow).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### (6)     Investor Requirements

325.     Different investors have different requirements for the institutions servicing their loans.  FHA, the GSEs (Fannie Mae and Freddie Mac), private-label mortgage-backed securities trusts, and investors holding loans in their portfolio have their own loan servicing requirements. These requirements can impact the likelihood that a given loan goes to foreclosure, the likelihood that a given loan comes out of foreclosure before a foreclosure sale, and the time it takes to complete foreclosure.  For example, some investors may be less likely to accept certain loan modifications as a means of avoiding foreclosure or foreclosure sale.  Professor McFadden failed to control for investor requirements.

### d.     Conclusion

326.     Rather than being "able to control for or rule out these confounding factors," Professor McFadden has left out of his model at least six important determinants of default and foreclosure.  By omitting these confounding variables, his model fails the test that *he* established for a scientifically sound quantitative analysis.  His opinions drawn from this model, therefore, are unreliable.

### 6.     Professor McFadden misidentifies his dependent variable: foreclosures.

327.     The most important variable that a proportional hazard model must specify correctly is the model's dependent variable.  In Professor McFadden's model, this variable is the occurrence of foreclosure.  Professor McFadden, however, gets this variable wrong, overstating foreclosures by 31%.

### a.     Professor McFadden's Specification of the Foreclosure Variable

328.     Professor McFadden's model assumes that no loan which undergoes foreclosure initiation survives, and that the initiation of foreclosure is a non-survival event leading to

damages.[230]  He defines foreclosure initiation as the occurrence of the first legal filing.  He then

notes that 44.6% of loans with a first legal filing had a foreclosure sale, 1.5% were "rescinded,"

and 53.9% are "ongoing."[231]

329.     Professor McFadden correctly treats the "rescinded" loans as no longer subject to

the possibility of foreclosure completion, but he erroneously treats the "ongoing" loans as having

a 96.7% probability of an eventual foreclosure sale and a 3.3% probability of being

"rescinded."[232]  A review of the Transaction History data would have revealed to him that the

initial foreclosure action for most of these "ongoing" loans had been cancelled.

### b.     How Professor McFadden's Specification Error Corrupts His Results

330.     Professor McFadden's specification error relates to loans he classifies as

"ongoing."  As noted above, he assumes that 96.7% of these loans – *i.e.*, loans with a first filing

but no foreclosure sale during the relevant time period – eventually will have a foreclosure sale.

His assumption, however, is contradicted by the Transaction History data he relies on for other

aspects of his analysis, causing him to significantly overstate the number of foreclosures among

the treatment and control groups, and invalidating any opinions he formulated based on the

results of his model.

331.     His proportional hazards model includes 31,284 loans that are flagged as

foreclosures.  The Transaction History data, however, shows that 7,485 of these loans were either

---

[230] McFadden Report, pp. 43-44.

[231] McFadden Report, pp. 54-55.

[232] These probabilities are calculated using the relative proportions of foreclosure sales completed (44.6%) to rescinded (1.5%), McFadden Report, p. 60.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                123

modified, reinstated, fully paid through a date after the first filing date, or paid-off in full, thereby ending the foreclosure process.[233]  These results are summarized in **Table 10**, below.

332.    For the same reasons, Professor McFadden's count of 32,190 Allegedly Harmed and Foreclosed Loans (whether or not included in the sample of loans on which Professor McFadden's model is based) overstates the population of foreclosed loans (24,171) by 33%. Stated in the alternative, 25% of the 32,190 Allegedly Harmed and Foreclosed Loans (*i.e.*, 8,019 of the 32,190) were not ultimately foreclosed.  These results are summarized in **Table 10**, below.

**Table 10**

**Summary of Professor McFadden's Foreclosure Specification Error**

|  | Included in Model | | | | |
|---|---|---|---|---|---|
|  | Overcharge/ Undercharge[235] | Zero/Missing Accrual[234] | Control Group | **Total** | **Total "Harmed"** |
| Actual Foreclosures | 14,304 | 8,265 | 1,230 | **23,799** | **24,171** |
| Reinstated/Modified | 4,825 | 1,676 | 470 | **6,971** | **7,417** |
| Paid Off | 329 | 145 | 40 | **514** | **602** |
| Mis-specified | 5,154 | 1,821 | 510 | **7,485** | **8,019** |
| Total per McFadden | 19,458 | 10,086 | 1,740 | **31,284** | **32,190** |
| Over-Specification Rate | 36% | 26% | 41% | **31%** | **33%** |

---

[233] This detail is set forth at **Exhibit 10A**.  As explained later in this report, the only borrower-incurred costs identified by Professor McFadden in connection with a foreclosure are moving costs.  These borrowers by definition, did not pay moving costs in connection with a foreclosure because no foreclosure sale occurred.

[234] Overcharge/Undercharge loans are the subset of the 272,007 allegedly harmed loans with an accrued surplus or shortage listed at Ocwen's Exhibit C Litigation Work Product.

[235] Zero/Missing Accrual loans are loans at Exhibit C where the accrued surplus or shortage is "0" or is blank.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

333.     An example of such a specification error is Loan Number ███████ This loan had a first filing date of October 31, 2016.[236]  The borrower reinstated the loan on August 31, 2017,[237] thereby ending the foreclosure process before a foreclosure sale was scheduled.[238]  The reinstatement occurred 30 months after the allegedly late escrow analysis,[239] and did not require the borrower to pay any foreclosure-related fees.[240]  Yet, Professor McFadden claims that because of the late escrow analysis 30 months earlier, this *performing* loan still has a 96.7% probability of going to a foreclosure sale.[241]  Such a claim is nonsensical.  If the borrower was able to bring the loan current, notwithstanding that the escrow analysis in question allegedly was delayed by 25 days, the likelihood of a subsequent foreclosure filing, let alone a foreclosure sale, is considerably smaller than 96.7%.  Furthermore, should a subsequent foreclosure occur, it would clearly be due to some factor other than the 25-day delay in the escrow analysis that occurred 2.5 years earlier.

### 7.     Professor McFadden includes loans in his analysis that, by his own admission, did not foreclose as a result of any allegedly delayed escrow analysis.

334.     Throughout his report, Professor McFadden states that loans with a delinquency or foreclosure prior to the Alleged Analysis Due Date should be excluded when attempting to estimate additional foreclosures resulting from the allegedly delayed escrow analyses.  For

---

[236] Per data produced in response to RFP #9 of the Bureau's Fifth Set of Requests for Production.

[237] Per the Transaction History data.

[238] The borrower continued to make payments thereafter.  As a consequence of the reinstatement, if the borrower were to again fall into a severe delinquency, Ocwen would be required to make another first filing in order to start a new foreclosure process.

[239] The escrow analysis was allegedly delayed from March 3, 2015 to March 28, 2015.

[240] The reinstatement payment was $20,102.36, all of which was applied to principal, interest, and escrow (*see* Transaction History data).

[241] The percentage of "ongoing" foreclosures that Professor McFadden assumes to result in foreclosure sales.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

example, on page 15 of his report, he says that foreclosure-related damages accrue when an

adverse credit event occurs <u>subsequent</u> to the delayed analysis:

> If the borrower was not able to pay the additional amount demanded by Ocwen or was unable to pay on other credit accounts, then she **may have subsequently experienced an adverse credit** event such as delinquency, bankruptcy, or foreclosure. (emphasis added)[242]

> With an undercharge, if Ocwen seeks to collect that undercharge at a later date, then the borrower would receive a payment shock…The borrower **may fall into an adverse credit event**... (emphasis added)[243]

335.    Similarly, at page 41, Professor McFadden claims to exclude loans with

preexisting delinquencies:

> I am able to … **exclude subpopulations of loans** with possible confounding factors, **such as preexisting bankruptcies or delinquencies**, whose influence cannot be fully controlled, so that I have high confidence that the elevated risks that I measure **following** service failures are caused by these failures. (emphasis added)[244]

336.    Professor McFadden failed to consistently apply his own criteria when he selected

loans for his treatment group.  An example of one such loan is Loan Number ██████

discussed in paragraph 269 above.  This loan was *40 payments past-due* as of the Alleged

Analysis Due Date.  Of the 31,284 foreclosures specified in Professor McFadden's proportional

hazards model, 17,165, or 55% were at least 120 days delinquent as of the Alleged Analysis Due

Date, and the borrowers made no payments at all on these loans after the Alleged Analysis Due

Date.  These results are summarized in **Table 11**, below.  **Table 11** also shows that Professor

McFadden's control group is fundamentally different from his "harmed" group.  For example, of

the loans specified as foreclosures in the control group, 19% had already experienced their

---

[242] McFadden Report, p. 15.
[243] McFadden Report, p. 15.
[244] McFadden Report, p. 41.

ultimate default,[245] whereas 51% of the overcharge and undercharge loans specified as foreclosures had already experienced their ultimate default. It appears that his decision to include these loans in his analysis may be due to his failure to accurately identify delinquencies.[246]

337. Similarly, of the 32,190 Allegedly Harmed and Foreclosed Loans in Professor McFadden's damages analysis, 50% were at least 120 days delinquent as of the Alleged Analysis Due Date, and borrowers made no payments at all on these loans after the Alleged Analysis Due Date. These results are also summarized in **Table 11**, below.   On average, these loans were over 900 days past due as of the Alleged Analysis Due Date. It is not plausible that any of these loans were adversely impacted by an allegedly delayed escrow analysis because by the alleged due date, a default had already occurred and the loans were already well on their way to foreclosure.

---

[245] As of January 1, 2014, which is the earliest Alleged Analysis Due Date.

[246] Professor McFadden claims that he performed a "robustness" test of his model by re-running the exact same model, but "excluding from the model harmed loans that suffered adverse credit events before the harm from servicing failures." (Appendix H, p. 1) In my opinion, re-running a severely flawed model with different data tells us nothing about the model's validity. Furthermore, I find two noteworthy aspects of Professor McFadden's purported robustness test. First, his alternate model does not actually exclude all loans suffering from adverse credit events prior to the allegedly delayed analysis, as he claims. It includes 29,701 loans that were 120-days or more delinquent as of the Alleged Analysis Due Date (or January 1, 2014, in the case of control group loans). Second, even this partial exclusion has a very significant effect on the model's results. The probability of foreclosure for undercharge loans drops from 5.073% to 0.345% and the probability of foreclosure for overcharge loans drops from 6.733% to 5.522% (comparing McFadden Report, Table 12, p. 52 to Appendix H, Table 2, p. 3). Moreover, 2% (638) of the delinquent loans he included in this "robustness" test model are undercharged loans, while 23% (6,691) are overcharged loans. These findings demonstrate that, while Professor McFadden fails to exclude all loans with prior adverse credit events, his exclusion criteria is less effective at excluding overcharged loans with prior delinquencies than undercharged loans, and when such undercharged loans are excluded, his estimate of the impact of the alleged untimely escrow analysis on the average cumulative probability of an initiated foreclosure decreases to 0.345%.

**Table 11**

**Summary of Professor McFadden's Failure to Exclude Pre-Existing Defaults[247]**

|  | Included in Model | | | | |
|---|---|---|---|---|---|
|  | Overcharge/ Undercharge[249] | Zero/Missing Accrual[248] | Control Group | **Total** | **Total "Harmed"** |
| Total Population | 131,574 | 17,611 | 47,051 | **196,236** | **272,007** |
| 120+ Days DQ | 15,290 | 11,128 | 3,961 | **30,379** | **31,238** |
| % of Population | 12% | 63% | 8% | **15%** | **11%** |
| Foreclosed Pop. | 19,458 | 10,086 | 1,740 | **31,284** | **32,190** |
| 120+ Days DQ | 9,941 | 6,890 | 334 | **17,165** | **16,057** |
| % of Population | 51% | 68% | 19% | **55%** | **50%** |

**8.    Professor McFadden ignores other data produced by Ocwen relevant to causation.**

338.    Professor McFadden's causation theories ignore relevant data produced by Ocwen that indicates the reason for the loan default.  Because there is no mystery as to why these loans ended up in foreclosure, they should have been excluded from both Professor McFadden's proportional hazards model and his damages calculation.  Professor McFadden, however, chose to include these loans in both groups, causing him to grossly overstate the importance of delayed escrow analyses in causing foreclosures.

---

[247] *See* **Exhibit 10B**.  This analysis only considers loans that were at least 120 days delinquent <u>and</u> never made a subsequent payment.  If I look at any loan that was at least 120 days delinquent, even if the loan made subsequent payments or cured, the incidence rate is much higher.  This analysis is at **Exhibit 10C**.

[248] Overcharge/Undercharge loans are the subset of the 272,007 allegedly harmed loans with an accrued surplus or shortage listed at Ocwen's Exhibit C Litigation Work Product.

[249] Zero/Missing Accrual loans are loans at Exhibit C where the accrued surplus or shortage is "0" or is blank.

339.     It is common for servicers to collect information from borrowers as to the reason for their default.  The Bureau asked Ocwen to produce this information when it requested "the ESI you possess identifying reasons You entered for the Default and the Date You entered that reason(s)."[250]   Examples of the reasons for default specified in this data include:

      a)      Reduction of income;

      b)      Medical problems;

      c)      Insufficient fixed income;

      d)      Marital problems;

      e)      Death of the borrower or a family member;

      f)      Fraud; and

      g)      Incarceration.

340.     As a specific example, Loan Number ███████ had its escrow analysis allegedly delayed by 16 days (from March 3, 2015 to March 19, 2015) – so brief a delay that it likely had no effect on the loan.  The loan was current at the time of the allegedly delayed analysis.  After the loan defaulted, more than one year after the allegedly delayed analysis, Ocwen reported the following reasons for default: Unexpected Medical Expense, Inability to Rent Property, and Excess Use of Credit.  None of these reasons has any connection to the allegedly delayed escrow analysis.

341.     I have analyzed this data for the loans for which Professor McFadden calculates foreclosure-related damages, after excluding the loans which Professor McFadden misidentifies as "foreclosures" and the loans which defaulted prior to the alleged delayed escrow analysis.  I have conservatively classified the reasons for default as (a) "non-Ocwen" reasons for default,

---

[250] RFP #6 at *Plaintiff's Fifth Set of Requests for Production to Defendants*.  "ESI" stands for Electronically Stored Information.

and (b) reasons for which I could not rule out the possibility of a borrower's assertion that Ocwen's conduct may have affected the default.  For example, I did not classify "excessive obligation" as a non-Ocwen reason because I could not rule out the possibility that a borrower might consider the Ocwen-serviced loan to be an "excessive obligation."  However, it is quite unlikely that a borrower would consider the escrow payment an "excessive obligation."  My classification of all reasons for default is set forth at **Exhibit 10E**.  The results of my analysis are summarized in **Table 12**, below.[251]

**Table 12**

**Analysis of Reason for Default Data[252]**

| | Included in Model | | | | |
| --- | --- | --- | --- | --- | --- |
| | Overcharge/ Undercharge | Zero/Missing Accrual | Control Group | **Total** | **Total "Harmed"** |
| McFadden FC Population | 19,458 | 10,086 | 1,740 | **31,284** | **32,190** |
| Less: | | | | | |
|     Mis-specified | (5,154) | (1,821) | (510) | **(7,485)** | **(8,019)** |
|     Pre-Existing Defaults | (9,941) | (6,890) | (334) | **(17,165)** | **(16,057)** |
| Remaining FC Population | 4,363 | 1,375 | 896 | **6,634** | **8,114** |
| | | | | | |
| Has Reason for Default | 3,061 | 888 | 578 | **4,527** | **5,742** |
|     % of Remaining | 70% | 65% | 65% | **68%** | **71%** |
| | | | | | |
| Non-Ocwen RFD | 2,931 | 844 | 553 | **4,328** | **5,491** |
|     % of Pop with RFD | 96% | 95% | 93% | **96%** | **96%** |
|     % of McFadden FC Pop | 15% | 8% | 32% | **14%** | **17%** |

---

[251] Payment adjustment is listed as a reason for default for 263 loans.  However, 233 of these loans also list some other reason for default unrelated to Ocwen's actions, such as an income reduction.  There is no indication that the payment adjustment referred to is the at-issue adjustment, rather than some other payment adjustment, such as the conversion of a loan's monthly payment from interest only to principal and interest.

[252] These calculations are explained and summarized at **Exhibit 10D**.  The reason for default data utilized in this analysis is summarized at **Exhibit 10E**.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    130

342.     In summary, by adding the 17% of "harmed" loans with non-Ocwen reasons for default in **Table 12** above, to the 50% of the "harmed" loans that were pre-existing defaults (in **Table 11**), and the 25% of the "harmed" loans that did not actually experience foreclosure (paragraph 332), I am able to establish,  without performing a loan-by-loan review, that approximately 92% of the Professor McFadden's 32,190 Allegedly Harmed and Foreclosed Loans could not possibly have sustained a foreclosure as a result of the alleged escrow analysis delay.[253]  This calculation is found in **Table 13** below.  I am surprised Professor McFadden failed to exclude these loans from his proportional hazards model and his damages analysis, given what the data tells us about these loans.

343.     When Professor McFadden's model finds that loans which did not have a foreclosure sale, loans that defaulted before the alleged delayed escrow analysis, and loans that defaulted because of, say, the borrower's incarceration, were foreclosed as a result of an escrow analysis delay, it should leave no doubt in anyone's mind that his model is irreparably flawed.

---

[253] Given how small Professor McFadden's estimate of the borrowers' opportunity cost damages is, I am confident that a loan-by-loan review would establish that the vast majority – and probably all – of the remaining Allegedly Harmed and Foreclosed Loans went to foreclosure for reasons having nothing to do with the alleged late escrow analyses.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                          131

**Table 13**

**Summary of Data Analysis of 32,190 Allegedly Harmed and Foreclosed Loans**

**Before Individual Analysis**

|  |  | Percent |
|---|---|---|
| Mis-specified Foreclosures | ¶332 | 25 |
| Pre-Existing Defaults | Table 11 | 50 |
| Unrelated Reason for Default | Table 12 | 17 |
| Percent Not Caused by Escrow Analysis - Before Individual Analysis |  | 92 |

### 9. Professor McFadden's model yields results that contradict well-established principles of mortgage finance.

344.    Another indicator that Professor McFadden's model is irreparably flawed is the fact that it yields results which defy widely accepted principles of mortgage finance. Specifically, three of the variables in his model have coefficients with the wrong sign (*i.e.*, + instead of –, or – instead of +).

### a. Professor McFadden's model finds that, all else constant, higher unemployment is associated with *lower* foreclosure risk.

345.    One of the independent variables in Professor McFadden's model is the unemployment rate.  In plain English, this means that Professor McFadden believes the unemployment can affect the foreclosure rate – presumably, because a high unemployment rate means more borrowers will be without jobs and therefore unable to make their monthly mortgage payments.  In Professor McFadden's model, however, the coefficient on the unemployment rate

variable is negative *and* statistically significant at the 99% confidence level.[254]  The negative coefficient means that according to Professor McFadden's model, a higher unemployment rate reduces the risk of foreclosure.  Simply put, this result is nonsensical, and it calls into question the reliability of all other coefficients in Professor McFadden's model, including those that he uses to estimate damages.

> **b.  Professor McFadden's model finds that, all else constant, investment properties have lower foreclosure risk than owner occupied properties.**

346.    Another independent variable in Professor McFadden's model identifies whether the property financed by a loan is occupied by someone other than the property's owner (*e.g.,* a renter).  It makes sense to include this variable, because loans on non-owner-occupied property are widely perceived as riskier than owner-occupied property, and therefore more likely to go through foreclosure.  For example, *Securitization, Structuring and Investment Analysis* states:

> Mortgages for nonowner-occupied residences are considered riskier than [mortgages for] owner-occupied homes, because a home owner is more likely under economic hardship to forfeit a second home than his or her primary residence.  Moreover, rental properties have an additional risk in that owners rely on rental income to make their mortgage payments, which can suffer lapses.[255]

347.    In Professor McFadden's model, however, the non-owner occupancy variable has a *negative* sign that is statistically significant at the 99% confidence level.[256]  Thus, Professor McFadden's model is telling us that a non-owner occupied property (an investment property) has a lower foreclosure risk than an owner-occupied property – the reverse of what mortgage finance professionals believe, and the reverse of what the mortgage finance literature has found.  The

---

[254] McFadden Report, p. 50.

[255] Davidson, Sanders, Wolff, Ching, *Securitization, Structuring and Investment Analysis*. John Wiley & Sons, Inc. 2003, p. 292.

[256] McFadden Report, p. 50.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

wrong sign on this variable further calls into question the reliability of all other coefficients in Professor McFadden's model, including those that he uses to estimate damages.

### c. Professor McFadden's model finds that, all else constant, seasoned loans have a higher risk of foreclosure than unseasoned loans.

348.     Professor McFadden's model also includes a variable for the age of the loan.  This also makes sense because seasoned loans – loans that are still performing years after the loan was originated – are perceived by investors to have less risk than relatively new loans.  The reason for this perception is two-fold.  First, over time, the combination of the borrower's monthly mortgage payments and the trend in housing prices (usually, but not always, up) tend to increase the borrower's equity in the property, thereby providing additional cushion for the loan.  Second, nominal borrower income tends to increase over time, but nominal principal and interest payments usually do not increase, making the monthly payment more affordable over time.

349.     I know from my experience that models used to calculate a financial institution's loan loss reserves take the ages of loans in the portfolio into account, and require less reserves for older loans because they are perceived as less risky. The authors of *Securitization, Structuring and Investment Analysis* reached the same conclusion, stating "The risk of default tends to decline as loans become more seasoned."[257]

350.     In Professor McFadden's model, the coefficient for the loan-age variable has a positive sign that is statistically significant at the 99% confidence level.[258]  In effect, the model is telling us that in any given month, all else constant, an older loan is more likely to go into

---

[257] Davidson, Sanders, Wolff, Ching, *Securitization, Structuring and Investment Analysis*. John Wiley & Sons, Inc. 2003, p. 292.
[258] McFadden Report, p. 50.  The sign on the coefficient of the square of the log of loan age is positive, indicating risk is increasing at a decreasing rate.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

foreclosure than a younger loan.  This conclusion is contradicted by one of the "payment shock" studies cited by Professor McFadden:

> Across different delinquency statuses, the effect of a payment shock was found to gradually decay over time although payment shocks encountered and overcome by a borrower a long time ago can be a positive signal of a borrower's future resilience.[259]

351.    Here again, the fact that Professor McFadden's model yields the wrong sign on the coefficient for the loan-age variable brings into question all of the other coefficients in the model, including those that he uses to estimate damages.

**10.    Because Professor McFadden failed to perform a basic reasonableness check of his results, he failed to see that the modeled foreclosure probabilities are contradicted by the available data.**

352.    When a model builder has run the model and captured the output, his or her job is not finished.  He or she must subject the results to a reasonableness test.  As one college econometrics textbook titled *Introductory Econometrics with Applications* puts it:

> In carrying out an empirical project, an investigator must have satisfactory answers to the following questions:
>
> Does the model make economic sense?...
>
> Are the data reliable?...
>
> How do the results of the models compare with those obtained from other competing models?
>
> What do the results show? Are they what economic theory or intuition would lead one to expect?[260]

---

[259] Cristian deRitis, Chionglong Kuo, and Yongping Liang, "Payment shock and mortgage performance," *Journal of Housing Economics*, 2010, 19: 295-314, at 298.

[260] Ramu Ramanthan, *Introductory Econometrics with Applications, Fifth Edition*, South-Western, 2002, p. 13.

353.     In this section, I do what Professor McFadden apparently did not do: perform a reasonableness test of the findings and conclusions yielded by his model.[261]

### a.     Professor McFadden's model yields counterintuitive results.

354.     As explained in the foregoing sections, Professor McFadden's model contains so many critical flaws that its results are unreliable.  As explained in the last section, one manifestation of these flaws is the demonstrably false conclusions it reaches regarding the impact of certain factors, like the unemployment rate, on loan performance.

355.     Another manifestation of these flaws is the model's finding that there is a 6.733% probability of foreclosure for "overcharge" loans, and a 5.073% foreclosure probability for "undercharge" loans.  Professor McFadden uses these probabilities in reaching his opinion that the delayed escrow analyses caused 16,636 of the foreclosures initiated for such loans, or *51 percent* of the 32,190 Allegedly Harmed and Foreclosed Loans.  Therefore, according to his model, all of the factors that have been found by scholars and mortgage finance professionals to comprise the primary causes of defaults and foreclosures – job losses, serious medical problems, divorces, deaths, major financial problems, incarcerations, negative equity, etc. – collectively account for fewer foreclosures (49%) than escrow analysis delays (51%).  Such a finding is irrational.

356.     To test the reasonableness of Professor McFadden's novel finding that 51 percent of the 32,190 purported foreclosures involving the Allegedly Harmed and Foreclosed Loans

---

[261] I could find no such analysis in the McFadden Report.  Professor McFadden claims to perform three "robustness" tests on his model.  The results of these tests show how sensitive his model is to the choice of data used in the model, but they do not prove that the model yields results that actually make sense.  For example, both Ocwen-only models still find that, controlling for other factors, (a) higher unemployment is associated with lower foreclosure risk, (b) older loans have greater foreclosure risk, and (c) non-owner-occupied properties have greater foreclosure risk than owner-occupied properties (Appendix H, pp. 1-5).   It is also important to note that all three "robustness" tests yield lower foreclosure probabilities – and that 2 of the 3 tests (partially excluding loans with an adverse credit event and the MBS-Ocwen model) yield significantly lower estimates of average impact on the probability of an initiated foreclosure that imply significantly lower damages than Professor McFadden claims.

were caused by improper escrow analysis delays, I drew a 100-loan random sample from this population of 32,190 loans.  If Professor McFadden's findings are valid, I would expect the data to show that the alleged escrow analysis delay was the cause of the foreclosure for about fifty percent of the 100 loans – or, at a minimum, show a reasonable connection to the alleged escrow analysis delays and the foreclosures.  If, on the other hand, Professor McFadden's model is as flawed as my analysis shows it to be, I would not expect to see any causal relationship between the delays and the foreclosures.

### b.    Sampling Methodology

357.    I drew my sample of 100 loans from the population of 32,190 Allegedly Harmed and Foreclosed Loans.  (Each of these loans is also included in the 272,007 loans to which Professor McFadden applied his foreclosure probability calculations.)

358.    The hypothesis I sought to test is that none of the foreclosures was caused by a delayed escrow analysis, notwithstanding the findings from Professor McFadden's flawed model.  According to the financial auditing textbook I consulted, a sample size of 100 is adequate for testing purposes where the expected deviation rate is 0 percent.[262]  In this case, a deviation would be a foreclosure caused by a delayed escrow analysis.  If, instead, I found a significant rate of deviations, I would have been required to perform additional analyses or setup an alternative model, in order to estimate the likelihood of foreclosure resulting from an allegedly delayed escrow analysis.

359.    The sampling methodology I employed is designed to provide 95% confidence that the deviation rate in the population is 3% or less if I find no exceptions in the sample.[263]

---

[262] Whittington and Pany. *Principles of Auditing & Other Assurance Services, 16th Ed.* McGraw-Hill. 2008, p. 343.

[263] *Id.*

This sampling methodology, by itself, does not allow me to completely rule out the possibility that a delayed escrow analysis may have impacted one loan, or even a small number of loans, but it allows me to conclude, with a 95% confidence, that the true exception rate does not exceed 3% of the 32,190 Allegedly Harmed and Foreclosed Loans from which the sample was drawn, and is not more than 0.4% of the 272,007 loans that Professor McFadden claims to have been potentially harmed.  This sampling methodology provides a robust test of the reliability of Professor McFadden's model.

360.    In my opinion, the number of loans that were adversely affected by delayed escrow analyses to such an extent that the delay was a substantial causal factor in a foreclosure would be so vanishingly small (most likely zero) that a reliable economic model would not be capable of discerning these loans among the hundreds of thousands of loans subject to allegedly delayed escrow analyses, based on the available data for those loans.  Rather, identifying such loans would require an individual study of each loan, based on data that is not presently available for all relevant loans.

### c.    Analysis of the Sample

361.    The details of my analysis are set forth at **Exhibit 11A**, and are summarized below.  As noted in **Table 13**, without performing an individualized review of the loans, I find that approximately 92% of the 32,190 Allegedly Harmed and Foreclosed Loans did not sustain a foreclosure as a result of the alleged escrow analysis delay.  This result contradicts and invalidates Professor McFadden's implicit conclusion that 51% of the foreclosures on these loans were a result of the alleged delay.  My analysis of the 100-loan sample finds that none of these loans – not a single loan – shows evidence of a foreclosure caused by the allegedly delayed escrow analysis.

### (1)    *22 Misidentified Foreclosures*

362.    The first check I applied to the sample of loans was to see if the loan actually went through foreclosure.  As explained above, a major and fatal error in Professor McFadden's model is that he misidentified the occurrence of foreclosures.  Not surprisingly, 22 of the loans in the sample had a first filing after the allegedly delayed escrow analysis, but were subsequently modified or reinstated, thereby ending the foreclosure.  An example of one such loan is Loan Number ███████ which I discussed above.  These 22 loans clearly did not sustain foreclosure damages stemming from the delayed escrow analysis because the first filing did not result in a foreclosure.

### (2)    *52 Pre-Existing Defaults*

363.    The second check I performed was to see if the delinquency giving rise to the foreclosure started before the allegedly delayed escrow analysis and was never cured.  As explained above, another major error in Professor McFadden's model is his failure to exclude existing defaults from his analysis, notwithstanding his assertion that such loans should be excluded.

364.    Consistent with my finding that 50% of the 32,190 Allegedly Harmed and Foreclosed Loans had already defaulted as of the Alleged Analysis Due Date, 52% of the sampled loans had already defaulted (*i.e.*, completely stopped paying) as of this date.  On average, these loans were 799 days (more than two years) past due on the Alleged Analysis Due Date.  The most-recent delinquency among this group of loans was 121 days (four months) and the some of the oldest were more than 2,000 days (*i.e.*, delinquent since at least 2008).  Because the borrowers had already stopped making payments on their loans, it is unreasonable to claim,

as Professor McFadden does, that any of these loans were adversely affected by an allegedly delayed escrow analysis.

### (3)   *18 With Other Reasons for Default*

365.   Of the remaining 26 loans in the sample, the available data for 18 of them gives a reason for the default that cannot be attributed to Ocwen's performance as a servicer, and is completely unrelated to the timeliness of the borrower's escrow analysis.  The reasons given for default that Ocwen contemporaneously provided for these loans include:[264]

   a)   Reduction of income;

   b)   Medical problems;

   c)   Insufficient fixed income;

   d)   Marital problems; and

   e)   Death of a family member.

### (4)   *None of the 8 Remaining Loans Show Causation by the Alleged Delay*

366.   For 4 of the remaining loans,[265] the alleged delay period in early 2015 was 21 days or less.  These delays were so brief that neither the payment effective dates nor the financial

---

[264] One of the sampled loans, number ███████ lists "payment adjustment" as a reason for default.  As explained in paragraph 323 through 324 above, the payment adjustment affecting this loan was the end of the interest-only period, and not the escrow payment change.  Ocwen's data also lists reduction of income as a reason for default.  All of the reasons for default after the Alleged Analysis Due Date for the sampled loans are listed at **Exhibit 11B**.

[265] ███████████████████████████████ .

results of the escrow analysis were materially affected by the delay.[266]  Furthermore, none of the defaults correspond in time to, or were caused by, the alleged delay.[267]

367.    The four remaining loans were already delinquent on the Alleged Analysis Due Date.  To make clear that there was no connection between the alleged delay and the foreclosure, I will briefly explain the circumstances of each of these four defaults.

368.    Loan Number ▆▆▆▆▆▆ was delinquent on the Alleged Analysis Due Date (March 31, 2014) as well as on the Actual Analysis Date (February 25, 2015).  The loan had been delinquent in earlier periods as well.  Because of these prior delinquencies, the borrower would have been more likely than the average borrower to go through foreclosure, without regard to the escrow analysis delay.  Moreover, the delay had no material financial effect on the borrower[268] because the level of escrow disbursement activity was virtually unchanged from the Alleged Analysis Due Date to the Actual Analysis Date.[269]  The borrower filed for bankruptcy in April 2015, the bankruptcy closed on October 26, 2017, foreclosure was initiated on February 7, 2018 and the foreclosure sale occurred on March 6, 2018.[270]  This borrower clearly had problems

---

[266] For loan ▆▆▆▆▆▆ there may have been a short delay in the payment of the escrow surplus to the borrower.  However, the borrower did not stop performing on the loan until July 2017 – more than two years after the alleged 17-day escrow analysis delay, long after he received the refund of the surplus in his escrow account, and after a new escrow payment had already taken affect.  The borrower was offered a trial loan modification in December 2017, but made no payments during the trial period.  The first filing of foreclosure occurred in May 2018, and clearly was not caused by the allegedly delayed escrow analysis.

[267] One of the loans, loan ▆▆▆▆▆▆ defaulted close in time to the alleged delay period, but not close enough that there is logical correlation.  The borrower made the January 1, 2015 payment on January 12, 2015, and made no payments thereafter.  The payment change for this loan was effective April 1, 2015, and would have been effective on the same date even if the analysis had been performed on January 31, 2015, when it allegedly was due.  Furthermore, the financial results of this escrow analysis were in no way affected by the alleged delay.  (As of both January 31, 2015 and February 21, 2015, the trailing twelve-month escrow disbursement activity was a single $1,108.76 property tax payment that was used in calculating the Target Payment Amount of $92.39 per the Transaction History and Escrow Statement data for this loan.)

[268] The escrow payment changed from $157.35 (per the Transaction History data) to $155.27 (per the Escrow Statement data corresponding to the February 25, 2015 escrow analysis effective date), a reduction of $2.08.

[269] $2,219.02 as of March 31, 2014 and $2,192.93 as of February 25, 2015.

[270] While this is a relatively quick time period between first filing and bankruptcy, it is also a first filing immediately following the exit from bankruptcy, which is not a common occurrence.

affording the loan long before the Alleged Analysis Due Date, and the alleged delay had virtually no economic effect on the loan, such that the default and ultimate foreclosure cannot be reasonably attributed to the alleged delay.[271]

369.   Loan Number ███████ was severely delinquent on both the Alleged Analysis Due Date (July 1, 2014) and the Actual Analysis Date (October 28, 2014).  After the delayed analysis, the borrower was offered a trial loan modification, which made the loan more affordable to the borrower.  The borrower performed satisfactorily during the trial period, and was able to obtain the permanent modification on April 17, 2015.  He was unable to perform under the permanent modification, however, and defaulted on the January 2016 loan payment. The first filing of foreclosure occurred in May 2016, and clearly was not caused by the allegedly delayed escrow analysis.

370.   Loan Number ███████ was severely delinquent on both the Alleged Analysis Due Date (April 10, 2014) and the Actual Analysis Date (August 18, 2014).  During the period when the escrow analysis was allegedly delayed, the borrower was offered a trial loan modification (on July 1, 2014), but no permanent modification was made.  When the first filing was made on November 9, 2015, the borrower was still in default on the payment due more than five years earlier, on April 1, 2010.  The first filing of foreclosure clearly was not caused by the allegedly delayed escrow analysis.

371.   Loan Number ███████ was severely delinquent on both the Alleged Analysis Due Date (April 2, 2014) and the Actual Analysis Date (October 15, 2014).  After the allegedly delayed analysis, the borrower was offered a trial loan modification, under which the borrower performed satisfactorily so as to obtain the permanent modification on March 5, 2015.  However,

---

[271] Certainly, the delayed analysis was not the tipping point pushing the borrower into insolvency.

the borrower was ultimately unable to perform under the permanent modification and defaulted

on the September 2015 loan payment.  The first filing of foreclosure occurred in April 2016, and

clearly was not caused by the allegedly delayed escrow analysis.

> **11.    Professor McFadden's estimates of foreclosure costs are not supported by the literature *he* cites and are contradicted by data *he* relied upon.**

372.    Professor McFadden claims that borrowers incurred damages averaging between

$21,130 and $29,066 as a result of foreclosures caused by delayed escrow analyses.  His

estimates are summarized in **Table 14**.

**Table 14**

**Professor McFadden's Estimates of Foreclosure Cost**

| | Calculated Amount | | Percent of Loans | Amount Applied | |
|---|---|---|---|---|---|
| | Lower | Upper | | Lower | Upper |
| Legal and Administrative Fees for All Borrowers | $1,086 | $3,320 | 100.0% | $1,086 | $3,320 |
| Relocation Fees for Evicted Borrowers | $780 | $0 | 30.8% | $240 | $0 |
| Equity Loss for Non-Rescinded Sales | $20,470 | $26,612 | 96.7% | $19,804 | $25,746 |
| McFadden's Per-Loan Foreclosure Damages | $22,336 | $29,932 | | **$21,130** | **$29,066** |

> **a.    Foreclosure does not cause equity loss.**

373.    Professor McFadden is wrong when he claims that foreclosures typically cause

borrowers to lose the equity they had in the foreclosed property.  The reverse is true.  Most

borrower defaults occur because the borrower is unable to afford the monthly mortgage

payments and does not have equity in the mortgaged property. Most other defaults occur because a borrower has decided to strategically default, due to negative equity in the mortgaged property.[272]

374.    Defaults do not always lead to foreclosure. For borrowers with equity in their property – the type of borrowers that Professor McFadden claims suffered equity losses averaging $20,470-26,612, default should rarely lead to foreclosure. A borrower who is unable to afford the mortgage but has equity in the mortgaged property has a powerful economic incentive, and usually the ability, to avoid foreclosure by selling the property, paying off the lender, and retaining the equity value of the property.

375.    The U.S. Department of Housing and Urban Development's Office of Policy Development and Research, in a January 2010 *Report to Congress on the Root Causes of the Foreclosure Crisis,* explained why foreclosures usually involve properties in which the owner has no equity:

> foreclosures are most accurately thought of as being driven by a two-stage process: first a trigger event reduces the borrower's financial liquidity, and then a lack of home equity makes it impossible for the borrower to either sell their home to meet their mortgage obligation or refinance into a mortgage that is affordable given their change in financial circumstances. In this view, a lack of home equity is an important determinant of foreclosures as it precludes other means that borrowers can take to resolve an inability to meet their mortgage obligations.[273]

---

[272] A survey of 1,000 households in 2008-2009 (designed to be representative of all U.S. households) found that 26% of defaults were strategic defaults. This finding was based on responses to a survey that asked participants how many people they knew who had defaulted on their mortgage, and how many of these people walked away from their mortgages, even though they could afford to make the required monthly payment (Guiso, Luigi, Paola Sapienza, and Luigi Zingales, "Moral and Social Constraints to Strategic Default on Mortgages," Einaudi Institute for Economics and Finance, EIEF Working Paper, 05/09, June 2009). A 2010 study used borrower-level credit bureau files to identify strategic defaults, defined as mortgage defaults by borrowers who kept their non-real-estate trade-lines current (a proxy for ability to pay). The study found that 19% of mortgage defaults in Q4 2008 and Q2 2009 were strategic defaults (Experian/Oliver Wyman Market Intelligence Report, *Understanding strategic default in mortgages: Q2 2010 update*, Experian, Oliver Wyman, www.marketintelligencereports.com (available at: https://www.experian.com/assets/decision-analytics/reports/strategic-default-report-2-2010.pdf).

[273] https://www.huduser.gov/portal/publications/Foreclosure_09.pdf.

376.   Similarly, the Federal Trade Commission's "Consumer Information" web page provides guidance to borrowers struggling to make payments on a mortgage.  The FTC advises borrowers to take the following options to avoid foreclosure:

a)   Reinstatement;

b)   Repayment plan;

c)   Forbearance;

d)   Loan modification;

e)   Selling your home; or

f)   Bankruptcy.[274]

377.   I have analyzed the payoff transaction data for the 32,190 Allegedly Harmed and Foreclosed Loans.  Within this population of loans, there are 602 where the loan was paid off in full, but where there was neither a completed foreclosure sale nor a charge-off.[275]  An example is Loan Number ███████   This property was located in ███████, and sold for $330,000 on December 18, 2017.[276]  The borrowers purchased the home in 2000 for $250,000.  Having sold the home for $330,000, after paying an estimated 6% realtor commission, the borrowers would have received $310,200.[277]  At the time of the sale, the borrowers were in default on the payment due on September 1, 2015 (*i.e.*, the loan was more than 2 years past

---

[274] https://www.consumer.ftc.gov/articles/0187-when-paying-mortgage-struggle.  A similar process is set forth in the 2012 NYU Default Pathways Study.

[275] Indicating that sale proceeds were at least as much, if not more than the amounts owed.  These calculations are summarized at **Exhibit 10A**.

[276] https://www.zillow.com/homedetails/███████ The property was listed for sale on September 22, 2017 and went pending on November 3, 2017 – for a total time on the market of 42 days.  The property address is listed in the Borrower and Loan information provided in response to RFP #1 to the Bureau's Fifth Set of Requests for Production.

[277] I have no reason to believe that the borrowers received less than the value of the property in this transaction.

due).[278]  The borrowers used the sale proceeds to repay Ocwen $152,109, but retained the balance of $158,091.[279]

378.    Thus, even though the borrowers appear to have been unable to afford their loan and were potential *candidates* for foreclosure, they avoided foreclosure by selling the home, thereby monetizing their equity in the property.[280]  In his damages analysis, however, Professor McFadden treats this loan as having been foreclosed, and losing between $19,804 and $25,746 as a result of the foreclosure.

379.    As a test of Professor McFadden's assertion that a loss of borrower equity averaging between $20,460 and $26,612 is the norm whenever there is a foreclosure sale, I performed an analysis of the 14,555 loans among the 32,190 Allegedly Harmed and Foreclosed Loans where a foreclosure sale occurred.[281]  For 14,469 of these loans, Ocwen produced estimated loan-to-value ratios based predominantly on exterior inspection valuations obtained while the loan was in default.[282]  The average loan-to-value ratio for these loans was 126%, before taking into account unpaid interest, escrow advances, and other costs advanced by the

---

[278] The Alleged Analysis Due Date for this loan was May 1, 2016.  Therefore, the alleged delay did not cause the default on this loan.

[279] Assuming there was not a second lien holder.  The $158,091 retention amount is calculated as $310,200 in estimated sale proceeds, less $152,109 paid to Ocwen.  This repayment included $103,337.35 of principal, $12,811.96 in unpaid interest, $30,857.28 in property taxes and insurance payments advanced by Ocwen for the borrowers' benefit, and $5,102.50 in other costs incurred by Ocwen to service this defaulted loan (of the reimbursement amount to Ocwen $4,866.59 was applied on December 19, 2017 to previously posted expenses and $235.91 was set aside for incurred but not yet posted expenses, of which it appears that $195.91 may have been refunded to the borrowers).

[280] Even when a home proceeds to foreclosure sale with positive borrower equity, the home would be expected to sell at foreclosure, and not convert to REO.  If the foreclosure sale yielded excess proceeds, the excess would be remitted to the borrower.

[281] *i.e.*, the loans included in the 32,190 Allegedly Harmed and Foreclosed Loans, where a foreclosure sale date was specified in the data provided by Ocwen in response to RFP #10 of the Bureau's Fifth Set of Requests for Production, and where the foreclosure sale was not listed as rescinded.

[282] In an exterior-inspection valuation, the valuation professional does not see the inside of the home and therefore must value the home based only on the condition of the exterior.  LTV data was produced by Ocwen in response to RFP #18 of the Bureau's Fifth Set of Requests for Production.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                146

servicer, together with amounts that may have been owed for other liens.  Interest and escrow alone average 37% of the principal balance at the time of liquidation for foreclosed loans.[283] After adjusting <u>only</u> for interest and escrow,[284] and a normal 6% realtor commission as a reduction to property value proceeds, the average ratio is 184% and only 18% of the loans had a ratio less than 100%.[285] This test refutes Professor McFadden's claim that a loss of equity is the norm when foreclosure occurs.

380.    As a second test of Professor McFadden's assertion that a loss of equity averaging $20,460 to $26,612 is the norm when there is a foreclosure sale, I performed an analysis of the 11,873 loans among the 32,190 Allegedly Harmed and Foreclosed Loans where there was a foreclosure sale <u>and</u> liquidation proceeds reported in the Transaction History data.[286]  I found that Ocwen reported total proceeds that were less than the outstanding principal of the Ocwen-serviced loan (before consideration of unpaid interest, escrow advances, and other costs advanced by the servicer, together with amounts that may have been owed for other liens) for 9,993 (84%) of the loans.[287]  On average, the outstanding principal balance for these 11,873 loans was $158,070 and the average proceeds from foreclosure were $102,495 – or 35% less

---

[283] Using Transaction History data.  For the subset of loans with a PYF, PYC, PYG, or PYW transaction, the sum of INTEREST_AMT and ESCROW_AMT associated with the PYF, PYC, PYG, or PYW transaction types, divided by the sum of PRINCIPAL_AMT corresponding to the same transaction types.

[284] For loans with a PYF, PYC, PYG, or PYW transaction, I utilize the actual ratio of interest and escrow to principal, otherwise I use 37%.

[285] To adjust the LTV ratio, I first add the interest and escrow percent of principal to the LTV ratio, I then divide this new ratio by 0.94 in order to account for a 6% realtor commission.

[286] *i.e.*, loans: (a) included in the 32,190 Allegedly Harmed and Foreclosed Loans, where a foreclosure sale date was specified in the data provided by Ocwen in response to RFP #10 of the Bureau's Fifth Set of Requests for Production, and where the foreclosure sale was not listed as rescinded; and (b) where there was a PYF, PYC, PYG, or PYW transaction.  This is a subset of loans with foreclosure sale.  If a foreclosure sale only turns the property to REO, there can be a foreclosure sale, but no liquidation proceeds.

[287] Using Transaction History data.  The total proceeds are the TRANSACTION_AMT corresponding to the PYF transaction.  The proceeds are then compared to the total PRINCIPAL_AMT corresponding to PYF, PYC, PYG, or PYW transactions for the loan.

than the outstanding principal balance.  This test also refutes Professor McFadden's claim that borrowers typically lose positive equity value when there is a foreclosure on their property.

381.    In summary, the evidence shows that the normative experience for loans liquidated through foreclosure is as I expected it to be: the borrower had no equity in the property going into the foreclosure, and the investor was unable to recoup even the amount of the loan principal.  Professor McFadden's failure to utilize the available data to test his claim that borrowers typically lose equity as a result of foreclosure caused him to grossly overstate his estimate of damages.[288]

### b.    Professor McFadden transmogrifies the investor's REO discount into the borrower's lost equity.

382.    Professor McFadden estimates his lower-bound borrower equity loss by multiplying his estimate of the properties' average value ($204,704) by 10%.  He cites a Mortgage Market Note published by the Federal Housing Finance Agency ("FHFA") titled "A Primer on Price Discount of Real Estate Owned (REO) Properties" as the basis for his 10 percent multiplier.[289]

383.    The FHFA paper that he relies on begins as follows:

> In the news media and the housing finance literature, houses repossessed by mortgage servicers, lenders or guarantors—known as Real Estate Owned (REO) properties—are reported to sell at a discount from their inherent property values. This price discount is known as the REO discount.[290]

---

[288] In 2007 the US Government passed The Mortgage Forgiveness Debt Relief Act of 2007 to allow borrowers to avoid taxes on the discharge of debt from their residence from 2007 through 2017 (https://www.irs.gov/newsroom/home-foreclosure-and-debt-cancellation).  If the normative experience in the event of foreclosure was a loss of equity, the lender would not normally have to forgive debt because the proceeds from the foreclosure sale would be sufficient to repay the indebtedness in full, and this law would have provided very little relief to borrowers.  In reality, the law provided meaningful relief because foreclosure nearly always results in debt forgiveness.

[289] https://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/20120917_MMNote_12-01_508.pdf.

[290] https://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/20120917_MMNote_12-01_508.pdf.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                148

In a later section of the paper, the authors state:

> While the academic estimates range from zero to 50 percent depending on location, time and controls used in the econometric models, the majority of estimates of REO discount in the academic literature are in the 10 to 25 percent range, particularly for nationwide averages.

The paper then goes on to explain that the causes of the REO discount include:

    a)    Condition Effect – Diminution in property condition from unrepaired damage to the property, inadequate maintenance by the loan servicer, and abandonment (*i.e.*, lack of a tenant).

    b)    Buyer-Related Effect – Buyers of REO properties are concerned about hidden costs, unforeseen delays and potential loss of property value due to unexpected issues.

    c)    Seller Motivation Effect - Like buyer risk aversion, seller motivation also affects the REO discount.  Servicers have costs associated with holding REO properties.

    d)    Stigma Effect – A small discount unexplained by other effects.

384.     The paper also notes factors that tend to inflate the measured REO discount, such as the tendency for REO properties to be inferior properties in the first place (*e.g.*, older and smaller), as compared to surrounding non-REO properties, and to be located in inferior markets.

385.     In summary, the 10% decline in property value referenced in this paper does not reflect a decline, or loss, experienced by the borrower.  Rather, this decline in value is experienced by the investor, when the property is directly owned by the investor and managed by the loan servicer or its agent.  Because the *former* borrower had no ownership interest in the property for the entirety of the period during which the property value declined, none of the loss was incurred by the borrower.

386.    The FHFA study does not purport to measure the borrower's loss of equity, and indeed does not even consider the borrower's equity loss.  Clearly, Professor McFadden has misapplied the study's findings, and he is left with no basis for his 10 percent equity loss. As demonstrated in the previous section, the correct equity loss percentage is zero.

### c.    The Moreno Report provides no support for Professor McFadden's upper-bound equity loss.

387.    Professor McFadden's upper-bound equity loss estimate of $26,612 is derived from the Moreno Report.  Professor McFadden claims that he developed his estimate by taking what the Moreno Report characterizes as the homeowner's "long-term loss of the financial investment in the property" ($7,200) and adjusting the figure for inflation using the consumer price index.[291]

### (1)    The Moreno Report estimates borrower equity with borrowers who *avoided* foreclosure.

388.    The Moreno Report describes the basis for the $7,200 figure as follows:

> Long-term loss of the financial investment in the property. For the homeowners served by [the Northside Residents Redevelopment Council (NRRC)] and [Saint Paul Housing Information Office (HIO)] the difference between the assessed market value and the balance on the home mortgage was $7,200 on average.[292]

The report then notes that this calculation was retrieved from "Wilder Research Center's Quarterly Report, Cumulative from 7/1/91 to 12/31/94."[293]  The population that the Center analyzed consists of all homeowners served by the Northside Residents Redevelopment Council

---

[291] McFadden Report, pp. 58-59.  Professor McFadden's method of inflating this figure is incorrect and unsupported.  First, Professor McFadden provides no basis for utilizing consumer prices to measure the change in the value of real property.  Second, in order to properly inflate this figure, Professor McFadden would need to study the inflation of the applicable property values relative to the inflation in loan amounts.

[292] McFadden Report, p. 59.

[293] Moreno Report, p. 12.  The report also notes: "Of the homeowners served, almost a quarter had two or more mortgages on their house.  Therefore, for those homeowners the home equity would be reduced by the amount of other mortgages on the home."

(NRRC) and Saint Paul Housing Information Office (HIO).  The Moreno Report describes this population as follows:

> a)  Over 800 homeowners in Minneapolis and Saint Paul who received foreclosure prevention counseling and/or emergency assistance between July 1, 1991 and December 31, 1994;
>
> b)  60 percent had their mortgages reinstated;
>
> c)  Fifty percent of those reinstated were "still current in their mortgage payments two years after coming to the program."

389.    Clearly, the surveyed population of 800 homeowners is *not* limited to those borrowers who went through foreclosure.  In fact, while the study makes an effort to point out the number of reinstatements, it fails to identify *any* borrower in this population who experienced a foreclosure.  Consequently, it provides no basis whatsoever for Professor McFadden's upper-bound estimate of the equity lost by borrowers who went through foreclosure as a result of allegedly delayed escrow analyses.

### (2)  The Moreno Report tells us nothing about the equity lost by borrowers who did go through foreclosure.

390.    The $7,200 figure is an estimate of borrower equity for borrowers many of whom were able to avoid foreclosure by reinstating their mortgages.  This statistic tells us nothing about the equity of borrowers who were *not* able to avoid foreclosure, such as those with whom Professor McFadden is concerned.  Indeed, the Moreno Report supports my opinion (as well as HUD's and FHFA's opinions) that borrowers with positive equity value in their property are usually able to avoid foreclosure.  As I noted earlier in this report, foreclosure is generally for borrowers who have no equity in their mortgaged property; borrowers with equity have a

powerful economic incentive – and usually the ability – to avoid foreclosure by selling their homes or refinancing their mortgages.

391.    It is true that the Moreno Report claims foreclosure costs homeowners $7,200, but this claim mischaracterizes the data in the report, as I have demonstrated.  The report's author, Ms. Moreno, almost certainly would have detected this error if she had submitted her report for publication in a peer-reviewed scholarly journal.  She did not do so, however and, instead, allowed it to be published on the website of an advocacy group – Family Housing Fund, where it is unlikely to have undergone rigorous scrutiny.[294]

> **d.    Borrowers do not pay the type of legal and administrative fees identified by Professor McFadden.**

392.    The fees included in Professor McFadden's calculation of borrower damages are described as follows:

> a)    Foreclosure attorney fees, and publication/posting and process server fees. Professor McFadden claims to estimate these fees based on "Ocwen & Public Sources."
>
> b)    Foreclosure legal fees and legal expenses (title work, filing fees, and publication costs).  Professor McFadden claims to estimate these fees based on the Moreno Report.

393.    The legal and administrative fees identified by Professor McFadden as one component of his damages estimate are almost never paid by borrowers; they are paid by investors.  These fees are incurred relatively late in the foreclosure process, closer to the

---

[294] Ms. Moreno describes the Family Housing Fund as, "a nonprofit organization whose mission is to preserve and expand quality affordable housing for families with low and moderate incomes in the seven county metropolitan area of Minneapolis and Saint Paul, Minnesota."  I do not mean to belittle the Fund or its mission in any way.

foreclosure sale date.  They are almost always funded by an advance made by the servicer on behalf of the investor, and the advance typically is reimbursed by the investor from the investor's liquidation proceeds.  Even the Moreno Report that Professor McFadden relies on in estimating damages describes these types of fees as "Fannie Mae's Typical Expenses During the Foreclosure Process."[295]

## C.   Additional Costs that Professor McFadden Claims to Exist, but Did Not Quantify

394.     Professor McFadden also claims that borrowers "are harmed by inaccurate and [un]timely information regarding their loans that can adversely affect their financial position."[296] In his report, however, he fails to document that Ocwen actually provided borrowers "with inaccurate and [un]timely information that . . . adversely affect their financial position." Consequently, his claim is more in the nature of a hypothetical than a finding.  Moreover, Professor McFadden did not attempt to quantify any such additional costs or include them in his estimate of damages.  Nevertheless, I have several observations to offer on this matter that may assist the Court.

395.     Professor McFadden attempts to provide a hypothetical example of a borrower who is harmed by inaccurate and untimely information – specifically, by a delayed escrow analysis.  In his hypothetical, the borrower's payment is $200 lower than it would have been if the analysis had been performed on time.  According to Professor McFadden's logic (which I discuss elsewhere in this report), however, this hypothetical borrower clearly benefitted from the delay, because he or she in effect enjoyed an interest-free loan from Ocwen during the delay period.  Yet, Professor McFadden opines that this borrower was harmed, and would have been

---

[295] Moreno Report at page 16 and Exhibit F.
[296] McFadden Report, p. 62.

better off actually paying the $200 to Ocwen during the delay period, which results in no interest savings, rather than using the money to pay-down higher cost debt.[297]  I note that the conclusion Professor McFadden draws from his hypothetical is the exact opposite of the conclusion he draws from the same hypothetical in articulating his opportunity cost damages theory.  In estimating opportunity cost damages, Professor McFadden opines that a borrower with a delayed escrow analysis who was overcharged would have been better off *not* making the higher payments to his or her escrow account and, instead using the funds to pay-down higher-cost debt.

396.     Professor McFadden also identifies, but does not quantify, two other potential costs of foreclosures: a lower credit score for the borrower and adverse effects on the neighborhood in which the foreclosed property is located.  I fully agree that foreclosures may damage a borrower's credit score,[298] and may have adverse effects on communities.  These possible effects of foreclosures, however, have no implications for damages in the context of Professor McFadden's report because he has not documented that either delayed escrow analyses or any other alleged servicing errors on Ocwen's part caused even one additional foreclosure to occur.  As my analysis of Professor McFadden's model demonstrated, there is no evidence that any foreclosures resulted from the allegedly delayed escrow analyses.

**D.    Conclusion on Professor McFadden's Estimate of Foreclosure-Related Damages**

397.     Professor McFadden's model for calculating damages from additional foreclosures that he claims were caused by delayed escrow account analyses, is flawed to its core.  Accordingly, the opinions on damages that he offers based on the results of his model are unsupported and untenable.  In this part of my report, I have demonstrated the many ways in

---

[297] McFadden Report, p. 63.

[298] Whether a lower credit score actually harms a borrower depends on factors such as whether the borrower applies for credit or would have applied for credit if his or her credit score had not been impaired.

which Professor McFadden's methodology is fatally deficient, as well as the folly of claiming that borrowers typically lose equity as a result of foreclosure.

398.    Even beyond the flaws in Professor McFadden's model and assumptions, the conclusions he draws from his model are unsound.  Professor McFadden offers no sound basis for the view that a relatively small, temporary, and self-correcting overcharge or undercharge could cause more loans to go bad and end up in foreclosure than the combined effects of job losses, catastrophic illnesses, financial misfortunes, divorces, deaths, incarceration, and the disincentive to continue paying on a loan when the mortgaged property is underwater (*i.e.*, the borrower has no equity in the property).

399.    Based on both my experience running a large loan servicing business unit and my training and experience as an economist, it is my opinion that the alleged escrow analysis delays are simply too brief and the financial consequences of these delays too small to cause foreclosures or increase the probability of foreclosures.  The evidence produced in this case, when properly analyzed, supports my opinion.  Generally speaking, foreclosures do not occur because of relatively small, temporary self-correcting payment differences; they occur because a borrower is fundamentally unable to afford a loan and lacks equity in the property.  For all of these reasons, it is my opinion that damages from additional foreclosures are $0.

## VIII. PROFESSOR MCFADDEN'S ASSERTION REGARDING OTHER SO-CALLED SERVICING FAILURES

400.     In his report, Professor McFadden refers to 898,774 "servicing failures," the effects of which are not included in his damages analysis.  He nonetheless claims that borrower loans were "potentially impacted" by these "servicing failures."[299]  In this section I evaluate each of the categories and counts of "servicing failures" referenced in Professor McFadden's report, and offer comments on the likelihood of these alleged "failures" causing damages, and the type of analysis that would be required in order to calculate any damages that they might cause.

### A.     Professor McFadden's Failure to Document Any of the Alleged Servicing Failures

401.     In his report, Professor McFadden does not seek to substantiate that any of these alleged servicing failures actually occurred.  His references to these servicing failures apparently are based on an understanding that he gained from the Bureau's counsel.[300]

### B.     Alleged Loan Verification Errors

402.     Professor McFadden claims there were 628,152  loan verification "servicing failures."  He describes this count as "the number of unique loans" listed in the files OCW-CFPB-001-00083874 and OCW-CFPB-001-00083901.[301]

403.     First, I note that the files on which Professor McFadden bases his count of loan verification "servicing errors" do not identify "servicing errors."  These files simply show instances where, upon a review of a loan, Ocwen identified and corrected some sort of discrepancy in its data.  When a servicer corrects a discrepancy, it does not imply that the servicer had previously been using inaccurate information to service the loan.  In order to prove

---

[299] McFadden Report, pp. 11-12.
[300] McFadden Report, p. 69 ("First, I understand from counsel that there are additional types of servicing failures that may have impacted hundreds of thousands of borrowers.")
[301] McFadden Report, p. 12.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that a servicer was using inaccurate information to service a loan, one would need to show that the information was material to the loan servicing process, and that the discrepancy actually impacted the loan servicing process in some material way. Professor McFadden apparently did not make any effort to develop such proof.

404.    Second, many of the discrepancies relate to information that generally would not be relevant to the servicing of a loan.  For example, the most common loan verification discrepancy (26% of the total) involves the date of the appraisal obtained during the loan origination process.  The appraisal date generally is irrelevant for loan servicing purposes, particularly in the case of loans that have been outstanding for several years – as is almost always the case with loans in Ocwen's servicing portfolio.

405.    The second most common discrepancy (8% of the total) involves the indicator field regarding the borrower certification. The borrower certification is a document obtained during the loan origination process.  This document generally is not relevant for a loan servicer.[302]

## C.    Alleged Failures to Send Escrow Statements

406.    Professor McFadden claims there were 147,589 instances of alleged failures to send annual escrow statements.[303]  The document cited by Professor McFadden in support of his claim (OCW-CFPB-001-01294664) is labeled as "RFP 4 data" and lists an analysis date, a bucket, a remediated date, and remediation type.  The count of loans identified by Professor McFadden includes all loans in the buckets "Not Delinquent, Not Mailed" and "Not Delinquent, Mailed Late, (31-45 Days)."[304]

---

[302] A summary of the data at OCW-CFPB-001-00083874 and OCW-CFPB-001-00083901 is attached at **Exhibit 12**.
[303] McFadden Report, p. 12.
[304] OCW-CFPB-001-01294664.

407.     A failure to send an escrow statement is unlikely to cause material harm to a borrower.  Even if a borrower does not receive an escrow analysis letter, the borrower is informed of the amount and effective date of the escrow payment change by way of the monthly billing statement.  Furthermore, a borrower for which a surplus was computed would receive notification of the surplus when he or she received a surplus refund check.

408.     In my opinion, the only way that a borrower could be economically harmed by the servicer's failure to send an escrow statement is if (a) the escrow calculation was incorrect, (b) the borrower would have spotted the error when reviewing the statement, (c) the borrower would have brought the error to Ocwen's attention, and (d) the revised calculation would have reduced the borrower's monthly payment or increased the surplus refund.  Professor McFadden apparently did not attempt to determine how frequently this scenario occurred.  Accordingly, he has no basis to assert that any of the alleged failures to send escrow statements adversely affected any borrower's financial condition.

**D.      Allegedly Inaccurate Reinstatement Quotes**

409.     Professor McFadden's count of allegedly inaccurate reinstatement quotes includes all 82,763 loans listed at Exhibit I to Interrogatories 5-8.[305]  Exhibit I is described by Ocwen as follows:

---

[305] 2019.05.28 Exhibit I to Response to Interrogatories 5-8 (AMENDED ROG NOS. 5 EXHIBIT 1) (CONFIDENTIAL).xlsx.

for purposes of this Interrogatory, Ocwen has used a model to create historical reinstatement quotes, hereinafter the "Model Reinstatement" quotes, as a basis to assess the escrow component of the reinstatement quotes provided to borrowers. The Model Reinstatement quote recreated an approximation of what funds should have been collected at the time of the reinstatement quote in order to arrive at an estimated escrow balance which would allow for future timely disbursements from the customer's escrow account… Ocwen then compared the Model Reinstatement quotes to those provided to borrowers to identify any differences…Ocwen does not admit that the quotes identified in Exhibit I are inaccurate; by identifying them it only states that the reinstatement quotes were potentially inaccurate, and a manual review is required to confirm whether the historical quote provided to the borrower contained an accurate calculation of the escrow portion of the quote for each loan."[306]

410.    Professor McFadden mischaracterizes Exhibit I when he describes Exhibit I as a tabulation of servicing errors regarding inaccurate reinstatement quotes.  As the previous paragraph demonstrates, Ocwen does not describe this work product as listing occurrences of inaccurate reinstatement quotes.  Rather, Ocwen describes the contents of Exhibit I as the output from a model that it developed in its attempt to identify *potentially* inaccurate quotes, and states that a manual review of each occurrence would be required to determine if the quote was actually inaccurate.  Professor McFadden does not describe any work he performed to manually review each potentially inaccurate quote.  Consequently, he has no basis for characterizing Ocwen's Exhibit I litigation work product as a tabulation of servicing errors.

411.    Even if a manual review found that all potentially inaccurate reinstatement quotes were, in fact, inaccurate, it would be important to recognize that there are many situations where an inaccurate reinstatement quote would not adversely affect the borrower.  For example, a borrower who did not make the reinstatement payment would not be adversely impacted if:

    a)    the quote was too low; or

---

[306] Amended and Supplemental Response to Interrogatory No. 5 of *Defendant's Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019.*

b)      the quote was too high, but the borrower lacked the capacity to make the

reinstatement payment assuming a correct quote.

Similarly, borrowers who make the reinstatement payment would not be adversely impacted if:

a)      the quote was too low, the borrower paid the quote amount, was then told

to pay the additional amount, and then paid it; or

b)      the quote was too high, the borrower paid the full amount, including the

excess, and was immediately refunded the excess portion.

## E.      Alleged Escrow Shortage Errors

412.    Professor McFadden's count of alleged escrow shortage errors includes all 36,054

loans listed at Exhibit H to Interrogatory 12.[307]   Ocwen describes Exhibit H as follows:

> loans where the escrow shortage payment was not processed, and the
> borrower's escrow balance not updated within the timeframe set forth in the
> applicable SLA for the particular loan at issue. While Ocwen is using the
> SLA requirements as a proxy for what is "timely" processing for purposes
> of this Interrogatory, it does not concede that an escrow shortage payment
> processed outside of the applicable SLA, but before the borrower suffered
> any harm, is a violation of any law or statute or is in any way unfair or
> deceptive. Indeed, it is Ocwen's position that no statute or regulation sets
> forth the required timeframe for Ocwen to process escrow shortage
> payments and to update the borrower's escrow balance to reflect the
> shortage payment received, and Ocwen's use of 5 business days (and
> previously 15 business days) as an SLA stems out of a desire to provide
> outstanding customer service and does not reflect a judgment that the
> customer would be harmed if payments were processed outside of the
> SLA.[308]

413.    I have no opinion on whether Ocwen's interpretation of the law and regulations is

correct.  Until it is established that this interpretation is not correct, Professor McFadden has no

---

[307] 2019.05.28 Exhibit H to Response to Interrogatory 12 (CONFIDENTIAL) (TAB 1).xlsx.

[308] Second Amended and Supplemental Response to Interrogatory No. 12 of *Defendant's Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendants, dated May 28, 2019.*

basis for claiming that each instance where Ocwen did not meet its own internal standard represents a violation of a regulation.

414.   In any event, a delay in processing an escrow shortage payment is highly unlikely to result in harm to a borrower.  A delayed posting of an escrow shortage payment could only impact the borrower's cash flows if the delay was so long that it extended beyond the date on which the new escrow payment took effect, causing Ocwen to increase each monthly escrow payment by one-twelfth of the shortage amount.  If this occurred, and the borrower did not request an interim escrow analysis, the borrower would be repaid the excess (and, in some states, accrued interest on the excess) automatically at the next escrow analysis, although he or she would not have used of the shortage amount during the interim.  This hypothetical series of events would be unlikely to have a material adverse impact on the borrower because a borrower with sufficient funds to send in a lump-sum shortage payment is unlikely to be so financially constrained that a temporarily excessive monthly payment would push the loan into default.

415.   In sum, Professor McFadden has no basis for concluding that the alleged escrow shortage errors (a) constitute servicing errors, or (b) caused financial harm to the borrower.

**F.   Alleged Interest-Only Errors**

416.   Professor McFadden's 4,216 alleged interest-only errors include all loans listed at OCW-024-0103993 (an Ocwen email) and OCW-024-0104007 (the spreadsheet attached to the email).  The cited documents describe the listed loans as "IO loans with issues." The documents stratify the 4,216 loans as follows:[309]

---

[309] OCW-024-0103993.

| Comments | Count of Loans |
|---|---|
| Non IO Loans with IO Payments | 2,670 |
| IO Loans with Non IO Payments | 706 |
| Non IO loans with IO Flag Raised | 512 |
| IO Loans without IO Flags | 328 |
| Total | 4,216 |

417.    The documents do not describe exactly what the "issue" is and provide no clue as to what effect, if any the "issue" had on the actual servicing of the loan.

418.    Not all interest-only inaccuracies would be expected to impact the servicing of a loan.  For example, (a) if the interest-only end date was inaccurate, (b) the inaccuracy was corrected before the correct interest-only end date, and (c) only interest-only payments were collected before the change from interest only to full amortization occurred, the inaccuracy would have no effect on the actual servicing of the loan.

419.    In summary, Professor McFadden provides no basis for his claim that each of the 4,216 occurrences in the table above represent a servicing failure, or that any actual failure materially impacted a loan.

## IX. CONCLUSION

420.    In sum, it is my opinion that both Professor McFadden's estimate of opportunity cost damages and his estimate of foreclosure-related damages are so thoroughly flawed and inflated that they cannot be reliably used to determine the extent to which any wrongful actions on Ocwen's part harmed borrowers.

### A.    Professor McFadden's Opportunity Cost Damages Opinions

421.    Professor McFadden's opportunity cost damages estimates are significantly overstated because his assumption regarding the borrowers' opportunity costs is untenable.

422.    His methodology for modeling opportunity cost damages from allegedly delayed escrow analyses is severely flawed because:

- 85% of his calculated damages are for borrowers who had escrow account shortages and were not overcharged;

- He makes no allowance for the interest that some borrowers received on their alleged overpayments;

- He makes no allowance for the offsetting impact of subsequent escrow analyses;

- He ignores the actual timing of borrower payments, and instead makes unsupported assumptions about payment timing; and

- He inappropriately relies on Ocwen's litigation work product, rather than the transaction history that is the primary record of escrow receipts and disbursements for every loan that Ocwen services.

423.    His methodology for modeling opportunity cost damages from PMI overcharges is severely flawed because:

- He erroneously assumes that Ocwen's PMI refunds were deficient; and

- He erroneously assumes that all borrowers received one year's worth of interest on their refunds.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                      163

424.     His methodology for modeling opportunity cost damages from ARM overcharges is flawed because:

- He incorrectly assumes that the overcharge amount was constant throughout the relevant period, even though the overcharges declined over time.

425.     When I correct for Professor McFadden's errors, and consider the level of prevailing interest rates on savings accounts during the relevant period, I find that:

- The most-likely amount of opportunity cost damages incurred by borrowers is $0; and

- The upper bound on these damages is $141,143.

## B.     Professor McFadden's Opinions on Damages from Additional Foreclosures

426.     Professor McFadden's model yields results that are implausible: to wit, a small, temporary, and self-correcting over- or under-charge caused more foreclosures than loss of employment, major medical problems, financial reversals, divorce, incarceration of the borrower, and negative equity in the property, combined.

427.     His claim that the allegedly delayed escrow analyses caused 16,636 foreclosures, at a cost to borrowers ranging from $351.5 million to $483.5 million, is based on a model that is fatally flawed in numerous ways, and fails to reliably show that *any* foreclosures or *any* damages resulted from these alleged delays.  These flaws include the following:

- Professor McFadden lacks a plausible and consistent causation theory;

- He uses an unproven and unrealistic model that is significantly different from the models used in the literature on which he relies;

- His control group is invalid because it fails the test that *he* established for a valid control group;

- He ignores a critical difference between the two main groups of loans with alleged escrow analysis delays;

- He omits variables from his model that mortgage finance scholars and professionals agree affect the probability of default and foreclosure;

- The dependent variable (foreclosures) in his model is mis-specified, causing him to count as foreclosures loans that did not go through foreclosure;

- He includes loans in his analysis that, by his own admission, did not go through foreclose as a result of any allegedly delayed escrow analysis;

- He ignores data produced by Ocwen that is relevant to an analysis of causation;

- By finding that an increase in unemployment corresponds to a reduced probability of foreclosure and similar anomalies, his model contradicts well-established principles of mortgage finance;

- He failed to perform a basic reasonableness check of his results, and therefore failed to see that his results are contradicted by the available data; and

- His estimates of foreclosure costs are not supported by the literature he cites and are contradicted by the data he relied upon.

428.     Based on my experience in loan servicing and my expertise in mortgage finance, I would not expect the alleged escrow analysis delays – many of which, using Professor McFadden's logic, conferred clear economic benefits, not costs, on borrowers – to either cause foreclosures or increase the probability of foreclosure.  This is because foreclosures typically occur because the borrower is fundamentally unable to afford his or her loan and lacks any equity in the mortgaged property – not because of small, temporary and self-correcting over- or under-charges for the borrower's escrow account.

429.     My analysis of a 100-loan sample of foreclosures did not find a single foreclosure that could be reasonably attributed to escrow analysis delays, thereby confirming my expectation.

430.     In my opinion, no foreclosures were caused by the alleged escrow account delays, and the foreclosure-related damages resulting from these delays is $0.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**C.**     **Other Purported Servicing Failures Identified by Professor McFadden**

431.     Professor McFadden's claim that Ocwen is guilty of 898,774 "servicing failures" misrepresents the documents he cites and is unsupported.

432.     Even if it could be demonstrated that some of these alleged servicing failures occurred, additional analysis would be required to determine if such failures had an adverse impact on borrowers and there is no indication in the McFadden Report that Professor McFadden attempted the required additional analysis.

# Exhibit 1
## Documents Considered

**Legal Filings:**
- Complaint dated April 20, 2017
- Amended Complaint dated October 4, 2019
- Defendants' Motion to Dismiss and Incorporated Memorandum of Law dated June 23, 2017
- Defendants' Reply in Support of Their Motion to Dismiss dated August 4, 2017
- Plaintiff's Opposition to Defendants' Motion to Dismiss dated July 20, 2017
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss

**Expert Reports:**
- Expert Report of Daniel McFadden, August 15, 2019 and Appendices
- Amended Expert Report of Daniel McFadden, August 27, 2019 and Appendices
- Amended Expert Report of Daniel McFadden, September 19, 2019 and Appendices

**Declarations and Depositions:**
- Declaration of Andrew Combs dated August 1, 2019
- Deposition and Exhibits of Krysta Sebastian, May 21, 2019
- Deposition of Andrew Combs, May 29, 2019
- Deposition of Tom Arnett, May 22, 2019

**Interviews:**
- Interview with Andrew Combs, September 13, 2019

**Papers and Textbooks:**
- Athey, Susan and Guido W. Imbens. "Design-based Analysis in Difference-In- Differences Settings with Staggered Adoption," NBER Working Paper, No. 24963, August 2018.
- Brevoort, Kenneth P. and Cheryl R. Cooper. "Foreclosure's Wake: The Credit Experiences of Individuals Following Foreclosure," Real Estate Economics, 2013, 41(4): 747-792.
- Cameron, A. Colin and Pravin K. Trivedi. "Microeconometrics, Methods and Applications." New York: Cambridge University Press. 2005.
- Chan, Sharygin, Been, and Haughwout, "Pathways After Default: What Happens to Distressed Mortgage Borrowers and Their Homes?" *Journal of Real Estate Finance and Economics*, 2014, 45:342-379
- Currie, Janet, and Erdal Tekin. "Is There a Link between Foreclosure and Health?" American Economic Journal: Economic Policy, 2015, 7(1): 63-94.
- Davidson, Sanders, Wolff, Ching, "Securitization, Structuring and Investment Analysis." John Wiley & Sons, Inc. 2003
- Demyanyk, Yuliya. "The Impact of Missed Payments and Foreclosures on Credit Scores," Quarterly Review of Economics and Finance, 2017, 64: 108-119.
- Deng, Yongheng, John M. Quigley, and Robert van Order. March 2000. "Mortgage Terminations, Heterogeneity and the Exercise of Mortgage Options." *Econometrica*, Vol. 68, No. 2, 275-307.
- DeRitis, Cristian, Chionglong Kuo, and Yongping Liang. "Payment shock and mortgage performance," Journal of Housing Economics, 2010, 19: 295-314.
- Di Maggio, Marco, Amir Kermani, Benjamin J. Keys, Tomasz Piskorski, Rodney Ramcharan, Amit Seru, and Vincent Yao. "Interest Rate Pass-Through: Mortgage Rates, Household Consumption, and Voluntary Deleveraging," American Economic Review, 2017, 107(11): 3550-3588.
- Downing, Janelle. "The Health Effects of the Foreclosure Crisis and Unaffordable Housing: A Systematic Review and Explanation of Evidence," Social Science & Medicine 2016, 162: 88-96. Accessed July 26, 2019. https://doi.org/10.1016/j.socscimed.2016.06.014.
- Epouhe, Onesime and Arden Hall; "Payment shock in HELOCs at the end of the draw period," Journal of Economics and Business, 2016, 84: 131-147.
- Fabozzi, Frank J.. "The Handbook of Fixed Income Securities, Eighth Edition." McGraw-Hill Education. Kindle Edition
- Frederick, Shane, George Loewenstein, and Ted O'Donoghue, "Time Discounting and Time Preference: A Critical Review," *Journal of Economic Literature*, June 2002, 40: 351-401
- Freedman, David A. Survival Analysis: A primer, UC Berkeley, March, 2008. Retrieved from https://www.stat.berkeley.edu/~census/survival.pdf

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- Gerardi, et al., Can't Pay or Won't Pay?  Unemployment, Negative Equity, and Strategic Default, Federal Reserve Bank of Boston Working Papers, No. 15-13
- Greene, William H. "Econometric Analysis, 7 ed.," Upper Saddle River, NJ: Prentice Hall. 2012.
- Gupta, Arpit. "Foreclosure Contagion and the Neighborhood Spillover Effects of Mortgage Defaults." The Journal of Finance, 2019, Early View, Online Version of Record before inclusion in an issue: 1-53. Accessed July 30, 2019. https://onlinelibrary.wiley.com/doi/pdf/10.1111/jofi.12821.
- Handel, Benjamin R. and Jonathan T. Kolstad. "Health Insurance for 'Humans:' Information Frictions, Plan Choice, and Consumer Welfare," American Economic Review, 2015, 105(8): 2449-2500.
- Harding, John P., Eric Rosenblatt and Vincent W. Yao. "The Contagion Effect of Foreclosed Properties," Journal of Urban Economics, July 15, 2008, 3:164-178. Accessed 5, 2019. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1160354 .
- Hastings, Justine S., Brigitte C. Madrian, and William L. Skimmyhorn, "Financial Literacy, Financial Education, and Economic Outcomes," Annual Review of Economics, 2013, 5:347-373.
- Hausman, Jerry, "Individual Discount Rates and the Purchase and Utilization of Energy-Using Durables," The Bell Journal of Economics, Spring 1979, 10(1): 33-54.
- Hedberg, William and John Krainer, "Credit Access Following a Mortgage Default," Federal Reserve Bank of San Francisco Economic Letter, October 29, 2012.
- Immergluck, Dan, and Geoff Smith. "The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values," Housing Policy Debate 2006, 17 (1): 57-79. Accessed July 25, 2019. https://www.researchgate.net/publication/237246807_The_External_Costs_of_Foreclos ure_The_Impact_of_Single-Family_Mortgage_Foreclosures_on_Property_Values.
- James H. Carr and Michelle Mulcahy, "Rebuilding Communities in Economic Distress: Local Strategies to Sustain Homeownership, Reclaim Vacant Properties, and Promote Community-Based Employment," National Community Reinvestment Coalition, October 2010 (https://www.fdic.gov/about/comein/mar11.pdf)
- John M. Clapp, Yongheng Deng and Xudong An, "Unobserved Heterogeneity in Models of Competing Mortgage Termination Risks," *Real Estate Economics* , 2006, V34 2: pp. 243-273.
- Johnson, Kathleen W., and Robert F. Sarama, "End of the Line: Behavior of HELOC Borrowers Facing Payment Changes," Finance and Economics Discussion Series 2015-073, Washington: Board of Governors of the Federal Reserve System. Accessed August 31, 2018. http://dx.doi.org/10.17016/FEDS.2015.073.
- Keys, Benjamin, Jialan Wang, "MinimumPayments and Debt Paydown in Consumer Credit Cards," Working Paper 22742 (https://www.nber.org/papers/w22742.pdf)
- Kingsley, Thomas G., Robin Smith, and David Price. "The Impacts of Foreclosures on Families and Communities," The Urban Institute. May 2009. Accessed July 31, 2019. https://www.urban.org/sites/default/files/publication/30426/411909-The-Impacts-of-Foreclosures-on-Families-and-Communities.PDF.
- Kling, Jeffrey R., Sendhil Mullainathan, Eldar Shafir, Lee C. Vermeulen, and Marian V. Wrobel, "Comparison Friction: Experimental Evidence from Medicare Drug Plans," The Quarterly Journal of Economics, 2012, 127:199-235. Accessed August 12, 2019. https://academic.oup.com/qje/article/127/1/199/1833354.
- Laio, Tim Futing. "Interpreting probability Models: Logit, Probit, and Other Generalized Linear Models," Series/Number 07-101, Michael S. Lewis-Beck, ed. 1994. Thousand Oaks, California: Sage Publications, Inc.
- Lee, Kai-yan. "Foreclosure's Price-Depressing Spillover Effects on Local Properties: A Literature Review," Federal Reserve Bank of Boston, September 2008, 2008-01.
- Leonard, Tammy, and James C. Murdoch. "The Neighborhood Effects of Foreclosure," Journal of Geographical Systems, 2009, 11: 317-332. Accessed August 2, 2019. https://link.springer.com/article/10.1007/s10109-009-0088-6.
- Liberti, José Maria and Mitchell A. Petersen, "Information: Hard and Soft," NBER Working Paper No. 25075, September 2018.

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

## Exhibit 1
## Documents Considered

- Lin, Zhengou, Eric Rosenblatt and Vincent W. Yao. "Spillover Effects of Foreclosures on Neighborhood Property Values." The Journal of Real Estate Finance and Economics, 2009, 38(4): 387-407. Accessed July 31, 2019. https://link.springer.com/article/10.1007/s11146-007-9093-z.
- Liu, Yishen, and Anthony M. Yezer. "Foreclosure Externalities: Have We Confused the Cure with the Disease?" Real Estate Economics, 2019, 0(0): 1-33. Accessed August 1, 2019. https://onlinelibrary.wiley.com/doi/abs/10.1111/1540-6229.12281.
- Lusardi, Annamaria and Olivia S. Mitchell, "How Ordinary Consumers Make Complex Economic Decisions: Financial Literacy and Retirement Readiness," Quarterly Journal of Finance, 2017, 7(3): 1750008-1-17500083-1.
- Lusardi, Annamaria and Peter Tufano, "Debt literacy, financial experiences, and overindebtedness," Journal of Pension Economics & Finance, 2015, 14(4): 332-368.
- Min Qi and Harald Harry Scheule, "The Impact of Positive Payment Shocks on Mortgage Credit Risk–A Natural Experiment from Home Equity Lines of Credit at End of Draw," available at SSRN 2781359, 2016.
- Molloy, Raven, and Hui Shan. "The Postforeclosure Experience of U.S. Households," Real Estate Economics, 2013, 41(2): 225-254. Accessed July 25, 2019. https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1540-6229.2012.00344.x.
- Moreno, Ana "The Cost-Effectiveness of Mortgage Foreclosure Prevention," Family Housing Fund Minneapolis, Minnesota, 1995.
- Munroe, David J. and Laurence Wilse-Samson. "Foreclosure Contagion: Measurement and Mechanisms," Columbia University, Department of Economics, December 14, 2013.
- Pennington-Cross, Anthony. April 2006. "The Duration of Foreclosures in the Subprime Mortgage Market: A competing Risks Model with Mixing." Federal Reserve Bank of St. Louis, Working Paper 2006-027A.
- Pindyck and Rubinfeld, Microeconomics, Sixth Edition, Prentice-Hall, 2009.
- Pintilie, Melania, "Competing Risks, A Practical Perspective," England: John Wiley & Sons, Ltd, 2006.
- Qi, Min and Harald Harry Scheule, "The Impact of Positive Payment Shocks on Mortgage Credit Risk–A Natural Experiment from Home Equity Lines of Credit at End of Draw," *available at SSRN 2781359*, 2016.
- Ramanthan, Ramu, "Introductory Econometrics with Applications, Fifth Edition," South-Western, 2002
- Russell, Louise B. "Opportunity Costs in Modern Medicine," Health Affairs, 1992, 11(2): 162-169. August 9, 2019. https://www.healthaffairs.org/doi/10.1377/hlthaff.11.2.162.
- Stucky, Thomas D., John R. Ottensmann and Seth B. Payton. "The Effects of Foreclosure on Crime in Indianapolis, 2003-2008," Social Science Quarterly, 2012, 93(3): 602-624. Accessed July 31, 2019. https://www.jstor.org/stable/42864089.
- Towe, Charles, and Chad Lawley. "The Contagion Effect of Neighboring Foreclosures," American Economic Journal: Economic Policy, 2013, 5(2): 313-335. Accessed July 31, 2019. https://www.jstor.org/stable/43189336
- U.S Congress. "The 2007 Joint Economic Report of the Joint Economic Committee Congress of the United States on the 2007 Economic Report of the President Together with Minority Views." Accessed July 31, 2019. https://www.jec.senate.gov/reports/110th Congress/The 2007 Joint Economic Report (1810).pdf.
- Verma, Nidhi. "A deeper understanding of payment shock dynamics," Journal of Risk Management in Financial Institutions, 2017, 10(3): 276.
- Whittington and Pany, "Principles of Auditing & Other Assurance Services, 16th Ed." McGraw-Hill. 2008
- Wooldridge, Jeffrey M. Econometric Analysis of Cross Section and Panel Data. 2002. Cambridge, MA: The MIT Press.
- Zhe Jin, Ginger, Michael Luca, and Daniel J. Martin, "Complex Disclosure," NBER Working Paper No. 24675, October 2018.

## Exhibit 1
## Documents Considered

**Other Research:**

- "A Primer on Price Disocunt of REO Properties," Mortgage Market Note 12-01 (https://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/20120917_MMNote_12-01_508.pdf"
- "Credit Scoring and Loan Default," The Federal Reserve Bank of Kansas City Research Working Papers, RWP 15-02, February 2015 (https://www.kansascityfed.org/publicat/reswkpap/pdf/rwp15-02.pdf)
- "Home Foreclosue and Debt Cancellation," IRS website (https://www.irs.gov/newsroom/home-foreclosure-and-debt-cancellation)
- "When Paying the Mortgage is a Stuggle," FTC Consumer Information (https://www.consumer.ftc.gov/articles/0187-when-paying-mortgage-struggle)
- "Average Credit Card APR," U.S. News & World Report, July 1, 2019. Accessed August 5, 2019, https://creditcards.usnews.com/articles/average-apr
- 12 CFR Pat 024 (https://www.consumerfinance.gov/policy-compliance/rulemaking/regulations/1024/17/)
- 2019 Consumer Financial Literacy Survey Summary (https://www.nfcc.org/2019-consumer-financial-literacy-survey/)
- Board of Governors of the Federal Reserve System. "Consumer Credit – Current Release," Federal Reserve System Press Release. June 2019. Accessed August 12, 2019, https://www.federalreserve.gov/releases/g19/current/.
- Boone, Mary. "How Much Does It Cost to Move," Zillow.com, March 23, 2018. Accessed August 9, 2019, https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663/.
- Bureau of Labor Statistics, "CPI-All Urban Consumers (Current Series)," Accessed August 3, 2019, https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201906.pdf.
- Consumer Finance Protection Bureau. CFPB Consumer Laws and Regulations, "Homeowners Protection Act (PMI Cancellation Act)," October 2012. Accessed August 5, 2019, http://files.consumerfinance.gov/f/documents/102012_cfpb_homeowners-protectionact-hpa-pmi-cancellation-act_procedures.pdf.
- Consumer Financial Protection Bureau. "What is Private Mortgage Insurance," July 28, 2017. Accessed August 5, 2019, https://www.consumerfinance.gov/ask-cfpb/what-is-private-mortgage-insurance-en-122/.
- Experian/Oliver Wyman Market Intelligence Report, Understanding strategic default in mortgages: Q2 2010 update, Experian, Oliver Wyman, www.marketintelligencereports.com (https://www.experian.com/assets/decision-analytics/reports/strategic-default-report-2-2010.pdf
- Fannie Mae - DTI Ratios (https://www.fanniemae.com/content/guide/selling/b3/6/02 html)
- Fannie Mae Website (https://www.fanniemae.com/content/guide_exhibit/foreclosure-timeframes-compensatory-fees-allowable-delays.pdf)
- Fannie Mae website (https://www.fanniemae.com/singlefamily/security-instruments)
- Federal Housing Finance Agency (FHFA). "House Price Index," Accessed August 12, 2019, https://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index.aspx.
- Federal Reserve Bank of New York, Center for Microeconomic Data, Quarterly Report on Household Debt and Credit, 2019: 2Q, Released August 2019 (www.newyorkfed.org/microeconomics)
- Federal Reserve Bank of New York, Center for Microeconomic Data. "Quarterly Report on Household Debt and Credit, 2019: 2Q,"August 2019. Accessed August 14, 2019, www.newyorkfed.org/microeconomics/hhdc.
- FRED (Federal Reserve Bank of St. Louis). "Commercial Bank Interest Rate on Credit Plans, Accounts Assessed Interest," May 2019. Accessed August 12, 2019, https://fred.stlouisfed.org/series/TERMCBCCINTNS.
- FRED National Rate on Non-Jumbo Deposits (https://fred.stlouisfed.org/series/MMNRNJ)
- FRED Personal Saving Rate (https://fred.stlouisfed.org/series/PSAVERT)
- HAMP Stadard and Alternative Modification Waterfalls (https://www.hmpadmin.com/portal/learningcenter/docs/presentations/mhaserverwebinar_stdaltwtrfall_presentation.pdf

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- Home Affordable Modifcation Program, October 26, 2015
  (https://www hmpadmin.com/portal/programs/docs/hamp  servicer/BaseNPVModelDocumentationv7.pdf )
- https://www.zillow.com/homedetails/24-Jacqueline-Pl-Sewell-NJ-08080/52399269  zpid/
- Internal Revenue Service, "Home Foreclosure and Debt Cancellation," Accessed July
  25, 2019,
  http://www.irs.gov/newsroom/home-foreclosure-and-debt-cancellation.
- Joint Economic Committee, "Sheltering Neighborhoods from the Subprime Foreclosure
  Storm," April 11, 2007. Accessed August 3, 2019,
  https://www.jec.senate.gov/archive/Documents/Reports/subprime11apr2007revised.pdf
- MBS Data: Mortgage Backed Securities Data & Analytics. Accessed August 12, 2019,
  http://www mbsdata.com/.
- Nobel Prizes and Laureates. "'Daniel L. McFadden – Facts,' The Sveriges Riksbank
  Prize in Economic Sciences in Memory of Alfred Nobel 2000," Accessed August 12,
  2019,
  https://old nobelprize.org/nobel_prizes/economicsciences/laureates/2000/mcfaddenfacts.
  html .
- Ocwen 2014 10-K filed May 11, 2015
- Ocwen Financial Corporation. "Our Company," Accessed August 12, 2019,
  http://www.ocwen.com/our-company.
- Radian Group, Inc., 2018 10-K, filed March 28, 2019
- Report to Congress on the Root Causes of the Foreclosrue Crisis
  (https://www huduser.gov/portal/publications/Foreclosure  09.pdf)
- Research Report for Importance of Mortgage Downpayment as a Deterrent to Delinquency and Default as Observed in
  Black Knight (McDash) Servicing History (https://www huduser.gov/portal/sites/default/files/pdf/Downpayment-
  FinalReport.pdf)
- Scott Mackey and Joseph Bisop_Henchman, "Wireless Taxes and Fees Climb Again in 2018," Tax Foundation,
  December 11, 2018, retrieved from https://taxfoundation.org/cell-phone-taxes-2018/.
- Smith, Stacy. "Am I Able to get an Old Foreclosure Taken Off my Credit Report,"
  Experian, June 8, 2017. Accessed August 10, 2019, https://www.experian.com/blogs/ask-experian/am-i-able-to-get-an-
  old-foreclosuretaken-
  off-my-credit-report/.
- Testimony of Governor Randall S. Kroszner on Federal Housing Administration Housing Stabilization and
  Homeownership Act Before the Committee on Financial Services, U.S. House of Representatives, April 9, 2008
  (https://www federalreserve.gov/newsevents/testimony/kroszner20080409a.htm)
- The HAMP NPV Model: Development and Early Performance, FHFA Working Paper 11-1
  (https://www fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/2011-07  WorkingPaper  11-1  508.pdf)
- U.S. Department of Housing and Urban Development, "Economic Impact Analysis of
  the FHA Refinance Program for Borrowers in Negative Equity Positions," 2010.
  Accessed August 3, 2019,
  https://www hud.gov/sites/documents/IA-REFINANCENEGATIVEEQUITY.PDF.
- United States Department of Labor, Bureau of Labor Statistics. "Local Area
  Unemployment Statistics," Accessed August 12, 2019,
  https://www.bls.gov/lau/.
- Zillow website (https://www.zillow.com/blog/how-much-will-you-pay-to-move-91663)

**Interrogatory/RFP Correspondence, Documents, and Data:**
- OCW-040-0059248
- OCW-040-0059249
- OCW-CFPB-001-05479659
- RFP0006979.sql
- OCW3-014-0000001
- Plaintiff's First Supplement to its Initial Disclosures dated December 17, 2018
- Defendants' Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendant dated May 28, 2019

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

## Exhibit 1
## Documents Considered

- 2019.05.28 Exhibit A to Response to Interrogatories 1-4 (CONFIDENTIAL).xlsx
- 2019.05.28 Exhibit B to Response to Interrogatories 1-4 (CONFIDENTIAL).xlsx
- 2019.05.28 Exhibit C to Response to Interrogatories 1-4 (CONFIDENTIAL).xlsx
- 2019.05.28 Exhibit D to Response to Interrogatories 1-4 (CONFIDENTIAL).xls
- 2019.05.28 Exhibit E to Response to Interrogatories 1-4 (CONFIDENTIAL).xlsx
- 2019.05.28 Exhibit F to Response to Interrogatories 1-4 (CONFIDENTIAL).xlsx
- 2019.05.28 Exhibit G to Response to Interrogatories  9-11.xlsx
- 2019.05.28 Exhibit H to Response to Interrogatory 12 (CONFIDENTIAL) (TAB 1).xlsx
- 2019.05.28 Exhibit I to Response to Interrogatories 5-8 (AMENDED ROG NOS. 5 EXHIBIT 1) (CONFIDENTIAL).xlsx
- Letter to J. Dippold from L. Carven re: Ocwen's data production response to the Bureau's Fifth Set of Requests for Production, Nos. 12 & 13 dated August 30, 2019
- RFP12_688_Loans.xlsx
- RFP13_38246_Loans.XLSX
- RFP13_TranHist_examples.xlsx
- January 18, 2019 L. Craven Letter to J. Healey Dippold Re: CFPB v. Ocwen et al., Civil Action No. 9:17-CV-80495-KAM (S.D. Fla.)
- March 13, 2019 L. Craven Letters to J. Healey Re: CFPB v. Ocwen Financial Corp., et al., Case No. 9:17-cv-80495
- March 20, 2019 L. Craven Letter to J. Healey Re: CFPB v. Ocwen Financial Corp., et al., Case No. 9:17-cv-80495
- April 18, 2019 L. Craven Letter to J. Healey Re: CFPB v. Ocwen Financial Corp., et al., Case No. 9:17-cv-80495
- April 23, 2019 L. Craven Letter to A. Desai Re: CFPB v. Ocwen Financial Corp., et al., Case No. 9:17-cv-80495
- April 26, 2019 L. Craven Letter to J. Healey Re: CFPB v. Ocwen Financial Corp., et al., Case No. 9:17-cv-80495
- Ominbus Discovery Order on Plaintiff'sMotion to Compel Complete Responses to Its Fourth and Fifth Set of Requests for Production (DE 190 and 192); Denying Plaintiff's Motion to Compel Defendants to Answer the Complaint (DE 221); Granting in Part and Denying in Part Plaintiff's Motion for Leave to Take Additional Depositions (DE223); and Ruling on an Extension of Discovery Deadline Dispute Contained in Joint Notice (DE 236) dated January 25, 2019
- Plaintiff's Fifth Set of Requests for Production to Defendants
- Defendants' Responses and Objections to Plaintiff's Fifth Set of Requests for Production to Defendants dated September 5,2018
- Fifth Set of RFPs #1 - Borrower and Loan Information_1: rfp1.csv
- Fifth Set of RFPs #1 - Borrower and Loan Information_2: rfp1_supplemental.csv
- Fifth Set of RFPs #1 - Service Transfer Information: rfp1_supplemental_ServiceTransfer.csv
- Fifth Set of RFPs #10 - Foreclosure Sale: CFPB_RFP10.csv
- Fifth Set of RFPs #11 - Loss Mitigation Applications: CFPB_RFP11_2014.csv
- Fifth Set of RFPs #11 - Loss Mitigation Applications: CFPB_RFP11_2015.csv
- Fifth Set of RFPs #11 - Loss Mitigation Applications: CFPB_RFP11_2016.csv
- Fifth Set of RFPs #11 - Loss Mitigation Applications: CFPB_RFP11_2017.csv
- Fifth Set of RFPs #11 - Loss Mitigation Applications: CFPB_RFP11_2018.csv
- Fifth Set of RFPs #12 - Trial Modification: CFPB_RFP12.csv
- Fifth Set of RFPs #13 - Permanent Modification: RFP13.csv
- Fifth Set of RFPs #14 - Forebearance Plan: CFPB_RFP14.csv
- Fifth Set of RFPs #15 - Credit Score Capture: CFPB_RFP15.csv
- Fifth Set of RFPs #15 - Credit Score Capture: rfp15_supplemental_050819.csv
- Fifth Set of RFPs #16 - Monthly gross income: CFPB_RFP16.csv
- Fifth Set of RFPs #17 - DTI: CFPB_RFP17.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JAN_JUN_2013.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JAN_JUN_2014.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JAN_JUN_2015.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JAN_JUN_2016.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JAN_JUN_2017.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JAN_JUN_2018.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JUL_DEC_2013.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JUL_DEC_2014.csv
- Fifth Set of RFPs #18 - LTV: CFPB_RFP18_LTV_Extract_JUL_DEC_2015.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #18 – LTV: CFPB_RFP18_LTV_Extract_JUL_DEC_2016.csv
- Fifth Set of RFPs #18 – LTV: CFPB_RFP18_LTV_Extract_JUL_DEC_2017.csv
- Fifth Set of RFPs #18 – LTV: CFPB_RFP18_LTV_Extract_JUL_DEC_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_APR_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_APR_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_APR_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_APR_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_APR_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_AUG_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_AUG_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_AUG_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_AUG_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_AUG_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_DEC_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_DEC_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_DEC_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_DEC_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_FEB_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_FEB_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_FEB_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_FEB_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_FEB_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JAN_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JAN_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JAN_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JAN_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JAN_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUL_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUL_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUL_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUL_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUL_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUN_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUN_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUN_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUN_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_JUN_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAR_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAR_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAR_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAR_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAR_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAY_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAY_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAY_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAY_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_MAY_2018.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_NOV_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_NOV_2015.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_NOV_2016.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_NOV_2017.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_OCT_2014.csv
- Fifth Set of RFPs #19 – Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_OCT_2015.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #19 - Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_OCT_2016.csv
- Fifth Set of RFPs #19 - Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_OCT_2017.csv
- Fifth Set of RFPs #19 - Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_SEP_2014.csv
- Fifth Set of RFPs #19 - Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_SEP_2015.csv
- Fifth Set of RFPs #19 - Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_SEP_2016.csv
- Fifth Set of RFPs #19 - Flag History Extract: CFPB_RFP_19B_Flag_History_Extract_SEP_2017.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2016_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2016_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_APR_2016_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_AUG_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_AUG_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_AUG_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_AUG_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_AUG_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_AUG_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_DEC_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_DEC_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_DEC_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_DEC_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_DEC_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_DEC_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2016_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2016_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_FEB_2016_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2016_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2016_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JAN_2016_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUL_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUL_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUL_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUL_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUL_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUL_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JULY_2016.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUN_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUN_2014_2.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUN_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUN_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUN_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUN_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_JUNE_2016.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2016_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2016_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAR_2016_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAY_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAY_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAY_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAY_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAY_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAY_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_MAY_2016.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_NOV_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_NOV_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_NOV_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_NOV_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_NOV_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_NOV_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_OCT_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_OCT_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_OCT_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_OCT_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_OCT_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_OCT_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_SEP_2014_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_SEP_2014_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_SEP_2014_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_SEP_2015_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_SEP_2015_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_comments_data_range_SEP_2015_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_01012017_to_06302017_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_01012017_to_06302017_10.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_01012017_to_06302017_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_01012017_to_06302017_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_01012017_to_06302017_4.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_01012017_to_06302017_5.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_01012017_to_06302017_6.csv

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012017 to 06302017 7.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012017 to 06302017 8.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012017 to 06302017 9.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 10.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 11.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 4.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 5.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 6.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 7.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 8.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 01012018 to 08062018 9.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 10.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 11.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 12.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 4.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 5.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 6.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 7.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 8.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB 19A COMMENTS DATE RANGE 07012017 to 12312017 9.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_10.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_11.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_4.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_5.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_6.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_7.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_8.csv
- Fifth Set of RFPs #19 - Select Servicing Comments:
  CFPB_19A_COMMENTS_DATE_RANGE_09012016_to_12312016_9.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_COMMENTS_DATE_RANGE_AUG_2016_1.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_COMMENTS_DATE_RANGE_AUG_2016_2.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_COMMENTS_DATE_RANGE_AUG_2016_3.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_COMMENTS_DATE_RANGE_AUG_2016_4.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_COMMENTS_DATE_RANGE_AUG_2016_5.csv
- Fifth Set of RFPs #19 - Select Servicing Comments: CFPB_19A_COMMENTS_DATE_RANGE_AUG_2016_6.csv
- Fifth Set of RFPs #2 - Insurance Escrow: CFPB_RFP2A_INS_2016.csv
- Fifth Set of RFPs #2 - Insurance Escrow: CFPB_RFP2A_INS_2017.csv
- Fifth Set of RFPs #2 - Insurance Escrow: CFPB_RFP2A_INS_above_2017.csv
- Fifth Set of RFPs #2 - Insurance Escrow: CFPB_RFP2A_INS_upto_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_APR_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_APR_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_APR_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_APR_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_APR_2018.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_AUG_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_AUG_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_AUG_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_AUG_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_DEC_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_DEC_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_DEC_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_DEC_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_FEB_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_FEB_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_FEB_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_FEB_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_FEB_2018.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JAN_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JAN_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JAN_2016.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JAN_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JAN_2018.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUL_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUL_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUL_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUL_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUL_2018.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUN_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUN_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUN_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUN_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_JUN_2018.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAR_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAR_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAR_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAR_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAR_2018.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAY_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAY_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAY_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAY_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_MAY_2018.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_NOV_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_NOV_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_NOV_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_NOV_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_OCT_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_OCT_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_OCT_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_OCT_2017.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_SEP_2014.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_SEP_2015.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_SEP_2016.csv
- Fifth Set of RFPs #2 - Insurance Policy Data: CFPB_RFP2C_insurance_policies_SEP_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_APR_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_APR_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_APR_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_APR_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_APR_2018.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_AUG_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_AUG_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_AUG_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_AUG_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_DEC_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_DEC_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_DEC_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_DEC_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_FEB_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_FEB_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_FEB_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_FEB_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_FEB_2018.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JAN_2014.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JAN_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JAN_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JAN_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JAN_2018.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUL_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUL_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUL_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUL_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUL_2018.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUN_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUN_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUN_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUN_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_JUN_2018.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAR_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAR_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAR_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAR_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAR_2018.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAY_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAY_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAY_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAY_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_MAY_2018.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_NOV_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_NOV_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_NOV_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_NOV_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_OCT_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_OCT_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_OCT_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_OCT_2017.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_SEP_2014.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_SEP_2015.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_SEP_2016.csv
- Fifth Set of RFPs #2 - Insurance/Tax Disbursements: CFPB_RFP2B_insurance_tax_disbursements_SEP_2017.csv
- Fifth Set of RFPs #2 - Tax Escrow: CFPB_RFP2A_Tax.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2018_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_APR_2018_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2014_1.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_AUG_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_DEC_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2018_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_FEB_2018_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2018_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JAN_2018_3.csv

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2018_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUL_2018_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2018_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_JUN_2018_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2018_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAR_2018_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2016_2.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2018_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2018_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_MAY_2018_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_NOV_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_OCT_2017_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2014_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2014_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2014_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2015_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2015_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2015_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2016_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2016_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2016_3.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2017_1.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2017_2.csv
- Fifth Set of RFPs #21 - Monthly Billing Statement Data: CFPB_RFP21_SEP_2017_3.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_APR_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_APR_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_APR_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_APR_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_APR_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_APR_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_AUG_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_AUG_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_AUG_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_AUG_2016.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_AUG_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_AUG_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_DEC_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_DEC_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_DEC_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_DEC_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_DEC_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_FEB_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_FEB_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_FEB_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_FEB_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_FEB_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_FEB_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JAN_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JAN_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JAN_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JAN_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JAN_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JAN_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUL_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUL_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUL_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUL_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUL_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUL_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUN_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUN_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUN_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUN_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUN_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_JUN_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAR_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAR_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAR_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAR_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAR_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAR_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAY_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAY_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAY_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAY_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAY_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_MAY_2018.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_NOV_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_NOV_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_NOV_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_NOV_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_NOV_2017.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_OCT_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_OCT_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_OCT_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_OCT_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_OCT_2017.csv

## Exhibit 1
## Documents Considered

- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_SEP_2013.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_SEP_2014.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_SEP_2015.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_SEP_2016.csv
- Fifth Set of RFPs #22 - Transaction History: CFPB_RFP22_V2_SEP_2017.csv
- Fifth Set of RFPs #23 - Data Dictionaries for RFPs 22 and 26: RFP23_dictionary(22) (Includes RFP27(26)).xlsx
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q1_2013.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q1_2014.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q1_2015.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q1_2016.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q1_2017.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q1_2018.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q2_2013.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q2_2014.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q2_2015.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q2_2016.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q2_2017.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q2_2018.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q3_2013.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q3_2014.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q3_2015.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q3_2016.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q3_2017.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q3_2018.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q4_2013.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q4_2014.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q4_2015.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q4_2016.csv
- Fifth Set of RFPs #24 - Other Payment Change Data: CFPB_RFP24B_ARLT_FIELDHST_Q4_2017.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q1_2013.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q1_2014.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q1_2015.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q1_2016.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q1_2017.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q1_2018.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q2_2013.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q2_2014.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q2_2015.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q2_2016.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q2_2017.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q2_2018.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q3_2013.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q3_2014.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q3_2015.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q3_2016.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q3_2017.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q3_2018.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q4_2013.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q4_2014.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q4_2015.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q4_2016.csv
- Fifth Set of RFPs #24 - Pending Change Data: CFPB_RFP24A_PENDCHNG_Q4_2017.csv
- Fifth Set of RFPs #29 - Escrow Statement Info: RFP29_2014.csv

**Exhibit 1**
**Documents Considered**

- Fifth Set of RFPs #29 - Escrow Statement Info: RFP29_2015.csv
- Fifth Set of RFPs #29 - Escrow Statement Info: RFP29_2016.csv
- Fifth Set of RFPs #29 - Escrow Statement Info: RFP29_2017.csv
- Fifth Set of RFPs #29 - Escrow Statement Info: RFP29_2018.csv
- Fifth Set of RFPs #3 - ARM Data: CFPB_RFP3_ARM_Details_Extract.csv
- Fifth Set of RFPs #4 - Interest Only Period Data: CFPB_RFP4.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_1_2015.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_1_2016.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_1_above_2016.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_1_upto_2015.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_2_2015.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_2_2016_2017.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_2_2018.csv
- Fifth Set of RFPs #5 - Delinquent Status/Cure/Reinstatement Data: CFPB_RFP5_2_upto_2015.csv
- Fifth Set of RFPs #6 - Reason for Default Data: CFPB_RFP6_01Jan2017_to_06Aug2018.csv
- Fifth Set of RFPs #6 - Reason for Default Data: CFPB_RFP6_10Jan2014_to_31Dec2016.csv
- Fifth Set of RFPs #7 - Bankruptcy Info: CFPB_RFP7.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q1_2014.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q1_2015.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q1_2016.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q1_2017.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q1_2018.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q2_2014.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q2_2015.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q2_2016.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q2_2017.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q2_2018.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q3_2014.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q3_2015.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q3_2016.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q3_2017.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q3_2018.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q4_2014.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q4_2015.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q4_2016.csv
- Fifth Set of RFPs #8.1 - Adverse Credit Reporting: CFPB_RFP8A_CCS_AD_CR_FINAL_Q4_2017.csv
- Fifth Set of RFPs #8.2 - Adverse Credit Reporting: CFPB_RFP_8B_CCS_AD_CR_FINAL.csv
- Fifth Set of RFPs #9 - Foreclosure Initiation: CFPB_RFP9.csv

**McFadden Backup Materials:**
- 0.13ARM dmgs.csv
- 0.13ARM panel.csv
- 0.13PMI_dmg.csv
- 0.13PMI_dmg_summ.csv
- 0.16ARM dmgs.csv
- 0.16ARM panel.csv
- 0.16PMI_dmg.csv
- 0.16PMI_dmg_summ.csv
- 0.2ARM dmgs.csv
- 0.2ARM panel.csv
- 0.2PMI_dmg.csv
- 0.2PMI_dmg_summ.csv
- 01 - Load data.R

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- 01_load_data.R
- 01_master.R
- 01_pull_hpi_indices.R
- 02 - Create Flags for Rog 2.2.R
- 02_ARM.R
- 02_draw_sample.R
- 02_fc_category.R
- 02_get_bls_data.R
- 03 - Clean Rog 2.2.R
- 03_create_credit_event_panel.R
- 03_get_hpi_data.R
- 03_PMI.R
- 04 - Clean Rog 1&2.R
- 04_join_panel_and_control_vars.R
- 04_merge_bls_hpi.R
- 05 - Create Panel.R
- 05_recode_vars.R
- 06 - Calculate Damages.R
- 06_compute_hpi_change.R
- 07_create_forbearance_flags.R
- 08_create_loan_modification_variables.R
- 1) Ocwen_Only Model-Data.do
- 1_create_MBS_sample.sql
- 1_get_exclusions.R
- 1_identify_clean_loans.R
- 1_load_constants.R
- 2 - rog_2_2_with_flags.csv
- 2) Ocwen_Only Model-Results.do
- 2_finalize_MBS_panel.R
- 2_match_loans.R
- 2_read_sql.R
- 2019.08.20 - McFadden Materials\raw mbs data (PRODUCTION) - FOLDER
- 3 - rog_2.2.fst
- 3) MBS_Ocwen Model-Data.do
- 3_add_characteristic_flags.R
- 3_identify_late_analyses_(brattle).R
- 3_identify_late_analyses_(ocwen).R
- 4 - rog_1_2_sho.fst
- 4 - rog_1_2_sur.fst
- 4) MBS_Ocwen Model-Results.do
- 4_identify_addl_rog2.2_analyses.R
- 4_upload_crosswalk.R
- 5 - final_panel.fst
- addl_rog_2.2_analyses.csv
- addl_rog_2.2_analyses_filtered.csv
- Aegis Fortress - Manuale dell'utente
- Aegis Padlock - Benutzerhandbuch
- Aegis Padlock 3 - Guia de Usuario
- Aegis Padlock 3 - Mode d'emploi
- always_delq_loans.csv
- always_delq_loans.rda
- area_titles.xlsx
- ARM.R

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- ARMADJ Comments.xlsx
- ARMADJ_parsed.csv
- AVG_FMV rda
- bk_cleaned.csv
- bk_cleaned rda
- bk_cleaned_01 rda
- bk_comments.csv
- bk_r rda
- Brattle_Classification_MBS_Loan_Characteristics.xlsx
- Brattle_Classification_RFP1_Loan_Characteristics.xlsx
- BRG_Master.txt
- category rda
- clean_bankruptcy_data_01.R
- clean_bankruptcy_data_02.R
- clean_delinquency_data.R
- clean_foreclosure_data.R
- comment_dates_from_python_regex.csv
- control_group.csv
- count_untimely_escrow_damages_loans.R
- county_unemployment_06_16.csv
- county_unemployment_17_18.csv
- county_unemployment_95_05.csv
- COUNTY_ZIP_032019.xlsx
- Creating Control Group.sql
- damages_summary_avg.csv
- damages_summary_cat.csv
- damages_summary_pay2.csv
- damages_summary_stats.csv
- data_brattle.rds
- data_ocwen rds
- delinquency_clean.csv
- delinquency_clean.rda
- eligible_loans_for_fcl_damages.csv
- eligible_loans_for_fcl_damages.rda
- Extract loan details from RFP19 ARMADJ Comments.py
- extract_bk_dates_from_comments.py
- fc_category.R
- fcl_reg_data_50pct.dta
- fhfa_hpi_3zip.csv
- fhfa_hpi_metro.csv
- fhfa_hpi_nonmetro.csv
- fhfa_hpi_pr.csv
- Figure 1 - Ocwen Market Summary.xlsx
- Figure 2-3 and 10.pptx
- Figure 6-8 - Loan Examples.xlsx
- First Half Loans.csv
- foreclosure_clean.rda
- HPI for Three-Digit Zip Codes (All Transactions Index)
- HPI_AT_metro.xlsx
- HPI_AT_nonmetro.xlsx
- HPI_AT_pr.xlsx
- hpi_ocwen_sample.rda
- HUD USPS Zip Code Crosswalk Files  https://www.huduser.gov/portal/datasets/usps_crosswalk.html

**Exhibit 1**
**Documents Considered**

- loan_numbers_closing_dates.csv
- loans_clean.rds
- loans_with_credit_events.csv
- loans_with_credit_events.R
- macros.rda
- macros_state_avg rda
- MBS Data
- MBS Data (c) Layout With Definitions V21.xls
- mbs_ocwen_fcl_reg_data.dta
- mbs_ocwen_model_results.log
- mbs_panel.dta
- OCW-019-0011419-471
- OCW-024-0103993-4006
- OCW-024-0104007
- OCW-030-0024009-011
- OCW-030-0024021-024
- OCW-049-0071308-360
- OCW3-002-0000001
- OCW3-016-0000002
- OCW3-016-0000005
- OCW3-016-0000006
- OCW3-019-0000001
- OCW3-019-0000002
- OCW3-019-0000003
- OCW3-021-0000001
- OCW3-021-0000002
- OCW3-027-0005675
- OCW-CFPB-001-00083874
- OCW-CFPB-001-00083901
- OCW-CFPB-001-01294664
- OCW-CFPB-001-01464439-612
- OCW-CFPB-001-02292346
- OCW-CFPB-001-05787062
- OCW-CFPB-001-05819247-250
- OCW-CFPB-001-06048934
- OCW-CFPB-001-06048935
- OCW-CFPB-001-06048935.xlsx
- OCW-CFPB-001-06235505-525
- OCW-CFPB-001-06523242-270
- OCW-CFPB-001-06730240
- OCW-CFPB-001-06822743
- ocwen_only_model_results.log
- ocwen_sample_panel.dta
- ocwen_sample_panel.rda
- ocwen_sample_panel_unsampled.dta
- ocwen_sample_panel_unsampled.rda
- Overcharge Population (SQL Output).csv
- Overcharges.sql
- PMI Loan List.R
- PMI.R
- PMI_Loan_List.csv
- Potentially Harmed Loans.csv
- Potentially Harmed Loans.xlsx

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- property_type_exclusions.csv
- pull_hpi_indices.R
- Quarterly Census of Employment and Wages https://data.bls.gov/cew/doc/titles/area/area_titles.htm
- RFP 19A Part 01.xlsx
- RFP 19A Part 02.xlsx
- RFP 19A Part 03.xlsx
- RFP 19A Part 04.xlsx
- RFP 19A Part 05.xlsx
- RFP 19A Part 06.xlsx
- RFP 19A Part 07.xlsx
- RFP 19A Part 08.xlsx
- RFP 19A Part 09.xlsx
- RFP 19A Part 10.xlsx
- RFP 19A Part 11.xlsx
- RFP 19A Part 12.xlsx
- RFP 19A Part 13.xlsx
- RFP 19A Part 14.xlsx
- RFP 19A Part 15.xlsx
- RFP 19A Part 16.xlsx
- RFP 19A Part 17.xlsx
- RFP 19A Part 18.xlsx
- RFP 19A Part 19.xlsx
- RFP 19A Part 20.xlsx
- RFP 19A Part 21.xlsx
- RFP 19A Part 22.xlsx
- RFP 19A Part 23.xlsx
- RFP 19A Part 24.xlsx
- RFP 19A Part 25.xlsx
- RFP 19A Part 26.xlsx
- RFP 19A Part 27.xlsx
- RFP 19A Part 28.xlsx
- RFP 19A Part 29.xlsx
- RFP 19A Part 30.xlsx
- RFP 19A Part 31.xlsx
- RFP 19A Part 32.xlsx
- RFP 19A Part 33.xlsx
- RFP 19A Part 34.xlsx
- RFP 19A Part 35.xlsx
- RFP 19A Part 36.xlsx
- RFP 19A Part 37.xlsx
- RFP 19A Part 38.xlsx
- RFP 19A Part 39.xlsx
- RFP 19A Part 40.xlsx
- RFP 19A Part 41.xlsx
- RFP 19A Part 42.xlsx
- RFP 19A Part 43.xlsx
- RFP 19A Part 44.xlsx
- RFP 19A Part 45.xlsx
- RFP 19A Part 46.xlsx
- RFP 19A Part 47.xlsx
- RFP 19A Part 48.xlsx
- RFP 19A Part 49.xlsx
- RFP 19A Part 50.xlsx

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

**Exhibit 1**
**Documents Considered**

- RFP 19A Part 51.xlsx
- RFP 19A Part 52.xlsx
- RFP 19A Part 53.xlsx
- RFP 19A Part 54.xlsx
- RFP 19A Part 55.xlsx
- RFP 19A Part 56.xlsx
- RFP 19A Part 57.xlsx
- RFP 19A Part 58.xlsx
- RFP 19A Part 59.xlsx
- RFP 19A Part 60.xlsx
- RFP 19A Part 61.xlsx
- RFP 19A Part 62.xlsx
- RFP 19A Part 63.xlsx
- RFP 19A Part 64.xlsx
- RFP 19A Part 65.xlsx
- rfp_19a.fst
- rfp_24a.fst
- rfp_29 fst
- rfp1.csv
- rfp1_supplemental_ServiceTransfer.csv
- Second Half Loans.csv
- SQL_RFP_22 fst
- SQL_ROG_1_2_SHO fst
- SQL_ROG_1_2_SUR.fst
- SQL_ROG_2.2 fst
- supplemental_loans_always_delinquent.R
- Table 1 and 2 - Count of Violations.xlsx
- Table 13-15 - Foreclosure Costs Tables.xlsx
- Table 3 and 4 - Descriptive Stats.xlsx
- Table 5 - OC for PMI Overcharges.xlsx
- Table 6 and 10 - Summary of Opportunity Costs.xlsx
- Table 8 - OC for ARM.xlsx
- Table 9 - Summary of NPV.xlsx
- Tables 11 and 12 (Plus_Regression_Tables_Report).xlsx
- total_damages fst
- Untimely Escrow.csv
- Updated population (2.1M loans).csv
- Zillow Home Value Index: Methodology https://www.zillow.com/research/zhvi-methodology-6032/
- zillow_hpi.csv
- Zip_Zhvi_AllHomes.csv

CONFIDENTIAL -
SUBJECT TO PROTECTIVE ORDER

Curriculum Vitae

**BRG**
Berkeley Research Group

# Exhibit 2

**WILLIAM G. HAMM**
BERKELEY RESEARCH GROUP, LLC
2200 Powell Street, Suite 1200 | Emeryville, CA 94608
Direct: 510.285.3254
bhamm@thinkBRG.com

## EDUCATION

Ph.D., Economics, University of Michigan
Fields of Emphasis: Industrial Organization and Labor Economics

M.A., Economics, University of Michigan

A.B., Government, Dartmouth College

## PROFESSIONAL CAREER SUMMARY

Economics Consultant, 1995 - present

Business Executive, 1986 - 1995

Government Official, 1969 - 1986

## ECONOMICS CONSULTANT EXPERIENCE

Berkeley Research Group, LLC
Managing Director, 2010 – present

LECG, LLC
Managing Director, 1996 – 2010

Bill Hamm & Associates
President, 1995-1996

## Expert Witness Engagements

Banking/Financial Services

*Wells Fargo & Company, et al., v. United States* (United States District Court, District of Minnesota: 09-cv-02764-PJS-AJB): Provided expert testimony at trial re: plaintiffs' $177 million tax claim.

Confidential international arbitration involving an institutional investor and a money-center bank: Provided expert testimony at JAMS arbitration hearing re: plaintiff's $4 billion misrepresentation claim.

**BRG**
Berkeley Research Group

*American Savings Bank, FA, et al., v. United States* (Court of Federal Claims: 92-872C):  Provided expert testimony at trial re: plaintiffs' $800 million damages claim.

*Sterling Savings Association, et al., v. United States* (Court of Federal Claims: 95-829-C):  Provided expert testimony at trial re: plaintiff's $63 million damages claim.

*Granite Management Corporation v. United States* (Court of Federal Claims: 95-515C):  Provided expert testimony at trial re: plaintiff's $137 million damages claim.

*Bank of America, et al., v. United States* (Court of Federal Claims: 95-660C; 95-7971C): Provided expert testimony at trial re: plaintiffs' $89 million damages claim.

*American Capital Corporation, et al., v. United States* (Court of Federal Claims: 95-523C):  Provided expert testimony at trial re: plaintiffs' $216 million damages claim.

*Frank P. Slattery, Jr., et al., v. United States* (Court of Federal Claims: 93-280C): Provided expert testimony at trial re: plaintiff's $3 billion damages claim.

*WestFed Holdings, Inc., et al., v. United States* (Court of Federal Claims: 92-820C, 95-731C, 95-797C, 95-803C (Consolidated)):  Provided expert testimony at trial re: plaintiffs' $480 million damages claim.

*California Federal Bank, FSB, v. United States* (Court of Federal Claims: 92-138C): Provided expert testimony at trial re: plaintiffs' $600 million lost profits claim.

*Southern California Federal Savings and Loan Association, et al., v. United States* (Court of Federal Claims: 93-52C):  Provided expert testimony at trial re: plaintiffs' $400 million damages claim.

*John K. Castle, et al., v. United States* (Court of Federal Claims: 90-1291C): Provided expert testimony at trial re: plaintiffs' $250 million damages claim.

*C. Robert Suess, et al., v. United States* (Court of Federal Claims: 90-981C): Provided expert testimony at trial re: plaintiffs' $1.1 billion damages claim.

*California Federal Bank, FSB, v. United States* (Court of Federal Claims: 92-138C): Provided expert testimony at trial re: plaintiffs' $1.7 billion restitution/reliance damages claim.

*Glendale Federal Bank v. United States* (Court of Federal Claims: 90-772C): Provided expert testimony at trial re: plaintiffs' $2 billion damages claim.

*Eugenio and Rosa Contreras,* et al*., on behalf of themselves and all others similarly situated, v. Nationstar Mortgage LLC, et al.* (United States District Court for the Eastern District of California, Sacramento Division: Civil Action No. 2:16-cv-00302-MCE-EFB): Submitted expert report re: plaintiffs' request for class certification.  (Case pending.)

*David Weiner, individually, and on behalf of other members of the public similarly situated, v. Ocwen Financial Corporation, et al.,* (United States District Court for the Eastern District of California: Case No. 2:14-cv-02597-MCE-DB): Submitted

2

expert reports re: plaintiffs' request for class certification and economic damages; deposed.  (Case pending.)

*United States of America, Ex rel. Michael J. Fisher, Brian Bullock and Michael Fisher, Individually and Brian Bullock, Individually, v. Ocwen Loan Servicing, LLC, et al.* (United States District Court for the Eastern District of Texas Sherman Division: Case No. 4:12-cv-543): Submitted expert report on plaintiffs' claim for $11.2 billion in damages; deposed.  (Case settled prior to trial.)

*Federal Deposit Insurance Corporation as Receiver of R-G Premier Bank of Puerto Rico, v. Victor J. Galán-Álvarez, et al.,* (United States District Court for the District of Puerto Rico: 12-1029 (PAD)): Submitted expert reports on (1) the Bank Directors' and Officers' performance in effectively managing risks, and (2) the plaintiff's damages; deposed.  (Case pending.)

*Gregory Young, et al., v. Wells Fargo & Co., et al.* (United States District Court for the Southern District of Iowa, Central Division: 4:08-cv-507-RP-CFB): Filed two expert report re: (1) plaintiffs' request for class certification, and (2) Wells Fargo's loan servicing practices; deposed.  (Case settled prior to trial.)

*Dr. Enrico Bondi, Extraordinary Commissioner, v. Bank of American Corp., et al.,* (U.S. District Court, Southern District of New York: 05 CIV. 04015):  Filed expert report re: defendants' $442 million counter-claim; deposed. (Case settled prior to trial.)

*Home Savings of America FSB, et al., v. United States* (Court of Federal Claims: 92-620C):  Filed expert report re: plaintiffs' $940 million damages claim; deposed.  (Plaintiffs subsequently withdrew claims addressed in my expert report.)

*Coast Federal Bank, FSB, v. United States* (Court of Federal Claims: 92-466C):  Filed two expert reports re: plaintiff's $1.4 billion damages claim; deposed. (Court granted summary judgment.)

*Maco Bancorp, Inc., v. United States* (Court of Federal Claims: 94-625C):  Filed expert report re: plaintiffs' $300 million damages claim; deposed. (Case settled prior to trial.)

*County of Orange v. Merrill Lynch & Company, Inc.* (United States District Court, Central District of California: CV-95-0037 GLT):  Filed expert report re: plaintiff's $2 billion damages claim. (Case settled prior to trial.)

*Irvine Ranch Water District v. Merrill Lynch & Company, Inc.* (United States District Court, Central District of California: SA CV-97-254 GLT):  Filed expert report re: plaintiff's $100 million damages claim. (Case settled prior to trial.)

*Federal Deposit Insurance Corporation as Receiver of R-G Premier Bank of Puerto Rico v. Ace Insurance Company* (United States District Court for the District of Puerto Rico: Civil No.: 16-1812 (GAG)): Retained to testify at trial regarding the Plaintiff's damages attributable to a bank failure. (Case settled before expert report was due.)



*Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B., v. Michael Perry* (United States District Court, Central District of California: CV 11-5561 ODW (MRWx)): retained as testifying expert re: the condition of the secondary mortgage market and its implications for IndyMac's mortgage banking business strategy.  (Case settled before expert report was due.)

*Bill Graves, et al., v. Southwestern & Pacific Specialty Finance, Inc. DBA Check 'N Go, et al.* (United States District Court, Northern District of California, Oakland Division: CV13-1159-SBA): Retained as testifying expert re: the determinants of interest rates on short-term consumer loans.  (Case settled before expert report was due.)

*People of the State of California, by and through the City Attorney of the City and County of San Francisco, v. Check 'n Go of California, Inc., et. al.* (San Francisco Superior Court: 462-779): Retained as testifying expert re: business models employed in marketing credit products.  (Case settled before expert report was due.)


Housing/Mortgage Lending

*Claremont Village Commons, et al., v. United States* (Court of Federal Claims: 94-1): Provided expert testimony at trial re: plaintiffs' $101 million damages claim.

*Chancellor Manor, et al., v. United States* (Court of Federal Claims: 98-39C): Provided expert testimony at trial re: plaintiffs' $25 million damages claim.

*Cienega Gardens, et al., v. United States* (Court of Federal Claims: 94-1C): Provided expert testimony at trial re: plaintiffs' $41 million damages claim.

*Carabetta Enterprises, et al., v. United States* (Court of Federal Claims: 02-1134C): Provided expert testimony at trial re: plaintiffs' $53 million damages claim.

*Independence Park, et al., v. United States* (Court of Federal Claims: 94-1AC): Provided expert testimony at trial re: plaintiffs' $3.4 million damages claim.

*Franconia Associates, et al., v. United States* (Court of Federal Claims: 97-381C): Provided expert testimony at trial re: plaintiffs' claims for damages.

*Rincon EV Realty LLC, et al., v. CP III Rincon Towers, Inc.* (Superior Court of the State of California for the County of San Francisco: CGC 10-496887): Filed expert report re: plaintiffs' damages claims; deposed.

*Grass Valley Terrace, et al., v. United States* (Court of Federal Claims: 98-726C): Filed expert report re: plaintiffs' $20 million damages claim; deposed. (Case settled prior to trial.)

*Tamerlane, Limited, et al., v. United States* (Court of Federal Claims: 05-677C): Filed expert report re: plaintiffs' claim for just compensation in connection with an alleged taking.  (Case settled prior to trial)

*Rosemary Hernandez, et al., v. America's Servicing Company* (United States District Court, Central District of California: CV-06-7686-ODW (PLAx)): filed

4

**BRG**
Berkeley Research Group

expert declaration regarding the amount at stake in the litigation.  (Court granted summary judgment.)

*Pierceall, et al., v. Ameriquest Mortgage Company and Ameriquest Capital Corporation:*  (Superior Court of California, County of San Mateo: 415620): Designated testifying expert re: economic damages experienced by class of borrowers.  (Case settled before expert report was due; parties adopted my methodology for calculating losses.)

*Federal Trade Commission v. Citigroup, Inc., et al.* (No. 1:01-CV-0606 (N.D. Ga. Sept. 24, 2002)): Designated testifying expert to determine and quantify the economic consequences of The Associates' marketing practices on low-income borrowers. (Case settled before expert report was due.)

Public Finance/Government Policy

*The Deron School of New Jersey, et al., v. The United States Department of Agriculture, et al.*  (United States District Court, District of New Jersey: 2:2009cv03477): Provided expert testimony at trial re: the economic impact of a USDA regulatory action.

*Jicarilla Apache Nation v. United States* (Court of Federal Claims, No. 02-25L): Provided expert testimony at Phase-1 trial re: the calculation of prejudgment interest.

*County of San Diego & County of Orange v. State of California, et al.* (Superior Court of California, County of San Diego, GIC 825109): Provided expert testimony at trial re: the State's ability to honor claims for reimbursement totaling $155 million.

*US West Communications, Inc., et al., v. City of Coralville* (Iowa District Court for Johnson County: LA CV-058956):  Provided expert testimony at trial re: the economic and public policy consequences of a municipal ordinance.

*City of Richmond (CA) v. Chevron Corporation et al.* (Superior Court of California, County of Contra Costa, C13-01654): Retained to offer opinions at trial regarding the impact, if any, of a fire at a Chevron refinery on the plaintiff's cost of credit; deposed.  (Case settled prior to trial.)

*Quapaw Tribe of Oklahoma v. United States (*Court of Federal Claims, No. 12-592L): Filed two expert reports re: plaintiffs' claims for damages; deposed. (Case settled prior to trial.)

*Grace M. Goodeagle, et al., v. United States (*Court of Federal Claims, No. 12-431L): Filed two expert reports re: plaintiffs' claims for damages; deposed. (Case settled prior to trial.)

*Thomas Charles Bear, et al., v. United States (*Court of Federal Claims, No. 13-51X): Filed two expert reports re: plaintiffs' claims for damages; deposed. (Case settled prior to trial.)

(Amount at stake in *Quapaw, Goodeagle,* & *Bear:* $5.6 billion)

*The Chickasaw Nation & The Choctaw Nation v. the Department of the Interior, et al.* (United States District Court for the Western District of Oklahoma: No. CIV-05-1524-W): Filed expert report re: calculation of interest on alleged foregone revenues; deposed.  (Case settled prior to trial.)

*Jicarilla Apache Nation v. United States* (Court of Federal Claims, No. 02-25L): Filed expert report re: the calculation of Phase-2 damages and interest-as-a-component-of-damages; deposed.  (Case settled prior to trial.)

*Quechan Tribe of the Fort Yuma Indian Reservation v. United States* (Court of Federal Claims, No. 06-888L): Filed expert report re: calculation of prejudgment interest.  (Case settled prior to trial.)

*United States v. Anne (Sandy) Batchelor-Robjohns, et al.* (United States District Court, Southern District of Florida, Miami Division, 03-20164).  Filed expert report re: a complex financial transaction between a multinational bank and a U.S. corporation; deposed.  (Court granted summary judgment.)

*U.S. West Communications, Inc., v. City of Santa Fe, New Mexico* (United States District Court, New Mexico: CIV 00-795 LH):  Filed expert report re: the economic and public policy consequences of a municipal ordinance.  (Court granted summary judgment.)

*Levi Townsend v. Lyle Quasim* (United States District Court, Western District of Washington at Seattle: C00-0944Z):  Filed expert report re: economic and budgetary consequences of relief sought by plaintiff.  (Case settled prior to trial.)

*Qwest Corporation v. Central Puget Sound Regional Transit Authority, et al.* (United States District Court for the Western District of Washington at Seattle: CO2-0155P): Filed expert declaration re: cost of protecting and relocating Plaintiff's facilities.

*Alliance of American Insurers, et al., v. California Department of Motor Vehicles* (Superior Court of the State of California: 02CS00702):  Filed expert declaration re: cost of responding to electronic requests for information on licensed drivers and registered vehicles.

*Qwest Corporation v. City of Portland* (United States District Court, District of Oregon: 01-CV-1005-JE):  Filed expert declaration regarding information needed to assess the City's right-of-way management needs.

*Markieta Malory, et al., v. University of Maryland Medical System Corporation* (Circuit Court for Baltimore City: 24-C-98410624):  Filed expert affidavit re: economic impact of medical malpractice insurance reforms.

*The Arc of Washington State, Inc., et al., v. Lyle Quasim, et al.* (United States District Court, State of Washington: C99-5577FDB):  Designated testifying expert re: economic and budgetary consequences of relief sought by plaintiff; deposed.  (Case settled prior to trial.)

*Hollywood Park Land Company, LLC, et al., v. Golden State Transportation Financing Corporation and California Infrastructure and Economic Development*

6



*Bank* (Court of Appeals of the State of California, Third Appellate District: C057166): Submitted expert declaration re: the issuance of certain bonds authorized by California law.

*Neal M. Douglas, et ux., v. United States* (United States District Court, Northern District of California, San Jose Division: C03-04518-JW-EAI): Designated testifying expert re: complex financial transaction between a multinational bank and a U.S. corporation.  (Case settled before expert report was due.)

*Washington Federation of State Employees, et al., v. State of Washington* (Superior Court of the State of Washington: 98-2-02432-9):  Designated testifying expert re: economics of public retirement systems.  (Court granted summary judgment.)

*Washington Federation of State Employees, et al., v. State of Washington* (Superior Court of the State of Washington: 98-2-00100-1):  Designated testifying expert re: economics of public retirement systems.  (Court granted summary judgment.)

## Consulting Engagements

*People's Initiative to Protect Proposition 13 Savings.*  Analyzed the likely economic and fiscal impacts of a proposed ballot initiative that would broaden the circumstances in which California homeowners could transfer the property tax assessment base from one home to another.

*Patients and Caregivers to Protect Dialysis Patients.*  Analyzed the likely economic and fiscal impacts of a proposed ballot initiative that would limit private health insurers' reimbursements to dialysis clinics for treatments provided to patients with end-stage renal diseases.

*Committee to Protect California Jobs.*  Analyzed the likely economic and fiscal impacts of a proposed ballot initiative that would regulate the use of consumer data and impose fines on companies that improperly release (or allow others to gain access to) such data.

*Texas Alliance for Patient Access.*  Analyzed the impact of medical liability tort reform on Texas residents' access to health care.

*U.S. Attorney's Office.*  Retained to provide analysis and advice in a criminal prosecution of certain former bank officers.

*PhRMA California Initiative Fund.*  Analyzed the likely economic and fiscal impacts of a proposed ballot proposition that would regulate the prices at which the State of California purchases or pays for prescription drugs.

*Global Holdings Inc.*  Analyzed the economics of providing digital imaging services to certain workers compensation claimants.



*Outerwall Inc.*  Performed an econometric analysis of FBI and U. S. Census Bureau data in order to test the hypothesis that the presence of smartphone recycling kiosks in a community affects the robbery and larceny-theft rates.

*Reckitt Benckiser LLC.*  Analyzed the likely economic impact of a proposed rule that would ban the sale in California of certain rodenticides.

*Patients, Provider and Healthcare Insurers to Protect Access and Contain Health Costs.*  Analyzed the economic and fiscal impact of a voter initiative intended to change the medical liability tort system.

*Scientific Games.*  Performed a multi-state statistical analysis of the variables that determine per capita spending on instant lottery games.

*E & B Natural Resources.*  Analyzed the economic and fiscal impact of a proposed oil development project.

*American Beverage Association:* Analyzed the economic and fiscal impact of a proposed tax on sweetened beverages.

*U.S. Chamber of Commerce:* Analyzed the impact on property and casualty insurance rates of state laws allowing bad-faith lawsuits against insurance companies.

*UCBH Holdings, Inc. Bankruptcy:* Retained by the general bankruptcy counsel to (1) analyze UCBH's Board of Director's and officers' actions in evaluating a proposed acquisition, and (2) opine on the extent to which the holding company was damaged by their actions.

*Federated Investors, Inc.:*  Analyzed the likely fiscal impact of shifting from the standard apportionment formula under UDITPA to a special formula for mutual fund service providers.

*Calaveras Telephone Company, et al.:* Submitted expert analysis and opinion to the California Public Utilities Commission regarding the ratemaking treatment of proceeds from the companies' sale of Rural Telephone Bank stock.

*Californians Allied for Patient Protection*:  Tested the claim that medical malpractice tort reform discourages the filing of meritorious malpractice claims.

*California Alliance for Jobs:*  Analyzed the impact of environmental compliance costs on public infrastructure.

*Wilson-Miller Communications*:  Analyzed the economic and fiscal impact of a proposed initiative intended to fund $9.8 billion in alternative energy/conservation projects.

*American Council of Engineering Companies of California*: Analyzed the effectiveness of California's county self-help program for delivering transportation infrastructure.



*California Hospital Association:*  Analyzed, and recommend changes to, proposed legislation intended to maximize California's receipt of federal Medicaid payments.

*Californians Against Higher Property Taxes*:  Analyzed the economic consequences of taxing business/commercial property at a higher effective rate than residential property

*Coalition to Protect California:*  Analyzed the economic and fiscal impact of an initiative limiting the use of eminent domain and increasing the number of regulatory takings that are compensable.

*Californians Against Higher Taxes:*  Analyzed the economic and fiscal impact of an initiative imposing a severance tax on California oil production.

*Pacific Gas and Electric:*  Analyzed the likely impact on consumers if a municipal utility annexed a portion of PG&E's service area.

*Stop the Reiner Initiative Coalition:* Analyzed the fiscal impact of an initiative to create a preschool entitlement in California, and evaluated the program's design.

*Californians for Affordable Prescriptions:*  Analyzed the fiscal and economic impact of two ballot propositions that would establish prescription drug discount programs for certain California residents.

*Californians Allied for Patient Protection:*  Tested the claim that regulation of insurance rates (Proposition 103), rather than tort reform, is responsible for limiting the growth in medical malpractice insurance premiums.

*Californians for Public Safety and Education:*  Analyzed the fiscal impact of a proposed citizen initiative that would increase revenue to the state and local governments from legalized gambling.

*A coalition of health care providers:*  Analyzed the impact of proposed reforms to Nevada's medical malpractice tort system on the cost of, and access to, healthcare.

*Committee for Workers Compensation Reform and Accountability:*  Analyzed the economic and fiscal consequences of proposed changes to California's Workers Compensation system.

*Coalition of Horseracing Interests:*  Analyzed the economic impact of a proposed casino expansion on the thoroughbred racing circuit in Northern California.

*California Scholarship Opportunity Act:*  Analyzed the fiscal impact of a proposed constitutional amendment that would authorize use of public funds for scholarships to students in underperforming schools.

*California Association of Marriage & Family Therapists:*  Analyzed the cost effectiveness of expanding the list of providers eligible to offer counseling to Medi-Cal participants.



*Nutritional Grocers Association of California*:  Analyzed the impact of a proposed methodology for limiting redemption prices under the Women, Infants and Children Program ("WIC").

*American Liver Foundation*:  Analyzed the fiscal impact on California's General Fund of proposed legislation establishing a statewide inoculation program for Hepatitis A.

*American Insurance Association, the Association of California Insurance Companies, and the Personal Insurance Federation of California:*  Analyzed the taxation of insurance companies in California.

*Business for Economic Growth in California*:  Analyzed the economic and revenue impact of adopting a single-factor (sales) income apportionment formula under the state's corporate income tax program.

*Coalition of Automotive Firms:*  Analyzed the impact of a proposed fuel economy regulation on jobs, income, and prices in California.

*Association of California Insurance Companies*:  Analyzed workers' compensation benefits paid in California, relative to the benefit levels in other states.

*Californians Against Fraud and Higher Insurance Costs*:  Analyzed the impact of proposed legislation on automobile insurance premiums, incentives to combat fraud, and number of lawsuits.

*Consulting Engineers and Land Surveyors of California*:  Analyzed the economic and public policy consequences of a proposed constitutional amendment that would prevent the State of California from contracting-out certain professional services.

*Coalition for Fair Liability Laws*:  Analyzed the economic impact of replacing joint-and-several liability with proportional liability for professional service providers.

*Californians Allied for Patient Protection*:  Analyzed the economic and public policy consequences of legislative proposals to weaken medical malpractice insurance reforms in California.

*Car and Truck Renting and Leasing Association*:  Analyzed the economic rationale for state controls on the prices that rental car companies may charge.

*Saddleback Constructors:* Analyzed the fiscal and economic consequences of proposed legislation that would prohibit the construction or expansion of roads on land owned, or in the possession of, certain California state agencies.

*International Game Technology*:  Analyzed the economic impact of legislation to regulate business relationships, and testified before a committee of the Nevada Legislature.

*Coalition of Investor-Owned Utilities*:  Analyzed the effects of the proposed Utility Rate Reduction Act on rate-payers, the state and local governments, and consumers.

10



*Coalition Against Unregulated Gambling*:  Analyzed the impact on state and local governments of a proposed ballot proposition expanding Indian casino gambling.

*Major commercial bank*:  Analyzed the issues raised, and conditions imposed, by regulators in connection with bank merger applications in six countries.

*Yolo County, California*:  Analyzed the impact on county revenues of a recent change in state law.

*Major technology corporation*:  Helped client identify probable impact of network-centric computing on competition, products, and business organization within a key customer segment (insurance).

*GTECH Corporation*:  Identified opportunities for improving the management, organization, and effectiveness of the California State Lottery.

## BUSINESS EXPERIENCE

FEDERAL HOME LOAN BANK OF SAN FRANCISCO, 1991 - 1995.

<u>Executive Vice President - Chief Operating Officer</u>

Responsibilities:  Accountable to the CEO for all business and financial operations of this $50 billion bank, including:

| | | |
|---|---|---|
| Sales/Marketing | Investments | Financial reporting |
| Underwriting | Hedging/Derivatives | Information systems |
| Collateral | Real estate | Affordable Housing |
| Interest rate risk | Strategic planning | Accounting/Budgeting |

Accomplishments:

- Increased assets by $9 billion.
- Increased annual net income by $53 million.
- Implemented comprehensive risk management policies that increased income stability and reduced risk.
- Reduced operating expenses by 14%.
- Developed customer/product/business unit profitability system.
- Helped win support for the bank's legislative priorities from key federal agencies.
- Led the shift to a customer- and market-oriented corporate culture.

<u>Senior Vice President - Sales & Marketing</u>

Responsibilities:  Accountable to the CEO for strategic planning, marketing, and sales.

Accomplishments:

- Reversed the downward trend in business.

11

**BRG**
Berkeley Research Group

- Implemented a segmented pricing strategy that generated $3 billion in new business within 3 months.

Senior Vice President - Administration

Responsibilities:  Accountable to the CEO for strategic planning, budgeting, information systems, and real estate.

- Reduced operating expenses by 42%.
- Initiated strategies that helped bring occupancy in the Bank's 320,000-square-foot headquarters building from 28% to 90% within 2 years.

WORLD SAVINGS AND LOAN ASSOCIATION, Oakland, CA, 1986 - 1991.

Vice President - Loan Service

Responsibilities:  Accountable to SVP for providing quality service to 155,000 real estate loan customers and collecting $1.5 billion in payments annually. Managed 12 departments.

Accomplishments:

- Raised customer satisfaction by reducing telephone wait times 80% and error rates 50%.
- Instrumental in developing a product that, at one time, accounted for 10% of World's new business.

Vice President - Operations Analysis

Responsibilities: Accountable to EVP for corporate budgeting ($200 million/year) and operations improvement programs. Also supported strategic planning and business analysis.

**GOVERNMENT EXPERIENCE**

STATE OF CALIFORNIA, OFFICE OF THE LEGISLATIVE ANALYST, Sacramento, CA, 1977 - 1986.

Director (Legislative Analyst)

Responsibilities: Led a 95-person office that provided the Legislature and the public with objective analyses and recommendations on all aspects of state government.  Testified before legislative committees on hundreds of occasions, and delivered more than 100 speeches on complex policy issues to civic and other groups.

Accomplishments:



- Prepared objective analyses of all Constitutional amendments, bond measures, citizen initiatives and other ballot propositions submitted to the voters.
- Published annual analyses of the Governor's Budget that recommended spending reductions totaling more than $1 billion.
- Prepared analyses of all bills affecting state expenditures or revenues, prompting thousands of perfecting amendments.
- Published analyses of key public policy issues, such as Proposition 13, rapid transit, health care, tax incentives, the environment, education, and corrections.
- Conceived and published a highly acclaimed annual report on strategic issues facing the state of California.

EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF MANAGEMENT AND BUDGET, Washington, D.C., 1969 - 1977.

<u>Division Director</u>
Responsibilities: Analyzed, and made recommendations to the President on, the programs/budgets of 3 cabinet-level agencies with $60 billion in spending authority.  Previously served as a budget analyst and Branch Chief.

Accomplishments:
- Spearheaded the most extensive revision of subsidized housing and urban development programs ever undertaken.
- Prepared the analyses that helped convince the President to suspend or terminate nearly two dozen ineffective federal programs.
- Devised and won approval for new scorekeeping techniques that significantly increased the President's ability to control spending.
- Earned two Presidential citations.

**ACADEMIC HONORS AND AWARDS**

William A. Jump Memorial Foundation Meritorious Award for Exemplary Achievement in Public Administration
Phi Beta Kappa
Graduated magna cum laude, with high distinction in major
National Science Foundation Fellowship
Phi Kappa Psi (honorary fraternity for scholars)
Colby Prize (shared)
Institute for Labor and Industrial Relations Fellowship
Institute for Public Utilities Fellowship



**OTHER APPOINTMENTS/AFFILIATIONS**

Member, American Economic Association, 1964-present
Fellow, National Academy of Public Administration, 1983-present
Member, American Law and Economics Association, 1996-present
Member, Board of Directors, Grameen Foundation USA, 2016-present
Member, Commonwealth Club, 1990-2017
Member, Board of Trustees, Freedom from Hunger, 2004-2016
Member, Advisory Group for the National Academy of Public Administration's Organizational Study of the U.S. Department of Housing and Urban Development Office of Chief Financial Officer, 2014-2015
Member, Board of Directors, LECG-Europe, 2008-2010
Founding Principal, Council on Excellence in Government, 1986-2009
Chairman, National Academy of Public Administration Panel for improving health care and services to veterans of the Afghanistan/Iraq wars, 2007-2008
Member, National Academy of Public Administration Panel for improving the Small Business Administration's effectiveness in responding to presidentially declared disasters, 2005-2007
Chairman, National Academy of Public Administration Panel for improving management/operations of the Corporation for National and Community Services, 2004-2005
Member, Governing Board of the California Institute for County Government, 1999-2005
Member, National Academy of Public Administration Panel for improving the financial stability of the Presidio Trust, 2003-2004
Member, Advisory Panel of the California Earthquake Authority, 1998-2004
Member, Board of Directors - PrimeTech, Inc., 1997-2000
Member, California Citizens Budget Commission, 1993-2000
Member, Dean's Advisory Council, San Francisco State University, 1995-1998
Founding Member, Dean's Advisory Council, Graduate School of Management, University of California/Davis, 1984-1993
Member, Board of Visitors, Institute for Public Policy, Duke University, 1986-1989
President, Western Legislative Fiscal Officers Association, 1983-1985

August 2019

# Exhibit 3

## William G. Hamm
## <u>Testimony – Past Four Years</u>

| <u>CASE</u> | <u>COURT</u> | <u>YEAR</u> |
|---|---|---|
| **Testimony at trial** | | |
| *Wells Fargo & Co., et al., v. United States of America* | United States District Court District of Minnesota Civil No. 09-cv-02764-PJS-AJB | 2016 |
| **Depositions** | | |
| *David Weiner, individually, and on behalf of other members of the public similarly situated, v. Ocwen Financial Corporation, et al.* | United States District Court for the Eastern District of California: Case No. 2:14-cv-02597-MCE-DB | 2019 |
| *City of Richmond v. Chevron Corporation, et al.* | Superior Court of California, County of Contra Costa C13-01654 | 2018 |
| *David Weiner, individually, and on behalf of other members of the public similarly situated, v. Ocwen Financial Corporation, et al.* | United States District Court for the Eastern District of California: Case No. 2:14-cv-02597-MCE-DB | 2017 |
| *United States of America, Ex rel. Michael J. Fisher, Brian Bullock and Michael Fisher, Individually, and Brian Bullock, Individually,* v. *Ocwen Loan Servicing, LLC, et al.* | United States District Court for the Eastern District of Texas, Sherman Division: (Case No. 4:12-cv-543) | 2016 |
| *Quapaw Tribe of Oklahoma v. United States of America* | Court of Federal Claims Case No. 12-431L | 2016 |
| *Thomas Charles Bear, et al., v. United States of America* | Court of Federal Claims Case No. 13-51X | 2016 |
| *Grace M. Goodeagle, et al., v. United States of America* | Court of Federal Claims Case No. 12-431L | 2016 |
| *Federal Deposit Insurance Corporation As Receiver of R-G Premier Bank of Puerto Rico v. Victor J. Galan-Alvaraz, et al.* | United States District Court For the District of Puerto Rico Civil Action #12-01029 (PAD) | 2015 |
| *Federal Deposit Insurance Corporation As Receiver of R-G Premier Bank of* | United States District Court For the District of Puerto Rico | 2015 |

*Puerto Rico v. Victor J. Galan-Alvaraz, et al.*          Civil Action #12-01029 (PAD)

*The Chickasaw Nation & the Choctaw Nation*          Court for the Western District          2015
*v. the Department of the Interior, et al.*                 of Oklahoma CIV-05-1524-W

# Exhibit 4

## WILLIAM G. HAMM
### Publications

1. "Introduction to Comprehensive Tort Reform Through House Bill 4 (H.B. 4) By the Texas Legislature: The Crisis in Access to Medical Care," (with C. Paul Wazzan, Ph.D.), *Texas Tech Law Review,* Volume 51, Number 3 (Spring 2019).

2. "Controlling Medical Malpractice Insurance Costs – Congressional Act or Voter Proposition?" (with H.E. Frech III and C. Paul Wazzan), *Indiana Health Law Review,* Volume 3, Issue 1 (2006).

3. "An Economic Assessment of Damage Caps in Medical Malpractice Litigation Imposed By State Laws and the Implications For Federal Policy and Law" (with H.E. Frech III and C. Paul Wazzan), *Health Matrix: Journal of Law and Medicine,* Volume 16, Number 2 (Summer 2006).

4. "The Economic Effects of California Adopting a Split Roll Property Tax," (with Jose Alberro), LECG White Paper, September 2008.

5. "The Self-Help Program: A Better Way to Deliver Local Transportation Projects," (with Heather Schmidt), LECG White Paper, September 2008.

6. "The Impact of Bad Faith Lawsuits on Consumers in Florida and Nationwide," (with Jeannie Kim and Rebecca Reed-Arthurs), BRG White Paper, September 2010.

7. "Has the Presence of Smartphone Recycling Kiosks in Major U.S. Cities Affected the Incidence of Robbery and Larceny," (with Jenny Young), BRG White Paper, August 2014.

8. "Story of S&L Titan H.F. Ahmanson," Book Review: Sandman for the American Dream, *ABA Banking Journal*, April 25, 2013.


## Seminars & Speaking Engagements

1. "2014 California and U.S. Economic Outlook," State Bar of California Business Law Section's Financial Institutions Committee Meeting, January 14, 2014.


## News & Commentary

1. *Wall Street Journal*, cites a January 2014 study regarding Malpractice claims and non-economic damages for medical liability judgments, April 16, 2014.

2. *Law 360*, William Hamm comments on the potential impacts and effects of Detroit's bankruptcy, July 19, 2013

3. *Beach Reporter*, Mention of William Hamm's completed study analyzing how much revenue the City of Hermosa Beach and its school district would receive from a potential oil-drilling project.

**Exhibit 5**
**Summary of Escrow Account Interest Rates in 15 States**

| State | Language | Rate | Website |
|---|---|---|---|
| Alaska | The rate of interest paid on money in a reserve account shall equal two percent less than the rate of interest charged to the borrower for the mortgage loan and shall be computed on the average monthly balance in that account each month | 2% Below the Note Rate | http://www akleg gov/basis/Bill/Text/19?Hsid=HB0363A |
| California | No financial institution subject to the provisions of this section shall impose any fee or charge in connection with the maintenance or disbursement of money received in advance for the payment of taxes and assessments on real property securing loans made by such financial institution, or for the payment of insurance, or for other purposes relating to such real property, that will result in an interest rate of less than 2 percent per annum being paid on the moneys so received | 2% minimum | http://leginfo legislature ca gov/faces/codes_displayText xhtml?lawCode=CIV&division=3 &title=14 &part=4 &chapter=2 &article=2 |
| Connecticut | Connecticut General Statutes § 49-2a: requires that the interest rate be not less than the deposit index, rounded to the nearest one-tenth of one percentage point<br><br>Connecticut General Statutes § 36a-26: The Banking Commissioner shall determine the deposit index for each calendar year and publish such deposit index in the Department of Banking's news bulletin and on the department's Internet web site not later than December fifteenth of the prior year  The commissioner may also disseminate the deposit index and any information the commissioner deems appropriate in a manner designed to alert the parties that may rely on the deposit index, including the issuance of press releases and public service announcements, the encouragement of news stories in the mass media and the posting of conspicuous notices at financial institutions  For purposes of this section, "deposit index" means (1) the average of the national rates for savings deposits and money market deposits for the last week in November of the prior year, as published by the Federal Deposit Insurance Corporation in accordance with 12 CFR 337 6, as amended from time to time, or (2) if said corporation no longer publishes such rates, the average of substantially similar national rates for the last week in November of the prior year as published by a federal banking agency | 2014-2018: 0 1%<br>2019: 0 2% | https://portal ct gov/DOB/Rental-Security-Deposits/Rental-Security-Deposits/Connecticut-Deposit-Index-and-Interest-Rates |
| Iowa | A bank receiving funds in escrow pursuant to an escrow agreement executed on or after July 1, 1982 in connection with a loan as defined in section 535 8, subsection 1, shall pay interest to the borrower on those funds, calculated on a daily basis, at the rate the bank pays to depositors of funds in ordinary savings accounts | Bank account savings rate | https://www legis iowa gov/publications/search/document?fq=id:1006946&pdid=972492&q=524 905#524 905 |
| Maine | Under state law, Maine financial institutions and lenders must calculate the interest to be paid on mandatory escrow account balances based upon an index identified on the first business day of the calendar year  The rate of interest, which must be at least equal to 50% of the index, must be paid quarterly | 2015: 0 13%<br>2016: 0 31%<br>2017: 0 45%<br>2018: 0 92%<br>2019: 1 3% | https://www maine gov/pfr/financialinstitutions/escrow htm |
| Maryland | A lending institution that makes a loan to a consumer borrower secured by a first mortgage or first deed of trust on residential real property and creates or is the assignee of an escrow account in connection with that loan shall pay interest to the consumer borrower on the funds in the escrow account at an annual rate not less than the weekly average yield on United States Treasury securities adjusted to a constant maturity of 1 year, as published by the Federal Reserve in "Selected Interest Rates (Daily) – H 15", as of the first business day of the calendar year | 1 year Treasuries | http://mgaleg maryland gov/2020RS/Statute_Web/gcl/gcl pdf |
| Massachusetts | A mortgagee holding a first mortgage or lien on a dwelling house located in the commonwealth of 4 or fewer separate households occupied or to be occupied in whole or in part by the mortgagor who requires advance payments, deposits or other security by the mortgagor for the payment of real estate taxes on mortgaged property, shall pay interest to the mortgagor on any amount so paid or deposited in advance  Interest shall be paid at least once a year at a rate and in a manner to be determined by the mortgagee  Mortgagees showing a net loss from the investment of the amounts so paid or deposited may file with the commissioner of banks a request for an exemption from the requirement that the interest be paid to mortgagors | Not specificied | https://malegislature gov/Laws/GeneralLaws/PartII/TitleI/Chapter183/Section61 |

**Exhibit 5**
**Summary of Escrow Account Interest Rates in 15 States**

| State | Language | Rate | Website |
|---|---|---|---|
| Minnesota | Each mortgagee requiring funds of a mortgagor to be paid into an escrow, agency or similar account for the payment of taxes or homeowner's insurance premiums with respect to a mortgaged one-to-four family, owner-occupied residence located in this state, unless the account is required by federal law or regulation or maintained in connection with a conventional loan in an original principal amount in excess of 80 percent of the lender's appraised value of the residential unit at the time the loan is made or maintained in connection with loans insured or guaranteed by the secretary of housing and urban development, by the administrator of veterans affairs, or by the administrator of the Farmers Home Administration or any successor, shall calculate interest on such funds at a rate of not less than three percent per annum  Such interest shall be computed on the average monthly balance in such account on the first of each month for the immediately preceding 12 months of the calendar year or such other fiscal year as may be uniformly adopted by the mortgagee for such purposes and shall be annually credited to the remaining principal balance on the mortgage, or at the election of the mortgagee, paid to the mortgagor or credited to the mortgagor's account  If the interest exceeds the remaining balance, the excess shall be paid to the mortgagor or vendee  The requirement to pay interest shall apply to such accounts created in conjunction with mortgage loans made prior to July 1, 1996 | 3% minimum | https://www revisor mn gov/statutes/cite/47 20 |
| New Hampshire | Rate set for a 6-month period by the Bank Commissioner on February 1 and August 1 of each year at rate that is 1% below the mean interest rate paid by New Hampshire chartered banks on regular savings accounts  The escrow rate for the period August 1, 2019 through January 31, 2020 is 0 00% | 0 0% | https://www nh gov/banking/ ; https://law justia com/codes/new-hampshire/2015/title-xxxv/chapter-384/section-384-16-c |
| New York | [NY Gen  Oblig  Law § 5-601 ]: Any mortgage investing institution which maintains an escrow account pursuant to any agreement executed in connection with a mortgage on any one to six family residence occupied by the owner or on any property owned by a cooperative apartment corporation, as defined in subdivision twelve of section three hundred sixty of the tax law, (as such subdivision was in effect on December thirtieth, nineteen hundred sixty), and located in this state shall, for each quarterly period in which such escrow account is established, credit the same with dividends or interest at a rate of not less than two percent per year based on the average of the sums so paid for the average length of time on deposit or a rate prescribed by the superintendent of financial services pursuant to section fourteen-b of the banking law and pursuant to the terms and conditions set forth in that section whichever is higher  The superintendent of financial services shall prescribe by regulation the method or basis of computing any minimum rate of interest required by this section and any such minimum rate shall be a net rate over and above any service charge that may be imposed by any mortgage lending institution for maintaining an escrow account | 2% minimum | http://public leginfo state ny us/lawssrch cgi?NVLWO: |
| Oregon | Interest on security protection deposits; exception  (1) As used in this section, "discount rate" means the auction average rate on 91-day United States Treasury bills, as established by the most recent auction of such Treasury bills, as published by the United States Department of the Treasury, Bureau of the Public Debt, less 100 basis points | 91-day Treasuries | https://www oregonlegislature gov/bills_laws/Archive/2013ors086 pdf |
| Rhode Island | Every mortgagee holding funds of a mortgagor in escrow for the payment of taxes and insurance premiums with respect to mortgaged property located in this state shall pay or credit interest on those funds at a rate equal to the rate paid to the mortgagee on its regular savings account, if offered, and otherwise at a rate not less than the prevailing market rate of interest for regular savings accounts offered by local financial institutions as determined by the director, said determination to be made within thirty (30) days of the effective date of this provision and thereafter annually on the first business day of the year | regular savings account rate | http://webserver rilin state ri us/Statutes/TITLE19/19-9/19-9-2 HTM |

**Exhibit 5**
**Summary of Escrow Account Interest Rates in 15 States**

| State | Language | Rate | Website |
|-------|----------|------|---------|
| Utah | (1)Except as provided in Subsection (2), each lender requiring the establishment or continuance of a reserve account in connection with an existing or future real estate loan shall, on a yearly basis as of December 31, calculate and credit to the account interest on the average daily balance of funds deposited in the account at a rate equal to: (a)5-1/2%; (b)the average of the 11th District monthly weighted average cost of funds index as calculated and published by the Federal Home Loan Bank of San Francisco during the calendar year, less 1-1/2 percentage points; or (c)   the statement savings rate or share account rate offered to the public for accounts of like size by the depository institution holding the reserve account (2)Subsection (1) does not apply to: (a)a reserve account required by a governmental insurer or guarantor of the loan as a condition of insurance or guaranty; (b)a reserve account maintained in connection with a real estate loan in an original principal amount exceeding 80% of the lender's appraised value of the property at the time the loan is made, until the principal balance of the loan is paid down to 80% of the lender's appraised value at the time of the loan; or (c)payment of interest or other compensation to the borrower if this payment is prohibited by federal law or regulations (3)A lender may not require or impose a service charge for the administration of a reserve account | regular savings account rate | https://le utah gov/xcode/Title7/Chapter17/7-17-S3 html?v=C7-17-S3_1800010118000101 |
| Vermont | A lender shall pay into an escrow account for the benefit of the borrower interest on funds deposited into the account under the same conditions as the lender's regular savings account, if offered, and otherwise at a rate not less than the prevailing market rate of interest for regular savings accounts offered by local financial institutions, calculated on the basis of the average monthly balance in the account and credited on the first day of each quarter | regular savings account rate | https://legislature vermont gov/statutes/section/08/200/10404 |
| Wisconsin | Between 0 14% and 0 18% | 2014: 0 15% 2015: 0 15% 2016: 0 14% 2017: 0 14% 2018: 0 15% 2019: 0 18% | http://www wdfi org/_resources/indexed/site/fi/banks/HistoricalInterestRates pdf |

**Exhibit 6A**
**Counts of "Harmed" Loans**
**by Month of Alleged Analysis Due Date and Delinquency Status**

| Month of Alleged Analysis Due Date | Delinquent[1] | Performing[2] | Total |
|---|---|---|---|
| 01/01/14 | 25,510 | 2,794 | 28,304 |
| 02/01/14 | 80 | 1 | 81 |
| 03/01/14 | 4,091 | 1,570 | 5,661 |
| 04/01/14 | 9,133 | 427 | 9,560 |
| 05/01/14 | 3,922 | 516 | 4,438 |
| 06/01/14 | 121 | 1 | 122 |
| 07/01/14 | 4,362 | 802 | 5,164 |
| 08/01/14 | 2,445 | 313 | 2,758 |
| 09/01/14 | 944 | 84 | 1,028 |
| 10/01/14 | 3,710 | 1,564 | 5,274 |
| 11/01/14 | 5 | 2 | 7 |
| 12/01/14 | 907 | 10,449 | 11,356 |
| 01/01/15 | 4,742 | 138,593 | 143,335 |
| 02/01/15 | 215 | 3,565 | 3,780 |
| 03/01/15 | 1,306 | 46,154 | 47,460 |
| 04/01/15 | 4 | 317 | 321 |
| 05/01/15 | 69 | 356 | 425 |
| 07/01/15 | 92 | 307 | 399 |
| 08/01/15 | 141 | 161 | 302 |
| 09/01/15 | 0 | 3 | 3 |
| 10/01/15 | 117 | 152 | 269 |
| 11/01/15 | 27 | 53 | 80 |
| 12/01/15 | 205 | 422 | 627 |
| 01/01/16 | 27 | 99 | 126 |
| 02/01/16 | 0 | 2 | 2 |
| 03/01/16 | 13 | 54 | 67 |

CONFIDENTIAL
 - SUBJECT TO PROTECTIVE ORDER

**Exhibit 6A**
**Counts of "Harmed" Loans**
**by Month of Alleged Analysis Due Date and Delinquency Status**

| Month of Alleged Analysis Due Date | Delinquent[1] | Performing[2] | Total |
|---|---|---|---|
| 05/01/16 | 197 | 348 | 545 |
| 07/01/16 | 84 | 94 | 178 |
| 08/01/16 | 45 | 33 | 78 |
| 10/01/16 | 44 | 56 | 100 |
| 12/01/16 | 30 | 22 | 52 |
| 01/01/17 | 11 | 15 | 26 |
| 02/01/17 | 0 | 1 | 1 |
| 03/01/17 | 18 | 5 | 23 |
| 05/01/17 | 9 | 3 | 12 |
| 06/01/17 | 0 | 1 | 1 |
| 07/01/17 | 4 | 6 | 10 |
| 08/01/17 | 0 | 1 | 1 |
| 10/01/17 | 8 | 4 | 12 |
| 12/01/17 | 9 | 10 | 19 |
| **Total** | **62,647** | **209,360** | **272,007** |

Notes:

[1] I define delinquency as at least 60-days delinquent, as this was Ocwen's cutoff for causing an annual escrow analysis not to occur.  I evaluate delinquency status using the Transaction History data produced by Ocwen in response to RFP 22 of the Bureau's Fifth Set of Requests for Production. A delinquent loan in this analysis is a loan where the NEXTDUEDT corresponding to the first transaction with an EFFECTIVE_DATE after the Alleged Analysis Due Date is at least 60 days before the Alleged Analysis Due Date.

[2] "Performing" loans in this case include loans that were 30-60 days delinquent.

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 6B**
**Average Days of Alleged Escrow Analysis Delay and Foreclosure Rate by Payment Status**

| | Number of Loans[1] | Average Days of Delay | Foreclosed per McFadden | Mis-specified as Foreclosures per Exhibit 10A | | Corrected Foreclosures | Foreclosure Rate |
| | | | | Reinstated / Modified | Paid Off | | |
|---|---|---|---|---|---|---|---|
| Performing Loans | **209,360** | **37** | 4,484 | 1,174 | 165 | 3,145 | **1.5%** |
| Delinquent Loans | **62,647** | **161** | 27,706 | 6,243 | 437 | 21,026 | **33.6%** |
| Overall | **272,007** | **66** | 32,190 | 7,417 | 602 | 24,171 | **8.9%** |

Notes:
[1] See Exhibit 6A.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 7**
**Analysis of McFadden's Opportunity Cost Damages Calculation**
**For Loans with Allegedly Delayed Escrow Analyses**

| | Count | | McFadden 16% | | Hamm 3.25% Upper Bound | |
| --- | --- | --- | --- | --- | --- | --- |
| | Amount | Percent | Amount | Percent | Amount | Percent |
| All Loans | 93,223 | 100% | $1,420,930 | 100% | $353,413 | 100% |
| Less: | | | | | | |
| Loans with Shortages on Actual Analysis Date[1] | (58,323) | 63% | (1,210,609) | 85% | (308,086) | 87% |
| Loans with Escrow Interest[2] | (28,354) | 30% | | | | |
| Add Back Loans with Shortage, Already Deducted | 16,437 | -18% | | | | |
| Loans with Surplus and Escrow Interest | (11,917) | 13% | (76,056) | 5% | (16,307) | 5% |
| **Corrected** | **22,983** | 25% | **$134,265** | 9% | **$29,020** | 8% |

Notes:

[1] Identified with the field "is_lad_short" in Professor McFadden's output file. This total also reconciles to the two counts in Table 4 of the McFadden Report (56,321+2,002=58,323).

[2] I identify loans with escrow interest as the loans with Escrow Interest Postings in the Transaction History data produced in response to RFP #22 of the Bureau's Fifth Set of Requests for Production.

**Exhibit 8**
**Analysis of PMI Overcharge Opportunity Cost Damages**

|  | All Loans | Remediated in August 2014, Before Interest Credited by Ocwen[3] | Remaining Loans |
|---|---|---|---|
| **Count of Loans** | 6,293 | 2,075 | 4,218 |
| **McFadden Calculation at 16%:[1]** | | | |
| Sum of Undiscounted Cash Flows[2] - *i.e.*, Premiums Minus Credits | $196,004 | $66,004 | $130,000 |
| Sum of Discounted Cash Flows - *i.e.*, Damages | **$343,623** | **$92,081** | **$251,542** |
| **Hamm Upper Bound Calculation at 3.25%:[5]** | | | |
| Sum of Undiscounted Cash Flows[4] - *i.e.*, Premiums Minus Credits | $0 | $0 | $0 |
| Sum of Discounted Cash Flows - *i.e.*, Damages | **$31,349** | **$4,831** | **$26,518** |

Notes:

[1] Per *0.16PMI_dmg.csv*

[2] This is the sum of the pay_stream column.  Even with a 3.25% increase to the credit amount, Professor McFadden's premiums still exceed his credits.

[3] Loans with a credit date in August 2014 at OCW-CFPB-001-06730240.

[4] Premiums equal credits in my calculations.

[5] I utilize the same general methodology as Professor McFadden, but without his errors.  First, I limit my calculations to January 1, 2014 and later.  To do this, I first calculate the amount of time to which the PMI credit at OCW-CFPB-001-06730240 pertains by dividing the credit amount by the premium amount reported in the same data set.  Second, I subtract this period of time from the credit date.  If this period of time predates January 1, 2014, I limit the time period for damages to the period between January 1, 2014 and the credit date, and I adjust the amount of the credit proportionally.  Third, for each loan, I array the monthly premium payments, with the credit amount in the final period.  I then calculate the net present value of this cash flow stream, treating the first premium payment (i.e., the later of the first payment after the policy should have been cancelled or January 1, 2014) as period 0, just as Professor McFadden does, but using a discount rate of 3.25%.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 1 | | 1 | 7,508.35 | 2.2% | 1,843.65 | 2.2% |
| 2 | | 1 | 6,603.83 | 4.2% | 1,840.64 | 4.3% |
| 3 | | 1 | 5,583.40 | 5.8% | 1,370.98 | 5.9% |
| 4 | | 1 | 5,138.15 | 7.4% | 1,331.39 | 7.5% |
| 5 | | 1 | 4,276.08 | 8.6% | 1,108.01 | 8.8% |
| 6 | | 1 | 4,130.81 | 9.8% | 1,014.31 | 9.9% |
| 7 | | 1 | 4,104.43 | 11.1% | 980.85 | 11.1% |
| 8 | | 1 | 3,879.76 | 12.2% | 952.66 | 12.2% |
| 9 | | 1 | 3,524.73 | 13.3% | 913.32 | 13.3% |
| 10 | | 1 | 3,510.47 | 14.3% | 909.62 | 14.3% |
| 11 | | 1 | 3,397.11 | 15.3% | 880.25 | 15.4% |
| 12 | | 1 | 3,300.09 | 16.3% | 855.11 | 16.4% |
| 13 | | 1 | 3,289.45 | 17.3% | 858.07 | 17.4% |
| 14 | | 1 | 3,071.03 | 18.2% | 795.76 | 18.3% |
| 15 | | 1 | 2,970.21 | 19.0% | 769.64 | 19.2% |
| 16 | | 1 | 2,774.19 | 19.9% | 681.19 | 20.0% |
| 17 | | 1 | 2,769.72 | 20.7% | 717.68 | 20.8% |
| 18 | | 1 | 2,595.23 | 21.5% | 632.95 | 21.6% |
| 19 | | 1 | 2,545.35 | 22.2% | 625.00 | 22.3% |
| 20 | | 1 | 2,470.80 | 22.9% | 640.23 | 23.0% |
| 21 | | 1 | 2,435.05 | 23.7% | 630.97 | 23.8% |
| 22 | | 1 | 2,398.83 | 24.4% | 589.02 | 24.5% |
| 23 | | 1 | 2,388.32 | 25.1% | 586.44 | 25.1% |
| 24 | | 1 | 2,350.43 | 25.8% | 577.14 | 25.8% |
| 25 | | 1 | 2,251.96 | 26.4% | 552.96 | 26.5% |
| 26 | | 1 | 2,195.28 | 27.1% | 539.04 | 27.1% |
| 27 | | 1 | 2,189.78 | 27.7% | 537.69 | 27.7% |
| 28 | | 1 | 2,172.36 | 28.4% | 555.41 | 28.4% |
| 29 | | 1 | 2,140.88 | 29.0% | 554.74 | 29.0% |
| 30 | | 1 | 1,945.85 | 29.6% | 510.98 | 29.6% |
| 31 | | 1 | 1,929.07 | 30.2% | 473.68 | 30.2% |
| 32 | | 1 | 1,925.56 | 30.7% | 522.72 | 30.8% |
| 33 | | 1 | 1,856.71 | 31.3% | 455.91 | 31.3% |
| 34 | | 1 | 1,739.91 | 31.8% | 463.02 | 31.9% |
| 35 | | 1 | 1,734.87 | 32.3% | 449.54 | 32.4% |
| 36 | | 1 | 1,723.58 | 32.8% | 423.22 | 32.9% |
| 37 | | 1 | 1,719.40 | 33.3% | 422.19 | 33.4% |
| 38 | | 1 | 1,680.48 | 33.8% | 412.64 | 33.9% |
| 39 | | 1 | 1,663.84 | 34.3% | 431.13 | 34.4% |
| 40 | | 1 | 1,651.55 | 34.8% | 466.41 | 34.9% |
| 41 | | 1 | 1,610.26 | 35.3% | 417.25 | 35.4% |
| 42 | | 1 | 1,588.01 | 35.8% | 411.48 | 35.9% |
| 43 | | 1 | 1,547.77 | 36.2% | 401.06 | 36.3% |
| 44 | | 1 | 1,529.73 | 36.7% | 375.62 | 36.8% |
| 45 | | 1 | 1,464.77 | 37.1% | 359.67 | 37.2% |
| 46 | | 1 | 1,464.77 | 37.5% | 359.67 | 37.6% |
| 47 | | 1 | 1,461.90 | 38.0% | 378.80 | 38.1% |
| 48 | | 1 | 1,458.48 | 38.4% | 358 13 | 38.5% |
| 49 | | 1 | 1,442.86 | 38.8% | 354 29 | 38.9% |
| 50 | | 1 | 1,432.79 | 39.3% | 351.82 | 39.3% |
| 51 | | 1 | 1,369.36 | 39.7% | 336.24 | 39.7% |
| 52 | | 1 | 1,365.03 | 40.1% | 335.18 | 40.1% |
| 53 | | 1 | 1,359.65 | 40.5% | 352.31 | 40.5% |
| 54 | | 1 | 1,354.31 | 40.9% | 350.93 | 40.9% |
| 55 | | 1 | 1,349.79 | 41.3% | 331.44 | 41.3% |
| 56 | | 1 | 1,314.95 | 41.7% | 322.88 | 41.7% |
| 57 | | 1 | 1,299.97 | 42.1% | 319.20 | 42.0% |
| 58 | | 1 | 1,287.41 | 42.4% | 316.12 | 42.4% |
| 59 | | 1 | 1,283.33 | 42.8% | 348.38 | 42.8% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 60 | | 1 | 1,275.69 | 43.2% | 313.24 | 43.2% |
| 61 | | 1 | 1,273.69 | 43.6% | 330.04 | 43.6% |
| 62 | | 1 | 1,271.47 | 43.9% | 373.41 | 44.0% |
| 63 | | 1 | 1,270.48 | 44.3% | 329.21 | 44.4% |
| 64 | | 1 | 1,210.62 | 44.7% | 297.26 | 44.7% |
| 65 | | 1 | 1,202.89 | 45.0% | 295.36 | 45.1% |
| 66 | | 1 | 1,186.18 | 45.4% | 307.36 | 45.4% |
| 67 | | 1 | 1,172.78 | 45.7% | 303.89 | 45.8% |
| 68 | | 1 | 1,167.48 | 46.1% | 286.67 | 46.1% |
| 69 | | 1 | 1,155.36 | 46.4% | 299.37 | 46.5% |
| 70 | | 1 | 1,154.82 | 46.8% | 299.24 | 46.8% |
| 71 | | 1 | 1,152.05 | 47.1% | 294.55 | 47.2% |
| 72 | | 1 | 1,147.44 | 47.4% | 311.49 | 47.5% |
| 73 | | 1 | 1,131.60 | 47.8% | 277.86 | 47.9% |
| 74 | | 1 | 1,078.13 | 48.1% | 292.67 | 48.2% |
| 75 | | 1 | 1,077.80 | 48.4% | 264.65 | 48.5% |
| 76 | | 1 | 1,075.72 | 48.7% | 282.48 | 48.8% |
| 77 | | 1 | 1,075.54 | 49.1% | 278.69 | 49.2% |
| 78 | | 1 | 1,063.42 | 49.4% | 275.55 | 49.5% |
| 79 | | 1 | 1,053.09 | 49.7% | 258.58 | 49.8% |
| 80 | | 1 | 1,046.04 | 50.0% | 271.05 | 50.1% |
| 81 | | 2 | 1,040.87 | 50.3% | 255.58 | 50.4% |
| 82 | | 1 | 1,020.40 | 50.6% | 264.40 | 50.7% |
| 83 | | 1 | 1,014.42 | 50.9% | 232.68 | 51.0% |
| 84 | | 1 | 1,004.17 | 51.2% | 260.20 | 51.3% |
| 85 | | 1 | 1,000.37 | 51.5% | 289.99 | 51.6% |
| 86 | | 1 | 992.41 | 51.8% | 243.68 | 51.9% |
| 87 | | 1 | 974.90 | 52.1% | 239.38 | 52.2% |
| 88 | | 1 | 962.35 | 52.4% | 236.30 | 52.5% |
| 89 | | 1 | 961.94 | 52.7% | 249.26 | 52.8% |
| 90 | | 1 | 952.15 | 52.9% | 248.37 | 53.1% |
| 91 | | 1 | 951.53 | 53.2% | 233.65 | 53.3% |
| 92 | | 1 | 938.84 | 53.5% | 243.27 | 53.6% |
| 93 | | 1 | 930.36 | 53.8% | 269.70 | 53.9% |
| 94 | | 1 | 924.44 | 54.0% | 226.99 | 54.2% |
| 95 | | 1 | 922.49 | 54.3% | 239.03 | 54.5% |
| 96 | | 1 | 915.20 | 54.6% | 237.15 | 54.8% |
| 97 | | 2 | 913.97 | 54.9% | 227.48 | 55.0% |
| 98 | | 1 | 910.65 | 55.1% | 223.61 | 55.3% |
| 99 | | 1 | 901.53 | 55.4% | 221 37 | 55.5% |
| 100 | | 1 | 893.68 | 55.7% | 219.44 | 55.8% |
| 101 | | 1 | 893.16 | 55.9% | 231.43 | 56.1% |
| 102 | | 1 | 890.10 | 56.2% | 218 56 | 56.3% |
| 103 | | 1 | 889.13 | 56.5% | 230 39 | 56.6% |
| 104 | | 1 | 878.01 | 56.7% | 187 95 | 56.8% |
| 105 | | 1 | 861.59 | 57.0% | 211 56 | 57.1% |
| 106 | | 1 | 845.88 | 57.2% | 207.70 | 57.3% |
| 107 | | 1 | 840.03 | 57.5% | 206 27 | 57.5% |
| 108 | | 1 | 833.96 | 57.7% | 204.78 | 57.8% |
| 109 | | 1 | 833.94 | 58.0% | 213.21 | 58.0% |
| 110 | | 1 | 831.69 | 58.2% | 204.22 | 58.3% |
| 111 | | 1 | 822.12 | 58.5% | 201.87 | 58.5% |
| 112 | | 1 | 813.01 | 58.7% | 220.70 | 58.8% |
| 113 | | 1 | 812.98 | 58.9% | 199.62 | 59.0% |
| 114 | | 2 | 811.39 | 59.2% | 196.55 | 59.2% |
| 115 | | 1 | 809.92 | 59.4% | 198.87 | 59.5% |
| 116 | | 1 | 806.73 | 59.7% | 232.34 | 59.7% |
| 117 | | 1 | 798.84 | 59.9% | 196.15 | 60.0% |
| 118 | | 1 | 798.67 | 60.1% | 206.95 | 60 2% |

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 119 | | 1 | 790.20 | 60.4% | 194.03 | 60.4% |
| 120 | | 1 | 786.01 | 60.6% | 193.00 | 60.6% |
| 121 | | 1 | 783.54 | 60.8% | 204.39 | 60.9% |
| 122 | | 2 | 769.57 | 61.1% | 186.42 | 61.1% |
| 123 | | 1 | 757.30 | 61.3% | 185.95 | 61.3% |
| 124 | | 1 | 739.35 | 61.5% | 191.58 | 61.5% |
| 125 | | 1 | 733.81 | 61.7% | 180.18 | 61.8% |
| 126 | | 1 | 728.49 | 61.9% | 191.30 | 62.0% |
| 127 | | 1 | 724.28 | 62.1% | 192.74 | 62.2% |
| 128 | | 1 | 720.74 | 62.4% | 174.59 | 62.4% |
| 129 | | 1 | 714.64 | 62.6% | 185.17 | 62.6% |
| 130 | | 1 | 713.54 | 62.8% | 175.21 | 62.8% |
| 131 | | 1 | 711.28 | 63.0% | 174.65 | 63.0% |
| 132 | | 1 | 708.85 | 63.2% | 183.68 | 63.2% |
| 133 | | 1 | 696.87 | 63.4% | 171.11 | 63.4% |
| 134 | | 1 | 692.63 | 63.6% | 179.47 | 63.7% |
| 135 | | 1 | 690.24 | 63.8% | 169.49 | 63.9% |
| 136 | | 1 | 689.97 | 64.0% | 178.78 | 64.1% |
| 137 | | 1 | 686.48 | 64.2% | 196.42 | 64.3% |
| 138 | | 1 | 683.60 | 64.4% | 167.85 | 64.5% |
| 139 | | 1 | 682.80 | 64.6% | 176.93 | 64.7% |
| 140 | | 1 | 680.10 | 64.8% | 167.00 | 64.9% |
| 141 | | 1 | 680.10 | 65.0% | 167.00 | 65.1% |
| 142 | | 1 | 680.09 | 65.2% | 176.22 | 65.3% |
| 143 | | 1 | 670.78 | 65.4% | 164.71 | 65.5% |
| 144 | | 1 | 670.10 | 65.6% | 164.54 | 65.7% |
| 145 | | 1 | 669.72 | 65.8% | 164.45 | 65.9% |
| 146 | | 1 | 668.82 | 66.0% | 164.23 | 66.1% |
| 147 | | 1 | 668.33 | 66.2% | 173.18 | 66.3% |
| 148 | | 1 | 656.96 | 66.4% | 190.44 | 66.5% |
| 149 | | 1 | 652.29 | 66.6% | 177.08 | 66.7% |
| 150 | | 1 | 647.22 | 66.8% | 167.71 | 66.9% |
| 151 | | 1 | 646.48 | 67.0% | 156.61 | 67.1% |
| 152 | | 1 | 646.39 | 67.2% | 158.72 | 67.3% |
| 153 | | 1 | 642.44 | 67.4% | 157.75 | 67.4% |
| 154 | | 1 | 635.94 | 67.6% | 156.15 | 67.6% |
| 155 | | 1 | 634.33 | 67.8% | 155.76 | 67.8% |
| 156 | | 1 | 631.19 | 67.9% | 154.99 | 68.0% |
| 157 | | 1 | 630.41 | 68.1% | 154.80 | 68.2% |
| 158 | | 1 | 629.23 | 68.3% | 163.05 | 68.4% |
| 159 | | 1 | 623.84 | 68.5% | 153 18 | 68.5% |
| 160 | | 1 | 611.86 | 68.7% | 150 24 | 68.7% |
| 161 | | 1 | 610.61 | 68.9% | 149 93 | 68.9% |
| 162 | | 1 | 607.96 | 69.0% | 149 28 | 69.1% |
| 163 | | 1 | 606.90 | 69.2% | 149.02 | 69.2% |
| 164 | | 1 | 602.66 | 69.4% | 161.45 | 69.4% |
| 165 | | 1 | 595.70 | 69.6% | 146 27 | 69.6% |
| 166 | | 1 | 591.10 | 69.8% | 145 14 | 69.8% |
| 167 | | 1 | 590.53 | 69.9% | 160 31 | 70.0% |
| 168 | | 1 | 587.06 | 70.1% | 144.15 | 70.1% |
| 169 | | 1 | 579.69 | 70.3% | 142.34 | 70.3% |
| 170 | | 1 | 579.12 | 70.4% | 150.06 | 70.5% |
| 171 | | 1 | 574.94 | 70.6% | 148.98 | 70.6% |
| 172 | | 1 | 574.82 | 70.8% | 143.06 | 70.8% |
| 173 | | 1 | 570.05 | 71.0% | 139.97 | 71.0% |
| 174 | | 1 | 567.32 | 71.1% | 139.30 | 71.1% |
| 175 | | 1 | 557.12 | 71.3% | 136.80 | 71 3% |
| 176 | | 1 | 553.21 | 71.4% | 135.84 | 71.4% |
| 177 | | 1 | 550.50 | 71.6% | 160.62 | 71.6% |

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| | | | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| Count | Loan Number | dmg_ID | Amount | Cum. Percent | Amount | Cum. Percent |
| 178 | | 1 | 532.57 | 71.8% | 138.00 | 71.8% |
| 179 | | 1 | 526.19 | 71.9% | 136.35 | 72.0% |
| 180 | | 1 | 516.45 | 72.1% | 126.81 | 72.1% |
| 181 | | 1 | 515.88 | 72.2% | 132.78 | 72.3% |
| 182 | | 1 | 515.60 | 72.4% | 133.60 | 72.4% |
| 183 | | 1 | 513.94 | 72.5% | 133.17 | 72.6% |
| 184 | | 1 | 511.41 | 72.7% | 125.58 | 72.7% |
| 185 | | 1 | 507.61 | 72.8% | 138.71 | 72.9% |
| 186 | | 1 | 500.50 | 73.0% | 137.67 | 73.0% |
| 187 | | 1 | 497.89 | 73.1% | 122.26 | 73.2% |
| 188 | | 1 | 496.72 | 73.3% | 121.97 | 73.3% |
| 189 | | 1 | 496.12 | 73.4% | 121.82 | 73.5% |
| 190 | | 1 | 495.61 | 73.6% | 128.42 | 73.6% |
| 191 | | 1 | 494.57 | 73.7% | 136.94 | 73.8% |
| 192 | | 1 | 489.72 | 73.9% | 126.89 | 73.9% |
| 193 | | 1 | 482.70 | 74.0% | 141.76 | 74.1% |
| 194 | | 1 | 477.22 | 74.2% | 123.66 | 74.2% |
| 195 | | 1 | 476.64 | 74.3% | 117.04 | 74.4% |
| 196 | | 1 | 469.86 | 74.4% | 115.37 | 74.5% |
| 197 | | 1 | 469.76 | 74.6% | 127.52 | 74.7% |
| 198 | | 1 | 469.43 | 74.7% | 115.27 | 74.8% |
| 199 | | 1 | 468.32 | 74.8% | 114.99 | 74.9% |
| 200 | | 1 | 468.06 | 75.0% | 114.93 | 75.1% |
| 201 | | 1 | 468.04 | 75.1% | 120.47 | 75.2% |
| 202 | | 1 | 466.85 | 75.3% | 120.97 | 75.3% |
| 203 | | 1 | 463.37 | 75.4% | 120.07 | 75.5% |
| 204 | | 1 | 462.99 | 75.5% | 113.69 | 75.6% |
| 205 | | 1 | 458.97 | 75.7% | 112.70 | 75.7% |
| 206 | | 1 | 458.58 | 75.8% | 118.83 | 75.9% |
| 207 | | 1 | 454.25 | 75.9% | 111.54 | 76.0% |
| 208 | | 1 | 453.38 | 76.1% | 117.48 | 76.2% |
| 209 | | 1 | 452.65 | 76.2% | 128.67 | 76.3% |
| 210 | | 1 | 452.49 | 76.3% | 111.11 | 76.4% |
| 211 | | 1 | 451.57 | 76.5% | 110.88 | 76.6% |
| 212 | | 2 | 448.29 | 76.6% | 110.08 | 76.7% |
| 213 | | 1 | 446.18 | 76.7% | 109.56 | 76.8% |
| 214 | | 1 | 445.59 | 76.9% | 115.46 | 77.0% |
| 215 | | 2 | 445.31 | 77.0% | 109.35 | 77.1% |
| 216 | | 1 | 445.10 | 77.1% | 115.33 | 77.2% |
| 217 | | 1 | 444.70 | 77.3% | 109 20 | 77.3% |
| 218 | | 1 | 444.15 | 77.4% | 109.06 | 77.5% |
| 219 | | 1 | 443.32 | 77.5% | 108.85 | 77.6% |
| 220 | | 1 | 443.01 | 77.7% | 117.89 | 77.7% |
| 221 | | 1 | 427.97 | 77.8% | 105.09 | 77.9% |
| 222 | | 1 | 426.87 | 77.9% | 110.61 | 78.0% |
| 223 | | 1 | 424.57 | 78.0% | 104 25 | 78.1% |
| 224 | | 1 | 421.79 | 78.2% | 103 57 | 78.2% |
| 225 | | 1 | 420.58 | 78.3% | 103 27 | 78.4% |
| 226 | | 1 | 420.51 | 78.4% | 103 25 | 78.5% |
| 227 | | 1 | 418.92 | 78.5% | 108.55 | 78.6% |
| 228 | | 1 | 411.20 | 78.7% | 100.29 | 78.7% |
| 229 | | 1 | 410.76 | 78.8% | 106.44 | 78.8% |
| 230 | | 1 | 410.56 | 78.9% | 100.81 | 79.0% |
| 231 | | 1 | 408.09 | 79.0% | 100.20 | 79.1% |
| 232 | | 1 | 407.03 | 79.2% | 105.47 | 79.2% |
| 233 | | 1 | 403.88 | 79.3% | 99.17 | 79.3% |
| 234 | | 1 | 402.56 | 79.4% | 98.85 | 79.4% |
| 235 | | 1 | 402.13 | 79.5% | 98.74 | 79 5% |
| 236 | | 1 | 402.13 | 79.6% | 98.74 | 79.7% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 237 | | 1 | 401.23 | 79.7% | 103.27 | 79.8% |
| 238 | | 1 | 400.67 | 79.9% | 110.94 | 79.9% |
| 239 | | 1 | 399.32 | 80.0% | 98.05 | 80.0% |
| 240 | | 1 | 395.57 | 80.1% | 97.13 | 80.1% |
| 241 | | 1 | 390.74 | 80.2% | 101.25 | 80.3% |
| 242 | | 1 | 383.85 | 80.3% | 94.25 | 80.4% |
| 243 | | 1 | 382.87 | 80.4% | 99.21 | 80.5% |
| 244 | | 1 | 382.42 | 80.6% | 99.09 | 80.6% |
| 245 | | 1 | 376.84 | 80.7% | 97.65 | 80.7% |
| 246 | | 1 | 376.45 | 80.8% | 92.44 | 80.8% |
| 247 | | 1 | 374.46 | 80.9% | 97.03 | 80.9% |
| 248 | | 1 | 372.69 | 81.0% | 91.51 | 81.0% |
| 249 | | 1 | 366.90 | 81.1% | 90.09 | 81.1% |
| 250 | | 1 | 365.27 | 81.2% | 94.65 | 81.3% |
| 251 | | 1 | 364.31 | 81.3% | 88.85 | 81.4% |
| 252 | | 1 | 363.98 | 81.4% | 94.31 | 81.5% |
| 253 | | 2 | 362.73 | 81.5% | 94.62 | 81.6% |
| 254 | | 1 | 359.93 | 81.6% | 88.38 | 81.7% |
| 255 | | 1 | 355.68 | 81.8% | 87.34 | 81.8% |
| 256 | | 1 | 355.16 | 81.9% | 87.21 | 81.9% |
| 257 | | 1 | 351.41 | 82.0% | 91.06 | 82.0% |
| 258 | | 1 | 349.24 | 82.1% | 90.49 | 82.1% |
| 259 | | 1 | 346.48 | 82.2% | 99.14 | 82.2% |
| 260 | | 1 | 345.49 | 82.3% | 88.92 | 82.3% |
| 261 | | 1 | 343.71 | 82.4% | 82.14 | 82.4% |
| 262 | | 1 | 340.97 | 82.5% | 88.35 | 82.5% |
| 263 | | 1 | 340.76 | 82.6% | 83.67 | 82.6% |
| 264 | | 1 | 340.25 | 82.7% | 88.17 | 82.7% |
| 265 | | 1 | 339.22 | 82.8% | 86.15 | 82.8% |
| 266 | | 1 | 339.09 | 82.9% | 83.26 | 82.9% |
| 267 | | 1 | 334.72 | 83.0% | 86.15 | 83.0% |
| 268 | | 2 | 332.77 | 83.1% | 81.71 | 83.1% |
| 269 | | 1 | 332.02 | 83.2% | 86.03 | 83.2% |
| 270 | | 1 | 329.49 | 83.3% | 80.91 | 83.3% |
| 271 | | 1 | 325.98 | 83.4% | 80.04 | 83.4% |
| 272 | | 1 | 325.46 | 83.5% | 84.33 | 83.5% |
| 273 | | 1 | 324.15 | 83.6% | 89.17 | 83.6% |
| 274 | | 1 | 322.79 | 83.7% | 94.80 | 83.7% |
| 275 | | 1 | 321.53 | 83.8% | 83.32 | 83.8% |
| 276 | | 1 | 319.96 | 83.8% | 82.91 | 83.9% |
| 277 | | 1 | 317.79 | 83.9% | 82.35 | 84.0% |
| 278 | | 1 | 316.52 | 84.0% | 77.72 | 84.1% |
| 279 | | 1 | 314.38 | 84.1% | 81.46 | 84.2% |
| 280 | | 1 | 313.68 | 84.2% | 74.96 | 84.3% |
| 281 | | 1 | 313.62 | 84.3% | 90.91 | 84.4% |
| 282 | | 1 | 312.53 | 84.4% | 76.74 | 84.5% |
| 283 | | 1 | 311.72 | 84.5% | 76.54 | 84.6% |
| 284 | | 1 | 311.63 | 84.6% | 76.52 | 84.7% |
| 285 | | 1 | 311.27 | 84.7% | 76.43 | 84.7% |
| 286 | | 1 | 309.63 | 84.8% | 76.03 | 84.8% |
| 287 | | 1 | 309.02 | 84.9% | 80.07 | 84.9% |
| 288 | | 1 | 308.37 | 85.0% | 85.39 | 85.0% |
| 289 | | 1 | 304.52 | 85.0% | 78.91 | 85.1% |
| 290 | | 1 | 304.08 | 85.1% | 74.67 | 85.2% |
| 291 | | 1 | 303.75 | 85.2% | 79.77 | 85.3% |
| 292 | | 1 | 301.75 | 85.3% | 78.19 | 85.4% |
| 293 | | 1 | 301.27 | 85.4% | 73.98 | 85.5% |
| 294 | | 1 | 299.39 | 85.5% | 73.51 | 85.6% |
| 295 | | 1 | 298.90 | 85.6% | 77.45 | 85.7% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 296 | | 1 | 295.73 | 85.7% | 72.62 | 85.7% |
| 297 | | 1 | 294.55 | 85.8% | 72.33 | 85.8% |
| 298 | | 1 | 293.95 | 85.8% | 79.27 | 85.9% |
| 299 | | 1 | 293.77 | 85.9% | 72.14 | 86.0% |
| 300 | | 1 | 287.92 | 86.0% | 70.70 | 86.1% |
| 301 | | 1 | 286.37 | 86.1% | 69.84 | 86.2% |
| 302 | | 1 | 285.14 | 86.2% | 70.02 | 86.2% |
| 303 | | 1 | 285.07 | 86.3% | 77.90 | 86.3% |
| 304 | | 1 | 280.75 | 86.4% | 72.75 | 86.4% |
| 305 | | 1 | 278.66 | 86.4% | 68.42 | 86.5% |
| 306 | | 1 | 276.02 | 86.5% | 67.78 | 86.6% |
| 307 | | 1 | 273.54 | 86.6% | 67.17 | 86.7% |
| 308 | | 1 | 270.46 | 86.7% | 70.55 | 86.7% |
| 309 | | 1 | 268.38 | 86.8% | 65.90 | 86.8% |
| 310 | | 1 | 266.82 | 86.8% | 65.52 | 86.9% |
| 311 | | 1 | 263.63 | 86.9% | 68.31 | 87.0% |
| 312 | | 1 | 262.46 | 87.0% | 65.32 | 87.1% |
| 313 | | 1 | 262.10 | 87.1% | 64.36 | 87.1% |
| 314 | | 1 | 261.63 | 87.1% | 61.68 | 87.2% |
| 315 | | 1 | 260.31 | 87.2% | 66.55 | 87.3% |
| 316 | | 1 | 259.26 | 87.3% | 72.26 | 87.4% |
| 317 | | 1 | 258.48 | 87.4% | 63.47 | 87.4% |
| 318 | | 1 | 257.93 | 87.5% | 66.84 | 87.5% |
| 319 | | 1 | 257.91 | 87.5% | 66.38 | 87.6% |
| 320 | | 1 | 256.06 | 87.6% | 62.87 | 87.7% |
| 321 | | 1 | 253.71 | 87.7% | 65.74 | 87.7% |
| 322 | | 1 | 252.67 | 87.8% | 62.04 | 87.8% |
| 323 | | 1 | 248.45 | 87.8% | 64.38 | 87.9% |
| 324 | | 1 | 248.34 | 87.9% | 64.35 | 88.0% |
| 325 | | 1 | 248.29 | 88.0% | 64.34 | 88.0% |
| 326 | | 1 | 244.72 | 88.1% | 63.41 | 88.1% |
| 327 | | 1 | 242.36 | 88.1% | 59.51 | 88.2% |
| 328 | | 1 | 241.77 | 88.2% | 59.37 | 88.3% |
| 329 | | 1 | 237.62 | 88.3% | 58.35 | 88.3% |
| 330 | | 1 | 236.71 | 88.3% | 64.68 | 88.4% |
| 331 | | 1 | 232.21 | 88.4% | 60.98 | 88.5% |
| 332 | | 1 | 231.07 | 88.5% | 56.74 | 88.5% |
| 333 | | 1 | 228.53 | 88.5% | 56.11 | 88.6% |
| 334 | | 1 | 227.69 | 88.6% | 59.00 | 88.7% |
| 335 | | 1 | 227.02 | 88.7% | 58.82 | 88.7% |
| 336 | | 1 | 226.09 | 88.7% | 61 37 | 88.8% |
| 337 | | 1 | 225.96 | 88.8% | 58 55 | 88.9% |
| 338 | | 1 | 224.68 | 88.9% | 58 22 | 88.9% |
| 339 | | 1 | 221.88 | 88.9% | 57.49 | 89.0% |
| 340 | | 1 | 221.47 | 89.0% | 57 39 | 89.1% |
| 341 | | 1 | 220.73 | 89.1% | 59 53 | 89.1% |
| 342 | | 1 | 220.17 | 89.1% | 54.06 | 89.2% |
| 343 | | 1 | 219.27 | 89.2% | 53.84 | 89.3% |
| 344 | | 1 | 217.94 | 89.3% | 60 35 | 89.3% |
| 345 | | 1 | 217.84 | 89.3% | 53.49 | 89.4% |
| 346 | | 1 | 216.17 | 89.4% | 53.08 | 89.5% |
| 347 | | 1 | 215.68 | 89.5% | 52.96 | 89.5% |
| 348 | | 1 | 213.27 | 89.5% | 55.26 | 89.6% |
| 349 | | 1 | 211.83 | 89.6% | 55.26 | 89.7% |
| 350 | | 1 | 211.10 | 89.6% | 55.44 | 89.7% |
| 351 | | 1 | 210.43 | 89.7% | 54.53 | 89.8% |
| 352 | | 1 | 210.29 | 89.8% | 54.49 | 89 9% |
| 353 | | 1 | 208.40 | 89.8% | 54.00 | 89 9% |
| 354 | | 1 | 208.36 | 89.9% | 54.71 | 90.0% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 355 | | 2 | 208.22 | 90.0% | 51.13 | 90.0% |
| 356 | | 1 | 206.83 | 90.0% | 53.59 | 90.1% |
| 357 | | 1 | 205.21 | 90.1% | 50.73 | 90.2% |
| 358 | | 1 | 204.28 | 90.1% | 50.16 | 90.2% |
| 359 | | 1 | 203.74 | 90.2% | 50.03 | 90.3% |
| 360 | | 1 | 201.75 | 90.3% | 52.28 | 90.3% |
| 361 | | 1 | 201.63 | 90.3% | 52.25 | 90.4% |
| 362 | | 1 | 199.60 | 90.4% | 49.01 | 90.5% |
| 363 | | 1 | 199.50 | 90.4% | 51.01 | 90.5% |
| 364 | | 1 | 199.00 | 90.5% | 47.56 | 90.6% |
| 365 | | 1 | 196.68 | 90.6% | 50.96 | 90.6% |
| 366 | | 1 | 195.94 | 90.6% | 48.44 | 90.7% |
| 367 | | 1 | 193.50 | 90.7% | 47.51 | 90.7% |
| 368 | | 1 | 193.33 | 90.7% | 50.10 | 90.8% |
| 369 | | 1 | 190.38 | 90.8% | 46.75 | 90.9% |
| 370 | | 1 | 190.32 | 90.8% | 50.98 | 90.9% |
| 371 | | 1 | 188.32 | 90.9% | 45.62 | 91.0% |
| 372 | | 1 | 187.54 | 91.0% | 46.05 | 91.0% |
| 373 | | 1 | 187.27 | 91.0% | 51.85 | 91.1% |
| 374 | | 1 | 187.03 | 91.1% | 45.93 | 91.1% |
| 375 | | 1 | 185.11 | 91.1% | 45.45 | 91.2% |
| 376 | | 1 | 183.99 | 91.2% | 45.18 | 91.2% |
| 377 | | 1 | 183.96 | 91.2% | 47.67 | 91.3% |
| 378 | | 1 | 183.63 | 91.3% | 45.09 | 91.4% |
| 379 | | 1 | 182.87 | 91.3% | 44.90 | 91.4% |
| 380 | | 2 | 182.82 | 91.4% | 44.89 | 91.5% |
| 381 | | 1 | 181.39 | 91.4% | 44.54 | 91.5% |
| 382 | | 1 | 181.34 | 91.5% | 44.53 | 91.6% |
| 383 | | 1 | 178.53 | 91.6% | 46.26 | 91.6% |
| 384 | | 1 | 177.03 | 91.6% | 45.26 | 91.7% |
| 385 | | 1 | 175.31 | 91.7% | 35.99 | 91.7% |
| 386 | | 2 | 175.09 | 91.7% | 42.70 | 91.8% |
| 387 | | 1 | 173.75 | 91.8% | 45.02 | 91.8% |
| 388 | | 1 | 172.26 | 91.8% | 46.76 | 91.9% |
| 389 | | 1 | 171.97 | 91.9% | 45.16 | 91.9% |
| 390 | | 1 | 170.69 | 91.9% | 44.23 | 92.0% |
| 391 | | 1 | 170.63 | 92.0% | 44.21 | 92.0% |
| 392 | | 1 | 169.71 | 92.0% | 41.67 | 92.1% |
| 393 | | 1 | 166.09 | 92.1% | 42.18 | 92.1% |
| 394 | | 1 | 165.92 | 92.1% | 36.52 | 92.2% |
| 395 | | 1 | 165.87 | 92.2% | 40.73 | 92.2% |
| 396 | | 1 | 165.71 | 92.2% | 40.41 | 92.3% |
| 397 | | 1 | 165.63 | 92.3% | 42 92 | 92.3% |
| 398 | | 1 | 164.73 | 92.3% | 40.45 | 92.4% |
| 399 | | 1 | 163.58 | 92.4% | 42.67 | 92.4% |
| 400 | | 1 | 163.48 | 92.4% | 40 14 | 92.5% |
| 401 | | 1 | 162.87 | 92.5% | 39 99 | 92.5% |
| 402 | | 1 | 162.51 | 92.5% | 45 29 | 92.6% |
| 403 | | 1 | 161.18 | 92.5% | 41.76 | 92.6% |
| 404 | | 1 | 160.23 | 92.6% | 39 34 | 92.6% |
| 405 | | 1 | 159.33 | 92.6% | 40.74 | 92.7% |
| 406 | | 1 | 158.92 | 92.7% | 39.02 | 92.7% |
| 407 | | 1 | 158.72 | 92.7% | 41.40 | 92.8% |
| 408 | | 1 | 158.02 | 92.8% | 38.80 | 92.8% |
| 409 | | 1 | 157.89 | 92.8% | 38.77 | 92.9% |
| 410 | | 1 | 156.07 | 92.9% | 40.17 | 92.9% |
| 411 | | 1 | 155.76 | 92.9% | 38.25 | 93.0% |
| 412 | | 1 | 155.69 | 93.0% | 38.23 | 93.0% |
| 413 | | 1 | 155.51 | 93.0% | 44.21 | 93 1% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| | | | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| Count | Loan Number | dmg_ID | Amount | Cum. Percent | Amount | Cum. Percent |
| 414 | | 1 | 154.61 | 93.1% | 40.06 | 93.1% |
| 415 | | 1 | 153.39 | 93.1% | 37.67 | 93.2% |
| 416 | | 1 | 152.62 | 93.2% | 37.48 | 93.2% |
| 417 | | 1 | 152.12 | 93.2% | 39.42 | 93.2% |
| 418 | | 1 | 151.70 | 93.2% | 41.18 | 93.3% |
| 419 | | 1 | 151.56 | 93.3% | 37.21 | 93.3% |
| 420 | | 2 | 151.04 | 93.3% | 39.40 | 93.4% |
| 421 | | 1 | 150.36 | 93.4% | 36.92 | 93.4% |
| 422 | | 1 | 149.81 | 93.4% | 36.78 | 93.5% |
| 423 | | 1 | 149.66 | 93.5% | 36.75 | 93.5% |
| 424 | | 1 | 148.87 | 93.5% | 38.57 | 93.6% |
| 425 | | 1 | 148.40 | 93.6% | 43.02 | 93.6% |
| 426 | | 1 | 147.95 | 93.6% | 36.33 | 93.7% |
| 427 | | 1 | 147.65 | 93.6% | 40.88 | 93.7% |
| 428 | | 1 | 146.30 | 93.7% | 31.32 | 93.7% |
| 429 | | 1 | 145.33 | 93.7% | 35.69 | 93.8% |
| 430 | | 1 | 144.96 | 93.8% | 40.14 | 93.8% |
| 431 | | 1 | 144.82 | 93.8% | 37.53 | 93.9% |
| 432 | | 2 | 144.63 | 93.9% | 34.80 | 93.9% |
| 433 | | 1 | 142.63 | 93.9% | 36.96 | 94.0% |
| 434 | | 1 | 142.24 | 93.9% | 36.86 | 94.0% |
| 435 | | 2 | 141.59 | 94.0% | 34.30 | 94.0% |
| 436 | | 1 | 140.44 | 94.0% | 36.39 | 94.1% |
| 437 | | 1 | 137.55 | 94.1% | 36.36 | 94.1% |
| 438 | | 1 | 136.52 | 94.1% | 33.52 | 94.2% |
| 439 | | 1 | 136.04 | 94.1% | 35.25 | 94.2% |
| 440 | | 1 | 135.55 | 94.2% | 35.60 | 94.2% |
| 441 | | 1 | 135.23 | 94.2% | 35.04 | 94.3% |
| 442 | | 1 | 134.95 | 94.3% | 33.14 | 94.3% |
| 443 | | 1 | 134.00 | 94.3% | 34.72 | 94.4% |
| 444 | | 1 | 133.99 | 94.3% | 32.90 | 94.4% |
| 445 | | 1 | 133.60 | 94.4% | 34.85 | 94.4% |
| 446 | | 1 | 130.50 | 94.4% | 32.04 | 94.5% |
| 447 | | 1 | 130.47 | 94.5% | 37.82 | 94.5% |
| 448 | | 1 | 130.39 | 94.5% | 35.40 | 94.6% |
| 449 | | 1 | 130.38 | 94.5% | 36.34 | 94.6% |
| 450 | | 1 | 129.54 | 94.6% | 35.17 | 94.6% |
| 451 | | 1 | 129.18 | 94.6% | 37.45 | 94.7% |
| 452 | | 1 | 125.82 | 94.7% | 32.60 | 94.7% |
| 453 | | 1 | 125.39 | 94.7% | 30.79 | 94.8% |
| 454 | | 1 | 125.06 | 94.7% | 30.71 | 94.8% |
| 455 | | 1 | 124.41 | 94.8% | 30 55 | 94.8% |
| 456 | | 1 | 122.59 | 94.8% | 30 10 | 94.9% |
| 457 | | 1 | 121.03 | 94.8% | 25.73 | 94.9% |
| 458 | | 1 | 120.95 | 94.9% | 31 34 | 94.9% |
| 459 | | 1 | 120.13 | 94.9% | 31 13 | 95.0% |
| 460 | | 1 | 119.91 | 94.9% | 31.07 | 95.0% |
| 461 | | 1 | 119.72 | 95.0% | 27.84 | 95.0% |
| 462 | | 1 | 119.61 | 95.0% | 35 13 | 95.1% |
| 463 | | 1 | 117.96 | 95.0% | 28 96 | 95.1% |
| 464 | | 1 | 116.80 | 95.1% | 30.06 | 95.2% |
| 465 | | 2 | 116.40 | 95.1% | 28.58 | 95.2% |
| 466 | | 1 | 115.84 | 95.2% | 31.24 | 95.2% |
| 467 | | 1 | 114.03 | 95.2% | 25.45 | 95.3% |
| 468 | | 1 | 113.70 | 95.2% | 29.46 | 95.3% |
| 469 | | 2 | 113.47 | 95.3% | 27.86 | 95.3% |
| 470 | | 1 | 110.85 | 95.3% | 28.72 | 95.4% |
| 471 | | 1 | 110.51 | 95.3% | 28.63 | 95.4% |
| 472 | | 1 | 110.44 | 95.4% | 27.12 | 95.4% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 473 | | 1 | 109.36 | 95.4% | 28.34 | 95.5% |
| 474 | | 1 | 109.15 | 95.4% | 26.44 | 95.5% |
| 475 | | 2 | 108.84 | 95.4% | 26.73 | 95.5% |
| 476 | | 1 | 108.17 | 95.5% | 26.56 | 95.5% |
| 477 | | 1 | 107.43 | 95.5% | 26.38 | 95.6% |
| 478 | | 2 | 106.53 | 95.5% | 25.98 | 95.6% |
| 479 | | 1 | 106.35 | 95.6% | 26.29 | 95.6% |
| 480 | | 2 | 105.67 | 95.6% | 25.95 | 95.7% |
| 481 | | 1 | 105.09 | 95.6% | 25.80 | 95.7% |
| 482 | | 1 | 104.69 | 95.7% | 25.71 | 95.7% |
| 483 | | 1 | 103.95 | 95.7% | 27.12 | 95.8% |
| 484 | | 1 | 103.50 | 95.7% | 25.41 | 95.8% |
| 485 | | 1 | 103.45 | 95.8% | 26.80 | 95.8% |
| 486 | | 1 | 102.79 | 95.8% | 26.46 | 95.9% |
| 487 | | 2 | 101.75 | 95.8% | 24.99 | 95.9% |
| 488 | | 1 | 101.62 | 95.9% | 24.95 | 95.9% |
| 489 | | 1 | 100.60 | 95.9% | 24.70 | 95.9% |
| 490 | | 1 | 99.79 | 95.9% | 27.09 | 96.0% |
| 491 | | 1 | 99.72 | 95.9% | 25.84 | 96.0% |
| 492 | | 1 | 99.64 | 96.0% | 25.82 | 96.0% |
| 493 | | 1 | 98.90 | 96.0% | 24.28 | 96.1% |
| 494 | | 1 | 98.33 | 96.0% | 24.14 | 96.1% |
| 495 | | 1 | 97.88 | 96.1% | 24.03 | 96.1% |
| 496 | | 1 | 97.07 | 96.1% | 25.15 | 96.1% |
| 497 | | 1 | 96.73 | 96.1% | 23.75 | 96.2% |
| 498 | | 1 | 96.22 | 96.1% | 24.93 | 96.2% |
| 499 | | 1 | 95.12 | 96.2% | 23.36 | 96.2% |
| 500 | | 1 | 94.97 | 96.2% | 23.32 | 96.3% |
| 501 | | 1 | 94.58 | 96.2% | 19.83 | 96.3% |
| 502 | | 1 | 94.03 | 96.3% | 23.09 | 96.3% |
| 503 | | 2 | 93.05 | 96.3% | 22.85 | 96.3% |
| 504 | | 1 | 89.85 | 96.3% | 22.06 | 96.4% |
| 505 | | 1 | 89.29 | 96.3% | 21.78 | 96.4% |
| 506 | | 2 | 89.18 | 96.4% | 21.90 | 96.4% |
| 507 | | 1 | 87.92 | 96.4% | 21.44 | 96.4% |
| 508 | | 1 | 87.76 | 96.4% | 22.59 | 96.5% |
| 509 | | 1 | 87.56 | 96.4% | 21.50 | 96.5% |
| 510 | | 1 | 87.53 | 96.5% | 21.49 | 96.5% |
| 511 | | 1 | 87.45 | 96.5% | 22.66 | 96.5% |
| 512 | | 1 | 86.18 | 96.5% | 21.16 | 96.6% |
| 513 | | 1 | 85.72 | 96.5% | 22 21 | 96.6% |
| 514 | | 1 | 84.78 | 96.6% | 23 32 | 96.6% |
| 515 | | 1 | 84.59 | 96.6% | 20.77 | 96.6% |
| 516 | | 1 | 84.30 | 96.6% | 20.70 | 96.7% |
| 517 | | 1 | 84.04 | 96.6% | 20.78 | 96.7% |
| 518 | | 1 | 83.67 | 96.7% | 20 55 | 96.7% |
| 519 | | 1 | 82.83 | 96.7% | 21.46 | 96.7% |
| 520 | | 1 | 82.72 | 96.7% | 21.43 | 96.8% |
| 521 | | 1 | 80.80 | 96.7% | 21.08 | 96.8% |
| 522 | | 1 | 79.96 | 96.8% | 20.44 | 96.8% |
| 523 | | 1 | 78.47 | 96.8% | 19 27 | 96.8% |
| 524 | | 1 | 78.46 | 96.8% | 19.26 | 96.9% |
| 525 | | 2 | 77.82 | 96.8% | 19.50 | 96.9% |
| 526 | | 2 | 76.91 | 96.9% | 18.88 | 96.9% |
| 527 | | 1 | 76.83 | 96.9% | 18.86 | 96.9% |
| 528 | | 1 | 76.09 | 96.9% | 18.68 | 96.9% |
| 529 | | 1 | 75.96 | 96.9% | 19.68 | 97.0% |
| 530 | | 1 | 75.62 | 96.9% | 18.57 | 97.0% |
| 531 | | 1 | 73.70 | 97.0% | 18.10 | 97.0% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 532 | | 1 | 73.29 | 97.0% | 17.87 | 97.0% |
| 533 | | 1 | 73.03 | 97.0% | 17.93 | 97.1% |
| 534 | | 1 | 72.89 | 97.0% | 18.64 | 97.1% |
| 535 | | 1 | 72.58 | 97.1% | 17.82 | 97.1% |
| 536 | | 1 | 71.77 | 97.1% | 17.62 | 97.1% |
| 537 | | 1 | 70.87 | 97.1% | 18.24 | 97.1% |
| 538 | | 1 | 70.57 | 97.1% | 17.33 | 97.2% |
| 539 | | 1 | 69.82 | 97.1% | 18.33 | 97.2% |
| 540 | | 1 | 69.14 | 97.2% | 16.64 | 97.2% |
| 541 | | 1 | 69.00 | 97.2% | 16.94 | 97.2% |
| 542 | | 1 | 68.71 | 97.2% | 16.87 | 97.2% |
| 543 | | 1 | 68.54 | 97.2% | 20.13 | 97.3% |
| 544 | | 1 | 67.84 | 97.2% | 17.58 | 97.3% |
| 545 | | 1 | 67.38 | 97.3% | 16.43 | 97.3% |
| 546 | | 1 | 66.67 | 97.3% | 16.15 | 97.3% |
| 547 | | 1 | 65.37 | 97.3% | 17.17 | 97.3% |
| 548 | | 1 | 65.34 | 97.3% | 16.05 | 97.4% |
| 549 | | 1 | 65.25 | 97.3% | 16.79 | 97.4% |
| 550 | | 1 | 64.42 | 97.4% | 17.37 | 97.4% |
| 551 | | 1 | 64.00 | 97.4% | 15.71 | 97.4% |
| 552 | | 1 | 61.99 | 97.4% | 15.22 | 97.4% |
| 553 | | 1 | 60.17 | 97.4% | 17.22 | 97.5% |
| 554 | | 1 | 59.87 | 97.4% | 15.51 | 97.5% |
| 555 | | 1 | 59.58 | 97.4% | 12.67 | 97.5% |
| 556 | | 1 | 59.39 | 97.5% | 14.48 | 97.5% |
| 557 | | 1 | 58.65 | 97.5% | 15.20 | 97.5% |
| 558 | | 1 | 58.12 | 97.5% | 14.86 | 97.5% |
| 559 | | 1 | 57.86 | 97.5% | 16.45 | 97.6% |
| 560 | | 1 | 57.84 | 97.5% | 16.88 | 97.6% |
| 561 | | 1 | 57.60 | 97.6% | 15.13 | 97.6% |
| 562 | | 1 | 57.25 | 97.6% | 15.03 | 97.6% |
| 563 | | 1 | 56.94 | 97.6% | 14.75 | 97.6% |
| 564 | | 1 | 56.18 | 97.6% | 15.45 | 97.6% |
| 565 | | 1 | 56.14 | 97.6% | 13.79 | 97.7% |
| 566 | | 1 | 55.67 | 97.6% | 14.52 | 97.7% |
| 567 | | 1 | 55.67 | 97.7% | 15.42 | 97.7% |
| 568 | | 1 | 55.43 | 97.7% | 13.61 | 97.7% |
| 569 | | 1 | 55.19 | 97.7% | 14.30 | 97.7% |
| 570 | | 1 | 54.96 | 97.7% | 15.73 | 97.8% |
| 571 | | 1 | 54.67 | 97.7% | 13.42 | 97.8% |
| 572 | | 1 | 54.54 | 97.7% | 14.90 | 97.8% |
| 573 | | 1 | 53.87 | 97.7% | 13.23 | 97.8% |
| 574 | | 1 | 53.00 | 97.8% | 13.01 | 97.8% |
| 575 | | 1 | 52.69 | 97.8% | 12.94 | 97.8% |
| 576 | | 1 | 52.62 | 97.8% | 13.63 | 97.8% |
| 577 | | 1 | 52.51 | 97.8% | 12.89 | 97.9% |
| 578 | | 1 | 52.04 | 97.8% | 13.48 | 97.9% |
| 579 | | 1 | 51.17 | 97.8% | 13.26 | 97.9% |
| 580 | | 1 | 50.80 | 97.9% | 11.57 | 97.9% |
| 581 | | 1 | 50.50 | 97.9% | 12.40 | 97.9% |
| 582 | | 1 | 49.87 | 97.9% | 12.08 | 97.9% |
| 583 | | 1 | 49.84 | 97.9% | 12.24 | 97.9% |
| 584 | | 1 | 49.20 | 97.9% | 13.36 | 98.0% |
| 585 | | 1 | 49.10 | 97.9% | 11.97 | 98.0% |
| 586 | | 1 | 49.03 | 97.9% | 11.64 | 98.0% |
| 587 | | 1 | 48.78 | 98.0% | 11.98 | 98.0% |
| 588 | | 1 | 48.05 | 98.0% | 11.80 | 98.0% |
| 589 | | 1 | 47.69 | 98.0% | 11.63 | 98.0% |
| 590 | | 1 | 47.36 | 98.0% | 10.42 | 98.0% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 591 | | 1 | 47.29 | 98.0% | 11.61 | 98.1% |
| 592 | | 1 | 47.07 | 98.0% | 12.03 | 98.1% |
| 593 | | 1 | 46.98 | 98.0% | 10.41 | 98.1% |
| 594 | | 1 | 46.28 | 98.1% | 11.91 | 98.1% |
| 595 | | 1 | 44.92 | 98.1% | 11.64 | 98.1% |
| 596 | | 1 | 44.33 | 98.1% | 11.87 | 98.1% |
| 597 | | 1 | 44.13 | 98.1% | 10.84 | 98.1% |
| 598 | | 1 | 43.48 | 98.1% | 10.68 | 98.2% |
| 599 | | 1 | 43.22 | 98.1% | 10.61 | 98.2% |
| 600 | | 1 | 42.69 | 98.1% | 11.21 | 98.2% |
| 601 | | 1 | 42.19 | 98.1% | 11.01 | 98.2% |
| 602 | | 1 | 42.11 | 98.2% | 10.34 | 98.2% |
| 603 | | 1 | 42.11 | 98.2% | 10.34 | 98.2% |
| 604 | | 1 | 41.69 | 98.2% | 10.10 | 98.2% |
| 605 | | 1 | 41.55 | 98.2% | 10.70 | 98.2% |
| 606 | | 1 | 41.50 | 98.2% | 10.19 | 98.2% |
| 607 | | 2 | 41.22 | 98.2% | 10.05 | 98.3% |
| 608 | | 1 | 41.15 | 98.2% | 10.10 | 98.3% |
| 609 | | 1 | 40.98 | 98.2% | 10.06 | 98.3% |
| 610 | | 1 | 40.18 | 98.3% | 9.47 | 98.3% |
| 611 | | 1 | 40.16 | 98.3% | 9.80 | 98.3% |
| 612 | | 1 | 39.94 | 98.3% | 10.77 | 98.3% |
| 613 | | 1 | 39.72 | 98.3% | 10.22 | 98.3% |
| 614 | | 1 | 39.58 | 98.3% | 10.12 | 98.3% |
| 615 | | 1 | 39.02 | 98.3% | 9.98 | 98.4% |
| 616 | | 1 | 38.94 | 98.3% | 9.50 | 98.4% |
| 617 | | 1 | 38.76 | 98.3% | 9.78 | 98.4% |
| 618 | | 2 | 38.51 | 98.4% | 9.46 | 98.4% |
| 619 | | 2 | 37.78 | 98.4% | 9.22 | 98.4% |
| 620 | | 1 | 37.67 | 98.4% | 7.95 | 98.4% |
| 621 | | 1 | 37.58 | 98.4% | 7.71 | 98.4% |
| 622 | | 1 | 37.54 | 98.4% | 9.22 | 98.4% |
| 623 | | 1 | 37.11 | 98.4% | 9.43 | 98.4% |
| 624 | | 1 | 36.86 | 98.4% | 9.55 | 98.5% |
| 625 | | 1 | 36.53 | 98.4% | 8.91 | 98.5% |
| 626 | | 1 | 36.43 | 98.4% | 7.96 | 98.5% |
| 627 | | 1 | 36.35 | 98.4% | 9.36 | 98.5% |
| 628 | | 1 | 36.32 | 98.5% | 8.86 | 98.5% |
| 629 | | 1 | 36.17 | 98.5% | 9.25 | 98.5% |
| 630 | | 1 | 36.17 | 98.5% | 9.37 | 98.5% |
| 631 | | 1 | 36.04 | 98.5% | 9.40 | 98.5% |
| 632 | | 1 | 35.84 | 98.5% | 8.80 | 98.5% |
| 633 | | 1 | 35.73 | 98.5% | 9.70 | 98.5% |
| 634 | | 1 | 34.71 | 98.5% | 8 93 | 98.6% |
| 635 | | 1 | 34.64 | 98.5% | 7 26 | 98.6% |
| 636 | | 1 | 34.04 | 98.5% | 8.82 | 98.6% |
| 637 | | 1 | 33.71 | 98.6% | 8.62 | 98.6% |
| 638 | | 1 | 33.44 | 98.6% | 9 38 | 98.6% |
| 639 | | 1 | 33.12 | 98.6% | 8 58 | 98.6% |
| 640 | | 1 | 33.01 | 98.6% | 8.00 | 98.6% |
| 641 | | 1 | 32.95 | 98.6% | 8 31 | 98.6% |
| 642 | | 1 | 32.88 | 98.6% | 6.84 | 98.6% |
| 643 | | 1 | 32.80 | 98.6% | 8.39 | 98.6% |
| 644 | | 1 | 32.51 | 98.6% | 7.98 | 98.7% |
| 645 | | 1 | 32.41 | 98.6% | 7.96 | 98.7% |
| 646 | | 1 | 32.41 | 98.6% | 8.29 | 98.7% |
| 647 | | 2 | 32.40 | 98.7% | 7.96 | 98.7% |
| 648 | | 1 | 32.37 | 98.7% | 7.90 | 98.7% |
| 649 | | 1 | 32.34 | 98.7% | 7.94 | 98.7% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 650 | | 1 | 31.89 | 98.7% | 8.21 | 98.7% |
| 651 | | 1 | 31.61 | 98.7% | 7.76 | 98.7% |
| 652 | | 1 | 30.99 | 98.7% | 7.61 | 98.7% |
| 653 | | 1 | 30.83 | 98.7% | 7.78 | 98.7% |
| 654 | | 1 | 30.56 | 98.7% | 7.40 | 98.7% |
| 655 | | 1 | 30.22 | 98.7% | 7.73 | 98.8% |
| 656 | | 1 | 30.08 | 98.7% | 7.39 | 98.8% |
| 657 | | 2 | 30.02 | 98.7% | 7.27 | 98.8% |
| 658 | | 1 | 29.90 | 98.8% | 7.29 | 98.8% |
| 659 | | 1 | 29.82 | 98.8% | 7.73 | 98.8% |
| 660 | | 1 | 29.68 | 98.8% | 7.29 | 98.8% |
| 661 | | 1 | 29.60 | 98.8% | 7.27 | 98.8% |
| 662 | | 1 | 29.38 | 98.8% | 6.60 | 98.8% |
| 663 | | 2 | 29.26 | 98.8% | 7.19 | 98.8% |
| 664 | | 3 | 28.82 | 98.8% | 7.52 | 98.8% |
| 665 | | 1 | 28.63 | 98.8% | 7.57 | 98.8% |
| 666 | | 1 | 28.46 | 98.8% | 6.76 | 98.8% |
| 667 | | 1 | 28.17 | 98.8% | 6.87 | 98.9% |
| 668 | | 2 | 28.06 | 98.8% | 6.84 | 98.9% |
| 669 | | 1 | 27.82 | 98.8% | 7.26 | 98.9% |
| 670 | | 2 | 27.54 | 98.9% | 6.76 | 98.9% |
| 671 | | 1 | 27.27 | 98.9% | 7.75 | 98.9% |
| 672 | | 1 | 27.15 | 98.9% | 6.67 | 98.9% |
| 673 | | 1 | 26.71 | 98.9% | 6.30 | 98.9% |
| 674 | | 1 | 26.62 | 98.9% | 5.98 | 98.9% |
| 675 | | 1 | 26.58 | 98.9% | 6.53 | 98.9% |
| 676 | | 1 | 26.45 | 98.9% | 6.45 | 98.9% |
| 677 | | 1 | 26.04 | 98.9% | 6.66 | 98.9% |
| 678 | | 1 | 25.87 | 98.9% | 6.35 | 98.9% |
| 679 | | 1 | 25.77 | 98.9% | 6.77 | 98.9% |
| 680 | | 1 | 25.74 | 98.9% | 6.58 | 99.0% |
| 681 | | 1 | 25.72 | 98.9% | 6.27 | 99.0% |
| 682 | | 2 | 25.68 | 98.9% | 6.61 | 99.0% |
| 683 | | 1 | 25.64 | 99.0% | 6.30 | 99.0% |
| 684 | | 1 | 25.52 | 99.0% | 6.22 | 99.0% |
| 685 | | 1 | 25.51 | 99.0% | 6.61 | 99.0% |
| 686 | | 1 | 25.18 | 99.0% | 6.14 | 99.0% |
| 687 | | 1 | 25.09 | 99.0% | 6.41 | 99.0% |
| 688 | | 1 | 25.04 | 99.0% | 6.11 | 99.0% |
| 689 | | 1 | 25.00 | 99.0% | 6.43 | 99.0% |
| 690 | | 1 | 24.79 | 99.0% | 6.09 | 99.0% |
| 691 | | 2 | 24.69 | 99.0% | 6.02 | 99.0% |
| 692 | | 1 | 24.64 | 99.0% | 6 30 | 99.0% |
| 693 | | 2 | 24.21 | 99.0% | 5 94 | 99.1% |
| 694 | | 1 | 24.15 | 99.0% | 5.85 | 99.1% |
| 695 | | 1 | 23.94 | 99.0% | 6 16 | 99.1% |
| 696 | | 1 | 23.75 | 99.1% | 6 15 | 99.1% |
| 697 | | 1 | 23.69 | 99.1% | 6.06 | 99.1% |
| 698 | | 1 | 23.31 | 99.1% | 6.04 | 99.1% |
| 699 | | 1 | 23.17 | 99.1% | 6.00 | 99.1% |
| 700 | | 1 | 23.01 | 99.1% | 6 58 | 99.1% |
| 701 | | 1 | 22.89 | 99.1% | 5.66 | 99.1% |
| 702 | | 1 | 22.88 | 99.1% | 5.62 | 99.1% |
| 703 | | 2 | 22.79 | 99.1% | 5.60 | 99.1% |
| 704 | | 1 | 22.76 | 99.1% | 5.55 | 99.1% |
| 705 | | 1 | 22.61 | 99.1% | 5.90 | 99.1% |
| 706 | | 1 | 22.58 | 99.1% | 6.25 | 99 1% |
| 707 | | 1 | 22.55 | 99.1% | 5.92 | 99 1% |
| 708 | | 2 | 22.42 | 99.1% | 5.73 | 99 2% |

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 709 | | 1 | 22.31 | 99.1% | 5.70 | 99.2% |
| 710 | | 1 | 22.05 | 99.1% | 5.64 | 99.2% |
| 711 | | 1 | 21.90 | 99.2% | 5.34 | 99.2% |
| 712 | | 1 | 21.75 | 99.2% | 5.56 | 99.2% |
| 713 | | 1 | 21.58 | 99.2% | 5.59 | 99.2% |
| 714 | | 1 | 21.57 | 99.2% | 5.26 | 99.2% |
| 715 | | 1 | 21.49 | 99.2% | 5.28 | 99.2% |
| 716 | | 1 | 21.38 | 99.2% | 5.58 | 99.2% |
| 717 | | 1 | 21.15 | 99.2% | 5.19 | 99.2% |
| 718 | | 2 | 21.15 | 99.2% | 4.79 | 99.2% |
| 719 | | 1 | 21.15 | 99.2% | 5.16 | 99.2% |
| 720 | | 1 | 20.91 | 99.2% | 5.42 | 99.2% |
| 721 | | 1 | 20.83 | 99.2% | 5.08 | 99.2% |
| 722 | | 1 | 20.82 | 99.2% | 5.11 | 99.2% |
| 723 | | 1 | 20.64 | 99.2% | 4.42 | 99.2% |
| 724 | | 2 | 20.54 | 99.2% | 5.29 | 99.3% |
| 725 | | 1 | 20.37 | 99.2% | 5.53 | 99.3% |
| 726 | | 1 | 20.34 | 99.2% | 5.00 | 99.3% |
| 727 | | 1 | 20.31 | 99.3% | 4.66 | 99.3% |
| 728 | | 1 | 20.17 | 99.3% | 4.95 | 99.3% |
| 729 | | 1 | 19.55 | 99.3% | 4.77 | 99.3% |
| 730 | | 1 | 19.54 | 99.3% | 5.00 | 99.3% |
| 731 | | 1 | 19.52 | 99.3% | 4.79 | 99.3% |
| 732 | | 1 | 19.42 | 99.3% | 4.77 | 99.3% |
| 733 | | 2 | 19.36 | 99.3% | 4.75 | 99.3% |
| 734 | | 1 | 19.14 | 99.3% | 4.89 | 99.3% |
| 735 | | 2 | 18.98 | 99.3% | 4.41 | 99.3% |
| 736 | | 2 | 18.86 | 99.3% | 4.12 | 99.3% |
| 737 | | 2 | 18.81 | 99.3% | 4.62 | 99.3% |
| 738 | | 1 | 18.67 | 99.3% | 4.55 | 99.3% |
| 739 | | 1 | 18.66 | 99.3% | 4.77 | 99.3% |
| 740 | | 2 | 17.99 | 99.3% | 4.39 | 99.3% |
| 741 | | 1 | 17.83 | 99.3% | 4.03 | 99.3% |
| 742 | | 1 | 17.52 | 99.3% | 4.48 | 99.4% |
| 743 | | 1 | 17.50 | 99.3% | 4.27 | 99.4% |
| 744 | | 1 | 17.33 | 99.3% | 4.23 | 99.4% |
| 745 | | 1 | 17.33 | 99.4% | 4.92 | 99.4% |
| 746 | | 2 | 17.17 | 99.4% | 3.86 | 99.4% |
| 747 | | 1 | 16.94 | 99.4% | 4.13 | 99.4% |
| 748 | | 1 | 16.84 | 99.4% | 4.69 | 99.4% |
| 749 | | 1 | 16.82 | 99.4% | 4.07 | 99.4% |
| 750 | | 1 | 16.71 | 99.4% | 3.73 | 99.4% |
| 751 | | 1 | 16.71 | 99.4% | 4 30 | 99.4% |
| 752 | | 1 | 16.66 | 99.4% | 4.06 | 99.4% |
| 753 | | 1 | 16.66 | 99.4% | 4.09 | 99.4% |
| 754 | | 1 | 16.59 | 99.4% | 4 50 | 99.4% |
| 755 | | 1 | 16.49 | 99.4% | 4 24 | 99.4% |
| 756 | | 1 | 16.46 | 99.4% | 4.01 | 99.4% |
| 757 | | 1 | 16.40 | 99.4% | 4.03 | 99.4% |
| 758 | | 1 | 16.29 | 99.4% | 4.00 | 99.4% |
| 759 | | 1 | 16.00 | 99.4% | 4 29 | 99.4% |
| 760 | | 1 | 16.00 | 99.4% | 3.90 | 99.4% |
| 761 | | 1 | 15.94 | 99.4% | 3.91 | 99.4% |
| 762 | | 1 | 15.92 | 99.4% | 3.88 | 99.5% |
| 763 | | 1 | 15.73 | 99.4% | 3.84 | 99.5% |
| 764 | | 1 | 15.72 | 99.4% | 4.27 | 99.5% |
| 765 | | 1 | 15.64 | 99.4% | 4.45 | 99 5% |
| 766 | | 1 | 15.57 | 99.5% | 3.43 | 99 5% |
| 767 | | 1 | 15.56 | 99.5% | 4.03 | 99 5% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 768 | | 1 | 15.40 | 99.5% | 3.94 | 99.5% |
| 769 | | 1 | 15.16 | 99.5% | 3.70 | 99.5% |
| 770 | | 1 | 14.98 | 99.5% | 3.68 | 99.5% |
| 771 | | 1 | 14.96 | 99.5% | 3.12 | 99.5% |
| 772 | | 1 | 14.89 | 99.5% | 3.83 | 99.5% |
| 773 | | 1 | 14.89 | 99.5% | 3.81 | 99.5% |
| 774 | | 1 | 14.65 | 99.5% | 3.57 | 99.5% |
| 775 | | 2 | 14.56 | 99.5% | 3.55 | 99.5% |
| 776 | | 1 | 14.41 | 99.5% | 3.51 | 99.5% |
| 777 | | 1 | 14.35 | 99.5% | 3.67 | 99.5% |
| 778 | | 1 | 14.29 | 99.5% | 3.65 | 99.5% |
| 779 | | 1 | 14.25 | 99.5% | 3.48 | 99.5% |
| 780 | | 1 | 13.97 | 99.5% | 3.41 | 99.5% |
| 781 | | 1 | 13.94 | 99.5% | 3.24 | 99.5% |
| 782 | | 1 | 13.92 | 99.5% | 3.56 | 99.5% |
| 783 | | 1 | 13.85 | 99.5% | 3.57 | 99.5% |
| 784 | | 1 | 13.05 | 99.5% | 3.18 | 99.5% |
| 785 | | 1 | 12.86 | 99.5% | 3.49 | 99.5% |
| 786 | | 1 | 12.78 | 99.5% | 3.27 | 99.6% |
| 787 | | 1 | 12.77 | 99.5% | 3.14 | 99.6% |
| 788 | | 1 | 12.57 | 99.5% | 3.09 | 99.6% |
| 789 | | 1 | 12.52 | 99.5% | 2.62 | 99.6% |
| 790 | | 1 | 12.51 | 99.6% | 3.03 | 99.6% |
| 791 | | 1 | 12.49 | 99.6% | 3.39 | 99.6% |
| 792 | | 1 | 12.44 | 99.6% | 3.27 | 99.6% |
| 793 | | 2 | 12.37 | 99.6% | 3.04 | 99.6% |
| 794 | | 1 | 12.27 | 99.6% | 2.99 | 99.6% |
| 795 | | 1 | 12.24 | 99.6% | 2.99 | 99.6% |
| 796 | | 1 | 11.97 | 99.6% | 3.23 | 99.6% |
| 797 | | 1 | 11.93 | 99.6% | 2.91 | 99.6% |
| 798 | | 2 | 11.92 | 99.6% | 2.93 | 99.6% |
| 799 | | 1 | 11.70 | 99.6% | 2.85 | 99.6% |
| 800 | | 1 | 11.61 | 99.6% | 2.85 | 99.6% |
| 801 | | 1 | 11.54 | 99.6% | 2.99 | 99.6% |
| 802 | | 1 | 11.51 | 99.6% | 2.38 | 99.6% |
| 803 | | 1 | 11.41 | 99.6% | 2.78 | 99.6% |
| 804 | | 1 | 11.31 | 99.6% | 2.93 | 99.6% |
| 805 | | 1 | 11.30 | 99.6% | 2.93 | 99.6% |
| 806 | | 1 | 11.20 | 99.6% | 2.73 | 99.6% |
| 807 | | 1 | 11.20 | 99.6% | 2.86 | 99.6% |
| 808 | | 1 | 11.19 | 99.6% | 2.73 | 99.6% |
| 809 | | 1 | 11.12 | 99.6% | 2.71 | 99.6% |
| 810 | | 1 | 10.94 | 99.6% | 2.67 | 99.6% |
| 811 | | 1 | 10.80 | 99.6% | 2 91 | 99.6% |
| 812 | | 2 | 10.67 | 99.6% | 2.60 | 99.6% |
| 813 | | 1 | 10.42 | 99.6% | 2 56 | 99.6% |
| 814 | | 1 | 10.40 | 99.6% | 2 15 | 99.6% |
| 815 | | 1 | 10.26 | 99.6% | 2 50 | 99.6% |
| 816 | | 1 | 10.22 | 99.6% | 2.49 | 99.7% |
| 817 | | 2 | 10.16 | 99.6% | 2.48 | 99.7% |
| 818 | | 1 | 10.16 | 99.6% | 2.76 | 99.7% |
| 819 | | 2 | 10.10 | 99.6% | 2.27 | 99.7% |
| 820 | | 1 | 10.00 | 99.7% | 2.44 | 99.7% |
| 821 | | 1 | 9.98 | 99.7% | 2.43 | 99.7% |
| 822 | | 1 | 9.88 | 99.7% | 2.54 | 99.7% |
| 823 | | 1 | 9.87 | 99.7% | 2.41 | 99.7% |
| 824 | | 1 | 9.81 | 99.7% | 2.51 | 99.7% |
| 825 | | 1 | 9.79 | 99.7% | 2.52 | 99.7% |
| 826 | | 1 | 9.60 | 99.7% | 2.34 | 99.7% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 827 | | 1 | 9.51 | 99.7% | 2.43 | 99.7% |
| 828 | | 1 | 9.49 | 99.7% | 2.31 | 99.7% |
| 829 | | 2 | 9.32 | 99.7% | 2.27 | 99.7% |
| 830 | | 2 | 9.21 | 99.7% | 2.26 | 99.7% |
| 831 | | 2 | 9.19 | 99.7% | 2.24 | 99.7% |
| 832 | | 1 | 9.09 | 99.7% | 2.33 | 99.7% |
| 833 | | 1 | 9.04 | 99.7% | 2.21 | 99.7% |
| 834 | | 1 | 9.02 | 99.7% | 1.92 | 99.7% |
| 835 | | 1 | 9.01 | 99.7% | 2.20 | 99.7% |
| 836 | | 1 | 9.00 | 99.7% | 2.32 | 99.7% |
| 837 | | 2 | 8.73 | 99.7% | 2.14 | 99.7% |
| 838 | | 1 | 8.73 | 99.7% | 2.14 | 99.7% |
| 839 | | 1 | 8.69 | 99.7% | 2.36 | 99.7% |
| 840 | | 1 | 8.58 | 99.7% | 2.52 | 99.7% |
| 841 | | 1 | 8.58 | 99.7% | 2.09 | 99.7% |
| 842 | | 1 | 8.55 | 99.7% | 2.19 | 99.7% |
| 843 | | 1 | 8.48 | 99.7% | 2.07 | 99.7% |
| 844 | | 1 | 8.47 | 99.7% | 2.08 | 99.7% |
| 845 | | 1 | 8.47 | 99.7% | 2.19 | 99.7% |
| 846 | | 2 | 8.45 | 99.7% | 2.07 | 99.7% |
| 847 | | 2 | 8.43 | 99.7% | 2.07 | 99.7% |
| 848 | | 1 | 8.41 | 99.7% | 2.05 | 99.7% |
| 849 | | 1 | 8.39 | 99.7% | 2.15 | 99.7% |
| 850 | | 1 | 8.39 | 99.7% | 2.05 | 99.7% |
| 851 | | 2 | 8.31 | 99.7% | 2.04 | 99.7% |
| 852 | | 1 | 8.18 | 99.7% | 2.01 | 99.7% |
| 853 | | 1 | 8.04 | 99.7% | 2.06 | 99.7% |
| 854 | | 1 | 7.95 | 99.7% | 1.68 | 99.8% |
| 855 | | 1 | 7.85 | 99.7% | 1.91 | 99.8% |
| 856 | | 2 | 7.80 | 99.7% | 1.90 | 99.8% |
| 857 | | 1 | 7.78 | 99.7% | 1.90 | 99.8% |
| 858 | | 1 | 7.76 | 99.8% | 1.70 | 99.8% |
| 859 | | 1 | 7.74 | 99.8% | 2.01 | 99.8% |
| 860 | | 1 | 7.74 | 99.8% | 1.99 | 99.8% |
| 861 | | 1 | 7.71 | 99.8% | 2.01 | 99.8% |
| 862 | | 1 | 7.70 | 99.8% | 1.87 | 99.8% |
| 863 | | 1 | 7.62 | 99.8% | 1.87 | 99.8% |
| 864 | | 1 | 7.54 | 99.8% | 1.83 | 99.8% |
| 865 | | 1 | 7.52 | 99.8% | 2.04 | 99.8% |
| 866 | | 1 | 7.50 | 99.8% | 1.94 | 99.8% |
| 867 | | 1 | 7.34 | 99.8% | 2.06 | 99.8% |
| 868 | | 1 | 7.32 | 99.8% | 1.79 | 99.8% |
| 869 | | 1 | 7.30 | 99.8% | 1.87 | 99.8% |
| 870 | | 1 | 7.30 | 99.8% | 1.78 | 99.8% |
| 871 | | 1 | 7.27 | 99.8% | 1.77 | 99.8% |
| 872 | | 1 | 7.09 | 99.8% | 1.73 | 99.8% |
| 873 | | 1 | 7.08 | 99.8% | 1.81 | 99.8% |
| 874 | | 1 | 7.00 | 99.8% | 1.46 | 99.8% |
| 875 | | 1 | 6.95 | 99.8% | 1.70 | 99.8% |
| 876 | | 1 | 6.91 | 99.8% | 1.80 | 99.8% |
| 877 | | 1 | 6.86 | 99.8% | 1.67 | 99.8% |
| 878 | | 1 | 6.75 | 99.8% | 1.65 | 99.8% |
| 879 | | 1 | 6.67 | 99.8% | 1.63 | 99.8% |
| 880 | | 1 | 6.63 | 99.8% | 1.62 | 99.8% |
| 881 | | 1 | 6.60 | 99.8% | 1.94 | 99.8% |
| 882 | | 1 | 6.53 | 99.8% | 1.58 | 99.8% |
| 883 | | 1 | 6.44 | 99.8% | 1.57 | 99.8% |
| 884 | | 1 | 6.36 | 99.8% | 1.31 | 99.8% |
| 885 | | 2 | 6.34 | 99.8% | 1.35 | 99.8% |

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| | | | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| Count | Loan Number | dmg_ID | Amount | Cum. Percent | Amount | Cum. Percent |
| 886 | | 1 | 6.24 | 99.8% | 1.59 | 99.8% |
| 887 | | 1 | 6.19 | 99.8% | 1.51 | 99.8% |
| 888 | | 1 | 6.18 | 99.8% | 1.27 | 99.8% |
| 889 | | 1 | 6.14 | 99.8% | 1.50 | 99.8% |
| 890 | | 1 | 6.13 | 99.8% | 1.31 | 99.8% |
| 891 | | 2 | 6.03 | 99.8% | 1.48 | 99.8% |
| 892 | | 1 | 5.93 | 99.8% | 1.52 | 99.8% |
| 893 | | 1 | 5.84 | 99.8% | 1.42 | 99.8% |
| 894 | | 1 | 5.80 | 99.8% | 1.25 | 99.8% |
| 895 | | 1 | 5.77 | 99.8% | 1.48 | 99.8% |
| 896 | | 2 | 5.70 | 99.8% | 1.19 | 99.8% |
| 897 | | 2 | 5.67 | 99.8% | 1.38 | 99.8% |
| 898 | | 2 | 5.61 | 99.8% | 1.38 | 99.8% |
| 899 | | 1 | 5.59 | 99.8% | 1.36 | 99.8% |
| 900 | | 1 | 5.55 | 99.8% | 1.44 | 99.8% |
| 901 | | 1 | 5.53 | 99.8% | 1.36 | 99.8% |
| 902 | | 1 | 5.53 | 99.8% | 1.35 | 99.8% |
| 903 | | 1 | 5.50 | 99.8% | 1.13 | 99.8% |
| 904 | | 1 | 5.43 | 99.8% | 1.39 | 99.8% |
| 905 | | 1 | 5.40 | 99.8% | 1.33 | 99.8% |
| 906 | | 1 | 5.39 | 99.8% | 1.46 | 99.8% |
| 907 | | 1 | 5.37 | 99.8% | 1.31 | 99.9% |
| 908 | | 1 | 5.32 | 99.8% | 1.31 | 99.9% |
| 909 | | 1 | 5.32 | 99.8% | 1.30 | 99.9% |
| 910 | | 1 | 5.19 | 99.9% | 1.27 | 99.9% |
| 911 | | 1 | 5.15 | 99.9% | 1.26 | 99.9% |
| 912 | | 2 | 5.11 | 99.9% | 1.25 | 99.9% |
| 913 | | 1 | 5.08 | 99.9% | 1.23 | 99.9% |
| 914 | | 1 | 5.07 | 99.9% | 1.25 | 99.9% |
| 915 | | 2 | 5.07 | 99.9% | 1.24 | 99.9% |
| 916 | | 1 | 5.02 | 99.9% | 1.22 | 99.9% |
| 917 | | 1 | 4.90 | 99.9% | 1.20 | 99.9% |
| 918 | | 1 | 4.86 | 99.9% | 1.19 | 99.9% |
| 919 | | 1 | 4.85 | 99.9% | 1.17 | 99.9% |
| 920 | | 2 | 4.82 | 99.9% | 1.18 | 99.9% |
| 921 | | 1 | 4.82 | 99.9% | 0.99 | 99.9% |
| 922 | | 1 | 4.80 | 99.9% | 1.17 | 99.9% |
| 923 | | 2 | 4.74 | 99.9% | 1.15 | 99.9% |
| 924 | | 2 | 4.73 | 99.9% | 1.15 | 99.9% |
| 925 | | 1 | 4.70 | 99.9% | 1.15 | 99.9% |
| 926 | | 1 | 4.63 | 99.9% | 1 17 | 99.9% |
| 927 | | 1 | 4.61 | 99.9% | 1 20 | 99.9% |
| 928 | | 1 | 4.56 | 99.9% | 1 17 | 99.9% |
| 929 | | 1 | 4.49 | 99.9% | 1 22 | 99.9% |
| 930 | | 1 | 4.41 | 99.9% | 1 13 | 99.9% |
| 931 | | 2 | 4.41 | 99.9% | 1 14 | 99.9% |
| 932 | | 1 | 4.39 | 99.9% | 1 12 | 99.9% |
| 933 | | 2 | 4.35 | 99.9% | 1.06 | 99.9% |
| 934 | | 1 | 4.34 | 99.9% | 1 18 | 99.9% |
| 935 | | 1 | 4.33 | 99.9% | 1.06 | 99.9% |
| 936 | | 1 | 4.33 | 99.9% | 1 11 | 99.9% |
| 937 | | 1 | 4.26 | 99.9% | 1.10 | 99.9% |
| 938 | | 2 | 4.26 | 99.9% | 0.90 | 99.9% |
| 939 | | 1 | 4.20 | 99.9% | 1.14 | 99.9% |
| 940 | | 1 | 4.12 | 99.9% | 1.01 | 99.9% |
| 941 | | 1 | 4.09 | 99.9% | 1.11 | 99.9% |
| 942 | | 2 | 4.09 | 99.9% | 1.00 | 99 9% |
| 943 | | 1 | 4.02 | 99.9% | 0.98 | 99 9% |
| 944 | | 1 | 3.98 | 99.9% | 0.96 | 99 9% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| | | | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
| Count | Loan Number | dmg_ID | Amount | Cum. Percent | Amount | Cum. Percent |
|---|---|---|---|---|---|---|
| 945 | | 1 | 3.94 | 99.9% | 0.96 | 99.9% |
| 946 | | 1 | 3.94 | 99.9% | 1.01 | 99.9% |
| 947 | | 1 | 3.84 | 99.9% | 0.94 | 99.9% |
| 948 | | 1 | 3.82 | 99.9% | 0.93 | 99.9% |
| 949 | | 1 | 3.82 | 99.9% | 0.93 | 99.9% |
| 950 | | 1 | 3.81 | 99.9% | 0.93 | 99.9% |
| 951 | | 1 | 3.81 | 99.9% | 0.79 | 99.9% |
| 952 | | 1 | 3.79 | 99.9% | 1.03 | 99.9% |
| 953 | | 1 | 3.77 | 99.9% | 0.92 | 99.9% |
| 954 | | 1 | 3.69 | 99.9% | 0.90 | 99.9% |
| 955 | | 1 | 3.66 | 99.9% | 0.99 | 99.9% |
| 956 | | 2 | 3.63 | 99.9% | 0.88 | 99.9% |
| 957 | | 2 | 3.62 | 99.9% | 0.80 | 99.9% |
| 958 | | 2 | 3.61 | 99.9% | 0.75 | 99.9% |
| 959 | | 1 | 3.52 | 99.9% | 0.86 | 99.9% |
| 960 | | 1 | 3.48 | 99.9% | 0.73 | 99.9% |
| 961 | | 1 | 3.47 | 99.9% | 0.89 | 99.9% |
| 962 | | 1 | 3.40 | 99.9% | 0.87 | 99.9% |
| 963 | | 1 | 3.37 | 99.9% | 0.92 | 99.9% |
| 964 | | 1 | 3.36 | 99.9% | 0.82 | 99.9% |
| 965 | | 1 | 3.32 | 99.9% | 0.81 | 99.9% |
| 966 | | 2 | 3.31 | 99.9% | 0.81 | 99.9% |
| 967 | | 1 | 3.25 | 99.9% | 0.79 | 99.9% |
| 968 | | 3 | 3.25 | 99.9% | 0.79 | 99.9% |
| 969 | | 1 | 3.23 | 99.9% | 0.79 | 99.9% |
| 970 | | 1 | 3.19 | 99.9% | 0.78 | 99.9% |
| 971 | | 2 | 3.18 | 99.9% | 0.77 | 99.9% |
| 972 | | 1 | 3.16 | 99.9% | 0.82 | 99.9% |
| 973 | | 1 | 3.14 | 99.9% | 0.82 | 99.9% |
| 974 | | 1 | 3.13 | 99.9% | 0.65 | 99.9% |
| 975 | | 1 | 3.06 | 99.9% | 0.75 | 99.9% |
| 976 | | 1 | 3.05 | 99.9% | 0.74 | 99.9% |
| 977 | | 1 | 3.04 | 99.9% | 0.74 | 99.9% |
| 978 | | 1 | 3.03 | 99.9% | 0.74 | 99.9% |
| 979 | | 1 | 3.02 | 99.9% | 0.74 | 99.9% |
| 980 | | 1 | 3.02 | 99.9% | 0.77 | 99.9% |
| 981 | | 1 | 3.00 | 99.9% | 0.73 | 99.9% |
| 982 | | 1 | 2.99 | 99.9% | 0.73 | 99.9% |
| 983 | | 1 | 2.91 | 99.9% | 0.65 | 99.9% |
| 984 | | 1 | 2.91 | 99.9% | 0.71 | 99.9% |
| 985 | | 1 | 2.90 | 99.9% | 0.71 | 99.9% |
| 986 | | 1 | 2.90 | 99.9% | 0.74 | 99.9% |
| 987 | | 1 | 2.88 | 99.9% | 0.71 | 99.9% |
| 988 | | 1 | 2.84 | 99.9% | 0.64 | 99.9% |
| 989 | | 2 | 2.82 | 99.9% | 0.69 | 99.9% |
| 990 | | 2 | 2.77 | 99.9% | 0.58 | 99.9% |
| 991 | | 1 | 2.77 | 99.9% | 0.67 | 99.9% |
| 992 | | 1 | 2.76 | 99.9% | 0.75 | 99.9% |
| 993 | | 1 | 2.75 | 99.9% | 0.67 | 99.9% |
| 994 | | 1 | 2.74 | 99.9% | 0.58 | 99.9% |
| 995 | | 1 | 2.65 | 99.9% | 0.78 | 99.9% |
| 996 | | 1 | 2.59 | 99.9% | 0.67 | 99.9% |
| 997 | | 2 | 2.58 | 99.9% | 0.63 | 99.9% |
| 998 | | 1 | 2.54 | 99.9% | 0.63 | 100.0% |
| 999 | | 2 | 2.54 | 99.9% | 0.62 | 100.0% |
| 1,000 | | 1 | 2.53 | 99.9% | 0.62 | 100.0% |
| 1,001 | | 1 | 2.50 | 100.0% | 0.53 | 100.0% |
| 1,002 | | 2 | 2.49 | 100.0% | 0.52 | 100.0% |
| 1,003 | | 1 | 2.47 | 100.0% | 0.60 | 100.0% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 1,004 | | 2 | 2.46 | 100.0% | 0.60 | 100.0% |
| 1,005 | | 1 | 2.45 | 100.0% | 0.60 | 100.0% |
| 1,006 | | 1 | 2.43 | 100.0% | 0.59 | 100.0% |
| 1,007 | | 1 | 2.35 | 100.0% | 0.57 | 100.0% |
| 1,008 | | 2 | 2.33 | 100.0% | 0.57 | 100.0% |
| 1,009 | | 1 | 2.32 | 100.0% | 0.57 | 100.0% |
| 1,010 | | 1 | 2.32 | 100.0% | 0.50 | 100.0% |
| 1,011 | | 1 | 2.25 | 100.0% | 0.55 | 100.0% |
| 1,012 | | 1 | 2.20 | 100.0% | 0.60 | 100.0% |
| 1,013 | | 1 | 2.17 | 100.0% | 0.53 | 100.0% |
| 1,014 | | 1 | 2.17 | 100.0% | 0.53 | 100.0% |
| 1,015 | | 1 | 2.15 | 100.0% | 0.58 | 100.0% |
| 1,016 | | 2 | 2.07 | 100.0% | 0.50 | 100.0% |
| 1,017 | | 1 | 2.06 | 100.0% | 0.50 | 100.0% |
| 1,018 | | 1 | 2.01 | 100.0% | 0.49 | 100.0% |
| 1,019 | | 1 | 2.01 | 100.0% | 0.52 | 100.0% |
| 1,020 | | 1 | 1.97 | 100.0% | 0.48 | 100.0% |
| 1,021 | | 1 | 1.92 | 100.0% | 0.48 | 100.0% |
| 1,022 | | 2 | 1.91 | 100.0% | 0.47 | 100.0% |
| 1,023 | | 1 | 1.89 | 100.0% | 0.46 | 100.0% |
| 1,024 | | 1 | 1.88 | 100.0% | 0.46 | 100.0% |
| 1,025 | | 1 | 1.85 | 100.0% | 0.38 | 100.0% |
| 1,026 | | 1 | 1.85 | 100.0% | 0.45 | 100.0% |
| 1,027 | | 1 | 1.78 | 100.0% | 0.38 | 100.0% |
| 1,028 | | 1 | 1.70 | 100.0% | 0.41 | 100.0% |
| 1,029 | | 2 | 1.66 | 100.0% | 0.41 | 100.0% |
| 1,030 | | 1 | 1.64 | 100.0% | 0.40 | 100.0% |
| 1,031 | | 1 | 1.63 | 100.0% | 0.47 | 100.0% |
| 1,032 | | 1 | 1.63 | 100.0% | 0.42 | 100.0% |
| 1,033 | | 1 | 1.63 | 100.0% | 0.40 | 100.0% |
| 1,034 | | 1 | 1.61 | 100.0% | 0.42 | 100.0% |
| 1,035 | | 1 | 1.59 | 100.0% | 0.39 | 100.0% |
| 1,036 | | 1 | 1.54 | 100.0% | 0.40 | 100.0% |
| 1,037 | | 2 | 1.50 | 100.0% | 0.31 | 100.0% |
| 1,038 | | 1 | 1.47 | 100.0% | 0.30 | 100.0% |
| 1,039 | | 2 | 1.41 | 100.0% | 0.29 | 100.0% |
| 1,040 | | 1 | 1.41 | 100.0% | 0.34 | 100.0% |
| 1,041 | | 1 | 1.34 | 100.0% | 0.35 | 100.0% |
| 1,042 | | 1 | 1.33 | 100.0% | 0.29 | 100.0% |
| 1,043 | | 1 | 1.33 | 100.0% | 0.28 | 100.0% |
| 1,044 | | 1 | 1.32 | 100.0% | 0.34 | 100.0% |
| 1,045 | | 2 | 1.29 | 100.0% | 0.32 | 100.0% |
| 1,046 | | 1 | 1.28 | 100.0% | 0.38 | 100.0% |
| 1,047 | | 1 | 1.27 | 100.0% | 0.26 | 100.0% |
| 1,048 | | 1 | 1.26 | 100.0% | 0.31 | 100.0% |
| 1,049 | | 2 | 1.24 | 100.0% | 0.26 | 100.0% |
| 1,050 | | 1 | 1.23 | 100.0% | 0.30 | 100.0% |
| 1,051 | | 1 | 1.23 | 100.0% | 0.32 | 100.0% |
| 1,052 | | 1 | 1.18 | 100.0% | 0.29 | 100.0% |
| 1,053 | | 1 | 1.16 | 100.0% | 0.29 | 100.0% |
| 1,054 | | 1 | 1.16 | 100.0% | 0.28 | 100.0% |
| 1,055 | | 1 | 1.14 | 100.0% | 0.24 | 100.0% |
| 1,056 | | 1 | 1.14 | 100.0% | 0.30 | 100.0% |
| 1,057 | | 1 | 1.13 | 100.0% | 0.30 | 100.0% |
| 1,058 | | 1 | 1.12 | 100.0% | 0.29 | 100.0% |
| 1,059 | | 1 | 1.12 | 100.0% | 0.29 | 100.0% |
| 1,060 | | 1 | 1.11 | 100.0% | 0.28 | 100.0% |
| 1,061 | | 1 | 1.11 | 100.0% | 0.29 | 100.0% |
| 1,062 | | 1 | 1.11 | 100.0% | 0.29 | 100.0% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 1,063 | | 1 | 1.10 | 100.0% | 0.29 | 100.0% |
| 1,064 | | 1 | 1.07 | 100.0% | 0.27 | 100.0% |
| 1,065 | | 1 | 1.07 | 100.0% | 0.28 | 100.0% |
| 1,066 | | 1 | 1.06 | 100.0% | 0.27 | 100.0% |
| 1,067 | | 1 | 1.05 | 100.0% | 0.27 | 100.0% |
| 1,068 | | 1 | 1.05 | 100.0% | 0.22 | 100.0% |
| 1,069 | | 1 | 1.03 | 100.0% | 0.27 | 100.0% |
| 1,070 | | 1 | 1.03 | 100.0% | 0.27 | 100.0% |
| 1,071 | | 1 | 1.02 | 100.0% | 0.25 | 100.0% |
| 1,072 | | 1 | 1.02 | 100.0% | 0.27 | 100.0% |
| 1,073 | | 2 | 1.02 | 100.0% | 0.24 | 100.0% |
| 1,074 | | 1 | 1.02 | 100.0% | 0.25 | 100.0% |
| 1,075 | | 1 | 1.01 | 100.0% | 0.26 | 100.0% |
| 1,076 | | 2 | 1.00 | 100.0% | 0.24 | 100.0% |
| 1,077 | | 1 | 1.00 | 100.0% | 0.26 | 100.0% |
| 1,078 | | 1 | 0.98 | 100.0% | 0.26 | 100.0% |
| 1,079 | | 1 | 0.98 | 100.0% | 0.24 | 100.0% |
| 1,080 | | 1 | 0.97 | 100.0% | 0.24 | 100.0% |
| 1,081 | | 1 | 0.96 | 100.0% | 0.24 | 100.0% |
| 1,082 | | 1 | 0.94 | 100.0% | 0.24 | 100.0% |
| 1,083 | | 1 | 0.94 | 100.0% | 0.23 | 100.0% |
| 1,084 | | 1 | 0.94 | 100.0% | 0.24 | 100.0% |
| 1,085 | | 1 | 0.93 | 100.0% | 0.23 | 100.0% |
| 1,086 | | 1 | 0.92 | 100.0% | 0.22 | 100.0% |
| 1,087 | | 1 | 0.92 | 100.0% | 0.20 | 100.0% |
| 1,088 | | 1 | 0.92 | 100.0% | 0.24 | 100.0% |
| 1,089 | | 1 | 0.90 | 100.0% | 0.19 | 100.0% |
| 1,090 | | 1 | 0.90 | 100.0% | 0.22 | 100.0% |
| 1,091 | | 1 | 0.89 | 100.0% | 0.23 | 100.0% |
| 1,092 | | 1 | 0.86 | 100.0% | 0.23 | 100.0% |
| 1,093 | | 1 | 0.86 | 100.0% | 0.21 | 100.0% |
| 1,094 | | 1 | 0.84 | 100.0% | 0.23 | 100.0% |
| 1,095 | | 1 | 0.83 | 100.0% | 0.17 | 100.0% |
| 1,096 | | 4 | 0.82 | 100.0% | 0.17 | 100.0% |
| 1,097 | | 1 | 0.82 | 100.0% | 0.21 | 100.0% |
| 1,098 | | 1 | 0.81 | 100.0% | 0.21 | 100.0% |
| 1,099 | | 2 | 0.80 | 100.0% | 0.17 | 100.0% |
| 1,100 | | 1 | 0.80 | 100.0% | 0.20 | 100.0% |
| 1,101 | | 1 | 0.78 | 100.0% | 0 19 | 100.0% |
| 1,102 | | 1 | 0.76 | 100.0% | 0 19 | 100.0% |
| 1,103 | | 1 | 0.76 | 100.0% | 0 16 | 100.0% |
| 1,104 | | 1 | 0.73 | 100.0% | 0 18 | 100.0% |
| 1,105 | | 2 | 0.72 | 100.0% | 0 15 | 100.0% |
| 1,106 | | 1 | 0.72 | 100.0% | 0 15 | 100.0% |
| 1,107 | | 1 | 0.72 | 100.0% | 0 17 | 100.0% |
| 1,108 | | 1 | 0.71 | 100.0% | 0 18 | 100.0% |
| 1,109 | | 3 | 0.71 | 100.0% | 0 15 | 100.0% |
| 1,110 | | 1 | 0.71 | 100.0% | 0 17 | 100.0% |
| 1,111 | | 1 | 0.69 | 100.0% | 0 17 | 100.0% |
| 1,112 | | 1 | 0.69 | 100.0% | 0 17 | 100.0% |
| 1,113 | | 1 | 0.67 | 100.0% | 0 17 | 100.0% |
| 1,114 | | 1 | 0.66 | 100.0% | 0 17 | 100.0% |
| 1,115 | | 1 | 0.64 | 100.0% | 0 16 | 100.0% |
| 1,116 | | 2 | 0.63 | 100.0% | 0 16 | 100.0% |
| 1,117 | | 1 | 0.63 | 100.0% | 0 15 | 100.0% |
| 1,118 | | 2 | 0.61 | 100.0% | 0 15 | 100.0% |
| 1,119 | | 1 | 0.61 | 100.0% | 0 16 | 100.0% |
| 1,120 | | 1 | 0.61 | 100.0% | 0 15 | 100.0% |
| 1,121 | | 1 | 0.61 | 100.0% | 0 16 | 100.0% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 1,122 | | 1 | 0.59 | 100.0% | 0.13 | 100.0% |
| 1,123 | | 1 | 0.56 | 100.0% | 0.14 | 100.0% |
| 1,124 | | 1 | 0.55 | 100.0% | 0.14 | 100.0% |
| 1,125 | | 1 | 0.55 | 100.0% | 0.13 | 100.0% |
| 1,126 | | 1 | 0.55 | 100.0% | 0.11 | 100.0% |
| 1,127 | | 1 | 0.53 | 100.0% | 0.14 | 100.0% |
| 1,128 | | 1 | 0.49 | 100.0% | 0.12 | 100.0% |
| 1,129 | | 2 | 0.47 | 100.0% | 0.11 | 100.0% |
| 1,130 | | 1 | 0.46 | 100.0% | 0.12 | 100.0% |
| 1,131 | | 1 | 0.45 | 100.0% | 0.12 | 100.0% |
| 1,132 | | 1 | 0.45 | 100.0% | 0.11 | 100.0% |
| 1,133 | | 1 | 0.44 | 100.0% | 0.11 | 100.0% |
| 1,134 | | 4 | 0.43 | 100.0% | 0.09 | 100.0% |
| 1,135 | | 2 | 0.42 | 100.0% | 0.10 | 100.0% |
| 1,136 | | 2 | 0.40 | 100.0% | 0.10 | 100.0% |
| 1,137 | | 1 | 0.33 | 100.0% | 0.08 | 100.0% |
| 1,138 | | 1 | 0.31 | 100.0% | 0.08 | 100.0% |
| 1,139 | | 2 | 0.30 | 100.0% | 0.06 | 100.0% |
| 1,140 | | 2 | 0.30 | 100.0% | 0.07 | 100.0% |
| 1,141 | | 1 | 0.27 | 100.0% | 0.07 | 100.0% |
| 1,142 | | 1 | 0.27 | 100.0% | 0.07 | 100.0% |
| 1,143 | | 3 | 0.26 | 100.0% | 0.06 | 100.0% |
| 1,144 | | 1 | 0.25 | 100.0% | 0.06 | 100.0% |
| 1,145 | | 1 | 0.25 | 100.0% | 0.05 | 100.0% |
| 1,146 | | 1 | 0.24 | 100.0% | 0.06 | 100.0% |
| 1,147 | | 1 | 0.24 | 100.0% | 0.06 | 100.0% |
| 1,148 | | 1 | 0.22 | 100.0% | 0.05 | 100.0% |
| 1,149 | | 1 | 0.22 | 100.0% | 0.04 | 100.0% |
| 1,150 | | 3 | 0.21 | 100.0% | 0.04 | 100.0% |
| 1,151 | | 2 | 0.20 | 100.0% | 0.05 | 100.0% |
| 1,152 | | 1 | 0.20 | 100.0% | 0.04 | 100.0% |
| 1,153 | | 1 | 0.20 | 100.0% | 0.05 | 100.0% |
| 1,154 | | 1 | 0.18 | 100.0% | 0.05 | 100.0% |
| 1,155 | | 1 | 0.18 | 100.0% | 0.05 | 100.0% |
| 1,156 | | 1 | 0.18 | 100.0% | 0.04 | 100.0% |
| 1,157 | | 1 | 0.16 | 100.0% | 0.04 | 100.0% |
| 1,158 | | 1 | 0.15 | 100.0% | 0.04 | 100.0% |
| 1,159 | | 1 | 0.14 | 100.0% | 0.03 | 100.0% |
| 1,160 | | 1 | 0.14 | 100.0% | 0.03 | 100.0% |
| 1,161 | | 1 | 0.14 | 100.0% | 0.03 | 100.0% |
| 1,162 | | 1 | 0.13 | 100.0% | 0.03 | 100.0% |
| 1,163 | | 1 | 0.13 | 100.0% | 0.03 | 100.0% |
| 1,164 | | 1 | 0.12 | 100.0% | 0.03 | 100.0% |
| 1,165 | | 2 | 0.12 | 100.0% | 0.02 | 100.0% |
| 1,166 | | 1 | 0.11 | 100.0% | 0.03 | 100.0% |
| 1,167 | | 1 | 0.10 | 100.0% | 0.03 | 100.0% |
| 1,168 | | 2 | 0.10 | 100.0% | 0.02 | 100.0% |
| 1,169 | | 1 | 0.10 | 100.0% | 0.02 | 100.0% |
| 1,170 | | 1 | 0.09 | 100.0% | 0.02 | 100.0% |
| 1,171 | | 1 | 0.09 | 100.0% | 0.02 | 100.0% |
| 1,172 | | 1 | 0.08 | 100.0% | 0.02 | 100.0% |
| 1,173 | | 1 | 0.08 | 100.0% | 0.02 | 100.0% |
| 1,174 | | 1 | 0.08 | 100.0% | 0.02 | 100.0% |
| 1,175 | | 2 | 0.07 | 100.0% | 0.02 | 100.0% |
| 1,176 | | 2 | 0.07 | 100.0% | 0.02 | 100.0% |
| 1,177 | | 1 | 0.06 | 100.0% | 0.02 | 100.0% |
| 1,178 | | 2 | 0.05 | 100.0% | 0.01 | 100.0% |
| 1,179 | | 1 | 0.05 | 100.0% | 0.01 | 100.0% |
| 1,180 | | 1 | 0.05 | 100.0% | 0.01 | 100.0% |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 9**
**Analysis of Opportunity Cost Damages from ARM Overcharges**
**Using Professor McFadden's Model, Correcting His Excessive Opportunity Cost**

| Count | Loan Number | dmg_ID | McFadden 16% Calculation | | Hamm 3.25% Upper Bound | |
|---|---|---|---|---|---|---|
| | | | Amount | Cum. Percent | Amount | Cum. Percent |
| 1,181 | ■■■ | 1 | 0.05 | 100.0% | 0.01 | 100.0% |
| 1,182 | ■■■ | 1 | 0.04 | 100.0% | 0.01 | 100.0% |
| 1,183 | ■■■ | 1 | 0.03 | 100.0% | 0.01 | 100.0% |
| 1,184 | ■■■ | 2 | 0.03 | 100.0% | 0.01 | 100.0% |
| 1,185 | ■■■ | 1 | 0.03 | 100.0% | 0.01 | 100.0% |
| 1,186 | ■■■ | 1 | 0.03 | 100.0% | 0.01 | 100.0% |
| 1,187 | ■■■ | 1 | 0.02 | 100.0% | 0.00 | 100.0% |
| 1,188 | ■■■ | 1 | 0.01 | 100.0% | 0.00 | 100.0% |
| 1,189 | ■■■ | 1 | 0.01 | 100.0% | 0.00 | 100.0% |
| 1,190 | ■■■ | 1 | 0.01 | 100.0% | 0.00 | 100.0% |
| 1,191 | ■■■ | 1 | 0.01 | 100.0% | 0.00 | 100.0% |
| 1,192 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,193 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,194 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,195 | ■■■ | 2 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,196 | ■■■ | 2 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,197 | ■■■ | 2 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,198 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,199 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,200 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,201 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,202 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,203 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| 1,204 | ■■■ | 1 | 0.00 | 100.0% | 0.00 | 100.0% |
| | Count | | 1,204 | | 1,204 | |
| | Count < $10 | | 385 | | 592 | |
| | Mean | | $280.37 | | $71.10 | |
| | Median | | $42.11 | | $10.42 | |
| | Total | | $337,568.82 | | $85,605.11 | |

Notes:
[1] Professor McFadden's loan level output is at 0.16ARM panel.csv. My calculations only change the interest rate used in the calculation.

**Exhibit 10A**
**Summary of Professor McFadden's Specification Error for Foreclosures**

| | Included in Model | | | | |
| --- | --- | --- | --- | --- | --- |
| | Overcharge/ Undercharge | Zero/Missing Accrual | Control Group | **Total** | **Total "Harmed"** |
| Actual Foreclosures | 14,304 | 8,265 | 1,230 | **23,799** | **24,171** [A] |
| Mis-specified as Foreclosures | | | | | |
| Reinstated / Modified[1] | 4,825 | 1,676 | 470 | **6,971** | **7,417** [B] |
| Paid Off[2] | 329 | 145 | 40 | **514** | **602** [C] |
| Total | 5,154 | 1,821 | 510 | **7,485** | **8,019** [D]=[B]+[C] |
| Total per McFadden[3] | 19 458 | 10 086 | 1 740 | **31,284** | **32,190** [E]=[A]+[D] |
| Over-specification Rate | 36% | 22% | 41% | **31%** | **33%** [F]=[D]/[A] |

Notes:

[1] I consider a loan reinstated or modified if a) the latest date through which the loan is paid in the Transaction History data produced in response to RFP 22 of the Bureau's Fifth Set of Requests for Production (where the maximum date through which the loan is paid is the maximum value of NEXTDUEDT, plus one month), is greater than or equal to b) the latest foreclosure initiation date reported in the data produced in response to RFP 9 of the Bureau's Fifth Set of Requests for Production.  In analyzing the Transaction History data, I omit entries that were reversed, or were posted for the purpose of reversing another entry.

[2] I consider a loan to have been paid off, thereby ending the foreclosure if a) there is not a completed foreclosure sale reported in the data produced in response to RFP 10 of the Bureau's Fifth Set of Requests for Production, b) there is a PYF transaction in the Transaction History data produced in response to RFP 22 of the Bureau's Fifth Set of Requests for Production, and c) there are no transaction types of PYC, PYW, PYT, or PYG in the Transaction History data.

[3] BRG generated these lists/counts of loans from the following McFadden programs:  "2) Ocwen_Only Model-Results.do" and "02_fc_category.R."

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 10B**

# Summary of Seriously Delinquent Loans in Professor McFadden's Model

### Loans 120+ Days Delinquent as of Alleged Analysis Due Date, with No Payments Thereafter

|  | Included in Model | | | | Total "Harmed" |
|---|---|---|---|---|---|
|  | Overcharge/ Undercharge | Zero/Missing Accrual | Control Group[4] | **Total** | |
| Total Population[1] | 131,574 | 17,611 | 47,051 | **196,236** | **272,007** |
| 120+ Days DQ[2] | 15,290 | 11,128 | 3,961 | **30,379** | **31,238** |
| % of Population | 12% | 63% | 8% | **15%** | **11%** |
| Specified Foreclosed Population[3] | 19,458 | 10,086 | 1,740 | **31,284** | **32,190** |
| 120+ Days DQ[2] | 9,941 | 6,890 | 334 | **17,165** | **16,057** |
| % of Population | 51% | 68% | 19% | **55%** | **50%** |

Notes:

[1] BRG generated these lists/counts of loans from the following McFadden program and file: "2) Ocwen_Only Model-Results.do" and "eligible_loans_for_fcl_damages.csv."

[2] I evaluate delinquency status using the Transaction History data produced by Ocwen in response to RFP 22 of the Bureau's Fifth Set of Requests for Production. The count of delinquent loans in this analysis meet the following conditions: a) the NEXTDUEDT corresponding to the first transaction with an EFFECTIVE_DATE after the Alleged Analysis Due Date is at least 120 days before the Alleged Analysis Due Date; and b) either of the following conditions are satisfied: i) the latest NEXTDUEDT is equal to the NEXTDUEDT in step (a); or (ii) the latest NEXTDUEDT is less than the Alleged Analysis Due Date, and there are no non-zero values in the CUST_SENT_AMT field (except those associated with "waive" transactions) dated after the Alleged Analysis Due Date.

[3] BRG generated these lists/counts of loans from the following McFadden programs: "2) Ocwen_Only Model-Results.do" and "02_fc_category.R."

[4] For the Control Group loans, there is no Alleged Analysis Due Date. I use January 1, 2014 as an analysis due date because this is the earliest Alleged Analysis Due Date.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 10C**
# Summary of Seriously Delinquent Loans in Professor McFadden's Model
### Loans 120+ Days Delinquent as of Alleged Analysis Due Date

| | Included in Model | | | | Total "Harmed" |
|---|---|---|---|---|---|
| | Overcharge/ Undercharge | Zero/Missing Accrual | Control Group[4] | Total | |
| Total Population[1] | 131,574 | 17,611 | 47,051 | 196,236 | 272,007 |
| 120+ Days DQ[2] | 27,106 | 16,028 | 6,343 | 49,477 | 54,563 |
| % of Population | 21% | 91% | 13% | 25% | 20% |
| Specified Foreclosed Population[3] | 19,458 | 10,086 | 1,740 | 31,284 | 32,190 |
| 120+ Days DQ[2] | 16,194 | 9,657 | 635 | 26,486 | 26,008 |
| % of Population | 83% | 96% | 36% | 85% | 81% |

Notes:

[1] BRG generated these lists/counts of loans from the following McFadden program and file:  "2) Ocwen_Only Model-Results.do" and "eligible_loans_for_fcl_damages.csv."

[2] I evaluate delinquency status using the Transaction History data produced by Ocwen in response to RFP 22 of the Bureau's Fifth Set of Requests for Production. The count of delinquent loans in this analysis are those where the NEXTDUEDT corresponding to the first transaction with an EFFECTIVE_DATE after the Alleged Analysis Due Date is at least 120 days before the Alleged Analysis Due Date.

[3] BRG generated these lists/counts of loans from the following McFadden programs:  "2) Ocwen_Only Model-Results.do" and "02_fc_category.R."

[4] For the Control Group loans, there is no Alleged Analysis Due Date. I use January 1, 2014 as an analysis due date because this is the earliest Alleged Analysis Due Date.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit 10D
## Analysis of Reason for Default Data

| | Included in Model | | | | Total "Harmed" |
|---|---|---|---|---|---|
| | Overcharge/ Undercharge | Zero/Missing Accrual | Control Group | Total | |
| McFadden Foreclosure Population[1] | 19,458 | 10,086 | 1,740 | **31,284** | **32,190** [A] |
| Less: | | | | | |
| Not Foreclosures[2] | (5,154) | (1,821) | (510) | **(7,485)** | **(8,019)** [B] |
| Pre-Existing Defaults[3] | (9,941) | (6,890) | (334) | **(17,165)** | **(16,057)** [C] |
| Remaining Foreclosed Population | 4,363 | 1,375 | 896 | **6,634** | **8,114** [D]=[A]+[B]+[C] |
| | | | | | |
| Has Reason for Default[4] | 3,061 | 888 | 578 | **4,527** | **5,742** [E] |
| % of Remaining | 70% | 65% | 65% | **68%** | **71%** [F]=[E]/[D] |
| | | | | | |
| Non-Ocwen Reason for Default[4] | 2,931 | 844 | 553 | **4,328** | **5,491** [G] |
| % of Pop with RFD | 96% | 95% | 96% | **96%** | **96%** [H]=[G]/[E] |
| % of McFadden FC Pop | 15% | 8% | 32% | **14%** | **17%** [I]=[G]/[A] |

Notes:

[1] BRG generated these lists/counts of loans from the following McFadden programs: "2) Ocwen_Only Model-Results.do" and "02_fc_category.R."

[2] See Exhibit 10A.

[3] See Exhibit 10B.

[4] Reason for Default data was produced by Ocwen in response to RFP #6 of the Bureau's Fifth Set of Requests for Production. I analyze this data and identify non-Ocwen reasons for default at Exhibit 10E.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Exhibit 10E
## Frequency of Reasons for Default

| Reason for Default | Non-Ocwen[1] | Count of Loans[2] |
|---|:---:|---:|
| CURTAILMENT OF INCOME | x | 3,403 |
| RED_OF_INC | x | 2,340 |
| LOSS OF INCOME/UNEMPLOYMENT | x | 2,112 |
| ILLNES OF PRINCIPAL MORTGAGOR | x | 1,366 |
| EXCESSIVE OBLIGATION | | 1,042 |
| *UNEXPECTED MEDICAL EXPENSE | x | 1,001 |
| LOSS OF INCOME/GARNISHMENT | x | 931 |
| ILLNESS OF MORTGAGORS FAMILY MEMBER | x | 744 |
| EXCESS_OBLIGATION | | 597 |
| DISPUTE/MISCELLANEOUS | | 542 |
| DEATH OF MORTGAGORS FAMILY MEMBER | x | 529 |
| *UNNECESSARY EXPENSE | x | 516 |
| LOSS OF INCOME/SELF EMPLOYMENT | x | 465 |
| OTHER_REASON | | 457 |
| *DIVORCE COMPLETE | x | 380 |
| *DIVORCE PENDING | x | 290 |
| *HOME REPAIRS | x | 287 |
| DEATH OF PRINCIPAL MORTGAGOR | x | 286 |
| *DISABILITY OF BORROWER[S] | x | 277 |
| PAYMENT ADJUSTMENT | | 263 |
| *FIXED INCOME | x | 255 |
| *UNDEREMPLOYED | x | 244 |
| DEATH OF BORROWER[S] | x | 196 |
| PRIN_MORT_ILL | x | 193 |
| INABILITY TO RENT PROPERTY | x | 178 |
| BUSINESS FAILURE | x | 147 |
| *DISPUTE/PAYMENT | | 135 |
| ILL_OR_INJURY | x | 134 |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

## Exhibit 10E
## Frequency of Reasons for Default

| Reason for Default | Non-Ocwen[1] | Count of Loans[2] |
|---|---|---|
| MARITAL_PROBLEMS | x | 131 |
| EXCESS_USE_OF_CREDIT | x | 121 |
| *AUTO REPAIRS | x | 105 |
| *NATURAL DISASTER | x | 98 |
| *SELF EMPLOYED/SLOW RECEIVABLES | x | 98 |
| MARITAL DIFFICULTIES | x | 98 |
| *SELLING PROPERTY | x | 91 |
| SERVICING PROBLEMS | | 79 |
| CASUALTY LOSS | x | 78 |
| *GARNISHMENT | x | 73 |
| BANKRUPTCY | x | 71 |
| ABANDONMENT OF PROPERTY | x | 67 |
| UNEMPLOYMENT | x | 66 |
| FRAUD | x | 63 |
| *MISPLACED PRIORITIES | x | 60 |
| *SEASONAL UNEMPLOYMENT | x | 52 |
| PROPERTY PROBLEM | x | 52 |
| MOVED OR DISTANT EMPLOYMENT TRANSFER | x | 51 |
| DEATH_IN_FAMILY | x | 50 |
| BORROWER_DEATH | x | 39 |
| *RECENT RETIREMENT | x | 38 |
| *INCARCERATION | x | 37 |
| *IRS ISSUES | x | 35 |
| *ENVIRONMENTAL ISSUES | x | 33 |
| MARITAL DISCORD OR DIVORCE | x | 29 |
| *ROBBERY/THEFT | x | 27 |
| ILLNESS OF PRINCIPAL MORTGAGOR | x | 20 |
| MARITAL DISCORD/DIVORCE | x | 18 |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

## Exhibit 10E
## Frequency of Reasons for Default

| Reason for Default | Non-Ocwen[1] | Count of Loans[2] |
|---|:---:|:---:|
| INABILITY TO SELL PROPERTY | x | 16 |
| *REFINANCE PROPERTY | x | 15 |
| *HOMEOWNERS POLICY | | 14 |
| *PAYMENT PRIOR SERVICER | | 14 |
| MILITARY SERVICE | x | 14 |
| *DISPUTE/INSURANCE | | 13 |
| *PAYMENT SENT TO WRONG ADDRESS | x | 13 |
| *DISPUTE/TAXES | | 12 |
| CASUALTY_LOSS | x | 12 |
| *DECLINING PROPERTY VALUE | x | 11 |
| PROPERTY_PROBLEM | x | 11 |
| BUSS_FAIL | x | 10 |
| *INCORRECT BILLING | | 9 |
| OTHER | | 9 |
| *PAST DUE PROPERTY TAX | | 8 |
| *SPEEDPAY CORRECTION | | 7 |
| NEIGHBORHOOD PROBLEM. | x | 7 |
| ILLNESS OF BORROWER FAMILY MEMBER | x | 4 |
| ILLNESS OF PRINCIPAL BORROWER | x | 4 |
| TRANSFER OF OWNERSHIP PENDING | x | 4 |
| *RESEARCH PENDING | | 3 |
| DISTANT EMPLOYMENT TRANSFER | x | 3 |
| SELLING PROPERTY | x | 3 |
| *FERRELL ENDED | x | 2 |
| DEATH OF BORROWER FAMILY MEMBER | x | 2 |
| DIST_EMPL_TRANS | x | 2 |
| PROPERTY VALUE LESS THAN OWED | x | 2 |
| DISPUTE OR PAYMENT | | 1 |

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 10E**
**Frequency of Reasons for Default**

| Reason for Default | Non-Ocwen[1] | Count of Loans[2] |
|---|---|---|
| NO | | 1 |
| DEATH OF BORROWER | x | 1 |
| DUE TO CASH SAVINGS MONEY MARKET FUNDS M | x | 1 |
| ENERGY ENVIRONMENT COST | x | 1 |
| INCARCERATION | x | 1 |
| REFINANCING PROPERTY | x | 1 |

Notes:

[1] It is entirely possible that certain reasons for default that I have failed to classify as non-Ocwen are actually non-Ocwen reasons.  I have attempted to err on the side of being under-inclusive in the event of ambiguity.

[2] A single loan can have multiple reasons for default. This listing of reasons for default relates to 7,451 loans, representing: a) the 5,742 "harmed and foreclosed" loans at Exhibit 10D, plus b) the 888 zero/missing accrual loans at Exhibit 10D, plus c) 578 control group loans at Exhibit 10D, plus d) an additional 243 loans included as foreclosed overcharged/ undercharged loans in Professor McFadden's model but not in the 32,190 "harmed and foreclosed" loans shown in Exhibit 10D (235 of which are in the 272,007 eligible "harmed" loans).

[3] BRG generated these lists/counts of loans from Exhibit C to Response to Interrogatories 1-4 (CONFIDENTIAL) and the following McFadden programs: "02_fc_category.R" and "2) Ocwen_Only Model-Results.do."

[4] Reason for Default data was produced by Ocwen in response to RFP #6 of the Bureau's Fifth Set of Requests for Production.  I analyze this data and identify non-Ocwen reasons for default at "Reason for Default Flags.csv".

CONFIDENTIAL
- SUBJECT TO PROTECTIVE ORDER

**Exhibit 11A**

**Analysis of 100-Loan Sample Drawn from 32,190 Allegedly Harmed and Foreclosed Loans[4]**

| Loan Number | Alleged Analysis Due Date (AADD) | Actual Analysis Date (AAD) | Alleged Delay (Days) | Exhibit A Surplus/(Shortage) | Due Date as of AADD | Max Due Date | Days DQ Status as of AADD | Min FC Initiation Date | Max FC Initiation Date | Check for Misidentified Foreclosures | | | Check for Pre-Existing Defaults | Check for Other RFD[5] | | Remainder |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Max Pay Date After Max FC Date | Full Payoff | Resolved Foreclosure | | Listed RFD After AADD | Non-Owen RFD | |
| | 03/03/15 | 03/28/15 | 25 | (3,898) | 02/01/15 | 07/01/18 | 30 | 10/31/16 | 10/31/16 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (306) | 11/01/12 | 07/01/18 | 426 | 04/11/14 | 04/11/14 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/16/15 | 02/21/15 | 36 | 150 | 02/01/15 | 08/01/18 | current | 02/27/18 | 02/27/18 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/16/15 | 02/25/15 | 40 | (778) | 12/01/14 | 03/01/15 | 46 | 08/03/15 | 08/03/15 | 0 | 1 | 1 | 0 | | | 0 |
| | 01/01/14 | 08/28/14 | 239 | (1,720) | 06/01/12 | 05/01/18 | 579 | 04/21/14 | 04/21/14 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/01/14 | 03/20/15 | 443 | 841 | 06/01/13 | 08/01/18 | 214 | 08/18/14 | 08/18/14 | 1 | 0 | 1 | 0 | | | 0 |
| | 03/03/14 | 08/18/14 | 168 | (12) | 02/01/13 | 08/01/18 | 395 | 12/12/14 | 12/12/14 | 1 | 0 | 1 | 0 | | | 0 |
| | 03/03/14 | 04/02/14 | 30 | (2,019) | 09/01/13 | 09/01/15 | 183 | 05/11/16 | 05/11/16 | 0 | 1 | 1 | 0 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (4,983) | 07/01/13 | 08/01/18 | 184 | 09/08/14 | 09/08/14 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/01/14 | 10/15/14 | 287 | (821) | 07/01/12 | 08/01/18 | 731 | 04/28/16 | 04/28/16 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/01/14 | 08/11/14 | 222 | (11,803) | 03/01/10 | 09/01/18 | 1,402 | 07/12/17 | 07/12/17 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/31/15 | 02/27/15 | 27 | (66) | 03/01/15 | 09/01/18 | current | 02/10/16 | 02/10/16 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/31/15 | 02/25/15 | 25 | (5,267) | 06/01/14 | 07/01/18 | 244 | 09/17/15 | 09/17/15 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/01/14 | 07/23/14 | 203 | (6,627) | 04/15/10 | 08/01/16 | 1,357 | 07/19/18 | 08/04/15 | 1 | 0 | 1 | 0 | | | 0 |
| | 03/20/14 | 09/29/14 | 193 | (1,902) | 05/01/12 | 09/01/18 | 688 | 05/27/15 | 05/27/15 | 1 | 0 | 1 | 0 | | | 0 |
| | 03/20/14 | 08/18/14 | 151 | (8,472) | 01/01/12 | 08/01/18 | 809 | 06/05/15 | 06/05/15 | 1 | 0 | 1 | 0 | | | 0 |
| | 04/10/14 | 10/15/14 | 188 | (5,521) | 11/01/11 | 07/01/18 | 891 | 04/22/14 | 04/22/14 | 1 | 0 | 1 | 0 | | | 0 |
| | 03/20/14 | 09/29/14 | 193 | (1,062) | 12/01/12 | 05/01/18 | 474 | 03/08/16 | 03/08/16 | 1 | 0 | 1 | 0 | | | 0 |
| | 04/10/14 | 10/28/14 | 201 | (193) | 12/01/12 | 09/01/18 | 495 | 11/25/14 | 11/25/14 | 1 | 0 | 1 | 0 | | | 0 |
| | 03/03/15 | 03/20/15 | 17 | (1,149) | 01/01/15 | 10/01/16 | 61 | 03/29/16 | 03/29/16 | 1 | 1 | 1 | 0 | | | 0 |
| | 02/02/15 | 02/25/15 | 23 | (1,244) | 12/01/13 | 09/01/18 | 428 | 07/29/15 | 07/29/15 | 1 | 0 | 1 | 0 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (908) | 02/01/11 | 02/01/11 | 1,065 | 05/27/15 | 05/27/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 03/31/14 | 02/25/15 | 331 | 83 | 01/01/13 | 01/01/13 | 454 | 04/04/16 | 08/03/17 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 10/15/14 | 287 | (3,538) | 12/01/11 | 12/01/11 | 762 | 03/06/15 | 03/06/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | n/a | | 0 | 06/01/12 | 06/01/12 | 579 | 05/08/14 | 05/08/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (31) | 02/01/13 | 02/01/13 | 334 | 02/01/17 | 02/01/17 | 0 | 0 | 0 | 1 | | | 0 |
| | 08/31/16 | 05/29/17 | 271 | (1,259) | 09/01/15 | 09/01/15 | 365 | 04/12/17 | 04/12/17 | 0 | 0 | 0 | 1 | | | 0 |
| | 08/31/14 | 10/30/14 | 60 | (6,002) | 08/01/13 | 08/01/13 | 395 | 02/23/18 | 02/23/18 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/31/15 | 02/25/15 | 25 | (347) | 09/01/14 | 09/01/14 | 152 | 01/26/16 | 01/26/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 03/03/14 | 09/18/14 | 199 | 73 | 11/01/13 | 11/01/13 | 122 | 05/06/16 | 05/06/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 09/18/14 | 260 | (1,854) | 10/01/11 | 10/01/11 | 823 | 04/10/15 | 04/10/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 07/31/14 | 08/18/14 | 18 | (1,597) | 12/01/13 | 12/01/13 | 242 | 09/18/14 | 09/18/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | n/a | | 0 | 01/01/13 | 01/01/13 | 365 | 02/19/14 | 02/19/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 10/01/14 | 10/15/14 | 14 | (4,419) | 07/01/13 | 07/01/13 | 457 | 09/04/15 | 09/04/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/31/15 | 02/25/15 | 25 | (355) | 11/01/13 | 11/01/13 | 456 | 11/12/15 | 11/12/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (2,235) | 02/01/11 | 02/01/11 | 1,065 | 04/06/15 | 04/06/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 10/15/14 | 287 | (1,273) | 12/01/12 | 12/01/12 | 396 | 09/02/16 | 09/02/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | n/a | | 0 | 06/01/12 | 06/01/12 | 579 | 02/20/14 | 02/20/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 05/01/15 | 09/08/15 | 130 | (1,507) | 09/01/14 | 09/01/14 | 242 | 11/25/15 | 11/25/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/03/14 | 183 | (44,026) | 03/01/09 | 03/01/09 | 1,767 | 07/24/15 | 07/24/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 09/18/14 | 09/18/14 | 260 | 126 | 11/01/12 | 11/01/12 | 426 | 05/07/15 | 05/07/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 12/31/14 | 02/25/15 | 56 | 485 | 09/01/14 | 09/01/14 | 121 | 04/21/15 | 04/21/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 08/31/14 | 09/29/14 | 29 | (1,952) | 08/01/13 | 08/01/13 | 395 | 12/15/14 | 12/15/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (4,405) | 08/01/12 | 08/01/12 | 518 | 07/28/15 | 07/28/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (12,271) | 11/01/07 | 09/01/12[1] | 2,253 | 08/29/17 | 08/29/17 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (757) | 07/01/13 | 07/01/13 | 184 | 05/15/15 | 05/15/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 05/28/14 | 147 | (5,948) | 09/01/10 | 09/01/10 | 1,218 | 10/30/14 | 10/30/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/03/14 | 183 | (1,512) | 08/01/10 | 08/01/10 | 1,249 | 04/03/15 | 04/03/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/03/14 | 183 | (10,070) | 01/01/10 | 01/01/10 | 1,461 | 09/09/14 | 09/09/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 07/01/14 | 07/03/14 | 2 | (9,816) | 08/01/13 | 08/01/13 | 334 | 03/02/15 | 03/02/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/23/14 | 203 | (11,802) | 05/01/08 | 05/01/08 | 2,071 | 02/17/14 | 02/17/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/24/14 | 204 | (8,739) | 09/01/11 | 09/01/11 | 853 | 05/08/15 | 05/08/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/23/14 | 203 | (14,495) | 12/01/08 | 12/01/08 | 1,857 | 11/24/14 | 11/24/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/23/14 | 203 | (15,117) | 08/01/08 | 08/01/08 | 1,979 | 02/02/15 | 02/02/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 07/24/14 | 204 | (50,493) | 02/01/11 | 02/01/11 | 1,065 | 12/19/14 | 12/19/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 08/18/14 | 229 | (21,251) | 07/01/09 | 07/01/09 | 1,645 | 04/11/16 | 04/11/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | n/a | | 0 | 02/28/09 | 02/28/09 | 1,768 | 01/24/14 | 01/24/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/15/14 | 196 | (4,593) | 01/01/12 | 01/01/12 | 822 | 10/13/16 | 10/13/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 08/18/14 | 138 | (2,826) | 03/01/12 | 03/01/12 | 762 | 07/18/14 | 07/18/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/15/14 | 196 | (248) | 01/01/13 | 01/01/13 | 456 | 08/17/15 | 08/17/15 | 0 | 0 | 0 | 1 | | | 0 |

SUBJECT TO PROTECTIVE ORDER

**Exhibit 11A**

**Analysis of 100-Loan Sample Drawn from 32,190 Allegedly Harmed and Foreclosed Loans[4]**

| Loan Number | Alleged Analysis Due Date (AADD) | Actual Analysis Date (AAD) | Alleged Delay (Days) | Exhibit A Surplus/(Shortage) | Due Date as of AADD | Max Due Date | Days DQ Status as of AADD | Min FC Initiation Date | Max FC Initiation Date | Check for Misidentified Foreclosures — Max Pay Date After Max FC Date | Full Payoff | Resolved Foreclosure | Check for Pre-Existing Defaults | Check for Other RFD[3] — Listed RFD After AADD | Non-Ocwen RFD | Remainder |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 07/31/14 | 08/18/14 | 18 | (111) | 05/01/13 | 05/01/13 | 456 | 06/14/16 | 06/14/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/15/14 | 196 | (1,688) | 08/01/11 | 08/01/11 | 975 | 07/08/15 | 07/08/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 08/31/14 | 10/15/14 | 45 | 15 | 05/01/13 | 05/01/13 | 487 | 10/16/14 | 10/16/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/28/14 | 209 | (2,255) | 10/01/11 | 10/01/11 | 914 | 06/15/15 | 06/15/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/15/14 | 196 | (9,055) | 04/01/11 | 04/01/11 | 1,097 | 01/05/16 | 01/05/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 02/25/15 | 329 | (697) | 06/01/12 | 06/01/12 | 670 | 10/20/15 | 10/20/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/28/14 | 209 | 1,911 | 01/01/13 | 01/01/13 | 456 | 07/16/14 | 07/16/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/15/14 | 196 | (23,058) | 09/01/08 | 09/01/08 | 2,039 | 12/28/16 | 12/28/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/10/14 | 08/20/14 | 132 | (2,082) | 08/01/13 | 08/01/13 | 252 | 08/14/15 | 08/14/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 08/20/14 | 08/20/14 | 153 | (2,045) | 09/01/13 | 09/01/13 | 200 | 07/10/14 | 07/10/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 04/02/14 | 10/15/14 | 196 | (932) | 12/01/11 | 12/01/11 | 853 | 05/02/16 | 05/02/16 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/03/15 | 03/26/15 | 82 | (794) | 04/01/13 | 04/01/13 | 642 | 08/11/15 | 08/11/15 | 0 | 0 | 0 | 1 | | | 0 |
| | 10/03/14 | 10/15/14 | 12 | (1,684) | 07/01/13 | 07/01/13 | 459 | 12/11/14 | 12/11/14 | 0 | 0 | 0 | 1 | | | 0 |
| | 01/01/14 | 03/23/16 | 812 | (6,636) | 05/01/12 | 02/01/17 | 610 | 03/29/16 | 11/20/17 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/01/14 | 06/16/14 | 166 | (2,377) | 01/01/12 | 02/01/15 | 731 | 02/09/16 | 02/09/16 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/16/15 | 02/25/15 | 40 | (2,019) | 12/01/14 | 02/01/17 | 46 | 07/10/17 | 07/10/17 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/16/15 | 02/25/15 | 40 | (1,436) | 11/01/14 | 01/01/15 | 76 | 08/25/15 | 08/25/15 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 03/03/15 | 03/19/15 | 16 | (1,614) | 04/01/15 | 07/01/16 | current | 09/30/16 | 09/30/16 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/31/15 | 02/25/15 | 25 | (812) | 09/01/14 | 10/01/16 | 152 | 12/16/15 | 06/01/18 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 05/31/14 | 08/20/14 | 81 | (159) | 03/01/13 | 09/01/14 | 456 | 09/24/14 | 01/23/17 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/31/15 | 02/25/15 | 25 | (189) | 10/01/14 | 03/01/15 | 122 | 09/24/15 | 09/24/15 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/01/14 | 08/18/14 | 229 | (2,361) | 12/01/13 | 08/01/14 | 31 | 07/01/15 | 07/01/15 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/01/14 | 08/20/14 | 231 | (7,192) | 01/01/14 | 12/01/14 | current | 07/08/16 | 07/08/16 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 04/02/14 | 10/15/14 | 196 | (5,081) | 06/01/11 | 06/01/16 | 1,036 | 01/24/18 | 01/24/18 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 04/10/14 | 08/18/14 | 130 | (2,437) | 07/01/12 | 10/01/15 | 648 | 04/08/16 | 04/08/16 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 03/20/14 | 04/25/15 | 401 | 2,983 | 03/01/13 | 01/01/17 | 384 | 05/15/17 | 05/15/17 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 04/10/14 | 08/18/14 | 130 | (74,901) | 01/01/10 | 02/01/10 | 1,560 | 09/04/14 | 09/04/14 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 03/03/15 | 03/25/15 | 22 | (593) | 04/01/15 | 03/01/17 | current | 09/18/17 | 09/18/17 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 12/04/14 | 03/20/15 | 106 | 770 | 12/01/14 | 06/01/15 | 3 | 01/21/16 | 01/21/16 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/31/15 | 02/27/15 | 27 | 173 | 03/01/15 | 04/01/15 | current | 11/30/15 | 11/30/15 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 03/31/15 | 04/25/15 | 25 | (1,995) | 03/01/15 | 10/01/16 | 30 | 09/06/17 | 09/06/17 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| | 01/31/15 | 02/21/15 | 21 | (35) | 03/01/15 | 07/01/15 | current | 06/17/16 | 06/17/16 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | 01/31/15 | 02/21/15 | 21 | (311) | 04/01/15 | 03/01/16 | current | 07/20/17 | 07/20/17 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 03/03/15 | 03/20/15 | 17 | 858 | 04/01/15 | 07/01/17 | current | 05/18/18 | 05/18/18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 01/31/15 | 02/21/15 | 21 | (231) | 02/01/15 | 02/01/15 | current | 11/18/15 | 11/18/15 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 03/31/14 | 02/25/15 | 331 | (477) | 02/01/14 | 06/01/17 | 58 | 07/02/18 | 02/07/18 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 07/01/14 | 10/28/14 | 119 | (797) | 11/01/12 | 01/01/16 | 607 | 05/26/16 | 05/26/16 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 04/10/14 | 08/18/14 | 130 | (9,167) | 10/01/09 | 04/01/10 | 1,652 | 11/09/15 | 11/09/15 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 04/02/14 | 10/15/14 | 196 | 2,277 | 07/01/11 | 09/01/15 | 1,006 | 04/12/16 | 04/12/16 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Total** | | | | | | | | | | 20 | 3 | 22 | 52 | 19 | 18 | 8 |

Notes

[1] For loan [redacted] the next due date advanced from 11/01/07 to 09/01/12 on 03/22/17. However, this was not the result of a reinstatement (the CUST_SNT_AMT was $0) or modification (the principal balance was not adjusted). Furthermore, 09/01/12 is still well before the Alleged Analysis Due Date (01/01/14) for this loan.

[2] Data used in this analysis from Ocwen's Exhibit C Litigation Work Product, and data produced in response to RFP #22 and RFP #9 to the Bureau's Fifth Set of Requests for Production.

[3] See Exhibit 11B.

[4] BRG generated the 100-loan sample in SAS using the SURVEYSELECT procedure to pull a simple random sample. SAS allows for the selection of a "seed" so that the sample pull is replicable. I used the date the sample was pulled to generate the seed  the sample was pulled on 9/4/19, so the seed I used was 90419. The software assigned a pseudo random number to each of the 32,190 loan numbers and selected 100 in numerical order. Each loan number had an equal probability of being selected into the sample.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 11B**
**Reason for Default Data from RFP #6 for Select Loans**
**Dated After Alleged Analysis Due Date**

| Loan Number | SRCE | RFD_DESC | RFD_DATE | Alleged Analysis Due Date |
|---|---|---|---|---|
| | RR | Curtailment of income | 01/27/15 | 01/01/14 |
| | RR | Curtailment of income | 05/01/14 | 01/01/14 |
| | RS | Loss of Income/Unemployment | 05/28/15 | 01/01/14 |
| | RS | Illness of Mortgagors Family Member | 10/20/15 | 01/16/15 |
| | RS | Loss of Income/Garnishment | 12/15/15 | 01/16/15 |
| | RS | Business Failure | 04/16/15 | 01/16/15 |
| | RS | Curtailment of Income | 08/26/15 | 01/16/15 |
| | RS | Excessive Obligation | 08/31/15 | 01/16/15 |
| | RS | Business Failure | 12/28/15 | 01/16/15 |
| | RS | Business Failure | 04/01/16 | 01/16/15 |
| | RS | Loss of Income/Unemployment | 10/14/16 | 01/16/15 |
| | RS | Excessive Obligation | 01/15/17 | 01/16/15 |
| | RS | *Self Employed/Slow Receivables | 02/24/17 | 01/16/15 |
| | RS | *Unexpected Medical Expense | 10/22/16 | 03/03/15 |
| | RS | Inability to Rent Property | 11/28/16 | 03/03/15 |
| | RS | Curtailment of Income | 01/27/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 02/28/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 03/03/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 03/07/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 03/08/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 03/09/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 03/10/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 03/28/17 | 03/03/15 |
| | BITB | EXCESS_USE_OF_CREDIT | 05/27/17 | 03/03/15 |
| | RS | Inability to Rent Property | 01/03/18 | 03/03/15 |
| | RS | Business Failure | 04/17/15 | 01/31/15 |

**Exhibit 11B**
**Reason for Default Data from RFP #6 for Select Loans**
**Dated After Alleged Analysis Due Date**

| Loan Number | SRCE | RFD_DESC | RFD_DATE | Alleged Analysis Due Date |
|---|---|---|---|---|
| | RS | Loss of Income/Self Employment | 01/22/16 | 01/31/15 |
| | RS | Loss of Income/Self Employment | 11/06/15 | 05/31/14 |
| | RS | Curtailment of Income | 02/18/16 | 05/31/14 |
| | RS | Illnes of Principal Mortgagor | 03/11/15 | 01/31/15 |
| | RS | Dispute/Miscellaneous | 04/15/15 | 01/31/15 |
| | RS | Excessive Obligation | 02/17/14 | 01/01/14 |
| | RS | *Seasonal Unemployment | 09/26/14 | 01/01/14 |
| | RR | Curtailment of income | 03/13/15 | 01/01/14 |
| | RS | *Underemployed | 04/22/15 | 01/01/14 |
| | RS | Curtailment of Income | 05/29/15 | 01/01/14 |
| | RS | Loss of Income/Unemployment | 08/11/15 | 01/01/14 |
| | RS | Loss of Income/Unemployment | 01/20/16 | 01/01/14 |
| | RS | Curtailment of Income | 02/25/16 | 01/01/14 |
| | RS | Loss of Income/Self Employment | 03/29/16 | 01/01/14 |
| | RS | Curtailment of Income | 04/04/16 | 01/01/14 |
| | RS | Loss of Income/Unemployment | 06/14/16 | 01/01/14 |
| | RS | Loss of Income/Self Employment | 09/09/16 | 01/01/14 |
| | RS | *Divorce pending | 02/28/15 | 01/01/14 |
| | RS | Loss of Income/Unemployment | 02/15/16 | 01/01/14 |
| | RS | Curtailment of Income | 03/30/16 | 01/01/14 |
| | RS | Loss of Income/Unemployment | 05/25/16 | 01/01/14 |
| | RS | Curtailment of Income | 07/15/16 | 01/01/14 |
| | RS | Loss of Income/Garnishment | 09/29/15 | 04/02/14 |
| | RS | Curtailment of Income | 11/24/15 | 04/02/14 |
| | RS | Illnes of Principal Mortgagor | 09/28/16 | 04/02/14 |
| | RS | Loss of Income/Unemployment | 05/08/17 | 04/02/14 |

**Exhibit 11B**
**Reason for Default Data from RFP #6 for Select Loans**
**Dated After Alleged Analysis Due Date**

| Loan Number | SRCE | RFD_DESC | RFD_DATE | Alleged Analysis Due Date |
|---|---|---|---|---|
| | BITB | RED_OF_INC | 07/18/17 | 04/02/14 |
| | BITB | RED_OF_INC | 07/19/17 | 04/02/14 |
| | BITB | RED_OF_INC | 07/20/17 | 04/02/14 |
| | BITB | RED_OF_INC | 08/08/17 | 04/02/14 |
| | BITB | RED_OF_INC | 08/09/17 | 04/02/14 |
| | BITB | RED_OF_INC | 08/11/17 | 04/02/14 |
| | BITB | RED_OF_INC | 08/21/17 | 04/02/14 |
| | BITB | RED_OF_INC | 08/22/17 | 04/02/14 |
| | RS | Curtailment of Income | 02/10/18 | 04/02/14 |
| | RS | Loss of Income/Unemployment | 11/20/15 | 04/10/14 |
| | RS | Loss of Income/Unemployment | 06/05/17 | 03/20/14 |
| | RS | Curtailment of Income | 03/08/18 | 03/20/14 |
| | BITB | RED_OF_INC | 07/31/18 | 03/20/14 |
| | BITB | RED_OF_INC | 08/02/18 | 03/20/14 |
| | BITB | EXCESS_OBLIGATION | 11/07/17 | 04/10/14 |
| | BITB | EXCESS_OBLIGATION | 11/08/17 | 04/10/14 |
| | BITB | EXCESS_OBLIGATION | 01/26/18 | 04/10/14 |
| | BITB | UNEMPLOYMENT | 01/31/18 | 04/10/14 |
| | RS | *Unnecessary Expense | 05/02/17 | 03/03/15 |
| | RS | Illnes of Principal Mortgagor | 06/16/17 | 03/03/15 |
| | RS | Loss of Income/Unemployment | 08/25/17 | 03/03/15 |
| | RS | *Self Employed/Slow Receivables | 05/14/15 | 12/04/14 |
| | RS | Payment Adjustment | 05/27/15 | 01/31/15 |
| | RS | Curtailment of Income | 07/02/15 | 01/31/15 |
| | RS | *Fixed Income | 04/28/15 | 03/31/15 |
| | RS | Death of Mortgagors Family Member | 06/17/15 | 03/31/15 |

**Exhibit 11B**
**Reason for Default Data from RFP #6 for Select Loans**
**Dated After Alleged Analysis Due Date**

| Loan Number | SRCE | RFD_DESC | RFD_DATE | Alleged Analysis Due Date |
|---|---|---|---|---|
| | RS | Death of Mortgagors Family Member | 07/20/15 | 03/31/15 |
| | RS | Curtailment of Income | 03/03/16 | 03/31/15 |
| | RS | Death of Mortgagors Family Member | 03/28/17 | 03/31/15 |
| | BITB | RED_OF_INC | 04/12/17 | 03/31/15 |
| | BITB | RED_OF_INC | 04/18/17 | 03/31/15 |
| | BITB | RED_OF_INC | 04/20/17 | 03/31/15 |
| | RS | *Dispute/Payment | 07/08/15 | 01/31/15 |

**Exhibit 12**
**Counts of Discrepancies**
September 2014 - September 2017
at CFPB-001-00083874 and OCW-CFPB-001-00083901

| Category | Count | Percent |
|---|---|---|
| Appraisal Date | 333,495 | 25.6% |
| Certification | 109,953 | 8.4% |
| Property Location | 100,375 | 7.7% |
| LC | 95,130 | 7.3% |
| Purpose Code | 85,983 | 6.6% |
| Borrower Information | 76,628 | 5.9% |
| MOM | 63,168 | 4.9% |
| Interest Rate | 62,395 | 4.8% |
| Loan Term | 54,817 | 4.2% |
| Closing Date | 53,796 | 4.1% |
| Maturity Date | 43,096 | 3.3% |
| UCCC | 36,273 | 2.8% |
| Appraisal Value | 33,880 | 2.6% |
| Payment Date | 27,745 | 2.1% |
| Purchase Price | 27,239 | 2.1% |
| MERS ID | 20,253 | 1.6% |
| Next Adj Date | 18,466 | 1.4% |
| Grace Days | 13,223 | 1.0% |
| APR | 10,345 | 0.8% |
| Mortgage Lender | 10,267 | 0.8% |
| Balloon | 6,561 | 0.5% |
| Mortgage Broker | 4,275 | 0.3% |
| Subtitle 9/10 | 3,980 | 0.3% |
| ARM Interest | 2,705 | 0.2% |
| Floor | 2,385 | 0.2% |
| Index | 998 | 0.1% |
| OPB | 580 | 0.0% |
| Mortgage Originator | 561 | 0.0% |
| Notice Days | 530 | 0.0% |
| Ceiling | 413 | 0.0% |
| FHA | 341 | 0.0% |
| MIN | 341 | 0.0% |
| Nbr Rvws | 243 | 0.0% |
| LOC Maturity Date | 237 | 0.0% |
| Margin | 207 | 0.0% |
| Chng Incrm | 197 | 0.0% |
| Force Mx P&I Change % | 195 | 0.0% |
| Round Basis | 142 | 0.0% |
| OPT | 126 | 0.0% |
| Int Adj Period | 123 | 0.0% |
| IO End Date | 113 | 0.0% |
| Look Back Days | 66 | 0.0% |
| Min Annual Payment Cap | 50 | 0.0% |
| Teaser Rate | 16 | 0.0% |
| Financial Screen IO | 12 | 0.0% |
| Neg Amort Limit | 9 | 0.0% |
| Force Period | 9 | 0.0% |
| Contractual Recast | 6 | 0.0% |
| Mx Negative Amort | 5 | 0.0% |
| Max Neg Amortization Bal | 4 | 0.0% |
| Change Code | 3 | 0.0% |
| Max P&I Adj Pct | 3 | 0.0% |
| ALREADY UPDATED | 1 | 0.0% |
| Next Force | 1 | 0.0% |
| | 1,301,965 | 100.0% |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Appendix A: Escrow Analysis Example for Loan ███████

1.　　　The purpose of this Appendix is to explain the mechanics of the escrow analysis with an example loan.  This Appendix shows how a new escrow payment is determined during the escrow analysis process, as well as the impact of subsequent changes in escrow disbursements on results of subsequent escrow analyses.

2.　　　For this loan, I will start my analysis as of the Actual Analysis Date: July 30, 2014.  I will show each of the steps Ocwen took in its July 30, 2014 escrow analysis.  I will then explain the later escrow analyses performed on this loan that also caused the escrow payment to change.

3.　　　The key variables that factor into an escrow analysis are:

- The date of the escrow analysis;

- The date that the new escrow payment will take effect;

- The escrow disbursement activity during the 12 months leading up to the escrow analysis date; and

- The escrow account balance on the escrow analysis date.

4.　　　I explain the relevance of each of these variables below.

**The Date of the Escrow Analysis**

5.　The servicer has information on escrow account disbursement activities leading up to the escrow analysis date, but it does not know what will happen thereafter; it can only project escrow disbursements after the escrow analysis date.  The methodology used by Ocwen, and by all other servicers of which I am aware, to project forthcoming escrow disbursements is to project that escrow disbursement activity in the twelve months after the escrow analysis date will be identical to the disbursement activity in the twelve months before the escrow analysis date.  In

other words, servicers assume that the past reasonably predicts the future. This assumption generally works in favor of borrowers because property taxes and insurance premiums tend to increase over time. As such, under normal circumstances, the projection methodology used by loan servicers will tend to understate the amount of money needed to make future escrow disbursements – effectively delaying a portion of borrower escrow payments into the next escrow period, and giving the borrower use of these funds until then. With perfect foresight, these funds, instead would be in the borrower's escrow account.

6. In **Table A1** below, I show the escrow disbursements for loan number ███████ as recorded in the loan transaction history for the period from July 2013 through July 2014. I have placed a box around the trailing twelve-month disbursement activity for this loan that would factor into the escrow analysis as of July 30, 2014.

**Table A1**

**Escrow Disbursement Activity for Loan Number ██████**

**Per Transaction History Data Produced by Ocwen**

| Date | Description | Amount |
|------|-------------|--------|
| 07/17/13 | Tax Escrow Disbursement | (701.15) |
| 09/24/13 | Tax Escrow Disbursement | (167.15) |
| 12/13/13 | Tax Escrow Disbursement | (701.15) |
| 01/27/14 | Tax Escrow Disbursement | (528.60) |
| 02/05/14 | Insurance Escrow Disbursement | (726.00) |
| 07/16/14 | Tax Escrow Disbursement | (697.60) |

7. In **Table A2**, below, I calculate the trailing twelve-month disbursement amount, at various month-end dates (including the July 30, 2014 Actual Analysis Date). As shown in **Table**

**A2**, the trailing twelve-month disbursement activity for this loan is stable from March 2014 through June 2014.  However, because the tax payment in July 2014 ($697.60 per **Table A1** above) is $3.55 lower than the tax payment in July 2013 ($701.15 per **Table A1** above), the trailing twelve-month disbursement total drops by $3.55 as of the July 30, 2014 Actual Analysis Date.  If an escrow analysis were performed as of March 31, 2014, the analysis would assume annual disbursements of $2,824.05, whereas an analysis on July 31, 2014 would assume annual disbursements of $2,820.50.

**Table A2**

**Rolling Twelve Month Escrow Disbursement Activity for Loan Number █████**

**Per Transaction History Data Produced by Ocwen**

| Twelve Months Ended | Annual Disbursement Amount |
|---|---|
| 03/14 | (2,824.05) |
| 04/14 | (2,824.05) |
| 05/14 | (2,824.05) |
| 06/14 | (2,824.05) |
| 07/14 | (2,820.50) |

**The Escrow Payment Change Date**

8.      The escrow payment change date is the date when the new escrow payment will take effect, and usually is at least 30-45 days after the escrow analysis date.  In his analysis,

Professor McFadden makes no allowance for the interval between the escrow analysis date and the escrow payment change date. This causes many of his calculations to be wrong.[1]

9.       Due to the interval between the escrow analysis date and the payment change date, the servicer must project the intervening activity in the escrow account (payments from borrowers and disbursements by the servicer). The effective date for the new escrow payment for loan number ███████ was September 1, 2014.[2]

10.       For loan number ███████ the borrower made the payment due on August 1, 2014 (including the $244.79 escrow payment) on July 29, 2014. As such, there were no projected inflows to the escrow account between the Actual Analysis Date (July 30, 2014) and the payment change date of September 1, 2014. If, like most borrowers, the borrower made this payment on or shortly after the August 1, 2014 due date, Ocwen would have projected an escrow inflow for the borrower's monthly escrow payment amount of $244.79.

11.       There were no escrow disbursements during August <u>2013</u> (as shown in **Table A1** above). Therefore, Ocwen did not project escrow outflows during August <u>2014</u>. In **Table A3** below, I show the formula utilized by Ocwen to project the change in the escrow account balance between the Actual Analysis Date (July 30, 2014) and the payment change date (September 1, 2014).

---

[1] See, e.g., Figures 6, 7, and 8 of the McFadden Report.

[2] Per Transaction History Data and Escrow Statement Data

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Table A3**

**Projected Escrow Activity for Loan ██████**

**Between the Escrow Analysis Date and the Payment Effective Date**

|  | **Escrow Transaction Amount** |
|---|---|
| Projected Escrow Inflows - from Monthly Payments | $0 |
| Projected Escrow Disbursements - Based on Historical Activity | <u>0</u> |
| **Projected Change in Escrow Account Balance** | **<u>$0</u>** |

**The Escrow Balance**

12.     The escrow account balance as of July 30, 2014 was $1,785.20.  In **Table A4**, below, I show how Ocwen projected the beginning escrow balance on this loan to be $1,785.20.

**Table A4**

**Calculation of Projected Beginning Escrow Balance for Loan** ▓▓▓▓▓▓

|  | Escrow Balance Amount |
|---|---|
| Escrow Account Balance on Analysis Date | $1,785 |
| Plus Projected Increase/Minus Projected Decrease in Escrow Account Balance | <u>0</u> |
| **Projected Escrow Account Balance on Payment Change Date** | **<u>$1,785</u>** |

**Calculation of Target Escrow Payment Amount and Cushion Amount**

13.      The next step in the escrow analysis is to project the total escrow disbursement activity during the 12 months beginning on the escrow payment change date (September 1, 2014 in this case), and then divide that number by 12 to obtain the target escrow payment amount.  As noted above, the twelve-month projected activity is set equal to the preceding 12-months.  As shown in **Table A2**, above, the trailing twelve-month total was $2,820.50, which equates to a monthly equivalent of $235.04.  This calculation is summarized in **Table A5**, below, and ties to the reported TARGETPMTAMT in the escrow statement data produced by Ocwen in this matter as part of its responses to Request 29 in the Bureau's Fifth RFP.

14.      The CFPB's regulations allow servicers to provide for a cushion in the escrow account, in order to cover timing differences between receipts and disbursement, as well as unexpected disbursements.  The Cushion Amount is equal to 2 times the Target Escrow Payment, or $470.08.  This calculation is also summarized in **Table A5**, below.

**Table A5**

**Calculation of Target Escrow Payment Amount and Cushion Amount**

**for Loan** ███████

|  | Amount |
|---|---|
| Trailing Twelve-Month Escrow Disbursement Total | $2,820.50 |
|  | ÷ 12 |
| **Target Escrow Payment Amount** | **$235.04** |
|  | x 2 |
| **Cushion Amount** | **$470.08** |

**Calculation of Shortage or Surplus Amount**

15.     The next step in the escrow analysis is to array the projected escrow balances, as a function of the projected starting balance, projected collections of the Target Escrow Payment, and projected disbursements. The arrayed escrow balances are then compared to the calculated Cushion Amount.  This projected array is set forth in **Table A6**, below.

**Table A6**

**Projected Escrow Balances for Loan ███████**

| Historical Month | Projected Month | [A]<br>Projected Outflows | [B]<br>Target Payment | [D]=[D$_{t-1}$]+[A]+[B]<br>Projected Balance | [E]=[D]-$470.08<br>Balance vs Cushion |
|---|---|---|---|---|---|
| | | | Beginning Balance: | $1,785.20 | |
| 09/13 | 09/14 | ($167.15) | $235.04 | $1,853.09 | $1,383.01 |
| 10/13 | 10/14 | $0.00 | $235.04 | $2,088.13 | $1,618.05 |
| 11/13 | 11/14 | $0.00 | $235.04 | $2,323.17 | $1,853.09 |
| 12/13 | 12/14 | ($701.15) | $235.04 | $1,857.06 | $1,386.98 |
| 01/14 | 01/15 | ($528.60) | $235.04 | $1,563.50 | $1,093.42 |
| 02/14 | 02/15 | ($726.00) | $235.04 | $1,072.54 | **$602.46** |
| 03/14 | 03/15 | $0.00 | $235.04 | $1,307.58 | $837.50 |
| 04/14 | 04/15 | $0.00 | $235.04 | $1,542.62 | $1,072.54 |
| 05/14 | 05/15 | $0.00 | $235.04 | $1,777.66 | $1,307.58 |
| 06/14 | 06/15 | $0.00 | $235.04 | $2,012.70 | $1,542.62 |
| 07/14 | 07/15 | ($697.60) | $235.04 | $1,550.14 | $1,080.06 |
| 08/13 | 08/15 | $0.00 | $235.04 | $1,785.18 | $1,315.10 |

16.     As **Table A6** shows, the lowest projected escrow balance is $602.46 more than the Cushion Amount. This means that there is a surplus of $602.46 in the account.  This surplus amount ties to the SURPLUS in the escrow statement data produced by Ocwen in this matter, in connection with its responses to Request 29 in the Bureau's Fifth RFP.  The transaction history for this loan shows that the surplus amount was refunded to the borrower on August 22, 2014.

**Subsequent Escrow Analyses and Payment Changes**

*First Subsequent Escrow Analysis*

17.     Now, I look at what actually happened after September 1, 2014 and leading up the next escrow analysis on July 21, 2015.  First, the borrower's property tax payments increased by 0.4%, from $2,094.50 (for the 12-month lookback period, above) to $2,102.10 (for the 12-month lookback period as of the July 21, 2015 escrow analysis date).  Second, offsetting this slight payment increase, the borrower's homeowner's insurance premiums decreased by 30%, from $726 to $438.  In addition, the escrow account accrued $27 of interest.

18.     In summary, during the intervening period between these two escrow analyses, the borrower paid more into escrow than was required to make property tax and insurance payments on the loan.  As shown in **Table A7** below, the excess of borrower payments over escrow disbursements caused a surplus to accumulate in the escrow account.

**Table A7**

**Comparison of At-Issue Escrow Analysis to First Subsequent Escrow Analysis**

|  | Outflow Activity | Target Payment |
|---|---|---|
| **At-Issue Escrow Analysis:** | | |
| Taxes | $2,094.50 | |
| Insurance | 726.00 | |
| Total | $2,820.50 | $235.04 |
| | | |
| **First Subsequent Analysis:** | | |
| Taxes | $2,102.10 | |
| Insurance | 438.03 | |
| Total | $2,540.13 | $211.67 |
| | | |
| **Calculated Monthly Inflows in Excess of Monthly Outflows** | | **$23.37** |

19.     As a consequence of the foregoing, when Ocwen performed an escrow analysis on July 21, 2015, based on a payment change date of December 1, 2015, it calculated a $568.33 surplus and refunded this surplus amount on October 8, 2015.  Ocwen also lowered the monthly escrow payment from $235.04 to $211.67.

*Second Subsequent Escrow Analysis*

20.     The next escrow analysis was performed on October 20, 2016.  During this escrow lookback period, the borrower's property taxes increased by $62.31 – to $2,164.41, as compared to $2,102.10 in the prior analysis.  At the same time, the borrower's insurance payments decreased by $23.63 – to $414.40 from $438.03.  The borrower's escrow account was also credited with $16 in interest.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

21.     In summary, during the intervening period between these two escrow analyses, the borrower paid less into escrow than was required to make property tax and insurance payments on the loan.  As shown in **Table A8** below, the excess of escrow disbursements over borrower payments accumulated a shortage in the escrow account.

**Table A8**

**Comparison of First Subsequent Escrow Analysis to Second Subsequent Escrow Analysis**

|  | Outflow Activity | Target Payment |
|---|---|---|
| **First Subsequent Analysis:** | | |
| Taxes | $2,102.10 | |
| Insurance | 438.03 | |
| | $2,540.13 | $211.67 |
| | | |
| **Second Subsequent Analysis:** | | |
| Taxes | $2,164.41 | |
| Insurance | 414.40 | |
| | $2,578.81 | $214.90 |
| | | |
| **Calculated Monthly Deficiency of Inflows Compared to Monthly Outflows** | | (**$3.23**) |

22.     As a consequence of the net increases in disbursement activity, the Target Payment Amount increased slightly, from $211.67 to $214.90, and Ocwen also calculated a small account balance shortage of $36.04.  This shortage was allowed to be repaid by the borrower over the following twelve months by adding one-twelfth of the shortage ($3) to the

Target Payment Amount – resulting in an actual escrow payment of \$217.90 (*i.e.*, \$214.90 + \$3)

for the ensuing twelve months.