# EXHIBIT 5
# (redacted)

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA


CONSUMER FINANCIAL           )
PROTECTION BUREAU,           )
                             )
          PLAINTIFF,         )
                             )  CASE NO.
     VS.                     )  9:17-CV-80495
                             )
OCWEN FINANCIAL CORPORATION, )
ET AL.,                      )
                             )
          DEFENDANTS.        )
_____)


CONFIDENTIAL VIDEOTAPED DEPOSITION OF

WILLIAM HAMM, PH.D., VOLUME I

SAN FRANCISCO, CALIFORNIA

THURSDAY, FEBRUARY 6, 2020


REPORTED BY:  LISA DAY, CSR NO. 12960

Page 2

1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4    CONSUMER FINANCIAL            )
     PROTECTION BUREAU,            )
5                                  )
                      PLAINTIFF,   )
6                                  )   CASE NO.
              VS.                  )   9:17-CV-80495
7                                  )
     OCWEN FINANCIAL CORPORATION,  )
8    ET AL.,                       )
                                   )
9                      DEFENDANTS. )
     _____)

10

11

12

13

14

15          VIDEOTAPED DEPOSITION OF WILLIAM G. HAMM,

16   PH.D., TAKEN ON BEHALF OF THE PLAINTIFF, AT 301 HOWARD

17   STREET, SUITE 1200, SAN FRANCISCO, CALIFORNIA,

18   BEGINNING AT 9:06 A.M. AND ENDING AT 5:33 P.M., ON

19   THURSDAY, FEBRUARY 6, 2020, BEFORE LISA DAY, CERTIFIED

20   SHORTHAND REPORTER NO. 12960.

21

22

23

24

25

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU:

 3           CONSUMER FINANCIAL PROTECTION BUREAU
             BY:  ATUR DESAI, ESQ.
 4               JEAN HEALEY, ESQ.
                 SHIRLEY CHIU, ESQ.
 5           1700 G STREET NW
             WASHINGTON, CALIFORNIA 20552-0003
 6           (202) 435-7978
             ATUR.DESAI@CFPB.GOVE
 7
             THE BRATTLE GROUP
 8           BY:  PABLO ROBLES, ESQ.
             181 WEST MADISON STREET
 9           SUITE 3400
             CHICAGO, CALIFORNIA 60602
10           (872) 302-6112
             PABLO.ROBLES@BRATTLE.COM
11
     FOR THE PLAINTIFF OFFICE OF THE ATTORNEY GENERAL, THE
12   STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS:

13           OFFICE OF THE ATTORNEY GENERAL,
             STATE OF FLORIDA
14           BY:  JENNIFER HAYES PINDER, ESQ.
                 SASHA FUNK GRANAI, ESQ. (TELEPHONICALLY)
15               ELIZABETH MARTIN, ESQ. (TELEPHONICALLY)
             3507 E. FRONTAGE ROAD
16           SUITE 325
             TAMPA, CALIFORNIA 33607
17           (813) 287-7950
             JENNIFER.PINDER@MYFLORIDALEGAL.COM
18
     FOR THE DEFENDANTS:
19
             GOODWIN PROCTER LLP
20           BY:  SABRINA M. ROSE-SMITH, ESQ.
             1900 N STREET NW
21           WASHINGTON, CALIFORNIA 20036
             (202) 346-4185
22           SROSESMITH@GOODWINLAW.COM

23

24

25   THE VIDEOGRAPHER:  HECTOR ALDANA
```

```
 1                    I N D E X

 2   WITNESS:                                        PAGE

 3   WILLIAM HAMM, PH.D., VOLUME I

 4

 5           BY MR. DESAI                                7

 6           BY MS. ROSE-SMITH                         237

 7           BY MR. DESAI                              248

 8

 9

10

11                    EXHIBITS

12   PLAINTIFF'S                                      PAGE

13   EXHIBIT 1   SUBPOENA TO TESTIFY AT A DEPOSITION    8
                 IN A CIVIL ACTION
14
     EXHIBIT 2   EXPERT REPORT OF WILLIAM G. HAMM,     11
15               PH.D. REBUTTAL OF PROFESSOR DANIEL
                 MCFADDEN DATED OCTOBER 15, 2019
16
     EXHIBIT 3   APPENDIX A:  ESCROW ANALYSIS          12
17               EXAMPLE FOR LOAN ████████

18   EXHIBIT 4   EXHIBITS TO THE EXPERT REPORT OF      12
                 WILLIAM G. HAMM, PH.D. REBUTTAL OF
19               PROFESSOR DANIEL MCFADDEN DATED
                 OCTOBER 15, 2019
20
     EXHIBIT 5   THE HARRIS POLL 2019 CONSUMER         44
21               FINANCIAL LITERACY SURVEY

22   EXHIBIT 6   DOCUMENT ENTITLED "MINIMUM PAYMENTS   49
                 AND DEBT PAYDOWN IN CONSUMER CREDIT
23               CARDS"

24   EXHIBIT 7   DOCUMENT ENTITLED "DR. WILLIAM HAMM  228
                 EXPERT SERVICES (AS OF JANUARY 19,
25               2020)"
```

1                    INDEX (CONTINUED)

2

3

4            INSTRUCTION NOT TO ANSWER

5                      (NONE)

6

7

8

9

10             INFORMATION REQUESTED

11                     (NONE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1    SAN FRANCISCO, CALIFORNIA; THURSDAY, FEBRUARY 6, 2020

2                         9:06 A.M.

3                          * * *

4            THE REPORTER:  COUNSEL, PURSUANT TO FEDERAL

5    RULE 30, I AM REQUIRED TO MAKE THE FOLLOWING STATEMENT

6    FOR THE RECORD.

7            MY NAME IS LISA DAY.  I AM A CERTIFIED

8    SHORTHAND REPORTER WITH THE OFFICES OF HERITAGE COURT

9    REPORTERS HEADQUARTERED IN WASHINGTON D.C.

10           THE DATE IS FEBRUARY 6, 2020 AND THE TIME IS

11   APPROXIMATELY 9:06 A.M.

12           THE DEPOSITION IS TAKING PLACE AT 301 HOWARD

13   STREET, SUITE 1200, SAN FRANCISCO, CALIFORNIA.

14           PRESENT TODAY IS THE DEPONENT, WILLIAM HAMM,

15   AS WELL AS COUNSEL MS. ROSE-SMITH, MR. DESAI,

16   MS. HEALEY, MR. ROBLES, AND MS. CHIU.

17           I WILL NOW ADMINISTER THE OATH.

18           DO YOU SOLEMNLY SWEAR UNDER THE PENALTY OF

19   PERJURY THAT THE TESTIMONY YOU WILL GIVE IN THIS MATTER

20   WILL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE

21   TRUTH?

22           THE WITNESS:  YES, I DO.

23   ///

24   ///

25   ///

1            WILLIAM G. HAMM, PH.D.,

2    CALLED AS A WITNESS BY THE PLAINTIFF, AND HAVING BEEN

3    FIRST ADMINISTERED AN OATH BY THE CERTIFIED SHORTHAND

4    REPORTER, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

5            MS. HAYES PINDER:  MA'AM, COULD YOU JUST NOTE

6    FOR THE RECORD THAT I'M HERE AS WELL.

7            THE REPORTER:  MY APOLOGIES.  AS WELL AS

8    MS. PINDER.

9                         EXAMINATION

10   BY MR. DESAI:

11       Q    GOOD MORNING.  COULD YOU PLEASE STATE YOUR

12   NAME AND SPELL IT FOR THE COURT REPORTER?

13       A    YES.  IT'S WILLIAM GILES, G-I-L-E-S, HAMM,

14   H-A-M-M.

15       Q    THANK YOU, DR. HAMM.

16            MY NAME IS ATUR DESAI AND I REPRESENT THE

17   CONSUMER OF FINANCIAL PROTECTION BUREAU.

18            WITH ME ARE MY COLLEAGUES, SHIRLEY CHIU AND

19   JEAN HEALEY, ALSO FROM THE BUREAU.

20            ALSO WITH ME IS PLAINTIFF -- IS WITH ME,

21   COUNSEL FOR THE PLAINTIFF, THE FLORIDA ATTORNEY

22   GENERAL, JENNIFER PINDER.

23            ARE YOU REPRESENTED BY COUNSEL TODAY?

24       A    YES.

25            MR. DESAI:  COUNSEL, COULD YOU PLEASE STATE

Page 8

```
 1   YOUR NAME FOR THE RECORD?

 2           MS. ROSE-SMITH:  SURE.  SABRINA ROSE-SMITH

 3   WITH GOODWIN PROCTER ON BEHALF OF THE OCWEN DEFENDANTS

 4   AND THE WITNESS.

 5           MR. DESAI:  AND I'M HANDING THE COURT REPORTER

 6   TO BE MARKED AS EXHIBIT 1.

 7           (EXHIBIT 1 WAS MARKED FOR

 8            IDENTIFICATION AND WAS ATTACHED

 9            HERETO.)

10           THE WITNESS:  THANK YOU.

11   BY MR. DESAI:

12   Q    AND THIS IS A COPY OF THE DEPOSITION SUBPOENA

13   ISSUED BY THE BUREAU FOR YOU, DR. HAMM, TO TESTIFY.

14           HAVE YOU REVIEWED EXHIBIT 1 BEFORE?

15   A    I HAVE.

16   Q    COULD YOU PLEASE TURN TO ATTACHMENT A?

17   A    I'M THERE.

18   Q    ATTACHMENT A ARE A SERIES OF DOCUMENT

19   REQUESTS.

20           DID YOU PRODUCE ALL MATERIALS THAT WERE

21   RESPONSIVE TO THESE DOCUMENT REQUESTS?

22   A    LET ME REFRESH MY MEMORY.

23   Q    SURE.

24   A    I THINK PROBABLY IT WOULD BE HELPFUL TO GO

25   THROUGH THEM ONE BY ONE.
```

1    Q    OKAY.  WELL, LET'S JUST -- LET ME JUST ASK YOU

2  A SPECIFIC QUESTION.

3         LOOKING AT REQUEST NUMBER 4, "ANY NOTES

4  MEMORANDA OR OTHER WRITTEN DOCUMENTS MADE BY YOU, MADE

5  AT YOUR DIRECTION, OR PROVIDED TO YOU REFLECTING THE

6  SUBSTANCE OF CONVERSATIONS OR OTHER" --

7         THE REPORTER:  I'M SORRY.  COULD YOU SLOW DOWN

8  A LITTLE BIT.

9         MR. DESAI:  I'M SORRY.

10 BY MR. DESAI:

11   Q    -- "MADE AT YOUR DIRECTION OR PROVIDED TO YOU

12 REFLECTING THE SUBSTANCE OF CONVERSATIONS OR OTHER

13 COMMUNICATIONS YOU HAD WITH OCWEN EMPLOYEES INCLUDING

14 ANDREW COMBS THAT YOU RELIED ON IN FORMING THE OPINIONS

15 IN YOUR REPORT"?

16   A    THERE ARE NO SUCH NOTES.

17   Q    AND, DR. HAMM, HAVE YOU EVER HAD YOUR

18 DEPOSITION TAKEN BEFORE?

19   A    YES.

20   Q    ARE YOU PREPARED TO ANSWER MY QUESTIONS TODAY?

21   A    I AM.

22   Q    IS THERE ANYTHING THAT WILL PREVENT YOU FROM

23 GIVING ME YOUR FULL ATTENTION?

24   A    NO.

25   Q    ARE YOU TAKING ANY MEDICATIONS THAT WILL

Page 10

1    PREVENT YOU FROM GIVING ME YOUR FULL, COMPLETE, AND

2    TRUTHFUL ANSWERS TO MY QUESTIONS?

3        A    NOT THAT I KNOW OF.

4        Q    I'M JUST GOING TO GO OVER SOME GENERAL GROUND

5    RULES FOR TODAY'S DEPOSITIONS.  PLEASE MAKE SURE YOU

6    PROVIDE VERBAL RESPONSES, THE COURT REPORTER CANNOT

7    PICK UP NODS, SHRUGS, OR UH-HUHS.

8            IF YOU DO NOT UNDERSTAND A QUESTION, PLEASE

9    LET ME KNOW AND I'LL TRY TO REPHRASE IT, BUT IF YOU

10   ANSWER MY QUESTION, I WILL ASSUME THAT YOU UNDERSTOOD

11   IT.

12           IS THAT FAIR?

13       A    YES.

14       Q    WE'LL TAKE BREAKS THROUGHOUT THE DAY, HOWEVER,

15   IF YOU NEED TO TAKE A BREAK, PLEASE LET ME KNOW.  I MAY

16   ASK YOU TO FINISH ANSWERING ANY PENDING QUESTIONS PRIOR

17   TO TAKING THAT BREAK.

18           IS THAT FAIR?

19       A    YES.

20       Q    HOW DID YOU PREPARE FOR TODAY'S DEPOSITION?

21       A    I RE-READ MY EXPERT REPORT.  I REVIEWED SOME

22   DOCUMENTS THAT WERE MENTIONED IN THE FOOTNOTES TO MY

23   REPORT.  I MET YESTERDAY WITH COUNSEL.  THAT'S PRETTY

24   MUCH IT.

25       Q    AND DID YOU MEET WITH MS. ROSE-SMITH WHEN YOU

Page 11

```
 1    SAY YOU MET WITH COUNSEL?

 2        A    I DID.

 3             MS. ROSE-SMITH:  PATRICE HENDRIKSEN FROM

 4    GOODWIN WAS ALSO ON THE PHONE.

 5             MR. DESAI:  AND I'M HANDING TO THE COURT

 6    REPORTER TO MARK AS EXHIBIT 2 -- EXHIBIT 2 IS A --

 7             (EXHIBIT 2 WAS MARKED FOR

 8             IDENTIFICATION AND WAS ATTACHED

 9             HERETO.)

10             THE WITNESS:  THANK YOU.

11    BY MR. DESAI:

12        Q    BEFORE MOVING ON TO EXHIBIT 2, ARE YOU AWARE

13    THAT PROFESSOR MCFADDEN WAS DEPOSED THIS PAST TUESDAY?

14        A    YES.

15        Q    DID YOU REVIEW HIS ROUGH TRANSCRIPT?

16        A    NO.

17        Q    IN FRONT OF YOU IS EXHIBIT 2.  THIS IS A COPY

18    OF THE EXPERT REPORT OF WILLIAM G. HAMM, PH.D.,

19    REBUTTAL OF PROFESSOR DANIEL MCFADDEN.  IT'S A BIT OF A

20    MOUTHFUL.

21             CAN WE AGREE THAT FOR PURPOSES TODAY I'LL

22    REFER TO THIS AS YOUR REBUTTAL REPORT?

23        A    YES.

24        Q    AND JUST TO GET THIS OUT OF THE WAY RIGHT NOW

25    BECAUSE YOUR REBUTTAL REPORT ALSO INCLUDED A COUPLE
```

Page 12

1   SEPARATE EXHIBITS, LET'S JUST ENTER THESE INTO THE

2   RECORD.

3           I'M HANDING THE COURT REPORTER TO MARK AS

4   EXHIBIT 3.  EXHIBIT 3 IS APPENDIX A TO YOUR REBUTTAL

5   REPORT.

6           (EXHIBIT 3 WAS MARKED FOR

7            IDENTIFICATION AND WAS ATTACHED

8            HERETO.)

9           MR. DESAI:  THEN FINALLY, JUST SO IT'S

10  COMPLETE, HANDING TO THE COURT REPORTER TO MARK AS

11  EXHIBIT 4.  AND EXHIBIT 4 ARE YOUR EXHIBITS TO YOUR

12  EXPERT REPORT.

13          (EXHIBIT 4 WAS MARKED FOR

14           IDENTIFICATION AND WAS ATTACHED

15           HERETO.)

16  BY MR. DESAI:

17    Q    SO STARTING WITH EXHIBIT 2, YOUR REBUTTAL

18  REPORT, ARE YOU FAMILIAR WITH THIS REPORT?

19    A    YES.

20    Q    DID YOU WRITE THIS REBUTTAL REPORT?

21    A    YES.

22    Q    AND IF YOU PLEASE TURN TO WHAT I JUST HANDED

23  YOU, EXHIBIT 4.

24          I APOLOGIZE TO THE COURT REPORTER, THIS MIGHT

25  BE A LITTLE CONFUSING, BUT EXHIBIT 1 OF EXHIBIT 4,

Page 13

1    DOCUMENTS CONSIDERED.

2            AND DOES YOUR REBUTTAL REPORT, EXHIBIT 1,

3    CONTAIN ALL THE MATERIALS THAT YOU CONSIDERED IN

4    FORMING YOUR OPINIONS?

5        A    TO THE BEST OF MY KNOWLEDGE, YES.

6        Q    AND SITTING HERE TODAY, YOU DON'T HAVE

7    ANYTHING -- ANY OTHER MATERIALS THAT YOU WOULD ADD TO

8    EXHIBIT 1?

9        A    TO THE BEST OF MY KNOWLEDGE, I DO NOT.

10       Q    AND IF YOU SCROLL ABOUT HALFWAY DOWN THE PAGE,

11   IT SAYS "INTERVIEWS."

12       A    YES.

13       Q    AND I SEE AN INTERVIEW WITH ANDREW COMBS ON

14   SEPTEMBER 13, 2019?

15       A    YES.

16       Q    DID YOU CONDUCT ANY OTHER INTERVIEWS FOR

17   PURPOSES OF DEVELOPING YOUR EXPERT OPINIONS IN THIS

18   CASE?

19       A    I INTERPRET THE PREMISE OF YOUR QUESTION AS

20   THAT I CONDUCTED THIS INTERVIEW.  I DID NOT CONDUCT

21   THIS INTERVIEW, BUT I DID NOT CONDUCT ANY OTHER

22   INTERVIEWS, NOR DID I CONDUCT THIS ONE.

23       Q    WHO CONDUCTED THE INTERVIEW?

24       A    GREG HALM, H-A-L-M.

25       Q    AND WHO IS GREG HALM?

1      A    HE IS -- AT THE TIME HE WAS, I BELIEVE, A

2  PRINCIPAL -- OR DIRECTOR, HE'S NOW MANAGING DIRECTOR AT

3  BRG WHO WORKED UNDER -- AT MY DIRECTION AND UNDER MY

4  SUPERVISION ON THIS MATTER.

5      Q    AND YOU WERE NOT PRESENT FOR THIS --

6      A    I WAS NOT PRESENT.

7      Q    DO YOU KNOW WHO MR. COMBS IS?

8      A    YES.  HE WAS A FACT WITNESS DESIGNATED BY

9  OCWEN TO TESTIFY ON CERTAIN ISSUES.

10      Q    ARE YOU FAMILIAR WITH MR. COMBS' TITLE?

11      A    I'VE READ HIS DEPOSITION.  I CAN'T -- I CAN'T

12  REMEMBER EXACTLY WHAT HIS TITLE WAS.

13      Q    DO YOU HAVE AN UNDERSTANDING OF WHAT

14  MR. COMBS' ROLE AT OCWEN WAS?

15      A    HE WAS INVOLVED, A FAIRLY SENIOR PERSON IN

16  LOAN SERVICE, BUT I DON'T RECALL EXACTLY WHAT HIS

17  DUTIES WERE.

18      Q    AND DO YOU KNOW HOW LONG MR. COMBS WAS

19  EMPLOYED BY OCWEN?

20      A    I DO NOT.  AGAIN, I READ HIS DEPOSITION.  I

21  KNEW AT ONE TIME, BUT I HAVE FORGOTTEN.

22      Q    DO YOU KNOW IF MR. HALM TOOK ANY NOTES OF HIS

23  CONVERSATION WITH MR. COMBS?

24      A    I DO KNOW.  HE DID NOT TAKE ANY NOTES.

25      Q    DO YOU KNOW WHO ELSE WAS PRESENT FOR THIS

1    INTERVIEW WITH MR. COMBS?

2       A    TO THE BEST OF MY KNOWLEDGE, HE WAS BY

3    HIMSELF.  THERE WAS NO THIRD PARTIES.

4       Q    AND DO YOU KNOW IF MR. HALM -- I APOLOGIZE IF

5    I'M PRONOUNCING HIS NAME INCORRECTLY -- BUT DO YOU KNOW

6    WHAT HE TALKED TO MR. COMBS ABOUT?

7       A    YES.  GENERALLY, I THINK HE WANTED TO CONFIRM

8    THE FACTS REGARDING HOW OCWEN DECIDED NOT TO SEND OR

9    PREPARE ESCROW ANALYSES FOR CERTAIN BORROWERS.  THAT'S

10   MY RECOLLECTION.  HE MAY HAVE TALKED ABOUT OTHER ISSUES

11   AS WELL.

12      Q    DO YOU KNOW WHY MR. HALM DECIDED TO TALK WITH

13   MR. COMBS?

14      A    I BELIEVE BECAUSE I ASKED HIM TO CONFIRM

15   SOMETHING THAT I HAD READ IN HIS DEPOSITION OR THAT

16   WASN'T CLEAR IN HIS DEPOSITION.  I WASN'T -- I CAN'T

17   REMEMBER EXACTLY WHY, BUT THAT'S GENERALLY THE REASON.

18      Q    AND DID YOUR STAFF TALK TO ANYONE ELSE AT

19   OCWEN?

20      A    NOT TO MY KNOWLEDGE.  I BELIEVE THE ANSWER IS

21   NO.  NOT KNOWINGLY ANYWAY.

22      Q    WHAT DID YOU DO TO PREPARE FOR YOUR INTERVIEW

23   WITH MR. HALM -- SORRY.

24           DID YOU DO ANYTHING TO HELP MR. HALM PREPARE

25   FOR HIS INTERVIEW WITH MR. COMBS?

1     A     NO.

2          MS. ROSE-SMITH:  ATUR, I'LL JUST NOTE SO THAT

3     IT'S NOT CONFUSING LATER, COUNSEL WAS ALSO ON THE PHONE

4     WITH MR. HALM, SO IT'S POSSIBLE IN PREPARING FOR THE

5     DISCUSSION WITH ANDY COMBS, MR. HALM TALKED TO COUNSEL.

6          MR. DESAI:  OKAY.  THANK YOU.

7     BY MR. DESAI:

8     Q     DID YOU PREPARE ANY SPECIFIC QUESTIONS IN

9     ADVANCE OF YOUR STAFF'S INTERVIEW WITH MR. COMBS?

10    A     NO.  AS I RECALL, I SIMPLY SAID, LET'S SEE IF

11    WE CAN PIN A COUPLE OF THINGS DOWN AND I -- AS I SAY, I

12    THINK THEY HAD TO DO WITH THE POLICY REGARDING WHEN

13    LOANS WERE NOT -- DID NOT GET AN ESCROW ANALYSIS, BUT

14    IT WAS QUITE A WHILE AGO.  I DON'T REMEMBER EXACTLY

15    WHAT.

16    Q     AND DO YOU RECALL WHAT SPECIFICALLY MR. COMBS

17    TOLD YOU ABOUT OCWEN'S -- THE POLICIES REGARDING

18    WHEN -- SORRY -- WHEN ESCROW -- WHEN OCWEN DID NOT

19    PERFORM AN ESCROW ANALYSIS?

20    A     WELL, FIRST OF ALL, HE DIDN'T TELL ME ANYTHING

21    BECAUSE I DIDN'T SPEAK WITH HIM, BUT MY RECOLLECTION IS

22    FROM MY CONVERSATION WITH MR. HALM, I COULD GO TO THAT

23    SECTION OF THE REPORT WHERE HE -- THIS INTERVIEW IS

24    CITED AND CONFIRM IT, BUT I BELIEVE THAT HE CONFIRMED

25    OUR UNDERSTANDING OF WHAT THE POLICIES WERE THAT CAUSED

Page 17

1    SOME BORROWERS NOT TO RECEIVE A TIMELY ESCROW ANALYSIS.

2        Q    IS IT FAIR TO SAY THAT THE CONVERSATION THAT

3    YOUR STAFF HAD WITH MR. HALM -- SORRY -- WITH MR. COMBS

4    IS FULLY SUMMARIZED IN YOUR REPORT?

5        A    CERTAINLY THE SUBSTANTIVE POINTS THAT WE WERE

6    INTERESTED IN -- OR THAT I WAS INTERESTED IN ARE

7    SUMMARIZED IN THE REPORT.

8        Q    AND YOU RELIED ON THIS INTERVIEW WITH

9    MR. COMBS; CORRECT?

10       A    CORRECT.

11       Q    DO YOU BELIEVE THE INFORMATION PROVIDED BY

12   MR. COMBS TO BE RELIABLE?

13       A    I HAVE NO REASON TO DOUBT THAT IT WAS

14   RELIABLE.  IT'S CONSISTENT WITH HIS SWORN TESTIMONY.  I

15   HAVE NO REASON TO DOUBT THE VERACITY OF THAT TESTIMONY.

16       Q    AND DID YOU DO ANYTHING TO CONFIRM THE

17   RELIABILITY OF MR. COMBS' STATEMENTS?

18       A    YES.  WE RAN AN ANALYSIS OF THE DELINQUENCY

19   STATUS OF LOANS THAT WERE ON THE LIST OF LOANS THAT DID

20   NOT RECEIVE A TIMELY ESCROW ANALYSIS DURING 2014, AND

21   AS I RECALL THAT CONFIRMED WHAT MR. COMBS HAD SAID.

22       Q    OUTSIDE OF THIS ANALYSIS, DID YOU DO ANYTHING

23   ELSE TO CONFIRM THE RELIABILITY OF MR. COMBS'

24   STATEMENTS?

25       A    NOT THAT I RECALL.  MR. HALM MAY HAVE, BUT I'M

Page 18

1    NOT AWARE OF IT.

2         Q    AND IS IT YOUR TESTIMONY THAT MR. COMBS

3    CONFIRMED TO YOUR STAFF TO -- THE INFORMATION TO WHICH

4    HE TESTIFIED AT HIS DEPOSITION?

5         A    WELL, ONLY INSOFAR AS THE ITEMS THAT I WAS

6    INTERESTED IN CONFIRMING, YES.  WE DIDN'T DETECT ANY

7    INCONSISTENCY BETWEEN WHAT HE TOLD US AND WHAT HE

8    TESTIFIED TO AT HIS DEPOSITION.

9         Q    CAN WE TURN BACK TO EXHIBIT 2, PLEASE?

10        A    I CAN.  SO I DON'T DROWN IN PAPER, I'LL PUT

11   THE CLIPS BACK ON WHEN I'M NOT USING THESE BIG

12   DOCUMENTS.

13        Q    SURE.  I DON'T ANTICIPATE RETURNING TO

14   EXHIBIT 4 FOR A WHILE, SO YOU CAN PUSH IT OFF TO THE

15   SIDE.

16        A    OKAY.

17        Q    PLEASE TURN TO PARAGRAPH 5.

18        A    I'M THERE.

19        Q    PARAGRAPH -- YOU BEAT ME THERE.

20             IN PARAGRAPH 5, YOU SAY THAT YOUR ANALYSIS IS

21   ONGOING AND YOU RESERVE THE RIGHT TO SUPPLEMENT THIS

22   REPORT, AND THE PARAGRAPH CONTINUES.

23             MY QUESTION IS:  SITTING HERE TODAY, DO YOU

24   CURRENTLY INTEND TO SUPPLEMENT YOUR REBUTTAL REPORT?

25        A    WITH A PREPARED REPORT, NO, I DON'T.

1     Q    ARE YOU CURRENTLY PERFORMING ANY ADDITIONAL

2  WORK IN ORDER TO SUPPLEMENT YOUR OPINIONS?

3     A    I HAVE -- AFTER READING PROFESSOR MCFADDEN'S

4  SURREBUTTAL REPORT, I ASKED THE STAFF TO PERFORM SOME

5  ANALYSES OR TO EXTRACT SOME INFORMATION FROM THE RUNS

6  THAT WE'VE ALREADY TURNED OVER TO COUNSEL JUST TO

7  CONFIRM SOME THINGS; BUT BEYOND THAT, NO.

8     Q    AND FOR PURPOSES OF TESTIFYING TODAY, ARE YOU

9  RELYING ON ANY OF THAT CONFIRMATORY WORK YOU AND YOUR

10  STAFF PERFORMED?

11     A    NO.

12     Q    HAVE YOU BEEN ASKED TO PERFORM ANY ADDITIONAL

13  WORK IN CONNECTION WITH PROFESSOR MCFADDEN'S OPINIONS

14  IN THE FUTURE?

15         MS. ROSE-SMITH:  ATUR, I'LL JUST NOTE FOR THE

16  RECORD THAT A NUMBER OF PIECES OF INFORMATION THAT

17  DR. HAMM SORT OF -- A NUMBER OF ANALYSES AND RESPONSES

18  THAT HE HAD TO MCFADDEN'S SURREBUTTAL, HE HAS A COUPLE

19  OF ONE-PAGERS THAT SORT OF SET FORTH INFORMATION ABOUT

20  THOSE.  THEY ARE TO REFRESH HIS RECOLLECTION ABOUT HIS

21  SPECIFIC THOUGHTS IN RESPONSE TO THE SURREBUTTAL.  AND

22  SO I HAVE THEM HERE.  I HAVE COPIES OF THEM.  I'M HAPPY

23  TO GIVE THEM TO YOU.

24         THEY ARE NOT -- ALL THEY ARE IS IT STARTS WITH

25  THE PARAGRAPH THAT MCFADDEN HAS IN HIS SURREBUTTAL AND

1   HAS NOTES FROM DR. HAMM ABOUT THE VARIOUS THOUGHTS HE

2   HAD ABOUT THEM TO HELP HIM TESTIFY TODAY.

3           MR. DESAI:  OKAY.  WHY DON'T WE TALK ABOUT

4   THAT NEXT BREAK.

5           MS. ROSE-SMITH:  OKAY.

6   BY MR. DESAI:

7       Q   IN PARAGRAPH 2 OF YOUR REBUTTAL REPORT, YOU

8   IDENTIFY THREE OCWEN ENTITIES THAT RETAINED YOU:  OCWEN

9   FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, AND

10  OCWEN LOAN SERVICING.  ARE YOUR OPINIONS THE SAME FOR

11  ALL THREE ENTITIES?

12      A   YES, TO THE EXTENT THERE -- IT'S RELEVANT TO

13  THOSE ENTITIES.

14      Q   DID YOU CONSIDER THE PRACTICES OF EACH ENTITY

15  SEPARATELY?

16      A   NO.

17      Q   SO THROUGHOUT YOUR REPORT WHEN YOU REFER TO

18  OCWEN, DID YOU INTEND TO REFER TO ALL THREE ENTITIES

19  COLLECTIVELY?

20      A   YES.

21      Q   AND FOR PURPOSES OF TODAY, WILL YOU UNDERSTAND

22  MY USE OF "OCWEN" TO REFER TO ALL THREE ENTITIES

23  COLLECTIVELY?

24      A   I WILL.

25          MS. ROSE-SMITH:  OBJECTION.

Page 21

1   BY MR. DESAI:

2       Q    IF ANY TIME DURING TODAY YOU THINK IT'S

3   IMPORTANT TO DISTINGUISH ONE OF THE THREE OCWEN

4   ENTITIES, PLEASE JUST LET ME KNOW.

5       A    I WILL DO SO.

6       Q    DOCTOR, PLEASE TURN TO SECTION 5 OF YOUR

7   REPORT, WHICH BEGINS ON PAGE 51.

8       A    I'M THERE.

9       Q    IN PARAGRAPH 132, YOU HAVE A PARAGRAPH UNDER

10  ASSIGNMENT.

11           DOES PARAGRAPH 132 FULLY DESCRIBE YOUR

12  ASSIGNMENT IN THIS CASE?

13      A    YES.

14      Q    AND IN PARAGRAPH 133, YOU WRITE THAT "OCWEN'S

15  COUNSEL DIRECTED ME TO ASSUME ARGUENDO THAT THE COURT

16  WILL FIND FOR THE BUREAU ON LIABILITY."

17           DID I READ THAT CORRECTLY?

18      A    YES.

19      Q    WERE YOU ASKED TO MAKE ANY OF THE OTHER

20  ASSUMPTIONS BY COUNSEL FOR PURPOSES OF THIS REBUTTAL

21  REPORT?

22      A    I WAS NOT.  IF I HAD BEEN, THEY WOULD HAVE

23  APPEARED IN THIS SECTION OF MY REPORT.

24      Q    AND FOR PURPOSES OF THIS REPORT, YOU ASSUMED

25  THAT THE COURT WILL FIND FOR THE BUREAU ON LIABILITY.

Page 22

1            IN PARAGRAPH 62 OF YOUR REPORT, YOU ALSO STATE

2   THAT YOU ASSUMED ARGUENDO LIABILITY FOR CERTAIN OF THE

3   BUREAU'S CONCERN -- SORRY -- CERTAIN OF THE BUREAU'S

4   ALLEGATIONS.

5            ARE THE BUREAU'S ALLEGATIONS IN PARAGRAPH 62

6   THE ONLY ALLEGATIONS FOR WHICH YOU ASSUMED LIABILITY?

7       A    I'LL HAVE TO LOOK AT PARAGRAPH 62 BEFORE I

8   COULD ANSWER.

9       Q    APOLOGIZE.  THERE'S A LITTLE BIT OF FLIPPING

10  AROUND.

11      A    NO PROBLEM.

12           MS. ROSE-SMITH:  PAGE 24.

13           THE WITNESS:  THOSE ARE THE ONLY ALLEGATIONS

14  FOR WHICH I'M ASSUMING ARGUENDO THAT THE COURT WILL

15  FIND FOR THE BUREAU.

16  BY MR. DESAI:

17      Q    DO YOU OFFER ANY OPINIONS REGARDING LIABILITY

18  FOR THE BUREAU'S ALLEGATIONS?

19      A    NO.

20      Q    ASSUMING LIABILITY, AS SUMMARIZED IN

21  PARAGRAPH 15 OF YOUR REBUTTAL REPORT, DO YOU BELIEVE

22  THAT FOR THE OPPORTUNITY COST DAMAGES THOSE ARE BETWEEN

23  ZERO DOLLARS AND $141,143?

24           THE REPORTER:  I'M SORRY.  CAN YOU KEEP YOUR

25  VOICE UP.

Page 23

1          MR. DESAI:  SURE.  BETWEEN ZERO DOLLARS AND

2     $141,143.

3          THE WITNESS:  YES, THAT IS MY OPINION.

4     BY MR. DESAI:

5     Q    AS DETAILED IN TABLE 1 OF YOUR REBUTTAL

6     REPORT, IS IT YOUR OPINION THAT THE MOST LIKELY AMOUNT

7     OF OPPORTUNITY COST DAMAGES IS ACTUALLY ZERO?

8     A    YES.

9     Q    AND WHICH NUMBER DO YOU THINK IS MORE

10    RELIABLE, THE ZERO DOLLARS OR THE UPPER BOUND OF

11    $141,000 AND CHANGE?

12    A    THE ZERO DOLLARS.

13    Q    OKAY.  AND ALSO ASSUMING LIABILITY SUMMARIZED

14    IN PARAGRAPH 17 OF YOUR REBUTTAL REPORT FOR ADDITIONAL

15    FORECLOSURE DAMAGES, YOUR OPINION IS THAT DAMAGES ARE

16    ZERO DOLLARS; IS THAT CORRECT?

17    A    WELL, MY OPINION IS THAT THE DELAYS IN

18    PREPARING ESCROW ANALYSES DID NOT RESULT IN ANY

19    FORECLOSURE-RELATED DAMAGES BECAUSE THE AMOUNTS IN

20    QUESTION ARE SIMPLY TOO SMALL IN ORDER TO CAUSE SUCH

21    DAMAGES.

22          MY PRIMARY CONCLUSION OR OPINION IS THAT

23    PROFESSOR MCFADDEN HAS NOT DEMONSTRATED THAT EVEN A

24    SINGLE LOAN OR A SINGLE BORROWER SUFFERED ANY

25    FORECLOSURE-RELATED DAMAGES.

1      Q    SO IS IT FAIR TO SAY THAT YOUR OPINION AS

2    SUMMARIZED IN PARAGRAPH 17 IS THAT THE DAMAGES

3    RESULTING FROM ADDITIONAL FORECLOSURES IS ZERO DOLLARS?

4      A    THE DAMAGES THAT -- WELL, I DON'T BELIEVE THAT

5    THERE IS ANY EVIDENCE IN THIS CASE THAT THE DELAYED

6    ESCROW ANALYSIS, WHICH IS WHAT PROFESSOR MCFADDEN

7    CLAIMS CAUSED ADDITIONAL FORECLOSURES TO HAPPEN -- OR I

8    GUESS MORE PROPERLY INCREASED THE PROBABILITY THAT

9    ADDITIONAL FORECLOSURES WOULD OCCUR.  I DON'T THINK

10   THERE'S ANY EVIDENCE TO SUPPORT THAT.

11          PERHAPS THERE ARE OTHER ALLEGATIONS THAT

12   PROFESSOR -- NEITHER PROFESSOR MCFADDEN NOR I LOOKED AT

13   THAT MIGHT HAVE RESULTED IN ADDITIONAL FORECLOSURES.  I

14   WOULDN'T KNOW ABOUT THAT.

15          BUT IN TERMS OF THE DELAYED ESCROW ANALYSES,

16   NO, IT'S MY OPINION THAT THAT DID NOT CAUSE ANY

17   ADDITIONAL FORECLOSURES.  ZERO.

18     Q    AND TURNING BACK TO PARAGRAPH 132 UNDER

19   "ASSIGNMENT" --

20     A    I'M THERE.

21     Q    -- YOU WRITE THAT YOU WERE ALSO ASKED TO

22   EVALUATE THE EXTENT TO WHICH PROFESSOR MCFADDEN'S

23   ASSUMPTIONS REGARDING LIABILITY ARE CONSISTENT WITH THE

24   CLAIMS ARTICULATED BY THE --

25          THE REPORTER:  I'M SORRY.

Page 25

1    BY MR. DESAI:

2        Q    -- ARE CONSISTENT WITH THE CLAIMS ARTICULATED

3    BY THE BUREAU AND THE INFORMATION THAT OCWEN PROVIDED

4    DISCOVERY.

5            AT A HIGH LEVEL, CAN YOU PLEASE EXPLAIN WHAT

6    EVALUATION DR. MCFADDEN'S LIABILITY ASSUMPTION YOU

7    PERFORMED?

8            MS. ROSE-SMITH:  OBJECTION.

9            THE WITNESS:  SORRY.

10           I JUST LOOKED AT HIS ASSUMPTIONS REGARDING

11   LIABILITY AND ATTEMPTED TO DETERMINED IF THEY WERE

12   CONSISTENT WITH THE ALLEGATIONS IN THE BUREAU'S

13   COMPLAINT.

14   BY MR. DESAI:

15       Q    AND IS THE EXTENT OF YOUR REVIEW CONTAINED IN

16   YOUR REBUTTAL REPORT?

17       A    IT IS.

18       Q    PLEASE TURN TO PARAGRAPH 135 IN YOUR REBUTTAL

19   REPORT.

20       A    I'M THERE.

21       Q    HERE YOU REFER TO DATA EXTRACTED FROM OCWEN'S

22   SYSTEMS AS RAW TRANSACTIONAL DATA; IS THAT CORRECT?

23       A    YES.

24       Q    AND IT IS YOUR OPINION THAT RAW TRANSACTIONAL

25   DATA IS, QUOTE, THE MOST RELIABLE DATA, END QUOTE, WHEN

1  ANALYZING LOAN SERVICING ACTIVITIES.  YOU IDENTIFY

2  THREE REASONS.

3           FIRST, IT IS COMPILED IN THE ORDINARY COURSE

4  OF BUSINESS; SECOND, IS USED TO SERVICE THE LOANS; AND

5  FINALLY, IT IS SUBJECT TO OCWEN'S INTERNAL CONTROL

6  PROCESSES.

7           IS THAT CORRECT?

8      A    YES.

9           MS. ROSE-SMITH:  OBJECTION.

10  BY MR. DESAI:

11     Q    ARE THERE ANY OTHER REASONS YOU BELIEVE RAW

12  TRANSACTIONAL DATA TO BE THE MOST RELIABLE?

13     A    LET ME THINK.  I WOULD SIMPLY ADD SOMETHING

14  THAT IS IMPLICIT IN THE OTHER THREE -- OR CERTAINLY THE

15  FIRST TWO -- AND THAT IS IT IS THE DEFINITIVE RECORD OF

16  ALL CASH FLOWS INVOLVING THE LOAN, ALL DISBURSEMENTS ON

17  BEHALF OF THE LOAN, ALL RECEIPTS FROM THE BORROWER OR

18  ANY OTHER SOURCE.

19           SO IT IS THE DEFINITIVE RECORD OF CASH FLOWS

20  FOR THAT PARTICULAR LOAN.

21     Q    AND FOCUSING ON THE LAST REASON YOU OFFER,

22  OCWEN'S INTERNAL CONTROL PROCESSES.

23           WHICH INTERNAL CONTROL PROCESSES ARE YOU

24  REFERRING TO?

25     A    A NUMBER OF THEM.  THE EDIT CHECKS THAT ARE

1   BUILT INTO A LOAN SERVICING SYSTEM THAT ARE DESIGNED TO

2   SPOT ERRORS; THE INTERNAL AUDIT PROCESS THAT SAMPLES

3   LOANS AND REVIEWS THE RECORDS FOR ACCURACY; THE

4   SUPERVISORY LEVELS WITHIN ANY LOAN SERVICER, IN THIS

5   CASE OCWEN, THAT IS, AMONG OTHER DUTIES, INTENDS TO

6   ENSURE THAT THE INFORMATION IS ACCURATE.

7         THERE MAY BE OTHERS.  THOSE ARE THE ONES THAT

8   COME TO MIND AS I SIT HERE.

9      Q    DID YOU REVIEW OCWEN'S SYSTEMS EDIT CHECKS

10  PROCESSES?

11     A    I DID NOT.

12     Q    DID YOU REVIEW OCWEN'S INTERNAL AUDIT

13  PROCESSES?

14     A    NOT THE PROCESSES.  I SAW SOME RESULTS OF THE

15  INTERNAL AUDIT -- INDIVIDUAL INTERNAL AUDITS, BUT NO, I

16  DID NOT CONDUCT AN ANALYSIS OR REVIEW OF THE PROCESSES

17  THEMSELVES.

18     Q    AND DID YOU REVIEW OCWEN'S SUPERVISORY LEVELS

19  AS YOU DESCRIBED IT?

20     A    I DID NOT.

21     Q    DID YOU PERFORM ANY ANALYSIS REGARDING THE

22  SUFFICIENCY OF OCWEN'S INTERNAL CONTROL PROCESSES?

23     A    NO.

24         MS. ROSE-SMITH:  OBJECTION.

25  ///

Page 28

1    BY MR. DESAI:

2        Q    ARE YOU OFFERING ANY OPINIONS REGARDING THE

3    ADEQUACY OF OCWEN'S INTERNAL CONTROL PROCESSES?

4        A    NO.

5        Q    AND IN PARAGRAPH 136 AND 137 OF YOUR REBUTTAL

6    REPORT, YOU DETAIL DATA YOU CATEGORIZED AS "REMEDIATION

7    WORK PRODUCT."

8             DO YOU SEE THAT?

9        A    I DO.

10       Q    IS IT YOUR OPINION THAT OCWEN'S REMEDIATION

11   WORK PRODUCT IS RELIABLE?

12       A    PUT IT THIS WAY:  I HAVE NO REASON TO BELIEVE

13   THAT THE REMEDIATION WORK PRODUCT IS UNRELIABLE.

14       Q    AND IN PARAGRAPH 137 YOU STATE THAT "GENERALLY

15   SPEAKING THE ACTIVITIES REFLECTED IN REMEDIATION WORK

16   PRODUCT CAN BE CORROBORATED BY RAW TRANSACTION DATA."

17            WHAT DO YOU MEAN BY "GENERALLY SPEAKING" IN

18   THIS SENTENCE?

19       A    THERE MAY BE SOME INFORMATION IN A REMEDIATION

20   WORK PRODUCT THAT IS DERIVED FROM SOURCES OTHER THAN

21   THE RAW TRANSACTIONAL DATA COULD COME -- UNLESS YOU

22   EXPAND THE DEFINITION OF THE DEFINITION OF RAW

23   TRANSACTIONAL DATA TO INCLUDE COMMON FILES, FOR

24   EXAMPLE, THAT THE LOAN SERVICERS PREPARE AS THEY TAKE

25   ACTION ON INDIVIDUAL LOANS.  BUT THAT'S WHY I SAID

1    "GENERALLY SPEAKING."

2        Q     AND WHAT REMEDIATION WORK PRODUCT ARE YOU

3    SPECIFICALLY REFERRING TO?

4        A     I CAN'T -- I CAN'T RECALL A SPECIFIC ROG OR

5    DESIGNATION, BUT THERE WAS A PRODUCTION IN THIS CASE

6    THAT SUMMARIZED OCWEN'S EFFORTS TO REMEDIATE ERRORS,

7    FOR EXAMPLE, IN THE SERVICING OF ARM LOANS.  AND THAT'S

8    WHAT I RECALL.

9        Q     WOULD ANY REMEDIATION WORK PRODUCT YOU

10   IDENTIFIED BE CONTAINED IN YOUR MATERIALS CONSIDERED?

11       A     ANY REMEDIATION WORK PRODUCT THAT I'M AWARE OF

12   FOR PURPOSES OF THE BUREAU'S CASE WOULD BE IN MY

13   MATERIALS CONSIDERED.

14       Q     AND HOW DID YOU CORROBORATE THAT THE

15   ACTIVITIES REFLECTING THE REMEDIATION WORK PRODUCT

16   MATCHED THOSE IN THE RAW TRANSACTION DATA?

17       A      TO THE EXTENT IT WAS RELEVANT TO ANY ANALYSIS

18   I CONDUCTED, I WOULD LOOK IN THE RAW TRANSACTIONAL DATA

19   TO CONFIRM THAT THE INFORMATION MATCHED UP.  IF IT

20   DIDN'T MATCH UP -- AND I CAN'T RECALL AS I SIT HERE

21   WHETHER THERE WERE ANY SUCH INSTANCES -- THEN I WOULD

22   ASK THE STAFF TO ATTEMPT A RECONCILIATION TO GET MORE

23   INFORMATION, IF I COULDN'T RECONCILE THEM.  AND IT WAS

24   THE TYPE OF INFORMATION FOR WHICH THE RAW TRANSACTIONAL

25   DATA AS A DEFINITIVE SOURCE, I WOULD USE THAT.

1    Q    AND WHEN YOU DISCUSS "RAW TRANSACTIONAL DATA,"

2  WHAT DATA ARE YOU SPECIFICALLY REFERRING TO?

3    A    SPECIFICALLY WHAT IS CALLED IN MOST LOAN

4  SERVICE OPERATIONS THE FINANCIAL HISTORY DATA, DATASET.

5    Q    AND FOR PURPOSES OF THIS LITIGATION, IS THIS

6  OCWEN'S RESPONSES TO THE BUREAU'S FIFTH SET OF REQUEST

7  FOR PRODUCTION OF DOCUMENTS NUMBER 22?

8    A    CORRECT.

9    Q    CAN WE JUST REFER TO THIS AS RFP 22 TODAY?

10    A    SURE.

11    Q    AND GENERALLY THROUGHOUT TODAY, IF I REFER TO

12  RFP FOLLOWED BY A SPECIFIC NUMBER, WILL YOU UNDERSTAND

13  THAT I'M REFERRING TO A SPECIFIC REQUEST NUMBER FROM

14  THE BUREAU'S FIFTH SET OF PRODUCTION OF DOCUMENTS?

15    A    I WILL.

16    Q    AND YOU JUST MENTIONED THAT YOU ASKED YOUR

17  STAFF TO PERFORM CERTAIN ANALYSES OF RECONCILIATION OF

18  WORK -- OF REMEDIATED WORK PRODUCT TRANSACTIONAL DATA.

19         DO YOU REMEMBER THAT?

20    A    CORRECT.

21    Q    DID YOU PRODUCE THESE RECONCILIATIONS?

22    A    TO THE EXTENT THEY TOOK THE FORM OF A DOCUMENT

23  OR ELECTRONIC DOCUMENT, YES.

24    Q    AND THAT WOULD BE EITHER IN YOUR BACKUP

25  MATERIALS OR SOMEWHERE WITHIN THE BODY OF YOUR REPORT?

1      A     CORRECT.

2      Q     AND ARE YOU OFFERING ANY OPINIONS REGARDING

3   REMEDIATION OCWEN CONTENDS WAS PROVIDED WAS, IN FACT,

4   PROVIDED?

5           MS. ROSE-SMITH:  OBJECTION.

6           THE WITNESS:  COULD YOU REPEAT THE QUESTION,

7   PLEASE?

8   BY MR. DESAI:

9      Q     SURE.

10          ARE YOU OFFERING ANY OPINIONS REGARDING

11  WHETHER REMEDIATION WHICH OCWEN CONTENDS WAS PROVIDED

12  WAS, IN FACT, PROVIDED?

13          MS. ROSE-SMITH:  SAME OBJECTION.

14          THE WITNESS:  I WILL SIMPLY SAY THIS:  THAT IF

15  THE REMEDIATION APPEARS AS A DISBURSEMENT TO THE

16  BORROWER IN THE FINANCIAL HISTORY DATASET, I ASSUME

17  THAT IT HAPPENED, BUT I DID NOTHING TO CONFIRM THAT A

18  CHECK WAS ACTUALLY WRITTEN AND PROVIDED TO THE BORROWER

19  OR THAT A CREDIT WAS GIVEN IN ONE OF THE BORROWER'S

20  ACCOUNTS.

21  BY MR. DESAI:

22     Q     AND DID YOU PROVIDE -- OR SORRY.  STRIKE THAT.

23          DID YOU, AS PART OF THIS CHECK THAT YOU

24  PERFORMED, DID YOU ALSO INQUIRE AS TO WHETHER OR NOT

25  THE DISBURSEMENT WAS OFFERED SPECIFICALLY FOR

Page 32

1    REMEDIATION FOR A SPECIFIC SERVICING ERROR?

2              MS. ROSE-SMITH:  OBJECTION.

3              THE WITNESS:  NOT THAT I RECALL.

4    BY MR. DESAI:

5       Q    DO YOU RECALL ANY SPECIFIC POPULATIONS FOR

6    WHICH YOU PERFORMED THIS CHECK OF REMEDIATION CREDITS

7    TO DISBURSEMENTS?

8       A    I DO NOT.

9       Q    ARE YOU OFFERING ANY OPINIONS REGARDING THE

10   SUFFICIENCY OF THE REMEDIATION OCWEN PROVIDED?

11      A    NO.

12      Q    AND IN PERFORMING YOUR CHECK OF REMEDIATION

13   CREDITS TO DISBURSEMENTS, DID YOU COMPARE THE DATE OF

14   THE CREDIT TO THE DATE OF THE SERVICING ERROR?

15      A    AS I SIT HERE, I DON'T RECALL ONE WAY OR

16   ANOTHER.

17      Q    PLEASE TURN TO PAGE 56.

18              SECTION 6 OF YOUR REBUTTAL REPORT IS TITLED

19   "PROFESSOR MCFADDEN'S OPPORTUNITY COST DAMAGES."  I

20   WANT TO FOCUS A LITTLE BIT ON THE SUBSECTION HERE WHICH

21   IS MY AFFIRMATIVE OPINIONS ON DAMAGES.

22              THE REPORTER:  WHICH IS?

23              MR. DESAI:  MY AFFIRMATIVE OPINIONS ON

24   DAMAGES.  I HAVE A SOFT VOICE.

25   ///

Page 33

1    BY MR. DESAI:

2        Q    ARE YOUR OPINIONS SURROUNDING OPPORTUNITY COST

3    DAMAGES LIMITED TO THE SAME THREE POPULATIONS AS THE

4    ONES PROFESSOR MCFADDEN QUANTIFIED OPPORTUNITY COST

5    DAMAGES FOR?

6        A    YES.  I'M A REBUTTAL WITNESS.  AND SO I SIMPLY

7    CONSIDERED PROFESSOR MCFADDEN'S OPINIONS ON OPPORTUNITY

8    COST DAMAGE AND MY ANALYSIS WAS CONFINED TO THE SAME

9    POPULATION GROUP THAT HE DEALT WITH.

10       Q    AND THE FIRST POPULATION IS DELAYED ESCROW

11   ANALYSIS; IS THAT CORRECT?

12       A    IT'S ONE OF THE THREE, AND I THINK

13   CHRONOLOGICALLY IT'S THE FIRST ONE I DISCUSSED IN MY

14   REPORT.

15       Q    I'M JUST GOING TO GO THROUGH ALL THREE JUST TO

16   MAKE SURE WE'RE ON THE SAME PAGE.

17       A    SURE.

18       Q    AND THE SECOND POPULATION IS PMI OVERCHARGES;

19   IS THAT CORRECT?

20       A    YES.

21       Q    AND THE FINAL AND THIRD POPULATION IS ARM LOAN

22   SERVICING ERRORS; IS THAT CORRECT?

23       A    YES.

24       Q    AND CAN WE AGREE THAT UNLESS I REFER TO A

25   SINGLE ONE OF THE SPECIFIC POPULATIONS, THAT WE'RE

1   REFERRING TO ALL THREE CUMULATIVELY AS OPPORTUNITY COST

2   POPULATIONS FOR TODAY?

3        A    WE CAN.

4        Q    AND OF COURSE IF YOUR ANSWER IS LIMITED TO

5   ONLY ONE OF THE THREE SUBPOPULATIONS, JUST PLEASE LET

6   ME KNOW AND ANSWER APPROPRIATELY.

7        A    I WILL DO SO.

8        Q    IN PARAGRAPH 147 YOU WRITE THAT, "I FIND THAT

9   THE OPPORTUNITY COST DAMAGES SUFFERED BY OCWEN'S

10  BORROWERS IS NOT MATERIALLY DIFFERENT FROM ZERO"; IS

11  THAT CORRECT?

12       A    CORRECT.

13       Q    WHEN YOU SAY "NOT MATERIALLY DIFFERENT FROM

14  ZERO," WHAT DO YOU MEAN?

15       A    I MEAN IT COULD BE IN SOME CASES LESS THAN A

16  DOLLAR, BUT IT -- SO IT MAY NOT -- IN MANY CASES, IT

17  WILL BE EXACTLY ZERO.  IN SOME CASES, IT MAY BE A

18  NICKEL OR A DIME OR SOMETHING LIKE THAT, BUT NOT

19  MATERIALLY DIFFERENT FROM ZERO.

20       Q    AND AS WE TALKED A LITTLE BIT EARLIER, YOU DO

21  BELIEVE THAT ACROSS ALL THREE POPULATIONS, THE SUM

22  TOTAL OF OPPORTUNITY COST DAMAGES ARE ACTUALLY ZERO;

23  CORRECT?

24       A    WELL, AS I SAY IN MY REPORT, I BELIEVE THAT

25  THE MOST LIKELY MEASURE OF DAMAGES IS ZERO AND I ALSO

1    INCLUDE A HIGH ESTIMATE THAT IS GREATER THAN ZERO.

2        Q    AND IN PARAGRAPH 152 YOU WRITE, "THAT THE

3    CONCEPT OF OPPORTUNITY COST IS OFTEN EMPLOYED IN

4    DAMAGES ANALYSES"; IS THAT CORRECT?

5        A    YES.

6        Q    AND WHAT DO YOU MEAN BY THIS STATEMENT?

7        A    THAT I HAVE BEEN INVOLVED IN LITIGATION

8    MATTERS AS A TESTIFYING EXPERT IN WHICH PART OF THE

9    CLAIM, IN SOME CASES PART OF THE AWARD, WAS AN EFFORT

10   TO PUT THE AGGRIEVED PARTY BACK IN THE SAME ECONOMIC

11   POSITION THE PARTY WOULD HAVE BEEN IN HAD THE DEFENDANT

12   NOT ACTED IMPROPERLY AND WHERE THERE IS INFORMATION

13   AVAILABLE ON WHAT THE OPPORTUNITY COSTS ARE THAT MAY BE

14   -- THAT IS USED AS A MEASURE OF THE COMPENSATION NEEDED

15   IN ORDER TO ACCOMPLISH THAT OBJECTIVE.

16       Q    DO YOU BELIEVE THAT USING AN OPPORTUNITY COST

17   MEASURE IS APPROPRIATE IN CASES WHERE THE CLAIM

18   INVOLVES A PARTY BEING OVERCHARGED FOR SOMETHING?

19       A    IF A PARTY WAS DENIED THE USE OF THEIR MONEY,

20   THEN I THINK IT IS APPROPRIATE TO ASK AND ANSWER THE

21   QUESTION WHAT WOULD THE AGGRIEVED PARTY, WHAT WOULD THE

22   PLAINTIFF IN THIS CASE, HAVE DONE WITH THE MONEY AND

23   WHAT WAS THE ECONOMIC LOSS AS A RESULT OF NOT BEING

24   ABLE TO DO THAT WITH THEIR MONEY.

25            THAT IS AN APPROPRIATE LINE OF INQUIRY FOR

Page 36

1  DAMAGES, IN MY OPINION.

2      Q    AND YOU WROTE IN PARAGRAPH 145 THAT YOU

3  BELIEVE THAT PROFESSOR MCFADDEN'S OPPORTUNITY COST

4  DAMAGES OVERSTATES THE HARM THAT BORROWERS EXPERIENCED

5  DUE AND, QUOTE, PRIMARILY FROM THE ^ CK  ILLOGICAL AND

6  INFLATED INTEREST RATES, END QUOTE, USED.

7          IS THAT CORRECT?

8      A    LET ME CATCH UP WITH YOU, PLEASE.

9      Q    SURE.

10     A    YES.

11     Q    AND YOUR OPINIONS REGARDING THE APPROPRIATE

12  INTEREST RATE IS THE SAME FOR ALL THREE OF THE

13  OPPORTUNITY COST POPULATIONS; IS THAT CORRECT?

14     A    THAT'S CORRECT.

15     Q    AND IT'S YOUR AFFIRMATIVE OPINION THAT THE

16  OPPORTUNITY COST DAMAGES TO BORROWERS IMPACTED BY

17  OCWEN'S SERVICING FAILURES IS BEST MEASURED BY THE

18  INTEREST RATE ON SAVINGS ACCOUNTS DURING THE RELEVANT

19  TIME PERIOD; IS THAT CORRECT?

20     A    I BELIEVE SO, YES.

21     Q    WHY DID YOU SELECT THE INTEREST RATE ON

22  SAVINGS ACCOUNTS DURING THE RELEVANT TIME PERIOD AS THE

23  BEST MEASURE OF OPPORTUNITY COSTS?

24     A    BECAUSE I THINK THE AVAILABLE EVIDENCE

25  SUGGESTS THAT'S WHERE THE MONEY WOULD HAVE GONE IF IT

```
                                                  Page 37
 1    HAD -- IF IT HAD NOT BEEN HELD BY OCWEN AND HAD GONE TO

 2    THE BORROWER ON A TIMELY BASIS.

 3         Q    IS IT YOUR OPINION THAT THE BORROWERS

 4    SPECIFICALLY AT ISSUE IN THE THREE OPPORTUNITY COST

 5    POPULATIONS HAD EXTRA CASH ON HAND TO COVER THE

 6    OVERCHARGES?

 7              MS. ROSE-SMITH:  OBJECTION.

 8              THE WITNESS:  WELL, IN -- NO.  ACTUALLY, IN

 9    THE CASE OF, WHAT, 85 PERCENT OF THE CLAIMED DAMAGES OR

10    THE DAMAGES THAT PROFESSOR MCFADDEN CLAIMS, THEY DIDN'T

11    PAY ANYTHING.  THEY WERE -- THEY WERE DELINQUENT AND

12    NOT PAYING.  AND MAYBE IT WASN'T 85 PERCENT.  BUT THEY

13    HAD A SHORTAGE IN THEIR ACCOUNT MAINLY BECAUSE THEY

14    WERE DELINQUENT SO THEY WERE NOT PAYING.  THEY WERE NOT

15    ABLE TO PAY ANY PART OF THE MORTGAGE.

16              THOSE BORROWERS THAT DID PAY IT, YES, THEY

17    CERTAINLY HAD THE RESOURCES TO PAY IT AND THOSE

18    RESOURCES UNDOUBTEDLY CAME, IN MOST CASES, NOT EVERY

19    SINGLE CASE, BUT IN MOST CASES, FROM THE BORROWER'S

20    LIQUID ASSETS, CHECKING ACCOUNT, SAVINGS ACCOUNT,

21    SOMETHING LIKE THAT.  MONEY MARKET ACCOUNT.

22    BY MR. DESAI:

23         Q    AND YOU USED AN OUTWARD BOUND INTEREST RATE OF

24    3.25 PERCENT FOR CALCULATING THE OPPORTUNITY COST; IS

25    THAT CORRECT?
```

Page 38

1      A    THAT IS CORRECT.

2           MS. ROSE-SMITH:  OBJECTION.

3   BY MR. DESAI:

4      Q    AND YOU DESCRIBED THAT AS BEING GENEROUS; IS

5   THAT CORRECT?

6      A    YES.

7      Q    WHY DO YOU BELIEVE IT'S GENEROUS?

8      A    WELL, BECAUSE THE ORIGIN OF THE 3.25 PERCENT

9   IS WHAT AN OCWEN DOCUMENT THAT I REVIEWED INDICATED WAS

10  THE MAXIMUM INTEREST RATE THAT ANY STATE IN THE UNION

11  REQUIRED A LOAN SERVICER TO PAY ON BALANCES IN AN

12  ESCROW ACCOUNT.

13          AND AS YOU KNOW FROM MY REPORT, I BELIEVE THAT

14  THE -- WHEN THE DEMOCRATIC PROCESS ESTABLISHES A

15  MINIMUM INTEREST RATE THAT MUST BE PAID ON AN ESCROW

16  ACCOUNT, THAT THAT IS -- THAT THAT IS THE MAXIMUM THAT

17  A DEFENDANT WOULD NEED TO PAY IN ORDER TO COMPENSATE

18  THE BORROWER.  AND 3.25 PERCENT WAS THE HIGHEST.

19          MY STATE, CALIFORNIA, AT THE TIME REQUIRED

20  2 PERCENT, WHICH WAS ALSO GENEROUS, BUT NOT AS GENEROUS

21  AS 3.25 PERCENT.  THE REASON I SAY IT WAS GENEROUS IS I

22  WAS IN CALIFORNIA AT THE TIME.  THERE WAS NO BANK OR

23  SAVINGS AND LOAN YOU COULD GO TO AND GET 2 PERCENT ON

24  YOUR LIQUID ASSETS.  THOSE RATES AT THE TIME WERE --

25  WELLS FARGO CHECKING ACCOUNT RATE, WHICH I KNOW

Page 39

1   PAINFULLY VERY WELL, WAS .05 PERCENT DURING THIS

2   PERIOD.  AGAIN, NOT MATERIALLY DIFFERENT FROM ZERO.  SO

3   I THINK 3.25 PERCENT WAS PRETTY GENEROUS.

4        Q    AND YOU OFFER A DEFINITION IN PARAGRAPH 150

5   FOR OPPORTUNITY COST.  YOU WRITE THAT, "IT'S THE

6   COST" -- "THE COST ASSOCIATED WITH OPPORTUNITIES THAT

7   ARE FOREGONE WHEN RESOURCES ARE NOT PUT TO THEIR BEST

8   ALTERNATIVE USE."

9             DID I READ THAT CORRECTLY?

10       A    YOU DID.

11       Q    YOU WRITE IN PARAGRAPH 151 THAT THE CONCEPT OF

12  OPPORTUNITY COST IS OFTEN APPLIED IN THE CONTEXT OF

13  INVESTMENT DECISION-MAKING; IS THAT CORRECT?

14       A    YES.

15       Q    AND YOU BELIEVE THAT CONSUMER'S BEST

16  ALTERNATIVE USE TO EXCESS CASH IS PUTTING IT IN A

17  SAVINGS ACCOUNT; IS THAT RIGHT?

18       A    FOR THESE CONSUMERS AT THIS TIME, YES.

19       Q    ARE YOU FAMILIAR WITH RETIREMENT 401(K) FUNDS?

20       A    I HAVE ONE.

21       Q    SO IS THAT A YES?

22            MS. ROSE-SMITH:  OBJECTION.

23            THE WITNESS:  YES, I AM FAMILIAR WITH

24  RETIREMENT 401(K) FUNDS.

25  ///

Page 40

1    BY MR. DESAI:

2        Q     ARE YOU FAMILIAR WITH MUTUAL FUNDS?

3        A     YES.

4        Q     CONSUMERS WITH EXCESS CASH HAVE A CHOICE WITH

5    HOW TO USE THAT EXCESS CASH; IS THAT CORRECT?

6        A     THEY HAVE A CHOICE WITH HOW TO USE THAT EXCESS

7    CASH.

8        Q     IN YOUR OPINION, IS IT POSSIBLE THAT SOME

9    CONSUMERS MIGHT SEE THE HIGHER RETURN POTENTIAL OF AN

10   INVESTMENT AS THE BEST ALTERNATIVE USE OF CASH?

11       A     I THINK WHEN YOU'RE TALKING ABOUT A POPULATION

12   AS LARGE AS THIS, MIGHT YOU FIND ONE BORROWER, MAYBE

13   SEVERAL BORROWERS WHO FELT THAT WAY.  YES, THAT'S

14   POSSIBLE.

15       Q     AND IS IT ALSO POSSIBLE THAT SOME CONSUMERS

16   MIGHT USE THEIR EXCESS CASH IN PLACE IN THEIR

17   RETIREMENT 401(K)?

18       A     PROBABLY NOT BECAUSE THEY WOULD FUND THE

19   401(K) OUT OF THEIR OTHER RESOURCES AND PROBABLY WOULD

20   HAVE FULLY FUNDED IT.

21             BUT, AGAIN, WHEN YOU'RE TALKING ABOUT A

22   POPULATION THIS LARGE, COULD YOU FIND ONE BORROWER WHO

23   MAY NOT HAVE -- WHO CAME WITHIN $15 OF MAXING OUT ON

24   THEIR 401(K) AND JUST COULDN'T FIND THAT $15 BECAUSE

25   THAT'S WHAT OCWEN -- THAT WAS THE ALLEGED OPPORTUNITY

Page 41

1    COST THAT THEY BORE.  I SUPPOSE THAT IS REMOTELY

2    POSSIBLE, BUT NOT VERY LIKELY.

3         Q    AND IS IT SIMILARLY POSSIBLE THAT SOME

4    CONSUMERS MIGHT USE THEIR EXCESS CASH AND BUY A MUTUAL

5    FUND?

6         A    IT IS POSSIBLE, AGAIN, BUT NOT LIKELY.  AGAIN,

7    WHEN YOU'RE TALKING ABOUT A POPULATION THIS LARGE, I

8    HAVE TO ACKNOWLEDGE THAT THERE MAY BE ONE BORROWER WHO

9    SOUGHT AS AN ALTERNATIVE USE OF THE FUNDS IN QUESTION

10   NOT BUILDING UP THEIR BANK ACCOUNT, BUT BUYING $15 ON

11   AVERAGE OF ADDITIONAL SHARES IN A MUTUAL FUND, YEAH,

12   THAT'S A POSSIBILITY.

13        Q    AND WHAT ANALYSIS DID YOU PERFORM TO DETERMINE

14   THAT CONSUMERS IN GENERAL PLACE EXCESS CASH IN A

15   SAVINGS ACCOUNT AS OPPOSED TO SOME OTHER INVESTMENT

16   OPPORTUNITY IN THIS TIME PERIOD?

17             MS. ROSE-SMITH:  OBJECTION.

18             THE WITNESS:  SO, AGAIN, WHAT I DID WAS I'M A

19   REBUTTAL WITNESS AND I AM REBUTTING PROFESSOR MCFADDEN,

20   WHO SELECTED NOT MUTUAL FUND BUT CREDIT CARD INTEREST

21   RATES, AND I CITE A NUMBER OF DOCUMENTS WHY THAT IS

22   WRONG AND HE VERY HELPFULLY IN HIS SURREBUTTAL REPORTS

23   CITED SOME ADDITIONAL INFORMATION THAT ALSO SUPPORTS MY

24   OPINION.

25             SO I DIDN'T CONDUCT A SURVEY OF BORROWERS

Page 42

1    BECAUSE IT WASN'T NECESSARY.  I'M A REBUTTAL WITNESS

2    AND MY FOCUS WAS ON THE CREDIT CARD RATES THAT HE USED.

3             I'VE ALSO INDICATED, MR. DESAI, THAT IN MY

4    OPINION, WHEN THE DEMOCRATIC PROCESS ESTABLISHES A

5    MINIMUM LEVEL OF RETURN FOR BALANCES IN ESCROW

6    ACCOUNTS, WHICH IS WHERE ALL OF THIS MONEY WAS, THAT

7    THAT IS A REASONABLE MEASURE OF WHAT AN APPROPRIATE

8    RATE OF RETURN IS FOR THOSE INDIVIDUALS.

9             BUT NO, I DIDN'T CONDUCT A SURVEY OF BORROWERS

10   AND ASK EACH OF THEM WHAT THEIR NEXT BEST ALTERNATIVE

11   WAS.

12   BY MR. DESAI:

13     Q    AND DID YOU PERFORM ANY ANALYSIS TO DETERMINE

14   THAT OCWEN'S BORROWERS IN PARTICULAR PLACED EXCESS CASH

15   IN SAVINGS ACCOUNTS AS OPPOSED TO SOME OTHER

16   OPPORTUNITY?

17     A    I DIDN'T CONDUCT ANY SURVEY OF OCWEN'S

18   BORROWERS, NO.

19     Q    AND DID YOU PERFORM ANY ANALYSIS TO DETERMINE

20   THAT THE OCWEN BORROWERS IN THE THREE SPECIFIC

21   OPPORTUNITY COST POPULATIONS PLACED EXCESS CASH IN A

22   SAVINGS ACCOUNT AS OPPOSED TO SOME OTHER OPPORTUNITY?

23             MS. ROSE-SMITH:  OBJECTION.

24             THE WITNESS:  WELL, IF YOU'RE ASKING ME WHAT

25   THEY WOULD HAVE DONE IF THEY DIDN'T PLACE THAT MONEY IN

Page 43

1   AN ESCROW ACCOUNT, BECAUSE THEY HAD TO, WHAT THEY WOULD

2   HAVE DONE WITH IT, NO, I DIDN'T CONDUCT A SURVEY, NOR

3   DID PROFESSOR MCFADDEN FOR THAT MATTER CONDUCT A SURVEY

4   OF WHAT -- WHAT THEY WOULD HAVE DONE WITH THE MONEY.

5   BY MR. DESAI:

6       Q    AND IN PARAGRAPH 154, YOU WRITE THAT, "MOST

7   CREDIT CARD HOLDERS DO NOT CARRY BALANCES FROM ONE

8   MONTH TO THE NEXT AND THEREFORE PAY NO INTEREST ON

9   THEIR CARDS."

10          YOUR SUPPORT FOR THIS STATEMENT IS BASED ON

11  THE NATIONAL FOUNDATION OF CREDIT COUNSELING FINANCIAL

12  LITERACY SURVEY.

13          IS THAT CORRECT?

14      A    WHERE ARE YOU?  I'M SORRY.

15      Q    PARAGRAPH 154.

16      A    ACTUALLY IN PARAGRAPH 155 I TALK ABOUT THE

17  NATIONAL FOUNDATION FOR CREDIT COUNSELING'S FINANCIAL

18  LITERACY SURVEY AND I DO CITE THAT AS EVIDENCE THAT A

19  LARGE MAJORITY OF HOUSEHOLDS DO NOT INCUR INTEREST

20  CHARGES ON THEIR CREDIT CARDS BECAUSE THEY DON'T CARRY

21  BALANCES FROM MONTH TO MONTH.

22          MR. DESAI:  I'M HANDING TO THE REPORTER TO

23  MARK AS EXHIBIT 5.

24  ///

25  ///

Page 44

1          (EXHIBIT 5 WAS MARKED FOR

2          IDENTIFICATION AND WAS ATTACHED

3          HERETO.)

4     BY MR. DESAI:

5       Q    AND EXHIBIT 5 IS THE 2019 CONSUMER FINANCIAL

6     LITERACY SURVEY.

7            IS THIS THE SAME SURVEY THAT YOU RELIED ON,

8     SIR?

9       A    I THINK SO, BUT I'M NOT SURE.  THE ONE THAT --

10    LET ME CHECK MY DOCUMENTS CONSIDERED LIST BEFORE I

11    ANSWER.

12      Q    I THINK THE NOTE 100 MIGHT ALSO HELP.

13      A    AGAIN, I JUST WANT TO MAKE SURE -- I MEAN, I

14    THINK IT WAS DEFINITELY THE 2019 SURVEY.

15      Q    SURE.

16      A    I BELIEVE THIS IS THE ONE.  LET ME JUST LOOK

17    THROUGH AND SEE IF IT COMES BACK TO ME.

18           YES, THIS LOOKS LIKE THE ONE THAT I RELIED ON.

19      Q    GREAT.

20           IF YOU TURN TO PAGE 2 UNDER -- OF THE SURVEY

21    UNDER "SURVEY METHODOLOGY," IT STATES -- IT READS

22    RATHER, "RESPONDENTS FOR THE SURVEY WERE SELECTED FROM

23    AMONG THOSE WHO HAVE AGREED TO PARTICIPATE IN THE

24    HARRIS POLL SURVEYS.  THE DATA HAD BEEN WEIGHTED TO

25    REFLECT THE COMPOSITION OF ADULT POPULATION.  BECAUSE

Page 45

1    THE SAMPLE IS BASED ON THOSE WHO AGREED TO PARTICIPATE

2    IN THE HARRIS POLL PANEL, NO ESTIMATES OF THEORETICAL

3    SAMPLING ERROR CAN BE CALCULATED."

4            DID I READ THAT CORRECTLY?

5        A    YOU DID.

6        Q    SO MY QUESTION IS:  IS THIS A SURVEY OF

7    RESPONDENTS ACROSS THE ENTIRE U.S.?

8        A    WELL, THEY ARE -- THE RESPONDENTS ARE, AS FAR

9    AS I KNOW, FROM ACROSS THE U.S.  THEN WHAT THIS

10   PARAGRAPH SAYS IS THAT THE HARRIS ORGANIZATION

11   RE-WEIGHTS THE RESPONSES SO THAT IT IS INDICATIVE OF

12   THE COMPOSITION OF THE U.S. POPULATION OR U.S.

13   HOUSEHOLDS.

14           I HAVE NO REASON TO BELIEVE THAT IT ISN'T A

15   NATIONWIDE SURVEY.

16       Q    AND THE SURVEY'S ALSO LIMITED TO ONLY THOSE

17   BORROWERS WHO CHOSE TO RESPOND; IS THAT RIGHT?

18       A    THAT'S CORRECT.

19       Q    THE SURVEY IS NOT LIMITED TO JUST HOMEOWNERS;

20   IS THAT CORRECT?

21       A    NO, IT'S -- I BELIEVE IT'S HOUSEHOLDS, BUT LET

22   ME SEE.

23           YES, IT'S -- I BELIEVE IT'S HOUSEHOLDS.

24       Q    AND BASED ON THIS SURVEY IN PARAGRAPH 156, YOU

25   WRITE THAT "61 TO 69 PERCENT OF ALL HOUSEHOLDS DO NOT

Page 46

1    PAY INTEREST ON THEIR CREDIT CARDS."

2           AND A LITTLE BIT LOWER IN PARAGRAPH 156, YOU

3    CONCLUDE THAT "ASSUMING THE PERCENTAGES FOR HOMEOWNERS

4    ARE SIMILAR."

5           DO YOU SEE THAT?

6       A   I DO.

7       Q   WHAT ANALYSIS DID YOU PERFORM TO TEST WHETHER

8    YOUR ASSUMPTION THAT THE SURVEY RESULTS WERE

9    APPROPRIATELY EXTRAPOLATED TO HOMEOWNERS GENERALLY?

10      A   WELL, I DIDN'T PERFORM ANY ANALYSIS, BUT I

11   RECOGNIZE THAT AS A GROUP, HOMEOWNERS ARE FINANCIALLY

12   BETTER OFF -- THE AVERAGE HOMEOWNER IS FINANCIALLY

13   BETTER OFF THAN THE AVERAGE HOUSEHOLD BECAUSE

14   HOUSEHOLDS INCLUDE A LOT OF PEOPLE WHO CAN'T AFFORD TO

15   BE HOMEOWNERS, THEY'RE NOT ABLE TO GET CREDIT, SO THEY

16   ARE GENERALLY BETTER OFF THAN THE AVERAGE HOUSEHOLD.

17          SO TO THE EXTENT YOU HAVE DATA ON HOUSEHOLDS

18   HERE, IT IS MY OPINION THAT IF YOU WERE ABLE TO JUST

19   PULL THE HOMEOWNERS OUT OF THAT, BECAUSE THEY ARE

20   GENERALLY BETTER OFF FINANCIALLY, THE NUMBERS WOULD BE

21   EVEN -- SHOW EVEN LESS MONTH-TO-MONTH CARRYOVER FOR

22   THOSE HOMEOWNERS.  BUT I DID NOT DO ANYTHING TO TRY TO

23   RECONCILE OR TO TRY TO EXTRACT THE HOMEOWNERS FROM THIS

24   SURVEY OF HOUSEHOLDS.

25      Q    AND WHAT ANALYSIS DID YOU PERFORM TO TEST

Page 47

1    WHETHER YOUR ASSUMPTION THAT THE SURVEY RESULTS WERE

2    APPROPRIATELY EXTRAPOLATED TO OCWEN'S HOMEOWNERS IN

3    PARTICULAR?

4        A    I DIDN'T DO ANYTHING IN ORDER TO MAKE THAT

5    DETERMINATION.

6        Q    AND DID YOU PERFORM ANY ANALYSIS TO DETERMINE

7    WHETHER THE SAMPLE UNDERLYING THE CONSUMER FINANCIAL

8    LITERACY SURVEY WERE REPRESENTATIVE OF THE BORROWERS IN

9    OCWEN'S LOAN PORTFOLIO?

10       A    I DIDN'T DO ANYTHING TO TRY TO MATCH UP THE

11   RESPONDENTS WHO WERE NOT KNOWN TO ME WITH OCWEN'S

12   BORROWERS.

13       Q    AND DID YOU PERFORM ANY ANALYSIS TO DETERMINE

14   WHETHER THE SAMPLE UNDERLYING THE CONSUMER FINANCIAL

15   LITERACY SURVEY WERE REPRESENTATIVE OF THE BORROWERS AT

16   ISSUE IN THE THREE OPPORTUNITY COST POPULATIONS?

17       A    NO.

18       Q    DR. HAMM, IT'S BEEN ABOUT AN HOUR.

19            DO YOU WANT -- DO YOU WANT A BREAK?

20       A    THAT WOULD BE FINE.

21            MR. DESAI:  CAN WE GO OFF THE RECORD?

22            THE VIDEOGRAPHER:  GOING OFF THE RECORD AT

23   10:04 A.M.

24            (RECESS TAKEN.)

25            THE VIDEOGRAPHER:  GOING BACK ON THE RECORD

Page 48

1    10:18 A.M.

2    BY MR. DESAI:

3        Q    DR. HAMM, CAN YOU PLEASE TURN TO

4    PARAGRAPH 167?

5        A    I CAN AND WILL.

6        Q    THAT'S NOT THE RIGHT PARAGRAPH THOUGH.

7            THE REPORTER:  I'M SORRY?

8            MR. DESAI:  I SAID THAT'S NOT THE RIGHT

9    PARAGRAPH.

10   BY MR. DESAI:

11       Q    LET ME GET YOU TO THE RIGHT ONE.

12           MS. ROSE-SMITH:  WHAT PARAGRAPH NUMBER ARE YOU

13   LOOKING FOR?

14           MR. DESAI:  I THINK IT'S 167.  ONE SECOND.  I

15   APOLOGIZE.  157.

16           THE WITNESS:  I'M THERE.

17   BY MR. DESAI:

18       Q    AND IN PARAGRAPH 157 YOU WRITE, "THAT A STUDY

19   PUBLISHED BY THE NATIONAL BUREAU OF ECONOMIC RESEARCH

20   USING CREDIT CARD DATA FOUND THAT 29 PERCENT OF

21   ACCOUNTS REGULARLY MAKE PAYMENTS NEAR" -- "AT OR NEAR

22   THE MINIMUM"; IS THAT CORRECT?

23       A    YES.

24           THE REPORTER:  AT OR NEAR THE?

25           MR. DESAI:  THE MINIMUM.

Page 49

```
 1              I'M HANDING THE COURT REPORTER TO MARK AS

 2    EXHIBIT 6.

 3              (EXHIBIT 6 WAS MARKED FOR

 4              IDENTIFICATION AND WAS ATTACHED

 5              HERETO.)

 6    BY MR. DESAI:

 7       Q    EXHIBIT 6 IS THE SOURCE FOR THIS QUOTE, WHICH

 8    IS FULLY CITED IN FOOTNOTE 1 OF 2, WHICH IS THE KEYS

 9    AND WANG MINIMUM PAYMENTS --

10              THE REPORTER:  KEYS AND WANG?

11              MR. DESAI:  YEP.

12              THE REPORTER:  SPELL IT FOR ME, PLEASE.

13              MR. DESAI:  KEYS, LIKE CAR KEYS; AND WANG

14    W-A-N-G.

15              -- MINIMUM PAYMENT AND DEBT PAYDOWN ON

16    CONSUMER CREDIT CARDS.

17    BY MR. DESAI:

18       Q    ARE YOU FAMILIAR WITH THIS PAPER?

19       A    I AM.

20       Q    AND I'LL DIRECT YOUR ATTENTION TO THE ABSTRACT

21    ON PAGE 1.

22       A    I'M THERE.

23       Q    AND THE ABSTRACT BEGINS WITH, "USING A DATASET

24    COVERING ONE QUARTER OF THE U.S. GENERAL-PURPOSE CREDIT

25    CARD MARKET."
```

1           SO MY QUESTION IS:  DOES THE SAMPLE IN THE

2    STUDY INCLUDE ALL CONSUMERS WHO PARTICIPATE IN THE

3    CREDIT CARD MARKET GENERALLY?

4       A    IT'S REPRESENTATIVE OF ALL CONSUMERS WHO

5    PARTICIPATE IN THE GENERAL-PURPOSE CREDIT CARD MARKET

6    GENERALLY.

7       Q    SO IT IS NOT LIMITED TO JUST HOMEOWNERS;

8    CORRECT?

9       A    CORRECT.

10      Q    AND YOU WRITE IN THIS PARAGRAPH THAT, "MAKING

11   THE MINIMUM PAYMENTS DUE TO ANCHORING IMPLIES THAT SOME

12   CREDIT CARD HOLDERS PAY THE MINIMUM BY CHOICE NOT

13   BECAUSE THEY'RE UNABLE TO PAY MORE"; IS THAT RIGHT?

14      A    THAT'S RIGHT.  THAT'S A CONCLUSION I DREW FROM

15   THIS WORKING PAPER.

16      Q    SURE.

17           CAN YOU DEFINE HOW YOU'RE USING THE TERM

18   "ANCHORING" IN THIS PARAGRAPH?

19      A    ANCHORING IS A TERM THAT I BELIEVE WAS FIRST

20   USED BY KAHNEMAN AND TVERSKY.

21           THE REPORTER:  SPELL, PLEASE.

22           THE WITNESS:  THAT'S GOING TO BE TOUGH.

23   K-A-N-N-E-M-A-N-N [SIC] IS MY BEST GUESS, AND TVERSKY

24   IS T-V-E-R-S-K-Y, BUT I COULD BE WRONG.

25           AT ANY EVENT, I -- THAT'S THE FIRST USE OF THE

1  TERM "ANCHORING" IN THIS CONTEXT THAT I'M AWARE OF,

2  WHICH IS NOT TO SAY IT'S THE FIRST TERM -- FIRST TIME

3  THAT TERM WAS USED, BUT MY INTERPRETATION OF WHAT THEY

4  MEAN BY ANCHORING IS THAT BECAUSE THE CREDIT CARD

5  STATEMENT SAYS HERE IS THE MINIMUM AMOUNT THAT YOU NEED

6  TO PAY, MANY BORROWERS ARE KIND OF ANCHORED TO THAT

7  MINIMUM AND SIMPLY PAY IT EVEN THOUGH THEY COULD PAY

8  MORE AND THEY USE ANY AVAILABLE FUNDS FOR CONSUMPTION

9  PURPOSES OR FOR TRAVEL OR FOR SOMETHING ELSE.  THEY

10 DON'T USE IT TO PAY DOWN CREDIT CARD DEBT.  SO IT'S AN

11 INDICATION THAT EVEN FOR THE MINORITY OF HOUSEHOLDS

12 THAT CARRY DEBT FROM MONTH TO MONTH, A SIGNIFICANT

13 FRACTION OF THOSE HOUSEHOLDS, THE HOUSEHOLDS IN THE

14 MINORITY, DO NOT USE THE MARGINAL DOLLAR TO PAY DOWN

15 DEBT.  THEY USE IT FOR SOME OTHER PURPOSE.  THAT'S MY

16 INTERPRETATION OF THE RESULTS HERE.

17 BY MR. DESAI:

18     Q    I SEE.  AND YOU JUST MENTIONED THAT SOME OF

19 THE OPTIONS THAT A CONSUMER WHO IS ANCHORED TO PAY THE

20 MINIMUM AMOUNT MIGHT USE THAT -- THEIR ADDITIONAL FUNDS

21 TO -- AS CONSUMPTION OR TRAVELING, IS THAT RIGHT, OR

22 OTHER SIMILAR EXPENSES?

23          MS. ROSE-SMITH:  OBJECTION.

24          THE WITNESS:  THAT'S WHAT I SAID.

25 ///

Page 52

1   BY MR. DESAI:

2       Q    AND IS ONE OTHER POTENTIAL EXPENDITURE PAYING

3   FOR OTHER DEBT?

4       A    IT'S A POSSIBILITY.  IT'S A POSSIBILITY.  TO

5   THE EXTENT THEY HAVE OTHER DEBT AND DON'T JUST HAVE

6   CREDIT CARD DEBT.

7       Q    AND IS IT YOUR OPINION THAT SOME OF THE CREDIT

8   CARD HOLDERS WHO YOU BELIEVE PAY THE MINIMUM BY CHOICE

9   COULD ACTUALLY ALSO PAY THE FULL BALANCE ON THEIR

10  CREDIT CARD ACCOUNT?

11      A    NO.  IT'S SIMPLY MY OPINION THAT THEY COULD

12  PAY MORE THAN THE MINIMUM.  SOME OF THEM UNDOUBTEDLY

13  COULD PAY THE FULL AMOUNT, BUT CHOOSE TO SPEND IT ON

14  CONSUMPTION ITEMS.

15          BUT I'M NOT MAKING ANY SUCH CLAIM THAT THOSE

16  WHO PAY THE MINIMUM BY CHOICE COULD PAY THE FULL

17  AMOUNT.  I'M SIMPLY SAYING THAT IF THEY'RE PAYING THE

18  MINIMUM BY CHOICE, THEY COULD PAY MORE BUT INSTEAD

19  THE -- THEY'RE -- WHAT THEY REGARD AS THE OPTIMAL USE

20  OF THE FUNDS IN QUESTION IS NOT TO PAY DOWN CREDIT CARD

21  DEBT, BUT TO -- FOR OTHER PURPOSES, MANY OF WHICH

22  INVOLVE CONSUMPTION THAT DOES NOT YIELD AN INTEREST

23  RETURN.

24      Q    AND IS IT ALSO YOUR OPINION THAT SOME

25  CONSUMERS MAY PAY THE MINIMUM BY CHOICE AS OPPOSED TO

Page 53

1    BEING ANCHORED?

2              MS. ROSE-SMITH:  OBJECTION.

3              THE WITNESS:  YES, IT IS, THAT SOME -- I MEAN,

4    I DON'T KNOW.  YOU'D HAVE TO ASK INDIVIDUAL CONSUMERS

5    WHETHER THEY'RE PAYING THE MINIMUM BECAUSE THEY'RE

6    ANCHORED TO IT BECAUSE OF THE PSYCHOLOGICAL FACTORS

7    THAT KAHNEMAN AND TVERSKY DISCUSS IN THEIR WRITINGS,

8    BUT SOME OF THEM UNDOUBTEDLY MAKE THE DECISION THAT

9    YES, I CAN PAY MORE, BUT I'M GOING TO USE THIS MONEY TO

10   TAKE MY WIFE OUT FOR VALENTINE'S DAY.  AND TO ME THAT'S

11   A HIGHER AND BETTER USE OF THE FUNDS THAN PAYING DOWN

12   THE DEBT.

13   BY MR. DESAI:

14      Q    WOULD A HIGHER AND BETTER USE OF THE FUNDS

15   ALSO INCLUDE PAYING DOWN MORE EXPENSIVE DEBT?

16              MS. ROSE-SMITH:  OBJECTION.

17              THE WITNESS:  IS IT POSSIBLE THAT THERE IS A

18   CONSUMER WHO WAS SURVEYED FOR PURPOSES OF THIS WORKING

19   PAPER WHO WAS IN THOSE CIRCUMSTANCES, YES, IT IS

20   POSSIBLE.

21   BY MR. DESAI:

22      Q    IF A CONSUMER PAID ANYTHING OTHER THAN THE

23   FULL BALANCE, THEN THEY WOULD CARRY A CREDIT CARD

24   BALANCE FROM ONE MONTH INTO THE NEXT; IS THAT CORRECT?

25      A    THAT'S CORRECT.

Page 54

1          MR. DESAI:  CAN WE GO OFF THE RECORD FOR JUST

2   A SECOND?

3          THE VIDEOGRAPHER:  GOING OFF THE RECORD

4   10:26 A.M.

5          (RECESS TAKEN.)

6          THE VIDEOGRAPHER:  GOING BACK ON THE RECORD

7   10:27 A.M.

8   BY MR. DESAI:

9      Q    DR. HAMM, COULD YOU PLEASE TURN TO PAGE 14 OF

10  THIS EXHIBIT?

11     A    WE'RE DONE WITH THE KEYS WANG?

12     Q    OF THIS EXHIBIT.  WE'RE STICKING WITH THE KEYS

13  AND WANG?

14     A    PAGE 14?

15     Q    UH-HUH.

16     A    I'M THERE.

17     Q    AND YOU'LL SEE IN THE LAST FULL PARAGRAPH, THE

18  ONE THAT BEGINS, "FINALLY THE BOTTOM RIGHT FIGURE."

19  THE SECOND FULL SENTENCE READS, "CONSUMERS WITH FICO

20  SCORES LESS THAN 700 MAKE LOW PAYMENTS MORE THAN

21  67 PERCENT OF THE TIMES WHILE THOSE WITH SCORES ABOVE

22  800 MAKE LOW PAYMENTS ONLY 18 PERCENT OF THE TIME."

23          DID I READ THAT CORRECT?

24     A    YES, YOU DID.

25     Q    DID YOU PERFORM ANY ANALYSIS TO DETERMINE

1    WHETHER THE 27 PERCENT AVERAGE ACROSS ALL CREDIT CARD

2    CONSUMERS YOU CITE TO IN PARAGRAPH 157 IS APPROPRIATELY

3    EXTRAPOLATED TO THE OCWEN CONSUMERS?

4         MS. ROSE-SMITH:  OBJECTION.

5         THE WITNESS:  I ACTUALLY CITE, USE THE FIGURE

6    29 PERCENT, WHICH IS WHAT CAME OUT OF THE SURVEY.

7    BY MR. DESAI:

8    Q    APOLOGIZE.  CORRECT.  CORRECT.  CORRECT.

9    A    DID I DO ANY ANALYSIS TO COMPARE -- IF YOUR

10   QUESTION IS DO I DO ANY ANALYSIS TO COMPARE THE

11   POPULATION THAT WAS SURVEYED FOR PURPOSES OF THE KEYS

12   WANG PAPER, COMPARE THAT TO ANY OTHER POPULATION,

13   BORROWERS, FOR EXAMPLE, I DID NOT.

14        EXCEPT I WILL REPEAT WHAT I SAID EARLIER, THAT

15   HOUSEHOLDS AS A GROUP ARE GENERALLY NOT AS WELL OFF AS

16   BORROWERS AS A GROUP BECAUSE BORROWERS HAVE

17   DEMONSTRATED THAT THEY HAVE ACCESS TO CREDIT AND CAN

18   AFFORD THE RESPONSIBILITIES OF HOMEOWNERSHIP, MOST OF

19   THEM, WHEREAS HOUSEHOLDS INCLUDE MANY PEOPLE WHO WOULD

20   LIKE TO BE HOMEOWNERS, BUT CAN'T AFFORD TO BE.

21        SO GENERALLY SPEAKING, BORROWERS ARE BETTER

22   OFF FINANCIALLY THAN HOUSEHOLDS GENERALLY.

23   Q    AND IS YOUR OPINION THE SAME FOR BORROWERS WHO

24   ARE DELINQUENT?

25   A    FOR BORROWERS WHO ARE DELINQUENT?

Page 56

1      Q     CORRECT.

2      A     WELL, BORROWERS WHO ARE DELINQUENT ARE LIKELY

3   TO BE WORSE OFF FINANCIALLY THAN BORROWERS WHO ARE

4   CURRENT.

5            WHETHER BORROWERS WHO ARE DELINQUENT, HOW THEY

6   COMPARE TO HOUSEHOLDS GENERALLY, I HAVEN'T SEEN ANY

7   DATA ON THAT THAT WOULD ALLOW ME TO REACH A CONCLUSION.

8      Q     YOU CAN PUT THE KEYS AND WANG STUDY TO THE

9   SIDE.

10           CAN YOU PLEASE TURN TO PAGE 71 OF YOUR

11  REBUTTAL REPORT, WHICH IS EXHIBIT 2?

12     A     I AM THERE.

13     Q     YOU WRITE UNDER SUBHEADING E, "THAT PROFESSOR

14  MCFADDEN RELIES ON OCWEN'S LITIGATION WORK PRODUCT WHEN

15  HE SHOULD HAVE RELIED ON THE TRANSACTION DATA."

16           DO YOU SEE THAT?

17     A     I DO.

18     Q     AND YOU IDENTIFY TWO SPECIFIC PIECES OF WHAT

19  YOU CALL LITIGATION WORK PRODUCT IN PARAGRAPH 188.

20           DO YOU SEE THAT?

21     A     I DO.

22     Q     AND BOTH OF THESE PIECES OF WHAT YOU LABEL

23  "LITIGATION WORK PRODUCT" ARE OCWEN'S VERIFIED

24  RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF

25  INTERROGATORIES; IS THAT RIGHT?

Page 57

1     A    THAT'S CORRECT.

2     Q    IS IT YOUR OPINION THAT OCWEN'S VERIFIED

3  INTERROGATORY RESPONSES ARE UNRELIABLE?

4     A    I HAVE NO OPINION --

5          MS. ROSE-SMITH:  OBJECTION.

6          THE WITNESS:  -- ON WHETHER THEY'RE UNRELIABLE

7  OR NOT BECAUSE THAT WOULD -- THAT WOULD DEPEND ON HOW

8  THE BUREAU ASKED ITS QUESTION, HOW OCWEN INTERPRETED

9  THE QUESTION, HOW THEIR -- HOW THEY DEVELOPED THE MODEL

10 TO EXTRACT THE DATA, AND HOW THE BUREAU AND ITS

11 CONSULTANTS INTERPRETED THE RESPONSE.  AND I CAN'T -- I

12 CAN'T REALLY SPEAK TO THAT.

13         IF THE QUESTION IS, IS THE INFORMATION IN

14 THESE LITIGATION WORK PRODUCT RELIABLE FOR THE PURPOSES

15 THAT PROFESSOR MCFADDEN PUT THEM TO, THE ANSWER IS NOT

16 AS RELIABLE AS THE FINANCIAL HISTORY DATABASE THAT I

17 THINK WE'VE AGREED TO REFER TO AS WHAT, ROD 22?

18 BY MR. DESAI:

19    Q    RFP.

20    A    I'M SORRY.  RFP 22.

21         THIS IS NOT TO CONDEMN THESE EXHIBITS.  THEY

22 MAY BE PERFECTLY RELIABLE FROM THE STANDPOINT OF WHAT

23 OCWEN THOUGHT IT WAS ASKED OR WHAT OCWEN THOUGHT IT

24 PROVIDED, BUT THEY ARE NOT AS RELIABLE AS RFP 22 FOR

25 THE PURPOSES PROFESSOR MCFADDEN PUT THE INFORMATION TO.

1      Q    AND IS IT YOUR OPINION THAT PROFESSOR

2    MCFADDEN'S OPINIONS ARE UNRELIABLE BECAUSE THEY

3    UTILIZED OCWEN'S VERIFIED INTERROGATORY RESPONSES?

4      A    HIS OPINIONS AS TO WHO WAS OVERCHARGED, WHO

5    WAS UNDERCHARGED, WHO WAS SUBJECT TO A PAYMENT SHOCK,

6    YES, HIS OPINIONS WITH RESPECT TO THOSE ISSUES ARE

7    UNRELIABLE AND THAT'S HIS OPINIONS WITH RESPECT TO

8    OPPORTUNITY COST DAMAGES FOR THE ESCROW -- LATE ESCROW

9    ANALYSIS POPULATION ARE UNRELIABLE BECAUSE, AS A

10   REBUTTAL WITNESS, I TESTED HIS OPINIONS USING THE

11   FINANCIAL HISTORY DATABASE AND DEMONSTRATED IN MY

12   REPORT THAT HE REACHED THE WRONG CONCLUSIONS.

13     Q    AND IN PARAGRAPH 189 YOU STATE THAT THESE

14   RESPONSES -- REFERRING TO OCWEN'S VERIFIED

15   INTERROGATORY RESPONSES -- ARE NOT RECORDS MAINTAINED

16   AND USED IN THE NORMAL COURSE OF BUSINESS.

17          WHAT IS YOUR BASIS FOR THAT OPINION?

18     A    I THINK MR. COMBS' TESTIMONY OR SOME OTHER

19   FACT WITNESS' TESTIMONY.

20          MY UNDERSTANDING IS THAT OCWEN HAD TO WRITE

21   CODE IN ORDER TO EXTRACT THE INFORMATION THAT THE

22   BUREAU WAS SEEKING OR AT LEAST WHAT IT INTERPRETED THE

23   BUREAU'S REQUEST TO BE SEEKING.  IT COULDN'T JUST TAKE

24   AN EXISTING DATABASE THAT IT USED IN A NORMAL COURSE OF

25   BUSINESS AND SHARE THAT WITH THE BUREAU.

1      Q     AND I BELIEVE YOU JUST ANSWERED THIS, BUT YOU

2    REVIEWED THE CORPORATE TESTIMONY OF ANDREW COMBS;

3    CORRECT?

4      A     I BELIEVE SO, YES.

5      Q     AND YOU UNDERSTAND THAT THE CORPORATE

6    TESTIMONY OF ANDREW COMBS IS ACTUALLY ANDREW COMBS

7    TESTIFYING ON BEHALF OF OCWEN; CORRECT?

8           MS. ROSE-SMITH:  OBJECTION.

9           THE WITNESS:  THAT'S MY UNDERSTANDING OF HIS

10   TESTIMONY.

11   BY MR. DESAI:

12     Q     AND DID YOU ASK COUNSEL FOR OCWEN HOW THE

13   VERIFIED INTERROGATORY RESPONSES WERE CREATED?

14     A     I DIDN'T ASK COUNSEL.  I -- I REVIEWED THE

15   TESTIMONY OF MR. COMBS AND GOT ENOUGH OUT OF THAT TO

16   SATISFY ANY CURIOSITY I HAD.  I WAS MUCH MORE

17   INTERESTED IN GETTING THE FACTS RIGHT THAN I WAS TRYING

18   TO EXPLAIN THE PROCESS OF HOW OCWEN INTERPRETED THE

19   BUREAU'S REQUEST, HOW IT WENT ABOUT TRYING TO ANSWER IT

20   THAN I WAS GETTING THE FACTS RIGHT.

21           AND SO MY FOCUS WAS ON RFP 22, WHICH IS, AS

22   I'VE SAID ALL ALONG, THE DEFINITIVE SOURCE OF

23   INFORMATION ON THESE PARTICULAR ISSUES.

24     Q     DO YOU HAVE ANY OPINION OF WHETHER THE

25   INTERROGATORIES WERE RELIABLY CREATED?

Page 60

1          MS. ROSE-SMITH:  OBJECTION.

2          THE WITNESS:  I DIDN'T CONDUCT AN ANALYSIS OR

3     REVIEW OF THE CODE.  I UNDERSTAND THAT THE CODE RUNS TO

4     700, 800 LINES.  I DIDN'T ANALYZE THAT, NOR DID I

5     INTERVIEW EITHER THE BUREAU TO SEE HOW THEY

6     INTERPRETED -- HOW IT INTERPRETED ITS REQUEST OR

7     INTERVIEWED OCWEN TO UNDERSTAND HOW IT INTERPRETED THE

8     REQUEST.  SO NO, I DIDN'T DO THAT.

9     BY MR. DESAI:

10      Q    JUST TO CONFIRM, YOUR BASIS OF YOUR

11    UNDERSTANDING OF THE CREATION OF THE RESPONSES -- THE

12    VERIFIED RESPONSES TO THE BUREAU'S INTERROGATORIES IS

13    YOUR REVIEW OF MR. COMBS' CORPORATE TESTIMONY; IS THAT

14    CORRECT?

15      A    YES, PERHAPS SUPPLEMENTED BY MR. HALM'S

16    INTERVIEW WITH MR. COMBS.  I'D HAVE TO REFRESH MY

17    MEMORY ON THAT.  BUT I PRIMARILY RELIED ON HIS

18    TESTIMONY IN THIS MATTER.

19          BUT, AGAIN, MY INTEREST IS IN MAKING SURE THAT

20    THE COURT HAS THE RIGHT FACTS; THAT IT UNDERSTANDS

21    WHICH BORROWERS WERE OVERCHARGED, WHICH BORROWERS WERE

22    UNDERCHARGED.

23          AND IN ORDER TO MAKE THAT DETERMINATION, YOU

24    GO TO RFP 22 BECAUSE THAT IS THE DEFINITIVE SOURCE OF

25    CERTAINLY WHAT THE STATUS OF THE ESCROW ACCOUNTS WERE.

1   YOU DO NEED THE VERIFIED RESPONSES THAT YOU CITED

2   EARLIER, AT LEAST TO GET THE DATES OF THE ESCROW

3   ANALYSES.  BUT AS FAR AS THE CASH FLOWS ARE CONCERNED,

4   THEY COME OUT OF RFP 22.

5       Q    AND IN YOUR ANSWER YOU SAID, WHEN I ASKED YOU

6   IF YOUR BASIS WAS YOUR REVIEW OF -- THE BASIS FOR YOUR

7   UNDERSTANDING OF HOW THESE VERIFIED INTERROGATORIES

8   RESPONSES WERE CREATED WAS YOUR REVIEW OF MR. COMBS'

9   CORPORATE TESTIMONY AND YOU SAID YES, BUT PERHAPS

10  SUPPLEMENTED BY REFRESHING YOUR RECOLLECTION OF

11  MR. HALM'S INTERVIEW WITH MR. COMBS; IS THAT CORRECT?

12      A    THAT'S WHAT I SAID.  I JUST -- I CAN'T

13  REMEMBER AS I SIT HERE.

14      Q    AND I BELIEVE YOU TESTIFIED EARLIER, YOU DID

15  NOT TAKE ANY -- YOU PERSONALLY DIDN'T, OBVIOUSLY, TAKE

16  ANY NOTES OF YOUR CONVERSATION WITH MR. HALMS ABOUT HIS

17  INTERVIEW WITH MR. COMBS, DID YOU?

18      A    I DID NOT.

19      Q    AND MR. HALMS DID NOT TAKE ANY NOTES OF HIS

20  INTERVIEW WITH MR. COMBS?

21      A    THAT IS MY UNDERSTANDING.

22      Q    ARE YOU AWARE OF ANY NOTES EXISTING?

23      A    I CAN'T SPEAK FOR COUNSEL WHO I JUST LEARNED

24  THIS MORNING WAS ON THE PHONE DURING THAT INTERVIEW,

25  BUT MR. HALM TOLD ME THAT HE TOOK NO NOTES.  I BELIEVE

Page 62

1    HIM.

2              AND SO I'M NOT AWARE OF ANYBODY TAKING NOTES

3    OTHER THAN PERHAPS COUNSEL, BUT I HAVEN'T SEEN THOSE

4    NOTES AND I'M NOT AWARE OF THEM IF THEY EXIST.

5        Q    DID YOU ASK MR. HALM TO ASK MR. COMBS ABOUT

6    THE CREATION OF THESE INTERROGATORY RESPONSES?

7        A    IT'S SO LONG AGO, I JUST DON'T REMEMBER WHAT

8    HE -- WHAT I ASKED HIM TO ASK.  I JUST -- I JUST

9    REMEMBER THAT I WANTED TO PIN DOWN SOME FACTS ABOUT THE

10   PROCESS OF ASSIGNING BORROWER -- OR HOW BORROWERS --

11   HOW IT WAS DETERMINED THAT A BORROWER WOULD NOT GET A

12   TIMELY ESCROW STATEMENT.

13             AND BEYOND THAT, JUST -- I CAN'T REMEMBER WHAT

14   ELSE HE MAY HAVE COVERED.

15       Q    AND DID YOU DOCUMENT IN ANY FORM THE QUESTIONS

16   OR TOPICS THAT YOU ASKED MR. HALM TO DISCUSS WITH

17   MR. COMBS?

18       A    I DID NOT.  THIS WAS AN ORAL EXCHANGE BETWEEN

19   MR. HALM AND ME.

20       Q    AND DID MR. HALM SEND YOU ANY DOCUMENTATION OF

21   HIS INTERVIEW WITH MR. COMBS, INCLUDING FOR EXAMPLE BY

22   EMAIL?

23       A    NO, HE DIDN'T.

24       Q    IS THAT ORAL AS WELL?

25       A    YES.

Page 63

```
 1      Q    AND -- SO SITTING HERE TODAY, YOU HAVE NO

 2  SPECIFIC KNOWLEDGE ABOUT WHAT MR. COMBS MAY HAVE TOLD

 3  MR. HALMS ABOUT THE VERIFIED INTERROGATORY RESPONSES.

 4           IS THAT CORRECT?

 5           MS. ROSE-SMITH:  OBJECTION.

 6           THE WITNESS:  I CAN'T REMEMBER THE

 7  CONVERSATION IN DETAIL.  I REMEMBER THE CONVERSATION,

 8  BUT I CAN'T REMEMBER IN DETAIL WHAT EXACTLY HE TOLD ME

 9  AND SO I CAN'T TELL YOU ANY MORE THAN I ALREADY HAVE.

10  BY MR. DESAI:

11      Q    WHAT DO YOU REMEMBER OF THE CONVERSATION?

12      A    MR. HALM SAYING, I SPOKE TO COMBS AND HERE'S

13  WHAT I LEARNED.

14           IT WAS A VERY SHORT CONVERSATION AND I JUST

15  DON'T REMEMBER THE DETAILS.  I'VE HAD SO MANY

16  CONVERSATIONS WITH MR. HALM, IT'S DIFFICULT TO

17  DIFFERENTIATE ONE FROM ANOTHER.

18      Q    BUT THIS IS THE ONLY CONVERSATION WITH

19  MR. HALM ON WHICH YOU RELIED; IS THAT CORRECT?

20      A    YES.

21      Q    AND APPROXIMATELY HOW LONG WAS THIS SPECIFIC

22  CONVERSATION WITH MR. HALM, IF YOU REMEMBER?  WAS IT

23  FIVE MINUTES?

24      A    I DON'T THINK IT WAS THAT LONG, BUT I DON'T

25  REMEMBER.  I THINK IT WAS MORE LIKE A MINUTE OR TWO.
```

1      Q    OKAY.  IN PARAGRAPH 190 YOU WRITE THAT, "WHILE

2   I DID NOT ATTEMPT TO FULLY AUDIT OCWEN'S EXHIBIT A

3   LITIGATION WORK PRODUCT, I NOTED SEEMING

4   INCONSISTENCIES BETWEEN THE DATA REPORTED AT EXHIBIT A

5   AND THE UNDERLYING TRANSACTION DATA."

6           DID I READ THAT CORRECT?

7      A    YOU DID.

8      Q    WHAT WAS YOUR METHODOLOGY FOR IDENTIFYING

9   ESCROW ANALYSES USING THE DATA IN RFP 22?

10     A    WELL, AS I RECALL, WE HAD A LOAN NUMBER AND WE

11  HAD A DATE.  AND FROM THAT INFORMATION, YOU CAN GET

12  TRANSACTIONS THAT OCCURRED AROUND THAT DATE.  SO YOU

13  CAN FIND A PAYMENT CHANGE, FOR EXAMPLE.

14          I BELIEVE I TALK ABOUT A LOAN IN MY REPORT

15  THAT APPEARED ON THE LIST OF THE LATE ESCROW ANALYSES.

16  THIS IS THE ONE YOU MAY RECALL THAT HAD A $5,000

17  OVERPAYMENT OR ALLEGED $5,000 OVERPAYMENT.  I WAS ABLE

18  TO ESTABLISH FROM THE TRANSACTIONS -- THE FINANCIAL

19  HISTORY FILE THAT THERE WERE MULTIPLE ESCROW PAYMENT

20  CHANGES DURING THE INTERVAL DURING WHICH THIS LOAN

21  ALLEGEDLY WAS OVERCHARGED OR UNDERCHARGED.  AS I SIT

22  HERE, I CAN'T REMEMBER WHICH IT WAS.  I THINK IT WAS

23  OVERCHARGED.

24          BUT SO THERE'S AN EXAMPLE OF A DISCREPANCY

25  BETWEEN WHAT THE VERIFIED RESPONSE SEEMINGLY TELLS US

Page 65

1    AND WHAT THE FINANCIAL HISTORY TELLS US.

2         Q    SO IN RFP 22, YOU LOOKED FOR ESCROW PAYMENT

3    CHANGES AS EVIDENCE THAT AN ESCROW ANALYSIS TOOK PLACE;

4    IS THAT CORRECT?

5         A    WELL, I LOOKED FOR ESCROW PAYMENT CHANGES, AND

6    THEN I ASKED MYSELF BASED ON MY EXPERIENCE AS A LOAN

7    SERVICE MANAGER WHAT COULD CAUSE AN ESCROW PAYMENT

8    CHANGE.  AND THE ONLY THING I'VE BEEN ABLE TO COME UP

9    WITH IS AN ESCROW ANALYSIS.  I CAN'T RECALL ANY OTHER

10   CIRCUMSTANCES WHEN AT WORLD SAVINGS WE WOULD CHANGE AN

11   ESCROW PAYMENT OTHER THAN BASED ON AN ANALYSIS.

12        SO I CONCLUDED, WITH THE APPROPRIATE CAVEATS,

13   THAT GIVEN THESE CHANGES, IT WOULD APPEAR TO ME THAT

14   THERE WERE INTERVENING ESCROW ANALYSES THAT SOMEHOW

15   DIDN'T GET PICKED UP IN THE VERIFIED RESPONSE.

16        Q    AND IN THIS AUDIT, DID YOU IDENTIFY SOME LOANS

17   FOR WHICH OCWEN DID NOT PERFORM A TIMELY ESCROW

18   ANALYSIS?

19             MS. ROSE-SMITH:  OBJECTION.

20             THE WITNESS:  NO.

21             DID I -- I MEAN, OTHER THAN THE ONES THAT

22   APPEARED ON THE LIST -- MAYBE I BETTER START AGAIN.

23             CAN YOU REPHRASE YOUR QUESTION BECAUSE I'M NOT

24   SURE I UNDERSTAND IT.

25   ///

Page 66

1    BY MR. DESAI:

2        Q    SURE.  SO I BELIEVE YOU USED AN ALTERNATIVE

3    METHODOLOGY TO DETERMINE WHEN ESCROW ANALYSES WERE

4    TAKING PLACE; CORRECT?

5            MS. ROSE-SMITH:  OBJECTION.

6    BY MR. DESAI:

7        Q    RELYING ON THE TRANSACTION DATA.

8        A    FOR THOSE LOANS THAT APPEARED ON EITHER

9    EXHIBIT A OR EXHIBIT C, FOR THOSE LOANS, YES, I -- I

10   SOUGHT TO DETERMINE WHAT THE STATE OF THE ESCROW

11   ACCOUNT BALANCE WAS AND WHETHER THERE WERE PAYMENT

12   CHANGES, BUT I DON'T RECALL LOOKING BEYOND THAT, AT

13   LEAST FOR PURPOSES OF THIS -- LET'S CALL IT A PARTIAL

14   RECONCILIATION.  AS I SAY, IT WAS NOT A FULL AUDIT, BUT

15   IT'S A PARTIAL RECONCILIATION.  THAT'S WHAT I LOOKED

16   AT.

17       Q    AND YOUR PARTIAL RECONCILIATION USING RFP 22,

18   YOUR CONCLUSION FROM THAT WAS THAT EXHIBIT A HAD

19   IDENTIFIED UNTIMELY ESCROW ANALYSES THAT YOU BELIEVE

20   WERE NOT, IN FACT, UNTIMELY; IS THAT CORRECT?

21       A    I THINK THAT -- I WILL SAY WHAT I BELIEVE I

22   SAID IN THE REPORT.  I CAN GO TO THAT PAGE AND CONFIRM

23   IT, BUT MY RECOLLECTION OF WHAT I SAID IS THERE ARE

24   ABOUT 3,000 LOANS THAT WERE ON THE LIST OF UNTIMELY

25   ESCROW ANALYSES WHERE -- I THINK I'VE GOT THIS NUMBER

1    RIGHT -- WHERE IT APPEARS THAT THERE WAS AN ESCROW

2    PAYMENT CHANGE BETWEEN THE DATE OF THE SO-CALLED "BUT

3    FOR ANALYSIS" AND THE DATE OF THE ACTUAL ANALYSIS.

4         AND MY CONCLUSION FROM THAT DISCREPANCY OR

5    THOSE ADDITIONAL PAYMENT CHANGES IS THERE MUST HAVE

6    BEEN ANOTHER ANALYSIS BECAUSE OTHERWISE I CAN'T THINK

7    OF A REASON WHY THE PAYMENT WOULD HAVE CHANGED.

8    PERHAPS IN SOME CASES THERE WAS A MODIFICATION, BUT I

9    DON'T THINK THAT WOULD EXPLAIN IT.

10   Q    AND I BELIEVE IN PARAGRAPH 190 YOU DESCRIBE

11   WHAT YOU JUST SUMMARIZED, SO LET ME JUST READ WHAT YOU

12   WROTE AND ASK YOU SOME QUESTIONS.

13   A    OKAY.

14   Q    "BECAUSE AN ESCROW PAYMENT NORMALLY IS CHANGED

15   ONLY AS A RESULT OF AN ESCROW ANALYSIS, I CANNOT RULE

16   OUT THE POSSIBILITY THAT EXHIBIT A IS AN OVERINCLUSIVE

17   LISTING OF DELAYED ANALYSES"; IS THAT CORRECT?

18   A    THAT'S CORRECT, THAT'S WHAT I SAY.

19   Q    AND YOU BELIEVE IT'S OVERINCLUSIVE AROUND THE

20   MAGNITUDE OF 3000 OR SO; IS THAT CORRECT?

21   A    I HAVE THAT NUMBER IN MY REPORT AS I RECALL.

22   LET ME SEE IF I CAN FIND IT.

23        OH, 3,000 -- I HAVE IDENTIFIED 3,082 INSTANCES

24   WHERE THE ESCROW PAYMENT CHANGED.

25   Q    AND DID YOU LOOK FOR INDICIA THAT OCWEN'S

1    EXHIBIT A WAS UNDER INCLUSIVE, THAT IS THAT THERE WERE

2    DELAYED ESCROW ANALYSES THAT WERE NOT IDENTIFIED BY

3    EXHIBIT A?

4        A    NO.  I FIGURED THAT THE PARTY WITH THE BURDEN

5    OF PROOF WOULD HAVE PRODUCED THAT, BUT I DID NOT -- I

6    DID NOT LOOK FOR THAT.

7        Q    SO YOU ONLY LOOKED IN THE DIRECTION OF IT

8    BEING OVERINCLUSIVE; IS THAT CORRECT?

9        A    I WAS -- AGAIN, I'M A REBUTTAL WITNESS.  SO I

10   TOOK PROFESSOR MCFADDEN'S MODEL OF OPPORTUNITY COST

11   DAMAGES AND I DEALT WITH THOSE LOANS, THE LOANS HE

12   DEALT WITH, AND I TESTED HIS CONCLUSIONS AGAINST RFP

13   22.  AND AS YOU KNOW FROM MY REPORT, IN MOST CASES HE

14   FAILED THE TEST.

15            BUT I DIDN'T -- I DIDN'T TRY TO DO MY OWN

16   ANALYSIS AND TRY TO DUPLICATE WHAT OCWEN DID.  I SIMPLY

17   DEALT -- AS A REBUTTAL WITNESS, I DEALT WITH PROFESSOR

18   MCFADDEN'S UNIVERSE OF LOANS AND THEN CORRECTED HIS

19   MISTAKES.

20       Q    JUST SO IT'S CLEAN, YOU DID NOT LOOK FOR

21   INSTANCES IN THE TRANSACTION DATA THAT WOULD SUGGEST

22   THAT EXHIBIT A WAS UNDER INCLUSIVE; IS THAT CORRECT?

23       A    I DIDN'T.

24            MS. ROSE-SMITH:  OBJECTION.

25            THE WITNESS:  I WASN'T ASKED TO DO IT AND I

Page 69

1    DIDN'T DO IT.

2    BY MR. DESAI:

3        Q    AND RFP TRANSACTION DATA -- RFP 22 TRANSACTION

4    DATA, DO YOU RECALL HOW THE DATE COVERAGE -- HOW FAR

5    BACK IN TIME RFP 22 GOES BACK?

6        A    I THINK IT GOES BACK -- IN SOME CASES TO 2013.

7    DOESN'T GO BACK BEFORE THAT.  AND I DON'T THINK THE

8    DATA IN 2013 IS COMPLETE ACTUALLY.  I THINK WE -- WE

9    WERE STYMIED A COUPLE TIMES IN TRYING TO GET THE PRIOR

10   ESCROW ANALYSIS DATE FOR SOME OF THESE LOANS AND

11   COULDN'T FIND IT IN THE DATA.

12       Q    WHEN YOU SAY YOU WERE STYMIED, DO YOU MEAN IN

13   YOUR ANALYSIS OF THE DATA THAT WAS PRODUCED IN RFP 22?

14       A    WHAT I'M SAYING IS THAT IN SOME CASES IT WOULD

15   HAVE BEEN HELPFUL TO KNOW THE DATE OF THE ANALYSIS

16   PRIOR TO THE ALLEGEDLY -- THE DATE OF THE ALLEGED

17   BUT-FOR ANALYSIS.  AND AS I RECALL, WE COULDN'T ALWAYS

18   FIND THOSE DATES.

19            SO I COULDN'T CONFIRM, FOR EXAMPLE, THAT IN

20   ALL CASES THE BUT-FOR DATE WAS ACTUALLY THE BUT-FOR

21   DATE.  IF I'D HAD THE DATE OF THE PREVIOUS ANALYSIS, IT

22   WOULD BE 365 PLUS 30 AND YOU WOULD GET THE BUT-FOR

23   DATE, BUT I COULDN'T ALWAYS GET THOSE.  MAYBE SOME OF

24   THEM WERE 2012 AND LATE IN THE YEAR AND EXTENDED INTO

25   2014.  I DON'T KNOW.

Page 70

1     Q    AND THIS IS JUST A QUICK DEFINITIONAL QUESTION

2  JUST TO MAKE SURE WE'RE ON THE SAME PAGE.

3          THROUGHOUT TODAY AND IN FOOTNOTE 118, YOU

4  REFER TO TRANSACTION HISTORY DATA SIMULTANEOUSLY

5  REFERRED TO IT AS RAW TRANSACTION DATA.

6          IN BOTH INSTANCES, ARE YOU JUST REFERRING TO

7  RFP 22?

8     A    YES.  I WILL TRY TO USE THAT TERM TO MAKE THE

9  RECORD CLEANER.

10    Q    IT'S OKAY.  AS LONG AS WE ALL ARE ON THE SAME

11 PAGE, I THINK WE'RE OKAY.

12         AND SO YOU USED -- DID YOU ONLY USE RFP 22 TO

13 IDENTIFY WHETHER A ESCROW ANALYSIS WAS PERFORMED?

14         MS. ROSE-SMITH:  OBJECTION.

15         THE WITNESS:  WELL, I THINK THAT CERTAINLY I

16 USED RFP 22 TO DETERMINE THE STATUS OF THE BORROWER'S

17 ESCROW ACCOUNT FOR THE LOANS IN QUESTION.  I USED IT TO

18 IDENTIFY THE EFFECTIVE DATE OF PAYMENT CHANGES.  I --

19 AS I RECALL, I NEEDED TO SUPPLEMENT THE INFORMATION IN

20 RFP 22 TO GET THE ANALYSIS DATES, BOTH THE BUT-FOR AND

21 THE ACTUALLY.

22         MIGHT HAVE BEEN ABLE TO DETERMINE THOSE FROM

23 RFP 22, BUT I BELIEVE THAT I USED EITHER EXHIBIT C OR

24 EXHIBIT A, I DON'T REMEMBER WHICH, TO GET THOSE DATES.

25 ///

Page 71

1   BY MR. DESAI:

2       Q    BUT YOU WOULD HAVE USED THE INTERROGATORY

3   RESPONSES FOR THE DATES OF THE ESCROW ANALYSES; IS THAT

4   CORRECT?

5       A    CORRECT.  I HAVE NO ALTERNATIVE SOURCE FOR

6   THOSE DATES.

7       Q    AND RFP 22 DOES NOT CONTAIN THE ESCROW

8   ANALYSIS DUE DATE; CORRECT?

9            MS. ROSE-SMITH:  OBJECTION.

10           THE WITNESS:  AS I RECALL, THAT IS CORRECT.

11  BY MR. DESAI:

12      Q    AND DOES RFP 22 CONTAIN THE DATE THAT AN

13  ESCROW ANALYSIS WAS COMPLETED?

14           MS. ROSE-SMITH:  OBJECTION.

15           THE WITNESS:  I BELIEVE IT HAS THE EFFECTIVE

16  DATE OF THE ESCROW ANALYSIS, BUT I DON'T THINK IT HAS

17  THE DATE THAT THE ESCROW ANALYSIS WAS COMPLETED.  I

18  COULD BE WRONG ON THAT, BUT I DON'T THINK IT HAS THAT

19  DATE.

20  BY MR. DESAI:

21      Q    AND DID YOU COMPARE RFP 22 TO RFP 29, WHICH IS

22  THE DATA OCWEN PRODUCED AS CONTAINING THE INFORMATION

23  THAT POPULATES ESCROW STATEMENTS IN YOUR AUDIT?

24      A    NOT THAT I RECALL.

25      Q    AND DID YOU COMPARE --

1      A     AND REMEMBER, I DID NOT PERFORM -- I DID NOT

2    ATTEMPT TO FULLY AUDIT THE DATA, SO I DID SOME

3    COMPARISONS --

4      Q     SURE.

5      A     -- BUT I DON'T WANT TO LEAVE THE IMPRESSION I

6    DID A FULL AUDIT BECAUSE I DIDN'T.

7      Q     AND DID YOU COMPARE RFP 22 TO RFP 19, WHICH IS

8    THE DATA THAT OCWEN PRODUCED AS CONTAINING SYSTEM

9    COMMENT CODES AND FLAGS IN YOUR AUDIT?

10          MS. ROSE-SMITH:  OBJECTION.

11          THE WITNESS:  I CAN'T REMEMBER IF WE -- IF I

12   NEEDED ANY OF THE DATA IN RFP 19 TO CONDUCT MY

13   ANALYSIS.  I THINK THE COMMENT CODES WERE USED.  I DID

14   USE THEM IN CERTAIN CASES, BUT I DIDN'T DO A COMPARISON

15   OR, QUOTE, AN AUDIT, THAT COMPARED RFP 22 TO RFP 19.

16   BY MR. DESAI:

17     Q     AND TO THE EXTENT YOU USED ANY ADDITIONAL

18   DATA, THAT WOULD BE DISCLOSED IN EITHER YOUR BACKUP

19   MATERIALS OR YOUR EXPERT REPORT; IS THAT CORRECT?

20     A     YES.

21     Q     AND DID YOU COMPARE RFP 22 TO RFP 24, WHICH

22   CONTAINS THE DATA THAT OCWEN PRODUCED AS CONTAINING

23   THEIR APPENDING CHANGE INFORMATION IN YOUR AUDIT?

24          MS. ROSE-SMITH:  OBJECTION.

25          THE WITNESS:  AGAIN, WITH THE CLARIFICATION

1  THAT I DON'T REGARD MY ACTIONS AS HAVING AMOUNTED TO A

2  FULL AUDIT, I DON'T -- I DON'T BELIEVE WE DID ANY

3  CONSISTENCY CHECK OF THOSE TWO SOURCES.  OR THAT I DID

4  THAT.

5  BY MR. DESAI:

6     Q    DID YOU ASK MR. HALM TO ASK MR. COMBS ABOUT

7  THE DISCREPANCIES THAT YOU SAW BETWEEN RFP 22 AND THE

8  INTERROGATORY RESPONSES?

9     A    NO.

10         MS. ROSE-SMITH:  OBJECTION.

11 BY MR. DESAI:

12    Q    DO YOU RECALL -- DID MR. HALM DISCUSS THE

13 INCONSISTENCIES THAT YOU IDENTIFIED BETWEEN RFP 22 AND

14 THE INTERROGATORY RESPONSES WITH MR. COMBS?

15         MS. ROSE-SMITH:  OBJECTION.

16         THE WITNESS:  NOT THAT I RECALL OR NOT THAT

17 I'M AWARE OF, LET'S PUT IT THAT WAY.

18 BY MR. DESAI:

19    Q    AND DO YOU RECALL, ROUGHLY, WHEN IN YOUR --

20 WHEN IN THE CALENDAR YEAR YOU IDENTIFIED THESE

21 DISCREPANCIES?

22    A    NO.

23    Q    DR. HAMM, YOU'VE SERVED AS AN EXPERT WITNESS

24 IN MANY CASES; CORRECT?

25         MS. ROSE-SMITH:  OBJECTION.

Page 74

1          THE WITNESS:  YES.

2     BY MR. DESAI:

3          Q    AND IN ANY OF THE CASES IN WHICH YOU'VE SERVED

4     AS AN EXPERT, HAVE YOU EVER RELIED ON VERIFIED

5     INTERROGATORY RESPONSES IN FORMING YOUR OPINIONS?

6          A    YE- -- UNDOUBTEDLY, BECAUSE IN THIS CASE I

7     RELIED ON THE BUT-FOR AND ACTUAL ESCROW ANALYSES DATES,

8     WHICH APPEAR IN VERIFIED RESPONSES TO INTERROGATORIES.

9               WHERE THERE IS NO MORE RELIABLE DATA

10    AVAILABLE, WHEN IT'S ALL YOU HAVE, THEN PERHAPS I WOULD

11    HAVE NO OTHER PLACE TO GET DATA, I WOULD BE FORCED TO

12    RELY ON THOSE.

13              WHENEVER THERE IS MORE RELIABLE DATA

14    AVAILABLE, THAT'S WHAT I WOULD USE.  I'M SURE THAT IN

15    OTHER CASES WHERE THERE WAS A FINANCIAL HISTORY FILE

16    AND VERIFIED INTERROGATORY RESPONSES THAT OVERLAPPED,

17    I'M SURE I WOULD TAKE THE SAME APPROACH AND USE THE

18    FINANCIAL HISTORY FILE.

19         Q    AND YOU ALSO USED RFP 22 FOR IDENTIFYING

20    WHETHER A LOAN WAS DELINQUENT OR NOT; IS THAT CORRECT?

21         A    CORRECT.

22         Q    WHY DID YOU USE THE DATA THAT OCWEN PRODUCED

23    IN RESPONSE TO RFP 22 INSTEAD OF THE SPECIFIC

24    DELINQUENCY DATA OCWEN PRODUCED IN RESPONSE TO RFP 5

25    FOR IDENTIFIED DELINQUENCY?

1          MS. ROSE-SMITH:  OBJECTION.

2          THE WITNESS:  BECAUSE IN MY OPINION AS A

3    FORMER LOAN SERVICE MANAGER, RFP 22 IS THE DEFINITIVE

4    SOURCE OF THAT INFORMATION.  IT SHOWS THE PAID TO DATE,

5    IT SHOWS THE DUE DATE.  YOU CAN EASILY DETERMINE

6    WHETHER ANY LOAN IS CURRENT OR IN ARREARS.  AND JUST

7    BASED ON MY OWN EXPERIENCE, IF I WERE ASKED BY A COURT

8    OF LAW OR THE OTHER SIDE IN LITIGATION TO PROVIDE

9    INFORMATION ON DELINQUENCY, THAT'S WHERE I WOULD HAVE

10   TO GO.  THAT'S A DEFINITIVE RECORD.

11          I MIGHT EXTRACT THAT DATA AND PUT IT IN

12   ANOTHER DOCUMENT, BUT IT WOULD COME FROM THE LOAN

13   HISTORY FILE.  THAT'S HOW YOU KNOW.  THAT'S HOW YOU

14   SERVICE A LOAN.  THAT'S WHAT THE COLLECTION DEPARTMENT

15   DOES EVERY MORNING, GET A LIST OF LOANS THAT ARE IN

16   ARREARS THAT ARE DRAWN FROM THE FINANCIAL HISTORY FILE

17   AND THEY BEGIN MAKING THEIR CALLS.  THAT'S HOW YOU

18   SERVICE A LOAN.

19   BY MR. DESAI:

20   Q    AND ARE YOU AWARE THAT THE BUREAU SPECIFICALLY

21   REQUESTED THE DELINQUENCY DATA THAT OCWEN ITSELF USED

22   TO SERVICE ITS LOANS IN RFP 5?

23          MS. ROSE-SMITH:  OBJECTION.

24          THE WITNESS:  I HAVE READ THE INTERROGATORIES.

25   I HAVEN'T COMMITTED THEM TO MEMORY.  I DON'T REMEMBER

Page 76

1    EXACTLY HOW YOU WORDED THAT.  AND I DON'T KNOW HOW

2    OCWEN INTERPRETED YOUR REQUEST, WHAT IT DID.

3    BY MR. DESAI:

4         Q    AND IN FOOTNOTE 93, WHICH APPEARS ON PAGE 53,

5    YOU WRITE THAT "RFP 5 CAN BE CALCULATED USING RFP 22";

6    IS THAT CORRECT?

7         A    LET ME GO TO -- PAGE 53 YOU SAID?

8         Q    CORRECT.  FOOTNOTE 93.

9         A    YES, THAT IS A TRUE STATEMENT.  I BELIEVE IT

10   TO BE TRUE.

11        Q    IS IT YOUR OPINION THAT RFP 22 DATA IS THE

12   SAME AS RFP 5 DATA?

13             MS. ROSE-SMITH:  OBJECTION.

14             THE WITNESS:  I AM NOT OFFERING THAT OPINION.

15   BY MR. DESAI:

16        Q    ARE YOU OFFERING ANY OPINION AS TO WHETHER OR

17   NOT RFP 22 IS MORE RELIABLE THAN RFP 5 DATA?

18             MS. ROSE-SMITH:  OBJECTION.

19             THE WITNESS:  I WOULD SAY THAT RFP -- RFP

20   NUMBER 22 IS THE MOST RELIABLE SOURCE; AND IF IT IS

21   IDENTICAL WITH RESPECT TO DELINQUENCIES AS TO RFP

22   NUMBER 5, THEN BOTH ARE RELIABLE.

23             TO THE EXTENT THERE ARE ANY DISCREPANCIES, I

24   WOULD GO WITH RFP NUMBER 22 BECAUSE I BELIEVE THAT TO

25   BE THE DEFINITIVE SOURCE OF INFORMATION ON THE

Page 77

1    DELINQUENCY STATUS OF THE LOAN, AND PERHAPS THE

2    INTERPRETATION OF THE REQUEST FOR PRODUCTION NUMBER 5

3    WAS SUCH THAT IT PRODUCED DIFFERENT DATA.  I DON'T KNOW

4    ABOUT THAT.

5            RFP 22 -- IF YOU WANT TO KNOW WHETHER A LOAN

6    IS DELINQUENT, YOU GO TO RFP 22.

7    BY MR. DESAI:

8        Q    AND DID YOU COMPARE RFP 5 AND RFP 22?

9            MS. ROSE-SMITH:  OBJECTION.

10           THE WITNESS:  NOT FORMALLY, BUT I'M CERTAINLY

11   AWARE THAT THERE ARE SOME LOANS THAT SHOW UP AS

12   DELINQUENT ON RFP 22 THAT DO NOT APPEAR ON SOME OF THE

13   OTHER RESPONSES TO THE INTERROGATORIES THAT THE BUREAU

14   SERVED ON OCWEN.

15   BY MR. DESAI:

16       Q    AND A NUMBER OF TIMES TODAY YOU SAID YOU

17   BELIEVE THAT RFP 22 IS THE DEFINITIVE SOURCE OF DATA;

18   IS THAT CORRECT?

19       A    YES.

20       Q    WHAT IS THE BASIS FOR MAKING THIS STATEMENT --

21   YOUR STATEMENT?

22       A    WELL, FIRST, MY EXPERIENCE AS A LOAN SERVICE

23   MANAGER AND MY FAMILIARITY WITH LOAN SERVICE AND LOAN

24   SERVICING SYSTEMS; AND ALSO MY UNDERSTANDING FROM THE

25   DOCUMENTS I'VE REVIEWED AND TESTIMONY I'VE REVIEWED

Page 78

```
 1   THAT OCWEN USES OR DUTIFULLY ENTERS ALL OF THE
 2   FINANCIAL TRANSACTIONS AND DUE DATES INTO ITS FINANCIAL
 3   HISTORY FILE.
 4          AND IF IT DOES THAT, IT MAY BE RIGHT, IT MAY
 5   BE WRONG, BUT IT IS THE MOST RELIABLE SOURCE OF
 6   INFORMATION AND IN MOST CASES, IT IS LIKELY TO BE
 7   RIGHT.  AND I THINK IT IS THE BEST SOURCE THAT AN
 8   EXPERT CAN GO TO IN ORDER TO UNDERSTAND THE STATUS OF
 9   LOANS AND THE PAYMENT FLOWS THAT INVOLVE THOSE LOANS.
10   Q     AND DO YOU RECALL WHAT SPECIFIC DOCUMENT OR
11   TESTIMONY YOU REVIEWED TO FORM YOUR UNDERSTANDING THAT
12   OCWEN DUTIFULLY ENTERED ALL OF THE FINANCIAL
13   TRANSACTIONS AND DUE DATES INTO ITS FINANCIAL HISTORY
14   FILE?
15   A     NO.
16   Q     AND IF OCWEN DID NOT, IN FACT, DUTIFULLY ENTER
17   ALL OF THE FINANCIAL TRANSACTIONS AND DUE DATES INTO
18   ITS FINANCIAL HISTORY FILE, WOULD IT STILL BE YOUR
19   OPINION THAT IT IS THE MOST RELIABLE SOURCE OF
20   INFORMATION?
21          MS. ROSE-SMITH:  OBJECTION.
22          THE WITNESS:  RELATIVE TO ANY OTHER SOURCE,
23   YES, BECAUSE ESSENTIALLY THERE IS NO OTHER SOURCE THAT,
24   FOR EXAMPLE, RFP 5 WOULD BE DRAWN IN SOME WAY FROM RFP
25   22 AND, THUS, IF THERE WERE DEFICIENCIES IN RFP 22,
```

Page 79

1   THEY WOULD BE SHARED BY RFP 5.

2          AGAIN, I DON'T KNOW HOW THE BUREAU -- HOW THE

3   OCWEN INTERPRETED THE INTERROGATORY REQUEST, AND SO I

4   CAN'T HELP YOU IN REC -- IN RECONCILING THE

5   DISCREPANCIES BETWEEN RFP 22 AND RFP 5.

6          I CAN SAY THAT RFP 22 IS THE -- IS THE SET OF

7   RECORDS THAT IS AT THE CORE OF LOAN SERVICING.  IT'S

8   WHAT ALL LOAN SERVICERS RELY ON.  EVERY PERSON INVOLVED

9   IN SERVICING A LOAN HAS A PC ON THEIR DESK THAT HAS

10  ACCESS TO THE FINANCIAL HISTORY.  IT'S ESSENTIAL TO

11  HAVE THAT INFORMATION.

12         SO, AGAIN, I HAVE NO REASON TO BELIEVE THAT

13  THE INFORMATION IN THERE IS ANYTHING BUT ACCURATE, BUT

14  TO THE EXTENT IT IS NOT ACCURATE, THAT INACCURACY IS

15  GOING TO SHOW UP IN ANY CHILD OF THAT DATASET THAT IS

16  CREATED BASED ON IT.  SO IT IS THE MOST RELIABLE.

17  BY MR. DESAI:

18     Q   IS IT YOUR OPINION THAT RFP 22 CAPTURES EVERY

19  DATA ELEMENT THAT OCWEN MAINTAINS ON A BORROWER'S LOAN

20  FILE?

21     A   NO.

22         MS. ROSE-SMITH:  OBJECTION.

23  BY MR. DESAI:

24     Q   DOES RFP 22 MAINTAIN ALL THE SAME DATA

25  ELEMENTS AS RFP 5?

Page 80

1          MS. ROSE-SMITH:  OBJECTION.

2          THE WITNESS:  I CAN'T ANSWER THE QUESTION AS I

3     SIT HERE.

4     BY MR. DESAI:

5      Q    DO YOU KNOW IF RFP 22 CONTAINS, FOR EXAMPLE,

6     THE DELINQUENCY CURE DATE?

7      A    THE DELINQUENCY CURE DATE?

8      Q    CORRECT.

9          MS. ROSE-SMITH:  OBJECTION.

10         THE WITNESS:  WHETHER THERE IS A FIELD CALLED

11    "CURE DATE," I DON'T KNOW, BUT IT IS SOMETHING THAT YOU

12    COULD DERIVE FROM THE DATE BECAUSE YOU COULD SEE WHEN

13    THE PAID-THROUGH DATE CHANGED AND REVIEW THE FINANCIAL

14    HISTORY TO SHOW THE PAYMENT THAT BROUGHT THE LOAN

15    CURRENT.

16         SO YES, YOU COULD -- YOU COULD ESTABLISH --

17    WHEN -- AT LEAST WHEN THE PAYMENT WAS ENTERED INTO THE

18    RECORD THAT BROUGHT THE LOAN CURRENT.

19    BY MR. DESAI:

20     Q    AND DO YOU KNOW IF RFP 22 HAS A DATA ELEMENT

21    FOR REINSTATEMENT DATE?

22         MS. ROSE-SMITH:  OBJECTION.

23         THE WITNESS:  I DON'T KNOW WHETHER THERE IS A

24    SEPARATE FIELD FOR REINSTATEMENT DATE, NO.

25    ///

Page 81

1    BY MR. DESAI:

2        Q    IN YOUR OPINION, IS THE CURE DATE THAT OCWEN

3    MAINTAINS THE SAME AS THE REINSTATEMENT DATE?

4            MS. ROSE-SMITH:  OBJECTION.

5            THE WITNESS:  I'D HAVE TO TAKE A LOOK AT THEIR

6    DATA DICTIONARY IN ORDER TO TELL YOU.  I DON'T KNOW OFF

7    THE TOP OF MY HEAD.

8    BY MR. DESAI:

9        Q    IS IT YOUR OPINION THAT IN RFP 22 YOU CAN

10   DISTINGUISH BETWEEN A CURE DATE AND A REINSTATEMENT

11   DATE?

12           MS. ROSE-SMITH:  OBJECTION.

13           THE WITNESS:  I DON'T HAVE AN OPINION BECAUSE

14   I DON'T KNOW AS I SIT HERE -- OR I DON'T RECALL JUST

15   HOW OCWEN USES THOSE TERMS.

16           I MEAN, I KNOW WHAT "CURE DATE" MEANS AND

17   HOW -- HOW OCWEN DIFFERENTIATES THAT FROM A

18   REINSTATEMENT DATE, I DON'T KNOW.

19   BY MR. DESAI:

20       Q    IS YOUR UNDERSTANDING THAT THE CURE DATE IS

21   THE SAME AS THE REINSTATEMENT DATE?

22           MS. ROSE-SMITH:  OBJECTION.

23           THE WITNESS:  TO MANY LOAN SERVICERS, THE

24   ANSWER WOULD BE YES, BUT I CAN'T SAY FOR OCWEN.

25           I THINK "REINSTATEMENT" IS A BROADER TERM THAN

Page 82

```
 1   "CURE" AND INCLUDES SOME ACTIONS THAT WOULD NOT BE

 2   DEEMED TO BE A CURE.  SO I THINK THE TERM IS BROADER AS

 3   I THINK ABOUT IT.

 4   BY MR. DESAI:

 5        Q    DR. HAMM, CAN YOU PLEASE TURN TO PAGE 77 OF

 6   YOUR EXPERT REPORT?

 7        A    I CAN.

 8        Q    TALK TO YOU ABOUT PARAGRAPH 204.

 9             AND IN PARAGRAPH 204 YOU CALCULATE A TARGET

10   PAYMENT ABOUT -- EXCUSE ME -- A TARGET PAYMENT AMOUNT

11   BY TAKING THE TRAILING 12-MONTH ESCROW DISBURSEMENTS

12   AND DIVIDING BY 12; IS THAT CORRECT?

13        A    YES.

14        Q    AND THIS IS ALL USED -- THIS IS ALL DONE USING

15   THE DATA IN RFP 22; IS THAT CORRECT?

16        A    CORRECT.

17        Q    AND IN THIS PARAGRAPH YOU COMPARE YOUR

18   CALCULATED TARGET PAYMENT DATE -- OR PAYMENT AMOUNT TO

19   THE ACTUAL MONTHLY ESCROW PAYMENT; IS THAT CORRECT?

20        A    YES.

21        Q    AND THE ACTUAL MONTHLY ESCROW PAYMENT IS THE

22   PAYMENT THAT YOU OBSERVED IN RFP 22?

23        A    YES.

24        Q    AND THE ACTUAL MONTHLY ESCROW PAYMENT IS THE

25   SAME THING AS THE TOTAL MONTHLY PAYMENT; IS THAT
```

Page 83

1    CORRECT?

2        A    LET ME SEE HOW OCWEN USES THAT TERM BY LOOKING

3    QUICKLY AT APPENDIX A.

4        Q    PLEASE DO SO.

5        A    YES.

6        Q    AND ARE YOU FAMILIAR WITH THE TERM "ESCROW

7    CUSHION"?

8        A    YES.

9        Q    AND DOES THE ACTUAL MONTHLY ESCROW AMOUNT

10   INCLUDE ANY APPROPRIATE CUSHION AMOUNT?

11       A    DOES THE AMOUNT THAT THE BORROWER PAYS PER

12   MONTH, YES, IT -- WELL, IT INCLUDES -- IT MAY INCLUDE A

13   CUSHION AMOUNT.  IT ALL DEPENDS ON WHAT THE STATUS OF

14   THE ESCROW ACCOUNT IS AT THE TIME THAT THE ESCROW

15   ANALYSIS IS DONE.  OR ACTUALLY, TECHNICALLY SPEAKING,

16   NOT AT THE TIME IT IS DONE, BUT AT THE TIME THE NEW

17   ESCROW PAYMENT IS INTENDED TO GO INTO EFFECT.

18       Q    CORRECT.  BUT THE TOTAL MONTHLY AMOUNT BEING

19   REPRESENTED HERE, IF THERE WERE A CUSHION AMOUNT, THAT

20   WOULD BE REFLECTED IN THE TOTAL MONTHLY ESCROW AMOUNT;

21   CORRECT?

22       A    CORRECT.

23            MS. ROSE-SMITH:  OBJECTION.

24   BY MR. DESAI:

25       Q    AND DOES THE ACTUAL MONTHLY ESCROW PAYMENT,

1    WOULD THAT ALSO INCLUDE ANY SHORTAGE SPREAD BEING

2    ASSESSED?

3        A    WELL, IT'S -- THE CUSHION AMOUNT AND THE --

4    ANY AMOUNT TO RECOUP A SHORTAGE WOULD KIND OF BE DONE

5    SIMULTANEOUSLY.  IT'S REALLY THE SAME CALCULATION.  YOU

6    WANT TO MAKE SURE THAT IN THE MONTH WITH THE MINIMUM

7    ESCROW BALANCE, THE MINIMUM ESCROW BALANCE IS EQUAL TO

8    THE CUSHION.

9            IF YOU PROJECT IT TO BE SHORT OF THE CUSHION,

10   THEN THERE'S A SHORTAGE AND YOU WOULD CALCULATE THE

11   SHORTAGE AND YOU WOULD ADD ONE-TWELFTH OF THAT TO THE

12   TARGET ESCROW PAYMENT.

13           IF IT'S AN OVERAGE, YOU REFUND THE MONEY TO

14   THE BORROWER.

15           SO IT'S NOT -- AS I UNDERSTAND, IT'S NOT TWO

16   DIFFERENT PROCESSES.  IT'S THE SAME PROCESS.

17       Q    CORRECT.  I'M JUST -- IF THERE WAS A SHORTAGE

18   AMOUNT BEING COLLECTED, ONE-TWELFTH -- ONE-TWELFTH OF

19   THE TOTAL SHORTAGE IN A MONTH, THAT SHORTAGE AMOUNT

20   WOULD APPEAR IN THE TOTAL MONTHLY ESCROW AMOUNTS; IS

21   THAT CORRECT?

22       A    CORRECT.

23       Q    AND USING EXAMPLE IN PARAGRAPH 204, YOU CLAIM

24   THAT A BORROWER'S ACTUAL ESCROW PAYMENT IS $211;

25   CORRECT?

Page 85

1     A    YES.  HOW ABOUT IF YOU JUST GIVE ME A MINUTE

2    TO REFRESH MY --

3     Q    YES.

4     A    BECAUSE THIS IS A SPECIFIC LOAN, LET ME JUST

5    REFRESH MY MEMORY.

6     Q    I THINK YOU DISCUSS THIS LOAN IN PARAGRAPH

7    202.

8     A    I DO.  OKAY.  COULD YOU ASK ME YOUR QUESTION

9    AGAIN?

10     Q    THIS IS WHY REALTIME IS HELPFUL.

11          USING THE EXAMPLE IN PARAGRAPH 204, YOU CLAIM

12    THAT A BORROWER'S ACTUAL ESCROW PAYMENT IS $211; IS

13    THAT CORRECT?

14     A    AS OF THE ALLEGED ANALYSIS DUE DATE -- AS OF

15    THIS DATE, THE TARGET PAYMENT AMOUNT WOULD BE $211.07.

16     Q    THAT IS YOUR CALCULATED TARGET PAYMENT; IS

17    THAT CORRECT?

18     A    CORRECT.

19     Q    AND THE ACTUAL AMOUNT THAT WAS BEING CHARGED

20    WAS $211; CORRECT?

21     A    NO.  THE BORROWER'S ESCROW PAYMENT PRIOR TO

22    THE ANALYSIS WAS $200.77.

23     Q    OKAY.  SO THE ACTUAL ESCROW PAYMENT WAS

24    $200.77; CORRECT?

25     A    CORRECT.

Page 86

1      Q    AND YOU CALCULATE THE TARGET PAYMENT AT $211;

2   IS THAT CORRECT?

3      A    AGAIN, USING THE ALLEGED ANALYSIS DUE DATE, IT

4   WAS -- THE CALCULATED PAYMENT IS $211.07.

5      Q    AND YOU COMPARE THE ACTUAL MONTHLY ESCROW

6   PAYMENT TO YOUR TARGET PAYMENT; IS THAT CORRECT?

7      A    YES.

8      Q    AND DOES YOUR TARGET PAYMENT INCLUDE ANY

9   ESCROW CUSHION AMOUNT, IF ONE WAS BEING ASSESSED I

10  SHOULD SAY?

11          MS. ROSE-SMITH:  OBJECTION.

12          THE WITNESS:  WELL, THE -- I CAN'T TELL FROM

13  THE DATA IN THIS PARAGRAPH IF WHAT YOU'RE SAYING IS

14  THAT THE AMOUNT MIGHT BE HIGHER IN ORDER TO RECOUP THE

15  SHORTAGE, I DON'T HAVE THE INFORMATION I NEED.  BUT

16  THAT WOULD JUST REENFORCE MY POINT, THAT THE ACCOUNT

17  WAS NOT BEING OVERCHARGED AS PROFESSOR MCFADDEN

18  ALLEGES.  IT WAS BEING UNDERCHARGED BY EVEN MORE THAN

19  THE $10 PER MONTH THAT I TALK ABOUT HERE, BUT I CAN'T

20  TELL WITH THE INFORMATION AVAILABLE TO ME.

21  BY MR. DESAI:

22      Q    I THINK MY QUESTION IS -- LET ME SEE IF I CAN

23  MAKE A SIMPLER QUESTION.

24          YOU'RE COMPARING THE ACTUAL MONTHLY AMOUNT

25  THAT OCWEN WAS CHARGING THE CONSUMER; CORRECT?

Page 87

1        A     CORRECT.

2        Q     AND YOU COMPARED THAT TO YOUR CALCULATED

3    TARGET PAYMENT; CORRECT?

4        A     CORRECT.

5        Q     AND WE JUST DISCUSSED THAT AN ACTUAL ESCROW

6    PAYMENT MAY INCLUDE A CUSHION AMOUNT; CORRECT?

7        A     IT MAY.  IF -- AS NEEDED TO BRING THE CUSHION

8    UP.

9        Q     CORRECT.  AND IT COULD ALSO INCLUDE A

10   SHORTAGE; CORRECT?

11       A     WELL, AS I SAID BEFORE, MR. DESAI, I REGARD

12   THAT AS PRETTY MUCH THE SAME CALCULATION BECAUSE THE

13   SHORTAGE AMOUNT, IF THERE IS A SHORTAGE, THE SHORTAGE

14   AMOUNT IS WHAT IS NEEDED IN ADDITION TO THE TARGET

15   PAYMENT TO ACHIEVE THE CUSHION AND NOT A PENNY MORE.

16   AND SO THERE'S NOT -- YOU CAN THINK OF THIS AS

17   RESTORING THE CUSHION IF YOU WANT TO, OR YOU CAN THINK

18   OF IT AS A RECOUPING OF A SHORTAGE THAT BUILT UP IN THE

19   ACCOUNT, BUT IT'S ONE AND THE SAME THING.

20       Q     I UNDERSTAND, BUT --

21       A     OKAY.

22       Q     THE TARGET PAYMENT'S NOT THE SAME AS THE

23   ACTUAL PAYMENT; CORRECT?

24       A     WELL, I -- I DON'T KNOW WHAT THE -- FOR

25   EXAMPLE, THE -- WE KNOW WHAT THE ACTUAL PAYMENT IS --

Page 88

1    Q    CORRECT?

2    A    -- AND THAT $200.77 INCLUDES -- EITHER

3  INCLUDES THE TARGET PAYMENT AND PERHAPS -- ALTHOUGH NOT

4  NECESSARILY -- AN ADDITIONAL AMOUNT TO ESTABLISH THE

5  CUSHION.

6         THE TARGET PAYMENT WE'RE TALKING ABOUT EARLIER

7  IN THIS PARAGRAPH IS SIMPLY THE TARGET PAYMENT.  IT

8  DOESN'T INCLUDE ANYTHING TO ESTABLISH OR RE-ESTABLISH

9  THE CUSHION.

10   Q    AND I BELIEVE EARLIER YOU TESTIFIED THAT YOU

11  IDENTIFIED ESCROW ANALYSES BY LOOKING AT THE RFP 22

12  TRANSACTION DATE -- DATA FOR CERTAIN CHANGES IN ESCROW

13  PAYMENT AMOUNTS; IS THAT CORRECT?

14   A    YES.

15   Q    AND TURNING TO PARAGRAPH 214 OF YOUR REPORT,

16  YOU WRITE THAT, "I AM NOT AWARE OF ANY REASON THAT

17  WOULD CAUSE AN ESCROW PAYMENT TO CHANGE OTHER THAN AN

18  ESCROW ANALYSIS PERFORMED BY THE SERVICERS."

19        DO YOU SEE THAT?

20   A    I DO.

21   Q    I BELIEVE EARLIER YOU ALSO SAID SOMETHING

22  SIMILAR.

23        DO YOU RECALL THAT?

24   A    I DO.

25   Q    AND CAN YOU EXPLAIN FOR ME WHAT THE BASIS OF

Page 89

1    YOUR STATEMENT IS?

2            MS. ROSE-SMITH:  OBJECTION.

3            THE WITNESS:  MY EXPERIENCE AS A LOAN SERVICE

4    MANAGER, MY INVOLVEMENT IN THE PROCESS OF ENSURING THAT

5    ESCROW ACCOUNTS ARE PROPERLY FUNDED.  LOAN SERVICERS DO

6    NOT MAKE ARBITRARY CHANGES IN THE PAYMENT OF ESCROW.

7    THEY MAKE IT AS A RESULT OF ANALYSIS THAT SHOWS THE

8    PAYMENT EITHER NEEDS TO GO UP OR DOWN.  AND AS A

9    CONSEQUENCE -- I THOUGHT LONG AND HARD WHEN I BECAME

10   AWARE OF THE FACT THAT THERE ARE 3,000-PLUS LOANS WITH

11   PAYMENT CHANGES DURING WHAT PROFESSOR MCFADDEN WOULD, I

12   BELIEVE WRONGLY, CHARACTERIZE AS THE PERIOD OF HARM.

13   AND I CAN'T THINK OF ANOTHER REASON, AS I SAY HERE,

14   THAT WOULD ACCOUNT FOR THAT PAYMENT CHANGE OTHER THAN

15   THE PREPARATION OF AN ESCROW ANALYSIS.

16           MAY NOT HAVE BEEN SENT TO THE BORROWER SINCE

17   OCWEN IS NOT REQUIRED TO SEND ESCROW ANALYSES TO

18   CERTAIN BORROWERS, BUT I CAN'T THINK OF A REASON WHERE

19   OCWEN WOULD HAVE CHANGED THE AMOUNT OUT OF CYCLE; IN

20   OTHER WORDS, NOT AS A RESULT OF AN ESCROW ANALYSIS.

21           I MAY BE OVERLOOKING SOMETHING, BUT I CAN'T

22   THINK OF ANOTHER REASON FOR IT.

23   BY MR. DESAI:

24       Q    AND DID YOU REVIEW ANY OCWEN-SPECIFIC

25   DOCUMENTS TO ARRIVE AT THAT CONCLUSION?

Page 90

1       A    I DID NOT.

2       Q    DO YOU KNOW WHETHER OCWEN WOULD CHANGE AN

3   ESCROW PAYMENT AFTER THE ESCROW YEAR HAD BEGAN --

4   BEGUN, RATHER, IF THE BORROWER PAID OFF AN ENTIRE

5   SHORTAGE AMOUNT?

6       A    PAID OFF A SHORTAGE AMOUNT?  IF THE BORROWER

7   REQUESTED IT, YES, IT WOULD.  IT WOULD PREPARE A NEW

8   ANALYSES -- ANALYSIS AND MAKE A PAYMENT CHANGE

9   ACCORDINGLY.  AGAIN, THE PAYMENT CHANGE WOULD FOLLOW

10  THE ANALYSIS.

11      Q    DO YOU KNOW IF OCWEN WOULD PERFORM AN ESCROW

12  ANALYSIS AFTER THE BORROWER PAID THE FULL SHORTAGE

13  AMOUNT AFTER THE ESCROW YEAR HAD ALREADY BEGUN?

14      A    AS I SIT HERE, I DON'T KNOW WHETHER THEY WOULD

15  PERFORM A NEW ANALYSIS AS A RESULT OF THAT IF THEY WERE

16  NOT REQUESTED TO DO SO BY THE BORROWER.  I CAN'T RECALL

17  WHAT THE REGULATIONS SAY, IF THEY ADDRESS THESE

18  CIRCUMSTANCES.

19      Q    DID YOU ASK OCWEN TO IDENTIFY WHETHER OR NOT

20  THERE WERE ESCROW PAYMENT CHANGES UNRELATED TO AN

21  ESCROW ACCOUNT ANALYSIS?

22      A    I DID NOT.

23      Q    WHY NOT?

24      A    BECAUSE AS A FORMER LOAN SERVICE MANAGER WHO'S

25  VERY FAMILIAR WITH THE PROCESS, I CAN'T THINK OF A

Page 91

1    REASON WHY SUCH A PAYMENT CHANGE WOULD BE MADE, HOW

2    OCWEN COULD DERIVE THE AMOUNT OF THE NEW PAYMENT --

3    WHAT THE PAYMENT SHOULD BE WITHOUT PERFORMING THE KIND

4    OF ANALYSIS THAT WE TERM "AN ESCROW ANALYSIS."

5         I MEAN, CAN I RULE OUT THE POSSIBILITY THAT

6    OCWEN JUST RANDOMLY MADE CHANGES IN ESCROW PAYMENTS

7    WITHOUT PERFORMING AN ANALYSIS?  WELL, I THINK IT'S

8    HIGHLY UNLIKELY AND WOULD BE FLABBERGASTED REALLY IF

9    THAT WERE THE CASE.  BUT BECAUSE I HAVEN'T CONFIRMED

10   THE VALIDITY OF EACH ONE OF THESE ESCROW PAYMENT

11   CHANGES, I REALLY CAN'T SAY ANYMORE EXCEPT IN ORDER TO

12   GET THAT NUMBER THAT IS THE NEW PAYMENT AMOUNT, YOU

13   HAVE TO PERFORM AN ANALYSIS.  AND I CAN'T THINK OF ANY

14   OTHER PROCESS THAT WOULD LEAD TO THE PAYMENT CHANGE

15   OTHER THAN AN ESCROW ANALYSIS, AS I SAY IN

16   PARAGRAPH 214.

17        Q    BUT YOU DIDN'T SPECIFICALLY ASK OCWEN?

18             MS. ROSE-SMITH:  OBJECTION.

19             THE WITNESS:  I DID NOT.

20   BY MR. DESAI:

21        Q    DO YOU KNOW WHETHER OCWEN DISCLOSED TO STATE

22   BANKING REGULATORS THAT CERTAIN ESCROW BALANCES HAD

23   NONCASH TRANSACTIONS RELATING TO PRINCIPAL AMOUNTS

24   RELATING TO THE PROCESSING OF THEIR SHARED APPRECIATION

25   LOAN MODIFICATIONS?

Page 92

1          MS. ROSE-SMITH:  OBJECTION.

2          THE WITNESS:  I DON'T KNOW WHAT COMMUNICATIONS

3   THEY MAY HAVE HAD WITH REGULATORS, ALTHOUGH I'M VERY

4   FAMILIAR WITH THE FACT THAT IN CONNECTION WITH EVERY

5   MODIFICATION THAT I'M AWARE OF, YOU PERFORM AN ESCROW

6   ANALYSIS.  BUT I DON'T KNOW WHAT THEY COMMUNICATED TO

7   THE BANKER -- TO THE REGULATORS.

8   BY MR. DESAI:

9      Q    DO YOU KNOW WHETHER OCWEN HAD TO PERFORM

10  CERTAIN CORRECTIONS TO ESCROW ACCOUNTS AS A RESULT OF

11  THE -- THIS ISSUE?

12         MS. ROSE-SMITH:  OBJECTION.

13         THE WITNESS:  I AM GENERALLY AWARE THAT THEY

14  HAVE HAD TO MAKE SOME CORRECTIONS TO ESCROW ACCOUNTS AS

15  A RESULT OF ANALYSIS OF SOME SORT THAT WOULD TELL THEM

16  WHAT THE CORRECT PAYMENT WAS NEEDED TO BE.

17  BY MR. DESAI:

18     Q    AND DO YOU KNOW HOW MANY ACCOUNTS OCWEN HAD TO

19  MAKE CORRECTIONS TO?

20     A    NO.

21     Q    DID YOU HAVE A SENSE OF WHETHER OR NOT IT WAS

22  IN THE THOUSANDS?

23     A    I HAVE NO IDEA WHAT IT IS.

24         MR. DESAI, WHEN WE GET TO A STOPPING POINT

25  THAT'S CONVENIENT FOR YOU, IF WE COULD HAVE A BREAK.

Page 93

1     Q    ABSOLUTELY.  JUST ONE MORE QUESTION FOR YOU.

2     A    SURE.

3     Q    DID YOU ASK OCWEN IF THE VERIFIED

4    INTERROGATORY -- IF THEIR VERIFIED INTERROGATORY

5    RESPONSES, IN FACT, EXCLUDED ESCROW PAYMENT CHANGES

6    RELATING TO THE SHARED APPRECIATION MODIFICATION CHANGE

7    ISSUE WE JUST DISCUSSED?

8         MR. DESAI:  NO.

9         MS. ROSE-SMITH:  OBJECTION.

10         MR. DESAI:  WE CAN GO OFF THE RECORD.

11         THE WITNESS:  GOING OFF THE RECORD 11:29 A.M.

12         (RECESS TAKEN.)

13         THE VIDEOGRAPHER:  GOING ON THE RECORD

14    11:43 A.M.

15    BY MR. DESAI:

16     Q    DR. HAMM, CAN YOU PLEASE TURN TO PAGE 97 OF

17    YOUR REBUTTAL REPORT?

18     A    I'M THERE.

19     Q    GREAT.  IN PARAGRAPH 253, WHICH IS UNDER THE

20    HEADING "AFFIRMATIVE OPINIONS ON DAMAGES," YOU WRITE

21    THAT "BASED ON MY EXPERIENCE, I WOULD NOT EXPECT THE

22    ALLEGED ESCROW ANALYSIS TO HAVE A MATERIAL IMPACT ON

23    THE PROBABILITY OF FORECLOSURE."

24         DO YOU SEE THAT?

25     A    I DO.

Page 94

1    Q    WHAT DO YOU MEAN BY "A MATERIAL IMPACT"?

2    A    WELL, IN THIS CASE, ANY IMPACT.

3    Q    SO YOU WOULD EXPECT THE ALLEGED ESCROW

4    ANALYSIS TO HAVE ZERO IMPACT ON THE PROBABILITY OF

5    FORECLOSURE; IS THAT CORRECT?

6    A    EXACTLY.

7    Q    AND YOU WRITE IN PARAGRAPH 54 THAT, "IT IS

8    INCONCEIVABLE TO ME THAT DURING THE PERIOD SINCE 2013 A

9    RELATIVELY SMALL CHANGE IN THE MONTHLY PAYMENT ON A

10   LOAN THAT THE BORROWER COULD OTHERWISE AFFORD WOULD

11   CAUSE THE LOAN TO GO INTO FORECLOSURE."

12        DID I READ THAT CORRECTLY?

13   A    YOU DID.

14   Q    AND IS YOUR OPINION RELATED ONLY TO THE TIME

15   PERIOD SINCE 2013?

16   A    NO.  ACTUALLY THAT -- IF WE'RE TALKING ABOUT

17   THE OVERCHARGES AND UNDERCHARGES OF THE MAGNITUDE THAT

18   ARE ALLEGED TO HAVE OCCURRED IN THIS CASE, IT WOULD BE

19   MY OPINION THAT THOSE OVERCHARGES OR UNDERCHARGES WOULD

20   NEVER RESULT IN A FORECLOSURE.  NEVER.  AND I'D BE

21   HAPPY TO EXPLAIN WHY THAT IS THE CASE.

22   Q    WELL, LET ME -- WE'LL PROBABLY GET THERE, SO

23   LET ME SEE IF MY QUESTIONS NATURALLY BRING THAT OUT.

24        IN PARAGRAPH 254 YOU STATE THAT "THE" -- "THAT

25   REAL ESTATE LOANS GENERALLY PROCEED TO FORECLOSURE SALE

1    ONLY WHEN," AND YOU OFFER A SERIES OF THREE CONDITIONS.

2              "THE FIRST IS THE BORROWER IS FUNDAMENTALLY

3    UNABLE TO AFFORD THE LOAN.

4              "THE SECOND IS ALL OTHER LOSS MITIGATION

5    OPTIONS SUCH AS FORECLOSURE [SIC] AND LOAN MODIFICATION

6    HAVE BEEN EXHAUSTED" --

7              THE REPORTER:  SUCH AS...

8              MR. DESAI:  -- "SUCH AS FORBEARANCE AND LOAN

9    MODIFICATION HAVE BEEN EXHAUSTED.

10             "AND, LASTLY, THE BORROWER LACKS SUFFICIENT

11   EQUITY IN HIS" -- "HIS OR HER HOME TO MAKE A SALE

12   ECONOMICALLY ADVANTAGEOUS."

13             IS THAT CORRECT?

14        A    YOU HAVE CORRECTLY READ WHAT I WROTE IN

15   PARAGRAPH 254.

16        Q    WHEN YOU SAY "GENERALLY," WHAT DO YOU MEAN?

17        A    IT'S SIMPLY ALLOWING FOR SOME RARE, RARE

18   CIRCUMSTANCE WHEN THESE THREE RULES WOULD NOT APPLY.

19   IT'D BE MY OPINION THAT THEY APPLY IN THE VAST

20   OVERWHELMING MAJORITY OF CASES BASED ON MY EXPERIENCE

21   AND THE SCHOLARLY LITERATURE.

22        Q    JUST FOR CLARITY, IS YOUR OPINION THAT ALL

23   THREE CONDITIONS APPLY; CORRECT?

24        A    NOT NECESSARILY.  THE LITERATURE HAS CERTAINLY

25   DOCUMENTED, AND MY PERSONAL EXPERIENCE HAS CERTAINLY

Page 96

1    DOCUMENTED, THAT IF THE DEFICIENCY IN C -- OR PUT IN

2    ENGLISH, IF THE BORROWER OWES SIGNIFICANTLY MORE ON THE

3    MORTGAGE THAN THE HOUSE IS WORTH, EVEN IF THE BORROWER

4    IS ABLE TO AFFORD THE LOAN AND EVEN IF THAT LOAN MIGHT

5    QUALIFY FOR LOSS MITIGATION, THE BORROWER STILL MAY

6    DEEM IT IN HIS OR HER ECONOMIC INTEREST TO DEFAULT AND

7    LET THE LENDER, OR THE OWNER, FORECLOSE ON THE

8    COLLATERAL BECAUSE AS A MATTER OF ECONOMICS, IT

9    WOULDN'T MAKE SENSE FOR THE BORROWER TO, IN EFFECT, BUY

10   HOUSE FOR MORE THAN IT'S WORTH.

11        Q    OKAY.  I BELIEVE YOU TESTIFIED, THOUGH, THAT

12   IT WOULD BE -- LET ME ASK.

13             IS IT YOUR TESTIMONY THAT IT WOULD BE RARE FOR

14   AT LEAST THE FIRST TWO CONDITIONS, THE FIRST BEING THE

15   BORROWER IS FUNDAMENTALLY UNABLE TO AFFORD THE LOAN;

16   AND THE SECOND, ALL OTHER LOSS MITIGATION OPTIONS SUCH

17   AS FORECLOSURE AND LOAN MODIFICATIONS HAVE BEEN

18   EXHAUSTED --

19             THE REPORTER:  AH...

20             MR. DESAI:  -- SUCH AS FORBEARANCE AND LOAN

21   MODIFICATION HAVE BEEN EXHAUSTED.

22             MS. ROSE-SMITH:  OBJECTION.

23             MR. DESAI:  I DIDN'T EVEN FINISH MY QUESTION.

24             MS. ROSE-SMITH:  I THOUGHT YOU WERE READING.

25   YOU DID FINISH YOUR QUESTION.  YOU SAID IS IT YOUR

Page 97

1    TESTIMONY AND YOU READ THAT STATEMENT AND I SAID

2    OBJECTION.

3         MR. DESAI:  I WAS SUMMARIZING -- IT'S OKAY.

4    LET ME START OVER.

5    BY MR. DESAI:

6    Q    YOU TESTIFIED EARLIER THAT YOU THOUGHT THAT IT

7    WOULD BE RARE FOR A REAL ESTATE LOAN TO PROCEED TO

8    FORECLOSURE SALE OUTSIDE OF THESE THREE RULES; CORRECT?

9    A    VERY RARE, YES.

10   Q    AND DO YOU HAVE -- WHEN YOU SAY "VERY RARE,"

11   DO YOU QUANTIFY THAT IN ANY -- IN ANY WAY?

12   A    VANISHINGLY SMALL, BUT I CAN'T PUT A NUMBER ON

13   IT.

14   Q    WOULD YOU SAY LESS THAN 1 PERCENT?

15   A    I BELIEVE THAT WOULD BE TRUE.

16   Q    AND THE FIRST COMPONENT OF YOUR RULES, I

17   SHOULD SAY, IS THE BORROWER IS FUNDAMENTALLY UNABLE TO

18   AFFORD THE LOAN.

19        WHAT DO YOU MEAN BY "FUNDAMENTALLY UNABLE TO

20   AFFORD THE LOAN"?

21   A    THE BORROWER DOES NOT HAVE THE FINANCIAL

22   CAPACITY TO PAY THE PRINCIPAL, INTEREST, PROPERTY

23   TAX -- TAXES, AND INSURANCE PREMIUMS THAT THE LOAN

24   REQUIRES.

25        DOES NOT HAVE THAT FINANCIAL CAPACITY.

```
 1      Q    AND IS THERE A CERTAIN POINT WHEN A BORROWER

 2   BECOMES UNABLE TO AFFORD THE LOAN?

 3      A    I'M SURE IN EVERY CASE THERE IS.  MAY BE

 4   DIFFERENT FOR DIFFERENT BORROWERS.  BORROWER MAY LOSE

 5   HIS JOB, LOSE HER JOB, AND NO LONGER HAVE A SOURCE OF

 6   INCOME TO MAKE THE MONTHLY PAYMENTS.

 7           BORROWER MAY KEEP HIS OR HER JOB AND MAY HAVE

 8   A MEDICAL EMERGENCY THAT IMPOSES A ADDITIONAL FINANCIAL

 9   BURDEN ON THE BORROWER, AND THE BORROWER CAN'T CARRY

10   THAT BURDEN AND MAKE THE PAYMENTS ON THE LOAN.

11           THE BORROWER MAY BE INCARCERATED AND PREVENTED

12   FROM WORKING IN ORDER TO GENERATE THE INCOME NEEDED TO

13   MAKE THE MONTHLY PAYMENTS.

14           IT COULD BE ANY NUMBER OF EVENTS THAT TRIGGER

15   THE LACK OF FINANCIAL CAPACITY TO MAKE THE PAYMENT.  IT

16   WILL NOT BE AN OVERCHARGE THAT HAS AN ECONOMIC VALUE

17   AVERAGING, IF YOU BELIEVE ME, NO MORE THAN $1.26, OR IF

18   YOU BELIEVE PROFESSOR MCFADDEN, NO MORE THAN $15.24.

19   BUT IT WILL -- IT'LL BE DIFFERENT FOR DIFFERENT

20   BORROWERS.

21      Q    DR. HAMM, DO YOU HAVE ANY EXPERIENCE WITH

22   ASSISTING HOMEOWNERS WHO ARE STRUGGLING TO PAY THEIR

23   MORTGAGE?

24      A    YES.

25      Q    WHAT IS THAT EXPERIENCE?
```

Page 99

1      A      BECAUSE I RAN LOAN SERVICE AT WORLD SAVINGS

2   AND WE DIDN'T HAVE A LOT OF BORROWERS THAT WEREN'T ABLE

3   TO PAY THEIR MORTGAGE BECAUSE WE WERE PRETTY GOOD

4   UNDERWRITERS IN THOSE DAYS, BUT WE DID HAVE SOME AND WE

5   WOULD TRY TO WORK OUT THE TERMS SO THAT THEY COULD KEEP

6   THE HOUSE AND WE COULD KEEP THE LOAN.

7           SO SOME EXPERIENCE -- HAVE SOME EXPERIENCE

8   WITH CREDIT COUNSELING AGENCIES THAT WE WOULD REFER

9   BORROWERS TO IN ORDER TO HELP THEM GET A HANDLE ON

10  THEIR FINANCES AND ENABLE THEM TO KEEP THEIR MORTGAGE.

11     Q      AND HAVE YOU PERSONALLY EVER INTERVIEWED A

12  BORROWER WHO WAS STRUGGLING TO MAKE -- STRUGGLING TO

13  PAY HIS OR HER MORTGAGE?

14     A      YES.

15     Q      YOU HAVE.  OKAY.  WHEN?

16     A      WHEN I WAS LOAN SERVICE MANAGER.  I WON'T SAY

17  I FREQUENTLY DID IT, BUT I DID IT FROM TIME TO TIME.  I

18  HAVE VERY VIVID MEMORIES OF ONE SUCH CONVERSATION.

19     Q      HAVE YOU EVER PROVIDED EXPERT OPINIONS ON

20  BEHALF OF A BORROWER WHO IS STRUGGLING TO PAY HIS OR

21  HER MORTGAGE?

22     A      NO.

23     Q      HAVE YOU EVER STUDIED THE BEHAVIORS OF

24  BORROWERS WHO ARE FINANCIALLY DISTRESSED?

25     A      I'VE STUDIED THE SCHOLARLY LITERATURE THAT

Page 100

1    TALKS ABOUT THE TRIGGERS FOR DEFAULT AND THAT LEAD TO

2    FORECLOSURE, SO I'M FAMILIAR WITH THAT.

3           I'VE REVIEWED, FOR EXAMPLE, THE REASONS THAT

4    BORROWERS GAVE FOR DEFAULTING ON THE LOANS IN QUESTION.

5    Q    HAVE YOU PUBLISHED ANY ARTICLES REGARDING THE

6    BEHAVIORS OF BORROWERS WHO ARE FINANCIALLY DISTRESSED?

7    A    NO.

8    Q    HAVE YOU STUDIED FINANCIAL DECISION -- THE

9    FINANCIAL DECISION-MAKING OF BORROWERS WHO ARE

10   FINANCIALLY DISTRESSED?

11   A    TO SOME DEGREE.  THE SCHOLARLY LITERATURE

12   DEALS WITH THAT.  IT'S GENERALLY CALLED "OPTION

13   THEORY," BUT YES.

14   Q    AND HAVE YOU PUBLISHED ANY ARTICLES REGARDING

15   THE FINANCIAL DECISION-MAKING OF BORROWERS WHO ARE

16   FINANCIALLY DISTRESSED?

17   A    NO.

18   Q    AND, DR. HAMM, YOU DID NOT DEVELOP YOUR OWN

19   AFFIRMATIVE MODEL TO TEST WHAT IMPACT THE ALLEGED

20   ESCROW ANALYSES WOULD HAVE HAD ON THE PROBABILITY OF

21   FORECLOSURE; IS THAT CORRECT?

22   A    I WASN'T -- THAT IS CORRECT.  I WASN'T ASKED

23   TO DO THAT AND AS A REBUTTAL WITNESS, OR EXPERT, I WAS

24   NOT -- IT'S NOT SOMETHING I HAD TO DO.

25          MY ASSIGNMENT WAS TO CONSIDER DR. -- OR

Page 101

1    PROFESSOR MCFADDEN'S OPINIONS AND ADVISE THE COURT TO

2    THE EXTENT TO WHICH THEY WERE SOUND.  BUT I WAS NOT

3    ASKED TO DO THE PLAINTIFF'S WORK AND DEVELOP AN

4    AFFIRMATIVE OPINION.

5        Q    IS IT YOUR OPINION THAT A SERVICER'S FAILURE

6    TO PERFORM AN ESCROW ANALYSIS NEVER HARMS A BORROWER?

7        A    NO.

8        Q    WHAT SITUATIONS MIGHT A SERVICER'S FAILURE TO

9    PERFORM AN ESCROW ANALYSIS HARM A BORROWER?

10       A    IF THE -- YOU HAD A CIRCUMSTANCE WHERE THE

11   BORROWER -- THE FAILURE TO PERFORM AN ESCROW ANALYSIS

12   RESULTED IN THE PAYMENT BEING TOO HIGH FOR A CERTAIN

13   PERIOD OF TIME, DENYING THE BORROWER THE OPPORTUNITY TO

14   USE THE MONEY, AND IT WAS 1981 OR 1979 AND INTEREST

15   RATES ON MONEY MARKET ACCOUNTS AND SAVINGS ACCOUNTS --

16   WELL, SAY MONEY MARKET ACCOUNTS, NOT SAVINGS ACCOUNTS,

17   WERE 8 OR 9 PERCENT, THE DELAY IN THAT PARTICULAR CASE

18   WOULD HARM A BORROWER.

19            AND THERE MAY BE OTHER CIRCUMSTANCES AS WELL.

20       Q    SITTING HERE TODAY, CAN YOU THINK OF ANY OTHER

21   CIRCUMSTANCES?

22       A    I HAVEN'T REALLY THOUGHT ABOUT IT.  IF I GAVE

23   IT ENOUGH THOUGHT, I'M SURE I COULD COME UP WITH MORE.

24       Q    AND DO THOSE -- STRIKE THAT.

25            IS IT YOUR OPINION THAT FAILING TO PERFORM AN

Page 102

1    ESCROW ANALYSIS ON TIME DOES NOT INCREASE THE RISK THAT

2    A BORROWER HAVE A FORECLOSURE BEING INITIATED?

3        A    CORRECT, THAT IS MY OPINION.  CERTAINLY GIVEN

4    THE FACTS IN THIS CASE.  THERE MIGHT BE CIRCUMSTANCES

5    WHERE MY OPINION WOULD BE DIFFERENT.  I CAN'T

6    REALISTICALLY IMAGINE THAT THAT WOULD BE THE CASE.  BUT

7    WHEN YOU'RE TALKING ABOUT THE KINDS OF DELAYS THAT

8    WE'RE TALKING ABOUT HERE, MY OPINION IS THAT THE DELAY

9    IN THE ESCROW ANALYSIS COULD NOT CAUSE A FORECLOSURE.

10       Q    LET ME ASK YOU THE MORE GENERAL QUESTION, NOT

11   RELATED NECESSARILY TO THE FACTS OF THIS CASE.  BUT IS

12   IT YOUR OPINION THAT FAILING TO PERFORM AN ESCROW

13   ANALYSIS ON TIME CAN NEVER INCREASE THE RISK THAT A

14   BORROWER HAVE A FORECLOSURE BE INITIATED?

15           MS. ROSE-SMITH:  OBJECTION.

16           THE WITNESS:  COULD I -- COULD I, IF GIVEN

17   ENOUGH TIME, COME UP WITH A COMPLETELY REMOTE

18   POSSIBILITY WHERE THAT COULD HAPPEN?  YES, PROBABLY I

19   COULD.  BUT WE WOULD BE TALKING ABOUT SOMETHING

20   VANISHINGLY REMOTE.

21   BY MR. DESAI:

22       Q    AND WHEN YOU SAY "VANISHING REMOTE," ARE YOU

23   USING THAT SIMILAR TO BEFORE, LESS THAN 1 PERCENT BE

24   APPROPRIATE?

25       A    FAR LESS THAN 1 PERCENT.  FAR LESS.

Page 103

1      Q     TURNING TO PARAGRAPH 260 ON PAGE 9 OF YOUR

2  REBUTTAL REPORT.

3      A     I'M THERE.

4      Q     YOU WRITE THAT, "YOU KNOW" -- I'M SORRY.  IT'S

5  WEIRD WHEN I TRY TO QUOTE YOU AND I SAY "I" WHEN IT'S

6  NOT ME, BUT ME IS DR. HAMM.

7            NO, YOU WRITE THAT, "YOU KNOW OF NO STUDY THAT

8  CHARACTERIZES NORMAL ESCROW PAYMENT CHANGES AS A SOURCE

9  OF PAYMENT SHOCK."

10           DID I READ THAT CORRECTLY?

11     A     I'M TRYING TO FIND WHERE YOU ARE.  OH, OKAY.

12           YES, THAT'S CORRECT.

13     Q     WHY DO YOU DESCRIBE THE PAYMENT CHANGE BEING

14  THE RESULT OF A, QUOTE, NORMAL ESCROW PAYMENT CHANGE,

15  END QUOTE?

16     A     WELL, I WANTED TO DIFFERENTIATE THE PAYMENT

17  CHANGE THAT RESULTS FROM AN INCREASE IN PROPERTY TAXES

18  OR AN INCREASE IN INSURANCE PAYMENTS FROM THE PAYMENT

19  CHANGE THAT RESULTS FROM A PERIOD OF UNDERCHARGE FOR A

20  BORROWER THAT DOES NOT HAVE A SURPLUS IN HIS OR HER

21  ACCOUNT BECAUSE THE FORMER, THE PAYMENT CHANGE THAT

22  RESULTS FROM AN INCREASE IN PROPERTY TAXES OR HAZARD

23  INSURANCE PREMIUMS IS A SHOCK COMMON -- WHETHER IT'S A

24  SHOCK OR NOT OR JUST A CHANGE, I'LL LEAVE TO THE

25  DIALECTICIANS.  BUT AS FAR AS I'M CONCERNED, THAT

Page 104

1   CHANGE IS COMMON TO BOTH THE ACTUAL WORLD AND THE

2   BUT-FOR WORLD.  IT DOESN'T MATTER WHEN THE ESCROW

3   PAYMENT -- ESCROW ANALYSIS IS CONDUCTED.  THE BORROWER

4   IS ON THE HOOK TO PAY THE PROPERTY TAXES AND HAZARD

5   INSURANCE.

6          AND TO THE EXTENT THAT WERE THE STRAW THAT

7   BROKE THE CAMEL'S BACK AND SENT THE BORROWER INTO

8   FORECLOSURE, THAT WOULD -- THE LATE ESCROW ANALYSIS

9   WOULD HAVE NOTHING TO DO WITH IT BECAUSE THE BORROWER

10  IS OBLIGATED TO PAY THE PROPERTY TAXES AND HAZARD

11  INSURANCE PREMIUM.  THAT'S IN THE NOTE, THAT EVERY

12  BORROWER, NO EXCEPTIONS, SIGNS.

13         THE ONLY THING THAT'S DIFFERENT ABOUT A LATE

14  ESCROW ANALYSIS IS IF THE BORROWER IS UNDERCHARGED FOR

15  A PERIOD, THAT WILL CAUSE THE BALANCE IN THE ESCROW

16  ACCOUNT TO BE LESS THAN IT SHOULD BE AND WILL REQUIRE

17  AN INCREMENT TO THE TARGET ESCROW PAYMENT OVER THE NEXT

18  12 TO 60 MONTHS TO COMPENSATE FOR THAT UNDERCHARGE.

19  THAT'S WHAT WE SHOULD BE FOCUSING ON BECAUSE THAT'S THE

20  ONLY PAYMENT CHANGE THAT CAN BE ATTRIBUTED TO A LATE

21  ESCROW ANALYSIS, A POINT THAT I BELIEVE YOUR EXPERT

22  OFTEN OVERLOOKS.

23    Q    AND YOU SAY YOU KNOW OF NO STUDY.

24         DID YOU PERFORM A LITERATURE REVIEW

25  SURROUNDING PAYMENT SHOCK?

Page 105

```
 1              MS. ROSE-SMITH:  OBJECTION.

 2              THE WITNESS:  YES.

 3   BY MR. DESAI:

 4      Q    AND IS THE EXTENT OF YOUR LITERATURE REVIEW

 5   SUMMARIZED IN YOUR REBUTTAL REPORT?

 6      A    WELL, YES, BECAUSE IT SAYS HERE, "I KNOW OF NO

 7   STUDY THAT CHARACTERIZES NORMAL ESCROW PAYMENT

 8   CHANGES."  I THINK WE DID A SEARCH AND CAME UP EMPTY.

 9              SO YES, IT'S SUMMARIZED HERE.

10      Q    WAS YOUR SEARCH LIMITED JUST TO ESCROW PAYMENT

11   CHANGES?

12      A    YES.

13      Q    SO IT WAS --

14      A    IF WE HAD -- IF WE HAD FOUND A STUDY, I

15   CAN'T -- I WOULDN'T BET MY ENTIRE NET WORTH THAT THERE

16   ISN'T A DOCTORAL DISSERTATION SOMEWHERE THAT DIDN'T

17   MAKE IT ONTO MY -- DIDN'T COME UP IN MY SEARCH, BUT

18   EVEN IF ONE HAD COME UP, THEN THE NEXT THING I WANT TO

19   KNOW IS HOW DID THEY DEFINE PAYMENT CHANGE AND HOW DID

20   THEY DEAL WITH THIS LITTLE STUB THAT YOU ADD TO THE

21   PAYMENT CHANGE IN ORDER TO COMPENSATE FOR A PERIOD OF

22   UNDERCHARGE.

23              WELL, WE MADE A GOOD FAITH EFFORT TO IDENTIFY

24   SUCH A STUDY AND WE COULDN'T FIND ONE.  AND ALTHOUGH I

25   SOMETIMES HAVE PEOPLE ASK ME FOR IDEAS FOR A DOCTORAL
```

Page 106

1    DISSERTATION, I'M NOT GOING TO SUGGEST THAT THEY STUDY

2    THIS BECAUSE I THINK IT'S A BLIND ALLEY.  I DON'T

3    THINK -- I THINK IT MAKES MUCH MORE SENSE TO STUDY

4    THINGS LIKE THE END OF THE LITERATURE SOMETIMES REFERS

5    TO IT AS A TEASER RATE.  MY BOSSES AT WORLD SAVINGS

6    WOULD CUT MY TONGUE OFF IF I SAID "TEASER RATE" RATHER

7    THAN INTRODUCTORY RATE --

8              (INTERRUPTION IN PROCEEDINGS.)

9              THE WITNESS:  -- OR THE END OF A DRAW PERIOD

10   FOR HOME EQUITY LINE OF CREDIT.  THOSE ARE -- THOSE ARE

11   REAL SHOCKS.

12             OR IF YOU WANT TO STUDY THE IMPACT OF A

13   SIGNIFICANT INCREASE IN INSURANCE PREMIUMS SUCH AS

14   WE'VE HAD HERE IN CALIFORNIA UNDER THE COVERED

15   CALIFORNIA PROGRAM, THAT'S WORTH STUDYING.  BUT I DON'T

16   THINK AN INCREASE IN PROPERTY TAXES AND INSURANCE

17   PREMIUMS IS A PRODUCTIVE PLACE TO STUDY THE IMPACT OF

18   PAYMENT SHOCK.  BUT -- AND I CERTAINLY DON'T THINK

19   STUDYING THE IMPACT OF THAT LITTLE STUB ON BORROWERS

20   THAT HAS TO BE ADDED TO THE TARGET PAYMENT AMOUNT IN

21   ORDER TO RECOVER A SHORTAGE DURING THE DELAYED ESCROW

22   PERIOD.  THAT'S DEFINITELY A BLIND ALLEY IN MY OPINION.

23             MS. ROSE-SMITH:  DO YOU WANT TO DO SOMETHING

24   ABOUT THAT OR NO?

25             MS. HAYES PINDER:  I JUST COMMUNICATED WITH MY

Page 107

1    PEOPLE.  THEY ALL SAID ON A BREAK IS FINE.

2           MR. DESAI:  YEAH, WHY DON'T WE GO FOR A FEW

3    MORE MINUTES AND THEN WE'LL BREAK FOR LUNCH AND WE'LL

4    DEAL WITH IT THEN.

5           MS. ROSE-SMITH:  THAT'S FINE.

6    BY MR. DESAI:

7       Q    IN PARAGRAPH 262, DR. HAMM, YOU WRITE THAT,

8    "IN THE PRESENT MATTER, HOWEVER, EACH PAYMENT CHANGE

9    WAS INEVITABLE AND WOULD HAVE OCCURRED IN THE ABSENCE

10   OF ALLEGED DELAY."

11          WHAT DO YOU MEAN BY "EACH PAYMENT CHANGE WAS

12   INEVITABLE"?

13      A    LET ME CATCH UP WITH YOU HERE.

14      Q    SURE.

15      A    FIRST OF ALL, I SAY "MOST OF EACH PAYMENT

16   CHANGE WAS INEVITABLE."

17          WHAT I MEAN BY THAT IS LET'S ASSUME OCWEN HAD

18   PERFORMED THE ESCROW ANALYSIS ON THE BUT-FOR DATE AND

19   WHATEVER YOU WANT TO CALL IT, THE DATE THAT ACCORDING

20   TO THE REGULATIONS THEY SHOULD HAVE PERFORMED THE

21   ANALYSIS BY.

22          OKAY.  IF PROPERTY TAX PAYMENTS WENT UP IN THE

23   12 PRECEDING MONTHS OR IF THE HAZARD INSURANCE PAYMENT

24   WENT UP DURING THE 12 PRECEDING MONTHS, THE PAYMENT TO

25   ESCROW AND, THEREFORE, THE MONTHLY PAYMENT, ASSUMING

Page 108

1   IT'S NOT AN ARM IN A DECLINING INTEREST RATE

2   ENVIRONMENT, THE PAYMENT IS GOING TO GO UP.  YOU CAN

3   CALL THAT A PAYMENT SHOCK IF YOU WANT, BUT IT'S NOT A

4   PAYMENT SHOCK THAT WOULD -- IT'S A PAYMENT SHOCK THAT'S

5   GOING TO OCCUR REGARDLESS OF WHETHER OCWEN IS ON TIME

6   WITH THE ESCROW ANALYSIS OR NOT.

7          THAT'S WHAT I MEAN BY THE INEVITABILITY OF

8   THAT PORTION OF THE PAYMENT CHANGE.

9          THE PORTION OF THE PAYMENT CHANGE THAT

10  ARGUABLY IS NOT INEVITABLE IS THE PORTION THAT IS DUE

11  TO THE FACT -- OR TO THE ALLEGATION THAT OCWEN WAS LATE

12  IN PERFORMING THE ANALYSIS, THEY ENDED UP UNDERCHARGING

13  THE BORROWER DURING THIS INTERIM PERIOD AND THE

14  BORROWER DID NOT HAVE A SURPLUS IN THEIR ESCROW

15  ACCOUNT, AND THEREFORE OCWEN NEEDED TO RECOUP THE

16  SHORTAGE DUE TO THE LATE ESCROW ANALYSIS OVER A PERIOD

17  OF TIME RANGING FROM 12 TO 60 MONTHS.

18         THAT PORTION OF THE PAYMENT CHANGE WAS NOT

19  INEVITABLE.  IT WAS DUE TO -- IF WE ASSUME THAT OCWEN

20  WAS LATE WITH ITS ANALYSIS, IT WAS DUE TO OCWEN'S

21  BEHAVIOR.

22         BUT IT HAS TO BE DISTINGUISHED FROM THE PART

23  OF THE PAYMENT CHANGE -- THE ESCROW PAYMENT CHANGE THAT

24  WAS GOING TO HAPPEN ANYWAY REGARDLESS OF WHEN THAT

25  ESCROW ANALYSIS IS PREPARED.

Page 109

1      Q    IN YOUR OPINION DOES THE TIMING OF WHEN THE

2   CHANGE, IN FACT, HAPPENS MATTER IN ASSESSING THE

3   EFFECTS OF PAYMENT SHOCK?

4           MS. ROSE-SMITH:  OBJECTION.

5           THE WITNESS:  THE -- DOES THE TIMING OF THE

6   CHANGE OF -- NO, I THINK WHAT MATTERS IS -- IF THERE IS

7   ANYTHING TO THE IDEA THAT PAYMENT CHANGE PUTS BORROWERS

8   IN A FINANCIAL HOLE AND MAKES IT MORE DIFFICULT FOR

9   THEM TO CARRY THEIR MORTGAGE, THE MORE IMPORTANT PART

10  IS WHAT IS THE AMOUNT AND NOT NECESSARILY WHAT THE

11  TIMING IS.

12          I MEAN, AGAIN, YOU COULD PROBABLY CONSTRUCT

13  SOME HYPOTHETICAL WHERE TIMING WOULD BE IMPORTANT, BUT

14  THE MOST IMPORTANT THING IS THE AMOUNT.

15          AND IF YOU HAD A SITUATION WHERE THE TARGET

16  PAYMENT AMOUNT TO ESCROW WAS GOING TO GO UP BY 100 --

17  BY $120 AND THE ESCROW PAYMENT WAS DELAYED BY TWO

18  MONTHS SO THAT YOU WERE $20 SHORT, OKAY, REGARDLESS OF

19  WHEN YOU DO THAT ESCROW ANALYSIS, THE PAYMENT IS GOING

20  TO GO UP BY $120, BUT IF THE ESCROW ANALYSIS IS LATE BY

21  TWO MONTHS, IT'S GOING TO GO UP BY 120 PLUS 20 DIVIDED

22  BY 12.  AND IT'S THE 20 DIVIDED BY 12 THAT IS THE NON

23  INEVITABLE PORTION OF THE PAYMENT CHANGE.  THE 120 IS

24  THE INEVITABLE PORTION.  I HOPE THAT HELPS.

25  ///

Page 110

1    BY MR. DESAI:

2        Q    LOOK AT PARAGRAPH 263 OF YOUR REPORT.

3        A    I'M THERE.

4        Q    YOU COMPARE THE PAYMENT INCREASES FOR

5    NONDELAYED ESCROW ANALYSES WITH THAT FOR DELAYED ESCROW

6    ANALYSES; IS THAT CORRECT?

7             MS. ROSE-SMITH:  OBJECTION.

8             THE WITNESS:  LET ME REFRESH MY MEMORY HERE.

9             YES, I DID COMPARE USING THE RFP 22 DATA, THE

10   SIZE -- THE PERCENTAGE INCREASE IN THE MONTHLY MORTGAGE

11   PAYMENT FOR THE BORROWERS WHOSE -- THE UNDERCHARGED

12   BORROWERS WHOSE PAYMENT -- THE UNDERCHARGED BORROWERS

13   TO THE PERCENTAGE INCREASE IN THE MONTHLY PAYMENT FOR

14   THE BORROWERS IN THE CONTROL GROUP.  AND THE DIFFERENCE

15   IS .8 PERCENT OF THE PAYMENT WHICH INTERESTINGLY IS

16   60 PERCENT GREATER THAN THE PERCENTAGE INCREASE THAT

17   PROFESSOR MCFADDEN FOUND -- WOULD FIND IN HIS

18   SURREBUTTAL REPORT IF ONLY HE HAD REMEMBERED THAT THE

19   SHORTAGE IS SPREAD OVER A 12- TO 60-MONTH PERIOD AND

20   NOT PAID AS A LUMP SUM IN THE FIRST MONTH.

21             HE -- WHEN YOU DIVIDE HIS --

22   BY MR. DESAI:

23        Q    DR. HAMM --

24        A    LET ME JUST FINISH THE SENTENCE.

25             IF YOU DIVIDE IT BY 12, IT'S .5 PERCENT RATHER

Page 111

1    THAN .8 PERCENT.  I JUST THOUGHT THAT WAS INTERESTING

2    CONTEXT.

3        Q    AND .8 PERCENT IS JUST THE DIFFERENCE BETWEEN

4    YOUR 6.7 PERCENT AVERAGE AND YOUR 5.9 PERCENT AVERAGE?

5        A    THAT IS CORRECT.

6        Q    MATHEMATICALLY, ISN'T A CHANGE FROM

7    5.9 PERCENT TO 6.7 PERCENT AN ACTUAL CHANGE OF

8    13.6 PERCENT INCREASE?

9        A    WE'RE ONLY -- PAYMENT SHOCK IS WHAT IS THE

10   INCREASE IN THE PAYMENT RELATIVE TO THE OLD PAYMENT?

11   AND THE INCREASE IN THE PAYMENT RELATIVE TO THE OLD

12   PAYMENT IS .8 PERCENT.

13       Q    YOU CONCLUDE THAT YOU KNOW OF NO PRECEDENT FOR

14   LABELING A MARGINAL INCREASE TO -- STRIKE THAT.

15            LET ME ASK YOU A QUESTION.  EARLIER YOU MADE A

16   DISTINCTION BETWEEN PAYMENT INCREASES THAT HAPPEN AS A

17   RESULT OF ESCROW -- OF A DELAYED ESCROW ANALYSIS AND

18   PAYMENT CHANGES THAT HAPPEN AT THE END OF A HELOC DRAW

19   PERIOD.

20            DO YOU RECALL THAT?

21       A    YES.

22       Q    CAN YOU EXPLAIN TO ME WHY YOU THINK THAT

23   DISTINCTION IS RELEVANT?

24       A    YES, BECAUSE THE PAYMENT INCREASES RESULTING

25   FROM A DELAYED ESCROW ANALYSIS ARE TINY, .8 PERCENT BY

Page 112

1   THE CALCULATION IN PARAGRAPH 263, .5 PERCENT IF YOU USE

2   PROFESSOR MCFADDEN'S DATA IN HIS SURREBUTTAL REPORT.

3   THE PAYMENT INCREASES FOR A BORROWER WHO GETS TO THE

4   END OF THE DRAW PERIOD FOR HELOC, 25 PERCENT,

5   50 PERCENT.  THAT'S A -- THAT'S A SIGNIFICANT CHANGE,

6   FAR MORE SIGNIFICANT THAN .5 OR .8 PERCENT.

7        Q    AND IN PARAGRAPH 266 YOU WRITE, "THAT

8   PROFESSOR MCFADDEN FAILS TO ARTICULATE A PLAUSIBLE

9   THEORY AS TO HOW TEMPORARY OVERCHARGE THAT WAS FULLY

10  REPAID COULD HAVE CAUSED PERMANENT DEFAULT AND

11  FORECLOSURE."

12          YOU REFER TO THE RESULT OF A FAILURE TO

13  PERFORM AN ESCROW ANALYSIS CAUSING A TEMPORARY CHANGE.

14          WHAT DO YOU MEAN BY "TEMPORARY"?

15       A    WELL, THE -- I'M JUST PUTTING THAT THERE

16  BECAUSE IT'S UNCOMFORTABLE IN MY POCKET.

17       Q    OH, SURE.

18       A    IF THERE IS AN OVERCHARGE, EVERY PENNY OF THAT

19  OVERCHARGE IS GOING TO BE REFUNDED TO THE BORROWER.

20  EVERY PENNY.  THAT'S THE WAY THE ESCROW ACCOUNT

21  ANALYSIS WORKS.  THAT'S WHY I REPEATEDLY SAY IN MY

22  REPORT THAT WE'RE TALKING ABOUT SMALL TEMPORARY AND

23  SELF-CORRECTING OVERCHARGES.

24          SO THAT IS -- THAT IS THE REASON THAT I SAY

25  "TEMPORARY."

Page 113

1            THE ONLY THING THAT IS PERMANENT HERE IS THE

2    OPPORTUNITY COST HARM IF THERE IS OPPORTUNITY COST

3    HARM, YOU KNOW THAT MY OPINION IS THAT THE OPPORTUNITY

4    COST HARM ROUNDS TO ZERO BECAUSE OF THE INTEREST RATE

5    ENVIRONMENT THAT PREVAILED DURING THE RELEVANT TIME

6    PERIOD.

7            BUT EVEN IF WE USE PROFESSOR MCFADDEN'S

8    GROSSLY INFLATED OPPORTUNITY COST RATES, THE CREDIT

9    CARD RATES, THE AVERAGE OVERCHARGE, AND THUS THE

10   AVERAGE PERMANENT DAMAGE IS $15.24.  $15.24 IS NOT

11   ENOUGH TO HAVE THE CONSEQUENCES THAT HE POSTULATES FROM

12   THIS OVERCHARGE.  IT DOESN'T WORK THAT WAY IN THE REAL

13   WORLD.

14   Q    DR. HAMM, YOU JUST OPINE -- YOU JUST

15   TESTIFIED, RATHER, THAT A BORROWER WHO IS OVERCHARGED

16   WILL HAVE EVERY PENNY OF A SURPLUS RETURNED TO THEM AS

17   SOON AS OCWEN DOES THAT ESCROW ANALYSIS; IS THAT

18   CORRECT?

19   A    WELL, WHAT I SAID WAS THEY WILL GET ALL OF THE

20   MONEY BACK.  AND IT ALL DEPENDS ON -- I MEAN, THEY WILL

21   GET A CHECK FOR THE -- THE EXCESS SURPLUS IN THEIR

22   ESCROW ACCOUNT AS SOON AS THE ANALYSIS IS PERFORMED.

23   Q    WHAT IF A BORROWER FALLS DELINQUENT, WOULD

24   THEY STILL RECEIVE THEIR ESCROW SURPLUS CHECK?

25   A    A BORROWER -- PROBABLY NOT.  THE CHECK WOULD

Page 114

1   BE USED -- THEY WOULD RECEIVE THE EFFECTIVE USE OF THE

2   FUNDS BECAUSE THAT CHECK WOULD BE USED TO MAKE UP FOR

3   WHAT THEY DIDN'T PAY INTO THEIR ESCROW ACCOUNT AND THUS

4   IT WOULD HAVE THE VERY SAME EFFECT.

5           THEY'RE -- THEY'RE -- THEY'RE OBLIGATED EACH

6   MONTH TO MAKE PAYMENTS TO THE ESCROW ACCOUNT.  IF THEY

7   DON'T MAKE THOSE PAYMENTS, YOU CAN THINK OF THE REFUND

8   OF THE OVERAGE AS OCWEN USING THE MONEY TO MAKE THE

9   BORROWER'S PAYMENT, BUT THE BORROWER STILL GETS

10  EFFECTIVE USE OF THE MONEY.

11     Q   IS IT YOUR OPINION, DR. HAMM, THAT HAVING CASH

12  IN HAND IS THE FUNCTIONAL EQUIVALENT OF HAVING THAT

13  MONEY IN A BORROWER'S ESCROW ACCOUNT?

14     A   IN THIS PARTICULAR --

15         MS. ROSE-SMITH:  OBJECTION.

16         THE WITNESS:  I'M SORRY.  IN THIS PARTICULAR

17  CASE, YES.

18  BY MR. DESAI:

19     Q   INCLUDING IF THAT BORROWER IS DELINQUENT?

20     A   WELL, WHEN DID THE BORROWER BECOME DELINQUENT

21  IN YOUR HYPOTHETICAL?

22     Q   IN MY HYPOTHETICAL, IT'S AFTER THE DATE THAT

23  HAD OCWEN DONE THE ESCROW ANALYSIS, A SURPLUS CHECK

24  WOULD HAVE BEEN RETURNED.

25     A   OKAY.  SO OCWEN -- SO THE BORROWER IS CURRENT

Page 115

1    ON THE BUT-FOR --

2         Q    CORRECT.

3         A    -- DATE, BECOMES DELINQUENT, AND ON THE ACTUAL

4    DATE, OCWEN DOES THE ANALYSIS, FINDS OUT THAT THERE WAS

5    TOO MUCH MONEY IN THE ESCROW ACCOUNT, AND USES THE

6    EXCESS TO, IN EFFECT, MAKE A PAYMENT INTO THE ESCROW

7    ACCOUNT TO COMPENSATE FOR THE FACT THAT THE BORROWER

8    DID NOT FEED HIS ESCROW ACCOUNT AS HE WAS OBLIGATED BY

9    THE PROMISSORY NOTE TO DO.

10         SO YES, I THINK EFFECTIVELY THE BORROWER HAS

11   THE USE OF THE MONEY AS IF IT WERE CASH BECAUSE THAT'S

12   HIS OBLIGATION OR HER OBLIGATION TO MAKE THAT PAYMENT.

13        Q    AND IN YOUR OPINION, DR. HAMM, HOW LONG WAS

14   THE PAYMENT CHANGE BE IN EFFECT FOR IT TO INCREASE THE

15   PROBABILITY THAT -- SORRY.

16         HOW MUCH -- HOW LONG MUST THE OVERPAYMENT BE

17   IN EFFECT FOR IT TO INCREASE THE PROBABILITY THAT A

18   BORROWER DEFAULT?

19        A    I DON'T THINK THE KIND OF OVERPAYMENTS WE'RE

20   TALKING ABOUT IN THIS CASE ARE GOING TO HAVE ANY IMPACT

21   ON THE RATE OF FORECLOSURE INITIATION, AND I'D BE HAPPY

22   TO EXPLAIN WHY.

23        Q    THAT'S OKAY.

24         IS IT POSSIBLE THAT A SINGLE PAYMENT INCREASE

25   MIGHT INCREASE THE PROBABILITY THAT A BORROWER DEFAULT?

Page 116

```
 1      A     NO.  YOU MEAN -- WHAT PAYMENT INCREASE ARE WE

 2   TALKING ABOUT?  STRIKE MY ANSWER.

 3      Q     ANY SINGLE PAYMENT INCREASE.

 4      A     YES.

 5      Q     IS IT YOUR OPINION --

 6      A     I THINK THE SCHOLARLY LITERATURE SHOWS THAT IF

 7   YOU HAVE A 25 OR 50 PERCENT PAYMENT INCREASE BECAUSE A

 8   BORROWER HAS GOTTEN TO THE END OF A HOME EQUITY LINE OF

 9   CREDIT, THAT THAT CAN INCREASE THE CHANCES OF THAT

10   BORROWER GOING INTO FORECLOSURE.  I BELIEVE THAT'S BEEN

11   PRETTY WELL ESTABLISHED.

12      Q     AND WITH THE MAGNITUDE OF THEIR REQUIRED

13   PAYMENT INCREASE IN TERMS OF INCREASING THEIR

14   PROBABILITY OF DEFAULT, WOULD THAT MATTER BASED ON WHO

15   THE BORROWER IS?  THEIR FINANCIAL CONDITION, I SHOULD

16   SAY.

17      A     AS A GENERAL RULE, NO, BECAUSE THE BORROWER IS

18   GETTING EVERY PENNY OF THE OVERAGE BACK, AND SO THAT,

19   COUPLED WITH THE REALITIES OF LOAN SERVICING AND THE

20   POWERFUL ECONOMIC INTEREST THAT THE SERVICER HAS IN

21   KEEPING THAT LOAN ON THE BOOKS AND PERFORMING, IS --

22   MAKES IT ALMOST IMPOSSIBLE, I WILL SAY, FOR THAT

23   OVERCHARGE TO HAVE ANY EFFECT ON THE RATE OF

24   FORECLOSURE.  JUST DOESN'T WORK THAT WAY IN THE REAL

25   WORLD.
```

1          MR. DESAI:  WHY DON'T WE GO OFF THE RECORD?

2          THE VIDEOGRAPHER:  GOING OFF THE RECORD

3     12:20 P.M.

4          (LUNCH RECESS TAKEN.)

5          THE VIDEOGRAPHER:  GOING BACK ON THE RECORD.

6     IT'S 1:16 P.M.

7          MR. DESAI:  THANK YOU.

8     BY MR. DESAI:

9     Q    DR. HAMM, IN PARAGRAPH 271, YOU WRITE THAT

10    "PROFESSOR MCFADDEN, QUOTE, DOES NOT CITE ANY MORTGAGE

11    FINANCE LITERATURE REGARDING, END QUOTE, EITHER HIS

12    ECONOMETRIC MODEL OR INDEPENDENT VARIABLE CHOICES."

13         DO YOU SEE THAT?

14    A    NOT YET.

15    Q    OKAY.  SORRY.

16    A    YES, I DO.

17    Q    DO YOU BELIEVE PROFESSOR MCFADDEN SHOULD HAVE

18    USED A DIFFERENT ECONOMETRIC MODEL SPECIFICATION OTHER

19    THAN THE PROPORTIONAL HAZARD MODEL?

20    A    WELL, I CAN'T ADVISE HIM ON WHICH MODEL TO USE

21    EXCEPT IF HE IS GOING TO USE A PROPORTIONAL HAZARDS

22    MODEL, HE HAS TO CONSIDER COMPETING RISK.  HE DIDN'T DO

23    THAT.

24         HE'S OBVIOUSLY AWARE OF THE FACT THAT WHERE

25    THERE ARE COMPETING RISK, THE ACCEPTED PRACTICE IS TO

Page 118

1    USE A PROPORTIONAL HAZARD MODEL WITH COMPETING RISK.

2    AND THAT'S WHAT I MEANT WHEN I SAID "DECISION TO USE A

3    PROPORTIONATE HAZARD MODEL OF THIS TYPE."

4        Q    AND HOW IS IT THAT YOU BELIEVE THAT THE

5    PROPORTIONAL HAZARD MODEL THAT PROFESSOR MCFADDEN USED

6    DIFFERS FROM THE COMPETING RISKS MODEL THAT YOU THINK

7    IS MORE APPROPRIATE?

8        A    WELL, BECAUSE PROFESSOR MCFADDEN'S

9    PROPORTIONAL HAZARDS MODEL CONSIDERS TWO POSSIBLE

10   OUTCOMES, SURVIVAL OR FORECLOSURE INITIATION; BUT IN

11   THE MORG- -- IN LOAN SERVICING, THERE ARE MORE POSSIBLE

12   OUTCOMES THAT NEED TO BE MODELED IN A MODEL OF THIS

13   TYPE.

14          THERE IS -- THERE ARE MODIFICATIONS, THERE ARE

15   PAYOFFS, THERE ARE -- THERE'S FORBEARANCE, OBVIOUSLY

16   LESS IMPORTANT, BUT YOU HAVE TO TAKE INTO ACCOUNT THESE

17   OTHER POSSIBLE OUTCOMES IN ORDER TO AVOID DISTORTING

18   THE COEFFICIENTS ON THE PARAMETERS THAT YOU THINK ARE

19   IMPORTANT.

20       Q    AND DID YOU PERFORM AN ANALYSIS TO DETERMINE

21   WHAT THE EFFECT OF NOT USING A COMPETING RISK MODEL ARE

22   ON PROFESSOR MCFADDEN'S MODEL RESULTS?

23       A    DID I PERFORM AN ANALYSIS AS TO SHOWING WHAT

24   THE EFFECT OF USING THE WRONG SPECIFICATION WAS?  NO, I

25   DIDN'T.

Page 119

1      Q    DID YOU -- STRIKE THAT.

2           DID YOU IMPLEMENT PROFESSOR MCFADDEN'S MODEL

3    BUT INSTEAD USING YOUR -- THE COMPETING CHOICE

4    SPECIFICATION THAT YOU SUGGEST IS MORE APPROPRIATE?

5           MS. ROSE-SMITH:  OBJECTION.

6           THE WITNESS:  I'VE ALREADY TESTIFIED THAT I

7    WAS NOT ASKED TO CREATE A MODEL AND RUN THE MODEL TO

8    ATTEMPT TO ESTIMATE WHAT EFFECT, IF ANY, THE DELAY IN

9    ESCROW ANALYSIS HAD.  SO NO, I DIDN'T DO THAT.

10   BY MR. DESAI:

11     Q    SO HOW DO YOU KNOW THAT YOUR PREFERRED

12   ECONOMETRIC MODEL SPECIFICATION OF COMPETING RISKS IS

13   SUPERIOR TO PROFESSOR MCFADDEN'S CHOICE?

14     A    BECAUSE THE LITERATURE ON PROPORTIONAL HAZARD

15   MODELS SAYS THAT WHEN THERE ARE COMPETING RISKS, YOU

16   NEED TO ACCOUNT FOR THEM IN THE MODEL.

17     Q    BUT YOU YOURSELF DIDN'T ACTUALLY ATTEMPT TO

18   IMPLEMENT YOUR COMPETING RISK MODEL; IS THAT CORRECT?

19     A    I WASN'T ASKED TO DO THAT.  IT WASN'T MY JOB.

20   I SIMPLY OBSERVED THAT PROFESSOR MCFADDEN'S CHOICE OF A

21   MODEL -- AND I'M NOT SAYING THIS IS THE PREFERRED

22   MODEL.  THERE ARE OTHER MODELS, OTHER TYPES OF MODELS

23   HE COULD HAVE USED.  BUT IF HE'S GOING TO USE A

24   PROPORTIONAL HAZARD MODEL, HE HAS TO TAKE INTO ACCOUNT

25   COMPETING RISK; AND IF HE DOESN'T DO THAT, THE RESULTS

Page 120

 1   ARE UNRELIABLE.

 2          BUT I DIDN'T ATTEMPT TO CREATE A MODEL OF MY

 3   OPINION TO SHOW WHY THE RESULTS ARE UNRELIABLE.

 4      Q    SO SITTING HERE TODAY, YOU DON'T KNOW IF THE

 5   RESULTS WOULD BE ANY DIFFERENT; IS THAT CORRECT?

 6          MS. ROSE-SMITH:  OBJECTION.

 7          THE WITNESS:  I KNOW HIS MODEL IS INCOMPLETE.

 8   I CAN'T TELL YOU WHAT THE SIGNIFICANCE WOULD BE.  JUST

 9   WHAT WOULD CHANGE, WHAT WOULDN'T CHANGE.  I DON'T KNOW

10   THAT WITHOUT ACTUALLY RUNNING A PROPORTIONAL HAZARDS

11   MODEL WITH COMPETING RISK, AND I HAVEN'T DONE THAT.

12   BY MR. DESAI:

13      Q    TURN TO PARAGRAPH 287.

14      A    287.

15      Q    LET ME GIVE YOU A MINUTE TO GET THERE RATHER

16   THAN JUST DIVING IN.

17      A    I AM THERE.

18      Q    OKAY.  IN PARAGRAPH 287, YOU CRITIQUE

19   PROFESSOR MCFADDEN'S CONTROL GROUP BY SAYING THAT "HIS

20   CONTROL GROUP HAS LOANS THAT WERE NOT ESCROW"; IS THAT

21   CORRECT?

22      A    THAT'S CORRECT.

23      Q    HOW DID YOU IDENTIFY WHETHER A BORROWER HAD AN

24   ESCROW ACCOUNT OR NOT?

25      A    IT'S REVEALED IN THE FINANCIAL HISTORY DATASET

Page 121

1   THAT -- I CAN'T REMEMBER WHAT THE ACRONYM IS, BUT IT'S

2   AN ABBREVIATION OF ESCROW BALANCE.  AND WHEN IT IS

3   ZERO, AS FAR AS THE EYE CAN SEE, THAT'S A PRETTY GOOD

4   INDICATION THERE'S NOT AN ESCROW ACCOUNT.

5       Q    SO YOU USED THE ESCROW BALANCE FIELD IN

6   RFP 22; IS THAT CORRECT?

7       A    YES.

8       Q    RFP 22 DOES NOT HAVE A SEPARATE DATA ELEMENT

9   STATING WHETHER OR NOT THE ESCROW ACCOUNT IS --

10  SORRY -- WHETHER OR NOT A LOAN IS ESCROWED; IS THAT

11  CORRECT?

12          MS. ROSE-SMITH:  OBJECTION.

13          THE WITNESS:  AS FAR AS I'M CONCERNED, THE

14  ESCROW BALANCE FIELD IN THE DATABASE PROVIDES AN

15  EQUIVALENT ANSWER TO THAT QUESTION.  IT TELLS YOU

16  WHETHER OR NOT THERE IS AN ESCROW ACCOUNT.  IF THERE

17  ARE POSITIVE BALANCES OR NEGATIVE BALANCES, THEN

18  THERE'S AN ESCROW ACCOUNT.  IF THERE'S NO INTEGER,

19  POSITIVE OR NEGATIVE ALL THE WAY THROUGH, THEN THERE'S

20  NO ESCROW ACCOUNT.

21  BY MR. DESAI:

22      Q    AND YOU WRITE FURTHER DOWN THIS PARAGRAPH THAT

23  YOU BELIEVE THAT THIS FAILURE RENDERS PROFESSOR

24  MCFADDEN'S OPINIONS UNRELIABLE AND INVALID; IS THAT

25  CORRECT?

Page 122

1        A    BY ITSELF, YES.

2        Q    AND WHAT DO YOU MEAN BY "UNRELIABLE" AS USED

3    IN THIS SENTENCE?

4        A    WELL, BECAUSE IT IS NOT INFORMATIVE TO THE

5    COURT TO COMPARE THE -- PARTICULARLY GIVEN HIS

6    CAUSATION THEORY, TO COMPARE THE PERFORMANCE OF LOANS

7    THAT DO NOT HAVE AN ESCROW PAYMENT -- ESCROW ACCOUNT

8    AND THUS CAN'T HAVE AN OVERAGE OR UNDERAGE WITH LOANS

9    THAT DO.

10           I MEAN, THIS IS HIS CRITERIA, NOT MINE.  HIS

11   CRITERIA IS THAT A LOAN MUST HAVE AN EQUAL CHANCE OF

12   WINDING UP IN EITHER THE TREATMENT GROUP OR THE CONTROL

13   GROUP.  CLEARLY A LOAN WITHOUT AN ESCROW ACCOUNT

14   DOESN'T HAVE ANY CHANCE OF GETTING INTO THE TREATMENT

15   GROUP.

16       Q    DR. HAMM, PROFESSOR MCFADDEN WAS DEPOSED ON

17   TUESDAY.  I MEAN, I'D APPRECIATE IF YOU WOULD JUST

18   LIMIT YOUR ANSWERS TO YOUR OPINIONS AND NOT

19   RECHARACTERIZING PROFESSOR MCFADDEN'S.

20       A    WELL, I DON'T KNOW HOW I COULD ANSWER THE

21   QUESTION WITHOUT BRINGING IN THE PROBABILITY QUESTION

22   THAT HE HAS IN HIS REPORT, BUT I WILL TRY TO RESPECT

23   YOUR REQUEST.

24       Q    THANK YOU.

25           DID YOU RUN PROFESSOR MCFADDEN'S ECONOMETRIC

Page 123

1    MODEL AFTER REMOVING THE LOANS THAT YOU BELIEVED SHOULD

2    BE REMOVED FROM THE CONTROL GROUP?

3        A    NO.

4        Q    AND YOU WRITE IN PARAGRAPH 289 THAT PROFESSOR

5    MCFADDEN HAD SUFFICIENT DATA TO PERFORM THIS ANALYSIS;

6    CORRECT?

7        A    YES.

8        Q    BUT YOU YOURSELF DID NOT IMPLEMENT PROFESSOR

9    MCFADDEN'S MODEL BY EXCLUDING THE LOANS THAT YOU

10   BELIEVE SHOULD HAVE BEEN EXCLUDED; CORRECT?

11       A    I DID NOT.

12       Q    AND IN PARAGRAPH 288, YOU OFFER CERTAIN

13   REASONS WHY BORROWERS WITH AN ESCROW ACCOUNT ARE

14   DIFFERENT THAN THOSE WITHOUT AN ESCROW ACCOUNT;

15   CORRECT?

16       A    YES.

17       Q    AND YOU BELIEVE THAT THOSE WITH AN ESCROW

18   ACCOUNT ARE LESS LIKELY TO DEFAULT ON THEIR LOAN; IS

19   THAT CORRECT?

20       A    AS A GROUP, THOSE WITHOUT AN ESCROW ACCOUNT

21   ARE LESS LIKELY TO -- ARE HIGHER -- LOWER RISK THAN

22   THOSE WITH ESCROW ACCOUNTS.

23       Q    AS AN ECONOMIST, ONE COULD TEST WHETHER OCWEN

24   BORROWERS WITHOUT AN ESCROW ACCOUNT ARE LESS LIKELY TO

25   DEFAULT ON THEIR LOANS THAN THOSE WITH AN ESCROW

Page 124

1    ACCOUNT; CORRECT?

2        A    ONE COULD.

3        Q    DID YOU PERFORM THIS ANALYSIS?

4        A    NO.

5        Q    PLEASE TURN TO PARAGRAPH 294.

6        A    294.

7        Q    APOLOGIZE.  BEFORE MOVING ON TO PARAGRAPH 294,

8    IN THE PRECEDING THREE PARAGRAPHS, 290 AND 293,

9    DR. HAMM, YOU OPINED THAT "THE PERCENTAGE OF THE

10   DELINQUENT LOANS IN THE TREATMENT GROUP WAS MUCH LARGER

11   THAN THE CORRESPONDING PERCENTAGE FOR THE CONTROL

12   GROUPS."

13           DID I READ THAT CORRECTLY?

14       A    YES.

15       Q    IS IT YOUR OPINION THAT PROFESSOR MCFADDEN DID

16   NOT CONTROL FOR PREEXISTING DELINQUENCY IN HIS

17   ECONOMETRIC MODEL?

18       A    HE DID NOT CONTROL FOR IT PROPERLY.

19       Q    IS IT YOUR OPINION THAT HE DID NOT CONTROL FOR

20   IT AT ALL?

21       A    HE SAYS HE CONTROLLED FOR IT, BUT HE DIDN'T,

22   IN FACT, CONTROL FOR IT.

23           AND, IN FACT, IF I RECALL HIS REPORT

24   CORRECTLY, HE SAYS THAT IT -- YOU CAN'T CONTROL FOR

25   PREEXISTING CREDIT EVENTS LIKE DELINQUENCY, BUT IN ANY

Page 125

1    EVENT, HE DID NOT CONTROL FOR IT PROPERLY FOR SEVERAL

2    REASONS.

3        Q    I THINK WE'RE ALL -- THOSE REASONS ARE

4    DETAILED IN YOUR REBUTTAL REPORT; CORRECT?

5        A    AS I SIT HERE, I CAN'T REMEMBER EXACTLY -- I'M

6    SURE WE'LL GET TO THE FACT THAT THE DELINQUENT LOANS IN

7    THE CONTROL GROUP ARE FUNDAMENTALLY DIFFERENT FROM THE

8    DELINQUENT LOANS IN THE TREATMENT GROUP.  BUT WE CAN

9    WAIT UNTIL WE GET THERE.

10       Q    AND I BELIEVE WE JUST -- STRIKE THAT.

11            IN PARAGRAPH 294 YOU IDENTIFY TWO REASONS FOR

12   WHY YOU BELIEVE THE MAJORITY OF LOANS THAT, QUOTE,

13   ALLEGEDLY EXPERIENCE ESCROW ANALYSIS DELAYS FALL INTO

14   ONE OF TWO CATEGORIES.

15            AND I WANT TO FOCUS YOUR ATTENTION ON THE

16   SECOND REASON YOU IDENTIFIED IN THIS PARAGRAPH WHICH

17   IS, "LOANS THAT HIT THEIR DUE DATE DURING THE PERIOD OF

18   DECEMBER 2014 TO MARCH 2015 WHEN OCWEN WAS TEMPORARILY

19   NOT PERFORMING ESCROW ANALYSIS BECAUSE OF A SYSTEM

20   CHANGE."

21            DO YOU SEE THAT?

22       A    I DO.

23       Q    IS YOUR SEPTEMBER 2019 INTERVIEW THE BASIS FOR

24   YOUR UNDERSTANDING REGARDING WHY OCWEN WAS NOT

25   PERFORMING ESCROW ANALYSES DURING THE TIME PERIOD OF

Page 126

1   DECEMBER 2014 TO MARCH 2015 -- YOUR SEPTEMBER 29TH

2   INTERVIEW WITH MR. COMBS?

3        A    I DON'T BELIEVE SO.  I BELIEVE THIS IS

4   MR. COMBS'S TESTIMONY AT DEPOSITION, BUT I COULD BE

5   MISTAKEN.

6        Q    BUT OUTSIDE OF MR. COMBS, IT'S EITHER THE

7   INTERVIEW WITH MR. COMBS OR WHAT YOU BELIEVE YOU MAY

8   HAVE READ IN HIS TESTIMONY?  YOU DON'T HAVE ANY OTHER

9   BASIS FOR THIS BELIEF; IS THAT CORRECT?

10           MS. ROSE-SMITH:  OBJECTION.

11           THE WITNESS:  ANY -- JUST TO MAKE SURE I'M ON

12   THE SAME PAGE AS YOU ARE, ANY OTHER BASIS FOR SAYING

13   THAT LOANS THAT HIT THEIR DUE DATE DURING THE PERIOD

14   DECEMBER 2014 TO MARCH 2015 DID NOT RECEIVE A TIMELY

15   ESCROW ANALYSIS BECAUSE OCWEN WAS ENGAGED IN A SYSTEM

16   CHANGE AND WASN'T PERFORMING --

17   BY MR. DESAI:

18        Q    CORRECT.

19        A    -- ESCROW ANALYSES, YES, AS I SAY, I THINK MY

20   BASIS IS THE TESTIMONY OF MR. COMBS AS I RECALL.

21        Q    SORRY.  I'M JUST TRYING TO SEE IF I CAN FIND A

22   FOOTNOTE THAT MIGHT HELP REFRESH YOUR RECOLLECTION.

23   AND IF YOU -- APOLOGIZE.

24           IF YOU TURN TO PARAGRAPH 96 AND FOOTNOTE 34,

25   THIS IS ON PAGE 37, IF THAT'S HELPFUL.

```
                                                 Page 127
 1      A    IT IS.

 2      Q    THERE YOU WRITE THAT, "IN CONTRAST, THE VAST

 3   MAJORITY OF THE DELAYS FOR PERFORMING LOANS WERE THE

 4   RESULT OF OCWEN'S TEMPORARY INABILITY TO PERFORM ESCROW

 5   ANALYSES DURING LATE 2014 AND EARLY 2015 WHILE IT WAS

 6   UPGRADING ITS LOAN SERVICING SYSTEM."

 7           DO YOU SEE THAT?

 8      A    I DO.

 9      Q    AND FOOTNOTE 34 IS THE BRG INTERVIEW OF ANDREW

10   COMBS?

11      A    CORRECT.

12      Q    SO IT'S YOUR BASIS FOR UNDERSTANDING WHY OCWEN

13   WAS NOT PERFORMING ESCROW ANALYSES DURING THE TIME

14   PERIOD OF DECEMBER 2014 THROUGH MARCH OF 2015, THIS

15   INTERVIEW WITH MR. COMBS?

16      A    YES.  AND, AGAIN, MY MEMORY MAY BE FAULTY, BUT

17   I THOUGHT THAT HE TOUCHED ON THAT DURING HIS

18   DEPOSITION.

19           BUT IN ANY EVENT, YES, I CITE THE INTERVIEW AS

20   A SOURCE OF THAT UNDERSTANDING.

21      Q    AND -- BUT THERE ARE -- OUTSIDE OF THAT

22   INTERVIEW OR PERHAPS YOUR RECOLLECTION BASED ON THE

23   DEPOSITION TESTIMONY OF MR. COMBS, YOU DON'T HAVE

24   ANOTHER SOURCE; IS THAT CORRECT?

25      A    I DON'T.
```

```
 1              MS. ROSE-SMITH:  OBJECTION.

 2   BY MR. DESAI:

 3       Q    AND DO YOU RECALL WHAT SYSTEM MR. COMBS SAID

 4   THEY WERE CHANGING FROM?

 5       A    I -- I KNEW AT ONE TIME.  I CAN'T REMEMBER.

 6       Q    DO YOU RECALL WHAT SYSTEM MR. COMBS STATED

 7   THEY WERE CHANGING TO?

 8       A    AS I SAY, I KNEW AT ONE TIME.  I HAVE

 9   FORGOTTEN.

10       Q    AND YOU WRITE THAT OCWEN WAS TEMPORARILY NOT

11   PERFORMING ESCROW ANALYSES DUE TO THE SYSTEM CHANGE.

12              IS IT YOUR UNDERSTANDING THAT OCWEN WAS NOT

13   PERFORMING -- WAS NOT PERFORMING ESCROW ANALYSES FOR

14   THIS ENTIRE TIME PERIOD?

15       A    THAT'S MY UNDERSTANDING.

16       Q    AND THAT INCLUDES ALL OF DECEMBER 2014; IS

17   THAT CORRECT?

18       A    OH, I DON'T KNOW WHAT DATE IN DECEMBER OR WHAT

19   DATE IN MARCH.  I -- I JUST REMEMBER THAT IT WAS DURING

20   THAT FOUR-MONTH INTERVAL THAT THEY WERE NOT PERFORMING

21   ESCROW ANALYSES.

22       Q    WAS OCWEN NOT PERFORMING ESCROW ANALYSES FOR

23   ANY PARTICULAR TYPE OF LOAN?

24              DO YOU KNOW?

25              MS. ROSE-SMITH:  OBJECTION.
```

Page 129

```
 1              THE WITNESS:  IT IS MY UNDERSTANDING THAT THEY

 2    WEREN'T PERFORMING ESCROW ANALYSES FOR ANY LOAN.

 3    PERHAPS THEY WERE PERFORMING THEM FOR MODIFICATIONS

 4    BECAUSE IT'S DIFFICULT TO MAKE A DECISION ON A

 5    MODIFICATION WITHOUT AN ESCROW ANALYSIS -- OR NOT TO

 6    MAKE A DECISION, BUT TO STRUCTURE THE MONTHLY PAYMENT

 7    THAT THE BORROWER CAN AFFORD IF YOU DON'T HAVE THAT

 8    INFORMATION.

 9              BUT IT'S MY UNDERSTANDING THAT THAT APPLIED

10    EQUALLY, FOR EXAMPLE, TO DELINQUENT AND NON DELINQUENT

11    LOANS.

12    BY MR. DESAI:

13       Q    WAS MR. COMBS AN EMPLOYEE OF OCWEN DURING THE

14    TIME PERIOD OF DECEMBER 2014 THROUGH MARCH 2015?

15       A    I CAN'T RECALL.

16       Q    DO YOU RECALL HOW MR. COMBS LEARNED OF THIS

17    SYSTEM CHANGE?

18       A    ACTUALLY I THINK HE TESTIFIED THAT HE WAS TOLD

19    ABOUT IT, BUT I CAN'T REMEMBER.

20       Q    AND DO YOU KNOW WHO TOLD MR. COMBS?

21       A    NO.

22       Q    AND YOUR CRITIQUE IN PARAGRAPH 294 IS "THE

23    BORROWERS IN THE PRE-DECEMBER 2014 TIME PERIOD HAVE

24    DIFFERENT CHARACTERISTICS THAN THOSE IN THE

25    DECEMBER 2014 THROUGH MARCH 2015 TIME PERIOD"; IS THAT
```

Page 130

1    CORRECT?

2        A    YES.

3        Q    AND THE MAIN DIFFERENCE THAT YOU BELIEVE

4    EXISTS IS THAT THE BORROWERS IN DECEMBER 2014 THROUGH

5    FEBRUARY 2015 GROUP WERE MOSTLY NON DELINQUENT

6    BORROWERS, UNLIKE THE PRE-DECEMBER 2014 GROUP?

7            MS. ROSE-SMITH:  OBJECTION.

8            THE WITNESS:  YES, THAT'S CORRECT.

9    BY MR. DESAI:

10       Q    AND YOU BELIEVE THAT BECAUSE OF THIS

11   DIFFERENCE, THE TWO GROUPS OF LOANS SHOULD HAVE BEEN

12   ANALYZED SEPARATELY; IS THAT CORRECT?

13       A    YES.

14       Q    DID YOU PERFORM ANY ANALYSIS TO DETERMINE THE

15   IMPACT TO PROFESSOR MCFADDEN'S ECONOMETRIC MODEL IN

16   SEPARATELY STUDYING BOTH GROUPS OF LOANS?

17       A    NO, YOU COULDN'T PREPARE -- YOU COULDN'T

18   PERFORM THAT ANALYSES -- ANALYSIS BECAUSE OF ALL OF THE

19   OTHER PROBLEMS WITH HIS MODEL THAT I'M SURE WE'LL GET

20   TO.  BUT I DID NOT ATTEMPT TO CORRECT ALL OF THOSE

21   PROBLEMS AND PERFORM SUCH AN ANALYSIS.

22       Q    LIMITED TO THIS -- THE CRITIQUE YOU IDENTIFY

23   HERE, DID YOU PERFORM AN ANALYSIS TO DETERMINE THE

24   IMPACT OF PROFESSOR MCFADDEN'S ECONOMETRIC MODEL IN

25   SEPARATELY STUDYING BOTH GROUPS OF LOANS?

Page 131

1      A    I DID NOT.

2           MS. ROSE-SMITH:  OBJECTION.

3  BY MR. DESAI:

4      Q    DO YOU HAVE AN AFFIRMATIVE STATISTICAL OPINION

5  REGARDING THE IMPACT OF IMPLEMENTING YOUR CRITIQUE THAT

6  YOU IDENTIFY IN PARAGRAPHS 294 AND 295 ON THE RESULTS

7  OF PROFESSOR MCFADDEN'S MODEL?

8      A    WELL, PROFESSOR MCFADDEN IN THE SURREBUTTAL

9  REPORT CLAIMS TO HAVE DONE THAT VERY TASK, AND SO I

10 KNOW WHAT HE PURPORTS TO HAVE FOUND.  WOULD YOU LIKE ME

11 TO --

12     Q    NO.  I'M CURIOUS IF -- YOU DIDN'T PERFORM THE

13 ANALYSIS YOURSELF, THOUGH, CORRECT?

14          MS. ROSE-SMITH:  OBJECTION.

15          THE WITNESS:  I DID NOT PERFORM THE ANALYSIS

16 MYSELF.

17 BY MR. DESAI:

18     Q    AND IN PARAGRAPH 300 YOU WRITE THAT, "NO

19 SERVICER, INCLUDING OCWEN, POSSESSES DATA FOR ALL

20 IMPORTANT CONFOUNDING FACTORS."

21          DID I READ THAT CORRECTLY?

22     A    THAT'S A PARTIAL READING, A CORRECT READING OF

23 PART OF THAT SENTENCE, YES.

24     Q    AND OVER THE NEXT SEVERAL PAGES, SPECIFICALLY

25 PAGES 114 THROUGH 122, YOU IDENTIFY SIX SPECIFIC

Page 132

1    VARIABLES THAT YOU BELIEVE PROFESSOR MCFADDEN OMITTED

2    FROM HIS ECONOMETRIC MODEL; IS THAT CORRECT?

3        A    YES.

4        Q    I'M JUST GOING TO LIST OFF THESE VARIABLES ONE

5    BY ONE AND LET ME KNOW IF I MISSED ANY.

6             THE FIRST IS EQUITY?

7             MS. ROSE-SMITH:  IS THAT A QUESTION?  OH,

8    OBJECTION.

9    BY MR. DESAI:

10       Q    CORRECT?

11       A    EQUITY IS ONE OF THE CONFOUNDING VARIABLES

12   THAT HE OMITTED.

13       Q    AND THE SECOND CONFOUNDING VARIABLE THAT YOU

14   BELIEVE HE OMITTED HERE IS CREDIT SCORE?

15       A    CURRENT CREDIT SCORE.  AND I SHOULD HAVE SAID

16   AS I BELIEVE I EXPLAINED IN HERE, THE CURRENT EQUITY

17   IN -- THAT THE BORROWER HAS IN THE PROPERTY.

18            YES, CURRENT CREDIT SCORE WOULD BE A SECOND

19   ONE.

20       Q    AND THE THIRD COMPOUNDING -- OR CONFOUNDING

21   VARIABLE THAT YOU BELIEVE PROFESSOR MCFADDEN OMITTED IS

22   PAYMENT CAPACITY; IS THAT CORRECT?

23       A    PAYMENT CAPACITY.  CURRENT PAYMENT CAPACITY IS

24   MEASURED BY EITHER THE FRONT-END DTI OR THE REAR-END

25   DTI.

Page 133

1      Q     AND THE FOURTH CONFOUNDING FACTOR THAT YOU

2   BELIEVE PROFESSOR MCFADDEN EXCLUDED IS ACTIONS OVER

3   PRIOR SERVICER?

4      A     CORRECT.

5      Q     AND THE FIFTH CONFOUNDING FACTOR THAT YOU

6   BELIEVE PROFESSOR MCFADDEN OMITTED IS OTHER PAYMENT

7   CHANGES; IS THAT CORRECT?

8      A     CORRECT.

9      Q     AND THE LAST CONFOUNDING FACTOR THAT YOU

10  BELIEVE PROFESSOR MCFADDEN OMITTED IS INVESTOR

11  REQUIREMENTS; IS THAT RIGHT?

12     A     IF YOU'RE ASKING ME AS I SIT HERE TODAY IF

13  THIS IS THE LAST THAT I BELIEVE HE OMITTED, THE ANSWER

14  WOULD BE NO.

15          HE HAS ALSO REMINDED ME THAT HE OMITTED

16  FORECLOSURE CONTAGION, THAT IS FORECLOSURES IN THE

17  GENERAL AREA OF THE AREA IN QUESTION.  HE SHOULD HAVE

18  INCLUDED THOSE AS WELL.

19     Q     AND FORECLOSURE CONTAGION, THIS IS A NEW

20  OPINION; CORRECT?

21     A     YES, IT'S A NEW OPINION IN RESPONDING TO

22  PROFESSOR MCFADDEN'S SURREBUTTAL REPORT.

23     Q     IT'S NOT DISCLOSED IN YOUR REBUTTAL REPORT;

24  CORRECT?

25     A     IT'S NOT, I THINK I MENTIONED IT IN MY

1  REBUTTAL REPORT, CORRECT.

2          MS. ROSE-SMITH:  I'LL JUST NOTE FOR THE RECORD

3  THAT THAT'S NOT POSSIBLE IN THAT THE REBUTTAL REPORT

4  WAS ISSUED BEFORE THE SURREBUTTAL.  IT'S NOT AN ACTUAL

5  POSSIBLE THING.

6  BY MR. DESAI:

7      Q    AND, DR. HAMM, WHAT DO YOU MEAN BY

8  "CONFOUNDING FACTORS"?

9      A    I MEAN VARIABLES THAT ARE CORRELATED WITH BOTH

10  THE PROBABILITY OF GETTING A LATE ESCROW ANALYSIS AND

11  THE PROBABILITY OF A FORECLOSURE INITIATION THAT HAS

12  THE EFFECT OF UNDERMINING THE CREDIBILITY OF THE

13  COEFFICIENTS THAT ARE CALCULATED IN THE MODEL OF ANY

14  KIND.

15      Q    WHAT VARIABLE IN PARTICULAR DO YOU BELIEVE IS

16  BEING CONFOUNDED BY THE OMISSION IN THE VARIABLES YOU

17  JUST SAID FOR ME?

18      A    AS I SAID THE -- THERE IS A CORRELATION

19  BETWEEN THESE FACTORS AND THE OVERCHARGE OR UNDERCHARGE

20  AFTER BUT-FOR ANALYSIS DATE AND THE INITIATION OF

21  FORECLOSURE, THE DEPENDENT VARIABLE.

22      Q    DR. HAMM, ARE YOU FAMILIAR WITH THE TERM

23  "OMITTED VARIABLE BIAS"?

24      A    YES.

25      Q    HOW DO YOU DEFINE OMITTED VARIABLE BIAS?

Page 135

1      A    A BIAS IN THE RESULTS OF AN ECONOMETRIC OR

2  OTHER QUANTITATIVE MODEL THAT ARISES BECAUSE OF THE

3  FACT THAT A INSTRUMENTAL VARIABLE IS NOT INCLUDED IN

4  THE MODEL SPECIFICATION.

5      Q    AND IS IT YOUR OPINION THAT THE OMISSION OF

6  THE SIX VARIABLES, NOW SEVEN VARIABLES, WHICH YOU

7  IDENTIFIED CAUSES AN OMITTED VARIABLE BIAS IN PROFESSOR

8  MCFADDEN'S ECONOMETRIC MODEL?

9      A    IT IS MY OPINION THAT IT UNDERMINES A

10  RELIABILITY OF HIS OPINION, FOR WHATEVER TERM YOU WANT

11  TO HANG ON THAT.  BUT WHERE YOU HAVE THAT KIND OF

12  CORRELATION BETWEEN THE VARIABLE OF INTEREST AND THE

13  DEPENDENT VARIABLE, YOU CAN'T DRAW ANY MEANINGFUL

14  CONCLUSIONS ABOUT THE COEFFICIENT OF THE VARIABLE OF

15  INTEREST BECAUSE OF THAT FACT THAT THEY'RE CONFOUNDING.

16      Q    LET'S GO THROUGH YOUR VARIABLES ONE BY ONE.

17      A    OKAY.

18      Q    LET'S START WITH CURRENT EQUITY.

19      A    OKAY.

20      Q    STARTING WITH CURRENT EQUITY.

21           IS IT YOUR OPINION THAT OCWEN CHOSE WHETHER OR

22  NOT TO PERFORM A TIMELY ESCROW ANALYSIS FOR BORROWER'S

23  BASED ON THAT BORROWER'S CURRENT EQUITY?

24           MS. ROSE-SMITH:  OBJECTION.

25           THE WITNESS:  SORRY, INDIRECTLY, PERHAPS, AND

Page 136

1   DEFINITELY IN SOME CASES, YES.

2   BY MR. DESAI:

3       Q    DO YOU BELIEVE THAT OCWEN DIRECTLY CHOSE

4   WHETHER OR NOT TO PERFORM A TIMELY ESCROW ANALYSIS

5   BASED ON A BORROWER'S CURRENT EQUITY?

6           MS. ROSE-SMITH:  OBJECTION.

7           THE WITNESS:  WELL, DURING THE PERIOD JANUARY

8   TO NOVEMBER 2014, OCWEN'S POLICY WAS NOT TO PERFORM AN

9   ANALYSIS -- AN ESCROW ANALYSIS FOR LOANS THAT WERE

10  DELINQUENT, AND SOME OF THOSE LOANS THAT WERE

11  DELINQUENT WERE DELINQUENT, UNDOUBTEDLY, BECAUSE THE

12  BUYER REALIZED THAT HE OR SHE HAD NO EQUITY IN THE

13  PROPERTY AND, IN EFFECT, WAS BUYING THE PROPERTY FOR

14  MORE THAN IT WAS WORTH AND SO DEFAULTED ON THE LOAN.

15  AND THAT'S WHY IT WAS DELINQUENT.  THAT'S WHY IT DIDN'T

16  GET AN ESCROW ANALYSIS.

17          SO THE THOUGHT PROCESS WAS NOT THIS LOAN

18  DOESN'T HAVE ANY POSITIVE EQUITY, THEREFORE WE'RE NOT

19  GOING TO DO AN ESCROW ANALYSIS.  THE LOAN WAS

20  DELINQUENT AND DIDN'T GET AN ESCROW ANALYSIS, BUT WHY

21  WAS IT DELINQUENT?  IT WAS DELINQUENT BECAUSE THE

22  BORROWER REALIZED THAT HE OR SHE OWED MORE ON THE LOAN

23  THAN THE PROPERTY WAS WORTH.  SO THERE IS CLEARLY A

24  CORRELATION BETWEEN THE TWO.

25  ///

Page 137

1    BY MR. DESAI:

2        Q     ONCE YOU CONDITION OUT DELINQUENCY, THERE'S

3    NO -- STRIKE THAT.

4            I BELIEVE YOU JUST TESTIFIED THAT OCWEN WAS

5    MAKING THE DECISION TO PERFORM AN ESCROW ANALYSIS ON

6    WHETHER OR NOT THE BORROWER WAS DELINQUENT; CORRECT?

7            MS. ROSE-SMITH:  OBJECTION.

8            THE WITNESS:  MY UNDERSTANDING OF THEIR

9    POLICY, BASED ON THE TESTIMONY IN THIS MATTER, IS THAT

10   OCWEN RIGHTLY OR WRONGLY DID NOT BELIEVE IT WAS

11   REQUIRED TO PERFORM AN ESCROW ANALYSIS FOR A LOAN THAT

12   WAS DELINQUENT.

13           I'M NOT A LAWYER.  I DIDN'T REVIEW THE

14   REGULATION, BUT NOT AN UNREASONABLE UNDERSTANDING OR

15   ASSUMPTION GIVEN THE FACT THAT THEY WERE NOT REQUIRED

16   TO SEND AN ESCROW ANALYSIS TO SUCH BORROWERS BY THE

17   REGULATIONS AND THE BORROWERS WEREN'T PAYING, SO IT WAS

18   KIND OF ACADEMIC.

19           BUT IN ANY EVENT, THAT WAS THEIR

20   INTERPRETATION OF THE REGULATIONS.  AND ACCORDINGLY,

21   THEY ADOPTED A POLICY THEY WERE NOT GOING TO PERFORM

22   THOSE ANALYSES FOR DELINQUENT BORROWERS.  THAT'S WHAT I

23   UNDERSTAND TO BE THE FACTS OF THE CASE.

24   BY MR. DESAI:

25       Q     AND IS -- SO IT'S YOUR UNDERSTANDING THAT

1    OCWEN'S DECISION WHETHER OR NOT TO PERFORM A TIMELY

2    ESCROW ANALYSIS ON THE DELINQUENCY STATUS OF THE

3    BORROWER AT THIS TIME PERIOD; IS THAT CORRECT?

4        A    THAT IS CORRECT.

5        Q    SO IT'S NOT YOUR OPINION THAT OCWEN WAS

6    DECIDING WHETHER OR NOT TO PERFORM A TIMELY ESCROW

7    ANALYSIS DURING THIS TIME PERIOD BASED EXPLICITLY ON

8    THEIR CURRENT EQUITY; IS THAT CORRECT?

9        A    I BELIEVE I'VE ALREADY TESTIFIED TO THAT, THAT

10   THEY DID NOT BASE THEIR DECISION ON WHAT THE EQUITY

11   RATIO WAS OR THE CLTV WAS, BUT MY CRITICISM IS ABOUT A

12   CORRELATION BETWEEN THESE TWO VARIABLES, NOT HOW OCWEN

13   MADE THE DECISION.

14           BUT IN ANY EVENT, NO, I DON'T THINK THEY MADE

15   THE DECISION BASED ON THE LTV RATIO.  THEY MADE IT

16   BASED ON THE DELINQUENCY STATUS OF THE LOAN.

17       Q    AND YOU DID NOT IMPLEMENT PROFESSOR MCFADDEN'S

18   ECONOMETRIC MODEL USING A VARIABLE FOR CURRENT EQUITY,

19   DID YOU?

20       A    I DID NOT.

21       Q    SO SITTING HERE TODAY, YOU DO NOT KNOW WHAT

22   THE IMPACT OF PROFESSOR MCFADDEN'S ECONOMETRIC MODEL

23   WOULD BE, HAD YOU INCORPORATED A VARIABLE FOR CURRENT

24   EQUITY; IS THAT CORRECT?

25       A    I JUST KNOW THAT THE MODEL IS INVALID BECAUSE

Page 139

1    IT DOESN'T HAVE THAT VARIABLE, BUT I DON'T KNOW THE

2    EXTENT TO WHICH IT WOULD CHANGE THE OUTPUT.

3        Q    AND DO YOU BELIEVE THAT OCWEN HAD THE CURRENT

4    EQUITY DATA THAT YOU BELIEVE PROFESSOR MCFADDEN SHOULD

5    HAVE INCLUDED IN HIS ECONOMETRIC MODEL?

6            MS. ROSE-SMITH:  OBJECTION.

7            THE WITNESS:  PROBABLY FOR MANY OF THE

8    DELINQUENT LOANS.  UNFORTUNATELY, IT DIDN'T HAVE ANY OF

9    THAT INFORMATION FOR THE NON DELINQUENT LOANS AND IT

10   WOULD NEED THEM FOR ALL LOANS IN ORDER TO RUN THE

11   MODEL.

12   BY MR. DESAI:

13       Q    AND IN YOUR REPORT, YOU DO NOT OFFER AN

14   ALTERNATIVE DATA SOURCE THAT PROFESSOR MCFADDEN SHOULD

15   HAVE USED TO CONTROL FOR CURRENT EQUITY; IS THAT

16   CORRECT?

17       A    THAT'S CORRECT.  NOT MY JOB.

18       Q    LET'S MOVE ON TO PAGE 117 AND CURRENT CREDIT

19   SCORE.

20           DR. HAMM, IS IT YOUR OPINION THAT OCWEN

21   SPECIFICALLY CHOSE DURING THIS TIME PERIOD WHETHER OR

22   NOT TO PERFORM A TIMELY ESCROW ANALYSIS FOR A BORROWER

23   BASED ON THAT BORROWER'S CURRENT CREDIT SCORE?

24       A    SIMILAR TO MY ANSWER TO YOUR QUESTION ABOUT

25   THE CURRENT LTV, NO, I DON'T BELIEVE THAT THEY BASED

1   THEIR DECISION NOT TO PREPARE AN ESCROW ANALYSIS FOR A

2   LOAN BASED ON THE BORROWER'S FICO -- CURRENT FICO

3   SCORE.

4           BUT, AGAIN, MY CRITICISM, WHICH IS DESCRIBED

5   ON PAGE 117, HAS TO DO WITH CORRELATION BETWEEN THE

6   INDEPENDENT VARIABLE OF INTEREST AND THE DEPENDENT

7   VARIABLE, WHICH IS SO OCWEN'S MOTIVATION OR THOUGHT

8   PROCESS IS IRRELEVANT.

9       Q    DID OCWEN HAVE CURRENT CREDIT SCORE -- STRIKE

10  THAT.

11          (DISCUSSION HELD OFF THE RECORD.)

12  BY MR. DESAI:

13      Q    DID OCWEN HAVE THE CURRENT CREDIT SCORE DATA

14  THAT YOU BELIEVE PROFESSOR MCFADDEN SHOULD HAVE

15  INCLUDED IN HIS ECONOMETRIC MODEL?

16      A    I KNOW THAT OCWEN PERIODICALLY RUNS CREDIT

17  SCORES ON ITS BORROWERS, BUT WHETHER OR NOT IT HAD

18  CURRENT CREDIT SCORES CLOSE ENOUGH IN TIME FOR THE

19  ENTIRE POPULATION OF LOANS THAT WE'RE CONCERNED WITH

20  HERE, I DON'T KNOW.

21      Q    AND YOU DO NOT OFFER AN ALTERNATIVE DATA

22  SOURCE THAT PROFESSOR MCFADDEN SHOULD HAVE USED; IS

23  THAT CORRECT?

24      A    NO.  I'M SIMPLY POINTING OUT A WEAKNESS IN HIS

25  MODEL.

1    Q    AND, DR. HAMM, YOU DID NOT IMPLEMENT PROFESSOR

2    MCFADDEN'S ECONOMETRIC MODEL INCLUDING A VARIABLE FOR

3    CURRENT CREDIT STORE; IS THAT CORRECT?

4    A    I DID NOT.

5    Q    SO SITTING HERE TODAY, YOU DO NOT KNOW WHAT

6    IMPACT ON PROFESSOR MCFADDEN'S ECONOMETRIC MODEL WOULD

7    BE HAD HE INCORPORATED A VARIABLE FOR A CURRENT CREDIT

8    SCORE; IS THAT CORRECT?

9    A    I KNOW THE IMPACT OF NOT INCLUDING IT IS TO

10   UNDERMINE THE RELIABILITY OF THE MODEL, BUT I DON'T

11   KNOW TO WHAT EXTENT IT UNDERMINES THE RELIABILITY

12   BECAUSE I DIDN'T RERUN HIS MODEL WITH THE NEEDED DATA.

13   Q    AND THE NEXT OMITTED VARIABLE YOU IDENTIFY IS

14   CURRENT PAYMENT CAPACITY ON PAGE 118; IS THAT CORRECT?

15   A    IT IS.

16   Q    IS IT YOUR OPINION THAT DURING THE RELEVANT

17   TIME PERIOD, OCWEN CHOSE SPECIFICALLY WHETHER OR NOT TO

18   PERFORM A TIMELY ESCROW ANALYSIS AS FAR BASED ON THAT

19   BORROWER'S CURRENT PAYMENT CAPACITY?

20   A    AS I'VE ANSWERED THE QUESTIONS ABOUT THE TWO

21   PREVIOUS CONFOUNDING VARIABLES, IT DID NOT MAKE ITS

22   DECISION TO WITHHOLD AN ESCROW ANALYSIS BASED ON ITS

23   PERCEPTION OF THE BORROWER'S PAYMENT CAPACITY.  BUT AS

24   I SAY, MY CRITICISM HERE IS ABOUT THE CORRELATION

25   BETWEEN THE INDEPENDENT VARIABLE OF INTEREST AND THE

Page 142

```
 1   DEPENDENT VARIABLE, WHICH DOES NOT DEPEND IN ANY WAY,

 2   SHAPE, OR FORM ON OCWEN'S THOUGHT PROCESS.

 3       Q    DID OCWEN HAVE CURRENT PAYMENT CAPACITY DATA

 4   THAT YOU BELIEVE PROFESSOR MCFADDEN SHOULD HAVE

 5   INCLUDED IN HIS ECONOMETRIC MODEL?

 6            MS. ROSE-SMITH:  OBJECTION.

 7            THE WITNESS:  I DON'T BELIEVE THAT OCWEN HAD

 8   THAT DATA AT THE TIME THAT PROFESSOR MCFADDEN -- OR AT

 9   THE RELEVANT -- DURING THE RELEVANT TIME PERIOD.

10   BY MR. DESAI:

11       Q    AND IN YOUR REPORT, YOU DID NOT OFFER ANY

12   ALTERNATIVE DATA SOURCE THAT PROFESSOR MCFADDEN SHOULD

13   HAVE USED; IS THAT CORRECT?

14       A    THAT'S CORRECT.

15       Q    AND YOU DID NOT IMPLEMENT PROFESSOR MCFADDEN'S

16   ECONOMETRIC MODEL INCLUDING A VARIABLE FOR CURRENT

17   PAYMENT CAPACITY; IS THAT CORRECT?

18       A    THAT IS CORRECT.

19       Q    SO SITTING HERE TODAY, YOU DO NOT KNOW WHAT

20   THE IMPACT -- THE IMPACT OF PROFESSOR MCFADDEN'S

21   ECONOMETRIC MODEL WOULD BE HAD HE INCORPORATED A

22   VARIABLE FOR CURRENT PAYMENT CAPACITY; IS THAT CORRECT?

23            MS. ROSE-SMITH:  OBJECTION.

24            THE WITNESS:  I KNOW THE IMPACT OF NOT

25   ACCOUNTING FOR THIS CONFOUNDING VARIABLE IS TO
```

1   UNDERMINE THE RELIABILITY OF PROFESSOR MCFADDEN'S

2   OPINIONS AND THE RESULT OF HIS MODEL, BUT I DON'T KNOW

3   TO WHAT EXTENT.

4   BY MR. DESAI:

5       Q    AND MOVING TO THE FOURTH OMITTED VARIABLE YOU

6   IDENTIFY, WHICH IS ON PAGE 119, ACTIONS OF A PRIOR

7   SERVICER.

8           IS IT YOUR OPINION THAT DURING THE RELEVANT

9   TIME PERIOD, OCWEN SPECIFICALLY DECIDED WHETHER OR NOT

10  TO PERFORM A TIMELY ESCROW ANALYSIS FOR BORROWERS BASED

11  ON THAT BORROWER'S PRIOR SERVICER?

12          MS. ROSE-SMITH:  OBJECTION.

13          THE WITNESS:  NO.

14  BY MR. DESAI:

15      Q    YOU DID NOT IMPLEMENT PROFESSOR MCFADDEN'S

16  ECONOMETRIC MODEL INCLUDING A VARIABLE FOR THE ACTIONS

17  OF A PRIOR SERVICER; IS THAT CORRECT?

18      A    THAT IS CORRECT.

19      Q    SO SITTING HERE TODAY, YOU DON'T KNOW WHAT

20  IMPACT, IF ANY, THERE WOULD BE ON PROFESSOR MCFADDEN'S

21  ECONOMETRIC MODEL HAD HE INCORPORATED A VARIABLE FOR

22  PRIOR SERVICER; IS THAT CORRECT?

23          MS. ROSE-SMITH:  OBJECTION.

24          THE WITNESS:  IF THERE IS ANYTHING TO

25  PROFESSOR MCFADDEN'S HYPOTHESIS THAT THE ACTIONS OF A

Page 144

1   LOAN SERVICER CAN AFFECT THE PROPENSITY FOR A

2   FORECLOSURE, THEN YES, I KNOW THE IMPACT, NOT INCLUDING

3   THIS VARIABLE, IS TO UNDERMINE THE RELIABILITY OF HIS

4   MODEL.  BUT I DON'T KNOW TO WHAT EXTENT.

5   BY MR. DESAI:

6       Q    TURNING TO PAGE 120.  YOU IDENTIFY THE FIFTH

7   OMITTED VARIABLE, OTHER PAYMENT CHANGES.

8            IS IT YOUR OPINION THAT OCWEN, DURING THE

9   RELEVANT TIME PERIOD, SPECIFICALLY DECIDED WHETHER OR

10  NOT TO PERFORM A TIMELY ESCROW ANALYSIS FOR BORROWERS

11  BASED ON THAT BORROWER'S OTHER PAYMENT CHANGES?

12      A    AS I'VE ANSWERED PREVIOUS QUESTIONS, I DO NOT

13  BELIEVE OCWEN'S THOUGHT PROCESS TOOK INTO ACCOUNT OTHER

14  PAYMENT CHANGES WHEN IT MADE ITS DECISION TO WITHHOLD A

15  TIMELY ESCROW ANALYSIS.  BUT, OF COURSE, MY CRITICISM

16  HERE IS ABOUT THE CORRELATION BETWEEN A VARIABLE THAT

17  PROFESSOR MCFADDEN AND I BOTH BELIEVE CAN HAVE AN

18  IMPACT ON FORECLOSURES AND THE -- THE INDEPENDENT

19  VARIABLE OF INTEREST AND THE DEPENDENT VARIABLE.

20      Q    DR. HAMM, YOU DID NOT IMPLEMENT PROFESSOR

21  MCFADDEN'S ECONOMETRIC MODEL INCLUDING A VARIABLE FOR

22  PAYMENT CHANGES; IS THAT CORRECT?

23      A    THAT'S CORRECT.

24      Q    SO SITTING HERE TODAY, YOU DO NOT KNOW WHAT

25  IMPACT, IF ANY, THERE WOULD BE ON PROFESSOR MCFADDEN'S

Page 145

1    ECONOMETRIC MODEL HAD HE INCORPORATED VARIABLE FOR

2    OTHER PAYMENT CHANGES; IS THAT CORRECT?

3              MS. ROSE-SMITH:  OBJECTION.

4              THE WITNESS:  I DO KNOW THAT THE OMISSION OF

5    THIS VARIABLE THAT BOTH HE AND I BELIEVE IS CORRELATED

6    WITH FORECLOSURES UNDERMINES THE RELIABILITY OF HIS

7    MODEL AND HIS OPINIONS, BUT I DON'T KNOW TO WHAT EXTENT

8    IT DOES.

9    BY MR. DESAI:

10    Q    AND WHAT SPECIFIC DATA IS IT THAT YOU BELIEVE

11    PROFESSOR MCFADDEN SHOULD HAVE CONSIDERED TO ACCOUNT

12    FOR YOUR OMITTED VARIABLE OF PAYMENT CHANGES?

13    A    WELL, SINCE HIS ENTIRE THEORY OF CAUSATION FOR

14    THE UNDERCHARGED LOANS IS PAYMENT SHOCK, HE SHOULD HAVE

15    CONSIDERED ALL OTHER POSSIBLE SOURCES OF PAYMENT SHOCK

16    WHICH INVARIABLY ARE LARGER, SUCH AS AN INCREASE IN THE

17    INTEREST RATE FOR ARM LOANS, AN INCREASE IN HEALTH

18    INSURANCE PREMIUMS FOR THE BORROWER, AN INCREASE IN

19    MEDICAL COSTS FOR THE BORROWER.  ANYTHING ELSE THAT

20    WOULD HAVE A MATERIAL IMPACT ON THE BORROWER'S ABILITY

21    TO AFFORD THE MORTGAGE.

22              AGAIN, THIS IS HIS THEORY.  HE SHOULD HAVE

23    TAKEN THAT INTO ACCOUNT.  INSTEAD HE ONLY CONSIDERED

24    THE SMALLEST OF ALL OF THESE POSSIBLE PAYMENT SHOCKS.

25    Q    AND TURNING TO PAGE 122, YOUR SIXTH -- THE

Page 146

1    SIXTH OMITTED VARIABLE THAT YOU IDENTIFY IS INVESTOR

2    REQUIREMENTS; IS THAT CORRECT?

3         A    THAT'S CORRECT.

4         Q    IS IT YOUR OPINION THAT DURING THE RELEVANT

5    TIME PERIOD, OCWEN SPECIFICALLY CHOSE WHETHER OR NOT TO

6    PERFORM A TIMELY ESCROW ANALYSIS FOR A BORROWER BASED

7    ON THAT BORROWER'S INVESTOR REQUIREMENTS?

8         A    NO.

9         Q    AND YOU DID NOT IMPLEMENT PROFESSOR

10   MCFADDEN'S -- STRIKE THAT.

11             YOU DID NOT IMPLEMENT PROFESSOR MCFADDEN'S

12   ECONOMETRIC MODEL INCLUDING A VARIABLE FOR INVESTOR

13   REQUIREMENTS; IS THAT CORRECT?

14        A    I DID NOT.

15        Q    SO SITTING HERE TODAY, YOU DON'T KNOW WHAT

16   IMPACT, IF ANY, THERE WOULD BE ON PROFESSOR MCFADDEN'S

17   ECONOMETRIC MODEL HAD HE INCORPORATED A VARIABLE FOR

18   INVESTOR REQUIREMENTS; IS THAT CORRECT?

19             MS. ROSE-SMITH:  OBJECTION.

20             THE WITNESS:  I KNOW THAT THE ABSENCE OF THIS

21   CONFOUNDING VARIABLE FROM HIS MODEL UNDERMINES A

22   RELIABILITY OF THE MODEL'S OUTPUT AND UNDERMINES THE

23   RELIABILITY OF HIS OPINIONS, BUT I CAN'T TELL YOU WHAT

24   WITH THE MAGNITUDE OF THE PROBLEM IS CAUSED BY THE

25   OMISSION OF THIS VARIABLE.

Page 147

1    BY MR. DESAI:

2        Q    AND EARLIER TODAY YOU IDENTIFIED ONE

3    ADDITIONAL OMITTED VARIABLE THAT YOU BELIEVE PROFESSOR

4    MCFADDEN SHOULD HAVE CONTROLLED FOR, FORECLOSURE

5    CONTAGION; IS THAT CORRECT?

6        A    CORRECT.

7        Q    IS IT YOUR OPINION THAT OCWEN CHOSE WHETHER OR

8    NOT TO PERFORM A TIMELY ESCROW ANALYSIS DURING THE

9    RELEVANT TIME PERIOD FOR A BORROWER SPECIFICALLY BASED

10   ON THEIR FORECLOSURE CONTAGION?

11       A    I DON'T BELIEVE OCWEN'S THOUGHT PROCESS WORKED

12   IN THAT WAY, BUT OF COURSE MY CRITICISM IS THAT THERE

13   IS A CORRELATION BETWEEN NEARBY FORECLOSURES AND THE

14   LIKELIHOOD THAT A PARTICULAR LOAN WILL GO INTO

15   FORECLOSURE AND THAT CORRELATION UNDERMINES THE

16   RELIABILITY OF ANY COEFFICIENT ASSIGNED TO THE

17   INDEPENDENT VARIABLE OF INTEREST.

18       Q    AND YOU DID NOT IMPLEMENT PROFESSOR MCFADDEN'S

19   ECONOMETRIC MODEL INCLUDING A VARIABLE FOR FORECLOSURE

20   CONTAGION; IS THAT CORRECT?

21           MS. ROSE-SMITH:  OBJECTION.

22           THE WITNESS:  THAT IS CORRECT.

23   BY MR. DESAI:

24       Q    SO SITTING HERE TODAY, YOU DO NOT KNOW WHAT

25   IMPACT, IF ANY, THERE WOULD BE ON PROFESSOR MCFADDEN'S

1   ECONOMETRIC MODEL HAD HE INCORPORATED A VARIABLE FOR

2   FORECLOSURE CONTAGION; IS THAT CORRECT?

3          MS. ROSE-SMITH:  OBJECTION.

4          THE WITNESS:  WELL, I -- I DO KNOW THAT THE

5   ABSENCE OF THIS VARIABLE TENDS TO UNDERMINE THE

6   RELIABILITY OF HIS -- THE OUTPUT FROM HIS MODEL AND THE

7   OPINIONS HE DRAWS FROM THAT OUTPUT, BUT I CAN'T TELL

8   YOU WHAT THE MAGNITUDE OF THE PROBLEM IS.

9   BY MR. DESAI:

10   Q    AND YOU DID NOT IMPLEMENT PROFESSOR MCFADDEN'S

11   ECONOMETRIC MODEL TO INCLUDE ALL THE OMITTED -- ALL THE

12   VARIABLES THAT YOU BELIEVE WERE OMITTED; IS THAT

13   CORRECT?

14   A    GIVEN MY ANSWER TO PREVIOUS QUESTIONS, I THINK

15   IT PRETTY APPARENT THAT I DID NOT.

16   Q    SO SITTING HERE TODAY, YOU DO NOT KNOW WHAT

17   IMPACT, IF ANY, THERE WOULD BE TO PROFESSOR MCFADDEN'S

18   ECONOMETRIC MODEL HAD HE INCORPORATED ALL THE VARIABLES

19   YOU BELIEVE HE OMITTED; CORRECT?

20          MS. ROSE-SMITH:  OBJECTION.

21          THE WITNESS:  I DO KNOW THAT THE ABSENCE OF

22   SUCH IMPORTANT AND WIDELY RECOGNIZED VARIABLES FROM HIS

23   MODEL RENDERS HIS MODEL OF NO VALUE IN TELLING US

24   ANYTHING ABOUT THE EXPERIENCE OF THE OVERCHARGED AND

25   UNDERCHARGED BORROWERS, BUT I CAN'T TELL YOU THE

Page 149

1    MAGNITUDE OF THE DIFFERENCE.

2              MR. DESAI:  WHY DON'T WE GO OFF THE RECORD.

3              THE VIDEOGRAPHER:  GOING OFF THE RECORD

4    2:00 P.M.

5              (RECESS TAKEN.)

6              THE VIDEOGRAPHER:  GOING BACK ON THE RECORD

7    2:20 P.M.

8    BY MR. DESAI:

9       Q    DR. HAMM, DIRECT YOUR ATTENTION TO

10   PARAGRAPH 327, WHICH IS ALSO ON PAGE 122.

11      A    I'M THERE.

12      Q    YOU WRITE IN PARAGRAPH 327 THAT, "THE MOST

13   IMPORTANT VARIABLE THAT A PROPORTIONAL HAZARD MODEL

14   MUST SPECIFY CORRECTLY IS THE MODEL'S DEPENDENT

15   VARIABLE."

16              WHAT IS IT YOU BELIEVE THAT THE DEPENDENT

17   VARIABLE IN PROFESSOR MCFADDEN'S ECONOMETRIC MODEL IS?

18      A    THE INITIATION OF FORECLOSURE.

19      Q    AND IN THE -- I'M SORRY.  JUST THE INITIATION

20   OF FORECLOSURE OR IS IT THE INCREASED -- IS IT THE

21   PROBABILITY OF THE INITIATION OF FORECLOSURE?

22      A    THE PROBABILITY OF THE INITIATION OF

23   FORECLOSURE.

24      Q    JUST WANT TO MAKE SURE WE'RE ON THE SAME PAGE.

25      A    OKAY.

Page 150

1    Q    AND IN -- YOU BELIEVE THAT -- AND THIS IS ON

2  PAGE 123 RIGHT ABOVE PARAGRAPH 130 -- THAT PROFESSOR

3  MCFADDEN HAS MISSPECIFIED HIS DEPENDENT VARIABLES; IS

4  THAT CORRECT?

5    A    YES.  WELL, IN A SENSE, THAT HE USES HIS MODEL

6  TO PREDICT THE PROBABILITY -- WELL, HE TREATS AN

7  INITIATION OF FORECLOSURE THE SAME AS AN ACTUAL

8  FORECLOSURE UNLESS THE FORECLOSURE IS RESCINDED.  AND

9  THAT'S HOW HE CALCULATES DAMAGES.

10         SO FOR ALL INTENTS AND PURPOSES, HE MIGHT HAVE

11  DESCRIBED THE DEPENDENT VARIABLE AS THE PROBABILITY OF

12  A FORECLOSURE SALE BECAUSE THAT'S HOW HE USES THE

13  RESULTS IN CALCULATING DAMAGES.

14         SO HE -- HE TREATS THE INITIATION OF

15  FORECLOSURE AS LEADING TO A FORECLOSURE UNLESS THERE IS

16  A RESCISSION.  AND THAT'S NOT TRUE.

17    Q    AND IF WE TURN TO PARAGRAPH 332, YOU REFERENCE

18  32,190 ALLEGEDLY HARMED FORECLOSED LOANS.

19         DO YOU SEE THAT?

20    A    NOT YET.  YES, I SEE IT.

21    Q    AND WHAT ARE THESE 32,190 LOANS?

22    A    THESE ARE LOANS THAT RECEIVED A LATE ESCROW

23  ANALYSIS AND, BASED ON THE RESULTS OF HIS MODEL, HE

24  ESTIMATES WERE HARMED.

25    Q    AND JUST SO WE'RE CLEAR, THE 32,190

```
                                                 Page 151
 1    FORECLOSURE INITIATIONS, THESE ARE ACTUALLY ACTUAL
 2    FORECLOSURES THAT WERE INITIATED AS OPPOSED TO BEING
 3    ECONOMETRICALLY MODELED; IS THAT CORRECT?
 4         A    YES.
 5         Q    AND -- AND YOUR -- IS IT -- I BELIEVE YOU JUST
 6    TESTIFIED, AND I'M GOING TO PARAPHRASE A LITTLE BIT, SO
 7    PLEASE CORRECT ME, THAT YOU BELIEVE THAT PROFESSOR
 8    MCFADDEN TREATS ALL OF THE 32,190 INITIATED
 9    FORECLOSURES AS IF THEY WERE COMPLETED FORECLOSURE
10    SALES UNLESS THEY WERE RESCINDED; IS THAT CORRECT?
11         A    THAT'S MY UNDERSTANDING, YES.
12         Q    AND IS THAT THE NATURE -- THE MAIN CORE OF
13    YOUR DISPUTE WITH HIS USE OF THESE 32,190 INITIATED
14    FORECLOSURES?
15         A    WELL, I DON'T KNOW THAT I HAVE A MAIN BASIS
16    FOR DISPUTE.  I HAVE MANY DISPUTES.  BUT YES, AS YOU
17    CAN SEE FROM TABLE 10, THERE ARE NOT 32,190 ACTUAL
18    FORECLOSURES.  THERE ARE ONLY 24,171 ACTUAL
19    FORECLOSURES.  BUT IN CALCULATING DAMAGES, HE ASSUMES
20    THAT THERE ARE 32,190 FORECLOSURES.  THAT'S WRONG.
21         Q    AND THE DIFFERENCE BETWEEN THE 24,171 ACTUAL
22    FORECLOSURES AND WHAT YOU HAVE LISTED HERE, THE TOTAL
23    PER MCFADDEN THAT YOU HAVE LISTED HERE, THE 32,190 IS
24    8,019; IS THAT CORRECT?
25         A    YES.
```

Page 152

1      Q    AND 8,019 ARE THE ONES YOU BELIEVE ARE

2    MISSPECIFIED; IS THAT CORRECT?

3      A    CORRECT.  THEY'RE CERTAINLY MISSPECIFIED FROM

4    A DAMAGES STANDPOINT, YES.

5      Q    AND JUST BREAKING DOWN THE COMPOSITION OF THE

6    8,019, YOU BELIEVE THAT 7,417 OF THOSE WERE

7    REINSTATED/MODIFIED; CORRECT?

8      A    THAT'S WHAT THE DATA SHOWS.

9      Q    AND WHEN YOU SAY "THAT'S WHAT THE DATA SHOWS,"

10   YOU'RE USING RFP 22; IS THAT CORRECT?

11     A    YES.

12     Q    SO YOU'RE USING RFP 22 TO IDENTIFY THAT THESE

13   7,417 LOANS WERE EITHER REINSTATED OR MODIFIED;

14   CORRECT?

15     A    CORRECT.

16     Q    AND OF THE 7,417 LOANS IDENTIFIED IN THE

17   REINSTATED/MODIFIED CATEGORY, DO YOU HAVE AN OPINION ON

18   HOW MANY OF THESE WERE REINSTATED?

19     A    I DON'T.

20     Q    DO YOU HAVE AN OPINION ON HOW MANY OF THESE

21   WERE MODIFIED?

22     A    I DON'T.  IF I KNEW EITHER ONE, I COULD TELL

23   YOU THE OTHER.  I'M SURE IT'S IN THE MATERIAL THAT WE

24   PRODUCED ALONG WITH MY REPORT, BUT I DON'T REMEMBER THE

25   NUMBERS OFF THE TOP OF MY HEAD.

Page 153

1      Q    SO IF YOU HAD DISTINGUISHED BETWEEN REINSTATED

2   AND MODIFIED, IT WOULD BE IN EITHER YOUR REPORT OR IN

3   THE BACK MATERIALS TO YOUR REPORT; IS THAT CORRECT?

4      A    YES.

5      Q    BUT THIS TABLE ITSELF JUST AGGREGATES THE TWO;

6   IS THAT CORRECT?

7      A    WELL, NO.  IT TELLS YOU HOW MANY ARE

8   REINSTATED AND HOW MANY ARE PAID OFF, BUT --

9      Q    SORRY.  WHEN I SAY "AGGREGATED THE TWO," I

10  MEAN, HOW MANY ARE REINSTATED -- THAT AGGREGATES THE

11  NUMBER OF LOANS THAT EITHER YOU BELIEVE REINSTATED OR

12  MODIFIED; CORRECT?

13     A    YES.  SO THE TABLE SHOWS THAT 7,417 LOANS WERE

14  REINSTATED AND 602 LOANS WERE PAID OFF.

15     Q    IT SHOWS THAT 7,417 WERE EITHER REINSTATED OR

16  MODIFIED; CORRECT?

17     A    RIGHT.  BUT I CAN'T BREAK THAT DOWN BETWEEN

18  THOSE TWO.

19     Q    AND YOUR BACKUP MATERIALS DO NOT BREAK DOWN

20  BETWEEN THE TWO, DO THEY, TO THE BEST OF YOUR

21  KNOWLEDGE?

22     A    I DON'T REMEMBER OFF THE TOP OF MY HEAD.  THEY

23  MAY.  I JUST DON'T REMEMBER.

24     Q    AND WHEN YOU SAY "MODIFIED," DO YOU KNOW HOW

25  MANY OF THE 7,417 ARE TRIAL MODIFICATIONS?

Page 154

1      A    I DO NOT.

2      Q    AND DO YOU KNOW HOW MANY OF THE 7,417 ARE

3   PERMANENT MODIFICATIONS?

4      A    I DO NOT.  NOT OFF THE TOP OF MY HEAD.

5      Q    DO YOU KNOW HOW MANY OF THE BORROWERS IN THE

6   7,417 PAID FORECLOSURE FEES?

7      A    I WOULD BE SURPRISED IF VERY MANY PAID THEM,

8   BUT I DON'T KNOW OFF THE TOP OF MY HEAD.

9      Q    AND DO YOU KNOW IF OCWEN STOPPED A PENDING

10  FORECLOSURE FOR ANY OF THESE 7,417 BORROWERS?

11     A    WHEN YOU SAY "PENDING FORECLOSURE," IT'S MY

12  UNDERSTANDING THAT A FORECLOSURE WAS INITIATED FOR EACH

13  OF THOSE LOANS.

14     Q    UH-HUH.

15     A    DID YOU MEAN A FORECLOSURE SALE WHERE A --

16     Q    CORRECT.

17     A    OKAY.  YES, IT MAY HAVE BEEN.  I'M SURE SOME

18  FORECLOSURE SALES WERE SCHEDULED AND THEN CANCELLED

19  EITHER BECAUSE A LOAN WAS MODIFIED OR BECAUSE IT WAS

20  FOR SOME OTHER REASON REINSTATED.

21     Q    AND DO YOU BELIEVE THAT SOME WERE SCHEDULED

22  AND -- SOME FORECLOSURE SCALES -- SALES WERE SCHEDULED

23  FOR THIS POPULATION OF 7,417 AND COMPLETED?

24     A    ONLY AFTER THEY WERE BROUGHT CURRENT AFTER THE

25  ALLEGED HARM WAS INFLICTED EITHER BY AN OVERCHARGE OR

1   AN UNDERCHARGE.  SO THE LOAN WAS BROUGHT BACK TO

2   CURRENT.  THE BORROWER HAD SQUARED ACCOUNTS WITH OCWEN.

3   OBVIOUSLY IF IT FAILS AT THAT POINT, IT CAN'T POSSIBLY

4   BE DUE TO THE LATE ESCROW ANALYSIS.

5       Q    AND DID YOU PERFORM AN ANALYSIS TO DETERMINE

6   WHETHER OR NOT THAT FACT PATTERN INDEED OCCURRED?

7       A    I THINK ONE OR MORE OF THE EIGHT LOANS THAT WE

8   ANALYZED IN THE REPORT FITS THAT FACT PATTERN, BUT I'D

9   HAVE TO REVIEW THEM TO BE SURE.

10      Q    DID YOU PERFORM A SYSTEMATIC ANALYSIS OF ALL

11  7,417 LOANS?

12      A    I DID NOT.

13      Q    OF THE 24,171 LOANS, THESE ARE LOANS THAT BOTH

14  HAD A FORECLOSURE INITIATED AND INDEED HAD A

15  FORECLOSURE SALE; IS THAT CORRECT?

16      A    YES.

17      Q    AND OF THE BORROWERS WHO HAD A FORECLOSURE

18  SALE COMPLETED, DO YOU KNOW HOW MANY HAD A

19  REINSTATEMENT PRIOR TO THE DATE OF THE FORECLOSURE

20  SALE?

21      A    I DO NOT.  I DO NOT KNOW.  BUT CLEARLY UNDER

22  THOSE CIRCUMSTANCE, THE LATE ESCROW ANALYSIS WOULD BE

23  IRRELEVANT.

24      Q    AND OF THE BORROWERS WHO HAD A FORECLOSURE

25  SALE COMPLETED, DO YOU KNOW HOW MANY HAD A LOAN

Page 156

1    MODIFICATION PRIOR TO THE FORECLOSURE DATE?

2        A    SAME ANSWER.  I DON'T KNOW WHAT THE NUMBER IS

3    BUT OBVIOUSLY IF IT HAD BEEN MODIFIED AND BROUGHT

4    CURRENT UNDER THOSE CIRCUMSTANCES, A LATE ESCROW

5    ANALYSIS WOULD BE IRRELEVANT.

6        Q    ON MOVING BACK TO THE 7,417 IN THE

7    REINSTATED/MODIFIED, DO YOU KNOW HOW MANY OF THESE

8    BORROWERS HAD A REINSTATEMENT DATE PRIOR TO THE

9    FORECLOSURE BEING INITIATED?

10       A    I DON'T THINK -- I DON'T BELIEVE ANY OF THEM,

11   BUT I'D HAVE TO GO BACK AND CHECK MY WORK PAPERS TO BE

12   SURE.

13       Q    AND JUST SO WE'RE ON THE SAME PAGE, RFP --

14   RFP 22 DOES NOT HAVE A SEPARATE DATA ELEMENT FOR A

15   PERMANENT LOAN MODIFICATION DATE, DOES IT?

16       A    NO.  YOU HAVE TO GO TO THE MODIFICATION FILE,

17   WHICH I DON'T THINK HAS BEEN PRODUCED IN THIS CASE, OR

18   MAYBE IT HAS -- BUT IT -- IT'S -- THE TERMS ARE NOT IN

19   THE RFP 22.

20       Q    AND YOU ARE SIMPLY -- I SHOULDN'T SAY

21   "SIMPLY."  STRIKE THAT.

22            YOU'RE REVIEWING RFP 22 AND INTERPRETING IT TO

23   IDENTIFY THE 7,417 LOANS THAT YOU BELIEVE WERE EITHER

24   REINSTATED OR MODIFIED; IS THAT CORRECT?

25       A    YES.  THAT'S WHAT THE DATA SHOWS.

Page 157

1      Q    JUST TO BE CLEAR, THE DATA AT RFP 22, CORRECT?

2      A    YES.

3      Q    AND IN TABLE 10 YOU ALSO IDENTIFY 602 LOANS

4  THAT YOU BELIEVE WERE PAID OFF; IS THAT RIGHT?

5      A    THAT'S WHAT THE DATE SHOWS.

6      Q    AGAIN, JUST FOR THE RECORD, WHEN YOU SAY

7  "THAT'S WHAT THE DATA SHOWS," YOU MEAN RFP 22; IS THAT

8  CORRECT?

9      A    CORRECT.

10     Q    AND DO YOU KNOW HOW MANY, IF ANY, OF THESE

11 LOANS WERE SHORT SALES?

12     A    I DO NOT KNOW.

13     Q    DO YOU KNOW HOW MANY, IF ANY, OF THESE LOANS

14 WERE DEED IN LIEU -- DEED IN LIEU OF FORECLOSURE?

15     A    LET ME SEE IF THE FOOTNOTE WILL INFORM --

16     Q    SURE.

17     A    -- ME ON THIS.

18          PAID OFF IN FULL, THEREBY ENDING THE

19 FORECLOSURE PROCESS.  SO THEY WERE PAID OFF IN FULL,

20 THEY WOULD NOT HAVE BEEN A DEED IN LIEU OR A SHORT

21 SALE.

22     Q    AND YOU'RE IDENTIFYING, AGAIN, PAID OFF IN

23 FULL BASED ON YOUR REVIEW OF RFP 22; IS THAT CORRECT?

24     A    THAT'S RIGHT.  SPECIFICALLY THERE WOULD NOT BE

25 A PYC ENTRY, WHICH IS THE CHARGE; BUT THERE WOULD BE A

Page 158

1    PYF ENTRY, WHICH IS THE PAYOFF.

2        Q    AND, DR. HAMM, HOW DID YOU COME TO YOUR

3    UNDERSTANDING OF THE RELEVANT TRANSACTION CODES THAT

4    YOU JUST IDENTIFIED, THE PYF AND THE PYC?

5        A    I'M FAMILIAR WITH OCWEN'S DATA SYSTEM.  I

6    HAVE, AS YOU NO DOUBT SAW IN MY CV, I HAVE BEEN

7    RETAINED IN ANOTHER OCWEN CASE, AND IN CONNECTION WITH

8    MY ASSIGNMENT IN THAT CASE, I HAD TO BECOME FAMILIAR

9    WITH THE VARIOUS DATASETS THAT OCWEN USES TO SERVICE A

10   LOAN.  AND I KNOW THAT PYC AND PYF ALLOW YOU TO

11   DETERMINE WHETHER THE BORROWER FULLY PAID OFF THE LOAN

12   OR WHETHER THE INVESTOR HAD TO TAKE A LOSS IN THE FORM

13   OF A CHARGE-OFF.  I DON'T KNOW WHERE I ACQUIRED THIS

14   INFORMATION.  IT WAS LONG BEFORE I EVER HEARD OF THIS

15   CASE, SO...

16       Q    AND JUST FOR THE RECORD, CAN YOU DEFINE WHAT A

17   PYC TRANSACTION CODE IS?

18       A    YES.  IT STANDS FOR A LOAN WHERE THERE WAS A

19   PAYOFF THAT WAS LESS THAN IN FULL; AND, THUS, THERE WAS

20   A CHARGE-OFF IN THE AMOUNT OWED.

21           OCWEN DID NOT COLLECT ON THE INVESTOR'S BEHALF

22   THE FULL AMOUNT OWED BY THE BORROWER.  SOME HAD TO BE

23   CHARGED OFF.  AND IN MOST CASES, THAT WOULD BE A LOSS

24   TO THE INVESTOR.

25       Q    AND CAN YOU ALSO DEFINE WHAT A PYF TRANSACTION

Page 159

1   IS?

2       A    PYF IS A PAYOFF, IF I'VE GOT THE CODE

3   CORRECTLY.  THERE ARE 30 PAGES WORTH OF CODES AND I

4   DON'T REMEMBER THEM ALL, BUT I BELIEVE PYF IS THE CODE

5   THAT THEY USE THAT WILL APPEAR FOR ANY LOAN WHERE THERE

6   IS A PAYOFF, EVEN A PARTIAL PAYOFF AND THE RECEIPT OF

7   SOME FUNDS.  THERE WILL ALWAYS BE A PYF.  THERE MAY OR

8   MAY NOT BE A PYC DEPENDING ON WHETHER IT'S PAID IN FULL

9   OR NOT.

10      Q    DO YOU KNOW WHETHER OCWEN TREATS A DEED IN

11  LIEU AS A FULL PAYOFF?

12      A    I DON'T BELIEVE SO BECAUSE -- THE BORROWER IS

13  RELEASED FROM ITS OBLIGATION, SO FROM THE BORROWER'S

14  STANDPOINT IT MAY BE TREATED -- IT MAY BE VIEWED AS A

15  FULL PAYOFF, BUT FROM OCWEN'S STANDPOINT OR MORE

16  IMPORTANTLY FROM THE INVESTOR'S STANDPOINT, A DEED IN

17  LIEU IS NOT A FULL PAYOFF UNLESS THE PROPERTY YIELDS

18  THE AMOUNT THAT IS OWED ON THE LOAN, AT LEAST THAT

19  AMOUNT.

20      Q    DO YOU SPECIFICALLY KNOW THAT FOR PURPOSES OF

21  MAINTAINING TRANSACTION DATA THAT OCWEN DOES NOT TREAT

22  A DEED IN LIEU OF FORECLOSURE THE SAME AS A FULL

23  PAYOFF?

24      A    I DON'T KNOW IF THERE IS NO ENTRY FOR PYC,

25  THEN IT DOESN'T MATTER HOW THEY TREAT IT.  THERE IS NO

Page 160

```
 1   CHARGE-OFF AND THEREFORE IT IS THE EQUIVALENT OF A FULL

 2   PAYOFF.

 3          IF THERE IS A PYC, DOESN'T MATTER WHAT THEY

 4   CALL IT, THERE IS A LOSS TO SOMEBODY, INVARIABLY THE

 5   INVESTOR, AND IN A FEW CASES OCWEN ITSELF, BUT NOT TO

 6   THE BORROWER.

 7   Q    SO IF THERE IS ONLY A PYF, THEN IT IS A PAYOFF

 8   IN FULL ACCORDING TO YOUR UNDERSTANDING OF OCWEN'S

 9   TRANSACTION RECORDS --

10   A    YES.  THAT'S CORRECT.

11   Q    -- IS THAT CORRECT?

12          AND DO YOU KNOW IF OCWEN USES THE PYF WITHOUT

13   THE PYC TO ACCOUNT FOR ANY OTHER OPTIONS OTHER THAN A

14   PAID IN FULL?

15   A    I HAVE NEVER -- I'VE NEVER ENCOUNTERED A

16   SITUATION WHERE THERE'S NO PYC AND THERE'S LESS THAN

17   FULL PAY, BUT AT ANY RATE, I'VE NEVER SEEN ONE.

18   Q    AND DID YOU COMPARE THE FAIR MARKET VALUE OF

19   THE PROPERTY TO THE PAYOFF AMOUNT?

20   A    WELL, DID I MAKE A COMPARISON?  NO, I DID NOT

21   MAKE A COMPARISON OF THE FAIR MARKET VALUE TO THE

22   PAYOFF AMOUNT.

23          IF IT WAS A PAYOFF THAT WAS ENABLED BY THE

24   SALE OF THE PROPERTY, THEN IT SOLD AT ITS FAIR MARKET

25   VALUE.  THAT'S THE NATURE OF AN ARM'S LENGTH
```

Page 161

1    TRANSACTION.  IF IT WAS SOME OTHER TRANSACTION, THEN MY

2    ANSWER MIGHT BE DIFFERENT.

3        Q    DO YOU KNOW IF ANY OF THE PYF WITHOUT A PYC

4    WERE FORECLOSURE SALES?

5             MS. ROSE-SMITH:  OBJECTION.

6             THE WITNESS:  I'M NOT SURE AS I SIT HERE.  I'D

7    HAVE TO GO BACK AND CHECK.  I'M JUST NOT SURE.

8    BY MR. DESAI:

9        Q    DR. HAMM, PARAGRAPH 334 IN YOUR REBUTTAL

10   REPORT, YOU OPINE THAT "PROFESSOR MCFADDEN STATES THAT

11   LOANS WITH A DELINQUENCY OR FORECLOSURE PRIOR TO THE

12   ALLEGED ANALYSIS THAT SHOULD BE EXCLUDED."

13           IS THAT RIGHT?

14       A    WELL, LET ME REFRESH MY MEMORY.

15       Q    SURE.

16       A    OKAY.  COULD YOU ASK YOUR QUESTION AGAIN?

17   I'VE FORGOTTEN.

18       Q    SURE.

19           IN PARAGRAPH 334 OF YOUR REBUTTAL REPORT --

20       A    YES.

21       Q    -- YOU OPINE THAT "PROFESSOR MCFADDEN STATES

22   THAT LOANS WITH A DELINQUENCY OR FORECLOSURE PRIOR TO

23   ALLEGED ANALYSIS SHOULD" -- "SHOULD BE EXCLUDED"; IS

24   THAT RIGHT?

25       A    YES, THAT'S WHAT I SAY.

Page 162

1    Q    AND TURNING TO PARAGRAPH 335 --

2    A    YES.

3    Q    -- YOU REFER TO PROFESSOR MCFADDEN'S REPORT

4    AND YOU BEGIN TO QUOTE FROM IT AND YOU WRITE, "I AM

5    ABLE TO" -- AND THEN YOU INCLUDE THREE ELLIPSIS --

6    "EXCLUDE SUBPOPULATIONS OF LOANS WITH POSSIBLY

7    CONFOUNDING FACTORS SUCH AS PREEXISTING BANKRUPTCIES OR

8    DELINQUENCIES WHOSE INFLUENCES CANNOT BE FULLY

9    CONTROLLED SO THAT I HAVE HIGH CONFIDENCE THAT THE

10   ELEVATED RISKS THAT I MEASURE FOLLOWING SERVICE

11   FAILURES ARE CAUSED BY THESE FAILURES."

12        DID I READ YOUR QUOTATION CORRECTLY?

13   A    YOU DID.

14   Q    I'M GOING TO READ YOU WHAT WAS MISSING FROM

15   THE THREE ELLIPSIS.

16   A    OKAY.

17   Q    PROFESSOR MCFADDEN'S FULL QUOTE IS, "IN THE

18   SURVIVAL ANALYSIS I HAVE DONE IN THIS CASE, I AM ABLE

19   TO CONTROL FOR OR RULE OUT THESE CONFOUNDING FACTORS

20   AND EXCLUDE SUBPOPULATIONS OF LOANS WITH POSSIBLE

21   CONFOUNDING FACTORS SUCH AS PREEXISTING BANKRUPTCIES OR

22   DELINQUENCIES WHOSE INFLUENCE CANNOT BE FULLY

23   CONTROLLED."

24        YOU EXCLUDE FROM YOUR QUOTE THE CONTROL FOR OR

25   RULE-OUT LANGUAGE.  WHY DID YOU EXCLUDE THIS LANGUAGE

Page 163

1    FROM YOUR QUOTE IN PARAGRAPH 335?

2           MS. ROSE-SMITH:  OBJECTION.

3           THE WITNESS:  VERY SIMPLE, BECAUSE PROFESSOR

4    MCFADDEN SAID HIMSELF YOU CANNOT FULLY CONTROL FROM

5    PREEXISTING BANKRUPTCIES OR DELINQUENCIES.  HIS WORDS,

6    NOT MINE.

7           SO THE FACT THAT HE TALKS ABOUT CONTROL IN THE

8    OMITTED PORTION IS IRRELEVANT TO THE POINT I'M MAKING.

9    NO LESS THAN INDIVIDUAL THAT PROFESSOR MCFADDEN SAYS

10   "THE INFLUENCE OF PREEXISTING BANKRUPTCIES AND

11   DELINQUENCIES CANNOT BE FULLY CONTROLLED."  SO YOU

12   CAN'T DO IT.

13   BY MR. DESAI:

14      Q    AND PROFESSOR MCFADDEN INCLUDES A RIGHT-HAND

15   SIDE VARIABLE TO CONTROL FOR PREEXISTING

16   DELINQUENCIES --

17           THE REPORTER:  HOLD ON.  I CAN'T HEAR YOU.

18   BY MR. DESAI:

19      Q    PROFESSOR MCFADDEN INCLUDES A INDEPENDENT

20   VARIABLE TO CONTROL FOR PREEXISTING DELINQUENCIES; IS

21   THAT CORRECT?

22      A    WELL, HE INCLUDES AN INDEPENDENT VARIABLE THAT

23   HE CLAIMS CONTROLS FOR WHAT HE SAYS IN HIS REPORT HE

24   CAN'T FULLY CONTROL FOR.  SO YES, THAT'S MY ANSWER.

25      Q    AND IT'S -- IS IT YOUR OPINION THAT YOU NEED

Page 164

1   TO, IN FACT, EXCLUDE ANY BORROWER WITH A PREEXISTING

2   DELINQUENCY FROM THE POPULATION OF BORROWERS WHO

3   SUFFERED A HARM?

4       A    WELL, SINCE YOU CAN'T FULLY CONTROL FOR THE

5   EFFECTS OF THE PREEXISTING DELINQUENCY ON THE VARIABLE

6   OF INTEREST, YES, YOU SHOULD DO THAT.

7       Q    AND WHAT IS THE BASIS FOR YOUR OPINION?

8       A    WELL, I DON'T KNOW THAT I CAN ADD TO IT.  IF

9   YOU'RE UNABLE TO CONTROL FOR SOMETHING THAT HAS A HIGH

10  CORRELATION WITH BOTH THE INDEPENDENT VARIABLE OF

11  INTEREST, THE INITIATION OF FORECLOSURE -- OR THE --

12  I'M SORRY -- THE LATE ESCROW ANALYSIS, AND THE

13  DEPENDENT VARIABLE, WHICH IS THE INITIATION OF

14  FORECLOSURE WHICH WE ESTABLISHED BEFORE THE PROBABILITY

15  OF INITIATION OF FORECLOSURE, IF YOU CAN'T FULLY

16  CONTROL FOR THAT INFLUENCE, THAT CORRELATION, THEN

17  WHAT'S THE POINT OF PRETENDING LIKE YOU CAN DO THAT IN

18  PUTTING IN A CONTROL VARIABLE THAT YOU YOURSELF HAVE

19  SAID DOES NOT CONTROL?

20          I DON'T KNOW THAT I HAVE ANYTHING BEYOND THAT,

21  BUT THAT SHOULD BE ENOUGH.  THOSE ARE HIS WORDS, NOT

22  MINE, BUT I AGREE WITH HIM.

23      Q    SO, DR. HAMM, OUTSIDE OF YOUR INTERPRETATION

24  OF WHAT MR. -- WHAT PROFESSOR MCFADDEN SAYS, WHAT IS

25  YOUR BASIS FOR YOUR OPINION?

Page 165

1      A    THE BASIS FOR MY OPINION IS THAT IN

2   ECONOMETRICS, YOU NEED TO INCLUDE ALL RELEVANT

3   VARIABLES.  IF YOU'RE MISSING VARIABLES, THEN YOU HAVE

4   MISSPECIFIED YOUR MODEL AND YOU CAN'T DRAW ANY

5   MEANINGFUL CONCLUSIONS FROM IT.

6           IF YOU CAN'T CONTROL FOR A VARIABLE THAT IS

7   CORRELATED WITH BOTH THE INDEPENDENT VARIABLE OF

8   INTEREST AND THE DEPENDENT VARIABLE, IF YOU CAN'T

9   CONTROL FOR THAT, THEN YOUR RESULTS ARE INVALID.

10  I'M -- I WOULDN'T THINK THAT ANYONE WOULD DISAGREE WITH

11  THAT, BUT IF THEY DO, SO BE IT.  BUT THAT IS -- THAT IS

12  MY UNDERSTANDING OF BEST PRACTICES IN ECONOMETRICS.

13     Q    AND WHERE DID YOUR UNDERSTANDING OF BEST

14  PRACTICES IN ECONOMETRICS, WHERE WAS THAT FORMED?

15     A    IT WAS FORMED OVER THE LAST 57 YEARS SINCE I

16  HAVE BEEN EITHER A STUDENT OF OR A PRACTITIONER OF

17  ECONOMICS.

18     Q    AND WHY DO YOU BELIEVE YOU CAN'T CONTROL FOR

19  PREEXISTING DELINQUENCIES?

20     A    WELL, THERE ARE A LOT OF REASONS, BUT I THINK

21  THE MOST IMPORTANT IS ONE THAT I DEAL WITH FURTHER DOWN

22  HERE AND THAT IS THE CONTROL GROUP -- WE KNOW -- WE

23  KNOW THAT OCWEN'S POLICY WAS NOT TO PREPARE ESCROW

24  ANALYSES FOR LOANS THAT WERE DELINQUENT DURING MOST OF

25  2014.  AND YET THE CONTROL GROUP HAS DELINQUENT LOANS

1  THAT PURPORTEDLY DID NOT RECEIVE A LATE ESCROW

2  ANALYSIS, NOTWITHSTANDING THE POLICY.

3            ALL RIGHT.  LET'S ASSUME THAT THAT IS RIGHT

4  AND THAT THOSE LOANS IN THE CONTROL GROUP DID NOT HAVE

5  A LATE ESCROW ANALYSIS.  THEN THE QUESTION IS:  WHY DID

6  THEY -- WHY DID THEY GET AN ESCROW ANALYSIS WHEREAS THE

7  DELINQUENT LOANS IN THE TREATMENT GROUP DID NOT GET

8  ONE?  SOMETHING ABOUT THOSE DELINQUENT LOANS IN THE

9  CONTROL GROUP IS FUNDAMENTALLY DIFFERENT FROM THE

10  DELINQUENT LOANS IN THE TREATMENT GROUP.

11            AND AS A CONSEQUENCE, YOU CAN'T DRAW ANY

12  REASONABLE CONCLUSIONS FROM ANY DIFFERENCE BETWEEN THE

13  PERFORMANCE OF THE LOANS IN THE CONTROL GROUP AND THE

14  PERFORMANCE OF THE LOANS IN THE TREATMENT GROUP.

15            THE CONTROL GROUP IS SUPPOSED TO MIMIC THE

16  TREATMENT GROUP IN ALL RESPECTS EXCEPT THE LATE ESCROW

17  ANALYSIS.

18            BUT CLEARLY THESE ARE TWO DIFFERENT GROUPS OF

19  DELINQUENT LOANS, AND THAT BY ITSELF, WITHOUT REGARD TO

20  ANYTHING ELSE I SAY IN THIS REPORT, INVALIDATES

21  PROFESSOR MCFADDEN'S RESULTS.

22     Q    DR. HAMM, DID YOU IMPLEMENT PROFESSOR

23  MCFADDEN'S ECONOMETRIC MODEL WITH THESE BORROWER'S

24  EXCLUDED?

25     A    I DID NOT.  "THESE BORROWERS," BEING

1   DELINQUENT BORROWERS?

2       Q     BORROWERS WITH A PREEXISTING DELINQUENCY THAT

3   YOU BELIEVE SHOULD HAVE BEEN EXCLUDED.

4       A     I DID NOT RUN HIS MODEL WITH THOSE LOANS

5   EXCLUDED.  I DID COMPARE THE RATE OF FORECLOSURES FOR

6   THE NON DELINQUENT LOANS IN THE CONTROL GROUP AND THE

7   NON DELINQUENT LOANS IN THE TREATMENT GROUP AND I FOUND

8   THE RATE OF FORECLOSURE WAS VIRTUALLY THE SAME, AS I

9   WOULD EXPECT IT TO BE.

10          ACTUALLY IT WAS A LITTLE HIGHER FOR THE

11  CONTROL GROUP THAN FOR THE TREATMENT GROUP, WHICH

12  SURPRISED ME, BUT, I WOULD SIMPLY SUMMARIZE THAT

13  COMPARISON AS NO -- NO SIGNIFICANT DIFFERENCE, WHICH IS

14  EXACTLY WHAT I WOULD EXPECT.

15      Q     AND DR. HAMM, DO YOU KNOW IF PROFESSOR

16  MCFADDEN CONTROLS FOR PREEXISTING DELINQUENCY IN BOTH

17  HIS CONTROL AND TREATMENT GROUP?

18      A     AS I SAID, HE PURPORTS TO, BUT HE DOESN'T --

19  HE DOESN'T CONTROL FOR THEM.  AND IT'S NOT SURPRISING

20  THAT HE DOESN'T SINCE HE ACKNOWLEDGES IN HIS REPORT

21  THAT YOU CANNOT FULLY CONTROL FOR DELINQUENCIES AND

22  BANKRUPTCIES.

23          BUT IN ANY EVENT, HE DOESN'T.  HE DOESN'T TAKE

24  INTO ACCOUNT THIS FUNDAMENTAL DIFFERENCE BETWEEN THE

25  DELINQUENCIES IN TWO GROUPS.

Page 168

1          HE DOESN'T PROPERLY IDENTIFY DELINQUENT LOANS

2    IN THE TREATMENT GROUP AS WE ESTABLISHED EARLIER.

3    MAYBE WE DIDN'T, I CAN'T REMEMBER.

4          BUT HE COMES UP 29,000 SHORT IN TERMS OF

5    IDENTIFYING DELINQUENT LOANS.

6          SO WHATEVER HE THINKS HE'S DONE, HE CERTAINLY

7    HASN'T CONTROLLED FOR THE INFLUENCE OF DELINQUENCY ON

8    THE COEFFICIENT OF THE OVERCHARGE OR UNDERCHARGE FLAG.

9      Q    DR. HAMM, I THINK WHAT YOU'RE REFERRING TO IS

10   YOU USED RFP 22 TO IDENTIFY WHETHER OR NOT BORROWERS

11   WERE DELINQUENT; IS THAT CORRECT?

12     A    CORRECT.

13     Q    NOT OCWEN'S DELINQUENCY DATA AS PRODUCED IN

14   RFP 5; IS THAT CORRECT?

15     A    NO.  I WENT TO THE DEFINITIVE SOURCE -- AND I

16   THINK OCWEN IN THEIR LETTER OF TRANSMITTAL TO THE

17   BUREAU INDICATED THAT RFP 22 WAS THE -- I DON'T KNOW

18   THAT HE USED THE WORD "DEFINITIVE SOURCE," -- BUT THE

19   MOST RELIABLE SOURCE OF INFORMATION ON THESE LOANS.

20   THAT'S WHAT I USED.

21     Q    DO YOU KNOW THE IMPACT -- SITTING HERE TODAY,

22   DO YOU KNOW THE IMPACT OF EXCLUDING BORROWERS WITH A

23   PREEXISTING DELINQUENCY FROM PROFESSOR MCFADDEN'S

24   ECONOMETRIC MODEL?

25          MS. ROSE-SMITH:  OBJECTION.

```
1            THE WITNESS:  I THINK I DO FOR THE REASON THAT

2   I JUST GAVE, IN THAT THE FORECLOSURE RATE FOR NON

3   DELINQUENT LOANS IN A CONTROL GROUP AND NON DELINQUENT

4   LOANS IN THE TREATMENT GROUP IS, ESSENTIALLY, THE SAME

5   WITH THE CONTROL GROUP'S FORECLOSURE RATE BEING A

6   LITTLE BIT HIGHER.

7            I DON'T SUGGEST THAT THAT PROVES THAT A

8   DELAYED ESCROW ANALYSIS REDUCES THE RISK OF

9   FORECLOSURE.

10           AS I SAY, I CHARACTERIZE IT -- THE FORECLOSURE

11  RATE AS BEING THE SAME FOR THE TWO GROUPS, WHICH IS

12  WHAT I WOULD EXPECT IT TO BE.

13  BY MR. DESAI:

14     Q    DR. HAMM, I BELIEVE YOU TESTIFIED EARLIER THAT

15  YOU DID NOT IMPLEMENT PROFESSOR MCFADDEN'S ECONOMETRIC

16  MODEL WITH THE BORROWER'S -- WITH THE PREEXISTING

17  DELINQUENCY EXCLUDED; CORRECT?

18     A    I DID.

19     Q    SO SITTING HERE TODAY, YOU DO NOT KNOW THE

20  IMPACT OF EXCLUDING BORROWERS WITH A PREEXISTING

21  DELINQUENCY FROM PROFESSOR MCFADDEN'S ECONOMETRIC

22  MODEL; IS THAT CORRECT?

23           MS. ROSE-SMITH:  OBJECTION.

24           THE WITNESS:  I DON'T KNOW FOR SURE, BUT AS I

25  SAY, BASED ON THE FORECLOSURE RATES FOR THE TWO GROUPS,
```

1    I WOULD CERTAINLY EXPECT THAT HIS MODEL, IF PROPERLY

2    SPECIFIED, IF IT INCLUDES THE APPROPRIATE VARIABLES, IF

3    IT IS OTHERWISE PROPERLY SPECIFIED AND HAS A VALID

4    CONTROL GROUP IS GOING TO PRODUCE RESULTS ALONG THE

5    LINES OF WHAT I JUST DESCRIBED.

6            IN OTHER WORDS, ESSENTIALLY NO DIFFERENCE.

7    BY MR. DESAI:

8        Q    DR. HAMM, PLEASE TURN TO PAGE 128 OF YOUR

9    REPORT AND THE SECTION TITLED "PROFESSOR MCFADDEN

10   IGNORES OTHER DATA PRODUCED BY OCWEN RELEVANT TO

11   CAUSATION."

12       A    I'M THERE.

13       Q    AND THE DATA YOU BELIEVE PROFESSOR MCFADDEN

14   IGNORED ARE OCWEN'S IDENTIFIED REASONS FOR BORROWER

15   DEFAULTS?

16       A    CORRECT.

17           THE REPORTER:  FOR WHAT DEFAULTS?

18           MR. DESAI:  OCWEN'S IDENTIFIED REASONS FOR

19   BORROWER DEFAULTS.

20   BY MR. DESAI:

21       Q    AND YOU WRITE IN PARAGRAPH 338, YOU BELIEVE

22   THAT "THERE IS NO MYSTERY AS TO WHY THESE LOANS ENDED

23   UP IN FORECLOSURE.  THEY SHOULD HAVE BEEN EXCLUDED FROM

24   BOTH PROFESSOR MCFADDEN'S PROPORTIONAL HAZARD MODEL AND

25   HIS DAMAGES CALCULATION"; IS THAT RIGHT?

Page 171

1      A    CORRECT.

2      Q    IS IT YOUR OPINION THAT OCWEN'S CAPTURED

3  REASON FOR DEFAULT EXPLAINS WHY THESE LOANS ENDED UP IN

4  FORECLOSURE?

5      A    IT IS THE BEST INFORMATION AVAILABLE TO OCWEN

6  ON WHY THEY DID, AND I HAVE NO REASON TO DISAGREE WITH

7  WHAT OCWEN CONSIDERS THE BEST INFORMATION UPON THE

8  FORECLOSURE.

9      Q    WHAT IS YOUR -- THE BASIS OF YOUR KNOWLEDGE

10  FOR OCWEN CONSIDERING THIS IS THE BEST INFORMATION FOR

11  THE REASON FOR DEFAULT?

12          MS. ROSE-SMITH:  OBJECTION.

13          THE WITNESS:  BECAUSE THE SYSTEM IS DESIGNED

14  TO CAPTURE WHAT THE BORROWER SAYS AS THE REASON FOR THE

15  DEFAULT.  AND IT DOES ASSUME THAT THE BORROWER IS IN

16  THE BEST POSITION TO EXPLAIN WHY THE BORROWER CAN'T

17  MAKE THE PAYMENTS THAT THE BORROWER PROMISED TO MAKE

18  WHEN HE OR SHE SIGNED THE PROMISSORY NOTE, BUT THAT'S

19  MY REASON.

20  BY MR. DESAI:

21      Q    AND DO YOU KNOW WHO CREATED THE REASONS FOR

22  DEFAULT IN OCWEN'S REASONS FOR DEFAULT?

23      A    SOMEONE FROM OCWEN'S COLLECTION DEPARTMENT

24  UNDOUBTEDLY CALLED -- THIS IS MY UNDERSTANDING --

25  CALLED THE BORROWER AS SOMEONE FROM THE COLLECTION

Page 172

1    DEPARTMENT DID NUMEROUS TIMES IN AN EFFORT TO BRING THE

2    LOAN CURRENT, AND AT SOME POINT ASKED THE BORROWER

3    TO -- FOR ONE OR MORE REASONS WHY THE BORROWER WAS NOT

4    ABLE TO MAKE THE PAYMENTS AND WAS IN DEFAULT.

5        Q    AND OCWEN ENTERS THE REASON FOR DEFAULT;

6    CORRECT?

7        A    THE BORROWER COMMUNICATES TO OCWEN AND OCWEN

8    ACTUALLY TYPES IT INTO THE SYSTEM.

9        Q    AND DOES OCWEN SELECT A PRESPECIFIED REASON

10   FOR DEFAULT?

11       A    NOT TO MY KNOWLEDGE.

12           MS. ROSE-SMITH:  OBJECTION.

13   BY MR. DESAI:

14       Q    SO THEY -- IS IT YOUR UNDERSTANDING THAT THEY

15   CAPTURE VERBATIM WHATEVER IT IS THE BORROWER TELLS THEM

16   IS THE REASON FOR DEFAULT?

17           MS. ROSE-SMITH:  OBJECTION.

18           THE WITNESS:  I THINK THEY HAVE A NUMBER OF

19   CATEGORIES THAT RUNS TO SEVERAL PAGES AND THEY TRY TO

20   FIND A CATEGORY -- AN EXISTING CATEGORY THAT IS CLOSEST

21   TO WHAT THE BORROWER ARTICULATED.

22           AND IF YOU'VE LOOKED AT THESE -- THE FREQUENCY

23   DISTRIBUTION, YOU KNOW THAT MOST OF THE REASONS FALL

24   INTO A RELATIVELY SMALL NUMBER OF CATEGORIES, BUT YES,

25   THAT'S THE WAY IT WORKS.

Page 173

1   BY MR. DESAI:

2       Q    AND ARE YOU AWARE OF THE ORIGIN OF THESE

3   PREEXISTING DEFAULT REASONS?

4       A    I THINK THEY ARE BASED ON THE COMMON REASONS

5   THAT ARE GIVEN BY BORROWERS FOR THEIR FAILURE TO

6   PERFORM AS PROMISED.

7       Q    CAN A LOAN HAVE MORE THAN ONE DEFAULT REASON?

8       A    YES.

9       Q    DOES EVERY LOAN WITH A DEFAULT REASON END UP

10  IN FORECLOSURE?

11      A    NO.

12      Q    IS IT YOUR OPINION THAT THE DEFAULT REASON IS

13  THE DISPOSITIVE REASON FOR WHY A BORROWER ENDS UP IN

14  FORECLOSURE?

15          MS. ROSE-SMITH:  OBJECTION.

16          THE WITNESS:  I THINK IT IS THE MOST LIKELY

17  REASON.  IT'S THE BEST INFORMATION THAT EXISTS ON THE

18  REASON FOR THAT DEFAULT.

19  BY MR. DESAI:

20      Q    SO IS YOUR OPINION THAT IS THE MOST LIKELY

21  REASON BUT NOT THE DISPOSITIVE REASON; IS THAT RIGHT?

22          MS. ROSE-SMITH:  OBJECTION.

23          THE WITNESS:  IF BY "DISPOSITIVE REASON" YOU

24  MEAN A REASON THAT IS 100 PERCENT CERTAIN TO BE TRUE

25  BECAUSE THERE IS NO AUDIT OF THE BORROWER'S THINKING,

Page 174

```
 1   THE BORROWERS DO NOT HAVE TO JUSTIFY THEIR ANSWERS BY

 2   SHOWING CHECK REGISTERS AND BANK ACCOUNTS AND

 3   APPRAISALS OF THEIR PROPERTY IN ORDER TO SUBSTANTIATE

 4   THE REASONS THAT THEY GIVE, I WOULD AGREE.

 5           IN THAT SENSE OF DISPOSITIVENESS, NO, IT'S NOT

 6   DISPOSITIVE.  IT'S MOST LIKELY.  IT'S THE BEST

 7   INFORMATION THAT'S AVAILABLE.

 8   BY MR. DESAI:

 9      Q    DO YOU KNOW WHEN OCWEN ENTERS THE REASON FOR

10   THE DEFAULT?

11      A    IT ENTERS IT SOMETIME AFTER THE LOAN GOES INTO

12   DEFAULT.  I'M NOT SURE EXACTLY WHEN.  IN THIS

13   PARTICULAR CASE, MY ANALYSIS, MY TABULATION OF THESE

14   REASONS WAS, IN ALL CASES, AFTER THE ESCROW ANALYSIS

15   HAS BEEN DELAYED AND THE BORROWER WOULD BE AWARE OF

16   WHATEVER NEGATIVE IMPACT THAT ESCROW ANALYSIS HAD.  BUT

17   I CAN'T TELL YOU EXACTLY WHEN IN THE PROCESS IT

18   HAPPENS, BUT IT'S AFTER THE LOAN HAS GONE INTO DEFAULT.

19      Q    AND DID YOU COMPARE THE DATE ON WHICH OCWEN

20   ENTERED THE REASON FOR DEFAULT TO THE DATE ON WHICH THE

21   FORECLOSURE WAS INITIATED?

22      A    I DID NOT, NO.

23      Q    DID YOU COMPARE THE DATE ON WHICH OCWEN

24   ENTERED THE REASON FOR DEFAULT TO THE DATE THAT THE

25   FORECLOSURE SALE WAS COMPLETED, IF IT WAS COMPLETED?
```

Page 175

1      A    BY THAT POINT -- NO, I DID NOT BECAUSE AT THAT

2    POINT THE BORROWER IS OUT OF THE PICTURE.

3      Q    AND DID YOU COMPARE THE DATE THAT OCWEN

4    ENTERED THE DEFAULT REASON TO WHEN THEY BEGAN CHARGING

5    THE CURRENT ESCROW AMOUNT?

6      A    WELL, AS I SAY, IT IS IN ALL CASES AFTER THE

7    DATE OF HARM, WHICH IS CERTAINLY IN THE CASE OF

8    UNDERCHARGED BORROWERS, YES, IT WOULD BE AFTER THE NEW

9    ESCROW AMOUNT IS CHARGED.

10         I'D HAVE TO GO BACK AND LOOK TO SEE IF WE --

11   HOW WE TREATED THE OVERCHARGED BORROWERS.  OUR

12   INTENTION WAS TO ONLY CONSIDER REASONS THAT WERE

13   ENTERED AFTER THE ALLEGED HARM DATE.  AND THAT WAS

14   CERTAINLY OUR INTENTION.  I HAVE EVERY REASON TO

15   BELIEVE THAT WE DID IT CORRECTLY AND PROPERLY.

16     Q    AND WHEN YOU SAY "WE," DR. HAMM --

17     A    I MEAN ME.

18     Q    -- WHO ARE YOU REFERRING TO?

19     A    I MEAN, ME.

20     Q    YOU DID IT YOURSELF?

21          THE REPORTER:  ONE AT A TIME, PLEASE.

22          THE WITNESS:  NO, I HAD STAFF WORKING AT MY

23   DIRECTION AND UNDER MY SUPERVISION DO IT.  BUT THIS IS

24   MY REPORT AND I TAKE RESPONSIBILITY SINCE I REVIEWED

25   THE MATERIAL BEFORE IT WENT INTO MY REPORT AND SHAPED

Page 176

1    MY OPINIONS.

2    BY MR. DESAI:

3        Q    DID YOU REVIEW THE CODE THAT PRODUCED THE

4    ANALYSIS SURROUNDING THE DATES THE DEFAULT REASONS WERE

5    ENTERED?

6            MS. ROSE-SMITH:  OBJECTION.

7            THE WITNESS:  CAN YOU RE-ASK THE QUESTION?  I

8    DIDN'T UNDERSTAND IT.

9    BY MR. DESAI:

10       Q    SURE.

11           DID YOU REVIEW ANY STATISTICAL CODE OR

12   PROGRAMMING CODE THAT WAS USED TO PRODUCE THE RESULTS

13   THAT SURROUNDED YOUR ANALYSIS OF THE REASONS FOR

14   DEFAULT?

15           MS. ROSE-SMITH:  OBJECTION.

16           THE WITNESS:  I DON'T KNOW WHETHER WE DID OR

17   NOT.  I CAN'T TELL YOU AS I SIT HERE.

18   BY MR. DESAI:

19       Q    I'M ASKING IF YOU PERSONALLY DID.

20       A    OH, I DID NOT PERSONALLY DO IT.

21       Q    AND YOU WRITE THAT, "THERE IS NO MYSTERY AS TO

22   WHY THESE LOANS ENDED UP IN FORECLOSURE."

23           WHY DO YOU BELIEVE THERE'S NO MYSTERY,

24   DR. HAMM?

25       A    WELL, FOR MAYBE HALF OF THEM, THE LOANS WERE

1  WELL OVER 120 DAYS DELINQUENT AND THE REASONS THAT THE

2  BORROWER GAVE ARE PRETTY -- PRETTY MUCH ANSWER THE

3  QUESTION.  THE BORROWER SAYS, I CAN'T MAKE MY MORTGAGE

4  PAYMENTS BECAUSE I'VE LOST MY JOB AND I HAVE NO SOURCE

5  OF INCOME.  UNDER THOSE CIRCUMSTANCES, THERE'S NO

6  MYSTERY WHY THE LOAN IS IN DEFAULT.  THE BORROWER HAS

7  NO SOURCE OF INCOME TO MAKE THE PAYMENTS THAT THE

8  BORROWER PROMISED TO MAKE.

9          IF THE WIFE OF THE BORROWER SAYS MY HUSBAND IS

10  IN JAIL AND HAS NO WAY TO EARN THE MONEY NEEDED TO PAY

11  THE -- MAKE THE MORTGAGE PAYMENTS, THERE'S NO MYSTERY

12  AS TO WHY THAT LOAN DEFAULTED.  DEFAULTED BECAUSE THE

13  BORROWER DOES NOT HAVE THE SOURCE OF INCOME FROM WHICH

14  HE CAN DRAW IN ORDER TO MAKE THE PAYMENT.

15          IF THE BORROWER SAYS, MY WIFE IS SICK IN THE

16  HOSPITAL.  I DON'T HAVE INSURANCE.  I DON'T HAVE

17  MEDICARE.  I DON'T HAVE MEDICAID.  AND I'M HAVING TO

18  USE EVERY PENNY OF MY RESOURCES IN ORDER TO PAY HER

19  HOSPITAL BILLS AND I CAN'T MAKE THE MORTGAGE PAYMENTS,

20  IT'S NO MYSTERY AS TO WHY THE LOAN IS IN DEFAULT.

21    Q    WELL, LET'S EXPLORE SOME OF THIS MYSTERY.

22  LET'S USE YOUR EXAMPLE OF THE BORROWER WHO SAYS THEY

23  LOST THEIR JOB AND HAS NO SOURCE OF INCOME.

24          DOES OCWEN CAPTURE FOR HOW LONG THAT BORROWER

25  LOST THEIR JOB AND HAS NO SOURCE OF INCOME?

Page 178

1           MS. ROSE-SMITH:  OBJECTION.

2           THE WITNESS:  NO, BUT BECAUSE THE BORROWER HAS

3    GIVEN HIS REASON AFTER THE LOAN HAS GONE IN TO DEFAULT,

4    THE BORROWER HAS EXPLAINED FULLY WHY THE LOAN WENT INTO

5    DEFAULT AND BECAME DELINQUENT.

6    BY MR. DESAI:

7       Q    BUT IF A BORROWER REGAINED A JOB AT A HIGHER

8    WAGE THE VERY NEXT WEEK, WOULD THAT EXPLAIN WHY THEY

9    WENT INTO FORECLOSURE STILL?

10      A    THAT WOULD EXPLAIN WHY THEY CAME OUT OF

11   FORECLOSURE AND WHY THEY DID NOT GO TO A FORECLOSURE

12   SALE BECAUSE WERE THAT TO HAPPEN AND THE BORROWER

13   REGAINED THE CAPACITY TO SERVICE THE LOAN, THE LOAN IS

14   NOT GOING TO BE FORECLOSED.

15      Q    DOES OCWEN DO ANY VALIDATION OF THE BORROWER'S

16   REASON FOR DEFAULT?

17      A    I'VE ALREADY TESTIFIED TO THAT.  IT DOES NOT.

18   IT TAKES THE BORROWER'S WORD.

19      Q    AND OCWEN DOES NOT KNOW OF ANY CHANGES TO THE

20   BORROWER AFTER THE REASON THE DEFAULT IS ENTERED; IS

21   THAT CORRECT?

22           MS. ROSE-SMITH:  OBJECTION.

23           THE WITNESS:  IT DOES NOT CONTINUALLY ASK THE

24   BORROWER IF ANYTHING CHANGED, IF THAT'S WHAT YOU MEAN.

25   ///

1    BY MR. DESAI:

2        Q    IT IS.

3             AND IN PARAGRAPH 341 YOU STATE THAT YOU

4    CLASSIFIED LOANS -- I'M SORRY.  LET ME LET YOU GET

5    THERE.

6        A    I'M THERE.

7        Q    AND IN PARAGRAPH 341, YOU STATE THAT YOU

8    CLASSIFIED LOANS WITH DEFAULT REASONS UNDER ONE OF TWO

9    CATEGORIES.

10            THE FIRST WAS NON OCWEN REASON -- REASONS FOR

11   DEFAULT AND THE SECOND FOR -- WAS REASONS FOR WHICH YOU

12   COULD NOT RULE OUT THE POSSIBILITY OF A BORROWER'S

13   ASSERTION THAT OCWEN'S CONDUCT MAY HAVE AFFECTED THE

14   DEFAULT.

15            IS THAT RIGHT?

16       A    YES.

17       Q    AND THESE ARE YOUR CLASSIFICATIONS; CORRECT?

18       A    THAT'S CORRECT.  AND WE HAVE SPELLED THEM OUT

19   FOR YOU IN THE MATERIALS THAT I'VE PRODUCED.

20       Q    CORRECT.

21            DO YOU BELIEVE THAT OCWEN, DURING THE RELEVANT

22   TIME PERIOD, WAS FAILING TO PERFORM A TIMELY ESCROW

23   ANALYSIS FOR BORROWERS SPECIFICALLY BASED ON THAT

24   BORROWER'S REASON FOR DEFAULT?

25            MS. ROSE-SMITH:  OBJECTION.

Page 180

1          THE WITNESS:  AS I THINK I'VE ANSWERED SIMILAR

2    QUESTIONS IN THE PAST, OCWEN'S FAILURE TO PERFORM AN

3    ESCROW ANALYSIS FOR LET'S CALL IT THE CLASS OF 2014

4    WHEN ITS POLICY WAS NOT TO PERFORM ESCROW ANALYSES FOR

5    DELINQUENT LOANS, WAS BASED ON THE LOAN'S DELINQUENCY,

6    NOT THE REASON FOR THE DELINQUENCY.

7          BUT, AGAIN, FROM A STATISTICAL STATEMENT, THE

8    CORRELATION BETWEEN THESE REASONS AND BOTH THE

9    OVERCHARGE OR UNDERCHARGE FLAG AND THE INITIATION OF

10   FORECLOSURE IS SUCH THAT IT INVALIDATES ANY CONCLUSIONS

11   THAT CAN BE DRAWN FROM PROFESSOR MCFADDEN'S MODEL.

12         IN OTHER WORDS, IT DOESN'T MATTER WHAT OCWEN'S

13   REASONING IS SO LONG AS THERE IS THIS CORRELATION

14   BETWEEN THE REASON AND THE INDEPENDENT VARIABLE OF

15   INTEREST AND THE DEPENDENT VARIABLE OF INTEREST.

16   BY MR. DESAI:

17      Q    DR. HAMM, IS IT YOUR OPINION THAT FOR ANY

18   BORROWER WITH A NON OCWEN REASON FOR DEFAULT AS

19   CATEGORIZED BY YOU, THAT OCWEN'S FAILURE TO PERFORM A

20   TIMELY ESCROW ANALYSIS COULD NOT HAVE CAUSED THE

21   INITIATION OF FORECLOSURE?

22      A    THAT IS --

23         MS. ROSE-SMITH:  OBJECTION.

24         THE WITNESS:  -- THAT IS EXACTLY MY OPINION.

25   ///

Page 181

1    BY MR. DESAI:

2        Q    AND IS IT YOUR OPINION THAT FOR ANY BORROWER

3    WITH A NON OCWEN REASON FOR DEFAULT AS CATEGORIZED BY

4    YOU, THAT OCWEN'S FAILURE TO PERFORM A TIMELY ESCROW

5    ANALYSIS COULD NOT INCREASE THE PROBABILITY THAT A

6    BORROWER HAVE A FORECLOSURE INITIATED?

7             MS. ROSE-SMITH:  OBJECTION.

8             THE WITNESS:  THAT IS MY OPINION.

9    BY MR. DESAI:

10       Q    PLEASE TURN TO -- APOLOGIZE, MAKE YOU GO BACK

11   TO EXHIBIT 4, WHICH ARE YOUR EXHIBITS TO YOUR EXPERT

12   REPORT.

13            IT MIGHT TAKE YOU A MINUTE TO FIND, BUT I'M

14   GOING TO DIRECT YOUR ATTENTION TO EXHIBIT 10E WHICH IS

15   THE FREQUENCY OF THE REASONS FOR DEFAULT -- YEAH, THE

16   FREQUENCY FOR REASONS OF DEFAULT.

17       A    EXHIBIT 4?

18       Q    EXHIBIT 10.  10E?

19            MS. ROSE-SMITH:  LOOKS LIKE THIS.

20            THE WITNESS:  I'M FAMILIAR WITH THE EXHIBIT.

21   I WAS LOOKING FOR 4.

22   BY MR. DESAI:

23       Q    THIS IS WHERE IT GETS CONFUSING, IT'S

24   EXHIBIT 4 TO THE DEPOSITION, BUT EXHIBIT 10 --

25       A    OH, I SEE.  GOT IT.  GOT IT.  10.

```
                                                       Page 182

 1       Q    10E.

 2       A    10E.  I'M THERE.

 3       Q    DO YOU BELIEVE THAT THE REASONS FOR DEFAULT

 4  THAT OCWEN HAS IDENTIFIED IN YOUR EXHIBIT 10E ARE

 5  EXHAUSTIVE?

 6       A    NO.  WELL, CURTAILMENT OF INCOME IS PRETTY

 7  BROAD.  BUT COULD THERE BE SOMETHING THAT IS NOT ON

 8  THIS LIST?  I THINK IT WOULD ACCOUNT FOR VERY FEW

 9  FORECLOSURE INITIATIONS, BUT I CAN'T -- I CAN'T RULE

10  OUT THE POSSIBILITY THAT THERE IS ANOTHER REASON THAT'S

11  NOT ON THIS LIST.  JUST NOT AN IMPORTANT REASON.  THESE

12  ARE THE IMPORTANT REASONS.

13       Q    I SEE.

14            DOES THE EXHIBIT IDENTIFY THE FAILURE TO

15  PERFORM A TIMELY ESCROW ANALYSIS AS A REASON FOR

16  DEFAULT?

17       A    NO.

18       Q    DO YOU KNOW IF OCWEN TELLS BORROWERS THAT IT

19  HAS OVERCHARGED THEM?

20       A    WHEN IT ULTIMATELY PERFORMS AN ESCROW

21  ANALYSIS, IT WILL TELL THEM IF THERE IS A SURPLUS IN

22  THEIR ESCROW ACCOUNT AND IT WILL REFUND THAT MONEY TO

23  THEM WITHIN A VERY SHORT PERIOD OF TIME, NO LONGER THAN

24  30 DAYS.  BUT I THINK OCWEN'S POLICY IS MUCH QUICKER

25  THAN THAT.
```

Page 183

1            I BELIEVE THE REASON WHY IT DOESN'T SEPARATELY

2    IDENTIFY A LATE ESCROW ANALYSIS IS THERE WOULDN'T BE

3    ANY ENTRIES FOR IT.

4        Q    AND DID YOU REVIEW ANY OF OCWEN'S CONSUMER

5    COMPLAINTS IN TRYING TO ASSESS WHETHER OR NOT THE

6    BORROWER-STATED REASONS TO DEFAULTS WERE EXHAUSTIVE?

7        A    NOT FOR THAT PURPOSE.  I REVIEWED SOME OF THE

8    COMPLAINTS THAT APPEAR IN THE BUREAU'S COMPLAINT, BUT I

9    DIDN'T REVIEW THEM FOR THE PURPOSE OF TRYING TO SEE IF

10   THIS LIST OF REASONS IN EXHIBIT 10E THAT IS PART OF

11   DEPOSITION EXHIBIT 4 WERE EXHAUSTIVE.

12       Q    DID YOU REVIEW ANY OF -- ANY OCWEN BORROWER

13   COMPLAINTS FOR PURPOSES OF FORMING YOUR OPINIONS IN

14   THIS CASE?

15       A    NO.

16       Q    DID YOU HAVE ACCESS TO OCWEN'S CONSUMER

17   COMPLAINT DATABASE THAT WAS PRODUCED IN THIS

18   LITIGATION?

19       A    I BELIEVE I DID.

20       Q    WHY DIDN'T YOU REVIEW ANY OF OCWEN'S BORROWER

21   COMPLAINTS IN ORDER TO FORM YOUR OPINIONS IN THIS CASE?

22       A    BECAUSE IT WASN'T RELEVANT TO OPINING ON

23   DAMAGES.  AT LEAST IN TERMS OF -- AS PROFESSOR MCFADDEN

24   EXPLAINS THEM.

25            AGAIN, I'M A REBUTTAL WITNESS, AND SO I TOOK

1    PROFESSOR MCFADDEN'S OPINIONS AND APPLIED MY ANALYSIS

2    BASED ON MY ECONOMICS TRAINING, MY EXPERIENCE IN LOAN

3    SERVICE, MY UNDERSTANDING OF THE PROCESS TO WHAT HE DID

4    AND IDENTIFIED THE FLAWS THAT ARE SET FORTH IN THIS

5    REPORT.  BUT I DIDN'T ATTEMPT TO PLOW NEW GROUND

6    BECAUSE I WAS A REBUTTAL WITNESS.  I WASN'T ASKED TO DO

7    ANYTHING BEYOND ANALYZE PROFESSOR MCFADDEN AND

8    PROFESSOR POWELL'S OPINIONS AND SHARE MY CONCLUSIONS

9    WITH THE COURT.

10       Q    WELL, DR. HAMM, YOU STATE THAT FOR 17 PERCENT

11   OF BORROWERS IN -- OUT OF THE -- IN THE RELEVANT

12   POPULATION, THAT THEY SHOULD BE EXCLUDED FROM THE MODEL

13   AND FROM THE DAMAGES CALCULATION BECAUSE THEY HAVE A

14   NON OCWEN REASON FOR DEFAULT, AND YOU DID NOT THINK IT

15   WAS RELEVANT FOR THOSE 17 PERCENT OF BORROWERS TO LOOK

16   AT THEIR CONSUMER COMPLAINTS TO SEE IF THERE'S ANY

17   ADDITIONAL INFORMATION THAT MIGHT EXPLAIN THEIR REASON

18   FOR DEFAULT.

19            IS THAT YOUR TESTIMONY?

20            MS. ROSE-SMITH:  OBJECTION.

21            THE WITNESS:  THAT'S MY TESTIMONY.  I DID NOT

22   THINK IT WAS RELEVANT AND I DID REVIEW OVER 100 LOANS,

23   WHICH IS OVER 100 LOANS MORE THAN PROFESSOR MCFADDEN

24   DID AT LEAST IN SETTING FORTH IN HIS TWO REPORTS TO

25   IDENTIFY THE REASON FOR DEFAULT.

Page 185

1              BUT NO, I DIDN'T THINK IT WAS RELEVANT.

2    APPARENTLY NEITHER DID PROFESSOR MCFADDEN, TO REVIEW

3    THOSE CONSUMER COMPLAINTS.

4    BY MR. DESAI:

5       Q    AS I MENTIONED EARLIER, I'D ASK THAT YOU LIMIT

6    YOUR ANSWERS TO YOUR OPINIONS IN YOUR REPORT AND NOT

7    CHARACTERIZE WHAT PROFESSOR MCFADDEN DID OR DIDN'T DO

8    IN HIS.

9              MS. ROSE-SMITH:  OBJECTION.  I BELIEVE HE WAS

10   GIVING YOU HIS IMPRESSION OF THAT OPINION.

11             MS. HEALEY:  I THINK HE WAS JUSTIFYING

12   HIMSELF.

13             MS. ROSE-SMITH:  HE'S NOT TESTIFYING ABOUT --

14   HE'S NOT TESTIFYING ABOUT WHAT DR. MCFADDEN [SIC] SAYS,

15   BUT HE IS SAYING HERE IS MY IMPRESSION OF WHAT MCFADDEN

16   DID.  AND I THINK HE'S ALLOWED TO DO THAT BECAUSE YOU

17   ASKED THE QUESTION.

18   BY MR. DESAI:

19      Q    SO, DR. HAMM, IS YOUR TESTIMONY THAT WHAT

20   CONSUMERS ACTUALLY TOLD OCWEN ABOUT THEIR EXPERIENCES

21   WAS NOT RELEVANT?

22      A    NO.  WHEN --

23             MS. ROSE-SMITH:  OBJECTION.

24             THE WITNESS:  WHEN ASKED FOR THE REASON FOR

25   THEIR DEFAULT, I THINK THEIR ANSWER IS HIGHLY RELEVANT.

Page 186

1    AND I HAVE THAT INFORMATION.  I DON'T NEED TO

2    SUPPLEMENT IT.  I HAVE IT.

3    BY MR. DESAI:

4        Q    YOU CAN PUT EXHIBIT 4 TO THE SIDE.  WE'RE

5    GOING TO GO BACK TO EXHIBIT 2, WHICH IS YOUR REBUTTAL

6    REPORT.

7        A    OKAY.

8        Q    IN PARAGRAPH 338, DR. HAMM, YOU WRITE THAT --

9    AND THIS IS IN THE VERY LAST SENTENCE -- "THAT

10   PROFESSOR MCFADDEN CHOSE TO INCLUDE THESE LOANS CAUSING

11   HIM TO GROSSLY OVERSTATE THE IMPORTANCE OF DELAYED

12   ESCROW ANALYSES IN CAUSING FORECLOSURE."  AND BY "THESE

13   LOANS" YOU'RE REFERRING TO THOSE LOANS WITH A NON OCWEN

14   REASON FOR DEFAULT; CORRECT?

15       A    LET ME READ THE WHOLE PARAGRAPH.

16       Q    SURE.

17       A    YES, THAT IS MY OPINION.

18       Q    AND WHAT DO YOU MEAN BY "IMPORTANCE" IN THIS

19   SENTENCE?

20       A    WELL, I MEAN AS A CAUSAL FACTOR IN THE

21   FORECLOSURE.  WE KNOW WHAT THE CAUSE WAS.  THE BORROWER

22   TOLD US WHAT THE CAUSE WAS.  AND SO HE GROSSLY

23   OVERSTATES THE IMPORTANCE OF DELAYED ESCROW ANALYSES AS

24   A CAUSAL FACTOR IN A FORECLOSURE INITIATION, NEVER MIND

25   ABOUT A FORECLOSURE, A FORECLOSURE INITIATION.

Page 187

1      Q     AND WHAT DO YOU MEAN BY "GROSS OVERSTATEMENT,"

2   AS USED IN THIS SENTENCE?

3      A     WELL, PROFESSOR MCFADDEN, BECAUSE HE -- AMONG

4   OTHER DEFICIENCIES IN HIS ANALYSIS, BECAUSE HE INCLUDES

5   LOANS WHERE AN EXPLANATION OF THE CAUSAL FACTOR IS NOT

6   NEEDED, BECAUSE WE ALREADY KNOW WHAT THE CAUSAL FACTOR

7   WAS, IT DISTORTS HIS -- THE OUTPUT OF HIS MODEL AND

8   CAUSES THE HARM ATTRIBUTED TO A DELAYED ESCROW ANALYSIS

9   TO BE GROSSLY HIGHER THAN IT ACTUALLY WAS.  THAT'S WHAT

10  I MEAN.

11     Q     WHEN YOU SAY "GROSSLY," DO YOU HAVE AN

12  ESTIMATE OF HOW MUCH HIGHER YOU BELIEVE?

13     A     AND YOU'RE JUST -- YOU'RE JUST ASKING ME HOW

14  MUCH THIS ONE DEFICIENCY, PUTTING ASIDE ALL OTHER

15  DEFICIENCIES?

16     Q     THAT'S CORRECT.

17     A     NO, I CAN'T TELL YOU WHAT ITS PROPORTIONATE

18  CONTRIBUTION IS.

19           I MEAN, OVERALL YOU KNOW MY OPINION, THAT HE

20  OVERSTATES IT BY AN INFINITE PERCENTAGE.  THE TRUE

21  PERCENTAGE IS ZERO.  AND PROBABILITY IS ZERO.  AND HE

22  HAS SOMETHING IN THE 5 TO 6 TO 7 RANGE.

23           BUT HOW MUCH OF THAT ERROR, HOW MUCH OF THAT

24  DIFFERENCE BETWEEN ZERO AND 5 TO 6 TO 7 PERCENT IS DUE

25  TO THE INCLUSION OF THESE LOANS WHERE WE ALREADY KNOW

Page 188

1    WHAT CAUSED THE DEFAULT, I CAN'T SAY.

2         Q     WHAT STATISTICAL ANALYSIS DID YOU PERFORM TO

3    STUDY THE RELATIONSHIP BETWEEN THE REASON FOR DEFAULT

4    AND THE INCREMENTAL CONTRIBUTION TO FORECLOSURE

5    INITIATION?

6         A     I SIMPLY CREDITED THE BORROWER WITH KNOWING

7    WHY THE BORROWER WAS UNABLE TO FULFILL ITS PROMISES TO

8    THE LENDER WHEN IT TOOK OUT THE LOAN.  AND I DIDN'T DO

9    ANY FURTHER ANALYSIS OTHER THAN CREDIT THE BORROWER

10   WITH HONESTY AND CANDOR.

11        Q     AND THE ANALYSIS THAT YOU DESCRIBED, THAT

12   WOULD NOT TELL YOU ABOUT THE INCREMENTAL IMPACT TO

13   PROFESSOR MCFADDEN'S MODEL; IS THAT CORRECT?

14        A     COULD YOU JUST CLARIFY THE QUESTION?  I THINK

15   I KNOW WHAT YOU MEAN, BUT I'D LIKE TO MAKE SURE I KNOW

16   WHAT YOU MEAN BEFORE I TRY TO ANSWER IT.

17        Q     SURE.

18              YOU PREVIOUSLY TESTIFIED THAT OUTSIDE THE

19   ANALYSIS OF CREDITING THE BORROWER WITH KNOWING WHY THE

20   BORROWER WAS UNABLE TO FULFILL ITS PROMISE TO THE

21   LENDER WHEN IT TOOK OUT THE LOAN, YOU DID NOT PERFORM

22   ANY ADDITIONAL ANALYSIS; IS THAT CORRECT?

23        A     I THINK I'VE ALREADY ANSWERED THAT BEFORE, BUT

24   YES, THAT IS CORRECT.

25        Q     AND THE ANALYSIS THAT YOU JUST DESCRIBED THAT

Page 189

1    YOU DID PERFORM, THAT WOULD NOT TELL YOU ABOUT THE

2    INCREMENTAL IMPACT TO PROFESSOR MCFADDEN'S MODEL; IS

3    THAT CORRECT?

4            MS. ROSE-SMITH:  OBJECTION.

5            THE WITNESS:  WELL, WHEN YOU ALREADY KNOW THE

6    CAUSE OF THE DEFAULT, YOU DON'T NEED TO INCLUDE IT IN

7    THE MODEL -- A MODEL THAT IS SEEKING TO DETERMINE HOW

8    MUCH OF A CAUSAL FACTOR A LATE ESCROW ANALYSIS WAS.

9            AND SO HE SHOULD HAVE TAKEN THESE LOANS OUT OF

10   HIS -- BOTH HIS MODEL AND HIS DAMAGES CALCULATION

11   BECAUSE WE ALREADY KNOW WHAT CAUSED THE FORECLOSURE

12   INITIATION.  WE DON'T NEED TO ANALYZE IT FURTHER.  WE

13   KNOW.

14           SO AS A CONSEQUENCE, I BELIEVE HE SHOULD HAVE

15   EXCLUDED THEM.

16   BY MR. DESAI:

17     Q    SO IS IT YOUR OPINION THAT FOR THE -- THOSE

18   BORROWERS WITH A NON OCWEN REASON FOR DEFAULT, THAT

19   DEFAULT CURED CAPTURES THE SOLE EXPLANATION FOR THE

20   INITIATION FOR A BORROWER'S FORECLOSURE?

21           MS. ROSE-SMITH:  OBJECTION.

22           THE WITNESS:  LET'S PUT IT THIS WAY:  IT

23   CAPTURES THE PRIMARY FACTOR OR FACTORS, BUT IT LEAVES

24   NO ROOM FOR A OPPORTUNITY COST IN THE CASE OF

25   OVERCHARGED BORROWERS, WHICH PROFESSOR MCFADDEN SAYS

Page 190

1    AVERAGE $15.24 AND I SAY AVERAGED, AT MOST, $1.26.

2           IT LEAVES NO ROOM FOR SUCH AN INSIGNIFICANT,

3    TINY OPPORTUNITY COST TO INFLUENCE THE OUTCOME OF THE

4    LOAN.

5           AND I'VE OFFERED TO EXPLAIN WHY THIS IS

6    NUMEROUS TIMES.  WE MAY GET TO IT IN THE COURSE OF THIS

7    DEPOSITION.

8           SAME FOR UNDERCHARGED BORROWERS.  THERE'S

9    SIMPLY NO ROOM FOR A $27.49 OR $6, WHATEVER IT IS, TO

10   HAVE THAT KIND OF EFFECT WHEN A BORROWER SAYS, I LOST

11   MY JOB AND I CAN'T PAY THE MORTGAGE.  YOU -- YOU CAN'T

12   ASSIGN ANY MEANINGFUL VALUE TO SUCH A TINY AND

13   REVERSIBLE AND COMPENSABLE EFFECT OF A LATE ESCROW

14   ANALYSIS.

15          I'M NOT CONDONING LATE ESCROW ANALYSES.  I'M

16   JUST SIMPLY SAYING THAT IN THE REAL WORLD THEY CAN'T

17   HAVE ANYTHING CLOSE TO THE EFFECT THAT PROFESSOR

18   MCFADDEN THINKS THEY DO.

19   BY MR. DESAI:

20      Q   DR. HAMM, CAN YOU PLEASE TURN TO TABLE 13 ON

21   PAGE 132 OF YOUR REBUTTAL REPORT.

22      A   I WILL.  I AM THERE.

23      Q   AND IN THIS TABLE YOU HAVE A SUM OF 92 PERCENT

24   OF LOANS NOT CAUSED BY ESCROW ANALYSIS.

25      A   WITHOUT LOOKING AT INDIVIDUAL LOANS.  THAT'S

Page 191

1    THE KEY.  I'M NOT SUGGESTING THAT 8 PERCENT WERE CAUSED

2    BY ESCROW ANALYSIS -- DELAYED ESCROW ANALYSES.  I'M

3    SIMPLY SAYING YOU CAN ELIMINATE 92 PERCENT OF THE LOANS

4    JUST FOR THESE THREE COMPELLING REASONS.

5         Q    AND WHAT ARE THESE PERCENTAGES OF?

6         A    THE TOTAL.  THE PERCENT OF THE 32,109

7    ALLEGEDLY HARMED AND FORECLOSED LOANS BEFORE --

8    FORECLOSED LOANS, PERIOD.

9         Q    AND YOU HAVE 92 PERCENT HERE.  AND YOU SAID

10   THAT 8 PERCENT WOULD REQUIRE AN INDIVIDUAL ANALYSIS; IS

11   THAT CORRECT?

12        A    CORRECT.

13        Q    AND DID YOU PERFORM AN INDIVIDUAL ANALYSIS OF

14   THE ENTIRE 8 PERCENT OF THE 32,190 ALLEGEDLY HARMED AND

15   FORECLOSED LOANS?

16        A    I DID NOT.  I PERFORMED AN ANALYSIS OF EIGHT

17   INDIVIDUAL LOANS IN MY SAMPLE OF 100 THAT COULD NOT

18   OTHERWISE BE ELIMINATED AS HAVING BEEN SENT TO

19   FORECLOSURE BY A LATE ESCROW ANALYSIS.  I DID REVIEW

20   THOSE EIGHT LOANS.

21        Q    AND JUST TO MAKE SURE WE'RE ON THE SAME PAGE,

22   THIS 32,190 HERE, THIS IS THE SAME POPULATION OF 32,190

23   FORECLOSURES THAT WERE INITIATED THAT WERE DISCUSSED

24   EARLIER; CORRECT?

25        A    CORRECT.

Page 192

```
 1      Q     AND STARTING WITH THE FIRST, YOU IDENTIFY

 2   THREE DISTINCT REASONS AS TO WHY THAT YOU BELIEVE THAT

 3   THE FORECLOSURE COULD NOT HAVE BEEN INITIATED BY THE

 4   UNTIMELY ESCROW ANALYSIS; IS THAT CORRECT?

 5      A     CORRECT.

 6      Q     AND WHEN YOU SAY "FORECLOSED HERE," YOU

 7   ACTUALLY MEAN INITIATED FORECLOSURES; CORRECT?

 8      A     I MEAN ACTUALLY HAVING RESULTED IN A

 9   FORECLOSURE.  I MEAN, ALL OF THE -- THE PRINCIPAL

10   DAMAGES THAT PROFESSOR MCFADDEN ATTRIBUTES TO LATE

11   ESCROW ANALYSES COMES FROM THE LOSS OF EQUITY AND FEES

12   THAT ARE IMPOSED ON THE BORROWER BUT INVARIABLY PAID BY

13   THE INVESTOR LATE IN THE FORECLOSURE PROCESS.  THAT'S

14   WHERE ALL OF THE MONEY COMES FROM.

15           THE DAMAGES ARE NOT CAUSED FOR THE MOST PART

16   BY THE INITIATION OF THE FORECLOSURE.  IT'S MOVING TO A

17   FORECLOSURE SALE.

18      Q     SO STARTING WITH THE FIRST NUMBER, 25 PERCENT,

19   WHICH ARE -- AND THIS IS THE EARLIER POPULATION THAT WE

20   DISCUSSED THAT YOU BELIEVE WERE MISSPECIFIED

21   FORECLOSURES AS SUMMARIZED IN PARAGRAPH 332; IS THAT

22   CORRECT?

23      A     THE 7000-WHATEVER-IT-WAS THAT WERE ACTUALLY

24   EITHER PAID OFF IN FULL, MODIFIED SO THAT ANY LATE

25   ESCROW ANALYSIS, THE EFFECTS WERE COMPLETELY
```

Page 193

```
1   ELIMINATED, OR OTHERWISE REINSTATED.  SO THAT WE
2   KNOW -- WE CAN BE VERY SURE THAT THE LATE ESCROW
3   ANALYSIS HAD NOTHING TO DO WITH -- DID NOT CAUSE ANY
4   DAMAGES TO THOSE LOANS -- THOSE BORROWERS WHATSOEVER.
5        Q    AND THOSE THAT KNOW ME KNOW THAT I'M HYPER
6   PRECISE, ESPECIALLY WITH NUMBERS.
7             SO I BELIEVE YOU'RE REFERRING TO THE 8,019
8   LOANS IN TABLE 10 ON PAGE 124 THAT YOU BELIEVE WERE
9   MISSPECIFIED; CORRECT?
10       A    I AM.  THANK YOU.  I APPRECIATE THE
11  CORRECTION.  MY MEMORY IS NOT AS GOOD AS I THINK IT IS.
12       Q    NO WORRIES.
13            AND DO YOU BELIEVE THAT THESE 25 PERCENT OF
14  BORROWERS DID NOT SUFFER HARM AS A RESULT OF OCWEN'S
15  FAILURE TO PERFORM A TIMELY ESCROW ANALYSIS?
16       A    CORRECT, THAT IS MY OPINION.
17       Q    AND DO YOU BELIEVE THAT THESE 25 PERCENT OF
18  BORROWERS SHOULD BE EXCLUDED FROM PROFESSOR MCFADDEN'S
19  ECONOMETRIC MODEL?
20       A    YES, I BELIEVE THEY SHOULD BE.
21       Q    AND IS IT YOUR OPINION THAT THE BORROWERS IN
22  THIS POPULATION DID NOT SUFFER AN INCREASED RISK OF
23  FORECLOSURE INITIATION DUE TO OCWEN'S FAILURE TO
24  PERFORM A TIMELY ESCROW ANALYSIS?
25       A    THAT IS MY OPINION.
```

Page 194

1       Q    LET'S GO ON TO THE 50 PERCENT.  THESE ARE THE

2   50 PERCENT OF BORROWERS WITH A PREEXISTING DEFAULT THAT

3   WE DISCUSSED EARLIER AND YOU SUMMARIZED IN TABLE 11; IS

4   THAT CORRECT?

5       A    YES.

6       Q    AND IS IT YOUR OPINION THAT THESE 50 PERCENT

7   OF BORROWERS DID NOT SUFFER HARM AS A RESULT OF OCWEN'S

8   FAILURE TO PERFORM A TIMELY ESCROW ANALYSIS?

9       A    LET ME GO BACK TO TABLE 11 --

10      Q    SURE.

11      A    -- JUST SO I CAN HAVE THAT IN FRONT OF ME

12  BEFORE I ANSWER YOUR QUESTION.

13      Q    UH-HUH.

14      A    YES.  THESE WERE LOANS THAT WERE 120 DAYS

15  DELINQUENT AT THE TIME OF THE ALLEGED SERVICING FAILURE

16  AND NEVER MADE ANOTHER PAYMENT.

17           ON AVERAGE, THESE LOANS OWED $50,000.  THEY

18  WERE PAST DUE $50,000.  AND THE VERY IDEA THAT EVEN

19  PROFESSOR MCFADDEN'S INFLATED OPPORTUNITY COST AT

20  $15.24 ADDED TO A $50,000 PAST DUE AMOUNT COULD NOT

21  POSSIBLY HAVE SENT ANY OF THESE LOANS TO FORECLOSURE.

22  ESSENTIALLY THEY WERE DEAD AT THE TIME OF THE SERVICING

23  FAILURE.  THEY NEVER PAID AN OVERCHARGE BECAUSE THEY

24  NEVER MADE ANOTHER PAYMENT AFTER THEY BECAME 120 DAYS

25  DELINQUENT.

Page 195

```
 1              SO YES, THERE IS NO POSSIBILITY THAT A LATE

 2    ESCROW ANALYSIS COULD HAVE CAUSED ANY OF THESE

 3    BORROWERS TO INCUR ANY LOSSES.

 4        Q    WAS THE $50,000 AMOUNT THAT YOU JUST TESTIFIED

 5    TO, WAS THAT THE AVERAGE OR THE MEDIAN?

 6        A    I BELIEVE IT WAS THE AVERAGE.

 7        Q    DO YOU KNOW WHAT THE MEDIAN WAS?

 8        A    NO.

 9        Q    AND DO YOU BELIEVE THAT THESE 50 PERCENT OF

10    BORROWERS SHOULD BE EXCLUDED FROM PROFESSOR MCFADDEN'S

11    ECONOMETRIC MODEL?

12        A    I MOST CERTAINLY DO.

13        Q    IS IT YOUR OPINION THAT BORROWERS IN THIS

14    POPULATION DID NOT SUFFER AN INCREASED RISK OF

15    FORECLOSURE INITIATION DUE TO OCWEN'S FAILURE TO

16    PERFORM A TIMELY ESCROW ANALYSIS?

17        A    THAT IS MY OPINION.

18        Q    FINALLY, BACK TO THIS TABLE, WE RETURN BACK TO

19    THE 17 PERCENT OF BORROWERS WHO HAD A NON OCWEN REASON

20    FOR DEFAULT, AND I BELIEVE YOU SUMMARIZE IN TABLE 12;

21    IS THAT CORRECT?

22        A    YES.

23        Q    AND IS IT YOUR OPINION THAT THESE 17 PERCENT

24    OF BORROWERS DID NOT SUFFER HARM AS A RESULT OF OCWEN'S

25    FAILURE TO PERFORM A TIMELY ESCROW ANALYSIS?
```

Page 196

1      A    THAT IS MY OPINION.

2      Q    DO YOU BELIEVE THAT THESE 17 PERCENT OF

3   BORROWERS SHOULD BE EXCLUDED FROM PROFESSOR MCFADDEN'S

4   ECONOMETRIC MODEL?

5      A    YES.

6      Q    IS IT YOUR OPINION THAT BORROWERS IN THIS

7   POPULATION DID NOT SUFFER INCREASED RISK OF FORECLOSURE

8   INITIATION DUE TO OCWEN'S FAILURE TO PERFORM A TIMELY

9   ESCROW ANALYSIS?

10     A    THAT INDEED IS MY OPINION.

11     Q    AND THE WAY YOU ARRIVED AT 92 PERCENT IN

12  TABLE 13 IS BY ADDING THE 25 PERCENT MISSPECIFIED

13  FORECLOSURES -- FORECLOSURES THAT YOU BELIEVE ARE

14  MISSPECIFIED; THE 50 PERCENT OF PREEXISTING DEFAULTS

15  THAT YOU BELIEVED SHOULD HAVE BEEN EXCLUDED; AND THE

16  17 PERCENT OF UNRELATED REASONS FOR DEFAULT THAT YOU

17  BELIEVE SHOULD BE EXCLUDED; CORRECT?

18     A    CORRECT.

19     Q    DID YOU DO ANY ANALYSIS TO DETERMINE WHETHER

20  OR NOT THESE BORROWER POPULATIONS OVERLAP?

21     A    WELL, TO THIS EXTENT, THE ONLY -- YES, AND

22  THEY DO NOT OVERLAP BECAUSE THE PREEXISTING DEFAULTS

23  THAT NEVER MADE ANOTHER PAYMENT WENT TO FORECLOSURE.

24  THE 25 PERCENT THAT WERE MISSPECIFIED AS FORECLOSURES

25  DID NOT GO TO FORECLOSURE -- A FORECLOSURE SALE AT

Page 197

1    LEAST WITHOUT AN INTERVENING MODIFICATION OR

2    REINSTATEMENT.  AND THE UNRELATED REASONS FOR DEFAULT

3    ALL OCCURRED AFTER THE DATE OF HARM, OR THE ALLEGED

4    DATE OF HARM, AND COULD NOT HAVE OVERLAPPED WITH EITHER

5    OF THE OTHER TWO CATEGORIES.  SO I DON'T BELIEVE

6    THERE'S ANY OVERLAP HERE.

7        Q    SO IT'S YOUR TESTIMONY THAT YOU BELIEVE THERE

8    WAS NO OVERLAP?

9        A    THAT IS MY TESTIMONY.

10            MR. DESAI, WHEN WE GET TO A GOOD POINT IN YOUR

11   OUTLINE THAT WE COULD TAKE A BRIEF BREAK --

12       Q    ABSOLUTELY.  WHY DON'T WE TAKE A BREAK NOW?

13            THE VIDEOGRAPHER:  GOING OFF THE RECORD AT

14   3:30 P.M.

15            (RECESS TAKEN.)

16            THE VIDEOGRAPHER:  GOING ON THE RECORD

17   3:51 P.M.

18   BY MR. DESAI:

19       Q    DR. HAMM, IN PARAGRAPH 355 OF YOUR REBUTTAL

20   REPORT, YOU OPINE THAT -- THIS IS PAGE 136.

21       A    YES.

22       Q    IN PARAGRAPH 355 YOU OPINE THAT "ACCORDING TO

23   PROFESSOR MCFADDEN, ALL OF THE FACTORS THAT ARE THE

24   PRIMARY CAUSES OF DEFAULT AND FORECLOSURES ACCOUNT FOR

25   FEWER FORECLOSURES THAN ESCROW ANALYSIS DELAYS; IS THAT

1  CORRECT?

2      A    THAT'S WHAT I SAY.

3      Q    IS IT YOUR OPINION THAT PROFESSOR MCFADDEN'S

4  ECONOMETRIC MODEL PREDICTS THAT DELAYED ESCROW ANALYSES

5  POSE A HIGHER RISK TO CAUSING FORECLOSURE -- THE

6  INITIATION OF FORECLOSURES THAN ALL OTHER PRIMARY

7  CAUSES?

8      A    LET'S PUT IT THIS WAY... PROFESSOR MCFADDEN'S

9  OPINION IS THAT 51 PERCENT OF THE FORECLOSURES WOULD

10  NOT HAVE HAPPENED HAD IT NOT BEEN FOR THE LATE ESCROW

11  ANALYSIS.

12          SO THAT ONLY LEAVES 49 PERCENT OF THE

13  FORECLOSURES.

14      Q    WHAT'S THE BASIS FOR YOUR OPINION?

15      A    WELL, BECAUSE HE -- HE SAYS THAT 16,636

16  FORECLOSURES WERE CAUSED BY THE LATE ESCROW ANALYSIS.

17  THAT'S 51 PERCENT OF THE TOTAL.  SO THAT'S THE CAUSAL

18  FACTOR FOR 51 PERCENT.  THAT LEAVES 49 PERCENT WHERE

19  THERE WAS A DIFFERENT CAUSAL FACTOR.

20      Q    AND LET'S MOVE ON TO PARAGRAPH 13 -- OR ONE --

21  SORRY -- 357 WHERE YOU DESCRIBE YOUR HUNDRED LOAN

22  SAMPLE.

23      A    YES.

24      Q    HOW DID YOU CHOOSE YOUR SAMPLE SIZE OF 100?

25      A    THERE IS A PROGRAM, AND I THINK WE'VE TURNED

Page 199

1    IT OVER TO YOU SO THAT YOU COULD REPLICATE IT.

2         IT'S A PROGRAM THAT IS USED TO SELECT LOANS AT

3    RANDOM TO MAKE UP A SAMPLE.  THAT'S HOW -- THAT'S HOW I

4    SELECTED THE SPECIFIC LOANS.

5         I SELECTED THE NUMBER 100, AS I EXPLAIN IN MY

6    REPORT, BASED ON THE AUDITING GUIDELINES THAT ALLOW YOU

7    TO DETERMINE THE MINIMUM SIZE OF THE SAMPLE.

8         IF YOU'RE EXPECTING NO DEVIATIONS FROM THE

9    EXPECTED RESULT -- IN THIS CASE MY EXPECTED RESULT IS

10   THAT ESCROW ANALYSES -- DELAYED ESCROW ANALYSES WOULD

11   CAUSE ZERO FORECLOSURES.

12        AND SO IF YOU LOOK UP IN THE TABLE, THE BOOK

13   THAT I CITE, PRINCIPLES OF AUDITING, IT'LL TELL YOU HOW

14   MANY LOANS YOU HAVE TO SAMPLE IN ORDER TO HAVE, I

15   THINK, A 5 PERCENT CONFIDENCE THAT IF YOU GET INDEED

16   ZERO DEVIATIONS, THAT THERE IS ONLY A 3 PERCENT

17   POSSIBILITY THAT THE VARIABLE YOU'RE TALKING ABOUT, IN

18   THIS CASE A LATE ESCROW ANALYSIS, COULD HAVE CAUSED A

19   FORECLOSURE.

20   Q    WHAT STATISTICAL POWER DID YOU CHOOSE TO

21   ASSESS YOUR SAMPLE?

22   A    WHAT STATISTICAL POWER?

23   Q    CORRECT.

24   A    I LOOKED IT UP IN A TABLE.  I SELECTED THE

25   EXPECTED DEVIATION RATE, ZERO.

Page 200

1            I SELECTED THE CONFIDENCE LEVEL THAT I WAS

2    SEEKING, AS I RECALL IT WAS 5 PERCENT, IT COULD HAVE

3    BEEN 3 PERCENT.

4            AND I JUST LOOKED IT UP IN A TABLE AND IT'LL

5    TELL YOU THIS IS HOW MANY LOANS YOU NEED TO SAMPLE IN

6    ORDER TO HAVE THAT DEGREE OF CONFIDENCE THAT THE LATE

7    ESCROW ANALYSES ARE NOT CAUSING ANY MATERIAL

8    FORECLOSURES.

9        Q    AND HOW DO YOU KNOW THAT 100 WAS AN

10   APPROPRIATE SAMPLE SIZE?

11       A    THAT'S WHAT THIS AUDITING TABLE TELLS YOU.  I

12   DIDN'T BUILD THE TABLE, BUT I'M TOLD -- AND I -- I'VE

13   USED THIS IN OTHER CASES.  I USED IT IN A CASE EARLIER

14   THIS YEAR -- OR LATE -- EARLIER LAST YEAR.

15           BUT IT'S A STANDARD REFERENCE FOR AUDITING A

16   SAMPLE OF LOANS TO DETERMINE IF THERE ARE ANY

17   DEVIATIONS FROM THE EXPECTED OUTCOME.  IF THERE ARE

18   DEVIATIONS, THEN YOU NEED TO GET A LARGER SAMPLE AND

19   YOU NEED TO DO MORE WORK.

20           BUT THE INITIAL TEST IS, I SAID I'M GOING TO

21   SAMPLE X LOANS AND I EXPECT THAT I WILL FIND NOT ONE

22   SINGLE LOAN IN THAT SAMPLE WILL -- CAN BE REASONABLY --

23   NOT ONE SINGLE LOAN IN THAT SAMPLE THAT IS A FORECLOSED

24   LOAN THAT CAN BE REASONABLY ATTRIBUTED TO A LATE ESCROW

25   ANALYSIS.  THAT WAS MY EXPECTATION.  IN AUDITING TERMS,

1  THAT WAS A ZERO DEVIATION FROM EXPECTATION.  AND THIS

2  TABLE SAID IF YOU WANT TO DO THAT, YOU WANT TO HAVE A

3  5 PERCENT CONFIDENCE LEVEL, YOU'VE GOT TO DO 99 LOANS.

4  I ROUNDED IT TO 100 TO MAKE THE PERCENTAGES EASIER.

5      Q    AND DID YOU ONLY DO ONE DRAW OF THE SAMPLE

6  SIZE OF 100?

7      A    I DON'T KNOW HOW THE STATISTICAL PROGRAM WORKS

8  THAT DREW THE LOANS.  I KNOW THAT YOU ENTER A RANDOM

9  NUMBER OF SOME SORT, AND BY PRESERVING THAT RANDOM

10  NUMBER, ANOTHER EXPERT CAN CONFIRM THAT THE LOANS WERE

11  DRAWN AT RANDOM.  AND IT'LL TELL YOU -- TELL YOU WHICH

12  LOANS THEY ARE.

13          BUT I'M NOT EXACTLY SURE HOW THIS PROGRAM

14  WORKS.  IT MAY DO TWO OR THREE ITERATIONS BEFORE IT

15  COMES UP TO 100, BUT I DON'T KNOW.

16      Q    AND DO YOU KNOW WHETHER OR NOT YOUR SAMPLE OF

17  100 WAS A SAMPLE WITH OR WITHOUT REPLACEMENT?

18      A    WITH OR WITHOUT REPLACEMENT?

19      Q    CORRECT.

20      A    AS I SIT HERE, I DON'T KNOW.  I'D HAVE TO GO

21  BACK AND TAKE A LOOK AT THE WORK PAPERS.

22      Q    AND THAT WOULD BE IDENTIFIED -- IF IT WAS A

23  SAMPLE WITH OR WITHOUT REPLACEMENT, IT WOULD BE

24  IDENTIFIED IN YOUR BACKUP MATERIALS?

25      A    I BELIEVE SO, YES.

Page 202

```
 1        Q     AND FOR THE HUNDRED LOANS FOR WHICH YOU DREW

 2   THE SAMPLE, DID YOU REVIEW ANY -- ANY CONSUMER

 3   COMPLAINTS ASSOCIATED WITH THESE HUNDRED LOANS?

 4        A     NO.

 5        Q     LET'S GO TO PARAGRAPH 373 OF YOUR EXPERT

 6   REPORT.

 7        A     I'M THERE.

 8        Q     AND YOU WRITE IN PARAGRAPH 373 THAT, "MOST

 9   BORROWER DEFAULTS OCCUR BECAUSE THE BORROWER IS UNABLE

10   TO AFFORD THE MONTHLY MORTGAGE PAYMENT AND DOES NOT

11   HAVE EQUITY IN THE MORTGAGED PROPERTY.  MOST OTHER

12   DEFAULTS OCCUR BECAUSE A BORROWER HAS DECIDED TO

13   STRATEGICALLY DEFAULT DUE TO NEGATIVE EQUITY IN THEIR

14   MORTGAGE PROPERTY."

15            AND YOU SUPPORT THESE OPINIONS WITH

16   FOOTNOTE 272; IS THAT CORRECT?

17        A     YES, BUT I THINK I PROBABLY COULD HAVE CITED A

18   COUPLE OF DOZEN SCHOLARLY STUDIES THAT WOULD SAY THAT

19   MOST DEFAULTS OCCUR BECAUSE THE BORROWER IS UNABLE TO

20   AFFORD THE MORTGAGE PAYMENT AND DOES NOT HAVE EQUITY IN

21   THE MORTGAGE PROPERTY.

22            IN FACT, ONE OF THE SCHOLARLY ARTICLES THAT

23   PROFESSOR MCFADDEN PUT FORWARD IN HIS SURREBUTTAL

24   REPORT GOES SO FAR AS TO SAY NEGATIVE EQUITY IS A

25   NECESSARY CONDITION FOR FORECLOSURE BUT NOT A
```

Page 203

1    SUFFICIENT CONDITION.

2              I'M NOT SURE I WOULD GO QUITE THAT FAR.

3              BUT IN ANY EVENT, I THINK THIS IS GENERALLY

4    BELIEVED TO BE TRUE BY PEOPLE WHO HAVE STUDIED THE

5    DEFAULT PROCESS CERTAINLY BELIEVED TO BE TRUE BY PEOPLE

6    IN THE MORTGAGE BUSINESS OR LOAN SERVICING BUSINESS

7    LIKE I WAS.

8       Q    FOR THE TWO STUDIES YOU CITE IN FOOTNOTE 272,

9    DID YOU PERFORM ANY REVIEW FOR WHETHER MORE RECENT

10   VERSIONS OF THOSE STUDIES WERE AVAILABLE?

11      A    I DID NOT.

12      Q    DO YOU KNOW IF MORE RECENT VERSIONS ARE, IN

13   FACT, AVAILABLE?

14      A    OH, I THINK THERE'S ALWAYS ADDITIONAL

15   INFORMATION OR ADDITIONAL STUDIES BEING ADDED TO THE

16   LITERATURE.

17      Q    AND HOW DO YOU DEFINE "NEGATIVE EQUITY" AS

18   YOU'RE USING THIS TERM?

19      A    THAT THE BORROWER OWES MORE TO THE INVESTOR

20   THAN THE VALUE OF THE BORROWER'S PROPERTY.

21      Q    AND WHEN YOU SEE --

22      A    THE FAIR MARKET VALUE.

23      Q    AND IN PARAGRAPH 370 -- STRIKE THAT.

24              AND ARE YOU AWARE OF ANY RECENT STUDIES THAT

25   ANALYZED STRATEGIC DEFAULTS SINCE THE 2014 TO 2019 TIME

Page 204

1  PERIOD?

2      A    OH, I THINK THERE HAVE BEEN SOME.  I COULDN'T

3  TELL YOU ABOUT THEM AS I SIT HERE.

4      Q    DO YOU KNOW IF ANY OF THOSE HAVE DIFFERENT

5  FINDINGS THAN THOSE THAT YOU REPORT HERE?

6      A    I WOULDN'T BE AT ALL SURPRISED IF THE

7  INCIDENCES OF STRATEGIC DEFAULTS HAS COME DOWN.  I

8  WOULD EXPECT IT TO COME DOWN AS WE RECOVER FROM THE

9  COLLAPSE OF HOME VALUES DURING THE GREAT RECESSION.

10         BUT I'M SURE ANY STUDY CONDUCTED EVEN AS

11  RECENTLY AS YESTERDAY WOULD FIND THAT THERE ARE STILL

12  BORROWERS WHO ARE SMART ENOUGH TO UNDERSTAND THAT IT IS

13  NOT IN THEIR ECONOMIC INTEREST TO CONTINUE TO PAY THE

14  MORTGAGE, EVEN IF THEY'RE CAPABLE OF IT, WHEN THE VALUE

15  OF THEIR PROPERTY IS 25 PERCENT LESS THAN THE AMOUNT

16  THEY OWE.

17         IN OTHER WORDS, THE INCIDENCE OF STRATEGIC

18  DEFAULT MAY HAVE DROPPED AS HOME PRICES RECOVERED, BUT

19  IT HASN'T GONE AWAY.

20     Q    AND PLEASE NOW TURN TO PARAGRAPH 379.

21     A    379?

22     Q    CORRECT.

23     A    I'M THERE.

24     Q    AND YOU WRITE IN PARAGRAPH 379 THAT FOR 14,469

25  OF LOANS IN THE RELEVANT POPULATION, YOU WRITE "THAT

Page 205

1    OCWEN PRODUCED ESTIMATED LOAN-TO-VALUE RATIOS BASED

2    PREDOMINANTLY ON AN EXTERIOR INSPECTION VALUATIONS

3    OBTAINED WHILE THE LOAN WAS IN DEFAULT"; IS THAT

4    CORRECT?

5         A    YES, IT'S WHAT I SAY.

6         Q    AND WHAT DO YOU MEAN BY "PREDOMINANTLY"?

7         A    THAT TYPICALLY THESE DAYS WHAT LOAN SERVICERS

8    DO WHEN A LOAN GOES INTO DEFAULT, ONE OF THE FIRST

9    THINGS THEY DO IS ORDER A VALUATION OF THAT LOAN.

10             AND THERE ARE SEVERAL DIFFERENT WAYS -- WELL,

11   THERE ARE A NUMBER OF DIFFERENT WAYS YOU CAN DO IT

12   RANGING IN COST FROM A BROKER OR PRICE OPINION ALL THE

13   WAY UP TO A FULL-FLEDGED APPRAISAL.  APPRAISALS ARE

14   MORE THOROUGH, THEY'RE MORE COMPLETE, THEY NARROW THE

15   RANGE OF VALUE, BUT THEY'RE MUCH MORE EXPENSIVE.

16             BROKER PRICE OPINION IS RELATIVELY INEXPENSIVE

17   BUT IT HAS A MUCH WIDER RANGE OF UNCERTAINTY BECAUSE

18   THE BROKER SIMPLY LOOKS AT THE HOUSE FROM THE OUTSIDE,

19   TAKES A LOOK AT WHAT PROPERTY IN THE NEIGHBORHOOD OF

20   SIMILAR QUALITY AND FEATURES IS GOING FOR, SOLD FOR,

21   AND THEN OFFERS AN OPINION ON WHAT THIS PROPERTY WOULD

22   SELL FOR.  BUT HE OR SHE HAS NO IDEA WHAT THE CONDITION

23   OF THE PROPERTY IS INSIDE, WHETHER THERE ARE ANY LATENT

24   DEFECTS THAT HE CAN'T SPOT FROM OUTSIDE, WHETHER THE

25   WALLS ARE ALL CHEWED UP, WHETHER IT'S INFESTED WITH

Page 206

1   VERMIN OR ANYTHING ELSE.  HE JUST KNOWS THIS IS WHAT IT

2   LOOKS LIKE ON THE OUTSIDE, THE LAWN'S BEING MOWED OR IT

3   ISN'T BE MOWED, AND OFFERS HIS OPINION ON VALUE.

4          AND THAT'S -- THE BROKER PRICE OPINION IS, I

5   THINK, THE DOMINANT WAY OF VALUING.

6          ANOTHER METHOD IS HYBRID VALUATION THAT WILL

7   MAKE USE OF AN AUTOMATED VALUATION MODEL WHERE NOBODY

8   WOULD EVEN LOOK AT THE PROPERTY AND MAKE AN ASSUMPTION

9   THAT THIS PROPERTY IS SIMILAR IN CONDITION TO OTHER

10  PROPERTIES THAT HAVE RECENTLY SOLD.  AND WE USE A

11  PROPRIETARY ALGORITHM TO PUT A VALUE ON THE PROPERTY

12  WITHIN A RANGE, PLUS OR MINUS.  THAT'S WHAT I MEAN BY

13  "PREDOMINANTLY EXTERIOR INSPECTION VALUATION."

14      Q    AND YOU JUST SAID THE BROKER PRICE OPINION IS

15  A DOMINANT WAY OF VALUATING.  DOMINANT BY WHOM?

16      A    LOAN SERVICERS BECAUSE IT'S RELATIVELY

17  INEXPENSIVE AND IT PRODUCES SUFFICIENT -- A SUFFICIENT

18  OPINION ON VALUE TO SUPPORT WHAT THE LOAN SERVICER HAS

19  TO DO, WHICH IS TO DECIDE WHAT KIND OF LOSS MITIGATION

20  IS MOST IMPORTANT HERE AND PERHAPS EVEN TO ADVISE THE

21  BORROWER ON WHAT THE BEST COURSE OF ACTION FOR A

22  BORROWER IS.

23          A LOAN SERVICER, FOR EXAMPLE, IF IT BELIEVED

24  THE PROPERTY WAS WORTH MORE THAN THE LOAN -- THAN THE

25  OUTSTANDING BALANCE AND -- BUT THE BORROWER COULDN'T

Page 207

1    AFFORD IT, A LOAN SERVICER MIGHT SAY YOU'RE MUCH BETTER

2    OFF SELLING THE PROPERTY, POCKETING THE EQUITY, AND NOT

3    CONTINUING TO -- NOT CONTINUE TO ALLOW THE VALUE TO GO

4    DOWN AND HAVE THE LOAN END UP IN FORECLOSURE WHERE BY

5    THAT TIME THE DEPRECIATION WILL HAVE USED UP ALL OF THE

6    EQUITY.

7         Q    DID YOU COMPARE THE DATE THE VALUATION WAS

8    CAPTURED BY OCWEN TO THE DATE OF THE FORECLOSURE SALE?

9         A    I THINK THAT INFORMATION IS -- ACTUALLY YOU

10   NEED A DIFFERENT LOG OR DATASET IN ORDER TO GET THAT

11   DATE.  YOU CAN INFER IT BY WHEN THE CHARGE HITS THE

12   BORROWER'S ACCOUNT FOR THE VALUATION, BUT IT'S NOT

13   PRECISE.

14         OCWEN DOES TRACK THAT DATE, BUT I DON'T

15   BELIEVE THAT WAS PART OF THE PRODUCTION, AT LEAST I

16   HAVEN'T SEEN IT.

17         Q    SO IS IT FAIR TO SAY THEN THAT YOU DID NOT DO

18   ANY ADJUSTMENT TO THE VALUATIONS THAT YOU UTILIZED FOR

19   PURPOSES OF YOUR EXPERT REPORT?

20         MS. ROSE-SMITH:  OBJECTION.

21         THE WITNESS:  WELL, IT WASN'T NECESSARY

22   BECAUSE YOU -- YOU HAVE THE ACTUAL DATA ON WHAT THE

23   PROPERTY IS WORTH.  YOU GET THAT FROM THE PYF ENTRY IN

24   THE FINANCIAL HISTORY.  SO YOU KNOW WHAT IT FETCHED ON

25   THE MARKET.  OF COURSE THAT'S NET OF ANY BROKER FEES OR

Page 208

1   ESCROW FEES, BUT YOU CAN CERTAINLY DETERMINE --

2   DETERMINE THAT.

3          BUT I DIDN'T DO -- I USED THE BEST AVAILABLE

4   INFORMATION AND DIDN'T TRY TO IMPROVE UPON IT.

5   BY MR. DESAI:

6      Q    DO YOU KNOW IF BORROWERS WHO HAVE EQUITY

7   ATTEMPT TO AVOID FORECLOSURE BY WORKING WITH OCWEN?

8      A    YES, THEY DO.

9      Q    AND WHAT'S THE BASIS FOR YOUR KNOWLEDGE?

10     A    WELL, OCWEN IS A LEADER IN LOSS MITIGATION.

11  EVERYTHING I KNOW ABOUT OCWEN IS IT'S -- IT DOES MORE

12  MODS THAN ANY OTHER MAJOR LOAN SERVICER.

13         THIS ACCORDING TO U.S. TREASURY DEPARTMENT

14  BASED ON ITS EXPERIENCE IN HAMP.

15         I MEAN, OCWEN GETS THE FUNDAMENTAL LOGIC OF

16  LOAN SERVICING AND THAT IS YOU HAVE ESSENTIALLY ONE

17  EARNING ASSET AND THAT'S THE SERVICING RIGHTS ON THE

18  LOAN IN YOUR PORTFOLIO.  AND YOUR BEST BET IS ALWAYS TO

19  TRY TO KEEP THAT LOAN ON THE BOOKS AS LONG AS YOU CAN

20  AND TO PRESERVE THE MAXIMUM VALUE SO THAT YOUR

21  INVESTOR, WHO YOU'RE DUTY BOUND TO SERVE, DOESN'T TAKE

22  A LOSS.

23         SO YES, OCWEN, I KNOW JUST FROM WORKING --

24  REVIEWING OCWEN DOCUMENTS AND IN MY FAMILIARITY WITH

25  OCWEN IS, YES, THEY WILL WORK WITH A BORROWER TO TRY TO

Page 209

1  MINIMIZE THE BORROWER -- MINIMIZE THE INVESTOR'S LOSS

2  WHEN THEY HAVE A PROPERTY THAT IS WORTH LESS THAN THE

3  AMOUNT THAT IS OWED.  OR EVEN IF IT'S WORTH MORE THAN

4  THE AMOUNT THAT IS OWED BUT THE BORROWER CAN'T AFFORD

5  TO MAKE THE PAYMENTS.

6        I THINK THIS IS GENERALLY TRUE IN THE

7  SERVICING INDUSTRY TODAY.  IT'S MUCH DIFFERENT THAN

8  WHEN I WAS IN THE INDUSTRY.  BUT OCWEN IS, I THINK,

9  REGARDED BY PRETTY MUCH EVERYBODY AS A LEADER IN LOSS

10  MITIGATION STRATEGIES.

11   Q    DR. HAMM, YOU JUST SAID WHEN YOU WERE LAST IN

12  THE MORTGAGE SERVICING INDUSTRY.

13        WHEN DID YOU EXIT THE MORTGAGE SERVICING

14  INDUSTRY?

15   A    WELL, I WAS IN CHARGE OF LOAN SERVICE FROM

16  1988 TO 1991 I THINK AT WORLD SAVINGS AND THEN I WAS

17  INVOLVED IN LOAN SERVICING AT THE FEDERAL HOME LOAN

18  BANK THROUGH 1995.

19        BUT IN TERMS OF MY ACTIVE PARTICIPATION IN THE

20  MARKET, THAT ENDED IN 1995.

21        BUT, OF COURSE, AS AN ECONOMIC CONSULTANT IN

22  THE MORTGAGE AND MORTGAGE SERVICING AREA, I'VE KEPT

23  MY -- MAINTAINED MY KNOWLEDGE AND CONTINUED TO LEARN

24  ABOUT DEVELOPMENTS IN THE MORTGAGE BUSINESS.  AND

25  THAT'S WHY I SAY THAT MODIFICATIONS ARE MUCH MORE

Page 210

1    COMMON TODAY THAN THEY WERE WHEN I WAS A LOAN SERVICE

2    MANAGER.

3        Q    DR. HAMM, IS IT YOUR OPINION THAT AN EXTERIOR

4    INSPECTION VALUATION IS THE SAME AS A FAIR MARKET VALUE

5    FOR THE BORROWERS?

6            MS. ROSE-SMITH:  OBJECTION.

7            THE WITNESS:  IT IS AN ESTIMATE OF THE FAIR

8    MARKET VALUE IN THAT IT IS THE BROKER'S OPINION AS TO

9    WHAT THAT HOUSE COULD SELL FOR IF IT WAS PLACED ON THE

10   MARKET FOR A REASONABLE PERIOD OF TIME.  SO IT'S AN

11   ESTIMATE OF WHAT THAT IS.

12           BUT THE ONLY WAY TO KNOW WHAT THE FAIR MARKET

13   VALUE OF A PROPERTY IS, IS TO PUT IT UP FOR SALE AND

14   SEE WHAT YOU CAN SELL IT FOR.

15   BY MR. DESAI:

16       Q    DR. HAMM, YOU KEEP USING THE TERM "BROKER."

17           WHAT IS YOUR UNDERSTANDING OF WHO IT IS THAT

18   PERFORMS THIS EXTERIOR INSPECTION OF PROPERTIES?

19       A    WELL, IN -- WHEN I'M TALKING ABOUT BPOS, IT IS

20   A LICENSED REAL ESTATE BROKER.  THERE ARE ALSO EXTERNAL

21   VISUAL APPRAISALS CONDUCTED BY LICENSED APPRAISERS.

22   THOSE, I THINK, ARE A LITTLE BIT MORE EXPENSIVE THAN

23   BPOS, AND THAT'S WHY BPOS I THINK ARE USED MORE

24   COMMONLY.

25       Q    DO YOU KNOW IF OTHER DATA SOURCES EXIST TO

Page 211

1    DETERMINE THE FAIR MARKET VALUE FOR THESE OCWEN

2    BORROWER HOMES?

3        A    NO, I DON'T KNOW OF ANOTHER SOURCE OTHER THAN

4    THE BROKER'S ESTIMATE OR THE LICENSED APPRAISER'S

5    ESTIMATE BASED ON AN EXTERNAL VISUAL APPRAISAL OR AN

6    AUTOMATED VALUATION MACHINE ESTIMATE -- OR AUTOMATED

7    VALUATION MODEL, ESTIMATE OF THE FAIR MARKET VALUE.  I

8    DON'T KNOW OF ANOTHER SOURCE.

9        Q    DOES ZILLOW.COM HAVE AN AUTOMATED VALUATION

10   MODEL?

11       A    WELL, THEY HAVE WHAT'S CALLED A ZESTIMATE.

12   I'M VERY FAMILIAR WITH THE ZESTIMATE.

13            YES, THEY DO HAVE THAT.  I THINK THAT -- I

14   THINK THEY WILL TELL YOU, BECAUSE THEY'VE TOLD ME, THAT

15   IT IS NOT A SUBSTITUTE FOR AN APPRAISAL.  IT'S BASED ON

16   CERTAIN INFORMATION.  AND IN CALIFORNIA THAT

17   INFORMATION IS UNRELIABLE.  IT'S DISTORTED BY

18   PROPOSITION 13, AND I'VE TRIED FOR SEVERAL YEARS NOW TO

19   GET THEM TO ALTER THEIR ALGORITHM TO TAKE INTO ACCOUNT

20   THE DEFECT IN IT, BUT THEY HAVE A MODEL.  BUT I DON'T

21   THINK THEY WOULD TRY TO CONVINCE YOU IT WAS EQUIVALENT

22   TO AN APPRAISAL OF A FAIR MARKET VALUE.

23       Q    MY QUESTION IS MUCH SIMPLER.

24            DOES ZILLOW.COM HAVE AN ESTIMATE OF FAIR

25   MARKET VALUES OF HOMES?

Page 212

1      A    THEY GIVE YOU A RANGE OF WHICH THEY THINK THE

2  HOME WILL SELL.  THEY GIVE YOU SOMETHING THAT IS A

3  ZESTIMATE, BUT AS I'VE EXPLAINED, THEY DON'T CONSIDER

4  THAT THE EQUIVALENT OF AN APPRAISAL.  SO -- AND I

5  CERTAINLY DON'T EITHER.

6      Q    AND IS YOUR UNDERSTANDING OF ZILLOW'S

7  EVALUATION OF ITS ZESTIMATE PUBLISHED ANYWHERE?

8      A    IT'S AVAILABLE ONLINE FOR JUST ABOUT EVERY

9  PROPERTY THAT THEY HAVE INFORMATION ON.

10     Q    MY QUESTION WAS YOUR RECOLLECTION OF WHAT YOU

11 BELIEVE ZILLOW ITSELF WOULD SAY ABOUT ITS -- THE

12 RELIABILITY OF ITS ZESTIMATE, IS THAT PUBLISHED

13 ANYWHERE?

14     A    I'M SURE IT IS.  I'M SURE THAT IF YOU EXPLORE

15 THEIR WEBSITE, YOU WILL FIND A PAGE THAT DESCRIBES WHAT

16 THE ZESTIMATE IS, HOW THEY PUT IT TOGETHER.  I DON'T

17 THINK THEY WERE GIVING ME ANY PROPRIETARY INFORMATION.

18 I WAS TRYING TO HELP THEM, AND THAT'S WHAT -- HAD

19 NOTHING TO DO WITH THIS CASE.  I WAS TRYING TO HELP

20 THEM CLEAN UP THEIR ALGORITHM, AND IN THE COURSE OF IT

21 THEY EXPLAINED TO ME HOW THEY GO ABOUT MAKING AN

22 ESTIMATE.

23     Q    AND YOU USED ZILLOW.COM IN PARAGRAPH 377; IS

24 THAT CORRECT?

25     A    I DON'T KNOW.

Page 213

1     Q     SPECIFICALLY IN FOOTNOTE 276.

2           IN YOUR -- LET ME COMPLETE THE STATEMENT.

3           YOU USED ZILLOW.COM TO GET THE PURCHASE PRICE

4  FOR A HOME; CORRECT?

5     A     UMM...

6           MS. ROSE-SMITH:  WHICH FOOTNOTE DID YOU SAY?

7           MR. DESAI:  276.

8           THE WITNESS:  276.  YES, THAT INFORMATION CAME

9  FROM ZILLOW.COM.

10  BY MR. DESAI:

11     Q     ARE YOU FAMILIAR WITH CORELOGIC?

12     A     YES.

13     Q     DOES CORELOGIC ALSO MAINTAIN DATA ON THE FAIR

14  MARKET VALUE OF HOMES?

15     A     I BELIEVE SO, YES.

16     Q     YOU DID NOT USE THE CORELOGIC FAIR MARKET

17  ESTIMATE IN YOUR ANALYSIS IN PARAGRAPH 379; IS THAT

18  CORRECT?

19     A     NO, WASN'T NECESSARY.  I DIDN'T.

20     Q     YOU ONLY RELIED ON THE -- STRIKE THAT.

21           DO YOU KNOW WHAT OCWEN DOES TO DETERMINE THE

22  FAIR MARKET VALUE OF A PROPERTY FOR PURPOSES OF

23  CONSTRUCTING A FORECLOSURE BID AT A FORECLOSURE

24  AUCTION?

25     A     WHAT THEY DO IS THEY BID THE AMOUNT THAT IS

1    OWED THEM, AND IF SOMEONE OUTBIDS THEM, IN OTHER WORDS

2    MAKES THEIR INVESTOR WHOLE, MAKES THEM WHOLE, THEY'RE

3    DELIGHTED.

4         TYPICALLY OR FREQUENTLY WHAT HAPPENS IS NOBODY

5    WILL OUTBID THEM AND THEN THE PROPERTY IS OWNED BY THE

6    SERVICER IN THE NAME OF THE INVESTOR AND IS CONSIDERED

7    REAL ESTATE OWNED.

8         BUT THE BID IS SET AT THE AMOUNT THAT IS DUE

9    ON THE LOAN.

10   Q    WHAT IF THE PAYOFF AMOUNT IS FAR BELOW MARKET

11   VALUE?  DO YOU KNOW WHAT OCWEN DOES?

12   A    IF THE PAYOFF -- I DON'T UNDERSTAND --

13        MS. ROSE-SMITH:  OBJECTION.

14        THE WITNESS:  I DON'T UNDERSTAND YOUR

15   QUESTION.

16   BY MR. DESAI:

17   Q    WHAT IF THE BORROWER OWES AN AMOUNT THAT IS

18   FAR LESS THAN THE FAIR MARKET VALUE?  HOW DOES OCWEN

19   MAKE THAT DETERMINATION?

20   A    AS I SAID, THEY HAVE A BROKER PRICE OPINION OF

21   WHAT THE FAIR MARKET VALUE IS.  AND IF THERE IS A

22   SIGNIFICANT DISCREPANCY IN THE BORROWER'S FAVOR -- IN

23   OTHER WORDS, IF THE -- THE AMOUNT OWED ON THE LOAN IS

24   SIGNIFICANTLY LESS THAN THE BROKER PRICE OPINION OF

25   WHAT THE LOAN -- WHAT THAT PROPERTY IS WORTH ON THE

Page 215

1   MARKET, IT WILL GENERALLY -- I'M NOT SURE EXACTLY WHAT

2   OCWEN WOULD DO.  I KNOW WHAT WE DID AT WORLD SAVINGS.

3           WE WOULD TELL THE BORROWER THAT IF THEY CAN'T

4   AFFORD TO CONTINUE MAKING THE PAYMENTS ON THE LOAN,

5   THEY'RE BETTER OFF SELLING THE PROPERTY AND MOVING INTO

6   SOMETHING THEY CAN AFFORD BECAUSE THAT WAY THEY'LL COME

7   OUT WITH THE EQUITY AS OPPOSED TO SIMPLY LETTING THE

8   PROPERTY DETERIORATE AND ENDING UP WITH LESS.

9           IF I UNDERSTOOD YOUR QUESTION, THAT'S MY

10  RESPONSE.

11      Q   DO YOU KNOW IF THAT IS WHAT OCWEN WOULD TELL

12  BORROWERS, BY THAT I MEAN YOU MENTIONING YOUR PREVIOUS

13  ANSWER THAT WE WOULD TELL BORROWERS THAT IF THEY CAN'T

14  CONTINUE MAKING PAYMENTS ON THE LOAN, THEY'RE BETTER

15  OFF SELLING THE PROPERTY AND MOVING INTO SOMETHING THEY

16  CAN AFFORD BECAUSE THAT WAY THEY'LL COME OUT WITH THE

17  EQUITY AS OPPOSED TO SIMPLY LETTING THE PROPERTY

18  DETERIORATE AND ENDING UP WITH LESS?

19          MS. ROSE-SMITH:  OBJECTION.

20          THE WITNESS:  WHAT OCWEN AND ALL LOAN

21  SERVICERS WILL DO, IS, HERE ARE YOUR OPTIONS:  YOU

22  CAN -- YOU CAN BRING THE LOAN CURRENT.  THAT'S WHAT WE

23  HOPE YOU WILL DO.  AND THEN CONTINUE TO MEET -- MAKE

24  GOOD ON THE PROMISES YOU MADE WHEN YOU GOT THE LOAN.

25          IF YOU QUALIFY -- IF YOU CAN'T AFFORD YOUR

Page 216

1    CURRENT LOAN AND YOU QUALIFY, WE WILL BE HAPPY TO

2    DISCUSS A MODIFICATION OF THE TERMS AND TRY TO REVISE

3    THEM SO THAT YOU CAN AFFORD THE LOAN.

4            IF THAT'S NOT GOING TO WORK, YOU CAN SELL THE

5    PROPERTY ON YOUR OWN FOR WHATEVER YOU GET FOR IT, AND

6    WE WILL RELEASE YOU FROM THE DEBT.

7            ONE OF THE OTHER OPTIONS THEY DISCUSS, THEY

8    HAVE VARIOUS MODIFICATION PROGRAMS.  THEY MAY DISCUSS

9    THOSE INDIVIDUALLY OR COLLECTIVELY, BUT THEY GIVE THE

10   BORROWER WHAT THE BORROWER'S OPTIONS ARE AND WORK WITH

11   THE BORROWER TO HELP THE BORROWER MAKE A GOOD DECISION.

12   BY MR. DESAI:

13       Q    DR. HAMM, ARE YOU FAMILIAR WITH THE DETERMINE

14   GSC?

15       A    YES.

16       Q    DO YOU KNOW IF THE GSC LET OCWEN USE THE BPO

17   AS THE BASIS TO CONSTRUCT A FORECLOSURE BID?

18            MS. ROSE-SMITH:  OBJECTION.

19            THE WITNESS:  I DON'T KNOW ONE WAY OR THE

20   OTHER.

21            BY GSC, I ASSUME YOU'RE REFERRING TO FANNIE

22   MAE AND FREDDIE MAC.

23   BY MR. DESAI:

24       Q    THAT'S CORRECT.

25            IS IT YOUR OPINION THAT ALL BORROWER -- ALL

Page 217

1   OCWEN BORROWERS WHO HAVE A FORECLOSURE INITIATED BELONG

2   IN ONE OF THE TWO POPULATIONS WHICH YOU DESCRIBED IN

3   PARAGRAPH 373, THE FIRST PARAGRAPH BEING THEY CAN'T

4   AFFORD THEIR MONTHLY MORTGAGE AND HAVE NEGATIVE EQUITY,

5   AND THE SECOND POPULATION BEING THEY STRATEGICALLY

6   DEFAULT?

7            MS. ROSE-SMITH:  OBJECTION.

8            THE WITNESS:  I THINK THE OVERWHELMING

9   PERCENTAGE OF BORROWERS FALL INTO THOSE CATEGORIES AND

10  THAT IS INDEED THE CONCLUSION REACHED BY THE SCHOLARLY

11  LITERATURE, IS THERE SOME -- SOMEONE WHO CAN AFFORD TO

12  PAY THE MORTGAGE AND HAS POSITIVE EQUITY BUT DECIDES

13  NOT TO DO IT FOR WHATEVER REASON AND WOULD PREFER TO

14  DEFAULT RATHER THAN DO SOMETHING ELSE.  IN A SAMPLE

15  SIZE THIS BIG, THERE MIGHT BE AN OUTLIER LIKE THAT.

16           BUT I THINK IF YOU REVIEW THE SCHOLARLY

17  LITERATURE, YOU WILL FIND THAT THE SECOND SENTENCE OR

18  THIRD SENTENCE IN -- THE THIRD AND FOURTH SENTENCES IN

19  PARAGRAPH 373 CAPTURE THE OVERWHELMING MAJORITY OF

20  BORROWERS WHO ARE -- GO INTO FORECLOSURE.

21  BY MR. DESAI:

22      Q    AND WHAT PERCENTAGE OF OCWEN BORROWERS WHO HAD

23  A FORECLOSURE INITIATED FIT INTO YOUR FIRST POPULATION,

24  CANNOT AFFORD THEIR MORTGAGE AND HAVE NEGATIVE EQUITY?

25           MS. ROSE-SMITH:  OBJECTION.

Page 218

1            THE WITNESS:  WELL, I HAVEN'T REVIEWED THE

2    INFORMATION AT THE TIME THAT THEY GO INTO FORECLOSURE.

3    WE KNOW WHAT THE PROCEEDS ARE FROM THE FORECLOSURE OR

4    THE PAYOFF, WHATEVER IT IS, BECAUSE WE HAVE THOSE PYF

5    AND PYC FIELDS AND RFP 22.

6            BUT, AGAIN, AS I SAY, PROFESSOR MCFADDEN CITES

7    A STUDY THAT CLAIMS NEGATIVE EQUITY IS A NECESSARY

8    CONDITION FOR FORECLOSURE.  AND FOR THE MOST PART

9    THAT'S TRUE.  I DON'T THINK IT'S NECESSARILY A NEGATIVE

10   REQUIREMENT -- OR A PREREQUISITE, BUT IT CERTAINLY IS

11   THE CASE IN MOST SITUATIONS.

12   BY MR. DESAI:

13     Q    OKAY.  DR. HAMM, DID YOU PERFORM AN ANALYSIS

14   TO ALLOCATE OCWEN-SPECIFIC BORROWERS INTO ONE OF THE

15   TWO POPULATIONS THAT YOU DESCRIBED?

16     A    NO.

17     Q    IS IT YOUR OPINION THAT NOT A SINGLE ONE OF

18   THE APPROXIMATELY 14,500 BORROWERS WHO HAD FORECLOSURES

19   SALE HAD LOST EQUITY?

20            MS. ROSE-SMITH:  OBJECTION.

21            THE WITNESS:  NO.

22   BY MR. DESAI:

23     Q    IN PARAGRAPH 375 YOU OPINE THAT THE 10 PERCENT

24   DECLINE IN REO -- REO-OWNED PROPERTY IS EXPERIENCED BY

25   THE INVESTOR, NOT THE BORROWER; IS THAT RIGHT?

Page 219

1      A    THAT'S RIGHT.

2      Q    FIRST, IN YOUR REPORT, YOU DO NOT DISPUTE THE

3   10 PERCENT DECLINE IN REO-OWNED PROPERTY VALUE IS

4   CORRECT; IS THAT RIGHT?

5           MS. ROSE-SMITH:  OBJECTION.

6           THE WITNESS:  WELL, I THINK IT'S AN

7   OVERSTATEMENT, BUT I DID NOT DISPUTE IT IN MY REPORT.

8   BY MR. DESAI:

9      Q    ARE YOU FAMILIAR WITH THE CONCEPT OF A

10  DEFICIENCY JUDGMENT?

11     A    YES.

12     Q    AND WHAT IS A DEFICIENCY JUDGMENT?

13     A    A DEFICIENCY JUDGMENT IS WHEN YOU GO TO COURT

14  AND SEEK A COURT ORDER TO RECOVER MONEY OWED BY, IN

15  THIS CASE, A BORROWER TO A LENDER.

16     Q    AND IF THE FORECLOSURE PROCEEDS ARE LESS THAN

17  THE TOTAL DEBT OWED, IS THAT KNOWN AS A DEFICIENCY?

18     A    YES.

19     Q    SO THE AMOUNT OF PROCEEDS RECEIVED AT A

20  FORECLOSURE SALE IS RELEVANT TO CALCULATING THE AMOUNT

21  OF THE DEFICIENCY; CORRECT?

22     A    YES.

23     Q    AND AT A FORECLOSURE SALE, IF THE FORECLOSURE

24  BID IS HIGHER THAN THE PAYOFF AMOUNT, WOULD THE

25  BORROWER RECEIVE THE SURPLUS FUNDS?

Page 220

```
 1      A    YES.

 2      Q    ARE BORROWERS LIABLE TO PAY DEFICIENCY

 3   JUDGMENTS?

 4      A    WHAT DO YOU MEAN "LIABLE"?

 5      Q    DO THEY HAVE AN OBLIGATION TO PAY THE

 6   DEFICIENCY JUDGMENT?

 7      A    IF A LENDER OR INVESTOR GOES TO COURT AND GETS

 8   SUCH A JUDGMENT, IF IT'S A LEGAL ORDER TO THE BORROWER

 9   TO PAY -- VERY RARELY HAPPENS, BUT IF IT DOES HAPPEN --

10   THEN UNDER THE LAW THE BORROWER WOULD BE OBLIGATED TO

11   PAY.

12           UNDOUBTEDLY IN THE VAST MAJORITY OF CASES

13   WOULD NOT HAVE THE RESOURCES TO PAY, WHICH IS WHY

14   DEFICIENCY JUDGMENTS ARE SO RARE.

15           BUT IN THEORY, YES, THEY WOULD HAVE A LEGAL

16   OBLIGATION.

17           IF AN INVESTOR DOES NOTHING TO SEEK ADDITIONAL

18   RESOURCES FROM THE BORROWER WHO HAS DEFAULTED AND WHERE

19   THE SALE OF THE COLLATERAL IS NOT SUFFICIENT TO PAY OFF

20   ALL OF THE AMOUNT OWED, THEN THE BORROWER IS NOT ON THE

21   HOOK.

22           IT'S OCWEN'S POLICY, AS I UNDERSTAND IT, NOT

23   TO SEEK ADDITIONAL RESOURCES FROM BORROWERS IN THE CASE

24   OF A DEFICIENCY.  CERTAINLY IN THE CASE OF SHORT SALES

25   AND DEED IN LIEU AND I BELIEVE IN THE CASE OF
```

Page 221

1    FORECLOSURE SALES AS WELL.

2        Q    IF AN INVESTOR OR LENDER GOES TO COURT AND

3    GETS A DEFICIENCY JUDGMENT, DOES A BORROWER HAVE AN

4    OBLIGATION TO PAY THAT DEFICIENCY JUDGMENT?

5        A    WELL, YOU'RE ASKING ME A LEGAL QUESTION.  I

6    CAN TELL YOU WHAT MY UNDERSTANDING IS, BUT I WOULD

7    DEFER TO SOMEONE WITH LEGAL TRAINING TO GIVE YOU A MORE

8    PRECISE ANSWER.

9            MY UNDERSTANDING, IF A COURT ORDERS SOMEONE TO

10   PAY, THAT BARRING FURTHER LEGAL ACTION, THEY HAVE AN

11   OBLIGATION TO PAY.  NOT NECESSARILY THE ABILITY TO PAY,

12   BUT THEY HAVE AN OBLIGATION TO PAY.

13           AND THEY CAN GO TO COURT AND GET THAT

14   JUDGMENT -- THEY CAN GET THAT JUDGMENT REVERSED --

15   SORRY.

16       Q    NO PROBLEM.

17       A    -- THEY CAN GET THAT JUDGMENT REVERSED AND IN

18   WHICH CASE THEY'RE OFF THE HOOK.  THAT'S MY

19   UNDERSTANDING OF HOW IT WORKS.

20       Q    HOW --

21       A    I'M NOT -- I'M NOT AS UP TO SPEED ON THIS AS I

22   MIGHT BE IF THIS WAS A COMMON PRACTICE IN LOAN

23   SERVICING, BUT IT IS A MOST UNCOMMON PRACTICE.

24       Q    DR. HAMM, WHAT IS -- ARE YOU FAMILIAR WITH

25   WHAT THE PROCESS IS BY WHICH A BORROWER GET THE

Page 222

1    DEFICIENCY JUDGMENT REVERSED, WHAT IT'S KNOWN AS?

2        A    NO.

3        Q    WHO OWNS THE RIGHT TO COLLECT ON A DEFICIENCY

4    JUDGMENT?

5            MS. ROSE-SMITH:  OBJECTION.

6            THE WITNESS:  WHOEVER FILED THE DEFICIENCY

7    JUDGMENT AND CONVINCED THE COURT TO GRANT IT.

8    BY MR. DESAI:

9        Q    IF AN INVESTOR OWNS A DEFICIENCY JUDGMENT, CAN

10   THEY DICTATE THE COLLECTION OF THAT JUDGMENT?

11       A    THEY CAN SEEK THE COLLECTION OF THAT JUDGMENT.

12       Q    DOES OCWEN OWN THE DEFICIENCY JUDGMENT?

13           MS. ROSE-SMITH:  OBJECTION.

14           THE WITNESS:  I BELIEVE THE INVESTOR OWNS THE

15   DEFICIENCY JUDGMENT.  IF THERE IS A DEFICIENCY

16   JUDGMENT, IT WILL NOT BE FILED BY OCWEN.  IT WILL NOT

17   BE FILED ON BEHALF OF OCWEN BECAUSE OCWEN'S POLICY, AS

18   I UNDERSTAND IT, IS NOT TO GO AFTER THE BORROWERS IN

19   THOSE CIRCUMSTANCES.

20           THE INVESTOR MAY CHOOSE TO DO SO, BUT OF

21   COURSE THE INVESTOR IS WELL AWARE OF THE FACT THAT THE

22   REASON THE BORROWER DEFAULTED IN THE FIRST PLACE IS

23   THEY DON'T HAVE RESOURCES TO AFFORD THE LOAN AND TO PAY

24   OFF THE MORTGAGE, AND AS A CONSEQUENCE, INVESTORS

25   KNOW -- IN FACT, I'VE HEARD INVESTORS SAY THIS, THAT

Page 223

1    IT'S NOT WORTH THE LEGAL EXPENSE IN ORDER TO TRY TO GET

2    MONEY FROM A BORROWER WHO HAS DEFAULTED ON THE

3    MORTGAGE, EXCEPT IN RARE CASES.

4    BY MR. DESAI:

5       Q    DR. HAMM, IF FANNIE MAE IS THE INVESTOR, CAN

6    THEY DECIDE TO COLLECT ON THE JUDGMENT?

7            MS. ROSE-SMITH:  OBJECTION.  I JUST NEED TO

8    SAY A LITTLE BIT MORE ABOUT THIS PARTICULAR OBJECTION.

9    THERE'S BEEN A LONG SERIES OF QUESTIONS THAT YOU'VE

10   ASKED WHERE YOU'RE ASKING WHAT ARE, IN MY OPINION,

11   LEGAL QUESTIONS ABOUT OWNERSHIP OF JUDGEMENTS AND

12   RIGHTS TO COLLECT ON JUDGMENTS.

13           I'M LETTING HIM ANSWER THE QUESTIONS TO THE

14   EXTENT THAT HE KNOWS, BUT I DO HAVE AN OBJECTION THAT

15   TO THE EXTENT THAT WHAT YOU'RE ASKING CALLS FOR A LEGAL

16   CONCLUSION.  HE'S JUST ANSWERING BASED ON HIS OWN

17   PERSONAL KNOWLEDGE.

18   BY MR. DESAI:

19      Q    GO AHEAD.  YOU CAN ANSWER THE QUESTION.

20      A    MY UNDERSTANDING IS THAT IF FANNIE MAE WAS THE

21   INVESTOR IN A LOAN, THE LOAN IS FORECLOSED, THE

22   PROPERTY IS SOLD, EITHER AT FORECLOSURE AUCTION OR AS

23   REO, THAT FANNIE MAE STILL HOLDS THE NOTE.  THEY CAN

24   STILL SEEK, IF THEY WISH, TO GET A JUDGMENT AGAINST THE

25   BORROWER TO MAKE GOOD ON THE AMOUNT OWED, BUT IT RARELY

Page 224

1    HAPPENS.

2         IF YOU TOOK A LOOK AT THE DATA ON CASH FLOWS

3    WITH RESPECT TO DEFAULTED MORTGAGES, YOU'LL SEE A TINY

4    AMOUNT FROM A BROAD CATEGORY OF OTHER REVENUE SOURCES

5    THAT INCLUDE BUT IS NOT LIMITED TO DEFICIENCY

6    JUDGMENTS.  IT JUST DOESN'T HAPPEN VERY OFTEN BECAUSE

7    THE ECONOMICS DON'T MAKE IT A SENSIBLE COURSE OF

8    ACTION.

9    Q    DR. HAMM, DO YOU HAVE ANY IDEA HOW LONG A

10   DEFICIENCY JUDGMENT CAN LAST?

11        MS. ROSE-SMITH:  SAME OBJECTION.

12        THE WITNESS:  NO.

13   BY MR. DESAI:

14   Q    YOU WRITE IN PARAGRAPH 393 THAT THE LEGAL AND

15   ADMINISTRATIVE FEES IDENTIFIED BY PROFESSOR MCFADDEN AS

16   ONE COMPONENT OF HIS DAMAGES ESTIMATE ARE ALMOST NEVER

17   PAID BY THE BORROWERS.  THEY'RE PAID BY INVESTORS.

18        DID I READ THAT CORRECTLY?

19   A    YES.

20   Q    AND WHAT IS YOUR BASIS FOR YOUR OPINION THAT

21   BORROWERS ALMOST NEVER PAY THE LEGAL ADMINISTRATIVE

22   FEES IDENTIFIED BY PROFESSOR MCFADDEN?

23   A    MY EXPERIENCE IN THE INDUSTRY.  MY REVIEW OF

24   OCWEN DATA FOR MANY LOANS.  THE ANALYSES THAT I DID IN

25   CONNECTION WITH THIS CASE THAT SHOWS THE AMOUNT OF THE

Page 225

1    INVESTORS' LOSS ON SUCH LOANS.

2        Q    DR. HAMM, IF A BORROWER WANTS TO REINSTATE

3    THEIR LOAN, DO THEY HAVE TO PAY THE FORECLOSURE-RELATED

4    LEGAL ADMINISTRATIVE FEES?

5            MS. ROSE-SMITH:  OBJECTION.

6            THE WITNESS:  GENERALLY NO.

7    BY MR. DESAI:

8        Q    AND WHAT'S THE BASIS FOR YOUR UNDERSTANDING?

9        A    THAT'S MY UNDERSTANDING OF WHAT IT SAYS IN

10   OCWEN'S REINSTATEMENT LETTERS.  THEY NEED TO BRING THE

11   LOAN CURRENT WITH RESPECT TO PRINCIPAL AND INTEREST AND

12   ESCROW, BUT THE FEES CAN SIT THERE AND BE PAID OFF AT

13   THE TIME THE LOAN IS ULTIMATELY PAID OFF.

14           THAT'S MY UNDERSTANDING OF WHAT IT SAYS.  I'VE

15   REVIEWED A NUMBER OF LETTERS THAT -- AND THAT'S MY

16   INTERPRETATION OF WHAT THEY'RE TELLING THE BORROWER.

17       Q    IF A BORROWER WANTS TO PAY OFF THEIR LOAN, DO

18   THEY HAVE TO PAY THE FORECLOSURE-RELATED ADMINISTRATIVE

19   FEES?

20       A    YES.

21       Q    AND A DEFICIENCY JUDGMENT, IS IT YOUR

22   UNDERSTANDING THAT IT WOULD INCLUDE THE

23   FORECLOSURE-RELATED LEGAL ADMINISTRATIVE FEES?

24       A    AGAIN, I'M SURE THAT PRACTICES VARY AMONGST

25   THE STATES THAT PERMIT DEFICIENCY JUDGMENT.  NOT ALL

Page 226

1    STATES PERMIT DEFICIENCY JUDGMENTS AGAINST THE

2    BORROWER.  I KNOW IN CALIFORNIA IT'S VERY, VERY LIMITED

3    WHAT YOU CAN GO AFTER THE BORROWER FOR.  SO I'M SURE

4    THAT THERE'S NO SINGLE ANSWER TO YOUR QUESTION.

5            BUT I'M SURE SOME STATES WOULD PERMIT A

6    INVESTOR TO SEEK TO -- TO SEEK TO RECOVER ANYTHING THAT

7    THE INVESTOR IS OWED FROM THE BORROWER.  AS I SAID,

8    THIS IS KIND OF ACADEMIC BECAUSE IT JUST DOESN'T HAPPEN

9    WITH ANY KIND OF FREQUENCY.

10   Q    DID YOU REVIEW ANY REINSTATEMENT LETTERS FOR

11   BORROWERS IN THIS CASE?

12   A    NO.

13   Q    IF A BORROWER OBTAINED A LOAN MODIFICATION, DO

14   YOU KNOW WHETHER OR NOT FORECLOSURE FEES ARE EVER

15   CAPITALIZED INTO THE PRINCIPAL ON THE LOAN MOD?

16   A    ARE THEY EVER CAPITALIZED?

17   Q    CORRECT.

18   A    I'M SURE THAT IN SOME CASES THEY ARE.

19   PROBABLY A MAJORITY OF THE CASES THEY ARE NOT, BUT I'M

20   SURE THAT YOU CAN FIND ONE OR MORE SITUATIONS WHERE

21   THEY WERE CAPITALIZED.  IT WOULD ALL DEPEND ON WHAT THE

22   BORROWER'S CAPABLE OF PAYING.

23   Q    DR. HAMM, DO YOU HOLD YOURSELF OUT AS AN

24   EXPERT IN ECONOMETRICS?

25   A    WELL, I CERTAINLY HAVE ENOUGH EXPERTISE IN

Page 227

1   ECONOMETRICS TO RENDER THE OPINIONS THAT ARE IN MY

2   REPORT.  I HAVE BEEN PUT FORWARD BY THE UNITED STATES

3   AS AN EXPERT IN ECONOMETRIC AND THE COURT HAS ACCEPTED

4   ME AS SUCH.

5           SEVERAL COURTS HAVE ACCEPTED MY TESTIMONY ON

6   ECONOMETRIC ISSUES.

7           I DON'T THINK YOU CAN GET -- YOU CAN GET A

8   PH.D. IN ECONOMICS SINCE MAYBE 1955 OR 1960 WITHOUT

9   HAVING A SOLID GROUNDING IN ECONOMETRICS BECAUSE THAT'S

10  HOW EMPIRICAL RESEARCH IS CONDUCTED IN ALL FUNCTIONAL

11  AREAS OF ECONOMICS.

12          SO IN THAT SENSE I HAVE ECONOMETRIC EXPERTISE.

13  BUT I DON'T MARKET MYSELF AS AN EXPERT IN ECONOMETRICS.

14  I DON'T SEEK CASES THAT REQUIRE THAT KIND OF EXPERTISE,

15  BUT I HAVE IT.

16      Q   HAVE YOU EVER TAUGHT A GRADUATE-LEVEL CLASS IN

17  ECONOMETRIC?

18      A   WELL, I'VE TAUGHT A GRADUATE-LEVEL COURSE IN

19  LABOR ECONOMICS AND I CAN'T REMEMBER WHETHER WE HAD

20  ECONOMETRIC ISSUES IN THAT COURSE.  IT WAS MORE THAN

21  50 YEARS AGO.  IT PROBABLY -- SOME OF THE READINGS

22  WOULD HAVE ECONOMETRIC MODELS IN THEM AND I WOULD HAVE

23  HAD TO SPEAK TO THAT, BUT THE FOCUS WAS CERTAINLY NOT

24  ON ECONOMETRICS.

25      Q   HAVE YOU EVER PUBLISHED A PAPER ON ECONOMETRIC

Page 228

1   MODELING?

2       A    NO.

3       Q    HAVE YOU EVER PUBLISHED AN ARTICLE ON

4   ECONOMETRICA?

5       A    NO.

6       Q    HAVE YOU EVER BEEN THE EDITOR OF A

7   PEER-REVIEWED JOURNAL REGARDING ECONOMETRIC MODELING?

8       A    NO.

9       Q    HAVE YOU EVER BEEN A REFEREE ON A

10  PEER-REVIEWED JOURNAL REGARDING ECONOMETRIC MODELING?

11      A    NO.

12           MR. DESAI:  I'M HANDING THE COURT REPORTER FOR

13  MARKING AS EXHIBIT 7.

14           (EXHIBIT 7 WAS MARKED FOR

15           IDENTIFICATION AND WAS ATTACHED

16           HERETO.)

17  BY MR. DESAI:

18      Q    EXHIBIT 7 WAS PRODUCED BY YOUR COUNSEL IN

19  RESPONSE TO THE BUREAU'S DEPOSITION SUBPOENA TO YOU.

20           DO YOU RECALL THIS DOCUMENT?

21      A    YES.

22      Q    WHEN WERE YOU RETAINED BY OCWEN?

23      A    MAY OR EARLY JUNE.  I DON'T RECALL EXACTLY

24  WHEN.

25      Q    AND IN EXHIBIT 7 YOU IDENTIFY 201.81 HOURS FOR

Page 229

1    YOUR WORK ON THE OCWEN LITIGATION THROUGH JANUARY 19TH,

2    2020; IS THAT CORRECT?

3        A    CORRECT.

4        Q    AND THIS INCLUDES TIME SPENT BOTH IN YOUR WORK

5    RESPONDING TO PROFESSOR MCFADDEN AND DR. POWELL'S

6    OPINIONS; IS THAT CORRECT?

7        A    CORRECT.

8        Q    HOW MUCH OF THIS 201.81 HOURS WAS SPENT ON

9    WORK RELATED TO RESPONDING TO PROFESSOR MCFADDEN?

10       A    I DON'T KNOW.

11       Q    DO YOU HAVE AN ESTIMATE?

12       A    NO.

13       Q    IS IT FAIR TO SAY HALF?

14       A    I DON'T HAVE AN ESTIMATE.  I MEAN, WHAT I

15   CAN'T SEPARATE OUT IS THE PRELIMINARY WORK THAT I HAD

16   TO DO THAT POTENTIALLY OR ACTUALLY APPLIED TO BOTH

17   MATTERS.  AND SO I CAN'T BE SURE.

18            IT MAY BE MORE THAN HALF, BUT I DON'T REALLY

19   HAVE A GOOD FEEL FOR HOW IT WOULD BREAK DOWN BETWEEN

20   POWELL, MCFADDEN, AND JOINT.

21       Q    DO YOU BELIEVE YOU SPENT MORE TIME PREPARING

22   FOR -- PREPARING YOUR OPINIONS REGARDING PROFESSOR

23   MCFADDEN'S OPINIONS THAN DR. POWELL'S?

24       A    YES.

25       Q    HOW MUCH TOTAL COMPENSATION DID YOU EARN FOR

Page 230

1    PREPARING THIS EXPERT REPORT?

2        A    WELL, I CAN ONLY TELL YOU HOW MUCH

3    COMPENSATION FEES I HAVE RECEIVED THROUGH JANUARY 19TH,

4    2020 FOR ALL OF THE ACTIVITIES, ALL OF THE TIME I

5    BILLED ON THESE TWO CASES.  I DON'T BREAK IT OUT

6    SEPARATELY FOR PREPARATION OF THE EXPERT REPORT, BUT

7    THE TOTAL, AS YOU CAN SEE FROM EXHIBIT 7, IS

8    $136,221.75.

9        Q    AND YOU NOTE THAT YOU WERE ASSISTED BY STAFF

10   AT THE BERKLEY RESEARCH GROUP IN PREPARING EXPERT

11   OPINIONS; IS THAT RIGHT?

12       A    CORRECT.

13       Q    AND WHO AT THE BERKLEY RESEARCH GROUP ASSISTED

14   YOU?

15       A    MANY PEOPLE.  WELL, THE PRIMARY INDIVIDUALS

16   WHO ASSISTED ME ARE GREG HALM, WHO I MENTIONED BEFORE,

17   H-A-L-M.  ALSO, ANTHONY SANTANA, S-A-N-T-A-N-A; SCOTT

18   STERNBERG, THAT'S SCOTT WITH TWO TS, AND STERNBERG,

19   S-T-E-R-N-B-E-R-G; KELLY LEAR NORDBY, KELLY WITH ONE E,

20   LEAR, L-E-A-R, NORDBY, N-O-R-D-B-Y.

21           THOSE ARE THE INDIVIDUALS THAT I WORKED WITH

22   MOST CLOSELY ON THIS.

23           IN ADDITION THERE WERE A NUMBER OF RESEARCH

24   ASSOCIATES WHO CARRIED OUT DISCREET TASKS IN THE COURSE

25   OF THE CASE.  SOME OF THEIR NAMES I REMEMBER -- I KNOW

Page 231

1    OF, BUT IF I REVIEWED THE BILLING STATEMENTS, I COULD

2    TELL YOU WHO ALL OF THEM WERE.

3         Q    AND DO YOU KNOW HOW MUCH TIME YOUR SUPPORT

4    STAFF AT THE BERKLEY RESEARCH GROUP SPENT IN ASSISTING

5    YOU IN RESPONDING TO THESE REPORTS?

6         A    NO.  I'D HAVE TO LOOK AT THE BILLING RECORDS.

7         Q    DO YOU HAVE AN ESTIMATE?

8         A    NO.

9         Q    DO YOU KNOW HOW MUCH BERKLEY RESEARCH GROUP

10   WAS COMPENSATED FOR SUPPORTING YOU FOR YOUR OPINIONS IN

11   THE OCWEN LITIGATIONS?

12        A    NO.

13        Q    DO YOU HAVE AN ESTIMATE?

14        A    I'D SAY IN EXCESS OF $750,000, BUT I DON'T --

15   I CAN'T DO BETTER THAN THAT.

16        Q    DO YOU THINK IT WAS MORE THAN A MILLION

17   DOLLARS?

18             MS. ROSE-SMITH:  OBJECTION.

19             THE REPORTER:  I'M SORRY?

20   BY MR. DESAI:

21        Q    DO YOU THINK IT WAS MORE THAN A MILLION

22   DOLLARS?

23        A    I DON'T KNOW.  I DON'T HAVE A THOUGHT EITHER

24   WAY.  I DON'T KNOW WHAT THE STATUS OF COLLECTIONS ARE.

25   I DON'T KNOW WHAT THE TOTAL OF THE BILLED AMOUNT IS AND

Page 232

1    HOW MUCH WE COLLECTED.

2         I DON'T RULE OUT THE POSSIBILITY THAT IT'S

3    MORE THAN A MILLION DOLLARS, BUT I DON'T KNOW WHAT IT

4    IS.

5    Q    AND HOW DID THE BERKLEY RESEARCH GROUP STAFF

6    ASSIST YOU?

7    A    THEY ASSISTED ME IN MANY DIFFERENT WAYS.  THEY

8    GATHERED THE DATA THAT I FELT I NEEDED IN ORDER TO

9    COMPLETE MY ASSIGNMENT.  THEY DID ANALYZE THE OCWEN

10   DATA, AS I DIRECTED THEM TO, THAT APPEAR ON MY

11   DOCUMENTS CONSIDERED LIST.  THEY PREPARED TABLES.  THEY

12   AUDITED MY REPORT AFTER IT WAS COMPLETED OR IN THE

13   PROCESS OF BEING COMPLETED IN ORDER TO ENSURE,

14   HOPEFULLY ENSURE, THAT THERE WERE NO FACTUAL ERRORS.

15        MS. HAYES PINDER:  MR. HAMM, I DON'T MEAN TO

16   INTERRUPT YOU.

17        THE WITNESS:  THOSE WERE THE PRINCIPAL DUTIES

18   THAT THEY PERFORMED ON MY BEHALF AND UNDER MY

19   SUPERVISION.

20        MS. HAYES PINDER:  SABRINA, I WAS GOING TO ASK

21   IF YOUR CLIENT WANTS, TO THE EXTENT THERE'S ANY

22   DISTINCTION BETWEEN WHAT HIS TEAM DID FOR FLORIDA

23   VERSUS MCFADDEN'S REPORT SO THAT IF YOU WANT TO

24   ELIMINATE SOME QUESTIONS TOMORROW, IF THERE'S ANY

25   DISTINCTIONS RELATED TO WORK PERFORMED RELATED TO

Page 233

1    MR. POWELL'S REPORT, YOU KNOW, MAYBE SET THAT FORTH

2    SO -- SO HE DOESN'T HAVE TO BE ASKED THE SAME EXACT

3    KIND OF QUESTIONS TOMORROW.  I'M JUST TRYING TO HELP.

4           MS. ROSE-SMITH:  NO, NO.  SO I APPRECIATE

5    THAT.  I SUSPECT THAT THE ANSWER'S ROUGHLY THE SAME,

6    BUT --

7           MS. HAYES PINDER:  IT SEEMS LIKE --

8           MS. ROSE-SMITH:  -- WHEN HE SAYS HE PREPARE --

9    HE HAD THEM PREPARE TABLES, HE MAY HAVE HAD THEM

10   PREPARE DIFFERENT TABLES FOR ONE SIDE OR THE OTHER.

11          SO I APPRECIATE WHAT YOU'RE TRYING TO DO, BUT

12   I THINK THE BEST WE CAN SAY IS THAT HE DID THE SAME

13   KIND OF -- THEY DID THE SAME KINDS OF ACTIVITIES, BUT

14   MAYBE TO DIFFERENT DEGREES.

15          MS. HAYES PINDER:  RIGHT, RIGHT, RIGHT.

16          THE WITNESS:  I WILL TELL YOU THAT MS. NORDBY

17   DID NOT ASSIST ME ON THE POWELL CASE, AS BEST I CAN

18   RECALL.

19   BY MR. DESAI:

20      Q    DID YOUR STAFF CONTRIBUTE TO THE DRAFTING OF

21   YOUR REPORT?

22      A    YES, SOME SPECIFIC SECTIONS.  I WOULD ASK

23   ABOUT BACKGROUND INFORMATION ON THE COMPLAINT.  I WOULD

24   ASK THEM TO GIVE ME A DRAFT THAT I WOULD THEN REVISE.

25      Q    AND YOU SAID THAT YOUR SUPPORT STAFF ASSISTED

Page 234

1    YOU IN ANALYZING THE DATA AND PREPARING THE TABLES THAT

2    APPEARED IN YOUR REPORT; IS THAT CORRECT?

3        A    YES.

4        Q    DID YOU REVIEW, PERSONALLY, THE BACKUP -- THE

5    CODE USED TO GENERATE THOSE ANALYSES AND TABLES?

6        A    I LOOKED AT THE CODE, BUT I THINK IT WOULD BE

7    AN EXAGGERATION TO SAY THAT I REVIEWED IT.  I LOOKED AT

8    SOME OF THE CODE.

9        Q    YOU DID NOT LOOK AT ALL OF IT, THOUGH.

10           IS THAT FAIR?

11       A    I DON'T BELIEVE SO, NO.

12       Q    SO IS IT FAIR TO SAY THAT YOU TRUSTED THAT

13   YOUR DIRECTED STAFF DID THEIR WORK ACCURATELY?

14           MS. ROSE-SMITH:  OBJECTION.

15           THE WITNESS:  WELL, I TRUST THEM TO DO IT

16   ACCURATELY, BUT AS I SAY, WE ALSO HAVE A QUALITY

17   CONTROL PROCESS THAT AUDITS THE WORK AND RELIES ON

18   INDIVIDUALS WHO HAVE THE CAPABILITY TO UNDERSTAND THE

19   ANALYSES BUT WEREN'T INVOLVED IN THEIR PREPARATION SO

20   THERE'S NO CONFLICT OF INTEREST.

21   BY MR. DESAI:

22       Q    DR. HAMM, YOU ADOPT ALL OF THE WORK UNDERLYING

23   YOUR OPINIONS THE SAME AS YOU DO WHAT'S WRITTEN HERE;

24   IS THAT CORRECT?

25       A    I DON'T UNDERSTAND YOUR QUESTION.

```
 1     Q    STRIKE IT.

 2          WHY DON'T WE GO OFF THE RECORD?

 3          THE VIDEOGRAPHER:  GOING OFF THE RECORD

 4   4:48 P.M.

 5          (RECESS TAKEN.)

 6          THE VIDEOGRAPHER:  GOING BACK ON THE RECORD

 7   5:07 P.M.

 8   BY MR. DESAI:

 9     Q    DR. HAMM, EARLIER YOU TESTIFIED THAT OCWEN WAS

10   A LEADER IN LOAN MODIFICATION.

11          DO YOU RECALL THAT?

12     A    I DO.

13     Q    AND MY QUESTION FOR YOU IS:  DO BORROWERS WITH

14   POSITIVE EQUITY WHO ARE ALSO IN FORECLOSURE, DO THEY

15   APPLY FOR LOAN MODIFICATIONS EVER?

16          MS. ROSE-SMITH:  OBJECTION.

17          THE WITNESS:  THEY CAN.  SURE.  SURE.

18   BY MR. DESAI:

19     Q    DO YOU KNOW WHETHER OR NOT OCWEN BORROWERS

20   WITH POSITIVE EQUITY WHO ARE IN FORECLOSURE, DO THEY

21   EVER APPLY FOR LOAN MODIFICATIONS?

22     A    OCWEN BORROWERS WHO HAVE RECEIVED A

23   FORECLOSURE NOTICE --

24     Q    CORRECT.

25     A    -- AND HAVE POSITIVE EQUITY.  YES, I'M SURE
```

Page 236

1    SOME OF THEM APPLY FOR MODIFICATION.  THEY WANT TO STAY

2    IN THEIR HOUSE.

3         Q    AND WHY WOULD A BORROWER WITH POSITIVE EQUITY

4    WHO'S ALSO IN FORECLOSURE, APPLY FOR A LOAN MOD?

5              MS. ROSE-SMITH:  OBJECTION.

6              THE WITNESS:  BECAUSE THEY WANT TO KEEP THEIR

7    HOUSE.  THEY'RE ATTACHED TO THE HOUSE.  AND THEY CAN'T

8    AFFORD TO STAY IN IT UNDER THE LOAN TERMS AND THE

9    PROMISSORY NOTE THAT THEY SIGNED, AND THEY'RE HOPING

10   THAT OCWEN AND THE INVESTOR WILL DECIDE THAT IT IS

11   BETTER TO MAKE THE LOAN MORE AFFORDABLE THAN TO SEND IT

12   INTO FORECLOSURE AND RISK TAKING A LOSS AS A RESULT.

13   THAT'S WHY THEY WOULD DO IT.

14             WHETHER OCWEN WOULD GRANT THEIR REQUEST WOULD

15   DEPEND ON THE DISCOUNTED PRESENT VALUE ANALYSIS.

16   BY MR. DESAI:

17        Q    SO IT'S POSSIBLE THAT SOME BORROWERS MIGHT

18   PREFER -- WITH POSITIVE EQUITY WHO'VE HAD A FORECLOSURE

19   INITIATED, MIGHT PREFER A LOAN MODIFICATION OVER JUST

20   SELLING THE HOUSE; IS THAT CORRECT?

21        A    YES.

22             MS. ROSE-SMITH:  OBJECTION.

23             MR. DESAI:  I THINK WE ARE DONE.

24             MS. ROSE-SMITH:  I HAVE A FEW QUESTIONS.

25   ///

Page 237

1                        EXAMINATION

2   BY MS. ROSE-SMITH:

3       Q    EARLIER TODAY, DR. HAMM, YOU WERE ASKED ABOUT

4   THE BRG INTERVIEW OF ANDY COMBS THAT WAS CONDUCTED BY

5   GREG HALM.

6            DO YOU REMEMBER THAT?

7       A    I DO.

8       Q    CAN I ASK YOU, ARE ALL OF THE FACTUAL -- IS

9   ALL OF THE FACTUAL INFORMATION THAT YOU OBTAINED AS A

10  RESULT OF THAT INTERVIEW REFLECTED IN YOUR REPORT?

11      A    YES.

12      Q    DO YOU HAVE ANY REASON TO BELIEVE THAT GREG

13  HALM LEARNED ANYTHING IN THE INTERVIEW THAT BRG

14  CONDUCTED THAT WILL CONTRADICT THE FACTUAL DETAILS YOU

15  RELIED ON FROM THAT INTERVIEW IN YOUR REPORT?

16      A    NO.  IN FACT, I'M VERY CONFIDENT THAT HE

17  WOULDN'T WITHHOLD SUCH INFORMATION FROM ME BECAUSE AS

18  AN EXPERT IN HIS OWN RIGHT, HE KNOWS HOW DANGEROUS IT

19  WOULD BE TO DO SOMETHING LIKE THAT.  SO I HAVE EVERY

20  CONFIDENCE THAT HE FAITHFULLY CONVEYED WHAT HE LEARNED

21  FROM MR. COMBS.

22      Q    EARLIER TODAY YOU TESTIFIED THAT YOU DID NOT

23  ALWAYS HAVE OCWEN DATA ON THE DATE OF THE LAST ESCROW

24  ANALYSIS, SO THE DATA THAT YOU HAD AVAILABLE TO YOU DID

25  NOT ALWAYS REFLECT THE DATE OF THE LAST ESCROW

Page 238

1    ANALYSIS.

2             DO YOU RECALL THAT?

3        A    I DO.

4        Q    WHY WAS THAT?

5        A    WELL, BECAUSE I THINK THE COMPLETE DATASET

6    BEGINS JANUARY 1ST, 2014.  THERE IS SOME INFORMATION

7    THAT GOES BACK TO 2013, BUT I DON'T BELIEVE IT'S

8    COMPLETE.

9             AND YOU COULD HAVE AN ESCROW ANALYSIS, A LAST

10   ESCROW ANALYSIS ON DECEMBER 30, 2012 THAT WOULDN'T

11   NECESSARILY HAVE A DUE DATE OR A NEW ESCROW ANALYSIS

12   UNTIL 2014.  THERE'S NO WAY YOU WOULD KNOW WHAT THE

13   DATE OF THAT ESCROW ANALYSIS WAS.

14       Q    DO YOU RECALL THE QUESTIONS YOU WERE ASKED

15   TODAY ABOUT RFP 5, THE DELINQUENCY DATA THAT WAS

16   PROVIDED TO THE BUREAU BY OCWEN?

17       A    I DO.

18       Q    WHY IS IT THAT YOU CHOSE TO RELY ON THE RFP 22

19   DATA RATHER THAN THE DATA PROVIDED IN RFP 5 WHEN

20   ATTEMPTING TO DETERMINE INFORMATION ABOUT THE

21   DELINQUENCIES?

22       A    WELL, TWO REASONS.

23             MR. DESAI:  OBJECTION.

24             THE WITNESS:  TWO REASONS.  NUMBER ONE, OCWEN

25   ADVISED THE BUREAU WHEN IT SUBMITTED ITS RESPONSES TO

Page 239

1    THE INTERROGATORIES THAT THE MOST RELIABLE SOURCE OF

2    INFORMATION WAS RFP 22.

3            SECONDLY, AS I THINK I TESTIFIED DURING THE

4    DIRECT, I KNOW FROM MY OWN EXPERIENCE THAT THE

5    FINANCIAL HISTORY FILES ARE THE MOST COMPLETE, THE MOST

6    RELIABLE SOURCE OF INFORMATION ON SUCH MATTERS AS

7    DELINQUENCY.

8            AND SO THOSE ARE THE TWO REASONS THAT I USED

9    THEM.

10           I THINK THAT -- AS I RECALL, I THINK THIS IS

11   ON MY DOCUMENTS CONSIDERED LIST, THE TRANSMITTAL LETTER

12   FOR THE RESPONSES TO THE INTERROGATORIES EXPLICITLY

13   SAYS THAT RFP 22 IS THE MOST RELIABLE SOURCE OF DATA.

14   BY MS. ROSE-SMITH:

15       Q    SEVERAL TIMES OVER THE COURSE OF THE DAY IN

16   GIVING A RESPONSE TO COUNSEL YOU SAID, I'M HAPPY TO

17   EXPLAIN WHY IT'S MY OPINION THAT LATE ESCROW ANALYSES

18   CAUSED ZERO FORECLOSURES, AND YOU MENTION I'M SURE

19   WE'LL GET TO THAT AT SOME POINT IN THE DEPOSITION.

20           CAN YOU EXPLAIN WHAT IT IS THAT IS THE BASIS

21   FOR YOUR OPINION THAT LATE ESCROW ANALYSES CAUSED ZERO

22   FORECLOSURES?

23       A    YES, I THINK I CAN DO IT QUICKLY.

24           SO PROFESSOR MCFADDEN'S THESIS IS THAT

25   OVERCHARGES THAT HAD AN ADVERSE ECONOMIC EFFECT ON THE

Page 240

1    BORROWER AVERAGING $15.24 BY HIS RECKONING, $1.26 BY MY

2    RECKONING, THAT THESE ADVERSE EFFECTS WERE SUFFICIENT

3    TO SEND AN OTHERWISE AFFORDABLE LOAN TO FORECLOSURE

4    AND, IN FACT, ACCOUNTED FOR 5100 FORECLOSURES THAT

5    WOULDN'T HAVE HAPPENED WERE IT NOT FOR THIS $1.26 TO

6    $15.24 ECONOMIC BURDEN.

7            SIMILARLY, WITH RESPECT TO THE UNDERCHARGES,

8    IT IS HIS THESIS THAT A PAYMENT SHOCK AMOUNTING TO

9    .5 PERCENT, WHICH ASSUMING AN AVERAGE-SIZED LOAN AS

10   REPORTED IN MY REPORT WOULD WORK OUT TO $6 A MONTH FOR

11   12 MONTHS OR SIX PLUS A MONTH FOR 12 MONTHS, THAT THAT

12   WOULD SEND LOANS INTO FORECLOSURE.  I THINK THAT'S THE

13   5100, THE OVERCHARGE LOANS ARE MORE LIKE 11,500.

14           THIS WOULD NEVER HAPPEN.  AND THE REASON IS

15   OCWEN IS IN THE BUSINESS OF SERVICING LOANS.  THEY GET

16   THEIR REVENUE FROM THE SERVICING FEE ON THE LOANS IN

17   THEIR PORTFOLIO.

18           ON AVERAGE, EACH OF THE LOANS THAT WE'RE HERE

19   TO TALK ABOUT TODAY, THE ALLEGEDLY HARMED LOANS, HAD AN

20   ANNUAL VALUE TO OCWEN OF 500 TO $1,000.

21           SO EVERY YEAR, OCWEN GETS BETWEEN $500 AND A

22   THOUSAND DOLLARS FOR THIS -- FOR SERVICING THIS LOAN.

23           THEY WOULD NEVER LET A $15 DEFICIENCY -- THE

24   BORROWER SAYS, I CAN AFFORD THIS LOAN EXCEPT FOR THE

25   $15 THAT I HAVE TO PAY IN INTEREST CHARGES BECAUSE YOU

Page 241

1  OVERCHARGED ME.  THEY WOULD NEVER LET THAT LOAN GO BAD.

2  IT WOULD BE A CRAZY BUSINESS DECISION.  IT'S NOT HOW

3  LOAN SERVICERS OPERATE.

4        SIMILARLY WITH THE UNDERCHARGED LOANS, IF A

5  BORROWER CAME IN AND SAID, LOOK, I CAN AFFORD TO MAKE

6  THE MONTHLY PAYMENTS, BUT NOT IF YOU'RE GOING TO ADD $6

7  OR $15 OR $30 TO THE ANNUAL PAYMENT IN ORDER TO RECOUP

8  THE UNDERCHARGE, WHAT A LOAN SERVICER WOULD DO, AND I'M

9  SURE OCWEN WOULD DO, IS SAY HOW MUCH TIME DO YOU NEED

10  TO PAY THAT OFF?

11        THEY SAY THREE YEARS, THEN THEY'D STRETCH THAT

12  OUT OVER THREE YEARS.  THEY SAID I JUST CAN'T AFFORD TO

13  PAY IT, THEN THEY'D LET THAT DEFICIENCY SIT IN THE

14  ACCOUNT BECAUSE IT'S MUCH CHEAPER TO THE INVESTOR AND

15  TO OCWEN THAN TO LOSE THE LOAN AND $500 TO A THOUSAND

16  DOLLARS IN ANNUAL CASH FLOW.  THAT'S WHY A DEFICIENCY

17  ANALYSIS WOULD NEVER RESULT IN FORECLOSURE.  OCWEN

18  WOULDN'T LET IT.

19  BY MS. ROSE-SMITH:

20    Q    DO YOU KNOW WHETHER, IN FACT, OCWEN DID SPREAD

21  OUT THE AMOUNT THAT WAS OWED FOR UNDERCHARGES OVER

22  PERIODS LIKE YOU GAVE IN YOUR EXAMPLE, THREE YEARS OR

23  LONGER?

24        MR. DESAI:  OBJECTION.

25        THE WITNESS:  IN SOME CASES THEY SPREAD THE

Page 242

1  PAYMENTS OUT OVER 60 MONTHS, FIVE YEARS.

2  BY MS. ROSE-SMITH:

3      Q     EARLIER YOU WERE ASKED A SERIES OF QUESTIONS

4  ABOUT WHETHER THE ESCROW PAYMENT CHANGES THAT YOU

5  OBSERVED IN THE TRANSACTION DATA THAT WAS PROVIDED BY

6  OCWEN COULD EVER BE ANYTHING OTHER THAN AS A RESULT OF

7  A PAYMENT CHANGE.

8          DO YOU REMEMBER THAT?

9      A     YES.

10     Q     IN A CIRCUMSTANCE WHERE THE BORROWER PAYS OFF

11 AN ESCROW SHORTAGE, BUT THEY ONLY DO SO AFTER OCWEN HAS

12 BEGUN SPREADING THAT OWED SHORTAGE OUT OVER THE COURSE

13 OF THE BORROWER'S SUCCESSIVE NEXT MONTHLY PAYMENTS --

14 SO THE BORROWER THEN ALREADY HAS MADE SOME OF THOSE

15 PAYMENTS -- WOULD -- WOULD THERE BE A PAYMENT CHANGE

16 THAT YOU MIGHT HAVE MISTAKEN IN YOUR REPORT FOR AN

17 ESCROW ANALYSIS?

18     A     IT'S POSSIBLE IF A BORROWER HAD A POINT OF

19 VIEW ABOUT WHAT WAS IN THEIR ECONOMIC INTEREST THAT IS

20 THE EXACT OPPOSITE OF PROFESSOR MCFADDEN'S AND SAID,

21 I'M MUCH BETTER OFF GIVING OCWEN MONEY I DON'T HAVE TO

22 YOU THAN TO HOLD IT IN MY POCKET AND USE IT FOR OTHER

23 PURPOSES.

24          IF THEY PAID THE SHORTAGE AND IF OCWEN ROLLED

25 BACK THE PAYMENT TO ESCROW TO THE TARGET PAYMENT, YES,

Page 243

1    THAT COULD -- THAT COULD SHOW UP AS A PAYMENT CHANGE

2    THAT WOULD NOT BE THE RESULT OF A NEW ESCROW ANALYSIS

3    EXCEPT WE ATTEMPTED TO SCREEN FOR THINGS LIKE THIS IN

4    PUTTING TOGETHER OUR COUNT OF THE 3,012 LOANS WITH

5    SUBSEQUENT ESCROW PAYMENT CHANGES.  COULD WE HAVE

6    MISSED SOME?  YES, IT'S POSSIBLE.

7         Q    BUT DO YOU THINK THE NUMBER YOU ULTIMATELY

8    CAME UP WITH REFLECTS IN ANY SIGNIFICANT NUMBER ONES

9    WHERE YOU MISTOOK A PAYMENT CHANGE FOR AN ESCROW

10   ANALYSIS THAT ACTUALLY WASN'T CONDUCTED?

11        A    I CAN'T RULE OUT THAT THERE ARE SOME, BUT I

12   DON'T THINK THEY ACCOUNT FOR MANY OF THE 3,012.

13        Q    EARLIER YOU WERE ALSO ASKED ABOUT WHAT, IF

14   ANYTHING, YOU DID TO CONFIRM THE INFORMATION THAT YOU

15   OBTAINED FROM ANDY COMBS REGARDING THAT DECEMBER 2014

16   TO MARCH 2015 PERIOD WHERE OCWEN DID NOT CONDUCT ESCROW

17   ANALYSES ON LOANS.

18             DO YOU REMEMBER THAT?

19        A    I DO.

20        Q    DID YOU CHECK THE DATA THAT YOU HAD AVAILABLE

21   TO YOU TO SEE IF THE DATA ITSELF WAS CONSISTENT WITH

22   WHAT YOU LEARNED FROM MR. COMBS ABOUT OCWEN NOT

23   CONDUCTING ANALYSES DURING THIS PERIOD?

24             MR. DESAI:  OBJECTION.

25             THE WITNESS:  WELL, I HAVE A CHART IN MY

Page 244

```
 1   REPORT THAT SHOWS A DELINQUENCY, NON DELINQUENCY STATUS

 2   OF LOANS IN BOTH OF THOSE COHORTS, I'M GOING TO CALL

 3   THEM THE CLASS OF 2014, THE MOSTLY DELINQUENT LOANS.

 4   AND THEN THOSE THAT CAME TO THEIR ESCROW ANALYSIS DATE

 5   DURING THE HIATUS WHEN OCWEN WAS MAKING THE SYSTEM

 6   CHANGE.

 7             AND THAT CHART IS CERTAINLY CONSISTENT WITH

 8   WHAT WE LEARNED FROM MR. COMBS, THAT THIS WAS -- THIS

 9   WAS A SYSTEM-WIDE CESSATION OF ESCROW ANALYSES AND IT

10   WAS NOT -- DID NOT JUST APPLY TO DELINQUENT LOANS OR

11   NON DELINQUENT LOANS.  IT'S A PATTERN THAT YOU WOULD

12   EXPECT IF THE DISTRIBUTION OF LOANS WERE RANDOM.

13   BY MS. ROSE-SMITH:

14       Q    EARLIER YOU WERE ASKED ABOUT THE CRITICISMS

15   THAT YOU OFFER OF DR. MCFADDEN WHERE YOU SAY THAT HE --

16   HE DIDN'T CONSIDER CERTAIN CONFOUNDING FACTORS.  AND I

17   BELIEVE YOU TESTIFIED THAT IN A LOT OF CASES THE DATA

18   THAT YOU BELIEVED MCFADDEN SHOULD HAVE CONSIDERED WAS

19   NOT ACTUALLY AVAILABLE TO HIM.

20             DO YOU REMEMBER THAT?

21       A    I DO.

22             MR. DESAI:  OBJECTION.

23   BY MS. ROSE-SMITH:

24       Q    GIVEN THAT DR. MCFADDEN DIDN'T HAVE THE DATA

25   THAT YOU CLAIM IN YOUR REPORT HE SHOULD HAVE BEEN
```

Page 245

1  CONSIDERING IN HIS MODEL, WHAT DO YOU SUPPOSE HE SHOULD

2  HAVE DONE?

3      A    HE SHOULD HAVE TAKEN A DIFFERENT APPROACH AND

4  PERHAPS PULLED A SAMPLE OF LOANS AND REVIEWED THE LOAN

5  FILES AND ATTEMPTED TO DETERMINE THE CAUSAL INFLUENCE,

6  IF ANY, OF THE LATE ESCROW ANALYSIS ON SUBSEQUENT

7  PERFORMANCE OF THOSE LOANS.

8          WHAT HE SHOULDN'T DO IS TRY TO EXPLAIN THE

9  IMPORTANCE OF LATE ESCROW ANALYSES WITHOUT INCLUDING

10  THE -- THE VARIABLES THAT HE HIMSELF RECOGNIZES ARE

11  INSTRUMENTAL IN ACCOUNTING FOR FORECLOSURES.

12      Q    I WANT YOU TO TURN TO EXHIBIT 4.  AND

13  PARTICULARLY WITHIN EXHIBIT 4, I WANT YOU TO LOOK AT

14  THE -- AT THE PAGE THAT'S LABELED EXHIBIT 10-A.

15      A    OH, I TURNED RIGHT TO IT.

16      Q    HOW DO YOU ALWAYS MANAGE TO DO THAT?

17      A    IT'S THE FIRST TIME.

18      Q    EARLIER TODAY YOU WERE ASKED ABOUT THE PYF

19  TRANSACTION CODE THAT YOU OBSERVED IN THE TRANSACTION

20  HISTORY DATA.

21      A    YES.

22      Q    DO YOU RECALL THAT?

23      A    I DO.

24      Q    IF YOU LOOK AT FOOTNOTE NUMBER 2 ON

25  EXHIBIT 10-A, THERE'S A REFERENCE TO THAT PYF

Page 246

1    TRANSACTION CODE.

2             DO YOU SEE THAT?

3      A    YES.

4      Q    AND THERE ARE ALSO REFERENCES TO THE PYC

5    TRANSACTION CODE AT THE LAST LINE OF THAT FOOTNOTE.

6             DO YOU SEE THAT?

7      A    YES, YES.

8      Q    AND I BELIEVE YOU TESTIFIED ABOUT THE PYF AND

9    THE PYC TRANSACTION CODE, BUT WHAT ARE THE OTHER

10   TRANSACTION CODES THAT ARE REFERENCED HERE?

11     A    THEY ARE -- THE PYW, PYT AND PYG CODES.  I

12   CAN'T REMEMBER EXACTLY WHAT THEY REPRESENT, BUT THEY'RE

13   ALSO INDICATIVE OF SHORT PROCEEDS, WHERE THE PROCEEDS

14   FROM SALE ARE NOT SUFFICIENT TO COMPLETELY PAY OFF THE

15   AMOUNT DUE.

16             AND I'M SORRY, WITH THE DATA DICTIONARY, I CAN

17   TELL YOU, BUT I CAN'T TELL YOU FROM MEMORY.  THEY DON'T

18   SHOW UP A LOT AND THAT'S, I THINK, THE REASON WHY

19   I'M -- I'M UNABLE TO TELL YOU EXACTLY WHAT THEY ARE.

20     Q    EARLIER YOU WERE ASKED IF YOU HAD DONE ANY

21   ANALYSIS TO -- TO TRY AND UNDERSTAND THE RELATIONSHIP

22   BETWEEN THE BORROWER'S REASON FOR DEFAULT AND THE

23   INCREMENTAL CONTRIBUTION TO FORECLOSURE INITIATION THAT

24   MIGHT HAVE BEEN CAUSED BY THAT, THE REASON FOR THAT

25   DEFAULT.

Page 247

1              DO YOU BELIEVE THAT?

2       A    I DO.

3              MR. DESAI:  OBJECTION.

4    BY MS. ROSE-SMITH:

5       Q    ARE YOU AWARE OF STUDIES IN THE ACADEMIC

6    LITERATURE THAT DO STUDY THAT RELATIONSHIP?

7       A    THE RELATIONSHIP BETWEEN SOME OF THE REASONS

8    FOR DEFAULT THAT ARE LISTED IN 10E, EXHIBIT 10E THAT'S

9    PART OF EXHIBIT 4, AND PERFORMANCE OF THE LOAN,

10   DEFAULT, FOR EXAMPLE?

11      Q    YES.

12      A    YES.  THERE IS A LOT OF LITERATURE ON THIS,

13   QUITE A BIT OF LITERATURE.  I'D LIKE TO SAY I -- I'D

14   LOVE TO SAY I REVIEWED IT ALL, BUT I HAVEN'T COME CLOSE

15   BECAUSE THERE'S SO MUCH OF IT, BUT IT'S SOMETHING THAT

16   IS -- CONTINUES TO DRAW THE ATTENTION OF SCHOLARS.

17      Q    AND IS THAT --

18              THE REPORTER:  I'M SORRY.

19              THE WITNESS:  OF SCHOLARS.  I'M SORRY.

20   BY MS. ROSE-SMITH:

21      Q    AND IS THAT LITERATURE -- I KNOW YOU HAVEN'T

22   HAD THE OPPORTUNITY TO REVIEW IT ALL -- BUT IS THAT

23   LITERATURE SOMETHING WITH WHICH YOU ARE FAMILIAR?

24      A    YES, I AM.

25              MS. ROSE-SMITH:  THAT'S ALL THE QUESTIONS I

Page 248

1    HAVE.

2              MR. DESAI:  I HAVE A FEW.

3                    FURTHER EXAMINATION

4    BY MR. DESAI:

5        Q    DR. HAMM, IN RESPONSE TO QUESTIONS FROM

6    COUNSEL YOU STATED THAT OCWEN, IN A TRANSMITTAL LETTER,

7    REFERRED TO RFP 22 AS THE MOST RELIABLE DATA.

8              ARE YOU FAMILIAR WITH THAT?

9        A    YES, I THINK THEY MENTIONED RFP 22.  THEY MAY

10   HAVE MENTIONED IT BY ITS GENERIC NAME, THE FINANCIAL

11   HISTORY FILE.  BUT YES, I AM FAMILIAR WITH IT.

12       Q    MAY THEY NOT HAVE REFERRED TO RFP 22 AS THE

13   MOST RELIABLE, BUT INSTEAD THE MOST DETAILED?

14       A    THAT COULD BE.  I HAVEN'T REVIEWED THE LETTER

15   IN SOME TIME.

16       Q    SO YOU DON'T KNOW, IN FACT, IF THEY SAID THE

17   MOST RELIABLE; IS THAT CORRECT?

18       A    AS I SIT HERE, THAT'S CORRECT.

19       Q    YOU TESTIFIED EARLIER IN RESPONSE TO A

20   QUESTION FROM MS. ROSE-SMITH THAT OCWEN RECEIVES

21   BETWEEN 500 TO A THOUSAND DOLLARS PER YEAR IN VALUE PER

22   LOAN IT SERVICES; IS THAT CORRECT?

23       A    CORRECT.

24       Q    IS THAT NUMBER DISCLOSED IN YOUR REBUTTAL

25   REPORT?

Page 249

1      A    I DON'T ACTUALLY KNOW.  I DON'T THINK SO.

2      Q    IS THAT NUMBER CONTAINED IN YOUR BACKUP

3  MATERIALS?

4      A    I CAN'T SAY ONE WAY OR THE OTHER AS I SIT

5  HERE --

6      Q    WHAT IS THE BASIS -- SORRY.

7           WHAT IS THE BASIS FOR YOUR OPINION THAT OCWEN

8  EARNS BETWEEN 500 TO A THOUSAND DOLLARS PER YEAR IN

9  VALUE TO OCWEN?

10     A    WELL, BECAUSE THE SERVICING FEE THAT THE LOAN

11 SERVICER IS ABLE TO RETAIN IS BETWEEN ONE-QUARTER OF A

12 PERCENT OF THE OUTSTANDING PRINCIPAL BALANCE AND HALF A

13 PERCENT OF THE OUTSTANDING PRINCIPAL BALANCE.

14          AND ACCORDING TO DATA IN MY REPORT, THE

15 AVERAGE LOAN BALANCE OR UNPAID PRINCIPAL BALANCE OF THE

16 LOANS IN QUESTION IS $200,400, OR SOMETHING LIKE THAT.

17 SO IF YOU MULTIPLY THAT FIRST BY .0025 AND THEN .005

18 YOU GET 500 TO A THOUSAND DOLLARS.

19     Q    WHEN DID YOU PERFORM THIS ANALYSIS TO ARRIVE

20 AT OCWEN EARNS BETWEEN 500 TO A THOUSAND DOLLARS PER

21 VALUE?

22     A    WELL, I KNEW ALL ALONG.  I DON'T KNOW WHEN I

23 ACTUALLY PERFORMED THE MATH TO DO THAT, BUT OBVIOUSLY

24 I'M VERY FAMILIAR WITH THE COMPENSATION THAT LOAN

25 SERVICERS RECEIVE.  I KNOW IT'S A QUARTER TO A HALF,

Page 250

1    BUT I DON'T KNOW WHETHER -- WHERE I ACTUALLY MULTIPLIED

2    IT OUT.

3        Q    IS IT POSSIBLE YOU DID THIS MATH AFTER YOU

4    SUBMITTED YOUR SURREBUTTAL REPORT?

5        A    IT'S POSSIBLE.

6        Q    IS IT POSSIBLE YOU DID THIS MATH IN

7    PREPARATION FOR THIS DEPOSITION?

8        A    NO.

9        Q    YOU ALSO SAID WHEN TESTIFYING ABOUT THIS $500

10   TO A THOUSAND DOLLARS TO OCWEN, YOU SUGGEST THAT OCWEN

11   WOULDN'T LET A LOAN GO TO FORECLOSURE BECAUSE IT

12   WOULDN'T BE IN THEIR ECONOMIC INTEREST.

13           DO YOU RECALL THAT?

14       A    I DO.

15           MS. ROSE-SMITH:  OBJECTION.

16   BY MR. DESAI:

17       Q    IS IT YOUR TESTIMONY THAT OCWEN ALWAYS ACTS IN

18   ITS ECONOMIC SELF-INTEREST?

19           MS. ROSE-SMITH:  OBJECTION.

20           THE WITNESS:  IN EVERY CONCEIVABLE DECISION

21   THAT'S EVER MADE, NO.

22           GENERALLY SPEAKING, YES.

23           IN FACT, IN THE OVERWHELMING MAJORITY OF

24   CASES, IT DOES.  AND THAT'S GENERALLY TRUE OF

25   BUSINESSES THAT ARE ABLE TO SURVIVE.

Page 251

1    BY MR. DESAI:

2        Q    AND IN RELATION TO OCWEN SERVICING FEES, DO

3    YOU KNOW IF A BORROWER GOES INTO DEFAULT, DOES OCWEN

4    CHARGE LATE FEES?

5        A    IT -- WELL, IF THEY -- NOT ON ACCOUNT OF

6    DEFAULT.  THEY CHARGE A LATE FEE WHEN THE BORROWER

7    MAKES A LATE PAYMENT.

8        Q    WHO EARNS THE FEES, THESE LATE FEES?

9            MS. ROSE-SMITH:  OBJECTION.

10           THE WITNESS:  WELL, THEY ARE -- OCWEN KEEPS

11   THE LATE FEES.  THEY'RE BUILT INTO THE PRICING MODEL.

12   THEY COMPENSATE OCWEN FOR THE COST OF BORROWING THE

13   MONEY TO PAY THE INVESTOR WHEN THE BORROWER DOES NOT

14   PAY OCWEN.

15           SO IT'S KIND OF A NET TO OCWEN.

16   BY MR. DESAI:

17       Q    SO DR. HAMM, IS IT YOUR TESTIMONY THAT OCWEN'S

18   LATE FEES ARE NOT PROFITABLE?

19           MS. ROSE-SMITH:  OBJECTION.

20           THE WITNESS:  GENERALLY SPEAKING, THEY'RE

21   NOT -- THEY'RE NOT A SIGNIFICANT PART OF THE PROFIT

22   STREAM.  THEY MAY BE A SIGNIFICANT PART OF THE REVENUE

23   STREAM.  BUT AGAIN, OCWEN HAS TO FINANCE ITSELF, THE

24   PAYMENTS TO THE INVESTORS WHEN THE BORROWER DOESN'T

25   MAKE THE PAYMENTS.  AND THE TWO GENERALLY NET OUT --

Page 252

1    THERE MAY BE -- I HAVEN'T ACTUALLY STUDIED WHAT THE

2    ACTUAL COST OF CAPITAL IS FOR OCWEN AND -- BUT AGAIN

3    THERE'S AN OFFSET TO THAT.  IT'S NOT PURE PROFIT.

4    THERE MAY BE SOME PROFIT.  THERE MAY BE SOME LOSS.  I

5    CAN'T SAY AS I SIT HERE.

6    BY MR. DESAI:

7         Q    SO, DR. HAMM, YOU HAVEN'T ACTUALLY PERFORMED

8    ANY ANALYSIS COMPARING THE LATE FEES OCWEN EARNS TO THE

9    COST IT MUST EXPEND TO EARN THOSE FEES; IS THAT

10   CORRECT?

11        A    THAT IS CORRECT.

12        Q    DOES OCWEN EARN ANY -- DOES OCWEN EARN ANY

13   OTHER DEFAULT-RELATED FEES?

14             MS. ROSE-SMITH:  OBJECTION.

15             THE WITNESS:  WELL, IT CHARGES DEFAULT-RELATED

16   FEES.  IT ASSESSES THOSE FEES AGAINST THE BORROWER'S

17   ACCOUNT TO -- FOR OUT-OF-POCKET COSTS THAT IT INCURS

18   AND IN MOST CASES GETS REIMBURSED FOR THOSE

19   OUT-OF-POCKET COSTS NOT FOR THE BORROWER, BUT BY THE

20   INVESTOR.

21             IN SOME CASES IT HAS TO EAT THOSE COSTS

22   BECAUSE THERE'S NOT SUFFICIENT FUNDS RESULTING FROM THE

23   LIQUIDATION FROM THE COLLATERAL TO COVER THOSE COSTS.

24   IT'S NOT A SOURCE OF PROFIT.

25   ///

Page 253

1    BY MR. DESAI:

2        Q    WHAT IS THE BASIS FOR YOUR OPINION THAT IT'S

3    NOT A SOURCE OF PROFIT?

4        A    BECAUSE THE COSTS ARE GENERALLY PASSED ON.

5    SERVICERS TODAY -- AND THIS WAS ALSO TRUE IN MY DAY --

6    HAVE TO BE ABLE TO DEFEND THEIR CHARGES AND THE CHARGES

7    HAVE TO BE REASONABLE AND AS -- ACCORDINGLY, LIKE A BPO

8    FEE IS GENERALLY PASSED, RIGHT, TO THE BORROWER.  IF

9    THE BORROWER DOESN'T PAY IT, OCWEN HAS TO PAY IT.

10   OCWEN WILL GET REIMBURSED FROM THE INVESTOR IF THE

11   BORROWER GOES INTO FORECLOSURE, BUT OCWEN DOESN'T MAKE

12   ANY MONEY OFF OF THAT.

13       Q    IF THE BORROWER PAYS THE FEE, DOES OCWEN KEEP

14   THAT MONEY?

15            MS. ROSE-SMITH:  OBJECTION.

16            THE WITNESS:  WELL, OCWEN HAS ALREADY LAID OUT

17   THE MONEY FOR THE BPO FEE, SO IF THE BORROWER

18   REIMBURSES OCWEN, THEN OCWEN IS MADE WHOLE.  IT HASN'T

19   MADE ANY MONEY.  IT HAS SIMPLY GOTTEN ITS OUTLAY OF

20   CASH BACK.

21   BY MR. DESAI:

22       Q    SO IN THE CASE OF A DEFAULT, IF A BORROWER

23   HASN'T PAID, OCWEN COULD BE OUT THE MONEY; IS THAT

24   CORRECT?

25       A    ONLY IN THE CIRCUMSTANCES WHERE LIQUIDATION OF

Page 254

1    THE COLLATERAL IS NOT SUFFICIENT TO GENERATE THE AMOUNT

2    OF MONEY NEEDED FOR THE INVESTOR TO REIMBURSE OCWEN FOR

3    THAT FEE.  AND THAT DOESN'T HAPPEN TOO OFTEN.  IT DOES

4    HAPPEN.  BUT IN MOST CASES THE COLLATERAL WILL FETCH

5    ENOUGH MONEY TO COVER WHAT ARE CALLED "DEFAULT

6    SERVICING FEES" SO THAT OCWEN WILL BREAK EVEN.

7         Q    ONCE A FORECLOSURE SALE IS COMPLETED AND THE

8    LIQUID -- AND THE FORECLOSURE PROCEEDS HAVE BEEN

9    RECOVERED, ARE THE PROCEEDS -- ARE THE PROCEED SALES

10   PAID TO OCWEN BEFORE THEY'RE PAID TO THE INVESTOR?

11        A    WELL --

12             MS. ROSE-SMITH:  OBJECTION.

13             THE WITNESS:  -- IT CAN BE -- IT CAN GO ONE OF

14   TWO WAYS.  IT CAN BE PAID TO OCWEN OR IT CAN BE

15   DEPOSITED IN AN ACCOUNT THAT IS OWNED BY THE INVESTOR

16   THAT OCWEN HAS THE AUTHORITY GRANTED BY THE INVESTOR TO

17   WITHDRAW FROM SOLELY FOR THE PURPOSE OF COVERING ITS

18   DEFAULT SERVICE FEES.

19   BY MR. DESAI:

20        Q    SO AT THE TIME OF A FORECLOSURE SALE AND THE

21   PROCEEDS HAVE BEEN RECEIVED, OCWEN WOULD BE REPAID FOR

22   ANY OF THE DEFAULT FEES THAT HAVE NOT BEEN RECOVERED TO

23   DATE; CORRECT?

24             MS. ROSE-SMITH:  OBJECTION.

25             THE WITNESS:  FOR THE COSTS THAT IT HAD

Page 255

1    INCURRED FOR THOSE DEFAULT SERVICING TASKS THAT IT HAD

2    NOT PREVIOUSLY RECOVERED, IT WOULD GET THAT FROM THE

3    INVESTOR.

4    BY MR. DESAI:

5        Q    YOU STATED EARLIER, ALSO IN RESPONSE TO A

6    QUESTION BY MS. ROSE-SMITH, WHEN DISCUSSING CONFOUNDING

7    FACTORS THAT FACED WITH THESE CONFOUNDING FACTORS

8    PROFESSOR MCFADDEN SHOULD HAVE TAKEN A DIFFERENT

9    APPROACH.

10           DO YOU RECALL THAT?

11       A    I DO.

12       Q    AND YOU SAID HE SHOULD HAVE APPLIED A SIMPLER

13   APPROACH.

14           DO YOU RECALL THAT?

15       A    I DON'T THINK I RECALL SAYING HE SHOULD HAVE.

16   I THINK I SAID HE COULD HAVE, BUT THERE ARE OTHER

17   ALTERNATIVES.  BUT WHAT I SAID HE SHOULD NOT DO IS PUT

18   FORWARD A MODEL THAT OMITTED VARIABLES THAT HE CONCURS

19   ARE IMPORTANT DETERMINATES OF FORECLOSURE AND THAT ARE

20   CORRELATED WITH THE INDEPENDENT VARIABLE OF CONCERN

21   HERE.  HE WOULD HAVE OTHER OPTIONS.  ONE OF THEM WOULD

22   BE TO DRAW A SAMPLE.  ANOTHER OPTION -- OR THERE MAY BE

23   OTHER OPTIONS.  IF I THOUGHT MORE ABOUT IT, I MIGHT

24   COME UP WITH THEM.  BUT THERE'S ONE OPTION.

25       Q    IN YOUR SURREBUTTAL REPORT, YOU DON'T IDENTIFY

Page 256

1    THIS SAMPLING ALTERNATIVE; IS THAT CORRECT?

2        A    I DO NOT.

3             MR. DESAI:  NO OTHER QUESTIONS.

4             MS. ROSE-SMITH:  NOTHING FURTHER FOR ME.

5             WE'LL MARK THIS DEPOSITION AS CONFIDENTIAL

6    PURSUANT TO THE PARTY'S PROTECTIVE ORDER IN THIS CASE

7    AND HE'S GOING TO READ AND SIGN.

8             MR. DESAI:  WE CAN GO OFF THE RECORD.

9             THE VIDEOGRAPHER:  GOING OFF THE RECORD.  IT'S

10   5:33 P.M.  THIS CONCLUDES THE COURT DEPOSITION.

11             (DEPOSITION CONCLUDED AT 5:33 P.M.)

12                         -OOO-

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 257

```
 1                   INSTRUCTIONS TO WITNESS

 2

 3          PLEASE READ YOUR DEPOSITION OVER CAREFULLY AND

 4    MAKE ANY NECESSARY CORRECTIONS.  YOU SHOULD STATE THE

 5    REASON IN THE APPROPRIATE SPACE ON THE ERRATA SHEET FOR

 6    ANY CORRECTIONS THAT ARE MADE.  AFTER DOING SO, PLEASE

 7    SIGN THE ERRATA SHEET AND DATE IT.

 8          YOU ARE SIGNING SAME SUBJECT TO THE CHANGES

 9    YOU HAVE NOTED ON THE ERRATA SHEET, WHICH WILL BE

10    ATTACHED TO YOUR DEPOSITION.

11          IT IS IMPERATIVE THAT YOU RETURN THE ORIGINAL

12    ERRATA SHEET TO THE DEPOSING ATTORNEY WITHIN THIRTY

13    (30) DAYS OF RECEIPT OF THE DEPOSITION TRANSCRIPT BY

14    YOU.  IF YOU FAIL TO DO SO, THE DEPOSITION TRANSCRIPT

15    MAY BE DEEMED TO BE ACCURATE AND MAY BE USED IN COURT.

16

17

18

19

20

21

22

23

24

25
```

Page 258

```
1                    - - - - - -

2                  E  R  R  A  T  A

3                    - - - - - -

4    PAGE  LINE   CHANGE

5    ____  ____   _____

6    REASON: _____

7    ____  ____   _____

8    REASON: _____

9    ____  ____   _____

10   REASON: _____

11   ____  ____   _____

12   REASON: _____

13   ____  ____   _____

14   REASON: _____

15   ____  ____   _____

16   REASON: _____

17   ____  ____   _____

18   REASON: _____

19   ____  ____   _____

20   REASON: _____

21   ____  ____   _____

22   REASON: _____

23   ____  ____   _____

24   REASON: _____

25
```

Page 259

1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, WILLIAM G. HAMM, PH.D., DO HEREBY CERTIFY

4    THAT I HAVE READ THE FOREGOING PAGES, AND THAT THE SAME

5    IS A CORRECT TRANSCRIPTION OF THE ANSWERS GIVEN BY ME

6    TO THE QUESTIONS THEREIN PROPOUNDED, EXCEPT FOR THE

7    CORRECTIONS OR CHANGES IN FORM OR SUBSTANCE, IF ANY,

8    NOTED IN THE ATTACHED ERRATA SHEET.

9

10

11   _____          _____

12     (DATE)                               (SIGNATURE)

13

14

15

16   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____DAY

17   OF_____, 2020.

18

19   MY COMMISSION EXPIRES:_____

20

21

22

23   _____

24            NOTARY PUBLIC

25

Page 260

1          DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA )
                         ) SS.
4    COUNTY OF ORANGE    )

5          I, LISA DAY, HEREBY CERTIFY:

6          I AM A DULY QUALIFIED CERTIFIED SHORTHAND

7    REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

8    CERTIFICATE NO. CSR 12960 ISSUED BY THE COURT REPORTERS

9    BOARD OF CALIFORNIA AND WHICH IS IN FULL FORCE AND

10   EFFECT. (FED. R. CIV. P. 28(A).)

11         I AM AUTHORIZED TO ADMINISTER OATHS OR

12   AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

13   PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING EXAMINED,

14   THE DEPONENT WAS FIRST DULY SWORN BY ME.  (FED R. CIV.

15   28(A), 30(F)(1).)

16         I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR

17   COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR

18   EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I

19   FINANCIALLY INTERESTED IN THIS ACTION.  (FED R. CIV. P.

20   28.)

21         I AM THE DEPOSITION OFFICER THAT

22   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

23   FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS A

24   TRUE RECORD OF THE TESTIMONY GIVEN.  (FED. R. CIV. P.

25   30(F)(1).)

Page 261

1           BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

2    THE TRANSCRIPT WAS REQUESTED.  IF REQUESTED, ANY

3    CHANGES MADE BY THE DEPONENT (AND PROVIDED TO THE

4    REPORTER) DURING THE PERIOD ALLOWED, ARE APPENDED

5    HERETO. (FED. R. CIV. P. 30(E).)

6

7

8    DATED FEBRUARY 11, 2020.

9

10

11                    _____

                                LISA DAY, CSR NO. 12960
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA )
                          ) SS.
4    COUNTY OF ORANGE     )

5              I, LISA DAY, HEREBY CERTIFY:

6              I AM A DULY QUALIFIED CERTIFIED SHORTHAND

7    REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF

8    CERTIFICATE NO. CSR 12960 ISSUED BY THE COURT REPORTERS

9    BOARD OF CALIFORNIA AND WHICH IS IN FULL FORCE AND

10   EFFECT. (FED. R. CIV. P. 28(A).)

11             I AM AUTHORIZED TO ADMINISTER OATHS OR

12   AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL

13   PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING EXAMINED,

14   THE DEPONENT WAS FIRST DULY SWORN BY ME.  (FED R. CIV.

15   28(A), 30(F)(1).)

16             I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR

17   COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR

18   EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I

19   FINANCIALLY INTERESTED IN THIS ACTION.  (FED R. CIV. P.

20   28.)

21             I AM THE DEPOSITION OFFICER THAT

22   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE

23   FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS A

24   TRUE RECORD OF THE TESTIMONY GIVEN. (FED. R. CIV. P.

25   30(F)(1).)

261

1        BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF

2   THE TRANSCRIPT WAS REQUESTED.   IF REQUESTED, ANY

3   CHANGES MADE BY THE DEPONENT (AND PROVIDED TO THE

4   REPORTER) DURING THE PERIOD ALLOWED, ARE APPENDED

5   HERETO. (FED. R. CIV. P. 30(E).)

6

7

8   DATED FEBRUARY 11, 2020.

9

10

11           *Lisa Day*

          LISA DAY, CSR NO. 12960

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 259

1                    ACKNOWLEDGMENT OF DEPONENT

2

3           I, WILLIAM G. HAMM, PH.D., DO HEREBY CERTIFY

4    THAT I HAVE READ THE FOREGOING PAGES, AND THAT THE SAME

5    IS A CORRECT TRANSCRIPTION OF THE ANSWERS GIVEN BY ME

6    TO THE QUESTIONS THEREIN PROPOUNDED, EXCEPT FOR THE

7    CORRECTIONS OR CHANGES IN FORM OR SUBSTANCE, IF ANY,

8    NOTED IN THE ATTACHED ERRATA SHEET.

9

10

11   _February 25, 2020_                   _William G. Hamm_

12        (DATE)                            (SIGNATURE)

13

14

15

16   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____DAY

17   OF_____, 2020.

18

19   MY COMMISSION EXPIRES:_____

20

21

22

23   ____See attached certificate____

24           NOTARY PUBLIC

25

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Alameda_

Subscribed and sworn to (or affirmed) before me on this _25th_ day of _February_ , 20_20_ , by _____
_William Giles Hamm_ ,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

KASSIA AKAMINE
Notary Public · California
Alameda County
Commission # 2276952
My Comm. Expires Feb 8, 2023

(Seal)                     Signature _Kassia Akamine_

Re: Deposition of William G. Hamm, Ph.D.
Date: 2/6/2020
*CFPB v. Ocwen*, 9:17-cv-80495 (S.D. Fla.)

| Page | Line | Correction/Change | Reason |
|------|------|-------------------|--------|
| 19 | 5 | Replace "**runs**" with "**data and analysis**" | Clarification |
| 28 | 22 | Delete one occurrence of "**the definition of**" | Clarification |
| 28 | 23 | Change "**common**" to "**comment**" | Transcription Error |
| 29 | 25 | Change "**as**" to "**is**" | Transcription Error |
| 46 | 15 | Change "**they**" to "**homeowners**" | Clarification |
| 57 | 17 | Change "**ROD**" to "**ROG**" | Transcription Error |
| 58 | 7 | Change "**that's**" to "**that**" | Transcription Error |
| 58 | 9 | Change "**population are**" to "**population – are**" | Transcription Error |
| 59 | 20 | Change "**than I was**" to "**.  I was less interested in the process than I was**" | Clarification |
| 60 | 6 | Change "**request**" to "**request,**" | Transcription Error |
| 70 | 21 | Change "**actually**" to "**actual**" | Transcription Error |
| 70 | 22 | Change "**might**" to "**I might**" | Transcription Error |
| 80 | 12 | Change "**date**" to "**data**" | Transcription Error |
| 89 | 16 | Change "**may**" to "**It may**" | Transcription Error |
| 96 | 10 | Insert "**the**" before "**house**" | Transcription Error |
| 98 | 3 | Change "**may**" to "**It may**" | Transcription Error |
| 98 | 8 | Change "**a additional**" to "**an additional**" | Transcription Error |
| 99 | 7 | Change "**have**" to "**I have**" | Transcription Error |
| 104 | 6 | Change "**were**" to "**was**" | Transcription Error |
| 106 | 4 | Change "**end of the**" to "**end of what the**" | Transcription Error |
| 116 | 1 | Delete "**No.**" | Clarification |

Re: Deposition of William G. Hamm, Ph.D.
Date: 2/6/2020
*CFPB v. Ocwen*, 9:17-cv-80495 (S.D. Fla.)

| 120 | 3 | Change "**opinion**" to "**own**" | Transcription Error |
|---|---|---|---|
| 123 | 21 | Delete "**less likely to – are higher**" | Clarification |
| 133 | 17 | Change "**area of the area**" to "**area of the property**" | Clarification |
| 135 | 9 | Change "**undermines a**" to "**undermines the**" | Transcription Error |
| 146 | 21 | Change "**undermines a**" to "**undermines the**" | Transcription Error |
| 146 | 24 | Delete "**with**" | Clarification |
| 154 | 4 | Insert at the end of the line: "**Although it is important to note that to the extent any of the 7,417 were modified, they would have also received a trial modification. However, none of the 7,417 would have received just a trial modification and not a permanent modification, or otherwise reinstated the loan.**" | Clarification |
| 155 | 21-23 | Replace with: "**None had a reinstatement after the foreclosure initiation. I do not know how many may have reinstated prior to the default that led to the at-issue foreclosure.**" | Correction |
| 157 | 25 | Change "**charge**" to "**charge-off**" | Transcription Error |
| 159 | 24 | Change "**know**" to "**know.**" | Transcription Error |
| 163 | 4 | Change "**from**" to "**for**" | Transcription Error |
| 163 | 9 | Delete "**No Less than individual that**" | Clarification |
| 168 | 18 | Change "**he**" to "**it**" | Clarification |
| 171 | 7 | Change "**upon**" to "**on**" | Transcription Error |
| 177 | 12 | Change "**defaulted because**" to "**It defaulted because**" | Transcription Error |
| 192 | 23 | Change "**7000-whatever-it-was**" to "**8,019**" | Clarification |
| 205 | 12 | Change "**broker or price**" to "**broker price**" | Transcription Error |
| 206 | 10 | Change "**we**" to "**they**" | Transcription Error |

Re: Deposition of William G. Hamm, Ph.D.
Date: 2/6/2020
*CFPB v. Ocwen*, 9:17-cv-80495 (S.D. Fla.)

| 213 | 9 | Insert the following after "**Zillow.com**": "**, but it is not the Zestimate, it is the actual sale price**" | Clarification |
|---|---|---|---|
| 213 | 19 | Change "**wasn't**" to "**it wasn't**" | Transcription Error |
| 216 | 21 | Change "**GSC**" to "**GSE**" | Transcription Error |
| 218 | 9 | Change "**negative**" to "**necessary**" | Transcription Error |
| 227 | 3 | Change "**econometric**" to "**econometrics**" | Transcription error |
| 240 | 4 | Change "**5100**" to "**11,500**" | Clarification |
| 240 | 20 | Change "**500**" to "**$500**" | Transcription Error |
| 241 | 7 | Change "**payment in order**" to "**payment for 12 months in order**" | Clarification |
| 241 | 16 | Change "**deficiency**" to "**delayed**" | Transcription Error |
| 242 | 21 | Insert "**to**" between "**have**" and "**to**" | Transcription Error |
| 250 | 5 | Change to: "**It's possible I did after I submitted my rebuttal report.**" | Clarification |
| 252 | 19 | Change "**for**" to "**by**" | Transcription Error |
| 256 | 22 | Change to: "**I do not in my rebuttal report.**" | Clarification |