# EXHIBIT 6

```
 1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
 2              WEST PALM BEACH DIVISION

 3

 4  CONSUMER FINANCIAL PROTECTION     ) Case No.
    BUREAU,                           ) 9:17-CV-80495-
 5                                    ) MARRA-MATTEWMAN
             Plaintiff,               )
 6                                    )
             vs.                      )
 7                                    )
    OCWEN FINANCIAL CORPORATION,      )
 8  OCWEN MORTGAGE SERVICING, INC.,   )
    and OCWEN LOAN SERVICING LLC,     )
 9                                    )
             Defendants.              )
10  _____  )
                                      )
11  OFFICE OF THE ATTORNEY GENERAL,   ) Case No.
    THE STATE OF FLORIDA,             ) 9:17-CV-80496
12  Department of Legal Affairs,      ) MARRA-MATTHEWMAN
                                      )
13  and                               )
                                      )
14  OFFICE OF FINANCIAL REGULATION,   )
    THE STATE OF FLORIDA, Division    )
15  of Consumer Finance,              )
                                      )
16           Plaintiffs,              )
                                      )
17           vs.                      )
                                      )
18  OCWEN FINANCIAL CORPORATION,      )
    et al,                            )
19                                    )
             Defendants.              )
20  _____  )
21      VIDEO-RECORDED DEPOSITION OF DANIEL McFADDEN
22             San Francisco, California
23             Tuesday, February 4, 2020
24  Job No: 175499
25      Reported by:  Hanna Kim, CLR, CSR No. 13083
```

1          Tuesday, February 4, 2020

2                   8:46 a.m.

3

4     Video-recorded deposition of DANIEL

5     McFADDEN, PH.D., taken on behalf of the

6     Defendants, at the law offices of Goodwin

7     Procter LLP, located at 3 Embarcadero

8     Center, Suite 2800, San Francisco,

9     California 94111, before Hanna Kim, CLR,

10    Certified Shorthand Reporter, No. 13083.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S:

 2

 3     For Plaintiffs:

 4              CONSUMER FINANCIAL PROTECTION BUREAU

 5              BY:  SHIRLEY CHIU, ESQ.

 6              BY:  ATUR DESAI, ESQ.

 7              BY:  JEAN HEALEY, ESQ.

 8              1700 G Street, NW

 9              Washington, D.C. 20552

10

11     For Defendants:

12              GOODWIN PROCTER

13              BY:  THOMAS HEFFERON, ESQ.

14              1900 N Street, NW

15              Washington, D.C. 20036

16

17     Also Present:

18              JOSEPHINE DUH, Brattle Group

19              GREG HALM, BRG

20

21

22

23

24

25
```

1                        INDEX OF EXAMINATION

2

3    WITNESS:  DANIEL McFADDEN, PH.D.

4    EXAMINATION                                    PAGE

5            BY MR. HEFFERON:                  7, 308

6            BY MS. CHIU:                          306

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              INDEX OF EXHIBITS

2

3    McFADDEN DEPOSITION EXHIBITS                    PAGE

4    Exhibit 1    Appendix A to Second Amended        23

5                 Report of Daniel McFadden

6    Exhibit 2    Supplement to resume of Daniel       34

7                 McFadden

8    Exhibit 3    Appendix to surrebuttal report       48

9                 of Daniel McFadden

10   Exhibit 4    "Cost Effectiveness of Mortgage      69

11                Foreclosure Prevention"

12   Exhibit 5    Second amended report dated          93

13                September 19, 2019

14   Exhibit 6    Surrebuttal report of                93

15                November 14, 2019

16   Exhibit 7    Printout from Zillow.com            185

17   Exhibit 8    "Total Hours through 12/31/2019"    298

18   Exhibit 9    "Moody's Mortgage Metrics Prime:    301

19                A Quasi-Structural Model of

20                Prime Mortgage Portfolio"

21                     --o0o--

22

23

24

25

1          San Francisco, California

2      Tuesday, February 4, 2020; 8:46 a.m.

3                --o0o--

4          THE VIDEOGRAPHER:  This is the start of

5    media labeled Number 1 of the video-recorded

6    deposition of Daniel McFadden, in the matter

7    Consumer Financial Protection Bureau versus Ocwen

8    Financial Corporation, et al., in the United States

9    District Court, Southern District of Florida, West

10   Palm Beach Division, Case Number 9:17-CV-80495.

11         This deposition is being held at Three

12   Embarcadero Center in San Francisco, California, on

13   February 4th, 2020, at approximately 8:47 a.m.

14         My name is Joseph Blea.  I'm the legal

15   video specialist from TSG Reporting, Inc.,

16   headquartered at 747 Third Avenue, New York, New

17   York.

18         The court reporter is Hanna Kim, in

19   association with TSG Reporting.

20         Counsel, would you please introduce

21   yourselves, beginning with the questioning attorney.

22         MR. HEFFERON:  Thomas Hefferon for the

23   Defendants.

24         MS. CHIU:  Shirley Chiu for the Consumer

25   Financial Protection Bureau.

1          MR. DESAI:  Atur Desai for the Consumer

2   Financial Protection Bureau.

3          MS. HEALEY:  Jean Healey for the Consumer

4   Financial Protection Bureau.

5          MS. DUH:  Josephine Duh, The Brattle

6   Group.

7          MR. HALM:  Greg Halm, BRG.

8          THE VIDEOGRAPHER:  And present on the

9   phone?

10         MS. GRANAI:  Sash Funk Granai, State of

11  Florida, Office of the Attorney General.

12         THE VIDEOGRAPHER:  Will the court reporter

13  please swear in the witness.

14              DANIEL McFADDEN, PH.D.,

15  having been administered an oath, was examined and

16  testified as follows:

17         THE VIDEOGRAPHER:  You may proceed.

18         MR. HEFFERON:  Thank you.

19                   EXAMINATION

20  BY MR. HEFFERON:

21     Q.   Good morning, Professor McFadden.  My name

22  is Tom Hefferon.  I represent the Defendants in the

23  case, the -- the Ocwen companies.  And I'm here to

24  take your deposition today.

25         I know you've been deposed before, so I

1    won't go over the ground rules, but I do want to ask

2    you if you're aware of any limitations on your

3    ability to provide full and complete testimony

4    today?

5         A.   No.

6         Q.   Okay.  You feel well enough to perform

7    that function for us today?

8         A.   Yes.

9         Q.   Okay.  And you understand that your role

10   in this case is as an expert witness; correct?

11        A.   Correct.

12        Q.   Okay.  On whose behalf are you testifying

13   as an expert witness?

14        A.   Repeat the question.

15        Q.   Sure.

16             On whose behalf are you testifying as an

17   expert witness?

18        A.   Consumer Financial Protection Bureau.

19        Q.   Okay.  What's the -- what is your relevant

20   field of expertise for this case?

21        A.   I'm an economist, an econometrician.  I --

22   I work broadly across many fields of economics and

23   statistics.

24        Q.   And what are the primary subjects of the

25   opinions you're giving in this case?

1      A.    They have to do with the contributing

2  factor of Ocwen servicing errors on outcomes for its

3  borrowers in the mortgages it services.

4      Q.    And what do you mean by "outcomes"?

5      A.    Financial outcomes.

6      Q.    What do you mean by "financial outcomes"?

7      A.    The question is, had Ocwen not had

8  servicing errors, how would the financial

9  circumstances of its borrowers differ.

10     Q.    And what qualifies you to be an expert on

11 the subject of how Ocwen -- had Ocwen not had

12 servicing errors, how would the financial

13 circumstances of its borrowers be different?

14     A.    The question that's raised here is the

15 im- -- scientific impact -- scientific question is

16 the impact of these factors on outcomes,

17 particularly foreclosure initiations, lost access to

18 funds that are the property of the borrower, and

19 similar issues.  Those are issues that economists,

20 such as myself, ordinarily deal -- deal with.

21     Q.    And what do you mean by saying that the

22 scientific question is those impacts?

23          MS. CHIU:  Objection.  Form.

24          THE WITNESS:  The role of an expert -- an

25 economic expert in this case is to determine the

1   harm and quantify the harm done to Ocwen mortgage

2   borrowers as a result of its conduct.

3   BY MR. HEFFERON:

4       Q.   And why do you say that's a scientific

5   question?

6       A.   Because in the end, the -- the question

7   is -- the science here is the -- the statistical

8   science is the economic science of -- of quantifying

9   those harms and -- and putting dollar values on

10  them.

11      Q.   And what did you do to become

12  knowledgeable about the -- the mortgage servicing

13  issues in this case?

14           MS. CHIU:  Objection.  Form.

15           THE WITNESS:  With respect -- with

16  specific regard to this case, I -- I am familiar

17  with the complaints in the case, and I have worked

18  with the data provided by Ocwen to the CFPB.

19  BY MR. HEFFERON:

20      Q.   Okay.  Did you do anything else to become

21  knowledgeable about the mortgage servicing issues in

22  this case?

23           MS. CHIU:  Objection.  Form.

24           THE WITNESS:  I've, of course, drawn my

25  general economic background on a variety of

Page 11

1   subjects.

2   BY MR. HEFFERON:

3        Q.   Anything else?

4        A.   Perhaps you could focus your question.  I

5   don't --

6        Q.   It's a simple question, sir, which is, I'm

7   asking you just what you've done to become

8   knowledgeable about the mortgage servicing issues in

9   this case.

10           You've told me you're familiar with the

11  complaint, you looked at the data, and you drew on

12  general economic background in a variety of areas.

13           Did you do anything else?

14       A.   I -- I drew upon my general experience

15  in -- in dealing with the issue of -- of loan

16  defaults and mortgage defaults.

17       Q.   Describe that general -- general

18  experience to me, please.

19           THE COURT REPORTER:  Counsel, you're

20  covering your mic.

21           MR. HEFFERON:  Oh, I'm sorry.

22           THE WITNESS:  I have worked for a number

23  of decades on issues of the economics of housing, on

24  loan default risk, and how to analyze it

25  quantitatively and make predictions on defaults.

Page 12

1    BY MR. HEFFERON:

2         Q.   Are you able to be more specific?

3              MS. CHIU:   Objection.   Form.

4              MR. HEFFERON:   What's wrong with the

5    question?

6              MS. CHIU:   It -- it seemed kind of vague.

7              THE WITNESS:   Would you like me to go

8    through my resume?

9    BY MR. HEFFERON:

10        Q.   I would like you to explain to me your

11   work for a number of decades on issues of economic

12   housing, on loan default risk, and how to analyze it

13   quantitatively and make predictions on defaults.

14        A.   Well, I'll give you some -- some

15   background then.   I began working on the issues

16   of -- of debt default risk in the late 1970s on a

17   project for the World Bank.   That was not

18   specifically directed to mortgage default, but

19   generally debt risk.

20             In the -- around 1966 -- I'm sorry, 1986,

21   I began work on the question of housing problems of

22   the elderly, and the difficulties they could

23   encounter from having housing costs that were out of

24   line with their ability to pay.   In that connection,

25   I did quite a lot of work on housing prices.

1          I did work on the nature of the housing

2  market, and projections of housing market problems

3  in work done in the 1990s.

4          I don't recall the exact date, but around

5  1998 I have a published paper that predicted that

6  the United States would have a housing crisis in

7  about...

8          And in the last decade, I have worked on

9  two cases, specifically legal cases, having to do

10 with the evaluation of mortgage default risk.

11     Q.   And what were those cases?

12     A.   Syncora versus Countrywide and Bank --

13 USDOJ versus Countrywide.

14     Q.   What was your work in Syncora versus

15 Countrywide that related to your evaluation of

16 mortgage default risk?

17     A.   I'm limited by a nondisclosure agreement,

18 but I can say generally that I worked on the factors

19 that influenced default risk, and the prediction of

20 default probabilities.

21     Q.   And when you say you are bounded by a

22 nondisclosure agreement, what's the nature of that

23 agreement?

24     A.   I don't recall the exact nature, except I

25 have -- I have a -- a signed nondisclosure agreement

Page 14

1    for that case.

2         Q.   So I guess I'm trying to understand what I

3    can ask you about, and what I can't ask you about

4    because you told me you're limited by a

5    nondisclosure agreement, but you haven't been able

6    to recall the exact nature of it.

7         A.   Well, my understanding, in general, on

8    nondisclosure agreements, that if it's in the

9    published -- public demain, it's -- it's available.

10   And if it's not in the public domain, I'm not

11   supposed to discuss it.

12        Q.   What did you conclude were the factors

13   that influenced default risk in connection with your

14   work on the Syncora case?

15             MS. CHIU:  Objection.  Form.

16             THE WITNESS:  I don't think I can discuss

17   the specifics, because as far as I'm aware, the

18   modeling that I did has not been released to the

19   public.  I can tell you that I did not have findings

20   that were substantially different from the

21   literature on default risk.

22   BY MR. HEFFERON:

23        Q.   Okay.  So what -- we'll come back to that.

24             What was your work in the USDOJ versus

25   Countrywide?

1         MS. CHIU:  Objection.  Form.

2         THE WITNESS:  It was similarly with the

3   prediction of the probability of a default and the

4   factors that influence default risk.

5   BY MR. HEFFERON:

6      Q.   And what did you conclude in that case

7   regarding the probability of default, and factors

8   that influence default risk?

9      A.   As I sit here, I don't recall the

10  specifics of the findings, nor do I believe I would

11  be free to -- to discuss them.

12     Q.   Were your conclusions, like Syncora, not

13  substantially different from the literature on

14  default risk?

15        MS. CHIU:  Objection.  Form.

16        THE WITNESS:  As a general statement, I

17  think that's correct.

18  BY MR. HEFFERON:

19     Q.   Now, you're familiar, aren't you,

20  Professor, with the fact that there has been a

21  substantial amount of literature published on the

22  causes of home mortgage defaults published within

23  the last ten years or so after the financial crisis?

24     A.   Yes.

25     Q.   Okay.  Are you familiar with that

Page 16

1    literature?

2         A.    Generally, yes.

3         Q.    Have you read those papers, any of them?

4         A.    I'm -- I'm familiar with this literature.

5    I've read various papers.  But you would have to be

6    specific.

7         Q.    Well, I'm asking you to be specific, sir,

8    since, as you've indicated, that -- that you agree

9    there's been a substantial amount of literature.

10        So I'm only asking you to tell me at least

11   one paper in -- within that substantial amount of

12   literature published on the causes of home mortgage

13   defaults in the last ten years that you've read.

14        A.    I would refer you to my report where I

15   cite -- and particularly to the surrebuttal report

16   where I cite specific studies.

17        Q.    Can you identify any person who has

18   published literature in the last ten years on the

19   causes of mortgage defaults, who you believe to be

20   an expert in that field?

21             MS. CHIU:  Objection.

22             THE WITNESS:  There's a paper of -- the

23   lead author is Campbell.  I consider that a

24   representative paper.

25   BY MR. HEFFERON:

1      Q.    Campbell was the lead author?

2      A.    Yes.

3      Q.    Okay.  Any other persons that you can

4  identify, who has published, literature in the last

5  ten years on the causes of mortgage defaults, whom

6  you believe to be an expert in that field?

7           MS. CHIU:  Objection.

8           THE WITNESS:  I would refer to my report.

9  I -- I didn't do a memory exercise to memorize these

10  names.

11  BY MR. HEFFERON:

12      Q.    So the answer is, no, you can't name

13  identify anyone, other than Mr. Campbell or

14  Ms. Campbell?

15           MS. CHIU:  Objection.

16           THE WITNESS:  I think it is unreasonable

17  to ask me to do that.  I can look at my report and

18  tell you what papers I've read.  I -- I can identify

19  that from my report.

20  BY MR. HEFFERON:

21      Q.    Sir, we're going to have a difficult time

22  in this deposition if you start to pass judgment on

23  what's reasonable or unreasonable.  If the answer

24  is, no, you can't answer the question, just say no.

25           THE COURT REPORTER:  Can you slow down

1   some?

2          MR. HEFFERON:  Sure.

3   BY MR. HEFFERON:

4      Q.   If -- we're going to have a difficult time

5   in this deposition if you start to pass judgement on

6   whether the questions are reasonable or

7   unreasonable.  So please answer the question.

8      A.   We will have a difficult time if you -- if

9   you're unwilling to provide me with a copy of my

10  report so I can respond from my report.

11     Q.   Are you unable to testify without your

12  report, sir?

13         MS. CHIU:  He's -- objection.

14         THE WITNESS:  I believe that I have the

15  right to have my report if you're asking me

16  questions about my report.

17  BY MR. HEFFERON:

18     Q.   I'm asking questions about your opinions,

19  sir.

20         Let me -- let me ask you, though, before

21  we move on to things in your report, do you have a

22  mortgage on your home?

23     A.   Do I personally have a mortgage?

24     Q.   Correct.

25     A.   I do.

1          Q.    Okay.  And have you -- how long have you

2    had mortgages on your personal residence?

3                MS. CHIU:  Objection.

4    BY MR. HEFFERON:

5          Q.    Just generally.

6          A.    I've had various mortgages at various

7    times.

8          Q.    And has Ocwen ever been your mortgage

9    servicer?

10               MS. CHIU:  Objection.

11               THE WITNESS:  No.

12   BY MR. HEFFERON:

13         Q.    Have you ever had a dispute with your

14   mortgage servicer?

15               MS. CHIU:  Objection.

16               THE WITNESS:  No.

17   BY MR. HEFFERON:

18         Q.    Have you -- any of your loans ever been

19   referred for foreclosure?

20         A.    No.

21         Q.    Have any members of your family had loans

22   referred for foreclosure?

23               MS. CHIU:  Objection.

24               THE WITNESS:  No.

25               MR. HEFFERON:  What was the basis for that

Page 20

1    objection?

2              MS. CHIU:  It's vague as to "foreclosure."

3    BY MR. HEFFERON:

4         Q.   Do you know what "foreclosure" is, sir?

5         A.   Yes.

6         Q.   Okay.  So do you know of anyone --

7    personally know of anyone who has or has had Ocwen

8    as their mortgage servicer?

9              MS. CHIU:  Objection.

10             THE WITNESS:  I would not be in a

11   position -- not -- not that I'm specifically aware

12   of, and I wouldn't necessarily know.

13   BY MR. HEFFERON:

14        Q.   Prior to being retained for this matter,

15   had you ever had any knowledge or information about

16   Ocwen?

17        A.   No.

18        Q.   Now, Professor, correct me if I'm wrong,

19   but you have in this case served a report which was

20   then amended and then was further amended, and

21   you've also had a surrebuttal report.  Is that

22   accurate?

23        A.   That's correct.

24        Q.   Why did you amend the report the first

25   time?

Page 21

1       A.     The first amendment was to make

2  corrections.

3       Q.     What were the -- why was there a need for

4  corrections?

5              MS. CHIU:  Objection.  Form.

6              So, counsel, we sent to you a redlined

7  version of the changes from the first report --

8              THE COURT REPORTER:  I'm sorry, the first

9  report -- I didn't hear you.

10             MS. CHIU:  From the -- we sent a redlined

11 version of the changes from the first report

12 compared to the second report.

13             THE WITNESS:  I don't recall the specific

14 corrections.

15 BY MR. HEFFERON:

16      Q.     Okay.  Were they corrections made at your

17 request?

18      A.     They were corrections brought to my

19 attention by staff.

20      Q.     Which staff?

21      A.     Which staff, is that the question?

22      Q.     Correct.

23      A.     Brattle staff.

24      Q.     What is the role of Brattle in this

25 matter?

Page 22

1          A.    I worked with a team of data experts and

2     economic experts, that worked under my direction.

3          Q.    Okay.  And someone from Brattle brought to

4     your attention that you needed to amend your first

5     report?

6               MS. CHIU:  Objection.

7               THE WITNESS:  Correct.

8     BY MR. HEFFERON:

9          Q.    And what was the reason that you needed to

10    amend the report a second time?

11         A.    New data was received from Ocwen.

12         Q.    Do you remember what that was?

13         A.    I do not remember the specifics, no.

14         Q.    Okay.  My questions today, Professor, with

15    respect to your initial report, will be focused on

16    the last version, the second amended report.

17               I assume that you agree with me that that

18    is -- in the first round of reports, that's the

19    definitive one because it's the last one?

20         A.    Correct.

21         Q.    Okay.

22               MR. HEFFERON:  Let's mark this as the

23    first exhibit.

24               THE COURT REPORTER:  Do you mind if we go

25    off the record?

Page 23

1          MR. HEFFERON:  Sure.

2          THE VIDEOGRAPHER:  This is end of Media 1.

3   We're going off the record at 9:10 a.m.

4          (Off the record.)

5          THE VIDEOGRAPHER:  This is the beginning

6   of Media 2.  We're going back on the record at

7   9:11 a.m.

8          (McFadden Deposition Exhibit 1 was

9          marked.)

10  BY MR. HEFFERON:

11     Q.   Mr. McFadden, I have shown you what has

12  been marked as Exhibit 1 for your deposition, which

13  is the appendix to your second amended report.

14          Do you see that?

15     A.   Yes.

16     Q.   Now, in the pages following from -- from

17  the beginning until about the bottom of page 18,

18  contain articles and other publications you have

19  authored, as well as information about your

20  experience, degrees, prizes, and the like; is that

21  correct?

22     A.   Correct.

23     Q.   Okay.  And so this -- this information

24  that you told me this morning, about the work you've

25  done in the area of economics of housing, they would

1    all be reflected in Exhibit A?

2         A.   They should be.

3         Q.   Among those first 18 pages of Exhibit A,

4    which reflect your publications and experiences,

5    there's no references there to work that you've done

6    in the area of -- or articles you've published in

7    the area of mortgage servicing; is there?

8              MS. CHIU:  Objection.

9              THE WITNESS:  Are you drawing a

10   distinction between mortgage servicing and mortgage

11   default?  Is that -- do you view those as -- as

12   different subjects?

13   BY MR. HEFFERON:

14        Q.   Do you understand --

15        A.   Is that the question?

16        Q.   -- do you understand what "mortgage

17   servicing" is?

18        A.   I'm sorry?

19        Q.   Do you understand what "mortgage

20   servicing" is?

21        A.   I understand what Ocwen's business was,

22   yes.

23        Q.   What is "mortgage servicing"?

24        A.   It's -- it's the processing of -- of

25   loans, the collection of payments, the calculation

1  of amounts due, the assessment of penalties for

2  delinquencies, the management of foreclosure, if

3  foreclosure is initiated, the collection of escrow

4  establishment, and collection of escrow amounts,

5  et cetera.

6       Q.   And none of the articles and experiences

7  that are set forth in the first 18 pages of your CV

8  mention any experiences specifically related to

9  mortgage servicing; isn't that correct?

10           MS. CHIU:  Objection.

11           THE WITNESS:  Correct.

12  BY MR. HEFFERON:

13       Q.   Have you ever reviewed a mortgage

14  servicing file --

15           MS. CHIU:  Objection.

16  BY MR. HEFFERON:

17       Q.   -- records of what happened in the

18  mortgage servicing of a particular loan?

19           MS. CHIU:  Objection.  Form.

20           THE WITNESS:  Not before this case.

21  BY MR. HEFFERON:

22       Q.   Okay.  And -- that's fair enough.  I

23  appreciate the clarification.

24           Have you ever applied economic --

25  econometric modeling to calculate damages based on

Page 26

1    servicing errors?

2              MS. CHIU:  Objection.  Form.

3              THE WITNESS:  Would you be specific about

4    servicing errors?

5    BY MR. HEFFERON:

6         Q.   Have you ever applied an economic --

7    econometric model to calculate damages, based upon

8    events of mortgage servicing?

9              MS. CHIU:  Objection.  Form.

10             THE WITNESS:  There's two issues.  One is

11   whether I've looked at the question of default risk

12   and how that's influenced by the way mortgages are

13   handled.  I have done that.

14             The ques- -- second question is, have I

15   calculated damages from that?  And the answer is, I

16   have not done that.

17   BY MR. HEFFERON:

18        Q.   And when have you looked at default risk

19   and how that's influenced by the way mortgages are

20   handled?

21        A.   In the cases that I men- -- there were

22   mentioned before, Syncora versus Countrywide and

23   USDOT versus Countrywide.

24        Q.   DOJ?

25        A.   I'm sorry?

1    Q.   DOJ; correct?  You said "DOT."

2    A.   What did I say?

3    Q.   "DOT."

4    A.   Oh, sorry, DOJ, yes.

5    Q.   Okay.  And so what type of events of

6  mortgage servicing were relevant to your work in the

7  Syncora and USDOJ cases?

8         MS. CHIU:  Objection.  Form.

9         THE WITNESS:  Again -- again, I'm not sure

10  what I'm allowed to disclose, but I can say that,

11  what I looked at, was mortgage -- was loan

12  verification.  I did not look at other servicing

13  issues.

14  BY MR. HEFFERON:

15    Q.   And what's loan verification, if you can

16  define that for me?

17    A.   That's confirming that the paperwork on

18  the loan is complete, that the parameters of

19  servicing are set properly.

20    Q.   You mean that the mortgage servicing data

21  matches the underlying transaction and the status of

22  the loan?

23         MS. CHIU:  Objection.

24         THE WITNESS:  I would have to plead that

25  it's been sufficiently long, since I've worked on

1   that case that I don't -- I don't recall.

2   BY MR. HEFFERON:

3       Q.   Okay.  In any event, those cases didn't

4   have anything to do with escrow; did they?

5            MS. CHIU:  Objection.

6            THE WITNESS:  They did not.

7   BY MR. HEFFERON:

8       Q.   And these first 18 pages of your resume do

9   not reflect any experience that you've had in

10  applying economic theory to whether a mortgage

11  servicing event was a contributing cause to a loan

12  going into default or being referred to foreclosure?

13           MS. CHIU:  Objection.

14           THE WITNESS:  The -- that -- that is

15  correct.  There's not -- not a -- there's not a

16  specific publication on that issue.

17  BY MR. HEFFERON:

18      Q.   And you had never worked on that subject

19  until you were hired for this case; isn't that

20  correct?

21           MS. CHIU:  Objection.  Counsel, I'm going

22  to object to all these leading questions that you've

23  been asking, and I'm just going to point out that

24  these -- a lot of these are leading questions, and

25  I'm going to continue making this form objection.

1          MR. HEFFERON:  I'll give you a standing

2     objection to leading questions offered, asked by a

3     lawyer who represents the party, and against whom

4     the expert's been offered.

5          THE WITNESS:  Could you clarify what you

6     mean by "that"?

7     BY MR. HEFFERON:

8          Q.   Sure.  That's a good request.

9          And you have never worked, until you were

10    hired for this case, on the subject of applying

11    economic theory to whether a mortgage servicing

12    event was a contributing cause to a loan going into

13    default or being referred to foreclosure?

14          MS. CHIU:  Objection.

15          THE WITNESS:  That's correct.

16    BY MR. HEFFERON:

17          Q.   Professor McFadden, could you explain to

18    me what -- strike that.  I'll just ask a simpler

19    question.

20          Does your work, for which you were awarded

21    the Nobel Prize, and have continued in that field,

22    have anything to do with the opinion you're giving

23    in this case?

24          MS. CHIU:  Objection.

25          THE WITNESS:  In a general way, yes.

1  The -- the methods that I use in this case are --

2  were related to the handling of data in which one --

3  one has observed discrete events, and one is dealing

4  with the prob- -- with the question of prediction,

5  the probability of those events.

6  BY MR. HEFFERON:

7      Q.   Well, what was the field for which you

8  were awarded a Nobel Prize?

9      A.   The award was specifically for my -- what

10  was generally for my work in econometrics, and

11  specifically for the examination of discrete outcome

12  data and models for analyzing the economic

13  application of techniques for that kind of data

14  analysis.

15     Q.   And how does that bear on this case, if at

16  all?

17          MS. CHIU:  Objection.  Form.

18          THE WITNESS:  One aspect of my report is

19  concerned with the probability of foreclosure

20  initiations and the impact Ocwen conducts on those

21  probabilities.  And that work is -- follows in a

22  direct line from my innovations in this field,

23  50 years ago.

24  BY MR. HEFFERON:

25     Q.   How does it follow in a direct line?

1       A.    The models originally developed, the

2    techniques originally developed are use -- used in

3    this case, and are used widely for analysis of risks

4    of various outcomes.

5       Q.    Your resume, Exhibit 1, refers to the fact

6    that the Nobel Prize was given for your work in the

7    analyses of discrete choices.

8            Does the analyses of discrete choices have

9    anything to do with your opinions in this case?

10      A.    The award mentions that, but the work, it

11   applies generally to discrete outcomes.  So from

12   it -- from its very early days, it was used to

13   analyze con- -- deliberate choices of consumers, but

14   also other outcomes.

15      Q.    Well, why don't you look at Exhibit 1.  In

16   the middle of the first paragraph, do you see a --

17   you do see a reference, don't you, to the Nobel

18   Prize?

19           MS. CHIU:  Counsel, can you point to where

20   in that first paragraph, you're talking about the

21   Nobel -- Nobel Prize shows up multiple times.

22           THE WITNESS:  Yes.

23   BY MR. HEFFERON:

24      Q.    Okay.  Do you see the sentence that starts

25   "he was awarded the Nobel Prize for"?

1          Do you see that?

2     A.    Yes.

3     Q.    Okay.  And then, do you see the sentence

4 says, quote, "in particular, his pioneering

5 theoretical, methodological, and empirical work in

6 the analyses of discrete choices"?

7          Do you see that?

8     A.    Yes.

9     Q.    Okay.  I'm asking you whether your work in

10 the analyses of discrete choices has something to do

11 with this case.  So I'll ask you that question

12 again.

13     A.    And -- and my answer, again, is that it

14 was developed for that purpose, it was -- I was --

15 received the award that identified that purpose, but

16 the work more broadly deals with discrete outcomes

17 that are statistical techniques I developed.

18 They're -- deal with discrete outcomes, it's been

19 very widely used in everything from predicting

20 mergers, to predicting outcomes of horse races.

21          And -- and so, it's not a consumer

22 discrete choice.  It's essentially discrete

23 outcomes.  The -- the statistical foundations are

24 exactly the same, and that was recognized from the

25 very first days, and the work is much broader than

1   that.  So that it applies -- it can be used for any

2   statistical application where one is trying to

3   examine the wide -- the probability that discrete

4   outcomes occur, and what factors may contribute to

5   that.

6        Q.   But the application of those techniques to

7   consumer discrete choices is not something that you

8   are relying on for -- as part of your opinion in

9   this case; is it?

10           MS. CHIU:  Objection.

11           THE WITNESS:  I believe that I answered

12   this before.  The techniques that were developed for

13   that particular application have much broader

14   applicability, and I'm using those techniques, which

15   were developed and -- and I received the Nobel Prize

16   for, in this -- in this work, in this case and much

17   more broadly.

18   BY MR. HEFFERON:

19        Q.   Okay.  I think you didn't listen to my

20   question, so I'll try it again.

21           But the application of those techniques to

22   consumer discrete choices, it's not something that

23   you're relying on as part of your opinion; is it?

24           MS. CHIU:  Objection.  I'll also note

25   that's an objection to form, as well.

Page 34

1          THE WITNESS:  I -- I -- I'm not sure I

2    understand your -- your -- your twisting of the

3    words.  I don't -- I don't see what the distinction

4    is between what I've told you that I've used and

5    what you're -- what you're now trying to exclude.

6    I -- I don't understand the question.

7          MR. HEFFERON:  Let's mark this as

8    Exhibit 2.

9          (McFadden Deposition Exhibit 2 was

10          marked.)

11          MS. CHIU:  Counsel, do you have -- do you

12    have another copy of that exhibit?

13          MR. HEFFERON:  Oh, I thought I -- I handed

14    two over.

15          MS. CHIU:  I think there's -- oh, I guess

16    there is one.

17          MR. HEFFERON:  Yeah, there's two.  That's

18    okay.

19          MS. CHIU:  Apologies.

20    BY MR. HEFFERON:

21     Q.   Now, Professor McFadden, this is --

22    Exhibit 2 is -- is a supplement to your resume that

23    was supplied by counsel for the CFPB.  That is an --

24    an update to your listing of expert testimony and

25    consulting that otherwise appeared in Exhibit 1.

1        A.    Correct.

2        Q.    Okay.  And -- and there's -- I just want

3   to ask you a couple of things, if you can go to the

4   last page of it.  Couple things about your recent

5   expert work.  Let's -- let me just ask about the

6   last five or six years.

7              In the middle of the page, there's a

8   reference to a case called Vernet Text versus Apple?

9              Do you see that?

10       A.    Page 22?

11       Q.    Yes.

12       A.    Yes.

13       Q.    Okay.  And what was the nature of your

14  expert work in that case?

15       A.    That case involved a patent infringement

16  claim against Apple, and the use of survey

17  experiments to value the harm to the plaintiff.

18       Q.    And that was the subject of your expert

19  report?

20             MS. CHIU:  Objection.

21             THE WITNESS:  Correct.

22  BY MR. HEFFERON:

23       Q.    Couple entries down, there's a reference

24  to a case against Novartis.

25             Do you see that?

Page 36

1       A.   Yes.

2       Q.   What was the nature of your expert work in

3   that case?

4       A.   There, the complaint was that Novartis had

5   improperly marketed a -- a range of prescription

6   drugs.  And I analyzed the crowding patterns and the

7   impact of Novartis marketing on the probability that

8   the drugs in question would be prescribed.

9       Q.   A couple items down, there's a reference

10  to the General Motors ignition switch case.

11           Do you see that?

12      A.   Yes.

13      Q.   What was the nature of your expert work in

14  that case?

15      A.   The plaintiffs used a consumer survey and

16  its analysis to make their damage claim, and I

17  critiqued their survey and analysis, their consumer

18  survey and -- and analysis methodology.

19      Q.   And what were the nature of the damages

20  for which the survey was supposedly relevant?

21           MS. CHIU:  Objection.  Form.

22           THE WITNESS:  This was -- this was a case

23  that involved defective ignition -- ignition

24  switches.

25  BY MR. HEFFERON:

1    Q.   Right.  And what was the nature of the

2   damages for which the survey was supposedly

3   relevant?

4        MS. CHIU:  Objection.  Form.

5        THE WITNESS:  The plaintiffs claimed that

6   there was a delay in informing customers of the --

7   of the defect, and that owners of cars with

8   defective switches were put at -- at risk for this

9   and -- and harm -- suffered economic harm as a

10  result of that risk.

11  BY MR. HEFFERON:

12   Q.   The -- the entry immediately under that

13  one, what was the nature of your expert work in that

14  case?

15   A.   Actually, please point to me where

16  you're -- where you're --

17   Q.   The insurance subscribers.

18        MS. CHIU:  Counsel, which case --

19        MR. HEFFERON:  Let me see.

20        MS. CHIU:  -- are you referring to?

21        THE WITNESS:  I -- I still don't

22  specifically -- history --

23  BY MR. HEFFERON:

24   Q.   Oh, the actual name?  Sure.  The Blue

25  Cross/Blue Shield case.

Page 38

1      A.   Yes.

2      Q.   What was the nature of your expert work in

3   that case?

4      A.   The case is one in which Blue Cross was

5   imposing nom- -- essentially, noncompetition rules

6   on its subsidiary companies -- I should --

7   subsidiary is a legal or -- a term here, but the

8   organization of that entity is that Blue Cross is an

9   umbrella organization.  And there are various,

10  typically, state Blue Cross entities underneath it.

11  And Blue Cross was -- was imposing on those state

12  organizations, various noncompete clauses that they

13  couldn't operate in other states.  That's -- that's

14  the nature of the complaint.

15       My -- my work involves the question of how

16  you analyze and how you set up an analysis of the --

17  the harm to subscribers from that kind of restraint.

18      Q.   And then under that, there's a reference

19  to Polaris Industries.

20       What was your ref- -- what was your work

21  in connection with Polaris Industries?

22      A.   The complaint in the Polaris case is that

23  Polaris had a flaw in their product, and that buyers

24  of that product were harmed as a result of the --

25  the risk, increase risk from that flaw.  That was

Page 39

1   the nature of the complaint.

2           The plaintiffs used a consumer survey,

3   consumers experi- -- experiments and analysis.  And

4   I critiqued those experiments and the methodology

5   used to analyze the data.

6       Q.   And the -- there's a reference to a matter

7   called McMorrow.

8           What was your expert work -- what is your

9   expert work in connection with the McMorrow case?

10      A.   That case is a case in which it is alleged

11  that the defendant improperly advertised the product

12  or improperly labeled the product, and buyers of the

13  product were harmed by this mis- -- mislabeling.

14  The -- and I was testifying on the -- I was

15  critiquing the methodology used by the plaintiffs'

16  experts in analyzing data, and the harm in that

17  case.

18      Q.   What was the product?

19           MS. CHIU:  Objection.  Form.

20           THE WITNESS:  Breakfast foods.

21           THE COURT REPORTER:  I'm sorry, what

22  foods?

23           THE WITNESS:  Breakfast foods.

24  BY MR. HEFFERON:

25      Q.   Are there any matters in which you are --

1   have been retained, that are not listed on

2   exhibit -- expert matters in which you've been

3   retained, that are not listed on Exhibit 2?

4           MS. CHIU:  Objection.  Form.

5           THE WITNESS:  As far as I'm aware, I --

6   I -- I work with Brattle company, a firm that does

7   litigation support.  And on some cases, I've been

8   contacted regarding other matters.  And I don't

9   necessarily know what the current status of those

10  con- -- contacts are.

11  BY MR. HEFFERON:

12      Q.   So -- so you don't know whether you've

13  been retained in matters that are not listed on

14  Exhibit 2?

15          MS. CHIU:  Objection.

16          THE WITNESS:  As far as -- I -- I would --

17  sorry.

18          Are you finished?

19          MS. CHIU:  Yes.

20          THE WITNESS:  I'm not actively working on

21  any cases that are not listed here.  And as I say,

22  as far -- I'm -- as far as I'm aware, I have not

23  been told that I've been retained in any other

24  cases.  But I'm cautioning you that there may be

25  cases that have -- I've been approached about

1   that -- or I don't know what the circumstances are.

2   BY MR. HEFFERON:

3       Q.   Are there any cases involved with mortgage

4   servicing that you've been approached about, but you

5   don't know whether you've been retained --

6       A.   No.

7       Q.   -- as an expert?

8       A.   No.

9       Q.   Are you offering any opinions in this

10  case, Professor, concerning liability, in

11  particular, whether Ocwen should be held liable to

12  the CFPB?

13      A.   I am not.

14      Q.   You assume liability based on instructions

15  from counsel?

16      A.   Yes.

17      Q.   We talked about you -- the numerous

18  studies of causes and reasons for mortgage defaults.

19  And do you recall that testimony a little earlier

20  today?

21      A.   Yes.

22      Q.   Okay.  And you also indicated that, in

23  some of your retention, specifically two retentions,

24  Syncora and USDOJ, you provided opinions about

25  evaluations of mortgage default risk, and said that

Page 42

1   those are consistent with -- substan- -- not

2   substantially different from the literature on -- on

3   mortgage default risk; is that correct?

4           MS. CHIU:  Objection.  Objection.

5           THE WITNESS:  Yes.  That's -- that -- the

6   question was broad and the response is equally

7   broad.

8   BY MR. HEFFERON:

9       Q.   And I asked you if you had read any of the

10  studies and publications which had been published in

11  the last 10 or 15 years in the wake of the financial

12  crisis.  And you said you wanted to look at a list

13  of sources in order to identify those.

14          Do you recall that?

15          MS. CHIU:  Objection.

16          THE WITNESS:  Yes.  I've read quite a few,

17  but in order to actually list off names, I would

18  want to go to my list, rather than try to do it from

19  memory.

20  BY MR. HEFFERON:

21      Q.   Okay.  Can I see Exhibit 1, if you --

22          MR. HEFFERON:  Actually or, Shirley, could

23  you just pass me yours?  Thank you.

24  BY MR. HEFFERON:

25      Q.   Let's take a look at the listing of -- in

1   Exhibit 1, of documents considered, which is

2   Appendix B.  It's right after your resume.

3          Do you see the list of literature that

4   appears there as -- on Exhibit B, the 37 articles?

5          Do you see that?

6   A.   Yes.

7   Q.   Okay.  And are those articles that you

8   rely upon or -- what is that listing of 37 articles?

9   A.   These are documents that I -- I rely upon,

10  or I had available to rely upon.

11  Q.   The heading says "Documents Considered."

12  Did you consider all of these studies?

13  A.   They -- they were collected for that

14  purpose.

15  Q.   Okay.  And -- but did you consider them?

16          MS. CHIU:  Objection.

17          THE WITNESS:  I would say, yes, they were

18  considered.

19  BY MR. HEFFERON:

20  Q.   Did you consider them?

21          MS. CHIU:  Objection.

22          THE WITNESS:  What's the distinction?

23  BY MR. HEFFERON:

24  Q.   As opposed to Brattle.

25  A.   Oh, I think the answer to that is, there's

Page 44

1   some combination of things that I read myself,

2   things that have been found by Brattle staff, and

3   passed on to me.  Some of which I read in full; some

4   of which I've read -- read only the abstract.

5        Q.   So is it your testimony that you read the

6   abstract of each one of these 37 articles, or more

7   in the article?

8             MS. CHIU:  Objection.

9             THE WITNESS:  I did not say that.  I -- I

10  said that I -- these -- these were available to me

11  and I've -- I -- I could not sit here now and tell

12  you which ones that I've processed in various ways.

13  BY MR. HEFFERON:

14       Q.   So you can't identify which of these 37

15  articles you actually considered?

16            MS. CHIU:  Objection.  He's disclosed

17  these as documents he considered.  That's --

18  BY MR. HEFFERON:

19       Q.   That --

20       A.   This -- this list airs on the side of

21  including things that I had.  So I -- I -- I cannot

22  say that in every case that I actually used it, no.

23       Q.   Okay.  So the heading should be "documents

24  that may have been considered"; is that fair?

25            MS. CHIU:  Objection.  Your conclusion

1    mischaracterizes his statement.

2              MR. HEFFERON:  I -- please, Counsel.

3    There's a pending question to the witness.

4              THE WITNESS:  I -- I -- I would accept

5    your -- your re- -- renaming.

6    BY MR. HEFFERON:

7         Q.   Okay.

8         A.   That's --

9         Q.   Which of these are -- which of these

10   articles, of the 37 articles that appear in

11   Appendix B of Exhibit 1, did you actually read?

12             MS. CHIU:  Objection.  Form.

13             THE WITNESS:  I'm not prepared to -- as --

14   as we sit here, I would have to go back now, and --

15   and look at those articles to determine whether --

16   which ones I had read through, which ones I had

17   looked only at part of.

18   BY MR. HEFFERON:

19        Q.   Okay.  Is it fair to say that you read all

20   the articles that are actually cited in your report,

21   or in your surrebuttal report?

22             MS. CHIU:  Objection.  Form.

23             THE WITNESS:  I would say that's not the

24   case, because some of those were, essentially, in

25   response to Dr. Halm, Dr. Halm's claims.  And I just

Page 46

1    asked staff to provide relevant citations.

2    BY MR. HEFFERON:

3        Q.   Is it fair to say that you read all of the

4    articles that are cited in your second amended

5    report, as opposed to the surrebuttal?

6            MS. CHIU:  Objection.  Form.

7            THE WITNESS:  I think it's -- it's fair to

8    say that I -- I read relevant parts of the

9    literature that were relevant -- the relevant parts

10   of the literature for my analytic purposes.

11   BY MR. HEFFERON:

12       Q.   Okay.  And -- and my question's a little

13   different, Professor, which is:  If you've cited an

14   article in your second amended report, did you read

15   it?

16           MS. CHIU:  Objection.  Form.  I think it

17   would help for you to define what you mean by

18   "read."

19           MR. HEFFERON:  Please, that -- that is a

20   totally inappropriate speech.  And if I get -- if we

21   have to get Magistrate Matthewman on the phone, I'd

22   be very happy to do that.  It's an objection, form,

23   or whatever, as opposed to prompting the witness to

24   ask for a definition of a word in the question.

25           MS. CHIU:  I'm just trying to help.

1          MR. HEFFERON:  You're trying to help the

2    witness, exactly.

3          MS. CHIU:  No.  I'm trying to help you

4    clarify the question.

5          MR. HEFFERON:  No.  You're trying to help

6    the -- you're trying to help the witness.

7          MS. CHIU:  I'm sorry you feel that way.

8    BY MR. HEFFERON:

9      Q.   Okay.  My -- I'll go back and ask you the

10   question again, Mr. -- Professor McFadden.

11     A.   The -- the general answer to your question

12   is that I acquired a knowledge of the contents of

13   these papers where it was relevant to my work, and

14   that was done either by my reading the entire paper,

15   by reading an abstract of the paper, by having staff

16   give me a summary of the paper.

17     Q.   Were those summaries in writing?

18     A.   No.

19     Q.   Who did work you with at Brattle on the

20   second amended report?

21     A.   There's a fairly long list.  I -- I'm not

22   sure I will get -- hit everyone, but the key people

23   involved were Mark Berkman, Josephine Duh, Pablo

24   Robles, Rich Goldberg.

25          MR. HEFFERON:  Let's mark this as the next

1    exhibit.

2              (McFadden Deposition Exhibit 3 was

3              marked.)

4    BY MR. HEFFERON:

5        Q.    Professor McFadden, I've shown you what

6    has been marked as Exhibit 3, which is the appendix

7    to your surrebuttal report.

8              Do you recognize that?

9        A.    I would have to go through it in detail,

10   but I -- I believe that's correct.

11       Q.    Okay.  Thank you.  I appreciate you taking

12   my word for it.  And of course, at the break, you

13   should feel free to take a look, but that's --

14   that's what I intend it to be.  That's where I got

15   it from.

16             I marked it because of your comment that,

17   in asking about which studies you reviewed, that in

18   particular you are interested in the list of

19   documents that are contained in this surrebuttal

20   appendix.

21             So is there a list of documents contained

22   in that Exhibit 3, the surrebuttal appendix?

23       A.    Beginning on page 24, yes.

24       Q.    Okay.  Now, I asked you -- I asked you, in

25   the earlier part of the deposition, to identify any

1  persons who have made recent publications on the

2  area of mortgage default risk, and whom you

3  considered to be an expert, and you referred to

4  "Campbell" as a representative paper.

5          Looking at Exhibits [verbatim] 1, which

6  contains the list of documents considered for the

7  second amended report, and Exhibit 3, the listing of

8  documents considered for the surrebuttal report,

9  could you identify that paper for me?

10      A.   It's not, as you note, listed explicitly.

11  It's one of the papers under Number 23.

12      Q.   In which exhibit?

13      A.   It's Number 23 in the "Documents

14  Considered" in --

15      Q.   Right.  But which --

16      A.   -- in Exhibit 3.

17      Q.   Exhibit 3?

18          Okay.  Why don't you take a look at

19  Exhibit 3, which you in particular said you wanted

20  to focus on, and if you could identify for me,

21  looking at that list, any particular studies or

22  papers, that you can recall reading and rely on, in

23  connection with your opinion in this matter.

24      A.   As I've indicated, there -- one that I

25  remember specifically is the Campbell study.  And

Page 50

1    it's one of the studies that's covered in the

2    survey -- Number 23 is a survey of studies of

3    default of the impact of foreclosures on selling

4    prices.

5              MS. CHIU:  Tom, sorry to interrupt, but

6    we've been going for a little over an hour.  When

7    there's a good time, can we take a break?

8              MR. HEFFERON:  Yeah.  I'm almost done with

9    this line, actually.

10             THE WITNESS:  And -- and I've read a

11   number of the papers behind that survey.

12   BY MR. HEFFERON:

13        Q.   Okay.  Can you just describe for me again

14   what was the nature of that, the Campbell paper?  I

15   just missed it.

16        A.   The -- the Campbell paper is a study of

17   housing price sales as a function of various

18   house -- house features, and of whether the sale was

19   a [verbatim] REO sale.

20        Q.   Okay.  And as relevant to your opinion,

21   the Campbell paper was something you relied upon

22   because of its information about REO sales?

23             MS. CHIU:  Objection to form.

24             THE WITNESS:  It's one of a -- it's one of

25   a literature [verbatim] on the impact of REO sales

1    on sale prices.

2    BY MR. HEFFERON:

3        Q.   Right.  And so, as relevant to your

4    opinion, the part of the Campbell paper you found

5    useful was the part that relates to REO sales?

6        A.   That -- that is -- was the -- the reason

7    that I was particularly interested in that paper,

8    yes.

9        Q.   Okay.  Looking at the list in -- in

10   Exhibit 3, do you see any other articles that you

11   considered and relied upon in particular to support

12   your opinions in this case?

13       A.   Well, first, with regard to mortgage

14   shock, papers 4 and 25 were ones that were utilized

15   in forming my opinion on the impact of payment

16   shocks.

17            Paper 7 and 13 were papers that I referred

18   back to to form my opinion on consumer discount

19   rates, and their willingness to borrow or lend at

20   various rates.

21            Paper 18 was one of the papers that I

22   looked at regarding my opinion on the impact of an

23   REO sale on the sales price.

24            And I've already mentioned Number 23 as a

25   paper that I relied upon as a survey.  I relied upon

1  the survey and on its -- some of the papers that

2  were surveyed for the purpose of -- again, of

3  determining the impact of REO status on a selling

4  price.

5       Q.   In connection with this assignment,

6  Professor -- and this is the last question I'll ask

7  you before the break -- did you have occasion --

8  strike that.

9            In connection with this assignment,

10 Professor, did you reach out and speak with the

11 authors of any of the papers on which you relied, in

12 connection with your opinions?

13      A.   I did not.

14           MR. HEFFERON:  Okay.  Let's take a break.

15           THE VIDEOGRAPHER:  This is end of Media 2.

16 We're going off the record at 9:57 a.m.

17           (Short recess taken.)

18           THE VIDEOGRAPHER:  This is the beginning

19 of Media 3.  We're going back on the record at

20 10:11 a.m.

21 BY MR. HEFFERON:

22      Q.   Professor McFadden, if you could look at

23 Exhibit 1.  It's right there in the front.  And

24 there's a list of "Documents Considered" in that

25 exhibit, as well, appearing about 25 pages in,

1    Appendix B.  We had looked at that before.

2        A.   Yes.

3        Q.   I'm going to ask you the same question I

4    asked you about Exhibit 3, which was the surrebuttal

5    list of documents considered.  And that is, are

6    there any documents listed here, under Appendix B

7    for Exhibit 1, of the 37 articles and papers that

8    you particularly relied upon in connection with

9    giving your opinion in this case?

10           MS. CHIU:  Objection -- Objection.  Form.

11           THE WITNESS:  I will just list these off

12   seriatim, and I think there will be -- there will be

13   overlap from what we've done before.

14           Number 5, Number 8, Number 9, Number 14,

15   Number 15.  I'd say those are the primary ones.

16   I -- I generally reviewed or had my staff review the

17   literature on externalities, resulting from

18   foreclosure neighborhood effects.  That's part of my

19   report, although not part of my quantitative damages

20   calculations.

21   BY MR. HEFFERON:

22       Q.   There's a reference on Exhibit 1, Number

23   30, under "Documents Considered," to an article

24   called -- or a paper called "The Cost Effectiveness

25   of Mortgage Foreclosure Prevention."

Page 54

1          Do you see that?

2      A.   Yes.

3      Q.   Okay.  Number 30?

4      A.   Yes.  And, in fact, I ^ -- I -- normally

5  that's actually an important source for me.

6      Q.   Is that a peer-reviewed study?

7          MS. CHIU:  Objection to form.

8          THE WITNESS:  I do not believe so, but I

9  did not pursue the question of what happened to that

10  study.  I -- I simply know that it's widely cited.

11  BY MR. HEFFERON:

12     Q.   What's the relevance of something being

13  widely cited?

14         MS. CHIU:  Objection.  Form.

15         THE WITNESS:  Generally, the releva- --

16  the relevance is this:  Papers are generally

17  published only if they have -- they have some

18  contribution to central economics.

19         There are many applications that are

20  important on their own bottom, but are not eligible

21  for publication or -- or publication is not sought

22  because they don't have broader implications to

23  other subjects.  Nevertheless, within the area of

24  application, may be -- they may be considered

25  similar or important contributions.

1      My judgment for the citations of the

2  Moreno paper is that it's viewed as a seminal paper

3  in the -- in the area of the question of an REO

4  discount and the costs of -- of foreclosures.

5  BY MR. HEFFERON:

6      Q.   Is that published?

7      A.   You just asked.  I believe that it -- that

8  it was --

9      Q.   I asked if it was peer-reviewed, so my

10  question is a little different, but is -- is it

11  published?

12      A.   Oh, I'm sorry.

13      Generally, if a -- if a paper is not

14  published, it's -- it's not peer-reviewed.  Peer

15  review is part of the publication process.  As far

16  as I know, this is not peer-reviewed or published.

17  It's circulated in the form listed here.

18      Q.   In deciding whether or not you can rely on

19  a paper for reliable conclusions, is it appropriate

20  to consider whether the paper is peer-reviewed?

21      MS. CHIU:  Objection.  Form.

22      THE WITNESS:  I would say that it is

23  definitely relevant information.  It's not

24  definitive information.

25  BY MR. HEFFERON:

1    Q.   In deciding whether a paper is reliable

2  for consideration by an economist, is it relevant

3  about whether the paper's been published?

4           MS. CHIU:  Objection.  Form.

5           THE WITNESS:  I would say in general, if I

6  were looking at something that I would like to rely

7  upon, I go and look at the paper itself and its

8  content, and make a judgment on what's been done.

9           If someone has done some of the work for

10  me by peer-reviewing it favorably and publishing it,

11  that makes my job easier, but it doesn't eliminate

12  it.

13  BY MR. HEFFERON:

14    Q.   Do you consider it important to understand

15  the qualifications of the author in deciding whether

16  to rely upon a publica- -- excuse me, a paper?

17           MS. CHIU:  Objection.  Form.

18           THE WITNESS:  The qualifications of the

19  author are useful information, and knowing whether

20  you can expect uncovered details to have been done

21  well.

22           But again, I think the primary thing you

23  would do is -- is look at the content and the

24  analysis itself, what was done, and judge it on the

25  basis of the actual work.

Page 57

1    BY MR. HEFFERON:

2         Q.    And do you consider it important to

3    understand whether the author was unbiassed?

4              MS. CHIU:  Objection to form.

5              THE WITNESS:  The answer to that is -- is

6    yes, although, in general, my experience in working

7    in economics is that, bias is not typically an -- an

8    issue.  That is to say, a good deal of this work is

9    done for academic purposes or relatively

10   straightforward administrative purposes.  So that

11   is, it's not subject to the same risk bias as -- as

12   if it were done, say, in the context of litigation.

13   BY MR. HEFFERON:

14        Q.    And what was the purpose for the Moreno

15   paper to be done?

16             MS. CHIU:  Objection.  Form.

17             THE WITNESS:  I would say the purpose of

18   that was to provide a -- provide guidelines and

19   suggestions for the ways that borrowers in trouble

20   could avoid foreclosure or deal -- deal with

21   foreclosure initiation.

22   BY MR. HEFFERON:

23        Q.    And it was in -- to advocate for the

24   Family Housing Fund Minneapolis; wasn't it?

25             MS. CHIU:  Objection.  Form.

1        THE WITNESS:  My interpretation of what

2   they were doing is that they were looking at -- at

3   policies that could be adopted -- adopted, which

4   would reduce the risk of -- of having a foreclosure

5   initiated or -- or relieve the economic consequences

6   of being -- having an initiation.

7   BY MR. HEFFERON:

8        Q.   And wasn't the purpose of the paper to

9   advocate that this Family Housing Fund Minneapolis

10  be funded in order to increase the possibility that

11  foreclosures would be avoided?

12        MS. CHIU:  Objection.  Form.

13        THE WITNESS:  I don't -- I don't recall.

14  From when I looked at that paper, I don't -- I don't

15  recall that, so I -- one way or the other.

16  BY MR. HEFFERON:

17        Q.   If that was the purpose, would you

18  consider the paper subject to potential bias?

19        A.   I don't remember.

20        Q.   No, if that was the case, would you

21  consider the paper subject to a potential bias?

22        MS. CHIU:  Objection.

23        THE WITNESS:  No, not necessarily.  I

24  don't -- I don't see why -- why they would have had

25  an incentive to propose policies or -- or analyze

1   the impact to policies that was -- that was biassed.

2   BY MR. HEFFERON:

3       Q.   Do you believe that -- or so you don't

4   believe that, in advocating for the success of the

5   Housing Fund Minneapolis, there was no incentive to

6   inflate or overstate the impact of foreclosures when

7   that organization has, as its purpose, the avoidance

8   of foreclosures?

9           MS. CHIU:  Objection.

10          THE WITNESS:  I've read the con- -- I've

11  read the contents of that study, and I -- I was

12  persuaded, from the contents, that it was -- it was

13  a reasonable analysis of -- of this issue.

14          And it's -- the -- the fact that it's

15  cited in other studies of the impact of foreclosure

16  suggested to me that other people working in this

17  applied area have found it useful as well.  It's not

18  the only source that I used for determining the cost

19  of -- of foreclosure initiations and possible

20  outcomes.

21  BY MR. HEFFERON:

22      Q.   So is it your testimony that you don't

23  believe that the study is potentially biassed

24  because of the perspective of the author, and the

25  purpose for which it was published?

Page 60

1          MS. CHIU:  Objection.

2          THE WITNESS:  I -- it -- what I'm -- what

3    I'm saying is that I've -- I've read the content of

4    this paper, and I did not see in the -- the way it

5    was analyzed, any evidence of bias that I detected.

6    BY MR. HEFFERON:

7        Q.   And you don't believe the study is

8    potentially biassed because of the perspective of

9    the author and the purpose for which it was

10   published?

11         MS. CHIU:  Objection.  Asked and answered.

12         THE WITNESS:  In this case, I'm basing my

13   opinion on the content of -- of the paper, and my

14   judgment of what they actually did.

15   BY MR. HEFFERON:

16       Q.   But as a -- as a [verbatim] expert

17   economist, it's important to make sure you're not

18   relying on biassed studies; isn't it?

19         MS. CHIU:  Objection.

20         THE WITNESS:  Are you suggesting this

21   study is fraudulent?

22   BY MR. HEFFERON:

23       Q.   My question -- I'll ask you again -- as an

24   expert economist, it's important to make sure you're

25   not relying on biassed studies; isn't it?

1      MS. CHIU:  Objection.

2      THE WITNESS:  I would say that it's

3 important to avoid relying on studies that are --

4 that are fraudulent, say, have -- have

5 misrepresented the results or failed to analyze the

6 data properly.

7 BY MR. HEFFERON:

8    Q.   Well, I appreciate that, but now I'm going

9 to ask you my question again.

10      As an expert economist, it's important to

11 make sure you're not relying on biassed studies;

12 isn't it?

13      MS. CHIU:  Objection.  Asked and answered.

14      THE WITNESS:  As an -- as an economist,

15 it's important that you not rely on biassed content

16 without being aware and adjusting for that.

17      I do not -- beyond that, I don't

18 understand the distinction between judging the

19 content of work and -- and the -- who -- say who

20 paid for, or the -- the -- paid for the work.

21      For example, I think that work done for

22 legal purposes as experts is not -- even though it's

23 paid for by one side or the other, are not

24 necessarily biassed.

25 BY MR. HEFFERON:

Page 62

1    Q.   The -- it's relevant, isn't -- isn't it,

2    though, to find out what an -- who paid the author

3    for the work in connection with the study?

4         MS. CHIU:  Objection.  Form.

5         THE WITNESS:  As a general matter, yes, I

6    would like to know if -- and -- and the usual

7    publication standards require that the financing of

8    work be -- be disclosed and that if it -- if it was

9    funded by a party that had a -- a financial interest

10   in the results, and that's certainly a reason to be

11   careful and skeptical about using those results and

12   being dili- -- doing due diligence in determining

13   the results you do use are free of bias.

14   BY MR. HEFFERON:

15   Q.   Okay.  And in this case, the Moreno study

16   was funded by a party that had a financial interest

17   in the results; wasn't it?

18        MS. CHIU:  Objection.  Form.

19        THE WITNESS:  What I know about this paper

20   is -- is the -- it's listed funding.  I don't know

21   any details about the organization otherwise.

22   BY MR. HEFFERON:

23   Q.   Okay.  You mean you rely upon it

24   extensively in your report; don't you?

25   A.   I -- I used it as one alternative for

Page 63

1   determining or -- the cost of -- of the various

2   outcomes resulting after a foreclosure initiation.

3        Q.   And as a result of your reliance upon that

4   study, your damage estimate is tens of millions of

5   dollars larger than your alternative; isn't that

6   correct?

7             MS. CHIU:  Objection.

8             THE WITNESS:  That -- that study gives --

9   one set of numbers depends -- depends on exactly

10  what calculations you're looking at.  But the other

11  study in which I used a very conservative lower

12  bound, lower end on there, the calculation gives --

13  does give a lower estimate by a -- a substantial

14  amount, but not -- well, leave it at that, by a

15  substantial amount.

16  BY MR. HEFFERON:

17       Q.   Okay.  So in relying on the Moreno study,

18  though, you are coming up with a damages opinion,

19  which is tens of millions of dollars than your lower

20  alternative; correct?

21            MS. CHIU:  Objection.

22            THE WITNESS:  I have used the Moreno

23  analysis, and I've also used an alternative analysis

24  to give a range of damage numbers, which are based

25  on a range of foreclosure initiation subsequent cost

Page 64

1    to the consumer.  And in my report, I have indicated

2    that range.

3    BY MR. HEFFERON:

4        Q.   And the range that's dictated by your

5    review of the Moreno study is hundreds of millions

6    of dollars [verbatim] than the other alternative;

7    isn't that correct?

8            MS. CHIU:  Objection.

9    BY MR. HEFFERON:

10       Q.   Tens of millions of dollars larger, excuse

11   me.

12       A.   If you --

13           MS. CHIU:  Objection.

14           THE WITNESS:  -- if you wish me to refer

15   to my report, I will tell you exactly what the

16   difference is in numbers.

17   BY MR. HEFFERON:

18       Q.   It's larger; correct?

19       A.   I'm sorry?

20       Q.   It's larger; correct?

21       A.   It's large, yes.

22       Q.   Larger than the other alternative; isn't

23   that true?

24           MS. CHIU:  Objection.  Form.

25           THE WITNESS:  Yes.  I've explained that

1    the -- the other alternative is a -- is a

2    conservative -- actually quite a conservative

3    estimate.  But, yes.

4    BY MR. HEFFERON:

5        Q.   Okay.  And so, in using the Moreno study

6    to come up with an estimate of damages, which is

7    tens of millions of dollars larger than your

8    alternative calculation, did you take into account

9    the fact that the Moreno paper was funded by a party

10   with a financial interest in showing that

11   foreclosures were expensive?

12              MS. CHIU:  Objection.  Form.

13              THE WITNESS:  I primarily accounted for

14   the fact that -- that by my own review of the paper,

15   and its citation by other people working in this

16   field, it seems to be accepted as one -- one study

17   indicating the -- the costs of -- to the borrowers

18   of foreclosure.

19   BY MR. HEFFERON:

20       Q.   Okay.  So -- so you're attaching

21   significance to the fact that others have cited it

22   and found that that's an indicator of reliability?

23              MS. CHIU:  Objection.

24              THE WITNESS:  In this -- in this area, if

25   that study has been cited, for example, by the

1    Federal Housing Administration as a -- a basis for

2    some of its conclusions on these costs, I would say

3    that's -- that's some -- some support for -- for

4    those numbers.

5    BY MR. HEFFERON:

6        Q.   Is there a principle of economics, that

7    I'm not aware of, that citation of an unpublished

8    non-peer-reviewed article, published by an advocacy

9    group, is something that economists can rely upon,

10   simply because others have cited it in some paper or

11   publication?

12           MS. CHIU:  Objection.

13           THE WITNESS:  You -- you referred to this

14   as a paper circulated by a -- by an advocacy group.

15   That's -- that's not my interpretation of what this

16   paper is and what its content is.

17   BY MR. HEFFERON:

18       Q.   What's your interpretation of who the

19   paper was circulated by?

20       A.   My interpretation is, this is a -- is a

21   paper which carried out a specific analysis of

22   households in distress in -- in Minneapolis, and did

23   an analysis of what would happen to those households

24   under alternative policies for how their -- how

25   their mortgages were handled by them.

Page 67

1       Q.   Okay.  Well, accepting my -- my statement

2   that it was created by an advocacy group, is there a

3   principle of economics that the citation of an

4   unpublished, non-peer-reviewed article that's been

5   circulated and funded by an advocacy group, is

6   something that economists can rely upon, simply

7   because others have cited it in some paper or

8   publication?

9            MS. CHIU:  Objection.

10           THE WITNESS:  My -- my opinion is that

11  what an economist relied upon depends, first of all,

12  on their own assessment of the work and what -- what

13  was done, and that publication, peer-review,

14  citations are a -- a secondary piece of information

15  which may indicate that others find this work more

16  or less useful.

17  BY MR. HEFFERON:

18       Q.   And you have -- what have you done to test

19  the reliability of the Moreno paper?

20           MS. CHIU:  Objection.  Form.

21           THE WITNESS:  I'd say the primary thing

22  I've done is to use an alternative method of

23  determining these costs --

24  BY MR. HEFFERON:

25       Q.   What -- what do you mean by that?

Page 68

1      A.    -- and -- and impacts on the borrower.

2      Q.    What do you mean by that?

3      A.    I have a second method that's described in

4   my report, that uses public sources and FHA

5   documents and Ocwen documents.

6      Q.    Okay.  So have you done anything to test

7   the reliability of the Moreno report -- paper?

8            MS. CHIU:  Objection.  Form.

9            THE WITNESS:  I think I just answered that

10  question.

11  BY MR. HEFFERON:

12     Q.    I don't think you did.

13     A.    Yes, I did it -- I did it in a -- a

14  separate way.  So I have two -- two sets of

15  numbers -- I have two sets of numbers before me, and

16  I have a knowledge from the -- from the other -- the

17  second way of doing this, as to what the range of

18  REO discounts is.

19     Q.    So the -- is it the fact that the only

20  thing you've done to test the reliability of the

21  Moreno papers, you've conducted another analysis

22  which reflected damages tens of millions of dollars

23  less than those calculated, based on Moreno?

24            MS. CHIU:  Objection.

25            THE WITNESS:  No.  My testimony is that

1  I've done a -- a -- a second analysis, based on

2  Ocwen documents, FHA documents, and public sources.

3  And I have taken from that, a cons- -- conservative

4  estimate that the RE -- there's an REO discount, REO

5  sales discount of -- of 10 percent, the Moreno study

6  says there's an ROA -- REO discount of 13 percent.

7            The pub- -- the study -- the other study

8  that I did, the one using Ocwen documents and public

9  sources suggest, in fact, REO discounts from

10 approximately 10 percent, to approximately

11 20 percent or more.  So that the Moreno study is

12 well -- well within the span of numbers indicated by

13 other sources.

14            MR. HEFFERON:  Let's mark this as the next

15 exhibit.

16            (McFadden Deposition Exhibit 4 was

17            marked.)

18            MR. HEFFERON:  I'm sorry.  What number is

19 that, 4?  Thank you.

20 BY MR. HEFFERON:

21    Q.   Professor McFadden, I'm showing you what's

22 been marked as Exhibit 4.  And ask you if you

23 recognize it.

24    A.   As -- as -- it's been a while since I

25 looked at this.  But as this is not my recollection,

Page 70

1    this is the document I reviewed before.

2         Q.   Okay.  Is this the Moreno set?

3         A.   Yes.

4         Q.   I should say, Moreno article.

5              MS. CHIU:  Is there a question?

6              THE WITNESS:  As -- as -- yes, I believe

7    so.

8    BY MR. HEFFERON:

9         Q.   Okay.  I believe you said that the article

10   says there is an REO discount of 13 percent.

11             Where's that in Exhibit 4?

12        A.   Oh, I would have to -- I'd have to go back

13   and reread it.  I don't recall.  I don't recall the

14   exact place.  I can reread the paper.

15        Q.   Okay.  So -- but it's your testimony that

16   Exhibit 4 contains the statement that there's an REO

17   discount of 13 percent; that's your testimony?

18        A.   No.

19             MS. CHIU:  Objection.

20             THE WITNESS:  My testimony is that the --

21   the paper contains information on the bor- --

22   borrower eq- -- borrow equity in -- in foreclosure

23   sales.

24   BY MR. HEFFERON:

25        Q.   Okay.  And -- and it -- and you're relying

Page 71

1    upon the information it contains about how much

2    borrower equity is lost in foreclosure; is that

3    correct?

4              MS. CHIU:  Objection.

5              THE WITNESS:  I'm sorry.  Could you --

6    could you repeat?  I didn't --

7    BY MR. HEFFERON:

8         Q.   That's fine.

9         A.   -- quite get the question.

10        Q.   That's fine.  It's a difficult question.

11   I know you -- we're not -- I don't ask good

12   questions all the time, and you don't necessarily

13   pick up on them, even if they're good.  So I'll just

14   ask it again.

15             You're relying upon the information in the

16   Moreno study that shows how much borrower equity is

17   lost in foreclosure; is that correct?

18             MS. CHIU:  Objection.

19             THE WITNESS:  It's my -- my recollection

20   is that I used the number on the average housing

21   price and on the -- their -- their dollar value for

22   borrower equity lost in -- in a -- in a foreclosure,

23   in the -- in the cases that they studied, and that

24   the ratio of those two is 13 percent.

25             Let me correct my answer.  I said borrower

1   equity lost.  The -- the -- usually, it's simply

2   what is the borrower's equity.  I -- I -- I should

3   not make a statement about lost -- I -- I didn't

4   mean to use the word "lost."  That's a -- a separate

5   issue.

6   BY MR. HEFFERON:

7        Q.   What do you mean it -- what do you mean by

8   the fact that lost is a separate issue?

9        A.   There -- there's -- there's the question

10  of what the borrower's equity is in a -- in a

11  foreclosure sale.  And they're a separate question

12  of whether they get that equity back or not.  That's

13  a -- that requires a further analysis of how -- how

14  the foreclosure is processed, for example.

15       Q.   So how did you calculate the REO discount,

16  based upon the Moreno report?

17            MS. CHIU:  Objection.  Form.

18            THE WITNESS:  I -- I think that I should

19  be careful here, and I -- I may have, in my answers,

20  confused the -- the REO discount and the borrow --

21  borrower's equity.  Those are -- those are two

22  distinct things.  And I'd have to review my answers

23  to see if I -- I misstated and used -- and used one

24  term rather than the other.

25            MR. HEFFERON:  Then strike the answer as

1   totally not responsive.

2          THE WITNESS:  This -- this is -- this

3   study was used in my analysis to -- to determine --

4   to make one estimate of what -- what the borrower's

5   skin was in the -- in the game at the time of a

6   foreclosure.

7   BY MR. HEFFERON:

8     Q.   And what estimate did you make, based on

9   the Moreno study -- or excuse me.

10         How did you calculate, using the Moreno

11  study, what the borrower's skin was in the game at

12  the time of a foreclosure?

13         MS. CHIU:  Objection.

14         THE WITNESS:  Their -- their analysis is

15  that the -- the average borrower, in their study,

16  would -- would have had -- would have recovered

17  $7,000 -- more -- $7,000 and something, if -- if --

18  on a $55,000 house, at the time that study would

19  have been done.

20  BY MR. HEFFERON:

21    Q.   Is that 13 percent?

22    A.   That's the 13 percent.

23    Q.   What's -- you keep using the term "REO

24  discount."  What is that?

25    A.   If I -- if I misstated it, I -- let me

Page 74

1    explain clearly what it is.  There -- there's a

2    widely observed phenomenon, that foreclosure sales

3    occur at -- at prices below the existing market

4    price for non-foreclosure sales, and that discount

5    is found -- found to be between 10 and 20 percent.

6        Q.   When you refer to foreclosure sales, who

7    are the parties involved?

8        A.   The sales --

9             MS. CHIU:  Objection.

10            THE WITNESS:  -- at issue are the --

11   when -- when the property is an REO, real estate

12   owned seller.

13   BY MR. HEFFERON:

14       Q.   Okay.  And who's the counter-party?

15       A.   Buyers in a -- in a foreclosure auction,

16   which might be individual -- individuals, investors.

17       Q.   Okay.  And what is REO?

18       A.   Real estate enterprise -- REO is real

19   estate enterprise, I believe [verbatim].

20       Q.   And you said that the seller of the

21   property is the REO seller.  Would that be the

22   mortgage company that has completed the foreclosure

23   and now owns the property?

24            MS. CHIU:  Objection.

25            THE WITNESS:  My understanding is that

1    the -- most mortgaging service -- servicing

2    companies have a real estate arm, and at the point

3    that -- at -- this takes place, they -- they become

4    the -- the seller of the -- of the property.

5    BY MR. HEFFERON:

6         Q.   Okay.

7         A.   And they -- they are labeled an REO.

8         Q.   Okay.  So that -- so in this -- in the

9    instance of the REO discount, it's -- it measures

10   the discount against the value of the property

11   that's already been foreclosed, and now is in the

12   hands of the -- of the mortgage servicer; is that

13   correct?

14             MS. CHIU:  Objection.

15             THE WITNESS:  No.  It's -- it's -- the --

16   the comparison is between the sale of a property

17   that has been foreclosed and the sale of a

18   comparable property which is a non-for sale of --

19   that is a completely voluntarily open-market sale

20   [verbatim].

21   BY MR. HEFFERON:

22        Q.   How, if at all, does the REO discount

23   measure the price at which the house is foreclosed

24   upon versus how the house would be valued in the

25   open market?

Page 76

1          MS. CHIU:  Objection.  Form.

2          THE WITNESS:  My -- my understanding is

3  that a -- when -- when -- when a foreclosure

4  judgment is made, there will be some determination

5  of -- of continued liability for the -- for the

6  borrower.  And at the time of the actual fore- --

7  fore- -- the REO sale, there will be some discharge

8  of -- in full or in part of those deficiencies.

9  BY MR. HEFFERON:

10     Q.  Are you aware, Professor McFadden, one way

11  or another, whether Ocwen has ever pursued

12  collection of deficiencies arising from foreclosures

13  at issue in this case?

14          MS. CHIU:  Objection.  Form.

15  BY MR. HEFFERON:

16     Q.  Strike that.  Let me ask a different

17  question.

18          Are you aware, Professor McFadden, one way

19  or the other, whether Ocwen has ever pursued

20  collection of deficiencies arising from

21  foreclosures?

22          MS. CHIU:  Objection.  Form.

23          THE WITNESS:  Yeah.  The answer's, I -- I

24  have only the Ocwen documents.  And I -- as I sit

25  here, I don't recall -- I don't -- I don't recall

1    the particular data in -- that dealt with -- dealt

2    with deficiencies, so I don't know.

3    BY MR. HEFFERON:

4       Q.   If you assume my representation, that

5    Ocwen does not pursue deficiencies, what effect does

6    that have on your opinion in this case?

7            MS. CHIU:  Objection.

8            THE WITNESS:  I -- I have -- I have no

9    basis for -- for evaluating your -- your

10   representation.  I have no -- I have no -- I have

11   not -- I have not seen data or, for that matter, any

12   other sources, which provide me a basis for judging

13   what Ocwen did or...

14   BY MR. HEFFERON:

15      Q.   Professor McFadden, tell me everything,

16   everything that you know about the behavior of

17   anyone in the mortgage industry, about whether

18   deficiencies are ever pursued in connection with a

19   residential mortgage foreclosure in the last ten

20   years.

21           MS. CHIU:  Objection.  Vague.  Calls for a

22   narrative.

23           THE WITNESS:  I could only tell you what

24   I've -- I've done in my report.  And my --

25   BY MR. HEFFERON:

1      Q.   Why?

2      A.   -- and my report does not --

3      Q.   But excuse me --

4      A.   -- discuss --

5      Q.   Excuse me.  Why -- why can you only tell

6   me what I've done in my report [verbatim]?  I asked

7   you everything that you know about the behavior of

8   anyone in the industry on pursuing deficiencies.  So

9   whether it's in your report or not, tell me

10  everything you know about the behavior of the

11  industry participants in pursuing deficiencies?

12     A.   That's -- that's outside my investigation.

13  I have not investigated deficiency, rather --

14     Q.   So you -- so you don't know?

15     A.   I have not investigated, that's correct.

16          MS. CHIU:  Objection.

17  BY MR. HEFFERON:

18     Q.   Okay.  So assume for me that Ocwen does

19  not pursue deficiencies.  What impact does that have

20  on your opinion in this case?

21          MS. CHIU:  Objection.  Asked and answered.

22          THE WITNESS:  That -- that calls for a

23  speculation.  I don't think I can an- -- I couldn't

24  answer it without understanding what deficiency --

25  what -- what it means to say they don't -- they

1   don't pursue deficiencies.  That -- there would be a

2   whole question of -- of what that means and what the

3   consequences for borrowers are.  That's a whole

4   other study.

5   BY MR. HEFFERON:

6       Q.   Okay.  Assume for me, Ocwen does not

7   pursue deficiencies, but which I mean, makes no

8   attempt whatsoever to collect a penny on any

9   deficiency resulting for -- from a foreclosure.

10  Okay?

11          With that assumption, what impact does

12  that have on your opinion in this case?

13          MS. CHIU:  Objection.  Incomplete

14  hypothetical.

15          THE WITNESS:  Well, I've done -- I've done

16  an -- an analysis which uses information on the

17  costs of various foreclosure outcomes.  And I've

18  used, primarily, published studies in the past on

19  those costs.  And I have not analyzed de- --

20  deficiency resolutions separately from all -- of the

21  overall -- overall costs.

22          So without specific information on how

23  deficiencies fit into the -- the literature and

24  how -- how they're, in fact, treated, I have no

25  basis for answering the question.

Page 80

1   BY MR. HEFFERON:

2       Q.   Okay.  So -- so the impact or lack of

3   impact of deficiencies is irrelevant to any of your

4   opinions?

5           MS. CHIU:  Objection.

6           THE WITNESS:  It -- it -- I wouldn't say

7   it's necessarily irrelevant, but I have no

8   information on it.

9   BY MR. HEFFERON:

10      Q.   I'll ask the question again.  I mean, it's

11  either relevant to your opinion or not.

12          So is the impact or lack of impact of

13  deficiencies relevant to your opinion?

14          MS. CHIU:  Objection.

15          THE WITNESS:  I -- I have -- first of all,

16  I have an opinion on the -- the probability of

17  foreclosure initiation as a result of Ocwen conduct

18  that's not affected by the issue of the resolution

19  of deficiencies.  As -- in terms of the costs of --

20  subsequent to a foreclosure initiation, I've done a

21  very conservative calculation of those costs.

22          I believe it's sufficiently conservative

23  so that under -- under many possible alternative

24  paths, by which one could consider how these things

25  work out for the borrower, that -- my opinion on

1   damages would -- would stand.

2           And beyond that, you raise a vast issue

3   of -- a representation of what Ocwen did or didn't

4   do, in which their -- their -- I am not aware of any

5   evidence in this case that's come to me, which

6   would -- which, in fact -- indicates, in fact, what

7   Ocwen did or didn't do.

8   BY MR. HEFFERON:

9       Q.   So I'll ask the question again.   And

10  I please ask you, Professor, to not make a speech,

11  but instead, answer my question, okay, which is

12  whether the impact of deficiencies is relevant to

13  your opinion or not.

14          MS. CHIU:  Objection.

15  BY MR. HEFFERON:

16      Q.   Yes or no?

17          MS. CHIU:  Objection.  Asked and answered.

18          THE WITNESS:  The answer is, without some

19  more information about what deficiencies are, and

20  some representation based on -- on fact as to

21  regarding what Ocwen actually did, the answer is, I

22  don't know.  But as I've indicated, in the absence

23  of any information that I have as I sit here, I

24  would say no, it has no effect.

25  BY MR. HEFFERON:

1    Q.   Okay.  Now, isn't it true that, if Ocwen

2   does not ever attempt to collect on a deficiency,

3   that the REO discount that you've defined as a

4   decrease in the value when the property is sold at

5   the REO stage, isn't it true that the REO discount

6   would be irrelevant to borrower damages if Ocwen

7   doesn't attempt to collect any deficiencies?

8           MS. CHIU:  Objection.  Form.

9           THE WITNESS:  So as I understand, your --

10   your -- your representation is that if -- if the

11   borrower has a continuing debt and has not -- has

12   not been relieved of that debt, but Ocwen doesn't

13   actively move to collect that debt, then the -- then

14   the borrower's unharmed; is that your

15   representation?

16   BY MR. HEFFERON:

17    Q.   I'm asking you whether the REO discount

18   has anything to do with the borrower's harm if Ocwen

19   doesn't attempt to collect any deficiency or debt

20   remaining after foreclosure.

21           MS. CHIU:  Objection.  Form.

22   BY MR. HEFFERON:

23    Q.   Simple question.

24           MS. CHIU:  Objection.  Form.

25           THE WITNESS:  I -- and I -- I think the --

Page 83

1  well, the answer is that the -- my damage

2  calculations are based on conservative estimates of

3  the costs to borrowers subsequent to disclosure.

4  And as far as I'm aware, in terms of the -- of the

5  information that I've been provided, my estimates

6  are conservative.  And I have -- I have seen no --

7  no evidence that Ocwen has taken action subsequent

8  to judgment of deficiencies, one way or the other.

9  BY MR. HEFFERON:

10     Q.   Yeah.  Well, you accepted counsel's

11  instruction to you to assume liability in this case;

12  correct?

13     A.   Yes.

14     Q.   Okay.  So I'm asking you to accept my

15  representation, Ocwen doesn't collect deficiencies,

16  which, in fact, it doesn't.

17         So with that assumption, isn't it true,

18  then, the REO discount could never have an impact on

19  the borrower's cause them damage because it's

20  something that happens after the foreclosure is

21  over; isn't that true?

22         MS. CHIU:  Objection.

23         THE WITNESS:  I -- as -- as -- as an

24  economic proposition, I do not agree with your

25  claim.

Page 84

1   BY MR. HEFFERON:

2       Q.   What -- what about my statement is wrong?

3       A.   Your statement is that a borrower placed

4   in the situation is unharmed, and I do not agree.

5       Q.   From the REO discount, that's my

6   statement.

7            And how is that wrong?

8            MS. CHIU:  Objection.  Form.

9   BY MR. HEFFERON:

10      Q.   Assuming that Ocwen makes no attempt to

11  collect deficiencies.

12           MS. CHIU:  Objection.

13           THE WITNESS:  For that individual, that --

14  that debt is still owed.  And I don't -- I don't

15  understand why -- why you would claim that that

16  borrower freighted [verbatim] with that debt is

17  unharmed.

18  BY MR. HEFFERON:

19      Q.   If the -- the debt exists and it's -- it's

20  bigger because of the REO discount, how is the

21  borrower harmed?

22           MS. CHIU:  Objection.  Form.  Incomplete

23  hypothetical.

24           THE WITNESS:  I -- as a general economic

25  proposition, I would say -- say that any time that

1   the -- a bor- -- a borrower has debt that is -- is

2   on the books, even if it's not collected, they're

3   harmed by -- by having -- having debt that's going

4   to influence things like their FICO score and their

5   ability to get financing for other purposes.

6   BY MR. HEFFERON:

7       Q.   Do you have any opinions in this case

8   about the damages resulting from impact on FICO

9   score?

10      A.   Ask -- ask the question again.

11      Q.   Sure.

12           Do you have any opinions in this case

13  about damages resulting from the impact on FICO

14  score?

15      A.   I'm -- I have examined the literature

16  on -- and -- and analyzed data on the impact of

17  foreclosures on FICO scores, yes.

18      Q.   Professor McFadden, I'll speak slowly.

19           Do you have any opinions in this case

20  about the damages resulting from impact on FICO

21  score?  Please answer that question.

22           MS. CHIU:  Objection.  Asked and answered.

23           THE WITNESS:  Have I quantified damages

24  from an impact on FICO scores?  The answer is, no, I

25  have not.

1    BY MR. HEFFERON:

2         Q.   Okay.   Thank you.

3              Why don't you look at the Moreno paper,

4    Exhibit 4, page 8.   In the box, there is a sentence,

5    which I'll read to you, it says "Through this study,

6    the Family Housing Fund accomplished its objective

7    to assess the cost efficiencies of the Mortgage

8    Foreclosure Prevention program."

9              Do you see that?

10        A.   Give me a -- a moment to read the box.

11             MS. CHIU:   Counsel, I think it says

12   "effectiveness," not "efficiencies" in the sentence.

13             MR. HEFFERON:   Okay.   Thank you.

14             THE WITNESS:   (Witness reviews.)

15             I've read the box.

16   BY MR. HEFFERON:

17        Q.   Okay.   Now, this reflects, does it not,

18   that the Moreno paper, Exhibit 4 has, as its

19   objective, assessing the cost effectiveness of the

20   Mortgage Foreclosure Prevention program; correct?

21             MS. CHIU:   Objection.

22             THE WITNESS:   That -- that is -- those are

23   the words, yes.

24   BY MR. HEFFERON:

25        Q.   Well, you don't have any reason to think

1   that this study had any other objective; do you?

2        A.   I haven't thought about the matter at all.

3        Q.   You haven't thought about whether this

4   study was written for a purpose that may have

5   resulted in bias; is that your testimony, sir?

6             MS. CHIU:  Objection.  Mischaracterizing

7   testimony.

8             THE WITNESS:  No.  My test- -- my

9   testimony in the past has been that I looked at this

10  study, I looked at what they did, and I looked at

11  the numbers they obtain from their study, and I have

12  concluded that those were useful numbers for an

13  assessment of borrow -- borrower equity in -- in a

14  foreclosure.

15  BY MR. HEFFERON:

16       Q.   And you didn't consider whether this study

17  was written with an objective in mind to establish

18  that the organization's program was effective?

19            MS. CHIU:  Objection.

20  BY MR. HEFFERON:

21       Q.   You didn't consider that fact?

22            MS. CHIU:  Objection.  Form.

23            THE WITNESS:  My understanding of the

24  study was that it was intended to assess the

25  effectiveness of policies that would prevent

1   disclosure.

2   BY MR. HEFFERON:

3        Q.   Foreclosure.

4        A.   I'm sorry.  Foreclosure.  Thank you.

5        Q.   And you didn't consider whether that meant

6   the study might have bias in favor of showing that

7   foreclosure was expensive and inefficient, so as to

8   justify the article auth- -- article's author's

9   program?

10            MS. CHIU:  Objection.  Form.

11            THE WITNESS:  In -- in my judgment, this

12  study can be read for its content and judged --

13  judged in terms of what they actually did.  And

14  that's -- it can be used on the basis of that.

15  BY MR. HEFFERON:

16       Q.   Okay.  Do you typically rely on your

17  research on non-peer-reviewed papers written by

18  advocacy groups in order to justify their programs?

19            MS. CHIU:  Objection.  Form.

20            THE WITNESS:  Well, your -- it's your --

21  you -- you have referred to this as an advocacy --

22  advocacy paper used for funding justification.  I --

23  I have read it as a -- I've read it as a study in

24  which they did spec- -- specific things, in terms of

25  the houses they -- households they surveyed and the

1   mortgages that they analyzed, and that's my basis

2   for utilization of the study, which is the -- a

3   specific analysis they did, and the specific numbers

4   that they obtained.  I have -- that -- that's how I

5   used it.

6   BY MR. HEFFERON:

7       Q.   Okay.  I'll ask you the question again

8   then, sir.

9            Do you typically rely, in your research,

10  on non-peer -- do you typically rely, in your

11  research, on non-peer-reviewed papers written by

12  advocacy groups in order to justify their programs?

13      A.   I typically re- -- rely on my research on

14  content that can be evaluated on its own basis,

15  without -- what -- what -- what the source it comes

16  from would be important in the degree of skepticism

17  in which I approach any study, but it's not the

18  definitive determination.

19      Q.   Did you -- did you apply any degree of

20  skepticism to the Moreno article, based upon the

21  fact it was written by an organization that was

22  attempting to evaluate the effectiveness of its

23  program?

24            MS. CHIU:  Objection.  Form.

25            THE WITNESS:  Yes.

Page 90

1    BY MR. HEFFERON:

2         Q.   Okay.  And tell me what made you skeptical

3    about the report, in light of that objective?

4         A.   I applied to it the skepticism I would

5    have for any study, and that's why I did a -- an

6    alternative approach to doing this calculation.

7         Q.   As between the two sets of calculations,

8    do you consider the one based on the Moreno article

9    to be less persuasive because it relies upon a

10   report that -- that you were skeptical about?

11             MS. CHIU:  Objection.

12             THE WITNESS:  I would say I was primarily

13   concerned about -- about the fact that it was a --

14   a -- not a large sample, and it was in one city,

15   Minneapolis.  That -- that was the primary reason

16   that I wanted to do it a different way.

17   BY MR. HEFFERON:

18        Q.   And do you consider the part of your

19   report, that relies on the Moreno article, to be

20   just an alternative, but that that's not your --

21   your main opinion, that your main opinion is instead

22   based upon the Ocwen information and the other

23   information in public sources?

24        A.   I don't --

25             MS. CHIU:  Objection.  Form.

1          THE WITNESS:  Sorry.

2          I -- I have given numbers based on each of

3   the two methods, and I have not -- the -- both of

4   those numbers are in the report.  I have not

5   indicated a preference for one over the other, in

6   terms of which I judge more reliable.

7   BY MR. HEFFERON:

8      Q.   Do you have a preference for one over the

9   other?

10          MS. CHIU:  Objection.

11          THE WITNESS:  I would say that -- that

12  there is -- there is more -- more research work and

13  more visible data nationally based or -- or more

14  broadly based for the calculations that use public

15  sources, the Ocwen data.

16  BY MR. HEFFERON:

17     Q.   Okay.  And so do you -- does that mean you

18  have a preference over that calculation of damages

19  as opposed to the one that relies upon the

20  geographically limited Moreno paper?

21     A.   I -- I did not, in my report, express a

22  preference.  And I think, as I sit here, I -- I

23  don't have a preference.  But if you -- if you asked

24  me which one has more -- more evidence to support

25  it, I would say that the public source, the

Page 92

1    Ocwen/FHA calculation has more evidence to support

2    it.

3        Q.   Okay.  Which is more reliable, in your

4    view as an expert econometrician who's won the Nobel

5    Prize?

6        A.   I would say the -- the preponderance of

7    the evidence is for the public source alternative.

8        Q.   Okay.  Let me get your report marked here.

9            MR. HEFFERON:  That will be Number 5.

10           Do you want me to give you this, Shirley,

11   or no?  Do you --

12           MS. CHIU:  Yes.

13           MR. HEFFERON:  -- have it already?  Yeah.

14   Okay.  That's just the report.

15   BY MR. HEFFERON:

16       Q.   You can certainly keep access to those,

17   but I don't think I'll be asking you at this point

18   about them.

19           MS. CHIU:  Tom, are these both one

20   exhibit?

21           MR. HEFFERON:  No.

22           MS. CHIU:  Oh, okay.  Sorry.

23           MR. HEFFERON:  I know, the problem is,

24   I'm -- go ahead.  Did you mark --

25           (McFadden Deposition Exhibit 5 was

1      marked.)

2           MR. HEFFERON:   That one's 6.

3           (McFadden Deposition Exhibit 6 was

4      marked.)

5  BY MR. HEFFERON:

6      Q.   Okay.  Professor McFadden, I have shown

7  you what has been marked as Exhibit 5, which is the

8  second amended report dated September 19, 2019.

9           Do you recognize it as such?

10     A.   Yes.

11     Q.   And I've also marked as Exhibit 6 the

12 surrebuttal report of November 14, 2019.

13          Do you recognize it as such?

14     A.   Yes.  Both reports are missing their

15 appendices.

16     Q.   Fair enough.  You're anticipating what I

17 was going to say.

18          But otherwise, those are your two reports,

19 Exhibits 5 and 6?

20     A.   That appears to be the case.

21     Q.   Okay.  Do you have any changes to make

22 here today to either of those two reports?

23     A.   No.

24     Q.   Okay.  Did you review those reports in

25 anticipation of your deposition here today?

Page 94

1        A.   I did.

2        Q.   Okay.  Are there any changes that you

3   would make in -- in -- either substantive or

4   non-substantive to either one?

5        A.   No.

6        Q.   Okay.  And do you provide any opinions in

7   this case about damages, other than set forth in

8   those two reports?

9        A.   I do not.

10        Q.   And do you provide any opinions in this

11   case about anything, whether damages or otherwise,

12   other than as set forth in those two reports?

13        A.   The answer is that I -- at this point, I

14   have not been asked to do so.  I have not done so.

15   I do not anticipate being asked to do so.

16        Q.   Okay.  Do you provide any opinions in this

17   case relevant to the claims brought by the State of

18   Florida?

19        A.   I'm -- I'm not aware of any distinct

20   claims from the State of Florida.

21        Q.   Okay.  So -- so you're not providing any

22   opinions about damages that are claimed by the State

23   of Florida?

24        A.   No, I'm not.

25        Q.   And you are not providing any opinions at

Page 95

1   all about this -- the claims made in the lawsuit

2   filed by the State of Florida?

3        A.   Correct, I am not.

4        Q.   Okay.  And of course that's -- you

5   haven't -- that's because you haven't actually been

6   retained by the State of Florida; have you?

7        A.   I have not.

8        Q.   Okay.  Have you ever spoken to anybody who

9   is working on the State of Florida matter, as far as

10  you know?

11       A.   No, I have not.

12       Q.   You've referred several different times in

13  this deposition, Professor, to your opinion about

14  damages for foreclosures -- increased numbers of

15  foreclosures.

16            And let me ask you to point out in -- in

17  your report -- we'll start with Exhibit 5 -- point

18  out in your report for where you provide the damages

19  calculation for -- for borrower injury, based upon

20  additional foreclosures which you believe are

21  traceable to Ocwen servicing conduct.

22            MS. CHIU:  Objection.  Form.

23            THE WITNESS:  This begins in paragraph 78,

24  on page 38.

25            MS. CHIU:  Tom --

Page 96

1          MR. HEFFERON:  Mm-hmm.

2          MS. CHIU:  -- we've been going for about

3    an hour.  Whenever it makes sense, could we break?

4          MR. HEFFERON:  Sure.

5    BY MR. HEFFERON:

6       Q.  My question was a little bit more

7    specific, Professor, which is, can you show me where

8    the calculations are in your report, of damages for

9    additional foreclosures that you believe were

10   traceable to Ocwen servicing conduct?

11      A.  That -- that's a compound question in

12   the -- in the sense that there are two distinct

13   calculations.  One is the calculation of the

14   increased risk of a foreclosure initiation as a

15   result of Ocwen conduct, specifically escrow

16   servicing delays.

17          And the second is the calculation of the

18   harm to borrowers as a result of foreclos- -- these

19   additional foreclosures forecast by this risk

20   analysis.

21      Q.  The second one was the question.

22          MS. CHIU:  Objection.

23          THE WITNESS:  The second calculations

24   begin on page 53, paragraph 114.

25   BY MR. HEFFERON:

1      Q.    Let me show you what's on page 58,

2   paragraph 118, Table 13.

3            Do you see that?

4      A.    I have it in front of me, yes.

5      Q.    Okay.  And that's your calculation of the

6   estimated cost by component of foreclosure costs,

7   and these are costs to a borrower; correct?

8      A.    This is the calculation in the amended --

9   second amended report, yes.

10     Q.    And -- and you stand behind all these

11  numbers; you wouldn't change them at this point?

12     A.    Correct.

13     Q.    Okay.  And then paragraph 118, itself,

14  actually starting on page 55, actually discusses how

15  the calculations in Table 13 were completed for the

16  Ocwen and public sources column?

17     A.    Correct.

18     Q.    Okay.  And then paragraph 119, which

19  follows Table 13, discusses how you calculated the

20  cost components using the Moreno article; correct?

21     A.    Correct.

22     Q.    Okay.

23            MR. HEFFERON:  All right.  Why don't we

24  take a break.

25            THE VIDEOGRAPHER:  This is the end of

1   Media 3.  We're going off the record at 11:16 a.m.

2             (Short recess taken.)

3             THE VIDEOGRAPHER:  This is the beginning

4   of Media 4.  We're going back on record at

5   11:34 a.m.

6   BY MR. HEFFERON:

7       Q.    Professor McFadden, I think you testified

8   before that you actually have a mortgage currently

9   on your home?

10      A.    Correct.

11      Q.    Okay.  Do you have equity?

12      A.    Yes.

13      Q.    Okay.  And how did you calculate -- or

14  have you ever calculated what equity you have in the

15  home?

16      A.    Yes.

17      Q.    Okay.  And how did you calculate that?

18      A.    By taking the Zillow internet valuation of

19  my house and comparing that to the mortgage balance.

20      Q.    Okay.  So -- so to calculate the equity

21  you have in your home, you took the valuation of the

22  property and subtracted the amount you owed on it?

23            MS. CHIU:  Objection.

24            THE WITNESS:  Correct.

25  BY MR. HEFFERON:

1        Q.    I'm going to -- I should be more specific.

2              So -- so to calculate the equity that you

3    have in your home, you took the valuation of your

4    home and subtracted the amount of the mortgage

5    balance that you owned [verbatim] to the mortgage

6    company; correct?

7        A.    Correct.

8              MS. CHIU:  Objection.

9    BY MR. HEFFERON:

10       Q.    Okay.  And the data points you used are --

11   for a valuation, you used Zillow?

12       A.    When I've done this calculation,

13   typically, yes.

14       Q.    And -- and then to -- to determine the

15   amount that you owed on your home, what information

16   did you rely upon for that?

17       A.    That's a number which appears in my

18   monthly statement.

19       Q.    Now, as part of your calculation of

20   damages in this case, you take into account

21   something you call "equity loss"; correct?

22             MS. CHIU:  Objection.

23             THE WITNESS:  Correct.

24   BY MR. HEFFERON:

25       Q.    Okay.  And is equity loss the same concept

Page 100

1    as a loss by the borrower of the equity that they

2    have in their home?

3         A.   No.

4         Q.   How is it different?

5         A.   The equity loss here is the difference

6    between what the property -- the property would have

7    sold for in a [verbatim] open market sale and what

8    it would typically sell for in a foreclosure sale,

9    adjusted for the share -- share of that difference

10   and additional equity, which would be paid out to

11   the borrower.  Let me -- let me say that once --

12   once again --

13        Q.   Okay.  That would be helpful.

14        A.   -- perhaps more clearly.

15             In a foreclosure sale, the -- the borrower

16   would walk away with the difference between the

17   selling price of the house and the amount needed to

18   pay off the mortgage, less any additional fees and

19   penalties for which they were obligated.

20             And -- and in a but-for world, where the

21   sale was not forced, it would be the same

22   calculation, except the house would now sell at

23   the -- at the open market price, not foreclosured

24   [verbatim] sale price.

25             And in this calculation, one -- these two

Page 101

1  take into account whether -- whether it's in a

2  recourse state or nonrecourse state.

3        In a -- in a recourse state, the

4  borrower -- borrower remains liable for any -- any

5  remaining debt owed on the mortgage.  And in a

6  nonrecourse state, the borrower is relieved of -- of

7  the deficiency.

8     Q.   And that was the deficiency issue that we

9  talked about previously?

10    A.   Well, I used the term -- I think it's

11 clear- -- close to the same term, but I'm not used

12 to using the term "deficiency."  I understand that's

13 a legal term in the -- in the foreclosure process.

14       It's easier for me to talk in the economic

15 terminol- -- terminology about simply the difference

16 between what -- what the borrower ends up in net --

17 with net at the -- at the -- as a result of the

18 analysis in a -- in a foreclosure sale or in an --

19 in a free market sale at the same date.

20    Q.   Okay.  In any event, whether it be a

21 foreclosure sale or a free market sale, the things

22 you had to take into account to determine equity

23 loss would be the selling price, the amount to pay

24 off the outstanding balance of the loan, and fees

25 and penalties.  Correct?

1    A.   Certainly in terms of what the borrower

2  walks away with, yes.

3    Q.   And the borrower -- the borrower's

4  equity -- if the selling price is less than the

5  amount to pay off the loan, plus the fees and

6  penalties, that equity would be zero; correct?

7         MS. CHIU:  Objection.

8         THE WITNESS:  The -- the borrower will --

9  will see a reduction in equity as a result of a

10  discount off the free market selling price.  And

11  then the question subsequent to that is, what --

12  what is the -- what is the disposition of that loss.

13  Does that remain on the books of the borrower, or

14  does some of it get passed to the lender --

15  BY MR. HEFFERON:

16    Q.   Well, let's talk --

17    A.   -- to the investor.

18    Q.   Let's talk about what you referred to as

19  the open market sale.  So if the selling price of

20  the open market sale is less than the amount to pay

21  off the loan, then the borrower, in that situation,

22  has no equity; correct?

23         MS. CHIU:  Objection.

24         THE WITNESS:  At the open market price,

25  that's correct.

Page 103

1   BY MR. HEFFERON:

2       Q.   Okay.  So in those instances, those

3   borrowers who are in that situation, but instead

4   were -- were foreclosed, they didn't lose any

5   equity; did they?

6            MS. CHIU:  Objection.

7            THE WITNESS:  If the property had been

8   sold at market, that would be true, but that's

9   not -- that's not the -- the actual situation.  The

10  actual situation is in that situa- -- is that the --

11  the house that's sold in a foreclosure sale.

12  BY MR. HEFFERON:

13      Q.   But if they have no equity in an open

14  market sale scenario, then they didn't lose any

15  equity in a forced sale; did they?

16           MS. CHIU:  Objection.

17           THE WITNESS:  I -- I believe I agree with

18  your -- your question, although I'm having a little

19  trouble with the wording.

20  BY MR. HEFFERON:

21      Q.   Well, let me make sure it's clear.  So in

22  a situation, where a borrower owed more money on the

23  mortgage than she would have received to sell the

24  property on the open market, that if that borrower

25  was foreclosed on, she would not have lost any

1  equity as a result of being foreclosed on, rather

2  than selling in the open market?

3       MS. CHIU:  Objection.

4       THE WITNESS:  Yeah, I don't find that a

5  clarifying restatement of your question.  Please try

6  again.

7  BY MR. HEFFERON:

8       Q.   Okay.  So -- so we're going to talk about

9  a situation where a borrower owed more money on

10 their loan than they could sell the house for on the

11 open market.  Accept that as the scenario we're

12 going to talk about.

13      A.   Okay.  And in that case, I would agree

14 that they have no equity.

15      Q.   Okay.  And so, if that person was

16 foreclosed upon, rather than making a sale in the

17 open market, the foreclosure would not have caused a

18 loss of equity; isn't that correct?

19      MS. CHIU:  Objection.

20      THE WITNESS:  That depends on whether

21 they're in a recourse state or not.  Because if they

22 are in a recourse state, they -- they remain liable

23 for any -- any part of the loan not paid off.

24 BY MR. HEFFERON:

25      Q.   Okay.  So in -- so in that scenario, a

Page 105

1    borrower who was foreclosed upon, and lives in a

2    nonrecourse state, hasn't lost -- has not lost any

3    equity; correct?

4              MS. CHIU:  Objection.

5              THE WITNESS:  In a -- in a nonrecourse

6    state, that's correct.

7    BY MR. HEFFERON:

8        Q.    Okay.  And in a recourse state, it's your

9    testimony that the borrower has lost equity as a

10   result of the foreclosure?

11       A.    That would be my testimony, yes.

12       Q.    What equity?

13       A.    I'm sorry, in a -- in a foreclosure, the

14   house is not being sold at market.

15       Q.    And I'm -- I'm --

16       A.    So I'm sorry, you -- you've lost me in

17   your question because I'm -- I'm having difficulty

18   separating -- you're talking about foreclosure,

19   but you're talking about a market sale, but you're

20   also talking about a foreclosure.  So the sale is

21   not at open market.

22              I -- so could you clarify what's -- you

23   know, what's hypothetical -- what's -- what's the

24   but-for case and what's the as-is case?

25       Q.    Well, I -- I -- we're still talking about

1    a situation where the borrower owes more money on

2    her loan than her property would fetch on an open

3    market; correct?  That's what we're talking about.

4              And my question to you, sir, is if she was

5    foreclosed and lived in a recourse state, what

6    equity did she lose as a result of being foreclosed?

7              MS. CHIU:  Objection.

8              THE WITNESS:  If the house were, in fact,

9    sold at market -- at the open market, then she would

10   -- she would not have a loss -- loss of equity,

11   that's correct.

12   BY MR. HEFFERON:

13      Q.   Okay.  And so, if she was foreclosed and

14   lived in a recourse state, she also wouldn't have

15   had any loss of equity; correct?

16      A.   No, I disagree.

17      Q.   She didn't have any equity; did she?

18              MS. CHIU:  Objection.

19              THE WITNESS:  I'm sorry, your -- I'm

20   actually finding your -- your questions so confusing

21   that I -- I don't know how to answer.  I mean, we --

22   we need to talk about what the actual situation was,

23   in which case there was an actual foreclosure sale,

24   or we have to talk about the free -- free market

25   sale.  And I'm -- I'm -- you keep going back and

1    forth.  I just can't keep track.

2    BY MR. HEFFERON:

3        Q.   Well, we're talking about someone who has

4    no equity in their house when you're thinking about

5    the possibility of sale on the open market.  Okay?

6            That person, if she gets foreclosed, how

7    could she lose equity since she didn't have any,

8    even if she could sell on the open market?

9            MS. CHIU:  Objection.

10           THE WITNESS:  The -- the calculation is --

11   is this, which is that if there -- if -- if it was

12   all open market transactions in every case, then she

13   would -- she would have no equity loss.  I agree

14   with that.

15   BY MR. HEFFERON:

16       Q.   All right.  So if she was foreclosed, how

17   does that mean that she has a loss of equity, since

18   she didn't lose equity in an open market sale?

19       A.   Because if she's foreclosed, then it --

20   then she's going through a foreclosure sale at an

21   REO discount, and there's a [verbatim] equity loss

22   associated with that.

23       Q.   How do you calculate that equity loss?

24       A.   It's the difference between what she would

25   have in her pocket in -- in the open market, and

1   what she would have in her pocket net of debt still

2   owed in -- in the foreclo- -- in the foreclosure

3   case.

4        Q.   Okay.  Well, she would have in her pocket

5   zero as a result of an open market sale?

6        A.   She would have in her pocket a -- a

7   remaining indebtedness.

8        Q.   And -- and -- and so how does that harm

9   her?

10           MS. CHIU:  Objection.

11           THE WITNESS:  We discussed this earlier

12   today.  I -- I -- I think it's a matter of

13   economics.  If -- someone who has a large debt -- or

14   any debt balance on their personal accounts is -- is

15   harmed by the -- whatever process is used to

16   discharge -- eventually discharge that debt.  She

17   either has to pay it off or something else has to

18   happen, which impact -- impacts her one way or the

19   other.

20   BY MR. HEFFERON:

21        Q.   And in a situation, assuming that Ocwen

22   does not, in fact, seek recourse from anyone who's

23   been foreclosed, how is the borrower harmed if they

24   emerge from the foreclosure owing amount?

25           MS. CHIU:  Objection.

1          THE WITNESS:  Well, first of all -- sorry.

2          First of all, as I've indicated, I have no

3     evidence, and I'm aware of no knowledge to support

4     the -- the assumption that Ocwen did not pursue

5     any -- any recourse.

6     BY MR. HEFFERON:

7          Q.   Well, actually, we established you have no

8     knowledge at all of anyone's practices in the

9     industry on recourse; isn't that correct?

10          MS. CHIU:  Objection.

11          THE WITNESS:  What I said is, I'm not

12    aware of any data that Ocwen has, that indicated

13    that they did not receive recourse.

14          What I'm aware of is that they -- a simple

15    way to say that they -- they did not pursue

16    recourse, would be to say they re- -- they

17    reinstated these -- these properties or they

18    essentially officially discharged this obligation.

19    And that -- I don't see that in the Ocwen records.

20    BY MR. HEFFERON:

21          Q.   Did you ask?

22          A.   Yes.

23          Q.   You asked for that information?

24          A.   It's in the interrogatories, yes.

25          Q.   Where?

1        A.    Interrogatory 5, I believe.

2        Q.    Okay.  You asked whether Ocwen discharged

3   its deficiencies?

4        A.    We can look and see what they did with it.

5        Q.    You asked whether Ocwen seeks recourse?

6        A.    I'm sorry?

7        Q.    You asked whether Ocwen seeks recourse?

8             MS. CHIU:  Objection.

9             THE WITNESS:  That's in that

10  interrogatory -- my response to that interrogatory,

11  yes.

12  BY MR. HEFFERON:

13       Q.    Okay.  Assuming Ocwen never seeks

14  recourse, are you providing an opinion today about

15  what damages the borrower suffers, who has a

16  deficiency that is not the subject of collection?

17            MS. CHIU:  Objection.

18            THE WITNESS:  I've not provided damage

19  calculations for purely speculative hypotheticals

20  for which there's -- I have no evidence.

21  BY MR. HEFFERON:

22       Q.    Why did you assume Ocwen does collect?

23            MS. CHIU:  Objection.  Form.

24            THE WITNESS:  My understanding of what

25  recourse means is that the -- the borrower is still

Page 111

1    on the hook before --

2    BY MR. HEFFERON:

3        Q.   And did you make an assumption about

4    whether the borrowers, in fact, had to pay out of

5    their pocket to discharge some or all of the

6    deficiency?

7            MS. CHIU:  Objection.  Form.

8            THE WITNESS:  I don't -- I have no

9    evidence regarding that.  I've -- I've seen no

10   testimony in this case that -- that addresses that

11   issue.

12   BY MR. HEFFERON:

13       Q.   Isn't it true, Professor McFadden, that as

14   part of your opinion in terms of determining the

15   equity loss, you are assuming that borrowers, who

16   are foreclosed and their account has a deficiency,

17   that they are paying that deficiency out of their

18   pocket?

19           MS. CHIU:  Objection.

20           THE WITNESS:  What I would say is, that

21   I've done a damage calculation that is sufficiently

22   conservative, so that that damage calculation is

23   supportable under a variety of complex outcomes.

24   BY MR. HEFFERON:

25       Q.   Is that really your answer, sir?

Page 112

1      A.    That is really my answer.

2      Q.    Okay.  Well, then, I'll ask the question

3  again.

4            Isn't it true, Mr. -- Professor McFadden,

5  that as part of your opinion, in terms of

6  determining the equity loss, you are assuming that

7  borrowers, who are foreclosed and their counts as a

8  deficiency, that they are paying that deficiency out

9  of their pocket?

10           MS. CHIU:  Objection.  Asked and answered.

11           THE WITNESS:  What is true is that the --

12  the calculation that I do for a recourse state do

13  not assume that those are nonrecourse states.

14  BY MR. HEFFERON:

15     Q.   Is it -- isn't it true,

16  Professor McFadden, that as part of your opinions,

17  in terms of determining the equity loss, you're

18  assuming that borrowers, who are foreclosed, and the

19  account has a deficiency, that they are paying that

20  deficiency out of their pocket?

21           MS. CHIU:  Objection.  Asked and answered.

22           THE WITNESS:  I'm not doing that

23  calculation at all; I'm simply applying what I

24  understand to be the rules of recourse, to which is

25  that the borrower remains liable for -- for any

Page 113

1   amount that's not discharged in the loan.

2   BY MR. HEFFERON:

3       Q.   Okay.  So this figure for equity loss

4   includes borrowers who were foreclosed on, and

5   there's a deficiency generated and you're not

6   assuming, one way or another, about whether they

7   ever paid it?

8           MS. CHIU:  Objection.

9           THE WITNESS:  This calculation is a

10  calculate -- calculates -- does a -- this

11  calculation proceeds by assuming that, in a recourse

12  state, where the borrower remains liable for any

13  undischarged amount on the loan, that if the -- if

14  the property was sold at a discount, that remains an

15  additional debt that they are -- are obligated for.

16  BY MR. HEFFERON:

17      Q.   And those people are included in your

18  calculation of equity loss?

19      A.   That's correct.

20      Q.   Okay.  If those deficiencies were

21  discharged or otherwise forgiven, would you take

22  them out of the equity loss calculation?

23          MS. CHIU:  Objection.

24          THE WITNESS:  I would say that, if there

25  was reliable evidence that they were processed in

1    some other way, then one -- one could -- one could

2    do -- do the calculation of the actual harm as a

3    result of however the -- the foreclosure is

4    resolved.

5            I've done a sufficiently conservative

6    calculation, so I can accommodate a variety of

7    potentially quite messy resolutions.

8    BY MR. HEFFERON:

9        Q.   If those deficiencies were discharged or

10   otherwise forgiven, would you take those out of the

11   equity loss calculation?

12           MS. CHIU:  Objection.  Asked and answered.

13           THE WITNESS:  I believe that the way I

14   would answer that is to say that, in the way I

15   calculated damages, it wouldn't -- it should not

16   matter whether they're included or excluded from the

17   equity loss calculation, that the -- my damage

18   estimate is sufficiently conservative, so that if

19   there was some other method of resolving the

20   foreclosure, that the -- the harm to the borrower

21   net from that, which has not been resolved, I didn't

22   do it.  It would -- might be difficult to do.  But

23   my final number is sufficiently conservative, so it

24   should be able to accommodate any -- any

25   complexities there.

1    BY MR. HEFFERON:

2         Q.   What does it mean for a loan to be

3    underwater?

4         A.   It means that at -- at market price, the

5    value -- the principal remaining on the loan is

6    higher than the market price.

7         Q.   Okay.  Did you make any attempt to

8    determine which of these wrongfully foreclosed

9    borrowers were underwater at the time of

10   foreclosure?

11             MS. CHIU:  Objection.

12             THE WITNESS:  I have some difficulty with

13   your question, because my analysis is a -- a

14   statistical analysis.  You seem to be referring to

15   individual borrowers.  Was that the intention of

16   your question?

17   BY MR. HEFFERON:

18        Q.   So is it your testimony that this

19   calculation is scientific and statistical, but

20   doesn't take into account what actually happened in

21   the real world with people, and how much they owed

22   and whether they actually lost equity; is that your

23   testimony, sir?

24             MS. CHIU:  Objection.

25             THE WITNESS:  My -- my analysis in this

Page 116

1   case does a statistical projection of the number of

2   foreclosure initiations, which came about because of

3   Ocwen misconduct, which would not otherwise have

4   occurred.  And from that, does a calculation of

5   the -- of the cost of -- of resolution of those

6   foreclosure initiations.  It's not -- it's not a

7   calculation done of individual borrower, by an

8   individual borrower.

9   BY MR. HEFFERON:

10      Q.   Does it take into account the fact that

11  some of the borrowers, that are the subject of your

12  calculation, were underwater?

13          MS. CHIU:  Objection.

14          THE WITNESS:  It does, yes.

15  BY MR. HEFFERON:

16      Q.   Okay.  Do you find that any one of those

17  people had an equity loss?

18      A.   You, again, seem to be bringing this back

19  to individual loans.  And the -- the answer is, I do

20  not analyze individual loans.  I'm doing a

21  statistical analysis of the population and the

22  subpopulations that suffer from Ocwen servicing

23  errors.  And the subpopulation of those who have the

24  foreclosure initiated.  That's --

25      Q.   So is it your testimony, sir, that your

1  calculation includes, as borrower suffering an

2  equity loss, some borrowers who were underwater?

3          MS. CHIU:  Objection.

4          THE WITNESS:  Some -- some proportion of

5  the population that have foreclosure initiated are

6  indeed underwater.

7  BY MR. HEFFERON:

8      Q.  Okay.  And --

9      A.  By -- the question of what "underwater"

10  means here it, in fact, is a data issue, because the

11  question is, what is the market price of the house,

12  but yes.

13      Q.  Does Ocwen have the information on the

14  market price of the house?

15      A.  Do they?

16          MS. CHIU:  Objection.

17          THE WITNESS:  They have sporadic and

18  sometimes dated information, yes.

19  BY MR. HEFFERON:

20      Q.  How about information at the time of the

21  foreclosure initiation about the market value of the

22  house, does Ocwen have that?

23          MS. CHIU:  Objection.

24          THE WITNESS:  There's the question of

25  timing, but I think the -- the answer is that,

1  around the time of foreclosure initiation, perhaps

2  closer to the time of a foreclosure sale, they do

3  have what is described, I believe, as a drive-by

4  appraisal.

5  BY MR. HEFFERON:

6      Q.    And did you use that information to

7  determine whether the borrower, at that time, had

8  any equity in the property?

9          MS. CHIU:  Objection.  Form.

10         THE WITNESS:  I don't -- I don't view that

11 as a reliable source.

12 BY MR. HEFFERON:

13     Q.    On what basis?

14     A.    Because the drive-by appraisals are

15 appraisals of the house -- in -- in a house as it

16 would be sold in a foreclosure auction, they already

17 reflect an REO effect.

18     Q.    What's the basis for your opinion?

19         MS. CHIU:  Objection.

20         THE WITNESS:  That's my understanding of

21 the appraisal process as it -- as footnoted by

22 Dr. Halm.

23 BY MR. HEFFERON:

24     Q.    What's your basis for that -- so you're

25 relying on Dr. Halm for that?

1        A.    Well, Dr. Halm described this, yes.

2        Q.    You did this report before you got

3   Dr. Halm's report.  What did you rely upon in doing

4   Exhibit 5, in determining whether to include

5   valuation of properties and deciding you're not

6   going to use the information Ocwen had?

7            MS. CHIU:  Objection.

8            THE WITNESS:  Please clarify your

9   question.

10  BY MR. HEFFERON:

11       Q.    I'll ask a different one.  So I -- I'm

12  just trying to understand, Professor McFadden, about

13  equity loss.  So let me go back to the first

14  principles.

15           You -- you testified that you thought that

16  you had equity in your house because you owed less

17  than the market value of the house; isn't that

18  right?

19       A.    Correct.

20       Q.    Okay.  To determine the equity that

21  borrowers had, that you studied, did your

22  calculation take into account what the market value

23  of those homes was, versus the amount that was owed

24  on those homes at the relevant times?

25       A.    Yes.

1      Q.    Okay.  How did it do that?

2      A.    Sorry.  What was the question?

3      Q.    How did it do that?

4      A.    How did I do that or what -- do that -- is

5   that--

6      Q.    Correct.  Yeah.  It's a -- well, let me --

7   let me break it down.

8            So you told me that your calculation took

9   into account the market value of those homes, and

10  took into account the amount that was owed on those

11  homes at the relevant times; correct?

12     A.    You were asking about my mortgage.  Are

13  you now switching back to the Ocwen?

14     Q.    Try -- try to keep up with me, Professor.

15  Yes, we're talking about your study.  All right?

16           You testified that you thought that the --

17  that all these borrowers suffered equity loss, and

18  I'm asking you whether you took a look, in making

19  that calculation, at what those borrowers actually

20  owed on their homes.

21           MS. CHIU:  Objection.  What was the

22  question?

23           THE WITNESS:  I don't believe that I

24  testified that all borrowers suffered this equity

25  loss.  I -- this is a -- this is an -- an average

1    equity loss.

2    BY MR. HEFFERON:

3        Q.   Okay.  For those borrowers who suffered an

4    equity loss, did you take into account how much

5    money they owed on their loan?

6            MS. CHIU:  Objection.

7            THE WITNESS:  I don't understand the

8    question.

9    BY MR. HEFFERON:

10       Q.   I don't know how to ask it more simply, so

11   I'll ask it again.

12           For those borrowers who suffered an equity

13   loss, did you take into account how much money they

14   owed on their loan?

15           MS. CHIU:  Objection.

16           THE WITNESS:  The answer is, that the

17   amount they owed on their loan was part -- part of

18   the calculation that would -- would go into an

19   individual's equity loss.  That's -- that's --

20   that's the logical sequence of that calculation.

21   The -- the number in Table 14, if that's your --

22   what you're referring to, is an -- is an average.

23   BY MR. HEFFERON:

24       Q.   And in conducting your calculation of

25   equity loss, did you take into account the

1    outstanding balance of the mortgages?

2         MS. CHIU:  Objection.  Form.

3         THE WITNESS:  I thought I just answered

4    that question by saying that's -- that's one of the

5    in- -- one of the pieces in the chain of the

6    calculation.  So the answer is, yes, it's part of

7    the calculation.

8    BY MR. HEFFERON:

9         Q.  How did you take into account the amount

10   that the borrowers owed on their mortgages?

11        A.  Well, in the -- in the calculations

12   associated with Table 14, it's taking into account

13   by using a -- an -- an average of equity loss

14   from -- from a foreclosure sale, from -- from the

15   literature.  And it's a conservative estimate of

16   what that equity loss is.  That's -- that's not a

17   calculation done borrower-by-borrower from the Ocwen

18   data.

19        Q.  Let's look at paragraph 118C, which

20   describes how you calculated equity loss.

21        And read the first sentence in that

22   section, if you would, out loud, please.

23        A.  So which paragraph again?

24        Q.  '18C, first sentence.  Describes --

25   describes how you calculated equity loss; does it

Page 123

1    not?

2              MS. CHIU:  You mean 118?

3              MR. HEFFERON:  Yeah, 118C.

4              THE WITNESS:  Okay.  Yes.  What is the

5    question?

6    BY MR. HEFFERON:

7        Q.   Okay.  So paragraph 118C describes how you

8    calculated equity loss; does it not?

9              MS. CHIU:  Objection.  Form.

10             THE WITNESS:  It explains how -- explains

11   how the calculation as -- as regards to the number

12   for equity loss in Table 13, yes.

13   BY MR. HEFFERON:

14       Q.   Okay.  And is -- as your own words

15   provide, according to your report, quote, "equity

16   loss is estimated as the decrease in property value

17   at the time of foreclosure," end quote.

18             Did I read that correctly?

19       A.   Correct.

20       Q.   Okay.  So your calculation is an estimate

21   of the decrease in the property value, but does not

22   take into account the amount that the borrower owns

23   [sic] on the mortgage; isn't that correct?

24             MS. CHIU:  Objection.  Form.

25             THE WITNESS:  My -- my testimony before,

1   and I -- and I will say it again, is that this --

2   this calculation reflects -- is -- is downstream of

3   a calculation, which takes into account the selling

4   price of the property and the -- and the amount of

5   the mortgage.  So it's -- it's taken to a -- into

6   account in the -- in the stream of calculation.

7   BY MR. HEFFERON:

8       Q.   How does it take the mortgage amount

9   into calc- -- into account?

10          MS. CHIU:  Objection.  Form.

11          THE WITNESS:  You -- you want me to

12  reproduce the arithmetic for you?  Because I don't

13  understand what your question is.

14  BY MR. HEFFERON:

15      Q.   I want you to describe it to me.  You're

16  the one -- you're -- you're here, Doctor --

17  Professor McFadden, describing equity loss of well

18  over 10,000 borrowers, you're saying it was an

19  average of about $26,000 per person, on average.

20  And your report says, equity loss is estimated as a

21  decrease in the property value.

22          My question for you, sir, is quite simple,

23  which is:  How, if at all, did you take into

24  account, in making that calculation, the amounts

25  owed by the 16,000 borrowers on their loans?

1          MS. CHIU:  Objection.

2          THE WITNESS:  And the answer is that the

3   number that appears here, let's use the $20,470, in

4   the public source calculation for equity loss in

5   Table 13, that's -- that's based on the lit -- on --

6   on the literature and it's -- it's based on the

7   size -- size of the REO discount, and it's a very

8   conservative estimate of the impact on the borrower

9   of the resolution of the loan, which includes pay --

10  what -- what gets paid off after the property is

11  sold --

12  BY MR. HEFFERON:

13      Q.   And that 20 --

14      A.   -- in a foreclosure sale.

15      Q.   And that 20,000 number is a decrease in

16  the property value as a result of the REO discount;

17  isn't that correct?

18          MS. CHIU:  Objection.

19          THE WITNESS:  It's -- it's a conservative

20  estimate of the loss to the borrower as a result of

21  the foreclosure sale.

22  BY MR. HEFFERON:

23      Q.   And how is the borrower, who is underwater

24  to start with, actually suffering a loss as a result

25  of this REO discount on the property value?

1      A.   Well, in fact, some borrowers are

2   underwater; some are not.  The 20,000 --

3      Q.   Not my question, sir.  My question is:

4   How is the borrower, who is underwater to start

5   with, actually suffering a loss, as a result of the

6   REO discount on the property value?

7      A.   The $20,000 is an average, which reflects

8   the loss to borrowers who have -- did not have any

9   borrower equity and -- and those who had larger

10  amounts of borrower equity.  It's an average which

11  we -- which takes into account the -- that -- that

12  some of these borrowers are underwater.  It's, in

13  fact, a conservative estimate that takes into

14  account --

15     Q.   Is it your testimony --

16          THE COURT REPORTER:  I'm sorry.

17          MR. HEFFERON:  I'm sorry.  My -- my

18  mistake.

19          MS. CHIU:  Counsel, I'm going to ask that

20  you let the witness finish his answer.

21  BY MR. HEFFERON:

22     Q.   Is it your testimony that borrowers who

23  are underwater suffered losses as a result of the

24  decrease in property value from this REO discount?

25     A.   No.  My testimony is that this is an

1 average loss, and it's an average across borrowers

2 who did not have a loss and borrowers who had

3 perhaps, larger losses.

4     Q.  And how much did the borrowers, who had no

5 equity to start with, how much did they lose?

6         MS. CHIU:  Objection.  Asked and answered.

7         THE WITNESS:  This is a conservative

8 est- -- this is a conservative estimate of the

9 average -- of an average in which they would have

10 zero loss --

11 BY MR. HEFFERON:

12     Q.  Okay.

13     A.  -- a borrower underwater would have zero

14 loss if -- when the property was sold at -- at fair

15 market value.

16     Q.  Okay.  So if you had information that --

17 if you had information that 88 percent of the

18 borrowers we're talking about were underwater at the

19 time and -- strike that.

20         So if you accept my representation, that

21 88 percent of the borrowers were underwater at the

22 time, would you still have set up your calculation

23 based upon an average, rather than taking those

24 people just completely out of the calculation?

25         MS. CHIU:  Objection.

1           THE WITNESS:  First of all, I would take

2     strong exception to your representation of

3     88 percent.  That's simply not anywhere close to the

4     reality of --

5     BY MR. HEFFERON:

6           Q.   What's your basis for that?

7           A.   -- of Ocwen's numbers.

8           Q.   What's your basis?

9           MS. CHIU:  Counsel, please let him finish

10     his answer.

11           THE WITNESS:  My basis is Ocwen's data.

12     BY MR. HEFFERON:

13           Q.   And what --

14           A.   That -- that number is con- --

15     inconsistent with Ocwen's data.

16           Q.   What does it show?

17           A.   What does what show?

18           Q.   The data.

19           MS. CHIU:  Objection.

20           THE WITNESS:  Go and -- go and -- have

21     Dr. Halm go and look at -- at inter- -- RFP 9 and 10

22     and Interrogatory Response 5.  It's -- it's just not

23     consistent with your -- with that representation.

24     BY MR. HEFFERON:

25           Q.   And what's your -- what's your

1    recollection of what the data shows for the number

2    of underwater borrowers?

3                MS. CHIU:  Objection.

4                THE WITNESS:  I would say that -- first of

5    all, I make a distinction between recourse and

6    nonrecourse states.  Okay.

7    BY MR. HEFFERON:

8        Q.   Without that distinction taken into

9    account, what's the recollection of the --

10       A.   Well -- I --

11       Q.   -- number of --

12       A.   I --

13               THE COURT REPORTER:  Hold on.

14               THE WITNESS:  Sorry.

15               I don't consider it relevant as to what --

16   what the situation is in recourse states?  That

17   is -- underwater has no meaning in a recourse state

18   because, you know, you -- you're -- you're liable

19   for the total balance, whether or not it can be a --

20   recovered through sale.

21   BY MR. HEFFERON:

22       Q.   Well, I'm answering the question -- I'm

23   asking the questions and I'm telling you to answer

24   my question based upon all loans, regardless of

25   whether the borrower's in a recourse or nonrecourse

Page 130

1    state.

2              MS. CHIU:  Objection.

3    BY MR. HEFFERON:

4         Q.    What's your testimony about how many

5    borrowers or what percentage of borrowers were

6    underwater at the time that you were calculating an

7    equity loss?

8              MS. CHIU:  Objection.  Form.

9              THE WITNESS:  I can -- I can recall a

10   calculation for nonrecourse states.  And for that

11   calculation, approximately, somewhere between 40 and

12   50 percent of the loans are underwater.

13   BY MR. HEFFERON:

14        Q.    All right.  In con- -- performing your

15   calculation of equity loss, why did you include

16   those 40 to 50 percent of borrowers who you knew,

17   based on the data, had no equity that they could

18   possibly lose?

19             MS. CHIU:  Objection.

20             THE WITNESS:  The whole intent of the

21   calculation is to compute from -- from an average

22   loss.  What you've asked is why didn't I exclude the

23   borrowers who had -- who were -- had no equity loss.

24   The answer is, I -- they were in the calculation the

25   same way the people in the calculation that had

1   twice -- or three times the equity loss.  That's an

2   average.  And then there -- there's no reason to

3   exclude one group without some -- some -- it -- it

4   simply is not a -- is not a -- not a sensible

5   calculation to perform -- to take an average loss

6   and apply it only to a fraction of the population.

7   BY MR. HEFFERON:

8       Q.   And that's how you perform your

9   econometric work, you include people who couldn't

10  possibly have been harmed in conducting damage

11  calculations; is that what you normally do?

12          MS. CHIU:  Objection.  Objection.

13          THE WITNESS:  I believe this is a

14  legitimate way to do the calculation.  I have done

15  tabulations which take these -- take the details

16  into account.  And I can -- those are tab- --

17  tabulations based on data previously delivered --

18  delivered to defendants, but not included in my

19  surrebuttal report, so...

20  BY MR. HEFFERON:

21      Q.   So you're sticking with how you did it,

22  which was to include all of the underwater

23  borrowers; correct?

24          MS. CHIU:  Objection.

25          THE WITNESS:  The answer is that I took

Page 132

1    this population, I took the average loss for the

2    population, and I applied it to the population, and

3    that will include some borrowers who had zero loss.

4    That'll include some borrowers that had 40,000- to

5    $60,000 loss.  They -- they differ from borrower to

6    borrower, but that -- this is an average loss.  In

7    fact, it's a quite conservative estimate of the

8    average loss.

9    BY MR. HEFFERON:

10        Q.   Did you, in conducting -- in determining

11   what the fair market value was at foreclosure to do

12   this calculation, you had to make that calculation,

13   right, the fair market value of the property at the

14   time of foreclosure?

15             MS. CHIU:  Objection.

16             THE WITNESS:  You're asking, does that --

17   is that a factor in Table 13?  Is that -- is the

18   question?

19   BY MR. HEFFERON:

20        Q.   In your opinion.

21        A.   Table 13 --

22             MS. CHIU:  Objection.

23             THE WITNESS:  -- is based on a literature

24   estimate of the -- of the average equity loss, a --

25   a calculation which uses the -- the market value of

1 house -- houses in this population.  And that's, in

2 turn, based on the data that comes from Ocwen.

3 BY MR. HEFFERON:

4     Q.   That's based upon the original purchase

5 price?

6     A.   Well, it's based on the original purchase

7 price, and on the appreciation of houses in the

8 neighborhood.

9     Q.   And -- well, actually, it was based upon

10 the averages in the whole county; wasn't it?

11     A.   I'm sorry.

12     Q.   Actually, it was based on the averages in

13 the whole county; wasn't it?

14          MS. CHIU:  Objection.  Also, Counsel, I --

15 I'm going to ask that you watch your tone of voice.

16 BY MR. HEFFERON:

17     Q.   Go ahead, Professor.

18          MS. CHIU:  Please be respectful to our

19 witness.

20          THE WITNESS:  It's -- it's based on ZIP

21 code level prices where those were available.

22 BY MR. HEFFERON:

23     Q.   How about when they weren't available?

24          MS. CHIU:  Objection.

25          THE WITNESS:  In -- in a -- a small

Page 134

1    minority of cases, they -- ZIP code information

2    wasn't available, in which case a broader average

3    was used.

4    BY MR. HEFFERON:

5         Q.   Okay.  And as far as fair market value,

6    you chose -- when you created the report, you chose

7    not to use data that Ocwen had of the value, based

8    upon what you referred to as drive-by appraisals?

9              MS. CHIU:  Objection.  Form.

10             THE WITNESS:  Yes, the -- the Ocwen data

11   is not -- is not satisfactory or adequate for that

12   calculation.

13   BY MR. HEFFERON:

14        Q.   And when you created this report and

15   finished it off, I think it was in September of

16   2019, what information did you have about whether

17   the -- the drive-by appraisals were not satisfactory

18   or adequate?

19             MS. CHIU:  Objection.

20             THE WITNESS:  What I had at that time

21   were -- were the Ocwen documents, Ocwen responses,

22   which -- which indicated where -- where new

23   appraisals had been made, or new determinations had

24   been made, and those data were extremely spotty and

25   were certainly not usable for a broad statistical

Page 135

1    calculation.

2    BY MR. HEFFERON:

3        Q.   Did you try to use them when they were

4    available as a better calculation of fair market

5    value than your attempt to generate fair market

6    value, based upon historical purchase price?

7            MS. CHIU:  Objection.  Form.

8            THE WITNESS:  The answer is, in my

9    judgment it was not appropriate to do that the --

10   these -- these data were so spotty and so -- and

11   most- -- mostly unavailable, that they were not

12   useful for statistical purposes.

13   BY MR. HEFFERON:

14       Q.   And when you say "spotty," what do you

15   mean?

16       A.   I'm sorry, I -- you --

17       Q.   When you say "spotty," what do you mean?

18       A.   Spotty, I mean missing -- the -- very --

19   very few of the properties had loan -- loan-to-value

20   numbers which were current at the time of

21   foreclosure in the data that I looked at.

22       Q.   I'm not asking about loan to value.  I'm

23   asking about fair market value.

24           MS. CHIU:  Counsel, is there a question?

25           MR. HEFFERON:  Yeah.

Page 136

1    BY MR. HEFFERON:

2         Q.   I mean, I'll ask the same question.  When

3    you say "spotty" when referring to the data on fair

4    market value that Ocwen had, what do you mean?

5         A.   As far as I'm aware, the only data that

6    Ocwen had on value was -- was the origination value

7    and the origination loan and a -- a very -- an often

8    unreported or unmeasured loan-to-value ratio at some

9    later date.

10        Q.   Okay.  So at the time you did your report,

11   were you not aware that Ocwen had drive-by

12   appraisals for the properties that you were studying

13   showing the value at the time of foreclosure

14   initiation?

15             MS. CHIU:  Objection.

16             THE WITNESS:  What I stated is that what I

17   -- what I knew from the data was that Ocwen did not

18   have a generally available and clear housing --

19   market value or housing prices data at -- at the

20   time -- at the dates that I would -- I needed it.

21   BY MR. HEFFERON:

22        Q.   Okay.  So you weren't aware that that --

23   those documents and records existed; is that your

24   testimony?

25        A.   Say it one more time.

1    Q.   You weren't aware that those documents and

2  records of valuations existed in Ocwen's hands; is

3  that your testimony?

4         MS. CHIU:  Objection.

5         THE WITNESS:  You're suggesting there --

6  there are documents that were not turned over?  Is

7  that what you're asking?

8  BY MR. HEFFERON:

9    Q.   I'm asking whether you were aware of

10  documents and records that Ocwen had, showing the

11  fair market value, based upon an appraisal that was

12  contemporaneous with the foreclosure process.  Were

13  you aware of those?

14         MS. CHIU:  Objection.

15         THE WITNESS:  I've already mentioned

16  the -- the data that I -- I cited specifically on

17  this, which is -- well, actually, no.  I would have

18  to go back and -- and recall the -- the RFPs.  I

19  don't have the numbers memorized.

20  BY MR. HEFFERON:

21    Q.   REO discount, I think we talked about

22  before, is the -- the discount that you described in

23  the price of the property when it is sold -- when

24  the foreclosure is over from the mortgage servicing

25  company to a -- a third party; isn't that correct?

Page 138

1            MS. CHIU:  Objection.

2            THE WITNESS:  That's my understanding,

3    yes.

4    BY MR. HEFFERON:

5        Q.   Okay.  Do you have any information about

6    the -- about the difference between the fair market

7    value on an open sale, as you described it, and the

8    amounts that loans typically -- excuse me, that

9    properties typically received at a foreclosure

10   auction?

11       A.   Please re- -- re- --

12       Q.   Sure.

13           Do you have any information -- do you have

14   any information about the difference between the

15   fair market value of a property at an open sale and

16   the amount that a property typically received at a

17   foreclosure auction?

18       A.   Yes.

19           MS. CHIU:  Objection.  Form.

20   BY MR. HEFFERON:

21       Q.   And what information do you have about

22   that?

23       A.   There's substantial literature on housing

24   market sale prices with -- with and without a flag

25   for an REO sale.  And those studies can give a

1   specific discount -- or give -- give a range of

2   discounts associated with an REO sale.

3        Q.   Okay.  Sir, I'm not asking about an REO

4   sale.  I'm asking about the foreclosure auction.

5        Do you have any information about the

6   difference about -- the difference between the fair

7   market value of a property at open sale and the

8   amount the property typically received at a

9   foreclosure auction?

10        MS. CHIU:  Objection.  Form.

11        THE WITNESS:  I have some information on

12   that from -- from the papers that are in the

13   academic literature, yes.

14   BY MR. HEFFERON:

15        Q.   Okay.  And why did you not use that

16   information in conducting your calculation of equity

17   loss?

18        MS. CHIU:  Objection.

19        THE WITNESS:  We could -- we can go to

20   specific papers, but what those specific papers do

21   is -- is analyze the sale at the time of the -- of

22   an REO sale.

23   BY MR. HEFFERON:

24        Q.   Do you understand the difference between

25   an REO sale and a foreclosure auction?

Page 140

1      A.    Yes.

2      Q.    What's the difference?

3      A.    Well, I think at the -- at the -- as I

4  understand it, at the initial auction, the property

5  is offered for sale at a price which would discharge

6  the loan.  If a -- if a private bidder or investor

7  offers above that price, they acquire the property

8  and the loan is discharged.

9           If not, the lender -- effectively the --

10  the real estate agency of the renter becomes the --

11  the owner of the property.  And that's the R- -- and

12  then if they have somebody sell it, that's the REO

13  sale.

14     Q.    Okay.  So I'm not asking about the

15  subsequent sale of the property at REO.  I'm asking

16  about the difference between the fair market value

17  of the property at an open sale and the amount that

18  it was sold for at foreclosure auction.

19           Do you have any information about that

20  discount, as it were?

21     A.    Well, I'm aware of the way that market

22  worked, and I certainly have an econ- -- an economic

23  view on what the relationship is between that and

24  the -- and the subsequent REO sale.

25     Q.    I'm not asking about an REO sale.  I'm

1    asking you about the difference between the value of

2    the property at fair market on the open market and

3    the amount that it sold for at foreclosure.

4         A.   I understand your question, and I'm -- I'm

5    saying that I have an opinion on that, based on the

6    REO sale and the -- and the economic link one would

7    expect between the foreclosure sale and the REO

8    sale.

9         Q.   Okay.  What is your opinion, sir?

10        A.   My opinion is that prices in the

11   foreclosure sale would reflect the subsequent RE- --

12   REO sale value.

13        Q.   And so my question for you, sir, is -- is

14   why, in calculating the property value discount for

15   purposes of the equity loss, why do you use the REO

16   discount rather than a discount based upon the

17   original foreclosure auction sale?

18             MS. CHIU:  Objection.

19             THE WITNESS:  A very -- a large majority

20   of foreclosure auction outcomes go back to the

21   real -- to the lender and -- and become a subsequent

22   REO sale.  And that -- for a vast majority of

23   these -- of these properties, the RE- -- REO sale is

24   the definitive economic sale, which determines their

25   value.

Page 142

1   BY MR. HEFFERON:

2        Q.    For -- for a borrower who got foreclosed

3   upon, the loss of equity that the borrower suffered

4   from the foreclosure would have occurred at the time

5   of the auction; isn't that correct?

6             MS. CHIU:  Objection.

7             THE WITNESS:  I do not understand that to

8   be the case.  I understand that the borrower had --

9   had continuing obligations af- -- after the

10  foreclosure sale.

11  BY MR. HEFFERON:

12       Q.    How about in nonrecourse state, is it your

13  understanding that the borrower -- for a borrower

14  who got foreclosed upon in a nonrecourse state, the

15  loss of equity the borrower suffered from in the

16  foreclosure would have occurred at the time of the

17  auction?

18            MS. CHIU:  Objection.

19            THE WITNESS:  Okay.  In a nonrecourse

20  state -- let me -- I need to paraphrase your

21  question because I'm just losing track of the

22  language.

23            So we're talking about a nonrecourse

24  state.  We're talking about a borrower who's

25  underwater or not underwater?

1   BY MR. HEFFERON:

2       Q.   Not underwater.  I think we've already

3   established, have we not, that people who are

4   underwater have no equity to lose?

5           So my question is, in a nonrecourse state

6   for a borrower who is not underwater, isn't it true

7   that any loss of equity they suffered would have

8   occurred at the time of the foreclosure auction?

9       A.   And I -- and I believe the answer -- I

10  will elaborate my answer, which is that, to the

11  extent that that property wasn't acquired by a third

12  party, not -- not reverting to the lender, that

13  would have been the price at which that bid would

14  have been made -- or the -- the amount of that bid

15  would reflect some foreclosure stigma.

16          So -- and -- and, in fact, that

17  foreclosure stigma would typically be estimated

18  relatively well by the subsequent REO discount,

19  since many of these investors would turn around

20  and -- and resell the property.

21      Q.   So in a nonrecourse state, for a borrower

22  who is not underwater, isn't it true that the loss

23  of equity by that borrower would have occurred at

24  the foreclosure auction?

25          MS. CHIU:  Objection.  Asked and answered.

1      THE WITNESS:  Yes, let's distinguish

2  between its -- its -- when it occurs and when it's

3  measured.  And the -- the statement is that, the way

4  I measure that -- or the way these studies have

5  measured that, and I use these studies, is to look

6  at what -- what happened in the subsequent REO sale.

7      So that's -- and -- and now I'm saying, as

8  a matter of economics, that if an investor paid more

9  in the foreclosure auction, my -- my economic

10  assumption would be that they -- they -- on resale

11  they're going to be in the same market with a --

12  with a property that carries the same baggage as an

13  REO sale.

14  BY MR. HEFFERON:

15      Q.   So in a nonrecourse state, for a borrower

16  who is not underwater, isn't it true that the loss

17  of equity by that borrower would have occurred at

18  the foreclosure auction?

19      A.   Please repeat the question.

20      Q.   Sure.  I've already tried it five times.

21      So in a nonrecourse state, for a borrower

22  who is not underwater, isn't it true that the loss

23  of equity by that borrower would have occurred at

24  the foreclosure auction?

25      MS. CHIU:  Objection.  Asked and answered.

1         THE WITNESS:  I believe I just answered

2  that question.  I'm not dis- -- I didn't dispute

3  that.  I did -- I described --

4  BY MR. HEFFERON:

5     Q.   So your answer is yes?

6     A.   -- how -- how the -- how it's measured.

7     Q.   Okay.  But your answer is yes in terms of

8  occurrence; it would have occurred at the

9  foreclosure auction?

10        MS. CHIU:  Objection.

11        THE WITNESS:  I -- I will leave open the

12  exception that it's not clear to me that the

13  borrower doesn't have continuing obligations, even

14  in a recourse -- even in a nonrecourse state, and

15  that some -- the -- the final takeaway from that

16  borrower could -- could involve down- -- further

17  downstream calculations.

18  BY MR. HEFFERON:

19     Q.   Which are not the subject of your opinion?

20     A.   I'm just simply saying that I can't -- I

21  cannot definitively rule that out.  I -- it's not

22  part of my opinion.

23     Q.   In any event, is it your testimony that

24  these papers that are cited in your report, that

25  contain a [verbatim] REO discount that -- that you

Page 146

1   use are actually describing the discount in

2   connection with the foreclosure auction?

3            MS. CHIU:  Objection.

4            THE WITNESS:  My testimony would be from

5   the numbers that I know in the literature

6   that that's -- that's something by -- something on

7   the order of 80 percent of foreclosure auctions are

8   unsuccessful, in the sense that the property reverts

9   to the lender, and so that the REO sale of those

10  properties is the -- is the relevant sale directly.

11           And it's my economic opinion that the

12  remaining 18 -- 18, 20 percent or so, which are, in

13  fact, acquired by third-party investors, those

14  third-party investors, in my economic opinion would

15  be in the same market as the -- as the REO entity,

16  and would be bidding -- taking that -- the resale

17  value into account that would reflect the same kind

18  of discount.

19  BY MR. HEFFERON:

20       Q.   And are there published studies that you

21  cite in your paper that estimate the equity loss at

22  the time of foreclosure auction by referring to

23  measurements of the REO discount?

24           MS. CHIU:  Objection.

25           THE WITNESS:  Please restate the question.

Page 147

1   BY MR. HEFFERON:

2        Q.   Are there published papers, that you cite

3   in your report, that estimate the equity loss at the

4   time of foreclosure auction by referring to

5   measurements of the REO discount?

6             MS. CHIU:  Objection.

7             THE WITNESS:  I'd refer you to the

8   Campbell paper.  That's the -- the basis for my

9   understanding of -- of this.  I don't recall that it

10  makes a -- a specific claim.  That's my -- when I've

11  made a claim here, it's my economic inference.

12  BY MR. HEFFERON:

13       Q.   And you made no attempt, other than

14  referring to the REO discount, to try to determine

15  the equity loss at the time of foreclosure auction;

16  isn't that right?

17            MS. CHIU:  Objection.

18            THE WITNESS:  That's correct.

19            MR. HEFFERON:  Okay.  Let's take a break

20  for lunch.

21            THE VIDEOGRAPHER:  This is end of Media 4.

22  We're going off the record at 12:36 p.m.

23            (Lunch recess taken.)

24            THE VIDEOGRAPHER:  This is the beginning

25  of Media 5.  We're going back on the record at

1    1:35 p.m.

2    BY MR. HEFFERON:

3        Q.    Professor McFadden, my first question is

4    that, now you've had a little time to reflect on the

5    lunch break, is there anything about the testimony

6    this morning that you would like to amend or

7    correct?

8        A.    No.

9        Q.    As part of your calculations -- I'm sorry,

10   as part of your work in trying to determine the

11   equity loss for these loans, as reflected in your

12   report, paragraph 118, did you ever attempt to

13   calculate the equity that borrowers in the property,

14   by subtracting the amounts owed on the loan from the

15   fair market value of those properties?

16           MS. CHIU:  Objection.

17           THE WITNESS:  That was not done in Table

18   14 of the amended report.  I have done calculations

19   like that subsequently.

20   BY MR. HEFFERON:

21       Q.    Okay.  And what was the result of -- what

22   was the occasion for doing those calculations?

23       A.    Please say it again.

24       Q.    Sure.  Why did you do those calculations

25   subsequently?

1        A.    To clarify Dr. Halm's claims.

2              MS. CHIU:  Can we go off the record for a

3     second?  This isn't updating.

4              THE COURT REPORTER:  I'm sorry, one

5     second, please.  One second.

6              THE VIDEOGRAPHER:  This is end of Media 5.

7     We're going off the record at 1:36 p.m.

8              (Off the record.)

9              THE VIDEOGRAPHER:  This is the start of

10    Media 6.  We're going back on the record at

11    1:38 p.m.

12    BY MR. HEFFERON:

13       Q.    Okay.  Professor, it might just be easier

14    to sort of start back at the beginning.

15              As part of your work in calculating the

16    equity loss on these loans involved in your report,

17    did you ever attempt to calculate the equity the

18    borrower had by subtracting the amounts owed on the

19    loans from the fair market value of those

20    properties?

21       A.    And my answer was not in Table 14, not in

22    the amended report, but subsequently I have done

23    such calculations.

24       Q.    And why did you do those calculations

25    subsequently?

1    A.   Dr. Halm complained -- made claims in his

2  rebuttal that there were a very large number --

3  share of mortgages that were underwater.  And so I

4  went back to the Ocwen data and did my own

5  calculations as to -- to the share underwater and

6  the net -- and -- and the equity of those who were

7  not underwater, the average equity.

8    Q.   Okay.  And what -- what was the conclusion

9  of your calculations?

10   A.   The conclusion is -- is that the number in

11 Table 14 is -- is conservative.  It is a -- it is

12 less than the number you would get by looking at the

13 population of borrowers in foreclosure and doing the

14 calculation borrowed by borrower.

15   Q.   And what do you mean by -- what do you

16 mean by "borrowed by borrower"?

17   A.   There -- there were a -- a number of

18 borrowers in the Ocwen data who actually went -- had

19 foreclosure sales.  And for those, one can es- --

20 estimate the fair market value of their property.

21 And one can determine their -- their -- their cost

22 of closing out the loan and do that calculation.

23 Penalties and fees can -- can be handled before or

24 after that calculation.

25   Q.   And which were the borrowers that you were

1    able to determine fair market value?

2              MS. CHIU:  Objection.

3              THE WITNESS:  The pertinent analysis I did

4    in this connection was [verbatim] -- was with

5    borrowers that were in a match between the MBS Data

6    set and the Oc- -- and Ocwen loans and -- and which

7    met the -- the various screenings that I applied to

8    the data actually used in the damage calculation.

9    BY MR. HEFFERON:

10        Q.   Okay.  And have you produced -- when did

11   you do those calculations?

12             MS. CHIU:  Objection.  Form.

13             THE WITNESS:  I -- I did the most recent

14   of those calculations as part of deposition --

15   deposition preparation within the last two weeks.

16   BY MR. HEFFERON:

17        Q.   And have you produced them?

18        A.   No, I have not.

19        Q.   Okay.  How many sets of calculations are

20   there that you haven't produced?

21             MS. CHIU:  Objection.  Form.

22             THE WITNESS:  I believe that -- well, I

23   have done several calculations, so I -- you asked me

24   how many.  I've -- I've done several additional runs

25   of the --

1    THE COURT REPORTER:  I'm sorry, what

2  model?  I didn't hear you.

3    THE WITNESS:  Proportional hazards model,

4  and I've done this analysis I just described.

5  BY MR. HEFFERON:

6    Q.   Okay.  Let's -- let's put the proportional

7  hazards model to one side.  We'll ask about that in

8  a minute.

9    As to this analysis that you were just

10  talking about, how many -- how many analyses did you

11  conduct?

12    MS. CHIU:  Objection.  form.

13    THE WITNESS:  I'm not sure, quite how you

14  count analyses, but basically one.  I did one, one

15  analysis.

16  BY MR. HEFFERON:

17    Q.   And when did you do that?

18    A.   When did I do that?

19    Q.   Yeah.  You said in the last two weeks, but

20  that's --

21    A.   Within the last two weeks.

22    Q.   Yeah.  Can you be more specific?

23    A.   Oh, I think I initiated that calculation

24  about two weeks ago, and it went -- it went through

25  discussions, and I think I had the final results

1   probably a few days ago.

2       Q.   Okay.  And -- and describe again what the

3   final results were.

4       A.   I don't have the -- I don't have my

5   cal- -- the calculations in front of me, but they --

6   they confirmed that the approximately $2,000

7   estimate for -- average for equity loss is a

8   conservative estimate of the average in the

9   population, taking these other issues into account.

10      Q.   Taking -- but these were only calculations

11  that you did using fair market value that you could

12  acquire from actual completed foreclosure sales?

13          MS. CHIU:  Objection.

14          THE WITNESS:  You don't obtain a voluntary

15  market value from actual foreclosure sales.

16  BY MR. HEFFERON:

17      Q.   Well, what -- what -- I guess I don't

18  understand the calculation, since you haven't

19  produced them.

20          So tell me, then, what you -- what you did

21  to -- to calculate the equity loss using these new

22  analyses.

23      A.   The -- the elements of this calculation

24  are al- -- already present in my previous reports

25  and in the backup data for them.

1          I -- I have a [verbatim] origination price

2     provided by Ocwen for individual loans.  I have a

3     price -- housing price index for the ZIP code in

4     which that property is located.  And I can update

5     the -- the origination price by that price index to

6     estimate current fair market value for that property

7     in a voluntary sale.

8          Q.   But what did you do most recent in the

9     last two weeks, that was different from what you had

10    done before you signed the report -- the surrebuttal

11    report?

12         A.   I then -- I then took those housing

13    values.  I took calculations of the borrowers'

14    obligation and -- which was the loan principal and

15    other obligations at that point in time, such as

16    discharging the escrow balance.

17         And I took the difference between the --

18    this estimated value of the property and those --

19    those obligations, the obligations that would have

20    had to have been discharged in a voluntary sale.

21         Q.   You did that for the entire population

22    that was the subject of this part of your report?

23         A.   I did that for --

24         MS. CHIU:  Objection.

25         THE WITNESS:  -- the sample that was

1  matched between MBS and Ocwen, and which met the

2  other screening criteria that are used in my damage

3  analysis.

4  BY MR. HEFFERON:

5       Q.   And how many loans were those?

6            MS. CHIU:  Objection.

7            THE WITNESS:  I'll give you only -- I -- I

8  don't remember exactly.  So I'll give you a rough

9  approximation that it is approximately 4,000.

10           MR. HEFFERON:  And why has that not been

11 produced, Shirley?

12           MS. CHIU:  Because it doesn't change

13 his -- his opinions don't change.  He was doing --

14 this was -- this was analysis he was doing to

15 confirm opinions that he already had in his report.

16           MR. HEFFERON:  So your position is, it is

17 not required to be produced?

18           MS. CHIU:  Our position is that this

19 was -- he had provided the backup materials, which

20 contained the information that he used for this

21 analysis.

22           MR. HEFFERON:  And is it your position

23 this didn't need to be produced?

24           MS. CHIU:  There are no new opinions

25 resulting from this -- from this analysis.  And

Page 156

1  we've already provided to you the information that

2  he used to do this additional work that he just

3  described.

4  BY MR. HEFFERON:

5      Q.   Now, Mr. -- Professor McFadden --

6           MR. HEFFERON:  Certainly, I object to that

7  and am going to hold the deposition open, as well as

8  clawback some of the time we wasted on -- on

9  questions that would not have been asked, had the

10  proper materials been produced.

11  BY MR. HEFFERON:

12      Q.   Professor McFadden --

13           MS. CHIU:  So we disagree with that.  I

14  just want to note on the record that we disagree

15  with what you just stated, but --

16  BY MR. HEFFERON:

17      Q.   Professor McFadden, why did you do these

18  calculations if they were, as your counsel said,

19  utterly irrelevant to your opinions?  What was your

20  purpose of doing them?

21           MS. CHIU:  Objection.  That misstates what

22  I stated.

23           THE WITNESS:  The purpose in doing it was

24  to confirm for myself that my original opinion was

25  conservative and stood.

1   BY MR. HEFFERON:

2       Q.   And I think you mentioned a number of

3   times today that you were referring back to the fact

4   that your conservative -- your opinion was

5   conservative in defending the opinion.

6            Do you recall those occasions this

7   morning?

8       A.   Yes.

9       Q.   Okay.  And this calculation you did was

10  one of the reasons why you testified today that your

11  opinion in this area was conservative; isn't that

12  correct?

13           MS. CHIU:  Objection.

14           THE WITNESS:  The reason I testified it

15  was conservative was that it was originally designed

16  to be conservative.  It took the low end of numbers

17  from the literature.

18  BY MR. HEFFERON:

19      Q.   And isn't it true that one of the reasons

20  why you testified today, that your opinions were

21  conservative, is because in the last two weeks, you

22  did a calculation that confirmed your opinions were

23  conservative?

24           MS. CHIU:  Objection.

25           THE WITNESS:  Well, you asked me if I had

Page 158

1    done any -- any additional calculations, and I

2    answered -- I answered your question with a

3    statement that I have done it.  And you asked me

4    what those were for and I asked -- I said that that

5    was to reassure myself that, in fact, my -- my

6    statement that this was conservative was, in fact,

7    true and my conclusion is that it was true.

8    BY MR. HEFFERON:

9        Q.    Okay.  And that's why you testified today

10   that your opinion's conservative; correct?

11            MS. CHIU:  Objection.  Misstates

12   testimony.

13            THE WITNESS:  I -- I -- as I stated

14   already, the -- the original -- the original

15   statement was that the whole calculation was

16   designed to be conservative.  That is from the --

17   from the public sources, I took the -- the low end

18   of a whole range of numbers, which could have easily

19   been -- I could have been aggressive and taken

20   double that.  I did not.  I took the conservative

21   end of it.

22            And my statement to you today is that I

23   have done none of the calculations I -- calculations

24   I've done suggest that I was wrong in the state --

25   in the belief and the statement that that was a

1   conservative estimate.

2   BY MR. HEFFERON:

3       Q.   And one of the reasons you testified today

4   that your opinion is conservative is because of the

5   check you conducted in the last two weeks on your

6   calculation of equity loss; isn't that correct?

7           MS. CHIU:  Objection.

8           THE WITNESS:  If this calculation had

9   shown I was not conservative, I would tell you that.

10  BY MR. HEFFERON:

11      Q.   And that was why you conducted the test;

12  correct?

13          MS. CHIU:  Objection.

14          THE WITNESS:  No.  I conducted the test

15  because I -- I did not understand Dr. Halm's

16  calculations and I wanted to -- I wanted to clarify

17  why -- why there were such large differences between

18  his calculations and mine.

19  BY MR. HEFFERON:

20      Q.   And what was your conclusion in that

21  regard?

22      A.   My conclusion is that Dr. Halm -- I do not

23  under -- I still do not understand Dr. Halm's

24  calculations.

25      Q.   Okay.  Again, certainly, this material

Page 160

1  should have been produced.

2          Let's talk about your proportional hazards

3  model.  You also conducted additional runs of your

4  proportional hazards model that you haven't

5  produced; is that correct?

6          MS. CHIU:  Objection.

7          THE WITNESS:  I -- I -- I -- I have done

8  several -- two additional -- additional runs,

9  correct.

10 BY MR. HEFFERON:

11      Q.   Okay.  And what was the purpose of doing

12 that?

13      A.   Dr. Halm has claims about the share of

14 loans that were delinquent in the month in which a

15 servicing error occurred, and escrow delay occurred.

16 And his calculations are inconsistent with my own

17 work.  And I was trying to understand more about why

18 he was getting numbers that were so much at variance

19 with my work.

20      Q.   Are those the only reasons you reran

21 additional proportional hazards model analyses?

22      A.   That's correct.

23      Q.   Okay.  Why did you do that after you

24 submitted the surrebuttal report rather than before?

25      A.   I believe I -- that I -- I've already

Page 161

1   responded to Dr. Halm's claims in my surrebuttal

2   report.   This was simply a refinement of statements

3   in my surrebuttal report.

4        Q.   And you didn't answer my question, so I'll

5   ask again.

6             Why did you not perform that analyses

7   before you signed the surrebuttal report?

8             MS. CHIU:   Objection.   Asked and answered.

9             THE WITNESS:   I -- I did the analysis that

10  I did for my surrebuttal report.   The -- some of the

11  work that I've done since is a refinement of that.

12  It would give -- it would actually give higher

13  damages because it's a more precise calculation.

14  But I have not -- I'm not modifying my estimate of

15  damages or my opinion as a re- -- result of those

16  additional calculations.

17  BY MR. HEFFERON:

18       Q.   Okay.   And so why did you perform the

19  analyses after you signed the surrebuttal report,

20  rather than before?

21            MS. CHIU:   Objection.   He already answered

22  the question.

23            THE WITNESS:   Because I wanted to

24  understand -- again, I was trying to understand why

25  Dr. Halm was getting results so much at variance of

Page 162

1    mine.

2    BY MR. HEFFERON:

3         Q.   And was it not necessary to figure that

4    out before you signed the surrebuttal report?

5         A.   I -- I would say no, it was not necessary.

6         Q.   Okay.

7              MR. HEFFERON:  So -- so, again, we

8    certainly call for the production of those

9    materials, and as well as clawback of time spent.

10             MS. CHIU:  I'm just going to -- Counsel,

11   I'm just going to state for the record that we've

12   produced all backup materials, you know, that --

13   with which he ran those analyses.  And he has

14   already indicated that his opinions do not change as

15   a result.

16             MR. HEFFERON:  Well, that -- that's not

17   the standard.  The standard is whether it's -- it's

18   something that the party's entitled to find out as

19   part of the witness's work.  Whether or not it

20   affects his opinion is not the standard, because a

21   lot might not affect his opinion, but still be

22   relevant to the Court and to the jury.

23             MS. CHIU:  Just note for the record that

24   we disagree.

25   BY MR. HEFFERON:

1    Q.   The -- the -- so I -- I asked you a

2  question, I'm not sure you've actually answered it

3  when I first started.  So let me ask it again.

4          Did you ever attempt to calculate the

5  equity for the borrowers at issue by subtracting the

6  amount they owed from the fair market value?

7          MS. CHIU:  Objection.

8          THE WITNESS:  The previous answer was yes.

9  BY MR. HEFFERON:

10   Q.   Okay.  So that -- did you do that before

11  you submitted your report or your surrebuttal

12  report?

13   A.   The answer is that -- no.  That was done

14  as -- when I began deposition preparation and I

15  wanted to clarify my -- clarify for my own purposes

16  exactly what was going on and why Dr. Halm's numbers

17  were, in fact, so far in variance from mine.

18   Q.   And it's helping you to testify here

19  today?

20   A.   I'm sorry?

21   Q.   And it's helping you to testify here

22  today, clarifying the information needed to testify?

23          MS. CHIU:  Objection.  Form.

24          THE WITNESS:  I -- I would say it's -- it

25  is not hurting.  I don't think it makes any

Page 164

1   difference to my testimony, in fact.

2   BY MR. HEFFERON:

3       Q.   So let's talk about the foreclosure costs.

4   In calculating the costs, legal administrative fees

5   for foreclosures, both started and completed, it's

6   true, is it not, that you did not use actual amounts

7   charged to the accounts of the subject borrowers?

8               MS. CHIU:  Objection.  Form.

9               THE WITNESS:  What I use as --

10  BY MR. HEFFERON:

11      Q.   Sir, that's not what my question is.  Let

12  me -- you have to answer my question.

13              You cal- --

14              MS. CHIU:  Counsel, I'm going to ask that

15  you let him finish his answer.

16              MR. HEFFERON:  No, I'm not going to -- no.

17  Because he's not answering my question.

18              MS. CHIU:  Well, how do you know he's not

19  going to answer your question unless you let him

20  answer?

21  BY MR. HEFFERON:

22      Q.   So, Professor McFadden, I'll ask you a

23  different question.

24              In calculating the legal administrative

25  fees for foreclosure, it's true, is it not, that you

Page 165

1   did not look at the accounts, and use the actual

2   amounts that were charged to actual borrowers by

3   Ocwen?

4         MS. CHIU:  Objection.  Form.

5         THE WITNESS:  I don't know how to answer

6   that question.  I did statistical analysis.  I am

7   not doing an- -- analysis of individual borrowers.

8   I'm doing an analysis of the population of borrowers

9   that have foreclosure initiations.  And --

10  BY MR. HEFFERON:

11        Q.   And you didn't --

12        A.   -- and I used Ocwen -- Ocwen documents on

13  the administrative fees associated with events

14  following a foreclosure initiation.

15        Q.   And you didn't look at the entire data set

16  and do the calculation based upon amounts actually

17  imposed; correct?

18        MS. CHIU:  Objection.

19        THE WITNESS:  I -- I guess I don't --

20  is -- is the question whether the numbers that Ocwen

21  reports for the fees they charged different from

22  what they actually imposed?  Is that the -- what

23  you're representing?

24  BY MR. HEFFERON:

25        Q.   The question is what you -- I'm not

1  representing anything.  I'm only asking questions.

2          The question is whether, when you did a

3  calculation of foreclosure costs, whether you looked

4  at the data set for what oc- -- Ocwen actually

5  charged.

6          MS. CHIU:  Objection.  Form.

7          THE WITNESS:  And -- and the answer is, I

8  used the Ocwen data, which is the RFP data on what

9  Ocwen says their -- the fees were associated with a

10  foreclosure.

11  BY MR. HEFFERON:

12      Q.  So you didn't use the actual amounts that

13  were actually charged; correct?

14          MS. CHIU:  Objection.

15          THE WITNESS:  So if I understand your --

16  you're saying that the Ocwen fees that they state

17  they charged were not actually the fees they

18  charged?

19  BY MR. HEFFERON:

20      Q.  I'm asking you a question, sir.  I'm not

21  stating anything.

22      A.  Okay.  I -- yeah.  I'll agree that if --

23  if -- if the Ocwen data is fraudulent, then I have

24  worked with fraudulent data.

25      Q.  What do you -- are you doing, accusing my

1    client using fraudulent data?  Is that seriously

2    what your testimony is?

3         A.    I -- I --

4              MS. CHIU:  Objection.  That misstates his

5    testimony.

6              THE WITNESS:  I -- I understand what

7    should be your question.  Your question is:  If the

8    numbers they've represented as being valid are, in

9    fact, invalid, isn't -- isn't that your -- your

10   question?

11   BY MR. HEFFERON:

12        Q.    No.  My question is -- well, let me ask it

13   differently.

14              Where did Ocwen represent what it actually

15   charged this population of borrowers for

16   administrative and legal fees?

17              MS. CHIU:  Objection.

18              THE WITNESS:  I don't remember the exact

19   language associated with the RFPs.  I would have to

20   look back at the definition of the -- and the

21   particular RFP and the definition of the variables.

22   BY MR. HEFFERON:

23        Q.    And the RFP is -- is what, a request for

24   proposal?

25        A.    Yes.

1       Q.   Okay.  And my question, sir -- or maybe

2  I'll just ask a generic question.

3            Isn't it the case that there can be

4  something that's a request for proposal, but it

5  might not be the actual amounts that were charged;

6  isn't that fair?

7       A.   I have no -- I have -- all I know is, the

8  data that I -- had been turned over to me that has

9  been received from Ocwen.  And I have no further

10 information on what they actually did.

11      Q.   Did you look at the data of what Ocwen

12 actually did that was turned over to counsel?

13           MS. CHIU:  Objection.

14           THE WITNESS:  I do not understand the

15 distinction between what they -- what they turned

16 over, which I understand to be what they've said

17 they did and what -- what they actually did.  If

18 you're saying -- asking me -- proposing that they --

19 something they actually did was different than what

20 they said they did, then I -- I have -- have no way

21 of dealing with that.

22 BY MR. HEFFERON:

23      Q.   Well, if you want to find out whether --

24 if you want to find out the amounts that borrowers

25 were injured, as a result of these foreclosures, you

1    would want to look at the actual loan account

2    information to see what they had been charged; isn't

3    that correct?

4            MS. CHIU:  Objection.

5            THE WITNESS:  I believe the first place

6    that I would look is for the answers to their

7    interrogatories and their -- and -- and our

8    responses to RFPs for specific data from their data

9    sources.

10   BY MR. HEFFERON:

11       Q.   But as far as the question of what the

12   borrowers actually were charged, the place to look

13   for that is in the account information for what the

14   borrowers were actually charged; isn't that true?

15           MS. CHIU:  Objection.

16           THE WITNESS:  If they -- if that -- the

17   answer -- the answer -- if Ocwen has cleaned up

18   their account -- accounting data, and provided clean

19   versions of it, I would use the clean data provided

20   by Ocwen in preference to uncleaned accounting data.

21   BY MR. HEFFERON:

22       Q.   Why are you talking about clean data?

23       A.   Because accounting data is often quite

24   difficult to interpret.  There -- there are a

25   variety of entries in -- in a -- accounts, which are

Page 170

1    often quite difficult to unravel.  And if Ocwen

2    itself, which has -- knows a great deal more about

3    their data than, obviously, I do, has said, we've --

4    we've gone through this, we've clean -- cleared up

5    the ambiguities and this a -- this is our response

6    to your specific questions, that's the data I would

7    use.

8        Q.   Now, you use the survey by a consulting

9    firm to identify administrative fees and legal fees;

10   correct?

11            MS. CHIU:  Objection.  Form.

12            THE WITNESS:  Are -- are you referring,

13   now, to which --

14   BY MR. HEFFERON:

15       Q.   I'm not referring to anything, sir.  I'm

16   asking you what you did.

17            MS. CHIU:  Counsel, is there somewhere in

18   the report you're referring to?

19            MR. HEFFERON:  I -- no.  I'm asking him

20   what he did.

21            THE WITNESS:  My understanding is, this

22   was done -- collected for me by staff, and my

23   understanding is, they've collect -- they assembled

24   it from Ocwen responses.

25   BY MR. HEFFERON:

1    Q.    So you don't even know actually, what was

2    done to calculate foreclosure costs in this case; do

3    you?

4         MS. CHIU:  Objection.

5         THE WITNESS:  The answer is that -- that I

6    gave general directions to the staff to process the

7    Ocwen data, to obtain the administrative cost.  And

8    I have not gone back to check the programs myself.

9    BY MR. HEFFERON:

10   Q.    So you don't know the source of data that

11   was used?

12   A.    It was Ocwen data.

13   Q.    Which Ocwen data?

14   A.    Well, I would have to have the -- the list

15   of data sources in front of me, and I -- I don't

16   have this memorized.

17   Q.    Well, you -- in fact, you don't even know

18   whether you memorized it or not.  You don't even

19   know -- never knew what source of data was used for

20   the foreclosure costs; do you?

21        MS. CHIU:  Objection.  This is not a

22   memory test.  If there's somewhere in the report you

23   could refer him to.

24        MR. HEFFERON:  No.  No.  And I will --

25   stop.  Stop.  Do that again, we're definitely

Page 172

1    getting Matthewman on the phone.

2    BY MR. HEFFERON:

3         Q.   Now, Professor, isn't it true that you

4    don't -- you never knew what information was used --

5    what data, to calculate foreclosure costs for

6    purposes of your opinion?

7              MS. CHIU:   Objection.   Form.

8              THE WITNESS:   I would answer that I have a

9    general familiarity with the data that was turned

10   over from Ocwen to C -- CFPB.   And so I would -- I

11   have a general knowledge of those data and what --

12   what their contents are.

13   BY MR. HEFFERON:

14        Q.   But sitting here today, you can't tell me

15   how those foreclosure costs were calculated?

16        A.   I can't re- -- reproduce the program from

17   memory, no.

18        Q.   You never knew how they were calculated;

19   did you?

20             MS. CHIU:   Objection.

21             THE WITNESS:   That's you -- that's your

22   statement.   I don't agree with it.

23   BY MR. HEFFERON:

24        Q.   What -- what's wrong with my statement?

25        A.   That I -- I -- I gave general directions

1  as to how this was to be calculated, and -- that was

2  done under my supervision.

3      Q.   And what general direction did you give?

4      A.   That they should -- they should go to the

5  Ocwen data and determine what Ocwen says its

6  attorneys' fees were.

7      Q.   What Ocwen data did they look at?

8      A.   I would have to go back to the source, to

9  the programs, to -- to tell you that.  I don't have

10 it in my memory.

11     Q.   Did you ever learn?

12          MS. CHIU:  Objection.  Form.

13          THE WITNESS:  I don't -- I'm not sure what

14 exactly you're -- you're looking for.  I -- I've

15 indicated that I -- I gave directions as to look at

16 the data, and they've gone to the data.  I -- I

17 don't think they -- I don't recall that I specified

18 that specific RFPs they should go and look at for

19 that.  I told them to go and get -- get those data

20 and they -- and they came back with the data.

21 BY MR. HEFFERON:

22     Q.   Well, sir, it's your opinion.  And so

23 what's the basis for your opinion that the

24 foreclosure cost incurred in connection with these

25 foreclosures, completed ones was, on average,

Page 174

1    $1,086?

2          A.   My -- my opinion is based on the -- on the

3    work of my staff, under my direction.   And I -- I

4    trust them to do careful work.   I also can compare

5    this with other estimates of the cost, and some of

6    the considerations.   I believe this is a very

7    conservative estimate of the attorneys' fees

8    actually charged in a foreclosure.

9          Q.   Did you compare -- did you conduct that

10   comparison?

11         A.   Did I do a comparison with other studies?

12         Q.   Correct.

13         A.   I've -- I've asked staff to look at that,

14   and they've responded.

15         Q.   What did they tell you?

16         A.   Well, they -- they cite the Moreno study,

17   for one.

18         Q.   What did they tell you?

19         A.   Well, the Moreno study says these fees are

20   something over $3,000.

21         Q.   Why don't you look at Exhibit 3 and show

22   me where it says that, the Moreno study.   Actually,

23   I think it's 4.

24         A.   Oh, I don't recall determining that myself

25   directly from the Moreno study.   I asked them to --

1   I asked the staff to do this, so I'd have to read

2   the study to find it.

3       Q.   Did you do anything -- other than what we

4   both just talked about, did you do anything else to

5   determine what the foreclosure costs were for this

6   group of borrowers?

7           MS. CHIU:  Objection.  Form.

8           THE WITNESS:  I did not.

9   BY MR. HEFFERON:

10      Q.   With respect to rescinded foreclosures,

11  there are -- there are some foreclosures in this

12  group which were rescinded; correct?

13      A.   Correct.

14      Q.   Okay.  And what does it mean to rescind a

15  foreclosure?

16      A.   My understanding is, that's a legal step

17  in which the foreclosure itself is reversed.

18      Q.   Okay.  And what -- what's the basis for

19  your understanding?

20      A.   I would -- I asked counsel for the

21  definition of "rescinded" and that was my -- my

22  paraphrase of what they explained to me.

23      Q.   Okay.  And for purposes of your opinion,

24  what did you calculate for the losses -- I'm

25  sorry -- for the cost on rescinded foreclosures?

1         MS. CHIU:  Objection.  Form.

2         THE WITNESS:  This is a detail that I -- I

3   would need to check by going back, but I believe

4   they were excluded from the calculation.

5   BY MR. HEFFERON:

6         Q.   Of cost?

7         A.   Of -- of cost -- well, of the -- of

8   damages.

9         Q.   What would be your understanding as to

10  what legal administrative costs would incur -- would

11  be incurred in connection with a rescinded

12  foreclosure?

13        MS. CHIU:  Objection.  Form.

14        THE WITNESS:  As I say, I -- I -- first of

15  all, I do not believe that from -- from memory, at

16  least, that my damage calculation attributes to any

17  legal cost to a re- -- a rescinded foreclosure

18  initiation -- foreclosure.  But if you asked me --

19  if the question is, are there costs, the answer's

20  clearly yes, to the borrower.  And what they are, I

21  don't know.

22  BY MR. HEFFERON:

23        Q.   Okay.  So you don't have an understanding

24  of what would be the costs in connection with the

25  rescinded foreclosure?

Page 177

1          MS. CHIU:  Objection.

2          THE WITNESS:  I know that re- -- recension

3    is typically the result of a legal procedure, and

4    clearly the borrower, or some party, would have

5    costs in bringing a legal case.

6    BY MR. HEFFERON:

7          Q.   Do you know what a nonjudicial state is?

8          A.   I'm sorry?

9          Q.   Do you know what a nonjudicial state is?

10          MS. CHIU:  Objection.  Form.

11          THE WITNESS:  In general.  Not -- not in

12    the legal detailed language.

13    BY MR. HEFFERON:

14          Q.   In the detail of -- relevant to this case

15    and rescinded foreclosures, what's the process for

16    rescinding a foreclosure in a nonjudicial state?

17          MS. CHIU:  Objection.

18          THE WITNESS:  I don't know.

19    BY MR. HEFFERON:

20          Q.   Okay.  And did -- as -- as to the -- the

21    costs, did -- did the borrowers, that are the

22    subject of your study, actually pay the foreclosure

23    costs that have been calculated as part of your

24    opinion?

25          MS. CHIU:  Objection.

1          THE WITNESS:  Could you clarify the

2    question?  There are many cost components here, and

3    we could take them one by one.

4    BY MR. HEFFERON:

5          Q.   Sure.  Well, any of them I'll just ask.

6              Is it your testimony -- is it your

7    testimony that the borrowers, that are the subject

8    of your study, suffered damages in the way of

9    foreclosure costs because they actually paid those

10   costs?

11          MS. CHIU:  Objection.  Form.

12          THE WITNESS:  What I have done, with the

13   help of my staff, is to use Ocwen's numbers on the

14   costs assessed.  And I -- as far as I know, I do not

15   have any -- any direct data which tells me what

16   obligations the borrower had which were actually

17   paid off by the borrower.

18   BY MR. HEFFERON:

19          Q.   Okay.  If the borrowers, that are the

20   subject of your study, did not actually pay those

21   costs, in those instances the borrowers would not

22   have suffered damages from those costs; isn't that

23   correct?

24          MS. CHIU:  Objection.  Incomplete

25   hypothetical.

1          THE WITNESS:  I don't agree with that

2    economically.  If the borrower has -- has incurred

3    an unsatisfied debt as a result of these costs, even

4    if it's not paid immediately, it's a -- it's an

5    obligation of that borrower.

6    BY MR. HEFFERON:

7        Q.   If the borrowers -- as to borrowers who

8    never paid those costs out of their own pocket,

9    isn't it true that those borrowers did not, in fact,

10   incur an actual out-of-pocket loss in the amount of

11   those costs?

12         MS. CHIU:  Objection.

13         THE WITNESS:  I would make an economic

14   distinction between an out-of-pocket cost and a cost

15   which is associated with having a -- an unpaid debt,

16   which eventually will have to be discharged in some

17   way or other.

18   BY MR. HEFFERON:

19       Q.   Okay.  Let's -- let's start with the out

20   of pocket.  So if the borrower never paid those

21   costs, isn't it the case that the borrower had --

22   did not have an out-of-pocket loss?

23         MS. CHIU:  Objection.  Form.

24         THE WITNESS:  If I understand your

25   question, you're saying that if -- if the ser- --

Page 180

1  servicer formally discharged that debt, would the

2  borrower not have an out-of-pocket cost from that

3  debt?

4  BY MR. HEFFERON:

5      Q.   No, you've misunderstood --

6      A.   Then I would -- I would agree, yes.

7      Q.   You've misunderstood my question.

8          My question was, if the borrower never

9  actually paid those costs, isn't it the case that

10 the borrower did not have an out-of-pocket loss?

11         MS. CHIU:  Objection.  Form.

12         THE WITNESS:  And I have trouble, as an

13 economist, with your distinction between an

14 out-of-pocket loss and -- and an economic harm.

15         And my -- my response is that a -- a

16 borrower can suffer an economic harm if a -- an

17 undischarged debt remains on their books even if,

18 over the period I can observe, then that debt is

19 never forgiven or paid.

20 BY MR. HEFFERON:

21     Q.   Well, sir, you may have a difficulty of

22 that as an economist, but from the standpoint of the

23 law, it matters whether someone has actually paid

24 something out of pocket.  So we're going to focus

25 only on the out of pocket.

1        So if the borrower never actually paid

2  those costs, isn't it true that they did not suffer

3  an out-of-pocket loss?

4        MS. CHIU:  Objection.

5        THE WITNESS:  The answer is that I have no

6  data on whether, what you've described, happened or

7  to the extent to which it happened, but I would

8  agree that if -- if the borrower did not pay

9  out-of-pocket, then they did not have an out of

10  pocket cost.  They had other costs, but not an

11  out-of-pocket cost.

12  BY MR. HEFFERON:

13    Q.   Part of your opinion also is relocation

14  fees as a cost of these foreclosures.  Why don't you

15  explain to me what you mean by a "relocation fee"

16  as -- as part of your damage analysis.

17    A.   The starting point for this analysis is

18  the examination of a population who had a

19  foreclosure initiation, where, absent Ocwen conduct,

20  they would not have.  So that's -- so they are being

21  placed in a situation where they are forced to move,

22  evicted, or otherwise no longer have the ability to

23  live in their current dwelling, so they have to move

24  to another location.  And they incur some costs

25  associated with that.  So we have an estimate of the

Page 182

1    relatively modest -- well, modest for us, perhaps

2    not for them, cost of such a move.

3         Q.   And what's the basis for your estimate?

4         A.   It's described in a footnote in my report.

5    I don't -- haven't committed it to memory.  I can go

6    back and read it.

7         Q.   Do you recall giving any direction to your

8    staff about where to find information to estimate

9    the costs?

10        A.   No.  I asked them at the higher level

11   to -- to account for -- account for the costs.

12        Q.   Did you --

13        A.   And that -- that was one they came back

14   with.

15        Q.   Did you go back and check their work about

16   whether that was a reasonable cost or reasonable

17   source?

18             MS. CHIU:  Objection.

19             THE WITNESS:  I did not go and

20   specifically check that number, no.  It seemed

21   plausible, reasonable, and I understood the source

22   from which it was drawn.

23   BY MR. HEFFERON:

24        Q.   Did you draw a conclusion about whether it

25   was a reasonable source for the information on which

Page 183

1    your opinion relied?

2              MS. CHIU:  Objection to form.

3              THE WITNESS:  I actually drew two

4    conclusions.  One is I -- I -- I concluded it was a

5    reasonable source.  And, secondly, I concluded that

6    my calculation was sufficiently conservative so that

7    moving costs were -- didn't matter.  If you didn't

8    include them, it would -- it would still -- I -- I

9    would still have the same opinion on damages.

10   BY MR. HEFFERON:

11        Q.   So should we just take them out?

12        A.   Sorry?

13        Q.   Should we just take them out?

14             MS. CHIU:  Objection.  Counsel, I'd also

15   ask that you watch your tone and please be

16   respectful to our witness.

17             MR. HEFFERON:  I don't need a lecture.

18   Thank you.

19   BY MR. HEFFERON:

20        Q.   Should we just take them out?

21        A.   I -- I don't see any reason to take them

22   out.  But my opinion is that, if they were taken

23   out, it would not have any impact on my final

24   conclusion.

25        Q.   You'd still have the exact same number

Page 184

1    that you have on -- on your opinion here if those

2    figures were included or excluded?

3         A.   No.  My -- my opinion is that the damages

4    were at least the number that I gave, and I think

5    that would still be the case.

6         Q.   Okay.  So if the relocation cost was not

7    accepted by the Court as legitimate, you would still

8    stick by the opinion that you have here, of the

9    total damages in Table 15, as being between

10   351.5 million and 483.5 million?

11        A.   I'm sorry, which table?  Table 14?

12        Q.   Table 15.

13        A.   Yes, I've continued to have the opinion

14   that those are sound estimates.

15        Q.   Going back to Table 14 -- no, I'm sorry,

16   Table 13, which is the "Chart of Estimated Cost by

17   Component," page 58.

18             Do you see that?

19        A.   Yes.

20        Q.   Okay.  And what is -- in the footnotes

21   sources and notes, what is the source of the

22   information for relocation costs per foreclosure?

23             MS. CHIU:  Objection.  Form.

24             THE WITNESS:  As -- as you can see in the

25   footnote, it's a report that came out of Zillow.

Page 185

1          MR. HEFFERON:  Let's mark that report as

2     the next exhibit.

3          THE COURT REPORTER:  4 -- I mean 7.

4          MR. HEFFERON:  7.

5          (McFadden Deposition Exhibit 7 was

6          marked.)

7          THE VIDEOGRAPHER:  Are there two there?

8          MR. HEFFERON:  Yeah, there should be.

9          THE COURT REPORTER:  Excuse me.  Excuse

10    me.

11         MS. CHIU:  Thank you.

12    BY MR. HEFFERON:

13       Q.   Now, Professor McFadden, what you have in

14    front of you is what I printed out last night from

15    the internet using the citation that appears in

16    paragraph 118 under Table 13 to a blog post by Mary

17    Boone on zillow.com.

18              And what I've done, I printed it and I

19    truncated the comments is why it says it's 14 pages,

20    but I've only printed out the first five, because

21    the first five contain the -- the post.

22              And let me ask you, sir, have you ever

23    seen this blog post before?

24       A.   The answer is no.  This was described to

25    me by staff.  I actually had not previously looked

1  at this document before.

2     Q.   And let's look at Ms. Boone's

3  qualifications, if we can, which appear on page 5.

4  And this -- by the way, this Exhibit 7 is the entire

5  sum total of the information on which your opinion

6  relies for relocation costs; isn't that true?

7     A.   For this number that appears in my report,

8  yes.

9     Q.   Okay.  So let's look at the qualifications

10  of the person who wrote this blog post.  And this

11  identifies Ms. Boone as a newspaper writer/editor,

12  someone who worked as a spokesperson for a Fortune

13  500 company, a freelance writer, and someone who has

14  authored more than two dozen books for young

15  readers, and writes for a handful of home and garden

16  magazines.

17        Did I accurately summarize what's listed

18  on this blog post for her qualifications?

19     A.   Yes.

20     Q.   Okay.  So you're relying, as part of your

21  opinion, that my client imposed losses of over

22  $350 million, on a blog post written by someone with

23  these qualifications.

24        And in light of the blog post and the

25  qualifications, is it still your testimony that you

Page 187

1    believe that you are relying on a reasonable source?

2            MS. CHIU:  Objection.

3            THE WITNESS:  My testimony is that the

4    damage number is sufficiently conservative, so that

5    if you make this zero, it's still my estimate of --

6    that the damages are at least that.  And so that

7    it's really of no consequence whether this is, in

8    fact, part of the costs or not.

9            And the second part of my response is that

10   this document -- document is extremely simple.  It's

11   simply a compilation of moving costs per hour and

12   some calculated times.  And there's -- it's done by

13   someone who is not -- has no -- is not a party to a

14   legal case.  There's no reason that this shouldn't

15   be an accurate collection of relatively simple data.

16   BY MR. HEFFERON:

17       Q.   Well, let's look at the first comment

18   under Ms. Boone's qualifications on page 5; shall

19   we?

20            And this is a comment by someone, whose

21   name is Leo, who says that he only paid $350 to move

22   a two-bedroom apartment; isn't that right?

23       A.   Yes.

24       Q.   Okay.  Why did you not use Leo's number as

25   opposed to Ms. Boone's number?

MS. CHIU: Objection.

THE WITNESS: Her number is, as I understand it, between 200 and 400. And the Yelp quotes for 450 to 750, I -- I'd say Leo did well in looking around for an inexpensive mover. What more is there to say?

BY MR. HEFFERON:

Q. Professor McFadden, are you fairly comfortable that your opinion in this case relies, for one of the element of damages, on a Zillow post written by someone who has no apparent qualifications for providing information about the costs of moving?

MS. CHIU: Objection. Form.

THE WITNESS: As I've said, this is a -- this is a -- a number. It's 750 -- $780 here. If I said it was zero, it would not change my opinion that I've given a conservative estimate of the damages in this case. And that was -- that was -- it's a small item. And at the time I was doing this, that was the -- it seemed to be adequate evidence on what those costs are.

This is not particularly consequential. It's not -- there's no reason -- particular reason to believe that these numbers are biassed, that the

Page 189

1    moving costs per hours here are unrepresentative.

2    There is no -- I can think of no reason why a

3    journalist would choose to misrepresent that.

4    BY MR. HEFFERON:

5        Q.   Okay.  So as part of your -- so you're

6    testifying here today in your capacity as a

7    [verbatim] expert economist, a Nobel laureate, that

8    in coming up with an opinion about damages, that

9    you're comfortable in relying on a single blog post

10   on Zillow, that provides information by someone who

11   has no apparent qualifications; is that correct?

12            MS. CHIU:  Objection.

13            THE WITNESS:  I'm -- my -- my testimony is

14   that I have a damage calculation in this case, and I

15   believe it's conservative.  And it would be a lower

16   bound, I believe, in -- irrespective of whether this

17   moving calculation here is correct or not.

18   BY MR. HEFFERON:

19       Q.   Do you still rely on Exhibit 7, the Zillow

20   post, for your opinion?

21       A.   I -- it's a small and -- and irrelevant

22   number and I -- it was the best number available to

23   me on a quick search for something that is of --

24   inconsequential in the case.

25       Q.   In fact -- in fact, you didn't conduct any

Page 190

1    search; did you?  That was done by your staff?

2             MS. CHIU:  Objection.

3    BY MR. HEFFERON:

4        Q.   Correct?

5             MS. CHIU:  Objection.

6             THE WITNESS:  I -- I don't -- I'm not

7    making that distinction.  I work with staff on these

8    issues.

9    BY MR. HEFFERON:

10       Q.   Well, I'm making that distinction, sir.

11   You didn't conduct a survey or search of moving

12   costs.  You relied on your staff's selection of --

13   of that information; isn't that right?

14       A.   That's correct.

15       Q.   Okay.  And now that you discover that the

16   source was a Zillow blog post, I just want to know,

17   do you believe it's appropriate to rely upon

18   Exhibit 7 as part of your opinion here today?

19            MS. CHIU:  Objection.  Form.

20            THE WITNESS:  Yes.

21   BY MR. HEFFERON:

22       Q.   How many other times have you provided

23   opinions or written scholarly literature upon which

24   you relied for an element of your statements on a

25   post -- a blog post?  Is this the first time?

1          MS. CHIU:  Objection.

2          THE WITNESS:  I have no way -- no way of

3    knowing how to answer that question.  I -- I -- I

4    rely on a variety of sources for my academic work,

5    including everything from newspaper reports, to --

6    to suggestions from acquaintances, and then I --

7    then I set about doing the due diligence that I feel

8    appropriate to work with -- work with the data that

9    I use.

10   BY MR. HEFFERON:

11       Q.   And this, Exhibit 7, is a reasonable

12   source to rely on in your view?

13       A.   Please repeat the question.

14       Q.   Sure.  Exhibit 7 is a reasonable source to

15   rely on in your view?

16       A.   I can't hear you.

17       Q.   Exhibit 7 is a reasonable source to rely

18   on in your view?

19       A.   Is Exhibit 7?  Is that what your question

20   is?  Is Exhibit 7 a reliable source?

21       Q.   Yeah.

22       A.   I have no reason to see why it would --

23   why it would be biassed.  I -- I -- I don't think

24   this is a parti- -- this is an important number.  I

25   don't think it's a number that has any consequence

1    for my bottom line damage calculations.  I -- I

2    think it's not inappropriate to account for -- for

3    removal costs.  And this was a straightforward

4    estimate obtained from an easy source on a quite

5    minor element.

6        Q.   How much money are you saying my clients

7    injured borrowers collectively, based upon the

8    information that you're using here?

9            MS. CHIU:  Objection.

10           THE WITNESS:  I'm sorry, would you

11   please --

12   BY MR. HEFFERON:

13       Q.   Sure.

14       A.   What was the question?

15       Q.   Looking only at relocation costs, okay,

16   what's your total calculation for damages incurred?

17           MS. CHIU:  Objection.  Form.

18           THE WITNESS:  I don't think that question

19   can be answered in isolation because --

20   BY MR. HEFFERON:

21       Q.   Well, I do.  Tell me the answer.  It's

22   just a question.  It's just a math question.  That's

23   all it is.  You can answer.  If your counsel wants

24   to ask you questions to explain your answer later,

25   she can.

1      My question's just a math question, which

2  is, what's your total calculation of damages

3  incurred, based upon the relocation costs as

4  evidenced by Exhibit 7?

5      MS. CHIU:  Counsel, I'm just going to ask

6  that you let him finish his answer.

7  BY MR. HEFFERON:

8      Q.   Go ahead.

9      A.   Well, I would have to do the arithmetic in

10  my head.  It's --

11      Q.   Why don't you take a shot at it.

12      A.   -- roughly a hundred thousand dollars.

13      Q.   A hundred thousand dollars?

14      A.   Well, roughly.  I am not going to do the

15  math in my head and guarantee it.

16      Q.   $780 times how many people?

17      A.   Approximately 15,000.

18      Q.   Okay.  And that's an inconsequential

19  amount to whom --

20      MS. CHIU:  Objection.  Form.

21  BY MR. HEFFERON:

22      Q.   -- a hundred thousand dollars?

23      A.   It's inconsequential in the sense that my

24  damage estimate is going to be the same, even if you

25  make that -- that number zero.  That is to say, this

Page 194

1    is a completely -- completely inconsequential in

2    terms of my -- my damage estimates in this case.

3    BY MR. HEFFERON:

4        Q.    The -- the information that you have in

5    here on equity loss, did you -- did you look at any

6    blog posts about whether your figures of

7    20-some-thousand dollars of equity loss is

8    reasonable?

9            MS. CHIU:  Objection.

10           THE WITNESS:  Well, the answer is that,

11   between me and my staff, we did quite a general

12   search in the literature, and I personally did not

13   look at any blogs on this.  I can't tell you

14   whether -- and I don't recall staff reporting to me

15   that they had done so.

16   BY MR. HEFFERON:

17       Q.    Did you or your staff look at any blog

18   posts in order to confirm whether the costs for

19   legal and administrative fees was accurate or

20   inaccurate?

21           MS. CHIU:  Objection.

22           THE WITNESS:  Not as -- not to my

23   recollection.  Not as I recall.

24   BY MR. HEFFERON:

25       Q.    So the only blog post you used, as part of

1   your opinion, was the one you used to calculate

2   relocation fees?

3          A.   Please ask the question again.

4          Q.   Sure.

5               The only blog post that you looked at, for

6   purposes of your opinion, is the one that relates to

7   relocation fees?

8          A.   In terms of -- of what I'm aware of,

9   what's been reported to me, I'm not aware of any

10  others.

11         Q.   Okay.  And is it consistent with good

12  economic practice to calculate damages in a -- in an

13  assignment based upon only a single source of

14  information, and that information is contained in a

15  blog post?

16              MS. CHIU:  Objection.  Form.

17              THE WITNESS:  I would say in general it's

18  good -- it's good economic practice to do

19  conservative damage estimates, which are robust to

20  detailed issues about the data.  And I would

21  classify this as a situation where I've used a

22  robust conservative -- conservative damage

23  estimation method for -- for which the use of these

24  numbers pulled from the internet is inconsequential.

25  BY MR. HEFFERON:

1      Q.    Do you consider that your work, with

2  respect to the relocation costs, was robust and

3  conservative?

4      A.    It was the best estimate I had, and it

5  doesn't matter to my final opinion on damages.

6      Q.    So including a number in your

7  calculations, that is based on a blog post which you

8  consider to be inconsequential, you believe that

9  that's consistent with your opinion that your

10  calculation of damages is conservative?

11          MS. CHIU:  Objection.

12          THE WITNESS:  I've explained what I mean

13  by conservative, which is that, if you take this

14  number and reduce it to zero, I would -- I would --

15  I would stand by my estimate of damages.  The -- the

16  reason being that there are other places where I've

17  gone to the low -- lower end of the range of

18  possible damages and -- so that whether or not a

19  person actually moved as a result, for example, of

20  foreclosure, is not -- is not going to have any

21  consequence.

22  BY MR. HEFFERON:

23      Q.    So I -- just to finish up:  So are you

24  testifying that there's relocation costs that you

25  calculate to be $780 on average as part of the

Page 197

1  damages, or are we -- are you taking that number

2  out?

3        A.   I'm -- I'm --

4             MS. CHIU:  Objection.

5             THE WITNESS:  I've testified -- I'm

6  testifying that that was part of the calculation

7  as -- or reported in -- in my report, that the

8  damage number that comes from that is a conservative

9  estimate of actual damages.  And if that number were

10 in question, and were taken away, my est- -- my

11 estimate would still be a conservative estimate of

12 the actual damages.

13 BY MR. HEFFERON:

14      Q.   It would still total the same number that

15 you have in Table 15?

16            MS. CHIU:  Objection.  Form.

17            THE WITNESS:  It -- it could vary -- it

18 could vary by $100,000, that's true.  But the --

19 the -- this estimate is sufficiently far below

20 the -- the -- and so -- so the best estimate that I

21 could have made the most -- what I, in fact, believe

22 in my opinion to be the most accurate estimate, that

23 the $100,000, one way or the other, wouldn't make

24 any difference.

25            The -- the -- the estimates of damages in

Page 198

1   this case are, already, a large range -- within a

2   fairly large range, depending on the source used for

3   factors such as the equity -- REO discount.

4           MS. CHIU:  Tom, we've been going about an

5   hour.

6           MR. HEFFERON:  Yeah, just about -- just

7   about done.

8   BY MR. HEFFERON:

9       Q.   Do you plan on doing any more work on this

10  particular issue before testifying at trial in this

11  case?

12          MS. CHIU:  Objection.  Form.

13          THE WITNESS:  The issue being what?  What

14  issue?

15  BY MR. HEFFERON:

16      Q.   Relocation cost.  What's the proper

17  estimate for relocation cost.

18          MS. CHIU:  Objection.

19          THE WITNESS:  No.  I -- I haven't been

20  asked to, nor have I -- do I believe it's necessary.

21  BY MR. HEFFERON:

22      Q.   Now, you testified, I think it was, that

23  if it's about 15,000 affected borrowers and $780,

24  that that's $100,000, but that's not correct; is it?

25      A.   I -- I -- you asked me to do it off the

1  top of my head.  I -- I was -- I'm willing to assume

2  that you can do it more accurately on your

3  calculator.

4       Q.  Okay.  Well, I'm getting $11.7 million.  A

5  little less than 15,000 times 1,000.

6            MS. CHIU:  Objection.  Counsel, is there a

7  question?

8            THE WITNESS:  I -- I will take your --

9  yeah, I will assume your calculator is correct.

10 BY MR. HEFFERON:

11      Q.  Okay.  All right.  So let's assume --

12 let's assume I'm right, and that the total damages

13 you've traced to relocation costs are $11.7 million.

14            Is it still your testimony that that is an

15 inconsequential amount, and you would still have the

16 opinions given in Table 15 as to the losses, if the

17 relocation expenses were taken out of the equation?

18            MS. CHIU:  Objection.  Form.

19            THE WITNESS:  Your -- your calculation is

20 incorrect, I believe, because the relocation cost

21 would only be incurred by the portion of the 15,000

22 that are -- are sold and -- and -- and evicted or

23 predicted to be sold and evicted.  That's -- that's

24 not -- that's not the total.

25 BY MR. HEFFERON:

1    Q.   And -- okay.  And what's the --

2    A.   Well, again, you're asking me to do

3  arithmetic.  I -- that's not -- that's not

4  appropriate for me to try to do arithmetic in my

5  head.

6    Q.   What's your opinion for the percentage of

7  people who get evicted when the foreclosure is

8  completed and therefore, there would be relocation

9  expenses?

10   A.   Well, I -- the opinion is based on my

11 figure -- is given in my Figure 10, 14 -- 14 percent

12 of initiated foreclosures end in eviction.

13   Q.   Okay.

14   A.   In this -- in Figure 10.

15   Q.   And is it still your testimony that, if

16 it's $2 million, that that's an inconsequential

17 number, and doesn't affect your opinion of damages

18 in this case?

19   A.   Well, my testimony is -- is that I have --

20 I have the damage numbers, which I believe are in

21 Table 15, which range from 351 million to

22 483 million.  That's already a fairly large range.

23 I believe that the 351 million is -- is -- is

24 conservative.  And, in fact, the -- the damages

25 could be somewhere in that range.  I am not prepared

1  to give a more -- more precise estimate.  And -- and

2  my opinion is that some -- some fraction of

3  $11 million, if it's an issue in this case, does not

4  sub- -- substantively change my opinion as to what

5  the damages in this case are.

6       Q.   And it's typically your approach that, as

7  long you're close, that's good enough?

8            MS. CHIU:  Objection.

9            MR. HEFFERON:  I'll withdraw the question.

10 Let's take a break.

11           THE VIDEOGRAPHER:  This is the end of

12 Media 6.  We're going off the record at 2:43 p.m.

13           (Short recess taken.)

14           THE VIDEOGRAPHER:  This is the beginning

15 of Media 7.  We're going back on the record at

16 3:03 p.m.

17 BY MR. HEFFERON:

18      Q.   Professor McFadden, when you're

19 calculating the damages in Table 15 in your report,

20 Exhibit 5, you use the average costs per

21 foreclosure, which is the number we've been talking

22 about, and you multiply it by the number of loans

23 that resulted in additional foreclosures, based upon

24 your model, that predicts the number of additional

25 foreclosures; isn't that correct?

1      A.    Correct.

2      Q.    And just to confirm:  The model that

3    predicts the additional foreclosures cannot tell us

4    which of the loans harmed by the servicing failure

5    foreclosed because of the escrow delay?

6          MS. CHIU:  Objection.

7          THE WITNESS:  Correct.

8    BY MR. HEFFERON:

9      Q.    Okay.  So you have no opinion as to

10   whether a particular loan or another loan foreclosed

11   because of that delay?

12          MS. CHIU:  Objection.

13          THE WITNESS:  Correct.  That was not the

14   purpose of my analysis, and this analysis does not

15   provide that information.

16          THE COURT REPORTER:  I'm sorry.  By that

17   what?  I'm sorry, I didn't hear you.

18          THE WITNESS:  Provide that information.

19   BY MR. HEFFERON:

20     Q.    Okay.  I'm going to draw your attention to

21   Exhibit 5, your report, paragraph 123, which is

22   the -- the text right before Table 15.

23          Do you see that?

24     A.    Yes.

25     Q.    It's on the bottom of page 61.

1          And it just introduces the report,

2    Table 15; correct?

3       A.   Correct.

4       Q.   Okay.  And it said, "Damages range from

5    the 352 million to 480 million, depending on the

6    estimated average cost per foreclosure"?

7       A.   Yes.

8       Q.   All right.  And then I want you to ask

9    about -- ask about Footnote 128.  And Footnote 128

10   to this statement says, "If asked, I would be able

11   to allocate damages across individual loans into

12   scale damages to a January 10, 2014, start date."

13          What do you mean when you say that "I

14   would be able to allocate damages across individual

15   loans"?

16      A.   That the intent of that foot- -- of that

17   footnote was to indicate that one could take loans

18   that foreclosed at different points in time, and

19   allocate damages to the loans that were actually

20   foreclosed at -- at different dates.

21          Those damages would not distinguish

22   individual loans in terms of -- of -- well, the

23   model does not distinguish -- the -- the particular

24   causal path for individual loans, it only -- it only

25   predicts the overall tendency in this population to

Page 204

1   have a foreclosure.  So the 16,000 or so that are

2   the extra foreclosed loans, we don't know which

3   loans those are.

4       Q.   So -- so --

5       A.   But we do know, within a given month, say

6   one month versus a -- a different month, there would

7   be some share of -- share that foreclosed in this

8   month versus foreclosed in that month, and if

9   there's a -- a difference, relevant difference there

10  in -- in either the foreclosure -- well, I

11  shouldn't -- I don't do this by month on the

12  foreclosure probability.  But if -- if there were a

13  cost difference from month to month, that could be

14  taken into account.

15      Q.   In fact, foreclosure costs change over

16  time?

17          MS. CHIU:  Objection.

18          THE WITNESS:  Well, the -- the answer to

19  that is, in -- in my calculations of average costs,

20  I -- I have not tried to build that into the damage

21  calculation.

22  BY MR. HEFFERON:

23      Q.   Right.  But I've asked a factual question,

24  which is, that they change other time; don't they?

25          MS. CHIU:  Objection.  Form.

Page 205

1           THE WITNESS:  I have no reason to believe

2    that they don't, but I do not -- I do not take

3    account of that in my analysis.

4    BY MR. HEFFERON:

5       Q.    Okay.  So look at Footnote 117, which

6    discusses foreclosure costs, page 56.  And it states

7    there, does it not, that average costs had fallen

8    since the last review period.

9           Do you see that?

10      A.    Yes.

11      Q.    Okay.  You don't take into account the

12   fact that average costs fall, in conducting the cost

13   analysis for your damage?

14          MS. CHIU:  Objection.

15          THE WITNESS:  I would say that I take --

16   I -- I take average costs.  Obviously, the most --

17   the germane costs in this case are for loans at --

18   at risk due to Ocwen conduct.  And those are --

19   primarily occur before the first quarter of --

20   before or during the first quarter of 2015.  So it's

21   a question of whether -- whether cost -- whether

22   these costs were, in fact, changing substantively

23   over that 12- -- 14-month period.

24   BY MR. HEFFERON:

25      Q.    And you don't make a determination of that

1   either way?

2        A.   I do not.

3        Q.   Going back to Footnote 128 on page 61, I

4   still don't understand what you're talking about

5   there.  You say that "I would be able to allocate

6   damages across individual loans."

7             And how is it that you think you're able

8   to do that, if your model does not tell us which of

9   the foreclosures happened because of the escrow

10  delay?

11       A.   I'm -- I'm sorry if the term "individual"

12  there is ambiguous.  It has multiple meanings, but

13  the intent was to allocate damages across the -- the

14  different categories of loans that we could -- we --

15  we could distinguish.  So it would -- it would be

16  for -- it would be an allocation of across classes

17  of loans that might be by time, that might be by

18  lien type, for example, or -- or something like

19  that.  It's not -- it's not individual in the terms

20  of specific mortgage numbers.

21       Q.   But it's just -- but it's collective

22  groups?

23       A.   It is a --

24            MS. CHIU:  Objection.

25            THE WITNESS:  It is a collective group,

Page 207

1    that's correct.

2    BY MR. HEFFERON:

3        Q.  So how is it that you can allocate damages

4    across collective groups if your model doesn't tell

5    you which of the foreclosures happened because of

6    the escrow delay?

7            MS. CHIU:  Objection.

8            THE WITNESS:  The all- -- the damages are

9    not being allocated -- well, let me back up for a

10   minute.

11           The model in my analysis identifies an

12   overall increase in the probability of going into a

13   foreclosure initiation as a result of Ocwen -- Ocwen

14   delayed escrow.  Okay.  That probability applies to

15   all loans that are so treated.  That -- that risk

16   is, in fact, applied to all loans.

17           And what one can do, then, is ask of

18   the -- of the economic costs that these borrow --

19   borrowers incur as a result of this overall increase

20   in the risk of a foreclosure initiation, one can --

21   one can allocate that to different groups, depending

22   on things like lien type, month of -- of servicing

23   error, and so forth.

24           But that has -- but the -- the model does

25   not distinguish and the -- this footnote is -- was

Page 208

1    not intended to imply that you could -- you could

2    somehow identify those who, for which servicing

3    error was the cause and others for which it was not.

4    In fact, the -- that's not the -- that's not the

5    purpose of the model.  That's not what the model

6    purports to do.

7    BY MR. HEFFERON:

8         Q.   But you believe that, even though it

9    doesn't identify which of the foreclosures happened

10   because of the escrow delay, that you could,

11   nonetheless, allocate damages across groups of

12   loans?

13             MS. CHIU:  Objection.

14             THE WITNESS:  You can allocate damages

15   for -- say, for example, in -- in -- in principle --

16   I haven't done it.  In principle, one could

17   distinguish owners of single-family houses from

18   those of -- of other kinds of properties, say,

19   condos.  And one could determine a -- a damage for

20   the -- for the class of Ocwen borrowers that are --

21   were single-family owners who were -- who were --

22   had a foreclosure initiation at a different cost for

23   the condo owners.

24   BY MR. HEFFERON:

25        Q.   And how can you do that if your model

1  doesn't tell you which of the foreclosures occurred

2  among the single families, and which occurred among

3  the condos?

4      A.   I -- what I described is not

5  distinguishing between -- does not distinguish by

6  some -- some kind of particular string of causation.

7  That's -- I -- I -- I've testified that that's not

8  what the model does, and it's not what is intended

9  to do.

10         And what I -- what I've just described is

11 that one can look at observed characteristics of

12 borrowers, what kind of class they're in, where --

13 were they -- did they have a large property, a

14 small -- a small property, were they -- was it a

15 single family, was it a condo, and so forth.  One

16 could do -- one could do an allocate -- and part of

17 this footnote is that -- the intent of this footnote

18 is that you could do an allocation of those damages

19 across those groups.

20         It does not intend -- it's intended to

21 imply that -- that within the group, there is any

22 way of identifying those that are -- are

23 differentially affected by the servicing error.

24      Q.   Meaning that if you had -- 25 percent of

25 the loans were condos, 75 percent were single

Page 210

1    family, you can take your numbers and allocate

2    25 percent to condos and 75 percent to the group of

3    single families?

4              MS. CHIU:  Objection.

5              THE WITNESS:  That's -- that's essentially

6    correct.  You could also take an account of the --

7    of the -- of the price of single-family dwellings

8    versus the price of condos and so forth, and make an

9    adjustment for the total --

10   BY MR. HEFFERON:

11       Q.   But, in fact, you wouldn't don't know

12   whether 25 percent of the condos suffered this loss,

13   it could've been 22 percent, or 28 percent.  You

14   just don't know, because you don't identify which

15   loans actually foreclosed; correct?

16             MS. CHIU:  Objection.

17             THE WITNESS:  The -- the model -- the

18   probability model does allow you to make those

19   distinctions, as to say it -- it provides a -- an

20   as-is and but-for estimate of the probability of

21   foreclosure for the kinds of identified groups that

22   I just mentioned.

23   BY MR. HEFFERON:

24       Q.   And you'd have to take into account

25   whether condos have a higher risk profile than --

1    than single families, though, too; wouldn't you?

2          A.   That's part of the model.

3          Q.   You haven't done that work?

4          A.   I have done that.  It's in the model.

5          Q.   But you haven't allocated damages across

6    individual loans; have you?

7          A.   I said that it could be done.  I have not

8    done it.

9          Q.   Okay.  Do you anticipate doing that?

10         A.   Sorry?

11         Q.   Do you anticipate doing that?

12              MS. CHIU:  Objection.  Form.

13              THE WITNESS:  I've not been asked to.

14   I -- I don't anticipate it, no.

15   BY MR. HEFFERON:

16         Q.   Okay.  I noted that, in the Halm report,

17   there was a long discussion of a review of a sample

18   of 100 loans.  And I didn't think you had responded

19   to that in your surrebuttal report, Exhibit 6.

20              Did you respond to that, and -- and if

21   not, why not?

22              MS. CHIU:  Objection.

23              THE WITNESS:  Well, there are several

24   reasons that I did not respond specifically to it,

25   but --

1  BY MR. HEFFERON:

2      Q.   Okay.  First, you did not respond

3  specifically to it?

4      A.   Sorry?

5      Q.   I just want to confirm, you did not

6  respond specifically to that?

7      A.   I did not -- I did not re- -- do my own

8  analysis of the -- on the loans -- I -- I did -- I

9  did some processing of his 100.

10     Q.   What do you mean by that?

11     A.   I looked, for example, at the question of

12  whether they were -- they were in a recourse state

13  or not.

14     Q.   Did you -- and you never looked at any of

15  the files; correct?

16          MS. CHIU:  Objection.  Form.

17  BY MR. HEFFERON:

18     Q.   Any of the 100 loan files?

19          MS. CHIU:  Objection.  Form.

20          THE WITNESS:  In order to understand his

21  data, I did look -- I did look at -- at that, yes.

22  But simply to understand what data he was drawing

23  from.

24  BY MR. HEFFERON:

25     Q.   Okay.  And why did you not respond to the

1    observations that he made of the sample of 100

2    loans?

3              MS. CHIU:  Objection.

4              THE WITNESS:  Because I considered it

5    statistically inappropriate.  The model that I did

6    is a model of the general tendency of Ocwen conduct

7    to change the probability of foreclosure initiation.

8              I -- I would -- I would make an analogy

9    with -- a medical analogy, which is, people --

10   people -- some people get the flu.  Some people die

11   as a result, and some people don't get the flu and

12   they die following that.  And it's -- if one is

13   trying to establish, for a particular individual,

14   whether the flu caused their death, you would have

15   to do a detailed study of their medical record.

16             But if you're trying to establish whether

17   the population death rate was influenced by the

18   presence of the flu, what you would do is a study,

19   which is analogous to the study that I did, which is

20   to look at the death rates that re- -- that result

21   as a -- for people who did have the flu and who

22   didn't have the flu.  That's -- that's -- so that

23   kind of a study is the study that I did.

24             And going back and looking at individual

25   medical records would -- would not be a -- a useful

1    addition to that kind of a -- that kind of a study.

2    The analogy here is that I do not think that looking

3    at individual loan records, particularly for a

4    sample as small as 100, is a -- is a -- is a useful

5    response to the study that I did.

6    BY MR. HEFFERON:

7         Q.   Provides you no information?

8              MS. CHIU:  Objection.  Form.

9              THE WITNESS:  I wouldn't say that it

10   provides no information; I would say that the -- the

11   study of individual records, at least a small number

12   of individual records, provides very -- very limited

13   information.

14   BY MR. HEFFERON:

15        Q.   Did you find the -- the study of the 100

16   loans to be utterly unhelpful?

17             MS. CHIU:  Objection.  Form.

18             THE WITNESS:  I would say I found it to be

19   not particularly relevant.

20   BY MR. HEFFERON:

21        Q.   Did -- did you have any concern about your

22   study, based upon Halm's analysis that, over half of

23   the loans in his sample were more than two years

24   past due?

25             MS. CHIU:  Objection.

Page 215

1      THE WITNESS:  The answer is, yes.  First

2  of all, I was concerned as to where that number came

3  from, and how he came by it, because it is grossly

4  inconsistent with my own accounting, based on the

5  Ocwen data.  So I, first of all, have a concern as

6  to what Dr. Halm has done, which is so different

7  than what Ocwen has reported itself and its data.

8  BY MR. HEFFERON:

9      Q.   What's your understanding of the

10  percentage of borrowers in this cohort whose loans

11  were more than two years past due?

12      MS. CHIU:  Objection.

13      THE WITNESS:  What I can -- what I can

14  tell you is that, in my own accounting, which I

15  trust, that -- and this is in the -- in the data

16  sets that I'm working with now, so it's already

17  screening out some -- some types of loans -- that

18  the number is -- the number of loans that are

19  currently 30 days or more delinquent at the time of

20  the servicing errors, is somewhere between 25 and

21  30 percent.

22  BY MR. HEFFERON:

23      Q.   Do you believe that, as a result of

24  servicing errors of the type you've identified, that

25  a borrower, whose loan is more than two years past

1   due, could ever be said to go into foreclosure

2   because of the escrow issue, as opposed to the large

3   aggregate delinquency?

4            MS. CHIU:  Objection.  Form.

5            THE WITNESS:  The analysis that I've done

6   is not designed to answer that question.  But --

7   but --

8   BY MR. HEFFERON:

9        Q.   I'm asking you as an economist.

10       A.   If -- if you're asking me as an

11   economist --

12       Q.   Mm-hmm.

13       A.   -- not about the data, I would say that

14   if -- if -- if there is a servicing error, it has

15   the potential to -- to disrupt the borrower's

16   financial life.  And that could have an economic

17   impact, even -- even a small disruption.

18       Q.   So take an example of a borrower who

19   hasn't paid their mortgage for more than two years.

20            As an economist, do you believe that

21   escrow delays, of the type you've studied, could

22   have caused that person to go into foreclosure?

23            MS. CHIU:  Objection.

24            THE WITNESS:  I would say in the -- in the

25   model analysis that -- that I've done, I believe,

Page  217

1    you would -- you would find that that model has --

2    predicts a high -- very high probability of

3    foreclosure for those individuals.  There,

4    nevertheless, may be some incremental impact of a --

5    of a servicing error.

6    BY MR. HEFFERON:

7        Q.   Does that make sense to you as an

8    economist?

9        A.   The data are what they are.  I -- I -- I

10   will defend -- I will defend my model on the -- on

11   the grounds that I have -- I think it is an

12   appropriate model.  I've taken a set of data, which

13   is for use in the model.  I have done robustness

14   tests on it, including robustness tests which

15   exclude all of the individuals of the types you've

16   just mentioned.  And my -- my reports contain

17   results based on those kinds of robustness tests.

18            And so the -- the answer is, as far as the

19   individual with -- who has a long -- long history

20   of -- and are continually active delinquency, the

21   model cannot answer -- cannot answer the question at

22   the individual level.  It's not designed to do that.

23   And I'm -- I'm basically not offering a damage

24   estimate that's based on making assumptions on that

25   individual.

1      Q.   And is it your testimony that, as part of

2    model design and verification -- validation, excuse

3    me.

4           Is it your testimony that, as part of the

5    model design and validation, that you don't need to

6    consider whether the model finds a probability of

7    foreclosure tied to someone who is so far past due

8    that they owe $100,000; you don't think that's

9    important to consider whether the model actually

10   still treats those people as possibly foreclosed

11   because of the escrow issue?

12           MS. CHIU:  Objection.

13           THE WITNESS:  I think it is important.

14   And I think that one needs to do the robustness test

15   to determine the sensitivity of the damage estimates

16   to the exclusion of such individuals from the -- the

17   model estimation and from the damage calculation.

18   And I have done those calculations.

19   BY MR. HEFFERON:

20      Q.   But -- but it's your testimony that

21   someone who's more than two years past due might,

22   nonetheless -- I'm sorry.

23           So it's your testimony that your model

24   predicts that someone, who is more than two years

25   past due might, nonetheless, be referred to

Page 219

1   foreclosure as a result of the escrow error, as

2   opposed to the two-year delinquency?

3            MS. CHIU:  Objection.

4            THE WITNESS:  My testimony -- testimony

5   would be that -- that the -- the model is designed

6   to estimate the overall increase in the

7   population -- in the population of the probability

8   of foreclosure, the number of foreclosures that not

9   what -- that would not have occurred, but for Ocwen

10  conduct and the -- the subsequent costs to that --

11  of that to the borrower.

12           And that it's -- it is the -- it is

13  appropriate to do robustness tests as to whether

14  that calculation is influenced by borrowers who --

15  who have adverse histories and -- and the issue --

16  the issue in this case is, do they have adverse

17  histories, which affects the probability of there

18  being -- of their experiencing a servicing error.

19  If -- if that were the case, that is an issue for

20  the model.

21  BY MR. HEFFERON:

22     Q.   Anyway, your model does predict that, even

23  if someone is more than two years past due, they

24  might be referred to foreclosure because of the kind

25  of de- -- delayed escrow you've studied?

Page 220

1          MS. CHIU:  Objection.

2   BY MR. HEFFERON:

3      Q.   That's correct; isn't it?

4          MS. CHIU:  Objection.

5   By MR. HEFFERON:

6      A.   The -- the model predicts for various

7   classes of people, in various observable

8   circumstances, what the probability of foreclosure

9   is, and that can then be calculated with and without

10  the Ocwen errors, and --

11     Q.   And --

12     A.   -- and that's what the model does.

13     Q.   Right.

14     A.   And the model -- so my -- my base model

15  includes the flags for previous conditions, such as

16  adverse credit events, previous delinquencies.  So

17  I -- yes, the -- the model takes into account to a

18  -- to a -- in considerable detail as to how -- how

19  those kinds of histories would affect the

20  probability of default.

21     Q.   And my question was more specific.  Your

22  model does predict that even if someone is more than

23  two years past due, they might be referred to

24  foreclosure because of the kind of delayed escrow

25  you studied --

1          MS. CHIU:  Objection.  Asked --

2    BY MR. HEFFERON:

3      Q.   -- correct?

4          MS. CHIU:  Objection.  Asked and answered.

5          THE WITNESS:  And my answer is that the --

6    the model predicts the probability of foreclosure

7    with and without Ocwen service errors for every

8    observed category of loans that we consider, where

9    those categories are broken down by lien type,

10   building type, and mortgage type and so forth.

11   BY MR. HEFFERON:

12     Q.   Your model doesn't exclude anyone from the

13   possibility of being referred to foreclosure based

14   upon the servicing error; correct?

15         MS. CHIU:  Objection.

16         THE WITNESS:  In the baseline model, that

17   is so, although people that were already in

18   foreclosure are not in the analysis.

19   BY MR. HEFFERON:

20     Q.   And when you say "baseline model," you're

21   talking -- that's the model you used?

22     A.   That's right.  That's -- that's the --

23   that's the base model in the second amended report.

24     Q.   Right.  That's what you used to calculate

25   the 5 or 6 percent chance of foreclosure?

1       A.    That's correct.

2             MS. CHIU:   Objection.

3    BY MR. HEFFERON:

4       Q.    Okay.   Now, you -- you use that -- let's

5    find that in the report.   I'd ask you to look at

6    Exhibit 5, paragraph 110, Table 12.

7             Are you with me?

8       A.    I am.

9       Q.    Okay.   And Table 12 demonstrates the

10   result of this base model predicting that, for loans

11   that were overcharged as a result of the servicing

12   error, there is a 6.733 percent increased

13   probability of foreclosure initiation; is that

14   correct?

15      A.    Correct.

16      Q.    And for those loans that were subject to a

17   servicing error, that resulted in the loans being

18   undercharged, that has an impact of increasing the

19   probability of foreclosure initiation by

20   5.073 percent?

21      A.    Correct.

22      Q.    Okay.   And so, to figure out the number of

23   foreclosure initiations, you just took those

24   percentages and multiplied it by the number of loans

25   that were harmed, either by being overcharged for

Page 223

1    the 6.7 number or undercharged at the 5.1 number?

2         A.   That's a -- a rather brief description

3    of the -- of the process, and -- and I -- I don't

4    disagree with this -- its -- its outline, but I

5    believe that it's a little short on the details.

6         Q.   Okay.  Well -- so it's just setting up a

7    later question, so I'll take that.

8              So the result of those -- those

9    calculations led you to conclude that there were

10   16,636 additional foreclosures that resulted from

11   either an overcharge or an undercharge servicing

12   error?

13             MS. CHIU:  Objection.

14             THE WITNESS:  That's correct.  I -- I

15   believe this refers to Table 15 on page 62.

16   BY MR. HEFFERON:

17        Q.   Okay.  And then, how did you determine how

18   many actual completed foreclosures there were out of

19   this population of 16,636?

20        A.   That's done in two steps.  So using the

21   Ocwen data, we have Ocwen data on the completion of

22   a foreclosure initiation through either a recension

23   or a finished sale or a loan, which is in -- in an

24   ongoing status, name- -- name- -- namely that

25   neither of the two previous things had happened, and

Page 224

1    it had not been re- -- written off --

2         Q.   And you're referring --

3         A.   -- in -- in the -- in the Ocwen records.

4         Q.   And you're referring to paragraph 116 in

5    Figure 10?

6         A.   Correct.

7         Q.   Okay.  And so you had a number of

8    completed, right, percentage of completed at 44.6;

9    correct?

10             MS. CHIU:  Objection.

11             THE WITNESS:  Correct.

12   BY MR. HEFFERON:

13        Q.   And you had a number rescinded of

14   1.5 percent?

15        A.   Correct.

16        Q.   And the remaining were, as you indicated,

17   outstanding through the last date of the data set?

18        A.   Correct.

19        Q.   And how did you determine what was the

20   likely disposition of those?

21        A.   What was done in my calculations was to

22   allocate those loans in the same proportions as to

23   the ones which had a completed -- completed process?

24        Q.   And why did you do that?

25        A.   Why did -- I -- I did not have information

1   that I felt was reliable to do anything -- do it

2   otherwise.  That seemed to be -- it's -- it seemed

3   that an ongoing loan, which simply had not completed

4   the process, and I have no data or information which

5   I felt was reliable, which would establish that it

6   was -- they would be processed in any way

7   differently than the ones that had been completed.

8       Q.   For this group of 53.9 percent of loans

9   that were in process as of the last date of the data

10  set, what was the status of those loans?

11          MS. CHIU:  Objection.

12          THE WITNESS:  These -- these loans, I

13  believe, are all loans which have -- have not

14  been -- as of the point of this observation, they

15  had not been formally rescinded or -- or discharged,

16  as they say, you know, legally written off.

17  BY MR. HEFFERON:

18      Q.   And what percentage of those loans were

19  currently in a loan workout?

20          MS. CHIU:  Objection.  Form.

21          THE WITNESS:  I don't -- you'll have to

22  explain to me what "loan workout" means.

23  BY MR. HEFFERON:

24      Q.   Do you know what a "loan workout" is?

25      A.   No.

Page 226

1      Q.   Okay.  Have you ever heard of "HAMP,"

2  H-A-M-P?

3      A.   Yes.

4      Q.   What's HAMP?

5      A.   It's a -- a procedure that I understand

6  was established after the recession, to facilitate

7  the foreclosure process, reduce the cost of

8  foreclosures to borrowers in trouble.  I don't know

9  the details of it.

10     Q.   How -- how did the HAMP process facilitate

11 foreclosure?

12     A.   I don't -- I don't know the details.

13     Q.   Okay.  After a loan is -- after a

14 foreclosure is initiated by Ocwen, what are the

15 various possible paths it can take between

16 initiation and -- and, you know, either a completed

17 sale or a rescission?

18         MS. CHIU:  Objection.

19         THE WITNESS:  Well, in addition to the

20 categories here, they could be rescinded.  It could

21 actually go into a foreclosure sale.  It could -- it

22 could go into a restatement.  It could go into a

23 trial or permanent loan modification.  It could be

24 paid off.  And there may be some other categories,

25 but those are the ones I recall.

1    BY MR. HEFFERON:

2         Q.   Okay.  Did you take into account, in your

3    calculations of the disposition of initiated

4    foreclosures, those loans -- or the frequency at

5    which loans were reinstated?

6              MS. CHIU:  Objection.  Form.

7              THE WITNESS:  Please re- -- re- --

8    BY MR. HEFFERON:

9         Q.   Did you take into account, in your

10   calculations of the disposition of initiated

11   foreclosures, the frequency of those loans that were

12   reinstated?

13             MS. CHIU:  Objection.  Form.

14             THE WITNESS:  I would -- I would say that,

15   in the calculation described here, I don't recall

16   that was done.  I -- I have looked at RFP 5.  So

17   I've -- I've looked at -- at frequency in which that

18   occurs.

19   BY MR. HEFFERON:

20        Q.   And of the 53.9 percent of loans that were

21   designated as ongoing foreclosures at the time you

22   looked at the data, did you determine what

23   percentage of those were involved in a temporary or

24   a permanent loan modification?

25             MS. CHIU:  Objection.

1        THE WITNESS:  I -- I have asked staff to

2   look at that.  I don't recall now the numbers.

3   BY MR. HEFFERON:

4        Q.   Did they tell you that they looked at

5   that?

6        A.   Yes, they did.

7        Q.   And what did they tell you?

8        A.   That -- that -- well, certainly that

9   there -- that restatement -- frequency restatement

10  was very low.  The frequence of -- frequency of --

11       THE COURT REPORTER:  Sorry, the what loan

12  modifications?  I didn't hear you.  The frequency

13  of?

14       THE WITNESS:  Of restatements was low.

15  The frequency of trial loan modifications was --

16  were reasonably high.  Of permanent loan

17  modifications, somewhat less.  The frequency in

18  which borrowers emerged from the process with a loan

19  that was maintained current thereafter was fairly

20  low.  I don't re- -- as I sit here, I can't recall

21  the percentages or numbers associated with that.

22  BY MR. HEFFERON:

23       Q.   So -- so what you did was, you took the

24  foreclosures that were initiated, and you determined

25  that 97 percent of any foreclosure that was

1   initiated would likely proceed to a foreclosure

2   sale?  Isn't that your conclusion?

3          MS. CHIU:  Objection.

4          THE WITNESS:  That is the way the

5   calculation was done, yes.

6   BY MR. HEFFERON:

7      Q.   So your conclusion is that, of the --

8   every foreclosure Ocwen initiates, 97 percent of the

9   time that loan ends up in a completed foreclosure

10  sale --

11         MS. CHIU:  Objection.

12  BY MR. HEFFERON:

13     Q.   -- correct?

14         MS. CHIU:  Objection.

15         THE WITNESS:  No.  I would say that my

16  conclusion is, if I do the calculation that way and

17  combine it with a very conservative estimate of the

18  costs per foreclosure initiation, that I will have a

19  damage estimate that is conservative, irrespective

20  of the complexities of loan restatements and other

21  outcomes.

22  BY MR. HEFFERON:

23     Q.   So your $350 million number's going to be

24  close enough, even if it turned out you

25  overcalculated the possibility that these loans

Page 230

1    would actually be foreclosed?

2         MS. CHIU:  Objection.

3    BY MR. HEFFERON:

4         Q.   Is that your testimony?

5         A.   I'd -- I'd say my -- my position is that I

6    have -- I have two damage numbers in -- in my -- my

7    table from 3- -- 350 to 480 or so and -- yes, and I

8    would anticipate that there are economic costs to

9    borrowers from restatement, that it is not -- it's

10   not a get-out-of-jail-free outcome for borrowers.

11        And the -- the 20- -- 20,000 -- $21,000 or

12   so average cost per foreclosure initiation is

13   sufficiently conservative so that I -- I believe

14   that any -- any reasonable unwinding of this

15   category of ongoing would not fall below my -- the

16   lowering -- lowering of my current damage estimates.

17        Q.   So your testimony is that, even if your

18   opinions in paragraph 116 and 117 are wrong,

19   specifically your opinion that 97 percent of all

20   foreclosures proceed to sale, that, nonetheless,

21   your opinion of damages in this case of 351- to

22   $483 million is still accurate?

23        MS. CHIU:  Objection.

24        THE WITNESS:  Conservative.

25   BY MR. HEFFERON:

1    Q.   And, therefore, accurate; correct?

2    A.   I would distinguish between a point

3  estimate, which is the highest probability estimate,

4  and an estimate, which is robust in the sense that

5  the damages are at least that, even under a variety

6  of questions about specific categories of

7  resolutions.

8    Q.   Okay.  Let me ask you, then, paragraph

9  123, Table 15, is your damages calculation; correct?

10    A.   Yes.

11    Q.   And it's your testimony that this is only

12  an estimate?

13    A.   All these damage calculations are, in --

14  in the terminology of economics, estimates.  That is

15  to say, these are based on operation of the

16  probability that Ocwen conduct led to increased

17  foreclosures, and cost per foreclosure initiation

18  was obtained from various sources in the literature.

19        All those are -- are -- involve some --

20  some degree of uncertainty.  So, yes, this is an

21  estimate.  It's my -- it's what I am testifying

22  is -- is -- I'm quite confident is a lower bound on

23  the damages.

24    Q.   And what's -- what is the range of error

25  involved in your estimate?

1          MS. CHIU:  Objection.

2     BY MR. HEFFERON:

3          Q.   How far off could your opinion be, since

4     it's only an estimate?

5          MS. CHIU:  Objection.

6          THE WITNESS:  Well, I think the -- the

7     range from 350 to 480 is already a -- a pretty wide

8     bound.  I would say that's the -- that -- that's

9     one -- one way of giving a quantitative answer to

10    your question.

11    BY MR. HEFFERON:

12         Q.   What's your range of error on the 350?

13    How low could it be?

14         A.   I have not completed a standard error for

15    it.

16         Q.   Why not?  You weren't asked?

17         A.   I -- I wasn't asked to do it and --

18         Q.   Okay.  Thank you.

19         Now, Mr. -- Professor McFadden, let's go

20    back to your opinion in here in paragraph 117 that

21    "97 percent of all foreclosures initiated by Ocwen

22    proceed to sale."  Is that a true statement, an

23    estimate, a guess, a fact?  How would you

24    characterize that?

25         MS. CHIU:  Objection.

Page 233

1        THE WITNESS:  Paragraph -- paragraph

2   117 --

3   BY MR. HEFFERON:

4        Q.   Correct.

5        A.   -- is an assumption.

6        Q.   Where did you get that assumption?

7        A.   I have no evidence on the final discharge

8   of the -- of the foreclosures that were ongoing, so

9   I -- I assumed that, for foreclosures in which I

10  have no evidence in which they would end up, that

11  the pattern of terminations for the ones where I did

12  observe an end was a -- a reasonable starting point

13  for predicting where the ones where I did not

14  observe an end would, in fact, end up.

15       Q.   Well, it wasn't a reasonable starting

16  point; isn't that right?  It was actually your

17  ending point.  It was what you drew your conclusion

18  based upon --

19            MS. CHIU:  Objection.

20  BY MR. HEFFERON:

21       Q.   -- and only based on that; isn't that

22  true?

23            MS. CHIU:  Objection.

24            THE WITNESS:  That's true.

25  BY MR. HEFFERON:

1    Q.   Okay.  And -- and applying these -- the

2  ratio of sales finished to rescinded would only be

3  appropriate, is it not, if the population of loans

4  in that group was similar to the population of loans

5  in the ongoing group?

6           MS. CHIU:  Objection.  Form.

7           THE WITNESS:  I'm not sure what your

8  question means by "similar," but certainly that

9  assumption is that -- that the -- the loans that are

10  in the ongoing group will end up having re- -- would

11  end up having resolutions like the ones where the --

12  the process has been completed.

13  BY MR. HEFFERON:

14    Q.   Okay.  Did you do anything to check or

15  confirm whether your assumption was reasonable, that

16  Ocwen or any mortgage servicer in this day and age,

17  completes 97 percent of all foreclosures initiated?

18           MS. CHIU:  Objection.

19           THE WITNESS:  I did some checking.  I went

20  to look at what Ocwen -- Ocwen said it was doing

21  with the foreclosure process.  And I noticed --

22  noticed, first of all, that the rate of restatement

23  was quite low.

24           I -- staff gave me information on some of

25  the other interim states of -- of these loans, where

1  they were not -- not reinstated, so they were still

2  in process, perhaps with additional events.  So

3  I've -- I've -- I've looked at what the -- what

4  the -- at least the shares of those are.

5  BY MR. HEFFERON:

6       Q.   And you're comfortable that 97 -- with the

7  opinion that 97 percent of all initiated

8  foreclosures end up in foreclosure?

9       A.   No.  I'm comfortable with the proposition

10  that what- -- whatever the outcome for this group

11  was, whether that's exactly right or even only

12  approximately right, that my -- my cost per

13  foreclosure initiation estimate is sufficiently

14  conservative so that my -- my end estimate of

15  damages is a lower bound on the actual damages.

16       Q.   Well, this -- this figure in paragraph

17  117, 97 percent is the number which you use to -- in

18  Table 15 to calculate the number of additional

19  foreclosures; isn't it?

20       A.   Please state -- restate the question.

21       Q.   Sure.

22            This figure of 97 percent of completed

23  foreclosure is the figure that you use to determine

24  your damages calculation?

25            MS. CHIU:  Objection.

Page 236

1    THE WITNESS:  That, combined with the

2  $20,000 or so cost per foreclosure initiation,

3  that's correct.

4  BY MR. HEFFERON:

5    Q.  Okay.  And if the percentage of

6  foreclosures that were -- resulted in a sale is not

7  97 percent, but it was instead 30 percent less, then

8  your damage calculation would be off by 30 percent;

9  isn't that correct?

10    MS. CHIU:  Objection.

11    THE WITNESS:  Yes.  And if the cost per

12  foreclosure initiation was 30 percent higher, it

13  would be off by 30 percent in the other direction.

14  BY MR. HEFFERON:

15    Q.  And I believe you did testify today that

16  you have no idea how the cost of foreclosures were

17  calculated; isn't that true?

18    MS. CHIU:  Objection.

19    THE WITNESS:  Would you read me back my --

20  BY MR. HEFFERON:

21    Q.  No.  I'll withdraw the question.

22    So -- so if the -- so to use it in the

23  terms of sensitivity, your -- your damages

24  calculation is sensitive to this information in

25  paragraph 117; that is, if the number of completed

1    foreclosures is lower, then that's going to drive

2    your damages down by the same proportion?

3            MS. CHIU:  Objection.  Form.

4            THE WITNESS:  I've just -- I've just

5    agreed that your arithmetic is right for that.  And

6    that if you -- if you do arithmetic in the other

7    direction on the cost per foreclosure initiation, it

8    can go the other way.  Yes, there is that degree of

9    --

10   BY MR. HEFFERON:

11       Q.   And --

12       A.   -- of range in the estimate.

13       Q.   -- did you take into account in -- in

14   calculating the chance of foreclosure completion,

15   the fact that these borrowers were people who you

16   believe had been referred to foreclosure because of

17   an escrow delay, as opposed to some other problem or

18   issue with the loan?

19           MS. CHIU:  Objection.

20           THE WITNESS:  What -- what the model does

21   is -- is predict the probability of a foreclosure

22   initiation for borrowers with -- with -- in loans

23   with various characteristics with and without a --

24   an escrow delay.

25   BY MR. HEFFERON:

Page 238

1    Q.   And did you assume that a loan, referred

2  to foreclosure because of an escrow delay, is going

3  to be completed as a foreclosure at the same rate as

4  a loan that was referred to foreclosure for other

5  reasons, such as a two-or three-year delinquency?

6    A.   First of all, I'm not aware that any loans

7  were referred to foreclosure for an escrow delay.

8  The mechanics of it is, is a proximate cause of a

9  foreclosure initiation, is a 90-day-plus

10 delinquency.

11       So there is some legal standard which

12 triggers or allows foreclosure initiation.  That's

13 the proximate cause.

14       I'm -- I'm -- so I -- my model does -- is

15 not predicting the probability that an escrow delay

16 itself would -- would be a proximate cause.  That's

17 not what the model does.

18       What the model does is ask what -- what is

19 the change in the probability of a foreclosure

20 initiation with and without the Ocwen misconduct.

21    Q.   And did you consider whether the nature of

22 the Ocwen misconduct was such that loans referred to

23 foreclosure, that had a delay, were perhaps more

24 easily remediated, and a foreclosure could be

25 rescinded or a loan could be subject to a

1    modification as opposed to loans that didn't have

2    that issue, but instead were two or three or five

3    years late in payments?

4         A.   I'm sorry, you'll have to --

5              MS. CHIU:  Objection to form.

6              THE WITNESS:  -- restate that question.

7    It's quite long.

8    BY MR. HEFFERON:

9         Q.   Sure.

10             Did you consider whether the nature of the

11   Ocwen misconduct was such that loans referred to

12   foreclosure, that had delay, were perhaps more

13   easily remediated, or a foreclosure could be

14   rescinded or a loan modified as opposed to loans

15   that were in foreclosure without that issue, but

16   instead were two or three or five years late in

17   payments?

18             MS. CHIU:  Objection.  Form.

19             THE WITNESS:  I'm sorry, I -- I -- I

20   cannot understand your question.  There's too -- too

21   many moving parts.

22   BY MR. HEFFERON:

23        Q.   Well, I take it that you -- that in trying

24   to figure out what percentage of loans would be

25   foreclosed after a foreclosure was initiated, you

Page 240

1    didn't pay attention to whether the loan may have

2    been rescinded or modified more frequently if it had

3    a problem of the nature we're talking about here?

4            MS. CHIU:  Objection.  Is there a

5    question?

6            MR. HEFFERON:  Yep.  I asked it and it's

7    got a question mark on the transcript and

8    everything.

9            MS. CHIU:  Okay.  Objection.

10           THE WITNESS:  Let me see if I understand

11   your -- your -- your proposition.  Your proposition

12   is that Ocwen combined escrow delays with some other

13   actions?

14   BY MR. HEFFERON:

15       Q.   That's your testimony; isn't it?

16           MS. CHIU:  Objection.

17           THE WITNESS:  No, I don't believe so.

18   Why --

19   BY MR. HEFFERON:

20       Q.   Well, your testimony isn't --

21       A.   Perhaps you -- perhaps you can restate

22   your question.

23       Q.   Your testimony, isn't it, that the loans

24   we're talking about, were ones in which a

25   foreclosure was initiated, because of the escrow

Page 241

1   delay?

2            MS. CHIU:  Objection.

3            THE WITNESS:  No, that's not what the

4   model does, and that's not the calculation that I

5   do.  That's a mischaracterization.

6   BY MR. HEFFERON:

7        Q.   Okay.  In any event, the loans that were

8   initiated, you didn't take into account the reason

9   why the foreclosure was initiated; did you?

10           MS. CHIU:  Objection.  Form.

11           THE WITNESS:  That was not the purpose of

12   the model, nor would it be appropriate.  The -- the

13   proximate cause of foreclosure initiation is that

14   the loan has gone into at least 90-days delinquency.

15   And -- and the -- the -- what the model does is look

16   at the change in the probability that that

17   foreclosure initiation will start as a result of

18   Ocwen behavior.

19   BY MR. HEFFERON:

20        Q.   And you didn't take into account whether

21   the loans that were initiated on Ocwen's general

22   population, whether those were ones that were in the

23   foreclosure because of Ocwen misbehavior, as opposed

24   to the ones you were studying, which were in there

25   because of Ocwen misbehavior?

Page 242

1          MS. CHIU:  Objection.

2          THE WITNESS:  Again, I do -- I'm not --

3    I'm not understanding your question at all.

4    BY MR. HEFFERON:

5       Q.   Well, let me ask it this way:  When you --

6    when you use this 97 percent number -- that you

7    believe that 97 percent of all foreclosures

8    initiated would result in a foreclosure, you believe

9    that that applies to the loans that you're looking

10   at, which are the ones that have an escrow delay;

11   correct?

12         MS. CHIU:  Objection.

13         THE WITNESS:  I did the calculation on the

14   following basis:  I used that assumption to predict

15   the -- the costs of the final resolution of the

16   ongoing loans.  I combined that with a conservative

17   estimate of the costs per foreclosure initiation

18   in -- in such a way that I -- in my opinion, that my

19   final damage number is a lower bound than what the

20   actual damages are.

21   BY MR. HEFFERON:

22      Q.   When you use this 97 percent number that

23   you believe -- 97 percent of all foreclosures

24   initiated would result in a foreclosure, you believe

25   that applies to the loans that we're looking at,

1  which are ones that have an escrow delay; correct?

2      A.   I just explained what -- the calculation

3  that I did, and the -- and the basis for my -- my

4  damage estimate.  The -- you using the -- I said I

5  made this assumption as a way of estimating what the

6  cost for the ongoing loans would be.  It's not --

7  it's not a belief.  It's just an assumption.

8      Q.   Who gave you that assumption?

9      A.   Who gave it to me?

10     Q.   Correct.  You said it's an assumption.

11 Who gave it to you?

12         MS. CHIU:  Objection.

13         THE WITNESS:  I -- I -- I followed

14 whatever I think is -- is good econometric practice,

15 which is that when I -- when I have a piece of the

16 analysis which is -- which, if there's not direct

17 evidence from the data, I look at -- at the cases

18 that are most comparable, so I can determine whether

19 the -- the data is available and I impute the

20 missing data.

21 BY MR. HEFFERON:

22     Q.   Did you ask --

23     A.   I would say this -- this followed that

24 standard practice.

25     Q.   Did you ask anyone to determine from

Page 244

1   Ocwen, or Ocwen's data, what percentage of loans,

2   that get referred to foreclosure, actually complete

3   the foreclosure?

4           MS. CHIU:  Objection.  Form.

5           THE WITNESS:  I am unsure how to respond

6   to that question.  And it's -- it's certainly the

7   case that, in discussions with staff at the time of

8   the preparation of the -- of second amended report,

9   I was asking them to examine Ocwen data to see if

10  there was a basis for -- any other basis for

11  handling the ongoing foreclosures.  And the

12  conclusion of those conversations back and forth,

13  that -- it was that we did not have a better basis

14  for doing that than this assumption.

15  BY MR. HEFFERON:

16      Q.   Did anybody conduct any literature

17  research, publicly available studies, or reports

18  from FHA, Fannie Mae, other investors, that would

19  explain the frequency of completed foreclosures?

20          MS. CHIU:  Objection.

21          THE WITNESS:  To my knowledge, in terms of

22  what I asked staff to do, and what they reported to

23  me, it was -- it was confined to examination of the

24  Ocwen data.

25  BY MR. HEFFERON:

Page 245

1      Q.   Okay.  Do you think it's reasonable that,

2  to have an opinion, that 97 percent of all

3  foreclosures that are initiated complete to a sale?

4          MS. CHIU:  Objection.

5  BY MR. HEFFERON:

6      Q.   Are you comfortable that's a reasonable

7  assumption?

8          MS. CHIU:  Objection.

9          THE WITNESS:  I've indicated that this is

10  an assumption.  And it is an assumption which is

11  appropriate, in combination with a conservative

12  assumption on cost-per-foreclosure initiation.

13  BY MR. HEFFERON:

14      Q.   But -- but I'm --

15      A.   I'm -- I'm comfortable with the

16  combination of those two assumptions.

17      Q.   All right.  Putting that aside, my

18  question, sir, is:  Are you comfortable that it is

19  reasonable to assume that 97 percent of all

20  foreclosure initiations complete in a sale?

21          MS. CHIU:  Objection.  Asked and answered.

22          THE WITNESS:  I've de- -- I've described

23  what I'm comfortable with.

24  BY MR. HEFFERON:

25      Q.   And I'm asking -- and I know, because

Page 246

1    that's what you said, and you avoided my question.

2    So I'll ask you again.

3            Are you comfortable that it is reasonable

4    to assume that 97 percent of all foreclosure

5    initiations result in a sale?

6            MS. CHIU:  Objection.  Asked and answered.

7            THE WITNESS:  I am comfortable that, if

8    you wish to make a -- a conservative estimate of

9    damages, that you can use a combination of

10   assumptions, which provide the best evidence you

11   have on various elements, and you can do it in such

12   a way that, in the overall result, it's relative --

13   relatively robust to the possibility that some of

14   those assumptions are wrong.

15           That's what I've done in this case.

16   I'm -- I'm comfortable that I have used a

17   combination of assumptions to provide a damage

18   estimate that is a lower bound on actual damages,

19   whether or not the -- this particular assumption in

20   117 is -- is 100 percent correct.

21   BY MR. HEFFERON:

22       Q.   Are you comfortable with it?

23           MS. CHIU:  Objection.  Asked and answered.

24           THE WITNESS:  I'm comfortable with my

25   overall study, yes.

Page 247

1    BY MR. HEFFERON:

2        Q.   Not my question, sir.

3             Are you comfortable with this 97 percent

4    assumption?

5             MS. CHIU:  Objection.  Asked and answered.

6             THE WITNESS:  I am comfortable with the

7    elements in my overall study.

8    BY MR. HEFFERON:

9        Q.   I'll ask it again.

10            Are you comfortable with the 97 percent

11   assumption?

12            MS. CHIU:  Objection.  Asked and answered.

13            THE WITNESS:  I think the appropriate

14   response would be that, if I had data which was

15   better than this assumption, I would definitely use

16   it.  And I -- actually, with the help of staff, I

17   looked for data within the Ocwen data supplied to us

18   for a basis for an alternative assumption.  I did

19   not find that.  So this was the -- a -- a reasonable

20   assumption, I believe, given the data that I had,

21   that loans that I didn't see a final end for would

22   behave like loans that I did see a final end for.

23            In order to make a conservative final

24   damage estimate, I combined this with a conservative

25   assumption.  And another point in the analysis,

1    namely the costs associated with the foreclosure

2    initiation.  That's the reason that I say I'm

3    comfortable with my overall damage estimate.

4    BY MR. HEFFERON:

5        Q.   Is the select -- is the selection of the

6    97 percent a conservative assumption?

7            MS. CHIU:  Objection.  Form.

8            THE WITNESS:  I would say that I do not

9    have evidence to suggest anything -- suggest

10   otherwise.

11   BY MR. HEFFERON:

12       Q.   Did you look for it?

13       A.   Yes.

14       Q.   Did you look at what the reported

15   foreclosure rates are on and on publicly reported

16   FHA loans?

17           MS. CHIU:  Objection.

18   BY MR. HEFFERON:

19       Q.   Did you look at that, sir?

20           MS. CHIU:  Objection.

21           THE WITNESS:  Are you -- for -- are you

22   asking me to look at a new data set?  Im' -- I'm

23   familiar with --

24   BY MR. HEFFERON:

25       Q.   Yes or no, did you look at the reported

1   foreclosure rates on publicly reported FHA loan?

2            MS. CHIU:  Objection.

3            THE WITNESS:  I did -- I find the question

4   vague, because you're -- are you suggesting there

5   are studies on this?

6   BY MR. HEFFERON:

7        Q.   You didn't look for that data?

8            MS. CHIU:  Objection.

9            THE WITNESS:  I don't know -- if you're

10  asking me to look for something, you have to first

11  tell me that it exists, and that it's relevant.

12  BY MR. HEFFERON:

13       Q.   And in your practice, do you not look for

14  something until you're sure it exists if you went

15  looking for it?

16           MS. CHIU:  Objection.

17           THE WITNESS:  It's -- it's -- it's

18  certainly in -- in my practice to not try to respond

19  to vague spec- -- speculations.  I don't -- I have

20  no idea what you're talking about.  So I don't know

21  how to respond to it.

22  BY MR. HEFFERON:

23       Q.   I think you -- you previously testified --

24  I'm sure you previously testified that, when you

25  provided opinions in the two lawsuits, Syncora and

1  USDOJ, that it concerned the questions of factors

2  that influence default risk, and that your opinions

3  were not substantially different from the literature

4  on the factors that influence default risk.

5          And with that as my predicate, I want to

6  ask you, sir, to tell me what the literature teaches

7  are the factors that influence de- -- default risk

8  of single-family residential mortgages of the type

9  that are at issue in our case?

10          MS. CHIU:  Objection.

11          THE WITNESS:  You're asking for a -- a

12  summary of a rather broad literature.  But what I --

13  what I can tell you that -- is that the -- the type

14  of loan matters, the lien status matters, the

15  property type matters, the borrower income matters,

16  the total amount of the loan and the value of the

17  property at origination matters.  So CLTV matters.

18  That the borrower's credit history, as reflected in

19  FICO scores and so forth, matter.  And those are --

20  that's just a subset of the factors that matter.  I

21  think those -- those reappear in most studies of

22  default risk.

23          MS. CHIU:  Tom?

24          MR. HEFFERON:  Yeah.

25          MS. CHIU:  We've been going about an hour.

Page 251

1   When it's a good time, can we take a break?

2            MR. HEFFERON:  In about five minutes.

3            MS. CHIU:  Okay.  Also, I'd like to note

4   for the record, that you previously cut off the

5   witness from answering a question earlier, which was

6   inappropriate, and he should have the opportunity to

7   fully complete his answer.

8            MR. HEFFERON:  You can ask him that on

9   cross-examination, if you'd like.

10  BY MR. HEFFERON:

11       Q.   Mr. -- I'm sorry.

12            Professor McFadden, in what ways does your

13  study take into account these factors that influence

14  default risk in making a determination that a

15  certain number of loans were referred to foreclosure

16  as a result of Ocwen's servicing errors?

17            MS. CHIU:  Objection.  Form.

18            THE WITNESS:  In -- in this study, the

19  factors which are important to consider are the

20  factors which Ocwen considered in how they

21  administratively processed their escrow accounts.

22            So the first place that I looked for, in

23  terms of explanatory variables, were those variables

24  that Ocwen reported that they kept in connection

25  with and as part of their loan pro- -- loan

1   servicing business and their escrow business, escrow

2   account -- accounting.

3   BY MR. HEFFERON:

4        Q.   And what factors did you find that Ocwen

5   considered, in deciding to process esc- -- escrow

6   accounts?

7        A.   Well, it's basically the data that they

8   reported that appear in my model as explanatory

9   variables.

10       Q.   And what were those?

11       A.   Well, I'd have to go back and look at the

12  model.  I can do that.

13       Q.   You can't remember any of them?

14       A.   Oh, of course I can, but there's no point

15  in making it a memory test.

16       Q.   Well, I just want to understand what you

17  can recall, since it's been unclear to me today how

18  much work you did versus how much Brattle did.

19            So why don't you tell me what you --

20            MS. CHIU:  Objection.  Move to strike --

21  BY MR. HEFFERON:

22       Q.   -- considered --

23            MS. CHIU:  -- that last statement.

24            MR. HEFFERON:  I'm just making an

25  observation about my own difficulty --

Page 253

1          MS. CHIU:  Well, your obser- -- your

2    observation --

3          THE COURT REPORTER:  I'm sorry.  One

4    person at a time.  One person at a time.

5          MS. CHIU:  Counselor, your observation is

6    inappropriate.

7          MR. HEFFERON:  I'm just explaining the

8    reason I'm asking the question.

9    BY MR. HEFFERON:

10     Q.  What are the factors that you considered

11   that the literature identifies as factors that

12   influence default risk and that, to you, match up to

13   those that Ocwen considered in deciding how to

14   process escrow accounts?

15         MS. CHIU:  Objection.

16         THE WITNESS:  Table -- Table 11, the --

17   the model lists the variables that are included in

18   the model.  And these were variables that were

19   contained in the Ocwen RFPs and interrogatories.

20   BY MR. HEFFERON:

21     Q.  Does Ocwen consider occupancy type in

22   processing escrow accounts?  I see that listed in

23   Table 11.

24     A.  The data we have are the data that Ocwen

25   delivered to us, that they say are their records

Page 254

1   in -- in -- in determining escrow calculations.

2   These -- those are the data that we have.  I do not

3   have information -- direct information on how Ocwen

4   administers its -- its escrow analysis programs.

5       Q.   What is the source of your information

6   about how escrow analysis is conducted by Ocwen?

7           MS. CHIU:  Objection.  Form.

8           THE WITNESS:  What I can say is that

9   the -- the request to Ocwen were for the information

10  on -- on the data they used in escrow analysis and

11  those are the data that I have worked with.

12  BY MR. HEFFERON:

13      Q.   Okay.  So when you refer to the data, it's

14  data that Ocwen reported as having used in its

15  conduct of the actual analysis?

16      A.   I wouldn't put it in those words.  I

17  believe the -- the RFPs and interrogatories, which I

18  do not have -- have copies of, had specific req- --

19  requests.  And I -- I cannot rephrase -- rephrase

20  those requests.

21      Q.   Did -- did -- other than the data, did you

22  have any other information on how escrow analysis is

23  conducted by Ocwen?

24      A.   Well, I'm -- I'm aware there's some

25  depositions by Mr. Coombs, for example, on some of

Page 255

1    this --

2            THE COURT REPORTER:  By Mr. -- who?

3    Mr. --

4            THE WITNESS:  Coombs, C-O-O-M-B-S; is that

5    correct?

6            MR. HEFFERON:  Let's take a break.

7            THE VIDEOGRAPHER:  This is the end of

8    Media 7.  We're going off the record at 4:14 p.m.

9            (Short recess taken.)

10           THE VIDEOGRAPHER:  This is the beginning

11   of Media 8.  We're going back on the record at

12   4:33 p.m.

13   BY MR. HEFFERON:

14       Q.   Professor McFadden, we just took a break,

15   and I wanted to know whether you have any amendments

16   or corrections to make to your testimony?

17       A.   No.

18       Q.   Okay.  Your -- your opinion refers to the

19   concept of a loan being -- or a borrower's loan

20   being treated or not.

21           What did you mean by the use of the

22   word "treated"?

23       A.   That's an economic term of art.  It -- it

24   re- -- refers to a -- in this case, a loan or a

25   borrower that receives one kind of processing versus

Page 256

1    one that receives a different kind of processing.

2    In this case, the treatment is that they were --

3    they experienced a -- a delay from the legal time,

4    escrow analysis time.  That's the -- that's the

5    treatment.  And if they did not receive such a delay

6    that's -- they were untreated.

7         Q.   Okay.  For loans that -- and -- and when

8    you say "treatment," do you mean either a delay that

9    resulted in an overpayment or a delay that resulted

10   in an underpayment?

11             MS. CHIU:  Objection.  Form.

12             THE WITNESS:  That's correct.  Those

13   are -- those are type one and type two treatments.

14   BY MR. HEFFERON:

15        Q.   Okay.  You don't have different terms?

16   Treatment is a delay?

17        A.   These are -- these are both treatments,

18   yes.

19        Q.   Okay.  And for those loans that were

20   treated and experienced an escrow delay, escrow

21   review delay and -- which resulted in an overcharge,

22   what was the average length of the delay?

23        A.   I would -- I would rather than try to do

24   it from memory, I would look it up in the report.

25             (Witness reviews.)

1          And now, I'm -- do you have -- do you have

2     a --

3          Q.   I don't have a citation.

4          Page 31, paragraph 65 -- 63, Table 3.

5          A.   Yes.  Well, with the exception of pointing

6     out, this is not exactly the same population that

7     was used in the model.  This was the population that

8     was -- that was used for the opportunity cost

9     analysis, which overlaps substantially, but it's not

10    identical.  Yes, I have the table in front of me.

11         Q.   Okay.  Was the average length of delay for

12    those escrow analyses that resulted in an overcharge

13    about a month and a half?

14              MS. CHIU:  Objection.

15              THE WITNESS:  The table is a little hard

16    to read, since it doesn't summarize between

17    currently -- current and delinquent; but, yes, I

18    agree with that.

19    BY MR. HEFFERON:

20         Q.   Okay.  And for those loans that were

21    treated and had a -- a delay, which resulted in an

22    undercharge, was the average delay also about a

23    month and a half?  Actually, it may be a little

24    less.

25         A.   Yes.  Again, the table's actually a little

1   hard to read; but, yes, I agree.

2        Q.   Okay.  And in a situation, where there was

3   an overcharge as a result of the delay -- let's talk

4   about those first.

5             In -- in -- for those loans, the failure

6   was in not looking at the loan within the 12-month

7   period, such that the escrow might be adjusted

8   downwards.  And since that didn't happen, that

9   resulted in an overcharge; correct?

10            MS. CHIU:  Objection to form.

11            THE WITNESS:  Correct.

12  BY MR. HEFFERON:

13       Q.   Okay.  And in those situations, the

14  borrower, thinking about her experience, is that for

15  the months of the delay -- for the month and a half

16  of delay, what she is seeing is her monthly

17  statement is just no different from what the prior

18  monthly statements had been for a year.  There's no

19  change in the -- in the escrow; isn't that correct?

20            MS. CHIU:  Objection.

21            THE WITNESS:  I agree.

22  BY MR. HEFFERON:

23       Q.   Okay.  In a situation -- and -- and so, in

24  that situation, if the borrower's current, she's

25  been making payments based upon the monthly amount

Page 259

1   for 12 months, and then during the month and a half

2   delay, those two additional months, her payments

3   haven't increased, she's just getting the same bill

4   for that period; correct?

5       A.   As -- as opposed to the but-for world in

6   which she would have gotten a lower bill --

7       Q.   Correct.

8       A.   -- that's correct.

9       Q.   Okay.  And in that situation, then, it's

10  not as if she is shocked or surprised by an increase

11  in her payment, as a result of this overcharge, she

12  actually just doesn't see it decrease?

13          MS. CHIU:  Objection.

14          THE WITNESS:  Yeah, in -- in terms of

15  my -- my analysis in the first part of my report,

16  she has an opportunity cost harm, because funds that

17  she owns are not -- are being held by Ocwen, rather

18  than returned to her --

19          MR. HEFFERON:  Okay.

20          THE WITNESS:  -- for -- for that period.

21  BY MR. HEFFERON:

22      Q.   But it's not as if she's going out to

23  borrow an additional sum in any way to make the

24  monthly payments, because her payment actually

25  hasn't increased during those two months?

1          MS. CHIU:  Objection.

2          THE WITNESS:  I don't disagree with your

3    characterization, but I also think that, from an

4    economic point of view, the -- the appropriate

5    analysis is what -- what her opportunity costs were.

6    BY MR. HEFFERON:

7        Q.   Okay.  I'm just focused on what the

8    borrower's experience is for now.  I'm putting your

9    opinion to one side.  It's not as if you're saying

10   that, in that first month and a half where the

11   escrow is delayed, it's not as if that borrower has

12   had to go out and seek additional funding for this

13   escrow overcharge, because her monthly payment

14   actually hasn't changed to what she says?

15          MS. CHIU:  Objection.

16          THE WITNESS:  Well, it may be that she has

17   other urgent needs and -- and because that money --

18   her money, that's being held by Ocwen, is not

19   available, she has to go finance that in a different

20   way.

21   BY MR. HEFFERON:

22       Q.   Okay.  And that's your concept of

23   opportunity cost?

24       A.   That's my concept of opportunity cost,

25   true.

1      Q.   But you don't have any reason to believe

2   that, because of the overcharge, the borrower -- a

3   typical borrower, who's experienced this delay, is

4   going out and borrowing extra money in order to make

5   those month and a half, two months' worth of monthly

6   payments?

7           MS. CHIU:  Objection.

8           THE WITNESS:  I don't -- that, to me, just

9   doesn't -- is not a sensible economic question.

10  That is to say, well, what you -- what you look at

11  economically is the borrower's current situation,

12  their availability of funds, their current needs,

13  their discount rate per what -- they're -- their

14  willingness to trade off future versus current

15  consumption.

16  BY MR. HEFFERON:

17     Q.   And --

18     A.   That's what's economically relevant.

19     Q.   Okay.  And I'm not asking the economic

20  question.  I'm actually asking the factual question.

21          And there is no reason to believe that a

22  borrower in this situation, experiencing the

23  overcharge, but still getting the same monthly

24  payments, is going out and borrowing the extra money

25  to make those monthly payments that she had already

Page 262

1   been making for the prior year?

2          MS. CHIU:  Objection.  Asked and answered.

3          THE WITNESS:  I -- I find your -- your

4   proposition to be incomplete, because you've not

5   told -- you've not told me what she would have done

6   had she, in fact, been -- had her money released to

7   her.

8   BY MR. HEFFERON:

9      Q.   That's true, I'm not telling you that.

10  I'm asking you whether, as a factual matter, you

11  have any reason to believe that a typical borrower,

12  experiencing a delay for these two months, is

13  actually going out and borrowing money to make the

14  payments on their loan if they had already been

15  current, making the same payment, for the prior

16  12 months.

17         MS. CHIU:  Objection.  Asked and answered.

18         THE WITNESS:  And I think the -- sorry.

19         I think the answer is, perhaps she was

20  already borrowing money.  If she had gotten her --

21  her -- some of her money back, she would have to

22  borrow less.  So maybe -- maybe she -- maybe she

23  used credit card debt to cover this, and she -- if

24  she had had those funds, she could have reduced her

25  credit card debt by that amount.  So to me, that's

1    the economic calculation that's relevant here.

2    BY MR. HEFFERON:

3        Q.   And that's speculation on your part.  You

4    don't know that people were borrowing credit card

5    payments to make the 12 monthly payments or these

6    extra two monthly payments?

7            MS. CHIU:  Objection.

8            THE WITNESS:  That's -- that's basic

9    economics.  I wouldn't call it speculation.  I would

10   call it what I do for a living.

11   BY MR. HEFFERON:

12       Q.   How many people use their credit card to

13   pay their mortgage?

14           MS. CHIU:  Objection.

15   BY MR. HEFFERON:

16       Q.   Anyone in America?

17           MS. CHIU:  Objection.

18           THE WITNESS:  I don't know the answer.

19   BY MR. HEFFERON:

20       Q.   Let's talk about the undercharges.  In a

21   situation, where the person has been undercharged as

22   a result of the delay, their escrow has been

23   undercollected for, again, the average of two

24   months; correct?

25       A.   Yes.

1  Q. Okay. And in that situation, they have

2 actually had the use of money for that -- those two

3 months, that otherwise, had their escrow been

4 calculated timely, they would instead have paid to

5 Ocwen; is that correct?

6  A. Correct.

7  Q. Okay. Does your calculation of

8 opportunity cost take into account the benefits to

9 these undercharged borrowers for the use of those

10 funds for the -- for the time between when they

11 should have had their escrow analyzed and when they

12 did?

13    MS. CHIU: Objection. Form.

14    THE WITNESS: No, I -- I do not do that.

15 In my -- I believe that's appropriate because I

16 believe that, at least from an economic standard and

17 perhaps even from a legal standard, harm to one

18 consumer is not offset by a benefit to a -- to

19 another consumer.

20    That is to say, you don't -- if your -- if

21 your conduct causes harm to some and a benefit to

22 the other, I don't -- I don't think you -- you're --

23 it's economically appropriate to net, and I'm not

24 sure it would be legally to net.

25 BY MR. HEFFERON:

1     Q.   Well, you're not a legal expert.

2     A.   No, but I -- I -- I am aware of enough of

3     the -- of the standards for calculating damages that

4     certainly, in cases I've worked on in -- in the

5     past, you cannot, in general, play off one group of

6     consumer sources off another.

7     Q.   You're not giving a legal opinion in this

8     case; correct?

9     A.   I'm sorry?

10    Q.   You're not giving a legal opinion in this

11    case; correct?

12    A.   I'm not giving a legal opinion.

13    Q.   Okay.

14    A.   And if it's --

15    Q.   Professor --

16    A.   -- I guess, a legal issue, I agree.

17    Q.   Professor McFadden, I'm not asking about

18    anybody other than the undercharged borrower.  So if

19    there is an undercharged borrower, she has had the

20    use of money for a couple of months, on average,

21    that had the escrow been analyzed, she would have

22    had to pay those funds to Ocwen; isn't that correct?

23         MS. CHIU:  Objection.

24         THE WITNESS:  That is correct.  She -- she

25    has a -- in -- in the opportunity cost terms

1    [verbatim], she has a combination of an opportunity

2    cost gain for those two months, followed by a

3    payment shock, in my terminology, in the sense that

4    Ocwen, at this point, would present her with a --

5    effectively present her with a bill for the

6    shortage -- accrued shortage.

7    BY MR. HEFFERON:

8        Q.   Okay.  In calculating the opportunity cost

9    for that borrower that I just hypothesized, I think

10   you just told me you don't take into account the

11   opportunity cost gain that that borrower

12   experienced?

13       A.   That's correct.

14            MS. CHIU:  Objection.

15   BY MR. HEFFERON:

16       Q.   Okay.  Would it be true, as an economic

17   matter, that the opportunity cost gain for the

18   theoretical borrower is going to be larger than the

19   opportunity cost that you calculate always?

20            MS. CHIU:  Objection.  Form.

21            THE WITNESS:  Could you explain what you

22   mean?

23   BY MR. HEFFERON:

24       Q.   That was a relatively simple concept.

25            So the question is, is the opportunity

Page 267

1  cost gain that this borrower receives, who was the

2  undercharged borrower, isn't it always the case that

3  that opportunity cost gain is going to be larger

4  than the opportunity cost loss that she suffers when

5  she had to then pay those sums to Ocwen after her

6  escrow was reanalyzed?

7          MS. CHIU:  Objection.  Form.

8          THE WITNESS:  I understand the question,

9  and the answer's yes.

10  BY MR. HEFFERON:

11      Q.    Okay.  Thank you.

12          What is your understanding of the reasons

13  why Ocwen sometimes delayed analysis of escrow?

14          MS. CHIU:  Objection.

15          THE WITNESS:  Let me begin by saying that

16  I have very little personal evidence on this.  I --

17  I know about this primarily from discussions with

18  counsel.  And my understanding is that Ocwen

19  acquired and onboarded a -- a very large number of

20  loans, and did not have servicing capacity and

21  software that could handle the on boarded loans

22  well.  That's -- that's my understanding --

23  that's -- that's the way it's been described to me,

24  that Ocwen got into these problems.

25  BY MR. HEFFERON:

1     Q.   I think you made reference earlier in the

2   testimony to something about the fact that the

3   delays didn't happen, or didn't happen at a high

4   rate after March of 2015.  Do you remember that

5   testimony?

6            MS. CHIU:  Objection.

7            THE WITNESS:  Yes.

8   BY MR. HEFFERON:

9     Q.   Okay.  Why don't you tell me again what it

10  is, because I'm sure I mischaracterized it.

11    A.   Yes.  If one -- if one looks at the number

12  of loans effected by escrow delays month by month,

13  that's a -- occurs at a relatively high rate through

14  2014.  It is actually at a -- at a high rate during

15  the first quarter of 2015, and then drops quite

16  precipitously and is at a -- quite a low rate

17  thereafter.

18    Q.   Okay.  And is it your understanding that

19  the reason for the delays in the pre-March 2015

20  period were staffing shortages?

21           MS. CHIU:  Objection.

22           THE WITNESS:  That's more specific than my

23  description that I've received from counsel, but

24  they -- they indicated that that appeared to be

25  one of the -- one of the factors that Ocwen did not

Page 269

1   deal with very well.

2   BY MR. HEFFERON:

3       Q.   Are you aware that loans with an untimely

4   escrow analysis -- strike that.

5           Were you aware that the vast majority of

6   loans, that experienced an untimely escrow analysis,

7   fell into one of two groups:  Group 1, where the

8   loans had an escrow due date between December '14

9   and March of '15, when Ocwen had a systems change;

10  and Group 2, where Ocwen had a practice of not

11  analyzing loans that were delinquent?  Are you aware

12  of that?

13      A.   I'm aware that those are -- I'm aware that

14  those are claims.  The first -- the second one was a

15  claim that I was aware of at the time I wrote my

16  first report.  And the second one, the -- the claim

17  that there was a system changeover in the first

18  quarter of 2015 --

19      Q.   Mm-hmm.

20      A.   -- I was not -- not aware of until I read

21  Dr. Halm's rebuttal.  I was aware, from my own

22  analysis, that something different did happen in

23  that quarter.

24      Q.   Okay.  And did you take into account

25  the -- in doing your analysis of the probability of

Page 270

1    an increased foreclosure, did you take into account

2    those two factors in reaching your conclusions?

3            MS. CHIU:  Objection.

4            THE WITNESS:  Let me -- let me -- this is

5    a multi- -- multipart answer, so the answer's, yes,

6    in my -- in my baseline model, I was taking into

7    account the adverse credit history of the -- of the

8    loan.

9            And in my surrebuttal, I -- I went further

10   and examined loans that -- that did not have an

11   adverse credit history, and were not actively

12   delinquent, to determine the impact of this

13   phenomenon, as you've described it, the phenomenon

14   that Ocwen was, as a matter of administrative

15   policy, not doing timely escrows when the loan was

16   currently delinquent up -- up in -- up before 2015.

17   BY MR. HEFFERON:

18       Q.   Okay.  And you then recalculated your

19   damages, based upon that analysis; correct?

20           MS. CHIU:  Objection.

21           THE WITNESS:  Well, I -- I -- I did a

22   robustness check on it and -- and took that to the

23   point of a final damage estimate that would be

24   associated with essentially excluding loans from the

25   analysis that were causing that issue.

1  BY MR. HEFFERON:

2      Q.   Okay.  So looking over at your surrebuttal

3  report, which is Exhibit 6, paragraph 53, let me ask

4  you about that.

5      A.   I'm sorry, which --

6      Q.   The surrebuttal is Exhibit 6, paragraph

7  53, page 29.

8      A.   I have that in front of me.

9      Q.   Okay.  And is that your calculation of the

10  damages, taking into account the analysis of both of

11  those two groups separately?

12      A.   There are two different issues.  Well, I

13  think in -- in the previous questions we were

14  discussing the issue of Ocwen administration --

15  administrative decisions to not process loans in

16  active default prior to 2015.  And the second is the

17  question of the treatment of the first quarter of

18  2015 separately.

19          Paragraph 53 is concerned with the second,

20  whereas the previous questions had been concerned

21  with the other.

22      Q.   Well, doesn't paragraph 53 talk about

23  analyzing both groups separately and then gives

24  separate numbers for -- for the first group of 89.2

25  to 122.7 and for the second group of 81.8 to 112.5?

1          MS. CHIU:  Objection.  Form.

2          THE WITNESS:  That's really a different

3    analysis than the -- than the analysis in which

4    loans with adverse credit histories are excluded.

5    Loans that are currently delinquent are excluded.

6    BY MR. HEFFERON:

7          Q.    And where does -- where does that analysis

8    appear in your surrebuttal report?

9          A.    Well, I'll find it.  It's -- it's in line

10   4 of -- of the final table, 7.  And that, in turn,

11   refers to paragraph 59.

12         Q.    Okay.  Let's look over at your surrebuttal

13   report on page 37, and there's commentary, starting

14   at paragraph 69, about Dr. Halm's critique of your

15   model for having unexpected coefficient signs.

16         Do you see that?

17         A.    Yes.

18         Q.    Okay.  And what's an "unexpected

19   coefficient sign"?

20         A.    Well, Dr. Halm points out that -- that

21   in -- in many studies of loan default, what you find

22   is that as the -- as the loan ages, the probability

23   of it becoming delinquent goes down.

24         And, secondly, that -- and macroeconomic

25   condition matter so that if the -- the economy goes

1  into a slump and borrowers are not earning as much

2  income, the risk of default goes up.  Those are

3  typical findings.

4           And in my analysis, these signs are not

5  always -- they don't always appear in my model.  It

6  has a -- it has a relatively straightforward

7  explanation.

8      Q.   Okay.  The -- in other words, what

9  Dr. Halm points out is that in your model, an

10 increase in unemployment rate lowers foreclosure and

11 investor-owned properties are less likely to

12 foreclose than owner-occupied and older loans have a

13 higher probability of foreclosure than younger ones?

14     A.   Yes.  By -- by the way, the last comment

15 is not quite right.  What the -- what the model

16 finds is that foreclosure risk rises for about the

17 first ten years, and then falls after that.  It's

18 not linear.  But what's going on here is that --

19     Q.   Well, first, let me give you a question.

20 So -- because I was just asking whether that's what

21 your model showed.

22          So you provide explanations in your view

23 about why the critique is not -- is not fair,

24 correct, paragraph 70, 71, and 72?

25          MS. CHIU:  Objection.

Page 274

1          THE WITNESS:  Yes, I -- I stand by those

2    explanations.

3    BY MR. HEFFERON:

4        Q.   Okay.  And in paragraph 71, the second

5    sentence, it says -- it refers to something called

6    "the usual principles of mortgage finance."

7             Do you see that?

8        A.   Yes.

9        Q.   As used in the sentence, it says "The

10   usual principles of mortgage finance need not

11   necessarily apply, as we are not comparing these

12   risky borrowers with a normal set of borrowers."

13            Do you see that?

14       A.   Yes.

15       Q.   Okay.  What are "the usual principles of

16   mortgage finance" that you're referring to?

17       A.   I would say it's the -- it's the

18   observations that I mentioned before; namely, if you

19   look at a -- a single class of borrowers, say

20   single-family borrowers, in an otherwise fairly

21   uniform group, you will -- you will find that

22   default risk has consistently signs of a particular

23   sign for various variables, like typ- -- like

24   typically a -- a -- as the loan ages, the default

25   risk will go down, et cetera.

1           Now, the -- a particular feature of these

2    loans is, they're not a representative sample of

3    U.S. borrowers for two reasons:  One is they are

4    clearly more risky than mortgages in the U.S. as a

5    whole; and, secondly, they are from loans that

6    are -- were heavily originated before -- before and

7    in the first years of the great recession.

8        Q.   Have you done an analysis to compare what

9    you refer to as a normal set of borrowers and --

10   with the borrowers that are at issue here, looking

11   at the default risk factors you identified

12   previously; namely, type of loan, lien status,

13   property type, income, principal balance, values,

14   CLTV, FICO?

15           MS. CHIU:  Objection.  Form.

16           THE WITNESS:  Yes, I have.

17   BY MR. HEFFERON:

18       Q.   You have compared those two groups?

19       A.   I've -- using the --

20           THE COURT REPORTER:  Using what data?

21           MS. CHIU:  Using what?

22           THE WITNESS:  Using MBS Data, I've -- I've

23   compared the Ocwen loans within the UBS -- MBS

24   sample with loans that are not Ocwen loans, just the

25   general class of loans.

1    BY MR. HEFFERON:

2        Q.   Okay.  And have you concluded that the

3    default risk factors between the two populations is

4    different enough, such that the usual principles of

5    mortgage finance do not apply --

6             MS. CHIU:  Objection.  Form.

7    BY MR. HEFFERON:

8        Q.   -- to the borrowers that you're looking

9    at, the Ocwen borrowers?

10            MS. CHIU:  Objection.  Form.

11            THE WITNESS:  I think they're -- they --

12   yes, they are sufficiently different so that some

13   of -- some of the effects you would expect in the

14   class of -- of mortgages as a whole in the U.S.

15   are -- you would not necessarily expect them to be

16   reproduced in the Ocwen portfolio.

17   BY MR. HEFFERON:

18       Q.   Such that the usual principles of mortgage

19   finance don't apply to them?

20            MS. CHIU:  Objection.  Form.

21            THE WITNESS:  If by that you mean things

22   like loan age, yes.

23   BY MR. HEFFERON:

24       Q.   Such that your analysis tells you that,

25   even though an increase in the unemployment rate

1  typically increases foreclosure initiation, that

2  usual principle of mortgage finance doesn't apply to

3  these highly risky borrowers, and instead an

4  increase in the unemployment rate actually lowers

5  foreclosure initiation?

6          MS. CHIU:  Objection.

7          THE WITNESS:  We're dealing with a

8  portfolio of la- -- of loans which, over time, is --

9  is in a period where foreclosure rates are going

10  down and unemployment rates are going down.  There

11  is an ecological correlation of those in which --

12  which, I think, is the explanation for the sign in

13  the -- in the model.  And that is simply a control

14  for the possibility of confounding macroeconomic

15  effects in these data.

16  BY MR. HEFFERON:

17      Q.   Now, I noted that, in your discussion of

18  the unexpected coefficient signs in paragraph 70 and

19  71, you don't cite anything.

20          Do you have any literature or support for

21  your statements in paragraph 70 and 71?

22          MS. CHIU:  Objection.  Form.

23          THE WITNESS:  Literature support, no.  My

24  own previous work on default risk, yes.

25  BY MR. HEFFERON:

1    Q.   And -- okay.  Do you agree with the

2    statement that in -- in designing a model, the

3    factors in the model should have a coefficient that

4    is consistent in direction and magnitude with --

5    consistent with economic reasoning?

6         MS. CHIU:  Objection.  Form.

7         THE WITNESS:  The answer is -- is no.  And

8    I will qualify the answer, which is that, if the

9    purpose of the model is to estimate the impact of a

10   particular factor, unconfounded by other factors,

11   then it's appropriate to include other factors in

12   the model, even though they are not entering with

13   a -- a priority expected sign; that is, their

14   purpose there is not to estimate their direct

15   impact; their purpose is to eliminate the

16   possibility that they are confounding [verbatim] the

17   results.

18        So in that situation, those variables

19   should be there whe- -- I think whether or not they

20   are compounding [verbatim].

21        But the second part of my answer is that

22   given -- given the nature of these data, given

23   this -- this portfolio, and given what was going on

24   with this portfolio over time as we --  as we

25   emerged from the financial recession, the -- the --

1   the standards of finance, which are based on

2   relatively stable populations, under stable

3   conditions, is -- is not applied.

4           This is, in -- I'd say, in a large part, a

5   statement that characteristics of loan portfolios,

6   which would hold under stationary conditions, are

7   not necessarily correct or realistic for -- for

8   these loans that are undergoing substantial dynamic

9   and environmental changes.

10  BY MR. HEFFERON:

11      Q.   And what's your literature support for

12  that?

13      A.   I don't need a literature support for

14  that.  That's -- that's commonsense economics.

15      Q.   So the answer is --

16      A.   Commonsense econometrics.  In terms of the

17  first part of my statement, that's standard

18  econometrics.  The second part of my statement is

19  just a simply, commonsense economic observation on

20  the turmoil that followed the financial recession.

21      Q.   And these loans all are ones that were

22  in 2014, '15, and '16; correct?

23      A.   I -- I didn't hear the question.

24      Q.   And these loans are all ones that were

25  in 2014, '15, and '16; correct?

1          MS. CHIU:  Objection.  Form.

2          THE WITNESS:  The loans originated at

3    various times in the -- in the past.  Is that -- is

4    that the question?

5    BY MR. HEFFERON:

6        Q.    The servicing at issue here is happening

7    in 2014, '15, and '16; correct?

8        A.    That's correct.

9        Q.    And is it your testimony that modeling of

10   the performance of those loans is not something that

11   has to be done consistent with modeling theory for

12   other types of loans at other times?

13         MS. CHIU:  Objection.

14   BY MR. HEFFERON:

15       Q.    Is that your statement?

16         MS. CHIU:  Objection.

17         THE WITNESS:  No.  My statement is that

18   what you would expect to be -- have true about

19   portfolio mortgages in a -- in a stationary static

20   situation, does not necessarily carryover to a

21   dynamic situation, such as we were in, in the period

22   of analysis in this case.  These were loans that

23   were, I think, clearly impacted by the fact that

24   they were originated in the year -- a few years

25   before or up to the time of the financial crisis.

1   BY MR. HEFFERON:

2       Q.   So -- so as part of your analysis, you

3   considered the nature of the loans and of the

4   borrowers who took out these loans in trying to

5   figure out whether the for- -- whether the escrow

6   delay was a contributing factor to being foreclosed;

7   correct?

8           MS. CHIU:  Objection.  Form.

9           THE WITNESS:  Yes.  I -- I controlled for

10  the possible confounding factors that could have

11  been confounding me, because they were data

12  contained in the Ocwen records.

13          MR. HEFFERON:  Okay.  I'm going to strike

14  everything after the word "yes."

15  BY MR. HEFFERON:

16      Q.   So the -- what are the primary reasons why

17  borrowers default on home mortgage?

18          MS. CHIU:  Objection.  Form.

19          THE WITNESS:  Well, the obvious proximate

20  cause is that they fail to make payments and fall

21  more than 90 days delinquent.

22  BY MR. HEFFERON:

23      Q.   Okay.  And why -- what are the -- the

24  chief reasons why they fail to make payments and as

25  a consequence, become more than 90 days delinquent?

Page 282

1      A.    There can be a variety of reasons for

2  that.

3      Q.    Which is why I asked you:  What are the

4  chief reasons?

5            MS. CHIU:  Objection.

6            THE WITNESS:  Well, obvious ones are

7  medical emergencies, deaths, divorces, bad financial

8  management, loss of job.

9  BY MR. HEFFERON:

10     Q.    Okay.  You told me that you took into

11  account, in designing your model, the

12  characteristics of the borrowers and of the loans,

13  in determining whether the escrow delay was a

14  contributing factor.

15           Did you take into account, in this

16  population, their relative experience with medical

17  emergencies, death, divorce, loss of job?

18           MS. CHIU:  Objection.

19           THE WITNESS:  It would not have been

20  appropriate to do so.  The model treats these --

21  treats this in an appropriate way.  Namely, there is

22  a treatment, which is either they experience a

23  escrow delay or not.  And then that population is

24  followed, in terms of whether they have the

25  consequence of a foreclosure initiation.

1          The treatment will have effects.  To the

2    extent that the model predicts that the treatment

3    will have effects, it will have effects on

4    borrowers -- borrowers who are more or less

5    vulnerable to a foreclosure initiation.  And

6    certainly, the factors such as unemployment, death,

7    medical emergencies, are powerful contributing

8    factors.

9          The issue in the model is, whatever are

10   the proximate contributing factors, did the

11   treatment, the escrow delay, have a differential or

12   incremental impact.

13   BY MR. HEFFERON:

14      Q.   Okay.  So in designing your model and

15   justifying the fact that its coefficient signs were

16   inconsistent with econometric practice, you said

17   that it was important to take into consideration the

18   borrowers' situations and the types of loans, but

19   now you're telling me the model did not take those

20   factors into account; is that your testimony?

21          MS. CHIU:  Objection.

22          THE WITNESS:  I object to your question.

23   First of all, I did not say what I did was

24   inconsistent with econometric practice.  I think it

25   is consistent with best economic -- econometric

1   practice.  That's a very unfair mischaracterization

2   of what I did.

3   BY MR. HEFFERON:

4       Q.   Well, the testimony will show --

5       A.   And secondly, I've testified that it's

6   appropriate in this model to look at the impact of

7   the treatment of the outcome of a foreclosure

8   initiation.  That model does not require, nor would

9   it be appropriate to introduce factors downstream

10  from that.

11           The issue is what -- and not whether

12  someone becomes unemployed or not.  It's be- --

13  whatever their circumstances afterwards, whether it

14  was -- whether the risk of their going into a

15  foreclosure initiation, as the result of whatever

16  happened to them, otherwise was increased by the

17  escrow delay.

18      Q.   So it's your testimony that, in

19  determining whether the borrower was referred to

20  foreclosure, potentially, because of an escrow

21  delay, that the issue is not whether that person

22  became unemployed; correct?

23           MS. CHIU:  Objection.

24           THE WITNESS:  I -- I've explained how --

25  what -- what the basis of this model is.  And the

1   basis of the model is to ask the question, would the

2   probability of foreclosure initiation rise if they

3   were treated to an escrow delay versus the but-for

4   alternative, they were not.  That -- that--

5   BY MR. HEFFERON:

6       Q.   And it's irrelevant --

7       A.   Let me finish my sent- -- response.

8            That's -- that's the probability that I

9   determined.  Now, in terms of how that foreclosure

10  initiation comes about, what -- what the approximate

11  cause of failing to keep the loan current, other

12  intervening causes, such as death or medical

13  emergencies, all those things can happen, but they

14  are not required, nor are they needed for the

15  appropriate application of this model.

16       Q.   So you've included in your model, people

17  who died.  And you don't take them out because

18  you're trying to figure out whether the dead person

19  was potentially not able to pay because of an escrow

20  delay; is that correct?

21            MS. CHIU:  Objection.  Mischaracterizes

22  testimony.

23            THE WITNESS:  The model examines the

24  question of whether Ocwen escrow delays influenced

25  the probability of foreclosure initiation.  That

1   foreclosure initiation may involve other intervening

2   and proximate factors, certainly one of which would

3   be that the primary payer died and the managers of

4   the estate are then not able to maintain the

5   payments.  That's certainly -- that's certainly a

6   possibility.

7   BY MR. HEFFERON:

8       Q.   And in those possibilities, you would

9   agree with me, wouldn't you, that there is zero

10  possibility that the reason the loan was referred to

11  foreclosure was because of an inability to pay due

12  to the escrow delay?

13          MS. CHIU:  Objection.

14          THE WITNESS:  Please restate your

15  question.

16  BY MR. HEFFERON:

17      Q.   Sure.  And in those possibilities, you

18  would agree with me, wouldn't you, that there is

19  zero possibility that the reason the loan was

20  referred to foreclosure was because of an inability

21  to pay due to the escrow delay?

22          MS. CHIU:  Objection.

23          THE WITNESS:  If -- if I understand your

24  question, the answer is, the model does not claim

25  that.  The analysis does not claim that.  The

1   analysis does not require such a claim.  And I'm not

2   making such a claim.

3   BY MR. HEFFERON:

4        Q.   As an economist, you would agree with me,

5   wouldn't you, that if someone is this -- is the sole

6   obligor on the loan, and they lose their job because

7   of a serious illness, where they become disabled and

8   have no income, that there is a zero possibility

9   that that loan was referred to a foreclosure because

10  of the escrow delay?

11            MS. CHIU:  Objection.  Incomplete

12  hypothetical.

13            THE WITNESS:  The relevant -- the relevant

14  comparison is to ask the following question:

15  Suppose a mortgage -- a borrower experiences an

16  adverse event following an escrow servicing delay.

17  Is -- is the probability of that adverse event,

18  leading to a foreclosure initiation, higher if they

19  experienced an escrow delay than if they did not?

20            That -- that's the relevant question, and

21  that's what my model predicts.

22  BY MR. HEFFERON:

23       Q.   And for people whose adverse event was

24  death, complete disability, loss of job,

25  incarceration, that the probability that any of

1    those events led to a foreclosure initiation was not

2    higher if they had also experienced an escrow delay;

3    isn't that true?

4            MS. CHIU:  Objection.

5            THE WITNESS:  No.  I disagree with that.

6    I -- there's -- that -- that's not a -- adverse --

7    adverse events happening in these households may be

8    resolved in -- in a -- in a variety of ways.  And on

9    the -- if the escrow delay had an impact, as the

10   model says it does, on -- on the probability, then

11   that's essentially saying that there was an escrow

12   delay and -- and an subsequent impact on the

13   borrower's finances from that point on.

14           It could have made a difference, even if

15   they -- the foreclose -- the approximate cause of

16   foreclosure was the death of the principal payer, it

17   could make any difference in -- in how it's resolved

18   from that point, what the ability of the status to

19   pay.

20           The model does not analyze at that

21   granularity.  It's essentially analyzing the

22   question as to whether this overall population is

23   impacted by these treatments.  You're -- you're --

24   what you're doing -- I'll make an analogy to what

25   you're -- you're doing.  You're essentially --

1    BY MR. HEFFERON:

2         Q.    Mr. --

3         A.    I would like to finish my sentence.

4         Q.    This is not your answer.  This is a --

5    this is a speech.  You answered the question, which

6    is your belief is, you disagree with my statement.

7    If your counsel wants to ask you a question to

8    induce you to give a speech, that's fine.  But I'm

9    not going to allow you to keep going.  You answered

10   my question.

11            My next question.

12            MS. CHIU:  He wasn't finished with his

13   answer.

14   BY MR. HEFFERON:

15        Q.    Oh, my next question, Professor.

16            Are you aware that Ocwen has records of

17   the reported reason for defaults for each of these

18   loans?

19        A.    Yes.  And if you'll allow me to finish my

20   question [sic], it's completely immaterial.

21        Q.    The -- okay.  And you didn't consider any

22   of those records?

23        A.    I did consider those records.  Those --

24   those records are completely irrelevant.

25        Q.    Okay.  So you didn't use them?

Page 290

1      A.    That's correct.

2      Q.    Okay.  I take it, Professor, you've never

3  had difficulty making your mortgage payments?

4            MS. CHIU:  Objection.

5            THE WITNESS:  What's the -- why is that a

6  germane question to my report?

7  BY MR. HEFFERON:

8      Q.    I'm trying to understand whether you have

9  any basis in the real world for understanding how

10  people deal with difficulties, such as the type I

11  described, and whether that makes them more or less

12  likely to pay their mortgage.

13            MS. CHIU:  Objection.

14            THE WITNESS:  I'm -- I'm not sure how to

15  an- -- answer your question.  I -- I don't believe

16  my personal finances are at issue in this case.

17  BY MR. HEFFERON:

18      Q.    So you -- so I take it that means you've

19  never had difficulty making mortgage payments, so

20  you don't understand how people who are facing these

21  kinds of difficulties address them?

22            MS. CHIU:  Objection.  That

23  mischaracterizes testimony.

24            THE WITNESS:  I find that -- you're now

25  con- -- confounding my personal financial history

1    with my understanding of personal finance.  And the

2    answer is, those are two separate questions

3    entirely.

4    BY MR. HEFFERON:

5        Q.   Just trying to understand if you have any

6    basis, other than the theoretical, for providing

7    your opinion.  And so maybe I'll just ask that.

8             Do you have any basis, other than

9    theoretical econo- -- econometrics or econometric

10   theory, for providing your opinion here today?

11            MS. CHIU:  Objection.

12            THE WITNESS:  Yes.

13   BY MR. HEFFERON:

14       Q.   Let me ask the question again, because I

15   sort of fumbled the words.

16            Do you have any basis, other than

17   econo- -- econometric theory for providing your

18   opinions?

19       A.   Yes.

20       Q.   What basis do you have, other than theory?

21       A.   I'm familiar with a literature on

22   financial literacy and the -- and the problems that

23   people have.  I have, myself, conducted experiments

24   on -- and designed questionnaires, and analyzed data

25   on financial literacy.

Page 292

1      Q.   Any other basis?

2           MS. CHIU:  Objection.  Form.

3           THE WITNESS:  That -- that's the basis

4  enough.

5  BY MR. HEFFERON:

6      Q.   Is there some basis you're not telling me

7  about, or is that the whole basis --

8      A.   I don't understand what it means -- basis

9  I'm not telling you about, what do you mean?

10     Q.   You said that's basis enough.  I wanted to

11 find out if there's some basis you're not telling

12 me.

13          MS. CHIU:  Objection.  Form.

14          THE WITNESS:  I'm -- I'm telling you I

15 have a basis.  I have experience and I have a basis

16 for understanding the problems that people have with

17 their finances getting out of whack.

18 BY MR. HEFFERON:

19     Q.   But you don't take that into account in

20 designing your model because to you, it's irrelevant

21 whether the person is suffering from a death or a

22 complete disability or unemployment or a loss of

23 job, in trying to answer the question of whether it

24 is more likely that those loans will be referred to

25 foreclosure because of an escrow delay; that's

Page 293

1    correct, isn't it?

2            MS. CHIU:  Objection.  Mischaracterizes.

3    Objection.

4            THE WITNESS:  The answer is, that's

5    basically correct, because while there would be

6    proximate causes for foreclosure initiation, the

7    issue is, does an escrow delay change the

8    probability that those -- whatever

9    those approximate -- proximate causes are, they

10   will, in fact, lead to the foreclosure initiation.

11   That's -- that's the issue in the case.

12   BY MR. HEFFERON:

13        Q.   Let me take a look at your report.  If you

14   would go back to Exhibit 5.  And in the beginning of

15   Exhibit 5, paragraph 27 at page 12, do you see

16   Table 2?  Do you see that on page 12?

17        A.   Yes.

18        Q.   Okay.  And Table 2, what is that?

19        A.   Table 2 is a count of servicing failures

20   identified by Ocwen.

21        Q.   In fact, it -- it's actually servicing

22   failures that you don't account for as part of your

23   damages analysis; isn't that correct?

24        A.   Those are failures which I -- for which I

25   have not produced an estimate of harm.

Page 294

1          Q.    Okay.  So you have no opinion as to the

2     damages that were incurred as a result of loan

3     verification errors?

4          A.    Correct.

5          Q.    And you have no opinion as to the damages

6     that were incurred as a result of failure to send

7     annual escrow statements?

8          A.    Correct.

9          Q.    And you have no opinion of the damages

10    that were incurred as a result of providing

11    inaccurate reinstatement quotes?

12         A.    Correct.

13         Q.    And you have no opinion of the damages

14    incurred as a result of escrow shortage errors?

15         A.    Correct.

16         Q.    And you have no opinion of the damages

17    incurred as a result of interest-only errors?

18         A.    Correct.

19         Q.    Let's look at the back of your report.

20    Okay.  Hold on a second.  Page 62, paragraph 124.

21    And starting at that point, and continuing on to the

22    end of your opinion, at page 68, paragraph 135, you

23    have an identification of what you have referred to

24    as "cost not quantified to the borrower and

25    community."

Page 295

1       Do you see that?

2       A.   Yes.

3       Q.   Okay.  And your statements made in these

4  pages, between page 62 and 68, are observations of

5  cost that you have not quantified; is that correct?

6       A.   That's correct.  These are -- these are

7  costs identified in the literature, but I have not

8  attempted to quantify them in this case.

9       Q.   Okay.  And you have no opinion of the

10 damages that were incurred as a result of borrowers

11 receiving inaccurate or untimely information about

12 their loans?

13       MS. CHIU:  Objection.

14       THE WITNESS:  My opinion is that they are

15 potentially additional harms.

16 BY MR. HEFFERON:

17       Q.   Okay.  But you have -- you have no damage

18 calculation or estimate for loss resulting from the

19 receipt of inaccurate or untimely information?

20       A.   That's correct.

21       Q.   Okay.  And over on page 65, prior to

22 paragraph 131, you have -- start a section that has

23 to do with credit reporting.

24       Do you see that?

25       A.   Yes.

Page 296

1      Q.   Okay.  I think we covered this before.

2   But you have no damage calculation or estimate for

3   the loss resulting from any credit reporting, data

4   inaccuracies that arised -- arose as a result of

5   Ocwen servicing?

6      A.   That -- that is correct.  I think they may

7   be significant, but I have made no estimate of it.

8      Q.   Okay.  And then, over the next page, in

9   the bottom, just before paragraph 134, you have some

10  observations about cost on communities.

11          Do you see that?

12     A.   Paragraph 134, yeah.

13     Q.   Just before that paragraph 134.

14     A.   Yes.

15     Q.   And you had no damage calculation or

16  estimate for the cost or damages to communities

17  through reduced property values and tax revenues

18  supposedly arising from Ocwen's servicing errors; do

19  you?

20     A.   It's correct.  I have not made any

21  estimate of those costs.

22     Q.   Okay.  As to any of these items we just

23  reviewed, namely, the receipt of timely information,

24  the credit reporting, and the cost of communities,

25  do you have any plan or have you been given any

Page 297

1    request to conduct any sort of damage calculation or

2    estimate?

3        A.   I have not.

4        Q.   Okay.  Do you anticipate conducting such

5    an estimate or calculation for any or all of those

6    items?

7        A.   I certainly have not been asked to do so,

8    so I -- on the basis of current information, no, I

9    do not anticipate doing that.

10       Q.   Okay.  I'm going to ask the same question.

11   You can refer, on page 12, but it's the same

12   question:  With respect to the items listed on

13   page 12, where you identified servicing events as to

14   which you have not calculated damages, the five

15   listed there on page 12, Table 2, do you anticipate

16   conducting any sort of damage analysis or

17   calculation with respect to one, some, or all of

18   those five items?

19       A.   I do not.

20       Q.   Okay.  Have you been asked to do that?

21       A.   No, I have not.

22            MS. CHIU:  Tom?

23            MR. HEFFERON:  Okay.  Wait.

24            MS. CHIU:  We've been going for about an

25   hour.  So before you go into your next topic, I just

1   wanted to see if we could take a quick break, if

2   that makes sense.

3            MR. HEFFERON:  Well, I'm almost done and I

4   only have 20 minutes anyway, so let me finish up,

5   unless you -- unless you really insist, in which

6   case, we can take a break.

7            MS. CHIU:  Ask the witness.

8            Are you -- do you need a break?

9            THE WITNESS:  I'm -- I'm okay.

10           MR. HEFFERON:  Okay.

11           MS. CHIU:  You can proceed.

12  BY MR. HEFFERON:

13      Q.   Professor McFadden, --

14           MR. HEFFERON:  Let's mark this as the next

15  exhibit.  Let me take one.  Thank you.

16           THE COURT REPORTER:  8.

17           MR. HEFFERON:  8.

18           (McFadden Deposition Exhibit 8 was

19           marked.)

20  BY MR. HEFFERON:

21      Q.   Professor McFadden, I'm handing you what's

22  been marked as Exhibit 8, which is a summary

23  document that was given to us by the CFPB's counsel,

24  which indicates -- what does it indicate, if you

25  know?

Page 299

1    A.   These are my total hours billed to this

2  project, from its inception to my last statement, to

3  Brown -- Brattle, which was the last day of

4  December.

5    Q.   Okay.  And since December 31, 2019, and up

6  until -- but not including today, how much

7  additional time have you spent on this matter?

8    A.   I haven't done that calculation in detail,

9  but I would say probably close to ten days.

10   Q.   How many hours is that?

11   A.   80 hours.  That may be a little high.

12   Q.   And your hourly rate is -- I can't do the

13 math that quickly.

14   A.   I think it's 1,100.

15   Q.   Is that your -- your normal or typical

16 rate that is then being charged in this matter, or

17 is there -- is that a different rate from what rate

18 you took -- you charge others?

19       MS. CHIU:  Objection.

20       THE WITNESS:  This is my normal rate.

21 BY MR. HEFFERON:

22   Q.   And how did you set that rate?

23   A.   I -- I had advice from my associates from

24 the Brattle Group as what -- what's appropriate for

25 experts.

1    Q.   Prior to the end of December 2019, during

2  the period where you spent 105 hours, you produced

3  the -- the report and you produced the rebuttal

4  report; correct?

5    A.   Correct.

6    Q.   Okay.  And what time of the 105 hours,

7  just estimate, did you spend that wasn't involved in

8  either one of those two tasks?

9    A.   In -- in the report preparation itself?

10  I -- I certainly do not have very firm numbers, but

11  I suppose three or four full days on each -- three

12  days, maybe, on each.

13    Q.   And that's eight hours; right, that's what

14  you --

15    A.   Yes.

16    Q.   Okay.  Other than the work on the reports,

17  what occupied the remainder of -- of your

18  50, 60 hours in that period?

19    MS. CHIU:  Objection to form.

20    THE WITNESS:  Initially, I was involved in

21  ad- -- advising CFPB on what data to ask for, what

22  would be needed for the analysis, and in formulating

23  a framework for the analysis.  And then, over -- I

24  was involved very -- involved, very likely, for a

25  long period while those data were requested and came

1  back in.  And then I became active again when those

2  data were available for analysis.  And at that

3  point, I was directing the staff as to how to do the

4  analysis.

5  BY MR. HEFFERON:

6      Q.    Okay.  And then, since the end of December

7  of 2019, where you identified that you spent, you

8  thought, probably about 80 hours, maybe a little

9  less, what's been the primary thing or things that

10  have occupied your time?

11          MS. CHIU:  Object to form.

12          THE WITNESS:  Well, a great deal of it has

13  been spent rereading the various reports and

14  refreshing my memory of the RFP responses and the

15  interrogatory responses.

16  BY MR. HEFFERON:

17      Q.    Anything else?

18      A.    I -- I met, I think, for a total of two or

19  three days with counsel.

20          MR. HEFFERON:  Let's mark this as the next

21  exhibit.

22          (McFadden Deposition Exhibit 9 was

23          marked.)

24          THE COURT REPORTER:  9.

25          MR. HEFFERON:  9.  Thank you.

1   BY MR. HEFFERON:

2       Q.   Professor McFadden, I've handed you what's

3   been marked as Exhibit 9, which is a -- an article

4   that you cited in your report -- your surrebuttal

5   report on page 17.

6            And my question for you, sir, is whether

7   you can recall reviewing this document at any time.

8       A.   The answer is I -- I did not personally

9   review this.  The status of this was that I asked --

10  I said, in response to Dr. Halm's claim, that these

11  models are used all the time, and I'm -- go -- go

12  find the -- the papers and documents so -- where

13  that appears, so that he can be apprised of that

14  literature.

15      Q.   Okay.  And -- and then you cited this in

16  the surrebuttal report; correct?

17      A.   Correct.

18      Q.   Okay.  And you -- in doing so, you believe

19  that this was authoritative; correct?

20           MS. CHIU:  Objection.

21           THE WITNESS:  The answer is that this --

22  this was collected for me by staff, as examples of

23  the use of discrete response models, which is my

24  specialty, and proportional hazard models, which fit

25  within that in -- in this literature.

1          The question was had -- had this model

2     been used before in this literature, and the answer

3     is, yes, by, not only myself, but by others.  And I

4     asked for a collection of things in the literature

5     which demonstrated that.

6     BY MR. HEFFERON:

7          Q.   Okay.  And, in fact, you cite this study

8     for the proposition that models like the one you use

9     are commonly used by industry participants?

10         A.   I forget my exact language, but I would --

11    I would agree with that sentiment.

12         Q.   Okay.  And this was the only study you

13    cited in that proposition?

14              MS. CHIU:  Objection.

15              THE WITNESS:  Oh, I think that -- I think

16    that these kinds of models are -- are, in fact,

17    widely used in industry.  I'm unaware of specific

18    instances, but they're, in fact, quite widely used,

19    and I think Dr. Halm made a mistake by not -- not

20    relating proportional hazard models to the broader

21    class of discrete outcome models, which are used for

22    mortgage default analysis.

23    BY MR. HEFFERON:

24         Q.   And you think this study, Exhibit 9, is a

25    good example of the proper use of proportionate

1    hazard models?

2         A.   The Stein study?

3         Q.   Number 9, Stein, yes.

4         A.   I think it is an example of the use of

5    these models.

6         Q.   Okay.  Do you think there is anything

7    wrong with it?  You wouldn't have if -- if you --

8    you wouldn't have cited it if you thought there was

9    something wrong with it; would you?

10             MS. CHIU:  Objection.

11             THE WITNESS:  I'll explain the sequence

12   here, which is I ask staff to locate papers in this

13   literature just so -- to demonstrate that this was

14   not a novel model that had not been used in finance

15   before.

16   BY MR. HEFFERON:

17        Q.   So you're not willing to take a position,

18   one way or the other, whether this is authoritative

19   or a proper use of proportionate hazard models?

20        A.   No.  I'll take the position that my use

21   was appropriate.

22        Q.   I'm not asking that.

23        A.   And I believe the best -- a very suitable

24   model for this purpose.  And if Dr. Halm doubts that

25   that's a standard model or a model that's previously

1    been used in this literature, then I will have the

2    staff find some -- find some papers which show that

3    that's, in fact, the case.

4        Q.   So you're not one -- you're not going to

5    take a position, one way or the other, whether this

6    study, Exhibit 9, is authoritative or a proper use

7    of the proportionate hazard model?

8             MS. CHIU:  Objection.

9             THE WITNESS:  The answer's I -- that's

10   correct, I'm not taking a stand.

11            MR. HEFFERON:  Okay.

12            All right.  Why don't we take a break.

13            THE VIDEOGRAPHER:  This is the end of

14   Media 8.  We're going off the record at 5:45 p.m.

15            (Short recess taken.)

16            THE VIDEOGRAPHER:  This is the beginning

17   of Media 9.  We are going back on the record at

18   6:00 p.m.

19   BY MR. HEFFERON:

20       Q.   Professor McFadden, we've had a break.  Is

21   there anything, upon reflection, that you would like

22   to change or amend in your prior testimony?

23       A.   No.

24            MR. HEFFERON:  Subject to the statement I

25   made that -- about holding the record open and this

Page 306

1    deposition for failure to produce certain

2    information, I have no further questions of this

3    witness.

4          MS. CHIU:  I have some questions for

5    redirect.

6          THE COURT REPORTER:  Counsel, do you mind

7    putting the mic a little closer to you?

8                        EXAMINATION

9    BY MS. CHIU:

10   Q.   Professor McFadden, previously you were

11   asked what costs you included in calculating

12   foreclosure costs for a borrower who had their

13   foreclosure sale rescinded; is that right?

14   A.   I'm sorry, I'll have to ask you to speak a

15   little louder.  I'm not hearing you.

16   Q.   Professor McFadden, previously you were

17   asked what costs you included in calculating a

18   foreclosure cost for a borrower who had a

19   foreclosure sale rescinded.

20        Do you remember Mr. Hefferon asking you

21   about that?

22   A.   Yes.

23   Q.   I just want to confirm your opinion for

24   the record, so I'm going to direct your attention to

25   your second amended report, which was Exhibit 5,

1    Table 14.  It's on page 60.  Let me know when you're

2    there.

3         A.   Yes.

4         Q.   Okay.  And Table 14 is titled "Foreclosure

5    Cost by Stage of Foreclosure Process and Average

6    Foreclosure Costs to Homeowners."  Is that right?

7         A.   Yes.

8         Q.   And I would like to direct your attention

9    to the second column, "Foreclosure Rescinded,"

10   Column B.

11            Do you see that?

12        A.   Yes.

13        Q.   And three rows down under "Foreclosure

14   Costs, Ocwen and Public Sources," there's a line

15   that reads "Legal and Administrative Fees."

16            Do you see that?

17        A.   Yes.

18        Q.   And there's an amount next to that under

19   "Foreclosure Rescinded" in Column B.

20            Do you see that number?

21        A.   I do.

22        Q.   The 1,086 --

23        A.   Correct.

24        Q.   -- is that right?

25            You -- did you include the legal and

Page 308

1  administrative costs for recessions, this 1,086, in

2  calculating foreclosure costs for borrowers who had

3  their foreclosure sale rescinded?

4          MR. HEFFERON:  Objection --

5          THE WITNESS:  I did.

6          MR. HEFFERON:  Objection.  Leading

7  question.  Impermissible to lead your own witness.

8  Lacks foundation.

9  BY MS. CHIU:

10     Q.   Is that right?

11     A.   That -- as this table demonstrates, that's

12  exactly right.

13         MS. CHIU:  I have -- I have no further

14  questions.

15         MR. HEFFERON:  I have a question or two of

16  Professor McFadden.

17                    FURTHER EXAMINATION

18  BY MR. HEFFERON:

19     Q.   Professor McFadden, I think you just

20  testified on redirect that there's an amount of

21  legal and administrative fees of 1,086 for

22  situations where Ocwen rescinded the foreclosure.

23         What does it mean to "rescind a

24  foreclosure"?

25     A.   My understanding is that it was a -- a

1  legal ruling that the foreclosure was improper and

2  the borrowers reinstated.

3      Q.   Okay.  And where did you gain that

4  understanding?

5           MS. CHIU:  Objection.  This was asked and

6  answered previously.

7  BY MR. HEFFERON:

8      Q.   Where did you gain that understanding,

9  sir?

10     A.   That's -- that's -- that's described to me

11  by counsel.

12     Q.   Okay.  Do you have any other basis for

13  understanding what it means to rescind a

14  foreclosure?

15     A.   No.

16     Q.   Okay.  In a situation where Ocwen has

17  referred somebody to foreclosure, and then the

18  process does not complete for some reason or

19  another, is that a rescinded foreclosure, or is that

20  not a rescinded foreclosure in your definition?

21     A.   Please repeat the question.

22          MS. CHIU:  Objection.  Incomplete

23  hypothetical, and this is outside the scope of our

24  redirect.

25  BY MR. HEFFERON:

Page 310

1       Q.    Do you want me to repeat a question?

2       A.    Please.

3       Q.    Okay.  In a situation where Ocwen referred

4    a file to foreclosure, and the foreclosure did not

5    complete, and the foreclosure instead was withdrawn,

6    is that within your definition of a rescinded

7    foreclosure?

8            MS. CHIU:  Objection.  This is outside the

9    scope of redirect.

10           THE WITNESS:  I'm not sure what

11   "withdrawn" means, but in the -- in the Ocwen data,

12   I do not believe that would be identified as

13   rescinded.

14   BY MR. HEFFERON:

15      Q.    What's the basis for that belief?

16      A.    Well, I'm not sure what "withdrawn" means.

17   Rescinded, I think, has a specific meaning in the

18   Ocwen data.

19      Q.    So --

20      A.    But your term, "withdrawn," I -- I

21   don't -- I can't relate that to particular fields in

22   the Ocwen data.

23      Q.    Okay.  So you have no understanding of

24   what it means, in the world of mortgage servicing,

25   to withdraw a foreclosure?

1          MS. CHIU:  Objection.  Misstates the

2     testimony.  This is also outside the scope of our

3     redirect.

4          THE WITNESS:  No.  No, I -- I -- as --

5     as -- as opposed to the terms that are used in

6     Ocwen's documents, no, I don't know what your use of

7     the term would mean.

8     BY MR. HEFFERON:

9          Q.   Okay.  So when you're talking about a

10    rescinded foreclosure for purposes of your

11    testimony, and for purposes of the redirect

12    questions, you're talking about a loan account where

13    a foreclosure sale actually occurred and then was

14    later rescinded?

15         A.   I do not --

16         MS. CHIU:  Objection.

17         THE WITNESS:  -- believe that recensions

18    are limited to sales.  I think they, in fact -- I

19    don't have the data.  I understand that they're the

20    result of a legal response to the borrower, that the

21    foreclosure initiation is improper, and they

22    would most -- I think most typically occur before a

23    foreclosure sale.

24    BY MR. HEFFERON:

25         Q.   Well, you referred to rescinding the

Page 312

1    foreclosure.  Are you talking instead about

2    rescinding the foreclosure proceeding?

3              MS. CHIU:  Objection.

4    BY MR. HEFFERON:

5         Q.   I'm just trying to understand your

6    testimony, sir.

7              MS. CHIU:  Objection.  Form.

8              THE WITNESS:  I -- I don't recall this

9    now, the specifics from the Ocwen data, but my -- my

10   general recollection is that there are foreclosure

11   initiations, and then there are Ocwen records that

12   show that a property -- a property was rescinded

13   without a recorded sale.  That's my recollection.

14   BY MR. HEFFERON:

15        Q.   Okay.  And it would be your testimony that

16   this sub- -- subpart of your damages only relates to

17   a situation where a foreclosure proceeding was

18   rescinded because of a legal determination that the

19   foreclosure proceeding was improper?

20             MS. CHIU:  Objection.  Form.  It's outside

21   the scope of --

22             THE WITNESS:  My understanding from --

23             MS. CHIU:  -- redirect.

24             THE WITNESS:  My understanding from

25   counsel is that rescinded means that -- that it was

1   legally reversed, that the foreclosure initiation,

2   the -- from -- from the -- the initial filing of

3   papers for foreclosure was -- was, in a judicial

4   proceeding, declared improper, and that -- so the

5   whole process was stopped.

6   BY MR. HEFFERON:

7       Q.   Okay.  So this would only involve

8   situations where there was a judicial ruling that

9   the procedure was improper?

10          MS. CHIU:  Objection.

11          THE WITNESS:  My only knowledge of this is

12   from instructions from counsel that -- my

13   understanding from counsel is -- is that's

14   associated with a judicial finding, yes.

15   BY MR. HEFFERON:

16      Q.   Okay.  And it's your understanding that

17   something recorded as a rescission in Ocwen's

18   records are only those situations where there is a

19   judicial finding that there was an improper

20   foreclosure started?

21          MS. CHIU:  Objection.

22          THE WITNESS:  I don't specifically know

23   that.  I -- I asked for the definition of

24   rescission, and I've described what was explained to

25   me.

Page 314

1    BY MR. HEFFERON:

2         Q.   Okay.   And -- and in those situations that

3    were explained to you, that's your interpretation of

4    what it means to have a rescinded foreclosure for

5    purposes of your calculations?

6              MS. CHIU:   Objection.

7              THE WITNESS:   The explanation I received

8    is that a recension is associated with a judicial

9    finding.

10   BY MR. HEFFERON:

11        Q.   Of impropriety?

12             MS. CHIU:   Objection.

13             THE WITNESS:   I -- I -- if I stated

14   "impropriety," I -- I -- I think that goes beyond

15   what I was told, that it -- that it's just the --

16   it's a reversal of the process or a termination of

17   the process as a result of a judicial finding.

18             MR. HEFFERON:   Okay.   I have no further

19   questions.

20             THE COURT REPORTER:   Off the record?

21             MR. HEFFERON:   Thank you.

22             MS. CHIU:   Yeah.

23             THE VIDEOGRAPHER:   This concludes the

24   deposition on February 4th, 2020.   Master media will

25   be held by TSG Reporting.   We are now going off the

Page 315

1     record at 6:10 p.m.

2              (Proceedings concluded, 6:10 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          JURAT

2

3          I, DANIEL McFADDEN, do hereby certify

4    under penalty of perjury that I have read the

5    foregoing transcript of my deposition taken on

6    Tuesday, February 4, 2020; that I have made such

7    corrections as appear noted herein in ink, initialed

8    by me; that my testimony as contained herein, as

9    corrected, is true and correct.

10

11          Dated this _____ day of _____,

12   2020, at _____,

13   California.

14

15

16

17                    _____

                        DANIEL McFADDEN

18

19

20

21

22

23

24

25

Page 317

```
1                    CERTIFICATE OF REPORTER

2            I, Hanna Kim, a Certified Shorthand

3    Reporter, do hereby certify:

4            That prior to being examined, the witness

5    in the foregoing proceedings was by me duly sworn to

6    testify to the truth, the whole truth, and nothing

7    but the truth;

8            That said proceedings were taken before me

9    at the time and place therein set forth and were

10   taken down by me in shorthand and thereafter

11   transcribed into typewriting under my direction and

12   supervision;

13           I further certify that I am neither

14   counsel for, nor related to, any party to said

15   proceedings, not in anywise interested in the

16   outcome thereof.

17           Further, that if the foregoing pertains to

18   the original transcript of a deposition in a federal

19   case, before completion of the proceedings, review

20   of the transcript [ ] was [X] was not requested.

21           In witness whereof, I have hereunto

22   subscribed my name.

23   Dated: 17th day of February, 2020

24                      _____

                        Hanna Kim

25                      CLR, CSR No. 13083
```

Page 318

```
1              ERRATA SHEET FOR THE TRANSCRIPT OF:

2      Case Name: CFPB vs. OCWEN, et al.

3      Dep. Date: 02/04/2020

4      Deponent:  DANIEL McFADDEN, PH.D.

5                      CORRECTIONS:

6      Pg.   Ln.     Now Reads      Should Read    Reason

7     ____  ____   _____  _____ _____  _____

8     ____  ____   _____  _____  _____

9     ____  ____   _____  _____  _____

10    ____  ____   _____  _____  _____

11    ____  ____   _____  _____  _____

12    ____  ____   _____  _____  _____

13    ____  ____   _____  _____  _____

14    ____  ____   _____  _____  _____

15    ____  ____   _____  _____  _____

16    ____  ____   _____  _____  _____

17    ____  ____   _____  _____  _____

18    ____  ____   _____  _____  _____

19                             _____

20                             Signature of Deponent

21    SUBSCRIBED AND SWORN BEFORE ME

22    THIS_____DAY OF_____, 2020.

23    _____

24    (Notary Public) MY COMMISSION

25    EXPIRES:_____
```

Page 318

1             ERRATA SHEET FOR THE TRANSCRIPT OF:

2      Case Name: CFPB vs. OCWEN, et al.

3      Dep. Date: 02/04/2020

4      Deponent:  DANIEL McFADDEN, PH.D.

5                    CORRECTIONS:

6      Pg.   Ln.    Now Reads      Should Read     Reason

7      ____  ____   _____   _____see attached_____

8      ____  ____   _____  _____  _____

9      ____  ____   _____  _____  _____

10     ____  ____   _____  _____  _____

11     ____  ____   _____  _____  _____

12     ____  ____   _____  _____  _____

13     ____  ____   _____  _____  _____

14     ____  ____   _____  _____  _____

15     ____  ____   _____  _____  _____

16     ____  ____   _____  _____  _____

17     ____  ____   _____  _____  _____

18     ____  ____   _____  _____  _____

19                           ___ _Daniel L McFadd_ _____

20                            Signature of Deponent

21              SUBSCRIBED AND SWORN BEFORE ME

22     THIS_____DAY OF_____, 2020.

23     _____

24     (Notary Public) MY COMMISSION

25     EXPIRES:_____

Privileged and Confidential

**Deposition of Daniel McFadden (February 4, 2020) – Correction Sheet**

| Page:Line | Now Reads | Should Read | Reason |
|---|---|---|---|
| 7:10 | Sash Funk Granai | Sasha Funk Granai | Typo |
| 13:4-7 | I don't recall the exact date, but around 1998 I have a published paper that predicted that the United States would have a housing crisis in about… | I don't recall the exact date, but around 1998 I have a published paper that predicted that the United States would have a housing crisis in about a decade. | Sentence left unfinished |
| 14:9 | demain | domain | Typo |
| 17:4 | has | have | Typo |
| 22:2 | that | who | Typo |
| 26:14-15 | The quest- -- second question is, have I calculated damages from that? | The second question is, have I calculated damages from specific mortgage servicing events? | Clarification |
| 30:11 | outcome | outcomes | Typo |
| 30:20 | impact Ocwen conducts | impact of Ocwen's conduct | Typo |
| 32:18 | They're – deal | The techniques deal | Typo/Clarification |
| 35:8 | Vernet Text | VirnetX | Typo |
| 36:6 | crowding | prescribing | Typo |
| 38:5 | noncompetition | non-compete | Typo |
| 38:25 | increase | increased | Typo |
| 39:7 | McMorrow | Mondelez | Typo |
| 39:9 | McMorrow | Mondelez | Typo |
| 44:20 | airs | errs | Typo |
| 45:25 | Dr. Halm, Dr. Halm's claims | Dr. Hamm, Dr. Hamm's claims | Typo |
| 49:5 | Exhibits | Exhibit | Typo |
| 51:17 | Paper | Papers | Typo |
| 54:18 | to central economics | central to economics | Typo |
| 54:20 | Bottom | [delete] | Typo |
| 57:3 | unbiassed | unbiased | Typo |
| 59:1 | biassed | biased | Typo |
| 59:23 | biassed | biased | Typo |
| 60:8 | biassed | biased | Typo |
| 60:16 | a [verbatim] expert economist | an [verbatim] expert economist | Typo |
| 60:18 | biassed | biased | Typo |
| 60:25 | biassed | biased | Typo |
| 61:11 | biassed | biased | Typo |
| 61:15 | biassed | biased | Typo |

Privileged and Confidential

| Page:Line | Now Reads | Should Read | Reason |
|---|---|---|---|
| 61:24 | biassed | biased | Typo |
| 63:12 | lower end on there | lower end of the range | Clarification |
| 74:18-19 | REO is real estate enterprise | REO stands for real estate owned enterprise | Clarification |
| 75:18 | non-for sale | non-foreclosure sale | Clarification |
| 83:3 | disclosure | Foreclosure | Typo |
| 100:23-24 | not foreclosured [verbatim] sale price | Not the foreclosure-sale price | Typo |
| 103:9-11 | The actual situation is in that situa- -- is that the – the house that's sold in a foreclosure sale. | The actual situation is that the house is sold in a foreclosure sale. | Clarification |
| 110:10 | my response to that interrogatory | my response is that it is in that interrogatory | Clarification |
| 112:12-13 | the calculation that I do for a recourse state do not assume that those are nonrecourse states. | the calculation that I do for a recourse state does not assume the cancellation of remaining debt that occurs in nonrecourse states. | Clarification |
| 118:22 | Halm | Hamm | Typo |
| 118:25 | Halm | Hamm | Typo |
| 119:1 | Halm | Hamm | Typo |
| 119:3 | Halm's | Hamm's | Typo |
| 128:21 | Halm | Hamm | Typo |
| 140:10 | renter | lender | Typo |
| 149:1 | Halm's | Hamm's | Typo |
| 150:1 | Halm | Hamm | Typo |
| 150:14 | borrowed | borrower | Typo |
| 151:4 | connection | calculation | Typo |
| 153:6 | $2,000 | $20,000 | Typo |
| 154:1 | a | an | Typo |
| 159:15 | Halm's | Hamm's | Typo |
| 159:22 | Halm | Hamm | Typo |
| 159:23 | Halm's | Hamm's | Typo |
| 160:13 | Halm | Hamm | Typo |
| 161:1 | Halm's | Hamm's | Typo |
| 161:25 | Halm | Hamm | Typo |
| 163:16 | Halm's | Hamm's | Typo |
| 176:16 | attributes to any | attributes any | Typo |
| 177:2 | recension | rescission | Typo |
| 188:25 | biassed | biased | Typo |
| 189:6 | a | an | Typo |

Privileged and Confidential

| Page:Line | Now Reads | Should Read | Reason |
|---|---|---|---|
| 191:23 | biassed | biased | Typo |
| 192:3 | removal costs | moving costs | Typo |
| 207:13 | Ocwen | Ocwen's | Typo |
| 209:16 | allocate | allocation | Typo |
| 211:16 | Halm | Hamm | Typo |
| 214:22 | Halm's | Hamm's | Typo |
| 215:6 | Halm | Hamm | Typo |
| 223:22 | recension | rescission | Typo |
| 224:23 | ? | . | Typo |
| 226:22 | restatement | reinstatement | Typo |
| 228:9 | restatement – frequency restatement | reinstatement – frequency of reinstatement | Typo |
| 228:14 | restatements | reinstatements | Typo |
| 229:20 | restatements | reinstatements | Typo |
| 230:9 | restatement | reinstatement | Typo |
| 234:22 | restatement | reinstatement | Typo |
| 244:8 | of second | of the second | Typo (omission) |
| 254:25 | Coombs | Combs | Typo |
| 255:4 | Coombs, C-O-O-M-B-S | Combs, C-O-O-M-B-S | Typo |
| 269:21 | Halm's | Hamm's | Typo |
| 272:14 | Halm's | Hamm's | Typo |
| 272:20 | Halm | Hamm | Typo |
| 273:9 | Halm | Hamm | Typo |
| 274:21-23 | you will find that default risk has consistently signs of a particular sign for various variables | you will find that default risk has consistent signs of a particular direction for various variables | Clarification |
| 278:13 | a – a priority | a priori | Typo |
| 278:18-20 | So in that situation, those variables should be there whe- -- I think whether or not they are compounding [verbatim]. | So in that situation, those variables should be in the model if they could confound results for the factor of interest. | Clarification |
| 281:10-11 | possible confounding factors that could have been confounding me | possible factors that could have been confounding the impact of the delayed escrow | Clarification |
| 288:18 | status | estate | Typo |
| 294:24 | cost | costs | Typo |
| 300:24 | likely | lightly | Typo |
| 302:10 | Halm's | Hamm's | Typo |
| 303:19 | Halm | Hamm | Typo |

3

Privileged and Confidential

| Page:Line | Now Reads | Should Read | Reason |
|---|---|---|---|
| 303:25 | proportionate | proportional | Typo |
| 304:19 | proportionate | proportional | Typo |
| 304:24 | Halm | Hamm | Typo |
| 305:7 | proportionate | proportional | Typo |
| 307:5 | Cost | Costs | Typo |
| 311:17 | recensions | rescissions | Typo |