**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495 and CASE NO. 9:17-CV-80495**
**MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

---

OFFICE OF THE ATTORNEY GENERAL, THE STATE OF FLORIDA, Department of Legal Affairs,
and
OFFICE OF FINANCIAL REGULATION, THE STATE OF FLORIDA, Division of Consumer Finance,

Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**INTRODUCTION** .... 1

**ARGUMENT** .... 3

**I. ALMOST ALL OF PLAINTIFFS' MOTION MUST BE DENIED BECAUSE THE CLAIMS ARE PRECLUDED BY THE NMS (CFPB COUNTS I-VII, IX & FL COUNTS I-III, VI-VIII)** .... 4

**II. PLAINTIFFS' REQUEST FOR AN INCHOATE "LIABILITY" RULING DIVORCED FROM INDIVIDUAL LOANS IS LEGALLY IMPROPER AND WOULD NOT SIMPLIFY THE CASE IN ANY EVENT** .... 7

A. Plaintiffs Must Prove the Elements of Their Claims for Each At-Issue Loan .... 8

1. The Court and Plaintiffs Have Expressly Recognized That Plaintiffs Must Prove Their Claims for Specific Loans .... 8

2. Plaintiffs' Claims Require Proof for Each At-Issue Loan .... 9

B. A Partial Summary Judgment Ruling Untethered to Specific Loans Would Not Shorten the Trial and Would Be Improper .... 10

**III. PLAINTIFFS HAVE NOT SHOWN THE ABSENCE OF A TRIABLE ISSUE ON THEIR CLAIMS THAT OCWEN VIOLATED THE CFPA, FDCPA, FDUTPA, OR TILA BY USING INACCURATE INFORMATION (CFPB COUNTS I-II, IV-VI & FL COUNT VIII)** .... 12

A. The Cited Documents Do Not Prove Beyond Dispute That Ocwen Used Inaccurate Loan Information in Violation of the CFPA and FDCPA .... 12

1. Plaintiffs Mischaracterize the Relevant Inquiry Under Section 5531(c)(1) .... 12

2. The Cited Documents Do Not Prove That Ocwen Unlawfully Serviced Any Specific Loans Using Inaccurate Information, Much Less That Any Specific Borrowers Suffered Substantial Injury .... 14

3. There Also Is a Triable Dispute as to Whether the Benefit of Each of Ocwen's Loan Servicing Practices Outweighed Any Harms .... 19

B. The Documents Cited By Plaintiffs Do Not Show That Ocwen Deceived Borrowers in Violation of the CFPA and FDCPA (CFPB Counts II and VI, Florida Count VIII) .... 20

C. The Cited Evidence Also Fails Prove That Ocwen Violated TILA. .... 22

D. Plaintiffs' Evidence Also Fails to Establish That the FDCPA Even Applies to the At-Issue Loans .... 23

**IV. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR ESCROW-RELATED CLAIMS UNDER RESPA (CFPB COUNT VII; FL COUNTS I-II)** .... 25

A. Plaintiffs Have Not Established Beyond Dispute Their RESPA Claims Relating to Escrow Analyses and Statements .... 25

1. The Cited Document Does Not Prove Beyond Dispute That Ocwen Violated Regulation X by Failing to Send Timely Escrow Statements .... 25

2. The Cited Documents Do Not Indisputably Prove That Ocwen Violated Regulation X by Failing to Conduct Timely Escrow Analyses ........ 26

3. Plaintiffs Also Have Failed to Show Beyond Dispute That Any Late Escrow Analysis or Statement Caused Any Consumer Harm ........ 27

B. Plaintiffs Have Not Indisputably Established Their Claim That Ocwen Required Borrowers to Pay Escrow Shortage Amounts No Longer Owed........ 28

C. Plaintiffs Have Not Proven Beyond Dispute That Ocwen Failed to Timely Pay Hazard Insurance Premiums for the At-Issue Loans ........ 30

**V. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR INSURANCE-RELATED CLAIMS UNDER THE HPA (CFPB COUNT X; FLORIDA COUNT IV)** ........ 32

**VI. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR LOSS MITIGATION AND FORECLOSURE CLAIMS (CFPB COUNTS III, IX AND FLORIDA COUNT III)** ........ 33

A. Plaintiffs' Loss Mitigation and Foreclosure Claims Lack Evidentiary Support or, at Most, Raise Disputed Fact Issues for Trial ........ 33

1. The CFPB Has Not Established Beyond Dispute That Ocwen Violated the CFPA by Sending Foreclosure-Related Letters (CFPB Count III) ........ 33

2. Florida Has Not Proven Beyond Dispute That Ocwen Violated RESPA's Acknowledgment Letter Requirements (FL Count III) ........ 34

3. Florida Has Not Indisputably Shown That Ocwen Violated RESPA's Evaluation Notice Requirements (FL Count III)........ 34

B. Plaintiffs Also Have Not Proven the Alleged Conduct Harmed Individual Borrowers. 35

**VII. FLORIDA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS FDUTPA CLAIMS CONCERNING PROPERTY INSPECTIONS AND INSURANCE (FLORIDA COUNTS VI & VII)** ........ 36

A. Florida Has Not Proven Beyond Dispute That Ocwen's Property Inspection Fees Violated the FDUTPA (FL Count VII)........ 36

B. Florida Has Not Proven That Ocwen's Arrangement of Lender-Placed Insurance Violated the FDUTPA (Count VI)........ 38

**VIII. PLAINTIFFS' MOTION ON THEIR RESPA CLAIMS MUST BE DENIED AS TO OFC AND OMS BECAUSE NEITHER IS A SERVICER (CFPB COUNTS III, VII, IX; FLORIDA COUNTS I-III)** ........ 39

**CONCLUSION** ........ 40

**INTRODUCTION**

Defendants respectfully submit this opposition to the CFPB's and Florida's joint motion for partial summary judgment (ECF No. 630, "Plaintiffs' Motion" or "Mot.").[1] Plaintiffs' Motion suffers from not one, but two, irreparable flaws: (1) massive evidentiary gaps between the documents they rely on and the required elements of their claims; and (2) the National Mortgage Settlement ("NMS") that resolved Plaintiffs' prior suit against Ocwen and precludes almost all of the claims. Each of these threshold problems is enough for the Court to grant ***Ocwen's*** motion for summary judgment on all (or virtually all) of Plaintiffs' claims. *See* ECF No. 634 ("Ocwen Motion").[2] Together, at the very least, they require that the Court deny Plaintiffs' Motion in its entirety.

Plaintiffs' case suffers from a massive evidentiary failure. Judge Matthewman asked Plaintiffs how—without analyzing a representative sample of loans and extrapolating from that review—they could prove "by loan number" each of the thousands of highly individualized statutory violations they allege. Plaintiffs promised they would have an expert analyze the individual loan data Ocwen produced and provide testimony summarizing all of the purported loan-specific violations. The Court thereupon ordered Ocwen to produce the loan-specific data requested by Plaintiffs, and Ocwen did so. Ocwen also produced nearly 7 million pages in response to Plaintiffs' other discovery requests, on top of the tens of thousands of documents the CFPB demanded and received during its three-year pre-suit investigation. In addition to the data, new productions of documents, and investigative materials, Plaintiffs also have years of documents and data obtained from Ocwen from years of supervising its operations.

Armed with all of that data and colossal amounts of other evidence, Plaintiffs then delivered—***nothing***. Plaintiffs offer ***no*** expert testimony identifying ***any*** servicing failure in ***any*** loan—much less the promised expert testimony identifying the alleged servicing violations in thousands of individual loans.

Having failed to generate their own promised evidence, the government parties instead move to "Plan B": pretending that their claims are proven—and not just proven, but proven

[1] Plaintiffs' accompanying statement of facts (ECF No. 631) is referred to herein as "Pls.' SOF," and the exhibits attached to it are referred to as "SJX." Ocwen's rebuttal and counterstatement statement of facts, filed concurrently with this Opposition, are referred to as "RSF" and "CSF."

[2] Ocwen's statement of material facts (ECF No. 635) is referred to as "Ocwen SMF."

beyond genuine factual dispute—by documents generated by Ocwen. Specifically, they contend that Ocwen's discovery answers, internal reports, and self-audits amount to indisputable admissions that Ocwen committed many statutory violations. Accordingly, Plaintiffs want for Ocwen's own documents to do all the work that they failed or were unable to do themselves.

These contentions are remarkable. They are also entirely meritless. Even a cursory review of the cited Ocwen documents exposes Plaintiffs' complete failure to adduce the level of evidence required to establish summary judgment in their favor. And it is no wonder why: Ocwen's documents were created to run its business, not to analyze whether servicing events met all of the criteria for statutory violations for specific loans. So, it is entirely unsurprising that the documents do not serve Plaintiffs' purpose but instead are missing numerous data and factual elements Plaintiffs would need to prove all of the elements of their statutory claims. Likewise, Plaintiffs' citation to records where Ocwen provided "remediation," such as a fee cancellation or other account adjustments, is equally unavailing. Such subsequent remedial measures are inadmissible to prove liability. They also prove ***nothing***, in any event, because Ocwen often, for purposes of good will and efficiency, voluntarily elected to provide relief to potentially impacted borrowers regardless of any legal violation.

For all of these reasons, and the others explained below and in Ocwen's objections to Plaintiffs' factual statement and counterstatement, Plaintiffs' "Plan B" effort to prove their claims by piggybacking on documents that Ocwen prepared for an entirely different purpose—***rather than through the expert testimony that Plaintiffs promised but failed to deliver***—is unsuccessful. That requires summary judgment for Ocwen and, at the very least, makes clear that Plaintiffs have not proven all of the elements of their claims beyond genuine dispute.

The massive evidentiary holes in Plaintiffs' Motion dovetail with yet another glaring, threshold defect: the Motion improperly seeks an inchoate ruling that would declare Ocwen "liable" for violating the laws but not identifying the specific loans and circumstances. For example, during discovery Plaintiffs identified 2,104,530 loans that Ocwen allegedly serviced using inaccurate information. Ocwen SMF ¶ 82. But Plaintiffs' Motion does not even purport to establish on undisputed facts that Ocwen did so for each (or any) of the 2,104,530 listed loans. Their request for a finding that Ocwen is liable for servicing loans using inaccurate information without reference to which and how many specific loans is patently improper. Yet, Plaintiffs' Motion takes this approach throughout, and so is fatally deficient. Under each of the statutes,

"liability" must be proven as to each individual at-issue loan, as confirmed by Judge Matthewman's colloquy with Plaintiffs' counsel discussed above. Moreover, any inchoate ruling that Ocwen "violated" the statutes without identifying how, and for which loans, would not shorten the trial. This is because trial would still require all of the same loan-specific liability evidence in order to resolve the remaining issues, including claimed consumer damages and penalties. For this additional threshold reason, the Court has ample discretion—and, we respectfully believe, the duty—to deny Plaintiffs' motion for partial summary judgment.

Plaintiffs' failure to adduce the loan-specific evidence that they promised is not their only problem. As Ocwen's Motion showed in detail (ECF No. 634 at 4-13), virtually all of the CFPB's and Florida's claims are foreclosed by the NMS because the conduct at issue in all but one of their claims overlap with the NMS Consent Judgment. While federal and state statutes ordinarily empower the CFPB and Florida to enforce legal requirements, the NMS Consent Judgment documents Plaintiffs' agreement to a different regime for Ocwen during the consent judgment's monitoring period. Critically here, the agreement recognized that absolute perfection in loan servicing, while always the goal, is almost impossible to achieve and did not require it. Instead, the CFPB and Florida agreed that Ocwen would be subject to limited potential penalties in a specified court if—***but only if***—the independent monitor concluded that (1) Ocwen did not comply with the NMS agreement's error tolerance thresholds ***and*** (2) failed to cure the issue within the prescribed time period. Yet Plaintiffs' Motion does not even acknowledge their binding agreement with Ocwen. Nor do Plaintiffs attempt to show that Ocwen exceeded ***any*** of the agreed-upon threshold error rates relating to the conduct alleged, or that Ocwen was given the opportunity to and failed to cure any of the alleged errors.

Even beyond two overarching flaws, Plaintiffs' arguments for partial summary judgment fail for still other claim-specific reasons, as fully described below. Thus, Plaintiffs' Motion should be denied in its entirety and Ocwen's Motion should be granted.

## ARGUMENT

"Summary judgment may only be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Shell v. BellSouth Telecomms., LLC*, 2020 U.S. Dist. LEXIS 100842, at *15 (S.D. Fla. June 8, 2020) (citing Fed. R. Civ. P. 56). Because Plaintiffs here bear the burden of proof at trial, they "must establish all essential elements of the

claim or defense in order to obtain summary judgment" and "must support [their] motion with credible evidence . . . that would entitle [them] to a directed verdict if not controverted at trial." *Blackhawk Yachting, LLC v. Tognum Am., Inc.*, 2015 U.S. Dist. LEXIS 192400, at *6 (S.D. Fla. June 30, 2015). In determining whether Plaintiffs have met their burden, the court must view the evidence and draw all reasonable inferences in the light most favorable to Ocwen. *Samedi v. Miami-Dade Cty.*, 134 F. Supp. 2d 1320, 1328 (S.D. Fla. 2001); *Shell*, 2020 U.S. Dist. LEXIS 100842, at *15.

