# OCWEN RSF EXHIBIT 8

```
 1            CONSUMER FINANCIAL PROTECTION BUREAU
 2
 3
 4   In the matter of:              )
 5   OCWEN FINANCIAL                 )
 6   CORPORATION                     )
 7    -----------------------------)
 8
 9                                  Wednesday, June 8, 2016
10                                  Consumer Financial
11                                  Protection Bureau
12                                  1625 I Street, N.W.
13                                  Washington, D.C.  20006
14
15
16            The above-entitled matter came on for
17    investigational hearing, pursuant to notice, at
18    8:00 a.m., for the testimony of:
19
20                    MARK EHRENREICH
21
22
23
24    Reported by:  Deborah Wehr, RPR
25
```

```
 1                P R O C E E D I N G S
 2                    -    -    -    -    -
 3    Whereupon --
 4                MARK EHRENREICH,
 5    a witness, called for examination, having been
 6    first duly sworn, was examined and testified as
 7    follows:
 8                    EXAMINATION
 9        BY MR. DESAI:
10        Q.   Good morning.  Today is June 8, 2016.
11    My name is Atur Desai.  I am an enforcement
12    attorney with the Consumer Financial Protection
13    Bureau, the CFPB or the Bureau.  With me is Jan
14    Singelmann.  And Jean Healey will be joining us
15    a bit later.  They are also attorneys with the
16    CFPB.  Please state your full name and spell it
17    for the record.
18        A.   Mark David Ehrenreich, M-A-R-K,
19    D-A-V-I-D, E-H-R-E-N-R-E-I-C-H.
20             MR. DESAI:  Counsel, can you please
21    state your name for the record.
22             MR. O'DELL:  Brian O'Dell from Bradley.
23             MR. PREVIN:  Matthew Previn at Buckley
24    Sandler.
25             MR. PIPES:  Greg Pipes, Bradley.
```

```
 1      A.   Presumably they would open a task to research to
 2   send out more detailed instructions.
 3      Q.   When research sends out instructions, if the
 4   borrower is Spanish-speaking, are the instructions
 5   translated?
 6      A.   Instructions are in English.
 7           MS. HEALEY:  So let's go off the record for a
 8   minute.
 9           (Discussion off the record.)
10           (Recess)
11           BY MS. HEALEY:
12      Q.   Now we're back on the record.
13           In Ocwen's PARR response at Exhibit 3, Ocwen
14   indicates -- and this is at page 18, second full
15   paragraph --
16      A.   Uh-huh.
17      Q.   -- "From a loss mitigation perspective, if a
18   successor applies for assistance the underwriter will
19   verify whether or not the system of record has been
20   updated to reflect that the borrower is deceased and
21   the account has been changed to 'Estate of
22   [Borrower's Name].'  If it has, Ocwen proceeds with the
23   evaluation and will review the account accordingly.  In
24   this case, Ocwen does not seek any additional proof
25   from the successor in interest.  If, on the other hand,
```

48
Ehrenreich
Ocwen Financial Corporation                                    1/19/2016

```
 1   the system of record does not reflect the successor in
 2   interest, the underwriter will place a code on the
 3   system indicating that the Loan Setup Team should obtain
 4   the required executory documentation or validate any
 5   documentation already received.  In either case, it is
 6   Ocwen's policy to review successors in interest for loss
 7   mitigation programs allowed by the owner or investor of
 8   the loan."
 9           Is this what was occurring as of 2014?
10      A.   I'm sorry.  Is that in the second paragraph of
11   18?
12      Q.   The second full paragraph.
13      A.   I'm sorry.
14      Q.   That starts with "From a loss mitigation
15   perspective."
16      A.   I got it.
17      Q.   Essentially, is what is written in that second
18   full paragraph what was occurring as of 2014?
19      A.   Yes.
20      Q.   So going back to the discussion we were having
21   prior to the break about Ocwen will require a potential
22   successor to assume the mortgage prior to evaluating
23   him or her for a loss mitigation option, is that
24   reflected in the loss mitigation policies and
25   procedures?
```

```
 1     impacts are what you would --
 2         A.    Correct.
 3         Q.    Who is responsible for performing the
 4     actual investigation?
 5         A.    The writers in the research group.
 6         Q.    And it would be a similar role in the
 7     ombudsman group?
 8         A.    Basically.
 9         Q.    So when we say that they are
10     researching the issue or when you say they are
11     researching the issue, what is it that they
12     are -- what are they doing?  How do they go
13     about performing this research or this
14     investigation?
15         A.    Well, they'll look at the loan.  Again,
16     it depends on the issue raised.  So they'll look
17     at the loan to see, you know, what activity
18     occurred on the loan.
19         Q.    And when you say look at the loan, do
20     you mean look at the system of record or
21     REALServicing?
22         A.    Yes.  Well, there's a bunch of systems
23     of record.  So REALServicing would be one.  I
24     mean, there may be, depending on what the issues
25     are that are raised, it could be the imaging
```

```
 1   system, what communications were sent.
 2        Q.   So what are the general sources of
 3   information that either research or ombudsman,
 4   their writers, what are the main sources of
 5   information that they are using to research
 6   their complaint?
 7        A.   Well, I would think primarily
 8   REALServicing, but they could also -- they may
 9   also need to look at the imaging system.
10   Conceivably, they would need to look at
11   iCaseWork to see if there had been a previous
12   complaint about this.  I think those are the
13   primary systems.  They might have to reach out
14   to other departments for explanation.
15        Q.   So you mentioned primarily they are
16   going to look into REALServicing.  If
17   information is kept in other systems in addition
18   to REALServicing, say the total reinstatement
19   account, for instance, say it appears in
20   REALServicing, but it also appears in a
21   different system, REALResolution, wherever,
22   would a writer look in both places to see if the
23   information matched both places?
24        A.   I don't know.  The writer is going to
25   look -- my assumption is in most cases the
```

```
 1   writer is going to look to REALServicing.  If
 2   that doesn't fully explain what the customer is
 3   asking about or complaining about, then they
 4   would continue to look at ancillary systems
 5   until they can understand how the perception the
 6   customer has was formed, all right.
 7           So you know, not everything that comes
 8   in is black and white.  They don't provide --
 9   the customer isn't required to send in
10   documentation on how they got to where they got
11   to.  They just can write in and say, I don't
12   agree with this or I disagree with this or --
13   you know, borrowers can write in and say I don't
14   owe this money, all right.  And then we'll go
15   and produce a copy of the note and say, yeah,
16   but you signed it.  There is a certain amount of
17   detective work to try and figure out what
18   precipitated the borrower's position and how
19   we've communicated and how we got to where we
20   got to.
21       Q.  So if a writer goes into REALServicing,
22   they know the complaint, they go into
23   REALServicing and they determine that they can
24   resolve the complaint with just information in
25   REALServicing, that stops that part of the --
```