**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**
**CASE NO. 9:17-CV-80496-MARRA-MATTHEWMAN**

| |
|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br>                 Plaintiff, <br> v. <br><br> OCWEN FINANCIAL CORPORATION; <br> OCWEN MORTGAGE SERVICING, INC.; <br> OCWEN LOAN SERVICING, LLC; and PHH <br> MORTGAGE CORPORATION, <br>                 Defendants. |
| OFFICE OF THE ATTORNEY GENERAL, <br> THE STATE OF FLORIDA, <br> Department of Legal Affairs, <br> and <br> OFFICE OF FINANCIAL REGULATION, <br> THE STATE OF FLORIDA, <br> Division of Consumer Finance, <br><br>           Plaintiffs, <br><br> v. <br><br> OCWEN FINANCIAL CORPORATION; <br> OCWEN MORTGAGE SERVICING, INC.; <br> OCWEN LOAN SERVICING, LLC, and PHH <br> MORTGAGE CORPORATION, <br>                 Defendants. |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY</u>**
**<u>JUDGMENT</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. iii

ARGUMENT ......................................................................................................................... 1

I. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CONSENT JUDGMENT ........ 1

   A. Background of the Consent Judgment .................................................................... 1

   B. Plaintiffs released Ocwen from liability only for certain past conduct ........................ 3

   C. The Consent Judgment does not bar Plaintiffs' Claims. ................................................ 4

      1. The plain language of the Consent Judgment does not bar future claims. ............... 4

      2. Plaintiffs' Claims do not overlap with the Servicing Standards
         and Metrics and so cannot be viewed as an attempt to enforce
         the Consent Judgment ...................................................................................... 7

II. PLAINTIFFS' CLAIMS ARE NOT BARRED BY WAIVER OR
    RES JUDICATA .................................................................................................... 9

      1. Plaintiffs' Claims are not barred by waiver ........................................................... 10

      2. Plaintiffs' Claims are not barred by res judicata.................................................... 11

III. PLAINTIFFS HAVE ABUNDANT EVIDENCE TO
     ESTABLISH LIABILITY...................................................................................... 13

   A. Ocwen's "individualized" liability standard has no basis in law ............................... 13

   B. Admissible evidence exists as to Ocwen's liability on all claims ............................... 17

IV. OCWEN'S OTHER ARGUMENTS DO NOT ENTITLE IT TO
    SUMMARY JUDGMENT ON LIABILITY ................................................................ 21

   A. A liability expert is not required or needed .................................................................. 21

   B. Ocwen's "memory aid" arguments and attacks on Plaintiffs'
      "loan bucketing" are specious because they ignore evidence in
      Ocwen's possession ....................................................................................... 23

   C. Ocwen's argument about Count III was already rejected........................................... 29

V. OCWEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAMAGES........... 30

   A. Ocwen is not entitled to summary judgment on foreclosure-initiation
      damages ......................................................................................................... 30

   B. Ocwen is not entitled to summary judgment on opportunity-cost damages............... 36

   C. Ocwen is not entitled to summary judgment on other damages................................. 36

VI. OCWEN IS NOT ENTITLED TO SUMMARY JUDGMENT
    ON ENHANCED PENALTIES FOR ITS UNTIMELY
    ESCROW-ACCOUNT ANALYSES........................................................................ 37

i

VII. OMS AND OFC ARE LIABLE UNDER RESPA
      INDIVIDUALLY AND AS PART OF A COMMON ENTERPRISE  .......................... 38

CONCLUSION ......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.R. v. Dudek*,
  2016 WL 3221140 (S.D. Fla. June 9, 2016) .......................................................................... 33

*Adkins v. Morgan Stanley*,
  2013 WL 3835198 (S.D.N.Y. July 25, 2013) ........................................................................ 35

*Affiliated Hosp. Prods, Inc. v. Merdel Game Mfg.*,
  513 F.2d 1183 ........................................................................................................................ 12

*Albright v. City of New Orleans*,
  208 F. Supp. 2d 634 (E.D. La. 2002) .................................................................................... 35

*Albright v. City of New Orleans*,
  105 Fed. App'x 552 (5th Cir. 2004) ...................................................................................... 35

*Allapattah Servs., Inc. v. Exxon Corp.*,
  61 F. Supp. 2d 1335 (S.D. Fla. 1999) ................................................................................... 32

*Allen v. Dairy Marketing Servs., LLC*,
  2013 WL 6909953 (D. Vt. Dec. 31, 2013) ........................................................................... 32

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) ............................................................................................................... 31

*Balbirer v. Austin*,
  790 F.2d 1524 (11th Cir.1986) .............................................................................................. 12

*Bazemore v. Friday*,
  478 U.S. 385 (1986) ............................................................................................................... 32

*Bennett, v. Nationstar Mortg., LLC*,
  2015 WL 5294321 (S.D. Ala. Sept. 8, 2015) ........................................................................ 40

*Bernstein v. Wells Fargo Bank, N.A.*,
  2016 WL 4546653 (N.D. Ga. May 13, 2016) ........................................................................ 40

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946) .......................................................................................................... 31, 32

*Bowen v. Public Agencies Opposed to Social Sec. Entrapment*,
  477 U.S. 41 (1986) ................................................................................................................. 10

*Bryant v. Aargon Collection Agency, Inc.*,
  2017 WL 2955532 (S.D. Fla. June 30, 2017) ........................................................................ 14

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) ............................................................................................... 32

*Curry v. Sec'y, Dep't of Veterans Affairs*,
  518 F. App'x 928 (11th Cir. 2013) ........................................................................................ 11

iii

*Day v. Celadon Trucking Servs., Inc.*,
827 F.3d 817 (8th Cir. 2016) ........................................................................... 31

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) ......................................................................................... 32

*FTC v. Phoebe Putney Health System, Inc.*,
568 U.S. 216 (2012) ......................................................................................... 10

*F.T.C. v. Primary Grp. Inc.*,
2016 WL 4056206 (N.D. Ga. May 19, 2016) .................................................. 14

*F.T.C. v. Primary Grp., Inc.*,
713 F. App'x 805 (11th Cir. 2017) ............................................................ 14, 15

*F.T.C. v. Roca Labs, Inc.*,
345 F. Supp. 3d 1375 (M.D. Fla. 2018) ..................................................... 14, 15

*FTC v. Tashman*,
318 F.3d 1273 (11th Cir. 2003) ....................................................................... 14

*F.T.C. v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3rd Cir. 2015) ........................................................................... 35

*G.M. Brod & Co. Inc. v. U.S. Home Corp.*,
759 F.2d 1526 (11th Cir. 1985) .................................................. 32, 34, 35, 36

*Gates v. Towery*,
456 F. Supp. 2d 953 (N.D. Ill. 2006) .............................................................. 12

*General Telephone v. E.E.O.C.*,
446 U.S. 318 (1980) ......................................................................................... 33

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*,
117 F.3d 1328 (11th Cir. 1997) ......................................................................... 5

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ......................................................................................... 35

*In re Methyl Tertiary Butyl ("MTBE") Prod. Liab. Litig.*, No.,
2015 WL 5051660 (S.D.N.Y Aug. 26, 2015) .................................................. 12

*In re Neurontin Marketing and Sales Practices Litigation*,
712 F.3d 21 (2d. Cir. 2013) .............................................. 31, 33, 34, 35

*In re: Disposable Contact Lens Antitrust*,
329 F.R.D. 336 (M.D. Fla. 2018) ............................................................... 32, 35

*Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*,
898 F.3d 1087 (11th Cir. 2018) ......................................................................... 5

*Jimenez v. City of Chicago*,
732 F.3d 710 (7th Cir. 2013) ........................................................................... 38

*Julian v. Swift Transp. Co. Inc.*,
    2019 WL 7282025 (D. Ariz. Dec. 27, 2019) ................................................................. 31, 35

*Landau v. Lucasti*,
    2010 WL 502972 (D.N.J. Feb. 8, 2010) ............................................................................. 38

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955) ................................................................................................ 1, 6, 11

*Lopez v. Farmers Ins. Co.*,
    2011 WL 1807158 (W.D. Okla. May 6, 2011) ................................................................... 38

*Manning v. City of Auburn*,
    953 F.2d 1355 (11th Cir. 1992) ......................................................................................... 11

*Marchisio v. Carrington Mortg. Servs., LLC*,
    919 F.3d 1288 (11th Cir. 2019) ........................................................................................... 5

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ............................................................................................................... 5

*McCarley v. KPMG Int'l*,
    293 F. App'x 719 (11th Cir. 2008) ..................................................................................... 40

*McLean v. GMAC Mortg. Corp.*,
    2008 WL 1956285 (S.D. Fla. May 2, 2008) ...................................................................... 31

*Melidor v. Ocwen Loan Servicing, LLC*,
    2018 WL 7079992 (S.D. Fla. Feb. 26, 2018) .................................................................... 27

*Merrion* v. *Jicarilla Apache Tribe*,
    455 U.S. 130 (1982) ........................................................................................................... 10

*Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dept. of Legal Affairs,*
    *State of Fla.*,
    761 So. 2d 1256 (Fla. 3d DCA 2000) ................................................................................ 27

*Mortgage Now, Inc. v. Stone*,
    2012 WL 12964891 (N.D. Fla. Nov. 14, 2012) ................................................................. 31

*Norfolk S. Corp. v. Chevron, USA*,
    371 F.3d 1285 (11th Cir. 2004) ..................................................................................... 6, 12

*Nutrimatix Inc. v. Xymogen, Inc.*,
    2017 WL 385753 (M.D. Fla. Jan. 27, 2017) ................................................................ 31, 35

*Paradise v. Prescott*,
    767 F.2d 1514 (11th Cir. 1985) ........................................................................................... 4

*Porsche Cars N. Am., Inc. v. Diamond*,
    140 So. 3d 1090 (Fla. Dist. Ct. App. 2014) ...................................................................... 14

*Prohias v. Asurion Corp.*,
    2006 WL 8433132 (S.D. Fla. Mar. 7, 2006) ....................................................................... 5

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ......................................................................................... 29

*Rawlings v. Dovenmuehle Mortg., Inc.*,
64 F. Supp. 2d 1156, (M.D. Ala. 1999) ............................................................ 31

*Reese v. JPMorgan Chase & Co.*,
2009 WL 10702443 (S.D. Fla. July 15, 2009) ................................................. 40

*Renfroe v. Nationstar Mortg., LLC*,
822 F.3d 1241 (11th Cir. 2016) ........................................................................ 27

*Reynolds v. Roberts*,
207 F.3d 1288 (11th Cir. 2000) .......................................................................... 5

*Schafler v. Indian Spring Maint. Ass'n*,
139 F. App'x 147 (11th Cir. 2005) ................................................................... 11

*United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Ass'n*,
878 F.3d 309 (D.C. Cir. 2017) ..................................................................... 6, 12

*Taylor, Bean & Whitaker Corp. v. GMAC Mortg. Corp.*,
2008 WL 3819752 (M.D. Fla. Aug. 12, 2008) ................................................. 31

*Turner v. Orr*,
759 F.2d 817 (11th Cir. 1985) ............................................................................ 4

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ......................................................................................... 10

*United States* v. *Cherokee Nation of Okla.*,
480 U.S. 700 (1987) ......................................................................................... 10

*United States v. City of Miami*,
195 F.3d 1292 (11th Cir. 1999) .................................................................. 34, 35

*United States v. Long*,
300 F. App'x 804 (11th Cir. 2008) ................................................................... 22

*World's Finest Choc. Inc. v. World Candies, Inc.*,
409 F. Supp. 840 (N.D. Ill. 1976) .................................................................... 12

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ......................................................................................... 32

**Statutes**

12 U.S.C. § 5531(c)(1) ............................................................................................ 14

12 U.S.C. § 5565 ...................................................................................................... 30

12 U.S.C. § 5565(c) ........................................................................................... 15, 16

12 U.S.C. § 5565(c)(1) ............................................................................................ 37

12 U.S.C. § 5565(c)(2) ............................................................................................ 37

**Rules**

Fed. R. Civ. P. 23 .................................................................................................. 33

**Regulations**

12 C.F.R. § 1024.2(b) ..................................................................................... 38, 40

12 C.F.R. § 1024.38(a) ........................................................................................ 15

12 C.F.R. § 1024.41 ............................................................................................... 8

12 C.F.R. § 1024.41(h)(4) ...................................................................................... 9

**Other Authorities**

Fla. Stat. § 501.207 .............................................................................................. 30

Local Rule 56 ......................................................................................................... 6

Wash. Rev. Code § 31.04.015(29) ....................................................................... 39

Ocwen's Motion for Summary Judgment ("Motion") fails for four reasons: (1) Ocwen fails to present any undisputed facts or legal principle that show that its prior settlements with Plaintiffs bar these actions; (2) while Ocwen contends that the Plaintiffs have *no admissible* evidence to support their claims, even a cursory review of Plaintiffs' statement of facts in support of their summary-judgment motion reveals that is not true; (3) Ocwen's contention that Plaintiffs must present "individualized" evidence to show liability and damages is wrong as a matter of law, and in any event, Plaintiffs have identified the kind of evidence Ocwen asserts is lacking; and (4) Ocwen's assertion that Ocwen Financial Corporation and Ocwen Mortgage Servicing did not service loans is belied by the record, and regardless Defendants are jointly and severally liable as a common enterprise. This Court should therefore deny Ocwen's Motion.

