**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495 and CASE NO. 9:17-CV-80496**
**MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

---

OFFICE OF THE ATTORNEY GENERAL, THE STATE OF FLORIDA, Department of Legal Affairs,
and
OFFICE OF FINANCIAL REGULATION, THE STATE OF FLORIDA, Division of Consumer Finance,

Plaintiffs,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

---

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


INTRODUCTION ..................... 1

ARGUMENT ..................... 2

I. THE PARTIES' SETTLEMENT AGREEMENT AND CONSENT JUDGMENT BAR ALMOST ALL OF PLAINTIFFS' CLAIMS (CFPB COUNTS I-IX & FL COUNTS I-III, VI-VIII) ..................... 2

A. The NMS Bars Plaintiffs' Claims As a Matter of Contract Law ..................... 2

1. The NMS Provided the Exclusive Standards and Remedies for the Conduct That It Covered ..................... 3

2. The Settlement Agreement Covered the Ocwen Conduct At Issue in This Case......... 5

a. Plaintiffs cannot sidestep the agreement by invoking metrics beyond those negotiated by the parties ..................... 5

b. Plaintiffs' claims *do* overlap with the settlement agreement's metrics ..................... 6

c. In any event, the agreement provided that additional metrics could be added to assess Ocwen's conduct. ..................... 8

B. Plaintiffs' Claims Are Barred by Waiver ..................... 9

C. Plaintiffs' Claims Are Barred by *Res Judicata* ..................... 9

II. PLAINTIFFS HAVE NOT SHOWN THAT THEY HAVE EVIDENCE SUFFICIENT TO TRY ANY OF THEIR CLAIMS (ALL COUNTS) ..................... 10

A. Due to the Individualized Nature of Plaintiffs' Claims, They Must Present Evidence Relating to Each Loan ..................... 10

1. Extensive Caselaw Establishes That Individualized Proof Is Required Where, as Here, the Defendant's Alleged Conduct Did Not Involve a Single Act or Uniform Course of Conduct ..................... 11

2. Judge Matthewman *Did* Say that Plaintiffs Must Present Evidence At Trial Proving a Violation For Each At-Issue Loan, and Plaintiffs *Did* Promise to Do That—But They Have Not Done So In Response to Ocwen's Motion ..................... 13

3. Plaintiffs' Obligation to Present Evidence Proving How Many and Which Loans Had Violations Is Confirmed by the Remedies That Plaintiffs Seek ..................... 15

B. Plaintiffs Have Failed to Satisfy Their Burden of Presenting Competent Evidence Sufficient to Prove Violations for Each Of The At-Issue Loans ..................... 16

1. The Documents Cited in Plaintiffs' Opposition Fail to Show There Is Any Triable Issue on Liability ..................... 16

2. Plaintiffs' Arguments About Their "Memory Aids" Are Moot Now and, in Any Event, the Aids Provide No Support for Their Claims ..................... 20

III. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS TO RECOVER FOR ALLEGED BORROWER DAMAGES ..................... 20

A. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Costs from Additional Foreclosures That Resulted From Ocwen's Late

Escrow Analyses" ..... 20

B. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Foregone Interest" ..... 24

C. Defendants Are Entitled to Summary Judgment on Florida's Damages Claims ..... 24

D. Defendants Are Entitled to Summary Judgment on All Other Damages Claims ..... 24

IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING LOSS MITIGATION APPLICATIONS (COUNT III) ..... 25

V. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON MOST OF PLAINTIFFS' ESCROW VIOLATION CLAIMS (CFPB COUNT VII & FLORIDA COUNTS I AND II) ..... 26

A. The Court Must Grant Summary Judgment as to the 1.3 Million Loans for Which the CFPB Has Not Even Determined There Was a Legal Violation ..... 26

B. Plaintiffs Cannot Show That Ocwen Acted Recklessly or Knowingly by Allegedly Failing to Conduct Annual Escrow Analyses for Nonperforming Loans ..... 27

VI. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING OCWEN'S POLICIES AND PROCEDURES (CFPB COUNT VIII) 28

VII. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON FLORIDA'S REMAINING FDUTPA CLAIMS ..... 29

VIII.DEFENDANTS OFC AND OMS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY DID NOT ENGAGE IN SERVICING ACTIVITIES ..... 29

CONCLUSION ..... 30

## INTRODUCTION

Two fundamental flaws in Plaintiffs' sprawling claims have been evident since this case's early stages. It is therefore entirely unsurprising that Plaintiffs are unable to show that they are entitled to a trial on those claims (never mind summary judgment in their favor).

The first fundamental flaw is that Plaintiffs' claims allege conduct by Ocwen that was already ***comprehensively*** covered by a court-approved settlement agreement between the parties. Ocwen agreed to implement detailed servicing protocols, with extensive independent monitoring for three years, and to pay or provide consumer remediation of over $2 billion. In return, Plaintiffs agreed that, for conduct occurring during that three-year period, Ocwen would have the opportunity to cure any errors, would be subject to enforcement only if it exceeded agreed error tolerances, and could be sued only in federal court in Washington and for specified remedies. This case seeks to deprive Ocwen of all of those benefits—after Plaintiffs received all of their benefits under the deal.

Plaintiffs' Opposition (ECF No. 679) ("Pls. Opp.") argues for that windfall on the ground that Plaintiffs did not release claims related to Ocwen's future conduct. That argument misses the point, which is that Plaintiffs expressly agreed on the substantive and procedural terms ***that would govern those claims***, and those terms bar this case. Plaintiffs alternatively argue that the settlement agreement does not bar their claims on the theory that, although the agreement's Servicing Standards covered Ocwen's alleged conduct, the "metrics" that the Monitor reviewed to enforce those Standards did not precisely cover their claims. But Plaintiffs' argument that they can sue over the same conduct covered by the settlement, simply by pointing to a metric that the parties did not agree would be used to assess that conduct, would make a mockery of both the agreement and the multimillion-dollar monitorship. Further, the agreement's metrics in fact did cover Plaintiffs' claims in this case. And, on top of that, the agreement expressly provided that additional metrics could be added, and one in fact was.

The second fundamental flaw that has pervaded this case from Day One is that Plaintiffs allege that Ocwen committed literally millions of loan-specific errors, and thus Plaintiffs necessarily need to muster loan-specific evidence in order to prove Ocwen made each of those errors. Plaintiffs seek to avoid that burden by citing inapposite cases where the defendant engaged in a uniform course of conduct, and by trying to rewrite their open-court admissions accepting that burden, but those arguments go nowhere. Now grappling with the obligations that

come with that burden of proof, Plaintiffs contend they can support their sprawling claims simply by offering thousands of Ocwen's documents into evidence. But the offered documents and Plaintiffs' allegations fall woefully short of Plaintiffs' burden, in opposing summary judgment, to present competent evidence sufficient to prove their claims. Indeed, Plaintiffs do not even try to explain how the cited Ocwen documents prove violations for each of the millions of loans that Plaintiffs say are at issue. That is no surprise because the documents that Plaintiffs cite—largely by reference to their own motion for partial summary judgment—are insufficient on their face to prove millions of alleged loan-specific violations. Moreover, the individualized nature of Plaintiffs' claims also forecloses their claim to recover for alleged borrower damages. That is so because Plaintiffs, unwilling to expend the time and effort to obtain actual evidence of the loan-specific losses allegedly suffered by the borrowers, instead seek to shortcut their evidentiary burden through hypothetical statistical models. That the law does not allow.

For these core reasons, as well as the other reasons shown herein, summary judgment should be granted to Ocwen on all of Plaintiffs' claims.

## ARGUMENT

### I. THE PARTIES' SETTLEMENT AGREEMENT AND CONSENT JUDGMENT BAR ALMOST ALL OF PLAINTIFFS' CLAIMS (CFPB COUNTS I-IX & FL COUNTS I-III, VI-VIII)

Ocwen showed in both its Motion for Summary Judgment ("Motion") (ECF No. 634) and its Opposition to Plaintiffs' Motion for Partial Summary Judgment ("MPSJ Opp.") (ECF No. 674) that Plaintiffs' claims in this case address the same conduct covered by the NMS settlement agreement and Consent Judgment that resolved Plaintiffs' earlier lawsuit against Ocwen. Mot. 4-10; MPSJ Opp. at 4-7. As a result, Plaintiffs' claims in this case are barred as a matter of contract law, waiver, and res judicata. *Id*. Plaintiffs' counter-arguments are unavailing.

#### A. The NMS Bars Plaintiffs' Claims As a Matter of Contract Law

Plaintiffs cannot argue that they are free to violate their contractual commitments. To the contrary, "[t]he government, more than any other party must be held to honor its commitments," and "[w]hen the government fails, United States Courts must be prepared to enforce these commitments." *Reed v. United States,* 717 F. Supp. 1511, 1518 (S.D. Fla. 1988), *aff'd*, 891 F.2d 878 (11th Cir. 1990).

Likewise, Plaintiffs do not dispute that if their claims are subject to the settlement agreement's substantive and procedural terms, their claims violate those terms. The agreement

allows Plaintiffs to pursue enforcement if, but only if, Ocwen's servicing performance exceeded certain threshold error rates during the monitoring period. Mot. at 5-6, 9-10; ECF No. 635, ¶¶ 9, 13-16, 24-34 ("Ocwen SMF"). Plaintiffs make no effort to show Ocwen violated ***any*** specified error rate or exceeded ***any*** metric. The agreement also contained "a series of steps before [a servicer] could be penalized for violating the servicing standards, including the Monitor's citation, failure to cure, [and] failure of informal dispute resolution . . . ." *United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Assoc.*, 878 F.3d 309, 315 (D.C. Cir. 2017); *see also* Mot. at 5-6 & Ocwen SMF ¶¶ 9-10, 13-16, 24-34. Plaintiffs ***concede*** that they did not exhaust the steps required prior to bringing an action under the NMS enforcement framework. Pls. Opp. at 6.

