**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,
Plaintiff,
v.

OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
OCWEN LOAN SERVICING, LLC; and
PHH MORTGAGE CORPORATION,
Defendants.

# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ....... iii

INTRODUCTION ....... 1

I. BACKGROUND ....... 3

II. SUMMARY JUDGMENT STANDARD ....... 5

III. OCWEN VIOLATED THE CFPA, FDCPA, AND TILA BY SERVICING LOANS USING INACCURATE LOAN INFORMATION AND SENDING FALSE COMMUNICATIONS TO BORROWERS. ....... 5

A. Ocwen is subject to the CFPA's prohibitions on unfair and deceptive acts. ....... 5

B. Ocwen is a debt collector subject to the FDCPA. ....... 7

C. Ocwen's use of inaccurate information to service loans was unfair in violation of the CFPA and FDCPA (Bureau Counts I and V). ....... 8

1. Ocwen's servicing of loans using inaccurate loan information caused and was likely to cause substantial borrower injury. ....... 9

2. Consumers were not able to reasonably avoid this harm. ....... 18

3. The harm is not outweighed by countervailing benefits. ....... 19

D. Ocwen's false representations about amounts borrowers owed were deceptive in violation of the CFPA and FDCPA (Bureau Counts II and VI). ....... 20

E. Ocwen's inaccurate periodic statements violated TILA (Bureau Count IV). ....... 23

IV. OCWEN VIOLATED RESPA, HPA, AND THE CFPA THROUGH NUMEROUS ESCROW AND INSURANCE SERVICING FAILURES. ....... 24

A. Ocwen is subject to RESPA as a servicer of federally related mortgage loans. ....... 24

B. Ocwen violated 12 C.F.R. § 1024.17(c)(3) by failing to conduct escrow account analyses annually (Bureau Count VII). ....... 25

C. Ocwen violated 12 C.F.R. § 1024.17(i) by failing to send annual escrow account statements to borrowers within 30 days of the end of the escrow account computation year (Bureau Count VII). ....... 26

D. Ocwen violated 12 C.F.R. § 1024.17(f)(3) by requiring borrowers to make escrow shortage payments that duplicated what they had already paid in a lump sum (Bureau Count VII). ....... 27

E. Ocwen violated RESPA by failing to pay insurance premiums before the penalty deadline (Bureau Count VII). ....... 28

F. Ocwen violated the HPA by failing to cancel private mortgage insurance on the termination date (Bureau Count X). ....... 28

V. OCWEN VIOLATED RESPA AND THE CFPA THROUGH ITS FORECLOSURE PRACTICES. ....... 29

A. Ocwen violated RESPA by initiating foreclosure proceedings while it was still evaluating borrowers for loss mitigation options to save their homes (Bureau Count IX). 29

B. Ocwen violated the CFPA by sending deceptive foreclosure-related letters (Bureau Count III). ........ 30

VI. DEFENDANTS ACTED AS A COMMON ENTERPRISE........ 31

A. Defendants operated under common control, acted as one entity, shared key employees and offices, and critical resources. ........ 32

1. Defendants operated under the common control of OFC. ........ 32

2. Defendants acted as one organization, “Ocwen,” in their servicing activities and in dealing with external parties. ........ 33

3. Defendants share key staff, resources, and funds. ........ 34

B. Because Defendants acted as a common enterprise, they are jointly and severally liable for each violation. ........ 35

VII. CONCLUSION........ 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alvarez v. BAC Home Loans Servicing, L.P.*,
228 Cal. App. 4th 941 (Cal. Ct. App. 2014) .......... 19

*Anderson v. Liberty Lobby, Inc*.,
477 U.S. 242 (1986) .......... 5

*Anderson v. United Parcel Serv., Inc.*,
506 F. Supp. 2d 1215 (S.D. Fla. 2007).......... 5

*Bryant v. Aargon Collection Agency, Inc.*,
2017 WL 2955532 (S.D. Fla. June 30, 2017) .......... 8, 18, 19

*Bryant v. Kass Shuler, P.A.*,
2017 WL 766343 (S.D. Fla. Feb. 28, 2017).......... 21

*Caceres v. McCalla Raymer, LLC*,
755 F.3d 1299 (11th Cir. 2014).......... 21

*CFPB v. Frederick J. Hanna & Assocs., P.C.,*
*114 F. Supp. 3d 1342 (N.D. Ga. 2015)* .......... 20*,* 35

*CFPB v. NDG Fin. Corp.*,
2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .......... 35

*CFPB v. Weltman, Weinberg & Reis Co., L.P.A.*,
2018 WL 3575882 (N.D. Ohio July 25, 2018) .......... 21

*CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*,
323 F. Supp. 2d 482 (S.D.N.Y. 2004).......... 35

*Charest v. Fed. Nat. Mortg. Ass'n*,
9 F. Supp. 3d 114 (D. Mass. 2014) .......... 17

*Cima v. Wellpoint Healthcare Networks, Inc.*,
2006 WL 1914107 (S.D. Ill. July 11, 2006).......... 17

*Coyne v. Midland Funding LLC*,
895 F.3d 1035 (8th Cir. 2018).......... 21, 23

*Crawford v. LVNV Funding, LLC*,
758 F.3d 1254 (11th Cir. 2014).......... 21

*Cuervo v. Airport Servs.*,
984 F. Supp. 2d 1333 (S.D. Fla. Nov. 22, 2013).......... 6, 32

*Davidson v. Capital One Bank (USA), N.A.*,
797 F.3d 1309 (11th Cir. 2015).......... 7

*Farquharson v. Citibank, N.A.*,
664 F. App'x 793 (11th Cir. 2016) ........ 21

*Fried v. JP Morgan Chase & Co.*,
850 F.3d 590 (3d Cir. 2017) ........ 29

*FTC v. 1st Guar. Mortg. Corp.*,
2011 WL 1233207 (S.D. Fla. Mar. 30, 2011) ........ 31

*FTC v. Amazon*,
71 F. Supp. 3d 1158 (W.D. Wash. 2014) ........ 15

*FTC v. Atlantex Assocs.*,
1987 WL 20384 (S.D. Fla. Nov. 25, 1987) ........ 21

*FTC v. Capital Choice Consumer Credit, Inc.*,
2004 WL 5149998 (S.D. Fla. Feb. 20, 2004) ........ 31

*FTC v. Direct Benefits Grp., LLC*,
2013 WL 3771322 (M.D. Fla. July 18, 2013) ........ 15, 32

*FTC v. Hispanic Glob. Way, Corp.*,
2014 WL 12531538 (S.D. Fla. July 1, 2014) ........ 18, 19

*FTC v. Johnson*,
156 F. Supp. 3d 1202 (D. Nev. 2015) ........ 32

*FTC v. Lanier Law, LLC*,
194 F. Supp. 3d 1238 (M.D. Fla. 2016) ........ 22

*FTC v. Lanier Law, LLC*,
715 F. App'x 970 (11th Cir. 2017) ........ 31

*FTC v. Nat'l Urological Grp., Inc.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) ........ 32

*FTC v. Neovi, Inc.*,
598 F. Supp. 2d 1104 (S.D. Cal. 2008) ........ 18, 19

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ........ 15, 18

*FTC v. Network Servs. Depot, Inc.*,
617 F.3d 1127 (9th Cir. 2010) ........ 32

*FTC v. OMICS Grp. Inc.*,
302 F. Supp. 3d 1184 (D. Nev. 2017) ........ 21

*FTC v. Pointbreak Media, LLC*,
376 F. Supp. 3d 1257 (S.D. Fla. 2019) ........ 31, 32

*FTC v. Roca Labs, Inc.*,
345 F. Supp. 3d 1375 (M.D. Fla. Sep. 14, 2018) ........ 9, 17

*FTC v. SlimAmerica,* Inc.,

77 F. Supp. 2d 1263 (S.D. Fla. 1999)........................................................................21

*FTC v. Tashman*,
318 F.3d 1273 (11th Cir. 2003)........................................................................20, 23

*FTC v. USA Beverages, Inc.*,
2006 WL 8432509 (S.D. Fla. June 28, 2006) ........................................................................21

*FTC v. Vacation Commc'ns Grp., LLC*,
2014 WL 12823960 (M.D. Fla. Feb. 27, 2014) ........................................21, 22, 23, 31

*FTC v. Wash. Data*,
856 F.Supp.2d 1247 (M.D. Fla. 2012) ........................................................................22, 32

*FTC v. Windward Mktg., Inc.*,
1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ........................................................................20

*FTC v. Wolf*,
1996 WL 812940 (S.D. Fla Jan. 31, 1996) ........................................................................32

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015)........................................................................17

*Goldman v. First Nat. Bank of Chicago*,
532 F.2d 10 (7th Cir. 1976)........................................................................23

*Greene v. Benefit Mortg. Corp.*,
2009 WL 56056 (E.D. Mich. Jan. 8, 2009)........................................................................27

*Illinois v. Alta Colleges, Inc.*,
2014 WL 4377579 (N.D. Ill. Sept. 4, 2014)........................................................................9

*In re Dominique*,
368 B.R. 913 (Bankr. S.D. Fla. 2007)........................................................................26

*In re Griffin Sys., Inc.*,
117 FTC 515 (1994)........................................................................20

*In re: Orkin Exterminating Co.*,
108 FTC 263 (1986)........................................................................20

*Jeanty v. Wash. Mut. Bank F.A.*,
305 F. Supp. 2d 962 (E.D. Wis. 2004)........................................................................18, 23

*Johnson v. Specialized Loan Servicing, LLC*,
2018 WL 4403838 (M.D. Fla. Sept. 17, 2018) (vacated on other grounds..............................31

*Langan v. Johnson & Johnson Consumer Cos.*,
95 F. Supp. 3d 284 (D. Conn. 2015) ........................................................................15

*Luberda v. Regions Bank*,
2011 WL 2600412 (E.D. Mo. June 29, 2011)........................................................................28

*McWhorter v. Ocwen Loan Servicing, LLC*,
2017 WL 3315375 (N.D. Ala. Aug. 3, 2017)........................................................................8

*Monaco v. Bear Stearns Cos., Inc.*,
2011 WL 4059801 (C.D. Cal. Sept. 12, 2011) ... 16

*Murphy v. Foster Premier, Inc.*,
2018 WL 3428084 (N.D. Ill. July 16, 2018) ... 19

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*,
773 F. Supp. 2d 151 (D.D.C. 2011) ... 18, 19

*Orkin Exterminating Co. v. FTC*,
849 F.2d 1354 (11th Cir. 1988) ... 9, 15, 18, 19

*Romo v. Wells Fargo Bank, N.A.*,
2016 WL 324286 (N.D. Cal. Jan. 27, 2016) ... 19

*Ruvalcaba v. Ocwen Loan Servicing, LLC*,
2016 WL 7178855 (S.D. Cal. Dec. 9, 2016) ... 23

*Saccameno v. Ocwen Loan Servicing, LLC*,
372 F. Supp. 3d 609 (N.D. Ill. 2019) ... 17, 18

*Saccameno v. U.S. Bank Nat'l Ass'n*,
943 F.3d 1071 (7th Cir. 2019) ... 17, 18

*Sprint Sols., Inc. v. LaFayette*,
2018 WL 3097027 (W.D. Tenn. June 22, 2018) ... 19

*Subramaniam v. Beal*,
2013 WL 5462339 (D. Or. Sept. 27, 2013) ... 18

*Walker v. Darby*,
911 F.2d 1573 (11th Cir. 1990) ... 5

*Wilson v. Deutsche Bank et. al.*,
2019 WL 5840325 (N.D. Tex. Nov. 7, 2019) ... 6, 32

*Yarney v. Ocwen Loan Servicing, LLC*,
929 F. Supp. 2d 569 (W.D. Va. 2013) ... 8

**Statutes**

12 U.S.C. § 2601 ... 36

12 U.S.C. § 2602(1) ... 24

12 U.S.C. § 2605(g) ... 28

12 U.S.C. § 4901(15) ... 29

12 U.S.C. § 4901(18) ... 29

12 U.S.C. § 4902(b)(1) ... 29

12 U.S.C. § 5481(1) ... 6

12 U.S.C. § 5481(5) ... 5

12 U.S.C. § 5481(6)(A) .......... 5, 6
12 U.S.C. § 5481(6)(B) .......... 6, 7
12 U.S.C. § 5481(15)(A)(i) .......... 5
12 U.S.C. § 5481(25)(B) .......... 7
12 U.S.C. § 5481(25)(C)(ii) .......... 6
12 U.S.C. § 5481(26)(A) .......... 6
12 U.S.C. § 5481(26)(B) .......... 6
12 U.S.C. § 5531(a) .......... 5
12 U.S.C. § 5531(c)(1) .......... 8
12 U.S.C. § 5531(c)(1)(A) .......... 18
12 U.S.C. § 5531(c)(1)(B) .......... 19
12 U.S.C § 5536(a)(1)(A) .......... 5, 24, 29, 35
15 U.S.C. § 1601(a) .......... 23
15 U.S.C. §1692a(6) .......... 7
15 U.S.C. §1692a(6)(F) .......... 7
15 U.S.C. § 1692e .......... 21
15 U.S.C. § 1692e(2)(A) .......... 21, 23
15 U.S.C. § 1692f .......... 8

