**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION; OCWEN MORTGAGE SERVICING, INC.; OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page(s)**

I. DEFENDANTS' CORPORATE STRUCTURE, BUSINESS, AND RELEVANT BACKGROUND .......... 1

A. Defendants had common ownership during the Relevant Period .......... 1

B. Defendants individually and, as a common enterprise, service mortgage loans .......... 1

1. OFC is a mortgage servicer .......... 1

2. OMS is a mortgage servicer .......... 4

3. OLS was a mortgage servicer and was succeeded by PHH .......... 4

4. Defendants operated as a common enterprise .......... 5

5. Defendants serviced residential mortgage loans .......... 10

II. RELEVANT BACKGROUND .......... 11

A. Ocwen grew rapidly from 2009 through 2013 .......... 11

B. Ocwen entered into a lengthy technology contract with Altisource with few protections and despite the acknowledged risk of "conflicts of interest." .......... 12

C. Ocwen contracted with an ill-prepared insurance vendor .......... 15

D. Ocwen was not technologically prepared to handle its explosive growth .......... 15

E. Entering 2014, Ocwen's compliance program was ill-prepared to meet its legal obligations .......... 18

III. OCWEN'S SERVICING FAILURES .......... 21

A. Ocwen serviced loans using inaccurate and incomplete information .......... 21

1. Ocwen had a loan-verification process to confirm the accuracy of information it entered into its system of record .......... 21

2. Ocwen serviced loans that it boarded onto its system of record for extended periods, often years, without performing its loan-verification process .......... 23

3. When Ocwen verified loans, it found discrepancies in the information in its system of record. .......... 24

4. Because it maintained inaccurate loan information in its system of record, Ocwen collected wrong amounts from borrowers and denied loss mitigation applications .......... 25

B. Ocwen failed to meet numerous escrow and insurance requirements. .......... 29

1. Ocwen failed to conduct escrow account analyses at the end of the escrow account computation year .......... 30

2. Ocwen failed to send borrowers' annual escrow account statements within 30 days of the escrow account computation year ..... 36

3. Ocwen required borrowers to pay shortage amounts that they had already paid ..... 36

4. Ocwen failed to pay insurance premiums on time, paid some premiums twice, and force-placed flood insurance on borrowers whose properties were not in flood zones ..... 38

5. Ocwen failed to cancel private-mortgage insurance when it was required to ..... 43

C. OLS failed to send accurate loan modification agreements to borrowers. ..... 44

D. Ocwen failed to comply with requirements relating to foreclosures ..... 45

1. Ocwen commenced illegal foreclosure proceedings on borrowers' loans ..... 45

2. Ocwen sent deceptive foreclosure letters to borrowers ..... 45

| PLAINTIFF'S EXHIBIT KEY | | |
|---|---|---|
| **SJX No.** | **Abbreviated name** | **Description of Exhibit** |
| 1 | Ocwen 2009 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2009 (Form 10-K) (Mar. 8, 2010) |
| 2 | Ocwen 2013 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2013 (Form 10-K) (Mar. 3, 2014) |
| 3 | Ocwen 2014 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2014 (Form 10-K) (May 11, 2015) |
| 4 | Ocwen 2015 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2015 (Form 10-K) (Feb. 29, 2016) |
| 5 | Ocwen 2016 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2016 (Form 10-K) (Feb. 22, 2017) |
| 6 | Ocwen 2017 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2017 (Form 10-K) (Feb. 28, 2018) |
| 7 | Ocwen 2018 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2018 (Form 10-K) (Feb. 27, 2019) |
| 8 | Ocwen 2019 10-K | Ocwen Financial Corporation, Annual Report for the year ended December 31, 2019 (Form 10-K) (Feb. 26, 2020) |
| 9 | Ocwen 10-Q, Aug. 4, 2009 | Ocwen Financial Corporation, Quarterly Report, August 4, 2009 (Form 10-Q) |
| 10 | Ocwen 2013 10-K/A | Ocwen Financial Corporation, Amended Annual Report, filed Aug. 18, 2014 |
| 11 | OLS 2014 Filing | Ocwen Loan Servicing 2014 Foreign LLC Annual Report, filed April 12, 2014 |
| 12 | OLS 2016 Filing | Ocwen Loan Servicing 2016 Foreign LLC Annual Report, filed April 15, 2016 |
| 13 | OLS 2017 Filing | Ocwen Loan Servicing 2017 Foreign LLC Annual Report, filed April 13, 2017 |
| 14 | OLS 2015 Am. Filing | Ocwen Loan Servicing 2015 Foreign LLC Amended Annual Report, filed Feb. 4, 2015 |
| 15 | OMS 2014 Am. Filing | Ocwen Mortgage Servicing 2014 Foreign Profit Corp. Amended Annual Report, filed Dec. 23, 2014 |
| 16 | OMS 2014 Filing | Ocwen Mortgage Servicing 2014 Foreign Profit Corp. Annual Report, filed April 14, 2014 |
| 17 | OMS 2015 Filing | Ocwen Mortgage Servicing 2015 Foreign Profit Corp. Annual Report, filed Feb. 3, 2015 |
| 18 | Ally Feb. 2, 2012 Press Release | Ally Financial Reports Preliminary Fourth Quarter and Full Year 2011 Financial Results, Feb. 2, 2012 |
| 19 | Feb. 27, 2019 Press Release | Press Release announcing Hayes retirement, Feb. 27, 2019 |
| 20 | Oct. 24, 2012 Press Release | ResCap Acquisition Press Release, Oct. 24, 2012 |
| 21 | May 2, 2013 Press Release | OFC Press Release "Ocwen Financial Announces Operating Results for First Quarter 2013," May 2, 2013 |

| | | |
|---|---|---|
| 22 | MD Consent Order Feb. 23, 2018 | Consent Order between Ocwen & MD Office of the Commissioner of Financial Regulation, Feb. 23, 2018 |
| 23 | Washington Consent Order | In the Matter of Determining Whether there has been a violation of the Consumer Loan Act of Washington by Ocwen Loan Servicing LLC et al, (C-16-1867-16-C001) (August 23, 2016) |
| 24 | NY DFS Consent Order Dec. 22, 2014 | In the Matter of Ocwen Fin. Corp., Ocwen Loan Serv., LLC, New York State Dep't of Fin. Serv. Dec. 22, 2014 Consent Order |
| 25 | Freddie Mac FL Mortg. Form | Freddie Mac's Florida Mortgage Form 3010 |
| 26 | https://files.consumerfinance.gov/f/201212_CFPB_depository-institutions.pdf | CFPB Depository Institutions Based on Dec. 31, 2012 Total Assets |
| 27 | Screenshot "Contact Us" webpage | Screenshot of http://www.ocwen.com/commercial/contact-us |
| 28 | Screenshot "Ocwen Cares" webpage | Screenshot of http://www.ocwencares.com/homeowners/ |
| 29 | Ocwen - Finding Resolution Video | "Finding Resolution for Borrowers Across the Country" video, http://www.ocwencares.com/homeowners/ |
| 30 | Ocwen - Keeping You in Home Video | "Keeping You in Your Home" video, http://www.ocwencares.com/homeowners/ |
| 31 | Ocwen - Connecting with Homeowners Video | "Connecting with Homeowners Everywhere" video, http://www.ocwencares.com/homeowners/ |
| 32 | Arnett 30(b)(6) 5/22/19 Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Thomas Arnett, May 22, 2019 |
| 33 | Haas 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Steven Haas, May 15, 2019 |
| 34 | Kennedy 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Christopher Kennedy, May 30, 2019 |
| 35 | Sebastian 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Krysta Sebastian, May 21, 2019 |
| 36 | Abate 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Paul Abate, May 21, 2019 |
| 37 | Aery 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Parveen Aery, May 15, 2019 |
| 38 | Combs 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Andrew Combs, May 29, 2019 |
| 39 | Goodman 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Sherri Goodman, May 22, 2019 |
| 40 | Kacher 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Julie Kacher, May 21, 2019 |

| | | |
|---|---|---|
| 41 | Miller 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Kim McCall Miller, May 15, 2019 |
| 42 | Williams 30(b)(6) Dep. | Deposition Transcript of Ocwen 30(b)(6) Corporate Representative, Michael Williams, Aug. 22, 2019 |
| 43 | Jefferies Dep. | Deposition Transcript of SWBC 30(b)(6) Corporate Representative, Cory Jefferies, May 17, 2019 |
| 44 | Diller Dep. | Deposition Transcript of Thomas Diller, June 3, 2019 |
| 45 | Erbey Dep. | Deposition Transcript of William Erbey, June 4, 2019 |
| 46 | Faris Dep. | Deposition Transcript of Ronald Faris, May 31, 2019 |
| 47 | Anderson Dep. | Deposition Transcript of Scott Anderson, June 28, 2019 |
| 48 | Rinear Dep. | Deposition Transcript of Denise Rinear, June 17, 2019 |
| 49 | Jastrzemski Dep. | Deposition Transcript of Jason Jastrzemski, Apr. 10, 2019 |
| 50 | Kacher Corporate IH Tr. | Investigational Hearing Transcript of Ocwen Corporate Representative, Julie Kacher, June 21, 2016 |
| 51 | Kennedy IH 6/14/2016 Tr. | Investigational Hearing Transcript of Christopher Kennedy, June 14, 2016 |
| 52 | Reeves IH Tr. | Investigational Hearing Transcript of Daniel Reeves, June 2, 2016 |
| 53 | Latman IH 12/17/2015 Tr. | Investigational Hearing Transcript of Brandon Latman, Dec. 17, 2015 |
| 54 | Rinear IH Tr. | Investigational Hearing Transcript of Denise Rinear, May 20, 2016 |
| 55 | Ridder Aff. | Affidavit of Theresa Ridder and Attachments A and B, May 26, 2020 |
| 56 | Sebastian Decl. | Declaration of Krysta Sebastian, August 30, 2019 |
| 57 | OFC PARR Response | OFC PARR Response to CFPB, Dec. 5, 2014, OCW-CFPB-001-06442422 |
| 58 | 2016 Loan Verification Procedures | Ocwen's 2016 Loan Verification Procedure, Version 2 (approved Apr. 13, 2016), OCW4-001-0000041 |
| 59 | Inaccurate Interest Rate MAF | ARM Management Assertion of Issue Remediation, May 29, 2013, OCW-030-0027208 |
| 60 | Loan Verification Backlog MAF | Management Assertion of Remediation, "Backlog In The ARM Loan Verification Process Due to Inadequate Staffing," (Oct. 28, 2014), OCW-CFPB-001-00084142 |
| 61 | ARM Procedures | Ocwen Standard Operating Procedure, Servicing Transaction Management: Adjustable Rate Mortgages, (effective May 14, 2014), OCW-CFPB-001-06099339 |
| 62 | 2014 Boarding Procedures | 2014 boarding procedures describing information boarded, Nov. 14, 2014, OCW-013-0006532 |
| 63 | 2014 Loan Verification Procedures | Ocwen's Standard Operating Procedures for Loan Verification/Information Review (effective June 18, 2014), OCW-029-0055277 |
| 64 | June 18, 2014 E-mail | June 18, 2014 E-mail from Brandon Wirth to Denise Rinear and Ben Purser, OCW-039-0069368 |

| | | |
|---|---|---|
| 65 | Oct. 9, 2014 E-mail | Oct. 9, 2014 E-mail from D. Rinear to B. Purser, forwarding e-mail from P. Glemser re "Boarding activities," OCW-039-0093942 |
| 66 | OFC 2015 Customer Complaint Policy | OFC 2015 Customer Complaint Policy, OCW3-006-0000076 |
| 67 | 2016 OFC Servicing Org Chart | 2016 OFC Servicing Operations Organization Chart, OCW-CFPB-001-00170593 |
| 68 | 2017 OFC Servicing Org Chart | 2017 OFC Servicing Operations Organization Chart, OCW-CFPB-001-00170604 |
| 69 | 2009 Technology Services Agreement | Aug. 10, 2009 Technology Services Agreement with Altisource, OCW3-007-0000050 |
| 70 | TransCentra Lockbox Agreement | Transcentra Lockbox Agreement, EXELA001 |
| 71 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 72 | First Am. Altisource Agreement | First Amendment to Technology Products Services Agreement, Dep. Ex. 141, OCW3-007-0000072 |
| 73 | Second Am. Altisource Agreement | Second Amendment to Technology Products Services Agreement, Dep. Ex. 142, OCW3-007-0000076 |
| 74 | Oct. 31, 2015 Escrow Audit | Escrow Administration, Tax and Insurance Audit, Oct. 31, 2015, OCW-012-0000550 |
| 75 | OFC 2016 Payment Processing Procedure | OFC 2016 Payment Processing Procedure, April 4, 2016, OCW3-006-0001249 |
| 76 | Dec. 2, 2014 Letter | Dec. 2, 2014 Letter from Fannie Mae to R. Faris, OCW-039-0012144 |
| 77 | Oct. 16, 2015 E-mail | Oct. 16, 2015 E-mail from C. Jefferies to T. Mitchell, T. Diller and D. Reeves and E-mail Attachment, Dep. Ex. 5, OCW-CFPB-001-01291264 |
| 78 | Sept. 5, 2014 Rinear/Purser E-mail | Sept. 5, 2014 E-mail from D. Rinear to B. Purser re: Action Plan, OCW-023-0002617 |
| 79 | OFC Cashiering Audit | Ocwen Financial Corporation Cashiering Mortgage Servicing Audit, March 30, 2016, OCW3-004-0000029 |
| 80 | Aug. 25, 2014 E-mail | Aug. 25, 2014 E-mail from S. Anderson to T. Diller, OCW3-027-0005675 |
| 81 | Property Insurance CAP | Ocwen Financial Corrective Action Plan, Property Insurance Payments, March 4, 2015, OCW-027-0142112 |
| 82 | Apr. 17, 2014 MAF | Management Assertion of Issue Remediation, Apr. 17, 2014, OCW-030-0024009 |
| 83 | PMI Action Plan Form | PMI Action Plan Form, OCW-030-0024021 |
| 84 | Reinstatement Quote MAF | Reinstatement Quote Management Assertion of Issue Remediation, April 7, 2014, OCW-030-0027038 |
| 85 | Attachment to Reinstatement Quote MAF | Attachment to Reinstatement Quote Management Assertion of Issue Remediation, OCW-030-0027058 |
| 86 | July 31, 2013 Audit | Escrow and Insurance Audit, July 31, 2013, OCW-030-0040608 |

| | | |
|---|---|---|
| 87 | RFP 4 Submission Excerpt | Excerpt of RFP 4 Submission, Dep. Ex. 196, OCW-CFPB-001-01294664 |
| 88 | June 24, 2015 Letter | SWBC Letter, June 24, 2015, SWBC Dep. Ex. 3, OCW-CFPB-001-01045628 |
| 89 | Nov. 9, 2014 E-mail | Nov. 9, 2014 E-mail from T. Diller to R. Faris and S. Anderson re: LPI Program, OCW-CFPB-001-01576357 |
| 90 | Nov. 20, 2014 E-mail | Nov. 20, 2014 E-mail from B. Brown to C. Trombley re: Ocwen Daily Stats, OCW-CFPB-001-06270994 |
| 91 | Sept. 5, 2014 Rinear/ Hollerich E-mail | Sept. 5, 2014 E-mail from D. Rinear to M. Hollerich re: Action Plan, OCW-CFPB-001-06324866 |
| 92 | July 21, 2014 E-mail | July 21, 2014 E-mail from S. Anderson to R. Faris, et. al, re: Bank of America, OCW3-010-0002065 |
| 93 | CAP 16 | Corrective Action Plan 16, Sept. 4, 2015, Latman IH Ex. 16 |
| 94 | Foreclosure Letters | Loss Mitigation Application Response Letters to consumers with bates ranges as set forth in Ridder Aff. (SJX 55) at 11-13 |
| 95 | Jan. 22, 2014 Letter | Jan. 22, 2014 Letter from Chase to R. Faris, Dep. Ex. 238, OCW-CFPB-001-01576053 |
| 96 | May 24, 2016 E-mail | March 22, 2016 to May 24, 2016 E-mail thread with the subject: “Modify Maturity Dates and Draw Period End Dates SR1622704 PM-4526”, OCW-CFPB-001-06245328 |
| 97 | Defs.' Resp. to CID Rogs. 1-11 | Answers to Interrogatories 1-11 of CFPB's CID to Ocwen, May 20, 2016, IH Ex. 183 |
| 98 | Program Management Agreement | Program Management Agreement, June 1, 2014, SWBC Dep. Ex. 9 |
| 99 | Agreement for Hazard Insurance | Underwriting Agency Agreement for Hazard Insurance, June 1, 2014, SWBC Dep. Ex. 10 |
| 100 | Agreement for Flood Insurance | Underwriting Agency Agreement for Flood Insurance, June 1, 2014, SWBC Dep. Ex. 11 |
| 101 | OFC 2016 Escrow Procedure | Ocwen Financial Corporation 2016 Escrow Procedure, OCW-CFPB-001-01686967 |
| 102 | OFC 2016 PMI Cancellation Procedure | Ocwen Financial Corporation 2016 Borrower Requested Private Mortgage Insurance Cancellation Procedure, OCW-CFPB-001-01803751 |
| 103 | 2016 Foreclosure Portfolio Procedure | Ocwen Financial Corporation 2016 Foreclosure Portfolio Procedure, OCW2-006-0018796 |
| 104 | TransCentra/Regulus Vendor Audit | OFC Vendor Audit Report of TransCentra/Regulus, OCW-011-0002375, Dep. Ex. 143 |
| 105 | 2013 Report | OMS’s Consolidated Financial Statements for the years ending December 31, 2013 and 2014 and Independent Auditor’s Report, OCW-039-0178210 |
| 106 | Scott Anderson 2014 Org Structure | OFC “Scott W. Anderson Organization Structure 2014,” OCW-CFPB-001-00170614 |
| 107 | Scott Anderson 2015 Org Structure | OFC “Scott W. Anderson Organization Structure 2015,” OCW-CFPB-001-00170626 |

