**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,
Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., and OCWEN LOAN SERVICING, LLC,

Defendants.

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), Ocwen Loan Servicing, LLC ("OLS"), and PHH Mortgage Corporation ("PHH"), collectively "Ocwen" or "Defendants," submit this statement of material facts ("SMF") and exhibits hereto in support of their motion for summary judgment on all of Plaintiff Consumer Financial Protection Bureau's ("CFPB" or "the Bureau") claims in its Amended Complaint (ECF No. 481, "Am. Compl."), and the accompanying memorandum filed in support.

## I. THE NATIONAL MORTGAGE SETTLEMENT ("NMS") PRECLUDES VIRTUALLY ALL THE CFPB's CLAIMS

### A. <u>The Parties Entered Into a Consent Judgment in 2013 Concerning Ocwen's Past and Future Servicing Conduct</u>

1. In 2013, the CFPB, Florida, and 48 other states sued OFC and OLS alleging that Ocwen's loan servicing practices violated federal and state law. *See* SMF Ex. 1, *CFPB v. Ocwen Fin. Corp.*, No. 13-2025, ECF No. 1 (D.D.C. Dec. 19, 2013) ("2013 Compl.").

2. The CFPB and the states alleged that Ocwen was engaging in "practices" that included, among others, "failing to provide accurate and timely information to borrowers," "providing false or misleading information to borrowers" about various matters, and "failing to properly process borrowers' applications." SMF Ex. 1, 2013 Compl. ¶ 20.

3. The complaint sought both monetary relief for Ocwen's alleged conduct prior to the filing of the lawsuit, and an injunction to "[p]ermanently enjoin Ocwen from committing future violations." SMF Ex. 1, 2013 Compl. at p. 16.

4. Ocwen, the CFPB, and the states agreed to resolve the 2013 lawsuit as part of the NMS, and entered into a consent judgment in the U.S. District Court for the District of Columbia. SMF Ex. 2, Consent Judgment, *CFPB v. Ocwen Fin. Corp.*, No. 13-2025, ECF No. 12 (D.D.C. Feb. 26, 2014) ("NMS Consent Judgment" or "NMS C.J.").

5. The Bureau was a party to the Ocwen NMS Consent Judgement, and Lucy Morris was its authorized representative. SMF Ex. 2, NMS C.J. at 14; SMF Ex. 124, 30(b)(6) Deposition of Gabriel O'Malley, at 445:5-9 (June 26, 2019) ("O'Malley 30(b)(6) Dep."); *id.* at 460:17-461:4.

6. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

7. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

8. To resolve past and future claims, Ocwen agreed to: (1) provide $2 billion in relief to customers; (2) pay an additional $127.3 million into a borrower relief fund; (3) abide by

a 46-page single-spaced stipulation that contained over 300 detailed "Servicing Standards"; (4) consent to and pay for extensive ongoing monitoring while the NMS remained in effect; and (5) consent to the NMS's enforcement framework and provide certain remedies if it failed to meet the "Servicing Standards" and related metrics. SMF Exs. 2, 3 & 6, NMS C.J. ¶¶ 3-5 & Exs. A, D.

9. In exchange, the CFPB and the states agreed that: (1) the government would broadly release all claims for Ocwen's past conduct (SMF Exs. 2, 7-8, NMS C.J. ¶ 9 & Exs. E-F); (2) during the course of the NMS Consent Judgment, Ocwen would not be subject to future enforcement concerning the subject matter of the Servicing Standards and Metrics unless its non-compliance exceeded certain agreed-upon "Threshold Error Rates" (SMF Ex. 6, NMS C.J. Ex. D ¶ C.11 & Sched. D-1); (3) if the government believed that Ocwen exceeded any of those Threshold Error Rates, it would follow an agreed dispute-resolution process that afforded Ocwen an opportunity to correct any identified errors by bringing itself within the threshold (SMF Exs. 2, 6, NMS C.J. ¶ 6 & Ex. D); (4) if (and only if) Ocwen failed to bring itself within the "Threshold Error Rates," the government would then be limited to certain defined and capped remedies (SMF Ex. 6, NMS C.J. Ex. D ¶¶ I.3(a)-(c)); and (5) exclusive jurisdiction over any action relating to the Consent Judgment and its remedies would vest in the U.S. District Court for the District of Columbia (SMF Ex. 2, 6, NMS C.J. ¶ 12 & Ex. D ¶ I-1). *See also* SMF Ex. 12, Consent Motion, *CFPB v. Ocwen Fin. Corp.*, No. 13-2025, ECF No. 45 at 1-4 (D.D.C. Sept. 6, 2017) (citing NMS C.J. at 10 & NMS C.J. Ex. D); SMF Exs. 2, 3 & 6, NMS C.J. ¶¶ 3-6 & Exs. A, D.

## B. The NMS Contains Detailed Compliance and Enforcement Terms That Govern the Conduct Described in Its Servicing Standards and Metrics

10. Exhibit A to the NMS Consent Judgment consists of over 300 detailed "Servicing Standards" to which Ocwen agreed to comply. SMF Exs. 2, 3, NMS C.J. ¶ 3 & Ex. A (Ocwen "***shall*** comply with the Servicing Standards, attached hereto as Exhibit A") (emphasis added); SMF Ex. 124, O'Malley 30(b)(6) Dep. at 447:13-20, 460:9-14 ("The servicing standards as reflected in Exhibit A, set forth particular obligations agreed to by the plaintiffs and the Bureau and Ocwen and entered into by the Court that Ocwen would have for three years from the date that the order was entered by the Court which was in February of 2014"); *see also* SMF Ex. 13, Declaration of Jenna D. Evans, ¶¶ 3-4 (June 4, 2020) ("Evans Decl.").

11. The Servicing Standards (and the NMS's enhanced monitoring, reporting, and compliance requirements) are the product of the agreement between Ocwen, the CFPB, and the plaintiff states (*i.e.,* the NMS Consent Judgment). SMF Ex. 2, NMS C.J. ¶ 3; SMF Ex. 6, NMS C.J. Ex. D, ¶¶ C.11, C.22, D.5, E, I & Schedule D-1.

12. The NMS contained detailed descriptions of how compliance with the settlement would be monitored. SMF Ex. 2, NMS C.J. ¶¶ 3, 6-7; SMF Ex. 3, NMS C.J. Ex. A (settlement terms sheet with Servicing Standards); SMF Ex. 6, NMS C.J. Ex. D (Enforcement Terms, detailing monitoring and enforcement procedures); *see also* SMF Ex. 13, Evans Decl. ¶¶ 3-9, 12.

13. Under the terms of the NMS Consent Judgment, Ocwen's "compliance with the Servicing Standards ***shall*** be assessed via metrics identified and defined in Schedule D-1 hereto." SMF Ex. 6, NMS C.J. Ex. D ¶ C.11 & Schedule D-1; SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 1-2 (citing NMS C.J. at 10 & Ex. D) ("The [NMS] Consent Judgment includes ***detailed*** compliance and enforcement terms.").

14. Exhibit D to the NMS Consent Judgment further provides the process for resolving disputes between the parties as to Ocwen's compliance with the Servicing Standards in Exhibit A, and mandates that the standards "***shall*** be enforced in accordance with the authorities provided in the 'Enforcement Terms'" identified in Exhibit D. SMF Exs. 2, 6, NMS C.J. ¶ 6 & Ex. D (emphasis added); SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 1-4 (citing NMS C.J. at 10 & Ex. D); SMF Ex. 13, Evans Decl. ¶¶ 3-12.

15. In the NMS Consent Judgment, the CFPB, and the states agreed that Ocwen would not be subject to enforcement if its error rate remained below a defined level. SMF Exs. 2 & 6, NMS C.J. ¶ 3 & Ex. D, ¶¶ C.11, C.22, D.5, E, I & Schedule D-1; SMF Ex. 13, Evans Decl. ¶¶ 4, 7-9.

16. Specifically, Exhibit D includes "Servicing Standards tested by the Monitor", which "are set forth in Schedule D-1 to Exhibit D [and include] 34 'metrics,' each of which identifies ***the topic tested***, the population of loans subject to testing, ***the threshold error rate***, and ***the specific test questions used to determine compliance*** with the servicing standards that relate to the particular metric." SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 1-2 (citing NMS C.J. at 10 & Ex. D) (emphasis added); SMF Ex. 6, NMS C.J. Ex. D, ¶¶ C.11, C.22, D.5, E, I & Schedule D-1; SMF Ex. 13, Evans Decl. ¶¶ 4, 7-9.

17. To monitor Ocwen's compliance with the Servicing Standards and Metrics, the NMS required that Ocwen perform internal testing via a group referred to as the Internal Review Group ("IRG"). SMF Ex. 6, NMS C.J. Ex. D ¶ C.7; SMF Ex. 13, Evans Decl. ¶¶ 5-6.

