**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION
BUREAU,

        Plaintiff,

   v.

OCWEN FINANCIAL CORPORATION,
OCWEN MORTGAGE SERVICING, INC.,
OCWEN LOAN SERVICING, LLC; and
PHH MORTGAGE CORPORATION,

        Defendants.

**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF BUREAU EXPERT**
**DANIEL MCFADDEN AND INCORPORATED MEMORANDUM OF LAW**

Ocwen submits this Motion and Incorporated Memorandum of Law to Exclude the Opinions and Testimony of the Bureau's Expert, Daniel McFadden. The Court should exclude evidence from Dr. McFadden because it is not relevant to the Court's inquiries at summary judgment or trial and his analysis lacks the requisite reliability for admission.

### MCFADDEN'S EXPERT REPORT

The Consumer Financial Protection Bureau alleges Ocwen violated certain loan servicing regulations, which, among other things (1) required an annual analysis of certain consumers' loan escrow accounts, (2) governed the cancelation of private mortgage insurance ("PMI") after a consumer's principal balance fell below 80% of the consumer's original property value, and (3) required Ocwen to maintain accurate data sufficient to make certain adjustable rate mortgage ("ARM") interest rate adjustments. Complaint, Dkt. No. 1-2 ("Compl.") ¶102, 144-5, 219.

The Bureau now claims that these three specific alleged violations led to two forms of consumer harms, which are each addressed by McFadden in his Report and Surrebuttal[1]: (i) economic losses resulting from increased foreclosures, and (ii) opportunity costs associated with overpayments that consumers made into their escrow accounts, for PMI, and for interest on ARM loans. The Bureau asserts that these harms are redressable through this case, and would support an award of damages or remediation for the benefits of allegedly affected consumers. To address these categories of damages, McFadden opines as follows:

- *"Late escrow opportunity cost".* Ocwen's failure to perform timely escrow analyses caused some consumers to overfund their escrow accounts temporarily, because Ocwen did not adjust those consumers' monthly escrow payments at the end of the year to account for changes in the required taxes and insurance payments. Consumers who received a late escrow analysis were overcharged (in the Bureau's view) in that Ocwen retained some monies for some time before it refunded excess amounts. McFadden calculates lost opportunity costs for those monies. McFadden Rep. ¶22,

---

[1] The Bureau served McFadden's "Second Amended Expert Report" ("McFadden Rep.") on September 19, 2019, attached as Ex. 1. McFadden's Surrebuttal Report ("Surrebuttal") was submitted on November 14, 2019 and is attached as Ex. 2. Ocwen took McFadden's deposition on February 4, 2020. Excerpts from the transcript of McFadden's Deposition ("McFadden Dep.") are attached as Ex. 3. *See* McFadden Dep. 93:6-15 (authenticating reports).

1

48-53.[2]

- *"Foreclosure probability".* Because consumers' escrow refunds were retained for an average of 1.4 months between when the escrow analysis allegedly should have been done, and when Ocwen conducted it, McFadden opines that those small "overcharges" increased the average probability that an affected loan would go to foreclosure proceedings. *Id.* ¶63. McFadden generates a hypothetical probability model and applies it to all of the subject loans, and concludes that Ocwen may have started foreclosures on an estimated 16,636 consumers as a result of these modest escrow recalculation delays. *Id*. ¶139. McFadden does not identify any actual loans that were the subject of new foreclosures caused by the escrow refund delays.

- *"Foreclosure cost".* According to McFadden, far more than 90 percent of the 16,636 foreclosure initiations that he determined were made more likely proceeded all the way from foreclosure initiation to foreclosure sale, and collectively those consumers lost money from the resulting foreclosure process and loss of the property. *Id*. ¶123. Again, this is just a modeling estimate and is not tethered to any particular loans that he (or anyone) can show actually was foreclosed due to brief escrow delays.

- *"PMI lost opportunity cost".* Ocwen's alleged failure timely to cancel consumers' PMI insurance resulted in consumers paying for PMI insurance for a period of time when they were not required to do so. McFadden calculates the lost opportunity cost to consumers resulting from these alleged overpayments. *Id*. ¶66-70.

- *"ARM Interest Lost Opportunity Cost".* Ocwen's alleged failure to timely and accurately make ARM interest rate adjustments also led consumers to overpay Ocwen. McFadden calculates the lost opportunity costs to consumers resulting from these alleged overpayments. *Id.* ¶71-7.[3]

---

[2] McFadden's reports proffered an opinion that those consumers whose escrow analyses showed the need to increase monthly payments had opportunity-cost losses as well (McFadden Rep. ¶50), but McFadden admitted during his deposition that those consumers were not harmed. McFadden Dep. 266:8-267:9. Ocwen does not address that opinion here for that reason.

[3] McFadden also refers to other servicing errors and damages. McFadden Rep. ¶27. As discussed in Section I(B), the Court should exclude evidence and testimony as to those other alleged errors

## SUMMARY OF ARGUMENT

The Court should exclude testimony and any other evidence from McFadden because it is irrelevant, and because his opinions lack the required indicia of reliability under Rule 702.

First, McFadden's foreclosure probability opinion and foreclosure cost opinion (the latter is derivative of the former) are irrelevant because neither would aid the Court in understanding any evidence or determining any fact at issue, as required by Rule 702(a). McFadden's foreclosure opinions purport only to show that Ocwen's alleged conduct increased the probability that loans in Ocwen's servicing portfolio had an increase in likelihood of foreclosure. But McFadden admittedly did not analyze any individual loan using his methodology, and his analysis accordingly does not and cannot identify a single loan for which the probability of foreclosure actually increased. McFadden also does not and cannot say foreclosures actually were caused by untimely escrow analyses and thus, he cannot show that any damages flowing from foreclosures were caused by Ocwen. His analysis does not establish that Ocwen's actions (as opposed to events unrelated to Ocwen's alleged conduct) were the proximate cause of even one foreclosure. Because the Bureau bears the burden to prove Ocwen's alleged conduct caused specific loans to foreclose (*Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, and Stevens, P.A.*, 525 F.3d 1107 (11th Cir. 2008)), McFadden's foreclosure opinions are irrelevant.

