**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,
Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., and OCWEN LOAN SERVICING, LLC,

Defendants.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AND DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## RESPONSE TO STATEMENT OF FACTS

Defendants Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), Ocwen Loan Servicing, LLC ("OLS"), and PHH Mortgage Corporation ("PHH"), collectively "Ocwen" or "Defendants," submit this response to Plaintiff Consumer Financial Protection Bureau's ("CFPB" or "the Bureau") Statement of Material Facts (ECF No. 729, "SOF") and exhibits attached thereto ("SJX") in support of Defendants' opposition to the CFPB's consolidated motion for partial summary judgment. Defendants do not respond to the headings in the CFPB's SOF as none assert facts.[1]

1. Disputed. The alleged fact is a legal conclusion, and further disputed because the original complaint in this action (ECF No. 1) was filed on April 20, 2017 and only concerned alleged conduct dating back to January 2014. Ocwen understands the Relevant Time Period to be limited to January 2014 through December 2017. *See e.g.*, SJX 150, at 2.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Undisputed.

8. Undisputed.

9. Disputed. Only OLS received periodic payments from borrowers and made payments from those amounts during the Relevant Time Period. Ocwen SMF 240-43. Additionally, as the CFPB's own evidence demonstrates, borrowers were directed to make checks or express payments to OLS. *See* SJX 115, OCW3-009-0000118 at 119.[2]

---

[1] For the purposes of this response, Defendants' responses to Plaintiff's Statements of Facts or SOF are referred to as "RSF," and any exhibits attached in support are referred to as "RSF Ex." Counterstatements of Fact submitted in support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment are referred to as "CSF."

Ocwen's Statement of Material Facts (ECF No. 731) and accompanying exhibits, which were filed in support of Defendants' motion for summary judgment (ECF No. 730), are referred to as "Ocwen SMF" and "Ocwen SMF Ex." respectively.

[2] The CFPB relies on Ocwen's 10-K to support this statement, which uses the terms "Ocwen" "OCN," "we," "us" and "our," to refer to "Ocwen Financial Corporation ***and its consolidated subsidiaries***." SJX 3, at 4; SJX 4, at 4; SJX 5, at 4; SJX 6, at 4. References to "Ocwen" thus do

10. Undisputed.

11. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43.

12. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43.

13. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43. Further disputed because SJX 75 defines Ocwen as "Ocwen Financial Corporation ("Ocwen") ***and all of its domestic and international subsidiaries*** (collectively "Ocwen" or "Company")," and thus does not refer to the actions of all entities or any one specific entity. SJX 75 at 4. As reflected in the record, policies and procedures for function were set at the corporate level (through OFC), but operational detail and the execution of specific functions—specifically servicing functions—occurred at the subsidiary level that housed any specific function (and in servicing functions, specifically with OLS). CSF 289-91. Also disputed because the CFPB misrepresents the testimony cited in SJX 45, as Mr. Erbey testified that he was unsure which legal entity took in payments from borrowers, but said that "***I believe those are activities that were carried out through subsidiaries*** but, again, that's not something that I ever really of my level that I really focused on day to day." SJX 45 at 17:8-13; RSF Ex. 9, Errata to Deposition of William Erbey at 17:10.

14. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43. Further disputed because SJX 66 defines Ocwen as "Ocwen Financial Corporation ("Ocwen") ***and all of its domestic and international subsidiaries*** (collectively "Ocwen" or "Company")," and thus does not refer to the actions of all entities or any one specific entity. SJX 75 at 4. As reflected in the record, policies and procedures for function were set at the corporate level (through OFC), but operational detail and the execution of specific functions—specifically servicing functions—occurred at the subsidiary level that housed any specific function (and in servicing functions, specifically with OLS). CSF 289-91.

---

not refer to the actions of all entities or any one specific entity. In fact, language in the same paragraph which the CFPB references qualifies that the specific conduct is performed through OFC's subsidiaries. *E.g.*, SJX 3, at 4 ("Ocwen Financial Corporation is a financial services holding company which, ***through its subsidiaries***…"). The last two documents cited by the CFPB, SJX 7 and SJX 8, are from outside of the relevant time period and are thus irrelevant.

15. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43. Further disputed because SJX 101-103 define Ocwen as "Ocwen Financial Corporation ("Ocwen") ***and all of its domestic and international subsidiaries*** (collectively "Ocwen" or "Company")," and thus do not refer to the actions of all entities or any one specific entity. SJX 75 at 4. As reflected in the record, policies and procedures for function were set at the corporate level (through OFC), but operational detail and the execution of specific functions—specifically servicing functions—occurred at the subsidiary level that housed any specific function (and in servicing functions, specifically with OLS). CSF 289-91.

16. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43. Further disputed because the cited testimony refers to "Ocwen" generally and thus does not refer to the actions of all entities or any one specific entity. To the extent TranCentera processed payments specifically accepting borrower payments, those payments were made to OLS. *See* RSF 9; Ocwen SMF 240-43.

17. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43. Further disputed because SJX 70 and the purported facts reference a transaction occurring more than a decade before the relevant time period, and thus are irrelevant to the present action.

18. Disputed because the record evidence shows that OFC did not service loans during the relevant time period. *See* RSF 9; Ocwen SMF 240-43. Further disputed because the agreement states that the contract was for "the benefit of and its affiliates and subsidiaries" and does not refer to the actions of all entities or any one specific entity. SJX 70 at EXELA 045.

19. Undisputed.

20. Undisputed.

21. Disputed. Only OLS received periodic payments from borrowers and made payments from those amounts during the Relevant Time Period. Ocwen's SMF 240-43. Additionally, as the CFPB's own evidence demonstrates, borrowers were directed to make checks or express payments to OLS. *See* SJX 115, OCW3-009-0000118 at 119. Further

disputed because the cited evidence does not reference, in any way, OMS engaging in "servicing activities," as that term is defined under RESPA. *See* ECF No. 550 ¶¶ 11, 13, 16.[3]

22. Disputed because the record evidence shows that OMS did not service loans during the relevant time period. *See* RSF 21; Ocwen SMF 240-43.

23. Disputed because the record evidence shows that OMS did not service loans during the relevant time period. *See* RSF 21; Ocwen SMF 240-43. Further disputed because the CFPB relies on Ocwen's responses to RFA Nos. 222-224 (SJX 150), yet Ocwen denied RFA Nos. 223-24 and RFA No. 222 admitted only that the document cited stated that "Ocwen" subscribed to TranCentera's service—not OMS.

24. Undisputed.

25. Undisputed.

26. Undisputed.

27. Disputed. The CFPB relies on Ocwen's responses to RFA Nos. 222-224 (SJX 150), yet Ocwen denied RFA Nos. 223-24 and RFA No. 222 admitted only that the document cited stated that "Ocwen" subscribed to TranCentera's service. Further disputed because as CFPB's own evidence demonstrates, borrowers were directed to make checks or express payments to OLS. SJX 115, OCW3-009-0000118 at 119.

28. Disputed. Ocwen's answer (ECF No. 550) states PMC (PHH Mortgage Corporation) is the servicing entity as successor by merger, and operates under PMC licenses.

29. Undisputed.

30. Undisputed.

31. Disputed. The testimony cited in SOF 31 was in response to non-specific or broad, enterprise-wide questions. Further, as reflected in the record, policies and procedures for function were set at the corporate level (through OFC), but operational detail and the execution of specific functions—specifically servicing functions—occurred at the subsidiary level that housed any specific function (and in servicing functions, specifically with OLS). CSF 289-91.

---

[3] Paragraph 11 of states only that OMS is a U.S. Virgin Island corporation that maintains its principal place of business in the U.S. Virgin Islands and that "at all times relevant to this complaint, OMS maintained a call center" on behalf of OLS. Paragraph 13 states only that OMS engaged in certain functions in support of its subsidiary OLS, where appropriately licensed to do so, but does not admit to receiving and processing borrower payments, as required for liability under RESPA. 12 U.S.C. § 2605(i)(2), (3).

32. Disputed because the record evidence shows that OFC and OMS did not service loans on behalf of Ocwen during the relevant time period. *See* RSF 9, 21; Ocwen SMF 240-43.

33. Undisputed.

34. Undisputed.

35. Undisputed.

36. Partially disputed. Mr. Faris further testified: "I should clarify. I don't believe that John Patrick Cox necessarily had any position or role at Ocwen Financial Corporation." SJX 46 at 19:6-8.

37. Disputed because the record evidence shows that OFC and OMS did not service loans on behalf of Ocwen during the relevant time period. *See* RSF 9, 21; Ocwen SMF 240-43. Further disputed because Mr. Faris was asked whether "OFC, ***through its subsidiaries***, originates and services loans." SJX 46 at 19:6-8.

38. Disputed because the record evidence shows that OFC and OMS did not service loans on behalf of Ocwen during the relevant time period. *See* RSF 9, 21; Ocwen SMF 240-43. Further disputed because the cited evidence does not detail Mr. Erbey's titles, roles, or tenure, and because the CFPB misrepresents the testimony of Mr. Erbey. *See* RSF 13.

39. Undisputed.

40. Disputed. Mr. Anderson testified that he did not know if he had worked for OLS ***in the past***, but he understood that in his present capacity he is an employee of OFC. SJX 47 at 8:17-10:4.

41. Undisputed.

42. Undisputed.

43. Partially disputed as written. SJX 106 shows Directors from OFB and OFSPL, not OFC, reporting into Patrick Cox. SJX 106 at OCW-CFPB-001-00170622.

44. Undisputed.

45. Disputed. In the cited testimony (SJX 44), Diller acknowledges he worked at "Homeward Lending Solutions, but it was all mostly related to work done by Ocwen Loan Servicing, OLS." SJX 44 at 11:15-12:4. Nowhere in Diller's testimony does he acknowledge being a direct report to Scott Anderson, nor did he recall ever working for OFC. *See* SJX 44.

46. Disputed. The referenced organizational chart (SJX 107) shows Tom Arnett and Jason Jastrzemski reporting to Thomas Diller—an employee of "Homeward US."

47. Disputed. The cited testimony does not support SOF 47. Arnett and Jastrzemski testified only that they were not aware of all the different corporate structures.[4] Diller testified that he was not familiar with "all the entities," and his cited statement was not specific to servicing. SJX 44 at 17:17–18:11.

48. Undisputed.

49. Disputed because SOF 49 is not limited to a specific time period, and Erbey qualified his response by stating "[i]t depends on what time period you're taking about." SJX 45 at 18:23-19:7.

50. Undisputed.

51. Disputed. The cited testimony does not support SOF 51.[5]

52. Undisputed but irrelevant because SJX 28 is a screenshot from March 2020, which is outside the relevant time period. *See* RSF 1.

53. Undisputed but irrelevant because all three exhibits (SJX 29-31) clearly reference PHH Mortgage, and therefore must be from after June 1, 2019, which is outside the relevant time period. *See* RSF 1, 7.

54. Undisputed.

55. Disputed. OFC's response was dated December 5, 2014. *See* SJX 57.

56. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

57. Undisputed, but irrelevant because the Consent Order (SJX 22) was signed with a nonparty and dated outside the relevant time period. *See* RSF 1.

58. Disputed because the record evidence shows that OFC and OMS did not service loans during the relevant time period. *See* RSF 9, 21. Further disputed because Ocwen's merger with PHH occurred outside the relevant time period, and is irrelevant. *See* RSF 1, 7.

