**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,
Plaintiff,

v.

OCWEN FINANCIAL CORPORATION; OCWEN MORTGAGE SERVICING, INC.; OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,
Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND ADDITIONAL FACTS IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## NOTE ON CITATIONS

In this response to Defendants' statement of material facts and in support of Plaintiff's opposition to Defendants' motion for summary judgment, each responsive and additional fact below is abbreviated as Pl.'s Opp. SMF and each exhibit attached to this response is abbreviated as Pl.'s Opp. Ex. This response also contains the following shortened citations to previously filed documents and exhibits:

- Plaintiff's Motion for Partial Summary Judgment (ECF No. 728) ("Pl.'s MSJ") and accompanying exhibits ("Pl.'s SJX");
- Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment (ECF No. 729) ("Pl.'s SOF");
- Defendants' Statement of Material Facts (ECF No. 731) ("Defs.' SMF") and accompanying exhibits ("Defs.' SMF Ex.") in support of Their Motion for Summary Judgment;
- Plaintiff's Opposition to Defendants' Motion to Exclude Testimony of John Searson (ECF No. 734) ("Pl.'s Opp. Searson") and accompanying exhibits ("Pl.'s Opp. Searson Ex.");
- Plaintiff's Motion to Strike the Declaration of Benjamin Verdooren (ECF No. 735) (Pl.'s Mot. to Strike Decl. of Benjamin Verdooren); and
- Plaintiff's Opposition to Defendants' Motion to Exclude Testimony of Daniel McFadden (ECF No. 736) ("Pl.'s Opp. McFadden") and accompanying exhibits ("Pl.'s Opp. McFadden Ex.").

In addition, Plaintiff's exhibits attached to this response are set forth in the chart below.

| Pl.'s Opp. Ex. No. | Description of Exhibit |
|---|---|
| 1 | Excerpt of Bureau's Response to Defendants' 4th Set of Requests for Production at Response No. 15 |
| 2 | Excerpt of Bureau's Second Set of Requests for Production to Ocwen at Request Nos. 11 and 12 |
| 3 | Letter from C. Azuero to J. Healey dated July 9, 2018 |
| 4 | Letter from CFPB to S. Rose-Smith re: Bureau's Fourth Supplemental Answer to Defendants' Interrogatory No. 1 dated August 16, 2019 |
| 5 | Navigant Customer Complaint Assessment (Goodman Dep. Ex. 175) |
| 6 | Investigational Hearing Transcript of Mark Ehrenreich, June 8, 2016 |

| | |
|---|---|
| 7 | Ocwen Servicing Transaction Management – CFPB Compliance Oversight and Loan Transfer Review, OCW024-0060855 (Kennedy Dep. Ex. 218) |
| 8 | Deposition Transcript of Frederick B. Purser, April 3, 2019 |
| 9 | Investigational Hearing Transcript of Patrick Cox, May 4, 2016 |
| 10 | Deposition of Ocwen 30(b)(6) Corporate Representative Stephanie Ruiz, August 22, 2019 |
| 11 | E-mail and attachment from P. Nair to A. Tarvadi, P. Gireesh, V. Nagpal re: Event Rescission Request (Ruiz Dep. Ex. 228) |
| 12 | Deposition Transcript of Marcel Bryar, Dec. 19, 2019 |
| 13 | (Intentionally Omitted) |
| 14 | CFPB Frequently Asked Questions about the Ocwen Settlement at https://files.consumerfinance.gov/f/201312_cfpb_common-questions_ocwen.pdf |
| 15 | CFPB Press Release on Ocwen Settlement, https://www.consumerfinance.gov/about-us/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/ |
| 16 | Wells Fargo National Mortgage Settlement Consent Order, *U.S., et al. v. Bank of America Corp.*, et al., 12-cv-00361 at 8-10 (D.D.C. Apr. 4, 2012) |
| 17 | JPMorgan Chase National Mortgage Settlement Consent Order, *U.S., et al. v. Bank of America Corp.*, et al., 12-cv-00361 at 8-10 (D.D.C. Apr. 4, 2012) |
| 18 | CitiMortgage National Mortgage Settlement Consent Order, *U.S., et al. v. Bank of America Corp.*, et al., 12-cv-00361 at 8-10 (D.D.C. Apr. 4, 2012) |
| 19 | Consent Order between CFPB and CitiMortgage, *In the Matter of: CitiMortgage Inc.*, Administrative Proceeding, File No. 2017-CFPB-0005 (CFPB Jan. 23, 2017) |
| 20 | Order Approving Settlement Between the United States Trustee Program and Wells Fargo Bank, N.A., *In re: Ernestine C.J. Green*, Case No. 11-33377-TJC, ECF No. 54 (Bankr. Md. Nov. 19, 2015) |
| 21 | Order Approving Settlement Between the United States Trustee Program and JPMorgan Chase Bank, N.A., *In re: David S. Belzack, Lynda J. Belzak*, 10-23963-dob (Bankr. E.D. Mich. March 9, 2015) |
| 22 | Memory Aid re: inaccurate and incomplete loss mitigation and foreclosure information (CFPB 30(b)(6) Dep. Ex. 50) |
| 23 | Memory Aid re: inaccurate information relating to amounts owed by and received from borrowers (CFPB 30(b)(6) Dep. Ex. 63) |
| 24 | Memory Aid re: loan verification (CFPB 30(b)(6) Dep. Ex. 64) |
| 25 | Memory Aid re: inaccurate information relating to adjustable rate mortgages (CFPB 30(b)(6) Dep. Ex. 66) |
| 26 | Memory Aid re: deceptive foreclosure-related letters (CFPB 30(b)(6) Dep. Ex. 51) |
| 27 | Memory Aid re: policies and procedures relating to foreclosure counsel (CFPB 30(b)(6) Dep. Ex. 52) |
| 28 | Memory Aid re: policies and procedures relating to handling consumer complaints (CFPB 30(b)(6) Dep. Ex. 53) |

| | |
|---|---|
| 29 | Memory Aid re: policies and procedures relating to outbound mortgage servicing transfers (CFPB 30(b)(6) Dep. Ex. 62) |
| 30 | Memory Aid re: common enterprise (CFPB 30(b)(6) Dep. Ex. 57) |
| 31 | Memory Aid re: escrow- and insurance (CFPB 30(b)(6) Dep. Ex. 60) |
| 32 | Memory Aid re: system problems (CFPB 30(b)(6) Dep. Ex. 65) |

## I. PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1. Undisputed, except for the time period for the allegations. Disputed to the extent Defendants (collectively "Defendants" or "Ocwen") imply that the allegations in the complaint related to conduct that occurred after December 18, 2013.

2. Undisputed, except for the time period for the allegations. Disputed to the extent Ocwen implies that the allegations in the complaint related to conduct that occurred after December 18, 2013.

3. Undisputed.

4. Undisputed as to the substance of the fact, but disputed based on Ocwen's reliance only on Defs.' SMF Ex. 2, which is not the full December 2013 consent judgment ("Consent Judgment"). The full Consent Judgment is Defs.' SMF Exs. 2–8, ECF No. 731.

5. Undisputed.

6. INTENTIONALLY OMITTED/WITHDRAWN.

7. INTENTIONALLY OMITTED/WITHDRAWN.

8. Disputed. The Consent Judgment did not resolve any future claims or excuse Ocwen from complying with state or federal laws. It explicitly reserved the authority of the Plaintiff ("Bureau" or "CFPB") to bring future actions for violations of state and federal law, such as these. Specifically, the Bureau's Release described below in (a) through (b) expressly reserved the Bureau's authorities and claims for conduct that occurred on or after December 18, 2013:

a. The Consent Judgment says: "[n]othing in this Consent Judgment shall relieve the Defendant of its obligation to comply with applicable state and federal law."[1]

b. The Bureau's Release in the Consent Judgment states: (1) Section B: "the CFPB fully and finally releases the Released Parties from all potential liability that has been or might have been asserted by the CFPB relating to the mortgage servicing practices described in the complaint (the "Mortgage Servicing Practices") that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013"; (2) Section C: "Notwithstanding any other term of this Release, the CFPB specifically reserves and does not release any liability for conduct other than conduct related to the Mortgage Servicing Practices asserted or that might have been asserted in the complaint"; and (3) Section E: "Nothing in this Release shall limit the CFPB's authority with

---

[1] Defs.' SMF Ex. 2, ¶ 17.

respect to Released Parties, except to the extent the CFPB has herein expressly released claims."[2]

9. Disputed that the Bureau agreed that "the government would broadly release all claims for Ocwen's past conduct" or that "Ocwen would not be subject to future enforcement concerning the subject matter of the Servicing Standards and Metrics unless its non-compliance exceeded certain agreed-upon 'Threshold Error Rates.'" The express terms of the Consent Judgment did not release all claims for past conduct and did not release any claims for future conduct. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

14. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

15. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen would not be subject to enforcement *for non-compliance with the Consent Judgment* if Ocwen's error rate remained below a defined level, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

16. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

17. Undisputed.

18. Undisputed.

[2] Defs.' SMF Ex. 7, ¶¶ B, C, and E.

19. Disputed. Declaration in support does not cite to any record evidence, and thus should not be relied on. L.R. 56.1(c). Further, the declarant–counsel for Ocwen Financial Corporation–was not previously disclosed to the Bureau.

20. Undisputed.

21. Undisputed.

22. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

23. Undisputed.

24. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates. *See* Pl.'s Opp. SMF ¶ 8, *supra*. The Bureau further disputes Ocwen's implication that this instant action is to enforce the Consent Judgment. *See* Bureau's Am. Complaint (ECF No. 481).

25. Undisputed.

26. Undisputed.

27. Undisputed.

28. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process, including the right to cure provision, defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates, such as this instant action. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

29. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process, including the corrective action plan provision, defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates, such as this instant action. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

30. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process, including the right to cure provision, defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for

conduct that occurred after specified dates, such as this instant action. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

31. Disputed. In the Consent Judgment, the Bureau agreed that Ocwen's compliance with the Consent Judgment would be tested through the process, including the metric fail provision, defined in the Judgment, but the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates, such as this instant action. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

32. Disputed. The Bureau disputes that the "sole relief" available to the Bureau was through the Consent Judgment enforcement procedures and remedies. The Judgment does not state this, and the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates, such as this instant action. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

33. Disputed. The Bureau disputes that the "relief available" to the Bureau was only through the Consent Judgment enforcement procedures and remedies. The Judgment does not state this, and the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates, such as this instant action. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

34. Undisputed as to the quote in Defs.' SMF ¶ 34, but disputed as to the implication that the Bureau could only bring an "enforcement action" through the Consent Judgment. The Judgment does not state this, and the Bureau expressly reserved its right to bring any new claim for conduct that occurred after specified dates, such as this instant action. *See* Pl.'s Opp. SMF ¶ 8, *supra*.

35. Undisputed.

36. Disputed. The Bureau's Counts I–IX are not the same as the Servicing Standards and metrics, or otherwise governed by the Consent Judgment, as is clear from the Bureau's Amended Complaint (ECF No. 481), the Bureau's Release, *see* Pl.'s Opp. SMF ¶ 8 *supra*, and, as set forth below in Pl.'s Opp. SMF ¶¶ 37–44, *infra*.

