**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION; OCWEN MORTGAGE SERVICING, INC.; OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

**PLAINTIFF'S BRIEF IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ........ iii

**I. OCWEN'S INVENTED LIABILITY STANDARDS ARE WRONG.** ........ 1

**II. OCWEN'S ATTEMPTS TO UNDERMINE ITS OWN DISCOVERY RESPONSES DO NOT CREATE DISPUTED ISSUES OF FACT.** ........ 3

A. Ocwen's assertions that its discovery responses may be inaccurate, including through the use of its employee declaration directed at undermining them, are unavailing. ........ 3

B. Ocwen's business records are admissible. ........ 7

1. Ocwen's audit findings are admissible evidence. ........ 7

2. Ocwen's other business records relating to the alleged conduct are admissible. ........ 8

3. Ocwen's consultant's report, which Ocwen adopted, is not hearsay. ........ 9

**III. OCWEN'S ATTEMPTS TO CREATE DISPUTES OF FACT REGARDING ITS SERVICING OF LOANS USING INACCURATE AND INCOMPLETE RECORDS FAIL** ........ 10

A. Ocwen's already-rejected assertion that its use of inaccurate data to service loans is not an unfair practice is wrong. ........ 10

B. Ocwen's subsequent remediation does not preclude liability. ........ 12

C. Ocwen's assertions that its practices did not cause substantial borrower harm are nothing more than speculation. ........ 13

D. Ocwen fails to show any legitimate countervailing benefits to consumers or competition arising from the relevant unfair servicing acts and practices at issue. ........ 18

E. The FDCPA applies to the relevant loans and Ocwen has not shown otherwise. ........ 19

F. Ocwen does not raise a genuine dispute that it communicated inaccurate information to borrowers and its invented individualized standards are wrong. ........ 20

**IV. OCWEN'S ARGUMENTS REGARDING THE BUREAU'S RESPA CLAIMS ARE UNAVAILING.** ........ 20

A. Ocwen's argument that the Bureau must show individualized damages under RESPA has no support, including under the language of RESPA. ........ 20

B. Ocwen does not raise a genuine dispute of fact that it failed to timely send escrow statements within the prescribed time period. ........ 21

C. Ocwen does not raise a genuine dispute of material fact that it failed to timely analyze borrowers' escrow accounts within the prescribed time period. ........ 22

D. Ocwen does not raise a genuine dispute of material fact that it over-collected escrow shortages. ........ 22

E. Ocwen does not raise a genuine factual dispute regarding its late insurance payments. 23

**V. OCWEN DOES NOT RAISE A GENUINE DISPUTE OF FACT REGARDING ITS FAILURE TO CANCEL PRIVATE MORTGAGE INSURANCE WHEN REQUIRED.** ........ 24

**VI. OCWEN DOES NOT RAISE A GENUINE DISPUTE OF FACT AS TO THE BUREAU'S FORECLOSURE CLAIMS.** ........ 24

**VII. DEFENDANTS ARE JOINTLY AND INDIVIDUALLY LIABLE FOR ALL VIOLATIONS.** ........ 25

**VIII. THE CONSENT JUDGMENT DOES NOT BAR THE BUREAU'S CLAIMS.** .. 26

**IX. GRANTING THE BUREAU'S MOTION WOULD SHORTEN TRIAL.** ........ 27

**X. CONCLUSION** ........ 28

## TABLE OF AUTHORITIES

**Cases** **Page (s)**

*Averbach v. Rival Mfg. Co.*,
879 F.2d 1196 (3d Cir. 1989)........................................ 4

*Beck v. Haik*,
377 F.3d 624 (6th Cir. 2004)........................................ 10

*CFPB v. All Am. Check Cashing, Inc.*,
No. 16-cv-356, 2016 WL 11635752 (S.D. Miss. July 15, 2016)........................................ 1

*CFPB v. Nationwide Biweekly Admin., Inc.*,
2017 U.S. Dist. LEXIS 145923 (N.D. Cal. Sept. 8, 2017)........................................ 20

*CFPB v. Navient,*
No. 17-cv-00101 (M.D. Pa.)........................................ 2

*Chartis Chile Compania De Seugoros Generales, S.A. v. Bullet Freight Sys., Inc.*,
No. 12-cv-22664, 2013 WL 12129293 (S.D. Fla. Apr. 2, 2013)........................................ 13, 25

*Chatman v. National R.R. Passenger Corp.*,
246 F.R.D. 695 (M.D. Fla. Nov. 21, 2007)........................................ 4

*Cleveland v. Policy Mgmt. Sys. Corp.*,
526 U.S. 795 (1999)........................................ 6

*Cortina v. F.A.D. Detective & Sec. Servs., Inc.*,
No. 11-cv-20732, 2011 WL 6025638 (S.D. Fla. Dec. 1, 2011)........................................ 4

*Davidson v. Capital One Bank (USA), N.A.*,
797 F.3d 1309 (11th Cir. 2015)........................................ 19

*Dimingo v. Midnight Xpress, Inc.*,
325 F. Supp. 3d 1299 (S.D. Fla. 2018)........................................ 6

*Fla. Atl. Univ. Rsch. Corp. v. Acer, Inc.,*
No. 12-cv-80694, 2014 WL 12385711 (S.D. Fla. June 12, 2014)........................................ 7

*F.T.C. v. Amazon.com, Inc.*,
71 F. Supp. 3d 1158 (W.D. Wash. 2014)........................................ 13

*F.T.C. v. Direct Benefits Grp., LLC*,

No. 11-cv-1186, 2013 WL 3771322 (M.D. Fla. July 18, 2013) .......................................... 12, 13

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ............................................................................................. 13

*FTC v. Qualcomm Inc.*,
No. 17-cv-00220, 2018 WL 6576029 (N.D. Ca. Dec. 13, 2018)............................................. 10

*FTC v. Roca Labs, Inc.,*
345 F. Supp. 3d 1375 (M.D. Fla. Sep. 14, 2018) .................................................................. 13

*FTC v. Wilcox,*
926 F. Supp. 1091 (S.D. Fla. 1995) ..................................................................................... 13

*Godelia v. Zoll Services, LLC*,
No. 16-cv-60471, 2019 WL 3883682 (S.D. Fla. Aug. 16, 2019) .............................................. 9

*Hynix Semiconductor Inc. v. Rambus Inc.,*
No. 00-cv-20905, 2009 WL 230039 (N.D. Cal. Jan. 27, 2009),
*aff''d*, 645 F.3d 1336 (Fed. Cir. 2011) ..................................................................................... 7

*In re Horizon Healthcare Servs. Data Breach Litig*.,
846 F.3d 625 (3d Cir. 2017)...................................................................................................... 9

*Johnston v. HBO Film Mgmt.,*
265 F.3d 178 (3d Cir. 2001)................................................................................................... 20

*Langan v. Johnson & Johnson Consumer Cos*.,
95 F. Supp. 3d 284 (D. Conn. 2015) ...................................................................................... 12

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955)................................................................................................................ 26

*Lebron v. Sec'y of Fla. Dep't of Children & Families*,
772 F.3d 1352 (11th Cir. 2014) ................................................................................................ 6

*Matsushita Electronic Industrial Co. v. Zenith Radio Corp*.,
475 U.S. 574 (1986)............................................................................................................. 1, 6

*Novick v. Shipcom Wireless, Inc.*,
946 F.3d 735 (5th Cir. 2020) .................................................................................................... 9

*Orkin Exterminating Co. v. FTC*,
849 F.2d 1354 (11th Cir. 1988) .............................................................................................. 12

*Pittman v. Seterus, Inc.*,
2015 U.S. Dist. LEXIS 157773 (N.D. Tex. Oct. 28, 2015) .......... 20

*QBE Ins. Corp. v. Jorda Enterprises, Inc.*,
277 F.R.D. 676 (S.D. Fla. 2012) .......... 4

*Reid v. Hasty*,
2008 U.S. Dist. LEXIS 133879 (N.D. Ga. March 13, 2008) .......... 20

*Rock v. Sunbelt Cranes, Const. & Hauling, Inc.*,
678 F.Supp.2d 1264 (M.D. Fla. Oct. 26, 2009) .......... 8

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) .......... 9

*U.S. v. Stinson*,
No. 14-cv-1534, 2016 WL 8488240 (M.D. Fla. Aug. 26, 2016) .......... 7

*United States v. 2204 Barbara Lane*,
960 F.2d 126 (11th Cir. 1992) .......... 4

*United States v. Roe*,
670 F.2d 956 (11th Cir. 1982) .......... 10

*Walker v. Darby,*
911 F.2d 1573 (11th Cir. 1990) .......... 1

*Wright-Simmons v. City of Oklahoma City*,
155 F.3d 1264 (10th Cir. 1998) .......... 10

**Statutes**

12 U.S.C. § 2605(f) .......... 21

12 U.S.C. § 5481(14) .......... 21

12 U.S.C. § 5552(a)(1) .......... 21

12 U.S.C. § 5564(a) .......... 21

12 U.S.C. § 5565(a) .......... 21

12 U.S.C. § 5565(c)(2) .......... 8

15 U.S.C. § 1640 .......... 20

15 U.S.C. § 1640(a) .......... 20

15 U.S.C. § 1692a(6)(F) .......... 19

**Rules**

Fed R. Civ. P. 26(e)(1) .......... 4
Fed. R. Evid. 401 .......... 7
Fed. R. Evid. 407 .......... 8, 9
Fed. R. Evid. 701(c) .......... 6
Fed. R. Evid. 801(d)(2)(A) .......... 7
Fed. R. Evid. 801(d)(2)(B) .......... 8, 10
Fed. R. Evid. 801(d)(2)(D) .......... 10

**Regulations**

12 C.F.R. § 1024.17(b) .......... 14
12 C.F.R. § 1024.17(c)(1)(ii) .......... 22, 23
12 C.F.R. § 1024.17(i)(2) .......... 21

In its motion for summary judgment ("Motion"), Plaintiff, Consumer Financial Protection Bureau ("Bureau"), has identified facts that show liability and for which no genuine dispute exists. In its opposition, Ocwen has failed to meet its burden to "do more than simply show there is some metaphysical doubt as to the material facts."[1] Instead, Ocwen (1) attempts to invent liability standards; (2) seeks to disavow the accuracy of its own discovery responses, including through an unsupported employee declaration; (3) raises incorrect evidentiary objections to its own business records; (4) manufactures factual disputes to oppose the Bureau's claims; (5) recycles its argument about the 2013 Consent Order between the parties, while ignoring the language of that Order; (6) claims two of the Defendants should not be considered servicers under RESPA (despite conceding Ocwen is a common enterprise); and (6) asserts that granting summary judgment on liability for almost all claims would not shorten the trial. As demonstrated herein, however, these arguments are without merit. Ocwen engaged in the alleged misconduct to the detriment of its borrowers, and the Bureau is entitled to summary judgment.

