**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORP.

Defendants.

# PLAINTIFF'S REPLY STATEMENT OF MATERIAL FACTS TO DEFENDANTS' RESPONSE AND COUNTERSTATEMENT IN SUPPORT OF ITS BRIEF IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## NOTE ON CITATIONS

Plaintiff, Consumer Financial Protection Bureau ("Bureau"), submits this reply to Defendants' ("Ocwen") response and counterstatement to Plaintiff's Statement of Material Facts. Each of the Bureau's replies to Ocwen's responses and counterstatements, as well as the Bureau's additional facts herein are abbreviated as "PRF," and its accompanying new exhibits are abbreviated as "PRF Ex." The Bureau's accompanying brief in reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment is abbreviated herein as "Reply."

This reply statement of material facts also contains the following shortened citations to previously filed documents and exhibits:

- Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment (ECF No. 729) ("SOF") and accompanying exhibits ("SJX");
- Defendants' Statement of Material Facts (ECF No. 731) ("Ocwen SMF") and accompanying exhibits ("Ocwen SMF Ex.");

- Plaintiff's Response to Defendants' Statement of Material Facts and Additional Facts in support of its Opposition to Defendants' Motion for Summary Judgment (ECF No. 742) ("Pl.'s. Opp. SOF");
- Defendants' Response to Plaintiff's Statement of Material Facts and Defendants' Counterstatement of Material Facts in Support of Defendants' Opposition to Plaintiff's Joint Motion for Partial Summary Judgment (ECF No. 741):
  - Response to Statement of Facts ("RSF"), Facts 1 through 286,
  - Counterstatement of Facts ("CSF"), Facts 286 through 332, and
  - accompanying exhibits ("RSF Ex.").

In addition, Plaintiff's exhibits attached to this reply statement of material facts (PRF Ex.) are set forth below.

| PRF Ex. | Description of Exhibit |
|---|---|
| 1 | Defendants' Amended and Supplemental Responses and Objection to Plaintiff's Fourth Set of Requests for Production to Defendants (Request 48). |
| 2 | Deposition Transcript of Krysta Sebastian, November 9, 2018 |
| 3 | Loan Data Excerpt (Ocwen's response to RFP No. 5 to the Bureau's Fifth Set of Requests for Production) for xxx4324 |
| 4 | Form 8-K, Ocwen Financial Corporation, December 1, 2017 |

**Plaintiff's Response in reply to Defendants' Rebuttal and Counter Facts**

**1.** Ocwen fails to raise a genuine dispute: the Bureau alleges ongoing conduct since January 2014.

**2.** Ocwen does not dispute this fact and it should be deemed admitted.

**3.** Ocwen does not dispute this fact and it should be deemed admitted.

**4.** Ocwen does not dispute this fact and it should be deemed admitted.

**5.** Ocwen does not dispute this fact and it should be deemed admitted.

**6.** Ocwen does not dispute this fact and it should be deemed admitted.

**7.** Ocwen does not dispute this fact and it should be deemed admitted.

**8.** Ocwen does not dispute this fact and it should be deemed admitted.

**9.** Ocwen's response does not dispute the substance of the fact and the fact should be deemed admitted.[1] Ocwen's remaining response is unsupported. *See* Pl.'s Opp. SOF ¶¶ 240–243.[2]

**10.** Ocwen does not dispute this fact and it should be deemed admitted.

**11.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, Ocwen's response about whether "OFC is a servicer" is based on an impermissible legal conclusion.[3] *See* Pl.'s Opp. SOF ¶¶ 240–243.

**12.** Ocwen's response does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243.

**13.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243, PRF ¶ 289.

---

[1] *State Farm Mut. Auto. Ins. Co. v. Health & Wellness Servs., Inc.*, 446 F. Supp. 3d 1032, 1041 (S.D. Fla. 2020), reconsideration denied, No. 18-23125-CIV, 2020 WL 4586399 (S.D. Fla. Aug. 10, 2020) (where the response does not controvert the fact "the [c]ourt will deem that fact admitted"); *Leigh v. Avossa*, No. 16-81612-CIV, 2019 WL 1296881 at *1 n.1 (S.D. Fla. Mar. 21, 2019) (J. Marra) (where the only information presented in the response is not inconsistent with a fact or portions thereof, the fact or portions thereof are "treated as admitted").

[2] Where the Bureau cites to other or prior factual responses (using "*See*" or "*See also*") they are incorporating such responses into their response to the fact at issue.

[3] *Leigh*, 2019 WL 1296881 at *1 n.1 (where the response is an opinion or legal conclusion, "the fact is deemed admitted").

**14.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243, PRF ¶ 289.

**15.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243, PRF ¶ 289.

**16.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243.

**17.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243.

**18.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243.

**19.** Ocwen does not dispute this fact and it should be deemed admitted.

**20.** Ocwen does not dispute this fact and it should be deemed admitted.

**21.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's Answer admits OMS engaged in mortgage servicing activities, ECF No. 550 ¶¶ 11, 13, 16. *See* Pl.'s Opp. SOF ¶¶ 240–243.

**22.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen's response is unsupported and based on an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243, PRF ¶ 21.

**23.** Ocwen admitted to the substance of the fact when responding to a request for admission, its remaining response is not inconsistent with the fact, and the fact should be deemed admitted. **SJX 150** at 1, 161 (defining OMS and OLS as "Ocwen," Answer to RFA 223 (mislabeled as Answer to RFA 222) referring to "Ocwen"). *See also* Pl.'s Opp. SOF ¶¶ 240–243. Ocwen also raises an impermissible legal conclusion.

**24.** Ocwen does not dispute this fact and it should be deemed admitted.

**25.** Ocwen does not dispute this fact and it should be deemed admitted.

**26.** Ocwen does not dispute this fact and it should be deemed admitted.

**27.** Ocwen admitted to the substance of fact when responding to a request for admission, its remaining response is not inconsistent with the fact, and the fact should be deemed admitted. **SJX 150** at 1, 161 (defining OMS and OLS as "Ocwen," Answer to RFA 223 (mislabeled as Answer to RFA 222) referring to "Ocwen"). *See also* Pl.'s Opp. SOF ¶¶ 240–243.

**28.** Ocwen's response does not dispute (and admits to) the substance of the fact and the fact should be deemed admitted. Ocwen's response takes issue with the Bureau's abbreviation of PHH Mortgage Corporation as "PHH" versus "PMC," and does not create a dispute of the fact.

**29.** Ocwen does not dispute this fact and it should be deemed admitted.

**30.** Ocwen does not dispute this fact and it should be deemed admitted.

**31.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See* PRF ¶ 289.

**32.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response raises an impermissible legal conclusion. *See* Pl.'s Opp. SOF ¶¶ 240–243, PRF ¶¶ 9, 21.

**33.** Ocwen does not dispute this fact and it should be deemed admitted.

**34.** Ocwen does not dispute this fact and it should be deemed admitted.

**35.** Ocwen does not dispute this fact and it should be deemed admitted.

**36.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See* **SJX 107** at 627 (listing Cox on OFC organizational chart).

**37.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See* PRF ¶¶ 9, 21; *see also* Pl.'s Opp. SOF ¶¶ 240–243. Ocwen's response is also based on an impermissible legal conclusion.

**38.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See* PRF ¶¶ 9, 21; *see also* Pl.'s Opp. SOF ¶¶ 240–243. Ocwen's response is also based on an impermissible legal conclusion.

**39.** Ocwen does not dispute this fact and it should be deemed admitted.

**40.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted.

**41.** Ocwen does not dispute this fact and it should be deemed admitted.

**42.** Ocwen does not dispute this fact and it should be deemed admitted.

**43.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. The OFB Directors listed in **SJX 106** and to which Ocwen refers in its response are also listed as working for OFC. *See* **SJX 107** at -636 (identifying Goldstein and Sharma as working for OFC).

**44.** Ocwen does not dispute this fact and it should be deemed admitted.

**45.** Ocwen's response claiming that "[n]owhere in Diller's testimony does he acknowledge being a direct report to Scott Anderson" is wrong. Mr. Diller testified that Scott Anderson was his boss. **SJX 44** at 18:23–24. Further, Mr. Diller's e-mail signature block indicates he worked for OFC. **SJX 90** at 995–996.

**46.** Ocwen does not dispute the substantive fact—**SJX 107** at 637 lists Thomas Diller as the supervisor of OFC Directors, Jason Jastrzemski and Thomas Arnett—and the fact should be deemed admitted. *See* PRF ¶ 45.

**47.** Ocwen's citation to other testimony that does not contradict SOF ¶ 47 fails to raise a genuine dispute and it should be deemed admitted.

**48.** Ocwen does not dispute this fact and it should be deemed admitted.

**49.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. The fact that Mr. Erbey could not specify the time frame is not inconsistent with SOF ¶ 49.

**50.** Ocwen does not dispute this fact and it should be deemed admitted.

**51.** Ocwen's response does not dispute the substance of the fact and the fact should be deemed admitted. Ms. Sebastian testified: "Q. Do personnel from each Ocwen entity also use the data? A. I believe so." **SJX 35** at 9:8–10.

**52.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**53.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**54.** Ocwen does not dispute the fact and it should be deemed admitted.

**55.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. The Bureau admits OFC's response was dated December 5, 2014. **SJX 57** at 422.

**56.** INTENTIONALLY OMITTED/WITHDRAWN.

**57.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**58.** Ocwen does not dispute the fact as to OLS. As to OFC and OMS, Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is also based on an impermissible legal conclusion. *See* PRF ¶¶ 1, 7, 9, 21.

**59.** Ocwen does not dispute the fact as to OLS. As to OFC and OMS, Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is also based on an impermissible legal conclusion. *See* PRF ¶¶ 1, 7, 9, 21.

**60.** Ocwen does not dispute the fact as to OLS. As to OFC and OMS, Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is also based on an impermissible legal conclusion. *See* PRF ¶¶ 1, 7, 9, 21.

**61.** Ocwen does not dispute the fact as to OLS. As to OFC and OMS, Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is also based on an impermissible legal conclusion. *See* PRF ¶¶ 1, 7, 9, 21.

**62.** Ocwen does not dispute the fact as to OLS. As to OFC and OMS, Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is also based on an impermissible legal conclusion. *See* PRF ¶¶ 1, 7, 9, 21.

**63.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**64.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**65.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**66.** Ocwen does not dispute the fact and it should be deemed admitted. Ocwen's response is also based on an impermissible legal conclusion. *See also* PRF ¶ 73.

**67.** Ocwen does not dispute the fact and it should be deemed admitted. Ocwen's response is also based on a legal conclusion. *See also* PRF ¶ 73.

**68.** Ocwen does not dispute this fact and it should be deemed admitted.

**69.** Ocwen does not dispute this fact and it should be deemed admitted. Ocwen's further response—including that its acquisitions benefitted borrowers—is unsupported by record evidence. Further, Ocwen's suggestion that it was the only servicer able or willing to service loans from servicers who "went bankrupt or were failing" is wrong: other servicers competed to purchase these portfolios. *See* RSF ¶ 71 (GMAC's loans were also awarded to another servicer (Walter Invest. Man.)).

