**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495**
**MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC; and PHH MORTGAGE CORPORATION,

Defendants.

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. THE PARTIES' SETTLEMENT AGREEMENT AND CONSENT JUDGMENT BAR ALMOST ALL OF THE CFPB'S CLAIMS (COUNTS I-IX) ........ 2

A. The NMS Bars the CFPB's Claims As a Matter of Contract Law ........ 2

1. The NMS Provided the Exclusive Standards and Remedies for the Conduct That It Covered ........ 3

2. The Settlement Agreement Covered the Ocwen Conduct At Issue in This Case ........ 5

a. Plaintiff cannot sidestep the agreement by invoking metrics beyond those negotiated by the parties ........ 5

b. The CFPB's claims *do* overlap with the settlement agreement's metrics ........ 6

c. In any event, the agreement provided that additional metrics could be added to assess Ocwen's conduct ........ 8

B. The CFPB's Claims Are Barred by Waiver ........ 9

C. The CFPB's Claims Are Barred by *Res Judicata* ........ 9

II. PLAINTIFF HAS NOT SHOWN THAT IT HAS EVIDENCE SUFFICIENT TO TRY ANY OF ITS CLAIMS (ALL COUNTS) ........ 10

A. Due to the Individualized Nature of the CFPB's Claims, It Must Present Evidence Relating to Each Loan ........ 10

1. Extensive Caselaw Establishes That Individualized Proof Is Required Where, as Here, the Defendant's Alleged Conduct Did Not Involve a Single Act or Uniform Course of Conduct ........ 11

2. Judge Matthewman *Did* Say that Plaintiff Must Present Evidence At Trial Proving a Violation For Each At-Issue Loan, and Plaintiff *Did* Promise to Do That—But It Has Not Done So In Response to Ocwen's Motion ........ 13

3. The CFPB's Obligation to Present Evidence Proving How Many and Which Loans Had Violations Is Confirmed by the Remedies That the CFPB Seeks ........ 15

B. Plaintiff Has Failed to Satisfy Its Burden of Presenting Competent Evidence Sufficient to Prove Violations for Each Of The At-Issue Loans ........ 15

1. The Documents Cited in the CFPB's Opposition Fail to Show There Is Any Triable Issue on Liability ........ 16

2. The CFPB's Arguments About Its "Memory Aids" Are Moot Now and, in Any Event, the Aids Provide No Support for Its Claims ........ 19

III. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIMS TO RECOVER FOR ALLEGED BORROWER DAMAGES ........ 20

A. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Costs from Additional Foreclosures That Resulted From Ocwen's Late Escrow Analyses" ........ 20

B. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Foregone Interest" ... 23

C. Defendants Are Entitled to Summary Judgment on All Other Damages Claims ... 24

IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING LOSS MITIGATION APPLICATIONS (COUNT III) ... 24

V. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON MOST OF THE CFPB'S ESCROW VIOLATION CLAIMS (COUNT VII) ... 25

A. The Court Must Grant Summary Judgment as to the 1.3 Million Loans for Which the CFPB Has Not Even Determined There Was a Legal Violation ... 25

B. The CFPB Cannot Show That Ocwen Acted Recklessly or Knowingly by Allegedly Failing to Conduct Annual Escrow Analyses for Nonperforming Loans ... 26

VI. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING OCWEN'S POLICIES AND PROCEDURES (COUNT VIII) ... 27

VII. DEFENDANTS OFC AND OMS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY DID NOT ENGAGE IN SERVICING ACTIVITIES ... 28

CONCLUSION ... 29

# INTRODUCTION

Two fundamental flaws in the CFPB's sprawling claims have been evident since this case's early stages. It is therefore entirely unsurprising that the CFPB is unable to show that it is entitled to a trial on those claims (never mind summary judgment in its favor).

The first fundamental flaw is that the CFPB's claims allege conduct by Ocwen that was already ***comprehensively*** covered by a court-approved settlement agreement between the parties. Ocwen agreed to implement detailed servicing protocols, with extensive independent monitoring for three years, and to pay or provide consumer remediation of over $2 billion. In return, the CFPB agreed that, for conduct occurring during that three-year period, Ocwen would have the opportunity to cure any errors, would be subject to enforcement only if it exceeded agreed error tolerances, and could be sued only in federal court in Washington and for specified remedies. This case seeks to deprive Ocwen of all of those benefits—after the CFPB received all of its benefits under the deal.

Plaintiff's Opposition (ECF No. 740) ("Pl. Opp.") argues for that windfall on the ground that the CFPB did not release claims related to Ocwen's future conduct. That argument misses the point, which is that the CFPB expressly agreed on the substantive and procedural terms ***that would govern those claims***, and those terms bar this case. The CFPB alternatively argues that the settlement agreement does not bar its claims on the theory that, although the agreement's Servicing Standards covered Ocwen's alleged conduct, the "metrics" that the Monitor reviewed to enforce those Standards did not precisely cover its claims. But the CFPB's argument that it can sue over the same conduct covered by the settlement, simply by pointing to a metric that the parties did not agree would be used to assess that conduct, would make a mockery of both the agreement and the multimillion-dollar monitorship. Further, the agreement's metrics in fact did cover the CFPB's claims in this case. And, on top of that, the agreement expressly provided that additional metrics could be added, and one in fact was.

The second fundamental flaw that has pervaded this case from Day One is that the CFPB alleges that Ocwen committed literally millions of loan-specific errors, and thus the CFPB necessarily needs to muster loan-specific evidence in order to prove Ocwen made each of those errors. The CFPB seeks to avoid that burden by citing inapposite cases where the defendant engaged in a uniform course of conduct, and by trying to rewrite its open-court admissions accepting that burden, but those arguments go nowhere. Now grappling with the obligations that

come with that burden of proof, the CFPB contends it can support its sprawling claims simply by offering thousands of Ocwen's documents into evidence. But the offered documents and the CFPB's allegations fall woefully short of the CFPB's burden, in opposing summary judgment, to present competent evidence sufficient to prove its claims. Indeed, the CFPB does not even try to explain how the cited Ocwen documents prove violations for each of the millions of loans that the CFPB says are at issue. That is no surprise because the documents that the CFPB cites—largely by reference to its own motion for partial summary judgment—are insufficient on their face to prove millions of alleged loan-specific violations. Moreover, the individualized nature of the CFPB's claims also forecloses its claim to recover for alleged borrower damages. That is so because the CFPB, unwilling to expend the time and effort to obtain actual evidence of the loan-specific losses allegedly suffered by the borrowers, instead seeks to shortcut its evidentiary burden through hypothetical statistical models. That the law does not allow.

For these core reasons, as well as the other reasons shown herein, summary judgment should be granted to Ocwen on all of the CFPB' claims.

## ARGUMENT

### I. THE PARTIES' SETTLEMENT AGREEMENT AND CONSENT JUDGMENT BAR ALMOST ALL OF THE CFPB'S CLAIMS (COUNTS I-IX)

Ocwen showed in both its Motion for Summary Judgment ("Motion") (ECF No. 730) and its Opposition to Plaintiff's Motion for Partial Summary Judgment ("MPSJ Opp.") (ECF No. 739) that the CFPB's claims in this case address the same conduct covered by the NMS settlement agreement and Consent Judgment that resolved the CFPB's earlier lawsuit against Ocwen. Mot. 4-11; MPSJ Opp. at 4-7. As a result, the CFPB's claims in this case are barred as a matter of contract law, waiver, and res judicata. *Id*. The CFPB's counter-arguments are unavailing.

#### A. The NMS Bars the CFPB's Claims As a Matter of Contract Law

The CFPB cannot argue that it is free to violate its contractual commitments. To the contrary, "[t]he government, more than any other party must be held to honor its commitments," and "[w]hen the government fails, United States Courts must be prepared to enforce these commitments." *Reed v. United States,* 717 F. Supp. 1511, 1518 (S.D. Fla. 1988), *aff'd*, 891 F.2d 878 (11th Cir. 1990).

Likewise, the CFPB does not dispute that if its claims are subject to the settlement agreement's substantive and procedural terms, its claims violate those terms. The agreement

allows the CFPB to pursue enforcement if, but only if, Ocwen's servicing performance exceeded certain threshold error rates during the monitoring period. Mot. at 5-6, 7-9; ECF No. 731, ¶¶ 9, 13-16, 24-34 ("Ocwen SMF"). The CFPB makes no effort to show Ocwen violated ***any*** specified error rate or exceeded ***any*** metric. The agreement also contained "a series of steps before [a servicer] could be penalized for violating the servicing standards, including the Monitor's citation, failure to cure, [and] failure of informal dispute resolution . . . ." *United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Assoc.*, 878 F.3d 309, 315 (D.C. Cir. 2017); *see also* Mot. at 4-5 & Ocwen SMF ¶¶ 9-10, 13-16, 24-34. The CFPB ***concedes*** that it did not exhaust the steps required prior to bringing an action under the NMS enforcement framework. Pl. Opp. at 6.

Instead, in an effort to salvage its claims, the CFPB advances two arguments. First, it says that the agreement's substantive and procedural provisions were not mandatory, and hence that the CFPB can ignore them. Alternatively, the CFPB contends that the agreement's "metrics" did not cover its claims. Both arguments are entirely unavailing.

