**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-CV-80495-MARRA**

**CONSUMER FINANCIAL PROTECTION BUREAU,**

    **Plaintiff,**

**vs.**

**OCWEN FINANCIAL CORPORATION,**
**OCWEN MORTAGE SERVICING, INC.,**
**OCWEN LOAN SERVICING, LLC and**
**PHH MORTGAGE CORPORATION,**

    **Defendants.**
_____/

**ORDER GRANTING IN PART AND RESERVING RULING IN PART ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO COUNTS 1-9;**
**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO COUNT 10**
**OF PLAINTIFF'S AMENDED COMPLAINT [DE 730] AND DENYING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT ON LIABILITY [DE 728]**

**I.  INTRODUCTION**

  The Consumer Financial Protection Bureau ("CFPB" or "the Bureau"), a federal agency charged with enforcing federal consumer financial laws, sued Defendants Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), and Ocwen Loan Servicing, LLC ("OLS") (cumulatively "Ocwen"), alleging that the Ocwen companies violated the Consumer Financial Protection Act ("CFPA"), the Fair Debt Collection Practices Act ("FDCPA"), the Real Estate Settlement Procedures Act ("RESPA") and Regulation X, the Truth in Lending Act ("TILA") and Regulation Z, and the Homeowners Protection Act of 1998 ("HPA").  The Bureau alleges that since January 2014 Ocwen used inaccurate and incomplete information to service residential mortgage

loans; inputted inaccurate and incomplete loan account information into its system of record; made material misrepresentations to borrowers regarding loan account information and monthly amounts due; mishandled borrowers' loss mitigation applications, initiated premature foreclosures and other foreclosure-related misconduct; failed to provide accurate periodic statements to borrowers; engaged in improper escrow-related practices; and failed to terminate automatically private mortgage insurance (PMI) on scheduled termination dates.  Familiarity with the underlying facts is presumed for the purposes of this Order.[1]

Currently before the Court is Ocwen's motion for summary judgment [DE 730] on the ground, among others, that most of the Bureau's current claims (Counts 1-9) are barred by the preclusive effect of a 2014 Consent Judgment entered by the United States District Court for the District of Columbia. As to the Bureau's remaining claim (Count 10), Ocwen recognizes that this cause of action does not overlap with the causes of action governed by the 2014 Consent Judgment;  however, it contends that the Bureau has failed to adduce sufficient proofs establishing each element of the alleged PMI irregularities, and that summary judgment is appropriately entered against it due to this evidentiary deficiency. As to all claims, Ocwen alternatively argues that the Bureau has failed to adduce individualized case-specific evidence demonstrating the alleged statutory violations as applied to each borrower.  Further, it challenges the legal and evidentiary sufficiency of the Bureau's claims on discrete damage issues and statutory violations.[2]

---

[1] For a complete recitation of the Bureau's factual allegations, see the November 5, 2019 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Amended Complaint [DE 435].

[2] Ocwen separately contends, for example, that it is entitled to summary judgment on the Bureau's claim for recovery of certain foreclosure-related costs and its "foregone interest" claims.  It also raises specific challenges to the Bureau's claims on loss mitigation application mishandling (Count 3); escrow-related violations (Count 7); and defects in Ocwen's policy manual (Count 8).  Finally, it seeks summary judgment on the claims against OFC and OMS on the ground these entities did not engage in "servicing" activities on which to predicate the alleged statutory violations.

Also before the Court is the Bureau's motion for partial summary judgment on the issue of liability [DE 728]. Ocwen defends against this motion, in part, with the assertion of its *res judicata* and related preclusion defenses. For the reasons discussed below, the Court concludes, as a matter of law, that the Bureau's claims, as set forth in Counts 1-9 of its Amended Complaint, are barred by *res judicata* to the extent these claims are premised on servicing activity which occurred *prior* to February 26, 2017, and that partial summary judgment is appropriately entered on this basis as to this discrete category of claims. As to Count 10, the Court concludes that the summary judgment record reveals a genuine issue of material fact on whether all prequalifying conditions for cancellation of PMI existed for all loans underlying the alleged HPA violations, and accordingly shall deny the motion for summary judgment.

Ruling on the remainder of issues raised in the parties' summary judgment motions shall be reserved pending the submission of a supplemental statement from the Bureau indicating whether, as to Counts 1-9, it intends to pursue claims for alleged loan servicing misconduct occurring *after* February 26, 2017. In this event, it shall provide a list of the relevant Counts it contends remain viable under this timeline, along with a corresponding index of specific citations to the summary judgment record where supporting evidence may be located. Pending submission of this statement, the Court will reserve ruling on Ocwen's various alternative arguments advanced in support of summary judgment as they potentially may be mooted, in whole or in part, by the Bureau's supplemental statement.

## II.  BACKGROUND [3]

Defendant Ocwen Financial Corporation ("Ocwen Financial" or "OFC") is a publicly traded corporation headquartered in West Palm Beach, Florida engaged in the business of servicing mortgage loans since 1988.  It is one of the largest mortgage servicers in the United States and specializes in servicing the loans of distressed borrowers.  Ocwen Financial is the parent corporation of Ocwen Mortgage Servicing, Inc. ("OMS"), which, in turn, is the parent corporation of Ocwen Loan Servicing, LLC ("OLS").  PHH Mortgage Corporation is a successor-by-merger to OLS.  All Defendants are cumulatively referenced as "Ocwen."

### A.  **The 2013 District of Columbia Action**

On December 19, 2013, the Bureau, the State of Florida, and 48 other States sued Ocwen Financial and OMS alleging that the Ocwen companies violated federal and state laws by engaging in unlawful and deceptive consumer practices with respect to loan servicing and foreclosure processing. By way of example, the Plaintiffs in the District of Columbia action alleged that the Ocwen companies failed to apply payments timely and accurately; failed to maintain accurate account statements; charged unauthorized fees for default-related services; imposed forced-placed insurance on borrowers who already had sufficient coverage; provided false or misleading account information in response to borrowers' complaints; provided false or misleading information to borrowers regarding loans transferred from other servicers; failed to provide accurate and timely information to borrowers seeking information about loss mitigation services and loan modifications; provided false or misleading

---

[3] The recited facts are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in support or in opposition to the motions, and the exhibits filed in support or in opposition to the motions for summary judgment, including the contents of the D.C. Consent Judgment and all of its incorporated exhibits. These facts are undisputed unless otherwise noted. Where disputed, the facts are viewed in the light most favorable to the non-moving party. *See Beard v. Banks*, 548 U.S. 521, 529-30, 126 S. Ct. 2572, 165 L.Ed.2d 697 (2006).

information to borrowers about the status of foreclosure proceedings in cases where the borrowers in good faith were actively pursuing loss mitigation alternatives; failed to calculate eligibility for loan modification programs properly and failed to process applications for loan modifications properly; and gave false or misleading reasons for the denial of loan modifications and they used false or misleading documents as part of the foreclosure process, including the use of "robo-signed" affidavits in foreclosure proceedings. *CFPB v. Ocwen Financial Corp*., Case No. 13-2025-RMC (Complaint, DE 1) (D.D.C. Dec. 19, 2013) ("D.C. Complaint") (DE 731-2).

