United States District Court<br>
Southern District of Florida   (West Palm Beach)

RE: JANICE WOLK GRENADIER (JWG)[1]       CASE #: 9:17-cv-80495-KAM
          Pro Se  Intervener

Consumer Financial Protection Bureau

Vs.

OCWEN Financial Corporation, Inc
     OCWEN Loan Servicing L.L.C.
     OCWEN Mortgage Servicing Inc.
     PHH Mortgage Corporation



FILED BY ___cos___ D.C.
JUN 24 2022
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

**INTERVENER JANICE WOLK GRENADIER HAS NEW EVIDENCE TO BE ADDED TO HER:**

**RESPONSE TO MOTION DATED JUNE 2, 2022**
**JOINT RECOMMENDATION PLAN FOR GOING FORWARD**
**INTERVENER'S NOTICE TO NEGOTIATIONS AS TO NEW EVIDENCE AND DEMAND**

**CRIMINAL INVESTIGATION INTO INSIDER TRADING**
Attached Complaints Filed with SCC and Ignored Exhibit 1
Insider Trading: ***Bought* 4,106,171** *stocks for* **$12,114,662** = *SOLD FOR* **$317,056,930**

***PROFIT:***    **$304,942,268**  on Insider Trading
                              **Ignored by SEC & ALL COURTS/JUDGES**

**Law Firms Profits[2] OCWEN/PHH et al in the BILLIONS**
**TO COVER-UP ENTERPRISE / SCHEME**

| 28 | Goodwin Procter | $1,330,176,000 | 1,091 | $1,219,000 | $2,463,000 | United States |
|----|-----------------|----------------|-------|------------|------------|---------------|
| 19 | Greenberg Traurig | $1,641,790,000 | 2,070 | $793,000 | $1,750,000 | United States |

Other Lawyers in this CLUB:  Troutman Pepper Hamilton Sanders, McQuireWoods, McCabe Weisberg
           Conway, BWW LAW Group, Brock & Scott

**THE UNITED STATES SENATE IS REVISITING  THE ILLEGAL ACTION OF**
**ROBO SIGNING starting with**
**JAMES DIMON Chairman and Chief Executive Officer JP MORGAN CHASE & Co.**

---

[1] JWG is Pro Se and doe not have teh electronic means for submitting this Response
[2] https://amlegalnews.blogspot.com/2022/04/money-money-money-buys-justice.html

Comes Now Intervener Janice Wolk Grenadier adds additional Exhibits and Information

Exhibit 1 to this Letter from Senators:

>   Sherrod Brown
>   Robert Menendez
>   Tina Smith
>   Exizabeth Warren
>   Chris Van Hollen
>   Raphael Warnock

FINALLY responding to the publics concerns about the Robo-Signing et al that OCWEN never stopped which all documents that JWG have been Robo-Signed by OCWEN.   JWG is reaching out to each Senator with her information that shows a bigger fraud of selling Mortgages after foreclosure to other Servicers et al as in Orginial Intervene and Respons filed on or around June 20, 2022..

Exhibit 2

JP Morgan Chaes's Rap Sheet -  which shows a pattern and practice of Fraud - No different than OCWEN / PHH

Exhibit 3

Article from Fraudsters:  Notary sentenced to 14 years and further states:

> "[Siders] abused her position as an escrow officer and as a notary public to make this criminal enterprise succeed," said Talbert. "The sentence imposed is a significant reminder that those who engage in such conduct will be held accountable."
>
> "Anyone [who] profits from fraudulent mortgage transactions—whether by creating the scheme or facilitating it—will not escape justice," said Supervisory Special Agent Dan Bryant at the FBI Sacramento field office. "The FBI aggressively pursues those involved in such large-scale, complex financial fraud matters to seek justice for the victims and protect the regional economy."

