**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN**

CONSUMER FINANCIAL PROTECTION
BUREAU,
                         Plaintiff,
    v.

OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
OCWEN LOAN SERVICING, LLC; and
PHH MORTGAGE CORPORATION,
                         Defendants.

<u>PLAINTIFF'S BRIEF PURSUANT TO THIS COURT'S JULY 27, 2022 ORDER (DE 806)</u>

**INTRODUCTION**

      Plaintiff, Consumer Financial Protection Bureau (Bureau), files this brief pursuant to this court's July 27, 2022 order and in response to the Eleventh Circuit's order remanding this action to determine which claims are "covered by the consent judgment's servicing-standard, monitoring, and enforcement regime" set forth in the parties' 2013 National Mortgage Settlement (NMS).[1]

      The Eleventh Circuit has directed this Court to perform an analysis specifically comparing each Bureau count against the NMS terms to determine whether any overlap exists. This Court should conclude that the NMS's terms do not cover any of the Bureau's claims. There is no place that this is clearer than Count VII, where the Bureau alleges that Defendants (collectively Ocwen) failed to timely conduct the required annual analyses of borrowers' escrow accounts. Not a single NMS Servicing Standard or Metric applies to Ocwen's timely performance of annual escrow analyses and Ocwen's own expert could not identify one. Indeed, Ocwen has not met its burden to show that any of the Bureau's claims were covered by the NMS, and this Court should accordingly deny Ocwen's motion for summary judgment.

---

[1] Order (DE 806); *CFPB v. Ocwen*, 30 F.4th 1079 (11th Cir. Apr. 6, 2022).

1

## ARGUMENT

The Bureau's claims are not covered by the NMS. Ocwen has not shown any actual overlap, and instead relies on vague references to Servicing Standards and Metrics to argue overlap exists. Such vagaries and general conclusions are insufficient to meet Ocwen's burden of proof. Further, Ocwen's overlap arguments are wrong, which is clear from a careful study of the NMS's actual requirements and the undisputed facts.

### I. The NMS does not cover the Bureau's Escrow Analysis Claim (Count VII).

The Bureau's allegation that Ocwen failed to timely conduct annual escrow analyses (Escrow Analysis Claim) is entirely outside the purview of the NMS.[2] First, the escrow analysis required by the Real Estate Settlement Procedures Act (RESPA) is a detailed accounting for the purpose of estimating future escrow amounts that is not covered by the text or purpose of the NMS. Second, Ocwen's own expert confirmed that the NMS does not cover the Bureau's current escrow claims. Third, the NMS Servicing Standards and Metrics that Ocwen contends cover the Escrow Analysis Claim are unrelated to assessing Ocwen's performance of a timely annual escrow analysis, and instead relate to different requirements—whether Ocwen appropriately placed insurance on borrowers' accounts; appropriately posted borrowers' payments in the correct order (*e.g.,* principal, interest, escrow); and consistently sent out billing statements that reflected the information in Ocwen's system of record.[3] In short, the NMS did not address the RESPA requirements relating to a timely escrow analysis that the Bureau seeks to enforce in its Escrow Analysis Claim in Count VII.

#### 1. Escrow analyses are a detailed accounting exercise to determine *future* monthly escrow amounts owed.

The Bureau's Escrow Analysis Claim alleges that Ocwen violated RESPA by failing to perform required annual escrow analyses within 30 days of the end of the escrow account computation year. By way of background, RESPA requires a mortgage servicer to perform an accounting each year for borrowers with an escrow account. The purpose of this accounting is

---

[2] Pl.'s Second Amended Complaint (DE 775) ¶¶ 251(a) and 252(a) (Count VII allegations specifically relating to annual escrow analysis violations under RESPA).
[3] Defs.' Mot. for Summ. Judg. (DE 730) at 7 (identifying as relevant Servicing Standards I.B., VII.A.1, and Metrics 4.B., 33).

not to verify the accuracy of any current amount or balance, but rather to predict what the monthly escrow amount will be in the upcoming escrow computation year (*i.e.*, to determine the *future* monthly escrow amount). More specifically, the annual escrow analysis is designed to:

- determine the appropriate *target* balance or estimated month-end balance in an escrow account sufficient to cover the remaining disbursements from the escrow account in the escrow account computation year, while taking into account the remaining scheduled periodic payments, and a cushion, if any;
- compute the borrower's monthly payments *for the next* escrow account computation year and any deposits needed to establish or maintain the account; and
- determine whether shortages, surpluses, or deficiencies exist.[4]

