## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO. 9:17-CV-80495-MARRA-MATTHEWMAN

CONSUMER FINANCIAL PROTECTION
BUREAU,

       Plaintiff,

   v.

OCWEN FINANCIAL CORPORATION,
OCWEN MORTGAGE SERVICING, INC.,
and OCWEN LOAN SERVICING, LLC,

       Defendants.

## OCWEN'S POST-REMAND BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (ECF 730)

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

I.     This Court Already Granted Ocwen Summary Judgment Because Counts I-IX Are Covered by the NMS's Servicing Standards and Enforcement Framework. ........................................... 2

II.    The Eleventh Circuit Agreed the CFPB's Claims Are Precluded by the NMS. .................... 5

ARGUMENT .......................................................................................................................... 5

I.     On Remand, the Court Need Only Identify the Servicing Standards and Metrics It Already Held Preclude Each Count in the CFPB's SAC .......................................................................... 5

II.    The Record Indisputably Shows That the CFPB's Action Is Based on Allegations Encompassed by the NMS Servicing Standards. ........................................................................ 6

   A.    The CFPB Can Sue Ocwen Only for Legal Violations Not Covered by the NMS's Servicing Standards. ................................................................................................................ 6

   B.    All of the Conduct Alleged in the CFPB's Operative Complaint Is Covered by the NMS Servicing Standards and Metrics. ............................................................................................. 7

      1.   The Conduct Alleged in Counts I, II, IV, V, and VI Is Covered. ............................... 7

      2.   The Conduct Alleged in Count VII Is Covered. ........................................................ 8

      3.   The Conduct Alleged in Count VIII Is Covered. ....................................................... 8

      4.   The Conduct Alleged in Counts III and IX Is Covered. ............................................ 9

CONCLUSION ..................................................................................................................... 11

## INTRODUCTION

Pursuant to the Court's June 3, 2022 and July 27, 2022 orders (ECF 802 & 806), the Ocwen Defendants[1] submit this brief in further support of Ocwen's motion for summary judgment (ECF 730, "Ocwen MSJ") and to advise the Court on resolution of the sole issue on remand from the Eleventh Circuit: whether a "claim-by-claim analysis" of the Consumer Financial Protection Bureau's Second Amended Complaint (ECF 775, "SAC") confirms that each claim overlaps with the Servicing Standards, monitoring, and enforcement regime contained in the National Mortgage Settlement ("NMS").

On March 4, 2021, this Court granted Ocwen summary judgment on all claims comprising the CFPB's Operative Complaint (Counts I-IX),[2] holding that res judicata precluded the claims because Counts I-IX concerned the same conduct encompassed by the mandatory and exclusive provisions of the NMS. ECF 764 at 13-29 ("Order").

On appeal, the Eleventh Circuit agreed with the central principle in this Court's order, and held that the Bureau could "sue Ocwen for alleged violations that occurred between January 2014 and February 26, 2017 *only* if they aren't covered by the consent judgment's servicing standard, monitoring, and enforcement regime." *CFPB v. Ocwen Fin. Corp.,* No. 21-11314, at 13-14 (11th Cir. Apr. 6, 2022) ("Opinion") (emphasis in original). But because the Eleventh Circuit found that the Court's Order did not expressly contain a "claim-by-claim analysis" of the overlap this Court found between the NMS and Counts I-IX, it vacated the judgment and remanded the case so this Court could include such an analysis in a further opinion.

Although this Court's original Order did not *expressly* identify each specific Servicing Standard or Metric it found overlapped with each of the CFPB's claims, the Order shows that this Court already conducted a claim-by-claim analysis in reaching its prior conclusion. In its Order, the Court first stated that it conducted a "careful review" of the overlap between the NMS

---

[1] Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), Ocwen Loan Servicing, LLC ("OLS"), and PHH Mortgage Corporation ("PHH") (collectively, "Ocwen").

