## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:17-CV-80495-MARRA

CONSUMER FINANCIAL PROTECTION BUREAU,

      Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, *et al.*,

      Defendants.

_____/

### SUMMARY JUDGMENT ORDER (SECOND) ON REMAND FROM THE ELEVENTH CIRCUIT COURT OF APPEALS

### I.     INTRODUCTION

This case is back before the Court on remand from the Eleventh Circuit Court of Appeals. After a review of the Court of Appeals' Mandate, a review of the record evidence, and consideration of the arguments of the parties, the Court rules as follows:

### II.     BACKGROUND

On April 6, 2022, the Eleventh Circuit Court of Appeals vacated the Court's final judgment in favor of Defendants Ocwen Financial Corporation, *et al.* ("Ocwen"), remanding the matter for further proceedings. More specifically, the appellate court directed this Court to conduct "a claim-by-claim assessment" to determine whether any of the nine counts of Plaintiff Consumer Financial Protection Bureau ("Bureau")'s complaint survive because they "[are *not*] covered by the consent judgment's servicing-standard, monitoring, and enforcement regime." *Consumer Financial Protection Bureau v. Ocwen Financial Corporation*, 30 F.4th 1079, 1086 (11th Cir. 2022) (emphasis added). The mandate recognizes that *res judicata* may preclude the Bureau's claims; its

"course correction" requires the Court to perform a more particularized assessment of the current claims as compared to the consent judgment's regime.

The consent judgment[1] stems from litigation in a District of Columbia action between and among the same parties herein. *See Consumer Financial Protection Bureau v. Ocwen Financial Corporation*, Case No. 13-cv-02025 (D. D.C. February 26, 2014) at DE 12, 12-1, 12-2, 12-3, 12-4, 12-5[2] ("the 2013 action"). The current operative complaint (the Bureau's Second Amended) identifies January 1, 2014 through February 26, 2017 as the "Relevant Time Period" (DE 775 at 1), the same time period the NMS was prospectively enforceable and Ocwen's conduct was under agreed upon scrutiny for allegedly harming borrowers. Through the consent judgment, the parties "agreed to resolve their claims without the need for litigation" (DE 12 at 7) and created a roadmap of oversight through its servicing-standard, monitoring, and enforcement regime, including but not limited to options to petition the D. C. court if necessary (DE 12-4, *e.g.*, at 14 (G): "*Subject to Section I* [Enforcement]*, below, in the event that a dispute cannot be resolved, Servicer, the Monitor, or the Monitoring Committee may petition the Court for resolution of the dispute*"). As noted by the Eleventh Circuit, the monitoring committee successfully petitioned the D.C. court to obtain the consent judgment's prescribed relief for an uncured potential violation on at least one occasion. *CFPB v. Ocwen Financial Corp.*, 30 F.4th at 1082.

In brief sum, the Bureau's current complaint frames allegations that Ocwen, during the Relevant Time Period, violated the Consumer Financial Protection Act of 2010 ("CFPA") and

---

[1] The consent judgment is alternately referred to as "National Mortgage Settlement [NMS] C.J.," or "NMS."
[2] References to "DE 12" and its exhibits (DE 12-1, 12-2, 12-3, 12-4 and 12-5) all refer to docket entries from the 2013 action.

laws and regulations enumerated thereunder[3] through the conduct of its mortgage servicing business (DE 775).[4] This Court's final judgment in favor of Ocwen was based on *res judicata* as set forth in the judgment and related summary judgment order (DE 777; DE 764 at 29-31). The Bureau's successful appeal of the Court's final judgment brings us to this moment.

Having reviewed the pertinent portions of the record, with the benefit of oral argument on March 14, 2023 and the parties' post-remand briefing on the merits, and being otherwise duly advised in the premises, the Court rules that the terms of the parties' bargain -- *i.e.*, the consent judgment -- bar the Bureau's current claims in toto, based upon the reasoning and claim-by-claim analysis set forth below.

## III.   DISCUSSION

### A.   *The Complaint*

The Bureau's allegations are summarized for ease of reference as follows:

| COUNT | ALLEGATION | LAW CITED |
|:---:|:---|:---|
| I | Use of Inaccurate and Incomplete Information to Service Loans Was Unfair | Section 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B) |
| | | |
| II | Deceptive Acts and Practices Regarding Loan Terms and Status | Same as above |
| | | |
| III | Deceptive Foreclosure Communications | Same as above; and Truth in Lending Act ("TILA"), and Regulation Z[5] |

---

[3] "Enumerated consumer laws" under the CFPA means, at 12 U.S.C.A. § 5481(12)(H) (Fair Debt Collection Practices Act ("FDCPA")); 12 U.S.C.A. § 5481(12)(M) (Real Estate Settlement Procedures Act ("RESPA") of 1974); 12 U.S.C.A. § 5481(12)(O) (Truth in Lending Act ("TILA")); and related regulations found at 12 C.F.R. §1024 (Regulation X, RESPA); and 12 C.F.R. §1026 (Regulation Z, TILA).

[4] Familiarity with the record (exceeding 800 docket entries) is presumed for purposes of this Order; salient portions are restated here to refresh memories only.