## I. ALMOST ALL OF PLAINTIFFS' MOTION MUST BE DENIED BECAUSE THE CLAIMS ARE PRECLUDED BY THE NMS (CFPB COUNTS I-VII, IX & FL COUNTS I-III, VI-VIII)

For the reasons explained in Ocwen's motion for summary judgment, which Ocwen incorporates by reference here, the vast majority of Plaintiffs' Motion—including its motion for summary judgment on CFPB Counts I-VII & Count IX, and Florida Counts I-III & VI-VIII—must be denied because each of these claims is barred by the NMS Consent Judgment. Indeed, ***Ocwen*** is entitled to summary judgment on these overlapping counts because they are barred by the parties' agreement, *res judicata*, and waiver. Ocwen Mot. at 4-13 & SMF ¶¶ 1-67.

While the Dodd-Frank Act empowers the CFPB and Florida to enforce certain legal requirements as to almost all companies, Plaintiffs agreed with Ocwen in February 2014 to a different enforcement regime for Ocwen's loan servicing during the Ocwen monitoring period. Ocwen Mot. at 4-5 & SMF ¶¶ 1-9. In that agreement, which was submitted to and approved by a federal district court as a consent judgment, Plaintiffs and Ocwen agreed that Ocwen would service mortgage loans in the ***future***—beginning in 2014 and continuing through at least February 2017—in accordance with certain defined standards. *Id.* at 5-6 & SMF ¶¶ 10-35. The parties further agreed that an independent monitor would test Ocwen's compliance and report the results to both the CFPB and Florida. *Id.* Having created that different regime, the agreement bars Plaintiffs' use of the Act and other state laws against Ocwen. *Id.* at 4-8 & SMF ¶¶ 1-67.[3]

Some of the NMS Consent Judgment's defined standards mirrored existing or new servicing regulations, while others were more stringent. *See* Ocwen SMF ¶¶ 36-52. But

---

[3] *See also United States v. Armour & Co.*, 402 U.S. 673, 681-83 (1971) (affirming dismissal based on consent judgment because, "although the relief the Government seeks may be in keeping with the purposes of the antitrust laws, we do not believe that it is supported by the terms of the consent decree").

importantly, because absolute perfection in loan servicing is almost impossible to achieve, the NMS Consent Judgment did not require error-free loan servicing. Ocwen Mot. at 5-6 & SMF ¶¶ 10-35, 53-67. Instead, each Servicing Standard and related Metric contained servicing error tolerance thresholds ("Threshold Error Rates") that Ocwen had to stay below. *Id.* at 5-6 & SMF ¶¶ 10-35, 53-67. Importantly, the agreement also included ***mandatory*** dispute resolution procedures and limited potential penalties if—but only if—the monitor concluded that Ocwen failed to comply with those error tolerance thresholds and Ocwen failed to cure. *Id*. Only if all three of those preconditions were met could Plaintiffs bring an action in the federal court that had entered the Consent Judgment and, at most, seek non-monetary remedies and a civil penalty of $1 million for the first violation. *Id.* at 5-6 & SMF ¶¶ 9, 24-34.

Fundamentally, the NMS Consent Judgment set a different set rules for Ocwen that were tougher than those for others in the industry. But in exchange, the NMS created express tolerance standards and channeled any disputes and enforcement penalties into the federal court administering the consent judgment, with limits on what could be awarded and how. This binding agreement was a central feature of Ocwen's loan servicing during this period, yet Plaintiffs' Motion does not even acknowledge its existence. But this Court cannot turn a blind eye to it. Plaintiffs must be held to their agreement, as Ocwen itself was held to it. They simply cannot reap the benefits and then sue for more. Plaintiffs' Motion for judgment on the many claims that overlap with NMS standards must be denied. *See* Ocwen Mot. at 6-13.

Indeed, it is evident that ***even if all of Plaintiffs' factual claims were true***, they would not exceed the tolerances Plaintiffs agreed to in the NMS Consent Judgment. As one example, Plaintiffs allege that Ocwen "commenced first notices or filings against 124 borrowers who had submitted Complete Applications that Ocwen had not yet evaluated." Mot. at 31. Similarly, Plaintiffs allege that Ocwen harmed borrowers due to errors flowing from the use of inaccurate information, such as: (1) over-collecting from 367 borrowers and under-collecting from 972 borrowers due to inaccurate reinstatement quotes (*id.* at 10-11); (2) overcharging principal-and-interest payments for 269 borrowers (*id.* at 13); and (3) causing 725 borrowers to incur higher insurance premiums, after improperly cancelling the borrowers insurance (*id.* at 14). But given the volume of loans Ocwen serviced—which Plaintiffs acknowledge was "***nearly three million loans***" during the Relevant Time Period (*id.* at 3)—these alleged violations do not come close to exceeding the Consent Judgment's 5% Threshold Error Rates for these covered issues. *See*

Ocwen SMF ¶¶ 24-35, 53-67; CSF ¶ 287. Indeed, the undisputed evidence shows that Ocwen ***passed*** each of these Metrics ***every quarter*** during the Ocwen monitoring period.[4] Thus, while each individual error, if true, would be regrettable and Ocwen would have taken steps to remedy known issues and prevent future mistakes, the errors are not actionable because none of Plaintiffs' allegations exceed the agreed-upon NMS Metric tolerances.

Furthermore, even if Plaintiffs could show that some of the alleged claims exceeded NMS tolerances (***and their Motion makes no attempt to do so***), they still cannot show that Ocwen was ever given the opportunity to and then failed to cure the alleged errors—as required by the NMS prior to any lawsuit on the overlapping claims. *See United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Assoc.,* 878 F.3d 309, 315 (D.C. Cir. 2017) (describing the "series of steps before [a servicer] could be penalized for violating the servicing standards"); Ocwen SMF Ex. 12, at 1-4 (describing the specific "detailed" steps that must be taken before seeking to enforce the NMS in Ocwen's case). Plaintiffs agreed to follow that dispute-resolution process, and only if Ocwen failed to cure would any claim become actionable with specific, limited remedies. Ocwen Mot. at 4-13 & SMF ¶¶ 24-35. Thus, Plaintiffs' Motion should be denied because it failed to prove ***any*** of the prerequisites to bringing their claims were met.

Finally, even more basically, Plaintiffs' Motion should be denied because it (and the record) contains ***zero*** evidence that Plaintiffs or the NMS Monitor ever raised the concerns detailed in CFPB Counts I-VII & IX or Florida Counts I-III & Counts VI-VIII. For example, Plaintiffs' Motion seeks judgment on a number of broad, nonspecific claims alleging that Ocwen "violated [state and federal] consumer protection laws more than half-a-million times" since 2014. Mot. at 1.[5] Surely if that were true, the ***independent*** NMS Monitor—and the NMS Monitoring Committee, ***which included the CFPB and OAG***—would have raised these issues and sought appropriate relief under the consent judgment. *See* Ocwen Mot. at 4-13 & SMF ¶¶ 24-67. Between 2014 and 2017, the ***independent*** NMS Monitor painstakingly evaluated

---

[4] Ocwen received a ***PASS*** in each NMS Monitor with respect to 4.B (timely and accurate payment processing), 6.B.viii.a (dual tracking), and 33 (accurate billing statements), and others. CSF ¶ 287; *see also* Ocwen SMF ¶¶ 64-67.

[5] Again, even if true, 500,000 violations accrued over the course of servicing over three million loans—a majority of which required ***dozens of actions per loan*** over the course of the relevant period—would not be sufficient to violate the NMS Tolerance Thresholds, and the Plaintiffs have made no attempt to show otherwise. *See* CSF ¶ 288; Ocwen SMF ¶¶ 1-67.

Ocwen's compliance and issued regular quarterly reports after consultation with the NMS Monitoring Committee. *Id.* at 4-6, 10-13 & SMF 24-35, 53-67. Thus, the CFPB and Florida were well aware of when and how often Ocwen made servicing errors, yet they never raised those issues in response to NMS Monitor reports. *See id*. This is because they could not, as those reports showed that, with few exceptions, Ocwen stayed within the error tolerance thresholds set forth in the agreement throughout the entire monitoring period. *Id.* at 4-6, 10-13 & SMF 63-67.[6] And to the extent Plaintiffs disagreed with the Monitor's reports and his findings, by failing to do anything at all, Plaintiffs ***waived*** their claims. Ocwen Mot. at 10-13.

Thus, for the reasons stated in Ocwen's Motion and here, Plaintiffs' Motion must be denied as to each of the Overlapping Counts, including CFPB Counts I-VII & IX and Florida Counts I-III & VI-VIII, because they are barred by the terms of the parties' agreement. *See* Ocwen Mot. at 4-13. Instead, for those very reasons, Ocwen should be awarded summary judgment on each of these counts.[7]

## II. PLAINTIFFS' REQUEST FOR AN INCHOATE "LIABILITY" RULING DIVORCED FROM INDIVIDUAL LOANS IS LEGALLY IMPROPER AND WOULD NOT SIMPLIFY THE CASE IN ANY EVENT

Plaintiffs' Motion says (at 3 & n.1) that it seeks partial summary judgment as to "liability"—but not damages, penalties, or injunctive relief—for certain counts in their complaints. But the Motion does not even pretend to show on undisputed facts that Ocwen is liable as to any of those counts with respect to each specific, at-issue loan. Instead, having indiscriminately chosen to make overbroad allegations involving over two million loans about which they could never offer proof, Plaintiffs seek a massive evidentiary shortcut through an inchoate "liability" ruling. Specifically, Plaintiffs ask the Court to rule that Ocwen violated the cited laws by using inaccurate information, misleading borrowers, and engaging in other forms of conduct ***without reference to the specific loans supposedly affected by the alleged conduct***. As we now show, Plaintiffs' motion should be denied as a threshold matter because (A) liability under the at-issue statutes must be established as to each specific loan, and (B), in any event, an inchoate "liability" ruling untethered to specific loans would not shorten the trial.

[6] In the few instances where Ocwen did not, the NMS parties resolved the compliance issues in accordance with the settlement. *Id.* at 5-6 & SMF ¶¶ 65-67.

[7] Plaintiffs' Motion does not seek summary judgment on CFPB Count VIII, *see* Mot. at 3 n.2, but that count is also barred by the NMS Consent Judgment. Ocwen Mot. at 6-7 & SMF ¶ 43.

### A. Plaintiffs Must Prove the Elements of Their Claims for Each At-Issue Loan

As Ocwen already showed in its Motion and SMF, Plaintiffs must establish Ocwen's liability as to each individual loan, not in the abstract. This is clear for two reasons: (1) this Court and Plaintiffs themselves already acknowledged this; and (2) the statutes require it.

#### 1. The Court and Plaintiffs Have Expressly Recognized That Plaintiffs Must Prove Their Claims for Specific Loans

During discovery, Judge Matthewman said, and Plaintiffs acknowledged, that Plaintiffs must prove their claims "by loan number." Specifically, Judge Matthewman said to Plaintiffs:

> But if you present this case to a jury or even summary judgment, aren't you going to have to go ***by loan number***? In other words, aren't you going to have to say this loan was violative and this loan was violative and have to prove it? I mean, at some point aren't you going to have to prove ***loan numbers***, that a certain loan number or a certain group of loan numbers, whatever it is, somehow violated a law or statute?

Ocwen SMF ¶ 71 & Ex. 28 at 29:13-20 (emphasis added). Far from disputing Judge Matthewman's observation that they would be obliged to prove violations for each loan, Plaintiffs acknowledged it. In fact, recognizing that they bore this burden, Plaintiffs demanded that Ocwen produce vast quantities of loan-specific documents on the ground that "the data, the actual ***loan-level data***, is what the Bureau needs to complete these [loan] analyses in order to, ***with precision***, provide the defendants with I think what they're asking for in terms of … ***each precise error*** that the Bureau says existed in these files." Ocwen SMF ¶ 75 & Ex. 30 at 21:3-7 (emphasis added).

Plaintiffs further recognized their duty to present loan-specific evidence when they promised Judge Matthewman that they would do so through expert testimony, stating: "[W]ith respect to Your Honor's first question about the expert, we do intend for the expert to look through the 1.58 million borrowers and to crunch and assess the data, both in a summary witness fashion and both as to an expert opinion with respect to all of the errors …." Ocwen SMF ¶ 94 & Ex. 56 at 88:22-24-89:9-14. Indeed, Plaintiffs insisted they would undertake the task of proving all of the individual violations in the entire loan population rather than proceed by way of sampling and extrapolation, as Judge Matthewman implored. *See* ECF No. 634 at 14.

Finally, Judge Matthewman reiterated Plaintiffs' duty to prove their claims at the loan level when he ordered Plaintiffs to "identify the loans that belong in these [statutory claim] buckets and the evidence you have that supports why you said that those loans had violations."

Ocwen SMF ¶ 76 & Ex. 30 at 46:3-14, 51:9-12. And again, far from disputing their obligation to prove their claims individually for each loan, Plaintiffs generated lists of the loan numbers whose servicing allegedly violated each of the at-issue statutes. Ocwen SMF ¶¶ 81-92. In short, the Court has already repeatedly held in this case, and Plaintiffs have repeatedly acknowledged, that they must prove their claims as to each specific, individual loan.