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CONSENT JUDGMENT.

By the clear terms of a 2013 settlement agreement with Plaintiffs, Ocwen was, and always has been, required to "comply with applicable state and federal law," while Plaintiffs expressly reserved their right, without limit, to sue Ocwen for post-settlement conduct that violated these laws. Ocwen now seeks to rewrite this contract. It asks the Court to ignore the unambiguous terms of the agreement and find that Plaintiffs broadly abdicated their law-enforcement authority by requiring Ocwen, as a result of its past misconduct, to institute additional protections for borrowers going forward. Basic principles of contract interpretation and Supreme Court precedent defeat Ocwen's argument: settlement agreements must be interpreted to give effect to their plain meaning, and waivers of law-enforcement authority are not casually inferred. And as the Supreme Court has explained, to preclude claims because a previous lawsuit contained forward-looking injunctive relief, like here, would improperly "confer on [defendants] a partial immunity from civil liability for future violations."[1] Thus, Plaintiffs' claims are not barred by the 2013 agreement.

### A.  Background of the Consent Judgment.

Following the financial crisis of 2007–2008, several state banking regulators, state attorneys general, and the Consumer Financial Protection Bureau ("Bureau") examined and investigated Ocwen and two other mortgage servicers that Ocwen later acquired for conduct that

---

[1] *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328–29 (1955).

occurred from 2009 through 2011.[2] As a result of these efforts, the Bureau and state attorneys general filed a complaint in December 2013 against Ocwen Financial Corporation and Ocwen Loan Servicing (for purposes of Section I, collectively "Ocwen") in federal district court in the District of Columbia alleging, *inter alia*, that Ocwen was "robo-signing" foreclosure affidavits, backdating assignments, and failing to effectively communicate with borrowers applying for loss-mitigation help.[3] To resolve that complaint and disputes with the state banking regulators concerning their examination findings, Ocwen entered into a consent judgment with the Bureau, the Florida Office of the Attorney General ("OAG"), and 48 other states and the District of Columbia, as well as a settlement agreement with the Florida Office of Financial Regulation ("OFR") that incorporated the terms of the consent judgment with the Bureau and OAG (collectively, the "Consent Judgment").[4] The Consent Judgment and its releases were largely the same as those in the consent judgments that 49 states and the United States entered into with other large mortgage servicers in 2012 (collectively, "National Mortgage Settlement").[5]

In addition to requiring Ocwen to provide restitution and remediation to borrowers for its alleged past misconduct, the Consent Judgment provided additional protections to borrowers—beyond what the law required of all servicers—related to Ocwen's conduct going forward.[6] Specifically, an independent monitor ("Monitor") was assigned to test Ocwen's compliance with enumerated servicing standards ("Servicing Standards") using certain metrics ("Metrics").[7] The Consent Judgment set forth a limited process to address any failures identified by the Monitor's Metric testing.[8] The Servicing Standards and Metric testing did not relieve Ocwen of any of its obligations under federal or state law, as the Consent Judgment states that "[n]othing in this

---

[2] Plaintiffs' Response to Defendants' Statement of Material Facts ("Pls.' Opp. SMF") ¶ 244.
[3] Pls.' Opp. SMF ¶¶ 245–246.
[4] Pls.' Opp. SMF ¶ 247 (consent judgment with the Bureau, 49 states and D.C.); Defendants' Statement of Material Facts, ECF No. 634 ("Defs.' SMF") ¶ 7 (consent order with OFR).
[5] Compare Defs.' SMF Ex. 7, ECF No. 635.8, Ex. E to Consent Judgment at E-3, §§ B–E (releasing Ocwen only for past conduct and reserving the Bureau's authority) *with, e.g.*, Plaintiffs' Response to Defendants' Statement of Material Facts Exhibit ("Pls.' Opp. Ex.") 18, CitiMortgage NMS Order at Exhibit F, ¶¶ 7 (Bureau releasing Citi from liability only for past conduct), 11(k)(v) (otherwise reserving the Bureau's authority).
[6] Pls.' Opp. SMF ¶¶ 251–253.
[7] Pls.' Opp. SMF ¶¶ 249–251.
[8] Pls.' Opp. SMF ¶ 250.

Consent Judgment shall relieve the Defendant of its obligation to comply with applicable state and federal law."[9] And, as detailed below, the releases contained in the Consent Judgment (collectively, "Releases") also made clear that the Consent Judgment's injunctive relief was *in addition* to the government parties' existing authorities, not a wholesale replacement of it.

### B. Plaintiffs released Ocwen from liability only for certain past conduct.

The Consent Judgment makes clear what was actually released: liability for certain *past* conduct. The Bureau's release in the Consent Judgment states:

> [T]he CFPB fully and finally releases the Released Parties from all potential liability that has been or might have been asserted by the CFPB relating to the mortgage servicing practices described in the complaint (the "Mortgage Servicing Practices") that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013.[10]

The Consent Judgment also unambiguously states that Ocwen was not released from liability for future misconduct, conduct which the Bureau reserved the authority to pursue liability for:

> Notwithstanding any other term of this Release, the CFPB specifically reserves and does not release any liability for conduct other than conduct related to the Mortgage Servicing Practices asserted or that might have been asserted in the complaint.[11]

The Bureau also expressly made clear that it did not limit its authority to pursue future misconduct, including its enforcement authority, in a different section:

> Nothing in this Release shall limit the CFPB's authority with respect to Released Parties, except to the extent the CFPB has herein expressly released claims.[12]

OAG likewise released only certain past conduct by Ocwen:

> [T]he Attorneys General of the Plaintiff States that are parties to this Consent Judgment release and forever discharge the Released Parties from the following: any civil or administrative claim, of any kind whatsoever, direct or indirect, that an Attorney General has or may have or assert, including, without limitation, claims for damages, fines, injunctive relief, remedies, sanctions, or penalties of any kind whatsoever based on, arising out of, or resulting from the Covered Conduct occurring on or before the Effective Date [February 26, 2014].[13]

---

[9] Pls.' Opp. SMF ¶ 256.
[10] Pls.' Opp. SMF ¶ 258.
[11] Pls.' Opp. SMF ¶ 259.
[12] Pls.' Opp. SMF ¶ 260.
[13] Pls.' Opp. SMF ¶ 261.

The OAG release also provides that it does not affect OAG's authority: "[t]hese provisions are intended to supplement and do not supplant or in any way restrict the Attorney General Offices' subpoena power and investigatory authority under any state law."[14]

OFR, in its separate release with Ocwen, also released only certain past conduct:

[A]ny administrative enforcement actions pertaining to the practices identified herein as Examination Findings that occurred between January 1, 2009 and December 31, 2012 (the "Release Period"). This release shall not otherwise preclude or impair the State Mortgage Regulators from taking enforcement action for any other violations of law not released herein, even if such violations fall within the Release Period[15]

Further, OFR's release also provides that the agreement "shall in no way preclude the State Mortgage Regulators from exercising their examination or investigative authority authorized under the laws of the Participating States. . . ."[16]

Consistent with the Releases, Ocwen publicly admitted, 2014 through 2017, that Ocwen was still subject to "supervision, examination and enforcement by the CFPB."[17]

### C.  The Consent Judgment does not bar Plaintiffs' Claims.

In Ocwen's view, the Consent Judgment limited Plaintiffs' authorities when Plaintiffs "negotiated which claims they could pursue and how they would pursue them."[18] Ocwen argues that the Bureau's Counts I–IX and Florida's Counts I–IV and VI–VIII (collectively, "Claims") are barred because they overlap with the Consent Judgment's injunctive requirements. But both arguments fail because the unambiguous language of the Consent Judgment allows for these lawsuits. Further, Ocwen has not shown overlap between the Claims and what the Monitor tested. In short, Ocwen is not entitled to summary judgment based on the Consent Judgment.

### 1.  The plain language of the Consent Judgment does not bar future claims.

A consent judgment should be interpreted like a contract.[19] In the first instance, a consent judgment's meaning is determined by its "four corners."[20] The unambiguous meaning of the

---

[14] Pls.' Opp. SMF ¶ 262.
[15] Pls.' Opp. SMF ¶ 263.
[16] Pls.' Opp. SMF ¶ 264.
[17] Pls.' Opp. SMF ¶¶ 254–255. The Bureau agreed and publicly stated the same. *See id.* at ¶ 252.
[18] Motion ("Mot.") at 10.
[19] *See Paradise v. Prescott*, 767 F.2d 1514, 1525 (11th Cir. 1985).
[20] *See Turner v. Orr*, 759 F.2d 817, 821 (11th Cir. 1985) (citation and quotation omitted).

consent judgment's written terms control.[21] And a consent judgment "should be read to give effect to all its provisions and to render them consistent with each other."[22] Finally, "[i]t is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject."[23]

The Bureau's release makes clear that the Bureau released only certain past conduct that had taken place before December 18, 2013.[24] The Bureau did not release liability for other past conduct or any future conduct.[25] And it did not limit in any way, but rather specifically reserved, its enforcement authority with respect to such conduct.[26] OAG's and OFR's releases likewise released only certain conduct prior to certain dates (February 27, 2014 for OAG, and January 1, 2013 for OFR), and expressly reserved all other claims and authority.[27] The specific language of the Releases contradict Ocwen's argument that the Consent Judgment is the exclusive mechanism for the Plaintiffs to bring their Claims.

Ocwen ignores these explicit contractual provisions when arguing that all "future conduct during the monitoring period was to be judged according to the agreed Servicing Standards and related Metrics to measure those standards, and that any non-compliance with those agreed standards would be addressed through the agreed Enforcement Terms, including as to remedies

---

[21] *Reynolds v. Roberts*, 207 F.3d 1288, 1300–01 (11th Cir. 2000) ("Where they are unambiguous, the court must uphold a decree as written.").

[22] *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *see also Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 117 F.3d 1328, 1338 (11th Cir. 1997)("[A]n interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable.") (citation and quotation omitted).

[23] *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1318 (11th Cir. 2019)(citation and quotation omitted); *see also Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*, 898 F.3d 1087, 1093 (11th Cir. 2018) ("When general propositions in a contract are qualified by the specific provisions, the rule of construction is that the specific provisions in the agreement control.") (citation and quotation omitted).

[24] Pls.' Opp. SMF ¶¶ 257–258.

[25] Pls.' Opp. SMF ¶ 259; *see also, e.g.*, *Prohias v. Asurion Corp.*, No. 05-cv-22259, 2006 WL 8433132, at *3 n.5 (S.D. Fla. Mar. 7, 2006) (language barring plaintiffs from bringing lawsuits based on certain claims "that have been or could have been asserted" between January 1, 1986 and February 20, 2004 did not bar future claims, in contrast to language barring claims that "might in the future be asserted," which did bar future claims).

[26] Pls.' Opp. SMF ¶ 260.

[27] Pls.' Opp. SMF ¶¶ 261–264.

and available judicial forum."[28] But there is no language in the Consent Judgment stating that it is the sole mechanism to enforce the law or that its injunctive relief supersedes the language of the Releases. Ocwen thus asks this Court to adopt an interpretation of the Consent Judgment that does not give effect to the unambiguous, specific language of the Releases, contrary to several bedrock principles of contractual interpretation.[29] Adopting Ocwen's interpretation would also serve to improperly "bestow upon" Ocwen "a windfall of immunity from litigation."[30]

Unable to find language in the text of the Consent Judgment to support its argument, Ocwen cites to *US ex rel. Schneider v. JP Morgan Chase Bank* for the proposition that the National Mortgage Settlement "contains a series of steps before [a servicer] could be penalized for violating the servicing standards."[31] It is not in dispute that the National Mortgage Settlement and the Consent Judgment contain a process to address violations of their servicing standards. But under the unambiguous settlement terms, that process does not foreclose the instant lawsuits. And as this Court recognized, the court in *Schneider* never "never reached the exhaustion issue or whether an action regarding similar conduct outlined in the consent judgment could be separate from an action to enforce the consent judgment."[32] *Schneider* therefore does not support Ocwen's argument that a separate action is foreclosed.[33]

---

[28] Mot. at 9. Ocwen impermissibly relies on a declaration of an undisclosed witness–counsel to Ocwen–who cites to no record evidence. *See* Evans Declaration, Defs.' SMF Ex. 13. Under Local Rule 56(c) and (d), this court should not rely upon the Evans Declaration, including when used in support of Defs' SMF ¶¶ 10–12; 14–21; 23–33; and 61–67.

[29] *See* nn. 19–23, *supra*.

[30] *Norfolk S. Corp. v. Chevron, USA*, 371 F.3d 1285, 1291 (11th Cir. 2004) ("to preclude a wider range of matters than those specified in the Agreement would frustrate the parties' expressed intent and bestow upon Chevron a windfall of immunity from litigation"); *see also Lawlor*, 349 U.S. at 329 ("Acceptance of [defendant's] novel contention" that forward-looking injunctive relief barred future claims "would in effect confer on them a partial immunity from civil liability for future violations.").

[31] Mot. at 9.

[32] Order on Mot. to Dismiss Florida's Compl., ECF No. 477, at 9.

[33] Although *Schneider* did not reach the issue of separate actions outside the National Mortgage Settlement, many have occurred. Various government signatories to the National Mortgage Settlement brought and settled enforcement actions—separate from actions to enforce that agreement—against servicers that were subject to the National Mortgage Settlement for servicing misconduct while the monitoring process was still in full effect. Pls.' Opp. SMF ¶¶ 270–278.