Instead, in an effort to salvage their claims, Plaintiffs advance two arguments. First, they say that the agreement's substantive and procedural provisions were not mandatory, and hence that Plaintiffs can ignore them. Alternatively, Plaintiffs contend that the agreement's "metrics" did not cover their claims. Both arguments are entirely unavailing.

### 1. The NMS Provided the Exclusive Standards and Remedies for the Conduct That It Covered

Plaintiffs' first argument is that the settlement agreement's detailed Servicing Standards and enforcement provisions were a one-way street. Plaintiffs contend that Ocwen had to comply with the agreement's comprehensive Servicing Standards, fund and participate in its monitoring regime and other Enforcement Terms, and pay or provide remediation of over $2 billion. But, at the same time, Plaintiffs maintain that they are free to ignore the NMS's Enforcement Terms and, instead, file a new suit that challenges Ocwen's conduct covered by the Servicing Standards without regard to those agreed-upon Enforcement Terms. Pls. Opp. at 4-6. In advancing this argument, Plaintiffs transparently seek a windfall under which they would keep all their benefits while honoring none of their obligations—which is particularly ironic given Plaintiffs' looking-glass assertion (at 6) that Ocwen is seeking a windfall.

Plaintiffs' illogical and unjust reading of the agreement is patently wrong. If accepted, it would embolden those who, contrary to the premise of court-approved settlements, accept a deal then sue for more.

Plaintiffs' central argument is that, under the settlement agreement, they did not release their claims for Ocwen's 2014-2017 conduct. Pls. Opp. at 4-6. But Ocwen is not arguing that Plaintiffs ***released*** their claims relating to Ocwen's future conduct; indeed, the Motion noted that

Plaintiffs may bring certain claims concerning that conduct. Mot. at 8-10. Instead, the point is that, in the settlement agreement, the parties agreed that those claims concerning Ocwen's future conduct, while not released, ***would be governed by the negotiated substantive and procedural terms*** set forth in the parties' deal. *Id.* at 9-10.

Plaintiffs completely ignore the language in the settlement agreement unambiguously providing that its substantive and procedural terms concerning Ocwen's 2014-2017 conduct are both mandatory and exclusive. Specifically, the NMS Consent Judgment explicitly states that (1) Ocwen "***shall*** comply with the Servicing Standards" and (2) "[t]he Servicing Standards . . . ***shall be enforced in accordance with the authorities provided in the Enforcement Terms***." Mot. at 9 & Ocwen SMF Ex. 2, NMS C.J. ¶¶ 3, 6 (emphasis added). Thus, the agreement expressly provides that both its substantive terms (the Servicing Standards) and its procedural provisions concerning Ocwen's 2014-2017 conduct are compulsory and binding.

It defies logic to suggest the parties (and the NMS court) ever contemplated or agreed that Plaintiffs could jettison the detailed error thresholds and remedy limitations in the NMS Consent Judgment just because Plaintiffs feel constrained by those agreed-upon terms and conditions. Certainly, Ocwen has not considered itself free to disregard the NMS's provisions, nor has it done so. Instead, over the three-year monitoring period, Ocwen invested over $55 million and hundreds of thousands of employee hours to comply with the settlement terms. Mot. at 6 & Ocwen SMF ¶ 55.[1] Ocwen did so in reliance on the mutuality of the Consent Judgment and on the courts' authority to enforce the parties' agreement according to its terms. For this

[1] Plaintiffs contend that the Court should not rely on Jenna Evans' declaration, cited by Ocwen for background information concerning NMS compliance, arguing that she is an undisclosed witness. Pls. Opp. at 6 n.28. Rule 26 does not require that Ocwen list the name of every employee who might later offer evidence or describe company processes. *See* ECF No. 684, at 4-7. Further, Ocwen's initial disclosures made clear that it may call upon any current employee in a long list of business units as needed to offer evidence in support of it claims. *See id.* at 5 (citing Defendants' Third Supp. Initial Disclosures at 3). Regardless, "Rule 56 . . . does not require that affiants be included in a witness list before their affidavits may be used to support a motion for summary judgment." *Ryder Auto. Carrier Grp. v. Gen. Teamsters Sales & Serv. & Indus. Union Local No. 654*, Nos. 96-3712, 96-3738, 1997 U.S. App. LEXIS 23246, at *7 (6th Cir. Sep. 2, 1997).

equitable reason, as well as the agreement's plain language, Plaintiffs' argument that they are free to ignore the agreement's substantive and procedural terms is baseless.[2]

### 2. The Settlement Agreement Covered the Ocwen Conduct At Issue in This Case

Plaintiffs argue (at 7-9) that even if the settlement agreement did provide the exclusive standards and remedies for the conduct that it covered, the agreement did not cover the Ocwen conduct here. But Plaintiffs do not—and cannot—dispute that their claims in this case overlap with the agreement's Servicing Standards. Pls. Opp. at 7. The Servicing Standards, which specified how Ocwen had to conduct its servicing activities, covered the same conduct at issue in almost all of Plaintiffs' claims. Mot. at 7-8; Ocwen SMF ¶¶ 36-52. In fact, those Servicing Standards specifically covered the accuracy of Ocwen's data, requiring Ocwen to "maintain procedures to ensure ***accuracy and timely updating*** of borrower[s'] account information." Ocwen SMF Ex. 3, NMS C.J. Ex. A, ¶ I.B.1 (emphasis added). Plaintiffs even acknowledge the "facial overlap between the text of the Claims and the Servicing Standards." Pls. Opp. at 7.

Still, Plaintiffs argue that their claims were not covered by the settlement agreement on the theory that the specific "metrics" that the Monitor was to use to test Ocwen's compliance with the Servicing Standards did not measure the conduct that Plaintiffs now allege in their claims. *Id*. Plaintiffs' theory fails for three separate reasons.

#### a. Plaintiffs cannot sidestep the agreement by invoking metrics beyond those negotiated by the parties

Even if the specific metrics that the parties agreed that the Monitor would apply to assess Ocwen's conduct did not cover Plaintiffs' claims in this case, that would ***not*** mean that Plaintiffs are now free to assert those claims. As shown above, Plaintiffs concede that the conduct alleged in their claims was covered by the agreement's Servicing Standards. To the extent the parties agreed that only certain defined metrics would be analyzed to assess Ocwen' covered conduct, that most certainly did not mean that Plaintiffs could sue Ocwen outside the agreement on the ground that additional metrics identify defects in Ocwen's covered conduct. To the contrary, such an interpretation would render the agreement's mandatory Enforcement Terms nugatory

[2] To the extent Plaintiffs argue (at 6 n.33) that out-of-court settlements with any other servicers suggest that Plaintiffs may bring separate actions outside the NMS, those settlements are not authority and have no bearing on this case. Further, Plaintiffs fail to show that such actions, like this one, involved conduct squarely covered by the parties' prior agreement.

and meaningless, robbing Ocwen of their entire value. Simply put, the parties negotiated and agreed on (1) how Ocwen had to conduct itself and (2) what measurements would be taken to assess its conduct. Even if Plaintiffs now believe that the agreed metrics were insufficient to assess Ocwen's covered conduct, Plaintiffs cannot rewrite, much less violate, the agreement they signed and to which Ocwen fully adhered.

**b. Plaintiffs' claims *do* overlap with the settlement agreement's metrics**

Plaintiffs' argument also fails for the additional reason that their claims in fact ***are*** covered by the agreement's metrics and other assessment tools.

i. <u>Plaintiffs' claims that Ocwen serviced loans based on inaccurate information or made misrepresentations (CFPB Counts I-II, IV-VI; Florida Count VIII)</u>: Plaintiffs argue that their Counts alleging that Ocwen used or communicated inaccurate information do not overlap with the agreement's metrics on the theory that these Counts allege there was inaccurate data in Ocwen's system of record ("SOR"), while the metrics assumed that the SOR data was correct and only tested Ocwen's use of that data. Pls. Opp. at 7-8. Plaintiffs quote the Monitor as stating that he was not charged with reviewing the accuracy of the data in the SOR. *Id*. This argument fails for two separate reasons. *Id.*

First, in a sentence that Plaintiffs omitted in their Opposition (at 7), the Monitor stated that although he was not charged with reviewing the accuracy of the SOR, "***[t]he Settlement requires that an independent third party periodically review those parts of the SOR that pertain to account information for accuracy and completeness***." Ocwen SMF Ex. 25, at 6 (emphasis added). Indeed, the agreement expressly provided that Ocwen's "***systems to record*** account information shall be periodically reviewed ***for accuracy and completeness*** by an independent reviewer." *Id.* Ex. 3, NMS C.J. Ex. A, ¶ I.B.9 (emphasis added). Thus, regardless of what was in the metrics that the Monitor applied, the agreement separately provided that Ocwen's SOR would be reviewed "for accuracy and completeness." *Id*. And it was: the Monitor reported that "[Ocwen] has provided for my review its two most recent independent service auditor's reports of its system of record and will provide future independent service auditor's reports of its system of record until the Judgment sunsets." Ocwen's Response to Plaintiffs' Additional Facts ("RAF") Ex. 2, *United States v. Bank of Am. Corp.*, No. 12-0361, ECF No. 194 at 19 (D.D.C. Dec. 16, 2014) (discussing Ocwen). Further, he reported that he had also "charged McGladrey [an independent auditing firm] . . . to assess the reliability of [Ocwen's] system of

record." RAF Ex. 3, at OCW-039-0244950. Thus, Plaintiffs are flatly wrong in asserting that their claims alleging inaccuracies in the data in the SOR are outside the scope of the agreement.