**Rules**

Fed. R. Civ. P. 56 .......... 5
Fed. R. Evid. 803(6) .......... 18

**Regulations**

12 C.F.R. § 1024.2(b) .......... 24
12 C.F.R. § 1024.17(b) .......... 9, 25, 27
12 C.F.R. § 1024.17(c)(1) .......... 27
12 C.F.R. § 1024.17(c)(1)(ii) .......... 27
12 C.F.R. § 1024.17(c)(3) .......... 25, 26
12 C.F.R. § 1024.17(f)(1) .......... 24
12 C.F.R. § 1024.17(f)(1)(i) .......... 25
12 C.F.R. § 1024.17(f)(3) .......... 24, 27, 28
12 C.F.R. § 1024.17(f)(3)(ii) .......... 27

12 C.F.R. § 1024.17(i) ........ 24, 26, 27
12 C.F.R. § 1024.17(k)(1) ........ 24, 28
12 C.F.R. § 1024.41(f)(2) ........ 29, 30
12 C.F.R. § 1024.41(i) ........ 30
12 C.F.R. pt. 1026, supp. i, pt. 3, cmt. 41(d)(1) ........ 23
12 C.F.R. § 1026.41(a)(1) ........ 23
12 C.F.R. § 1026.41(a)(2) ........ 23, 24
12 C.F.R. § 1026.41(d) ........ 9
12 C.F.R. § 1026.41(d)(1) ........ 23
12 C.F.R. § 1026.41(d)(1)(iii) ........ 23
24 C.F.R. § 3500.17(c)(3) ........ 26
53 Fed. Reg. 50097 ........ 8
76 Fed. Reg. 79772 ........ 23

## INTRODUCTION

Ocwen specializes in servicing mortgage loans for distressed borrowers who may have trouble making their mortgage payments. As a mortgage servicer, Ocwen is subject to federal consumer protection laws that make it unlawful to engage in unfair or deceptive acts or practices or to fail to meet certain consumer protection requirements when: (1) handling borrowers' escrow accounts; (2) using escrow funds to pay borrowers' taxes or insurance; (3) communicating to borrowers how much they owe; and (4) foreclosing on borrowers' loans. Since 2014, Ocwen has violated these consumer protection laws more than half-a-million times.

Borrowers cannot choose their servicer, so borrowers who had their loans serviced by Ocwen (Ocwen borrowers) have endured years of its widespread violations of law. In fact, as shown by its own corporate records—and confirmed in discovery responses and testimony—Ocwen serviced at least hundreds of thousands of mortgage loans, in many instances for years, using inaccurate information. Ocwen serviced many borrowers' loans using the wrong loan terms (for example, the loan's interest rate), the wrong amounts owed in principal and interest, and the wrong amounts owed for escrow. It also used faulty information about borrowers' homeowners' insurance policies, flood insurance policies, and the amount of insurance coverage borrowers were required to maintain. And finally, it used the wrong information to assess when it was obligated by law to cancel private mortgage insurance (PMI).

Because Ocwen frequently used incorrect information when billing borrowers, many Ocwen borrowers paid amounts that were too high and suffered economic harm as a result. Others paid too little, and Ocwen later sought to collect these amounts as lump sums or by increasing their monthly payments. Ocwen's sudden payment increases risked creating "payment shock" for its borrowers, which increased the probability that these vulnerable borrowers would have foreclosure proceedings initiated against them. Also, because of its use of incorrect information, Ocwen failed to pay borrowers' insurance policies, resulting in cancellations and higher premiums. Further, when assessing flood insurance requirements, it wrongly concluded that its borrowers' homes were in flood zones and improperly charged them for flood insurance. Similarly, by relying on faulty information about PMI, Ocwen failed to cancel PMI when it was required by law to do so, and instead continued to bill borrowers for unnecessary insurance.

Ocwen's use of inaccurate information to service borrowers' loans violated the prohibitions on unfair acts or practices in the Consumer Financial Protection Act (CFPA) and the

Fair Debt Collection Practices Act (FDCPA). The undisputed facts show that Ocwen's acts and practices caused a risk of substantial harm and actually harmed its borrowers, who could not choose their mortgage servicer and had no way to reasonably avoid Ocwen's widespread failures. Further, Ocwen's misstatements to borrowers about the amounts they owed in monthly billing statements and other communications violated the prohibitions on deceptive acts or practices under the CFPA and the FDCPA, and the requirement to send accurate billing statements under the Truth-in-Lending Act (TILA).

Ocwen also violated other applicable legal requirements in servicing borrowers' loans. For example, Ocwen failed to analyze hundreds of thousands of borrowers' accounts to determine whether the payments Ocwen was requesting from borrowers for taxes and insurance—that is, their payments toward escrow—were in the right amounts. And Ocwen failed to make timely payments for borrowers' insurance policies. Each of these failures is a violation of the Real Estate Settlement Procedures Act (RESPA) and its associated regulations. When Ocwen failed to cancel PMI when it was required to do so, it violated the Homeowners' Protection Act (HPA). Ocwen also concedes that it initiated foreclosure proceedings against more than 100 borrowers who had applied for loan modifications or other loss mitigation options before it had evaluated their applications, in violation of RESPA and its regulations. And Ocwen foreclosed on at least 45 borrowers' homes, despite assuring these borrowers that they would not be foreclosed on during Ocwen's pending loss mitigation evaluation process, violating the CFPA's prohibition on deceptive acts and practices.

Each of the Defendants that comprise or have comprised Ocwen since 2014—Ocwen Financial Corp. (OFC), Ocwen Mortgage Servicing, Inc. (OMS), Ocwen Loan Servicing, LLC (OLS), and OLS's successor PHH Mortgage Corporation (PHH)—are jointly and severally liable for these violations. Defendants functioned as a single organization, without regard for their separate corporate forms, and thus constituted a common enterprise that renders them jointly and severally liable for the violations at issue. Distinctions between Defendants did not matter or exist. They also engaged individually in the violations and are separately liable for that reason.

The undisputed facts in this case—which are evidenced principally by Ocwen's own documents and the testimony of its witnesses—demonstrate that the company violated the

CFPA, RESPA, the HPA, the FDCPA, and TILA. Thus, summary judgment[1] is warranted in favor of the Consumer Financial Protection Bureau (Bureau) on Counts I–VII, IX, and X of its Amended Complaint.[2]

## I. BACKGROUND

Ocwen[3] was founded in 1988 and specializes in servicing mortgage loans of financially distressed borrowers.[4] In the wake of the 2008 financial crisis, after almost two decades of servicing a relatively small number of loans, Ocwen expanded the portfolio of loans it serviced eight-fold. From 2009 through 2013, Ocwen bought the rights to service millions of subprime loans, many of which were made during the run-up to the financial crisis.[5] During these four years, Ocwen went from servicing approximately 350,000 loans to nearly three million loans.[6] By 2014, Ocwen was the largest servicer of subprime loans in the country.[7]

To support its servicing of this expanding portfolio, Ocwen contracted with vendors owned by its largest shareholder and top executives. In 2009, Ocwen spun off its technology department into a separate company, Altisource Solutions, SA (Altisource), and then contracted with Altisource for services, including the system of record (REALServicing) that Ocwen used to service its loans.[8] Despite Altisource's poor performance, and years before its initial eight-year contract with Altisource expired, Ocwen twice extended the contract term to run until

---

[1] The Bureau moves for summary judgment as to liability, but not damages, on these counts. At trial, the Bureau intends to seek damages and other monetary relief for borrowers. It will demonstrate through the testimony of its damages expert, Nobel Laureate Professor Daniel McFadden, that borrowers suffered hundreds of millions of dollars in quantifiable damages as a result of Defendants' conduct. *See* Second Amended Expert Report of Daniel McFadden at Ex. A. The Bureau also intends to seek injunctive relief and civil money penalties.
[2] ECF No. 481. The Bureau is not moving on Count VIII.
[3] Defendants are referred to collectively in this motion as "Ocwen." As described below in Section VI, Defendants acted as a common enterprise and are jointly and severally liable for the violations addressed herein. Defendants are discussed individually where relevant.
[4] Pl.'s Statement of Material Facts in Supp. of Pl.'s Mot. for Summ. J. (SOF) ¶¶ 9, 63–65.
[5] SOF ¶¶ 68–74.
[6] SOF ¶¶ 68, 74.
[7] SOF ¶ 11. The relevant period for this motion is January 1, 2014, through the present (Relevant Period). Unless otherwise specified, the described acts and practices occurred throughout the Relevant Period.
[8] SOF ¶¶ 50–51, 75.

2025.[9] Conflicts prevailed in this arrangement, as Ocwen recognized.[10] Ocwen's founder and then-CEO, William Erbey, was the Chairman and a prominent shareholder of both Ocwen and Altisource.[11] Other key Ocwen executives also owned Altisource stock, and the companies shared key personnel.[12]

As Ocwen's loan volume and regulatory obligations increased, Ocwen's servicing system slowed and broke down in many areas, crippling its ability to service loans properly.[13] As Ocwen's Chief Servicing Officer wrote in 2014, Ocwen's system of record was:

> An absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow I would. I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here. I'm talking about getting systems to stay online, escrow analysis to work, letters to print, et cetera. It's ridiculous.[14]

At the same time, Ocwen failed to invest in and develop a compliance program appropriate for its growing size and the changing regulatory landscape.[15] On January 10, 2014, new federal mortgage-servicing regulations, designed to protect consumers after the financial crisis, went into effect. But Ocwen's compliance program, according to its own CEO, was still in the "early stages of development" in 2014.[16] This is apparent from the internal database that Ocwen used to track systemic problems in its servicing of borrowers' loans.[17] As of mid-2015, this tracking database contained more than [redacted], many of which Ocwen's database described as [redacted].[18] Over a year later, Ocwen had not analyzed the [redacted].[19] When the Bureau asked Ocwen to identify any review it had performed of the impact its servicing failures were having on borrowers, Ocwen reported that it had reviewed [redacted]

[9] SOF ¶¶ 77–80, 84, 91–100.
[10] SOF ¶¶ 75–90.
[11] SOF ¶¶ 76, 84–85.
[12] SOF ¶¶ 76, 84.
[13] SOF ¶¶ 91–100, 111–112.
[14] SOF ¶ 94.
[15] SOF ¶¶ 101–114.
[16] SOF ¶ 103.
[17] SOF ¶¶ 108–112.
[18] SOF ¶ 110.
[19] SOF ¶¶ 113–114.

[redacted]."[20]

## II. SUMMARY JUDGMENT STANDARD

When "there is no genuine issue as to any material fact . . . the moving party is entitled to judgment as a matter of law."[21] Once the moving party has made a prima facie case establishing that there are no genuine issues of material fact, the burden shifts to the non-moving party to present "a sufficient showing that the jury could reasonably find for that party."[22] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[23]

## III. OCWEN VIOLATED THE CFPA, FDCPA, AND TILA BY SERVICING LOANS USING INACCURATE LOAN INFORMATION AND SENDING FALSE COMMUNICATIONS TO BORROWERS.

The undisputed facts show that Ocwen violated the CFPA, FDCPA, and TILA by using inaccurate information to service loans, and by sending false communications to borrowers. Because the FDCPA and TILA are "federal consumer financial laws," and each Defendant is a covered person under the CFPA, Defendants' violations of those laws also violate the CFPA.[24]

### A. Ocwen is subject to the CFPA's prohibitions on unfair and deceptive acts.

The CFPA prohibits a "covered person" from committing unfair, deceptive, or abusive acts or practices "in connection with any transaction with a consumer for a consumer financial product or service."[25] A "covered person" includes "any person that engages in offering or providing a consumer financial product or service,"[26] which includes "servicing loans" that were provided "for use by consumers primarily for personal, family, or household purposes."[27]

OLS and OMS admit that they have continuously engaged in servicing residential

---

[20] SOF ¶¶ 113–114.
[21] Fed. R. Civ. P. 56.
[22] *Anderson v. United Parcel Serv., Inc.*, 506 F. Supp. 2d 1215, 1222–23 (S.D. Fla. 2007) (citing *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)) (quotation marks omitted).
[23] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).
[24] 12 U.S.C § 5536(a)(1)(A).
[25] 12 U.S.C. § 5531(a).
[26] 12 U.S.C. § 5481(6)(A).
[27] *Id.* § 5481(5), (15)(A)(i).

mortgage loans since at least 2014.[28] On June 1, 2019, OLS merged into PHH.[29] At that time, PHH assumed OLS's servicing obligations (and liability for the conduct addressed in this litigation) as its successor-by-merger, and PHH now services the loans that OLS previously serviced.[30] OFC, the parent company of OLS (and now PHH) and OMS, also engaged in mortgage servicing.[31] Because each Defendant serviced mortgage loans, each one is a covered person under 12 U.S.C. § 5481(6)(A).