| | | |
|---|---|---|
| 108 | June 2015 Stakeholder Summary | Stakeholder Summary "Servicing Platform Target State Roadmap" June 2015, OCW4-001-0001136 |
| 109 | July 11, 2014 E-mail | July 11, 2014 E-mail from S. Anderson to R. Faris, OCW3-010-0002086 |
| 110 | Vendor Risk Assessment Report | Ocwen Financial Corporation, Vendor Risk Assessment Report, April 6, 2015, Dep. Ex. 117, OCW-011-0001230 |
| 111 | Compliance Risk Assessment | Ocwen Compliance Risk Assessment, Mortgage Servicing Baseline Results, Aug. 28, 2014, OCW-027-0190340 |
| 112 | Loan Transfer Overview Procedure | Ocwen Loan Transfer Overview Procedure, v.4 (approved Jan. 19. 2016), OCW4-0001-0000227 |
| 113 | July 8, 2014 E-mail | E-mail chain from M. Chandraseckariah, July 8, 2014, OCW-024-0001843 |
| 114 | 2015 Flood Audit | 2015 Flood Audit, OCW-CFPB-001-05431031 |
| 115 | Ocwen Periodic Statement Template | Ocwen Periodic Statement Template, OCW3-009-0000118 |
| 116 | Mar. 30, 2016 Audit | Cashiering Audit Report, Mar. 30, 2016, OCW3-004-00000029 |
| 117 | 2009 Technology Letter | 2009 Technology Letter, OCW3-007-0000079 |
| 118 | July 10, 2014 Anderson E-mail | July 10, 2014 E-mail from S. Anderson to R. Faris re: "FW: ASPS" OCW-CFPB-001-06735261 |
| 119 | Oct. 28, 2014 ARM Audit | Adjustable Rate Mortgage Audit, Oct. 28, 2014, OCW-012-0000308 |
| 120 | HELOC MAF | HELOC MAF, OCW-CFPB-001-05997822 |
| 121 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 122 | 2016 Loan Verification Report | May 2016 Loan Verification Production Report, OCW-CFPB-001-00083890 |
| 123 | PMI Terminations | Spreadsheet of PMI Terminations, OCW-CFPB-001-06730240 |
| 124 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 125 | Overcharge Audit | Overcharge Audit Spreadsheet, OCW-CFPB-001-02292992 |
| 126 | Overcharge Loans | Overcharge Loans Spreadsheet, OCW-CFPB-001-06048935 |
| 127 | Oct. 2016 Loan Verification Report | Loan Verification Production Report, October 2016, OCW-CFPB-001-00083897 |
| 128 | Escrow Action Plan | Escrow Action Plan, Sept. 3, 2014, OCW-023-0002619 |
| 129 | Apr. 2015 Loan Verification Report | April 2015 Loan Verification Report, OCW4-001-0001032 |
| 130 | Servicing Platform Analysis | Accenture Ocwen Servicing Platform Analysis, May 8, 2015, OCW4-001-0001081 |
| 131 | Remediation Report | Remediation Report, Dep. Ex. 135, OCW3-034-0000001 (overlay 5) |
| 132 | 2017 Loan Verification Report | Apr. 2015 LV Report at Tab Loan Level REALServicing Update & Oct. 2016 LV Report at Tab Loan Level REALServicing Update & Ocwen Loan Verification Report (Sept. 2017), OCW-CFPB-001-00083901 |

| | | |
|---|---|---|
| 133 | Undercharge Audit RFP 48 | Undercharge Audit in response to RFP 48 of the Bureau's Fourth Set of RFPs, OCW-CFPB-001-06048934 |
| 134 | Aug. 2015 RC Rpt. | Risk Convergence Report, Aug. 14, 2015, OCW-019-0010624 |
| 135 | May 19, 2016 CID | May 19, 2016 CFPB Civil Investigative Demand, Dep. Ex. 119 |
| 136 | April 8, 2016 CID | April 8, 2016 CFPB Civil Investigative Demand, Dep. Ex. 134 |
| 137 | Bureau's First Set of Rogs. | Bureau's First Set of Interrogatories to Defendants, Jan. 8, 2018 |
| 138 | Defs.' Resp. First Rogs. | Defendants' Verified Responses to Plaintiff's First Set of Interrogatories to Defendants, Interrogatories 1-13, June 14, 2019 |
| 139 | Ex. A to Defs.' Resp. First Rogs. | Exhibit A to Defendants' Verified Responses to Plaintiff's First Set of Interrogatories to Defendants, June 14, 2019 |
| 140 | Ex. C to Defs.' Resp. First Rogs. | Exhibit C to Defendants' Verified Responses to Plaintiff's First Set of Interrogatories to Defendants, June 14, 2019 |
| 141 | Ex. G to Defs.' Resp. First Rogs. | Exhibit G to Defendants' Verified Responses to Plaintiff's First Set of Interrogatories to Defendants, June 14, 2019 |
| 142 | Ex. H to Defs.' Resp. First Rogs. | Exhibit H to Defendants' Verified Responses to Plaintiff's First Set of Interrogatories to Defendants, June 14, 2019 |
| 143 | Ex. I to Defs.' Resp. First Rogs. | Exhibit I to Defendants' Verified Responses to Plaintiff's First Set of Interrogatories to Defendants, June 14, 2019 |
| 144 | Ocwen's Verification of its Responses to Bureau's Rog. Nos. 14 and 15 | Ocwen's Verification of its Responses to Bureau's Interrogatories 14 and 15 |
| 145 | Defs.' Sec. Am. and Suppl. Resp. to Rogs. 14-15 | Defendants' Second Amended and Supplemental Response to Bureau's Interrogatories 14 and 15 |
| 146 | Bureau's Third Set of Rogs. | Plaintiff's Third Set of Interrogatories to Defendants |
| 147 | Defs.' Resp. Third Set of Rogs. | Defendants' Responses and Objections to Plaintiff's Third Set of Interrogatories to Defendants, May 19, 2019 |
| 148 | Bureau's Second RFAs to OLS | Plaintiff's Second Requests for Admission to Ocwen Loan Servicing |
| 149 | Bureau's Second RFAs to OMS | Plaintiff's Second Requests for Admission to Ocwen Mortgage Servicing |
| 150 | Defs.' Resp. to Bureau's Second RFAs | Ocwen Loan Servicing's and Ocwen Mortgage Servicing's Responses to the Bureau's Second Requests for Admission |
| 151 | Pl.'s Second Set RFPs | Plaintiff's Second Set of Requests for Production to Defendants |
| 152 | OLS Resp. to Written Report Req. 14 | Ocwen Loan Servicing's Written Report in response to Report Request #14, OCW3-002-0000001 (overlay) |

| | | |
|---|---|---|
| 153 | Ocwen's Resp. to WR 1 | Ocwen's Response to Written Report No. 1, OCW4-004-0000001 |
| 154 | Ocwen's Response to Bureau's Fourth Set of RFPs | Defendants' Responses and Objections to Plaintiff's Fourth Set of Requests for Production to Defendants |
| 155 | Pl.'s Fifth Set RFPs | Plaintiff's Fifth Set of Requests for Production to Defendants |
| 156 | Defs.' Resp. to Fifth Set of RFPs | Defendants' Responses and Objections to Plaintiff's Fifth Set of Requests for Production |
| 157 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 158 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 159 | Oct. 28, 2015 MAF | Management Assertion of Issue Remediation form completed by Daniel Reeves on Oct. 28, 2015, OCWFL000043556 |
| 160 | May 11, 2016 E-mail | May 11, 2016 E-mail thread from Tracy Mitchell, OCW-CFPB-001-06483979 |
| 161 | Apr. 20, 2016 E-mail | April 20, 2016 E-mail thread from Sandeep Singh, OCW-CFPB-001-02905850 |
| 162 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 163 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 164 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 165 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 166 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 167 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 168 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 169 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 170 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 171 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 172 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 173 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 174 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 175 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 176 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 177 | INTENTIONALLY OMITTED/WITHDRAWN | |
| 178 | March 13, 2015 E-mail | March 13, 2015 E-mail, OAG-01302641 |
| 179 | Feb. 24, 2015 Letter | February 24, 2015 Letter, OCW-CFPB-001-01593155 |
| 180 | Lookback | Florida Escrow Lookback Analysis, OCWFL000014065 |

## I. DEFENDANTS' CORPORATE STRUCTURE, BUSINESS, AND RELEVANT BACKGROUND

### A. Defendants had common ownership during the Relevant Period.

1. The relevant period for this motion is January 1, 2014 through the present ("Relevant Period"). Unless otherwise specified, the below facts occurred throughout the Relevant Period.

2. Ocwen Financial Corporation ("OFC") is a publicly-traded corporation headquartered in West Palm Beach, Florida.[1]

3. OFC has wholly owned the common stock of Ocwen Mortgage Servicing, Inc. ("OMS").[2]

4. From at least January 1, 2014 until June 1, 2019, OMS wholly owned the common stock of Ocwen Loan Servicing ("OLS").[3]

5. From at least January 1, 2014 until June 1, 2019, OFC, through its ownership of OMS, owned OLS.[4]

6. From at least January 1, 2014 until June 1, 2019, OLS was incorporated in Delaware and maintained its principal place of business in West Palm Beach, Florida.[5]

7. OLS merged into PHH Mortgage Corporation ("PHH") on June 1, 2019, and PHH is a successor-by-merger to OLS.[6]

8. Since at least June 1, 2019, PHH has been a wholly owned subsidiary of PHH Corporation, and OFC has owned 100 percent of the common stock of PHH Corporation.[7]

### B. Defendants individually and, as a common enterprise, service mortgage loans.

#### 1. OFC is a mortgage servicer.

9. OFC and its subsidiaries have "been servicing residential mortgage loans since 1988."[8]

---

[1] Defs.' Am. Answer, ECF No. 550 ¶ 10.
[2] Defs.' Am. Answer, ECF No. 550 ¶ 14.
[3] Defs.' Am. Answer, ECF No. 550 ¶ 14.
[4] Defs.' Am. Answer, ECF No. 550 ¶ 14.
[5] Bureau's Am. Compl., ECF No. 481 ¶ 12; Defs.' Am. Answer, ECF No. 550 ¶ 12.
[6] Bureau's Am. Compl., ECF No. 481 ¶ 12; Defs.' Am. Answer, ECF No. 550 ¶ 12.
[7] Defs.' Am. Discl. Statement, ECF No. 451 at 2.
[8] **SJX 3**, Ocwen 2014 10-K at 4; **SJX 4**, Ocwen 2015 10-K at 4; **SJX 5**, Ocwen 2016 10-K at 4; **SJX 6**, Ocwen 2017 10-K at 4; **SJX 7**, Ocwen 2018 10-K at 5; **SJX 8**, Ocwen 2019 10-K at 4.

10. In its filings with the Securities and Exchange Commission, OFC "refer[s] to itself and its consolidated subsidiaries" as "Ocwen."[9]

11. On December 22, 2014, OFC and OLS entered into a consent order with the New York State Department of Financial Services ("NY DFS") in which they were defined as "Ocwen" and "stipulate[d] that . . . Ocwen is the fourth largest mortgage loan servicer and the largest servicer of subprime loans in the United States, servicing an unpaid principal balance ("UPB") of approximately $430 billion."[10]

12. OFC has described its servicing activities as involving "the collection and remittance of principal and interest payments received from borrowers, the administration of mortgage escrow accounts, the collection of insurance claims, the management of loans that are delinquent or in foreclosure or bankruptcy, including making servicing advances, evaluating loans for modification and other loss mitigation activities and, if necessary, foreclosure referrals and the sale of the underlying mortgaged property following foreclosure (real estate owned or REO) on behalf of investors or other servicers."[11]

13. OFC's 2016 Payment Processing Procedure states:

> The purpose of this Payment Processing Procedure ("Procedure") is to document the processes and activities performed by Ocwen Financial Corporation ("Ocwen") and all of its domestic and international subsidiaries (collectively "Ocwen" or "Company") related to processing payments in accordance with the appropriate guidelines. . . . [and] applies to all Ocwen personnel and contractors . . . Ocwen accepts payments through various payment methods and each or many of these payment methods are processed in separate ways.[12]

14. OFC's 2015 Customer Complaint Policy states:

> The Customer Complaint and Escalation Policy ("Policy") is developed to facilitate compliance with regulatory requirements around complaints, inquiries, and escalations associated with customer correspondence or phone calls received by Ocwen Financial Corporation ("Ocwen") and all of its domestic and international subsidiaries (collectively "Ocwen" or "Company"). . . .[13]

---

[9] **SJX 3**, Ocwen 2014 10-K at 4; **SJX 4**, Ocwen 2015 10-K at 4; **SJX 5**, Ocwen 2016 10-K at 4; **SJX 6**, Ocwen 2017 10-K at 4; **SJX 7**, Ocwen 2018 10-K at 4; **SJX 8**, Ocwen 2019 10-K at 4.

[10] **SJX 24**, NY DFS Consent Order Dec. 22, 2014 at 1.

[11] **SJX 3**, Ocwen 2014 10-K at 5; **SJX 4**, Ocwen 2015 10-K at 4; **SJX 5**, Ocwen 2016 10-K at 4; **SJX 6**, Ocwen 2017 10-K at 5; **SJX 7**, Ocwen 2018 10-K at 5; **SJX 8**, Ocwen 2019 10-K at 5.

[12] **SJX 75**, OFC 2016 Payment Processing Procedure, OCW3-006-0001249 at 252; *see also* **SJX 45**, Erbey Dep. at 11:6–11:24, 16:8–21 (William Erbey, OFCs Chairman of the Board until Jan. 2015, testifying that "certainly OFC as an entity was intaking payments" from borrowers).

[13] **SJX 66**, OFC 2015 Customer Complaint Policy, OCW3-006-0000076 at 080.

15. OFC's 2016 Escrow, 2016 Borrower Requested Private Mortgage Insurance Cancellation, and 2016 Foreclosure Portfolio Procedures each state that their intended use is for "Ocwen Financial Corporation ("Ocwen") and all of its domestic and international subsidiaries (collectively "Ocwen" or "Company")."[14]

16. Ocwen testified that TransCentra was a lockbox vendor or central collector of checks for "Ocwen" (defined as OFC, OLS, and OMS), and that borrowers' checks were mailed to TransCentra's processing center, processed by TransCentra, and the results of those transactions were forwarded to Ocwen for posting.[15]

17. In 2003, Ocwen Federal Bank FSB, the predecessor to OFC, subscribed to the lockbox or payment remittance services of TransCentra, which also did business as Regulus West, LLC, (collectively "TransCentra"). This agreement, which defines Ocwen Federal Bank FSB as "Ocwen," described the lockbox or payment remittance services to include opening mail containing mortgage payments, such as checks, that borrowers sent to a "U.S. Postal Service box in Ocwen's name," depositing the payments in a "deposit account in Ocwen's name," and providing the relevant payment information to Ocwen.[16]

18. On July 24, 2015, OFC took over the agreement described in Fact 17 as the "successor-in-interest to Ocwen Federal Bank, FSB, for itself and for the benefit of OFC and its affiliates and subsidiaries ("Ocwen")."[17]

19. An August 13, 2014 OFC audit of TransCentra identified issues related to TransCentra's payment processing activities, including that Ocwen's Cashiering Department may not be receiving accurate dates as to when borrower payments were received or borrower instructions as to how to apply their payments, despite requirements that "[c]ustomer payments must reflect accurate effective-date and [be] applied per borrower direction."[18]

---

[14] **SJX 101**, OFC 2016 Escrow Procedure, OCW-CFPB-001-01686967 at 970; **SJX 102**, OFC 2016 PMI Cancellation Procedure, OCW-CFPB-001-01803751 at 753; **SJX 103**, 2016 Foreclosure Portfolio Procedure, OCW2-006-0018796 at 804.

[15] **SJX 34**, Kennedy 30(b)(6) Dep. at 7:1–7:3 (confirming that "Ocwen" refers to OFC, OMS, and OLS) and 77:3–77:13; *see also* **SJX 40**, Kacher 30(b)(6) Dep. at 16:23–17:12 (testifying that "Ocwen" hired TransCentra to do the same).

[16] **SJX 70**, TransCentra Lockbox Agreement, EXELA001 at 2, ¶¶ 1–2.

[17] **SJX 70**, TransCentra Lockbox Agreement, EXELA001 at 45.

[18] **SJX 104**, TransCentra/Regulus Vendor Audit, OCW-011-0002375 at 397 (Issue #7).

20. A March 30, 2016 OFC audit of its Cashiering Department was distributed to senior executives, including OFC's President and Chief Executive Officer, and identified four issues and "Management Action Plans" to address those issues.[19]

**2. OMS is a mortgage servicer.**

21. From at least January 1, 2014 until at least June 2019, OMS engaged in mortgage servicing activities in support of OLS.[20]

22. OMS accepted and collected payments from borrowers.[21]

23. During 2014 and 2015, OMS subscribed to TransCentra's "customer payment remittance service," which involved TransCentra processing borrowers' checks that were mailed to its processing center and sending the details of those transactions to OMS.[22]

24. From at least January 1, 2014 until at least June 1, 2019, OMS maintained a call center on behalf of OLS.[23]

**3. OLS was a mortgage servicer and was succeeded by PHH.**

25. From at least January 1, 2014 until June 1, 2019, OLS engaged in mortgage servicing.[24]

26. From at least January 1, 2014 until June 1, 2019, OLS collected payments from borrowers.[25]

27. During 2014 and 2015, OLS subscribed to TransCentra's "customer payment remittance service," which involved TransCentra processing borrowers' checks that were mailed to its processing center and sending the details of those transactions to OLS.[26]

28. PHH assumed the servicing obligations of OLS on June 1, 2019 and now services the loans that OLS previously serviced.[27]

---

[19] **SJX 79**, OFC Cashiering Audit, OCW3-004-0000029 at 031–034, 037.
[20] Defs.' Am. Answer, ECF No. 550 ¶¶ 11, 13, and 16.
[21] **SJX 105**, 2013 Report, OCW-039-0178210 at 220 ¶ 4 (OMS is "a primary servicer" and may be required to make payments of principal and interest to investors "before collecting them from borrowers"); **SJX 23**, Washington Consent Order ¶ 1.7 (OLS represented to the Washington Dep't of Licensing that OMS (and OLS) conduct mortgage servicing).
[22] **SJX 150**, Defs.' Resp. to Bureau's Second RFAs at Answer Nos. 222–224.
[23] Defs.' Am. Answer, ECF No. 550 ¶¶ 11, 14.
[24] Defs.' Am. Answer, ECF No. 550 ¶¶ 13, 14.
[25] **SJX 115**, Ocwen Periodic Statement Template, OCW3-009-0000118 at 119 (directing borrowers to make checks or express payments to Ocwen Loan Servicing, LLC).
[26] **SJX 150**, Defs.' Resp. to Bureau's Second RFAs at Answer Nos. 222–224.
[27] Defs.' Am. Answer, ECF No. 550 ¶ 17.