18. Pursuant to the NMS, the IRG was required to be staffed with dedicated individuals outside of the chain of command of the servicing business unit. SMF Ex. 6, NMS C.J. Ex. D ¶¶ C.7-C.10; SMF Ex. 13, Evans Decl. ¶ 5.

19. At any one time during the course of the NMS, the staffing of this group within Ocwen exceeded 40 individuals. SMF Ex. 13, Evans Decl. ¶ 5.

20. The IRG would perform testing of the NMS metrics to determine the error rate for that metric. SMF Ex. 6, NMS C.J. Ex. D ¶ C-11; SMF Ex. 13, Evans Decl. ¶ 6.

21. Pursuant to the NMS, the IRG was to report their results to the consulting firms employed by the NMS Monitor, who would review those work papers, including the evidence in support of the results, and come back to the IRG with questions to confirm their understanding. SMF Ex. 13, Evans Decl. ¶ 6; SMF Ex. 6, NMS C.J. Ex. D ¶ D.4.

22. Under the NMS, it was the sole "responsibility of the Monitor to determine whether [Ocwen] [was] in compliance with the Servicing Standards and whether [Ocwen] satisfied the Consumer Relief Requirements . . . ." SMF Ex. 6, NMS C.J. Ex. D ¶ D.5

23. Once the NMS Monitor accepted the IRG's results, they were presented to the court in the form of the Monitor's quarterly compliance reports. SMF Ex. 6, NMS C.J. Ex. D ¶¶ D.4-D.5; SMF Ex. 13, Evans Decl. ¶ 6.

24. Ocwen agreed that the CFPB could seek to enforce Ocwen's obligations under the NMS without the need for a lawsuit, while the CFPB agreed that Ocwen would have an opportunity to correct any identified errors. SMF Ex. 6, NMS C.J. Ex. D, ¶¶ E, I; SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 1-2 (citing NMS C.J. Ex D, ¶¶ E.1-E.2) ("If a Potential Violation occurs, Ocwen has the right to cure the Potential Violation."); *see also* SMF Ex. 13, Evans Decl. ¶¶ 7-9.

25. Exhibit D outlines "Potential Violations and the Right To Cure." SMF Ex. 6, NMS C.J. Ex. D, ¶¶ E.1-E.6; SMF Ex. 13, Evans Decl. ¶¶ 3-13.

26. A "Potential Violation" of this Consent Judgment occurs if the Servicer has exceeded the Threshold Error Rate set for a Metric in a given Quarter. SMF Ex. 6, NMS C.J.

Ex. D ¶ E-1; SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 1-2; SMF Ex. 13, Evans Decl. ¶ 7.

27. For example, if a metric tested whether Ocwen had timely issued refunds of force-placed insurance upon receiving proof of the borrower's own insurance, this would only be a "Potential Violation" under the NMS if it occurred in more than 5% of the statistically valid sample pulled by the IRG. SMF Ex. 6, NMS C.J. Ex. D, at D1-16; SMF Ex. 13, Evans Decl. ¶ 7.

28. Ocwen had the right to cure a Potential Violation. SMF Ex. 6, NMS C.J. Ex. D ¶¶ E-2-E-3; SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 2; SMF Ex. 13, Evans Decl. ¶¶ 8-9.

29. If a metric had a failure rate that exceeded the threshold set forth in the NMS, that was considered a "Potential Violation," which the NMS allowed Ocwen to cure by proposing a corrective action plan ("CAP") to the Monitor to address the issue that gave rise to the potential violation, and implementing an approved CAP and returning the metric to active testing with passing results. SMF Ex. 6, NMS C.J. Ex. D ¶¶ E-2-E-6; SMF Ex. 13, Evans Decl. ¶ 8.

30. If a Potential Violation is cured, then there is no remedy available to Plaintiffs. SMF Ex. 6, NMS C.J. Ex. D ¶ E-6; SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 2; SMF Ex. 13, Evans Decl. ¶ 9; *see also id.* ¶¶ 10-11.

31. The terms of the NMS only considered a metric fail to be an uncured Potential Violation of the NMS if Ocwen experienced a second error rate above threshold during the cure period for said violation. SMF Ex. 6, NMS C.J. Ex. D ¶ E-4; SMF Ex. 13, Evans Decl. ¶ 9.

32. In the event of an uncured violation, the CFPB's or the state plaintiffs' "sole relief" was available pursuant to the NMS enforcement procedures and remedies. SMF Ex. 6, NMS C.J. Ex. D ¶ I-3; SMF Ex. 12, *CFPB v. Ocwen*, No. 13-02025, ECF No. 45 at 3-4 (citing NMS C.J. Ex. D, ¶ I.2); SMF Ex. 13, Evans Decl. ¶¶ 9-11.

33. Section I.3 of NMS Consent Judgment Exhibit D "sets forth the relief available in an enforcement action of this Consent Judgment." SMF Ex. 12, *CFPB v. Ocwen*, No. 13-02025, ECF No. 45 at 3-4; SMF Ex. 6, NMS C.J. Ex. D, ¶ I-3; SMF Ex. 13, Evans Decl. ¶ 10.

34. "Specifically, when an enforcement action is filed as the result of an uncured Potential Violation for which [Ocwen's] time to cure has expired, the Court may award (a) non-monetary equitable relief and (b) a civil penalty of up to $1 million." SMF Ex. 12, *CFPB v. Ocwen*, No. 13-02025, ECF No. 45 at 3-4; SMF Ex. 6, NMS C.J. Ex. D, ¶ I-3.

35. The parties agreed that the CFPB or any of the plaintiff states could withdraw from the Consent Judgement only if Ocwen failed to make a required payment. SMF Ex. 2, NMS C.J. ¶ 11.

### C. <u>Virtually All of the Conduct at Issue in the CFPB's Case Is Governed by the NMS Servicing Standards and Metrics (Counts I-IX)</u>

36. Virtually all of Ocwen's alleged conduct at issue in the CFPB case (Counts I-IX) is addressed in the Servicing Standards and subject to Threshold Error Rates, dispute resolution procedures, and enforcement frameworks described in the NMS. *Compare* SMF Exs. 3 & 6, NMS C.J. Exs. A, D, *with* Am. Compl., *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, ECF No. 481 (Oct. 4, 2019) ("Am. Compl.").

37. Conduct concerning "inaccurate and incomplete information to service borrowers' loans" (Am. Compl. ¶¶ 207, 240, Counts I & V) was governed by the agreed-upon standards in Section I.B of the NMS ("Requirements for Accuracy and Verification of Borrower's Account Information") and Metrics 4.B ("Adherence to customer payment process") and 33 ("Billing Statement Accuracy"). SMF Ex. 3, NMS C.J. Ex. A ¶¶ I.B.1-I.B.11; SMF Ex. 6, NMS C.J. Ex. D at D1-7, D1-21.

38. Conduct concerning misrepresentations to borrowers (Am. Compl. ¶¶ 215-16, 248-49, Count II & VI) was also governed by the agreed-upon Servicing Standards in NMS Section I.B and Metrics 4.B and 33. SMF Ex. 3, NMS C.J., Ex. A ¶ I.B; SMF Ex. 6, NMS C.J. at D1-7, D1-21.

39. Conduct concerning the amount of time borrowers had to submit additional information related to loss mitigation applications and prematurely foreclosed on borrowers (Am. Compl. ¶ 219, Count III) was governed by the agreed Servicing Standards in NMS Sections IV.B.1-2, IV.B.11, and IV.D.2 of the NMS and Metrics 6 and 30. SMF Ex. 3, NMS C.J. Ex. A ¶¶ IV.B.1-IV.B.2, IV.B.11, IV.D.2; SMF Ex. 6, NMS C.J. Ex. D at D1-16, D1-18.

40. Conduct concerning crediting payments, advancing payment due dates when sufficient moneys accumulate in suspense accounts, and providing accurate periodic billing statements (Am. Compl. ¶¶ 229-30, Count IV) was governed by the agreed Servicing Standards in NMS Sections I.B.1 (prompt acceptance and application of payments), I.B.3 (post payments within two business days), I.B.3.b (advancing payment due dates when sufficient moneys accumulate in suspense accounts) and I.B.5 (timely and accurate periodic statements), as

measured by Metrics 4.B (timely payment processing) and 33 (accurate monthly billing statements). SMF Ex. 3, NMS C.J. Ex. A ¶¶ I.B.1-I.B.5, I.B.8-I.B.10; *id.*, Ex. D at D1-7, D1-21.

41. Conduct concerning payment of borrowers' hazard insurance premiums when they became due (Am. Compl. ¶ 257, Count VII) was governed by the agreed Servicing Standards in NMS Section VII.A.1. SMF Ex. 3, NMS C.J. Ex. A ¶ VII.A.1.