Second, McFadden improperly relies on insufficient data in arriving at his opinions on both probability and foreclosure costs, and thus his opinions do not meet the requirements of Rule 702(b). McFadden is trying to guess at how many foreclosures may have resulted from short escrow delays but he ignores loan-specific data that Ocwen produced that give him at least a partial answer to his questions. Critically, that data shows one quarter of the loans in McFadden's analysis did not result in foreclosure at all. That data also refutes McFadden's conclusions about the cause of the foreclosures that he hypothesizes occurred. The Court should not admit any opinion that is refuted by relevant data.

Finally, none of McFadden's opinions are the product of scientific methodology that has been reliably applied to the facts in this case, as is required by Rule 702(c) and (d). The models

---

because McFadden offers no admissible opinions on either. He claims to have lacked data to determine damages, and he offers no other analysis or opinions on other alleged servicing errors.

McFadden built to approximate all three types of opportunity costs (from late escrow, PMI cancellation, and ARM adjustments) suffer from related fundamental flaws: (1) McFadden uses an inflated interest rate to measure a consumer's opportunity cost—though interest rate is the key part of any lost opportunity cost calculation—and as a result, provides a scientifically unreliable opinion for all three opportunity cost categories; (2) McFadden's PMI lost opportunity cost opinion is flawed by his model, which rests on demonstrably inaccurate assumptions about PMI refunds that Ocwen paid; and (3) the ARM lost opportunity cost opinion fails because that model, too, is unarguably deficient based on demonstrably inaccurate assumptions. Consequently, McFadden's three opinions regarding opportunity costs are unreliable, and the Court should exercise its gate-keeping function to exclude all of them.

McFadden's foreclosure opinions are even less sound. The foreclosure cost model he uses to estimate damages is unproven, unrealistic and differs from models used in the literature on which McFadden relies. His control group is invalid, and his model omits key variables, which undermines the integrity of the model he built. McFadden also relies on research materials that cannot reasonably be credited and he admits he was unaware of some of the damages components that form the basis for his foreclosure cost opinion. The foreclosure probability and foreclosure cost opinions also fail because the models they both rest on have no error rate, and McFadden otherwise takes an unscientific approach to models' predictions and their accuracy.

Thus, the Court should exclude McFadden's opinion and testimony in their entirety.[4]

## **LEGAL STANDARD**

Expert testimony is admissible where (a) the expert's knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The Supreme Court has further held that expert testimony must be properly disclosed and "rest[] on a reliable foundation and [be] relevant." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), *see also MDS (Canada), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1318

---

[4] Contemporaneously with this Motion, Defendants filed their motion for summary judgment, which is incorporated herein by reference.

(11th Cir. 2011). *Daubert* held that reliability is the touchstone for expert testimony, and set out non-exhaustive factors for courts to consider, including whether the expert's theories or techniques: (1) can be tested; (2) have been subject to peer review; (3) have a known or potential rate of error; and (4) are accepted within the scientific community. 509 U.S. 579, 593-594.

Expert testimony must not only be reliable; it must also be relevant, both generally under Rule 402, and specifically in determining, if admitted, whether the evidence would assist the trier of fact as required by Rule 702(a). *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999). This inquiry includes whether the testimony is based on the correct legal standard. *Daubert*, 509 U.S. at 580.

Finally, the Court must be mindful of the potential for expert testimony to mislead and under Rule 403 must exclude evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Allison*, 184 F.3d at 1310 (expert testimony could "be both powerful and quite misleading because of the difficulty in evaluating it"). Similarly, it is within the Court's discretion to exclude expert testimony and data when there "is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

The party proffering the expert testimony bears the burden of laying the foundation for admissibility, and that admissibility must be shown by a preponderance of the evidence. *Ward v. Carnival Corp.*, 2019 WL 1228063, *1 (S.D. Fla. Mar. 14, 2019) (citing *Allison*, 184 F.3d at 1306). *See also U.S. v. Frazier*, 387 F.3d 1244, 1260 (2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").[5]

## **ARGUMENT**

## I.     **MCFADDEN'S OPINIONS ARE NOT RELEVANT BECAUSE HE FAILED TO ANALYZE ANY ACTUAL LOANS**.

### A.     **McFadden's Foreclosure Probability Opinion Is Irrelevant.**

---

[5] *See also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1316 (11th Cir. 2014) (party is "*required* to have *Daubert*-qualified, general and specific-causation-expert testimony that would be admissible at trial to avoid summary judgment") (emphasis in original).

McFadden's opinion is irrelevant for several fundamental reasons, all of which center around McFadden's admitted choice not to analyze any of the data Ocwen produced from consumers' servicing files. McFadden could have reviewed loans for the purpose of assisting the Court in determining whether some action of Ocwen did not comply with relevant servicing laws or regulations, or the specific dollar amount of any costs flowing from the liability he assumes. Because he undertook no such review, McFadden does not and cannot establish a relevant causal link between Ocwen's actions and increased foreclosures. Instead, his econometric model predicts only that alleged late escrow analyses increased the overall probability that loans in Ocwen's portfolio would foreclose. He cannot identify any specific loan for which probability was actually increased—even if he could, increased probability does not establish the proximate cause required for his opinion to help the trier of fact. Moreover, even as to the estimated 16,636 foreclosures McFadden opines were more likely due to Ocwen's actions, he cannot identify a single loan result validating his predicted increase in probability. That is, McFadden predicts foreclosures generally were more likely, but he failed to analyze Ocwen's data to identify a sample of loans—or even one loan—where Ocwen's actions actually impacted the likelihood of foreclosure. Absent specific evidence of loss or damage, McFadden's opinions have no utility.