59. Disputed. *See* RSF 58.

60. Disputed. *See* RSF 58.

---

[4] Arnett stated he only knew "of one Ocwen" when asked which "Ocwen" employed him. SJX 32 at 7:22–8:4. And Jastrzemski stated only that he worked for OFC, was familiar with OLS, but that he did not know what "***Ocwen Loan Servicing specifically does***." SJX 49 at 30:12–31:15. With respect to OMS, Jastrzemski stated he was "***not familiar with what they do***." *Id.*

[5] Sebastian merely testified that she was "not a hundred percent sure" if all Ocwen entities have access to the data, but that she "believe[s]" that personnel from each entity also use the data. SJX 35 at 9:2-13, 12:3-13:1. Further, her declaration only stated that OFC is responsible for maintaining the data Ocwen produced in response to the 5th RFPs. SJX 56, ¶ 4.

61. Disputed. *See* RSF 58.

62. Disputed. *See* RSF 58.

63. Undisputed that Ocwen's 2013 10-K (SJX 2), which is outside the relevant time period, contains this quote.

64. Undisputed that Ocwen's 2019 10-K (SJX 8), which is outside the relevant time period, contains this quote.

65. Undisputed that Ocwen's 2018 10-K (SJX 7), which is outside the relevant time period, contains this quote.

66. Partially disputed. Undisputed that Ocwen has serviced loans for others as described in the cited documents, but disputed that this is relevant to the FDCPA, *see Kirchner v. Ocwen Loan Servicing, LLC*, 2017 U.S. Dist. LEXIS 38010, at *29 (S.D. Fla. Mar. 15, 2017) ("A servicer does not fall within the FDCPA's definition of 'debt collector' unless the debt at issue was acquired after the borrower's default."), nor is it evidence that the FDCPA applies to ***any*** of the at-issue loans in this case because that must be determined for each specific loan, *see Prince v. NCO Fin. Servs*., 346 F. Supp. 2d 744, 751 (E.D. Pa. 2004).

67. Partially disputed. *See* RSF 66.

68. Undisputed.

69. Undisputed that Ocwen acquired mortgage servicing rights from the servicers listed in SOF 69—to the benefit of borrowers—after some of the servicers went bankrupt or were failing (and therefore could no longer service the loans). *See, e.g.,* RSF Ex. 11, Ocwen Form 8-K, at 2-3 (Oct. 5, 2012) (discussing Homeward asset purchase); RSF Ex. 12, Ocwen Form 8-K, at 2 (Feb. 19, 2013) (discussing GMAC and ResCap asset purchase).

70. Undisputed.

71. Disputed. The cited testimony does not support SOF 71. The cited testimony notes that "the mortgage servicing and origination platform assets of [ResCap]" "were jointly awarded" to OLS ***and*** Walter Investment Management Corp. SJX 20 at 1.

72. Undisputed.

73. Disputed. The cited testimony (SJX 55 ¶¶ 18-19) does not support SOF 73. Ridder's affidavit states that Ocwen identified borrowers being in default "at the time [Ocwen] acquired the rights to service the Loan." SJX 55 ¶¶ 18-19. The data, however, in fact shows borrowers identified in REALServicing as being in default at the date of boarding, not

acquisition. *See* RSF 116. Further, the CFPB's reliance on SJX 155 & Attach. A as to each loan's default status is flawed because the loan transaction files, rather than the REALServicing database, are the best evidence of whether a loan was in default on any particular date. *See* RSF Ex.13, Declaration of Krysta Sebastian, ¶¶ 19-27; 29-31 (July 24, 2020) ("Sebastian Decl."). For example, if a borrower whose loan was being transferred to Ocwen sent her next payment to her prior servicer (or someone else) rather than Ocwen, that loan might have been listed as being in default on the boarding date even though the loan servicing files would accurately reflect that it was not in default once the misdirected payment was transferred to Ocwen. *See id.* ¶¶ 22-24. A review of the credit reporting files indicates that this (or something similar) likely happened for at least some of the loans that Ridder claim were delinquent at the time of boarding. *See id.* ¶¶ 22-27.

74. Undisputed.

75. Undisputed that in 2009, Ocwen "completed the distribution of our Ocwen Solutions (OS) line of business, except for BMS Holdings, Inc. (BMS Holdings) and Global Servicing Solutions, LLC (GSS), via the spin-off of a separate publicly traded company, Altisource Portfolio Solutions S.A. (Altisource)." SJX 1 at 3.

76. Undisputed that Ocwen's August 4, 2009 10-Q (SJX 9), which is outside the relevant time period, contains excerpted quote contained in SOF 76.

77. Undisputed.

78. Undisputed.

79. Undisputed.

80. Disputed and misleading. The cited testimony does not support SOF 80 and was in response to a prior hypothetical question. *See* SJX 50 at 185:2-185:5 ("Well, if you had your say at Ocwen, if you came in to Ocwen and were given the option of amending the 2009 technology services agreement out until 2025, would you recommend doing so?").

81. Undisputed.

82. Disputed. The cited testimony does not support SOF 82. *See* SJX 110 at -1231 ("ATS annual spend from September 2013 to October 2014 was approximately $93,904,224.00").

83. Partially disputed. Undisputed that, according to a June 2015 Stakeholder Summary, "Ocwen is currently the only investor/user of REALServicing." SJX 108, OCW4-

001-0001136 at 150. Disputed that the cited testimony in SJX 46 supports SOF 83. When asked "[s]ince 2014 are you aware of any other mortgage servicer that has used REALServicing" Faris testified that he "wouldn't necessarily know if there was or wasn't." SJX 46 at 33:18–33:21.

84. Disputed. SJX 24 contains the excerpted quotes contained in paragraph 84, but disputed that OFC and OLS "agreed" with DFS's findings or each statement in the order.

85. Undisputed.

86. Disputed. "In August 2013 Ocwen appointed Beltline Road Insurance Agency . . . a subsidiary of [Altisource], as insurance Broker of Record to help Ocwen develop a replacement program for the 2019 expiring LPI program," but disputed that Ocwen "hired" Beltline. *See* SJX 97 at 16-17 ("Consistent with industry practice, Owen did not pay Beltline for its services, as Beltline would expect to receive customary payment by the Managing General Underwriter ("MGU") for its services through placement commissions.").

87. Undisputed.

88. Undisputed.

89. Undisputed.

90. Undisputed, but misleading and incomplete. SJX 90 contains the excerpted quote comparing SWBC to Assurant, but Diller further inquired whether Ocwen could take steps such as sending SWBC a breach letter to spur improvement. *See* SJX 90 at -993-95. Later emails reflect that Ocwen intended to discuss the issues with SWBC and put an action plan in place. *Id.*

91. Partially disputed. As stated in SJX 153, Ocwen made over 1,700 requests to Altisource related to projects on a wide variety of items concerning technology provided by Altisource, including additions requested by specific business units for new fields, updates to conform to new rules put out by investors or regulators, revisions to code, and other types of typical technology projects.

92. Undisputed, but incomplete and not material as it does not evidence or establish any violation of any law. SJX 118 contains the excerpted, partial quotes cited in SOF 92. However, Diller's statements were made in the context of identifying "root causes" to determine how Ocwen could fix the purported issues and Scott Anderson then writes regarding the steps Ocwen can take to "change this quickly," including "wholesale changes to the ASPA process coupled with probably personnel changes." SJX 118 at -261-62.

93. Undisputed, but incomplete and immaterial. *See* RSF 92.

94. Undisputed, but incomplete and immaterial. SJX 109 contains the excerpted, partial quotes cited in SOF 94, which were made in the context of identifying "root causes" to determine how Ocwen could address the purported issues identified in the email.

95. Disputed, immaterial, and partially inadmissible based on the rule against hearsay. Fed. R. Evid. 802. Rinear testified that based solely on conversations and things she overheard while working at Ocwen, she had concerns "from a compliance perspective" that the business units may not be able to comply with unspecified laws or regulations, and that this issue was raised frequently by her and other individuals. *See* SJX 54 at 60:13-63:10.

96. Disputed, immaterial, and partially inadmissible based on the rule against hearsay. Fed. R. Evid. 802. Rinear testified that based solely on conversations and things she overheard while working at Ocwen, business units "almost always" identified REALServicing and the processes Ocwen was using as "root causes" of unspecified compliance issues. *See* SJX 54 at 60:13-63:10.

97. Inadmissible and therefore disputed. Undisputed that SJX 130 contains the excerpted quotes cited in SOF 97, but inadmissible based on the rule against hearsay. *See* Fed. R. Evid. 802.

98. Inadmissible and therefore disputed. Undisputed that SJX 130 contains the excerpted quotes contained in SOF 98 and identifies certain "pain points," some of which were found to be "minor." *See* SJX 130 at 8. But SJX 130 is inadmissible based on the rule against hearsay. *See* RSF 97.

99. Inadmissible and therefore misleading based on the rule against hearsay. *See* RSF 97-98.

100. Undisputed that SJX 110 contains the excerpted quotes contained in SOF 100.

101. Undisputed but irrelevant, as the cited evidence is from Ocwen's August 4, 2009 10-Q, which is outside the relevant time period.

102. Undisputed that the cited evidence (SJX 3-8) contains the excerpted quote, but the extent to which OFC is required to comply with certain statutes is a conclusion of law, not fact.

103. Partially disputed as incomplete and misleading. Faris testified that, as expected, Ocwen's compliance manage capabilities were in their "early stages of development" and that Ocwen hired its first chief compliance officer in February 2013 "as the CFPB put its rules in

place" and in accordance with CFPB recommendations—as contemplated by the servicing standards implemented in the NMS. *See* SJX 46 at 92:7-93:16; Ocwen SMF ¶¶ 1-67.

104. Disputed because SOF 104 is incomplete, misleading, and partially inadmissible based on the rule against hearsay. Fed. R. Evid. 802. Faris testified that he believed Chase found that Ocwen's compliance management system was lacking, but he was "not sure they found [Ocwen's] actual servicing of the loans and compliance with laws and regulations to be deficient. . . ." SJX 46 at 239:24-240:6. Further, Faris testified that there was "disagreement between Ocwen and Chase about how to interpret and approach CFPB's rules." *Id.* at 238:11-14.

105. Partially disputed. Undisputed that SJX 46 states that Chase terminated Ocwen as its subservicer, but the testimony does not state that Ocwen was required to transfer loans back to Chase. *See* SJX 46 at 242:25-243:4.

106. Undisputed. However, as stated in SJX 111, risk items did not necessarily mean that no control was in place with respect to that particular issue. SJX 111 at -347.

107. Undisputed that SJX 76 contains the excerpted quote cited in SOF 107, but inadmissible based on the rule against hearsay. *See* Fed. R. Evid. 802.

108. Partially disputed. Undisputed that Ocwen currently tracks issues in Metric Stream, but its precursor database was known as Business, Risk, and Controls Database.

109. Undisputed. *But see* RSF 110.

110. Undisputed that the August 15, 2015 Issue Tracking document (SJX 134) contains the excerpted quotes contained in paragraph 110, which are entries by line of business individuals or auditors who identify, in their own words, an issue that they have identified as being potentially problematic. *See* SJX 134; SJX 36 at 60:24-61:22.

111. Disputed and misleading. SJX 110 contains the excerpted quote in paragraph 111, but disputed because the quote related specifically to Issue 8: "Policies and Procedures not Documented or Inadequate," not all issues with Altisource generally. *See* SJX 111 at -1261.