37. Disputed. The Bureau disputes that Section I.B. and Metrics 33 and 4.B of the Consent Judgment "governed," or otherwise barred the Bureau's Counts I and V, S*ee* Pl.'s Opp. SMF ¶ 8, *supra*. Metrics 33 and 4.B tested only whether the information in the system was matching the information in borrower communications such as billing statements and whether Ocwen applied payments correctly. As the Monitor stated, the Bureau's allegations about the underlying inaccurate and incomplete information in Ocwen's system of record ("SOR") went beyond the

scope of the Monitor's duties and he did not test the underlying accuracy of the information in Ocwen's SOR. *See* Pl.'s Opp. SMF ¶¶ 268–269, *infra*.

38. Disputed. The Bureau disputes that Section I.B. and Metrics 33 and 4.B of the Consent Judgment "governed" or otherwise barred the Bureau's Count II and VI. *See* Pl.'s Opp. SMF ¶ 8, *supra*. Metrics 33 and 4.B only tested whether the information in the system was matching the information in borrower communications such as billing statements and whether Ocwen applied payments correctly. As the Monitor stated, the Bureau's allegations about the underlying inaccurate and incomplete information in Ocwen's system of record ("SOR") went beyond the scope of the Monitor's duties and he did not test the underlying accuracy of the information in Ocwen's SOR. *See* Pl.'s Opp. SMF ¶¶ 268–269, *infra*.

39. Disputed. The Bureau disputes that Sections IV.B.1–2, IV.B.11, and IV.D.2 of the NMS and Metrics 6 and 30 of the Consent Judgment "governed" or otherwise barred the Bureau's Count III. *See* Pl.'s Opp. SMF ¶ 8, *supra*. The Monitor did not perform any testing to determine if Ocwen was sending letters to borrowers requesting that they send in additional information to complete their loss mitigation applications by a certain deadline, and before the expiration of the deadline to submit these additional documents, foreclosing upon these borrowers. *See* Sections IV.B.1-2, IV.B.11, and IV.D.2 of the NMS and Metrics 6 and 30.

40. Disputed. The Bureau disputes that Sections I.B.1, I.B.3, I.B.3.b and I.B.5, as measured by Metrics 4.B and 33 of the Consent Judgment "governed" or otherwise barred the Bureau's Count IV. *See* Pl.'s Opp. SMF ¶ 8, *supra*. Metrics 33 and 4.B only tested whether the information in the system was matching the information in borrower communications such as billing statements and whether Ocwen applied payments correctly. As the Monitor stated, the Bureau's allegations about the underlying inaccurate and incomplete information in Ocwen's system of record ("SOR") went beyond the scope of the Monitor's duties and he did not test the underlying accuracy of the information in Ocwen's SOR. *See* Pl.'s Opp. SMF ¶¶ 268–269, *infra*.

41. Disputed. The Bureau disputes that Section VII.A.1 of the Consent Judgment "governed" or otherwise barred the Bureau's Count VII. *See* Pl.'s Opp. SMF ¶ 8, *supra*. Section VII.A.1 did not concern Ocwen's making of timely disbursements (*i.e.*, payments) from borrowers' escrow accounts (including payment of hazard insurance), and instead related to when Ocwen could impose force-placed insurance charges on borrowers' accounts.

42. Disputed. The Bureau disputes that Section I.B.5 of the Consent Judgment, as measured by Metrics 4.B and 33, "governed" or otherwise barred the Bureau's Count VII. *See* Pl.'s Opp. SMF ¶ 8, *supra,* and the reasons stated in Pl.'s Opp. SMF ¶ 37, *supra*. Further, Section I.B.5 and Metrics 4.B and 33 do not concern Ocwen's performance of timely analyzing escrow analyses, Ocwen's sending of accurate escrow statements (in that the information contained within accurately reflects what the borrower should owe in escrow amounts, not that it reflects the information in the system of record which could be inaccurate if a timely escrow analysis was not performed), or Ocwen's collection of escrow shortages that do not, in fact, exist.

a. Ocwen's expert, Mr. Marcel Bryar, Esq., testified that he did not believe any Consent Judgment Metric related to escrow: "I don't believe -- I can't recall whether the servicing standards in the NMS cover escrow. I don't think there's a metric related to escrow in the NMS."[3]

b. Mr. Bryar, in his expert report, does not identify or opine on a single applicable Consent Judgment Standard or Metric relating to Ocwen's escrow practices including: (1) Ocwen's timely performance of escrow analyses; (2) Ocwen's collection of escrow shortages; and (3) Ocwen's provision of escrow statements.[4]

43. Disputed. The Bureau disputes that Section II.A.1-9 of the Consent Judgment "governed" or otherwise barred the Bureau's Count VIII. *See* Pl.'s Opp. SMF ¶ 8, *supra*. Further, Section II.A.1-9 do not concern whether Ocwen has reasonably-designed policies and procedures relating to handling consumer complaints, the sale of mortgage servicing rights, or access to accurate and current documents and information reflecting the actions of its foreclosure attorneys.

44. Disputed. The Bureau disputes that Section IV.B and Metrics 1, 3, 6, and 30 of the Consent Judgment "governed" or otherwise barred the Bureau's Count IX. *See* Pl.'s Opp. SMF ¶ 8, *supra*. Further, Section IV.B and Metrics 1, 3, 6, and 30 do not fully overlap with the elements of the foreclosure initiation prohibition under 12 C.F.R. § 1024.41, as set forth in the Bureau's Amended Complaint, ECF No. 481, ¶¶ 269–276.

45. INTENTIONALLY OMITTED/WITHDRAWN.

---

[3] Pl.'s Opp. Ex.12, Deposition of Marcel Bryar Tr. at 189:16–22, 210:7–210:10.

[4] Defs.' SMF Ex. 21, Bryar Report, ¶¶ 153–156, Ex. 4 (table summarizing Ocwen NMS Metric Compliance).

46. INTENTIONALLY OMITTED/WITHDRAWN.

47. INTENTIONALLY OMITTED/WITHDRAWN.

48. INTENTIONALLY OMITTED/WITHDRAWN.

49. INTENTIONALLY OMITTED/WITHDRAWN.

50. INTENTIONALLY OMITTED/WITHDRAWN.

51. INTENTIONALLY OMITTED/WITHDRAWN.

52. INTENTIONALLY OMITTED/WITHDRAWN.

53. Undisputed.

54. Undisputed.

55. Disputed. Declaration in support does not cite to any record evidence, and thus should not be relied on. L.R. 56.1(c). Further, the declarant–counsel for Ocwen Financial Corporation–was not previously disclosed to the Bureau.

56. Undisputed.

57. Undisputed as to the fact that the Bureau received the quarterly reports Ocwen attached as Defs.' SMF Exs. 22–26, disputed as to any implication that the Bureau received information relating to the claims in this instant action through those quarterly reports. *See* Defs.' SMF Exs. 22–26.

58. INTENTIONALLY OMITTED/WITHDRAWN.

59. Undisputed.

60. Disputed. Lacks specific information based on record evidence, including as to the number, date, content, and participants in the meetings and communications referenced in this fact. Undisputed that the Bureau served on the Monitoring Committee and received the information to which it was entitled under the Consent Judgment, such as reports from the Monitor, *see* Defs.' SMF ¶ 59, and invitations to meetings as listed in Defs.' SMF Exs. 16–20. Further, disputed as to Ocwen's implication that any of the information in Defs.' SMF Exs. 14–20 relate to the claims in this instant action.

61. Undisputed that Defs.' SMF Ex. 19 contains a single meeting invitation sent by Ocwen to the Bureau relating to the failure of Consent Judgment Metric 19. Disputed as to the remainder. Ocwen provides no record evidence that, each time it became aware of a potential violation, it presented the issue to the Monitoring Committee, and disclosed the root cause and CAP for addressing the issue. The Declaration (Defs.' SMF Ex. 13) in support does not cite to any record

evidence, and thus should not be relied on. L.R. 56.1(c). Further, the declarant–counsel for Ocwen Financial Corporation–was not previously disclosed to the Bureau. Further, disputed as to Ocwen's implication that any of the information in Defs.' SMF Exs. 13 and 19 relate to the claims in this instant action.

62. Undisputed that Defs.' SMF Ex. 19 contains a single instance of meeting invitation sent by Ocwen to the Bureau relating to failure for Metric 19. Disputed as to the remainder as Ocwen provides no record evidence that, for each time it became aware of a potential violation through IRG testing, it met with the Monitoring Committee "to disclose those issues and set forth its CAP to address the issue." Further, the Declaration in support (Defs.' SMF Ex. 13) does not cite to any record evidence, and thus should not be relied on. L.R. 56.1(c). Further, the declarant–counsel for Ocwen Financial Corporation–was not previously disclosed to the Bureau. Further, disputed as to Ocwen's implication that any of the information in Defs.' SMF Exs. 13 and 19 relate to the claims in this instant action.

63. Disputed to the extent that Ocwen is implying its compliance or lack thereof with a "Threshold Error Rate" under the Consent Judgment excused Ocwen's obligations under state or federal law or barred the Bureau's ability to enforce such laws. *See* Pl.'s Opp. SMF ¶ 8, *supra.*

64. Disputed to the extent that Ocwen is implying its compliance or lack thereof with a "Threshold Error Rate," Metrics, or Servicing Standards, under the Consent Judgment excused Ocwen's obligations under state or federal law or barred the Bureau's ability to enforce such laws. *See* Pl.'s Opp. SMF ¶ 8, *supra.* Further, disputed as to Ocwen's implication that the Bureau received information through the Monitors' reports relates to the claims in this instant action: none of the information in Defs.' SMF Exs. 22–27 relate to the claims in this instant action. Further, as the Monitor stated, the Bureau's allegations about the underlying inaccurate and incomplete information in Ocwen's system of record ("SOR") went beyond the scope of the Monitor's duties and he did not test the underlying accuracy of the information in Ocwen's SOR. *See also* Pl.'s Opp. SMF ¶¶ 268–269, *infra*.

65. Disputed. Defs.' SMF Exs. 12 and 27 and Defs.' SMF ¶ 66 show that Ocwen failed to cure a potential violation, as Ocwen concedes. Further, disputed to the extent that Ocwen is implying its efforts to cure potential violations under the Consent Judgment excused Ocwen's obligations under state or federal law or barred the Bureau's ability to enforce such laws through these actions. *See* Pl.'s Opp. SMF ¶ 8, *supra.* Further, disputed as to Ocwen's implication that

any of the information in Defs.' SMF Exs. 13, 21, and 25 relate to the claims in this instant action.

66. Undisputed that an unopposed motion was filed, but disputed to the extent that Ocwen is implying that this motion excused Ocwen's obligations under state or federal law or barred the Bureau's ability to enforce such laws through this action. *See* Pl.'s Opp. SMF ¶ 8, *supra.* Further, the Bureau disputes that the referenced motion relates to the claims in this instant action. *See, e.g.*, Defs.' SMF Exs. 12 and 27.

67. Undisputed that the members of the Monitoring Committee did not bring an action under the Consent Judgment but disputed to the extent that Ocwen is implying that the lack of such actions excused or provides a defense to Ocwen's obligations under state or federal law or barred the Bureau's ability to enforce such laws through this action. *See* Pl.'s Opp. SMF ¶ 8, *supra.*

68. Undisputed to all, except that the Bureau's Amended Complaint does not reference over two million loans.

69. INTENTIONALLY OMITTED/WITHDRAWN.

70. Undisputed as to the text of Judge Matthewman's statements but disputed to the extent Ocwen is implying that Judge Matthewman ordered sampling of the loan data or proof of error by loan sample, or suggested sampling for any reason other than Ocwen's complaints of burden.

71. Undisputed as to the text of Magistrate Judge Matthewman's statements but disputed as to Ocwen's characterization that he "warned" the parties or made any findings or orders regarding the Bureau's burden-of-proof or other pre-trial or trial-related issues.