## I. OCWEN'S INVENTED LIABLITY STANDARDS ARE WRONG.

Ocwen argues that the Bureau must establish liability "as to each specific loan" through "individualized" evidence and an expert witness.[2] As set forth in the Bureau's opposition to Ocwen's motion for summary judgment ("Bureau's Opposition"), which the Bureau incorporates by reference into this Reply, there is no such "individualized" proof or expert witness standard.[3]

Under the Consumer Financial Protection Act of 2010 ("CFPA"), and the Fair Debt Collection Practices Act ("FDCPA"), courts do not require the government to produce evidence showing all—or even any—of the particular individuals that suffered the alleged unfair or deceptive acts or practices.[4] Ocwen cites no case law to the contrary. Ocwen suggests that this "obligation to adduce individualized proof" is apparent from an exchange in a discovery hearing

---

[1] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*. 475 U.S. 574, 586 (1986); *see also Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir. 1990) (a mere scintilla of doubt about material facts "will not suffice; there must be enough of a showing that the jury could reasonably find" for a party).
[2] Defs.' Opp. to Pl.'s Mot. Summ. J. ("Defs.' Opp.") at 7–8, 10, ECF No. 739.
[3] Pl.'s Opp. to Defs.' Mot. Summ. J. ("Pl.'s Opp.") at 11–15, ECF No. 740 (individualized evidence is not required); *see also, e.g.*, *CFPB v. All Am. Check Cashing, Inc.*, No. 16-cv-356, 2016 WL 11635752, at *2 (S.D. Miss. July 15, 2016) (requiring the Bureau to allege "individual transactions that violated the CFPA . . . ignores the CFPA's prohibition on 'any unfair, deceptive, or abusive … practice,' which by its very nature addresses policies and patterns rather than individual transactions"); Pl.'s Opp. at 18–19 (an expert witness is not required).
[4] Pl.'s Opp. at 12.

in another Bureau case, *CFPB v. Navient*, in which the court, seeking to determine the necessary length of trial, asked if the Bureau intended to call each of millions of consumers affected by Navient's practices to testify.[5] The Bureau explained that it did not, but rather would "have a representative number of consumers come forward . . . a small number who would testify on each particular issue," and establish damages through an expert.[6] The Bureau did not state or even suggest that to establish liability it had to put forth individual evidence for each borrower at issue. Neither did the court.[7] Nor did either the Bureau or the court suggest that testimony from affected consumers, or records of borrowers' individual transactions, was the only kind of evidence that may show liability under the CFPA.

Moreover, as described in the Bureau's Opposition, the Bureau has identified abundant "individualized" evidence of Ocwen's violations, including Ocwen's verified interrogatory responses, which it confirmed in corporate testimony, and its admissions. Indeed, the evidence here is "individualized" in that it identifies: each of the specific borrowers impacted by the over 390,000 instances in which Ocwen failed to timely analyze escrow accounts and the amounts it over- and under-collected as a result; over 82,000 borrowers to whom Ocwen communicated inaccurate reinstatement quotes (including those that paid the quoted amount); 1,367 borrowers for whom Ocwen failed to pay insurance policies, resulting in the policies' cancellations; and 124 borrowers for whom Ocwen illegally initiated foreclosure proceedings.[8] This evidence also includes, for example, reports Ocwen produced in discovery, and which it confirmed in corporate testimony, that identify: more than 628,000 borrowers whose loans Ocwen serviced using data with discrepancies in key fields, such as interest rate terms; over 145,000 borrowers to whom Ocwen failed to timely send the required escrow statements; and over 7,700 borrowers for whom Ocwen failed to cancel purchase mortgage insurance premiums.[9] Indeed, Ocwen's argument is not fundamentally that the Bureau has failed to identify "individualized" evidence—there can be no doubt that the evidence demonstrates that in these individual instances Ocwen violated the

---

[5] Defs.' Opp. at 10; Attachment A to Defs.' Opp. at 5:14–6:10.
[6] Attachment A to Defs.' Opp. at 6:11–6:19.
[7] Attachment A to Defs.' Opp. at 6:20–7:6.
[8] Pl.'s Statement of Material Facts in support of its Mot. for Summ. J., ECF No. 729, ("SOF"), SOF ¶¶ 184–186 (escrow analyses); 194–197 (reinstatement quotes); 222–224 (insurance cancellations); 259–260 (foreclosure initiations).
[9] SOF ¶¶ 127, 131–133, 135–154 (loan discrepancies); 199–201 (escrow statements); and 248–252 (PMI premiums).

law. Rather, Ocwen's assertion is essentially that the Bureau simply should not be allowed to rely on the evidence that shows these facts. As described below, this too is wrong.[10]

Finally, without citing any legal support, Ocwen continues to assert that the Bureau is required to prove liability with evidence "generated" by an expert.[11] But a liability expert is not required and is particularly unnecessary in this case given Ocwen's admissions and the unambiguous evidence of liability.[12] Alternatively, Ocwen claims that the Bureau should have ignored Ocwen's interrogatory and discovery responses, and instead conducted its own "individualized reviews" of consumers' loan files, again without citing any legal support.[13] But Ocwen already produced the relevant servicing data and information, identified borrowers affected by its violations at the individual level (including through its own reviews), and produced and attested to this information in discovery. An expert witness is not required to understand such clear-cut evidence in this matter.

## II. OCWEN'S ATTEMPTS TO UNDERMINE ITS OWN DISCOVERY RESPONSES DO NOT CREATE DISPUTED ISSUES OF FACT.

Ocwen opposes summary judgment by attempting to undermine its own discovery responses, including those containing "individualized" evidence; relying on an unsupported employee declaration; and objecting to the admissibility of its business records. Each attempt fails.

### A. Ocwen's assertions that its discovery responses may be inaccurate, including through use of its employee declaration directed at undermining them, are unavailing.

Ocwen contends that its discovery responses—which concede violations of the laws at issue—may not be fully accurate to some unspecified extent, and therefore cannot support summary judgment. Its attempts to undermine those discovery responses are procedurally improper at this stage. Ocwen makes unsupported arguments, relying on assertions in an employee declaration that is itself unsupported.[14] An examination of Ocwen's argument and the declaration that underlies it reveals that there is in fact no doubt as to the material facts here, notwithstanding Ocwen's attempts to muddy the waters.

---

[10] *See also* Pl.'s Opp. at 11–18.
[11] Defs.' Opp. at 14.
[12] Pl.'s Opp. at 18–19.
[13] Defs.' Opp. at 1, 10, 14, 16, 18, and 21.
[14] Defs.' Opp. at 17.

In various discovery requests, the Bureau asked Ocwen to identify each borrower who was subjected to certain conduct.[15] Ocwen reviewed its servicing data, identified individual borrower accounts, and provided its responses. It reaffirmed them in many instances, including through corporate testimony provided in Rule 30(b)(6) depositions, and by verifying its interrogatory responses as true and accurate. Ocwen now contends that its discovery responses cannot establish liability because other Ocwen data supposedly "would contain more accurate information."[16] Ocwen cannot now, at summary judgment, manufacture disputed facts by claiming that its discovery responses *could be* inaccurate to some unspecified extent.[17] Ocwen is bound by its interrogatory answers, admissions, and corporate testimony.[18] If Ocwen believed that its responses and testimony were inaccurate, it had an affirmative duty to correct them during discovery.[19] Ocwen's gamesmanship undermines the very purpose of discovery in the first place: "the Federal Rules of Civil Procedure are structured to elicit truthful answers given under oath," and thus parties "may reasonably rely on interrogatory answers."[20]

Ocwen attempts to manufacture a dispute by citing a declaration of its employee, Krysta Sebastian. Notably, Sebastian was deposed twice in this litigation, both times regarding Ocwen's production of servicing data pursuant to 29 specific discovery requests ("Servicing Data"), which includes the data on each credit and debit to a borrower's account ("Transaction History Data") and other more specific data, such as when each escrow analysis on each account was

---

[15] *See, e.g.*, Pl.'s Summ. J., ECF No. 729, Exhibit, ("SJX") 137, Bureau's First Set of Rogs. at Rog. No. 1 (asking Ocwen to identify each escrow account that it failed to timely analyze).
[16] Defendants' Resp. to Pl.'s Statement of Facts, ECF No. 741, ("Defs.' RSF") ¶ 168.
[17] *See, e.g., Cortina v. F.A.D. Detective & Sec. Servs., Inc,* No. 11-cv-20732, 2011 WL 6025638, at *3 (S.D. Fla. Dec. 1, 2011) (rejecting summary-judgment position that was inconsistent with admission).
[18] *See, e.g.*, *United States v. 2204 Barbara Lane*, 960 F.2d 126, 129–30 (11th Cir. 1992) (admissions under Fed. R. Civ. P. 36 are binding); *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012) ("A corporation has an affirmative duty to provide a [30(b)(6)] witness who is able to provide binding answers on behalf of the corporation."); *Chatman v. Nat'l R.R. Passenger Corp.*, 246 F.R.D. 695, 700 (M.D. Fla. Nov. 21, 2007) (corporation's interrogatory answers were binding to the corporation).
[19] Fed. R. Civ. P. 26(e)(1).
[20] *See, e.g.*, *Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1201 (3d Cir. 1989) ("A litigant is entitled to accept answers to previous interrogatories as true, and to refrain from seeking additional discovery directed to the same issue. . . . the opposing party . . . may reasonably rely on interrogatory answers.").

performed.[21] As an initial matter, Sebastian disavowed in this very litigation the personal knowledge requisite to offer the opinions she now offers. She testified that she lacked "technical" knowledge about the accuracy of the Servicing Data and how it was used.[22] Further, Sebastian's statements in her declaration have no basis in the record evidence (apart from brief references to portions of Servicing Data for only eight loans), conflict with Ocwen's prior corporate testimony, and are impermissible expert testimony.