**70.** Ocwen does not dispute this fact and it should be deemed admitted.

**71.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted.

**72.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**73.** Ocwen's response fails to raise a genuine dispute of fact. Ocwen produced loan-level data for 434,000 borrowers referenced in SOF ¶ 73. In that data, Ocwen indicated for each of those borrowers that it acquired the right to service the loan when the loan was in default.[4] For the first time, Ocwen now contends in RSF ¶ 73—relying on an employee declaration of Sebastian—that certain of this loan-level data it produced may not be accurate. Sebastian, however, identified *only* one specific loan out of the 434,000 loans that may not have been in default at the time of acquisition. Sebastian Declaration, RSF Ex. 13 (hereafter "Sebastian Decl.") ¶ 27. Ocwen and Sebastian then speculate, without citing any record evidence, that some other unspecified number of loans may also not have been acquired while in default despite Ocwen identifying it as so. *Id*. ¶¶ 19–27. Further, with respect to the credit reporting data Sebastian attests to and analyzes to reach conclusions about the above single loan (and other unspecified loans), Sebastian Decl. ¶ 27, she testified that she did not know how to interpret the same credit reporting information.[5] Ocwen and Sebastian's opinions, which are based on an analysis of a single loan, are not supported by the record evidence.

**74.** Ocwen does not dispute this fact and it should be deemed admitted.

**75.** Ocwen does not dispute this fact and it should be deemed admitted.

**76.** Ocwen does not dispute this fact and it should be deemed admitted.

**77.** Ocwen does not dispute this fact and it should be deemed admitted.

**78.** Ocwen does not dispute this fact and it should be deemed admitted.

**79.** Ocwen does not dispute this fact and it should be deemed admitted.

**80.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**81.** Ocwen does not dispute this fact and it should be deemed admitted.

**82.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

---

[4] **SJX 155** at 12 (Request No. 1(u) of the 5th Set of RPDs requiring Ocwen to identify "whether the Loan was in Default at the time you acquired the rights to service the Loan (Y/N)); ECF No. 219 (ordering Ocwen to produce data in response to the 5th Set of RPDs).

[5] **SJX 35** at 40:9–40:20 (Ms. Sebastian was unable to explain credit reporting data, including how to interpret the data to determine the dates of delinquency being reported, and testified: "that would be a question for the credit reporting team.")

**83.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**84.** Ocwen fails to raise a genuine dispute of fact. The quoted Consent Order (**SJX 24**) expressly states that OFC and OLS "stipulate" and "agree" to the information listed in the Consent Order. *See* **SJX 24** at 1 (parties stipulating to whereas clauses) and 2 (to resolve the matter "parties agree to the following" including the facts set forth in SOF ¶ 84).

**85.** Ocwen does not dispute this fact and it should be deemed admitted.

**86.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Its response only confirms the fact by acknowledging that "Ocwen appointed Beltline Road Insurance . . to help Ocwen . . . ." RSF ¶ 86.

**87.** Ocwen does not dispute this fact and it should be deemed admitted.

**88.** Ocwen does not dispute this fact and it should be deemed admitted.

**89.** Ocwen does not dispute this fact and it should be deemed admitted.

**90.** Ocwen does not dispute the fact and it should be deemed admitted. The additional information in RSF ¶ 90 confirms that Mr. Diller believed SWBC's service was "crap."

**91.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Its response only confirms the fact and it is unclear what Ocwen is disputing.

**92.** Ocwen does not dispute the fact and it should be deemed admitted. Ocwen's remaining response contains improper legal argument and unsupported opinions about **SJX 118**.

**93.** Ocwen does not dispute the fact and it should be deemed admitted. *See* PRF ¶ 92.

**94.** Ocwen does not dispute the fact and it should be deemed admitted. Ocwen's remaining response is not inconsistent with SOF ¶ 94.

**95.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Rinear's testimony—reflecting her concerns about REALServicing and actions taken in response—is based on her personal knowledge and is not hearsay.

**96.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Rinear's testimony—reflecting her concerns about REALServicing and actions taken in response—is based on her personal knowledge and is not hearsay.

**97.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. The fact that Ocwen hired a consultant who reviewed REALServicing and interviewed Ocwen's senior leaders is not hearsay. *See* Reply, Section II.B.3.

**98.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. The information that Ocwen's business leaders reported to its consultant, identified in **SJX 130**, is not hearsay, neither is the consultant's report **SJX 130** that outlines such admissions. *See* Reply, Section II.B.3.

**99.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. The information that Accenture reported in SJX 130 is not hearsay. *See* Reply, Section II.B.3.

**100.** Ocwen does not dispute this fact and it should be deemed admitted.

**101.** Ocwen does not dispute this fact and it should be deemed admitted.

**102.** Ocwen does not dispute this fact and it should be deemed admitted.

**103.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ronald Faris did not testify that Ocwen developed such compliance measures "as contemplated by the servicing standards implemented in the NMS," but instead "as the CFPB put its rules in place." *See* **SJX 46** at 92:7–93:16.

**104.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. The cited letter is admissible evidence, *see* Reply, Section II.B.1. Likewise, Ocwen's CEO's testimony and own understanding of Chase's view of Ocwen is not hearsay.

**105.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen transferred loans back to Chase in 2015. *See* **SJX 34** at 142:6–9 (corporate testimony).

**106.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**107.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Fannie Mae's business records are not inadmissible hearsay. *See* Reply, Section II.B.1.

**108.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted.

**109.** Ocwen does not dispute this fact and it should be deemed admitted.

**110.** Ocwen does not dispute the fact and it should be deemed admitted. Ocwen's characterization of **SJX 134** is not supported by that document.

**111.** Ocwen does not dispute the substance of the fact and it should be admitted. Ocwen's remaining response about how the cited page of **SJX 110** was titled does not change the substance of what OFC auditors concluded as set forth in SOF ¶ 111.

**112.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. As explained in the materials the Bureau cites, when **SJX 134**, [redacted]. Ocwen's response is based on a narrow search for the term for the specific phase "[redacted]."

**113.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. **SJX 34**, and the information therein (such as what Ocwen identified relating to its past errors), is admissible. *See* Reply, Section II.B.2. Further, Ocwen's additional response *speculating* that "there could be remediation that was provided to borrowers that is not captured in the Remediation Report" is not supported by record evidence. *See* **SJX 36** at 92:7-25 (Ocwen's corporate witness testifying that he was unaware of any remediation beyond that which was included in the Remediation Report); *see also* PRF ¶ 114.

**114.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. **SJX 34**, and the information therein (such as what Ocwen identified relating to its past errors), is admissible. *See* Reply, Section II.B.2. The point of **SJX 34** and SOF ¶ 114 is that Ocwen did not consider borrower impact or perform a lookback for over [redacted] of the identified problems and, for the [redacted] of those problems it reviewed, it only performed research to identify impacted borrowers for [redacted] of those problems. In sum, the Bureau does not use **SJX 34** or SOF ¶114 to show voluntary remediation that Ocwen contends it made.

**115.** Ocwen does not dispute this fact and it should be deemed admitted. *See* PRF ¶ 116.

**116.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**117.** Ocwen does not dispute the substance of the fact, including that it conducted a loan-verification process to ensure the accuracy of key data points loaded into REALServicing during the "relevant time period," and the fact should be deemed admitted. Ocwen's response is not inconsistent with SOF ¶ 117. Further, Ocwen's suggestion that its processes, controls, and checks identified and corrected the relevant 1.38 million discrepancies, *see* SOF ¶ 127, is not supported by the record. *See* PRF ¶¶ 296–307.

**118.** Ocwen does not dispute this fact and it should be deemed admitted.

**119.** Ocwen does not dispute this fact and it should be deemed admitted. Ocwen's remaining response is not inconsistent with SOF ¶ 119 and its suggestion that its processes, controls, and checks identified and corrected the relevant 1.38 million discrepancies, *see* SOF ¶ 127, is not supported by the record. *See* PRF ¶¶ 296–307.

**120.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response confirms SOF ¶ 120 and raises an impermissible legal conclusion. Ocwen's suggestion that it captured discrepancies through other controls is unsupported, *see* PRF ¶ 119.

**121.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response confirms that Ocwen relied on data in its system to generate billing statements. Its remaining response raises an impermissible legal argument about individual evidence.

**122.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's suggestion that it captured discrepancies through other controls is unsupported, *see* PRF ¶ 119.

**123.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's suggestion that it captured discrepancies through other controls is unsupported, *see* PRF ¶ 119.

**124.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's suggestion that it captured discrepancies through other controls is unsupported, *see* PRF ¶ 119.

**125.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's suggestion that it captured discrepancies through other controls is unsupported, *see* PRF ¶ 119.

**126.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen's response that its compliance unit raised an impermissible legal argument does not create a genuine dispute of fact.

**127.** Ocwen fails to raise a genuine dispute of fact. Ocwen's primary "dispute" appears to be derived from a scrivener error in that **SJX 55** ¶ 25 states 628,165 borrowers as opposed to the 628,166 borrowers stated in SOF ¶ 127. Further, Ocwen's response that the "misinformation" was not used to service loans is unsupported and contrary to its testimony that: (1) its loan verification reports identified discrepancies in loan data that Ocwen was using to service loans

until it corrected discrepancies, *see* **SJX 33** at 102:9–103:2, 112:6–113:19; and (2) if discrepancies or "misinformation" existed, then Ocwen communicated such misinformation to borrowers, including in periodic statements. *See* PRF ¶ 121. Ocwen's response raises a meritless impermissible legal argument about individual evidence. *See* Reply Section I.

**128.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 149–154.

**129.** Ocwen fails to raise a genuine dispute of fact. The Bureau sought responses "[f]or each Borrower in the Loan Verification Population," *i.e.*, loan-level detail in **SJX 147**, Rog No. 19.

**130.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted.

**131.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's remaining response that it may not have used such misinformation is unsupported and its impermissible legal argument about individual evidence is meritless. *See* Reply Section I; *see also* PRF ¶ 127.

**132.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's remaining response that it may not have used such misinformation is unsupported and its impermissible legal argument about individual evidence is meritless. *See* Reply Section I; *see also* PRF ¶ 127.

**133.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's remaining response that it may not have used such misinformation is unsupported and its impermissible legal argument about individual evidence is meritless. *See* Reply Section I; *see also* PRF ¶ 127.

**134.** Ocwen's response fails to raise a genuine dispute of fact. Ocwen's counsel represented the e-mail concerned the transfer of loans. **SJX 34** at 140:10–142:4.

**135.** Ocwen fails to raise a genuine dispute of fact. Ocwen does not dispute it communicates to borrowers amounts owed in periodic statements or testified that the data it produced was the same data it used to service loans, including when calculating amounts owed and communicating to borrowers. **SJX 35** at 10:14–12:2.