**1. The NMS Provided the Exclusive Standards and Remedies for the Conduct That It Covered**

The CFPB's first argument is that the settlement agreement's detailed Servicing Standards and enforcement provisions were a one-way street. The CFPB contends that Ocwen had to comply with the agreement's comprehensive Servicing Standards, fund and participate in its monitoring regime and other Enforcement Terms, and pay or provide remediation of over $2 billion. But, at the same time, the CFPB maintains that it is free to ignore the NMS's Enforcement Terms and, instead, file a new suit that challenges Ocwen's conduct covered by the Servicing Standards without regard to those agreed-upon Enforcement Terms. Pl. Opp. at 3-5. In advancing this argument, the CFPB transparently seeks a windfall under which it would keep all its benefits while honoring none of its obligations—which is particularly ironic given the CFPB's looking-glass assertion (at 5) that Ocwen is seeking a windfall.

The CFPB's illogical and unjust reading of the agreement is patently wrong. If accepted, it would embolden those who, contrary to the premise of court-approved settlements, accept a deal then sue for more.

The CFPB's central argument is that, under the settlement agreement, it did not release its claims for Ocwen's 2014-2017 conduct. Pl. Opp. at 3-5. But Ocwen is not arguing that the CFPB ***released*** its claims relating to Ocwen's future conduct; indeed, the Motion noted that the

CFPB may bring certain claims concerning that conduct. Mot. at 7-9. Instead, the point is that, in the settlement agreement, the parties agreed that those claims concerning Ocwen's future conduct, while not released, ***would be governed by the negotiated substantive and procedural terms*** set forth in the parties' deal. *Id.* at 8-9.

The CFPB completely ignores the language in the settlement agreement unambiguously providing that its substantive and procedural terms concerning Ocwen's 2014-2017 conduct are both mandatory and exclusive. Specifically, the NMS Consent Judgment explicitly states that (1) Ocwen "***shall*** comply with the Servicing Standards" and (2) "[t]he Servicing Standards . . . ***shall be enforced in accordance with the authorities provided in the Enforcement Terms***." Mot. at 8 & Ocwen SMF Ex. 2, NMS C.J. ¶¶ 3, 6 (emphasis added). Thus, the agreement expressly provides that both its substantive terms (the Servicing Standards) and its procedural provisions concerning Ocwen's 2014-2017 conduct are compulsory and binding.

It defies logic to suggest the parties (and the NMS court) ever contemplated or agreed that the CFPB could jettison the detailed error thresholds and remedy limitations in the NMS Consent Judgment just because the CFPB feels constrained by those agreed-upon terms and conditions. Certainly, Ocwen has not considered itself free to disregard the NMS's provisions, nor has it done so. Instead, over the three-year monitoring period, Ocwen invested over $55 million and hundreds of thousands of employee hours to comply with the settlement terms. Mot. at 5-6 & Ocwen SMF ¶ 55.[1] Ocwen did so in reliance on the mutuality of the Consent Judgment and on the courts' authority to enforce the parties' agreement according to its terms. For this

[1] The CFPB contends that the Court should not rely on Jenna Evans' declaration, cited by Ocwen for background information concerning NMS compliance, arguing that she is an undisclosed witness. Pl. Opp. at 5 n.23. Rule 26 does not require that Ocwen list the name of every employee who might later offer evidence or describe company processes. *See* ECF No. 745, at 4-8. Further, Ocwen's initial disclosures made clear that it may call upon any current employee in a long list of business units as needed to offer evidence in support of it claims. *See id.* at 5 (citing Defendants' Third Supp. Initial Disclosures at 3). Regardless, "Rule 56 . . . does not require that affiants be included in a witness list before their affidavits may be used to support a motion for summary judgment." *Ryder Auto. Carrier Grp. v. Gen. Teamsters Sales & Serv. & Indus. Union Local No. 654*, Nos. 96-3712, 96-3738, 1997 U.S. App. LEXIS 23246, at *7 (6th Cir. Sep. 2, 1997).

equitable reason, as well as the agreement's plain language, the CFPB's argument that it is free to ignore the agreement's substantive and procedural terms is baseless.[2]

**2. The Settlement Agreement Covered the Ocwen Conduct At Issue in This Case**

The CFPB argues (at 6-7) that even if the settlement agreement did provide the exclusive standards and remedies for the conduct that it covered, the agreement did not cover the Ocwen conduct here. But the CFPB does not—and cannot—dispute that its claims in this case overlap with the agreement's Servicing Standards. Pl. Opp. at 6-7. The Servicing Standards, which specified how Ocwen had to conduct its servicing activities, covered the same conduct at issue in almost all of the CFPB's claims. Mot. at 6-7; Ocwen SMF ¶¶ 36-52. In fact, those Servicing Standards specifically covered the accuracy of Ocwen's data, requiring Ocwen to "maintain procedures to ensure ***accuracy and timely updating*** of borrower[s'] account information." Ocwen SMF Ex. 3, NMS C.J. Ex. A, ¶ I.B.1 (emphasis added). The CFPB even acknowledges the "facial overlap between the text of the Claims and the Servicing Standards." Pl. Opp. at 6.

Still, the CFPB argues that its claims were not covered by the settlement agreement on the theory that the specific "metrics" that the Monitor was to use to test Ocwen's compliance with the Servicing Standards did not measure the conduct that the CFPB now alleges in its claims. *Id*. The CFPB's theory fails for three separate reasons.

**a. Plaintiff cannot sidestep the agreement by invoking metrics beyond those negotiated by the parties**

Even if the specific metrics that the parties agreed that the Monitor would apply to assess Ocwen's conduct did not cover the CFPB's claims in this case, that would ***not*** mean that the CFPB is now free to assert those claims. As shown above, the CFPB concedes that the conduct alleged in its claims was covered by the agreement's Servicing Standards. To the extent the parties agreed that only certain defined metrics would be analyzed to assess Ocwen' covered conduct, that most certainly did not mean that the CFPB could sue Ocwen outside the agreement on the ground that additional metrics identify defects in Ocwen's covered conduct. To the contrary, such an interpretation would render the agreement's mandatory Enforcement Terms

---

[2] To the extent the CFPB argues (at 5 n.28) that out-of-court settlements with any other servicers suggest that the CFPB may bring separate actions outside the NMS, those settlements are not authority and have no bearing on this case. Further, the CFPB fails to show that such actions, like this one, involved conduct squarely covered by the parties' prior agreement.

nugatory and meaningless, robbing Ocwen of their entire value. Simply put, the parties negotiated and agreed on (1) how Ocwen had to conduct itself and (2) what measurements would be taken to assess its conduct. Even if the CFPB now believes that the agreed metrics were insufficient to assess Ocwen's covered conduct, the CFPB cannot rewrite, much less violate, the agreement it signed and to which Ocwen fully adhered.

**b. The CFPB's claims *do* overlap with the settlement agreement's metrics**

The CFPB's argument also fails for the additional reason that its claims in fact ***are*** covered by the agreement's metrics and other assessment tools.

i. CFPB's claims that Ocwen serviced loans based on inaccurate information or made misrepresentations (Counts I-II, IV-VI): The CFPB argues that its Counts alleging that Ocwen used or communicated inaccurate information do not overlap with the agreement's metrics on the theory that these Counts allege there was inaccurate data in Ocwen's system of record ("SOR"), while the metrics assumed that the SOR data was correct and only tested Ocwen's use of that data. Pl. Opp. at 6-7. The CFPB quotes the Monitor as stating that he was not charged with reviewing the accuracy of the data in the SOR. *Id.* This argument fails for two separate reasons. *Id.*

First, in a sentence that the CFPB omitted in its Opposition (at 6), the Monitor stated that although he was not charged with reviewing the accuracy of the SOR, "***[t]he Settlement requires that an independent third party periodically review those parts of the SOR that pertain to account information for accuracy and completeness***." Ocwen SMF Ex. 25, at 6 (emphasis added). Indeed, the agreement expressly provided that Ocwen's "***systems to record*** account information shall be periodically reviewed ***for accuracy and completeness*** by an independent reviewer." *Id.* Ex. 3, NMS C.J. Ex. A, ¶ I.B.9 (emphasis added). Thus, regardless of what was in the metrics that the Monitor applied, the agreement separately provided that Ocwen's SOR would be reviewed "for accuracy and completeness." *Id.* And it was: the Monitor reported that "[Ocwen] has provided for my review its two most recent independent service auditor's reports of its system of record and will provide future independent service auditor's reports of its system of record until the Judgment sunsets." Ocwen's Response to Plaintiff's Additional Facts ("RAF") Ex. 2, *United States v. Bank of Am. Corp.*, No. 12-0361, ECF No. 194 at 19 (D.D.C. Dec. 16, 2014) (discussing Ocwen). Further, he reported that he had also "charged McGladrey [an independent auditing firm] . . . to assess the reliability of [Ocwen's] system of record." RAF

Ex. 3, at OCW-039-0244950. Thus, the CFPB is flatly wrong in asserting that its claims alleging inaccuracies in the data in the SOR are outside the scope of the agreement.