The D.C. Complaint was divided into four counts:  The States alleged violation of state laws prohibiting unfair and deceptive consumer practices with respect to loan servicing and foreclosure processing (Counts 1 and 2, respectively).  The Bureau alleged parallel violations of the CFPA with respect to loan servicing  generally (alleging unfair and deceptive acts or practices employed in loan servicing conduct) (Count 3) and with respect to foreclosure processing specifically (alleging unfair and deceptive acts or practices employed in  foreclosure processing) (Count 4)  [DE 731-2, pp. 15-17]. The D.C. Complaint sought monetary relief for past servicing misconduct and injunctive relief to transform Ocwen's servicing practices going forward.   When the Plaintiffs filed the D.C. Complaint, they also entered into a settlement agreement, entitled the National Mortgage Settlement ("NMS"), and filed a  proposed consent judgment which incorporated the agreement and its dispute resolution requirements.

On February 26, 2014, the District Court for the District of Columbia entered the Consent Judgment ("NMS C.J.") [DE 731-3]  [Case No. 13-2025-RMC,  DE  12], which  required Ocwen to (1) pay  $2 billion in relief in the form of principal reduction loan modifications to consumers who met set eligibility criteria over a three-year period;  (2)  pay $127.3 million in  monetary relief to consumers

who were foreclosed upon by Ocwen (or its predecessors) between January 1, 2009 and December 31, 2012; (3) abide by comprehensive "Servicing Standards" [NMS C.J. ¶ 3 and Ex A] [DE 731-4] and corresponding Metrics [NMS C.J.,¶3 and Ex. D-1 through D-21] [DE 731-7] in its servicing practices going forward over the three-year term of the Judgment (February 26, 2014 to February 26, 2017); (4) pay for ongoing compliance monitoring by an independent monitor (Joseph A. Smith, Jr.) during the three-year term of the Judgment, and (5) submit to specific dispute resolution procedures and enforcement terms to redress compliance failures reported by the Monitor during that term [NMS C.J. ¶¶ 3-5 and Ex. D][DE 731-7].   Ocwen also agreed to maintain accurate records and timely update borrowers' account information to ensure accuracy and completeness as required by the Servicing Standards.[4]

In exchange, the Bureau and States agreed to release Ocwen for all claims for past misconduct, and agreed that Ocwen would not be subject to future administrative or judicial enforcement actions for conduct covered by the NMS Servicing Standards and occurring during the term of the Judgment, unless its loan service performance exceeded certain "Threshold Error Rates" and Metrics set by the NMS, and Ocwen failed to bring itself within the threshold after being afforded an opportunity to cure.

The Release executed by the Bureau pursuant to the NMS Consent Judgment provided in

---

[4] The Servicing Standards established by the NMS [DE 731-4] required routine independent third-party testing of Ocwen's system of record data ("SOR") for accuracy and completeness. *See* NMS C.J. Ex. A, Section I.B. 1 ["Servicer shall maintain procedures to ensure accuracy and timely updating of borrowers' account information, including posting of payments and imposition of fees.  Servicer shall also maintain  adequate documentation of borrower account information which may be in either electronic or paper format."] and Section I.B. 9 ["Servicer's system to (sic) record account information shall be periodically and independently reviewed for accuracy and completeness by an independent reviewer."].

The Servicing Standards also required Ocwen to provide accurate information to borrowers on monthly billing and other account statements  which clearly and conspicuously showed the  total amount due; allocation of payments; unpaid principal; fees and charges; current escrow balance and reasons for any payment changes (including interest rate or escrow account adjustments).  NMS C.J. Ex A. at I.B.5.  [DE 731-4, A-4 through A-5].

pertinent part:

    B.  Subject to the exceptions in Paragraph C (concerning excluded claims) below, the CFPB fully and finally releases the Released Parties from all potential liability that has been or might have been asserted by the CFPB relating to mortgage servicing practices described in the complaint (the "Mortgage Servicing Practices") that have taken place as of 11:59 p.m., Eastern Standard Time, on December 18, 2013.

    C.  Notwithstanding any other term of this Release, the CFPB specifically reserves and does not release any liability for conduct other than conduct related to the Mortgage Servicing Practices asserted or that might have been asserted in the complaint. Furthermore the CFPB specially reserves and does not release any liability arising under any provision of the Equal Credit Opportunity Act, the Home Mortgage Disclosure Act, or any other statute or law that prohibits discrimination of persons based on race, color, national origin, gender, disability or any other protected status.

       ….

    E.  Nothing in this Release shall limit the CFPB's authority with respect to the Released Parties, except to the extent the CFPB has herein expressly released claims.

[NMS C.J. at Ex. E.] [DE 731-8, p. 5]

      The Consent Judgment recited Ocwen's general ongoing obligation to adhere to the requirements of all applicable state and federal laws,[5] making it clear that the NMS and its incorporated Service Standards operated to supplement, not supplant, Owen's obligations under the law going forward.

      As a party to the NMS, the Bureau agreed to abide by its dispute resolution procedures for addressing noncompliance issues reported by the Monitor and agreed to the substantive and procedural limitations on enforcement which it prescribed.  Under the NMS, the Monitor had sole discretion to determine whether Ocwen followed the Servicing Standards[6] and Consumer Relief Requirements imposed by the Consent Judgment.   If the Monitor found a potential violation involving a failure rate

---

[5] The NMS C.J., at ¶17 recites, "Nothing in this Consent Judgment shall relieve Defendant of its obligation to comply with applicable state and federal law."

[6]The Servicing Standards, described at Ex. A to the NMS Consent Judgment [DE 731-4], consisted of over 300 detailed standards, with corresponding Metrics listed at Schedule D-1 *et seq.* for assessing Ocwen's compliance with those Standards.

that exceeded the prescribed threshold, Ocwen had the right to attempt a cure by proposing and successfully implementing a remedial plan approved by the Monitor.  If the potential violation was self-cured in this fashion, the NMS authorized no further remedy.  If Ocwen experienced a second error rate above the threshold during the cure, or was unable to cure the initial violation, the NMS  allowed the Bureau or States to then pursue an "enforcement action" in the District Court of the District of Colombia seeking equitable relief and  a civil penalty of up to $1 million for a first violation [NMS C.J. Ex. D-1, 2 ,3].

The Consent Judgment authorized the Servicer, Monitor or Monitoring Committee to petition the District Court for the District of Columbia for resolution of "any dispute concerning any issue arising under the Consent Judgment, including any dispute or disagreement related to … the exercise of discretion …..," [7] thus allowing for  judicial review of any perceived deficiencies in the exercise of discretion by the Monitor, or compliance by the Servicer, among other matters controlled by the Judgment.   The Judgment also authorized the parties to seek modification of its terms – without reference to Rule 60 standards - by joint motion.[8]

The Consent Judgment mandated that its incorporated Servicing Standards (Ex. A) and Consumer Relief Requirements (Ex. C) "shall be enforced in accordance with the authorities provided in the Enforcement Terms (Ex. D)." [NMS C.J., V. ¶ 6 and Ex. D]. [DE 731-3 p. 11].