Which we can now see with my case - that the FBI and Government is not doing their jobs -

WHEREFORE, JWG requests that this Court:

1. Return of 15 W. Spring St., Alexandria, VA 22301 to Janice Wolk Grenadier at 15 West Spring Street, Alexandria Virginia 22301 and any other relief this courts fills acceptable
2. Criminal Investigation into the: CFPB, SEC, FTC, and or DOJ and FBI investigation of criminal acts involving defendants in this matter or further order of the Court,

2

3. Award JWG compensatory, punitive, xplorie damages against defendants jointly of $39 million dollars to send a strong message of deterrence for this type of attorney / trustee / banks / servicers behavior.
4. Award JWG reasonable attorney fees and costs if an attorney is appointed by the court or will take case on contingency.
5. Grant to JWG such other and further relief as The Honorable Court may find just and proper under the circumstances, including but not limited to appropriate injunctive relief

DATE: June 22, 2022

Respectfully Submitted,

_____
Janice Wolk Grenadier
15 W. Spring Street
Alexandria, Virginia 22301
202-368-7178
jwgrenadier@gmail.com

CERTIFICATION: *I declare under penalty and perjury: That No attorney has prepared or assisted in the preparation of this document. Janice Wolk Grenadier - Name of Pro Se Party.*

_____
*Janice Wolk Grenadier,*
June 22, 2022

### Certificate of Service

I certify that on or around June 22, 2022 a copy of this was emailed, or hand delivered or sent through the USPS is placed in a postage-paid envelope addressed to the USDC Florida
  Paul G. Rogers Federal Building and U.S. Courthouse
  701 Clematis Street, Room 202
  West Palm Beach, FL 33401
  (561) 803-3400

  defendant's attorney, at the address stated below:

**Consumer Financial Protection Bureau:** Represented by: Jean Marie Heale
  Email: jean.healey@cfpb.gov                    Atur Ravi Desai    Email: atur.desai@cfpb.gov
  Adam Harris Cohen    Email:                    Erin Mary Kelly    Email: erin.kelly@cfpb.gov
  adam.cohen@cfpb.gov                            Gregory Ryan Nodler   Email:
  Amanda Christine Roberson Email:               Greg.Nodler@CFPB.gov
  amanda.roberson@cfpb.gov

3

Jack Douglas Wilson   Email: doug.wilson@cfpb.gov
James Joseph Savage   Email: james.savage@cfpb.gov
Jan Edwards Singelmann   Email: jan.singelmann@cfpb.gov
Lawrence DeMille-Wagman   Email: lawrence.wagman@cfpb.gov

Michael Posner  Email: michael.posner@cfpb.gov
Shirley T. Chiu   Email: shirley.chiu@cfpb.gov
Stephanie C. Brenowitz  Email: stephanie.brenowitz@cfpb.gov
Tianna Elise Baez  Email: tianna.baez@cfpb.gov

**Consol Plaintiff:  Office of the Attorney General  State of Florida, Department of Legal Affairs**
Blaine H Winship   Email: Blaine.winship@myfloridalegal.com
Jennifer Hayes Pinder  Email: jennifer.pinder@myfloridalegal.com
Sasha Funk Granai  Email:Sasha.Granai@myfloridalegal.com

Scott Ray Fransen   Email: scott.fransen@flofr.com
**Catalina E Azuero**  Email: CAzuero@goodwinlaw.com

**Consol Plaintiff:   Office of Financial Regulation  State of Florida, Division of Consumer Finance**
Jennifer Hayes Pinder,  Sasha Funk Granai,  Scott Ray Fransen,  Catalina E Azuero   (See above for address)
Joaquin Alvarez  Email: joaquin.alvarez@flofr.com

**Intervenor Plaintiff:**  Robynne Fauley  09/2018,  12125 SE Laughing Water,  Sandy, OR  97055 - PRO SE
**Intervenor Plaintiff:**  Denise Subramaniam 9/20/18,  13865 SW Walker Road,  Beaverton, OR  97005 - PRO SE

**DEFENDANTS:**   OCWEN Financial Corporation (a Florida corporation),  OCWEN Loan Servicing, LLC ( a Delaware Limited Liability Company),  OCWEN Mortgage Servicing Inc.  ( a U.S. Virgin Islands Corporation)