A timely annual escrow analysis provides borrowers with the details surrounding what escrow amounts were distributed in the past year, and critically what *future* disbursements from escrow will be required over the upcoming year. While this accounting uses current balances, such as the current escrow balance, as one of several inputs, RESPA's annual escrow analysis requirement is not to verify the accuracy of the inputs but to calculate the future amounts owed based on future disbursements and to identify deficiencies, shortages, and surpluses. Ocwen failed to perform these duties when it was required by law to do so.[5]

There is nothing in the NMS servicing standards that assesses whether Ocwen performed this detailed accounting within 30 days of the end of the escrow computation year. Further, there is no mechanism in the NMS that would allow the Bureau to enforce these RESPA requirements through its monitoring or enforcement processes. Indeed, the Bureau only first learned that Ocwen failed to timely analyze escrow accounts through its investigation that led to this lawsuit.[6] This timeline is consistent with the fact that the Bureau's 2013 Complaint (in the action

---

[4] 12 C.F.R. §§ 1024.17(b) (defining the accounting required during an escrow analysis) and (c)(3) and (f)(1)(requiring annual escrow analyses at the end of each computation year).
[5] Pl.'s Second Amended Complaint (DE 775) ¶¶ 251(a) and 252(a) (Count VII allegations specifically relating to annual escrow analysis violations under RESPA).
[6] Pl.'s Stat. of Mat. Facts in Support of Its Mot. for Summ. Judg. (DE 729) ¶¶ 167-168.

that the NMS resolved) did not allege that Ocwen violated escrow obligations.[7] This is also reflected in this Court's recital of the allegations in the 2013 action.[8]

### 2. Ocwen's own expert confirms that NMS was not intended to and did not cover annual escrow analysis requirements.

Ocwen's expert, Mr. Bryar, who "evaluate[d] Ocwen's performance based on the same principles inherent in the NMS," reinforced the fact that the NMS does not cover Ocwen's obligation to timely perform an annual escrow analysis.[9] While Mr. Bryar, a lawyer, liberally interprets NMS Servicing Standards and Metrics to cover various Ocwen servicing practices throughout his report, he does not identify a single NMS Servicing Standard or Metric that relates to Ocwen's obligation to perform a timely escrow analysis in either his expert report or his deposition testimony.[10] When asked during his deposition whether there was an applicable NMS Servicing Standard that related to escrow analysis, Mr. Bryar answered: "not that I can think of,"[11] and ultimately "[did not] think there's a metric related to escrow in the NMS."[12] In short, Mr. Bryar could not identify a NMS Servicing Standard or Metric that relates to the Escrow Analysis Claim because there are none.

### 3. Ocwen's contention that the NMS indirectly covers escrow analyses is incorrect.

Ocwen contends that the NMS was highly specific, comprehensive, and detailed, including over 300 Servicing Standards.[13] Yet, Ocwen cannot point to a single Servicing Standard or related testing Metric that specifically assesses whether Ocwen performed an annual escrow analysis on time. Indeed, the term "escrow analysis" only appears once in the NMS, in a single Servicing Standard that requires that bankruptcy proofs of claim include "any expenses or

---

[7] *CFPB v. Ocwen Financial Corp.*, Case No. 13-2025-RMC (Complaint, DE 1) (D.D.C. Dec. 19, 2013) (D.C. Complaint). This Complaint is attached at DE 731-2 in this action.
[8] Order Granting in Part and Reserving Ruling in Part on Defendants' Motion for Summary Judgment as to Counts 1-9; Denying Defendants' Motion for Summary Judgment as to Count 10 of Plaintiff's Amended Complaint [DE 730] and Denying Plaintiff's Motion for Summary Judgment on Liability [DE 728]. DE 764 at 4-5.
[9] Ex. 21 to Defs.' Mot. for Summ. Judg. (DE 731-20) ¶ 27.
[10] *Id.* ¶¶ 27, 152 (billing statement), 158 (dual tracking), and 166 (payment processing).
[11] Ex. 12 to Pl.'s Opp. to Defs.' Mot. for Summ. Judg. (DE 742-12) at 189:16-22.
[12] *Id.* at 209:22-210:10; *but see* 235:11-235:25 (testifying about NMS Servicing Standard pertaining to dual tracking standard).
[13] Defs.' Mot. for Summ. Judg. (DE 730) at 5.

charges based on an escrow analysis as of the date of filing."[14] This Servicing Standard has nothing to do with the Bureau's Escrow Analysis Claim in Count VII, a claim premised on RESPA's requirements.