[2] The Court's Order granted Ocwen summary judgment on First Amended Complaint (ECF 481) Counts I-IX to the extent they concerned conduct that was alleged to occur between January 2014 and February 26, 2017. Order at 29-31. The CFPB subsequently filed the Operative Complaint, which amended its pleadings to remove Count X and any claims concerning conduct alleged to have occurred after February 26, 2017. *See* SAC ¶ 1; ECF 777. Thus, the sole remaining claims in this case concern conduct that the Court held was barred by res judicata due to the NMS. *See* Order at 13-29.

and the CFPB's claims, and concluded that the NMS's "detailed Servicing Standards," monitoring, and enforcement regime were intended to cover the conduct alleged in Counts I-IX. Order at 21. The Order also evidences the results of the Court's careful analysis. For example, this Court determined it could not grant summary judgment to Ocwen on First Amended Complaint Counts I-IX where those counts encompassed post-February 26, 2017 conduct, because conduct occurring after February 26, 2017 was not covered by the NMS. Order at 30.

Section I of Ocwen's Argument below asserts that the only action necessary post-remand is for the Court to revise its original Order to *explicitly* identify the provisions it relied on (from Ocwen's summary judgment materials and the Court's analysis of the record) in its determination that each of the CFPB's claims is covered by the NMS. *See id.*; Ocwen MSJ at 4-11; ECF 753 at 2-10 ("Ocwen Reply"). And, as Ocwen shows in Section II of its Argument below, even if the Court were to re-review the record, the NMS's Servicing Standards and Metrics indisputably cover each category of conduct alleged in the Operative Complaint.[3]

## BACKGROUND

**I.     This Court Already Granted Ocwen Summary Judgment Because Counts I-IX Are Covered by the NMS's Servicing Standards and Enforcement Framework.**

After extensive discovery, the parties submitted cross motions for summary judgment. In its motion, Ocwen argued that Counts I-IX of the CFPB's amended complaint were barred by res judicata under the terms of the NMS.[4] App. Ex. 1, Ocwen MSJ at 4-11.[5] The Court granted

---

[3] For the Court's convenience, Attachment A is the chart identifying each Count in the CFPB's Operative Complaint and the overlapping Servicing Standards and Metrics. The relevant portions of the summary judgment record, including Ocwen's Statement of Material Facts, Response to Plaintiff's Additional Facts, and relevant underlying exhibits identified in Attachment A and referenced below have been re-filed as exhibits to the Appendix ("App.") to this brief.

[4] Ocwen also sought summary judgment on additional merits grounds, and hereby preserves those arguments verbatim as previously submitted. *See* App. Ex. 1, Ocwen MSJ at 11-30; App. Ex. 6, Ocwen Reply at 10-29. In accordance with the Court's July 27, 2022 Order, Ocwen does not re-brief those arguments here because this Court reserved ruling on those arguments given its ruling on res judicata, and those grounds were not subject to appeal. Should the Court nonetheless look beyond the res judicata arguments, Sections II-VII of Ocwen's MSJ provide additional bases for dismissing all of the CFPB's remaining claims as a matter of law, including based on the CFPB's failure to prove violations and failure to prove damages.

[5] Ocwen also argued that the CFPB had waived any right it might have to assert Counts I-IX by entering into the NMS Settlement, agreeing to its exclusive enforcement regime, and failing to raise any concerns regarding Ocwen's alleged conduct with the Monitor. App. Ex. 1, Ocwen

Ocwen's motion as to Counts I-IX, holding that they are barred by res judicata through February 26, 2017 because they are directed at the same category of conduct encompassed by the mandatory provisions of the NMS. Order at 13-27.

As the Court explained, it conducted a "careful review" of the terms of the NMS, and found that its "detailed Servicing Standards" were "designed to prevent the same genre of loan servicing misconduct" at issue in the CFPB's complaint. *Id.* at 21-22. Further, the Court held that the NMS "subject[ed]" the parties "to the exclusive dispute resolution procedures and enforcement mechanisms prescribed by the [Consent] Judgment" as the sole means of "test[ing] Ocwen's compliance with [the] Servicing Standards." *Id.* at 21-22. From this, the Court concluded that the alleged conduct underlying Counts I-IX was "substantially the same as [that] covered by [the NMS]," and did not involve "new matters that were not or could not have been subjected to the dispute resolution procedures and enforcement mechanism prescribed by the [Consent] Judgment." *Id.*