[5] Paragraphs 216-220 of Second Amended Complaint ("SAC") Count III set forth prohibitions and definitions under TILA and Regulation Z without specifying how Ocwen allegedly violated those

| | IV | Periodic Statement Failures | 12 C.F.R. § 1026.41(d) [TILA], and 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A); Fair Debt Collections Act (FDCPA)[6] |
|---|---|---|---|
| | V | Use of Inaccurate and Incomplete Information to Service Loans Was Unfair | FDCPA and CFPA |
| | VI | Deceptive Debt Collection Practices | FDCPA, CFPA; RESPA, Regulation X |
| | VII | Escrow Violations | RESPA, Regulation X; CFPA |
| | VIII | Servicing Policies and Procedures Violations | RESPA, Regulation X; CFPA |
| | IX | Foreclosure Violations | RESPA, Regulation X; CFPA |

(DE 775).

### B. The Bargain

As the Bureau concedes, the consent judgment terms constitute "the deal that was struck" (Transcript of Mar. 14, 2023 Oral Argument ("Tr") at 13) and the lens through which the Court must perform its analysis to more specifically articulate how, if at all, those terms do *not* cover the claims before the Court. *CFPB v. Ocwen Financial Corp*., 30 F.4th at 1084. The Court's previous *res judicata* analysis will not be revisited herein except as may be necessary to fulfill the appellate court's mandate (DE 764 at 13-26).

The Bureau's express intention "in effecting [the] settlement [was] to remediate harms allegedly resulting from the alleged unlawful conduct of the Defendant" (DE 12 at 8). Pertinent

---

laws and regulations (DE 775 at 67-68). (In remand briefing, the Bureau cites only to the CFPA for Count III (DE 807 at 8), not the enumerated laws thereunder, such as TILA or Regulation Z.)
[6] Paragraphs 225-230 of SAC Count IV set forth prohibitions and definitions under FDCPA without specifying how Ocwen allegedly violated that law (DE 775 at 69-70).

exhibits to the consent judgment include a "Settlement Term Sheet" /Servicing Standards (DE 12-1 (Exhibit A)); "Enforcement Terms" /Servicing Standards, including Metrics (DE 12-4 (Exhibit D)); and the "CFPB Release" (DE 12-5 (Exhibit E)).

      *C. The Metrics*

      The Bureau, post-remand, reasserts as one of its two central arguments that if there is no Metric to cover an allegation in its complaint, then there is, in substance, daylight through which one or more of its claims may gain traction to avoid the effects of *res judicata* (DE 807 at 1)[7] ("you have to look at the metrics in order to determine whether in fact there was a violation at the end of the day") (Tr at 7). It claims that there is "no place that this is clearer than Count VII," where it alleges that Ocwen "failed to timely conduct the required annual analyses of borrowers' escrow accounts. Not a single NMS Servicing Standard or Metric applies to Ocwen's timely performance of annual escrow analyses and Ocwen's own expert could not identify one"[8] (DE 807 at 1); "there is no coverage as it relates to escrow, specifically escrow analysis, on the face of the National Mortgage Settlement . . . " (Tr at 5).

---

[7] The Bureau's second central argument -- the "System of Record" deficiency theory -- as with the "absence of Metric" theory was considered and rejected by the Court in its pre-remand order on summary judgment (DE 764 at 17 -21).

[8] The Bureau appears to be referring to the following specific testimony of Ocwen's expert, which the Court quotes here for completion: "Q: . . . Let me be more precise. Is there an NMS standard that is informing your opinion as to what the generally accepted servicing standards are? A: For what purposes? Q: For escrow analyses. A: Oh. Not that I can think of" (DE 742-12 at 190). Subsequently, the following exchange transpires: "Q: . . . So here, you title this section Three, 'Ocwen Collected Escrow Shortages In Accordance With Servicing Standards.' Again, what do you mean by 'servicing standards' here? A. Generally accepted servicing standards. Q: Is there an NMS standard that informs your opinion here? A: I don't believe -- I can't recall whether the servicing standards in the NMS cover escrow. I don't think there's a metric related to escrow in the NMS. Q: Because, presumably, you would have listed it, had one existed? A: I'm just telling you, I don't recall" (*Id*. at 210-11).

The Bureau's attempts to distinguish the NMS from the Metrics, as if the latter are a stand-alone scheme and prerequisite to a potential violation, are eclipsed by the plain terms of the consent judgment, the penumbra under which they both travel. The Eleventh Circuit repeatedly refers to Ocwen's need to comply with the Servicing Standards as the umbrella precept, with just one specific reference to a servicing standard's "applicable compliance metric." *CFPB v. Ocwen Financial Corp.*, 30 F.4th at 1082.  *Cf.*, *id.* at 1081 ("consent judgment released Ocwen from liability for the conduct alleged in the CFPB's complaint and established a three-year period during which Ocwen had to *comply with detailed servicing standards* enforced through a specific monitoring and compliance regime" and "[b]ased on our review of the entire settlement agreement, however, we hold that the parties intended to preclude new challenges to conduct covered by the settlement agreement's *three-year servicing-standard, monitoring, and enforcement regime*"); at 1082 ("First, the consent judgment remained operative for a three-year period, until February 26, 2017, and required Ocwen to abide by *specific servicing standards* during that timeframe. Those provisions covered a wide range of mortgage-servicing activity, prescribing standards for, among other things, verifying borrowers' account information, documenting notes, notifying borrowers about loan-modification options, participating in bankruptcy proceedings, charging servicing fees, and obtaining force-placed insurance. Second, the consent judgment created a monitoring and enforcement regime *to police Ocwen's compliance with the servicing standards*"); and at 1085 ("Ocwen persuasively argues that the settlement agreement's extensive three-year servicing-standard, monitoring, and enforcement regime indicates that if it committed a legal violation covered by *the standards*, the parties intended for the CFPB to remedy that violation through the agreed-upon processes—not through a *separate* court proceeding") (emphasis added).