**2. Plaintiffs' Claims Require Proof for Each At-Issue Loan**

The statutes themselves likewise require Plaintiffs to prove violations with respect to ***specific loans***, rather than in the abstract. To begin with, Plaintiffs' claims do not allege any across-the-board practice that uniformly affected all (or even many) loans. Instead, they allege a hodgepodge of loan-specific errors that—if they existed—necessarily must be proved on a loan-specific basis. *See* Ocwen Mot. at 13-14. Further, the two main remedies that Plaintiffs seek—penalties and consumer remediation—reinforce that Plaintiffs must prove their claims for each specific loan because those remedies necessarily depend upon the number of violations and the losses allegedly suffered by the borrowers on those specific loans. *See id*. at 15.

Moreover, the statutes themselves require proof of specific violations. For example, under the CFPA, an act or practice is not unfair unless it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1)(A)-(B); *cf. CFPB v. ITT Educ. Servs.*, 219 F. Supp. 3d 878, 913 (S.D. Ind. 2015) (borrowing the Federal Trade Commission Act standard, "substantial injury in the context of consumer protection is most often a financial one," and further stating that "a trivial or speculative harm will not suffice") (internal quotation marks omitted). As Plaintiffs admit (Mot. at 8), the same is true for "unfair" practices brought under the FDCPA (CFPB Count V). 12 U.S.C. § 1692f. Plaintiffs, therefore, cannot prove their claims merely by suggesting in the abstract that Ocwen was using or communicating inaccurate loan information without proving that conduct with respect to ***specific loans***. It is only in the context of a ***specific loan*** that one can assess whether the particular inaccuracy or error caused or was likely to cause substantial injury to the borrower, whether the borrower could reasonably have avoided the injury, and whether the benefits to the great majority of consumers from the particular loan servicing practice outweighed the harm to a small fraction of the allegedly-affected borrowers. Likewise, Plaintiffs' other statutory claims, such as their claim that Ocwen unlawfully foreclosed on loans despite a pending loan

modification application, must be proven as to each specific loan because the statutes and regulations only apply to loans meeting certain criteria. *See, e.g.,* 12 C.F.R. § 1024.41 (regulation does not apply when an application has already been denied, or is submitted less than 37 days before foreclosure, is incomplete, among other limits); *see also infra* Sections IV-VII.

Indeed, Plaintiffs' obligation to adduce individualized proof has been recognized in a similar case pending in the Middle District of Pennsylvania, *CFPB v. Navient Corp.*, No. 3:17-cv-00101-RDM (M.D. Pa.). In *Navient*, the CFPB filed unfair practice claims against a student loan servicer under the CFPA and FDCPA. The court asked the CFPB if it contemplated seeking penalties and "making a damages claim for every borrower whom you believe has been victimized or been subject to unfair or deceptive or abusive practices," to which the CFPB responded in the affirmative and said that it planned to have experts address these issues. Hr'g Tr., *Navient Corp.*, No. 3:17-cv-00101-RDM, at 5:14-18 (M.D. Pa. Apr. 17, 2018) (attached as Attach. A to this Opposition). The court asked how the CFPB intended to present the evidence, which the court considered to be "the most significant issue in the case." *Id.* at 7:2-4. Upon learning that the number of borrowers with whom Navient had contact was in the hundreds of thousands, if not millions, the court said:

> As a consequence here, this troubles me, because I see inherent difficulties in trying a case like this. And as a consequence of that, I want to know – you are in a discovery phase where you are not narrowing anything, as far as I can see. ***How in the world are you going to present a case where your proof will depend on applying the elements of the statute to that many persons on whose behalf you're proceeding?***

*Id.* at 5:19-6:10 (emphasis added). The Court added that it "expect[ed] to hear testimony from real people about their experiences." *Id.* at 9:4-5. In response, the CFPB explained that to satisfy its obligation of proving its claims as to specific loans, ***it would use a representative sample of the loans*** and also offer expert reports calculating the amount of damages to all consumers. *Id.* at 6:11-24. As already noted, however, Plaintiffs here rejected Judge Matthewman's suggestion that they proceed on the basis of sampling, instead asserting that they would meet their burden of proving loan-specific violations through summary expert testimony.

For all of these reasons, Plaintiffs must prove their claims on a loan-specific basis.

### B. A Partial Summary Judgment Ruling Untethered to Specific Loans Would Not Shorten the Trial and Would Be Improper

Even if the prior proceedings in this case and the applicable law did not bar Plaintiffs'

request for an inchoate "liability" ruling untethered to the specific loans, such a ruling would be improper under Rule 56 because it would not shorten the trial and would be unfair to Ocwen. Partial summary judgment should not be granted where "the piecemeal resolution of the issues raised by the parties will not significantly simplify or extenuate the evidence at trial." *McKenzie v. Lindstrom Air Conditioning, Inc.*, 2009 U.S. Dist. LEXIS 139086, *4 (S.D. Fla. Sept. 3, 2009); *see also Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975) (pre-split Fifth Circuit held a court "in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation"); *2927764 Canada, Inc. v. Dew Drop Farms, L.L.C.*, 2005 WL 8159930, at *2 (M.D. Fla. Dec. 23, 2005) (same).[8] Moreover, even though "the Court has discretion to grant such partial relief when the summary judgment standard is met, it may properly decline to exercise that discretion if it decides the effort is not worth the candle or that 'it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.'" *FTC v. PSC Admin., LLC*, 2016 WL 3406113, at n.20 (S.D. Ala. June 17, 2016) (*quoting* F.R.C.P. Advisory Comm. notes 2010 amendment); *accord Motis Energy, LLC v. SWN Prod. Co.*, 2018 U.S. Dist. LEXIS 239361, at *13-15 (S.D. Tex. Oct. 17, 2018).

In this case, the remedies that Plaintiffs seek depend in part on ***how many*** and ***which loans*** violated the statutes. *See* Ocwen Mot. at 13-16. In particular, the amount of penalties depends on the number of violations, and the amount of the alleged consumer losses to be remedied depends on which, if any, specific loans were unlawfully serviced. *See id.*; 12 U.S.C. § 5565; *A.R. v. Dudek*, 2016 WL 3221140, at *11 (S.D. Fla. June 9, 2016). Thus, any ruling declaring that Ocwen violated the statutes by engaging in certain conduct—without a determination as to each of the loans whose servicing violated those statutes—would not save any time at trial. Trial would still require all of the same evidence to establish: (1) how many, and which loans were impacted by those supposed forms of conduct; and (2) how many, and which borrowers suffered injury as a result. Moreover, the issues concerning Ocwen's alleged conduct would be "better illuminated" by consideration in the context of all of the loan-specific

---

[8] Further, as the Advisory Committee has stated, "[i]f it is readily apparent that the court cannot grant all the relief required by the motion, it may properly decide that the cost of determining whether potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial." Fed. R. Civ. P. 56 advisory committee's note, subdiv. (g) (2010).

and other evidence that will be adduced at trial, rather than in the abstract (even if Plaintiffs had sufficient evidence to warrant a trial). For these reasons, Plaintiffs' request for an inefficient and unjust "partial summary judgment" order should be denied in any event.

## III. PLAINTIFFS HAVE NOT SHOWN THE ABSENCE OF A TRIABLE ISSUE ON THEIR CLAIMS THAT OCWEN VIOLATED THE CFPA, FDCPA, FDUTPA, OR TILA BY USING INACCURATE INFORMATION (CFPB COUNTS I-II, IV-VI & FL COUNT VIII)

Plaintiffs argue (at 5-24) that Ocwen serviced loans using inaccurate information and sent incorrect loan information to borrowers, and thereby violated the CFPA, FDCPA, and TILA. As shown in Part II above, Plaintiffs must prove these claims on a loan-by-loan basis—that is, that Ocwen serviced ***specific*** loans using inaccurate information or sent incorrect information to ***specific*** borrowers. Plaintiffs' Motion, however, fails to cite evidence sufficient to prove these claims as to any specific loans—much less evidence to prove these claims beyond genuine factual dispute as to all of the millions of at-issue loans.

### A. The Cited Documents Do Not Prove Beyond Dispute That Ocwen Used Inaccurate Loan Information in Violation of the CFPA and FDCPA

To establish that an act or practice is unfair under the CFPA, Plaintiffs must prove that "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition." *CFPB v. Universal Debt & Payment Sols.*, 2019 U.S. Dist. LEXIS 46492, at *16 (N.D. Ga. Mar. 21, 2019) (citing 15 U.S.C. § 5531(c)(1)). Plaintiffs fail to muster undisputed evidence establishing these elements.

#### 1. Plaintiffs Mischaracterize the Relevant Inquiry Under Section 5531(c)(1)

Plaintiffs go astray at the outset by asserting (at 8) that Ocwen had a practice of "servic[ing] loans using inaccurate information." That fundamentally miscomprehends the relevant inquiry under Section 5531(c)(1) by misconstruing the relevant "practice." *See* 12 U.S.C. § 5531(c)(1). Under Plaintiffs' theory of this case, Ocwen had a number of ***loan servicing practices*** that allegedly caused it to use inaccurate information in servicing ***a fraction of the loans***. For example, the undisputed evidence (including documents cited by Plaintiffs) establishes that Ocwen had a practice of proceeding to service loans it obtained from failing servicers while simultaneously verifying the data it had received from those other servicers. RSF ¶¶ 69, 117; CSF 292-96. Plaintiffs argue that Ocwen's documents analyzing the loans it had

obtained from other servicers (so-called Loan Verification Reports) show that ***that practice*** resulted in Ocwen using inaccurate information that Ocwen had obtained from the prior servicers when Ocwen continued to service a fraction of those loans. *See* Pls.' SOF ¶¶ 117-57. As we will show, Plaintiffs are wrong on the merits of that specific claim and others. But the threshold legal point is what really matters: that the relevant "practices" for purposes of applying Section 5531(c)(1) are Ocwen's loan servicing practices, not some non-existent practice of "servicing loans using inaccurate information."

Furthermore, in applying Section 5531(c)(1), the Court must take into account Ocwen's voluntary loan adjustments, reversals, and other self-correction activities. The undisputed evidence establishes that self-audits and voluntary credits, reimbursements, and reversals were an integral part of Ocwen's loan servicing practices. *See* RSF ¶¶ 117, 122-27; CSF ¶¶ 296-307. And that was necessarily so, because Ocwen was in a business where it had to use, in real time, data it obtained from other servicers in order to continue to service ***active*** loans, while also working to verify that data. *See* CSF ¶¶ 292-95; RSF ¶¶ 69, 117. Indeed, some of the very Ocwen documents on which Plaintiffs improperly rely were documents summarizing actions that Ocwen ***voluntarily*** conducted to remedy any potential harm to borrowers, including harm that may have resulted through no fault of its own or that specific borrowers might not even have suffered. *E.g.,* CSF ¶¶ 304, 313, 316-17, 319-20, 322, 324-28, 331; RSF ¶¶ 117, 122-27. Because they were part of Ocwen's loan servicing practices, such actions must be taken into account in determining, under Section 5531(c)(1), whether Ocwen's loan servicing practices resulted in substantial injury to borrowers and whether the benefit of those practices outweighed any resulting harms.

An analogy may further clarify these points. Even reputable newspapers indisputably use inaccurate information in a fraction of their published articles. But that does not mean that they have a "practice" of publishing articles using inaccurate information. To the contrary, their "practices" are their news gathering, writing, and editing processes—journalistic practices that utilize accurate information in the great majority of instances but, in a fraction of cases, do not. Furthermore, in assessing a paper's journalistic practices, one must also take into account the corrections that it publishes when it discovers (or is told) that it has gotten some information wrong. As this analogy confirms, the Ocwen practices that must be examined under Section 5531(c)(1) are its loan servicing practices, including its remediations, and not some imagined

and fictitious practice of "servicing loans using inaccurate information."

**2. The Cited Documents Do Not Prove That Ocwen Unlawfully Serviced Any Specific Loans Using Inaccurate Information, Much Less That Any Specific Borrowers Suffered Substantial Injury**

As shown in Ocwen's Motion (at 2-3, 14-15, 17-18) and again above, Plaintiffs promised Judge Matthewman that they would adduce the loan-level evidence required to prove these elements by arranging for their "expert to look through the 1.58 million borrowers and to crunch and assess the data, both in a summary witness fashion and both as to an expert opinion with respect to all the errors." Ocwen SMF ¶ 94. On the basis of that statement, the Court ordered Ocwen to produce huge volumes of loan-specific information and documents, and Ocwen duly did so. *Id.* ¶¶ 95-96.