2.  *Plaintiffs' Claims do not overlap with the Servicing Standards and Metrics and so cannot be viewed as an attempt to enforce the Consent Judgment.*

As explained in the previous section, the Consent Judgment expressly states that Plaintiffs were not waiving their rights or limiting their authorities to bring lawsuits for any future misconduct. Ocwen's argument that the Consent Judgment bars Plaintiffs' Claims fails for this reason alone. But even assuming, *arguendo*, that Plaintiffs had not preserved their authorities to bring these Claims, Ocwen's argument would still fail because Plaintiffs' Claims do not overlap with the testing regime in the Consent Judgment (*i.e.*, the Servicing Standards tested by the Monitor through certain Metrics).[34] Because there is no overlap—and Ocwen has not shown any—Plaintiffs' lawsuits cannot be viewed as an attempt to enforce the Consent Judgment.

When discussing the Claims in these instant actions, the Monitor stated that such Claims "questioning the accuracy and reliability of Ocwen's system of record" are "outside of the scope of my duties as Monitor"; that he was not "charged with reviewing the SOR [system of record] to determine the accuracy and completeness of the information contained in the SOR"; and that the testing results discussed in his reports and his review of such results and findings "are based on the assumption" that "such information in the SOR is accurate and complete."[35] These facts are fatal to Ocwen's argument that overlap exists between the Consent Judgment and the Claims.

Further, Ocwen does not cite to any evidence in support of its Motion showing any *actual* overlap between the Claims and what the Monitor tested. At best, Ocwen argues there is facial overlap between the text of the Claims and the Servicing Standards that were tested through the Metrics. But this argument also fails upon a close inspection of the Metrics and Claims:

| Count | Nature of Claim | Metrics Ocwen relies on (Mot. 7–8) | The Lack of Overlap Between the Monitor's Testing and Claims |
|---|---|---|---|
| CFPB Count I & Count V<br><br>OAG Count VIII | CFPA & FDCPA: used inaccurate or incomplete information.<br><br>CFPA: system deficiencies resulted in | **Metrics:**<br>4.B & 33<br>(SMF Ex. 6 at D1-7, D1-21) | Ocwen failed to show that the Monitor was testing whether the information in Ocwen's system of record (or periodic statements) was, in fact, accurate and complete. Rather, as the Monitor stated, he assumed, but did not test whether, the information in the system of record was accurate and complete.[36] Specifically, under Metrics 4.B. and 33, the Monitor respectively tested: |

---

[34] Pls.' Opp. SMF ¶¶ 36–52, 266–269.

[35] Pls.' Opp. SMF ¶¶ 268–269.

[36] Pls.' Opp. SMF ¶ 268.

| Count | Nature of Claim | Metrics Ocwen relies on (Mot. 7-8) | The Lack of Overlap Between the Monitor's Testing and Claims |
|---|---|---|---|
| CFPB Count II & VI | Ocwen calculating inaccurate amounts<br><br>CFPA & FDCPA: misrepresented amounts owed, | | • whether Ocwen timely processed borrower payments to principal and interest first—*not* whether Ocwen billed borrowers' correct amounts in the first instance; and<br>• whether the billing statement accurately reflected the information in Ocwen's system of record (SOR): *not* whether the amount in the SOR was, in fact, accurate. |
| CFPB Count IV | TILA and CFPA: inaccurate periodic statements | | |
| CFPB Count VII; OAG and OFR Count I; OAG Count II | RESPA and CFPA: escrow and insurance-related violations | **Metrics**: 4.B., 33 (SMF. Ex. 6 at D1-7, D1-21) | Ocwen failed to show that the Monitor tested whether Ocwen was timely conducting escrow analyses, properly and timely crediting escrow shortages, properly and timely refunding escrow surpluses, timely sending escrow statements that were, in fact, accurate, and/or timely disbursing payments to pay borrowers' insurance policies. |
| CFPB Count III | CFPA: promising not to foreclose and then doing so. | **Metrics**: 6 & 30 (SMF Ex. 6 at D1-16, D1-18) | Ocwen failed to show that the Monitor tested whether Ocwen sent letters to borrowers seeking information related to their loss mitigation applications by an applicable deadline and, contrary to its promises, foreclosed upon them before the time it gave them to respond expired. |
| CFPB Count IX | RESPA and CFPA: foreclosure-related conduct | | Ocwen failed to show that the Monitor tested whether Ocwen had initiated a foreclosure proceeding while still reviewing a borrower's complete application, as defined and required by RESPA. |
| OAG Count III | RESPA: foreclosure-related conduct | **Metrics**: 1, 3, 6, 30 (SMF Ex. 6 at D13, 5-6, 13-16 and 18) | Ocwen failed to show the Monitor tested whether:<br>• Ocwen had failed to send an acknowledgment letter indicating whether the borrower was missing any information in an application for all available loss mitigation options (and not just a loan modification)<br>• Ocwen failed to evaluate complete loss mitigation applications eligible under 12 C.F.R. § 1024.41, such as applications that are not duplicative requests. |

| Count | Nature of Claim | Metrics Ocwen relies on (Mot. 7-8) | The Lack of Overlap Between the Monitor's Testing and Claims |
|---|---|---|---|
| | | | • Ocwen failed to send appeal notices with the language required under 12 C.F.R. § 1024.41(h)(4) within thirty days. |
| CFPB Count VIII | RESPA and CFPA: lack of reasonably-designed policies and procedures | **Metric**: 5 (SMF Ex. 6 at D1-9) | Ocwen failed to show that the Monitor tested whether Ocwen had reasonably-designed policies and procedures relating to its sale of mortgage servicing rights, handling consumer complaints, or receiving information from foreclosure attorneys. |
| OAG Count VI | FDUPTA: force-placed insurance | **Metric**: 5 (SMF Ex. 6 at D1-9) | Ocwen failed to show that the Monitor tested whether Ocwen placed excessive insurance force-placed coverage on borrowers or imposed force-place insurance, despite having proof of a borrower's voluntary insurance policy. (If Ocwen meant to cite Metric 6(c)(2), this Metric is testing the reverse of Ocwen's imposing FPI *after* having evidence of voluntary coverage.) |
| OAG Count VII | FDUPTA: excessive PPI-related fees | **Metric**: 4.A. (SMF Ex. 6 at D1-7) | Ocwen failed to demonstrate that the Monitor tested whether Ocwen charged excessive property preservation fees under four scenarios, including more than one vendor inspecting the property, ordering duplicate inspections, ordering inspections when a loss mitigation application was pending, and charging more than allowable by contract. |

In sum, Ocwen has not shown, whether through the language of the Consent Judgment or in any evidence it references, that Plaintiffs are attempting to enforce the Consent Judgment.

## II.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY WAIVER OR RES JUDICATA.

Ocwen contends that Plaintiffs' Claims are barred by waiver and *res judicata*. Ocwen's arguments fail because they once again contradict the express language of the Consent Judgment and are inconsistent with well-established case law.

1. *Plaintiffs' Claims are not barred by waiver.*

Ocwen argues that Plaintiffs implicitly waived their authority to bring the Claims they now assert, covering conduct from 2014 until 2017, when they signed the Consent Judgment in 2013.[37] Ocwen's argument finds no support in the language of the Consent Judgment or the law.

First, as explained above, the Releases did not waive Plaintiffs' authorities or claims, implicitly or explicitly, and instead expressly reserved them.[38] Ocwen's argument fails for the simple reason that the Consent Judgment does not contain any express waiver of Plaintiffs' authorities or Claims, and, in fact, states the opposite.

Second, Ocwen's request that this Court waive the government's authority is contrary to the Supreme Court's repeated admonition that government authority must be "surrendered in unmistakable terms" and "[s]uch a waiver of sovereign authority will not be implied."[39] And "contracts should be construed, if possible, to avoid foreclosing the exercise of sovereign authority."[40] Indeed, Ocwen does not cite to any case law that supports the proposition that sovereign authority can be surrendered through anything other than an express waiver. The one case Ocwen does cite in support of its argument, *United States v. Armour & Co.*, actually supports Plaintiffs' position.[41] In *Armour*, the Supreme Court determined that the United States could not seek to enforce a consent order through a separate action while noting that the United States could bring a separate action for a violation of the antitrust laws.[42] Here, Plaintiffs have not expressly waived their authority or claims and Ocwen cannot not show otherwise. Based on the express, unambiguous terms of the Consent Judgment and Supreme Court precedent, Ocwen's waiver argument fails.

---

[37] Mot. at 10–11.

[38] Section I.B., *supra*.

[39] *United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 707 (1987) (citing *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 52 (1986)); *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982). Ocwen's implied-waiver argument is also contrary to the Supreme Court's view that state-action immunity does not apply unless a state government has "clearly articulated and affirmatively expressed policy" allowing conduct that would otherwise violate federal antitrust laws. *FTC v. Phoebe Putney Health System, Inc.*, 568 U.S. 216, 226 (2013)(citation and quotation omitted).

[40] *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 52–53 (1986).

[41] Mot. at 11 (citing *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).

[42] *United States v. Armour & Co.*, 402 U.S. 673, 674 (1971).

2.   *Plaintiffs' Claims are not barred by* res judicata.

Ocwen's *res judicata* argument also fails.[43] "*Res judicata* bars the filing of claims which were raised or could have been raised in an earlier proceeding."[44] This includes claims that were "in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings or otherwise in the earlier action," but not "claims which arise after the original pleading is filed in the earlier litigation."[45]

Plaintiffs' claims here are not barred by *res judicata* because they relate to conduct that has taken place "since January 2014,"[46] which is after Plaintiffs' earlier suit and settlement. Plaintiffs therefore could not have raised them in the earlier lawsuit.[47] And many of Plaintiffs' claims are based on provisions of Regulation X and Z that were not even in effect until January 10, 2014.[48] Thus, Plaintiffs' claims were not in existence at the time of the earlier lawsuit (and so not barred) for this reason, as well.[49] Ocwen argues that Plaintiffs' claims are barred because Plaintiffs sought forward-looking injunctive relief in their 2013 lawsuit.[50] The Supreme Court has already considered and rejected this "novel contention."[51] The authorities Ocwen relies on do

---

[43] Mot. at 11–12.

[44] *Schafler v. Indian Spring Maint. Ass'n*, 139 F. App'x 147, 150 (11th Cir. 2005).

[45] *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992) (emphasis in original).

[46] *See* Bureau Am. Compl., ECF. No. 481, ¶¶ 206 (Count I), 214 (Count II), 219 (Count III), 229 (Count IV), 239 (Count V), 257, 259 (Count VII), 263-265 (Count VIII), 274-276 (Count IX), and 286 (Count X); Florida's Third Am. Compl. ECF No. 506, ¶ 1.

[47] *See, e.g.*, *Lawlor*, 349 U.S. at 328 ("The conduct presently complained of was all subsequent to the 1943 judgment. . . . While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."); *Curry v. Sec'y, Dep't of Veterans Affairs*, 518 F. App'x 928, 931 (11th Cir. 2013) (discrimination claim based on 2009 conduct not barred under *res judicata* because previous lawsuit "was limited to claims based on pre-December 5, 2008 actions.").

[48] Bureau Am. Compl. ECF No. 481, ¶¶ 228-231 (Count IV – Reg. Z), 261–277 (Counts VIII and IX – Reg. X); Florida's Third Am. Compl. ECF No. 506, ¶¶ 209–219 (Count III – Reg X).

[49] *See, e.g.*, *Curry*, 518 F. App'x at 931 (11th Cir. 2013) (claim also not barred under *res judicata* because plaintiff had not exhausted her administrative remedies when she sued previously, and so her claims "did not exist when she filed" her previous complaint).

[50] Mot. at 12 ("As shown above, Plaintiffs' 2013 complaint did, in fact, seek relief concerning Ocwen's **future** conduct in servicing loans.") (emphasis in original).

[51] *Lawlor*, 349 U.S. at 328–29 (The Court's conclusion that plaintiff's claim is not barred under *res judicata* by a previous consent judgement "is unaffected by the circumstance that the 1942 complaint sought, in addition to treble damages, injunctive relief which, if granted, would have prevented the illegal acts now complained of. . . . Acceptance of [defendant's] novel contention

11

not say otherwise. Ocwen cites to cases applying *res judicata* where, unlike here, the operative facts giving rise to the two lawsuits were "identical"[52] or liability for the "continuing nature" of the conduct was expressly released in the prior settlement,[53] and to cases that did not decide or even mention *res judicata*.[54]

In any event, even if *res judicata* would typically apply, Plaintiffs' express reservations of their ability to bring these suits forecloses its application here. As the Eleventh Circuit has made clear, the preclusive effect of a settlement "should be interpreted according to [the agreement's] express terms, rather than according to traditional principles of *res judicata*."[55] Here, because the Releases expressly reserved Plaintiffs' ability to bring these suits, *res judicata* does not bar them.[56]

Because Ocwen has not put forth any undisputed evidence or precedent in support of its affirmative defenses related to the Consent Judgment, the Court should deny Ocwen summary judgment as to the Bureau's Counts I–IX and Florida's Counts I–IV, and VI–VIII.

---

would in effect confer on them a partial immunity from civil liability for future violations. Such a result is consistent with neither the antitrust laws nor the doctrine of *res judicata*."); *see also Norfolk*, 371 F.3d at 1291 ("to preclude a wider range of matters than those specified in the Agreement would frustrate the parties' expressed intent and bestow upon Chevron a windfall of immunity from litigation").