Plaintiffs' argument also fails because it is based on the false premise that their claims that Ocwen used or transmitted inaccurate information relate solely to the accuracy of the data in the SOR, rather than to Ocwen's use of the SOR data to service loans. Pls. Opp. at 7. Although the Amended Complaint alleges errors in the SOR, it also alleges that "***[e]ven when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about borrowers' loans due to system deficiencies***." Am. Compl. ¶ 34 (emphasis added). Indeed, large portions of Plaintiffs' Amended Complaint are devoted to precisely those claims that Ocwen was generating inaccurate information, all of which indubitably were covered by the settlement agreement's metrics. Am. Compl. ¶¶ 48-67, 207(b-(c), 240(b)-(c). By arguing only that the agreement did not cover their claims alleging inaccurate data in the SOR, Plaintiffs effectively concede that Ocwen is entitled to summary judgment on all of Plaintiffs' claims alleging that Ocwen's system generated inaccurate information.

ii. <u>Plaintiffs' claims concerning escrow, insurance, and foreclosure issues (CFPB Counts III, VII-IX; Florida Counts I-III, VI-VII)</u>: In the chart at pages 8-9 of their Opposition, Plaintiffs argue that their Counts concerning escrow, insurance, and foreclosure issues are outside the agreement's metrics. That is equally incorrect. As the following chart shows, the agreement's metrics ***did*** cover the conduct alleged in those Counts:

| Count | Metrics that Overlap with Claims in Count |
|---|---|
| CFBP III (foreclosure after asking for more information) | • Metric 6.B.i tested whether Ocwen afforded borrowers 30 days from the date of its notification of any missing information or document prior to making a determination on approval of a loan modification. Ocwen SMF Ex. 6 at D1-13.<br>• Metric 30 also tested if Ocwen gave borrowers "at least 30 days to submit any additional required documents from the last [Additional Document Request Letter] before referring the loan to foreclosure or proceeding to foreclosure sale." *Id*. at D1-18. |
| CFPB VII; Florida I-II (escrow and insurance issues) | • Metric 33 tested billing statement accuracy, each of which necessarily included a review of the escrow balance. *Id*. at D-21.<br>• Metric 4.B measured whether "[p]ayments posted timely . . . and accurately," including whether "payments posted to principal interest and escrow before fees and expenses." *Id*. at D1-7. |
| CFPB VIII (policies) | • Metric 5 measured Ocwen's "Policy/Process Implementation," including its third-party vendor management, customer portal, implementation of a single |

| | |
|---|---|
| | point of contact, workforce management, and account status activity. *Id*. at D1-9-D1-12.<br>• Metric 6 monitored Ocwen's "Customer Experiences," including "Complaint response timeliness." *Id.* at D1-13. |
| CFPB IX Florida III (foreclosure issues) | • Metric 1.B tested whether a borrower's modification was incorrectly denied. *Id*. at D1-3.<br>• Metric 3.B tested whether accurate pre-foreclosure notifications (including Loss Mitigation Statements) were sent. *Id*. at D1-6.<br>• Metric 6.B.i-iii tested loan modification document collection, decision and notification timeline compliance, and appeal timeline compliance—including whether Ocwen "responded to a borrower['s] request for an appeal within 30 days of receipt." *Id*. at D1-13-14.<br>• Metric 6.b.viii tested whether a "Dual Track" violation occurred. *Id*. at D1-15-16.<br>• Metric 30 tested whether Ocwen allowed borrowers "at least 30 days to submit the documents requested . . . before declining the borrower for incomplete or missing documents," and "at least 30 days to submit any additional required documents" requested "before referring the loan to foreclosure or proceeding to foreclosure sale." *Id*. at D1-18. |
| Florida VI (forced place insurance) | • Metric 6.C tested whether Ocwen "assess forced place insurance when there was evidence of a valid policy" and if it "terminate[d] FPI within 15 days of receipt of evidence of a borrower's existing insurance coverage and refund the prorated portion to the borrower's escrow account." *Id*. at D1-16. |
| Florida VII (fees) | • Metric 4 tested whether property preservation, valuation, and attorney's fees adhered to guidance, and whether "services rendered" were consistent with "applicable requirements." *Id*. at D1-7. |

In sum, all of Plaintiffs' claims under all of these Counts were covered by the metrics and independent SOR review provisions of the settlement agreement.

**c. In any event, the agreement provided that additional metrics could be added to assess Ocwen's conduct.**

Plaintiffs' effort to evade the agreement on the theory that their claims are outside its designated metrics also fails because the agreement allowed for additional metrics to be added. Sections C.22-23 of the Enforcement Terms provided that if there was any information suggesting that Ocwen might be violating any "material term of the Servicing Standards," the Monitor could add "an additional Metric and associated Threshold Error Rate." Ocwen SMF Ex. 6, NMS C.J. Ex. D, ¶¶ C.22-23. Indeed, after the settlement was approved, the Monitor added an additional Metric (#34) to assess Ocwen's compliance with the Standards relating to servicing transfers. RAF Ex. 1, *United States v. Bank of Am. Corp.*, No. 12-0361, ECF No. 158 at 8 n.7 (D.D.C. May 14, 2014). Because Plaintiffs do not dispute that Ocwen's claimed conduct was

"facially covered" by the Servicing Standards, and because the agreement allowed additional metrics to be added as necessary to assess those Standards, Plaintiffs' argument that their claims are outside the agreement's scope is plainly meritless. Now that the monitoring period has lapsed, Plaintiffs cannot be allowed to insert additional testing metrics—and seek remedies beyond those permitted by the agreement—through this lawsuit.

**B. Plaintiffs' Claims Are Barred by Waiver**

Plaintiffs' Overlapping Claims in this case are also barred by the doctrine of waiver. Mot. at 10-11. Plaintiffs argue (at 10) there was no waiver because Plaintiffs did not release their claims for future conduct, but this release argument fails for the same reasons discussed on pages 3-5 above. Alternatively, Plaintiffs contend (at 10) that Ocwen seeks a "surrender" of "sovereign authority" that must be expressed in "unmistakable terms." Even if that standard applied here, it is satisfied. Courts have repeatedly held that "the intent to make mandatory is ***unmistakable*** when 'shall . . .' language is used." *Center for Biological Diversity v. Esper*, 958 F.3d 895, 906 n.7 (9th Cir. 2020) (citation omitted) (emphasis added).[3] And here, as quoted above, the parties' agreement says that the Standards "***shall*** be enforced in accordance with the authorities provided in the Enforcement Terms." Mot. at 9 (emphasis added). Moreover, Plaintiffs draw that standard from cases in which plaintiffs argued that Congress's ability to enact future legislation had been waived.[4] Such cases are far afield. In this case, Plaintiffs simply agreed to certain substantive and procedural limitations on their own claims in exchange for benefits from Ocwen, which an Article III federal court approved. The waivers inherent in such litigation settlement agreements by the government are routinely enforced. Mot. at 8-9.

**C. Plaintiffs' Claims Are Barred by *Res Judicata***

Ocwen's Motion showed Plaintiffs' claims are also barred by res judicata, because claims concerning Ocwen's conduct from 2014-2017 were actually litigated and resolved in Plaintiffs' prior lawsuit against Ocwen. Mot. at 11-13. In addition to Plaintiffs' release argument (Pls. Opp. at 12), which fails for the reasons above, Plaintiffs' two counter-arguments are unavailing.

---

[3] *See also*, *e.g.*, *Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (holding that the state "has used language of an unmistakably mandatory character, requiring that certain procedures 'shall' . . . be employed"), *overruled on other grounds*, 515 U.S. 472 (1995); *Lopez v. Superintendent*, 2019 U.S. Dist. LEXIS 4102, *38 (E.D. Pa. Jan. 8, 2019) (holding that "the rule speaks in 'unmistakable' terms, as it uses the mandatory 'shall'").

[4] Pls. Opp. at 10 n.39, citing, *e.g.*, *U.S. v. Cherokee Nation of Okla.*, 480 U.S. 700, 707 (1987).

First, relying on *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327-28 (1955), Plaintiffs argue (at 11-12) that a prior lawsuit is not *res judicata* as to claims concerning a defendant's future conduct where the prior lawsuit "sought forward-looking injunctive relief." In *Lawlor*, however, the plaintiffs in the earlier action had nominally sought, ***but had neither pressed for nor obtained***, relief concerning the defendants' future conduct. *Id*. at 328-29. Here, by contrast, preclusion principles apply with full force because Plaintiffs pressed for and actually obtained extensive prospective relief covering the exact same conduct at issue in this case (Ocwen SMF ¶¶ 1-52 & SMF Exs. 2-3, 6). *See* Mot. at 12 & n.3 (citing cases).

Second, Plaintiffs argue (at 11) that their claims in CFPB Counts IV, VIII, and IX and Florida Count III are not precluded because they are based on provisions of Regulation X and Z that were not in effect until January 10, 2014. But the NMS Consent Judgment was entered on February 26, 2014 (Ocwen SMF Ex. 2), ***after*** those Regulation X and Z provisions took effect. Also, as Plaintiffs concede (ECF No. 631, Pls.' SOF ¶ 252), the new parts of Regulation X and Z had been proposed, and were known by the parties, long before the NMS Consent Judgment went into effect.[5] Thus, Plaintiffs had both the chance and the duty to incorporate those provisions into the settlement agreement—and in fact, as shown above, the NMS does overlap with Plaintiffs' claims under those regulations.

## II. PLAINTIFFS HAVE NOT SHOWN THAT THEY HAVE EVIDENCE SUFFICIENT TO TRY ANY OF THEIR CLAIMS (ALL COUNTS)

Plaintiffs lack evidence sufficient to prove their claims that Ocwen made over 2 million separate servicing errors. Mot. at 13-27. To prove those loan-specific claims, Plaintiffs must present evidence that proves all of the required statutory elements for each, individual loan. Plaintiffs' failure to develop the expert testimony that they promised would prove all of those alleged violations means that Plaintiffs lack evidence sufficient to prove their 2 million loan-specific claims. *Id*. Plaintiffs' responsive arguments are in vain.

### A. Due to the Individualized Nature of Plaintiffs' Claims, They Must Present Evidence Relating to Each Loan

Plaintiffs acknowledged to Judge Matthewman that "***this is not a case where there's common impact or common error***," but rather is a case with "highly individualized populations

[5] *See, e.g.*, 78 Fed. Reg. 10,902, 11,007 (Feb. 14, 2013) (CFPB Count IV, citing Regulation Z, 12 C.F.R. § 1026.41(d)); 78 Fed. Reg. 10,696 (Feb. 14, 2013) (CFPB Counts VIII-IX & Florida Count III, citing Regulation X, 12 C.F.R. §§ 1024.38(a), (b), 1024.41(b), (c), (f), (g)).