OFC and OMS are also covered persons subject to the CFPA for two additional reasons: each is both a "related person" to, and an "affiliate" of, a covered person. Under the CFPA, a "related person" is, *inter alia*, a "controlling shareholder of a covered person" if that covered person is not a bank holding company.[32] A related person is deemed a covered person under the CFPA.[33] The CFPA provides that a person is an "affiliate" of another if it "controls, is controlled by, or is under common control with" that other person.[34] An affiliate of a covered person is itself a covered person if it "acts as a service provider" to that covered person.[35] A person acts as a service provider to a covered person if it "provides a material service to [the] covered person in connection with the offering or provision by such covered person of a consumer financial product or service," including "participat[ing] in designing, operating, or maintaining the product or service" or "process[ing] transactions relating to" the product or service.[36]

Until June 1, 2019, OFC wholly owned OMS, and OMS wholly owned OLS.[37] Thus,

---

[28] SOF ¶¶ 21–24 (OMS's servicing activities); 25–28 (OLS's servicing activities).
[29] SOF ¶¶ 7–8.
[30] SOF ¶ 28. *See, e.g.*, *Wilson v. Deutsche Bank et. al.*, No. 3:18-CV-0854-D, 2019 WL 5840325, at *3 (N.D. Tex. Nov. 7, 2019) (PHH admitted it stepped into the shoes of OLS as successor-by-merger); *Cuervo v. Airport Servs.*, 984 F. Supp. 2d 1333, 1340 (S.D. Fla. Nov. 22, 2013) (successor who assumes predecessor's obligations is liable for predecessor's violations).
[31] SOF ¶¶ 3–20, 32, 35, 37–38.
[32] 12 U.S.C. § 5481(25)(C)(ii) (a "related person" is deemed a covered person, and includes "any shareholder . . . who materially participates in the conduct of the affairs of a covered person that is not a bank holding company.").
[33] *Id.*
[34] *Id.* § 5481(1) (defining affiliate).
[35] 12 U.S.C. § 5481(6)(B) (an affiliate is also a "covered person" where that "affiliate acts as a service provider" to that person).
[36] 12 U.S.C. § 5481(26)(A). The definition of service provider contains two exceptions, *id.* § 5481(26)(B), neither of which apply here.
[37] SOF ¶¶ 3–5.

OFC indirectly owned OLS until June 2019, and since then has owned OLS's successor, PHH.[38] Because of these controlling ownership interests, OFC and OMS are each a related person to OLS, and OFC is also a related person to OMS. Because they are related persons to covered persons that are not bank holding companies, OFC and OMS are deemed covered persons under 12 U.S.C. § 5481(25)(B).

These same controlling ownership interests render OFC an affiliate of both OLS and OMS, and OMS an affiliate of OLS. And OFC provided both OLS and OMS with numerous services directly related to Ocwen's servicing operations throughout the period from 2014 to 2019, including management, technology, compliance, risk, audit, and other operational services.[39] OMS also provided OLS with material services, such as call center operations.[40] Because OFC is an affiliate that acted as a service provider to OLS and OMS, it is a covered person under 12 U.S.C. § 5481(6)(B). The same is true of OMS with respect to OLS.

**B. Ocwen is a debt collector subject to the FDCPA.**

The FDCPA prohibits unfair practices and deceptive misrepresentations by a "debt collector," which includes "any person . . . who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another"[41] and excludes any person collecting debt "which was not in default at the time it was obtained."[42]

Ocwen meets this definition. First, the vast majority of loans that Ocwen services (a process that involves attempting to collect debts) are owned by—and thus due to—others, such as trusts holding loans insured by government-sponsored enterprises (GSEs) and other investors.[43] Ocwen has serviced between one and three million loans for others throughout the Relevant Period.[44] Second, many of these loans, including those at issue in this litigation, were in

---

[38] SOF ¶¶ 7–8.
[39] SOF ¶¶ 12 (OFC describing its servicing activities); 13–15 (OFC's policies and procedures), 16–18 (OFC's payment processing activities); 19–20, 100 (examples of OFC's audits), 39 (OFC's executives overseeing servicing operations); 50–51, 82 (OFC's provision and payment of technology services for OLS and OMS).
[40] SOF ¶ 24.
[41] 15 U.S.C. §1692a(6).
[42] 15 U.S.C. §1692a(6)(F); *see also*, *e.g.*, *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1314 (11th Cir. 2015) ("any person who collects or attempts to collect any debt owed or due another, which debt was in default at the time it was obtained by such person, is a 'debt collector' under FDCPA").
[43] SOF ¶¶ 66–67.
[44] SOF ¶¶ 67, 74.

default when Ocwen acquired the rights to service them.[45] Thus, Ocwen is a debt collector under the FDCPA.[46]

**C. Ocwen's use of inaccurate information to service loans was unfair in violation of the CFPA and FDCPA (Bureau Counts I and V).**

An act or practice is unfair under the CFPA if it "[1] causes or is likely to cause substantial injury to consumers; [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[47] The same test applies to unfairness under the FDCPA, which prohibits using unfair means "to collect or attempt to collect any debt."[48]

Ocwen routinely serviced loans using inaccurate information, including loan terms (for example, interest rates), principal and interest amounts owed by borrowers, escrow amounts owed by borrowers, insurance information, whether borrowers lived in flood zones, when cancellation of private mortgage insurance was required, and loan modification terms. The number and variety of ways in which Ocwen used inaccurate information renders a complete accounting of its failures and resulting borrower harm all but impossible. Yet, as described below, the undisputed facts demonstrate that, at a minimum, Ocwen's errors caused both a likelihood of substantial injury, as well as actual injuries, to hundreds of thousands of borrowers. This injury was not reasonably avoidable by consumers or outweighed by any countervailing benefits.

---

[45] SOF ¶¶ 69, 73.

[46] *See, e.g.*, *Yarney v. Ocwen Loan Servicing, LLC*, 929 F. Supp. 2d 569, 575 (W.D. Va. 2013) ("Ocwen, the loan servicer in this case, is a debt collector under the meaning of the FDCPA" because loan was in default when acquired); *McWhorter v. Ocwen Loan Servicing, LLC*, No. 2:15-CV-01831-MHH, 2017 WL 3315375, at *6 (N.D. Ala. Aug. 3, 2017) (Complaint plausibly alleged that "Ocwen acted as a debt collector" when it sent statements seeking to collect discharged debt). Each Defendant individually meets the definition of debt collector because each serviced mortgage loans (including those that were in default upon acquisition), as described in Section III.A above.

[47] 12 U.S.C. § 5531(c)(1).

[48] 15 U.S.C. § 1692f (prohibiting use of "unfair or unconscionable means to collect, or attempt to collect, any debt"); *Bryant v. Aargon Collection Agency, Inc.*, No. 17-CV-14096, 2017 WL 2955532, at *7 (S.D. Fla. June 30, 2017) (citing FTC *Staff Commentary on the Fair Debt Collection Practices Act*, 53 Fed. Reg. 50097-50110 (Dec. 13, 1988)) (providing same test for unfairness under FDCPA).

*1. Ocwen's servicing of loans using inaccurate loan information caused and was likely to cause substantial borrower injury.*

An injury may be substantial, for purposes of establishing unfairness, where there is a small amount of harm to a large number of people, or a large amount of harm to a smaller number of people.[49] Actual injury is not required; a "significant risk of concrete harm" suffices.[50]

Based on undisputed facts, the injury from Ocwen's conduct meets this standard. Servicing mortgage loans involves the collection of principal and interest payments from borrowers, the administration of escrow accounts, and the management of loans that are delinquent or in foreclosure or bankruptcy, among other activities.[51] When servicing loans, servicers use information about each loan—such as the loan's interest rate, the duration of the loan, whether the loan is escrowed for taxes or insurance, and the identity of the borrower's insurance carrier—to calculate amounts owed, to collect those debts from borrowers, and to make payments on behalf of escrowed borrowers.[52] Servicers inform borrowers of the amounts they must pay through periodic statements and other payment demands.[53] Here, Ocwen caused substantial injury by using inaccurate information to service loans of at least hundreds of thousands of borrowers in the following ways:

**Ocwen used inaccurate escrow amounts owed**.[54] Ocwen serviced hundreds of thousands of loans using inaccurate information about monthly escrow amounts that borrowers owed. A mortgage servicer is required to conduct an escrow account analysis each year to determine whether it collected too much or too little from the borrower to cover escrow disbursements—that is, payments for a borrower's taxes and home insurance—and to adjust the borrower's monthly escrow amount going forward if taxes or insurance premiums changed.[55] It is normal for a borrower's monthly escrow amount to change from year to year as taxes and

---

[49] *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988); *Illinois v. Alta Colleges, Inc.*, No. 14-CIV-3786, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014) (CFPA prohibition of unfair and deceptive conduct is "virtually identical" to FTCA prohibition).
[50] *FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1397 (M.D. Fla. Sep. 14, 2018) (citation and quotation marks omitted).
[51] SOF ¶ 12.
[52] SOF ¶ 12.
[53] *See, e.g.*, 12 C.F.R. § 1026.41(d) (periodic statements must include the amount due).
[54] SOF ¶¶ 158–197, 203–238, 246–257.
[55] 12 C.F.R. § 1024.17(b) (defining escrow account analysis).

insurance premiums often change.[56]

Ocwen did not conduct more than 391,000 escrow account analyses on time for over 389,000 borrowers from 2014 until 2018,[57] as described below in Section IV.B. For many borrowers, Ocwen's failure to perform a timely escrow analysis resulted in its charging them too little in monthly escrow amounts, which led to unnecessary shortages in borrowers' escrow accounts.[58] As a result, it charged these borrowers outdated—and, where taxes or insurance premiums changed, inaccurate—monthly escrow amounts.[59] Once Ocwen conducted the late analyses, these borrowers had to pay extra monthly escrow amounts to make up for the extra shortages Ocwen caused.[60] For many other borrowers, Ocwen's late escrow analyses resulted in Ocwen charging them too much in monthly escrow amounts, which led to unnecessary surplus amounts accruing in borrowers' escrow accounts.[61] Because borrowers cannot access funds in their escrow accounts—and may not even be aware of a surplus until notified by their servicer—these borrowers could not use these surplus funds until Ocwen conducted the late analysis and refunded these amounts.[62]

Many borrowers paid the inaccurate, outdated escrow amounts that Ocwen billed them.[63] Due to its late analyses, Ocwen over-collected at least $104 million in escrow surpluses from at least 194,000 borrowers, and undercharged—and later sought to collect—at least $43.5 million in extra escrow shortages from at least 131,000 borrowers.[64]

Ocwen also used the inaccurate escrow amounts that resulted from its untimely analyses when calculating other payment demands, including quotes it provided to 82,000 borrowers

---

[56] SOF ¶ 178.
[57] SOF ¶¶159–171.
[58] SOF ¶¶ 172–173, 181–182, 184–185. For example, if tax and insurance increases resulted in the borrower needing to pay $100 more in monthly escrow amounts, and Ocwen was six months late in performing the escrow analysis, a $600 escrow shortage would have accrued due to Ocwen's failure ($100 x 6 months). If, on the other hand, a borrower's taxes and insurance decreased in the new escrow year such that they should be paying $100 less in monthly escrow amounts, and Ocwen was six months late in performing the escrow analysis, a $600 escrow surplus would have accrued due to Ocwen's failure ($100 x 6 months).
[59] SOF ¶¶ 187–190.
[60] SOF ¶ 185.
[61] SOF ¶ 186.
[62] SOF ¶¶ 187–190.
[63] SOF ¶ 186.
[64] SOF ¶¶ 184–186.

stating the amounts they needed to pay to reinstate their loans—that is, to bring their loans current.[65] Through these inaccurate reinstatement quotes, Ocwen sought to over-collect at least $102 million in un-owed reinstatement amounts from at least 19,000 borrowers.[66] Ocwen in fact over-collected over $608,000 from 367 of those borrowers, in amounts as high as $41,632.[67] Ocwen also sought to under-collect at least $142 million from at least 39,000 borrowers, with 972 borrowers paying the underquoted amount.[68]