**4. Defendants operated as a common enterprise.**

29. Ocwen designated ten corporate witnesses to testify pursuant to Plaintiff's 30(b)(6) notices, with each one designed to testify on behalf of OFC, OMS, and OLS.[28]

30. Paul Abate, Parveen Aery, Sheri Goodman, Andrew Combs, Julie Kacher, Christopher Kennedy, Krysta Sebastian, and Jay Williams were designated as corporate witnesses on behalf of OFC, OMS, and OLS and testified that they worked for OFC.[29]

31. When the ten corporate witnesses described in Fact 30 testified, they testified about the activities of "Ocwen" and their testimony did not distinguish among the servicing activities carried out by any of the individual entities, OFC, OMS, or OLS, distinct from one another.[30]

32. Christopher Kennedy, an OFC employee who was designated by OFC, OMS, and OLS to testify about their cashiering and payment processing activities, testified that TransCentra collected borrowers' checks for "Ocwen," which was defined as OFC, OMS, and OLS.[31]

33. Tom Arnett, Ocwen's Director of Pre-Foreclosure, stated that he was testifying on behalf of OFC, OMS, and OLS, and when asked which Ocwen entity employed him, he responded: "I only know of one Ocwen."[32]

---

[28] **SJX 36**, Abate 30(b)(6) Dep. at 5:15–6:2; **SJX 37**, Aery 30(b)(6) Dep. at 5:11–6:2; **SJX 32**, Arnett 30(b)(6) 5/22/19 Dep. at 6:16–7:13; **SJX 38**, Combs 30(b)(6) Dep. at 6:7–6:25; **SJX 39**, Goodman 30(b)(6) Dep. at 7:14–7:24; **SJX 40**, Kacher 30(b)(6) Dep. at 5:11–5:21; **SJX 34**, Kennedy 30(b)(6) Dep. at 6:11–6:25; **SJX 41**, Miller 30(b)(6) Dep. at 6:14–7:6; **SJX 35**, Sebastian 30(b)(6) Dep. at 5:16–7:7; **SJX 42**, Williams 30(b)(6) Dep. at 6:16–7:24.

[29] **SJX 36**, Abate 30(b)(6) Dep. at 5:15–6:18; **SJX 37**, Aery 30(b)(6) Dep. at 6:14–6:16; **SJX 38**, Combs 30(b)(6) Dep. at 7:13–7:17; **SJX 39**, Goodman 30(b)(6) Dep. at 9:7–9:8; **SJX 40**, Kacher 30(b)(6) Dep. at 6:5–6:9; **SJX 34**, Kennedy 30(b)(6) Dep. at 7:12–7:14; **SJX 35**, Sebastian 30(b)(6) Dep. at 8:16–8:19; **SJX 42**, Williams 30(b)(6) Dep. at 8:8–8:17.

[30] *See e.g.*, **SJX 36**, Abate 30(b)(6) Dep. at 7:4–7:25; **SJX 37**, Aery 30(b)(6) Dep. at 31:16–36:9; **SJX 32**, Arnett 30(b)(6) 5/22/19 Dep. at 7:22–8:4; **SJX 38**, Combs 30(b)(6) Dep. at 7:17–7:24; **SJX 39**, Goodman 30(b)(6) Dep. at 14:5–14:11; **SJX 40**, Kacher 30(b)(6) Dep. at 16:23–17:12; **SJX 34**, Kennedy 30(b)(6) Dep. at 11:14–12:3; **SJX 41**, Miller 30(b)(6) Dep. at 7:13–7:24; **SJX 35**, Sebastian 30(b)(6) Dep. at 11:6–11:16; **SJX 42**, Williams 30(b)(6) Dep. at 7:19–7:24, 9:17–10:5.

[31] **SJX 34**, Kennedy 30(b)(6) Dep. at 6:15–6:22, 7:1–7:3, and 77:3–77:13.

[32] **SJX 32**, Arnett 30(b)(6) 5/22/19 Dep. at 7:22–8:4.

**OFC controlled OMS, OLS, and PHH, and Defendants shared employees.**

34. OFC's Answer admits that, "[a]s the parent company, OFC has ultimate control over all of its subsidiaries."[33]

35. Ronald Faris was OFC's Chief Executive Officer from at least 2010 until June 29, 2018; a manager at OLS from at least April 12, 2014 until at least April 13, 2017; and a Director of OMS from at least April 14, 2014 until February 3, 2015.[34]

36. Ronald Faris testified that "President" and "Chief Executive Officer" were "primarily my titles that were at the [OFC] level, but . . . generally we would hold titles at subsidiaries as well including Ocwen Loan Servicing," and that OFC executives Timothy Hayes, Michael Bourque, and John Patrick Cox performed duties at OLS and OMS in "some capacity" either "in a sort of oversight role or . . . management role" at those entities.[35]

37. Ronald Faris testified that, as of April 20, 2017, OFC, OMS, and OLS collectively engaged in loan servicing by "among other things, processing borrower payments, administering loss mitigation processes, and managing foreclosure," and that "Ocwen also acquires and collects upon borrowers' mortgage debts that are in default."[36]

38. William Erbey, OFC's Chief Executive Officer from 1988 until 2000 and OFC's Director and Chairman of the Board from 1988 until January 2015, testified that while OFC "was intaking payments" from borrowers, OFC had "a lot" of subsidiaries but he did not know the number "so it's difficult for [him] to say how many of those [Ocwen] subsidiaries were actually servicing loans."[37]

39. According to OFC's corporate organizational charts, from 2014 through 2017, OFC's Chief Servicing Officer, Scott Anderson, supervised executives who led Call Center Operations,

---

[33] Defs.' Am. Answer, ECF No. 550 ¶ 15.

[34] **SJX 46**, Faris Dep. at 9:19–10:4 (Faris was OFC CEO from 2010 to June 2018); **SJX 11**, OLS 2014 Filing (Faris signs as OLS Manager); **SJX 14**, OLS 2015 Am. Filing (Faris signs as OLS Manager); **SJX 12**, OLS 2016 Filing (Faris signs as OLS Manager); **SJX 13**, OLS 2017 Filing (Faris signs as OLS Manager); **SJX 16**, OMS 2014 Filing (Faris listed as a Director of OMS); **SJX 17**, OMS 2015 Filing (Faris listed as a Director of OMS).

[35] **SJX 46**, Faris Dep. at 10:5–10:12; 18:11–19:3.

[36] **SJX 46**, Faris Dep. at 17:6–17:20.

[37] **SJX 45**, Erbey Dep. at 9:1–9:10, 10:12–10:19 (president and CEO of OFC from 1988 to 2000); 11:6–11:24 (Director from 1988, Board Chairman until Jan. 2015); 14:15–15:21 (didn't know how many existed and which subsidiaries were servicing loans); and 16:18–16:23 (OFC was intaking borrower payments).

Record Services, Loss Mitigation, Default Servicing (which includes Foreclosure and Bankruptcy units), Servicing Financial Operations, Investor Services (which includes the Cashiering and Service Transfer Management units), Servicing Operations (which includes Escrow units), Customer Experience, and Operational Controls.[38]

40. Scott Anderson testified that he did not know whether, in addition to OFC, he also worked for OLS or OMS, and he understood that he worked for OFC only because "[f]olks in HR told [him] that," and that the entity he worked for "doesn't affect [his] job one way or the other."[39]

41. From 2014 through 2017, one of Scott Anderson's direct reports, John Patrick Cox, worked as OMS's Senior Vice President of Default Servicing.[40]

42. In 2015, John Patrick Cox was the Vice President of Default Servicing at OLS.[41]

43. In 2014 through 2017, Mr. Cox's direct reports have been the OFC Directors of Foreclosure, Bankruptcy, and Default Servicing.[42]

44. In 2016 and 2017, one of Scott Anderson's direct reports, Jean-Marc Eichner, Vice President of Customer Experience, worked for OLS.[43]

---

[38] *See* **SJX 67**, 2016 OFC Servicing Org Chart, OCW-CFPB-001-00170593 at 594 (listing all units), 599 (Investor Services units), 600 (Default Services units), and 602 (Servicing Operations units); **SJX 68**, 2017 OFC Servicing Org Chart, OCW-CFPB-001-00170604 at 605 (listing all units), 609 (Investor Services units), 600 (Default Services units), and 601 (Servicing Operations units); *see also* Scott Anderson 2014 Org Structure, OCW-CFPB-001-00170614 at 615 (Scott Anderson overseeing the same operations); Scott Anderson 2015 Org Structure, OCW-CFPB-001-00170626 at 627 (Scott Anderson overseeing the same operations).

[39] **SJX 47**, Anderson Dep. at 8:22-10:4; *see also* **SJX 14**, OLS 2015 Am. Filing (listing Anderson as the "Control Person" for OMS).

[40] *See* **SJX 106**, Scott Anderson 2014 Org Structure, OCW-CFPB-001-00170614 at 615; **SJX 107**, Scott Anderson 2015 Org Structure, OCW-CFPB-001-00170626 at 627; **SJX 67**, 2016 OFC Servicing Org Chart, OCW-CFPB-001-00170593 at 594; **SJX 68**, 2017 OFC Servicing Org Chart, OCW-CFPB-001-00170604 at 605; *see also* **SJX 16**, OMS 2014 Filing at 1 (listing Cox as the VP of Default Servicing of OMS); **SJX 17**, OMS 2015 Filing at 1 (same).

[41] **SJX 15**, OMS 2014 Am. Filing at 1 (listing Cox as the "VP of Default Servicing"); **SJX 14**, OLS 2015 Am. Filing at 1 (listing Cox as the "VP of Default Servicing").

[42] *See* **SJX106**, Scott Anderson 2014 Org Structure, OCW-CFPB-001-00170614 at 622; **SJX 107**, Scott Anderson 2015 Org Structure, OCW-CFPB-001-00170626 at 636; **SJX 67**, 2016 OFC Servicing Org Chart, OCW-CFPB-001-00170593 at 600; **SJX 68**, 2017 OFC Servicing Org Chart, OCW-CFPB-001-00170604 at 610.

[43] *See* **SJX 67**, 2016 OFC Servicing Org Chart, OCW-CFPB-001-00170593 at 594; **SJX 68**, 2017 OFC Servicing Org Chart, OCW-CFPB-001-00170604 at 605.

45. Another one of Scott Anderson's direct reports, Thomas Diller, was OLS's Senior Vice President for Servicing and Operations.[44]

46. Tom Arnett, Director of Pre-Foreclosure, and Jason Jastrzemski, Director of Mortgage Servicing Oversight, are listed as working for OFC and under Thomas Diller on OFC's 2015 organizational chart.[45]

47. Tom Arnett, Thomas Diller, and Jason Jastrzemski testified that it did not matter which Ocwen entity an employee worked for in performing their servicing responsibilities because all of the entities were working together to get the same job—servicing borrowers' loans—done.[46]

**Defendants shared office space.**

48. From at least January 1, 2014 through June 1, 2019, OLS and OFC shared office space and facilities at 1661 Worthington Suite 100, West Palm Beach, Florida,[47] with "no physical separation between the office space for OFC and OLS."[48]

49. OFC's Chairman of the Board (William Erbey), OFC's General Counsel (Timothy Hayes), and OFC's Chief Risk Officer (Michael Bourque) were located in OMS's offices in the U.S. Virgin Islands.[49]

**Defendants acted as one.**

50. Since 2009, OFC contracted with vendor Altisource Solutions, S.a.r.l and affiliates (collectively, including with predecessors, successors, and subsidiaries, "Altisource") for technology services, including the residential mortgage servicing platform (*i.e.*, Ocwen's system of record), REALServicing (collectively with all associated and ancillary systems, "REALServicing"), which OMS and OLS also used without a separate agreement.[50]

---

[44] **SJX 44**, Diller Dep. at 11:6–12:2 (Diller testifying that he worked for OLS).

[45] **SJX 107**, Scott Anderson 2015 Org Structure, OCW-CFPB-001-00170626 at 637.

[46] **SJX 32**, Arnett 30(b)(6) 5/22/19 Dep. at 7:22–8:4; **SJX 44**, Diller Dep. at 17:17–18:11; **SJX 49**, Jastrzemski Dep. at 30:12–31:15.

[47] **SJX 27**, Screenshot "Contact Us" webpage (created Apr. 27, 2020).

[48] Defs.' Am. Answer, ECF No. 550 ¶ 21; **SJX 46**, Faris Dep. at 14:13–16:25.

[49] **SJX 45**, Erbey Dep. at 18:23–19:7.

[50] **SJX 69**, 2009 Technology Services Agreement, OCW3-007-0000050 at 050; **SJX 72**, First Am. Altisource Agreement, OCW3-007-0000072 at 072; **SJX 73**, Second Am. Altisource Agreement, OCW3-007-0000076 at 076; **SJX 40**, Kacher 30(b)(6) Dep. at 13:14–14:13.

51. Ocwen testified that personnel from OFC, OLS, and OMS all used the same mortgage servicing data that were available on REALServicing.[51]

52. On the "Ocwen" customer-facing website, "ocwencares.com/homeowners," Ocwen identifies itself as "Ocwen Financial Corporation" on the site's bottom banner.[52]

53. The website in Fact 52 contains three video testimonials about Ocwen employees assisting borrowers. Two of the employees were identified as working for "Ocwen Financial Corporation" and the third employee was identified as working for "Ocwen."[53]

54. OFC has received communications from Fannie Mae, a government-sponsored enterprise and guarantor of loans Defendants serviced, about Defendants' servicing practices and obligations, and OFC controlled and directed responses on behalf of OLS and OFC.[54]

55. [redacted].[55]

56. INTENTIONALLY OMITTED/WITHDRAWN.

57. In June 2018, OFC, OMS, and OLS entered into a consent order with the Maryland Office of the Commissioner of Financial Regulation related to the companies' mortgage servicing practices, with Timothy Hayes, OFC's General Counsel, signing on behalf of OMS and OLS, and Ronald Faris signing on behalf of OFC.[56]

---

[51] **SJX 35**, Sebastian 30(b)(6) Dep. at 9:2–9:13, 12:3–13:1; **SJX 56**, Sebastian Decl. ¶ 4.

[52] **SJX 28**, Screenshot "Ocwen Cares" webpage (created March 9, 2020).

[53] **SJX 29**, Ocwen - Finding Resolution Video on website http://ocwencares.com/homeowners/; **SJX 30**, Ocwen - Keeping You in Home Video on website http://ocwencares.com/homeowners/; **SJX 31**, Ocwen - Connecting with Homeowners Video on website http://ocwencares.com/homeowners/.

[54] **SJX 76**, Dec. 2, 2014 Letter, OCW-039-0012144 at 144 (Fannie Mae letter addressed to OFC CEO R. Faris discussing OLS's contractual obligations to Fannie Mae and Faris's meeting with Fannie Mae).

[55] **SJX 57**, OFC PARR Response ¶ 1.

[56] **SJX 22**, MD Consent Order, Feb. 23, 2018, at 23–25; **SJX 19**, Feb. 27, 2019 Press Release (OFC announcing the retirement of Timothy Hayes, its executive VP and general counsel).

**5. Defendants serviced residential mortgage loans.**

58. Defendants OFC, OMS, OLS, and PHH (hereafter collectively "Ocwen") have serviced loans secured by structures for occupancy by one to four families ("Residential Mortgage Loans").[57]

59. Ocwen has serviced Residential Mortgage Loans that were originated by lenders that were regulated by, or whose deposits or accounts were insured by, a federal agency.[58]

60. Ocwen has serviced Residential Mortgage Loans that were guaranteed by or intended to be sold to a government-sponsored enterprise, including Fannie Mae or Freddie Mac.[59]

61. Ocwen has serviced Residential Mortgage Loans that were insured or guaranteed by the Federal Housing Administration of the U.S. Department of Housing and Urban Development, and the U.S. Department of Veterans Affairs.[60]

62. Ocwen has serviced Residential Mortgage Loans that were originated by mortgage entities that originated more than $1 million in loans annually.[61]

63. Ocwen has "specialize[d] in servicing non-prime portfolios that are often the most expensive portfolios for . . . large banks to service."[62]

64. Ocwen described servicing delinquent loans as involving "an inherently high level of potential operational and compliance risk and requires a disproportionately high level of operating staff, oversight support infrastructure and overhead which drives the elevated average cost per loan."[63]

---

[57] **SJX 3**, Ocwen 2014 10-K at 5; **SJX 4**, Ocwen 2015 10-K at 4; **SJX 5**, Ocwen 2016 10-K at 4; **SJX 6**, Ocwen 2017 10-K at 4; **SJX 7**, Ocwen 2018 10-K at 5 (all describing Ocwen's core servicing business is primarily "residential mortgage servicing").

[58] **SJX 3**, Ocwen 2014 10-K at 6 (listing Ocwen's acquisitions from entities such as Bank of America (BOA), OneWest Bank N.A., Homeward, ResCap, and Ally). The Bureau regulates mortgage originators, including banks with assets of over $10 billion, such as BOA and OneWest Bank, N.A. *See* **SJX 26**, https://files.consumerfinance.gov/f/201212_CFPB_depository-institutions.pdf.

[59] **SJX 3**, Ocwen 2014 10-K at 7 (as of Dec. 31, 2014, 58.0% of loans serviced were insured by federal agencies, guaranteed by the GSEs, or underwritten to GSE standards).

[60] **SJX 3**, Ocwen 2014 10-K at 7.