42. Conduct concerning timely escrow analyses, providing borrowers with escrow statements, and collecting shortages (Am. Compl. ¶ 259, Count VII) was governed by the agreed-upon standards in NMS Section I.B ("Requirements for Accuracy and Verification of Borrower's Account Information"), including but not limited to NMS Section I.B.5 (timely and accurate periodic statements), as measured by Metrics 4.B (timely payment processing) and 33 (accurate monthly billing statements). SMF Ex. 3, NMS C.J. Ex. A ¶ I.B; *id.*, SMF Ex. 6, NMS C.J. Ex. D at D1-7, D1-21.

43. Conduct concerning the maintenance of policies and procedures "reasonably designed to ensure its personnel had access to accurate and current documents and information reflecting actions performed by service providers" (Am. Compl. ¶ 264, Count VIII) was governed by the agreed Servicing Standards in NMS Section II.A.1-9, which required Ocwen to "adopt policies and processes to oversee and manage foreclosure firms [and] law firms." SMF Ex. 3, NMS C.J. Ex. A ¶ II.A; SMF Ex. 6, NMS C.J. Ex. D at D1-9.

44. Conduct concerning foreclosing while the borrower was on a track towards a loan modification or other non-foreclosure solution (Am. Compl. ¶¶ 273-76, Count IX) was governed the agreed Servicing Standards in NMS Section IV.B ("Dual Track Restricted"), and Metrics 1, 3, 6, and 30. SMF Ex. 3, NMS C.J. Ex. A ¶ IV.B; SMF Ex. 6, NMS C.J. Ex. D at D1-2-D1-3, D1-5-D1-6, D1-13-D1-16, and D1-18.

**D. <u>[SECTION INTENTIONALLY OMITTED PURSUANT TO DE 713]</u>**

45. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

46. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

47. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

48. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

49. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

50. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

51. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

52. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

**E. <u>The NMS Consent Judgment Was Implemented in Accordance with the Agreement Up Until the CFPB Its Lawsuit</u>**

53. The NMS Consent Judgment was effective on February 26, 2014 and remained in effect for three years until February 26, 2017. SMF Ex. 2, NMS C.J. ¶¶ 14-15.

54. Ocwen's obligations under the NMS Consent Judgment were to expire after the three-year period, except for certain requirements related to the filing of a final report and ongoing compliance with the Monitor's review of said report, which was to extend no longer than six months after the expiration of the agreement (until August 26, 2017). SMF Ex. 2, NMS C.J. ¶ 15.

55. Ocwen spent over $55 million and hundreds of thousands of employee hours on NMS-related monitoring, reporting, and audits. SMF Ex. 13, Evans Decl. ¶ 13.

56. The CFPB served on the NMS Monitoring Committee throughout the existence of the NMS. SMF Ex. 6, NMS C.J. Ex. D ¶ B; SMF Ex. 12, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 45 at 1 n. 1; SMF Ex. 124, O'Malley 30(b)(6) Dep. at 461:5-462:24 (discussing Bureau's membership on the NMS Monitoring Committee); SMF Ex. 13, Evans Decl. ¶¶ 4, 10, 12.

57. As a member of the Monitoring Committee and parties the settlement, the CFPB received quarterly reports from the NMS Monitor (Joseph Smith) tracking Ocwen's compliance and detailing any Potential Violations. SMF Ex. 124, O'Malley Dep. at 476:11-13, 487:9-11; SMF Ex. 13, Evans Decl. ¶¶ 4, 10-11.

58. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

59. The agreement required the NMS Monitor to confer with the Monitoring Committee prior to issuing reports. SMF Ex. 6, NMS C.J. Ex. D ¶ D.4 ("Prior to issuing any Monitor Report, the Monitor shall confer with Servicer and the Monitoring Committee regarding its preliminary findings and the reasons for those findings.").

60. The CFPB also received and participated in various monitoring-related communications and meetings concerning Ocwen's performance against the NMS Consent Judgment's Servicing Standards, Metrics, and Threshold Error Rates. *E.g.,* SMF Ex. 14, Bradlow Dep. at 51:12-53:24; 60:6-18; SMF Ex. 16, OAG-01290647 (communication related to monitoring committee that include NMS Monitor, CFPB, and others); SMF Ex. 17, OAG-

01287290 (same); SMF Ex. 18, OAG-01287478 (same); SMF Ex. 19, OAG-01290879 (same); SMF Ex. 20, OAG-00831927 (same).

61. For example, when Ocwen became aware of a Potential Violation, Ocwen would hold a call with representatives of the Monitoring Committee for the NMS, consisting of representatives of the CFPB, the state attorneys general, and the state regulators. On such calls, Ocwen would present the issue giving rise to the metric failure to the Monitoring Committee, including the root cause and CAP for addressing the issue. While the precise attendees varied from call to call, representatives of the CFPB were typically attendees on these calls. SMF Ex. 13, Evans Decl. ¶ 12; SMF Ex. 19, OAG-01290879 (notice of metric failure and communication scheduling call to review, including CFPB representatives).

62. Additionally, whenever Ocwen became aware that the IRG testing would exceed thresholds and therefore be a Potential Violation, it held a meeting with the members of the Monitoring Committee to disclose those issues and set forth its CAP to address the issue. SMF Ex. 13, Evans Decl. ¶ 12; SMF Ex. 19, OAG-01290879 (notice of metric failure and communication scheduling call to review, including CFPB representatives).

63. The fact that Ocwen complied with a Servicing Standard or Metric did not mean it was perfect; rather, it simply meant that Ocwen satisfied the agreed NMS Metrics and did not exceed its agreed Threshold Error Rate for that particular time period. SMF Ex. 2, NMS C.J. ¶ 6; SMF Ex. 6, NMS C.J. Ex. D ¶ C-11 & Schedule D-1; *see also* SMF Ex. 13, Evans Decl. ¶¶ 3-12.

64. The NMS Monitor Reports reflect that Ocwen generally met and performed within the agreed NMS Consent Judgment thresholds—*i.e.,* Ocwen may have committed some errors throughout the period the NMS was in effect, but did not exceed the NMS's 5% margin for error with respect to most Servicing Standards and Metrics. SMF Ex. 13, Evans Decl. ¶¶ 10-11; SMF Ex. 21, Rebuttal Expert Report of Marcel Bryar, ¶¶ 94, 152, 158, 166 & Ex. 4 (Oct. 15, 2019) ("Bryar Report"); SMF Ex. 22, Monitor's Report for the Reporting Periods Ended March 31, 2015 & June 30, 2015, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 37, at 9-10 (D.D.C. April 28, 2016) (reporting Ocwen did not exceed the Threshold Error Rate for Q1 and Q2 of 2015 for the metrics tested, including Overlapping Metrics 1, 3, 6, 9 and 33); SMF Ex. 23, Monitor's Report for the Reporting Periods Ended September 30, 2015 & December 31, 2015, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 41, at 8-12 (D.D.C. Sept. 8, 2016)

(reporting Ocwen did not exceed the Threshold Error Rate for any metrics tested for Q3 2015); SMF Ex. 24, Monitor's Report for the Reporting Periods Ended March 31, 2016 & June 30, 2016, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 42, at 8-10 (D.D.C. July 3, 2017) (reporting Ocwen did not exceed the Threshold Error Rate for the Q2 2016 for the metrics tested); SMF Ex. 25, Monitor's Report for the Reporting Periods Ended September 30, 2016, December 31, 2016 & March 31, 2017, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 44, at 13-15 (D.D.C. Aug. 25, 2017) (reporting that "for Metrics where the Threshold Error Rate is based on a percentage of the total sample tested by the IRG, [Ocwen] reported that the Threshold Error Rate was not exceeded for any of the Metrics that were reported on in the Quarterly Reports for the calendar quarters ended September 30, 2016, December 31, 2016, and March 31, 2017, with the exception of Metric 29 in the calendar quarter ending March 31, 2017").

65. Where Ocwen was determined to have failed to comply with those standards or meet certain thresholds in a given quarter, Ocwen was able to cure the respective issues and bring itself into compliance with the agreement. SMF Ex. 13, Evans Decl. ¶ 10; SMF Ex. 21, Bryar Report, Ex. 4. *E.g.,* SMF Ex. 25, Monitor's Report for the Reporting Periods Ended September 30, 2016, December 31, 2016 & March 31, 2017, *CFPB v. Ocwen Fin. Corp.*, 13-cv-02025, ECF No. 44, at 18 (D.D.C. Aug. 25, 2017) (reporting that Ocwen's corrective actions under the CAP had "cured" the potential violation of Metric 28 and its remediation efforts had been "satisfactorily completed in all material respects and no additional remediation was required."); SMF Ex. 26, Monitor's Report for the Reporting Periods Ended September 30, 2014 & December 31, 2014, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 36 (D.D.C. Oct. 22, 2015) (describing Ocwen's right to cure, and explaining that Ocwen sufficiently current "fails" from prior quarter).[1]

66. On the one occasion where Ocwen was unable to cure a Potential Violation concerning a single Metric in a single quarter, the Monitoring Committee filed an unopposed

[1] *See also* SMF Ex. 22, Monitor's Report for the Reporting Periods Ended March 31, 2015 and June 30, 2015, *CFPB v. Ocwen Fin Corp.,*No. 13-02025, ECF No. 37, at 21-30 (D.D.C. April 28, 2016) (detailing corrective action and remediation); SMF Ex. 23, Monitor's Report for the Reporting Periods Ended September 30, 2015 and December 31, 2015, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 41, at 20-31 (D.D.C. Sept. 8, 2016) (same); SMF Ex. 24, Monitor's Report for the Reporting Periods Ended March 31, 2016 and June 30, 2016, *CFPB v. Ocwen Fin. Corp.*, No. 13-02025, ECF No. 42, at 19-27 (D.D.C. July 3, 2017) (same).

consent motion to enforce the NMS Consent Judgment triggering the remedies contemplated by the NMS—a $1 million penalty and non-monetary equitable relief. SMF Ex. 13, Evans Decl. ¶¶ 10-11; SMF Exs. 12, 27, Unopposed Mot. & Order, *CFPB v. Ocwen Fin. Corp.*, No. 13-cv-02025, ECF Nos. 45-46 (D.D.C. Sept. 6, 2017).