1. **McFadden Assumes Liability, And So Offers The Fact Finder No Proposed Methodology, Analysis, Or Interpretation Of Record Evidence To Inform A Liability Determination.**

In his report, McFadden admitted that he did not perform any liability analysis. Instead, he stated that "[c]ounsel has instructed me to assume liability – that is, that Ocwen's conduct violated the law." McFadden Rep. ¶17. At deposition, McFadden confirmed he had no opinion on liability. Nor does his report purport to offer any analysis of whether, in fact, any of the servicing errors for which he calculated damages occurred. McFadden did not analyze any individual loans (McFadden Dep. 115:7-116:24), and he testified that he does not have opinions regarding the existence of any servicing error in any one loan or sample loan population. *Id.* 215:23-221:10. As a result, the Bureau cannot offer McFadden's opinions to support its claim that Ocwen committed any alleged servicing errors or that any specific error actually occurred in the loan population for which McFadden calculates damages. *Allison*, 184 F.3d at 1311-12.

2. **McFadden's Foreclosure Probability Analysis Is Irrelevant Because It Does Not And Cannot Show That Ocwen's Conduct Was The**

**Proximate Cause of Foreclosures.**

McFadden opines that, because Ocwen conducted annual escrow analyses on certain loans in its portfolio an average of 1.4 months later than scheduled, these delayed analyses on specific loans "increased the average cumulative probability that a foreclosure would be initiated" for Ocwen's entire loan portfolio. McFadden Rep. ¶110. McFadden then multiplied this increase in average cumulative probability across the population of loans that both received a late escrow analysis and had a foreclosure initiated to estimate that 16,636 foreclosures—or 51% of the 32,190 loans he claims had a late escrow analysis and an initiated foreclosure—would not have gone to foreclosure absent a late escrow analysis. *Id.* ¶139. He then estimates that those foreclosures resulted in costs to consumers ranging from $352MM to $484MM. *Id.* ¶123, 139.

Even if the trier of fact made the analytical leap required to conclude that any loan, much less 16,000+ loans, went to foreclosure due to an annual escrow analysis that was fewer than 45 days late, McFadden's opinion still would be irrelevant, because increased statistical probability is not proximate cause.[6] Rather, McFadden's report amounts to, at most, a contention that foreclosures were *more likely* to occur because of late escrow analyses. McFadden's model does not distinguish "the particular causal path for [any] individual loans" but merely "predicts the overall *tendency* in this population to have a foreclosure." McFadden Dep. 203:8-204:3 (emphasis added). Offering no evidence of actual consumer impact, McFadden testified only that if a consumer was two or more years delinquent, there "may be some incremental impact" resulting from a servicing error for loans that went into foreclosure. *Id.* 215:23-217:25. McFadden also acknowledged that his model "cannot answer the question at the individual level," about the impact of delinquency, but rather, his model offers "a damage estimate that's based on making assumptions on that individual." *Id.* At deposition, McFadden testified that he is "not aware that any loans were referred to foreclosure for an escrow delay." *Id.* 238:1-20. Instead, he tries to predict the "change in the probability of a foreclosure initiation." *Id.*

---

[6] As argued in Section III of Ocwen's Motion for Summary Judgment, because the Bureau alleges that Ocwen's actions harmed only some consumers and the resulting damages differed between consumers, to obtain actual damages, the Bureau must prove Ocwen's actions proximately caused each consumer harm, ***and*** the amount of those damages using individualized evidence. *See A.R. v. Dudek*, 2016 WL 3221140, *11 (S.D. Fla. June 9, 2016). McFadden's analysis ignores factors that he admits could be the proximate cause of a foreclosure.

McFadden's opinion would not be relevant to determining causation even if the opinion was definitively accurate (and as shown below, it is not) because he fails to account for relevant causal considerations. McFadden admits that individual life events, such as job loss, serious medical problems, divorce, death, major financial problems, incarceration, and negative equity, among others, may be the "main contributors to eventual foreclosures." Surrebuttal ¶73. Yet, his model does not control for such events.[7] Similarly, McFadden's foreclosure probability model fails to control for other relevant facts, like prolonged existing delinquency. *Id.* 215:23-221:18. As a result, in McFadden's opinion, even a loan that had been delinquent for years before Ocwen was a month and a half late in conducting the escrow analysis would be more likely to foreclose due the short delay. *See Chapman*, 766 F.3d at 1310 (citing *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions").

### 3.     McFadden's Foreclosure Cost Opinion Also Is Irrelevant Because McFadden Cannot Show That Ocwen's Conduct Impacted Any Loan.

The Court should also exclude McFadden's foreclosure cost testimony because he failed to show that any consumer actually paid the additional foreclosure costs that he claims were made more likely due to short delays in escrow analysis processing. McFadden testified that he does not have any direct data that indicates whether any consumer actually paid the foreclosure costs he quantifies, and he agreed that if a consumer never actually paid those costs, then the consumer did not suffer an out-of-pocket loss. McFadden Dep. 177:20-181:11.

At best then, McFadden offers the factfinder a list of types and amounts of possible foreclosure costs that any consumer whose loan goes into foreclosure *might* pay—which the Court does not need expert testimony to understand—but no evidentiary support for the claim that consumers whose loans are at issue here actually paid any amount. Even if the Court sought help in calculating such costs, as shown in Section III.B., McFadden's opinion is unreliable for that purpose because his source data is unreliable. McFadden also failed to analyze any accounts to determine what fees were or were not paid, and his existing analysis does not account for,

---

[7] Even if a consumer died, McFadden's model could still conclude that a short delay in conducting an annual escrow analysis made foreclosure more likely and would then attribute losses related to that foreclosure to Ocwen. McFadden Dep. 281:23-283:12.

much less tell the Court how to treat, variations in costs by geographic area. Thus, McFadden's damages numbers are too "imprecise" and "unspecific" "to assist the trier of fact in any meaningful way." *Trasylol Prod. Liab. Litig.*, 2013 WL 1192300, *14 (S.D. Fla. Mar. 22, 2013).