112. Disputed. If SJX 111 is searched for the term [redacted]

113. Disputed, inadmissible as a voluntary subsequent remedial measure, and misleading because it is incomplete. *See* Fed. R. Evid. 407. Ocwen produced a written report on October 3, 2016, in response to a CID that asked Ocwen to provide more details for a specific Risk Convergence Spreadsheet, based on a diligent search of documents in the possession,

custody, and control of the individuals likely to possess responsive information. Those details included whether a look back was performed to determine a population of impacted borrowers, the number of borrowers, and whether there was harm to borrowers, among other questions. SJX 136. Ocwen provided the best answers it could based on its existing records, although Ocwen's documentation of its control/remediation process was not formalized for the entire relevant time period. *See* SJX 36 at 36:13-20 (testifying that while lookbacks have always existed, the documentation and formalization of the process has been more of a recent development). Accordingly, there could be remediation that was provided to borrowers that is not captured in the Remediation Report, and that would require a review of specific loan level documentation. *See* SJX 32 at 120.

114. Disputed because inadmissible voluntary subsequent remedial measure. *See* Fed. R. Evid. 407. [redacted] *See* SJX 32 at 119:18-120:23.

115. Undisputed. *But see* RSF 116.

116. Disputed. The boarded date ("BOARDEDDT) reflects "the date that Ocwen first began servicing loans on REALServicing." *See* SJX 147 at 11. It does not reflect the date on which Ocwen obtained or acquired the loan's servicing rights, which would have been some time earlier. *See* SOF 73.[6]

117. Partially disputed. Undisputed that Ocwen conducted a loan-verification process during the relevant time period to verify certain loan information received from prior servicers that was boarded into REALServicing. SJX 147 at 11; SJX 33 at 14:4-20, 124:23-125:24; CSF 292-95. Disputed because the evidence cited in SOF 117 does not support the statement that Ocwen conducted its loan verification process "[f]rom January 2014 until at least the second

[6] Ocwen ceased licensing the REALServicing system from Altisource in 2019 following its transition to Black Knight MSP, and the conversion to Black Knight MSP was completed by June 2019. SJX 8 at 61-62.

quarter of 2019."[7] Further, the loan verification process is just one of the processes Ocwen used to verify information in REALServicing, and the evidence demonstrates that Ocwen had multiple controls and checks that would capture and update information. *See* CSF 296-307.

118. Undisputed that Ocwen verified certain data fields in its system of record, not all of which was considered to be "critical." SJX 33 at 121:20-122:9; CSF 292-95.

119. Undisputed, but the loan verification process is just one of the processes Ocwen used to update information in REALServicing, and the evidence demonstrates that Ocwen had multiple controls and checks within the ARM team that would capture and update information. CSF 296-307.

120. Disputed. Ocwen's internal policy is not a material fact, as it is not relevant to any purported statutory violation. Further, Hass testified that Ocwen's internal goal was to complete the loan verification within the 60-day seasoning period after loans were boarded onto Ocwen's servicing system. SJX 33 at 27:2-21. During the loan verification process, Ocwen verified specific information, not all of which was considered to be "critical." *Id.* at 121:20-122:9; CSF 292-95. Further, the loan verification process is just one of the processes Ocwen used to update information in REALServicing, and the evidence demonstrates that Ocwen had multiple controls and checks within the ARM team that would capture and update information. CSF 296-307.

121. Disputed. The cited evidence correctly describes the way that the systems that the Correspondence Department uses populate data for the periodic statements that are sent using various templates, as confirmed by Mr. Kennedy who testified that "the data that's in the system is what is on the billing statement." SJX 34 at 118:18-21. However, the cited evidence does not support SOF 121, which states a hypothetical, and it does not support a single instance or occasion where Ocwen's system of record generated an inaccurate periodic statement that was "communicated" to a particular borrower. To confirm whether any particular information was conveyed at a particular point in time would require a review of an individual borrower's servicing file, including the borrower's actual periodic statements. *See, e.g.,* SJX 32, Arnett 30(b)(6) Dep. at 121:4-25; SJX 35, Sebastian Dep. at 152:20-156:5, 157:16-158:15.

---

[7] Haas testified that SJX 63 contained Ocwen's loan verification procedures used as of June 18, 2014, and that the effective date of the loan verification policies means that it is the policy that is in effect until the next effective date of the next policy in line. *See* SJX 33 at 28:15-19, 123:5-8.

122. Disputed as incomplete. The loan verification process is just one of the processes Ocwen used to update loan information in REALServicing, including ARM information. CSF 296-307. The evidence demonstrates that Ocwen had multiple controls and checks within the company that would capture and update information. *Id.* There were multiple internal controls to catch errors, including the ARM team itself, the QA process, the regular audit process, an investor audit, etc. *Id.*

123. Disputed as incomplete. The cited document states that there was a backlog of certain loans that had yet to go through Ocwen's voluntary internal process to verify certain information received from prior servicers. *See* RSF 117; CSF 292-95. However, the loan verification process is just one of the processes Ocwen used to update loan information in REALServicing, including ARM information. *See* CSF 296-307. The evidence demonstrates that Ocwen had multiple controls and checks within the company that would capture and update information. *Id.* There were multiple internal controls to catch errors, including the ARM team itself, the QA process, the regular audit process, an investor audit, etc. *Id.*

124. Disputed as incomplete. The cited document states that there was a backlog of certain loans that had yet to go through Ocwen's voluntary internal process to verify certain information received from prior servicers. *See* RSF 117; CSF 292-95. However, the loan verification process is just one of the processes Ocwen used to update loan information in REALServicing, including ARM information. *See* CSF 296-307. The evidence demonstrates that Ocwen had multiple controls and checks within the company that would capture and update information. *Id.* There were multiple internal controls to catch errors, including the ARM team itself, the QA process, the regular audit process, an investor audit, etc. *Id.*

125. Disputed. The cited document states that there was a backlog of certain loans that had yet to go through Ocwen's voluntary internal process to verify certain information received from prior servicers. *See* RSF 117; CSF 292-95. However, the loan verification process is just one of the processes Ocwen used to update loan information in REALServicing, and the evidence demonstrates that Ocwen had multiple controls and checks within the ARM team that would capture and update information. *See* CSF 296-307. The evidence demonstrates that Ocwen had multiple controls and checks within the company that would capture and update information. *Id.* There were multiple internal controls to catch errors, including the ARM team itself, the QA process, the regular audit process, an investor audit, etc. *Id.*

126. Disputed to the extent the attributed quote in SJX 111 asserts a legal conclusion, not a finding of fact, and further disputed that the testimony cited in SJX 48 supports the quoted statement in SJX 111. *See* SJX 48 at 19:5-23:7. Further disputed that the attributed quote in SJX 111 referring to some unspecified provision of RESPA accurately states any requirements under RESPA, or is an admission or evidence that Ocwen in any way violated those requirements.

127. Partially disputed. Undisputed that Ocwen conducted a loan verification process during the relevant time period to verify certain loan information received from prior servicers that was boarded into REALServicing. *See* RSF 117; CSF 292-95. Disputed that SOF 127 accurately states the number of borrowers from SJX 55 at ¶ 25, and further disputed that the cited evidence shows that misinformation was actually used to service the loans or communicated to borrowers. *See* RSF 121 (citing SJX 32 at 121:4-25; SJX 35 at 152:20-158:15) (explaining that to determine whether a particular field had ever been changed as result of a loan verification review, and how it had been changed, you would have to review the loan individually, including its transaction history).[8]

128. Disputed. Ocwen did not "object" to the term "audit"; rather, Ocwen stated that "the undercharge and overcharge audits referenced in the Request are not 'audits' run by an audit or quality control department." SJX 154 at 51. Further disputed because the cited evidence does not support the statement contained in footnote 145 and SOF 149-154. *See* RSF 149-54.

129. Partially disputed. Undisputed that SOF 129 accurately quotes an excerpt from the CFPB's Interrogatory, but disputed that it requested "loan-level detail." *See* SJX 146.

130. Partially disputed. Undisputed that SOF 130 contains an accurate partial quote of a portion of Ocwen's response. But in its response, Ocwen further explained that the Interrogatory incorrectly suggested that the purpose of the loan verification process was to correct data errors Ocwen made in its servicing platforms. SJX 147, Rog. No. 19(m), at 11. In fact, the purpose of the loan verification process was simply to determine whether the prior servicer had provided inaccurate servicing data in certain fields when Ocwen onboarded loans for which it had acquired the MSR. *See* CSF 292-95; RSF 117.

---

[8] *See also* SJX 33 at 116:13-18 (the loan verification process does not determine impact to borrower); *id.* at 124:23-125:24 (loans corrected could also mean the loans had information that was previously reflected in a different place in REALServicing, that the field was corrected due to the format of the data, or the data was never there in the first place).

131. Partially disputed. Undisputed that SJX 55 ¶ 29 accurately summarizes the cited evidence, but disputed that the cited evidence shows that any specific misinformation was actually used to service the loans or communicated to borrowers. SJX 33 at 116:13-18 (the loan verification process does not determine impact to borrower); *id* at 124:23-125:24 (loans corrected could also mean the loans had information that was previously reflected in a different place in REALServicing, that the field was corrected due to the format of the data, or the data was never there in the first place).

132. Partially disputed. Undisputed that SJX 55 ¶ 28 accurately summarizes the cited evidence, but disputed that the cited evidence shows that any specific misinformation was actually used to service the loans or communicated to borrowers. *See* RSF 121 (citing SJX 32 at 121:4-25; SJX 35 at 152:20-158:15) (explaining to determine whether a particular field had ever been changed as result of a loan verification review, and how it had been changed, you would have to review the loan individually, including its transaction history).[9]

133. Partially disputed. Undisputed that SJX 55 ¶ 27 accurately summarizes the cited evidence, but disputed that the cited evidence shows that misinformation was actually used to service the loans or communicated to borrowers. *See* RSF 121 (citing SJX 35 at 152:20-158:15) (explaining to determine whether a particular field had ever been changed as result of a loan verification review, and how it had been changed, you would have to review the loan individually, including its transaction history).[10]

134. Disputed. Ocwen testimony regarding SJX 92 indicated that the email did not concern an outbound transfer of loans; instead, it concerned investor reporting for loans that Ocwen serviced for Bank of America, and that "errors/edits" usually indicates investor reporting. *See* SJX 34 at 140:10-21.

135. Partially disputed. Undisputed that Ocwen communicates amounts borrowers owe in periodic statements, but disputed that the cited documents and testimony concern

[9] *See also* SJX 33 at 116:13-18 (the loan verification process does not determine impact to borrower); *id.* at 124:23-125:24 (loans corrected could also mean the loans had information that was previously reflected in a different place in REALServicing, that the field was corrected due to the format of the data, or the data was never there in the first place).

[10] *See also* SJX 33 at 116:13-18 (the loan verification process does not determine impact to borrower); *id.* at 124:23-125:24 (loans corrected could also mean the loans had information that was previously reflected in a different place in REALServicing, that the field was corrected due to the format of the data, or the data was never there in the first place).

"various communications" to borrowers with amounts they owe. *See* SJX 34 at 111:1-111:4; SJX 115; SJX 33 at 103:14-104:24; SJX 35 at 11:17-12:2.

136. Undisputed.

137. Disputed. First, this is a hypothetical statement ("If …"), not a statement of fact. In addition, the cited evidence does not support this statement. It also is contradicted by the record evidence. *See* RSF 121. Moreover, the CFPB has not demonstrated that Ocwen actually serviced any specific, at-issue loan based on inaccurate information. *See* Ocwen SMF ¶¶ 68-178, 200-13. Further, SJX 130 is inadmissible based on the rule against hearsay. RSF 97.