72. Undisputed as to the text of Magistrate Judge Matthewman's statements but disputed as to Ocwen's characterization that he made any findings or orders regarding the Bureau's burden-of-proof or other pre-trial or trial-related issues.

73. Disputed. The Bureau said it seeks civil money penalties in accordance with 12 U.S.C. § 5565(c) and provided illustrative computations, only one of which Ocwen cites demonstrating potential penalty requests depending on Ocwen's level of scienter, the number of days a violation(s) exists, and other factors.[5]

74. Disputed. The Bureau has not limited its damages claim to the borrowers analyzed by Professor McFadden or any specific type of evidence. Further, Professor McFadden quantified

---

[5] Defs.' SMF Ex. 128 at 3.

damages that borrowers incurred as a result of Ocwen's servicing failures, but he also identified other borrower harms that he did not quantify.[6]

75. Undisputed as to the accuracy of the quoted language that was part of oral argument regarding what discovery Ocwen should produce, but disputed to the extent Ocwen implies that the Bureau limited itself, including during the hearing, to relying only on loan-level evidence or proving liability through an expert.

76. Disputed. The quoted text is part of oral argument regarding what information Ocwen was entitled to in discovery and was not part of any finding or order regarding the Bureau's burden-of-proof or other pre-trial or trial-related issues. Magistrate Judge Matthewman, in fact, ordered the Bureau to: (1) identify "approximately how many loans match each of the major allegations in the Bureau's complaints" and "how many loans fall into each bucket, to the extent they are reasonably able to do so" and (2) "fully prepare" their 30(b)(6) representatives for their upcoming depositions to the best of their abilities, even though the Bureau was still receiving discovery from Ocwen.[7] Ocwen moved for sanctions against the Bureau, claiming it failed to comply with the above order, but Judge Matthewman denied Ocwen's motion, holding that "Plaintiffs have substantially complied in good faith with the Court's Orders" requiring them to identify at-issue loans, and that "Defendants have sufficient information and discovery to defend against these two cases."[8]

77. Undisputed.

78. Undisputed.

79. Disputed. Ocwen omits the entirety of the Bureau's response except for the last phrase and the Bureau does not dispute that last phrase. The Bureau, in fact, told Ocwen it already produced all responsive information, except for the information that Ocwen had only recently produced, and directed Ocwen to the Bureau's numerous and specific discovery responses to Ocwen's August 2017 First Set of Requests for Discovery.[9]

80. Undisputed.

[6] Defs.' SMF Ex. 60 at ¶ 27.
[7] June 6, 2019 Omnibus Order, ECF No. 396 ¶¶ 3–4.
[8] Oct. 18, 2019 Omnibus Order, ECF No. 499 ¶ 1.
[9] Pl.'s Opp. Ex. 1, Bureau's Response to No. 15 of Defendants' 4th Set of RPD responses.

81. Undisputed to the extent that the Bureau provided the answers Ocwen requested—loan numbers of "at issue loans"—but disputed to the extent Ocwen is implying that its Interrogatory No. 1., *see* Defs.' SMF ¶ 77, requested anything more than lists of loans.

82. Disputed. The Bureau supplemented its disclosures and answers to Interrogatory No. 1 to identify 14,392 more borrowers "at issue," in addition to the previously-identified borrowers referenced in Defs.' SMF ¶ 82.[10]

83. Disputed. The Bureau supplemented its disclosures and Answers to Interrogatory No. 1 to identify 14,392 more borrowers "at issue," in addition to the previously-identified borrowers referenced in Defs.' SMF ¶ 83.[11]

84. Undisputed.

85. Disputed. The Bureau specifically identified the loans at issue for Count IV by referencing the loans listed for Count I.

86. Undisputed.

87. Undisputed.

88. Disputed. The Bureau supplemented its disclosures and answer to Interrogatory No. 1 to identify 11,056 more borrowers whose escrow shortage payments were not timely processed and 462 more borrowers whose escrow accounts were not timely analyzed, in addition to the previously identified borrowers referenced in Defs.' SMF ¶ 88.[12]

89. Undisputed.

90. Undisputed.

91. Disputed. The Bureau supplemented its disclosures and answer to Interrogatory No. 1 to identify 1,825 additional borrowers "at issue" under Count X, in addition to the previously identified referenced in Defs.' SMF ¶ 91.[13]

92. Undisputed.

93. Undisputed as to the accuracy of Magistrate Judge Matthewman's questions, but disputed to the extent Ocwen is implying that he issued any finding on the Bureau's burden-of-proof or made any trial-related orders.

---

[10] Pl.'s Opp. Ex. 4, August 16, 2019 Letter identifying additional borrowers.
[11] Pl.'s Opp. Ex. 4, August 16, 2019 Letter identifying additional borrowers.
[12] Pl.'s Opp. Ex. 4, August 16, 2019 Letter identifying additional borrowers.
[13] Pl.'s Opp. Ex. 4, August 16, 2019 Letter identifying additional borrowers.

94. Undisputed as to the accuracy of the Bureau's statement but disputed because Ocwen omits the context for the statement: the Bureau explained it requested data to create samples to determine which "characteristics are most relevant to determining damages."[14] Undisputed as to the accuracy of the Bureau's statement but disputed because Ocwen omits the context for the statement. The Bureau explained it requested data to create samples to determine which "characteristics are most relevant to determining damages."[15]

95. Undisputed as to accuracy of Magistrate Judge Matthewman's statement, but disputed that Ocwen timely and completely produced the data as ordered.[16]

96. Undisputed as to types of data Ocwen produced but disputed that Ocwen timely and completely produced the data as ordered.[17]

97. Undisputed that Mr. Searson offered opinions regarding Ocwen's adherence to industry best practices, among other opinions, and that some opinions concerned Ocwen's policies and procedures.[18]

98. Undisputed that Mr. Searson does not opine as to whether Ocwen's servicing practices violated the law and does not offer any opinions regarding a specific loan number. Disputed to the extent that Ocwen implies Mr. Searson did not offer opinions regarding Ocwen's servicing of loans, or review evidence of Ocwen's servicing practices, including loan-level evidence.[19]

99. Undisputed that Professor Daniel McFadden is one of the Bureau's expert witnesses. Disputed that his opinions are "only" regarding "the calculation" of damages. Professor McFadden also offers opinions regarding additional harms and also include, from an economic perspective, the lack of countervailing benefits to Ocwen's servicing failures.[20]

100. Undisputed.

---

[14] Defs.' SMF Ex. 57 at 4 (Bureau explaining that sampling is a "multi-step process," requiring study of "which characteristics are most relevant to determining damages").

[15] Defs.' SMF Ex. 57 at 4 (Bureau explaining that sampling is a "multi-step process," requiring study of "which characteristics are most relevant to determining damages.")

[16] June 6, 2019 Omnibus Order, ECF No. 396 ¶ 1–2 (Ocwen's production of overdue data).

[17] June 6, 2019 Omnibus Order, ECF No. 396 ¶ 1–2 (Ocwen's production of overdue data).

[18] Pl.'s Opp. Searson Exs. 1 and 2 (Mr. Searson's Expert and Surrebuttal Reports containing full set of opinions.)

[19] *See, e.g.*, Pl.'s Opp. Searson Ex. 1 at App. B and Ex. 2 at App. B (listing documents considered, including loan-level admissions contained in Verified Interrogatory Responses.)

[20] Pl.'s Opp. McFadden Ex. 1 at ¶¶ 124–135, 141–143.

101. Disputed. The Bureau did not produce the "Memory Aid" in response to Ocwen's discovery requests but rather created this aid for its 30(b)(6) witness's use. Further, long before Ocwen's 30(b)(6) deposition of the Bureau, the Bureau had already produced or identified documents supporting each of its claims in response to Ocwen's August 2017 First Set of Document requests. *See* Pl.'s Opp. SMF ¶ 79, *supra*. The Bureau did, however, summarize these documents and other admissible evidence in various memory aids for its 30(b)(6) witnesses, all of which were provided to Ocwen. *See* Pl.'s Opp. SMF ¶¶ 279–289.

102. Undisputed.

103. Undisputed that the Memory Aid contains "at issue" loans for Count I. Disputed as to the characterization of the Memory Aid which, in fact, identifies each source used to identify such loans, the reason why the Bureau included the loans identified in that source, and related loan-level evidence. The Bureau further disputes that the Memory Aid is the exclusive source of evidence for Count I or the "at issue" loans because: (1) the Bureau had already produced or identified extensive documents supporting each of its claims in response to Ocwen's August 2017 First Set of Document requests, *see* Pl.'s Opp. SMF ¶ 79, *supra*; (2) the Bureau had prepared 30(b)(6) witnesses and memory aids to summarize key admissible evidence supporting all claims, *see* Pl.'s Opp. SMF ¶¶ 279–289, *infra*; and (3) the Bureau's Motion for Partial Summary Judgment also identifies sufficient undisputed facts, including loan-level facts, for all Counts, except Count VIII for which disputed facts are identified below at Pl.'s Opp. SMF ¶¶ 299–307, *infra*.

104. Undisputed that the Memory Aid contains "at issue" loans for Count I. Disputed as to the characterization of the Memory Aid, which identifies each source used to identify such loans, the reason why the Bureau included the loans identified in that source, and related loan-level evidence. Further disputed that the Bureau identified 2,104,530 loans: the Bureau supplemented its disclosures and Answers to Interrogatory No. 1 to identify 14,392 more loans "at issue." *See* Pl.'s Opp. SMF ¶ 82. Further disputed that the Memory Aid is the exclusive source of evidence for Count I or the "at issue" loans for the same reasons set forth in Pl.'s Opp. SMF ¶ 103, *supra*.

105. Undisputed.

106. Disputed. The Memory Aid identifies the sources of information that identify why Loan Number ending in 0209 was included as an "at issue" loan for Count I. For example, Loan Number ending in 0209 is identified in a loan-verification report that Ocwen produced. This

report and other evidence relating to Ocwen's use of inaccurate and unverified information is listed on a memory aid that was provided to Ocwen at its 30(b)(6) deposition of the Bureau.[21] As explained in the Bureau's Summary Judgment Motion and Statement of Facts, this and other loan-verification reports identify, at the loan level, discrepancies in the loan data Ocwen used to service borrowers' loans, such as Loan Number ending in 0209.[22]

107. Disputed. The Memory Aid contains the sources of information that identify why "at issue" loans are included as "at issue" loans for each Count. For example, the Bureau identified "Rogs 1–4, Exs. A–F" for certain counts because these interrogatory responses identify "[b]orrowers whose escrow accounts were not timely analyzed and had associated inaccurate escrow information."[23] Further disputed that the Memory Aid is the exclusive source of evidence for all counts or the "at issue" loans for the same reasons set forth in Pl.'s Opp. SMF ¶ 103.

108. Undisputed that the Memory Aid identifies OCW-CFPB-001-00585088 and describes it as detailing "[a]ccounts Ocwen identified relating to erroneous flood insurance charges," but disputed insofar as Ocwen implies that it was unaware of what the document meant: Ocwen produced OCW-CFPB-001-00585088 in response to the Bureau's request to produce "[d]ocuments sufficient to identify each Account for which You erroneously charged a Borrower for any type of insurance, such as hazard, flood, or wind insurance, including: (a) the Accounts about which Daniel Reeves, Your corporate witness, testified; (b) the 1,605 loans that "showed required on CoTrak and not on CoreLogic or ServiceLink," the 3,251 loans with "mismatches," and "1,111 loans that "showed required flood zones from CoreLogic and ServiceLink."[24] Further disputed that this document was the only evidence the Bureau disclosed as supporting its flood-insurance-related allegations for the reasons set forth in Pl.'s Opp. SMF ¶ 103. *See also* Pl.'s Opp. Ex. 31 (memory aid received by Ocwen that identified escrow-and-insurance evidence).