First, Sebastian's opinions have no basis in record evidence apart from her assertions that she reviewed Servicing Data for eight borrowers. Her central opinion is that Transaction History Data is the "most detailed and accurate data," as compared to Ocwen's Servicing Data, verified interrogatory responses, and other discovery responses.[23] But Sebastian cites to no record evidence to support this opinion.[24] Next, Sebastian performs an individual analysis of eight specific loans, and opines based on these analyses that borrowers had certain delinquency or bankruptcy statuses on a given date, paid certain amounts, or received certain information.[25] While Sebastian reviewed only eight individual loans, she then attempts to extrapolate the results of her individual analyses to some unspecified "many" loans.[26] Sebastian provides no record evidence to expand her opinions beyond the eight loans she in fact reviewed.[27] Rather, she admits that she "did not do an analysis of all of the loans."[28] And last, outside of being asked to do so by counsel, Sebastian offers no basis for using methodologies different from those Ocwen used in producing, verifying, and testifying about its discovery responses.[29] In sum, Sebastian's analyses and conclusions are not based on record evidence and should be ignored. Her analyses

[21] Pl.'s Reply Statement of Facts ("PRF") Ex. 2, Nov. 9, 2018 Sebastian Dep. ("Sebastian Fact Dep."); SJX 35, Sebastian 30(b)(6) Dep. ("Sebastian Corp. Dep.").
[22] Sebastian Fact Dep. at 29:4–30:7; Sebastian Corp. Dep. at 142:22–143:17 (testifying she lacked certain knowledge as to the Transaction History Data but that other Ocwen personnel would have such knowledge); 39:11–40:20 (testifying the same relating to the credit reporting data).
[23] Defs.' RSF Ex. 13, Declaration of Krysta Sebastian, ("Sebastian Decl.") ¶¶ 29, 31, 55. *See also* PRF ¶¶ 168, 200–201.
[24] *See* Sebastian Decl. ¶¶ 29–31, 55 (no citations to support opinion).
[25] *Id.* ¶¶ 27, 55–56, 72 (loan status), 44, 47, 65 (paid amounts), 59 (received information).
[26] *Id.* ¶¶ 45, 48, 57, 60, 66, 73.
[27] *Id.*
[28] *Id.* ¶¶ 45, 48, 57, 60, 66, 73.
[29] *Id.* ¶¶ 28, 36–38, 49–51, 58, 61–63, 67–70.

of eight loans out of approximately one million falls short of raising even "metaphysical doubt," let alone creating a genuine dispute of material fact.[30]

Second, Sebastian's central opinion regarding the superiority of the Transaction History Data is contradicted by Ocwen's corporate testimony, including her own. Sebastian, as Ocwen's corporate witness, testified that Ocwen used the Servicing Data to service its loans, not only the Transaction History Data as she now claims.[31] Further, Ocwen's Transaction History Data lacks substantial information contained in the Servicing Data; it is simply an accounting of credits and debits. Ocwen's own corporate witness designated to testify about its answers to interrogatories relating to escrow analyses (Combs, not Sebastian) provided an illustrative example of the differences between these data sources. To answer these interrogatories, which he testified were Ocwen's "most complete and accurate" answer, Combs said that Ocwen used a system-generated "last escrow analysis date" not contained in the Transaction History Data. He called the last escrow analysis date the "primary" method used to determine whether an escrow analysis had in fact been performed.[32] Yet, Sebastian does not address the absence of this, and other, information in the Transaction History Data.[33] "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."[34] That is precisely what the Sebastian declaration does.

Third, portions of Sebastian's declaration are also impermissible lay witness testimony under Federal Rule of Evidence 701.[35] Testimony that relies on "specialized knowledge," such as testimony that uses a hypothesis, supposition, or extrapolation to present a fact, is expert testimony subject to Rule 702's gatekeeping requirements.[36] Sebastian, whom Ocwen has not

---

[30] *Matsushita*, 475 U.S. at 586.
[31] Sebastian Corp. Dep. at 11:6–12:2; Sebastian Decl. ¶¶ 31, 54 (claiming Ocwen "actually used [the Transaction History Data]" to service loans).
[32] PRF ¶ 168.
[33] *See* PRF ¶¶ 168, 201.
[34] *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *see also, e.g.*, *Dimingo v. Midnight Xpress, Inc.*, 325 F. Supp. 3d 1299, 1305 (S.D. Fla. 2018) (excluding affidavit statements that could not "be reconciled with [ ] prior testimony or discovery responses").
[35] Fed. R. Evid. 701(c) (prohibiting lay witness testimony based on technical or specialized knowledge, which is expert testimony within the scope of Rule 702).
[36] *Lebron v. Sec'y of Fla. Dep't of Child. & Families*, 772 F.3d 1352, 1372 (11th Cir. 2014).

sought to qualify as an expert, opines on the comparative accuracy of Ocwen's data, performs an analysis of eight loans interpreting what various data points mean,[37] and attempts to extrapolate these analyses to other loans.[38] This supposed specialized and technical knowledge is quintessential expert testimony.[39] Indeed, Sebastian offers the same unsupported–by–the–record opinion as Ocwen's damages expert, Dr. Hamm, regarding the supposed superiority of the Transaction History Data.[40] Sebastian's declaration should be disregarded because she is not a qualified expert and her testimony falls outside the scope of FRE 701.

**B. Ocwen's business records are admissible.**

*1. Ocwen's audit findings are admissible evidence.*

Ocwen also contends that its internal and external audits are inadmissible and irrelevant.[41] Both arguments fail. Ocwen's internal audits are admissible as records of regularly conducted activity under Rule 803(6) and admissions of a party-opponent under Rule 801(d)(2)(A).[42] And Ocwen's relevance objections to certain audits are equally meritless. For example, Ocwen contends that an internal audit from July 2013 is irrelevant to the Bureau's claims because the "audit was completed before the time period covered by this case."[43] But "evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[44] The audit report is not

---

[37] *See* n.25 *supra.*

[38] Sebastian Decl. ¶¶ 45, 48, 57, 60, 66, 73.

[39] *Fla. Atl. Univ. Rsch. Corp. v. Acer, Inc.,* No. 12-cv-80694, 2014 WL 12385711, at *3 (S.D. Fla. June 12, 2014); *see also Hynix Semiconductor Inc. v. Rambus Inc.,* No. 00-cv-20905, 2009 WL 230039, at *11 (N.D. Cal. Jan. 27, 2009), *aff'd*, 645 F.3d 1336 (Fed. Cir. 2011).

[40] Hamm Expert Report, ECF No. 732, Ex. 4, ¶¶ 139, 188–190; Sebastian Decl. ¶¶ 29, 31, 54 (claiming that the "Transaction History" is the proper data to analyze); *see* PRF ¶ 168.

[41] Defs.' RSF ¶¶ 149–151, 154 (implying that internal audits cited by the Bureau are inadmissible by stating that "the CFPB does not cite to any . . . other admissible evidence"); Defs.' Opp. at 26 (contending that a July 13, 2013 internal audit (SJX 86) is irrelevant because it is from 2013).

[42] *See, e.g.*, *U.S. v. Stinson*, No. 14-cv-1534, 2016 WL 8488240 at *8 (M.D. Fla. Aug. 26, 2016) ("[A]udit reports made in the course of regular business activity may be admissible under the business records exception, unless the audit reports were prepared for the purpose of litigation or are shown to be untrustworthy"). Under Fed. R. Evid. 801(d)(2)(A) an opposing party's statement can be offered against the opposing party if "it was made by the party in an individual or representative capacity." Ocwen's internal audits were conducted and prepared by Ocwen, and are therefore statements made by Ocwen.

[43] Defs.' Opp. at 26 (citing SJX 86).

[44] Fed. R. Evid. 401.

only relevant to show whether Ocwen was failing to conduct annual escrow analyses as of January 2014 but also shows Ocwen's knowledge, a fact relevant to the appropriate civil monetary penalty tier under the CFPA.[45] Thus, such evidence is relevant and admissible.[46]

Ocwen also contends that letters it received from Fannie Mae and Chase Bank reporting findings from their external compliance reviews of Ocwen's practices are inadmissible as hearsay.[47] Such information is admissible as Ocwen's (and Fannie Mae's and Chase's) records of regularly conducted activity under Rule 803(6). They are also admissions of a party-opponent under Rule 801(d)(2)(B), as Ocwen's CEO adopted the information in those documents.[48]

*2. Ocwen's other business records relating to the alleged conduct are admissible.*

Ocwen also contends that other documents it created in its regular course of business, including "Management Assertion Forms" (MAFs), "Corrective Action Plans" (CAPs) and Written Report 12 "Remediation Report," are inadmissible as evidence of subsequent remedial measures under Federal Rule of Evidence 407.[49] Ocwen is wrong for two independent reasons.