**136.** Ocwen does not dispute the fact and it should be deemed admitted.

**137.** Ocwen does not dispute the substance of the (conditional, not hypothetical) fact—that if Ocwen's system of record had incorrect information about a loan, it would service the loan using

that incorrect information—and it should be deemed admitted. *See* PRF ¶¶ 121, 127, 138. Further, Ocwen's processes are not hearsay. *See* Fed. R. Evid. 801(d)(2) (admissions by party-opponents are not hearsay).

**138.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶ 121, 127. Ocwen's remaining impermissible legal argument about individual evidence is meritless. *See* Reply Section I. Further, Ocwen does not deny the accuracy of Ms. Sebastian's testimony in **SJX 35** at 11:17–12:2 and its response confirms that it used "its system of records to populate specific borrower data for certain written borrower communications that went out via an autogenerated system."

**139.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 121, 127, 137, 138. Ocwen does not deny the accuracy of Ms. Sebastian's testimony in **SJX 35** at 11:17–12:2; 93:19–94:3.

**140.** Ocwen does not dispute the fact and it should be deemed admitted.

**141.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 121, 127, 137–139. Further, Ocwen's impermissible legal argument about individual evidence lacks merit. *See* Reply Section I.

**142.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 121, 127, 137–139. Further, Ocwen's impermissible legal argument about individual evidence lacks merit. *See* Reply Section I. Moreover, Ocwen testified that certain interest rate fields, including adjustable rate mortgage term fields, it reviewed during the loan verification process would affect the information on a borrower's periodic statement. **SJX 33** at 106:4–106:16.

**143.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 121, 127, 137–139. Further, Ocwen's impermissible legal argument about individual evidence lacks merit. *See* Reply Section I.

**144.** Ocwen does not dispute the fact and it should be deemed admitted. Ocwen's suggestion that its processes, controls, and checks identified and corrected the relevant 1.38 million discrepancies, *see* SOF ¶ 127, is not supported by the record. *See* PRF ¶¶ 296–307. Ocwen's response citing RSF Ex. 6 also provides no support: Ocwen's witness testifies he has no knowledge of any controls to correct data prior to the loan verification process. RSF Ex. 6 at 169:3-17.

**145.** Ocwen does not dispute the fact and it should be deemed admitted.

**146.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, Ocwen's impermissible legal argument about individual evidence lacks merit. *See* Reply Section I.

**147.** Ocwen does not dispute the fact and it should be deemed admitted.

**148.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, its response confirms the fact by detailing, for example, the undercharges caused by the loan verification process.

**149.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen produced the overcharge report ("Overcharge Report"), **SJX 126**, and, in its amended discovery response relating to the Overcharge Report, stated: "[Ocwen] will produce available data responsive to this request, including account number, borrower name, undercharge or overcharge amount, and the adjustment date. Specifically, Ocwen will produce … available overcharge data from April 2016 through January 2018."[6] In an interrogatory response, Ocwen further referred to the Overcharge Report as: "data Ocwen provided to the Bureau regarding over and undercharges in response to Request No. 48 . . . discovered during the loan verification process." **SJX 147** at 12.

**150.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶ 149.

**151.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen produced the undercharge report ("Undercharge Report"), **SJX 133**, and, in its amended discovery response relating to the Undercharge Report, stated: "[Ocwen] will produce available data responsive to this request, including account number, borrower name, undercharge or overcharge amount, and the adjustment date. Specifically, Ocwen will produce available undercharge data from the time period January 2017 through January 2018."[7] In responding to an interrogatory, Ocwen states: "the data Ocwen provided to the Bureau regarding over and undercharges in response to Request No. 48 . . . discovered during the loan verification process[.]" **SJX 147** at 12.

---

[6] PRF Ex. 1, Ocwen's Amended Response to RFP No. 48 at 11–12.

[7] *Id.*

**152.** Ocwen's response fails to raise a genuine dispute and its response is misleading. Ocwen testified that it did not waive an undercharged amount but would "collect it from the consumer." **SJX 32** at 36:13–37:16.

**153.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 151–152.

**154.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶ 151.

**155.** Ocwen does not dispute the fact and it should be deemed admitted.

**156.** Ocwen does not dispute the fact and it should be deemed admitted.

**157.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response is unsupported and cites to testimony of its witness who stated he was "speculating." RSF Ex. 10 at 348:19.

**158.** Ocwen's response fails to raise a genuine dispute: the cited document states that Ocwen has over 3 million "documented CFPB violations." *See* **SJX 128** at 2.

**159.** Ocwen does not dispute the substance of the fact, and it should be deemed admitted. Ocwen does not explain the supposed "misstate[ment]."

**160.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen does not explain the supposed "misstate[ment]."

**161.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen does not explain the supposed "misstate[ment]."

**162.** Ocwen's response does not raise a genuine dispute because Ocwen does not contest that, if Ocwen collected too much or too little in the past escrow year (and so identified a shortage or surplus in the escrow analysis), Ocwen would adjust the borrower's monthly escrow payment going forward. Further, Ocwen's response is based only on a declaration that the Bureau has moved to strike.[8] Last, Ocwen, in its RSF ¶ 178, does not dispute that borrower's monthly escrow amount would normally change from one year to another as that borrower's taxes and insurance change between those years.

**163.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, if Ocwen is correct that it does not adjust borrowers' monthly escrow payments after it identifies

---

[8] Plaintiff's Motion to Strike Declaration of Benjamin Verdooren and Incorporated Memorandum of Law, ECF No. 735.

that taxes or insurance premiums have changed, then Ocwen is charging borrowers inaccurate escrow amounts even after performing an escrow analysis. Last, Ocwen, in its RSF ¶ 178, does not dispute that borrower's monthly escrow amount would normally change from one year to another as that borrower's taxes and insurance change between those years.

**164.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Instead, Ocwen raises an impermissible legal argument which lacks merit: the audit shows that Ocwen was, and knew it was, not conducting timely escrow analyses as of January 2014.

**165.** Ocwen does not dispute the fact and it should be deemed admitted.

**166.** Ocwen does not dispute the fact and it should be deemed admitted.

**167.** Ocwen does not dispute the fact and it should be deemed admitted.

**168.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen does not dispute that its verified response to Interrogatory No. 1 states that its servicing "data indicates that Ocwen did not complete an Escrow Account Analysis within thirty days of the completion of the applicable Escrow Account Computation Year" 391,603 times. Instead, Ocwen suggests that its Interrogatory No. 1 is not accurate and that Ocwen's loan-level data showing each debit and credit to a borrower's account ("Transaction History Data") "would contain more accurate information about whether or not Ocwen completed an analysis."[9] But Ocwen's contention that Interrogatory No. 1 is not accurate is not supported by the record evidence. For example, Ocwen:

(1) testified that its response to Interrogatory No. 1 was Ocwen's most complete and accurate answer.[10]

(2) testified that it understood that Interrogatory No. 1 was asking Ocwen to "identify loans in which an analysis [was] performed greater than 30 days after the end of the computation year."[11]

---

[9] In response to the Bureau's Fifth Set of Request of Production of Documents No. 22 (**SJX 155** at 20–21), Ocwen produced this Transaction History Data for at-issue loans.

[10] **SJX 38** Combs 30(b)(6) Dep. at 46:10–47:7. Ocwen served Amended and Supplemental Responses and Objections to Interrogatories Nos. 1–4 on May 1, 2019, which are the same as those responses that it later verified.

[11] *Id*. at 48:16–49:13.

(3) testified that it derived its answer to Interrogatory No. 1 from various relevant data, including the "last analysis date" in its system of record.[12] Ocwen also testified that the "primary" way it determined when an escrow analysis was performed was through its system-generated last analysis date.[13]

(4) admitted that Interrogatory No. 1 (and Ocwen's data) identified 391,603 borrowers for whom it failed to perform timely escrow analyses in each year 2014 through 2017.[14]

Ocwen's suggestion that its Transaction History Data "would contain more accurate information" is also not supported by any record evidence. As an initial matter, the Transaction History Data does not contain the last analysis field that Ocwen testified was the "primary" method for identifying whether an escrow analysis was performed.[15] Further, the three sources which Ocwen cites provide no record evidence in support of their contention.

First, Ocwen cites to the opinions of its rebuttal expert; this is an opinion, not a fact. Ocwen's expert opines that the Transaction History Data is more accurate than Ocwen's verified interrogatory response because the interrogatory response is "litigation work product."[16] This opinion is not based on any record evidence.[17] Ocwen's expert testified that this opinion was based on his industry experience,[18] rather than any review of Ocwen's documents[19] or interviews with Ocwen employees.[20] Further, Ocwen's expert infers—but does not in fact know—that an escrow analysis has taken place by looking for changes in the monthly escrow account in the Transaction History Data.[21] He justifies his inference based on his inability to "think of another

---

[12] **SJX 38** Combs 30(b)(6) Dep. at 52:20–53:10.
[13] *Id.* at 10:13–11:10.
[14] **SJX 150** OMS and OLS Answer to RFA No. 114 at 80–81. *See also id*. Answer to No. 109 at 76 (170,477 untimely escrow analyses for the year of 2014), Answer to No. 110 at 77 (218,258 untimely escrow analyses for the year of 2015), Answer to No. 111 at 78 (2,348 untimely escrow analyses for the year of 2016), Answer to No. 112 at 79 (550 untimely escrow analyses for the year of 2017).
[15] *See* RSF Ex. 20 (no field capturing the date of when an escrow analysis was performed).
[16] *See* Ocwen SMF Ex. 90, Hamm Report, ¶¶ 139, 188–189.
[17] *Id*. at ¶¶ 139, 188–190, n.118 (citing to no record evidence as to why Transaction History Data is more accurate for determining if and when escrow analyses are performed, rather than the analysis Ocwen performed to answer Interrogatory No. 1).
[18] ECF No. 736, Ex. 5, Hamm Dep. at 88:25–89:22.
[19] *Id*. at 89:24–90:1.
[20] *Id*. at 90:19–90:22.
[21] Ocwen SMF Ex. 90, Hamm Report, ¶¶ 190, n.118, 214.

reason . . . that would account for the [escrow] payment change other than the preparation of an escrow analysis."[22] But his opinion also conflicts with the record. Ocwen testified that there is a common situation when a borrower's monthly escrow payment would change, as reflected in the Transaction History Data, without Ocwen performing an escrow analysis: when borrowers made lump-sum shortage payments.[23]

*Second*, Ocwen cites to paragraph 29 of Sebastian's Declaration ("Sebastian Decl." RSF Ex. 13). There, Sebastian parrots Ocwen's expert's opinion about the Transaction History Data being the most accurate. Sebastian Decl. ¶ 29. As with Ocwen's expert, Sebastian cites no record evidence to support her opinion. Further, the Bureau first deposed Sebastian in November of 2018 about another declaration she filed in this case, in which she claimed Ocwen would be burdened by having to validate for accuracy the production of the servicing data requested by the Bureau.[24] When asked what specific validation work she was referring to in her declaration, she testified: "I would know less technical…I'm not necessarily sure what the data should look like. From a high-level, yes, but as far as, does this seem accurate, we need to work with the business units 'cause they're the ones that actually do the work."[25] Likewise, when deposed as Ocwen's corporate witness, Sebastian directed questions about the underlying meaning of the data Ocwen produced to other witnesses from specific business units. For example:

- she was unsure what certain transaction history data meant but that Ocwen's "Cashiering" business unit "would be an appropriate place to start to understand the transaction history;"[26]
- with respect to how to interpret information in certain escrow data fields, she responded that such questions should be directed to the "escrow team;"[27]

---

[22] ECF No. 736, Ex. 5, Hamm Dep. at 88:15–89:22; *See also* 66:17–67:9.
[23] **SJX 38** Combs 30(b)(6) Dep. 28:7–29:7: 31:23–34:12 (identifying that Ocwen would remove the escrow shortage portion from the total monthly escrow payment after receipt of a shortage payment by adjusting the shortage amount being collected, not by performing a new escrow analysis: "we typically would not reanalyze the loan [after receipt of a shortage payment] until the next scheduled [escrow] analysis.").
[24] PRF Ex. 2, Krysta Sebastian Nov. 2018 Dep. at 29:24–30:14.
[25] *Id*.
[26] *See, e.g.*, **SJX 35**, Sebastian 30(b)(6) Dep. at 142:22–143:17.
[27] *Id*. at 97:20–22 (unable to explain a certain type of escrow analysis); 98:2-9 (unable to explain the data relating to the date of the analysis).