The CFPB's argument also fails because it is based on the false premise that its claims that Ocwen used or transmitted inaccurate information relate solely to the accuracy of the data in the SOR, rather than to Ocwen's use of the SOR data to service loans. Pl. Opp. at 6. Although the Amended Complaint alleges errors in the SOR, it also alleges that "***[e]ven when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about borrowers' loans due to system deficiencies***." Am. Compl. ¶ 34 (emphasis added). Indeed, large portions of the CFPB's Amended Complaint are devoted to precisely those claims that Ocwen was generating inaccurate information, all of which indubitably were covered by the settlement agreement's metrics. Am. Compl. ¶¶ 48-67, 207(b-(c), 240(b)-(c). By arguing only that the agreement did not cover its claims alleging inaccurate data in the SOR, the CFPB effectively concedes that Ocwen is entitled to summary judgment on all of the CFPB's claims alleging that Ocwen's system generated inaccurate information.

ii. CFPB's claims concerning escrow, insurance, and foreclosure issues (Counts III, VII-IX ): In the chart at page 7 of its Opposition, the CFPB argues that its Counts concerning escrow, insurance, and foreclosure issues are outside the agreement's metrics. That is equally incorrect. As the following chart shows, the agreement's metrics ***did*** cover the conduct alleged in those Counts:

| Count | Metrics that Overlap with Claims in Count |
|---|---|
| Count III (foreclosure after asking for more information) | • Metric 6.B.i tested whether Ocwen afforded borrowers 30 days from the date of its notification of any missing information or document prior to making a determination on approval of a loan modification. Ocwen SMF Ex. 6 at D1-13.<br>• Metric 30 also tested if Ocwen gave borrowers "at least 30 days to submit any additional required documents from the last [Additional Document Request Letter] before referring the loan to foreclosure or proceeding to foreclosure sale." *Id*. at D1-18. |
| Count VII; (escrow and insurance issues) | • Metric 33 tested billing statement accuracy, each of which necessarily included a review of the escrow balance. *Id*. at D-21.<br>• Metric 4.B measured whether "[p]ayments posted timely . . . and accurately," including whether "payments posted to principal interest and escrow before fees and expenses." *Id*. at D1-7. |
| Count VIII (policies) | • Metric 5 measured Ocwen's "Policy/Process Implementation," including its third-party vendor management, customer portal, implementation of a single |

| | |
|---|---|
| | point of contact, workforce management, and account status activity. *Id*. at D1-9-D1-12.<br>• Metric 6 monitored Ocwen's "Customer Experiences," including "Complaint response timeliness." *Id.* at D1-13. |
| Count IX<br><br>(foreclosure issues) | • Metric 1.B tested whether a borrower's modification was incorrectly denied. *Id*. at D1-3.<br>• Metric 3.B tested whether accurate pre-foreclosure notifications (including Loss Mitigation Statements) were sent. *Id.* at D1-6.<br>• Metric 6.B.i-iii tested loan modification document collection, decision and notification timeline compliance, and appeal timeline compliance—including whether Ocwen "responded to a borrower['s] request for an appeal within 30 days of receipt." *Id.* at D1-13-14.<br>• Metric 6.b.viii tested whether a "Dual Track" violation occurred. *Id*. at D1-15-16.<br>• Metric 30 tested whether Ocwen allowed borrowers "at least 30 days to submit the documents requested . . . before declining the borrower for incomplete or missing documents," and "at least 30 days to submit any additional required documents" requested "before referring the loan to foreclosure or proceeding to foreclosure sale." *Id*. at D1-18. |

In sum, all of the CFPB's claims under all of these Counts were covered by the metrics and independent SOR review provisions of the settlement agreement.

**c. In any event, the agreement provided that additional metrics could be added to assess Ocwen's conduct**

The CFPB's effort to evade the agreement on the theory that the CFPB's claims are outside its designated metrics also fails because the agreement allowed for additional metrics to be added. Sections C.22-23 of the Enforcement Terms provided that if there was any information suggesting that Ocwen might be violating any "material term of the Servicing Standards," the Monitor could add "an additional Metric and associated Threshold Error Rate." Ocwen SMF Ex. 6, NMS C.J. Ex. D, ¶¶ C.22-23. Indeed, after the settlement was approved, the Monitor added an additional Metric (#34) to assess Ocwen's compliance with the Standards relating to servicing transfers. RAF Ex. 1, *United States v. Bank of Am. Corp.*, No. 12-0361, ECF No. 158 at 8 n.7 (D.D.C. May 14, 2014). Because the CFPB does not dispute that Ocwen's claimed conduct was "facially covered" by the Servicing Standards, and because the agreement allowed additional metrics to be added as necessary to assess those Standards, the CFPB's argument that its claims are outside the agreement's scope is plainly meritless. Now that the monitoring period has lapsed, the CFPB cannot be allowed to insert additional testing metrics—and seek remedies beyond those permitted by the agreement—through this lawsuit.

**B. The CFPB's Claims Are Barred by Waiver**

The CFPB's Overlapping Claims in this case are also barred by the doctrine of waiver. Mot. at 9-10. The CFPB argues (at 8) there was no waiver because the CFPB did not release its claims for future conduct, but this release argument fails for the same reasons discussed on pages 3-5 above. Alternatively, the CFPB contends (at 8) that Ocwen seeks a "surrender" of "sovereign authority" that must be expressed in "unmistakable terms." Even if that standard applied here, it is satisfied. Courts have repeatedly held that "the intent to make mandatory is ***unmistakable*** when 'shall . . .' language is used." *Center for Biological Diversity v. Esper*, 958 F.3d 895, 906 n.7 (9th Cir. 2020) (citation omitted) (emphasis added).[3] And here, as quoted above, the parties' agreement says that the Standards "***shall*** be enforced in accordance with the authorities provided in the Enforcement Terms." Mot. at 8 (emphasis added). Moreover, the CFPB draws that standard from cases in which plaintiffs argued that Congress's ability to enact future legislation had been waived.[4] Such cases are far afield. In this case, the CFPB simply agreed to certain substantive and procedural limitations on its own claims in exchange for benefits from Ocwen, which an Article III federal court approved. The waivers inherent in such litigation settlement agreements by the government are routinely enforced. Mot. at 7-8.

**C. The CFPB's Claims Are Barred by *Res Judicata***

Ocwen's Motion showed the CFPB's claims are also barred by res judicata, because claims concerning Ocwen's conduct from 2014-2017 were actually litigated and resolved in the CFPB's prior lawsuit against Ocwen. Mot. at 10-12. In addition to the CFPB's release argument (Pl. Opp. at 10), which fails for the reasons above, the CFPB's two counter-arguments are unavailing.

First, relying on *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327-28 (1955), the CFPB argues (at 9-10) that a prior lawsuit is not *res judicata* as to claims concerning a defendant's future conduct where the prior lawsuit "sought forward-looking injunctive relief." In *Lawlor*, however, the plaintiffs in the earlier action had nominally sought, ***but had neither***

---

[3] *See also*, *e.g.*, *Hewitt v. Helms*, 459 U.S. 460, 471 (1983) (holding that the state "has used language of an unmistakably mandatory character, requiring that certain procedures 'shall' . . . be employed"), *overruled on other grounds*, 515 U.S. 472 (1995); *Lopez v. Superintendent*, 2019 U.S. Dist. LEXIS 4102, *38 (E.D. Pa. Jan. 8, 2019) (holding that "the rule speaks in 'unmistakable' terms, as it uses the mandatory 'shall'").

[4] Pl. Opp. at 8 n.34, citing, *e.g.*, *U.S. v. Cherokee Nation of Okla.*, 480 U.S. 700, 707 (1987).

***pressed for nor obtained***, relief concerning the defendants' future conduct. *Id*. at 328-29. Here, by contrast, preclusion principles apply with full force because the CFPB pressed for and actually obtained extensive prospective relief covering the exact same conduct at issue in this case (Ocwen SMF ¶¶ 1-52 & SMF Exs. 2-3, 6). *See* Mot. at 11 & n.2 (citing cases).

Second, the CFPB argues (at 9) that its claims in Counts IV, VIII, and IX are not precluded because they are based on provisions of Regulation X and Z that were not in effect until January 10, 2014. But the NMS Consent Judgment was entered on February 26, 2014 (Ocwen SMF Ex. 2), ***after*** those Regulation X and Z provisions took effect. Also, as the CFPB concedes (ECF No. 729, Pl. SOF ¶ 252), the new parts of Regulation X and Z had been proposed, and were known by the parties, long before the NMS Consent Judgment went into effect.[5] Thus, the CFPB had both the chance and the duty to incorporate those provisions into the settlement agreement—and in fact, as shown above, the NMS does overlap with the CFPB's claims under those regulations.

## II. PLAINTIFF HAS NOT SHOWN THAT IT HAS EVIDENCE SUFFICIENT TO TRY ANY OF ITS CLAIMS (ALL COUNTS)

The CFPS lacks evidence sufficient to prove its claims that Ocwen made over 2 million separate servicing errors. Mot. at 12-21. To prove those loan-specific claims, the CFPB must present evidence that proves all of the required statutory elements for each, individual loan. The CFPB's failure to develop the expert testimony that it promised would prove all of those alleged violations means that the CFPB lacks evidence sufficient to prove its 2 million loan-specific claims. *Id*. The CFPB's responsive arguments are in vain.