---

[7] See NMS C.J. at V., ¶6 [DE 731-3] and Ex. D [DE 731-7], Section G., "Dispute Resolutions Procedures."

[8] *See* NMS C.J. at VII., ¶12 [DE 731-3, p. 12]:

> This Court retains jurisdiction for the duration of this Consent Judgment to enforce its terms.  The parties may jointly seek to modify the terms of this Consent Judgment subject to the approval of this Court.  This Consent Judgment may be modified only by order of this Court.

Failing an agreed upon modification as basis for a joint motion under this provision, any party to the NMS Judgment presumably remained free to seek modification unilaterally under any of the grounds provided under Rule 60.

The "Enforcement Terms" provided in pertinent part:

G. **Dispute Resolution Procedures**. Servicer, the Monitor and the Monitoring Committee will engage in good faith efforts to reach agreement on the proper resolution of any dispute concerning any issue arising under the Consent Judgment, including any dispute or disagreement related to the withholding of consent, the exercise of discretion, or the denial of any application. Subject to Section I, below, in the event that a dispute cannot be resolved, Servicer, the Monitor or the Monitoring Committee may petition the Court for resolution of the dispute. Where a provision of this agreement requires agreement, consent of or approval of any application or action by a Party or the Monitor, such agreement, consent or approval shall not be unreasonably withheld.

…

I. **Enforcement**

1. **Consent Judgment**. This Consent Judgment shall be filed in the U.S. District Court for the District of Columbia and shall be enforceable therein. Servicer and the Releasing Parties shall waive their rights to seek judicial review or otherwise challenge or contest in any court the validity or effectiveness of this Consent Judgment. Notwithstanding such waiver any State party may bring an action in that Party's state court to enforce the Judgment. Servicer and the Releasing Parties agree not to contest any jurisdictional facts, including the Court's authority to enter the Consent Judgment

2. **Enforcing Authorities**. Servicer's obligations under this Consent Judgment shall be enforceable in the U.S. District Court for the District of Columbia or in the state court of any State Party that brings an action to enforce the Judgment. An enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee. The Monitor Report(s) and Quarterly Report(s) shall not be admissible into evidence by a Party to this Consent Judgment, except in an action in the court or state court to enforce this Consent Judgment. ….

3. **Enforcement Action**. In the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation for which Servicer's time to cure has expired, the sole relief available in such an action will be:

   (a) **Equitable Relief.** An order directing non-monetary equitable relief, including injunctive relief, directing specific performance under the terms of this Consent Judgment, or other non-monetary corrective action.

   (b) **Civil Penalties**. The Court or state court may award as civil penalties an amount not more than $1 million per uncured Potential Violation, or in the event of a second uncured Potential Violation of Metrics 1.a., 1.b. or 2.a. (i.e. a Servicer fails the specific Metric in a Quarter, then fails to cure that Potential Violation, and then in subsequent Quarters fails the same Metric again in a Quarter and fails to cure that Potential Violation again in a subsequent Quarter), where the final uncured Potential Violation involves widespread noncompliance with that Metric, the Court or state court may award as civil penalties an amount not more than $5

million for the second uncured Potential Violation.

Nothing in this Section shall limit the availability of remedial compensation to harmed borrowers as provided in Section E. 5.

[DE 731-7].

The Consent Judgment became effective February 26, 2014 and remained in effect until February 26, 2017. The District Court for the District of Columbia retained exclusive jurisdiction over enforcement actions brought by non-State parties [NMS C.J. V., Ex. D at Section I. 2] and retained jurisdiction to enforce any outstanding violations identified in the Monitor's final Monitor Report that occurred but were not cured during the term of Judgment. [NMS C.J. ¶ 15].

The Bureau was familiar with and actively participated in monitoring Ocwen's servicing performance under the NMS Consent Judgment. As a member of the "Monitoring Committee" designated by the Judgment, the Bureau was also charged with an obligation to monitor Ocwen's compliance with its terms. [NMS C.J. V. ¶ 8] ["The Monitoring Committee shall serve as the representative of the Plaintiffs in the administration of all aspects of this Consent Judgment and the monitoring of compliance with it by the Defendant."]. And, since the Monitor was charged with an obligation to confer with the Monitoring Committee and Servicer before issuance of his quarterly compliance reports, the Bureau was consistently afforded an opportunity to participate actively in ongoing compliance issue discussions with fellow committee members and the Monitor. [NMS C.J. at Ex. D.4]

The Monitor reported that Ocwen almost always met the Servicing Standards during the three-year term of the Consent Judgment. In instances where it did not, Ocwen was generally able to cure the identified issue and come into compliance with the Servicing Standards established by the NMS. [Jenna Evans Affidavit, DE 731-12 at ¶¶ 10-11]. In the one instance where it was it unable to

accomplish a cure, involving a single metric in a single quarter,  the Monitoring Committee filed an unopposed motion to enforce the NMS Consent Judgment for a first violation in the District Court for the District of Columbia,  triggering recovery of  a $1 million civil penalty and  non-monetary equitable relief as prescribed by the Judgment. *Id*. [Case 13-2025, DE 45, 46 (D.D.C. Sept 6, 2017)].

    B. **The 2017 Florida Action**

    Two months after expiration of the term of the Consent Judgment, on April 20, 2017, the Bureau filed the instant lawsuit alleging that Ocwen violated the CFPA and other federal consumer financial laws[9] "in numerous instances since January 2014" as the result of alleged loan servicing failures impacting over two million loans.  In its now operative Amended Complaint, filed October 4, 2019 [DE 481], the Bureau claims Ocwen used inaccurate and incomplete loan data in the servicing of loans, the product of its inputting of inaccurate and incomplete account information obtained from other servicers without review and substantiation along with other deficiencies in the operation of its proprietary "system of record" ("SOR" ), all constituting "unfair deceptive acts and practices" in violation of the CFPA (Count 1);  made material misrepresentations to borrowers regarding loan terms and status (again allegedly due to its reliance on inaccurate loan data placed into its system of record without substantiation), constituting "unfair deceptive acts and practices" in violation of the CFPA (Count 2); made material misrepresentations to borrowers regarding foreclosures and committed other foreclosure-related misconduct, constituting unfair and deceptive acts and practices  in violation of the CFPA (Count 3); failed to provide accurate periodic billing statements to borrowers, constituting unfair

---

[9] Unlike the 2013 D.C. Complaint, where the Bureau asserted violations of Consumer Financial Protection Act of 2010 only (Counts 3, 4), in the 2017 Florida Complaint the Bureau alleged that the loan servicing misconduct giving rise to the CFPA violations also violated the Fair Debt Collection Practices Act, the Truth in Lending Act and Regulation Z, the Real Estate Settlement Procedures Act and Regulation X, and the Homeowners Protection Act of 1998.