Bridget Ann Berry  Email: BerryB@gtlaw.com
Matthew P. Previn   Email: mprevin@buckleysandler.com
Sabrina M. Rose-Smith   Email: srosesmith@goodwinlaw.com
Thomas M. Hefferon   Email: thefferon@goodwinlaw.com
Amanda B. Protess   Email: AProtess@goodwinlaw.com
Andrew Stuart Wein   Email: weina@gtlaw.com
**Catalina E Azuero**  Email: CAzuero@goodwinlaw.com

Laura S. Craven  Email: LCraven@goodwinlaw.com
Laura Stoll  Email: lstoll@goodwinlaw.com
Matthew L. Riffee   Email: MRiffee@goodwinlaw.com
Matthew S. Sheldon   Email: msheldon@goodwinlaw.com
Tierney E. Smith   Email: TierneySmith@goodwinlaw.com
W. Kyle Tayman   Email: KTayman@goodwinlaw.com

4

**PHH Mortgage Corporation**
Andrew Stuart Wein, Bridget Ann Berry, Catalina E Azuero, (See above for address)

June 22, 2022

_____
Janice Wolk Grendier    Pro Se Intervener

SHERROD BROWN, OHIO, CHAIRMAN

JACK REED, RHODE ISLAND
ROBERT MENENDEZ, NEW JERSEY
JON TESTER, MONTANA
MARK WARNER, VIRGINIA
ELIZABETH WARREN, MASSACHUSETTS
CHRIS VAN HOLLEN, MARYLAND
CATHERINE CORTEZ MASTO, NEVADA
TINA SMITH, MINNESOTA
KYRSTEN SINEMA, ARIZONA
JON OSSOFF, GEORGIA
RAPHAEL G. WARNOCK, GEORGIA

PATRICK J. TOOMEY, PENNSYLVANIA
RICHARD C. SHELBY, ALABAMA
MIKE CRAPO, IDAHO
TIM SCOTT, SOUTH CAROLINA
MIKE ROUNDS, SOUTH DAKOTA
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA
BILL HAGERTY, TENNESSEE
CYNTHIA M. LUMMIS, WYOMING
JERRY MORAN, KANSAS
KEVIN CRAMER, NORTH DAKOTA
STEVE DAINES, MONTANA

LAURA SWANSON, STAFF DIRECTOR
BRAD GRANTZ, REPUBLICAN STAFF DIRECTOR

**United States Senate**
COMMITTEE ON BANKING, HOUSING, AND
URBAN AFFAIRS
WASHINGTON, DC 20510-6075

February 7, 2022

Mr. James Dimon
Chairman and Chief Executive Officer
JPMorgan Chase & Co.
207 Park Avenue
New York, NY 10017

Dear Mr. Dimon:

We are deeply troubled by recent reports that JPMorgan Chase ("Chase") – the nation's largest bank with over $3.2 trillion in assets – has renewed its predatory practice of robo-signing purported evidence of credit card debt to sue customers during the pandemic.[1] We were concerned to hear that this practice has resumed after the January 1, 2020 expiration of Chase's consent order with the Consumer Financial Protection Bureau ("CFPB" or Bureau). We request that Chase provide detailed information regarding the bank's credit card debt collection practices. Chase should not utilize robo-signing in pursuing these debt collection suits, or any other debt.

At the height of the robo-signing scandal following the 2008 financial crisis, the CFPB found that Chase wrongfully sued thousands of customers for debt they did not owe. As you know, "robo-signing" is the practice where important documents are reviewed and signed by individuals with little to no knowledge about the case and proper procedures are not followed. From 2009 to 2013, the CFPB estimated that the error rate in robo-signing cases in which Chase obtained a judgement against consumers reached approximately 9 percent.[2] In 2015, the CFPB issued a consent order prohibiting Chase from engaging in robo-signing and certain debt collections practices that were in violation of the Consumer Financial Protection Act.[3] The consent order established that Chase's practices harmed consumers by "subject[ing] certain consumers to collections activity for accounts that were not theirs, in amounts that were incorrect or uncollectable."[4] Robo-signing enabled Chase to obtain judgments and collect from consumers