Ocwen's argument appears to be that RESPA's annual escrow analysis requirements are indirectly subsumed within NMS Servicing Standard I.B.5 and Metrics 4.B and 33.[15] Ocwen is wrong, and the Court should reject its argument.

Servicing Standard I.B.5 requires Ocwen to provide certain information on a monthly billing statement, including a current escrow balance and the current monthly escrow amount.[16] Calculating these amounts has no bearing on the subject of the Bureau's Escrow Analysis Claim, which is about whether an annual escrow *analysis* was performed on time. The current escrow balance is simply the *current* ledger amount after all previous debits and credits have been accounted for; whereas the escrow analysis is a forward-looking accounting that determines a borrower's *future* monthly escrow payments. The same is true of the current monthly escrow amount; it does not show if a timely escrow analysis determining the *future* monthly escrow amount was performed. Moreover, a borrower's monthly escrow amount owed may not change as a result of an escrow analysis and thus any argument that a borrower or the Monitor could indirectly infer from a monthly escrow amount on a billing statement that an escrow analysis has taken place, let alone took place on time, should be rejected outright.[17] Lastly, nothing in

---

[14] Ex. 3 to Defs.' Stat. of Mat. Facts in Supp. of Their Mot. for Summ. Judg. (DE 731-4) at A-9.
[15] Defs.' Stat. of Mat. Facts in Supp. of Their Mot. for Summ. Judg. (DE 731) ¶ 42.
[16] Ex. 2 to Defs.' Stat. of Mat. Facts in Support of Their Mot. for Summ. Judg. (DE 731-4) at A-5-6, (Servicing Standard I.B.5 reads: "Servicer shall provide to borrowers (other than borrowers in bankruptcy or borrowers who have been referred to or are going through foreclosure) adequate information on monthly billing or other account statements to show in clear and conspicuous language: (a.) total amount due; (b.) allocation of payments, including a notation if any payment has been posted to a 'suspense or unapplied funds account'; (c.) unpaid principal; (d.) fees and charges for the relevant time period; (e.) current escrow balance; and (f.) reasons for any payment changes, including an interest rate or escrow account adjustment, no later than 21 days before the new amount is due (except in the case of loans as to which interest accrues daily or the rate changes more frequently than once every 30 days).").
[17] Ocwen also argued that its failure to perform an escrow analysis may not result in a change to a borrower's monthly payment. *See* Stat. of Defs.' Resp. to Pl.'s Stat. of Mat. Facts and Defs.' Counterstatement of Mat. Facts in Supp. of Defs.' Opp. to Pl.'s Mot. For Partial Summ. Judg. (DE 741) ¶ 173 "[I]f or when Ocwen failed to timely analyze borrowers' escrow accounts, the borrowers would not necessarily accrue any shortages or surpluses as a result of the delay

5

Servicing Standard I.B.5 assesses whether Ocwen performed the annual escrow analysis *on time*, that is within 30 days of the end of the escrow computation year, which is the RESPA violation at issue.

NMS Metrics 4.B and 33, respectively, relate to "procedures" to ensure billing statement accuracy, payment processing, and whether the information in Ocwen's system of record matched its billing statements. These Metrics are irrelevant to assessing whether Ocwen performed the detailed annual escrow analysis to identify the appropriate target balance or estimated month-end balance in an escrow account sufficient to cover the remaining disbursements from the escrow account; determined *future* escrow amounts owed; and determined if a borrower had an escrow shortage, surplus, or deficiency.

Metric 4.B addresses Ocwen's application of payments.[18] None of the test questions under this Metric assess whether Ocwen performed a timely annual escrow analysis to identify the above information; they concern whether Ocwen was applying payments appropriately.

Metric 33 is equally irrelevant to the Bureau's Escrow Analysis Claim. This Metric is explicitly tied to Servicing Standard I.B.5. It explains what "accuracy" means under Servicing Standard I.B.5 as it seeks to assess whether various account balances displayed in the "monthly billing statement *accurately show, as compared to the system of record at the time of the billing statement.*"[19] In other words, this Metric checks the amounts in billing statements for accuracy by looking at whether they match Ocwen's system of record at the time the billing statement was generated; this Metric does not test whether Ocwen performed a timely annual escrow analysis.