The Court rejected the Bureau's efforts to find daylight between parts of the NMS and the allegations underlying Counts I-IX. For example, the CFPB argued that its complaint was focused on the "accuracy" of information stored in Ocwen's system of record, while the Metrics did not require the Monitor to assess the accuracy of Ocwen's system of record. ECF 740 at 6-7 ("CFPB Opp."). The Court rejected this argument because the plain terms of the NMS "'require[] . . . an independent third party [to] periodically review those parts of the [system of record] that pertain to account information for accuracy and completeness,'" and Ocwen had provided the results of the independent reviews to the Monitor. Order at 18. Thus, it was "apparent that [system of record] accuracy issues were specifically addressed in the . . . Servicing Standards and were part of the servicing activity routinely reviewed by the . . . Monitor." *Id.*

The CFPB also argued that the Metrics did not test for Ocwen's compliance with the Servicing Standards overlapping with the categories of conduct underlying Counts I-IX. CFPB Opp. at 12-13. The Court rejected this argument, too. Order at 20-21, 27. The Court assumed *arguendo* that the Metrics did not measure all possible non-compliance with the Servicing Standards, but concluded that this did not matter because the CFPB had "agreed to test compliance with the Servicing Standards under [certain] Metrics agreed upon under the [NMS]." *Id.* at 21. Thus, even if the Metrics were "insufficient" to "test[]" Ocwen's compliance with the

---

MSJ at 9-10.

Servicing Standards," that "simply points to a limitation in the negotiated settlement between the parties," and did "not defeat an overlap of claims or causes of action." *Id.* at 20-21.

Finally, the Court addressed the CFPB's argument that *Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285 (11th Cir. 2004) required it to apply a "modified form of res judicata" by determining the preclusive effect of the NMS exclusively by its terms. Order at 24-25. The Court noted that *Norfolk Southern* involved different facts, but then expressly applied that decision's framework and concluded that it was "plainly discernable" from the "express terms of the NMS" that the parties intended and agreed that only departures from the Servicing Standards which exceeded the minimal Threshold Error Rates prescribed by the NMS would be actionable, and even then, "would be actionable only within the narrow confines of the Enforcement Terms prescribed by the NMS Consent Judgment." *Id.* at 25.[6] The CFPB's current claims, the Court concluded, were "[c]ontrary to that intent" because the CFPB was "seek[ing] redress for departures from the Servicing Standards occurring during the term of the [NMS] Consent Judgment, without regard to the Threshold Error Rates." *Id.* at 25-26. Accordingly, because the NMS "already established the means by which Ocwen's noncompliance with federal law would be measured and redressed . . . as to matters controlled by the Servicing Standards," the CFPB's "claims are precluded" by res judicata, as articulated in *Norfolk Southern*. *Id.* at 26.

For these reasons, the Court granted summary judgment in Ocwen's favor as to Counts I-IX insofar as they were based on alleged conduct preceding the NMS's expiration. Order at 26-27. The Court allowed the CFPB to clarify whether any issues remained for further litigation. *Id.* at 29-31. The CFPB filed a Second Amended Complaint that dropped the only count on which the district court did not grant summary judgment (Count X), and clarified that Counts I-IX were based on alleged conduct occurring before the NMS's expiration. ECF 777 at 1. The Court then entered Final Judgment in Ocwen's favor, *id.* at 1-2, and the CFPB appealed.

---

[6] The Eleventh Circuit also held that the 2014 consent judgment controls, and determined that, "to the extent that the district court held otherwise and applied traditional principles of res judicata, it erred." Opinion at 9. However, as noted above, this Court's original opinion analyzed the Bureau's claims based on both traditional principles of res judicata and a modified res judicata analysis as outlined in *Norfolk Southern*. Order at 25-26. Like this Court, the Eleventh Circuit also determined that *Norfolk Southern* did not require the Court to ignore the "injunction-like forward-facing standards or enforcement provisions" contained in the NMS, and that those provisions must be considered. Opinion at 10-11. For this reason, the Eleventh Circuit ruling does not require this Court to revisit that portion of its Order.