Ocwen characterizes the Metrics as part of the overall consent judgment, operating both as a means to test certain aspects of the Servicing Standards and a vehicle to obtain a "liquidated damages" award (Tr at 43-44). It argues, and the Court agrees, that to the extent the Metrics may have proven insufficient to test compliance with the Servicing Standards, this only demonstrates the consent judgment's limitation, not a basis to file putatively new claims for the same timeframe in this Court for alleged misconduct covered by the consent judgment.  (DE 810 at 8-9; DE 764 at 20-21).

Contrary to the Bureau's arguments in post-remand briefing and at the post-remand Oral Argument, the Court finds that the Servicing Standards and Metrics, while interdependent, are not so inextricably intertwined that there can be no violation of the consent judgment without a violation of a particular Metric. This is illustrated not just by reference to the Eleventh Circuit decision as shown above, but also by the following terms of the consent judgment:

> "Defendant shall comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms *and* Section A of Exhibit D [Metrics] attached hereto." (DE 12 at 9 (III.3.)) (emphasis added)

> Implementation Timeline for Servicing Standards overall, referring only five (5) Metrics to specific deliverable dates (DE 12-4 at 2 (A).)

> Monitoring Committee "shall monitor [Ocwen's] compliance with this Consent Judgment," *i.e.*, which includes both the Servicing Standards and Metrics (DE 12-4 at 2 (B.))

> The Monitor's Responsibilities are "to determine whether [Defendant] is in compliance with the Servicing Standards," *i.e.*, not just the Metrics (*Id*. at 4 (C.5.))

> "The Internal Review Group shall have personnel skilled at evaluating and validating process, decisions and documentation utilized through the implementation of the Servicing Standards," *i.e.*, not just the Metrics (*Id*. at 5 (C.9.))

As Ocwen correctly points out, "[t]here are some standards that have no accompanying [M]etric at all" (Tr at 44), and the Eleventh Circuit did not remand the matter for the Court to

articulate whether there was a Metric to cover an allegation, it was to determine whether any "alleged violations that occurred between January 2014 and February 26, 2017 . . . *aren't* covered by the consent judgment's servicing-standard, monitoring, and enforcement regime." *CFPB v. Ocwen Financial Corp*., 30 F.4th at 1086 (emphasis added). Even if the Bureau's position as to the need for a specific Metric to cure an alleged violation were true, as to the foreclosure Counts III and IX, the NMS' servicing-standard, monitoring, and enforcement regime expressly provides a mechanism to add Metrics at least as to borrowers or tenants in foreclosed properties (DE 12-4 at 8-9 (C. 22-23)).   Hence, these counts clearly could have been covered by the NMS. More importantly, if the "Servicer, the Monitor, and the Monitoring Committee" were unable to resolve "*any dispute* concerning *any issue* arising under the Consent Judgment," the parties could have petitioned the D.C. court for resolution of "*a* dispute," or "*the* dispute" -- not any narrow category of disputes (DE 12-4 at 14) (emphasis added). There is simply no term stating that there must be a specific Metric in dispute to petition the D.C. court for relief. The consent judgment provided a plethora of means for the Bureau to petition the D.C. court for relief consistent with the consent judgment terms, during and after the Relevant Time Period, *e.g.*:

> 12. *This Court retains jurisdiction for the duration of this Consent Judgment to enforce its terms.  The parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court.  This Consent Judgment may be modified only by order of this Court*. (DE 12 at 11)

> 15. . . . .*Defendant shall have no further obligations under this Consent Judgment six months after the expiration of the Term, but the Court shall retain jurisdiction for purposes of enforcing or remedying any outstanding violations that are identified in the final Monitor* **Report and that have occurred but not been cured during the Term**.[9] (*Id*. at 12)

---

[9] To the extent the Court's previous Order on summary judgment suggested that the current action was filed just two months after the expiration of the Consent Judgement (DE 764 at 11), this Order supersedes the previous inadvertent misstatement. Based on this provision (DE 12 at 11), Ocwen was still answerable to the NMS (and, by extension, the presiding D.C. court) until August 26, 2017, six months after the February 26, 2017 expiration of the consent judgment, making the

*G. . . . Subject to Section I, below, in the event that a dispute cannot be resolved, Servicer, the Monitor, or the Monitoring Committee may petition the Court for resolution of the dispute.* (DE 12-4 at 14)

*I. 1. Consent Judgment. This Consent Judgment shall be filed in the U.S. District Court for the District of Columbia and shall be enforceable therein.* (*Id.*)

Ergo, where Servicing Standards at I. B.1. also require that "Servicer shall maintain procedures *to ensure accuracy and timely updating of borrower's account information*, including posting of payments and imposition of fees," these requirements as to accuracy and timeliness cover the Bureau's related allegations and were available for the Bureau to act upon during the Relevant Time Period or, if deficient from the Bureau's point of view, may have been grounds to petition the D.C. court for relief (DE 12-1 at 5) (emphasis added).

Finally, while the Eleventh Circuit agreed with the Bureau that the *res judicata* preclusive effect on its current, 2017, action should be analyzed based upon the consent judgment which grew out of the 2013 complaint, not the complaint itself, it held that the "parties intended to preclude new challenges to conduct covered by the settlement agreement's three-year servicing-standard, monitoring, and enforcement regime." *CFPB v. Ocwen Financial Corp*., 30 F.4th at 1081. The parties simply, and still, dispute "the CFPB's authority with respect to Ocwen's conduct that occurred [during the Relevant Time Period], when the consent judgment that resolved the 2013 action was in effect." *Id.* at 1083.