But then Plaintiffs laid an egg—or not even an egg. Plaintiffs failed to come forward with ***any*** expert testimony identifying ***any*** inaccurate information used to service ***any*** specific loan—much less testimony that Ocwen used inaccurate information in servicing each of the thousands (or even millions) of listed loans. Having failed to generate the evidence that they told the Court they would use to prove their claims, Plaintiffs' Motion attempts an eleventh-hour pivot to "Plan B." Instead, Plaintiffs contend they can prove their claims based entirely on documents generated ***by Ocwen***. Specifically, Plaintiffs argue that documents Ocwen generated in the course of running its business, as well as Ocwen's discovery responses, should be read as admissions that prove—conclusively beyond any genuine factual dispute—that Ocwen violated the CFPA, FDCPA, and TILA by servicing the loans using inaccurate information.

It is hardly surprising that, as we now show, Ocwen's documents are no substitute for Plaintiffs' promised-but-missing expert testimony. These documents were created so Ocwen could run its business, not to identify, years later, whether servicing events in identified loans met each criteria for Plaintiffs' alleged statutory violations. *See* RSF ¶¶ 117-285, CSF ¶¶ 293-95. Moreover, in the interests of customer relations and operational efficiency, Ocwen often voluntarily elected to provide relief to all potentially impacted borrowers without trying to figure out which, if any, of the loans had an actual legal violation—an analysis that frequently would have required an individualized, loan-by-loan review. *E.g.,* CSF ¶¶ 304, 313, 316-17, 319-20, 322, 324-28, 331. For these reasons, there simply is an unbridgeable evidentiary gap between the information that the Ocwen documents contain, on the one hand, and what the Plaintiffs must

prove to establish their statutory claims, on the other.[9]

Moreover, Plaintiffs' extensive reliance on documents that Ocwen created in the course of voluntary remediations (SJX 59-60, 81-85, 93, 121, 131, 159, 162-66, 170-73, 184) is misplaced for yet another reason. That is because those documents are flatly inadmissible under Federal Rule of Evidence 407, which provides that "evidence of [] subsequent remedial measures is not admissible to prove … culpable conduct." *See*, *e.g.*, *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 634 n.12 (3d Cir. 2017) (evidence of voluntary credit remediation inadmissible under Fed. R. Evid. 407-408). The inadmissibility of an entire class of the Ocwen documents on which Plaintiffs rely creates still further evidentiary holes in their case.

As a threshold matter, Plaintiffs' Motion argues (at 11-18) that Ocwen used four categories of inaccurate information that did, or could have, substantially injured borrowers: information as to (1) escrow amounts owed, (2) loan terms and amounts owed, (3) insurance, and (4) loan modifications. *Id*. But those four categories only cover a small fraction of the 2.1 million loans that Plaintiffs have claimed violate the CFPA and FDCPA. Instead, a great many of those 2.1 million loans were referenced in the underlying documents as having an immaterial correction made to, for example, the borrower's zip code. RSF ¶¶ 118, 120; CSF ¶¶ 292-95. Not only does Plaintiffs' Motion indisputably ***not*** show their entitlement to a "liability" ruling as to those many other loans, but the Motion's failure to establish which loans even allegedly fall into those four categories requires its denial altogether.

Even beyond that threshold point, the documents Plaintiffs cite for their four categories of allegedly inaccurate information are insufficient to establish beyond genuine dispute their claims as to any specific loans. In short, their "evidence" does not prove what they say it does. We now address each of those claimed categories.

***<u>Information as to escrow amounts owed</u>:*** Plaintiffs argue that an Ocwen discovery response establishes that delayed escrow analyses led Ocwen to over-collect from borrowers by charging inaccurate escrow amounts. Mot. at 10-11, Pls.' SOF ¶¶ 167-69. Not so. The response does ***not*** show that ***any*** borrower actually paid any extra amount. RSF ¶¶ 168-77, 181-90; CSF

[9] Plaintiffs have proffered a declaration by a non-expert CFPB employee (Theresa Ridder) who purports to summarize information from the face of Ocwen's documents. SJX 55. Because she offers (and possesses) no information beyond the face of those documents, her declaration cannot and does not bridge any of the gaps in Plaintiffs' evidence.

¶¶ 314-21. Moreover, Ocwen's additional evidence establishes that it is likely that many of the borrowers did not pay any extra amount, as many were already delinquent or in bankruptcy and either (A) never became current, or (B) only became current through a loan modification, and did not pay off the loan in full.[10] *E.g.,* RSF ¶¶ 171-73; CSF ¶¶ 314-21. Further, to the extent any borrowers might have paid any potentially extra amounts, Ocwen's evidence establishes that it had already voluntarily remediated these loans. *See* CSF ¶¶ 316-17, 319-20. Hence the borrowers did not suffer any substantial injury. Finally, Ocwen's discovery response emphasized that the electronic data being produced merely "indicate[d]" that analyses had not been timely performed for the listed loans. *Id.* ¶ 168. Yet while Plaintiffs had extensive loan-level information from Ocwen that could actually establish whether or not timely analyses had actually been conducted, Plaintiffs apparently never bothered to do that analysis. In fact, a review of a portion of the loan-level data shows that Ocwen most likely ***did*** conduct escrow analyses for many of the listed loans during the period when Plaintiffs allege the escrow analysis was delayed. *See* CSF ¶ 311; RSF ¶¶ 168, 177, 181.

Plaintiffs also contend another Ocwen discovery response shows that Ocwen generated reinstatement quotes with inaccurate escrow information. Mot. at 11; Pls.' SOF ¶¶ 191-97. But that response expressly said that this electronically-generated list identified loans that "***potentially***" had incorrect information about escrow amounts, and that an individualized review would be required to determine if the quotes were in fact were inaccurate. RSF ¶¶ 193-194. Even though Ocwen pointed this out to Plaintiffs over a year ago (*see* SJX 138), Plaintiffs never analyzed those individual files or said they were unable to do so. In fact, the evidence shows that for the vast majority of borrowers who received an allegedly inaccurate quote, there was no "substantial injury" because, for example, Ocwen provided the borrower a loan modification after providing the reinstatement quote (CSF ¶ 319) and remediated the borrowers (RSF ¶ 192).

Finally, Plaintiffs mistakenly point to yet another Ocwen discovery response as evidence that Ocwen serviced loans using erroneous information as to escrow shortages. Mot. at 11; Pls.' SOF ¶¶ 209-11. But, again, Plaintiffs have misrepresented what this response says: the response has nothing at all to do with the ***use of information*** to calculate escrow shortages. Instead, it

[10] This would include the subset of borrowers Plaintiffs claim are subject to the FDCPA, as those borrowers must have been delinquent at the time of acquisition in order for the statute to apply. *See infra*, Section III.D.

merely concerns escrow payments that were processed outside of Ocwen's ***internal*** timeframes. RSF ¶¶ 209-11; SJX 138 & 142. Moreover, Ocwen's evidence shows that ***if*** Ocwen's late processing of a shortage payment ever led Ocwen to over-collect money, that would have been automatically remedied when the next escrow analysis was conducted. RSF ¶ 211.

In sum, the cited documents do not prove that Ocwen serviced any specific loans using inaccurate escrow information, nor do they prove that any specific borrowers suffered substantial injury. In fact, Ocwen's own additional evidence powerfully rebuts each of those allegations. Summary judgment on this claim is therefore unwarranted.

***Information as to loan terms and amounts owed:*** Plaintiffs argue that two of Ocwen's Loan Verification Reports (SJX 122 & 132) show that Ocwen identified errors in its data system concerning some of the loans. Mot. at 12-13; Pls.' SOF ¶ 127. But the evidence shows that those reports reflected information that Ocwen was correcting ***as it was being imported into*** Ocwen's data system—typically, from a prior vendor's system. RSF ¶ 127; CSF ¶¶ 293-94. The reports do ***not*** contain any information that establishes for each (or any) loan that Ocwen used the incorrect data to service the loan prior to correcting the data. *See* RSF ¶ 127. Further, Ocwen's evidence establishes that even if a particular piece of data made it into Ocwen's system before being corrected, that does ***not*** prove that the incorrect information was used to service the loan because Ocwen could well have been using the right information from another location in its data system. RSF ¶¶ 127-33. Rather than relying on these Loan Verification Reports that prove nothing, Plaintiffs could have sought to assemble evidence that Ocwen actually ***used*** incorrect information from the extensive loan files and transaction histories that Ocwen produced at Plaintiffs' insistence. *See* Ocwen SMF ¶ 96; RSF Ex. 13. But Plaintiffs evidently either did not bother or were unable to do so.

Next, Plaintiffs point to two Ocwen spreadsheets (SJX 126 and 133) that Plaintiffs assert show that Ocwen over- or under-charged borrowers based on inaccurate information. Mot. at 12-13; Pls.' SOF ¶¶ 148-54. But Plaintiffs offer ***zero*** testimony or other admissible evidence showing how these spreadsheets were created, what their fields mean, or what caused the purported charges. *See* Pls.' SOF ¶¶ 148-54. Instead, Plaintiffs merely had their "investigator" who admittedly has no personal knowledge of the documents or data perform a tabulation. *See id.* But that "tabulation" proves nothing—not that a charge occurred as a result of the use of inaccurate information, or even what the spreadsheets mean and how their contents were

assembled. *See id.* Further, the spreadsheets do not establish that each or any borrower suffered substantial injury. In fact, the spreadsheets do not show that the borrowers actually paid any purported overcharge or repaid any purported undercharge. *See id.* And for context, some of the alleged over- and undercharges were as low as one penny and others almost certainly would have been incurred with a prior servicer and/or prior to the statutory limitations period. *See* SJX 125, 126, 133; ECF No. 452 at 44-51 (three-year limitations period for CFPB claims).

***Insurance information:*** Plaintiffs argue that an Ocwen discovery response (SJX 138 and 141) shows that borrowers' insurance policies were cancelled due to Ocwen's use of inaccurate information. Mot. at 14; Pls.' SOF ¶¶ 222-223. But Plaintiffs are just wrong. The discovery response expressly said that the listed loans were ones where insurance was "***potentially***" cancelled as a result of an error, and that an individualized review would be required to determine why the insurance policy was cancelled. RSF ¶ 222. Apparently, Plaintiffs never undertook that required analysis and never asked for more information. Moreover, Ocwen's additional evidence shows that, in situations where Ocwen determined that an inadvertent cancellation of insurance may have led to increased premiums or other monetary harm, those borrowers were remediated with a credit equivalent to at least three years of the increase in the premium, thus negating any injury. CSF ¶ 322.

Next, Plaintiffs argue that [redacted] and certain deposition testimony shows that Ocwen used inaccurate information about whether borrowers lived in flood zones and thus required borrowers to purchase unnecessary flood insurance. Mot. at 14; Pls.' SOF ¶¶ 110(d), 235-38 & [redacted]. In the first place, that report and testimony did not identify any specific loan, thus it cannot satisfy Plaintiffs' burden of adducing evidence of loan-specific violations. *See* [redacted]; SJX 38 at 228-36; SJX 43 at 161-78. Moreover, Ocwen's testimony further establishes that Ocwen voluntarily remediated any borrowers impacted by this issue. RSF ¶¶ 236-38; CSF ¶ 324.

Finally, Plaintiffs argue that an Ocwen spreadsheet shows that, as a result of Ocwen using inaccurate information, there were 7,771 borrowers "for whom [Ocwen] should have terminated PMI [private mortgage insurance] on the termination date but failed to do so." Mot. at 14; Pls.' SOF ¶¶ 246-252 (citing SJX 123). But Ocwen was only required to automatically terminate insurance for "single-family dwelling[s]" and "the principal residence of the mortgagor[s]," and even then only if the borrower was current on the termination date. 12 U.S.C. § 4901(15); *id.*

§ 4902(b). The document relied on by Plaintiffs contains none of this information. RSF ¶ 248. What the document does show, however, is that Ocwen provided remediation to virtually all of the borrowers—again foreclosing any finding of substantial injury. SJX 123; CSF ¶ 331.

***Loan modification information:*** Plaintiffs argue [redacted] Mot. at 14-15; Pls.' SOF ¶¶ 254-57. To begin with, [redacted] is inadmissible to prove liability. *See supra* at 15. In any event, the cited evidence does not establish that any borrower suffered substantial harm. [redacted] Ocwen completed that investigation and its evidence establishes that borrowers were not substantially harmed by any these alleged errors because Ocwen mailed corrected agreements to each impacted borrower and provided remediation that mitigated any potential borrower harm. RSF ¶¶ 253, 256.[11] Moreover, Ocwen's evidence rebuts Plaintiffs' substantive assertions (Mot. at 15) that Ocwen failed to tell borrowers that they would owe a deferred lump sum. [redacted] Plaintiffs also assert that Ocwen failed to tell borrowers that the loans would later be subject to higher interest rates. But Plaintiffs' own evidence establishes that these [redacted] And Ocwen's evidence establishes that this [redacted] and that all impacted borrowers were [redacted]. *Id.*

**3. There Also Is a Triable Dispute as to Whether the Benefit of Each of Ocwen's Loan Servicing Practices Outweighed Any Harms**

Not only do Plaintiffs lack loan-specific evidence establishing beyond dispute that Ocwen's loan-servicing practices led it to use inaccurate information that substantially harmed

[11] Plaintiffs argue (at 15) that [redacted]. RSF ¶ 257. Thus, Plaintiffs have not shown any substantial injury even for that small, unidentified fraction of borrowers.

individual borrowers, but a trial is also required to determine whether the benefits from Ocwen's loan servicing practices outweighed any such harms. As noted above, Plaintiffs mischaracterize the inquiry under Section 5531(c)(1) by focusing on Ocwen's supposed "practice" of using inaccurate information. As a result, Plaintiffs do not even purport to present evidence showing—as they must—that Ocwen's ***loan servicing practices*** caused harm that was not outweighed by their numerous countervailing benefits to borrowers.