[52] *Gates v. Towery*, 456 F. Supp. 2d 953, 963-65 (N.D. Ill. 2006) (holding that the plaintiff's due process claim for *injunctive relief* was barred under *res judicata* because of prior consent decree's express limitation to equitable relief; claim for damages was not barred).

[53] *In re Methyl Tertiary Butyl ("MTBE") Prod. Liab. Litig.*, No. M21-88, 2015 WL 5051660, at *2–*3 (S.D.N.Y Aug. 26, 2015) (where plaintiff had already *expressly released claims* for *continuing* nuisance actions, it could not bring a continuing nuisance action relating to the same ongoing groundwater contamination); *World's Finest Choc. Inc. v. World Candies, Inc.*, 409 F. Supp. 840, 844–45 (N.D. Ill. 1976) (defendant was barred under *res judicata* from using plaintiff's trademark where prior consent judgment between the parties enjoined defendant from using plaintiff's trademark).

[54] *Affiliated Hosp. Prods, Inc. v. Merdel Game Mfg.*, 513 F.2d 1183, 1188 n. 8, 1189 n. 12 (2d Cir. 1975); *Schneider*, 878 F.3d at 311.

[55] *See, e.g.*, *Norfolk*, 371 F.3d at 1291 (the preclusive effect of a settlement agreement "should be interpreted according to [the agreement's] express terms, rather than according to traditional principles of *res judicata*"); *Balbirer v. Austin,* 790 F.2d 1524, 1528 (11th Cir.1986) ("[A] consent judgment cannot constitute collateral estoppel unless the party pleading collateral estoppel proves from the record of the prior case or through extrinsic evidence that the parties intended the consent judgment to operate as a final adjudication of a particular issue.").

[56] *Norfolk*, 371 F.3d at 1289 (holding that plaintiff's suit was not barred by *res judicata* because the express terms of the settlement did not preclude the claims at issue).

### III. PLAINTIFFS HAVE ABUNDANT EVIDENCE TO ESTABLISH LIABILITY.

Ocwen contends that "Plaintiffs developed no admissible evidence that would enable them to prevail" on summary judgment.[57] To the contrary, Plaintiffs have collected a mountain of evidence that proves liability, including admissions and interrogatory responses, corporate and fact-witness testimony, and Ocwen's own business records, all of which undeniably show that Ocwen violated the law. Plaintiffs rely on some of this clear-cut evidence in their motion for partial summary judgment to prove liability for most claims,[58] and have cited evidence for their remaining claims in their response to Ocwen's statement of material facts.[59]

In its motion for summary judgment, Ocwen does not dispute the veracity of the evidence on which Plaintiffs rely. Nor can Ocwen dispute, for example, that it acknowledged in admissions, interrogatory responses, and corporate testimony that it failed to conduct nearly 400,000 escrow-account analyses on time—conduct that, without question, violates RESPA, as Ocwen itself recognized in contemporaneous documents.[60] Instead, Ocwen attempts to erase the effect of this evidence by inventing a new legal standard for liability: that Plaintiffs must produce "individualized" evidence of a legal violation.[61] Ocwen's attempt fails for two fundamental reasons. First, this is not the applicable legal standard, as made clear by the fact that Ocwen does not cite a single case in support of its position. Second, even if loan-level evidence were required, the Plaintiffs *have* an abundance of such evidence for every count (as Ocwen well knows since it produced it), in addition to other admissible evidence that shows liability.

### A. Ocwen's "individualized" liability standard has no basis in law.

Citing no statutory provisions or cases in support, Ocwen argues that it is entitled to summary judgment on every count because, in its view, "Plaintiffs cannot, as they must, present individualized evidence" to prove their claims.[62] This is not the correct burden of proof or standard for a government plaintiff.

---

[57] Mot. at 2.

[58] *See generally* Plaintiffs' Partial Motion for Summary Judgment ("Pls.' MSJ"), ECF No. 630; Plaintiffs' Statement of Facts in support of Pls.' MSJ ("Pls.' SOF"), ECF No. 631 and accompanying exhibits ("Pls. SJX").

[59] Pls.' Opp. SMF ¶¶ 216–219.

[60] Pls.' MSJ at 26–27.

[61] Mot. at 13–16.

[62] Mot. at 13.

Under the CFPA, FDCPA, and FDUPTA, an act or practice is unfair or deceptive if it meets certain requirements, and to find violations of these laws courts do not require the government to produce evidence identifying all—or even any—of the individuals that suffered the unfair or deceptive act or practice. In *F.T.C. v. Primary Grp. Inc.*, for example, the district court found that declarations from fourteen consumers who were contacted by a debt collector and the company's telephone scripts "for use in conversations with consumers" showed that the company's debt-collection practices were "false and deceptive."[63] After considering this evidence, which did not purport to establish every individual who was subjected to a deceptive call, the court concluded that the "overwhelming and uncontroverted evidence establishes as a matter of law that [the defendant] made material false and deceptive representations likely to mislead consumers," and so granted summary judgment against the company.[64] Affirming on appeal, the Eleventh Circuit reasoned that the telephone scripts alone were sufficient to establish liability because they contained language that falsely implied that the debtors faced criminal charges, and the FDCPA prohibits threats of action that cannot legally be taken and representations that nonpayment of debt will result in arrest.[65] Because "individualized" evidence is not a requirement, neither the trial nor appellate court stated or suggested that the F.T.C. was required to show the specific borrowers who were subjected to the false representations.

Indeed, the unfairness and deceptive legal standards do not require individualized evidence by their very nature. An act or practice is unfair if it is "*likely to cause* substantial injury to consumers"[66] and deceptive if it "is *likely to mislead* the consumer."[67] These standards specifically provide for finding violations without an identified victim, and so courts find liability without evidence of any individually identified customers who were likely to have been harmed or misled. In *F.T.C. v. Roca Labs, Inc.*, for example, the F.T.C. alleged that

---

[63] No. 15-CV-1645-MHC, 2016 WL 4056206, at *8–*9 (N.D. Ga. May 19, 2016), *aff'd*, 713 F. App'x 805 (11th Cir. 2017).

[64] *Id*. at *11.

[65] *F.T.C. v. Primary Grp., Inc.*, 713 F. App'x 805, 807–08 (11th Cir. 2017).

[66] 12 U.S.C. § 5531(c)(1) (emphasis added); *Bryant v. Aargon Collection Agency, Inc.*, No. 17-CV-14096, 2017 WL 2955532, at *7 (S.D. Fla. June 30, 2017) (same test for unfairness under the FDCPA); *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. Dist. Ct. App. 2014) (same test for unfairness under FDUPTA).

[67] *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (analyzing FTCA standard, which is the same as CFPA and FDCPA standard) (emphasis added).

representations on a company's website were deceptive, and that a "gag clause" that prohibited customers from disparaging the company was unfair.[68] After determining that the representations at-issue were likely to mislead, the court granted summary judgment against the company— without citing evidence of any actual customers who were likely to be misled.[69] Similarly, the court found the gag order unfair because, without negative reviews of the company, consumers were likely to buy products that they otherwise would not—again without relying on evidence of specific customers that bought or were likely to buy any products as a result of the gag order.[70]

Nor do the other consumer-protection statutes at-issue require government plaintiffs to produce evidence showing every harmed individual in order to establish liability. Indeed, the government can obtain penalties or other relief, such as disgorgement, under consumer-protection statutes absent proof of harm to any individuals.[71] And Ocwen cites no authority or principle to explain which legal provisions at-issue require "individualized" evidence and which do not. Regulation X, for example, requires Ocwen to maintain policies and procedures that are reasonably designed to achieve certain objectives.[72] Under Ocwen's "individualized" liability standard, proof that a policy was deficient on its face—or even that a required policy did not exist—would not suffice to establish a violation, since the Bureau would have to show "which specific loans" were subjected to the deficient or non-existent policy.[73] That is nonsensical. Yet Ocwen offers no basis, in law or otherwise, to distinguish between legal requirements it believes require "individualized" evidence and legal requirements that do not.

Further, Ocwen's belief as to how Plaintiffs should prove their case squarely contradicts its view that "individualized" evidence is necessary. Ocwen claims that Plaintiffs should have "sample[d] loans and prove[n] violations in the sample that could be extrapolated to all loans."[74] But a review of a subset of loans and extrapolation to a larger population would not meet the

---

[68] 345 F. Supp. 3d 1375, 1381–84 (M.D. Fla. 2018).

[69] *Id*. at 1387–93.

[70] *Id*. at 1393–95.

[71] *See, e.g*., *FTC v. Primary Group, Inc*., 713 Fed. Appx. 805, 808 (11th Cir. 2017) (affirming district court's disgorgement order even though the FTC "did not present evidence showing that any consumers actually paid Primary Group"); *see also* 12 U.S.C. § 5565(c) (authorizing civil money penalties for violations of federal consumer financial law).

[72] 12 C.F.R. § 1024.38(a).

[73] Mot. at 16.

[74] Mot. at 22; *see also id*. at 13.

liability standard for which Ocwen argues—evidence showing "which specific loans violated []
what specific legal standard"—for the population outside of the sample.[75]

Ocwen invents its "individualized" evidence requirement by relying on: (1) questions
posed by Magistrate Judge Matthewman at a discovery hearing;[76] (2) its view that penalties must
be calculated based on the number of borrowers who suffered violations;[77] and (3) that the
Bureau requested loan-level data in discovery.[78] Ocwen is grasping at straws.

First, Magistrate Judge Matthewman was questioning Plaintiffs regarding Defendants'
demand that Plaintiffs identify all loans "at issue" in the case; he was not articulating a governing
legal standard for liability.[79] Second, the penalty provision of Dodd-Frank speaks to penalty
amounts for each day a violation continues, but is silent as to the *evidence* required to prove that
violation.[80] And civil money penalties need not be assessed based on the number of borrowers
who suffered a violation, as Ocwen suggests, but under the plain language of the penalty
provision can also be assessed based on the number of days a violation existed.[81] Third, that the
Bureau *sought* loan-level data in discovery—which it uses to establish the magnitude of some of
Ocwen's violations and to quantify certain damages—does not mean that the law requires
individual-loan evidence to prove liability.

Ultimately, Ocwen seeks to use its invented liability standard to deem as inadmissible its
admissions, interrogatory responses, business records, sworn deposition testimony, and other
admissible evidence unless it contains loan-level information.[82] The evidence in this case shows
the absurdity of Ocwen's position. Under Ocwen's view, its internal audit stating that "███████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████" is somehow not
evidence of liability, since it does not specify any individuals with ███████████.[83] Nor is

---

[75] Mot. at 16.
[76] Mot. at 14–15.
[77] Mot. at 15.
[78] Mot. at 17–18.
[79] ECF No. 349 at 29–30.
[80] *See* 12 U.S.C. § 5565(c) (assigning penalties for "each day" a "violation continues").
[81] *See id.*
[82] *See, e.g.,* Mot. at 19 (Plaintiff's "Memory Aid does not identify admissible evidence that could prove violations").
[83] Pls.' SOF ¶ 164.

the e-mail from Ocwen's 

,"[84] or even Ocwen's

*admissions* that it failed to conduct hundreds of thousands of escrow analyses on time.[85] Nor,

under Ocwen's standard, are the internal audits finding that Ocwen

.[86] Nor is Ocwen's corrective action plan

stating that "

."[87] Nor is Ocwen's interrogatory response

acknowledging that it provided inaccurate reinstatement quotes to over 82,000 borrowers.[88]

The list goes on and on. These are just a few examples of the indisputable evidence that Ocwen tries to erase by claiming that Plaintiffs have "no evidence" to establish liability. And although not required, the evidence collected by Plaintiffs does, in fact, include loan-level identification of borrowers who were subjected to legal violations, as described below.

**B.  Admissible evidence exists as to Ocwen's liability on all claims.**

Plaintiffs have an abundance of admissible evidence to prove liability on all counts, including (but by no means limited to) loan-level evidence.

**<u>Bureau Counts I and V & OAG Count VIII</u>**:[89] These counts allege that Ocwen's servicing of loans with inaccurate information was unfair in violation of the CFPA and FDCPA. In their motion for summary judgment, Plaintiffs cited more-than-sufficient evidence to establish liability.[90] And contrary to Ocwen's contention that Plaintiffs lack "individualized" evidence, this evidence includes, for example, an interrogatory response in which Ocwen identified by loan number the individuals who paid too much or too little into their escrow accounts due to Ocwen's use of inaccurate escrow information.[91]

---

[84] Pls.' SOF ¶ 179.
[85] Pls.' SOF ¶¶ 170–171.
[86] Pls.' SOF ¶ 205.
[87] Pls.' SOF ¶ 217.
[88] Pls.' SJX 138, Defs.' Resp. First Rogs at Rog. No. 5 at 17–18.
[89] For ease of review, Plaintiffs describe counts in the same order as in their motion for summary judgment. Plaintiffs address the counts not included in their motion for summary judgment last.
[90] *See* Pls.' MSJ at 8–15; *see also* Pls.' SOF ¶¶ 127, 131–133, 135–143, 146, 149–154, 175, 177, 188–190, 207, 210–211, 250, 252.
[91] Pls.' SJX 138, Defs.' Resp. First Rogs. at Rog. No. 2 at 11.