[and] ***highly individualized errors***." 12/20/2018 Hr'g Tr. at 5:9-13 (emphasis added) (attached as Ocwen Reply Ex. 1). Likewise, Plaintiffs' Opposition does not rebut the Motion's showing that (1) there were no errors in the vast majority of the loans that Ocwen serviced during the period at issue; and (2) for the small fraction of loans that allegedly had errors, Plaintiffs advance a hodgepodge of allegations that vary from loan to loan. Mot. at 13-14; Ocwen SMF ¶ 96 & Exs. 54 & 55-55B. Plaintiffs' argument (at 13-17) that they, nevertheless, need not come forward with evidence proving the individual loan errors is untenable.

#### 1. Extensive Caselaw Establishes That Individualized Proof Is Required Where, as Here, the Defendant's Alleged Conduct Did Not Involve a Single Act or Uniform Course of Conduct

Plaintiffs cite to a handful of cases as supposedly showing that their claims do not require individualized proof. Pls. Opp. at 14-15. But the defendant in those cases had engaged in a common course of conduct that uniformly had impacted all the consumers. In *FTC v. Primary Group, Inc.*, 2016 WL 4056206 (N.D. Ga. May 19, 2016), *aff'd*, 713 F. App'x 805 (11th Cir. 2017), the government's evidence included telephone "scripts" through which the defendant made uniform misrepresentations, and uniformly failed to make required disclosures, to all the consumers. 2016 WL 4056206, at *8-9. Similarly, in *F.T.C. v. Roca Labs*, 345 F. Supp. 3d 1375 (M.D. Fla. 2018), the allegedly deceptive statements at issue were made on the defendant company's website and in identical documents that were enclosed with the company's products. *Id*. at 1381-84.

By contrast, many decisions under consumer protection statutes hold that where—as here—the defendant's conduct varied from person to person, individualized evidence is required to prove those claims. That is true in cases alleging misrepresentations. *See*, *e.g.*, *Perisic v. Ashley Furniture Indus., Inc.*, 2018 U.S. Dist. LEXIS 118337, *21 (M.D. Fla. June 27, 2018) (Magistrate) (holding in FDUTPA case that "individualized inquiries will be needed in light of the varying representations"), *adopted*, 2018 U.S. Dist. LEXIS 218663 (M.D. Fla. Aug. 13, 2018); *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 685-87 (S.D. Fla. 2008) (same); *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 480-82 (S.D. Fla. 2006) (same). It is equally true in cases alleging other kinds of conduct. *See*, *e.g.*, *Long v. Nationstar Mortg. LLC*, 2018 U.S. Dist. LEXIS 38757, *30 (S.D.W.V. Mar. 9, 2018) (holding that individualized proof was required for consumer protection law claims against loan servicer because the defendant "serviced each [borrower's] loan differently according to the individual circumstances of that

loan," and thus "the class members' injuries do not derive from a unitary course of conduct"); *Merrill v. Rossen*, 2016 U.S. Dist. LEXIS 197113, *13-17 (W.D. Mich. Jan. 25, 2016) (in case asserting FDCPA claim, citing need for "individualized proofs" to establish lawfulness of each collection effort) (also citing other such rulings under the FDCPA); *Bushbeck v. Chicago Title Ins. Co.*, 2011 U.S. Dist. LEXIS 158134, *46-50 (W.D. Wash. Aug. 15, 2011) (in case asserting RESPA claims, citing need for "individualized determinations" as to whether defendant failed to refund processing an actually performed services); *Eversole v. EMC Mortg. Corp*, 2007 U.S. Dist. LEXIS 38892, *42 (E.D. Ky. May 29, 2007) (citing need for "individualized proof of liability" in case under RESPA, including "individualized evidence of representations" made to each borrower as well as the other allegedly "violating conduct" by the defendant relating to particular loans).

These many holdings are highly instructive because they turned on an understanding of what evidence would have been required at trial in each case to prove claims under the relevant consumer protection statutes.[6] Indeed, the court in *CFPB v. Navient Corp.*, No. 3:17-cv-00101-RDM (M.D. Pa.), which is presently pending, has expressly recognized in a CFPB enforcement action that the Bureau's "proof will depend on applying the elements of the statute to the many persons on whose behalf you're proceeding." *See* Ocwen MPSJ Opp. at 10.

Plaintiffs also argue that claims alleging "unfair" or "deceptive" conduct do not require individualized evidence on the theory that such claims apply objective criteria—that "unfair" practice claims ask whether the use of inaccurate information was "likely" to cause injury and "deceptive" practice claims ask whether the misrepresentation was likely to mislead the consumer. Pls. Opp. at 14. That argument does not even apply to many of Plaintiffs' claims (CFPB Counts VI-X; Florida Counts I-IV, VI-VII), and it is an oversimplified description of the claims to which it does apply. In any event, it fails to defeat Ocwen's motion even on its own terms. Before the trier of fact could even consider whether the use of inaccurate information or misrepresentation was likely to cause substantial injury or to mislead the consumer—that is, the causation elements of these claims—the Plaintiffs will always have to ***first*** prove that Ocwen ***in***

---

[6] The Supreme Court has made clear that, under the Rules Enabling Act, the same substantive law must be applied in class actions as in non-class-action cases. *E.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1176 (11th Cir. 2010).

***fact used inaccurate information or made a misrepresentation***. But because all agree that the alleged use of inaccurate information or misrepresentation was unique to each borrower, Plaintiffs cannot avoid their burden to come forward with evidence relating to each of the at-issue loans. For that very reason, as already shown, numerous decisions under statutes proscribing "unfair" or "deceptive" conduct have held that individualized proof is required in these circumstances. *See* page 11-12 *supra*.

### 2. Judge Matthewman *Did* Say that Plaintiffs Must Present Evidence At Trial Proving a Violation For Each At-Issue Loan, and Plaintiffs *Did* Promise to Do That—But They Have Not Done So In Response to Ocwen's Motion

The conclusion that Plaintiffs must adduce evidence covering each of the at-issue loans is confirmed by Judge Matthewman's and Plaintiffs' statements in the course of this case. Specifically, Judge Matthewman repeatedly told Plaintiffs that they must come forward with loan-specific evidence of the alleged violations, and Plaintiffs promised to come forth with individualized loan evidence (through expert testimony covering all of the alleged errors). Mot. at 14-15; MPSJ Opp. at 8-9. Plaintiffs try to wish all of this case management history away, having found themselves unable to offer what they admitted they need to offer.

Plaintiffs assert (at 16) first that Judge Matthewman's statements can be disregarded because they were just "questioning Plaintiffs regarding Defendants' demand that Plaintiffs identify all loans 'at issue' in the case" rather than "articulating a governing legal standard for liability." Not so: Judge Matthewman was explicitly addressing how Plaintiffs would have to prove their case at trial. Thus, in the first colloquy, the Court directed CFPB counsel: "if you present this case to a jury or even summary judgment, aren't you going to have to go by loan number? In other words, aren't you going to have to say this loan was violative and this loan was violative and have to prove it?" Ocwen SMF ¶ 71; Ocwen SMF Ex. 28 at 29:13-20 (ECF No. 635). Likewise, in the second colloquy, Judge Matthewman said to Plaintiffs' counsel: "A[t] trial in this case, you are not going to be producing information about 1.58 million people in file form. You are going to do this in some sort of overarching expert opinion type of testimony." Ocwen SMF ¶ 94; Ocwen SMF Ex. 56 at 88:22-24-89:9-14 (ECF No. 639).[7]

[7] Confirming this still further, Judge Matthewman expressly opined that Ocwen had the right to know the specific loans for which Plaintiffs were asserting claims in order to "get[] the case ready for dispositive motions and trial." 6/5/2019 Hrg. Tr. at 47:23-48:1 (attached as Ocwen Reply Ex. 3).

Nor were these idle comments. Judge Matthewman was intimately involved in discovery management of this matter, which at times (including at those hearings) focused intently on the very question of what type of evidence Plaintiffs would need to offer ***at trial*** and what discovery obligations flowed from that ***trial*** burden. Indeed, as Ocwen's Motion demonstrated without rebuttal, Judge Matthewman, at Plaintiffs' request, ordered Ocwen to produce loan-level servicing data on the numerous at-issue loans for precisely this reason: that Plaintiffs would need to adduce evidence at trial concerning each of the loans. Mot. at 2-3, 17, 19.

Further attempting to revise the recorded history on which this case has been litigated for years, Plaintiffs contend (at 22) that they did not promise Judge Matthewman to prove liability as to the individualized alleged violations through an expert witness. Once again, the transcript says otherwise. As just quoted, during this second colloquy, Judge Matthewman specifically told Plaintiffs that, "[at] trial," they would need "some sort of overarching expert opinion type of testimony," not just "information about 1.58 million people in file form." Ocwen SMF ¶¶ 93-94; Ocwen SMF Ex. 56 at 88:18-89:14. In direct response to that warning, Plaintiffs' counsel replied:

> Yes. That's exactly right. . . . [W]ith respect to Your Honor's first question about the expert, we do intend for the expert to look through the 1.58 million borrowers and to crunch and assess the data, both in a summary witness fashion and both as to an ***expert opinion with respect to all of the errors*** . . . ."

*Id*. (emphasis added). So, Plaintiffs' counsel was not talking about damages or discovery. She was agreeing that, at trial, Plaintiffs would need to prove their claims by way of "an expert opinion ***with respect to all of the errors***." And further confirming this point, Plaintiffs' counsel emphasized to Judge Matthewman that "we need the [loan-by-loan] data ***to establish the liability***." 11/29/2018 Hrg. Tr. at 90:17-19 (emphasis added) (attached as Ocwen Reply Ex. 2).