Ocwen also serviced loans using inaccurate information about the escrow shortage amounts that borrowers owed. As explained in Section IV.D below, after borrowers made lump-sum shortage payments, Ocwen continued to service their loans as if those payments had not been made, thereby overcharging borrowers.[69]

**Ocwen used inaccurate loan terms and amounts owed**.[70] In addition to servicing hundreds of thousands of loans with inaccurate escrow amounts owed, during the Relevant Period Ocwen serviced at least 628,000 loans using inaccurate loan information for periods up to three years.[71] Ocwen had a policy that called for it to verify, when it started servicing new portfolios of loans, that certain loan information that it loaded onto its system of record matched the actual loan terms in the loan documents and other information it received.[72] Ocwen's policy was to perform this loan verification within sixty days of loading data onto its system of record.[73] Yet, due to the increased volume of loans it had boarded onto its system, Ocwen was unable to timely verify new loans.[74] As of October 2014, Ocwen had a backlog of over 1.39 million unverified loans.[75]

Ocwen's long delay in verifying loans mattered: when it eventually verified the data it was using to service these loans, it found vast discrepancies. As of September 2017, it had identified over 1.3 million discrepancies between the loan information in its system of record and

---

[65] SOF ¶¶ 191–197.
[66] SOF ¶ 194.
[67] SOF ¶ 195.
[68] SOF ¶¶ 196–197.
[69] SOF ¶¶ 203–211.
[70] SOF ¶¶ 115–157.
[71] SOF ¶ 127.
[72] SOF ¶¶ 117–119.
[73] SOF ¶ 120.
[74] SOF ¶¶ 122–126.
[75] SOF ¶ 124.

the underlying loan documents, requiring corrections to over 628,000 loans.[76] Ocwen found numerous discrepancies in fields that could impact amounts borrowers owed.[77] For example, Ocwen found discrepancies in: (1) over 89,000 adjustable-rate mortgage rider terms (the loan terms used to calculate monthly amounts owed for adjustable-rate mortgages); (2) over 55,000 loan terms (the lengths of the loans); and (3) over 38,000 maturity dates (the date when the mortgage matures).[78] Because Ocwen calculated what borrowers owed based on some of these fields, Ocwen serviced those loans—and demanded payments from borrowers, in many cases for years—based on inaccurate information.[79] This led Ocwen to collect too much from some borrowers and too little from others, harming them as discussed below.[80]

Ocwen did not begin systematically recording corrections to the accounts of borrowers it overcharged or undercharged until the third quarter of 2017.[81] And Ocwen asserted in discovery that it could not, absent what it claimed to be an unduly burdensome manual review of borrowers' loans files, identify the remediation for overcharges or undercharges, such as refunds, credits, or waivers, that it provided to borrowers prior to late 2017.[82] Specifically, Ocwen did not identify which accounts it may have remediated or the amount of any remediation for up to 1.3 million discrepancies it found during the loan-verification process because "a manual review of the loan history in each loan file would be required to link the transaction history credits to the loan verification error."[83]

In the limited period from the third quarter of 2017 until July 2018, Ocwen found that it had charged approximately 2,000 borrowers too much or too little because it used inaccurate information to service their loans.[84] Specifically, Ocwen identified 269 borrowers whom it overcharged $132,000 in principal and interest payments.[85] It overcharged individuals in this group in amounts up to $10,000.[86] It also determined that it undercharged an additional 1,705

[76] SOF ¶ 127.
[77] SOF ¶¶ 117–119, 121, 126, 135–147.
[78] SOF ¶¶ 131–133.
[79] SOF ¶¶ 121, 126–133, 135–154.
[80] SOF ¶¶ 148–154.
[81] SOF ¶ 128.
[82] SOF ¶¶ 128–130.
[83] SOF ¶ 130.
[84] SOF ¶¶ 148–154.
[85] SOF ¶ 150.
[86] SOF ¶ 150.

borrowers and later sought to collect $3.6 million in principal and interest from them.[87] After failing for months and in some cases years to notify these borrowers of the accurate monthly amounts they owed, Ocwen then sought to make up for its prior under-collection by seeking to collect amounts from individual borrowers as high as $235,529.60; $145,820.10; $131,643.32; $107,075.67; and $84,003.42.[88]

Because Ocwen did not centrally record the impact its loan-verification failures had on the other 626,000 borrowers it identified as needing corrections in key loan-data fields, these numbers significantly understate the harm its use of inaccurate information caused to borrowers.[89] Indeed, Ocwen identified other, large populations of borrowers who were likely impacted by its use of inaccurate information but whose precise harm it did not identify or record, such as: (1) 18,000 borrowers with incorrect home-equity-line-of-credit (HELOC) dates, which likely affected the amounts Ocwen told these borrowers they owed;[90] (2) another 40,000 borrowers with HELOC maturity-date errors, which likely affected the amounts Ocwen told these borrowers they owed;[91] and (3) another 6,500 borrowers with potentially inaccurate origination or maturity dates, which resulted in Ocwen wrongly denying some of these borrowers loss mitigation help.[92]

**Ocwen used inaccurate insurance information**.[93] Ocwen used inaccurate information about which insurance company Ocwen needed to pay for borrowers whose escrow accounts Ocwen was maintaining, which caused Ocwen to fail to timely pay borrowers' insurance policies, as set forth in Section IV.E below.[94] As a result, 1,367 borrowers' policies were cancelled,[95] and 725 of these borrowers obtained replacement policies with higher premiums and/or Ocwen imposed force-placed insurance on their loans.[96]

In addition, Ocwen serviced loans using inaccurate information about whether borrowers

---

[87] SOF ¶¶ 151–154.
[88] SOF ¶ 154.
[89] SOF ¶¶ 126, 128–130, 134, 156–157.
[90] SOF ¶ 157.
[91] SOF ¶ 157.
[92] SOF ¶ 156.
[93] SOF ¶¶ 212–252.
[94] SOF ¶¶ 212–227.
[95] SOF ¶ 222.
[96] SOF ¶ 223.

lived in "flood zones" and so incorrectly required borrowers to purchase unnecessary flood insurance.[97] Mortgage agreements typically require borrowers to have flood insurance if they live in an area that the Federal Emergency Management Agency has determined to have a certain risk of flooding, commonly referred to as a "flood zone."[98] But in many instances Ocwen maintained inaccurate information in its system of record about whether borrowers' homes were in flood zones and so required borrowers to purchase flood insurance—and pay insurance premiums—even though their homes were not, in fact, in flood zones.[99]

Ocwen also serviced loans using inaccurate information about the date it was required to automatically cancel PMI, called the "termination date."[100] Significantly, an internal Ocwen assessment concluded that "[t]he automatic PMI termination date is currently being calculated by Altisource and stored in REALServicing. Internal testing has shown the date to be missing or inaccurate in approximately 90 percent of test cases."[101] As a result, as described below in Section IV.F, Ocwen failed to timely cancel over 7,700 borrowers' PMI and, as a result, over-collected over $3 million in premiums from these borrowers.[102]

**Ocwen used inaccurate loan modification information**.[103] Finally, in 2014 Ocwen sent 1,800 borrowers loan modification agreements—that is, agreements to change the terms of an existing loan—with incorrect or missing terms.[104] In particular, Ocwen failed to tell borrowers who received these agreements that they would owe a deferred lump sum of additional principal at the end of the mortgage term.[105] Ocwen also failed to tell borrowers that their loans would be subject to higher interest rates, and therefore higher monthly payments, later in the mortgage term.[106] Ocwen thus offered, and in some cases made, loan modifications on more expensive terms than it stated to the borrowers. Moreover, after realizing that it mailed borrowers permanent loan modifications with inaccurate loan terms, Ocwen [redacted]

---

[97] SOF ¶¶ 110(d), 235–238.
[98] SOF ¶ 235.
[99] SOF ¶¶ 110(d), 236–238.
[100] SOF ¶ 246.
[101] SOF ¶ 247.
[102] SOF ¶¶ 248–252.
[103] SOF ¶¶ 253–257.
[104] SOF ¶ 253.
[105] SOF ¶ 254.
[106] SOF ¶ 255.

[redacted] re-evaluated the borrowers' applications.[107] Some of these borrowers did not [redacted] or did not pass Ocwen's new evaluations, resulting in Ocwen denying them assistance and leaving them with no loan modification agreements at all.[108]

* * *

The injuries and risk of injuries that resulted from Ocwen's use of inaccurate information to service borrowers' loans satisfies the substantial-injury prong of an unfairness analysis. Ocwen's use of inaccurate information injured borrowers in at least four different ways: (1) borrowers were overcharged; (2) borrowers were undercharged and then later subject to payment shock when Ocwen sought to collect the undercharged amounts; (3) borrowers' insurance policies were cancelled; and (4) borrowers were deprived of loan modifications. Each of these constitutes substantial injury.

First, courts have consistently found that the over-collection of payments constitutes substantial injury, even where those over-collections were significantly smaller than Ocwen's over-collections here, which totaled more than $100 million.[109] When Ocwen over-collected from borrowers, it denied them the ability to use the over-collected funds for a purpose of their choosing until the funds were returned.[110] Moreover, Ocwen specializes in the servicing of loans for vulnerable borrowers.[111] Beyond the loss of use of the funds, Ocwen's overcharges also

---

[107] SOF ¶¶ 256–257.

[108] SOF ¶¶ 256–257.

[109] *See, e.g.*, *FTC v. Direct Benefits Grp., LLC*, No. 6:11-CV-1186-ORL-28, 2013 WL 3771322, at *13 (M.D. Fla. July 18, 2013) (improper debits between $39.95 and $99.90 per person totaling $9.5 million constituted substantial injury); *Orkin*, 849 F.2d at 1365 ($7 million in unlawful renewal fees constituted substantial injury because "although the actual injury to individual customers may be small on an annual basis, this does not mean that such injury is not 'substantial'"); *Langan v. Johnson & Johnson Consumer Cos.*, 95 F. Supp. 3d 284, 290 (D. Conn. 2015) (while overcharges of $3 to $6 were "rather small for each individual consumer," such injury is substantial injury because "the cumulative injury to class members is in excess of $5 million"); *FTC v. Amazon*, 71 F. Supp. 3d 1158, 1164 (W.D. Wash. 2014) (collecting cases for the proposition that billing customers without their permission causes substantial injury.

[110] *See, e.g.*, *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010) (affirming finding of substantial injury where consumers "lost access to and use of [their] funds" and explaining that, even if "a bank eventually restored consumers' money, the consumer suffered unavoidable injuries that could not be fully mitigated.").

[111] SOF ¶¶ 11, 63–65.

increased the probability that these borrowers would have foreclosure proceedings initiated.[112] Indeed, as one Ocwen employee explained in an e-mail when Ocwen identified inaccuracies in its loan-term data, "[b]orrowers could be forced to repay their loan before the date stated in the promissory note and could inappropriately wind up in delinquency and/or foreclosure. This is a disaster we must avoid."[113]

Second, Ocwen's under-collections, which totaled tens of millions of dollars, created a risk of substantial injury because Ocwen's later attempts to collect the amounts that it had failed to charge created a significant risk that borrowers would suffer payment shock.[114] Such payment shocks—*i.e.*, sudden increases to the total amount owed—create a risk of substantial injury for borrowers by increasing the probability that these borrowers have foreclosure proceedings initiated against them.[115] As Ocwen's Director of Servicing Compliance acknowledged in an email addressing Ocwen's failure to perform timely escrow account analyses, this failure "could have a disproportionate impact to already-distressed borrowers."[116] She testified that, as to Ocwen's failure to perform timely escrow analyses, "[a]n escrow analysis can result in an increase or a decrease in what you owe," and "if it results in an increase in . . . what you owe, a distressed borrower would have disproportionate potential impact."[117] Indeed, Ocwen recognizes, under-collection, and subsequent attempts to collect the amounts it did not initially collect, harms borrowers.[118]

Third, the insurance cancellations and forced-placements of insurance, which resulted in

[112] A precise quantification of the damages from this increased risk of foreclosures initiation is not necessary at this stage because the undisputed facts already show substantial injury. At trial, the Bureau intend to prove, through their expert witness and other evidence, that Ocwen's errors caused hundreds of millions of dollars in quantified damage to borrowers by increasing their risk of foreclosure initiation. *See* Second Amended Expert Report of Daniel McFadden attached at Exhibit A.