[61] **SJX 3**, Ocwen 2014 10-K at 6 (listing Ocwen's acquisitions from entities such as BOA, OneWest Bank N.A., Homeward, ResCap/Ally). These entities originated more than $1 million in loans annually. *See, e.g.*, **SJX 18**, Ally Feb. 2, 2012 Press Release, at 9 (Ally and ResCap originated more than $16.5 billion in prime loans in just the fourth quarter of 2011).

[62] **SJX 2**, Ocwen 2013 10-K at 8.

[63] **SJX 8**, Ocwen 2019 10-K at 11.

65. Ocwen identified its core competencies as including "serving underserved and at-risk borrowers."[64]

66. Ocwen has serviced loans for others and has collected (or attempted to collect) from borrowers on these loans, including between $33.8 billion and $75.5 billion annually in the years 2014 through 2018.[65]

67. Ocwen serviced loans for others including: (1) 2.4 million loans as of December 2014; (2) 1.6 million loans as of December 2015; (3) 1.3 million loans as of December 2016; (4) 1.2 million loans as of December 2017;[66] (5) 1.5 million loans as of December 2018; and (6) 1.4 million loans as of December 2019.[67]

## II. RELEVANT BACKGROUND

### A. Ocwen grew rapidly from 2009 through 2013.

68. As of December 31, 2009, Ocwen serviced 351,595 residential loans.[68]

69. From 2010 to 2013, Ocwen acquired mortgage servicing rights from the following entities, and those acquired loan portfolios had the following delinquency rates (the percentage of the loan portfolio that was delinquent at the time Ocwen boarded (*i.e.*, loaded) the loans onto REALServicing):

a. Barclays Bank PLC acquired servicing business (HomEq), Sept. 2010 acquisition, 28% delinquency rate;

b. Litton Loan Servicing LP, Sept. 2011 acquisition, 35% delinquency rate;

c. Saxon Mortgage Services, Inc., Apr. 2012 acquisition, 28.7% delinquency rate;

d. Homeward, Dec. 2012 acquisition, 21.7% delinquency rate; and

e. Residential Capital, LLC (ResCap), Feb. 2013 acquisition, 11.4% delinquency rate.[69]

---

[64] **SJX 7**, Ocwen 2018 10-K at 4.

[65] **SJX 46**, Faris Dep. at 17:6–17:23 (confirming that as of the time the Complaint was filed (April 20, 2017), "OFC, OMS, and OLS, collectively Ocwen . . . . acquires and collects upon borrowers' mortgage debts that are in default"); *see also* **SJX 7**, Ocwen 2018 10-K at 61; **SJX 4**, Ocwen 2015 10-K at 56 ("Collection on loans serviced for others" was approximately $69.8 billion in UPB in 2015, $75.5 billion in UPB in 2014).

[66] **SJX 6**, Ocwen 2017 10-K at 48.

[67] **SJX 8**, Ocwen 2019 10-K at 44.

[68] **SJX 10**, Ocwen 2013 10-K/A at 4.

[69] **SJX 3**, Ocwen 2014 10-K at 6.

70. Ocwen's servicing revenues for "[s]ervicing and subservicing fees" grew from approximately $264 million in 2009 to approximately $1.8 billion in 2013.[70]

71. On October 24, 2012, Ocwen announced that OLS had been awarded the winning bid—a bid of $3 billion—for the purchase, subject to approvals, of "the mortgage servicing and origination platform assets of [ResCap]."[71]

72. In February 2013, Ocwen acquired the mortgage servicing business of ResCap, including the rights to service 1.74 million loans previously serviced by ResCap.[72]

73. Of those borrowers for whom Ocwen produced responsive data in this litigation, Ocwen identified over 434,000 borrowers as being in default at the date of boarding.[73]

74. As of December 31, 2013, Ocwen serviced 2,861,918 residential loans.[74]

**B. Ocwen entered into a lengthy technology contract with Altisource with few protections and despite the acknowledged risk of "conflicts of interest."**

75. In 2009, Ocwen spun off its technology products business into a separate company, Altisource.[75]

76. On August 4, 2009, Ocwen stated in a filing with the Securities and Exchange Commission:

> **We could have conflicts with Altisource, and our Chief Executive Officer and Chairman of the Board, and other officers and directors, could have conflicts of interest due to their relationships with Ocwen and Altisource, which may be resolved in a manner adverse to us.** . . .
>
> Certain of our executive officers and directors may be subject to conflicts of interest with respect to such agreements and other matters due to their relationships with Altisource. William C. Erbey, who will remain our Chief Executive Officer and Chairman of the Board, will become Altisource's non-executive Chairman of the Board as a result of the spin-off. As a result, he has obligations to us as well as to Altisource and may potentially have conflicts of interest with respect to matters potentially or actually involving or affecting Altisource and us. Mr. Erbey will own substantial amounts of Altisource common stock and stock options because of his relationships with Altisource. This ownership could create or appear to create potential conflicts of interest when our Chairman of the Board is faced with decisions that involve Ocwen, Altisource or any of their respective subsidiaries. . . .

---

[70] **SJX 10**, Ocwen 2013 10-K/A at 32.
[71] **SJX 20**, Oct. 24, 2012 Press Release.
[72] **SJX 3**, Ocwen 2014 10-K at 6.
[73] **SJX 55**, Ridder Aff. ¶¶ 18–19.
[74] **SJX 10**, Ocwen 2013 10-K/A at 4.
[75] **SJX 1**, Ocwen 2009 10-K at 3.

> Matters that could give rise to conflicts between Altisource and us include, among other things . . . the quality and pricing of services that Altisource has agreed to provide to us or that we have agreed to provide to Altisource.[76]

77. On August 10, 2009, OFC entered into an eight-year Technology Product Services Agreement with Altisource ("2009 Altisource Agreement"), which was signed by Ronald Faris and provided that Altisource would provide OFC with a residential loan servicing system, REALServicing.[77]

78. On October 1, 2012, OFC amended the 2009 Altisource Agreement with an amendment signed by Ronald Faris ("First Amendment") that extended the term until August 31, 2020.[78]

79. On March 19, 2013, OFC amended the 2009 Altisource Agreement and First Agreement in a second amendment ("Second Amendment"), which extended these agreements until August 31, 2025.[79]

80. On June 12, 2016, during the Bureau's investigation that preceded this litigation, OLS's corporate witness testified that extending the agreement to 2025 was longer than was reasonable.[80]

81. The 2009 Altisource Agreement, First Amendment, and Second Amendment did not contain any terms requiring Altisource to make technology upgrades to REALServicing.[81]

---

[76] **SJX 9**, Ocwen 10-Q, Aug. 4, 2009, at 64 (emphasis in original)*; see also* **SJX 3**, Ocwen 2014 10-K at 28 (recognizing that where "certain of our officers and directors own stock or options" in Altisource and its affiliates, this could create actual or potential "conflicts of interest" with respect to matters between Ocwen and Altisource and its affiliates).

[77] **SJX 69**, 2009 Technology Services Agreement, OCW3-007-0000050 at 054 (stating at Paragraph 5(a), initial term is 8 years), and 070 (services include "Residential Loan Servicing System"); **SJX 117**, 2009 Technology Letter, OCW3-007-0000079 at 081 (attachment to the 2009 Technology Servicing Agreement listing [redacted]); **SJX 40**, Kacher 30(b)(6) Dep. at 9:4–10:9.

[78] **SJX 72**, First Am. Altisource Agreement, OCW3-007-0000072 at 072–073.

[79] **SJX 73**, Second Am. Altisource Agreement, OCW3-007-0000076 at 076.

[80] **SJX 50**, Kacher Corporate IH Tr. at 185:2–185:16; **SJX 40**, Kacher 30(b)(6) Dep. at 15:1–16:12 (affirming the truth and completeness of Kacher's prior 6/21/16 IH corporate testimony).

[81] **SJX 37**, Aery 30(b)(6) Dep. at 93:11–94:16; *see also* **SJX 69**, 2009 Technology Services Agreement, OCW3-007-0000050; **SJX 72**, First Am. Altisource Agreement, OCW3-007-0000072; **SJX 73**, Second Am. Altisource Agreement, OCW3-007-0000076 (agreements contain no requirement for Altisource to invest).

82. From September 2013 to October 2014, Altisource was paid approximately $93.9 million for technology services used by OFC, OLS, and OMS.[82]

83. Ocwen was the only servicer to use REALServicing.[83]

84. In a December 22, 2014 consent order with NY DFS, OFC and OLS agreed to the following statements:

> A frequent occurrence is that a fix to one system [within REALServicing] creates unintended consequences in other systems. As a result, Ocwen regularly gives borrowers incorrect or outdated information . . . and maintains inaccurate records. There are insufficient controls in place— either manual or automated—to catch all of these errors and resolve them.[84]
>
> Ocwen's core servicing functions rely on its inadequate systems . . . . Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans.[85]
>
> The Department's review of Ocwen's mortgage servicing practices also uncovered a number of conflicts of interest between Ocwen and [Altisource and other related companies], all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen. . . . Other Ocwen executives and directors also own significant investments in both Ocwen and the related parties.[86]
>
> Conflicts of interest are evident at other levels of the Ocwen organization. For example, during its review, the Monitor discovered that Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource Portfolio. The Chief Risk Officer reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer.[87]

85. In the December 22, 2014 consent order with the NY DFS, Ocwen agreed to pay $150 million and William Erbey would resign from his positions as of January 16, 2015.[88]

---

[82] **SJX 110**, Vendor Risk Assessment Report, OCW-011-0001230 at 231 ("ATS annual spend from September 2013 to October 2014 was approximately $93,904,224.00").
[83] **SJX 46**, Faris Dep. at 33:18–33:21; *see also* **SJX 108**, June 2015 Stakeholder Summary, OCW4-001-0001136 at 150 ("Ocwen is currently the only investor/user of REALServicing").
[84] **SJX 24**, NY DFS Consent Order Dec. 22, 2014 ¶ 14.
[85] **SJX 24**, NY DFS Consent Order Dec. 22, 2014 ¶¶ 17–18.
[86] **SJX 24**, NY DFS Consent Order Dec. 22, 2014 ¶ 20; *see also* **SJX 97**, Defs.' Resp. to CID Rog. No. 5 at 6–11 (identifying Faris, Anderson, Aery, and other Ocwen executives and Board members who owned Altisource shares or stock options); **SJX 36**, Abate 30(b)(6) Dep. at 80:15–80:18, 82:4–82:15 (verifying Interrogatory No. 5 as true and accurate.).
[87] **SJX 24**, NY DFS Consent Order Dec. 22, 2014 ¶ 23.
[88] **SJX 24**, NY DFS Consent Order Dec. 22, 2014 ¶¶ 24, 57.

**C. Ocwen contracted with an ill-prepared insurance vendor.**

86. In August 2013, Ocwen hired a subsidiary of Altisource, Beltline Road Insurance Agency, to help Ocwen select a new insurance vendor.[89]

87. Beltline selected Southwest Business Corporation ("SWBC").[90]

88. In 2014, OLS entered into agreements with SWBC to provide insurance-related services, including those related to paying and placing borrowers' hazard and flood insurance.[91]

89. In connection with its 2014 contract with Ocwen, SWBC also contracted with Altisource and Beltline for services concerning Ocwen loans, and agreed to pay, among other amounts, Altisource $10,000 per month for these "Additional Program Services."[92]

90. According to OFC's Sr. Vice President of Servicing Operations, Ocwen was paying SWBC "twice as much as [its prior insurance vendor] and the service so far is crap."[93]

**D. Ocwen was not technologically prepared to handle its explosive growth.**

91. From January 2014 until May 19, 2016, Ocwen made over 1,700 requests to Altisource to fix or enhance its technology.[94]

92. In a July 2014 e-mail, Thomas Diller wrote to Scott Anderson about Altisource:

a. "Every tech org I've ever seen in the past has a project control and management process that simply does not exist at [Altisource]";

b. "They are significantly understaffed to implement these changes on the front line";

c. "There is literally no one at [Altisource] that understands what escrow is, why we do it, and how it's supposed to work. No one. . . . This has been the absolute biggest problem – there is no one to translate the business requirements into programming language. . . . Every other tech org I've seen has this role."; and

---

[89] **SJX 97**, Defs.' Resp. to CID Rog. 9 at 16.

[90] **SJX 97**, Defs.' Resp. to CID Rog. 9 at 17–18.

[91] **SJX 99**, Agreement for Hazard Insurance (SWBC Dep. Ex. 10) at 1; **SJX 100**, Agreement for Flood Insurance (SWBC Dep. Ex. 11) at 1.

[92] **SJX 98**, Program Management Agreement (SWBC Dep. Ex. 9) §§ 3.1, 3.2(c).

[93] **SJX 90**, Nov. 20, 2014 E-mail, OCW-CFPB-001-06270994 at 995.

[94] **SJX 135**, May 19, 2016 CID at Written Report Request No. 1 at 3 (requiring OLS to report and provide information on each technology projected it assigned to Altisource from January 10, 2014 to May 19, 2016); **SJX 153**, Ocwen's Resp. to WR 1, OCW4-004-0000001 (listing 1,706 projects); **SJX 37**, Aery 30(b)(6) Dep. at 65:15–66:22.

d. "I know [Altisource] is changing and it's difficult to find resources that can work on REALServicing, but they are our Achilles' heel. We are absolutely dependent upon them for so much critical change and they don't have the basic structure in place to fulfill that. . . . [Altisource's president of technology services] even agrees with me."[95]

93. In a July 10, 2014 e-mail, Scott Anderson forwarded an e-mail from Thomas Diller to Ronald Faris about Altisource and stated: "this is well summarized and you should read it. I'll be the first to admit . . . technology is an absolute train wreck."[96]

94. In a July 11, 2014 e-mail, Scott Anderson wrote to Ronald Faris that REALServicing was "an absolute train wreck" and:

> I know there's no shot in hell, but if I could change systems tomorrow I would**.** I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here. I'm talking about getting systems to stay online, escrow analysis to work, letters to print, etc. It's ridiculous.[97]

95. OFC's former head of Servicing Compliance, Denise Rinear, testified that she was "absolutely" concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015 and that she, other members of the Compliance Department, and the leaders of Servicing Operations, Loss Mitigation, and other Ocwen business units "frequently" and "loudly" raised this concern.[98]

96. Denise Rinear testified that, in determining the root cause of various issues, "the answer would almost always be REALServicing and the processes that we're using, would be the answer we would get from the business. . . . [It] was a commonality across all of [the business units]. . . . Everything in servicing, every department in servicing."[99]

---

[95] **SJX 118**, July 10, 2014 Anderson E-mail, OCW-CFPB-001-06735261 at 261.
[96] **SJX 118**, July 10, 2014 Anderson E-mail, OCW-CFPB-001-06735261 at 261.
[97] **SJX 109**, July 11, 2014 E-mail, OCW3-010-0002086 at 086; **SJX 47**, Anderson Dep. at 215:7–217:10.
[98] **SJX 54**, Rinear IH Tr. at 60:24–62:24; **SJX 48**, Rinear Dep. at 12:1–12:12 (confirming prior investigational hearing testimony was truthful and accurate).
[99] **SJX 54**, Rinear IH Tr. at 62:25–65:7; **SJX 48**, Rinear Dep. at 12:1–12:12 (confirming prior investigational hearing testimony was truthful and accurate).

97. In 2015, Ocwen hired a consultant, Accenture, who performed a "Servicing Platform Analysis," reviewing REALServicing, and interviewing Ocwen's senior leaders.[100]

98. An Accenture presentation dated May 8, 2015 listed "pain points" that were identified by "subject matter experts" from Ocwen's business units and that represented "functional and/or technical deficiencies" that "stemm[ed] from systematic and manual processes,"[101] including:

a. With respect to escrow: a "technical gap causing escrow analysis to be conducted incorrectly";[102]

b. With respect to disbursements from borrowers' escrow accounts to insurance companies: "no systematic controls exist in [sic] to prevent duplicate disbursements in REALServicing resulting in 6k –12k incidents per year";[103]

c. With respect to loan modification processes: "[u]pon review of a [loan modification] package, terms are found to be incorrect approximately 80% of the time (e.g., NPV miscalculation, final modification date incorrect)";[104]

d. With respect to foreclosure data: "[d]ata between REALResolution [the REALServicing application for foreclosures] and REALServicing is not always in sync due to lack of adequate system mapping";[105] and

e. With respect to the payment of borrower taxes: "[a]lthough tax assessment information is supposed to be used to project more accurate payments, REALServicing automatically uses last year[']s billing amount, even if installments for the current year are different."[106]

99. In a June 2015 presentation, Accenture reported that Altisource is "not currently planning to invest in further development or marketing of REALServicing."[107]

100. In 2014, OFC audited Altisource and failed the vendor in every area, finding:

---

[100] **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 22 and 26–45; **SJX 37**, Aery 30(b)(6) Dep. at 74:23–75:25 (confirming that Accenture's list of executives interviews and interviews of Ocwen's executives are respectively detailed at slides at pages 22 and 26–45).
[101] **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 8 (stating what "pain points" represented) and p. 10 (61 pain points were "identified by Subject Matter Experts").
[102] **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 27.
[103] **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 28.
[104] **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 32.
[105] **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 35.
[106] **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 45.
[107] **SJX 108**, June 2015 Stakeholder Summary, OCW4-001-0001136 at 150.

a. "Lack of Vendor Oversight by Ocwen Business Unit over [Altisource]" with the "Cause" being "Ocwen Assessment Team has not implemented significant vendor management policies and procedures to help ensure comprehensive vendor management oversight program of [Altisource]";[108] and

b. "Existing Contracts Lack the Necessary Provisions, Business Requirements, and Service Level Agreements" followed by a "Vendor Response" stating "many of the issues identified in this Audit Report are the result of the absence of a clear fully-documented set of commercial expectations. . . . Altisource is committed to working . . . with Ocwen to develop agreement terms that are reasonable, appropriate, and fair."[109]

**E. Entering 2014, Ocwen's compliance program was ill-prepared to meet its legal obligations.**

101. Prior to 2014, OFC identified one of Ocwen's "Competitive Strengths" to be: "Lowest Cost Provider. We believe OLS has the lowest operating cost in the mortgage servicing industry."[110]

102. OFC stated that it "must comply with, among others . . . the Fair Debt Collection Practices Act, the Real Estate Settlement Procedures Act (RESPA), the Truth in Lending Act (TILA) . . . the Homeowners Protection Act . . . [and] the Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). . . ."[111]

103. Ronald Faris testified that Ocwen had hired its first chief compliance officer a few months after acquiring the ResCap portfolio and that Ocwen's compliance management capabilities in January 2014 were in the "early stages of development."[112]

---

[108] **SJX 110**, Vendor Risk Assessment Report, OCW-011-0001230 at 241 (OFC also notes on this same page under "Impact" that "[t]hrough its agency relationship with Altisource. . . Ocwen is potentially exposed to regulatory, economic and reputational risk and damages due to the actions, non-compliance or inadequate control. . . of vendors").