67. At no point did any members of the Monitoring Committee (or any other plaintiffs in the NMS) bring a proceeding in the lawsuit that culminated in the NMS to attempt to declare Ocwen to be in breach of its obligations under the NMS. SMF Ex. 13, Evans Decl. ¶ 11.

## II. THE CFPB WAS WARNED THAT IT MUST ADDUCE LOAN-SPECIFIC EVIDENCE TO PROVE ITS CLAIMS

68. The CFPB's Amended Complaint includes ten counts, alleging that Ocwen's servicing conduct between January 2014 and April 20, 2017 violated various consumer protection statutes, including the Consumer Financial Services Protection Act of 2010 ("CFPA"), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA") and its implementing regulation, 12 C.F.R. part 1024 ("Regulation X"), the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), and the Homeowners' Protection Act, 12 U.S.C. § 4901 *eq seq.* ("HPA")—purportedly affecting over two million loans. *See* Am. Compl., ECF No. 481.

69. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

70. During discovery in this case, Judge Matthewman asked the CFPB to take a sample of Ocwen's loans and loan data, and make its case by identifying proof of errors in the loan sample and extrapolating across all similar loans. *See* SMF Ex. 131, Dec. 20, 2018 Hearing Tr., *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, at 3:5-9 ("[I]t seems like the issues are dealing with the document requests pertaining to 1.58 million loan file document requests, and I'd asked the parties to see if they could resolve the issue by sampling since it's such a large volume of documents."); *id.* at 42:10-16 ("I was hoping that the parties could agree to a sampling process … which would avoid the production of such a large number of documents and would result in the production of a reduced number of documents in light of the fact that we're talking about a total universe of approximately 1.58 million loans").

71. Judge Matthewman repeatedly warned the CFPB that, to prove their claims at trial, they would have to adduce specific evidence "by loan number"—that is, for each specific loan. For example, at the May 2, 2019 hearing, he said:

> But if you present this case to a jury or even summary judgment, aren't you going to have to go by loan number? In other words, aren't you going to have to say this

> loan was violative and this loan was violative and have to prove it? I mean, at some point aren't you going to have to prove loan numbers, that a certain loan number or a certain group of loan numbers, whatever it is, somehow violated a law or statute?

SMF Ex. 28, May 2, 2019 Hearing Tr., *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, at 29:13-20.

72. Similarly, on December 4, 2019, Judge Matthewman said: "This is a difficult case to try because of the amount of documents and the amount of distinct, separate allegations that are made and the differences between this borrower and that borrower. It really is a complicated prosecution when it comes to that." SMF Ex. 29, Dec. 4, 2019 Hearing Tr. *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, at 179:25-180:4.

73. The CFPB has made clear that its position is that penalties should be calculated based on the number of violations. SMF Ex. 128, CFPB's First Supplement to Its Initial Disclosures (stating that it computes the total penalty amount as "(# of … Violations) x (# of Days of Violations) x (Penalty Amount…)").

74. The CFPB's calculation of the dollar amount of alleged consumer harm it seeks to recover here is specifically based on the number of violations, again making it necessary for the CFPB to prove how many, if any, violations actually occurred. SMF Ex. 60, Second Amended Expert Report of Professor Daniel McFadden, ¶¶ 123 (Sept. 19, 2019) ("McFadden Report") (calculating foreclosure-related damages based on his assumption that exactly 272,007 loans were harmed by servicing violations).

75. In support of its demand for loan-level information and acknowledging Ocwen's demand for loan-level disclosures from the CFPB, the CFPB told Judge Matthewman that "the data, the actual loan-level data, is what the Bureau needs to complete these [loan] analyses in order to, ***with precision***, provide the defendants with I think what they're asking for in terms of … ***each precise error*** that the Bureau says existed in these files." SMF Ex. 30, June 5, 2019 Hearing Tr., *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, at 21:3-7.

76. Judge Matthewman specifically ordered the CFPB to disclose which specific loans were improperly serviced and, in detail, the basis for those contentions. ECF No. 396 ¶ 3 (June 6, 2019 Order); SMF Ex. 30, June 5, 2019 Hearing Tr. at 31:8-12 (instructing that where CFPB alleges a violation, defendants have the "absolute right" to "get to the bottom of what their evidence is to support that allegation"); *id.* at 46:3-14 (agreeing with Defendants' counsel's statement that the CFPB should "identify the loans that belong in these buckets and the evidence

you have that supports why you said that those loans had" violations); *see also id.* at 51:9-12 ("[OAG] [y]ou brought a complaint. You're the one who started the lawsuit. If you don't have facts supporting your allegations, then that will be a motion that I'm sure the defense will file.").

**III. THE CFPB'S AT-ISSUE LOAN DISCLOSURES**

77. Ocwen served discovery requests on the CFPB that asked the Bureau to identify the loan numbers at issue in this litigation. Ocwen's First Set of Interrogatories to Plaintiff CFPB, Interrogatory No. 1, asked the Bureau to "[i]dentify by loan number each loan you contend is at issue in this Litigation." SMF Ex. 31, Defendants' First Set of Interrogatories to Plaintiff, Interrogatory No. 1 (Aug. 24, 2017); SMF Ex. 32, Declaration of Sabrina Rose-Smith ¶ 3 (June 5, 2020) ("Rose-Smith Decl.").

78. Ocwen's Fourth Request for Production of Documents to Plaintiff CFPB, Request No. 15, also requested that the CFPB produce, for each "At Issue Loan":

> (a) Documents sufficient to show the specific procedures, actions, or practices that the Bureau contends Defendants wrongfully took or followed, or failed to take or follow; (b) Documents sufficient to show each statute, regulation, or provision of law that the action, procedure, or practice violated with which the Bureau contends Defendants failed to comply; (c) Documents that support or evidence the damages and penalties you seek to recover for the loan as to each violation in subsection (b); (d) Documents that support or evidence the factual basis for any penalty you seek to recover; (e) Documents concerning any customer complaint the Bureau has received, the result of any Bureau examination or review regarding, or corrective action plan supervision regarding each loan; and (f) Documents concerning any compliance review of each loan.

SMF Ex. 135, Defendants' Fourth Requests for Production of Documents to Plaintiff Consumer Financial Protection Bureau, at 6-7 (Apr. 15, 2019); SMF Ex. 32, Rose-Smith Decl. ¶ 4.

79. The CFPB's response to Ocwen's Fourth Requests for Production of Documents, Request No. 15, stated that the CFPB "will disclose all information relied upon by the expert by the agreed-upon court-ordered deadline." SMF Ex. 136, Plaintiff's Responses and Objections to Defendants' Fourth Set of Requests for Production of Documents, at 32-34 (May 20, 2019); SMF Ex. 32, Rose-Smith Decl. ¶ 5.

80. Ocwen also sought 30(b)(6) deposition testimony from the CFPB about the loans at issue in the litigation, specifically, for each "At Issue Loan":

> (a) The specific procedures, actions, practices that the Bureau contends Ocwen wrongfully took or followed, or failed to take or follow; (b) The statute, regulation, or provision of law that the action, procedure, or practice violated; (c) Whether

> Ocwen's conduct that resulted in the alleged violation was knowing or reckless and the basis for your contention, including any standard applied by the Bureau to reach its conclusion; (d) The damages and penalties you seek to recover as to each violation; and (e) The basis for any penalty you seek to recover.

SMF Ex. 127, Defendants' Notice of Rule 30(b)(6) Deposition of Plaintiff Consumer Financial Protection Bureau, at 4 (April 15, 2019) (Topic 1); SMF Ex. 32, Rose-Smith Decl. ¶ 6.