McFadden's opinions must be excluded because he did nothing to determine (1) whether any loan evidenced any misconduct by Ocwen, (2) whether any harm to a consumer actually occurred, or (3) if a consumer experienced harm, whether Ocwen proximately caused that harm.

## B.     McFadden's Other Servicing Failures Opinions Also Do Not Aid The Factfinder And Must Be Excluded As Irrelevant.

Finally, in McFadden's report, he refers to 898,774 "servicing failures" he claims "potentially impacted" consumers. McFadden Rep. ¶27. As with other alleged servicing errors, McFadden does not analyze any loans to substantiate that the failures he identifies occurred. Although McFadden claims these errors resulted in myriad damages due to consumers receiving inaccurate or untimely information, inaccuracies in credit reporting, or reduced property values or tax revenues, he fails to quantify those damages. *Id.* ¶124. Because McFadden conducted no analysis as to these allegations or the allegedly impacted loans, his opinions are not relevant. He cannot show the Court that any alleged error occurred, show any consumer harm, or offer any method for calculating damages resulting from that harm. McFadden Dep. 295:3-297:9.

## II.     MCFADDEN'S SELECTIVE USE OF RECORD EVIDENCE RENDERS ALL HIS OPINIONS UNRELIABLE.

McFadden ignored the comprehensive loan data Ocwen produced. In discovery, the Bureau sought comprehensive loan level[8] data from Ocwen. *CFPB v. Ocwen Fin. Corp.*, No. 17-80495, ECF No. 195 at 1. When Ocwen objected to the burden of producing loan level data for the 2.1 million loans the Bureau alleged were "at issue" and proposed that the Bureau select and analyze a representative sample, the Bureau refused. At discovery hearings on the issue, the Bureau represented that the data on every loan was critical, and Judge Matthewman eventually

---

[8] The Bureau sought 180+ data points, covering all aspects of the servicing of every loan. For each loan, Ocwen produced personal data; principal balance data; escrow data and escrow statement information; adjustable interest rate data; consumer delinquency data; bankruptcy data; consumer credit reporting data; consumer credit scores; foreclosure details; loss mitigation application details; loan modification data; detailed loan transaction data, including credits, debits and comments associated with each loan; codes used to service the loan, including comment codes, and flags in the loan data; periodic statement data; and account change data.

ordered the data produced, at the Bureau's expense. ECF No. 219 at 4. Thus, well before a single expert report was served, the Bureau had data that McFadden could have, but did not, use to (i) evaluate the actual number and type of alleged servicing errors, (ii) amass specific evidence of consumer impact, and (iii) accurately calculate the individual damages that he estimates in his report. Rule 702(b) requires that an expert's testimony be based on sufficient facts or data. *Korsing v. United States*, 2017 WL 7794276, *4 (S.D. Fla. Aug. 24, 2017). Courts have interpreted this requirement to mean that an expert's treatment of the evidence available should be considered in assessing reliability. *Frazier*, 387 F.3d at 1272. Unwarranted dismissal or outright blindness to contrary record evidence renders an expert's testimony unreliable, and therefore inadmissible. *Joiner*, 522 U.S. at 146. McFadden's failure to consider this evidence in forming his opinions renders his testimony unreliable.

McFadden's failure to analyze Ocwen's loan level data results in multiple flaws in his foreclosure probability and costs analyses. First, McFadden assumes the existence of foreclosures where no foreclosure even occurred. Rebuttal Expert Report of William Hamm, , dated October 15, 2019 ("Hamm Rep."), attached as Exhibit 4, ¶16-7. Fully 25% of the loans McFadden claims were more likely to foreclose due to Ocwen's actions did not ultimately complete the foreclosure proceeding he identified. *Id*. ¶332. Remarkably, McFadden *still* calculates foreclosure related damages for those loans as if a foreclosure had in fact occurred. McFadden could have eliminated this blindspot by looking at Ocwen-produced loan data to determine which loans actually went to foreclosure. He did not.

Second, 50% of the loans McFadden claimed were more likely to foreclose because of a late escrow analysis were already in default at the time of the escrow analysis at issue. *Id*. ¶337. Despite this, McFadden concludes that it was the alleged late escrow analysis, and not the consumer's prior default, sometimes years earlier, that made the foreclosure initiation (and the assumed foreclosure sale) likely.

Third, although McFadden had access to evidence that Ocwen produced regarding the actual causes of consumer default, he ignored it. As a result, in his probability analysis, at least 17% of the foreclosures he claims were made more probable due to a short escrow delay were actually caused by consumer circumstances, such as a lost job, illness, or other life event. In fact, Ocwen's expert, in reviewing the individual loan evidence, was able to conclude that 92% of the

10

loans for which McFadden calculates damages are wrongly included. *Id*. ¶342.

McFadden's lost opportunity costs analyses are similarly flawed. McFadden asserts that consumers who failed to get a timely escrow analysis may have paid more than they owed into their escrow accounts for property taxes and insurance. McFadden Rep. ¶54-6. To calculate damages for these overpayments, McFadden calculates the lost opportunity cost to consumers whom he assumes could have used the excess funds paid to Ocwen for other purposes, specifically, to pay down credit card interest. *Id*. ¶34. Again, McFadden's analysis ignores record evidence and renders his conclusions unreliable—85% of the consumers McFadden assumed were overcharged (and thus suffered a lost opportunity to pay down credit cards) were actually undercharged. That is, the consumer's taxes and insurance went up during the time that Ocwen allegedly failed to do an escrow analysis, but the consumer's payment did cover the increase, so each month, the consumer paid Ocwen less than the amount truly owed. McFadden could have determined this by analyzing loan transaction data, but did not.