138. Partially disputed. Undisputed that Ocwen generally used its system of records to populate specific borrower data for certain written borrower communications that went out via an autogenerated system, but disputed because to confirm whether any particular information was conveyed at a particular point in time would require a review of an individual borrower's servicing file, including the borrower's actual periodic statements. *See* RSF 121, 127. Further disputed because for oral communications and non-autogenerated written communications, such as certain complaint responses, Ocwen used other sources, such as the loan file to use in its communications. RSF Ex. 8, Mark Ehrenreich Hr'g Tr. at 49:9 -51:6 (June 8, 2016) (when researching a borrower compliant, Ocwen reviews activity on the loan, and systems in addition to REALServicing, such as the imaging system for communications, iCasework, or other ancillary systems); *see also* SJX 39 (attaching Ehrenreich testimony as Exhibit 173 to the 30(b)(6) deposition of Sherri Goodman).

139. Partially disputed. *See* RSF 138.

140. Undisputed.

141. Disputed. First, this is a hypothetical statement ("If …"), not a statement of fact. In addition, it is contradicted by the record evidence. *See* RSF 121, 127 (noting that information may have been contained in multiple places in Ocwen's data system); *see also* RSF 138-39. Further disputed because the additional document cited in SOF 141 does not support this statement.[11] Moreover, the CFPB has not demonstrated that Ocwen actually "communicate[d] an inaccurate 'total amount due'" to any specific borrower for any of the at-issue loans. *See* Ocwen SMF ¶¶ 83, 85, 115-16.

---

[11] SJX 113 only concerns 83 loans, for which future pending changes were made and remediation was discussed. SJX 113 at OCW-024-0001843-46.

142. Disputed. First, this is a hypothetical statement ("If …"), not a statement of fact. In addition, it is contradicted by the record evidence. *See* RSF 121, 127, 141. Moreover, the CFPB has not demonstrated that Ocwen actually "communicate[d] an inaccurate 'total amount due'" to any specific borrower in a periodic statement for any of the at-issue loans. *See* Ocwen SMF ¶¶ 83, 85, 115-16.

143. Disputed. *See* RSF 121, 141-42. Moreover, the CFPB has not demonstrated that Ocwen actually "calculate[d] the total amount incorrectly and then communicate an inaccurate amount" to any borrower for any of the at-issue loans. *See* Ocwen SMF ¶¶ 83, 85, 115-16.

144. Partially disputed because SOF 144 is misleading. Undisputed that SOF 144 accurately quotes an excerpt of SJX 119. Disputed because the loan verification process is just one of the processes Ocwen used to update ARM information in REALServicing, and the evidence demonstrates that Ocwen had multiple controls and checks within the ARM team that would capture and update information. CSF 296-307; RSF Ex. 6, Deposition of Christopher Kennedy at 167:11-169:1, 170:5-10 (Apr. 23, 2019) ("Kennedy Dep.").

145. Undisputed that many discrepancies identified in the Loan Verification Process did not affect the accuracy of Ocwen's calculations of the amounts owed by borrowers. SJX 33 at 99:2-100:2.

146. Disputed. An Ocwen witness testified that of the 86 data fields that Ocwen voluntarily reviewed and verified during the Loan Verification Process, "some of the information … ***could*** also affect the borrower's payment amount." SJX 51 at 128:2-12 (emphasis added). But the cited testimony does not evidence that Ocwen serviced any specific at-issue loan using inaccurate information or calculated or communicated inaccurate amounts to specific borrowers at issue.

147. Undisputed that the 2016 Loan Verification Procedures document which, in 2016, was used to verify information received and boarded ***from other servicers*** states: "Loans that are financially impacted (over charges/ under charged) in REALServicing, the fields such as (Interest only IO, Late charge, Pending change) during the Loan Verification process will be listed in the RAF (Risk Appetite Framework) Report." SJX 58, at 183.

148. Disputed. The cited evidence does not contain any information concerning overcharges. *See* SJX 58. SJX 58 states that Ocwen's loan verification process, which were used to verify information received and boarded from other servicers, contained procedures for

an "Under Charge Audit," which included a process "to calculate the difference in amount (amount lesser than actual payment)," make corrections in REALServicing, and escalate the audit to upper management for approval—after which the Cashiering Team would make any necessary changes to an account. SJX 58 at 177-80, 183.

149. Disputed. The cited testimony and documents do not support this statement. The testimony in SJX 32 does not describe SJX 125 or SJX 126, *see* SJX 32 at 37:21-40:4, and the CFPB does not cite any testimony, documents, or other admissible evidence that demonstrates how or why the purported amounts included in SJX 125 or SJX 126 were incurred, what they in fact reflect, or whether any borrowers actually were charged and paid the stated amount.

150. Disputed because the CFPB does not cite any testimony, documents, or other admissible evidence that demonstrates how or why the purported amounts included in SJX 126 were incurred, what they in fact reflect, or whether any borrowers actually were charged and paid the stated amount. *See* RSF 149.

151. Disputed. The cited document does not support this statement and the CFPB does not cite any testimony, documents, or other admissible evidence that demonstrates how or why the purported amounts included in SJX 133 were incurred, what they in fact reflect, or whether any borrowers actually were charged and paid the stated amount.

152. Disputed. The cited testimony does not support this statement. The testimony cited in SOF 152 only generally describes certain codes, not SJX 133 or the borrowers described in SOF 151. *See* SJX 32 at 31:15-32:13, 26:13-27:20.

153. Disputed. *See* RSF 151-52.

154. Disputed because the CFPB does not cite any testimony, documents, or other admissible evidence that demonstrates how or why the purported amounts included in SJX 133 were incurred, what they in fact reflect, or whether any borrowers actually were charged and paid the stated amount. *See* RSF 151.

155. Undisputed.

156. Undisputed, but irrelevant to any of the CFPB's claims. *See* ECF Nos. 481, 506.

157. Partially disputed. Undisputed that the excerpt in SOF 157 accurately quotes from SJX 96. Otherwise disputed because an Ocwen witness testified that the other document cited in SOF 157 (SJX 120) did not indicate that any borrower or payment would be impacted

based on a misalignment of those dates on HELOCs since HELOCs function differently than ARM loans. RSF Ex. 10, Deposition of Thomas Arnett at 348:10-349:7 (Apr. 25, 2019).

158. Disputed. SJX 128 identifies "issues," not "violations," relating to the escrow analysis, flood, tax, insurance, and loss drafts business units. Further, to the extent SJX 128 uses the term "CFPB violations," the term is undefined and the cited evidence does not establish that any of the "issues" identified in the report, much less any issue with respect to ***any*** individual loans, were actionable violations of law.

159. Disputed. The alleged fact is a legal conclusion and misstates the regulation.

160. Disputed. The alleged fact is a legal conclusion and misstates the regulation.

161. Disputed. The alleged fact is a legal conclusion and misstates the regulation.

162. Disputed. If a shortage or surplus is identified during an escrow account analysis, the borrower can elect to pay the shortage back in a lump sum, or receive the extra amount back as a credit to their account, without changing their prior monthly escrow payment. *See* Ocwen SMF Ex. 92 at ¶ 3.

163. Disputed. The cited testimony (SJX 38) does not establish that Ocwen would change a borrowers' future monthly escrow payment if amounts owed for taxes and insurances changed from the prior year.

164. Disputed and irrelevant. The audit was from July 31, 2013 and refers to loans and practices outside the relevant time period, and therefore is irrelevant.

165. Undisputed.

166. Undisputed.

167. Undisputed.

168. Disputed. Ocwen's verified response stated only that its "data indicates"—but does not state and cannot prove—that Ocwen "did not complete" an analysis within 30 days of the completion of the applicable Escrow Account Computation Year for any individual loan. SJX 138 at 9. Further, the transaction history would contain more accurate information about whether or not Ocwen completed an analysis. Ocwen SMF Ex. 90, Hamm Report ¶¶ 188-190, n. 118; *see also* RSF Ex. 13, Sebastian Decl. ¶ 29; SJX 32, Arnett 30(b)(6) Dep. at 121:4-25.

169. Disputed. *See* RSF 168.

170. Undisputed.

171. Disputed in part. Ocwen's discovery response expressly stated that its answer was based on a review of certain electronic data that was subject to "the same accompanying limitations and caveats" set forth in Ocwen's earlier discovery responses. SJX 150, RFA Nos. 109-112, at 76-79. As previously stated, the transaction history would contain more accurate information about whether Ocwen completed an escrow analysis. RSF 168. Moreover, SJX 150 explicitly denied that "the conduct evidenced by this data amounts to any violation of any applicable law or regulation, or caused any injury, harm or loss to any affected borrower."

172. Disputed. The cited evidence does not support the statement in SOF 172. *See also* RSF 171. Moreover, the CFPB's own expert concedes that even if the CFPB's allegations were true, for the loans he claims suffered opportunity cost damages, Ocwen on average adjusted those borrowers' escrow amounts owed within 1.4 months of the purported delay. Ocwen SMF Ex. 60, ¶ 63 & Table 3; Ocwen SMF Ex. 90, at ¶ 249.[12] Further, in at least some cases, the delay in completing the analysis did not even affect the timing or amount of the borrower's new mortgage loan payments. *See* Ocwen SMF Ex. 90, at ¶¶ 96, 366, 249.

173. Disputed. The cited evidence does not support the statement in SOF 173. *See also* RSF 171-172. Moreover, if or when Ocwen failed to timely analyze borrowers' escrow accounts, the borrowers would not necessarily accrue any shortages or surpluses as a result of the delay, for example, because (1) the estimated payments for taxes and insurance may not have changed from the prior year, (2) Ocwen ran the analysis after a change from the prior year but before the borrower's next payment was due, and/or (3) the borrower was already delinquent and therefore not making any payments. *See* Ocwen SMF Ex. 90, at ¶¶ 19, 96, 366; RSF Ex. 13, Sebastian Decl. ¶¶ 36-48.

174. Disputed. SOF 174 mischaracterizes the testimony in SJX 38. The cited testimony concerns only Ocwen's definition of the term "harm" in the context of its response to Interrogatory No. 3 (SJX 38 at 85:13-16), which specifically concerns borrowers who filed for bankruptcy, and Ocwen's response stated that Ocwen did not admit that any borrower identified in response to Interrogatory No. 3 was harmed due to a delay in analysis. SJX 138, at 14.

---

[12] Even for the loans that the CFPB's expert erroneously claims had an increased foreclosure probability due to the escrow analysis delay, the average delay was only 2.2 months. Ocwen SMF Ex. 90, at ¶¶ 93, 97, 249-51 & n. 32. Further, many of those loans were delinquent on the alleged analysis due date and therefore would not have made any payments on their loan before the allegedly delayed analysis was conducted several months later. *See id.*; RSF 173.

175. Disputed. SOF 175 mischaracterizes the testimony in SJX 38. *See* RSF 174. The cited testimony concerns only Ocwen's definition of the term "harm" in the context of its response to Interrogatory No. 3 (SJX 38 at 85:13-24), which specifically concerns borrowers who filed for bankruptcy, and Ocwen's response stated that Ocwen did not admit that any borrower identified in response to Interrogatory No. 3 was harmed due to a delay in analysis. SJX 138, at 14.