109. Disputed as to Ocwen's characterization of OCW-CFPB-001-00585088. Ocwen is aware of the meaning of OCW-CFPB-001-00585088 and the evidence related to it. *See* Pl.'s Opp. SMF ¶ 108, *supra*.

---

[21] Pl.'s Opp. Ex. 24 (loan-verification memory aid).
[22] Pl.'s MSJ at 11–13 (describing Ocwen's loan-verification failures).
[23] Defs.' SMF Ex. 62 at 2, Row 26 (Count I, II loans) and at 16, Row 8 (Count VII, previously Count X, loans).
[24] Pl.'s Opp. Ex. 2, Bureau's Request Nos. 11 and 12; Pl.'s Opp. Ex. 3, Ocwen's July 9, 2018 Letter at 2 (chart identifying OCW-CFPB-001-00585088 as responsive to RFPs 11–12).

110. Disputed. The Bureau supplemented its disclosures to identify more "at issue" Count X loans.[25]

111. Disputed as to Ocwen's implication that OCW-CFPB-001-00585087 is "the only document" in support of Count X. The Bureau supplemented its disclosures to identify more "at issue" loans for Count X based on another report Ocwen produced at OCW-CFPB-001-06730240 ("PMI Report").[26] This PMI Report, which Ocwen testified to, contains loan-level data identifying each borrower, the date Ocwen was supposed to remove a borrower's private mortgage insurance charges, the date it did, the refund owed, and when Ocwen provided the refund.[27] This PMI Report was also described in another memory aid that Ocwen received[28] and in the Bureau's Motion for Partial Summary Judgment.[29]

112. Undisputed that Defs.' SMF Ex. 65 lists 2,124 loans, but disputed that it is the exclusive source or list of the "at issue" loans for Count X. The Bureau supplemented its disclosures to identify more "at issue" Count X loans. *See* Pl.'s Opp. SMF ¶ 111, *supra*.

113. Undisputed that Defs.' SMF Ex. 65 lists "refunds completed" and "no refunds due on this loan," but disputed that Defs.' SMF Ex. 65 is the exclusive source or list of "at issue" loans for Count X. The Bureau supplemented its loan lists and disclosed those sources in another memory aid during its 30(b)(6) deposition. *See* Pl.'s Opp. SMF ¶ 111, *supra*.

114. Undisputed that Defs.' SMF Ex. 65 lists "refunds completed," but disputed that it is the exclusive source or list of "at issue" loans for Count X. The Bureau supplemented its loan lists and sources, and disclosed those sources in another memory aid during its 30(b)(6) deposition. *See* Pl.'s Opp. SMF ¶ 111, *supra*.

115. Undisputed.

116. Disputed. The Bureau does not dispute the accuracy of the quotation, but Ocwen's implication that the Bureau disclosed no other information relating to Count IV is disputed for the reasons set forth in Pl.'s Opp. SMF ¶ 103.[30]

---

[25] Pl.'s Opp. Ex. 4, August 16, 2019 Letter identifying additional borrowers.
[26] Pl.'s Opp. Ex. 4, August 16, 2019 Letter identifying additional borrowers.
[27] Pl.'s SJX 123, Spreadsheet of PMI Terminations, OCW-CFPB-001-06730240.
[28] Pl.'s Opp. Ex. 31, (escrow-and-insurance memory aid) at 12–13.
[29] Pl.'s MSJ at 28–29 (describing Ocwen's Count X violations).
[30] *See also* Pl.'s Opp. SMF ¶¶ 285–287, *infra*; Pl.'s Opp. Ex. 23 at 2, 11 (inaccurate-amounts memory aid listing evidence relating to inaccurate amounts, including in periodic statements);

117. INTENTIONALLY OMITTED/WITHDRAWN.

118. INTENTIONALLY OMITTED/WITHDRAWN.

119. INTENTIONALLY OMITTED/WITHDRAWN.

120. INTENTIONALLY OMITTED/WITHDRAWN.

121. INTENTIONALLY OMITTED/WITHDRAWN.

122. INTENTIONALLY OMITTED/WITHDRAWN.

123. INTENTIONALLY OMITTED/WITHDRAWN.

124. INTENTIONALLY OMITTED/WITHDRAWN.

125. INTENTIONALLY OMITTED/WITHDRAWN.

126. INTENTIONALLY OMITTED/WITHDRAWN.

127. INTENTIONALLY OMITTED/WITHDRAWN.

128. INTENTIONALLY OMITTED/WITHDRAWN.

129. INTENTIONALLY OMITTED/WITHDRAWN.

130. INTENTIONALLY OMITTED/WITHDRAWN.

131. INTENTIONALLY OMITTED/WITHDRAWN.

132. INTENTIONALLY OMITTED/WITHDRAWN.

133. INTENTIONALLY OMITTED/WITHDRAWN.

134. INTENTIONALLY OMITTED/WITHDRAWN.

135. INTENTIONALLY OMITTED/WITHDRAWN.

136. INTENTIONALLY OMITTED/WITHDRAWN.

137. INTENTIONALLY OMITTED/WITHDRAWN.

138. INTENTIONALLY OMITTED/WITHDRAWN.

139. INTENTIONALLY OMITTED/WITHDRAWN.

140. INTENTIONALLY OMITTED/WITHDRAWN.

141. INTENTIONALLY OMITTED/WITHDRAWN.

142. INTENTIONALLY OMITTED/WITHDRAWN.

143. INTENTIONALLY OMITTED/WITHDRAWN.

144. INTENTIONALLY OMITTED/WITHDRAWN.

---

Ex. 24 at 18 (loan-verification memory aid listing evidence of unverified and inaccurate information used in periodic statements); Ex. 25 at 19 (adjustable-rate-mortgage memory aid listing evidence of inaccurate overcharge and undercharge information Ocwen used).

145. INTENTIONALLY OMITTED/WITHDRAWN.

146. INTENTIONALLY OMITTED/WITHDRAWN.

147. INTENTIONALLY OMITTED/WITHDRAWN.

148. INTENTIONALLY OMITTED/WITHDRAWN.

149. INTENTIONALLY OMITTED/WITHDRAWN.

150. INTENTIONALLY OMITTED/WITHDRAWN.

151. INTENTIONALLY OMITTED/WITHDRAWN.

152. INTENTIONALLY OMITTED/WITHDRAWN.

153. INTENTIONALLY OMITTED/WITHDRAWN.

154. INTENTIONALLY OMITTED/WITHDRAWN.

155. INTENTIONALLY OMITTED/WITHDRAWN.

156. INTENTIONALLY OMITTED/WITHDRAWN.

157. INTENTIONALLY OMITTED/WITHDRAWN.

158. INTENTIONALLY OMITTED/WITHDRAWN.

159. INTENTIONALLY OMITTED/WITHDRAWN.

160. INTENTIONALLY OMITTED/WITHDRAWN.

161. INTENTIONALLY OMITTED/WITHDRAWN.

162. INTENTIONALLY OMITTED/WITHDRAWN.

163. INTENTIONALLY OMITTED/WITHDRAWN.

164. INTENTIONALLY OMITTED/WITHDRAWN.

165. INTENTIONALLY OMITTED/WITHDRAWN.

166. INTENTIONALLY OMITTED/WITHDRAWN.

167. INTENTIONALLY OMITTED/WITHDRAWN.

168. INTENTIONALLY OMITTED/WITHDRAWN.

169. INTENTIONALLY OMITTED/WITHDRAWN.

170. INTENTIONALLY OMITTED/WITHDRAWN.

171. INTENTIONALLY OMITTED/WITHDRAWN.

172. INTENTIONALLY OMITTED/WITHDRAWN.

173. INTENTIONALLY OMITTED/WITHDRAWN.

174. INTENTIONALLY OMITTED/WITHDRAWN.

175. INTENTIONALLY OMITTED/WITHDRAWN.

176. INTENTIONALLY OMITTED/WITHDRAWN.

177. INTENTIONALLY OMITTED/WITHDRAWN.

178. INTENTIONALLY OMITTED/WITHDRAWN.

179. Undisputed that Professor Daniel McFadden is one of the Bureau's expert witnesses and included opinions on two types of quantified damages: opportunity-cost damages and foreclosure-initiation damages. Disputed that his opinions are "only" regarding these two types of quantified damages. Professor McFadden offers opinions regarding: (1) harms that he did not quantify, and (2) from an economic perspective, the lack of countervailing benefits to Ocwen's servicing failures.[31]

180. Undisputed that Bureau Count VII alleges that Ocwen failed to perform escrow analyses within the timeline provided by RESPA for certain loans including the 391,603 untimely analyses identified in Ocwen's Verified Response to Interrogatory No. 1.

181. Disputed. Professor McFadden does not offer a "range" of aggregate damages. Professor McFadden opines that the damages attributable to Ocwen's failure to perform a timely escrow analysis increasing the risk of foreclosure initiation is *either* $351.5 million or $483.5 million, depending on which of two different foreclosure costs estimates used.[32]

182. Disputed. Professor McFadden does not "claim" anything. As disclosed in his expert report, Professor McFadden, in fact, used Ocwen's Verified Interrogatory Responses Nos. 1–4 to identify borrowers for whom Ocwen failed to perform a timely escrow analysis. He assessed the harm to all of these borrowers and determined that each had an increased probability of foreclosure initiation as a consequence of Ocwen's failure to perform an untimely escrow analysis, and not other causes.[33]

183. Undisputed that of the borrowers for whom Professor McFadden calculated foreclosure initiation damages, 32,190 borrowers had a foreclosure initiated. Disputed as to the count of borrowers for whom he calculated foreclosure initiation damages, which is 272,007 borrowers. Also disputed to the extent Ocwen is implying that these 272,007 borrowers did not suffer harm as a consequence of Ocwen's failure. Professor McFadden found that for each of these loans,

[31] Pl.'s Opp. McFadden Ex. 1 ¶¶ 124–135, 141–143.
[32] Pl.'s Opp. McFadden Ex. 1, ¶ 123, Table 15, ¶ 139.
[33] Pl.'s Opp. McFadden Ex. 1, ¶¶ 17(a), 21–24, Table 1, 109–110, Table 12, 123, Table 15, 139, including Notes.

which Ocwen admitted had a servicing error of an untimely escrow analysis, suffered the harm of an increased risk of a foreclosure initiation as a consequence of Ocwen's failure, and not other causes. He further found that but for Ocwen's failure to perform a timely escrow analysis, 16,636 fewer foreclosures would have been initiated.[34]

184. Disputed. Professor McFadden's foreclosure-initiation model determines that 16,636 foreclosures were initiated as a consequence of Ocwen's failure to perform a timely escrow analysis, and not other causes. His model also determines that each of the 272,007 borrowers for whom he quantified damages suffered harm as a consequence of Ocwen's failure to timely perform escrow analyses, as detailed in Pl.'s Opp. SMF ¶ 183, *supra*.[35]

185. Disputed. It is unclear what Ocwen means by "amount of any loss." To the extent this refers to the average foreclosure cost component of foreclosure initiation damages, Professor McFadden details the average foreclosure-initiation costs Ocwen borrowers bore, including such costs identified in an Ocwen-commissioned report[36] that he used in light of Ocwen's lack of data. *See* Pl.'s Opp. SMF ¶ 292, *infra*. To the extent that Ocwen is implying that each of the 272,007 borrowers were not harmed, this is disputed for the same reasons stated in Pl.'s Opp. SMF ¶ 183. Last, Professor McFadden's model shows that each Relevant Borrower suffered harm and each has their own risk of foreclosure initiation based on their borrower and loan characteristics; he can allocate damages to individual borrowers based on these individual probabilities.[37]

186. Disputed as to Ocwen's characterization of the model being "theoretical" and that Professor McFadden's Foreclosure Initiation Model did "not analyze any individual loans." Professor McFadden's econometric model is well-accepted in mortgage finance.[38] Further, Professor McFadden analyzed the individual loan-level data from Ocwen's servicing system that Ocwen itself used to service loans.[39]

---

[34] Pl.'s Opp. McFadden Ex. 1 ¶¶ 17(a), 22–24, Table 1, 109–110, Table 12, 123, Table 15, 139, including Notes.
[35] Pl.'s Opp. McFadden Ex. 1 ¶¶ 109–110, Table 12, ¶123, Table 15, ¶139, including Notes.
[36] Pl.'s Opp. McFadden Ex. 1 ¶ 118; Pl.'s Opp. McFadden Ex. 2 ¶ 87.
[37] Pl.'s Opp. McFadden Ex. 1 ¶ 123 n.128.
[38] Pl.'s Opp. McFadden Ex. 2 ¶¶ 29–32.
[39] Pl.'s Opp. McFadden Ex. 1 ¶¶ 17, 21, 55, 73, 102–108, Table 11, ¶110, Table 12, Fig. 10, App'x E.