First, Ocwen mischaracterizes the Bureau's reliance on these reports. Rule 407 only excludes evidence of measures that were actually taken "that would have made an earlier injury or harm less likely to occur."[50] The Bureau does not raise facts or cite to remedial measures actually taken by Ocwen, and Ocwen does not argue otherwise.[51] Instead, the Bureau cites to portions of these documents to show what conduct occurred, the borrowers identified by Ocwen as being affected, and the actual or potential harm to borrowers.[52] The portions of these documents on which the Bureau relies are akin to "post-accident investigation reports," and not subsequent

---

[45] 12 U.S.C. § 5565(c)(2) (penalty tiers based on a defendants' knowledge).
[46] *Rock v. Sunbelt Cranes, Const. & Hauling, Inc.*, 678 F. Supp. 2d 1264, 1266 (M.D. Fla. Oct. 26, 2009) (witness's testimony is not limited to the time period at issue and it is for the court as trier of fact "to determine the weight and credibility to be given to [ ] testimony").
[47] Defs.' RSF ¶¶ 104, 107 (claiming such letters are inadmissible as hearsay).
[48] SJX 46, Faris Dep. at 236:15–242:1 (Ocwen's CEO agreeing that Ocwen could not provide the infrastructure that Chase complained Ocwen lacked in its letter); 245:21–250:13 (agreeing that Fannie's concerns as to Ocwen's lagging risk controls were "understandable").
[49] Defs.' Opp. at 15 (referencing SJX 59–60, 81–85, 93, 131, 159).
[50] Fed. R. Evid. 407.
[51] *See e.g.*, Defs.' RSF ¶ 191 (Ocwen concluding that the underlying document is inadmissible remedial evidence, despite that the Bureau cites no information relating to remedial measures).
[52] SOF ¶¶ 113–114, 191, 217 (facts demonstrating Ocwen's conduct and harm to borrowers); Defs.' RSF ¶¶ 113–114, 191, 217 (Ocwen claiming such information is inadmissible remedial evidence).

remedial measures under Rule 407, because a description of past events "would not make the event 'less likely to occur,' only the actual implemented changes make it so."[53]

Second, even if parts of the documents referred to changes, those were changes that Ocwen was considering or implementing to comply with federal law and GSE requirements.[54] The Bureau does not cite to such changes, but even if it did, such changes are not considered excludable "voluntary" remediation. Courts have not applied Rule 407 to such required compliance changes, since doing so would not further Rule 407's "social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety."[55]

In support of its argument, Ocwen cites to a footnote in one inapposite case, *In re Horizon Healthcare Servs. Data Breach Litig*.[56] There, the court found that Horizon's provision of free credit monitoring should not be viewed as a concession that borrowers suffered injury.[57] Unlike in *Horizon*, however, the Bureau does not cite to the information relied on at issue here to show any purported remedial measures, but rather to describe what conduct occurred and the resulting actual or potential harm to borrowers.

*3. Ocwen's consultant's report, which Ocwen adopted, is not hearsay.*

Ocwen claims that an analysis of its servicing system by its consultant, Accenture, which identified Ocwen's "pain points" and system deficiencies ("Accenture Report") is inadmissible hearsay.[58] This too is wrong, because the document is an admission of a party opponent.

---

[53] *Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 739–740 (5th Cir. 2020); *see also*, *e.g.*, *Godelia v. Zoll Services, LLC*, No. 16-cv-60471, 2019 WL 3883682 at *1 (S.D. Fla. Aug. 16, 2019) (audit report containing findings regarding the defendants' compliance with FDA regulations was not a subsequent remedial measure).
[54] *See e.g*., SJX 59, 60, 84–85, 159 (discussing Ocwen's audit findings); SJX 81 ([redacted]); SJX 82, 83 (identifying violations of law and GSE requirements due to inaccurate PMI premiums); SJX 93, (discussing Bureau's findings of potential legal violations); SJX, 184 (discussing GSE audits).
[55] *See, e.g.*, *Novick*, 946 F.3d at 740 (not excluding evidence because defendant was "legally obligated to take the … measures in question to comply with the FLSA"); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1343 (5th Cir. 1978) (exclusion of engineering report was "particularly inappropriate" because the remedial measure was required by a government authority).
[56] Defs.' Opp. at 15 (citing 846 F.3d 625, 634 n.12 (3d Cir. 2017)).
[57] *Horizon Healthcare Servs.*, 846 F.3d at 634 n.12.
[58] Defs.' RSF ¶¶ 97–98.

First, under Rule 801(d)(2)(D), statements are admissible if "offered against an opposing party" and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"[59] The Accenture Report was prepared for Ocwen, at its request, while Accenture was acting as Ocwen's agent.[60] Thus, it is an admission of Ocwen.[61]

Second, under Federal Rule of Evidence 801(d)(2)(B), a statement is not hearsay if it is offered against the opposing party and the party adopted or believed it to be true. Ocwen adopted the contents of the Accenture Report by following recommendations in it.[62] And Ocwen also believed its contents to be true, since the "pain points" reflect statements made by its own executives to Accenture.[63] The Accenture Report is therefore an adoptive admission of Ocwen.[64]

## III. OCWEN'S ATTEMPTS TO CREATE DISPUTES OF FACT REGARDING ITS SERVICING OF LOANS USING INACCURATE AND INCOMPLETE RECORDS FAIL.

Ocwen's opposition does not raise a genuine dispute about the facts that establish the Bureau's Counts I, II, IV, and VI ("Inaccurate Records Claims"). Ocwen does not dispute that its use of inaccurate records created a risk of substantial injury that borrowers could not reasonably avoid. Instead, it argues that its practices created no actual harm but, even if they did, such harm was outweighed by Ocwen's overall value as a mortgage servicer. Neither argument is supported by fact or law.

### A. Ocwen's already-rejected assertion that its use of inaccurate data to service loans is not an unfair practice is wrong.

The Bureau's unfairness claim centers on Ocwen's servicing of loans using inaccurate or incomplete information. Ocwen argues that such practices cannot be unfair because: all of its servicing practices should be the alleged conduct; even if it did use inaccurate information, such inaccuracies were the fault of the prior servicer or immaterial; and the Bureau has not set forth facts relating to all loan-level discovery it sought.

---

[59] Fed. R. Evid. 801(d)(2)(D).
[60] *See* SJX 130 (Accenture Report includes Ocwen's next steps on the project); SJX 37, Aery 30(b)(6) Dep. at 71:6–72:7 (testifying that Ocwen hired Accenture to prepare the report).
[61] *See*, *e.g.*, *Beck v. Haik*, 377 F.3d 624, 638–39 (6th Cir. 2004) (admitting letters written to county defendant by a risk consultant); *United States v. Roe*, 670 F.2d 956, 965 (11th Cir. 1982).
[62] *See* SJX 37, Aery 30(b)(6) Dep. at 72:15–74:19.
[63] SJX 37, Aery 30(b)(6) Dep. at 74:25–76:3 (pain points based on interviews with Ocwen).
[64] *See, e.g., Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268–69 (10th Cir. 1998) (admitting report and interview notes where defendant acted on them, at least in part); *FTC v. Qualcomm Inc.*, No. 17-cv-00220, 2018 WL 6576029 (N.D. Ca. Dec. 13, 2018) (consultant's statements were admissible as statements of a party-opponent).

First, Ocwen argues that its admitted use of inaccurate data to service loans cannot be an unfair practice, and that rather only "Ocwen's loan servicing practices" could be actionable.[65] This Court already resolved these questions when ruling on Ocwen's motion to dismiss, holding that the Bureau stated a claim when it alleged that Ocwen serviced loans using inaccurate or incomplete information.[66]

Next, Ocwen suggests that any harm was "no fault of its own" because it used data it obtained from other servicers.[67] But Ocwen voluntarily purchased the loans containing inaccuracies; Ocwen decided what due diligence efforts to take *before* buying the loans; and Ocwen decided how and when to bring the loans onto its systems and how to verify their accuracy. Ocwen may pursue any recourse it may have against any previous servicer. And, in fact, it has already done so and recovered at least $29.9 million from prior servicers.[68] Regardless, this Court already rejected Ocwen's argument that it cannot be held accountable if it "imported data from prior servicers that had errors."[69] And any suggestion that the consumer harm here was not caused by Ocwen's own actions is belied by the record.[70]

Ocwen then argues that even if it used inaccurate data to service loans, "a great many" of the 2.1 million borrowers whose loan data it produced in discovery had only an "immaterial correction" to data about their loan, and points to one example—a wrong zip code.[71] Ocwen's zip code example is hardly compelling: a wrong zip code may delay payment demands, escrow statements, and loss-mitigation notices, among other critical information, or render them undeliverable. The Bureau, however, does not rely on "immaterial" inaccuracies in its Motion to show that Ocwen's conduct was likely to cause, and did cause, substantial harm to borrowers. Rather, the Bureau identifies Ocwen's use of inaccurate interest rates and maturity dates, which led it to charge borrowers inaccurate amounts, and other such inaccuracies in loan terms, escrow

---

[65] Defs.' Opp. at 12–13.
[66] Sept. 5, 2019 Order on Ocwen's Motion to Dismiss ("Sept. 5, 2019 Order") at 33, ECF No. 452. Ocwen also has had fair notice since 2013 that such conduct could be unfair. *Id.* at 39.
[67] Defs.' Opp. at 13.
[68] PRF ¶ 334.
[69] Defs.' Mot. to Dismiss at 12, ECF No. 31; Sept. 5, 2019 Order at 37–39 (Bureau's 2013 bulletin warning servicers to perform proper due diligence, conduct post-transfer audits, and correct identified errors "provides fair notice" that Ocwen's use of inaccurate information "could be actionable") (citation omitted).
[70] Pl.'s Mot. Summ. J., ECF No. 728, ("Pl.'s MSJ") at 8–15.
[71] Defs.' Opp. at 15.

and insurance data, and loan-modification information, that can and did lead to consumer harm.[72] Ocwen does not substantively address the actual inaccuracies the Bureau has identified. Even if other immaterial inaccuracies exist, this does not negate the other evidence demonstrating substantial harm or risk of harm from its practices. Apart from unsupported rhetoric, Ocwen raises no genuine disputes to the record evidence demonstrating that it used inaccurate escrow, insurance, loan-modification and loan-term information to service consumers' loans, or that its inaccuracies caused, or were likely to cause, substantial consumer injury.