Sebastian's Declaration at paragraph 29 (opining on the superiority of Transaction History Data) lacks support.

Third, Ocwen cites to Arnett's corporate testimony but the cited passage does not concern the accuracy of the Transaction History Data or discuss escrow analyses.

**169.** Ocwen's response does not raise a genuine dispute for the same reasons as in PRF ¶ 168.

**170.** Ocwen does not dispute the fact and it should be deemed admitted.

**171.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶ 168.

**172.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's verified response to Interrogatory No. 2 identifies the amounts that borrowers who suffered untimely escrow analysis were inaccurately overcharged by Ocwen (as measured by the identified accrued surplus) and undercharged and which Ocwen later sought to collect in extra payments (as measured by the identified accrued shortage).[28] These inaccurate amounts were the result of Ocwen's failure to perform a timely escrow analysis, which had it performed, Ocwen would have adjusted the monthly escrow amount being collected. Further, Ocwen's argument about and citation to its expert report about opportunity-cost damages is unsupported and not inconsistent with the fact.

**173.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Specifically, Ocwen's hypothetical reasons as to why an unidentified borrower *may* not have accrued or paid a shortage due to Ocwen's failure to perform a timely escrow analysis are not inconsistent with the fact that borrowers did accrue surpluses or shortages as a result of Ocwen's untimely escrow analyses, *see* Ocwen's verified response to Interrogatory No. 2.[29] Further, the cited opinions of Ocwen's expert and employee-declarant Sebastian are unsupported and not inconsistent with the fact.

**174.** Ocwen fails to raise a genuine dispute of fact. In relation to Interrogatory No. 3, which relates to borrowers who filed for bankruptcy and for whom Ocwen failed to perform a timely escrow analysis, Ocwen testified that performing a delayed escrow analysis could result in

---

[28] **SJX 140**, Ex. C to Defs.' Resp. First Rogs (**SJX 138**) at Rog. No. 2.; **SJX 38**, Combs 30(b)(6) Dep. at 70:8–73:1 (explaining that Ex. C shows 'the escrow shortage or surplus that accrued during the time period for which an escrow analysis was outstanding").

[29] *Id.*

"financial harm" and that "[f]inancial harm [from a delayed escrow analysis] could be where a customer was over or underbilled as part of the escrow payment."[30] Further, in claiming it remediated all borrowers identified in Interrogatory No. 1, not just those in Interrogatory No. 3 (those in bankruptcy), Ocwen testified that "impact" also referred to over-collection or under-collection by Ocwen.[31]

**175.** Ocwen fails to raise a genuine dispute of fact. Ocwen's corporate testimony referred to all borrowers Ocwen identified in Ocwen's response to Interrogatory No. 1. *See* PRF ¶ 174.

**176.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen testified that documentation harm from a delayed escrow analysis "could be not sending an escrow analysis statement."[32]

**177.** Ocwen does not dispute the substance of the fact or is inconsistent with the fact, and the fact should be deemed admitted. Ocwen's discovery responses, testimony, and admissions identify 391,603 instances where it failed to perform a timely escrow analysis. Ocwen testified that it used data in its system of record (REALServicing) to answer Interrogatory No. 2,[33] which identifies borrowers who were overcharged (that is, accrued surpluses) and were undercharged (that is, accrued shortages that Ocwen later sought to collect) between the time Ocwen should have conducted the escrow analysis and did perform the escrow analysis, and the amount of the accrued surpluses and shortages.[34] *See also* PRF ¶ 172.

**178.** Ocwen does not dispute the fact and it should be deemed admitted.

**179.** Ocwen does not dispute the fact and it should be deemed admitted.

**180.** Ocwen's response does not dispute the substance of the fact (a quote from its Director of Corporate Compliance). Further, Ocwen's expert's unsupported opinion on foreclosure-related damages is not a fact, nor is it inconsistent with the fact. The fact should be deemed admitted.

---

[30] **SJX 38**, Combs 30(b)(6) Dep. at 85:13–85:20.

[31] *Id.* at 117:25–118:15.

[32] SOF ¶¶ 174, 176.

[33] **SJX 38**, Combs 30(b)(6) Dep. at 71:24–73:1.

[34] **SJX 140**, Ex. C to Defs.' Resp. First Rogs (**SJX 138**) at Rog. No. 2.; **SJX 38**, Combs 30(b)(6) Dep. at 70:8–73:1 (explaining that Ex. C shows 'the escrow shortage or surplus that accrued during the time period for which an escrow analysis was outstanding").

**181.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, Ocwen's expert's unsupported opinion on foreclosure-related damages is not a fact, nor is it inconsistent with the fact. *See also* PRF ¶ 177.

**182.** Ocwen does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See also* PRF ¶¶ 168–169, 177, 181.

**183.** Ocwen does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See also* PRF ¶¶ 168–169, 177, 181.

**184.** Ocwen does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See also* PRF ¶¶ 168–169, 177, 181.

**185.** Ocwen does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See also* PRF ¶¶ 168–169, 177, 181. Moreover, Ocwen's response confirms the fact by acknowledging that it sought to collect shortages in two forms: lump sums or payment spreads.

**186.** Ocwen does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. *See also* PRF ¶¶ 168–169, 177, 181, 185.

**187.** Ocwen does not dispute the substance of the fact and its response confirms that when Ocwen performed an escrow account analysis, its system of record automatically generated an entry in REALServicing to change the monthly escrow amount owed by borrowers, if the analysis resulted in a change to the monthly escrow amount. Ocwen's remaining response that the new payment changes goes into effect at the effective date is not inconsistent with the fact.

**188.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. Further, Ocwen states that its system automatically changes the monthly escrow amount only after an escrow analysis occurs. RSF ¶ 187. Thus, if no escrow analysis occurs, the monthly escrow amount remains the same. PRF ¶ 187.

**189.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 168, 177, 182.

**190.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 168, 177, 182. Further, Ocwen's remaining response is not inconsistent with the fact.

**191.** Ocwen's response does not dispute the substance of the fact and is not inconsistent with the fact, and the fact should be deemed admitted. That some borrowers may not have ultimately had inaccurate reinstatement quotes is not inconsistent with the fact that other borrowers received

inaccurate reinstatement quotes. Further, Ocwen responds that the cited document does not state that Ocwen provided inaccurate reinstatement quotes. But the document states: "*The affected loan would result in incorrect reinstatement amounts being produced on Reinstatement Quotes*, Monthly Billing Statements, Scripting, *and other servicing communications* that reference TOTRA (Total Reinstatement Amount).[35] Ocwen's response that **SJX 84** related to "prior events" to imply that borrowers during the relevant time period did not receive inaccurate reinstatement quotes is not supported by the record. *See* SOF ¶ 193–194 (Ocwen's verified interrogatory responses indicating that Ocwen sent over 82,000 inaccurate quotes to borrowers since January 2014). Finally, the Bureau does not reference or rely on any voluntary remediation in SOF ¶ 217 or **SJX 84** and Ocwen's admissibility argument fails. *See* Reply, Section II.B.2.

**192.** Ocwen's response does not dispute the substance of the fact (that Ocwen identified 12,379 as needing to be remediated due to inaccurate reinstatement quotes) and the fact should be deemed admitted. Ocwen instead disputes only the timing of purported remediation. *See* PRF ¶ 191.

**193.** Ocwen's response does not dispute the substance of the fact or is inconsistent with the fact, and the fact should be deemed admitted. In Ocwen's verified response to Interrogatory No. 5, Ocwen identified 82,763 inaccurate reinstatement quotes it provided to borrowers as a consequence of Ocwen's failure to perform timely escrow analyses, and Ocwen testified that its answer was the "best [it] could do from a modeling perspective."[36] Ocwen's impermissible legal argument about individual evidence lacks merit. *See* Reply Section I.

**194.** Ocwen does not address the substance of the fact and it should be deemed admitted. *See* PRF ¶ 193.

**195.** Ocwen does not address the substance of the fact and it should be deemed admitted. *See* PRF ¶ 193.

**196.** Ocwen does not address the substance of the fact and it should be deemed admitted. *See* PRF ¶ 193.

**197.** Ocwen does not address the substance of the fact and it should be deemed admitted. *See* PRF ¶ 193.

---

[35] **SJX 84,** at 1 (emphasis added).

[36] **SJX 38**, Combs 30(b)(6) Dep. at 281:4–281:19.

**198.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's corporate witness testified that there were instances in each of the years 2014 through 2017 "where Ocwen should have and did conduct an escrow account analysis, but then failed to send the escrow account statement within 30 days of the escrow account computation year."[37] Ocwen's cite to its witness's speculation that there may have "also" been instances when Ocwen decided an escrow analysis was not necessary, and so did not send a statement, does not conflict with the testimony that Ocwen failed to send statements after performing escrow analyses.

**199.** Ocwen does not dispute the fact and it should be deemed admitted.

**200.** Ocwen's response does not create a genuine dispute of fact. The Bureau asked Ocwen to identify the accounts for which it failed to send escrow statements, and Ocwen responded by producing a document in which it identified 183,942 accounts ("Escrow Statement Discovery Response"), **SJX 87**. As Ocwen's response and its testimony confirm, Ocwen identified the accounts in the Escrow Statement Discovery Response by querying relevant data in its system of record—specifically the mail code identifying that an escrow statement had been sent.[38] In the testimony Ocwen cites, Ocwen's corporate witness speculates that certain of these borrowers *may* have received statements, even though the relevant mail codes for those borrowers' statements were missing. Ocwen has not cited any record evidence showing that it, in fact, sent escrow statements for the relevant 183,942 accounts. Ocwen also cites paragraphs of the Sebastian Declaration (RSF Ex. 13) in which Sebastian opines that the Escrow Statement Discovery Response *might* be inaccurate to some unspecified amount because the Transaction History Data—rather than mail code on which Ocwen relied to create the Escrow Statement Discovery Response—is an "important" way to detect whether an escrow statement was sent. Sebastian opines that Transaction History Data is superior by suggesting that only Transaction History Data was "actually used" to service loans, RSF Ex. 13 ¶ 54—contrary to her prior deposition testimony as Ocwen's corporate witness stating the exact opposite.[39]

Ocwen's response is not supported by and conflicts with the record evidence.