### A. Due to the Individualized Nature of the CFPB's Claims, It Must Present Evidence Relating to Each Loan

The CFPB acknowledged to Judge Matthewman that "***this is not a case where there's common impact or common error***," but rather is a case with "highly individualized populations [and] ***highly individualized errors***." 12/20/2018 Hr'g Tr. at 5:9-13 (emphasis added) (attached as Ocwen Reply Ex. 1). Likewise, Plaintiff's Opposition does not rebut the Motion's showing that (1) there were no errors in the vast majority of the loans that Ocwen serviced during the period at issue; and (2) for the small fraction of loans that allegedly had errors, the CFPB

---

[5] *See, e.g.*, 78 Fed. Reg. 10,902, 11,007 (Feb. 14, 2013) (Count IV, citing Regulation Z, 12 C.F.R. § 1026.41(d)); 78 Fed. Reg. 10,696 (Feb. 14, 2013) (Counts VIII-IX, citing Regulation X, 12 C.F.R. §§ 1024.38(a), (b), 1024.41(b), (c), (f), (g)).

advances a hodgepodge of allegations that vary from loan to loan. Mot. at 12-13; Ocwen SMF ¶ 96 & Exs. 54 & 55-55B. The CFPB's argument (at 11-15) that it, nevertheless, need not come forward with evidence proving the individual loan errors is untenable.

**1. Extensive Caselaw Establishes That Individualized Proof Is Required Where, as Here, the Defendant's Alleged Conduct Did Not Involve a Single Act or Uniform Course of Conduct**

The CFPB cites to a handful of cases as supposedly showing that its claims do not require individualized proof. Pl. Opp. at 12-13. But the defendant in those cases had engaged in a common course of conduct that uniformly had impacted all the consumers. In *FTC v. Primary Group, Inc.*, 2016 WL 4056206 (N.D. Ga. May 19, 2016), *aff'd*, 713 F. App'x 805 (11th Cir. 2017), the government's evidence included telephone "scripts" through which the defendant made uniform misrepresentations, and uniformly failed to make required disclosures, to all the consumers. 2016 WL 4056206, at *8-9. Similarly, in *F.T.C. v. Roca Labs*, 345 F. Supp. 3d 1375 (M.D. Fla. 2018), the allegedly deceptive statements at issue were made on the defendant company's website and in identical documents that were enclosed with the company's products. *Id*. at 1381-84.

By contrast, many decisions under consumer protection statutes hold that where—as here—the defendant's conduct varied from person to person, individualized evidence is required to prove those claims. That is true in cases alleging misrepresentations. *See*, *e.g.*, *Perisic v. Ashley Furniture Indus., Inc.*, 2018 U.S. Dist. LEXIS 118337, *21 (M.D. Fla. June 27, 2018) (Magistrate) (holding that "individualized inquiries will be needed in light of the varying representations"), *adopted*, 2018 U.S. Dist. LEXIS 218663 (M.D. Fla. Aug. 13, 2018);*Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 685-87 (S.D. Fla. 2008) (same); *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 480-82 (S.D. Fla. 2006) (same). It is equally true in cases alleging other kinds of conduct. *See*, *e.g.*, *Long v. Nationstar Mortg. LLC*, 2018 U.S. Dist. LEXIS 38757, *30 (S.D.W.V. Mar. 9, 2018) (holding that individualized proof was required for consumer protection law claims against loan servicer because the defendant "serviced each [borrower's] loan differently according to the individual circumstances of that loan," and thus "the class members' injuries do not derive from a unitary course of conduct"); *Merrill v. Rossen*, 2016 U.S. Dist. LEXIS 197113, *13-17 (W.D. Mich. Jan. 25, 2016) (in case asserting FDCPA claim, citing need for "individualized proofs" to establish lawfulness of each collection effort) (also citing other such rulings under the FDCPA); *Bushbeck v. Chicago Title Ins. Co.*, 2011 U.S.

Dist. LEXIS 158134, *46-50 (W.D. Wash. Aug. 15, 2011) (in case asserting RESPA claims, citing need for "individualized determinations" as to whether defendant failed to refund processing an actually performed services); *Eversole v. EMC Mortg. Corp*, 2007 U.S. Dist. LEXIS 38892, *42 (E.D. Ky. May 29, 2007) (citing need for "individualized proof of liability" in case under RESPA, including "individualized evidence of representations" made to each borrower as well as the other allegedly "violating conduct" by the defendant relating to particular loans).

These many holdings are highly instructive because they turned on an understanding of what evidence would have been required at trial in each case to prove claims under the relevant consumer protection statutes.[6] Indeed, the court in *CFPB v. Navient Corp.*, No. 3:17-cv-00101-RDM (M.D. Pa.), which is presently pending, has expressly recognized in a CFPB enforcement action that the Bureau's "proof will depend on applying the elements of the statute to the many persons on whose behalf you're proceeding." *See* Ocwen MPSJ Opp. at 10.

The CFPB also argues that claims alleging "unfair" or "deceptive" conduct do not require individualized evidence on the theory that such claims apply objective criteria—that "unfair" practice claims ask whether the use of inaccurate information was "likely" to cause injury and "deceptive" practice claims ask whether the misrepresentation was likely to mislead the consumer. Pl. Opp. at 12. That argument does not even apply to many of the CFPB's claims (Counts VI-X), and it is an oversimplified description of the claims to which it does apply. In any event, it fails to defeat Ocwen's motion even on its own terms. Before the trier of fact could even consider whether the use of inaccurate information or misrepresentation was likely to cause substantial injury or to mislead the consumer—that is, the causation elements of these claims—the CFPB will always have to ***first*** prove that Ocwen ***in fact used inaccurate information or made a misrepresentation***. But because all agree that the alleged use of inaccurate information or misrepresentation was unique to each borrower, the CFPB cannot avoid its burden to come forward with evidence relating to each of the at-issue loans. For that very reason, as already

---

[6] The Supreme Court has made clear that, under the Rules Enabling Act, the same substantive law must be applied in class actions as in non-class-action cases. *E.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1176 (11th Cir. 2010).

shown, numerous decisions under statutes proscribing "unfair" or "deceptive" conduct have held that individualized proof is required in these circumstances. *See* page 11-12 *supra*.

### 2. Judge Matthewman *Did* Say that Plaintiff Must Present Evidence At Trial Proving a Violation For Each At-Issue Loan, and Plaintiff *Did* Promise to Do That—But It Has Not Done So In Response to Ocwen's Motion

The conclusion that the CFPB must adduce evidence covering each of the at-issue loans is confirmed by Judge Matthewman's and the CFPB's statements in the course of this case. Specifically, Judge Matthewman repeatedly told the CFPB that it must come forward with loan-specific evidence of the alleged violations, and the CFPB promised to come forth with individualized loan evidence (through expert testimony covering all of the alleged errors). Mot. at 13-14; MPSJ Opp. at 8-9. The CFPB tries to wish all of this case management history away, having found itself unable to offer what it admitted it needs to offer.

The CFPB asserts (at 14) first that Judge Matthewman's statements can be disregarded because they were just "questioning the Bureau regarding Defendants' demand that the Bureau identify all loans 'at issue' in the case" rather than "articulating a governing legal standard for liability." Not so: Judge Matthewman was explicitly addressing how the CFPB would have to prove its case at trial. Thus, in the first colloquy, the Court directed CFPB counsel: "if you present this case to a jury or even summary judgment, aren't you going to have to go by loan number? In other words, aren't you going to have to say this loan was violative and this loan was violative and have to prove it?" Ocwen SMF ¶ 71; Ocwen SMF Ex. 28 at 29:13-20 (ECF No. 731). Likewise, in the second colloquy, Judge Matthewman said to CFPB counsel: "A[t] trial in this case, you are not going to be producing information about 1.58 million people in file form. You are going to do this in some sort of overarching expert opinion type of testimony." Ocwen SMF ¶ 94; Ocwen SMF Ex. 56 at 88:22-24-89:9-14 (ECF No. 731).[7]

Nor were these idle comments. Judge Matthewman was intimately involved in discovery management of this matter, which at times (including at those hearings) focused intently on the very question of what type of evidence the CFPB would need to offer ***at trial*** and what discovery obligations flowed from that ***trial*** burden. Indeed, as Ocwen's Motion demonstrated without

[7] Confirming this still further, Judge Matthewman expressly opined that Ocwen had the right to know the specific loans for which the CFPB was asserting claims in order to "get[] the case ready for dispositive motions and trial." 6/5/2019 Hrg. Tr. at 47:23-48:1 (attached as Ocwen Reply Ex. 3).

rebuttal, Judge Matthewman, at the CFPB's request, ordered Ocwen to produce loan-level servicing data on the numerous at-issue loans for precisely this reason: that the CFPB would need to adduce evidence at trial concerning each of the loans. Mot. at 2-3, 16, 18.

Further attempting to revise the recorded history on which this case has been litigated for years, the CFPB contends (at 18) that it did not promise Judge Matthewman to prove liability as to the individualized alleged violations through an expert witness. Once again, the transcript says otherwise. As just quoted, during this second colloquy, Judge Matthewman specifically told the CFPB that, "[at] trial," it would need "some sort of overarching expert opinion type of testimony," not just "information about 1.58 million people in file form." Ocwen SMF ¶¶ 93-94; Ocwen SMF Ex. 56 at 88:18-89:14. In direct response to that warning, CFPB counsel replied:

> Yes. That's exactly right. . . . [W]ith respect to Your Honor's first question about the expert, we do intend for the expert to look through the 1.58 million borrowers and to crunch and assess the data, both in a summary witness fashion and both as to an ***expert opinion with respect to all of the errors*** . . . ."

*Id*. (emphasis added). So, CFPB counsel was not talking about damages or discovery. She was agreeing that, at trial, the CFPB would need to prove its claims by way of "an expert opinion ***with respect to all of the errors***." And further confirming this point, CFPB counsel emphasized to Judge Matthewman that "we need the [loan-by-loan] data ***to establish the liability***." 11/29/2018 Hrg. Tr. at 90:17-19 (emphasis added) (attached as Ocwen Reply Ex. 2).