deceptive acts and practices in violation of the CFPA, as well as violations of the Truth in Lending Act (TILA) and Regulation Z (Count 4); used inaccurate and incomplete loan data in servicing of loans, constituting violations of both the CFPA and the Fair Debt Collection Practices Act ("FDCPA") (Count 5); engaged in deceptive debt collection practices, through material misrepresentations made to borrowers, constituting violations of both the FDCPA and the CFPA (Count 6); failed to pay hazard insurance premiums in a timely manner on behalf of escrowed borrowers and other escrow-related misconduct in violation of the Real Estate Settlement Procedures Act ("RESPA") and Regulation X (Count 7); failed to maintain adequate servicing policies and procedures reasonably designed to ensure that it provided its personnel with access to the accurate loan information needed to service borrower accounts and respond to consumer complaints properly, constituting violations of the RESPA and Regulation X as well as the CFPA (Count 8); improperly initiated foreclosures when the borrower was on track towards a loan modification and other foreclosure-related misconduct in violation of the RESPA and Regulation X and the CFPA  (Count 9); and failed to terminate private mortgage insurance (PMI) automatically in connection with  residential mortgage transactions when required to do so (i.e. on the "termination date," the date on which the principal balance is scheduled to reach 78% of property's original value), constituting violations of the Homeowner Protection Act  ("HPA") as well as the CFPA  (Count 10).

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354 (11th Cir. 1999).  Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive

law] will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" in this sense only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations… admissions, interrogatory answers, or other materials…" Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the moving party and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1274 (11th Cir. 2008).

A party may seek summary judgment under Rule 56 on *res judicata* grounds by introducing sufficient information into the record for the court to judge the validity of the defense, including sufficient evidence of the precluding decision and other trial court records from the prior case. *North Georgia Electric Membership Corp. v. City of Calhoun, Ga.*, 989 F.2d 429 (11th Cir. 1993); *Jones v. Gann,* 703 F. 2d 513, 515 (11th Cir. 1983). The question of the application of *res judicata* to the facts, viewed in the light most favorable to the nonmoving party, is ultimately a pure question of law properly decided by the Court on a motion for summary judgment. *See Kizzire v. Baptist Health System, Inc.,* 441 F.3d 1306, 1308 (11th Cir. 2006); *Plotner v. AT & T Corp.*, 224 F.3d 1161 (10th Cir. 2000); *Israel Discount Bank, Ltd. v. Entin,* 951 F.2d 311, 314 (11th Cir. 1992).

## IV.   DISCUSSION

### A.   *Res Judicata*

The primary thrust of Ocwen's summary judgment motion poses a pure question of law, i.e.

whether the bulk of the Bureau's current claims are barred by the *res judicata* effect of the D.C. Consent

Judgment.[10]  Under *res judicata*, also known as "claim preclusion," a final judgment on the merits bars

the parties to a prior action from re-litigating claims that were raised, or could have been raised, in the

prior action.  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183 1187 (11th Cir. 2003); *In re Piper Aircraft*

*Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001); *Richardson v. Ala. State Bd. of Education,* 935 F.2d 1240,

1244 (1991).  The doctrine is designed to relieve parties of the cost of multiple lawsuits, conserve

judicial resources, promote comity between state and federal courts, and, by preventing inconsistent

decisions, encourage reliance on adjudications.  *See Kremer v. Chemical Construction Co*., 456 U.S.

461, 466 n. 6 (1982); *Nwosun v. General Mills Restaurants, Inc*., 124 F.3d 1255, 1258 (10th Cir. 1997).

In the Eleventh Circuit,[11] a defendant asserting *res judicata* must establish four  elements: (1)

---

[10]  In separate preclusion arguments, Ocwen contends that the Bureau's current claims are barred "as a matter of contract law" by the 2014 NMS Consent Judgment.  In this vein, it asserts that it would be inequitable to allow the Bureau to enjoy the benefits of the NMS agreement, under which Ocwen has fully performed, while side-stepping the substantive and procedural limitations on compliance monitoring and enforcement actions imposed by the NMS Consent Judgment.  It contends that the Bureau's current claims at Counts 1-9 are all grounded on servicing activity controlled by the Servicing Standards of the NMS; that these claims therefore could and should have been raised in the context of the dispute resolution procedures established in the first action by agreement of the parties; and that it would be unfair for the Bureau to now circumvent those procedures by bringing a direct judicial enforcement action in contravention of the limitations imposed under the NMS.

Alternatively, as to the prospective injunctive relief and monitoring period established under the Consent Judgment, Ocwen argues that the Bureau waived its right to pursue judicial enforcement actions seeking redress for alleged misconduct controlled by the alternative dispute resolution procedures of the NMS.  Ocwen contends those dispute resolution procedures controlled all compliance issues attending the Servicing Standards imposed by the NMS, and that the Bureau, by agreeing to those procedures, waived the right to pursue an independent judicial enforcement action seeking redress for alleged misconduct covered by the NMS Servicing Standards.

The Court views both of these arguments as variations on the theme that an identity of causes of action exists between the Bureau's current claims and those which were asserted or could have been asserted in the first action under the mandatory dispute resolution procedures governing NMS compliance monitoring.  As such, these arguments will be considered in the context of Ocwen's *res judicata* defense -- where the identity of claims factor conceptually rests – and not as separate preclusion defenses.

[11]  The preclusive effect of a federal-court judgment is determined by federal common law.  *Taylor v. Sturgell*, 553 U.S. 880, 891, 128 S. Ct. 2161, 171 L.Ed.2d 155 (2008); *CSX Transp., Inc. v. Brotherhood of Maintenance of Way Employees*, 327 F.3d 1309, 1316 (11th Cir. 2003); *J.Z.G. Resources, Inc. v. Shelby Ins. Co.,* 84 F.3d 211, 213-14 (6th Cir. 1996).

a prior decision rendered by a court of competent jurisdiction; (2) constituting a final judgment on the merits; (3) an identity of parties or their privies; and (4) an identity of causes of action. *In re Piper Aircraft,* 244 F.3d at 1296; *Davila*, 326 F.3d at 1187; *Richardson,* 935 F.2d at 1316.   It is the defendant's burden to show that the later-filed suit is barred. *In re Piper Aircraft*, 244 F.3d at 1296.

*Res judicata* traditionally precludes not only the specific claims and legal theories brought in a prior complaint, but any other claims that stem "out of the same nucleus of operative fact, or [are] based upon the same factual predicate." *Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1239 (11th Cir. 1999); *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1356-57 (11th Cir. 1998). Thus, in assessing whether an identity of claims exists, the Court appropriately considers a variety of factors, including whether the later claims involve the same statutes, evidence, events or occurrences, parties and witnesses. *Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1238 (11th Cir. 1999).[12]

As a basic tenet, "if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, the two cases are really the same 'claim' or cause of action' for purposes of *res judicata." Id.*   After comparing the relevant occurrences giving rise to each action, the Court must determine whether the plaintiff  "could, or rather should, have brought the second claim with the first lawsuit." *Trustmark Insurance Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002).  If the answer is yes, *res judicata* bars the second action.