---

[1] https://www.propublica.org/article/a-return-to-robo-signing-jpmorgan-chase-has-unleashed-a-lawsuit-blitz-on-credit-card-customers
[2] https://files.consumerfinance.gov/f/201507_cfpb_consent-order-chase-bank-usa-na-and-chase-bankcard-services-inc.pdf
[3] https://files.consumerfinance.gov/f/201507_cfpb_consent-order-chase-bank-usa-na-and-chase-bankcard-services-inc.pdf
[4] *Id.* at 2.

based on "documents that were falsely sworn and that at times contained inaccurate amounts."[5] The purpose of the consent order was "to ensure [Chase] do[es] not revive these practices."[6]

Chase has stated that it "quality-check[s] 100%," of the affidavits used in the credit card suits.[7] We respectfully request that Chase substantiate this statement because a failure to properly check this information can lead to wage garnishment and direct bank withdrawals for debts consumers do not owe. Not only does this practice result in wage garnishing and taking money directly out of customers' accounts for wrongful debts, these collections negatively impact consumers' credit scores through credit reporting, making it more difficult for those consumers to obtain jobs, housing, and affordable credit—all due to Chase's mistakes. The potential resumption of this practice could affect tens of millions of American families who rely on Chase for financial services.

To better understand Chase's credit card collection practices, please provide the following information regarding the review processes:

1. Has Chase resumed the practice of robo-signing?
2. If so, does Chase believe that this practice is consistent with the CFPB's consent order?
3. How many employees of Chase are dedicated to reviewing customer files to decide whether to pursue a lawsuit collecting on debt?
4. How many supervisory employees review decisions to submit a lawsuit?
5. How many employees are tasked with substantiating the action via the drafting and signing of an affidavit?
    a. Do these employees have personal knowledge of the case?
    b. What particular elements of a customer's file are utilized in drafting the affidavit?
    c. How much time does a staff member utilize to review a customer's file and draft the affidavit to submit in support of a collections action?
6. How does Chase quality check the affidavits used in debt collection suits against credit card consumers?

Please provide the following information regarding Chase's credit card collections:

1. What types of hardship policies did Chase have in place in 2020 and 2021?
2. Did Chase affirmatively tell every customer about its hardship policy and any opportunity to put collection on hold for those impacted by the pandemic?
    a. If yes, how were these policies and opportunities communicated to customers?
3. How did Chase select people to sue during a pandemic? How did it screen out those with financial hardship as a result of the pandemic?
4. There is extensive evidence about racial disparities in debt collection and the disparate impact of the pandemic on black and Hispanic communities. How does Chase ensure that its collection activity and collection lawsuits do not create racial disparities?

---

[5] *Id.*
[6] *Id.*
[7] https://www.propublica.org/article/a-return-to-robo-signing-jpmorgan-chase-has-unleashed-a-lawsuit-blitz-on-credit-card-customers

2

5. How many lawsuits did Chase file against its credit card customers in 2019, 2020, and 2021?
    b. How many lawsuits ended in a default judgement?
    c. In how many lawsuits were defendants representing themselves, and what were those outcomes?
6. In jurisdictions with higher standards of judicial review, what number of cases were rejected on evidentiary grounds? Please provide this information on a state-by-state basis.

We request a response to these questions by February 21, 2022. Thank you for your prompt attention to this inquiry.

Sincerely,

SHERROD BROWN
U.S. Senator

ROBERT MENENDEZ
U.S. Senator

TINA SMITH
U.S. Senator

ELIZABETH WARREN
U.S. Senator

CHRIS VAN HOLLEN
U.S. Senator

RAPHAEL WARNOCK
U.S. Senator

# Jamie Dimon Lands in the Cross Hairs of Senate Banking Committee Chair Sherrod Brown

By Pam Martens and Russ Martens: February 8, 2022 ~

As Wall Street On Parade, two trial lawyers, the U.S. Department of Justice, the Senate's Permanent Subcommittee on Investigations and one of the bank's former lawyers have suggested, the largest bank in the United States, JPMorgan Chase, has enshrined crime as a business model.