---

[meaning no monthly escrow payment change], for example, because (1) the estimated payments for taxes and insurance may not have changed from the prior year, (2) Ocwen ran the analysis after a change from the prior year but before the borrower's next payment was due." *See also* ¶ 162 "If a shortage or surplus is identified during an escrow account analysis, the borrower can elect to pay the shortage back in a lump sum, or receive the extra amount back as a credit to their account, without changing their prior monthly escrow payment."

[18] Ex. 6 to Defs.' Stat. of Mat. Facts in Supp. of Their Mot. for Summ. Judg. (DE 731-7) at D1-7, (Metric 4 "Accuracy and Timeliness of Payment Application and Appropriateness of Fees" Subpart B "Adherence to customer payment processing" which measures whether "Payments posted timely (within 2 business days of receipt) and accurately" and assessing whether "Amounts understated by the greater $50.00 or 3% of the scheduled Payment.").

[19] Ex. 6 to Defs.' Stat. of Mat. Facts in Supp. of Their Mot. for Summ. Judg. (DE 731-7) at D1-21, (Metric 33 explicitly applies to Servicing Standard I.B.5. It measures "Billing Statement Accuracy" and asks whether "the monthly billing statement accurately show, as compared to the system of record at the time of the billing statement," various amounts).

Simply stated, the NMS does not cover the detailed escrow analysis process required by RESPA that is the basis of the Escrow Analysis Claim.

II. <u>The NMS and its regime also do not cover the Bureau's remaining claims.</u>

The specific terms of the NMS do not overlap with the Bureau's remaining claims.[20] While certain of the Standards contain language that superficially overlap with the Bureau's claims in that they use the term "accurate," it is clear from the actual substance of those standards, the interpretive guidance offered in the specific Metric testing, and the testing that in fact occurred, that the NMS did not cover the Bureau's claims.[21]

The fundamental difference between the NMS's Servicing Standards and the Bureau's current claims against Ocwen is that the Bureau is concerned with the accuracy of the information in Ocwen's system of record while the NMS focused on discrepancies between Ocwen's system of record and statements it made to consumers. Specifically, the Bureau's Counts I, II, V, and VI allege that Ocwen used inaccurate and incomplete records to service loans and make deceptive statements to borrowers in violation of the Consumer Financial Protection Act (CFPA) and Fair Debt Collection Practices Act (FDCPA). On the other hand, the actual substance of the Servicing Standard I.B.5 and Metric 33 make clear that the NMS covers whether billing statements were accurate "as compared to the system of record at the time of the billing statement."[22] This same measure of accuracy is repeated throughout the rest of the Metrics at 2.A, 2.B, 2.C, 3.A, 5.F, 6.A, and 33. Metric 4.B also makes clear that the Servicing Standards are unconcerned with whether the balances or information in the system of record

---

[20] The Bureau argued the same in response to Ocwen's summary judgment motion. *See* Pl.'s Opp. to Defs.' Mot. for Summ. Judg. (DE 740) at 6-7. *See also* Pl.'s Resp. to Defs.' Stat. of Mat. Facts and Add'l Facts in Supp. of Its Opp. to Defs.' Mot. for Summ. Judg. (DE 742) ¶¶ 36-44 (disputing Defendants' facts that "[v]irtually all of the conduct" is governed by the 2013 Consent Order) and ¶¶ 266-269 (facts relating to the lack of overlap, including Defendants' expert's testimony about the lack of overlap relating to escrow).

[21] Order Granting in Part and Reserving Ruling in Part on Defendants' Motion for Summary Judgment as to Counts 1-9; Denying Defendants' Motion for Summary Judgment as to Count 10 of the Plaintiff's Amended Complaint and Denying Plaintiff's Motion for Summary Judgment on Liability (DE 764).

[22] Ex. 6 to Defs.' Stat. of Mat. Facts in Supp. of Their Mot. for Summ. Judg. (DE 731-7) at D1-21, (Metric 33 explicitly applies to Servicing Standard I.B.5. It measures "Billing Statement Accuracy" and asks whether "the monthly billing statement accurately show, as compared to the system of record at the time of the billing statement," various amounts.).

were, in fact, accurate. The Bureau's claims, however, are not premised on discrepancies between Ocwen's system of record and its statements to borrowers. Instead, the Bureau alleges in Counts I, II, V, and VI that the underlying information in Ocwen's system of record was *itself* inaccurate and incomplete. The NMS terms thus do not cover the Bureau's allegations.