II.     **The Eleventh Circuit Agreed the CFPB's Claims Are Precluded by the NMS.**

On appeal, the Eleventh Circuit agreed with this Court that the CFPB could "sue Ocwen for alleged violations that occurred between January 2014 and February 26, 2017 *only* if they aren't covered by the consent judgment's servicing standard, monitoring, and enforcement regime." *Id.* at 13-14 (emphasis in original). The Eleventh Circuit acknowledged that Ocwen's appellate brief "carefully explained its appraisal of the overlap between the servicing standards and each of the counts in the CFPB's current complaint." *Id.* at 13 (citing Ocwen Appellate Br. at 13-14). However, it vacated this Court's judgment and remanded the case so that the Court could go "claim-by-claim" and identify the Servicing Standards or Metrics that preclude each of the CFPB's claims. *Id.* at 13-14.[7]

Thus, the sole issue on remand is whether the NMS Servicing Standards, monitoring, and enforcement regime cover each of the claims in the CFPB's Operative Complaint. As Ocwen previously demonstrated (App. Ex. 1, Ocwen MSJ at 4-11; App. Ex. 6, Ocwen Reply at 2-10), and the Court concluded based on its "careful review" of the record (Order at 13-27), each claim is covered by the NMS. The Court need only add detail to that previous finding in its Order. Summary judgment, therefore, (again) should be granted to Ocwen on all of the CFPB's claims because Counts I-IX remain precluded by the res judicata effect of the NMS.

**ARGUMENT**

I.      **On Remand, the Court Need Only Identify the Servicing Standards and Metrics It Already Held Preclude Each Count in the CFPB's SAC.**

As the Court has already carefully reviewed the record, it may easily satisfy the Eleventh Circuit's directive by supplementing the findings in its original Order to identify the specific Servicing Standards and Metrics that bar the CFPB's remaining claims. The Court previously held that Counts I-IX "are . . . substantially the same as those covered by the NMS Consent Judgment," as they overlapped with the "prospective monitoring of Ocwen's servicing performance from February 26, 2014 to February 26, 2017 under detailed Servicing Standards

_____

[7] On appeal the Bureau argued, as it had before this Court, that some counts were not covered by the NMS. Opinion at 13. As noted above, this Court previously considered and rejected this argument in its Order. Order at 18-21, 27. However, the Eleventh Circuit determined that the Order did not contain a "claim-by-claim" evaluation of this argument. Rather than evaluate each claim in the first instance, the Eleventh Circuit remanded "to the district court to do so." Opinion at 13-14.

5

designed to prevent the same genre of loan servicing loan misconduct as that charged by the Bureau in its current suit." *Id.* at 21, 27.

The record has not changed since this Court issued its Order, except that the CFPB amended its pleadings to remove the only allegations that the Court previously held were not precluded by the NMS. *See* SAC ¶ 1; ECF 777 at 1. Thus, on remand, the Court need only issue an order identifying the Servicing Standards and Metrics that it previously reviewed and found precluded Counts I-IX. *See* Opinion at 13-14; *see also* Attach. A (identifying the Servicing Standards and Metrics that overlap with each of the CFPB's claims).

## II.     The Record Indisputably Shows That the CFPB's Action Is Based on Allegations Encompassed by the NMS Servicing Standards.

The Court need not re-review the voluminous summary judgment record to articulate the details of its previous claim-by-claim analysis. The Court already did this work; the Eleventh Circuit has simply ordered that the Court document it. If, however, the Court determines it should review the record again, the evidence indisputably shows that each of the CFPB's claims is barred by res judicata, as articulated in *Norfolk Southern.* As Ocwen showed at summary judgment and shows again below, the NMS's Servicing Standards and Metrics contain a comprehensive set of requirements fully covering the conduct underlying Counts I-IX of the SAC. Attach. A & App. Exs. 1-11. Thus, the Court should reaffirm its original holding and grant Ocwen summary judgment on each of the CFPB's claims (Counts I-IX).

### A.     The CFPB Can Sue Ocwen Only for Legal Violations Not Covered by the NMS's Servicing Standards.

As the Eleventh Circuit confirmed, the CFPB can sue Ocwen only for legal violations not covered by the NMS's Servicing Standards, monitoring, and enforcement regime. Opinion at 13. Here, the Operative Complaint continues to allege violations of the Consumer Financial Protection Act ("CFPA"), the Truth in Lending Act ("TILA"), the Fair Debt Collection Practices Act ("FDCPA"), and the Real Estate Settlement Procedures Act ("RESPA"), and related regulations. SAC ¶¶ 205, 210, 215, 224, 238, 243, 253, 259, 270. Each of these counts alleged wrongdoing exclusively based on Ocwen's mortgage servicing activities undertaken during the three-year period when Ocwen remained subject to the NMS's comprehensive Servicing Standards and enforcement framework. SAC ¶¶ 1, 198-205, 206-10, 211-15, 216-20, 221-24, 231-38, 239-43, 247-53, 255-59, 260-70.