Based on the foregoing, and the mandate that this Court conduct a "claim-by-claim" analysis of how, if at all, the consent judgment precludes the extant claims, *Id.* at 1086, the Court provides as follows.

---

Bureau's April 20, 2017 filing in the Southern District of Florida (the instant matter) even more inappropriate than previously suggested by the Court.

### D. Claim-by-Claim Analysis

#### 1. Count VII ("Escrow Violations")

Following the Bureau's lead, we begin with Count VII, through which it claims Ocwen failed to pay hazard insurance premiums in a timely manner on behalf of escrowed borrowers, failed to timely conduct escrow analyses, or conduct them at all, and committed other escrow-related misconduct in violation of the Real Estate Settlement Procedures Act ("RESPA") and Regulation X (DE 775 at 76-78).

As previously stated, the Bureau asserts that "[n]ot a single NMS Servicing Standard or Metric applies to Ocwen's timely performance of annual escrow analyses." (DE 807 at 1). Ocwen asserts that Servicing Standards I.B.1, I.B.5, and VII.A.1, and Metrics 4.B and 33 overlap Count VII claims (DE 808-1 at 2). The Bureau further argues that "[e]scrow was simply not at issue in [the] underlying [2013] action, which is why it is also not at issue in the NMS" (Tr at 34). The Court's review of the NMS suggests otherwise. Specifically, the Settlement Term Sheet at I.B.5 requires Ocwen to

> provide to borrowers (other than borrowers in bankruptcy or borrowers who have been referred to or are going through foreclosure) adequate information on monthly billing **or other account statements** to show in clear and conspicuous language:
>
> a. total amount due;
>
> b. allocation of payments, including a notation if any payment has been posted to a *"suspense or unapplied funds account"*;
>
> c. unpaid principal;
>
> d. fees and charges for the relevant time period;
>
> e. **current escrow balance**; and
>
> f. reasons for any **payment changes, including an interest rate or escrow account adjustment**, no later than 21 days before the **new amount is due**

> *(except in the case of loans as to which interest accrues daily or the rate changes more frequently than once every 30 days)*

(DE 12-1 at 6-7) (emphasis added). An indispensable prerequisite to determining whether an "escrow account adjustment" is necessary is the performance of the annual escrow analysis by the Servicer, squarely refuting the Bureau's arguments. Similarly, Settlement Term Sheet at VI.B.4.b., provides that "Servicer shall not collect late fees (i) based on an amount greater than the past due amount; (ii) *collected from the escrow account or from escrow surplus* without the approval of the borrower; or (iii) deducted from any regular payment" (*Id*. at 40-41) (emphasis added), which also necessarily requires Ocwen to perform an escrow analysis.  Ocwen's need to maintain accurate escrow account data, and its escrow-related conduct more generally, was plainly at issue and covered by the Standards.

Finally, Metric 2 ("Integrity of Critical Sworn Documents"), at B and C, also includes related Test Questions referencing "escrow shortages and deficiencies," which necessarily requires the performance of an escrow analysis (DE 12-4 at 19-20) or at least inquiry as to whether an escrow analysis has been done. If the Bureau believed these or any other Metrics were deficient it was incumbent upon them to have petitioned the D.C. court to address such perceived shortcomings.

The Court also agrees with Ocwen that Servicing Standards VII.A.1 ("Forced-Placed Insurance), and Metrics 4.B (measuring whether payment postings are timely and accurate) and 33 (measuring billing statement accuracy) overlap with Count VII.

Based on the foregoing, and the entire record, the Court finds that Count VII was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

2.   <u>Count I ("Use of Inaccurate and Incomplete Information to Service
      Loans Was Unfair")</u>

In Count I, the Bureau claims Ocwen used inaccurate and incomplete loan data in servicing
borrowers' loans, the product of its inputting inaccurate and incomplete account information obtained
from other servicers without review and substantiation, along with other operational deficiencies in its
proprietary "system of record" ("SOR") (DE 775 at 63-65). Ocwen's alleged actions caused or were
likely to cause substantial injury including but not limited to unlawful commencement of foreclosures
and improper handling of loss mitigation applications, all constituting "unfair acts and practices" in
violation of the CFPA (*Id*. at 64-65).

In support that Count I is not covered by the NMS, the Bureau proffers that "the
fundamental difference" between the Servicing Standards and its current claims [specifically
including Counts I, II, V and VI] is that the "Bureau is concerned with the *accuracy* of the
information in Ocwen's system of record while the NMS focused on *discrepancies* between
Ocwen's system of record and statements it made to consumers" (DE 807 at 7) (emphasis added).
The Bureau further posits that the "NMS definition of accuracy [ ] only requires that the statements
mimic the system of record" (*Id*. at 10). In other words, the Bureau asserts that the NMS was not
concerned with whether Ocwen was providing factually accurate information to its borrowers.
Rather, the NMS was only concerned with whether the information provided by Ocwen to its
borrowers, even if factually incorrect, was consistent with its allegedly inaccurate system of
record. Not only is this an astounding proposition, but the Bureau's interpretation overlooks,
among other things, that under the NMS, Ocwen's "systems to record account information shall
be periodically independently reviewed for accuracy and completeness by an independent
reviewer" (DE 12-1 at 8, I.B.9). It also ignores the dictionary definitions of "discrepancy" -- "a
difference between two things that should be the same" -- and "accuracy" – "the fact of being exact

or correct."[10] The Bureau's argument simply constitutes a distinction *without* a difference: a discrepancy necessarily means one data set is accurate and one is inaccurate.  Moreover, even if Ocwen's system of record was itself an issue, as the Bureau claims, that would have been something the Internal Review Group and/or the Monitor was expressly empowered to address, *e.g.*: "*The Internal Review Group shall have personnel skilled at evaluating and validating* **processes**, *decisions*, **and documentation utilized through the implementation of the Servicing** **Standards**, and "*The qualifications and performance of the Internal Review Group will be subject to ongoing review by the Monitor*" (DE 12-4 at 4-5, C. 7-10 (emphasis added)).