As Plaintiffs acknowledge, many of the loans Ocwen serviced during the relevant period were challenging "loans for distressed borrowers" in need of a servicer. Mot. at 1, 4. The record reflects that Ocwen not only took on these loans and provided countless borrowers with loss mitigation options to help keep them in their homes, but did so "in a manner consistent with mortgage servicing standards [and], in many instances, … at a level that should serve as an example to other services." Ocwen SMF Ex. 21, ¶¶ 21, 113, 133. Further, Ocwen obtained many of the at-issue loans from prior servicers who had gone bankrupt or were otherwise failing, and whose servicing records were riddled with errors. Pls.' SOF ¶¶ 69-73; RSF ¶ 69; SJX 33 at 14:5-20. The benefits of Ocwen taking over those servicing activities, and correcting those records, are manifest. Moreover, as Ocwen's expert ***and Plaintiffs*** both acknowledge, "[i]t is impossible for servicers to avoid all inaccuracies or errors because they represent an inherent risk of mortgage servicing" due to its complexity, challenges posed by the volume and pace of regulatory and program changes, and the type of loans Ocwen services. CSF ¶ 332 (quoting Ocwen SMF Ex. 21, ¶ 21); Ocwen Mot. at 4-13 & *supra* Section I (discussing NMS's threshold error rates). Thus, the record contains abundant evidence from Ocwen, industry practices and standards, the NMS, and Plaintiffs themselves for the finder of fact to conclude that the benefits from each of Ocwen's servicing practices outweighed any potential harm to a small fraction of borrowers. A trial is therefore necessary before this Court can decide whether Ocwen is liable.

In sum, Plaintiffs' motion for partial summary judgment that Ocwen violated the CFPA and FDCPA by servicing loans using inaccurate information should be denied.

### B. The Documents Cited By Plaintiffs Do Not Show That Ocwen Deceived Borrowers in Violation of the CFPA and FDCPA (CFPB Counts II and VI, Florida Count VIII)

Plaintiffs argue (at 21-22) that the same Ocwen documents that they rely to try to show Ocwen used inaccurate information also show that Ocwen deceived borrowers. Specifically, this section of Plaintiffs' Motion cites to the same paragraphs in Plaintiffs' Statement of Facts that

are cited in the prior section of Plaintiffs' Motion. Unfortunately for Plaintiffs, ***the opposite is true***: for the same reasons that the Ocwen documents fail to establish that Ocwen unfairly used inaccurate information, they also fail to establish that Ocwen deceived borrowers.

As the Court previously wrote, under the CFPA, an act "is deceptive if: (1) there is a representation … that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation … is material." ECF No. 452 at 53-54 (citations and internal quotation marks omitted). The FDCPA, for its part, prohibits a "debt collector" from using a "false … representation … in connection with the collection of any debt," (15 U.S.C. § 1692e), but "[o]nly material misrepresentations constitute violations of the FDCPA," and "[t]o be a material misrepresentation, a statement must influence a consumer's decision or ability to pay or challenge a debt" (*Bryant v. Kass Shuler, P.A.*, 2017 U.S. Dist. LEXIS 27811, at *4 (S.D. Fla. Feb. 28, 2017) (citations and internal quotation marks omitted).

As a threshold matter, for the same reasons set forth above with respect to Plaintiffs' "unfairness" claims under the CFPA and FDCPA, Plaintiffs must prove their "deception" claims under with respect to ***specific individual loans***. That is so because: (1) Judge Matthewman and Plaintiffs already acknowledged that requirement; (2) the remedies that Plaintiffs seek turn on the number and identity of any violations; and (3) Plaintiffs allege individualized, loan-specific misrepresentations in individualized, loan-specific circumstances. *See supra* Section II. Indeed, courts have held that these kinds of claims must be established for specific individual loans. *See Pittman v. Seterus, Inc.*, 2015 U.S. Dist. LEXIS 157773, at *9 (N.D. Tex. Oct. 28, 2015) (plaintiffs must point to specific acts with credible summary judgment evidence; merely alleging "numerous instances" that constituted violations of 12 U.S.C. § 5536(a) does not suffice); *CFPB v. Nationwide Biweekly Admin., Inc.*, 2017 U.S. Dist. LEXIS 145923, at *17 (N.D. Cal. Sept. 8, 2017) (lack of consumer-specific proof foreclosed claimed monetary remedies). Moreover, courts have repeatedly held that where, as here, a misrepresentation claim is based on communications that "varied from customer-to-customer," resolving the claim "necessarily involves an individual review of what each [individual] was told and what information was provided." *Johnston v. HBO Film Mgmt.,* 265 F.3d 178, 185-90 (3d Cir. 2001).[12] Indeed, the

[12] *See*, *e.g.*, *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 685-87 (S.D. Fla. 2008) (denying class certification of FDUTPA claim based on need for "individual inquiry" of each

CFPB's own UDAAP Examination Manual provides that "an individual statement, representation, or omission" must be evaluated "not in isolation, but rather in the context of the entire . . . transaction[] or course of dealing." CFPB Consumer Laws and Regulations: Unfair, Deceptive, or Abusive Acts or Practices at 5 (2012).[13]

Plaintiffs' only effort to demonstrate that they have evidence supporting their deceptive misrepresentation claims consists of six bullet points set forth at pages 22-23 of their Motion, which Plaintiffs say are situations involving miscommunications "about the amount of debt a borrower owed." But those bullet points merely rehash a subset of the same factual assertions that Plaintiffs made in the section of their Motion concerning their unfairness claim. As shown in detail at pages 15-19 above, those factual assertions are not supported by the Ocwen documents that Plaintiffs rely on, and are refuted or at least rebutted by still other Ocwen evidence. In particular, the cited materials do not establish that the information was in fact inaccurate, do not show that any potentially inaccurate information was actually sent to each borrower, and do not address specific, individual loans. Thus, Plaintiffs clearly are not entitled to partial summary judgment on these claims either.

### C. <u>The Cited Evidence Also Fails Prove That Ocwen Violated TILA.</u>

In a single sentence, Plaintiffs assert (at 24) that the same documents they rely on for their CFPA and FDCPA claims also prove that Ocwen violated TILA and Regulation Z by sending inaccurate periodic statements to borrowers. For that claim, Plaintiffs must prove that: (1) each borrower's statement omitted or contained inaccuracies specifically governed by TILA and Regulation Z (*see* 12 C.F.R. § 1026.41(d)); (2) each borrower, in fact, received the purported inaccurate information in a periodic statement (*id.*); and (3) the inaccuracy or omission harmed or presented a material risk of harm to each borrower. *See Littlejohn v. Phoenix Title Loans, LLC*, 2020 WL 209936, at *3-4 (D. Ariz. Jan. 14, 2020) (dismissing TILA claim because plaintiff failed to show the procedural violation "harmed or presented a material risk of harm," as required to maintain a claim for a violation under TILA in federal court). Moreover, as with their other claims, Plaintiffs must establish the elements of their TILA claim for each individual

---

class member in light of varying communications); *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 480-82 (S.D. Fla. 2006) (same).

[13] Available at https://files.consumerfinance.gov/f/documents/102012_cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf (the "CFPB UDAAP Examination Manual").

loan. *See Bayer v. Nationstar Mortg. LLC,* 2017 U.S. Dist. LEXIS 44520, at *26-27 (D. Ariz. Mar. 27, 2017) (granting defendants' summary judgment where plaintiffs only cite to exhibits showing assessment of fees and receipt of payment, but did not explain why or how these instances violated TILA).[14]

For the same reasons already shown with respect to Plaintiffs' CFPA and FDCPA claims at pages 15-19 above, the documents relied on by Plaintiffs do not show, for any individual loan (much less all of the at-issue loans), any of the three elements of Plaintiffs' TILA claims. Plaintiffs, thus, are not entitled to partial summary judgment on their TILA claims either.

### D. Plaintiffs' Evidence Also Fails to Establish That the FDCPA Even Applies to the At-Issue Loans

As already shown, Plaintiffs' evidence fails to establish beyond dispute that Ocwen used and transmitted inaccurate loan information in violation of the CFPA and FDCPA. But Plaintiffs' claims under the FDCPA fail for the additional reason that Plaintiffs' evidence does not even establish that the FDCPA applied to the at-issue loans.

Plaintiffs assert (at 7-8) that the FDCPA applies to the loans at-issue in this case because Ocwen generally "is a debt collector under the FDCPA." But courts have held that whether the defendant is a "debt collector" under the FDCPA must be determined for the specific debt at issue in the plaintiff's claim. In *Prince v. NCO Fin. Servs.*, 346 F. Supp. 2d 744 (E.D. Pa. 2004), for example, the plaintiff argued that the FDCPA applied because the defendant had acknowledged that, for at least some of its business actions, it qualified as a "debt collector" within the meaning of the FDCPA. The court disagreed. It observed that the exception to the definition of a "debt collector" in 15 U.S.C. § 1692a(6)(F) "refers to the debt at issue" in the particular case. *Id*. at 751. Accordingly, the court held, "an entity may generally be a 'debt collector' without being a 'debt at collector' in a specific situation"—that is, if the debt at issue in the case was not in default at the time it was ***obtained*** by the defendant. *Id*. Multiple courts have agreed. *See, e.g.*, *Daye v. Portfolio Recovery Assoc., LLC*, 2008 U.S. Dist. LEXIS 134088, at *6-7 (D. Conn. Aug. 29, 2008); *Martin v. Select Portfolio Serv. Holding Corp.*, 2008 U.S. Dist. LEXIS 16088, at *12 (S.D. Ohio Mar. 3, 2008); *Pulawa v. Fed. Recovery Servs., Inc.*, 2006

---

[14] *See also Schwartzbaum v. Emigrant Mortg. Co.*, 2012 U.S. Dist. LEXIS 177492, at *10-11 (S.D.N.Y. Dec. 14, 2012) (granting defendant's motion for survive summary judgment because plaintiffs have not explained why the TILA-required disclosures were inaccurate, let alone pointed to any evidence on which a factfinder could find an inaccuracy).

U.S. Dist. LEXIS 31869, at *24-25 (D. Haw. Apr. 28, 2006).

Thus, to establish their FDCPA claims, Plaintiffs must prove, ***for each loan***, that the loan was in default at "the time it was obtained by" Ocwen. Plaintiffs have not cited any such evidence. Instead, Plaintiffs rely on data that reflects the delinquency status of these loans at the time that they were ***boarded*** into Ocwen's REALServicing system. Pl.'s SOF ¶ 73; RSF ¶¶ 73, 116.[15] But, for two separate reasons, a loan's status when it was boarded into REALServicing may have been different than its status when Ocwen acquired the loan. First, for loans acquired from other servicers, Ocwen could not simultaneously acquire and board loans into REALServicing both because transferring loan information from prior servicers with different data systems was not fully an automated process and necessarily took time, and because all of the information necessary for boarding was not always provided by the prior servicer on the date of acquisition. *See* RSF ¶¶ 73, 116-17 & RSF Ex. 13, ¶¶ 19-27. Thus, a loan's status at the time it was boarded may not be the same as its status at the time it was acquired. *See id.* Second, for loans that Ocwen had previously obtained and had serviced using one of its legacy data systems, and then later boarded into REALServicing, the reported delinquency status reflects the status as of the date each loan was boarded into REALServicing—not its status as of the date Ocwen ***acquired*** the loan (sometimes months or years prior). RSF ¶ 116. For both of these reasons, the fact that the document relied on by Plaintiffs indicates that a loan may have been in default at the time it was boarded into REALServicing does ***not*** prove that it was in default on the date it was ***obtained*** by Ocwen. Thus, Plaintiffs failed to meet their burden.

Second, Plaintiffs' reliance on the REALServicing data as to each loan's default status is also flawed because the loan transaction files are the best evidence of whether a loan was in default on any particular date. For example, if a borrower whose loan was being transferred to Ocwen sent her next payment to her prior servicer (or someone else) rather than Ocwen, that loan might have been listed as being in default on the boarding date even though the loan

[15] After a loan is acquired from another mortgage servicer, that loan (and information required to service it) needs to be "boarded" into the new servicers system of record (in this case Ocwen's REALServicing system) so that it can be serviced. RSF ¶ 116-17. As Ocwen explained to Plaintiffs' in querying the requested data, Ocwen could not query prior servicer's systems of record, nor could it reasonably query from any Ocwen systems pre-dating REALServicing. *Id.* ¶ 116; SJX 147 at 11. Thus, because REALServicing only recorded a loan's delinquency status at the time of ***boarding***, that was the information provided to the CFPB. *Id.*

servicing files would accurately reflect that it was not in default once the misdirected payment was transferred to Ocwen. *See* RSF ¶¶ 73, 116. Indeed, a review of the loan transaction files indicates that this (or something similar) likely happened for at least some of the loans that the CFPB claims were delinquent at the time of boarding. RSF ¶ 73 & Ex. 13, ¶¶ 19-35. But even though Plaintiffs were aware that the REALServicing data was not the best evidence of a loan's default status on the boarding date (much less on the date Ocwen acquired the loan), Plaintiffs did not bother to assemble evidence of each loan's status from the loan transaction files. For this further reason, they have not established beyond genuine dispute that the FDCPA even applied to each of the at-issue loans.