**Bureau Counts II, IV, and VI & OAG Count VIII**: These counts allege that Ocwen's false representations about amounts that borrowers owed were deceptive in violation of the CFPA and FDCPA, and that Ocwen's inaccurate periodic statements violated TILA. Plaintiffs have laid out evidence that shows Ocwen's liability beyond dispute.[92] This, too, includes loan-specific evidence, such as a report created by Ocwen that identifies thousands of borrowers for whom Ocwen ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ ).[93] And here, as elsewhere, Plaintiffs would have collected more loan-level evidence but for Ocwen's own inadequate records. For example, Ocwen identified in contemporaneous business records that it was ██████████████████████████████████████████ ."[94] When the Bureau asked Ocwen to identify "by account" each borrower who received an inaccurate reinstatement quote, Ocwen could not do so with certainty, responding instead by using a model to estimate recipients of inaccurate reinstatement quotes.[95]

**Bureau Count VII & Florida Count I & OAG Count II**: These counts allege that Ocwen violated RESPA by failing to conduct escrow-account analyses or send escrow-account statements on time, making borrowers pay un-owed shortages, and failing to pay insurance premiums on time. Plaintiffs have put forth ample indisputable evidence to establish liability.[96] This includes (but is by no means limited to) Ocwen's identification, in interrogatory responses and a written report, of nearly 400,000 borrowers subjected to untimely analyses,[97] ████ ████████████████████████████████████████████████████,[98] over 36,000 borrowers whose shortage payments were not processed timely,[99] and 1,367 borrowers whose insurance policies were cancelled due to Ocwen's error.[100] It is unclear if Ocwen is moving on

---

[92] *See* Pls.' MSJ at 21–24; Pls.' SOF ¶¶ 127, 131–133, 135–143, 146, 149–154, 175, 177, 188–190, 207, 210–211, 250, 252.
[93] Pls.' SOF ¶ 248.
[94] Pls.' SOF ¶ 191.
[95] Pls.' SJX 138, Defs.' Resp. First Rogs. at Rog. No. 5 at 17–18.
[96] Pls.' MSJ at 26–29; Pls.' SOF ¶¶ 158–231.
[97] Pls.' SJX 138, Defs.' Resp. First Rogs. at Rog. No. 1 at 10.
[98] Pls.' SOF ¶¶ 199–201.
[99] Pls.' SOF ¶¶ 209–210.
[100] Pls.' SOF ¶ 222.

OAG's Count II allegation that it failed to refund escrow surpluses as required by RESPA,[101] as Ocwen did not address it in its Motion. But OAG has enough evidence to create a dispute of material fact given that Ocwen's own business records reflect such errors.[102]

 **Bureau Count X & OAG Count IV**: These counts allege that Ocwen violated the Homeowners Protection Act by failing to cancel PMI on the termination date, instead continuing to charge borrowers for unneeded policies. Plaintiffs have put forth indisputable evidence to establish liability,[103] including a report created by Ocwen that identifies ███ of individual borrowers for whom Ocwen failed to cancel insurance timely.[104]

 **Bureau Count IX & OAG Count III**: These counts allege that Ocwen violated RESPA by initiating foreclosure proceedings while evaluating borrowers' loss-mitigation applications. Plaintiffs' indisputable evidence here includes Ocwen's identification in an interrogatory response of 124 borrowers who were subjected to conduct that violates RESPA,[105] and evidence showing that Ocwen pursued lien releases on ██ impacted borrowers after completed foreclosure sales and placed holds on pending foreclosure referrals or proceedings for ██ impacted borrowers due to its failures to comply with RESPA's loss-mitigation requirements.[106] OAG's indisputable evidence also includes internal documents acknowledging Ocwen's failure to include required language in evaluation notices and identifying ████ of potentially impacted borrowers.[107]

 **Bureau Count III**: This count alleges that Ocwen's false promise to borrowers that they had 30 days to submit missing information before being foreclosed on was deceptive in violation of the CFPA. The Bureau has identified indisputable evidence of liability,[108] which includes the identification of at least █ borrowers who received deceptive letters.[109]

---

[101] Florida's Third Am. Compl., ECF No. 506 ¶ 205.
[102] Pls.' Opp. SMF ¶¶ 296–297.
[103] Pls.' MSJ at 29–30; Pls.' SOF ¶¶ 246–252.
[104] Pls.' SOF ¶ 248.
[105] Pls.' MSJ at 31; Pls.' SOF ¶¶ 258–260.
[106] Pls.' SMF ¶ 270.
[107] Pls' SMF ¶¶ 265–269.
[108] Pls.' MSJ at 31–33; Pls.' SOF ¶¶ 261–264.
[109] Pls.' SOF ¶¶ 263–264.

**OAG Counts VI and VII**: OAG's Count VI alleges that Ocwen imposed lender-placed insurance in excessive amounts. OAG set forth indisputable evidence of liability in Plaintiffs' motion for summary judgment,[110] including evidence that Ocwen identified loans where it had placed excessive coverage of lender-placed insurance and Ocwen's Rule 30(b)(6) witness admitted to ████████████████████████████████████████ ████████████████.[111] OAG's Count VI also alleges that Ocwen imposed lender-placed insurance on borrowers who already had insurance. OAG has sufficient evidence to create a dispute of material fact given that Ocwen's business records reflect such errors.[112] OAG's Rule 30(b)(6) witness brought a memory aid to her deposition that included evidence of excessive insurance, including specific borrower examples, and the imposition of force-placed insurance on borrowers who had insurance.[113]

OAG's Count VII alleges that the Ocwen charged borrowers excessive property-inspection fees. OAG put forth evidence of liability in Plaintiffs' motion for summary judgment.[114] Such evidence includes, but is not limited to, Ocwen's admissions that (i) ██████ ████████████████████████████████████████████████████ ████████████████████  ██████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████.[117]

**Bureau Count VIII**: This count alleges that Ocwen violated Regulation X because its policies and procedures were not reasonably designed to achieve certain objectives, such as investigating borrower complaints. While the Bureau does not seek summary judgment on this count because of acknowledged factual disputes, significant evidence of liability exists. For one,

---

[110] Pls.' MSJ at 35; Pls.' SMF ¶¶ 239–245.
[111] Pls.' Opp. SMF ¶¶ 231; *see also* Pls.' SOF ¶¶ 239–245.
[112] Pls.' Opp. SMF ¶¶ 229, 298.
[113] Pls.' Opp. SMF ¶¶ 229, 231, 293–295.
[114] Pls.' SOF ¶¶ 271–285.
[115] Pls.' SOF ¶ 276(b).
[116] Pls.' SOF ¶ 276(c).
[117] Pls.' SOF ¶ 277.

only 

In sum, Plaintiffs have ample evidence to prove liability on all claims. And although not necessary to establish liability, such evidence includes loan-level identification of borrowers who were subjected to legal violations.

## IV. OCWEN'S OTHER ARGUMENTS DO NOT ENTITLE IT TO SUMMARY JUDGMENT ON LIABILITY.

Ocwen makes several other arguments to try to avoid liability: (1) a liability expert is required; (2) Plaintiffs did not disclose in discovery sufficient evidence to establish liability; and (3) the Bureau's Count III fails as a matter of law. These arguments are baseless.

### A. A liability expert is not required or needed.

Remarkably, Ocwen contends that Plaintiffs cannot prove liability with documents because the documents "do not say 'Ocwen serviced this loan in violation of law.'"[125] Because, in Ocwen's view, Plaintiffs can establish liability only by showing a legal violation for each

---

[118] Mot. at 36; Pls.' Opp. SMF ¶¶ 216–219.
[119] Pls.' Opp. SMF ¶¶ 217–219.
[120] Pls.' Opp. SMF ¶ 217.
[121] *See e.g.*, Defs.' SMF Ex. 103 (███████████████████████ ██████████).
[122] Pls.' Opp. SMF ¶ 218.
[123] Pls.' Opp. SMF ¶ 219.
[124] *Id.*
[125] Mot. at 19.

individual loan affected by the violation, it believes an expert is needed to summarize or analyze the loan-level data produced by Ocwen.[126] Ocwen also claims that the Bureau cannot prove that policies and procedures were not reasonably designed (Count VIII) because Plaintiffs lack expert testimony on the ultimate legal conclusion.[127] Ocwen is wrong.

There is no requirement to use an expert to establish liability. And contrary to Ocwen's statement in its motion for summary judgment, the Bureau did not "promise[]" to use an expert to establish liability.[128] At the discovery hearing cited by Ocwen, the Bureau explained that it sought loan-level servicing data for approximately 1.58 million loans to evaluate the scope of Ocwen's violations (which were already evident from documents, interrogatory responses, and testimony) and to quantify certain damages (which it did).[129]

Not only is a liability expert not required, it is particularly unnecessary in this case because of the clear-cut evidence establishing liability. An expert is not needed, for example, to testify about ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████]."[130] Nor is an expert required to interpret Ocwen's interrogatory responses or admissions acknowledging that it failed to perform nearly 400,000 escrow analyses within the legally prescribed period, or Ocwen's corporate testimony acknowledging the same.[131] This evidence, and much other evidence like it, establishes beyond any doubt Ocwen's liability without the need for expert testimony.

Ocwen's argument that the Bureau must use an expert to establish that its policies were not reasonably designed is even more misguided: experts are in fact generally *prohibited* from reaching such an ultimate legal conclusion, as that is this Court's role.[132]

---

[126] Mot. at 17–19.
[127] Mot. at 36.
[128] Mot. at 17.
[129] *See* Defs.' SMF Ex. 56 at, *e.g.*, 89:22–25 (explaining that the loan-level servicing data was "important, for example, for determining the full scope of errors. . . .").
[130] Pls.' SOF ¶ 164.
[131] Pls.' SOF ¶¶ 165–171.
[132] *See, e.g.*, *United States v. Long*, 300 F. App'x 804, 814 (11th Cir. 2008).

**B. Ocwen's "memory aid" arguments and attacks on Plaintiffs' "loan bucketing" are specious because they ignore evidence in Ocwen's possession.**

Ocwen points to one memory aid used by a 30(b)(6) witness for the Bureau to argue that the aid itself "and the documents it lists are not competent evidence to prove" liability.[133] This argument is baseless because it ignores: (1) the Bureau's eleven other memory aids and the abundant evidence referenced in them; and (2) Florida's seven binders of information which included key and exemplar documents to describe the kind of evidence it intended to rely on.

As background, Ocwen requested in discovery that Plaintiffs identify each loan "at-issue," but Magistrate Judge Matthewman ordered Plaintiffs only to "identify approximately how many loans fall into each 'bucket' [major allegation], to the extent they are reasonably able to do so."[134] Plaintiffs did so by providing to Ocwen lists of at-issue loans organized by allegation or regulatory violation.[135] Then, in order to prepare its 30(b)(6) witnesses to discuss *why* these loans were at-issue, the Bureau prepared a memory aid identifying each source document used to identify each at-issue loan and the reason that the loans were at-issue.[136] This "loan-bucketing memory aid" related only to the identification of at-issue loans. The Bureau also created eleven other memory aids, which were organized by topic (such as escrow and insurance claims) and laid out the evidence of liability for all the Bureau's claims.[137] The Bureau provided Ocwen the loan-bucketing memory aid and these other memory aids during Ocwen's deposition of the Bureau's 30(b)(6) witnesses.[138] OAG prepared a spreadsheet and organized the at-issue loans by the source of the identified loan (such as consumer complaints, Ocwen's internal audits, or other discovery responses from Ocwen) and then prepared a document that cross-referenced the loan numbers with the Florida Plaintiffs' allegations.[139]

In attacking the Bureau's evidence, Ocwen cites to only the loan-bucketing memory aid, failing to mention the others in its possession, to argue that the aid itself and the documents cited

---

[133] Mot. at 19.

[134] ECF No. 396 at 3.

[135] Defs.' SMF Ex. 33–52.

[136] Defs.' SMF Ex. 62.

[137] Pls.' Opp. SMF ¶¶ 279–289.

[138] *Id*.

[139] Defs.' SMF Ex 68, 69; *see also* Pls. Opp. SMF ¶ 76 (Court confirming that the Bureau and Ocwen had reached an agreement on loan bucketing and the Florida Plaintiffs were not required to "bucket" loans in the same manner).

in it cannot prove liability.[140] Similarly, Ocwen misguidedly and singularly focuses on Florida's at-issue loan lists,[141] ignoring the other evidence provided to Ocwen in support of Florida's claims. Plaintiffs are not relying solely on the information in the loan-bucketing memory aid or lists, nor are they using the aids or lists as evidence. Instead, the memory aids, including those that Ocwen fails to mention, list the abundant admissible evidence, some of which is also cited in Plaintiffs' motion for summary judgment, that establishes liability beyond any doubt.[142] And the memory aids were not produced in a vacuum; they were an aid for witnesses who were extensively prepared to testify about the evidence underlying each of Plaintiffs' claims.

Ocwen cherry-picks three documents from the Bureau's loan-bucketing memory aid in an attempt to show how they cannot be used to prove its liability.[143] Ocwen first argues that ████ ████████████████████████████████████████████████████████████████████ ███████████████████, cannot show liability because it has not "otherwise been explained in discovery."[144] This is false: the Bureau explained in its memory aid on escrow and insurance claims, which Ocwen ignores, that the document relates to ██████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████.[145] Ocwen next claims that "the only document listed" in support of the Bureau's claim that Ocwen failed to terminate PMI on time is ████████████████ ████████.[146] But once again, Ocwen refers only to the loan-bucketing memory aid and ignores the escrow and insurance memory aid, which contains other evidence, including another Ocwen-produced report that identifies each loan for which Ocwen failed to ████████████████ ████████████████████████████████████████████████████████████████ ████████████.[147] Ocwen also fails to mention that the Bureau supplemented its loan-

---

[140] Mot. at 19–22.