Plaintiffs try to divert attention from their unfulfilled promise to provide expert testimony covering all of the alleged loan-specific violations by arguing (at 22) that experts are generally prohibited from rendering ultimate legal conclusions. That is a red herring because it does not address Plaintiffs' recognition that it is their complete burden to come forward with loan-specific proof and their promise to do so through summary expert testimony. Moreover, nothing in the general rule prohibiting experts from offering opinions on legal issues would have barred Plaintiffs from providing expert testimony as to servicing errors in any, or all, of the individual loans. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an

ultimate issue."); *O'Brien v. NCL (Bahamas) Ltd.*, 2017 WL 10410455, at *8-9 (S.D. Fl. Oct. 13, 2017).[8]

### 3. Plaintiffs' Obligation to Present Evidence Proving How Many and Which Loans Had Violations Is Confirmed by the Remedies That Plaintiffs Seek

Plaintiffs' burden to come forward with evidence covering each of the at-issue loans is also clear because their claimed remedies depend, at least in large part, on which, and how many, loans involved legal violations. Mot. at 15; MPSJ Opp. at 9. Plaintiffs (at 16) offer half a response—that is, they address their claim for penalties but ignore their claim for consumer damages, apparently hoping that the Court will overlook that point. But the consumer damages claim by itself requires Plaintiffs to prove how many, and which, loans had violations, because the amount of consumer injury necessarily depends on, for example, whether Ocwen committed servicing errors on two loans or two million loans. Mot. at 15. Indeed, Plaintiffs' damages expert's opinion expressly depends upon the precise number of borrowers who were harmed by servicing errors. Ocwen SMF ¶ 74.

Moreover, Plaintiffs do not renounce making a claim for penalties based on the number of violations they prove, but instead merely argue that the amount of any penalty "***need not*** be assessed based on the number of borrowers who suffered a violation" but rather "***can*** also be assessed based on the number of days a violation existed." Pls. Opp. at 16 (emphasis added). In any event, even if Plaintiffs had actually limited themselves to seeking a penalty based solely on the number of days that a violation existed, that calculation would necessarily require knowing which loans had violations and when they occurred, to determine the length of the period over which any violations were in effect.

---

[8] Plaintiffs argue (at 15) that the suggestion that they could have used sampling—which Judge Matthewman urged them to do, as Ocwen's Motion showed (at 14) without rebuttal—somehow "squarely contradicts" the view that individualized evidence is required. That is wrong. Having a qualified expert analyze a sample of the specific loans could have produced the kind of loan-specific evidence required to prove Plaintiffs' loan-specific claims. Indeed, in *Navient* (discussed above), the CFPB responded to the court's admonishment that the CFPB would need proof applying the elements of the statute to the many loans by announcing that it would analyze a representative sample of the loans. *See* MPSJ Opp. at 10.

### B. Plaintiffs Have Failed to Satisfy Their Burden of Presenting Competent Evidence Sufficient to Prove Violations for Each Of The At-Issue Loans

Although Plaintiffs' discovery responses provided lists of loans that allegedly were the subject of violations—for example, they have listed 2,104,530 loans that allegedly were serviced with inaccurate information—they have never identified any ***corresponding*** piece or pieces of evidence to show at least a triable issue of liability as to each of those listed loans. Mot. at 18-27. Plaintiffs' Opposition does nothing to fill that evidentiary void. Without that missing link, Ocwen is entitled to summary judgment because Plaintiffs have not demonstrated the ability to make out a case at trial with sufficient evidence on all required elements. *See In re Chiquita Brands Int'l Inc.*, 2019 U.S. Dist. LEXIS 153856, *156 (S.D. Fla. Sept. 5, 2019) (Marra, J.) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Instead, Plaintiffs rest heavily on their legal position that they need not prove their claims for any of the individual loans. Pls. Opp. at 17-21. As just shown, Plaintiffs' position reflects a profound misunderstanding of what the substantive laws, the rules of evidence, and summary judgment procedures require of Plaintiffs. To the limited extent that Plaintiffs argue they do have some "loan-level evidence" (Opp. at 17), that contention is meritless.

#### 1. The Documents Cited in Plaintiffs' Opposition Fail to Show There Is Any Triable Issue on Liability

When Plaintiffs filed their motion, they merely identified a jumble of Ocwen documents as their claimed proof of Ocwen's liability, offering little or no explanation or testimony as to how each (or all) are sufficient to establish all the elements of their claims for the at-issue loans. MPSJ at 9-15. Plaintiffs' Opposition just incorporates those same documents by reference, asserting that the documents show at least a triable issue on liability. Pls. Opp. at 17-21.

As Ocwen showed in its Opposition to Plaintiffs' motion (ECF Nos. 674 & 675), which Ocwen incorporates by reference herein to avoid duplication, those cited Ocwen documents are legally insufficient to prove Plaintiffs' claims for three threshold reasons.

First, the documents do not evidence statutory violations. The vast majority were created to help Ocwen run its business, including to identify ways to improve processes and be more efficient and effective; they were not created to audit legal compliance against a series of elements from a statute or rule. MPSJ Opp. at 14-15. To illustrate, various documents applied Ocwen's own, internal servicing benchmarks, where those benchmarks were different than, and also did not consider additional elements that would be required to prove, the standards for a

statutory violation. *E.g.*, Ocwen RSF ¶ 211 (ECF No. 675). Furthermore, where the internal business documents identified consumers whose accounts were to be adjusted, those changes did not reliably tie back to legal requirements. For example, Ocwen often voluntarily undertook to provide broad relief to all potentially affected borrowers in the interest of customer relations and operational efficiency, rather than out of legal obligation. MPSJ Opp. at 14-15; Ocwen CSF ¶ 304 (ECF No. 675). It is highly ironic that Plaintiffs are trying to punish Ocwen for having a robust process and business improvement ethic and to discourage Ocwen (and others that are watching this case) from erring on the side of the consumer when its servicing fell short of its own standards. But, for summary judgment purposes, Plaintiffs get nowhere with these business documents because Plaintiffs have not shown the documents evidence violations of law.

In any event, even if these business documents could support the legal conclusions that Plaintiffs espouse, the documents reflect voluntary remediations and self-correction that are inadmissible as subsequent remedial measures. MPSJ Opp. at 14-15, citing Fed. R. Evid. 407; *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 634 n.12 (3d Cir. 2017). Moreover, even according to Plaintiffs themselves, the documents they cite only cover a small fraction of the 2.1 million at-issue loans. MPSJ Opp. at 15. For these same threshold reasons, the cited materials are insufficient to show a triable issue that would prevent the entry of summary judgment to Ocwen.

Even beyond these threshold reasons why the documents cited by Plaintiffs are legally insufficient to satisfy their burden of proof at trial, Plaintiffs' hodgepodge offering of internal tracking spreadsheets, unexplained documents, and cryptic snippets does not explain in any meaningful way why there is a triable issue of liability for each individual loan. Plaintiffs' attempt to overwhelm the record with vast quantities of legally insufficient proof does not create a need for trial. Ocwen's Opposition to Plaintiffs' Motion, which is incorporated herein to avoid duplication, shows in detail (at 14-39) that the documents relied on by Plaintiffs are legally insufficient—whether offered in support of their motion or in opposition to Ocwen's.

For the sake of completeness, we now address specifically the handful of documents that Plaintiffs reference in their Opposition to Ocwen's Motion:

**CFPB Counts I & V; Florida Count VII:** Plaintiffs assert that an Ocwen interrogatory response (Pls. SJX 138) identified borrowers "who paid too much or too little into their escrow accounts." Pls. Opp. at 17. That document, however, reflected only amounts owed, not amounts

actually paid. MPSJ Opp. at 27-28; Ocwen RSF ¶¶ 184, 186 & Pls. SJX 138 at 11. Moreover, Ocwen's own evidence indicates that many borrowers likely did not make an such payment. MPSJ Opp. at 27; Ocwen RSF ¶¶ 171-173, 177; Ocwen CSF ¶¶ 309-311.

**CFPB Counts II, IV, VI; Florida Count VIII:** Plaintiffs argue (at 18) that an Ocwen document (Pls. SJX 123) identified loans for which Ocwen failed to cancel private mortgage insurance ("PMI"). But Ocwen was required to terminate PMI only for "single-family dwelling[s]" and "the principal residence of the mortgagor[s]" if the loan was current. MPSJ Opp. at 18-19; U.S.C. § 4901(15); *id.* § 4902(b). The document cited by Plaintiffs does not address any of those elements, and hence fails to prove that Ocwen had a duty to terminate PMI, much less that Ocwen violated that duty. MPSJ Opp. at 18-19; Ocwen RSF ¶ 248. Plaintiffs argue (at 18) that another document shows that Ocwen communicated incorrect reinstatement amounts to borrowers. But that document only identified loans that "potentially" received inaccurate quotes, and Plaintiffs never analyzed the loan files to establish whether any of the quotes were, in fact, inaccurate. MPSJ Opp. at 16; Ocwen RSF ¶¶ 193-94. Moreover, other evidence establishes that borrowers who might have received inaccurate quotes suffered no "substantial injury" (as required to prove a statutory violation), due for example to loan modifications or voluntary remediations. MPSJ Opp. at 16; Ocwen RSF & CSF ¶¶ 192, 319.

**CFPB Count VII; Florida Count I-II:** Plaintiffs cite several documents as supposedly identifying loans with escrow-related violations, but each of those documents is insufficient to prove such claims. First, Plaintiffs argue (at 18) that an Ocwen discovery response and report identified loans with an untimely escrow analysis. But that discovery response expressly observed that it showed only what the electronic data indicated and that loan-level information was required to determine whether or not an analysis had been conducted; and the loan-level data in fact shows that Ocwen likely did perform timely analyses. MPSJ Opp. at 26-27. Second, Plaintiffs point (at 18) to a single Ocwen document as supposedly showing that certain borrowers did not receive escrow statements. But it is unrebutted that the absence of a mailing date code in that document reflected a data validation issue, not that a statement was not timely sent. MPSJ Opp. at 25-26; Ocwen RSF ¶ 200. Third, Plaintiffs assert (at 18) that another Ocwen discovery response identified loans for which shortage payments were not timely processed. But it merely identified payments that were processed outside Ocwen's ***internal*** timeframes—not outside any regulatory requirements. MPSJ Opp. at 16-17, 28-29; Ocwen RSF ¶¶ 209-211, Pls. SJX 138 &

142. Finally, Plaintiffs argue (at 18) that an Ocwen interrogatory answer identified 1,367 borrowers whose policies were cancelled due to Ocwen error. But that answer merely listed policies that might have been erroneously cancelled and observed that a manual file review (which Plaintiffs did not do) would be required to determine whether or not such a cancellation occurred; and in any event, any cancellations resulting from Ocwen error would have been remediated. MPSJ Opp. 30; Ocwen RSF ¶ 222; Pls. SJX 138 at 22-23 & 141; Ocwen CSF ¶ 322.