[113] SOF ¶ 157; *see also* SOF ¶ 144 (Ocwen's management stating that "[m]anagement does not have adequate resources to ensure [adjustable rate mortgage] loan verification procedures are performed timely" which "increases the risk of incorrect loan data in REALServicing and incorrect calculations of principal and interest that could impact the customer.")

[114] *See, e.g.*, *Monaco v. Bear Stearns Cos., Inc.*, No. CV 09-05438 SJO JCX, 2011 WL 4059801, at *11 (C.D. Cal. Sept. 12, 2011) (payment shock can constitute substantial injury).

[115] SOF ¶ 155.

[116] SOF ¶ 179.

[117] SOF ¶ 180.

[118] SOF ¶¶ 155, 175.

borrowers needing to search for new policies, pay higher premiums, or obtain less favorable insurance, also constitute substantial injury.[119] And fourth, Ocwen's denial of loan modification agreements after using incorrect terms also causes substantial injury or risk of injury.[120] Ocwen acknowledged that its "[redacted]."[121]

In sum, Ocwen's use of inaccurate information to service loans substantially injured at least hundreds of thousands of borrowers and created a risk of substantial injury to many more, which is more than sufficient to satisfy the substantial injury prong of unfairness.[122] In a recent borrower lawsuit against Ocwen, *Saccameno v. Ocwen*, the court found that Ocwen relied on inaccurate information when it serviced the plaintiff's account, which was unfair and deceptive under state law and violated the FDCPA and RESPA.[123] In assessing substantial injury, the district court held that, "given the sheer size of Ocwen's loan portfolio," it was reasonable to conclude that "Ocwen's conduct had the potential to injure a large number of other consumers."[124] Ms. Saccameno is just one example of the "chaos" and resulting harm that

---

[119] *See, e.g.*, *Cima v. Wellpoint Healthcare Networks, Inc.*, No. 05-CV-4127-JPG, 2006 WL 1914107, at *19 (S.D. Ill. July 11, 2006) (causing plaintiffs to pay higher insurance premiums, go temporarily without insurance, or obtain coverage with lower benefits were sufficient to show substantial injury).

[120] *See, e.g.*, *Charest v. Fed. Nat. Mortg. Ass'n*, 9 F. Supp. 3d 114, 126 (D. Mass. 2014) (plaintiff adequately stated an unfairness claim by alleging, among other things, that bank denied loan modification based on incorrect facts).

[121] SOF ¶ 256.

[122] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015) ( "Although unfairness claims usually involve actual and completed harms, they may also be brought on the basis of likely rather than actual injury") (internal citations and quotations omitted); *Roca Labs*, 345 F. Supp. 3d at 1395 (substantial injury does not require "proof of tangible harm to the exclusion of intangible harm") (citing *Wyndham*, 799 F.3d at 246–47).

[123] *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 632 (N.D. Ill. 2019), *aff'd sub nom. Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1082 (7th Cir. 2019).

[124] *Saccameno*, 372 F. Supp. 3d at 632. The Court of Appeals for the Seventh Circuit rejected Ocwen's attempt to "place most of the blame on what it calls 'an isolated miscoding error committed by a lone employee, identified as 'Marla.' Ocwen cannot pin this case on Marla. Her error was one among a host of others, and each error was compounded by Ocwen's obstinate refusal to correct them. . . . We are not sure how many human errors a company like Ocwen gets before a jury can reasonably infer a conscious disregard of a person's rights, but we are certain Ocwen passed it. The record is replete with evidence that Ocwen's servicing of Saccameno's loan was chaos from the moment Ocwen began working on the loan in 2011 to the day of the

borrowers experienced when Ocwen serviced their loans using inaccurate records. The evidence in this case shows that, as happened to Ms. Saccameno, Ocwen's use of inaccurate information has caused substantial harm to hundreds of thousands of borrowers.

2. *Consumers were not able to reasonably avoid this harm.*

In addition to substantial injury, unfairness claims under the CFPA and FDCPA requires that the injury not be reasonably avoidable by the consumer.[125] "Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end."[126] To determine whether consumers' injuries were reasonably avoidable, "courts look to whether the consumers had a free and informed choice."[127] "Consumers cannot reasonably avoid injury from an act or practice if it interferes with their ability to effectively make decisions."[128]

Here, the harm was not reasonably avoidable. First and foremost, borrowers had no reason to anticipate that Ocwen would collect the wrong amounts from them, fail to cancel PMI when the law required it, pay their insurance premiums late, or commit other errors. It is an established principle, consistent with common sense, that borrowers reasonably expect that their servicer will not make mistakes while servicing their loans.[129] Because borrowers had no reason to anticipate the harm from Ocwen's errors, the harm was not reasonably avoidable.[130] Further,

---

jury's verdict nearly seven years later." *Saccameno*, 943 F.3d at 1082–83 (internal quotation marks omitted).

[125] 12 U.S.C. § 5531(c)(1)(A); *Aargon*, 2017 WL 2955532, at *7 (same test applies to unfairness under the FDCPA).

[126] *Orkin*, 849 F.2d at 1365 (citation and quotation marks omitted).

[127] *Neovi*, 604 F.3d at 1158.

[128] *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 170 (D.D.C. 2011) (citation and quotation marks omitted).

[129] *Cf. Subramaniam v. Beal*, No. 3:12-CV-01681-MO, 2013 WL 5462339, at *6 n. 5 (D. Or. Sept. 27, 2013) ("A borrower can reasonably expect that payments on their loan will be properly recorded and credited"); *Jeanty v. Wash. Mut. Bank F.A.*, 305 F. Supp. 2d 962, 966 (E.D. Wis. 2004) ("[i]t is not unreasonable to expect a lender to modify a form so as to accurately disclose the regular payments due on a loan."). *See also* Fed. R. Evid. 803(6) Notes ("[t]he element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job").

[130] *See, e.g.*, *FTC v. Hispanic Glob. Way, Corp.*, No. 14-22018-CIV, 2014 WL 12531538, at *2 (S.D. Fla. July 1, 2014) ("By the time consumers learned of Defendants' post-sale practices, it

even if borrowers did know of Ocwen's proclivity for errors, they could not avoid them because borrowers do not have the freedom to switch servicers. On the contrary, borrowers are "captive" and "cannot pick their servicers or fire them for poor performance."[131] Indeed, as one court has noted, "because the borrowers cannot hire and fire their mortgage loan servicers, servicers may have positive incentives to misinform and under-inform the borrowers. When servicers provide limited and low-quality information, they can save money on customer service."[132] In short, borrowers could not have avoided the harm from Ocwen's servicing errors altogether.[133]

Nor could borrowers reasonably mitigate the harm from Ocwen's errors once the harm began to occur. Even after Ocwen began collecting the wrong amounts, borrowers would have no reason to know that the harm was occurring as they received Ocwen's requests for payment, and in many cases paid them, assuming they were accurate. Last, the injury here was not reasonably avoidable because, by providing borrowers with inaccurate information, Ocwen "interfere[d] with their ability to effectively make decisions."[134]

*3. The harm is not outweighed by countervailing benefits.*

Finally, for an act or practice to be unfair, the harm it causes must not be outweighed by countervailing benefits to consumers or competition.[135] "This prong of the test is easily

---

was too late to avoid injury – Defendants already had the consumers' money"); *FTC v. Neovi, Inc.,* 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) ("consumers who had their bank accounts accessed without authorization had no chance whatsoever to avoid the injury before it occurred," only learning of unauthorized access "after receiving a bank statement showing that their account had been looted").

[131] *Romo v. Wells Fargo Bank, N.A.*, No. 15-CV-03708-EMC, 2016 WL 324286, at *9 (N.D. Cal. Jan. 27, 2016) (citing *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal. App. 4th 941, 949 (Cal. Ct. App. 2014) (internal citations omitted)).

[132] *Id.*

[133] *See, e.g.*, *Orkin*, 849 F.2d at 1366 (rejecting defendant's claim "that customers could have avoided their injuries by electing to transfer their business to one of [defendant's] competitors," where no evidence existed that competitors would have assumed defendants' contracts); *Murphy v. Foster Premier, Inc.*, No. 17 CV 8114, 2018 WL 3428084, at *1, *4 (N.D. Ill. July 16, 2018) (injury from paying excessive fees for disclosures was not reasonably avoidable because plaintiffs "had no other reasonably practical means of accessing the documents" except from defendant).

[134] *Nat'l Ass'n of Mortg. Brokers,* 773 F. Supp. 2d at 170 (citation and quotation marks omitted); *see also Sprint Sols., Inc. v. LaFayette*, No. 2:15-CV-2595-SHM-CGC, 2018 WL 3097027, at *12 n. 5 (W.D. Tenn. June 22, 2018) (practices that unreasonably interfere with consumer decision-making include "withholding important information from consumers").

[135] 12 U.S.C. § 5531(c)(1)(B); *Aargon*, 2017 WL 2955532, at *7 (same test under the FDCPA).

satisfied 'when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition.'"[136] Here, Ocwen's servicing of loans using inaccurate loan information did not produce any countervailing benefits, let alone a benefit outweighing the substantial harm.

Ocwen's use of inaccurate loan information did not provide benefits such as cost savings or enhanced customer service to any of its borrowers. Nor did it benefit competition among mortgage servicers. To the contrary, Ocwen's use of inaccurate loan information was more likely to harm other servicers than to increase competition. First, Ocwen transferred out inaccurate loan information when it transferred loans to other servicers,[137] which the other servicers would be forced to identify and correct to avoid making errors themselves. Second, Ocwen's practices were likely harmful to competition because, if Ocwen was able to avoid the expenditures needed to service loans using accurate loan information, it enjoyed an illegitimate cost advantage that it could use to undercut the servicing fees of competitors that did not enjoy such savings.[138]

In sum, the substantial injury from Ocwen's servicing of loans using inaccurate loan information is not outweighed by countervailing benefits. This Court should find that Ocwen's servicing of loans using inaccurate information was unfair in violation of the CFPA and FDCPA.

**D. Ocwen's false representations about amounts borrowers owed were deceptive in violation of the CFPA and FDCPA (Bureau Counts II and VI).**

A communication is deceptive under the CFPA and the FDCPA if it involves a material representation that is likely to mislead consumers acting reasonably under the circumstances.[139] For an FDCPA claim, the communication must be "in connection with the collection of a

---

[136] *FTC v. Windward Mktg., Inc.*, No. 1996-CV-615F, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997) (citation omitted).
[137] SOF ¶ 134.
[138] *See*, *e.g.*, *In re Griffin Sys., Inc.*, 117 FTC 515, 558–59 (1994) (citing *In re: Orkin Exterminating Co*., 108 FTC 263, 365 (1986) ("[T]he respondents obtained an unfair competitive advantage by making claims of extended service coverage and then not providing such coverage. 'The market forces that reward efficient competitors would be impaired if a seller is allowed to gain a competitive edge by unilaterally changing the bargains it has made.'").
[139] *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). *See also* Order on Mot. to Dismiss, Sept. 5, 2019 (ECF No. 452) at 26–27 (courts look to FTCA case law when assessing deception under the CFPA and FDCPA); *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1369–73 (N.D. Ga. 2015) (applying FTCA deception standard to Bureau's deception claim under the CFPA and FDCPA).

debt."[140] In determining whether a communication is in connection with debt collection, courts "look to the language of the communication in question—specifically to statements that demand payment and discuss additional fees if payment is not tendered."[141]

A statement is material if it "influence[s] a consumer's decision or ability to pay or challenge a debt."[142] A false statement about the amount of debt owed is material because it "necessarily misleads the debtor about the amount he owes under his agreement with the creditor."[143] One of the FDCPA's specific examples of a deceptive communication is "[t]he false representation of the . . . amount . . . of any debt."[144]

In evaluating whether a communication was likely to mislead, the CFPA relies on a "reasonable person standard," while under the FDCPA, "the question is 'whether the 'least sophisticated consumer' would have been deceived' by the debt collector's conduct."[145] Under either standard, courts have often found that express, inaccurate claims are both inherently likely to mislead borrowers[146] and are "presumed material."[147] And notably, while "proof of actual consumer deception is unnecessary," "consumer interpretation informs whether a communication