[109] **SJX 110**, Vendor Risk Assessment Report, OCW-011-0001230 at 243–245; **SJX 37**, Aery 30(b)(6) Dep. at 30:11–31:1.

[110] **SJX 9**, Ocwen 10-Q Aug. 4, 2009 at 33; *see also* **SJX 21**, May 2, 2013 Press Release ("Ocwen remains very well-positioned with the lowest cost to service for non-performing loans in our industry").

[111] **SJX 3**, Ocwen 2014 10-K at 8–9; *see also* **SJX 4**, Ocwen 2015 10-K at 8; **SJX 5**, Ocwen 2016 10-K at 7; **SJX 6**, Ocwen 2017 10-K at 8; SJX7, Ocwen 2018 10-K at 7; SJX. 8, Ocwen 2019 10-K at 7; **SJX 86**, July 31, 2013 Audit, OCW-030-0040608 at 608 (stating Ocwen's escrow management practices are built around regulatory requirements).

[112] **SJX 46**, Faris Dep. at 92:7–92:21.

104. In early 2014, Chase Bank, N.A. reported the details of its evaluation of Ocwen as a servicer for Chase to Ronald Faris, who understood that Chase found Ocwen's "compliance management system lacking."[113]

105. Chase terminated Ocwen as its subservicer (*i.e.*, servicer of certain loans) and required Ocwen to transfer loans back to Chase.[114]

106. In or around 2014, Ocwen's Compliance Department, with assistance from two consulting firms, carried out a compliance risk assessment of 498 different items regarding Ocwen's mortgage servicing.

a. The assessment found that 70 percent of these items "require[d] remediation."

b. The subjects of the assessment included: Ocwen's compliance with RESPA, TILA, FDCPA, and CFPA in the areas of (i) consumer complaints; (ii) billing errors; (iii) communications; (iv) transfers; (v) home equity line of credit billing statements; (vi) cancellations of private mortgage insurance; (vii) escrow; (viii) flood insurance; (ix) foreclosure sales; and (x) communications to borrowers.[115]

107. In December 2014, Fannie Mae sent OFC a report of a servicer review it conducted of OLS "detailing a large number of high risk findings and evidencing various systematic weaknesses in [its] operational control environment."[116]

108. Ocwen tracked issues related to its servicing and other operations in databases it referred to as "Issue Tracking" and, later, "Metric Stream."[117]

109. In its August 14, 2015 issue-tracking report, Ocwen listed [redacted] issues.[118]

---

[113] **SJX 95**, Jan. 22, 2014 Letter (Dep. Ex. 238), OCW-CFPB-001-01576053 at 055; **SJX 46**, Faris Dep. at 238:15–240:6.

[114] **SJX 46**, Faris Dep. at 242:25–243:4.

[115] **SJX 48**, Rinear Dep. at 19:15–23:7; **SJX 111**, Compliance Risk Assessment (Dep. Ex. 284), OCW-027-0190340 at 344 (applicable regulations); 349–357 (listing top issues); and 358 (summarizing that 70% of regulatory items need remediation); **SJX 47**, Anderson Dep. at 99:22–101:1 (Compliance Department created the risk assessment); 117:12–118:9 (risk assessment indicates that 348 of 498 items required remediation).

[116] **SJX 76**, Dec. 2, 2014 Letter, OCW-039-0012144 at 145.

[117] **SJX 36**, Abate 30(b)(6) Dep. at 45:10–46:16.

[118] **SJX 36**, Abate 30(b)(6) Dep. at 46:17–47:5 (identifying the Aug. 2015 RC Rpt., **SJX 134**, OCW-019-0010624 ([redacted]); **SJX 55**, Ridder Aff. ¶¶ 5–6.

110. The August 14, 2015 issue-tracking report listed [redacted] issues under the "[redacted]" category of "[redacted]," including:[119]

a. "[I][redacted]";[120]

b. "[redacted];"[121]

c. [redacted]";[122]

d. "[redacted];"[123]

e. "[redacted][124] and

f. [redacted]."[125]

111. OFC's first on-site audit of Altisource in 2014 concluded that "70% of the issues listed on [Ocwen's issue-tracking] report relate to technology projects and enhancements needed which

---

[119] **SJX 55**, Ridder Aff. ¶ 6; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624.
[120] **SJX 55**, Ridder Aff. ¶ 8; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624 at No. 752.
[121] **SJX 55**, Ridder Aff. ¶ 9; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624 at No. 3212. NOPC refers to a Notice of Payment Change, a required notice to the Bankruptcy Court detailing changes in payments the servicer is requesting from the borrower.
[122] **SJX 55**, Ridder Aff. ¶ 10; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624 at No. 3203.
[123] **SJX 55**, Ridder Aff. ¶ 11; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624 at No. 3425.
[124] **SJX 55**, Ridder Aff. ¶ 12; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624 at No. 1503.
[125] **SJX 55**, Ridder Aff. ¶ 13; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624 at No. 1605.

are owned by Altisource. There is a lack of priority and very little is getting resolved/completed."[126]

112. Ocwen's August 15, 2014 issue-tracking report identified [redacted]"[127]

113. In response to a Bureau request, OLS produced a report on October 3, 2016, under penalty of perjury, identifying whether consumers were remediated for particular issues ("Remediation Report").[128]

114. In the Remediation Report identified in Fact 113, OLS reported that it [redacted][129]

## III. OCWEN'S SERVICING FAILURES

### A. Ocwen serviced loans using inaccurate and incomplete information.

#### 1. Ocwen had a loan-verification process to confirm the accuracy of information it entered into its system of record.

115. When Ocwen acquired the servicing rights to a loan from another servicer, it transferred (*i.e.*, "boarded") the loan information from the prior servicer onto REALServicing.[130]

116. Until at least the second quarter of 2019, Ocwen used REALServicing to service a loan beginning on the date the loan was boarded.[131]

---

[126] **SJX 110**, Vendor Risk Assessment Report (Dep. Ex. 117), OCW-011-0001230 at 261.
[127] **SJX 55**, Ridder Aff. ¶ 14; **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624.
[128] **SJX 36**, Abate (30)(b)(6) Dep. at 68:10–70:22 (testifying that this report was true as of October 3, 2016); **SJX 136**, April 8, 2016 CID (Dep. Ex. 134) at 10; **SJX 131**, Remediation Report (Dep. Ex. 135), OCW3-034-0000001 (overlay 5).
[129] **SJX 55**, Ridder Aff. ¶¶ 15–17; **SJX 131**, Remediation Report, OCW3-034-0000001 (overlay 5).
[130] **SJX 51**, Kennedy IH 6/14/2016 Tr. at 61:19–62:12, 66:14–67:1, 73:18–74:17; **SJX 34**, Kennedy 30(b)(6) Dep. at 130:2–130:20 (confirming the accuracy and completeness of corporate testimony provided during the Bureau's investigation on boarding-related topics); **SJX 62**, 2014 Boarding Procedures, OCW-013-0006532 at 539–540 (identifying data delivery requirements), 542–547 (identifying general requirements), 581 (referencing compliance with CFPB); **SJX 33**, Haas 30(b)(6) Dep. at 11:3–12:7.
[131] **SJX 147**, Defs.' Resp. Third Set of Rogs. Answer to No. 19(a) at 11 (identifying that the date Ocwen boarded the loan was the same date that it began servicing the loan on RealServicing); **SJX 35**, Sebastian 30(b)(6) Dep. 115:5-115:16; **SJX 8**, Ocwen 2019 10-K at 61 (Ocwen

117. From January 2014 until at least the second quarter of 2019, Ocwen conducted its loan-verification process "to confirm the accuracy of key data points loaded in REALServicing, including principal and interest, with the original loan documents received from the prior servicer,"[132] and "confirm the accuracy of the data that Ocwen's "business units . . . use in their day-to-day operation."[133]

118. Ocwen verified key data fields in its system of record, including principal balance, loan term, and the terms contained in a borrower's mortgage note.[134]

119. If Ocwen boarded an adjustable-rate mortgage ("ARM"), Ocwen verified the "ARM Rider" fields, including those that it used to "calculate[ ] the interest rate and monthly payments the borrower must make with an Adjustable Rate Mortgage."[135]

120. Ocwen's internal policy required it to verify critical loan information within sixty days of boarding the loans.[136]

121. Ocwen's process for generating statements to borrowers of the amounts they owed was automated and relied on the information in its system of record; if Ocwen boarded inaccurate information onto its system of record and that information affected the determination of an

---

completed the transfer of loans from REALServicing to a new system during the second quarter of 2019).

[132] **SJX 60**, Loan Verification Backlog Management Assertion Form ("MAF"), OCW-CFPB-001-00084142 at 142; *see also* **SJX 63**, 2014 Loan Verification Procedures, OCW-029-0055277 at 280 (loan verification is a "post[-]boarding comparison of specific fields in REALServicing to the mortgage loan documents. . . . Loan verification ensures accuracy and timely updating of the borrower's account information at the time of boarding").

[133] **SJX 33**, Haas 30(b)(6) Dep. at 16:3–16:9.

[134] **SJX 33**, Haas 30(b)(6) Dep. at 15:8–17:7 (Ocwen verifies key fields), 41:25–42:3 (regarding 2016 Loan Verification procedures); **SJX 58**, 2016 Loan Verification Procedures (Dep. Ex. 112), OCW4-001-0000041 at 052 (original principal balance), 056 (loan term), and 186–188 (listing in Appendix A the 86 fields Ocwen verifies, including fields in the borrower's mortgage note); *see also* **SJX 65**, Oct. 9, 2014 E-mail, OCW-039-0093942 at 943–944 (Ocwen personnel identifying, as of 2014, key fields that need to be verified through loan verification).

[135] **SJX 33**, Haas 30(b)(6) Dep. at 28:21–25, 41:10–42:4, **SJX 58**, 2016 Loan Verification Procedures (Dep. Ex. 112), OCW4-001-0000041 at 75; *see also* **SJX 63**, 2014 Loan Verification Procedures, OCW-029-0055277 at 293–298 (Ocwen's 2014 Loan Verification Procedures describing the ARM Rider fields to be verified).

[136] **SJX 33**, Haas 30(b)(6) Dep. 27:18–27:21; **SJX 51**, Kennedy IH 6/14/2016 Tr. at 105:13–105:24; 122:4–8; **SJX 112**, Loan Transfer Overview Procedure, OCW4-001-0000227 at 310.

amount owed, then Ocwen communicated to borrowers inaccurate amounts owed until Ocwen corrected the inaccurate information in its system of record.[137]

**2. Ocwen serviced loans that it boarded onto its system of record for extended periods, often years, without performing its loan-verification process.**

122. As of January 1, 2014, Ocwen was servicing hundreds of thousands of loans, including ARM and other mortgage loans, that it had not yet verified.[138]

123. As of January 2014, Ocwen was servicing "a backlog of approximately 315,000 ARM loans that had not gone through the verification process."[139]

124. By October 2014, when Ocwen completed boarding the acquired ResCap loans onto REALServicing, the backlog of unverified loans was over 1.39 million.[140]

125. As of April 2016, Ocwen had a backlog of over 263,000 ResCap loans that it had not yet verified.[141]

126. In the same risk assessment detailed in Fact 106, OFC's compliance unit wrote:

> Inbound transfers are based on data from the prior servicer and there is no timely reconciliation to the underlying documents as required under RESPA. . . . the large backlog of loans to review could result in numerous servicing errors. . . . In servicing transfers, the lack of reconciliation to the underlying documents creates a risk of inaccuracy in ongoing servicing. Inaccuracies harm borrowers and impact the activities of multiple business units.[142]

---

[137] **SJX 33**, Haas 30(b)(6) Dep. at 106:4–16, 109:5–109:20; *see also* **SJX 34**, Kennedy 30(b)(6) Dep. at 117:14–118:21 (confirming that if there is inaccurate data in the system the billing statement would include that information).

[138] **SJX 129**, Apr. 2015 Loan Verification Report, OCW4-001-0001032 at Tab Prior Servicer Outstanding, Cell B5 (588,578 loans outstanding as of Dec. 31, 2013); **SJX 33**, Haas 30(b)(6) Dep. at 78:7–78:15 (confirming the 588,578 loans referenced in **SJX 129** represented "[o]utstanding not moved through the loan verification process").

[139] **SJX 60**, Loan Verification Backlog MAF, OCW-CFPB-001-00084142 at 142.

[140] **SJX 127**, Oct. 2016 Loan Verification Report, OCW-CFPB-001-00083897 at Tab Loan Boarding, Cell AG5 (identifying 1,390,153 loans whose verification is outstanding); **SJX 33**, Haas 30(b)(6) Dep. at 90:14–90:18 ("Q. And as we look at the numbers here, as of the end of 2014, there were over 1.3 million Residential Capital loans that had not been verified, correct? A. Correct").

[141] **SJX 127**, Oct. 2016 Loan Verification Report, OCW-CFPB-001-00083897 at Tab Loan Boarding, Cell DA5 (identifying 263,974 outstanding loans); **SJX 33**, Haas 30(b)(6) Dep. at 91:25–92:8 (identifying a delay of at least 18 months in verifying the boarded loans).

[142] **SJX 48**, Rinear Dep. at 19:15–23:7; **SJX 111**, Compliance Risk Assessment (Dep. Ex. 284), OCW-027-0190340 at 350.

**3. When Ocwen verified loans, it found discrepancies in the information in its system of record.**

127. During the years 2014 through 2017, Ocwen found 1,380,401 discrepancies requiring corrections in 628,166 borrowers' loan data between the information in its system of record, which it had been using to service those loans, and the information in the original loan documents.[143]

128. When the Bureau requested that Ocwen produce documentation of corrections it made to discrepancies identified during its loan verification process in its "overcharge" and "undercharge" audits, Ocwen objected to the term "audit" and stated:

> [T]hey are a loan-by-loan check done on loans identified by various methods, such as investors, loan verification, customers or others and sent to the ARM team to determine whether there was an over or undercharge. Those anomalies were sent to the line of business via email, updated in the servicing system of record with a comment, **and the results were not put in a centralized system until the third Quarter of 2017**. Given the de-centralized nature of the storage of the reports, this Request purports to require Ocwen to undertake an unreasonable investigation that is disproportionate to the needs of the case.[144]

129. The Bureau requested in an interrogatory that Ocwen identify, with loan-level detail, that "If You contend that You provided Remediation to the Borrower as a result of Your Loan Verification Process, the amount(s) of Remediation, the type(s) of remediation (e.g., refund, credit, or waiver), and the date(s) You provided Remediation to the Borrower."[145]

130. Ocwen responded to the Bureau's interrogatory in Fact 129 by providing a narrative response that stated, among other things: "a manual review of the loan history in each loan file would be required to link the transaction history credits to the loan verification error."[146]

---

[143] **SJX 55**, Ridder Aff. ¶¶ 20–26; **SJX 122**, 2016 Loan Verification Report, OCW-CFPB-001-00083890; **SJX 132**, 2017 Loan Verification Report, OCW-CFPB-001-00083901.

[144] **SJX 154**, Ocwen's Response to Bureau's Fourth Set of RFPs No. 48 at 51 (emphasis added). Ocwen later agreed to query the date limited data it did maintain and produced two reports identifying its overcharges and undercharges to borrowers, as detailed in Facts 150–154. *See* **SJX 126**, Overcharge Loans, OCW-CFPB-001-06048935, **SJX 133**, Undercharge Audit RFP 48, OCW-CFPB-001-06048934.

[145] **SJX 146**, Bureau's Third Set of Rogs. Rog. No. 19(m) at 5.

[146] **SJX 147**, Defs.' Resp. Third Set of Rogs. Rog. No. 19(m) at 12.

131. From September 2014 through September 2017, Ocwen identified 89,479 discrepancies needing correction in the ARM Rider fields in its system of record.[147]

132. From September 2014 through September 2017, Ocwen identified 55,338 discrepancies needing correction in the "Loan Term" field (the number of months from first payment date to maturity) in its system of record.[148]

133. From September 2014 through September 2017, Ocwen identified 38,393 discrepancies needing correction in the "Maturity Date" field (the due date on which the borrower must pay back the loan in full) in its system of record.[149]

134. In 2014, after Ocwen transferred certain mortgage servicing rights to BOA, Ronald Faris e-mailed Scott Anderson and others that BOA "still ha[s] an outstanding issue with transferring data between Ocwen and BOA. The[y] indicated that errors/edits have been reduced from 50,000 to 7,000, but that there are still 7,000. They indicated that they don't have these types of issues with their other subservicers," and Mr. Anderson responded that "they mentioned that it's been going on for 6-9 months."[150]

**4. Because it maintained inaccurate loan information in its system of record, Ocwen collected wrong amounts from borrowers and denied loss mitigation applications.**

135. Ocwen has communicated to borrowers amounts that they owe in various communications, including in periodic statements.[151]

136. Ocwen has serviced loans with the information it boards onto its system of record.[152]

---

147 **SJX 55**, Ridder Aff. ¶ **29**; **SJX 122**, 2016 Loan Verification Report, OCW-CFPB-001-00083890; **SJX 132**, 2017 Loan Verification Report, OCW-CFPB-001-00083901; **SJX 58**, 2016 Loan Verification Procedures, OCW4-001-0000041 at 187 (identifying ARM rider fields that Ocwen verifies).