81. The CFPB responded to Ocwen's First Set of Interrogatories, Interrogatory No. 1, by merely listing the loans it contends are at issue for its claims against Ocwen in two narrative responses and multiple lists of loans, which are found in 15 exhibits grouped by each Count of the CFPB's Amended Complaint—referred to herein as the "CFPB Loan Lists." SMF Exs. 33-52 & 126, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories & Exs. 1-15 (Nov. 22, 2019); SMF Ex. 32, Rose-Smith Decl. ¶ 7.

82. The CFPB's Loan Lists identify a total of 2,104,530 loans at issue for Count I of the Amended Complaint (CFPA – use of inaccurate or incomplete information). *See* SMF Exs. 33-35 & 52, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Exs. 1 (999,999 loans), 1.2 (1,000,000 loans), 1.3 (102,095 loans), & 15 (2,436 additional loans, identified only by borrower name and not loan number, and which may overlap with other at-issue loans); *see also* SMF Ex. 53, 30(b)(6) Deposition of Richa Dasgupta at 625:19-631:22 (June 26, 2019) ("Dasgupta 30(b)(6) Dep."); SMF Ex. 32, Rose-Smith Decl. ¶ 8.

83. The CFPB's Loan Lists identify a total of 2,104,530 loans at issue for Count II of the Amended Complaint (CFPA – misrepresentations to borrowers) – the same loans identified as at-issue in Count I. *See* SMF Exs. 36-38 & 52, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Exs. 2.1 (999,999 loans), Exhibit 2.2 (1,000,000 loans), and Exhibit 2.3 (102,095 loans) & Ex. 15 (2,436 additional loans, identified only by borrower name and not loan number, and which may overlap with other at-issue loans); *see also* SMF Ex. 53, Dasgupta 30(b)(6) Dep. at 625:19-631:22; SMF Ex. 32, Rose-Smith Decl. ¶ 9.

84. The CFPB's Loan Lists identify 477 loans at issue for Count III of the Amended Complaint (CFPA – premature foreclosures). SMF Ex. 39, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 3; SMF Ex. 32, Rose-Smith Decl. ¶ 10.

85. The CFPB's Loan Lists do not identify a list of loans at issue for Count IV of the Amended Complaint (TILA and CFPA – failure to provide accurate periodic statements). Instead, the CFPB provides a narrative description: "Loans at issue for Count 4 are those loans at

issue in Count I where those borrowers received a periodic statement, including, without limitation, those loans listed in the loan-level data produced by Ocwen in response to Request Nos. 20 and 21 of the Bureau's Fifth Set of Requests for Production of Documents." SMF Ex. 40, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 4; SMF Ex. 32, Rose-Smith Decl. ¶ 11.

86. The CFPB's Loan Lists identify 415,307 loans at issue for Count V of the Amended Complaint (FDCPA and CFPA – use of inaccurate and incomplete information). SMF Ex. 41, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 5; SMF Ex. 32, Rose-Smith Decl. ¶ 12.

87. The CFPB's Loan Lists identify 415,307 loans at issue for Count VI of the Amended Complaint (FDCPA and CFPA – misrepresentations to borrowers). SMF Ex. 42, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 6; SMF Ex. 32, Rose-Smith Decl. ¶ 13.

88. The CFPB's Loan Lists identify a total of 2,176,532 loans at issue for Count VII of the Amended Complaint (RESPA and CFPA – various alleged escrow violations), as follows: 581,987 loans (identified by the CFPB as concerning failure to conduct escrow analyses); 1,406 loans (identified by the CFPB as concerning hazard insurance violations); 111,960 loans (identified by the CFPB as concerning escrow shortage); 145,907 (identified by the CFPB as concerning failure to send escrow statements ); a total of 1,332,993 loans (identified by the CFPB as concerning general escrow violations); and 2,279 additional loans (identified only by borrower name and not loan number). *See* SMF Exs. 43-48, 52, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Exs. 7, 8.1, 8.2, 9, 10, 11 & 15; *see also* SMF Ex. 53, Dasgupta 30(b)(6) Dep. at 623:8-631:3-22; SMF Ex. 32, Rose-Smith Decl. ¶ 14.

89. The CFPB's Loan Lists do not identify a list of loans at issue for Count VIII of the Amended Complaint (RESPA and CFPA – inadequate policies and procedures). Instead, the CFPB provides a narrative description, stating the loans at issue for Count VIII include: (i) "loans of borrowers who submitted complaints to Ocwen from January 10, 2014 to the present"; (ii) "loans upon which Ocwen, including through its foreclosure attorneys and/or on behalf of mortgagors, initiated a foreclosure, or was in the process of foreclosing upon, on or after January 10, 2014 to the present"; and (iii) "all mortgage servicing rights (loans) that Ocwen transferred to new servicers from January 10, 2014 to present." SMF Ex. 49, CFPB's Fifth

Amended Answer to Defendants' First Set of Interrogatories, Ex. 12; SMF Ex. 32, Rose-Smith Decl. ¶ 15.

90. The CFPB's Loan Lists identify 124 loans at issue for Count IX of the Amended Complaint (RESPA and CFPA – foreclosure-related conduct). SMF Ex. 50, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 13; SMF Ex. 32, Rose-Smith Decl. ¶ 16.

91. The CFPB's Loan Lists identify 10,227 loans at issue for Count X of the Amended Complaint (HPA and CFPA – failure to automatically terminate PMI). SMF Ex. 51, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 14; SMF Ex. 32, Rose-Smith Decl. ¶ 17.

## IV. THE BUREAU'S EVIDENCE "SUPPORTING" ITS LOAN DISCLOSURES IS NOT LOAN-SPECIFIC

### A. <u>The Bureau Sought and Obtained Substantial Loan-Level Discovery</u>

92. The CFPB moved to compel Ocwen to produce data for over 1.58 million loans, arguing that "[a] sample would not identify the ***specific*** borrowers who were harmed by Defendants' violations of law, or the ***specific*** harm to those borrowers, limiting the [CFPB's] ability to prove its case." SMF Ex. 57, Plaintiff's Reply in Support of Its Motion to Compel Complete Responses to Its Fourth and Fifth Requests for Production, *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, ECF No. 200 at 6 (Nov. 1, 2018) (emphasis in original).

93. During discovery, the Court said to the CFPB's counsel: "A trial in this case, you are not going to be producing information about 1.58 million people in file form. You are going to do this in some sort of overarching expert opinion type of testimony." SMF Ex. 56, Nov. 29, 2018 Hearing Tr., *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, at 88:18-23.

94. The CFPB's counsel responded: "Yes. That's exactly right…. [W]ith respect to Your Honor's first question about the expert, we do intend for the expert to look through the 1.58 million borrowers and to crunch and assess the data, both in a summary witness fashion and both as to an expert opinion with respect to all of the errors …." SMF Ex. 56, Nov. 29, 2018 Hearing Tr. at 88:22-24, 89:9-14.

95. Discovery and production of loan-level data and information proceeded. In fact, Judge Matthewman remarked that this is "probably one of the most overly discovered cases I've ever seen." SMF Ex. 134, Jan. 24, 2019 Hearing Tr., *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495, at 28:8-9.

96. Ultimately, in response to the CFPB's discovery requests, Ocwen produced extensive amounts of loan-specific data relating to the servicing of each of the 1.58 million loans, including, but not limited to: borrower information; loan origination dates, principal balance information; escrow data and escrow statement information; adjustable interest rate information; borrower delinquency data; borrower bankruptcy information; borrower credit reporting data; borrower credit scores; foreclosure information; loss mitigation application information; loan modification information; loan transaction data, including credits, debits and reversals made on the loan accounts; certain codes, including comment codes, and flags in the loan data; certain periodic statement data; account change information; and account reversal information. SMF Ex. 54, Declaration of Krysta Sebastian, at ¶ 9 (June 4, 2020); SMF Exs. 55-55B, Plaintiff's Fifth Set of Requests for Production to Defendants & Exs. A-B (Aug. 6, 2018).

**B. The Bureau's Expert Testimony Is Not Loan Specific**

97. CFPB expert witness John Searson opines generally that certain of Ocwen's policies did not reflect "best practices." SMF Ex. 58, Expert Report of John Searson on Behalf of Consumer Financial Protection Bureau, ¶¶ 12-17 (Aug. 15, 2019) ("Searson Report").

98. Searson does not offer any opinion concerning Ocwen's servicing of any individual loan, nor does he opine that Ocwen's servicing of any loan violated any law. SMF Ex. 58, Searson Report ¶¶ 12-17; SMF Ex. 59, Deposition of John Searson at 201:11-13 (Jan. 9, 2020) ("Searson Dep.") ("I don't enumerate the servicing errors. I don't quantify the servicing errors"); *id.* at 288:2-4 ("I didn't do any analysis of individual loans for the purposes of this report.").

99. The CFPB's other expert witness, Daniel McFadden, only offers an opinion as to the calculation of alleged damages. SMF Ex. 60, McFadden Report ¶¶ 6-12 (Sept. 19, 2019).