McFadden's PMI overcharge model and ARM overcharge models also ignore or make assumptions about critical data points that McFadden easily could have verified in the data Ocwen produced. For example, in arriving at the amount of damages Ocwen allegedly owes for overcharging PMI, McFadden attempted to account for the refunds to consumers that Ocwen already made. However, in doing so, McFadden's PMI model assumes that Ocwen paid one year's worth of interest to consumers for any PMI refunds, when McFadden could have reviewed Ocwen's servicing data and used the actual amount. Hamm Rep. ¶236-9. This error causes McFadden to assume Ocwen paid more in refunds than it actually did and undercount the damages he purports to be calculating. Likewise, in calculating ARM interest overcharges, McFadden assumed the alleged overcharge was the same every month. This assumption is wrong, because the interest rate charge is based on the principal balance of the loan, so as the consumer pays each month, the consumer's balance, and the amount of interest charged, goes down. *Id.* ¶243. Again, the actual amount Ocwen charged each consumer was easily determined from Ocwen's data, but McFadden failed to analyze it. And, his assumption results in overstated

damages here, because his model assumes consumers paid more than they did. *Id.*[9]

In each of the above instances, McFadden completely failed to acknowledge or account for evidence that undermined his methodology or reduced his damages totals, or he based his methodology and conclusions on false assumptions about what the data would show, rather than reviewing what the data did show. In such instances, courts decline to admit evidence based on selective treatment of data or false assumptions, and the Court should do so here.

## III.   MCFADDEN EMPLOYED FLAWED METHODOLOGY, AND FAILED TO RELIABLY APPLY HIS METHODOLOGY TO THE FACTS IN THIS CASE.

*Daubert* held that reliability is the touchstone for expert testimony. *Daubert*, 509 U.S. at 590. Reliable methods reliably applied to the facts are the baseline requirement for expert opinions, or else the evidence risks misdirecting the fact finder, rather than aiding the ultimate inquiry. *Frazier*, 387 F.3d at 1266. The Court must make a preliminary assessment of whether the reasoning or methodology used by the expert is scientifically valid, and of whether that reasoning and methodology properly can be applied to the facts of the case. *Id.* at 261-62. Here again, McFadden's opinions falls short.

### A.   McFadden's Testimony Should Be Excluded Because He Relies On A Faulty Model for Calculating Foreclosure Costs, And He Failed To Properly Apply His Other Econometric Models To The Facts In This Case.

#### 1.   McFadden used an unproven and unrealistic foreclosure cost model to calculate damages related to an alleged increase in foreclosures.

McFadden had not reviewed a residential mortgage servicing file prior to being retained in this case and has never before calculated damages based on the default risks related to how mortgages are handled. McFadden Dep. 25:13-26:16. So while he is a recognized expert in the field of econometrics, he lacks experience and expertise in mortgage finance and servicing. McFadden's choice of model reflects that lack of experience, and the econometric model he chose, while commonly used in the medical sciences, is not reliable or appropriate in the mortgage servicing context. Thus, notwithstanding McFadden's general credentials in the broad field of economics or the successful use of his model in other areas, the Court must determine

---

[9] While McFadden made "minor corrections" to his PMI overcharge calculation (Surrebuttal ¶26), the errors in his PMI overcharge model are just a few of the many errors that undermine the credibility of his analysis.

whether the reasoning or methodology McFadden employed is scientifically valid in this case, and whether that reasoning or methodology properly can be applied to the facts at issue. *Daubert*, 509 U.S. at 593-94; *see also McCorvey v. Baxter Healthcare Corp.*, 2001 WL 36393134, *4 (S.D. Fla. Sept. 30, 2001), aff'd in part, rev'd in part, 298 F.3d 1253 (11th Cir. 2002) ("general expertise" in the industry "does not necessarily translate into expertise in specialized" topics). Because McFadden used a non-standard model to predict outcomes, his opinions based on that model should be excluded under Rule 702(c). *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 2018 WL 10322164, *11 (S.D. Fla. Jan. 13, 2018) ("Expert testimony that is not 'the product of reliable principles and methods' is not admissible under Federal Rule of Evidence 702(c)").

To model the probability that Ocwen's actions increased the probability of foreclosure, McFadden used a discrete time proportional hazards model. This kind of model attempts to estimate the probability that foreclosure would be initiated on the loan (the "hazard") based on various independent variables. McFadden Rep. ¶88. McFadden asserts that his model is "standard" in "epidemiological research, where the question is the effect of a treatment [here, a servicing error by Ocwen] on the probability of survival [here, whether the loan goes into foreclosure or not]." *Id.* ¶85. The model works well in epidemioloecal research, where independent variables (such as medical treatment or drug) can be modeled individually to determine if that "treatment" results in survival or not. Hamm Rep. ¶278.

Mortgage finance scholars, however, do not use discrete proportional hazards models as McFadden did, and McFadden does not cite any mortgage finance literature endorsing the use of a discrete proportional hazards model for predicting the impact of servicing errors on probability of foreclosure. In reality, his model is not used in mortgage finance because modeling the factors affecting a mortgage loan's ultimate performance is multi-faceted, and the fate of a mortgage loan may include more than two outcomes. Hamm Rep. ¶272-8. For example, a mortgage loan can perform to maturity, pay off before maturity, default then return to current status, default and be reinstated with modifications, default and go to foreclosure, among other outcomes. *Id*. ¶278. A loan also may move in and out of these various states. So, to accurately determine whether any single servicing decision had an impact, economists choose a model that can account for more than two outcomes. *Id*. As a result of how McFadden's choice of model undermines his opinions,

13

the Court should note that, if foreclosure is initiated on the loan, McFadden's analysis assumes a foreclosure sale then takes place, and he includes the cost of that foreclosure in his damages estimate (with only a narrow carve out for rescinded sales). McFadden Rep. ¶123. McFadden does so even though a foreclosure may be initiated and never go to sale because the consumer reinstates the loan. Hamm Rep. ¶27. McFadden's failure to account for such an outcome means he counts damages from sales that never happened. *Id*. ¶330-3.