176. Disputed. SOF 176 mischaracterizes the testimony in SJX 38. *See* RSF 174-75. The cited testimony concerns only Ocwen's definition of the term "harm" in the context of its response to Interrogatory No. 3 (SJX 38 at 85:13-86:8), which specifically concerns borrowers who filed for bankruptcy, and Ocwen's response stated that Ocwen did not admit that any borrower identified in response to Interrogatory No. 3 was harmed due to a delay in analysis. SJX 138, at 14.

177. Disputed. The cited testimony (SJX 38) and documents (SJX 140 and 138) say nothing about Ocwen's use of "inaccurate information" with respect to any individual loan. Further, disputed that SJX 140 represents the actual shortage or surplus amount accrued "while the escrow analysis was delayed" for each loan listed. Ocwen's 30(b)(6) witness testified that SJX 140 does not contain numbers "captured in Ocwen's system of record; rather, it represents Ocwen's "attempt[]" to "model" potential shortages or surpluses. SJX 38 at 71:20-73:1. To determine whether an actual shortage or surplus was charged to an individual borrower as a result of an untimely escrow analysis, one should review the individual servicing file and transaction history. Ocwen SMF Ex. 90, Hamm Report ¶¶ 188, 192-194; *see also* RSF 137; CSF 315; SJX 32, Arnett 30(b)(6) Dep. at 121:4-25.

178. Undisputed, although it also possible for there to be ***no change*** in a borrower's year-to-year taxes and insurance premiums.

179. Undisputed.

180. Disputed. SOF 180 mischaracterizes the cited testimony. Rinear testified that not doing an escrow analysis for the accounts referenced in SOF 180 could have "a disproportionate ***potential*** impact." SJX 48 at 83:3-9. Rinear was not testifying on behalf of the company and was merely speculating. *See* SJX 48 at 80:3-83:9. Further, there is no evidence in the record that proves ***any*** of the borrowers referenced in SOF 180 were actually impacted by an untimely escrow analysis. Moreover, Ocwen's expert witness opines that the CFPB's damages expert

fails to "show that *any* foreclosures or *any* foreclosure-related damages resulted from the allegedly delayed escrow analyses." Ocwen SMF Ex. 90, at ¶¶ 11, 16.

181. Disputed. SJX 140 does not prove an actual shortage or surplus amount accrued "while the escrow analysis was delayed" for each loan listed. As Ocwen's 30(b)(6) witness testified, SJX 140 does not contain numbers "captured in Ocwen's system of record; rather, they represent Ocwen's "attempt[]" to "model" potential shortages or surpluses. SJX 38 at 71:20-73:1. To determine whether an actual shortage or surplus was charged to an individual borrower as a result of an untimely escrow analysis, one should review the individual servicing file and transaction history. Ocwen SMF Ex. 90, Hamm Report, at ¶¶ 188, 192-194; SJX 32 at 121:4-25.

182. Disputed. *See* RSF 168-69, 177, 181.

183. Disputed. *See* RSF 168-69, 177, 181-82.

184. Disputed. *See* RSF 168-69, 177, 181-83.

185. Disputed. *See* RSF 168-69, 177, 181-84. The cited document (SJX 138) does not state that Ocwen "sought to collect" shortages through a "lump sum." Moreover, as a general matter, while borrowers had the option to repay a shortage in lump sums, where Ocwen determined that certain borrowers incurred an escrow shortage ***that was owed*** to cover his or her taxes and insurance, Ocwen extended the amount of time for the borrower to repay beyond 12 months (and up to 60 months). SJX 138, Rog. No. 4, at 15; CSF 316.

186. Disputed. *See* RSF 168-69, 177, 181-185.

187. Disputed. SOF 187 mischaracterizes the testimony in SJX 38. Ocwen's 30(b)(6) witness testified that when an escrow analysis was performed, REALServicing would automatically generate a "pending change . . . associated with the effective date of the implementation of the payment" ***only if*** a payment change was required to a borrower's escrow account, and that it would not be implemented until "when the customer's due date reaches that effective date." SJX 38 at 16:7-20.

188. Disputed. None of the cited testimony (SJX 38, 35, and 34) establishes that Ocwen necessarily "use[d] the pre-existing monthly escrow amount" to "servic[e] the loan" if an escrow account analysis was not performed, nor does it establish that Ocwen used the preexisting monthly escrow amount to service any particular loan.

189. Disputed. *See* RSF 168, 177, 182.

190. Disputed. *See* RSF 168, 177, 182. Further, the cited testimony (SJX 35 and 38) does not state that Ocwen used "inaccurate monthly escrow amounts."

191. Disputed, inadmissible as a voluntary subsequent remedial measure, and irrelevant. *See* Fed. R. Evid. 407. The cited document (SJX 84) was a report prepared at the start of the relevant period (April 2014) addressing prior events. Moreover, the cited document (SJX 84) does not state that Ocwen "provid[ed] inaccurate reinstatement quotes" to borrowers. Rather, it states that for loans with a delayed escrow analysis, incorrect monthly escrow amounts could be "included in the reinstatement calculation logic," but Ocwen determined that was no effect to some escrow accounts "due to balance changes or delinquency changes." SJX 84 at -038-39.

192. Disputed. SOF 192 mischaracterizes the cited document (SJX 84). SJX 84 states that, as of April 7, 2014—the beginning of the relevant time period—payment adjustments had already been made to bring account balances down on loans.

193. Disputed. SOF 193 mischaracterizes the cited document (SJX 138). Ocwen's answer to Interrogatory No. 5 stated that "82,763 reinstatement quotes were identified as having an escrow amount discrepancy ***from the Model Reinstatement quote***," where "[t]he Model Reinstatement quote recreated an approximation of what funds should have been collected at the time of the reinstatement quote in order to arrive at an estimated escrow balance which would allow for future timely disbursements from the customer's escrow account." SJX 138, at 18 (emphasis added). Further, Ocwen specifically provided that they were only "potentially inaccurate," and that a manual review of the servicing file and historical loan-level data would be required to determine the accuracy of the escrow amount contained in the historical quote. *Id*.

194. Disputed. *See* RSF 193. Ocwen did not admit that any reinstatement quotes provided in SJX 143 were "inaccurate." Instead, it specifically provided that they were only "potentially inaccurate," and that a manual review of the servicing file and historical loan-level data would be required to determine the accuracy of the escrow amount contained in the historical quote. *See* SJX 138, Rog. No. 5, at 18.

195. Disputed. *See* RSF 193-94.

196. Disputed. *See* RSF 193-94.

197. Disputed. *See* RSF 193-94.

198. Partially disputed. Undisputed that Ocwen did not send certain borrowers who were delinquent or in bankruptcy annual escrow account statements within 30 days of the completion of the application escrow account computation year because it was not required. 12 C.F.R. § 1024.17(i)(2). Otherwise disputed because the cited testimony (SJX 38) is mischaracterized. Ocwen's 30(b)(6) witness testified that in each of the years 2014 through 2015, there were "instances" where Ocwen did not send an annual escrow account statement within 30 days of the completion of the applicable escrow account computation year, but that could have been because Ocwen decided, through a QC process after performing the analysis, that it needed to be reversed and the statement should be held or canceled. SJX 38 at 163:5-14. Further, Ocwen's 30(b)(6) witness testified that the number of instances this occurred in 2016 and 2017 was "very small" following an "update to controls and systems" to improve related processes. SJX 38 at 165:15-166:6.

199. Undisputed.

200. Disputed. Ocwen's 30(b)(6) witness testified (SJX 38) that the cited document (SJX 87) merely represents loans for which Ocwen "had the information in [its] system [of record] that indicated [an escrow statement] was mailed" in relation to an escrow account analysis, and for which "there wasn't a mail code available in the system [of record]," which "does not factually mean that a customer did not get [the escrow] statements." SJX 38 at 167:1-10, 169:9-23. To determine whether an escrow statement should have been sent within 30 days of the completion of the applicable escrow account computation year, one would have to review the individual loan transaction history. RSF Ex. 13, Sebastian Decl. ¶¶ 52-57.

201. Disputed. Determining how many, and which, borrowers were not current at the time Ocwen conducted the relevant escrow account analysis would require a manual review of each borrower's transaction history. RSF Ex. 13, Sebastian Decl. ¶¶ 52-57.

202. Disputed to the extent the attributed statement could be read to imply a legal conclusion, not a finding of fact, and further disputed as lacking any evidentiary basis. Further disputed that the attributed quote in SJX 91 referring to some unspecified provision of RESPA accurately states any requirements under RESPA, or is an admission or evidence that Ocwen in any way violated those requirements.

203. Disputed. The cited testimony (SJX 38) states that an annual escrow analysis statement informs borrowers that the identified "shortage could be made in a single payment or it

could be spread over a period not less than 12 months;" it does not state that Ocwen "asked" any particular borrowers to pay an escrow shortage. SJX 38 at 19:15-19.

204. Partially disputed. Disputed that Ocwen's stated process throughout the entire relevant time period was to remove from borrowers' monthly payments any lump sum payments borrowers made intending to be escrow shortage payments. *See* SJX 138, Rog. No. 12, at 26-27; ECF No. 623, at 33-34. Undisputed that, generally, during the relevant period where a borrower's payment matched the escrow shortage, was within one dollar of the escrow shortage amount, or Ocwen could otherwise determine that the payment was intended to cover a borrower's escrow shortage, Ocwen processed those received payments by recording them in REALServicing, and adjusting the shortage amount owed where appropriate. *See id*.

205. Disputed that the cited audits found that "Ocwen sometimes did not remove the appropriate shortage portion of the monthly payment." The 2015 audit found only that for 12 loans where "[t]he Cashiering Department applie[d] lump sum payments received towards escrow shortages to the borrower's escrow account in REALServicing," the Escrow Department did not adjust the future escrow payment amount upon receipt, and that for 21 loans, the billing statements sent to the borrower were not updated with the revised future escrow payment amount calculated by the Escrow Department. SJX 74 at -553. The 2016 audit said only that the applicable comment code indicating that payments were received for escrow shortages was not appearing in REALServicing for a small number of loans, which meant those loans "were not reviewed by the Escrow Department for an escrow shortage adjustment," but not that Ocwen was required and failed to adjust the escrow shortage amount. SJX 79 at -032.

206. Undisputed but only with respect to the 2015 and 2016 audit findings referenced in RSF 205. *See* RSF 205.

207. Disputed. The CFPB's use of the quoted term "timely remove" is vague, undefined, not found in the cited testimony, and otherwise disputed because the timeframe for adjusting a borrower's escrow balance to reflect a "lump sum" shortage payment received is not defined by statute or regulation. SJX 138, Rog. No. 12, at 26.

208. Disputed. The cited document (SJX 138) is mischaracterized. For the time period of July 1, 2015 to January 1, 2018, Ocwen's SLA required it to process an escrow shortage payment and adjust the borrower's escrow balance within 5 business days, and before

July 1, 2015, Ocwen's SLA required it to process an escrow shortage payment and adjust the borrower's escrow balance within 15 business days. SJX 138, Rog. No. 12, at 25-26.

209. Undisputed.

210. Undisputed, but Ocwen's discovery response explicitly stated that Ocwen does not concede that an escrow shortage payment processed outside of the applicable SLA, but before the borrower suffered any harm, is a violation of any law or statute, nor is it in any way unfair or deceptive; to the contrary, no statute or regulation sets forth a required timeframe. SJX 138, Rog No. 12, at 26.