187. Undisputed that 32,190 borrowers for whom Professor McFadden calculated foreclosure-initiation damages had a foreclosure initiated against them between January 2014 and August 2018. Disputed as to the characterizations contained in the remainder. Professor McFadden's foreclosure-initiation model shows that, but for Ocwen's failure to perform a timely escrow analysis, 16,636 fewer foreclosures would have been initiated against the borrowers for whom he calculated foreclosure-initiation damages between January 2014 and August 2018. His model estimates that the increased risk of foreclosure initiation attributable to Ocwen's failure to perform a timely escrow analysis is 6.73% for borrowers whom Ocwen overcharged, and 5.07% for borrowers whom Ocwen undercharged (and later sought to collect undercharged amounts). The average across both groups is 6.1%.[40] Disputed as to characterization that the loans in the Foreclosure Initiation model "purportedly" had an untimely escrow analysis; Ocwen's Verified Interrogatory Responses No. 1–4 identifies them as having a late analysis.[41]

188. Undisputed that Professor McFadden utilized the results from his econometric model and the two estimates of average foreclosure costs to determine aggregate foreclosure-initiation damages of approximately $352 million or $484 million. Disputed to the extent Ocwen seeks to imply that Professor McFadden's model does not show the damages attributable to Ocwen's failure to perform a timely escrow analysis and not other causes. Disputed that this is a range of damage. Disputed that he "supposedly" derived foreclosure costs from various sources; he derived foreclosure costs from his identified sources and disclosed those sources to Ocwen.[42]

189. Dispute the conclusions of Ocwen's expert witness, Dr. William Hamm, who made assumptions about Ocwen's data related to credits and debits to make conclusions about loans that were reinstated or paid off before foreclosure; Professor McFadden instead used relevant data, Ocwen's specific foreclosure system data, to form his opinions.[43]

190. Disputed. This mischaracterizes Professor McFadden's opinions. Professor McFadden, in ¶ 118 of his expert report, explains his average foreclosure-cost components, including why they are conservative. His foreclosure costs are conservative in that they, for example, include only a single instance of the imposition of certain foreclosure costs and do not include other costs.

---

[40] Pl.'s Opp. McFadden Ex. 1 ¶¶ 109–110, 139, Table 12 including Notes, Table 15.

[41] Pl.'s Opp. McFadden Ex. 1 ¶¶ 17(a), 22–24, Table 1, ¶¶109–110, 139, Table 12 including Notes, Table 15.

[42] Pl.'s Opp. McFadden Ex. 1 ¶ 118–123, 139, Table 13, 14 & 15.

[43] Pl.'s Opp. McFadden Ex. 1 ¶¶ 114–117, Figure 10.

Thus, borrowers would have faced more foreclosure-related costs, not less.[44] Further, Ocwen's system data surrounding credits and debits do not specifically identify any foreclosure costs assessed to a borrower. *See* Pl.'s Opp. SMF ¶ 292.

191. Undisputed that Professor McFadden calculated opportunity-cost damages for these populations. Disputed as to the total sum of damages of approximately $2 million. Depending on the interest rate chosen, 13%, 16%, or 20%, total opportunity-cost damages for this population is either approximately $1.5 million, $1.8 million, or $2.2 million.[45]

192. Undisputed that Professor McFadden assumed in his opportunity-cost model that Ocwen borrowers would have used excess funds to pay down other costly debt. Disputed to the extent Ocwen implies that Professor McFadden did not have a basis for his assumption. Professor McFadden assessed Ocwen's borrower profiles, and actually studied the credit score and other data of Ocwen borrowers and determined that "Ocwen's customers are, on average, at higher credit risk than the average U.S. borrower, and therefore have a higher financial vulnerability. This fact is supported by Ocwen's self-description in its annual reports." And based on Ocwen's borrower profile, Professor McFadden assumed that Ocwen's borrowers would have used excess funds to pay down other debt, and that the interest on credit cards is a conservative measure of these borrowers' opportunity costs.[46]

193. Undisputed that Professor McFadden opines that a "reasonable, if not conservative" measure of opportunity costs for Ocwen borrowers is the interest rate on consumer credit-card debt.[47] Disputed as to the remainder. The interest on credit cards is not a range. *See* Pl.'s Opp. SMF ¶ 191, *supra*. Further disputed to the extent Ocwen implies that Professor McFadden did not have a basis for his assumption for the same reasons set forth in Pl.'s Opp. SMF ¶ 192, *supra*.

194. Disputed. Professor McFadden calculated opportunity-cost damages only for borrowers who were in fact overcharged: "[t]o be conservative, [Professor McFadden] attempt[ed] to identify borrowers who actually paid the overcharge amounts."[48]

---

[44] Pl.'s Opp. McFadden Ex. 1 ¶ 118, Table 13.
[45] Pl.'s Opp. McFadden Ex. 2 ¶ 94, Table 6.
[46] Pl.'s Opp. McFadden Ex. 1 ¶¶ 37, 39; Pl.'s Opp. McFadden Ex. 2, ¶¶ 9–16, 46–48.
[47] Pl.'s Opp. McFadden Ex. 1 ¶ 41.
[48] Pl.'s Opp. McFadden Ex. 1 ¶¶ 49, 55(b) 67 (borrowers who paid overcharged PMI premiums), 72 (confirming borrowers with ARM loans were overcharged).

195. INTENTIONALLY OMITTED/WITHDRAWN.

196. INTENTIONALLY OMITTED/WITHDRAWN.

197. INTENTIONALLY OMITTED/WITHDRAWN.

198. INTENTIONALLY OMITTED/WITHDRAWN.

199. INTENTIONALLY OMITTED/WITHDRAWN.

200. Undisputed.

201. Undisputed to all, except that the Bureau's Amended Complaint ¶ 287 concerns Count X, not Count VII.

202. Disputed. The Bureau supplemented its disclosures and answer to Interrogatory No. 1 to identify 11,056 more borrowers whose escrow-shortage payments were not timely processed and 462 more borrowers whose escrow accounts were not timely analyzed, in addition to those borrowers the Bureau previously identified and who are referenced in this fact.

203. Undisputed. The Bureau, pursuant to Magistrate Judge Matthewman's order to "identify approximately how many loans fall into each 'bucket' [of major allegations], to the extent they are reasonably able to do so,"[49] identified approximately 1.3 million loans as being at issue for a potential escrow violation under the category of "general" for Count VII, *see* Defs.' SMF ¶ 88.

204. Undisputed that the quote is contained within the cited portion of the deposition transcript. Disputed to the extent the quote misrepresents the entirety of the Bureau's relevant testimony on the topic. In the follow-up answer to the quoted language, the Bureau's 30(b)(6) witness clarified: "That's [regarding the quoted language] not exactly what I meant. I think what the Bureau has done is, for the overall universe of loans at issue with respect to Count [7], if it could make a determination at this time that the specific loans were at issue with respect to a specific portion of Count [7], then it endeavored to indicate that by putting it on a more specific list. And with respect to loans that it was not able to do that as of this date, those are in the exhibit that relates to Count [7], General."[50]

205. Undisputed.

206. INTENTIONALLY OMITTED/WITHDRAWN.

207. Undisputed as to the language of 12 C.F.R. § 1024.17(i)(2). Disputed to the extent Ocwen is implying that such language affects Ocwen's separate obligations under different

---

[49] June 6, 2019 Omnibus Order, ECF No. 396, ¶ 3, at 2–3.

[50] Defs.' SMF Ex. 53, Dep. Tr. of Bureau's 30(b)(6) Witness, at 623:8–624:12.

provisions, 12 C.F.R. § 1024.17(c)(3) and (f)(i), to perform annual escrow analyses on or after 2014.

208. Disputed. Ocwen cites only a portion of the 1994 HUD rulemaking, which continues: "HUD maintains a requirement of at least one escrow account analysis per year. Servicers are free to do more."[51] The promulgated rule requires "[f]or each escrow account, the servicer shall conduct an escrow account analysis at the completion of the escrow account computation year to determine the borrower's monthly escrow account payments for the next computation year subject to the limitations of § 3500.17(c)(1)(ii) [governing shortages and cushion]."[52]

209. Disputed. Ocwen's 30(b)(6) deponent testified that he did not know what specific HUD guidance Ocwen relied on for its interpretation of what was required by RESPA with regard to escrow analyses.[53] Further, Ocwen's corporate deponent testified that Ocwen's interpretation of the unspecified HUD guidance related to Ocwen's obligation to *send an escrow statement* to borrowers who were not delinquent; he did not testify that Ocwen's interpretation related to borrowers who were in bankruptcy or foreclosure or to Ocwen's obligation to perform a *yearly escrow analysis*. Specifically, he testified that:

> And it was based on an interpretation for -- you know, from a regulatory guidance where **loans which were delinquent did not require an annual escrow analysis statement**. . . .[54]
>
> I'm not sure specifically if the HUD guidance -- I just know that **the interpretation at the time was based on not requiring an analysis statement**. And in review of the audit related to escrow, **it was determined that an analysis was required on the loans**.[55]

210. Disputed. A servicer's annual escrow analysis, which was previously codified at 24 C.F.R. § 3500 until the Bureau recodified this same requirement at 12 C.F.R. § 1024.17, has been in effect since at least the 1994 HUD rulemaking that Ocwen cites. *See* Pl.'s Opp. SMF ¶ 208. Ocwen knew this: on July 21, 2013, it issued an audit stating that it was not following 24

---

[51] Final Rule, RESPA: Escrow Accounting Procedures, 59 Fed. Reg. 53,890, 53,897 (Oct. 26, 1994).
[52] Final Rule, RESPA: Escrow Accounting Procedures, 59 Fed. Reg. 53,890, 53,903 (Oct. 26, 1994).
[53] Pl.'s SJX 38, Combs 30(b)(6) Dep. Tr., at 13:11–23.
[54] Pl.'s SJX 38, Combs 30(b)(6) Dep. Tr., at 12:15–23 (emphasis added).
[55] Pl.'s SJX 38, Combs 30(b)(6) Dep. Tr. at 14:16–21 (emphasis added).