Finally, Ocwen also argues that the Bureau's unfairness claim "only cover[s] a small fraction of the 2.1 million loans that the Bureau has claimed violate the CFPA and FDCPA,"[73] suggesting that to establish unfairness, the Bureau must include evidence on every loan in this group. As explained in the Bureau's Opposition, this proposition has no grounding in the law and Ocwen has cited none.[74] In its Motion, the Bureau has cited evidence showing that Ocwen serviced hundreds of thousands of loans using inaccurate information, resulting in substantial harm, including over-collecting over $100 million from borrowers.[75] This evidence far exceeds the showing required to establish unfairness, which requires only a substantial likelihood of injury.[76]

**B. Ocwen's subsequent remediation does not preclude liability.**

Ocwen also argues that this Court must take into account Ocwen's "self-correction activities" in determining unfairness because such activities "were part of Ocwen's loan servicing activities."[77] Even if Ocwen demonstrated that it eventually provided some remediation to some

---

[72] Pl.'s MSJ at 9–20.
[73] Defs.' Opp. at 15.
[74] Pl.'s Opp. at 11–15.
[75] Pl.'s MSJ at 8–18.
[76] *See, e.g.*, *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) ($7 million total in unlawful renewal fees constituted substantial injury); *FTC v. Direct Benefits Grp., LLC*, No. 11-cv-1186, 2013 WL 3771322, at *13 (M.D. Fla. July 18, 2013) (improper debits totaling $9.5 million constituted substantial injury); *Langan v. Johnson & Johnson Consumer Cos.*, 95 F. Supp. 3d 284, 290 (D. Conn. 2015) (overcharges constituted substantial injury because "the cumulative injury to class members is in excess of $5 million").
[77] Defs.' Opp. at 13; *see also* Defs.' RSF ¶¶ 191, 192, 211, 216, 225, 234, 236, 239, 243, 244, 253, 256, and Defs.' Counterstatement of Facts, ECF No. 741, ("Defs.' CSF") ¶¶ 301–304, 313, 316, 317, 319, 320, 322, 324–328, 331 (Ocwen's assertions of remediation).

consumers, this would not mean Ocwen did not harm those consumers, negate an unfairness claim,[78] or create a genuine dispute of material fact to defeat summary judgment.[79]

**C. Ocwen's assertions that its practices did not cause substantial borrower harm are nothing more than speculation.**

Ocwen argues throughout its opposition that its acts and practices were not unfair because Ocwen believes they did not cause harm, even if they had the potential to cause harm.[80] Ocwen does not appear to contest that it created a significant risk of harm.[81] And a "significant risk of harm" is all that is necessary to prevail on the first prong of unfairness—that an act caused injury or was likely to cause injury.[82] Ocwen has thus as much as conceded that this element is met, notwithstanding its protestations about the harm that stemmed from its violations.[83] Further, Ocwen's remaining attempts to create a genuine factual dispute about how its practices actually harmed borrowers—again largely focused on casting doubt on its own discovery responses and introducing unsupported facts about supposed practices that may have prevented or corrected its errors—also fail, as described below.

***Escrow amounts owed***: There is no genuine dispute that the record evidence shows Ocwen: (1) overcharged at least 194,000 borrowers $104 million; and (2) undercharged at least 131,000 borrowers at least $43.5 million and then demanded payment of those amounts.[84]

---

[78] *See, e.g.*, *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010) (finding substantial injury where, as here, consumers had "lost access to and use of [their] funds" and "[r]egardless of whether a bank eventually restored consumers' money"); *F.T.C. v. Amazon.com, Inc.*, 71 F. Supp. 3d 1158, 1167 (W.D. Wash. 2014) ("the possibility of—or even issuance of—a refund does not foreclose an action" for unfairness); *F.T.C. v. Direct Benefits Grp., LLC*, No. 11-cv-1186, 2013 WL 3771322, at *14 (M.D. Fla. July 18, 2013) ("[T]he fact that many customers were able to—eventually—obtain refunds from Defendants does not render the injury avoidable.").

[79] *FTC v. Wilcox*, 926 F. Supp. 1091, 1100 (S.D. Fla. 1995) (subsequent refunds do not create a genuine issue of material fact to defeat summary judgment (deception under FTC Act)).

[80] *See* Defs.' Opp. at, *e.g.*, 18 (asserting that borrower harm may not have occurred because insurance policies were only "'potentially' cancelled as a result of an error"); 19 (asserting that because its business records said "harm 'may have resulted'" substantial harm is not established).

[81] *Id.*; *see also id.* at 16 ("the borrowers did not suffer any substantial injury").

[82] *FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1397 (M.D. Fla. Sept. 14, 2018).

[83] *See, e.g.*, *Chartis Chile Compania De Seugoros Generales, S.A. v. Bullet Freight Sys., Inc.*, No. 12-cv-22664, 2013 WL 12129293, at *2 (S.D. Fla. Apr. 2, 2013) ("Plaintiffs' response in opposition does not address this argument, and therefore concedes the point.").

[84] SOF ¶¶ 184–186, Defs.' RSF ¶¶ 184–186, and PRF ¶¶ 184–186.

Ocwen does not dispute that these overcharges and undercharges occurred or that they were likely to cause substantial injury.[85] Instead, relying on Sebastian's declaration and its analysis of just two loans, Ocwen concludes that some unspecified borrowers may not have paid the incorrect amounts.[86] On that basis, Ocwen asserts that the data indicates that "many" borrowers did not pay the incorrect amounts.[87] First, the servicing data for the two loans actually reflect both borrowers *did pay* the incorrect amounts.[88] Second, Ocwen's assertion is further belied by evidence it does not question: there is no dispute that Ocwen's borrowers accrued $104 million in escrow surpluses during the relevant period. An escrow surplus, by definition, only accrues when a borrower has paid more escrow amounts than otherwise required.[89] In any event, Ocwen's arguments are unsupported, and indeed contradicted, by record evidence and do not create a genuine dispute, including as to the actual and potential harm borrowers suffered from being charged and/or paying inaccurate escrow amounts.

Ocwen disputes its verified interrogatory response indicates that nearly 400,000 escrow analyses were not performed on time by claiming, after relying on the opinion of its rebuttal expert, that other unspecified Ocwen data may show "that Ocwen most likely did conduct escrow analyses for many of the listed loans."[90] Ocwen, however, testified that its verified interrogatory answer represented the "most complete and most accurate response" it had.[91] Thus, Ocwen' argument is unsupported by record evidence and does not create a genuine dispute.

Finally, Ocwen also argues that it "voluntarily remediated" any overpayments; meaning it ultimately conducted an escrow analysis and potentially refunded surpluses to borrowers.[92] Conducting an escrow analysis and refunding escrow surpluses is required by law: it is not "voluntary remediation." And, as described in Section III.B, even if Ocwen ultimately returned some of the funds that it over-collected, that does not mean borrowers were not harmed or substantially likely to be harmed.

---

[85] *See e.g.*, Defs.' Opp. at 17–18 (only arguing that borrowers did not suffer substantial injury).
[86] Sebastian Decl. ¶¶ 39, 44, 47.
[87] Defs.' CSF ¶¶ 309–310.
[88] PRF ¶¶ 309–310.
[89] SOF ¶ 161, 12 C.F.R. § 1024.17(b) (definition of "Surplus").
[90] Defs.' Opp. at 15–16 (emphasis removed).
[91] SJX 38, Combs 30(b)(6) Dep. at 47:4–7.
[92] Defs.' Opp. at 16.

***Reinstatement quotes****:* There is no genuine dispute that the record evidence shows Ocwen provided inaccurate reinstatement quotes to borrowers. In its verified response to Interrogatory No. 5, Ocwen identified 82,763 inaccurate reinstatement quotes that it provided to borrowers.[93] Ocwen now points to the word "potentially" in its response to suggest that its answers *could* be incorrect, even though Ocwen testified that the "82,763 inaccurate reinstatement quotes" was its most accurate response.[94] While Ocwen attempts to undermine its response, it also relies on it to argue that borrowers who received inaccurate quotes were not substantially injured because they received unrelated loan modifications.[95] But even if some borrowers may have ultimately received subsequent loan modifications, Ocwen's conduct still caused harm or the likelihood of harm to thousands of borrowers who were quoted inaccurate reinstatement amounts.

***Escrow shortage amounts***: Ocwen does not dispute that it continued to seek to collect from borrowers who had already paid shortages,[96] or that it over-collected shortage amounts from borrowers.[97] Ocwen's only dispute is with the Bureau's reliance on its verified interrogatory response identifying tens of thousands of borrowers for whom it failed to process shortage payments by its internal deadlines to conclude that borrowers were affected by its conduct.[98] In fact, Ocwen's failure to timely process such payments demonstrates that it continued to treat the borrowers who had paid their escrow shortages as if they had not, and thus continued to use inaccurate information to service these loans in a way that created a risk of substantial injury—namely, that it would double-collect shortage amounts—and record evidence shows Ocwen did in fact over-collect such amounts.[99] Ocwen does not offer any reason to think this is not the case. Its general assertion that it "automatically remedied" any over-collection by performing the required escrow analyses is belied by the record, as described in Section III.C. (Escrow Amounts).[100] And even if it were true that Ocwen ultimately processed these payments and remediated consumers based on later-performed escrow analyses, performing a legally required

---

[93] SJX 138, Defs.' Resp. First Rogs to Rog. 5 at 18.
[94] SJX 38, Combs 30(b)(6) Dep. at 281:4–20 (testifying that Ocwen's response to interrogatories five through eight are "…the best [Ocwen] can do from a modeling perspective.").
[95] Defs.' Opp. at 16 (citing Ocwen CSF ¶ 319).
[96] SOF ¶ 206; Defs.' RSF ¶ 206.
[97] Defs.' RSF ¶¶ 205–207; *see also* PRF ¶¶ 204–211.
[98] Defs.' Opp. at 16–17.
[99] SOF ¶ 205; Defs.' RSF ¶ 205; PRF ¶ 205.
[100] Defs.' Opp. at 17.

annual escrow analysis—in some cases a year or more after first over-collecting from a consumer—and only then returning over-collected funds, does not demonstrate that consumers were not harmed or otherwise negate liability, as described in Section III.B.