**201.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. In its Escrow Statement Discovery Response, Ocwen identified which of the 183,942 borrowers to

---

[37] **SJX 38**, Combs 30(b)(6) Dep. at 163:16–166:6.

[38] *Id.* at 167:19–169:23.

[39] **SJX 35** at 11:6–16 (confirming the servicing data Ocwen produced was used to service loans).

whom Ocwen did not send an escrow statement were not delinquent (and so entitled to an escrow statement). *See* **SJX 87**. In corporate testimony, Ocwen confirmed that the Escrow Statement Discovery Response identified the delinquency status at the time of the relevant escrow analysis.[40] Now, in its response, Ocwen cites to the Sebastian Declaration (RSF Ex. 13) which Sebastian: (1) analyzes the Transaction History Data and bankruptcy data to opine that two loans in the Escrow Statement Discovery Response that Ocwen identified as not delinquent were actually delinquent or in bankruptcy[41], and (2) then opines—without any record evidence—that "many" other unspecified loans may also be delinquent or in bankruptcy.[42] The Transaction History Data, however, has no explicit fields identifying the dates a borrower is delinquent (start and end dates), the date a borrower cures that delinquency, or the date the borrower reinstates the loan; that data is contained in the delinquency servicing data Ocwen produced.[43] And, as demonstrated by Ocwen's single loan example in its response, the Transaction History does not accurately identify whether a borrower is in fact delinquent on a given date.[44] Ocwen's response is not supported by and conflicts with the record evidence.

**202.** Ocwen does not dispute the substance of the fact (a quote from its Director of Corporate Compliance) and it should be deemed admitted.

**203.** Ocwen's response does not create a genuine dispute of fact. While Ocwen takes issue with the term "asked," Ocwen admits that it "informed" borrowers that shortages could be paid in a single payment or spread over at least 12 months.

---

[40] **SJX 38**, Combs 30(b)(6) Dep. at 168:16–168:23.

[41] Sebastian Decl. ¶¶ 55–56. The delinquency data that Ocwen used to service this loan shows that the borrower cured her delinquency and was current as of August 4, 2014. *See* PRF Ex. 3, Delinquency Data for August 1–4, 2014 for xxx4324. The Transaction History Data for this same borrower also shows that the borrower became current (and was paying on a forbearance plan) on August 4, 2014, as is clear by observing Ocwen's later corrections (or reversals) in the Transaction History Data for the month of August 2014. *See* RSF Ex. 24 (Transaction History Data, xxx4324). Sebastian ignores these corrections in the Transaction History Data. Sebastian Decl. ¶ 55.

[42] Sebastian Decl. ¶ 57.

[43] *Compare* RSF Ex. 20 (Transaction History Data, lacking these fields) and RSF Ex. 14 (Ocwen's specific delinquency data, identifying periods of delinquency, and cure and reinstatement dates).

[44] *See* n.41 *supra*.

**204.** Ocwen's response does not create a genuine dispute of fact. Ocwen does not dispute that when borrowers' lump-sum payments matched their shortage amount, Ocwen's process was to adjust the monthly shortage amounts that borrowers owed.

**205.** Ocwen's response does not create a genuine dispute of fact. Ocwen does not dispute the contents of the 2015 and 2016 audits, which respectively found that, after borrowers already paid shortage amounts, Ocwen "continued collection of escrow shortage amounts" from the borrowers **SJX 74** at 553; **SJX 79** at 032.

**206.** Ocwen does not dispute this fact and it should be deemed admitted. *See* PRF ¶ 205.

**207.** Ocwen's response does not create a genuine dispute of fact. Ocwen's legal conclusion about its interrogatory response is not a basis to dispute a fact, and is also irrelevant and incorrect, *see* Reply, Section III.C. ("Escrow shortage amounts"). Further, Ocwen's contention that "CFPB's use of the quoted term 'timely remove'" is "not found in the cited testimony" is misleading. *See* **SJX 38**, Combs 30(b)(6) Dep. at 183:18–184:1 ("There were instances where the *removal* of the escrow payment did not occur *timely* when the customer made an escrow shortage payment, yes.") (emphasis added).

**208.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response confirms the fact, that, until July 1, 2015, its SLA required it to process escrow shortage payments and adjust escrow balances within 15 business days, and from July 1, 2015 until January 1, 2018, that time period was reduced to 5 business days.

**209.** Ocwen does not dispute this fact and so it should be deemed admitted.

**210.** Ocwen does not dispute this fact, its response is not inconsistent with the fact, and the fact should be deemed admitted.

**211.** Ocwen does not dispute this fact, its response is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's implication that relevant borrowers suffered no harm or Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**212.** Ocwen does not dispute this fact and so it should be deemed admitted.

**213.** Ocwen does not dispute this fact and so it should be deemed admitted.

**214.** Ocwen does not dispute this fact and so it should be deemed admitted.

**215.** Ocwen does not dispute this fact and so it should be deemed admitted.

**216.** Ocwen's response does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response that late disbursements "may" have occurred due to additional causes is not inconsistent with the fact or contents of the cited document.

**217.** Ocwen's response does not dispute the substance of the fact and it should be deemed admitted. Ocwen's admissibility objection lacks merit: the Bureau does not reference or rely on any voluntary remediation in SOF ¶ 217. *See also* Reply, Section II.B.2. Its remaining response about individual loan "examples" is irrelevant. *See* Reply Section I.

**218.** Ocwen's response does not dispute the substance of the fact and it should be deemed admitted. Ocwen's use of the word "requested" instead of "demanded" does not dispute the substance of the cited letter. And Ocwen's response that the document "does not identify any individual loan 'examples'" is irrelevant. *See* Reply Section I.

**219.** Ocwen does not dispute this fact and so it should be deemed admitted. Ocwen's response that the document "does not identify any individual loans" is irrelevant. *See* Reply Section I.

**220.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response to the Bureau's characterization of the cited document is not inconsistent with the fact or cited contents of the document.

**221.** Ocwen does not dispute this fact and it should be deemed admitted.

**222.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's implication that it only "potentially" determined that the 1,367 loans in its verified interrogatory response at Exhibit G is contradicted by its same response. Ocwen states in its interrogatory response: "Mr. Reeves testified that the 10,478 loans were those that Ocwen determined were potentially impacted by vender or errors, although Ocwen subsequently determined after review that not all such accounts reflected an erroneous cancellation" and that it "provides a list of loans in Exhibit G derived from the available vendor's records where a borrower's hazard insurance *was cancelled*, and that Ocwen interpreted to indicate that the cancellation was the result of Ocwen or vendor error." **SJX 138**, at 22 (emphasis added).

**223.** Ocwen's response does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶ 222. Further, Ocwen does not dispute that the 725 borrowers obtained replacement policies with higher premiums or had insurance force-placed on them by Ocwen, and this fact should be deemed admitted.

**224.** Ocwen's response does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶ 222. Further, Ocwen does not dispute that, of the 1,367 borrowers that it identified in its verified response to Interrogatory No. 9, 850 were current when their insurance premiums were due, and this fact should be deemed admitted.

**225.** Ocwen does not dispute this fact and it should be deemed admitted. Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**226.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Instead, Ocwen disputes facts not asserted in SOF ¶ 226. Further, in its RSF ¶ 225, Ocwen does not dispute that there are 853 "loan numbers for which Ocwen's vendors failed to make timely insurance disbursements from escrow accounts." The 45 loan numbers listed in SOF ¶ 226 are a subset of the 853 loan numbers referenced in SOF ¶ 225. Thus, Ocwen's dispute in RSF ¶ 226 is inconsistent with its lack of dispute (of the same underlying facts) in RSF ¶ 225.

**227.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Rather, Ocwen disputes facts that are not even asserted in SOF ¶ 227; again, Ocwen's response is inconsistent with its "Undisputed" response to SOF ¶ 225 which referred to "loan numbers for which Ocwen's vendors failed to make timely insurance disbursements from escrow accounts." The 49 loan numbers referenced are a subset of the loan numbers referenced in SOF ¶ 225.

**228.** INTENTIONALLY OMITTED/WITHDRAWN.

**229.** INTENTIONALLY OMITTED/WITHDRAWN.

**230.** INTENTIONALLY OMITTED/WITHDRAWN.

**231.** INTENTIONALLY OMITTED/WITHDRAWN.

**232.** Ocwen's response does not dispute the substance of the fact or is inconsistent with the fact, and the fact should be deemed admitted.

**233.** Ocwen does not dispute this fact and it should be deemed admitted.

**234.** Ocwen does not dispute the substance of the fact (that its vendor identified over 4,800 duplicate disbursements), it is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's contention that the duplicate disbursements were subsequently remediated is irrelevant to liability. *See* Reply, Section III.B.

**235.** Ocwen does not dispute this fact and it should be deemed admitted.

**236.** Ocwen does not dispute the substance of the fact, it is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**237.** Ocwen does not dispute the substance of the fact and it should be deemed admitted.

**238.** Ocwen does not dispute the substance of the fact (that it force-placed flood insurance on borrowers who were not in flood zones) and it should be deemed admitted. RSF ¶ 236 and 238 further confirm this fact. Ocwen's contention that borrowers subsequently received credits or refunds is irrelevant, *see* Reply III.B.

**239.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen does not dispute its corporate testimony at SJX 38, Combs 30(b)(6) Dep. at 264:4-13 (Q: "did it refresh your recollection at all that Ocwen had knowledge that there may have been instances in which where was excessive coverage on hazard LPI policies;" A: "I believe there was an instance where SWBC or data with SWBC had identified some examples of loans that had excessive coverage."). Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**240.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Rather, Ocwen impermissibly raises the legal argument in response to a fact that there is no requirement to not impose excessive insurance. The evidence cited to in SOF ¶ 240, an internal audit, shows that Ocwen was on notice that such practice could have legal implications as the audit states "lender-placing insurance to customers for amounts in excess of statutory and/or investor requirements could lead to potential UDAAP risk exposure." **SJX** 114 at 033.

**241.** Ocwen does not dispute this fact and it should be deemed admitted.

**242.** Ocwen does not dispute the substance of the fact, it is not inconsistent with SOF ¶ 242, and the fact should be deemed admitted. Rather, Ocwen misstated its corporate testimony ("Q: during the time period of January 2014 through the present day, is that – has that been the policy to look at the last known coverage or the replacement value for hazard LPI?" "A: I am not aware of any changes in policy relating to that. I know that a best practice analysis was done when it went to Assurant, and I believe it remained the same from SWBC to Assurant."). **SJX 38** at 258:14-22.