The CFPB tries to divert attention from its unfulfilled promise to provide expert testimony covering all of the alleged loan-specific violations by arguing (at 19) that experts are generally prohibited from rendering ultimate legal conclusions. That is a red herring because it does not address the CFPB's recognition that it is its complete burden to come forward with loan-specific proof and its promise to do so through summary expert testimony. Moreover, nothing in the general rule prohibiting experts from offering opinions on legal issues would have barred the CFPB from providing expert testimony as to servicing errors in any, or all, of the individual loans. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); *O'Brien v. NCL (Bahamas) Ltd.*, 2017 WL 10410455, at *8-9 (S.D. Fl. Oct. 13, 2017).[8]

---

[8] The CFPB argues (at 13) that the suggestion that it could have used sampling—which Judge Matthewman urged it to do, as Ocwen's Motion showed (at 13-14) without rebuttal—somehow "squarely contradicts" the view that individualized evidence is required. That is wrong. Having

### 3. The CFPB's Obligation to Present Evidence Proving How Many and Which Loans Had Violations Is Confirmed by the Remedies That the CFPB Seeks

The CFPB's burden to come forward with evidence covering each of the at-issue loans is also clear because its claimed remedies depend, at least in large part, on which, and how many, loans involved legal violations. Mot. at 14; MPSJ Opp. at 9. The CFPB (at 14) offers half a response—that is, it addresses its claim for penalties but ignores its claim for consumer damages, apparently hoping that the Court will overlook that point. But the consumer damages claim by itself requires the CFPB to prove how many, and which, loans had violations, because the amount of consumer injury necessarily depends on, for example, whether Ocwen committed servicing errors on two loans or two million loans. Mot. at 14. Indeed, the CFPB's damages expert's opinion expressly depends upon the precise number of borrowers who were harmed by servicing errors. Ocwen SMF ¶ 74.

Moreover, the CFPB does not renounce making a claim for penalties based on the number of violations its proves, but instead merely argues that the amount of any penalty "***need not*** be assessed based on the number of borrowers who suffered a violation" but rather "***can*** also be assessed based on the number of days a violation existed." Pl. Opp. at 14 (emphasis added). In any event, even if the CFPB had actually limited itself to seeking a penalty based solely on the number of days that a violation existed, that calculation would necessarily require knowing which loans had violations and when they occurred, to determine the length of the period over which any violations were in effect.

## B. Plaintiff Has Failed to Satisfy Its Burden of Presenting Competent Evidence Sufficient to Prove Violations for Each Of The At-Issue Loans

Although the CFPB's discovery responses provided lists of loans that allegedly were the subject of violations—for example, it has listed 2,104,530 loans that allegedly were serviced with inaccurate information—it has never identified any ***corresponding*** piece or pieces of evidence to show at least a triable issue of liability as to each of those listed loans. Mot. at 17-21. Plaintiff's Opposition does nothing to fill that evidentiary void. Without that missing link,

---

a qualified expert analyze a sample of the specific loans could have produced the kind of loan-specific evidence required to prove the CFPB's loan-specific claims. Indeed, in *Navient* (discussed above), the CFPB responded to the court's admonishment that the CFPB would need proof applying the elements of the statute to the many loans by announcing that it would analyze a representative sample of the loans. *See* MPSJ Opp. at 10.

Ocwen is entitled to summary judgment because the CFPB has not demonstrated the ability to make out a case at trial with sufficient evidence on all required elements. *See In re Chiquita Brands Int'l Inc.*, 2019 U.S. Dist. LEXIS 153856, *156 (S.D. Fla. Sept. 5, 2019) (Marra, J.) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Instead, the CFPB rests heavily on its legal position that it need not prove its claims for any of the individual loans. Pl. Opp. at 15-18. As just shown, the CFPB's position reflects a profound misunderstanding of what the substantive laws, the rules of evidence, and summary judgment procedures require of the CFPB. To the limited extent that the CFPB argues it does have some "loan-level evidence" (Opp. at 15), that contention is meritless.

### 1. The Documents Cited in the CFPB's Opposition Fail to Show There Is Any Triable Issue on Liability

When the CFPB filed its motion, it merely identified a jumble of Ocwen documents as its claimed proof of Ocwen's liability, offering little or no explanation or testimony as to how each (or all) are sufficient to establish all the elements of its claims for the at-issue loans. MPSJ at 9-15. Plaintiff's Opposition just incorporates those same documents by reference, asserting that the documents show at least a triable issue on liability. Pl. Opp. at 15-18.

As Ocwen showed in its Opposition to Plaintiff's motion (ECF Nos. 739 & 741), which Ocwen incorporates by reference herein to avoid duplication, those cited Ocwen documents are legally insufficient to prove the CFPB's claims for three threshold reasons.

First, the documents do not evidence statutory violations. The vast majority were created to help Ocwen run its business, including to identify ways to improve processes and be more efficient and effective; they were not created to audit legal compliance against a series of elements from a statute or rule. MPSJ Opp. at 14-15. To illustrate, various documents applied Ocwen's own, internal servicing benchmarks, where those benchmarks were different than, and also did not consider additional elements that would be required to prove, the standards for a statutory violation. *E.g.*, Ocwen RSF ¶ 211 (ECF No. 741). Furthermore, where the internal business documents identified consumers whose accounts were to be adjusted, those changes did not reliably tie back to legal requirements. For example, Ocwen often voluntarily undertook to provide broad relief to all potentially affected borrowers in the interest of customer relations and operational efficiency, rather than out of legal obligation. MPSJ Opp. at 14-15; Ocwen CSF ¶ 304 (ECF No. 741). It is highly ironic that the CFPB is trying to punish Ocwen for having a robust process and business improvement ethic and to discourage Ocwen (and others that are

watching this case) from erring on the side of the consumer when its servicing fell short of its own standards. But, for summary judgment purposes, the CFPB gets nowhere with these business documents because the CFPB has not shown the documents evidence violations of law.

In any event, even if these business documents could support the legal conclusions that the CFPB espouses, the documents reflect voluntary remediations and self-correction that are inadmissible as subsequent remedial measures. MPSJ Opp. at 14-15, citing Fed. R. Evid. 407; *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 634 n.12 (3d Cir. 2017). Moreover, even according to the CFPB itself, the documents it cites only cover a small fraction of the 2.1 million at-issue loans. MPSJ Opp. at 15. For these same threshold reasons, the cited materials are insufficient to show a triable issue that would prevent the entry of summary judgment to Ocwen.

Even beyond these threshold reasons why the documents cited by the CFPB are legally insufficient to satisfy its burden of proof at trial, the CFPB's hodgepodge offering of internal tracking spreadsheets, unexplained documents, and cryptic snippets does not explain in any meaningful way why there is a triable issue of liability for each individual loan. The CFPB's attempt to overwhelm the record with vast quantities of legally insufficient proof does not create a need for trial. Ocwen's Opposition to Plaintiff's Motion, which is incorporated herein to avoid duplication, shows in detail (at 14-34) that the documents relied on by the CFPB are legally insufficient—whether offered in support of its motion or in opposition to Ocwen's.

For the sake of completeness, we now address specifically the handful of documents that the CFPB references in its Opposition to Ocwen's Motion:

**Counts I & V:** The CFPB asserts that an Ocwen interrogatory response (Pl. SJX 138) identified borrowers "who paid too much or too little into their escrow accounts." Pl. Opp. at 15. That document, however, reflected only amounts owed, not amounts actually paid. MPSJ Opp. at 27-28; Ocwen RSF ¶¶ 184, 186 & Pl. SJX 138 at 11. Moreover, Ocwen's own evidence indicates that many borrowers likely did not make an such payment. MPSJ Opp. at 27; Ocwen RSF ¶¶ 171-173, 177; Ocwen CSF ¶¶ 309-311.

**Counts II, IV & VI:** The CFPB argues (at 16) that an Ocwen document (Pl. SJX 123) identified loans for which Ocwen failed to cancel private mortgage insurance ("PMI"). But Ocwen was required to terminate PMI only for "single-family dwelling[s]" and "the principal residence of the mortgagor[s]" if the loan was current. MPSJ Opp. at 18-19; U.S.C. § 4901(15);

*id*. § 4902(b). The document cited by the CFPB does not address any of those elements, and hence fails to prove that Ocwen had a duty to terminate PMI, much less that Ocwen violated that duty. MPSJ Opp. at 18-19; Ocwen RSF ¶ 248. The CFPB argues (at 16) that another document shows that Ocwen communicated incorrect reinstatement amounts to borrowers. But that document only identified loans that "potentially" received inaccurate quotes, and the CFPB never analyzed the loan files to establish whether any of the quotes were, in fact, inaccurate. MPSJ Opp. at 16; Ocwen RSF ¶¶ 193-94. Moreover, other evidence establishes that borrowers who might have received inaccurate quotes suffered no "substantial injury" (as required to prove a statutory violation), due for example to loan modifications or voluntary remediations. MPSJ Opp. at 17; Ocwen RSF & CSF ¶¶ 192, 319.