Conversely, *res judicata* does not operate as a bar to a second action between the same parties or their privies when the second action is brought on a different cause of action for a new wrong.

---

[12] Other circuits employ similar tests for determining an identity of claims under traditional *res judicata* applications, focusing on whether substantially the same evidence is presented in the two actions; whether the two suits involve infringement of the same right; whether the two suits arise out of the same transactional nucleus of facts; whether the rights or interests established in the prior judgment would be destroyed or impaired by the prosecution of the second action. *See e.g. Nordhorn v. Ladish Co*., 9 F.3d 1402, 1405 (9th Cir. 1993).

*Herendeen v. Champion Intern. Corp.*, 525 F.2d 130, 133 (2nd Cir. 1975). However, new evidence of injury does not necessarily establish a new wrong, and allegations of a "continuing violation" arising out of the same occurrence or course of conduct do not necessarily avoid a *res judicata* bar. *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1326 (7th Cir. 1992) (environmental claims for ongoing pollution from closed waste dump held precluded because existence of ongoing releases was known at time of initial suit); *Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewerage District,* 382 F.3d 743, 758 (7th Cir. 2000) (post-settlement claims of harm shared identity with those covered by settlement because settlement "was intended to address the underlying cause of the continuing violations").

There is no dispute as to the existence of first three elements in this case. The District Court which entered the D.C. Consent Judgment had proper jurisdiction based on federal subject matter jurisdiction, and the Consent Judgment which it entered constituted a final judgment on the merits: The parties reached a settlement agreement (NMS), and the District Court entered a Consent Judgment which incorporated that agreement into a final judgment. Even though premised on an agreement of the parties, a consent decree is considered a former adjudication on the merits which is entitled to *res judicata* effect. *Paradise v. Prescott*, 767 F.2d 1514, 1525 (11th Cir. 1985), *aff'd*, 40 U.S. 149 (1987); *Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1238 (11th Cir 1999); *Citibank, N.A. v. Data Lease Financial Corp.,* 904 F.2d 1498, 1501-02 (11th Cir. 1990); *Arrieta-Gimenez v. Arrieta-Negron*, 551 So.2d 1184 (Fla. 1989); *Evans v. Deutsche Bank Nat'l Trust Co*., 2015 WL 12746108, at *1 (S.D. Fla. 2015). The Bureau does not contend otherwise. There is also an identity of parties: The Bureau was a party to the D.C. Action, and the current Ocwen Defendants or their privies were parties to the D.C. Action.

Thus, the only disputed question is whether the two suits involve the same causes of action.

On this issue, the Bureau recognizes that Ocwen has shown "facial overlap" between the text of the Bureau's current claims and the Servicing Standards imposed under the NMS Consent Judgment over Ocwen's servicing performance during the three-year term of the Consent Judgment (February 26, 2014 through February 26, 2017) [DE 740 at p. 6]. However, the Bureau argues that the first and the second actions are different in two primary respects: First, it contends that its current action is different because it focuses primarily on defects in Ocwen's "system of record," including its collection and input of inaccurate and incomplete loan data from prior loan servicers into its record without proper review and verification, as well as other systemic failures impairing the reliability of the information generated by that system, while the first action did not test or challenge the accuracy of the underlying loan data but instead focused on Ocwen's alleged misuse of that data.

Second, the Bureau argues that the "Metrics" used by the Monitor to test Ocwen's compliance with the NMS Servicing Standards during the term of the Consent Judgment do not precisely cover the claims which it asserts in the second action. As evidence of this incongruity, it notes that the Monitor never identified the servicing misconduct alleged in its current complaint in his quarterly monitor reports. In other words, the Bureau contends that its current claims require assessment under different metrics than those prescribed by the NMS, and for that reason could not have been resolved under the dispute resolution procedures prescribed by NMS.

1. **System of Record (SOR) Failures**

As to alleged deficiencies in Ocwen's System of Record (SOR), the purported "new wrongs" underpinning the Bureau's Florida action, the Bureau notes that the Monitor acknowledged that the

NMS Metrics which he used to gauge Ocwen's performance under the NMS Servicing Standards assumed that the underlying SOR data was correct.  It also notes that the Monitor disclaimed any duty on his part to review that data for accuracy.

However, the Monitor also recognized that "[t]he [NMS] Settlement requires that an independent third party periodically review those parts of the SOR that pertain to account information for accuracy and completeness." [Monitor's Report for Periods Ending September 30, 2016, December 31, 2016 and March 31, 2017] [DE 731-24, p. 7].  *See also* NMS C.J. and Ex A, ¶I. B. 9.  He also reported in December 2014 that "Servicer [Ocwen] has provided for my review its two most recent independent service auditor's reports of its system of record and will provide future independent service auditor's reports of its system of record until the Judgment sunsets." [DE 754-2, p. 20] [Monitor's Interim Report Regarding Compliance by Ocwen Loan Servicing LLC, filed in *United States v. Bank of America*, Case No. 12-0361 (RMC) (D. D. C. Dec 16, 2014), and that  he "also charged McGladrey (independent auditor) with additional supplemental work  … to assess the reliability of [Ocwen's] systems of record." [DE 754-4, p. 17].

Thus, the Bureau's current allegations regarding SOR deficiencies plainly derive from the same nucleus of operative fact underpinning the D.C. Action, and it is apparent that SOR accuracy issues were specifically addressed in the NMS Servicing Standards and were part of the servicing activity routinely reviewed by the NMS Monitor.   Given this overlap, the Bureau's newly asserted statutory violations based on alleged SOR defects do not establish a "new wrong," and are barred by traditional *res judicata* applications.  *See e.g. Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewerage Dist.*, 382 F.3d 743 (7th Cir. 2004) (ongoing or continuing violations of  Clean Water Act did not constitute separate and distinct cause of action, for *res judicata* purposes, since

violations were related in origin and had same factual basis as pre-stipulation violations and stipulation was intended to address underlying causes of continuing violations by implementing remedial measures over time); *Jet, Inc. v. Sewage Aeration Systems*, 223 F.3d 1360, 1362 (Fed. Cir. 2000).

   2.   **Gap in NMS Metrics**

While the Bureau would not be precluded from alleging a new set of statutory violations based on loan servicing activities separate and apart from the services monitored under the terms of the Consent Judgment, the claims asserted here do not fall in that category.  Instead, the new set of alleged statutory violations are based on the same loan servicing activities as those which gave rise to DC Action and which were monitored under the NMS Consent Judgment.    Indeed, the Bureau does not dispute that the subject matter of the NMS Servicing Standards overlaps with the loan servicing activity and misconduct alleged in its Florida Complaint.