The man ultimately responsible for this business model is Jamie Dimon, the bank's Chairman and CEO since December 31, 2006. Since 2014, JPMorgan Chase has the unprecedented distinction of admitting to five felony counts brought by the U.S. Department of Justice. In each case, it was given a deferred prosecution agreement and put on probation. (See a sampling of its Rap Sheet here.)



Senator Sherrod Brown

Now Dimon and the bank have come into the cross hairs of Senator Sherrod Brown, Chairman of the powerful Senate Banking Committee that oversees the megabanks on Wall Street.

Yesterday, Brown and five of his Democratic colleagues on the Senate Banking Committee sent Dimon a letter demanding answers regarding the bank's credit card collection practices. The letter opens with this:

> "We are deeply troubled by recent reports that JPMorgan Chase ('Chase') – the nation's largest bank with over $3.2 trillion in assets – has renewed its predatory practice of robo-signing purported evidence of credit card debt to sue customers during the pandemic. We were concerned to hear that this practice has resumed after the January 1, 2020 expiration of Chase's consent order with the Consumer Financial Protection Bureau ('CFPB' or Bureau). We request that Chase provide detailed information regarding the bank's credit card debt collection practices. Chase should not utilize robo-signing in pursuing these debt collection suits, or any other debt.
>
> "At the height of the robo-signing scandal following the 2008 financial crisis, the CFPB found that Chase wrongfully sued thousands of customers for debt they did not owe. As you know, 'robo-signing' is the practice where important documents are reviewed and signed by individuals with little to no knowledge about the case and proper procedures are not followed. From 2009 to 2013, the CFPB estimated that the error rate in robo-signing cases in which Chase obtained a judgement against consumers reached approximately 9 percent. In 2015, the CFPB issued a consent order prohibiting Chase from engaging in robo-signing and certain debt collections practices that were in violation of the Consumer Financial Protection Act. The consent order established that Chase's practices harmed consumers by 'subject[ing] certain consumers to collections activity for accounts that were not theirs, in amounts that were incorrect or uncollectable.' Robo-signing enabled Chase to obtain judgments and collect from consumers based on 'documents that were falsely sworn and that at times contained inaccurate amounts.' The purpose of the consent order was 'to ensure [Chase] do[es] not revive these practices.' "

The robo-signing reports come courtesy of a January 5 article written by Patrick Rucker and jointly published by Pro-Publica and The Capital Forum. That article revealed that "Today, just as it did before running afoul of the CFPB, Chase is mass-producing

affidavits from the same San Antonio office where low-level employees generated hundreds of thousands of affidavits in the past, according to defense attorneys and court documents. Those affidavits are often the main piece of evidence that Chase uses to win its case while detailed customer records — and any errors they may contain — remain out of sight."



*Jamie Dimon, Chairman and CEO, JPMorgan Chase*

The article goes on to explain that after Dimon publicly bemoaned wealth inequality in the United States, his bank brought thousands of consumer debt lawsuits last year after filing very few when it was under the CFPB's consent order. The article's author, Rucker, notes further that: "Those sued by Chase, then and now, might spot errors if the company provided full records in its court filings, consumer advocates say. Instead, Chase typically submits copies of a few credit card statements along with a two-page affidavit attesting that the bank's records were accurate and complete."

Taking the word of a five-count felon bank with a long history under Dimon of serial law-breaking is not something courts should be doing. The Rap Sheet we linked to above should be introduced into evidence to open the eyes of the judges that are presiding over these cases.

Senator Brown and his colleagues have given Dimon until February 21st to answer a list of questions in this matter. If the Senate Banking Committee wants to serve the public interest, it will call Dimon to testify under oath as to why it is the only U.S. bank with five felony counts notched in its belt and why it <u>continues to thumb its nose at the law</u>.