Ocwen also failed to demonstrate that the NMS Servicing Standards and Metrics cover the Bureau's remaining claims, which allege that Ocwen:

- made material misrepresentations to borrowers that they had a certain amount of time to submit additional information needed by Ocwen to complete and evaluate their loss mitigation applications, and that borrowers would not be foreclosed on while that request was pending, but then foreclosed on those borrowers prior to the promised submission deadline—Count III (CFPA);
- failed to send borrowers periodic statements accurately detailing required information such as the monthly payment amount due (accurate in reality, as opposed to the NMS definition of accuracy which only requires that the statements mimic the system of record)—Count IV (Truth-in-Lending Act and Regulation Z);
- failed to pay hazard insurance premiums in a timely manner on behalf of escrowed borrowers and other escrow-related misconduct—Count VII (RESPA and Regulation X);
- failed to maintain adequate servicing policies and procedures reasonably designed to ensure that it provided its personnel with access to accurate loan information needed to service borrower accounts and respond to consumer complaints properly—Count VIII (RESPA and Regulation X); and
- improperly initiated foreclosures when the borrower was on track towards a loan modification and engaged in other foreclosure-related misconduct—Count IX (RESPA, Regulation X, and the CFPA).

For these remaining claims, the Bureau cited hundreds of facts, supporting exhibits, and extensive loan-level evidence showing that Ocwen:

- boarded on its system of record, 1,380,401 critical data fields containing discrepancies requiring corrections for 628,166 borrowers. This led to, for example, Ocwen identifying 1,875 instances where it undercharged 1,705 borrowers and later sought to collect a total of more than $3.6 million from them, including demanding

- from individual borrowers immediate payments of lump sums in the amounts of $235,519.60, $145,820.10, $131,643.32, $107,075.67, and $84,003.42;[23]
- provided 82,763 inaccurate reinstatement quotes to borrowers, for a total of over $102 million in overquoted amounts, including, for example, a borrower who was overquoted and paid an extra $41,632.79;[24]
- erroneously cancelled homeowners' insurance for 1,367 borrowers;[25]
- sent inaccurate loan modification agreements to over 1,800 borrowers;[26]
- commenced foreclosure proceedings on 1,118 borrowers' loans while still evaluating their applications;[27] and
- foreclosed on 45 borrowers while evaluating them for loss mitigation assistance, despite promising borrowers that Ocwen had stopped the foreclosure process.[28]

Ocwen does not contend that any of the above evidence, including the specific loan-level and transaction-level evidence, was, or could have been, reviewed by the Monitor or any third party assessing the accuracy of Ocwen's system of record. Ocwen cannot and does not cite a single incorrect reinstatement quote, wrongful foreclosure, or inaccuracy in a borrower's record that was or could have been covered by the NMS. Tellingly, the NMS required Ocwen to self-disclose conduct that revealed a significant pattern or practice of noncompliance with a material aspect of an NMS Servicing Standard, yet Ocwen did not disclose any of the above evidence, revealing that Ocwen believed that the misconduct alleged by the Bureau was not covered by the NMS terms.[29]

---

[23] Pl.'s Stat. of Mat. Facts in Supp. of Its Mot. for Summ. Judg. (DE 729) at 127, 154.
[24] *Id.* at 193-194.
[25] *Id.* at 222.
[26] *Id.* at 253.
[27] *Id.* at 259.
[28] *Id.* at 263-264.
[29] Ex. 6 to Defs.' Stat. of Mat. Facts in Support of Their Mot. for Summ. Judg. (DE 731-7) at D-6 ("Servicer shall notify the Monitor promptly if Servicer becomes aware of reliable information indicating Servicer is engaged in a significant pattern or practice of noncompliance with a material aspect of the Servicing Standards.").

## CONCLUSION

Ocwen has failed to meet its burden to demonstrate that the Bureau's claims were covered by the NMS. The undisputed facts also reveal the same. The Bureau respectfully requests that this Court issue a decision in response to the Eleventh Circuit's April 6, 2022 Order finding that the Bureau's claims—including its Escrow Analysis Claim at Count VII—were not covered or precluded by the NMS.

Dated: September 1, 2022

Respectfully submitted,
Attorneys for Plaintiff,
CONSUMER FINANCIAL PROTECTION BUREAU

RICHA DASGUPTA
Deputy Enforcement Director

JAMES T. SUGARMAN
Assistant Litigation Deputy

/s/ *Jean M. Healey Dippold*
Jean M. Healey Dippold
Phone: (202) 435-7514
Email: jean.healeydippold@cfpb.gov

Atur Desai        atur.desai@cfpb.gov
Shirley Chiu      shirley.chiu@cfpb.gov
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722