**B.      All of the Conduct Alleged in the CFPB's Operative Complaint Is Covered by the NMS Servicing Standards and Metrics.**

Critically, each count in the CFPB's Operative Complaint alleges violations of law based on the same conduct addressed by the Servicing Standards and Metrics. *See* Attach. A & App. Exs. 4-5 (identifying each of the Servicing Standards and Metrics that overlap with the CFPB's claims).

1.      The Conduct Alleged in Counts I, II, IV, V, and VI Is Covered.

The CFPB's Counts I, II, and IV-VI are premised on alleged inaccuracies underlying Ocwen's system of record, alleged misrepresentations made to borrowers based on inaccurate information, and alleged incomplete statements sent to borrowers. *See* SAC ¶¶ 199-201, 207-09, 223, 232-34, 240-42. These counts are precluded by the NMS because they are covered by the NMS's Servicing Standards, which imposed detailed requirements addressing the accuracy of borrower information held by Ocwen. Attach. A at 1-2; App. Ex. 2 ¶¶ 37-38, 40 (citing App. Exs. 4, 5). In particular, Section I.B of the Servicing Standards sought to ensure that Ocwen maintained accurate borrower information by requiring it to (a) "maintain procedures to ensure accur[ate] and timely updating of borrowers' account information," and (b) "maintain adequate documentation of borrower account information." App. Ex. 4, NMS C.J. Ex. A ¶ I.B.1; App. Ex. 2 ¶¶ 37-38, 40. Ocwen also was required to utilize an "independent reviewer" to evaluate "[Ocwen's] systems [of] record . . . for accuracy and completeness," and to "take appropriate action to remediate any inaccuracies in borrowers' account information." App. Ex. 4, NMS C.J. Ex. A ¶¶ I.B.8, I.B.9. Further, the Servicing Standards sought to ensure that borrowers received accurate and complete information by requiring that Ocwen provide "adequate information" on account statements, including "total amount due," "unpaid principle," "current escrow balance," and "allocation of payments." App. Ex. 4, NMS C.J. Ex. A ¶ I.B.5; *see also id.* ¶ I.B.10 (requiring Ocwen to provide certain borrowers under threat of foreclosure "an itemized plain language account summary" listing detailed account information).

Finally, as the Court previously held, the Monitor plainly monitored and tested these Servicing Standards, including by specifically monitoring and testing the accuracy of Ocwen's system of record. Order at 18 (holding that it was "apparent that [system of record] accuracy issues were specifically addressed in the . . . Servicing Standards and were part of the servicing activity routinely reviewed by the . . . Monitor"). *See also* App. Ex. 5, NMS C.J. Ex. D at D1-7, D1-13-D1-17, D1-21 (Metrics 4.B, 6, and 33 monitored and tested whether "payments posted

timely . . . and accurately" (4.B), the "accuracy" of billing statements (33), and whether Ocwen timely and accurately handled complaints, loan modifications and other loss mitigation efforts, forced place insurance, and pending loan modifications from prior servicers (6)).

        2.      <u>The Conduct Alleged in Count VII Is Covered.</u>

Count VII is precluded because it also addressed categories of conduct encompassed by the NMS Servicing Standards. *See* Attach. A at 2; App. Ex. 2 ¶¶ 41-42 (citing App. Exs. 4, 5). Count VII alleges various errors related to the maintenance of accurate escrow information and timely payment of hazard insurance. SAC ¶¶ 250-52. But Section I.B of the Servicing Standards already required Ocwen to "ensure accur[ate] and timely updating of borrower's account information, including posting of payments," and to "provide to borrowers . . . adequate information on monthly billing or other account statements," including "clear and conspicuous language" indicating the borrower's "current escrow balance." App. Ex. 4, NMS C.J. Ex. A ¶¶ I.B.1, I.B.5, I.B.5(e). Additionally, for "escrowed accounts" with hazard insurance, the Servicing Standards required Ocwen to "advance payments for the homeowner's existing policy." *Id*. ¶ VII.A.1.