The Bureau's position that the Standards are not concerned with accuracy is also contraindicated by the NMS. For example, Metric 4 ("Accuracy and Timeliness of Payment Application and Appropriateness of Fees"), at "B," requires "Payment posted timely (within 2 business days of receipt) and accurately," and a related test question asks, "Were payments posted in the right amount?" (DE 12-4 at 23); Metric 2 requires that "amounts agree to system of record within tolerance if overstated" (DE 12-4 at 19).

Finally, Servicing Standards at I ("Foreclosure and Bankruptcy Information and Documentation") and IV ("Loss Mitigation") and accompanying Metrics, *e.g.*, Metrics 1, 3 address foreclosure issues and loss mitigation issues (DE 12-1 at 2-13, 18-37; DE 12-4 at 18, 21-22).

Ocwen also persuasively argues that Standard I.B.1 --

> *Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format* (DE 12-1 at 5),

Standard I.B.8 --

---

[10] https://dictionary.cambridge.org/us/dictionary/english/discrepancy;
https://dictionary.cambridge.org/us/dictionary/english/accuracy.

> *Servicer shall take appropriate action to promptly remediate any inaccuracies in borrowers' account information, including: a. Correcting the account information; b. Providing cash refunds or account credits; and c. Correcting inaccurate reports to consumer credit reporting agencies* (DE 12-1 at 8),

and Metric 33 (measuring billing statement accuracy, with test questions asking, relative to balances, payments, fees, and charges) --

> *Does the monthly billing statement **accurately show**, **as compared to the system of record** at the time of the billing statement the allocation of payments, including a notation if any payment has been posted to a 'suspense or unapplied funds account'*? (DE 12-4 at 37) (emphasis added)

in particular cover the claims asserted in Count I (DE 808 at 9-10, DE 808-1 at 1).

Based on the foregoing, and the entire record, the Court finds that Count I was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

### 3. Count II ("Deceptive Acts and Practices Regarding Loan Terms and Status")

In Count II, the Bureau claims Ocwen made material misrepresentations to borrowers regarding loan terms and status (again allegedly due to its reliance on inaccurate loan data placed into its system of record without substantiation), constituting "deceptive acts and practices" in violation of the CFPA (DE 775 at 65-67).

In its remand briefing, the Bureau again (as with Count I) refers to the SOR as itself being inaccurate and incomplete and argues NMS' focus on discrepancies and the Bureau's focus on accuracies leads to the conclusion that "[t]he NMS terms thus do not cover the Bureau's allegations" (DE 807 at 7-8). As was the case with Count I, the Court finds this position unavailing. Moreover, the Court rejects the Bureau's assertion that "Metric 4.B also makes clear that the Servicing Standards are *unconcerned* with whether the balances or information in the [SOR] were, in fact, accurate" (DE 807 at 7-8) (emphasis added). According to Metric 4.B, payments must be posted timely and accurately, to the "right account number," "in the right amount," and refer to "properly identified conforming payments" (DE 12-4 at 23).

Furthermore, Servicing Standards at I.A.1. require Ocwen to ensure that factual assertions made in documentation supporting foreclosure and bankruptcy proceedings (*e.g*., pleadings, proofs of claim, affidavits) are "*accurate and complete*," "supported by *competent and reliable evidence*," and "that [Ocwen] has reviewed *competent and reliable evidence* to substantiate the borrower's default and the right foreclose, including the *borrower's loan status and loan information*" (DE 12-1 at 2) (emphasis added). Although seemingly redundant, Ocwen's *affiants* were also required to confirm in filings related to such proceedings "that *they* have reviewed *competent and reliable evidence* to substantiate the borrower's default and the right to foreclose, *including the borrower's loan status and required loan ownership information*" (*Id*. at 2-3) (emphasis added).  Servicing Standards at IV.B.14 requires that Ocwen "shall ensure timely and accurate communication of or access *to relevant loss mitigation status and changes in status* to its foreclosure attorneys, bankruptcy attorneys and foreclosure trustees and, where applicable, to court-mandated mediators" (*Id*. at 23) (emphasis added). Servicing Standards IV.C.3., 4 and 8 are replete with requirements that Ocwen establish a single point of contact ("SPOC") primarily responsible for communicating with borrowers about the status of their loan accounts and being knowledgeable about the loan status throughout loss mitigation, loan modification and foreclosures processes (*Id*. at 23-25). Servicing Standards at IV.E. further requires that Ocwen "shall develop or contract with a third-party vendor to develop an online portal linked to Servicer's primary servicing system where borrowers can check, at no cost, *the status of their first lien loan modifications*." (*Id*. at 28). Finally, Metric 5.B., requires that these borrower portals -- which are subject to quarterly review -- "provide loss mitigation status updates" (DE 12-4 at 25); and Metric 5.F., "Account Status Activity," requires "System of record electronically documents key activity of a foreclosure, loan modification, or bankruptcy" (*Id*. at 28).