## IV. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR ESCROW-RELATED CLAIMS UNDER RESPA (CFPB COUNT VII; FL COUNTS I-II)

Plaintiffs allege that Ocwen violated RESPA in servicing borrower escrow accounts. *See* Mot. at 24-29. As a threshold matter, as shown in Section I above and in Ocwen's summary judgment motion (at 4-13 & SMF ¶¶ 1-67), these claims are precluded by the NMS, including the parties' agreed-upon threshold tolerance for the escrow-related conduct. Plaintiffs' motion for partial summary judgment on their RESPA claims should also be denied because Plaintiffs lack evidence to prove all of the RESPA elements as to any individual loans, and because Ocwen's contrary evidence raises genuine fact disputes in any event.

### A. <u>Plaintiffs Have Not Established Beyond Dispute Their RESPA Claims Relating to Escrow Analyses and Statements</u>

Plaintiffs request partial summary judgment as to Ocwen's alleged failure to conduct timely escrow analyses and to send timely escrow statements. Mot. at 26-27. Both claims fail for lack of undisputed evidence establishing all of their elements.

#### 1. The Cited Document Does Not Prove Beyond Dispute That Ocwen Violated Regulation X by Failing to Send Timely Escrow Statements

Plaintiffs' claim that Ocwen failed to timely send out escrow analysis statements is based on a single Ocwen document that contains a mailing date code from the Ocwen data system indicating that the statement was not sent within 30 days of the year-end. Pls.' SOF ¶¶ 199-200 (citing SJX 87); RSF ¶ 200. But that document does not establish Plaintiffs' RESPA claim beyond genuine dispute for two separate reasons.

First, Ocwen's 30(b)(6) witness testified that the lack of a mailing date code in the data system "does not factually mean that a customer did not get" a timely annual escrow analysis

statement. RSF ¶ 200 (citing SJX 38 at 169:4-23). Instead, as evidenced by the Escrow Action Plan to which Plaintiffs cite, third-party consultants determined that code issue reflected only an inability to "validate the mailing of statements in all cases"—not an actual failure to mail statements. RSF ¶ 158. Accordingly, the single document relied on by Plaintiffs' does not prove beyond genuine factual dispute that the statement for each loan was mailed late.

Furthermore, as Plaintiffs concede (at 27), Regulation X did not require Ocwen to send escrow statements to borrowers who were delinquent, in bankruptcy, or in foreclosure at the time the statement otherwise would have been due. 12 C.F.R. § 1024.17(i)(2); Ocwen Mot. at 34-35 & SMF ¶ 207. In a claimed effort to exclude such loans, Plaintiffs rely on a data field, in the same chart, that contained the words "not delinquent" for certain of the loans. Pls.' SOF ¶¶ 200-201. But Plaintiffs have no proof that that field, in that chart, reflects that the borrower was not delinquent within the meaning of Regulation X. RSF ¶¶ 200-01. Moreover, documents from the actual loan servicing files from these loans show that some of the loans marked as "not delinquent" on that chart were, in fact, delinquent or in bankruptcy the time of the escrow analysis statement. *Id.* ¶ 201. For all these reasons, this one Ocwen document plainly does not establish Plaintiffs' late-statement claim beyond genuine dispute for any loans.

#### 2. The Cited Documents Do Not Indisputably Prove That Ocwen Violated Regulation X by Failing to Conduct Timely Escrow Analyses

To support their claim that Ocwen failed to conduct timely escrow analyses, Plaintiffs point to an Ocwen audit from July 2013. Pls.' SOF ¶ 164 (citing SJX 86). But that audit was completed before the time period covered by this case and is thus irrelevant to Plaintiffs' claims. That is particularly so because it is undisputed that Ocwen changed its processes regarding annual escrow analyses by 2014. RSF ¶ 164; Ocwen SMF 210 & Ex. 92. Alternatively, Plaintiffs point to an Ocwen discovery response that, they contend, admitted that Ocwen failed to timely perform escrow analyses for certain at-issue loans. *See* Pls.' SOF ¶ 169 (citing SJX 55). As already shown above (at 15-16), however, Ocwen's discovery response said that the electronic data being produced merely "indicate[d]" that analyses had not been timely performed. RSF ¶ 168. And while Plaintiffs had extensive loan-level information from Ocwen that would actually have established whether or not timely analyses had been conducted, Plaintiffs never bothered to do that review. Moreover, a review of a portion of the loan-level data shows that Ocwen likely ***did*** conduct escrow analyses for many of the listed loans during the period where Plaintiffs allege the escrow analysis was delayed. CSF ¶ 311. Thus, Plaintiffs

have not established this late-statement claim beyond genuine dispute for any loans.

#### 3. Plaintiffs Also Have Failed to Show Beyond Dispute That Any Late Escrow Analysis or Statement Caused Any Consumer Harm

Even beyond Plaintiffs' failure to prove late statements or analyses for any individual loans, Plaintiffs have not presented any undisputed evidence that individual borrowers were injured by these claimed errors. Plaintiffs' Motion thus fails because "[a]bsent a showing of actual damages as a result of noncompliance with any provision of the Act, a plaintiff cannot maintain a successful action under RESPA." *Reid v. Hasty*, 2008 U.S. Dist. LEXIS 133879, at *23 (N.D. Ga. March 13, 2008) (recommending that Ocwen's motion to dismiss be granted), *adopted by Reid*, No. 07-cv-02475 (ECF No. 67) (N.D. Ga. July 16, 2008).

As a preliminary matter, Plaintiffs cite no documents that show that each borrower ***actually overpaid*** as a result of an allegedly delayed escrow analysis or escrow analysis statement. Instead, Plaintiffs attempt to support their vague claim that "[m]any borrowers paid the inaccurate, outdated escrow amounts that Ocwen billed them" (Mot. at 11) based on SJX 140. But that document merely shows "the Escrow Shortage or Escrow Surplus that ***accrued*** [ ] during the time period where Ocwen did not complete an Escrow Account Analysis." Pls.' SOF ¶¶ 184, 186 & SJX 138 at 11. It does not show whether the borrower actually ***paid*** the shortage.[16] RSF ¶¶ 184-86 & SJX 138 at 11. Again, Plaintiffs' effort to piggyback on Ocwen documents fails because they do not contain the information needed to establish Plaintiffs' claims. Further, Ocwen's own evidence indicates that many borrowers likely did ***not*** make any such payment. For example, some borrowers either never became current and thus never paid the shortage amount, or had their loans modified to become current. RSF ¶¶ 171-73, 177; CSF ¶¶ 309-11. Additionally, in some instances when borrowers might not have received a timely annual escrow analysis statement, the analysis was still performed and the borrower still received accurate, timely information about their escrow account through another updated billing statement or other communication from Ocwen. CSF ¶ 311. Thus, there was no risk of the borrower paying Ocwen incorrect escrow amounts because the borrower still received ***the exact same information*** that would have been in the escrow statement.

Whether each borrower suffered harm is genuinely disputed for the additional reason that

[16] Ocwen's damages expert opined that Plaintiffs' damages expert's reliance on that document "yield[ed] clearly erroneous estimates of damages" when contrasted with the transaction history produced in this litigation. CSF ¶ 315.

even if a borrower actually made a payment that was actually affected by a late analysis, Ocwen's evidence shows that the financial impact was often ***de minimis*** and, in any event, was remediated by Ocwen. Many loans "had no accrued shortage or surplus, or an accrued shortage or surplus of less than $50," and for "[t]he majority of the accounts" where a borrower's escrow analysis was delayed, the loans accrued "less than a $250 shortage or surplus." CSF ¶ 314 (citing SJX 138 at 11-12); *id.* ¶ 318.[17] Further, Ocwen provided remediation for those borrowers. *See* CSF ¶¶ 316-17; Ocwen SMF ¶ 213. For borrowers who were in bankruptcy when a shortage or surplus accrued, Ocwen waived the shortages and credited the surpluses. CSF ¶ 317; Ocwen SMF ¶ 213. For other borrowers, Ocwen refunded surpluses and extended the amount of time allotted to the borrower to repay the accrued shortage beyond 12 months—typically 24-to-60 months. CSF ¶ 316; *see also* RSF ¶ 185.

Likewise, the existence of consumer harm is in genuine dispute with respect to Plaintiffs' claim that some consumers received an inaccurate reinstatement quote. Mot. at 11. Plaintiffs offer no evidence of such consumer harm. Rather, in the document cited by Plaintiffs, Ocwen said only that the identified reinstatement quotes were ***potentially*** inaccurate, and their accuracy could not be precisely determined without a manual review of the servicing file. RSF ¶ 194 (citing SJX 138 at 18). As noted, even though Ocwen pointed that out to Plaintiffs in June of 2019 (SJX 138), Plaintiffs apparently never analyzed those individual files. Furthermore, Ocwen's evidence shows that for the vast majority of borrowers who may have received a potentially inaccurate reinstatement quote, the escrow amount would have had no impact for several reasons—e.g., because Ocwen provided the borrower a loan modification after providing the reinstatement quote or because the borrowers were compensated through a targeted remediation. RSF ¶¶ 191-97 (citing SJX 138 at 18-21); RSF ¶ 192 (citing SJX 84).

In sum, Plaintiffs' motion on their RESPA claims must be denied for the further reason that the borrower harm element of those claims is genuinely disputed as well.

### B. Plaintiffs Have Not Indisputably Established Their Claim That Ocwen Required Borrowers to Pay Escrow Shortage Amounts No Longer Owed

Plaintiffs claim (Mot. at 27-28) that Ocwen violated Regulation X (12 C.F.R.

[17] Relatedly, even though Plaintiffs' damages expert (McFadden) claims that certain loans suffered opportunity cost damages due to escrow analysis delays, he concedes that those loans had an average delay of ***only 1.4 months*** and estimates that the average amount of opportunity cost damages experienced by the borrowers on these loans was a mere $15. RSF ¶ 172.

§ 1024.17(f)(3)) by, supposedly, "requir[ing] borrowers to pay purported escrow shortages that no longer existed." Mot. at 28. This hyperbolic claim is based entirely on a discovery response that identified instances where a borrower made a shortage payment, but Ocwen did not reflect that payment on the borrower's account within Ocwen's own ***internal*** time limit for doing so. Pls.' SOF ¶ 210 (citing SJX 138, 142). That document fails to prove Plaintiffs' Regulation X claim for three separate reasons.

First, the provision of Regulation X on which Plaintiffs rely has nothing to do with how quickly a shortage payment must be reflected on the borrower's account. Instead, Section 1024.17(f)(3) simply provides that "[i]f an escrow account analysis discloses a shortage of less than one month's escrow account payment," the servicer may: (a) "allow a shortage to exist and do nothing to change it;" (b) "require the borrower to repay the shortage amount within 30 days;" or (c) "require the borrower to repay the shortage amount in equal monthly payments over at least a 12-month period." Plaintiffs acknowledge that Ocwen allowed borrowers to repay the shortages over a period of 12 months or more. Mot. 28; Pls.' SOF ¶¶ 185, 203; RSF ¶¶ 185, 203. And any supposed delay in processing the payment does not show a violation of the Regulation.

Second, Ocwen's discovery response simply identified certain shortage payments as having been processed outside of Ocwen's then-operative ***internal*** service level accuracy ("SLA") standard.[18] RSF ¶ 210. But neither Regulation X nor any other statute or regulation imposed such a deadline for Ocwen to process escrow shortage payments. RSF ¶ 207 (citing SJX 138, at 26).[19] It is ironic, to say the least, that the watchdog agency that put the regulatory timelines in place (CFPB) is seeking to hold Ocwen liable for not moving ***faster*** than required.

Third, Plaintiffs have also failed to prove that any borrower was actually harmed by Ocwen's delay in processing shortage payments, which as noted above is an element of this RESPA claim. *Reid*, 2008 U.S. Dist. LEXIS 133879, at *23 (proof of actual damages is an essential element of RESPA claim). Moreover, Ocwen's own evidence shows that even if Ocwen's late processing of a shortage ever contributed to Ocwen over-collecting some money

[18] Plaintiffs have not made any effort to connect these shortage payments to the 111,960 loans the CFPB claims are at issue for this claim. *See* Ocwen SMF ¶ 202.

[19] Moreover, Ocwen has established that often the delayed processing of a shortage occurred through no fault of its own. CSF ¶ 321. For example, many borrowers during the relevant time period failed to mark their payments as an escrow shortage payment, and failed to send their payments to the proper address for payment of escrow shortages. *Id.*

from a borrower, that would have been automatically remedied when the next escrow analysis was conducted. RSF ¶ 211 (citing SJX 138). Likewise, the testimony that Plaintiffs rely on confirms that if any borrower overpaid towards escrow, the surplus would be refunded to the borrower automatically or through a lookback analysis. *See* CSF ¶¶ 316-17, 319-20. For all of these reasons, Plaintiffs' RESPA claim as to the timing of payment processing either fails as a matter of law or, at most, presents genuine issues of fact for trial.