[141] Mot. at, *e.g.*, 24 ("Ocwen is left to guess what Florida believes it did wrong . . . or what law (i.e., Count) Ocwen supposedly violated").

[142] Pls.' Opp. SMF ¶¶ 270–289.

[143] Mot. at 20–21.

[144] Mot. at 20–21.

[145] Pls.' Opp. SMF ¶ 108(a), (b).

[146] Mot. at 21 (referencing Defs.' SMF ¶ 111, which identifies the spreadsheet).

[147] Pls.' Opp. Ex. 31 (escrow-and-insurance memory aid) at 12–13.

bucketing memory aid (and its response to Ocwen's interrogatory seeking the identification of each at-issue loan by major allegation) to identify this second report.[148]

In its third example, Ocwen argues that the CFPB did not produce any evidence to establish that Ocwen sent inaccurate periodic statements "for each at-issue loan."[149] But as explained above, the Bureau need not prove a violation for every individual loan. The Bureau has ample evidence to establish its periodic-statement claim, which it spelled out in several memory aids that Ocwen once again ignores by citing only to the loan-bucketing memory aid.[150]

Ocwen also takes issue with the way the Bureau "bucketed" 1.3 million loans in response to Magistrate Judge Matthewman's order that Plaintiffs "identify approximately how many loans fall into each 'bucket' [major allegation], to the extent they are reasonably able to do so."[151] The Bureau bucketed these 1.3 million loans under Count VII (which was Count X at the time, since the Bureau had not amended its Complaint yet) because, based on consumer complaints, these borrowers potentially suffered escrow violations.[152] Ocwen argues that the Court should grant summary judgment as to these 1.3 million loans because the Bureau bucketed them under Count VII without specifying the legal violation within Count VII.

Ocwen similarly cherry-picks information related to Florida's "buckets",[153] improperly and inaccurately narrowing the scope of the significant evidence presented by Plaintiffs – even as related to Florida's at-issue loan lists. Ocwen's discussion surrounding Florida's at-issue loans fails to present a credible argument that Plaintiffs lack any evidence to support their claims, which is the high burden that Ocwen is required to meet.

Florida's loan "bucketing" exercise related to discovery requests propounded by Ocwen.[154] Upon hearing Plaintiffs' objections, Magistrate Judge Matthewman ordered the

---

[148] Pls.' Opp. Ex. 4 (identifying second PMI report).
[149] Mot. at 21.
[150] Pls.' SOF ¶¶ 127, 131–133, 135–143, 146, 149–154, 175, 177, 188–190, 207, 210–211, 250, 252 (evidence showing inaccurate amounts that was repeated in periodic statements); Pls.' Opp. Ex. 23 at 2, 11; Ex. 24 at 18; and Ex. 25 at 19 (memory aids all listing evidence relating to inaccurate amounts being populated in periodic statements, among other evidence).
[151] ECF No. 396 at 3.
[152] *See* Defs.' SMF Ex. 62 at 15 (row 8 under Count X of the loan-bucketing memory aid stating that these loans were at-issue because of "[c]omplaints related to escrow issues.").
[153] Mot. at 22-27.
[154] *See* Defs.' SMF Ex. 66–69; 72.

Attorney General to use its "best efforts" to identify and categorize at-issue loans in response to Defendants' discovery requests.[155] OAG listed loans from three broad categories: (1) consumer complaints to OAG and Ocwen; (2) discovery ordered to be produced by Magistrate Judge Matthewman related to the allegation that Ocwen failed to timely disburse insurance premium payments from borrowers' escrow accounts; and (3) loan-level information reviewed by Ocwen in connection with certain audits.[156] OAG also provided Ocwen with a list cross-referencing the issues presented by loans in each of the "buckets", which are set forth in tabs on two spreadsheets – one in response to Ocwen's request for production, and a close to identical spreadsheet produced in response to Ocwen's interrogatories.[157] OFR specifically identified loans reviewed in connection with the 2015 Multistate Mortgage Examination.[158] OAG incorporated relevant loans identified by the Bureau, and OFR incorporated relevant loans identified by the Bureau or OAG.[159]

Ocwen mischaracterizes the OAG's 30(b)(6) testimony with respect to OAG's consumer complaints,[160] explaining how complaints are stored and tracked, and the process by which they were reviewed in connection with the "buckets" exercise the Plaintiffs undertook.[161] Notably, of the 1,618 loans identified in connection with consumer complaints filed with the OAG or Ocwen, Ocwen challenges inclusion of a single loan, ignoring that Ocwen's own records state that the consumer's loss mitigation payment complaint was resolved through non-financial relief.[162] The loans affiliated with the consumer complaints identified by the OAG, and Ocwen's responses to same, present information that helps support Plaintiffs' allegations. Ocwen's insistence that consumer complaints should be required to "prove that each loan even involved a

---

[155] ECF No. 348 at 3; *see also* Pls. Opp. SMF ¶ 76.
[156] Defs.' SMF Ex. 67.
[157] Defs.' SMF Ex. 68.
[158] Defs.' SMF Ex. 72.
[159] Defs.' SMF ¶¶122, 128.
[160] Defs.' Mot. 25–26.
[161] Pls. Opp. SMF ¶¶153, 156.
[162] Pls. Opp. SMF ¶160.

violation of law"[163] is an invented standard that does not minimize the important role consumer complaints play in supporting government enforcement actions.[164]

Ocwen next attacks loans *it* identified in connection with Florida's discovery requests for borrower-level information.[165] Florida propounded over 130 requests for populations identified by Ocwen as impacted or remediated in various internal audits, corrective action plans, audit status reports, and quality assurance monthly reports.[166] Florida did not receive information related to many of its requests[167] and, in one instance, sought Court intervention where Florida had information that Owen had prepared a "lookback analysis" and "remediation plan".[168] The document that was produced to the Attorney General listed remediation provided to borrowers,[169] and this information was in turn included in Florida's at-issue loan list. Though Ocwen did not finish production of documents responsive to these requests until August 2019, after the 30(b)(6) depositions, and after the close of fact discovery,[170] the loans identified by Ocwen in response to specific requests were properly included as "at-issue".

Ocwen, which controlled virtually all of the information at-issue and identified same to Florida in discovery tailored to identify loan-level information, attempts to downplay audit

---

[163] Mot. at 25.

[164] *See, e.g., Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1247 (11th Cir. 2016) ("there is no magic number of violations that create a pattern or practice of noncompliance") (*internal quotation omitted*); *Melidor v. Ocwen Loan Servicing, LLC*, No. 0:17-CV-62320-UU, 2018 WL 7079992, at *5 (S.D. Fla. Feb. 26, 2018) (suggesting plaintiffs can potentially allege pattern or practice of RESPA violations with consumer complaints available on the CFPB's website).

[165] Mot. at 26; *see also* Pls. Opp. SMF ¶164, 230.

[166] *Id.*

[167] Per Magistrate Judge Matthewman's Order, the Florida Plaintiffs' discovery was restricted to Florida loans.  However, the OAG has standing to bring claims against a Florida company for conduct originating in Florida that affects out-of-state consumers. *Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dept. of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1261 (Fla. 3d DCA 2000) (the Attorney General has authority to investigate and enforce FDUTPA with respect to a Florida-based entity that transacts business with non-resident consumers). There has been no challenge to the OAG's standing to bring claims on behalf of borrowers nationwide, and no order precluding same.

[168] ECF No. 37 in Case No. 17-CV-18096 (Plaintiffs' Motion to Compel); *see also* ECF No. 65 in Case No. 17-CV-18096 (Order compelling Ocwen to provide the requested information); Pls. Opp. SMF ¶ 166.

[169] *Id.*

[170] Pls. Opp. SMF ¶ 121.

findings because such audits may refer to investor guidelines or other non-consumer facing issues.[171] For example, Ocwen relies on a statement in █████████████████████ ████████████████████████████████████████████████████████████ █████████████████)[172] to imply that such issues do not impact borrowers simply because borrowers do not pay for directly for these services.[173] However, the audits Ocwen cites ████ ████████████████████████████████████████████████████.[174] In fact, these audits expressly acknowledge that ████████████████████████████████ █████████████████.[175] The very documents Ocwen relies on in its Motion for Summary Judgment evidence Ocwen's liability for various state and federal statutory violations, specifically the CFPA and FDUTPA.

Ocwen also cites two of the OAG's memory aids for the 30(b)(6) deposition, complaining only that these aids do not identify a ***single loan***,[176] which is first untrue and second beside the point. Ironically, Ocwen identifies a ***single loan*** number in the section of the Motion attacking Florida's claims. As noted above, the OAG prepared and produced during its deposition seven memory aid binders, organized by issue, that included exemplar, internal Ocwen documents such as audits, management assertion forms of issue remediation, and corrective action plans.[177] One of the two Florida memory aids Ocwen challenges pertains to a claim that the OAG no longer pursues.[178] Thus the only Florida memory aid that Ocwen references relates to evidence supporting Plaintiffs' claims that Ocwen services loans with inaccurate information contained in its system of record. As pointed out herein, requiring government enforcement agencies to provide individualized, loan-level evidence to support systemic violations would render aspects of the CFPA unenforceable.

At bottom, Ocwen contests the way Plaintiffs disclosed during discovery the evidence on which they rely to show liability. But Ocwen fails to mention that, when it raised this same

---

[171] Mot. at 27.
[172] Mot. at 27; *see also* Pls. Opp. SMF 175
[173] *Id.*
[174] Pls. Opp. SMF ¶¶ 173, 175.
[175] *Id.*
[176] Defs. SMF ¶¶177–178.
[177] Pls' Opp. SMF ¶¶ 293–295.
[178] Pls.' Opp. SMF ¶ 178.

grievance in a motion for sanctions, Magistrate Judge Matthewman denied that motion, holding that "Plaintiffs have substantially complied in good faith with the Court's Orders" requiring them to identify at-issue loans, and that "Defendants have sufficient information and discovery to defend against these two cases."[179]

Ocwen also suggests that Plaintiffs rely on *too much* evidence by speculating that Plaintiffs will impermissibly "dump pieces of a puzzle on the floor" and "ask this Court . . . to put it together."[180] This is a novel argument indeed, given that it is apparently based on Ocwen's guess as to how Plaintiffs will present their evidence at trial. As Plaintiffs have shown with their motion for partial summary judgment, they are capable of presenting relevant evidence in a way that allows this Court to draw its conclusions.

### C. Ocwen's argument about Bureau Count III was already rejected.

In Count III, the Bureau alleges that Ocwen falsely promised borrowers that they had 30 days to submit missing information before being foreclosed on, in violation of the CFPA's prohibition of deception.[181] Ocwen argues that, because the Bureau did not allege that this conduct violates Regulation X, it cannot show deception.[182] But this Court already rejected this exact argument when ruling on Ocwen's motion to dismiss because of "the absence of any legal support for Defendants' position that Regulation X limits the CFPB's authority to bring actions under the CFPA."[183] The one case cited by Ocwen in support of its contention, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, does not change anything. In that case, the Supreme Court explained that the specific governs the general in order to avoid "contradiction" or "superfluity of a specific provision."[184] Here, recognizing a deceptive practice under the CFPA does not contradict Regulation X or render it superfluous; Ocwen does not show otherwise.

---

[179] ECF No. 499 at ¶ 1.
[180] Mot. at 18. Ocwen also wrote that "the Memory Aid is nothing more than a multi-page list of over 100 specific documents . . ." *Id.*
[181] Bureau's Am. Compl., ECF No. 481, at 69.
[182] Mot. at 32–33.
[183] ECF No. 452 at 51–52.
[184] 566 U.S. 639, 645 (2012).

## V.  OCWEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAMAGES.

Ocwen argues that the Bureau has "no evidence" to prove any damages.[185] That is wrong. Through its expert, Plaintiffs quantified the foreclosure-initiation and opportunity-cost damages flowing from Ocwen's violations with well-accepted methods using Ocwen's interrogatory responses and its own data.[186] And there is abundant record evidence to establish other damages, which need not be proven by an expert.

### A.  Ocwen is not entitled to summary judgment on foreclosure-initiation damages.

Ocwen argues that it is entitled to summary judgment on the Bureau's and OAG's claim for damages resulting from Ocwen's late escrow analyses because Plaintiffs quantified these damages using a model that, in Ocwen's view, "is entirely divorced from any analysis, consideration, or evidence concerning each individual loan."[187] Professor McFadden's analysis, Ocwen maintains, did not identify which individual consumer loans went into foreclosure and, if they did, the out-of-pocket costs associated with each of those foreclosures.[188] Ocwen's argument, however, flows from the same fallacy that underlies its contention on liability: that Plaintiffs must prove their claims with "individualized" evidence.[189] And in any event, Professor McFadden's model does shows damages on an individual-loan level.[190]

It is simply not the law that Plaintiffs must establish the exact out-of-pocket costs that borrowers suffered. In many different contexts, courts have recognized that a reasonable estimate of damages suffices if liability has been shown. For example, the Supreme Court held that employees seeking damages for uncompensated work under the Fair Labor Standards Act (FLSA) may prevail if "there is a basis for a reasonable inference as to the extent of the

---

[185] Mot. at 27.