**CFPB Count X & Florida Count IV:** Plaintiffs cite (at 19) to a single chart (Pls. SJX 123) as supposedly showing that Ocwen failed to cancel PMI as required for some loans. But this chart does not prove their claims, including because (1) the duty to cancel only applied to current loans, and the chart does not indicate which if any of the loans were current; and (2) the chart does not show the date that PMI was actually canceled. MPSJ Opp. at 18-19, 32-33.

**CFPB Count III:** The CFPB (at 19) cites certain Ocwen letters as purportedly showing that Ocwen falsely told borrowers that it would not foreclose during the mitigation evaluation process. But those letters expressly stated that the mitigation evaluation process would start only if, and when, the borrowers completed their mitigation applications—which they largely had not done. MPSJ Opp. at 33-34; Ocwen RSF ¶¶ 263-64.

**Florida Counts VI-VII:** As for lender-placed insurance, Florida argues (at 20) that Ocwen documents show that some loans received more than the required minimum amount of coverage. But the borrower contracts expressly allowed Ocwen to arrange for greater insurance coverage to protect its interests. MPSJ Opp. at 38-39. Florida's additional assertion that some specific loans received excessive amounts either is unsupported by the cited material or involved a scrivener's error that was promptly remediated. MPSJ Opp. at 39; Ocwen RSF ¶¶ 244-45.

As for property inspection fees, Florida (at 20) relies heavily on a voluntary remediation report, but that report is not admissible evidence under Fed. R. Evid. 407 and, in any event, shows that the loans were remediated so that borrowers suffered no substantial injury (which is an element of Florida's claims). MPSJ Opp. at 37-38. Florida's other cited evidence likewise fails to support its claims. *Id*.

In sum, Plaintiffs' obligation in responding to Ocwen's Motion was to actually present competent evidence that would be sufficient at trial to prove their claims for each of the at-issue

loans. Because Plaintiffs have failed to present such evidence, as required, summary judgment should be entered in Ocwen's favor as to all of Plaintiffs' claims.[9]

#### 2. Plaintiffs' Arguments About Their "Memory Aids" Are Moot Now and, in Any Event, the Aids Provide No Support for Their Claims

At the time when Ocwen filed its Motion for Summary Judgment, the only place where Plaintiffs had identified the evidence that supposedly supports their claims was in the so-called "memory aids" that Plaintiffs prepared for the depositions of their Rule 30(b)(6) witnesses. One of those memory aids supposedly identified evidence showing the individual loans for which violations allegedly occurred, while the others supposedly identified additional supporting documents. Because those constituted Plaintiffs' only identification of their claimed evidence, and because the first memory aid (Ocwen SMF Ex. 62) was the one that supposedly identified evidence relating to the individual loans on Plaintiffs' loan lists, Ocwen showed in detail that the memory aids failed to constitute or identify information sufficient to prove Plaintiffs' claims. Mot. at 18-27.

Now, however, Plaintiffs have identified (in their cross-motion for summary judgment and Opposition to Ocwen's Motion) the evidence that supposedly enables them to prove their claims. Moreover, Plaintiffs' Opposition acknowledges (at 24), as Ocwen noted in its Motion (at 18 n.8), that Plaintiffs cannot "use the aids or lists as evidence." Accordingly, there is no need any longer to consider the documents indirectly referenced in Plaintiffs' memory aids, because Plaintiffs' summary judgment filings have now directly cited to the documents that they contend are sufficient to satisfy their burden of proof in this case.

## III. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS TO RECOVER FOR ALLEGED BORROWER DAMAGES

### A. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Costs from Additional Foreclosures That Resulted From Ocwen's Late Escrow Analyses"

The CFPB's evidence to recover for losses that borrowers allegedly suffered due to additional foreclosures resulting from late escrow analyses is insufficient as a matter of law. Mot. at 28-30. McFadden's opinion is the only evidence offered of such losses, yet it is entirely hypothetical and theoretical. McFadden does not identify a single loan that went into foreclosure

---

[9] The reasons for granting summary judgment on the CFPB's claim concerning Ocwen's policies and procedures, despite Plaintiffs' claimed evidence, are discussed at pages 28-29 below.

due to a delayed escrow analysis, nor does his opinion identify a single dollar of damages suffered by any identified borrowers. *Id.* at 29. The CFPB does not dispute any of those patent deficiencies with the professor's wholly-academic opinion backed by no real-world experience or evidence from borrower files. Instead, the CFPB argues that McFadden's opinion is sufficient to create an issue for trial on the theory that any "reasonable estimate" of damages is sufficient. Pls. Opp. at 30-31. That legal proposition is as unsupported as the CFPB's damages claim itself.

The CFPB rests most heavily on cases where damages estimates were allowed because it was impossible for the plaintiff to prove actual damages—not simply because the plaintiff did not go to the trouble of doing so.[10] In many of the cited cases, the plaintiff's inability to prove actual damages resulted from the defendant's failure to maintain required records.[11] Those cases are plainly inapposite. Contrary to the CFPB's baseless assertion (at 31), Ocwen did not fail to maintain or produce in discovery any information relevant to these supposed foreclosure-related losses. Indeed, the CFPB identifies no such discarded or withheld information. To the contrary, Ocwen produced voluminous data on one element of McFadden's academic calculation, foreclosure-related charges, including loan-level data identifying costs charged to loans while in foreclosure status. McFadden simply ignored it. Ocwen RSF ¶ 292; ECF No. 672, at 4 n.2. Most of the other elements that McFadden "estimated" involve items that would be known to the borrowers (rather than to Ocwen), including their "relocation costs," lost home equity, and "income tax liability." Ocwen SMF Ex. 60 (McFadden Report), ¶ 115. The CFPB's failure to use evidence it obtained from Ocwen and to assemble evidence from others is no excuse.

Critically, moreover, the CFPB acknowledges (at 31) that reasonable estimates of the ***amount*** of damages are permissible only if the "fact of damage" is certain—that is, if it is certain that at least some damages were sustained by the person whose loss is then estimated. *See, e.g.,*

---

[10] *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123-24 (1969) (allowing estimate in patent case where damages "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts"); *Nutrimatix Inc. v. Xymogen, Inc.*, 2017 WL 385753, at *9 (M.D. Fla. Jan. 27, 2017) (allowing estimate for new businesses that have no "track record" to prove actual lost profits) (citation omitted).

[11] *See, e.g.*, *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 825-26, 834-35 (8th Cir. 2016) (allowing estimate where there was an "unexplained absence of certain records" and "the employees would be unable to prove damages with certainty"); *Julian v. Swift Transp. Co.*, 2019 WL 7282025, at *6 (D. Ariz. Dec. 27, 2019) (damages calculation was "imprecise but [defendant] has not offered any way to avoid such imprecision given its failure to provide any records regarding these Plaintiffs").

*AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1342-43 (S.D. Fla. May 26, 2006) (describing the "distinction between proof of the fact of damages, which must be established with at least reasonable certainty, and the amount of damages, which may be estimated, provided it is not merely speculative") (citation omitted). This explains why, for example, employees who prove they were not paid any overtime can sometimes prove the amount of their loss by approximations and reasonable assumptions. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946). But contrary to the CFPB's unsupported assertion (at 31), the "fact of damage" to the hypothesized borrowers in this case is entirely uncertain. The CFPB does not even allege that ***every*** loan with a supposedly late escrow analysis went into foreclosure. Ocwen SMF ¶¶ 180-83. McFadden also admitted that "some borrowers . . . had zero loss." RAF Ex. 5, McFadden Dep. at 131:21-132:8. Moreover, the CFPB offers no admissible evidence that ***any*** borrowers went into foreclosure as a result of a late escrow analysis. Mot. at 29; Ocwen SMF ¶ 184. Speculation (including guesses by the "expert") that this may have happened to some borrowers is not enough to meet the requirement that the "fact of damage" must be proven with certainty before estimates can potentially be allowed.[12]

McFadden's "estimate" is not admissible evidence that could create a triable issue on damages for the related reason that it is based on a calculation of the borrower population in the aggregate, rather than on an individualized basis. An aggregate figure extrapolated from supposed averages will not do in a case, like this, where the alleged damages varied from person to person. *See, e.g., Albright v. City of New Orleans*, 208 F. Supp. 2d 634, 641 (E.D. La. 2002) (rejecting use of averages to determine damages and holding in a discrimination case "that the most precise calculation that can be made of each plaintiff's damages is the value of the promotion as to each individual plaintiff" . . . "to reflect each plaintiff's actual loss"). This is not a securities case, where everyone affected owned the stock and prices are market-wide, or a consumer purchasing dispute, where everyone affected bought the same product and at uniform retail prices. Rather, whether and to what extent a homeowner lost money when his escrow calculation was delayed—because, as Plaintiffs hypothesize, he suffered a cascade of events that resulted in foreclosure, he had equity in the home (in the time of the Great Recession) and lost it, he paid foreclosure expenses that depended on foreclosure case events in that locality, and he

[12] The "fact of damage" is also uncertain because even if any losses occurred, they could have been borne by investors rather than the borrower. Ocwen SMF Ex. 90, Hamm Report ¶¶ 36-39.

paid someone to move his belongings—indisputably varied dramatically from borrower to borrower. Ocwen SMF ¶ 190. Indeed, this is clear from the cases cited by the CFPB itself. *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1257 (11th Cir. 2003) (affirming that "the determination of the amount that each [affected person] was overcharged during the class period must take place on an individual basis" where the applicable amount of interest owed varies as between individuals, and only some individuals' claims are subject to further reduction by set-off claims); *Albright*, 208 F. Supp. 2d at 641.