[140] 15 U.S.C. § 1692e.
[141] *Farquharson v. Citibank, N.A.*, 664 F. App'x 793, 801 (11th Cir. 2016) (citing *Caceres v. McCalla Raymer, LLC*, 755 F.3d 1299, 1302 (11th Cir. 2014)).
[142] *Bryant v. Kass Shuler, P.A.*, No. 16-CV-24082, 2017 WL 766343, at *2 (S.D. Fla. Feb. 28, 2017) (citation and quotation marks omitted).
[143] *Coyne v. Midland Funding LLC*, 895 F.3d 1035, 1038 (8th Cir. 2018) (citations omitted).
[144] 15 U.S.C. § 1692e(2)(A).
[145] *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1258–59 (11th Cir. 2014)(citation omitted) (explaining "least-sophisticated person" standard for FDCPA claims under §§ 1692e, 1692f); s*ee also CFPB v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 1:17-CV-817, 2018 WL 3575882, at *3, n.1 (N.D. Ohio July 25, 2018) ("CFPA "uses a 'reasonable person' standard rather than a 'least sophisticated consumer' standard. The elements otherwise mirror those in the FDCPA.").
[146] *FTC v. Vacation Commc'ns Grp., LLC*, No. 613CV789ORL18DAB, 2014 WL 12823960, at *7 (M.D. Fla. Feb. 27, 2014) ("False claims are 'inherently likely to mislead,' and consumers have no obligation to doubt the veracity of such express claims.") (citation and quotation marks omitted); *FTC v. USA Beverages, Inc.*, No. 05-61682-CIV, 2006 WL 8432509, at *11 (S.D. Fla. June 28, 2006) ("When claims at issue are express, it is appropriate to infer that reasonable consumers interpret them to mean what they say.") (citation omitted); *FTC v. Atlantex Assocs.*, No. 87-0045-CIV-NESBITT, 1987 WL 20384, at *11 (S.D. Fla. Nov. 25, 1987) (same).
[147] *FTC v. OMICS Grp. Inc.*, 302 F. Supp. 3d 1184, 1189 (D. Nev. 2017) ("Express claims are presumed material"); *FTC v. SlimAmerica,* Inc., 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) (same).

was deceptive."[148] Thus, when consumers are, in fact, misled, courts have found deception.[149]

Here, Ocwen made numerous express, false representations about the amount of debt a borrower owed, including:

- When Ocwen serviced loans using inaccurate loan terms, Ocwen communicated to borrowers in periodic statements and other payment demands that borrowers owed incorrect amounts of principal and interest.[150]
- When Ocwen failed to perform hundreds of thousands of escrow account analyses and as a result used inaccurate monthly escrow amounts to service the affected loans, Ocwen communicated to borrowers in periodic statements and other payment demands that they owed these inaccurate escrow amounts.[151]
- When Ocwen failed to timely perform required escrow account analyses, Ocwen communicated to over 82,000 borrowers inaccurate reinstatement quotes—that is, amounts that they owed to bring their loans current. [152]
- When Ocwen failed to credit lump-sum shortage payments from borrowers, as detailed in Section IV.D, Ocwen communicated to borrowers in periodic statements that they owed shortage payments that they had already paid and no longer owed.[153]
- When Ocwen serviced loans using inaccurate information indicating borrowers' homes were located in flood zones, Ocwen communicated to borrowers that they owed flood-insurance premiums for required flood insurance that was not in fact required.[154]
- When Ocwen failed to terminate private mortgage insurance on the termination date, Ocwen subsequently communicated to approximately 7,700 borrowers in periodic statements that they owed money for required premiums that were not in fact required.[155]

Because these periodic statements and other communications contained expressly false

---

[148] *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1274 (M.D. Fla. 2016) (citing *FTC v. Wash. Data Res.*, 856 F.Supp.2d 1247, 1272 (M.D. Fla. 2012)).
[149] *See, e.g.*, *Vacation Commc'ns Grp.*, 2014 WL 12823960, at *8 (The likelihood of the representations misleading consumers, and the materiality of the representations, are also established because the representations did, in fact, mislead consumers").
[150] SOF ¶¶ 127, 131–133, 135–154.
[151] SOF ¶¶ 187–190.
[152] SOF ¶¶ 191–197.
[153] SOF ¶¶ 203–211.
[154] SOF ¶¶ 110(d.), 236–237.
[155] SOF ¶¶ 246–252.

representations about the amount of debt a borrower owed, they were deceptive.[156]

Moreover, many borrowers were, in fact, misled and paid the incorrect amounts demanded by Ocwen,[157] further illustrating that Ocwen's communications were deceptive.[158] That borrowers were misled is not surprising, as reasonable borrowers should expect that information provided by their servicer is accurate.[159] This Court should find that these inaccurate communications were deceptive in violation of the CFPA and the FDCPA.

**E. Ocwen's inaccurate periodic statements violated TILA (Bureau Count IV).**

Under TILA and Regulation Z, a mortgage servicer must provide each borrower with a periodic statement each billing cycle that includes, among other information, the amount that the borrower owes each month, with a breakdown of how much is for principal, interest, and escrow.[160] As one of the central purposes of TILA is "[t]o protect the consumer against inaccurate and unfair credit billing . . . practices,"[161] the official interpretation of Regulation Z makes clear that "[t]he periodic statement must be accurate."[162] The requirement to send accurate periodic statements applies to "closed-end consumer credit transaction[s] secured by a dwelling,"[163] which is the type of loan that Ocwen services.[164]

As described above, after January 10, 2014 Ocwen sent at least hundreds of thousands of

---

[156] *See* 15 U.S.C. § 1692e(2)(A). *See also*, *e.g.*, *Ruvalcaba v. Ocwen Loan Servicing, LLC*, No. 15-CV-744-BAS-DHB, 2016 WL 7178855, at *4 (S.D. Cal. Dec. 9, 2016) (plaintiff adequately stated a deception claim by alleging that "Ocwen falsely stated the amount of the debt" she owed in its monthly billing statements); *Coyne*, 895 F.3d at 1038.
[157] *See, e.g.*, SOF ¶¶ 150, 186, 195, 197, 252.
[158] *See, e.g.*, *Tashman*, 318 F.3d at 1278 (finding a deceptive practice when "reasonable consumers were likely to (and, in fact, did) rely on" statements from the defendant); *Vacation Commc'ns Grp.*, 2014 WL 12823960, at *8.
[159] *See, e.g.*, *Jeanty*, 305 F. Supp. 2d at 966 (lender that used model form nonetheless violated TILA by not disclosing borrower's insurance premium in monthly payment amount, since "[i]t is not unreasonable to expect a lender to modify a form so as to accurately disclose the regular payments due on a loan.").
[160] 12 C.F.R. pt. 1026, supp. i, pt. 3, cmt. 41(d)(1) (official CFPB interpretation of § 1026.41(d)(1)(iii) regarding periodic statements issued by mortgage servicers to reinstate loans), *orig. pub'd* at 76 Fed. Reg. 79772 (Dec. 22, 2011).
[161] 15 U.S.C. § 1601(a). *Cf. Goldman v. First Nat. Bank of Chicago*, 532 F.2d 10, 22 (7th Cir. 1976) (In enacting TILA, "Congress clearly sought to compel accurate disclosure.").
[162] Supplement I to Part 26, Official Interpretation of 12 C.F.R. § 1026.41(d)(1).
[163] 12 C.F.R. § 1026.41(a)(1), 1026.41(a)(2).
[164] SOF ¶ 58.

borrowers inaccurate periodic statements.[165] This Court should thus find that Ocwen violated 12 C.F.R. § 1026.41(a)(2).

## IV. OCWEN VIOLATED RESPA, HPA, AND THE CFPA THROUGH NUMEROUS ESCROW AND INSURANCE SERVICING FAILURES.

RESPA and the HPA impose obligations on servicers related to escrow accounts and insurance. Undisputed facts show that Ocwen violated RESPA and the HPA. Because RESPA and the HPA are "federal consumer financial laws" and each Defendant is a covered person under the CFPA, Defendants' violations of those laws are also violations of the CFPA.[166]

### A. Ocwen is subject to RESPA as a servicer of federally related mortgage loans.

The RESPA requirements at issue in this litigation apply to "servicers."[167] For purposes of RESPA, a servicer is "a person responsible for the servicing of a federally related mortgage loan," and servicing, in turn, is "receiving any scheduled periodic payments from a borrower. . . and making the payments to the owner of the loan or other third parties of principal and interest . . . ."[168] A "federally related mortgage loan" is a loan that is secured by a lien on residential real property designed principally for the occupancy of one to four families and that meets any one of four additional criteria.[169]

Each Defendant is a servicer under RESPA because each (1) engaged in servicing of (2) federally related mortgage loans. First, each Defendant engaged in servicing mortgage loans. OLS (and PHH as successor-by-merger to OLS) and OMS admit that they have engaged in mortgage servicing continuously since January 2014.[170] OFC also engaged in servicing, including receiving payments from borrowers, throughout the Relevant Period,[171] and acknowledged it "must comply" with RESPA.[172] OFC's 2016 payment processing procedures state, for example, that it "accepts payments through various methods" and documents its (and its subsidiaries') processes and activities "related to processing payments."[173] OFC directly

---

[165] SOF ¶¶ 127, 131–133, 135–143, 146, 149–154, 175, 177, 188–190, 207, 210–211, 250, 252.
[166] 12 U.S.C § 5536(a)(1)(A).
[167] *See* 12 C.F.R. §§ 1024.17(f)(1) (escrow analyses); 1024.17(f)(3) (escrow shortages); 1024.17(i) (annual escrow statements); 1024.17(k)(1) (timely payments from escrow accounts).
[168] 12 C.F.R. § 1024.2(b) (definitions of "servicer" and "servicing") (internal citations omitted).
[169] 12 U.S.C. § 2602(1).
[170] SOF ¶¶ 21–28.
[171] SOF ¶¶ 9–20, 32.
[172] SOF ¶ 102.
[173] SOF ¶ 13.

managed the processing of mortgage payments, hired vendors to perform Ocwen's payment processing work, and audited Ocwen's payment-processing (*i.e.*, "cashiering") activities, including those conducted by its vendors.[174]

Second, Ocwen serviced federally related mortgage loans throughout the Relevant Period because the loans it serviced were secured by liens on residential real property designed principally for the occupancy of one to four families that were: (1) originated by creditors regulated by, or whose deposits were regulated by, a federal agency; (2) originated by creditors that originated more than $1 million in loans annually; (3) insured by a federal agency; or (4) guaranteed by a GSE (Fannie Mae, Freddie Mac, or Ginnie Mae).[175] Ocwen's servicing of federally related mortgage loans includes the loans at issue in this case.[176]

Because Ocwen serviced federally related mortgage loans, RESPA and Regulation X apply to Ocwen's conduct here, as Ocwen itself has acknowledged.[177]

**B. Ocwen violated 12 C.F.R. § 1024.17(c)(3) by failing to conduct escrow account analyses annually (Bureau Count VII).**

Regulation X requires that a servicer conduct an "escrow account analysis" once per year for each borrower with an escrow account.[178] As described above, an escrow account analysis is the accounting the servicer performs to determine whether it collected too much or too little money from the borrower for escrow disbursements—that is, payments for a borrower's taxes and home insurance—during the previous "escrow account computation year."[179] The analysis must also determine the monthly amount the servicer needs to collect for the upcoming year.[180] The escrow account analysis must be completed for each escrow account at the completion of the relevant computation year.[181]

From January 1, 2014 through January 8, 2018, Ocwen failed to conduct 391,603 escrow

---

[174] SOF ¶¶ 13, 16–20, 39 (OFC executives oversee all Ocwen operations, including cashiering).
[175] SOF ¶¶ 58–62.
[176] SOF ¶¶ 167–168, 170–171, 199–200, 209–210, 259–260 (Ocwen's discovery responses identifying federally related mortgages for the applicable loan populations).
[177] SOF ¶ 101 (10Ks: acknowledging that Ocwen "must comply with a large number of federal, state and local consumer protection laws including…RESPA). *See also id*. ¶¶ 158, 164, 168, 202.
[178] 12 C.F.R. § 1024.17(f)(1)(i) (requiring an annual analysis "for each escrow account").
[179] *Id.* § 1024.17(b). An "escrow account computation year" (computation year) is the 12-month period that a servicer establishes for an escrow account, beginning with the initial payment date, and the subsequent 12-month period, unless a servicer chooses to issue a short year statement. *Id.*
[180] *Id.* § 1024.17(b) (defining escrow account analysis).
[181] *Id.* § 1024.17(f)(1)(i).

account analyses at the completion of the relevant computation year for 389,668 borrowers,[182] violating 12 C.F.R. § 1024.17(c)(3) in each instance.[183] Ocwen's failure to perform these escrow analyses is not disputed.[184] And Ocwen itself was well aware of its escrow analysis obligations and the legal implications of its failure to comply well before the Relevant Period: On July 21, 2013 Ocwen issued an audit in which the company itself concluded it was routinely violating this legal requirement.[185] As Ocwen's own audit stated:

> Ocwen is not following the RESPA requirements as per Section 3500.17(c)(3) related to conducting an annual escrow analysis in situations where the borrower is more than 30 days overdue, or where the servicer has brought an action for foreclosure under the underlying mortgage loan, or where the borrower is in a bankruptcy case. . .Non-compliance with RESPA requirements can subject Ocwen to fines and penalties. . . . Management agrees that RESPA requires an annual escrow analysis for loans that are greater than 30 days delinquent.[186]

The Court should therefore find that Ocwen violated 12 C.F.R. § 1024.17(c)(3).