148 **SJX 55**, Ridder Aff. ¶ 28; **SJX 122**, 2016 Loan Verification Report, OCW-CFPB-001-00083890; **SJX 132**, 2017 Loan Verification Report, OCW-CFPB-001-00083901; **SJX 58**, 2016 Loan Verification Procedures, OCW4-001-0000041 at 056 (defining "loan term").

149 **SJX 55**, Ridder Aff. ¶ 27; **SJX 122**, 2016 Loan Verification Report, OCW-CFPB-001-00083890; **SJX 132**, 2017 Loan Verification Report, OCW-CFPB-001-00083901; **SJX 58**, 2016 Loan Verification Procedures, OCW4-001-0000041 at 055 (defining "maturity date").

150 **SJX 92**, July 21, 2014 E-mail, OCW3-010-0002065 at 065.

151 **SJX 34**, Kennedy 30(b)(6) Dep. at 111:1–111:4; **SJX 115**, Ocwen Periodic Statement Template, OCW3-009-0000118 at 118–119 (identifying, among other things, amounts owed); **SJX 33**, Haas 30(b)(6) Dep. at 103:14–104:24 (discussing the Periodic Statement Template); **SJX 35**, Sebastian 30(b)(6) Dep. at 11:17–12:2.

152 **SJX 147**, Defs.' Resp. Third Set of Rogs. Answer to No. 19(a) at 11; **SJX 35**, Sebastian 30(b)(6) Dep. at 115:5–115:16.

137. If the information that Ocwen maintained in its system of record was inaccurate, then Ocwen serviced the loan with inaccurate information until it corrected the information.[153]

138. When servicing loans, Ocwen used the loan information in its system of record in written and oral communications with borrowers.[154]

139. Ocwen used the information in its system of record to populate the information that it communicated to borrowers in annual escrow account statements.[155]

140. Ocwen sent borrowers periodic statements containing the "total amount due," which equaled the sum of the following amounts owed: (1) principal payment owed; (2) interest payment owed; (3) escrow payment owed; (4) past due fees and other amounts owed; and (5) amounts owed for optional products.[156]

141. If one of the amounts owed identified in Fact 140 was inaccurate in Ocwen's system of record on the date a periodic statement was generated, then Ocwen would communicate an inaccurate "total amount due" to the borrower.[157]

142. If information in a particular data field in Ocwen's system of record that it used to calculate an amount owed, such as the loan's interest rate, was inaccurate on the date a periodic statement

[153] **SJX 147**, Defs.' Resp. Third Set of Rogs. Answer to No. 19(a) at 11; **SJX 35**, Sebastian 30(b)(6) Dep. at 115:5–115:16; *see also* **SJX 130**, Servicing Platform Analysis, OCW4-001-0001081 at 46 (management identifying a pain point was the "lack of quality check capability within the system" for "[n]ewly boarded loans"); **SJX 59**, Inaccurate Interest Rate MAF, OCW-030-0027208 at 208 (identifying loans boarded with incorrect interest rates).

[154] **SJX 35**, Sebastian 30(b)(6) Dep. at 11:17–12:2; *see also* **SJX 34**, Kennedy 30(b)(6) Dep. at 117:14–118:21 (confirming that if there is inaccurate data in the system, the billing statement would include that information).

[155] **SJX 35**, Sebastian 30(b)(6) Dep. at 11:17–12:2, 93:19–94:3.

[156] **SJX 115**, Ocwen Periodic Statement Template, OCW3-009-0000118 at 118 (including "Explanation of Amount Due"); **SJX 156**, Defs.' Resp. to Fifth Set of RFPs at RFP No. 21.

[157] **SJX 34**, Kennedy 30(b)(6) Dep. at 117:14–118:21 (confirming that if there is inaccurate data in the system the billing statement would include that information); **SJX 33**, Haas 30(b)(6) Dep. at 106:4–106:16 (identifying that certain interest rate fields (and ARM rider terms) would affect the information on a borrower's periodic statement); *see also* **SJX 113**, July 8, 2014 E-mail, OCW-024-0001843 at 846 ("loans wrongly got boarded as Interest Only. As a result, only IO amount was picked as the P&I amount and letter was sent to borrower with comparatively less payments.").

was generated, then Ocwen would calculate the amount owed incorrectly and then communicate an inaccurate "total amount due" to the borrower in that periodic statement.[158]

143. If information in a particular data field in Ocwen's system of record that it used to calculate an amount owed, such as the loan's interest rate, was inaccurate on the date that any communication to a borrower was generated, then Ocwen would calculate the amount owed incorrectly and then communicate an inaccurate amount to the borrower in that communication.[159]

144. In an October 2014 audit, OFC found that "[m]anagement does not have adequate resources to ensure ARM loan verification procedures are performed timely," which "increases the risk of incorrect loan data in REALServicing and incorrect calculations of principal and interest that could impact [borrowers]."[160]

145. Some discrepancies that Ocwen identified in the loan information in its system of record did not affect the accuracy of Ocwen's calculations of the amounts owed by borrowers.[161]

146. Some discrepancies that Ocwen identified in the loan information in its system of record led Ocwen to calculate and communicate inaccurate amounts owed to borrowers until Ocwen corrected the discrepancy.[162]

147. OFC's 2016 Loan Verification Procedures included procedures to identify those "[l]oans that are financially impacted (over charged/under charged) in REALServicing."[163]

148. According to OFC's 2016 Loan Verification Procedures, when Ocwen discovered that it was using incorrect information that affected amounts it charged borrowers, it audited the

[158] **SJX 34**, Kennedy 30(b)(6) Dep. at 117:14–118:21 (confirming that if there is inaccurate data in the system, the billing statement would include that information); **SJX 34**, Kennedy 30(b)(6) Dep. at 116:3–116:6 ("[W]hatever amount showed as due within the servicing system is what showed up on the billing statement, that is what was checked with the billing statement"); *see also* **SJX 113**, July 8, 2014 E-mail OCW-024-0001843 at 846.

[159] **SJX 34**, Kennedy 30(b)(6) Dep. at 116:3–116:6 ("[W]hatever amount showed as due within the servicing system is what showed up on the billing statement, that is what was checked with the billing statement."); **SJX 33**, Haas 30(b)(6) Dep. at 106:4–106:16 (identifying that certain interest rate fields (and ARM rider terms) would affect the information on a borrower's periodic statement); *see also* **SJX 113**, July 8, 2014 E-mail, OCW-024-0001843 at 846.

[160] **SJX 119**, Oct. 28, 2014 ARM Audit, OCW-012-0000308 at 315.

[161] **SJX 33**, Haas 30(b)(6) Dep. at 99:8–100:4.

[162] **SJX 51**, Kennedy IH 6/14/2016 Tr. at 128:2–128:12; **SJX 34**, Kennedy 30(b)(6) Dep. at 116:3–116:6.

[163] **SJX 58**, 2016 Loan Verification Procedures, OCW4-001-0000041 at 183.

borrowers' accounts to determine the impact (*i.e.,* whether the borrowers were overcharged or undercharged).[164]

149. When Ocwen audited some borrowers' accounts, it determined that it sought to collect, and in fact collected, too much money for a period of time, sometimes years, and needed to provide a refund.[165]

150. In one example, Ocwen identified 301 instances involving 269 borrowers where it overcharged borrowers a total of over $132,000, including per-borrower amounts of $10,430.88; $5,765.01; $5,399.18; and $5,177.83.[166]

151. When Ocwen audited some borrowers' accounts, it determined that it had charged too little for a period of time, sometimes years.[167]

152. Ocwen did not waive the amounts it undercharged the borrowers described in Fact 151.[168]

153. Ocwen assessed the borrowers described in Fact 151 a lump-sum charge—*i.e.*, a balloon payment—for the total undercharged amount that the borrowers were required to pay if they refinanced, sold the home, or otherwise sought to pay off the loan.[169]

154. In one example, Ocwen identified 1,875 instances involving 1,705 borrowers where it undercharged the borrowers and later sought to collect a total of more than $3.6 million from them, including per-borrower lump sums of $235,519.60, $145,820.10, $131,643.32, $107,075.67, and $84,003.42.[170]

155. In a May 2014 Ocwen Standard Operating Procedure, Ocwen stated that:

> Payment shock occurs when a borrower's mortgage payment rises sharply (perhaps doubling or tripling) at a rate adjustment. Depending on the terms and conditions of a mortgage and changes in interest rates, ARM payments can change quite a bit

---

[164] **SJX 58**, 2016 Loan Verification Procedures, OCW4-001-0000041 at 177, 183 (describing the undercharge audit).

[165] **SJX 32**, Arnett 30(b)(6) 5/22/19 Dep. at 37:21–40:4; **SJX 126**, Overcharge Loans, OCW-CFPB-001-06048935 (report identifying overcharges); *see also* **SJX 125**, Overcharge Audit, OCW-CFPB-001-02292992 (example of an overcharge audit identifying overcharge of $5,399.18 over a two-year period).

[166] **SJX 55**, Ridder Aff. ¶¶ 30–34; **SJX 126**, Overcharge Loans, OCW-CFPB-001-06048935.

[167] **SJX 133**, Undercharge Audit RFP 48, OCW-CFPB-001-06048934 (report identifying undercharges).

[168] **SJX 32**, Arnett 30(b)(6) 5/22/19 Dep. at 31:15–32:13; 36:13–37:20.

[169] **SJX 32**, Arnett 30(b)(6) 5/22/19 Dep. at 31:15–32:2; 36:13–37:20 (detailing use of FB81 code to "recoup [the undercharged amount] from the consumer").

[170] **SJX 55**, Ridder Aff. ¶¶ 35-39; **SJX 133**, Undercharge Audit RFP 48, OCW-CFPB-001-06048934.

> over the life of the loan. So while a borrower could save money in the first few years of an ARM, he may find himself "shocked" when forced to face much higher payments in the future.[171]

156. In June 2014, an OFC compliance officer wrote to OFC's Director of Compliance (Denise Rinear) and Director of Servicing Compliance (Ben Purser), regarding Ocwen's loan verification process:

> We are finding this issue even with loss mitigation denials. We are denying borrowers due to incorrect origination and or maturity dates. I have zero faith that the imaging team is doing a doc to system audit. Currently as I understand we have over 6500 loans that we deem as "matured[.]" I doubt this is accurate[.] I cannot believe that there [are] that many loans that have matured. Brent pulled a sample of loan notes and determined that the system information was incorrect. These loans were either nowhere near mature date, a matured balloon, the loan was modified and the loan was extended etc . . .This is a huge data integrity issue[.][172]

157. In a March 2016 e-mail, an Ocwen employee wrote regarding approximately 18,000 loans that:

> Many fields associated with HELOC loans were boarded incorrectly or not updated appropriately after a modification. These must be fixed to prevent potential harm to borrowers. Borrowers could be forced to repay their loan before the date stated in the promissory note and could inappropriately wind up in delinquency and/or foreclosure. This is a disaster we must avoid. We need the Maturity Date, LOC Maturity Date, Expiry Option, and Draw Period End Date updated on a large batch of HELOC loans via data fix.[173]

**B. Ocwen failed to meet numerous escrow and insurance requirements.**

158. Consultants hired by Ocwen to review and report upon its escrow practices identified three million "documented CFPB violations" in the year 2014, including violations related to escrow analyses, escrow statements, and imposition of hazard and flood insurance.[174]

---

171 **SJX 61**, ARM Procedures, OCW-CFPB-001-06099339 at 350.

172 **SJX 64**, June 18, 2014 E-mail, OCW-039-0069368 at 368.

173 **SJX 96**, May 24, 2016 E-mail, OCW-CFPB-001-06245328 at 342; *see also* **SJX 120**, HELOC MAF, OCW-CFPB-001-05997822 at 822 (Ocwen identifying over 40,000 maturity-date errors in HELOC loans, requiring the review of the system data with the original note).

174 **SJX 128**, Escrow Action Plan, OCW-023-0002619 at 2 and 5–10 ([redacted]); *see also* **SJX 78**, Sept. 5, 2014 Rinear/Purser E-mail, OCW-023-0002617 at 617 (discussing the report).

**1. Ocwen failed to conduct escrow account analyses at the end of the escrow account computation year.**

159. An escrow account analysis is the accounting that a servicer conducts to determine a borrower's monthly escrow amount owed for the upcoming year and to determine whether shortages, surpluses, or deficiencies exist.[175]

160. A shortage is the amount needed to replenish an escrow account balance that has fallen short of the minimum balance necessary at the time of the escrow account analysis.[176]

161. A surplus is the amount in excess of the minimum escrow account balance necessary at the time of an escrow account analysis.[177]

162. When Ocwen conducted an escrow account analysis, it would change a borrower's monthly escrow payment if that escrow account analysis identified a shortage or surplus.[178]

163. When Ocwen conducted an escrow account analysis, it would change a borrower's future monthly escrow payment if the amounts owed for taxes or insurance identified in that analysis changed from the previous escrow year.[179]

164. In a July 21, 2013 audit, Ocwen's auditors stated:

> Ocwen is not following the RESPA requirements as per Section 3500.17(c)(3) related to conducting an annual escrow analysis in situations where the borrower is more than 30 days overdue, or where the servicer has brought an action for foreclosure under the underlying mortgage loan, or where the borrower is in a bankruptcy case. . . Non-compliance with RESPA requirements can subject Ocwen to fines and penalties. . . . Management agrees that RESPA requires an annual escrow analysis for loans that are greater than 30 days delinquent.[180]

165. On May 28, 2019, Andrew Combs, as Vice President of Servicing Operations at OLS, verified Ocwen's Responses to the Bureau's First Set of Interrogatories Nos. 1 through 13 on behalf of OLS, OFC, and OMS.[181]

166. On May 29, 2019, Andrew Combs testified that his position was Vice President of Servicing and that his employer was OFC.[182]

---

[175] 12 C.F.R. § 1024.17(b) (definition of "Escrow account analysis").
[176] 12 C.F.R. § 1024.17(b) (definition of "Shortage").
[177] 12 C.F.R. § 1024.17(b) (definition of "Surplus").
[178] **SJX 38**, Combs 30(b)(6) Dep. at 15:6–15:23; 71:5–71:9; 71:24–72:12; **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 2.
[179] **SJX 38**, Combs 30(b)(6) Dep. at 71:24–72:12; 119:10–119:17.
[180] **SJX 86**, July 31, 2013 Audit, OCW-030-0040608 at 621–622.
[181] **SJX 138**, Defs.' Resp. First Rogs. at 31–32.
[182] **SJX 38**, Combs 30(b)(6) Dep. at 7:13–7:17.

167. The Bureau's Interrogatory No. 1 asked Ocwen to identify each account for which Ocwen "maintained an Escrow Account" and "did not perform an Escrow Account Analysis within thirty days of the completion of the applicable Escrow Account Computation Year."[183]

168. In its verified response to the Bureau's Interrogatory No. 1, Ocwen answered that from January 1, 2014 through January 8, 2018 Ocwen "did not complete an Escrow Account Analysis within thirty days of the completion of the applicable Escrow Account Computation Year" 391,603 times.[184]

169. From January 1, 2014 through January 8, 2018, Ocwen did not complete an escrow account analysis within thirty days of the completion of the applicable escrow account computation year for 389,668 borrowers.[185]

170. The Bureau sent Ocwen requests for admissions asking Ocwen to admit that, in 2014, 2015, 2016, and 2017, it "failed to complete Escrow Account Analyses within 30 days of the completion of the Escrow Account Computation Year for some Borrowers whose Federally Related Mortgage Loans" it was servicing.[186]

171. In response to the Bureau's requests for admissions cited in Fact 170, OLS and OMS admitted that "Ocwen's data indicates that it did not complete an Escrow Account Analysis

---

[183] **SJX 137**, Bureau's First Set of Rogs. at Rog. No. 1. The Bureau defined the terms "Escrow Account," "Escrow Account Analysis," and "Escrow Account Computation year" to have the same meaning as in Regulation X. As defined in Regulation X, an "Escrow account" is "any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums (including flood insurance), or other charges with respect to a federally related mortgage loan." 12 C.F.R. § 1024.17(b). "Escrow account analysis" means "the accounting that a servicer conducts in the form of a trial running balance for an escrow account to (1) Determine the appropriate target balances; (2) Compute the borrower's monthly payments for the next escrow account computation year and any deposits needed to establish or maintain the account; and (3) Determine whether shortages, surpluses or deficiencies exist." *Id*. "Escrow account computation year" means "a 12-month period that a servicer establishes for the escrow account beginning with the borrower's initial payment date." *Id*. Ocwen did not object to these definitions. *See* **SJX 138**, Defs.' Resp. First Rogs. at 7-8 (Objections to Definitions).

[184] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 1; *see also* **SJX 139**, Ex. A to Defs.' Resp. First Rogs. (**SJX 138**) (listing the 391,603 untimely analyses); **SJX 38**, Combs 30(b)(6) Dep. at 52:16–53:1.

[185] **SJX 55**, Ridder Aff. ¶¶ 40–43.

[186] **SJX 148**, Bureau's Second RFAs to OLS and **SJX 149**, Bureau's Second RFAs to OMS at Nos. 109–112 at 22. The Bureau defined the terms "Escrow Account Analyses," "Escrow Account Computation Year," and "Federally Related Mortgage Loan" as those terms are defined in Regulation X. **SJXs 148** and **149**, RFAs at 2–3.

within 30 days of the completion of the applicable Escrow Account Computation Year" for 170,447 loans, 218,258 loans, 2,348 loans, and 550 loans "that required an Escrow Account Analysis" in 2014, 2015, 2016, and 2017, respectively.[187]

172. Ocwen's failure to perform timely escrow account analyses meant it failed to adjust the monthly escrow amounts owed by borrowers to account for any changes from the previous escrow account computation year, including changes to taxes or insurance.[188]

173. When Ocwen failed to timely analyze borrowers' escrow accounts and should have, but failed to, make changes to borrowers' escrow payments, borrowers accrued shortages or surpluses during the time period for which the escrow analysis was delayed that would not have accrued had Ocwen performed the escrow analysis on time.[189]

174. Ocwen testified that performing a delayed escrow analysis could result in "financial harm" and "documentation" harm.[190]

175. Ocwen testified that "[f]inancial harm [from a delayed escrow analysis] could be where a customer was over or underbilled as part of the escrow payment."[191]

176. Ocwen testified that documentation harm from a delayed escrow analysis "could be not sending an escrow analysis statement."[192]

177. When Ocwen failed to timely analyze borrowers' escrow accounts and shortages or surpluses accrued, it serviced the affected loans with inaccurate information related to monthly escrow amounts owed while the escrow analysis was delayed.[193]

---

[187] **SJX 150**, Defs.' Resp. to Bureau's Second RFAs at Answer Nos. 109–112 at 76–79.