100. McFadden's report expressly states that "[a]s requested by counsel, … I ***assumed*** Ocwen is liable" for the various violations alleged by the CFPB. SMF Ex. 60, McFadden Report ¶ 18(a)-(d) (emphasis added); SMF Ex. 61, Deposition of Daniel McFadden at 41:9-16 (Feb. 4, 2020) ("McFadden Dep.") (testifying he assumed liability based on instructions from counsel).

**C. The CFPB Cannot Prove Its Claims Through Non-Expert Evidence**

101. In response to Ocwen's discovery requests for the CFPB to identify its evidence that Ocwen violated the law, the CFPB produced—for the first time—at the CFPB's 30(b)(6)

deposition, a "Memory Aid" that lists various documents that it asserts support each Count. SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67 (June 26, 2019).[2] SMF Ex. 32, Rose-Smith Decl. ¶ 19.

102. The CFPB's Rule 30(b)(6) witness testified that "for each count, if you look at this memory aid, you will see each of the sources that the Bureau has used to identify the loans at issue" in that count. SMF Ex. 53, Dasgupta 30(b)(6) Dep. at 646:16-19.

103. For example, for Count I, which alleges that Ocwen used incomplete or inaccurate information in servicing over 2,000,000 loans, the Memory Aid is nothing more than a multi-page list of well over 100 specific documents, as well as multiple catch-all categories of unidentified documents (such as "select complaint types" and "complaints related to escrow issues"). SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67 at 2, 5.

104. Count I alleges that 2,104,530 loans were serviced using inaccurate or incomplete information, yet the pages of the Memory Aid relating to Count I do not identify, for each (or any) of those loans, what document listed on the Memory Aid is proof of that violation. SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67 at p. 1-5. Nor does the Memory Aid identify, for each (or any) of the 2,104,530 loans, what information about the loan was supposedly inaccurate or incomplete. *Id.*

105. For example, the CFPB's list of loans states that Loan No. [redacted]0209 is at issue for Count I. SMF Ex. 34, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 1.2; SMF Ex. 32, Rose-Smith Decl. ¶ 18.

106. However, the Memory Aid does not identify which, if any, piece of evidence shows that Ocwen serviced Loan No. [redacted]0209 using inaccurate or incomplete information. SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67 at p. 1-5.

---

[2] At the time the CFPB produced the Memory Aid, the original CFPB Complaint (ECF No. 1) was still the operative complaint, thus it references the original complaints 14 Counts (Counts I-XIV)—some of which were dismissed, dropped, or consolidated. *See* Am. Compl. For the Court's reference: "Count IV" in the Memory Aid refers to Count III of the Amended Complaint; "Count VII" in the Memory Aid refers to Count IV of the Amended Complaint; "Count X" in the Memory Aid refers to Count VII of the Amended Complaint; "Count XII" in the Memory Aid refers to Count VIII of the Amended Complaint; "Count XIII" in the Memory Aid refers to Count IX of the Amended Complaint; and "Count XIV" of the Memory Aid refers to Count X of the Amended Complaint. *Compare* SMF Ex. 62 & Compl. (ECF No. 1), *with* Am. Compl. SMF Ex. 32, Rose-Smith Decl. ¶ 20.

107. The same is true with respect to every other loan listed as violating Count I, and with respect to every other loan listed as violating every other count. SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67. at p. 1-22.

108. For both Counts I and II, the first specific document listed on the CFPB's Memory Aid is OCW-CFPB-001-00585088, which the CFPB says shows "[a]ccounts Ocwen identified relating to erroneous flood insurance charges." SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67, at p. 1 Row 7 & p. 6 Row 7.

109. OCW-CFPB-001-00585088 is merely an Ocwen Excel file with multiple spreadsheets, numerous column headings with various abbreviations, and rows of data; nowhere does the document state that Ocwen violated any law in imposing erroneous flood insurance charges for each of the listed loans. SMF Ex. 63, OCW-CFPB-001-00585088.

110. As another example, Count X alleges that Ocwen failed to properly terminate private mortgage insurance, and the CFPB has listed 10,227 loans for which it is asserting that claim. Am. Compl. ¶ 286; SMF Ex. 51, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 14; SMF Ex. 32, Rose-Smith Decl. ¶ 21

111. The only document listed in the Memory Aid for this claim is an Excel chart, identified as OCW-CFPB-001-00585087. SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67, at p. 22 Row 6; SMF Ex. 32, Rose-Smith Decl. ¶ 21.

112. The Count X Excel chart lists only 2,124 loans; it does not reference or identify the other 8,103 loans the CFPB identified in its loan list. SMF Ex. 65, OCW-CFPB-001-00585087; SMF Ex. 32, Rose-Smith Decl. ¶ 21.

113. Although the chart indicates "refunds completed" for some of the 2,124 loans, it states "no refunds due on this loan" for many other loans. SMF Ex. 65, OCW-CFPB-001-00585087.

114. Even for the particular loans that had "refunds completed," the report does not say that a refund was given because Ocwen had violated the law. *Id.*

115. As a final example, Count IV alleges that Ocwen failed to provide accurate periodic statements to borrowers. Am. Compl. ¶¶ 229-230.

116. For this Count, the CFPB has failed to identify the loans at issue in this Count; instead, the CFPB has merely asserted that the "[l]oans at issue for Count 4 are those loans at issue in Count I where those borrowers received a periodic statement …." SMF Ex. 40,

CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 4; SMF Ex. 32, Rose-Smith Decl. ¶ 11.

**V. [SECTION INTENTIONALLY OMITTED PURSUANT TO DE 713]**

117. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

118. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

119. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

120. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

121. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

122. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

123. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

124. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

125. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

126. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

127. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

128. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

129. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

130. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

131. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

**VI. [SECTION INTENTIONALLY OMITTED PURSUANT TO DE 713]**

132. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

133. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

134. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

135. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

136. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

137. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

138. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

139. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

140. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

141. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

142. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

143. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

144. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

145. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

146. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

147. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

148. [INTENTIONALLY OMITTED PURSUANT TO DE 713]

149. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

150. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

151. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

152. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

153. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

154. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

155. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

156. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

157. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

158. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

159. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

160. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

161. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

162. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

163. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

164. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

165. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

166. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

167. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

168. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

169. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

170. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

171. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

172. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

173. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

174. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

175. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

176. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

177. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

178. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

## VII. THE CFPB HAS NO EVIDENCE TO PROVE THE CLAIMED DAMAGES

### A. Defendants Should Receive Summary Judgment on the CFPB's Damages Claim for "Costs from Additional Foreclosures" (Count VII)

179. The CFPB's damages expert (Daniel McFadden) offered an opinion as to only two kinds of alleged damages: "(1) foregone interest on overpayments that borrowers made in response to Ocwen's overcharges, and (2) costs from additional foreclosures that resulted from Ocwen's Late Escrow Analyses." SMF Ex. 60, McFadden Report ¶ 9; *see also* SMF Ex. 61, McFadden Dep. at 93:6-94:15; 293:13-297:19 (confirming he has no other opinion regarding damages).

180. Count VII alleges that Ocwen was late in performing escrow analyses for certain specific loans. *See* Am. Compl. ¶¶ 258-259(a); SMF Ex. 43, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 7 (titled "Count 7 (EscAn)") (CFPB's list of loans with allegedly late escrow analyses).

181. McFadden opines that, in the aggregate, borrowers suffered damages in the range of approximately $352-$484 million as a result of additional foreclosures that supposedly resulted from those allegedly late escrow analyses. SMF Ex. 60, McFadden Report ¶ 11; SMF Ex. 89, Surrebuttal Expert Report of Professor Daniel McFadden on Behalf of Consumer Financial Protection Bureau, ¶ 65 (Nov. 14, 2019) ("McFadden Surreply Report").

182. McFadden claims his additional foreclosure analysis assessed the set of borrowers that suffered from an untimely escrow analysis and subsequently experienced a foreclosure initiation. SMF Ex. 60, McFadden Report ¶ 86.

183. Of the loans McFadden analyzed that had a delayed escrow analysis, not all of them went into initial foreclosure—the vast majority did not. SMF Ex. 60, McFadden Report ¶¶ 22, 116 (391,603 loans in the Late Escrow Analyses population; 32,190 loans in the Late Escrow Analysis population on which Ocwen had later initiated foreclosure).

184. McFadden does not identify ***any*** loan that went into foreclosure as a result of a late escrow analysis. SMF Ex. 61, McFadden Dep. at 202:2-:15; SMF Ex. 90, Expert Report of William G. Hamm, Ph.D., ¶¶ 16, 29, 34, 334-343 (Oct. 15, 2019) ("Hamm Report").

185. McFadden also does not identify the amount of ***any*** loss suffered by the borrower as a result of additional foreclosures that supposedly resulted from those allegedly late escrow analyses. SMF Ex. 61, McFadden Dep. at 115:18-116:8, 211:5-14; SMF Ex. 90, Hamm Report ¶¶ 337-378.