Just as there can be more than one outcome in the mortgage lending context, multiple factors simultaneously can influence which of the existing outcomes will occur. For example, a servicer could overcharge a consumer, ***and*** the consumer could lose a job, or fall ill. In those instances, to determine the impact of a late escrow analysis and resulting overcharge on whether the loan went into foreclosure, one must account for the impact of the lost job or illness. Other factors that influence whether a loan will go to foreclosure include loan characteristics, consumer behavior, consumer credit history, and servicing events. This is why models attempting to quantify impact, including the econometric models McFadden cites to support his analysis, account for a variety of factors that might make any individual loan go into foreclosure. *Id*. ¶280. McFadden ignores a significant body of applicable literature in the field of mortgage finance, including literature cited in his own report, that use a model specifically built to account for competing risks. *Id*. ¶280-4. As a result, McFadden omitted key variables that increase the probability of default even in the absence of any servicing error, including (i) the amount of consumer equity in the mortgaged collateral, (ii) the consumer's credit score, (iii) the consumer's payment capacity, and (iv) other payment changes. *Id*. ¶26. McFadden's choice to ignore, rather than control for, those variables undermines his model.

McFadden's use of an untried methodology has real consequences here, and ultimately undermines the reliability of his opinion. Because his model does not account for more than two outcomes and competing risks, it yields conclusions that one need not be a Nobel-prize winning economist to see are irrational. For example, according to his model, the factors that actually cause foreclosures—such as job loss and death—account for *fewer* foreclosures than the short escrow delays at issue. Hamm Rep. ¶355. In addition, according to his model: (1) as unemployment goes up, the risk of foreclosure goes *down*; (2) investment properties have a lower foreclosure risk than owner-occupied properties; and (3) loans where a consumer has been

14

paying on time for longer have a higher risk of foreclosure than loans where a consumer makes just a few payments before defaulting. *Id.* ¶345-51. These counterintuitive results underscore the unreliability of McFadden's model. While *Daubert* focuses on the validity of an expert's methodology, rather than the expert's ultimate conclusions, when the expert's conclusions clearly illustrate a flaw in methodology, the Court can and should draw inferences about the expert's methodology. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) (citing *Joiner*, 522 U.S. at 147). As the Supreme Court said in *Joiner:* "[c]onclusions and methodology are not entirely distinct from one another." And, unsurprisingly, every study McFadden cites in his report used a different model that lacked the limitations of McFadden's model, and all reach exactly the opposite conclusions regarding how unemployment, property purpose, or loan seasoning affects foreclosure risk. Hamm Rep. ¶427.

> **2.** **Even if the Court concludes that McFadden's model for evaluating foreclosure costs is scientifically valid, McFadden still erred in his assumptions and basic calculations in applying that model here.**

McFadden's choice of model is not the only fundamental error that should give the Court pause in relying on his damages estimate. McFadden also failed to apply his foreclosure costs model properly, and the clear errors in assumption and calculation make his conclusions so unreliable that they should be excluded. First, McFadden's chosen control group is invalid, such that the conclusions he reached based on it are scientifically invalid. For example, McFadden failed to control for whether a given loan was at risk of a delayed escrow account analysis, so 27 percent of the loans in the control group he used to evaluate the impact of delayed escrow analyses did not even have escrow accounts. Hamm Rep. ¶287. Because the control group includes ***non-escrowed*** loans, any conclusions McFadden reached about ***escrowed*** loans based on that control group are scientifically invalid. *Id*. ¶285-9. An expert may testify only if his methodology is reliable as determined by the inquiry mandated in *Daubert. See* Fed. R. Evid. 702; *Daubert,* 509 U.S. at 589. McFadden's model does not meet that test.

McFadden also failed to review actual loan data Ocwen produced. As a result, McFadden's model assumes 31 percent more foreclosures than actually occurred, by including as foreclosures loans that were paid off, modified or reinstated, and loans with a pre-existing default or foreclosure prior to the late escrow analysis. *Id*. ¶327-33.

Next, even aside from fundamental errors in the control group and his assumptions,

McFadden's estimate of damages from increased foreclosures is unsupported and unreliable. McFadden failed to conduct a consumer-by-consumer foreclosure damages calculation from the Ocwen data. McFadden Dep. 121:12-127:3. As a result, in calculating the equity loss that forms a substantial portion of the damages to which McFadden testifies, McFadden included consumers whom he knew, based on the data, had no equity they could possibly lose. *Id.* 130:14-132:8. McFadden also did not attempt to determine the actual equity loss at the time of the foreclosure sale. *Id*. 141:13-145:18. For this reason, McFadden assumes there was a foreclosure sale, and calculates a resulting estimated equity loss for 602 loans where Ocwen's data shows the foreclosure did not happen because the consumer actually sold the property before the sale, and paid off the existing loan in full. Hamm Rep. ¶377. In those instances, the sale proceeds were at least as much as, if not more than, the amount owed and some equity was retained. *Id.*

McFadden also did not use actual amounts charged to consumers to calculate the administrative fees for foreclosure. *Id*. 164:24-165:9. He also did not review the files or transaction data for any particular loan to confirm that consumers paid the foreclosure costs he asserts were charged. *Id*. 164:24-175:8. As a result, neither the amounts of the administrative fees in McFadden's analysis, nor his assumption that consumers paid such fees, is correct. *Id*. McFadden could have verified each charge and whether it was paid. Hamm Rep. ¶135. In choosing not to do so, he undermines the reliability of his opinions. *McClain*, 401 F.3d at 1243 (citing *Joiner*, 522 U.S. at 147) ("Although the court understands that *Daubert* focuses on the methodology used to derive opinions rather than on the accuracy of the opinion, when the opinions clearly demonstrate something about the expert's methodology, as in this case, the court can draw inferences about the methodology from the opinions.").