211. Undisputed, but misleadingly incomplete, because SOF 211 omits both (a) the portion of the response observing that "timely" was based on Ocwen's internal standards, not any timeline set forth in law; and (b) the preceding sentence which makes clear that such shortages "processed outside of the applicable SLA are ***automatically remediated*** when a borrower's escrow payment is recalculated." SJX 138, Rog No. 13, at 28 (emphasis added).

212. Undisputed.

213. Undisputed.

214. Undisputed that in or around August 2016 Ocwen contracted with Assurant to pay hazard insurance premiums on behalf of escrowed borrowers.

215. Undisputed that in some instances, Assurant and SWBC did not pay hazard insurance premiums on behalf of some borrowers by the relevant insurance companies' deadlines.

216. Partially disputed and incomplete. As stated in SJX 38, purportedly late insurance disbursements may have occurred, for example, because (a) ***the insurance company*** did not timely bill Assurant and SWBC (and therefore they could not make the payment), or (b) the checks were lost in the mail and not received by the insurance carrier. If or when this was found to have occurred, "any late charge or any fee assessed by the carrier would have been credited back to the customer's escrow account and attempts would be made . . . to reinstate the insurance as well." SJX 38 at 210:9-211:18, 213:7-214:13.

217. Disputed because SJX 81 is an inadmissible voluntary subsequent remedial measure. *See* Fed. R. Evid. 407. Also disputed because the cited document is misleadingly incomplete, as it contains the excerpted quote but does not identify any individual loan "examples." *See* SJX 81.

218. Disputed that "Ocwen demanded that SWBC identify certain information described therein." Ocwen requested that SWBC identify certain populations of loans, and further requested that, for these populations, SWBC take certain actions (including, for example, providing a credit to the borrower). SJX 179 at -156. Further, the cited document does not identify any individual loans as "examples." *See id.*

219. Undisputed, but misleadingly incomplete. The cited document contains the excerpted quote, but does not identify any individual loans. *See* RSF 218.

220. Disputed that the Vendor Remediation Plan attached as Exhibit 5 to SWBC's June 24, 2015 letter (which is a summary document) "fully discussed" all aspects of the "root causes." SJX 88 at -632, -646-54.

221. Undisputed.

222. Disputed. In response to the CFPB's request that Ocwen "[i]dentify each Account for which the Borrower's Insurance was erroneously cancelled," Ocwen stated:

> [Responding] would require that Ocwen query four years and hundreds of thousands of disbursements to determine a total potentially affected population, and then manually review each loan to determine whether hazard insurance on the account was cancelled due to Ocwen's or a vendor's error. As a compromise, Ocwen has provided the responsive data below from existing reviews, worked with the Bureau to sample borrower accounts and time periods not covered by the existing reviews, and to provide the Bureau with responsive data from that sample.

SJX 138 at 21-22. As such, Ocwen "determined that [insurance for] 1367 loans were ***potentially*** 'erroneously cancelled.'" SJX 138 at 21-22 (emphasis added). Ocwen's response did not concede that it, or its vendors, actually "erroneously cancelled" insurance for these loans, as that determination would require a manual review of each borrower's servicing file. *Id.*

223. Disputed that the referenced borrowers' "insurance policies were cancelled due to errors by Ocwen or its vendor." *See* RSF 222. Further disputed because of the 1,367 loans for which Ocwen determined insurance was "***potentially*** erroneously cancelled," Ocwen identified 725 accounts "where either: (1) Ocwen obtained hazard insurance on behalf of the owner or assignee of a mortgage loan, which insures the property securing such loan; or (2) a borrower obtained insurance coverage after an erroneous cancellation, but at a higher premium." SJX 138 at 21-24 (emphasis added).

224. Disputed that the referenced borrowers' "insurance policies were cancelled due to errors by Ocwen or its vendor." *See* RSF 222.

225. Undisputed, but to the extent that borrowers identified in the Florida Escrow Lookback Analysis were impacted by the timing of insurance disbursements, Ocwen remediated those borrowers. SJX 180; *see also* RSF 226.

226. Disputed that the referenced borrowers' insurance policies were cancelled due to errors by Ocwen or its vendor. Neither the Florida Escrow Lookback Analysis (SJX 180), Ocwen's discovery response to the Florida Plaintiffs' Request for Production No. 13 (RSF Ex. 1, Defs.' Responses to Plaintiffs' First Request for Production, at 20-21 (Dec. 6, 2017)), nor Ocwen's letter transmitting the analysis (RSF Ex. 3, July 5, 2018 Ltr. from Catalina Azuero to Sasha Funk Granai) indicate that the referenced Florida loans were loans for which the borrower's hazard insurance was cancelled as a result of Ocwen's or its vendor's error.

227. Undisputed, but neither the Florida Escrow Lookback Analysis (SJX 180), Ocwen's discovery response to the Florida Plaintiffs' Request for Production No. 13 (RSF Ex. 1 at 20-21), nor Ocwen's letter transmitting the analysis (RSF Ex. 3) indicate that the referenced Florida loans were loans for which "force-placed insurance was placed at a higher premium" as a result of Ocwen's or its vendor's error. *See* RSF 226.

228. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

229. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

230. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

231. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

232. Disputed as materially misleading. Mr. Diller's email contains the quoted statement in SOF 232, but disputed because the excerpt leaves out an important qualification preceding that statement. Mr. Diller wrote that he did not "believe any of" certain "issues" brought to his attention "put the borrower at risk of being put in the LPI cycle," but noted that "[t]his does however create a terrible customer experience, as their rightful expectation is that we pay their insurance timely." SJX 89 at -357.

233. Undisputed.

234. Disputed. The cited evidence states that in 2015, Ocwen's insurance vendor found that out of a population of 5,249 loans where there was a "***potential***" duplicate disbursement—***all of which were fully remediated by the vendor and/or Ocwen***—there were 3,015 "[l]oans where credits on [the] second disbursement have been received and processed"; 138 "[l]oans where the second [disbursement] was confirmed as monthly premium, payments for

multiple properties on the same loan, or additional premium and where no credit is due"; 1,826 "[l]oans where the agent or carrier confirmed that the second disbursement was returned to the borrower"; and 270 "[l]oans where we have not been successful in determining if a refund was sent to the borrower . . . ." SJX 43 at 139:22-140:3; SJX 77, Attach. at 3. For the last category, neither Ocwen nor its vendor had reached a "final disposition of whether or not it was a valid second disbursement." SJX 43 at 139:12-20.

235. Undisputed.

236. Disputed. For a period of time in 2015, for some loans, Ocwen's system of record did not contain current or updated flood zone data, but disputed that the existing information in the system was necessarily "inaccurate." *See* SJX 38 at 229:3-230:6. Further, in February 2015, Ocwen, SWBC, and their flood zone determination vendor (Core Logic) performed a reconciliation to update the flood zone data in their respective systems of record and Ocwen provided credits to any accounts for which flood insurance was placed and the property was not currently in a flood zone. *Id.*

237. Disputed. The cited testimony does not support the statement in SOF 237. The witnesses did not testify that Ocwen actually "sent notices" to or otherwise communicated the alleged information to borrowers. *See* SJX 38 at 228:11-229:6; SJX 43 at 165:4-165:11.

238. Disputed that Ocwen used "inaccurate flood-zone information"; Ocwen testified that, for some loans, it did not necessarily use the "most current flood zone on record." SJX 43 at 167:9-13. Also, to the extent those borrowers purchased or had flood insurance placed on their property, insurance payments were credited or refunded. *See* RSF 236; SJX 43 at 169:19-170:4.

239. Partially disputed. Ocwen testified that it was unaware of "excessive[] hazard insurance coverage" but that, for certain loans, "flood insurance was placed above the required amount of insurance." SJX 38 at 256:-257:20. Where the latter was determined to have occurred, Ocwen credited or refunded those borrowers. SJX 43 at 169:19-170:4.

240. Partially disputed to the extent this fact asserts a legal conclusion. Undisputed that the cited audit contains this statement, but disputed that there is any legal requirement to "to ensure lender-placed flood insurance policies do not exceed regulatory required coverage amounts." *See* SJX 114 at -033.

241. Undisputed.

242. Disputed. Ocwen's 30(b)(6) witness testified that Ocwen's current policy is to impose the last known coverage or the replacement value of the property, in conformity with industry "best practice." He further testified that he is "not aware of any changes in policy relating to that," and that he believed it remained the same, but was not sure. *See* SJX 38 at 257:11-258:22.

243. Partially disputed. Undisputed that the exhibit cited in SOF 243 contains this statement, but disputed that this would amount to a violation of UDAAP—[redacted] *See* RSF 304.

244. Disputed. The cited email reflects that Assurant, not Ocwen, cancelled a single borrower's hazard insurance and "in error Assurant updated the coverage amount on the loan as $510,000," rather than $51,000—resulting in a premium of $4,641. SJX 160 at -983-84. Upon discovery, Ocwen immediately took action to ensure the borrower's insurance coverage was reduced to $51,000 and that the borrower was refunded for any amounts paid above premiums due for a $51,000 policy. SJX 160 at -979-84.

245. Partially disputed. Undisputed that the exhibit cited in SOF 245 contains this statement referring to an unidentified loan, but disputed that this would amount to a violation of law where there is no evidence of how or why the coverage was excessive, or whether the borrower even paid the premium. SJX 161.

246. Undisputed, but the cited documents and testimony do not identify any individual loans. *See also* RSF 248.

247. Undisputed, but the cited documents and testimony do not identify any individual loans. *See also* RSF 248.

248. Disputed. Neither the CFPB's document request (SJX 151, at 13, Request Nos. 9-10) nor the document relied on by the CFPB (SJX 123) was limited to instances where Ocwen "should have terminated PMI on the termination date." Servicers need not terminate PMI on the termination date unless the property secured by the loan is both a "single-family dwelling" and "the principal residence of the mortgagor," ***and*** the borrower is current as of the termination date. 12 U.S.C. § 4901(15); *id.* § 4902(b). SJX 123 contains none of this information. Further, SJX 123 does not identify 7,771 borrowers for whom Ocwen did not "terminate[] PMI on the termination date," as to do so would require a manual review of each borrower's servicing file

and transaction history. RSF Ex. 13, Sebastian Decl. ¶¶ 68-69. Rather, SJX includes data for 7,771 instances where Ocwen recorded the cancellation of a borrower's PMI in its system of record after January 1, 2014.[13] SJX 38 at 197:11-20. Additionally, SJX 123 does not, however, reflect the date that Ocwen actually cancelled ***any*** borrower's PMI—rather, this document merely identifies the date that such cancellation was recorded in Ocwen's system of record. SJX 38 at 197:11-20. For many loans, this is evident from the face of the document. For example, approximately 2,773 loans identified in SJX 123 indicate that Ocwen recorded cancellation of the borrower's PMI ***on the termination date***.

249. Disputed. The cited evidence (SJX 123 and deposition testimony "based on the data" in SJX 123, *see* SJX 38 at 198:11-23) has not established that Ocwen failed to terminate PMI on the termination date for any individual borrower where it was required to do so. *See* RSF 248.

250. Disputed. The cited evidence has not established that Ocwen failed to terminate PMI on the termination date for any individual borrower where it was required to do so. *See* RSF 248-49.

251. Disputed. The cited evidence has not established that Ocwen failed to terminate PMI on the termination date for any individual borrower where it was required to do so. *See* RSF 248-49.