C.F.R. § 3500.17(c)(3), which required Ocwen to perform a yearly escrow analysis for borrowers who were delinquent, in bankrupt, and in foreclosure.[56] The Bureau further disputes that Ocwen's "voluntarily" changes meant that Ocwen performed all required escrow analyses for borrowers; they did not: from 2014 to 2017, Ocwen failed to perform timely escrow analyses for at least approximately 390,000 borrowers.[57] Last, in the passages cited by Ocwen, Combs, Diller, and Reeves do not specify the date on which any "process" change was made, let alone that it took place "when Ocwen determined that Regulation X could be interpreted differently."

211. Disputed. Ocwen did not "continue[] to pay the required tax and insurance payments on behalf of borrowers that were delinquent or in bankruptcy," where Ocwen failed to make payments as required, such to pay borrowers' insurance payments.[58] Ocwen's only evidence is a declaration from a witness who was never disclosed, does not base his declaration solely on personal knowledge, and provides no factual support that Ocwen continued to make required escrow payments for borrowers for whom it failed to perform timely escrow analysis. The Bureau has moved to strike the declaration.[59]

212. Disputed for the same reasons in Pl.'s Opp. SMF ¶ 211, *supra,* and because Ocwen did not, in fact, return inappropriately accrued surpluses (overcharges) to all borrowers, but would do so *only* when it finally performed the untimely analysis, if the borrower was still current on her loan.[60]

213. Undisputed that Ocwen contends it took remedial efforts for the borrowers as detailed in their Verified Response to Interrogatory No. 4. Disputed that Ocwen fully remediated such borrowers where, for example, Ocwen: (1) did not provide any remediation to borrowers who paid off their loans or whose loans Ocwen transferred or charged off;[61] (2) from January 2014 until March 2016, waived the negative escrow balance only after a borrower was discharged from bankruptcy, and did not waive the entire escrow shortage accrued during the bankruptcy

---

[56] Pl.'s SJX 86, July 31, 2013 Escrow and Insurance Audit, OCW-030-0040608 at 621–622.
[57] Pl.'s SJX 55 ¶¶ 40–43 (identifying 389,668 unique loans that had untimely escrow account analyses); Pl.'s SJX 150 (Defs.' Resp. to Bureau's Second RFAs at Answer Nos. 109–112 at 76–79).
[58] Pl.'s SOF ¶¶ 215–226.
[59] Pl.'s Mot. to Strike Decl. of Benjamin Verdooren.
[60] Pl.'s SJX 138, Defs.' Verified Resp. First Set of Rogs, Resp. 1 at 13 ("If there was a surplus, *and the borrower was current*, the surplus would be credited to the borrower) (emphasis added).
[61] Pl.'s SJX 138, Defs.' Verified Resp. First Set of Rogs, Resp. 3 at 13–14.

even though Ocwen never received bankruptcy-court approval to seek the escrow shortage;[62] and (3) did not provide any remediation for any damages quantified by Professor McFadden.

214. Disputed. Count VIII alleges that Ocwen violated Regulation X because it did not maintain *reasonably-designed* policies and procedures, as required, with respect to the three identified activities.

215. Undisputed.

216. Disputed. The policies that Ocwen references in Defs.' SMF ¶¶ 217–219 do not cover the entire relevant time period (January 10, 2014 to the present). Further, these policies are OFC's policies and procedures, not the other Ocwen defendants, and apply only to certain units of OFC rather than all of OFC's servicing operations, as described in Pl.'s Opp. SMF ¶¶ 217–219, *infra*. Further dispute any implication by Ocwen that "maintenance" of any policy and procedure for any period of time is the same as that policy and procedure being reasonably designed, for the same reasons set forth in Pl.'s Opp. SMF ¶¶ 217–219, *infra*.

217. Disputed. First, the exhibits in Defs.' SMF ¶ 217 are all OFC policies. Second, none are desktop manuals. Third, outside of Defs.' SMF Ex. 103, each policy applies only to Ocwen's Ombudsman's unit, even though other business units also handled complaints, including oral complaints such as the Customer Care Center and Research Departments.[63] Fourth, the OFC policy in Ex. 103 (the only policy that applies to other business units, not just the Ombudsman office) was approved only on July 7, 2015. Fifth, Ocwen testified that certain parts of that written policy were not actually operational: Ocwen's root-cause complaint-analysis process detailed within was not "fully operational" by June 2016.[64] Sixth, Ocwen's exhibits do not document the detailed step-by-step process by which Ocwen actually investigates and correct errors. Further disputed to the extent Ocwen is implying that "maintenance" of any policy and procedure for any period of time is the same as that policy and procedure being reasonably designed, where evidence shows that Ocwen's were not. *See* examples at Pl.'s Opp. SMF ¶¶ 299–301; *see also* Pl.'s Opp. Ex. 28 (memory aid provided to Ocwen that lists evidence supporting this claim).

[62] Pl.'s SJX 138, Defs.' Verified Resp. First Set of Rogs, Resp. 3 at 13.

[63] Defs.' SMF Ex. 103 at OCW3-006-00000101–103 (identifying units other the Ombudsman units that handle complaints).

[64] Pl.'s Opp. Ex. 6, Ehrenreich 30(b)(6) June 8, 2016 IH Tr., at 164:6–165:11.

218. Disputed. Ocwen cites to two OFC policies and has admitted that the first one was purportedly in effect only as of November 25, 2014. Further disputed to the extent Ocwen is implying that "maintenance" of any policy and procedure for any period of time is the same as that policy and procedure being reasonably designed, where evidence shows that Ocwen's were not, *see* examples at Pl.'s Opp. SMF, ¶¶ 302–305. *See also* Pl.'s Opp. Ex. 29 (memory aid provided to Ocwen that lists evidence supporting this claim).

219. Disputed. Ocwen cites only to one OFC policy that was first in effect only as of February 27, 2015. Further disputed to the extent Ocwen is implying that "maintenance" of any policy and procedure for any period of time is the same as that policy and procedure being reasonably designed, where evidence shows that Ocwen's were not, *see* examples at Pl.'s Opp. SMF, ¶¶ 306–307, *infra*. *See also* Pl.'s Opp. Ex. 27 (memory aid provided to Ocwen that lists evidence supporting this claim).

220. Undisputed that Mr. Bryar (an attorney) is attempting to offer this opinion. Disputed that it is a statement of fact. It is an inadmissible legal conclusion. Also disputed for the reasons articulated in Pl.'s Opp. SMF ¶ 218, *supra*.

221. Undisputed that Mr. Bryar (an attorney) is attempting to offer this opinion. Disputed that it is a statement of fact. It is an inadmissible legal conclusion. Also disputed for the reasons articulated in Pl.'s Opp. SMF ¶¶ 217–219, *supra*.

222. Undisputed. Mr. Searson does not offer an opinion as to whether Ocwen's practices violated the law.

223. Undisputed that Mr. Searson's opinions include those related to Ocwen's policy-and-procedure adherence to industry best practices, but disputed to the extent that Mr. Searson "only" offers opinions surrounding Ocwen's policy-and-procedure adherence to industry best practices; his opinions are much broader than that.[65]

224. Undisputed. Mr. Searson opines that industry best practices are the result of multiple sources, one of which is regulatory requirements.[66]

225. Undisputed. Mr. Searson offers this opinion.

226. Disputed. Mr. Searson acknowledged at his deposition that he was seeing for the first time the referenced November 2014 procedure. But he noted that the November 2014 date

---

[65] *See generally* Pl.'s Opp. Searson; Pl.'s Opp. Searson Ex. 1.

[66] Pl.'s Opp. Searson Ex. 1, ¶¶ 32, 53–55; Pl.'s Opp. Searson Ex. 2, ¶¶ 17–40.

conflicted with a February 2015 email from Ocwen's vice president of compliance suggesting no such procedure existed.[67]

227. INTENTIONALLY OMITTED/WITHDRAWN.

228. INTENTIONALLY OMITTED/WITHDRAWN.

229. INTENTIONALLY OMITTED/WITHDRAWN.

230. INTENTIONALLY OMITTED/WITHDRAWN.

231. INTENTIONALLY OMITTED/WITHDRAWN.

232. INTENTIONALLY OMITTED/WITHDRAWN.

233. INTENTIONALLY OMITTED/WITHDRAWN.

234. INTENTIONALLY OMITTED/WITHDRAWN.

235. INTENTIONALLY OMITTED/WITHDRAWN.

236. INTENTIONALLY OMITTED/WITHDRAWN.

237. INTENTIONALLY OMITTED/WITHDRAWN.

238. INTENTIONALLY OMITTED/WITHDRAWN.

239. INTENTIONALLY OMITTED/WITHDRAWN.

240. Disputed. The Bureau does not dispute the quoted language in Defs.' SMF ¶ 240, but disputes that the "Ocwen employee testimony demonstrates that OFC was not the entity that conducted the functions of 'daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Ocwen's loans.'" In the full deposition testimony that was excerpted by Ocwen in Defs.' SMF ¶ 240, Mr. Faris testified that OFC oversaw the daily cashiering and other functions, and immediately following the testimony excerpted by Ocwen, Mr. Faris testified that the head of cashiering reported to OFC leadership.[68]

241. Disputed. The Bureau objects to Ocwen's use and reliance on a declaration from a witness it did not disclose under Rule 26 and who lacks personal knowledge. The Bureau has moved to strike the declaration.[69]

242. Undisputed that these particular agreements signed in 2017 list Ocwen Loan Servicing, LLC as the subservicer, but dispute the implication that OMS and OFC were not engaged in or

[67] Pl.'s Opp. Searson Ex. 3 at 319:12–321:2.
[68] Pl.'s SJX 46, Faris Dep. at 20:7–22:22.
[69] Pl.'s Mot. to Strike Decl. of Benjamin Verdooren.

responsible for servicing Ocwen's loans. The agreements referenced in Defs.' SMF ¶ 242, in fact, refer to OMS and OFC and generically discuss the servicing obligations of "Ocwen."

243. Undisputed that these particular agreements signed in 2017 list Ocwen Loan Servicing, LLC as the subservicer. Disputed as to the implication that OMS and OFC were not engaged in or responsible for servicing Ocwen's loans. The agreements referenced in Defs.' SMF ¶ 243 refer to OMS and OFC and generically discuss the servicing obligations of "Ocwen."

## II. PLAINTIFF'S ADDITIONAL FACTS

### Consent Judgment Background

244. In early 2012, state financial regulators examined Ocwen and two other mortgage servicers that Ocwen later acquired for their conduct from January 1, 2009 through 2011.[70]

245. The Bureau and state attorneys general investigated and filed a complaint against Ocwen on December 19, 2013 in the District Court for the District of Columbia[71]

246. The Bureau and states' complaint alleged, among other misconduct, that Ocwen was robo-signing foreclosure affidavits and backdating assignments and failing to effectively communicate with borrowers applying for loss mitigation help.[72]

247. The lawsuit brought by the Bureau, 49 other states, and the District of Columbia against Ocwen Financial Corporation and Ocwen Loan Servicing, LLC resulted in a settlement in December 2013 that was approved by the District Court of the District of Columbia on February 26, 2014 ("Consent Judgment").[73]

248. The Consent Judgment remained in "full force and effect for three years" from February 26, 2014, the date it was entered.[74]

249. An independent monitor ("Monitor") was appointed with the responsibility of determining "whether Servicer is in compliance with the Servicing Standards and whether Servicer has satisfied the Consumer Relief Requirements" and "to report his or her findings."[75]

---

[70] Defs.' SMF Ex. 11, OFR Final Order (Mar. 7, 2014) at 3–4.
[71] Defs.' SMF Ex. 1.
[72] Defs.' SMF Ex. 1 at 12–13.
[73] Defs.' SMF Exs. 2–8.
[74] Defs.' SMF Ex. 6, Ex. D to Consent Judgment, at D-15, § J ("Sunset. This Consent Judgment and all Exhibits shall retain full force and effect for three years from the date it is entered (the "Term"), unless otherwise specified in the Exhibit.").
[75] Defs.' SMF Ex. 6, Ex. D, to Consent Judgment, at D-3, ¶ 5.