***Inaccurate loan terms and amounts owed***: Ocwen does not dispute that it serviced loans using inaccurate information as to loan terms and amounts owed. And Ocwen does not raise a genuine dispute that it: (1) had a process to verify critical loan data within 60 days of boarding loans onto its system; (2) failed to comply with this process for several months, if not years, for over 600,000 loans; (3) discovered over 1.3 million discrepancies in this loan data when it did verify the loans, including over 100,000 discrepancies in terms related to the interest amount being collected; and (4) identified overcharges and undercharges totaling millions of dollars to thousands of borrowers.[101] It is undisputed that the purpose of Ocwen's loan-verification process was to "confirm the accuracy of key data points loaded in REALServicing, including principal and interest, with the original loan documents received from the prior servicer," and "confirm the accuracy of the data that Ocwen's *business units . . . use in their day-to-day operation*."[102]

As elsewhere in its opposition, Ocwen simply argues that its loan-verification reports do not establish that it was using inaccurate data. It speculates that, based on its other general risk management processes, it "*could well have been* using the right information from another location."[103] But that is simply unsupported—as Ocwen confirmed in corporate testimony, the loan-verification reports show that Ocwen serviced the loans using that inaccurate information until it later corrected the information.[104] Ocwen's argument that it "*could* well have been using the right information" is baseless conjecture.

Ocwen also argues that the overcharge and undercharge reports it produced do not show what borrowers paid or that borrowers suffered substantial injuries.[105] Ocwen does not dispute that it billed borrowers the wrong amounts—in the same discovery response, Ocwen stated that these reports identified the "undercharge or overcharge amount."[106] Citing no facts, Ocwen speculates

---

[101] Defs.' Opp. at 17–18*; see also* PRF ¶¶ 115–157.
[102] Defs.' RSF ¶ 117; *see also* PRF ¶¶ 121, 127, 131–133, 292–307 (emphasis added).
[103] Defs.' Opp. at 17 (emphasis added) and Ocwen CSF ¶ 296. *But see* PRF ¶ 296.
[104] SOF ¶¶ 121, 127, *see also* PRF ¶¶ 127, 294.
[105] Defs.' Opp. at 17–18.
[106] PRF ¶¶ 149–151. In a separate interrogatory answer, Ocwen also referenced these same reports as identifying overcharges and undercharges. *Id.*

that "some" of these undercharge or overcharges "almost certainly" were incurred with a prior servicer or prior to 2014.[107] But even if *some* of the overcharges or undercharges accrued under a prior servicer or before 2014, that does not change the fact that Ocwen overcharged and undercharged vast numbers of borrowers since January 2014, which remains undisputed.

***Insurance Information***: Ocwen serviced loans using several types of inaccurate insurance information, causing or likely causing substantial injury. First, Ocwen does not raise a genuine dispute that it failed to pay borrowers' hazard insurance premiums on time,[108] which resulted in borrowers' insurance policies being cancelled,[109] and that certain borrowers had to obtain new, more expensive replacement insurance policies.[110] Ocwen now argues that its use of the word "potentially" in its verified interrogatory answers means that only an individualized review could establish the practice.[111] Ocwen's speculation is belied by its verified interrogatory response itself, which states that these 1,367 borrowers were those for whom Ocwen determined the "cancellation was the result of Ocwen or vendor error."[112] Further, Ocwen's claims of subsequent remediation where its errors led to an "inadvertent cancellation of insurance"[113] do not negate liability, for the reasons set forth in Section III.B.

Second, Ocwen does not dispute that its system of record sometimes "did not contain current or updated flood zone data,"[114] and that there were accounts "for which flood insurance was placed and the property was not currently in a flood zone."[115] Ocwen argues that no liability exists because its reports do "not identify any specific loans" and that it "voluntarily remediated any borrowers impacted by this issue."[116] As with Ocwen's other arguments about the Bureau's claims, individualized evidence is not required and remediation, even if it occurred later, does not negate liability, as described in Sections I and III.B.

---

[107] Defs.' Opp. at 18.
[108] Defs.' RSF ¶¶ 215, 221.
[109] SJX 138, Defs.' Resp. First Rogs. at Rog. No. 9 at 22.
[110] SOF ¶ 223, Defs.' RSF ¶ 223.
[111] Defs.' Opp. at 18.
[112] Defs.' RSF ¶ 222; PRF ¶ 222.
[113] Defs.' Opp. at 18.
[114] Defs.' RSF ¶ 236.
[115] *Id.*
[116] Defs.' Opp. at 18.

Third, Ocwen does not dispute that it failed to cancel private mortgage insurance on the legally-required cancellation date. Ocwen does not dispute that it identified that its system "contained inaccurate or missing information for the private-mortgage insurance ("PMI") 'termination date,'"[117] resulting in borrowers paying premiums after their policies were cancelled, leading Ocwen to overcharge consumers by over $3.8 million.[118] Despite identifying borrowers that "should have" had their PMI timely cancelled, but did not, Ocwen asks the court to disregard its discovery responses that establish these facts. It also argues, again, that it remediated "virtually all borrowers," which it argues "foreclose[s] a finding of substantial injury,"[119] a point on which, again, it is simply wrong. *See* Section III.B.

***Loan-Modification Information***: There is no genuine dispute Ocwen sent loan-modification agreements to borrowers with incorrect loan information, such as missing loan terms that increased a borrower's interest rate.[120] Ocwen does not dispute that it sent agreements (and letters) with inaccurate and missing terms.[121] Ocwen also concedes that this may have caused harm.[122] Ocwen's primary argument is that the cited evidence, a corrective action plan ("CAP") detailing [redacted], is inadmissible. This is wrong. The action plan was part of the Bureau's examination process, not "voluntary;"[123] and the Bureau uses the action plan to show the conduct that occurred and its potential harm to borrowers. Thus, it is admissible for the reasons described in Section II.B.2. Using this same evidence, Ocwen claims it subsequently remediated such borrowers but, even if true, that does not negate liability. *See* Section III.B.

**D. Ocwen fails to show any legitimate countervailing benefits to consumers or competition arising from the relevant unfair servicing acts and practices at issue.**

Ocwen also claims that its acts and practices are not unfair because the harm they caused or were likely to cause is outweighed by countervailing benefits to consumers or competition. Ocwen cites to no benefits from its servicing of loans with inaccurate information, let alone

[117] Defs.' RSF ¶¶ 246–47; SOF ¶¶ 246–47.
[118] Defs.' RSF ¶ 252.
[119] Defs.' Opp. at 19.
[120] Defs.' RSF ¶¶ 253–256.
[121] Defs.' RSF ¶¶ 254–255; PRF ¶¶ 254–255.
[122] Defs.' Opp. at 19 (the cited document "[redacted]").
[123] SJX 93 (noting [redacted]).

benefits sufficiently large enough to outweigh the immense consumer injury it caused.[124] Instead, Ocwen argues that the relevant practice for this element of the unfairness inquiry must be all of Ocwen's loan servicing practices, including providing borrowers with loss-mitigation options and the value of its business as a whole, and as a result, the court must conclude that its value to consumers outweighs the harm from its mistakes.[125] But, as this Court has already found, Ocwen's use of inaccurate information is the practice at issue in this case.[126] Because there are no countervailing benefits to Ocwen's use of inaccurate information to service loans that outweigh the harm (and, in fact, no benefits at all), Ocwen's argument fails.

**E. The FDCPA applies to the relevant loans and Ocwen has not shown otherwise.**

The FDCPA applies to Ocwen for any debts that were in default when acquired.[127] Ocwen argues that the Bureau has not proven that specific loans meet this requirement. Not so: the Bureau cited to loan-level data produced by Ocwen where Ocwen identified loans in default when Ocwen acquired the rights to service them ("Default Data").[128] Ocwen's argument to the contrary seeks to attack these discovery responses through Sebastian's Declaration. She asserts that a single loan (out of 434,000) was current when Ocwen acquired its servicing rights.[129] After admitting that she did not analyze every loan at issue, she opines that other unspecified loans in the Default Data may also have been current.[130] Ocwen then uses this information to dispute the accuracy of Default Data.[131] Ocwen's dispute is predicated on speculation and is not genuine or credible.

---

[124] Based on the opinions of its expert, Mr. Bryar, Ocwen claims that "no servicer is perfect," and that a certain amount of errors or legal violations are standard and acceptable. Defs.' CSF ¶ 332. Mr. Bryar's opinion is an incorrect legal conclusion that the Bureau intends to move to exclude. Further, Mr. Bryar does not opine that Ocwen's practices benefited its borrowers or competition, only that some degree of conduct that violates legal requirements is unavoidable and, paradoxically, does not violate the law.

[125] Defs.' Opp. at 19–20.

[126] Sept. 5, 2019 Order at 33, ECF No. 452.

[127] 15 U.S.C. §1692a(6)(F); *see also*, *e.g.*, *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1315 (11th Cir. 2015) ("[s]o, if subsection (F)(iii)'s exclusion is inapplicable because, for example, the subject debt was in default at the time it was acquired" the individual collecting the debt can qualify as a debt collector).

[128] SOF ¶ 73.

[129] Sebastian Decl. ¶ 27.

[130] Sebastian Decl. ¶¶ 19–27.

[131] *See e.g.,* PRF ¶ 73.

**F. Ocwen does not raise a genuine dispute that it communicated inaccurate information to borrowers and its invented individualized standards are wrong.**

Ocwen does not raise a genuine dispute (or dispute at all, in certain instances) that it used inaccurate information when collecting money from and communicating with borrowers. Instead, Ocwen claims that the Bureau must show individualized evidence of communications that were inaccurate under the CFPA, FDCPA, and TILA.[132] But there is no requirement to do so, *see* Section I, *supra*, and the cases Ocwen cites are inapposite.[133] In any event, the Bureau has shown loan-level evidence of inaccurate communications.[134]

Ocwen also suggests that the Bureau's claims under TILA, 15 U.S.C. § 1640(a), require individualized damages.[135] But Ocwen's claim is wrong. That section applies only to private plaintiffs. This Court already rejected Ocwen's analogous attempt to import another TILA private-plaintiff requirement, regarding the statute of limitations, from § 1640.[136]

## IV. OCWEN'S ARGUMENTS REGARDING THE BUREAU'S RESPA CLAIMS ARE UNAVAILING.

Ocwen argues that the Bureau must establish liability through "individualized" damages to prevail under RESPA and again relies on the same unsupported employee declaration to oppose summary judgment under RESPA. For the same reasons articulated in Sections I and II.A. and detailed below, Ocwen fails to raise a genuine dispute of fact or defeat summary judgment.