**243.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**244.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen's statement that its insurance vendor, Assurant, imposed the excessive insurance coverage is not inconsistent with SOF ¶ 244. Further, Ocwen did not the dispute SOF ¶ 221, which related to Ocwen's responsibility for the actions of its vendors. Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B. Ocwen's stated response that it "immediately took action," is not support by the cited evidence. *See generally* **SJX 160**.

**245.** Ocwen's response does not dispute the substance of the fact and the fact should be deemed admitted. Ocwen's opinion and legal argument are not facts or inconsistent with the fact.

**246.** Ocwen does not dispute this fact and it should be deemed admitted. Ocwen's response that the document "does not identify any individual loan 'examples'" is irrelevant. *See* Reply Section I.

**247.** Ocwen does not dispute this fact and it should be deemed admitted. Ocwen's response that the document "does not identify any individual loan 'examples'" is irrelevant. *See* Reply Section I.

**248.** Ocwen's response does not create a genuine dispute of fact. During the Bureau's investigation, Ocwen's corporate witness testified that "in the below 5,000 range" of accounts had private-mortgage insurance that "should have terminated" on the termination date but were not or were untimely cancelled. *See* **SJX 52**, Reeves IH Tr. at 61:13–63:11. To identify these loans, the Bureau requested documents sufficient to identify each account for which Ocwen failed to terminate private-mortgage insurance on the termination date, "including the approximately 5,000 Accounts about which" Mr. Reeves testified, as Ocwen's corporate witness. *See* **SJX 151** at 13 (Document Request 9). Ocwen responded with a list of 7,855 unique loan numbers. *See* **SJX 55**, Ridder Aff. ¶¶ 65–68; **SJX 123**, PMI Terminations (Dep. Ex. 197), OCW-CFPB-001-06730240. Thus, contrary to RSF ¶ 248, Ocwen identified thousands of loans that it "should have" cancelled on the termination date but did not. Of these 7,855 untimely cancellations, 7,771 occurred during the relevant time period–that is, after January 1, 2014. *See* **SJX 55**, Ridder Aff. ¶ 71. Ocwen's and Sebastian's contention that "a manual review of each

borrower's servicing file and transaction history" is unsupported and irrelevant. *See* Reply Section I. Further, apart from the 2,773 loans that Ocwen references in RSF ¶ 248, Ocwen does not dispute that **SJX 123** indicates that, for the remaining 4,998 loans, Ocwen did not cancel the PMI for these loans on their termination dates.

**249.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. As described in PRF ¶ 248, Ocwen identified in a discovery response the borrowers for whom it should have cancelled PMI but did not. And Ocwen's corporate witness unambiguously testified that, according to Ocwen's discovery response—which was based on Ocwen's servicing data—Ocwen failed to cancel PMI on the termination date in each of the years 2014 through 2018. **SJX 38**, Combs 30(b)(6) Dep. at 198:11–201:2.

**250.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 248, 249.

**251.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 248, 249.

**252.** Ocwen's response does not raise a genuine dispute of fact. Ocwen's refund total (approximately $3.8 million) includes borrowers with termination dates or cancellations before January 1, 2014, whereas the Bureau's total (approximately $3 million) is limited to borrowers with termination dates or cancellations after January 1, 2014. *See also* PRF ¶ 248.

**253.** Ocwen's response does not dispute the substance of the fact, it is not inconsistent with the fact, and it should be deemed admitted. Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**254.** Ocwen's response does not dispute the substance of the fact, it is not inconsistent with the fact, and it should be deemed admitted. Ocwen's additional response about whether other servicers had deferral amounts is not inconsistent with the fact that Ocwen incorrectly reprogrammed *its* loan modification templates causing errors in loan modification agreements. **SJX 53** at 348:25–350:16, or that two borrowers were impacted.

**255.** Ocwen's response fails to raise a genuine dispute of fact. Nothing in Ocwen's cited testimony relates to Ocwen's letters to borrowers but instead confirms that it had mail merge errors that led to omitted interest rates in loan modification agreements. Ocwen cites [redacted]" only further confirms the fact. RSF Ex. 5 at 26-27. Ocwen's

contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**256.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Further, Ocwen's written analysis of "potential borrower impact" from its servicing errors is *not* a voluntary subsequent remedial measure. *See* Reply Section II.B.2. Further, Ocwen's corporate witness testified that he *assumed* borrowers who were required to return corrected agreements did so because they viewed the agreement to be favorable, not because they had no choice, but he did not review any consumer complaints or calls from the impacted Ocwen borrowers.[45] Regardless, Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**257.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response is not inconsistent with the fact that it originally approved borrowers for loan modifications and then later denied these borrowers for loan modification agreements.

**258.** Ocwen does not dispute this fact and it should be deemed admitted.

**259.** Ocwen does not dispute this fact and it should be deemed admitted.

**260.** Ocwen's response does not raise a genuine dispute of fact. Ocwen's Second Amended and Supplemental Response to Interrogatory No. 14 (Response No. 14) stated that it reviewed applicable loans to determine those loans subject to RESPA for which Ocwen initiated a First Notice or Filing, as defined by RESPA, before completing its evaluation of a borrower's Complete Application, as defined by RESPA. **SJX 145** at 6-7; **SJX 137** at 2–3 (defining First Notice or Filing and Complete Application as defined by RESPA). In Response No. 14, Ocwen stated that it manually reviewed two sets of borrower accounts, and then excluded borrowers that were previously evaluated for, or obtained a loan modification, or should otherwise be excluded under RESPA. **SJX 145** at 6–7. From its review, Ocwen determined that for 124 loans (or 59 and 65 loans in each set), which were "subject to RESPA," Ocwen had initiated a First Notice or Filing before completing its evaluation of borrowers' Complete Applications. *Id.* at 6-7, n.1.

**261.** Ocwen does not dispute the substance of the fact, it is not inconsistent with the fact, and it should be deemed admitted. Ocwen's speculation about whether these letters—that Ocwen produced as a part of borrowers' servicing files—is unsupported. Moreover, Ocwen does not

---

[45] *See* **SJX 53** at 404:15–407:4.

counter the information on its own sworn report that these letters were sent to the borrowers on the dates specified in the report and on their letters.[46]

**262.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. Ocwen's response, which improperly suggests that the letter's plain promise was implicitly conditioned on the completion of an application, is inconsistent with the text of and unsupported by the letter.

**263.** Ocwen does not dispute the substance of the fact, it is not inconsistent with the fact, and the fact should be deemed admitted. Ocwen's response is based on a misreading of the record evidence. *See* PRF ¶¶ 261–262.

**264.** Ocwen does not dispute the substance of the fact and it should be deemed admitted. *See* PRF ¶¶ 261–262.

**265.** INTENTIONALLY OMITTED/WITHDRAWN.

**266.** INTENTIONALLY OMITTED/WITHDRAWN.

**267.** INTENTIONALLY OMITTED/WITHDRAWN.

**268.** INTENTIONALLY OMITTED/WITHDRAWN.

**269.** INTENTIONALLY OMITTED/WITHDRAWN.

**270.** INTENTIONALLY OMITTED/WITHDRAWN.

**271.** INTENTIONALLY OMITTED/WITHDRAWN.

**272.** INTENTIONALLY OMITTED/WITHDRAWN.

**273.** INTENTIONALLY OMITTED/WITHDRAWN.

**274.** INTENTIONALLY OMITTED/WITHDRAWN.

**275.** INTENTIONALLY OMITTED/WITHDRAWN.

**276.** INTENTIONALLY OMITTED/WITHDRAWN.

**277.** INTENTIONALLY OMITTED/WITHDRAWN.

**278.** INTENTIONALLY OMITTED/WITHDRAWN.

---

[46] **SJX 94**; *see also* **SJX 55**, Ridder Aff. ¶ 76 (identifying dates that letters were sent from Ocwen's written report in SJX 152). The dates identified in the written report match the dates of the letters identified in **SJX 94**. For example, Ocwen reported that loan number XXXXXX7642 was sent a letter on Feb. 21, 2014. In **SJX 94**, there is a letter to the borrower whose loan number XXXXXX7642 on Feb. 21, 2014. **SJX 94** at 134. As another example, Ocwen reported that loan number XXXX2804 was sent the relevant letter on Apr. 28, 2014. In **SJX 94**, there is a letter to borrower XXXX2804 dated Apr. 28, 2014 in the servicing file. **SJX 94** at -014.

**279.** INTENTIONALLY OMITTED/WITHDRAWN.

**280.** INTENTIONALLY OMITTED/WITHDRAWN.

**281.** INTENTIONALLY OMITTED/WITHDRAWN.

**282.** INTENTIONALLY OMITTED/WITHDRAWN.

**283.** INTENTIONALLY OMITTED/WITHDRAWN.

**284.** INTENTIONALLY OMITTED/WITHDRAWN.

**285.** INTENTIONALLY OMITTED/WITHDRAWN.

**Plaintiff's Response to Defendants' Counterstatement of Facts**

**286.** The Bureau incorporates its Responses to Defendants' Statement of Material Facts, ECF No. 742 and the exhibits filed therewith, Opp. Exhibits. 1–32 (ECF No. 742).

**287.** Disputed. Ocwen's reference to "many others" is vague and ambiguous.[47] Disputed as to Ocwen's implication that the information in the Monitor's reports relates to the claims in these instant actions. *See* Ocwen SMF Exs. 22–25 (Monitor's reports). Further, as the Monitor stated, the Bureau's allegations about the underlying inaccurate and incomplete information in Ocwen's system of record ("SOR") went beyond the scope of the Monitor's duties and he did not test the underlying accuracy of the information in Ocwen's SOR.[48] With respect to Ocwen's citations to its expert, Bryar (an attorney), his opinions are not facts, and the Consent Judgment and Monitor's reports speak for themselves. Likewise, Evans' Declaration, to which Ocwen cites, does not cite to or rely on any record evidence. Further, the declarant—counsel for OFC—was not previously disclosed to the Bureau.

**288.** Partially disputed. Disputed to the extent that Ocwen relies upon Sebastian's Declaration, RSF Ex. 13, ¶ 5. There, Sebastian cites to no record evidence and vaguely claims: "[a]ll of these actions [in CSF ¶ 288] are reflected within each individual loan's servicing file." Further, Ocwen has also repeatedly contradicted its CSF ¶ 288 by arguing that the information in borrower's servicing files may not be accurate. *See e.g.*, RSF ¶ 261 (raising a dispute on the basis that Ocwen may not have, in fact, sent relevant letters in borrowers' servicing files to those borrowers); RSF ¶ 248 (raising a dispute on the basis that its insurance cancellation dates may not have been the dates when Ocwen cancelled such policies, just the date when Ocwen recorded

---

[47] *See* Pl.'s Opp. SOF ¶ 8.

[48] *See* Pl.'s Opp. SOF ¶¶ 268–269 and Ocwen SMF Ex. 25, Aug. 25, 2017 Monitor's Report, at 6.

the cancellations); RSF ¶ 200 (raising a dispute on the basis that Ocwen may have Ocwen failed to enter the correct "mail code" in a borrower's file).