**Count VII:** The CFPB cites several documents as supposedly identifying loans with escrow-related violations, but each of those documents is insufficient to prove such claims. First, the CFPB argues (at 16) that an Ocwen discovery response and report identified loans with an untimely escrow analysis. But that discovery response expressly observed that it showed only what the electronic data indicated and that loan-level information was required to determine whether or not an analysis had been conducted; and the loan-level data in fact shows that Ocwen likely did perform timely analyses. MPSJ Opp. at 26-27. Second, the CFPB points (at 16) to a single Ocwen document as supposedly showing that certain borrowers did not receive escrow statements. But it is unrebutted that the absence of a mailing date code in that document reflected a data validation issue, not that a statement was not timely sent. MPSJ Opp. at 25-26; Ocwen RSF ¶ 200. Third, the CFPB asserts (at 16) that another Ocwen discovery response identified loans for which shortage payments were not timely processed. But it merely identified payments that were processed outside Ocwen's ***internal*** timeframes—not outside any regulatory requirements. MPSJ Opp. at 16-17, 28-29; Ocwen RSF ¶¶ 209-211, Pl. SJX 138 & 142. Finally, the CFPB argues (at 16) that an Ocwen interrogatory answer identified 1,367 borrowers whose policies were cancelled due to Ocwen error. But that answer merely listed policies that might have been erroneously cancelled and observed that a manual file review (which the CFPB did not do) would be required to determine whether or not such a cancellation occurred; and in any event, any cancellations resulting from Ocwen error would have been remediated. MPSJ Opp. 30; Ocwen RSF ¶ 222; Pl. SJX 138 at 22-23 & 141; Ocwen CSF ¶ 322.

**<u>Count X</u>:** The CFPB cites (at 17) to a single chart (Pl. SJX 123) as supposedly showing that Ocwen failed to cancel PMI as required for some loans. But this chart does not prove its claims, including because (1) the duty to cancel only applied to current loans, and the chart does not indicate which if any of the loans were current; and (2) the chart does not show the date that PMI was actually canceled. MPSJ Opp. at 18-19, 31-32.

**<u>Count III</u>:** The CFPB (at 17) cites certain Ocwen letters as purportedly showing that Ocwen falsely told borrowers that it would not foreclose during the mitigation evaluation process. But those letters expressly stated that the mitigation evaluation process would start only if, and when, the borrowers completed their mitigation applications—which they largely had not done. MPSJ Opp. at 33; Ocwen RSF ¶¶ 263-64.

In sum, the CFPB's obligation in responding to Ocwen's Motion was to actually present competent evidence that would be sufficient at trial to prove its claims for each of the at-issue loans. Because the CFPB has failed to present such evidence, as required, summary judgment should be entered in Ocwen's favor as to all of the CFPB's claims.[9]

### 2. The CFPB's Arguments About Its "Memory Aids" Are Moot Now and, in Any Event, the Aids Provide No Support for Its Claims

At the time when Ocwen filed its Motion for Summary Judgment, the only place where the CFPB had identified the evidence that supposedly supports its claims was in the so-called "memory aids" that the CFPB prepared for the depositions of its Rule 30(b)(6) witnesses. One of those memory aids supposedly identified evidence showing the individual loans for which violations allegedly occurred, while the others supposedly identified additional supporting documents. Because those constituted the CFPB's only identification of its claimed evidence, and because the first memory aid (Ocwen SMF Ex. 62) was the one that supposedly identified evidence relating to the individual loans on the CFPB's loan lists, Ocwen showed in detail that the memory aids failed to constitute or identify information sufficient to prove the CFPB's claims. Mot. at 17-21.

Now, however, the CFPB has identified (in its cross-motion for summary judgment and Opposition to Ocwen's Motion) the evidence that supposedly enables it to prove its claims. Moreover, Plaintiff's Opposition acknowledges (at 20), as Ocwen noted in its Motion (at 17 n.7),

[9] The reasons for granting summary judgment on the CFPB's claim concerning Ocwen's policies and procedures, despite the CFPB's claimed evidence, are discussed at pages 27-28 below.

that the CFPB cannot "use the aids or lists as evidence." Accordingly, there is no need any longer to consider the documents indirectly referenced in the CFPB's memory aids, because the CFPB's summary judgment filings have now directly cited to the documents that it contends are sufficient to satisfy its burden of proof in this case.

## III. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIMS TO RECOVER FOR ALLEGED BORROWER DAMAGES

### A. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Costs from Additional Foreclosures That Resulted From Ocwen's Late Escrow Analyses"

The CFPB's evidence to recover for losses that borrowers allegedly suffered due to additional foreclosures resulting from late escrow analyses is insufficient as a matter of law. Mot. at 22-24. McFadden's opinion is the only evidence offered of such losses, yet it is entirely hypothetical and theoretical. McFadden does not identify a single loan that went into foreclosure due to a delayed escrow analysis, nor does his opinion identify a single dollar of damages suffered by any identified borrowers. *Id.* at 22. The CFPB does not dispute any of those patent deficiencies with the professor's wholly-academic opinion backed by no real-world experience or evidence from borrower files. Instead, the CFPB argues that McFadden's opinion is sufficient to create an issue for trial on the theory that any "reasonable estimate" of damages is sufficient. Pl. Opp. at 23-24. That legal proposition is as unsupported as the CFPB's damages claim itself.

The CFPB rests most heavily on cases where damages estimates were allowed because it was impossible for the plaintiff to prove actual damages—not simply because the plaintiff did not go to the trouble of doing so.[10] In many of the cited cases, the plaintiff's inability to prove actual damages resulted from the defendant's failure to maintain required records.[11] Those cases are plainly inapposite. Contrary to the CFPB's baseless assertion (at 24), Ocwen did not fail to

---

[10] *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123-24 (1969) (allowing estimate in patent case where damages "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts"); *Nutrimatix Inc. v. Xymogen, Inc.*, 2017 WL 385753, *9 (M.D. Fla. Jan. 27, 2017) (allowing estimate for new businesses that have no "track record" to prove actual lost profits) (citation omitted).

[11] *See, e.g.*, *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 825-26, 834-35 (8th Cir. 2016) (allowing estimate where there was an "unexplained absence of certain records" and "the employees would be unable to prove damages with certainty"); *Julian v. Swift Transp. Co.*, 2019 WL 7282025, *6 (D. Ariz. Dec. 27, 2019) (damages calculation was "imprecise but [defendant] has not offered any way to avoid such imprecision given its failure to provide any records regarding these Plaintiffs").

maintain or produce in discovery any information relevant to these supposed foreclosure-related losses. Indeed, the CFPB identifies no such discarded or withheld information. To the contrary, Ocwen produced voluminous data on one element of McFadden's academic calculation, foreclosure-related charges, including loan-level data identifying costs charged to loans while in foreclosure status. McFadden simply ignored it. Ocwen CSF ¶ 292; ECF No. 751 at 4 n.1. Most of the other elements that McFadden "estimated" involve items that would be known to the borrowers (rather than to Ocwen), including their "relocation costs," lost home equity, and "income tax liability." Ocwen SMF Ex. 60 (McFadden Report), ¶ 115. The CFPB's failure to use evidence it obtained from Ocwen and to assemble evidence from others is no excuse.

Critically, moreover, the CFPB acknowledges (at 24) that reasonable estimates of the ***amount*** of damages are permissible only if the "fact of damage" is certain—that is, if it is certain that at least some damages were sustained by the person whose loss is then estimated. *See, e.g., AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1342-43 (S.D. Fla. May 26, 2006) (describing the "distinction between proof of the fact of damages, which must be established with at least reasonable certainty, and the amount of damages, which may be estimated, provided it is not merely speculative") (citation omitted). This explains why, for example, employees who prove they were not paid any overtime can sometimes prove the amount of their loss by approximations and reasonable assumptions. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946). But contrary to the CFPB's unsupported assertion (at 24), the "fact of damage" to the hypothesized borrowers in this case is entirely uncertain. The CFPB does not even allege that ***every*** loan with a supposedly late escrow analysis went into foreclosure. Ocwen SMF ¶¶ 180-83. McFadden also admitted that "some borrowers . . . had zero loss." RAF Ex. 5, McFadden Dep. at 131:21-132:8. Moreover, the CFPB offers no admissible evidence that ***any*** borrowers went into foreclosure as a result of a late escrow analysis. Mot. at 22; Ocwen SMF ¶ 184. Speculation (including guesses by the "expert") that this may have happened to some borrowers is not enough to meet the requirement that the "fact of damage" must be proven with certainty before estimates can potentially be allowed.[12]

McFadden's "estimate" is not admissible evidence that could create a triable issue on damages for the related reason that it is based on a calculation of the borrower population in the

[12] The "fact of damage" is also uncertain because even if any losses occurred, they could have been borne by investors rather than the borrower. Ocwen SMF Ex. 90, Hamm Report ¶¶ 36-39.

aggregate, rather than on an individualized basis. An aggregate figure extrapolated from supposed averages will not do in a case, like this, where the alleged damages varied from person to person. *See, e.g., Albright v. City of New Orleans*, 208 F. Supp. 2d 634, 641 (E.D. La. 2002) (rejecting use of averages to determine damages and holding in a discrimination case "that the most precise calculation that can be made of each plaintiff's damages is the value of the promotion as to each individual plaintiff" . . . "to reflect each plaintiff's actual loss"). This is not a securities case, where everyone affected owned the stock and prices are market-wide, or a consumer purchasing dispute, where everyone affected bought the same product and at uniform retail prices. Rather, whether and to what extent a homeowner lost money when his escrow calculation was delayed—because, as the CFPB hypothesizes, he suffered a cascade of events that resulted in foreclosure, he had equity in the home (in the time of the Great Recession) and lost it, he paid foreclosure expenses that depended on foreclosure case events in that locality, and he paid someone to move his belongings—indisputably varied dramatically from borrower to borrower. Ocwen SMF ¶ 190. Indeed, this is clear from the cases cited by the CFPB itself. *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1257 (11th Cir. 2003) (affirming that "the determination of the amount that each [affected person] was overcharged during the class period must take place on an individual basis" where the applicable amount of interest owed varies as between individuals, and only some individuals' claims are subject to further reduction by set-off claims); *Albright*, 208 F. Supp. 2d at 641.