   The Bureau nevertheless contends that its current claims of loan servicing misconduct implicate new wrongs which were not the subject of compliance monitoring under the NMS Consent Judgment, and which could not have been brought under the NMS dispute resolution procedures.  It thus maintains that its current claims are distinct from those brought in the first action, and do not impair any rights or interests create by the Consent Judgment.  As support for its contention that there is no identity of claims, the Bureau points out that the loan servicing misconduct  alleged in its current action was never reported by  Monitor in the quarterly reports  generated during the term of the Consent Judgment.  It also takes the position that the NMS Metrics were not adequate to test for the categories of servicing misconduct alleged in its current action, suggesting that this gap further evinces the existence of a new wrongs arising from a new factual predicate.

In response, Ocwen argues that the existing NMS Metrics *are* adequate to test the categories of servicing misconduct alleged in the Bureau's current complaint for compliance with Servicing Standards. Alternatively, it argues that to the extent new metrics are needed for this purpose, the NMS authorized the Monitor to develop and implement additional metrics as needed when presented with evidence of any material departure from the Servicing Standards. The Court finds the latter proposition to be unsupported by the record.[13] It finds it unnecessary to address the former because, regardless of the extent of Metric overlap, the first and second actions derive from the same set of transactional facts which, under traditional *res judicata* applications, triggers claim preclusion.

That the NMS Metrics originally agreed upon as a tool for testing Ocwen's compliance with the Servicing Standards may have proven insufficient to accomplish that task, as to the statutory violations alleged in the second suit, does not defeat an overlap of claims or causes of action – as seemingly advanced by the Bureau. It simply points to a limitation in the negotiated settlement between

---

[13] In support of this argument, Ocwen cites to Section C. ¶¶ 22-23 of the "Enforcement Terms" of the Consent Judgment [NMS C.J. at Ex. D], contending this provision allowed the Monitor to add an additional Metric and associated Threshold Error Rate upon receipt of any information suggesting Owen's violation of any "material term of the Servicing Standards." DE 753-pp. 10-11

This contention finds no support, however, in the text of the Enforcement Terms from which it is extrapolated. The provision relating to the addition of new metrics, found under "Monitors' Powers" of the Enforcement Terms, refers to noncompliance with Servicing Standards *in the specific context of foreclosure-related properties*, as the first sentence of the cited paragraph makes clear:

> If the Monitor becomes aware of facts or information that lead the Monitor to reasonably conclude that Servicer may be engaged in a pattern of *noncompliance of a material term of the Servicing Standard that is reasonably likely to cause harm to borrowers or tenants residing in foreclosure properties*, the Monitor shall engage Servicer in a review of determine if the facts are accurate or the information is correct. If after that review, the Monitor reasonably concludes that such a pattern exists and is reasonably likely to cause material harm to *borrowers or tenants residing in foreclosure properties*, the Monitor may propose an additional Metric and associated threshold Error Rate *relating to Servicer's compliance with the associated term or requirement*.

[NMS C.J. at Ex. D, D-7, C.22] [DE 731-7, pp. 9-10] (emphasis supplied). Section C.23, in turn, provides for judicial review of any additional metrics proposed by the Monitor under C.22 in the event the Servicer does not agree with additional metrics so proposed. In short, the NMS Consent Judgment did not create an open-ended authority for the Monitor to develop new Metrics to assess Ocwen's violation of *any* material term of the Servicing Standards, contrary to the position here advanced by Ocwen.

the parties.   Having agreed to test compliance with the Servicing Standards under Metrics agreed upon

under the Consent Judgment, the Bureau cannot now claim that testing Ocwen's compliance with those

standards under any other set of metrics somehow implicates the existence of a new wrong not covered

by the NMS.   Furthermore, to the extent the Bureau perceived that the NMS Metrics had proven

inadequate to test compliance with the Servicing Standards, it could and should have petitioned the

District Court in the District of Columbia for review of the matter, pursuant to its reserved jurisdiction

to resolve "any disputes concerning any issue arising under the Consent Judgment" that the parties

were  unable, in good faith, to resolve by agreement amongst themselves.

### 3.   **Identity of Causes of Action**

After a careful review of the record in this case, the Court concludes that the Bureau's attempts

to distinguish this case from the D.C. action are artificial and do not avoid the preclusive effect of the

Consent Judgment entered in the D.C. action. The Bureau's claims at Counts 1-9 are the substantially

the same as those covered by the NMS Consent Judgment.  They stem from the same wrong -- Ocwen's

use of incomplete and inaccurate loan account data in the servicing of residential mortgage loans which

it acquired from other servicers. While the Consent Judgment was signed in December 2013 and

provided monetary compensation to borrowers for servicing violations occurring prior to that time, it

also required prospective monitoring of Ocwen's servicing performance from February 26, 2014 to

February 26, 2017 under detailed Servicing Standards designed to prevent the same genre of loan

servicing misconduct as that charged by the Bureau in its current suit.

In its Florida Complaint,  the Bureau alleges that "in numerous instances" since January 2014,

Ocwen  violated  the CFPA and other  consumer financial laws as a result of its reliance on  inaccurate

and incomplete loan data, collected from prior servicers without proper review and substantiation, in

its account servicing and in its communications with borrowers.  At Counts 1 through 9, the Bureau essentially realleges the same misconduct as that alleged in the D.C. Action, only this time it asserts that the misconduct gave rise not only to CFPA violations (Counts 1-6, 8, 9) but also to violations of the TILA and Regulation Z (Count 4),  the FDCPA (Counts 5, 6 ), and the RESPA and  Regulation X (Counts 7-9).

As to alleged loan servicing misconduct occurring *before* February 26, 2017 (the expiration of the three-year term of Consent Judgment), the Bureau does not identify new matters that were not or *could not have been* subjected to the dispute resolution procedures and enforcement mechanism prescribed by the Judgment, or to judicial review procedures governing enforcement of the terms of the Judgment. The 2014 NMS Consent Judgment included a three-year term of monitoring compliance going forward, as part of the injunctive relief awarded, and tested Ocwen's compliance with NMS Servicing Standards over that term, subject to the exclusive dispute resolution procedures and enforcement mechanisms prescribed by the Judgment.  That the NMS Metrics may have proven inadequate to test compliance with overlapping consumer protections imposed under the TILA, RESPA, and FDCPA, does not defeat an identity of causes of action under traditional *res judicata* applications.

As to Bureau's further argument it could not have pursued redress in the first action for violations of regulations which did not take effect until January 2014, the Court is not persuaded that the overlapping consumer protections relayed under these regulations support a showing of a "new wrong" arising from servicing conduct separate and apart from that monitored by the NMS Consent Judgment.

4.   **Contract Defense**

As an alternative and independent basis for avoiding the asserted *res judicata* bar, the Bureau raises a contractual defense – arguing simply that the language of the NMS Consent Judgment allows it to bring this suit.  On this point, it correctly notes that the Release it executed pursuant to the Consent Judgment released liability only for violations up through the date of execution of the NMS (i.e. December 2013), and at the same time specifically reserved the Bureau's enforcement authority against Ocwen going forward.