If the Senate Banking Committee limits its investigation to JPMorgan Chase's consumer debt practices, it will be replicating the mistake made by the SEC when it ignored years of Harry Markopolos pounding on its door with evidence that Bernie Madoff was running a massive criminal enterprise.

**Bookmark the <u>permalink</u>.**

## JPMorgan Chase's Rap Sheet

### (Highlights)

April 21, 2011, JPMorgan Chase <u>agreed to settle a civil lawsuit</u> and pay $56 million to settle claims that it overcharged members of the military service on their mortgages in violation of the Service Members Civil Relief Act and the Housing and Economic Recovery Act of 2008.

February 7, 2012, JPMorgan Chase <u>agreed to pay $110 million</u> to settle consumer litigation that claimed it overcharged customers for overdraft fees.

February 9, 2012, JPMorgan Chase <u>reaches an agreement with the OCC</u> to pay $113 million for unsafe and unsound mortgage servicing and foreclosure practices.

August 10, 2012, <u>JPMorgan Chase agreed to pay $1.2 billion</u> to settle claims that it, along with other banks, conspired to set the price of credit and debit card fees.

November 16, 2012, JPMorgan Chase <u>agreed to pay $296.9 million to the SEC</u> to settle claims that it misstated information about the delinquency status of its residential mortgage portfolio.

July 2013, a unit of JPMorgan Chase <u>agreed to pay $410 million</u> to the Federal Energy Regulatory Commission to settle claims of bidding manipulation of California and Midwest electricity markets.

September 19, 2013, <u>JPMorgan Chase agreed to pay</u> $80 million in combined fines to the Consumer Financial Protection Bureau (CFPB) and Office of the Comptroller of the Currency (OCC) and $309 million in refunds to customers whom the bank billed for credit monitoring services that the bank never provided.

September 19, 2013, JPMorgan Chase <u>agreed to pay $920 million</u> to U.S. and U.K. regulators for its unsafe and unsound banking practices in using bank depositors' money to trade in derivatives in London. It lost at least $6.2 billion in the trades. This was known as the "London Whale" scandal.

November 15, 2013, JPMorgan Chase announced that it had <u>agreed to pay $4.5 billion</u> to settle claims by private investors that it defrauded them in mortgage-backed securities.

November 19, 2013, <u>JPMorgan agreed to pay $13 billion</u> to settle claims by the Department of Justice; the FDIC; the Federal Housing Finance Agency; and various State Attorneys General over its fraudulent practices with respect to mortgage-backed securities. JPMorgan acknowledged it made serious misrepresentations to the public.

December 4, 2013, JPMorgan Chase <u>agreed to pay 79.9 million Euros</u> to settle claims of the European Commission relating to illegal rigging of benchmark interest rates.

In December 2013, <u>JPMorgan Chase agreed to pay $22.1 million</u> to settle claims that the bank imposed expensive and unnecessary flood insurance on homeowners whose mortgages the bank serviced.

January 7, 2014 the U.S. Department of Justice charged JPMorgan Chase with two criminal counts for its banking conduct in the Bernard Madoff Ponzi scheme. The bank admitted to the charges; agreed to pay $1.7 billion to a Madoff victim fund and agreed to a Deferred Prosecution Agreement.

May 20, 2015, JPMorgan Chase pleaded guilty to one criminal count brought by the U.S. Department of Justice for its role with other banks in rigging the foreign exchange market. The bank agreed to a fine of $550 million.

December 18, 2015 the bank agreed to charges by the SEC that it had steered its customers into in-house products where it reaped higher profits without disclosing this conflict to the customer. It paid $267 million to settle these charges.

On January 20, 2017 JPMorgan Chase agreed to pay $53 million to settle charges that it had discriminated against minority borrowers by charging them more for a mortgage than white customers.