The NMS Metrics further demonstrate the parties' intent that the Servicing Standards encompass the timely payment, processing, and maintenance of escrow accounts. For example, Metric 33 tested billing statement accuracy, which necessarily included a timely review of escrow balances because, as noted, billing statements must include that information (I.B.5(e)). App. Ex. 5, NMS C.J. Ex. D at D1-21 (ECF 731-7). Additionally, Metric 4.B specifically measured "[p]ayments posted timely . . . and accurately, including whether "payments posted to principal interest and *escrow* before fees and expenses." *Id.* at D1-7 (emphasis added).

        3.      <u>The Conduct Alleged in Count VIII Is Covered.</u>

Count VIII, which alleges various shortcomings in Ocwen's "policies and procedures" related to processing borrowers' complaints, maintaining accurate information regarding foreclosure attorneys, and the transfer of accurate information to new servicers, SAC ¶¶ 256-58, also is addressed and thus precluded by the NMS Servicing Standards. *See* Attach. A at 2; App. Ex. 2 ¶ 43 (citing App. Exs. 4, 5). The Servicing Standards required Ocwen to "adopt enhanced billing dispute procedures," to "[e]stablish[] readily available methods for customers to lodge complaints," to "[a]ssess[] and ensur[e] adequate and competent staff to answer and respond to consumer disputes promptly," to "[e]stablish[] a process for dispute escalation," and to "[t]rack[]

the resolution of complaints." App. Ex. 4, NMS C.J. Ex. A ¶ I.B.7. Additionally, Ocwen was required to develop policies or procedures "to ensure that relevant records relating to borrowers' account(s) are promptly available to the borrower's [Single Point of Contact (SPOC)], so that the SPOC can timely, adequately and accurately inform the borrower of the current status of loss mitigation, loa modification, and foreclosure activities." *Id.* ¶ IV.C.8. The Servicing Standards also required Ocwen to "adopt policies" to "oversee and manage foreclosure firms . . . and other . . . third parties" that it retained to "provide foreclosure, bankruptcy or mortgage servicing activities," and to "conduct regular reviews" of foreclosure filings to "verify the accuracy of the statements" made in such filings. *Id.* ¶¶ II.A, I.E. The Servicing Standards further imposed requirements governing Ocwen's "transfer[] of servicing rights . . . to a third party," including requirements that Ocwen "inform the successor servicer . . . whether a loss mitigation request is pending." *Id.* ¶ IV.M.1; *id.* at IV.M.4 (same for borrowers in bankruptcy). Finally, the Monitor monitored and tested Ocwen's implementation of the Servicing Standards, including by specifically monitoring Ocwen's implementation of policies and procedures and its responsiveness to customer complaints. *See* App. Ex. 5, NMS C.J. Ex. D at D1-9-D1-13, D1-17 (Metrics 5.A, 6.A, 6.D).

　　　　　4.　　The Conduct Alleged in Counts III and IX Is Covered.

Counts III and IX allege that Ocwen foreclosed on borrowers after misrepresenting that they had more time to complete loss-mitigation applications, and that Ocwen foreclosed on borrowers while an application was pending. SAC ¶¶ 212-14, 266-69. Again, these Counts are precluded because the Servicing Standards address this category of conduct. *See* Attach. A at 1-2; App. Ex. 2 ¶¶ 39, 44 (citing App. Exs. 4, 5). The Servicing Standards required Ocwen to fully "evaluate borrowers for all available loan modification options" before "referring a borrower to foreclosure," App. Ex. 4, NMS C.J. Ex. A ¶ IV.A.1, and prohibited Ocwen from "refer[ring] . . . [an] account to foreclosure" if a complete, or substantially complete, loan-modification application is submitted within 120 to 130 days of delinquency. *Id.* ¶ IV.B.1; *see also id.* ¶ IV.B.2. The Servicing Standards also limited Ocwen's ability to pursue foreclosure for post-referral borrowers if they subsequently submitted a loss-mitigation application. *E.g., id.* ¶¶ IV.B.4, IV.B.6, IV.B.8, IV.B.11.