Based on the foregoing, and the entire record, the Court finds that Count II was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

### 4.   Count III ("Deceptive Foreclosure Communications")

In Count III, the Bureau alleges Ocwen made material misrepresentations to borrowers regarding foreclosures and committed other foreclosure-related misconduct, constituting deceptive acts and practices in violation of the CFPA (DE 775 at 67). More specifically, the Bureau claims that Ocwen, during the Relevant Time Period, misrepresented timeframes within which borrowers who were engaged in loss mitigation efforts would not be foreclosed upon. In post remand briefing, the Bureau contends that this count is not covered by the NMS simply because Ocwen "failed to demonstrate that the NMS Servicing Standards and Metrics cover" this claim (DE 807 at 8). Ocwen's post remand brief, on the other hand, accurately identifies a litany of NMS Servicing Standards and Metrics that apply to this Count (DE 808 at 9-10).

Servicing Standards at I.A-C ("Foreclosure and Bankruptcy Information and Documentation"), including their enumerated subparagraphs, of which there are many, amply cover Count III and will not be restated here (DE 12-1 at 2-10). In addition, to the extent that the Bureau asserts Ocwen "benefited from [ ] limited Metric testing that was funneled through [the Servicing] standards" (Tr at 13) to show Count III is not covered by the NMS, the Servicing Standards provided the Bureau with express terms for the number of Metrics to grow in the context of borrowers or tenants in foreclosed properties, terms which the Bureau appears to have overlooked to remediate complaint allegations found in Count III (DE 12-4 at 8-9 (C. 22, 23)). More specifically, the Standards' "Work Plan'" provides that Ocwen's "compliance with the Servicing Standards shall be assessed via metrics identified and defined in Schedule D-1 hereto, as supplemented by and consistent with the metrics provided in the [NMS] 2012 Consent Judgment *and any additional metrics that may*

be developed in accordance with Section C.22 below ('the Metrics'). The threshold error rates for the Metrics are set forth in Schedule D-1 (*as supplemented from time to time in accordance with Section C.22, below*, the 'Threshold Error Rates')" (*Id*. at 5 (C.11) (emphasis added)).

Based on the foregoing, and the entire record, the Court finds that Count III was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

### 5. Count IV ("Periodic Statement Failures")

In Count IV, the Bureau alleges that Ocwen failed to provide accurately detailed periodic billing statements to borrowers, in violation of the CFPA and Regulation Z (DE 775 at 68-69). In post remand briefing, the Bureau contends that this count, like Count III, is also not covered by the NMS simply because Ocwen "failed to demonstrate that the NMS Servicing Standards and Metrics cover" this claim, renewing its attempts to pierce the plain meaning of "accurate" by asserting an illusory distinction between "(accurate in reality, as opposed to the NMS definition of accuracy which only requires that the statements mimic the system of record)" (DE 807 at 8).

Ocwen counters that Count IV is precluded by the NMS "because they are covered by the NMS's Servicing Standards, which imposed detailed requirements addressing the accuracy of borrower information held by Ocwen" (DE 808 at 9). Ocwen specifically cites Servicing Standards I.B.1, 5, and 10 and Metrics 4.B. and 33 in support of its position (DE 808-1 at 1).

The Court's analysis of Count IV as compared to the NMS finds that Servicing Standards I.B.1., 5, 9 and 10 (DE 12-1 at 5-9) cover this claim by their detailed itemization of account information that must be sent to borrowers -- "systems to record account information [which] shall be periodically independently reviewed for *accuracy and completeness* by an independent reviewer" (*Id*. at 8) (emphasis added).  In addition, Metric 33 (citing Standards I.B.5) measures "Billing Statement Accuracy" and lists as "Test Questions" the following:

> *1.Does the monthly billing statement accurately show, **as compared to the system of record** at the time of the billing statement, the unpaid principal balance?*
>
> *2.Does the monthly billing statement accurately show **as compared to the system of record** at the time of the billing statement each of the following: a. total payment amount due; and, b. fees and charges assessed for the relevant time period?*
>
> *3. Does the monthly billing statement accurately show **as compared to the system of record** at the time of the billing statement the allocation of payments, including a notation if any payment has been posted to a "suspense or unapplied funds account"?*

(DE 12-4 at 37) (emphasis added). These questions, in addition to illustrating how Count IV is covered by the NMS Standards and Metrics, also undermine the Bureau's insistence that the SOR itself was the issue because the billing statements were *expected* to mimic the SOR (*see generally*, *supra* at 12-14). These questions, which engender a comparison between the monthly billing statements and the SOR, suggest that the two data sets were not merely to be checked for mimicry, but to see if there was any discrepancy between them which would require appropriate further inquiry and/or corrective action. In any event, and as previously stated, if the Bureau had an issue with the SOR itself, it was incumbent upon it to use the existing tools it had under the "deal that was struck."

Based on the foregoing, and the entire record, the Court finds that Count IV was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

### 6. Count V ("Inaccurate and Incomplete Information to Service Loans Was Unfair")

In Count V, the Bureau alleges that Ocwen used inaccurate and incomplete information to service loans which were in default, and through acts and practices constituting unfair or unconscionable means to collect on these debts, violated both the CFPA and the Fair Debt Collection Practices Act ("FDCPA"). More specifically, the Bureau claims that Ocwen's SOR and Ocwen's manual processes both resulted

in erroneous borrower account information as to loan terms, payments, payoff amounts, escrow amounts and loss mitigation information (DE 775 at 71-72). This misinformation allegedly caused unlawful foreclosure proceedings, mishandling of loss mitigation applications and misapplication of payments, collection, and billing, among other potential or actual injuries (*Id.*).