### C. Plaintiffs Have Not Proven Beyond Dispute That Ocwen Failed to Timely Pay Hazard Insurance Premiums for the At-Issue Loans

Plaintiffs allege that Ocwen failed to timely pay insurance premiums for "many current borrowers" by alleging that "Ocwen has acknowledged late payments due to errors by Ocwen or its vendors" through four pieces of evidence. Mot. at 28-29. But none of Plaintiffs' evidence supports summary judgment on that claim.

First, Plaintiffs assert that an Ocwen discovery response "identified 1,367 loans 'where a borrower's hazard insurance was cancelled, and … that cancellation was the result of Ocwen or vendor error.'" Pls.' SOF ¶ 222. That misrepresents the response. In fact, Ocwen's response stated that insurance policies for these loans were "***potentially*** 'erroneously canceled'" as a result of Ocwen or vendor error, and that it would be necessary to "manually review each loan to determine whether hazard insurance on the account was cancelled due to Ocwen's or a vendor's error." SJX 138 at 22-23 (emphasis added) & 141; RSF ¶ 222. That response plainly does not constitute an admission satisfying Plaintiffs' burden of proving their claim for each (or any) of the loans, much less proving them beyond genuine factual dispute. Moreover, even if any of these loans had its insurance cancelled due to Ocwen or vendor error, the cancellation resulted in increased premiums or other monetary harm for only 352 borrowers, and those borrowers were remediated with a credit equivalent to at least three years of the increase in the premium. CSF ¶ 322. Thus, this discovery response does not establish, beyond factual dispute, either erroneous cancellations or resulting borrower harm.

Second, Plaintiffs point to a letter Ocwen sent to its vendor saying that "in October 2014, SWBC had approximately 40,000 premium disbursements that were not processed timely." Pls.' SOF ¶¶ 218-219 & SJX 179. This letter does not support summary judgment for multiple reasons. At the outset, it does not address—let alone admit violations for—***any specific loans***. Also, Ocwen's statement in the letter that insurance disbursements were not "timely" processed did not refer to any RESPA-required standard. Finally, as Plaintiffs concede, RESPA and

Regulation X only require servicers to make a borrower's payments for insurance premiums to the relevant third party in a timely manner "as long as the borrower's payment is not more than 30 days overdue." Pls.' Mot. at 28-29 (citing 12 U.S.C. § 2605(g) and 12 C.F.R. § 1024.17(k)(1)). But the letter does not state, and Plaintiffs point to no other evidence to establish, that the 40,000 disbursements were for ***current*** loans. Once again, Plaintiffs' reliance on Ocwen business documents to prove Plaintiffs' statutory claims is wildly misplaced.

Next, Plaintiffs point to three documents allegedly reflecting [redacted]. The first two documents reflect voluntary subsequent remedial measures and hence are inadmissible. *See supra* at 15. Those two documents also are insufficient on their face because they do not acknowledge RESPA violations for any specific loans. RSF ¶ 231 (discussing [redacted]). The third document [redacted] prepared by state regulators. That self-serving document is inadmissible hearsay. *See FDIC v. Hall*, 2016 U.S. Dist. LEXIS 185592, at *3-7 (M.D. Fla. Oct. 6, 2016) (Reports of Examination of bank prepared by state and federal regulators may not be offered for the truth of the matter asserted) (citing Fed. R. Evid. 801(c)(2)). And, in any event, that document cannot support summary judgment as it contains no loan-specific proof of the alleged violations. RSF ¶ 230.

Finally, Plaintiffs point to lookback and remediation analysis information that Ocwen produced regarding certain Florida loans, to claim 853 Florida loans also had untimely insurance disbursements. Pls.' SOF ¶¶ 225-27 & SJX 180. Contrary to Plaintiffs' claim, however, neither the lookback analysis, Ocwen's discovery response, nor Ocwen's letter transmitting the analysis says that the Florida loans were loans for which the borrower's hazard insurance was cancelled as a result of Ocwen's or its vendor's error. RSF ¶ 226. Moreover, Plaintiffs ***do not even allege that any of these 853 loans were current*** when their insurance premiums were due (as required to establish a RESPA claim). The servicing records would show that many likely were not. Thus, Plaintiffs cannot establish a RESPA violation for any of the 853 loans. And, finally, whether there was any resulting consumer harm is at least genuinely in dispute given that fewer than 100 of the loans obtained a lender-placed insurance policy with a higher premium and Ocwen remediated each of those loans. Pls.' SOF ¶¶ 226-27; RSF ¶ 225; CSF ¶ 324.

## V. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR INSURANCE-RELATED CLAIMS UNDER THE HPA (CFPB COUNT X; FLORIDA COUNT IV)

Plaintiffs assert that Ocwen violated the HPA, 12 U.S.C. § 4902(b), by "(1) failing to terminate PMI on the [required] termination date; (2) in connection with residential mortgage transactions; for (3) borrowers who were current" on their loans. Mot. at 29-30. Plaintiffs rely on a single chart that Ocwen produced in response to a discovery request. Pls.' SOF ¶¶ 246-52 (citing Plaintiffs' Ex. 123).[20] But that chart does not indisputably establish an HPA violation for any loan, much less all of the loans listed on that chart, for at least three reasons.

First, as Plaintiffs' Motion acknowledges but then ignores, the HPA's requirement to cancel PMI on the "termination date" applies only to "borrowers who were current." Mot. at 29. That is, "if, on that [termination] date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction." 12 U.S.C. § 4902(b)(1). The chart on which Plaintiffs rely does not indicate whether or not each loan was current on the termination date. *See* RSF ¶¶ 246-52 & SJX 123. And documents from the actual loan servicing files from these loans confirm that some loans identified on the chart were, in fact, delinquent or in bankruptcy the time of the escrow analysis statement. *See* CSF ¶ 330. On this element, thus, Plaintiffs' HPA claim either is totally unsupported or, at best, in genuine dispute.

Second, the information on the chart does not even establish, for each loan, that PMI was canceled after the specified "termination date." Ocwen's Rule 30(b)(6) witness testified that the "Cancellation Date" listed on the chart for each loan was ***not*** "the date it was actually canceled," but instead was "the date that the transaction recorded in the system as canceled." SJX 36 at 197:11-20; RSF ¶¶ 248-52.[21] Thus, the chart also fails to establish beyond dispute that each, or any, of the loans had PMI canceled after the specified termination date—yet another required but unsatisfied (or at least disputed) element of Plaintiffs' PMI claims.

Finally, for many loans on the chart cited by Plaintiffs, the listed "Cancellation Date" was

[20] Plaintiffs also rely generally on an "Action Plan" and "Management Assertion Form" concerning the method by which Ocwen determined the termination date. Neither document, however, establishes that Ocwen failed to terminate PMI for any eligible loan in accordance with HPA requirements.

[21] Plaintiffs' employee Ridder asserts in her Declaration (at ¶ 67) that the Cancellation Date shown on the chart is "the date that Ocwen, in fact, cancelled the PMI," but all she cites is Combs' testimony which in fact says the opposite.

the same as—not later than—the identified "termination date." RSF ¶¶ 248-49. There is simply no basis for Plaintiffs to contend that these loans are violations of the HPA. For all of these reasons, Plaintiffs are not entitled to summary judgment on their HPA claims.

## VI. PLAINTIFFS ARE NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR LOSS MITIGATION AND FORECLOSURE CLAIMS (CFPB COUNTS III, IX AND FLORIDA COUNT III)

Plaintiffs argue (Mot. at 30-33) that the "undisputed facts show that Ocwen violated RESPA and the CFPA in its loss mitigation and foreclosure practices." As a threshold matter, these claims are barred by the NMS Consent Judgment, especially because the number of alleged violations falls well below the agreed-upon permissible error rates. *See supra* Section I; Ocwen Mot. at 4-13. Moreover, these claims are not eligible for summary judgment for two further reasons: (1) Plaintiffs lack evidence to establish multiple essential elements of their claims, and Ocwen's contrary evidence at a minimum raises a genuine dispute; and (2) Plaintiffs also have not presented undisputed evidence of consumer harm, another required element.

### A. <u>Plaintiffs' Loss Mitigation and Foreclosure Claims Lack Evidentiary Support or, at Most, Raise Disputed Fact Issues for Trial</u>

Plaintiffs assert that Ocwen engaged in three kinds of unlawful conduct relating to loss mitigation applications and foreclosures, but Plaintiffs demonstrably are not entitled to partial summary judgment on any of these claims.

#### 1. The CFPB Has Not Established Beyond Dispute That Ocwen Violated the CFPA by Sending Foreclosure-Related Letters (CFPB Count III)

The CFPB asserts (Mot. at 32) that Ocwen violated the CFPA when it sent letters to 45 borrowers with language supposedly indicating that Ocwen would not foreclose during the loss mitigation evaluation process, but then proceeded to do so. That argument, however, misreads the letters. By its plain terms, each letter's statement that the borrowers would not lose their home during the evaluation process applied only if (and after) the borrower's loss mitigation application was ***"certified as complete."*** RSF ¶ 262 (quoting SJX 94) (emphasis added). Specifically, the relevant section of the letter begins with the sentence, "***Once the package or your request has been certified as complete***, your application moves to underwriting, where we determine your eligibility." *Id.* (emphasis added). The letter goes on to state, "While you will not lose your home ***during the evaluation process***, to protect your rights under applicable foreclosure law, you may need to respond to these foreclosure notices or take other actions. *Id.* (emphasis added). Therefore, by its unambiguous terms, each letter's statement about

foreclosure only applied if and after the borrower's application was certified as complete. That limitation also makes sense, because no servicer could promise to forego foreclosure without an application ripe to evaluate. However, the vast majority of the 45 letters expressly stated that the borrowers' applications were "incomplete," and none of them certified that the borrower's application was complete. *E.g.*, SJX 94 at -135 ("At this time, your loss mitigation application is incomplete."). Thus, the letters ***refute*** Plaintiffs' claims. Finally, even if the letters' language were viewed as ambiguous, their correct interpretation raises a genuine dispute that must be resolved at trial. *See Shell*, 2020 U.S. Dist. LEXIS 100842, at *16.

**2. Florida Has Not Proven Beyond Dispute That Ocwen Violated RESPA's Acknowledgment Letter Requirements (FL Count III)**

Florida points (at 30) to a single Ocwen document as supposed proof that Ocwen "frequently" violated RESPA's deadline to acknowledge a borrower's initial mitigation application. Pls.' SOF ¶ 265 & [redacted]. But that document is inadmissible under Rule 407 as a voluntary subsequent remedial measure. *See supra* at 15. In any event, that document does not contain the information necessary to establish (much less beyond genuine dispute) a RESPA violation as to any loan. First, RESPA only requires a response if the application was received 45 or more days before the foreclosure sale. 12 C.F.R. § 1024.41(b)(2). The Ocwen document [redacted]), however, does not address whether each or any application met that condition. Second, RESPA applies only to a borrower's first application. 12 C.F.R. § 1024.41(i). The Ocwen document ([redacted]), however, does not address whether each or any application was the borrower's first. RSF ¶ 265. In short, the cited Ocwen document does not prove that Ocwen failed to acknowledge ***any*** application that was (1) received more than 45 or more days before the foreclosure date, and (2) was the borrower's first application. Once again, Florida's "Plan B" effort to salvage their case based on Ocwen's business documents does not remotely meet their burden to justify partial summary judgment.

**3. Florida Has Not Indisputably Shown That Ocwen Violated RESPA's Evaluation Notice Requirements (FL Count III)**

Florida asserts (at 30-31) that Ocwen violated RESPA by failing to send timely evaluation notices to certain borrowers within 30 days of receiving complete loss mitigation applications. Again, Florida's sole support for this allegation is a single Ocwen document that is inadmissible under Rule 407 as a subsequent remedial measure (*supra* at 15). Pls.' SOF ¶ 266, [redacted]. Furthermore, this RESPA requirement applies only if the completed application was

received more than 37 days before a foreclosure sale (12 C.F.R. § 1024.41(c)(1)), but the Ocwen document on which Florida relies ([redacted]) did not address whether each, or any, of the loans met that statutory requirement. RSF ¶ 266.