[186] Ocwen argues that Defendants are "entitled to summary judgment on Florida's damages claims" because Florida's expert, Lawrence Powell, did not opine on damages. Mot. at 31. But as OAG has already adequately disclosed, it is relying on Professor McFadden at trial. Further, OAG may seek relief apart from actual damages. *See* 12 U.S.C. § 5565 and Section 501.207, Fla. Stat. Where Ocwen does not argue or seek summary judgment against Florida on anything other than actual damages, and thus cannot raise such an argument on reply.

[187] Mot. at 28 (emphasis removed).

[188] *Id*. at 29.

[189] *See id.* at 29–30.

[190] The Bureau incorporates all its arguments in its opposition to Ocwen's Motion to Exclude Testimony of Plaintiffs' Expert Daniel McFadden, ECF No. 656 ("Pls.' Opp. McFadden").

damages."[191] In reaching this conclusion, the Court considered both "the remedial nature of [the] statute and the great public policy which it embodies" and the fact that the defendant's lack of complete records made a precise calculation impossible.[192] Thus, the Court allowed a reasonable estimate of damages, finding that such a result was not barred "by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where, unlike here, the fact of damage is itself uncertain."[193] That damages may be calculated with reasonable certainty is especially appropriate in this case in light of the remedial nature of RESPA, which was enacted to protect consumers,[194] and the inadequacy of Ocwen's records.[195]

Courts have explained that a reasonable estimate of damages is sufficient in many other contexts.[196] As the Eleventh Circuit has explained, "while the damages may not be determined

---

[191] *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) (superseded on other grounds).

[192] *Id.* at 687; *see also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946) (approving a reasonable estimate of damages "where the defendant by his own wrong has prevented a more precise computation").

[193] *Anderson*, 328 U.S. at 688; *see also Julian v. Swift Transp. Co.*, No. CV-16-00576-PHX-ROS, 2019 WL 7282025, at *5 (D. Ariz. Dec. 27, 2019) (relying on expert's estimates and noting that "damages . . . are not required to be exact").

[194] *See Rawlings v. Dovenmuehle Mortg., Inc.*, 64 F. Supp. 2d 1156, 1165 (M.D. Ala. 1999) ("both the statutory language of other sections of RESPA and RESPA's legislative history demonstrate that Congress intended RESPA to be a remedial consumer-protection statute."); *McLean v. GMAC Mortg. Corp.*, No. 06-22795-CIV, 2008 WL 1956285, at *11 (S.D. Fla. May 2, 2008) (cited the quoted portion of *Rawlings* with approval).

[195] For example, one cannot identify actual foreclosure costs assessed against borrowers in Ocwen's produced servicing system data because the data related to transactional credits and debits uses only generic descriptions and do not explicitly identify any foreclosure-related costs. Pls.' Opp. SMF ¶ 292.

[196] *See, e.g.*, *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d 21, 49 (1st Cir. 2013) (where causation was established, there was a more relaxed burden of proof on damages) (internal quotation marks and citations omitted); *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 835 (8th Cir. 2016) (allowing "employees to submit representative evidence" in action under Worker Adjustment and Retraining Notification Act); *Nutrimatix Inc. v. Xymogen, Inc.*, No. 6:15-cv-790-Orl-37GJK, 2017 WL 385753, at *11 (M.D. Fla. Jan. 27, 2017) (holding that lost profits may be based on reasonable estimates and noting that expert "is allowed some economic imagination so long as it does not become fantasy"); *Mortgage Now, Inc. v. Stone*, No. 3:09cv80/MCR/CJK, 2012 WL 12964891, at *2 (N.D. Fla. Nov. 14, 2012); *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, No. 5:05-cv-260-Oc-GRJ, 2008 WL 3819752, at *3 (M.D. Fla. Aug. 12, 2008) (allowing damages to be established through expert testimony based on indices compiled by industry group).

by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only proximate. The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data."[197] In explaining that damages can be reasonably estimated, courts recognize that to reject claims because the damages that flow from them cannot be calculated with absolute precision serves only to reward the misconduct at issue.[198]

   As Plaintiffs explained in opposing Ocwen's motion to exclude Professor McFadden, econometric modeling like that done by Professor McFadden has been recognized for decades as one way to quantify damages with reasonable certainty.[199] For example, in an antitrust case involving the pricing of disposable contact lenses, the plaintiffs relied on an expert's multiple regression analysis to show that the defendants' practices caused them to pay higher prices for contact lenses.[200] The defendants, objecting to the expert's analysis, argued that some plaintiffs actually paid less—or paid nothing—for their contact lenses, and thus the expert's opinion said nothing "about whether any consumer suffered any actual injury." [201] The court rejected this challenge, recognizing that econometric analysis "is a sufficiently reliable means of demonstrating that nearly all consumers who purchased contact lenses paid more than they would have in the absence of the alleged conspiracy, and of measuring those overcharges."[202]

---

[197] *G.M. Brod & Co. Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985) (internal brackets and quotation marks omitted).

[198] *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969) (in patent infringement action, damages could be established by circumstantial evidence; a contrary rule would "make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain"); *Bigelow*, 327 U.S. at 264 (same).

[199] Pls. Opp. McFadden at 3, n. 21 (citing *Bazemore v. Friday*, 478 U.S. 385, 400–01 (1986) (J. Brennan, concurring in part and joined by all other members of the Court) (regression analysis, a type of econometric model, is an acceptable way to establish damages); *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) (statistician's testimony on damages would be helpful because regression analysis is "a methodology that is well-established as reliable); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1347 (S.D. Fla. 1999), *aff'd*, 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005)).

[200] *In re: Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 357-58 (M.D. Fla. 2018).

[201] *Id.* at 374.

[202] *Id.* at 389; *see also Allen v. Dairy Marketing Servs., LLC*, No. 5:09-cv-230, 2013 WL 6909953, at *17-18 (D. Vt. Dec. 31, 2013).

Ocwen addresses none of the case law in the many areas in which courts approve of reasonable estimates of damages (and econometric modeling and other statistical methods as permissible ways to establish this reasonable estimate). Instead, it relies almost exclusively on one case, *A.R. v. Dudek*,[203] for its argument that Plaintiffs must use "individualized" evidence to prove damages. In *Dudek*, the Department of Justice sought damages on behalf of all children who had been unduly institutionalized in Florida, in violation of the Americans with Disabilities Act.[204] The State of Florida challenged DOJ's entitlement to damages, and the court agreed with the state.[205] It did so, however, because DOJ had not shown that all the children for whom it sought damages had been unduly institutionalized.[206] Thus, the court reached the commonsense conclusion that, without a violation, there could be no damages. Unlike in *Dudek*, Plaintiffs here seek foreclosure-initiation damages only for borrowers who were subject to a legal violation: a late escrow analysis in violation of RESPA.[207] Thus, this case is nothing like *Dudek*.[208]

This case is similar instead to the many other cases where a reasonable estimate of damages, often performed through an econometric analysis like Professor McFadden's, has been deemed an appropriate way to measure the harm caused by a defendant's unlawful conduct. As shown above in Section III, there is no question that Plaintiffs have established Ocwen's violations of RESPA. Indeed, Ocwen has admitted that it failed to perform timely escrow analyses for hundreds of thousands of consumers. Because Plaintiffs have demonstrated liability, they are not required to establish consumer damages by the type of "individualized" evidence Ocwen demands. In *In re Neurontin Marketing and Sales Practices Litigation*, for example, the Second Circuit rejected this very argument that only individualized evidence can prove damages,

---

[203] No. 12-cv-60460, 2016 WL 3221140 (S.D. Fla. June 9, 2016).

[204] *Id.* at *1.

[205] *Id.* at *11.

[206] *Id.*

[207] *See, e.g.*, McFadden's Second Amended Expert Report (Sept. 19, 2019), ECF No 656-1 ("McFadden Report"), at ¶ 22, 123, Table 15, and App'x G.

[208] The other case mentioned by Ocwen, *General Telephone v. E.E.O.C.*, is also inapposite. In that case, the Supreme Court addressed only the issue of whether the EEOC may seek certain relief under Title VII without being certified as a class representative under Federal Rule of Civil Procedure 23. 446 U.S. 318 (1980). The Court mentioned that the EEOC "requested relief only on behalf of 'those persons adversely affected' and 'in an amount to be proven at trial'" to reason that the EEOC was not impermissibly seeking an "unjustified[] windfall." The Court did not address in any way whether individualized evidence is required to prove damages. *Id.* at 324.

accepting instead an expert's econometric model as a valid and reliable way to establish the damages attributable to the legal violation (as opposed to other causes).[209]

Ocwen also contends that Professor McFadden did not establish what foreclosure costs each borrower suffered.[210] This does not entitle Ocwen to summary judgment. As Plaintiffs also explained in opposing Ocwen's motion to exclude Professor McFadden, Professor McFadden used relevant data sources to determine foreclosure costs, including a report of assessed foreclosure costs commissioned by Ocwen.[211] Any assumptions made by Professor McFadden were reliable and reasonable.[212] His opinions on foreclosure costs are therefore admissible evidence.[213] Ocwen's disagreement about this foreclosure data reveals why they are not entitled to summary judgment on damages: the parties' genuine dispute of fact over foreclosure costs, which is why the Plaintiffs did not move for summary judgment on damages.

Although it is not required, Professor McFadden's damages calculations were, in fact, "individualized." Professor McFadden calculated harm—specifically, an increased risk of foreclosure initiation—only for borrowers who suffered an untimely escrow analysis as identified in Ocwen's own interrogatory responses, and he made use of Ocwen's loan-level servicing data for these borrowers to do so.[214] This loan-level data included specific data about borrowers and loan-specific characteristics.[215] As a result, while Professor McFadden expressed his results as the average increased probability of foreclosure initiation attributable to the legal violation, his model calculates for each of these borrowers the specific increased probability of foreclosure based on their own characteristics.[216] That is the epitome of individualized.

If Ocwen is arguing that each borrower's increased probability of foreclosure initiation is not a legally cognizable or quantifiable harm, it is wrong. In *United States v. City of Miami*, for

---

[209] 712 F.3d 21, 30, 42 (1st Cir. 2013); *see also* Pls. Opp. McFadden at 8–9.
[210] Mot. at 29–30.
[211] Pls. Opp. McFadden at 6.
[212] *Id*. at 11.
[213] *See, e.g.*, *G.M. Brod*, 759 F.2d at 1539 (damages testimony was "admissible and relevant" because it is enough if the evidence "shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data").
[214] McFadden Report ¶¶ 102–107, Appendix E.
[215] *Id*. ¶¶ 86–87, 98–101, 108, Table 11, App'x G.
[216] McFadden Report ¶ 123 n. 128.

example, the City of Miami unlawfully discriminated against police officers based on race when assigning promotions.[217] But because not all the plaintiffs would have been promoted even absent the unlawful discrimination (and so suffered damages), and it was not possible to identify which plaintiffs would have been promoted, the court held that damages should be awarded to each police officer who suffered the legal violation (unlawful discrimination) based on each one's *probability* that they would have been promoted absent the unlawful conduct.[218]

If Ocwen is arguing instead that it is entitled to summary judgment on damages because Professor McFadden's foreclosure-initiation model does not establish that Ocwen's untimely analyses were the "proximate cause" or largest driver of foreclosure initiation, it is also wrong. To the extent proximate cause must be shown in the damages context, it requires a "direct relation between the injury asserted and the injurious conduct alleged."[219] Professor McFadden's model shows exactly such a direct relationship: between Ocwen's untimely analyses and the harm of an increased risk of foreclosure.[220] Even if it did not, courts have long recognized that a defendant cannot escape liability because its "conduct was not the most proximate cause of an injury" if the harm was "foreseeable."[221] When a servicer collects too much or too little (and then later seeks to recoup those amounts) from financially vulnerable borrowers, it is foreseeable that those borrowers will experience a heightened risk of foreclosure initiation.

Ocwen characterizes Professor McFadden's damages calculations as "theoretical" and "divorced from facts" without describing what he actually did: use specific data about the consumers harmed by Ocwen's conduct to calculate their damages. Like the experts in *G.M. Brod*, *Nutrimatix*, *Julian*, *Disposable Contact Lens*, and many other cases, Professor McFadden's

---

[217] 195 F.3d 1292, 1294 (11th Cir. 1999).

[218] *Id*. at 1300 (damages should be awarded on a pro rata basis because "[b]ased on mathematical probability alone, each lieutenant candidate stood only a one in twenty-three (or four percent) chance of promotion"); *see also, e.g.*, *Adkins v. Morgan Stanley*, No. 12-cv-7667, 2013 WL 3835198, at *3 (S.D.N.Y. July 25, 2013) ("Plaintiffs have suffered a cognizable injury. . . . These loans placed Plaintiffs at greater risk of default, delinquency, and foreclosure.") (internal citations removed); *Albright v. City of New Orleans*, 208 F. Supp. 2d 634, 641 (E.D. La. 2002), *aff'd*, 105 Fed. App'x 552 (5th Cir. 2004) (assessing damages based on the probability that each victim of discrimination would have suffered monetary harm).

[219] *Neurontin,* 712 F. 3d at 35 (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

[220] *See* Pls.' Opp. McFadden at 3–4, nn. 17–23.