The CFPB's assertion (at 34) that McFadden's calculations were "the epitome of individualized" on the theory that his model "made use of Ocwen's loan-level servicing data" is unsupportable. His model may have "made use of" servicing data but it stopped short of making *admissible* use of that data when McFadden—by his own admission—chose not to identify any individual loan that went into foreclosure as a result of a late analysis, much less what losses that individual borrower suffered as a result. Ocwen SMF Ex. 61, McFadden Dep. at 211:5-14. Instead, his model explicitly relies entirely on supposed "***average[s]***," including ones purportedly derived from a Zillow "blog" post and other frivolous sources. Ocwen SMF Ex. 60 at 53-62 (emphasis added).

The CFPB's effort to distinguish the cases cited by Ocwen are equally unsuccessful. The CFPB argues (at 33) that in *A.R. v. Dudek*, 2016 WL 3221140, at *11-16 (S.D. Fla. June 9, 2016), this Court held that individualized evidence was required to prove a violation of law, rather than damages. That is not so: this Court held that the government needed individualized proof to "establish causation and injury in fact"—that is, to establish that each child suffered injury that was caused by the alleged systemic violation. *Id.* at *11. Indeed, in reaching this decision, this Court quoted the Supreme Court's ruling in *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975), that "[i]n the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Dudek,* 2016 WL 321140, at *12. Likewise, here, the CFPB must prove that Ocwen's alleged late escrow analyses caused specific borrowers to suffer foreclosure-related losses—which requires individualized evidence the CFPB is lacking.[13]

[13] The CFPB also argues (at 33 n.208) that the Supreme Court's opinion in *General Tel. Co. of*

### B. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Foregone Interest"

Like McFadden's opinion as to purported foreclosure-related costs, his opinion as to "foregone interest" is not based on any evidence that any specific borrowers actually lost interest, much less the actual amount of interest that they lost. Instead, it is an estimate based on hypothetical mathematical modeling using across-the-board assumptions. Mot. at 30-31. The CFPB again does not deny that it has no individualized evidence of actual foregone interest, but instead defends McFadden as providing a "reasonable estimate." Pls. Opp. at 33, 36. For the same reasons shown above as to why a supposed estimate cannot establish the CFPB's claim for foreclosure-related damages, an estimate cannot prove up its claim for lost interest either. The CFPB has not shown that (1) the information to actually calculate any damages is unavailable (much less due to some fault of Ocwen's); (2) each borrower suffered the "fact of damage"; and (3) the purported damages did not vary substantially from borrower to borrower. Accordingly, the CFPB's so-called "estimate" is legally insufficient to establish this damages claim.

### C. Defendants Are Entitled to Summary Judgment on Florida's Damages Claims

Florida does not dispute that its only expert (Lawrence Powell) did not offer any opinion on damages. Pls. Opp. at 30 n.186. Instead, Florida asserts that it "adequately disclosed" that it plans to rely on testimony by the CFPB's damages expert, McFadden. *Id.* But Florida does not even respond to Owen's showing that Florida failed to disclose its intent to rely on McFadden until ***almost six months*** after Florida was required to disclose its experts. Mot. at 22-23, 31; Ocwen SMF ¶¶ 139, 141. Moreover, during McFadden's deposition, he expressly disclaimed offering testimony on behalf of Florida. Ocwen SMF ¶ 142. Ocwen, thus, plainly would be prejudiced if Florida were allowed to belatedly use him as its expert witness.

### D. Defendants Are Entitled to Summary Judgment on All Other Damages Claims

Plaintiffs argue (at 36) that although McFadden's opinion covers only the two categories of alleged damages discussed above, they can prove types of damages through non-expert

---

*the Nw., Inc. v. EEOC*, 446 U.S. 318, 324 (1980), merely noted that the government was seeking relief only for specific affected third parties. Not so. As this Court explained in *Dudek*, the Supreme Court, in approving the government's damages claim, held that the government was "expected to specifically establish at trial which individuals were adversely affected by the employer's practice and the amount of their damages." 2016 WL 321140, at *11.

evidence. But Plaintiffs fail to present any such non-expert evidence, as required for them to satisfy their summary judgment burden to "present[] competent evidence on which a reasonable juror could rule in [their] favor" on such theorized other categories of damages. *In re Chiquita Brands Int'l Inc.*, 2019 U.S. Dist. LEXIS 153856, at *157. Instead, Plaintiffs merely refer back to their own summary judgment motion (Pls. Opp. at 36, citing MPSJ at 9-18), but that motion did not even purport to present evidence relating to damages.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING LOSS MITIGATION APPLICATIONS (COUNT III)

In Count III, the CFPB alleges that Ocwen's borrower communications concerning loss mitigation applications violated the CFPA's general ban on deceptive acts. Even beyond Plaintiffs' lack of evidence (Section II above), this claim fails because the communications do not violate Regulation X, which comprehensively regulates the loss mitigation process. Mot. at 31-33. The CFPB argues (at 29) that the Court rejected this argument in ruling on Ocwen's motion to dismiss. But that ruling simply held that Ocwen had not come forward with "any legal support" for its position (ECF No. 452 at 52)—which Ocwen's Motion has now done. In any event, "a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court." *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991); *see also Bonanno v. New Penn. Fin., LLC*, 2017 U.S. Dist. LEXIS 118407, at *12-13 (M.D. Fla. July 28, 2017) (party whose argument failed at motion to dismiss stage was not foreclosed "from making this] argument at the summary judgment stage when the facts and law will have been more thoroughly briefed for the Court").

On the merits, the CFPB seeks (at 29) to evade *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), which otherwise would preclude the CFPB's effort to supplement Regulation X's specific terms with the CFPA's general ones. Mot. at 32. *RadLAX* held that where two provisions of law potentially overlap, the principle that "the specific governs the general" is applied with particular force where "Congress has enacted a comprehensive scheme and deliberately targeted specific problems with specific solutions." 566 U.S. at 645 (citations omitted). The CFPB tries to sideline *RadLAX* by arguing that applying the CFPA's general provisions would not override Regulation X, but that is plainly incorrect. As Ocwen's Motion showed without rebuttal, this Court has expressly held that RESPA (which is the basis for Regulation X) provides "a ***comprehensive*** set of interrelated requirements ***and deadlines*** that servicers must comply with when a borrower submits a loss mitigation

application." *Brosnick v. Wells Fargo Bank, N.A.*, 2018 WL 6807340, *8 (S.D. Fla. Sept. 25, 2018) (emphasis added and citation omitted). If the CFPB were allowed to challenge any and all conduct concerning loss mitigation applications as being "deceptive" or "unfair" under the general provisions of the CFPA, that would render superfluous all of Regulation X's specific provisions that comprehensively tell servicers what obligations they have in connection with loss mitigation applications. Such a result is precisely what *RadLAX*, and many other cases applying the same well-settled principle of law, forbid.[14]

## V. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON MOST OF PLAINTIFFS' ESCROW VIOLATION CLAIMS (CFPB COUNT VII & FLORIDA COUNTS I AND II)

Even beyond Plaintiffs' lack of individualized evidence for their escrow-related claims (Section II above), summary judgment should be entered for Ocwen both (A) as to 1.3 million loans for which the CFPB admittedly has not even determined that there was any escrow-related violation; and (B) as to Plaintiffs' claims for enhanced penalties arising from Ocwen's purported failure to perform an escrow analysis for loans that were delinquent, in bankruptcy, or in foreclosure. Mot. at 33-36. Plaintiffs' Opposition does not undermine either of these points.

### A. The Court Must Grant Summary Judgment as to the 1.3 Million Loans for Which the CFPB Has Not Even Determined There Was a Legal Violation

Plaintiffs pretend that Ocwen's motion for summary judgment on Plaintiffs' escrow-related claims concerning 1.3 million loans is based on the way the CFPB "bucketed" those loans for purposes of discovery. Pls. Opp. at 25. That is untrue. Instead, Ocwen is entitled to summary judgment on those 1.3 million loans because the CFPB's Rule 30(b)(6) witness admitted that these are loans "where ***the Bureau has not yet determined that they relate to a specific regulatory violation*** that's at issue." Mot. at 33-34 (quoting Ocwen SMF ¶ 204 & Ex. 53 at 623:8-20). Far from trying to dispute that testimony, Plaintiffs admit that these are loans that "***potentially*** suffered escrow violations." Pls. Opp. at 25 (emphasis added). Given that Plaintiffs themselves have not even determined that a violation occurred for each loan—much

---

[14] The CFPB does not argue that *FTC v. Wyndam Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015), which was raised in connection with Ocwen's motion to dismiss, supports its position. The defendant in *Wynham* argued against application of a general law on the ground that a specific law had left the field ***unregulated***. This case, like *RadLAX*, involves the opposite situation—where the specific law ***comprehensively regulates*** the field, and thus would be rendered surplusage if that general law were applied as well.

less presented competent evidence proving such a violation, which is Plaintiffs' burden at summary judgment—Plaintiffs are not entitled to a trial on their claims concerning these loans. Mot. at 34, *citing Holt v. Blakely*, 167 F. App'x 86, 88-89 (11th Cir. 2006); *Thompson v. McDonald*, 2019 U.S. Dist. LEXIS 50566, *3 (S.D. Fla. Mar. 25, 2019) (Marra, J.), *aff'd*, 2020 U.S. App. LEXIS 3552 (11th Cir. Feb. 6, 2020).