### C. Ocwen violated 12 C.F.R. § 1024.17(i) by failing to send annual escrow account statements to borrowers within 30 days of the end of the escrow account computation year (Bureau Count VII).

Regulation X requires a servicer to send each borrower with an escrow account an annual escrow account statement within 30 days of the end of the computation year,[187] unless the borrower is more than 30 days overdue, in foreclosure, or in a bankruptcy proceeding when the servicer conducts the escrow account analysis.[188] From January 1, 2014 through January 8, 2018, Ocwen failed to send timely statements to numerous borrowers who should have received them.[189] Ocwen acknowledges that it failed to send 147,589 annual escrow account statements

[182] SOF ¶¶ 168–171.
[183] *See, e.g.*, *In re Dominique*, 368 B.R. 913, 916, 922 (Bankr. S.D. Fla. 2007) (RESPA and Regulation X "unambiguously and unequivocally impose upon a loan servicer the obligation to do an escrow analysis annually"; servicer barred from recovering escrow shortage for each prior year that servicer failed to conduct required analysis).
[184] SOF ¶¶ 158, 164, 168–171.
[185] SOF ¶ 164.
[186] SOF ¶ 164. Ocwen's audit cited to a previously applicable regulation, 24 C.F.R. § 3500.17(c)(3), which is identical to the requirement recodified at 12 C.F.R. § 1024.17(c)(3) after the Bureau took over responsibility for enforcing and promulgating regulations under RESPA.
[187] 12 C.F.R. § 1024.17(i).
[188] *Id*. § 1024.17(i)(2).
[189] SOF ¶¶ 198–201.

within 30 days of the computation year to borrowers who were not delinquent.[190] Ocwen was required to timely send these statements, it failed to do so, and its failure violated the law. As OFC's Director of Servicing Compliance wrote in 2014: "Escrow notices not compliant with RESPA, not sent timely or not sent at all are huge."[191] The Court should therefore find that Ocwen violated 12 C.F.R. § 1024.17(i).[192]

**D. Ocwen violated 12 C.F.R. § 1024.17(f)(3) by requiring borrowers to make escrow shortage payments that duplicated what they had already paid in a lump sum (Bureau Count VII).**

A servicer may not require a borrower to pay into an escrow account—including to repay escrow shortages—more than Regulation X permits.[193] A servicer may require monthly payments of no more than one-twelfth of the total estimated escrow disbursements for the year, plus a "cushion" of no more than one-sixth of this total, and—as most relevant here—such "additional deposits to make up a shortage or deficiency."[194]

A shortage occurs when an escrow account analysis finds that the account's balance falls short of the estimated amount needed to cover disbursements for the year.[195] When a shortage is equal to or greater than one month's escrow account payment, RESPA allows a servicer to either (1) ignore the shortage or (2) require payment to make up the shortage.[196] When a servicer elects to charge the borrower to repay the shortage, the servicer must spread out the shortage payments into equal monthly payments due over no less than a 12-month period.[197]

From 2014 through at least 2018, Ocwen required borrowers to pay purported escrow shortages that no longer existed.[198] When Ocwen became aware of escrow shortages, Ocwen notified the impacted borrowers of the option to: (1) make a full or partial payment to reduce the escrow shortage; or (2) pay an additional amount each month—on top of their usual mortgage payments—to collect those shortages.[199] Certain borrowers elected the first option to reduce, if

---

[190] SOF ¶¶ 198–201.
[191] SOF ¶ 202.
[192] *See, e.g.*, *Greene v. Benefit Mortg. Corp.*, No. 08-12968, 2009 WL 56056, at *4 (E.D. Mich. Jan. 8, 2009) (failure to provide timely escrow statements to current borrowers violates RESPA).
[193] 12 C.F.R. § 1024.17(c)(1).
[194] 12 C.F.R. § 1024.17(c)(1)(ii).
[195] *Id.* § 1024.17(b) (defining "escrow shortage").
[196] *Id.* § 1024.17(f)(3)(ii).
[197] *Id.* § 1024.17(f)(3)(ii).
[198] SOF ¶¶ 203–211.
[199] SOF ¶ 203.

not eliminate, the extra monthly shortage payments.[200] Although Ocwen received their shortage payments, it failed to lower the monthly shortage amount being collected from the borrower to account for the lump-sum payment, and thus collected extra monthly shortage amounts no longer owed by the borrowers.[201] Ocwen testified that this over-collection of shortages occurred in each of the years 2014 through 2018.[202] Because Ocwen required borrowers to pay shortages that did not exist, Ocwen violated 12 C.F.R. § 1024.17(f)(3).

**E. Ocwen violated RESPA by failing to pay insurance premiums before the penalty deadline (Bureau Count VII).**

Under RESPA, when a servicer requires a borrower to make payments into an escrow account for taxes, insurance premiums, or other charges related to the property, then the servicer must make those payments to the relevant third party "in a timely manner as such payments become due as long as the borrower's payment is not more than 30 days overdue."[203] Regulation X clarifies that "timely manner" means "on or before the deadline to avoid a penalty."[204]

Ocwen failed to pay insurance premiums for many current borrowers by the penalty deadline in 2014, 2015, and 2016.[205] Ocwen has acknowledged late payments due to errors by Ocwen or its vendors in the following: (1) a sworn interrogatory response identifying 1,367 borrowers whose insurance policies were cancelled;[206] and (2) communications with its vendor where Ocwen demands explanation for "approximately 40,000 premium disbursements that were not timely processed."[207] Ocwen also acknowledges Florida-specific borrowers whose insurance policies were cancelled because of late payments due to errors by Ocwen or its vendor.[208] Thus, the Court should find that Ocwen violated 12 U.S.C. § 2605(g) and 12 C.F.R. § 1024.17(k)(1).

**F. Ocwen violated the HPA by failing to cancel private mortgage insurance on the termination date (Bureau Count X).**

Under the HPA, a servicer must automatically terminate a requirement for a borrower to

[200] SOF ¶¶ 204–205.
[201] SOF ¶¶ 205–207, 211.
[202] SOF ¶ 207.
[203] 12 U.S.C. § 2605(g).
[204] 12 C.F.R. § 1024.17(k)(1). *See also*, *e.g.*, *Luberda v. Regions Bank*, No. 4:10 CV 1638 DDN, 2011 WL 2600412, at *3 (E.D. Mo. June 29, 2011) ("Although the statute does not define a 'timely manner,'" it means in time to avoid penalties.).
[205] SOF ¶¶ 212–231.
[206] SOF ¶ 222.
[207] SOF ¶¶ 218–220.
[208] SOF ¶¶ 225–227.

pay for PMI "in connection with a residential mortgage transaction" on the "termination date" if the borrower is current on that date.[209] The termination date is defined as the date that the borrower's principal balance drops to 78% of the home's original value.[210] A "residential mortgage transaction" is a transaction consummated on or after July 29, 1999, in which a mortgage or other security interest is created against a single-family dwelling that is the principal residence of the mortgagor.[211]

In each of the years 2014 through 2018, Ocwen violated this requirement for numerous borrowers by: (1) failing to terminate PMI on the termination date; (2) in connection with residential mortgage transactions; for (3) borrowers who were current.[212] Ocwen identified 7,770 borrowers for whom it should have, but failed to, terminate PMI on the termination date.[213] This Court should therefore find that Ocwen violated 12 U.S.C. § 4902(b)(1).

## V. OCWEN VIOLATED RESPA AND THE CFPA THROUGH ITS FORECLOSURE PRACTICES.

The undisputed facts show that Ocwen violated RESPA and the CFPA in its foreclosure practices. As described above, because RESPA is a federal consumer financial law under the CFPA and each of the Defendants is a covered person, their violations of RESPA also constitute violations of the CFPA.[214]

### A. Ocwen violated RESPA by initiating foreclosure proceedings while it was still evaluating borrowers for loss mitigation options to save their homes (Bureau Count IX).

RESPA and Regulation X prohibit servicers from initiating foreclosure proceedings (*i.e.*, commencing a first notice or filing of foreclosure) until a servicer evaluates a borrower's Complete Application and sends an Evaluation Notice, as defined in Regulation X.[215]

Ocwen acknowledges in a sworn interrogatory response that it commenced first notices or filings against 124 borrowers who had submitted Complete Applications that Ocwen had not

---

[209] 12 U.S.C. § 4902(b)(1); 12 U.S.C. § 4901(18) (definition of "termination date"); *see also Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 596 (3d Cir. 2017).
[210] 12 U.S.C. § 4901(18); *Fried*, 850 F.3d 590 at 596.
[211] 12 U.S.C. § 4901(15).
[212] SOF ¶¶ 246–252.
[213] SOF ¶¶ 248, 252.
[214] 12 U.S.C § 5536(a)(1)(A).
[215] 12 C.F.R. § 1024.41(f)(2).

yet evaluated.[216] Thus, the Court should find that Ocwen violated 12 C.F.R. § 1024.41(f)(2) in each of these instances.

### B. Ocwen violated the CFPA by sending deceptive foreclosure-related letters (Bureau Count III).

As described in Section III.D above, a communication is deceptive in violation of the CFPA if it involves a material representation that is likely to mislead reasonable consumers.

Ocwen made deceptive communications when it promised borrowers that they would "not lose [their] home[s] during the evaluation process" for loss mitigation options, and then proceeded to foreclose on those borrowers before the end of that process, causing those borrowers to lose their homes.[217] Specifically, Ocwen sent letters to at least 45 borrowers requesting additional documents as part of its evaluation of their loss mitigation applications.[218] These letters informed borrowers that:

> You may receive foreclosure/eviction notices – delivered by mail or in person – or you may see steps taken to proceed with a foreclosure sale of your home. ***While you will not lose your home during the evaluation process***, to protect your rights under applicable foreclosure law, you may need to respond to these foreclosure notices or take other actions.[219]

The letters also included an explicit deadline by which the borrowers could submit any outstanding documents.[220] Despite this deadline and assurance that borrowers would not lose their homes during the evaluation, Ocwen foreclosed on these borrowers before the deadlines stated in the letters, and the borrowers lost their homes.[221] Ocwen acknowledges these facts in a sworn report provided in response to a civil investigative demand issued by the Bureau during its investigation of Ocwen.[222]

The representations in these 45 letters were deceptive under the CFPA. Ocwen told the borrowers they had a certain amount of time to return the requested information before Ocwen

---

[216] SOF ¶¶ 258–260. There are certain exclusions to Regulation X, 12 C.F.R. § 1024.41(i), and Ocwen already applied these exclusions to its interrogatory response.
[217] SOF ¶¶ 261–264.
[218] SOF ¶ 264.
[219] SOF ¶ 262 (bold emphasis added, underline emphasis in original).
[220] SOF ¶ 262.
[221] SOF ¶¶ 263–264.
[222] SOF ¶¶ 263–264.

would foreclose on their loans; it is reasonable for borrowers to rely on such express promises.[223] And assurances from a mortgage servicer that borrowers will not lose their homes before a certain date are without any doubt "information that is important to consumers" and therefore likely to affect their conduct.[224] Had consumers not been explicitly told that they were safe until a given date, they could have pursued other strategies for preventing foreclosure, such as local emergency funds, bankruptcy, or help from family or friends. Moreover, expressly false representations are inherently likely to mislead and presumed material.[225] This Court should therefore find that Ocwen's representations in the 45 letters were deceptive in violation of the CFPA.

## VI. DEFENDANTS ACTED AS A COMMON ENTERPRISE.

Defendants acted as a common enterprise, and as a result they are jointly and severally liable for each violation described above.

A corporate entity can be held liable for the conduct of other entities "where the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities."[226] In determining whether entities are a common enterprise, courts consider a variety of factors, such as whether the companies share office space and employees, commingle funds, coordinate advertising efforts, and operate under common control.[227] The Bureau "need not establish that all of the common enterprise factors [are] present," as "[n]o one factor is determinative."[228]

---

[223] *FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050 CIV, 2004 WL 5149998, at *33 (S.D. Fla. Feb. 20, 2004) (consumer reliance on express statements is presumptively reasonable); *FTC v. 1st Guar. Mortg. Corp.*, No. 09-CV-61840, 2011 WL 1233207, at *14 (S.D. Fla. Mar. 30, 2011) (consumers reasonably believed express promises about loan modifications).