[188] **SJX 38**, Combs 30(b)(6) Dep. at 16:7–18:21 (Ocwen explaining that its system changes monthly escrow amounts owed by borrowers though a system generated entry ("pending change" entry) that is automatically created after Ocwen performs an escrow analysis);); **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2 (identifying borrowers who were being charged inaccurate escrow amounts as reflected by the shortages and surpluses that accrued during the Delay Period).

[189] **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2; **SJX 38**, Combs 30(b)(6) Dep. at 70:8–73:1 (explaining that Ex. C shows "the escrow shortage or surplus that accrued during the time period for which an escrow analysis was outstanding").

[190] **SJX 38**, Combs 30(b)(6) Dep. at 85:13–85:16.

[191] **SJX 38**, Combs 30(b)(6) Dep. at 85:13–85:24; 117:25–118:15 (Ocwen defines "impact" for purposes of Interrogatories 1–4 as over- or under-collection).

[192] **SJX 38**, Combs 30(b)(6) Dep. at 85:25–86:8.

[193] **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2; **SJX 38**, Combs 30(b)(6) Dep. at 70:8–73:1.

178. It is normal for a borrower's monthly escrow amount to change from year to year as taxes and insurance premiums change.[194]

179. In a September 5, 2014 e-mail, Denise Rinear (OFC's then Director of Corporate Compliance) wrote to Benjamin Purser (OFC's Vice President of Compliance) and noted: "[w]e don't do escrow analysis on [a greater-than] 60-day delinquent accounts or bankruptcy accounts which could have a disproportionate impact to already distressed borrowers."[195]

180. Denise Rinear testified that not doing an escrow analysis for accounts that are greater than 60 days delinquent or bankruptcy accounts has a disproportionate impact on these borrowers: "[a]n escrow analysis can result in an increase or decrease in what you owe. So if it results in an increase in what you know – what you owe, a distressed borrower would have a disproportionate potential impact."[196]

181. Some borrowers for whom Ocwen failed to perform escrow analyses within 30 days of the end of the escrow account computation year accrued shortages or surpluses during the time period between: (a) 30 days after the completion of the applicable escrow account computation year; and (b) the subsequent escrow account analysis ("Delay Period").[197]

182. Of the 391,603 escrow account analyses that Ocwen did not conduct within 30 days of the end of the applicable escrow account computation year, 385,655 borrowers accrued a shortage or surplus during the Delay Period.[198]

183. For borrowers who accrued a shortage or surplus during the Delay Period, the borrower's monthly escrow amount was incorrect during the Delay Period.[199]

184. From January 1, 2014 through January 8, 2018, 131,994 borrowers accrued a total of $43,524,206.13 in shortages "that accrued only during the time period where Ocwen did not

---

[194] **SJX 38**, Combs 30(b)(6) Dep. at 72:9–72:15.
[195] **SJX 78**, Sept. 5, 2014 Rinear/ Purser E-mail, OCW-023-0002617.
[196] **SJX 48**, Rinear Dep. at 82:11–83:9.
[197] **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2.
[198] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 2 at 12; **SJX 55**, Ridder Aff. ¶ 44.
[199] **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2. (identifying borrowers who were being charged inaccurate escrow amounts as reflected by the shortages and surpluses that accrued during the Delay Period); **SJX 38**, Combs 30(b)(6) Dep. at 85:13–85:20, 118:7–118:15.

complete an Escrow Account Analysis within thirty days of the completion of the applicable Escrow Account Computation Year."[200]

185. Ocwen later sought to collect these shortages from borrowers through either a lump sum or through payments spread out up to five years.[201]

186. From January 1, 2014 through January 8, 2018, 194,820 borrowers accrued a total of $104,066,783.40 in surpluses "that accrued only during the time period where Ocwen did not complete an Escrow Account Analysis within thirty days of the completion of the applicable Escrow Account Computation Year."[202]

187. At least from January 1, 2014 through January 8, 2018, when Ocwen did perform an escrow account analysis, Ocwen's system of record automatically generated an entry in REALServicing to change the monthly escrow amount owed by borrowers if the analysis resulted in a change to the monthly escrow amount.[203]

188. At least from January 1, 2014 through January 8, 2018, if the escrow account analysis was not performed, then Ocwen continued to use the pre-existing monthly escrow amount while servicing the loan, including when communicating amounts owed to borrowers.[204]

189. During the Delay Period, Ocwen serviced the loans of the borrowers referenced in Fact 182 using inaccurate monthly escrow amounts in Ocwen's system of record.[205]

190. During the Delay Period, Ocwen communicated to the borrowers referenced in Fact 182 inaccurate monthly escrow amounts owed in periodic statements.[206]

---

[200] **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2; **SJX 55**, Ridder Aff. ¶ **46**.

[201] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 4 at 14–15.

[202] **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2; **SJX 55**, Ridder Aff. ¶ 45.

[203] **SJX 38**, Combs 30(b)(6) Dep. at 16:7–18:21 (Ocwen explaining that its system changes monthly escrow amounts owed by borrowers though a system generated entry ("pending change" entry) that is automatically created after Ocwen performs an escrow analysis)).

[204] **SJX 38**, Combs 30(b)(6) Dep. at 16:7–18:21 (data produced in response to 5th RFPs were used to service loans); **SJX 35**, Sebastian 30(b)(6) Dep. at 11:6–12:2 (5th RFP 29 populates details for escrow analyses sent to borrowers), 93:19–94:13; **SJX 34**, Kennedy 30(b)(6) Dep. At 19:5–20:15 (detailing how system pending change entries determine information communicated, to borrowers in periodic statements).

[205] **SJX 140**, Ex. C to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 2 (identifying borrowers who were being charged inaccurate escrow amounts as reflected by the shortages and surpluses that were accruing during the Delay Period); **SJX 38**, Combs 30(b)(6) Dep. at 70:8–73:1.

[206] **SJX 35**, Sebastian 30(b)(6) Dep. at 11:6–12:12; **SJX 38**, Combs 30(b)(6) Dep. at 16:7–18:21.

191. In April 2014, Ocwen identified that it was providing inaccurate reinstatement quotes:

> [O]n loans where the escrow analysis had not been performed in excess of a year, and resulted in incorrect monthly escrow amounts being included in the reinstatement calculation logic. The affected loan would result in incorrect reinstatement amounts being produced on Reinstatement Quotes, Monthly Billing Statements, Scripting, and other servicing communications that reference TOTRA (Total Reinstatement Amount).[207]

192. In April 2014, an Ocwen document identified 12,379 loans as "needing to be remediated" due to inaccurate reinstatement quotes.[208]

193. In its Verified Answer to the Bureau's Interrogatory No. 5, Ocwen stated that: "In the period January 1, 2014 through January 8, 2018, Ocwen estimated there were 318,819 reinstatement quotes provided to borrowers. Of those, 82,763 reinstatement quotes were identified as having an escrow amount discrepancy."[209]

194. Of the 82,763 inaccurate reinstatement quotes that Ocwen provided to borrowers, Ocwen provided 28,176 overquotes (*i.e.*, a quote that demanded more than what was required to bring the loan current) to 19,322 borrowers, with the overquote amounts totaling $102,278,556.20.[210]

195. Of the 19,322 borrowers who received an overquote, 367 of these borrowers "paid the quote (reinstated)," including a borrower who was overquoted and paid $41,632.79. The total overquote payments for all 367 borrowers totaled $608,116.36.[211]

196. Of the 82,763 inaccurate reinstatement quotes that Ocwen communicated to borrowers, Ocwen provided 54,587 underquotes (*i.e.*, a quote that demanded less than what was required to bring the loan current) to 39,751 borrowers, with the underquote amounts totaling $142,279,135.75.[212]

197. Of those 39,751 underquoted borrowers, 972 borrowers "paid the quote (reinstated)."[213]

---

[207] **SJX 84**, Reinstatement Quote MAF, OCW-030-0027038 at 038.

[208] **SJX 84**, Reinstatement Quote MAF, OCW-030-0027038 at 039; **SJX 85**, Attachment to Reinstatement Quote MAF, OCW-030-0027058 (identifying the 12,379 accounts).

[209] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 5 at 18.

[210] **SJX 143**, Ex. I to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 5; **SJX 55**, Ridder Aff. ¶¶ 49–52.

[211] **SJX 143**, Ex. I to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 5; **SJX 55**, Ridder Aff. ¶ 53.

[212] **SJX 143**, Ex. I to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 5; **SJX 55**, Ridder Aff. ¶ 54.

[213] **SJX 143**, Ex. I to Defs.' Resp. First Rogs. (**SJX 138**) at Rog. No. 5; **SJX 55**, Ridder Aff. ¶ 55.

**2. Ocwen failed to send borrowers' annual escrow account statements within 30 days of the escrow account computation year.**

198. In each of the years 2014 through 2017, Ocwen failed to send some borrowers annual escrow account statements within 30 days of the end of the relevant escrow account computation year.[214]

199. The Bureau sent Ocwen a discovery request seeking documents sufficient to identity accounts for which Ocwen "failed to send Escrow Statements to" borrowers from January 1, 2014 through January 8, 2018.[215]

200. In response to the Bureau's discovery request identified in Fact 199, Ocwen identified 183,942 annual escrow account statements that it did not send within 30 days of the relevant escrow account computation year.[216]

201. Of the borrowers identified in Fact 200, 147,589 borrowers were current at the time Ocwen conducted the relevant escrow account analysis.[217]

202. In an e-mail responding to the document referenced in Fact 158, Denise Rinear wrote:

> Escrow notices not compliant with RESPA, not sent timely or not sent at all are huge and are the foundation for all else. These are, by the way, the three biggest borrower communication issues across the board for Ocwen - required content not included, letter not sent, or letter not sent timely.[218]

**3. Ocwen required borrowers to pay shortage amounts that they had already paid.**

203. Ocwen asked borrowers to pay escrow shortages either as a lump sum or through equal monthly payments spread out over at least 12 months.[219]

---

[214] **SJX 38**, Combs 30(b)(6) Dep. at 162:19–166:3.
[215] **SJX 151**, Pl.'s Second Set RFPs at RFP 4 at 12. The Bureau defined the term "Escrow Statement" as the term "Annual escrow account statement" is defined in Regulation X. *See id*. at 8. As defined in Regulation X, "annual escrow account statement" means "a statement containing all of the information set forth in [12 C.F.R.] § 1024.17(i)." 12 C.F.R. § 1024.17(b).
[216] **SJX 87**, RFP 4 Submission Excerpt (Dep. Ex. 196), OCW-CFPB-001-01294664; *see also* **SJX 38**, Combs 30(b)(6) Dep. at 166:8–167:17; **SJX 55**, Ridder Aff. ¶¶ 56–58.
[217] **SJX 87**, RFP 4 Submission Excerpt (Dep. Ex. 196), OCW-CFPB-001-01294664 (identifying 147,589 accounts as "not delinquent"); **SJX 38**, Combs 30(b)(6) Dep. at 168:16–168:21 (testifying that "not delinquent" in Ex. 196 means "the account was less than 30 days delinquent" at the time of the escrow account analysis; **SJX 55**, Ridder Aff. ¶ 59.
[218] **SJX 91**, Sept. 5, 2014 Rinear/Hollerich E-mail, OCW-CFPB-001-06324866 at 866 (Point 1).
[219] **SJX 38**, Combs 30(b)(6) Dep. at 19:10–19:19.

204. When borrowers paid escrow shortages as lump sums, Ocwen's stated process was to record the shortage payment, remove the appropriate shortage portion from that borrower's monthly payment, and inform the borrower of the revised, lower monthly payment.[220]

205. According to OFC internal audits in 2015 and 2016, after borrowers made shortage payments in lump sums, Ocwen sometimes did not remove the appropriate shortage portion of the monthly payment. As a result, Ocwen continued to collect shortage amounts borrowers no longer owed, and when Ocwen did remove the appropriate shortage portion, Ocwen sometimes did not communicate this removal to borrowers.[221]

206. Because it did not adjust borrowers' monthly escrow payments to reflect borrowers' lump-sum shortage payments, Ocwen communicated to some borrowers in periodic statements that they continued to owe shortages that they had already paid.[222]

207. In each of the years 2014 through 2018, Ocwen did not "timely remove" escrow shortage amounts from the total monthly payments it requested from some borrowers after those borrowers had made lump-sum payments to reduce the shortage, and Ocwen therefore continued to collect shortage amounts that had already been paid.[223]

208. Until July 1, 2015, Ocwen's "internal service level accuracy" ("SLA") standard required Ocwen to process an escrow shortage payment and adjust the borrower's escrow balance within 15 days; after July 15, 2015, that SLA requirement was five business days.[224]

---

[220] **SJX 74**, Oct. 31, 2015 Escrow Audit, OCW-012-0000550 at 553; **SJX 79**, OFC Cashiering Audit, OCW3-004-0000029 at 032; *see also* **SJX 38**, Combs 30(b)(6) Dep. at 30:12–30:15.

[221] **SJX 74**, Oct. 31, 2015 Escrow Audit, OCW-012-0000550 at 553; **SJX 79**, OFC Cashiering Audit, OCW3-004-0000029 at 032; **SJX 38**, Combs 30(b)(6) Dep. at 184:3–184:10 (after borrowers made lump sum shortage payments but Ocwen did not remove the shortage portion of their monthly payment, borrowers "would have continued to make the escrow payment that was on the scheduled payment which would have included the target payment and the shortage").

[222] **SJX 74**, Oct. 31, 2015 Escrow Audit, OCW-012-0000550 at 553; **SJX 79**, OFC Cashiering Audit, OCW3-004-0000029 at 032; **SJX 38**, Combs 30(b)(6) Dep. at 183:18–186:8.

[223] **SJX 38**, Combs 30(b)(6) Dep. at 183:18–186:8; *see also* **SJX 74**, Oct. 31, 2015 Escrow Audit, OCW-012-0000550 at 553; **SJX 79**, OFC Cashiering Audit, OCW3-004-0000029 at 032.

[224] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 12 at 25–26.

209. The Bureau's Interrogatory No. 12 asked Ocwen to identity each account for which Ocwen "received a payment for an Escrow Shortage" but "failed to timely or accurately process the Escrow Shortage Payment."[225]

210. In its verified response to the Bureau's Interrogatory No. 12, Ocwen answered that: "[f]rom January 1, 2014 to January 8, 2018 . . . 36,054 payments were processed and/or updated outside of the operative SLA standard."[226]

211. Ocwen stated in a verified interrogatory response in this litigation that if:

> Ocwen's late processing of a shortage/readjustment of the escrow amount before Ocwen calculates and collects the borrower's next contractual payment (containing an escrow payment that excludes the shortage payment the borrower submitted) would result in Ocwen over-collecting some money from the borrower, that over-collection will be remedied when the next required escrow analysis is done.[227]

**4. Ocwen failed to pay insurance premiums on time, paid some premiums twice, and force-placed flood insurance on borrowers whose properties were not in flood zones.**

212. From at least January 2014 until September 15, 2014, Ocwen contracted with a company called Assurant to pay hazard-insurance premiums on behalf of escrowed borrowers.[228]

213. Between September 15, 2014 and August 15, 2016, Ocwen contracted with SWBC to pay hazard-insurance premiums on behalf of escrowed borrowers.[229]

214. In August 2016, Ocwen switched back to Assurant to pay hazard-insurance premiums on behalf of escrowed borrowers.[230]

215. Between 2014 and 2016, Assurant and SWBC failed to pay insurance premiums on behalf of some escrowed borrowers by the relevant insurance companies' penalty deadlines.[231]

---

[225] **SJX 137**, Bureau's First Set of Rogs. at Rog. No. 12 at 8–9. The Bureau defined "Escrow Shortage" as the term shortage is defined in Regulation X, which is "an amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis." 12 C.F.R. § 1024.17(b). *Id*. at 3. Ocwen did not object to this definition. *See* **SJX 138**, Defs.' Resp. First Rogs. at 7–8 (Objections to Definitions).

[226] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 12 at 26–27; **SJX 142**, Ex. H to Defs.' Resp. First Rogs. at Rog. No. 12 (identifying 36,054 untimely escrow shortage applications).

[227] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 13 at 28.

[228] **SJX 38**, Combs 30(b)(6) Dep. at 209:9–209:15.

[229] **SJX 38**, Combs 30(b)(6) Dep. at 212:19–213:5.

[230] **SJX 38**, Combs 30(b)(6) Dep. at 217:11–217:14.

[231] **SJX 38**, Combs 30(b)(6) Dep. at 209:17–222:23.

216. [redacted][232]

217. [redacted][233]

218. In a letter to SWBC dated February 24, 2015, Ocwen stated that "Ocwen has identified multiple examples where SWBC has not processed payments timely for escrow accounts and then failed to credit borrowers for the increased premiums associated with the late payment" and Ocwen demanded that SWBC identify certain information described therein.[234]

219. In this February 24, 2015 letter, Ocwen also stated to SWBC that "in October 2014, SWBC had approximately 40,000 premium disbursements that were not processed timely, and Ocwen continues to identify this as an ongoing issue."[235]

220. In a June 24, 2015 letter, SWBC responded to Ocwen that "SWBC failed to make escrow payments which resulted in cancellation of borrowers' preferred insurance policies due to five (5) unique root causes" which were fully discussed in the Remediation Plan attached thereto.[236]

221. Ocwen acknowledged that [redacted].[237]

---

[232] **SJX 81**, Property Insurance CAP, OCW-027-0142112 at 112–113.
[233] **SJX 81**, Property Insurance CAP, OCW-027-0142112 at 112.
[234] **SJX 179**, Feb. 24, 2015 Letter, OCW-CFPB-001-01593155 at 156 (Bullet No. 6).
[235] **SJX 179**, Feb. 24, 2015 Letter, OCW-CFPB-001-01593155 at 01593157 (Bullet No. 7).
[236] **SJX 88**, June 24, 2015 Letter (Dep. Ex. 3) OCW-CFPB-001-01045628 at 632; description of root causes of the untimely disbursements at 646–654.
[237] **SJX 178**, March 13, 2015 E-mail, OAG-0130264l at 642 ([redacted]).