186. This is because McFadden's foreclosure-damages opinion is based on a theoretical mathematical model that ***does not analyze any individual loans***. SMF Ex. 61, McFadden Dep. at 116:18-24; SMF Ex. 60, McFadden Report ¶¶ 86-101; SMF Ex. 90, Hamm Report ¶¶ 16, 21-22, 248, 360.

187. McFadden applies his mathematical model to "predict[]" that late escrow analyses increased borrowers' probability of foreclosure by 6.1 percent, or 16,636 additional foreclosures—or 51% of 32,190 loans that purportedly had late escrow analyses and a subsequent foreclosure initiated. *See* SMF Ex. 60, McFadden Report ¶¶ 11, 116, 139; SMF Ex. 90, Hamm Report ¶¶ 355-56.

188. McFadden "estimates" additional foreclosure damages by multiplying the 16,636 "additional foreclosures" by an "estimated" average cost of foreclosure of either $21,130 or $29,066 (which he supposedly derived from academic literature, other studies, and some Ocwen data) implies a damages range of between approximately $352 and $484 million. SMF Ex. 60, McFadden Report ¶¶ 80, 123 & Table 15.

189. Of the loans that went into initial foreclosure, many were reinstated or paid off before foreclosure. SMF Ex. 90, Hamm Report ¶¶ 27-28, 331 & Table 10.

190. Of the loans where the foreclosure process was actually completed and a foreclosure sale occurred, their costs or other expenses varied from person to person. SMF Ex. 60, McFadden Report ¶ 118 (estimating average costs based on data from Ocwen's records, and opining that fees could be far different than his estimates in any given foreclosure proceeding).

**B. Defendants Are Entitled to Summary Judgment on the CFPB's Damages Claim for Foregone Interest (Counts I, II, V, VI, VII, and X)**

191. McFadden opines that the opportunity costs for borrowers who were overcharged as a result of Ocwen's Late Escrow Analyses, PMI Overcharges, and ARM Servicing Errors sum

to approximately $2 million in damages in the form of foregone interest on overpayments. SMF Ex. 60, McFadden Report ¶ 10.

192. McFadden's foregone interest-damages opinion is based on his assumptions that all affected borrowers would have carried credit card debt, and if Ocwen had not overcharged borrowers, they would have used their respective overpayments to pay-down that hypothetical credit card debt. SMF Ex. 60, McFadden Report ¶ 37; SMF Ex. 90, Hamm Report ¶ 145.

193. On this basis, he opines that each borrower's opportunity cost is best represented by the interest rate on consumer credit card debt—which he estimates to be between 13%-20%. SMF Ex. 60, McFadden Report ¶ 43; SMF Ex. 90, Hamm Report ¶ 145.

194. McFadden does not opine that any individual borrower actually paid an overcharge, much less carried credit card debt; rather, his opinion is merely that "maybe [a borrower] used credit card debt to cover" the overcharges, and "if she had had those funds" from the overcharges, "she ***could have*** reduced her credit card debt by that amount." SMF Ex. 61, McFadden Dep. at 262:9-263:18 (emphasis added); SMF Ex. 60, McFadden Report ¶ 37; SMF Ex. 90, Hamm Report ¶¶ 153-158.

### C. [SECTION INTENTIONALLY OMITTED PURSUANT TO DE 713]

195. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

196. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

197. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

198. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

199. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

## VIII. THE CFPB FAILED TO ADDUCE ANY EVIDENCE TO SUPPORT CERTAIN ESCROW VIOLATIONS (COUNT VII)

### A. The CFPB's Count VII Escrow Allegations and Loan Lists

200. CFPB Count VII alleged four specific escrow-related violations: that Ocwen (1) "failed to pay hazard insurance premiums in a timely manner" (Am. Compl. ¶ 257); (2) "[f]ailed to timely conduct annual escrow analyses" (*id.* ¶ 259(a)); (3) "[f]ailed to provide borrowers who were not delinquent, in foreclosure, or in bankruptcy with escrow statements" (*id.*¶ 259(b)); and (4) "[c]ollected escrow shortages that did not exist" (*id.* ¶ 259(c)).

201. For each of those four categories, the CFPB has identified specific loans that allegedly had those violations. Am. Compl. ¶¶ 257, 259, 287.

202. Specifically, the Bureau alleges that:

a. 1,406 loans violated RESPA because Ocwen failed to pay hazard insurance in a timely manner. SMF Ex. 46, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 9 (titled "Count 7 (InsCanc)"); SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67 at 19;

b. 581,987 loans violated RESPA because Ocwen failed to timely conduct annual escrow analyses for borrowers pursuant to the requirements of Regulation X. SMF Ex. 43, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 7 (titled "Count 7 (EscAn)"); SMF Ex. 53, Dasgupta 30(b)(6) Dep. at 622:13-623:7 ("Escrow Analysis is intended to convey those loans that are at issue with respect to . . . Paragraph 287 . . .Subparagraph A of the [original] Complaint");

c. 145,907 loans violated RESPA because Ocwen failed to provide those borrowers with timely escrow analysis statements pursuant to the requirements of Regulation X. SMF Ex. 48, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 11 (titled "Count 7 (EscrStmt)"); SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67 at 17; and

d. 111,960 loans violated RESPA because Ocwen collected escrow shortages that did not exist. SMF Ex. 47, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Ex. 10 (titled "Count 7 (Shortage)"); SMF Ex. 62, CFPB 30(b)(6) Dep. Ex. 67, at 18.

203. In addition to those four categories and loan lists, the Bureau alleges that 1,322,993 loans are at issue in Count VII for unspecified "General" escrow mismanagement. SMF Exs. 44 & 45, CFPB's Fifth Amended Answer to Defendants' First Set of Interrogatories, Exs. 8.1, 8.2 (titled "Count 7 (General)").

204. At her deposition, the CFPB's Rule 30(b)(6) witness testified that "these are loans at issue where ***the Bureau has not yet determined that they relate to a specific regulatory violation that's at issue***" in Count VII. SMF Ex. 53, Dasgupta 30(b)(6) Dep. at 623:8-625:18 (emphasis added).

**B. <u>Ocwen's Purported Failure to Conduct Escrow Analyses for Delinquent Borrowers and Borrowers in Bankruptcy Was Based on Its Good Faith Interpretation of Regulation X</u>**

205. The CFPB alleges in Count VII that Ocwen violated RESPA Regulation X (12 C.F.R. § 1024.17(c)(3), and (f)(i)) by not conducting an annual escrow analysis for borrowers, including those who were delinquent, in bankruptcy, or in foreclosure. Am. Compl. ¶¶ 258(a), 259(a).

206. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

207. There was (and is still) no requirement to send a statement reflecting the results of such an annual escrow analysis to borrowers who were delinquent, in bankruptcy, or in foreclosure at the time the analysis otherwise would have been due. 12 C.F.R. § 1024.17(i)(2) ("If at the time the servicer conducts the escrow account analysis the borrower is more than 30 days overdue, then the servicer is exempt from the requirements of submitting an annual escrow account statement to the borrower . . . This exemption also applies in situations where the servicer has brought an action for foreclosure under the underlying federally related mortgage loan, or where the borrower is in bankruptcy proceedings.").

208. In promulgating Regulation X, the Department of Housing and Urban Development ("HUD") stated:

> HUD considers the annual escrow account statement to be the borrower's tool to check the past year's escrow account activities and the projections for the next year. As such, ***HUD believes that servicers need to perform an escrow account analysis to make the statements meaningful. An escrow account analysis, therefore, is one step in the process of preparing the escrow account statements***.

59 Fed. Reg. 53,890, 53,896 (Oct. 26, 1994) (emphasis added).

209. Ocwen's Rule 30(b)(6) witness testified that based on this guidance, for a period of time, it did not conduct escrow analyses for certain delinquent borrowers, or borrowers who were in bankruptcy or foreclosure. SMF Ex. 93, 30(b)(6) Deposition of Andrew Combs, at 12:20-13:16 (May 29, 2019) ("Combs 30(b)(6) Dep.") ("[I]t was based on an interpretation for – you know, from a regulatory guidance where loans which were delinquent did not require an annual escrow analysis statement.").

210. When Ocwen determined that Regulation X could be interpreted differently, it voluntarily changed its processes and began conducting annual escrow analyses for such delinquent borrowers, as well as those in bankruptcy. SMF Ex. 95, Deposition of Thomas Diller

at 107:3-7, 109:11-110:3 (June 3, 2019) ("Diller Dep."); SMF Ex. 96, Deposition of Daniel Reeves at 55:7-20 (June 2, 2016) ("Reeves Dep."); SMF Ex. 92, Declaration of Benjamin Verdooren, at ¶ 6 (June 5, 2020) ("Verdooren Decl.").

211. During the time when Ocwen did not typically conduct annual escrow analyses for certain loans that were delinquent or in bankruptcy, Ocwen continued to pay the required tax and insurance payments on behalf of borrowers that were delinquent or in bankruptcy. SMF Ex. 92, Verdooren Decl. ¶¶ 3-5.