### 3.    McFadden's lost opportunity cost opinions contain multiple inaccurate assumptions.

McFadden offered three lost opportunity cost calculations: (1) for consumers who allegedly paid Ocwen more than they owed due to Ocwen's failure to run an annual escrow analysis; (2) for consumers who allegedly paid Ocwen more in PMI premiums than they owed because Ocwen failed to timely cancel their PMI coverage, and (3) for consumers who allegedly paid Ocwen more interest on their adjustable rate mortgage loans than they owed, because Ocwen calculated the interest due improperly. All three calculations are faulty.

16

First, when calculating lost opportunity costs for the late escrow analysis population, McFadden assumed that the amount every consumer paid into escrow would have gone down if Ocwen had done the analysis on time. Of course, the amount a consumer pays into escrow only goes down if the consumer's taxes and insurance go down. McFadden assumes every consumer would have paid less into escrow, even though real estate taxes typically go up annually, and Ocwen's data bears this out. Fully 58,323 of the consumers McFadden assumes would have paid less (and thus were overcharged when Ocwen allegedly failed to do the analysis and lower their monthly escrow payments) actually owed more because their required monthly escrow payment went up. Hamm Rep. ¶177-8, Ex. 7. McFadden could have determined the actual increase in escrow for each consumer using Ocwen's loan data. He did not bother, and as a result, he assumed an overcharge when consumers were not, in fact, overcharged at all.

To calculate lost opportunity costs for the PMI and ARM overcharges, McFadden assumed that, if the consumers had not overpaid Ocwen for PMI premiums and ARM interest, they would have used that money to pay down credit card debt. He therefore used credit card interest rates of up to 20% without providing any evidence that consumers would have otherwise used the funds to pay down credit card balances. *Id*. ¶153-4. In fact, all the available evidence suggests that consumers in this case would not have used the money to pay credit card debt, for a variety of reasons. *Id*. ¶155-7.[10] Each of the lost opportunity cost calculation errors calls into question the accuracy, and therefore the reliability, of McFadden's lost opportunity cost models.

**B.    McFadden's Foreclosure Cost Opinion Also Should Be Excluded Because He Relied On Materials That Should Not Be Credited and He Lacks Knowledge of The Basis For His Cost Opinions.**

McFadden's opinion also should be excluded because his reliance on questionable research, his lack of understanding of certain foreclosure costs, and his unwillingness to address source data weaknesses show his opinion is not "the product of reliable principles and methods" even apart from the faulty model and inaccurate assumptions addressed in Section III.A., above.

**1.    McFadden improperly relied on materials that are not credible, and do not meet the standard of scientific rigor required under Rule 702.**

McFadden relies on written source "materials" that cannot seriously be credited. Two that

---

[10] The National Foundation for Credit Counseling's data shows that "since 2014, only 33 to 39 percent of households actually carry credit card debt from month-to-month." Hamm Rep. ¶155.

are central to the opinion are (1) a Zillow blog post and (2) an unpublished paper by an advocacy group in Minnesota, which was written with the stated goal of justifying its anti-foreclosure programs in Minneapolis (the "Moreno paper"). In McFadden's foreclosure cost analysis, he attempts to calculate consumer harm that resulted from the foreclosures he says were made more likely due to Ocwen's delays in doing loan escrow analyses. McFadden's foreclosure cost opinion is a component calculation—that is, he adds up consumer lost equity from foreclosure, payment of foreclosure-based fees, and relocation expenses to find new housing.[11] The Zillow post is the *sole* basis for the relocation component (totaling millions of dollars) (McFadden Rep. ¶118; McFadden Dep. 198:22-201:5) and the Moreno paper is the *sole* basis for the upper bound of the equity component (McFadden Rep. ¶122; McFadden Dep. 62:23-63:15), inflating McFadden's lower bound number by over $120 million. McFadden Rep. ¶119. So, both the Zillow post and the Moreno paper are crucial elements of the opinion. Despite their centrality, neither is the type of source any reasonable expert would rely on or that this Court should credit.

    ***Zillow Blog Post:***  The Zillow blog post is literally that, an entry from a www.zillow.com weblog. The author of the 4-page essay, which purports to estimate moving costs, is a freelance writer of children's books and home and garden magazines with no qualifications in any field or subject that matters here. McFadden Dep. Ex. 7, p. 5. The blog's author states she came up with the estimate based on moving cost information from a home improvement project planning company, and then multiplied the cost to use one truck and two movers to arrive at $700. *Id*. Notably, the first person who commented on the post helpfully reports he only paid $350. *Id*.

    ***Moreno Paper:***  Moreno was a housing consultant for a Minneapolis housing organization in ***1995***. As revealed in the paper, the organization received a grant to help prevent foreclosures in that community. The paper was written for the stated purpose of assessing the "cost effectiveness of its programs" (McFadden Dep. Ex. 4, p. 8), which obviously would be improved by any over-estimate of equity losses from foreclosures. In any event, the paper discussed only the experience of consumers the organization had served in Minneapolis for a short period 25 years ago. *Id*. Despite those limitations, McFadden applied the report's conclusion that consumers lost 13% of their equity (adjusted for inflation) to Ocwen consumers

---

[11] Ocwen refers to these as the equity, fee and relocation components of McFadden's model.

nationwide. McFadden Rep. ¶122.

McFadden's decision to rely on both the Zillow blog post and the Moreno paper for crucial parts of his foreclosure cost opinion causes the entire opinion to fail. "The *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *McClain*, 401 F.3d at 1245 (emphasis in original). An expert that relies on articles, studies or writings that are not peer-reviewed and published, or have other persuasive indicia of reliability, are not permitted to provide opinions because, by relying on unscientific materials, the opinions fail the bedrock requirements of Rule 702. *Id*. at 1240, 1248-50 (holding that expert testimony properly excluded where expert relied on unpublished, non-peer reviewed materials, because such opinion "lack[ed] the indicia of reliability necessary to survive a *Daubert* inquiry and challenge under Rule 702"); *see also Chapman*, 766 F.3d at 1306 ("It is proper and necessary for the trial judge to focus on the reliability of a proffered expert's sources and methods.").