252. Disputed. Ocwen refunded credits totaling over $3.8 million to the 7,771 borrowers identified on SJX 123 for which Ocwen recorded the cancellation of a borrower's PMI in its system of record after January 1, 2014. SJX 123 (Column E).[14] Further, as noted in RSF

---

[13] The CFPB requested that Ocwen produce "Documents sufficient to identify each Account for which You failed to automatically cancel a Borrower's purchase mortgage insurance when the balance on the Loan reached 78 percent of the home's original appraised value" and for each such account, "documents sufficient to show the Remediation You provided to the Borrower." SJX 151 at 13. Because that was not possible without a manual review of each loan file, Ocwen produced a spreadsheet (SJX 123) which identified loans for which the "cancellation date" (i.e., the date that Ocwen's cancellation of the borrower's PMI was recorded in its system of record) occurred sometime after the termination date (i.e., the date on which the principal balance of the mortgage is first scheduled to reach 78% of the original value of the property securing the loan). *See* RSF Ex. 13, Sebastian Decl. ¶¶ 67-69.

[14] The refunds referenced in SOF 252 and corrected in this RSF do not necessarily reflect the amount of PMI "premium payments made by 7,771 borrowers after their relevant termination dates." SJX 38 at 202:15-203:24. For example, according to SJX 123 the monthly premium for Loan No. [redacted]8789 was $63.16 its termination date was August 1, 2016, and Ocwen recorded

248, SJX 123 offers no basis to conclude that each of these 7,771 borrowers was entitled to have their PMI cancelled on the termination date. *See* RSF 248.

253. Partially disputed. Undisputed that Ocwen sent loan modification agreements to certain borrowers that included information that did not align with Ocwen's net present value model used for the loan modification process. But disputed because Ocwen mailed corrected agreements to each impacted borrower, fixed the letter template issues that caused these errors, and established a quality control process to identify missing data issues. SJX 53, at 319:22-321:10, 351:24-352:10; RSF Ex. 5, Loss Mitigation CFPB Presentation (June 2015), Brandon Latman Hr'g Tr. Ex. 14, at 13.

254. Disputed. GMAC loans Ocwen acquired did not have deferral amounts in their loan modification agreements, which was the industry standard. SJX 53 at 348:25-349:9. Further, Ocwen identified only two loans that were sent loan modification agreements without this information, and both received corrected agreements. SJX 53 at 351:24-352:5; RSF Ex. 5, Loss Mitigation CFPB Presentation (June 2015), Latman Hr'g Tr. Ex. 14, at 13.

255. Disputed. The evidence cited in SOF 255 establishes that these letters ***did not*** omit the alleged information. Instead, due to a programming error, interest payments for the second and sixth interest rate steps, if they existed, were omitted from the letters referenced in SOF 253. SJX 53 at 362:9-363:12, 367:21-368:9. The lack of these steps did not affect the accuracy of any other loan modification terms, and all impacted agreements were resent with the correct step rates. SJX 53 at 363:13-15, 367:21-368:9; RSF Ex. 5, Loss Mitigation CFPB Presentation (June 2015), Latman Hr'g Tr. Ex. 14, at 13.

256. Partially disputed and inadmissible as a voluntary subsequent remedial measure. *See* Fed. R. Evid. 407. Undisputed that the quoted language appears in SJX 93, but disputed because the conditions and/or modification rate were ***more favorable*** to borrowers than the current rate for the vast majority of borrowers (83%), and the remediation Ocwen provided mitigated any potential borrower harm for others. SJX 53 at 402:7-16, 403:22-405:4. Moreover, [redacted]

---

cancellation of the relevant PMI on October 21, 2016 (less than three months later). SJX 123, Row 2. But SJX 123 states that this loan was provided a credit for $1,032.80—well over the premium payments the borrower would have made between August 1, 2016 and October 21, 2016. *Id.*

[redacted]

257. Disputed. [redacted] SJX 53 at 411:22-417:3.

258. Undisputed.

259. Undisputed.

260. Disputed. Ocwen did not state or concede that the 124 borrowers referenced in SJX 145 "were entitled to RESPA protections." *See* SJX 145, at 6 (noting that a first notice or filing before evaluation of a Complete Application would be permissible in certain cases). Further, whether such borrowers were entitled to RESPA protections is a conclusion of law, not a statement of fact.

261. Disputed. The cited letters (SJX 94), without more, do not establish that any of these letters were actually sent to borrowers, and Ridder (SJX 55, ¶¶ 72-75) simply asserts that she observed these letters in the borrowers' servicing files.

262. Disputed as materially misleading. Although these letters contained the quoted language, other language in each letter explicitly said that this statement would apply ***only if (and after)*** the borrower's loss mitigation application was "***certified as complete***." *E.g.*, SJX 94 at -135 (emphasis added).[15]

263. Partially disputed. Although the response identified 69 borrowers, the letters made clear that the statement concerning foreclosure would apply only if and after the borrower's loss mitigation application was certified as complete. *See* RSF 261-62.

264. Disputed. *See* RSF 261-62.

265. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

266. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

267. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

268. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

---

[15] The relevant section of the letter begins with the sentence, "***Once the package or your request has been certified as complete***, your application moves to underwriting, where we determine your eligibility." *Id.* (emphasis added). The letter goes on to state, "While you will not lose your home ***during the evaluation process***, to protect your rights under applicable foreclosure law, ***you may need to respond to these foreclosure notices*** or take other actions. *Id.* (emphasis added).

269. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

270. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

271. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

272. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

273. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

274. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

275. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

276. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

277. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

278. [INTENTIONALLY OMITTED PURSUANT TO DE 713]

279. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

280. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

281. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

282. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

283. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

284. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

285. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

**DEFENDANTS' COUNTERSTATEMENT OF FACTS ("CSF")**

286. Ocwen incorporates by reference each of its SMF paragraphs 1-243 (ECF No. 731) and the exhibits filed therewith, Ocwen SMF Exs. 1-138.

287. Ocwen received a ***PASS*** from each NMS Monitor with respect to Metric 4.B (timely and accurate payment processing), 6.B.viii.a (dual tracking), and 33 (accurate billing statements), and many others. *See* Ocwen SMF ¶ 64; *id.* Ex. 13, Evans Decl. ¶¶ 10-11; *id.* Ex. 21, Rebuttal Expert Report of Marcel Bryar, ¶¶ 94, 152, 158, 166 & Ex. 4 (Oct. 15, 2019) ("Bryar Report"); *id.* Exs. 22-25, NMS Monitor's Reports (reporting that Ocwen did not exceed the Threshold Error Rate for metrics tested).

288. During the normal course of servicing loans during the relevant period, Ocwen necessarily took dozens of actions per year for each individual loan, including but not limited to generating and sending monthly billing statements, processing and crediting borrower payments, conducting escrow analyses, distributing annual or semi-annual taxes and insurance payments from escrow, and credit reporting. RSF Ex. 13, Sebastian Decl. ¶ 5.

289. Ocwen's Payment Processing Procedure (SJX 75), approved in early 2016, was "owned" by or housed with the "Director of Cashiering," which organization charts show was a title at the OFSPL subsidiary level. *See* SJX 107, 2015 Org Chart at -637 (showing "Director of Cashiering," and OFSPL role, reporting into Tom Diller of OFC); *see also* SJX 67, 2016 Org Chart at -599 (showing the "Vice President of Cashiering," an OFSPL role, reporting into Brian LaForest of OFC).

290. The Payment Processing Procedure (SJX 75) was subject to the approval of the "Cashiering Control Director," a position at the OFC parent level. *See* SJX Ex. 75, at 1 "Approved By: Cashiering Control Director"; *see also* SJX 107, 2015 Servicing Org Char at -628 (showing Leon Kerr, the "Director, Investor Services Operational Control" at the OFC parent level); RSF Ex. 7, LaForest Hearing Tr. 203:17-20 (describing Leon Kerr as Cashiering Control Director).

291. Similarly, OFC's 2015 Customer Complaint Policy (SJX 66) states the policy was set by Mark Ehrenreich, an OFC employee, at the corporate level. SJX 66, at 2; SJX 106, 2014 Servicing Org Chart at -617; SJX 107, 2015 Servicing Org Char at -630.

292. Ocwen's testimony regarding the loan verification explained:

> Loan verification process is a control that was put in place to ensure that the data is loaded into [Ocwen's] REALServicing system by the loan boarding team in [Servicing Transaction Management] is accurate. There's a three tier process. One is -- by group is data extraction, which is manual extraction of data from the underlying documents. They are basically looking for a number of fields from those documents as directed by the business units that are dependent on those fields. Once the data extracted, it goes to a tier II process, where the tier II process would do a deeper look at that data and determine if there's any corrections that are needed; that data would then -- any loans that were still had issues in terms of data inconsistencies would then move into a tier III process for correction.

SJX 33, Haas 30(b)(6) Dep. at 14:5-20.

293. The purpose of the loan verification process was simply to determine whether when Ocwen onboarded loans for which it had acquired the MSR, the prior servicer had provided inaccurate servicing data in certain fields. *See* RSF 117; SJX 147, Defs.' Responses to Pls.' Third Set of Interrogatories, Rog. No. 19 at 11.

294. If Ocwen identified an error in the prior servicer's data fields, it would update REALServicing to reflect the loan file information. *See* SJX 33, Haas 30(b)(6) Dep. at 14:5-20, 25:13-26:4; RSF 117.

295. Many of the loans were referenced in the Loan Verification Reports as having a correction made to a borrower's zip code. *See* SJX 122, 2016 Loan Verification Report, Loan Level REALServicing Update Tab; SJX 132, 2017 Loan Verification Report, Loan Level REALServicing Update Tab; RSF Ex. 13, Sebastian Decl. ¶¶ 74-75.

296. The loan verification process is just one of the processes by which Ocwen could identify and resolve potential errors. *See* CSF 297-307; RSF Ex. 6, Kennedy Dep. at 167:11-169:1 (the loan verification process is just one of the processes to identify errors; there are multiple controls within other business units).

297. Ocwen had a risk management process with three lines of defense. SJX 36, Abate 30(b)(6) Dep. at 7:4-25.

298. Ocwen's first line of defense was its business units that, with their own controls, policies and procedures, including quality assurance and an operational controls testing ream, reviewed transactions at the first line level. SJX 36, Abate 30(b)(6) Dep. at 7:4-25.

299. Ocwen's second line of defense was its risk and compliance group. Risk Management had oversight of risks to the entity and business units; compliance focused on consumer rules and regulations. SJX 36, Abate 30(b)(6) Dep. at 7:4-25.

300. Ocwen's third line of defense was its internal audit department, which had oversight of the entire organization. SJX 36, Abate 30(b)(6) Dep. at 7:4-25.

301. Ocwen's business units also had policies, procedures, work aids, and job aids to support this process and to ensure that if an error was found, Ocwen fixed the error and addressed the impacted borrowers. SJX 36, Abate 30(b)(6) Dep. at 25:6-20.

302. Ocwen could also identify potential errors or issues by receiving information from consumers or third parties, like GSE audits. SJX 36, Abate 30(b)(6) Dep. at 21:23-22:7, 63:22-64:3.

303. If an event or exception took place that possibly impacted a borrower, Ocwen performed "look backs" to identify the impacted population of borrowers and what, if anything, was necessary to correct that situation. SJX 36, Abate 30(b)(6) Dep. at 8:15-25.