250. The Monitor tested 33 Metrics to determine compliance with the Servicing Standards and, if Ocwen failed the metric testing, there was a process set forth in the Consent Judgment that was limited to addressing failures identified by the Monitor's metric testing.[76]

251. The Consent Judgment enhanced the Bureau's supervisory and enforcement authorities with "an extra layer of oversight of Ocwen's servicing practices" by the Monitor.[77]

252. The Bureau issued a press release stating: "In January 2013, the CFPB released new rules on mortgage servicing that will apply to every mortgage servicer. The standards that Ocwen must adhere to according to this court order are in addition to the protections offered to consumers under the new rules that take effect on Jan. 10, 2014."[78]

253. In its 2013 annual SEC filing, Ocwen acknowledged the Bureau's new mortgage servicing rules, stating that "[t]he new rules took effect on January 10, 2014 and could cause us to modify servicing processes and procedures and to incur additional costs in connection therewith."[79]

254. Ocwen disclosed in its annual SEC filings for the years 2014 and 2015 that it was subject to "supervision, examination and enforcement by the CFPB."[80]

255. Ocwen disclosed in 2016 and 2017 that its business was subject to "extensive oversight and regulation by ... the CFPB.…"[81]

---

[76] Defs.' SMF Ex. 6, Ex. D to Consent Judgment, at D-4, ¶ 11 (explaining that the Servicing Standards would be tested through the Metrics set forth in Schedule D-1); D-10–D-11, Section E (setting forth a "Potential Violation *of this Consent Judgment*" and right to cure process, if Ocwen failed to comply with a metric test) (emphasis added); D1-1–D1-22 (outlining the 33 Metrics to be tested).

[77] Pl.'s Opp. Ex. 14, FAQs about Ocwen Settlement, at 2 ("In addition, a special independent monitor will have the authority to oversee the settlement and require Ocwen's compliance, which will provide an extra layer of oversight of Ocwen's servicing practices.").

[78] Pl.'s Opp. Ex. 15, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-state-authorities-order-ocwen-to-provide-2-billion-in-relief-to-homeowners-for-servicing-wrongs/ (emphasis added).

[79] Pl.'s SJX 2, Ocwen 2013 10-K, at 10.

[80] Pl.'s SJX 3, Ocwen 2014 10-K, at 9; Pl.'s SJX 4, Ocwen 2015 10-K, at 8 (Ocwen also discloses that it received three Civil Investigative Demands from the Bureau and that if the Bureau sued Ocwen, a resolution "could have a material adverse impact" on its business).

[81] Pl.'s SJX 5, Ocwen 2016 10-K at 14 ("Our business is subject to extensive oversight and regulation by … the CFPB.…") and 15 ("We are subject to a number of ongoing federal and state regulatory examinations, consent orders, inquiries, subpoenas, civil investigative demands, requests for information and other actions that could result in further adverse regulatory action

**The Four Corners of the Consent Judgment**

256. The Consent Judgment states "[n]othing in this Consent Judgment shall relieve the Defendant of its obligation to comply with applicable state and federal law."[82]

257. Exhibit E to the Consent Judgment is titled "CFPB Release" and specifies those claims the Bureau released and those it did not release as part of the Consent Judgment.[83]

258. Section B of Exhibit E states: "Subject to the exceptions in Paragraph C (concerning excluded claims) below, the CFPB fully and finally releases the Released Parties from all potential liability that has been or might have been asserted by the CFPB relating to the mortgage servicing practices described in the complaint (the "Mortgage Servicing Practices") that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013."[84]

259. Section C of Exhibit E states: "Notwithstanding any other term of this Release, the CFPB specifically reserves and does not release any liability for conduct other than conduct related to the Mortgage Servicing Practices asserted or that might have been asserted in the complaint."[85]

260. Section E of Exhibit E states: "Nothing in this Release shall limit the CFPB's authority with respect to Released Parties, except to the extent the CFPB has herein expressly released claims."[86]

261. INTENTIONALLY OMITTED/WITHDRAWN.

262. INTENTIONALLY OMITTED/WITHDRAWN.

263. INTENTIONALLY OMITTED/WITHDRAWN.

264. INTENTIONALLY OMITTED/WITHDRAWN.

265. The Consent Judgment's enforcement procedures describe how the parties can enforce the Consent Judgment and the relief available under the Consent Judgment.[87]

---

against us."); Pl.'s SJX 6, Ocwen 2017 10-K at 7 ("Our business is subject to extensive oversight and regulation by … the CFPB….") and 8 ("We are subject to a number of ongoing federal and state regulatory examinations, consent orders, inquiries, subpoenas, civil investigative demands, requests for information and other actions that could result in further adverse regulatory action against us.").

[82] Defs.' SMF Ex. 2, Consent Judgment, ¶ 17.

[83] Defs.' SMF Ex. 7, Ex. E to Consent Judgment, at E-1, E-3, §§ B–E.

[84] Defs.' SMF Ex. 7, Ex. E to Consent Judgment, at E-3, § B.

[85] Defs.' SMF Ex. 7, Ex. E to Consent Judgment, at E-3, § C.

[86] Defs.' SMF Ex. 7, Ex. E to Consent Judgment, at E-3, § E.

[87] Defs.' SMF Ex. 6, Ex. D to Consent Judgment, at D-13–D-15, § I.

**Lack of Overlap**

266. The Consent Judgment's Servicing Standards and Metrics do not contain any mention of conduct relating to timely escrow analysis.[88]

267. Ocwen's expert, Mr. Marcel Bryar, testified that there was no Consent Judgment Metric related to escrow: "I don't believe -- I can't recall whether the servicing standards in the NMS cover escrow. I don't think there's a metric related to escrow in the NMS."[89]

268. The Monitor stated that "under the terms of Judgment [Consent Judgment], I am not charged with reviewing the SOR to determine the accuracy and completeness of the information contained in the SOR, or the functional integrity of the SOR. . . . All of the testing results discussed in this Report (and all prior Compliance Reports I have filed concerning Servicer), and my review of such testing results and findings relative thereto, are based on the assumption that the SOR has functional integrity, that the information tested and reviewed by me, as reflected in the IRG's Work Papers, is from the SOR, and that such information from the SOR is accurate and complete."[90]

269. The Monitor stated that: "On April 20, 2017, the Consumer Financial Protection Bureau (CFPB) filed suit against Servicer in the United States District Court for the Southern District of Florida. In its complaint, the CFPB has made allegations questioning the accuracy and reliability of Servicer's SOR [system of record]. In addition, since April 20, 2017, numerous State Mortgage Regulators have filed Cease and Desist Orders, or other forms of administrative Orders or charges, against Servicer in their respective States making allegations questioning the accuracy and reliability of Servicer's SOR. Servicer denies the allegations about the accuracy and reliability of Servicer's SOR in all of these proceedings. Resolving these issues is *outside* the scope of my duties as Monitor."[91]

---

[88] Defs.' SMF Exs. 2–8, Consent Judgment and all exhibits (no mention of untimely escrow analysis); *see also* Defs.' SMF Ex. 21, Expert Rebuttal Report of Marcel Bryar, at Ex. 4 (summary table of all NMS metrics, none of which reference untimely escrow analysis).
[89] Pl.'s Opp. Ex. 12, Deposition of Marcel Bryar Tr., at 189:16–22.
[90] Defs.' SMF Ex. 25, Aug. 25, 2017 Monitor's Report, at 6.
[91] Defs.' SMF Ex. 25, Aug. 25, 2017 Monitor's Report, at 6, n.4. (emphasis added).

**Other Government Enforcement Actions Brought Outside of Other NMS Consent Judgments**

270. On April 4, 2012, the United States government, 49 state attorneys general, and the District of Columbia entered into a consent judgment with Wells Fargo, JPMorganChase, and CitiMortgage regarding the companies' practices relating to residential mortgage foreclosures and mortgage servicing ("2012 NMS Consent Judgment").[92]

271. The United States of America, including the Department of Justice, was a party to the 2012 NMS Consent Judgment.[93]

272. The NMS Consent Judgment included a "Federal Release" which set forth certain claims and remedies that the federal government was releasing under the consent judgment, and certain claims and remedies that the federal government was not agreeing to release.[94]

273. The CFPB was a signatory to the "Federal Release" of the 2012 NMS Consent Judgment.[95]

274. The 2012 NMS Consent Judgment was in full force and effect for three-and-a-half years from the date of entry of the judgment on April 4, 2012.[96]

275. Under the "Federal Release" the CFPB did not release claims within its authority for the three and a half year-period during which the 2012 NMS Consent Judgment was in full force and effect.[97]

276. In January 2017, the Bureau brought an enforcement action against and entered into a consent order with CitiMortgage for mortgage-servicing violations (failing to send proper loss-

[92] Pl.'s Opp. Ex. 16, Wells Fargo NMS Order; Pl.'s Opp. Ex. 17, JPMorganChase NMS Order; Pl.'s Opp. Ex. 18, CitiMortgage NMS Order.
[93] Pl.'s Opp. Ex. 16, Wells Fargo NMS Order; Pl.'s Opp. Ex. 17, JPMorganChase NMS Order; Pl.'s Opp. Ex. 18, CitiMortgage NMS Order.
[94] Pl.'s Opp. Ex. 16, Wells Fargo NMS Order, at Exhibit F; Pl.'s Opp. Ex. 17, JPMorganChase NMS Order, at Exhibit F; Pl.'s Opp. Ex. 18, CitiMortgage NMS Order, at Exhibit F.
[95] Pl.'s Opp. Ex. 16, Wells Fargo NMS Order, at 12; Pl.'s Opp. Ex.17, Chase Bank NMS Order, at 12; Pl.'s Opp. Ex. 18, CitiMortgage NMS Order, at 12.
[96] Pl.'s Opp. Ex. 16, Wells Fargo NMS Order, at 6 ¶15; Pl.'s Opp. Ex. 17, JPMorganChase NMS Order, at 6 ¶15; Pl.'s Opp. Ex. 18, CitiMortgage NMS Order, at 6 ¶15.
[97] Pl.'s Opp. Ex. 16, Wells Fargo NMS Order, at Exhibit F ¶¶ 7 (releasing conduct before July 21, 2011) and 11(k) (reserving claims after "July 21, 2011 that are not expressly released in Paragraph 7"); Pl.'s Opp. Ex. 17, JPMorganChase NMS Order, at Exhibit F ¶¶ 7, 11 (same); Pl.'s Opp. Ex. 18, CitiMortgage NMS Order at Exhibit F ¶¶ 7, 11 (same).

mitigation-related notices) that took place in 2014 during the three-and-half-year period when the 2012 NMS Consent Judgment was in full force and effect and that were similar to certain Servicing Standards outlined in the 2012 NMS Consent Judgment.[98]

277. In November 2015, the U.S. Trustee Program, part of the Department of Justice, brought an action arising from a chapter 13 bankruptcy petition against Wells Fargo and entered into a settlement agreement with Wells Fargo, for bankruptcy-notice-related violations that took place in 2014 while the 2012 NMS Consent Judgment was in effect and that were similar to certain Servicing Standards outlined in the 2012 NMS Consent Judgment.[99]

278. In March 2015, the U.S. Trustee Program brought an action arising from a chapter 13 bankruptcy petition, against JPMorgan Chase, and entered into a settlement agreement with JPMorgan Chase, for bankruptcy notice related violations that took place after 2012 while the 2012 NMS Consent Judgment was in effect and that were similar to certain Servicing Standards outlined in the 2012 NMS Consent Judgment, Exhibit A.[100]

**<u>Bureau's Memory Aids That Ocwen Did Not Disclose in its Motion</u>**

279. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that Ocwen used inaccurate and incomplete loss mitigation and foreclosure information (now Counts I, II, V, VI).[101]

280. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that Ocwen used inaccurate information relating to amounts owed by and received from borrowers (now Counts I, II, IV, V, VI).[102]

---

[98] Pl.'s Opp. Ex. 19, CitiMortgage Consent Order (CFPB Admin. Proceeding Order, 2017-CFPB-0005), at ¶¶ 6–15 (describing failures to accurately communicate deficiencies in loss mitigation applications); *cf.* Pl.'s Opp. Ex. 18, CitiMortgage NMS Order, Exhibit A, A-25–A-26, § F.2 (obligation to timely notify borrower of any known deficiency in borrowers' initial loss mitigation application).