**A. Ocwen's argument that the Bureau must show individualized damages under RESPA has no support, including under the language of RESPA.**

Similar to its argument about TILA, Ocwen suggests the Bureau must demonstrate "actual damages" to show Ocwen is liable for violations of RESPA.[137] But Ocwen's claim that

---

[132] Defs.' Opp. at 21–22.
[133] *See Pittman v. Seterus, Inc.*, 2015 U.S. Dist. LEXIS 157773, at *9 (N.D. Tex. Oct. 28, 2015) (*pro se* plaintiff failed to respond to defendants' motion for summary judgment and had only alleged "instances of violations"); *CFPB v. Nationwide Biweekly Admin., Inc.*, 2017 U.S. Dist. LEXIS 145923, at *27 (N.D. Cal. Sept. 8, 2017) (discussing remedies rather than liability); *Johnston v. HBO Film Mgmt.,* 265 F.3d 178, 185-90 (3d Cir. 2001) (Determining whether class-action certification is available for individual oral misrepresentations).
[134] Pl.'s MSJ at 13–15, 22–23.
[135] Defs.' Opp. at 22–23.
[136] Sept. 5, 2019 Order, at 50, ECF No. 452.
[137] Defs.' Opp. at 27 (citing *Reid v. Hasty*, 2008 U.S. Dist. LEXIS 133879, at *23 (N.D. Ga. March 13, 2008)); at 29 ("Plaintiffs have also failed to prove that any borrower was actually harmed by Ocwen's delay in processing shortage payments, which as noted above is an element of this RESPA claim."), and at 35 ("Injury is an element of these RESPA-based claims.").

individualized damages must be established because of 12 U.S.C. § 2605(f) is wrong. That section, and the case interpreting it that Ocwen cites, applies only to private plaintiffs. The Bureau brought this matter under the CFPA, which authorizes it to enforce RESPA's requirements by empowering it to sue "any person [who] violates a Federal consumer financial law."[138] Unlike Section 2605(f), the Dodd-Frank Act does not limit the Bureau to seeking damages, but rather allows it to seek "a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law."[139] Thus, the Bureau, unlike private plaintiffs, is not required to seek or show actual damages under RESPA, and no court, including in the inapposite case Ocwen cites, has stated otherwise. This Court already rejected Ocwen's analogous attempt to import another private-plaintiff requirement under the FDCPA and TILA, and should do so here.[140]

**B. Ocwen does not raise a genuine dispute of fact that it failed to timely send escrow statements within the prescribed time period.**

Ocwen fails to raise a genuine dispute about its failure to timely send escrow statements to borrowers. Ocwen identified 183,942 borrowers that had not received timely escrow statements,[141] including 147,589 borrowers who were current at the time the statement should have been sent ("Escrow Statement Report").[142] In corporate testimony, Ocwen confirmed that this report identified which borrowers were indeed current at the time.[143] The "current" or "bankruptcy" status of borrowers is material because RESPA's escrow statement requirements apply only to current borrowers and those not in bankruptcy.[144]

Ocwen seeks to attack its Escrow Statement Report through Sebastian's declaration, in which she opines that two loans out of 147,589 were in default or bankruptcy on the date Ocwen should

[138] 12 U.S.C. § 5564(a); *see also id.* § 5552(a)(1) (allowing state attorneys general to bring a civil action to enforce and secure remedies under the Dodd-Frank Act); 12 U.S.C. § 5481(14).
[139] 12 U.S.C. § 5564(a); *see also id.* § 5565(a) (listing relief available under Dodd-Frank Act for violations of Federal consumer financial law).
[140] *See* Sept. 5, 2019 Order at 47–50, ECF No. 452.
[141] SJX 151, Pl.'s Second Set RFPs at RFP 4 at 8 ("Escrow Statement" as defined in RESPA) and 12 (discovery request seeking accounts for which Ocwen failed to send Escrow Statements); SJX 87, RFP 4 Submission Excerpt (Dep. Ex. 196), OCW-CFPB-001-01294664 (discovery response); SJX 55, Ridder Aff. ¶¶ 56–58.
[142] SJX 55, Ridder Aff. ¶ 59.
[143] SJX 38, Combs 30(b)(6) Dep. at 168:16–23.
[144] 12 C.F.R. § 1024.17(i)(2).

have sent the escrow statements.[145] Sebastian then, after admitting that she did not analyze every loan at issue, opines that other unspecified loans in the Escrow Statement Report may also have been current.[146] Ocwen relies on these assertions to dispute its Escrow Statement Report generally, and to claim that a "manual review" of borrowers' transaction history is necessary.[147] Ocwen also speculates, without evidence, that it *may* have mailed some of the 183,942 statements.[148] Ocwen's disputes are not genuine.

**C. Ocwen does not raise a genuine dispute of material fact that it failed to timely analyze borrowers' escrow accounts within the prescribed time period.**

Ocwen raises no genuine dispute of fact that it failed to timely analyze borrowers' escrow accounts, including no genuine dispute to its verified interrogatory response—which is affirmed in admissions and corporate testimony—in which Ocwen identified over 391,000 instances in which its "data indicates" that it did not complete a timely annual escrow analysis.[149]

Instead, ignoring its admissions, Ocwen impermissibly attacks its verified interrogatory response, claiming the "discovery response said that the electronic data being produced merely 'indicate[d]' that analyses had not been timely performed," and other Ocwen data *may* show otherwise for *some* unidentified borrowers.[150] For its support, Ocwen again relies on Sebastian's declaration to attack the accuracy of its discovery responses, but neither Sebastian nor Ocwen identify any record evidence or a single borrower to support the attack.[151] Thus, Ocwen's argument does not create a genuine dispute.

**D. Ocwen does not raise a genuine dispute of material fact that it over-collected escrow shortages.**

When borrowers have shortages in their escrow accounts, a servicer may collect "additional deposits to make up" the shortages—but no more than that.[152] Ocwen does not raise a genuine dispute that it continued to try to collect escrow shortages that borrowers had already paid, or that it actually collected shortage amounts from borrowers who had already paid, including for

---

[145] Sebastian Decl. ¶¶ 52–57.
[146] *Id.* ¶ 57.
[147] Defs.' RSF ¶¶ 200–201.
[148] PRF ¶ 200.
[149] SJX 138, Defs.' Resp. First Rogs. at Rog. No. 1; *see also* PRF ¶ 168.
[150] Defs.' Opp. at 26.
[151] PRF ¶¶ 168, 316–317.
[152] 12 C.F.R. §§ 1024.17(c)(1)(ii), (f)(3).

each year from 2014 through 2018.[153] And the same factual disputes Ocwen raised in response to the Inaccurate Records Claims also fail as to the Bureau's RESPA claim, *see* Section III.C (Escrow Shortage Amounts).

Ocwen also argues that Regulation X "has nothing to do with how quickly a shortage payment must be reflected on the borrower's account."[154] But the regulation makes clear that a servicer may collect only enough shortage payments to "make up" the shortage,[155] and where Ocwen failed to timely process shortages payments received and then collected shortages that borrowers had already paid, Ocwen has run afoul of the plain language of the regulation. Thus, Ocwen's arguments do not create a genuine dispute or defeat summary judgment.

**E. Ocwen does not raise a genuine factual dispute regarding its late insurance payments.**

As described in Section III.C (Insurance Amounts) above, Ocwen does not raise a credible or genuine dispute that it failed to pay insurance premiums on time, resulting in borrowers' insurance policies being cancelled. Ocwen also does not dispute that its data shows that 850 of the 1,367 borrowers with erroneous cancellations were current when their insurance premiums were due.[156] Instead, Ocwen argues that even though such cancellations resulted in monetary harm for "only 352 borrowers," it remediated such borrowers.[157] Ocwen's subsequent remediation does not provide a defense to RESPA, nor does Ocwen cite any support for such a conclusion. Last, Ocwen argues that its letter chiding its vendor for "approximately 40,000 [insurance] premium disbursements that were not processed timely" does not directly show liability.[158] Ocwen misses the point that the letter corroborates the other undisputed evidence (and shows that the number of violations is likely much larger than what Ocwen identified in interrogatory answers). Thus, Ocwen's arguments do not create a genuine dispute as to liability.

---

[153] PRF ¶¶ 204–211; *see also* SJX 74 at 553 and SJX 79 at 032 (Ocwen's internal audits showing that Ocwen continued to collect shortages not owed).
[154] Defs.' Opp. at 29.
[155] 12 C.F.R. § 1024.17(c)(1)(ii).
[156] Defs.' RSF ¶ 224; SOF ¶ 224; PRF ¶ 224.
[157] Defs.' Opp. at 30.
[158] *Id*. (citing SJX 179).

## V. OCWEN DOES NOT RAISE A GENUINE DISPUTE OF FACT REGARDING ITS FAILURE TO CANCEL PRIVATE MORTGAGE INSURANCE WHEN REQUIRED.

As described in Section III.C (Insurance Amounts) above, Ocwen does not dispute that its system "contained inaccurate or missing information for the private-mortgage insurance ("PMI") 'termination date,'"[159] leading Ocwen to overcharge consumers by $3.8 million.[160] Ocwen also fails to raise a genuine dispute with respect to its corporate witnesses' (repeated) testimony that borrowers still paid PMI premiums after their policies should have been cancelled.[161]

Instead, Ocwen again argues that its discovery response ("PMI Spreadsheet") identifying 7,771 borrowers who "should have" had their PMI timely cancelled by a certain termination date, but did not, is insufficient to show liability.[162] Ocwen is wrong. Ocwen again relies on Sebastian's declaration to try to undermine its PMI Spreadsheet. Sebastian identifies one potentially delinquent borrower and then speculates that even though she "did not do an analysis of all the loans in the PMI Spreadsheet," many other unidentified loans were delinquent.[163] Likewise, Ocwen provides no credible support for its speculation that the PMI Spreadsheet may only show when Ocwen *recorded* the PMI as cancelled, not when Ocwen *actually cancelled* it.[164] None of Ocwen's arguments creates a genuine dispute of material fact.