**289.** Disputed. "OFSPL" is not defined and vague, and the Payment Processing Procedure (SJX 75) was an Ocwen Financial Corporation ("OFC") Procedure, as stated on and in the Procedure. Further, the organizational charts to which Ocwen cites are titled as "Ocwen Financial Corporation."

**290.** Undisputed.

**291.** Undisputed.

**292.** Undisputed, including that Ocwen was verifying fields in loans "to ensure that the data is loaded into REALServicing . . . is accurate" and chose such fields "as directed by the business units that are dependent on those fields." *See* RSF ¶ 292.

**293.** Partially disputed. Undisputed that the purpose of Ocwen's loan verification process was to determine whether the loan data Ocwen boarded was inaccurate. Disputed that Ocwen's data inaccuracies were solely due to the prior servicer's data, as compared to Ocwen's conduct, such as Ocwen's lack of system functionality to service certain types of loans resulting in inaccuracies in borrowers' loan data.[49] Further, Ocwen's support for that contention is its interrogatory response in which Ocwen raises the same contention (that the data inaccuracies were due to prior servicer's data) but does not cite or provide any record evidence. *See* **SJX 147** at 11.

**294.** Disputed. Ocwen's fact is based on its testimony in which its witness makes this general statement. But the specific record evidence shows that, if Ocwen identified the error, it took months, if not years, to identify such errors. *See* SOF ¶ 127 and **SJXs 127, 129, 132**. The specific record evidence also shows that Ocwen did not accurately correct the errors it found: Ocwen's November 2014 internal audit found that of the loan fields its personnel updated in REALServicing "63% of samples reviewed have the incorrect loan information updated on Ocwen's system."[50] Further, Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

---

[49] *See* **SJX 134**, Rows labeled [redacted].

[50] **SJX 150**, Ocwen's Answer to Bureau's RFA No. 53, at 39 (Ocwen admitting the audit was the best evidence of its contents).

**295.** Disputed as to "many." Out of over 1.3 million discrepancies, Ms. Sebastian attests that there are 22,034 entries indicating a zip code discrepancy.[51]

**296.** Disputed. Mr. Kennedy generally testified that Ocwen had "multiple controls" other than loan verification but was unable to identify a single control when asked. RSF Ex. 6 at 168:15–169:17.

**297.** Partially disputed. Undisputed that Ocwen's witness testified to the content in CSF ¶ 297. Disputed to the extent that Ocwen implies such risk management processes were always in place, effective, or otherwise prevented or corrected errors, including those Ocwen later detected through its loan verification process.[52] Instead, the record evidence shows that Ocwen's compliance personnel and auditors repeatedly identified Ocwen's errors after they occurred and warned Ocwen of potential impacts to borrowers relating to such findings.[53]

**298.** Partially disputed. Undisputed that Ocwen's witness testified to the content in CSF ¶ 298. Disputed to the extent Ocwen implies that such risk management processes were always in place, effective, or otherwise prevented or corrected any errors at issue. *See* PRF ¶ 297.

**299.** Partially disputed. Undisputed that Ocwen's witness testified to the content in CSF ¶ 299. Disputed to the extent Ocwen implies that such risk management processes were always in place, effective, or otherwise prevented or corrected any errors at issue. *See* PRF ¶ 297.

**300.** Disputed. The cited testimony does not support Ocwen's contention that Ocwen's internal audit department had "oversight of the entire organization." Further disputed to the extent that Ocwen implies its audit processes prevented or corrected any errors at issue. *See* PRF ¶ 297.

**301.** Partially disputed. Undisputed that Ocwen's witness testified to the content in CSF ¶ 301. Disputed that such testimony supports that if Ocwen found an error, it fixed the error and addressed the affected borrowers. Ocwen puts forth no record evidence that it corrected any specific error. Instead, the record evidence reflects the opposite. For example, Ocwen's sworn written report shows that Ocwen [redacted]

---

[51] *See* RSF Ex. 13, Sebastian Decl., ¶¶ 74–75.

[52] *See* SOF ¶ 103 (Faris, Ocwen's CEO, testifying that Ocwen's compliance capabilities were in the early stages of development in 2014); 104 (Ocwen's master servicer, Chase, finding Ocwen's compliance management system lacking); 107 (GSE, Fannie Mae, finding high risk findings and systemic weaknesses in its operational control environment); and 110 (Ocwen's business individuals and auditors identifying numerous errors and potential violations).

[53] *See, e.g.*, SOF ¶¶ 106, 156, 179–180, 202 (compliance personnel routinely identifying violations and errors); 164, 240 (auditors finding various violations).

[redacted].[54] Further, Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**302.** Partially disputed. Undisputed that Ocwen could identify potential errors from GSE audits or consumers. Disputed that Ocwen, in fact, reviewed consumer complaints or notice of errors when Ocwen identified a risk item.[55]

**303.** Disputed. The record evidence shows that Ocwen did not perform lookbacks for every risk item it identified, including approximately [redacted] risk items that it reported on the sworn written report it produced to the Bureau.[56] Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**304.** Disputed. CSF ¶ 304, including its opinions about "potential harm" that "borrowers might not even have suffered," is vague and ambiguous, speculative, and not a fact. Ocwen provides no record evidence to support its contention that it remediated every borrower for every error it found. The record evidence shows the opposite. For example, as Ocwen confirmed in its sworn written report, it did not review over [redacted] risk items to determine if borrowers' accounts had errors or borrowers were harmed, let alone remediate borrowers harmed by such risks.[57] Further disputed to the extent that Ocwen implies that borrowers suffered no harm from the errors at issue or that Ocwen remediated all relevant borrowers for all harm suffered.[58] Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**305.** Disputed. While Ocwen's witness testified to the general information in CSF ¶ 305, he further testified that Ocwen did not perform any quality assurance checks to ensure the information in the periodic statements or system of record was, in fact, accurate and based on the terms of the borrowers' notes.[59]

---

[54] SOF ¶¶ 113, 114; *see also* **SJX 131** (sworn written report); **SJX 36**, Abate (30)(b)(6) Dep., at 68:10–70:22 (testifying that SJX 131 was true as of October 3, 2016); 92:7–25 (testifying that Ocwen was unaware of any information, including assessments of borrowers impacted (lookbacks) that was not on SJX 131)**.**

[55] **SJX 36**, Abate 30(b)(6) Dep., at 21:23–22:7.

[56] *See* n. 54 *supra*.

[57] *Id*.

[58] *See e.g.*, RSF ¶¶ 174–176 (stating that Ocwen does not admit borrowers suffered any harm as a result of its untimely escrow analyses).

[59] **SJX 34**, Kennedy 30(b)(6) at 115:6–116:6.

**306.** Partially disputed. Undisputed that Ocwen's witness testified to the process Ocwen engaged in prior to a servicing transfer. Disputed to the extent that Ocwen implies that such a process corrected discrepancies that Ocwen later found through its loan-verification process. Nothing in CSF ¶ 306 or cited testimony indicates these pre-transfer checks tested: (1) whether the information Ocwen was boarding matched relevant documents, such as borrowers' mortgage notes; or (2) whether, in fact, Ocwen accurately loaded its information into the system of record after the date of transfer. Instead, the record evidence shows that Ocwen, through the loan-verification process it performed *after a transfer*, tested the accuracy of the data it loaded and found over 1.3 million discrepancies in the loan data it used to service loans.[60]

**307.** Disputed. While Ocwen's witness testified to the general information in CSF ¶ 307, he further testified that Ocwen did not perform any quality assurance checks to ensure the information in the periodic statements or system of record was, in fact, accurate and based on the terms of the borrowers' notes.[61]

**308.** Disputed. Ocwen does not cite to any record evidence and instead relies on its expert's opinion, which is not a fact. Further, Ocwen's expert cites to no record evidence to justify his opinion, which, as detailed in PRF ¶¶ 168, 200, relies on a faulty assumption that the Transaction History Data is somehow more accurate than Ocwen's verified as "true and accurate" response to Interrogatory No. 1 identifying untimely escrow analyses. *See* PRF ¶¶ 168, 200.

**309.** Disputed. Ocwen provides no record evidence to support its CSF ¶ 309 and refers to "many loans" without specifying any actual loans to which it is referring. Instead, Ocwen's contention is based on the declaration of its employee, who also reviews no record evidence other than a single loan with an accrued shortage out of the hundreds of thousands at issue. Specifically, Sebastian states that even though she "did not do any analysis of all the loans," she opines, citing to no record evidence, "that many loans . . . were delinquent or in bankruptcy" when the escrow analysis was allegedly due. RSF Ex. 13, ¶ 48. Sebastian also speculates, citing to no record evidence, about whether borrowers paid the amounts identified in the "shortage/surplus field" of Ocwen's verified interrogatory response, stating that: (1) if a borrower was delinquent and never became current, they never paid the surplus or shortage; and (2) "if a loan was reinstated through a modification and was not paid off in full, *it is unlikely* that the borrower paid the surplus or

[60] SOF ¶ 127.

[61] **SJX 34**, Kennedy 30(b)(6) at 115:6–116:6.

shortage amount." *Id.* ¶ 39 (emphasis added). Further, with respect to the sole loan and its data that Sebastian does analyze, *id.* at ¶ 48, the loan's data shows that Sebastian and Ocwen are incorrect: Ocwen conducted a foreclosure sale upon this borrower's home and used the sale proceeds to pay off the borrower's outstanding escrow shortage.[62]

**310.** Disputed. Ocwen provides no record evidence to support its CSF ¶ 310 and refers to "many loans," without specifying any actual loans to which it is referring. CSF ¶ 310 is based on the declaration of its employee Sebastian, who also reviews no record evidence other than a single loan with an accrued surplus, out of the hundreds of thousands at issue. RSF Ex. 13 ¶ 47. The Bureau disputes Ocwen's contention for the same reasons as stated in PRF ¶ 309. Further, the very data Sebastian cites for the sole loan she reviews demonstrates that the borrower made multiple payments that Ocwen applied to his escrow account.[63] Sebastian also cites no record evidence to show or explain how the borrower's loan modification demonstrated he did not pay an accrued escrow surplus. Further, Ocwen's contention that borrowers did not pay escrow surpluses is belied by the very definition of what an escrow surplus is, an amount that a servicer has collected in excess of what is actually required. SOF ¶ 161, *see also* 12 C.F.R. § 1024.17(b) (defining escrow surplus). Last, the Bureau incorporates PRF ¶ 309 in responding to this fact.