The CFPB's assertion (at 27) that McFadden's calculations were "the epitome of individualized" on the theory that his model "made use of Ocwen's loan-level servicing data" is unsupportable. His model may have "made use of" servicing data but it stopped short of making *admissible* use of that data when McFadden—by his own admission—chose not to identify any individual loan that went into foreclosure as a result of a late analysis, much less what losses that individual borrower suffered as a result. Ocwen SMF Ex. 61, McFadden Dep. at 211:5-14. Instead, his model explicitly relies entirely on supposed "***average[s]***," including ones purportedly derived from a Zillow "blog" post and other frivolous sources. Ocwen SMF Ex. 60 at 53-62 (emphasis added).

The CFPB's effort to distinguish the cases cited by Ocwen is equally unsuccessful. The CFPB argues (at 26) that in *A.R. v. Dudek*, 2016 WL 3221140, at *11-16 (S.D. Fla. June 9, 2016), this Court held that individualized evidence was required to prove a violation of law,

rather than damages. That is not so: this Court held that the government needed individualized proof to "establish causation and injury in fact"—that is, to establish that each child suffered injury that was caused by the alleged systemic violation. *Id*. at *11. Indeed, in reaching this decision, this Court quoted the Supreme Court's ruling in *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975), that "[i]n the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Dudek,* 2016 WL 321140, at *12. Likewise, here, the CFPB must prove that Ocwen's alleged late escrow analyses caused specific borrowers to suffer foreclosure-related losses—which requires individualized evidence the CFPB is lacking.[13]

### B. Defendants Are Entitled to Summary Judgment on the CFPB's Claim to Recover for Borrowers' Purported "Foregone Interest"

Like McFadden's opinion as to purported foreclosure-related costs, his opinion as to "foregone interest" is not based on any evidence that any specific borrowers actually lost interest, much less the actual amount of interest that they lost. Instead, it is an estimate based on hypothetical mathematical modeling using across-the-board assumptions. Mot. at 24. The CFPB again does not deny that it has no individualized evidence of actual foregone interest, but instead defends McFadden as providing a "reasonable estimate." Pl. Opp. at 25-26, 29. For the same reasons shown above as to why a supposed estimate cannot establish the CFPB's claim for foreclosure-related damages, an estimate cannot prove up its claim for lost interest either. The CFPB has not shown that (1) the information to actually calculate any damages is unavailable (much less due to some fault of Ocwen's); (2) each borrower suffered the "fact of damage"; and (3) the purported damages did not vary substantially from borrower to borrower. Accordingly, the CFPB's so-called "estimate" is legally insufficient to establish this damages claim.

[13] The CFPB also argues (at 26 n.162) that the Supreme Court's opinion in *General Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 324 (1980), merely noted that the government was seeking relief only for specific affected third parties. Not so. As this Court explained in *Dudek*, the Supreme Court, in approving the government's damages claim, held that the government was "expected to specifically establish at trial which individuals were adversely affected by the employer's practice and the amount of their damages." 2016 WL 321140, at *11.

### C. Defendants Are Entitled to Summary Judgment on All Other Damages Claims

The CFPB argues (at 29) that although McFadden's opinion covers only the two categories of alleged damages discussed above, it can prove types of damages through non-expert evidence. But the CFPB fails to present any such non-expert evidence, as required for it to satisfy its summary judgment burden to "present[] competent evidence on which a reasonable juror could rule in its favor" on such theorized other categories of damages. *In re Chiquita Brands Int'l Inc.*, 2019 U.S. Dist. LEXIS 153856, *157. Instead, the CFPB merely refers back to its own summary judgment motion (Pl. Opp. at 29, citing MPSJ at 8-18), but that motion did not even purport to present evidence relating to damages.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING LOSS MITIGATION APPLICATIONS (COUNT III)

In Count III, the CFPB alleges that Ocwen's borrower communications concerning loss mitigation applications violated the CFPA's general ban on deceptive acts. Even beyond Plaintiff's lack of evidence (Section II above), this claim fails because the communications do not violate Regulation X, which comprehensively regulates the loss mitigation process. Mot. at 24-26. The CFPB argues (at 22) that the Court rejected this argument in ruling on Ocwen's motion to dismiss. But that ruling simply held that Ocwen had not come forward with "any legal support" for its position (ECF No. 452 at 52)—which Ocwen's Motion has now done. In any event, "a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court." *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991); *see also Bonanno v. New Penn. Fin., LLC*, 2017 U.S. Dist. LEXIS 118407, at *12-13 (M.D. Fla. July 28, 2017) (party whose argument failed at motion to dismiss stage was not foreclosed "from making this] argument at the summary judgment stage when the facts and law will have been more thoroughly briefed for the Court").

On the merits, the CFPB seeks (at 22) to evade *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), which otherwise would preclude the CFPB's effort to supplement Regulation X's specific terms with the CFPA's general ones. Mot. at 25. *RadLAX* held that where two provisions of law potentially overlap, the principle that "the specific governs the general" is applied with particular force where "Congress has enacted a comprehensive scheme and deliberately targeted specific problems with specific solutions." 566 U.S. at 645 (citations omitted). The CFPB tries to sideline *RadLAX* by arguing that applying the

CFPA's general provisions would not override Regulation X, but that is plainly incorrect. As Ocwen's Motion showed without rebuttal, this Court has expressly held that RESPA (which is the basis for Regulation X) provides "a ***comprehensive*** set of interrelated requirements ***and deadlines*** that servicers must comply with when a borrower submits a loss mitigation application." *Brosnick v. Wells Fargo Bank, N.A.*, 2018 WL 6807340, *8 (S.D. Fla. Sept. 25, 2018) (emphasis added and citation omitted). If the CFPB was allowed to challenge any and all conduct concerning loss mitigation applications as being "deceptive" or "unfair" under the general provisions of the CFPA, that would render superfluous all of Regulation X's specific provisions that comprehensively tell servicers what obligations they have in connection with loss mitigation applications. Such a result is precisely what *RadLAX*, and many other cases applying the same well-settled principle of law, forbid.[14]

## V. OCWEN IS ENTITLED TO SUMMARY JUDGMENT ON MOST OF THE CFPB'S ESCROW VIOLATION CLAIMS (COUNT VII)

Even beyond the CFPB's lack of individualized evidence for its escrow-related claims (Section II above), summary judgment should be entered for Ocwen both (A) as to 1.3 million loans for which the CFPB admittedly has not even determined that there was any escrow-related violation; and (B) as to the CFPB's claims for enhanced penalties arising from Ocwen's purported failure to perform an escrow analysis for loans that were delinquent, in bankruptcy, or in foreclosure. Mot. at 26-29. The CFPB's Opposition does not undermine either of these points.

### A. The Court Must Grant Summary Judgment as to the 1.3 Million Loans for Which the CFPB Has Not Even Determined There Was a Legal Violation

The CFPB pretends that Ocwen's motion for summary judgment on its escrow-related claims concerning 1.3 million loans is based on the way the CFPB "bucketed" those loans for purposes of discovery. Pl. Opp. at 21. That is untrue. Instead, Ocwen is entitled to summary judgment on those 1.3 million loans because the CFPB's Rule 30(b)(6) witness admitted that these are loans "where ***the Bureau has not yet determined that they relate to a specific***

[14] The CFPB does not argue that *FTC v. Wyndam Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015), which was raised in connection with Ocwen's motion to dismiss, supports its position. The defendant in *Wynham* argued against application of a general law on the ground that a specific law had left the field ***unregulated***. This case, like *RadLAX*, involves the opposite situation—where the specific law ***comprehensively regulates*** the field, and thus would be rendered surplusage if that general law were applied as well.

***regulatory violation*** that's at issue." Mot. at 26-27 (quoting Ocwen SMF ¶ 204 & Ex. 53 at 623:8-20). Far from trying to dispute that testimony, the CFPB admits that these are loans that "***potentially*** suffered escrow violations." Pl. Opp. at 21 (emphasis added). Given that the CFPB itself has not even determined that a violation occurred for each loan—much less presented competent evidence proving such a violation, which is the CFPB's burden at summary judgment—the CFPB is not entitled to a trial on its claims concerning these loans. Mot. at 27, *citing Holt v. Blakely*, 167 F. App'x 86, 88-89 (11th Cir. 2006); *Thompson v. McDonald*, 2019 U.S. Dist. LEXIS 50566, *3 (S.D. Fla. Mar. 25, 2019) (Marra, J.), *aff'd*, 2020 U.S. App. LEXIS 3552 (11th Cir. Feb. 6, 2020).