However, this contractual reservation does not operate as an exception to the principle of *res judicata*. There is no language in the Release supporting the ability of the Bureau to bring suit for wrongs covered by the Consent Judgment – which includes wrongs arising during the three-year term of Judgment which are  covered by the NMS Servicing Standards and therefore necessarily subject to the Enforcement Terms of the Judgment.   The preclusive effect of the 2014 NMS Consent Judgment, as to any such wrong, does not negate the Bureau's enforcement authority, it simply limits it to the boundaries to which the Bureau itself agreed in the prior action.

5.   **Prospective Injunctive Relief**

Finally, the Bureau contends as a general proposition that *res judicata* does not operate to preclude claims for new wrongs arising out of activity covered by prospective injunctive relief granted in a prior lawsuit.   As support for this premise, it cites *Lawlor v. Nat'l Screen Services*, 349 U.S. 322, 75 S. Ct. 875, 99 L.Ed. 1122 (1955) and *Norfolk Southern Corp. v. Chevron*, 371 F.3d 1285 (11th Cir. 2004).

Both *Lawlor* and *Norfolk* are distinguishable from the present case.  As a threshold matter, neither case involved the imposition of alternative dispute resolution procedures as part of the prospective

injunctive relief awarded in the first action (placing both substantive and procedural limitations on any future enforcement activity), as is present in the current case.

In *Lawlor*, the Supreme Court examined the asserted *res judicata* impact of a prior judgment of dismissal with prejudice, based on a settlement, in a civil suit involving violations of federal anti-trust laws.  The Court noted that the injunctive relief requested in the first suit – if granted – would have prevented the violations complained of in the second suit.   However, injunctive relief was not granted in the first suit.   Under those facts, the Court found  no *res judicata* bar to the plaintiffs' pursuit of a second suit based on the same course of wrongful conduct, but alleging new antitrust violations occurring after the entry of the first judgment. In reaching this result, it rejected the defendants' contention that the plaintiffs' failure in the first suit to press their demand for injunctive relief should preclude the new claims, commenting that such a result "would in effect confer on [defendants] a partial immunity from civil liability for future violations."  *Lawlor*, 349 U.S. at 329.

Unlike in *Lawlor,* in this case the Bureau *did* successfully press its demand for injunctive relief in the first action, resulting in entry of a Consent Judgment  which imposed a detailed schematic of injunctive relief, inclusive of narrowly tailored substantive and procedural limitations on enforcement terms governing future violations of the granted injunctive relief.   The preclusion of these newly alleged claims, arising from alleged misconduct falling within that schematic, would not result in a grant of immunity to Ocwen for future violations of consumer protection laws.  It simply results in imposition of agreed-upon substantive and procedural limitations on the extent of Ocwen's liability for future violations.

In  *Norfolk Southern*, the Eleventh Circuit  held, in the context of a stipulated voluntary dismissal with prejudice under Fed. R Civ. P. 41, that "a somewhat modified form of *res judicata* applies to the

written settlement agreement upon which such dismissal is predicated, if one exists." 371 F.3d at 1291.

Under this modified *res judicata* approach, whether a claim is precluded from future litigation is

determined by looking at the terms of the settlement agreement itself (as interpreted under traditional

principles of contract law), instead of by reference to the claims pled in the original complaint. *Id.* at

1289. Thus, in *Norfolk Southern*, the Eleventh Circuit held that the focus, in determining the *res*

*judicata* effect of a prior order of dismissal based on stipulated settlement, is on parties' intent as it is

reflected in the terms of the settlement agreement itself. *Id.*

Unlike in *Norfolk*, this Court is not tasked with interpreting the *res judicata* effect of a prior Rule

41 dismissal based on a stipulated settlement. Rather, the Court's *res judicata* ruling here is based on

the preclusive impact of a prior final consent judgment, incorporating a stipulated settlement

agreement, which was entered by a sister federal district court. Further, the prior judgment at issue

here included, per the parties' agreement, the mandatory imposition of alternative dispute resolution

procedures and an enforcement schematic governing any future instances of noncompliance with the

prospective injunctive relief. For these reasons, *Norfolk Southern* is inapposite.

Moreover, even assuming a modified *res judicata* analysis similar to that outlined in *Norfolk*

*Southern* is appropriate here, the Bureau's current claims (to extent they are based on servicing conduct

occurring prior to February 26, 2017) would still be precluded. Based on the express terms of the

NMS, the parties intended and agreed that only departures from the Servicing Standards which

exceeded the minimal Threshold Error Rates prescribed by the NMS would be actionable, and even

then, would be actionable only within the narrow confines of the Enforcement Terms prescribed by the

NMS Consent Judgment. This intent is plainly discernible from the face of the NMS.

Contrary to that intent, the Bureau now seeks redress for departures from the Servicing

Standards occurring during the term of the Consent Judgment, without regard to the Threshold Error Rates, contending that these departures violated multiple consumer financial laws beyond those which it alleged in the first action.

Because the NMS already established the means by which Ocwen's noncompliance with federal law would be measured and redressed during the term of Consent Judgment, *as to matters controlled by the Servicing Standards*, and because the Bureau's current claims at Counts 1-9 are concededly matters covered by the Servicing Standards, the Bureau's new claims are precluded, even under the application of the *Norfolk Southern* modified version of *res judicata*.

The Bureau's claims against Ocwen in this case also include the assertion of statutory rights under the CFPA that could have been and were originally brought in the first lawsuit.[14] Its attempt to assert new statutory violations (TILA, FDCPA and RESPA) arising out of alleged servicing misconduct occurring during the term of the Judgment which is also covered by the Servicing Standards is barred by *res judicata*.

6. **Conclusion**

   a. **Claims Based on Conduct Pre-Dating February 26, 2017**

Traditional principles of *res judicata* preclusion do allow additional litigation if some new wrong occurs after the first action is filed, *see Supporters to Oppose Pollution, Inc. v. Heritage Group*,

---

[14] To extent the Bureau claims it also seeks to enforce regulations taking effect after the NMS was executed, pursuant to its general enforcement authority, as to conduct controlled by the Servicing Standards, and felt the NMS was an inadequate vehicle by which to exercise that authority, it had the option of seeking a joint modification of the terms of Consent Judgment, to expand the Metrics needed to gauge compliance with new regulations, or of petitioning the D.C. Court for resolution of any dispute arising between the parties respecting Ocwen's general obligation to comply with all applicable federal and state laws going forward, an obligation recognized under the Consent Judgment and enforceable by its terms.

973 F.3d 1320, 1326 (7th Cir. 1992); *Pleming,* 142 F.3d at 1357, but the Bureau has not alleged new wrongs here.  The claims it asserts at Counts 1-9 of its Amended Complaint are based on the same underlying conduct as that giving rise to the first action and are asserted in the nature of continuing violations or wrongs.