October 2018 JPMorgan Chase agreed to pay $5.3 million to settle U.S. Treasury allegations that "it violated Cuban Assets Control Regulations, Iranian sanctions and Weapons of Mass Destruction sanctions 87 times," according to Reuters.

December 26, 2018 JPMorgan Chase settled claims with the SEC for $135 million over charges that it had improperly handled thousands of transactions involving the shares of foreign companies.

May 16, 2019, JPMorgan Chase settled charges for 228.8 million Euros with the European Commission that it rigged the foreign exchange market. (Other banks were also fined.)

September 16, 2019, the U.S. Department of Justice indicted two current and one former precious metals traders at JPMorgan Chase for turning the precious metals desk at the bank into a "racketeering" enterprise.

September 29, 2020, the U.S. Department of Justice brings two counts of wire fraud against JPMorgan Chase involving "tens of thousands of episodes of unlawful trading in the markets for precious metals futures contracts, and the second involving thousands of episodes of unlawful trading in the markets for U.S. Treasury futures contracts and in the secondary (cash) market for U.S. Treasury notes and bonds." The bank admits to the charges and agrees to pay $920 million in fines and restitution to various regulators.

December 17, 2021, the securities unit of JPMorgan Chase admits its traders and their supervisors were using personal communications devices to conduct company business. The firm failed to record and retain messages from these devices as required under the law. These violations occurred despite similar conduct in the bank's participation in the rigging of the foreign exchange market, where traders used unauthorized electronic chat rooms, called "The Cartel" and "The Mafia." That case brought a criminal felony charge against the bank by the Justice Department in May of 2015. In the current case, the SEC fined the firm $125 million.

Mortgage fraudster hit with 14.5-year sentence

A former notary public has been given a lengthy custodial sentence for her involvement in multi-million dollar mortgage fraud schemes

Mortgage fraudster hit with 14.5-year sentence

By Michael Mata
30 Sep 2016

Rachel Siders, a former notary public from Roseville, was recently sentenced to 14-and-a-half years in prison by US District Judge John A. Mendez. Siders was convicted for her involvement in mortgage fraud schemes that cost financial institutions north of $17 million.

According to the official press release from the Sacramento office of Acting U.S. Attorney Phillip A. Talbert, federal juries returned their verdicts in two trials—the first in March 2015 and the second in December 2015. Siders was found guilty of multiple counts of bank fraud, mail fraud, wire fraud, making a false loan application, and committing aggravated identity theft.

According to evidence from the first trial, Siders and her co-defendant, Theo Adams, applied for a home equity line of credit in 2008. The pair used the name of one of Adams' relatives on an underwater Roseville property owned by Adams. They submitted false tax returns in the relative's name with inflated income as well as mortgage application documents that contained forged signatures.

Siders falsely notarized the loan application documents, which were sent to Washington Mutual Bank. The bank approved the application and provided a $250,000 line of credit, with Siders receiving $170,000 of the proceeds. The pair soon defaulted after making minimal payments on the loan.

According to evidence from the second trial, from mid-2006 through early 2008, Siders, Vera Kuzmenko (a licensed real estate agent from Loomis), and other defendants engaged in a mortgage fraud scheme. The group secured more than $30 million in residential mortgage loans on more than 30 homes in Sacramento. The homes were purchased through straw buyers.

Kuzmenko received millions from the fraud scheme, while Siders received hundreds of thousands of dollars. Siders ran the Rocklin office of the escrow company used in the majority of the transactions, helping funnel millions of dollars to her co-defendants.

"[Siders] abused her position as an escrow officer and as a notary public to make this criminal enterprise succeed," said Talbert. "The sentence imposed is a significant reminder that those who engage in such conduct will be held accountable."

"Anyone [who] profits from fraudulent mortgage transactions—whether by creating the scheme or facilitating it—will not escape justice," said Supervisory Special Agent Dan Bryant at the FBI Sacramento field office. "The FBI aggressively pursues those involved in such large-scale, complex financial fraud matters to seek justice for the victims and protect the regional economy."

Siders' co-defendants were also convicted in court and given different prison sentences.