Further, to ensure accurate representations to borrowers and to avoid erroneous foreclosures, the Servicing Standards required Ocwen to "disclose and provide accurate

information to borrowers relating to the qualification process and eligibility factors for loss mitigation programs." App. Ex. 4, NMS C.J. Ex. A ¶ IV.D.2. And the Servicing Standards mandated that an Ocwen customer representative be assigned to each borrower "potentially eligible" for loan modification, to be responsible for reviewing all "relevant records relating to borrower's account," and for "timely, adequately, and accurately inform[ing] the borrower of the current status of loss mitigation, loan modification, and foreclosure activities." *Id.* ¶¶ IV.C.3, IV.C.8, IV.D.1 (requiring the single point of contact to "[c]ommunicat[e] the [loss mitigation and loan modification] options available to the borrower" and "[c]oordinat[e] receipt of all documents associated with loan modification or loss mitigation activities").

Moreover, the Monitor measured compliance with these Servicing Standards through multiple, specific Metrics. For example, Metric 1.A evaluated "error[s]" associated with "foreclosure sales." App. Ex. 5, NMS C.J. Ex. D at D1-2. Metric 3 assessed whether Ocwen complied with pre-foreclosure requirements, and whether its records "accurately reflect that [it] ha[d] the right to foreclose[.]" *Id.* at D1-5-D1-6; *see also id.* at D1-10 (Metric 5.C testing implementation of "single point of contact" requirement). Metric 6.B assessed Ocwen's compliance with loan modification requirements, including whether a "[l]oan was referred to foreclosure in error" because foreclosure was initiated when "[Ocwen] was in possession of an active, complete loan modification package." *Id.* at D1-13-D1-16 (addressing whether "[f]oreclosure proceedings [were] allowed to proceed in error" and testing whether Ocwen "proceed[ed] to judgment or order of sale upon receipt of a complete loan modification package"). Metric 6.D monitored whether Ocwen "accept[ed], and continue[d] to process pending loan modification requests from the prior servicer and honor[ed] loan modification agreements entered into the by the prior servicer." *Id.* at D1-17. And Metric 30 measured Ocwen's compliance with Standards governing the "[l]oan modification process," and assessed whether Ocwen afforded borrowers the required time period to supplement an application. *Id.* at D1-18.

\* \* \*

As evidenced above, the Servicing Standards imposed comprehensive and detailed requirements covering Ocwen's mortgage-servicing activities, including the categories of conduct specifically underlying each of the Counts in the CFPB's Operative Complaint, and the

Monitor tested Ocwen's compliance with the relevant Servicing Standards under the corresponding Metrics. *See* Attach. A & App. Exs. 4-5.

## CONCLUSION

For these reasons, the Court should reaffirm the holding in its original Order, and grant Ocwen summary judgment on all the CFPB's claims (Counts I-IX). By including the analysis above and the detail in Attachment A in its revised opinion, thereby documenting the specific NMS Servicing Standards, Metrics, and enforcement terms that bar each count in the SAC, the Court will address the sole issue on remand identified by the Eleventh Circuit.

Dated: September 1, 2022

Respectfully submitted,

*/s/ Catalina E. Azuero*

Bridget Ann Berry
Andrew Stuart Wein
**GREENBERG TRAURIG, P.A.**
777 South Flagler Drive, FL 33401
Tel.: 561.650.7900
berryb@gtlaw.com
weina@gtlaw.com

Thomas M. Hefferon (*pro hac vice*)
Sabrina M. Rose-Smith (*pro hac vice*)
Matthew L. Riffee (*pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel.: 202.346.4000
thefferon@goodwinlaw.com
srosesmith@goodwinlaw.com
mriffee@goodwinlaw.com

Laura A. Stoll (*pro hac vice*)
**GOODWIN PROCTER LLP**
601 S. Figueroa Street
Los Angeles, CA  90017
Tel.:  213.426.2500
lstoll@goodwinlaw.com

Catalina E. Azuero (Florida Bar No. 821411)
**GOODWIN PROCTER LLP**
100 Northern Avenue

Boston, MA  02210
Tel.:  617.570.1000
cazuero@goodwinlaw.com

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on September 1, 2022 via ECF on all counsel or parties of record.

/s/ *Catalina E. Azuero*
CATALINA E. AZUERO

13