The Bureau's post remand brief states that its claims in Count V (like Count I, II and VI)[11] are the result of the SOR itself being inaccurate and incomplete and the "NMS terms thus do not cover the Bureau's allegations" (DE 807 at 8).

Ocwen's Response to the Bureau's post remand brief points to the Court's Order on Summary Judgment in support of its position that even if the SOR was itself the issue, the Court already concluded that the NMS required an independent third party to review "'those parts of the [SOR] that pertain to account information for accuracy and completeness'" (DE 810 at 4-5; DE 764 at 18 (Order on SJ)).

Whether the SOR itself or Ocwen's manual processes were the source of alleged actual or potential injury during the Relevant Time Period, Servicing Standards and related Metrics were available to the Bureau to redress any issues. Servicing Standards I.B.1,[12] I.B.9,[13] for instance, cover Count V and afforded the Bureau an avenue of redress during the NMS enforcement period. Servicing Standard I.B.8 required Ocwen to "take appropriate action to promptly remediate any inaccuracies in borrowers' account information" (DE 12-1 at 8).  Servicing Standard I.C. contains

---

[11] Both parties group Counts I, II, V and VI together for post-remand argument purposes (DE 807 at 7; DE 808 at 9).

[12] "Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format" (DE 12-1 at 5).

[13] "Servicer's systems to record account information shall be periodically independently reviewed for accuracy and completeness by an independent reviewer" (DE 12-1 at 8).

a litany of requirements to ensure, for instance, that a foreclosing entity "has a documented enforceable interest . . . under applicable state law, or is otherwise a proper party to the foreclosure action." (DE 12-1 at 9). Metrics 1 through 3 expressly measure and test the propriety of a foreclosure action and the accuracy of account information leading to a foreclosure, to protect borrowers and tenants from injury (DE 12-4 at 18-22). Additional Metrics could have been proposed to the extent needed to address a suspected "pattern of noncompliance with a material term of the Servicing Standards that is reasonably likely to cause harm to borrowers or tenants residing in foreclosed properties" (DE 12-4 at 8-9).  But the failure to include such additional Metrics does not mean that the Servicing Standards that were adopted did not address the issue.

Based on the foregoing, and the entire record, the Court finds that Count V was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

### 7.  Count VI ("Deceptive Debt Collection Practices")

In Count VI, the Bureau asserts that during the Relevant Time Period, Ocwen engaged in deceptive debt collection practices through material misrepresentations made to borrowers as to monthly, reinstatement, payoff and escrow amounts due, on loans for which it had acquired servicing rights, constituting violations of both the FDCPA and the CFPA (DE 775 at 73-75). Ocwen allegedly had "knowledge or reason to believe that" the prior servicer data and its own SOR had inaccurate information, yet it did not review the data for accuracy prior to engaging in collection activity, and it failed to review or consider consumers' challenges to such inaccuracies (*Id.* at 74-75).

The allegations of Count VI are nearly indistinguishable from Count V, save the distinct sections of the FDCPA which are claimed to have been violated -- Section 807 in Count VI versus Section 808 in Count V. Both Count VI and Count V allege violations of 15 U.S.C. §1692 and §1036 of the CFPA

and 12 U.S.C. §5536 of the CFPA. Also, in Count VI, the gravamen of the alleged offenses is that Ocwen knew or should have known that the data it was using from prior servicers was inaccurate.

The Servicing Standards and Metrics cited above as to Counts I, II, and V apply with equal or substantially equal force to Count VI.

Based on the foregoing, and the entire record, the Court finds that Count VI was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

### 8.  Count VIII ("Servicing Policies and Procedures Violations")

In Count VIII, the Bureau alleges that Ocwen failed to maintain adequate servicing policies and procedures reasonably designed to ensure that it provided its personnel (and mortgage transferee personnel) with access to the accurate loan information needed to service borrower accounts, including but not limited to effectively respond to consumer complaints, implement foreclosure holds on accounts, and disclose known inaccuracies that may impact transferee servicers' ability to comply with applicable laws and investor guidelines (DE 775 at 78-80). These alleged offenses violate the RESPA and Regulation X as well as the CFPA (*Id*. at 80).

On remand, the Bureau again argues that Ocwen "failed to demonstrate that the NMS Servicing Standards and Metrics cover the Bureau's remaining claims" (including Count VIII) and in support cites "hundreds of facts, supporting exhibits and extensive loan level evidence showing that Ocwen," *e.g*., boarded 1.38 million "critical data fields containing discrepancies requiring corrections for 628,166 borrowers" (DE 807 at 8). This suggests to the Court that that the NMS' enforcement mechanisms *were* working, and to the extent discrepancies were uncovered, they should have been addressed through the available enforcement mechanisms.

The Court finds that the alleged offenses proffered under Count VIII are covered by Servicing Standards including but not limited to I.B.1.,[14] I.B.7.,[15] I.E. ("Quality Assurance Systems Review") (DE 12-1 at 12-13), II.A.,[16] II B. ("Additional Oversight of Activities by Third-Party Providers) (DE 12-1 at 15-16), IV.C. ("Single Point of Contact") (DE 12-1 at 23-26) and IV.M. ("Transfer of Servicing of Loans") (DE 12-1 at 35-37). Additionally, Metric 5 "Policy/Process Implementation" (including, at 5.C., the "Single Point of Contact" (SPOC) program) (DE 12-4 at 25-26), Metric 6 ("Customer Experience"), Metrics 30, 31 and 32 (measuring loan modification process, testing SPOC interactions with borrowers and SPOC implementation and effectiveness) (DE 12-4 at 29-36) all measure the means by which policies, process, and borrower experiences could be measured and provided a basis for the Bureau to have found relief for the alleged offenses.