Florida also asserts (Mot. at 31) that Ocwen violated RESPA by failing to include appeal language in 72,488 Evaluation Notices. But the three Ocwen documents cited for this claim do not establish a violation for any loan, much less all 72,488. As a dispositive preliminary matter, all three documents reflect subsequent remedial measures and thus are inadmissible under Rule 407. *See supra* at 15. Moreover, [redacted]. Furthermore, none of these documents establish ***any*** RESPA violation because none address whether or not each application was the borrower's first, as required in order for the RESPA requirement to apply. *See* 12 C.F.R. § 1024.41(i). Additionally, none of these documents indicate whether borrowers submitted their applications 90 or more days before their foreclosure sale dates and were therefore entitled to an appeal under RESPA. *See* 12 C.F.R. § 1024.41(h)(1). Hence, once again, these documents do not contain the information necessary to establish a RESPA violation for any loan, much less do so beyond genuine dispute.[22]

### B. <u>Plaintiffs Also Have Not Proven the Alleged Conduct Harmed Individual Borrowers</u>

Plaintiffs are not entitled to partial summary judgment on their loss mitigation and foreclosure claims for the further reason that Plaintiffs have not adduced evidence to show, much less beyond dispute, that ***any*** individual borrowers were ***actually*** harmed by the alleged loss mitigation or foreclosure conduct. Injury is an element of these RESPA-based claims. *See supra* Section III.A.2-3; *Reid*, 2008 U.S. Dist. LEXIS 133879, at *23 ("Absent a showing of ***actual*** damages as a result of noncompliance with any provision of the Act, a plaintiff cannot maintain a successful action under RESPA.") (emphasis added). Plaintiffs' Motion presents no evidence demonstrating that each and every at-issue borrower actually qualified for a

[22] To the extent these documents note that this issue "may" or "could have" affected other loans, obviously those statements do not constitute proof of any violation.

modification, nor have Plaintiffs shown that each and every borrower did not end up receiving a modification as a result of any alleged error. In fact, some of Plaintiffs' own evidence found that no borrower harm resulted. *E.g.,* SJX 121, at 357.

For all of these reasons, Plaintiffs should not be granted partial summary judgment on their loss mitigation and foreclosure claims.

## VII. FLORIDA IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS FDUTPA CLAIMS CONCERNING PROPERTY INSPECTIONS AND INSURANCE (FLORIDA COUNTS VI & VII)

Florida argues (at 33-35) that Ocwen violated the FDUTPA by (A) charging borrowers excessive property inspection fees and (B) charging premiums for excessive insurance coverage. Like the rest of Plaintiffs' claims, these allegations are not established at all, much less beyond any genuine dispute, by the Ocwen documents that Florida relies upon. Again, "Plan B" fails.

As this Court has recognized (ECF No. 477 at 34), there is a split of authority as to the applicable test under the FDUTPA. Some cases apply a test under which the plaintiff must prove that the defendant's conduct "'offends established public policy' [i.e.], is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *E.g.*, *Cox v. Porsche Fin. Servs.*, 2020 U.S. Dist. LEXIS 27895, at *13 (S.D. Fla. Feb. 19, 2020). Others apply a test under which the plaintiff must prove the defendant's conduct resulted in consumer injury that was (1) substantial, (2) not outweighed by any countervailing benefits to consumers or competition from the practice, and (3) could not have been reasonably avoided by the consumers. *E.g.*, *Harrod v. Express Scripts, Inc.*, 2019 WL 8273650, at *4 (M.D. Fla. Aug. 16, 2019).

Under either standard, Florida has the burden to prove that Ocwen's conduct was wrongful, caused substantial harm, and was improper from a cost/benefit perspective.[23] Florida's cited evidence fails to establish beyond triable dispute any of these elements, much less all of them, for any individual loan.

### A. <u>Florida Has Not Proven Beyond Dispute That Ocwen's Property Inspection Fees Violated the FDUTPA (FL Count VII)</u>

Florida charges (at 34) that Ocwen's documents establish that, in four circumstances, it overcharged borrowers for property inspections. But the cited documents do not indisputably prove that Ocwen violated the FDUTPA in any of these respects. Specifically, with respect to each of the four numbered situations argued in Plaintiffs' Motion (at 34):

---

[23] Even under the second test, "injury" necessarily implies wrongful conduct.

(1) Florida inaccurately asserts that [redacted] Thus, the document does not prove (or even suggest) that the amount of the charge violated Ocwen's agreement ***with the borrower***. In other words, it does not show that the borrower's rights were violated. [redacted] Thus, Florida also cannot establish that borrowers were substantially injured.

(2) Florida cites Ocwen documents that purportedly show that Ocwen sometimes allowed "more than one vendor to inspect the property." Mot. at 34. But the documents actually ***negate*** any contention, as required, that each borrower suffered substantial harm. First, the documents indicate that "***in some cases***, the activities result[ed] in a duplicative assessment to borrowers ***and/or investors***." RSF ¶ 277 & CSF ¶ 327 (emphasis added). Thus, the evidence does not even show that each borrower was charged; instead, on some loans the investor was charged, while on other loans no one was charged. Moreover, the documents show that in situations where the borrower was charged, the borrower has had "the same [charge] refunded." CSF ¶ 328 (quoting SJX 173, at -823). Thus, Florida's evidence fails to establish that any borrower suffered any substantial injury. Moreover, once again, the cited Ocwen documents do not identify any specific loans, and hence provide Florida with no loan-specific evidence, as it needs. *See* SJX 167, 173, 183-84.

(3) Florida argues that Ocwen documents (SJX 171, 174) indicate that Ocwen was "ordering property inspections where loss mitigation workouts were pending." Mot. at 34; Pls.' SOF ¶¶ 278-280. But the cited documents, which are inadmissible under Rule 407 as reflecting subsequent remedial measures (*supra* at 15), do not say that doing so violated each borrower's rights or "injured" each borrower, much less substantially. RSF ¶¶ 278-280. Furthermore, once again, the cited Ocwen documents do not identify any specific loans, much less suggest how many loans this may have happened with. *Id.*

(4) Finally, pointing primarily to two Ocwen documents, Florida contends that until mid-

2014, Ocwen sometimes "order[ed] property inspections more often than was contractually allowable by GSEs." Mot. at 34. As a threshold matter, Ocwen's testimony establishes that there are certain circumstances under which Ocwen was required to conduct inspections more frequently than the 30-day period referenced by Florida. CSF ¶ 329. Moreover, even where such inspections were not required, neither of the documents relied on by Florida (SJX 171-72) states that the frequency of the inspections violated the borrower's rights—as opposed to any guidelines that the GSEs had developed for their own separate purposes. Thus, these documents do not establish any FDUTPA violations. *See*, *e.g.*, *Kirchner v. Ocwen Loan Servicing, LLC*, 257 F. Supp. 3d 1314, 1321-22 (S.D. Fla. 2017) (no violation of state unfair trade practices statutes where Ocwen allegedly conducted inspections "inconsistent with . . . Fannie Mae Guidelines"). Finally, once again, the Ocwen documents relied on by Florida do not identify any specific loans, and thus provide no loan-specific evidence, as required. *See* SJX 171-72.

### B. Florida Has Not Proven That Ocwen's Arrangement of Lender-Placed Insurance Violated the FDUTPA (Count VI)

Florida also argues that Ocwen charged borrowers for premiums for "excessive" dollar amounts of hazard and flood insurance coverage that Ocwen arranged for certain borrowers (called Lender-Placed Insurance or "LPI").[24] Mot. at 35. Specifically, it alleges that, according to an Ocwen document, "Ocwen required borrowers to pay for coverage amounts … that exceeded the required statutory or investor minimum coverage." *Id.*; Pls.' SOF ¶ 240.

This claim fails—or, at the very least, is subject to genuine factual dispute—because the borrowers expressly agreed that if they failed to maintain insurance, Ocwen could arrange for insurance coverage in an amount at Ocwen's discretion (not just the minimum amount required by statute). Specifically, the borrowers explicitly agreed that:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by . . . any [] hazards . . . for which [Ocwen] requires insurance. This insurance shall be maintained in the amounts . . . that [Ocwen] requires. . . .
>
> If Borrower fails to maintain any of the coverages described above, [Ocwen] may obtain insurance coverage, at [Ocwen's] option and Borrower's expense. [Ocwen] is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender . . . and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of

[24] Florida has not moved for partial summary judgment on its separate claim that Ocwen improperly arranged for insurance "where the borrower had insurance." Mot. at 3 n.3.

> the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

CSF ¶ 323. Thus, by their plain terms, the borrowers expressly agreed that (1) Ocwen was not required to obtain "any particular . . . amount of coverage," (2) the amount of coverage might be "greater . . . than was previously in effect," and (3) "the cost" of that insurance "might significantly exceed" what he or she would have obtained on his or her own. *Id.*

Not only did borrowers expressly agree that Ocwen could arrange for greater amounts of insurance coverage, but Ocwen had good reason to do so. As the Eleventh Circuit recognized, while the minimum flood insurance amounts are based on the unpaid principal balance, "[t]he lender's interest in a mortgage is not limited to the unpaid principal balance, but rather extends to the continued receipt of the interest payments over the lifetime of the loan." *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1107 (11th Cir. 2014). Likewise, there is no evidence that Ocwen's policy relating to hazard insurance fell short of industry "best practice." RSF ¶ 242.

Finally, Florida points to two loans that allegedly had excessive hazard insurance coverage. Mot at 35.[25] For the first loan, Ocwen's vendor mistakenly entered the wrong coverage amount due to a simple scrivener's error (RSF ¶ 244), and Ocwen initiated a refund when the mistake was discovered (*id.* & SJX 160 at -982). And for the other loan, Florida offers no evidence of the loan number, how or why the coverage was excessive, or whether the borrower even paid the premium. RSF ¶ 245. Thus, neither loan shows wrongful conduct or substantial injury, nor could such examples be extrapolated to the remaining loan population.

For all of these reasons, Florida is not entitled to summary judgment on Count VI.[26]

## VIII. PLAINTIFFS' MOTION ON THEIR RESPA CLAIMS MUST BE DENIED AS TO OFC AND OMS BECAUSE NEITHER IS A SERVICER (CFPB COUNTS III, VII, IX; FLORIDA COUNTS I-III)

In addition to the multiple reasons (shown above) why Plaintiffs are not entitled to partial summary judgment on their RESPA claims, the RESPA claims against OFC and OMS also fail

---

[25] Florida incorrectly cites these as examples of Ocwen's flood insurance practices, when they in fact appear to concern hazard insurance.

[26] Notably, this is ***not*** a case where the insurance premiums allegedly were "excessive" in relation to the insurance protection provided, where the insurance "provide[d] less comprehensive coverage" than necessary to protect the borrower, or where the servicer kept a portion of the excessive premiums. *Compare Martorella v. Deutsche Bank Nat'l Trust Co.*, 161 F. Supp. 3d 1209, 1221 (S.D. Fla. 2015) (Marra, J.).

because neither is a "servicer" under RESPA. As Ocwen's Motion showed, neither OFC nor OMS meets the RESPA definition of a servicer because neither "receive[d] any scheduled periodic payments" from borrowers or "ma[de] the payments" in those amounts. Ocwen Mot. at 39 (citing 12 U.S.C § 2605(i)(3)); Ocwen SMF ¶¶ 240-43. Plaintiffs' evidence establishes nothing to the contrary. *See* RSF ¶¶ 9-18, 21-23, 31-32, 37-38, 58-62; CSF ¶¶ 288-90.

## CONCLUSION

For each and all of these reasons, Plaintiffs' motion for partial summary judgment should be denied. Instead, as Defendants demonstrated in their consolidated summary judgment motion (ECF No. 634), summary judgment in full should be granted for Defendants.

Dated: July 24, 2020

Respectfully submitted,

*/s/ Catalina E. Azuero*

Bridget Ann Berry (Fla. Bar No. 515639)
Andrew Stuart Wein (Fla. Bar No. 1005238)
**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, FL 33401
Tel.: 561.650.7900
berryb@gtlaw.com
weina@gtlaw.com

Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: 202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com

Laura A. Stoll (*pro hac vice*)
**GOODWIN PROCTER LLP**
601 S. Figueroa Street
Los Angeles, CA 90017
Tel.: 213.426.2500
lstoll@goodwinlaw.com

Catalina E. Azuero (Florida Bar No. 821411)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
cazuero@goodwinlaw.com

***Attorneys for Defendants***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on July 24, 2020 via ECF on all counsel or parties of record listed below:

Jennifer Hayes Pinder
Email: Jennifer.Pinder@myfloridalegal.com

Sasha Funk Granai
Email: Sasha.Granai@myfloridalegal.com

Victoria Butler
Email: Victoria.Butler@myfloridalegal.com

Scott R. Fransen
Email: Scott.Fransen@flofr.com

Miriam S. Wilkinson
Email: Miriam.Wilkinson@flofr.com

Anthony Cammarata
Email: Anthony.Cammarata@flofr.com

Jean Healey
Email: jean.healey@cfpb.gov

Atur Desai
E-mail: atur.desai@cfpb.gov

Tianna Baez
E-mail: tianna.baez@cfpb.gov

Amanda Roberson
E-mail: amanda.roberson@cfpb.gov

Stephanie Brenowitz
E-mail: stephanie.brenowitz@cfpb.gov

Erin Mary Kelly
E-mail: erin.kelly@cfpb.gov

James Savage
E-mail: james.savage@cfpb.gov

Greg Nodler
E-mail: greg.nodler@cfpb.gov

Michael Posner
E-mail: michael.posner@cfpb.gov

Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov

Shirley T. Chiu
E-mail: shirley.chiu@cfpb.gov

Blaine Winship
E-mail: blaine.winship@myfloridalegal.com

Joaquin Alvarez
E-Mail: Joaquin.alvarez@flofr.com

/s/ Catalina Azuero
Catalina E. Azuero