[221] *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3rd Cir. 2015).

35

damages calculations rest on relevant data—the data Ocwen used to service loans—to quantify damages with reasonable certainty.[222] His opinions are thus admissible evidence of damages.[223]

### B.  Ocwen is not entitled to summary judgment on opportunity-cost damages.

Ocwen raises the same arguments with respect to Professor McFadden's calculation of the opportunity-cost damages suffered by borrowers who were overcharged and so lost access to their funds. Specifically, Ocwen takes issue with Professor McFadden's conclusion that Ocwen's borrowers would have used the over-collected funds to pay credit-card debt because this does not meet Ocwen's standard of showing "individualized, actual evidence of the 'foregone interest' damages suffered by each borrower."[224] This argument fails for the same reasons described above: Plaintiffs are not required to prove damages with this kind of specificity. As Plaintiffs explained in their opposition to Ocwen's motion to exclude Professor McFadden, Professor McFadden made reasonable assumptions based on an analysis of the characteristics of Ocwen borrowers.[225] That is more than sufficient to reasonably estimate their lost opportunity costs.

### C.  Ocwen is not entitled to summary judgment on other damages.

Ocwen also argues that, because Plaintiffs' damages expert quantified only certain damages, "the CFPB has no evidence to prove" any other damages, entitling Ocwen to summary judgment.[226]  This argument is easily belied by the extensive record in this case. Plaintiffs, like any litigant, can establish damages through types of evidence other than expert testimony. Plaintiffs' summary-judgment motion set forth some of the considerable evidence that supports consumer damages resulting from Ocwen's violations, although Plaintiffs do not seek damages at this point.[227] For example, evidence produced by Ocwen in discovery shows that Ocwen over- and under-collected hundreds of millions of dollars related to: (1) escrow amounts owed; (2) principal and interest amounts owed; and (3) insurance amounts owed.[228] To the extent that Ocwen disputes these facts, those are issues to be resolved at trial.

---

[222] *See* nn. 193, 196, 200, 213 *supra*; McFadden Report at ¶¶ 102–107, Appendix E.
[223] *E.g., G.M. Brod*, 759 F.2d at 1539
[224] Mot. at 30–31 (formatting omitted).
[225] *See* Pls.' Opp. McFadden at 2, 18–19.
[226] Mot. at 28.
[227] Pls.' MSJ at 9–18.
[228] Pls.' MSJ at 9–18.

## VI. OCWEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON ENHANCED PENALTIES FOR ITS UNTIMELY ESCROW-ACCOUNT ANALYSES.

Civil money penalties may be assessed for any violation of federal consumer financial law.[229] Penalties are assessed in three tiers: the first tier applies to "any violation," the second tier applies when a person "recklessly engages in a violation," and the third tier applies when a person "knowingly" violates the law.[230] Ocwen argues that the "CFPB cannot prove Ocwen[] acted 'recklessly' or 'knowingly'" in failing to perform escrow-account analyses for borrowers who were delinquent, in bankruptcy, or in foreclosure because regulatory guidance did not require an annual escrow *statement* for those borrowers.[231] While an escrow statement was not required, the requirement to perform the analysis was clear under the law, and contemporaneous documents show that Ocwen knew that it was ████████████████████.

Indeed, there is more than enough evidence in the record to conclude that Ocwen acted recklessly and knowingly when it failed to conduct timely escrow analyses for borrowers who were delinquent, in bankruptcy, or in foreclosure. Ocwen identified in a ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████."[232] Ocwen's management agreed that ████████████████.[233] Yet over a year later, ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████."[234] And according to Ocwen's ███████████████ ███████████████████████████████████████████████████████████ ████████████████████████████.[235] Not surprisingly then, in 2014 and 2015 alone, Ocwen failed to conduct timely escrow analyses on nearly 390,000 loans, according

---

[229] 12 U.S.C. § 5565(c)(1).
[230] *Id*. § 5565(c)(2).
[231] Mot. at 34–36.
[232] Pls.' SOF ¶ 164.
[233] *Id.*
[234] Pls.' SOF ¶ 179.
[235] Pls.' SJX 134, Aug. 2015 RC Rpt., OCW-019-0010624, at Issue 1242.

to its interrogatory responses and its own admissions.[236] This evidence is more than sufficient to create a genuine dispute as to whether Ocwen acted knowingly and recklessly.

In addition, as Plaintiffs' industry expert explained, a prudent servicer would have expected difficulty in meeting its obligations when attempting manual workarounds for escrow analyses, as Ocwen did.[237] And the persistence of Ocwen's failure to perform escrow analyses was "outside of industry norms."[238] This testimony further belies Ocwen's contention that there is no genuine dispute as to its reckless or knowing conduct, since expert testimony on departures from industry standards is evidence as to whether a defendant acted recklessly or knowingly.[239]

## VII.   OMS AND OFC ARE LIABLE UNDER RESPA INDIVIDUALLY AND AS PART OF A COMMON ENTERPRISE.

For purposes of RESPA, a servicer is "a person responsible" for "servicing," which is defined as "receiving any scheduled periodic payments from a borrower . . . and making the payments to the owner of the loan or other third parties . . ."[240] Ocwen contends that OMS and OFC did not engage in servicing and thus cannot be held liable under RESPA.[241] Contrary to Ocwen's argument, OMS and OFC are and were servicers under RESPA—and so are individually liable for any violations—because they were actively involved in servicing loans, including the receipt and distribution of borrower payments. Even if this were not so, OFC is individually liable because it oversaw and was "responsible" for servicing. OMS and OFC are also jointly and severally liable as part of the Ocwen common enterprise.

The undisputed facts in support of Plaintiffs' motion for partial summary judgment show that OMS and OFC serviced loans.[242] For example, in OMS's ███████████████████
████████████████████████████████████████████████," which

---

[236] Pls.' SOF ¶¶ 168, 171.

[237] Expert Report of John Searson ("Searson Report"), ECF No. 655-1, at ¶ 148.

[238] Searson Report ¶ 161.

[239] *See, e.g.*, *Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (expert testimony regarding relevant professional standards can help jury conclude whether departures "were so severe or persistent as to support an inference of intentional or reckless conduct"); *Lopez v. Farmers Ins. Co.*, No. CIV-10-0584-HE, 2011 WL 1807158, at *4 (W.D. Okla. May 6, 2011); *Landau v. Lucasti*, No. 06-1229 (JBS), 2010 WL 502972, at *5 (D.N.J. Feb. 8, 2010).

[240] 12 C.F.R. § 1024.2(b) (definitions of "servicer" and "servicing").

[241] Mot. at 38–39.

[242] *See* Pls. SOF ¶¶ 9–24.

includes collecting and distributing payments from borrowers.[243] Similarly, OLS represented to the State of Washington that OMS (and OLS) conducted servicing as that term is defined by Washington's Consumer Loan Act.[244] Like RESPA, that law defines servicing to include receiving borrower payments.[245]

OFC was also actively involved in receiving borrower payments. For example, it



[249]

The documents cited by Ocwen in its statement of facts do not show otherwise. Ocwen first cites to testimony from its ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ and—in a portion of his testimony that Ocwen fails to cite or explain—████████████████████████ ████████████████[251]

Ocwen also cites to a declaration by an OFC "loan analyst" to claim that "[o]nly OLS received periodic payments from borrowers and made payments from those amounts."[252] But as

---

[243] Pls.' SJX 105, 2013 Report, OCW-039-0178210 at 220 ¶ 4.
[244] Pls.' SJX 23, Washington Consent Order ¶ 1.7
[245] *See* Wash. Rev. Code § 31.04.015(29).
[246] Pls.' SJX 104, ████████████████████████ OCW-011-0002375.
[247] Pls.' SJX 79, ████████████████, OCW3-004-0000029.
[248] Pls.' SJX 75, ████████████████████, OCW3-006-0001249 at 252.
[249] Pls.' SJX 45, Erbey Dep., at 16:7–16:21.
[250] Defs.' SMF ¶ 240 (internal citations omitted).
[251] Pls.' SJX 46, Faris Dep. at 19:17–20:5 (████████████████); 20:7–22:22 (████ ████████████).
[252] Defs.' SMF ¶ 241.

Plaintiffs explained in their motion to strike the declaration, Ocwen may not rely on the declaration because Ocwen failed to disclose the witness and he lacks personal knowledge.[253] And in any event, even if credited, the testimony does not show that OMS and OFC were not servicers under RESPA because it narrowly focuses on whether OLS was the entity that physically received and made payments while ignoring how OMS and OFC also engaged in servicing.[254] Moreover, even if OFC was not the entity that literally received or distributed all payments, it was still a servicer under RESPA because it was ultimately "responsible" for the receipt and distribution of payments.[255] As explained above, ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████[256]

OFC and OMS are also jointly and severally liable under a common-enterprise theory, for the reasons set forth in Plaintiffs' motion for partial summary judgment.[257] The cases cited by Ocwen in support of its contention that "parent companies cannot be held liable under RESPA" are inapposite because they do not consider—or even mention—common-enterprise liability.[258] They instead address "assigning liability to parent or subsidiary companies" that did not service loans solely because of their corporate relationship to the company that did service them.[259] OFC and OMS are not jointly liable strictly because of their relationship to OLS, but rather because the three entities acted as a common enterprise servicing loans.

## CONCLUSION

For the above reasons, Ocwen's motion for summary judgment should be denied in its entirety.

---

[253] *See* Pls.' Motion to Strike, ECF No. 669.
[254] Ocwen's citation to ███████████████████████████████████████████████████
████████████████████████████████.
[255] 12 C.F.R. § 1024.2(b) ("servicer" is "a person responsible" for . . . "servicing").
[256] Pls.' Opp. SMF ¶ 240.
[257] Pls.' MSJ at 35–40.
[258] Mot. at 39 (citing *McCarley v. KPMG Int'l*, 293 F. App'x 719, 722 (11th Cir. 2008); *Bernstein v. Wells Fargo Bank, N.A.*, Case No. 1:15-cv-2520-RWS-CMS, 2016 WL 4546653, at *4 n.3 (N.D. Ga. May 13, 2016); *Reese v. JPMorgan Chase & Co.*, Case No. 09-20912-CIV-KING, 2009 WL 10702443, at *4 (S.D. Fla. July 15, 2009); *Bennett, v. Nationstar Mortg., LLC*, Case No. 15-00165-KD-C, 2015 WL 5294321, at *11 (S.D. Ala. Sept. 8, 2015)).
[259] *McCarley v. KPMG Int'l*, 293 F. App'x 719, 722 (11th Cir. 2008).

Date: July 24, 2020

Respectfully submitted,

Attorneys for Plaintiff,
CONSUMER FINANCIAL PROTECTION BUREAU

JOHN C. WELLS
Deputy Enforcement Director

JAMES T. SUGARMAN
Assistant Litigation Deputy

/s/ Jean M. Healey Dippold
Jean M. Healey Dippold
Phone: (202) 435-7514
E-mail: jean.healeydippold@cfpb.gov

| | |
|---|---|
| Atur Desai | atur.desai@cfpb.gov |
| Michael Posner | michael.posner@cfpb.gov |
| Shirley Chiu | shirley.chiu@cfpb.gov |
| Tianna Baez | tianna.baez@cfpb.gov |
| Stephanie Brenowitz | stephanie.brenowitz@cfpb.gov |
| Erin Mary Kelly | erin.kelly@cfpb.gov |
| Greg Nodler | greg.nodler@cfpb.gov |
| Amanda Roberson | amanda.roberson@cfpb.gov |
| James Savage | james.savage@cfpb.gov |
| Doug Wilson | doug.wilson@cfpb.gov |

1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

Respectfully Submitted,

Office of the Attorney General
The State of Florida
Department of Legal Affairs
Ashley Moody
Attorney General

/s/ Jennifer Hayes Pinder
Jennifer Hayes Pinder
Senior Assistant Attorney General
Fla. Bar No.: 17325
Email: Jennifer.Pinder@myfloridalegal.com

Sasha Funk Granai

Assistant Chief-Assistant Attorney General
Fla. Bar No.: 96648
Email: Sasha.Granai@myfloridalegal.com

Victoria Butler
Director, Consumer Protection Division
Fla. Bar No.: 861250
Email: Victoria.Butler@myfloridalegal.com
3507 East Frontage Road, Suite 325 Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515

Respectfully Submitted,

Office of Financial Regulations
The State of Florida
Division of Consumer Finance

/s/ Joaquin Alvarez
Joaquin Alvarez
Assistant General Counsel
Fla. Bar No.: 113647
Email: Joaquin.Alvarez@flofr.com
The Fletcher Building
200 East Gaines Street
Tallahassee, FL 32399
Telephone: 850-410-9554
Facsimile: 850-410-9914

Scott R. Fransen
Assistant General Counsel
Fla. Bar No.: 0994571
Email: Scott.Fransen@flofr.com
1313 N. Tampa St., Suite 615
Tampa, FL 33602
Telephone: 813-218-5364
Facsimile: 813-272-3752

Miriam S. Wilkinson
Chief Counsel
Fla. Bar No.: 972101
Email: Miriam.Wilkinson@flofr.com

Anthony Cammarata
General Counsel
Fla. Bar No.: 767492

Email: Anthony.Cammarata@flofr.com
The Fletcher Building
200 E. Gaines Street
Tallahassee, FL 32399-0370
Telephone: 850-410-9601