### B. Plaintiffs Cannot Show That Ocwen Acted Recklessly or Knowingly by Allegedly Failing to Conduct Annual Escrow Analyses for Nonperforming Loans

Plaintiffs seek enhanced damages on the theory that Ocwen's alleged failure to conduct annual escrow analyses for non-performing loans was knowing or reckless. But Plaintiffs do not dispute that it was ***objectively*** reasonable to interpret Regulation X as not requiring such analyses for non-performing loans. Mot. at 34-36.[15] Instead, the CFPB argues that Ocwen cannot obtain summary judgment because an internal Ocwen audit in 2013 contains evidence that someone at Ocwen ***subjectively*** believed that escrow analyses were required even for non-performing loans. Pls. Opp. at 37. But that audit is legally insufficient to create a triable issue of material fact because both the Eleventh Circuit and the Supreme Court have held, applying the FCRA, that "evidence of subjective bad faith cannot support 'a willfulness finding . . . when the company's reading of the statute is objectively reasonable.'" *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1319 (11th Cir. 2009), *quoting Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007). In any event, the 2013 audit cited by Plaintiffs would not create a trial issue even as to Ocwen's subjective belief, because the audit expressly reflected the view of one particular department, not of Ocwen as a company. Pls. SJX 86, at pp. 1, 14-15. By contrast, the Rule 30(b)(6) testimony cited in Ocwen's Motion shows, without rebuttal, that the company's interpretation, based on the HUD guidance, was that annual analyses were not required for non-performing loans. Ocwen SMF ¶ 209 & Ex. 93 at 12:20-23.

---

[15] Indeed, courts and other servicers had adopted that same interpretation. *See e.g.*, *Diffley v. Nationstar Mortg., LLC*, 2017 U.S. Dist. LEXIS 201184, at *17-18, 25 (W.D. Wash. Dec. 6, 2017); *In re Payne*, 387 B.R. 614, 637 (Bankr. D. Kan. May 6, 2008); Ocwen SMF Ex. 96, at 55:7-20.

## VI. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING OCWEN'S POLICIES AND PROCEDURES (CFPB COUNT VIII)

Summary judgment should enter against the CFPB's claim that Ocwen's policies were not "reasonably designed" to achieve their objectives, because the CFPB has no expert testimony to support that claim, leaving Ocwen's contrary expert testimony unrebutted. Mot. at 36. The CFPB argues that it does not need expert testimony to prove this claim. But expert testimony is required where the issue to be decided is "beyond the familiarity of the average layperson." *Goolsby v. Gain Techs., Inc.*, 362 F. App'x 123, 135 (11th Cir. 2010). That is the situation here, as the average layperson plainly is not familiar with the highly specialized and technical question of whether or not a mortgage loan servicer's policies are "reasonably designed" to achieve various specified objectives. Indeed, the CFPB's argument that expert testimony is unnecessary is refuted by the fact that the CFPB retained its own expert to opine on Ocwen's policies—but his opinions failed to apply the correct legal standard and hence cannot support this claim. Mot. at 36.[16]

In any event, even if the CFPB did not have to present expert testimony, the CFPB has no non-expert evidence sufficient to prove its claim. The CFPB's threshold argument (Opp. at 20-21) that all the policies were inadequate because they applied only to OFC is contrary to the undisputed evidence. Specifically, most of the policies expressly stated that they applied to OFC "and all of its domestic and international subsidiaries," which included OMS and OLS. *E.g.*, Ocwen SMF Ex. 103, OCW3-006-0000076 at -80. The CFPB's additional arguments (Opp. at 21) are equally unsupported and insufficient to create a triable issue. First, the CFPB asserts that all but one of the consumer complaint policies applied only to the Ombudsman office. Opp. at 21. But the Ombudsman Procedure specifically said that although the Ombudsman Department

---

[16] The CFPB further argues that it could not have developed expert testimony that Ocwen's policies were not reasonably designed, on the theory that such testimony would be "prohibited" as an "ultimate legal conclusion." Opp. at 22. That argument is irrelevant to the point, just shown, that ***some*** expert testimony supporting this claim (whether or not articulated to match the ultimate legal test) is required. But that argument is also wrong. Federal Rule of Evidence 704(a) expressly provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." *See also O'Brien v. NCL (Bahamas) Ltd.*, 2017 WL 10410455, at *8-9 (S.D. Fl. Oct. 13, 2017). The one case cited by the CFPB for its contrary assertion (Opp. at 22 n.132) involves the exception in Fed. R. Evid. 704(b) for opinions as to the defendant's state of mind in a criminal case.

"maintains" the Procedure, "each affected department or Business Unit ('BU') is responsible for enforcing the standards and practices under this Procedure." *E.g.*, Ocwen SMF Ex. 104, OCW-CFPB-001-05932687 at -92. Second, the CFPB argues that "Ocwen's consumer-complaint policies lack any specificity as to how to investigate and correct errors." But the unrebutted testimony is that Ocwen instituted "desktop procedures that [its] research employees use that instruct them on how to go about researching complaints and errors." Ocwen SMF Ex. 116, at 14:5-11. Moreover, on its face, the "reasonably designed" standard does not require any particular level of specificity. Finally, the CFPB asserts that Ocwen made errors in outbound transfers or loan foreclosures. Opp. at 21. But even if the CFPB had evidence to prove that for any specific loans (which it lacks, as shown above), that would not prove that Ocwen's policies were unreasonably designed. In granting summary judgment against similar claims, courts have observed that a requirement to have "reasonable" policies "cannot be construed to require perfect" performance.[17]

## VII. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON FLORIDA'S REMAINING FDUTPA CLAIMS

As shown at pages 19-20 above, Florida has failed to identify competent evidence sufficient to support its claims under the FDUTPA. Thus, summary judgment should enter against those claims.

## VIII. DEFENDANTS OFC AND OMS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY DID NOT ENGAGE IN SERVICING ACTIVITIES

Plaintiffs present no evidence that OFC or OMS made or received any payments required pursuant to the terms of a loan, which is required to establish that they were servicers under the

---

[17] *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 618 (9th Cir. 2018); *see also Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971-72 (7th Cir. 2004) (affirming summary judgment for credit reporting agency defendant on claim that defendant lacked "reasonable procedures to assure maximum possible accuracy" in credit reporting; noting that "[o]ne can easily see how, even with safeguards in place, mistakes can happen. But given the complexity of the system and the volume of information involved, a mistake does not render the procedures unreasonable."); *CFTC v. Commonwealth Fin. Group, Inc.*, 1994 U.S. Dist. LEXIS 21650, *25 (S.D. Fla. Aug. 31, 1994) (finding after bench trial that a compliance program was "reasonably designed to prevent misrepresentation" by sales employees, even though defendant "cannot maintain an absolutely perfect compliance record with respect to sales solicitation"); *Mastin v. Ditech Financial, LLC*, 2018 WL 524871, *6 (E.D. Va. Jan. 23, 2018) (granting motion to dismiss § 1024.38 claim where plaintiff alleged only "isolated instances where [defendant's] procedures may have been deficient").

definition set forth in RESPA. *See* 12 U.S.C. § 2605(i)(3). Instead, Plaintiffs merely point (at 38-39) to generalized statements in some marketing materials or public filings that refer broadly to "Ocwen." But such statements simply do not constitute competent evidence that OFC or OMS in fact made or received payments required pursuant to loan terms, as required under the statute. Indeed, Plaintiffs' own evidence demonstrates that borrowers were directed to make checks or express payments to OLS, ***not to OFC or OMS***. *E.g.,* Pls. SJX 115, OCW3-009-0000118 at 119; Ocwen RSF ¶ 21. Thus, Ocwen's evidence that OFC and OMC did ***not*** make or receive such payments stands uncontroverted. Mot. at 38-39; Ocwen RSF ¶¶ 9-23, 31-32, 37-38, 58-62.

Plaintiffs alternatively argue (at 40) that OFC and OMS can be held jointly and severally liable. But courts refuse to permit such kinds of secondary liability under statutes, like RESPA, that are "precise about who . . . can be liable." *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006). Because RESPA is precise that liability is limited to conduct by "any servicer," secondary liability is not appropriate.

## CONCLUSION

For each and all of these reasons, summary judgment should be granted to Defendants as to all of Plaintiffs' claims.

Dated: September 4, 2020

Respectfully submitted,
*/s/ Catalina E. Azuero*

Bridget Ann Berry (Fla. Bar. No. 515639)
Andrew Stuart Wein (Fla. Bar. No. 1005238)
**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, FL 33401
Tel.: 561.650.7900
berryb@gtlaw.com
weina@gtlaw.com

Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: 202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com

Laura A. Stoll (*pro hac vice*)
**GOODWIN PROCTER LLP**
601 S. Figueroa Street
Los Angeles, CA 90017
Tel.: 213.426.2500
lstoll@goodwinlaw.com

Catalina E. Azuero (Florida Bar No. 821411)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
cazuero@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on September 4, 2020 via ECF on all counsel or parties of record listed below:

Jennifer Hayes Pinder
Email: Jennifer.Pinder@myfloridalegal.com

Sasha Funk Granai
Email: Sasha.Granai@myfloridalegal.com

Victoria Butler
Email: Victoria.Butler@myfloridalegal.com

Scott R. Fransen
Email: Scott.Fransen@flofr.com

Miriam S. Wilkinson
Email: Miriam.Wilkinson@flofr.com

Anthony Cammarata
Email: Anthony.Cammarata@flofr.com

Jean Healey
Email: jean.healey@cfpb.gov

Atur Desai
E-mail: atur.desai@cfpb.gov

Tianna Baez
E-mail: tianna.baez@cfpb.gov

Amanda Roberson
E-mail: amanda.roberson@cfpb.gov

Stephanie Brenowitz
E-mail: stephanie.brenowitz@cfpb.gov

Erin Mary Kelly
E-mail: erin.kelly@cfpb.gov

James Savage
E-mail: james.savage@cfpb.gov

Greg Nodler
E-mail: greg.nodler@cfpb.gov

Michael Posner
E-mail: michael.posner@cfpb.gov

Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov

Shirley T. Chiu
E-mail: shirley.chiu@cfpb.gov

Blaine Winship
E-mail: blaine.winship@myfloridalegal com

Joaquin Alvarez
E-Mail: Joaquin.alvarez@flofr.com

/s/ Catalina Azuero
Catalina E. Azuero