[224] *1st Guar. Mortg. Corp.*, 2011 WL 1233207, at *12, 14 (offers to reduce borrowers' mortgage payments and modify loans were "express claims that were material to consumers," and misled reasonable consumers, express offers to consumer are presumptively material). *See also*, *e.g.*, *Johnson v. Specialized Loan Servicing, LLC*, No. 3:16-CV-178-J-MCR, 2018 WL 4403838, at *8 (M.D. Fla. Sept. 17, 2018) (vacated on other grounds) (servicer's representation that it would not continue with foreclosure while reviewing borrower's loss mitigation application was deceptive because the servicer moved forward before the letter's deadline, and thus the servicer's "representation provided Plaintiff with a false sense of security").

[225] *See, e.g.*, *Vacation Commc'ns Grp.*, 2014 WL 12823960 at *7 (citations omitted).

[226] *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1282 (S.D. Fla. 2019) (citation and quotation marks omitted).

[227] *FTC v Lanier Law, LLC*, 715 F. App'x 970, 979-80 (11th Cir. 2017).

[228] *Pointbreak Media*, *LLC*, 376 F. Supp. 3d at 1283.

**A. Defendants operated under common control, acted as one entity, shared key employees and offices, and critical resources.**

Here, the undisputed facts show the Defendants acted as a common enterprise through a maze of integrated entities.[229] First, Defendants acted under the common control of OFC.[230] Second, Defendants acted as one entity when servicing loans.[231] Third, Defendants shared employees and office space,[232] as well as resources for critical services.[233]

*1. Defendants operated under the common control of OFC.*

OFC is the parent company of OMS, and OMS was the parent company of OLS until OLS merged into PHH on June 1, 2019.[234] As described above, PHH assumed OLS's servicing obligations (and liability for the conduct addressed in this litigation) as its successor-by-merger.[235] PHH is a wholly owned subsidiary of OFC.[236]

OFC exercised control over OMS and OLS, including through: (1) OFC's supervision and direction of all servicing functions performed by the three companies; (2) OFC's creation of policies and procedures for servicing functions applicable to each of the three companies; and (3) OFC's auditing of servicing operations performed by the three companies.

---

[229] *See Pointbreak Media*, *LLC*, 376 F. Supp. 3d at 1282.
[230] *See, e.g.*, *FTC v. Wolf*, No. 94–8119–CIV–WDF, 1996 WL 812940, at *3 (S.D. Fla Jan. 31, 1996) (common enterprise existed where the same individuals controlled and oversaw the day-to-day operations of thirty corporate defendants, treating them as if they were "divisions of one large corporation.").
[231] *See, e.g.*, *FTC v. Wash. Data Res.*, 856 F. Supp. 2d at 1272 (common enterprise existed where employees "failed to recognize a distinct corporate demarcation between each company"); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1184 (N.D. Ga. 2008) (common enterprise existed where companies shared expenses and "all worked together to achieve profitability").
[232] *See, e.g.*, *FTC v. Direct Benefits Grp.*, *LLC*, No. 6:11-CV-1186-ORL-28, 2013 WL 3771322, at *18 (M.D. Fla. July 18, 2013) (common enterprise existed when corporate entities "operated out of the same office space . . . with common employees and shared equipment"); *Wash. Data Res.*, 856 F. Supp. 2d at 1271–72 (common enterprise existed where "important" employees and officers worked for both companies).
[233] *See, e.g.*, *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010) (finding a common enterprise where the "companies pooled resources, staff, and funds"); *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015) (finding a common enterprise where companies shared offices, staff, accounts, and resources).
[234] SOF ¶¶ 3–5, 7.
[235] SOF ¶ 28; *see*, *e.g.*, *Wilson*, 2019 WL 5840325, at *3 (PHH admitted it stepped into the shoes of OLS as successor-by-merger); *Cuervo*, 984 F. Supp. 2d at 1340 (successor who assumes predecessor's obligations is liable for predecessor's violations).
[236] SOF ¶ 8.

First, OFC personnel, such as its CEO Ronald Faris, its Chief Servicing Officer Scott Anderson, and other OFC executives, oversaw all servicing functions conducted by the three companies.[237] Senior executives at OMS and OLS responsible for servicing operations reported directly to Anderson.[238] Further, in this litigation, Defendants designated the same corporate witnesses, most of whom were OFC senior executives, to testify on behalf of OFC, OLS, and OMS about their servicing activities.[239] OFC executives also verified interrogatory responses in this litigation from OFC, OMS, and OLS.[240]

Second, OFC established uniform policies and procedures not only for itself but also for OLS and OMS.[241] For example, OFC established procedures for cashiering, escrow, insurance-vendor management, and foreclosure which are intended for use by "Ocwen Financial Corporation ("Ocwen") and all of its domestic and international subsidiaries (collectively "Ocwen" or "Company") . . . [and] applies to all Ocwen personnel and contractors."[242]

Third, OFC audited all Defendants' servicing activities, such as the receipt and application of borrowers' payments (*i.e.*, cashiering activities), escrow, and vendor activities.[243]

*2. Defendants acted as one organization, "Ocwen," in their servicing activities and in dealing with external parties.*

Defendants also operated as if they were one organization when servicing loans and engaging with third parties, including the government, borrowers, and other third parties.

Faris, Anderson, and their subordinates all testified that there was no distinction between the corporate entities in their day-to-day servicing operations.[244] The corporate witnesses who were designated to testify on behalf of OFC, OMS, and OLS also responded to questions—including detailed questions about Defendants' servicing activities—without distinguishing among the entities.[245] Ocwen employees who were fact witnesses echoed such testimony. Anderson, whose title was Chief Servicing Officer for OFC, testified that he "assume[d]" that he worked for another Ocwen entity in addition to OFC; he understood that he worked for OFC

---

[237] SOF ¶¶ 35–47.
[238] SOF ¶¶ 36, 39, 41–42, 44–45.
[239] SOF ¶ 29.
[240] SOF ¶¶ 165–166, 258.
[241] SOF ¶¶ 13–15.
[242] SOF ¶¶ 13–15.
[243] SOF ¶¶ 19–20, 100, 144, 205.
[244] SOF ¶¶ 29–33, 40, 47.
[245] SOF ¶¶ 29–33.

only because "[f]olks in HR told [him] that," and the entity that he works for "doesn't affect [his] job one way or the other."[246] And when asked which of the Defendants employed him, OFC's Director of Pre-Foreclosure, Tom Arnett, testified: "I only know of one Ocwen."[247]

Defendants also acted as a single organization when engaging with the government and public. For example, [redacted].[248] OFC similarly responded on behalf of itself and OLS in communicating with Fannie Mae, a government-sponsored guarantor of loans that Ocwen serviced.[249] And all Defendants routinely enter into settlements when regulators have found unlawful mortgage servicing conduct by "Ocwen."[250] Finally, when engaging with borrowers, Defendants also presented themselves as one organization: they have one Ocwen website,[251] on which they posted videos of "OFC" or "Ocwen" employees helping borrowers.[252]

*3. Defendants share key staff, resources, and funds.*

Defendants shared key employees.[253] Faris was the CEO of OFC from 2010 to 2018, and during that time he also acted as a manager of OLS from at least 2014 to 2017 and a director at OMS from at least 2014 to 2015.[254] Indeed, Faris testified that while his "primary titles" were at OFC, "generally we [OFC executives] would hold titles at subsidiaries as well including [OLS]," and that key executives played "a sort of oversight role or . . . management role" at OFC, OMS, and OLS.[255] OFC's top servicing officer, Anderson, directly supervised senior executives at OMS and OLS,[256] and John Patrick Cox, OMS's and OLS's senior vice president for default servicing, supervised and reported to OFC employees.[257] And corporate witnesses designated to testify for OLS and OMS, as well as former "Ocwen" employees, all testified either that they also worked for OFC or did not know which Defendant employed them.[258]

---

[246] SOF ¶ 40.
[247] SOF ¶ 33.
[248] SOF ¶ 55.
[249] SOF ¶ 54.
[250] SOF ¶¶ 11, 57.
[251] SOF ¶ 52.
[252] SOF ¶ 53.
[253] SOF ¶¶ 35–36, 39–47.
[254] SOF ¶ 35.
[255] SOF ¶ 36.
[256] SOF ¶¶ 39, 41–45.
[257] SOF ¶¶ 41–43.
[258] SOF ¶¶ 30, 32–33, 36, 40.

Defendants shared office space as well. OFC and OLS used the same office in West Palm Beach, Florida.[259] And key OFC executives, including its Chairman of the Board, General Counsel, and Chief Risk Officer, were located at OMS's office in the U.S. Virgin Islands.[260]

Defendants also shared critical resources, such as technology and payment-processing services.[261] For example, OFC contracted with Altisource, paying about $93 million over approximately one year alone, for technology services that were used by OFC, OMS, and OLS, including, most significantly, the platform they used to service loans.[262]

**B. Because Defendants acted as a common enterprise, they are jointly and severally liable for each violation.**

Common enterprise liability exists for all laws at issue here. First, as this Court has recognized, common enterprise liability exists for violations of the CFPA.[263] Because a covered person's violation of a Federal consumer financial law violates the CFPA, common enterprise liability exists for all of the unlawful conduct at issue.[264] Further, courts, including this one, have also directly applied common enterprise liability under TILA and the FDCPA.[265]

The same reasoning that supports common enterprise liability under TILA and the FDCPA, is equally applicable to RESPA and the HPA. Courts apply common enterprise liability to a statute when it protects the public from harm and failing to apply the doctrine would "enable the corporate device to be used to circumvent the policy of the statute."[266] Under this reasoning, courts have "appl[ied] common enterprise liability to other financial protection statutes."[267] Both

---

[259] SOF ¶ 48.
[260] SOF ¶ 49.
[261] SOF ¶¶ 16–18, 50–53.
[262] SOF ¶¶ 50, 82.
[263] Order on Mot. to Dismiss, Sept. 5 2019 (ECF No. 452), at 22–23 (collecting cases).
[264] *See* 12 U.S.C. § 5536(a)(1)(A)(making it a violation of the CFPA for any covered person to "commit any act or omission in violation of a Federal consumer financial law"). *See also*, *e.g.*, *Frederick J. Hanna & Assocs.*, *P.C*, 114 F. Supp. 3d at 1380 (violation of FDCPA constitutes violation of CFPA).
[265] *See* Order on Mot. to Dismiss, Sept. 5 2019 (ECF No. 452), at 23 ("The Court also finds that the common enterprise liability theory has been applied to claims arising under TILA and the FDCPA" and collecting cases).
[266] *CFPB v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *16 (S.D.N.Y. Dec. 2, 2016) (citation and quotation marks omitted).
[267] *Id*. (citing *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 508 (S.D.N.Y. 2004)).

RESPA and the HPA were enacted to protect consumers from harm.[268] As with TILA and the FDCPA, Defendants should not be allowed to circumvent these public-interest goals solely because of their corporate structure.

Because Defendants operated as a common enterprise and common enterprise liability is applicable to all statutes at issue in this litigation, Defendants are jointly and severally liable for the violations discussed herein.

## VII. CONCLUSION

For the foregoing reasons, this Court should grant partial summary judgment in favor of the Bureau on its Counts I–VII, IX, and X.

[268] *See* 12 U.S.C. § 2601 (Congress found that RESPA was necessary "to insure that consumers" are protected from certain abusive practices and reduce "amounts home buyers are required to place in escrow accounts."); S. Rep. 105–129, at *3 (1997) (when enacting the HPA, finding that "carrying costs for unnecessary PMI can be significant" and "excessive PMI coverage does not benefit the homeowner.")

Date: December 4, 2020

Respectfully submitted,

Attorneys for Plaintiff,
CONSUMER FINANCIAL PROTECTION BUREAU

JOHN C. WELLS
Deputy Enforcement Director

JAMES T. SUGARMAN
Assistant Litigation Deputy

/s/ Jean M. Healey Dippold
Jean M. Healey Dippold
Phone: 202-435-7514
E-mail: jean.healeydippold@cfpb.gov

| | |
|---|---|
| Atur Desai | atur.desai@cfpb.gov |
| Shirley Chiu | shirley.chiu@cfpb.gov |
| Tianna Baez | tianna.baez@cfpb.gov |
| Amanda Roberson | amanda.roberson@cfpb.gov |
| Stephanie Brenowitz | stephanie.brenowitz@cfpb.gov |
| Erin Mary Kelly | erin.kelly@cfpb.gov |
| James Savage | james.savage@cfpb.gov |
| Greg Nodler | greg.nodler@cfpb.gov |
| Michael Posner | michael.posner@cfpb.gov |
| Jack Douglas Wilson | doug.wilson@cfpb.gov |

1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722