222. Ocwen identified 1,367 loans "where a borrower's hazard insurance was cancelled, and . . . that the cancellation was the result of Ocwen or vendor error."[238]

223. Of the 1,367 borrowers whose insurance policies were cancelled due to errors by Ocwen or its vendor, 725 either obtained replacement policies with higher premiums or had insurance force-placed on them by Ocwen.[239]

224. Of the 1,367 borrowers whose insurance policies were cancelled due to errors by Ocwen or its vendor, 850 borrowers were current when their insurance premiums were due.[240]

225. Ocwen identified in a lookback analysis 853 Florida loan numbers for which Ocwen's vendors failed to make timely insurance disbursements from escrow accounts (the "Florida Escrow Lookback Analysis").[241]

226. Of those 853 loans, Ocwen identified at least 45 Florida loans as having their insurance policies cancelled and the new voluntary policy had a higher premium.[242]

227. In the Florida Escrow Lookback Analysis, Ocwen also identified 49 Florida loans where a force-placed policy was placed at a higher premium.[243]

228. INTENTIONALLY OMITTED/WITHDRAWN.

---

[238] **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 9 at 21–23; **SJX 141**, Ex. G to Defs.' Resp. First Rogs. to Rog. No. 9 (listing 1,367 loans); *see also* **SJX 81**, Property Insurance CAP, OCW-027-0142112 at 114; **SJX 52**, Reeves IH Tr. at 183:22–184:13; **SJX 43**, Jefferies Dep. at, *e.g.*, 48:9–49:3.

[239] **SJX 141**, Ex. G to Defs.' Resp. First Rogs., **SJX 138**, Defs.' Resp. First Rogs. at Rog. No. 10 at 23–24 (describing Ex. G); *see also* **SJX 81**, Property Insurance CAP, OCW-027-0142112 at 112 ("[redacted].

[240] **SJX 55**, Ridder Aff. ¶¶ 60–64.

[241] **SJX 180**, Lookback, OCWFL000014065 at *Total Loan Detail & Scenario Descriptions* worksheets (the lookback analysis produced by Ocwen pursuant to the Court's Omnibus Discovery Order [DE 65, Case No. 17-50496] in response to the Florida Plaintiffs' Request for Production No. 13, which sought "Documents sufficient to determine all Florida Loans serviced by Ocwen for whom, during the Relevant Time Period, either Ocwen or its vendor failed to timely process escrow disbursement payments to insurance companies or taxing authorities.").

[242] **SJX 180**, Lookback, OCWFL000014065 at *Total Loan Detail* worksheet (identifying 45 loans as "New Pol Received – Higher Premium) and *Credit_LoanDetails & Scenario Descriptions* worksheet (identifying 49 Florida loans to receive three-times the difference in premium).

[243] **SJX 180**, Lookback, OCWFL000014065 at *Total Loan Detail* worksheet (identifying loans with a "Status" of "Total Loans Where Borrower Obtained a New Policy at Higher Premium – FP Policies").

229. INTENTIONALLY OMITTED/WITHDRAWN.

230. INTENTIONALLY OMITTED/WITHDRAWN.

231. INTENTIONALLY OMITTED/WITHDRAWN.

232. In an e-mail dated November 8, 2014, Thomas Diller wrote that customers' "rightful expectation is that we pay their insurance timely."[244]

233. When paying insurance premiums, Ocwen's insurance vendor sometimes "paid a policy twice."[245]

234. In 2015, Ocwen's insurance vendor identified over 4,800 duplicate insurance disbursements for the same premium.[246]

235. Mortgage agreements typically require borrowers to have flood insurance if they live in an area that the Federal Emergency Management Agency has determined has a certain risk of flooding, commonly referred to as a "flood zone."[247]

236. For some borrowers, during 2015, Ocwen's system of record contained inaccurate information about whether the borrowers' properties were in flood zones.[248]

237. Ocwen sent notices to some borrowers who were not in flood zones indicating that they needed to purchase flood insurance.[249]

238. Because Ocwen used inaccurate flood-zone information, it imposed flood insurance on some borrowers who were not in flood zones.[250]

---

[244] **SJX 89**, Nov. 9, 2014 E-mail, OCW-CFPB-001-01576357 at 357 (last paragraph).

[245] **SJX 43**, Jefferies Dep. at 127:5–127:15.

[246] **SJX 43**, Jefferies Dep. at 139:25–140:3 ("Okay. So this – [Exhibit 5] indicate[s] that the 3,015 and the 1,826 were duplicate disbursements for the same insurance premium? A. Yes."); **SJX 77**, Oct. 16, 2015 E-mail, OCW-CFPB-001-01291264 and attachment (collectively Dep. Ex. 5) at 1–3 of attachment.

[247] *See e.g.*, **SJX 25**, Freddie Mac FL Mortg. Form at Section 5 at 6, *available at*: https://sf.freddiemac.com/tools-learning/uniform-instruments/all-instruments#security-instruments (Freddie Mac's form mortgage for Florida requiring a borrower to maintain flood insurance, if the Federal Emergency Management Agency determines that the borrower's property is in a flood zone).

[248] **SJX 38**, Combs 30(b)(6) Dep. at 228:4–229:21; **SJX 88**, June 24, 2015 Letter (Dep. Ex. 3), OCW-CFPB-001-01045628 at 630 ("The Flood Zone Discrepancy Processing Accuracy service level has not been met due to flood-zone data integrity issues within REALServicing."); **SJX 43**, Jefferies Dep. at 167:6–170:4.

[249] **SJX 38**, Combs 30(b)(6) Dep. at 228:11–229:6; **SJX 43**, Jefferies Dep. at 165:4–165:11.

[250] **SJX 38**, Combs 30(b)(6) Dep. at 228:24–229:6; **SJX 43**, Jefferies Dep. at 166:20–170:5; 176:20–178:20.

239. Ocwen admits that it imposed excessive hazard-insurance coverage and flood-insurance coverage on some borrowers.[251]

240. A July 17, 2015 Ocwen audit stated:

> [t]he Property Insurance department lacks sufficient controls to ensure lender-placed flood insurance policies do not exceed regulatory required coverage amounts . . . Internal Audit reviewed a sample of 40 loans where the property was located in a flood zone and noted there were several loans where the lender-placed flood insurance policy amounts exceeded the required statutory or investor minimum coverage.[252]

241. An Ocwen MAF dated July 17, 2015, which referenced the audit in Fact 240, identified the statutory minimum required flood insurance coverage to be the lesser of (i) the loan's outstanding unpaid principal balance; (ii) the replacement value of the property; or (iii) $250,000 as the residential property maximum amount allowable under the National Flood Insurance Program.[253]

242. Regarding force placing hazard insurance, Ocwen testified that its policy was to impose the last known coverage or the replacement value of the property.[254]

243. Ocwen's August 14, 2015 issue-tracking report states that "[redacted]"[255]

244. During 2014 and 2015, Ocwen twice force-placed insurance on a borrower with a coverage amount of $510,000 that should have been coverage of $51,000, and as a result incorrectly charged the borrower a premium of $4,641 instead of $461.00.[256]

245. In an e-mail dated April 19, 2016, Daniel Reeves, Ocwen's Director of its Escrow, Tax and Insurance Department, stated that "we had one account with over $4.8mm in excessive coverage. I worry how many other loans have excessive coverage and do we look for them?"[257]

---

[251] **SJX 38**, Combs 30(b)(6) Dep. at 256:3–257:5, 264:4–265:11; *see also* **SJX 159**, Oct. 28, 2015 MAF, OCWFL000043556 at 556 (Ocwen imposed lender-placed flood insurance policies with coverage amounts exceeding regulatory required coverage amounts.).

[252] **SJX 114**, 2015 Flood Audit, OCW-CFPB-001-05431031 at 033.

[253] **SJX 159**, Oct. 28, 2015 MAF, OCWFL000043556 at 556 (citing to 12 CFR Chapter I Part 22.3(A)).

[254] **SJX 38**, Combs 30(b)(6) Dep. at 257:11–258:22.

[255] **SJX 134**, Aug. 2015 RC Rpt., OCW-019-0010624 at Row 2687 (discussing [redacted]).

[256] **SJX 160**, May 11, 2016 E-mail, OCW-CFPB-001-06483979 at 983–984.

[257] **SJX 161**, Apr. 20, 2016 E-mail, OCW-CFPB-001-02905850 at 850.

**5. Ocwen failed to cancel private-mortgage insurance when it was required to.**

246. For some loans, REALServicing contained inaccurate or missing information for the private-mortgage insurance ("PMI") "termination date," that is, the date when the principal balance was scheduled to reach 78 percent of the property's original value.[258]

247. In a 2014 "Action Plan Form," Ocwen personnel stated that "[t]he automatic PMI termination date is currently being calculated by Altisource and stored in REALServicing. Internal testing has shown the date to be missing or inaccurate in approximately 90 percent of test cases."[259]

248. In response to a document request from the Bureau, Ocwen identified 7,771 borrowers for whom it should have terminated PMI on the termination date but failed to do so.[260]

249. Ocwen's failure to terminate PMI on the termination date for certain borrowers occurred in each of the years 2014 through 2018.[261]

250. Because it failed to automatically terminate PMI on the termination date, Ocwen communicated to borrowers in periodic statements that they owed PMI premiums after the termination date.[262]

251. When Ocwen failed to cancel PMI on the termination date, some borrowers paid PMI premiums after the termination date that Ocwen later refunded.[263]

---

[258] **SJX 83**, PMI Action Plan Form, OCW-030-0024021 at 022; **SJX 82**, Apr. 17, 2014 MAF, OCW-030-0024009 at 009 (Ocwen's Management agreeing that the automatic termination date in REALServicing "does not properly calculate in all situations"); **SJX 52**, Reeves IH Tr. at 61:3–63:11.

[259] **SJX 83**, PMI Action Plan Form, OCW-030-0024021 at 022.

[260] **SJX 55**, Ridder Aff. ¶¶ 65–68, 71; **SJX 123**, PMI Terminations (Dep. Ex. 197), OCW-CFPB-001-06730240 (listing borrowers for whom Ocwen failed to cancel PMI on the termination date); **SJX 38**, Combs 30(b)(6) Dep. at 194:4–198:9 (describing the process by which Ocwen "identified that [for] these accounts [listed in Dep. Ex. 197], Ocwen failed to cancel private mortgage insurance on the termination date"); **SJX 52**, Reeves IH Tr. at 61:13-63:11 (testifying about accounts that "should have been cancelled at a certain point but were not").

[261] **SJX 38**, Combs 30(b)(6) Dep. at 198:11–201:2.

[262] **SJX 123**, PMI Terminations (Dep. Ex. 197), OCW-CFPB-001-06730240 (listing borrowers for whom Ocwen failed to cancel private mortgage insurance on the termination date for 7,856 borrowers); **SJX 52**, Reeves IH Tr. at 61:13–64:16.

[263] **SJX 55**, Ridder Aff. ¶¶ 69–70; **SJX 52**, Reeves IH Tr. at 61:13–64:16; **SJX 80**, Aug. 25, 2014 E-mail, OCW3-027-0005675 at 676.

252. Ocwen collected and later refunded a total of at least $3,001,620.48 in premium payments made by 7,771 borrowers after their relevant termination dates.[264]

**C. OLS failed to send accurate loan modification agreements to borrowers.**

253. In 2014, OLS sent incorrect loan modification terms to over 1,800 borrowers.[265]

254. In the original permanent modification agreements that OLS sent to the 1,800 borrowers referred to in Fact 253, it failed to include a term disclosing to borrowers that they would be required to pay principal deferral amounts, *i.e.*, a non-interest-bearing balloon payment, at the end of the mortgage term.[266]

255. The original permanent modification agreements that OLS sent to the 1,800 borrowers referred to in Fact 253 also failed to include a term disclosing to borrowers that they would be subject to higher or "step up" interest rates, and therefore higher monthly payments, later during the loan term.[267]

256. OLS acknowledged that [redacted][268]

257. OLS also acknowledged that certain borrowers whose loan modifications it originally approved but to whom it sent incorrect permanent loan modification agreements were subsequently denied loan modifications when Ocwen re-evaluated their eligibility under the corrected loan modification terms or [redacted][269]

---

[264] **SJX 55**, Ridder Aff. ¶¶ 69–70.

[265] **SJX 53**, Latman IH 12/17/2015 Tr. at 319:9–320:7, 327:2–328:3; **SJX 93**, CAP 16 (IH Ex. 16) at 1 ([redacted]).

[266] **SJX 53**, Latman IH 12/17/2015 Tr. at 346:11–20, 348:17–20, 350:13–351:23.

[267] **SJX 53**, Latman IH 12/17/2015 Tr. at 360:1–363:21(the sixth increase in an interest rate, if it existed, was missing in loan modification agreements) and 367:21–370:16 (the second increase in an interest rate, if it existed, was missing in loan modification agreements).

[268] **SJX 53**, Latman IH 12/17/2015 Tr. at 401:2–402:12; **SJX 93**, CAP 16 (Ex. 16) at 1 ([redacted]).

[269] **SJX 53**, Latman IH 12/17/2015 Tr. at 411:2–417:2, **SJX 93**, CAP 16 (Ex. 16) at 1 [redacted].

**D. Ocwen failed to comply with requirements relating to foreclosures.**

**1. Ocwen commenced illegal foreclosure proceedings on borrowers' loans.**

258. On June 27, 2019, Stephanie Ruiz, OFC's Director of Default Servicing, verified interrogatory responses 14 and 15 on behalf OFC, OMS, and OLS.[270]

259. The Bureau asked Ocwen in Interrogatory No. 14 to identify, from January 10, 2014 forward, "each Account for which You received a Complete Application from a Borrower but commenced a First Notice or Filing, prior to Your complete evaluation of the Complete Application, including the 1,118 Accounts You identified in Corrective Action Plan 17 and about which Thomas Arnett, Your corporate witness, testified."[271]

260. In its verified answer to Interrogatory No. 14, Ocwen stated that it "made a first filing or notice [of foreclosure] before Ocwen had performed a complete evaluation of a Completed Application" for 124 borrowers who were entitled to RESPA protections.[272]

**2. Ocwen sent deceptive foreclosure letters to borrowers.**

261. OLS sent borrowers who were seeking loss mitigation options a letter requesting documents that it needed to evaluate them for loss mitigation options and providing a date by which the borrowers should submit those documents.[273]

262. One of the types of letters OLS sent to borrowers who submitted loss mitigation applications but were missing documents needed to complete the application ("Additional Document Request Letter") provided a deadline by which borrowers were to provide the missing documents, and included the following language:

> You may receive foreclosure/eviction notices – delivered by mail or in person – or you may see steps taken to proceed with a foreclosure sale of your home. While you will not lose your home during the evaluation process, to protect your rights under applicable foreclosure law, you may need to respond to these foreclosure notices or take other actions.[274]

[270] **SJX 144**, Ocwen's Verification of its Responses to Bureau's Rog. Nos. 14 and 15.

[271] **SJX 137**, Bureau's First Set of Rogs. at Rog. No. 14, at 9. The Bureau defined "Complete Application" and "First Notice or Filing" as those terms are defined in Regulation X. *Id.* at 2–3. Ocwen did not object to these definitions. *See* **SJX 145**, Defs.' Sec. Am. and Suppl. Resp. to Rog. Nos. 14-15 at 3–5 (Objections to Definitions).

[272] **SJX 145**, Defs.' Sec. Am. and Suppl. Resp. to Rog. Nos. 14–15 at 6–8.

[273] **SJX 55**, Ridder Aff. ¶¶ 72–76; **SJX 94**, Foreclosure Letters.

[274] **SJX 55**, Ridder Aff. ¶ 75; **SJX 94**, Foreclosure Letters (emphasis in the original).

263. In response to a Bureau civil investigative demand, OLS produced a written report under penalty of perjury that identified 69 borrowers on whom it foreclosed before the due date for missing documents that was specified in the Additional Document Request Letter.[275]

264. Forty-five of the 69 borrowers who were foreclosed on before the due date for missing documents had received the Additional Document Request Letter that communicated to borrowers that they would "not lose [their] home during the evaluation process."[276]

[275] **SJX 152**, OLS Resp. to Written Report Req. 14, OCW3-002-0000001 (overlay) (spreadsheet produced by Ocwen listing 69 borrowers who were foreclosed on before the due date set forth in the Additional Document Request Letter).

[276] **SJX 55**, Ridder Aff. ¶¶ 75–76.

Date: December 4, 2020

Respectfully submitted,

Attorneys for Plaintiff,
CONSUMER FINANCIAL PROTECTION BUREAU

JOHN C. WELLS
Deputy Enforcement Director

JAMES T. SUGARMAN
Assistant Litigation Deputy

/s/ Jean M. Healey Dippold
Jean M. Healey Dippold
Phone: 202-435-7514
E-mail: jean.healeydippold@cfpb.gov

| | |
|---|---|
| Atur Desai | atur.desai@cfpb.gov |
| Shirley Chiu | shirley.chiu@cfpb.gov |
| Tianna Baez | tianna.baez@cfpb.gov |
| Amanda Roberson | amanda.roberson@cfpb.gov |
| Stephanie Brenowitz | stephanie.brenowitz@cfpb.gov |
| Erin Mary Kelly | erin.kelly@cfpb.gov |
| James Savage | james.savage@cfpb.gov |
| Greg Nodler | greg.nodler@cfpb.gov |
| Michael Posner | michael.posner@cfpb.gov |
| Jack Douglas Wilson | doug.wilson@cfpb.gov |

1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722