212. Also during that time, if a borrower that was delinquent or in bankruptcy made a payment in an amount that was more than what would have been required if an escrow analysis had been conducted on the borrower's loan, that surplus amount would be held in the borrower's escrow account until the analysis was performed, and the surplus would be identified and returned to the borrower. SMF Ex. 92, Verdooren Decl. ¶ 5.

213. Ocwen also voluntarily took steps to remediate borrowers who may have incurred shortages or were overcharged during the time-period when it did not conduct escrow analyses for delinquent borrowers and borrowers in bankruptcy. SMF Ex. 98, 30(b)(6) Deposition of Kim McCall Miller at 77:3-78:11 (May 15, 2019) ("Miller Dep."); SMF Ex. 99, Defendants' Amended and Supplemented Responses and Objections to Plaintiff's First Set of Interrogatories (Interrogatories Nos. 3 & 4), at 6-8 (Mar. 20, 2018); SMF Ex. 100, OCW-030-0027038, at -7038-7309 (Management Assertion of Remediation); SMF Ex. 101, Defendants' Amended and Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, Interrogatories Numbers 5-8, at 8-11 (Aug. 2, 2018); SMF Ex. 92, Verdooren Decl. ¶¶ 6-7.

## IX. THE CFPB HAS NOT DEMONSTRATED THAT OCWEN'S POLICIES AND PROCEDURES VIOLATED REGULATION X OR RESULTED IN ANY INDIVIDUAL HARM

214. Count VIII alleges that Ocwen violated Regulation X because it did not maintain such policies with respect to three activities: (1) obtaining "accurate and current" information from foreclosure counsel; (2) addressing borrower complaints; and (3) completing outbound servicing transfers. Am. Compl. ¶¶ 263-65.

215. Regulation X provided that "[a] servicer shall maintain policies and procedures that are ***reasonably designed*** to achieve" certain enumerated objectives. 12 C.F.R. § 1024.38(a) (emphasis added).

216. Ocwen had policies and procedures on each of the three subjects challenged by the CFPB. *See* SMF ¶¶ 217-19.

217. Ocwen maintained written procedures as well as desktop manuals for handling complaints. SMF Ex. 103, OCW3-006-0000076; SMF Ex. 104, OCW-CFPB-001-05932687; SMF Ex. 105, OCW-CFPB-001-05932757; SMF Ex. 106, OCW-CFPB-001-05932826; SMF Ex. 107, OCW-CFPB-001-05932902; SMF Ex. 108, OCW-CFPB-001-05932978; SMF Ex. 109, OCW-CFPB-001-05933054; SMF Ex. 110, OCW-CFPB-001-05933130; SMF Ex. 111, OCW-CFPB-001-05933196; SMF Ex. 112, OCW-CFPB-001-05933260; SMF Ex. 113, OCW-CFPB-001-05933322; SMF Ex. 114, OCW-CFPB-001-05933388; SMF Ex. 115, OCW-CFPB-001-05933457; SMF Ex. 116, 30(b)(6) Deposition of Sherri Goodman, at 12:5-15:12 (May 22, 2019) ("Goodman 30(b)(6) Dep.").

218. Ocwen maintained written procedures for handling outbound transfers, including as early as November 2014. SMF Ex. 117, OCW-CFPB-001-01036232, at -644-696 (effective date of Nov. 25, 2014); SMF Ex. 118, OCW-CFPB-001-01031629 (effective date of April 1, 2015).

219. Ocwen maintained written procedures for overseeing foreclosure counsel. SMF Ex. 119, OCW2-001-0004419.

220. Ocwen's expert witness (Marcel Bryar) testified that Ocwen's outbound servicing transfer policies and procedures were "reasonably designed to address inherent risk in these process." SMF Ex. 102, Deposition of Marcel Bryar at 261:21-24; 264:6-12; 268:4-7 (Dec. 19, 2019) ("Bryar Dep").

221. Mr. Bryar further testified that Ocwen's various servicing policies and practices also were "reasonably designed." SMF Ex. 102, Bryar Dep. at 268:9-12; 278:9-12, 284:6-9, 312:3-313:24, 316:22-25.

222. The CFPB's proffered expert, John Searson, on the other hand, testified that he is offering no opinion as to whether Ocwen's policies were "reasonably designed" to accomplish the objectives of Regulation X. SMF Ex. 59, Searson Dep. at 25:4-14 ("Q. And you do not intend to offer an opinion about whether or not they [Ocwen's policies] are reasonably designed to comply with servicing regulations? A. That wasn't part of my assignment for this report. Q. And again, you have said, "That wasn't part of my assignment." Can I take that then to mean no, you did not -- you do not? A. Yes, that's correct.").

223. Instead, Searson opined only that Ocwen's policies did not reflect the industry's "best practices." SMF Ex. 58, Searson Report ¶¶ 11-17; SMF Ex. 59, Searson Dep. at 25:4-14.

224. Searson admits that not all "best practices" are regulatory requirements. SMF Ex. 59, Searson Dep. at 128:24-129:23.

225. Searson also opined that Ocwen "appears to have lacked any policies and procedures for outbound transfers until July 10, 2015." SMF Ex. 58, Searson Report ¶¶ 182.

226. When shown Ocwen's November 2014 outbound transfer procedures during his deposition, however, Searson testified that he had not reviewed that document in forming his opinion and did not know whether Ocwen had any outbound transfer procedures in place prior to November 2014. Searson further testified that seeing Ocwen's November 2014 outbound transfer procedures changed this prior opinion that Ocwen "appear[ed] to have lacked" such policies and procedures . . . until July 10, 2015." SMF Ex. 59, Searson Dep. at 321:15-324:2

**X. [SECTION INTENTIONALLY OMITTED PURSUANT TO DE 713]**

227. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

228. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

229. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

230. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

231. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

232. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

233. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

234. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

235. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

236. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

237. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

238. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

239. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

**XI. OFC AND OMS DID NOT ENGAGE IN SERVICING ACTIVITIES**

240. Ocwen employee testimony demonstrates that OFC was not the entity that conducted the functions of "daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Ocwen's loans." SMF Ex. 120, Deposition of Ronald Faris at 19:17-20:5 (May 31, 2019) ("Faris Dep.").

241. Only OLS received periodic payments from borrowers and made payments from those amounts. SMF Ex. 92, Verdooren Decl. ¶¶ 8-10.

242. Pooling and Servicing Agreements (and Subservicing Agreements), signed by Ocwen Loan Servicing, LLC, required the Servicer (OLS) to collect payments on mortgage loans. *See e.g.*, SMF Ex. 122, OCW-CFPB-001-05784168, at § 2.2(a)(i) (at OCW-CFPB-001-05784196) (agreement between New Residential Mortgage and OLS); SMF Ex. 123, OCW-CFPB-001-01665892, at § 11.03 (at OCW-CFPB-001-01665950) (subservicing agreement between Angel Oak Funding, LLC and OLS).

243. Pooling and Servicing Agreements (and Subservicing Agreements), signed by Ocwen Loan Servicing, LLC, required the Servicer (OLS) to remit or distribute payments to investors or the loan holders. *See e.g.*, SMF Ex. 123, OCW-CFPB-001-01665892, at § 11.15 (at OCW-CFPB-001-01665958-59); SMF Ex. 122, OCW-CFPB-001-05784168, at § 2.8(a) (at OCW-CFPB-001-05784211).

Dated: December 4, 2020

Respectfully submitted,

*/s/ Catalina E. Azuero*

Bridget Ann Berry
Andrew Stuart Wein
**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, FL 33401
Tel.: 561.650.7900
berryb@gtlaw.com
weina@gtlaw.com

Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: 202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com

Laura A. Stoll (*pro hac vice*)
**GOODWIN PROCTER LLP**
601 S. Figueroa Street

Los Angeles, CA 90017
Tel.: 213.426.2500
lstoll@goodwinlaw.com

Catalina E. Azuero (Florida Bar No. 821411)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
cazuero@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on December 4, 2020 via ECF on all counsel or parties of record listed below:

Jean Healey
Email: jean.healey@cfpb.gov

Atur Desai
E-mail: atur.desai@cfpb.gov

Tianna Baez
E-mail: tianna.baez@cfpb.gov

Amanda Roberson
E-mail: amanda.roberson@cfpb.gov

Stephanie Brenowitz
E-mail: stephanie.brenowitz@cfpb.gov

Erin Mary Kelly
E-mail: erin.kelly@cfpb.gov

James Savage
E-mail: james.savage@cfpb.gov

Greg Nodler
E-mail: greg.nodler@cfpb.gov

Michael Posner
E-mail: michael.posner@cfpb.gov

Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov

Shirley T. Chiu
E-mail: shirley.chiu@cfpb.gov

/s/ Catalina E. Azuero
Catalina E. Azuero