The Zillow blog post is not evidence of anything. Nor is the Moreno paper which is neither published nor peer-reviewed, and biased because it is written by an organization attempting to justify its existence. This is not to say that the Minneapolis group did not do good work. But no economist should be credited for using that paper as his *sole* basis for attempting to inflate damages by over $100 million. Moreover, the Moreno paper does not provide any scientific explanation for how the data for the equity loss calculations was collected and verified and its conclusions are necessarily limited to a tiny geographic area two decades ago.

### 2.   McFadden is unaware of the basis for certain components of his foreclosure cost assessment.

McFadden's opinion also is unreliable because he admitted in deposition that at the time of his testimony he had ***no knowledge whatsoever*** about the basis for "his" opinion as to the cost component and as to the relocation component (the Zillow blog post). McFadden Dep. 65:5-66:4; 181:13-182:23. So, McFadden signed his original report, two amendments, and a supplemental report falsely. McFadden's excuse, that he delegated the task of locating information for each component (McFadden Dep. 171:1-16; 173:22-174:14; 184:20-186:1), does not salvage the opinion because he apparently never read what his team found—and so drew no

conclusions on his own. *Id*. An expert who abdicates key parts of his role to others does not employ "reliable principles and methods" under Rule 702. *Hudgens v. Bell Helicopters/Textron,* 328 F.3d 1329, 1344 (11th Cir. 2003) ("expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion…").

### C. The Foreclosure Probability and Cost Opinions Should Be Excluded Because McFadden Did Not Take A Scientific Approach.

Finally, McFadden's testimony showed that his foreclosure probability and cost opinions are not scientific or reliable. Although his reports devote dozens of pages to these issues, the resulting opinions are "estimates" with no error rate. McFadden Dep. 230:17-233:24. Moreover, the cost opinion has an alarmingly wide range— $352 million to $484 million—and it is so imprecise that it smacks of guesswork. To explain why he did not calculate an error rate so the Court could understand how accurate his estimate was, McFadden reported he did not take this important step because he was not asked to. McFadden Rep. ¶123.

The opinions are unscientific and unreliable as well because of how McFadden addressed the many deficiencies of his calculations underlying both opinions, such as the weaknesses of the Moreno paper, his ignorance of the basis for the foreclosure cost component, and the embarrassment of his team's decision to use a Zillow blog post to prove up to $11 million in damages. Throughout the deposition, McFadden contended that none of the areas where his opinion could be questioned were relevant because his opinion was "conservative." McFadden Dep. 79:6-83:8; 111:13-114:25; 181:13-184:14; 186:20-187:8; 196:23-198:3; 200:15-201:9; 229:7-230:24. Remarkably, McFadden testified that he still would have the exact same opinion of the quantum of consumer harm if, for example, the part of his opinion based on the Zillow blog post was discarded entirely. *Id*. But the foreclosure-probability and foreclosure harm opinions are calculations based on components of several discrete elements, and it makes no sense that if one component is ignored the expert's conclusion is unchanged. *See McClain*, 401 F.3d at 1245 (expert's failure to "show the reliability of each of his steps in [making his] deduc[tion]" was "a fatal defect under *Daubert*").

### CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court exclude the proposed expert opinions offered by Mr. McFadden.

Dated: December 4, 2020                    Respectfully submitted,


                                           /s/ Catalina E. Azuero

                                           Bridget Ann Berry
                                           Andrew Stuart Wein
                                           **GREENBERG TRAURIG, P.A.**
                                           777 South Flagler Drive, FL 33401
                                           Tel.: 561.650.7900
                                           berryb@gtlaw.com
                                           weina@gtlaw.com

                                           Thomas M. Hefferon (*pro hac vice*)
                                           Sabrina M. Rose-Smith (*pro hac vice*)
                                           **GOODWIN PROCTER LLP**
                                           1900 N Street, NW
                                           Washington, DC 20036
                                           Tel.: 202.346.4000
                                           thefferon@goodwinlaw.com
                                           srosesmith@goodwinlaw.com

                                           Laura A. Stoll (*pro hac vice*)
                                           **GOODWIN PROCTER LLP**
                                           601 S. Figueroa Street
                                           Los Angeles, CA  90017
                                           Tel.:  213.426.2500
                                           lstoll@goodwinlaw.com

                                           Catalina E. Azuero (Florida Bar No. 821411)
                                           **GOODWIN PROCTER LLP**
                                           100 Northern Avenue
                                           Boston, MA  02210
                                           Tel.:  617.570.1000
                                           cazuero@goodwinlaw.com

                                           *Attorneys for Defendants*

## CERTIFICATE OF CONFERRAL

Pursuant to L.R. 7.1(a)(3), undersigned counsel personally certifies that counsel for Defendants has conferred with Plaintiff's counsel in a good faith effort to resolve the issues raised in this motion and have been unable to do so.


                                        /s/ *Catalina E. Azuero*
                                        Catalina E. Azuero


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on December 4, 2020 via ECF on all counsel or parties of record listed below:

Jean Healey
Email: jean.healey@cfpb.gov

Atur Desai
E-mail: atur.desai@cfpb.gov

Tianna Baez
E-mail: tianna.baez@cfpb.gov

Amanda Roberson
E-mail: amanda.roberson@cfpb.gov

Stephanie Brenowitz
E-mail: stephanie.brenowitz@cfpb.gov

Erin Mary Kelly
E-mail: erin.kelly@cfpb.gov

James Savage
E-mail: james.savage@cfpb.gov

Greg Nodler
E-mail: greg.nodler@cfpb.gov

22

Michael Posner
E-mail: michael.posner@cfpb.gov

Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov

Shirley T. Chiu
E-mail: shirley.chiu@cfpb.gov

/s/ *Catalina E. Azuero*
Catalina E. Azuero