304. Ocwen also voluntarily conducted look backs to remedy any potential harm to borrowers, including harm that may have resulted through no fault of its own or that specific borrowers might not even have suffered, by making operational fixes and providing borrower credits, fee waivers, and/or loan modifications. *See, e.g.,* RSF ¶ 117, 122-27; CSF ¶¶ 313, 316-17, 319-20, 322, 324-28, 331; SJX 36, Abate 30(b)(6) Dep. at 9:1-13; SJX 41 at 77:3-78:11 (discussing how Ocwen waived full shortages plus deficiencies that accrued even where they did not have to ); SJX 48 at 131:4–132:4 (explaining how customer service could refund money and remediate borrowers without escalating or researching whether customer complaints were valid); *see also* RSF Ex. 29, Deposition of Frederick Benjamin Purser at 225:2-25 (Apr. 3, 2019) ("Purser Dep.") (testifying did not he did not recall Ocwen considering whether a legal violation or harm occurred prior to providing voluntary remediation).

305. Ocwen's witnesses described the processes and "multiple layers" of quality control that Ocwen used to populate borrowers' periodic statements during different time periods. SJX 34, Kennedy 30(b)(6) Dep. at 113:24-115:16.

306. When Ocwen acquires mortgage servicing rights from another servicer, shortly before it boards the loans onto its system, Ocwen runs a quality check on a dataset from the prior servicer to check different criteria, ensure data is within certain parameters, and ensure

information is not missing. RSF Ex. 6, Kennedy Dep. at 29:16-30:10, 204:4-205:5. For example, if an interest rate is greater than 15 percent, or the original principal balance amount is missing, an error will result. *Id.* at 204:4-205:5. Ocwen runs this process once or sometimes twice prior to the service transfer. *Id.* at 29:16-30:10. On the day before the effective date of the loan transfer, Ocwen also performs QC checks on a final data set and then boards the loans onto its system. *Id.*

307. From approximately 2014 forward, Ocwen's quality assurance ("QA") team performed quality control and compared periodic statements to the data within the REALServicing system to ensure that it matched. SJX 34, Kennedy 30(b)(6) Dep. at 114:11-115:16.

308. Ocwen's damages expert determined that in many instances where the CFPB claims that Ocwen failed to conduct escrow account analyses at the completion of the relevant computation year, the escrow payment for the loan ***actually changed*** during the reported delay period, which indicates that an escrow analysis was in fact conducted. Ocwen SMF Ex. 90, Hamm Report ¶ 190.

309. The transaction history indicates that many loans that the CFPB claims had accrued shortages and allegedly untimely escrow analyses were delinquent when the escrow analysis was allegedly due, and many of those loans were either modified or never became current, thus the borrowers never paid the alleged shortage amount. *See* RSF Ex. 13, Sebastian Decl. ¶¶ 36-48.

310. The transaction history indicates that many loans that the CFPB claims had accrued surpluses and allegedly delayed escrow analyses were delinquent when the escrow analysis was due and were either modified or never became current, thus the borrowers never paid all or much of the alleged surplus amount. RSF Ex. 13, Sebastian Decl. ¶¶ 36-48.

311. The transaction history shows that in at least some instances where borrowers may not have received an annual escrow analysis statement within 30 days of the completion of the applicable escrow account computation year, the escrow analysis was still performed and the borrower still received accurate information about their escrow account through periodic statements from Ocwen. RSF Ex. 13, Sebastian Decl. ¶¶ 58-60 (describing loan [redacted]8186). *See also* SJX 38, Combs 30(b)(6) Dep. at 162:24-163:9.

312. Many of the borrowers identified in SOF 225 were never current during the relevant period. *See* RSF Ex. 13, Sebastian Decl. ¶¶ 61-66.

313. To the extent that borrowers identified in the Florida Escrow Lookback Analysis may have been impacted by the timing of insurance disbursements, Ocwen remediated those borrowers. *See* SJX 180.

314. The majority of accounts listed for SJX 140, in which Ocwen attempted to model the escrow shortage or escrow surplus that accrued only during the time period where Ocwen did not complete an escrow account analysis within 30 days of the completion of the applicable escrow account computation year, would have had less than a $250 accrued shortage or surplus. SJX 138, Defs.' Responses to Pl.'s First Set of Interrogatories, Rog. No. 2, at 11-12; SJX 140, Ex. C to Defs.' Resp. to Pl.'s First Set of Interrogatories. Moreover, approximately a third of the accounts listed in SJX 140 had no accrued shortage or surplus, or an accrued shortage or surplus of less than $50. SJX 138, Rog. No. 2, at 12; SJX 140.

315. Ocwen's damages expert opined that the CFPB's damages expert's reliance on SJX 140 "yield[ed] clearly erroneous estimates of damages" when contrasted with the transaction history produced in this litigation. For example as to loan number [redacted]2909, SJX 140 reported that the borrower accrued a surplus of $279.09, but the transaction history data show that "the escrow account was being underfunded by around $10 per month . . . thereby creating a shortage." Ocwen SMF Ex. 90, Hamm Report ¶¶ 188, 192-194, 204.

316. Throughout the relevant time period, where Ocwen determined that it may not have conducted an escrow analysis within 30 days of the completion of the applicable Escrow Account Computation Year and the borrower was not in bankruptcy, Ocwen remediated this issue, including by conducting the required escrow analysis, and by either (A) extending the amount of time allotted to the borrower to repay the shortage beyond 12 months (typically to 24 or 60 months), or (B) refunding any surplus paid by current borrowers. SJX 138, Defs.' Responses to Pls.' First Set of Interrogatories, Rog. No. 4, at 14-15.

317. Where Ocwen determined that it may not have conducted an escrow analysis within 30 days of the completion of the applicable Escrow Account Computation Year and the borrower was in bankruptcy at the time the analysis would have been conducted, Ocwen's policy at the start of the relevant time period through March 2016 was to waive all shortages accrued and to credit all surpluses paid by current borrowers when Ocwen conducted an escrow analysis

upon the borrower's discharge from bankruptcy. Ocwen SMF Ex. 99, Rog. No. 4, at 8. Additionally, in March 2016, Ocwen did a lookback analysis to reset borrowers that were still in bankruptcy to the appropriate escrow payment amounts so that their escrow analyses would be timely conducted going forward, and waived any shortages accrued during prior years where the annual analysis was not done. *Id.*

318. To the extent the CFPB's damages expert (McFadden) opined that certain loans suffered opportunity cost damages due to escrow analysis delays because the borrowers would have otherwise paid down high interest credit card debt (ranging from 13-20% interest), he estimated that the average amount of damages was less than $15. Ocwen SMF Ex. 90, Hamm Report at ¶ 249; Ocwen SMF Ex. 60, McFadden Report at ¶¶ 39-44, and p. 30 (Figure 8)).

319. For the vast majority of borrowers who received a potentially inaccurate reinstatement quote, the escrow amount had no impact because, for example, Ocwen provided the borrower a loan modification after providing the reinstatement quote, the borrower was "underquoted" and was nonetheless able to reinstate, the borrower was able to become current after receiving the quote, or the borrower ultimately paid the pay-off amount, which does not rely on the reinstatement amount. SJX 138, Defs.' Responses to Pl.'s First Set of Interrogatories, Rog. No. 5, at 18-19.

320. If Ocwen's late processing of a shortage ever contributed to Ocwen over-collecting some money from a borrower, the shortage would have been automatically remedied when the next escrow analysis was conducted and/or through a lookback analysis. SJX 38, Combs 30(b)(6) Dep. at 184:13-185:8, 187:17-189:6.

321. For at least 55,144 escrow payments that Ocwen received during the relevant time period, the borrower failed to mark their payments as an escrow shortage payment, or failed to send their payments to the proper address for payment of escrow shortages. SJX 138, Defs.' Responses to Pl.'s First Set of Interrogatories, Rog. No. 12, at 26 n.7.

322. Ocwen determined that the insurance cancellation referenced in SJX 141 Exhibit G resulted in increased premiums or other monetary harm for only 352 borrowers, and each of those borrowers were remediated with a credit equivalent to at least three years of the increase in the premium. SJX 138, Defs.' Responses to Pl.'s First Set of Interrogatories, Rog. No. 11, at 24-25; SJX 81 at -119.

323. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

324. Where Ocwen determined that, for certain loans, "flood insurance was placed above the required amount of insurance, Ocwen credited or refunded those borrowers. SJX 38 Combs 30(b)(6) Dep. at 256:-257:20; SJX 43, Jefferies Dep. at 169:19-170:4.

325. Ocwen "self-identified" the property inspection fee charges referenced in SOF 274, "and the result was a refund to the affected customers of $6.2MM, with 30% being paid by Ocwen and 70% paid by the vendor." SJX 157, MMC Exam Report, at -751; SJX 177, -373, at Row 4. Ocwen "enhanced the controls surrounding fee payments." *Id.*

326. Ocwen issued "refunds and waivers" for "all duplicate fees identified" in connection with the lookback referenced in SOF 276. SJX 184, at -132.

327. The audit referenced in SOF 277 stated that "in some cases, the activities result[ed] in a duplicative assessment to borrowers and/or investors, and "accounts will be refunded/credited as applicable." SJX 167, at -735.

328. Likewise, the MAF referenced in SOF 276 stated that in situations where the borrower was charged, the borrower has had "the same [charge] refunded." SJX 173, at -823.

329. [INTENTIONALLY OMITTED PURSUANT TO DE 713].

330. The servicing files in SJX 123 indicate that many loans for which the CFPB claims Ocwen failed to timely terminate PMI on the "termination date" were delinquent on that date. RSF Ex. 13, Sebastian Decl. ¶¶ 67-73.

331. Ocwen provided credits to virtually all of the borrowers identified in SJX 123. *See* SJX 123, at -240.

332. Ocwen's expert opined that "[i]t is impossible for servicers to avoid all inaccuracies or errors because they represent an inherent risk of mortgage servicing" due to its complexity and challenges posed by the volume and pace of regulatory and program changes, and further stated that Ocwen operates "in a manner consistent with mortgage servicing standards [and], in many instances, … at a level that should serve as an example to other servicers." Ocwen SMF Ex. 21, Bryar Report ¶¶ 21, 113, 133.

Dated: December 10, 2020

Respectfully submitted,

*/s/ Catalina E. Azuero*

Bridget Ann Berry (Fla. Bar No. 515639)
Andrew Stuart Wein (Fla. Bar No. 1005238)
**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, FL 33401
Tel.: 561.650.7900
berryb@gtlaw.com
weina@gtlaw.com

Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: 202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com

Laura A. Stoll (*pro hac vice*)
**GOODWIN PROCTER LLP**
601 S. Figueroa Street
Los Angeles, CA 90017
Tel.: 213.426.2500
lstoll@goodwinlaw.com

Catalina E. Azuero (Florida Bar No. 821411)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
cazuero@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on December 10, 2020 via ECF on all counsel or parties of record listed below:

Jean Healey
Email: jean.healey@cfpb.gov

Atur Desai
E-mail: atur.desai@cfpb.gov

Tianna Baez
E-mail: tianna.baez@cfpb.gov

Amanda Roberson
E-mail: amanda.roberson@cfpb.gov

Stephanie Brenowitz
E-mail: stephanie.brenowitz@cfpb.gov

Erin Mary Kelly
E-mail: erin.kelly@cfpb.gov

James Savage
E-mail: james.savage@cfpb.gov

Greg Nodler
E-mail: greg.nodler@cfpb.gov

Michael Posner
E-mail: michael.posner@cfpb.gov

Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov

Shirley T. Chiu
E-mail: shirley.chiu@cfpb.gov

/s/ Catalina E. Azuero
Catalina E. Azuero