[99] Pl.'s Opp. Ex. 20, Wells Fargo Settlement Agreement, ¶¶ 2–4 (identifying untimely bankruptcy notices of payment change); Pl.'s Opp. Ex. 16, Wells Fargo NMS Order, Exhibit A, A-15–A-16, § III(B)(1)(e) (requiring timely bankruptcy notice of payment changes).

[100] Pl.'s Opp. Ex. 21, JPMorganChase Settlement Agreement, ¶¶ 24–31 (describing failures to timely file payment change notices); Pl.'s Opp. Ex. 17, JPMorganChase NMS Order, Exhibit A-15–A-16, § III(B)(1)(e) (requiring timely payment change notices).

[101] Pl.'s Opp. Ex. 22 (Dep. Ex. 50 Memory Aid).

[102] Pl.'s Opp. Ex. 23 (Dep. Ex. 63 Memory Aid).

281. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that, as result of its failure to verify loan data, Ocwen used inaccurate and incomplete information, including when calculating inaccurate amounts and sending periodic statements (now Counts I, II, IV, V, VI).[103]

282. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that Ocwen used inaccurate and incomplete information relating to adjustable rate mortgages and amounts due thereunder (now Counts I, II, IV, V, VI).[104]

283. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegation that Ocwen sent deceptive foreclosure-related letters (Count III) and unlawfully initiated foreclosures (Count IX).[105]

284. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that Ocwen lacked reasonably-designed policies and procedures relating to its foreclosure counsel (now Count VIII).[106]

285. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that Ocwen lacked reasonably-designed policies and procedures relating to handling consumer complaints (now Count VIII).[107]

286. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that Ocwen lacked reasonably-designed policies and procedures relating to outbound mortgage servicing transfers (now Count VIII).[108]

287. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations that Defendants acted as a common enterprise.[109]

288. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its escrow- and insurance-related allegations, including

---

[103] Pl.'s Opp. Ex. 24 (Dep. Ex. 64 Memory Aid).
[104] Pl.'s Opp. Ex. 25 (Dep. Ex. 66 Memory Aid).
[105] Pl.'s Opp. Ex. 26 (Dep. Ex. 51 Memory Aid).
[106] Pl.'s Opp. Ex. 27 (Dep. Ex. 52 Memory Aid).
[107] Pl.'s Opp. Ex. 28 (Dep. Ex. 53 Memory Aid).
[108] Pl.'s Opp. Ex. 29 (Dep. Ex. 62 Memory Aid).
[109] Pl.'s Opp. Ex. 30 (Dep. Ex. 57 Memory Aid).

under the CFPA and FDCPA (now Counts I, II, V, VI), RESPA (now Count VII) and HPA (now Count X).[110]

289. To prepare its 30(b)(6) witness, the Bureau created and provided to Ocwen a memory aid summarizing key evidence supporting its allegations relating to Ocwen's underlying system problems and knowledge thereof.[111]

290. Magistrate Judge Matthewman ordered the Bureau to: (1) identify "approximately how many loans match each of the major allegations in Plaintiffs' complaints" and "how many loans fall into each bucket, to the extent they are reasonably able to do so" and (2) "fully prepare" its 30(b)(6) representatives for their upcoming depositions to the best of their abilities, even though the Bureau was still receiving discovery from Ocwen.[112]

291. Ocwen moved for sanctions against the Bureau, claiming it failed to comply with the order referenced in Pl.'s Opp. SMF ¶ 290, *supra*, and Judge Matthewman denied Ocwen's motion, holding that "Plaintiffs have substantially complied in good faith with the Court's Orders" requiring them to identify at-issue loans and "Defendants have sufficient information and discovery to defend against these two cases."[113]

**<u>Ocwen's Lack of Specific Foreclosure Cost Data</u>**

292. Ocwen's Servicing Data that identifies transactional credits and debits uses generic descriptions and do not explicitly identify any foreclosure-related costs.[114]

293. INTENTIONALLY OMITTED/WITHDRAWN.

294. INTENTIONALLY OMITTED/WITHDRAWN.

295. INTENTIONALLY OMITTED/WITHDRAWN.

296. INTENTIONALLY OMITTED/WITHDRAWN.

297. INTENTIONALLY OMITTED/WITHDRAWN.

298. INTENTIONALLY OMITTED/WITHDRAWN.

---

[110] Pl.'s Opp. Ex. 31 (Dep. Ex. 60 Memory Aid).
[111] Pl.'s Opp. Ex. 32 (Dep. Ex. 65 Memory Aid).
[112] June 6, 2019 Omnibus Order, ECF No. 396, ¶ 3–4.
[113] Oct. 18, 2019 Omnibus Order, ECF No. 499 ¶ 1.
[114] Pl.'s Opp. McFadden Ex. 4 (Ocwen's transaction data dictionary).

**Ocwen's Lack of Reasonably-Designed Policies & Procedures**

299. In 2015, Ocwen's consultant identified numerous areas of improvement relating to Ocwen's consumer-complaint-handling procedures and Ocwen agreed to such observations.[115]

300. Ocwen has no policy or procedure to cross-reference complaints by consumers with the known issues it is tracking or lists of consumers it has identified for remediation.[116]

301. Ocwen has a policy of escalating only oral complaints if a borrower called five times within nine days.[117]

302. Ocwen admits it did not have any outbound-transfer policies and procedures in 2014.[118]

303. Ocwen's consultant identified deficiencies in its outbound-transfer processes and made several recommendations in 2015, in response to which Ocwen made certain changes that its Compliance Department was responsible for reviewing.[119]

304. Ocwen's Vice President of Compliance testified that, as of early 2015, he was unaware of any outbound-transfer policies and procedures and that he had had other concerns when Ocwen began to transfer loans to other servicers in 2015.[120]

305. Ocwen admits that, when transferring loans to new servicers, it does not disclose to new servicers all information, such as whether Ocwen identified that it was using inaccurate loan data; engaged in legal violations, such as failing to timely borrowers' escrow analyses; or provided inaccurate information, such as reinstatement quotes, to borrowers.[121]

306. Ocwen testified that since 2014 it and its foreclosure attorneys were failing to follow Ocwen's procedures to update key information in Ocwen's system of record, which affected

[115] Pl.'s SJX 39, Goodman Dep. Tr., at 20:1–25:11 (Ocwen agreeing with Navigant's observations); Pl.'s Opp. Ex. 5, Navigant Complaint Assessment, at 6 (observing Ocwen's complaint handling deficiencies, such as inconsistent policies and procedures, and lack of proper investigations).
[116] Pl.'s SJX 39, Goodman Dep. Tr., at 15:13–17:15.
[117] Pl.'s Opp. Ex. 6, Ehrenreich 30(b)(6) June 8, 2016 IH Tr. at 221:13–224:22.
[118] Pl.'s SJX 34, Kennedy 30(b)(6) Dep. Tr., at 137:23–138:4.
[119] Pl.'s SJX 34, Kennedy 30(b)(6) Dep. Tr., at 146:2–152:2; Pl.'s Opp. Ex. 7, OCW024-0060855, Kennedy Dep. Ex. 218 (CFPB Compliance Oversight and Loan Transfer Review).
[120] Pl.'s Opp. Ex. 8, Purser Dep. Tr., at 249:15–252:8 (confirming, including when reviewing a March 2015 e-mail, that Ocwen lacked outbound transfer policies and procedures), 241:8–246:15 (describing his concerns with Ocwen's 2015 transfers).
[121] Pl.'s SJX 34, Kennedy 30(b)(6) Tr., at 136:8–137:13.

whether Ocwen was following its foreclosure hold policies and procedures relating to holding or postponing foreclosure sale, including when required by law.[122]

307. Ocwen created "dual tracking" or milestone reports to record when attorneys were not complying with Ocwen's instructions to "hold," or not to proceed, with foreclosure sales.[123]

**Bureau's Supplement to its Loan Disclosure and Answer to Defs.' Interrogatory No. 1**

308. The Bureau supplemented its "loan bucketing" disclosures, answer to Defendants' Interrogatory No. 1, and the information it provided during Ocwen's 30(b)(6) deposition of the Bureau to identify more borrowers "at issue" by loan number, the sources, and the Bureau's bases for inclusion.[124]

[122] Pl.'s Opp. Ex. 9, Cox 30(b)(6) IH Tr., 261:24–296:9 (Ocwen testifying about its foreclosure law firms were failing to update Ocwen's system of record with critical information such as foreclosure sale dates); 308:24-318:21 (Ocwen testifying about missing foreclosure sales dates in its system, the effect on its hold processes, and how Ocwen tracked foreclosure sales that occurred, despite that such sales should have been on hold, through "dual tracking reports.").

[123] Pl.'s Opp. Ex. 9, Cox 30(b)(6) IH Tr., at 313:3-314:9 (describing dual tracking report); Pl.'s Opp. Ex. 10, Ruiz 30(b)(6) Dep. Tr., at 32:11–40:11 (describing the same), Pl.'s Opp. Ex. 11, Ruiz Dep. Ex. 228 (explaining an example of this report).

[124] Pl.'s Opp. Ex. 4, August 16, 2019 letter identifying additional borrowers.

Date: December 10, 2020

Respectfully submitted,

Attorneys for Plaintiff,
CONSUMER FINANCIAL PROTECTION BUREAU

JOHN C. WELLS
Deputy Enforcement Director

JAMES T. SUGARMAN
Assistant Litigation Deputy

/s/ Jean M. Healey Dippold
Jean M. Healey
Phone: (202) 435-7514
E-mail: jean.healeydippold@cfpb.gov

| | |
|---|---|
| Atur Desai | atur.desai@cfpb.gov |
| Michael Posner | michael.posner@cfpb.gov |
| Shirley Chiu | shirley.chiu@cfpb.gov |
| Tianna Baez | tianna.baez@cfpb.gov |
| Stephanie Brenowitz | stephanie.brenowitz@cfpb.gov |
| Erin Mary Kelly | erin.kelly@cfpb.gov |
| Greg Nodler | greg.nodler@cfpb.gov |
| Amanda Roberson | amanda.roberson@cfpb.gov |
| James Savage | james.savage@cfpb.gov |
| Doug Wilson | doug.wilson@cfpb.gov |

1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722