## VI. OCWEN DOES NOT RAISE A GENUINE DISPUTE OF FACT AS TO THE BUREAU'S FORECLOSURE CLAIMS.

Ocwen's opposition does not dispute that it initiated foreclosure proceedings while it was still evaluating borrowers for loss-mitigation options to save their homes or raise a genuine dispute as to the underlying facts supporting such counts.[165] Thus, the Bureau is entitled to summary judgment on Bureau Count IX.

---

[159] RSF ¶¶ 246–47, 252; PRF ¶¶ 246–47, 252.
[160] RSF ¶ 252.
[161] PRF ¶ 249; SJX 52, Reeves IH Tr. at 61:13–63:11 (Ocwen's corporate witness testifying that certain accounts that "should have been cancelled" on the PMI termination date but were not and that number was "in the below 5,000 range.").
[162] *See* SJX 55, Ridder Aff. ¶¶ 65–68, 71; SJX 123, PMI Terminations (Dep. Ex. 197) (listing borrowers for whom Ocwen failed to cancel PMI on the termination date).
[163] Sebastian Decl. ¶¶ 67–73; *see also* PRF ¶ 168.
[164] Defs.' Opp. at 31–32.
[165] *Id*. at 32–33.

Further, as to Count III, Ocwen does not dispute the contents of the foreclosure letters it sent to borrowers who had submitted loss-mitigation applications and does not dispute that those letters contained a "DUE DATE" for borrowers to submit "missing or additional documents."[166] Ocwen also does not dispute that it foreclosed on 45 borrowers before the due date listed in the letter.[167] These facts alone are sufficient to show that Ocwen communicated a material representation that is likely to mislead reasonable consumers—specifically, that the borrower had until the due date to return the requested information and that there would be no foreclosure until after that time period.

Citing to nothing, Ocwen questions whether it actually sent the letters contained in borrowers' loan files.[168] Ocwen also argues that a borrower should have known that Ocwen's additional assurance that "you will not lose your home during the evaluation process"[169] only applied *after* Ocwen received the documents and certified the borrower's loss-mitigation application as complete.[170] Ocwen's arguments only highlight how meaningless and misleading its due dates were to borrowers requesting loss-mitigation assistance to save their home. Ocwen's arguments do not create a genuine dispute.

## VII. DEFENDANTS ARE JOINTLY AND INDIVIDUALLY LIABLE FOR ALL VIOLATIONS.

In its Motion, the Bureau established that Defendants are a common enterprise and that common-enterprise liability applies to all violations.[171] Ocwen does not argue otherwise in its opposition and so concedes these points.[172] Defendants are therefore jointly and severally liable for all violations.

Defendants are also individually liable. Ocwen does not dispute that OLS is a servicer as defined by RESPA or that PHH assumed OLS's liability for the conduct addressed in this litigation as its successor-by-merger.[173] Ocwen contests only that OFC and OMS are servicers

---

[166] Defs.' RSF ¶¶ 261–264; SOF ¶¶ 261–264.
[167] Defs.' RSF ¶¶ 263–264; SOF ¶¶ 261–264.
[168] Defs.' RSF ¶ 261.
[169] SJX 94, Foreclosure Letters, OCW-CFPB-001-00990134 at, *e.g.*, 135.
[170] Defs.' RSF ¶ 262; Defs.' Opp. at 33.
[171] Pl.'s MSJ at 31–36.
[172] *See, e.g.*, *Chartis Chile Compania De Seugoros Generales, S.A. v. Bullet Freight Sys., Inc.*, No. 12-cv-22664, 2013 WL 12129293, at *2 (S.D. Fla. Apr. 2, 2013) ("Plaintiffs' response in opposition does not address this argument, and therefore concedes the point.").
[173] Pl.'s MSJ at 6, 24, 32.

and individually liable under RESPA.[174] OFC and OMS are servicers subject to individual RESPA liability because they both engaged in servicing, and in addition, OFC was ultimately "responsible" for servicing.[175] Indeed, Ocwen's responses to the Bureau's statement of material facts support the Bureau's argument that OFC was responsible for servicing. Ocwen states that servicing "policies and procedures . . . were set at the corporate level (through OFC)."[176]

## VIII. THE CONSENT JUDGMENT DOES NOT BAR THE BUREAU'S CLAIMS.

Ocwen argues that certain claims are barred by the parties' 2013 settlement agreement ("Consent Judgment").[177] Ocwen is wrong for the reasons stated in the Bureau's Opposition: the Consent Judgment released Ocwen from liability only for certain past conduct and the Bureau explicitly reserved its full authority to address conduct that occurred after a certain date (December 18, 2013 for the Bureau).[178] The Consent Judgment's forward-looking injunctive relief of a monitoring regime did not nullify the release language, did not withdraw the Bureau's enforcement powers, and does not bar the Bureau's claims.[179] In its opposition, Ocwen does not even attempt to explain how the express release terms of the Consent Judgment bar the Bureau's claims or are ambiguous. Ocwen therefore fails to defeat summary judgment (let alone establish its affirmative defenses).

Ocwen also argues that its failures are "not actionable" because the failures did not exceed the threshold error rates in the Consent Judgment.[180] This argument fails because the Consent Judgment did not limit the Bureau's ability to bring future cases in any way. But even assuming *arguendo* that the Bureau had not preserved its full authority to bring this case, the threshold error rates—which were used to determine whether Ocwen failed a metric and corresponding servicing standard—would be relevant only if a metric applied to the conduct underlying this case. There is no overlap between the metrics in the Consent Judgment and the Bureau's claims,[181] as is apparent from Ocwen's lack of evidence showing that any of the issues in this

---

[174] Defs.' Opp. at 34.
[175] Pl.'s Opp. at 31–33; *see also* Pl.'s MSJ at 32–33.
[176] *See e.g.*, Defs.' RSF ¶¶ 13–15, 31, and 289–291.
[177] Defs.' Opp. at 4–7.
[178] Pl.'s Opp. at 3–7.
[179] *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) ("Acceptance of [defendant's] novel contention" that forward-looking injunctive relief barred future claims "would in effect confer on them a partial immunity from civil liability for future violations.").
[180] Defs.' Opp. at 6.
[181] Pl.'s Opp. at 6–7.

litigation were tested by the Monitor.[182] The inapplicability of the metrics (and threshold error rate, and notice and cure processes) to the conduct at-issue here is also why the NMS record and Monitor's reports are bereft of any mention of such conduct. Ocwen claims that, if "Ocwen violated consumer protection laws more than half-a-million times," then "surely. . . the independent NMS Monitor" would have identified them and sought relief proves the Bureau's point: the Monitor did not test this evidence here.[183] As the Monitor himself made clear, he did not test for servicing data inaccuracies that are the basis of the Motion.[184]

Ocwen also seeks denial of the Motion because the Bureau did not inform the Monitor of the issues addressed in this litigation.[185] But the Consent Judgment imposes an obligation on *Ocwen*, not the Bureau, to self-disclose non-compliance.[186] And Ocwen does not argue that *it* disclosed this conduct. This too proves the Bureau's point: even Ocwen did not view the conduct at issue as being subject to the NMS disclosure provision and metric testing. Ocwen provides no support to meet its burden for its affirmative defense or to deny the Motion.

## IX. GRANTING THE BUREAU'S MOTION WOULD SHORTEN THE TRIAL.

Finally, granting the Motion would significantly shorten trial. The Bureau moved for liability holdings on nine of ten counts. If the Motion is granted, trial could more narrowly focus on: (1) damages incurred by borrowers, particularly those quantified by Professor McFadden; (2) other appropriate relief such as injunctive relief and civil money penalties; and (3) the few remaining claims on which the Bureau seeks liability. Ocwen incorrectly argues that to establish damages and penalties, the Bureau will need to put forth "the same evidence" as they do for liability.[187] That is not the case. For example, if this Court grants summary judgment on the Bureau's escrow-analysis claim that Ocwen failed to conduct nearly 400,000 escrow analyses within the time prescribed by law, then trial could focus on damages (primarily through expert testimony)

---

[182] For example, there is no metric that tested whether Ocwen timely completed escrow analyses.
[183] Defs.' Opp. at 6 (emphasis omitted).
[184] Pl.'s Resp. to Defs.' Statement of Material Facts in Support of their Mot. for Summ. J., ECF No. 742, ¶¶ 268–269 ("questioning the accuracy and reliability of Ocwen's system of record" are "outside of the scope of my duties as Monitor").
[185] Defs.' Opp. at 7.
[186] Defs.' Statement of Material Facts in Support of their Mot. for Summ. J, ECF No. 731, Ex. 6 at Exhibit D to Consent Judgment, at D-6 ¶ 16.
[187] Defs.' Opp. at 11.

and evidence related to penalties, such as Ocwen's scienter—neither of which is the same as the evidence that establishes liability.

## X. CONCLUSION

For the reasons set forth above, this Court should grant the Bureau's Motion for Partial Summary Judgment.

Date: December 18, 2020

Respectfully submitted,

Attorneys for Plaintiff,
CONSUMER FINANCIAL PROTECTION BUREAU

JOHN C. WELLS
Deputy Enforcement Director

JAMES T. SUGARMAN
Assistant Litigation Deputy

/s/ Jean M. Healey Dippold
Jean M. Healey Dippold
Phone: (202) 435-7514
E-mail: jean.healeydippold@cfpb.gov

| | |
|---|---|
| Atur Desai | atur.desai@cfpb.gov |
| Michael Posner | michael.posner@cfpb.gov |
| Shirley Chiu | shirley.chiu@cfpb.gov |
| Doug Wilson | doug.wilson@cfpb.gov |

1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722