**311.** Disputed. Ocwen states that "borrowers may not have" received the required escrow statements, but that the escrow analysis was still performed and the borrower "still received accurate information . . . through periodic statements" without specifying any actual loans or instances to which it is referring. Ocwen provides no record evidence to support its fact. *See* PRF ¶¶ 309 and 200. At best, it cites to Sebastian's Declaration, in which Sebastian analyzes a single loan (Loan No. XXXX8186) and then states that, even though she "did not do an analysis of all the loans," that "many of the borrowers" received periodic statements reflecting "accurate" information, Sebastian Decl. ¶ 58–60. Further disputed to the extent that Ocwen implies that the borrower received sufficient, accurate, and the same information through periodic statements that

---

[62] RSF Ex. 22. (Row 31 of the document shows on 1/22/2014 (Column K "Transaction Date") a "Payoff" transaction (Column P "Transaction Name") where Ocwen applied $30,064.73 to an escrow amount (Column V "Escrow Amt") from the borrower's foreclosure sale proceeds).
[63] RSF Ex. 23 at RFP 22 Transaction History, *see e.g.*, row entries dated August 15, 2013 and July 15, 2013 (Column G "Transaction Date") described as "Regular Spread" (Column L "Transaction Name") showing that the borrower made payments, approximately half of which Ocwen applied to his escrow amount balances (Column R "Escrow Amount").

the borrower otherwise would have received in an annual escrow statement. An annual escrow statement contains information about a borrower's escrow account, including how and why a borrower's monthly escrow payment is changing, and information about shortages and surpluses: that information is not contained in a periodic statement.[64] Sebastian's single borrower example proves the difference: instead of receiving an explanation and accompanying information in an escrow statement about *why* her escrow payment was increasing, the borrower simply received a billing or periodic statement with a nearly 25% increase in her escrow amount. Sebastian Decl. ¶ 59.

Additionally, the cited portion of Ocwen's corporate testimony in which Ocwen's corporate witness testifies that borrowers "*may have* gotten an updated billing statement or another type of communication" does not provide record evidence to support CSF ¶ 311.[65]

**312.** Disputed. Ocwen provides no record evidence to support its CSF ¶ 312 and refers to "many of the borrowers" without specifying any actual loans. Instead, Ocwen cites to Sebastian's declaration that also lacks citation to any record evidence. Specifically, Sebastian's declaration only lists one specific loan in paragraph 65 that she claims is delinquent and, despite claiming "many" other loans were also delinquent, states that "I did not do an analysis of all the loans [in the relevant spreadsheet]" and does not identify any further loans, Sebastian Decl. ¶¶ 61–66. *See also* PRF ¶ 291.

**313.** Disputed. Ocwen provides no record evidence that the borrowers, in fact, had credits applied to their specific accounts. Further disputed to the extent that Ocwen implies that: (1) borrowers in SJX 180 suffered no harm and (2) that Ocwen remediated such borrowers for all harm suffered. Finally, Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

---

[64] 12 C.F.R. ¶ 1024.17(i) (requiring that an annual escrow statement contain: (1) the total monthly amount was calculated based on all actual disbursements from escrow during the previous year; (2) the predicted disbursements from the upcoming year; (3) the minimum escrow balance necessary, which would include any cushion amounts; (4) whether or not a shortage resulted from the escrow analysis, and if so, identify how much of the *total* escrow payment is to pay back an identified escrow shortage; and (5) whether or not an escrow surplus resulted from the escrow analysis, and if so, identify how much of a surplus the borrower should expect in a check to be returned to them).

[65] **SJX 38**, Combs 30(b)(6) Dep. at 162:24-163:9.

**314.** Disputed as to the characterization of "majority" and "approximately a third." Ocwen's verified response to Interrogatory No. 2 includes precise counts, and that document speaks for itself.

**315.** Disputed. Ocwen's expert's opinion is an opinion, not a fact, and is contested by the Bureau's damages expert. Further, Ocwen's damages expert's opinion about a single loan is unreliable and unsupported for the same reasons the Bureau sets forth in PRF ¶ 168.

**316.** Partially disputed. Undisputed that Ocwen repeats the same general contention that it makes in its response to the Bureau's Interrogatory No. 4. Disputed to the extent that Ocwen implies that borrowers suffered no harm from its untimely escrow analyses or that Ocwen remediated all relevant borrowers for all harm suffered. Ocwen's general contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**317.** Disputed. Ocwen cites to no record evidence to support its CSF ¶ 317. Moreover, record evidence reflects that Ocwen contends its policy was to waive a *portion* of the shortage and not the full shortage. In Ocwen's verified interrogatory responses, it amends a statement in its unverified interrogatory response, which is the statement it now makes in CSF ¶ 317. Initially, Ocwen contended that its policy was to "waive all *shortages* accrued" when Ocwen conducted an escrow analysis upon the borrower's discharge from bankruptcy.[66] When verifying its interrogatory responses, however, Ocwen changed its original response to delete mention of its policy to waive all shortages accrued upon a borrower's discharge,[67] and instead contended its policy was to waive "any negative escrow balance, which would include a "*portion* of the shortage" upon discharge.[68] Further disputed to the extent that Ocwen implies that borrowers suffered no harm from its untimely escrow analyses or that Ocwen remediated all relevant borrowers for all harm suffered; indeed, Ocwen's CSF ¶ 317 states that Ocwen only remediated borrowers still in bankruptcy as of March 2016. Ocwen's contention that it subsequently remediated borrowers is irrelevant to liability. *See* Reply, Section III.B.

**318.** Disputed on the basis that the report of the Bureau's damages expert does not contain the $15 average opportunity cost in the passages cited by Ocwen. Further, the parties' dispute as to damages is not relevant to the Bureau's motion for partial summary judgment as to liability.

---

[66] Ocwen's SMF Ex. 99, Rog. No. 4, at 8 (unverified prior interrogatory).
[67] **SJX 138**, Ocwen's Verified Interrogatory No. 4 at 15 (third paragraph from the top).
[68] **SJX 138,** Ocwen's Verified Interrogatory No. 3 at 13.

**319.** Disputed. Ocwen does not define what it means by "impact," refers to "vast majority of borrowers" without specifying any actual borrowers, and does not cite to any record evidence in support. Disputed as to Ocwen's implication that communicating to borrowers that they owe inaccurate amounts–as it did in the reinstatement quotes identified in response to verified Interrogatory No. 5–causes no harm.

**320.** Partially disputed. Undisputed that Ocwen's corporate witness testified to the content of CSF ¶ 320. Disputed to the extent that Ocwen implies that affected borrowers suffered no harm and that Ocwen remediated all such affected borrowers for all harm suffered as a result of its overcollections. Last, Ocwen's subsequent remediation does not create a factual dispute where remediation is not relevant to the Bureau's motion for partial summary judgment, as set forth in the Reply, Section III.B.

**321.** Disputed. Undisputed that Ocwen's cited interrogatory response contains the same general contention as that in CSF ¶ 321. Disputed where Ocwen's cited interrogatory response merely states the same contention and cites to or provides no record evidence.

**322.** Partially disputed. Undisputed that Ocwen's insurance cancellation errors resulted in borrowers' insurance premiums increasing, as reflected in Ocwen's loan-level interrogatory responses cited at **SJX 141** Exhibit G. Disputed to the extent that Ocwen implies that affected borrowers suffered no harm and that Ocwen remediated all such affected borrowers for all harm suffered as a result of Ocwen's failure to pay and maintain their insurance policies. Last, Ocwen's subsequent remediation does not create a factual dispute where remediation is not relevant to the Bureau's motion for partial summary judgment, as set forth in the Reply, Section III.B.

**323.** INTENTIONALLY OMITTED/WITHDRAWN.

**324.** Disputed. Ocwen provides no record evidence to support its vague contention that it credited or refunded "certain" unspecified loans. Further disputed to the extent that Ocwen implies that relevant borrowers suffered no harm and that Ocwen remediated such borrowers for all harm suffered as a result of its overcollections. Last, Ocwen's subsequent remediation does not create a factual dispute where remediation is not relevant to the Bureau's motion for partial summary judgment, as set forth in the Reply, Section III.B.

**325.** INTENTIONALLY OMITTED/WITHDRAWN, s*ee* ECF No. 747.

**326.** INTENTIONALLY OMITTED/WITHDRAWN, *see* ECF No. 747.

**327.** INTENTIONALLY OMITTED/WITHDRAWN, *see* ECF No. 747.

**328.** INTENTIONALLY OMITTED/WITHDRAWN, *see* ECF No. 747.

**329.** INTENTIONALLY OMITTED/WITHDRAWN.

**330.** Disputed. Ocwen provides no record evidence to support its CSF ¶ 330 and refers to "many loans" without specifying any actual loans. Instead, Ocwen cites to Sebastian's Declaration, which also lacks citation to any record evidence. Specifically, Sebastian's Declaration only lists one specific loan in paragraph 72 that she claims is delinquent and, despite claiming "many" other loans were also delinquent, Sebastian states that "I did not do an analysis of all the loans [in the relevant spreadsheet]" and does not identify any further loans, *see* RSF Ex. 13, Sebastian Decl. ¶ 73. The Bureau further incorporates PRF ¶ 248.

**331.** Disputed. Ocwen's reference to "virtually all of the borrowers" is vague and Ocwen does not identify the specific loans to which it refers. Further disputed to the extent that Ocwen implies that relevant borrowers suffered no harm and that Ocwen remediated such borrowers for all harm suffered as a result of its overcollections. Last, Ocwen's subsequent remediation does not create a factual dispute where remediation is not relevant to the Bureau's motion for partial summary judgment, as set forth in the Reply, Section III.B.

**332.** Disputed. Ocwen's expert's opinion is not a fact and is not based on any record evidence. Further, the Bureau disputes the substance of Ocwen's expert's opinion through, for example, the opinion of their expert, Mr. Searson.

**<u>Plaintiff's Additional Reply Facts</u>**

**333.** Ocwen stated, in its Amended and Supplement Response to the Bureau's Request No. 48 in its Fourth Set of Requests for Production of Documents:

> Ocwen states that it will produce available data responsive to this request, including account number, borrower name, undercharge or overcharge amount, and the adjustment date. Specifically, Ocwen will produce available undercharge data from the time period January 2017 through January 2018, and available overcharge data from April 2016 through January 2018. (emphasis added).[69]

**334.** Ocwen filed an 8K report with the Securities and Exchange Commission on December 1, 2017 stating:

> Ocwen has entered into an agreement with CIT Bank, N.A. (formerly OneWest Bank, FSB or OneWest) relating to certain claims arising from indemnification obligations

[69] PRF Ex. 1 Ocwen's Amended Response to RFP No. 48.

under a 2013 transaction pursuant to which Ocwen acquired certain mortgage servicing rights and related servicing advance receivables from OneWest. Pursuant to the agreement, CIT Bank, N.A. will pay Ocwen $29.9 million.[70]

Date: December 18, 2020

Respectfully submitted,

Attorneys for Plaintiff,
CONSUMER FINANCIAL PROTECTION BUREAU

JOHN C. WELLS
Deputy Enforcement Director

JAMES T. SUGARMAN
Assistant Litigation Deputy

/s/ Jean M. Healey Dippold
Jean M. Healey Dippold
Phone: (202) 435-7514
E-mail: jean.healeydippold@cfpb.gov

| | |
|---|---|
| Atur Desai | atur.desai@cfpb.gov |
| Michael Posner | michael.posner@cfpb.gov |
| Shirley Chiu | shirley.chiu@cfpb.gov |
| Doug Wilson | doug.wilson@cfpb.gov |

1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

[70] PRF Ex. 4 Ocwen's 8K Filing dated Dec. 1, 2017.