### B. The CFPB Cannot Show That Ocwen Acted Recklessly or Knowingly by Allegedly Failing to Conduct Annual Escrow Analyses for Nonperforming Loans

The CFPB seeks enhanced damages on the theory that Ocwen's alleged failure to conduct annual escrow analyses for non-performing loans was knowing or reckless. But the CFPB does not dispute that it was ***objectively*** reasonable to interpret Regulation X as not requiring such analyses for non-performing loans. Mot. at 27-29.[15] Instead, the CFPB argues that Ocwen cannot obtain summary judgment because an internal Ocwen audit in 2013 contains evidence that someone at Ocwen ***subjectively*** believed that escrow analyses were required even for non-performing loans. Pl. Opp. at 30. But that audit is legally insufficient to create a triable issue of material fact because both the Eleventh Circuit and the Supreme Court have held, applying the FCRA, that "evidence of subjective bad faith cannot support 'a willfulness finding . . . when the company's reading of the statute is objectively reasonable.'" *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1319 (11th Cir. 2009), *quoting Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007). In any event, the 2013 audit cited by the CFPB would not create a trial issue even as to Ocwen's subjective belief, because the audit expressly reflected the view of one particular department, not of Ocwen as a company. Pl. SJX 86, at pp. 1, 14-15. By contrast, the Rule 30(b)(6) testimony cited in Ocwen's Motion shows, without rebuttal, that the company's interpretation, based on the HUD guidance, was that annual analyses were not required for non-performing loans. Ocwen SMF ¶ 209 & Ex. 93 at 12:20-23.

---

[15] Indeed, courts and other servicers had adopted that same interpretation. *See e.g.*, *Diffley v. Nationstar Mortg., LLC*, 2017 U.S. Dist. LEXIS 201184, *17-18, 25 (W.D. Wash. Dec. 6, 2017); *In re Payne*, 387 B.R. 614, 637 (Bankr. D. Kan. May 6, 2008); Ocwen SMF Ex. 96, at 55:7-20.

## VI. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CFPB'S CLAIM CONCERNING OCWEN'S POLICIES AND PROCEDURES (COUNT VIII)

Summary judgment should enter against the CFPB's claim that Ocwen's policies were not "reasonably designed" to achieve their objectives, because the CFPB has no expert testimony to support that claim, leaving Ocwen's contrary expert testimony unrebutted. Mot. at 29. The CFPB argues that it does not need expert testimony to prove this claim. But expert testimony is required where the issue to be decided is "beyond the familiarity of the average layperson." *Goolsby v. Gain Techs., Inc.*, 362 F. App'x 123, 135 (11th Cir. 2010). That is the situation here, as the average layperson plainly is not familiar with the highly specialized and technical question of whether or not a mortgage loan servicer's policies are "reasonably designed" to achieve various specified objectives. Indeed, the CFPB's argument that expert testimony is unnecessary is refuted by the fact that the CFPB retained its own expert to opine on Ocwen's policies—but his opinions failed to apply the correct legal standard and hence cannot support this claim. Mot. at 29.[16]

In any event, even if the CFPB did not have to present expert testimony, the CFPB has no non-expert evidence sufficient to prove its claim. The CFPB's threshold argument (Opp. at 17-18) that all the policies were inadequate because they applied only to OFC is contrary to the undisputed evidence. Specifically, most of the policies expressly stated that they applied to OFC "and all of its domestic and international subsidiaries," which included OMS and OLS. *E.g.*, Ocwen SMF Ex. 103, OCW3-006-0000076 at -80. The CFPB's additional arguments (Opp. at 17-18) are equally unsupported and insufficient to create a triable issue. First, the CFPB asserts that all but one of the consumer complaint policies applied only to the Ombudsman office. Opp. at 17. But the Ombudsman Procedure specifically said that although the Ombudsman

[16] The CFPB further argues that it could not have developed expert testimony that Ocwen's policies were not reasonably designed, on the theory that such testimony would be "prohibited" as an "ultimate legal conclusion." Pl. Opp. at 19. That argument is irrelevant to the point, just shown, that ***some*** expert testimony supporting this claim (whether or not articulated to match the ultimate legal test) is required. But that argument is also wrong. Federal Rule of Evidence 704(a) expressly provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." *See also O'Brien v. NCL (Bahamas) Ltd.*, 2017 WL 10410455, at *8-9 (S.D. Fl. Oct. 13, 2017). The one case cited by the CFPB for its contrary assertion (Pl. Opp. at 19 n.115) involves the exception in Fed. R. Evid. 704(b) for opinions as to the defendant's state of mind in a criminal case.

Department "maintains" the Procedure, "each affected department or Business Unit ('BU') is responsible for enforcing the standards and practices under this Procedure." *E.g.*, Ocwen SMF Ex. 104, OCW-CFPB-001-05932687 at -92. Second, the CFPB argues that "Ocwen's consumer-complaint policies lack any specificity as to how to investigate and correct errors." Pl. Opp. at 17. But the unrebutted testimony is that Ocwen instituted "desktop procedures that [its] research employees use that instruct them on how to go about researching complaints and errors." Ocwen SMF Ex. 116, at 14:5-11. Moreover, on its face, the "reasonably designed" standard does not require any particular level of specificity. Finally, the CFPB asserts that Ocwen made errors in outbound transfers or loan foreclosures. Opp. at 18. But even if the CFPB had evidence to prove that for any specific loans (which it lacks, as shown above), that would not prove that Ocwen's policies were unreasonably designed. In granting summary judgment against similar claims, courts have observed that a requirement to have "reasonable" policies "cannot be construed to require perfect" performance.[17]

## VII. DEFENDANTS OFC AND OMS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY DID NOT ENGAGE IN SERVICING ACTIVITIES

The CFPB presents no evidence that OFC or OMS made or received any payments required pursuant to the terms of a loan, which is required to establish that they were servicers under the definition set forth in RESPA. *See* 12 U.S.C. § 2605(i)(3). Instead, the CFPB merely points (at 31-32) to generalized statements in some marketing materials or public filings that refer broadly to "Ocwen." But such statements simply do not constitute competent evidence that OFC or OMS in fact made or received payments required pursuant to loan terms, as required under the statute. Indeed, the CFPB's own evidence demonstrates that borrowers were directed

[17] *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 618 (9th Cir. 2018); *see also Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971-72 (7th Cir. 2004) (affirming summary judgment for credit reporting agency defendant on claim that defendant lacked "reasonable procedures to assure maximum possible accuracy" in credit reporting; noting that "[o]ne can easily see how, even with safeguards in place, mistakes can happen. But given the complexity of the system and the volume of information involved, a mistake does not render the procedures unreasonable."); *CFTC v. Commonwealth Fin. Group, Inc.*, 1994 U.S. Dist. LEXIS 21650, *25 (S.D. Fla. Aug. 31, 1994) (finding after bench trial that a compliance program was "reasonably designed to prevent misrepresentation" by sales employees, even though defendant "cannot maintain an absolutely perfect compliance record with respect to sales solicitation"); *Mastin v. Ditech Financial, LLC*, 2018 WL 524871, *6 (E.D. Va. Jan. 23, 2018) (granting motion to dismiss § 1024.38 claim where plaintiff alleged only "isolated instances where [defendant's] procedures may have been deficient").

to make checks or express payments to OLS, ***not to OFC or OMS***. *E.g.,* Pl. SJX 115, OCW3-009-0000118 at 119; Ocwen RSF ¶ 21. Thus, Ocwen's evidence that OFC and OMC did ***not*** make or receive such payments stands uncontroverted. Mot. at 29-30; Ocwen RSF ¶¶ 9-23, 31-32, 37-38, 59-62.

The CFPB alternatively argues (at 33) that OFC and OMS can be held jointly and severally liable. But courts refuse to permit such kinds of secondary liability under statutes, like RESPA, that are "precise about who . . . can be liable." *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006). Because RESPA is precise that liability is limited to conduct by "any servicer," secondary liability is not appropriate.

## CONCLUSION

For each and all of these reasons, summary judgment should be granted to Defendants as to all of the CFPB's claims.

Dated: December 21, 2020

Respectfully submitted,

*/s/ Catalina E. Azuero*

Bridget Ann Berry (Fla. Bar. No. 515639)
Andrew Stuart Wein (Fla. Bar. No. 1005238)
**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, FL 33401
Tel.: 561.650.7900
berryb@gtlaw.com
weina@gtlaw.com

Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: 202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com

Laura A. Stoll (*pro hac vice*)
**GOODWIN PROCTER LLP**
601 S. Figueroa Street
Los Angeles, CA 90017
Tel.: 213.426.2500
lstoll@goodwinlaw.com

Catalina E. Azuero (Florida Bar No. 821411)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
cazuero@goodwinlaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on December 21, 2020 via ECF on all counsel or parties of record listed below:

Jean Healey
Email: jean.healey@cfpb.gov

Atur Desai
E-mail: atur.desai@cfpb.gov

Tianna Baez
E-mail: tianna.baez@cfpb.gov

Amanda Roberson
E-mail: amanda.roberson@cfpb.gov

Stephanie Brenowitz
E-mail: stephanie.brenowitz@cfpb.gov

Erin Mary Kelly
E-mail: erin.kelly@cfpb.gov

James Savage
E-mail: james.savage@cfpb.gov

Greg Nodler
E-mail: greg.nodler@cfpb.gov

Michael Posner
E-mail: michael.posner@cfpb.gov

Jack Douglas Wilson
E-mail: doug.wilson@cfpb.gov

Shirley T. Chiu
E-mail: shirley.chiu@cfpb.gov

/s/ Catalina Azuero
Catalina E. Azuero