Because its current claims at Counts 1-9 are based on activity covered by the Servicing Standards used to monitor Ocwen's performance during the three-year term of the Judgment, these claims are barred by *res judicata*. That the Bureau now better understands the cause and ramifications of the servicing misconduct alleged in the D. C. Action and wishes to cast a wider statutory net over it does not avoid a *res judicata* bar.  *See  e.g. Northern California  River Watch v. Humboldt Petroleum, Inc*., 162 Fed. Appx 760 (9th Cir. 2006) (unpub) (citing *Friends of Milwaukee's Rivers*, 382 F.3d at 758 (continuing violations from same underlying problem did not constitute separate and distinct causes of action from those identified in previous settlement that attempted to remedy underlying problem); *Sierra Club v. Two Elk Generation Partners, Ltd*.,  646 F.3d 1258, 1270 (10th Cir. 2011); *Deville v. Specialized Loan Servicing LLC,* 2020 WL 7861974 (C.D. Cal. 2020); *Levin v. County of Westchester,* 2017 WL 3309757 (S.D.N.Y. 2017) (consent decree providing means to seek court intervention in event of continuing violation or failure to comply with consent decree  precluded subsequent  putative class action alleging violations of Safe Drinking Water Act ).  *See also Anderson v. Vanguard Car Rental USA Inc.,* 427 Fed. Appx. 861, 2011 WL 2149486, at *2 (11th Cir. 2011) (citation of two different statutes as the bases for two suits did not prelude operation of *res judicata* bar on second suit arising from the same "nucleus of operative facts").

### b.   Claims Based on Conduct Post-Dating February 26, 2017

To the extent the Bureau's new claims are based on service activity occurring after the

expiration of the term of the 2014 Consent Judgment (Feb 26, 2017), *res judicata* is not a bar.  In its Amended Complaint, the Bureau simply asserts that each set of new statutory violations alleged is premised on loan servicing activity performed by Ocwen "in numerous instances since January 2014." It has since maintained that the relevant time period for its current claims is "January 1, 2014 to the present." [DE 728 p. 3, n. 7].  Whether the Bureau intends to include activity post-dating the expiration of term of Consent Judgment in its current claims is not clear.   Ocwen does not address this temporal dichotomy in the presentation of its *res judicata* defense, and it is not possible to resolve it on the face of the Bureau's pleadings or current summary judgment record.

For this reason, the Court will reserve ruling on the alternative grounds advanced by Owen in support of motion for summary judgment, as to claims arising from servicing activity conducted after February 26, 2017, pending submission of a supplemental position statement from the Bureau on this point as herein directed by the Court .

### B.  **Count 10:  PMI Irregularities**

Ocwen has not asserted a res *judicata* defense as to Count 10**.**   As to this Count, it contends the Bureau's failure to adduce evidence establishing each element of the claimed PMI violations warrants the entry of summary judgment in its favor.   The Bureau, in turn, has moved for summary judgment on liability on this Count.  The Bureau relies upon the deposition testimony of Ocwen's Rule 30(b)(6) witness, Andrew Scott Combs, Vice-President of Servicing Operations for Ocwen  Financial [DE 729-38, pp. 197-199], which explained the contents of a spreadsheet of loans  produced by Ocwen involving the cancellation of PMI [DE 729-127].  The Bureau contends this testimony establishes that subsequent to January 2014, with regard to 7,771 residential mortgage loans, the PMI was not cancelled timely on the scheduled termination dates.

28

At Count 10, the Bureau alleges that Ocwen violated Homeowners Protection Act, 12 U.S.C. § 4902(b) in each of these cases based on its failure to terminate timely PMI for borrowers who were current on their mortgages in "residential mortgage transactions," i.e. mortgages involving single family homes operating as the principal residence of the borrower. *See* 12 U.S.C. §§ 4902(b)(1) and (15). The parties dispute whether the spreadsheet produced in discovery, in conjunction with the deposition testimony of Mr. Combs, forecloses any dispute on whether the statutory prequalifying conditions for PMI cancellation were met as to each loan.

Ocwen contends that Combs testimony made clear that the "effective cancellation date" noted on the chart meant simply the date on which the transaction was recorded in Ocwen's records as cancelled, and did not necessarily correspond to the date on which cancellation actually occurred. Further, Ocwen adduces proof of at least one delinquent loan appearing on this list.   The Bureau contends that Combs' testimony regarding "effective cancellation" dates is speculative, and that one instance of a disqualifying loan cannot be extrapolated to infer the existence of other loans in default.

Following careful review of the Bureau's evidence on this Claim [DE 729-55, 729-127, 729-38 and 729-52], the Court finds that the summary judgment record raises a genuine issue of fact on whether the prequalifying conditions for PMI cancellation were met for each loan identified on the PMI cancellation spreadsheet [DE 729-127].   Therefore, as to this Count, the Bureau's motion for summary judgment, and Ocwen's motion for summary judgment are both denied.

## V.      CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED:**

1.  The Ocwen Defendants' motion for summary judgment, as to the claims asserted in Counts 1-

9 of the Bureau's Amended Complaint **[DE 730]** is **GRANTED IN PART AND DENIED IN PART** as follows**:**

(a) To the extent the Bureau's claims are based on alleged servicing misconduct which occurred before expiration of the NMS Consent Judgment (2/26/17), Ocwen's motion is **GRANTED** based on *res judicata*.

(b) To the  extent the Bureau's claims are based on alleged servicing misconduct which occurred after expiration of the NMS Consent Judgment (2/26/17), ruling on the remaining grounds advanced in support of  Ocwen's motion for summary judgment is **RESERVED** pending the Bureau's submission of a supplemental position statement.  Ruling on the Bureau's motion for partial summary judgment, as to this category of conduct, is also reserved pending submission of its supplemental position statement.

2.  As to Counts 1-9, the Bureau is directed to submit, within **FIFTEEN DAYS** from entry of this Order, a supplemental position statement indicating whether it intends to pursue claims for any alleged statutory violations arising out of loan servicing activity occurring *after* February 26, 2017.

To the extent the Bureau does intend to press any claims falling into this category, it shall provide a list of the relevant Counts it intends to pursue, under this timeline, with a corresponding index of specific citations to the summary judgment record where supporting evidentiary matter on each Count may be located.  [**<u>Note:</u>** *In this regard, evidentiary citations shall be made to specific locations in the summary judgment record where the supporting material may be found with a brief description of the subject matter of the material.  Citations*

*shall not be made to evidentiary synapses or summaries contained in either parties' statement of facts*].   No additional submissions shall be permitted unless specifically directed by the Court.

3.   Ocwen's motion for summary judgment as to Count 10 of the Amended Complaint, and the Bureau's motion for partial summary judgment as to Count 10 of the Amended Complaint **[DE 728]** are **DENIED**.

4.   A partial final summary judgment in favor of Ocwen shall be entered accordingly by separate order of the Court pursuant to Rule 58.

   **DONE** and **SIGNED** in Chambers at West Palm Beach, Florida this 4th day of March, 2021.

                                        KENNETH A. MARRA
                                        United States District Judge

cc.  all counsel