Based on the foregoing, and the entire record, the Court finds that Count VIII was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

### 9.   Count IX ("Foreclosure Violations")

Finally, in Count IX, the Bureau alleges Ocwen improperly initiated foreclosures when the borrower was on track towards a loan modification and other foreclosure-related misconduct in violation

---

[14] "Servicer shall maintain **procedures** to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format" (DE 12-1 at 5) (emphasis added).

[15] "Servicer shall adopt enhanced billing dispute procedures, including for disputes regarding fees. These procedures will include: a. Establishing readily available methods for customers to lodge complaints and pose questions, such as by providing toll-free numbers and accepting disputes by email; b. Assessing and ensuring adequate and competent staff to answer and respond to consumer disputes promptly; c. Establishing a process for dispute escalation; d. Tracking the resolution of complaints; and e. Providing a toll-free number on monthly billing statements" (DE 12-1 at 7-8).

[16] "Servicer shall adopt **policies and processes** to oversee and manage foreclosure firms, law firms, foreclosure trustees, subservicers and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by or on behalf of Servicer that provide foreclosure, bankruptcy or mortgage servicing activities" (DE 12-1 at 13-15) (emphasis added).

of the RESPA and Regulation X and the CFPA (DE 775 at 80-82).  Grouping Count IX with Counts III, IV, VII and VIII in its post remand brief, the Bureau again argues that Ocwen "failed to demonstrate that the NMS Servicing Standards and Metrics cover the Bureau's remaining claims" (DE 807 at 8-9). As to Count IX, the Bureau specifically asserts in support that Ocwen "commenced foreclosure proceedings on 1,118 borrowers' loans while still evaluating their applications; and foreclosed on 45 borrowers while evaluating them for loss mitigation assistance, despite promising borrowers that Ocwen had stopped the foreclosure process" (*Id.* at 9) (citations to the record omitted). The Court finds unpersuasive the Bureau's argument that Ocwen's alleged failure to disclose alleged misconduct reveals that such alleged misconduct was not covered by the NMS (*Id.*).

Ocwen more persuasively argues that, like Count III, Count IX is covered by the NMS as the conduct complained of was exhaustively covered by the Servicing Standards and Metrics (DE 808 at 11-12).

The Court's analysis of Count IX finds that the conduct complained of is covered generally by Servicing Standards I. ("Foreclosure and Bankruptcy Information and Documentation") and more specifically, in extensive detail, by Servicing Standards IV. ("Loss Mitigation") (DE 12-1 at 2-10, 18-34). In addition, the following Metrics apply to the allegations in Count IX: Metric 1.A. ("Foreclosure sale in error") (Test questions ask, *e.g.*, "2. *Was the borrower in an active trial period plan (unless the servicer took appropriate steps to postpone sale)*? 3. *Was the borrower offered a loan modification fewer than 14 days before the foreclosure sale date (unless the borrower declined the offer or the servicer took appropriate steps to postpone the sale)*?") (DE 12-4 at 18); Metric 3.A. ("Pre-Foreclosure Initiation"), measuring the accuracy of account information (DE 12-4 at 21); Metric 3.B. "(Pre-Foreclosure Initiation Notifications") (measuring, *inter alia*, whether required notifications were sent to the borrower "before 14 days prior to referral

to foreclosure") (DE 12-4 at 22); Metric 6.B.viii.a. ("Referred to foreclosure in violation of Dual Track Provisions") (measuring whether "[l]oan was referred to foreclosure in error")  (DE 12-4 at 32), Metric 6.B.viii.b.("Failure to postpone foreclosure proceedings in violation of Dual Track Provisions") (measuring whether "[f]oreclosure proceedings allowed to proceed in error.") (*Id.*), and Metric 30 (measuring loan modification process) (test questions ask, *inter alia*, "*did the Servicer afford the borrower at least 30 days to submit any additional required documents from the last ADRL* [Additional Document Request Letter] *before referring the loan to foreclosure or proceeding to foreclosure sale?*") (*Id.* at 34).

Based on the foregoing, and the entire record, the Court finds that Count IX was covered by the consent judgment's servicing-standard, monitoring, and enforcement regime.

## IV.    CONCLUSION

As the Court previously opined, "[t]hat the Bureau now better understands the cause and ramifications of the servicing misconduct alleged in the D. C. Action and wishes to cast a wider statutory net over it does not avoid a *res judicata* bar" (DE 764 at 27) (internal citation omitted). The NMS' forward looking enforcement regime spans the same Relevant Time Period the Bureau identifies in its Second Amended Complaint. The Bureau's Release reserved its right to assert claims "**other than** *conduct related to the Mortgage Servicing Practices asserted or that might have been asserted*" in the 2013 action (DE 12-5 at 4) (emphasis added). The NMS, the lodestar against which the Court has reviewed the Bureau's SAC contained the prospective-looking enforcement regime which covers conduct related to the mortgage servicing practices asserted.

The Court's claim-by-claim analysis leads it to the conclusion that the NMS Servicing Standards and Metrics preclude, based on *res judicata*, all of the claims asserted in Counts I-IX of the SAC.

Based upon the foregoing, it is **ORDERED AND ADJUDGED:**

Counts I-IX of the Bureau's Second Amended Complaint are, pursuant to *Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285 (11th Cir. 2004). Final judgment for Ocwen shall be entered by separate order of the Court pursuant to Rule 58.

   **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 2nd day of May, 2023.

_____
KENNETH A. MARRA
United States District Judge

cc: All counsel of record